## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x
       :
       :
       :
In re: Keurig Green Mountain Single-Serve   :   Case No. 1:14-md-02542 (VSB)
Coffee Antitrust Litigation        :   MDL No. 2542
       :
       :
       :
*This document concerns all related actions.*   :   Hon. Vernon S. Broderick
——————————————————————— x

**JOINT ELECTRONIC DISCOVERY SUBMISSION NO.1 AND ~~[PROPOSED]~~ ORDER**

The parties to this litigation believe that relevant information may exist or be stored in electronic format, and that this content is potentially responsive to anticipated discovery requests. This Joint Submission and [Proposed] Order (and any subsequent ones) shall be the governing document(s) by which the parties and the Court manage the electronic discovery process in this action and in Related Actions. As used in this Order, "Related Actions" means the action captioned *TreeHouse Foods, Inc. et al. v. Green Mountain Coffee Roasters, et al.*, No. 14 Civ. 905, filed in the United States District Court for the Southern District of New York, and all actions (1) consolidated with that action pursuant to Federal Rule of Civil Procedure 42; (2) transferred to the same court as that action pursuant to 28 U.S.C. § 1407 by the Judicial Panel on Multidistrict Litigation under Docket No. MDL 2542; and (3) all "tag-along" actions transferred pursuant to J.P.M.L. Rule 7.1. As used in this Order, the term "party" shall mean all named parties to the Related Actions, including defendant Keurig Green Mountain, f/k/a Green Mountain Coffee Roasters, Inc., and as successor to Keurig, Inc., together with its direct and indirect subsidiaries ("Keurig"), and all officers, directors or employees thereof; plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc., together with their

respective direct and indirect subsidiaries ("TreeHouse"), and all officers, directors or employees thereof; any named party added or joined to the Related Actions, together with their respective direct and indirect subsidiaries, and all officers, directors or employees thereof; JBR, Inc.; and any successors of named parties. The term "non-party" shall mean any individual, corporation, association, or other natural person or entity that is not a named party to the Related Actions.

The parties and the Court recognize that this ESI Protocol, Joint Electronic Discovery Submission No. 1, and [Proposed] Order are based on facts and circumstances as they are currently known to each party, that the electronic discovery process is iterative, and that additions and modifications to this Submission may become necessary as more information becomes known to the parties. This Order may be modified, and any matter related to it may be resolved, by written stipulation of the parties without further Order of the Court.

## I. DEFINITIONS

A. "Document" or "Documents" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rules of Civil Procedure 26 and 34.

B. "Email" means electronic messages sent or received asynchronously, including any documents incorporated as attachments, via messaging applications, including, but not limited to, Microsoft Outlook, Google Gmail or Lotus Notes.

C. "ESI" is an abbreviation of "electronically stored information" and shall have the same meaning and scope as it has in the Federal Rules of Civil Procedure.

D. "Extracted Text" means the text extracted from a Native Format file and includes at least all header, footer and document body information.

E. "Load File" means an electronic file that is used to import all required production information into a document database, including document images, extracted or

OCR text, Native Files where required, and Metadata, as well as information indicating document breaks, and document relationships such as those between an Email and its attachments and a Document and information related to embedded content.

**F.** "Metadata" means structured information about ESI that is created by the file system or application, embedded in the Document or Email and sometimes modified through ordinary business use. Metadata of the ESI describes, *inter alia*, the characteristics, origins, usage and validity of the collected ESI.

**G.** "Native Format" means the format of ESI in the application in which such ESI was originally created.

**H.** "OCR" means the optical character recognition technology used to read paper Documents or electronic images of Documents and output such documents to a searchable text format. The latter text is also referred to as the "OCR text" or simply "OCR."

**I.** "Producing Party" means a Party that produces documents.

**J.** "Receiving Party" means a Party to whom documents are produced.

**K.** "Tagged Image File Format" or "TIFF" refers to the CCITT Group IV graphic file format for storing bit-mapped images of ESI or paper Documents.

## II. JOINT STATEMENT DESCRIBING THE ACTION

Plaintiffs allege violations of Sections 1 and 2 of the Sherman Act, 15. U.S.C. §§ 1, 2; Section 3 of the Clayton Act, 15. U.S.C. § 14; and state antitrust and unfair competition statutes and common law. Plaintiffs seek substantial monetary damages in an amount to be determined

through expert evidence and at trial; permanent injunctive relief; costs, expenses and reasonable attorneys' fees; exemplary damages, and such other relief the Court may deem just and proper.

## III. COMPETENCE

Counsel for Plaintiffs and Defendant certify that they are sufficiently knowledgeable in matters relating to their clients' technological systems to discuss competently issues relating to electronic discovery.

## IV. MEET AND CONFER OBLIGATION

Although the parties have not yet met and conferred pursuant to Federal Rule of Civil Procedure 26(f), the parties have met and conferred regarding this ESI Protocol and Joint Electronic Discovery Submission Number 1 on May 30, June 2, June 13, June 20, June 24, and June 25, 2014.

## V. UNRESOLVED ISSUES

After the meet-and-confer conferences taking place on the aforementioned dates, there are currently no issues that remain outstanding or require court intervention.

## VI. RESOLVED ISSUES

As set forth below, to date, the parties have reached agreement on the following issues:

### A. <u>Preservation</u>

The parties have agreed to preserve potentially relevant electronically stored information ("ESI"). Each party will take reasonable steps in good faith to prevent the loss, destruction, alteration, overwriting, deletion, shredding, incineration, or theft of any document or data the party knows, or reasonably should know, falls within the scope of Federal Rule of Civil Procedure 26(b)(1).

The parties have agreed to preserve data from the systems described below, which represent the locations where potentially relevant data is likely to be stored. The parties further agree to the following scope and methods for preservation:

### 1. TreeHouse

TreeHouse has implemented a data preservation plan, issued preservation memoranda to relevant employees, and has confirmed with IT personnel that auto-deletions are suspended and that measures have been implemented to prevent the manual deletion of email by individual custodians.

TreeHouse expects that potentially relevant data may be stored in the following locations: email; employee computers; employee "home directory" spaces and/or shared drives that are accessible to relevant employees; handheld devices used for business purposes; portable storage drives, and databases that may contain potentially relevant information.

### 2. Keurig

Keurig has implemented a data preservation plan, issued preservation memoranda to relevant employees, and has confirmed with IT personnel that auto-deletions are suspended and that measures have been implemented to prevent the manual deletion of email by individual custodians.

Keurig expects that potentially relevant data may be stored in the following locations: email; employee computers; employee "home directory" spaces and/or shared drives that are accessible to relevant employees; handheld devices used for business purposes; portable storage drives, and databases that may contain potentially relevant information.

### 3. Rogers

Rogers has implemented a data preservation plan, issued preservation memoranda to relevant employees, and has confirmed with IT personnel that auto-deletions are suspended and that measures have been implemented to prevent the manual deletion of email by individual custodians.

Rogers expects that potentially relevant data may be stored in the following locations: email; employee computers; employee "home directory" spaces and/or shared drives that are accessible to relevant employees; handheld devices used for business purposes; portable storage drives, and databases that may contain potentially relevant information.

### 4. Direct Purchasers

The Direct Purchaser Plaintiffs have not yet identified the locations where potentially relevant data is likely to be stored and are not yet prepared to articulate the methods for preservation applicable to all named plaintiffs, but will promptly take steps to identify locations of relevant data, implement preservation efforts, and notify Keurig of those locations and efforts. All named plaintiffs have been instructed not to discard or delete any potentially relevant electronic or hard copy documentation related to the allegations of the Complaint.

### 5. Indirect Purchasers

The Indirect Purchaser Plaintiffs have not yet identified the locations where potentially relevant data is likely to be stored and are not yet prepared to articulate the methods for preservation applicable to all named plaintiffs, but will promptly take steps to identify locations of relevant data, implement preservation efforts, and notify Keurig of those locations and efforts. All named plaintiffs have been instructed not to discard or delete any potentially relevant electronic or hard copy documentation related to the allegations of the Complaint.

B.   **Limitations on Preservation**

The parties agree that they will use good faith efforts to avoid imposing excessive costs and burdens upon each other regarding the preservation of records.  Accordingly, the parties shall be under no obligation, subject to the parties' good faith to:

- Preserve deleted, fragmented or slack data;

- Preserve random access, cache or other ephemeral data;

- Preserve on-line data access data such as temporary internet files or cookies;

- Preserve electronically recorded telephone voicemail messages other than voicemail recorded or transcribed through email;

- Preserve records filtered out by an automatic spam and/or virus filter, so long as the filtering criteria are reasonable (such criteria to be provided to any other party upon request);

- Be prevented from upgrading, loading, reprogramming, customizing or migrating data, even if such actions modify or alter the way that data is maintained, stored or viewed, provided that the data itself and related metadata are not altered;

- Be prevented from inputting, accessing, updating or modifying data in good faith in an accounting or ERP database, resulting in the data being modified, altered or overwritten where such data is modified, altered or overwritten in the ordinary course of business, provided that employees with access to any potentially relevant accounting and ERP systems are provided with document preservation memoranda and instructed to preserve potentially relevant entries;

- Be prevented from editing, modifying or taking down web pages, internet, extranet or intranet sites, or other social media sites utilized by a party (including but not limited

to Facebook, Twitter, Instagram, Tumblr, Pinterest, Google+ and YouTube), as long as older, relevant information is properly archived and amenable to recreation (except that there is expressly no obligation to archive third-party content added to a party's social media sites and removed by the party as spam, profanity, *etc.*, in the ordinary course); or

- Be prevented from editing or revising copies of documents in good faith as long as an unedited or unrevised copy of the document is preserved and can readily be made accessible for collection.

If it comes to a party's attention that there is some other category of data that might potentially contain relevant material but that is burdensome to preserve, the parties will meet and confer to add additional limitations on preservation obligations.

## C.    "Litigation Hold" Communications

The parties hereby certify that they have issued preservation or "litigation hold" communications to all individuals reasonably identified as having information that may be potentially relevant to the Related Actions. The parties agree that within two weeks after reaching agreement as to the appropriate individual custodians for search and production, or within two weeks of any Court resolution of that issue, each party will confirm that each such custodian received a preservation or "litigation hold" communication regarding the Related Actions and will state the date of initial receipt as to each custodian.

Notwithstanding the foregoing, the parties shall adhere to their obligation diligently to take measures to identify additional individuals who may have potentially relevant to the Related Actions in accordance with applicable law and each party's ethical obligations. Should the parties identify additional individuals in the course of litigation who may have information that is

potentially relevant to the Related Actions, the parties shall issue additional preservation or "litigation hold" communications to such individuals as soon as reasonably practicable in good faith without waiting to determine whether or not that individual will become an agreed upon custodian whose documents will be produced in connection with the Related Actions. In the event that any party has good cause to believe relevant documents or data have not been adequately preserved, the parties shall meet and confer regarding the issue; the conference may include discussion of a request for the names of additional individuals to whom preservation or "litigation hold" communications have been issued and the date(s) of those communications.

### D. Search and Review Generally

The parties agree that they will cooperate in good faith in order to come to an agreement regarding the identification, disclosure, and formulation of appropriate custodians, categories of potentially responsive ESI, potentially relevant noncustodial sources, and search methodologies. The parties agree to discuss the use of search terms and advanced analytic tools (i.e., predictive coding, technology-assisted-review, computer-assisted-review) if used to eliminate potentially responsive documents.

The parties shall meet and confer in good faith regarding what categories of ESI, if any, shall be produced without the application of search terms or advanced analytics. Examples of such categories could include electronically stored data that is already segregated such that an electronic search is not necessary as well as electronically stored data that is kept in such a manner that the use of advanced analytic tools or search terms would not be effective or would not be the most efficient manner to locate and produce the relevant ESI. For example, the existence of certain ESI in discrete folders relating to various subject matters relevant to the litigation may suggest that the use of advanced analytics or search terms with respect to such

folders is either unnecessary or inappropriate, or certain file types or data may lack sufficient extracted text such that search terms or advanced analytics would not be more efficient. If the parties are not able to reach agreement regarding what categories of ESI shall be produced without the application of advanced analytics or search terms, the parties may seek a Court order to resolve the same.

(1) Advanced Analytics:

If a party chooses to utilize advanced analytics to eliminate non-responsive information (i.e., predictive coding, technology-assisted-review, computer-assisted-review), the parties will cooperate in good faith to discuss and agree to a protocol that will allow sufficient transparency for the parties to be confident in the process and results. The written protocol will take into consideration the practicalities of each party's chosen review tool and may include disclosure of information about the process, such as vendor/software, training workflow, testing or validation methods, quality control and assurance measures, and responsiveness rates. The parties recognize that if advanced analytics are employed to eliminate non-responsive information, search terms may need to be used to augment advanced analytics to ensure that responsive documents are located appropriately and efficiently.

(2) Search Terms:

If a party chooses to utilize keyword searching as a means of limiting the volume of ESI to be reviewed for responsiveness to discovery requests propounded, pursuant to the parties' objections and any applicable court orders, the parties shall cooperate in good faith to discuss and agree to a list of search terms to be used by that party, as discussed further below.

The fact that any ESI contains a search term does not mean that such document is responsive to any propounded discovery request or that it is otherwise relevant to or admissible

in this litigation.  Nothing in this Submission shall be interpreted to require disclosure of either irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.  Except as provided expressly herein, the parties do not waive any objections as to the production, discoverability, authenticity, admissibility, or confidentiality of documents and ESI.

 To the extent any party identifies responsive ESI or documents not hit upon by search terms, all such non-privileged documents must be produced, subject to any agreements reached regarding the parties' objections to discovery requests.

 **E.** **Procedure for Negotiating Search Terms**

  **1. Exchange of Terms:**  Unless otherwise agreed to by the parties, the party responding to any discovery request for which it plans to review potentially responsive ESI limited by the application of search terms will serve with its response a proposed list of search terms and an indication as to the ESI that will be subjected to such terms.  The proposed list of search terms shall include semantic synonyms, code words, terms, phrases or illustrations, acronyms, abbreviations, project names, or non-language alphanumeric associational references to relevant ESI, to the extent such terms exist and reasonably would lead to the identification of responsive ESI, subject to objections raised by the producing party.  No more than 10 days following receipt of the producing party's proposed terms, the requesting party will submit any additional proposed terms to the producing party.  The parties will exercise good faith efforts to propose reasonable terms likely to identify potentially relevant ESI without imposing undue burden.

2. **Application of Search Terms:** The producing party will proceed with the application of (1) its own proposed search terms, and (2) search terms from the requesting party's proposed search term list to which the producing party does not object (collectively, the "Agreed Search Terms"). For terms to which the producing party objects, the producing party will disclose to the requesting party the unique hit counts for those terms, the percentage of the document universe hitting on each term, and the total document count from the application of those proposed additional search terms to the universe of ESI to which those terms would be applied (before and after de-duplication unless impracticable). The parties will then meet and confer to discuss the utility of the Agreed Search Terms and discuss whether the Agreed Search Terms should be modified.

3. **Resolution of Disputed Terms:** The producing party will then search for the requesting party's proposed terms to which there is not agreement (the "Disputed Search Terms") in the remaining documents (i.e., those documents that did not contain any hits from the Agreed Search Terms).

   a. For Disputed Search Terms that create technical problems or terms that cannot be run practically, the producing party will inform the requesting party of those problems. The parties will meet and confer to discuss the issue.

   b. For Disputed Search Terms that can be run practically, the producing party will run those search terms and disclose to the requesting party unique hit counts for those terms as well as the percentage of the

document universe hitting on each term, and the total document count and volume of data for the application of those search terms. The parties will then meet and confer to discuss the utility of adding each of the Disputed Search Terms (or adding the terms in a modified form). During this discussion, the parties will exercise good faith efforts to provide qualitative and quantitative justification for their refusals to apply a term or their proposed modifications to each disputed term.

c.  If agreement as to the disputed search terms cannot be reached, the requesting party may bring the dispute to the Court for resolution.

4. **Additional Terms:**  Once a search term list is finalized and run in response to a particular discovery request, the requesting party may propose additional search terms ("Additional Terms") for consideration with good cause (for example, upon learning of new information that was unknown at the time of the original request and leads the requesting party to believe that use of an Additional Term is likely to identify significant additional non-duplicative responsive documents, such information including knowledge obtained from a review of produced documents and analytical review of the presence of the Additional Term in the universe of produced documents).

F.  <u>**Implementation of Search Terms**</u>

1.  Consistent with the obligations set forth elsewhere in this protocol, search terms will be run against applicable ESI content and against OCR created from paper content, including emails, their attachments, and related metadata.

If any search term returns an email or an attachment to an email, both the email and any attachment(s) will be within the scope of the ESI to be reviewed by the producing party for responsiveness to the opposing parties' discovery requests.  Further, if any email is produced, all non-privileged attachments to that email shall be produced.  Likewise, if any attachment to an email is produced, all non-privileged portions of the email to which it is attached and all other non-privileged attachments to that email shall be produced.

**2.** All search terms will be run in a non-case sensitive manner across all document content unless otherwise agreed to by the parties.

**3.** If the search syntax required by the tool being used is different from the search syntax provided by the party proposing the term, the actual syntax used for the search will be identified to the requesting party prior to conducting the search.

**4.** To the extent that a party or its document vendor identifies any files that cannot be programmatically searched using the agreed-upon search terms (*e.g.*, textual PDF and TIFF files, including textual PDF and TIFF files stored within RAR or ZIP files, and scanned or faxed textual files in any other format) and which would otherwise be subjected to the application of keyword searching, the producing party is obligated to review those documents for responsiveness, subject to any burden objections addressed by the parties.

### G.     <u>Sources of Production</u>

The parties agree to search and produce responsive documents and data from all of the sources that are likely to contain non-duplicative responsive information, to the extent those sources exist within the party's possession, custody, and control, or that of its individual custodians, including:  document servers, email servers and programs (including any calendar, contact, note, and task information residing therein, and including personal email accounts if used for work purposes), databases (such as accounting or ERP databases used to record pricing or to track customer proposals or competitive information), internet-based document repositories such as Sharepoint, repositories or transcribed audio or video records (such as any transcribed voicemail records and call logs), local electronic devices (such as hard drives and disk drives of employees' desktop or laptop computers), portable devices (such as mobile phones, PDAs, iPads and tablets, thumb drives, portable hard drives, disks, CDs, and DVDs), third-party hosted storage or platforms, including cloud storage, archived web pages hosted by or for the parties, and instant messages if they are preserved and retrievable in the ordinary course of business. However, portable devices need not be searched if they are synched with a custodian's computer such that all potentially relevant information on the portable device exists in duplicate form in another source of data that is searched.

The parties will search email; employee computers; employee "home directory" spaces and/or shared drives that are accessible to relevant employees; handheld devices used for business purposes to the extent that they are likely to contain unique and relevant documents; portable storage drives if applicable to the extent they are likely to contain unique and relevant data, and databases that may contain potentially relevant information.

If any party concludes that any of the sources of information listed above is inaccessible or that collection from or search of any of those sources would be unduly burdensome, the parties will meet and confer in an attempt to resolve the matter. Parties will use their best efforts to raise any such objections as soon as possible.

In addition to these sources of ESI, the parties agree to search and produce discoverable and responsive documents and data that exist in hard copy form, wherever they may reside including filing and records departments, desks, cabinets, and warehouses or other archives.

In addition, the parties agree to ask each of their document custodians whether he or she maintains potentially responsive documents or data in any of the electronic or hard-copy sources listed above, whether at the custodian's office, home, or online.

### H. Limitations on Production

The parties agree to the following limitations on the scope of production:

#### 1. Custodians

No later than 14 days after the parties hold their 26(f) conference, the parties shall identify those persons whose files are likely to contain documents relating to the subject matter of this litigation (each a "Custodian"), and shall provide company organizational charts or comparable documents (to the extent possible) covering the departments each such Custodian works or worked in throughout the responsive date range. The parties shall meet and confer regarding the proposed Custodians for search and production, with a goal of reaching agreement on the Custodians to be searched (the "Agreed Custodians"). If a dispute over additional custodians exists at the end of the meet and confer process, the requesting party may submit the dispute to the Court for resolution pursuant to the Discovery Procedures articulated in the

Court's Standing Order In re Pilot Project Regarding Case Management Techniques for Complex Civil Cases.

The parties further retain the right, upon reviewing the initial production of documents and conducting other investigation and discovery, or at any other point for good cause shown, to request that files from additional custodians be searched. The parties agree to meet and confer regarding such request and the requesting party may submit any unresolved dispute to the Court for resolution.

## 2. Responsive Date Ranges

The parties shall meet and confer regarding the applicable date range of discoverable documents and data at such time as general discovery is permitted to proceed. After a date range has been established, the parties agree that any party may propose a different date range for any particular party, custodian, or type of documents or data, when warranted. The parties agree to meet and confer regarding any such proposal and the requesting party may submit any unresolved dispute to the Court for resolution.

## 3. Timing of Productions

The parties will meet and confer regarding an appropriate schedule for the substantial completion of document production for each party, and will discuss in good faith any exceptions applicable to particular categories of responsive documents, types of data, custodial documents, or other special circumstances. Unless all responsive documents are included with an initial discovery response, the parties will produce documents in good faith on a regular, rolling basis.

## I. __Form of Productions__

The parties agree to produce ESI in the following formats:

1. **TIFF Image Files**

   a. All documents, except for the native files described below, will be produced as single page, Group 4 TIFF at minimum 300 dpi resolution.

   b. Each TIFF version of an electronic document will be created directly from the original electronic document.  Each image file will use the Bates number of the page as its unique file name.

   c. A unitization file, in standard format (*i.e.*, Opticon) showing the Bates number of each page and the appropriate unitization of the documents, will accompany each TIFF document.

2. **Native Files**

   a. Presentation-application files (*e.g.*, MS PowerPoint), spreadsheet-application files (*e.g.*, MS Excel), non-enterprise databases (*e.g.*, small MS Access database), and multimedia audio/visual files such as voice and video recordings (*e.g.*, .wav, .mpeg, and .avi), shall be produced in native format.  If a document to be produced in native format contains privileged information, the document will be produced by producing the document in TIFF format with redactions or appropriate redaction technique for audio or video files.  To the extent documents that fall under this paragraph contain privileged information and cannot be redacted or produced in TIFF format, such documents will be logged on a privilege log.  The production load files shall contain a link to the produced native files as described in Appendix 2.  To the extent a

response to discovery requires production of discoverable electronic information contained in an enterprise database, the producing and receiving parties shall discuss the production scope and format prior to production. Each electronic file produced in native format shall be assigned a unique document number, and the database record for that file shall include a single page TIFF image branded with this unique document number in the lower right corner of the image as a Bates number, with the phrase "PRODUCED IN NATIVE FORMAT" (or similar language) branded in the center of the page. To protect the confidentiality of files produced in native format, any confidentiality designations pursuant to the Protective Order must appear on the associated TIFF placeholder on the lower left hand corner in no less than 10-pt font. For each file produced in native format, the producing party shall also indicate its native status in the metadata field described in Appendix 2. The corresponding load file shall include NativeFileLink information for each native file that is produced.

b. Through the pendency of this Litigation, the producing parties shall exercise reasonable, good faith efforts to maintain all preserved and collected native files in a manner that does not materially alter or modify the file or the material metadata listed in Appendix 2.

c. Upon a showing of good cause and subject to reasonable objection by the producing party, a receiving party may request that the producing party produce the native file corresponding to an item originally

produced in TIFF format.  The request for production of any specific

native file(s) shall include Bates numbers of the TIFF documents to

identify the corresponding native file.  Any subsequent production of

the native file will include the Bates number of the first page of the

Bates range that corresponds to the previously produced TIFF image

which should be applied as a prefix to the file name.  If the producing

and receiving parties are unable to agree as to the production of the

requested documents in native format, those parties may submit the

matter to the Court.

**3.  Text Files**

    a.  Each document produced under this Submission shall be accompanied

by a single, multipage text file containing all of the text for that item,

not one text file per page.  Each text file shall be named to use the

Bates number of the first page of the corresponding production item.

    b.  OCR:  The parties will provide searchable OCR text of any paper

documents, including spreadsheets maintained in paper form, that were

scanned or otherwise converted into electronic form prior to the time

the documents are first produced in this litigation.  The parties

acknowledge, however, that due to poor quality of the originals, not all

documents lend themselves to the generation of accurate OCR.  To the

extent reasonably possible, the settings to achieve the highest quality

text should be turned on during the OCR process.  OCR text files

should indicate page breaks where possible.

c. ESI: The text of each ESI item shall be extracted directly from the ESI native file. For contacts and calendars, user modifiable fields should be extracted and populated in the metadata fields or included in the Extracted Text.

d. Redacted Documents: Redactions will be made using the word "REDACTED" on any redacted portion of the document. The parties will provide searchable OCR text for the non-redacted portion of any TIFF files containing redactions.

## 4. Production of ESI

a. ESI productions shall be de-NISTed using the industry standard list of such files maintained in the National Software Reference Library by the National Institute of Standards & Technology.

b. If a producing party excludes from review a standard, readable, and reviewable file type not within the industry standard, that party must disclose such an exclusion to the receiving party. Any party to whom such disclosure is made will have ten business days to object. Any objection not made in this period will be waived. If objections are made, the relevant parties will meet and confer to resolve them.

c. Unless otherwise agreed upon between the parties, ESI items shall be processed in good faith in a manner that preserves the source native file and all requested metadata without material modification.

d. Auto date/time stamps: Except for modifications attributable to time zone differences, ESI items containing an auto date shall be processed

to display either the date on which the document was last modified by the custodian or the term "AUTODATE" on the image of the document containing the auto date/time stamp.

e.  The producing party shall propose a single time zone for use in processing the ESI.

f.  Hidden text: ESI items shall be processed in a manner that preserves hidden columns or rows, hidden text or worksheets, speaker notes, tracked changes and comments.

g.  ESI items shall be produced with all of the metadata and coding fields set forth in Appendix 2.

h.  This Order does not create any obligation to create or manually code fields that are not automatically generated by the processing of the ESI, or that do not exist as part of the original metadata of the document; provided, however, that the producing party must populate the (a) Volume (b) BegBates, (c) EndBates, (d) BegAttach, (e) EndAttach, (f) PgCount, (g) Custodian, (h) NativeLink, (i) SourceParty, (j) Paper, (k) ParentBates, (l) AttachBates, (m) AttachCount, (n) TextPath, and (o) Redacted.  These fields should be populated for all produced ESI, as well as paper documents converted to electronic form as of the time the documents are first produced in this litigation, regardless of whether the fields can be populated pursuant to an automated process.

5.  **Paper Documents**

    a.  Paper documents must be converted into electronic format and produced in TIFF format per Section VI.I.1, above.

    b.  In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (*i.e.*, paper documents should be logically unitized).  The parties will use their best efforts to unitize documents correctly and to address situations where there are improperly unitized documents.

    c.  Where multiple documents were organized into groups, such as folders, clipped bundles and binders, each distinct document shall be unitized but maintained together in a family relationship.  The parties will make their reasonable best efforts to unitize family groups correctly.

    d.  Where a document or a document group such as folder, clipped bundle, or binder has an identification spine, "post-it note," or any other label, the information on the label shall be scanned and produced as the first page of the document or grouping.

    e.  The parties will utilize reasonable best efforts to ensure that paper records for a particular custodian, which are included in a single production, are produced in consecutive Bates stamp order.

6. **Load Files**

    a.  All productions will be provided with data load files and image load file as detailed in Appendix 1. The Receiving Party will propose its preferred load file format. The image load file must reference each TIFF file in the corresponding production, and the total number of TIFF files referenced in the load file must match the total number of image files in the production. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the corresponding image load file for that production.

7. **Bates Numbering**

    a.  The producing party will identify the Bates Number range of each production in a cover letter or production log accompanying the production. If a producing party intentionally skips a Bates number or set of Bates numbers in a production, the producing party will identify and note the gap in the cover letter or production log accompanying the production.

    b.  The producing party will brand all TIFF images in the lower right-hand corner with its corresponding Bates number, using a consistent font type and size. The producing party will take reasonable care to ensure that the Bates number does not obscure any part of the underlying image. If the placement in the lower right-hand corner will result in obscuring the underlying image, the Bates number should be

24

placed as near to that position as possible while preserving the underlying image.

**8. Family Relationships**

    a.  Family relationships for all ESI documents (*e.g.*, the association between an attachment and its parent e-mail), must be preserved by assigning sequential Bates numbers to all items within family group, and identifying those Bates numbers in the relevant ESI metadata. For example, if a party is producing an e-mail with attachments, the attachments must be processed and assigned Bates numbers in sequential order, following consecutively behind the parent e-mail.

**9. De-Duplication**

    a.  The producing party need only produce a single copy of a particular ESI item, and will make a good faith effort to de-duplicate ESI globally across the population of records in accordance with the standards set forth herein for the de-duplication of identical documents.

    b.  De-duplication shall be performed only at the document family level so that (i) attachments are not de-duplicated against identical stand-alone versions of such documents and vice versa, although each family member shall be hashed separately for purposes of populating the hash value field in Appendix 2; (ii) attachments to emails or other documents shall not be disassociated from the parent email or document even if they are exact duplicates of another document in the

production, and (iii) paper documents shall not be eliminated as duplicates of responsive ESI. However, lesser inclusive email threads may be excluded from production so long as the producing party's document review platform is capable of identifying lesser inclusive email threads in an automated fashion and so long as the most inclusive email thread is either produced or included on a privilege log, to the extent it is withheld on the basis of privilege.

c. Duplicates shall be identified by using industry standard MD5 or SHA-1 algorithms to create and compare hash values for exact matches only. Any other methodology for identification of duplicates must be discussed with the receiving party and approved in writing before implementation. The resulting hash value for each item shall be reflected in the HashValue field specified in Appendix 2.

d. All custodians who were in possession of a de-duplicated document must be identified in the CustodianOther metadata field specified in Appendix 2.

**10. Encryption**

a. The Parties will make reasonable efforts to ensure that all encrypted or password-protected documents are successfully processed for review and production under the requirements of this Stipulated Order, and if produced in native form, the decrypted document is produced.

### 11. Confidentiality Designations

    a. If a particular paper document or ESI item has been designated as Confidential or Highly Confidential pursuant to the Stipulated Protective Order, the designation shall be stamped on the face of all TIFF images pertaining to such item/document in accordance with the Protective Order. The confidentiality designation should also be reflected in the "Confidentiality" field specified in Appendix 2.

### 12. Privileged Materials

    a. The parties have agreed to adopt the protocol set forth in Federal Rule of Civil Procedure 26(b), unless as otherwise stipulated between the parties. The parties have further agreed that any document withheld entirely or in redacted form under a claim of privilege will be included in a privilege log, which shall conform to the requirements of S.D.N.Y. Local Civil Rule 26.2, subject to the limitations on privilege logs articulated in Section II.D and II.E of this Court's Standing Order In re Pilot Project Regarding Case Management Techniques for Complex Civil Cases.

    b. For purposes of creation of a privilege log, a party need include only one entry on the log to identify withheld emails that constitute an uninterrupted dialogue between or among individuals; provided, however, that disclosure must be made that the e-mails are part of an uninterrupted dialogue.

c.  Each Producing Party agrees to serve all Receiving Parties with a log
of all documents withheld from its production or produced in redacted
form on the grounds of attorney-client privilege, attorney work-
product, or any other applicable privilege within sixty days after the
close of document discovery.  Such privilege log may consist of
certain metadata fields for each of the listed documents, as long as it
comports with all requirements herein.  Privileged communications
"to" or "from" outside counsel need not be logged so long as the
communication is (1) made for the purpose of requesting or providing
legal advice in connection with the Related Actions; or (2) relating to
attorney work product prepared for the Related Actions.
Communications that only copy outside counsel must be included in
the privilege log.

d.  Privilege logs must contain columns with at least the following
information: (1) document date; (2) all document authors/senders and
recipients; (3) form of document (*e.g.*, email, memorandum, letter); (4)
brief description of the subject matter of the document, sufficient to
enable another party's evaluation of the claim of privilege; (5)
privilege claimed and the basis therefor; and (6) for documents
redacted rather than withheld entirely, the Bates number of the
produced version.  In order to minimize burden, the parties may use
reasonable categorical descriptions in good faith to apply to groups of
documents in order to satisfy (4) and (5) above.  Sufficient specificity

should be provided for all entries to ensure that the Receiving Party will be able to evaluate the claim of privilege. The privilege logs must also contain some method of identifying attorneys and attorneys' agents (such as paralegals and litigation support staff) whose names appear on the logs. The privilege logs must be produced in text-searchable format.

### 13. Redactions

a. Where a producing party redacts ESI items pursuant to an assertion of privilege, those items shall be produced in TIFF format with each redaction clearly indicated. Any unaffected data fields shall be provided.

b. If the items redacted and partially withheld from production are PowerPoint-type presentation decks and the native items are also withheld, the entire ESI item must be produced in TIFF format., including all unprivileged pages, hidden fields and other information that does not print when opened as last saved by the custodian or end-user. For PowerPoint-type presentation decks, this shall include, but is not limited to, any speaker notes. For Excel-type spreadsheets, the first fifty pages will be produced in TIFF format, with redactions as appropriate, and the producing party shall make reasonable efforts to ensure that hidden rows and columns, cell values, annotations, and notes are appropriately displayed and legible. The parties agree to meet and confer on further protocols if redacted excel-type documents

become a recurring issue in the production or if the Receiving Party either (a) is unable to test the asserted privilege based on the produced pages in TIFF format or (b) requests production of particular privileged spreadsheets in another format.  If the items redacted and partially withheld from production are audio/visual files or voice recordings, the producing party shall meet and confer to discuss the appropriate manner for the producing party to produce the unprivileged portion of the content.

**14. Materials Produced in Prior Litigations or Other Proceedings**

    a.  In the event that materials from prior litigations or proceedings are to be produced, at the request of the producing party, the parties shall meet and confer regarding the format for production of any such documents and reasonable steps that may be taken to minimize burden associated therewith.

**15. Expedited Discovery**

    a.  To the extent it is necessary to deviate from the protocols set forth herein in order to produce documents and data quickly to comply with requests for expedited discovery, the parties shall meet and confer to determine the appropriate production protocols given the circumstances.

**J.    Costs of Production**

Each party reserves its rights, to the extent permitted by applicable law, to seek costs associated with discovery and to object to the reimbursement of such costs.

*     *     *

The preceding constitutes the agreement reached between the parties to matters concerning electronic discovery as of this date. To the extent additional agreements are reached, modifications are necessary, or disputes are identified, they will be outlined in subsequent submissions or agreements and promptly presented to the Court. This Stipulation is effective upon execution by the parties, without regard to the filing with the Court, and may be signed in counterparts.

The next scheduled meet-and-confer conference to address electronic discovery issues, including the status of electronic discovery and any issues or disputes that have arisen since the last conference or Order, is currently unscheduled, given that the Court has stayed discovery.

The next scheduled conference with the Court for purposes of updating the Court on electronic discovery issues is currently unscheduled, given that the Court has stayed discovery.

__X_ Check this box if the parties believe that there exist a sufficient number of e-discovery issues, or the factors at issue are sufficiently complex, that such issues may be most efficiently adjudicated before a Magistrate Judge.

**AGREED TO AND SO STIPULATED, THIS 26TH DAY OF JUNE 2014:**

**WINSTON & STRAWN LLP**

By:

    Aldo A. Badini
    Susannah P. Torpey
    200 Park Avenue
    New York, NY 10166
    Telephone: (212) 294-6700
    abadini@winston.com
    storpey@winston.com

    Dan K. Webb (*pro hac vice*)
    James F. Herbison (*pro hac vice*)
    35 West Wacker Drive
    Chicago, IL 60601
    Telephone: (312) 558-5600
    dwebb@winston.com
    jherbison@winston.com

    Diana L. Hughes (*pro hac vice*)
    101 California Street
    San Francisco, CA 94111
    Telephone: (415) 591-1000
    dhughes@winston.com

*Counsel for Plaintiffs TreeHouse Foods, Inc.,*
*Bay Valley Foods, LLC, and Sturm Foods,*
*Inc.*

**CLEARY GOTTLIEB STEEN &**
**HAMILTON LLP**

By: Lev L. Dassin /WP/CLM

    Lev L. Dassin
    One Liberty Plaza
    New York, NY 10006
    Telephone: (212) 225-2790
    ldassin@cgsh.com

    George S. Cary
    Leah Brannon
    2000 Pennsylvania Avenue NW
    Washington, DC 20006
    Telephone: (202) 974-1920
    gcary@cgsh.com
    lbrannon@cgsh.com

    Wendelynne J. Newton
    **BUCHANAN INGERSOLL**
    **& ROONEY, P.C**
    One Oxford Centre
    301 Grant Street, 20th Floor
    Pittsburgh, PA 15219-1410
    Telephone: (412) 562-8932
    wendelynne.newton@bipc.com

*Counsel for Defendant Keurig Green*
*Mountain, Inc.*

**MORGAN, LEWIS & BOCKIUS LLP**

By: _____

     Daniel Johnson, Jr. (admitted *pro hac vice*)
     One Market, Spear Street Tower
     San Francisco, CA 94105-1126
     Tel: 415.442.1000
     Fax: 415.442.1001
     djjohnson@morganlewis.com

*Attorneys for Plaintiff JBR, Inc.*
*(d/b/a Rogers Family Company)*

**MOTLEY RICE LLC**

By: _____
   Michael M. Buchman
   William H. Narwold
   Donald A. Migliori
   John A. Ioannou
   Alex R. Strauss
   600 Third Avenue, 21st Floor
   New York, NY 10016
   Telephone: (212) 577-0040
   bnarwold@motleyrice.com
   dmigliori@motleyrice.com
   mbuchman@motleyrice.com
   jioannou@motleyrice.com
   astraus@motleyrice.com

*Interim Co-Lead Counsel for Direct*
*Purchaser Class & Counsel for Plaintiff Judy*
*Hoyer*

   Lewis T. LeClair
   **McKOOL SMITH, P.C.**
   300 Crescent Court, Suite 1500
   Dallas, TX 75201
   Telephone: (214) 978-4000
   lleclair@mckoolsmith.com

   John F. Garvish, II
   **McKOOL SMITH, P.C.**
   300 W. 6th Street., Suite 1700
   Austin, TX78701
   Telephone: (512) 692-8731
   jgarvish@mckoolsmith.com

   Lauren Lee Fornarotto
   **McKOOL SMITH**
   One Bryant Park, 47th Floor
   New York, NY 10036
   Telephone: (212)-402-9400
   lfornarotto@mckoolsmith.com

*Counsel for Plaintiff Judy Hoyer*

**ROBINS, KAPLAN, MILLER & CIRESI, LLP**

By: _____
   Kellie Lerner
   Hollis L. Salzman
   Bernard Persky
   601 Lexington Avenue
   New York, NY 10022
   Telephone: (212) 980-7400
   klerner@rkmc.com
   hsalzman@rkmc.com
   bpersky@rkmc.com

   K. Craig Wildfang
   Thomas J. Undlin
   Stephen P. Safranski
   800 La Salle Avenue,
   2800 LaSalle Plaza
   Minneapolis, MN 55402
   Telephone: (612) 349-8500
   kcwildfang@rkmc.com
   tjundlin@rkmc.com
   spsafranski@rkmc.com

*Interim Co-Lead Counsel for Direct Purchaser*
*Class & Counsel for Plaintiff Ney Silverman*
*Insurance Associates, LLC*

   John Domenick Zaremba
   **ZAREMBA BROWNELL & BROWN,**
   **PLLC**
   The Trump Building
   40 Wall Street, 28th Floor
   New York, NY 10005
   Telephone: (212) 400-7223
   jzaremba@zbblaw.com

*Counsel for Plaintiff Ney Silverman Insurance*
*Associates, LLC*

**GRANT & EISENHOFER P.A.**

By: _____

Peter Anthony Barile, III
Linda P. Nussbaum
485 Lexington Avenue
29th Floor
New York, NY 10017
Telephone: (646) 722-8500
pbarile@gelaw.com
lnussbaum@gelaw.com

*Interim Co-Lead Counsel for Direct*
*Purchaser Class & Counsel for Plaintiffs*
*Henry A. Rocker, LLC and David Rosenthal*

Dated: New York, New York
      June 2, 2014

                          **KAPLAN FOX & KILSHEIMER LLP**

                          Robert N. Kaplan
                          Richard J. Kilsheimer
                          Lauren I. Dubick
                          850 Third Avenue
                          New York, New York 10022

                          *Counsel for certain Actions for Indirect*
                          *Purchasers filed in the United States District*
                          *Court for the Southern District of New York*

                          *Proposed Co-Lead Counsel for all Indirect*
                          *Purchaser Actions in the MDL*

                          **PEARSON, SIMON & WARSHAW LLP**

                          Bruce L. Simon
                          44 Montgomery Street, Suite 2450
                          San Francisco, CA 94104

                          *Counsel for certain Actions for Indirect*
                          *Purchasers Actions originally filed in the United*
                          *Stated District Court for the Southern District of*
                          *New York*

                          *Proposed Co-Lead Counsel for all Indirect*
                          *Purchaser Actions in the MDL*

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**

Fred Taylor Isquith
Thomas H. Burt
Michael Liskow
270 Madison Avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212) 545-4653

**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
Rachele R. Rickert
Symphony Towers
750 B. Street –Ste. 2770
San Diego, CA 92101


**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLC**
Theodore B. Bell
55 West Monroe Street, Suite 1111
Chicago, Illinois 60603

*Interim Class Counsel for Transferred Indirect*
*Purchasers Actions filed in the United States*
*District Court for the Southern District of*
*California*

*Counsel for certain Actions for Indirect*
*Purchasers originally filed in the United States*
*District Court for the Southern District of New*
*York and for one action originally filed in the*
*United States District Court District of Michigan*
*and transferred to SDNY*

*Proposed Co-Class Counsel and Liaison for all*
*Indirect Purchaser Actions in the MDL*

756030

**SO ORDERED.**

DATE: 7/1/14

_____
**United States District Judge**

## Appendix 1:  Production Delivery Requirements

General Instructions

1.      A cover letter should be included with each production, listing each piece of media (hard drive, thumb drive, DVD or CD) and the Bates range of the production.
2.      Data can be produced on CD, DVD or hard drive.
3.      Label all media with the following:
    a.      Case number
    b.      Production date
    c.      Bates range
    d.      Disk number (1 of X, 2 of X, etc.), if applicable.

Production Load Files

• There will be two Load/Unitization files accompanying all productions of ESI.

• The first will be a Metadata import file, in .DAT format, that contains the agreed-upon Metadata fields in UTF-8 encoding.

• The second will be a cross-reference file that contains the corresponding image information [IDX] identifying document breaks.  Cross-reference files should be produced in Concordance Image (Opticon) format.

• The parties shall produce Load/Unitization files formatted for Opticon.

Images

• Produce documents in Single Page Group IV TIFF black and white files.

• Image Resolution of at least 300 DPI.

• Black and White.  A Producing Party need not initially produce items in color.  However, if an original document or ESI item contains color text, markings or graphics, and it is necessary to see those items in their original color to understand the full meaning or content of the document, then the Receiving Party may, in good faith, request that the document or ESI item be produced in color format.  The Producing Party will not unreasonably deny such a request.  The production of such documents or ESI in color shall be made in single-page JPEG format, provided JPEG format offers sufficient quality for the review of these documents or ESI.  If either Party deems the quality of the document produced in JPEG format to be insufficient, the Producing Party must produce the color image in TIFF or PDF format.

• The name of the image load file should mirror the name of the delivery volume, and should have the appropriate extension (*e.g.*, ABC001.OPT).

• The volume names should be consecutive (*e.g.*, ABC001, ABC002, et seq.).

- There should be one row in the load file for every TIFF image in the production.

- Every image in the delivery volume should be cross-referenced in the image load file.

- The imageID key should be named the same as the Bates number of the page.

- Load files should not span across media (*e.g.*, CDs, DVDs, hard drives, etc.), *i.e.*, a separate volume should be created for each piece of media delivered.

- Files that are the first page of a logical document should include a "Y" where appropriate. Subsequent pages of all documents (regular document, e-mail, or attachment) should include a blank in the appropriate position.

  <u>Sample Concordance Image (Opticon) Load File</u>:

  MSC000001,MSC001,D:\IMAGES\001\MSC000001.TIF,Y,,,3
  MSC000002,MSC001,D:\IMAGES\001\MSC000002.TIF,,,,,
  MSC000003,MSC001,D:\IMAGES\001\MSC000003.TIF,,,,,
  MSC000004,MSC001,D:\IMAGES\001\MSC000004.TIF,Y,,,2
  MSC000005,MSC001,D:\IMAGES\001\MSC000005.TIF,,,,,

<u>Concordance Data Load Files</u>:

- Data load files should be produced in Concordance .DAT format.

- The data load file should use standard Concordance delimiters:

  - Comma - ¶ (ASCII 20);

  - Quote - þ (ASCII 254);

  - Newline - ® (ASCII174).

- The first line of the .DAT file should contain the field names arranged in the same order as the data is arranged in subsequent lines.

- All date fields should be produced in mm/dd/yyyy format, if possible.

- All attachments should sequentially follow the parent document/email.

- Use carriage-return to indicate the start of the next record.

- Load files should not span across media (*e.g.*, CDs, DVDs, hard drives, etc.); a separate volume should be created for each piece of media delivered.

- The name of the data load file should mirror the name of the delivery volume, and should have a .DAT extension (*e.g.*, ABC001.DAT).

- The volume names should be consecutive (*e.g.*, ABC001, ABC002, et seq.).

- If foreign language / Unicode text exists, the .DAT file shall be in UTF-8 or UTF-16 format where appropriate.

     <u>Sample Concordance .DAT Load File</u>:

     þBegBatesþ¶þEndBatesþ¶þBegAttachþ¶þEndAttachþ¶þPgCountþ¶þCustodianþ

<u>OCR/Extracted Text Files</u>

- OCR or Extracted Text files shall be provided in a separate \OCR\ directory containing Document level text files.

- If Foreign Language/Unicode text exists, TEXT files shall be in appropriate UTF-8 or UTF-16 format.

## Appendix 2:  ESI Metadata and Coding Fields

**The chart below describes the metadata fields to be produced in generic, commonly used terms which the producing party is to adapt to the specific types of ESI it is producing, to the extent such metadata fields exist associated with the original electronic documents or are automatically generated as part of the electronic data discovery process, and to the extent such fields are extractable using tools ordinarily employed by a party's electronic discovery vendor.  In the event any such fields are not practically extractable, the parties shall meet and confer to ensure the production of information contained within such fields. Any ambiguity about a metadata field is to be discussed with the receiving party prior to processing the subject ESI for production.**

| Field Name | Field Description |
|---|---|
| Volume | Identifies production media deliverable (*i.e.*, the name of the CD, DVD, or hard drive) |
| BegBates | First Bates number (production number) of an item |
| EndBates | Last Bates number (production number) of an item<br>**The EndBates field should be populated for single-page items. |
| BegAttach | First Bates number of attachment range (*i.e.*, Bates number of the first page of the first attachment).  Documents that are part of document families, *i.e.*, containing parents or attachments, should receive a value. |
| EndAttach | Last Bates number of attachment range (*i.e.*, Bates number of the last page of the last attachment) |
| PgCount | Number of pages in the item |
| Custodian | Name of person (LastName FirstName format), central file location, database source, or other location from which the item is produced |
| CustodianOther | Name of the person(s) or location(s), in addition to the Custodian, from whose files the item may have been de-duplicated.  Parties shall provide an overlay file as needed should documents for additional custodians subsequently be requested. |
| FileSize | Size (in kilobytes) of the source native file |
| SourceFilePath | Full path of the original source ESI as stored by the custodian. Any container name (such as ZIP or PST containers) is included in the path. |
| HashValue | The MD5 or SHA-1 hash value of the file generated at the document family level. |
| NativeLink | Path for documents provided in native format only.<br>**The linked file must be named per the BegBates value. |
| SourceParty | Name of party producing the item |
| Paper | Designating that a document originated in paper form.  "Yes" for documents originating in paper form, otherwise left blank. |
| File Type | Indicates software application that generated the ESI item (*e.g.*, Outlook, Word, etc.) |
| FileExtension | Indicates file extension of source native file |
| DateSent (mm/dd/yyyy) | Date email or calendar item was sent |

| Field Name | Field Description |
|---|---|
| LastModDate (mm/dd/yyyy) | Date the item was last modified |
| TimeSent (hh:mmAM/PM) | Time email or calendar item was sent |
| Timezone | The time zone the document was processed in. |
| DateRecvd (mm/dd/yyyy) | Received date of an email message |
| TimeReceived | Received time of an email message |
| ParentBates | First Bates number for the parent item of a family **Will not be populated for items that are not part of a family. Should be populated in each record representing an attachment "child" item. |
| AttachBates | First Bates number of each "child" attachment. **Can be more than one Bates number listed depending on the number of attachments. Should be populated in each record representing a "parent" document. |
| To | To or Recipient field extracted from an email or calendar message |
| From | From field extracted from an email or calendar message |
| CC | CC or Carbon Copy field extracted from an email or calendar message |
| BCC | BCC or Blind Carbon Copy field extracted from an email or calendar message |
| AttachCount | Number of attached files |
| AttachName | The file name(s) of the attached items |
| Importance Ranking | Level of importance/sensitivity of messages or calendar items |
| Status as READ or UNREAD | Whether or not a message or calendar item was READ or UNREAD. |
| DateCreated (mm/dd/yyyy) | Date the item was created |
| TimeCreated (hh:mm AM/PM) | Time the item was created |
| LastAuthor | Name of individual who last saved a file |
| LastModTime (hh:mm AM/PM) | Time the item was last modified |
| LastAccessDate (mm/dd/yyyy) | Date the item was last accessed |
| LastAccessTime (hh:mm AM/PM) | Time the item was last accessed |
| LastPrintDate (mm/dd/yyyy) | Date the item was last printed |
| LastPrintTime (hh:mm AM/PM) | Time the item was last printed |
| FileName | The filename of the source native file for an ESI item |
| Title | Title field extracted from the source file metadata of a non-email document |

| Field Name | Field Description |
|---|---|
| EmailSubject | Subject line extracted from email message or calendar item |
| Author | Author field extracted from the source file metadata of a non-email message |
| TextPath | Full relative path to the current location of the document-level text file. There should be a folder on the deliverable, containing a separate text file per document. These text files should be named with their corresponding bates numbers. E-mails should include header information: author, recipient, cc, bcc, date, subject, etc. If the attachment or e-file does not extract text, then OCR for the document should be provided. |
| Redacted | "Yes" for redacted documents; otherwise blank |
| Confidentiality | Indicates if item has been designated as "Confidential" or "Highly Confidential" under the Protective Order; otherwise blank |
| ContactNames | All names associated with contact entry (such as first, last, middle, nicknames, prefix, suffix, etc.) |
| ContactEmail | All email addresses associated with the contact record |
| ContactEmailAlias | For example, the name or reference that will display in the email address lines in place of the actual email address |
| ContactPhone | All phone numbers associated with the contact entry |
| Contact Mail | All physical mailing addresses associated with the contact entry |
| Contact URL | All URL addresses associated with the contact entry |
| ContactNotes | All free text entered by user that is associated with and reflected in contact entry |
| ContactAssociations | Identification of other contact entries associated with and reflected in the contact entry, such as contact entry's assistant or manager |
| ContactCategories | Specific fields designed to sort, filter or classify the contact entry |
| CalendarStartDate | Calendar meeting/appointment start date |
| CalendarStarttime | Calendar meeting/appointment start time |
| CalendarEndDate | Calendar meeting/appointment end date |
| CalendarEndtime | Calendar meeting/appointment end time |
| CalendarParticipants | Calendar meeting/appointment attendees/participants/recipients |
| CalendarNotes | All free text entered by user that is reflected in the body text section of the calendar entry |
| CalendarImportance | Level of importance/sensitivity of calendar entry |
| CalendarResponse | The acceptance response given by each attendee/participant/recipient to a proposed appointment or meeting invitation (such as accept, tentative or decline) |