UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION<br><br>This Document Relates to: All Direct Purchaser Actions | Civil Action No. 14-md-02542-VSB<br>MDL No. 2542<br><br>**DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES ................................................................................................................... 8

    I.      PLAINTIFFS ...................................................................................................... 8

    II.     DEFENDANTS ................................................................................................... 9

    III.    AGENTS AND CO-CONSPIRATORS ................................................................ 9

JURISDICTION AND VENUE ......................................................................................... 10

INTERSTATE COMMERCE ..............................................................................................11

RELEVANT MARKETS .................................................................................................... 12

    I.      RELEVANT PRODUCT MARKETS.................................................................. 12

          A.     Single-Serve Brewer Market.................................................... 12

               1.     Keurig Single-Serve Brewers...................................... 13

               2.     Single-Serve Brewers Manufactured By Other Companies........... 14

          B.     The Compatible Cup Market .................................................... 15

               1.     The At-Home Market Segment ..................................... 16

               2.     The Away-From-Home Market Segment........................ 17

    II.     GEOGRAPHIC MARKET................................................................................. 17

MONOPOLY POWER ...................................................................................................... 17

    I.      KEURIG HAS MONOPOLY POWER IN THE SINGLE-SERVE BREWER MARKET......... 17

    II.     KEURIG HAS MONOPOLY POWER IN THE COMPATIBLE CUP MARKET................... 19

FACTUAL ALLEGATIONS .............................................................................................. 21

    I.      KEURIG ATTEMPTS TO PREVENT INTERNET DISTRIBUTORS FROM SELLING TO CUSTOMERS IN THE AT-HOME MARKET SEGMENT ................................................. 22

    II.     KEURIG AGGRESSIVELY ELIMINATED POTENTIAL COMPETITORS THROUGH SUCCESSIVE ACQUISITIONS ................................................................................... 23

    III.    KEURIG PURSUED SHAM LITIGATION TO RESTRAIN COMPETITION ...................... 24

    IV.    KEURIG ENTERED INTO NUMEROUS ANTICOMPETITIVE AGREEMENTS UP AND DOWN THE COMPATIBLE CUP SUPPLY CHAIN ...................................................... 27

          A.     Keurig Forestalled Potential Competition Through Anticompetitive Licensing Agreements ............................................................. 27

          B.     Keurig Coerced Machine Manufacturers And Component Suppliers To Enter Into Long-Term, Exclusive Contracts Denying Competitors Access To Equipment And Materials.................................................... 31

i

1.   Keurig Coerced Distributors And Retailers To Enter Into Long-Term, Anticompetitive Contracts Denying Competitors Access to Retail Customers and Distribution Channels ................................... 36

2.   Keurig Sold Its K-Cup Brewers At Or Below Cost To Consumers And Provided K-Cup Brewers To Businesses For Free As Long As Businesses Agreed To Purchase K-Cups Exclusively From Keurig ........................................................................................................... 38

3.   Keurig's Soon-To-Be Released 2.0 K-Cup Brewer With Lock-Out Technology Is Its Latest Tactic To Unlawfully Maintain Its Monopoly. ....................................................................................... 39

      a.   Keurig Announces The Anticipated Launch Of The 2.0 K-Cup Brewer With Purported "Interactive Technology" 40

4.   Contrary To Keurig's Initial Marketing Campaign, The 2.0 K-Cup Brewer May Not Include Interactive Technology ............. 42

5.   The 2.0 K-Cup Brewer's Lock-Out Technology Has No Consumer Benefit And Is Merely A Pretext To Eliminate Competition In The Compatible Cup Market ................................................................ 44

6.   Keurig's Deceptive Marketing Of Its 2.0 K-Cup Brewer Is Already Eliminating Actual And Potential Competition In The Compatible Cup Market....................................................................................... 47

THE ANTICOMPETITIVE EFFECTS OF KEURIG'S UNLAWFUL MONOPOLIZATION OF THE RELEVANT MARKETS ............................................................................................. 48

CLASS ALLEGATIONS ......................................................................................................... 50

CAUSES OF ACTION ............................................................................................................. 53

JURY TRIAL DEMANDED ..................................................................................................... 68

PRAYER FOR RELIEF ............................................................................................................ 68

Plaintiffs Kenneth B. Burkley, Judy Hoyer, James G. Long, Linda Major, Sally Rizzo, Henry A. Rocker, David Rosenthal, and Todd W. Springer, individually and on behalf of a class of direct purchaser plaintiffs (collectively, "Plaintiffs"), for their Consolidated Complaint against Keurig Green Mountain Inc. (formerly known as Green Mountain Coffee Roasters Inc. ("GMCR") and as successor to Keurig, Incorporated ("Keurig, Inc.") (collectively, "Keurig" or "Defendants"), allege, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, as against Defendant as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this Class Action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class (defined below) of all other similarly situated direct purchasers of K-Cups from Defendant Keurig.

2.     Plaintiffs seek damages and permanent injunctive relief against Defendants for violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 & 2 (as amended), Sections 3, 4 & 16 of the Clayton Act, 15 U.S.C. §§ 14, 15(a) & 26 (as amended), and certain laws of the Commonwealth of Massachusetts and State of Vermont.

3.     Keurig is a monopolist.  It has the power to control price and exclude competition. It has done both and is continuing to do so.  Plaintiffs and the Class have paid the price.

4.     Keurig has abused and is continuing to abuse its market and monopoly power to prevent, delay, exclude, restrain, and/or suppress competition in the Single-Serve Brewer Market (defined below) and the Compatible Cup Market (defined below) in the United States to impose supra-competitive prices in the Compatible Cup Market.  Plaintiffs and the Class have paid those supra-competitive prices for K-Cups (defined below) purchased directly from Keurig.

5.     From at least September 7, 2010 through the present (the "Class Period"), Keurig caused Plaintiffs and the Class to be damaged in the form of overcharges – overcharges on

1

Plaintiffs' and the Class' purchases of K-Cups directly from Keurig.  Plaintiffs and the Class seek redress for overcharge damages suffered by reason of Keurig's antitrust violations alleged herein.

6.      Overcharge damages are based on prices already charged by Keurig and paid by Plaintiffs.  These damages are calculated by determining the difference between what Plaintiffs actually paid to Keurig for K-Cups and what they would have paid, absent Keurig's unlawful conduct alleged to have already taken place.

7.      Whether or not Keurig's 2.0 K-Cup Brewers (defined below) ever enter the market, Plaintiffs and the Class will continue to pay artificially inflated prices for K-Cups until their Claims are adjudicated.

8.      Single-serve beverage brewers ("Single-Serve Brewers") are a type of electronic brewer capable of brewing at least a single cup by running hot water through a disposable, single use portion pack or "pod" containing coffee, and to a lesser extent some other beverages ("Portion Packs"). Unlike traditional drip-coffee brewers, Single-Serve Brewers only make one cup-sized serving at a time in less than a minute.  Consumers pay a significant premium for this: the price of traditional drip-coffee makers does not fully constrain prices for Single-Serve Coffee Brewers, demonstrating that Single-Serve Brewers are not reasonably interchangeable with traditional drip-coffee brewers.

9.      While Portion Packs come in many different forms such as cartridges, disks, cups, or pods, to be usable with a particular Single-Serve Brewer, a Portion Pack must be compatible with a particular Single-Serve Brewer.

10.     Keurig controls a market share approaching 90% in the Single-Serve Brewer market in the United States (the "Single-Serve Brewer Market") and its most popular Single-

Serve Brewer is the Keurig Single-Serve K-Cup Brewer (the "K-Cup Brewer").  Presently, K-Cup Brewers are designed to be compatible with: (i) single-serve pods sold by Keurig under its brand name as well as those sold under its licensees' brand names ("K-Cups"); and (ii) pods manufactured, distributed and sold by Keurig Competitors ("Competitor Cups") (together with K-Cups, "Compatible Cups").  Below is an illustration of a Keurig Coffee Brewer and K-Cup.



**Keurig Coffee Brewer**                    **K-Cup**

11.     Keurig is also the dominant manufacturer, distributor and seller of Compatible Cups with at least 86% of the Compatible Cup market in the United States (the "Compatible Cup Market").

12.     Keurig makes the overwhelming majority of its profits and revenues in the Compatible Cup Market, and it analyzes this discrete market for competitive purposes.  The revenues associated with sales of K-Cups are approximately four times those associated with sales of K-Cup Brewers.   This is because Keurig sells its K-Cup Brewers at or below cost and sells its K-Cups at a very high profit.  Keurig sells the brewers to create an installed base of customers.  The customers, in order to use the K-Cup Brewer, must purchase Compatible Cups.  The tighter the grip on Compatible Cup sales that Keurig has, the greater its profits.

13.     Keurig's market and monopoly power in the sale of Single-Serve Brewers and Compatible Cups is not the result of superior business acumen.  Rather, it results from an anticompetitive scheme to monopolize these markets and otherwise restrain trade and exclude competition.

14.     After being taken over by GMCR in 2006, Keurig devised a multi-pronged strategy to exclude competition so that it could unlawfully exploit the monopoly it enjoyed prior to and beyond the date its key patents covering the technology for its K-Cup filters would expire in September 2012.  Keurig followed through on that strategy and maintains its monopoly to this day, although its filter patents have long since expired.

15.     **Anticompetitive Acquisitions**.   Keurig started its anticompetitive campaign by aggressively eliminating potential Compatible Cups competition through successive and increasingly expensive acquisitions of Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc. (2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (Van Houtte) (2010).  These companies were all licensees of Keurig's filter patents, and would have the know-how and capacity to be strong competitors to Keurig in the Compatible Cup Market after Keurig's filter patents expired, leaving Keurig vulnerable to competition.  By buying out these companies, Keurig nipped this competitive threat in the bud.

16.     **Sham Litigation.**  In 2010, non-infringing competitors, particularly competitors making and selling filter-less K-Cups, had begun to emerge.  Just a few weeks after filter-less, non-infringing Compatible Cups first hit the shelves, on October 1, 2010, Keurig sued the leading Compatible Cup manufacturer, Sturm Foods, Inc. ("Sturm"), a subsidiary of TreeHouse Foods, Inc. ("TreeHouse"), alleging that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers.  Keurig also alleged that Keurig's own

consumers were infringing patents on the Keurig K-Cup Brewers by using Sturm's Compatible Cups, and that Sturm was liable for inducing infringement by Keurig consumers. Keurig instigated similar sham litigation against its other primary potential competitor, JBR, Inc. (d/b/a Rogers Family Company) ("Rogers"). Keurig's cases were objectively and subjectively baseless, and were eventually dismissed, but had their intended effect of suppressing actual and potential competition during the Class Period.

17. **Exclusive Dealing Arrangements.** On information and belief, Keurig has entered into exclusionary arrangements with companies at multiple levels of the Compatible Cup distribution system. These arrangements operate to exclude and suppress competition and have allowed Keurig to maintain its monopoly and monopoly pricing of K-Cups during the Class Period, including after patent expiry. To maintain its Compatible Cup monopoly into the post-patent world, Keurig has continued to increase its network of agreements and impeded the ability of competition to emerge.

18. To foreclose potential competition, Keurig entered into unduly restrictive exclusive dealing agreements with companies at every level of the Compatible Cup distribution system – from sellers of machinery used to make Compatible Cups; to sellers of Compatible Cup components; to competitor coffee roasters and coffee brands whose coffee is used in Compatible Cups; and to the distributors and retailers that sell and market Compatible Cups to end-user consumers, businesses, and institutions. The terms and number of these anticompetitive agreements cannot be justified by any purportedly pro-competitive purpose.

19.     Keurig also unlawfully maintained its monopoly power in the Compatible Cup Market by:

(a)     Entering into anticompetitive exclusive dealing agreements that restricted manufacturers of equipment used to make Compatible Cups from selling such equipment to Keurig's competitors;

(b)     Entering into anticompetitive exclusive dealing arrangements with the suppliers of components used to make Compatible Cups to limit or prohibit these suppliers from selling the components needed to manufacture Competitor Cups to competitors;

(c)     Entering into multi-year anticompetitive exclusive licensing agreements with competitor coffee roasters or systematically acquiring such competitors, in order to prevent them from doing business with manufacturers or sellers of Competitor Cups; and

(d)     Entering into multi-year anticompetitive exclusive deals with retail competitors who agreed not to do business with, or to severely limit the volume of business they would do with, manufacturers or sellers of Competitor Cups.

20.     **Keurig 2.0.**  To ensure a continuing monopoly well into the future, Keurig has announced it will be launching a successor K-Cup brewing system (the "2.0 K-Cup Brewer"), which will be embedded with technology to ensure that only K-Cups can be used with the 2.0 K-Cup Brewer.  As current generation K-Cup Brewers become obsolete, the 2.0 K-Cup Brewer will lock customers into purchasing only K-Cups and lock out competition from makers of Competitor Cups.

21.     According to Keurig press releases and promotional materials, the "interactive features" in the 2.0 K-Cup Brewer were designed to enhance the flavor of its coffee by brewing each "recipe" at differing temperatures. In reality, this "interactive technology" is identical to technology previously used in Keurig's now discontinued Vue Brewer,[1] which failed in the market due to poor sales and consumer dissatisfaction.  Keurig's assertion that this technology

---

[1]     The Vue Brewer is a Single-Serve Brewer manufactured by Keurig that uses a Portion Pack, known as the "Vue Pack," that is shaped differently than a K-Cup.

will improve the consumer experience is, therefore, implausible given consumer rejection of this "technology."

22.     The announcement of the 2.0 K-Cup Brewer has already hindered competition by scaring off actual and potential manufacturers of Competitor Cups. The competitors and/or potential competitors have been led to believe by Keurig's pronouncements that their cups will not work in the 2.0 K-Cup Brewers.

23.     Keurig is also using the anticipated launch of 2.0 K-Cup Brewers to force manufacturers and sellers of Competitor Cups to become Keurig licensees.

24.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and the Class have been deprived of a meaningful choice to purchase high-quality, less-expensive, and environmentally friendly Competitor Cups and forced to pay supra-competitive prices for K-Cups.

25.     Through this unlawful conduct, Keurig has insulated its K-Cups from competition, including well after the expiration of its filter patents, allowing Keurig to charge an artificially high price for K-Cups that has been (and continues to be) higher than it would, but for the monopolization, restraints of trade, and unlawful conduct alleged herein.

26.     Plaintiffs and the Class did, in fact, directly pay supra-competitive prices to Keurig for K-Cups, which materially and proximately caused Plaintiffs and the Class injury to their business and property, within the meaning of Section 4 of the Clayton Antitrust Act.

27.     Plaintiffs and the Class are threatened with impeding future harm in the form of additional overcharges, within the meaning of Section 16 of the Clayton Act, if Keurig's continuing scheme to monopolize is allowed to continue unabated.

## THE PARTIES

### I.   PLAINTIFFS

28.     Plaintiff Kenneth B. Burkley is a resident of Pennsylvania who purchased K-Cups directly from Keurig during the Class Period.

29.     Plaintiff Judy Hoyer is a resident of Florida who purchased K-Cups directly from Keurig during the Class Period.

30.     Plaintiff James G. Long is a resident of Massachusetts who purchased K-Cups directly from Keurig during the Class Period.

31.     Plaintiff Linda Major is a resident of New York who purchased K-Cups directly from Keurig during the Class Period.

32.     Plaintiff Sally Rizzo is a resident of Massachusetts who purchased K-Cups directly from Keurig during the Class Period.

33.     Plaintiff Henry A. Rocker is a resident of Florida who purchased K-Cups directly from Keurig during the Class Period.

34.     Plaintiff David Rosenthal is a resident of New York who purchased K-Cups directly from Keurig during the Class Period.

35.     Plaintiff Todd W. Springer is a resident of New Jersey who purchased K-Cups directly from Keurig during the Class Period.

36.     As a direct and proximate result of Defendants' anticompetitive conduct alleged herein, Plaintiffs paid supra-competitive prices for K-Cups, were injured as a result thereof, and will continue to sustain injury when making future purchases of K-Cups unless Defendants are enjoined from continuing such unlawful conduct.

## II.   DEFENDANTS

37.   Defendant Green Mountain Coffee Roasters, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Waterbury, Vermont.

38.   Defendant Keurig, Incorporated is a corporation organized under the laws of the State of Delaware, with its principal place of business in Reading, Massachusetts.  Keurig is a wholly-owned subsidiary of GMCR.

39.   Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.  Until March 6, 2014, Keurig was known as GMCR. Keurig is the successor to Keurig, Inc. which, prior to its merger with and into GMCR on December 31, 2013, was a wholly-owned subsidiary of GMCR organized under the laws of the State of Delaware with a principal place of business in Reading, Massachusetts.   On March 10, 2014, GMCR and Keurig Inc. announced that they changed their names to Keurig Green Mountain, Inc.

## III.   AGENTS AND CO-CONSPIRATORS

40.   Various persons and entities that are not named as Defendants participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted and/or communicated with others regarding, *inter alia*, the alleged conspiracy to monopolize the Single-Serve Brewer and Compatible Cup Markets. Plaintiffs reserve the right to name some or all of these entities as Defendants at a later date.

41.   On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiffs, are co-conspirators with Keurig in its unlawful restraints of trade.

## JURISDICTION AND VENUE

42.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiffs and the Class for their damages, including treble damages. This Court has jurisdiction over Defendants pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. § 15(a) and 22 and pursuant to 28 U.S.C. §§ 1331, 1337. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

43.     The Court has personal jurisdiction over Keurig because it regularly does and solicits substantial business in this District, either directly or through intermediaries, is continuously and systematically present in this District, and has established minimum contacts with this District, in particular by registering to do business in the State of New York, maintaining a registered agent for service of process in New York, maintaining a distribution center in New York, and conducting banking with financial institutions in this District. Furthermore, Keurig, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (i) transacted business in this District; (ii) directly or indirectly sold or marketed substantial quantities of K-Cup Brewers and K-Cups in this District; (iii) had substantial aggregate contacts in this District; or (iv) was engaged in an illegal, anticompetitive scheme to monopolize the Single-Serve Brewer Market and Compatible Cup Market, that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

44.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c) and (d) because Keurig can be found in

and transacts substantial business in this District and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

**INTERSTATE COMMERCE**

45.     Keurig manufactures, markets, and sells K-Cup Brewers and K-Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

46.     Keurig's business substantially affects interstate commerce in the United States, affects a substantial volume of trade and commerce in each state and territory of the United States, and has caused and continues to cause a substantial amount of economic harm and antitrust injury to the citizens of each state and territory of the United States.

47.     Keurig has manufacturing and distribution operations throughout the United States and sells and/or distributes K-Cup Brewers and K-Cups throughout the United States.

48.     Keurig stated in its most recent Annual Report:

> For fiscal 2013, approximately 92% of our consolidated net sales was attributed to the combination of portion packs and Keurig® Single Cup brewers and related accessories. Fiscal 2013 net sales of $4,358.1 million were comprised of $3,187.3 million portion pack net sales, $827.6 million Keurig® Single Cup Brewer and accessories net sales and $343.2 million of other product net sales such as whole bean and ground coffee selections in bags, fractional packages, and cans, as well as cups, lids and ancillary items to our customers primarily in the U.S. and Canada.[2]

49.     In 2013, Keurig had a total of $3.725 billion in sales in the United States, including $3.187 billion in K-Cup sales.

50.     Keurig's headquarters, executive offices, production, distribution, manufacturing, and research facilities are centralized in Vermont, and large manufacturing and distribution facilities are also located in Vermont, Tennessee, California, Virginia, and Washington.

---

[2] http://files.shareholder.com/downloads/GMCR/3348340072x0x722116/241A67DD-8DCC-4BE1-B30B-65371EDC095E/Green_Mountain_Annual_Report.pdf at pp. 2 and 9.

51.     The activities of Keurig and its co-conspirators, as alleged herein, were within the flow of, were intended to, and did have a substantial effect on Massachusetts, Vermont and United States interstate commerce.

52.     The unlawful anticompetitive conduct detailed herein impacted and harmed competition and purchasers in every state and territory of the United States. Keurig's anticompetitive conduct substantially affected trade and commerce and caused Plaintiffs and the Class to pay supra-competitive prices for K-Cups in every state and territory of the United States.

## RELEVANT MARKETS

### I.   RELEVANT PRODUCT MARKETS

53.     There are two relevant product markets in which to evaluate Defendants' anticompetitive conduct: the Single-Serve Brewer Market and the Compatible Cup Market. Keurig tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes.

### A.   Single-Serve Brewer Market

54.     The Single-Serve Brewer Market encompasses the design, manufacture, and sale of Single-Serve Brewers.

55.     Single-Serve Brewers offer unique convenience and efficiency that traditional drip coffee makers do not offer.  Consequently, lower cost traditional drip coffee makers do not fully constrain prices for Single-Serve Brewers.

56.     Consumers pay a premium for Single-Serve Brewers over the price of traditional drip coffee makers.  While traditional drip coffee makers are frequently sold around a price point of approximately $30 to $35, Single-Serve Brewers typically cost anywhere from $80 to several hundred dollars.

57.     Single-Serve Brewer sales revenue in the U.S. is expected to reach $5 billion by 2015, with the Single-Serve Brewer Market growing nine times faster than other brewer markets. In the United States, Single-Serve Brewer sales have multiplied more than six times over the past six years from 1.8 million units in 2008 to 11.6 million units in 2013.  Meanwhile, the traditional drip-coffee brewer market has remained relatively stagnant.

### 1.     Keurig Single-Serve Brewers

58.     Keurig designs, manufactures, markets and sells a variety of Single-Serve Brewers under the brand name Keurig®, including K-Cup® Brewers, Vue® Brewers, and Rivo® Brewers, each of which uses a different type of Portion Pack that is incompatible with other Single-Serve Brewers.

59.     Keurig markets its Single-Serve Brewers for use in the "At-Home" or "Away-From-Home" segments (defined herein).

60.     Single-Serve Brewers are sold for a range of prices.  For example, the Mr. Coffee KG2 brewer for home use has been priced at $89.95, while the Breville brewer for home use has been priced at $249.95.  Keurig's website lists the prices of only two of its commercial brewers, which are either $129.95 or $249.95.

61.     While Portion Packs and Single-Serve Brewers are sold as separate products in many stores and online, Keurig typically sells Single-Serve Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they purchase K-Cup Brewers.

62.     Many of Keurig's commercial Single-Serve Brewers do not even have their price listed anywhere on the Keurig website.  An interested consumer must specifically "request pricing" from a distributor.

63.     While businesses can request a "free trial" of a K-Cup Brewer on Keurig's website, Keurig often conceals the price of its commercial Single-Serve Brewers.

64.     Keurig also restricts the ability of distributors to advertise or display the prices of Portion Packs that are used in office Single-Serve Brewers.  For example, contractual provisions provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack . . . through or at any store operated by or for Distributor."  Exhibit A at § 2.1 (attaching Keurig Authorized Dealer Agreement).

65.     In addition to the Single-Serve Brewers manufactured by Keurig, Keurig also licenses Single-Serve Brewer technology to Mr. Coffee®, Cuisinart®, and Breville®, among other brands.

66.     Keurig also sells Vue Brewers that use a different type of Portion Pack, known as "Vue Packs," which are shaped differently than K-Cups.  The Vue Brewer is not compatible with K-Cups, and Vue Packs cannot be used in K-Cup Brewers.

67.     Keurig also offers the Rivo cappuccino and latte brewer, which is marketed for home use.  This brewer "exclusively uses Rivo® Packs," which, again, are shaped differently than K-Cups and are not compatible with K-Cup Brewers. K-Cups, therefore, cannot be used in Rivo brewers.

**2.     Single-Serve Brewers Manufactured By Other Companies**

68.     Additional Single-Serve Brewers aside from those manufactured by Keurig include Mars, Inc.'s "Flavia®," Bosch's "Tassimo®," Philips Electronics N.V's "Senseo®," Nestle's "Nespresso®," and Starbucks' "Verismo®."

69.     Prices across these Single-Serve Brewers can vary by as much as several hundred dollars.

70.    The market shares of these Single-Serve Brewers are fragmented and, collectively, represent a small share of the Single-Serve Brewer Market.

### B.    The Compatible Cup Market

71.    The second relevant product market in which to evaluate Keurig's anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups.

72.    The Compatible Cup Market is the market in which Keurig tracks the market share of K-Cups for competitive purposes.  As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high.  The New York Times has noted that "Folgers [K-Cups], with 8 grams per capsule, works out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."[3]

73.    Companies that manufacture or sell Competitor Cups offer prices that are substantially lower than K-Cups and, hence, appeal to large numbers of price-conscious businesses and consumers.

74.    Competitor Cups are typically priced at least 15% to 25% less than the K-Cups produced or licensed by Keurig.[4]

75.    Barriers to entry for the Compatible Cup Market are high and challenging for potential entrants into the Compatible Cup Market.

76.    Potential entrants to the Market cannot easily manufacture their own Single-Serve Brewers to accommodate their Competitor Cups because Keurig has a number of patents covering the technology in its Single-Serve Brewers.  Such a manufacturing effort would require

---

[3]      http://www.nytimes.com/2012/02/08/dining/single-serve-coffee-brewers-make-convenience-costly.html?_r=0.

[4]      *See, e.g.*, Green Mountain FQI 2014 Earnings Call Tr. (Green Mountain admitting that Competitor Cups "came in . . . at mostly 15 to 25% lower prices"), http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq at p. 6.

15

successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

77.     Potential entrants are further restrained from entering the Compatible Cup Market because Keurig has entered into exclusionary agreements with suppliers of the machinery and components used to make Compatible Cups.  These agreements have restricted the ability of competitors to purchase machinery and inputs needed to compete with Keurig in the Compatible Cup Market.

78.     Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer.  The reason is that most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked in to its use to find it impractical to substitute incompatible Portion Packs.  The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not, therefore, reasonably constrain the price of Compatible Cups.

### 1.     The At-Home Market Segment

79.     The Compatible Cup Market includes at least two large market segments, including one covering Compatible Cups purchased by consumers for use At-Home in their K-Cup Brewers ("At-Home Market Segment"), and one covering Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").

80.     The At-Home Market Segment is a billion dollar market.

81.     At least approximately 16 million U.S. households have a Keurig Single-Serve Brewer in the At-Home Market Segment.

### 2.    The Away-From-Home Market Segment

82.    K-Cups are also consumed outside of consumers' homes at, among other places, convenience stores, food service, workplace, higher education, and hospitality locations.

83.    The Away-From-Home Market Segment is a $600 million to billion dollar market.

84.    Keurig provides Single-Serve Brewers to "Office Coffee Services" customers (the "Office Coffee Services Market Segment"), which is part of the Away-From-Home Market Segment.

85.    The Office Coffee Services Market Segment is estimated to account for $175 million to $250 million worth of Keurig's sales.

## II.    GEOGRAPHIC MARKET

86.    The relevant geographic market is the United States. To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States. Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

## MONOPOLY POWER

87.    Keurig has monopoly power in the Relevant Markets defined above. It has the power to control prices and exclude competition in both the Single-Serve Brewer Market and in the Compatible Cup Market, including the At-Home and Away-From-Home segments.

## I.    KEURIG HAS MONOPOLY POWER IN THE SINGLE-SERVE BREWER MARKET

88.    Keurig dominates the Single-Serve Brewer Market, making it unlikely any new entrant could gain meaningful share.

89.     On a March 6, 2014 Shareholders' Conference Call, Keurig's Brian Kelley reported that Keurig has "now sold more than 20 billion portion packs [and] more than 35 billion brewers."[5]  In its 2013 Annual Report, Keurig reported that its Single-Serve Brewers are used in at least approximately 16 million U.S. households.[6]  Keurig also reported in November 2013 that, in fiscal year 2013 alone, Keurig sold approximately 10.6 million Single-Serve Brewers.[7]

90.     As of September 2013, Keurig's Single-Serve Brewers were among the top four best-selling coffeemakers in the United States by dollar volume.[8]

91.     From July 2012 to July 2013, Keurig sold approximately 4.8 million Single-Serve Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and 93% by dollar value during that time period.  Keurig controls at least 88% of the brewers sold in the Single-Serve Brewer Market for home use.

92.     In the first quarter of 2014, Keurig has already sold a record 5.1 million Single-Serve Brewers.[9]

93.     Keurig has the power to exclude competition in the Single-Serve Brewer Market. Keurig has unlawfully exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.

---

[5] Green Mountain Coffee Roasters' CEO Hosts Annual Meeting of Shareholders (Transcript) (Mar. 6, 2014), http://seekingalpha.com/article/2073423-green-mountain-coffee-roasters-ceo-hosts-annual-meeting-of-shareholders-transcript at p. 5.

[6] Green Mountain Annual Report at 2, http://files.shareholder.com/downloads/GMCR/2984019180x0x722116/241A67DD-8DCC-4BE1-B30B-65371EDC095E/Green_Mountain_Annual_Report.pdf at p. 2.

[7] Green Mountain Press Release (Nov. 20, 2013), "Green Mountain Coffee Roasters Reports Full Fiscal Year and Fourth Quarter Fiscal 2013 Results," http://investor.gmcr.com/releasedetail.cfm?ReleaseID=808735.

[8] See Green Mountain Form 10-K/A for the fiscal year ended September 28, 2013, http://www.sec.gov/Archives/edgar/data/909954/000104746913010715/a2217486z10-ka.htm at p. 8.

[9] Green Mountain Press Release (Feb. 5, 2014), http://investor.gmcr.com/releasedetail.cfm?releaseid=823624.

18

94.     Barriers to entry are high and formidable for any potential entrant into the Single-Serve Brewer Market.  Keurig still holds patents that cover its Single-Serve Brewers.  Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment.  Moreover, retailers are reluctant to stock Single-Serve Brewers unless the Portion Packs they use are readily and widely available. Portion Packs that are compatible with any particular Single-Serve Brewer are not widely available unless the corresponding brewers is popular. In light of the foregoing, potential market entrants face a substantial competitive disadvantage vis-à-vis established Single-Serve Brewer suppliers.

## II.     KEURIG HAS MONOPOLY POWER IN THE COMPATIBLE CUP MARKET

95.     Keurig owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee Inc., and LNH Holdings, Inc. (Van Houtte).

96.     Keurig also licenses the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks.  Keurig either owns or licenses some forty-nine brands.

97.     In total, and according to its own executive, Keurig controls approximately 86% of the Compatible Cup Market.[10]   The remaining 14% of the Compatible Cup Market is composed of sellers of unlicensed and private label Competitor Cups.  In fiscal year 2012, Keurig's net sales were $3.9 billion, with 90% of these consolidated net sales resulting from the combined sales of Single-Serve Brewers (which comprised 22%, or $760 million) and Portion

---

[10] *See* Green Mountain FQ1 2014 Earnings Call Tr. ("We had 100% of the system . . . and all of a sudden we have 86%. . . ."), http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq at p. 6.

Packs including K-Cups (which comprised 78%, or $2.7 billion).[11] This is consistent with Keurig's strategy of selling its Keurig Single-Serve Brewers at or below cost.

98.     In fiscal year 2013, Keurig sold approximately $3.187 billion in Portion Packs, including K-Cups.[12]

99.     Compatible Cups are not reasonably interchangeable with other Portion Packs, and consumers who purchase K-Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups.

100.     Because Compatible Cups are not reasonably interchangeable with other Portion Packs, Keurig locks consumers in to use Compatible Cups by selling its K-Cup Brewers at or below cost.   Keurig is then able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups sales.[13]

101.     Indeed, during the Class Period Keurig has been able to exercise its monopoly power in the Compatible Cup Market by profitably raising K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share.

102.     Keurig controls approximately 92% of the At-Home Market Segment for Compatible Cups.   Competitor Cup manufacturers hold the remaining 8% of that market segment.[14]

---

[11] *See* Green Mountain 2012 Annual Report, http://files.shareholder.com/downloads/GMCR/ 2984019180x0x630863/FDBC5F63-78E8-493C-9BB9-8F33000C0465/GMCR_2012_ANNUAL_REPORT.pdf at p. 2.

[12] *See* Green Mountain 2013 Annual Report, 10-K-A, http://files.shareholder.com/downloads/GMCR/ 2984019180x0x722116/241A67DD-8DCC-4BE1-B30B-65371EDC095E/Green_Mountain_Annual_Report.pdf at p. 38.

[13] *See* Green Mountain 2013 Investor Day Presentation, (Sept. 10, 2013), http://files.shareholder.com/ downloads/GMCR/2971051915x0x689991/2571face-a834-4ba2-9cab-c4aa52b82c27/MASTER_INVESTOR_ DAY_ALL_FINAL_For_Web.pdf at p. 164.

[14] *See* Green Mountain Investor 2013 Day Presentation (Sept. 10, 2013), http://files.shareholder.com/ downloads/GMCR/2971051915x0x689991/2571face-a834-4ba2-9cab-c4aa52b82c27/MASTER_INVESTOR_ DAY_ALL_FINAL_For_Web.pdf pp. 98-99.

103. Keurig's distributors are prohibited from selling Competitor Cups to the Office Coffee Services Market Segment because doing so would violate the Keurig Authorized Distributor Agreement ("KAD Agreement").

104. Keurig has substantially foreclosed competitors from selling to the Office Coffee Services Market Segment through its anticompetitive conduct, including through its web of exclusive dealing agreements.

105. Upon information and belief, Keurig also enters into exclusionary agreements with office specialty stores, such as Staples. Competitors of Keurig sought to supply Compatible Cups to Staples, but Staples had an exclusive licensing agreement with Keurig. As a result of that restrictive agreement, Keurig's competitors were unable to enter into a supply arrangement with Staples.

106. Keurig has admitted that it has more than 500 Keurig Authorized Distributors, who are contractually obligated to buy directly from Keurig and to only sell products that are "authorized" by Keurig.

107. Keurig maintains its monopoly power in the Away-From-Home and Office Coffee Services Market Segment by leveraging its monopoly over the Single-Serve Brewer Market to exclude competition from manufacturers or sellers of Competitor Cups. Specifically, Keurig and its distributors agree to provide K-Cup Brewers to commercial or office customers at little or no cost, provided those customers agree to exclude Competitor Cup suppliers from this market segment by purchasing Compatible Cups exclusively from Keurig.

## FACTUAL ALLEGATIONS

108. Upon acquiring Keurig, Inc. in 2006, GMCR embarked on a multifaceted campaign to unlawfully dominate and exclude competition in the Compatible Cup Market. The scheme consisted of several steps, including blocking Internet sales, anticompetitive acquisitions,

sham litigation, numerous forms of exclusionary agreements up and down the supply chain, and even changing the design of its brewers to exclude competition.

## I.   KEURIG ATTEMPTS TO PREVENT INTERNET DISTRIBUTORS FROM SELLING TO CUSTOMERS IN THE AT-HOME MARKET SEGMENT

109.    First, also in 2006, Keurig endeavored to control distribution of Compatible Cups to consumers in the At-Home Market Segment by forcing distributors to exit this highly valuable market in which they had invested substantial sums. At least two distributors objected to this strong-arm tactic by commencing an action in federal court.

110.    In December 2006, Evans Quality Coffee Service ("Evans") and Springtime, Inc. d/b/a Springtime Coffee, Co. ("Springtime") sued Keurig in the United States District Court for the District of New Jersey.   According to the pleadings in the *Evans* lawsuit, Evans and Springtime alleged that they were distributors of Keurig's brewers and Portion Packs in the Away-From-Home Market Segment and were later authorized to sell Keurig products nationwide over the Internet, including to the At-Home Market Segment.  Evans and Springtime further alleged that they spent hundreds of thousands of dollars to develop the infrastructure necessary to distribute Keurig products to consumers via the Internet. However, after GMCR acquired Keurig, Inc. and had the ability to distribute via the Internet, Keurig prohibited these distributors, and allegedly seven other distributors, from engaging in consumer transactions via the Internet concerning the At-Home Market Segment. Specifically, Keurig allegedly used its power to force Evans and Springtime into signing a new distribution agreement as a condition to keep their Keurig Away From Home business.  Prior to resolving their lawsuit, the *Evans* court issued a preliminary injunction ordering Keurig to honor the pre-acquisition agreements allowing these distributors to continue sales to consumers over the Internet.

## II.  KEURIG AGGRESSIVELY ELIMINATED POTENTIAL COMPETITORS THROUGH SUCCESSIVE ACQUISITIONS

111.   Keurig aggressively eliminated potential competitors, all contemporaneous licensees of Keurig patents, with the ability to sell during and after patent expiration, through successive acquisitions of Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc. (2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (2010).

| DATE | TARGET | PRICE |
|---|---|---|
| March 27, 2009 | Tully's Coffee | $40.3 million |
| November 13, 2009 | Timothy's Coffee | $155.7 million |
| May 11, 2010 | Diedrich | $305.3 million |
| December 17, 2010 | Van Houtte | $907.8 million |

112.   One analyst stated Keurig "eliminated the licensees by buying them.   [Keurig] paid high prices to avoid having to compete with the licensees."[15]   According to that analyst, these acquisitions made no business sense but for their value in eliminating potential competitors when Keurig's patents expired.[16]

113.   Having grown into a billion dollar publicly traded company by eliminating and restraining competition, Keurig was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices.

---

[15]David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress (Oct. 17, 2011), http://www.zerohedge.com/news/gaap-uccino-david-einhorns-full-short-green-mountain-coffee-presentation at p. 53.

[16] Id. at 49.

### III.    KEURIG PURSUED SHAM LITIGATION TO RESTRAIN COMPETITION

114.    For many years, Keurig's monopoly in the Compatible Cup market was protected by its K-Cup filter patents covering the use of filters in Compatible Cups.   However, the two principal patents associated with Keurig's filtered K-Cups expired in September 2012.

115.    Despite Keurig's patent protection, some competitors were able to enter the market prior to September 2012 by creating filter-less Compatible Cups that did not infringe Keurig's K-Cup filter patents.  One such competitor, TreeHouse, decided to enter the Compatible Cup Market in or about 2010.

116.    Thus, in August 2010, TreeHouse subsidiary Sturm introduced the first Compatible Cups for use in K-Cup Brewers that were not sold by Keurig or under a Keurig license.

117.    In response to Sturm's market entrance, Keurig filed a baseless lawsuit (asserting various infringement, trademark, and false advertising claims) on October 1, 2010, in the United States District Court for the District of Delaware. Just a matter of weeks after Sturm's Compatible Cups hit the shelves, Keurig sued Sturm, alleging, in bad faith, that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers – not even asserting any patents covering K-Cups themselves. Keurig also alleged that Keurig's own consumers were infringing patents on the K-Cup Brewers by using Sturm's unlicensed Compatible Cups, and that Sturm was thus also liable for "inducing" infringement by these consumers.

118.    No reasonable litigant could have realistically expected to succeed on the merits of such claims, and, thus, Keurig's complaint was objectively baseless. The action was also subjectively baseless because Keurig filed the action to interfere with its competitor.

119.    Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of non-infringement.

120.    In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims.

121.    Most importantly, the Court held that method patents are exhausted by selling merchandise that embodies the method.  Quoting the Supreme Court in *Quanta Computer, Inc. v. LG Elecs., Inc.*, the Court stated that "the authorized sale of an article that substantially embodied a patent exhausted the patent holder's rights and prevented the patent holder from invoking patent law to control post-sale use of the article."[17] Expanding on the Supreme Court's holding, the *Sturm* court held:

> [P]atent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products. After the first authorized sale to a purchaser who buys for use in the ordinary pursuits of life, a patent holder's patent rights have been exhausted.[18]

122.    Keurig appealed that decision to the United States Court of Appeals for the Federal Circuit.  The Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished."[19]

123.    The Federal Circuit's holding was clear:

> Keurig sold its patented brewers without conditions and its purchasers therefore obtained the unfettered right to use them in any way they chose, at least as against a challenge from Keurig ... Here, *Keurig is attempting to impermissibly restrict*

---

[17] 553 U.S. 617, 638 (2008).

[18] *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 U.S. Dist. LEXIS 130762 (D. Del. Sept. 13, 2012) (quoting *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575, 582 (E.D. Ky. 2009)).

[19] *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

*purchasers of Keurig brewers from using non-Keurig cartridges by invoking patent law to enforce restrictions on the post-sale use of its patented product.*[20]

124.    The Court noted that the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'"[21]

125.    Keurig also sued another early Compatible Cup Market entrant, Rogers, making similar claims. In Keurig's litigation against Rogers, a different federal district court likewise held on summary judgment that the Compatible Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.

126.    As the Federal Circuit expressly concluded in Keurig's appeal against Sturm, rather than pursuing any legitimate purpose, *"Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law."*[22]

127.    As the Federal Circuit implicitly recognized, Keurig's lawsuits were objectively baseless and had no realistic expectation for success on the merits.  Keurig's lawsuits were subjectively baseless attempts to directly interfere with the business relationships of its competitors.

---

[20] *Id.* (emphasis added).

[21] *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008) (quoting *Adams v. Burke*, 84 U.S. 453, 457 (1873))) (emphasis added)..

[22] *Id.*

IV.   **KEURIG ENTERED INTO NUMEROUS ANTICOMPETITIVE AGREEMENTS UP AND DOWN THE COMPATIBLE CUP SUPPLY CHAIN**

A.   **Keurig Forestalled Potential Competition Through Anticompetitive Licensing Agreements**

128.   In addition to foreclosing competition through multiple acquisitions, Keurig eliminated other would-be competitors by entering into anticompetitive license and manufacturing agreements with them. Keurig currently owns or licenses some 49 coffee brands, including well-known brands such as Caribou Coffee®, Wolfgang Puck®, and Newman's Own®.

129.   Keurig's anticompetitive and unduly restrictive exclusionary agreements with these competitors have further enabled it to wield its unlawful monopoly power in the Compatible Cup Market.  Upon information and belief, many, if not all, of these agreements have multi-year terms and are exclusive, which prevent these brands from also licensing trademarks or entering into manufacturing agreements with Keurig's competitors in the Compatible Cup Market.

130.   For example, the Amended and Restated Purchase and License Agreement entered into between Keurig and Caribou Coffee Company, Inc. ("Caribou"), dated December 20, 2011, expressly provides that Keurig Authorized Distributors and Keurig Authorized Re-Distributors enter into:

> distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase . . . of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale.[23]

131.   Pursuant to Keurig's contracts, competitor coffee brands further agreed not to: (i) "sell coffee, Tea or Other Hot Beverage Products to any third-party for the specific intended use

---

[23] *See* Exhibit B at 2 (attaching Am. and Restated Purchase and License Agreement between Keurig and Caribou Coffee Company, Inc. (Dec. 20, 2011)).

of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System;" and (ii) license any trademarks for use by third-parties in connection with products "intended for use with the Keurig Brewing System."[24]

132.    Starbucks, Wolfgang Puck, and other coffee brands have discussed entering into potential business relationships with Keurig competitor TreeHouse but were prevented from doing so after entering into contracts with Keurig.

133.    Such agreements with competitor coffee brands, such as Caribou, have the effect of allowing Keurig to allocate markets, restrain output, restrain price competition, and to exclude competitors.  According to one analyst report, the "only meaningful coffee brand that [Keurig] does not have in its portfolio is Maxwell House® (*i.e.*, Kraft)."[25]

134.    Upon information and belief, Keurig's agreements with coffee brands also contain restrictions dictating where and how licensed K-Cups can be sold, thereby allowing Keurig to maintain supra-competitive prices across licensed brands by controlling output.  This creates a further incentive for licensed coffee brands to renew their agreements with Keurig and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by Keurig, as demanded by Keurig as a pre-condition for selling Compatible Cups.

135.    In fact, Keurig has entered into numerous long-term, exclusionary licensing agreements with competitor coffee brands, some of which are highlighted below:

> (a)    In December 2006, Keurig entered into a multi-year agreement with Caribou under which Caribou branded coffee would be packaged and sold in K-Cups. The parties renewed and amended their agreement in December 2011. Under this agreement, Caribou sells Keurig its coffee, which Keurig packages into K-Cups, and grants Keurig a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups.

---

[24] *See* Exhibit B at 7 (attaching Am. and Restated Purchase and License Agreement between Keurig and Caribou).

[25] David Einhorn, *GAAP-uccino*, Greenlight Capital Value Investing Congress (Oct. 17, 2011), http://www.zerohedge.com/news/gaap-uccino-david-einhorns-full-short-green-mountain-coffee-presentation.

         Under the agreement, Caribou may only sell the K-Cups at Caribou coffee stores and on Caribou's website for "At-Home" use.

(b)      In February 2010, Keurig entered into a multi-year agreement with J.M. Smucker Company ("Smucker"), a leader in the domestic retail coffee market, under which Keurig is the exclusive manufacturer of Compatible Cups under Smucker's Folgers and Millstone coffee brands. Under the agreement, Smucker may only sell the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website.

(c)      In February 2011, Keurig entered into an agreement with Dunkin' Donuts, a market leader in the traditional and iced coffee markets in the United States, under which Keurig became the exclusive manufacturer of Dunkin' Donuts K-Cups. Under the agreement, Dunkin' Donuts may only sell its K-Cups at Dunkin' Donuts restaurants. Additionally, Dunkin' Donuts is prohibited from selling K-Cups in grocery stores, where it traditionally sells its bagged coffee.

(d)      In March 2011, Keurig entered into a multi-year agreement with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a "minimum five-year agreement," under which Starbucks was the "exclusive licensed super premium coffee brand on the Keurig platform" and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee." Under this agreement, Keurig began manufacturing additional varieties of Starbucks coffee and products from Starbucks' other brands, such as Seattle's Best. Keurig sells Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website.[26]

(e)      In May 2013, Keurig entered into a multi-year agreement with The Coffee Bean & Tea Leaf, "the largest privately held specialty coffee and tea retailer in the United States." Under the agreement, Coffee Bean K-Cups will be sold "in a variety of channels" beginning in the spring of 2014.[27]

(f)      In July 2013, Keurig entered into a multi-year agreement with Cinnabon. Under the agreement, Keurig will manufacture Cinnabon K-Cups which will be sold in the retail and commercial channels, as well as in Cinnabon restaurants.

---

[26] Starbucks Press Release, *Starbucks and Keurig Coffee Roasters Enter Into Expanded, Long-Term Strategic Partnership* (May 7, 2013), http://news.starbucks.com/news/starbucks-and-green-mountain-coffee-roasters-enter-into-expanded-long-term-.

[27] GMCR Press Release, *Keurig Coffee Roasters, Inc. Welcomes The Coffee Bean & Tea Leaf to the Keurig Family* (May 29, 2013), http://investor.gmcr.com/releasedetail.cfm?releaseid=767731.

136.    Keurig has also entered into similar agreements with Newman's Own Organics Coffee®, Gloria Jean's Coffee®, and Wolfgang Puck®, as well as agreements to manufacture and distribute non-coffee products with companies such as Bigelow®, Twinings®, Swiss Miss®, Snapple®, Celestial Seasonings®, Campbell's®, and most recently Coca-Cola®.

137.    As a result of the above-described anticompetitive agreements, Keurig was able to foreclose competition from would-be competitors both before and after the patents protecting its K-Cup technology expired in September 2012.

138.    Similarly, Keurig also entered into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Keurig's own coffee as well as the coffee and tea that Keurig purchases from coffee brands.

139.    In at least one such contract, Keurig is permitted to veto the roaster's ability to contract with manufacturers of Competitor Cups. Specifically, the contract provided that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and sale of private-label K-Cups by third parties] based on such contract's compliance with the terms and conditions of this Agreement. Keurig shall review and either approve or disapprove such contracts . . . ."[28]

140.    As Keurig's K-Cup patents have expired, there is no legitimate justification for this division of markets across competitors, or the restraints placed on dealing with Competitor Cup makers that could plausibly be grounded in any valid patent rights.  Nor is there any basis for Keurig to demand that Competitor Cup makers take a purported "license" or become "authorized" to sell Competitor Cups.  Keurig's lawful right to exclude Competitor Cup makers from the Compatible Cup Market expired when the patents protecting its K-Cup technology

---

[28] License and Distribution Agreement between Keurig, Incorporated and Diedrich Coffee, Inc. (July 29, 2003), http://www.sec.gov/Archives/edgar/containers/fix048/947661/000119312508208074/dex1037.htm.

expired in September 2012, and it cannot extend this right beyond the term it was granted by the U.S. Patent Office simply because it was the first to make K-Cup Brewers or K-Cups.

**B.    Keurig Coerced Machine Manufacturers And Component Suppliers To Enter Into Long-Term, Exclusive Contracts Denying Competitors Access To Equipment And Materials**

141.    Keurig has entered into unduly restrictive, anticompetitive, and exclusionary agreements with sellers of the machinery and components used to make K-Cups and sellers of K-Cup components. For example, Keurig restricts the ability of machinery manufacturers to sell machinery to Keurig competitors who intend to use it to make Compatible Cups, but allows machinery manufacturers to sell the same machinery for other purposes. Thus, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

142.    Suzanne Delong, Keurig's director of investor relations, has stated that there are only two companies in the world making K-Cup packaging equipment *and both are under contract with Keurig*. Thus, Keurig's web of exclusive dealing agreements has further enabled it to impose an unlawful monopoly in the Compatible Cup Market.

143.    These agreements were used as a shield to insulate Keurig from competition by TreeHouse. TreeHouse allegedly attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Compatible Cups.  On December 19, 2013, a Sales Manager from R.A. Jones allegedly responded in an email, stating: "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product."[29]

---

[29] Complaint at ¶ 179, *Treehouse Foods, Inc. v. Keurig Coffee Roasters, Inc.*, No. 14-cv-00905 (S.D.N.Y. Feb. 11, 2014).

144.   Under "the rules," as described by the R.A. Jones sales manager: "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it."   However, R.A. Jones can still "build equipment for all types of packages, just not K-Cups or anything that goes into a Keurig brewer."[30]

145.   According to TreeHouse, the Sales Manager allegedly expressed hope that the Keurig "agreement will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse.[31]

146.   Keurig also unreasonably restrains competitors' access to the inputs necessary to make Compatible Cups.

147.   Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter. There are few suppliers for each of these components because Compatible Cup components must generally be custom engineered for use in K-Cup Brewers.   Keurig has entered into exclusive dealing agreements with suppliers of each K-Cup component, which has allegedly forced potential competitors to work with less experienced suppliers at a higher cost to these potential competitors.[32]

148.   In 2010, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups.[33]

---

[30] *Id.* at ¶ 180.

[31] *Id.* at ¶ 181.

[32] *See id.* at ¶ 187.

[33] *See id.* at ¶ 188.

149.    Keurig competitor TreeHouse allegedly approached all three of these companies to find a supplier to make Compatible Cups.[34]

150.    At that time, Winpak was already supplying TreeHouse subsidiary Sturm with different types of cups and lids to make products that were not used in K-Cup Brewers. TreeHouse allegedly contacted Winpak to see if Winpak could also supply cups and lids to make Compatible Cups.   After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak allegedly refused to supply these materials to TreeHouse. Winpak still supplies Sturm with lids for products that are not used in K-Cup Brewers.[35]

151.    TreeHouse also allegedly met with Phoenix Cups to see if Phoenix could supply the plastic cups needed to make Compatible Cups. Phoenix initially agreed to supply TreeHouse and even began customizing the cups per TreeHouse's requirements. However, shortly thereafter, Phoenix allegedly informed TreeHouse that it could not supply TreeHouse with plastic cups for use in K-Cup Brewers due to concerns that TreeHouse was not an "authorized manufacturer" for Keurig.[36]

152.    Because Phoenix was free to supply plastic cups for use in products not intended for K-Cup Brewers, any restriction prohibiting Phoenix from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for Keurig.

153.    TreeHouse then allegedly contacted Curwood, the only remaining domestic supplier of plastic cups used to make Compatible Cups known at that time. Shortly after the

---

[34] *See id.* at ¶ 189.

[35] *See id.* at ¶ 190.

[36] *See id.* at ¶ 193.

initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with plastic cups for use in K-Cup Brewers, Curwood allegedly informed TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations."[37]

154.    As a direct result of these suppliers' alleged refusal to supply TreeHouse with the materials necessary to make Compatible Cups, TreeHouse was forced to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components.   Developing new cup components was a more costly and lengthy process as compared to purchasing cup materials from a company that already produced such components. TreeHouse allegedly incurred additional, unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture cups for use in K-Cup Brewers.  As a result, TreeHouse's start-up costs were allegedly substantially higher than they would have been if TreeHouse had been free to purchase cups from an experienced cup manufacturer.[38]

155.    TreeHouse also allegedly approached domestic suppliers of foil lids used to make Compatible Cups, Winpak and LMI Packaging Solutions ("LMI") to find a supplier for its Compatible Cups' foil lids.[39]

156.    As detailed above, Winpak allegedly refused to supply TreeHouse with lids after learning that TreeHouse intended to use the lids in Compatible Cups.

157.    LMI, then a supplier to TreeHouse of other cups and lids, also allegedly refused to supply TreeHouse with foil lids to make Compatible Cups, citing other business commitments. It would seem that these "other business commitments" were to Keurig.  After its initial refusal,

---

[37] *See id.* at ¶ 196.

[38] *See id.* at ¶ 198-99.

[39] *See id.* at ¶ 200.

LMI later informed TreeHouse that it no longer had a relationship with Keurig, and was, therefore, now free to do business with TreeHouse.[40]

158.   Once again, because TreeHouse was unable to contract with experienced domestic lid suppliers, it had to incur additional unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture lids for use in K-Cup Brewers. As a result, its start-up costs were substantially higher than they would have been if TreeHouse had been able to purchase lids from an experienced lid manufacturer.[41]

159.   Similarly, several filter suppliers allegedly declined to supply TreeHouse because they were already supplying Keurig with the same product.  Thus, TreeHouse was forced to find a new supplier of filters and adapt TreeHouse's production process to use the new products. TreeHouse allegedly had to incur additional costs because TreeHouse had to work with the new supplier to improve the filter for use in Compatible Cups.[42]

160.   As demonstrated by TreeHouse's experience, these multi-year, exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Keurig.

161.   These unduly restrictive agreements also negatively impacted TreeHouse's ability to effectively compete in the marketplace, which substantially reduced consumers' choice for Compatible Cups and increased the price of Competitor Cups as well as, by extension, allowing Keurig to continue charging supra-competitive prices for K-Cups.

---

[40] *See id.* at ¶ 202-03.

[41] *See id.* at ¶ 204.

[42] *See id.* at ¶ 206.

162.   Moreover, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.  As parties to these agreements have admitted, Keurig does not restrict the ability to sell these same products for other purposes just so long as those products are not sold to a Keurig competitor who intends to use them to make Compatible Cups for use in K-Cup Brewers.

> **1.     Keurig Coerced Distributors And Retailers To Enter Into Long-Term, Anticompetitive Contracts Denying Competitors Access to Retail Customers and Distribution Channels**

163.   Keurig distributes commercial K-Cup Brewers and accompanying K-Cups to the Away-From-Home Market Segment through over 500 Keurig Authorized Distributors, including Office Coffee Service operators, office suppliers such as WB Mason and United Stationers, hospitality service providers, and food-service management companies, such as Vistar and Aramark.

164.   Keurig requires at least some of these distributors to enter into a multi-year KAD Agreement, which prevents them from purchasing Compatible Cups from Keurig competitors, thereby substantially foreclosing access to the Office Coffee Services Market Segment. Specifically, certain KAD Agreements contain a "Keurig Loyalty" requirement that provides:

> 3.2. Keurig Loyalty. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs. *See* Exhibit B (attaching KAD Agreement).

165.   As one national coffee supplier for offices, food service and retail explained "[o]ur agreements [with Keurig] state that we cannot sell other brands of K-Cups to be used in Keurig brewers."   And a president of an office coffee distribution company explained that

"Private label K-Cups prices are probably 10% to 15% less than Keurig's K-Cups, but I am not offering anything private label.  I am not permitted by contract with them."  Similarly, the owner of a major North American Keurig-contracted online retailer said "We've abided by our contracts, so we haven't taken on any of the new K-Cups.  We've stuck with Keurig."[43]

166.    According to Rogers, one of Keurig's competitors, Keurig's KAD Agreement's "loyalty provision," intimidation tactics  and/or efforts to create "fear, uncertainty or doubt" in the marketplace concerning Competitor Cups have prevented it from doing business with customers and potential customers. Rogers was allegedly repeatedly told by office supply distributors that they were unable to purchase Rogers' Competitor Cups as a result of their distributorship agreements with Keurig.

167.    These KAD Agreements are unduly restrictive not only because they substantially exclude competition, but also because they do so for a multi-year period.

168.    Notably, the standard KAD Agreement also has the effect of locking in office and commercial customers that might otherwise switch to new suppliers if they were made better aware of Keurig's supra-competitive K-Cup prices.   Additionally, these KAD Agreements restrict distributors' ability to display prices for K-Cups, further insulating Keurig from competitive pricing. *See* Exhibit B at 2.1, 2.3.

169.    Keurig uses its monopoly power in the Single-Serve Brewer Market to force office supply distributors to enter into these standard form, non-negotiable KAD agreements by otherwise threatening to refuse access to Keurig's market-dominant office Single-Serve Brewers.

---

[43]    Reverdy Johnson, *Private-Label Threat Brewing for Keurig's K-Cups*, Blueshift Report (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.pdf.

### 2. Keurig Sold Its K-Cup Brewers At Or Below Cost To Consumers And Provided K-Cup Brewers To Businesses For Free As Long As Businesses Agreed To Purchase K-Cups Exclusively From Keurig

170. Keurig's business model depends upon its ability to leverage its Single-Serve Brewer monopoly to restrain competition and extract monopoly profits from the K-Cups it sells in the Compatible Cup Market. Specifically, this business model relies on Keurig's ability to: (i) drive sales of Keurig's highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (ii) restrain price competition for Compatible Cups; and (iii) maintain supra-competitive K-Cup prices for extended periods of time.

171. As it admits in its own statements to the public and investors, Keurig sells K-Cup Brewers at or below cost to saturate the market with brewers that are only compatible with the K-Cup format, thereby locking consumers in to using the K-Cup format instead of other types of Portion Packs.

172. K-Cups account for the bulk of Keurig's profit margin, and Keurig's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.

173. While Keurig sacrifices its brewer profits to drive K-Cup sales, it recoups and exceeds its losses on brewer sales by charging supra-competitive prices resulting in a 50% margin on K-Cups.

174. The chart below demonstrates how Keurig has dramatically increased its gross profits over the past five years mainly through Portion Pack sales, the majority of which are sales of K-Cups.



**Green Mountain Coffee Roasters Gross Profit by Segments**

Data Source: www.trefis.com

### 3. Keurig's Soon-To-Be Released 2.0 K-Cup Brewer With Lock-Out Technology Is Its Latest Tactic To Unlawfully Maintain Its Monopoly.

175.   In its latest effort to preserve and enhance its unlawful monopoly, Keurig now seeks to impose an exclusionary technological barrier to prevent consumers and commercial customers of K-Cup Brewers from using competitors' Compatible Cups and to coerce retailers into replacing low-priced Competitor Cups with K-Cups.

176.   Keurig Single-Serve Brewers (tying products) and Keurig K-Cups (tied products) are separate and distinct products.

39

177.    Keurig coerced customers of Keurig Single-Serve Brewers, into accepting Keurig K-Cups or at least into agreeing not to purchase Competitor Cups.

178.    Keurig has and had sufficient economic power in the Keurig Single-Serve Brewer Market to coerce Keurig Single-Serve Brewer purchasers' acceptance of Keurig K-Cups.

179.    Keurig's conduct has and had anticompetitive effects in the Compatible Cup Market.

a.      **Keurig Announces The Anticipated Launch Of The 2.0 K-Cup Brewer With Purported "Interactive Technology"**

180.    In November 2013, in the wake of increased competition from Competitor Cup manufacturers, Keurig announced that it would market its new 2.0 K-Cup Brewers with an anticipated release date in Fall 2014.

181.    Keurig has publicly stated that the 2.0 K-Cup Brewer will read Portion Packs with "interactive technology" which will instruct the brewers on the "recipes" to use, *i.e.,* set temperatures, brewing size, water pressure and other categories.[44]

182.    Keurig announced that this "interactive technology" is intended to "ensure the system delivers on the promise of excellent quality beverages, produced simply and consistently every brew."[45]

183.    Keurig further claims that this function will provide "game-changing performance."[46]

184.    When asked if the 2.0 K-Cup Brewers would have a more narrow footprint, a Keurig executive responded that "[t]his [2.0 K-Cup Brewer] will be the Keurig system and so it's

---

[44]  Brian Kelley, Keurig Q4 2013 Earnings Call Transcript, MORNINGSTAR (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

[45] *Id.*

[46] *Id.*; GMCR Innovation Pipeline for Web, GMCR (Sept. 10, 2013), http://investor.gmcr.com/investorday.cfm.

replacing the current Keurig system that's out there. And so this [2.0 K-Cup Brewer] is the Keurig system that all retailers would carry."[47] The so-called "breakthrough innovation" is in fact old.  For example, Bosch has for some time been selling its Tassimo brewer with "Intellibrew™" barcode technology that is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup."

185.    Keurig's claim that its imprinted ink ("Lock-Out Technology") benefits consumers by providing "game-changing" performance by recognizing the "recipes" on K-Cups is also belied by Keurig's own experience with its Vue Brewer, which also touted the same feature, but was largely rejected by consumers.

186.    As the Vue Vl200 product brochure states, "[e]ach commercial Vue pack contains an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your beverage." Just as Keurig now claims with respect to 2.0 K-Cup Brewers, this identification tag on Vue Portion Packs was touted by Keurig as promising the "perfect brew."

187.    Nonetheless, Vue's Lock-Out Technology was recognized as a failure. One analyst notes the "Vue platform was a poorly planned, researched and designed platform."[48] Even Mr. Kelley has acknowledged that the Vue Brewer Lock-Out Technology was poorly received by consumers, noting in a May 2013 call with investors that Vue Portion Packs offer only about 25% of the variety of K-Cups. Referring to the Vue Brewer's limited success, Mr. Kelley admitted that consumers "want the ability to have more choice. They want to have all of the brands available to them. And a lot of consumers who have [the] Keurig today, they don't

---

[47] Brian Kelley, Keurig Q1 2014 Earnings Conference Call, SEEKING ALPHA (Feb. 5, 2014), http://seekingalpha.com/article/1995291-q1-2014-green-mtn-coffee-roasters-earnings-conference-call-webcast.

[48] Seth Golden, *Keurig Roasters Investor Day Recap*, SEEKING ALPHA (Sept. 24, 2013), http://seekingalpha.com/article/1711532-green-mountain-roasters-investor-day-recap.

want to give up the K-Cup. They love the K-Cup . . . . And the most important thing they tell us about Vue is, give us more choice."[49]

188.   Keurig says it "learned" from its prior Vue introduction.  Indeed, it did learn that consumers wanted more choice across Compatible Cup brands.  But instead of responding to consumer demand, Keurig has decided it simply did not go far enough in order to force consumers and commercial customers to use K-Cups exclusively.  Thus, Keurig decided "to replace" all existing K-Cup Brewers that can be used with competitors' Compatible Cups to ensure that Keurig can fully realize its unlawful monopoly power by excluding competitors and maintaining supra-competitive prices.

### 4.    Contrary To Keurig's Initial Marketing Campaign, The 2.0 K-Cup Brewer May Not Include Interactive Technology

189.   Based upon expert analysis, it appears that there may not be interactive technology on the K-Cup lids at all.  *See* Exhibit C at pp. 12-16, Declaration of Larry F. Stewart dated June 16, 2014. The only information on the new K-Cup lids that the Lock-Out Technology is designed to identify is whether the K-Cup is a Keurig product. There is no imprint or ring containing "interactive technology" conveying "recipe" information.

190.   According to a forensic scientist who has analyzed Keurig's Single-Serve Brewer, its Vue Brewer, and 26 Portion Packs, Keurig's representation that its technology is "interactive"

---

[49] Keurig Coffee Roasters' CEO Discusses F2Q 2013 Results – Earnings Transcript, SEEKING ALPHA (May 8, 2013), http://seekingalpha.com/article/1416741-green-mountain-coffee-roasters-ceo-discusses-f2q-2013-results-earnings-call-transcript.

is a false. It is designed to encourage Plaintiffs and the Class to only purchase Keurig K-Cups.

According to this expert:

> The ink on the K-Cup lid is static and does not change when "read." … As such, it is my opinion that it is unlikely that the florescent ring on the 2.0 cups will be on the Keurig 2.0 K-Cup Brewer to change brew settings (e.g., temperature, size or pressure) based on the K-Cup inserted.[50]

191.   Simply put, the florescent ring on the 2.0 K-Cups was not intended to, nor does it actually enhance the beverage making process.  Instead, it is part of Keurig's attempt to prevent Competitor Cups from being used in the Keurig 2.0 K-Cup Brewer and to prevent competitors from being able to compete in the Compatible Cup Market once the Keurig 2.0 K-Cup Brewer comes to market.

192.   As Mr. Kelley admits, even with the 2.0 K-Cup Brewers, "a K-Cup will be a K-Cup." As Keurig has openly acknowledged, "very much of the [2.0 K-Cup Brewer] technology . . . is technology [it is] very familiar with."[51]

193.   Indeed, Keurig appears to be retreating from its claims that the 2.0 K-Cup Brewer uses interactive technology.  In two recent public conferences, the February 19, 2014 CAGNY Conference and the March 6, 2014 Annual Shareholder Meeting Presentation, Keurig omitted any reference to the technology after widely publicizing it in 2013.  Keurig's purported Lock-Out Technology has no real pro-consumer benefits and is merely a pretext for preventing competitors' products that would function with the 2.0 K-Cup Brewer.  This is precisely the type

---

[50] Exhibit C, p. 16.

[51] Keith Nunes, *GMCR playing hardball with Keurig 2.0*, FOOD BUSINESS NEWS (Nov. 21, 2013), http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing_hardball_with_Ke u.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1

of conduct the Federal Circuit ruled impermissible, *i.e.*, Keurig using its K-Cup Brewer patents to foreclose competition in the Compatible Cup Market.[52]

194.    The purported consumer benefit of a "perfect brew" delivered by interactive technology is a pretextual sham intended to conceal Keurig's true intention of excluding competition that threatens its ability to extract monopoly profits from the Compatible Cup Market

### 5.    The 2.0 K-Cup Brewer's Lock-Out Technology Has No Consumer Benefit And Is Merely A Pretext To Eliminate Competition In The Compatible Cup Market

195.    Rather than a true technological innovation, Keurig's announced new technology threatens to eliminate competitive access to 2.0 K-Cup Brewers as well as consumer and retail customer choice by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Compatible Cups. By tying 2.0 K-Cup purchases to 2.0 K-Cup Brewer purchases, Keurig intends to leverage its monopoly over the Single-Serve Brewer Market to exclude competition in the Compatible Cup Market.

196.    Even if Keurig were able to articulate a consumer benefit for the lock-out strategy, any such purported benefit would not, in any event, outweigh the anticompetitive effects. Consumers generally prefer having the ability to choose from a greater variety of Compatible Cups.

197.    Keurig deceptively claims that its 2.0 K-Cup Brewers and K-Cups together create one purportedly unified "system," but this is false. Indeed, Keurig has admitted that it could turn on or off this Lock-Out Technology, such that any purported claim that the 2.0 K-Cup Brewer and K-Cups constitute a unified system is pretextual.

---

[52] *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013) ("Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig cartridges by invoking patent law to enforce restrictions on the post-sale use of its patented product").

198.    As reported by USA Today, Mr. Kelley admitted as recently as October 2013 that it was "fair to say [Keurig] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not brewing them at all to brewing them a few times before they no longer work."[53]

199.    Keurig, therefore, cannot plausibly assert that this Lock-Out Technology, which could be programmed to be switched on or off (or to work only a limited number of times), is in any way integral to any purported consumer benefit or a necessary aspect of a unified "system." Notably, Keurig's counsel during a hearing before this Court, acknowledged that consumers could contact Keurig to learn how to turn off the Lock-Out Technology ("Opt-Out") if they so desired. By imposing this Opt-Out process in the hope that consumers will not take the time and effort to contact it, Keurig is harming competition. If the new lids do not contain "recipe" or "brewing" information logic suggests the lid imprint is exclusively designed to foreclose competition by locking-out Compatible Cups. Keurig should be Ordered to ship its 2.0 K-Cup Brewers with the Lock-Out Technology turned off. This would allow consumers the opportunity to contact Keurig to learn how to turn on the Lock-Out Technology if they so desire ("Opt-In"). Requiring the 2.0 K-Cup Brewers to be shipped by Keurig with the Lock-Out Technology turned off preserves and promotes competition and a level playing field in the marketplace. Keurig has not articulated any plausible justification for shipping its 2.0 K-Cup Brewers with the Lock-Out Technology. Nor has Keurig articulated any prejudice it will sustain if Ordered to ship its 2.0 K-Cup Brewers with the Lock-Out Technology turned off.

200.    Moreover, K-Cup Brewers and Compatible Cups have been sold as separate products for many years, and consumers have purchased and demanded to purchase Compatible

---

[53] Dan D'Ambrosio, *With K-Cup patent expired, others try to cash in*, USA TODAY (Oct. 29, 2013), http://www.usatoday.com/story/money/business/2013/10/29/life-after-the-k-cup-patent/3307187/.

Cups and their K-Cup Brewer separately, from different types of suppliers, from different stores or Internet retailers, in different locations, at different times, and under different promotions.

201.    Further, Keurig has successfully raised K-Cup prices without losing market share of its K-Cup Brewers, thereby demonstrating that the K-Cup Brewer and the K-Cup do not constitute a system.

202.    As industry news editor Keith Nunes explained, in fact "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share."[54]

203.    And, as one financial analyst recently observed, "the introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups . . . will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices. With the new machines, Keurig is effectively cutting off competition. I know, I know, a monopoly is good, but marketplace/consumer confusion isn't."[55]

204.    Accordingly, Mr. Kelley "expect[s] [the] unlicensed [competitor Compatible Cup] share of the system to . . . begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations of K-Cup Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer.[56]

205.    In addition, Keurig is seeking to convince competitors to become Keurig licensees. Mr. Kelley stated during the November 20, 2013 investor call that Keurig "will continue to convert current unlicensed players into licensed Keurig system partners," noting that

---

[54] Keith Nunes, *GMCR playing hardball with Keurig 2.0*, FOOD BUSINESS NEWS (Nov. 21, 2013), http://www.foodbusinessnews.net/articles/news_home/Business_News/2013/11/GMCR_playing_hardball_with_Ke u.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1.

[55] Herb Greenberg, *Cramer vs. Greenberg: The Battle of Keurig*, THE STREET (Nov. 21, 2013), http://www.thestreet.com/story/12119516/1/cramer-vs-greenberg-the-battle-of-green-mountain.html.

[56] Brian Kelley, Keurig Q4 2013 Earnings Call Transcript, MORNINGSTAR (Nov. 20, 2013), http://www.morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

"obviously [its] goal" is to "convert . . . as many [competitor Compatible Cup makers] as [it] can."[57]

### 6.  Keurig's Deceptive Marketing Of Its 2.0 K-Cup Brewer Is Already Eliminating Actual And Potential Competition In The Compatible Cup Market

206.  Keurig has been using the upcoming 2.0 K-Cup Brewer launch to coerce Compatible Cup makers to enter into exclusive licensing agreements with Keurig by enlisting the help of their retail customers. Specifically, Keurig has been contacting retailers to inform them that the Compatible Cups they have been purchasing from Keurig competitors will not work in 2.0 K-Cup Brewers.  Keurig then encourages those retailers to pressure their suppliers into becoming "authorized" or "licensed" partners.

207.  Keurig has engaged in a campaign designed to create "fear, uncertainty and doubt" in the marketplace by making false and disparaging statements about competitors' Compatible Cups. Keurig has suggested that competitors' Compatible Cups will "break" or "gum up" Keurig brewers.

208.  Retailers determine their coffee product offerings on an annual or semi-annual basis and, therefore, are not willing to take chances on carrying products that may not sell. Consequently, Keurig's anticompetitive business practices have allegedly caused retailers to express concern to at least one maker of non-licensed Competitor Cups. Specifically, retailers have allegedly told Rogers that they will delay purchasing decisions until they can confirm the Keurig 2.0 K-Cup Brewers will be compatible with Competitor Cups. A number of the following well-known and large retailers have expressed concern about purchasing Competitor Cups and have not recently purchased:  ADM Vending, A&P, Associated Services, Bed, Bath & Beyond,

---

[57] *Id.*

Big Y, Bozzutos, Coffee Pause, Costco, Delhaize, Diamond Rock Spring, Evans Coffee, Fairway, Garber Broz, Kroger, Ingles, Northeast Coffee Distributing Corp., One Cup Coffee, Price Rite, Quill, Shoprite, Staples, U.S. Coffee, and Wakefern.

209.    These retailers' hesitancy to stock Competitor Cups means that Plaintiffs and the Class are deprived of the choice of purchasing high-quality, less-expensive, and environmentally friendly Competitor Cups and forced to pay supra-competitive prices for K-Cups.

## THE ANTICOMPETITIVE EFFECTS OF KEURIG'S UNLAWFUL MONOPOLIZATION OF THE RELEVANT MARKETS

210.    Keurig's above-described anticompetitive acts have had serious anticompetitive effects on competition in the Single-Serve Brewer and Compatible Cup Markets overall and have resulted in Plaintiffs and the members of the Class paying supra-competitive prices for K-Cups.

211.    With little to no competition, depending on the line of business, Keurig and its owned or licensed coffee brands have been able to charge supra-competitive prices for K-Cups. As a result, consumers have been forced to pay at least 10% to 15% more for Keurig owned and licensed K-Cups than they would have in the absence of Keurig's unlawful anticompetitive conduct.

212.    At least twice in the past four years, Keurig has raised K-Cup prices approximately 12%.  While Keurig claimed such price increases were caused by rising input costs, industry sources state that commodity prices are insignificant to K-Cup pricing.  As one Compatible Cup manufacturer stated, "[o]nly a small amount of coffee is in each cup.  The price of the coffee is an insignificant factor in the cost of our production."[58]  A sales executive for a global private-label food manufacturer also explained that "single-cup products are relatively

---

[58] Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.pdf.

shielded from even a sudden upturn in raw coffee pricing."[59]   Similarly, a marketing director for a private-label coffee producer said "[c]ommodity costs are pretty irrelevant on the single-cup buyer side.  This is not a product type that goes up when coffee costs rise and down when they fall."[60]

213.   Keurig's conduct has also limited the number and variety of competitive Compatible Cup beverages available to consumers and commercial customers.  By foreclosing access to markets, inputs, suppliers, distributors, and brands, Keurig has limited the output, distribution, and availability of competitors' Compatible Cups.   As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by competitor Compatible Cup manufacturers.

214.   Restricted access to competitors' Compatible Cups has been especially harmful to consumers who prefer the taste, flavor, and/or quality of such cups over Keurig-owned or licensed K-Cups.

215.   Consumer choice has been further limited because competitors disadvantaged by Keurig's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Compatible Cups.

216.   Moreover, the introduction of Keurig's 2.0 K-Cup Brewer threatens to further harm competition and consumers in the future.  Keurig already controls approximately 86% of the Compatible Cup Market, but is threatening to substantially foreclose competitor Compatible Cup makers from the balance of the market by locking competitors' Compatible Cups out of the market for new brewers and the replacement of prior generations of K-Cup Brewers.

---

[59] *Id.*

[60] *Id.*

217.    In fact, as described above, Keurig's plans for the 2.0 K-Cup Brewer launch have already harmed competition.  For example, Keurig has used the anticipated 2.0 K-Cup Brewer launch to induce retailers and distributors to cease doing business with competitor Compatible Cup manufacturers and sellers.

218.    The unlawful elimination of Compatible Cup competition for Keurig's K-Cup Brewers will continue to harm consumers like Plaintiffs and members of the Class by maintaining or raising Compatible Cup prices at supra-competitive levels and by eliminating consumer choice.

## CLASS ALLEGATIONS

219.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages, and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons or entities that purchased at least one K-Cup directly from Keurig, or any other entity it owns or controls, at any time at least between September 7, 2010 and the present (the "Class Period").  Excluded from the Class are Defendants and its employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

220.    The Class is so numerous and geographically dispersed across the country such that joinder of all members is impracticable.  While the exact number of members of the Class is unknown to Plaintiffs at this time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that there are at least thousands of members in the Class and that their identities can be identified from records in Keurig's possession, custody or control.

221.    Class members are geographically dispersed throughout the U.S.

222.    Plaintiffs' claims are typical of the claims of the other members of the Class.