UNITED STATES U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X
:
IN RE: KEURIG GREEN MOUNTAIN              :     ECF Case
SINGLE SERVE COFFEE ANTITRUST             :
LITIGATION                                :     1:14-md-2542-VSB-HBP
                                          :
                                          :     MDL No. 2542
                                          :
                                          :
------------------------------------------------------ X
                                          :
JBR, Inc. (D/B/A ROGERS FAMILY            :
COMPANY),                                 :     1:14-cv-04242-VSB-HBP
                                          :
                 Plaintiff,               :
                                          :
         v.                               :
                                          :
KEURIG GREEN MOUNTAIN, INC.               :
(F/K/A GREEN MOUNTAIN COFFEE              :
ROASTERS, INC. AND AS SUCCESSOR           :
TO KEURIG, INC.),                         :
                                          :
                 Defendant.               :
                                          :
------------------------------------------------------ X


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF JBR, INC.'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND .............................................................................. 2

    A.      The Parties ................................................................................................. 2

    B.      Keurig Executes On Its Plan To Kill The Market For Non-Licensed
        Portion Packs By Replacing Its Brewer Lineup  With Next Generation
        Brewers That  Use A Technology To Lockout All Competition ........................... 3

        1.      Keurig Claims That Its "New" Technology Will Benefit The
            Customer With "Beverage Optimization" .................................. 4

        2.      Keurig's Claims Are False.  Technology's Sole Purpose Is To
            Lockout Competitors ......................................................... 5

        3.      Keurig's Purported Safety Concerns Are Merely Pretext ........................ 7

        4.      Keurig Admits That Software Can Be Reprogrammed To Allow
            Non-Licensed Portion Pack .................................................. 8

        5.      Keurig Relies On An Aggressive Pre-Launch Marketing Campaign
            To Cut Off Competitors From The Market Through Customer's
            Fear, Uncertainty And Doubt ................................................ 8

    C.      Keurig Has Made And Continues to Make False and Disparaging
        Allegations About Rogers and Rogers' Products .................................. 9

    D.      Other Anticompetitive Conduct ............................................................. 10

        1.      Keurig Aggressively Acquired Its Competitors ...................................... 11

        2.      Keurig Vigorously Pursued Objectively Baseless Patent Claims
            Against Its Competitors ...................................................... 11

        3.      Keurig Forces Its Distribution Partners To Enter Into Exclusive
            Agreements ..................................................................... 12

    E.      The Impact Of Keurig's Anticompetitive Conduct ................................ 12

III.    ARGUMENT ..................................................................................................... 16

    A.      Legal Standard ......................................................................................... 16

    B.      Rogers Is Likely To Succeed On The Merits Of Its Antitrust Claims ................. 17

        1.      The Relevant Markets ........................................................ 17

        2.      Keurig's Power Within The Relevant Markets ...................................... 19

        3.      Keurig Has Engaged In Anticompetitive Exclusionary Conduct ........... 20

    C.      Rogers Is Likely To Succeed On Its California Business And Professions
        Code Section § 17200 Claims .............................................................. 21

## TABLE OF CONTENTS
(continued)

1.  Keurig's Conduct Is "Unlawful" ................................................................ 22

2.  Keurig's Conduct Is "Unfair" ................................................................... 22

D.  Rogers Will Be Irreparably Harmed If A Preliminary Injunction Is Not
    Granted ................................................................................................. 23

E.  The Balance Of The Equities Strongly Favors Rogers ....................................... 24

F.  An Injunction Is In The Public Interest ........................................................ 25

IV.  CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acquaire v. Beverage, Inc.*
24 F.3d 401 (2d. Cir. 1994).............................................................................16

*Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers,*
*AFL-CIO v. United Technologies Corp., Pratt & Whitney,*
87 F. Supp. 2d 116 (D. Conn. 2000) *aff'd*, 230 F.3d 569 (2d Cir. 2000)...............24

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
472 U.S. 585 (1985).......................................................................................17

*Barquis v. Merchants Collection Ass'n of Oakland, Inc.,*
7 Cal. 3d 94 (1972) .......................................................................................22

*Beech-Nut Nutrition Corp. v. Gerber Prods. Co.,*
69 Fed. Appx. 350 (9th Cir. 2003).................................................................22

*Broadway Delivery Corp. v. United Parcel Service of America, Inc.,*
651 F.2d 122 (2d Cir. 1981)...........................................................................19

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962).......................................................................................18

*C.R. Bard, Inc. v. M3 Systems, Inc.,*
157 F.3d 1340 (Fed. Cir. 1998)......................................................................20

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
20 Cal. 4th 163 (1999) ............................................................................21, 22

*Choi v. United States*
944 F. Supp. 323 (S.D.N.Y. 1996) ................................................................23

*Doran v. Salem Inn, Inc.,*
422 U.S. 922 (1975).......................................................................................23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
504 U.S. 451 (1992)..................................................................................18, 20

*Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.,*
379 F. Supp (D. Haw. 1974)..........................................................................25

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.,*
386 F.3d 485 (2d Cir. 2004)...........................................................................17

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*,
    476 F.2d 687 (2d Cir. 1973)......................................................................25

*Healthcare Ins. Co. v. Advance–PCS*,
    316 F.3d 737 (8th Cir. 2002) ..................................................................24

*Heritage of Pride, Inc. v. Matinee NYC, Inc.*,
    No. 14-civ-4165, 2014 U.S. Dist. LEXIS 86495 (S.D.N.Y. Jun. 20, 2014)...........................17

*Keurig, Inc. v. JBR, Inc.*,
    No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845 (D. Mass. May 24, 2013) ..................1, 11

*Keurig, Inc. v. Sturm Foods, Inc.*,
    732 F.3d 1370 (Fed. Cir. 2013)........................................................1, 11

*National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab.*,
    850 F.2d 904 (2d Cir. 1988)..................................................................21

*Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*,
    614 F.2d 832 (2d Cir. 1980)..................................................................17

*North American Soccer League v. National Football League*,
    670 F.2d 1249 (2d Cir. 1982)................................................................19

*Pastoria v. Nationwide Ins.*,
    112 Cal. App. 4th 1490 (2003) .............................................................21

*Regents of University of California v. American Broadcasting Cos.*,
    747 F.2d 511 (9th Cir. 1984) ................................................................25

*Standard Oil Co. v. United States*,
    221 U.S. 1 (1911) (90%)......................................................................20

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ................................................................24

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) ..............................................................22

*Telecom Plus of Downstate New York, Inc. v. Local Union No. 3*,
    719 F.2d 613 (1983)............................................................................17

*Tom Doherty Assocs., Inc. v. Saban, Entm't, Inc.*,
    60 F.3d 27 (2d Cir. 1995).....................................................................24

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*U.S. v. Aluminum Co. of America,*
   148 F.2d 416 (2d Cir. 1945)........................................................................................20

*U.S. v. E. I. du Pont de Nemours & Co.,*
   351 U.S. 377 (1956)............................................................................................17, 19

*United States v. Grinnell Corp.,*
   384 U.S. 563 (1966)...................................................................................................20

*Volvo North America Corp. v. Men's International Professional Tennis Council,*
   857 F.2d 55 (2d. Cir. 1988).......................................................................................17

*Xerox Corp. v. MediaSciences Int'l, Inc.,*
   511 F. Supp. 2d 372 (S.D.N.Y. 2007)................................................................19, 20

STATUTES

Cal. Bus. & Prof. Code
   § 17200.........................................................................................................21, 22
   § 17203.........................................................................................................22, 17

OTHER AUTHORITIES

U.S. Department of Justice & FTC, Horizontal Merger Guidelines
   § 5.2 (2010) at http://www.justice.gov/atr/public/guidelines/hmg-2010.html#5c..................20

Plaintiff JBR, Inc., d/b/a Rogers Family Company ("Rogers"), submits this Memorandum of Law in Support of its Motion for a Preliminary Injunction.

## I.     <u>INTRODUCTION</u>

Defendant Green Mountain is currently engaged in a scheme to continue its monopolization of the single-serve brewer market. Once its patents expired in September 2012, Keurig began a desperate attempt to keep out competition. Its patent litigation strategy failed miserably, losing to both TreeHouse and Rogers in separate actions, in which both the Federal Circuit and a District Court in Massachusetts concluded that Keurig wrongfully attempted to extend its monopoly. *Keurig, Inc. v. Sturm Foods, Inc.,* 732 F.3d 1370, 1374 (Fed. Cir. 2013) (criticizing Keurig for "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers"); *Keurig, Inc. v. JBR, Inc.,* No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D. Mass. May 24, 2013) (finding that Keurig attempted to make an "end-run" around the proper use of the patent laws). Having failed with its legal challenge to lock out the competition, Keurig's latest scheme is to use technology to accomplish its objectives. Keurig executed a plan to lockout its competitors by placing a proprietary fluorescent ink system on its labels and adding a sensor to its brewers that could detect the ink. The concept was simple: if the ink was not there, the brewer would not operate. This lock-out system is euphemistically called "Consumer Benefit Technology" or CBT.

The following facts are undisputed having been taken from the depositions and documents produced by Keurig. Beginning in 2012, Keurig launched a campaign to destroy the market for non-licensed portion packs by (1) claiming that the non-licensed portion packs caused Keurig brewers to fail and/or were the cause of any poor brewer performance. These statements were made by Keurig representatives over the phone, on social media and on the Keurig website. (2) Keurig incorporated technology to lock-out competing portion packs and – once developed – unleashed a marketing blitz designed to freeze-out the non-licensed portion pack market. Keurig representatives met with all of its customers in its department store channel, mass retail channel and club channel, touting the benefits of the new 2.0 brewer system, emphasizing that non-

licensed portion packs would not work in the new system, and discussing Keurig's long-term plans to continue to dominate the U.S. brewer market.  The intended effect was to convince the channel members, who consisted of every major seller of brewers and portion packs in the United States, to stop doing business with Rogers and the other non-licensed portion pack manufacturers.  Keurig also told its customers that all non-CBT machines would be phased out, with the hope that retailers and distributors would stop ordering non-licensed portion packs and eventually that the entire non-licensed portion pack market would collapse.  Recognizing that it was eliminating consumer choice, Keurig increased its monopoly by signing restrictive license agreements with more of its competitors, now totaling approximately 40 licensees.

Keurig's plan has been a spectacular success:  Rogers' has lost significant business opportunities in the retail grocery segment of the market, and unless assisted by this court, Rogers has little chance of surviving the Keurig campaign.  The new Keurig CBT brewers are set to hit the market at the end of September.  Unless enjoined by this court Rogers will be irreparably injured and faces the loss of its business.  The irreparable harm to Rogers is counterbalanced by the trivial cost to Keurig to eliminate the lock-out feature, less than one hour of programming time and changing a few lines of code.  As the following will show, this Court should enjoin Keurig from (1) promoting, marketing or making available for sale any Keurig 2.0 brewer that includes a lock-out of non-licensed portion packs, and 2) making false or misleading statements about Rogers' products to its customers or to consumers.

## II.    FACTUAL BACKGROUND

### A.    The Parties

Keurig has held monopoly power in the United States market for single-serve brewers ("Single-Serve Brewer"), as well as the market for single-serve "portion packs" of coffee ("Portion Pack"), since the 1998 introduction of Single-Serve Brewers.  Declaration of Gordon Rausser ("Rausser Decl."), ¶¶ 15, 61; Declaration of Jon Rogers ("J. Rogers."), ¶ 12.  Keurig had net sales of approximately $4.3 billion in 2013.  *See* Declaration of Daniel Johnson, Jr. ("Johnson Decl."), Ex. 1, K-10 at 38.  K-Cup branded Portion Pack sales alone accounted for

$2.7 billion in fiscal year 2012, and grew to approximately $3.187 billion in fiscal year 2013.  *Id.*

Rogers Family Company located in Lincoln, California has been in the coffee business since 1979.  J. Rogers Decl., ¶ 2.  Rogers sells traditional packaged whole beans and ground coffee and single-serve Portion Packs, called the "OneCup."  *Id.* at ¶ 7, 8.  Rogers introduced its OneCup in October 2011.  *Id.* at ¶ 12.  Its initial version of OneCup reduced the environmental footprint of consumers with a product offering 30 to 35 percent less packaging than other Portion Packs.  *Id.* at ¶ 3.  In October 2013, Rogers introduced the world's first 97 percent biodegradable Portion Pack.  *Id.* at ¶ 10.  Rogers' OneCups have an average rating of 4.5 out of 5 stars on Amazon.com and its brand is regularly recognized as the "#1 Best Seller" in Beverages on Amazon.com.  *Id.* at ¶ 18; Declaration of Warren Yamauchi ("Yamauchi Decl."), ¶ 13.  As compared to Keurig's sales over $3 billion, Rogers' OneCup sales accounted for ▮▮▮▮▮▮▮▮ in fiscal year ending March 31, 2013 and ▮▮▮▮▮▮▮ in fiscal year ending March 31, 2014.  Declaration of Michael Sarina ("Sarina Decl."), ¶ 3.  Rogers has made significant investments in its OneCup business, including ▮▮▮▮▮▮▮ in machinery for OneCup production equipment, most of which has been financed over ▮▮▮▮▮▮▮. As of July 31, 2014, the remaining debt obligation for the OneCup packaging equipment was ▮▮▮▮▮▮▮.  *Id.* at ¶ 4.

### B.   Keurig Executes On Its Plan To Kill The Market For Non-Licensed Portion Packs By Replacing Its Brewer Lineup  With Next Generation Brewers That Use A Technology To Lockout All Competition

In November 2013, Keurig announced its strategy to "re-close the Keurig system, making Keurig 2.0, the next generation brewer, incompatible with unlicensed brands."  Johnson Decl., Ex. 2.  Specifically, the Keurig 2.0's "Brewing Technology…must read the lid and recognize the…Keurig pack that has been inserted" meaning that "the system will not brew unlicensed packs." Johnson Decl., Ex. 3 at 283; *see* Johnson Decl., Ex. 4 at 36  (explaining that consumers will see an "Oops!" screen if packs do not have "interactive technology").  This lock-out feature has been recognized by the industry as having the sole purpose of closing out the Keurig system to non-licensed brands.  *See* Johnson Decl., Ex. 5 ("So to ensure consumers stick with its own K-Cups moving forward, [Keurig] is implementing the physical equivalent of a [Digital Rights

Management] system with Keurig 2.0."); Ex. 2 ("If successful, we believe Green Mountain will significantly reduce competition."); Ex. 6 ("Keurig is following a path popular with technology companies: using software as a way to lock customers into a particular set of high-margin products").  Based on Keurig's own documents and witness testimony, the industry's recognition that the lock-out feature was anticompetitive is well warranted.

1.   **Keurig Claims That Its "New" Technology Will Benefit The Customer With "Beverage Optimization"**

Keurig claims that the Keurig 2.0 brewer "███████████████████████ ███████████████████████████████████████████ and promises ████████████████████████████████████████████ ███████████████████ Johnson Decl., Ex. 4 at 20, 34, 37; *see* Ex. 3 at 277 ████████████ ██████████████████████████████████████████████████ ████████████████████████████████████. It further explains that the ███████████ ████████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████ Johnson Decl., Ex. 3 at 275.  Keurig tried this concept just two years ago in its Vue brewer which was considered overwhelmingly unsuccessful by the industry.  *See* J. Rogers Decl., ¶ 33; Johnson Decl. Ex. 7 (CEO Kelly: "much of the technology we're using is technology we're very, very familiar with"); Declaration of Andrew Gross ("Gross Decl."), ¶ 8.

The recognized true appeal of the Keurig 2.0 is its additional ability to brew a carafe – a benefit that is completely unrelated to the CBT sensor.  In its Keurig 2.0 Master Messaging Guide, Keurig explains: ██████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████ Johnson Decl., Ex. 8 at 260; *see* Johnson Decl., Ex. 9 at

79:17-18 (explaining that ██████████████████████████████).  Tellingly, in

spite of these claimed benefits, the Keurig 2.0 brewers with lock-out technology are ██████

██████████████████████████████████████████████████ in

which Keurig already has protected its monopoly by requiring all of its office supply distributors

to enter into exclusive distributor agreements that prohibit the distributors from offering any

competing portion pack products.  *See* Johnson Decl., Ex. 8 at 240 ████████████████

██████████████████████).  Johnson Decl., Ex. 9 at 322:15-323:5 (explaining that

██████████████████████████████████).

        2.      **Keurig's Claims Are False.  Technology's Sole Purpose Is To Lockout Competitors**

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████





DB2/ 25241722.7



[REDACTED]

**C.** **Keurig Has Made And Continues to Make False and Disparaging Allegations About Rogers and Rogers' Products**

Since the introduction of Rogers' OneCup product, Keurig has attempted to dissuade consumers from using Rogers' coffee by falsely claiming that Rogers' OneCup products may cause the Keurig brewer to fail.  J. Rogers Decl., ¶ 29; Yamauchi Decl., ¶ 4-9. Keurig also claims

that using the Rogers' OneCup products may void the warranty.  J. Rogers Decl., ¶ 29; Yamauchi Decl., ¶¶ 4, 8.  These statements are blatantly false and intended to discourage consumers and retailers from buying Rogers' products.  J. Rogers., ¶ 30; Yamauchi Decl., ¶ 9-13.

Rogers has received numerous reports from consumers complaining that they had been advised by Keurig customer service that any problem with the performance of the brewers was attributed to their use of Rogers' OneCups.  Yamauchi Decl., ¶¶ 4-8; J. Rogers Decl., ¶ 29.  However, Keurig has no empirical basis for telling Rogers' customers that Rogers' portion packs are responsible for problems with the Keurig brewers, or its outright refusals to honor its warranties, having publically emphasized that "[w]e do not make or test the other brands."  Johnson Decl. Ex. 15; J. Rogers Decl., Ex. 2, *see* Yamauchi Decl. ¶ 13.  Similar unverified claims regarding Rogers' products were again revealed during Keurig's 30(b)(6) deposition.  Despite admitting that Keurig was not familiar with Rogers' OneCups, the witness continued to speculate that Rogers' OneCup product would not work in the Keurig 2.0, even though Keurig had never attempted to brew a Rogers' OneCup product in any brewer, let alone conduct any systematic testing.  Johnson Decl., Ex. 9, at 218:14-219:3.

If Keurig had tested Rogers' OneCup (as it easily could), it would have faced an inconvenient reality: OneCup works excellently in Keurig brewers and there is no evidence that it has ever damaged a K-Cup Brewer.  J. Rogers Decl., ¶ 30; Yamauchi Decl., ¶ 13.  To the contrary, OneCups regularly appear among Amazon's top 10 best selling grocery and gourmet products and over 89% of customer reviews give San Francisco Bay OneCup four or five stars.  J. Rogers Decl., ¶ 18; Yamauchi Decl., ¶ 13.

### D.     Other Anticompetitive Conduct

Keurig's dissemination of false, disparaging statements about Rogers' products to consumers and premature announcement of a new product specifically designed to lock-out Keurig's competitors are just two examples of the anticompetitive conduct that Keurig has historically and consistently engaged in.

1.     **Keurig Aggressively Acquired Its Competitors**

In 2006, Green Mountain Coffee Roasters, Inc. purchased its licensor, Keurig, Inc., for slightly over $100 million.  Johnson Decl., Ex. 20, 2006 SEC 10-K, F-15-16.  Since then, it has implemented a razors and razor blades type strategy of distributing the K-Cup Brewers at breakeven or lost profits, while selling its portion packs at a huge profit.  Johnson Decl., Ex. 1, 2013 K-10, 2; Ex. 21; Rausser Decl., ¶ 59.  To protect its monopoly, Keurig began acquiring the competition – the other entities that Keurig, Inc. had previously granted a license to manufacture and sell K-Cups.  Rausser Decl., ¶ 64; Johnson Decl., Ex. 22.  As a result, Keurig now controls the manufacturing of all licensed Compatible Portion Packs.  Rausser Decl., ¶ 65 n.87.  In the next phase of this strategy, Keurig began licensing all of the large remaining brands.  Rausser Decl., ¶ 65-67.

2.     **Keurig Vigorously Pursued Objectively Baseless Patent Claims Against Its Competitors**

Keurig employed a "scorched earth" litigation strategy for eliminating competition by initiating and vigorously litigating meritless patent infringement lawsuits against both TreeHouse and Rogers.  J. Rogers Decl., ¶ 20.  The respective Federal District Courts and the Court of Appeals for the Federal Circuit criticized Keurig for "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers" and for making an "end-run" around the proper use of the patent laws.  *Keurig, Inc. v. Sturm Foods, Inc.,* 732 F.3d 1370, 1374 (Fed. Cir. 2013); *Keurig, Inc. v. JBR, Inc.,* No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D. Mass. May 24, 2013).

The lawsuit created confusion in the market as Keurig assured consumers that it would win and would secure an injunction to prohibit the supply of non-licensed Portion Packs.  J. Rogers Decl., ¶ 21.  Rogers devoted significant resources to the defense of the baseless claim, including approximately $2 million in legal costs and fees.  Sarina Decl., ¶ 5. Rogers has no way of knowing how many customers and potential customers it lost because of Keurig's tactics.  J. Rogers Decl., ¶ 21.

3.     **Keurig Forces Its Distribution Partners To Enter Into Exclusive Agreements**

Keurig utilizes a force of Keurig Authorized Distributors ("KADs") to distribute its K-Cup Brewers and K-Cup Portion Packs to AFH locations, such as hotels, offices, and hospitals. Rausser Decl., ¶ 74; J. Rogers, ¶¶ 13.  Keurig requires these KADs to enter into multi-year Agreements, which include "loyalty" provisions that prohibit them from promoting, marketing, selling or otherwise making available any non-licensed Single-Serve Brewers or Portion Packs. Declaration of Jennifer Fox ("Fox Decl."), ¶ 5; J. Rogers Decl., Ex. 1, p. 4.

Keurig monitors KADs' adherence to the loyalty provision and regularly threatens to cancel the distributor agreement for non-compliance.  *Id.* at ¶ 15.  In March 2012, Keurig sent a letter to its KADs warning that "Any portion pack that you promote, market, sell, or otherwise make available that is not made by a Licensed Roaster subjects you to termination of your Keurig Agreement."  *Id.*, Ex. 2.  These threats and loyalty provisions have effectively blocked out all non-licensed portion pack manufacturers from the AFH market.  *Id.*, ¶¶ 13-16*;* Rausser Decl., ¶¶ 74-79; Fox Decl., ¶ 5-7, 9; Hybsch Decl., ¶¶ 4-9 (explaining that despite offering a sought-after product, Rogers has almost no business in the AFH market segment and has been told on numerous occasions that KADs will not carry Rogers' products out of fear of Keurig's retribution).

E.     **The Impact Of Keurig's Anticompetitive Conduct**

Keurig's anticompetitive conduct coupled with its monopoly power in both the AFH and AH markets has made it nearly impossible for Rogers to compete in the Compatible Portion Packs market.  J. Rogers Decl., ¶¶ 16-17.  Specifically, Keurig's loyalty provision within its exclusive agreements with AFH distributors coupled with its threats of enforcement and customers' fears of retribution from Keurig have almost entirely shut Rogers out of the AFH segment.  J. Rogers Decl., ¶¶13-16; Hybsch Decl., ¶ 4; Rausser Decl., ¶ 74-79.  Rogers' current sales of OneCup products to customers in the AFH segment amount to less than ██ of Rogers'

OneCup business.  Sarina Decl., ¶ 5.  Thus, Rogers relies on the AH segment for nearly all of its business opportunities.

Rogers has lost AH customers for both private label and branded Rogers portion pack products, and is at imminent risk of losing even more, due to Keurig's marketing efforts geared at disparaging non-licensed portion pack products and promoting the Keurig 2.0's lock-out feature.  J. Rogers Decl., ¶¶ 32-44; Hybsch Decl., ¶ 10-12; Rausser Decl., ¶ 91-105.  The impact of Keurig's conduct is evident by Rogers' loss of business despite Rogers' low prices and highly regarded product.  ███████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████  Johnson Decl., Ex. 4 at 93.  This business stands to erode if Keurig's 2.0 lock-out strategy is allowed to continue unchecked.

At a meeting between Rogers and Costco on January 31, 2014, Rogers was told that despite having lower prices than all other suppliers' portion packs – including Costco's own private label – Costco would not be widening distribution for Rogers, or any other non-licensed portion pack supplier, until the Keurig 2.0 issue was resolved.  During this same meeting, Costco informed Rogers that it would be requiring Rogers to implement a design change to its Costco packaging to inform customers that Rogers' products were not compatible with the Keurig 2.0 brewer.  J. Rogers Decl., ¶ 38.  This packaging design will undoubtedly act as a scarlet letter branded on Rogers' products that leaves consumers with the impression that Rogers' product is somehow inferior and deters them from purchasing its products, even if those consumers do not own a 2.0 brewer.  J. Rogers Decl., Ex. 6; *see* Rausser Decl., ¶¶ 30, 99; *Cf.* Johnson Decl., Ex. 4 at 79 (showing ██████████████████████████████████████

███████).

Other retailers have recently declined or delayed purchasing decisions for Rogers' branded OneCups based on the impending introduction of the Keurig 2.0 brewer.  The Army & Air Force Exchange Service (AAFES) informed Rogers on March 24, 2014 that it would no longer purchase Rogers' OneCups because it would only purchase portion packs compatible with

Keurig 2.0 brewers.  J. Rogers Decl., ¶ 39; Ex. 7.  Similarly, on July 17, 2014, The Bon-Ton Stores informed a Rogers' distributor that it was not interested in Rogers' OneCups because they will not work with the new Keurig 2.0 brewer.  *Id.* at ¶ 40; Ex. 8.  And Meijer has continually delayed its decision to purchase Rogers' OneCups due to ongoing discussions between Meijer and Keurig relating to the impending introduction of the Keurig 2.0 brewer.  *Id.* at ¶ 41.

Rogers has also lost significant private label business due to the Keurig 2.0.  On April 8, 2014, after spending eighteen months developing a private label OneCup product for grocery store giant Kroger, Rogers was informed that Kroger would only be using Rogers for its private label products until January or February 2015 rather than the customary multi-year arrangement. *Id.* at ¶ 43.  Shortly after receiving news regarding Kroger, Rogers' second largest retail customer - BJ's Wholesale – announced that it would be working with Keurig for its private label brand after Keurig and BJ's executives had a high level discussion relating to the 2.0 brewer and its incompatibility with non-licensed portion packs.  *Id.* at ¶ 44.  And on June 5, 2014, Wakefern – the largest retailer-owned grocery cooperative in the United States, which owns the ShopRite and Price Rite grocery chains – informed Rogers that it wanted to table discussions regarding Rogers' final stages of development of its organic private label portion pack product.  Hybsch Decl., ¶ 12.  Other retailers, including Big Y and Shoprite have all delayed their private label purchase decisions as a result of Keurig's statements regarding the Keurig 2.0 brewer's incompatibility with non-licensed portion packs.  Hybsch Decl., ¶ 11.  Since Keurig controls over 89% of the Single-Serve Brewer market and has committed to producing and selling only Keurig 2.0 brewers, Rogers' foreclosure from the Keurig 2.0 brewer market would equate to Rogers' foreclosure from the entire Compatible Portion Pack market.  J. Rogers Decl., ¶ 46; Rausser Decl., ¶ 4.

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████   Johnson Decl., Ex. 18 at 71; Ex.16 at 56.   ████████

███████████████████████████████████████████████

██████████ Johnson Decl., Ex. 18 at 74; Ex. 16 at 59. ████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████ Johnson Decl., Ex. 18 at 72; Ex. 16 at 57.

Rogers' injury will continue in the same, ever worsening, vein.  Rogers has already suffered a significant loss of business in the grocery retailer sector and expects that the introduction of the Keurig brewer into the market next month and the imminent replacement of all Keurig 1.0 brewers within a year will soon foreclose Rogers from the entire Compatible Portion Pack market.  Rausser Decl., ¶¶  98-107; Johnson Decl., Ex. 12 at 108:21-23; 173:9-24

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████. And the loss of sales, goodwill and business opportunities threatens to devastate Rogers' ability to stay in business during the pendency of this case.  Sarina Decl., ¶ 8; Rausser Decl., ¶  106-114.  Rogers' relative lack of resources for marketing campaigns, small size and recent entry into the market make it particularly vulnerable to Keurig's aggressive campaigns against non-licensed portion packs.  J. Rogers Decl., ¶ 30. Rogers has invested ████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Sarina Decl., ¶ 4.  Keurig has readily admitted that the

███████████████████████████████████████████████████████████████████

███████████████████ Johnson Decl., Ex. 4 at 123, 132 ████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████;

Johnson Decl., Ex. 17 ("[O]ur core single serve business, the primary driver of our profitability grew 9%....This was offset by a continued decline in our traditional coffee business, which includes our bagged and fractional pack business.").  Currently, over ██████ of Rogers' sales are

related to OneCup.  Sarina Decl., ¶ 3.  ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████   Sarina Decl, ¶ 4, 8; Rausser Decl., ¶ 106-108.

Nor is this injury unique to Rogers.  Independent media sources have widely reported that retailers are shunning non-licensed portion packs, especially for their private label brands.  *See* Johnson Decl. Ex. 23 ("Jagdale [analyst for KeyBank] sees signs that the strategy is already working. He notes that several retailers…that had been unlicensed have recently entered into licensing arrangements with Keurig.  He suggests that retailers prefer sharing coffee packet revenue with Keurig to being locked out of the business entirely.")  Indeed, Keurig itself has bragged about the rapid conversion of non-licensed portion packs to licensed partners.  Johnson Decl., Ex. 24 ("We're confident we'll get a significant piece of it. We'll make sure that we're confident. We're not only getting them already but we'll continue to get more that are converting in."); *see also* Johnson Decl., Ex. 25 (press releases announcing "Keurig Brewed" partnerships).

Keurig's actions harm consumers by maintaining the artificially high price of Compatible Portion Packs and by eliminating consumer choice.  J. Rogers Decl., ¶ 47; Rausser Decl., ¶ 4, 20, 24.  On average, Keurig's branded and licensed Portion Packs are 15-25% more expensive than non-licensed Portion Packs.  J. Rogers Decl., ¶ 47; Fox Decl., ¶ 8.  Losing Rogers would mean an increase in price for consumers and a decrease in choice – including more environmentally and socially responsible choices – for consumers.  J. Rogers Decl., ¶ 7, 10, 47 (Rogers' OneCup product has been 97% biodegradable since October 2013); Rausser Decl., ¶ 4, 20, 24; Johnson Decl., Ex. 8 at 246 ("[Keurig] is committed to ensuring that 100 percent of our K-Cup packs are recyclable by 2020.").

## III.   **ARGUMENT**

### A.   **Legal Standard**

Preliminary injunctive relief is available and appropriate in a wide variety of substantive causes of action, including antitrust and unfair competition claims.  *See Acquaire v. Beverage,*

*Inc.* 24 F.3d 401 (2d. Cir. 1994) (affirming district court's issuance of a preliminary injunction based on Sherman Act claims); *Telecom Plus of Downstate New York, Inc. v. Local Union No. 3*, 719 F.2d 613 (1983) (finding error where district court failed to consider motion for preliminary injunction based on Sherman Act claims).   Moreover, injunctions are explicitly available under California's Unfair Competition Law, Bus. & Prof. Cod § 17200, et seq. ("UCL"), which states that "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."  Bus. & Prof. Cod § 17203.

In this Circuit, courts grant preliminary injunction on a showing of a plaintiff's likelihood of success on the merits where (1) "the plaintiff is likely to suffer irreparable injury in the absence of an injunction"; (2) "remedies at law, such as monetary damages, are inadequate to compensate for that injury"; (3) the balance of hardships tips in the plaintiff's favor; and (4) "the 'public interest would not be disserved' by the issuance of a preliminary injunction."  *Heritage of Pride, Inc. v. Matinee NYC, Inc.*, No. 14-civ-4165, 2014 U.S. Dist. LEXIS 86495, *15-16 (S.D.N.Y. Jun. 20, 2014) (quoting *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010)).  Rogers meets this standard.

**B.**      **Rogers Is Likely To Succeed On The Merits Of Its Antitrust Claims**

To prevail on a monopolization claim, Rogers must show that the Defendant (i) possesses monopoly power in a relevant market and (ii) acquired, maintained, or used that power by anticompetitive or exclusions means or for anticompetitive or exclusionary purposes.  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 595 (1985); *Volvo North America Corp. v. Men's International Professional Tennis Council,* 857 F.2d 55, 73 (2d. Cir. 1988).  Rogers is likely to prevail as to each of these elements.

### 1.      The Relevant Markets

It is well-settled that a relevant market is defined for antitrust purposes as all products "reasonably interchangeable by consumers for the same purposes."  *U.S. v. E. I. du Pont de Nemours & Co*., 351 U.S. 377 (1956); *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832,

840 (2d Cir. 1980).  The Court must also analyze, "well-defined submarkets… which, in themselves constitute product markets for antitrust purposes."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Here, there are three relevant markets:  The Single-Serve Brewer market, the Portion Packs market and the Compatible Portion Packs submarket.  Single-Serve Brewers are an entirely different market than traditional drip coffee brewers because of the unique convenience and efficiency offered by Single-Serve Brewers.  J. Rogers Decl., ¶ 6; Rausser Decl. ¶ 45-47.  Consumers are willing to purchase single-serve brewers even though traditional drip coffee makers are typically less expensive.  J. Rogers Decl., ¶ 4; Johnson Decl., Ex. 21 ("In pod form, coffee can cost roughly the equivalent of $50 a pound.").

Single-Serve Brewers are useless without packaged coffee to be used in those brewers – which almost always consists of pre-packaged, disposable Portion Packs to take advantage of the convenience of Single-Serve Brewers.  Rausser Decl., ¶ 40.  The Portion Packs of coffee used in Single-Serve Brewers thus constitute a distinct market, separate from the market for traditional packaged ground coffee.  Rausser Decl. ¶ 49.  Within the Portion Packs market, however, there is also a submarket.  Rausser Decl., ¶ 50.   In defining a "submarket," courts may consider "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.  *Brown Shoe,* 370 U.S. at 325.  The Compatible Portion Packs Market – i.e., the Portion Packs that are compatible with K-Cup Brewers – is the most appropriate relevant market and is a prime example of a "locked-in" submarket described in *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451 (1992).  In *Kodak,* the Supreme Court recognized that consumers were "locked in" to service and replacement parts for Kodak-brand copiers because there was no alternative source of Kodak parts.  *Id.* at 476-77.  The Court recognized that because of their capital investment in Kodak equipment, consumers "will tolerate some level of service-price increases before changing equipment brands."  *Id.* at 497.  Courts have consistently recognized submarkets when defining a

relevant market.  *See North American Soccer League v. National Football League,* 670 F.2d 1249, 1260-61 (2d Cir. 1982) ("Indeed, the existence of such a submarket… [is] implicitly recognized by the defendants' proven intent in adopting the cross-ownership ban"); *Xerox Corp. v. MediaSciences Int'l, Inc.,* 511 F. Supp. 2d 372, 388-89 (S.D.N.Y. 2007) (finding a replacement solid ink market, because an owner of a Xerox phase change color printer was the primary customer of replacement solid ink sticks and would find that no other consumables are acceptable substitutes).

Applying these standards here, a submarket exists within the Portion Packs market by virtue of customers who have purchased a K-Cup Brewer needing to purchase Compatible Portion Packs that are specifically designed to work in the K-Cup Brewers or other brewers that utilize the same design of Portion Pack.  Rausser Decl., ¶ 50.  A consumer who owns a K-Cup Brewer will only consider purchasing Compatible Portion Packs, as Compatible Portion Packs are the only reasonably interchangeable products for use in the K-Cup Brewers.  For example, neither the flat pod-style portion pack that was designed for use in the Senseo brewer nor the T-Discs designed for use in the Tassimo brewer will work in a K-Cup Brewer.  *See* Johnson Decl., Ex. 26.  Thus, consumers that have K-Cup Brewers would never consider purchasing the flat pod-style portion packs or T-Discs as a substitute to the Compatible Portion Pack.

### 2.    **Keurig's Power Within The Relevant Markets**

Monopoly power is defined as "the power to control prices or *exclude competition*" in the relevant market.  *E. I. du Pont de Nemours & Co.*, 351 U.S. at 391.  A plaintiff may rely on market share to support an inference of monopoly power.  *See Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 129 (2d Cir. 1981) ("the trial judge may properly attach significance to market share evidence… the higher a market share, the stronger is the inference of monopoly power… a share above 70% is usually strong evidence of monopoly power.").  Here, Keurig clearly has a dominant share of the relevant markets.  Outside analysts have found that Keurig has an 89% share of the Single-Serve Brewer market, and Keurig itself acknowledges that it currently controls at least 86% of the Compatible Portion Pack market.

Rausser Decl., ¶ 24, 55.[2]  In total, for Keurig's fiscal year ending October 31, 2013, Keurig estimated that it held 92% market share for Compatible Portion Packs.  Johnson Decl., Ex. 7.  As confirmed by these percentages and the HHI scores in these markets, it is clear that Keurig maintains dominant monopoly power in both of these markets.  *See U.S. v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir. 1945) (90% share 'is enough to constitute a monopoly"); *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("The existence of such [monopoly] power ordinarily may be inferred from the predominant share [87%] of the market."); *Standard Oil Co. v. United States*, 221 U.S. 1, 33, 72-74 (1911) (90%); *Eastman Kodak Co. v. Image Technical Servs., Inc*., 504 U.S. 451, 481 (1992) (80%).

3.    **Keurig Has Engaged In Anticompetitive Exclusionary Conduct**

Monopolistic conduct is defined as acts that are (1) reasonably capable of creating, enlarging or prolonging monopoly power by impairing the opportunities of rivals; and (2) either (a) do not benefit consumers at all, or (b) are unnecessary for the particular consumer benefits claimed for them, or (c) produce harms disproportionate to any resulting benefits.  Areeda and Hovenkamp, § 6.04.  Keurig's acts constitute monopolistic and exclusionary conduct.

a.    **Keurig's Lock-Out Technology In Its Keurig 2.0 Is Anticompetitive And Exclusionary**

Product design changes that are predatory and have no procompetitive justification are anticompetitive.  *See Xerox Corp*, 511 F. Supp. 2d at 388-89 (denying a motion to dismiss because redesigning printers and patenting the compatible "replacement solid ink sticks" could be anticompetitive where the purpose is to "exclude plaintiff from the market and foreclose all other competition, and not to improve the product"); *C.R. Bard, Inc. v. M3 Systems, Inc*., 157

---

[2] The agencies generally consider markets in which the Herfindahl-Hirschman Index (HHI)… is in excess of 2,500 points to be highly concentrated.  U.S. Department of Justice & FTC, Horizontal Merger Guidelines § 5.2 (2010), available at http://www.justice.gov/atr/public/guidelines/hmg-2010.html#5c.  Keurig's share  of Single-Serve Brewers produces an Herfindahl-Hirschman Index (HHI) score of 7,921, more than three times the score required to be considered "highly concentrated."; Keurig's share of Compatible Portion Packs produces an HHI of 7,396, more than 2.5 times the score required to be considered "highly concentrated."

F.3d 1340, 1382 (Fed. Cir. 1998) (defendant's modification of its biopsy gun to prevent use of competing replacement needles was anticompetitive because the modification was made only for predatory reasons, not for improving the operations of the gun); *Microsoft Corp.*, 253 F.3d at 65 (defendant failed to show that its conduct served a purpose other than protecting its operating system monopoly).

The claimed benefits of the Keurig 2.0 technology is merely pretext to prolong Keurig's monopoly power by rendering non-licensed Compatible Portion Packs made by Keurig's competitors unusable in the Keurig 2.0.  Stewart Decl., ¶¶ 33-40.  As Keurig's documents and testimony and Rogers' expert have shown, the 2.0 brewer technology's sole purpose is to lock-out competitors.  *See* Section II.B.2.

<blockquote>

b.  Keurig's Lock-Out Technology In Its Keurig 2.0 Is Anticompetitive And Exclusionary
</blockquote>

As explained in Section II.C above, Keurig's statements to customers and consumers – made without any testing or factual support – that Rogers' OneCups may cause damage to K-Cup Brewers and void consumers' warranties are clearly false and constitute anticompetitive exclusionary conduct.  *See National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab.*, 850 F.2d 904, 916 (2d Cir. 1988) (product disparagements constitute an antitrust violation when: (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to consumers having little understanding of subject matter, (5) continued for extended time periods, and (6) not readily susceptible to counterstatement).

**C.** **Rogers Is Likely To Succeed On Its California Business And Professions Code Section § 17200 Claims**

California Business and Professions Code section § 17200 ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. Prof. Code § 17200; *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003) ("unlawful," "unfair," and "fraudulent" acts are separately actionable).  The breadth of the UCL is intentional.  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal. 4th 163, 181 (1999) ("the Legislature…intended by this sweeping language to permit tribunals to enjoin on-going wrongful business conduct in whatever

context such activity might occur."); *see also* Cal. Bus. & Prof. Code § 17203 ("Any person who engages, has engaged or proposes to engage in unfair competition may be enjoined.").  The facts submitted herewith show that Keurig has engaged in "unlawful" and "unfair" business practices.

1.     **Keurig's Conduct Is "Unlawful"**

Unlawful acts are "anything that can properly be called a business practice and that at the same time is forbidden by law . . . be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made. . . ."  *Barquis v. Merchants Collection Ass'n of Oakland, Inc.*, 7 Cal. 3d 94, 113 (1972); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151-52 (9th Cir. 2008).  "Conduct that violates the federal antitrust laws also violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200."  *Beech-Nut Nutrition Corp. v. Gerber Prods. Co.*, 69 Fed. Appx. 350, 353 (9th Cir. 2003).  Since Keurig has violated the Sherman Act, it has also violated the UCL under the unlawful prong.  Indeed, given Keurig's market power, the false and disparaging statements to customers alone should be considered an antitrust violation.

2.     **Keurig's Conduct Is "Unfair"**

The California Supreme Court has affirmed that because § 17200 is written in the disjunctive, an act or practice may be independently actionable as "unfair," even if the act or practice is "not specifically proscribed by some other law."  *Cel-Tech Commc'ns*, 20 Cal. 4th at 180.  Unfair acts among competitors include "conduct that threatens an incipient violation of an antitrust law, or *violates the spirit or policy of those laws* because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Sybersound*, 517 F.3d at 1151-52 (emphasis added).

Thus, even if this court were to find that Keurig's conduct does not yet amount to an antitrust violation, the conduct certainly violates the spirit or policy of the federal antitrust laws, and thus this Court may enjoin such acts without proof that the conduct is an outright violation.[3]

---

[3] The Court should be guided by recent antitrust action taken by European regulators against single-serve espresso maker, Nestle. French antitrust officials (l'Autorité de la concurrence)

**D.**   **Rogers Will Be Irreparably Harmed If A Preliminary Injunction Is Not Granted**

A court considering a request for a preliminary injunction must weigh the likelihood of irreparable harm in addition to the plaintiff's likelihood of success on the merits.  Here, in the absence of an injunction, Rogers will undoubtedly suffer irreparable and substantial harm that would not adequately be compensated through monetary damages.  *See Doran v. Salem Inn, Inc.,* 422 U.S. 922 , 932 (1975) ("[a]s required to support such relief, these respondents alleged (and petition did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy.  Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless.").  "[A] loss of thirty percent of one's business constitutes irreparable harm."  *Choi v. United States* 944 F. Supp. 323, 326 n.2 (S.D.N.Y. 1996).

Rogers faces such a threat here.  Sarina Decl., ¶ 8; Rausser Decl., ¶ 106-114.  Rogers' OneCup business accounts for over ██ of its total business and Rogers has been focusing its general business, sales and marketing strategy on OneCup as consumers have begun to switch from traditional brewers to Single-Serve Brewers.  Sarina Decl., ¶ 4; *see* Section II.E.  Rogers already has lost significant business opportunities as a result of the fear, uncertainty, and doubt that Keurig has instilled (and continues to instill) in consumers and customers about non-licensed Portion Packs.  J. Rogers Decl., ¶¶16-17, 27-30, 35-44; Hybsch Decl., ¶¶ 4-12; Rausser Decl., ¶

---

found circumstances strikingly similar to the instant case, noting "In France, 73% of single-portion espresso coffee machines sold are Nespresso machines and 85% of sales of capsules compatible with Nespresso machines are Nespresso-brand capsules." ████████████████ Regulators found that Nestle had abused this market power in three ways:  (1) at the technical level: subsequent modifications to Nespresso machines rendered capsules produced by competing manufacturers incompatible with the new models; (2) at the legal level: Nespresso has put wording encouraging consumers to only use Nespresso brand capsules on Nespresso coffee machines, on the packaging and in the instructions for use and, in particular, in the warranty; and (3) on a commercial level: Nespresso has spread messages to the press encouraging consumers to only use Nespresso brand capsules. Based on these findings, Nestle agreed to a seven year oversight period, in which the company would share technical information of brewer changes three months prior to launch, ensure compatibility, provide warranty service for its brewers regardless of the capsule used, and refrain from commenting on competitor capsules.  *Id.*

111-112.  Indeed, Keurig has suffered significant loss of business in the grocery retail segment and the threat of additional loss of business is imminent once Keurig 2.0 brewers are introduced to the market.  Sarina Decl., ¶ 6-7.  ███████████████████████████
████████████████████████████████  Sarina Decl., ¶ 8.

Even if Rogers could remain in business, it would still suffer irreparable harm through the loss of business and goodwill.  *See Tom Doherty Assocs., Inc. v. Saban, Entm't, Inc*., 60 F.3d 27, 37-38 (2d Cir. 1995) (deprivation of opportunity to expand business is irreparable harm); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,* 240 F.3d 832, 841 (9th Cir. 2001) (affirming an injunction because plaintiff stood to lose its newfound customers and accompanying goodwill and revenue); *Healthcare Ins. Co. v. Advance–PCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Damage to one's reputation may also be an irreparable injury… particularly if compensatory damages would be uncertain or inadequate.")

### E.  The Balance Of The Equities Strongly Favors Rogers

The balance of hardships tips heavily in favor of Rogers and granting injunctive relief. Rausser Decl., ¶ 115-118.  Injunctive relief would merely prohibit Keurig from continuing to act in violation of antitrust and unfair competition laws.  Here, Keurig will suffer no undue hardship, and definitely no irreparable harm, if a preliminary injunction is granted.  Whereas Rogers faces the loss of its business, all Keurig has to do is ██████████████████████████████████.
███████████████████████████████  Chatterjee Decl., ¶¶ 23-27.  By disabling the lock-out Keurig is free to ship and sell its 2.0 brewers.  A defendant is not entitled to "reap even more profits" through ongoing anticompetitive conduct.  *Aeronautical Indus. Dist. Lodge 91 of Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Technologies Corp., Pratt & Whitney*, 87 F. Supp. 2d 116, 135 (D. Conn. 2000) *aff'd*, 230 F.3d 569 (2d Cir. 2000).  Rogers is merely asking this court to keep the market for Compatible Portion Packs a competitive one in which consumers, and not Keurig, decide which Compatible Portion Packs they use in their brewers.  Even if the preliminary injunction is granted, Keurig can still maintain its relationships with all of its distributors and release the Keurig 2.0 brewer.

Rogers also seeks to enjoin Keurig from making claims to consumers and others that Rogers' pods cause harm to Keurig brewers and should not be used.  Such statements are false and cause injury to Rogers.

### F.    An Injunction Is In The Public Interest

In antitrust cases, courts have repeatedly held that the elimination of a potential competitor is necessarily against the public interest.  *See Gulf & Western Indus., Inc. v. Great Atl. & Pac. Tea Co.*, 476 F.2d 687, 698-99 (2d Cir. 1973) (the public interest is served by a preliminary injunction in antitrust actions); *Regents of University of California v. American Broadcasting Cos.,* 747 F.2d 511, 521 (9th Cir. 1984) ("With the issuance of the preliminary injunction the economic voice of the consumer may still be heard; without the preliminary injunction the options of the consumer have already been prescribed by the defendants."); *Foremost Int'l Tours, Inc. v. Qantas Airways Ltd.*, 379 F. Supp. 88, 97 (D. Haw. 1974) ("An award of only money damages in lieu of preserving a competitor disserves the public interest.").

The facts of this case demonstrate the logic of these decisions.  Absent a preliminary injunction, Keurig will be free to continue its anticompetitive practices and entirely remove all non-licensed Compatible Portion Packs, including Rogers' OneCup product, from the market.  This results in reduced competition and reduced customer choice, including a more affordable, socially and environmentally responsible option that Rogers provides through OneCups.  J. Rogers Decl., ¶ 47.  The public, thus, has a strong interest in protecting the existence of competition in the Compatible Portion Packs market.  Granting a preliminary injunction in this case will preserve the OneCup as a product offered to consumers.

## IV.    CONCLUSION

Based on the foregoing, and to prevent any further irreparable harm to Rogers, Rogers respectfully requests that the Court enter a preliminary injunction to enjoin Keurig from 1) promoting, marketing or making available for sale any Keurig 2.0 brewer that includes a lock-out of non-licensed portion packs, and 2) making false or misleading statements about Rogers' products to its customers or to consumers.

Dated: August 11, 2014          MORGAN, LEWIS & BOCKIUS LLP

By    /s/ Daniel Johnson, Jr.
      Daniel Johnson, Jr. (admitted *pro hac vice*)
      Kent M. Roger (admitted *pro hac vice*)
      One Market, Spear Street Tower
      San Francisco, CA  94105
      Tel:  (415) 442-1000
      Fax:  (415) 442-1001

      *Attorneys for Plaintiff JBR, Inc. (d/b/a Rogers Family Company)*