**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X
                                                                   :
IN RE: KEURIG GREEN MOUNTAIN SINGLE-      :     No. 1:14-md-02542 (VSB)
SERVE COFFEE ANTITRUST LITIGATION         :
                                                                   :     *Applies to:*
                                                                   :     *No. 14 Civ. 4242*
-------------------------------------------------------------------X


## MEMORANDUM OF LAW IN OPPOSITION TO JBR'S MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................. 2

ARGUMENT .......................................................................................................................... 6

    I.      JBR Has Not Shown Irreparable Harm .................................................................. 8

          A.     JBR Faces No Emergency ......................................................................... 8

          B.     Any Harm Would Be Compensable With Money Damages ................... 11

    II.     JBR Will Not Succeed On The Merits .................................................................. 14

          A.     The Introduction of Keurig 2.0 Will Not Harm Competition ................. 14

          B.     JBR Has No Substantial Likelihood of Showing That Keurig
                 Possesses Monopoly Power .................................................................... 19

          C.     JBR Has Not Shown A Substantial Likelihood That It Will Prevail
                 On Its Market Definitions ....................................................................... 22

          D.     JBR Has No Substantial Likelihood of Successfully Establishing
                 Antitrust Injury ....................................................................................... 24

          E.     Keurig's Statements Do Not Violate the Sherman Act .......................... 25

          F.     Plaintiff's California Law Claim Fails With Its Antitrust Claims .......... 27

    III.    The Balance of Harms Weighs Against An Injunction ....................................... 27

    IV.    A Preliminary Injunction Would Be Against The Public Interest ....................... 29

CONCLUSION ..................................................................................................................... 30

## TABLE OF AUTHORITIES

**FEDERAL CASES**

*Ad/SAT v. Associated Press,*
   181 F.3d 216 (2d Cir. 1999)....................................................................................................23

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Group LP,*
   592 F.3d 991 (9th Cir. 2010) ...........................................................................................15, 19

*American Professional Testing Services Inc., v. Harcourt Brace Jovanovich Legal
   & Professional Publications, Inc.,*
   108 F.3d 1147 (9th Cir. 1997) ..............................................................................................26

*Arbitron Co. v. Phoenix Broadcoasting Corp.,*
   No. 97 Civ. 4355(MBM)(HBP), 1997 WL 452020 (S.D.N.Y. Aug. 6, 1997) .......................11

*Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.,*
   784 F.2d 1325 (7th Cir. 1986) ..............................................................................................29

*Becoming, Inc. v. Avon Products, Inc.,*
   No. 01 CV 5863(JSM), 2001 WL 930794 (S.D.N.Y. Aug. 15, 2001) ....................................28

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
   603 F.2d 263 (2d Cir. 1983)....................................................................................... passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977)..............................................................................................................24

*Business Electronics Co. v. Sharp Electronics Corp.,*
   485 U.S. 717 (1988)..............................................................................................................17

*C.R. Bard, Inc. v. M3 Systems, Inc.,*
   157 F.3d 1340 (Fed. Cir. 1998) (Newman, J., dissenting)......................................................18

*California Computer Products, Inc. v. International Business Machines Corp.,*
   613 F.2d 727 (9th Cir. 1979) ................................................................................................15

*Cargill Inc. v. Monfort of Colorado, Inc.,*
   479 U.S. 104 (1986)..............................................................................................................17

*Carter v. Variflex, Inc.,*
   101 F. Supp. 2d 1261 (C.D. Cal. 2000) ...............................................................................27

*Chapman v. New York State Division of Youth,*
   546 F.3d 230 (2d Cir. 2008)..................................................................................................23

*Choi v. United States,*
    944 F. Supp. 323 (S.D.N.Y. 1996).......................................................................................13

*Citibank, N.A. v. Citytrust,*
    756 F.2d 273 (2d Cir. 1985)...............................................................................................8

*Commercial Data Servers, Inc. v. Internationl Business Machines Corp.,*
    166 F. Supp. 2d 891 (S.D.N.Y. 2001).................................................................................23

*Dexter 345 Inc. v. Cuomo,*
    663 F.3d 59 (2d Cir. 2011)...........................................................................................11, 13

*DSM Desotech Inc. v. 3D Systems Corp.,*
    749 F.3d 1332 (Fed. Cir. 2014)................................................................................ 16, 21-22

*Eastman Kodak Co. v. Image Technical Services,*
    504 U.S. 451 (1992).............................................................................................. 20-21, 23

*Eon Laboratories Manufacturing v. Watson Pharmaceuticals, Inc.,*
    164 F. Supp. 2d 350, 358 (S.D.N.Y. 2001).....................................................................17, 26

*Faiveley Transportation Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009)...............................................................................................8

*Gatt Communications, Inc. v. PMC Associates,*
    711 F.3d 68 (2d Cir. 2013)................................................................................................24

*George Haug v. Rolls Royce Motor Cars,*
    148 F.3d 136 (2d Cir. 1998)..............................................................................................24

*GPA Inc. v. Liggett Group, Inc.,*
    862 F. Supp. 1062 (S.D.N.Y. 1994).............................................................................. 13-14

*Hack v. President & Fellows of Yale College,*
    237 F.3d 81 (2d Cir. 2000)...........................................................................................16, 22

*Hanson Trust PLC v. SCM Corp.,*
    774 F.2d 47 (2d Cir. 1985).................................................................................................6

*Harrison Aire, Inc. v. Aerostar International, Inc.,*
    423 F.3d 374 (3d Cir. 2005)..............................................................................................20

*Ibrahim v. United States Through Department of Agriculture,*
    650 F. Supp. 163 (N.D.N.Y. 1987).....................................................................................14

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,*
    596 F.2d 70 (2d Cir. 1979)...............................................................................................11

iii

*Jackson v. American Plaza Corp.*,
　No. 08 Civ. 8980(PKC), 2009 WL 1158829 (S.D.N.Y. Apr. 28, 2009) ...............................10

*Jayaraj v. Scappini*,
　66 F.3d 36 (2d Cir. 1995) .....................................................................................................10

*Kim v. United States*,
　822 F. Supp. 107 (E.D.N.Y. 1993) .......................................................................................14

*Kind LLC v. Clif Bar Co.*,
　No. 14 Civ. 770, 2014 WL 2619817 (S.D.N.Y. June 12, 2013)......................................28-29

*Lanvin Inc. v. Colonia, Inc.*,
　739 F. Supp. 182 (S.D.N.Y. 1990)............................................................................. 10-11, 13

*LiveUniverse, Inc. v. MySpace, Inc.*,
　304 F. App'x 554 (9th Cir. 2008) ..........................................................................................27

*Loveridge v. Pendleton Woolen Mills, Inc.*,
　788 F.2d 914 (2d Cir. 1986).................................................................................................11

*Medtronic Minimed Inc. v. Smiths Medical MD Inc.*,
　371 F. Supp. 2d 578 (D. Del. 2005).................................................................................19, 25

*Merit Capital Group, LLC v. Trio Industries Management, LLC*,
　No. 04 Civ. 7690(RCC), 2005 WL 53283 (S.D.N.Y. Jan. 10, 2005) ....................................11

*Munaf v. Geren*,
　553 U.S. 674 (2008)...............................................................................................................6

*National Ass'n of Pharmaceutical Manufacturers v. Ayerst Laboratories*,
　850 F.2d 904 (2d Cir. 1988)..................................................................................................26

*Pamlab, L.L.C. v. Macoven Pharmaceuticals, L.L.C.*,
　881 F. Supp. 2d 470 (S.D.N.Y. 2012)....................................................................................29

*Park West Radiology v. Carecore National LLC*,
　240 F.R.D. 109 (S.D.N.Y. 2007) .....................................................................................11, 13

*Picard v. Fairfield Greenwich Ltd.*,
　No. 13-1289, 2014 WL 3882481 (2d Cir. Aug. 8, 2014) ........................................................7

*Programmed Tax Systems, Inc. v. Raytheon Co.*,
　419 F. Supp. 1251 (S.D.N.Y. 1976).......................................................................................28

*Rodriguez ex rel. Rodriguez v. DeBuono*,
　175 F.3d 227 (2d Cir. 1999)..........................................................................................7-8, 14

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010)...................................................................................................8, 27

*Sanderson v. Culligan International Co.*,
    415 F.3d 620 (7th Cir. 2005) (Easterbrook, J.).......................................................................25

*Sanofi-Synthelabo v. Apotex Inc.*,
    488 F. Supp. 317 (S.D.N.Y. 2006)...........................................................................................29

*Schachar v. American Academy of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) (Easterbrook, J.).......................................................................26

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*,
    11 F. Supp. 2d 166 (D. Mass. 1998).......................................................................................21

*SMS Systems Maintenance Services, Inc. v. Digital Equipment Corp.*,
    188 F.3d 11 (1st Cir. 1999).....................................................................................................20

*Smugglers Notch Homeowners' Ass'n., Inc. v. Smugglers' Notch Management Co.*,
    414 F. App'x 372 (2d Cir. 2011) .......................................................................................16, 22

*Southern California Institute of Law v. TCS Education System*,
    No. CV 10-8026 PSG AJWX, 2011 WL 1296602 (C.D. Cal. Apr. 5, 2011) .........................17

*Stearns Airport Equipment Co. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) ..................................................................................................26

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ..................................................................................................14

*Suchanek v. Sturm Foods, Inc.*,
    No. 13-3843, 2014 WL 4116493 (7th Cir. Aug. 22, 2014) ....................................................16

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
    60 F.3d 27 (2d Cir. 1995) .......................................................................................................13

*Trace X Chemical, Inc. v. Canadian Industries, Ltd.*,
    738 F.2d 261 (8th Cir. 1984) ..................................................................................................17

*Triebwasser & Katz v. American Telegraph & Telephone Co.*,
    535 F.2d 1356 (2d Cir. 1976)..................................................................................................10

*United Air Lines, Inc. v. Austin Travel Corp.*,
    867 F.2d 737 (2d Cir. 1989)....................................................................................................20

*United Healthcare Insurance Co. v. Advance–PCS*,
    316 F.3d 737 (8th Cir. 2002) ..................................................................................................14

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ............................................................................................23

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ............................................................................................20

*United States v. Long Island Jewish Medical Center*,
    983 F. Supp. 121 (E.D.N.Y. 1997) ....................................................................23

*United States. v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) .............................................................................19

*US Airways Group v. British Airways PLC*,
    989 F. Supp. 482 (S.D.N.Y. 1997).....................................................................25

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ...................................................................................... 15-16

*Walgreen Co. v. AstraZeneca Pharmaceuticals L.P.*,
    534 F. Supp. 2d 146 (D.D.C. 2008) ...................................................................15

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008).......................................................................... 7-8, 14, 29

*Xerox Corp. v. Media Sciences*,
    511 F. Supp. 2d 372 (S.D.N.Y. 2007)...........................................................18, 27

*Xerox Corp. v. Media Sciences*,
    660 F. Supp. 2d. 535 (S.D.N.Y. 2009)...................................................... 18, 20-21

*Xerox Corp. v. Media Sciences, Inc.*,
    609 F. Supp. 2d 319 (S.D.N.Y. 2009) ................................................................18

**STATE CASES**

*Cel-Tech Communications Inc. v. Los Angeles Cellular Telephone Co.*,
    20 Cal. 4th 163 (1999) .......................................................................................27

*Chavez. v. Whirlpool Corp.*,
    93 Cal. App. 4th 363 (Cal. Ct. App. 2d Dist. 2001) ..........................................27

*Drum v. San Fernando Valley Bar Ass'n*,
    106 Cal. Rptr. 3d 46 (Cal. Ct. App. 2d Dist. 2010) ..........................................27

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(c) ................................................................................................29

VIID Philip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d ed. 2006)...............................19

Defendant Keurig Green Mountain, Inc. ("Keurig") respectfully submits this memorandum in opposition to the motion for a preliminary injunction brought by JBR, Inc. (d/b/a Rogers Family Company) ("JBR" or "Plaintiff").

## INTRODUCTION

JBR asks this Court to impose an "extraordinary and drastic remedy"—requiring Keurig to stop selling and re-engineer its new Keurig 2.0 Brewer—based on unsupported claims at the fringes of antitrust law. Such an order would be unprecedented. JBR cites *no* case in which a court granted a preliminary injunction (or a permanent injunction after a trial on the merits) based on a product redesign claim. It is well established that companies may design their products as they choose, with consumers, not courts, evaluating the merits of their choices. Because JBR entirely fails to show a "substantial likelihood" of success on the merits, its request for a preliminary injunction must be denied.

JBR also fails to meet the basic threshold requirement for any preliminary injunction: showing that it will be *irreparably* harmed without an injunction. There is no emergency here that calls for urgent and extraordinary relief. As JBR's own documents acknowledge, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Indeed, JBR, like other portion pack competitors, anticipates ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The only harm JBR has alleged is that it might sell fewer portion packs than it otherwise would, which is not an antitrust injury.

Moreover, even this alleged harm could easily be avoided. Several competitors have announced that they have successfully reverse-engineered the interactive technology in the 2.0 brewer that JBR claims will lock it out. One of those, Plaintiff TreeHouse Foods, Inc., Bay

1

Valley Foods, LLC, and Sturm Foods, Inc. ("TreeHouse"), 

and persists in seeking emergency relief from this Court.

Keurig will suffer certain, immediate, and severe harm if the requested injunction is

granted. Keurig has produced and shipped approximately

If Keurig 2.0 is

enjoined,

Consumers, who should

decide on a product's merits,

. The balance of harms weighs dramatically in Keurig's favor.

Granting JBR an injunction is also against the public interest. In addition to depriving

consumers of the innovation that Keurig 2.0 offers, it would be an open invitation to competitors

to do battle in the courtroom, not the marketplace. The inevitable effect would be to chill the

very innovation and competition that the antitrust laws foster. Instead of benefitting the public

interest or competition generally, JBR's requested injunction is sought solely for the private

benefit of one competitor. JBR's motion should be denied.

## FACTUAL BACKGROUND

Keurig is the innovator behind the "K-Cup" single-serve coffee system, which it

launched in 1998. Since then, Keurig has continued to innovate, improving its products to meet

customer demand and ensure a high-quality user experience. Ewing Decl. Exs. 1, 2. In the face

of intense competition, Keurig has succeeded in becoming a popular producer of coffee brewers

by dint of its superior technology, simplicity, and reliability.

JBR is a diversified and highly profitable coffee roaster that has been in business for 35

2

years.  Rogers Decl. ¶ 2.  In 2011, JBR introduced "OneCup" portion packs compatible with

Keurig brewers.  Rogers Decl. ¶¶ 12.  Riding on Keurig's popularity, JBR's OneCup sales

experienced significant growth, ███████████████████████████████████████[1]

*See* Ewing Decl. Exs. 4, 6  (███████████████████████████████████

███████████[2]).  JBR also has a robust packaged coffee business ███████████

██████████████.  *See* Ewing Decl. Ex. 6.

In September 2013, Keurig announced that it would launch Keurig 2.0 this year.  *See*

Ewing Decl. Ex. 7 at 3, 142.  Keurig 2.0 is a direct response to consumer demand, Ewing Decl.

Ex. 8, particularly the desire to brew multiple servings of coffee at once, which consumers

commonly cite as the main reason they have not bought a Keurig brewer.  Ewing Decl. Ex. 9 at

9.  The design of Keurig 2.0 also reflects the lessons from Keurig's experience with the Vue, a

brewer launched in 2012.  While the Vue's superior piston pump technology drew critical

acclaim, Ewing Decl. Exs. 10-11, 30, it did not gain the consumer acceptance Keurig hoped for,

both because of the complexity of its user interface and because it could not brew K-Cup portion

packs ("K-Cups").[3]  Keurig 2.0 combines the Vue's piston pump technology and ability to brew

Vue packs, necessary for larger brew sizes and more intense flavors, with the simplicity of the K-

Cup system.

Another innovation of the Keurig 2.0 is its interactive technology, which allows the

brewer to read portion packs and offer up the appropriate user interface for K-Cups or Vue

packs.[4]  Keurig 2.0's interactive technology is Keurig's platform for future innovation.  Today,

---

[1] ███████████████████████████████ Ewing Decl. Ex. 3 at 6-7.
[2] JBR's fiscal years run from April 1 to March 31.  *See, e.g.*, Ewing Decl. Ex. 5.
[3] Johnson Decl. Ex. 2 at 2████████████████████████████████████████████████
.  *See also* Ewing Decl. Ex. 13, Manly Dep. I 78:18-80:2 and Ewing Decl. Ex. 14, Sarina
Dep. 219:3-6.
[4] The K-Carafe is a type of Vue-Cup; to determine whether to brew a single Vue pack or a carafe, the brewer also
detects whether a user has inserted a carafe.  Ewing Decl. Ex. 15, Sullivan Dep. I 79:17-80:5.

the technology can distinguish between K-Cups and Vue packs.  Keurig's R&D team ███████

███████████████████████████████████████████████████████████████████████████████████

███████████████████  *See, e.g.*, Ewing Decl. Ex. 15, Sullivan Dep. I 289:6-291:4;

Ewing Decl. Ex. 16, Sullivan Dep. II 378:24-379:6.  The use of interactive technology to allow

packs to provide information to a brewer is not unique; other brewers, including from Kraft

Foods (Tassimo) and Nestle (Nespresso), use such technology.  *See* Johnson Decl. Ex. 26 at 8.

Keurig believes that consumers will love the Keurig 2.0 innovation and that it will help

Keurig win new customers from households that do not own a single-serve brewer today.  Ewing

Decl. Ex. 17; Johnson Decl. Ex. 16 at 28; Ewing Decl. Ex. 18, Manly Dep. II 365:7-15, 366:7-

10.  But Keurig's past success with the 1.0 brewer does not guarantee that 2.0 will succeed.

Johnson Decl Ex. 2.  Indeed, third-party analysts (and JBR) have cited Keurig's lack of success

with the Vue brewer and expressed skepticism about whether consumers will choose Keurig 2.0.

Compl. ¶ 11; Ewing Decl. Exs. 20 at 1; 21 at 3; 22 at 4, 8.  In the end, consumers should decide.

If consumers do not find Keurig 2.0 compelling, they will continue to use their existing brewers

or they will purchase any of the many other coffee brewers available.  K-Cups[5] designed for

Keurig 2.0 are fully backwards compatible with existing and new 1.0 brewers made by Keurig

and others, so consumers who want K-Cups but not Keurig 2.0 can choose 1.0-compatible

brewers and still have access to the full range of Keurig K-Cups.  Johnson Decl. Ex. 8 at 243.

Consumers have the information they need to make an informed choice about 2.0.  As JBR

affirmatively alleges, Keurig has communicated clearly since its initial announcement that

Keurig 2.0 was designed as a closed system.  PI Br. 3.[6]

Keurig launched Keurig 2.0 on August 24, 2014.  The timing was carefully planned: each

---

[5] As its packaging indicates, the new K-Carafe pack is not compatible with 1.0 K-Cup or Vue brewers.
[6] *See also* Ewing Decl. Ex. 23.

year Keurig sells nearly half of its brewers in the fall holiday season.[7] The initial suggested retail prices for Keurig 2.0 range from $149.99-$199.99, Ewing Decl. Ex. 28, slightly more expensive than Keurig's 1.0 brewers and in line with high-end drip coffee brewers, whose owners Keurig hopes to win over. Johnson Decl. Exs. 1 at 11; 8 at 260; 16 at 28, 53; Ewing Decl. Ex. 18, Manly Dep. II 367:7-15. Keurig continues to sell the K10, a popular 1.0 brewer, which retails for around $99. Ewing Decl. Ex. 29. Cuisinart and Jarden (owner of the Mr. Coffee brand) will continue to sell 1.0-compatible licensed brewers. Ewing Decl. Ex. 18, Manly Dep. II 305:4-7.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████  Ewing Decl. Ex. 36.

The development of 2.0 was the largest investment project Keurig has ever undertaken.

███████████████████████████████████████████████████

████████████████████████  *See* Kothari Decl. ¶¶ 25.[8] Keurig has worked closely with retailers such as Walmart, Target, Kohl's, Bed Bath & Beyond, and Costco in anticipation of the launch, preparing in-store "re-branding" of 25,000 stores and arranging 30,000 in-store demonstrations this fall. Keurig has also launched broad consumer outreach, including a mobile tour offering 500,000+ samples and coverage in social media, radio, print publications, and television advertisements. Ewing Decl. Ex. 32 at 10, 31, 33, 38, 50. All told, Keurig has spent ██████████

████████████████████████████████████████████████████████  Ewing

---

[7] *See also, e.g.*, Ewing Decl. Ex. 18, Manly Dep. II 361:20-24. ████████████████

█████████████████████████ Ewing Decl. Exs. 24-27.

*See also* Ewing Decl. Ex. 18, Manly Dep. II 362:9-13, 363:6-13 (███████████████████).



Decl. Ex. 18, Manly Dep II 361:25-362:8.

[REDACTED]

TreeHouse announced on August 7, 2014 that it has "successfully developed new single serve coffee products that will work in both existing and next generation" Keurig brewers.[10]  Other competitors including Mother Parkers and Marley Coffee have announced the same.  Ewing. Decl. Ex. 33. [REDACTED]

[REDACTED] Ewing Decl. Ex. 14, Sarina Dep. 244:5-12; 250:20-22.

Instead, JBR asks this Court for emergency relief to block Keurig from promoting, marketing, or selling Keurig 2.0 as currently designed and built, so that consumers will not have the option of choosing it.  ECF No. 84.  JBR's requested relief would require Keurig [REDACTED]

[REDACTED]

[REDACTED] *See, e.g.*, Ewing Decl. Ex. 16, Sullivan Dep. II 405:16-18, 429:16-431:2; 452:2-453:20.  JBR's request would leave retailers and consumers [REDACTED].

## ARGUMENT

A preliminary injunction is an "extraordinary and drastic remedy . . . never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation and quotation marks omitted).  It is "one of the most drastic tools in the arsenal of judicial remedies."  *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985).  "A plaintiff seeking a preliminary injunction must

---

[9] [REDACTED] Ewing Decl. Ex. 14, Sarina Dep. 251:19-252:1.  In fact, [REDACTED] *Id*. at 81:20-25 [REDACTED] *Id*. 203:3.

[10] ECF No. 82-1 (TreeHouse Aug. 7, 2014 Press Release); *see also* Ewing Decl. Ex. 34 at 2 (stating that the "2.0 compatible" prototype was achieved "[f]ive weeks ago").  Ewing Decl. Ex. 35, Aug. 19, 2014 letter from Aldo Badini to Lev Dassin (enclosing video "demonstrating that in fact TreeHouse's cups do work in the [2.0] brewer.").

establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Picard v. Fairfield Greenwich Ltd.*, No. 13-1289, 2014 WL 3882481 (2d Cir. Aug. 8, 2014) (citing *Winter*). If the injunction "will alter rather than maintain the status quo," as JBR's would, the plaintiff must demonstrate a "'substantial' likelihood of success" on the merits. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999).

JBR has not met the basic requirements for a preliminary injunction, including a showing of irreparable injury. In addition, JBR has not shown a substantial likelihood of success on the merits. First, JBR has not articulated a viable antitrust theory. For example, while JBR repeatedly refers to the purported "lock out feature" of the Keurig 2.0 brewer, JBR ignores well-settled law that "closed systems" generally promote competition and are widely used in a variety of competitive markets (*e.g.*, razors and blades, video game systems and games). Second, JBR cannot show Keurig has monopoly power in any of JBR's three alleged markets. With respect to single serve brewers, the Keurig 2.0 was just introduced and has virtually 0% share. With respect to portion packs and "compatible" packs, JBR again ignores well-settled law rejecting the use of market shares to establish market power for "aftermarket" products (like razor blades and video games). Because JBR does not allege and cannot show that customers have been coerced and then locked in, JBR's claim of monopoly power in portion packs is flawed. Third, none of JBR's alleged markets survives scrutiny because JBR does not adequately account for cross-elasticity of demand between single serve brewers and alternative ways of making a cup of coffee, as the law requires. Finally, JBR cannot show antitrust injury because it has not shown harm to overall competition, as opposed to alleged harm to JBR.

A party seeking a preliminary injunction must satisfy each requirement. JBR, which offers weak facts in support of an unfounded antitrust theory, satisfies none.

## I.      JBR Has Not Shown Irreparable Harm

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction," and "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Rodriguez*, 175 F.3d at 233-34 (citations omitted). A mere "possibility" of irreparable harm is insufficient: a plaintiff must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. To do so, a plaintiff must show "an injury that is neither remote nor speculative, but *actual and imminent*, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citations omitted) (emphasis added). Moreover, harm is only irreparable where "remedies available at law, such as monetary damages, are inadequate to compensate" for the harm. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citation omitted). JBR cannot satisfy this high standard.

### A.  JBR Faces No Emergency

A preliminary injunction is appropriate only where "there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). The launch of Keurig 2.0 is no such emergency. As JBR's internal documents acknowledge, ███████████████████████████████████████████████████████████ ████████████████████████████████████ Ewing Decl. Ex. 53 at 9. ███████████ ██████████████████████████████████████████████████████████████████ ████████  *See* Ewing Decl. Ex. 22 at 8, Compl. ¶ 17. Both JBR and Keurig also anticipate ████████████████████████████████████  *See, e.g.,* Ewing Decl. Ex. 22 at 7-

8

8.[11] Consumers who want a 1.0 brewer will have many choices. One of Keurig's top selling 1.0 brewers and licensed 1.0 brewers from Cuisinart and Mr. Coffee will be sold indefinitely, as will Keurig's entire line of 1.0 office brewers. Ewing Decl. Ex. 22 at 7; Ex. 18, Manly Dep. II 305:4-7. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████ Ewing Decl. Ex. 36 at 7. As JBR also notes, ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ *See* Ewing Decl.

Ex. 22 at 5-7. In JBR's words, ████████████████████████████████████

██████████████████████████ *Id.* at 8. ██████████████████████

███████████████████████████ *Id.*

██████████████████████████████████████████████████████

██████████████████████████████████████████████ Ewing Decl. Ex.

4, 6.[12] ██████████████████████████████ Ewing Decl. Exs. 37-42. ████████

██████████ wholly inconsistent with JBR's claim of imminent injury.

████████████████████████████████████████ TreeHouse and others claim to have done

successfully, also undercuts its claim of irreparable harm. Ewing Decl. Ex. 43 at 2. "Any party claiming an injury is under a duty to mitigate its damages," and a party seeking a preliminary

---

[11] As discussed in the merits section below, if the 1.0-compatible installed base does not grow because customers choose to buy Keurig 2.0 instead of 1.0-compatible models, that is not an antitrust concern. That is the successful competition by Keurig on the merits that the antitrust laws encourage.

[12] ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

injunction "cannot mask an ongoing failure on its part to mitigate its damages as an ongoing

instance of irreparable harm." *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192-93 (S.D.N.Y.

1990); *see Triebwasser & Katz v. American Tel. & Tel. Co.*, 535 F.2d 1356 (2d Cir. 1976)

(reversing grant of preliminary injunction in antitrust case where plaintiff failed to mitigate).

Indeed, instead of taking mitigating action, ████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████    *See* Ewing Decl. Ex. 44.  ██████

█████████████████████████████████████████████    Ewing Decl. Ex. 14, Sarina

Dep. 244:5-12; 250:20-22.

    In sum, JBR's speculation about potential future harm falls short of its burden to show

that "it *will* suffer *imminent* irreparable harm." *Jayaraj v. Scappini*, 66 F.3d 36, 40 (2d Cir. 1995)

(emphasis added); *see Jackson v. Am. Plaza Corp.*, No. 08 Civ. 8980 (PKC), 2009 WL 1158829,

at *6 (S.D.N.Y. Apr. 28, 2009) (speculation as to possible harm was "far too remote to establish

probable irreparable harm").

    A claim of irreparable harm based on alleged statements that JBR's products "may cause

damage to K-Cup Brewers and void consumers' warranties" is even more farfetched. Pl. Br. 21.

According to JBR, Keurig has been making such statements "[s]ince the introduction of Rogers'

OneCup product" in 2011. Pl. Br. 9. █████████████████████████████████████

██████████████████████████████████████    Ewing Decl. Ex. 45.

JBR offers no explanation why these statements (of which it offers four purported hearsay

examples) will suddenly cause it irreparable injury requiring emergency relief. The Court should

"not grant preliminary injunctive relief based only on Plaintiff's speculative and unsubstantiated

assertions, which fail to specifically indicate to the Court why or how" Keurig's conduct would

cause irreparable harm. *Merit Capital Grp., LLC v. Trio Indus. Mgmt., LLC*, No. 04 Civ. 7690 (RCC), 2005 WL 53283, at *2 (S.D.N.Y. Jan. 10, 2005).

### B. Any Harm Would Be Compensable With Money Damages

"[I]rreparable injury means injury for which a monetary award cannot be adequate compensation." *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (vacating injunction because "[c]learly, money would be adequate compensation for the loss of . . . business"). A preliminary injunction is not appropriate where money damages are available. *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986). Lost sales are the paradigmatic example of injury compensable through money damages.

Lost sales by an established business do not constitute irreparable harm because the business' "track record" allows for the calculation of money damages. *See Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (affirming denial of injunction where plaintiffs' records would enable calculation of lost profits). Courts in this circuit have often refused to grant preliminary injunctions in antitrust cases on this basis. *See, e.g.*, *Park W. Radiology v. Carecore Nat'l LLC*, 240 F.R.D. 109, 114 (S.D.N.Y. 2007) (no irreparable injury where "damages can be determined on the basis of past sales of that product and of current and expected future market conditions") (citation omitted); *Arbitron Co. v. Phoenix Broad. Corp.*, No. 97 Civ. 4355 (MBM) (HBP), 1997 WL 452020, at *4 (S.D.N.Y. Aug. 6, 1997) (same); *see also Lanvin*, 739 F. Supp. at 194 (same).

Here, JBR's track record would allow for the calculation of any damages. JBR has been in the coffee business since 1979 and has sold OneCups since 2011. Rogers Decl. ¶¶ 2, 12. JBR maintains and has produced records of its OneCup sales from fiscal years 2012 through 2015,

█████████████████████████████ *See* Ewing Decl. Exs. 46-49. These data clearly

establish a "track record" that could be used to estimate damages, if any arise.[13]

JBR insinuates that Keurig 2.0 threatens its continued viability, but comes forward only

with evidence to the contrary. PI Br. 15. JBR's only ordinary course of business forecast

████████████████████████████████████████████████ *See* Ewing Decl. Ex. 4.

And, even in connection with this motion, JBR offers scant evidence of any loss of *existing*

business.[14] JBR asserts that potential customers were "not interested" (Bon-Ton) or delayed

their decision-making (Meijer, Wakefern, Big Y, and ShopRite), or called off future private label

tea business (Kroger), purportedly because of Keurig 2.0. Pl. Br. 14 JBR also claims that

Costco and BJ's declined to award it certain *additional* business. *Id.* 13-14. None of these

allegations suggests a decline in JBR's existing business, much less a decline so dramatic as to

threaten JBR's viability. JBR's balance sheet also reflects sound financial health. ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████ *See* Ewing Decl. Ex. 5 at -004-011.

Notwithstanding its strong position and rosy internal projections, ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Pl. Br. 24

(citing Sarina Decl. ¶ 8, emphasis added). ████████████████████████████████

████████████████████████████████████████████████████████████ Ewing

Decl. Ex. 14, Sarina Dep. 168:13-20. Furthermore, JBR never explains why it could not use

---

████████████████████████████████████████ JBR's vague

assertions in connection with this motion are far from an uncontroverted fact that "absent

preliminary relief [plaintiff] would suffer a substantial loss of business and perhaps even

bankruptcy," as in the only case JBR cites on this point.  Pl. Br. 23 (citing *Doran v. Salem Inn,*

*Inc.*, 422 U.S. 922, 932 (1975)).

But even if JBR could show the "'possible' insolvency" of its business as a whole, or that

it was about to lose its OneCup business, such a showing is insufficient where, as here, money

damages are calculable.  *GPA Inc. v. Liggett Grp., Inc.*, 862 F. Supp. 1062, 1069 (S.D.N.Y.

1994); *see also Dexter*, 663 F.3d. at 63 (no irreparable injury where sales track record supported

calculation of damages); *Lanvin*, 739 F. Supp. at 194 (loss of an entire "line of business . . . is

insufficient to show irreparable harm" where losses were calculable).  Nor can JBR show

irreparable injury simply by alleging a "loss of business and goodwill."  Pl. Br. 24.  In the

Second Circuit, where a plaintiff has a track record of sales, "[t]he long history of operation . . .

ensures that [it] will be able to calculate money damages for any loss of goodwill."  *Dexter*, 663

F.3d at 63; *see also Lanvin*, 739 F. Supp. at 194 ("To the extent a reputational injury can be

shown, such injury is compensable in money damages.").

The cases JBR cites are not to the contrary.  *Tom Doherty Associates, Inc. v. Saban*

*Entertainment, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995), addressed "a wholly unique opportunity" the

value of which was "beyond ready calculation."  That is not the case here.  Indeed, a court in this

district noted the narrow scope of *Tom Doherty* in a prior antitrust case.  *Park W. Radiology*, 240

F.R.D. at 113-14 ("Park West's damages are easier to quantify than the plaintiff's potential

damages in *Tom Doherty* because radiology services . . . are not a unique product.").  JBR's

reliance on *Choi v. United States*, 944 F. Supp. 323, 326 n.2 (S.D.N.Y. 1996), for the proposition

13

that "a loss of thirty percent of one's business constitutes irreparable harm" is also misplaced. First, the court in *Choi denied* an injunction for lack of likely success on the merits and addressed irreparable harm only in dicta in a footnote. Second, as the cases cited in *Choi* make clear, a loss of sales alone does not show irreparable harm. *Kim v. United States*, 822 F. Supp. 107, 110 (E.D.N.Y. 1993); *Ibrahim v. U.S. Through Dep't of Agric.*, 650 F. Supp. 163, 165-66 (N.D.N.Y. 1987).[15]

## II.   JBR Will Not Succeed On The Merits

Because JBR has not shown irreparable harm, the Court need not consider the merits of JBR's claims. *See, e.g., GPA Inc.*, 862 F. Supp. at 1070. If the Court does reach the merits, it is JBR's burden to show a "'substantial' likelihood of success" on the merits. *Rodriguez*, 175 F.3d at 233. JBR cannot do so. JBR's theory that this Court should impose an alternate design path is at the fringes of antitrust law. Keurig 2.0 is exactly what the antitrust laws promote: an innovative new product launched in response to consumer demand and clearly advertised so that consumers can make informed purchasing decisions. Enjoining this new product at the behest of a single competitor would be directly contrary to both Second Circuit precedent and the goal of the antitrust laws to encourage, not stifle, innovation and consumer choice.

### A.   The Introduction of Keurig 2.0 Will Not Harm Competition

As the Second Circuit has explained, "any firm, even a monopolist, may bring its products to market whenever and however it chooses." *Berkey Photo, Inc. v. Eastman Kodak*

---

[15]   JBR's out-of-Circuit citations are unavailing. Both cases pre-date *Winter* and apply standards of irreparable harm less stringent than the "likelihood" standard endorsed by the Supreme Court in *Winter*, 555 U.S. at 22. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 840-41 (9th Cir. 2001) (requiring "possibility" of irreparable harm); *United Healthcare Ins. Co. v. Advance–PCS*, 316 F.3d 737, 739-40 (8th Cir. 2002) (requiring "threat" of irreparable harm). Also, JBR's purported quote from *United Healthcare* does not appear in the case.

*Co.*, 603 F.2d 263, 286 (2d Cir. 1979).  Courts are not in the business of assessing a product's

merits, which "can only be inferred from the reaction of the market."  *Id.* at 287; *see also, e.g.*,

*Walgreen Co. v. AstraZeneca Pharm. L.P.*, 534 F. Supp. 2d 146, 151 (D.D.C. 2008) ("Courts and

juries are not tasked with determining which product among several is superior.  Those

determinations are left to the marketplace.").

　　　In order to "safeguard the incentive to innovate," *Verizon Communications Inc. v. Law*

*Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004), courts show great deference to a

company's decisions about product design.  Except in the narrowest of circumstances not

applicable here, a firm has the right to design its own products regardless of the impact on

competitors.  Relying on the Second Circuit's decision in *Berkey Photo*, the Ninth Circuit, where

JBR chose to file its case, articulated why courts should *not* evaluate product design:

> There is no room in this analysis for balancing the benefits or worth of a product
> improvement against its anticompetitive effects. . . . There are no criteria that courts
> can use to calculate the 'right' amount of innovation, which would maximize social
> gains and minimize competitive injury.  ***A seemingly minor technological***
> ***improvement today can lead to much greater advances in the future.***  The
> balancing test proposed by plaintiffs would therefore require courts to weigh as-yet-
> unknown benefits against current competitive injuries.  Our precedents and the
> precedents we have relied upon strongly counsel against such a test.

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir.

2010) (citing *Berkey Photo*, 603 F.2d at 286-87) (emphasis added); *see also Cal. Computer*

*Prods., Inc. v. Int'l Bus. Machs. Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) ("[Defendant],

assuming it was a monopolist, had the right to redesign its products to make them more attractive

to buyers . . . It was under no duty to help [its competitors] survive or expand.").  Keurig 2.0

well-illustrates the problems with a balancing approach.  It is a new product with immediate

benefits and also lays the groundwork for greater future innovation.  *See* Ewing Decl. Ex. 15,

Sullivan Dep. I 291:12-292:2; Ewing Decl. Ex. 16, Sullivan Dep. II 378:24-379:6, 450:25-451:3.

The only exception to broad deference to a company's design choice arises when a monopolist engages in coercion, *i.e.*, where it forces customers to accept its new design. *Berkey Photo*, 602 F.2d at 287. There is no coercion here. No one will be forced to purchase Keurig 2.0. And all of Keurig's K-Cups will work in both Keurig 2.0 and 1.0 brewers; consumers do not need to purchase Keurig 2.0 to continue to use the K-Cups they know and love. Nor is there any suggestion that consumers will be "baited and switched" into buying a Keurig 2.0 thinking it is an open system. The parties agree that Keurig engaged in a "marketing blitz" to make sure that consumers are fully informed and can make their own choice about whether they wish to buy a closed system. *See* Pl. Br. 8. This is precisely what the case law encourages. *See Smugglers Notch Homeowners' Ass'n., Inc. v. Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 377 (2d Cir. 2011) (dismissing antitrust claim where policies were fully disclosed in advance); *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 87 (2d Cir. 2000) (same); *see also DSM Desotech Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 n.6 (Fed. Cir. 2014).

JBR appears to believe that calling Keurig 2.0's interactive technology a "lock out" mechanism establishes that it is anticompetitive. But closed systems are widely used in a variety of markets and are legal, procompetitive, and supported by sound economic justifications. Closed systems allow companies to ensure safety and quality and to avoid the "shared blame" that can otherwise arise where problems with a third-party product are attributed to the maker of a durable good or system. *See Trinko*, 540 U.S. at 407-08 (forcing a firm to share its infrastructure with competitors would diminish the incentive to innovate); Murphy Report ¶¶ 108-17 (explaining the economic benefits to consumers of closed systems). Indeed, those benefits were ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ewing Decl. Ex. 7 at 33; *see also, e.g., Suchanek v. Sturm Foods, Inc.*, No. 13-3843, 2014 WL 4116493, at *2-3 (7th Cir. Aug. 22,

16

2014) (discussing "awful" public response to launch of a TreeHouse portion pack containing instant coffee, which was "not the kind of premium product that Keurig customers expected").

Closed systems also help companies encourage new users to try their products by allowing them to offer a low price on the primary product, knowing that they will realize a profit on the secondary product. Murphy Report ¶ 116. Such systems also encourage the interbrand competition that the antitrust laws prize. *See Bus. Elecs. Co. v. Sharp Elecs. Corp.*, 485 U.S. 717, 724-725 (1988) (interbrand competition is "the primary concern of antitrust law"). If Keurig were prohibited from offering a closed system, it would be at a pricing disadvantage relative to competitors like Tassimo and Nespresso, both of which have closed systems.[16]

JBR argues that Keurig 2.0 is an "underwhelming" innovation. Compl. ¶ 101. There is, of course, no guarantee that Keurig 2.0 will succeed, as Keurig learned with its Vue Brewer.[17] But whether 2.0 succeeds or fails should be entirely up to consumers. *See Berkey Photo*, 603 F.2d at 287. Remarkably, JBR fails to cite the Second Circuit's *Berkey Photo* decision anywhere in its brief. If JBR loses sales because of widespread adoption of Keurig 2.0, this is what the antitrust laws intend. *See, e.g., Cargill Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115-16 (1986) (competition for increased market share is not antitrust injury). The courts have rejected product redesign claims for precisely this reason. *See, e.g., Eon Labs. Mfg. v. Watson Pharm., Inc.*, 164 F. Supp. 2d 350, 358 (S.D.N.Y. 2001) (dismissing Sherman Act claims for lack of antitrust injury where defendant introduced a new product to plaintiff's detriment); *S. Cal. Inst. of Law v. TCS Educ. Sys.*, No. CV 10-8026 PSG AJWX, 2011 WL 1296602, at *9 (C.D. Cal.

---

[16] In addition, when multiple companies in an industry use a practice, that sends a strong message that the practice is procompetitive. *See Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984) ("Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2."); *see also Berkey Photo*, 603 F.2d at 291 (noting that Kodak's conduct might be what "a smaller firm with integrated capabilities but no market control might" have done).

[17] Ewing Decl. Ex. 20, Updated Thoughts on Keurig 2.0 and F1Q14, Stifel, Jan. 30, 2014.

Apr. 5, 2011) (dismissing Sherman Act claims for lack of antitrust injury where plaintiff's

allegations "amount to nothing more than product or service improvement [by defendant] as a

way to increase market share").

The only product design case in this Circuit that JBR cites, *Xerox Corp. v. Media Scis.*,

511 F. Supp. 2d 372 (S.D.N.Y. 2007) ("*Xerox I*"), is one in which the *defendant* prevailed on

summary judgment for precisely the reasons that Keurig should prevail here. *Xerox Corp. v.

Media Scis.*, 660 F. Supp. 2d 535 (S.D.N.Y. 2009) (*"Xerox III"*).[18]  As discussed in detail below,

*Xerox III* establishes that product design choices do not violate Section 2 where the compatibility

of a system is known in advance and there is no evidence of "bait and switch," and JBR has

affirmatively alleged clear marketing by Keurig here.  *Id.* at 547-50 (noting that, even where

these conditions are met, there is no violation of the antitrust laws unless it is prohibitive for

customers to switch to an alternative).  Strikingly, while referring the Court to *Xerox I*, JBR fails

to mention *Xerox III* anywhere in its brief.

The two out-of-circuit cases JBR cites do not help it avoid the clear rule in the Second

Circuit.  In *C.R. Bard*, a split three-judge panel upheld a jury verdict over a strong dissent that

relied on the *Second Circuit's* treatment of product design claims.  *C.R. Bard, Inc. v. M3 Sys.,

Inc.*, 157 F.3d 1340, 1370 (Fed. Cir. 1998) (Newman, J., dissenting).  The *Bard* dissent criticized

the majority opinion as "a novel and pernicious theory of antitrust law that is contrary to the

principles of competition, and fraught with litigation-generating mischief."  *Id.*  Relying on the

Second Circuit's decision in *Berkey Photo*, the dissent noted that "[t]he competition-favoring

rule is that an innovator has no duty to help its competitors."  *Id.* (*citing Berkey Photo*, 603 F.2d

---

[18] *Xerox II* (*Xerox Corp. v. Media Sciences, Inc.*, 609 F. Supp. 2d 319, 322 (S.D.N.Y. 2009)) pertains to an issue not relevant here.  For the sake of clarity, we use the court's convention in that matter and refer to *Xerox I* for the motion to dismiss decision (*Xerox Corp. v. Media Sciences*, 511 F. Supp. 2d 372 (S.D.N.Y. 2007)) and *Xerox III* for the summary judgment decision (*Xerox Corp. v. Media Sciences*, 660 F. Supp. 3d 535, 554 (S.D.N.Y. 2009)).

at 281); *see also* VIID Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 777 (3d ed. 2006) (criticizing *Bard* and noting that its rule would "chill innovation unnecessarily").[19]

Likewise, *United States. v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001), is not an aftermarket case and is irrelevant given the well-developed body of Second Circuit case law specifically on point. JBR makes no claim analogous to that of the Department of Justice in *Microsoft* that Keurig introduced 2.0 in order to reinforce its purported monopoly *in brewers*. To the contrary, JBR benefits from the success of the Keurig 1.0 brewer, on which its products free-ride. The leading antitrust treatise distinguishes fact patterns like those in *Berkey Photo* and the present case from *Microsoft*: "The threat of chilling innovation [through judicial intervention in product design] seems much less in *Microsoft* than in *Berkey*. Berkey was essentially a free rider who wanted predisclosure in order to have time to duplicate portions of Kodak's new product designs. In contrast, the rivals in *Microsoft* were in the process of developing true alternative technologies that were structurally quite different from Microsoft's technology." Areeda & Hovenkamp ¶ 776. *See also Allied Orthopedic*, 592 F.3d at 1000 (relying on *Berkey Photo* in rejecting balancing approach articulated in *Microsoft* as "unwise" and "unadministrable").

## B.  JBR Has No Substantial Likelihood of Showing That Keurig Possesses Monopoly Power

JBR relies on assertions of Keurig's purported market share in "single serve brewers" to infer that Keurig has monopoly power that it is using to force JBR out of a "portion pack market." Pl. Br. 19. But Keurig 1.0's share is irrelevant to that claim. JBR is not excluded by sales of 1.0 brewers—instead, JBR *benefits* from those sales. And, as Keurig's experience with

---

[19] While *Bard* is not the applicable standard, it is also distinguishable on the facts. Unlike the biopsy gun in *Bard*, Keurig 2.0 is a genuine innovation with new features (most obviously a carafe capability) designed to meet consumer demand. *See also Medtronic Minimed Inc. v. Smiths Med. MD Inc.*, 371 F. Supp. 2d 578, 587 (D. Del. 2005) (distinguishing *Bard*). Keurig 2.0 also lays the groundwork for greater future innovation. *See* Ewing Decl. Ex. 15, Sullivan Dep. I 291:12-292:2; Ewing Decl. Ex. 16, Sullivan Dep. II 378:24-379:6, 450:25-451:3.

the Vue makes clear, Keurig's share of 1.0 brewers does not force adoption of a new machine. In fact, the large installed base of 1.0 brewers makes it *more* difficult for Keurig to sell 2.0 brewers to consumers that have already purchased a new brewer.[20]

It is Keurig's alleged market power with respect to Keurig 2.0 that is relevant to JBR's complaint. And Keurig 2.0—which has been on sale for only five days—has a virtually 0% share in JBR's alleged "single serve brewer" market. A 0% share cannot possibly support an inference of monopoly power. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (requiring "the predominant share of the market"); *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742 (2d Cir. 1989) (finding that 31% share did not support inference of monopoly).

JBR also argues Keurig has monopoly power in a purported market for portion packs (or compatible portion packs), again based on assertions about Keurig's high share.[21] Pl. Br. 19-20. This ignores the established case law on monopoly power in an "aftermarket" product—*e.g.*, portion packs, razor blades, or ink cartridges, designed for use with a primary product. This case law, interpreting the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services,* 504 U.S. 451 (1992), holds that share is not the right metric to assess monopoly power in an aftermarket. *See Xerox III*, 660 F. Supp. 2d at 544 ("[W]hile evidence that a single firm controls a large share of a relevant market is generally sufficient . . . the analysis is substantially different in cases involving . . . [an] aftermarket."); *see also Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381-82 (3d Cir. 2005); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17-18 (1st Cir. 1999). Courts have declined to find monopoly power even in cases

---

[20] Indeed, Keurig is focusing its 2.0 marketing on consumers who do not already own a single serve brewer. *See, e.g.*, Johnson Decl. Ex. 8 at 260, Ewing Decl. Ex. 22 at 8 ██████████████████████████████
██████

JBR wrongly attributes to Keurig all sales of licensed packs even though many Keurig licensed packs are sold by licensees who determine product strategy and pricing independent of Keurig. *See, e.g.*, Ewing Decl. Ex. 7 at 43-55.

with very high aftermarket share. *See, e.g.*, *Xerox III*, 660 F. Supp. 2d at 540, 550 (no monopoly

power despite 90-97% aftermarket share); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,

11 F. Supp. 2d 166, 167 (D. Mass. 1998) (no monopoly power despite 91% aftermarket share).

A firm that "treats its customers poorly in the aftermarket . . . presumably will lose new

sales of machines." *DSM Desotech*, 749 F.3d at 1345 n.5. Thus, to establish monopoly power in

an aftermarket, a plaintiff must show that:

> (i) customers who own the [primary market] good are "locked in"
> by the prohibitive costs of switching to an alternate product, *and* (ii)
> the lock-in permitted those customers to be exploited, either
> because (a) some limitation on information undermined their
> ability to know that the aftermarket goods and services were being
> sold at high prices, or (b) the defendant changed its aftermarket
> prices after the lock-in occurred.

*Xerox III*, 660 F. Supp. 2d at 547 (emphasis added).  JBR fails on all counts.  First, JBR does not

suggest that it is prohibitively costly to switch coffee brewers.  *See Eastman Kodak Co.*, 504 U.S.

at 477 (noting "the heavy initial outlay for Kodak equipment, combined with the required

support material . . . makes switching costs very high" for existing customers); *Xerox III*, 660 F.

Supp. 2d at 548 (finding no monopoly in aftermarket where plaintiff "offers no evidence" that

typical user would be deterred from switching).  Nor could it.  The average K-Cup brewer owner

uses about 1,000 K-Cups per year.  TreeHouse Compl. ¶ 289.  With price estimates from $██

to $██, Ewing Decl. Ex. 14, Sarina Dep. 142:5-10; TreeHouse Compl. ¶ 93, the cost of even

one year's worth of K-Cups (around $██████) is far more than the typical cost of a brewer.  *See*

*also* Murphy Report ¶ 39.  As in *Xerox III*, an "economically rational user will switch to an

alternate" machine in response to a K-Cup price increase if the savings "outweigh the additional

cost" of a new brewer.  660 F. Supp. 2d at 547.  This alone is fatal to any suggestion of

monopoly power in a portion pack aftermarket.

JBR's claim of monopoly power fails for the independent reason that JBR alleges no possibility of exploitation. Keurig will continue to manufacture and sell packs compatible with 1.0 brewers—all Keurig 2.0 K-Cups are backwards compatible. Thus, Keurig is not leveraging its purported portion pack share to coerce consumers into buying the Keurig 2.0 system. *Cf. Berkey Photo*, 603 F.2d at 287 n.39 (noting that the situation might be different if Kodak ceased production of the old film in order to compel users to switch to the new camera and purchase the new film). Nor does JBR suggest that Keurig is tricking consumers into buying 2.0 by falsely leading them to believe the system is open. To the contrary, JBR asserts that Keurig engaged in a "marketing blitz" beginning as early as September 2013 to ensure that customers understood the closed nature of the Keurig 2.0 from the get go. *See* Pl. Br. 3; *see also* Rogers Decl. ¶¶ 35-44 (detailing consumer awareness of Keurig 2.0's features); Ewing Decl. Ex. 18, Manly Dep. II 338:11-14; 338:24-339:6. The Second Circuit has made clear that aftermarket monopoly power is impossible where customers understand *ex ante* what they are purchasing. *See Smugglers Notch Homeowners' Ass'n*, 414 F. App'x at 377 (no lock in and thus no monopoly power where policies were fully disclosed in advance); *Hack*, 237 F.3d at 87 (same); *see also DSM Desotech*, 749 F.3d at 1346 & n.6 ("no lock in" and no monopoly power where "there was a general market awareness" of proprietary technology).[22] Accordingly, JBR has not demonstrated, and cannot demonstrate, monopoly power in any purported portion pack market.

### C. JBR Has Not Shown A Substantial Likelihood That It Will Prevail On Its Market Definitions

JBR's claim separately fails because it has not provided substantial evidence of a

---

[22] Nor is there any "bait and switch" through an *ex post* policy change. Keurig 2.0 changes nothing for the millions of owners of Keurig 1.0 brewers, who can continue to use K-Cups or unlicensed portion packs. Indeed, the fact that the demand for packs for 1.0 brewers is so much larger than the demand for packs for 2.0 brewers constrains rather than confers market power on Keurig.

properly defined relevant market. *See, e.g., Chapman v. N.Y. State Div. of Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (granting motion to dismiss where plaintiffs offered no reasonable explanation for narrow product market); *Commercial Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 166 F. Supp. 2d 891 (S.D.N.Y. 2001) (granting motion to dismiss for failure to allege plausible product market definition). JBR has offered little more than assertions that single-serve brewers are a distinct market, which does not satisfy its burden. This is independently fatal to its Section 2 claims and thus to its request for a preliminary injunction. *See, e.g., United States v. Long Island Jewish Med. Ctr.*, 983 F. Supp. 121, 137, 149 (E.D.N.Y. 1997) (denying preliminary and permanent injunction where plaintiff failed to show plausible relevant market).

JBR alleges three markets in its brief (Single-Serve Brewers, Portion Packs, and Compatible Portion Packs). Pl. Br. 18. Yet the evidence it cites does not come close to supporting these alleged markets, which omit products that are "reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956). To assess interchangeability courts look to "cross elasticity of demand," *i.e.*, the degree to which "consumers will change their consumption of one product in response to a price change in another." *Eastman Kodak Co.*, 504 U.S. at 469. Keurig brewers, drip brewers, French presses, pour-over brewers, and other coffee systems are all used by consumers for the same purpose: making coffee. *See* Murphy Report ¶ 75-77; Rausser Decl. ¶ 44. JBR offers no analysis of the cross-elasticity of demand between the Keurig systems and these other methods beyond brief anecdotal speculation. Rausser Decl. ¶ 44. JBR argues that single-serve brewers are "typically" more expensive than drip brewers. Pl. Br. 18. But it is well established that simply alleging price differences does not define a market. *See, e.g., Ad/SAT v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) (citing 2A Areeda ¶ 562c, at 262 ("Products can be near-

23

perfect substitutes even when their prices or qualities differ.")); *see also* Murphy Report ¶ 129.

Indeed, the evidence of cross-elasticity of demand in the record, including the evidence submitted by JBR, undermines rather than supports JBR's overly narrow market definition.  JBR asserts that Keurig sells its brewers at or below cost *precisely because* it competes aggressively to win consumers over from traditional coffee brewers.  Compl. ¶ 143, *see also* Johnson Decl. Ex. 16 at 28, 32, 53; Ewing Decl. Ex. 51 at 38.  And 2.0 itself demonstrates the folly of JBR's alleged "single serve" market: 2.0 offers multi-serve capability and is directly marketed against traditional coffee brewers.  *See* Ewing Decl. Ex. 15, Sullivan Dep. I 67:7-69:7; Ewing Decl. Ex. 18, Manly Dep. II 365:10-15, 366:7-10.

JBR's proof is no better in support of its alleged markets for portion packs.  JBR ignores the cross-elasticity of demand between Keurig-brewed coffee and coffee from other sources, never explaining why a K-Cup price increase would not encourage consumers to buy fewer K-Cups and substitute more ground coffee or coffee from coffee shops.  *See* Johnson Decl. Ex. 16 at 53.

### D.  JBR Has No Substantial Likelihood of Successfully Establishing Antitrust Injury

JBR's motion should be denied for the independent reason that JBR lacks standing.  It is axiomatic that the antitrust laws "were enacted for 'the protection of competition not competitors.'"  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).  JBR lacks standing because it has not alleged antitrust injury, *i.e.*, harm to "competition as a whole in the relevant market" rather than just harm to an individual competitor.  *George Haug v. Rolls Royce Motor Cars*, 148 F.3d 136, 140 (2d Cir. 1998); *see also Gatt Commc'ns, Inc. v. PMC Assocs.*, 711 F.3d 68, 76 (2d Cir. 2013) (finding no standing for antitrust claims where plaintiff failed to show antitrust injury).

Other competitors report that they have successfully developed 2.0-compatible portion

packs.[23]  Ewing Decl. Ex. 14, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  *Id.* 244:5-12;

250:20-22.  Whatever injury JBR suffers arises from JBR's failure to compete—not from harm

to competition.  JBR thus lacks antitrust standing.  *See US Airways Grp. v. British Airways PLC,*

989 F. Supp. 482, 489 (S.D.N.Y. 1997) (no antitrust standing where plaintiff could have entered

the market).  JBR's "remedy for the competitive disadvantage it says it faces is in the

marketplace, not in court."  *Medtronic,* 371 F. Supp. 2d. at 588.

### E. Keurig's Statements Do Not Violate the Sherman Act

JBR also challenges certain alleged statements by Keurig about JBR's products.  Courts

are deeply skeptical of antitrust claims based on speech and require a plaintiff bringing such a

claim "to overcome a presumption that the effect on competition of such a practice was *De*

*minimis.*"[24]  *Berkey Photo,* 603 F.2d at 288 n. 41.  JBR makes no meaningful attempt to

overcome this presumption.  JBR's purported evidence is emails or instant message discussions

with four individual customers offering hearsay that "Keurig" told them that use of JBR's

products *could* void their brewer warranty or cause problems with their brewer.[25]

This falls far short of meeting the six-part test JBR must satisfy to overcome the

presumption against such claims: "proof that the representations were [1] clearly false, [2]

clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without

knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily

---

[23] TreeHouse claimed to have reverse engineered the machine August 7, three weeks before the product was even released. Ewing Decl. Ex. 3 at 2.

[24] Indeed, at least one Circuit Court has asserted that such claims should not be permitted. *See Sanderson v. Culligan Int'l Co.,* 415 F.3d 620, 624 (7th Cir. 2005) (Easterbrook, J.) ("Commercial speech is not actionable under the antitrust laws.").

[25] In its brief, JBR only refers to statements Keurig purportedly made to customers "that Rogers' OneCups may cause damage to K-Cup Brewers and void consumers' warranties." Pl. Br. 21. JBR's accusations about Keurig 2.0 in its statement of facts serve no purpose. *See* Pl. Br. 4-9.

susceptible of neutralization or other offset by rivals." *Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).  As an initial matter, the statements JBR alleges Keurig made are true.  Keurig's warranty explicitly states that it does not "cover damages caused by use of non Keurig Brewed® K-Cup® brand packs or accessories."  Ewing Decl. Ex. 50 at 14.  And, JBR portion packs, which do not have a cup but rather suspend an open porous filter from a ring, may in fact damage K-Cup Brewers.  ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  Ewing Decl. Ex. 14, Sarina Dep. 258:15-259:6.

Moreover, ████████████████████, these statements are readily susceptible to neutralization.  *See Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) (adopting the Second Circuit's *Ayerst* test and holding that "the test refers to 'susceptible to neutralization' not 'successful in neutralization'").  Indeed, JBR had the chance to neutralize statements through communications with consumers.[26] This is what the antitrust laws encourage.  When faced with a purportedly misleading statement by a competitor, a company should "tout the virtues of its product," not bring an antitrust suit. *See, e.g., Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 527 (5th Cir. 1999); *see also Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 400 (7th Cir. 1989) (Easterbrook, J.) (appropriate remedy is "not antitrust litigation but more speech—the marketplace of ideas.").

JBR also lacks antitrust standing to pursue its disparagement claim.  JBR fails to show *any harm whatsoever* to competition from Keurig's alleged statements.  *See Eon Labs.*, 164 F. Supp. 2d at 356.  Indeed, in *Xerox I*, the court dismissed plaintiff's disparagement claims for

---

[26] *See, e.g.,* Yamauchi Decl. ¶¶ 2, 9; *see also* Yamauchi Exs. A-B, D-E ████████████████
████████████████████████████████████ ).

failure to explain how statements that the plaintiff's product "damages Xerox printers," "affected competition generally, and did not just cause [plaintiff] economic injury." *Xerox I*, 511 F. Supp. 2d at 382. JBR likewise fails to meet its burden.

### F. Plaintiff's California Law Claim Fails With Its Antitrust Claims

JBR's state law unfair competition claims fail for the same reasons as its federal antitrust claims. The California Unfair Competition Law cannot save a deficient Sherman Act claim. Following *Cel-Tech Communications Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163 (1999), on which JBR relies, the courts have consistently rejected claims by competitors and uniformly held that dismissal of Sherman Act claims "precludes a finding of unfair competition." *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008); *accord Chavez. v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (Cal. Ct. App. 2d Dist. 2001) (same); *Carter v. Variflex, Inc.*, 101 F. Supp. 2d 1261, 1270 (C.D. Cal. 2000) (same); *Drum v. San Fernando Valley Bar Ass'n*, 106 Cal. Rptr. 3d 46, 51 (Cal. Ct. App. 2d Dist. 2010) (same).

## III.   The Balance of Harms Weighs Against An Injunction

A court may "issue the injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger*, 607 F.3d at 80. Here, Keurig would bear the hardships disproportionately. JBR can continue to sell its portion packs to the owners of ███████ 1.0-compatible brewers. In contrast, enjoining the 2.0 would immediately and substantially ████████████████ ████████████████████████, imposing devastating and immediate harm on Keurig, not to mention consumers, who would not be able to choose the 2.0 if they wished.

Keurig has manufactured more than ████████████████████████████

████████████████████████████████████████████████████

██████ *See* Ewing Decl. Ex. 18, Manly Dep. II 361:11-14, 362:16-24; Ewing Decl. Ex. 16, Sullivan Dep. II 430:1-431:2, 451:23-453:11. Dr. Chatterjee is simply wrong ████████████

27

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Chatterjee Decl. ¶¶ 26-27.  *See* Ewing Decl. Ex. 16, Sullivan Dep. II 405:16-18, 429:16-20, 449:7-20 ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[27]

This would be devastating for Keurig.  This is exactly the circumstance where courts deny a preliminary injunction on balance of harms grounds.  *See, e.g., Programmed Tax Sys., Inc. v. Raytheon Co.*, 419 F. Supp. 1251, 1252 (S.D.N.Y. 1976) (balance of hardships favored defendant that had invested more than $1 million advertising its system); *Kind LLC v. Clif Bar Co.*, No. 14 Civ. 770, 2014 WL 2619817, at *13 (S.D.N.Y. June 12, 2013) (balance of hardships favored defendant that invested approximately $13.9 million in new product); *Becoming, Inc. v. Avon Prods., Inc.*, No. 01 CV 5863 (JSM), 2001 WL 930794, at *10 n.10 (S.D.N.Y. Aug. 15, 2001) (balance of hardships favored defendant that had "expended a substantial amount of money in developing its product line, and [stood] to lose a significant amount if the launch [were] delayed").

An injunction would also have grave repercussions for Keurig's customer and consumer relationships.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See, e.g.*, Ewing Decl. Ex. 52 at 28, 30-33, 35, 125-133. Changing course now and leaving retailers with empty shelves would harm consumers, retailers, and Keurig.  ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Ewing Decl. Ex. 18, Manly Dep. II 364:10-13.

---

[27] *See* Ewing Decl. Exs. 24-27.  Keurig press releases announcing 2013 sales by quarter (4.95 million brewers were sold in the fiscal first quarter, which includes the holiday season.  5.46 million were sold during the rest of the year).

*See, e.g., Kind*, 2014 WL 2619817, at \*13 (finding balance of harms weighed in favor of defendant partly because of lost "window of opportunity to meet consumer demand and develop brand loyalty").

Denying the injunction will have minimal impact on JBR, given the installed base of 1.0 brewers. Ewing Decl. Ex. 18, Manly Dep. II 365:5-15. If anything happens to JBR, it will happen slowly, measurably, and as a result of consumers making an informed decision to buy Keurig 2.0, which is far outweighed by the harm faced by Keurig from a possible injunction.[28]

## IV.    A Preliminary Injunction Would Be Against The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 23-24 (citation omitted). Granting this preliminary injunction would send a message that seeking emergency relief is a good way to forestall competition, notwithstanding the Second Circuit's warning that courts "must always be mindful lest the Sherman Act be invoked perversely in favor of those who seek protection against the rigors of competition." *Berkey Photo*, 603 F.2d at 273. "Given the risk that business rivals may seek to use antitrust to stifle rather than promote competition, district courts should pay particular attention to the public interest in such litigation," and "in attempting to weigh the equities of granting or denying a preliminary injunction in the antitrust setting, the pro- or anti-competitive effects on the market at large should be an important factor in the district court's analysis." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986); *Pamlab, L.L.C. v. Macoven Pharm., L.L.C.*, 881 F. Supp. 2d 470, 481 (S.D.N.Y. 2012) (citing "countervailing interest in open

---

[28] If the Court were inclined to grant a preliminary injunction, Keurig would request the opportunity to present supplemental briefing on the appropriate amount of security under Rule 65. Fed. R. Civ. P. 65(c). *See, e.g., Sanofi-Synthelabo v. Apotex Inc.*, 488 F. Supp. 2d 317, 349 (S.D.N.Y. 2006) (setting $400 million bond to account for "costs of relaunch" in case product was wrongfully enjoined).

competition" in denying preliminary injunction to enjoin marketing of product).

## **CONCLUSION**

For all of these reasons, Keurig respectfully requests that this Court deny JBR's motion for a preliminary injunction.

Dated: August 29, 2014
New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

**George S. Cary**
**Leah Brannon**
**Elaine Ewing**
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone:  (202) 974-1500
*gcary@cgsh.com*
*lbrannon@cgsh.com*
*eewing@cgsh.com*


**Lev L. Dassin**
**Danielle Mindlin**
One Liberty Plaza
New York, New York 10006
Telephone:  (212) 225-2790
*ldassin@cgsh.com*
*dmindlin@cgsh.com*

BUCHANAN INGERSOLL & ROONEY

**Wendelynne J. Newton**
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, Pennsylvania 15219
Telephone:  (412) 562-8932
*wendelynne.newton@bipc.com*



*Attorneys for Defendant Keurig Green Mountain, Inc.,*
*f/k/a Green Mountain Coffee Roasters, Inc., and as*
*successor to Keurig, Incorporated*