USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: _9/19/2014_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                           :

IN RE:                             :

                           :

KEURIG GREEN MOUNTAIN SINGLE-  :
SERVE COFFEE ANTITRUST       :
LITIGATION                   :

                           :

*This order relates to 14-CV-4242*    :

                           :
-------------------------------------------------------- X

14-MD-2542 (VSB)
14-MC-2542 (VSB)

**MEMORANDUM & ORDER**

<u>Appearances</u>:

Daniel Johnson, Jr.
Kent Roger
Dion Bregman
Morgan, Lewis & Bockius LLP
San Francisco, CA
*Counsel for Plaintiff JBR, Inc.*

Lev Dassin
George S. Cary
Leah Brannon
Elaine Ewing
Danielle Mindlin
Cleary Gottlieb Steen & Hamilton LLP
New York, NY

Wendelynne Newton
Buchanan Ingersoll & Rooney PC
Pittsburgh, PA
*Counsel for Defendant Keurig Green Mountain, Inc.*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       Plaintiff JBR, Inc. ("JBR") seeks a preliminary injunction enjoining Defendant Keurig

Green Mountain, Inc. ("Keurig") from promoting or selling its new Keurig 2.0 brewer ("the 2.0")

and from making false or misleading statements about JBR's products. For the reasons set forth

below, JBR has not established that it is imminently likely to suffer irreparable injury in the

absence of preliminary relief. At most, the evidence in the record establishes only that JBR has

lost some potential business opportunities, that its sales increased more slowly than forecast in June and July 2014, and that its sales may decline by an unknown amount over an unknown period of time if the 2.0 is successful. The possibility that JBR will suffer such severe consequences as a possible breach of its loan covenants or potential bankruptcy as a result of actions by Keurig during the pendency of this litigation is speculative and remote. In addition, any injury JBR has shown it is likely to suffer would be compensable with money damages. Accordingly, I deny JBR's motion for a preliminary injunction.

## I.  **Background**[1]

Single-serve coffee brewers brew a single cup of coffee by running hot water through a disposable cartridge, or "portion pack," containing coffee grounds. (Compl. ¶ 13.)[2] Single-serve brewers offer consumers convenience and efficiency by allowing them to brew one cup of coffee at a time, in the flavor of their choice, with minimal effort, excess, or mess. (*See id.*)

Keurig developed and introduced to market in the 1990s the first commercially successful single-serve coffee brewer.[3] (*Id.* ¶ 15.) Since then, Keurig has developed a variety of single-serve brewers marketed for home use by consumers and for use in offices, hotels, and retail establishments. (*Id.* ¶ 16.) Keurig also markets and sells its own proprietary portion packs of coffee, known as "K-Cups." (*Id.* ¶ 15.) Keurig's business model relies upon selling brewers at or near cost, and then selling K-Cups at a substantial profit to previous purchasers of brewers. (*See, e.g.*, *id.* ¶¶ 48-49.) Keurig has entered into licensing agreements with major beverage

---

[1] Unless otherwise noted, the facts set forth here are drawn from the allegations of JBR's Complaint. I assume those allegations to be true for purposes of this background summary. My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

[2] "Compl." refers to JBR's Complaint. (No. 14-CV-4242, Doc. 1.)

[3] Keurig, Inc., was acquired by Green Mountain Coffee Roasters, Inc., a public company, in 2006. (Compl. ¶ 15.) The company changed its name to Keurig Green Mountain, Inc. this year. (*Id.* ¶ 6.)

retailers, such as Starbucks and Dunkin' Donuts, authorizing the sale of K-Cups bearing those companies' trademarks. (*Id.* ¶ 32.) It has also entered into exclusive "Keurig Authorized Distributor" agreements ("KAD agreements") with vendors of K-Cups and Keurig brewers in the commercial "away from home" market, requiring those vendors not to sell portion packs manufactured by Keurig's competitors. (*Id.* ¶¶ 74-75.) Keurig held patents relating to the design of the filter enclosed in the K-Cup until their expiration in 2012. (*Id.* ¶ 31.)

Keurig has sold over 30 million single-serve brewers. (*Id.* ¶ 17.) Other firms have developed and currently sell their own single-serve brewers, but they have not earned significant market share. (*Id.* ¶ 19.) In recent years, Keurig has introduced new single-serve brewers that use portion packs that are not compatible with K-Cup brewers, such as the VUE brewer. (*Id.* ¶ 16.) These brewers have not been commercially successful.[4] (*Id.*)

JBR, doing business as the Rogers Family Company, is a family-owned firm headquartered in California that roasts, packages, and sells sustainable premium coffee. (*Id.* ¶ 5.) In 2011, JBR introduced its own portion pack for the Keurig 1.0, called the OneCup. (*Id.* ¶ 35.) While the Keurig K-Cup encloses coffee grounds in a plastic chamber, the coffee grounds in a JBR OneCup are contained in a permeable mesh filter. (*Id.*) This design reduces production costs, increases the flow of water through the grounds, and minimizes the environmental impact of the disposed portion packs.[5] (*Id.*)

In 2011, Keurig filed suit against JBR in the U.S. District Court for the District of Massachusetts, alleging that JBR's OneCup infringed Keurig's patents relating to the K-Cup. (*Id.* ¶ 61.) The district court granted summary judgment in favor of JBR, *Keurig, Inc. v. JBR,*

---

[4] I will refer generally to the original Keurig single-serve brewer platform, including all models with which standard K-Cups are compatible, whether manufactured by Keurig or not, as the "Keurig 1.0" or the "1.0."

[5] In 2013, JBR introduced 97 percent biodegradable portion packs. (Compl. ¶ 35.)

*Inc.*, No. 11-CV-11941, 2013 WL 2304171 (D. Mass. May 24, 2013), and the Federal Circuit affirmed, 558 F. App'x 1009 (Fed. Cir. 2014). (Compl. ¶¶ 67, 70.)

In 2013, Keurig announced that it was developing a new line of brewers utilizing a new technology referred to as 2.0. (*Id.* ¶ 85.) The 2.0 offers consumers the ability to brew a carafe of coffee in addition to a single cup. The 2.0 only brews beverages contained in portion packs authorized by Keurig. (*Id.* ¶ 87.) The lid of every authorized portion pack is marked with special proprietary ink. (*Id.* ¶ 86.) The 2.0 is equipped with a scanner that detects the ink and allows the authorized portion pack to be used. (*Id.*) If the user inserts an unauthorized portion pack without the proprietary ink into the 2.0, the brewer will not brew the beverage.[6] Before the 2.0's release, Keurig engaged in an extensive promotional campaign to make retailers and consumers aware that the 2.0 would accept only authorized portion packs.[7] (*See, e.g.*, Johnson Decl. Ex. 16, at 65 (stating, in Keurig's presentation to Walmart, the need for "clear merchandising messaging regarding system compatibility: . . . K2.0 does not work with unlicensed portion packs").)[8]

---

[6] The parties differ in the nomenclature they use to describe the ink-reading process that prevents the use of unlicensed portion packs in the 2.0. JBR calls it "the lockout." Keurig calls it "the Consumer Benefit Technology." Underlying this semantic disagreement is a factual dispute over whether the technology serves a purpose in addition to preventing the use of unlicensed portion packs, such as differentiating between K-Cups and VUE portion packs or prompting the 2.0's user interface to display beverage recipes. I refer to the ink-reading process that prevents the use of unlicensed portion packs as "the ink-scanning technology" or simply "the ink scan." In doing so, I make no findings and reach no conclusions as to how the ink scan actually works, or as to whether it accomplishes or is technologically necessary to accomplish anything other than to prevent the use of unlicensed portion packs.

[7] In recent weeks, various models of the 2.0 have been made available to the public for retail purchase. *See, e.g.*, *Keurig 2.0 K300 Coffee Brewing System with Carafe*, Walmart, http://www.walmart.com/ip/Keurig-2.0-K300-Coffee-Brewing-System-with-Carafe/37650690 (last visited Sept. 17, 2014).

[8] "Johnson Decl." refers to the Declaration of Daniel Johnson, Jr., in Support of Plaintiff's Motion for a Preliminary Injunction. (No. 14-MD-2542, Doc. 99.)

## II.    <u>Procedural History</u>[9]

JBR initiated this action in the U.S. District Court for the Eastern District of California in Sacramento on March 13, 2014, alleging violations of the Sherman Act, 15 U.S.C. § 2, the Clayton Act, *id.* § 14, the Lanham Act, *id.* § 1125(a), and California statutory and common law. (*See* Compl. ¶¶ 126-207.)  The gravamen of JBR's complaint is that Keurig has monopoly power in the markets for single-serve brewers and portion packs, and has engaged in a variety of unlawful anticompetitive conduct.  JBR also alleges that Keurig has engaged in unlawful competition and unfair business practices under California law, including by making false and misleading statements that disparage JBR's OneCup product.  In April 2014, JBR moved for a preliminary injunction in the Eastern District of California seeking to prohibit Keurig from enforcing the exclusivity provisions of its KAD agreements with distributors; making false and disparaging statements about JBR and its products; and promoting or introducing the ink scan in the 2.0.  (No. 14-CV-4242, Doc. 19, at 2.)

JBR's lawsuit was one of many similar actions filed in early 2014 in federal district courts around the country alleging that Keurig has engaged in unlawful anticompetitive conduct in conjunction with the 2.0.  These included several related cases before me, including an action filed by another Keurig competitor, TreeHouse Foods, Inc., and its subsidiaries (collectively, "TreeHouse").[10]  On March 20, 2014, the named plaintiff in one of the related cases moved the Judicial Panel on Multidistrict Litigation ("JPML") to centralize all of the cases concerning the 2.0 in a single multidistrict litigation ("MDL") in this District.  The proposed MDL encompassed

---

[9] The following is only a summary of the procedural history relevant to issues related to the preliminary injunction motion.

[10] I refer to JBR and TreeHouse collectively as the "Competitor Plaintiffs."

three types of actions: direct purchaser class actions, indirect purchaser class actions, and the Competitor Plaintiffs' individual actions. (Doc. 1, at 1.)[11] The Competitor Plaintiffs opposed centralization. (*Id.*) The JPML concluded that all of the related actions, including the Competitor Plaintiffs', raised "virtually identical factual questions concerning the conduct of Keurig." (*Id.* at 2.) On June 3, 2014, pursuant to 28 U.S.C. § 1407, the JPML transferred JBR's action, as well as several others, to this District and assigned it to me for consolidated pretrial proceedings as part of the MDL. (*Id.* at 3.)

I granted in part and denied in part the Competitor Plaintiffs' request for expedited discovery. I permitted the Competitor Plaintiffs to propound requests for documents sufficient to show the development, design, and specifications of the ink-scanning technology and to show the testing, marketing, and sale of the 2.0. (Doc. 57, at 2-3.) I also permitted the Competitor Plaintiffs to depose witnesses designated to testify on Keurig's behalf, pursuant to Federal Rule of Civil Procedure 30(b)(6), concerning: the reasons for implementing the ink-scanning technology; Keurig's policies relating to the marketing and sale of the 2.0; and Keurig's analysis of the performance and safety of authorized and unauthorized portion packs in the 2.0.[12] (*Id.* at 4.) Keurig sought and was granted reciprocal discovery against any party moving for a preliminary injunction. (Doc. 64.) After publicly announcing that it had successfully reverse-engineered Keurig's ink-scanning technology to develop its own portion packs that would be compatible with the 2.0, TreeHouse declined to move for a preliminary injunction. (Doc. 82.)

JBR filed its operative motion for a preliminary injunction in this Court on August 11, 2014. (Doc. 84.) JBR seeks to enjoin Keurig from: (1) "[p]romoting, marketing, or making

---

[11] Unless otherwise noted, all such citations to numbered documents are to the docket in No. 14-MD-2452.

[12] General discovery has been stayed pending resolution of Keurig's forthcoming motions to dismiss. (Doc. 57, at 4.)

available for sale any 'Keurig 2.0' machine that includes a 'lock-out' of unlicensed portion packs"; and (2) "[m]aking false or misleading statements about [JBR]'s products to its customers or to consumers." (*Id.* at 2.) JBR's requested injunction does not address Keurig's exclusive KAD agreements with commercial vendors.[13]  In support of their positions, both parties submitted memoranda of law, numerous declarations from lay and expert witnesses, deposition transcripts, and documentary exhibits obtained through discovery.[14]

I heard argument on the motion at a hearing on September 3 and 4, 2014.  Although I ordered that all declarants be made available for cross-examination at the hearing, (Doc. 64), the parties mutually agreed not to present any live testimony.

### III.  Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  A party seeking a preliminary injunction must show:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of the injunction; (3) that the balance of hardships tips in the movant's favor; and (4) that the public interest is not disserved by the issuance of the injunction.  *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010).  The party seeking the injunction must demonstrate "by a clear showing" that the necessary elements are satisfied.  *Mazurek v. Armstrong*, 520 U.S. 968, 972

---

[13] After I instructed JBR to narrowly tailor its requests for expedited discovery, I was not asked to review requests for KAD agreements in connection with its motion for expedited discovery filed in this District.  (*See* Doc. 28, Exs. C, D.)  Keurig enters into KAD agreements with vendors in the commercial "away from home" market, such as office supply distributors, not with retailers who sell directly to individual consumers.  (Compl. ¶¶ 74-75.)  JBR's OneCup sales in the office supply market account for less than ▮▮▮▮▮ of its overall OneCup sales.  (Sarina Decl. ¶ 5.)  Because the KAD agreements are outside the scope of JBR's requested relief and concern a segment of the portion pack market immaterial to JBR's current business, I do not discuss any alleged injury relating to the KAD agreements below.

[14] Given the expedited nature of the proceedings, I did not conduct hearings on the admissibility of expert opinion testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).  I advised the parties that I would accept all proffered expert declarations, subject to the parties' arguments about the appropriate weight afforded each.  (9/4 Tr. 258:7-14.)  "9/4 Tr." refers to the record of proceedings of the preliminary injunction hearing on September 4, 2014.  (Doc. 143.)

(1997) (internal quotation marks omitted); *see Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 498 (S.D.N.Y. 2013). A plaintiff seeking an injunction that is mandatory—that is, that will alter rather than maintain the status quo—"must show a 'clear' or 'substantial' likelihood of success." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) (quoting *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995)).

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (per curiam) (internal quotation marks omitted); *accord Naden v. Numerex Corp.*, 593 F. Supp. 2d 675, 680 (S.D.N.Y. 2009) (citing *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981)) (noting that "[t]he threat of irreparable injury is a *sine qua non*"). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). The movant must establish a likelihood of irreparable harm before the other requirements for the issuance of a preliminary injunction will be considered. *See Rodriguez*, 175 F.3d at 234.

**IV.** **Discussion**

JBR's claims of irreparable injury are too remote, conclusory, and speculative to justify the emergency intervention it seeks.

**A.** ***Summary of JBR's allegations and evidence of injury***

JBR introduced the OneCup in 2011. Over the next three years, OneCup sales increased from ▮▮▮▮ of JBR's total gross sales in Fiscal Year 2012 t ▮▮▮▮ of total gross sales in Fiscal

Year 2014.  (Sarina Decl. ¶ 3.)[15]  Three retailers account for over ███████ of JBR's

OneCup sales: Costco; Amazon; and BJ's Wholesale Club.  (*See* Sarina Supp. Decl. ¶¶ 12, 17

███████████████████████████ respectively).)[16]  Beyond this "[c]oncentration . . .

at the very, very top," most other retailers to which JBR sells OneCups are "totally immaterial"

to its overall business.  (Sarina Dep. 197:14-18.)[17]  JBR has invested ███████ in the

machinery used to produce OneCups.  (Sarina Decl. ¶ 4.)

Because JBR is heavily dependent upon Costco and BJ's, the loss of either's business

would "drown" JBR.  (Sarina Supp. Decl. ¶ 12.)  Costco has required JBR to mark OneCup

boxes sold at Costco with labels stating:  "Can be used in most Keurig K-Cup Brewers – NOT

compatible with Version 2.0 or Vue Brewers."[18]  (Jon Rogers Decl. Ex. 6; *see* Sarina Supp. Decl.

¶ 11.)[19]  Costco has also declined to expand its distribution of OneCup products to any additional

stores.  (Jon Rogers Decl. ¶ 38.)  In June 2014, BJ's declined to enter into an agreement with

JBR to produce private-label portion packs; BJ's contracted with Keurig to do so instead.[20]  (*Id.*

¶ 44.)  As the 2.0 reaches the market, "[t]here is every reason to believe that . . . [JBR] will lose

significantly more business."  (Sarina Decl. ¶ 7.)

JBR avers that it has lost other opportunities for new business because retailers have

expressed concern after meeting with Keurig that JBR products will not work in the 2.0.  (*Id.* ¶

---

[15] "Sarina Decl." refers to the Declaration of Michael Sarina in Support of Plaintiff's Motion for a Preliminary Injunction.  (Doc. 93.)

[16] "Sarina Supp. Decl." refers to the Supplemental Declaration of Michael Sarina in Support of Plaintiff's Reply in Support of Its Motion for a Preliminary Injunction.  (Doc. 131.)

[17] "Sarina Dep." refers to the Deposition of JBR, Inc., by Michael Sarina, August 26, 2014.  (Doc. 127, Ex. 14.)

[18] An image of a JBR OneCup package with the Costco disclosure label affixed to it is attached as Appendix A.

[19] "Jon Rogers Decl." refers to the Declaration of Jon Rogers in Support of Plaintiff's Motion for a Preliminary Injunction.  (Doc. 86.)

[20] A private label program is the process by which a company manufactures and packages beverage products, "including single-serve portion packs, under the customers' own label."  (Hybsch Decl. ¶ 3.)  "Hybsch Decl." refers to the Declaration of Kathy Hybsch in Support of Plaintiff's Motion for a Preliminary Injunction.  (Doc. 87.)

6.)  After JBR spent 18 months working with the grocery chain Kroger to develop a Kroger private-label portion pack of tea, Kroger informed JBR that it would only contract with JBR for several months and would thereafter contract with Keurig.  (Jon Rogers Decl. ¶ 43.)  A regional sales manager for JBR testified that Keurig's statements to retailers that unauthorized portion packs will not work in the 2.0 have "caused much concern" among customers and potential customers and have "directly impacted" OneCup sales.  (Hybsch Decl. ¶ 11.)  As a result of Keurig's statements, at least two supermarket chains delayed their decisions concerning whether to hire JBR to produce private-label portion packs.  (*Id.*)  JBR also submitted electronic message exchanges between its customer service staff and several customers who said Keurig had told them that using JBR OneCups could damage their Keurig brewer or void its warranty.  (*See* Yamauchi Decl. Exs. 1-4.)[21]

JBR declares that it would lose the ability to ███████████████████ required by certain of its loan covenants if it los ███████ of its OneCup sales.  (Sarina Supp. Decl. ¶¶ 14(b), 29; *see also* Sarina Dep. 158:24-159:4 ("[W]hat we are worried about is our ███████████ ██████████████████████████████████████████████ we run the risk of being out of compliance with debt covenants.").)  A loss of ███████ of OneCup sales would also immediately result in a negative cash flow, impeding JBR's ability to service its debt and to advance money to coffee farmers, thus threatening its overall operations.  (*See* Sarina Supp. Decl. ¶¶ 14(c), 29.)  JBR has 93 full-time equivalent employees who work exclusively on the OneCup and "whose jobs would be eliminated if [JBR] no longer has a OneCup business."  (Sarina Decl. ¶ 9.)[22]

---

[21] "Yamauchi Decl." refers to the Declaration of Warren Yamauchi in Support of Plaintiff's Motion for a Preliminary Injunction.  (Doc. 98.)

[22] Previously incurred legal costs and fees associated with Keurig's unsuccessful patent litigation against JBR, (*see*

**B.** *JBR's asserted injury resulting from a future decline in sales is remote and speculative.*

JBR's argument necessarily assumes that: (1) the Keurig 2.0 will be successful; (2) consumer substitution away from the 1.0 will cause JBR to suffer a decline in OneCup sales; (3) this decline in sales will be large enough to prevent JBR from servicing its debt and to render JBR noncompliant with certain of its loan covenants; and (4) JBR's ongoing operations may be jeopardized. This attenuated chain of assumptions is not sufficiently supported by competent evidence to constitute a clear showing of irreparable injury.

It is wholly uncertain at this early date whether the Keurig 2.0 will be commercially successful. Keurig's VUE brewer was notably unsuccessful, and some market analysts have anticipated that consumer response to the 2.0 will be unenthusiastic.[23] (*See, e.g.*, Ewing Decl. Ex. 20.)[24] JBR's economic expert opines that customers are "likely to stay with the coffee brewer they have purchased because of the 'sunk cost problem.'" (Rausser Rebuttal Decl. ¶

---

Sarina Decl. ¶ 5), are not relevant to this motion for a preliminary injunction since they amount at most to past damage. *See Grand River Enter. Six Nations*, 481 F.3d at 66 (requiring imminent injury).

[23] To the extent online retailers' customer ratings are probative of consumer preferences, (*see, e.g.*, Yamauchi Decl. ¶ 13), I note—although I do not rely on material outside the record in reaching my conclusions—that initial consumer response to the 2.0 hardly appears overwhelmingly positive, *see, e.g.*, *Keurig 2.0 K300 Coffee Brewing System with Carafe*, Walmart, http://www.walmart.com/ip/Keurig-2.0-K300-Coffee-Brewing-System-with-Carafe/37650690 (last visited Sept. 17, 2014) (12 out of 19 reviewing customers giving lowest possible rating); *Keurig K550 2.0 Brewer*, Amazon, http://www.amazon.com/Keurig-K550-2-0-Brewer/dp/B00KYWL6E8 (last visited Sept. 17, 2014) (average rating of 2.5 stars; 31 out of 64 reviewing customers giving lowest possible rating); *Keurig 2.0 K560 Brewer with Keurig Carafe, 48 K-Cup Packs and 4 K-Carafe Packs*, Costco, http://www.costco.com/Keurig-2.0%C2%AE-K560-Brewer-with-Keurig%E2%84%A2-Carafe,-48-K-Cup%C2%AE-Packs-and-4-K-Carafe%E2%84%A2-Packs.product.100129587.html#BVRRWidgetID (last visited Sept. 17, 2014) (average rating of 2.5 stars). One consumer who rated the brewer 4 out of 5 stars apparently did so only because he discovered a way to "trick" the 2.0 into brewing unlicensed cups. *See Customer Review*, Amazon, http://www.amazon.com/review/R1TJ22Z2JOS8N5/#R1TJ22Z2JOS8N5 (last visited Sept. 15, 2014) ("I just purchased [the 2.0] and like everyone else I was extremely upset that not all the K-cups work in this brewer. I was about to return it but then I did some googling and found it is possible to trick the brewer into brewing any K-Cup you want!").

[24] "Ewing Decl." refers to the Declaration of Elaine Ewing in Support of Keurig Green Mountain's Opposition to JBR's Motion for a Preliminary Injunction. (Doc. 127.)

50.)[25]  That is, even if the marginal benefit of purchasing a new 2.0 exceeds the marginal cost, some consumers may decline to purchase a 2.0 out of a desire to maximize their prior investment in their existing machine, whether a 1.0 or a traditional drip brewer.  This supports the notion that owners of 1.0 machines will hold on to their machines rather than purchasing a new 2.0.

The evidence in the record does not support the conclusion that any consumers who do buy the 2.0 are imminently likely to replace existing 1.0 brewers in large numbers.  In developing the 2.0's carafe brewing function, Keurig responded in part to market research showing that consumers who had not purchased Keurig brewers had not done so because they wanted the ability to brew larger quantities of coffee.  (Johnson Decl. Ex. 16, at 32.)  Thus, "the primary audience for Keurig 2.0 is [the] new customer to the Keurig system who will appreciate the added benefits of the functionality of the system."  (Johnson Decl. Ex. 8, at 260.)  The majority of 1.0 brewers in use at the end of 2014 will have been shipped in the past two years, (Ewing Decl. Ex. 22, at 8), and Keurig brewers, like many consumer products, are designed to last for several years, (*see* Ewing Decl. Ex. 58, at 11; 9/3 Tr. 167:5-17).[26]  Accordingly, although the 2.0 will soon replace the 1.0 on retail shelves, (*see, e.g.*, Johnson Decl. Ex. 16, at 44), a substantial proportion of 2.0 purchasers in the near term will likely be converting from traditional drip coffee brewers rather than from 1.0 brewers that remain in good working order.  JBR presents no persuasive evidence to the contrary, or indeed any evidence at all to quantify the rate at which consumers should be expected to substitute the 2.0 for the 1.0.

By JBR's own admission, there will remain a significant market for 1.0-compatible

---

[25] "Rausser Rebuttal Decl." refers to the Rebuttal Declaration of Gordon Rausser, Ph.D., in Support of JBR Inc.'s Motion for Preliminary Injunction.  (Doc. 138.)

[26] "9/3 Tr." refers to the record of proceedings of the preliminary injunction hearing on September 3, 2014.  (Doc. 141.)

portion packs for the next several years. JBR estimates that there will be over 26 million Keurig 1.0 brewers in use at the end of 2014, and that there will still be over 15 million Keurig 1.0 brewers in use in 2019. (Ewing Decl. Ex. 22, at 8.) Keurig will also continue to sell its most popular 1.0 brewer, the K10 "Mini," for the foreseeable future. (Manly Dep. 200:11-201:6; Ewing Decl. Ex. 36, at 4.)[27] 1.0-compatible brewers produced by other manufacturers have recently been introduced to the market. (Ewing Decl. Ex. 36, at 7-8.) Firms that produce 1.0 brewers under license from Keurig, such as Mr. Coffee and Cuisinart, have not yet committed to adopting the 2.0. (*Id.* at 4.) JBR will therefore likely retain the ability to sell OneCups to serve the existing installed base of 1.0-compatible brewers for some time. As JBR put it in June 2014: "Even With the Launch of Keurig 2.0, It Will Take Substantial Time to Impact Current Keurig Brewer Penetration."[28] (Ewing Decl. Ex. 22, at 8.)

Nor does JBR present convincing evidence that a significant decline in OneCup sales is likely or imminent. In February 2014, after Keurig had announced that it would be releasing the 2.0 and that the 2.0 would not accommodate unlicensed portion packs, JBR generated sales projections for Fiscal Year 2015 to provide to its bank. (Sarina Dep. 139:2-6, 148:3-10, 151:12-

---

[27] "Manly Dep." refers to the Deposition of Keurig Green Mountain, Inc., by David W. Manly, August 8, 2014. (Doc. 127, Ex. 13.)

[28] In response, JBR points to Keurig's own prediction that "K2.0 will be ███ of installed base by 2015 [and] ███ (Reply Brief in Support of Plaintiff JBR Inc.'s Motion for a Preliminary Injunction, Doc. 130, at 13 (quoting Supplemental Declaration of Daniel Johnson, Jr., in Support of Plaintiff's Motion for a Preliminary Injunction, Doc. 135, Ex. 15, at 81); *see also* Manly Dep. 244:24-248:7 (asserting that this prediction assumed ███ ███ These forecasts of the 2.0's *share* of the installed base do not necessarily contradict JBR's predictions of the *number* of 1.0s remaining in the installed base. The 2.0's future share of Keurig's installed base depends largely upon Keurig's success or failure in expanding that installed base by reaching its primary target audience for the 2.0: consumers who currently own a conventional coffee brewer. To the extent these projections may be contradictory, the forecast JBR used for its own commercial purposes is at least as probative, if not more so, of JBR's expected future harm. I also note that JBR has not explicitly disclaimed the accuracy of the forecast it used.

15; PX-PI-133.)[29]  JBR subsequently combined these projections with actual sales data from April through July of 2014 to forecast ███████ in gross OneCup sales in Fiscal Year 2015. (Ewing Decl. Ex. 4.)  This would represent an approximately ███████ increase over JBR's ██████ in actual gross OneCup sales in Fiscal Year 2014.  (*See* Sarina Decl. ¶ 3; *see also* Sarina Dep. 165:21-25 (confirming projected increase of ██████).)

     JBR now attempts to disclaim the February projections, asserting that they were prepared before JBR knew when the 2.0 would be released or whether the OneCup would be compatible with the 2.0.  (Sarina Supp. Decl. ¶¶ 9-10.)  At the time, however, JBR was aware that the 2.0's release was scheduled for the Fall of 2014, (Compl. ¶ 85), and Costco had already told JBR that it would be required to "inform customers that [its] products were not compatible with the Keurig 2.0 brewer," (JBR Mem. at 13; *accord* Sarina Dep. 166:19-167:24).[30]  If the 2.0 and the Costco disclosure labels were truly the imminent threat to JBR's viability that it now claims, one would expect JBR to have accounted for them in some fashion.  That JBR did not know the 2.0's precise release date did not prevent it from making reasonable assumptions in its forecast to its lenders.  Moreover, JBR continued to use the February projections in the ordinary course of business several months later, (*see* Ewing Decl. Ex. 4), further calling into doubt its attempt to discredit those projections during these proceedings.[31]

     Even if JBR's argument that the February projections overstate its true current

---

[29] Both parties submitted and relied upon documentary exhibits at the hearing that were not introduced into the record through sworn declarations of counsel or witnesses.  Citations to these documents are to the exhibit designations provided by the parties for the preliminary injunction hearing, such as PX-PI-133.

[30] "JBR Mem." refers to the Memorandum of Law in Support of Plaintiff JBR Inc.'s Motion for a Preliminary Injunction.  (Doc. 92.)

[31] I note that JBR maintained its forecast of a ██████ increase in gross OneCup sales for 2015 after it should have become aware that the 2.0 would be released in August and used the actual sales figures for June and July 2014, the months in which JBR's sales did not meet projections.

expectations for the OneCup is credited, as of August 26, 2014, JBR had not generated any alternative projections in the ordinary course of business to reflect the 2.0's impact on its OneCup sales. (Sarina Dep. 149:13-15.) JBR has not provided meaningful revised data to its lenders or, more important for present purposes, to the Court. No projections generated by JBR in the ordinary course of business actually suggest that it will lose ███████ of its OneCup sales. (Sarina Dep. 174:4-9.) Other than statements made in connection with this litigation, JBR has no formal or informal projections suggesting that its OneCup sales will decrease at all from Fiscal Year 2014 to Fiscal Year 2015.[32] (Sarina Dep. 168:13-20.)

JBR's assertion that it may lose ███████ of its OneCup business is based largely on its belief that it may "lose . . . 100 percent of our Costco business, because the volume [of sales] is likely to drop when prospective customers read the label on the box that suggests [the OneCup is] not compatible with [the 2.0]." (Sarina Dep. 174:23-175:1.) JBR offers little evidence to support its contention that the disclosure label required by Costco will function as a "scarlet letter" that materially affects, let alone wholly destroys, its Costco sales. (JBR Mem. at 13.) The Costco disclosure label is accurate and notes that the OneCup works in "most" Keurig brewers, while specifying the brewers in which it does not work. (Jon Rogers Decl. Ex. 6.) The label may just as easily ameliorate as cause consumer confusion. As of August 26, 2014, JBR had not observed an actual decline from the previous year's sales at Costco. (Sarina Dep. 175:22.)

Furthermore, the Amazon webpage for JBR's "San Francisco Bay" OneCup packages

---

[32] In his supplemental declaration, JBR Chief Financial Officer Michael Sarina explains that JBR is a relatively small family-owned firm, and that his statements in his deposition about the absence of financial projections were simply meant to address the sort of formal projections common in publicly held corporations. (Sarina Supp. Decl. ¶ 5.) JBR, Sarina explains, gathers data and adjusts its expectations on a "'real-time' daily basis." (*Id.*) Even assuming that this explanation is credited, Sarina's most recent statements in his supplemental declaration still do not provide evidentiary support for the conclusion that JBR's sales will markedly decrease from prior years, rather than simply increase below existing expectations.

contains a disclosure statement similar to the one required by Costco, stating that JBR's OneCups are "[c]ompatible with Keurig K-Cup Brewers" but "not compatible with Keurig Vue or Rivo." (DX-PI-CS.) Yet JBR's Amazon sales are strong, and JBR does not claim it expects them to decline. (*See* JBR Mem. at 3 ("regularly recognized as the '#1 Best Seller'"); 9/3 Tr. 89:17-19 ("Amazon doesn't care about Keurig because they will sell everything, so our Amazon business is likely to be whatever it continues to be.").)

JBR's reliance on cases concluding that the loss of 30 percent of one's business constitutes irreparable harm is therefore misplaced. *See, e.g.*, *Young Jin Choi v. United States*, 944 F. Supp. 323, 326 n.2 (S.D.N.Y. 1996) (citing *Kim v. United States*, 822 F. Supp. 107, 110 (E.D.N.Y. 1993); *Ibrahim v. United States*, 650 F. Supp. 163, 165 (N.D.N.Y.), *aff'd*, 834 F.2d 52 (2d Cir. 1987))). Those cases involved administrative actions terminating grocery stores' participation in food stamp programs. Because it was not disputed that the grocery stores received 30 percent of their income from food stamps, *see, e.g.*, *Kim*, 822 F. Supp. at 110, it was imminently likely and substantially certain that the stores would lose 30 percent of their business if barred from accepting food stamps, since customers who used food stamps could not readily switch to using cash. Indeed, it was essentially "inevitable" that the plaintiffs' stores would close if their participation in food stamps was terminated. *Id*. While those businesses' immediate and virtually certain loss of 30 percent of total sales constituted irreparable harm, JBR's speculative claimed loss of ███████ of its OneCup sales over an undefined period does not.

I need not address the accuracy or credibility of JBR's assertions that it will be unable to service its debt and may be in breach of certain of its loan covenants if it loses ███████ of its OneCup sales, because I conclude that the alleged loss of ███████ of OneCup sales is

16

speculative and remote.[33]  Therefore, any further harm that may result from such a loss is still more speculative and remote.  I note, however, that JBR's overall course of conduct does not appear consistent with that of a firm anticipating imminent breach of its loan covenants or an imminent threat to its overall viability.  JBR has not provided its lenders with revised projections for its OneCup sales in 2015, (*see* Sarina Dep. 138:8-13 (stating that additional forecasts are provided "only when they ask for it," which "[t]hey never have")), and it has not approached its bank to discuss restructuring its debt, (*see* Sarina Dep. 173:14-174:3 (stating that renegotiation "could always be available" as an option but that "the bank would most likely not be willing to renegotiate" if a covenant had been violated)).  In July 2014, JBR agreed to buy out its expiring leases of four existing machines used in producing OneCups and to purchase the equipment.  (Sarina Supp. Decl. ¶ 20.)  Even if this decision was driven by a desire to reduce monthly cash payments and does not "reflect[] optimism about the future," (*id.*), JBR's action nonetheless suggests that it has no imminent expectation of ceasing OneCup production.

Nor has JBR taken other measures that a firm might consider if a significant portion of its business were at imminent risk of collapse.  For instance, TreeHouse approached JBR to determine whether JBR was interested in purchasing TreeHouse's reverse-engineered 2.0-compatible technology.  (Sarina Dep. 244:8-12.)  JBR was "not interested" and declined TreeHouse's offer without exploring possible terms or investigating any underlying patents in the ink-scanning technology.[34]  (Sarina Dep. 244:13-24.)  JBR has not notified its employees that they may be in danger of being laid off.  (9/4 Tr. 338:4-14.)

---

[33] Keurig asserts that JBR has refused its requests to produce the underlying loan documents that would establish the terms of JBR's loan agreements.  (9/4 Tr. 352:9-12.)  While I am not aware of JBR's response to this particular request or of the basis for any withholding, JBR does not dispute that the loan agreements are not in the record.

[34] Mother Parkers Tea and Coffee has also announced that its RealCup portion packs will be compatible with the 2.0, including a recyclable portion pack manufactured for Marley Coffee.  (*See* Ewing Decl. Ex. 71.)

**C.** **JBR's asserted injury resulting from Keurig's statements about its product is speculative.**

JBR also contends that Keurig's allegedly false and misleading statements in the course of marketing the 2.0 to retailers and consumers will cause JBR irreparable injury unless enjoined. JBR does not present sufficient evidence of the nature, frequency, and impact of these statements to support the assertion that they will irreparably harm its business.

As an initial matter, to the extent JBR's asserted injury results from alleged violations of the California Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code § 17200, that are independent of Keurig's alleged antitrust violations, I need not consider them here. At no point in its memorandum of law in support of its motion for a preliminary injunction did JBR argue a freestanding UCL claim independent of its antitrust claim. To the contrary, JBR argued that Keurig had violated the UCL by: (1) engaging in "[c]onduct that violates the federal antitrust laws," (JBR Mem. at 22 (quoting *Beech-Nut Nutrition Corp. v. Gerber Prods. Co.*, 69 F. App'x 350, 353 (9th Cir. 2003))); and (2) engaging in "conduct [that] violates the spirit or policy of the federal antitrust laws," (*id.*). Matters not raised in JBR's opening brief need not be considered.[35] *See, e.g.*, *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997). Accordingly, for purposes of this motion, I need not discuss any purported harm resulting from any alleged UCL violations that are not derivative of alleged antitrust violations. To the extent JBR asserts injury under the federal antitrust laws arising from Keurig's allegedly false or misleading advertising, it must overcome the presumption that such statements had a *de minimis* effect on competition. *See, e.g.*, *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288 n.41 (2d. Cir.

---

[35] JBR only argued a freestanding UCL claim in its reply after Keurig had pointed out that dismissal of JBR's Sherman Act claims would preclude a finding of unfair competition under state law. (*See* Memorandum of Law in Opposition to JBR's Motion for a Preliminary Injunction, Doc. 124, at 27.)

1979).

Regardless of the legal basis of its claim, JBR has not made a clear showing of irreparable injury arising from any of Keurig's challenged statements. JBR has introduced no evidence establishing that its asserted injury is causally related to the allegedly false and misleading statements of which it complains, rather than to Keurig's true statements about the 2.0, to the release of the 2.0 itself, to the merits of Keurig's offer, or to competition with other competitors. While JBR has introduced electronic messages from a handful of individual consumers stating that Keurig made allegedly false or misleading statements about JBR's products to them, (*see* Yamauchi Decl. Exs. 1-4), JBR has not introduced evidence of the frequency with which Keurig makes such statements to consumers.[36] Nor has JBR introduced any evidence demonstrating that Keurig's statements to individual consumers had or will have any material impact on JBR's sales or reputation.

JBR's evidence of lost opportunities and lost sales similarly fails to establish any causal connection to Keurig's challenged statements. JBR establishes that Keurig's communications caused "concern" among major retailers about the OneCup's compatibility with the 2.0, (*see, e.g.*, Hybsch Decl. ¶ 11, Jon Rogers Decl. ¶¶ 37), and that retailers made decisions adverse to JBR after meeting with Keurig representatives, (*see, e.g.*, Hybsch Decl. ¶ 12, Jon Rogers Decl. ¶¶ 38, 43, 44). There is no evidence in the record to demonstrate, however, that Keurig's allegedly false and misleading statements, rather than its true statements concerning OneCups' incompatibility with the 2.0 or the fact of incompatibility itself, affected or will affect retailers' decisions. In any event, assuming *arguendo* that JBR has lost some business because Keurig's

---

[36] I assume for purposes of this analysis that the consumers have accurately described the statements made to them by Keurig.

allegedly false and misleading statements persuaded certain retailers not to buy OneCups, JBR has not made the requisite showing that its lost sales or opportunities will amount to irreparable injury for the reasons explained above.

**D.    *Any likely injury is compensable with money damages.***

Excluding the remote and speculative possibility that the viability of JBR's entire enterprise will be jeopardized, any injury to JBR is compensable with money damages.  "Where the loss of a product with a sales record will not affect other aspects of a business, a plaintiff can generally prove damages on a basis other than speculation."  *Tom Doherty Assocs.*, 60 F.3d at 38.  Here, if JBR ultimately succeeds in proving that Keurig's unlawful conduct caused it cognizable harm, JBR's OneCup sales can be compared against its established track record and its reasonable forecasts to determine the extent of its damages.  JBR's own expert acknowledges that damages would be "difficult"—but not impossible—to calculate, and acknowledges that "any skilled economist would make an attempt to do so."  (Rausser Decl. ¶ 106; Rausser Rebuttal Decl. ¶ 75.)[37]

Nor is any injury to JBR's goodwill irreparable.  Here, "any loss of goodwill would result from [JBR's] inability to continue operating [its portion pack] business as [it] had in the past."  *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011).  Consequently, JBR's "history of operation . . . ensures that [it] will be able to calculate money damages for any loss of goodwill [it] may have suffered."  *Id.*; *see also, e.g.*, *Skydive Arizona, Inc. v. Quattrochi*, 673 F.3d 1105, 1112-13 (9th Cir. 2012) (district court did not abuse its discretion in upholding jury award of actual damages for loss of goodwill under the Lanham Act); *Toltec Fabrics Inc. v. August Inc.*,

---

[37] "Rausser Decl." refers to the Declaration of Gordon Rausser, Ph.D., in Support of Plaintiff JBR Inc.'s Motion for Preliminary Injunction.  (Doc. 96.)

29 F.3d 778, 780-81 (2d Cir. 1994) (collecting cases calculating damages for loss of goodwill). In general, injury resulting from the loss of goodwill is irreparable only when "the very viability of the plaintiff's business, or substantial losses of sales *beyond those of the terminated product*, have been threatened." *Tom Doherty Assocs.*, 60 F.3d at 38 (emphasis added) (citations omitted); *see also Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 621-23 (S.D.N.Y 2010) (finding irreparable harm from loss of goodwill because producer would be immediately deprived of its ability "to sell an entire line of merchandise" and would incur injury to its overall reputation for reliability during its absence from the market (internal quotation marks omitted)). JBR provides no evidence to suggest that any alleged harm to its goodwill in the single-serve portion pack market has affected its firm-wide reputation or its sales in the market for conventional packaged coffee, which still account for the majority of its business, (Ewing Decl. Ex. 6).

## V.    Conclusion

For the foregoing reasons, JBR has not made a clear showing that it is imminently likely to suffer irreparable harm without this Court's emergency intervention.[38]  I therefore need not address the other requirements for the issuance of an injunction, and I express no view concerning JBR's likelihood of success on the merits.  *See Rodriguez*, 175 F.3d at 234.  JBR's motion for a preliminary injunction is DENIED.[39]

SO ORDERED.

---

[38] Any evidentiary objections inconsistent with this order are hereby overruled.  However, the fact that such objections have been overruled for purposes of this decision does not constitute a ruling that such evidence would be admissible in any future proceedings.

[39] Briefing on Keurig's motions to dismiss shall proceed as previously scheduled.  (*See* Doc. 70.)

Dated: September 19, 2014
      New York, New York

 

_____

Vernon S. Broderick
United States District Judge

**APPENDIX A**



Source:  Jon Rogers Decl. Ex. 6