# Exhibit 2

to

Memorandum of Law in Support of Defendant's Motion
to Dismiss the Indirect Purchaser Plaintiffs' Consolidated
Amended Class Action Complaint

**EXHIBIT A**

1

| | | |
|---|---|---|
| 1 | STATE OF SOUTH DAKOTA ) | IN CIRCUIT COURT |

1  STATE OF SOUTH DAKOTA            )          IN CIRCUIT COURT
                                    : ss.
2  COUNTY OF PENNINGTON             )      SEVENTH JUDICIAL DISTRICT

3  *********************************************************

4  LINDA CORNELISON, on behalf     )
   of herself and all others       )        COPY
5  similarly situated,             )
                                    )
6              Plaintiff,           )
                                    )        Motion Hearing
7  vs.                              )        Case No. CIV03-1350
                                    )
8  VISA USA, INC., MASTERCARD       )
   INTERNATIONAL, INC.,             )
9                                   )
               Defendant.           )
10
   *********************************************************
11
12 PROCEEDINGS:   The above-entitled matter commenced on the 28th

13                day of September, 2004, at the Pennington County

14                Courthouse, Rapid City, South Dakota.

15 BEFORE:        The Honorable Janine M. Kern

16 *********************************************************
17
18
19
20
21
22
23
24
25

Jean A. Kappedal, RPR

```
1    APPEARANCES:   Mr. Aaron D. Eisland
                    Attorney at Law
2                   PO Box 6900
                    Rapid City, SD  57709
3                   Representing the Plaintiff.

4                   Mr. Steven J. Mitby
                    Attorney at Law
5                   601 Montgomery Street, Suite 601
                    San Francisco, CA 94111
6                   Representing the Plaintiff.

7                   Mr. Gene LeBrun
                    Attorney at Law
8                   PO Box 8250
                    Rapid City, SD  57709
9                   Representing Defendant Visa.

10                  Mr. Stephen V. Bomse
                    Attorney at Law
11                  333 Bush Street
                    San Francisco, CA  94104
12                  Representing Defendant Visa.

13                  Mr. Gregory Erlandson
                    Attorney at Law
14                  PO Box 2670
                    Rapid City, SD  57709
15                  Representing Defendant Mastercard.

16                  Ms. Patricia C. Crowley
                    Attorney at Law
17                  1615 L Street N.W., Suite 1300
                    Washington, DC 20036-5694
18                  Representing Defendant Mastercard.

19

20

21

22

23

24

25
```

1    THE COURT:  This is the time and place set for

2    motion hearing in File Civil C03-1350, in the matter of

3    Linda Cornelison, on behalf of herself and all others

4    simply situated, plaintiffs, versus Visa USA, Inc. and

5    Mastercard International, Inc.

6        If the Plaintiffs would begin by noting their

7    appearance with local counsel first, please.

8        MR. EISLAND:  Aaron Eisland, local counsel for

9    Plaintiff.

10       MR. MITBY:  Steve Mitby, your Honor, for

11   Plaintiff.  I will spell my last name, M-I-T-B-Y.

12       THE COURT:  Thank you.

13       MR. LEBRUN:  Gene LeBrun for Visa USA, Inc.

14       MR. ERLANDSON:  Good afternoon, Greg Erlandson,

15   local counsel on behalf of Mastercard.

16       MR. BOMSE:  Stephen Bomse, B-O-M-S-E, for Visa.

17       MS. CROWLEY:  Good afternoon, Patricia Crowley

18   on behalf of Mastercard International, Incorporated.

19       THE COURT:  Thank you.  Mr. Bushnell (sic) and

20   Mr. Erlandson, you have filed a motion to dismiss.  I

21   would like to begin with you and then I'll hear from

22   Plaintiff's counsel.

23       I'm sorry, Mr. LeBrun.

24       MR. LEBRUN:  Mr. Bromse will make the argument.

25       MR. BOMSE:  Your Honor, I don't know if you

1    have any preference as to whether or not counsel stands

2    when they address you or remain seated.

3              THE COURT:  Either.  Whatever you are most

4    comfortable with.  You can sit, you can stand.

5              MR. BOMSE:  I'm actually going to stand up and

6    test my eye sight here, but if I find my notes are

7    swimming, I may change my mind.

8         Thank you, your Honor.  It's very nice of the Court

9    to set aside this time to hear us on this motion.  As

10   your Honor may be aware, from the papers, this is one of

11   a number of what we call follow-on lawsuits which were

12   filed in various states around the country, approximately

13   20 of them, in the wake of the settlement of a federal

14   antitrust class action against my client, Visa and

15   Mastercard.  And the way we have been doing this in the

16   various states, is Mastercard and Visa have divided up

17   the arguments so I will be speaking this afternoon

18   principally on behalf of both defendants.  If the

19   Court --

20             THE COURT:  That's fine.

21             MR. BOMSE:  In those cases we have argued a

22   number of these motions previously and five of them have

23   been decided already.

24        We referenced three in our papers, New York,

25   Michigan and North Dakota, where the courts granted our

1    motions to dismiss essentially on the same grounds that
2    we urge here.   There is a fourth case that was decided
3    subsequent to the last briefs which is Minnesota.   It's a
4    case called Gordon Gutzwiller and the Court has received
5    that opinion which we sent in subsequently.
6         There is -- in addition, a fifth case, which, like
7    the other four, also dismissed the antitrust claims,
8    although in that case it was on entirely unrelated
9    grounds.   Obviously, we hope that we'll be able to
10   persuade your Honor that those cases were correctly
11   decided and that your Honor will elect to follow them.
12        We believe that while it is clear that South Dakota,
13   like the other states in which these cases are pending,
14   has decided that it does not wish to bar all indirect
15   purchaser cases.   That in no means grants a license for
16   any and all indirect purchases or cases without regard to
17   any standing limitations.   We believe rather that the
18   intention of the legislature was that in appropriate
19   cases indirect purchaser cases be permitted, but that
20   there still needs to be an analysis of standing under
21   what the Supreme Court and various other courts have
22   referred to as the analytically distinct requirement of
23   standing.   Analytically distinct, that is from the
24   Illinois Brick Rule which is a specific federal policy
25   based rule.

1          Now, just to put this matter in some context

2      factually. We, of course, accept the allegations of

3      Plaintiff's complaint for these purposes. They claim

4      that Visa and Mastercard have rules which improperly tie

5      the acceptance of Visa and Mastercards credit cards to

6      Visa and Mastercards debit cards. They claim that, as a

7      result of that, merchants end up paying more to accept

8      Visa debit cards then they otherwise would have. To that

9      extent, these cases and the federal case are entirely

10     common. That was that description I just gave you was a

11     description of the claim in the federal case.

12          In the federal case, that was where it stopped.

13     That is, the merchants claimed that they ended up paying

14     too much money and as your Honor again may know, if

15     you've had an opportunity to read the papers, we settled

16     those cases on the eve of trial facing a 100 billion

17     dollar damage exposure paying three billion dollars

18     seemed like the better part of valor.

19          Now, in these cases, we regard as important and we

20     find depositively a different additional step because the

21     claim now made is that once those merchants pay too much,

22     as it's alleged, to accept Visa and Mastercard debit

23     cards, they, in turn, raise the prices of everything they

24     sold to every consumer and regardless of how that

25     consumer paid for those things. Thus we don't have a

1        claim here that involves the purchase of our service, our
2        debit card service, which is offered to merchants.  We
3        don't even have a claim, based upon the resale of a
4        product containing that service as an ingredient.  It's
5        hard -- hard to imagine litigation.  Particularly what
6        that means, it's clear that it doesn't include the claims
7        here because in fact we know that according to the
8        plaintiff's theory and their complaint, it doesn't matter
9        whether a debit card in fact entered into the resale
10       transaction.
11            In that sense, these claims are what we have
12       referred to in our papers as overhead claims.  It is, as
13       if some cost of doing business, we gave an example of a
14       telephone service where the telephone prices went up to
15       merchants and the theory would be the merchants then
16       raised the price of spaghetti or tennis rackets or
17       television sets because they paid too much for telephone
18       service.  Or to use an example that the Plaintiffs seem
19       to be fond of.  They say this is a tax and a tax is in
20       effect a form of overhead.  It's a cost of doing
21       business.  And the question that we confront here today
22       is, can you bring a claim like that merely because South
23       Dakota, which generally follows federal law, and there is
24       abundant law that says that they are expected to follow
25       antitrust law merely because in this case the South

1    Dakota legislature has decided that we are going to a

2    limited extent to depart from federal law by allowing

3    indirect purchaser cases to be brought.

4         They say that the language of the statute begins and

5    ends.  The inquiry although, as I'll explain in a few

6    minutes, even they don't really believe that because they

7    don't argue that there is no standing limitation.  They

8    just want you to adopt a different one.  Something they

9    call target area and I'll come back to that.

10        But their basic position is when Illinois Brick was

11   disavowed in South Dakota, that was the end of standing.

12   We say that that is not so.  Any more than it was found

13   to be so in New York or Michigan or North Dakota or

14   Minnesota and any more than courts in those states in

15   other cases not involving the Visa and Mastercard have

16   simply abandoned the standing inquiry because they are

17   Illinois Brick repealer states.

18        **THE COURT:**  Well, how would you respond to the

19   Plaintiff's alternative suggestion to the Court that if

20   the Court is persuaded by your argument, that they should

21   be allowed to redefine the class to include only South

22   Dakota residents who purchase goods or services using

23   Visa or Mastercard branded debit cards?

24        **MR. BOMSE:**  Well, I would say this.  I would

25   say that it is a class definition which makes no sense in

1   terms of the allegations.  It's an attempt really in a --

2   I don't want to be projective in suggesting it's cute

3   because that's not exactly what it is.  But it is

4   attempting to connect two things that have no connection.

5   Let me explain what I mean.  The theory that they have,

6   because that's -- we know it from the class that they

7   have originally defined here and everywhere is a class in

8   which the presence or absence of a debit card has nothing

9   to do with the offense.  So we know, as we start out,

10   that there is no causation here that involves a debit

11   card otherwise that would have been the class that they

12   would have defined.

13      Their theory inside is in the same way as my

14   telephone or tax or janitorial service example, somebody

15   pays too much, they end up passing the cost along in all

16   products.  So that the presence or absence of a debit

17   card is therefore unrelated to the theory of violation.

18   To give the Court an example, I'll go back to my

19   telephone example.  Let us say that the theory was that

20   there was a conspiracy to raise telephone prices.  The

21   claim is brought.  Say prices of everything were raised

22   to every purchaser in the State of South Dakota.  Motion

23   to dismiss is made.  They say, well, let us redefine our

24   class as people who bought things over the telephone as

25   opposed to coming into the store.  It seems to me we

1    would fairly say there, as we ought to fairly say here,

2    hey, wait a minute, that makes no sense.  The existence

3    of a telephone sale as opposed to an in-person sale has

4    nothing to do with the theory of what was wrong anymore

5    than it does in this case.

6         So it seems to me that their attempt ought to fail

7    because it really doesn't have anything to do with the

8    case.  I could in fact go further, but I think I would be

9    outside of the pleadings.  But when we were arguing this

10   case with one of counsel's partners in Washington, DC,

11   the Judge said, you know -- because the same argument was

12   made by the same lawyers -- the Judge said, "you know, I

13   understand the theory, but isn't it somehow backwards to

14   say that it's the debit card people who somehow ought to

15   have the claim as opposed to anybody else?  After all,

16   the debit card people are the people who presumably got

17   the benefit of having a debit card. They wanted to use

18   the debit card."

19        Now, I don't think you need to go that far here.  I

20   think you merely need to find that there is no

21   relationship between the offense and the proposed

22   redefined class in order to say that that kind of a

23   redefinition isn't appropriate.  Again, while this Court,

24   of course, is going to make up its own mind, this issue

25   was briefed specifically in Michigan on a motion for

1     reconsideration which the Court denied as having raised

2     no new arguments.

3          Now, your Honor, if we go back to the question of

4     why we say standing rules still ought to apply here.   It

5     seems to me, that we go back to the fact that we do have

6     a difference between Illinois Brick and standing rules.

7     As I said, analytically distinct.  And courts have

8     recognized that one needs to still look at whether a

9     claim is so remote, whether the damages claimed are so

10    speculative and complicated in proof that we really are

11    beyond the bounds of what is sensible even in a place

12    where indirect purchaser cases are allowed.

13         As I say, in none of the states where we have been

14    successful so far has the law been any different.  We

15    have here not a claim that somebody's bought a product

16    that indirectly passed through a chain of distribution,

17    we don't have a claim that this is a product that became

18    an ingredient in something that passed through a chain of

19    distribution.  We have a claim here that is in effect for

20    every single product purchased by anybody not even in a

21    way that involves this product.  This is, as we say, a

22    non-purchaser case just as the Court found in Michigan

23    and then more recently in Minnesota and North Dakota.

24         You really don't have an assault, Plaintiffs

25    arguments to the contrary notwithstanding.  You don't

1    have an assault here on indirect purchaser cases.  You

2    have here a sensible application of some limits to claims

3    which really can't be proven and if we think about what

4    it is that's being alleged here and what it is the Court

5    is being asked to embark upon if this case goes forward,

6    I think that that becomes clear.  I don't know what it is

7    that Ms. Cornelison does or doesn't do herself in terms

8    of purchase, but if I think of myself on a Saturday

9    morning going out to do the errands, you go to the gas

10   station, you fill up your tank and you pay perhaps with

11   cash.  You go to the grocery store, maybe you buy 20 or

12   30 different items.  You might write a check there.  You

13   go pickup the dry cleaning, maybe you go and buy yourself

14   a new tennis racket, at night maybe you go out to dinner.

15   One day one person we now have to know what is it that

16   happened with respect to the dry cleaning and the corn

17   flakes and the gasoline and the meal in the restaurant

18   and the tennis racket.  We have to know what it is that

19   happened to the price of those goods because of some tiny

20   little fraction.  Because, to begin with, the price that

21   merchant pays for card services is on the order of one to

22   one and a half percent, if it's a debit card.  By the

23   time you spread -- decide what portion of that is, quote,

24   "an overcharge", and you then spread out that overcharge

25   out among all of the purchases, you can't be talking

1      about more than let's say ten cents on a hundred dollar

2      purchase.

3            And yet the theory is that for all of these various

4      things, somehow prices were affected in a way that

5      adversely affected Ms. Cornelison and any other consumer

6      in a class to be certified in this state.  And it doesn't

7      seem to me that once you think of it in those terms, that

8      the rhetoric which the courts have been prompted to use

9      in Michigan and in New York and in Minnesota is really

10     hyperbolic at all when they say these claims are far

11     beyond the capacity of a court to try.  So speculative

12     that no expert could possibly deal with them and

13     therefore not of a kind that are capable of being

14     adjudicated under the antitrust laws whether you allow

15     indirect purchaser claims or you don't.

16          I really do think that in some ways the Minnesota

17     Court, which is the most recent and I think the most

18     elaborate, pretty well incapsulated what we would have to

19     say to your Honor in the summary of its ruling.  The

20     Court said that, "despite the broad language of the

21     Minnesota antitrust law as set forth in that statute and

22     the broad language contained in a case in that court,

23     called Philip Morris, not every person claiming some

24     remote or tangential injury from an antitrust violation

25     can maintain a suit under the Minnesota antitrust laws."

1     The Judge then said "a literal reading of the Minnesota

2     statute is broad enough to encompass any harm it can be

3     attributed either directly or indirectly to the

4     consequences of an antitrust violation."  That being, of

5     course, exactly the argument that the plaintiffs make.

6     They say, "even though" -- I'm sorry, the Court in

7     Minnesota said, "even though the language of the statute

8     is clear and unambiguous, the Court must interpret the

9     statute in a manner which will not lead to an illogical

10    or absurd result."

11        "In this case, the Plaintiff's proposed

12    interpretation would lead to a decision that would

13    provide a remedy in damages for any injury, however

14    minor, that might conceivably be traced to the antitrust

15    violation in issue.  In short, the Plaintiff's proposed

16    construction of the Minnesota antitrust law, carried to

17    its logical conclusion, would provide the general public

18    and/or general taxpayer standing to sue for most

19    antitrust causes of action."

20        "In this case, the Plaintiff's proposed class is

21    likely as large or larger than a class limited to

22    Minnesota residents who pay property or income taxes."

23        "In this case, Plaintiff has only an abstract or

24    tenuous connection to the subject matter of the case.

25    Therefore, he lacks standing to sue for the injuries he

```
 1          claims to have incurred."

 2              Now, that's longer than I ordinarily would trouble

 3          the Court to read, but it seems to me that there is a

 4          particular reason why it is appropriate to read to the

 5          Court at that length from the Minnesota opinion.  And

 6          that is that the Plaintiff's have in fact told your Honor

 7          that you ought to pay particular attention.

 8                   THE COURT:  What page, Counsel?

 9                   MR. BOMSE:  Page 12.  There is pages eight and

10          nine and pages 12 here.  I'm reading, your Honor,

11          Minnesota's antitrust statute, exactly like South

12          Dakota's, grants standing to persons injured directly or

13          indirectly by an antitrust violation.  They then refer to

14          this Philip Morris case which was referenced also by the

15          Judge.  Then to quote again, "because Philip Morris

16          decisively rejects defendant's arguments, it must be

17          considered in some detail."  In other words, they are

18          saying, take a look at the same statutory language, take

19          a look at what Minnesota does.  Well, we say, amen to

20          that, but the decision that one, of course, needs to take

21          a look at, we suggest, is the decision addressing a claim

22          which is virtually identical brought by the same counsel

23          and decided within the past few weeks.

24              It is also the case, your Honor, that South Dakota

25          actually has a statute which urges the Court to construe
```

1   its laws in a way that is congruent with the laws of

2   other states. Not only the federal law, but the laws of

3   other states.  It's 37-1-22.  And Plaintiff's also, in

4   their brief, again urge the same -- the same thing here

5   at pages eight and nine.  Decisions -- again quoting,

6   "decisions from other state courts construing statutes

7   with virtually identical language provide persuasive

8   authority as to how South Dakota courts should interpret

9   South Dakota's antitrust law and they quote there SDCL

10   37-1-22.  It is the intent of the legislature that in

11   construing this chapter, that the courts may use as a

12   guide, interpretations given by state courts to

13   comparable antitrust statutes.

14       I would say, your Honor, that in this case the

15   comparable antitrust statutes, by their own terms, is

16   Minnesota, but it also is New York which is a repealer

17   state.  Michigan, that's the Stark case, which has

18   essentially identical language and is a case again

19   brought allegedly essentially identical violations by the

20   same counsel, and North Dakota.  It is not merely that

21   those courts have ruled in the way they have done, but

22   the fact that their analysis, we believe, is correct,

23   that together with the statute urging conformance, we

24   would suggest, adds yet further support for the broad

25   argument that we would make.

1           So, your Honor, we have tried to set out as

2     carefully as we can and as clearly as we can why we think

3     these cases can't go forward.  I've tried today to

4     summarize for the Court what our views are on that issue

5     and while I'm, of course, happy to respond to questions

6     that the Court has, at this point that would be our

7     submission.

8             THE COURT:  All right.  The Court would like to

9     hear from Ms. Crowley.  Is there anything you want to

10    add?

11            MS. CROWLEY:  No, I have nothing to add.  Thank

12    you, your Honor.

13            THE COURT:  All right.  Counsel?

14            MR. MITBY:  Thank you, your Honor.  Steven

15    Mitby on behalf of the -- on behalf of the Plaintiff.

16        Your Honor, this case is about South Dakota law not

17    federal law, not New York law and not the law of any

18    other state.

19        First, motions to dismiss are extremely disfavored

20    under South Dakota law and are rarely granted unless this

21    case is an extremely unusual case in which the pleadings

22    alone demonstrate to your Honor that there is no way that

23    the Plaintiffs could prove a cause of action, this Court

24    should not consider dismissing these claims of the

25    pleadings.

1          Secondly, by enacting one of the broadest antitrust

2     remedial statutes in the United States, the South Dakota

3     legislature explicitly rejected the very limitations on

4     standing that the Defendants advance here.  South Dakota

5     Codified Law 37-1-33 states unequivocally, and I'm going

6     to quote, "no provision of this chapter may deny any

7     person who is injured directly or indirectly in his

8     business or property by a violation of this chapter, the

9     right to sue for and obtain any relief afforded under

10    Section 37-1-14.3".

11         Now, under the expressed terms of this statute,

12    Plaintiffs have an absolute right to bring this action in

13    a South Dakota court because they were injured by

14    defendant's anti-competitive conduct.  Defendant's

15    illegal tying arrangement caused injury to consumers by

16    raising the price of consumer goods throughout and in

17    fact, the defendants do not even deny that consumers made

18    a portion of the fees that they charged to merchants and

19    how could they?  Whatever portion.  Excessive fees

20    merchants didn't absorb of your overhead, consumers might

21    have paid in higher prices in this case.  There are two

22    groups of victims in the Defendants' anti-competitive

23    conduct, consumers and merchants.  Moreover, the injury

24    to merchants is not speculative or remote.  While

25    merchants absolve and part of it, like 12 billion dollars

1    over the nation by out of pocket.  No one, including the

2    defendants, disputes that the consumers also paid a

3    substantial share of those costs.

4        Now, in an effort to avoid the implication was South

5    Dakota broad remedial and defendants are here seeking to

6    draft the federal standing requirement under 37-1-33.

7    Federal standing requirements are not appropriate for

8    South Dakota law because they're based on an entirely

9    different type of antitrust injury.  Federal law doesn't

10   recognize antitrust injury to indirect purchasers or

11   anyone else besides those who bought directly from the

12   defendant engaged in the illegal anti-competitive

13   practice.

14    In this case, your Honor, the defendants ask this

15   Court to adopt the Supreme Court's five factor test for

16   antitrust standing which was articulated in the

17   Associated General Contractors case.  That case was

18   decided ten years after the Supreme Court decided the

19   Illinois Brick case and adopted the direct purchaser

20   limitation.  At the time Associated General Contractors

21   was decided, the direct purchaser limitation was a

22   feature federal antitrust law and standing requirements

23   were crafted liberally in order to further the purposes

24   of the federal antitrust statute which was to limit

25   compensation to direct purchasers and avoid a series of

1    lawsuits by indirect purchasers who couldn't be

2    compensated under substantive federal law anyway.   And

3    consistent with the Supreme Court standing, Juris

4    Prudence in other areas, the Court adopted a test that

5    quite logically focussed on whether the plaintiff had

6    sustained a legally cognizable injury and was capable of

7    recovering damages.   That's the five factor test that the

8    Supreme Court adopted and the Supreme Court encouraged

9    lower courts in the federal system to consider factors

10   such as whether the plaintiff is a consumer or a

11   competitor in the restrained market, whether the injury

12   alleged is direct firsthand impact of the restraint

13   alleged, whether there were more directly injured

14   plaintiffs with a motivation to sue and whether the

15   plaintiffs claims would resist duplicative recoveries or

16   compensation from damages.   Precisely factors that

17   prompted the Court in Illinois Brick to adopt the direct

18   purchaser limitation in the first place, your Honor.

19       So the South Dakota legislature had an opportunity

20   to consider these factors when it rejected the direct

21   purchaser limitation and adopted Section 37-1-33 which

22   gives anyone who has been injured by an antitrust

23   violation the explicit right to sue.

24              THE COURT:   What is the import of the last part

25   of that statute "in any subsequent action arising from

1    the same conduct, the Court may take any steps necessary

2    to avoid duplicative recovery against a defendant"?

3         MR. MITBY:  Well, I think that is a logical

4    outgrowth of the statute.  It gives the Court the right

5    to limit damages in some way or take some other measure

6    in the context of an individual case to prevent a

7    duplicative recovery and that makes sense.  But what the

8    South Dakota legislature rejected, and I think this

9    second sentence of the statute proves it, is the idea

10    that the risk of duplicative recovery should somehow be

11    generalized that a standing requirement that applies to

12    all cases.

13     The South Dakota legislature has vested this court

14    and every other court in South Dakota with the duty of

15    fashioning remedies in a particular case such as

16    limitations on damages, such as some way of bringing

17    together all of the potential plaintiffs into a single

18    lawsuit as a way of avoiding duplicative recoveries.  The

19    legislature didn't authorize South Dakota courts to adopt

20    general rules of standing that would preclude a recovery

21    by an indirect purchaser simply because there is an

22    inherent risk of duplicative recoveries.

23     So I think that the second sentence of that statute

24    confirms the point that the Plaintiffs are trying to make

25    in this case, which is that we -- we are entitled to a

1      case -- a decision in the context of this individual case

2      about how best to reduce any potential risk of

3      duplicative recoveries and I think, as this Court will

4      recognize after discovery has been completed, the

5      settlement that Defendants paid to the merchants as a

6      result of the class action, the prior merchant class

7      action, was only a tiny fraction of the damage that was

8      actually caused in those cases and that is inconsistent

9      with the purpose of the antitrust laws which is to

10     provide for treble damages for violations of antitrust

11     policy.

12            THE COURT:  The parties chose to settle.  We

13     don't know what the damages would have been should the

14     matter been tried.

15            MR. MITBY:  That's correct, your Honor, but my

16     point is that this Court would be entitled to give them

17     settlement credit or find some other remedy to ensure

18     that there is no duplicative recovery in this case.  But

19     South Dakota has rejected the notion that the risk of

20     duplicative recovery should be incorporated into

21     generalized standing requirements.  The source that the

22     federal system has adopted.

23         The standing test in Associated General Contractors

24     is related to the types of injuries that are compensable

25     under federal law and, of course, this makes sense

Jean A. Kappedal, RPR

1    because the Supreme Court has explained again and again

2    that a legally recognized injury is a fundamental

3    requirement for standing.  There is a series of decisions

4    on this point and I have brought along one with me to

5    show to the Court for illustrative purposes.  May I

6    approach, your Honor?

7              THE COURT:  Yes.

8              MR. MITBY:  This is a recent decision, Bennett

9    versus Spear from the 1997 term of the Court.  And if,

10   your Honor, will look to the highlighted text, Justice

11   Sclera wrote, "to satisfy the case or controversy

12   requirement of Article III, a plaintiff must, generally

13   speaking, and demonstrate that he has suffered injury in

14   fact, that the injury is fairly traceable to the actions

15   of the defendant and that the injury will likely be

16   redressed by a favorable decision".  There is language of

17   this sort in a variety of decisions from the United

18   States Supreme Court over the years addressing standing.

19        The point of this is that in the federal system

20   courts adopt standing rules that further the goal of

21   compensating plaintiffs who are entitled to be

22   compensated and who can show an injury.  Under federal

23   law an indirect purchaser can't show that type of injury

24   because that type of injury isn't recognized by federal

25   antitrust laws.  It would not make sense to take standing

1    requirements that have been developed for the sole

2    purpose of trying to screen out folks that can't allege a

3    legally recognized injury and import them into South

4    Dakota law which has rejected the federal concept of

5    injury allows indirect purchaser suits.  In fact, goes so

6    far to say that anyone injured by an antitrust violation

7    has a right to sue for damages under South Dakota law.

8         The only factor in the federal test that is not

9    explicitly related to whether the antitrust injury was

10   direct or indirect, is whether the damages claims are

11   speculative.  And in this case the defendants have no

12   basis at this very preliminary stage of the litigation

13   for arguing that the damages claims are speculative

14   because there has been no discovery, there has been no

15   expert analysis.  Plaintiffs haven't had an opportunity

16   to come forward to this Court as in responding to a

17   motion for summary judgment and show exactly what

18   evidence we have adduced that demonstrates that these

19   claims for damages are not speculative.

20        If, at some point down the road, defendants can

21   convincingly argue to this Court that the damages claims

22   are speculative, couldn't be proved with certainty,

23   aren't entitled to compensation under South Dakota law,

24   then this Court can and should revisit Battley

25   (phonetic), but defendants aren't arguing that because

1     thus motion to dismiss and under South Dakota law the

2     defendants can't attach any evidence or make any

3     evidentiary arguments that are based on the facts of this

4     case.  They have to look solely to the pleadings.

5        I would submit that when counsel for Visa says that

6     the damages claims in this case are speculative, he is

7     relying on an assumption about what the evidence is going

8     to show at a later stage and we, as Plaintiffs, have not

9     had the opportunity to show to this Court what the

10    evidence in fact proves.  So we would like to -- we would

11    like to save those arguments about whether this is --

12    this claim is speculative or not until both sides are in

13    full possession of the facts.

14        Now, defendants, throughout their argument this

15    morning, have offered no reason for this Court to

16    disregard the plain language of Section 33-1-33.

17    Defendants proposed limitation on standing would leave

18    most of the injured parties in this case without any kind

19    of remedy at all.  And I submit that that result,

20    your Honor, is plainly contrary to the legislature's

21    purpose in enacting Section 37-1-33 and that purchase was

22    to afford, quote, "any person", end of quote, injured by

23    an antitrust violation, the right to sue regardless of

24    whether the injury was direct or indirect.  And under

25    defendants rule, only the merchants could sue for

1    inflated prices paid to consumers as a result of an

2    illegal tying arrangement. This approach would leave

3    consumers who are, by far, the most populous group of the

4    defendants antitrust victims without any kind of redress

5    at all.

6        I want to respond briefly to a point that the

7    defendants made when they said that that the overcharges

8    are alleged to be spread over a wide variety of consumer

9    goods and weren't really limited to people who were

10   consumers in one imagination or another of Visa and

11   Mastercard. I think that that argument really proves too

12   much. It would leave consumers in this case without a

13   remedy precisely because of the manner in which the

14   defendants chose to implement their tying ring. In

15   particular, Visa and Mastercard specifically prohibit

16   merchants from assessing on a debit card transaction a

17   fee directly to the debit card user. Under Visa's own

18   rules merchants are required to spread whatever portion

19   of that cost that they don't absorb in that overhead on

20   to all consumers. They can't just target pick debit card

21   users. Presumably not very many people would use the

22   Visa debit card. This puts defendants in the position of

23   being able to adopt policies that automatically deny most

24   of their victims standing to sue and thus any possibility

25   of compensation and this lesson will not be lost on

Jean A. Kappedal, RPR

1    future antitrust violaters.  It will almost certainly

2    endeavor to structure their conduct as to take advantage

3    of any judicially created bars to recover.  Given the

4    South Dakota legislature's unambiguous mandate in favor

5    of broad antitrust remedies, this outcome would be

6    unaccepted.

7        The defendants have also claimed that the

8    Plaintiff's injuries are somehow derivative or remote.

9    This is wrong for several reasons.  First, no one

10   disputes that South Dakota law provides a remedy for an

11   indirect purchasers injury.  Counsel for Visa has

12   conceded this afternoon, and I don't think there is

13   anyone that would attempt to read that type of provision

14   out of the statute, but in this case the injury to

15   consumers, is actually a lot less derivative or remote

16   than the injuries for indirect purchasers have recovered

17   in other cases.

18       In this case, remember, your Honor, that there are

19   only two groups of people who are potential plaintiffs

20   and potential victims of this tying arrangement,

21   merchants and consumers.  There is no long supply chain.

22   There is no long, long distribution chain.  There is no

23   passing through these charges through a series of middle

24   man.  There is two groups of merchants and consumers and

25   the defendants would concede, I suspect, that indirect

1     purchaser cases where a good is sold to one purchaser who

2     passes it onto another who passes that onto a third and

3     even onto a fourth, that more than just the first

4     indirect purchaser would be entitled to recover.  There

5     are several case that address the very issue we have

6     cited, some of them unbriefed and in the Holder versus

7     Archer Daniels Midland case where numerous indirect

8     purchasers of citric acid and other ingredients in food

9     products brought suit against Archer Daniels Midland for

10    price fixes and Archer Midland's principle argument,

11    look, these people don't have standing to sue.  They

12    didn't buy citric acid, they bought orange juice and that

13    citric acid passed through a series of transformations in

14    the factory, passed through a series of distributers.

15    How can these purchasers even begin to tell us how much

16    they were overcharged because of illegal price fixing

17    conspiracy?  Well, this case is really not much different

18    than that except the difference is overcharges were

19    passed directly to the consumers by the merchants.  They

20    didn't pass through the middle man.  There was no change

21    of the product or repeated changing of hands in this

22    transaction.  The merchants decided, after they saw the

23    bill from Visa, how much they were going to raise their

24    prices on all consumer goods in order to compensate them

25    for some of that increased cost.

1        This is also not like some daisy chain of causation

2    where the telephone company is fix pricing and suddenly

3    everybody who buys anything is a victim of a vast

4    antitrust conspiracy because everybody is using --

5    because every merchant in the world uses a telephone.

6    That's not the case at all.  In this case, again, the

7    charge is passed on directly to consumers.  There is just

8    one middle man, that's the merchant, and the plaintiffs

9    are entitled to try to prove that there is a specific

10   amount by which they were injured in each of these cases.

11   And the -- I think this Court should consider, you know,

12   revisiting the issue of speculativeness after there are

13   some facts on the table by which the plaintiffs can try

14   to show exactly what types of injuries they sustained and

15   how much.

16        I'd like to address next the defendants' reliance on

17   case law from states with narrower remedial statutes than

18   South Dakota's.  I have to confess that I have not seen a

19   copy of the Minnesota decision.  It wasn't sent to me.  I

20   don't have one in front of me.  I would be happy to

21   comment on it at greater length for this Court after

22   having a chance to review what the Minnesota Appellate

23   Court in this case actually said.  But I would submit

24   initially that the Minnesota case is a decision that has

25   not passed through appellate review including review by

1    the Supreme Court of Minnesota and this Court should pay

2    special attention to what the Supreme Court of Minnesota

3    says the law says because the Supreme Court of Minnesota,

4    reading the same type of statute, has interpreted it very

5    broadly as they did in the Blue Cross Blue Shield case.

6    Keep in mind that Blue Cross Blue Shield was suing

7    tobacco companies for driving up health care costs even

8    though I don't think anyone would argue that Blue Cross

9    Blue Shield was, in some sense, was a consumer that

10   bought products from the tobacco companies. So the

11   Minnesota Supreme Court needs a chance to be heard on

12   whether this decision is consistent with Minnesota law

13   before this Court assumes that Minnesota law would reject

14   these claims.

15          Secondly, plaintiffs rely on decisions from New York

16   and North Dakota. Well, New York and North Dakota do not

17   have statutes that are anything like Section 37-1-33. In

18   fact, if I may approach, your Honor, I brought a handout

19   for the Court that compares the language of the North

20   Dakota and New York statutes with the language of the

21   South Dakota statute. May I approach, your Honor?

22          **THE COURT:** Do you have a copy for counsel?

23          **MR. MITBY:** Yes, I do. Thank you, your Honor.

24   As your Honor will note, Section 5108.1 -- 08 and in any

25   tax for damages under this section, the fact that the

1    state said, "a person threatened with injury or injured

2    in its business or property by any violation of the

3    provisions of this chapter has not dealt directly with

4    the defendant does not bar recovery".  And looking to the

5    language of New York general business law section 340

6    subsection six, the state uses similar language.  It

7    says, "the fact that the plaintiff hasn't dealt directly

8    with the defendant, doesn't bar recovery".  That's very

9    different from saying that any person injured by an

10   antitrust violation has the right to sue.  These statutes

11   tell courts what fact they can't use as a way of denying

12   recovery all together,  The South Dakota law is an

13   affirmative grant of the right to sue and implicitly of

14   standing to sue for any type of antitrust violation.

15        Now, defendants also point to the Michigan statute

16   which is approximately the same as the South Dakota

17   statute, however what defendants failed to note is that

18   Michigan courts have interpreted the rights of indirect

19   purchasers much more narrowly than South Dakota courts.

20   And I would refer your Honor to page 679 of the Microsoft

21   antitrust litigation opinion which was from the South

22   Dakota Supreme Court.  It's cited actually by the

23   defendants in their brief.  And when you look at what the

24   South Dakota Supreme Court has to say about Michigan law,

25   first the Supreme Court noted that Michigan was one of

1        only two states in the country that allowed indirect

2        purchaser suits, but actually refused to permit indirect

3        purchasers to participate in antitrust class actions.   So

4        the Michigan Supreme Court -- or the South Dakota Supreme

5        Court first noted that Michigan is an out liar in giving

6        a narrow reading to its antitrust remedies provision and

7        then it refused to follow Michigan's interpretation of

8        that statute finding that it's interpretation was too

9        narrow.

10               So I would submit, your Honor, that Michigan and

11        South Dakota, even faced with the same type of statute,

12        have taken different paths.   The South Dakota Supreme

13        Court is likely to give full effect to the broad remedial

14        provision that the legislature enacted.   Thus none of the

15        defendants' authorities really address the fundamental

16        difference in this case between South Dakota law and the

17        law of the states on which they place their reliance.

18               I'd like to close by noting that, you know,

19        defendants have not argued that there are no standing

20        requirements at all in South Dakota law.   That's a false

21        choice.   First of all, plaintiffs have to be able to show

22        that they sustained an injury for which they can show

23        damages and at some point in this litigation, after some

24        evidence has been presented, this Court will have to

25        determine whether defendants have presented a genuine

1   issue of material fact on that point so there are

2   limitations on who can bring an antitrust claim except

3   that those limitations are not necessarily ones that can

4   be applied at this stage of the proceedings before any

5   type of discovery.

6       The second point is that there are other standing

7   tests that this Court could adopt.  South Dakota law has

8   not specifically defined what the standing tests should

9   be for actions by indirect purchasers or other victims of

10  antitrust violations but Justice Brennan gave a full

11  account of what he thought the test should be in his

12  dissent in Illinois Brick.  I think this Court is

13  entitled to give some weight to Justice Brennan in

14  Illinois Brick.  That it's ultimately the decision that

15  the South Dakota legislature agreed with and Justice

16  Brennan said that the test should be whether the

17  plaintiff's injury would be a reasonably foreseeable

18  consequence of the defendant's illegal conduct.

19      That's the so-called target area test and it is

20  based accordingly on, Justice Brennan, an accepted

21  general tort principles who can sue for tort injury and

22  who can't.  But the point to return to is that the

23  defendants are trying to craft an antitrust standing rule

24  which the Supreme Court adopted for the purpose of

25  furthering federal antitrust policy on to South Dakota

Jean A. Kappedal, RPR

1       law which has an entirely different policy and entirely

2       different scope and that effort should be rejected by

3       this Court because it's inconsistent with the will of the

4       South Dakota legislature.  Thank you, your Honor.

5                    THE COURT:  All right.  We'll take a short

6       recess and then I'll hear your response.

7                    MR. BOMSE:  Thank you, your Honor.

8                         (Whereupon, a recess was taken.)

9                    THE COURT:  All right.  Mr. Bomse.

10                   MR. BOMSE:  Thank you, your Honor.  It seemed

11      to me trying to put Mr. -- put this argument together, we

12      are kind of following progression.  The first is that

13      there are no standing requirements.  Second, Associated

14      General Contractors is really just Illinois Brick.

15      Third, we don't --

16                   THE COURT:  Would you repeat that, please?

17                   MR. BOMSE:  Yes.  The second is that the

18      Associated General Contractors is just Illinois Brick.

19      It's the same considerations and the same analysis.

20                   THE COURT:  Well, if the South Dakota

21      legislature, in drafting 37-1-33, is attempting to use an

22      Illinois Brick repealer, what does that do to the

23      standing factors set out in the contractor's case?

24                   MR. BOMSE:  It says that you have to interpret

25      Associated General Contractors in light of that and

1          that's --

2                    THE COURT:   What does that mean, which survive?

3                    MR. BOMSE:   Very simple.   The first factor

4          needs to be modified.   That is, the first factor is

5          whether somebody is a competitor or a consumer.   That

6          factor means that you have to have somebody who is

7          someone somewhere in the chain of defendants

8          distribution.   That is, you can't -- you can't simply

9          have an interpretation which does away with what the

10         South Dakota legislature does any more than you can

11         simply interpret what the South Dakota legislature did as

12         doing away with all antitrust standing requirements.   So,

13         what you do is you look to the defendants chain of

14         distribution.   And the problem here is that the

15         plaintiffs don't satisfy that.   They are not somewhere in

16         the defendant's chain of distribution.

17              Now, where do I get that?   Well, I get that from the

18         statute -- from the notion that we want to reject

19         Illinois Brick.   But I get it somewhere else.   I get it

20         from Justice Brennan's dissent.   What you were told when

21         we finally got to the fourth step in plaintiff's argument

22         on page 20 of their brief where the heading is "standing

23         under South Dakota's antitrust law should be determined

24         according to the target area test from Justice Brennan's

25         dissent in Illinois Brick".   If you go to Justice

1    Brennan's dissent in Illinois Brick, this is what you

2    find.  You find Justice Brennan saying, "I concede that

3    despite the broad wording of Section 4, there is a point

4    beyond which the wrongdoer should not be held liable".

5    This is on pages 760 and 761 of that opinion.  And then

6    he goes down in the paragraph and he says, "but if the

7    broad language of Section 4 means anything, surely it

8    must render the defendant liable to those within the

9    defendant's chain of distribution".  That is, if you have

10   an indirect purchaser who bought a product further down

11   the chain or although I think this is less clear, you

12   have somebody who bought a product that contains an

13   ingredient, their vitamin example or the Microsoft

14   example, where the operating system gets incorporated

15   into a computer that is purchased by a consumer, you

16   would meet the South Dakota test, at least that part of

17   it.  But where you have just what we have called an

18   overhead suit.  That is something that just says because

19   the costs of doing business are increased, everybody can

20   sue for anything, then you're way outside.

21           **THE COURT:**  So you submit that the first factor

22   of Associated Contractors survives and Illinois Brick is

23   a repealer?

24           **MR. BOMSE:**  I suggested it survives in the

25   modified format indicated, yes.  Yes.

1              THE COURT:  What about the remaining factors?

2              MR. BOMSE:   The second factor is about whether

3       injury is direct or derivative.   The Court in Associated

4       General Contractors used the term indirect.  But if you

5       go to that portion of the opinion, you'll see that they

6       didn't cite Illinois Brick.  They weren't invoking the

7       Illinois Brick part.  What they were talking about was

8       injury that is derivative.  Injury that has some

9       intervening cause.  And if you understand it in the way

10      that the Supreme Court actually is talking about it, as

11      opposed to turning into it into a simple slogan, then

12      that phrase applies -- that part of the test applies as

13.     well.

14          The third factor is, is there somebody else more

15      directly injured?  It seems to me that the -- that is

16      what the Court in Minnesota suggested.  It's hard to

17      apply that factor literally here.  Although let me have a

18      caveat to that.  Because the factor actually is there is

19      somebody more directly injured with a motivation to sue.

20      What they're really saying is, do we have a trouble of

21      antitrust violation perhaps not being pursued by anybody

22      and if you take Microsoft as an example, in Microsoft,

23      the indirect purchaser suits.  The consumer suits tended

24      to be the only ones that were brought at least initially.

25      So in that case somebody could argue, under South Dakota

1    law, we would meet the third -- the third factor.

2         Then when you get to the fourth factor, and at some

3    point I'm gonna outrun my memory, but we are concerned

4    with speculativeness of damages and I would suggest to

5    the Court that that factor absolutely was intended still

6    to apply.

7         THE COURT:  All right.  Now, does 37-1-33,

8    which refers to the duplicative recovery which is the

9    fifth factor.  What is the South Dakota legislature --

10   the fifth factor under Associated General Contractors is

11   whether the claim risk duplicative recovery.  What is the

12   South Dakota legislature intended by the last sentence of

13   37-1-33 when they indicate that the Court may take any

14   steps necessary to avoid duplicative recovery against a

15   defendant?

16        MR. BOMSE:  Well, I could -- I could be very

17   aggressive in my reading of that and say that the South

18   Dakota legislature intended not to allow this kind of a

19   suit where there already has been an earlier suit with a

20   recovery.  But I don't think that's right.  I think that

21   would be an overreading on my part.  Now, I don't have

22   legislative history here which answers that question

23   either way, but I don't want to over argue this because

24   I'm telling you that I think we have to have an

25   appropriate reading one way, so I'm not gonna tell you

1    that this was meant to take away this case as a matter of

2    law.  We didn't argue that in our papers.  I think what

3    it was reflecting was a clear sensitivity to it.  It is

4    plainly reflecting the notion that somewhere down the

5    line, if this case were to go forward, we would need to

6    deal with that, whether it means we're gonna bring in all

7    of the merchants in South Dakota and seek indemnity from

8    them.

9         THE COURT:  Is factor affecting standing?

10        MR. BOMSE:  I don't think it's factor... I don't

11   think it's a factor here affecting standing, but I

12   certainly think that it is a factor that is pertinent --

13   I think I'm not -- I think I didn't articulate that

14   correctly.  I don't think that this clause that you read

15.  has to do with standing.  I do think that duplicative

16   recovery does have to do with standing.  That is, it is

17   something you are expected to take into account.

18   Remember, Associated General Contractors, your Honor, if

19   you look at the opinion, the Court is very clear about

20   this.  It's saying, look, we can't just give all federal

21   courts a checklist of things to go down in every case and

22   if you hit three out of five, you lose.  If you only hit

23   one out of five you win.  They said that's not the way

24   you do this.  You have to look at the overall situation

25   in light of these factors and you have to make a

1    judgment.

2             THE COURT:  Are you urging the Court to find

3    that the action will result in a duplicative recovery?

4             MR. BOMSE:  Absolutely.

5             THE COURT:  And therefore should bar standing?

6             MR. BOMSE:  I'm asking the Court to find that

7    because of the clear potential for duplicative recovery,

8    there is less need for this kind of litigation and that

9    is something that ought to be part of the Court's

10   calculus.  It is not sufficient standing alone, no pun

11   intended, to bar standing.  But it certainly is something

12   that plainly was intended to be taken into account and

13   the legislature made that clear.

14        All we're suggesting, your Honor, is that it is

15   clear enough that standing requirements are not simply

16   subsumed by Illinois Brick or by an Illinois Brick

17   repealer.  They are not the same thing.  If you go back

18   to footnote seven in Illinois Brick, the Court has a long

19   discussion there about the relationship between standing

20   on one hand and Illinois Brick on the other.  And that's

21   where the phrase analytically distinct comes from.

22        In fact, in that case, the Court recites the history

23   in footnote seven.  In that case, the defendants had

24   actually won on standing grounds in the lower court, but

25   then the Supreme Court chose, after it granted the cert,

1     not to go off on generalized standing, but to in fact

2     adopt the policy based response, the corollary to Hanover

3     Shoe, and say we're not going to allow any indirect

4     purchaser suits.  That's a bright line test.

5          As counsel pointed out to you, it was about seven

6     years later when the Court got to the generalized

7     question of standing in Associated General Contractors.

8     Illinois Brick was already on the books.  And it then

9     went through those factors because it said and the Court

10    there in Associated General Contractors, started out with

11    actually the same kind of observation that you heard from

12    Mr. Mitby.  That's with the observation that a literal

13    reading of the statute is broad enough to encompass every

14    harm that can be attributed directly to or indirectly to

15    the consequences of an antitrust violation.

16         And the Court then proceeded, of course, to reject

17    that.  It did it by going through and I was -- I'm

18    starting here on pages 529 and 530.  But if you then

19    start there and go through the next several pages, you

20    will see the Supreme Court, going through a very

21    elaborate analysis of limitations on similarly broad

22    statutes, saying you can't mean what that says.  You have

23    to have some limitations.  And it goes through the

24    variety of limitations that were applied at common law in

25    both tort and contract actions and it does it actually

1    for several pages.  It's not something we kind of throw

2    off.  And that was then the preclude to their discussion

3    of standing factors.  And as we say, the courts have been

4    fairly resolute and the Illinois Brick repealer states in

5    still, saying, yeah, we have to have standing limitations

6    because otherwise you get into certain situations that

7    really don't make any sense and in some ways if you

8    allow, as the Minnesota court concluded, a case this

9    broad, what do you really have?  You have, as I said,

10   these overhead cases with damages, to use its word,

11   "inherently and hopelessly speculative".

12        I mean, on our way to lunch today we were talking

13   about the telephone example, Mr. LeBrun and I, and he

14   observed that under this theory of standing and the

15   telephone case really isn't, with all respect to

16   Mr. Mitby, any different in terms of it's breath or in

17   terms of the number of layers.  You have a situation in

18   which the telephone company overcharges a business, a law

19   firm.  A law firm raises its rates to its clients.  The

20   clients, a restaurant, then serves food to a consumer and

21   the consumer says I paid an overcharge somewhere in that

22   because it would be passed down along that chain.  I

23   mean, if one wants to really say that that is it because

24   of the words of the statute, I think you have done a

25   disservice to what the South Dakota legislature actually

1       had in mind in these cases.  I think that granting our

2       motion to dismiss here is not in any way going to cause

3       harm to the intent of the legislature and to appropriate

4       indirect purchaser cases.

5           I think on the other hand, opening up this kind of

6       an overhead case will do that kind of harm.  And I think

7       that the standing rules exist for the purpose of

8       preventing that from happening and they do have an

9       independent life independent of Illinois Brick.

10          The argument here, you know, it isn't like standing

11      somehow was invented after or at the time of Illinois

12      Brick.  We have had standing rules in antitrust cases

13      both federal and state going well back into the beginning

14      of the Sherman Act.  One of the most famous cases Hawaii

15      against -- Hawaiian Standard Oils in 1972 and many other

16      standing cases before that.

17          What they are suggesting to you is that somehow when

18      the State of South Dakota responded to Illinois Brick by

19      saying we're gonna allow indirect purchaser claims; that

20      they somehow silently intended to wipe out that whole

21      body of law and I think that's just a heroic and

22      unjustified reading which will have mischief and, you

23      know, I don't know if I'm being persuasive to this Court,

24      but I have been persuasive in other courts because I

25      think that when you do think, and I tried to listen

1    carefully, and the one thing that I didn't hear, other

2    than the conclusions about how this isn't speculative and

3    it isn't something that we can decide now, I didn't hear

4    a response to how you deal with what is manifest on the

5    face of this complaint.

6         My example about the Saturday morning errands or my

7    discussion of overhead or the fact that you are simply

8    opening the doors to claims that we don't need to have

9    further procedures in order to determine that they're

10   inherently and hopefully less speculative or as the Court

11   in New York said, "the complexity and speculative nature

12   are overwhelming" or as Michigan said, "the claims are

13   speculative and would be incredibly complex". I

14   respectfully submit, your Honor, that it stands there on

15   the face of this -- of this complaint. Standing cases

16   are resolved with all respect at the pleading stage.

17   That's almost always the way they are resolved because we

18   can cut them off that way. We're not asking you to deny

19   the allegations of the complaint, we're asking you to

20   accept them and to say accepting them, but accepting them

21   without leaving our common sense at the door. We can

22   figure out what it is you're asking us to do here and

23   we're gonna say that this simply goes -- goes too far.

24        Now, you know, I have some very specific things I

25   could tell your Honor about what plaintiffs have to say.

1    For example, their reference to Article III standing in

2    the case that they gave you.  I was -- I was puzzled,

3    since most of us know who do antitrust, that Article III

4    standing and antitrust standing are two different

5    animals.  And if you need to have a cite for that, it

6    happens that the Court said it in Associated General

7    Contractors in footnote 31 where they talk about the fact

8    that the two things are different.  I mean, it talks

9    about court antitrust cases needing to make a further

10    determination whether the plaintiff is a proper party to

11    bring a private antitrust action so it isn't just Article

12    III standing.

13         The other piece of paper that we were all handed

14    about the difference between New York and North Dakota

15    antitrust laws versus South Dakota.  I would say that

16    while the words may not be identical, the meaning is

17    identical and, of course, that leaves Michigan and

18    Minnesota unaddressed at all including the assertions

19    made in the briefs that were submitted by the plaintiffs'

20    firm here about how the Minnesota statute is identical

21    and interpretations are particularly important.

22         I think I have dealt with the target area issue in

23    the sense of explaining to you exactly what it was

24    they're arguing, the Justice Brennan test and referring

25    you to what he had to say what that means.  I mean, their

1      own recognition that there needs to be some test, says

2      that even they can't bring themselves at the end of the

3      day to really argue that there should be no standing

4      limits.  What they want you to do is instead to accept a

5      test that has been rejected and reject a test which has

6      been accepted, but when we look at the test that they

7      offer you, it is a test that were in fact -- that they

8      don't meet.  That is, Justice Brennan, in the chain of

9      distribution.  These people who are not in the chain of

10     distribution don't even have to have a debit card.

11     They're not indirect purchasers.  They're not purchasers

12     of a product with ingredients.  They are simply people

13     who purchased something that's supposedly went up in cost

14     because instead of telephone service or janitorial

15     services or rent being increased, debit card fees were

16     increased and that brings us back to whereas the

17     Minnesota court, we think, correctly concluded, you have

18     no limits at all.  We don't think that makes sense.

19              THE COURT:  Mr. Mitby, do you want to respond?

20              MR. MITBY:  Thank you, your Honor.  We're not

21     arguing for no limits at all.  There are limits.  The

22     limits are that you have a cognizable antitrust injury

23     that the Plaintiffs have done in this case.  It is not a

24     situation where some law firm was passing a minute charge

25     from on a telephone bill to its customers.  This is a

1    situation where the debit card fees are in the order of

2    1.5 percent or a little bit less on every hundred dollars

3    spent using a debit card.  That's a lot of money.  That's

4    why we have alleged that the actual damages in this case

5    exceed 12 billion dollars, treble would be 36 billion

6    potentially and that's why we believe that consumers in

7    South Dakota bore a significant part of this overcharge.

8    It's not a daisy chain of causation.  In this case there

9    are two injured parts here, merchants and consumers.

10   Whatever portion of these illegal overcharges, the

11   merchants did not absorb in their overhead, consumers had

12   to pay out of pocket.  Consumers under South Dakota law

13   have standing to sue because Section 37-1-33 grants

14   standing to any party who has been injured by an

15   antitrust violation and the courts across the country

16   have dealt with consumer class actions in the antitrust

17   context and outside the antitrust context.  It's not a

18   case that the complexities in this instance are so

19   overwhelming that we should disregard the plain language

20   of the South Dakota legislature and decide to ignore the

21   South Dakota legislature's rejection of the very standard

22   that the defendants advocate here and then simply allow

23   these claims to go without any compensation at all.

24   Should the defendants just get away with this?  Should

25   the defendants be allowed to get away with illegal

1      antitrust activity simply because they adopted rules that

2      require merchants to plead the costs?  These illegal

3      arrangements controls all goods instead of simply charge

4      the debit customers on those goods, that would allow

5      defendants to profit from their own ability to implement

6      this illegal scheme in a particular way.  And this Court

7      shouldn't allow that.  That's gonna allow every defendant

8      to structure its conduct so that it can come into court,

9      as the defendants are doing today, and argue that the

10     very victims of their illegal practices don't have

11     standing or fail for some other reason under the

12     antitrust laws.

13         Now, I like to address the point that Mr. Bomse made

14     regarding the so-called analytical distinction between

15     standing requirements and the concept of a legal injury

16     question.  The two injuries may be analytically distinct,

17     but as a practical matter, they're related.  That's why

18     five out of five of the factors are articulated in

19     Associated General Contractors relate to whether the

20     plaintiff had suffered a cognizable injury under federal

21     law, i.e. was a direct purchaser, and whether the

22     plaintiff was in a position to recover damages for that.

23     And I've given you one example of a standing case in the

24     Article III context where the Court explained the

25     relationship between substantive injury and standing, but

1       could I give you examples from other contexts as well?   I

2       don't think -- and I think perhaps the best example is

3       Associated General Contractors, itself, where the

4       standing factors that the Supreme Court asked courts to

5       consider when evaluating standing are based on the same

6       set of factors that it used in Illinois Brick to adopt

7       the direct purchaser rule.   The point is that if a

8       standing requirement is based on the notion that only

9       direct purchasers are ever gonna be entitled to recover

10      for an antitrust injury and so therefore we ought not to

11      hear claims from people who don't allege that they are in

12      fact direct purchasers, we can't import that concept into

13      South Dakota law because, your Honor, if we import that

14      concept into South Dakota law, we'll be overriding what

15      the legislature intended which is for anyone injured by

16      antitrust violations to be able to recover not just

17      direct purchasers, as the US Supreme Court has said.

18              THE COURT:   What assumption can you draw about

19      the repealer?   Are you assuming that the repealer goes

20      beyond the mere holding of Illinois Brick?

21              MR. MITBY:   Yes, your Honor, I am assuming that

22      because the repealer is broader than repealers adopted by

23      other states.   We seen two examples, North Dakota and New

24      York.   Those repealers are not substantively identical as

25      the defendants claim.   What they say is that a Court

1    can't use the fact that the plaintiff didn't have a

2    direct relationship with the antitrust violater.   In

3    other words, won't in privity.

4        I believe that the language from the statute is

5    dealt directly.  You can't use the fact that the

6    plaintiff didn't deal directly with the defendant to bar

7    recovery.  That's different from saying that anyone who

8    suffers an injury and I'll just quote the statute from

9    the beginning again.  The statute says "no provision of

10   this chapter may deny any person who is injured directly

11   or indirectly in his business or property, by a violation

12   of this chapter, the right to sue for and obtain any

13   relief afforded under 37-1-14-3".  That's different from

14   saying simply that's the fact and I quote, "the fact that

15   the state political subdivision, public agency or person

16   threatened with injury or injured in its business or

17   property by any violation of the provisions of this

18   chapter, has not dealt directly with the defendant, does

19   not bar recovery".  In other words, in North Dakota and

20   New York other factors might bar recovery even from

21   someone who has a bona fide antitrust injury.  In South

22   Dakota the legislature has said that that approach is

23   wrong and is not gonna be the policy of this state.

24       I'd like to call your Honor's attention to the

25   second part of 37-1-33 which allows this Court to take

1          measures necessary to prevent duplicative recoveries.  I

2          notice from your Honor's questions that your Honor is

3          wondering about the relationship between those two

4          provisions and contrary to what the defendants are

5          saying, I submit to you that that second part of the

6          statute basically says the legislature says we recognize

7          the concerns about duplicative recoveries, but we don't

8          want to simply bar indirect purchaser suits all together

9          whether on standing grounds or injury grounds.  We want

10         courts to deal with this on a case-by-case basis and we

11         want courts to use the many tools that are available from

12         joinder to class action devices to settlement credits to

13         some kind of jury instruction reducing the amount of

14         damages in an appropriate case.  We want courts to make

15         this decision on a case-by-case basis, not a Supreme

16         Court to incorporate the concern about duplicative

17         recoveries into a bar to standing which is one of the

18         things that the -- which is the approach that federal law

19         has taken.  South Dakota's rejected that approach and it

20         has instead asked courts to do the work in an individual

21         case of deciding how to minimize the risk of duplicative

22         recoveries rather than trying to generalize that issue

23         into a bar to standing that would leave some people

24         uncompensated.

25              In this case, we have conduct that, according to the

 1     allegations in this complaint, I don't even think the

 2     defendants are disputing this part of it.  That

 3     Mastercard and Visa don't allow their merchant

 4     subscribers to pass on the charges of these debit

 5     transactions to debit customers.  They have to spread

 6     them across the cost of goods generally or else they get

 7     thrown out of the Mastercard/Visa system.  Now, should

 8     Mastercard and Visa be entitled to profit from an illegal

 9     tying arrangement that has this feature by being able to

10     bar consumers at the courthouse door, I think not.  And I

11     think that -- I submit to you, your Honor, that the South

12     Dakota legislature has said that anyone who suffers an

13     antitrust injury is entitled to sue for damages and these

14     consumers are entitled to sue.  Thank you.

15               MR. BOMSE:  Your Honor, may I, as moving party,

16     in closing in less than a minute, I believe.

17               THE COURT:  You may.

18               MR. BOMSE:  First of all, may I respectfully

19     rise to the challenge that was made.  It isn't in the

20     motion you would have to justify the proceedings, maybe

21     it's entirely incorrect in his statement about our rules.

22     If the Court had any question about that, we could submit

23     the rule which does allow a differential in pricing, but

24     I don't think it's here nor there.  I just don't want to

25     let that misstatement go uncorrected, particularly when

1       it's suggested we concede that that is the situation.

2       But as I say, that is neither here nor there.

3           It seems to us, and this is the only point I want to

4       make, that Plaintiffs have really put to the Court a

5       challenge.  That is to conclude that the legislature

6       silently intended to do more than repeal Illinois Brick,

7       when I think it's quite clear from the legislative

8       history here, as everywhere else, that it was an Illinois

9       Brick repealer statute.  The timing all came about, it

10      would have been an easy enough thing for the legislature

11      to say that we intend to eliminate standing requirements.

12      So I think that they are in fact asking your Honor to go

13      beyond where the legislature actually chose to go.

14          I would observe, your Honor, that if you go back to

15      the federal statute, itself, that was at issue in AGC.

16      It is every bit as broad in its terms as the statute in

17      South Dakota.  Any person who shall be injured in his

18      business or property by reason of anything forbidden in

19      the antitrust laws may sue therefore that's the statute

20      that the Court -- the Supreme Court voted in AGC just

21      before it talked about how a literal reading of the

22      statute is broad enough to encompass any harm that can be

23      contributed to directly or indirectly to the consequence

24      of a antitrust violation.  So we have -- this Court has

25      the same issue in front of it that the Court had -- the

·54·

1    United States Supreme Court, that is the AGC case, that
2    is what to make of this language and both sides have
3    suggested to you what we think you should make of it.
4         THE COURT: All right. Thank you. Counsel,
5    the Court has considered the numerous authorities that
6    you have presented and the briefs you have submitted as
7    well as the at least an hour and a half of oral argument.
8    The Court in this case grants the motion to dismiss. The
9    Court relies on significant portions of Associated
10   General Contractors in applying several of the factors,
11   specifically factors one and five. The Court finds that
12   the Plaintiffs lack standing as they are not alleging
13   injury as consumers in the relevant market. Debit card
14   services that the antitrust law would seek to protect and
15   since the class of merchants has already recovered a
16   judgment, this suit would only threaten to duplicate the
17   recovery.
18        So the Court relies on factor one in Associated
19   General Contractor and factor five in making its
20   determination that the plaintiffs lack standing in this
21   case.
22        Again, the plaintiffs are not participants in the
23   relative market affected by the anti-competitive conduct
24   and further that the merchants have already recovered and
25   that there is a significant and real risk of duplicative

Jean A. Kappedal, RPR

1   recovery.

2        The Court assumes that there may be an appeal

3   brought to the South Dakota Supreme Court from this

4   Court's ruling and the Court thanks you for the effort

5   that you have put into preparing both of your arguments.

6   They were very well prepared and well argued.

7        You are directed to prepare an order for dismissal

8   on behalf of Visa and Mastercard, Mr. Bomse to submit it

9   to Mr. Mitby for his review prior to submission to the

10  Court.

11       With that, we're adjourned.

12                  (End of proceedings.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF SOUTH DAKOTA        )
                                  )  ss.        CERTIFICATE
 2   COUNTY OF PENNINGTON         )

 3

 4

 5           I, Jean A. Kappedal, RPR, Official Court Reporter

 6      of the Seventh Judicial Circuit and Notary Public

 7      within and for the State of South Dakota, do

 8      hereby certify that the testimony of the proceedings

 9      that came on for hearing in the aforecaptioned matter,

10      contained on the foregoing pages, 1 - 55, inclusive,

11      was reduced to stenographic writing by me and hereafter

12      caused to be transcribed; that said testimony commenced

13      on the 28th day of September, 2004, in the Courtroom

14      of the Pennington County Courthouse, Rapid City,

15      South Dakota; and the foregoing is a full, true and

16      complete transcript of my shorthand notes of the

17      proceedings had at the time and place above set forth.

18           Dated this 22nd day of October, 2004.

19

20

21

22                                           COPY

23                           Jean A. Kappedal, RPR
                             My Commission Expires:  2/13/10
24

25
```