UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION<br><br>This Document Relates to: All Direct Purchaser Actions | Civil Action No. 14-md-02542-VSB<br><br>MDL No. 2542<br><br>**DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**PUBLIC VERSION**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES ................................................................................................................... 8

    I.      PLAINTIFFS ......................................................................................... 8

    II.     DEFENDANTS ...................................................................................... 9

    III.    AGENTS AND CO-CONSPIRATORS ..................................................... 10

JURISDICTION AND VENUE ........................................................................................... 12

INTERSTATE COMMERCE ............................................................................................. 13

RELEVANT MARKETS ................................................................................................... 14

    I.      RELEVANT PRODUCT MARKETS ......................................................... 14

          A.      Single-Serve Brewer Market ................................................. 15

               1.     Keurig Single-Serve Brewers ....................................... 18

               2.     Single-Serve Brewers Manufactured By Other Companies ........... 20

          B.      The Compatible Cup Market .................................................. 20

               1.     The At-Home Market Segment ...................................... 23

               2.     The Away-From-Home Market Segment ........................ 23

    II.     GEOGRAPHIC MARKET ..................................................................... 24

MONOPOLY POWER ...................................................................................................... 24

    I.      KEURIG HAS MONOPOLY POWER IN THE SINGLE-SERVE BREWER MARKET ......... 24

    II.     KEURIG HAS MONOPOLY POWER IN THE COMPATIBLE CUP MARKET ................... 26

ADDITIONAL FACTUAL ALLEGATIONS ......................................................................... 29

    I.      KEURIG ATTEMPTS TO PREVENT INTERNET DISTRIBUTORS FROM SELLING TO CUSTOMERS IN THE AT-HOME MARKET SEGMENT ................................................. 29

    II.     KEURIG AGGRESSIVELY ELIMINATED POTENTIAL COMPETITORS THROUGH SUCCESSIVE ACQUISITIONS ........................................................................... 30

    III.    KEURIG PURSUED SHAM LITIGATION TO RESTRAIN COMPETITION ....................... 31

    IV.    KEURIG ENTERED INTO NUMEROUS ANTICOMPETITIVE AGREEMENTS AT MULTIPLE LEVELS OF THE COMPATIBLE CUP SUPPLY AND DISTRIBUTION CHAIN ............... 34

          A.      Keurig Prevented Potential Competition Through Anticompetitive Licensing Agreements ............................................................. 34

          B.      Keurig Coerced Distributors And Retailers To Enter Into Long-Term, Anticompetitive Contracts Denying Competitors Access to Retail Customers and Distribution Channels ...................................... 42

C.     Keurig Coerced Machine Manufacturers And Component Suppliers To
       Enter Into Long-Term, Exclusive Contracts To Deny Competitor Access
       To The Equipment And Supplies Necessary To Manufacture Compatible
       Cups .................................................................................................. 44

D.     Keurig Sells Its K-Cup Brewers At Or Below Cost To Consumers And
       Provided K-Cup Brewers To Businesses For Free As Long As Businesses
       Agree To Purchase K-Cups Exclusively From Keurig ............................ 49

V.     KEURIG PURPOSEFULLY DISSEMINATED FALSE, MISLEADING , AND DISPARAGING
       STATEMENTS ABOUT COMPETITORS' COMPATIBLE CUPS ..................................... 51

VI.    KEURIG DESIGNED ITS RECENTLY INTRODUCED 2.0 K-CUP BREWER TO BLOCK
       COMPETITION FROM COMPATIBLE CUPS ............................................................. 57

THE ANTICOMPETITIVE EFFECTS OF KEURIG'S UNLAWFUL MONOPOLIZATION OF
THE RELEVANT MARKETS ........................................................................................ 61

CLASS ALLEGATIONS ............................................................................................. 63

CAUSES OF ACTION ................................................................................................ 66

JURY TRIAL DEMAND ............................................................................................. 73

PRAYER FOR RELIEF ............................................................................................... 73

ii

Plaintiffs Kenneth B. Burkley, Roger Davidson, Judy Hoyer, Benjamin Krajcir, James G. Long, Linda Major, Sally Rizzo, Henry A. Rocker, David Rosenthal, and Todd W. Springer, individually and on behalf of a class of direct purchaser plaintiffs (collectively, "Plaintiffs"), for their Consolidated Amended Class Action Complaint against Keurig Green Mountain Inc. (formerly known as Green Mountain Coffee Roasters Inc. ("GMCR")) and as successor to Keurig, Incorporated (collectively, "Keurig" or "Defendants"), allege, upon knowledge as to themselves and their own acts, and upon information and belief as to all other matters, against Defendants as follows:

## **<u>NATURE OF THE ACTION</u>**

1.      Keurig's K-Cup brewers are extremely successful.  In North America, roughly 2.5 million cups are brewed per day using Keurig K-Cup brewers.  As of September 2013, Keurig's Single-Serve Brewers (defined below) constituted the top four best-selling Single-Serve coffeemakers in the United States by dollar volume.  In the first quarter of 2014 alone, Keurig had sold over 5 million brewers.  Consolidated net sales for FY 2013 for just the portion packs Keurig manufactures for use in its K-Cup brewers amounted to over $3 billion.  These staggering figures are a direct result of Keurig's greatest achievement:  its successful implementation of a multi-dimensional anticompetitive scheme designed to preserve, extend, and expand its K-Cup-related monopolies, as alleged herein.  Keurig is a monopolist.  It has the power to control price and exclude competition.  It has done both and is continuing to do so.  Plaintiffs and the Class have paid the price.  This action seeks redress for Keurig's anticompetitive conduct and consequent damages to Plaintiffs and the Class.

2.      Plaintiffs bring this class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class (defined below) of all other similarly situated direct purchasers of K-Cups from Keurig.

3.     Plaintiffs seek damages and permanent injunctive relief against Defendants for violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 (as amended) and Sections 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15(a), and 26 (as amended).

4.     Keurig has abused and is continuing to abuse its monopoly power by preventing, delaying, excluding, or otherwise restraining or suppressing competition in the Single-Serve Brewer Market (defined below) and the Compatible Cup Market (defined below) in the United States to impose supra-competitive prices in the Compatible Cup Market.  Plaintiffs and the Class have paid, and continue to pay, supra-competitive prices for K-Cups (defined below) purchased directly from Keurig.

5.     From at least September 7, 2010 through the present (the "Class Period"), Keurig caused Plaintiffs and the Class to be damaged in the form of overcharges – overcharges on Plaintiffs' and the Class' purchases of K-Cups directly from Keurig.  Plaintiffs and the Class seek redress for overcharge damages suffered by reason of Keurig's antitrust violations alleged herein.

6.     Even after Keurig's 2.0 K-Cup Brewers (defined below) entered the market, Plaintiffs and the Class have paid, and continue to pay, artificially inflated prices (*i.e.*, overcharges) for K-Cups.

7.     A single-serve beverage brewer ("Single-Serve Brewers") is a type of electronic low-pressure brewer which runs hot water through a disposable, single-use portion pack containing coffee and to a far lesser extent, other hot beverage components (like tea or hot chocolate) ("Portion Packs"), to make beverages in small quantities (*i.e.*, one or two-serving cups).  Unlike traditional drip-coffee brewers, Single-Serve Brewers make a one cup-sized serving in less than a minute.  Consumers pay a significant premium for this:  the price of

traditional drip-coffee makers does not fully constrain prices for Single-Serve Coffee Brewers, demonstrating that Single-Serve Brewers are not reasonably interchangeable with traditional drip-coffee brewers.

8.      While Portion Packs come in many different forms such as cartridges, disks, cups, or pods, to be usable with a particular Single-Serve Brewer, a Portion Pack must be compatible with a particular Single-Serve Brewer.

9.      Keurig controls over 90% of the Single-Serve Brewer market in the United States (the "Single-Serve Brewer Market") and Keurig's most popular Single-Serve Brewer is its Single-Serve K-Cup Brewer (the "K-Cup Brewer").  Portion Packs that are compatible with the K-Cup Brewer include:  (i) Portion Packs sold by Keurig under its brand name as well as those sold under its licensees' brand names ("K-Cups"); and (ii) Portion Packs manufactured, distributed and sold by Keurig Competitors ("Competitor Cups") (together with K-Cups, "Compatible Cups").  Below is an illustration of a Keurig Coffee Brewer and K-Cup.



**Keurig Coffee Brewer**                     **K-Cup**

10.     Keurig is also the dominant manufacturer, distributor, licensor, and seller of Compatible Cups, and now controls roughly 95% of the Compatible Cup market in the United States (the "Compatible Cup Market").[1]

11.     Keurig makes the overwhelming majority of its profits and revenues in the Compatible Cup Market, and it analyzes this discrete market for competitive purposes.  The revenues associated with sales of K-Cups are approximately four times those associated with sales of K-Cup Brewers.   This is because Keurig sells its K-Cup Brewers at or below cost and sells its K-Cups at a very high price at which it earns supra-competitive profits.  Keurig sells the brewers to create a captive base of customers.  The customers, in order to use the K-Cup Brewer, must purchase Compatible Cups.  The tighter the grip on Compatible Cup sales that Keurig has, the greater its (supra-competitive) profits.

12.     Keurig's market and monopoly power in the markets for the sale of Single-Serve Brewers and Compatible Cups is not the result of skill or superior business acumen.  Rather, as hereinafter alleged, it results from a multi-dimensional anticompetitive scheme to monopolize these markets and otherwise unlawfully restrain trade and exclude competition.

13.     After being taken over by GMCR in 2006, Keurig devised and successfully implemented a multi-dimensional scheme to exclude competition and unlawfully exploit its monopoly even beyond September 2012, the date its key patents covering the technology for its K-Cup filters expired.   The multi-dimensional anticompetitive scheme includes, without limitation, Keurig's blocking of competing internet sales, anticompetitive acquisitions, prosecution of sham litigation, exclusive dealing arrangements at multiple levels across the supply and distribution chain, disparagement of competitor products, and recent introduction of

---

[1] Even in a broader all-Portion Packs relevant market defined to include both Compatible Cups as well as all Portion Packs not compatible with K-Cup Brewers, Keurig would still dominate that market with a 73% market share.

the 2.0 K-Cup Brewer, Keurig's next-generation Single-Serve Brewer Keurig designed specifically for Competitor Cup incompatibility.

14.     **Blocking Internet Sales**.    Immediately after the merger, Keurig instituted measures designed to prevent online K-Cup sales through any entity other than Keurig.

15.     **Anticompetitive Acquisitions**.    Keurig also immediately sought to eliminate potential competition in the Compatible Cup Market through successive and increasingly expensive acquisitions, including Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc. (2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (Van Houtte) (2010). These companies were all licensees of Keurig's filter patents, and would have the know-how and capacity to be strong competitors to Keurig in the Compatible Cup Market after Keurig's filter patents expired, leaving Keurig vulnerable to competition on the merits.   By acquiring these potential competitors, Keurig eliminated this competitive threat.

16.     **Sham Litigation.**   By 2010, non-infringing competitors, particularly competitors making and selling filter-less K-Cups, had begun to emerge.   Just a few weeks after filter-less, non-infringing Compatible Cups first hit the shelves, on October 1, 2010, Keurig sued the leading Compatible Cup manufacturer, Sturm Foods, Inc. ("Sturm"), a subsidiary of TreeHouse Foods, Inc. ("TreeHouse"), alleging that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers.   Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup Brewers by using Sturm's Compatible Cups, and that Sturm was liable for inducing infringement by Keurig consumers.   Keurig initiated similar sham litigation against its other primary competitor, JBR, Inc. (d/b/a Rogers Family Company) ("Rogers").   Keurig's patent cases were objectively and subjectively baseless,

and were dismissed, but had their intended effect of suppressing actual and potential competition during the Class Period.

17. **Exclusive Dealing Arrangements.**   On information and belief, Keurig has entered into exclusionary arrangements at multiple levels of the Compatible Cup supply and distribution chain.  These arrangements operate to exclude and suppress actual and potential competition and have allowed Keurig to maintain its monopoly and monopoly pricing of K-Cups during the Class Period, including after expiration of Keurig's K-Cup patents.  To maintain its Compatible Cup monopoly into the post-patent world, Keurig has continued to increase its network of exclusionary agreements to further impede the emergence of competition, and has substantially foreclosed competition by, among other actions, entering into unduly restrictive exclusive dealing arrangements with companies at multiple levels of the Compatible Cup supply and distribution chain – from sellers of machinery used to make Compatible Cups; to sellers of Compatible Cup components; to competitor coffee roasters and coffee brands whose coffee is used in Compatible Cups; and to the distributors and retailers who sell and market Compatible Cups to end-user consumers, businesses, and institutions. The terms and number of these anticompetitive agreements cannot be justified by any purportedly pro-competitive purpose.

18. **Disparagement of Competitors.**  As part of its anticompetitive scheme, Keurig also engaged in systematic dissemination of false, misleading, and disparaging representations in the marketplace with respect to competitors' Compatible Cups.  Such disparagements included, without limitation, factually baseless claims regarding Competitor Cup quality and alleged adverse effects on Keurig brewer operability.

19. **Keurig 2.0.**  To ensure a continuing monopoly well into the future, Keurig has recently launched a successor K-Cup brewing system (the "2.0 K-Cup Brewer"), which is

embedded with technology intended to ensure that only K-Cups can be used with the 2.0 K-Cup Brewer. As current generation K-Cup Brewers become obsolete, the 2.0 K-Cup Brewer locks customers into purchasing only K-Cups and locks-out competition from Competitor Cups. The announcement and introduction of the 2.0 K-Cup Brewer has already hindered competition by scaring off actual and potential manufacturers of Competitor Cups. Keurig is also using its launch of 2.0 K-Cup Brewers to force manufacturers and sellers of Competitor Cups to become Keurig licensees.

20. As a direct and proximate result of Defendants' multi-dimensional anticompetitive scheme, Plaintiffs and the Class have been deprived of a meaningful choice to purchase high-quality, less-expensive, and environmentally friendly Competitor Cups and forced to pay supra-competitive prices for K-Cups.

21. Through this unlawful conduct, Keurig has insulated its K-Cups from competition, including well after the expiration of its filter patents, allowing Keurig to charge an artificially high price for K-Cups that has been (and continues to be) higher than it would, but for the monopolization, restraints of trade, and unlawful conduct alleged herein.

22. Plaintiffs and the Class did, in fact, directly pay supra-competitive prices to Keurig for K-Cups, which materially and proximately caused Plaintiffs and the Class injury to their business and property, within the meaning of Section 4 of the Clayton Act.

23. As a measure and reflection of the success of Keurig's anticompetitive scheme, Keurig has repeatedly raised the price of its K-Cups throughout the Class Period, including after Competitor Cup market entry in 2010 and after its filter patents expired in 2012, and has not lost any appreciable market share as a result of any of these successive price increases. These price increases include, without limitation, a 10-15% increase in late 2010, multiple price increases in

2011, and most recently, Keurig's announcement in August 2014 of another 9% price increase, effective November 2014.  These price increases without the meaningful loss of market share evidence Keurig's monopoly power.

24.     Plaintiffs and the Class are threatened with impending future harm in the form of additional overcharges, within the meaning of Section 16 of the Clayton Act, if Keurig's continuing scheme to monopolize is allowed to continue unabated.

## THE PARTIES

### I.     PLAINTIFFS

25.     Plaintiff Kenneth B. Burkley is a resident of Pennsylvania who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

26.     Plaintiff Roger Davidson is a resident of California who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

27.     Plaintiff Judy Hoyer is a resident of Florida who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

28.     Plaintiff Benjamin Krajcir is a resident of Georgia who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

29.     Plaintiff James G. Long is a resident of Massachusetts who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

30.     Plaintiff Linda Major is a resident of New York who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

31.     Plaintiff Sally Rizzo is a resident of Massachusetts who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

32.     Plaintiff Henry A. Rocker is a resident of Florida who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

33.     Plaintiff David Rosenthal is a resident of New York who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

34.     Plaintiff Todd W. Springer is a resident of New Jersey who purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct as alleged herein.

35.     As a direct and proximate result of Defendants' anticompetitive conduct alleged herein, Plaintiffs, listed above, all paid supra-competitive prices for K-Cups, were injured as a result thereof, and will continue to sustain injury when making future purchases of K-Cups unless Defendants are enjoined from continuing such unlawful conduct.

**II.    DEFENDANTS**

36.     Defendant Green Mountain Coffee Roasters, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Waterbury, Vermont.

37.     Defendant Keurig, Incorporated is a corporation organized under the laws of the State of Delaware, with its principal place of business in Reading, Massachusetts.  Keurig is a wholly-owned subsidiary of GMCR.

38.      Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in Waterbury, Vermont.  Until March 6, 2014, Keurig was known as GMCR.  Keurig is the successor to Keurig, Inc. which, prior to its merger with and into GMCR on December 31, 2013, was a wholly-owned subsidiary of GMCR organized under the laws of the State of Delaware with its principal place of business in Reading, Massachusetts.  On March 10, 2014, GMCR and Keurig Inc. announced that they changed their names to Keurig Green Mountain, Inc.

## III.     AGENTS AND CO-CONSPIRATORS

39.     Various persons and entities that are not named as Defendants participated as agents and/or co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  These other entities have facilitated, adhered to, participated in, aided and abetted and/or communicated with others regarding, *inter alia*, the alleged conspiracy to monopolize the Single-Serve Brewer and Compatible Cup Markets.  Plaintiffs reserve the right to name some or all of these entities as Defendants at a later date.

40.     Among these participating non-defendant agents and/or co-conspirators is M. Block & Sons ("MBlock"), a privately held logistics and supply chain services company headquartered at 5020 W. 73rd St., Bedford Park, IL 60638.  In disclosures made to the United States Securities and Exchange Commission ("SEC") during the Class Period, Keurig identifies MBlock as the primary "fulfillment entity" Keurig relies on "to process the majority of orders for [Keurig's At-Home] business sold through to retailers, department stores and mass merchants"

and attributes to MBlock's processing 37-43% of Keurig's consolidated net sales.[2]  In a January 2010 public earnings call, Keurig's President made clear that MBlock serves merely as Keurig's inventory manager and shipper of goods, but does not perform any sales or pricing related functions -- all sales and pricing "interface" for Keurig products is direct between Keurig's sales force and each retailer's "buying team."[3]   In response to an SEC inquiry into Keurig's relationship with MBlock, Keurig made clear in March 2011 that MBlock performs only an "administrative function" and does not actually take title to any of the Keurig goods it distributes:  "the substance of MBlock's relationship with the Company is administrative and procedural and not as a purchaser or consumer of the Company's products."[4]   According to Keurig, "[i]nstead, retailers, and the consumers purchasing brewers and K-Cup portion packs . . . are [Keurig's] primary customers."[5]  Similarly, among the "Purchase Order Policies and Terms of Sale" in Keurig's online application package for retailers seeking to sell Keurig products is a provision that makes clear that "[t]itle to goods and risk of loss passes to the purchaser upon delivery to the carrier [MBlock] at the time of the shipment" and that "[r]esponsibility for loss or damages while the goods are in transit rests with the purchaser of the product."[6]  Further, in other SEC-required disclosures made within the Class Period, Keurig represents that "[a]ll product shipped by the Company to the fulfillment entities are owned by the Company and included in

---

[2] *Compare* Green Mountain Coffee Roasters, Inc. Form 10-K/A for the Fiscal Year Ended Sept. 28, 2013 (filed Nov. 21, 2013) at p. 8, http://www.sec.gov/Archives/edgar/data/909954/000104746913010715/a2217486z10-ka.htm. ("GMCR 2013 10-K") *with* Form 10-K for the Fiscal Year Ended Sept. 29, 2012 (filed Nov. 28, 2012) at p. 2, http://www.sec.gov/Archives/edgar/data/909954/000119312510277481/d10k htm ("GMCR 2012 10-K").

[3] GMCR – Q1 2010 Earnings Call Tr. (dated Jan. 27, 2010) at p. 12 (Michelle Stacy:  "so the interface with the actual retailer and the buying team at the retailers is us. . . .  MBlock really services us in managing both the order and the shipping to that customer").

[4] Green Mountain Coffee Roasters, Inc. SEC Response Letter (dated Mar. 29, 2011), Resp. to Cmt. 9 at pp. 12-13, http://www.sec.gov/Archives/edgar/data/909954/000119312511081320/filename1 htm.

[5] *Id.*

[6] Keurig Purchase Order Policies and Terms of Sale, http://www.keurigretailqualifier.com/.

inventories on the accompanying consolidated balance sheets" and that the "Company recognizes revenue when delivery of the product from the fulfillment entity to the retailer has occurred based on the contractual shipping terms and when all other revenue recognition criteria are met."[7] Thus, any purchase of a Keurig product through MBlock constitutes a direct purchase from Keurig. Upon information and belief, MBlock has distributed Keurig products to, among others, major retail accounts MBlock identifies as including "Bed Bath and Beyond, Wal-Mart, Target, JC Penney, Macy's, Costco, Kohl's and other leading home retailers."[8]

41.     On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiffs, are agents and/or co-conspirators with Keurig in its unlawful conduct.

## JURISDICTION AND VENUE

42.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiffs and the Class for their damages, including treble damages. This Court has jurisdiction over Defendants pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. § 15(a) and 22, and pursuant to 28 U.S.C. §§ 1331, 1337. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

43.     The Court has personal jurisdiction over Keurig because it regularly does and solicits substantial business in this District, either directly or through intermediaries, is continuously and systematically present in this District, and has established minimum contacts

---

[7] GMCR 2013 10-K at p. 68.

[8] *See, e.g.*, M. Block & Sons, Inc. announces the opening of a new Distribution Center in Jefferson City, TN (June 2, 2011 Press Release), http://www.mblock.com/news_events/pressreleases.shtml.

with this District, in particular by registering to do business in the State of New York, maintaining a registered agent for service of process in New York, maintaining a distribution center in New York, and conducting banking with financial institutions in this District. Furthermore, Keurig, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (i) transacted business in this District; (ii) directly or indirectly sold or marketed substantial quantities of K-Cup Brewers and K-Cups in this District; (iii) had substantial aggregate contacts in this District; or (iv) was engaged in an illegal, anticompetitive scheme to monopolize the Single-Serve Brewer Market and Compatible Cup Market, that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to the business or property of persons and entities residing in, located in, or doing business in this District.

44.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. § 1391(b), (c), and (d), because Keurig can be found in and transacts substantial business in this District and a substantial part of the events or occurrences giving rise to the claims alleged occurred in this District.

## **INTERSTATE COMMERCE**

45.     Keurig manufactures, markets, and sells K-Cup Brewers and K-Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

46.     Keurig's business substantially affects interstate commerce in the United States, affects a substantial volume of trade and commerce in each state and territory of the United States, and has caused and continues to cause a substantial amount of economic harm and antitrust injury to the citizens of each state and territory of the United States.

47.     Keurig has manufacturing and distribution operations throughout the United States and sells and/or distributes K-Cup Brewers and K-Cups throughout the United States.

48.     Keurig stated in its most recent SEC Form 10-K:

For fiscal 2013, approximately 92% of our consolidated net sales was attributed to the combination of portion packs and Keurig® Single Cup brewers and related accessories.  Fiscal 2013 net sales of $4,358.1 million were comprised of $3,187.3 million portion pack net sales, $827.6 million Keurig® Single Cup Brewer and accessories net sales and $343.2 million of other product net sales such as whole bean and ground coffee selections in bags, fractional packages, and cans, as well as cups, lids and ancillary items to our customers primarily in the U.S. and Canada.[9]

49.     In 2013, Keurig had a total of $3.725 billion in sales in the United States, including $3.187 billion in K-Cup sales.

50.     Keurig's headquarters, executive offices, production, distribution, manufacturing, and research facilities are centralized in Vermont, and large manufacturing and distribution facilities are also located in Vermont, Tennessee, California, Virginia, and Washington.

51.     The activities of Keurig and its co-conspirators, as alleged herein, were within the flow of, were intended to, and did have a substantial effect on United States interstate commerce.

52.     The unlawful anticompetitive conduct detailed herein impacted and harmed competition and purchasers in every state and territory of the United States. Keurig's anticompetitive conduct substantially affected trade and commerce and caused Plaintiffs and the Class to pay supra-competitive prices for K-Cups in every state and territory of the United States.

## RELEVANT MARKETS

### I.     RELEVANT PRODUCT MARKETS

53.     There are two principal relevant product markets in which to evaluate Defendants' anticompetitive conduct:  the Single-Serve Brewer Market and the Compatible Cup

---

[9] GMCR 2013 10-K at p. 9.

Market.  Keurig tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes.

A.     **Single-Serve Brewer Market**

54.     The Single-Serve Brewer Market encompasses the design, manufacture, and sale of Single-Serve Brewers.

55.     Single-Serve Brewers are functionally distinct from other methods of making or procuring coffee and offer unique convenience, efficiency, and versatility that traditional drip coffee makers and other brewing devices do not offer.  Consequently, lower cost traditional drip coffee makers and other brewing devices do not meaningfully constrain prices for Single-Serve Brewers.

56.     Consumers do not consider other coffee products to be reasonably interchangeable with Single-Serve Brewers for the purposes for which Single-Serve Brewers are used. Single-Serve Brewers offer unique convenience and efficiency that traditional drip coffee makers do not, including that:  (i) the coffee is prepared fresh in around or under one minute; (ii) the coffee does not sit in the pot and become bitter; (iii) there is no need for consumers to grind beans, measure coffee, use a separate filter, or clean up after brewing the beverage; and (iv) it allows multiple coffee drinkers in the same home or office to not agree on a particular flavor or even brand of coffee, and instead permits each person to choose based upon his/her tastes and preferences.

57.     These distinguishing attributes are important to consumers. An early study by Keurig found that 88% of consumers preferred Single-Serve Brewers because of their convenience, quick-brewing, ease of use and minimal clean up, and reported that these features

were sources of "the most dissatisfaction with current home brewing systems."[10]  Another, more recent study, in 2012, reaffirmed consumers' convenience preference.[11]  Finally, "a web-based survey of daily coffee drinkers found that the 'main differentiating factor [of Single-Serve Brewers from other brew methods] revolved around the speed of brewing a cup of coffee'" and that "'second highest importance was the convenience of no preparation or clean-up.'"[12]  These studies show that purchasers do not consider other products to be reasonably interchangeable with Single-Serve Brewers for the purposes for which Single-Serve Brewers are used.

58.     As a result of these significant and unique attributes, lower cost traditional drip coffee makers do not fully constrain prices for Single-Serve Brewers.  In fact, Single-Serve Brewers do not exhibit strong, positive cross-elasticity of demand with respect to price as to traditional drip coffee markers.  While traditional drip coffee makers are frequently sold around a price point of approximately $30 to $35, Single-Serve Brewers typically cost anywhere from $80 to several hundred dollars. Consumers are willing to pay a premium for Single-Serve Brewers over the price of traditional drip coffee makers.[13]

59.     Despite this significant price difference, the share of Single-Serve Brewers has risen significantly unconstrained by the cheaper prices of traditional drip brewers. In 2013, Single-Serve Brewer sales revenue in the U.S. was approximately $900 million, with the Single-Serve Brewer Market growing at a rate of 7% per annum.[14]  Meanwhile, the traditional drip-

---

[10] *See* Cravens, David W. and Nigel F. Piercy, *Strategic Marketing*, at Case 6-7 (10th ed. McGraw Hill Irwin 2012).

[11] *See* "Coffee Drinkers Like Their Joe One Cup At A Time," *Mintel*, (Jan. 30, 2012) (reporting 79% of respondents preferred Single-Serve Brewers because of their convenience).

[12] *Id*. (citing Cravens, David W. and Nigel F. Piercy, Strategic Marketing, 10th ed. McGraw-Hill Irwin 2012, at Case 6-7.).

[13] *See e.g.*, Declaration of Jon Rogers In Support of Plaintiffs' Motion For A Preliminary Injunction (ECF No. 86) ("Rogers Decl.") at ¶ 4.

[14] "Hot Beverages Appliance Drivers,"  The NPD Group (May 22, 2013 Press Release),  http://www.npd.com/wps/portal/npd/us/news/press-releases/the-npd-group-reports-on-home-beverage-appliance-growth-drivers/.

coffee brewer market has remained relatively stagnant.  A small but significant, non-transitory price increase for Single-Serve Brewers would not have caused a loss of sales to traditional drip coffee makers to make such a price increase unprofitable.

60.     Additionally, Single-Serve Brewers do not compete in the same market as prepared coffee purchased at retail outlets such as coffee shops where beverages are prepared on the spot for customers.  The functionality of a single serve drip maker is simply not replaceable by prepared coffee, because (among other distinguishing features), unlike the single serve brewer, buying prepared coffee at retail shops requires a person to leave their house or office and travel to a shop -- each and every time they desire a coffee beverage.

61.     Available evidence bears this out.  If single serve brewers and coffee shops were in the same market, shares of coffee consumed outside of the home should have plunged as the share of Single-Serve Brewers has escalated.  They have not.  Rather the share of coffee consumed outside of the house has remained at around 15% to 20% over the last fifteen years, and has, in fact, increased since Keurig's introduction of the single serve brewer in 2004.[15] Single-Serve Brewers do not exhibit positive strong, cross-elasticity of demand with respect to price as to prepared coffee available from retail shops.

62.     Even if there were functional similarities between Single-Serve Brewers and traditional drip coffee brewers or prepared coffee from retail shops, they would be insufficient to permit inclusion of those products in the same relevant market with Single-Serve Brewers.  To be an economic substitute for antitrust purposes, a functionally similar product must also exert sufficient pressure on the prices and sales of another product, so the price of that product cannot

---

[15] *See* International Coffee Council, "Trends in Coffee Consumption in Selected Importing Countries," at p. VII-11 (Sept. 14, 2012),  http://tinyurl.com/n26halr; International Coffee Council, "World Coffee Trade (1963-2013): A Review of the Markets, Challenges and Opportunities Facing the Sector," at p. 29 (Feb. 24, 2014), http://tinyurl.com/ojnvzqt.

be maintained at levels that would be maintained in a competitive market.  But as alleged above, neither traditional drip coffee markets nor prepared coffee from retail stores have taken away sufficient sales from Single-Serve Brewers to constrain prices on Single-Serve Brewers, including those sold by Keurig.

### 1.    Keurig Single-Serve Brewers

63.    Keurig designs, manufactures, markets and sells a variety of Single-Serve Brewers under the brand name Keurig®, including K-Cup® Brewers, Vue® Brewers, and Rivo® Brewers.  Each of these brewers uses a different type of Portion Pack that is incompatible with other Single-Serve Brewers.[16]

64.    In addition to the Single-Serve Brewers manufactured by Keurig, Keurig also licenses Single-Serve Brewer technology to Mr. Coffee®, Cuisinart®, and Breville®, among other brands.

65.    Keurig markets its Single-Serve Brewers for use in the "At-Home" or "Away-From-Home" segments.

66.    These Single-Serve Brewers are sold for a range of prices.  For example, the Keurig® K45 Elite Brewing System has been priced at $119.99; the Mr. Coffee KG2 brewer for home use has been priced at $89.95; while the Breville brewer for home use has been priced at $249.95.

67.    Regarding the Away-From-Home segment of the market, while businesses can request a "free trial" of a K-Cup Brewer on Keurig's website, Keurig often conceals the price of its commercial Single-Serve Brewers.

---

[16] Vue Portion Packs previously could not be used in K-Cup Brewers but are now being made compatible with the 2.0 K-Cup Brewer.

68.     The Keurig website "Business Solutions" section featuring its "Keurig Commercial Brewing Systems" is largely silent regarding pricing, listing the prices for only two of its commercial brewers, which are either $129.95 for the OfficePRO® Brewing System with K-Cups®, or $249.95 for the Keurig® K155 OfficePRO® Premier Brewing System. For all other commercial systems, an interested consumer must specifically "request pricing" from a distributor.

69.     Keurig also restricts the ability of distributors to advertise or display the prices of Portion Packs that are used in office Single-Serve Brewers.  For example, contractual provisions provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack … through or at any store operated by or for Distributor."[17]

70.     Apart from its K-Cup Brewers, Keurig also sells Vue Brewers that use a different type of Portion Pack, known as "Vue Packs," which are shaped differently than K-Cups.  The Vue Brewer is not compatible with K-Cups, and Vue Packs cannot be used in pre-2.0 K-Cup Brewers.  Keurig is eliminating (or has eliminated) its Vue brewers.

71.     Keurig also offers the Rivo cappuccino and latte brewer, which is marketed for home use.  This brewer "exclusively uses Rivo® Packs," which, again, are shaped differently than K-Cups and are not compatible with K-Cup Brewers.  K-Cups, therefore, cannot be used in Rivo brewers.

72.     In Q1 2014, Vue brewers and Vue Portion Packs accounted for less than 1% of Keurig's total net sales,[18] while Rivo, Keurig's single-serve espresso machine, addresses an even

---

[17] *See, e.g.,* Keurig Non-Exclusive Distributorship Agreement:  "KAD Agreement," at § 2.1 (dated Nov. 16, 2013) (annexed hereto as Exhibit A).

[18] *See* Seth Golden, "Green Mountain Coffee Roasters Q4 2013 Earnings Preview," Seeking Alpha (Nov. 18, 2013), http://seekingalpha.com/articleIl846212-green-mountain-coffee-roasters-q4-2013-earnings-preview.

smaller segment of the market and therefore accounts for only a fraction of Keurig's sales.[19] The Keurig Monopoly in the Single-Serve Brewer Market (discussed herein) is based almost entirely on its sale of its K-Cup brewers.

### 2. Single-Serve Brewers Manufactured By Other Companies

73. Single-Serve Brewers manufactured by other companies include Mars, Inc.'s "Flavia®," Bosch's "Tassimo®," Philips Electronics N.V's "Senseo®," Nestle's "Nespresso®," and Starbucks' "Verismo®."

74. Prices across these non-Keurig Single-Serve Brewers can vary by as much as several hundred dollars.

75. The market share of the Single-Serve Brewers manufactured by other companies is fragmented and, collectively, represents a small share of the Single-Serve Brewer Market. Keurig dominates this market controlling at least 88% of the market.

### B. The Compatible Cup Market

76. The second relevant product market in which to evaluate Keurig's anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups.

77. Portion Packs in general have experienced dramatic growth despite the fact that they are far more expensive than traditional coffee. "[D]emand for GMCR's [Keurig's] K-Cups is still growing at a healthy 15% [year-over-year] clip."[20]

78. Numerous articles have detailed that the price of coffee delivered by K-Cups is extremely high. *The New York Times* has noted that "Folgers [K-Cups], with 8 grams per

---

[19] *See* GMCR – Q2 Earnings Call. Tr. (dated May 8, 2013) at p. 19.

[20] Northcoast Research, "GMCR Deep-Dive:  $5.00 of EPS in FY 14 Not a Stretch," at p. 3 (Dec. 6, 2013).

capsule, works out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."[21]

79.     For the owner of any given Single-Serve Brewer, the selection of Portion Packs is limited by brewer compatibility.  The difference in Single-Serve Brewer designs means that Portion Packs developed for one type of Single-Serve Brewer will not typically work with another.  For example, flat pod-style Portion Packs designed for use in the Senseo brewer and "T-Discs" designed for use in the Tassimo brewer will not work in a Keurig brewer.[22] Accordingly Portion Packs designed for non-Keurig brewers are not reasonably interchangeable with K-Cups for Keurig Single-Serve Brewers.

80.     Because the demand for Portion Packs is dependent upon the type of machine the buyer is using, Compatible Portion Packs that can be used with a K-Cup Brewer do not directly compete with Portion Packs that are not compatible with those Brewers.

81.     Keurig tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes.

82.     Companies that manufacture or sell Compatible Cups, which are not made or licensed by Keurig ("Competitor Cups"), offer prices that are substantially lower than K-Cups and, hence, appeal to large numbers of price-conscious businesses and consumers.

83.     Competitor Cups are typically priced at least 15% to 25% less than the K-Cups produced or licensed by Keurig.[23]  For example, recent Nielsen data collected from chain and

---

[21] Oliver Strand, "With Coffee With Coffee, the Price of Individualism Can Be High," *New York Times* (Feb. 7 2012), http://www nytimes.com/2012/02/08/dining/single-serve-coffee-brewers-make-convenience-costly html?_r=0.

[22] *See* Gabelli and Company, "The Global Coffee Industry--Growth (Still) Brewing," at pp. 7-8 (May 9, 2013).

[23] *See, e.g.*, GMCR – Q1 2014 Earnings Call Tr. (Green Mountain admitting that Competitor Cups "came in . . . at mostly 15 to 25% lower prices"), http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?part=single.

independent grocers stores with annual sales exceeding $2 million for the 52-week period ending in July 2014, reports that Keurig's K-Cups (excluding those marketed under Keurig's licensing agreements) are on average 16 percent more expensive than the Rogers OneCup, and that Keurig-licensed K-Cups and Portion Packs are priced even higher.

84.     Barriers to entry for the Compatible Cup Market are high and challenging for potential entrants into the Compatible Cup Market.  Potential entrants to the Market cannot easily manufacture their own Single-Serve Brewers to accommodate their Competitor Cups because Keurig has a number of patents covering the technology in its Single-Serve Brewers. Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

85.     Additionally, as discussed herein, potential entrants are further restrained from entering the Compatible Cup Market because Keurig has entered into exclusionary agreements with suppliers of the machinery and components used to make Compatible Cups.  These agreements have restricted the ability of competitors to purchase machinery and inputs needed to compete with Keurig in the Compatible Cup Market.

86.     Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer.  The reason is that most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked in to its use to find it impractical to substitute incompatible Portion Packs (as such substitution would necessarily require the added purchase of a non K-Cup Brewer).  The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not, therefore, reasonably constrain the price of

Compatible Cups. Purchasers, therefore, do not consider incompatible Portion Packs to be reasonably interchangeable with Compatible Cups.

### 1. The At-Home Market Segment

87. The Compatible Cup Market includes at least two large market segments, including one covering Compatible Cups purchased by consumers for use At-Home in their K-Cup Brewers ("At-Home Market Segment"), and one covering Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").

88. The At-Home Market Segment is an over one billion dollar a year market. Over 15 million U.S. households have a Keurig Single-Serve Brewer in the At-Home Market Segment.[24]

89. Portion packs are generally distributed to customers in the At-Home Market Segment through retailers, grocers, and on-line commerce.[25]

### 2. The Away-From-Home Market Segment

90. K-Cups are also consumed outside of consumers' homes at, among other places, convenience stores, food service, workplace, higher education, and hospitality locations.

91. The Away-From-Home Market Segment is a $600 million to one billion dollar market.

92. Portion packs are distributed to consumers in the Away-From-Home market almost exclusively through office supply distributors and food-service management companies.[26]

---

[24] Green Mountain Coffee Roasters, Inc. Fiscal 2013 Annual Report at p. 2 ("GMCR 2013 Annual Report"), http://files.shareholder.com/downloads/ GMCR/ 2984019180x0x722116/241A67DD-8DCC-4BE1-B30B-65371EDC095E/Green_Mountain_Annual_ Report.pdf.

[25] Rogers Decl. at ¶ 11.

[26] *Id.*

93.     Keurig provides Single-Serve Brewers to "Office Coffee Services" customers (the "Office Coffee Services Market Segment"), which is part of the Away-From-Home Market Segment.

94.     The Office Coffee Services Market Segment is estimated to account for $175 million to $250 million worth of Keurig's sales.

## II.     GEOGRAPHIC MARKET

95.     The relevant geographic market is the United States. Both the Single-Serve Brewer and Compatible Cup Markets operate on a nationwide basis.  Much of the sales activity in both markets occurs through nationwide channels, including Keurig itself and nationwide retailers that maintain a strong on-line presence.  National chain retailers that carry K-Cup Single-Serve Brewers and Compatible Cups include, without limitation, Wal-Mart, Costco, Best Buy, Target, Staples, and Bed, Bath & Beyond.

96.     To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States.  Compatible Cup manufacturers and sellers located outside of the United States who lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers who have such domestic assets and relationships.

## MONOPOLY POWER

97.     Keurig has monopoly power in the Relevant Markets defined above. It has the power to control prices and exclude competition in both the Single-Serve Brewer Market and in the Compatible Cup Market, including the At-Home and Away-From-Home segments.

## I.     KEURIG HAS MONOPOLY POWER IN THE SINGLE-SERVE BREWER MARKET

98.     Keurig dominates the Single-Serve Brewer Market, making it unlikely any new entrant could gain meaningful share.

99.     On a March 6, 2014 Shareholders' Conference Call, Keurig's President and CEO Brian Kelley reported that Keurig has "now sold more than 20 billion portion packs [and] more than 35 million brewers."[27]   In its 2013 Annual Report, Keurig reported that its Single-Serve Brewers are used in over 15 million U.S. households.[28]   Keurig also reported in November 2013 that, in fiscal year 2013 alone, Keurig sold approximately 10.6 million Single-Serve Brewers.[29]

100.     As of September 2013, Keurig's Single-Serve Brewers constituted the top four best-selling coffeemakers in the United States by dollar volume.[30]

101.     From July 2012 to July 2013, Keurig sold approximately 4.8 million Single-Serve Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and 93% by dollar value during that time period.   Keurig controls at least 88% of the brewers sold in the Single-Serve Brewer Market for home use.

102.     In the first quarter of 2014 alone, Keurig sold a record 5.1 million Single-Serve Brewers.[31]

103.     Keurig has the power to exclude competition in the Single-Serve Brewer Market. Keurig has unlawfully exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.

---

[27] Green Mountain Coffee Roasters' CEO Hosts Annual Meeting of Shareholders (Transcript) (Mar. 6, 2014), http://seekingalpha.com/article/2073423-green-mountain-coffee-roasters-ceo-hosts-annual-meeting-of-shareholders-transcript at p. 5.

[28] GMCR 2013 Annual Report at p. 2.

[29] Green Mountain Coffee Roasters Reports Full Fiscal Year and Fourth Quarter Fiscal 2013 Results (Nov. 20, 2013 Press Release), http://investor.gmcr.com/releasedetail.cfm?ReleaseID=808735.

[30] *See* GMCR 2013 10-K at p. 8.

[31] Green Mountain Coffee Roasters Reports First Quarter Fiscal Year 2014 Results Including  a Record 5.1 Million Keurig Brewers Sold in the Period (Feb. 5, 2014 Press Release), http://investor keuriggreenmountain.com/release detail.cfm?releaseid=823624.

104.    Barriers to entry are high and formidable for any potential entrant into the Single-Serve Brewer Market.  Keurig still holds patents that cover its Single-Serve Brewers.  Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment.  Moreover, retailers are reluctant to stock Single-Serve Brewers unless the Portion Packs they use are readily and widely available. Portion Packs that are compatible with any particular Single-Serve Brewer are not widely available unless the corresponding brewers are popular.  In light of the foregoing, potential market entrants face a substantial competitive disadvantage vis-à-vis established Single-Serve Brewer suppliers.

## II.    KEURIG HAS MONOPOLY POWER IN THE COMPATIBLE CUP MARKET

105.    Keurig owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee Inc., and LNH Holdings, Inc. (Van Houtte).

106.    Keurig also licenses the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks.  Keurig either owns or licenses some forty-nine brands.

107.    In total, and according to its own executive, Keurig, at its lowest market-share point, controlled approximately 86% of the Compatible Cup Market.[32]  The remaining 14% of the Compatible Cup Market was then composed of sellers of unlicensed and private label Competitor Cups.  Responding to this market share loss to Competitor Cups, Keurig reinforced its anti-competitive scheme by, among other actions, furthering its web of exclusionary

---

[32] *See* Green Mountain FQ1 2014 Earnings Call Tr. ("We had 100% of the system . . . and all of a sudden we have 86%. . . ."), http://seekingalpha.com/article/1997961-green-mountain-coffee-roasters-ceo-discusses-f1q-2014-results-earnings-call-transcript?source=nasdaq at p. 6.

arrangements throughout the Compatible Cup supply and distribution chain.  As a result, Keurig has almost entirely recouped its lost market share and now controls roughly 95% of the Compatible Cup Market.

108.    In fiscal year 2012, Keurig's net sales were $3.9 billion, with 90% of these net sales resulting from the combined sales of Single-Serve Brewers (which comprised 22%, or $760 million) and Portion Packs including K-Cups (which comprised 78%, or $2.7 billion).[33]  This is consistent with Keurig's strategy of selling its Keurig Single-Serve Brewers at or below cost.

109.    In fiscal year 2013, Keurig sold approximately $3.187 billion in Portion Packs, including K-Cups.[34]

110.    Compatible Cups are not reasonably interchangeable with other Portion Packs, and consumers who purchase K-Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups.

111.    Because Compatible Cups are not reasonably interchangeable with other Portion Packs, Keurig locks consumers in to use Compatible Cups by selling its K-Cup Brewers at or below cost.  Keurig is then able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups sales.[35]

112.    Indeed, during the Class Period Keurig has been able to exercise its monopoly power in the Compatible Cup Market by profitably raising K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share.

---

[33] *See* Green Mountain Coffee Roasters, Inc. Fiscal 2012 Annual Report at p. 2, http://files.shareholder.com/downloads/GMCR/2984019180x0x630863/FDBC5F63-78E8-493C-9BB9-8F33000C0465/GMCR_2012_ANNUAL_REPORT.pdf.

[34] *See* GMCR 2013 10-K at p. 38.

[35] *See* Green Mountain Coffee Roasters, Inc. Investor Day Presentation (Sept. 10, 2013) ("2013 Investor Presentation") at p. 164, http://files. shareholder.com/downloads/GMCR/2971051915x0x689991/2571face-a834-4ba2-9cab-c4aa52b82c27/ MASTER_INVESTOR_DAY_ALL_FINAL_For_Web.pdf at p. 164.

113.    Last year, Keurig controlled approximately 92% of the At-Home Market Segment for Compatible Cups; Competitor Cups accounted for the remaining 8% of that market segment.[36]

114.    Keurig's distributors are prohibited from selling Competitor Cups to the Office Coffee Services Market Segment because doing so would violate the Keurig Authorized Distributor Agreement ("KAD Agreement").

115.    Keurig has substantially foreclosed competitors from selling to the Office Coffee Services Market Segment through its anticompetitive conduct, including through its web of exclusive dealing agreements.

116.    Upon information and belief, Keurig also enters into exclusionary agreements with office specialty stores, such as Staples.  Competitors of Keurig sought to supply Compatible Cups to Staples, but Staples had an exclusive licensing agreement with Keurig.  As a result of that restrictive agreement, Keurig's competitors were unable to enter into a supply arrangement with Staples.

117.    Keurig has admitted that it has more than 500 Keurig Authorized Distributors, who are contractually obligated to buy directly from Keurig and to only sell products that are "authorized" by Keurig.

118.    Keurig maintains its monopoly power in the Away-From-Home and Office Coffee Services Market Segment by leveraging its monopoly over the Single-Serve Brewer Market to exclude competition from manufacturers or sellers of Competitor Cups.  Specifically, Keurig and its distributors agree to provide K-Cup Brewers to commercial or office customers at

---

[36] *See id.* at pp. 98-99.

little or no cost, provided those customers agree to exclude Competitor Cup suppliers from this market segment by purchasing Compatible Cups exclusively from Keurig.

## ADDITIONAL FACTUAL ALLEGATIONS

119.    Upon acquiring Keurig, Inc. in 2006, GMCR embarked on a multi-dimensional scheme to unlawfully dominate and exclude competition in the Compatible Cup Market.  The scheme consisted of several steps, including blocking internet sales, anticompetitive acquisitions, sham litigation, numerous exclusionary arrangements at multiple levels of the Compatible Cup supply and distribution chain, disseminating false, misleading, and disparaging statements about the quality and performance of Competitor Cups, and even changing the design of its brewers to exclude competition.

**I.    KEURIG ATTEMPTS TO PREVENT INTERNET DISTRIBUTORS FROM SELLING TO CUSTOMERS IN THE AT-HOME MARKET SEGMENT**

120.    In 2006, Keurig endeavored to control distribution of Compatible Cups to consumers in the At-Home Market Segment by forcing distributors to exit this highly valuable market in which they had invested substantial sums.  At least two distributors objected to this strong-arm tactic by commencing an action in federal court.

121.    In December 2006, Evans Quality Coffee Service ("Evans") and Springtime, Inc. d/b/a Springtime Coffee, Co. ("Springtime") sued Keurig in the United States District Court for the District of New Jersey.  According to the pleadings in the *Evans* lawsuit, Evans and Springtime alleged that they were distributors of Keurig's brewers and Portion Packs in the Away-From-Home Market Segment and were later authorized to sell Keurig products nationwide over the internet, including to the At-Home Market Segment.  Evans and Springtime further alleged that they spent hundreds of thousands of dollars to develop the infrastructure necessary to distribute Keurig products to consumers via the internet.  However, after GMCR

acquired Keurig, Inc. and had the ability to distribute via the internet, Keurig prohibited these distributors, and allegedly seven other distributors, from engaging in consumer transactions via the internet concerning the At-Home Market Segment.  Specifically, Keurig allegedly used its power to force Evans and Springtime into signing a new distribution agreement as a condition to keep their Keurig Away From Home business.  Prior to resolving their lawsuit, the *Evans* court issued a preliminary injunction ordering Keurig to honor the pre-acquisition agreements allowing these distributors to continue sales to consumers over the internet.

## II. KEURIG AGGRESSIVELY ELIMINATED POTENTIAL COMPETITORS THROUGH SUCCESSIVE ACQUISITIONS

122.    Keurig aggressively eliminated potential competitors, all contemporaneous licensees of Keurig patents, with the ability to sell during and after patent expiration, through successive acquisitions of Tully's Coffee Corporation (2009), Timothy's Coffees of the World, Inc. (2009), Diedrich Coffee, Inc. (2010), and LNH Holdings, Inc. (2010).

| DATE | TARGET | PRICE |
|---|---|---|
| March 27, 2009 | Tully's Coffee | $40.3 million |
| November 13, 2009 | Timothy's Coffee | $155.7 million |
| May 11, 2010 | Diedrich | $305.3 million |
| December 17, 2010 | Van Houtte | $907.8 million |

123.    One analyst stated Keurig "eliminated the licensees by buying them" and "paid high prices to avoid having to compete with the licensees."[37]  According to that analyst, these

---

[37]  David Einhorn, "GAAP-uccino," *Greenlight Capital Value Investing Congress* (Oct. 17, 2011) at p. 53.

acquisitions made no business sense but for their value in eliminating potential competitors when Keurig's patents expired.[38]

124.    Having grown into a multi-billion dollar publicly traded company by eliminating and restraining competition, Keurig was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices.

## III.    KEURIG PURSUED SHAM LITIGATION TO RESTRAIN COMPETITION

125.    For many years, Keurig's monopoly in the Compatible Cup market was protected by its K-Cup filter patents covering the use of filters in Compatible Cups.  However, the two principal patents associated with Keurig's filtered K-Cups expired in September 2012.

126.    Despite Keurig's patent protection, some competitors were able to enter the market prior to September 2012 by creating filter-less Compatible Cups that did not infringe Keurig's K-Cup filter patents.  One such competitor, TreeHouse, decided to enter the Compatible Cup Market in or about 2010.

127.    Thus, in August 2010, TreeHouse subsidiary Sturm introduced the first Compatible Cups for use in K-Cup Brewers that were not sold by Keurig or under a Keurig license.

128.    In response to Sturm's market entrance, Keurig filed a baseless lawsuit (asserting various infringement, trademark, and false advertising claims) on October 1, 2010, in the United States District Court for the District of Delaware. Just a matter of weeks after Sturm's Compatible Cups hit the shelves, Keurig sued Sturm, alleging, in bad faith, that Sturm's Compatible Cups infringed Keurig's patents directed at brewers and methods of using brewers – not even asserting any patents covering K-Cups themselves.  Keurig also alleged that Keurig's

---

[38] *Id.* at 49.

own consumers were infringing patents on the K-Cup Brewers by using Sturm's unlicensed Compatible Cups, and that Sturm was thus also liable for "inducing" infringement by these consumers.

129.   No reasonable litigant could have realistically expected to succeed on the merits of such claims, and, thus, Keurig's complaint was objectively baseless. The action was also subjectively baseless because Keurig filed the action to interfere with its competitor.

130.   Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of non-infringement.

131.   In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims.

132.   Most importantly, the court held that method patents are exhausted by selling merchandise that embodies the method.  Quoting the Supreme Court in *Quanta Computer, Inc. v. LG Elecs., Inc*., the court stated that "the authorized sale of an article that substantially embodied a patent exhausted the patent holder's rights and prevented the patent holder from invoking patent law to control post-sale use of the article."[39]  Expanding on the Supreme Court's holding, the *Sturm* court held:

> [P]atent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products. After the first authorized sale to a purchaser who buys for use in the ordinary pursuits of life, a patent holder's patent rights have been exhausted.[40]

133.   Keurig appealed that decision to the United States Court of Appeals for the Federal Circuit.  The Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather

---

[39] 553 U.S. 617, 638 (2008).

[40] *Keurig, Inc. v. Sturm Foods, Inc*., 2012 U.S. Dist. LEXIS 130762 (D. Del. Sept. 13, 2012) (quoting *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 615 F. Supp. 2d 575, 582 (E.D. Ky. 2009)).

trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished."[41]

134.    The Federal Circuit's holding was clear:

Keurig sold its patented brewers without conditions and its purchasers therefore obtained the unfettered right to use them in any way they chose, at least as against a challenge from Keurig … Here, *Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig cartridges by invoking patent law to enforce restrictions on the post-sale use of its patented product.*[42]

135.    The Court noted that the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'"[43]

136.    Keurig also sued another early Compatible Cup Market entrant, Rogers, making similar claims.  In Keurig's litigation against Rogers, a different federal district court likewise held on summary judgment that the Compatible Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.

137.    As the Federal Circuit expressly concluded in Keurig's appeal against Sturm, rather than pursuing any legitimate purpose, "*Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law.*"[44]

138.    As the Federal Circuit implicitly recognized, Keurig's lawsuits were objectively baseless and had no realistic expectation for success on the merits.  Keurig's lawsuits were also

---

[41] *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

[42] *Id.* (emphasis added).

[43] *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008) (quoting *Adams v. Burke*, 84 U.S. 453, 457 (1873))) (emphasis added).

[44] *Id.*

subjectively baseless attempts to directly interfere with the business relationships of its competitors.

IV.   **KEURIG ENTERED INTO NUMEROUS ANTICOMPETITIVE AGREEMENTS AT MULTIPLE LEVELS OF THE COMPATIBLE CUP SUPPLY AND DISTRIBUTION CHAIN**

A.   **Keurig Prevented Potential Competition Through Anticompetitive Licensing Agreements**

139.   In addition to foreclosing competition through multiple acquisitions, Keurig eliminated other would-be competitors by entering into anticompetitive license and manufacturing agreements with them.  Keurig currently owns or licenses more than 50 coffee brands, including well-known brands such as Starbucks®, Caribou Coffee®, Wolfgang Puck®, Newman's Own®, Eight O'Clock®, Peet's®, Maxwell House®, and Folgers®.

140.   Keurig's anticompetitive and unduly restrictive exclusionary agreements with these competitors have further enabled it to wield its unlawful monopoly power in the Compatible Cup Market.  Upon information and belief, many, if not all, of these agreements have multi-year terms and are exclusive, which prevent these brands from also licensing trademarks or entering into manufacturing agreements with Keurig's competitors in the Compatible Cup Market.

141.   For example, the Amended and Restated Purchase and License Agreement entered into between Keurig and Caribou Coffee Company, Inc. ("Caribou"), dated December 20, 2011, expressly provides that Keurig Authorized Distributors and Keurig Authorized Re-Distributors enter into:

> distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase . . . of [both bulk and non-bulk]

quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale.[45]

142.    Pursuant to Keurig's contracts, competitor coffee brands further agreed not to:  (i) "sell coffee, Tea or Other Hot Beverage Products to any third-party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System;" and (ii) license any trademarks for use by third-parties in connection with products "intended for use with the Keurig Brewing System."[46]

143.    Starbucks, Wolfgang Puck, and other coffee brands have discussed entering into potential business relationships with Keurig competitor TreeHouse but were prevented from doing so after entering into contracts with Keurig.  Such agreements with competitor coffee brands, such as Caribou, have the effect of allowing Keurig to allocate markets, restrain output, restrain price competition, and exclude competitors.

144.    Upon information and belief, Keurig's agreements with coffee brands also contain restrictions dictating where and how Keurig licensed K-Cups can be sold, thereby allowing Keurig to maintain supra-competitive prices across licensed brands by controlling output.  This creates a further incentive for Keurig-licensed coffee brands to renew their agreements with Keurig and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by Keurig, as demanded by Keurig as a pre-condition for selling Compatible Cups.

145.    In fact, Keurig has entered into numerous long-term, exclusionary licensing agreements with competitor coffee brands, some of which are highlighted below:

---

[45] *See* Am. and Restated Purchase and License Agreement by and among [Keurig] and Caribou Coffee Company, Inc., at § 1.11 (dated Dec. 20, 2011) (annexed hereto as Exhibit B).

[46] *Id.* at § 4.

(a)     In December 2006, Keurig entered into a multi-year agreement with Caribou under which Caribou branded coffee would be packaged and sold in K-Cups. The parties renewed and amended their agreement in December 2011. Under this agreement, Caribou sells Keurig its coffee, which Keurig packages into K-Cups, and grants Keurig a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups. Under the agreement, Caribou may only sell the K-Cups at Caribou coffee stores and on Caribou's website for "At-Home" use.

(b)     In February 2010, Keurig entered into a multi-year agreement with J.M. Smucker Company ("Smucker"), a leader in the domestic retail coffee market, under which Keurig is the exclusive manufacturer of Compatible Cups under Smucker's Folgers and Millstone coffee brands. Under the agreement, Smucker may only sell the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website.

(c)     In February 2011, Keurig entered into an agreement with Dunkin' Donuts, a market leader in the traditional and iced coffee markets in the United States, under which Keurig became the exclusive manufacturer of Dunkin' Donuts K-Cups. Under the agreement, Dunkin' Donuts may only sell its K-Cups at Dunkin' Donuts restaurants. Additionally, Dunkin' Donuts is prohibited from selling K-Cups in grocery stores, where it traditionally sells its bagged coffee.

(d)     In March 2011, Keurig entered into a multi-year agreement with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a "minimum five-year agreement," under which Starbucks was the "exclusive licensed super premium coffee brand on the Keurig platform" and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee." Under this agreement, Keurig began manufacturing additional varieties of Starbucks coffee and products from Starbucks' other brands, such as Seattle's Best. Keurig sells Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website.[47]

(e)     In May 2013, Keurig entered into a multi-year agreement with The Coffee Bean & Tea Leaf, "the largest privately held specialty coffee and tea

---

[47] Starbucks and Keurig Coffee Roasters Enter Into Expanded, Long-Term Strategic Partnership (May 7, 2013 Press Release), http://news.starbucks.com/news/starbucks-and-green-mountain-coffee-roasters-enter-into-expanded-long-term-.

retailer in the United States." Under the agreement, Coffee Bean K-Cups will be sold "in a variety of channels" beginning in the spring of 2014.[48]

    (f)    In July 2013, Keurig entered into a multi-year agreement with Cinnabon. Under the agreement, Keurig will manufacture Cinnabon K-Cups which will be sold in the retail and commercial channels, as well as in Cinnabon restaurants.

146.    Keurig has also entered into similar agreements with Newman's Own Organics Coffee®, Gloria Jean's Coffee®, and Wolfgang Puck®, as well as agreements to manufacture and distribute non-coffee products with companies such as Bigelow®, Twinings®, Swiss Miss®, Snapple®, Celestial Seasonings®, Campbell's®, and most recently Coca-Cola®.

147.    As a result of the above-described anticompetitive agreements, Keurig was able to foreclose competition from would-be competitors both before and after the patents protecting its K-Cup technology expired in September 2012.

148.    Subsequent to patent expiration, both branded and private label Competitor K-Cups began to enter the Compatible Cup Market.   According to a November 14, 2013 presentation by Rabobank to the National Automatic Merchandising Association, entitled "In Pod We Trust,"[49]   K-Cup market share as of September 2013 was as follows:

---

[48] Keurig Coffee Roasters, Inc. Welcomes The Coffee Bean & Tea Leaf to the Keurig Family (May 29, 2013 Press Release), http://investor.gmcr.com/releasedetail.cfm?releaseid=767731.

[49] http://www.vending.org/education/coffeeshow/presentations/NAMA_2013-In_Pod_We_Trust.pdf, at p. 25.



149.    At September 2013, Keurig directly or through license agreements controlled more than 81.7 % of the K-Cup drink market, including Green Mountain (45.1%), Smucker (14.3%), Starbucks (14.2%), Eight O'Clock (5%), and Caribou (3.1%).  The chart lists "Private Label, Others" as accounting for 11.6% of the K-Cup market but many of these offerings are also controlled by Keurig.  For example, Keurig produces the private label Kirkland Signature® brand K-Cups for Costco, the largest U.S. Warehouse Club store, and produces and distributes other licensed brands as discussed herein.

150.    According to Keurig's own data for the fiscal year to date ending August 4, 2013, Keurig controlled 92% of the Compatible Cup market, broken out as 48% Owned Brands, 22% Partner Brands, 18% Licensed Brands, and 3% Licensed Premium Store Brands.  The remainder of the market, a year after patent expiration, consisted of 5% of Unlicensed Brands and 3% of Unlicensed Private Label K-Cups.[50]

---

[50] 2013 Investor Presentation at pp. 98-99.

151.    As Keurig's spokesperson Katie Gilroy has stated:  "We're indifferent as to whether we're selling our own brand or a licensed pack."[51]

152.    During its Investor Day Presentation, Keurig announced that it is actively pursuing unlicensed brands to convert them to the Keurig system, and that it had some agreements in hand that it could not yet announce.

153.    Beginning January 1, 2014, Keurig began announcing additional multi-year exclusive agreements "converting" competitors across all market segments.  Recently converted competitors include:

(a)    Branded beverages Krispy Kreme,[52] Lavazza,[53] Laura Secord® hot chocolate,[54] and Café Bustelo;[55]

(a)    Private Label K-Cups for BJ's Wholesale Club Wellsley Farms® coffee,[56] available exclusively at BJ's locations and on BJs.com:

(b)    Private label K-Cups for national retailer Target, for both its Archer Farms and Market Pantry brands.[57]

(c)    Private label K-Cups for W.B. Mason, the largest privately owned office products dealer in the U.S; and

(d)    Private label K-Cups for Grocery Chains. Keurig is the exclusive manufacturer for:

---

[51] Venessa Wong, Green Mountain Gains as Starbucks Surges in a Crowded K-Cup Market, *Business Week* (Mar. 7, 2014),  http://www.businessweek.com/articles/2014-03-07/green-mountain-gains-as-starbucks-surges-in-a-crowded-k-cup-market.

[52] The Joy of Krispy Kreme Comes to Keurig (Feb. 10, 2014 Press Release), http://investor keuriggreenmountain .com/releasedetail.cfm?ReleaseID=824371.

[53] Green Mountain Coffee Roasters and Lavazza to Bring the Flavors of Italy to Keurig (Feb. 20, 2014 Press Release), http://investor keuriggreenmountain.com/releasedetail.cfm?ReleaseID=827029.

[54] Green Mountain Coffee Roasters Partners with Laura Secord® to Create Hot Chocolate K-Cup®Packs for Keurig® Single Cup Brewers (Feb. 27, 2014 Press Release), http://investor keuriggreenmountain.com/ releasedetail.cfm?ReleaseID=828799.

[55] Cafe Bustelo And Keurig Green Mountain Brew Up Single Cup Partnership (July 18, 2014 Press Release), http://investor.keuriggreenmountain.com/releasedetail.cfm?releaseid=860620.

[56] BJ's Members Raise Your Mugs! Wellsley Farms Coffee Now Comes in Convenient K-Cup Packs (June 23, 2014 Press Release), http://investor.keuriggreenmountain.com/releasedetail.cfm?ReleaseID=855906.

[57] http://blog keurig.com/blog/briana-keene/our-family-of-brands-2b-meet-some-new-members.

- Harris Teeter® K-Cups to be sold in store and online at HarrisTeeter.com;[58]

- Meijer K-Cups, available exclusively at Meijer stores;[59] and

- Java Delight, to be sold by Supervalu, one of the largest grocery wholesalers and retailers in the U.S., in its company owned stores known as Cub Foods, Hornbachers, Shop n' Save, Shoppers Food & Pharmacy, and Farm Fresh as well as in the 1,800 independent stores it serves.[60] Keurig "converted" Supervalu from the Keurig compatible, environment friendly UnCup™ pod, introduced in September 2012.[61]

154.    But the biggest announcements of 2014, however, dealt with the elimination of the two largest unlicensed branded competitors – Peet's and Kraft.

155.    On March 14, 2014, Keurig and Starbucks announced the amendment of their existing five-year agreement, with Starbucks giving up its right to be the exclusive super-premium Keurig licensed brand in exchange for "improved business terms."

156.    Within hours, Keurig and Peet's Coffee & Tea announced a multi-year manufacturing and distribution agreement.  Under the Agreement Keurig grinds Peet's coffee and packages it in K-Cups.  The Agreement provides that Peet's will distribute these K-Cups to grocery stores, mass merchandisers, club stores, Peet's retail stores and online at Peet's U.S. consumer direct site, as it was already doing, and Keurig will distribute Peet's K-Cups to "specialty and department stores and away from home channels."  In just seven months, Peet's had experienced "incredible growth and success in the single cup category" and was the largest

---

[58]Keurig Green Mountain to Bring the Keurig Brewed Seal to Harris Teeter K-Cup Packs (July 9, 2014 Press Release), http://investor keuriggreenmountain.com/releasedetail.cfm?ReleaseID=858784.

[59] Keurig Green Mountain Welcomes Meijer K-Cup Packs into the Keurig Brewed Family (Oct. 23, 2014 Press Release), http://invester.keuriggreenmountain,com/releasedetail.cfm?ReleaseID=877759.

[60] Keurig Green Mountain and SUPERVALU Announce New Java Delight for Keurig Hot Brewers (Oct. 30, 2014 Press Release), http://investor.keuriggreenmountain.com/releasedetail.cfm?ReleaseID=879348.

[61] SUPERVALU Launches Java Delight Single Serve Coffee UnCup (Sept. 4, 2012 Press Release), http://www.businesswire.com/news/home/20120904006429/en/SUPERVALU-Launches-Java-Delight-Single-Serve-Coffee#.VFMNEPnF8g0.

unlicensed super-premium single-serve coffee.  Peet's RealCups™[62] were already "available in over 12,000 stores nationwide."[63]  The key to Peet's sudden success appears to be the deal's grant of access to the markets that were otherwise foreclosed by Keurig's anticompetitive conduct.

157.    In August 2014, Keurig entered into a multi-year licensing, manufacturing, and distribution agreement for Kraft's branded coffees – Maxwell House®, Gevalia®, Yuban®, and McCafe®,[64] converting them to Keurig K-Cups and eliminating Keurig's largest unlicensed competitor remaining in the market.  Kraft's coffee brands had 5.4% of the Compatible Cup market.

158.    According to the "2014 Harris Poll EquiTrend® Coffee Brand of the Year" Keurig owns or licenses the top seven coffee brands:  1. Dunkin' Donuts, 2. Green Mountain Coffee, 3. Folgers, 4. Seattle's Best, 5. Maxwell House, 6. Caribou, and 7. McCafe.[65]

159.    Similarly, Keurig also entered into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Keurig's own coffee as well as the coffee and tea that Keurig purchases from coffee brands.

160.    In at least one such contract, Keurig is permitted to veto the roaster's ability to contract with manufacturers of Competitor Cups.  Specifically, the contract provided that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and

---

[62] Keurig competitor Mother Parkers Tea & Coffee is the owner and manufacturer of the RealCup™ technology and brand.

[63] Keurig Green Mountain and Peet's Coffee & Tea Announce Partnership (Mar. 14, 2014 Press Release), http://investor.peets.com/releasedetail.cfm?ReleaseID=840130.

[64] Prior to Keurig's agreement with Kraft, one analyst report stated the "only meaningful coffee brand that [Keurig] does not have in its portfolio is Maxwell House® (*i.e.*, Kraft)."

[65]   http://www.harrisinteractive.com/insights/equitrendranking/2014EquiTrendRankings.aspx   ("Beverages   drop-down menu, then "Coffee").

sale of private-label K-Cups by third parties] based on such contract's compliance with the terms and conditions of this Agreement."[66]

161.    As Keurig's K-Cup patents have expired, there is no legitimate justification for this division of markets across competitors, or the restraints placed on dealing with Competitor Cup makers that could plausibly be grounded in any valid patent rights.  Nor is there any basis for Keurig to demand that Competitor Cup makers take a purported "license" or become "authorized" to sell Competitor Cups.  Keurig's lawful right to exclude Competitor Cup makers from the Compatible Cup Market expired when the patents protecting its K-Cup technology expired in September 2012, and it cannot extend this right beyond the term it was granted by the U.S. Patent Office simply because it was the first to make K-Cup Brewers or K-Cups.

**B.      Keurig Coerced Distributors And Retailers To Enter Into Long-Term, Anticompetitive Contracts Denying Competitors Access to Retail Customers and Distribution Channels**

162.    Keurig distributes commercial K-Cup Brewers and accompanying K-Cups to the Away-From-Home Market Segment through over 500 Keurig Authorized Distributors, including Office Coffee Service operators, office suppliers such as WB Mason and United Stationers, hospitality service providers, and food-service management companies, such as Vistar and Aramark.

163.    Keurig requires at least some of these distributors to enter into a multi-year KAD Agreement, which prevents them from purchasing Compatible Cups from Keurig competitors, thereby substantially foreclosing access to the Office Coffee Services Market Segment. Specifically, certain KAD Agreements contain a "Keurig Loyalty" requirement that provides:

---

[66] License and Distribution Agreement between Keurig, Incorporated and Diedrich Coffee, Inc. (dated July 29, 2003), http://www.sec.gov/Archives/edgar/containers/fix048/947661/000119312508208074/dex1037.htm.

3.2. Keurig Loyalty. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.[67]

164.    As one national coffee supplier for offices, food service and retail explained "[o]ur agreements [with Keurig] state that we cannot sell other brands of K-Cups to be used in Keurig brewers."   And a president of an office coffee distribution company explained that "Private label K-Cups prices are probably 10% to 15% less than Keurig's K-Cups, but I am not offering anything private label.  I am not permitted by contract with them."  Similarly, the owner of a major North American Keurig-contracted online retailer said:  "We've abided by our contracts, so we haven't taken on any of the new K-Cups.  We've stuck with Keurig."[68]

165.    According to Rogers, one of Keurig's competitors, Keurig's KAD Agreement's "loyalty provision," intimidation tactics, and/or efforts to create "fear, uncertainty or doubt" in the marketplace concerning Competitor Cups have prevented it from doing business with customers and potential customers.  Rogers was allegedly repeatedly told by office supply distributors that suppliers were unable to purchase Rogers' Competitor Cups as a result of their distributorship agreements with Keurig.

166.    These KAD Agreements are unduly restrictive not only because they substantially exclude competition, but also because they do so for a multi-year period.

167.    Notably, the standard KAD Agreement also has the effect of locking in office and commercial customers that might otherwise switch to new suppliers.  Additionally, these KAD

---

[67] *See* annexed Exhibit A.

[68] Reverdy Johnson, Private-Label Threat Brewing for Keurig's K-Cups, *Blueshift Report* (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.pdf.

Agreements restrict distributors' ability to display prices for K-Cups, further insulating Keurig from competitive pricing.[69]

168.    Keurig uses its monopoly power in the Single-Serve Brewer Market to force office supply distributors to enter into these KAD agreements by threatening to otherwise refuse access to Keurig's market-dominant office Single-Serve Brewers.

### C.   Keurig Coerced Machine Manufacturers And Component Suppliers To Enter Into Long-Term, Exclusive Contracts To Deny Competitor Access To The Equipment And Supplies Necessary To Manufacture Compatible Cups

169.    Because competitor Compatible Cups were high-quality, less-expensive, and environmentally friendly, consumers started to buy competitor Compatible Cups over K-Cups, and as a result, Keurig's dominant share of the Compatible Cups market started to gradually erode.  Keurig responded quickly by coercing machine manufacturers and component suppliers to enter into long-term, exclusive contracts that categorically denied competitor access to the equipment and materials necessary to manufacture Compatible Cups.  As a result of these and other anticompetitive actions, as discussed herein, Keurig recaptured most of the Compatible Cup market, so that it now currently controls approximately 95% of that market.

170.    Keurig has entered into unduly restrictive, anticompetitive, and exclusionary agreements with sellers of the machinery and components used to make K-Cups and sellers of K-Cup components.  For example, Keurig restricts the ability of machinery manufacturers to sell machinery to Keurig competitors who intend to use it to make Compatible Cups, but allows machinery manufacturers to sell the same machinery for other purposes.  Thus, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

---

[69] *See, e.g.*, annexed Exhibit A at §§ 2.1, 2.3.

171.   Suzanne Delong, Keurig's Director of Investor Relations, has stated that there are only two companies in the world making K-Cup packaging equipment **and both are under contract with Keurig**.  Thus, Keurig's web of exclusive dealing agreements has further enabled it to impose an unlawful monopoly in the Compatible Cup Market.

172.   These agreements were used as a shield to insulate Keurig from competition by TreeHouse.  TreeHouse allegedly attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Compatible Cups.  On December 19, 2013, a Sales Manager from R.A. Jones allegedly responded in an email, stating:  "I am quite embarrassed to be writing this email, but it needs to be done.  R.A. Jones is declining to quote the new machine for soluble, non-filtered product."[70]

173.   Under "the rules," as described by the R.A. Jones sales manager:  "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it."   However, R.A. Jones can still "build equipment for all types of packages, just not K-Cups or anything that goes into a Keurig brewer."[71]

174.   According to TreeHouse, the Sales Manager allegedly expressed hope that the Keurig "agreement will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse.[72]

175.   Keurig also unreasonably restrains competitors' access to the inputs necessary to make Compatible Cups.

176.   Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter.  There are few suppliers for each of these components because Compatible

---

[70] Complaint at ¶ 179, *Treehouse Foods, Inc. v. Keurig Coffee Roasters, Inc.*, No. 14-cv-00905 (S.D.N.Y. Feb. 11, 2014).

[71] *Id.* at ¶ 180.

[72] *Id.* at ¶ 181.

Cup components must generally be custom engineered for use in K-Cup Brewers. Keurig has entered into exclusive dealing agreements with suppliers of each K-Cup component, which has allegedly forced potential competitors to work with less experienced suppliers at a higher cost to these potential competitors.[73]

177.    In 2010, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups.[74]

178.    Keurig competitor TreeHouse allegedly approached all three of these companies to find a supplier to make Compatible Cups.[75]

179.    At that time, Winpak was already supplying TreeHouse subsidiary Sturm with different types of cups and lids to make products that were not used in K-Cup Brewers. TreeHouse allegedly contacted Winpak to see if Winpak could also supply cups and lids to make Compatible Cups. After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak allegedly refused to supply these materials to TreeHouse. Winpak still supplies Sturm with lids for products that are not used in K-Cup Brewers.[76]

180.    TreeHouse also allegedly met with Phoenix Cups to see if Phoenix could supply the plastic cups needed to make Compatible Cups. Phoenix initially agreed to supply TreeHouse and even began customizing the cups per TreeHouse's requirements. However, shortly

---

[73] *Id.* at ¶ 187.

[74] *Id.* at ¶ 188.

[75] *Id.* at ¶ 189.

[76] *Id.* at ¶ 190.

thereafter, Phoenix allegedly informed TreeHouse that it could not supply TreeHouse with plastic cups for use in K-Cup Brewers due to concerns that TreeHouse was not an "authorized manufacturer" for Keurig.[77]

181.    Because Phoenix was free to supply plastic cups for use in products not intended for K-Cup Brewers, any restriction prohibiting Phoenix from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for Keurig.

182.    TreeHouse then allegedly contacted Curwood, the only remaining domestic supplier of plastic cups used to make Compatible Cups known at that time.  Shortly after the initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with plastic cups for use in K-Cup Brewers, Curwood allegedly informed TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations."[78]

183.    As a direct result of these suppliers' alleged refusal to supply TreeHouse with the materials necessary to make Compatible Cups, TreeHouse was forced to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components.  Developing new cup components was a more costly and lengthy process as compared to purchasing cup materials from a company that already produced such components. TreeHouse allegedly incurred additional, unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture cups for use in K-Cup Brewers.  As a result, TreeHouse's start-up costs were allegedly substantially higher than they would have been if TreeHouse had been free to purchase cups from an experienced cup manufacturer.[79]

---

[77] *Id.* at ¶ 193.

[78] *Id.* at ¶ 196.

[79] *Id.* at ¶¶ 198-99.

184.    TreeHouse also allegedly approached domestic suppliers of foil lids used to make Compatible Cups, Winpak and LMI Packaging Solutions ("LMI") to find a supplier for its Compatible Cups' foil lids.[80]

185.    As detailed above, Winpak allegedly refused to supply TreeHouse with lids after learning that TreeHouse intended to use the lids in Compatible Cups.

186.    LMI, then a supplier to TreeHouse of other cups and lids, also allegedly refused to supply TreeHouse with foil lids to make Compatible Cups, citing other business commitments. It would seem that these "other business commitments" were to Keurig.  After its initial refusal, LMI later informed TreeHouse that it no longer had a relationship with Keurig, and was, therefore, now free to do business with TreeHouse.[81]

187.    Once again, because TreeHouse was unable to contract with experienced domestic lid suppliers, it had to incur additional unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture lids for use in K-Cup Brewers. As a result, its start-up costs were substantially higher than they would have been if TreeHouse had been able to purchase lids from an experienced lid manufacturer.[82]

188.    Similarly, several filter suppliers allegedly declined to supply TreeHouse because they were already supplying Keurig with the same product.  Thus, TreeHouse was forced to find a new supplier of filters and adapt TreeHouse's production process to use the new products. TreeHouse allegedly had to incur additional costs because TreeHouse had to work with the new supplier to improve the filter for use in Compatible Cups.[83]

---

[80] *Id.* at ¶ 200.

[81] *Id.* at ¶¶ 202-3.

[82] *Id.* at ¶ 204.

[83] *Id.* at ¶ 206.

189.    As demonstrated by TreeHouse's experience, these multi-year, exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Keurig.

190.    These unduly restrictive agreements also negatively impacted the ability of TreeHouse and other competitors to effectively compete in the marketplace, which substantially reduced consumers' choice for Compatible Cups and increased the price of Competitor Cups as well as, by extension, allowing Keurig to continue charging supra-competitive prices for K-Cups.

191.    Moreover, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.  As parties to these agreements have admitted, Keurig does not restrict the ability to sell these same products for other purposes just so long as those products are not sold to a Keurig competitor who intends to use them to make Compatible Cups for use in K-Cup Brewers.

**D.    Keurig Sells Its K-Cup Brewers At Or Below Cost To Consumers And Provided K-Cup Brewers To Businesses For Free As Long As Businesses Agree To Purchase K-Cups Exclusively From Keurig**

192.    Keurig's business model depends upon its ability to leverage its Single-Serve Brewer monopoly in order to restrain competition and extract monopoly profits from the K-Cups it sells in the Compatible Cup Market.  Specifically, this business model relies on Keurig's ability to: (i) drive sales of Keurig's highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (ii) restrain price competition for Compatible Cups; and (iii) maintain supra-competitive K-Cup prices for extended periods of time.

193.    As it admits in its own statements to the public and investors, Keurig sells K-Cup Brewers at or below cost to saturate the market with brewers that are only compatible with the

K-Cup format, thereby locking consumers in to using the K-Cup format instead of other types of Portion Packs.

194.    K-Cups account for the bulk of Keurig's profit margin, and Keurig's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.

195.    While Keurig sacrifices its brewer profits to drive K-Cup sales, it recoups its losses on brewer sales by charging supra-competitive prices resulting in a 50% margin on K-Cups.

196.    The chart below demonstrates how Keurig has dramatically increased its gross profits over the past five years mainly through Portion Pack sales, the majority of which are sales of K-Cups.



## V. KEURIG PURPOSEFULLY DISSEMINATED FALSE, MISLEADING, AND DISPARAGING STATEMENTS ABOUT COMPETITORS' COMPATIBLE CUPS

197.   At various times throughout the Class Period Keurig has made false, misleading, and disparaging misrepresentations with respect to Competitor Cups (collectively, the "Misrepresentations and Disparagements").

198.   The Misrepresentations and Disparagements are part of Keurig's broader campaign of anti-competitive conduct and its strategy to unlawfully maintain its monopoly and eliminate competition in the Compatible Cup Market.   In making these Misrepresentations,

Keurig's intention was and continues to be to confuse customers with false information and discourage them from purchasing Competitor Cups.

199.    Throughout the Class Period, Keurig has misrepresented to current and prospective purchasers of Competitor Cups that the quality of Competitor Cups is inferior to Keurig's K-Cups.   Examples of such Misrepresentations include, but are not limited to, misrepresentations that Competitor Cups:

      (a)     will decrease the performance of Keurig Brewers;

      (b)     will decrease the overall life of Keurig Brewers;

      (c)     will cause damage to Keurig Brewers; and

      (d)     will void Keurig Brewers' One Year Limited Warranty.[84]

200.    Keurig has told Rogers' customers that Rogers' OneCups should not be used with Keurig Brewers because they will "gum up" the machine and the customer's warranty on the Keurig Brewer may be voided as a result of such use.[85]

201.    Rogers' CFO, Michael L. Sarina, testified on behalf of Rogers at a Fed. R. Civ. P. Rule 30(b)(6) deposition in connection with Rogers' Motion for a Preliminary Injunction that one effect of Keurig's Misrepresentations and Disparagements involved foreclosing Rogers from entering into agreements with certain retailers to supply private label products.[86]   Specifically, Sarina testified that "███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████.",[87]

---

[84] *See* Guidelines for Inquiries and Requests for Information, KGM00000089 - 104 at KGM00000095 ("Guidelines").

[85] Rogers Decl. at ¶ 29.

[86] Michael L. Sarina Dep. Tr. at 108:14-25.

[87] *Id.*

202.    Keurig  has  made  and  continues  to  make  these  Misrepresentations  and Disparagements to consumers who call Keurig's customer support telephone line.[88]   Indeed, Keurig instructs its customer support representatives to inform customers who call the customer service telephone line that "████████████████████████████████████ ████████████████████████████████████."[89]

203.    Purchasers of Competitor Cups have reported Keurig's Misrepresentations and Disparagements to competitor customer support lines.

204.    For example, Rogers' CFO testified that Rogers' customers "█████████████ ████████████████████████████████████████████████████████████ ████████████████████████████."[90]  "████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████."[91]

205.    Additional examples include:

    (a)    On December 19, 2013, one customer wrote to Rogers Gourmet Coffee & Tea Market:  "Hello, I just wanted to tell you that my Keurig Coffee pot has stopped making coffee.  One of the reasons, so they told me was that you[r] coffee doesn't have their seal of approval on it.  Even thou[gh] your coffee stated that we can use it.  They told me I shouldn't us[e] it… I love your coffee!  Please get approved.  My coffee pot is only 6 months old and they wont replace it if I continue to use your cups!!!!  Thank you, Lisa."[92]

    (b)    Similarly, on January 10, 2013, another customer wrote to Rogers Gourmet Coffee & Tea Market:  "I recently purchased San Franciso [sic]

---

[88] *Id.*

[89] *See* Guidelines.

[90] Sarina Dep. Tr. at 256:23-257:3.

[91] *Id.* at 259:17-23.

[92] Declaration of Warren Yamauchi in Support of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 98) ("Yamauchi Decl."), at Exhibit 1 (ECF No. 98-1).

bay French Roast coffee K Cup PODS.  On the Box you mention Keurig, Breville, Mr. Coffee etc.  I called Keurig and they said NOT to use this POD in the Keurig because it is NOT approved by Keurig and can mess up your Keurig coffee maker."[93]

(c)     On June 16, 2014, a couple wrote to Rogers Gourmet Coffee & Tea Market:  "Our Keurig 75 stopped making full cups of coffee.  When we contacted them they blamed the coffee pods we have been using.  We purchased three boxes of 160 pods each of your coffee and enjoy it immensely.  They specifically stated it was not approved for their product.  We are 75 years old and feel this does not make sense to us but feel you should be notified of their response.  Any help is greatly appreciated.  Sincerely, Joe ███."[94]

(d)     On June 5, 2014, a customer wrote to Rogers Gourmet Coffee & Tea Market:  "Sorry, I am so slow in getting back with you.  Approximately 2 weeks ago, when our Keurig coffee maker, which was about 4 months old, stopped working, we called the help line at Keurig to troubleshoot the problem.  The customer service lady asked us what pods we were using we replied San Francisco Bay pods.  She stated that using this brand voided our warranty with Keurig.  We wanted you to know that Keurig is telling people this.  We like your brand of coffee and hope that this problem can be resolved…"[95]

206.    Online customer reviews for Competitor Cups paint similar pictures.    In reviewing Rogers brand San Francisco Bay Coffee OneCups, an Amazon.com reviewer wrote: "When I called Keurig for assistance I was informed that this coffee was not a licensed manufacturer of 'K' cups and that by using them I would in essence void the warranty on the machine.  They did replace the machine but told me that using non-licensed coffee cups would result in voiding the warranty."[96]  Another reviewer wrote, "Not only can they not guaranty the unauthorized K-Cups, they can also void your warranty."[97]

---

[93] *Id.* at Exhibit 2 (ECF No. 98-2).

[94] *Id.* at Exhibit 3 (ECF No. 98-3).

[95] *Id*. at Exhibit 4 (ECF No. 98-4).

[96] Customer review, Amazon.com, San Francisco Bay Coffee, Breakfast Blend, 80 OneCup Single Serve Cups, http://www.amazon.com/review/RHR7BKT16FM6A/.

[97] *Id.,* http://www.amazon.com/review/R20Z2IUX9XADUX/.

207.   Online customer reviews for Treehouse brand Grove Square Cappuccino Single Serve Cups noted similar sentiments.  One Amazon.com reviewer wrote, "First of all, tasted pretty good.  BUT, contacted a few Keurig-Cup authorized on-line sellers and was told by all that Grove Square are NOT approved by Keurig and using them will void the warranty on your brewer.  Was told they are a "pirated" product."[98]   Another reviewer wrote, "Void your warranty????  This warning should be at the top of the reviewer comments!!!!  I never would have ordered it if I had known it would void my warranty & clog my coffee maker!!!""[99]

208.   Keurig made and promoted these Misrepresentations and Disparagements without any proper factual foundation.  By its own admission Keurig "does not make or test other brands"[100] to determine whether Competitor Cups decrease the performance or overall life of a Keurig Brewer, or cause damage to a Keurig Brewer.[101]

209.   Keurig's Chief Technology Officer, Kevin Sullivan testified at a Fed. R. Civ. P. Rule 30(b)(6) deposition on behalf of Keurig in connection with Rogers' Motion for a Preliminary Injunction that Keurig does not "



"[102]  "                            

"[103]

---

[98] Customer review, Amazon.com, Grove Square Cappuccino Variety Pack, 72-Count Single Serve Cup for Keurig K-Cup Brewers, http://www.amazon.com/review/R155AT1NBWJ62/.

[99] *Id.,* http://www.amazon.com/review/RGTQCLGRIDTHM.

[100] *See* Guidelines.

[101] Declaration of Daniel Johnson, Jr. in Support of Motion For Preliminary Injunction (ECF No. 99), at Exhibit 15 (ECF No. 99-15) (FAQ from Keurig's website noting, "we do not make or test the other brands").

[102] Kevin Sullivan Dep. Tr. at 207:1-4.

[103] *Id*. at 207:7-12.

210.    On the other hand, Rogers has conducted between 15,000 and 20,000 tests of Rogers' OneCup product in Keurig Brewers and did not discover a single instance in which the OneCup product caused damage to the Keurig Brewer or caused it to malfunction.[104]

211.    As Rogers' CFO testified, "████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████."[105]

212.    Moreover, overwhelmingly favorable reviews of Competitor Cups have shown that customers consider these products to be of high quality.[106]

213.    The Limited One Year Warranty included with existing Keurig Brewers does not explicitly indicate that the use of Competitor Cups will void the warranty or cause warranty issues.[107]    Rather, Keurig states, "Nor does this warranty cover damages caused by services performed by anyone other than Keurig or its authorized service providers, ***use of parts other then [sic] genuine Keurig parts***, or external causes such as abuse, misuse, including use in an office setting or other commercial setting, inappropriate power supply or acts of God."

214.    Keurig makes this vague statement regarding the limitations of its one year warranty in violation of the Magnuson-Moss Warranty Act (the "Act"), which strictly prohibits "tie-in" sales provisions.[108]

215.    Tie-in sales provisions link a warranty to the use of other branded products sold by the same manufacturer.  The one exception to the tie-in sales provision of the Act is for those

---

[104] Rogers Decl. at ¶ 30.

[105] Sarina Tr. at 257:3-7.

[106] Yamauchi Dec., at ¶ 13 (stating that Rogers brand OneCups have an average rating of 4.5 out of 5 stars on Amazon.com and its brand is regularly recognized as the "#1 Best Seller" in Beverages on Amazon.com); *see also* Mem. In Support of Plaintiff JBR, Inc. Mot. for a Preliminary Injunction (ECF No. 92) at p. 3.

[107] *See* Brewer Support, Keurig.com, http://www.keurig.com/support/k-cup-brewers#.

[108] Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 (1975).

who can demonstrate to the Federal Trade Commission that the warranted product will not work properly without a specified item or service.

216.   As noted above, Keurig has not tested Competitor Cups to determine whether they will, or will not work properly in a Keurig Brewer.  Moreover, tests performed by Keurig's competitors indicate that Competitor Cups work seamlessly with Keurig Brewers.

217.   Thus, Keurig further leverages its monopoly power in the Single-Serve Brewer Market by conditioning its brewer warranty on the purchase of its authorized portion packs in violation of the Act.

218.   Keurig's Misrepresentations and Disparagements in violation of the Act have the effect of coercing its brewer customers into buying K-Cups, or other Keurig licensed cups, rather than competing with Competitor Cups on the basis of quality and price.

219.   In disseminating these Misrepresentations and Disparagements, Keurig's purpose was and continues to be to confuse consumers with false information and discourage them from purchasing and/or dealing in Competitor Cups.

220.   Thus, Defendants' use of Misrepresentations and Disparagements is another unlawful method by which Plaintiffs and the Class are deprived of the choice of purchasing high-quality, less-expensive, and environmentally friendly Competitor Cups and forced to pay supra-competitive prices for K-Cups.

## VI.   KEURIG SPECIFICALLY DESIGNED ITS RECENTLY INTRODUCED 2.0 K-CUP BREWER TO BLOCK COMPETITION FROM COMPATIBLE CUPS

221.   In its latest effort to unlawfully preserve and enhance its monopoly, Keurig now imposes an exclusionary technological barrier to prevent consumers and commercial customers of K-Cup Brewers from using competitors' Compatible Cups and to coerce retailers into replacing low-priced Competitor Cups with K-Cups.

222.     In September 2014, Keurig launched its new 2.0 K-Cup Brewers with "interactive technology" which Keurig says will instruct the brewers on the "recipes" to use (*i.e.,* set temperatures, brewing size, water pressure, and other categories) to "ensure the system delivers on the promise of excellent quality beverages, produced simply and consistently every brew."[109]

223.     This so-called "breakthrough innovation" is, in fact, old.  For example, Bosch has been selling its Tassimo brewer with Intellibrew™ barcode technology, which is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup."

224.     Based upon expert analysis, it appears that there is no interactive technology on the K-Cup lids at all.[110]  The only information on the new K-Cup lids that the "interactive technology" is designed to identify is whether the K-Cup is a Keurig product. There is no imprint or ring containing "interactive technology" which conveys "recipe" information:

> The ink on the K-Cup lid is static and does not change when "read." Moreover, none of the 2.0 K-Cups I examined varied in terms of the fluorescent ink marketing used.  As such, it is my opinion that it is unlikely that the florescent ring on the 2.0 cups will be used on the Keurig 2.0 K-Cup Brewer to change brew settings (e.g., temperature, size, or pressure) based on the K-Cup inserted.[111]

225.     Simply put, the florescent ring on the 2.0 K-Cups was not intended to, nor does it actually enhance the beverage making process.  Instead, it is part of Keurig's attempt to prevent Competitor Cups from being used in the Keurig 2.0 K-Cup Brewer, prevent competitors from being able to compete in the Compatible Cup Market, and continue to extract monopoly profits from the Compatible Cup Market.

---

[109] *Id.*

[110] *See* June 16, 2014 Declaration of Larry F. Stewart at ¶¶ 21-33 (ECF No. 12-1).

[111] *Id.* at ¶ 33.

226.    Rather than a true technological innovation, Keurig's new technology eliminates competitive access to 2.0 K-Cup Brewers as well as consumer and retail customer choice by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Compatible Cups.  By tying K-Cup purchases to 2.0 K-Cup Brewer purchases, Keurig intends to continue to leverage its monopoly over the Single-Serve Brewer Market to exclude competition in the Compatible Cup Market.

227.    Even if Keurig were able to articulate a consumer benefit for its lock-out strategy, any such purported benefit would not, in any event, outweigh its anticompetitive effects. Consumers generally prefer having the ability to choose from a greater variety of Compatible Cups.

228.    Motiv, a third-party industrial design operation company working for Keurig on the Keurig 2.0 brewer wrote: "                                                                                                                                                          ."[112]

229.    Further, Andrew Gross, a former GMCR employee, in his declaration in support of JBR's motion for preliminary injunction specifically stated the Keurig 2.0 Brewer, with its lock-out technology, was developed by Keurig "                                                                                          ."[113]

230.    As industry news editor Keith Nunes explained, in fact "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share."[114]

---

[112] *See* Kevin Sullivan Dep. Ex. 39 (KVR0187677-79) (Aug. 17, 2012, Motiv letter to Scott Vogel, Senior Product Marketing Manager – At Home Division, Keurig) (annexed hereto as Exhibit C).

[113] *See* Declaration of Andrew Gross In Support of Plaintiffs' Motion For Preliminary Injunction (dated Aug. 11, 2014) at ¶ 8  (annexed hereto as Exhibit D).

[114] Keith Nunes, *GMCR playing hardball with Keurig 2.0*, FOOD BUSINESS NEWS (Nov. 21, 2013), http://www foodbusinessnews net/articles/news_home/Business_News/2013/11/GMCR_playing_hardball_with_Ke u.aspx?ID=%7B58DC5419-F51B-486C-8328-64CD811AFC81%7D&cck=1.

231.    And, as one financial analyst recently observed: "the introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups . . . will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices. With the new machines, Keurig is effectively cutting off competition. I know, I know, a monopoly is good, but marketplace/consumer confusion isn't."[115]

232.    Accordingly, Keurig's President and CEO "expect[s] [the] unlicensed [competitor Compatible Cup] share of the system to . . . begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations of K-Cup Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer.[116]

233.    Prior to the launch of the 2.0 K-Cup Brewer, Keurig began a campaign to mislead or coerce Compatible Cup makers to enter into exclusive licensing agreements with Keurig by enlisting the help of their retail customers.  Specifically, Keurig contacted retailers to inform them that the Compatible Cups they have been purchasing from Keurig competitors will not work in 2.0 K-Cup Brewers.  Keurig encouraged those retailers to pressure their suppliers into becoming "authorized" or "licensed" partners.

234.    Keurig's anticompetitive business practices have caused retailers to express concern to at least one maker of non-licensed Competitor Cups.  Specifically, retailers have told Rogers that they will delay purchasing decisions until they can confirm whether the Keurig 2.0 K-Cup Brewers will be compatible with Competitor Cups.  The following well-known and large retailers have expressed concern about purchasing Competitor Cups and, therefore, have not recently purchased Competitor Cups:  ADM Vending, A&P, Associated Services, Bed, Bath &

---

[115]  Herb Greenberg, *Cramer vs. Greenberg: The Battle of Keurig*, THE STREET (Nov. 21, 2013), http://www.thestreet.com/story/12119516/1/cramer-vs-greenberg-the-battle-of-green-mountain html.

[116]   Brian Kelley, Keurig Q4 2013 Earnings Call Transcript, MORNINGSTAR (Nov. 20, 2013), http://www morningstar.com/earnings/earnings-call-transcript.aspx?t=GMCR.

Beyond, Big Y, Bozzutos, Coffee Pause, Costco, Delhaize, Diamond Rock Spring, Evans Coffee, Fairway, Garber Broz, Kroger, Ingles, Northeast Coffee Distributing Corp., One Cup Coffee, Price Rite, Quill, Shoprite, Staples, U.S. Coffee, and Wakefern.

235.    These retailers' hesitancy to purchase and stock Competitor Cups indicates that Plaintiffs and the Class are, and continue to be, deprived of the choice of purchasing high-quality, less-expensive, and environmentally friendly Competitor Cups and are, instead, forced to pay supra-competitive prices for K-Cups.

## THE ANTICOMPETITIVE EFFECTS OF KEURIG'S UNLAWFUL MONOPOLIZATION OF THE RELEVANT MARKETS

236.    Keurig's above-described anticompetitive acts have had serious anticompetitive effects on competition in the Single-Serve Brewer and Compatible Cup Markets overall and have resulted in Plaintiffs and the members of the Class paying supra-competitive prices for K-Cups.

237.    With little to no competition, depending on the line of business, Keurig and its owned or licensed coffee brands have been able to charge supra-competitive prices for K-Cups. As a result, consumers have been forced to pay at least 10% to 15% more for Keurig-owned and licensed K-Cups than they would have in the absence of Keurig's unlawful anticompetitive conduct.

238.    At least twice in the past four years, Keurig has raised K-Cup prices approximately 12%.  While Keurig claimed such price increases were caused by rising input costs, industry sources state that commodity prices are insignificant to K-Cup pricing.  As one Compatible Cup manufacturer stated, "[o]nly a small amount of coffee is in each cup.  The price of the coffee is an insignificant factor in the cost of our production."[117]  A sales executive for a

---

[117]   Reverdy Johnson, *Private-Label Threat Brewing for Green Mountain's K-Cups*, BLUESHIFT REPORT (July 3, 2013), http://blueshiftideas.com/reports/071302PrivateLabelThreatBrewingforGreenMountainsKCups.pdf.

global private-label food manufacturer also explained that "single-cup products are relatively shielded from even a sudden upturn in raw coffee pricing."[118]  Similarly, a marketing director for a private-label coffee producer said "[c]ommodity costs are pretty irrelevant on the single-cup buyer side.  This is not a product type that goes up when coffee costs rise and down when they fall."[119]  Indeed, Keurig's CEO has admitted that its K-Cups are "insulated from rising coffee commodity costs due to a built-in price premium" and, as a result, "single-cup pricing has continued to premiumize the category regardless of what the commodity prices of coffee have done."

239.    Keurig's anti-competitive conduct has also limited the number and variety of competitive Compatible Cup beverages available to consumers and commercial customers.  By foreclosing access to markets, inputs, suppliers, distributors, and brands, Keurig has limited the output, distribution, and availability of Competitor Cups.   As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by competitor Compatible Cup manufacturers.

240.    Restricted access to competitors' Compatible Cups has been especially harmful to consumers who prefer the taste, flavor, and/or quality of such cups over Keurig-owned or licensed K-Cups.

241.    Consumer choice has been further limited because competitors disadvantaged by Keurig's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Compatible Cups.

---

[118] *Id.*

[119] *Id.*

242.    Moreover, the recent introduction of Keurig's 2.0 K-Cup Brewer threatens to further harm competition and consumers in the future.  Keurig already controls approximately 95% of the Compatible Cup Market, and is continuing to substantially foreclose competitor Compatible Cup makers from the balance of the market by locking competitors' Compatible Cups out of the market for new brewers and the replacement of prior generations of K-Cup Brewers.

243.    In fact, as described above, Keurig's 2.0 K-Cup Brewer launch has already harmed competition.  For example, Keurig has used the 2.0 K-Cup Brewer launch to induce retailers and distributors to cease doing business with competitor Compatible Cup manufacturers and sellers.

244.    The unlawful elimination of Compatible Cup competition will continue to harm consumers like Plaintiffs and members of the Class by maintaining or raising K-Cup prices at supra-competitive levels and by eliminating consumer choice.

## CLASS ALLEGATIONS

245.    Plaintiffs bring this class action on behalf of themselves and all others similarly situated under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking damages, and equitable and injunctive relief on behalf of the following class (the "Class"):

> All persons or entities that purchased between September 7, 2010 and the present (the "Class Period") at least one K-Cup either (1) directly from Keurig, any of Keurig's co-conspirators, or entities owned or controlled by Keurig or any of its co-conspirators, or (2) directly from Keurig using MBlock or any other entity acting as agent for Keurig.  Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities.

246.    The Class is so numerous and geographically dispersed across the country such that joinder of all members is impracticable.  While the exact number of members of the Class is

unknown to Plaintiffs at this time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that there are at least thousands of members in the Class and that their identities can be identified from records in Keurig's possession, custody, or control.

247.    Class members are geographically dispersed throughout the U.S.

248.    Plaintiffs' claims are typical of the claims of the other members of the Class.

249.    There are questions of law and fact common to the Class that relate to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)    Whether the United States Single-Serve Brewer Market constitutes a Relevant Market;

(b)    Whether the United States Compatible Cup Market constitutes a Relevant Market;

(c)    Whether Keurig possesses monopoly power in these two Relevant Markets;

(d)    Whether Keurig monopolized or attempted to monopolize the Single-Serve Brewer and Compatible Cup Markets in the United States in violation of Section 2 of the Sherman Act;

(e)    Whether Keurig entered into contracts, combinations or conspiracies to fix, raise, maintain, or stabilize K-Cup prices or otherwise restrain trade in the United States in violation of Section 1 of the Sherman Act;

(f)    Whether Keurig entered into exclusive dealing contracts constituting anticompetitive acts intended to maintain Keurig's monopoly in the Compatible Cup Market in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

(g)    Whether Keurig engaged in monopoly leveraging by using its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Compatible Cup Market in violation of Section 2 of the Sherman Act;

(h)    Whether Keurig unjustly enriched itself to the detriment of the Plaintiffs and the Class, thereby entitling Plaintiffs and the Class to disgorgement of all benefits derived by Keurig;

64

(i)     Whether the conduct of Keurig, as alleged in this Complaint, caused Plaintiffs and the Class to pay supra-competitive prices for K-Cups, and thereby, suffer antitrust injuries;

(j)     The appropriate injunctive and equitable relief for the Class; and

(k)     The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

250.    Plaintiffs purchased K-Cups at supra-competitive prices set by and through Keurig's anticompetitive conduct.  Plaintiffs' interests are coincident with and not antagonistic to those of the other members of the Class.  Plaintiffs are members of the Class, have claims that are typical of the claims of the Class members, and will fairly and adequately protect the interests of the Class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

251.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

252.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

253.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  The Class is readily definable and is one for which records should exist in the files of Keurig, and prosecution as a class action will eliminate the possibility of repetitious litigation. Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate an antitrust claim such as the ones asserted in

this Complaint.  This class action presents no difficulties of management that would preclude its

maintenance as a class action.

## CAUSES OF ACTION

### COUNT ONE
### Monopolization
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

254.   Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

fully set forth herein.

255.   Keurig, as alleged herein, has monopoly power in the Single-Serve Brewer and

Compatible Cup Markets, including the power to control prices and exclude competition.

256.   Keurig has willfully and intentionally engaged in anticompetitive conduct in order

to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman

Act, 15 U.S.C. § 2.

257.   Keurig has   unreasonably restrained, and further threatens to unreasonably

restrain competition in the Single-Serve Brewer and Compatible Cup Markets by:

> (a)   coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, exclude competitors, limit output, and raise competitors' costs;

> (b)   agreeing with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, allocate markets, and/or limit output;

> (c)   coercing distributors and retailers to enter into long-term, exclusive, anticompetitive agreements that restrain market entry, exclude competitors, and/or limit output;

> (d)   aggressively eliminating potential competitors through successive anticompetitive acquisitions;

> (e)   filing objectively and subjectively baseless ("sham") litigation against competitors for the purpose of interfering with their ability to compete in the Compatible Cup Market;

(f)  misusing its brewer patents  by attempting to impermissibly broaden their scope  to cover Competitor Cups, and by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups and engaging in an unlawful tying arrangement;

(g)  announcing an anticipated tie of the purchase of K-Cups to the purchase of 2.0 K-Cup Brewers in order to unreasonably restrain competition from Competitor Cup makers;

(h)  raising rivals' costs above those that would exist under competitive conditions by coercing Competitor Cup makers to enter purported "licenses" that restrict output and require the payment of improper "royalty" payments.

258.  While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

259.  As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things:  (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

### COUNT TWO
### Exclusive Dealing
(Violation of Sections 1& 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14)

260.  Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

261.  As detailed above, Keurig has monopoly power in the Single-Serve Brewer and Compatible Cup Markets, including the power to control prices and exclude competition.

262.  Keurig has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, and retailers, creating high barriers to entry and unreasonably excluding competitors in the Single-Serve Brewer and Compatible Cup Markets.

263.    These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

264.    This web of exclusive dealing agreements cannot be justified by any purportedly pro-competitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Keurig does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers.   Thus, Keurig's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Keurig.

265.    This conduct has substantially foreclosed competition in the Compatible Cup Market.

266.    Because this conduct involves exclusionary agreements between two or more unaffiliated entities, this conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1.   These exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, because these agreements constitute anticompetitive acts intended to maintain Keurig's monopoly in the Compatible Cup Market.

267.    As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things:  (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT THREE**
**Monopoly Leveraging**
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

268.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

269.    As detailed above, Keurig has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

270.    Keurig has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Compatible Cup Market, specifically, by selling K-Cup Brewers at or below cost to lock consumers into the K-Cup format, then coercing companies, whose business depends on access to K-Cup Brewers, to sign anticompetitive agreements prohibiting them from dealing with Keurig's competitors in the Compatible Cup Market.

271.    Keurig further threatens to continue to leverage its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Compatible Cup Market by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain "interactive technology" which locks out the use of Competitor Cups that cannot be justified on the basis of any legitimate consumer benefit.

272.    Keurig willfully has acquired or maintained monopoly power by the exclusionary conduct detailed above, rather than through legitimate business acumen, skill, efficiency or legitimate innovation.

273.    As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things:  (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

### COUNT FOUR
### Attempted Monopolization In The Alternative
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

274.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

275.    As detailed above, Keurig has monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the Single-Serve Brewer and Compatible Cup Markets, including the power to control prices and exclude competition.

276.    Keurig has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Single-Serve Brewer and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

277.    Keurig's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Single-Serve Brewer and Compatible Cup Markets.  Keurig's ongoing anticompetitive conduct presents a dangerous probability that Keurig will succeed, to the extent it has not already, in its attempt to monopolize the Single-Serve Brewer and Compatible Cup Markets.

278.    As a direct and proximate result of Keurig's anticompetitive and monopolistic conduct, Plaintiffs and the Class have been damaged by, among other things:  (i) Keurig's ability to charge supra-competitive prices for K-Cups; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

**COUNT FIVE**
**Declaratory and Injunctive Relief**
(Under Sections 1& 2 of the Sherman Act, 15 U.S.C. §§ 1, 2)

279.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

280.    Plaintiffs seek declaratory and injunctive relief under the federal antitrust laws.

281.    Plaintiffs' allegations described herein constitute violations of §§ 1 and 2 of the Sherman Act.

282.    Keurig effectuated a scheme to restrain trade and monopolize a market.

283.    There is and was no legitimate, non-pretextual, pro-competitive business justification for Keurig's conduct that outweighs its harmful effect.

284.    As a direct and proximate result of Keurig's anticompetitive scheme, as alleged herein, Plaintiffs and the Class were harmed as aforesaid.

285.    The goal, purpose and/or effect of the scheme was to prevent and/or delay competition to continue charging supra-competitive prices for K-Cups without a substantial loss of sales.

286.    The Keurig anticompetitive agreements alleged herein should be declared invalid and unenforceable.

287.    Plaintiffs and the Class have been injured in their business or property by reason of Keurig's antitrust violations alleged in this Count.  Their injury consists of paying higher prices for K-Cups than they would have paid in the absence of those violations.  These injuries will continue unless halted.

288.    Plaintiffs and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Keurig's conduct constitutes a violation of §§ 1 and 2 of the Sherman Act.

289.    Plaintiffs and the Class further seek equitable and injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Keurig's unlawful conduct.

**COUNT SIX**
**Unjust Enrichment**

290.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

291.    Keurig has benefited from the monopoly profits on the sale of K-Cups resulting from the unlawful and inequitable acts alleged in this Complaint.

292.    Keurig's financial benefit resulting from unlawful and inequitable conduct is traceable to overpayments for K-Cups by Plaintiffs and the Class.

293.    Plaintiffs and the Class have conferred upon Keurig an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiffs and the Class.

294.    The economic benefit of overcharges and unlawful monopoly profits derived by Keurig through charging supra-competitive and artificially inflated prices for K-Cups is a direct and proximate result of Keurig's unlawful practices.

295.    The financial benefits derived by Keurig rightfully belong to Plaintiffs and the Class, as Plaintiffs and the Class paid anticompetitive and monopolistic prices during the Class Period, inuring to the benefit of Keurig.

296.    It would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Keurig to be permitted to retain any of the overcharges for K-Cups derived from Keurig's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

297.    Keurig is aware of and appreciated the benefits bestowed upon it by Plaintiffs and the Class.

298.    Keurig should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Class all unlawful or inequitable proceeds it received.

299.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Keurig traceable to Plaintiffs and the Class.

300.     Plaintiffs and the Class have no adequate remedy at law.

## JURY TRIAL DEMAND

301.     Plaintiffs and the Class hereby demand a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

302.     WHEREFORE, Plaintiffs and the Class demand a trial by jury and hereby respectfully request:

(a)     An order certifying this action as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appointing Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

(b)     Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has monopolized, or in the alternative, attempted to monopolize, the Compatible Cup Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(c)     Pursuant to 28 U.S.C. § 2201, a declaration that Keurig's exclusive dealing agreements are unreasonable and unenforceable restraints of trade that violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

(d)     Pursuant to 28 U.S.C. § 2201, a declaration that Keurig has unlawfully misused its patents, filed sham litigation and used its monopoly power in the Single-Serve Brewer Market to monopolize the Compatible Cup Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(e)     Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from Keurig's violations of the Sherman Act;

(f)     Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Keurig from continuing the unlawful acts in violation the Sherman Act and requiring it to ship all 2.0 K-Cup Brewers with any "lock-out" technology turned off;

(g)     Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Keurig from implementing the announced 2.0 K-Cup Brewer "lock-out" technology that threatens to block Competitor Cups from working in 2.0 K-Cup Brewers;

(h)     Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Keurig from tying the sale of 2.0 K-Cups to 2.0 K-Cup Brewers;

(i)      Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

(j)      Plaintiffs' and the Class's costs, expenses, and reasonable attorneys' fees in bringing this action; and

(k)      Such other relief as this Court may deem just and proper.


Dated:  November 25, 2014                    **GRANT & EISENHOFER, P.A.**

                                             By: /s/ Linda P. Nussbaum
                                             Linda P. Nussbaum
                                             Peter A. Barile III
                                             Bradley J. Demuth
                                             485 Lexington Avenue
                                             New York, NY 10017
                                             Telephone:  (646) 722-8500
                                             Facsimile:  (646) 722-8501
                                             lnussbaum@gelaw.com
                                             pbarile@gelaw.com

                                             *Attorneys for Direct Purchaser Plaintiffs and Interim Liaison Counsel and Interim Co-Lead Counsel for the Proposed Direct Purchaser Plaintiff Class*

                                             Michael M. Buchman
                                             John A. Ioannou
                                             Alex R. Straus
                                             **MOTLEY RICE LLC**
                                             600 Third Avenue, 21st Floor
                                             New York, New York 10016
                                             Telephone:  (212) 577-0040
                                             Facsimile:  (212) 577-0054
                                             mbuchman@motleyrice.com
                                             jioannou@motleyrice.com
                                             astraus@motleyrice.com

                                             Kellie Lerner
                                             Bernard Persky

Meegan Hollywood
**ROBINS, KAPLAN, MILLER & CIRESI
L.L.P.**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
klerner@rkmc.com
bpersky@rkmc.com
mfhollywood@rkmc.com

*Attorneys for Direct Purchaser Plaintiffs and
Interim Co-Lead Counsel for the Proposed
Direct Purchaser Plaintiff Class*