UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION | Civil Action No. 14-md-02542-VSB MDL No. 2542 |
| This Document Relates to: All Direct Purchaser Actions | REDACTED PUBLIC VERSION |

**DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARGUMENT ................................................................................................................................ 3

    I.      STANDARD FOR MOTION TO DISMISS ...................................................... 3

    II.     DIRECT PURCHASER PLAINTIFFS HAVE STANDING TO ASSERT THEIR ANTITRUST CLAIMS ........................................................................... 5

    III.    KEURIG HAS MONOPOLY POWER IN THE PLAUSIBLY DEFINED RELEVANT MARKETS ................................................................................. 8

        A.     DPPs' Market Structure Allegations Establish Defendant's Monopoly Power in Both the Single-Serve Brewer and Compatible Cups Markets ... 8

            1.     DPPs' Allegations Establish Keurig's Monopoly Power in the Single-Serve Brewer Market ..................................................... 9

            2.     DPPs' Allegations Establish Keurig's Monopoly Power in the Compatible Cups Market ........................................................ 12

        B.     DPPs' Allegations Also Show Direct Evidence of Keurig's Ability to Control Price and Exclude Competition in Both the Single-Serve Brewer and Compatible Cups Markets ................................................. 14

    IV.    KEURIG'S ALLEGED ANTICOMPETITIVE CONDUCT AS A WHOLE PLAUSIBLY ESTABLISHES SUBSTANTIAL FORECLOSURE IN THE COMPATIBLE CUPS MARKET .. 15

    V.     KEURIG'S EXCLUSIVE DEALING, SHAM LITIGATION, PRODUCT DISPARAGEMENT, AND PRODUCT REDESIGN CONDUCT ALL SUPPORT PLAINTIFFS' CLAIM THAT KEURIG HAS MONOPOLIZED THE COMPATIBLE CUPS MARKET ............................ 17

        A.     DPPs Sufficiently Allege Independently Actionable Exclusive Dealing Arrangements Which Substantially Foreclose Competition ..................... 17

        B.     DPPs Sufficiently Allege Independently Actionable Sham Litigation Claims ........................................................................................... 18

        C.     DPPs Sufficiently Allege Independently Actionable Product Disparagement Claims ................................................................. 20

        D.     DPPs Sufficiently Allege Independently Actionable Predatory Innovation Claims ..................................................................... 22

    VI.    KEURIG EFFECTIVELY CONCEDES THE SUFFICIENCY OF DIRECT PURCHASER PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ......................................... 24

CONCLUSION ........................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
    181 F.3d 216 (2d Cir. 1999)................................................................................10

*Allen v. Dairy Farmers of Am., Inc.,*
    748 F. Supp. 2d 323 (D. Vt. 2010)........................................................................8

*Alternative Electrodes, LLC v. Empi, Inc.,*
    597 F. Supp. 2d 322 (E.D.N.Y. 2009) .................................................................20

*Anderson News, L.L.C. v. American Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012)..................................................................................4

*Argus Inc. v. Eastman Kodak Co.,*
    612 F. Supp. 904 (S.D.N.Y. 1985)........................................................................6

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,*
    909 F. Supp. 162 (S.D.N.Y. 1995)......................................................................10

*Bayer Schering Pharma AG v. Sandoz, Inc.,*
    813 F. Supp. 2d 569 (S.D.N.Y. 2011)............................................................10, 14

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................................................4

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979)........................................................................ passim

*Blessing v. Sirius XM Radio, Inc.,*
    756 F. Supp. 2d 445 (S.D.N.Y. 2010).................................................................25

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982).............................................................................................6

*Bowen v. New York News, Inc.,*
    366 F. Supp. 651 (S.D.N.Y. 1973)......................................................................14

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.,*
    651 F.2d 122 (2d Cir. 1981)................................................................................18

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977).............................................................................................6

*C.R. Bard, Inc. v. M3 Sys., Inc.,*
    157 F.3d 1340 (Fed. Cir. 1998)...........................................................................23

*California Computer Prod., Inc. v. IBM,*
  613 F.2d 727 (9th Cir. 1979) ........................................................................ 16-17

*California v. ARC Am. Corp.,*
  490 U.S. 93 (1989).............................................................................................1

*Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.,*
  996 F.2d 537 (2d Cir. 1993)...............................................................................5

*CDC Techs., Inc. v. IDEXX Labs, Inc.,*
  186 F.3d 74 (2d Cir. 1999)................................................................................14

*Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.,*
  No. 2:11-CV-02031, 2012 WL 511485 (W.D. Ark. Feb. 15, 2012)........................12

*Commercial Data Servers, Inc. v. IBM,*
  166 F. Supp. 2d 891 (S.D.N.Y. 2001)................................................................10

*Continental Ore Co. v. Union Carbide & Carbon Corp.,*
  370 U.S. 690 (1962)......................................................................................3, 16

*Daniel v. American Bd. of Emergency Med.,*
  428 F.3d 408 (2d Cir. 2005)............................................................................ 5-6

*DiFolco v. MSNBC Cable L.L.C.,*
  622 F.3d 104 (2d Cir. 2010)...............................................................................5

*GAF Corp. v. Eastman Kodak Co.,*
  519 F. Supp. 1203 (S.D.N.Y. 1981)........................................................22, 23, 24

*Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.,*
  697 F.3d 59 (2d Cir. 2012).................................................................................5

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
  711 F.3d 68 (2d Cir. 2013).................................................................................5

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,*
  386 F.3d 485 (2d Cir. 2004)..........................................................................8, 10

*Global Network Commc'ns, Inc. v. City of New York,*
  458 F.3d 150 (2d Cir. 2006)........................................................................... 4-5

*Hack v. President & Fellows of Yale College,*
  237 F.3d 81 (2d Cir. 2000)...............................................................................13

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
  392 U.S. 481 (1968).........................................................................................7

*Holloway v. Lockhart,*
  813 F.2d 874 (8th Cir. 1987) .............................................................................5

*IHS Dialysis Inc. v. Davita, Inc.*,
   No. 12 Civ. 2468(ER), 2013 WL 1309737 (S.D.N.Y. Mar. 31, 2013)....................................8

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ...........................................................................................1, 6, 7

*In re Aluminum Warehousing Antitrust Litig.*,
   No. 13-md-2481 (KBF), 2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014).................................6

*In re Buspirone Patent Litig.*,
   185 F. Supp. 2d 363 (S.D.N.Y 2002) ...........................................................................19, 25

*In re Credit Default Swaps Antitrust Litig.*,
   No. 12md2476 (DLC), 2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014).....................................4

*In re Crude Oil Commodity Futures Litig.*,
   913 F. Supp. 2d 41 (S.D.N.Y. 2012)...........................................................................8, 9

*In re Currency Conversion Fee Antitrust Litig.*,
   264 F.R.D. 100 (S.D.N.Y. 2010) ...................................................................................7

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)................................................................................. passim

*In re DDAVP Indirect Purchaser Antitrust Litig.*,
   903 F. Supp. 2d 198 (S.D.N.Y. 2012)................................................................................25

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011)................................................................................25

*In re Dobbs*,
   227 F. App'x 63 (2d Cir. 2007) ....................................................................................3

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...........................................................................25

*In re Grand Theft Auto Video Game Consumer Litig.*,
   No. 06 MD 1739(SWK), 2006 WL 3039993 (S.D.N.Y. Oct. 25, 2006) ...............................25

*In re Mushroom Direct Purchaser Antitrust Litig.*,
   514 F. Supp. 2d 683 (E.D. Pa. 2007) ...............................................................................9

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   562 F. Supp. 2d 392 (E.D.N.Y. 2008) ........................................................................ passim

*In re Term Commodities Cotton Futures Litig.*,
   No. 12 Civ. 5126(ALC)(KNF), 2013 WL 9815198 (S.D.N.Y. Dec. 20, 2013) .......................8

*International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*,
   146 F.3d 66 (2d Cir. 1998).........................................................................................5

*Keurig, Inc. v. Sturm Foods, Inc.*,
    732 F.3d 1370 (Fed. Cir. 2013) ........................................................................19

*Keurig, Inc. v. Sturm Foods, Inc.*,
    Civ. No. 10-841-SLR, 2012 WL 4049799 (D. Del. 2012) ...................................19

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) (*en banc*) ..............................................................17

*Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*,
    969 F.2d 1384 (2d Cir. 1992) ...............................................................................5

*Maxon Hyundai Mazda v. Carfax, Inc.*,
    No. 13-cv-2680 (AJN), 2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014) .................9

*National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988) ..........................................................................20, 21

*New York v. Actavis, PLC*,
    No. 14 Civ. 7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ...........................8

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) .............................................................................13

*Northeastern Tel. Co. v. AT&T*,
    651 F.2d 76 (2d Cir 1981) ......................................................................... 16, 23-24

*Olympia Equip. Leasing Co. v. Western Union Tel. Co.*,
    797 F.2d 370 (7th Cir. 1986) ...............................................................................17

*Omega Envtl. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .............................................................................14

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006) ............................................................................6, 7

*Playboy Enters., Inc. v. Dumas*,
    159 F.3d 1347 (2d Cir. 1998) ...............................................................................3

*Professional Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ..........................................................................................18, 19

*Quanta Computer, Inc. v. LG Elecs., Inc.*,
    553 U.S. 617 (2008) .............................................................................................19

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) .................................................................................4

*Rowley v. City of New York*,
    No. 00 Civ. 1793(DAB), 2005 WL 2429514 (S.D.N.Y. Sept. 30, 2005) .................3

*S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*,
  781 F.2d 198 (Fed. Cir. 1986) ................................................................. 19

*SMS Systems Maint. Servs., Inc. v. Digital Equipment Corp.*,
  11 F. Supp. 2d 166 (D. Mass. 1998) ....................................................... 13

*Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*,
  414 F. App'x 372 (2d Cir. 2011) ............................................................. 13

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010) ...................................................................... 4

*Tampa Electric Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961) ................................................................................ 17

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................. 8-9, 12

*Trans Sport, Inc. v. Starter Sportswear, Inc.*,
  964 F.2d 186 (2d Cir. N.Y. 1992) ........................................................... 16

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
  676 F.2d 1291 (9th Cir. 1982) ................................................................ 18

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005) ........................................................ 11, 16, 17

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ....................................................... 11, 18, 23

*United States v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229 (2d Cir. 2003) ............ 17

*Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007) ................................................. 17-18

*Woori Bank v. Citigroup Global Mkts., Inc.*,
  No. 12-cv-3868 (KBF), 2014 WL 3844778 (S.D.N.Y. Aug. 5, 2014) ..................... 4

*Xerox Corp. v. Media Scis., Inc.*,
  660 F. Supp. 2d 535 (S.D.N.Y. 2009) ..................................................... 13

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
  511 F. Supp. 2d 372 (S.D.N.Y. 2007) ................................................ 17, 23

## FEDERAL RULES AND STATUTES

15 U.S.C. § 2302(c) ................................................................................. 21

Federal Rule of Civil Procedure 12(b)(6) ............................................... 3-4

**OTHER AUTHORITIES**

II Areeda & Hovenkamp, *Antitrust Law*, P 310c6 (2014) ............................................................16

Jonathan M. Jacobson, *Exclusive Dealing, "Foreclosure," and Consumer Harm*, 70
 ANTITRUST L.J. 311 (2002)................................................................................................17

Direct Purchaser Plaintiffs ("DPPs") respectfully submit this Opposition to Defendant Keurig Green Mountain, Inc.'s (formerly known as Green Mountain Coffee Roasters Inc. ("GMCR") and as successor to Keurig, Incorporated) ("Keurig") Motion to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint (ECF 229, 230) (the "Motion").

## INTRODUCTION

Keurig's Motion is based on multiple mischaracterizations of DPPs' factual averments and legal claims, as well as applicable law.  Moreover, Keurig fails to cite dispositive, controlling authority and is clearly mistaken that DPPs' antitrust claims either "were and continue to be a subset of those brought by [Competitor Plaintiff] TreeHouse," ECF 230 at 4 n.4, or are somehow duplicative of the antitrust claims asserted by Indirect Purchaser Plaintiffs ("IPPs").  *See* ECF 230 at 7 (arguing that "the policies underlying [the Indirect Purchaser rule established by] *Illinois Brick* . . . apply with full force here."); *California v. ARC Am. Corp.*, 490 U.S. 93, 100-105 (1989) (holding both direct and indirect purchasers each have viable and distinct claims under federal and state antitrust law).  In effect, by focusing its arguments instead on inapposite cases and the allegations and legal claims raised by other, differently-situated plaintiffs, Keurig has not met its burden of demonstrating that the DPPs' Consolidated Amended Class Action Complaint (the "CACAC") fails to allege plausible claims for relief.

Keurig's fundamentally flawed approach is exemplified by its lead argument. Controlling Second Circuit authority, *In re DDAVP Direct Purchaser Antitrust Litigation* – nowhere addressed in Keurig's Motion – makes clear that DPPs have antitrust standing to pursue overcharge damage claims for K-Cups purchased directly from Keurig, regardless of whether an antitrust action is separately brought against Keurig by its competitors for the same underlying unlawful conduct.  585 F.3d 677, 688-89 (2d Cir. 2009).  The CACAC plainly alleges that DPPs

purchased K-Cups directly from Keurig and seeks, among other relief, damages based on the supra-competitive overcharges paid by direct purchasers of K-Cups.[1] The fact that Keurig's competitors have antitrust standing to sue for their lost profits does not detract from DPPs antitrust standing here.

Keurig's market power and relevant market arguments are similarly flawed and should be rejected, among other reasons, because they present, at most, fact-intensive issues that are particularly ill-suited for resolution on a motion to dismiss.  Regarding market power, Keurig dominates the Single-Serve Brewer and Compatible Cups markets, with an 88% and 95% share, respectively.  CACAC ¶¶101, 107.  Addressing the Compatible Cups market in particular, Keurig ignores DPPs' detailed allegations concerning:  (i) the lack of any significant pricing constraints; (ii) the lack of interchangeability; (iii) industry recognition of a distinct Compatible Cups market; and (iv) Keurig's ability to maintain 50% profit margins and to repeatedly increase K-Cup prices by 10-15% without material loss of market share.  Instead, Keurig mischaracterizes the CACAC as alleging only an aftermarket, an inapplicable analytical framework where, as here, Keurig is alleged to be a monopolist with monopoly power in both markets.  At best, Keurig's relevant market arguments raise questions of fact necessitating further discovery.

Keurig also offers fundamentally flawed arguments regarding DPPs' Section 2 claims.  DPPs' CACAC makes clear that, while many of the alleged "anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim" under Section 2.  CACAC ¶¶258.  Keurig simply ignores DPPs' broader

---

[1] *E.g.,* CACAC ¶4 ("Plaintiffs and the Class have paid, and continue to pay, supra competitive prices for K-Cups (defined below) purchased directly from Keurig."); ¶5 ("Plaintiffs and the Class seek redress for overcharge damages suffered by reason of Keurig's antitrust violations alleged herein."); ¶¶25-35 (each named plaintiff "purchased K-Cups directly from Keurig during the Class Period and was injured as a direct and proximate result of Keurig's anticompetitive conduct alleged herein.").  Thus, under *DDAVP*, DPPs clearly have standing here to pursue their antitrust claims against Keurig.

monopolization claim.  Instead, Keurig artificially seeks to isolate each alleged anticompetitive act to argue that DPPs have no actionable antitrust claim because each individual act is, by itself, legally insufficient to state a claim.  Keurig is wrong.  *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-699 (1962) (requiring consideration of combined effect of conduct as a whole).  Indeed, conduct otherwise legal in other contexts may establish antitrust liability when engaged in by a monopolist.  More importantly, by ignoring DPP's broader monopolization claim – *i.e.*, that it is the ***combination*** of the alleged anticompetitive acts that independently establishes a Section 2 claim – Keurig effectively concedes the legal sufficiency of DPPs' allegations on that point.[2]

In sum, Keurig's Motion is wrong on the facts alleged, wrong on the legal claims asserted, and wrong on the applicable law.  Accordingly, Keurig's Motion should be denied in its entirety.

## ARGUMENT

## I.   STANDARD FOR MOTION TO DISMISS

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must look to Plaintiffs' operative complaint for the controlling facts,[3] accept all factual allegations as true,

---

[2] Because Keurig failed to address the broader monopolization claim DPPs actually alleged in favor of its faulty reductionist strawman, this Court should not consider any further argument regarding that broader claim if raised for the first time in Keurig's reply.  *E.g., Playboy Enters., Inc. v. Dumas*, 159 F.3d 1347 (2d Cir. 1998), *aff'ing on opinion below*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) (permitting arguments raised for the first time in reply "would be manifestly unfair"); *Rowley v. City of New York*, No. 00 Civ. 1793(DAB), 2005 WL 2429514, *5-6 (S.D.N.Y. Sept. 30, 2005) (refusing to entertain arguments in reply brief that could have been raised in opening brief; "[t]his Circuit has made clear it disfavors new issues being raised in reply papers"); *see also In re Dobbs*, 227 F. App'x 63, 64 (2d Cir. 2007) (affirming district court's refusal to entertain arguments first raised in reply).

[3] Throughout the Motion, Keurig repeatedly misstates DPPs' averments and legal claims, often with citations to the no-longer-operative complaint filed in a separate action by Competitor Plaintiff TreeHouse.  *E.g.*, ECF 230 at 23 ("Indeed, **DPPs acknowledge** that competitors' sales have grown during the relevant period. *See* **Orig. TH Compl. ¶¶153-54**.") (emphasis added).  By intentionally confusing and conflating the actions brought by differently-situated plaintiffs, Keurig ignores the various significant and fundamental differences between them, including, for example, the fact that DPPs are seeking overcharge damages while the Competitor Plaintiffs are instead seeking lost profit damages.  *E.g.*, Operative TreeHouse Compl. ¶566 ("As a direct and proximate result of KGM's anticompetitive conduct, TreeHouse has lost profits due to higher costs of doing business and the fact that it has been substantially

and "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). To survive a motion to dismiss, a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard is not akin to a "probability requirement," but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556. "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News*, 680 F.3d at 184. "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* at 185. Thus, "although an innocuous interpretation of the defendants' conduct may be plausible," it "is not the province of the court to dismiss the complaint on the basis of the court's choice among plausible alternatives." *Id.* at 190; *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322-24 (2d Cir. 2010). Moreover, the court cannot rely on any materials outside the operative complaint to "make a

---

foreclosed from competing with KGM in the Compatible Cup Market."); Operative JBR Compl. ¶316 ("Rogers has been injured by Keurig's anticompetitive conduct through lost sales and profits."); *see also In re Credit Default Swaps Antitrust Litig.*, No. 12md2476 (DLC), 2014 WL 4379112, at *9 (S.D.N.Y. Sept. 4, 2014) (concluding that DPPs who paid supracompetitive prices and competitors who lost profits as a result of the alleged antitrust violation each have antitrust standing because each has "distinct injuries" – denying DPPs standing in favor of suits by competitors "would thus be likely to leave a significant antitrust violation . . . unremedied."). Keurig also suggests, wrongly and with citation to two inapposite cases (*Roth* and *Woori*), that by making similar or even identical averments to those in TreeHouse's complaint, or by otherwise citing that complaint, DPPs' claims are somehow transmuted into TreeHouse-like legal claims. ECF 230 at 2 n.2 ("The Court may consider the full contents of the TreeHouse complaint because it is incorporated by reference."). *Roth* did not involve incorporation of another party's complaint, and indeed, instead held that the court erred in dismissing the complaint on the basis of extrinsic SEC filings because the plaintiff did not allege fraud (*i.e.*, what those SEC filings did or did not say) and that, in any event, extrinsic materials of any kind cannot be considered for their truth on a motion to dismiss. 489 F.3d at 510. *Woori* did reference the other party's complaint to supplement plaintiff's skeletal allegations but in no way "relied," as Keurig states, on the other party's allegations to dismiss plaintiff's complaint. 2014 WL 3844778, at *7-11 (granting dismissal solely on limitations grounds).

finding of fact that *controvert*[s] the plaintiff's own factual assertions." *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006).[4]

## II.   DIRECT PURCHASER PLAINTIFFS HAVE STANDING TO ASSERT THEIR ANTITRUST CLAIMS

DPPs allege that, as a direct result of Keurig's alleged anticompetitive conduct, each named plaintiff and class member paid an overcharge (*i.e.*, suffered a direct injury-in-fact) for the K-Cups DPPs and class members purchased directly from Keurig on or after September 7, 2010.  CACAC ¶¶4-5, 25-35, 245.[5]  Under controlling Second Circuit authority – *DDAVP* – such allegations plainly establish DPPs' standing to assert their antitrust claims.

Keurig completely ignores *DDAVP*.   Instead, Keurig relies on inapposite cases,[6] misstatements of DPPs' claims, and erroneous legal standards to argue that DPPs' overcharge

---

[4]  In general, on a motion to dismiss, documents outside the pleadings may be considered only in very narrow circumstances and, in the case of litigation records from a separate action, "not to support any factual determination" that would need to be made in order to grant the motion.  *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388-89 (2d Cir. 1992) (reversing dismissal where district court improperly credited other litigation documents); *Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.*, 697 F.3d 59, 73-74 (2d Cir. 2012) (vacating dismissal where court drew inference against plaintiff from extrinsic materials); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (reversing dismissal where court improperly "assay[ed] the weight of the evidence" by choosing "between reasonably competing interpretations" of extrinsic material); *Global Network*, 458 F.3d at 156 (vacating dismissal where court's reliance on transcripts from another case impermissibly "*controverted* the plaintiff's own factual assertions set out in its complaint"); *cf. Holloway v. Lockhart*, 813 F.2d 874, 876, 878 (8th Cir. 1987) (reversing summary judgment where court improperly credited findings made in a separate case involving same underlying facts but differently-situated plaintiffs).  Similarly, the Court – contrary to Keurig's suggestion (ECF 230 at 2 n.3, 14, 16 n.19, 18 n.21) – must use special "caution" in determining whether "facts outside the trial record" are so "beyond controversy" so to be subject to judicial notice, lest a party be unfairly deprived of the "opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence." *International Star Class Yacht Racing Assoc. v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotations omitted).  Thus, with respect to other litigation, judicial notice is limited to "establish[ing] the fact of such litigation and related filings" and does not permit "the truth of the matters asserted in the other litigation."  *Id.*  This is in part because even very similar litigations have differences.  *Id.* at 71.

[5]  The direct purchases at-issue in DPPs' case are not limited to direct purchases from Keurig's website, as Keurig seemingly argues.  ECF 230 at 3-4.  In fact, there is no such limiting allegation anywhere in DPPs' CACAC.

[6]  Keurig's cases either further support DPPs' standing or are clearly inapposite.  *E.g., Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 77-79 (2d Cir. 2013) (denying antitrust standing to co-conspirator whose injuries flowed from its exclusion from alleged conspiracy, but repeatedly observing the propriety of conferring antitrust standing to direct purchasers forced to pay higher prices as a result of the conspiracy); *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 546-47 (2d Cir. 1993) (affirming summary judgment where plaintiffs failed to prove prices ever increased after the exclusionary scheme's implementation or that defendant ever controlled anything more than 2.3% of the relevant market); *Daniel v. American Bd. of Emergency Med.*, 428 F.3d 408, 438-39 (2d Cir. 2005) (affirming dismissal where plaintiffs' injuries flowed from being denied access to

injuries from K-Cups purchased directly from Keurig are "indirect and speculative" and that DPPs are not efficient enough enforcers[7] of the antitrust laws to warrant antitrust standing.  ECF 230 at 4-7.  *DDAVP* squarely rejects these arguments.

In *DDAVP*, direct purchaser plaintiffs, like DPPs here, alleged they were forced to pay "supra-competitive prices as a result of defendants' anticompetitive conduct" which prevented competitive market entry (and thereby prevented the lower prices to direct purchasers that would have otherwise resulted).  585 F.3d at 683, 688.  Defendants, like Keurig here, argued that direct purchasers lacked standing to assert their antitrust claims because the alleged anticompetitive conduct "targeted" defendants' competitors.  *Id.* at 687-88.  Although the district court granted defendants' motions to dismiss, the Second Circuit vacated that decision, holding that such direct purchaser overcharge damage claims established antitrust injury because they were "plainly . . . 'of the type the antitrust laws were intended to prevent'" and were "'inextricably intertwined' with the conduct's anti-competitive effects and thus 'flow[ed] from that which makes defendants' acts unlawful.'"  *Id.* at 688 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) and *Blue Shield of Va. v. McCready*, 457 U.S. 465, 484 (1982)).  The Second Circuit then analyzed direct purchasers' overcharge damage claims under all four "efficient enforcer" factors and concluded not only that each factor favored granting antitrust

---

alleged conspiracy); *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283 (2d Cir. 2006) (affirming dismissal where plaintiff alleged only indirect purchases and therefore lacked standing pursuant to the *Illinois Brick* Indirect Purchaser rule); *In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, *22 (S.D.N.Y. Aug. 29, 2014) (dismissing action because "[n]one of the complaints alleges that plaintiffs in fact themselves purchase any aluminum directly"); *Argus Inc. v. Eastman Kodak Co.*, 612 F. Supp. 904, 911 (S.D.N.Y. 1985) (granting summary judgment where distributor alleged lost profit damages from "a conspiracy to restrain competition by keeping secret an innovation by a camera manufacturer" which directly injured competitor camera manufacturers but not distributors).

[7] Keurig apparently argues that plaintiffs JBR and TreeHouse, as Keurig's competitors, are more efficient enforcers of the antitrust laws and thus better situated than DPPs to bring antitrust claims against Keurig "to vindicate the public interest in antitrust enforcement."  ECF 230 at 6.  Keurig has separately sought to dismiss both the JBR and TreeHouse actions on the grounds that neither states a plausible claim for relief.  *E.g.*, ECF 224, 227.  Thus, Keurig apparently takes the position that no party should be permitted to challenge any aspect of its anticompetitive scheme.

standing, but that direct purchasers "would be efficient enforcers under any formulation." *Id.* at 688-89.  Moreover, *DDAVP* expressly rejected the very *Paycom* argument upon which Keurig's standing arguments rely.  *Compare* ECF 230 at 5 ("Courts disfavor claims by purchasers that flow from the injuries suffered by a defendant's competitors because of the attenuated chain of causation such claims necessarily involve.") (citing *Paycom*, 467 F.3d at 293) *with DDAVP*, 585 F.3d at 688-89 ("the *Paycom* court asked if the plaintiff was *an* entity most motivated by self-interest, not *the* entity most motivated by self-interest. . . .  Even if the competitors might be the most motivated, the plaintiffs are also significantly motivated due to their 'natural economic self-interest' in paying the lowest price possible.").

In addition to ignoring *DDVAP*, *i.e.,* controlling authority refuting Keurig's standing argument, Keurig's standing arguments also fail because they misstate the fundamental nature of DPPs' claims.  DPPs here allege that Keurig engaged in a multi-dimensional monopolization scheme designed to frustrate competition on the merits in order for Keurig to maintain, if not increase, the supra-competitive prices Keurig charges DPPs for the K-Cups DPPs purchased directly from Keurig.  *E.g.*, CACAC ¶¶245, 258.  Thus, Keurig's standing arguments concerning the impact of Keurig's conduct on Keurig's competitors' costs (ECF 230 at 6-7), the prices paid by DPPs for Keurig's competitor's portion packs (ECF 230 at 6-7), the applicability of the *Illinois Brick* Indirect Purchaser rule (ECF 230 at 7), and whether DPPs purchased the 2.0 brewer (ECF 230 at 7-8), are all irrelevant.[8]

---

[8] Regarding DPPs' overcharge damages allegations:  it has long been black-letter law that DPPs need only show the difference in the price DPPs actually paid versus the price they would have paid but-for Keurig's anticompetitive conduct.  *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968) ("We think it sound to hold that when a buyer shows that the price paid by him for materials purchased . . . is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of [Section 4 of the Clayton Act].""); *see also, e.g., In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y. 2010) (granting class certification because "[b]ased on Plaintiffs' proposed methodology for determining the difference between the 'but for' fee and the actual fee, it should be possible to calculate the amount of the fee paid by each member for each transaction that was an overcharge on a class-wide basis").

III.   **KEURIG HAS MONOPOLY POWER IN THE PLAUSIBLY DEFINED RELEVANT MARKETS**

Monopoly power is the power to control prices or exclude competition, *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004), and can be established either "(1) through direct evidence of anticompetitive effects or (2) by defining a relevant market and showing defendants' excess market share." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012); *see also IHS Dialysis Inc. v. Davita, Inc.*, No. 12 Civ. 2468(ER), 2013 WL 1309737, at *4 n.3 (S.D.N.Y. Mar. 31, 2013) ("[A] relevant market definition is not a necessary component of a monopolization claim where there is direct evidence of monopoly power.") (internal quotations omitted).[9]  Here, under either the "direct evidence" or "relevant market" standard, DPPs have sufficiently alleged that Keurig has monopoly power in both the Single-Serve Brewer and Compatible Cups markets.

A.   **DPPs' Market Structure Allegations Establish Defendant's Monopoly Power in Both the Single-Serve Brewer and Compatible Cups Markets**

Monopoly power exists when a defendant has a dominant share in a relevant market along with other market characteristics, such as high barriers to entry and weak competition, demonstrating the lack of competitive restraints.[10]  *Geneva*, 386 F.2d at 500-01; *Crude Oil*, 913 F. Supp. 2d at 53; *New York v. Actavis, PLC*, No. 14 Civ. 7473, 2014 WL 7015198, at *36 (S.D.N.Y. Dec. 11, 2014).  An alleged product market is plausible and sufficient for pleading purposes when it accounts for product interchangeability or cross-elasticity of demand.  *Todd*, 275 F.3d at 200.  As the Second Circuit has explained:

---

[9] Because monopoly power and relevant market are "deeply fact-intensive" inquiries, it is generally inappropriate to grant a motion to dismiss on those issues. *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001); *Crude Oil*, 913 F. Supp. 2d at 53; *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008); *see also Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 (D. Vt. 2010) ("Dismissals for insufficient pleading of market power are rare pre-discovery").

[10] Market characteristic issues are also fact-intensive and thus generally not suitable for resolution on a motion to dismiss. *E.g., In re Term Commodities Cotton Futures Litig.*, No. 12 Civ. 5126(ALC)(KNF), 2013 WL 9815198, at *24 (S.D.N.Y. Dec. 20, 2013).

> In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product.

*Id*. at 201-02 (internal quotations omitted); *see also Payment Card*, 562 F. Supp. 2d at 399 ("Companies should be treated as competitors in a market if-considering price, use, and qualities-consumers treat their products as acceptable substitutes for the purposes for which the products were intended."); *Crude Oil*, 913 F. Supp. 2d at 53 (same). As discussed below, DPPs' allegations establish that Keurig has monopoly power in two separate markets, the Single-Serve Brewer and the Compatible Cups markets, both of which are plausibly defined by detailed allegations concerning inadequate substitutes, insufficient cross-elasticity of demand, and other indicia of market structure lacking competitive constraints.[11]

1.      **DPPs' Allegations Establish Keurig's Monopoly Power in the Single-Serve Brewer Market**

During the entire relevant time period, Keurig has dominated the Single-Serve Brewer market with an 88% market share. CACAC ¶¶9, 75, 101.[12] This fact alone is sufficient to establish Keurig's market power. *See Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2014 WL 4988268, at *15 (S.D.N.Y. Sept. 29, 2014) ("a market share over 70% is usually 'strong evidence' of market power.").

The relevant product market is Single-Serve Brewers because no other products constrain the price of Single-Serve Brewers. *First*, consumers do not consider other products, such as less-costly drip coffee makers, to be reasonably interchangeable with Single-Serve Brewers. In support, DPPs allege:

---

[11] Keurig's relevant geographic market arguments (ECF 230 at 9-10) present "question[s] of fact" generally inappropriate for a motion to dismiss. *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 698 (E.D. Pa. 2007).

[12] The few remaining, highly fragmented, competitors have been further weakened by Keurig's anticompetitive tactics, including the use of exclusive supply and distribution arrangements. CACAC ¶¶75, 103.

> Single-Serve Brewers offer unique convenience and efficiency that traditional drip coffee makers do not, including that: (i) the coffee is prepared fresh in around or under one minute; (ii) the coffee does not sit in the pot and become bitter; (iii) there is no need for consumers to grind beans, measure coffee, use a separate filter, or clean up after brewing the beverage; and (iv) it allows multiple coffee drinkers in the same home or office to not agree on a particular flavor or even brand of coffee, and instead permits each person to choose based upon his/her tastes and preferences.

CACAC ¶56; *see also* CACAC ¶57 (a study and recent survey confirm consumers do not find other products reasonably interchangeable with Single-Serve Brewers because of their convenience and efficiency).[13] *Second*, drip-coffee makers do not constrain the price for Single-Serve Brewers as evidenced by the total sales of Single-Serve Brewers increasing despite Single-Serve Brewers costing significantly more than traditional drip brewers. *See* CACAC ¶¶7, 55, 58, 59, 62. Indeed, a "small but significant, non-transitory price increase for Single-Serve Brewers would not have caused a loss of sales to traditional drip coffee makers to make such a price increase unprofitable." CACAC ¶59. *Third*, DPPs show that despite the escalating market size of Single-Serve Brewers, the share of coffee consumed outside the house remains unchanged, demonstrating that the market for, and the price of, Single-Serve Brewers is not constrained by prepared coffee purchased from retail stores. *See* CACAC ¶¶60-62. Because "neither traditional drip coffee markets nor prepared coffee from retail stores have taken away sufficient sales from

---

[13] Keurig incorrectly contends that a "difference in process or convenience does not create a plausible inference that end products do not compete." ECF 230 at 20. In fact, functionality and consumer perspective is a critical part of the totality of a market evaluation. *Geneva*, 386 F.3d at 496-99 (holding generic warfarin sodium market properly excluded its therapeutically equivalent branded counterpart in part because of differing marketplace perceptions); *Payment Card*, 562 F. Supp. 2d at 399. In any event, the cases upon which Keurig relies (ECF 230 at 20) are all inapposite because they, unlike the CACAC here, all involved the absence of any allegations addressing alternative products and the "rule of reasonable interchangeability." *E.g.*, *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) (pleading failed to distinguish any reasonably interchangeable alternatives); *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 576-577 (S.D.N.Y. 2011) (pleading failed to allege enough information about other potential alternatives to make proposed market definition plausible); *Commercial Data Servers, Inc. v. IBM*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) (pleading failed to allege any facts supporting the proposed market definition and otherwise explain certain product exclusions); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) (affirming summary judgment because of failures in plaintiff's proof, thereby underscoring the impropriety of dismissal prior to discovery).

Single-Serve Brewers to constrain prices on Single-Serve Brewers, including those sold by Keurig," they are not economic substitutes for Single-Serve Brewers.  CACAC ¶62.  These allegations are more than sufficient to demonstrate a separate Single-Serve Brewer market.  *See Payment Card*, 562 F. Supp. 2d at 399 ("[P]laintiff seeking to survive [a motion to dismiss] must do no more than allege a product market that is 'plausible.'").

Rather than squarely address these detailed allegations, Keurig instead focuses on the allegation that Keurig prices its brewers at or below cost, a fact which, Keurig argues, demonstrates that Keurig does not have monopoly in the Single-Serve Brewer market.  *See* ECF 230 at 19-20.[14]   Whether Keurig prices brewers above cost says nothing about Keurig's extraordinarily high market share and the existence of high barriers to entry in the Single-Serve Brewer market, and otherwise provides no basis for expanding the alleged relevant market beyond Single-Serve Brewers.  Indeed, Keurig's arguments here are irrelevant:  there is simply no requirement that DPPs show Keurig actually exerted its power to control price in order to plead market definition or monopoly power.  *E.g., Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979) ("It is not a defense to liability under § 2 that monopoly power has not been used to charge more than a competitive price or extract greater than a reasonable profit").[15]   This is especially true in this case since DPPs allege that Keurig's leveraged its

---

[14]  Additionally, Keurig argues that the 2.0 brewer, "the product originally at the heart of this case" – once again improperly conflating DPPs' claims with those of the Competitor Plaintiffs – cannot be included in the relevant market because it can brew a carafe of coffee.  ECF 230 at n.23.  This is incorrect.  Whether or not the Keurig 2.0 belongs in additional markets does not preclude its inclusion in the Single-Serve Brewer market which encompasses brewers like the 2.0 that can "brew one cup-sized servings in less than a minute."  *See* CACAC at ¶7.

[15]  *See also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005) ("Moreover, even if monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract [a monopoly price] provides no succor to the monopolist.") (internal quotations omitted); *United States v. Microsoft Corp.*, 253 F.3d 34, 57 (D.C. Cir. 2001) ("In any event, the court found, a price lower than the short-term profit-maximizing price is not inconsistent with possession or improper use of monopoly power.").

monopoly power in the Single-Serve Brewer market to extract monopoly overcharges in the Compatible Cups market.

## 2.   DPPs' Allegations Establish Keurig's Monopoly Power in the Compatible Cups Market

DPPs sufficiently allege Keurig has monopoly power in a separate relevant product market for Compatible Cups.  Even though K-Cups are priced equivalent to $50 per pound of coffee, making it among the most expensive coffee in the world, Keurig's sales have steadily increased year-over-year by approximately 15%.  CACAC ¶77-78.  This is because "Portion Packs designed for non-Keurig brewers are [incompatible with K-Cup Single-Serve Brewers and thus] not reasonably interchangeable with K-Cups for Keurig Single-Serve Brewers."  CACAC ¶79; *see also* CACAC ¶¶80, 110-111.  As a consequence, non-Keurig brewer Portion Packs "do not reasonably constrain the price of Compatible Cups."  CACAC ¶86.  Significantly, even the industry recognizes a distinct relevant market for Compatible Cups.  *See* CACAC ¶¶11, 53, 81; *Todd*, 275 F.3d at 205-206 (discussing importance of industry data compiled by defendants). These market structure allegations sufficiently plead a Compatible Cups market.[16]

DPPs allegations sufficiently show that Keurig has monopoly power in the Compatible Cups market, including:

- Keurig, through outright brand ownership or exclusive licensing, controlled, at its lowest point, an incredible 86% share of the Compatible Cups market, which, as a testament to the success of Keurig's monopolization scheme, has since grown to an astonishing 95% share.  CACAC ¶¶105-07, 113, 169, 242;

- Keurig earns a remarkable 50% margin on sales and has been able to charge and maintain supra-competitive prices on its Compatible Cups without losing market share throughout the relevant period.  CACAC ¶¶23, 83, 111-12;

---

[16] Keurig's reliance on *Coffee.org, Inc. v. Green Mountain Coffee Roasters, Inc.*, No. 2:11-CV-02031, 2012 WL 511485, at *5-7 (W.D. Ark. Feb. 15, 2012), is misplaced.  In that case, online K-Cup distributor-plaintiff did not plead a separate Single-Serve Brewer market and sought to define a relevant market limited to include only K-Cups, not all Compatible Cups as alleged in this case.

- Keurig has foreclosed competition through numerous exclusive dealing and distributor agreements.  CACAC ¶¶114-18, 139-168; and

- Potential market entrants face high barriers to entry, including high development costs, Keurig's exclusive agreements foreclosing access to input supplies and machinery; and they now face additional entry barriers arising from introduction of Keurig 2.0.  CACAC ¶¶84, 85, 169-191, 221-235.

Effectively conceding the sufficiency of the above detailed factual allegations, Keurig mischaracterizes DPPs' separate and distinct market for Compatible Cups as an "aftermarket" subject to a different analytical framework.  ECF 230 at 21-23.[17]  An aftermarket analysis, however, generally only applies when allegations of monopoly power are limited to a single-brand product aftermarket because, in that context, a purchaser could switch to a different branded product in the primary market where competition remains fierce.  *See Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 544 (S.D.N.Y. 2009) (*Xerox III*) ("[I]t would be short-sighted in the extreme to price-gouge aftermarket customers, *at least in situations where the primary market is competitive* and dissatisfied customers can switch to a competitor's product.") (emphasis added).  In contrast, DPPs here allege that Keurig has monopoly power in both the Single-Server Brewer and Compatible Cups markets and has used that power to disrupt competition in both markets.[18]

---

[17] In connection with its aftermarket arguments, Keurig introduces switching cost evidence not reflected in DPPs' CACAC, which, in the motion to dismiss context, is wholly inappropriate.  *See, supra,* at 4-5 n.4.

[18] Keurig's aftermarket cases are thus irrelevant.  *Compare Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*, 414 F. App'x 372, 375-76 (2d Cir. 2011) (affirming dismissal where plaintiffs failed to plausibly define primary "vacation properties" market and the "recreational facilities" aftermarket restrictions flowed from agreed-to contract terms – "economic power derived from contractual arrangements [cannot] serve as a relevant market for antitrust purposes") (quoting *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 85 (2d Cir. 2000)) and *SMS Systems Maint. Servs., Inc. v. Digital Equipment Corp.*, 11 F. Supp. 2d 166, 169-70 (D. Mass. 1998) (granting summary judgment where defendant's share of primary market was less than 30% and required "aftermarket" warranty applied only to prospective purchasers) *with Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1048 (9th Cir. 2008) ("Kodak customers did not knowingly enter a contract that gave Kodak the exclusive right to provide parts and services for the life of the equipment.  In other words, the simple purchase of Kodak-brand equipment . . . did not constitute a binding contractual agreement to consume Kodak parts and services in the aftermarket.").  But even were an aftermarket analysis to apply, DPPs sufficiently plead the requisite elements:  (i) DPPs are locked into K-Cup brewers (CACAC ¶¶11, 79, 80, 86, 192-193); (ii) DPPs are unable to adequately determine lifecycle costs (CACAC ¶¶67, 68, 69, 167); (iii) Keurig charges DPPs supra-competitive

**B.     DPPs' Allegations Also Show Direct Evidence of Keurig's Ability to Control Price and Exclude Competition in Both the Single-Serve Brewer and Compatible Cups Markets**

DPPs have also adequately provided direct evidence of Keurig's market power.  With respect to the Single-Serve Brewer market:  "Keurig has the power to exclude competition in the Single-Serve Brewer Market.  Keurig has unlawfully exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities."  CACAC ¶103.  With respect to the Compatible Cups market:  DPPs allege that Keurig sets price without regard to its costs of producing K-Cups as it reaps a 50% margin on K-Cup sales, and has profitability raised "K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share."  CACAC ¶¶111-12; ¶23; *see also* CACAC ¶82-83 (Defendant's produced or licensed K-cups are priced 15-25% higher than competitor's cups).[19]  In addition, DPPs allege that Keurig has excluded competition in the Compatible Cups market through, among other things, a web of exclusive supply and distribution agreements.  CACAC ¶¶114-118, 162-168.  These allegations more than plausibly establish Keurig's monopoly power in both the Single-Serve Brewer and the Compatible Cups markets. *Payment Card*, 562 F. Supp. 2d at 399 ("A company has monopoly power if it can sell

---

prices for K-Cups (CACAC ¶¶23, 112); and (iv) Keurig dominates the Compatible Cups market (CACAC ¶¶105-07, 113, 169, 242).

[19] Keurig's arguments regarding its competitors' growth are misguided.  ECF 230 at 8-9, 23-24.  The presence of limited competitor growth does not, as Keurig states, "negate[]" any monopolization claim.  *See Berkey Photo*, 603 F.2d at 273 n.11 ("The precipitous decline [of Defendant's market share is] not dispositive.").  And certainly any such competitor growth would not absolve defendant where, as in this case, the competitor's early market growth had been completely reversed by defendant's ongoing monopolistic scheme.  CACAC ¶169.  Keurig's cases are not to the contrary.  *E.g.*, *CDC Techs., Inc. v. IDEXX Labs, Inc.*, 186 F.3d 74, 80 (2d Cir. 1999) (affirming summary judgment where defendant's exclusive distributors did not buy or sell the allegedly foreclosed product); *Bowen v. New York News, Inc.*, 366 F. Supp. 651, 679-80 (S.D.N.Y. 1973) (finding no foreclosure where competitors had "ready access to a sufficient number of outlets" unaffected by the exclusionary agreements); *Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162-63 (9th Cir. 1997) (affirming summary judgment because substantial sales were completely unaffected by the exclusionary agreements); *Bayer*, 813 F. Supp. 2d at 579-80 (granting dismissal where defendant controlled only 29% of a market in which other large producers also competed).

a product or service for a supra-competitive price untroubled by market forces; in other words, if it is able to exert power to insulate its prices from competition.").

## IV.   KEURIG'S ALLEGED ANTICOMPETITIVE CONDUCT AS A WHOLE PLAUSIBLY ESTABLISHES SUBSTANTIAL FORECLOSURE IN THE COMPATIBLE CUPS MARKET

Keurig erroneously compartmentalizes DPPs' allegations of wrongdoing and argues that each is legally insufficient as if each were a standalone claim.  ECF 230 at Sections II.A – E. DPPs, however, plead a broad pattern of anticompetitive conduct by Keurig that has unreasonably restrained competition in the Single-Serve Brewer and Compatible Cups markets, including:

a) coercing manufacturers of machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, exclude competitors, limit output, and raise competitors' costs;

b) agreeing with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, allocate markets, and/or limit output;

c) coercing distributors and retailers to enter into long-term, exclusive, anticompetitive agreements that restrain market entry, exclude competitors, and/or limit output;

d) aggressively eliminating potential competitors through successive anticompetitive acquisitions;

e) filing objectively and subjectively baseless ("sham") litigation against competitors for the purpose of interfering with their ability to compete in the Compatible Cups Market;

f) misusing its brewer patents by attempting to impermissibly broaden their scope to cover Competitor Cups, and by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups and engaging in an unlawful tying arrangement;

g) announcing an anticipated tie of the purchase of K-Cups to the purchase of 2.0 K-Cup Brewers in order to unreasonably restrain competition from Competitor Cup makers;

h) raising rivals' costs above those that would exist under competitive conditions by coercing Competitor Cup makers to enter purported "licenses" that restrict output and require the payment of improper "royalty" payments.

15

CACAC ¶257 (a)-(h).  Although each act could itself constitute an antitrust violation, "together they support a broader monopolization claim."  *Id.* ¶258.  Indeed, the Supreme Court has rejected Keurig's faulty reductionist approach:

> It is apparent from the foregoing that the Court of Appeals approached Continental's claims as if they were five completely separate and unrelated lawsuits.  We think this was improper.  In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.

*Continental Ore*, 370 U.S. at 698-699.[20]  Even conduct otherwise legal in other contexts may establish antitrust liability when engaged in by a monopolist.  *Berkey Photo*, 603 F.2d at 275 (concluding that conduct "illegal when taken by a monopolist because it tends to destroy competition" may "in the hands of a smaller market participant . . . be considered harmless, or even 'honestly industrial.'"); *Dentsply*, 399 F.3d at 187 ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."); *cf. Northeastern Tel. Co. v. AT&T*, 651 F.2d 76, 93 n.26 (2d Cir 1981) ("introduction of a new product may violate § 2 if a monopolist acts to compel customer choice by withdrawing a substitute product from the market.").  Here, DPPs allegations describe, in detail, Keurig's multi-faceted anticompetitive scheme, the sum of which had the intent and effect of reducing or eliminating competition.  Keurig cites inapposite cases[21] and otherwise entirely ignores DPPs' "broader monopolization claim."  *See, supra*, at 3 n. 2.

---

[20] *See also* II Areeda & Hovenkamp, *Antitrust Law*, P 310c6, at 147 (2014) ("The fact finder should be permitted to consider the entire sum of unlawful exclusionary practices and their impact. . . .  A monopolist bent on preserving its dominant position is likely to engagein repeated and varied exclusionary practices.  Each one viewed in isolation might be viewed as *de minimus* or an error in judgment, but the pattern gives increased plausibility to the claim.").

[21] *E.g., Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 189-91 (2d Cir. N.Y. 1992) (upholding procompetitive intrabrand authorized reseller restrictions); *California Computer Prod., Inc. v. IBM*, 613 F.2d 727,

## V.   KEURIG'S EXCLUSIVE DEALING, SHAM LITIGATION, PRODUCT DISPARAGEMENT, AND PRODUCT REDESIGN CONDUCT ALL SUPPORT PLAINTIFFS' CLAIM THAT KEURIG HAS MONOPOLIZED THE COMPATIBLE CUPS MARKET

Even if viewed in isolation, Keurig's conduct evinces a widespread pattern of anticompetitive behavior which is more than sufficient to overcome a motion to dismiss.

### A.   DPPs Sufficiently Allege Independently Actionable Exclusive Dealing Arrangements Which Substantially Foreclose Competition

Keurig currently dominates roughly 95% of the Compatible Cups market, yet argues that because competitors are not 100% foreclosed from reaching at least some purchasers, DPPs' claims must fail.  Total foreclosure, however, is not the test.  Instead, as the Supreme Court has made clear, a plaintiff need only show "*substantial*" foreclosure in "the line of commerce affected." *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327 (1961) (emphasis added).[22]   Ignoring applicable law, Keurig instead manufactures a "numerators" and "denominators" legal test that is not even supported by the very case upon which Keurig relies.[23] *See Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, 516 F. Supp. 2d 270, 295 n. 8 (S.D.N.Y. 2007) ("The amended complaint contains no facts relating to the named distributors' shares of the consumer market" and thus presents no basis "from which significant foreclosure

---

744 (9th Cir. 1979) ("IBM . . . had the right to redesign its products to make them more attractive to buyers whether by reason of lower manufacturing cost and price or improved performance."); *Olympia Equip. Leasing Co. v. Western Union Tel. Co.*, 797 F.2d 370, 374-76 (7th Cir. 1986) (reversing jury verdict where market-exiting monopolist voluntarily undertook actions to foster competition but then stopped assisting competitors when its existing inventory was not being liquidated fast enough).

[22] *See also Dentsply*, 399 F.3d at 191-93 (holding defendants liable under Section 2 for exclusive dealing arrangements that choked-off access to principal distribution channel; the "test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit"); *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (*en banc*) (affirming plaintiff's jury verdict on Section 2 monopolization claims based on bundled rebates and exclusive dealing arrangements targeting only competitor's largest retail clients); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 379 (S.D.N.Y. 2001) (finding distribution restraint unlawful where other distribution channels remained open to competitors), *aff'd*, 344 F.3d 229 (2d Cir. 2003); Jonathan M. Jacobson, *Exclusive Dealing, "Foreclosure," and Consumer Harm*, 70 ANTITRUST L.J. 311 (2002).

[23] Indeed, there is no foreclosure percentage pleading requirement at all. *E.g.*, *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 390 (S.D.N.Y. 2007) ("*Xerox I*") (denying motion to dismiss where plaintiff alleged exclusion "from much of the market").

could be reasonably inferred."). Unlike the *Wellnx* plaintiffs, DPPs here allege that Keurig dominates the Single-Serve Brewer and Compatible Cups markets, with an 88% and 95% share, respectively. CACAC ¶¶101, 107. Indeed, DPPs allege that at its *lowest* point, Keurig controlled a dominant 86% share of the Compatible Cups market, which Keurig increased to an incredible 95% share through continuing implementation of its web of exclusive dealing arrangements throughout the Compatible Cups supply and distribution chain. CACAC ¶107.[24] Under any measure, DPPs' allegations plainly establish Keurig's substantial foreclosure of both markets. *E.g., Microsoft*, 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation."); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1298, 1304 (9th Cir. 1982) (24% foreclosure enough for long-term contracts).[25]

### B.   DPPs Sufficiently Allege Independently Actionable Sham Litigation Claims

Contrary to Keurig's contention, DPPs do not merely allege "that Keurig lost the prior [patent infringement] litigations." ECF 230 at 14. Rather, the CACAC alleges, consistent with *PRE*'s objective baselessness prong,[26] no objective litigant in Keurig's position could have reasonably expected a favorable outcome in its patent litigation because it had asserted non-applicable patents against its competitors in contravention of controlling Supreme Court

---

[24] As detailed in the CACAC, Keurig's multi-pronged approach included entering into long-term, anticompetitive licensing and manufacturing agreements with dominant coffee brands; coercion of distributors and retailers to enter into long-term anticompetitive deals which denied competitors access to critical channels of distribution and access to retail customers; and coercion of machine manufacturers and components supplier to enter into long-term, exclusive contracts to deny competitor access to supplies necessary to make Compatible Cups.

[25] Even the cases upon which Keurig relies make clear that Section 2 monopolization claims may go to the jury even when defendant is alleged to only control less than 50% of the market. *E.g., Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129-30 (2d Cir. 1981).

[26] *See Professional Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.* ("*PRE*"), 508 U.S. 49, 60 (1993) (litigation is objectively baseless where "no reasonable litigant could realistically expect success on the merits.").

precedent, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008).[27]  CACAC ¶¶128-138.  Indeed, as both the district court and the Federal Circuit made clear – consistent with *PRE*'s subjective intent test,[28] that Keurig was misusing patent law to improperly interfere with competitors and take control of the Compatible Cups market.[29]  Contrary to Keurig's assertion that "DPPs do not allege TreeHouse or JBR was prevented from competing as a result of the suits, much less that market-wide competition was harmed," ECF 230 at 15, the CACAC makes clear that Keurig's filed the sham suits against its competitors "for the purpose of interfering with the ability to compete in the Compatible Cup Market."  CACAC ¶257.[30]  These allegations plausibly establish actionable sham litigation claims under *PRE*.[31]

---

[27] *See also In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 373-75 (S.D.N.Y 2002) (no *Noerr-Pennington* immunity afforded to patent-holders enforcing non-applicable patents).

[28] 508 U.S. at 60-61 (subjective intent satisfied by showing sham litigation masked defendant's "attempt to interfere *directly* with the business relationships of a competitor").

[29] Following *Quanta*, the district court ruled against Keurig, explicitly holding "patent holders may not invoke patent law to enforce restrictions on the post-sale use of their patented products."  CACAC ¶132 (quoting *Keurig, Inc. v. Sturm Foods, Inc.*, Civ. No. 10-841-SLR, 2012 WL 4049799, at *6 (D. Del. 2012)).  Similarly, in rejecting Keurig's appeal, the Federal Circuit tellingly noted:  "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law."  CACAC ¶137 (quoting *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013)).

[30] That these sham patent suits imposed unnecessary costs on competitors, chilled would-be buyers from purchasing Competitor Cups, and added another high-barrier to entry for other would-be competitors, are all reasonable inferences to which DPPs are entitled on this motion.

[31] Keurig also argues that its patent suits were not objectively baseless because:  (i) with respect to its non-patent claims, Keurig survived summary judgment and ultimately settled those claims; (ii) the Competitor Plaintiffs did not seek attorneys' fees; and (iii) the Federal Circuit permitted oral argument but would not have if the appeal were frivolous.  ECF 230 at 14-15 & n.15.  These arguments are impermissibly based on facts beyond those alleged in the CACAC and must be rejected on that basis alone.  In any case, they are meritless.  What happened to Keurig's non-patent claims is irrelevant – those claims did not impose marketplace obstacles like the sham patent litigation claims did, and parties can settle even frivolous claims.  Attorney fee awards are the exception not the rule, and "[e]ven an exceptional case does not require in all circumstances the award of attorney fees."  *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986).  That a party elected not to further pursue the matter is not evidence of anything.  Similarly, the fact that oral argument was held on the appeal similarly evidences nothing since the Federal Circuit, like most courts, favors oral argument to afford each litigant an opportunity to be heard.

**C.**      **DPPs Sufficiently Allege Independently Actionable Product Disparagement Claims**

DPPs allege that Keurig made a variety of clearly false and material misstatements to current and prospective Compatible Cups purchasers – *e.g.,* that the use of Competitor Cups in Keurig Brewers will negatively impact Keurig Brewer performance, functionality, and the overall life of Keurig Brewers, and will otherwise void Keurig Brewers' One Year Limited Warranty.  CACAC ¶¶199-211.  These false and misleading statements, which Keurig made with the intent to disrupt competition in the Compatible Cups market, provide a basis for a product disparagement-predicated antitrust claim and are sufficient to withstand a motion to dismiss. *National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 916-17 (2d Cir. 1988); *see also Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 332 (E.D.N.Y. 2009) ("[C]ourts recognize that false and misleading statements may provide a basis for antitrust claims.").

Thus, for example, in *Pharm. Mfrs.,* the Second Circuit reversed a judgment dismissing plaintiff's complaint, holding that a single letter, sent by Ayerst to pharmacists, that was only false and misleading in certain respects, was sufficient, at the motion to dismiss stage, to entitle plaintiff to go forward with discovery on its antitrust claims.  *Id.* at 916-917.  Similarly, *Alternative Electrodes* held the allegations that defendants "made statements that were false and misleading to potential clients" entitled plaintiff to discovery.  597 F. Supp. 2d at 332-33.  Indeed, such statements are particularly pernicious when they come, as they do here, from the incumbent manufacturer.  *Id.* at 332 n.1.

Keurig admitted that it does not test, and has never tested, Competitor Cups.  CACAC ¶¶208-209.  Thus, it has absolutely no factual basis to make these disparaging statements.  The falsity of these statements is adequately demonstrated in the CACAC where it explains that

20

actual competitor testing of Competitor Cups clearly proved that such cups do <u>not</u> harm Keurig

Brewers.  CACAC ¶¶210-211 (quoting competitor Rogers' CFO testimony: ███████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████

Despite the fact that Keurig purportedly did not and does not test Competitor Cups,

Keurig instructs its customer service representatives to inform customers who call the customer

service telephone line that mere use of non-Keurig cups may decrease brewer performance and

adversely affect its warranty.  CACAC ¶202.  However, a Keurig phone operator on a telephone

consumer line could not possibly know whether the consumer's Keurig brewer is malfunctioning

because of damage caused by a Competitor Cup.  Moreover, Keurig's statements that the mere

use of a Competitor Cup automatically voids the Keurig brewer warranty is patently false.  While

the warranty disclaims coverage for "damages caused by use of non Keurig Brewed K-Cup

brand packs," the warranty contains no statement that the mere use of Competitor Cups voids the

warranty.  Any attempt to tie sales of K-Cups to brewer warranty coverage is also a violation of

the Magnuson-Moss Warranty Act, which prohibits provisions linking a warranty to use of other

branded products sold by the same manufacturer.  CACAC ¶¶213-217; 15 U.S.C. § 2302(c).

Thus, Keurig's false market statements alone are sufficient reason to deny the dismissal

motion.  In any event, DPPs should be permitted discovery to prove their claims.  *Pharm Mfrs.,*

850 F.2d 916-917.[32]

---

[32] Keurig's representation that "DPPs represented to both Keurig and the Court that their SCC raised no new claims" (ECF 230 at 17 n.20) is false.  Not only is Keurig's representation contradicted by the very language Keurig quotes, but DPPs' counsel specifically deleted Keurig's proposed "no new claims" language precisely to more accurately reflect that DPPs only dropped certain causes of action.  *Compare* 12/15/14 B. Demuth email to J. Hunsberger (replacing Keurig's proposed "which added no new legal claims" language in favor of "dropped several causes of action") (a true and correct copy of which is attached to the Declaration Bradley J. Demuth as Exhibit 1) *with* 12/15/14 E. Ewing email to B. Demuth (agreeing to delete "which added no new legal claims" language in favor of

**D.     DPPs Sufficiently Allege Independently Actionable Predatory Innovation Claims**

To preserve and enhance its monopoly, and its ability to continue to extract monopoly profits, Keurig recently launched the Keurig 2.0 K-Cup Brewer, in large measure to exclude competitors from the Compatible Cups market.[33]  CACAC ¶¶221, 225.  Keurig's claim that the 2.0 Brewer has interactive technology to instruct the Brewer's operation is false.  CACAC ¶224.  "The only information on the new K-Cup lids that the 'interactive technology' is designed to identify is whether the K-Cup is a Keurig product."  *Id.*  The sole function of the redesign (*i.e.*, adding detectible ink to) Keurig's K-Cups is to "lock-out" competitors.  CACAC ¶¶226-232.  DPPs allege:

> Rather than a true technological innovation, Keurig's new technology eliminates competitive access to 2.0 K-Cup Brewers as well as consumer and retail customer choice by technologically tying the purchase of K-Cups to the purchase of the K-Cup Brewers for the anticompetitve purpose of locking out Compatible Cups. By tying K-cup purchases to 2.0 K-Cup Brewer purchases, Keurig intends to continue to leverage its monopoly over the Single-Serve Brewer Market to exclude competition in the Compatible Cup Market.

CACAC ¶226.  Keurig admits that the bulk of its profits are based on the sale of K-Cups, and to drive K-Cup sales they sell the K-Cup Brewer at or below cost.  CACAC ¶¶11, 108, 111, 192-196; *see also* GMCR's 2013 Form 10-K at 2 (cited in ECF 230 at 16 n.19).  "As current generation K-Cup Brewers become obsolete, the 2.0 K-Cup Brewer locks customers into purchasing only K-Cups and locks-out competition from Competitor Cups."  CACAC ¶19.  Keurig is, thus, seeking to eliminate competitors from selling Competitor Cups for the 2.0 K-Cup

---

a variant which incorporated DPPs' proposed "dropped several causes of action" language) (a true and correct copy of which is attached to the Declaration of Bradley J. Demuth as Exhibit 2) *and* ECF 215, 217.

[33] Liability under Section 2 may still attach even if Keurig's monopoly power, as opposed to the technical superiority of its products, is not the only cause of its success in the marketplace.  *E.g.*, *GAF Corp. v. Eastman Kodak Co.,* 519 F. Supp. 1203, 1227 (S.D.N.Y. 1981).

Brewer.   And, Keurig used the introduction of the 2.0 Brewer to force conversion of manufacturers and sellers of Competitor Cups to become Keurig licensees.  CACAC ¶19.

Contrary to Keurig's arguments, "new product introductions by a monopolist are not *ipso facto* immune from antitrust scrutiny." *GAF,* 519 F. Supp. at 1226; *Xerox I,* 511 F. Supp. 2d at 388 (no *per se* rule); *Microsoft,* 253 F.3d at 65 ("Judicial deference to product innovation, however, does not mean that a monopolist's product design decisions are *per se* lawful").  To avoid liability under Section 2, a monopolist like Keurig "must refrain at all times from conduct directed at smothering competition." *Berkey Photo,* 603 F.2d at 275.  Even if Keurig acquired its monopoly legitimately, it may not "wield the resulting power to tighten its hold on the market." *Id.*  That is precisely what Keurig did here.

The intent of Keurig's product redesign is virtually identical to the design change intent in *Xerox I.*  In that case, Xerox, already the dominant provider in the market for replacement solid ink sticks, re-designed its phase change color printers (a/k/a/ solid ink printers) and replacement solid ink sticks solely to eliminate (successfully as it turned out) the only other competitor in the market.[34]  DPPs here similarly allege the sole purpose of Keurig's lock-out technology in Keurig 2.0 is to eliminate Competitor Cups.  The design change to the Brewer, adding an ink detector, and the design change to the K-Cups, adding detectable ink to the lid of the Cups, was done solely for the purpose of eliminating competition in the Compatible Cups market.  CACAC ¶225; *see also C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1382 (Fed. Cir. 1998) (sustaining Section 2 counterclaim on a finding that change in product was made for predatory reasons rather than product improvement); *Northeastern,* 651 F.2d at 94-95 (ordering

---

[34] Plaintiff alleged that:  "[t]he only benefit to consumers of the feed channels and corresponding solid ink sticks - preventing the insertion of the wrong color of ink into the wrong channel - was already served by key plates in previous models of Xerox phase change color printers."  511 F. Supp. 2d at 379.

new trial on whether defendant "intentionally designed the protective couplers to impede competition in the terminal equipment market.").

In that regard, this case is distinguishable from *Berkey Photo*.  In *Berkey*, Kodak introduced both a new camera and a new film to go along with it.  Plaintiff argued that the new film was not a product improvement, an area into which the Second Circuit was unwilling to tread.  Here, there is no new product.  Defendant made the identical K-Cups before and after the design change, the sole difference being the addition of the detectable ink to the lid of the cup for the sole purpose of excluding Competitor Cups.  Because the change in Keurig's products eliminated competition in the market for Competitor Cups, this is a situation where "market forces cannot operate" and the Court here can consider whether the product redesign by a monopolist (*e.g.*, Keurig) was reasonable.  *GAF*, 519 F. Supp. at 1227-1228. A design change having no purpose but to eliminate competition cannot be reasonable.  Thus, even if the sole claim here were based upon design change, the motion to dismiss should be denied and DPPs allowed to proceed to discovery.

## VI.   KEURIG EFFECTIVELY CONCEDES THE SUFFICIENCY OF DIRECT PURCHASER PLAINTIFFS' UNJUST ENRICHMENT CLAIMS

Keurig effectively concedes the sufficiency of DPPs' unjust enrichment allegations by challenging those allegations only on three wholly-procedural grounds:  (i) that such claims "are not linked to any particular state"; (ii) that such claims "are not premised on anything other than DPPs' deficient antitrust claims, and they must be dismissed along with those claims"; and (iii) that the named DPPs lack constitutional standing to assert such claims "under the laws in the states where they neither reside nor purchased."   ECF 230 at 24 & n.31.  Each of these procedural arguments is incorrect.

*First*, DPPs in fact have linked their claims to the states in that they allege, "[i]t would be inequitable under unjust enrichment principles in the *District of Columbia and each of the fifty states* for Keurig to be permitted to retain any of the overcharges for K-cups derived from Keurig's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint." CACAC ¶296 (emphasis added); *see also In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1163 (N.D. Cal. 2009) (declining to independently address the viability of plaintiffs' unjust enrichment claims with respect to certain states without defendant discussing the laws of each state separately and demonstrating that plaintiffs cannot, as a matter of law, maintain a separate claim for unjust enrichment). *Second*, as discussed above, DPPs sufficiently allege *prima facie* violations of antitrust law and, as a result, there is no basis to also dismiss the unjust enrichment claims. *Third*, because class certification is logically antecedent to the question of standing to assert state-law claims, courts generally defer determination of the standing issue until the class certification issues have been fully resolved. *E.g., In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213-14 (S.D.N.Y. 2012) (joining court consensus and denying dismissal for lack of standing pending class certification).[35]

## CONCLUSION

For the foregoing reasons, Keurig's Motion to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint should be denied in its entirety.

---

[35] *See also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011) (finding named plaintiffs' claims related to conduct "alleged to be the same no matter where any plaintiff resides" and deferring standing determination until after class certification); *Blessing v. Sirius XM Radio, Inc.*, 756 F. Supp. 2d 445, 451-52 (S.D.N.Y. 2010) (recognizing weight of authority to deny defendant's motion to dismiss state law claims for lack of standing pending determination of class certification issues); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739(SWK), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006) ("[A] detailed analysis of choice of law and the similarity of applicable laws would be premature at this point, and is better considered after these issues have been developed in conjunction with class certification."); *Buspirone*, 185 F. Supp. 2d at 377 (finding Article III standing challenges inappropriate to resolve prior to class certification).

Dated:  April 10, 2015

**GRANT & EISENHOFER, P.A.**

By:  s/Bradley J. Demuth
Linda P. Nussbaum
Peter A. Barile III
Bradley J. Demuth
485 Lexington Avenue
New York, NY 10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501
lnussbaum@gelaw.com
pbarile@gelaw.com
bdemuth@gelaw.com

*Attorneys for Direct Purchaser Plaintiffs and*
*Interim Liaison Counsel and Interim Co-Lead*
*Counsel for the Proposed Direct Purchaser*
*Plaintiff Class*

Michael M. Buchman
John A. Ioannou
Alex R. Straus
**MOTLEY RICE LLC**
600 Third Avenue, Suite 2101
New York, New York 10016
Telephone:  (212) 577-0040
Facsimile:  (212) 577-0054
mbuchman@motleyrice.com
jioannou@motleyrice.com
astraus@motleyrice.com

Kellie Lerner
Bernard Persky
Meegan Hollywood
**ROBINS KAPLAN LLP**
601 Lexington Avenue, Suite 3400
New York, NY 10022
Telephone:  (212) 980-7400
Facsimile:  (212) 980-7499
klerner@robinskaplan.com
bpersky@robinskaplan.com
mfhollywood@robinskaplan.com

*Attorneys for Direct Purchaser Plaintiffs and*
*Interim Co-Lead Counsel for the Proposed*
*Direct Purchaser Plaintiff Class*