UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- X
                              :
IN RE: KEURIG GREEN MOUNTAIN     :      ECF Case
SINGLE SERVE COFFEE ANTITRUST    :
LITIGATION                       :      1:14-md-2542-VSB-HBP
                              :
                              :      MDL No. 2542
                              :
---------------------------------------------------- X
                              :
JBR, Inc. (D/B/A ROGERS FAMILY      :
COMPANY),                       :      1:14-cv-04242-VSB-HBP
                              :
           Plaintiff,           :
                              :
       v.                      :
                              :
KEURIG GREEN MOUNTAIN, INC.      :
(F/K/A GREEN MOUNTAIN COFFEE    :
ROASTERS, INC. AND AS SUCCESSOR :
TO KEURIG, INC.),              :
                              :
           Defendant.        :
                              :
---------------------------------------------------- X

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FILED BY JBR, INC.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. ................................................................. ii

SUMMARY OF ALLEGATIONS ........................................................ 4

LEGAL STANDARD .......................................................................... 6

ARGUMENT ………........................................................................... 7

I.   KEURIG IS MONOPOLIZING THE SALE OF PORTION PACKS ............................. 7

   A.   KEURIG HAS MONOPOLY POWER ................................................. 7

   B.   KEURIG HAS MAINTAINED ITS MONOPOLY POWER THROUGH A PERVASIVE ANTICOMPETITIVE SCHEME TO IMPEDE COMPETING PORTION PACK SUPPLIERS' ACCESS TO THE MARKET ................................................................. 10

II.   KEURIG HAS MAINTAINED MARKET POWER THROUGH VARIOUS ANTICOMPETITIVE ACTIONS DESIGNED TO RAISE RIVALS' COSTS ............ 12

   A.   THE 2.0 BREWER LOCKOUT FEATURE IS ANTICOMPETITIVE ............. 12

   B.   KEURIG'S EXCLUSIVE DEALING AGREEMENTS VIOLATE THE ANTITRUST LAWS ......................................................... 15

      1.   EXCLUSIVE DEALING CLAIMS DO NOT REQUIRE TOTAL FORECLOSURE. ................................................... 16

      2.   IT IS NOT NECESSARY TO ALLEGE A SPECIFIC FORECLOSURE PERCENTAGE. ........................................ 17

   C.   KEURIG USES CONTRACTUAL TIES TO MAINTAIN ITS GRIP ON THE MARKET ............................................................. 19

   D.   ROGERS ALLEGES A PLAUSIBLE SECTION 1 CLAIM ............................. 20

   E.   KEURIG HAS ORCHESTRATED A GROUP BOYCOTT OF RIVAL PORTION PACK MANUFACTURERS ............................................. 21

   F.   KEURIG HAS USED SHAM LITIGATION TO SLOW ROGERS' MARKET ACCEPTANCE ....................................................... 22

   G.   KEURIG HAS MISUSED ITS PATENTS AND CAUSED ANTITRUST INJURY. ........................................................... 24

   H.   KEURIG'S FALSE STATEMENTS ARE ACTIONABLE ............................. 24

      1.   KEURIG'S DISPARAGEMENT SUPPORTS ROGERS' SHERMAN ACT CLAIMS ............................................... 25

      2.   ROGERS ALLEGES A PLAUSIBLE LANHAM ACT CLAIM .......... 26

   I.   KEURIG VIOLATED CALIFORNIA'S UNFAIR COMPETITION ACT ....... 27

   J.   ROGERS HAS ALLEGED PLAUSIBLE COMMON LAW CLAIMS ............. 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C ASES

*Allied Grape Growers v. Bronco Wine Co.*,
    203 Cal. App. 3d 432 (1988) ................................................................29

*American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*,
    922 F.2d 1317 (7th Cir. 1991) .............................................................10

*American Tobacco co. v. United States*,
    328 U.S. 781 (1946)...............................................................................7

*Anderson News, L.L.C. v. American Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012)..................................................................6

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
    No. 11 Civ. 8803 (AT), 2014 WL 5462547 (S.D.N.Y. Oct. 23, 2014) ..................................27

*Astra Aktiebolag v. Kremers Urban Dev. Co.*,
    99 Civ. 8928 (BSJ), 2001 WL 1807917 (S.D.N.Y. Oct. 26, 2001) ........................................24

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................1, 6

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979)..................................................12, 13, 14

*Blue Sky the Color of Imagination, LLC v. Mead Westvaco Corp.*,
    No. 10-cv-02175 DDP (ANx) 2010 WL 4366849 (C.D. Cal. Sept. 23, 2010).......................19

*Boulware v. State of Nevada, Dept. of Human Resources*,
    960 F.2d 793 (9th Cir. 1992) ...............................................................23

*C.R. Bard, Inc. v. M3 Systems*,
    157 F.3d 1340 (Fed. Cir. 1998)............................................................12

*Cablevision Sys. Corp. v. Viacom Int'l Inc.*,
    No. 13-cv-1278(LTS), 2014 WL 2805256 (S.D.N.Y. June 20, 2014) ...................................19

*Commercial Data Servers, Inc. v. Int'l Business Machines Corp.*,
    No. 00-cv-5008(CM), 2002 WL 1205740 (S.D.N.Y. Mar. 15, 2002)....................................18

*Day v. AT&T Corp.*,
    63 Cal. App. 4th 325 (1998) ................................................................28

DB2/ 25774221.8

*Duplan Corp. v. Deering Milliken Inc.*,
    594 F.2d 979 (4th Cir. 1979) .................................................................21

*E&L Consulting v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006)....................................................................20

*E.I. DuPont de Nemours & Co. v. Kolon Indus.*,
    637 F.3d 435 (4th Cir. 2011) ................................................................17

*Eastman Kodak Co. v. Image Technical Servs., Inc.*,
    504 U.S. 451 (1992).........................................................................8, 14

*Epicor Software Corp. v. Alternative Tech. Solns, Inc.*,
    No. SACV 13-00448-CJC(RNBx), 2013 WL 2382262 (C.D. Cal. May, 9, 2013) ..........26, 30

*Franklin Fueling Systems, Inc. v. Veeder-Root Co.*,
    No. S-09-580 FDC/JFM, 2009 WL 2462505 (E.D. Cal. Aug. 11, 2009) ...............................28

*Gorman v. Consol. Edison Corp.*,
    488 F.3d 586 (2d Cir. 2007).....................................................................6

*In re Ductile Pipe Fittings (DIPF) Direct Purchaser Antitrust Litig.*,
    Civ. No. 12-711, 2013 WL 812143 (D.N.J. Mar. 5, 2013)....................................19

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003).............................................................2, 12, 17

*Lexmark Int'l., Inc. v. Static Control Components, Inc.*,
    134 S.Ct. 1377 (2014) ...........................................................................27

*Merck Eprova AG v. Gnosis S.P.A.*,
    760 F.3d 247 (2d Cir. 2014)...................................................................26

*Methodist Health Servs. Corp. v. OSF Healthcare System*,
    Case No. 1:13-cv-01054, 2015 WL 1399229 (C.D. Ill. Mar. 25, 2015)................................18

*Mitsubishi Heavy Industries, Ltd. v. General Electric Co.*,
    720 F. Supp. 2d 1061 (W.D. Ark. 2010)..................................................22

*Nat'l Assoc. of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1987) ("*Ayerst*") ..........................................26, 27

*New York v. Actavis, PLC*,
    No. 14-cv-7473, 2014 WL 7015198 (S.D.N.Y. Dec. 11, 2014) ............................13

*Newcal Indus., Inc. v. IKON Office Soln.*,
    513 F.3d 1038 (9th Cir. 2008) ..................................................................9

DB2/ 25774221.8

*Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*,
   472 U.S. 284 (1985)..................................................................................................21, 22

*Oreck Corp. v. Whirlpool Corp.*,
   579 F.2d 126 (2d Cir.)....................................................................................................21

*Pastoria v. Nationwide Ins.*,
   112 Cal. App. 4th 1490 (2003) ................................................................................28, 29

*People v. First Federal Credit Corp.*,
   104 Cal. App. 4th 721 (2002) ........................................................................................29

*Pepsico, Inc. v. Coca-Cola Co., Inc.*,
   No. 98-cv-3282(LAP), 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) .....................................18

*Pom Wonderful LLC v. Purely Juice, Inc.*,
   No. cv-07-02633 CAS (JWJx), 2008 WL 4222045 (C.D. Cal. July 17, 2008) ......................29

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993)........................................................................................................22

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
   8 F.3d 1379 (5th Cir. 1994) ...........................................................................................20

*Sebastian Int'l, Inc. v. Vincenzo Russolillo*,
   162 F. Supp. 2d 1198 (C.D. Cal. 2001) ..........................................................................30

*Spectrum Sports, Inc. v. McQuillan*,
   506 U.S. 447 (1993).......................................................................................................7

*Spotless Enters., Inc. v. Carlisle Plastics, Inc.*,
   56 F. Supp. 2d 274 (E.D.N.Y. 1999) ..............................................................................27

*Square D Co. v. Schneider S.A.*,
   760 F.Supp. 362 (S.D.N.Y. 1991) ...................................................................................3

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)..........................................................................................21

*State of S. Dakota v. Kansas City Southern Indus., Inc.*,
   880 F.2d 40 (8th Cir. 1989) ..........................................................................................23

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) .......................................................................................28

*Synergetics USA, Inc. v. Alcon Labs., Inc.*,
   No. 08-cv-3669(DLC), 2009 WL 1564113 (S.D.N.Y. June 4, 2009) ....................................17

DB2/ 25774221.8

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..............................................................................9

*U.S. v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)............................................................................18

*United States v. Dentsply*,
    399 F.3d 181 (3d Cir. 2005)..........................................................3, 8, 16, 17, 18, 19

*United States v. Griffith*,
    334 U.S. 100 (1948).......................................................................................10

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966).........................................................................................7

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001)........................................................................8, 18

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948).......................................................................................21

*Verizon Comm'ns. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004).........................................................................................7

*Virgin Atlantic Airways Ltd. v. British Airways PLC*,
    872 F. Supp. 52 66 (S.D.N.Y. 1994)..............................................................19

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*,
    156 F.3d 535 (4th Cir. 1998)..........................................................................21

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
    857 F.2d 55 (2d Cir. 1988)...............................................................................7

*In re Wireless Telephone Services Antitrust Litig.*,
    385 F. Supp.2d 403, 414 (S.D.N.Y. 2005)......................................................20

*Xerox Corp. v. Media Sciences, Inc.*,
    660 F. Supp. 2d 535 (S.D.N.Y. 2009) ("*Xerox III*")........................................9

*Xerox v. Media Sciences Int'l., Inc.*,
    511 F. Supp. 2d 372 (S.D.N.Y. 2007) ("*Xerox I*") .................................8, 9, 17

*Yentsch v. Texaco, Inc.*,
    630 F.2d 46 (2d Cir. 1980)..............................................................................20

S‍TATUTES

California False Advertising Law §§ 17500, *et seq*..................................................28, 29

DB2/ 25774221.8

California's Unfair Competition Act, Cal. Bus. Code § 17200 ..........................................25, 28, 29

Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a) ..................................1, 4, 25, 26, 27, 28

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 8 ...................................................................................................6

Rule 12(b)(6)...............................................................................................................................2, 6

DB2/ 25774221.8

Keurig's opening brief makes numerous blanket assertions about defects in Rogers' amended complaint.  Keurig fails to address the detailed allegations and exhibits in the amended complaint or credibly argue why Rogers' complaint does not satisfy the most stringent pleading standards of *Twombly*.  A review of the allegations contained in the Rogers' amended complaint demonstrates that there is no merit to the Keurig motion other than to delay the discovery process and the inevitable outcome that Keurig has and continues to violate the antitrust laws, and the Lanham Act.  The amended complaint alleges in factual detail that Keurig has engaged in a concerted scheme designed to impede competition from other portion pack manufacturers, allowing it to maintain and enhance its monopoly over compatible portion pack sales.  That scheme included a series of interrelated and reinforcing anticompetitive acts, including:  (1) locking up both upstream suppliers and downstream distributors in long-term exclusive contracts, precluding potential rivals from accessing efficient supply and distribution; (2) locking out rival portion pack suppliers from its 2.0 brewers; (3) locking in distributors of its brewers with contracts requiring them also to purchase all of their portion packs from Keurig; and (4) pursuing baseless patent litigation and making false and/or misleading statements designed to impose costs on potential rivals and slow market acceptance of their products.  The various pieces of this scheme were mutually reinforcing, and they raised—and continue to raise— significant impediments to Rogers' access the market.

Keurig *does not contest* in its motion to dismiss either the intent or effectiveness of this pervasive scheme, which is alleged in detail in Rogers' First Amended Complaint ("FAC"), and frankly disclosed in Keurig's own documents.  For example, the ███████████████ (which is attached to the FAC) ███████████████████████████████████ ██████████████ FAC ¶ 178.  As a result of the pervasive anticompetitive scheme alleged in

the FAC, Keurig has been able to maintain a dominant share of compatible portion pack sales in the face of entry by Rogers and others with better and lower cost products than Keurig's and to earn margins on those sales that are far in excess of competitive norms.

Rather than addressing the nature and effects of the scheme as a whole, Keurig in its motion to dismiss instead relies on a series of factual arguments that inappropriately go beyond the FAC and seek to lead this Court into reversible error by considering extraneous facts and drawing inferences based on those facts against Rogers.  Most brazen is Keurig's proclamation that Rogers remains a "success," *see* Mot. at 9, when Rogers' allegations make explicit that the company has lost its principal distribution channels as a direct result of Keurig's anticompetitive conduct.   Rule 12(b)(6) forbids this Court from looking beyond the allegations and documents incorporated into a complaint to consider the extraneous fact assertions Keurig interjects.

Even if Keurig's factual assertions and inferences are (erroneously) considered, they miss the mark:  they fundamentally fail to address the combined effect of Keurig's anticompetitive conduct.  It is well established that "courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (citing *Cont'l Ore Co. v. Union Carbide & Carbon Corp*., 370 U.S. 690, 699 (1962).  The overall effect of Keurig's conduct is plainly anticompetitive, and it violates the law.

Moreover, contrary to Keurig's arguments, many aspects of Keurig's conduct are separately actionable:

Lockout Feature of 2.0 Brewer.   Keurig does not contest in its motion to dismiss that product changes designed to lock out competitors may violate the antitrust laws; nor that its intent in designing the lockout feature for its 2.0 brewers was to exclude portion pack competition.  It argues instead that competition for brewers may discipline the coercive effects of

-2-

Keurig's admitted lockout feature.  This is a factual argument that is inappropriate for the court

to decide at this stage of the litigation.  *Square D Co. v. Schneider S.A.*, 760 F.Supp. 362, 368

(S.D.N.Y. 1991) (questions of fact preclude the grant of a motion to dismiss).  Keurig

disingenuously claims that the market for "pressurized brewers" that Rogers alleges is

"gerrymandered."  That market definition *is taken directly from Keurig's contracts—where it*

defines the scope of products that compete with its brewers.  FAC ¶¶ 13-15.

<u>Exclusive Dealing Contracts.</u>  Keurig's arguments concerning its many exclusive dealing

contracts lack support in the law.  Contrary to Keurig's arguments there is no requirement to

allege the specific percentage of distributors that are locked into exclusive dealing contracts; nor

is there any requirement that competitors be completely foreclosed from the market.  Keurig's

argument is, in effect, that Rogers should be content with the tiny slice of the market that Keurig

has not foreclosed:  internet sales.  Exclusive dealing violates the law when it has the effect of

raising rivals' costs by foreclosing efficient means of distribution to actual or potential

competitors.  *United States v. Dentsply*, 399 F.3d 181, 193-95 (3d Cir. 2005).  Rogers has alleged

facts establishing that type of foreclosure. FAC ¶¶ 86, 97 311.

<u>Sham Litigation.</u>  Keurig sued Rogers on patent claims that were objectively baseless,

and continued to pursue those claims for the purpose of imposing costs on Rogers and sowing

doubts on the legitimacy of Rogers' competing product.  Contrary to Keurig's argument, no

inference of objective validity can be drawn from the litigation decision of Rogers to seek a

quick motion for summary judgment rather than filing a motion to dismiss.  The trial court and

the Federal Circuit's view of Keurig's patent claims is expressed in their opinions, where they

chastised Keurig for seeking to make an "end run" around the proper use of the patent laws by

utilizing "a tactic that the Supreme Court has explicitly admonished."  FAC ¶ 170.

<u>False Statements</u>.  Keurig falsely claimed the Rogers pods were unsafe (FAC ¶¶ 235, 237, 384); that Rogers violated its patents (FAC ¶ 409); that the Rogers products would void the warranty on the Keurig brewer (FAC ¶ 238); and that it had not tested the Rogers products (FAC ¶¶ 241, 245).  These statements cost Rogers business and contributed to Keurig's vise grip on the market.  They are actionable under the Lanham Act, the Sherman Act and the California Unfair Competition Act.

## **SUMMARY OF ALLEGATIONS**

Protected by patents, Keurig developed a lucrative monopoly over the sale of portion packs to be used with pressurized steam coffee machines.  Insulated from competition, Keurig was able to reap monopoly profits on its portion pack sales far in excess of competitive norms. FAC ¶¶ 198-99, 286-87.

Facing the expiration of its key portion pack patents, Keurig embarked on a scheme to preserve its monopoly position by creating a series of roadblocks for potential competitors.  As an initial step, Keurig filed a series of sham patent litigation actions designed to impose costs on potential rivals and raise questions about the legitimacy of their products.  FAC ¶ 158.  Keurig pursued those claims relying on a theory of liability that had been previously and unequivocally rejected by the Supreme Court of the United States, as the Federal Circuit noted in deciding Keurig's appeal following the District of Delaware's summary judgment.  FAC ¶ 170.  The patent claims had no objective basis, but they still accomplished their goal:  they imposed costs on Rogers and others and cast a cloud over the legitimacy of Rogers' competing products, which impeded market acceptance of the Rogers products.  FAC ¶¶ 172-73.  Keurig also moved to preclude competitors' access to efficient means of distribution.

-4-

Keurig locked up virtually all of the distributors to the lucrative Away-From-Home Market segment in long term exclusive contracts, creating substantial impediments to the efficient entry of potential competitors, who were then forced to seek market access through the fragmented distribution channels for the less established At-Home Market segment.[1]  FAC ¶¶ 95-98.  It has more recently sought to extend that foreclosure in exclusive dealing contracts with large retailers that serve At-Home customers.  FAC ¶¶ 108-110.  That effort has been aided by Keurig's exclusive contracts with virtually all major coffee brands, limiting the "upstream" options available to competing portion pack suppliers.  As of November 2014, Keurig admitted that it has "now signed the large majority of previously unlicensed portion pack volume to our system and we're in the process of transitioning these brands."  FAC ¶ 201.

Having shut the door on most market outlets, Keurig sought to turn the final key on locking out competitors by introducing a new brewer incompatible with competing portion packs, and ██████████████████████████████████████████████ ████████████████████████████████████████ FAC ¶¶ 206-07. ███████████ ████████████████████████████████████████████████████ FAC ¶¶ 177-78. ████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████ FAC ¶ 179. █████████ ████████████████████████████████████████████████ ████████████████ FAC ¶¶ 179-91. ████████████

---

[1] Keurig, having helped to pioneer the Single Serve Market is no doubt aware that the Away-From-Home market is the most lucrative and well-established market segment due to the popularity of Single Serve Brewers in office settings.  In comparison, the At-Home market is less established than the Away-From-Home market.  Rogers is increasingly forced to rely on online sales; a company that relies almost completely on online sales will be unlikely to achieve a minimum efficient scale to compete effectively in the marketplace.  FAC ¶ 71.

DB2/ 25774221.8

████████████████████████████████████████████████████

████████████████ and Keurig's false representations that if a customer uses a competing

portion pack supplier's products in her brewer, it will ruin her machine.  FAC ¶ 238.

The scheme has been successful.  ████████████████████████████

████████████████████████████████████  FAC ¶ 198.  Keurig has publicly

trumpeted that it controlled 100% of the Compatible Portion Pack Market until recently.  FAC ¶

46.  After a brief drop in to about 85% share immediately following expiration of its portion pack

patents, Keurig's anticompetitive practices have allowed it to recapture the large majority of its

lost share.  It now controls approximately 95% of the Compatible Portion Pack Market.  FAC ¶

46.

## LEGAL STANDARD

When considering a Rule 12(b)(6) motion, the court "must accept as true all allegations

in the complaint and draw all reasonable inferences in favor of the non-moving party."  *Gorman*

*v. Consol. Edison Corp.*, 488 F.3d 586, 591-92 (2d Cir. 2007).  "The choice between two

plausible inference that may be drawn from a factual allegations is not a choice to be made by

the court on a Rule 12(b)(6) motion."  *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d

162, 185 (2d Cir. 2012).  Federal Rule of Civil Procedure 8 requires only "a short and plain

statement of the claim showing that the pleader is entitled to relief," and the complaint need only

contain factual allegations sufficient "enough to raise a right to relief above the speculative level

on the assumption that all of the complaint's allegations are true."  *Bell Atlantic Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007). In fact, "a well-pleaded complaint may proceed even if it

strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very

remote and unlikely." *Twombly*, 550 U.S. at 556 (internal citations omitted).

<u>**ARGUMENT**</u>

I.    **KEURIG IS MONOPOLIZING THE SALE OF PORTION PACKS**

A company violates Section 2 of the Sherman Act if it (1) has monopoly power in a relevant market; and (2) has acquired or enhanced the monopoly power by anticompetitive conduct.  *Verizon Comm'ns. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Even if a company does not currently have monopoly power, moreover, Section 2 may be violated as long as there is a "dangerous probability" that the company will obtain monopoly power in the future as a result of the anticompetitive conduct alleged.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).  Intent to monopolize can be inferred by anticompetitive or exclusionary conduct and, when monopoly power is present, "evidence of anticompetitive conduct may demonstrate a dangerous probability of success."  *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988).  Keurig's scheme to thwart competition has allowed it to maintain its monopoly power in both the Compatible Portion Pack Market and the Portion Pack Market, and there is a dangerous probability that its market power will be enhanced further given its ongoing scheme to anticompetitively impede competition.

   **A. Keurig Has Monopoly Power**

Keurig currently has over 95% for the Compatible Portion Pack Market and at least a 73% share of all Portion Pack sales.  FAC ¶ 46, 58-59.  Those shares are sufficient to infer monopoly power.  *See, e.g., United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (possession of 87% of the market "leaves no doubt that the congeries of these defendants have monopoly power"); *American Tobacco co. v. United States*, 328 U.S. 781, 797 (1946) (holding "over two-thirds of the entire domestic field of [the product], and . . . over 80% of the field of comparable [products]" is a monopoly); *Xerox v. Media Sciences Int'l., Inc.*, 511 F. Supp. 2d

-7-

372, 385 (S.D.N.Y. 2007) ("*Xerox I*") (finding that a market share that exceeds 90% can establish that defendant has a monopoly share).

Keurig's pricing also demonstrates its monopoly power:  it has been able to maintain its prices, and supracompetitive margins, without losing significant share in the face of competing alternatives.  ███████████████████████████████████████████████████ FAC ¶ 198.  Prices for its packs stay high (and continue to rise), even in the face of lower-priced competition. FAC ¶¶ 105, 198.  This is evidence that Keurig has monopoly power in the Compatible Portion Pack market.  *See, e.g., United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001) (the court could infer monopoly power when defendant set the price for its products without considering the pricing practices of its rivals); *United States v. Dentsply*, 399 F.3d 181, 191 (3d Cir. 2005) (evidence that the defendant was able to continuously grow profit margins, even as other competitors did not follow price increases, established monopoly power).    Keurig cannot contest that its market share for Compatible Portion Packs is sufficiently high to cross the thresholds established by the Supreme Court for presuming monopoly power.  It instead asks the Court to ignore that binding precedent (leading the Court into reversible error) by arguing that the pleading requirements are different for plaintiffs claiming monopolization of "aftermarket products."   Defendant's Motion to Dismiss First Amended and Supplemental Complaint Filed by JBR, Inc. ("Def. Mot.") at 17-18.

Keurig's argument finds no support in the law.  The Supreme Court expressly rejected "adopt[ing] any exception to the usual antitrust analysis" when assessing monopoly power in an aftermarket, noting the Court has always "treat[ed] derivative aftermarkets as it has every other separate market."  *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 479 n.29 (1992).  While the "lock in" issues that Keurig describes may be relevant, those issues are

fundamentally factual in nature and are not appropriate for resolution at this stage of the case. The cases that Keurig cites as support both involve summary judgment motions. *See id.* at 451; *Xerox Corp. v. Media Sciences, Inc.*, 660 F. Supp. 2d 535 (S.D.N.Y. 2009) ("*Xerox III*"). Neither suggest a requirement to plead the "lock in" facts that Keurig describes.   In fact, the court in the *Xerox* case Keurig cites earlier denied a motion to dismiss raising similar arguments to those Keurig makes here, holding that such arguments were inappropriate for resolution on a motion to dismiss.   *Xerox I*, 511 F. Supp. 2d at 385-86.

Finally, the "aftermarket" analysis that Keurig urges fundamentally depends on their being robust competition in the primary market—here the market for Brewers. *Xerox III*, 660 F. Supp. 2d at 547 (holding analysis applies only where "a *nonmonopolist* producer of a durable good" is claimed to have "monopoly power in the aftermarket") (emphasis added).   Here, there are ample facts alleged in the Complaint establishing that Keurig has monopoly power in the Single Serve Brewer market.   Keurig does not dispute that it has a high share of sales of pressurized brewers—89% of unit sales—which, as noted above, is far above the threshold needed to establish monopoly power.   FAC ¶ 27. Keurig takes issue with the definition of the Single Serve Brewer market alleged in the Complaint (Def. Mot. at 16), but issues of market definition are inherently fact specific and should not ordinarily be decided based solely on the pleadings.   "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001).   *See also, e.g., Newcal Indus., Inc. v. IKON Office Soln.,* 513 F.3d 1038 (9th Cir. 2008).

Far from being a "gerrymander[ed] market definition to suit its case" (Def. Mot. at 16), moreover, the brewer definition used in the FAC is taken *directly from Keurig's own contracts.*

It is more than a little disingenuous for Keurig to claim that a market for pressurized brewers is "implausible" when it defines its competitors in its contracts to be other pressurized brewing suppliers.  It does so in the definition of the "competing systems" in its exclusive agreements with suppliers, distributors, and retail customers.  FAC ¶¶ 4-5.  Keurig asserts in those agreements that it does <u>not</u> compete with these coffee systems:  "hopper-based single-cup coffee systems" and "espresso pod-based systems."  FAC ¶ 14.[2]

## B. Keurig Has Maintained Its Monopoly Power Through a Pervasive Anticompetitive Scheme to Impede Competing Portion Pack Suppliers' Access to the Market

Keurig has engaged in a comprehensive scheme to maintain and extend its market power over Portion Pack sales by impeding competition from other Portion Pack suppliers, including Rogers, by raising barriers to their entry and anticompetitively slowing the market acceptance of their products.[3]  The different aspects of Keurig's anticompetitive scheme are mutually reinforcing.  Its sham litigation against Rogers and others slowed market acceptance of new Portion Pack products by casting a pall of illegitimacy over those products and diverting significant resources (both monetary and management) away from efforts to introduce their products and towards defending the baseless patent lawsuits.  FAC ¶¶ 166, 173.  Even once those lawsuits were resolved, Rogers found that the primary efficient means of distributing its Portion Packs foreclosed to it due to Keurig's extensive series of exclusive dealing contracts.  FAC ¶¶ 71, 308-10.  Rogers was effectively foreclosed completely from the lucrative and established

---

[2] Keurig also argues that it does not have monopoly power in the brewer market because it sells its product at or below cost.  Def's. Mot. at 16-18.  However, and contrary to Keurig's argument, pricing below cost can be a sign of monopoly power.  See, e.g., *American Academic Suppliers, Inc. v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320 (7th Cir. 1991) (the abuse of monopoly power can be demonstrated when "a monopolist by pricing below cost succeeds in repelling or intimidating new entrants or extending his monopoly in new markets").

[3] Anticompetitive conduct hurts consumers by "foreclos[ing] competition."  *United States v. Griffith*, 334 U.S. 100, 107 (1948).  Rogers has suffered antitrust injury in the form of lost sales and increased costs because of Keurig's anticompetitive conduct, and consumers have been forced to pay higher prices for Compatible Portion Packs because Keurig, through its anticompetitive behavior, has increased its competitors' costs.  *W. Penn*, 627 F.3d at 101.

-10-

Away-From-Home Market segment by these exclusive dealing contracts, forcing it to build a distribution network from scratch in the fragmented and nascent At-Home Market segment. FAC ¶¶ 79, 97, 104, 107.

There, too, Rogers and other competing Compatible Portion Pack suppliers have been thwarted by Keurig's anticompetitive scheme.  Keurig has locked up virtually all of the national coffee brands that it has not outright acquired in exclusive long term contracts, precluding Rogers from gaining market acceptance by leveraging those existing brands.  FAC ¶ 201.

Keurig also redesigned its brewers specifically to lock out competing Compatible Portion Pack suppliers.  FAC ¶¶ 178-79.  That anticompetitive product change directly forecloses Rogers and other Portion Pack manufacturers from selling their products to customers of the new machines, which will be the only machines offered by Keurig going forward.  FAC ¶¶ 204-07. Keurig has been successful in leveraging the lockout feature of its new machines to induce substantial national retailers to enter long-term exclusive dealing arrangements with it for Portion Packs based on the fact that its Portion Packs are the only packs compatible with both the new and old machines (and the false assertion that competing portion packs will damage the 2.0 machines).  FAC ¶¶ 206, 210.  The practical effect is that the curtain is also drawing closed on competing portion pack suppliers seeking to access the At-Home Market segment.

Keurig does not in its motion to dismiss even attempt to address the interrelated totality of its anticompetitive scheme.  The arguments that it makes concerning different aspects of the scheme are themselves misplaced, as demonstrated below.  More fundamentally, they misconstrue the nature of the claims here.  While different aspects of the scheme are independently sufficient to violate the antitrust laws, "a court should consider a defendant's anticompetitive conduct as a whole rather than considering each aspect in isolation." *W. Penn*

-11-

*Allegheny Health Sys. v. UPMC,* 627 F.3d 85 (3d Cir. 2010) (internal quotations omitted).  *See also LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (same) (*citing Cont'l Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699).  The overall effect of Keurig's conduct is plainly anticompetitive, and it violates the law.  For the same reasons stated above, Rogers has also satisfied its pleading burden for its Cartwright Act and common law unfair competition claims.

## II.   KEURIG HAS MAINTAINED MARKET POWER THROUGH VARIOUS ANTICOMPETITIVE ACTIONS DESIGNED TO RAISE RIVALS' COSTS

### A.   The 2.0 Brewer Lockout Feature Is Anticompetitive

A company violates the Sherman Act when it designs a product to impede competition.[4]  *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 288 (2d Cir. 1979) (holding that design limitations imposed out of "a desire to impede competition" may violate Section 2); *see also C.R. Bard, Inc. v. M3 Systems*, 157 F.3d 1340, 1382 (Fed. Cir. 1998) (modification of a biopsy gun violated the antitrust laws when the "real reasons for modifying the gun were to raise the cost of entry to potential makers of replacement needles").



FAC ¶ 178.

FAC ¶ 183; *see also* FAC Exhibit 10 at 1.   The special ink used to lock out competing portion packs from use with the 2.0 brewers serves no legitimate purpose:  it was introduced solely to impede portion pack competitors.  FAC ¶ 214-232.

---

[4]Keurig's product redesign for the purpose of raising barriers to competition supports Rogers' following claims: claim 1 (monopolization); claim 3 (monopoly leveraging); claim 6 (tying); claim 7 (anticompetitive redesign); claim 9 (attempted monopolization); claim 12 (violation of the Cartwright Act); claim 13 (common law unfair competition); and claim 15 (violation of California Unfair Competition Law).

Keurig argues that its product change is not "coercive" because "Keurig continues to make K-Cups that work in 1.0 brewers," and because Keurig does not hide the fact that its 2.0 brewers lock-out Competing Portion Packs.  Def. Mot. at 5-6.  This argument is both wrong as a factual matter and irrelevant as a legal matter.

It is factually wrong because it is focused on the wrong "coercion."  Rogers' claim does not depend on customers being coerced into buying the 2.0 brewer by the product change.  The claim is, instead, that customers are coerced into using only Keurig Compatible Portion Packs by virtue of the fact that the 2.0 brewer has been designed to lock out potential alternatives.  Rogers has alleged facts establishing that Keurig has market power over pressurized brewers, and it is leveraging that market power to coerce customers to use only Keurig Portion Packs.  FAC ¶¶ 176-232.  The fact that the Keurig Compatible Portion Packs remain compatible with the 1.0 Brewer is irrelevant to the coercion that results from their introduction of a 2.0 Brewer with lock out features (and the concomitant phasing out of the 1.0 Brewer).  *See* FAC  ¶ 207 ("For example, Keurig stated repeatedly to retailers that it expects to transition all the 1.0 brewers to 2.0 brewers within about a year of the 2.0 Brewer launch."); *New York v. Actavis, PLC*, No. 14-cv-7473, 2014 WL 7015198, at *38 (S.D.N.Y. Dec. 11, 2014) ("A monopolist's decision to withdraw a product from customers may violate the antitrust laws if done for the sole purpose of harming competition, i.e., if it constitutes exclusionary conduct.").[5]

In fact, and contrary to Keurig's contention, the lockout feature also results in coercion of existing users of 1.0 brewers.  Keurig has been successful in leveraging the lockout feature of its

---

[5] It should also be noted that Keurig's reliance on *Berkey* is fundamentally misplaced.  As one example, under the facts in *Berkey*, Kodak continued to market both Kodacolor X / 126 Instamatic style films and cameras after the release of the new and incompatible Kodacolor II / Pocket Instamatic system, and *consumers were allowed to choose between the competing systems. See Berkey*, 603 F.2d at 286-87.  Here, Keurig has denied customers that choice, by discontinuing production of all Keurig 1.0 reservoir brewers and widely announcing that the Keurig 2.0 would replace the current lineup of compatible 1.0 brewers.  FAC ¶ 212.

DB2/ 25774221.8

new machines to ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████  FAC ¶¶ 206, 210, 238.  The practical effect of the

exclusionary product redesign is that the curtain is also drawing closed on competing portion

pack suppliers seeking to access the At-Home Market segment.

Keurig's argument is also legally wrong.  The fact that Keurig's Portion Packs are

compatible with both the 2.0 and 1.0 brewers is legally irrelevant to the assessment of Rogers'

antitrust claims.  The case law is clear that lockout features like those incorporated in the 2.0

brewer may be anticompetitive even in the face of an "installed base" of users for earlier models

of products.  The *Berkey* court concluded that designing its new film to work only with a camera

that Kodak was introducing could violate the antitrust laws, even though Kodak continued to sell

other types of film that were compatible with cameras supplied by others in the market, including

the Plaintiff.  *Berkey*, 603 F.2d at 287-88 ("We shall assume arguendo that Kodak violated § 2 of

the Sherman Act if its decision to restrict Kodacolor II to the 110 format was motivated by a

desire to impede competition in the manufacture of cameras capable of using the new film.  This

might well supply the element of coercion we found lacking in the previous section."); *see also*,

*Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 483 (1992) (it is a violation of

Section 2 of the Sherman Act to use monopoly power in one market to enhance monopoly share

in a separate market).  The plaintiff's claim in *Berkey* failed because it failed to demonstrate that

it suffered injury as a result of the product change.  *Berkey*, 603 F.2d at 288.  Here, the injury to

Rogers is clearly alleged:  Rogers lost sales of portion packs due to the product change, and will

continue to lose such sales in the future.  FAC ¶¶ 211, 256, 268-74.

-14-

Purchasers of the 2.0 brewer are given no choice in terms of Portion Pack suppliers:  they must use Keurig Portion Packs because of the lockout feature incorporated into the machine. That feature serves no purpose except to impede competition.  The case law makes clear that conduct violates the law.

**B.  Keurig's Exclusive Dealing Agreements Violate The Antitrust Laws**

Keurig has used exclusive agreements to lock up the efficient means of distribution, thereby raising its rivals' costs of accessing the market.[6]  Keurig's exclusive agreements with KADs and large distributors foreclose Competing Portion Pack manufacturers' access to approximately 80% of the Compatible Portion Pack Market sales to Away-From-Home customers.  FAC ¶ 98.  Keurig also has exclusive agreements with retailers and distributors for the At-Home Market, and prohibits these distributors and retailers from marketing any Competing Portion Packs.  FAC ¶¶ 107-08.  These distributors and retailers are the most efficient means to reach At-Home consumers.  Keurig's exclusive agreements lock up the most efficient means of distribution and prevent rivals from achieving minimum sales to allow them to compete effectively.  FAC ¶¶ 97, 107, 310.

Finally, Keurig has limited competition through its exclusive agreements with competitor brands and roasters that restrict the brands or roasters from selling products to Competing Portion Pack manufacturers, licensing brands to Competing Portion Packs, or allowing competitors to manufacture Competing Portion Packs for the brand.  FAC ¶¶ 120-21.  Keurig's exclusive agreements with roasters and brands—some of which are not yet publicly known— represent, <u>according to Keurig</u>, "the large majority of previously unlicensed portion pack

---

[6] Keurig's anticompetitive exclusive dealing conduct supports the following claims: claim 1 (monopolization); claim 2 (exclusive dealing); claim 3 (monopoly leveraging); claim 8 (conspiracy to monopolize); claim 9 (conspiracy and group boycott); claim 10 (attempted monopolization); claim 12 (violation of the Cartwright Act); claim 13 (unfair competition); and claim 15 (violation of California's Unfair Competition Law).

-15-

volume." FAC ¶ 201.  By joining with its competitor roasters and brands, to limit competition from lower-priced Competing Portion Packs, Keurig limits the options available to competing Portion Pack suppliers as they seek a sufficient base of sales to compete effectively in the Portion Pack market.  FAC ¶ 123.

Keurig argues that the Rogers exclusive dealing claims should be dismissed because (a) Rogers has not been completely foreclosed from the market (*i.e.*, it has made sales since entering the market) and (b) Rogers has not alleged the specific "denominator" of the foreclosure ratio. Def. Mot. at 9.  Both arguments are misplaced.

### 1.    Exclusive Dealing Claims Do Not Require Total Foreclosure.

Keurig misstates the law when it implies that there is an absolute bar to recovery if Rogers has experienced any increase in sales.  Def. Mot. at 9.   Logically, Keurig's argument cannot be squared with the clear statements in the case law that total foreclosure is not required in order for exclusive dealing arrangements to be illegal.   "Under [Section 2], it is not necessary that all competition be removed from the market.  The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit."  *United States v. Dentsply*, 399 F.3d 181, 191 (3d Cir. 2005).  Any new entrant, like Rogers, will have some increase in sales unless there is complete foreclosure.  Exclusive dealing arrangements, like Keurig's, that foreclose access to key parts of the market are illegal.  *Id.* at 191.  Keurig's argument that <u>any</u> increase in sales by Rogers—which was starting from zero—is fatal to Rogers' claims is not supported by the cases they cite,[7] by the governing case law, or by the principles underlying the antitrust laws.

---

[7] Those cases considered the increase in sales in conjunction with other factors, but the decisions were based on the courts' conclusions that the plaintiff was not significantly impeded in its attempts to access the market.  In *CDC Technologies v. IDEXX Laboratories, Inc.*, which Keurig argues is "fatal to all of [Rogers'] exclusive dealing claims (Def. Mot. at 9), the court found, on a motion for summary judgment, that the exclusive agreements with distributors

Exclusive dealing arrangements can anticompetitively raise rivals' costs, which can ultimately impede effective competition from dislodging an entrenched monopolist, even if rivals retain some means of accessing the market. *Id.* at 191. Here, Rogers has alleged facts demonstrating the anticompetitive effects arising from Keurig's exclusive dealing contracts.

2.      **It is Not Necessary to Allege a Specific Foreclosure Percentage.**

Rogers need not allege a specific foreclosed numerator and denominator if it has alleged facts sufficient to show that the exclusive arrangement produced an anticompetitive effect. *See Xerox I*, 511 F. Supp. 2d at 390 (plaintiff need not provide exact percentage of market foreclosure at motion to dismiss stage); *see, also, E.I. DuPont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) (allowing a claim to proceed despite plaintiff's failure to allege a specific percentage of market foreclosure at the motion-to-dismiss stage); *LePage's Inc. v. 3M*, 324 F.3d 141, 158-59 (3d Cir. 2003) (upholding a verdict despite the fact that plaintiff had not alleged specific percentage of foreclosure; it was sufficient that the dominant competitor had created the strong incentives for consumers to deal with it exclusively); *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08-cv-3669(DLC), 2009 WL 1564113, at *3 (S.D.N.Y. June 4, 2009) (plaintiff need only "identi[y] a plausible theory of impact on a substantial volume of commerce"). "Neither comparative quantitative substantiality (*i.e.*, market share foreclosed) nor absolute quantitative substantiality (*i.e.*, the dollar volume foreclosed) is controlling. Instead, the test is whether the system of challenged exclusive arrangements in fact forecloses competitors from a substantial market." *Bowen*, 366 F. Supp. at 679 (internal citations omitted).

---

were not important to market access. 186 F.3d 74, 80 (2d Cir. 1999). In *Bowen v. N.Y. News, Inc.,* the court determined that the exclusive agreements did not prevent access to the market that would prevent "effective marketing of [competitor] products." 366 F. Supp. 651, 680 (S.D.N.Y. 1973), *aff'd in part and rev'd in part on other grounds*, 522 F.2d 1242 (2d Cir. 1975).

-17-

The requisite foreclosure may be found even if only a segment of the market is foreclosed, such as the Away-From-Home Market Segment here.  *See Microsoft*, 253 F.3d at 70-71 (Section 2 violated by substantial foreclosure of a "majority" of competition in only "one of two major [distribution] channels"); *U.S. v. Visa U.S.A., Inc.,* 344 F.3d 229, 240 (2d Cir. 2003) (upholding verdict for plaintiff based on foreclosure in a market "segment"); *Methodist Health Servs. Corp. v. OSF Healthcare System*, Case No. 1:13-cv-01054, 2015 WL 1399229, at *4-7 (C.D. Ill. Mar. 25, 2015) (upholding exclusive dealing claim where the relevant market was alleged to include only one distribution channel); *Commercial Data Servers, Inc*. *v. Int'l Business Machines Corp.*, No. 00-cv-5008(CM), 2002 WL 1205740, at *7 (S.D.N.Y. Mar. 15, 2002) (denying motion to dismiss where IBM coerced two sellers not to distribute products "through certain distribution channels"); *Pepsico, Inc. v. Coca-Cola Co., Inc.*, No. 98-cv-3282(LAP), 1998 WL 547088, at *18 (S.D.N.Y. Aug. 27, 1998) (plaintiff stated Section 2 claim by alleging effects just on a submarket of single distribution channel).

Here, Keurig's exclusive agreements foreclose the efficient ways for competitors such as Rogers to access the market, significantly and anticompetitively raising their costs.  Courts have found that entering into agreements in order to keep competitors "below the critical level necessary for any rival to pose a real threat" is a violation of the Sherman Act.  *Dentsply*, 399 F.3d at 191.  If a means of distribution does not allow a competitor to "pose[] a real threat" to the defendant's monopoly, like sales through Amazon, then courts have found that the alternate method is an ineffective  means of competition.  *Id* at 194.

Moreover, whether exclusive dealing arrangements "foreclose competition in a substantial share of the line of commerce affected" is a factual question inappropriate for resolution at the motion to dismiss stage.  *Virgin Atlantic Airways Ltd. v. British Airways PLC*,

872 F. Supp. 52 66 (S.D.N.Y. 1994);  *In re Ductile Pipe Fittings (DIPF) Direct Purchaser*

*Antitrust Litig.*, Civ. No. 12-711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question

of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line

of commerce is a merits question not proper for the pleading stage."); *Blue Sky the Color of*

*Imagination, LLC v. Mead Westvaco Corp.*, No. 10-cv-02175 DDP (ANx), 2010 WL 4366849

(C.D. Cal. Sept. 23, 2010) (allowing an exclusive dealing claim based on the market structure

and defendant's large market share).  Rogers has more than met its pleading burden.

### C. Keurig Uses Contractual Ties to Maintain Its Grip on the Market

Keurig's distribution contracts explicitly condition sales of its dominant brewers on the

purchasers' agreement to purchase and sell only Keurig Compatible Portion Packs.  FAC ¶¶ 90-

96, 109, 348.  This is an illegal tying arrangement.  Keurig does not deny these arrangements

involve tying, nor that it has used its market power over brewers to force customers to use its

Portion Packs.  Keurig instead argues that Rogers' tying claims should be dismissed because it

has not alleged the specific percentage of the market foreclosed through the tying.  Def. Mot. at

12.  Accepting that argument would be reversible error by the Court, as it is clear that Rogers

need not allege anticompetitive effects for the *per se* tying claims it has asserted against Keurig.

If the defendant has market power over the tying product, anticompetitive effect is presumed and

plaintiff need not plead foreclosure.  *See, e.g., Cablevision Sys. Corp. v. Viacom Int'l Inc.*, No.

13-cv-1278(LTS), 2014 WL 2805256, at *2 (S.D.N.Y. June 20, 2014) (when the defendant had

sufficient market power to establish a *per se* tying violation, "plaintiffs need not allege, let alone

prove, facts addressed to the [anticompetitive effects] element" and "the plaintiff is also relieved

of the burden of rebutting any justifications the defendant may offer for the tie.") (quoting *In re Wireless Telephone Services Antitrust Litig.,* 385 F. Supp.2d 403, 414 (S.D.N.Y. 2005).[8]

### D.  Rogers Alleges a Plausible Section 1 Claim

Keurig argues that its agreements with competitor roasters and brands are merely vertical agreements, with nothing connecting the different horizontal competitors into a "concerted scheme." Def. Mem. at 22.  That characterization is belied by the relationships among the conspirators, and their incentives in the market.

Through various anticompetitive agreements—including at least one agreement requiring that the brand not compete against Keurig in the coffee business—Keurig  has removed the potential for competition from the largest roasters and brands that would be the most likely to compete against Keurig-branded Portion Packs.  FAC ¶ 122.  Rogers is unable to market its Portion Packs to those roasters and brands, nor to seek an increase of its sales of Portion Packs by leveraging the market acceptance of well known brands.  It would not make economic sense for a roaster or brand to agree to such restrictive and draconian terms if it were not aware that its competitors were assenting to fundamentally the same agreement.  For purposes of a motion to dismiss, courts can infer that the conduct engaged in by defendants is not "independent action" when "plaintiffs have alleged behavior that would plausibly contravene each defendant's self

---

[8] The cases Keurig cites are distinguishable.  In *E&L Consulting v. Doman Indus. Ltd.*, 472 F.3d 23, 32 (2d Cir. 2006), the court dismissed plaintiff's tying claim because the complaint failed to sufficiently define the tied product; but here, Keurig does not dispute the Portion Pack and Compatible Portion Pack market definitions.  In *Yentsch v. Texaco, Inc.*, 630 F.2d 46 (2d Cir. 1980), the court found that the plaintiffs would not have purchased the tied product at all absent the tie, so ipso facto there was no market effect from the tying arrangement.  Here, consumers must buy Portion Packs to use the brewers.  In *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 8 F.3d 1379 (5th Cir. 1994), the court recognized that tying arrangements violate the antitrust laws where consumers are foreclosed from purchasing a product due to a tying arrangement at the distributor level.  "Where the only competition for an item occurs at the level of the distributor, a tie at that level may foreclose part of the market to competitors in the tied good.  If a company sells canning machinery on condition that a canner also buys cans, the consumers will purchase the two as a single product.  Competitors will not be able to sell cans directly to consumers of canned goods."  *Id.* at 1383 n.23.

interest in the absence of similar behavior by rivals." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010).

The terms of Keurig's agreements with roasters and brands are well known within the market, and each company would have known that its competitors had entered into these agreements.  FAC ¶¶ 123, 128, 366-67.  It is not necessary that each brand, roaster, distributor or reseller shared Keurig's anticompetitive intent to help Keurig monopolize the market. "Acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."  *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Conn.*, 156 F.3d 535, 541 (4th Cir. 1998) ("it is sufficient that [defendant], regardless of its own motive, merely acquiesced in the restraint with the knowledge that it would have anticompetitive effects"); *Duplan Corp. v. Deering Milliken Inc.*, 594 F.2d 979, 982 (4th Cir. 1979) ("Where, as here, the [defendants] were knowing participants in a scheme whose effect was to restrain trade, the fact that their motives were different from or even in conflict with those of the other conspirators is immaterial.")

### E.  Keurig Has Orchestrated A Group Boycott Of Rival Portion Pack Manufacturers

Concerted refusals to deal—or group boycotts—are per se illegal.  *Northwest Wholesale Stationers v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985).  Keurig's exclusive agreements amount to a boycott of Competing Portion Packs by At-Home retailers, Away-From-Home distributors and brands.  Group boycott claims stand even when the companies that engage in the boycott are not all horizontal competitors.  *See, e.g., Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131-32 (2d Cir.) (an agreement between two firms in a vertical relationship may be a horizontal restraint of trade if the agreement disadvantages a direct competitor of one of the firms in the agreement).  Keurig's arrangements to boycott Rogers are not procompetitive.

-21-

Group boycotts like those organized by Keurig here violate the Sherman Act when the boycott "cuts off access to a supply, facility or market necessary to enable the boycotted firm to compete" and lack any plausible argument that the boycott was "intended to enhance overall efficiency and make markets more competitive." *Northwest Wholesale Stationers*, 472 U.S. at 294 (internal citations omitted).

### F. Keurig Has Used Sham Litigation To Slow Rogers' Market Acceptance

Sham litigation violates the antitrust laws when it is both (1) "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits;" and (2) "whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor.'" *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993) (emphasis in original). Keurig does not take issue with the second element of the test: it does not contest that there are sufficient allegations in the Complaint to satisfy Rogers' initial burden to establish that the suit was brought as "an attempt to interfere *directly* with the business relationships of a competitor." *Id.* at 60 (emphasis in original).

Instead, Keurig argues that its patent suit did not qualify as sham litigation because (1) Rogers chose not to file a motion to dismiss; and (2) the Federal Circuit heard oral arguments. Def. Mot. at 7. Neither is fatal to Rogers' claim. Failing to file a motion to dismiss is not dispositive proof that litigation has an objective basis. *See Mitsubishi Heavy Industries, Ltd. v. General Electric Co.*, 720 F. Supp. 2d 1061, 1067 (W.D. Ark. 2010) (defendant's failure to file a motion to dismiss does not indicate that the defendant thought that the action was not a sham). In fact, the case law is clear that initial success in trial court is not dispositive proof that the litigation is not a sham. *See id.* at 1066-67; *Boulware v. State of Nevada Dept. of Human Resources*, 960 F.2d 793, 798 (9th Cir. 1992) (success on the merits is not dispositive in

-22-

assessing whether litigation is a sham); *S. Dakota v. Kansas City Southern Indus., Inc.*, 880 F.2d 40, 54 n.30 (8th Cir. 1989) (same).

Keurig knew or should have known that its suit against Rogers was objectively baseless. Keurig had previously sued Sturm Foods for the same alleged patent infringement claims, and lost its case in the District of Delaware.  FAC ¶¶ 164, 320.  During the course of Keurig's litigation against Rogers, Keurig had to know that their claims against Rogers were baseless because the claims had been addressed already in the context of the Tree House complaint.  But Keurig continued to pursue those claims.  FAC ¶¶ 168-72.

The only decisions addressing the merits of Keurig's claims were the summary judgment decision and the decision by the Federal Circuit, and both decisions clearly stated that the claims were objectively baseless.  FAC ¶¶ 168, 170.  The District of Massachusetts explicitly stated in its opinion that the true aim of Keurig's baseless complaint was to interfere with competition in the Compatible Portion Packs market and "to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers." FAC ¶ 168.  The litigation was baseless, as the courts found.

Keurig is also wrong in asserting that the only injury Rogers claims from this baseless litigation was the costs of defending the lawsuits.  While Rogers certainly had to face those substantial costs, it also has alleged that the baseless patent litigation was designed to and did slow Rogers' entry into the market by casting a pall of illegitimacy over the Rogers' products. FAC ¶172 ("Moreover, the lawsuits were used by Keurig to sow doubt and confusion amongst consumers about the viability of Competing Portion Packs.  On information and belief, Keurig used the existence of the lawsuit in order to convince distributors and third parties to stop doing business with Rogers and Sturm.")

-23-

### G.  Keurig Has Misused Its Patents And Caused Antitrust Injury.

Rogers has sufficiently alleged its claim for patent misuse.  Keurig's affirmative acts of patent misuse include its baseless assertion of its patent against it in the *Keurig v. JBR, Inc.* litigation, as well as the tying claims alleged in the FAC.[9]  FAC ¶ 333.  Rogers' allegations highlight the actual harm it has suffered from the resources spent defending against the previous litigation and from lost sales resulting from Keurig's scheme to tie the sales of Keurig's Compatible Portion Packs to its sales of its patented brewers.  The harm resulting from this anticompetitive conduct is sufficient to provide a basis for a patent misuse claim.

The sufficiency of Rogers' allegations of actual and actionable harm is supported by case law.  Misuse claims may be pursued even if there is no active enforcement of the misused patents where the misuse is causing the plaintiff injury.  *See Astra Aktiebolag v. Kremers Urban Dev. Co.*, 99 Civ. 8928 (BSJ), 2001 WL 1807917, at *1 (S.D.N.Y. Oct. 26, 2001) (allegations sufficient to support a counterclaim for declaratory judgment of patent misuse where defendants alleged that plaintiff "falsely certified" to the FDA that one patent covered an approved product sold under a particular trademark, and the false certification forced defendants to file an ANDA as to that patent).  Keurig here is using the market power deriving from its Brewer patents to cost Rogers sales and injure competition in the market.

### H.  Keurig's False Statements Are Actionable

Keurig's false and disparaging statements are sufficient to form the basis of a claim under the Sherman Act, Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a), and California's Unfair Competition Act, Cal. Bus. Code § 17200.  Rogers has alleged that Keurig has made numerous false and misleading statements and presentations to consumers and retailers:  Keurig

---

[9] Keurig's allegation that Rogers is attempting to relitigate the previous case is absurd.  Rogers won the previous case, so doing so would be pointless.

has implied that Competing Portion Packs are unsafe (FAC ¶¶ 235, 237, 384); that Rogers'

Portion Packs are "stale" (FAC ¶ 236); that use of Competing Portion Packs will damage the

brewer (FAC ¶ 238); and that Keurig does not test Competing Portion Packs (FAC ¶¶ 243-45).

These are outright fabrications or designed particularly to mislead consumers, retailers and

distributors.  Rogers has evidence that ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ FAC ¶¶ 206-

13.  Through these misstatements, Keurig induced retailers to fear consumer backlash if they also

carried Competing Portion Packs.  Indeed—why would retailers have any reason to doubt

Keurig's statements about the safety or functionality of Competing Portion Packs in the 2.0

brewer?  Keurig's false and misleading statements were designed to induce reasonable reliance,

and they did so.  Keurig's plan was successful:  multiple retailers informed Rogers that they

would not carry Competing Portion Packs due to concerns resulting from Keurig's false and

misleading statements. FAC ¶¶ 268-73.  Finally, despite having objective knowledge that its

patent claims were meritless, Keurig does not deny that it made public statements that it would

win its baseless patent litigation suit against Rogers and obtain an injunction against competing

Compatible Portion Packs.  As a result of Keurig's disparaging, false, and material statements,

Rogers lost many actual and potential customers and, consequently, lost out on sales.  FAC ¶¶

173, 270.  Lost sales from such incidents constitute antitrust injury.  *Nat'l Assoc. of Pharm.

Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 913 (2d Cir. 1987) ("*Ayerst*").

### 1. Keurig's Disparagement Supports Rogers' Sherman Act Claims

False and misleading statements can constitute anticompetitive conduct in violation of the

antitrust laws as long as the effect on competition is not *de minimis*.  *Ayerst*, at 916.  In *Ayerst*,

-25-

the Second Circuit determined that the plaintiff's allegation that defendant sent a single letter which contained false and misleading statements regarding product liability claims to sophisticated pharmacists was sufficient to allege a violation of both the Sherman Act and the Lanham Act. *Id.* at 906, 916-17. The *Ayerst* court allowed the plaintiffs to proceed with discovery to support their claim that the letter produced a more than *de minimis* effect. *Id.* at 916. Rogers has alleged specifically that the outrageous and misleading statements Keurig has made have cost it business. FAC ¶¶ 268-273. This is more than sufficient to meet the *Ayerst* standard. Further, it is inappropriate, considering the statements as a whole, to dismiss the claims without going through the discovery process when any of the claims are false or misleading. *See Ayerst*, 850 F.2d at 916.

### 2.       Rogers Alleges A Plausible Lanham Act Claim

Even advertisements that are literally true may support a Lanham Act claim if the statement is "likely to deceive or confuse customers." *Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 255 (2d Cir. 2014). Moreover, "determination of whether a business practice is deceptive is usually a question of fact not appropriate for decision at the pleadings stage." *Epicor Software Corp. v. Alternative Tech. Solns, Inc.*, No. SACV 13-00448-CJC(RNBx), 2013 WL 2382262, at *4 (C.D. Cal. May, 9, 2013) (citing *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008)).

Keurig has misrepresented the safety and functionality of Rogers' packs in the Keurig brewers (in the case of the 2.0 brewer, with the Rogers Freedom Clip) (FAC ¶¶ 235, 237-38, 384), and the freshness of Rogers' packs (which are sealed in an airtight container) (FAC ¶ 236), which are inherent characteristics of Rogers' packs. *See Ayerst*, 850 F.2d at 917 (misrepresentations concerning inherent quality on characterization of products is actionable).

Keurig has informed both customers and retailers/distributors that using Competing Portion Packs will void the warranty and damage the 2.0 brewer.  FAC ¶¶ 238-41, 271-72.  Keurig's statements regarding patent infringement are also material and (as demonstrated above) false. These misstatements also violate the Lanham Act.  *Spotless Enters., Inc. v. Carlisle Plastics, Inc.*, 56 F. Supp. 2d 274, 278 (E.D.N.Y. 1999) ("[Counterdefendants'] claim that [counterplaintiff's] product infringed their patent has subsequently been held to be false.  And it is certainly possible that [counterdefendants'] representations did harm [counterplaintiff's] sales; thus, both prongs of causation and materiality are satisfied by this allegation"; motion to dismiss was denied).

All of these statements are not only false, but "material" under a Second Circuit Lanham Act analysis in that they were likely to influence the purchasing decisions of consumers.  FAC ¶¶ 218, 261, 264-66; *see Apotex Inc. v. Acorda Therapeutics, Inc.*, No. 11 Civ. 8803 (AT), 2014 WL 5462547, at *9 (S.D.N.Y. Oct. 23, 2014) ("The plaintiff does not need to demonstrate that the defendant's representations actually affected consumer behavior, but rather only that they were likely to have done so.").

Rogers has sufficiently alleged that Keurig's misrepresentations have harmed it, and thus Rogers has standing and the claims.  FAC ¶¶ 241-47, 258-262, 270-74.  *See Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1395 (2014) ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations.").[10]

## I.  Keurig Violated California's Unfair Competition Act

---

[10] Because Rogers has sufficiently alleged a Lanham Act claim, Rogers' claim under the California False Advertising Law §§ 17500, *et seq.* claim are also sufficient.

-27-

A violation of antitrust laws necessarily implies a violation of Section 17200, but California State Law does not stop there.  In addition to prohibiting unlawful conduct, the statute encompasses and prohibits unfair and fraudulent conduct as well.  Thus, California State Law gives Rogers a separate remedy to bar Keurig's deceitful conduct, and broadens the horizons of the Court's antitrust authority, permitting it to halt an incipient anticompetitive scheme.  *Pastoria v. Nationwide Ins.*, 112 Cal. App. 4th 1490, 1496 (2003) ("unlawful," "unfair," and "fraudulent" acts are separately actionable); *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d 1137, 1151-52 (9th Cir. 2008) (17200 prohibits "conduct that threatens an incipient violation of antitrust law or violates the spirit or policy of those laws.")

The UCL "is designed to protect consumers against fraud and deceit as well as to protect competitors, and is broadly interpreted to bar all ongoing wrongful business activity in any context in which it appears." *Franklin Fueling Systems, Inc. v. Veeder-Root Co.*, No. S-09-580 FDC/JFM, 2009 WL 2462505,*8 (E.D. Cal. Aug. 11, 2009); *see also Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332 (1998) ("Section 17200 has been interpreted broadly to bar all ongoing wrongful business activity, including misleading advertising, in whatever context it presents itself.").  Thus, for all the reasons that the antitrust claims remain *and for additional reasons*, the Section 17200 claims also remain.  As such, even if the Court were to accept Keurig's argument that the Keurig 2.0 does not *yet* have enough market share to be enjoined under the Sherman Act, Section 17200 would empower the court to enjoin such an attempted grab of market share "in its incipiency."  Keurig's brief does nothing to address this.

Keurig's assertion that "courts have uniformly held that dismissal of Sherman Act claims 'precludes a finding of unfair competition'" looks only at the "unlawful" prong of Section 17200 and ignores that "unfair and fraudulent" conduct is also prohibited.  *Pastoria,* 112 Cal. App. 4th

-28-

at 1496.  California courts routinely enjoin false and misleading statements under the UCL. *See Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432 (1988) (affirming trial court's injunction under Section 17200 on wine grape buyer's practice of deceiving growers with a "primary price program of $150 per ton" but then not accepting or downgrading their grapes to pay lower prices); *People v. First Federal Credit Corp.*, 104 Cal. App. 4th 721, 736 (2002) (affirming issuance of a permanent injunction upon finding that the corporation violated the UCL, § 17200, and the false advertising law, § 17500); *Pom Wonderful LLC v. Purely Juice, Inc.*, No. cv-07-02633 CAS (JWJx) 2008 WL 4222045, at *13 (C.D. Cal. July 17, 2008) (issuing preliminary injunction sought by direct competitor when defendant "has made false claims as to the contents and composition of its product" and noting that "the literally false statements made with respect to '100% Pomegranate' product are exactly the type that California's unfair competition laws and false advertising statute are aimed at curtailing.").

### J.  Rogers Has Alleged Plausible Common Law Claims

Keurig incorrectly claims that Rogers is required to address a "competitor's privilege" in order for Rogers' claim regarding intentional interference with prospective economic advantage to survive a motion to dismiss.  Def. Mot. at 30.  Even the case Keurig cites for this argument, *Orion Tire Corp. v. Gen. Tire, Inc.*, however, is clear that a plaintiff is under no obligation to discuss a "competitor's privilege" when the plaintiff has already "effectively allege[d] that the [defendant] used fraud or any other unlawful means to accomplish its goal."  1992 WL 295224, at *3 (C.D. Cal. 1992).  Rogers has alleged that Keurig engaged in a multitude of anticompetitive conduct in order to interfere with Rogers' potential customers, including:  making false and disparaging statements about Competing Portion Pack products; encouraging retailers and distributors not to deal with Competing Portion Pack manufacturers after the introduction of the

-29-

DB2/ 25774221.8

2.0 Brewer; and pursuing baseless patent litigation.  FAC ¶ 409.  Finally, Keurig cannot claim

that it is unaware of the state under which Rogers' has assert this claim; all of Rogers' claims are

filed under either California state or federal law, and Rogers filed its initial Complaint against

Keurig in California.

       Keurig's arguments concerning the Rogers tortious interference with contractual relations

claims fare no better.  Def. Mot. at 29.  Contrary to Keurig's argument, there is no requirement to

identify in the pleadings the specific contractual relationship disrupted.  *Sebastian Int'l, Inc. v.*

*Vincenzo Russolillo*, 162 F. Supp. 2d 1198, 1203-04 (C.D. Cal. 2001) ("under California law, the

Plaintiff does not have to identify the specific contractual relations which have allegedly been

disrupted").  Moreover, Rogers has alleged contractual relationships disrupted by Keurig's

anticompetitive conduct.  Based on Keurig's actions, including in particular its introduction of

the 2.0 brewer, Kroger canceled its private label program with Rogers.  FAC ¶¶ 206-12, 273.

Other customers have followed suit.  FAC ¶¶ 268-83.  Rogers' detailed allegations in the FAC

are sufficient to state a claim for intentional interference with contract.  *Epicor,* 2013 WL

2382262, at *4.

Dated: April 10, 2015

MORGAN, LEWIS & BOCKIUS LLP

By _____

Daniel Johnson, Jr. (admitted *pro hac vice*)
One Market, Spear Street Tower
San Francisco, CA  94105
Tel:  (415) 442-1000
Fax:  (415) 442-1001

*Attorneys for Plaintiff JBR, Inc. (d/b/a
Rogers Family Company)*