# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

IN RE:

KEURIG GREEN MOUNTAIN SINGLE-
SERVE COFFEE ANTITRUST LITIGATION

———————————————————— x

TREEHOUSE FOODS, INC., BAY VALLEY
FOODS, LLC, and STURM FOODS, INC.,

                          Plaintiffs,

v.

KEURIG GREEN MOUNTAIN, INC.,

                          Defendant.

———————————————————— x

:  ECF Case
:
:  MDL No. 2542
:
:  Master Docket No. 1:14-md-02542-VSB
:
:
:
:
:
:  Civil Action No. 1:14-cv-00905-VSB
:
:  **ORAL ARGUMENT REQUESTED**
:
:
:
:
:
:
:
:
:

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO
DISMISS AMENDED AND SUPPLEMENTAL COMPLAINT FILED BY
<u>TREEHOUSE FOODS, INC., BAY VALLEY FOODS, LLC, AND STURM FOODS, INC.</u>**

**REDACTED**

**CONTAINS INFORMATION DESIGNATED AS CONFIDENTIAL, HIGHLY
CONFIDENTIAL, OR ATTORNEYS' EYES ONLY**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

STATEMENT OF FACTS ........................................................................................3

ARGUMENT ............................................................................................................5

I.      TreeHouse Has Satisfied Its Burden Under Rule 8 To State Plausible Claims ...........................................................................................................5

II.     The AC States Monopolization and Attempted Monopolization Claims ...............6

III.    The AC States a Monopoly Leveraging Claim .......................................................10

IV.     The AC States a Tying Claim .................................................................................10

V.      The AC States an Exclusive Dealing Claim ...........................................14

VI.     The AC States a Horizontal Conspiracy Claim ...................................................20

VII.    The AC States a Conspiracy to Monopolize Claim .............................................23

VIII.   The AC States a Concerted Refusal to Deal and Group Boycott Claim ................25

IX.     The AC States False Advertising Claims Under Federal and State Law ..............26

X.      KGM's Misrepresentations Also Violate Section 2 of the Sherman Act .............29

XI.     TreeHouse Has Adequately Alleged Antitrust Injury ...........................................30

XII.    The AC Pleads Evidentiary Facts Supporting Monopoly Power in Relevant Markets .................................................................................................31

        A.      The AC Supports Monopoly Power in the Single-Serve Brewer Market ........................................................................................................32

        B.      The AC Supports Monopoly Power in the Compatible Cup Market ........................................................................................................33

        C.      The AC Supports Monopoly Power in the Office Coffee Services Market ........................................................................................35

XIII.   The AC States a Sham Litigation Claim ................................................................36

XIV.    The AC States a Patent Misuse Claim ...................................................................38

i

XV.   The AC States Claims Under State Antitrust Laws ................................................. 39

XVI.  The AC States Claims Under State Unfair Competition Laws ............................. 40

XVII. The AC States New York, Illinois, and Wisconsin Interference with
      Business Claims ................................................................................................... 40

CONCLUSION ....................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*3M Co. v. Avery Dennison Corp.*,
673 F.3d 1372 (Fed. Cir. 2012)................................................................39

*AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*,
181 F.3d 216 (2d Cir. 1999).....................................................................31

*AIB Express, Inc. v. FedEx Corp.*,
358 F. Supp. 2d 239 (S.D.N.Y. 2004).......................................................10

*AlarMax Distribs., Inc. v. Tyco Safety Prods. Canada Ltd.*,
No. 7-cv-1744, 2008 WL 2622899 (W.D. Pa. June 27, 2008) .........................19, 30

*Alt. Electrodes, LLC v. Empi, Inc.*,
597 F. Supp. 2d 322 (E.D.N.Y. 2009) ......................................................7, 30, 38

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.*,
No. 04-cv-8967(BSJ), 2005 WL 1515399 (S.D.N.Y. June 23, 2005).....................15

*Am. Home Prods. Corp. v. Johnson & Johnson*,
654 F. Supp. 568, 589 (S.D.N.Y. 1987).....................................................28

*Am. Tobacco Co. v. U.S.*,
328 U.S. 781 (1946).................................................................................32

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012).......................................................................5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985).................................................................................6, 8

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)..................................................................................30

*B. Braun Med., Inc. v. Abbott Labs.*,
124 F.3d 1419 (Fed. Cir. 1997)..................................................................38, 39

*B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*,
909 F. Supp. 162 (S.D.N.Y. 1995)..............................................................32

*Baker v. Jewel Food Stores*,
355 Ill. App. 3d 62 (2005) .........................................................................39

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)...............................................................................18

*Bausch & Lomb, Inc. v. Allergan Inc.*,
   136 F. Supp. 2d 166 (W.D.N.Y. 2001) .........................................................38, 39

*Bayer Schering Pharm. AG v. Sandoz, Inc.*,
   813 F. Supp. 2d 569 (S.D.N.Y. 2011)............................................................10, 32

*Beckman Instruments, Inc. v. Technical Dev. Corp.*,
   433 F.2d 55 (7th Cir. 1970) ..............................................................................39

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   457 F. Supp. 404 (S.D.N.Y. 1978),
   *rev'd on other grounds*, 603 F.2d 263 (2d Cir. 1979)..........................................7

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
   603 F.2d 263 (2d Cir. 1979)......................................................................6, 7, 32

*Bertuglia v. City of New York*,
   839 F. Supp. 2d 703 (S.D.N.Y. 2012)..................................................................9

*Bigelow v. Unilever*,
   867 F.2d 102 (2d Cir. 1989)...............................................................................30

*Bio-Tech, Gen. Corp. v. Genentech Inc.*,
   886 F. Supp. 377 (S.D.N.Y. 1995)......................................................................37

*Bon-Ton Stores v. May Dep't Stores Co.*,
   881 F. Supp. 860 (W.D.N.Y. 1994) ...................................................................30

*BookLocker.com, Inc. v. Amazon.com, Inc.*,
   650 F. Supp. 2d 89 (D. Me. 2009) ......................................................................13

*Bowen v. N.Y. News, Inc.*,
   366 F. Supp. 651 (S.D.N.Y. 1973)......................................................................20

*Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*,
   651 F.2d 122 (2d Cir. 1981)..................................................................................6

*Brown Shoe Co. v. U.S.*,
   370 U.S. 294 (1962)............................................................................................35

*Brulotte v. Thys Co.*,
   379 U.S. 29 (1964)..............................................................................................39

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)............................................................................................30

*Byars v. Bluff City News Co.*,
  609 F.2d 843 (6th Cir. 1979) ...........................................................................9

*C.R. Bard v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)......................................................................7, 8

*Cablevision Sys. Corp. v. Viacom Int'l, Inc.*,
  No. 13-cv-1278(LTS), 2014 WL 2805256 (S.D.N.Y. June 20, 2014) ............11, 14

*Castrol Inc. v. Pennzoil Co.*,
  987 F.2d 939 (3d Cir. 1993)..............................................................................28

*CDC Technologies, Inc. v. IDEXX Labs*,
  186 F.3d 74 (2d Cir. 1999)...........................................................................18, 20

*Commercial Data Servers, Inc. v. IBM Corp.*,
  166 F. Supp. 2d 891 (S.D.N.Y. 2001)...........................................................16, 32

*Commercial Data Servers, Inc. v. IBM Corp.*,
  No. 00-cv-5008(CM), 2002 WL 1205740 (S.D.N.Y. Mar. 15, 2002)........16, 17, 35

*Cont'l Ore Co. v. Union Carbide Corp.*,
  370 U.S. 690 (1962)........................................................................................9, 17

*Conwood Co. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ........................................................................19, 20

*Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*,
  43 F.3d 1119 (7th Cir. 1995) ............................................................................40

*Deston Therapeutics LLC v. Trigen Labs.*,
  723 F. Supp. 2d 665 (D. Del. 2010)...................................................................29

*DSM Desotech, Inc. v. 3D Sys. Corp.*,
  749 F.3d 1332 (Fed. Cir. 2014)....................................................................34, 35

*E.I. DuPont De Nemours & Co. v. Kolon Indus.*,
  637 F.3d 435 (4th Cir. 2011) ............................................................................17

*E&L Consulting, Ltd. v. Doman Indus.*,
  472 F.3d 23 (2d Cir. 2006)................................................................................14

*E-One, Inc. v. Oshkosh Truck Corp.*,
  2006 WL 3320441 (N.D. Ill. 2006) ...................................................................40

*Eastman Kodak Co. v. Image Tech. Servs. Inc.*,
  504 U.S. 451 (1992)................................................................................... passim

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   314 F.3d 48 (2d Cir. 2002)...................................................................................26, 27

*Ferring Pharms., Inc. v. River's Edge Pharms., LLC*,
   No. 09-cv-02601, 2010 WL 3087419 (D. Md. Aug. 6, 2010) ...................................29

*Flickinger v. Harod C. Brown & Co.*,
   947 F.2d 595 (2d Cir. 1991)........................................................................................8

*Fortner Enters. v. U.S. Steel Corp.*,
   394 U.S. 495 (1969)...........................................................................................13, 32

*FTC v. Motion Picture Adver. Serv. Co.*,
   344 U.S. 392 (1953)...................................................................................................18

*GAF Corp. v. Eastman Kodak Co.*,
   519 F. Supp. 1203 (S.D.N.Y. 1981)............................................................................7

*Gatt Commc'ns, Inc. v. PMC Assocs.*,
   711 F.3d 68 (2d Cir. 2013).........................................................................................39

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004)............................................................................. passim

*GTE New Media Servs. Inc. v. Ameritech Corp.*,
   21 F. Supp. 2d 27 (D.D.C. 1998) .............................................................................25

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
   No. 08-cv-1101, 2011 WL 1336473 (D.N.M. Mar. 31, 2011) .................................28

*Hack v. President & Fellows of Yale Coll.*,
   237 F.3d 81 (2d Cir. 2000).................................................................................27, 35

*Halebian v. Berv*,
   644 F.3d 122 (2d Cir. 2011)......................................................................................30

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
   423 F.3d 374 (3d Cir. 2005).......................................................................................27

*Hayden Publ'g Co. v. Cox Broad. Corp.*,
   730 F.2d 64 (2d Cir. 1984).........................................................................................31

*Heerwagen v. Clear Channel Commc'ns*,
   435 F.3d 219 (2d Cir. 2006).......................................................................................16

*ICOS Vision Sys. Corp. v. Scanner Techs. Corp.*,
   No. 05-cv-6322 (DC), 2006 WL 838990 (S.D.N.Y. Mar. 29, 2006)........................38

*In re Buspirone Patent Litig.*,
   185 F. Supp. 2d 363 (S.D.N.Y. 2002)....................................................................38

*In re Crude Oil Commodity Futures Litig.*,
   913 F. Supp. 2d 41 (S.D.N.Y. 2012)...............................................................24, 33

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)...........................................................................24, 36

*In re Dobbs*,
   227 Fed. Appx. 63 (2d Cir. 2007).........................................................................9

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)..................................................5, 21, 22, 23

*In re Gabapentin Patent Litig.*,
   649 F. Supp. 2d 340 (D.N.J. 2009)......................................................................38

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)...................................................................................16

*In re McWane, Inc.*,
   No. 9351, 2012 WL 5375161 (F.T.C. Aug. 9, 2012)............................................20

*In re Neurontin Antitrust Litig.*,
   MDL No. 1479, 2009 WL 2751029 (D.N.J. Aug. 28, 2009)..................................37

*In re Visa Check/Mastermoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001),
   *superseded on other grounds by* Fed. R. Civ. P. Amendments .......................11, 14

*In re Visa Check/Mastermoney Antitrust Litig.*,
   No. 96-cv-5238, 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ..............................13

*Insignia Sys., Inc. v. News Corp.*,
   No. 04-cv-4213, 2005 WL 2063890 (D. Minn. 2005)............................................16

*Interstate Circuit, Inc. v. U.S.*,
   306 U.S. 208 (1939)......................................................................................22, 23

*JBCHoldings NY, LLC v. Pakter*,
   931 F. Supp. 2d 514 (S.D.N.Y. 2013)..................................................................40

*Kadic v. Karadzic*,
   No. 93-cv-1163(PKL), 1993 WL 385757 (S.D.N.Y. Sept. 24, 1993) ......................9

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*,
   845 F.2d 404 (2d Cir. 1988), *aff'd*, 492 U.S. 257 (1989) ................................6, 8

*Kellam Energy, Inc. v. Duncan*,
    668 F. Supp. 861 (D. Del. 1987) ............................................................................14

*Keurig, Inc. v. Sturm Foods, Inc.*,
    732 F.3d 1370 (Fed. Cir. 2013) ....................................................................36, 37

*Klor's, Inc. v. Broadway-Hale Stores, Inc.*,
    359 U.S. 207 (1959) ................................................................................................26

*Knowles Elecs., LLC v. Analog Devices, Inc.*,
    No. 11-cv-6804, 2012 WL 1405735 (N.D. Ill. Apr. 23, 2012) ..............................39

*La. Wholesale Drug Co. v. Sanofi-Aventis*,
    No. 07-cv-7343(HB), 2008 WL 169362 (S.D.N.Y. Jan. 18, 2008) ........................38

*Lampi Corp. v. Am. Power Prods., Inc.*,
    No. 93-cv-1225, 1994 WL 501996 (N.D. Ill. Sept. 12, 1994) ...............................26

*Laumann v. NHL*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012) ...................................................................23

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ................................................................................................23

*LePage's Inc. v. 3M*,
    324 F.3d 141 (3d Cir. 2003) ........................................................................9, 17, 20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ...........................................................................................29

*Linzer Prods. v. Sekar*,
    499 F. Supp. 2d 540 (S.D.N.Y. 2007) ...................................................................38

*Lorain Journal Co. v. U.S.*,
    342 U.S. 143 (1951) ............................................................................................8, 9

*Marchon Eyewear v. Tura LP*,
    No. 98-cv-1932, 2002 WL 31253199 (E.D.N.Y. Sept. 30, 2002) .........................38

*Marcyan v. Nissen Corp.*,
    578 F. Supp. 485 (N.D. Ind. 1982) .......................................................................29

*Mario Valente Collezioni, Ltd. v. AAK Ltd.*,
    280 F. Supp. 2d 244 (S.D.N.Y. 2003) ...................................................................27

*Maxon Hyundai Mazda v. Carfax, Inc.*,
    No. 13-cv-2680(AJN), 2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014) ...........14, 15, 17, 18

*McGahee v. N. Propane Gas Co.*,
    858 F.2d 1487 (11th Cir. 1988) ............................................................6

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007)............................................................................39

*Merck Eprova AG v. Gnosis S.P.A.*,
    760 F.3d 247 (2d Cir. 2014)................................................................26

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
    No. 1:13-cv-01054, 2015 WL 1399229 (C.D. Ill. Mar. 25, 2015) .........16

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
    518 F.3d 897 (Fed. Cir. 2008)............................................................39

*MIZ Eng'g, Ltd. v. Avganum*,
    No. 2:05-cv-722, 2007 WL 2892623 (E.D. Va. Sept. 28, 2007) ...........26

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)............................................................................21

*N. Pac. Ry. Co. v. U.S.*,
    356 U.S. 1 (1958).........................................................................11, 12

*N.Y. MedScan LLC v. N.Y. Univ. Sch. of Med.*,
    430 F. Supp. 2d 140 (S.D.N.Y. 2006)...............................................9, 30

*Nat'l Soc. of Prof'l Eng'rs v. U.S.*,
    435 U.S. 679 (1978)............................................................................20

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988)...........................................................29, 30

*Ne. Tel. Co. v. Am. Tel. & Tel. Co.*,
    651 F.2d 76 (2d Cir. 1981)...................................................................7

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    290 F.3d 578 (3d Cir. 2002)................................................................28

*Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*,
    472 U.S. 284 (1985).......................................................................25, 26

*Olstad v. Microsoft Corp.*,
    284 Wis. 2d 224 (2004) ......................................................................39

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ........................................................18, 20

*Paddock Publ'ns, Inc. v. Chi. Tribune Co.*,
    103 F.3d 42 (7th Cir. 1997) ...................................................................18

*People ex rel. Scott v. Schwulst Bldg. Ctr.*,
    89 Ill. 2d 365 (1982) ...........................................................................39

*Pepsico, Inc. v. The Coca-Cola Co.*,
    No. 98-cv-3282(LAP), 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ...................9, 16, 35, 36

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ................................................................27

*Prasco, LLC v. Medicis Pharm. Corp.*,
    537 F.3d 1329 (Fed. Cir. 2008)..............................................................39

*Precision IBC, Inc. v. PCM Capital, LLC*,
    No. 10-cv-00682, 2011 WL 5444114 (S.D. Ala. Oct. 17, 2011)......................................28, 29

*Primetime 24 Joint Venture v. NBC*,
    219 F.3d 92 (2d Cir. 2000)...................................................................20

*Proctor & Gamble Co. v. Chesebrough-Pond's Inc.*,
    747 F.2d 114 (2d Cir. 1984)..................................................................28

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*,
    508 U.S. 49 (1993)..............................................................................37

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) .............................................................27, 34

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)..................................................................36

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003).................................................25, 26

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F. 3d 1421 (9th Cir. 1995) ...............................................................20

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) ................................................................14

*Ryko Mfg Co. v. Eden Servs.*,
    823 F.2d 1215 (8th Cir. 1987) ..............................................................18

*SanDisk Corp. v. STMicroelectronics*,
    480 F.3d 1372 (Fed. Cir. 2007)..............................................................39

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
    No. 97-cv-5499, 2000 WL 264295 (S.D.N.Y. Mar. 9, 2000) ................................................5

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
    11 F. Supp. 2d 166 (D. Mass. 1998) ...........................................................................34, 35

*Standard Oil Co. v. U.S.*,
    221 U.S. 1 (1911) .........................................................................................................20

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) .............................................................................21, 22, 23

*Synergetics USA, Inc. v. Alcon Labs., Inc.*,
    No. 08-cv-3669(DLC), 2009 WL 1564113 (S.D.N.Y. June 4, 2009) ..................................13

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) .....................................................................................................17

*Teva Pharma. v. Abbott Labs.*,
    580 F. Supp. 2d 345 (D. Del. 2008) ..............................................................................37

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ....................................................................................31, 32

*Town of Hallie v. City of Chippewa Falls*,
    105 Wis. 2d 533 (Wis. 1982) ........................................................................................40

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) .................................................................................22, 23, 26

*TransWeb, LLC v. 3M Innovative Props. Co.*,
    No. 10-cv-4413, 2011 WL 2181189 (D.N.J. June 1, 2011) ............................................37

*Turbon Int'l, Inc. v. Hewlett-Packard Co.*,
    769 F. Supp. 2d 262 (S.D.N.Y. 2011) ...........................................................................27

*Tyco Healthcare Grp. v. Mut. Pharm. Co.*,
    762 F.3d 1338 (Fed. Cir. 2014) ....................................................................................37

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Works Local Union No. 3, AFL-CIO*,
    No. 00-cv-4763(RMB), 2002 WL 91625 (S.D.N.Y. Jan. 23, 2002) ....................21, 24, 25

*U.S. v. Am. Express*,
    No. 10-cv-4496, 2015 WL 728563 (E.D.N.Y. Feb. 19, 2015) ...............................17, 31, 32

*U.S. v. Consol. Laundries Corp.*,
    291 F.2d 563 (2d Cir. 1961) .........................................................................................24

*U.S. v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)................................................................................17, 18, 19

*U.S. v. Gen. Motors Corp.*,
  384 U.S. 127 (1966).........................................................................................21, 22, 26

*U.S. v. Grinnell Corp.*,
  384 U.S. 563 (1966).......................................................................................6, 20, 32, 33

*U.S. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ..........................................................................7, 15, 16, 19

*U.S. v. Visa U.S.A.*,
  344 F.3d 229 (2d Cir. 2003)...........................................................................................6, 16

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)...........................................................................................................10

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  872 F. Supp. 52 (S.D.N.Y. 1994)................................................................................10, 17

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55 (2d Cir. 1988)..............................................................................................24

*Wellnx Life Scis. Inc. v. Iovate Hlth. Scis. Res., Inc.*,
  516 F. Supp. 2d 270 (S.D.N.Y. 2007)................................................................16, 17, 18

*Williams v. Citigroup, Inc.*,
  104 A.D.3d 521 (N.Y. App. Div. 2013) ..........................................................................40

*Xerox Corp. v. Media Scis., Inc.*,
  660 F. Supp. 2d 535 (S.D.N.Y. 2009)......................................................................32, 34, 35

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
  511 F. Supp. 2d 372 (S.D.N.Y. 2007)................................................................... passim

*Yentsch v. Texaco, Inc.*,
  630 F.2d 46 (2d Cir. 1980)...............................................................................................14

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)............................................................................................17

## STATUTES

Illinois Unfair and Deceptive Practices Act, 815 Ill. Comp. Stat. 510/1, et seq.......................1, 40

Lanham Act, 15 U.S.C. § 1125(a) ............................................................................... passim

Sherman Act, 15 U.S.C. §§ 1-2 .................................................................................. passim

Rules

Fed. R. Civ. P. 8 ..................................................................................................................2, 5

Other Authorities

2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶533c (3d ed. 2007) ......................35

3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶651 (3d ed. 2008).......................8, 19

Lorenzo Coppi, *Aftermarket Monopolization: The Emerging Consensus in Economics*,
    Antitrust Bull. (Spring 2007), *available at*
    http://www.antitrustinstitute.org/files/Aftermarket%20monopolization,%20Antitrust,
    %20Spring%2007,%2052,%201_081320081459.pdf ...........................................34

DOJ & FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* § 3.3 (1995) ..........21

11 Herbert Hovenkamp, *Antitrust Law* ¶1821a (3d ed. 2011) .......................................15

## INTRODUCTION

Keurig Green Mountain, Inc. ("KGM"), begins its Motion by calling TreeHouse a "plaintiff in search of a case."  The reality is that KGM is a defendant in search of a different complaint.  KGM is only able to make its arguments by ignoring or distorting key facts in the Amended and Supplemental Complaint ("AC") and by misconstruing the applicable law.  When the facts are considered and presumed true, and the correct legal standard is applied, any premise for its Motion evaporates.

Despite KGM's repeated representations to this Court (in support of a stay of discovery) that it would move against all of TreeHouse's claims, it has failed to move to dismiss numerous claims, including those for: (1) monopolization; (2) tying; (3) monopoly leveraging; (4) conspiracy to monopolize; (5) concerted refusal to deal and group boycott; and (6) violation of the Illinois Unfair and Deceptive Practices Act.  KGM cannot cure this failure by raising arguments for the first time in reply, which this Court must treat as a "nullity."  *Infra* n.10.

KGM seems to believe that its critique of TreeHouse's market definition serves as a proxy to attack all Section 2 claims, but this is wrong.  KGM has not challenged TreeHouse's Compatible Cup Market definition.  Nor could it, given KGM's admission in 2014 that it then controlled 86% of the Compatible Cup Market (which it defined the same way TreeHouse does) *before* recapturing the share needed to regain the commanding 95% of the market it controls today.  This failure to challenge the Compatible Cup Market means that all but two of TreeHouse's Section 2 claims (tying and monopoly leveraging, which require a "primary" brewer market and a "secondary" cup market) cannot be dismissed on market definition grounds, contrary to what KGM suggests.

The overarching theme of KGM's Motion is that this Court should rule as a matter of law that KGM is exempt from the antitrust laws based on technicalities that are unsupported by the

facts or law and which this Court has warned are inappropriate on a motion to dismiss. *See infra* at 5. To take just two examples, KGM argues that the dozens of pages detailing KGM's exclusion of competitors from the market are insufficient to meet Rule 8 because TreeHouse pled foreclosure percentages and not the specific "numerator" and "denominator" composing those percentages. KGM also argues that despite being routinely disparaged and foreclosed from at least 80% of office customers, TreeHouse's ability to sell *any* products to *any* customers and to increase its market share since entering the market means it cannot be injured as a matter of law. Such a standard would impermissibly immunize incumbent monopolists and would vitiate monopoly maintenance claims. To argue that TreeHouse's 186-page AC and 252 pages of evidentiary exhibits fail adequately to support its claims with the factual "heft" required to place KGM on notice of the claims simply strains credulity.

TreeHouse has presented an extraordinary Complaint in an extraordinary case. Unlike most antitrust complaints, TreeHouse not only supported its allegations with facts, but has supported its claims with direct evidence, much *from KGM's own admissions.* Among other things:

1. *KGM admits* to a share of the Compatible Cup Market that the case law considers a monopoly share, AC ¶¶125, 223; *infra* at 33;

2. *KGM admits* that it competes with Single-Serve Brewers using a low-pressure brewing method and *not* with hopper-based, drip coffeemakers or high-pressure espresso machines, AC ¶¶66-68, Exs. 3 §5, 4 §13; resulting in a monopoly share of the Single-Serve Brewer Market as well, *infra* at 31 n.55, 32-33;

3. KGM employees "████████████████" and "████████████████," AC ¶398; Ex. 12 at ¶¶4-6; *infra* at 7;

4. *KGM's own planning documents show* that KGM intended to ████████████ ████████ and create a "████████████████" in order to give KGM a "████████████," AC ¶¶5, 7, 11-12, 400; Ex. 1 at 2-3; Ex. 2 at 2-3; *infra* at 7;

5. *KGM admits* that it has entered into hundreds of agreements prohibiting its business partners

from dealing with Competitive Cup makers, AC ¶185; Ex. 6; *infra* at 14-15;

6. *KGM admits* that the purchase or sale of Competitive Cups subjects business partners to termination of their brewer supply agreements, AC ¶¶359, 376; Ex. 10 at 2; *infra* at 11-12;

7. *KGM's* contracts last from several to ▮ or more years and prohibit the purchase or sale of Competitive Cups *even after contract termination*, AC ¶¶257, 294, 353, 364; Ex. 4 at §14.1; Ex. 5A at §12, Sch. A §2; Ex. 5B at §12, Sch. A at §2; Ex. 9 at §V; *infra* at 17-18;

8. *KGM admits* that it contracts for the "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" not to protect its supposed investments, but so that competitors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮" Competitive Cups, AC ¶¶12, 401; Ex. 1 at 2; Ex. 2 at 4; *infra* at 14;

9. *KGM admits* that it obtains contract terms from Licensees on behalf of other Licensees, AC ¶302; Ex. 4 at 66; *infra* at 22, thus facilitating a hub-and-spoke conspiracy; and

10. *KGM admits* that at least some of the statements it has disseminated to large national retail customers are in fact *false*, AC ¶¶16, 417-18, 463-64, 523-26; *infra* at 4-5, 25-26.

Far from a case where "zero and zero is zero," Motion to Dismiss ("MTD") at 3, this is a case pleading numerous anticompetitive acts where any number of them, if shown to be true, will result in massive antitrust liability. KGM has shown no basis to dismiss any of TreeHouse's claims.

## STATEMENT OF FACTS

Threatened by the expiration of its K-Cup patents in 2012, KGM embarked on an aggressive plan to restrain competition from lower-priced Competitive Cups by engaging in a wide range of anticompetitive acts with the goal of maintaining its monopolies. AC ¶¶2-4, 45-47, 64-65, 83-89, 105-07, 121-34, 201.[1] Yet KGM's Motion omits any discussion of the anticompetitive and anti-consumer scheming that led to the launch of the Keurig 2.0 Brewer ("2.0"). KGM ignores Project ▮▮▮▮, which was an integral part of KGM's illegal scheme to "incorporate a lock-out mechanism in [2.0] brewers" to "▮▮▮▮" the "▮▮" of Competitive Cups in order to "▮▮▮▮▮▮▮▮▮▮▮▮▮." AC ¶¶5-6, 8, 10, 14. While KGM asserts that the 2.0 was its "most significant innovation yet" (citing AC ¶405), the AC says no such thing. *See*

---

[1] Capitalized terms herein shall have the meaning ascribed to them in the AC.

AC ¶408. To the contrary, TreeHouse alleges that memoranda documenting Project ████ make "no reference to how [the] lock-out mechanism might benefit consumers." AC ¶13. In fact, "the only reference to consumer safety at all is under the header '████████.'" *Id.* While TreeHouse was ultimately able to reverse engineer the "lock-out," the damage was already done. *See* AC ¶¶20, 457, 565. At a time when the 2.0 was still under wraps, KGM systematically confronted retailers with its lock-out plan to coerce them to stop selling Competitive Cups and foreclosed future competition by entering into anticompetitive agreements with them. AC ¶20.

KGM also ignores facts showing that it has erected a network of more than 600 unlawful tying and exclusionary contracts, AC ¶2, and "coerc[ed] companies at every level of the Compatible Cup supply and distribution system" to enter "anticompetitive 'K-Cup Exclusivity,' 'Keurig Loyalty,' and 'Non-Competition' contracts," AC ¶4. This network of contracts has "almost entirely prevented competitors from selling [] to office customers," despite "interest in purchasing competitors' lower-priced, high-quality" cups. AC ¶¶4, 19; *see* AC ¶¶244-389.

As soon as TreeHouse entered the Compatible Cup Market, KGM retaliated with a baseless lawsuit that the Federal Circuit condemned as an effort "to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [cups] by invoking patent law." AC ¶¶43, 226-40, 598. KGM also "coerces consumers to purchase K-Cups instead of Competitive Cups by unlawfully tying consumer purchases of K-Cups to K-Cup Brewer purchases." AC ¶¶390-97.

KGM has also made many misrepresentations to retailers and consumers. KGM told retailers that the 1.0 would be pulled off the market in connection with the 2.0 launch, thereby creating retailer concerns that consumers who bought Compatible Cups would complain when they did not function with the brewers on the market. *See* AC ¶¶523-25. KGM's 30(b)(6) witness admitted that this statement was false when made. AC ¶526. KGM also confused,

misled, and deceived retailers and consumers by claiming falsely that "the new technology benefitted consumers by tailoring the brewing process to a unique 'recipe' for the specific inserted beverage;" that "competitors would not be able to reverse engineer the lock-out;" and "that the lock-out was 'critical' for brewer performance and consumer safety." AC ¶¶5, 641. The misrepresentations continue today; for instance, KGM continues to state falsely that only KGM-brand K-Cups work with the 2.0. AC ¶471.

## ARGUMENT

## I.     TreeHouse Has Satisfied Its Burden Under Rule 8 To State Plausible Claims

Rule 8 requires only a "short and plain statement of the claim" and "is fashioned in the interest of fair and reasonable notice, not technicality, and therefore is not meant to impose a great burden upon a plaintiff." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012) ("*eBooks*"); Fed. R. Civ. P. 8(a)(2). "Granting a motion to dismiss is a blunt weapon and a drastic remedy that a court should employ only after careful consideration of all the salient issues leads to the conclusion that no interpretation of facts could support a plaintiff's claims." *Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*, No. 97-cv-5499, 2000 WL 264295, at *36 (S.D.N.Y. Mar. 9, 2000) ("*Six W.*"). Dismissal is appropriate only where the complaint fails to "state a claim to relief that is plausible on its face," after accepting "as true all of the allegations" and drawing "all reasonable inferences in favor of the non-movant." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *eBooks*, 859 F. Supp. 2d at 680. A court may not "dismiss a complaint that states a plausible version of the events merely because the court finds a different version more plausible," and "fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Id.*

5

## II.     The AC States Monopolization and Attempted Monopolization Claims

Rather than expose the weakness of its arguments, KGM simply ignores TreeHouse's monopolization claim.[2]  As discussed *infra* in Section XII, TreeHouse has alleged numerous facts showing monopoly power in the relevant markets.[3]  Indeed, even before recapturing market share temporarily lost to TreeHouse, KGM's CEO *admitted* KGM controlled no less than 86% of the Compatible Cup Market, which constitutes a "substantial monopoly."  *Infra* at 33.[4]

TreeHouse has also pled facts showing that KGM has maintained its monopoly using "a wide range of anticompetitive conduct."  AC ¶¶2, 45.  A monopolist's conduct violates Section 2 if it "(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 & n.32 (1985) ("If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory.").[5]  The conduct pled here includes entering into more than 600 tying and exclusionary contracts; conspiring to suppress competition from lower-priced cups; demanding

---

[2] Monopolization "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power."  *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 481 (1992) ("*Kodak*") (quoting *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

[3] As KGM has declined to challenge the Compatible Cup Market definition, the Court need not consider the broader, alternative Portion Pack Market, in which KGM still controls 73% of the market, thereby providing "strong evidence of monopoly power."  *Broadway Delivery Corp. v. United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 129 (2d Cir. 1981); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 271-73 (2d Cir. 1979) (60% "clearly reached the level of a monopoly"); AC ¶151.  Notably, the market share required to plead an adverse effect on competition for Section 1 claims is far less than that required for monopoly power.  *See, e.g.*, *U.S. v. Visa U.S.A.*, 344 F.3d 229, 239-40 (2d Cir. 2003) (26% sufficient) ("*Visa U.S.A.*").

[4] KGM's argument that the AC fails to plead a dangerous probability of monopolization for an attempt or leveraging claim because TreeHouse's "sales have grown," MTD at 32, is contradicted by facts and law.  First, the AC alleges that "███████████████████████."  AC ¶542; *see* AC ¶¶6, 21.  Second, KGM's shares far exceed what is required to show a "dangerous probability" of success.  *See Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*, 845 F.2d 404, 408 (2d Cir. 1988), *aff'd*, 492 U.S. 257 (1989) (55% share sufficient); *infra* Section XII.  Third, a "*dangerous probability [is] not negated by … [a] plaintiff's market share increase.*"  *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1505 & n.43 (11th Cir. 1988) (emphasis added); *see Kelco Disposal*, 845 F.2d at 405, 409 (affirming attempted monopolization where plaintiff's share increased from 0 to 42%).

[5] *Cf.* AC ¶¶44, 241 (impairing rivals' opportunities with tying and exclusionary agreements); 29-30, 242, 256, 373 (conduct not competition on the merits); 251, 290-94, 363-65 (conduct more restrictive than reasonably necessary).

unjustified licenses for access to brewers, suppliers, and distributors; raising rivals' costs by adding unnecessarily restrictive barriers to brewers; lying to and threatening distributors, retailers, and consumers to limit Competitive Cup purchases; and filing sham litigations to hinder competitors' market entry. *See, e.g.*, AC ¶¶2, 23-47. ***Any one*** of these exclusionary acts (which also support TreeHouse's other claims) satisfies the conduct requirement for monopolization.

KGM's Motion is written as if TreeHouse's allegations relating to the 2.0 launch were the sole basis for its monopolization claim. They are not. But even if they were, the facts pled about the 2.0 are more than sufficient to support a Section 2 claim. The AC pleads that KGM sacrificed the interests of consumers to lock out competitors to get an unmeritorious market lead and to maintain its monopoly using exclusion rather than merit. AC ¶¶10-13, 373, 385, 402-03, 422-32.[6] KGM's argument that its intent behind the 2.0 is irrelevant is an attempt to bury some of the most incriminating direct evidence of its anticompetitive plan. This evidence includes the fact that KGM employees "███████████████████████████████████████ ████████████████████████ and "████████████████████████," as well as KGM's plans to create a "████████████████████" in order to give it a "██████████████," which unlawfully maintained KGM's monopoly. AC ¶¶5, 11-12, 398-403; MTD 17-18; *see Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 494 (2d Cir. 2004) (monopolist unlawfully obtained "unfair advantage as an entrenched first-mover, even after competitors eventually entered the market"); *Alt. Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 329

---

[6] The 2.0 redesign is not presumptively legal. *U.S. v. Microsoft Corp.*, 253 F.3d 34, 65-67 (D.C. Cir. 2001) (product redesign violated Section 2); *C.R. Bard v. M3 Sys., Inc.*, 157 F.3d 1340, 1382 (Fed. Cir. 1998) (same); *Ne. Tel. Co. v. Am. Tel. & Tel. Co.*, 651 F.2d 76, 95 (2d Cir. 1981) (ordering new trial based on evidence that redesign impeded competition); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 457 F. Supp. 404, 411 (S.D.N.Y. 1978), *rev'd on other grounds*, 603 F.2d 263 (2d Cir. 1979) (new products are not immune from antitrust attack); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 388 (S.D.N.Y. 2007) (same) ("*Xerox I*"); *GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1226, 1228 (S.D.N.Y. 1981) ("*Berkey* and *Northeastern Telephone* make clear … that new product introductions by a monopolist … may constitute a [Section 2] violation."). KGM's argument that the AC failed to allege "coercion" ignores the many paragraphs devoted specifically to coercion. *See, e.g.*, AC ¶¶390-97.

(E.D.N.Y. 2009) (monopolist "artificially creat[ed] barriers to entry" to maintain monopoly). The Supreme Court has made clear that "intent is … relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" *Aspen Skiing*, 472 U.S. at 602.  Citing Areeda & Hovenkamp, KGM contends that "examining intent … 'cannot help but chill perfectly appropriate behavior,'" MTD at 18, but Professor Areeda *in fact* states that "considerations of subjective intent are sometimes essential," especially when "innovations both harm rivals and fail to benefit consumers."  3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶651c2, at 115 (3d ed. 2008) ("The real question is what the innovator had in mind.").[7]  KGM's intent to "████" and "████████████" easily compels consideration by a jury and is relevant to all of TreeHouse's antitrust claims.[8]

KGM fails substantively to address three of TreeHouse's claims by merely stating that "TreeHouse packages the remains of its product redesign claims" under "Monopolization [Count 1], Monopoly Leveraging [Count III], and Tying [Count VI]," MTD at 15 n.4.[9]  But each of these claims is supported by more than just the "redesign" that led to the 2.0 launch, including KGM's systematic practice of coercing companies at every level of the supply chain to enter into unlawful contracts that prohibit such entities from dealing with KGM's competitors.  *See, e.g.*, AC ¶¶572 (a-c, f), 587-89, 612-14, 617.  The Supreme Court has long held that such conduct is more than sufficient to support a monopolization claim.  *Lorain Journal Co. v. U.S.*, 342 U.S.

---

[7]  *See also id.* (explaining that what should be avoided is simply assuming ex post that new technology was anticompetitive because it was not a significant improvement and discussing the proper reliance on intent in *C.R. Bard*, 157 F.3d at 1382 (affirming violation where evidence implied biopsy gun was changed to injure "competitors in the replacement needle market, rather than [to] improv[e]" gun)).

[8]  AC ¶¶10, 398.  KGM's intent to "████" competition also satisfies the specific intent element for monopoly leveraging and attempted monopolization.  AC ¶¶7-14, 398-401, 424; *see, e.g.*, *Kelco Disposal*, 845 F.2d at 408 (specific intent to monopolize where defendants stated "goal of driving [competitors] out of the … market").

[9]  KGM's argument that "pleading is by statement of claim, not by legal theory" cannot support dismissal of claims that KGM did not move to dismiss.  MTD at 15 n.14 (citing *Flickinger v. Harod C. Brown & Co.*, 947 F.2d 595, 600 (2d Cir. 1991)).  *Flickinger* addressed the liberalization of pleading to ensure complaints are not dismissed where the facts support an unpled legal theory and in no way relieves KGM of its burden on this motion.  947 F.2d at 600.

143, 149-55, 183-84 (1951). In *Lorain Journal*, for example, the defendant "violated § 2" by "attempt[ing] to regain its monopoly … by forcing [companies] to boycott" a market entrant by threatening to terminate contracts with anyone that dealt with the new competitor. *Compare id.* at 149-53, *with* AC ¶376 ("Any [Competitive Cup] that you … sell … subjects you to termination of your Keurig Agreement."). As this Court has observed, such an "[e]xtraction of an agreement not to deal with any competitor — or the equivalent, refusing to deal with buyers who do — can be exclusionary and particularly damaging where the buyers cannot do without the seller's product or service." *Pepsico, Inc. v. The Coca-Cola Co.*, No. 98-cv-3282(LAP), 1998 WL 547088, at *18 (S.D.N.Y. Aug. 27, 1998); *see Byars v. Bluff City News Co.*, 609 F.2d 843, 858 (6th Cir. 1979) ("a monopolist['s] refus[al] to deal with customers who deal with its rivals" is "inherently anticompetitive"). This is true even when the contracts at issue do not constitute exclusive dealing contracts. *See Pepsico*, 1998 WL 547088, at *16-17.

KGM may not "selectively refer to allegations in the complaint, ignoring the complete picture painted by plaintiffs." *N.Y. MedScan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 149 (S.D.N.Y. 2006). "[C]ourts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (citing *Cont'l Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962)). The numerous anticompetitive acts pled by TreeHouse present a pervasive course of conduct directed at one unlawful aim — the suppression of price competition from lower-priced cups — and support TreeHouse's monopolization claim. AC ¶574. KGM's failure to move to dismiss this claim warrants denial of its Motion and cannot be cured on reply.[10]

---

[10] *See In re Dobbs*, 227 Fed. Appx. 63, 64 (2d Cir. 2007) ("entirely proper" not to consider argument first raised in reply); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 737 (S.D.N.Y. 2012) ("[A]rguments raised for the first time in reply should not be considered …."); *Kadic v. Karadzic*, No. 93-cv-1163(PKL), 1993 WL 385757, at *1 (S.D.N.Y. Sept. 24, 1993) ("Any new issues raised … [on reply] will be treated as a nullity.").

### III.    The AC States a Monopoly Leveraging Claim

TreeHouse has detailed how KGM has leveraged its monopoly in the Single-Serve Brewer Market to restrain competition in the Compatible Cup Market.[11]   In response, KGM reasserts the argument made in its pre-motion letter that the Supreme Court's *Trinko* decision eliminated monopoly leveraging claims,[12] but fails to mention this Court's subsequent decision — which TreeHouse raised in response to KGM's pre-motion letter — that explicitly rejected the same argument.  *AIB Express*, 358 F. Supp. 2d at 250-51 (monopoly leveraging remains a valid independent claim following *Trinko*).[13]   Nor could any purported increase in TreeHouse's sales immunize KGM from TreeHouse's well-pled monopoly-leveraging claim.[14]

### IV.    The AC States a Tying Claim

KGM does not argue that TreeHouse has fallen short in pleading any element of a per se tying claim, and thus should be precluded from doing so on reply.  *See supra* n.10.  The elements of a per se tying claim are: (1) the existence of two distinct products (the tying and tied products); (2) actual tying of the sale of the two products; (3) the defendant's possession of appreciable market power in the tying market; and (4) the effects of the tying arrangement on a substantial (or "not insubstantial") amount of interstate commerce.  *See Kodak*, 504 U.S. at 462-63.   Where these elements are established, there is no need to inquire into actual market

---

[11] *See, e.g.*, AC ¶¶195-98, 225, 241-43, 286-95, 373-97, 432-33, 531-43, 585-93.  A monopoly leveraging claim will lie where "defendant (1) possessed monopoly power in one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct."  *AIB Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 246-47 (S.D.N.Y. 2004).

[12] MTD at 32 n.22 (citing *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004)), *TreeHouse* ECF Nos. 16, 24.

[13] *See Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 65 (S.D.N.Y. 1994) ("A defendant may be liable for monopoly leveraging even if it has not attempted to monopolize the second market.").

[14] *See supra* n.4.  *Bayer Schering Pharm. AG v. Sandoz, Inc.*, is not to the contrary.  813 F. Supp. 2d 569, 579-80 (S.D.N.Y. 2011) (rejecting attempted monopolization claim that was completely unsupported by facts) (MTD at 32).

conditions or anticompetitive effects of the tie.[15]   Such tying agreements are per se unlawful because they "deny competitors free access to the market for the tied product" and thus "buyers are forced to forego their free choice between competing products."  *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 6 (1958).

      *First*, *K-Cup Brewers and K-Cups are two distinct products*.  They have separate functions, are typically sold separately, and are marketed at vastly different price points.  *See* AC ¶¶45, 65, 72, 109, 436-43, 613; *Kodak*, 504 U.S. at 462.  The fact that the brewers and cups are designed to work together does not make them one product.  *Id.* at 463 ("By that logic, we would be forced to conclude that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires.").  Indeed, the Supreme Court has "often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices."  *Id.* (citation omitted).

      *Second, KGM ties sales of cups to brewers and prohibits the purchase of cups from competitors*.  KGM coerces business partners at every level of the Compatible Cup supply chain to forego purchasing, selling, or otherwise supporting competing brewers and Competitive Cups.  *See, e.g.*, AC ¶¶375-77.  TreeHouse quotes direct evidence of these illegal "ties," including KGM's standard "Keurig Loyalty" provision that prohibits distributors from promoting or selling "any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer."  AC ¶¶344-45; *see also id.* ¶359.  In other words, if a distributor wants to sell Keurig cups or brewers, it must purchase only K-Cups and cannot purchase or sell any cups made by Competitive Cup makers, such as TreeHouse, "because doing so would violate their [ ]

---

[15] *In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 133 n.5 (2d Cir. 2001) (Sotomayor, J.) ("*Visa Check*"), *superseded on other grounds by* Fed. R. Civ. Proc. amendments; *Cablevision Sys. Corp. v. Viacom Int'l, Inc.*, No. 13-cv-1278(LTS), 2014 WL 2805256, at *2 (S.D.N.Y. June 20, 2014) ("*Cablevision*").  Unlike exclusive dealing, tying redresses a monopolist's use of its "dominant position in a tying product market … as leverage to force the sale of tied products" in a second market.  *Cablevision*, 2014 WL 2805256, at *2.

Agreements." AC ¶183.  As explained by one of KGM's former KADs, KGM "uses these KAD agreements to cement its dominant market position … by forcing vendors to supply only licensed Keurig products, thereby locking customers into the K-Cup ecosystem." AC ¶381, Ex. 11 at ¶5.

KGM also engages in tying in the retail channel, agreeing to sell brewers to retailers "only on the condition that the buyers also purchase K-Cups or at least agree that they will not purchase Competitive Cups,"[16] and with roasters and brands, which are prohibited from "████████████████████████████████████████████████ ████████████████████████████████████████████████████ or from supporting Competitive Cups or competing Single-Serve Brewers.  *See, e.g.*, AC ¶¶291-315, 320, 388, Ex. 3 at § 5, Ex. 4 at § 13.1.  KGM even goes so far as to prohibit component and machinery suppliers from selling products to Competitive Cup makers.  *See* AC ¶¶257, 244-53.

These types of agreements constitute unlawful tying agreements, which are "defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *N. Pac. Ry.*, 356 U.S. at 5-6; *see Kodak*, 504 U.S. at 463 (evidence of tying where "Kodak would sell parts to third parties only if they agreed not to buy service from [competitors]").  The facts are even stronger here than in *Kodak*.  In *Kodak*, the Supreme Court held that *summary judgment* was properly defeated by evidence that Kodak suppressed the ability of competitors to provide aftermarket repair services for Kodak equipment by: (1) "pressur[ing] Kodak equipment owners and … distributors not to sell Kodak parts" to competitor service providers; and (2) agreeing with part manufacturers that they "would not sell parts that fit Kodak equipment to anyone other than Kodak." *Id.* at 458.  Here, the AC pleads that KGM *expressly* conditioned the purchase of the tying product (brewers) on the purchase of

---

[16] AC ¶373; *see, e.g.*, *id.* ¶¶367-72, 384.

the tied products (K-Cups) *in addition* to the provisions like those in *Kodak* stating that business partners cannot deal with competitors in the tied market.  *See, e.g.*, AC ¶359 ("[U]se o[f] Non-K-cups … put [ ] KAD brewer equipment agreements in jeopardy.").

*Third, KGM has appreciable market power in both the Single-Serve Brewer Market and the Compatible Cup Market*.  In the tying context, market power "ordinarily is inferred from the seller's possession of a predominant share of the [tying] market."  *Kodak*, 504 U.S. at 464.  The market shares alleged here (93% of the Single-Serve Brewer Market and 95% of the Compatible Cup Market) easily satisfy the "predominant share" test.  *See, e.g.*, *BookLocker.com, Inc. v. Amazon.com, Inc.*, 650 F. Supp. 2d 89, 103-04 (D. Me. 2009) ("consensus" among courts that "thirty percent is a threshold" for market power; holding 70% share satisfied element); *In re Visa Check/Mastermoney Antitrust Litig.*, No. 96-cv-5238, 2003 WL 1712568, at *4 (E.D.N.Y. Apr. 1, 2003) (between 43-60% "easily qualifies" for per se rule); AC ¶¶6, 83-89, 121-34.

*Fourth, KGM's tying arrangements affect a substantial amount of commerce.*  The commerce impacted by the tying arrangement must only be "substantial enough in terms of dollar-volume so as not to be merely de minimis."  *Fortner Enters. v. U.S. Steel Corp.*, 394 U.S. 495, 501 (1969); *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08-cv-3669(DLC), 2009 WL 1564113, at *3 (S.D.N.Y. June 4, 2009) ("plaintiff need not specify a dollar amount," and must instead simply "identif[y] a plausible theory of impact on a substantial volume of commerce"). There can be no doubt that KGM's tying agreements meet this test.[17]

KGM argues that the claim should be dismissed for failure to allege that KGM's tying arrangements foreclosed competition.  MTD at 14.  Apart from the fact that the AC did allege such foreclosure, *supra* n.17, *infra* at 15-17, TreeHouse is not required to plead anticompetitive

---

[17] *See, e.g.*, AC ¶¶178-90, 346, 349-51 (foreclosed from over $2 billion Away-From-Home ("AFH") and Office Coffee Services ("OCS") Markets).

effects (much less complete foreclosure) to state a per se tying claim.  *See Visa Check*, 280 F.3d at 133 n.5.[18]  No case KGM cited supports dismissal of TreeHouse's tying claim.[19]  Moreover, although unnecessary based on the alleged facts, TreeHouse has more than amply alleged anticompetitive effects to support a rule of reason claim as well.  *See, e.g.*, Section XI.

## V.    The AC States an Exclusive Dealing Claim

KGM has erected a barrier of over 600 exclusive dealing agreements with companies at every level of the Compatible Cup supply chain in order to suppress competition from market entrants and to maintain its substantial monopoly.  AC ¶¶7, 185, 241.  These agreements are "unduly restrictive and unreasonable in length" and "cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups," as evidenced by the fact that "KGM does not restrict the ability [of suppliers] to sell these same products for other purposes."  AC ¶¶242, 581.[20]  KGM is not protecting against free-riding on *its* investments, but is rather blocking competitors from accessing inputs and distribution networks that *others* created, as KGM admits.[21]  Thus, these exclusive dealing agreements "serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with KGM."  AC ¶¶242, 581.  Indeed, KGM's own documents are particularly incriminating in that they admit that KGM contracts for the "███████████████████" not

---

[18] *See also Cablevision*, 2014 WL 2805256, at *2.  Since deciding *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56-58 (2d Cir. 1980), relied on by KGM, the Second Circuit has clarified that plaintiffs in per se tying cases need not prove anticompetitive effects.  *See Visa Check*, 280 F.3d at 133 n.5; *Cablevision*, 2014 WL 2805256, at *2.

[19] In two of the cases KGM cited, the court concluded that there was no tying agreement at all (an argument not made here).  *See E&L Consulting, Ltd. v. Doman Indus.*, 472 F.3d 23, 32 (2d Cir. 2006); *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861, 881-83 (D. Del. 1987).  In *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, the plaintiff failed to prove market power, precluding application of a per se test.  28 F.3d 1379, 1385-87 (5th Cir. 1994).

[20] *See, e.g.*, ¶¶244-51 (supplier can sell machines if not used for Competitive Cups); 264-66 (supplier can sell cups and lids if not used for Competitive Cups); 267-69 (supplier can sell cups if not used for Competitive Cups).

[21] AC ¶¶31 (admitting KGM contracted with distributors to "[p]iggyback the established sales and service network" to avoid investing in "infrastructure" like "sales, service, [or] inventory"), 251, 274-75.  In any event, it is improper to weigh procompetitive justifications on a motion to dismiss.  *See Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680(AJN), 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014); *Xerox I*, 511 F. Supp. 2d at 389-90.

to protect its supposed investments, but so that competitors ███████████████

███████████ Competitive Cups.  AC ¶¶12, 401.[22]  The Second Circuit has made clear that "a

jury should decide what weight should be given to these statements."  *Geneva*, 386 F.3d at 504.

KGM does not dispute that it has entered into hundreds of agreements that are exclusive

in that they prohibit companies from dealing with *all* other Compatible Cup makers.[23]  Instead,

KGM argues that TreeHouse has failed to plead that KGM's agreements are unreasonable and

substantially foreclose competition because TreeHouse has "remained in the market," obtained

inputs, could theoretically find companies to "create new brands," and can reach some portion of

office customers and retail consumers.  MTD at 11-14.  But this argument proves too much and

would, if accepted, insulate any exclusive dealing arrangement from antitrust challenge where

the plaintiff has been able to enter the market.  "Substantial" foreclosure does not mean "total"

foreclosure.  "Generally speaking, cases … have held that an agreement must foreclose at least

30 percent to 40 percent of the market to support a [Section] 1 violation," and potentially even

less for a Section 2 violation.[24]  As alleged, "KGM's exclusionary agreements with [distributors]

alone foreclose Competitive Cup makers' access to approximately 80% or more of Compatible

Cup Market sales to [OCS] customers" nationally, and even more regionally.  AC ¶349; *see also*

AC ¶¶350 (foreclosing 90% of Compatible Cup Market sales to OCS customers in New York

region); 560 (foreclosed from OCS market); 366-72 (complete foreclosure from two retail and

---

[22] *Compare Geneva*, 386 F.3d at 508 (memorandum proposing to purchase exclusively "to block [a competitor's] entrance is particularly damning"), *with* AC ¶12 (KGM contracting exclusively to create a ████████ ███████ ).

[23] *See* 11 Herbert Hovenkamp, *Antitrust Law* ¶1821a, at 180 (3d ed. 2011) ("Unlawful exclusive dealing requires (1) an *agreement* (2) *not to deal* in the goods of another.") (emphases in original).  KGM argues that its "KAD agreement … does not prohibit the sale of competing systems," MTD at 13, but ignores the alleged exclusion of Competitive Cup makers in the market in which TreeHouse has been harmed — the Compatible Cup Market.  *See, e.g.*, AC ¶¶251, 257, 264-71, 292, 296-97, 345.

[24] *Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, No. 04-cv-8967(BSJ), 2005 WL 1515399, at *3 (S.D.N.Y. June 23, 2005); *see Microsoft*, 253 F.3d at 366 ("[M]onopolist's use of exclusive contracts … may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required … to establish a § 1 violation."); *Maxon Hyundai*, 2014 WL 4988268, at *13-14 (36% sufficient on motion to dismiss).

office specialty store customers).[25]   Thus, TreeHouse has alleged that "it was foreclosed from **customers**," as KGM concedes demonstrates foreclosure.  MTD at 13 (emphasis in original).

Contrary to KGM's argument, the foreclosure alleged of the OCS Market Segment and retail customers is sufficient to support a violation.  *See Visa U.S.A.*, 344 F.3d at 240 (affirming violation based on foreclosure in market "segment"); *Microsoft*, 253 F.3d at 70-71 (Section 2 violated by foreclosure of a "majority" of competition in "one of the two major [distribution] channels"); *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 1:13-cv-01054, 2015 WL 1399229, at *4-7 (C.D. Ill. Mar. 25, 2015) (upholding foreclosure of only one distribution channel); *Commercial II*, 2002 WL 1205740, at *1, 7 (denying motion to dismiss where IBM coerced two sellers not to distribute products "through certain distribution channels"); *Pepsico*, 1998 WL 547088, at *17-18 (plaintiff stated Section 2 claim by alleging effects just on a submarket of single distribution channel).[26]

While KGM argues that any foreclosure estimate must include a "numerator" and a "denominator," MTD at 15, KGM's own authority recognizes that an allegation of foreclosed market ***share***, such as the 80% alleged here, contains both the numerator (the percentage) and the denominator (100%), and is a sufficient estimate of foreclosure.[27]   Indeed, "[s]uch specificity is not required when the sources of proof are clearly within the defendant's control;" whether the

---

[25] KGM argues that "TreeHouse's factual allegations regarding purportedly exclusive retail agreements are limited to just two retailers" and should therefore be dismissed on that basis.  MTD at 15.  Even if that were true, substantial foreclosure has been found in just such an instance.  *See Commercial Data Servers, Inc. v. IBM Corp.*, No. 00-cv-5008(CM), 2002 WL 1205740, at *7 (S.D.N.Y. Mar. 15, 2002) ("*Commercial II*").

[26] The OCS and Compatible Cup Markets are *both* well-defined markets, and TreeHouse has plausibly alleged a national geographic market based on the "area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006); AC ¶191; *infra* Section XII.  Unlike *Commercial Data Servers, Inc. v. IBM Corp.*, 166 F. Supp. 2d 891, 897 (S.D.N.Y. 2001) ("*Commercial I*"), where plaintiff did not "allege any facts explaining why the relevant geographic market is domestic," the AC alleges that it is much more costly to obtain machinery from overseas.  AC ¶256.

[27] *See Insignia Sys., Inc. v. News Corp.*, No. 04-cv-4213, 2005 WL 2063890, at *3 (D. Minn. 2005) (seeking "some indication of the percentage" of market foreclosed); *cf. Wellnx Life Scis. Inc. v. Iovate Hlth. Scis. Res., Inc.*, 516 F. Supp. 2d 270, 295 n.8 (S.D.N.Y. 2007) (complaint "contains no facts" regarding "distributors' shares").

agreements "foreclose competition in a substantial share of the line of commerce affected" is "a uniquely factual inquiry" that "is inappropriate on the face of the complaint." *Virgin Atl.*, 872 F. Supp. at 66 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961)); *Xerox I*, 511 F. Supp. 2d at 389-90 (alleging loyalty rebates "'exclud[e] from much of the market' competing [products] sold by [plaintiff]" sufficient to allege substantial foreclosure).[28] TreeHouse has further pled facts explaining how KGM has unreasonably restricted every level of the Compatible Cup supply chain across suppliers, brand licensees, distributors, and retailers.[29] While KGM "tightly compartmentalize[s]" KGM's contracts by type of business partner, KGM's network of agreements must be considered "as a whole." *Cont'l Ore Co.*, 370 U.S. at 699.

TreeHouse alleges that KGM's exclusionary agreements caused antitrust injury and actual adverse effects on TreeHouse's business and competition in general by restraining output, consumer choice, incentives to create new products, and price competition, which has forced consumers to pay 15-25% more for Compatible Cups. AC ¶¶549-64. Where, as here, the "plaintiff can demonstrate an actual adverse effect on competition, such as reduced output," the plaintiff satisfies its "initial burden" of showing that the exclusive dealing is unreasonable and need not even show market power.[30] KGM's monopoly power also creates a presumption that "its exclusive dealing arrangements invariably have the power to exclude rivals."[31]

---

[28] *See Maxon Hyundai*, 2014 WL 4988268, at *9; *Commercial II*, 2002 WL 1205740, at *7; *see also E.I. DuPont De Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) (holding it would be "problematic" to dismiss an exclusive dealing claim for failure to allege a "specific percentage of market foreclosure" before discovery); *LePage's*, 324 F.3d at 158-59 (upholding verdict without a proven percentage of foreclosure).

[29] *See* AC ¶¶256 (restricting 90% of the machines worldwide and nearly 100% in U.S.), 277 (restricting 90% of cups), 284 (restricting 70% of foil), 309, 311 (controlling "virtually all prominent coffee brands" covering 75% of U.S. coffee consumption), 349 (foreclosing 80% of national distributors), 364-72 (complete foreclosure from certain retail customers and office specialty store customers). These are *current* estimates. *Contra* MTD at 8.

[30] *Geneva*, 386 F.3d at 509 (actual adverse effects, such as reduced output, harms competition); *see U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 194 (3d Cir. 2005) (limited consumer choice shows adverse impact and harms competition); *Am. Express*, 2015 WL 728563, at *50 (reduced incentive to lower prices harms competition); *Wellnx*, 516 F. Supp. 2d at 293 (reduced output, increased prices, or decreased quality harms competition).

[31] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012); AC ¶¶121-34.

The adverse effects alleged here include creating a bottleneck in the Compatible Cup supply chain precluding Competitive Cup makers from reaching hundreds of customers. *Geneva*, 386 F.3d at 509 (bottlenecks create "particular concern"); *supra* at 15-16.[32]  TreeHouse cannot simply "compete for the contract," as KGM argues (MTD at 12), because KGM's agreements are unduly restrictive in length.  Whereas the authority relied upon by KGM involves exclusive contracts that were short-term or terminable-at-will, here KGM's contacts are alleged to last anywhere from at least "several" to ▇ years.  AC ¶347; *see, e.g.*, AC ¶¶290, 316 (5 years); 294, 313 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ 257 ▇ years).[33]  Remarkably, direct evidence shows that the term of exclusivity imposed on certain retail stores is "perpetual" and that the exclusivity restrictions placed on KGM's hundreds of KADs even *survive termination*, preventing KADS from doing business with Competitive Cup makers *even after they are no longer doing business with KGM*.  AC ¶¶364, 353.  Such exclusivity terms are anticompetitive and unreasonable on their face.  *See FTC v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 393-96 (1953) (condemning contracts ranging 2 to 5 years); *Maxon Hyundai*, 2014 WL 4988268, at *10-11 (3 year term "sufficiently lengthy … to state a violation").

KGM also argues that there is no antitrust injury because elevated K-Cup prices would benefit competitors such as TreeHouse, MTD at 12, but TreeHouse cannot benefit by charging lower prices when 80% of office customers are not free to purchase lower-priced cups and retail

---

[32] *CDC Technologies, Inc. v. IDEXX Labs* is thus distinguishable because the "distributors," which merely provided leads on customers instead of actually reselling products, had "never been critical" for sales and the plaintiff "achieved distributor coverage almost nationwide" and could reach defendant's customers.  186 F.3d 74, 80-81 (2d Cir. 1999); *see also Wellnx*, 516 F. Supp. 2d at 293 (all competitors except one "compete unobstructed" for 100% of the market).

[33] "In some cases which we find distinguishable, courts have indicated that exclusive dealing contracts of short duration are not violations of the antitrust laws."  *Dentsply*, 399 F.3d at 194 n.2 (citing *CDC Techs.*, 186 F.3d at 81) (MTD at 1, 7, 11, 13); *see Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (MTD at 7); *Ryko Mfg Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987) (MTD at 13); *see also Paddock Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1997) ("annual (or more frequent) right to negotiate new terms or change partners" and either side may terminate on notice) (MTD at 8, 12); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) ("competition remain[s], since" contract can be cancelled without cause upon 6 months' notice) (MTD at 12).

stores are prohibited from selling lower-priced cups.  *See, e.g.*, *Dentsply*, 399 F.3d at 191 ("[a] set of strategically planned exclusive dealing contracts [that] may slow the rival's expansion by requiring it to develop alternative outlets … or rely … on inferior or more expensive outlets" harms competition); *Microsoft*, 253 F.3d 34, 70-71 (restricting access to most efficient distribution channel harms competition); *AlarMax Distribs., Inc. v. Tyco Safety Prods. Canada Ltd.*, No. 7-cv-1744, 2008 WL 2622899, at *4 & n.5 (W.D. Pa. June 27, 2008) (competitor did not stand to gain from exclusive dealing raising prices; loss of customer and restraint of competition on merits sufficient); AC ¶¶89, 349; *see* AC ¶¶355-57, 364-72, 384, 394-97, 560.

Nor is KGM exempt from the antitrust laws because TreeHouse's market share has previously grown or may grow in the future.  KGM's argument that TreeHouse cannot show harm to competition or substantial foreclosure because TreeHouse's "sales have grown" ignores allegations that KGM's exclusionary contracts caused a sharp decline in TreeHouse's market share and an increase in KGM's.  *See* AC ¶¶6, 130, 366-72.  It also ignores black letter law rejecting the proposition that a competitor cannot state a claim if its market share is increasing: "Of course, the law has never required complete market exclusion as a prerequisite to suit. Indeed, some successful § 2 plaintiffs have both grown their market shares and earned high profits even through the period that the exclusionary practices were occurring."  3 Areeda & Hovenkamp, *supra*, ¶651b5, at 108-09 (citing *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) (affirming monopoly maintenance where plaintiff's market share was increasing and market was expanding)); *supra* n.4 (collecting authority).  KGM cannot point to any case holding that increased sales or market share alone precludes a finding of substantial foreclosure.  Such a rule would create a prohibited non-statutory exemption to the antitrust laws, and could not be reconciled with Section 2 of the Sherman Act, which prohibits the

"maintenance" of a monopoly in the face of increasing competition as well as the "acquisition" of a monopoly where the dominant firm is growing.  *Grinnell*, 384 U.S. at 571; *LePage's*, 324 F.3d at 153 (noting a "good illustration" of conduct violating Section 2 is where defendant's "100% market share declined and it took … action that formed the basis of [the] complaint").[34]

As this Court has recognized, TreeHouse's allegation that "its sales would have grown much faster and steadily had it not been for KGM's [conduct]" is sufficient to establish antitrust injury.  AC ¶222; *see Conwood*, 290 F.3d at 789 (condemning violation where plaintiff alleged share would have grown faster if defendant had not obtained removal of plaintiff's products from shelves); *Xerox I*, 511 F. Supp. 2d at 381 (alleging potential sales had been reduced sufficient where sales were increasing).  Not surprisingly, the Federal Trade Commission has explicitly rejected KGM's reading of *Omega*, the case KGM relies on for its flawed argument.  *See In re McWane, Inc.*, No. 9351, 2012 WL 5375161, at *23 (F.T.C. Aug. 9, 2012) (increasing share did not provide sole basis for decision; *Omega* recognized need to examine range of evidence).[35]

## VI.    The AC States a Horizontal Conspiracy Claim

TreeHouse alleges that KGM has orchestrated a horizontal conspiracy with its competitor roasters and brands ("Licensees") that restrained output, excluded Competitive Cups from shelf space and lucrative contracts, and maintained supracompetitive K-Cup prices.  AC ¶¶286-301. TreeHouse has stated a claim by pleading: (1) a combination or concerted action between at least two distinct economic entities; that (2) unreasonably restrains trade.  *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 103 (2d Cir. 2000).   Because conspiracies are inherently secret, they

---

[34] *See Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 688-90, 692, 696 (1978) (the antitrust laws are "subject to exceptions defined by statute"); *Standard Oil Co. v. U.S.*, 221 U.S. 1, 65 (1911) ("restraints of trade within the purview of the statute …[can] not be taken out of that category by indulging in general reasoning").

[35] KGM's interpretation of *Omega* even contradicts precedent in the *Omega* court's circuit holding that gains made during anticompetitive conduct do not negate antitrust injury, but at most go to the "*measure* of damages, rather than the *existence* of antitrust injury."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F. 3d 1421, 1448 n.19 (9th Cir. 1995).  The cases KGM cites were also all decided after discovery and hold other factors as relevant.  *See Omega Envtl.*, 127 F.3d at 1163-64; *CDC Techs.*, 186 F.3d at 77; *Bowen v. N.Y. News, Inc.*, 366 F. Supp. 651, 678-79 (S.D.N.Y. 1973).

"nearly always must be proven through inferences" drawn "from the behavior of the alleged conspirators." *eBooks*, 859 F. Supp. 2d at 681; *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Works Local Union No. 3, AFL-CIO*, No. 00-cv-4763(RMB), 2002 WL 91625, at *4 (S.D.N.Y. Jan. 23, 2002).   Conduct that, in the absence of concerted action, would be against a party's independent economic interest supports a strong inference of the existence of a conspiracy.   *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 327 (2d Cir. 2010).   Conspirators need not share the same motivation for joining the conspiracy or the same involvement.   *eBooks*, 859 F. Supp. 2d at 690. Instead, a claim for conspiracy requires merely a "conscious commitment to a common scheme designed to achieve an unlawful objective" or "a unity of purpose or a common design and understanding … in an unlawful arrangement."   *Id.* at 681 (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

The AC alleges that "[b]y joining together with a conscious commitment to a common and unlawful scheme, KGM and its [Licensees] can limit competition from lower-priced Competitive Cups by agreeing … not to do business with Competitive Cup manufacturers unless they also become licensed and cede control of their pricing and output to KGM in order to elevate prices."   AC ¶299; *see* AC ¶¶286-300.   KGM argues that its agreements with Licensees amount to a series of "vertical" conspiracies, not a horizontal one, but this contention contradicts several recent cases where courts have found that plaintiffs alleging facts similar to those here stated a horizontal conspiracy claim.[36]   In *eBooks*, for example, Judge Cote found that plaintiffs had alleged a horizontal conspiracy where Apple served as the hub in a hub-and-spoke

---

[36] KGM stresses that its agreements may include trademark licenses, MTD at 33, but this does not immunize them. Indeed, federal antitrust enforcement authorities "treat a relationship between a licensor and its licensees, or between licensees, as horizontal when they would have been actual or likely potential competitors in a relevant market in the absence of the license."   DOJ & FTC, *Antitrust Guidelines for the Licensing of Intellectual Property* § 3.3 (1995). Moreover, the Supreme Court has expressly held that "[i]t is of no consequence … that each party acted in its own lawful interest" or whether a "system" of purportedly vertical agreements coordinated by one manufacturer is otherwise "lawful or economically desirable."   *U.S. v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966) (holding per se illegal a manufacturer's network of franchise contracts prohibiting dealers from working with discounters).

conspiracy among publishers aimed at raising ebook prices.  The publishers had all signed similar ("vertical") agreements with Apple but there was no direct evidence of a ("horizontal") agreement among the publishers.  However, Judge Cote inferred a horizontal agreement among the publishers because the "only condition on which a publisher would agree to Apple's terms was if it could be sure its competitors were doing the same thing."  *eBooks*, 859 F. Supp. at 685.

The *eBooks* court made this finding despite the fact that — unlike KGM here — Apple was not yet a dominant force in the relevant (ebook) market.  In doing so, Judge Cote relied on *Toys "R" Us, Inc. v. FTC* and *Interstate Circuit, Inc. v. United States.*[37]   The factual underpinning common to these cases is that: (1) the participants were alleged to have knowledge that other competitors were contemplating or agreed to the proposed restraints; (2) the restraints were eventually imposed; and (3) it would have made no economic sense for the competitors to have acted similarly unless the other participants to the conspiracy did the same, *see, e.g.*, AC ¶307.  In short, plaintiffs "alleged behavior that would plausibly contravene each defendant's self-interest 'in the absence of similar behavior by rivals.'"  *Starr*, 592 F.3d at 327.

These same factors are alleged here.  First, the competitor Licensees not only had "express knowledge" of KGM's agreements with other Licensees when entering into their agreements, AC ¶301, but also capitalized on that knowledge by using KGM as a "conduit," or the hub to their spokes, to "secur[e] agreements from other competitors in order to ensure that prices can be maintained at supracompetitive levels," AC ¶302.  For example, TreeHouse alleges that ███████ contractually required KGM to obtain a particular provision in an agreement between KGM and ██████ — ████████ *competitor* — that would insulate competitor

---

[37] *Interstate*, 306 U.S. 208, 222 (1939) (horizontal agreement where movie theater sent a letter to distributors stating it would show films only if distributor restricted later runs *despite* no evidence that distributors communicated with each other); *Toys "R" Us*, 221 F.3d 928, 932-33 (7th Cir. 2000) (defendant coordinated horizontal agreement by signing identical vertical agreements with manufacturers restricting ability to sell to lower-priced club stores); *see also Gen. Motors Corp.*, 384 U.S. at 142, 144-47 (manufacturer coordinated per se unlawful dealer agreements).

Licensees from price competition in the event there were a ███████████████████ *Id.*
Second, the restraints were actually imposed.  The Licensees have signed largely identical
agreements, and the AC offers examples of some Licensees refusing to sell to TreeHouse as a
result.  *See* AC ¶297.  Third, it would not have made economic sense for these entities to have
*unilaterally* entered into such restrictive agreements, which not only prohibit them from *selling*
Compatible Cups at will but also prevent them from *marketing* and *re-stocking* their own
products.  AC ¶32; *Starr*, 592 F.3d at 327; *accord* MTD at 12 n.9.  Such "suspicious" decisions
to deprive themselves "of a profitable sales outlet" because KGM induced Licensees to collude
"rather than to compete independently for shelf space" supports a finding of a horizontal
restraint.  *Toys "R" Us*, 221 F.3d at 935, 936.  The Licensees were "aware that all were in active
competition and that without substantially unanimous action … there was risk of a substantial
loss of the business …, but that with it there was the prospect of increased profits.  There was,
therefore, strong motive for concerted action."  *Interstate*, 306 U.S. 208 at 222; *see Laumann v.
NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012) (parties alleged to "have knowledge that
other market participants are bound by identical agreements, and their participation is contingent
upon that knowledge," "may be considered participants in a horizontal agreement").

The AC also alleges that the conspiracy unreasonably restrains trade and harms
competition by elevating K-Cup prices and reducing output.  *See* AC ¶¶299-300, 305-06, 309-
11; *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) ("A horizontal
cartel among [competitors] that decreases output or reduces competition in order to increase
price is, and ought to be, *per se* unlawful."); *eBooks*, 859 F. Supp. 2d at 685.

## VII.   The AC States a Conspiracy to Monopolize Claim

KGM has failed to offer any viable argument supporting dismissal of this claim, as it only
sought to dismiss TreeHouse's Section 2 claims (such as this one) for failure to allege monopoly

power in a relevant market, MTD at 27, but monopoly power is not an element of this claim. *U.S. v. Consol. Laundries Corp.*, 291 F.2d 563, 572 (2d Cir. 1961). In any event, TreeHouse has pled all of the conspiracy to monopolize elements: "(1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988); AC ¶¶625-31.

As for concerted action, the AC pleads that KGM and Licensees executed a network of anticompetitive "license" agreements coordinated by KGM and took overt acts in furtherance of the conspiracy by implementing those agreements, which restrain competition from lower-priced Competitive Cups by prohibiting Licensees from: (1) selling inputs to Competitive Cup makers; (2) granting licenses to Competitive Cup makers; (3) using Competitive Cup makers to manufacture Licensees' cups; and (4) selling Competitive Cups or Brewers. AC ¶¶286-339.

TreeHouse has also pled facts illustrating that KGM and its conspirators took these actions with the specific intent to monopolize the Compatible Cup Market. Specific intent to monopolize can be inferred by a party's words or conduct. *U.S. Info. Sys.*, 2002 WL 91625, at *8. It can also be "plausibly inferred" where an entity makes what would otherwise be an "uneconomic decision." *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 58 (S.D.N.Y. 2012). Even tenuous inferences of intent should survive a motion to dismiss, as such issues are more appropriate for resolution by the trier of fact. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 693 (2d Cir. 2009).

KGM's intent to monopolize has been clear from the time its cup patents first expired, when it filed sham lawsuits to intimidate competitors. AC ¶¶40-44, 226-40. Later, KGM partnered with Sagentia and Motiv to devise Project ███, with the specific intent to ███████ ███████████ AC ¶14. Exclusionary intent by the competitor Licensees can also be inferred

from the anticompetitive provisions of the agreements themselves; the Licensees' refusals to deal with Competitive Cup makers after coordinating with KGM; and their "uneconomic decisions" not to deal with KGM's competitors, not to compete with KGM, and to cede control to KGM over output, marketing, and re-stocking.[38]   One Licensee even admitted that its sole reliance on KGM presents a "material," reportable risk to the company.   AC ¶308.   The conspirators' "exclusionary [and] predatory means" to "drive … rival[s] from the market" support a finding of specific intent.   *See GTE New Media Servs. Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 45 (D.D.C. 1998).   Viewed together, as is required, the Licensees' decisions not to compete with KGM evidence a "common plan and scheme" in support of a Section 2 claim of conspiracy to monopolize.   *U.S. Info. Sys., Inc.*, 2002 WL 91625, at *9.

## VIII.   The AC States a Concerted Refusal to Deal and Group Boycott Claim

The same facts pled with respect to a conspiracy to restrain trade also support a claim for a concerted refusal to deal or group boycott, which is "an agreement to pressure a supplier or customer not to deal with another competitor."   *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 318 (S.D.N.Y. 2003) (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.*, 472 U.S. 284, 294 (1985)).   TreeHouse alleges that KGM secured a network of agreements from Licensees: (1) not to deal with Competitive Cup makers themselves; and (2) to further require that Licensees' distributors likewise refuse to deal with Competitive Cup makers by becoming Roaster-Nominated Keurig Authorized Distributors bound by the same contractual prohibitions in KAD agreements.   AC ¶¶303-04; *see also* AC ¶¶4-5, 19-20, 244-51.

Although KGM declines even to acknowledge this as an independent cause of action, MTD at 34 n.25, the Supreme Court has long recognized such claims and has held that such conduct is so plainly harmful to competition that it should be condemned as per se unreasonable.

---

[38] *See* AC ¶¶32, 38, 291 ("███████████████"), 298-99, 310, 313-14, 320, 334.

*See Nw. Wholesale Stationers*, 472 U.S. at 294; *Gen. Motors Corp.*, 384 U.S. at 135-48 (per se illegal group boycott where "General Motors sought to elicit from all the dealers agreements … that none of them would do business with discounters"); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213 (1959) (applying per se analysis to allegations of "a wide combination consisting of manufacturers, distributors, and a retailer"); *see also Toys "R" Us*, 221 F.3d at 936.[39]   Such "facially anticompetitive" facts are sufficient to withstand a motion to dismiss regardless of whether the per se rule or rule of reason is later applied.  *Reading Int'l*, 317 F. Supp. 2d at 318.

## IX.   The AC States False Advertising Claims Under Federal and State Law

TreeHouse has properly supported each Lanham Act element with allegations detailing numerous misrepresentations made in the course of advertising, including in packaging (AC ¶471), websites (AC ¶473), promotional event statements (AC ¶475), and advertising materials distributed with 2.0 brewers (AC ¶487).[40]   Likewise, TreeHouse alleged misrepresentations concerning the discontinuance of 1.0 brewers (some KGM admits were false when made), to at least *eight* large retailers that annually sell hundreds of millions of dollars of K-Cups and Competitive Cups, which satisfies the dissemination requirement.[41]

---

[39] This case is very similar to the facts in *U.S. v. General Motors Corp.*, 384 U.S. 127 (1966).  In *General Motors*, the car manufacturer coordinated a "system" of contracts restricting the territories in which dealers could resell General Motors cars.  General Motors cracked down on dealers that sought to increase their output by selling to discounters, purportedly in contravention of such territorial restrictions, by demanding agreements from all dealers that they would not work with discounters.  *Id.* at 130-44.  The Court expressly rejected the contention that the dealers merely "engaged in 'parallel action,'" holding that the "interrelated and interdependent" system of contracts constituted a "concerted effort to eliminate sales … by discounters" in order "to protect franchised dealers from real or apparent price competition." *Id.* at 142, 144-47.

[40] *See also* AC ¶¶459-548, 639-641.  A Lanham Act claim exists when a statement is "literally false as a factual matter," or "although … literally true, … is likely to deceive or confuse customers." *Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 255 (2d Cir. 2014).  Advertising or promotion for Lanham Act purposes encompass "more than the traditional advertising campaign." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  KGM concedes that TreeHouse's state false advertising claims are subject to the federal standard, MTD at 38-40, and thus TreeHouse has also met its pleading burden with respect to those claims.

[41] *See* AC ¶¶461, 501 n.11, 523-28; MTD at 37; *MIZ Eng'g, Ltd. v. Avganum*, No. 2:05-cv-722, 2007 WL 2892623, at *4 (E.D. Va. Sept. 28, 2007) (no dismissal where misrepresentations made to three large customers); *Lampi Corp.*

KGM argues that, prior to TreeHouse completing development of its Competitive Cup, its claim that only 2.0 K-Cups would work with its 2.0 Brewers was true.  It was not, as evidenced by KGM's contemporaneous admission that it expected ███████████ ███████████ that would work in 2.0 brewers.  AC ¶¶11, 400.  This claim, moreover, *is indisputably false now*, and yet KGM continues to make it notwithstanding the sale of TreeHouse's 2.0 Competitive Cups.  *See, e.g.*, AC ¶¶471-73, 476.  KGM argues that its 2.0 compatibility statements are not false because they "are not alleged to be false with respect to most of the industry."  MTD at 37.[42]  But that is not the alleged false claim.  It is that KGM has stated and continues to state that *only* K-Cups work in the 2.0 and that *all* Competitive Cups do "not work" or "function" with the 2.0.  *See, e.g.*, AC ¶¶471-73, 476.  This is demonstrably false.

KGM also argues that its alleged quality, performance, and safety misrepresentations are mere "puffery" and cannot be proven false.  MTD at 35.  KGM ignores the fact that the alleged claim is that the 2.0 produces a "perfect cup" *by reading the "recipe" on each K-Cup lid*, which the 2.0 does not do as admitted by its 30(b)(6) witness.[43]  Likewise, there is nothing subjective about TreeHouse's allegations that KGM misrepresented that it owns proprietary ████ ███████ technology that would prevent competitors from developing a 2.0 compatible cup.[44]

---

*v. Am. Power Prods., Inc.*, No. 93-cv-1225, 1994 WL 501996, at *2 (N.D. Ill. Sept. 12, 1994) (no dismissal where misrepresentations made to a few nationwide chains).  Neither case KGM cites is to the contrary.  *See Fashion Boutique*, 314 F.3d at 58 (insufficient evidence employees' remarks to shoppers were disseminated to public generally); *Mario Valente Collezioni, Ltd. v. AAK Ltd.*, 280 F. Supp. 2d 244, 256-57 (S.D.N.Y. 2003) (analyzing prior adjudication for collateral estoppel effect); *see also* AC ¶¶501-22 (alleging other retailer misrepresentations).

[42] None of KGM's authorities support its argument.  *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 384-85 (3d Cir. 2005) (did not involve a Lanham Act claim); *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 87 (2d Cir. 2000) (same); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997) (same); *Turbon Int'l, Inc. v. Hewlett-Packard Co.*, 769 F. Supp. 2d 262, 268 (S.D.N.Y. 2011) (statements addressed quality of competing products in general, not compatibility of defendant's own products with competing products).

[43] AC ¶¶16, 405, 417-19, 487-88, 484, 521; *see Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 501-02 (5th Cir. 2000) (mere puffery became actionable claim in particular context).

[44] MTD at 38; AC ¶¶503-17, 529, 539.

Also subject to being proven false is KGM's alleged misrepresentation that the 2.0 lock-out is critical for performance and safety reasons.  KGM's own tests found that TreeHouse's Competitive Cups performed at least as well or better than KGM's K-Cups in a 2.0 prototype; KGM documents show that safety was merely the ██████████ KGM planned to use to defend the lock-out; and KGM employees openly discussed that the true purpose of the lock-out was to ████████████████[45]  Thus, such representations do not constitute puffery.[46]

KGM also persists in claiming that its brewer warranty representations are true, but TreeHouse alleges just the opposite.  To discourage consumers from using Competitive Cups, KGM threatens customers that use of Competitive Cups may void their brewer warranties, but KGM honors brewer warranties even if consumers use such cups.  *See* AC ¶¶493-99.  These warranty representations have featured prominently in KGM's marketing of its brewers and K-Cups, including representations that KGM has made online (AC ¶¶474, 496), by customer service representatives to untold numbers of consumers (AC ¶¶497-99), and with product inserts (AC ¶¶390-92, 495), all of which are tools that KGM has used to "penetrate the public consciousness [as part of] the company's vast nationwide, multimedia marketing campaign to promote the K-Cup Brewers and K-Cups," AC ¶460.  Thus, TreeHouse has also met its pleading

---

[45] AC ¶¶16-17, 398, 423-31, 479-92, 522, 538-39.

[46] *See, e.g., Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945-46 (3d Cir. 1993) (measurable claims not puffery); *Precision IBC, Inc. v. PCM Capital, LLC*, No. 10-cv-00682, 2011 WL 5444114, at *14 (S.D. Ala. Oct. 17, 2011) (statements not puffery that "raise safety concerns" that "go beyond mere 'opinion'").  KGM argues that its supposed lack of a Competitive Cup testing program cannot be used to show that its representations are false, MTD at 36, but the authority KGM cites shows that it cannot make such claims without a factual basis.  *See Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 589 (S.D.N.Y. 1987) (claim Advil interacts with fewer drugs was false where it had "no credible support"); *cf. Proctor & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 119 (2d Cir. 1984) (claims were supported by a study); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, (3d Cir. 2002) (court may find unsubstantiated representations are false without evidence); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. 08-cv-1101, 2011 WL 1336473, at *9 (D.N.M. Mar. 31, 2011) (party liable for claim that its product was "safe" because "a reasonable consumer might believe that [it] had engaged in some sort of testing before making [such] statements" when in fact it "performed no such testing").

obligations with respect to KGM's warranty misrepresentations.[47]

For standing, TreeHouse need only plead "an injury to a commercial interest in sales or business reputation" caused by the misrepresentations. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1392, 1395 (2014) (rejecting prudential standing tests). TreeHouse has alleged many misrepresentations causing such injury by influencing purchasers.[48]

## X.   KGM's Misrepresentations Also Violate Section 2 of the Sherman Act

The misrepresentations summarized above not only violate the Lanham Act, but also support TreeHouse's monopolization claim under *National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Labs.*, 850 F.2d 904 (2d Cir. 1988) ("*Ayerst*").   In fact, TreeHouse's allegations are far more extensive than those that the Second Circuit deemed sufficient in *Ayerst*, which concerned misrepresentations made in a *single letter* to *sophisticated pharmacist customers* during just one *month. Id.* at 906, 916-17.

TreeHouse described many misrepresentations disseminated in many ways.   Even without discovery, it is clear that these representations are false.   *See supra* at 26-28.   And KGM's misrepresentations "relate to material characteristics of K-Cup Brewers, K-Cups, and Competitive Cups, were likely to and did induce reliance by retailers and consumers …, continued over a prolonged period of time, and could not be neutralized or offset by TreeHouse" for a number of reasons, including because many of the misrepresentations related to new products that were only made by KGM and with which retailers and customers were

---

[47] KGM warranty representations are in manuals that promote sales and *even include offers for free K-Cups*. *Contra* MTD at 36-37; *compare Marcyan v. Nissen Corp.*, 578 F. Supp. 485, 507 (N.D. Ind. 1982), *with* AC ¶471.   KGM cites no case holding that such materials are outside the Act's scope. *See Precision IBC, Inc.*, 2011 WL 5444114, at *13 (Act applies to "just about every imaginable print and media form"); *Deston Therapeutics LLC v. Trigen Labs.*, 723 F. Supp. 2d 665, 674 (D. Del. 2010) (product insert is commercial advertising or promotion); *Ferring Pharms., Inc. v. River's Edge Pharms., LLC*, No. 09-cv-02601, 2010 WL 3087419, at *7 (D. Md. Aug. 6, 2010) (same). KGM made such misrepresentations in a variety of contexts *in addition to* manuals. *See, e.g.*, AC ¶¶474, 496-99.

[48] *See, e.g.*, AC ¶500 (misrepresentations have misled a "substantial number of consumers," have "eroded TreeHouse's goodwill," and have "decreased [] demand" from retail customers); ¶529 (misled substantial number of retailers responsible for hundreds of millions of dollars' worth in sales); *see also* AC ¶¶459-548.

unfamiliar.[49]   These misrepresentations have harmed competition by, among other things, decreasing demand for Competitive Cups.  AC ¶¶415, 459-62, 572(i), 576.  *Ayerst* disposes of KGM's argument that misrepresentations cannot cause antitrust injury.[50]

## XI.   TreeHouse Has Adequately Alleged Antitrust Injury

Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  A plaintiff establishes antitrust injury by pleading facts showing an adverse effect on competition — *i.e.*, "by alleging adverse effects on the price, quality, or output of the relevant good or service."  *N.Y. MedScan LLC*, 430 F. Supp. 2d at 146. "The alleged conduct — higher [cup] prices and market foreclosure — is facially anticompetitive and exactly the harm the antitrust laws aim to prevent."[51]   KGM's contention that TreeHouse could not have been harmed as a matter of law by KGM's conduct because TreeHouse stands to benefit from higher K-Cup prices and the release of the 2.0 lacks merit.  MTD at 12-13, 18-19; *supra* at 18.   Not only is such ungrounded speculation inappropriate at the motion to dismiss stage,[52] but TreeHouse alleges that KGM's conduct has harmed both TreeHouse and consumers by restraining TreeHouse's ability to get its products to customers who want to purchase them.[53]

---

[49] AC ¶462; *see* AC ¶415; *Ayerst*, 850 F.2d at 916-17; *Alt. Electrodes*, 597 F. Supp. 2d at 331-33.

[50] *Ayerst*, at 916-17; *contra* MTD at 23.  Nor does *Xerox I* support KGM.  As KGM notes, the plaintiff there failed to allege that the misrepresentations harmed competition.  *See* MTD at 23; *Xerox I*, 511 F. Supp. 2d at 382.

[51] *Kodak*, 504 U.S. at 478; *see, e.g.*, AC ¶¶20, 32, 36,147-48, 241, 296, 336, 549-68, 572, 575, 601, 623, 636, 662-70; *supra* 25-26; *see also Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) (limited free choices between market alternatives is antitrust injury); *compare Alt. Electrodes*, 597 F. Supp. 2d at 329 (antitrust injury from combined effect of sham litigation, foreclosed price competition, and depriving consumers of ability to purchase lower-priced products for use with device), *with* AC ¶¶47, 482.

[52] *See* MTD at 12-13, 18-19; *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011).  Further, TreeHouse did not state that the 2.0 would "help TreeHouse grow," MTD at 18, but rather noted that TreeHouse's "*solution*" to the lock-out would mean that it would still have the "*ability to continue* to grow."  *See* MTD Ex. 1 at 7 (emphasis added).

[53] *See* AC ¶¶5, 20, 25, 180, 369, 394-95, 433, 457-58, 513, 546; *Bigelow v. Unilever*, 867 F.2d 102, 111 (2d Cir. 1989) (antitrust injury where access to shelf space was reduced); *AlarMax Distribs.*, 2008 WL 2622899, at *9-10 & n.5; *Bon-Ton Stores v. May Dep't Stores Co.*, 881 F. Supp. 860, 878 (W.D.N.Y. 1994); *supra* at 3-4.

## XII.   The AC Pleads Evidentiary Facts Supporting Monopoly Power in Relevant Markets

KGM does not challenge TreeHouse's Compatible Cup Market, which is supported with detailed allegations.  *See, e.g.*, AC ¶¶105-06, 111, 113, 116, 132; MTD at 11 (conceding TreeHouse "correctly" defined this market).  Nor could it credibly do so considering that KGM recognizes the Compatible Cup Market as a distinct market in which it tracks its own market share.  *See* AC ¶112.  Accordingly, the only claims KGM has moved to dismiss on market definition grounds are the two claims that depend upon a separate brewer market in addition to the Compatible Cup Market in which TreeHouse competes — Monopoly Leveraging (Count III) and Tying (Count VI).  *See Kodak*, 504 U.S. at 479 n.29.

The definition of a relevant market is an issue of fact and can be rejected on the pleadings only if the plaintiff fails to address reasonable substitutes or alleges a market that is wholly implausible on its face.[54]  KGM argues that TreeHouse's Single-Serve Brewer Market is implausible, but ***TreeHouse's market definition was taken directly from KGM's own description of the market and its competitors set forth in KGM's contracts***.[55]  KGM's admissions are powerful evidence of the contours of the relevant market.  *See U.S. v. Am. Express*, No. 10-cv-4496, 2015 WL 728563, at *24-28 (E.D.N.Y. Feb. 19, 2015) (taking into account "public statements and litigation positions" in excluding products from market).[56]

KGM seeks to escape its admissions by making the *factual* and economic argument that the defined market must include other types of coffeemakers (such as drip coffeemakers).  MTD

---

[54] *See Todd v. Exxon Corp.*, 275 F.3d 191, 199-200 (2d Cir. 2001) ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market"); *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 & n.8 (2d Cir. 1984); *see also Kodak*, 504 U.S. at 482.

[55] *Compare* AC ¶¶65-66 (market limited to competing brewers using "a low-pressure brewing method"); *with* AC ¶¶67-68 (KGM agreements defining competing brewers as those that use low-pressure brewing methods and stating **brewers "*that would not be competitive are hopper-based single-cup coffee systems … and espresso pod-based systems*,**" which use a high-pressure brewing method) (emphasis added).

[56] Even KGM's cases establish the relevance of its admission.  *See, e.g.*, *AD/SAT, Div. of Skylight, Inc. v. Assoc. Press*, 181 F.3d 216, 228 (2d Cir. 1999) (determining market based on who parties considered to be competitors).

31

at 27-28.  But the cases KGM cited each involve a failure even to *address* why products were excluded from the market.[57]  In contrast, the AC sets forth detailed facts supporting the exclusion of other types of coffeemakers, and applies the economic test commonly used to determine the bounds of the market.[58]  Because it alleges facts offering a "plausible explanation as to why [the] market should be limited in a particular way,"[59] dismissal on relevant market grounds would be contrary to well-established authority.  *Id.*; *Kodak*, 504 U.S. at 482.

The  AC  likewise  contains  detailed  allegations  establishing  that  KGM  has  monopoly power in the Single-Serve Brewer, Portion Pack, Compatible Cup, and Office Coffee Services Markets.  "Monopoly power is 'the power to control prices or exclude competition,'" and "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market."  *Geneva*, 386 F.3d at 500.  TreeHouse has supported its monopoly power allegations with high market shares as well as with direct evidence of KGM's ability to control prices and exclude competition.

## A.    The AC Supports Monopoly Power in the Single-Serve Brewer Market

KGM controls **93%** of the Single-Serve Brewer Market, AC ¶¶83, 87-88, 90-94, which supports an inference of a "substantial monopoly" and monopoly power.  *Grinnell*, 384 U.S. at 571 (87% is a "substantial monopoly"); *Am. Tobacco Co. v. U.S.*, 328 U.S. 781, 797 (1946)

---

[57] *See Bayer Schering*, 813 F. Supp. 2d at 577 (plaintiff did not address substitutes); *Commercial I*, 166 F. Supp. 2d at 897 ("failed to allege any facts" explaining why substitutes should be excluded); *B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 172 (S.D.N.Y. 1995) (did not discuss alternatives or narrow market).

[58] *See, e.g.*, AC ¶¶69-78; *compare* AC ¶¶70-74 ("small but significant changes in the price of drip coffee-makers would not cause consumers to switch"), *with Todd*, 275 F.3d at 201-02 (cross-elasticity "exists if consumers would respond to a slight increase in the price"); *Am. Express*, 2015 WL 728563, at *24 (discussing "SSNIP" test).

[59] *Todd*, 275 F.3d at 200.  Without citing a single case, KGM asks the Court to hold as a matter of law that pricing at cost suggests a broader market or the absence of monopoly power.  MTD at 27-28.  The Supreme Court, however, has repeatedly warned that monopolists may "evade price control in the tying product through clandestine transfer of the profit to the tied product."  *Kodak*, 504 U.S. at 487 (Scalia, J., dissenting) (quoting *Fortner Enters.*, 394 U.S. at 513-14); *see Berkey Photo*, 603 F.2d at 272 ("It is not a defense to liability under § 2 that monopoly power has not been used to charge more than a competitive price …."); *Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 539 (S.D.N.Y. 2009) (no dismissal where sales were "at a low margin or a loss, hoping to earn a profit through later [aftermarket] sales") ("*Xerox III*"); AC ¶¶131, 195-209, 587.

("over 80%" is "a substantial monopoly").  This market is characterized by high barriers to entry, which bolster the inference of monopoly power,[60] and KGM has exercised its ability to restrain brewer competition.[61]  TreeHouse's allegations exceed what is required at the pleading stage.  *See In re Crude Oil*, 913 F. Supp. 2d at 51 (high share *or* direct effects support monopoly power).

### B.     The AC Supports Monopoly Power in the Compatible Cup Market

KGM admitted in 2014 that it then controlled 86% of the Compatible Cup Market *before* entering into a series of additional exclusionary contracts with which KGM recaptured much of the market share it had lost to market entrants.  AC ¶¶125, 126-30; MTD at 29-31.  KGM now controls *approximately 95%* of the Compatible Cup Market — decisively exceeding the hallmarks of a "substantial monopoly."  AC ¶¶126-30; *Grinnell*, 384 U.S. at 571.

While alleging a high market share is sufficient, *In re Crude Oil*, 913 F. Supp. 2d at 51, TreeHouse has also asserted direct evidence of KGM's monopoly power.  For example, KGM has repeatedly imposed price increases for extended periods without losing significant share and while maintaining a substantial profit margin, despite expiration of its patents.[62]  KGM has also reduced output and excluded competition by imposing unduly restrictive contracts on business partners, *e.g.*, AC ¶¶298, 555, and TreeHouse describes market characteristics that strengthen the presumption of monopoly power created by KGM's high market share, *e.g.*, AC ¶¶138, 157.

KGM argues that market shares are irrelevant because "TreeHouse is alleging a purported 'aftermarket.'"  MTD at 29-31.  This argument misapplies the law.  First, in *Kodak*, the Supreme

---

[60] *Geneva*, 386 F.3d at 501; AC ¶¶95-104 (allegations that KGM's patents, installed base, extensive exclusive brand network, and exclusive agreements create high barriers to entry in the Single-Serve Brewer Market).

[61] AC ¶89; *see, e.g.*, AC ¶291 (KGM expressly prohibits ███████ from making or selling competing brewers or from expanding its relationship with brewer competitor ████; *see also Xerox I*, 511 F. Supp. 2d at 389-90.

[62] *See* AC ¶¶132 (KGM has "profitably rais[ed] K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share"); 35 (raised prices in 2010); 198 (KGM "charg[es] a 50% margin"); 443, 453 (9% price increase in November 2014 after lock-out); *see also* AC ¶39.

Court expressly rejected "adopt[ing] any exception to the usual antitrust analysis" when assessing monopoly power in an aftermarket, noting the Court has always "treat[ed] derivative aftermarkets as it has every other separate market."  504 U.S. at 479 n.29.  Second, as every case KGM cited makes clear, the applicability of this "aftermarket" analysis hinges on a *competitive primary market* — the opposite of what is alleged here.  *Xerox III*, 660 F. Supp. at 547 (analysis applies only where "*nonmonopolist* producer of a durable good" has "monopoly power in the aftermarket") (emphasis added).[63]  The *Kodak* analysis is irrelevant here because the AC alleges that KGM has monopoly power in the so-called "primary" Single-Serve Brewer Market and uses that power to exploit consumers in the alleged "secondary" markets.  *See supra* at 10-13.

Even if a special "aftermarket" test applied, however, TreeHouse has met it.  TreeHouse asserts that consumers do not realistically determine "the lifetime cost of owning a K-Cup Brewer" or receive brewers as gifts.  *See* AC ¶¶101, 160-66, 447.  KGM ignores these allegations and seeks a determination as a matter of law — based on discredited economic *theory* — that consumers invariably will switch to a less expensive brewer after calculating the lifecycle costs of the cups and brewer.  MTD at 30; *infra* n.64.  However, KGM's argument based on an assumption of consumer rationality has been specifically rejected by the Supreme Court and has been discredited by empirical economic studies.  *Kodak*, 504 U.S. at 473-74.[64]  Because analyzing power in a derivative market necessarily requires factual analysis of "actual user

---

[63] *See also DSM Desotech, Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1345 (Fed. Cir. 2014) ("[e]ven if a manufacturer does not have power in a primary market, it still may have power in an aftermarket"); *PSI Repair Servs. v. Honeywell, Inc.*, 104 F.3d 811, 818 (6th Cir. 1997) (arguing competition in primary equipment market precludes monopoly power in components); *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 11 F. Supp. 2d 166, 167 (D. Mass. 1998) (defendant "account[ed] for less than 30 percent of the [primary] computer equipment market").

[64] *See* Lorenzo Coppi, *Aftermarket Monopolization: The Emerging Consensus in Economics*, Antitrust Bull., Spring 2007, at 57, *available at* http://www.antitrustinstitute.org/files/Aftermarket%20monopolization,%20Antitrust,%20Spring%2007,%2052,%201_081320081459.pdf ("empirical studies on lifecycle costs … contradict" the view that "consumers are rational and farsighted").  KGM "urges a radical departure in [the Supreme] Court's antitrust law" by arguing that "because [KGM] has only an 'inherent' monopoly in [complementary products] for its equipment, … the antitrust laws do not apply to its efforts to expand that power into other markets."  *Kodak*, 504 U.S. at 479 n.29.

behavior" and whether "the typical [consumer] will be deterred from switching … because of prohibitive … costs," *Xerox III*, 660 F. Supp. 2d at 547-48, courts have declined to dismiss complaints that allege facts supporting the *Kodak* factors.  *See, e.g.*, *Xerox I*, 511 F. Supp. 2d at 386-87 (dismissal denied where plaintiff alleged "purchasers could not arrive at an accurate lifecycle price").[65]  Thus, even assuming that the *Kodak* standard applies (which TreeHouse disputes) TreeHouse's AC must survive the pleading stage under KGM's own authority.

### C.    The AC Supports Monopoly Power in the Office Coffee Services Market

KGM sells **95% of K-Cup Brewers supplied to offices** through the "Away-From-Home" distribution channel, AC ¶88, and has excluded Competitive Cup competitors from at least **80% of the OCS market**, AC ¶¶180, 349, 350, which supports a finding of monopoly power with both direct evidence and an inference from KGM's market share.  *See supra* at 32.  The OCS Market Segment satisfies the requisite market definition and market power tests because TreeHouse has pled the "practical indicia" courts consider in the market definition analysis, including "distinct customers, distinct prices, … and specialized vendors."  *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325 (1962); *Pepsico*, at *5.[66]  OCS customers managing an office break room for employees have different requirements than retail consumers purchasing for their individual home use and as a result purchase Compatible Cups through a network of distributors that create substantial efficiencies for office customers, which cannot be replicated by purchasing through the "At-

---

[65] *See also DSM Desotech*, 749 F.3d at 1346-47 (Fed. Cir. 2014) (summary judgment); *SMS Sys.*, 11 F. Supp. 2d at 170 (same).  As this Court held, *Hack*, 237 F.3d at 85-87, is distinguishable where, as here, customers used to be able to purchase the lower-priced products and thus would have expected to be able to do so.  *See, e.g.*, *Commercial II*, 2002 WL 1205740, at *7.  Contrary to KGM's misrepresentation, TreeHouse *did not* plead that KGM designed "its original system (the '1.0') as a 'closed' system."  *Compare* MTD at 3 (citing AC ¶199), *with* AC ¶199.

[66] The "OCS Market Segment" is a "submarket" for which the "definition turns on the same inquiry as a 'market' definition."  *PepsiCo*, 1998 WL 547088 at *5 (collecting cases); 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶533c, at 254-57 (3d ed. 2007) (courts consider the same criteria for evaluating submarkets and markets).  KGM sells different brewers that are professionally installed and maintained by OCS distributors at different price points to OCS customers.  AC ¶¶173-76; *see also Geneva*, 386 F.3d at 497 (different prices indicate separate markets).

Home" retail channel.  *See PepsiCo*, at *6 ("appropriate to limit a market to a discrete channel of distribution" where "enough customers do not view other methods of distribution as viable substitutes"); AC ¶¶181, 355-57.  "[N]umerous courts have defined product markets by reference to a channel of distribution."  *PepsiCo*, 1998 WL 547088, at*7; *see id.* at *1, 9.[67]

## XIII.   The AC States a Sham Litigation Claim

KGM's sham lawsuit asserted that *consumers who used TreeHouse cups in KGM brewers* were *direct infringers* of KGM *brewer patents* (***not*** cup patents) and that TreeHouse was indirectly liable as an *inducer* of consumers' patent infringement.  *See* AC ¶¶31, 229, 595; *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1372 (Fed. Cir. 2013).  The Federal Circuit correctly observed that consumers who purchase a product are free to do with it as they please without fear of infringement.  Logically, given that there was no direct infringement, TreeHouse could not be liable for inducement either.  *Id.* at 1374-75.  In affirming dismissal, the Federal Circuit held that the theory was a meritless "end-run" around the law in a "attempt[] to impermissibly restrict purchasers of Keurig brewers from using non-Keurig cartridges."  *Id.* at 1372-74.  Now KGM asks this Court to substitute its judgment *as a matter of law* for that of the Federal Circuit which ruled, on a full record, that KGM's case lacked merit.

TreeHouse has more than sufficiently pled a sham litigation claim based on these and other facts alleged in the AC.  *See In re DDAVP*, 585 F.3d at 694.  First, the AC pleads facts demonstrating that the prior litigation was "objectively baseless," as "no reasonable litigant could have realistically expected to succeed on the merits."  AC ¶231; *see* AC ¶¶40-43, 226-30,

---

[67] *See, e.g.*, *Geneva*, at 498 (holding distribution chain that was "different in important ways" a separate market); *compare PepsiCo*, 1998 WL 547088, at *1 (because distributors offer "one-stop shopping" for "logistical and economic reasons, these accounts make it a practice to have only a single foodservice distributor"); *with* AC ¶¶355-57.  Unlike the case in *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, the AC's allegations are based on economic interchangeability in that OCS customers will not substitute retail purchases for OCS distributor purchases to any degree that could restrain pricing.  124 F.3d 430 (3d Cir. 1997); *see PepsiCo*, 1998 WL 547088, at *11 (distinguishing *Queen City* because "PepsiCo allege[d] a market based on consumer demand, not on contractual restrictions").

235-38, 594-600.[68]  KGM ignores the fact that after KGM lost in the district court, the Federal Circuit also concluded that its claims were baseless.[69]  The court stated, for instance, that "[i]f Keurig were allowed to assert its claims …, the effect would be to *vitiate* the doctrine of patent exhaustion," and "[p]ermitting Keurig to recover multiple times on its patented brewers … would be contradictory to [existing] policies and the law."[70]

Second, TreeHouse alleged facts showing that KGM instituted the lawsuit "in bad faith," AC ¶¶229, 595, and "in an attempt to interfere with TreeHouse's ability to compete."[71]  This is the only reasonable conclusion from the totality of KGM's actions and an objective assessment of KGM's claims.  Indeed, the Federal Circuit reached precisely this conclusion in holding that KGM wrongfully filed its suit to make an "end-run" around the patent laws with a "tactic that the Supreme Court has explicitly admonished."  *See* AC ¶¶42-43, 236-37, 597-98.  Rather than pursuing a legitimate purpose, KGM "attempt[ed] to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law."  *Id.*

TreeHouse also adequately alleged that KGM's actions caused antitrust injury.  The sham litigation caused TreeHouse to incur years of litigation fees and costs, AC ¶602, a "well recognized type of antitrust injury" in such a claim.  *Bio-Tech, Gen. Corp. v. Genentech Inc.*, 886

---

[68] The fact that Sturm did not seek attorney's fees in the Delaware Court cannot lead to an inference that Sturm believed KGM's claims were not objectively baseless.  Sturm timely enforced its rights, filing the complaint in this case less than 30 days after KGM's deadline to file a petition for writ of certiorari to the Supreme Court expired.

[69] *See* AC ¶¶236-37; *see also Tyco Healthcare Grp. v. Mut. Pharm. Co.*, 762 F.3d 1338 (Fed. Cir. 2014) (other court's finding claim wholly without merit held probative); *Teva Pharma. v. Abbott Labs.*, 580 F. Supp. 2d 345, 364 (D. Del. 2008) (objective baselessness where Federal Circuit opined issue was clear).

[70] *Keurig*, 732 F.3d at 1372-74 (emphasis added).  KGM's contentions that Sturm "did not win all of the claims" and "withdrew" its motion to dismiss are misleading.  Contrary to Keurig's representation, Sturm did not withdraw this motion.  Instead, Keurig amended its complaint to address the deficiencies.  If anything, Keurig's threadbare original complaint supports an inference that Keurig filed suit to inflict cost on Sturm and *not* as Keurig argues, to assert a claim on which it thought it would prevail.  Further, Keurig did not obtain a final victory on any claim; the district court and the Federal Circuit dismissed its patent claims; and its other claims settled.  *See, e.g.,* AC ¶230.  Even "[s]urviving summary judgment" fails to "establish that a lawsuit is not a sham."  *In re Neurontin Antitrust Litig.*, MDL No. 1479, 2009 WL 2751029, at *22 (D.N.J. Aug. 28, 2009); *see Teva Pharm.*, 580 F. Supp. 2d at 365.

[71] AC ¶¶238, 601; *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993); *TransWeb, LLC v. 3M Innovative Props. Co.*, No. 10-cv-4413, 2011 WL 2181189, at *15-16 (D.N.J. June 1, 2011) (subjectively baseless upon "series of events" that "shed light on [ ] intent to drive [plaintiff] out of the market").

F. Supp. 377, 380 (S.D.N.Y. 1995).  Contrary to the factual argument KGM makes that the sham litigation actually *benefitted* TreeHouse, TreeHouse alleged that such litigation caused it to lose many potential customers who thought that they too would be sued for infringement.  AC ¶43. TreeHouse further alleged that as a consequence of KGM's baseless lawsuit and appeal, "[c]ompetition in the market for Compatible Cups has … been harmed."  AC ¶602.  This harm to competition was also caused by KGM's pursuit of a similar baseless litigation against Rogers and "threaten[ing] baseless patent infringement lawsuits against other competitors."  AC ¶¶239-40.  TreeHouse has thus met the showing required for this fact-intensive claim.[72]

## XIV.   The AC States a Patent Misuse Claim

At the pleading stage, a patent misuse claim "requires only allegations of conduct that had the effect of impermissibly extending the limited protection from competition afforded by the … patent," which TreeHouse has pled.[73]  First, the same facts that support TreeHouse's tying claim also support a claim for per se patent misuse.  *See Bausch & Lomb, Inc. v. Allergan Inc.*, 136 F. Supp. 2d 166, 169 (W.D.N.Y. 2001); *supra* Section IV.  Flouting the decisions by two federal courts that KGM cannot impermissibly extend its *brewer* patents to prevent the sale of Competitive Cups, *see* AC ¶¶236-39, KGM continues impermissibly to tie the purchase of its patented brewers to purchases of its non-patented K-Cups, thereby effectively expanding the *scope* of KGM's *brewer* patents to cover unpatented *cups*.[74]  Second, TreeHouse independently met the patent misuse pleading requirements with its sham litigation allegations.  *See Marchon*

---

[72] *See, e.g.*, *Alt. Electrodes*, 597 F. Supp. 2d at 331 (allegation that case was subjectively and objectively baseless enough); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07-cv-7343(HB), 2008 WL 169362, at *5 (S.D.N.Y. Jan. 18, 2008) (no dismissal where petition had "no reasonable chance of success"); *ICOS Vision Sys. Corp. v. Scanner Techs. Corp.*, No. 05-cv-6322 (DC), 2006 WL 839890, at *5 (S.D.N.Y. Mar. 29, 2006) (allegations defendant knew patent did not infringe and threatened litigation "is all that need be alleged at this early stage"); *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 375-76 (S.D.N.Y. 2002) (no dismissal if repeatedly argued baseless position).

[73] *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 349 (D.N.J. 2009); *see B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1428 n.5 (Fed. Cir. 1997) (can seek declaratory judgment of misuse); *Linzer Prods. v. Sekar*, 499 F. Supp. 2d 540, 552-53 (S.D.N.Y. 2007); *see, e.g.*, AC ¶¶4, 137, 331-39, 603-10.

[74] *See Braun*, 124 F.3d at 1426; AC ¶¶2, 241-43, 340-48, 608 (tying unpatented K-Cups to patented brewers).

*Eyewear v. Tura LP*, No. 98-cv-1932, 2002 WL 31253199, at *9 (E.D.N.Y. Sept. 30, 2002); *supra* Section XIII. Third, TreeHouse alleges that KGM demands license and royalty fees from TreeHouse and other competitors as a condition for the right to legitimately sell Competitive Cups.[75] Making royalty demands based on expired patents is patent misuse. *See Brulotte v. Thys Co.*, 379 U.S. 29, 30-34 (1964); *Beckman Instruments, Inc. v. Technical Dev. Corp.*, 433 F.2d 55, 61 (7th Cir. 1970).

TreeHouse has also alleged a continuing, live controversy. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007); *Micron*, 518 F. 3d at 902 (lenient standard enhances availability of declaratory judgment). An ongoing controversy is demonstrated by KGM's: (1) expanding number of tying agreements; (2) history of baseless litigations;[76] and (3) continued demands for licenses.[77] Finally, as patent misuse is "fact-intensive," *Braun*, 124 F.3d at 1426, it would be improper to dismiss such a claim at this stage. *See Bausch*, 136 F. Supp. 2d at 170-71.

## XV. The AC States Claims Under State Antitrust Laws

Because TreeHouse has sufficiently alleged claims under the Sherman Act, its state claims are sufficiently pled as well.[78] Indeed, the pleading requirements for TreeHouse's state antitrust claims are *less* stringent than those brought under the Sherman Act. *See, e.g.*, *People ex rel. Scott v. Schwulst Bldg. Ctr.*, 89 Ill. 2d 365 (1982) (state law more broadly construed);

---

[75] AC ¶607; *see* AC ¶¶137, 331-36 (statements regarding "licensees," "authorized" or "approved" brands suggest the same); 17, 335, 339 (threats); 503-17 (refers to Competitive Cups as ▮▮▮▮▮▮ to major retailers).

[76] *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 901 (Fed. Cir. 2008); *Prasco, LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008) ("[p]rior litigious conduct" should be considered).

[77] *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1378-79, 1381-82 (Fed. Cir. 2012) (ongoing controversy from statement "licenses are available"). KGM's licensing demands render irrelevant any assertion that it does not intend to sue. *See SanDisk Corp. v. STMicroelectronics*, 480 F.3d 1372, 1378-82 (Fed. Cir. 2007) (declining to hold "direct and unequivocal" "promise not to sue" eliminates controversy created by "need" to be licensed; defendant was "engaging in the kinds of 'extra-judicial patent enforcement … that the Declaratory Judgment Act was intended to obviate"); *Knowles Elecs., LLC v. Analog Devices, Inc.*, No. 11-cv-6804, 2012 WL 1405735, at *2 (N.D. Ill. Apr. 23, 2012); *accord Prasco*, 547 F. 3d at 1338 (patentee can cause injury by demanding the right to royalty payments).

[78] *Gatt Commc'ns, Inc. v. PMC Assocs.*, 711 F.3d 68, 81 (2d Cir. 2013); *Baker v. Jewel Food Stores*, 355 Ill. App. 3d 62, 91 (2005); *Olstad v. Microsoft Corp.*, 284 Wis. 2d 224, 246-47 (2004).

*Williams v. Citigroup, Inc.*, 104 A.D.3d 521, 521-22 (N.Y. App. Div. 2013) (refusing to dismiss state claims where federal claims dismissed); *Town of Hallie v. City of Chippewa Falls*, 314 N.W.2d 321, 323 (Wis. 1982).

## XVI.   The AC States Claims Under State Unfair Competition Laws

KGM did not move against TreeHouse's Illinois claim (AC ¶¶646-49), and concedes that its Wisconsin claim (AC ¶¶658-61) survives if the AC alleges conduct that is "actionable under another statute or the common law."  MTD at 39.  Because TreeHouse has alleged violations of other statutes and common law, this claim is adequately pled.  *Supra*, Sections I-XV; *see Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119, 1123 (7th Cir. 1995).

## XVII.   The AC States New York, Illinois, and Wisconsin Interference with Business Claims

KGM asserts that TreeHouse has failed to allege tortious interference with prospective business expectancy under Illinois law because "competition is a complete defense," MTD at 39, but this exception applies only if the "defendant's actions are not … anti-competitive." *E-One, Inc. v. Oshkosh Truck Corp.*, 2006 WL 3320441, at *3 (N.D. Ill. 2006).  The exception asserted under New York law for actions "in furtherance of normal economic self-interest," MTD at 39, likewise does not apply where conduct is "independently tortious."  *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 535-36 (S.D.N.Y. 2013).  KGM complains that "TreeHouse makes factual allegations of only one contract," which "TreeHouse fails to allege Keurig knew of," and that pre-termination statements were "about warranty, which are not alleged to be the but/for cause of termination."  MTD at 39-40.  These arguments misstate TreeHouse's allegations.[79]

## CONCLUSION

For all the reasons stated above, TreeHouse respectfully requests that Defendant KGM's Motion be denied.

---

[79] *See, e.g.*, AC ¶¶672-73, 686-87 ("KGM knew of TreeHouse's contracts with these customers and intentionally interfered in order to persuade the customers to breach or end their contracts with TreeHouse …."); 501-28.

Dated:   New York, New York                WINSTON & STRAWN LLP

        April 10, 2015                          Attorneys for Plaintiffs


By:   s/ Aldo A. Badini
        Aldo A. Badini
        abadini@winston.com
        Susannah P. Torpey
        storpey@winston.com
        WINSTON & STRAWN LLP
        200 Park Avenue
        New York, New York 10166
        (212) 294-6700

        Dan K. Webb
        dwebb@winston.com
        James F. Herbison
        jherbison@winston.com
        WINSTON & STRAWN LLP
        35 West Wacker Drive
        Chicago, IL 60601-9703
        (312)  558-5600

        Diana L. Hughes
        dhughes@winston.com
        WINSTON & STRAWN LLP
        333 South Grand Avenue
        Los Angeles, CA 90071
        (213) 615-1700