F79VKEUA

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE:  KEURIG GREEN MOUNTAIN
     SINGLE-SERVE COFFEE ANTITRUST
4    LITIGATION,                          14 MD 2542 (VSB)

5    ------------------------------x
                                          ARGUMENT
6

7

8                                         New York, N.Y.
                                          July 9, 2015
9                                         10:40 a.m.

10
     Before:
11
                        HON. VERNON S. BRODERICK,
12
                                          District Judge
13

14
                             APPEARANCES
15
     WINSTON & STRAWN
16        Attorneys for Plaintiffs Treehouse Foods, Inc.,
          Bay Valley Foods, LLC, and Sturm Foods, Inc.
17   BY:  ALDO A. BADINI
          DAN K. WEBB
18
     ROBINS KAPLAN
19        Attorneys for Direct Purchaser Plaintiffs
     BY:  BERNARD PERSKY
20
     MORGAN LEWIS & BOCKIUS
21        Attorneys for JBR, Inc.
     BY:  DANIEL JOHNSON, JR.
22

23

24

25
```

2

F79VKEUA

1                            APPEARANCES (continued)

2   KAPLAN FOX & KILSHEIMER
         Attorneys for Indirect Purchaser Plaintiffs
3   BY:  ROBERT N. KAPLAN
         -AND-
4   WOLF HALDENSTEIN ADLER FREEMAN & HERZ
    BY:  THOMAS H. BURT
5
    CLEARY GOTTLIEB STEEN & HAMILTON
6        Attorneys for Keurig Defendants
    BY:  GEORGE S. CARY
7        LEAH BRANNON
         ELAINE EWING
8        LEV L. DASSIN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F79VKEUA

```
 1              (Case called)
 2              THE COURT:  Is there anything preliminarily that the
 3   parties need to raise with me?
 4              Anything from plaintiffs?  No?
 5              Defense?  Okay.
 6              MR. CARY:  No, your Honor.
 7              THE COURT:  Fantastic.
 8              So, Mr. Johnson, I understand -- and I don't know what
 9   order -- we don't necessarily have to go in the order that's in
10   the order, but that's what I was planning on doing, if that's
11   okay.
12              MR. JOHNSON:  That's fine with me, your Honor.
13              THE COURT:  Okay.  So, Mr. Johnson, I understand that
14   you're going to be handling the issue of substantial
15   foreclosure for the plaintiffs.
16              MR. JOHNSON:  That's correct.
17              THE COURT:  Okay.  Are you ready to proceed?
18              MR. JOHNSON:  Oh, me, sure.
19              THE COURT:  Oh, you're right.  I'm sorry.
20              Sorry.  Defense.
21              Okay.  I'm sorry.  Are you ready to proceed?
22              MR. CARY:  Yes, your Honor, we're ready to proceed.
23              THE COURT:  All right.
24              MR. CARY:  Your Honor, these complaints should be
25   dismissed because they do not establish substantial
```

F79VKEUA

1   foreclosure.

2           "Substantial foreclosure" means an inability to

3   compete.  It doesn't mean you don't like the results of the

4   competition; it doesn't mean you didn't win a contract you

5   wanted to win; it doesn't mean that you're not able to sell to

6   a single retailer for three years till the contract expires.

7   It means that there's been an impact on the competitive process

8   such that you are not able to compete.  They have not

9   established that.  In fact, to the contrary, they've

10  established the opposite in their complaint.

11          And before I proceed to elaborate on that, I'd like to

12  ask for five minutes of rebuttal at the end of the

13  presentation, sticking within the guidelines of timing that you

14  elaborated in your order.

15          THE COURT:  Okay.  That's fine.

16          MR. CARY:  So what have they said here?

17          What they've said here is that they sell to retailers,

18  they sell to club stores, they sell to wholesale stores.  They

19  are able to compete for that business.

20          On the retail side, in the various complaints, they

21  allege, in combination, six retailers that they allege have

22  been foreclosed to them.  They don't say how long the contracts

23  are with Keurig, but the contracts that are attached to the

24  complaint and the earlier complaint establish that they are for

25  a limited duration.  Six retailers, among both or all four of

F79VKEUA

1    the complaints.

2         JBR cites a couple of retailers, office super stores.

3    Treehouse cites a couple of retailers.  That is not substantial

4    foreclosure.  In fact, in the *News Corp.* case that we've cited

5    in our brief, the court dismissed the complaint, alleging

6    35,000 retailers were under exclusive agreement.  Why?  Because

7    they didn't establish how many other retailers there are; they

8    didn't establish that those contracts could not be competed

9    for, because they come to an end at some point.  And we have

10   the same situation here.  There is no substantial foreclosure

11   that prevents them from reaching the consumer.

12         They also cite allegations of exclusive dealing

13   arrangements with input suppliers.  But, again, their own

14   complaints establish that they have been able to secure those

15   inputs.  They are able to compete.  Without an inability to

16   compete, there is no foreclosure case; there is no substantial

17   foreclosure at all.

18         On the inputs that we're talking about, they go

19   through a variety of different inputs, and they say, Well, it

20   was harder for us to get that, or we had to find our own

21   suppliers.  For example, plastic cups.  Plastic cups are

22   ubiquitous in the economy; you can buy plastic cups, they are

23   extruded plastic.

24         What they say is, Well, Keurig K-cup plastic cups have

25   a particular thickness, and they work with a particular lid

F79VKEUA

1   that is calibrated to particular pressures.  And unless we are

2   able to use the suppliers that Keurig has worked with to

3   develop these cups, it's going to cost us more to get into the

4   market.  Well, yeah, you have to make an investment if you want

5   to be in a market.  If you want to compete, you have to invest

6   to develop the product.  That goes without saying.

7        There's nothing in an agreement between Keurig and its

8   plastic cup supplier where they've worked together to develop a

9   cup with particular tolerances that precludes anybody else from

10  doing it.  What do they say about whether others can do it?

11  They say, We've done it.  They cite Mother Parkers, who's done

12  it.  They cite a variety of brands.  I think there are nine

13  brands that they mention as making K-cup-compatible portion

14  packs that have done it.

15       JBR doesn't even need a cup.

16       So how can you be substantially foreclosed from a

17  market if you don't even need the input that you're alleged is

18  under exclusive agreement?

19       The allegations don't make sense.  Their own complaint

20  establishes their ability to compete.  And again, to the extent

21  that Treehouse says, Well, we need a cup, the issue is not

22  Treehouse or any other single producer.  The issue is has

23  competition been foreclosed.

24       So JBR doesn't use a cup.  They haven't been

25  foreclosed at all; they can complete.  The competitive process

F79VKEUA

1   is alive and well.

2            They say the same thing on foil lids, again,

3   ubiquitous in the economy.  They don't need to use our

4   suppliers of aluminum foil lids; they can get their own, they

5   have gotten their own.  They do compete.  Not substantial

6   foreclosure.

7            They talk about equipment.  Here, again, all of the

8   percentages they give are percentages of what Keurig is

9   producing.  So they don't allege that they can't get equipment;

10  in fact, they allege they got the equipment to make the

11  product.  They allege that there are several manufacturers of

12  the equipment in Europe, and only one of them is under contract

13  with Keurig.

14           JBR affirmatively alleges that an equipment

15  manufacturer came to them and said, We have a piece of

16  equipment.  We want to get you in the portion pack business.

17  No impact on competition.  The process, the competitive

18  process, has not been in any way damaged here.

19           So bottom line, your Honor -- I see that my time is

20  running a little bit short -- but bottom line here is that they

21  have not made the requisition allegations of an impact on

22  competition.  They are able to address the customers; they are

23  able to compete in the marketplace; they are able to grow.

24           And I'll close with a document from Treehouse that's

25  cited at paragraph 469 of their complaint where Treehouse, as

F79VKEUA

1    late as the last quarter of 2014, said, We've grown by 40

2    percent over the last year.  We can assure you there's still

3    room for one and all.  We expect to achieve a triple double in

4    full year 2014, with double-digit gains and revenue, operating

5    income, earnings per share.

6              So these companies entered the marketplace while these

7    agreements were in place, these so-called exclusionary

8    agreements were in place.  They entered the market, they grew,

9    they expanded, they were able to compete while these agreements

10   were in place.  They continue to compete today.  Their growth,

11   they project, is going to grow at double-digit levels.  No

12   substantial foreclosure.

13             THE COURT:  Let me ask this, because with regard to

14   the growth issue, I know you cite *CDC Technologies* and indicate

15   that the plaintiffs' sales have increased, which you just

16   indicated, but are there cases -- CDC required -- in addition

17   to the growth, that were other issues that CDC considered.

18             Are there any cases that have indicated that the

19   plaintiff has to plead loss sales to stay in an exclusive

20   dealing claim that you're aware of?

21             MR. CARY:  We are not asserting that they have to

22   allege loss sales.  In fact, loss sales is the result of

23   competition.  That's what happens; you win and you lose.

24             There are cases that make clear that if you're able to

25   compete and grow, then you're not foreclosed.  Even if you're

F79VKEUA

1   not able to grow, if the competitive process has not been

2   injured, if customers are just choosing not to buy your

3   product, then there's not substantial foreclosure.

4           And a long line of cases establishes that if the

5   defendant is able to show that others have entered the market

6   and grown in the face of the contracts, that that is enough to

7   demonstrate that the competitive process is alive and well.

8           THE COURT:  Okay.  And I apologize.  You had mentioned

9   a paragraph, and I hadn't had the complaint open.  400 and

10  what?

11          MR. CARY:  69.

12          THE COURT:  69.  Okay.

13          In paragraphs 262 through 278 of Treehouse's amended

14  complaint, there's discussion with regard to Winpak, Phoenix,

15  and Kurwood with regard to foreclosure, which Treehouse claims

16  foreclosure of 100 percent in the plastic cup supply industry

17  that exists in the United States at the time.

18          And I know that other entities have entered into that

19  market; but, as I understand it, there's still three suppliers

20  that -- at least in the United States -- supply 90 percent of

21  those -- they have a 90 percentage share of the market.

22          Why wouldn't that be sufficient at a pleading stage to

23  allege substantial foreclosure?

24          MR. CARY:  Your Honor, this is a slight of hand.  The

25  way they get to those numbers is to look at Keurig's production

F79VKEUA

1   as a percentage of all K-cup production.  Then they say Keurig

2   suppliers account for production equivalent to Keurig's sales

3   of K-cups.

4        Well, yes, Keurig has a very big share of K-cups.  So

5   whoever supplies it, whatever company supplies it, is going to

6   have a high share of K-cups.  That's circular.

7        The question is are there other producers that could

8   produce the cup?  They allege that there are other producers

9   that could produce the cup.  They say, What we would have to do

10  is invest to figure out how to make the cup and the foil, and

11  how to attach it, and the pressures so that the needle can

12  pierce it and all of that.  They allege they have to do some

13  homework in order to get those cups.  They allege that we did

14  that homework, and now we have all the cups we need; we are not

15  precluded because we can't use Keurig suppliers.

16       So these numbers that they cite are simply equivalent

17  of Keurig's market share equals those inputs.  They define the

18  market as the inputs used today in Keurig cups.  They don't

19  define it as all of the plastic cups available in the world

20  that we could have bought.

21       THE COURT:  You mentioned the world.  And I know that

22  you make the point, I think in your brief, that they should

23  look -- or at least they haven't looked outside of the U.S.

24       What is the legal basis for that?  In other words, if

25  the markets have been defined as within the United States in

F79VKEUA

```
1    this regard, why should they need to look outside of the U.S.?

2              MR. CARY:  Right.

3              So with respect to the cups and the foil, I don't

4    think they allege that they can't buy cups and foil within the

5    United States.  They can.  They do.  That's fine.  It's with

6    respect to the equipment.

7              So on the equipment, they are saying we are foreclosed

8    from buying the equipment.  They then say, We've gotten the

9    equipment.

10             But they also say that there are manufacturers in

11   Europe that produce the equipment, and they affirmatively

12   allege that Keurig has purchased from one of those

13   manufacturers.  So to the extent that Keurig has purchased from

14   that manufacturer, to the extent that those manufacturers

15   operate globally, JBR, for example, says an Italian

16   manufacturer came to us and solicited our business to make a

17   machine for us to make portion packs.

18             That establishes, by their own facts, a global market

19   for this equipment.  Keurig buys globally, JBR buys globally,

20   it's all in the complaint.

21             Having established a global market, then the question

22   is whether they are precluded from buying the equipment they

23   need to compete as a result of exclusive dealing arrangements

24   with Keurig.  What they allege there is Keurig has agreements

25   with its providers, but there are other providers, and we are
```

F79VKEUA

1    buying from them, and they are soliciting us.  No foreclosure.

2    They are able to compete by buying from the other producers.

3         And to simply say, We have an exclusive with a

4    manufacturer in the United States and, therefore, we have to go

5    to Europe does not establish an anticompetitive foreclosure.

6         THE COURT:  Okay.  Thank you.

7         Mr. Johnson, now you're on.

8         MR. JOHNSON:  First, the last comment is illustrative

9    of all the problems that we see in this motion to dismiss.

10        He just made arguments based upon facts which we're

11    not pleading, and which he now asserts somehow preclude us from

12    going forward.

13        The test I think is important here.  And that is, in a

14    motion to dismiss, you have to look at the complaint.  All we

15    have to do is allege sufficient facts to raise the right to

16    relief, and it's got to be above a speculative level.  That's

17    what *Twombly* holds.

18        And what we've seen here in these briefs is nothing

19    more than arguing about what they may want to assert for

20    summary judgment; but that's not what they are here to do.

21    None of his assertions can be incorporated into the complaint.

22    He is limited to arguing what have we pleaded.

23        The other point that I'd like to emphasize from a

24    legal standpoint is that it's improper to consider any such

25    assertions that are not part of the complaint, and it would be

F79VKEUA

1   reversible error.  And I would cite to you the *DuPont v. Kolon*

2   case.  And not only that, if there were two plausible

3   inferences, the Court has to adopt the inference that supports

4   the complaint.  Those are basic issues.

5           Now, let's talk about substantial foreclosure.

6           First of all, he acts as if substantial foreclosure

7   covers all the allegations in the case.  It doesn't.

8   Substantial foreclosure only applies in exclusive dealing

9   cases; and that's the result of *Tampa Electric*.  So when you

10  look at this complaint, you have to say to yourself, What is

11  not covered, and that's everything else.  That's 16 causes of

12  action that are not affected by the question of what

13  constitutes substantial foreclosure.

14          And my slide show is lacking, but that's okay.

15          So first question -- hand the hard copy to the judge.

16          Your Honor, may we approach?

17          THE COURT:  Sure.

18          Do you want some time to try and work out the

19  electronics?

20          MR. JOHNSON:  No.  We have too many people, all of

21  whom are happily awaiting either their turn or to get out.

22          THE COURT:  Thank you.

23          MR. JOHNSON:  So if you will, your Honor, if you go to

24  the third slide in, you see these are the causes of action that

25  have no impact whatsoever on the test of substantial

F79VKEUA

foreclosure.  And that includes monopolization tieing,

anticompetitive product redesign, sham litigation, patent

issues, conspiracy, attempted monopolization, Lanham Act,

Cartwright Act, all the common law claims, false advertising,

unfair competition, and intentional interference.

          So we are talking about exclusive dealing and

exclusive dealing only.

          Now, the question for the Court is what's the test

that we have to plead to establish exclusive dealing?  And that

is we have to allege that there has been an exclusive

agreement; that there's been an unreasonable restraint of trade

either by actual adverse effect on competition or a substantial

foreclosure of competition in the relevant market.

          Now, you'll notice in the argument there was no

discussion of competition involving retailers, roasters, and

distributors.  He talked to you about plastic cups.  The

essence of this case is not about plastic cups.  While that's

certainly part of Treehouse's claim, the fundamental problem we

have here, your Honor, is the myriad of exclusive dealing

arrangements that are currently in place with the majority of

the major brands in America, virtually all of the distributors

for the away-from-home market, as well as the agreements that

cover the other ways in which we can distribute product.

That's not something that is made up.  I will show you exactly

where it is in the complaint.

F79VKEUA

1          But he told you the test for substantial foreclosure.

2     And he said, As long as you can compete, there's no substantial

3     foreclosure.  That is not now, nor has it ever been, the test.

4          As you will see, if you look at *State of New York v.*

5     *Actavis*, a Second Circuit case, 2015:  For there to be an

6     antitrust violation, competing products need not be barred from

7     all means of distribution if they are barred from the

8     cost-efficient ones.

9          So the basic legal premise he started on is wrong.

10         So the question is did we allege in our various

11    complaints that, in fact, we have been barred from

12    cost-efficient means of distribution.  And the answer is yes,

13    we had.

14         First, let's talk about the numbers test, since we

15    heard so much about that -- or we read so much about it.  The

16    test for substantial foreclosure is not 100 percent.  Courts

17    have held repeatedly that less than 40 percent foreclosure in a

18    market or portion of a market is sufficient.

19         THE COURT:  Mr. Johnson, when you said 40 percent in

20    those cases, I apologize for interrupting, was that at the

21    pleading stage or was that a summary judgment case?

22         MR. JOHNSON:  Right.  And, your Honor, that's a great

23    point.

24         The cases that they cite were all at the summary

25    judgment stage or after trial.  At the pleading stage, the

F79VKEUA

1    courts are much more lenient.  They simply say you have to

2    allege that you've been substantially foreclosed, and show the

3    way in which it has happened.

4          And a good illustration of that is what happened in

5    the *U.S. v. Visa*, which happened after a trial, and in the

6    *Microsoft* case, which also happened after trial.

7          But the one case where it was at the pleading stage

8    and we were talking about exclusive agreements was found in the

9    recent decision in *DuPont v. Kolon*, 637 F.3d 435.  That's a

10   Fourth Circuit case in 2011, your Honor.  And if you go to

11   middle of the slide deck -- I guess we are not going to get it

12   up.

13         The interesting thing about the *Kolon* case is they had

14   a situation in which DuPont had exclusive dealing arrangements

15   with several of its customers that enabled it to basically sell

16   fiber-optic fiber.  And that fiber-optic fiber had allowed them

17   to get over 75 percent of the market.

18         Their competitors came in, one of whom was a Taiwanese

19   company, *Kolon*, and had been sued for trade secret violation

20   and countersued for antitrust.

21         Your Honor, if you go through the deck, about midway,

22   you'll see the slide at page 19.

23         THE COURT:  19.

24         MR. JOHNSON:  Now, what we've done here is done a

25   comparison of what -- this is, again, a pleading case -- a

F79VKEUA

1     comparison of what was at issue in *Kolon* from a pleading

2     standpoint, and what is pleaded in our case.  And what you see

3     is there are multi-year supply agreements.  In the *Kolon* case

4     they only required 80 to 100 percent of this pyramid fiber to

5     be purchased, and then there was a "meet and release."  In

6     other words, DuPont had the right to match.  And there was not

7     a limit on the overall volume.

8          What's interesting is one of the issues here is

9     percentages and whether we have to show.  What the court in

10    *Kolon* said, and I want to read it:  While *Kolon* did not allege

11    a specific percentage of market foreclosure in its

12    counterclaim, it would be problematic to reject its

13    counterclaim with its extensive factual allegations solely on

14    that basis at the prediscovery, motion-to-dismiss stage, when

15    Kolon likely has insufficient information to calculate a

16    precise number.

17          So that's the correct standard.

18          Now let's see what we actually did.

19          Number one, we identified not one, we identified

20    numerous KAD agreements that have long-term, multi-year

21    contracts.  Those long-term contracts were from five and

22    sometimes at long as ten years.  And you'll find that at our

23    paragraph 87.  These brand agreements, which is a separate

24    group --

25          THE COURT:  Paragraph 87 of which amended complaint?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

F79VKEUA

1            MR. JOHNSON:  I'm sorry?

2            THE COURT:  Paragraph 87.

3            MR. JOHNSON:  Of the JBR complaint, your Honor.

4            THE COURT:  All right.

5            MR. JOHNSON:  I have a particular fondness --

6            THE COURT:  I figured that, but I just wanted to be

7    clear.  I'm sorry, go ahead.

8            MR. JOHNSON:  If you look at JBR, paragraph 125, what

9    you'll see is we then go over the scheme involving the brands.

10   And we identify all of the brands in our complaint.  And

11   unfortunately I can't flip back through the slides for you, but

12   if you go to paragraph 125, you'll see it's all detailed there.

13           So what we have here is a situation where the *DuPont*

14   case was less restrictive and still was unable to succeed with

15   a motion to dismiss.  Our case, these agreements were much more

16   restrictive.

17           And I'd like to, if I might, go back to the

18   away-from-home market, where we allege in our paragraph 73 that

19   45 percent of all portion packs sold in the United States occur

20   in the away-from-home market.  And we are barred from that

21   market by these distribution agreements, which means we've

22   already met the percentage requirements of the courts just in

23   that market alone.

24           Now, we also allege -- and this is in Treehouse's

25   complaint, 185 -- that there are over 500 KAD agreements; and

F79VKEUA

that of the portion pack manufacturers who have exclusive

agreements with Keurig, over 80 percent cover the market.  And

that's at our complaint 98, the Treehouse complaint 349.  And

the long-term effects are found in paragraph 87 concerning

multi-year contracts.

Also alleged in the complaint, quoted in the

complaint, are the express provisions that Keurig distributors

cannot directly sell or indirectly sell pods, nor can they

offer for sale or sell brewers.  And if they do, we allege in

the complaint they are subject to termination by Keurig, and

they lose access to the Keurig Eko system.  Again, those are

allegations.  I know them to be true; but for purposes of this

motion, you have to assume that they are.

Now, I think paragraphs 108 and 111 of our complaint

are illustrative of why there is no basis for this motion.

Paragraph 108 says:  Multiple potential Rogers

customers have informed Rogers of the exclusive provisions in

their agreements with Keurig and stated that Keurig has

threatened to terminate their access to K-cup branded portion

packs if the potential customer purchased any competing portion

packs.

Why is that important?

It is important because in an exclusive dealing

situation, if you want to overcome the presumption, you have to

show that conduct was engaged in above and beyond the mere

F79VKEUA

1    existence of an exclusive dealing agreement which was coercive

2    and impacted competition.  That's specifically alleged right

3    here.  That's just one of numerous allegations.

4          If you go to 111:  As a further example, on

5    information and belief, Keurig threatened retailers that it

6    will not provide its brewers for important holiday sales such

7    as Black Friday, and will limit promotions in incentives for

8    retailers, unless retailers agree not to sell competing portion

9    packs.

10         Again, that allegation is in the complaint, subject to

11   proof; but at this stage, that is more than enough to overcome

12   any of the objections.

13         But not only that, your Honor, if you look at

14   paragraph 291 of the Treehouse complaint, they quote the CEO of

15   Keurig, who brags, We have now signed a large majority of

16   previously unlicensed portion pack volume to our system, and we

17   are in the process of transitioning these brands.  Since last

18   quarter, we announced new relationships with Kraft, Mayer, W.B.

19   Mason, and Super Value, and began shipping Keurig-manufactured

20   store brands to several new customers, including Wal-Mart and

21   Sam's Club.

22         Both Wal-Mart and Sam's Club are significant because

23   they were both identified.

24         That was our complaint?

25         I'm sorry, your Honor.  201 is from our complaint.

F79VKEUA

1          THE COURT:  Okay.

2          MR. JOHNSON:  All right.

3          And then we said:  As we said previously, we have also

4    signed brands that we have not yet publicly announced in the

5    IRI data for the four-week period ending November 2nd.  We have

6    begun to see the shares shift toward the Keurig license pack.

7          This is a statement by them.  This was their plan.

8    They were already taking additional competition away, and they

9    are very pleased with that.  Unfortunately for them, that is

10   *prima facie* evidence, as alleged in this complaint, and for the

11   purposes of this motion, the Court has to accept as true.

12          It gets worse, your Honor.

13          THE COURT:  Okay.  I think you're relatively close to

14   your 15 minutes.

15          I just have a few questions, and then I'll hear some

16   remarks from you with regard to -- any concluding remarks you

17   want to make with regard to this point.

18          Let me ask this:  I think in both JBR and Treehouse's

19   complaints there is an indication that the companies are

20   substantially foreclosed from selling their products to certain

21   of the retailers such as Costco and Staples.

22          Do you have or is there an allegation in the complaint

23   what portion of the retail market Costco and Staples

24   represents?  I'm not sure, I may be missing some of the

25   retailers that are mentioned in the complaints.

F79VKEUA

1            MR. JOHNSON:  What we allege, your Honor, is that more

2    than a majority of these retailers now have agreements with

3    Keurig.  We can't allege more than that because we haven't had

4    discovery.

5            But what we can tell you, and if you go to our

6    complaint at paragraph 71, less than ten percent of the market

7    for portion pack sales occur in online sales.  That means that

8    the 91 percent of the market is through distributors and

9    retailers.

10           So by any stretch of the imagination, we have long

11   past any minimum threshold needed to show foreclosure and

12   injury.  And I would point out to the Court that in the *Kolon*

13   case that I mentioned earlier -- and you can see the slide in

14   the back -- one of the arguments made there by *DuPont* is the

15   same argument made here:  Why, in fact, you guys have grown

16   your business.  And the Court summarily dismissed that, arguing

17   that, A, you still control 90 percent of the business, which

18   is, coincidentally, what we've alleged Keurig controls; and the

19   fact that there was some growth is not a basis for granting a

20   motion to dismiss.

21           THE COURT:  Okay.

22           MR. JOHNSON:  Thank you.

23           THE COURT:  Thank you.

24           Mr. Cary, you have five minutes of rebuttal.

25           MR. CARY:  Yes.

F79VKEUA

1         MR. JOHNSON:  Your Honor, I think --

2         THE COURT:  I apologize.

3         MR. KAPLAN:  I think Mr. Badini --

4         MR. BADINI:  Your Honor, if the Court would indulge

5   me.

6         THE COURT:  I will.

7         MR. BADINI:  I think we need to go back to first

8   principles, your Honor, and make a couple of things clear.  I

9   have a direct answer to one of your questions, which is the

10  important question that this Court has to grapple with, which

11  is what is the standard on the motion to dismiss on this issue,

12  substantial foreclosure.

13        And there is a case that, I predict, you will hear a

14  lot about from defendants in the next module or section, which

15  is the *Xerox* case.  And the defendants like to talk about *Xerox*

16  *III*, colloquially *Xerox III*, because it's a summary judgment

17  decision.  They don't like to talk about *Xerox I*, which is

18  what's relevant here, because this is the motion-to-dismiss

19  stage.

20        *Xerox I* -- can we put up slide 91 -- answered the

21  question that the court asked, which is what has to be pled

22  with respect to substantial foreclosure at the

23  motion-to-dismiss stage.

24        Doesn't work?  Okay.  I'll just read it to the Court

25  while we're waiting, if that's okay.  We have copies.

F79VKEUA

1          I don't know how many pages you have in there, but
2     it's slide 91.
3          THE COURT:  Okay.
4          MR. CARY:  Your Honor, have we moved to the next
5     module?  I'm confused.
6          THE COURT:  I think that Mr. Badini was going to make
7     reference to *Xerox* in connection with this argument.
8          MR. BADINI:  That's correct.
9          THE COURT:  He is just mentioning that he thought you
10    would rely on it in the next argument.
11         MR. BADINI:  That's correct.  I'm not moving to the
12    next module.
13         In *Xerox I*, there was a motion to dismiss an exclusive
14    dealing claim.  And the allegation which was sustained was that
15    the agreements exclude the plaintiff from much of the market of
16    competing products, much of the market.  That was the
17    allegation.  That was held sufficient to survive the motion to
18    dismiss.
19         In *Virgin Atlantic*, which is a Southern District of
20    New York case, the Court said that substantial foreclosure is a
21    uniquely factual inquiry that is inappropriate to resolve on
22    the face of the complaint.
23         In fact, if you look at slide 87, there's a line of
24    cases that say even foreclosure in one segment, one segment or
25    one distribution channel, is enough.  As we'll hear later --

F79VKEUA

 1   and I don't want to go there now -- but as we'll hear later,

 2   there's been substantial foreclosure in the office market where

 3   we can't get in because of these agreements.  That's enough to

 4   allege substantial foreclosure.  It can even be one segment.

 5            And if you look at slide 88 in *Geneva*, which is a

 6   Second Circuit case, what's interesting about that case -- and

 7   I really commend it to the Court, because it shows you what the

 8   analysis should be for an exclusive dealing claim.  The case

 9   doesn't even discuss substantial foreclosure.  Why?  Because

10   the test for exclusive dealing is not substantial foreclosure,

11   it's what are the effects, what are the adverse effects.  And

12   if you can show adverse effects some other way -- which we

13   do -- that's enough to go forward.

14            Basically, if you'd look at slide 89, you can show

15   adverse effects by market power, you can show them by monopoly

16   power, or if you look at slide 90, you can show in all sorts of

17   ways, and that's enough for exclusive dealing.

18            In short, first of all, I'll end where Mr. Cary began.

19   Keurig says that the complaints must be dismissed for failure

20   to show substantial foreclosure.  As Mr. Johnson pointed out,

21   at best, at best, that's an issue relevant to one claim in the

22   complaints, exclusive dealing.  And I submit that the cases

23   show that the ultimate test is adverse effects or monopoly

24   power, not some magical percentage.

25            Thank you, your Honor.

F79VKEUA

1             MR. KAPLAN:  I'll just speak from here, your Honor.

2             I'm Robert Kaplan for the indirect purchasers and

3    generally for the plaintiffs.

4             Our complaint, the indirect purchaser complaint,

5    alleges at paragraph 10 that after the expiration of its

6    patents, Keurig's share fell as low as 86 percent, but has

7    since risen sharply due, in substantial part, to the conduct

8    complained of herein.

9             Paragraph 11 says:  Compatible cup competitors have

10   five percent of the market and other places we allege that

11   Keurig now has 95 percent of the market.

12            The competitors' market share has declined from 14

13   percent to five percent, roughly a 65 percent decline, due to

14   these practices that are alleged in the complaint.  That is

15   substantial foreclosure.  They've lost 65 percent.

16            I would also refer your Honor to the *U.S. v. Dentsply*

17   case in the Third Circuit, which is cited; which, as Mr. Badini

18   said, doesn't look at a percentage, it says:  Exclusive dealing

19   violates the law when it has the effect of raising rivals'

20   costs by foreclosing efficient means of distribution to actual

21   or potential competitors.

22            And that's exactly what happened here.  They've lost

23   65 percent of their market.  They've tied up all the

24   distributors, most of the distributors, 500 distributors.

25            Thank you, your Honor.

F79VKEUA

1           THE COURT:  Okay.  Thank you, Mr. Kaplan.

2           Sorry, Mr. Cary.  Your rebuttal.

3           MR. CARY:  Your Honor, I think we've heard exactly

4     what we have demonstrated is not the right test.

5           Keurig has a high market share if you count only

6     Keurig machines and packs that are designed to work with Keurig

7     machines.  That doesn't tell you anything.  It certainly

8     doesn't tell you anything about substantial foreclosure.

9     Keurig has a high market share; that doesn't mean they can't

10    compete for that market share.  They have alleged that they

11    have and are able to compete for that market share.

12          Mr. Johnson said I didn't mention retailers.  I did

13    mention retailers.  And I contrasted the six examples across

14    four complaints with the 35,000 examples that were insufficient

15    on a motion to dismiss in the *News Corp.* case.

16          On the distributors, again, their argument is, Well,

17    distributors might be 40-something percent of all K-cup sales.

18    Keurig has contracts with some distributors; those contracts

19    are exclusive to Keurig with respect to K-cups and, therefore,

20    somehow we're substantially foreclosed from the market.

21          There is no allegation in the complaint that those

22    distributors are the only efficient distribution channel.  To

23    the contrary, it is clear not only from their complaint, but

24    from all of the complaints that have been put forward, that the

25    primary means of distributing Keurig K-cups and compatible

F79VKEUA

K-cups for Keurig machines is through the retail channel, it's
not through the office distributors.  Office distributors are a
minority.  The vast majority is in the retail channel.  The
allegations with respect to foreclosure from the retail channel
are not only not there, their complaints establish that they
sell through the retail channel, and they make a big deal about
the growth of their sales in the retail channel.  So they are
not foreclosed from the only efficient channel, which are the
facts in the cases that they like to sell.

        With respect to KADs, the Keurig-authorized
distributors, well, of course, Keurig has contracts with its
own distributors.  They don't tell us how many other
distributors are out there.  Without that allegation, they
can't establish substantial foreclosure, even if one only
wanted to focus on KADs, which is totally incorrect under the
law.

        But, more importantly, let's get to the facts as
explained in their complaints.

        What these distributors do is they provide a service.
They go into the office and they provide a coffee service.
That's how they describe it in their complaint.  That coffee
service, according to their complaint, is a service by which
the distributor will place a brewer at the office location for
little or no cost -- that's a quote from the complaint, it's
not outside the complaint -- little or no cost, and then they

F79VKEUA

1    sell the packs.  So Keurig provides the brewer to its

2    distributor, and Keurig provides the packs, and the distributor

3    provides those packs.  Because they are not selling brewers;

4    what they are doing is providing an office coffee service.

5          In that environment, of course the contract is going

6    to be exclusive.  There is no reason why they can't compete for

7    that.  In fact, they cite to Mother Parkers, who does, in fact,

8    compete for that.  So they are not precluded from the overall

9    market; they are not precluded or foreclosed from the efficient

10   channel, as they describe it.  All they have alleged is that

11   Keurig has distributors.  Those distributors, by the way, are

12   free to put other brewers, other manufacturers' brewers, in the

13   office location.  They allege that.  They allege that they are

14   not limited in terms of offering a Flavia brewer to the office

15   customer.  In that case, they'll provide Flavia packs.  But

16   that's the way that service works.  They can also provide a pod

17   of coffee server.

18         So I think we've dealt with retailers, we've dealt

19   with distributors, we've dealt with the inputs.

20         Brands, being foreclosed from brands.

21         First of all, they allege in their complaint that

22   their primary customers are private label customers.  Guess

23   what?  Private label customers, you don't need a brand to sell.

24         What else do they allege?

25         They allege they've got these great brands:  Grove

F79VKEUA

1    Square is alleged in the complaint; San Francisco Bay is

2    alleged in the complaint.  They have their own brands; Keurig

3    has its own brands.

4         Then they allege, Well, there are fancy chefs.

5    Wolfgang Puck is one that they cite.  There is no shortage of

6    fancy chefs that they can go and do a deal with to promote

7    their brand, their coffee.  There's no limitation on their

8    getting the assets that they need to compete.  And, in fact,

9    Wolfgang Puck just recently -- they made a big deal about

10   Wolfgang Puck in the complaint; they cite Wolfgang Puck three

11   or four times.  Pursuant to *Boarding School Review v. Delta*

12   *Career Education*, this Court can take judicial notice of

13   material that is on a public website.

14        THE COURT:  Is that a motion-to-dismiss case?  I know

15   I can take judicial notice of certain things, but in a motion

16   to dismiss, was that case in the context of a motion to

17   dismiss?

18        MR. CARY:  Frankly, your Honor, I don't know.

19        THE COURT:  That's all right.

20        MR. CARY:  We'll find out though.

21        THE COURT:  I'm sorry.  Go ahead.

22        MR. CARY:  In any event, Wolfgang Puck has left Keurig

23   and gone off to Royal.  And if the Court cannot take judicial

24   notice of that, that they've terminated their relationship with

25   Keurig and gone to a competitor, RealCup, then I think it is

F79VKEUA

1    not plausible, given the allegations in the complaint, it's

2    just not plausible that there is any shortage of brands as

3    they've made clear by reference to their own brands.  Companies

4    develop a brand.  The Keurig brand is not something that came

5    out of some external source; it was developed by Keurig.

6    They've done that themselves, as well.

7              THE COURT:  Okay.  Thank you.

8              MR. JOHNSON:  Your Honor, just briefly.

9              Paragraph 95 says, contrary what you just heard --

10             THE COURT:  Of JBR's.

11             MR. JOHNSON:  Of JBR's complaint.  On information and

12   belief, these threats and loyalty provisions have effectively

13   blocked out nearly all competition from competing portion pack

14   manufacturers in the away-from-home market.  Despite offering a

15   sought-after product, Rogers has almost no business in the

16   away-from-home market, and has been told on numerous occasions

17   that KADs will not carry Rogers' product out of fear of

18   Keurig's retribution.

19             That is the allegation in the complaint before the

20   Court.

21             And finally, they cited the 35,000 retailers.  What

22   they fail to tell you, that was the *Insignia* case.  And in that

23   case, this was a case where the court concluded that there

24   could be no liability because there had been no allegation

25   regarding the extent of the foreclosure or foreclosure in a

F79VKEUA

1    specific market.  That's not this case.  We have specific

2    allegations to injury, as well as the market.

3           MR. BADINI:  May I just say something on judicial

4    notice, your Honor?

5           THE COURT:  Yes.

6           Let me just make a point, because we will literally be

7    here all day, and we are not going to be.  So while I'm going

8    to give the parties some leeway, I think at some point I'm

9    obviously going to have to cut off the back-and-forth.

10          But I'm sorry, Mr. Badini, go ahead.

11          MR. BADINI:  Yes, your Honor.

12          I wasn't going to make an argument.  I was just going

13   to say to the extent this is a matter of a press release or

14   something like that, I have no objection to the Court taking

15   judicial notice of it, as long as we're provided a copy.  All I

16   would add is that it seems to be injecting an issue of fact,

17   which is not appropriate to resolve.  But if Mr. Cary would

18   give me a copy, I have no objection.

19          MR. CARY:  Appreciate that.

20          THE COURT:  Okay.

21          MR. CARY:  Your Honor, *Boarding School* is a

22   motion-to-dismiss case.

23          THE COURT:  Okay.

24          MR. CARY:  And on *News Corp.*, Mr. Johnson is exactly

25   right, it was dismissed because an allegation that 35,000

F79VKEUA

1    retailers had been signed to exclusive agreements was

2    insufficient.  They have much less than that.

3              Thank you, your Honor.

4              THE COURT:  All right.  Thank you.

5              All right.  Let's move on to the next item:  Has

6    monopoly power in the relevant market been adequately alleged?

7              Mr. Cary, or is it going to be one of your colleagues?

8              MR. CARY:  Me again, your Honor.

9              THE COURT:  Okay.  You may proceed.

10             MR. CARY:  Your Honor, the question with respect to

11   the relevant product market is have these complaints adequately

12   alleged that there are not reasonably interchangeable

13   alternatives to Keurig brewers and Keurig portion packs.

14             They have alleged two markets in this case.  They keep

15   talking about the office coffee services market.  The complaint

16   doesn't talk about that, it talks about the office coffee

17   services segment.  It defines two relevant product markets, not

18   the office coffee services segment.  And those markets are

19   Keurig brewers and portion packs that work with Keurig brewers.

20             First of all, it's notable that the various complaints

21   do not allege the same relevant market; they are inconsistent.

22   So one of the complaints says single-serve coffee.  That's what

23   Treehouse's original complaint alleged, single-serve coffee.

24   Of course, that would exclude the 2.0 Keurig brewer, which

25   makes multiple cups of coffee.

F79VKEUA

1          Another complaint says only those single-serve brewers

2     that are less than 30 PSI are in the relevant market, without

3     any facts whatsoever alleged in the complaint as to why a

4     31-ounce-per-square-inch pressured brewer would not be a

5     reasonable substitute for a 29-ounce-per-square-inch brewer.

6          Other complaints now call it a low-pressure brewer.

7     And one of the complaints says:  A low-pressure brewer capable

8     of making one cup or more than one cup or tea or other

9     beverages, without explaining why other ways of making a cup of

10    coffee, other ways of making a cup of tea, are not reasonable

11    substitutes.  There are numerous ways to do that.  They never

12    explain why that's not reasonably interchangeable.  They give a

13    lot of characteristics of products, but characteristics do not

14    define a relevant market.

15         Next we go to the brewer.

16         They are required to allege monopoly power in a

17    well-defined relevant market.  But what their complaint alleges

18    is something very different from that.  What their complaint

19    alleges is that Keurig sells its brewers at or below cost.  So

20    the question is is that what a monopolist does, a monopolist

21    who has no alternatives that consumers can turn to in lieu of

22    its product.  Does it sell its product close to cost?

23         The answer is no.  The definition of a monopoly is

24    someone who's able profitably to raise its prices, elevate its

25    prices, above marginal cost and make monopoly profits.  If

F79VKEUA

1    Keurig is required to sell its brewers at or below cost in

2    order to win sales from alternatives, and JBR affirmatively

3    alleges that's what they are doing --

4              THE COURT:  Where is that?  When you say that's what

5    they allege, do you know what paragraph that is?

6              MR. CARY:  At paragraph 276 of their complaint.

7              THE COURT:  Okay.  Thank you.

8              MR. CARY:  They allege that single-serve brewers are

9    winning sales at the expense of drip brewers.

10             So to the extent that there are reasonable

11   alternatives that prevent Keurig from raising its prices to

12   monopoly levels, it cannot be found to have monopoly power in

13   the relevant market.  They affirmatively allege that Keurig

14   keeps its prices low.

15             In fact, Treehouse, in a document referenced in the

16   complaint, specifically cites it's City 2015 Global Consumer

17   Conference reports, which says that the trade-off options are

18   so broad, people can look at moving back to roast-and-grind;

19   and, therefore, this category shows more price elasticity than

20   just about any category in the grocery segment.  That's what

21   Treehouse says.

22             So no monopoly pricing, high-process elasticity with

23   roast-and-grind, unable to raise prices, and reasonably

24   interchangeable alternatives which Keurig has to price low in

25   order to win business from.  There is no monopoly in a

F79VKEUA

1  well-pled market.  The only way they get to these market shares

2  is to describe the market so as to basically apply to Keurig

3  and nothing else.

4         THE COURT:  In the motion-to-dismiss stage, are there

5  any cases that you cite or that you're aware of that state that

6  there can be no monopolization claim where the complaint

7  alleges that the product at issue was sold at or below cost?

8         MR. CARY:  Your Honor, I'm not aware of a case that

9  has so held, because in a typical monopoly case you wouldn't

10  find a defendant that's giving away its products at very

11  competitive prices.  But the standard for what is monopoly

12  power is very clear, and I think the courts have set that out

13  very clearly in terms of the ability to elevate prices above

14  competitive levels.

15         Let me turn to the portion packs.

16         On the portion packs, this is a classic aftermarket

17  case, your Honor.  It is not surprising or unusual for a brand

18  of a particular product to have a very high share in the

19  disposable components that are used with that product.  That

20  happens all the time, and we've seen that in a variety of cases

21  where the courts have made clear that a high market share in an

22  aftermarket is not indicative of monopoly power.

23         So, again, counsel alluded to the *Xerox I* and *Xerox*

24  *III* cases in his comments.  In that context, the *Xerox I* case,

25  Mr. Badini is correct, that case was denied on a motion to

F79VKEUA

1    dismiss.  But then a motion for summary judgment on the part of

2    the defendants was granted.

3           Here, you have in the complaint the kinds of facts

4    that caused the Court in *Xerox III* to grant summary judgment

5    for the defendant.  When a complaint on its face pleads the

6    facts that would result in summary judgment if those were the

7    only facts in the record, then a motion to dismiss is

8    appropriate.  And that's exactly what we have here.

9           In order to make a case on an aftermarket, they have

10   to show that customers who buy the primary product -- in this

11   case the brewer -- are locked in by the prohibitive costs of

12   switching to an alternative product.  They can't show that

13   here.  It wasn't shown in *Xerox III*, where the Xerox machine

14   cost $3500; it's certainly not shown here, where the coffee

15   brewer costs between 80 and $150.

16          THE COURT:  Let me ask this, and it's a little bit of

17   a factual point with regard to Xerox:  As I understand it,

18   Xerox, in the primary market, had 24 percent of the market.

19   And, again, depending upon the way you define it, I think if

20   you're just talking about the ink and I'll say "cartridges,"

21   but that's not the term they use, but the ink used, they

22   basically had all of that in part because it was just in their

23   machines.  That is a factual difference here.

24          Let me ask this:  As I understand it, Keurig, in the

25   brewer market, has a high percentage, 80, 90 percent or more,

F79VKEUA

of the market.  And in the aftermarket, isn't the percentage

similarly high?

I'm going to use the term "relevant."  Obviously *Xerox*

is relevant; but how relevant is it in light of that factual

distinction?

MR. CARY:  First, the market that they are defining to

get to that high percentage is Keurig and Keurig-compatible or,

in some cases, single-serve or PSI, whatever, below certain

PSI.  So by defining the market so narrowly, they get to those

percentages.  If that market falls apart, because we've

demonstrated through the allegations in the complaint that

Keurig does not have monopoly power in that market, then those

numbers go out the window.  That's number one.

But, number two, I think the key point, you're right

that if you accept their product market definition of below 30

PSI, single-serve, but can also make multiple, it can make

soup, it can make tea market, then the market share, by

definition, is going to be high in the primary market.

But the question is not that.  The question is are the

customers locked in.  So if the only way Keurig maintains that

market is to sell their brewers at or below cost, which is what

they allege, and they allege that the reason they do that is

because people would otherwise buy alternatives or because they

want to sell the packs, if you raise the price on the packs,

and the price of entry to an alternative system, whether it be

F79VKEUA

Mother Parkers, which is K-cup-compatible, or Flavia or Tassimo

or Barissimo, which are not, the only way to maintain it is by

keeping your prices low, then you don't have a monopoly.

So the Court in *Xerox* laid it out:  Are the customers

locked in by the prohibitive costs of switching?  Can the

customers, once they are locked in, be exploited?  Is there

some limitation on information that limits the ability of

customers to understand how much the packs cost when they buy

the machine?

Here we have none of that.  The customers are not

locked in.  The allegations in the complaint are that customers

purchase $600 a year on average of disposable K-cups.  With

that kind of volume and a relatively cheap brewer, when you can

buy it for $80, there is no lock-in, as contrasted, in fact,

with *Xerox*, where the price of entry was a lot higher than

that.

In the *Kodak* case, the issue there, the Supreme

Court's *Kodak* case, is you're buying a Kodak copier, you don't

know how often it's going to break and, therefore, you can't

life cycle, Judge, is it going to break every month, is it

going to break every five years.  That's different from a

consumable that you know exactly what it costs, it's sitting on

the shelf.  I went to Starbucks this morning.  There they are

on the shelf right next to the Barissimo packs.  You can say, I

drink two cups of coffee a day.  And if I can save 20 cents by

F79VKEUA

1    buying at JBR, I can do that; or if I can save 20 cents by

2    buying Flavia, I can do that.

3              It's very different.  There is no lock-in here.  There

4    is no prohibitive cost of switching.  Given that there is no

5    monopoly power in the aftermarket, that's what *Xerox* stands

6    for, regardless of whether it's a 24 percent share or 80

7    percent share of the primary market.

8              THE COURT:  Okay.

9              MR. CARY:  Your Honor, can I reserve a few minutes of

10   rebuttal?

11             THE COURT:  Sure.  I sort of lost track right now.

12   You can have a few minutes.

13             All right.  Mr. Badini.

14             MR. BADINI:  Thank you, your Honor.

15             Let me start with the Court's questions.  The Court

16   asked two key questions, and the answers that counsel for

17   Keurig gave, which they had to give, are illustrative.

18             The first question that you asked was are they aware

19   of any case at a motion-to-dismiss stage where the complaint

20   was dismissed, the monopoly power, monopolization complaint was

21   dismissed, because the plaintiff had alleged that there was

22   pricing at or below cost.  The answer was no, because there is

23   no such case that we are aware of, your Honor.  And

24   respectfully, it would be reversible error for the Court to do

25   anything like that, because that's not the test and it's

F79VKEUA

1    contrary to well-established law.  It's also contrary to

2    economics.

3            Monopolists can choose to price at or below cost for

4    all sorts of reasons.  There is a whole bunch of predatory

5    pricing case law, for example, when monopolists price at or

6    below cost for long periods of time and then recoup.  They also

7    price at or below cost when there are aftermarkets, as are

8    alleged here.

9            The other question that you asked was if we accept

10   plaintiffs' product definition for the primary market, isn't it

11   true that there is this monopoly power and that *Xerox III*

12   doesn't apply.  The answer I thought I heard was yes, but the

13   product definition is not right.

14           Well, respectfully, we have pled facially plausible

15   product markets.  And because we've alleged facts to support

16   those plausible products markets, they cannot be disregarded on

17   a motion to dismiss by arguing facts, which I heard counsel for

18   Keurig do.

19           But let me go to the aftermarket issue first because

20   that's the one that counsel started with, and that is the one

21   that is key here.

22           Let's look at slide 20, please.

23           So slide 20 has on it the Kodak case.  And actually

24   let's go to slide 2 first, which will set up slide 20.

25           Respectfully, your Honor, the way that they are able

F79VKEUA

1    to make their motion-to-dismiss argument is by ignoring reams

2    of governing Supreme Court authority.  By my count, they have

3    at least 19 highly-relevant U.S. Supreme Court cases that

4    govern the claims in this case that are ignored by Keurig in

5    their briefs.  Let me be clear as to what I mean by "ignored."

6    I don't mean slighted, mischaracterized, distinguished.  I mean

7    not cited at all.

8            Even though, for example, *Kodak*, which I'm about to

9    talk about, is a critical case for our tying claim, it's one of

10   the classic tying cases, we cited it so much in our brief that

11   we say *passim* in the Table of Authorities, they say not one

12   word about it.

13           In the letter that counsel sent to you yesterday on

14   supplemental authority, they accused us of not citing *Brulotte*.

15   In fact, we did cite *Brulotte*.  Counsel for Keurig never cited

16   *Brulotte*.  And that's a central case on patent misuse.

17   Absolutely central.

18           So let's go back to slide 20.

19           *Kodak* said that there is no special rule for

20   aftermarkets.  There is no special rule for aftermarkets.  You

21   look at the markets on a case-by-case basis.  And the ultimate

22   test, if you look at slide 8, please, is is there the power to

23   control prices or exclude competition.  That's the test.  And

24   that can be shown either by adverse effects or high market

25   share.  That's the test.  And there is no special aftermarket

F79VKEUA

1     test.

2              Now, let's look at *Xerox III*, because they like to

3     talk about *Xerox III*.   *Xerox III* actually had facts that don't

4     particularly help Keurig's argument here.

5              Let's take a look at slide 22.

6              So when you read *Xerox III*, it talks about the facts

7     of the case.   And it makes it clear that the facts in that case

8     were that *Xerox* sold the printers, which was the primary

9     market, at a margin or a loss, hoping to earn a profit through

10    later aftermarket sales.   Those were the facts.   And despite

11    those facts, the motion to dismiss was denied.

12             And in *Kodak*, again, one of the many Supreme Court

13    cases ignored by Keurig, they say that if there's direct

14    evidence of adverse effects -- which I'm going to get to in a

15    second -- that's evidence of monopoly power.   You don't need a

16    special monopolist test.

17             And as the Court recognized -- let's take a look at

18    slide 23, please -- this test, this so-called *Xerox III* test,

19    even if it has validity, as *Xerox III* expressly says, it

20    applies when there is a nonmonopolist producer in the primary

21    market, a nonmonopolist producer in a primary market.   Here,

22    we've alleged that they are a monopolist producer in the

23    primary market.

24             Your Honor, I think the case law is clear that the

25    special *Xerox III* test doesn't apply.   But even if it does, we

F79VKEUA

1    have pled the factors for that test.

2              You heard Mr. Keurig said -- I'm sorry.

3              THE COURT:  Mr. Cary.  Unless he's gone through a name

4    change.

5              MR. BADINI:  You've heard counsel for Keurig say that

6    in order to satisfy *Xerox III*, you have to plead lock-in and

7    you have to plead a limitation on information.  We have pled

8    both.

9              Take a look at slide 25, please.

10             We have pled that consumers do not realistically

11   determine the lifetime cost of owning a K-cup brewer.  You may

12   think, Well, that's conclusory, but we've also pled facts

13   supporting that.

14             For example, Keurig makes it difficult to figure out

15   the prices.  We've pled that on their website, they don't

16   advertise the prices for commercial brewers.  They don't have

17   an interest in people knowing what those price are.  And in

18   their contracts with KADs, they tell those KADs, You shall not

19   display the prices of our cups when you're servicing offices.

20   Why?  Because they don't want people to be able to compute the

21   life cycle costs; they obfuscate the life cycle costs.  We've

22   alleged that they've taken affirmative steps to do that.

23             Take a look at the next slide, 26.

24             And what does *Xerox I* say?  *Xerox I* says, Where

25   plaintiffs allege that purchasers could not arrive at an

F79VKEUA

1    accurate life cycle price -- which is precisely what we've

2    alleged here in a nonconclusory manner -- the dismissal should

3    be denied.

4              So so much for a special *Xerox III* test.

5              Now, let me talk a little bit about the relevant case

6    law for our claims.

7              Let's go back to slide 3, please.

8              These are some of the U.S. Supreme Court cases ignored

9    by Keurig.  And I won't spend a lot of time on them, your

10   Honor, but I think they all apply to some of the key

11   monopolization claims in this case.  And because of that, I

12   have to spend at least a minute telling you why I think they

13   are relevant.

14             *Aspen Skiing*, never cited by Keurig, says basically

15   there is no litmus test for what constitutes a Section 2

16   violation.  There is no formula.  Any sorts of types of

17   competitive acts that tend to impair the opportunities of

18   rivals or restrict competition in an unnecessarily restrictive

19   way, those things can violate Section 2.  There's no formulaic

20   way.  And then I'll get to how you prove monopoly power.  But

21   that's the basic test.  They've ignored that.

22             *Lorain Journal* is a classic group boycott case, which

23   is very close on the facts to what we've alleged here.  *Lorain*

24   *Journal* was a dominant newspaper in a market, and they felt

25   threatened by a radio station who wanted to compete with them.

F79VKEUA

1   By the way, the Court had no problem treating the radio station

2   as part of the same market as the newspaper.  And what did it

3   do?  It told its advertisers, If you want to advertise with

4   us -- and they wanted to; they recognized it was a great

5   product, just like many customers think the Keurig machines are

6   great products, but if you want to advertise with us, you can't

7   advertise with the radio station.  That is precisely what they

8   are telling the KADs in these 700 agreements.  If you want to

9   buy our brewer, you can't buy compatible cups.  *Lorain Journal*

10  ignored.

11        *Kodak* we've already talked about.

12        Next slide, please.

13        Just one word about the *General Motors* case.  And,

14  again, this goes to monopolistic conduct, all of which is

15  relevant to Section 2, and all of which is relevant to the

16  fundamental issue of this module, if you will, which is have

17  they exercised monopoly power.  And they can do it in various

18  ways.

19        In the *General Motors* case, again, very similar to

20  this case, there were these dealers of General Motors cars that

21  were upset about discount dealers.  And General Motors had all

22  of these contracts with these dealers and said, You shall not

23  deal with the discounters.  And just like Keurig says here,

24  Well, there was no evidence that the dealers talked to each

25  other, which is what they are trying to distinguish ebooks,

F79VKEUA

1     there's no evidence that the dealers talked to each other, so

2     there can't be a conspiracy claim.

3           The court below agreed with them and dismissed the

4     case.  Reversed.  The U.S. Supreme Court said, You don't need

5     evidence that the dealers talked to each other, when General

6     Motors is orchestrating this conspiracy.

7           Now, we've got some more slides about all of these

8     cases that are ignored, but I'll skip over them; you've got

9     them; counsel has them.

10          Let's go to the basic test, which is at slide 8.

11          So your question in this module, your Honor, was how

12    can we show monopoly power in a relevant market.  And there are

13    basically two ways to do it:  Market share is one way, adverse

14    effects are another way.

15          Slide 10, please.

16          I'm not going to read this into the record, but

17    suffice it to say they have contracted at all levels of the

18    distribution chain to raise prices and exclude competition.

19    They have restricted inputs, they have restricted outputs.

20          For example, I heard counsel for Keurig say that

21    there's no adverse effect in the brewer market; we haven't pled

22    any.  Not true.  In these contracts Keurig has with Tully's,

23    with Starbucks, with all these other roasters that they compete

24    with, because they are a roaster, too, they say, If you want to

25    deal with us, you can't sell any other compatible cup brewer.

F79VKEUA

1   That's not restriction of competition?  It sure is.  And we've

2   talked about the KADs, and they have similar agreements with

3   retailers.

4           Let's take a look at price effects and monopoly

5   maintenance at slide 12.

6           I submit to the Court that this slide is perhaps the

7   most devastating evidence that's pled in the complaint with

8   respect to adverse effects and how they have negatively

9   impacted the market.

10          In 2010, Treehouse entered the market with unfiltered

11  cups.  By the way, all of these are in our complaint; the cites

12  are in the slide.

13          One would expect in a normal competitive market that

14  when a new competitor comes in, prices would go down.  That's

15  the essence of competition.  Not here.  Not here.  Keurig

16  repeatedly raised its prices.

17          Then we entered into the filtered market in 2012, when

18  their patents expired.  What happened then?

19          Well, what happened then, and I won't belabor the

20  story about the 2.0 and the anticompetitive intent, we pled all

21  that.  But what also happened was Keurig went to retailers and

22  told them that this new machine is going to make your customers

23  unhappy; that this new machine will only work with our cups.

24  And I will later -- not now -- later tell you why those

25  statements were false.  But suffice it to say that those

F79VKEUA

1    meetings had their intended effect.  And Keurig's share went

2    from 100, which is what it was at the beginning of the

3    timeline, to 86, much to the dismay of its CEO.  But after

4    these retailer meetings and after 2.0 was launched, its share

5    increased to 95 percent.  And they then increased prices again.

6    That's anticompetitive.  That's an anticompetitive effect, an

7    adverse effect that suffices to plead monopoly power.  So

8    that's one way we can show monopoly power in a relevant market.

9           Let's talk about our market definition, because I

10   heard Keurig say that we had no support for it.

11          Let's start with the single-serve brewer market, and

12   let's go to 62.

13          I believe I heard Mr. Cary say that we had no support,

14   no reason to limit the brewer market to something with

15   pressures less than 30 PSI, we must have made this up.  In

16   fact, we took it from their contract with Caribou Coffee

17   Company.  We took it from their contracts with lots of these

18   roasters and brewers.  They don't consider competitive

19   high-pressure brewers like espresso machines.  They don't

20   consider competitive these pour-over cups that you can buy and

21   pour your water over some bagged coffee.  This is in their own

22   documents.  And the case law says that what a defendant said --

23   let's look at slide 60, please.  Industry recognition and how a

24   defendant defines the market are factors that should be

25   considered.  That's what we've done.  We've looked at how

F79VKEUA

1    they've defined the market; we've looked at how the industry

2    defines the market.

3         Then they said that the office coffee services

4    couldn't be a market because we called it a segment.

5         Let's take a look at slide 87, please.

6         I think I may have referred to this before, but the

7    *U.S. v. Visa* case, the Second Circuit talks about foreclosure

8    of a market segment.  The Second Circuit didn't seem to have a

9    problem with the word "segment."  And, in fact, the cases say,

10   What you call it is not what matters.  You can call it a

11   submarket, you can call it a segment.  What matters are the

12   facts that are pled and reasonable inferences that you can draw

13   from them, not what you call it.  So the Second Circuit didn't

14   have problems saying that was a market.

15        THE COURT:  Mr. Badini, I think you've gone through

16   your time.  So if there's one or two points that you'd like to

17   make, I'd like to then give -- I don't know if anyone else --

18        MR. BADINI:  Sure.

19        And maybe I can put up what the appropriate test is

20   and then I'll end on this.

21        If you look at slide 72, please.

22        This is how you determine what's a relevant market.

23   And by the way, some of these cases that they have ignored,

24   they all say that it is highly unusual, very rare to dismiss a

25   case on market definition grounds unless the definition is so

F79VKEUA

 1   implausible that it cannot go forward.  We've pled our markets

 2   looking at these factors, which are the *Brown Shoe* factors,

 3   U.S. Supreme Court case, and the cites to our complaint are

 4   there.  So we believe we've shown monopoly power in relevant

 5   markets.

 6            Thank you, your Honor.

 7            THE COURT:  Thank you.

 8            MR. KAPLAN:  Robert Kaplan again for the indirect

 9   purchasers and plaintiffs.

10            A couple of quick points.

11            On the brewer market, it's cited in one of the briefs,

12   but I would commend to your Honor the case of *Academic*

13   *Suppliers v. Beckley-Cardy, Inc*, 922 F.2d 1317, a Seventh

14   Circuit opinion, I believe, by Judge Posner.

15            He says:  "A monopolist by pricing below cost succeeds

16   in repelling or intimidating new entrance or extending his

17   monopoly in new markets.  A defendant's ability to recoup

18   losses on below-cost pricing by charging supercompetitive

19   prices is what demonstrates monopoly power."

20            Even if they were selling the brewers at cost or below

21   cost, it's a non sequitur to saying they didn't have monopoly

22   power.  However, there will be an issue going forward, if the

23   case hopefully goes forward, because in a case that they cited,

24   *Coffee.org v. Green Mountain Coffee Roasters*, they cited it at

25   page 22 of their brief, motion to dismiss the indirect

F79VKEUA

1   purchaser case, there the court said:  "However, at the hearing

2   before the magistrate on April 14, 2011, Jim Travis, vice

3   president of sales for GMCR, testified he was unaware of any

4   sales of Keurig brewers below cost."

5            So there may be issues going forward.

6            So that is the brewer market.

7            On the cup market, I and Mr. Badini repeated that the

8   competitor's market share declined dramatically due to these

9   anticompetitive practices.  But at the same time that they were

10  hurting the competitors and gaining market share, Keurig was

11  increasing prices.  So that's classic evidence or pleading of

12  the monopolist.  And we pled in our complaint increases in

13  prices.  As Mr. Badini said, they increased prices in 2010,

14  they increased prices in 2011, and then it is pled in, I

15  believe, the Treehouse complaint, they increased prices again

16  in 2014.

17           So at a time they were gaining market share, they were

18  increasing prices, classic definition of a monopolist in a

19  market economically.

20           Thank you, your Honor.

21           THE COURT:  Thank you, Mr. Kaplan.

22           MR. PERSKY:  My name is Bernard Persky of the Robins

23  Kaplan firm.  I am lead counsel for the direct purchasers.

24           I wish to briefly address an issue with respect to

25  Keurig's attack on our Section 2 Sherman Act claims.

F79VKEUA

1          Keurig improperly seeks to compartmentalize the direct

2    purchasers Section 2 act allegations.  The direct purchasers

3    Section 2 Sherman Act claims, monopolization and attempt to

4    monopolize, each allege a series of anticompetitive practices.

5          Can I have slide 1, please.

6          And Keurig seeks to dismiss our Section 2 claims

7    because Keurig asserts each series of anticompetitive acts,

8    when analyzed separately, is not sufficient to state a

9    standalone antitrust claim.  But when determining the legal

10   sufficiency of an antitrust complaint, the complaint must be

11   looked at as a whole.  It is manifestly improper, as Keurig

12   does, to parse the allegations of the complaint.

13         Slide 2, please.  Next slide.

14         Keurig improperly breaks up the direct purchasers

15   Section 2 allegations as if each was a completely separate and

16   unrelated claim.  The direct purchasers complaint should not be

17   compartmentalized into separate claims when they all are part

18   of one claim.

19         Next slide, please.

20         This is basic antitrust law.  Keurig may not dismember

21   a claim and analyze it piece-by-piece.  That's the *Continental*

22   *Ore* case and its progeny.

23         Keurig's anticompetitive activities, whether or not

24   each one is sufficient to state a Section 2 claim, are legally

25   sufficient when viewed together, as they must be.

F79VKEUA

1          Finally, even if Keurig's anticompetitive activities

2     in the marketplace would be lawful if committed by a smaller

3     competitor -- next slide, please -- they become unlawful when

4     engaged in by a monopolist such as Keurig.  Keurig currently

5     has more than 90 percent of both the single-serve brewer and

6     compatible cups markets.  As held in the *Berkey Photo* case in

7     the Second Circuit, activities otherwise harmless when engaged

8     in by a smaller market participant become illegal when done by

9     a monopolist.  And we also cite the *Dentsply* Third Circuit

10    case.  This is basic antitrust law.

11         A monopolist cannot maintain its monopoly power by

12    anticompetitive activities, even though a smaller player in the

13    marketplace can have these exclusive dealing agreements.  But

14    when you're a monopolist, you're judged differently.  And here,

15    Keurig is clearly a monopolist engaging in anticompetitive

16    activities.

17         Thank you.

18         THE COURT:  Thank you, Mr. Persky.

19         Yes.

20         MR. CARY:  It is hard to know where to start, since we

21    seem to have gone beyond the product market and monopoly Power

22    Point into a variety of other areas.

23         I guess the easiest place to start is that they've

24    alleged pretty much everything under the sun from an antitrust

25    point of view.  But nothing plus nothing plus nothing equals

F79VKEUA

1      nothing.  And we are going to address some of the other issues

2      that your Honor put on the table in terms of that, but I think

3      in our briefing we've made clear why the sham litigation claim,

4      for example, carries no water and no weight, even when combined

5      with everything else.

6              Clearly you can put together 700 pages of alleged

7      complaints with random facts; that doesn't mean that you've

8      pled an antitrust claim.  They have not pled predatory pricing.

9      To the extent that they have pled anything about pricing, it is

10     that Keurig prices its brewers at or below cost in order to win

11     sales from alternatives.  That is the definition of a market

12     that is broader than the market that they are alleging.  When

13     you price your product to win sales from alternatives that are

14     available, the market has been defined too narrowly.

15             In terms of the market share increase that they have

16     put forward, again, they have not demonstrated that that has

17     anything to do with anticompetitive activity here.  They don't

18     even allege that that comes at their own expense.  What they

19     have done is they've pointed out in paragraph 137 and 141 that

20     Keurig has successfully competed in order to win licensing

21     agreements with Peet's and with Kraft, that's what accounted

22     for the increase in the share attributable to Keurig.  But

23     that's Peet's and that's Kraft.  They could have competed for

24     those brand arrangements.  Before that, Kraft and Peet's were

25     selling their own packs without a licensing arrangement.  That

F79VKEUA

1    has nothing to do with any allegation of substantial

2    foreclosure here.

3           With regard to the KADs, what they are now calling the

4    office market, again, I refer your Honor back to their

5    complaint where they list three markets which do not include

6    the office coffee segment, they spell out what the relevant

7    lines of Congress are, and they include compatible portion

8    packs, portion packs, and the various definitions of

9    single-serve brewers.

10          So they can try to change their complaint through this

11   process; they are not permitted to do that.  But, in any event,

12   I think we have already established that the coffee

13   distributors are not a separate market by virtue of the

14   allegations they make.  And we refer your Honor to the *Pepsico*

15   case, where a similar gambit was tried; fountain colas are

16   somehow different from other kinds of colas.  Well, it's the

17   same product; it's sold in various channels.  And the Court

18   rejected that; the Court said cola is cola.

19          Here you have the exact same packs.  They are used in

20   the same machines; the product is the same.  They allege even

21   that the price increases were the same across office and

22   nonoffice segments.  So that does not establish a relevant line

23   of commerce.

24          Your Honor, for the limitations on the *Aspen Skiing*

25   case, which I think Judge Scalia pointed out was at the outer

F79VKEUA

1    extreme of antitrust analysis, this case has nothing to do with

2    *Aspen Skiing*.  There is no refusal to deal on the part of

3    Keurig in this case.

4           What there is is competition for contracts,

5    competition that they are not foreclosed from participating in,

6    and which they allege they have won, and which they allege they

7    were growing and expanding, and they allege they are the number

8    one seller on Amazon, etc.  So there's no relevance of that

9    case.  And the other cases from the '40s and the '50s and the

10   '60s that they cite, again, have no relevance.

11          *Xerox III* is relevant.  We've already distinguished

12   *Kodak* in terms of the inability to project life cycle costs and

13   a change in policy once people are locked in.  *Xerox* and

14   virtually every case that has followed *Kodak* has made that

15   distinction.  If the information is available in the

16   marketplace, then you're not precluded; you're not locked in.

17          They can allege that some consumer -- because Keurig

18   didn't advertise in a particular place or spot their prices --

19   may not have figured this out, but they cannot allege and they

20   don't allege that when you go to the grocery store, there isn't

21   a price on the Keurig pack; or when you go to the Starbucks,

22   there isn't a price on the Keurig pack; or when you go to

23   Amazon, there isn't a price on the Keurig pack.  The

24   information is available in the marketplace.  That's the test.

25   If the information is available in the marketplace, and if

F79VKEUA

1    there are no costs to switching -- or, sorry, let me rephrase

2    that more precisely.  If the cost to switching are not

3    prohibitive, do not lock you in, then there is no market power.

4           Of course Keurig controls its own price.  That's not

5    the definition of a monopolist.  Every firm sets its own price.

6    The question is do they control the entire market.  And their

7    allegations make clear that Keurig does not control the entire

8    market; otherwise, it wouldn't be selling their brewers at

9    cost.

10          They specifically allege that Keurig sells those

11   brewers at cost in order to win additional sales away from

12   alternatives, including other single-serve brewers.  And the

13   documents incorporated by reference in their complaint

14   establish also with respect to roast-and-grind coffee.  So in

15   light of that, they cannot establish monopoly.  And to the

16   extent that they affirmatively allege in their complaint that

17   Keurig's brewer prices are constrained by the desire to sell

18   more packs, that, again, establishes a competitive marketplace.

19          THE COURT:  Mr. Cary, I think we should move on to the

20   next topic.

21          MR. CARY:  Thank you, your Honor.

22          THE COURT:  We've been going for a little over an hour

23   and-a-half.  Should we take five minutes and then come back?

24   And it's going to be a real five minutes, because we still have

25   a fair amount of material to cover.  Okay?  Thank you.

F79VKEUA

1          (Recess)

2          THE COURT:  Mr. Cary, the next item is the claims

3    stated under federal or state law based on Keurig's alleged

4    misrepresentations or false statements.

5          MR. CARY:  Yes, your Honor.

6          Ms. Brannon is going to address this issue.

7          THE COURT:  All right.

8          MS. BRANNON:  Thank you, your Honor.

9          I'd like to reserve three minutes of my time, if I

10   may.

11         THE COURT:  Okay.  Three minutes.  Sure.

12         MS. BRANNON:  Your Honor asked whether plaintiffs

13   state a claim under federal or state law based on Keurig's

14   alleged misrepresentations or false statements, and the answer

15   to that question is no.  The speech claims fail as a matter of

16   law.

17         As a threshold matter, the courts are very skeptical

18   of claims based on speech.  Advertising is classic competition.

19   As the Second Circuit said in the *Berkey* case, a producer is

20   ordinarily permitted to bathe his cause in the best light

21   possible.

22         As the Second Circuit also said in the *Ayerst* case,

23   there is a social cost to litigation over speech, so the courts

24   want to be careful with these types of claims.

25         Similarly, as Judge Easterbrook put it in the

F79VKEUA

*Sanderson* case, "Neither the Sherman Act nor the Lanham Act is designed to throw into federal courts all disputes about the efficacy of competing products."

So the rule in the Second Circuit is that before you can bring an antitrust claim based on speech, you have to overcome a presumption at the motion-to-dismiss stage, provide allegations sufficient to overcome a presumption that the effect on competition of the challenged statements is *de minimis*.  The plaintiff needs to allege that the statements were clearly false, clearly material, clearly likely to induce reasonable reliance made to buyers without knowledge of the subject matter, continued for prolonged periods, not readily susceptible of neutralization or other offset by rivals, and caused antitrust injury, which is injury to overall competition.

In *Ayerst*, the plaintiffs point out that the motion to dismiss was denied.  But *Ayerst* doesn't hold that motions to dismiss can't be granted in this context; it depends on the facts of the case.  And the courts in this district do grant motions to dismiss speech-related claims frequently, and we have cited cases in our briefing, including the *Eon Labs. v. Watson* case, where Section 2 claims failed as a matter of law because they were not clearly false, not clearly likely to induce reasonable reliance.

And also Mr. Badini mentioned the *Xerox I* case.  And

F79VKEUA

1    he said we don't like to talk about it.  We do like to talk

2    about it.  It's a good case.  It points out that mere

3    allegations of business disparagement are not the type of

4    injuries to competition that the antitrust laws were designed

5    to prevent.  And it granted a motion to dismiss speech-related

6    claims.

7              The same is true of the Lanham Act.  The Lanham Act

8    does not have boundless application.  A plaintiff needs to

9    allege false or misleading statements that were made in

10   commercial advertising or promotion, and that such statements

11   were material, and that they proximately caused the plaintiff's

12   injury.

13             THE COURT:  On the materiality, how did the Court

14   define "materiality" in this context?

15             MS. BRANNON:  In the *National Basketball Association*

16   *v. Motorola* case out of the Second Circuit, it's a 1997 case,

17   the Court explained that "material" means likely to influence

18   purchasing decisions.

19             THE COURT:  Okay.

20             MS. BRANNON:  I think that is an important factor

21   here, particularly with the types of speech that they are

22   challenging.

23             We cited a number of cases where motions to dismiss

24   were granted in the Southern District of New York, including

25   the *Sytech* case, where Lanham Act claims were thrown out on a

F79VKEUA

motion to dismiss because the claims were challenging

subjective puffery; the *National Lighting Company v. Bridge*

*Metal* case, where a motion to dismiss was granted because the

other allegations in the complaint showed that the statements

at issue were true; the *Turbon* case, where the motion to

dismiss was granted.  The plaintiff alleged that the statements

were untrue, the manufacturer's statements were untrue as to

its own products.  But they hadn't alleged that statements were

generally untrue as to all of the other bargain toner producers

in the market.

They are challenging a lot of different statements.

And we tried to group them into buckets.  We basically grouped

them into five buckets:  Statements related to quality, safety,

or performance of portion packs; statements related to the

mechanics of the 2.0 brewer, statements related to

compatibility, statements related to Keurig's brewer warranty,

and statements related to Keurig's plans for the 1.0 brewer.

All of those fail, and I'd be happy to talk about any of those

buckets that your Honor is interested in.

The quality-related statements tend to be things like

Keurig-brewed is our seal of approval that ensures the quality,

taste, and safety of every cup.  These are classic examples of

subjective, nonspecific, nonactionable statements under both

the Sherman Act and the Lanham Act.  Like in the *Sytech* case,

where the producer said that its product was the new gold

F79VKEUA

standard.  That is not actionable under the Lanham Act.

And Treehouse itself, at paragraphs 405 to 406 of its complaint, specifically describes statements about the 2.0 brewer recognizing recipes to generate the perfect brew as vague claims that lack any real substance.  Because of that concession, which we think is accurate, it's very clear that these are not the type of statements that can state a claim.

With respect to the mechanics of the 2.0 brewer, the same is true.  Treehouse itself acknowledges that statements about recognizing recipes are meaningless statements.  They also concede that these statements are true.  So paragraph 253 of the JBR complaint, they challenge the statement that 2.0 was designed to read the lids of each pack.  But if you look at their complaint, for example, Treehouse, paragraph 418, they say the ink merely triggers the default setting for either a K-cup or a Vue cup.  It reads the ink and it triggers the default setting.  This is a true statement.  It is also not a statement that is material to purchasing decisions.  If a consumer reads this, this is not material to whether they would buy a Treehouse portion pack or a JBR portion pack.  So we don't think those statements come close, statements about the mechanics of the 2.0 brewer come close.

THE COURT:  What about though the statements -- and I guess this is under the quality bucket -- that relate to safety?  That seems to me that statements that could relate to

F79VKEUA

1     safety -- and you may need to look at the actual specifics of

2     what is actually said, but that an individual could or consumer

3     could make a decision to purchase something else based upon a

4     safety claim.

5             MS. BRANNON:  I think a general statement to look for

6     the Keurig logo, to know that this was tested by Keurig, and to

7     know that this is a safe product, those types of general

8     statements about safety in the abstract are nonactionable.

9             If Keurig said, Our product is the only one that's

10    safe because of X, Y, and Z, or plaintiffs have cited various

11    other cases in the medical device context, for example, where

12    this product doesn't meet FDA approval, this product causes

13    injury to children, those types of statements are far more

14    specific.  Something about look for our logo for safety, that's

15    in the bucket of the gold standard; that's typical advertising;

16    that happens all the time.  And the courts don't want to

17    encourage plaintiffs to come running into court suing one

18    another over statements about our product is safe.  That's in

19    the general category that is not actionable.

20            The statements related to compatibility we also

21    believe are nonactionable.  Statements about the 2.0 works only

22    with Keurig brand packs, those statements need to be judged at

23    the time they were made.  It's also not plausible to believe

24    that plaintiffs can't neutralize those statements and say, Our

25    product works in the 2.0 brewer.  There's references all

F79VKEUA

1    through the papers.  JBR's brief notes it has a freedom clip.

2    You can look at JBR's website, which the Court can take

3    judicial notice of, and see that they say on their website

4    their product works in the 2.0.  And it's just not plausible to

5    believe they can't label their products as 2.0-compatible when

6    their products are 2.0-compatible.

7         Your Honor, I think I might need to stop speaking

8    after I served my time.

9         THE COURT:  In connection with the neutralization

10   claim, can't a competitor in just about every case neutralize

11   the comments?  As a matter of law it seems to me that it can't

12   be the case.  If you can respond to something, is it measured

13   by the language of the statement itself, in other words, in the

14   severity of whatever is being said?

15        MS. BRANNON:  I think it does.  I think the specific

16   statement at issue matters.  The statement here at issue is

17   that Keurig said these nonKeurig portion packs don't work in

18   the 2.0 brewer.  That was a true statement when Keurig

19   originally said it.  In fact, that was the original premise of

20   this case.  Even as recently as September of last year we were

21   in this very courtroom and JBR was telling your Honor that its

22   portion packs wouldn't work with the 2.0 brewer and it was on

23   the brink of going out of business.  So I think there are

24   multiple issues.

25        The plaintiffs allege now that they have

F79VKEUA

1    reverse-engineered the product; their products are compatible;

2    and they label them as compatible.  So I think at least this

3    statement is susceptible of neutralization.

4            THE COURT:  You mentioned that the statements need to

5    be judged based upon at the time that they were -- is it at the

6    time that they were made or at the time the complaint -- is it

7    the time they were made or the time the complaint was filed?

8    It's probably cited in the brief, if you have the case law that

9    relates to that.

10           MS. BRANNON:  Yes.  That's the *Klayman* case.  And it

11   cites a couple of other cases, the *Alpo Pet Food* case and the

12   *Bracco* case are cited in *Klayman*.  But it's the right rule.

13           A manufacturer needs to say things as they are.  And

14   the world may change; that doesn't trigger retrospective Lanham

15   Act liability, that wouldn't make any sense.

16           It's also particularly important in this context, I

17   believe, because under the antitrust laws, if a manufacturer

18   wants to introduce a closed system, it is important to make

19   sure that consumers know that so that they can make an informed

20   decision about whether they want to buy the closed system.

21           So in this case Keurig said 2.0 was designed to work

22   only with Keurig licensed portion packs.  That was not only a

23   reasonable thing to say, it actually had a duty to tell

24   consumers that so that no one was bait-and-switched into buying

25   the product and not realizing that.  If consumers read that and

F79VKEUA

realized, Oh, I love JBR coffee, I don't want to buy a 2.0, if
they saw that statement, that doesn't cause any proximate harm
to JBR if they want to stick with their 1.0 machine.

The plaintiffs allege the presence of other 1.0
machines by nonKeurig manufacturers.  They allege, as Mr. Cary
was saying, that this is a single-serve brewer market with
other types and formats of brewers.  So it's just not plausible
that saying that 2.0 works with Keurig portion packs is a
material cause of any injury to them.  As I mentioned, they've
announced they have workarounds, and they now announce that
their products do work with 2.0.

I think your Honor was asking about the time the
complaint was filed, they cite relatively recent statements, I
believe, saying Keurig works only with Keurig licensed.  At
that point, Treehouse had announced that it had developed a
reverse-engineering solution for the 2.0 brewer.  What they
allege in the complaint is that their 2.0-compatible portion
packs were available with full distribution in Sam's Club.
They don't actually say that their products were yet on the
shelves or consumers were buying them, but they say they were
in distribution at Sam's Club.  I don't think they could have
said more than that, consistent with their Rule 11 allegation.

So that's the snapshot in time when the complaint was
filed.

THE COURT:  Thank you.

F79VKEUA

1          MS. BRANNON:  Thank you, your Honor.

2          THE COURT:  Mr. Badini.

3          MR. BADINI:  Your Honor, I have some slides, if you

4     don't mind.

5          THE COURT:  Okay.

6          MR. BADINI:  So let's just set the legal context

7     first, if we can look at slide 1.

8          Your Honor, we believe that the false or misleading

9     statements are actionable under three categories of law:  Of

10    course the Lanham Act, the state Lanham Act equivalence, and

11    your job is made easier by the fact that Keurig has conceded

12    that the relevant states apply the federal Lanham Act standard

13    and the cites to the statutes are there.  And also under

14    *Ayerst*, Sherman Act, Section 2.

15         If we can look at slide 3, these are the categories of

16    false statements that we allege.  And I think categories

17    because they said these statements in many media, at many

18    times, in slightly different ways; so these are not intended to

19    be exact quotes.  If you want the quotes, we've set forth the

20    paragraphs of the complaints where you can find what they've

21    said and why they are false.

22         But let me start at the beginning by saying your job

23    is also made easier by the fact that with respect to many of

24    these, and three of the categories at last count, and as of

25    today I think we can add two more categories, Keurig's own

F79VKEUA

1 admissions and facts show the falsity of the statements.

2          And let's put up slide 3, please.

3          There's the so-called compatibility bucket, the

4 compatibility statement.  I'm sorry, I'm starting at the bottom

5 and I'll work back up.  I'll get to the compatibility

6 statement.  I'm sorry.

7          There is the so-called puffery statement.  And

8 Ms. Brannon said the statement that something is going to make

9 the perfect beverage is mere puffery.  Well, if that's where

10 they stopped, they might have a good argument; but that's not

11 where they stopped.  They said:  It delivers the perfect brew

12 by recognizing the recipes of licensed portion packs and

13 adjusting the brew to those recipes.  That's like a hotel

14 saying, We will deliver to you the perfect vacation.  Puffery?

15 Maybe.  But if they say, We deliver the perfect vacation by

16 delivering to your door every morning truffles and

17 chocolate-dipped strawberries, that's no longer puffery;

18 because you are specifically saying how the perfect experience

19 is going to be delivered.

20          That is false.  And we've alleged that it's false.

21          Their 30(b)(6) witness admitted at the deposition --

22 and we rely on this in our amended complaint -- that they don't

23 do recipes; that the brewer just says it's a K-cup.  And it

24 could be tea, it could be cocoa, it could be coffee; treats it

25 exactly the same way.  No recipe.

F79VKEUA

1          THE COURT:  What about materiality?  In other words,

2     an antitrust context how is it material?  Assuming that the

3     statement was false, how is it material and what are the

4     allegations that those statements caused injury?

5          MR. BADINI:  So we've alleged in the complaint that

6     it's material both to the purchase of the brewer -- consumers

7     hear about this for the 2.0 brewer, they purchase the brewer,

8     and we were locked out.

9          By the way, they make a big deal out of the fact that

10    we eventually broke in.  But there is plenty of case law that

11    says getting an illegitimate market advantage with a market

12    lead as a frontrunner, if you do it in an anticompetitive

13    manner, that's illegal.  So the fact that we are in now doesn't

14    mean we don't have a claim.  We've got a claim.

15         And we also think it is material to the purchases of

16    the cups.  They say, You can get perfect recipes with our

17    proprietary ink.  So consumers, we believe, are led to buy

18    their cups instead of our cups.  So that's the perfect brew by

19    reading recipes.

20         The second thing they've said is:  It is critical for

21    performance and safety reasons that the 2.0 system only brews

22    Keurig brand packs.  Your Honor is quite right that a safety

23    claim is something that the case law has said -- and we cited

24    the cases in our brief -- you cannot make unless you have

25    substantiation.  They don't have substantiation.  We plead that

F79VKEUA

1   they generally don't test cups.  So how do they know that our

2   cups aren't safe?

3        We have pled that they did, in our case, test some

4   cups.  They tested our cups.  And what happened?  Our cups

5   performed at least as well as theirs.  And by the way, when

6   they were doing those tests, their cups made their brewers blow

7   up.  So how can they make these safety claims?

8        Mr. Cary asked that the Court take judicial notice,

9   and I did not object.  Keurig, on May 6, 2015, issued a press

10  release that I think the Court can take judicial notice of that

11  put the lie to the safety and quality claim.  And they said

12  that they needed this lockout because they don't know what

13  consumers are going to do, and we pled this in the complaint,

14  consumers could put cannabis, marijuana, in the cup, they could

15  put baby formula in the cup, and who knows what's going to

16  happen.

17       Well, in this press release, Keurig said, You know

18  what?  There used to be this feature you guys loved with the

19  Keurig 1.0 called My Cup.  And My Cup is this cup that you can

20  put your own stuff into.  You can put baby formula, marijuana,

21  any brand of coffee you want, and you can put it in the 2.0

22  brewer and brew it.  They are putting the My Cup back on the

23  market.  Well, if they had a safety and quality concern, why

24  are they doing that?  And the 2.0 brewer was never launched in

25  the office market; it was never launched in the office market.

F79VKEUA

1    So is it that Keurig doesn't care about office customers'

2    safety?  They don't care about people who go to the office?

3    No.  It puts the lie to this safety and quality claim.

4              Let's talk about compatibility.

5              Keurig says that the statements have to be judged at

6    the time they were made.  Let's take a look at a timeline here.

7    Bear with me for a second.

8              Can we take a look at 9, please.

9              This is the timeline.  The Keurig brewer launched in

10   August of 2014.  We allege that sales began of Treehouse cups

11   in November of 2014.  Keurig not only said that our cups will

12   not work with the brewers back then, our complaint says they

13   continue to make those representations on the box and

14   otherwise.  And the Court can take judicial notice of the fact

15   that if you go to a store today, that statement will still be

16   on the box:  Keurig brewer works only with Keurig-brand packs.

17   It is disingenuous to say that as of the date of the complaint

18   it was only a few weeks -- you can go there today and it's the

19   same packaging.  We know because we checked.

20             Now, they also talked about neutralization.  We were

21   in the position to neutralize.  As the Court says, if taken to

22   its extreme, that would defeat any Lanham Act claim.  You can

23   always neutralize.  But here, there was a particular reason why

24   we couldn't neutralize.

25             Let's look at the retailer timeline, which I think is

F79VKEUA

1    12.

2            Your Honor, all of these retailer meetings have been

3    alleged in excruciating detail in our amended complaint.  They

4    went to these retailers and they made all of these false

5    statements to these retailers during this time period,

6    including things like not only does the Keurig brewer not work

7    with other cups, it cannot be made to work with other cups,

8    which is a statement of a present-tense belief that the brewer

9    cannot be made to work with other cups.

10           How were we supposed to neutralize it?  Nobody had

11   access to the brewer.  We didn't know about these meetings.  We

12   didn't know what they were saying.  The retailers didn't have

13   access to the brewer.  Ms. Newton in this case sent us a letter

14   that said the brewer is highly confidential.  Of course it was.

15   It's highly confidential.  How are you going to say, You're

16   wrong about the brewer, it does recognize other packs.

17           We couldn't neutralize.

18           Now, as to *Ayerst*, let me say a couple of things about

19   *Ayerst*.

20           Oh, I'm sorry, there's one more point.  Ms. Newton

21   said -- I'm sorry, Ms. Brannon said --

22           THE COURT:  Oh, okay.

23           MR. BADINI:  -- that this is not really confusing and

24   it's a true statement.  In that same press release that was

25   issued by Keurig, their CEO admitted that their statements were

F79VKEUA

1    misleading consumers.  Let me read you the exact language, and

2    the Court can take judicial notice of this.

3              Their press release said:  The other key piece is we

4    look at the 2.0 launch.  We did not communicate effectively as

5    we could.  And there were many consumers who thought it only

6    brewed Green Mountain brand or Keurig-owned brands and we

7    didn't get the message out effectively, we didn't get it out

8    quickly enough and dispel the confusion consumers had.

9              That proves our case.  And we don't have to prove our

10   case.  All we have to do at this stage is plead facts showing

11   falsity, and we have done so, your Honor.

12             One quick point on *Ayerst*.  I think I heard counsel

13   say there were six elements to a Section 2 claim under *Ayerst*.

14   There aren't elements --

15             THE COURT:  I recognize that.

16             MR. BADINI:  -- there are factors.

17             THE COURT:  Yes.  And I recognize that there are

18   factors.

19             Mr. Badini, with regard to the statements though, do

20   you agree that -- I know that each side had referenced

21   categories, but that I could look to each of the statements to

22   make a determination about whether or not they pass muster for

23   purpose of a motion to dismiss.

24             MR. BADINI:  I'm sorry, I didn't hear that.

25             THE COURT:  In other words, there are multiple

F79VKEUA

1    statements in there.  There may be some that I agree are false

2    that are material, and others that I say on their face don't

3    appear to be false.  What I am asking is if I look at some of

4    the statements and I say that they are not false or they are

5    not material, the claim would still exist, but can I strike

6    those portions of the amended complaints?

7              MR. BADINI:  That's an excellent question, your Honor.

8              Let me say I am not aware of a case -- and that's not

9    to say there aren't some, I'm just not aware of a case that has

10   stricken them on a statement-by-statement basis.

11             I think the key issue for the Court is does the cause

12   of action survive.  So I think if several of the statements or

13   one of the statements survives, I think the cause of action

14   survives.  I'm not sure a statement-by-statement analysis is

15   what's required here.

16             THE COURT:  Okay.

17             MR. BADINI:  Thank you, your Honor.

18             MR. JOHNSON:  Your Honor, a brief comment.

19             THE COURT:  Sure.  And Mr. Johnson, also, if you

20   could, because there was another question I had, which was as I

21   understand it, there's at least one statement -- and again,

22   this may not be an issue, and I'll have to take a look at the

23   statement-by-statement versus cause of action.  But there is a

24   statement that using unlicensed packs in a 2.0 may void your

25   warranty.  And my question is how is that false; and the second

F79VKEUA

1    part would be how would that be misleading, especially when it

2    uses the term "may."

3               MR. JOHNSON:  Sure.

4          The answer to the first question is as pleaded, we

5    assert that it's false and that it is misleading consumers.

6    And we then go forth and allege how specific consumers have

7    contacted Keurig to specifically discuss this warranty and been

8    told you voided your warranty by using this product.  Those are

9    specific allegations in the complaint.  No more is required.

10         If the Court's assertion about whether I find certain

11   statements to be true or not true, that's at the proof stage,

12   not the pleading stage.  Are they going to file a motion for

13   summary judgment to say it's not false?  We assert that it is.

14   That's subject to proof.  That is not before you at this time.

15         I only have two points to make, and that is --

16              MR. BADINI:  May I answer your question, too?  Because

17   I think this is directly responsive.

18         First of all, with respect to the "may void your

19   warranty," Treehouse concedes that the "may" version of that

20   statement cannot be literally false.  However, as we've pled in

21   our complaint -- it can be misleading, but it cannot be

22   literally false.  As we've pled in our complaint, there are two

23   versions of the way they said it.  Another version is more

24   definitive; it's something like "does void your warranty."  We

25   believe that is literally --

F79VKEUA

1          THE COURT:  Okay.  And I think that may have been

2     connected to what Mr. Johnson was alluding to with regard to

3     the customer --

4          MR. BADINI:  Thank you.

5          THE COURT:  Okay.

6          MR. JOHNSON:  Two additional points that I would make

7     under 17200 and 17500.  The standard is was a statement false

8     or was it likely to mislead consumers.  That's the standard

9     that applies.

10          THE COURT:  This is a California statute.

11          MR. JOHNSON:  Under California law.  Was it false; was

12     it likely to deceive.

13          The case that I would direct the Court to is the *Pom*

14     *Wonderful v. Purely Juice* where representations were made about

15     the purity of pomegranate juice.  And the court said, You made

16     a statement that you were 100 percent pure; it's not true;

17     you're a liar.

18          So under 17200 and 17500, I'm not concerned at all

19     about whether or not there was some ability to ameliorate some

20     of these statements.  The facts as pleaded are sufficient to

21     give rise to the claim.

22          THE COURT:  Okay.  Thank you.

23          Ms. Brannon.

24          MS. BRANNON:  Thank you, your Honor.

25          I just wanted to go back briefly to the Treehouse

F79VKEUA

complaint.  Mr. Badini said if we had stopped at saying we had the perfect cup of coffee, that would be okay; but the problem is that perfect cup of coffee is combined with recipe and that makes it very specific.

I would point your Honor to paragraph 405 of their complaint where they say that Keurig asserted in its 2013 investor day slides that its interactive technology, recognizing only licensed portion packs, would allow 2.0 K-cup brewers to deliver the perfect beverage.  Mr. Kelley has claimed that this function provides game-changing performance, allowing the brewers to provide consumers with the perfect brew settings for each beverage by recognizing the recipes of licensed portion packs.

Paragraph 406 then says:  However, these vague claims lack any real substance.

I think this dispenses with their claims about quality, perfect brew, and their statements about the mechanics of the brewer and the recipes.  They themselves recognize that these are vague statements that are nonactionable under the Sherman Act and the Lanham Act.

With respect to the deposition testimony that Mr. Badini cited, saying that there were retailer presentations that were inaccurate when made, I think it is very important to look at the allegations in the complaint.

Paragraph 525 of the Treehouse complaint cites either,

F79VKEUA

I believe, two or three presentations made to specific
retailers where Keurig said that all of its 1.0 models would be
discontinued by the spring of 2015.  And what Mr. Badini is
alleging is that, in fact, Keurig decided not to retire the
last of its 1.0 models, the mini is still on the market.
That's what they are alleging.

So the question then becomes is this statement to
retailers about the precise sunset date for one model of the
1.0 brewer made by Keurig, is that material to any sales?  And
it's just not plausible that it would be material to anything.

The plaintiffs themselves concede, as I mentioned
before, that there are other 1.0 machines by other
manufacturers, including Mr. Coffee, Cuisinart, Breville.  This
is Treehouse paragraph 79, JBR paragraphs 204 to 05.  They also
allege a massive installed base of 1.0 brewers.  Treehouse
paragraphs 86 to 87 they allege 30 million Keurig 1.0 brewers
by the fall of 2013.  JBR, in Paragraph 28, an installed base
of approximately 40 million 1.0 brewers by fiscal year 2014.

With these massive install bases of 1.0 brewers
already out there, a new 1.0 brewer is continuing to be sold by
other manufacturers.  The precise sunset date of one Keurig
brewer model is simply not material to anything.

Third, with respect to compatibility, I think
Mr. Badini is confusing two different things.  He's saying they
couldn't neutralize the statement about their product not being

F79VKEUA

1    compatible in February of 2014, because the statement was true

2    at that time.  They didn't have a compatible cup.

3         Now, when they reverse-engineered the product, they

4    secured distribution at major retailers, and the complaint

5    alleges that their product was in full distribution; it was in

6    distribution at Sam's Club.  It's a major retailer.  And so the

7    reality is they couldn't neutralize it when the statement was

8    true.  When they reverse-engineered the product and they did

9    have something compatible, they immediately allege themselves

10   that they did neutralize it.  So I don't think they can state a

11   claim based on that either.

12        Then with respect to the warranty, Mr. Badini concedes

13   that the "may" version of the warranty is true.  But he says

14   there were some statements where Keurig went beyond "may" and

15   said, It will void your warranty.

16        If you look at the complaint at the specific

17   paragraphs that take it beyond "may," those paragraphs say that

18   it was a report of a customer service rep saying it to a

19   customer on the phone.  So Keurig's published materials that

20   were broadly disseminated or continued for prolonged periods as

21   required by the Sherman Act and the Lanham Act, those always

22   say "may."  There's nothing in the complaint that says

23   otherwise.  The statements where they say Keurig went further

24   than "may" is when they are alleging that was supposedly said

25   by a customer service rep to a customer.  And I don't think

F79VKEUA

1   that meets the promulgation dissemination requirements, and I

2   don't think it would be material or cause any proximate harm to

3   Treehouse and JBR.

4           Finally, with respect to your Honor's question about

5   whether the Court can look statement-by-statement, I do think

6   you can.  The Court in the *Sytech* case did that.  I think

7   that's a good one to look at.  Although I think that the

8   results should be different in our case, and I think all of

9   those statements fail to state a claim.

10          But in the *Sytech* case, the court said a small number

11  of the nearly three dozen statements identified may provide a

12  basis upon which relief may be granted, and identified in

13  particular statements that the machine at issue worked faster.

14  That is a specific statement that was alleged to be false.

15  There is no allegation here that Keurig said the 2.0 brewer

16  brews faster than any other brewer, and that's false.

17          I would also say with respect to one other materiality

18  point, Mr. Badini -- you asked how something was material, and

19  he said it was material to sales of 2.0 brewers.  But sales of

20  2.0 brewers also don't hurt Mr. Badini's client because he

21  alleges that his client has a 2.0-compatible portion pack.  In

22  their earnings calls, which they cite in the complaint, they

23  say that the 2.0 brewer has helped grow the market.  So I don't

24  see that that hurts them or is material to them or proximately

25  causes any injury.

F79VKEUA

1              In summary, your Honor, I do believe that you can look

2      at the statements individually.  And there are a lot of

3      statements; these are very large complaints.  But I do think if

4      you walk through every one of the statements, there's not a

5      single one of them that meets the requirements to state a

6      claim.

7              Thank you, your Honor.

8              THE COURT:  Thank you.

9              Okay.  We're onto the direct or indirect purchaser

10     plaintiffs have standing.  I don't know who is going to be

11     addressing --

12             MS. BRANNON:  That's me again on this side, your

13     Honor.

14             THE COURT:  Okay.

15             MR. BADINI:  I think we need to shuffle a little, your

16     Honor.

17             THE COURT:  Why don't you take your time.

18             (Pause)

19             THE COURT:  You may proceed.

20             MS. BRANNON:  Your Honor asked whether the direct and

21     indirect purchaser plaintiffs have standing.  The answer to

22     that question is no.  Neither the direct purchasers nor the

23     indirect purchasers are efficient enforcers of the antitrust

24     laws.  The injuries that they are alleging here are indirect

25     and derivative of the harm that's alleged to competitors.  The

F79VKEUA

1    standing is a threshold pleading stage inquiry.

2            It is well-established that Congress did not intend

3    the antitrust laws to provide a remedy in damages for all

4    injuries that might conceivably be traced to an antitrust

5    violation.

6            THE COURT:  That's what happens when you have people

7    on the clock.

8            MS. BRANNON:  Sorry.  I know everyone is hungry and

9    it's lunchtime.

10           THE COURT:  No, no, no, just take your time.  It's

11   fine.

12           MS. BRANNON:  I think there is no dispute between the

13   parties about what the efficient enforcer standards are.  They

14   look at the directness or indirectness of the alleged injury,

15   the existence of an identifiable class of persons whose

16   self-interests would normally motivate them to enforce the

17   antitrust laws, the speculativeness of the injury, and the

18   difficulty of identifying and apportioning damages so as to

19   avoid duplicative recovery.

20           And because I have very little time, I thought maybe

21   what would be useful is to focus on two cases that got a lot of

22   attention in the briefing:  *Paycom* and *DDAVP*.  They are both

23   Second Circuit decisions.  We've argued the facts here are much

24   more like *Paycom*; the plaintiffs have argued that the facts are

25   much more like *DDAVP*.

F79VKEUA

1          We believe that *Paycom* is the right Second Circuit

2     case to look at here.  This is a multifactor test; of course it

3     depends on the facts of the case.  These are two different

4     fact-specific applications.

5          In *Paycom*, plaintiff Paycom was a payment processor

6     for website operators who did not charge their customers

7     directly; tended to be adult-content websites.  Paycom was a

8     direct purchaser from MasterCard.  It purchased services and

9     MasterCard processed transactions.

10          What *Paycom* alleged was that MasterCard had what was

11    called the competitive programs policy, the CPP.  And they

12    alleged that that locked up issuing banks and made it hard for

13    MasterCard's competitors, Discover and American Express, to

14    work with banks.  And *Paycom* said, Because of that, because

15    competitors were locked out, they were not able to compete as

16    efficiently, they couldn't discipline MasterCard.  As a result,

17    MasterCard charged us, Paycom, higher fees.

18          I think that's very analogous to what the purchaser

19    plaintiffs are alleging here.  They are alleging that Keurig

20    engaged in certain conduct like an exclusive deal with a

21    plastic cup manufacturer, and that caused Treehouse -- although

22    not JBR -- to have to spend money to work with a plastic cup

23    developer to develop its own.  And although purchasers don't

24    spell out the chain of causation, their theory -- we walked

25    through in our briefs in bullet points what we think they would

F79VKEUA

need to prove or need to allege even to get to harm to them,
but somehow those costs led to Treehouse having higher prices,
Keurig responding to all the competitors in the industry having
higher prices by raising its own prices, and that being charged
onto purchasers.  And that is the precise type of theory that
the Court in the *Paycom* case said was indirect and speculative
under the AGC factors.

The other key issue in *Paycom*, I think, is that the
court noted that there were alternative enforcers.  And the
court said:  Denying Paycom a remedy on the basis of its
allegations in this case is not likely to leave a significant
antitrust violation undetected or unremedied.

The Second Circuit reached a similar conclusion in
*Gatt*, even though no more suitable plaintiffs had filed suit in
that case.

The same thing is true here.  As witnessed by the
presence of Mr. Badini and Mr. Johnson in this courtroom, there
are other plaintiffs.  The competitors, in fact, have the
resources and incentive to file suit.  They filed suit before
the purchasers here.

*DDAVP*, in contrast, is a different application of the
same factors to a different set of facts.  In *DDAVP*, the
allegation was that a branded drug company had committed fraud
on the patent office to obtain a patent that it shouldn't have
obtained.  It was able to use that patent to completely exclude

F79VKEUA

1    generic competition.  And the court said that's a more direct

2    theory of harm.  And the court said, In the context of the

3    pharmaceutical industry, where branded and generic drug

4    companies have complex relationships, relying on the generic

5    competitors to lead the antitrust charge may ask too much of

6    them, because they may not have those strategic interests or

7    the resources to start or win such a battle.  The generics had

8    not brought suit in that case, and the court was concerned that

9    they wouldn't do so.

10            Again, that is not a concern here.  We think our facts

11   are more like *Paycom* than *DDAVP*, and we believe the purchasers

12   are not efficient enforcers.

13            THE COURT:  Are damages though different?  In other

14   words, I think the allegation is, again, that the -- well,

15   let's deal with the direct purchasers.  The direct purchasers

16   ended up paying more for their cups than they would otherwise

17   have but for Keurig's actions.

18            MS. BRANNON:  The plaintiffs do make that argument.

19   That argument could also have been made in *Paycom.*  Paycom

20   could have said, Look -- I think they did make that argument,

21   that they are seeking a different recovery.

22            But the reality is it's a multifactor test.  And we

23   believe that because of the speculative nature of the injury,

24   because competitor plaintiffs have sued and are seeking treble

25   damages and an injunction against the conduct at issue, that

F79VKEUA

1       the public interest and enforcement factor is satisfied.  And

2       we think the presence of an alternative enforcer is clearly --

3       there is clearly an alternative enforcer present here, and that

4       the injury is simply too speculative in this case to have the

5       purchasers coming in, as well.

6                So we don't think they are efficient.

7                THE COURT:  Thank you.

8                MS. BRANNON:  Thank you, your Honor.

9                MR. PERSKY:  If I may, I'd like to have my colleague

10      hand up the slides that I referred to in my prior presentation,

11      and I'm going to refer to in this current presentation.

12               THE COURT:  Okay.

13               MR. PERSKY:  And my colleague will hand out the copies

14      of the slides to everyone else.

15               THE COURT:  Okay.

16               MR. PERSKY:  With respect to the standing of the

17      direct purchasers here, the direct purchasers -- slide 1

18      please -- directly purchased K-cups from Keurig and suffered

19      well-recognized classic antitrust injury here.  What is that

20      injury?  The payment of overcharges.  What are overcharges?

21      The difference between the price that was paid and the price

22      which they would have paid in the absence of Keurig's unlawful

23      conduct.

24               The leading case in the Second Circuit on this point

25      supporting the direct purchasers' standing here is the *DDAVP*

F79VKEUA

1    case, a case not even cited in defendants' moving brief.  That

2    case, the direct purchasers' standing was upheld even though

3    defendants' competitors had also sued for the same antitrust

4    violation.

5            Both in *DDAVP* and in our case the direct purchasers

6    are suing for overcharged damages, while the competitors in

7    *DDAVP* and in our case are suing for lost profits.

8            Contrary to Keurig's argument, the *DDAVP* holding is

9    not limited to patent cases such as Walker Process antitrust

10   claims.  The *DDAVP* case merely applied well-recognized, basic

11   antitrust standing principles.  The Second Circuit held in that

12   case that the presence of patent issues in the Walker Process

13   claim was not dispositive and didn't change the basic antitrust

14   analysis of standing.

15           Keurig claims that the direct purchasers fail to

16   satisfy the associated general contractors antitrust standing

17   test.  That's the basic test for standing under the antitrust

18   laws.

19           What about the directness of injury?  That's one of

20   the AGC factors.  The direct purchasers expressly allege they

21   were directly harmed when they paid overcharges directly to

22   Keurig.  Keurig cites the *Paycom* case.  The Second Circuit in

23   the *DDAVP* case disposed of that case and distinguished it from

24   the direct purchasers situation here.

25           The damages claimed by the plaintiff in *Paycom* were

F79VKEUA

speculative.  First of all, the chargebacks that they claimed

ended up that they were indirect purchasers with respect to

paying chargebacks.  With respect to the damages they were

claiming, they were talking about what if MasterCard changed

its rules, allowed the banks to join Discover and American

Express, there would be different rules and perhaps they would

be paying less.  The Court correctly held in the Second Circuit

*Paycom* case those damages were speculative.

What about the speculative nature of the injury and

the difficulty of apportionment of damages, an AGC factor here?

The overcharge harm constitutes traditional antitrust damages.

The overcharges here are computable and not speculative.

There's no overlap between the direct purchasers and the

competitor plaintiffs' damages.  Overcharges versus lost

profits.  And even if there were some overlap -- and there

isn't -- *DDAVP* allows some overlap in damages.

The Illinois Brick doctrine is inapplicable here to

the direct purchasers.  There was no apportionment between the

direct and the indirect purchasers under federal law.  In other

words, whatever the overcharges paid by the direct purchasers,

they are recoverable; they do not split them with the indirect

purchasers under federal law.  That does not occur.

I'd like to go to the next slide, please.

And that's because of the Illinois Brick doctrine, the

Illinois Brick repealers statutes passed by the states in

F79VKEUA

1    *California v. ARC America*, which the Supreme Court said the

2    federal antitrust laws do not preempt the state indirect

3    purchaser laws.  So the indirect purchasers can move forward

4    with their claims for whatever overcharges were passed down to

5    them, and the direct purchasers, under federal law, can sue for

6    the overcharges they paid.

7              Are there alternative enforcers?  Yes.

8              We agree that the competitors, like JBR and Treehouse,

9    are motivated to sue.  But so are the direct purchasers here.

10   They are also motivated to sue to recover their overcharges.

11   Thus, the direct purchasers are an efficient enforcer of

12   antitrust laws.  *DDAVP* held that they don't have to be the most

13   efficient enforcer.  In other words, you can have two sets of

14   efficient enforcers who are separately motivated to enforce the

15   antitrust laws so long as their damages are not duplicative.

16             Keurig also asserts lack of standing for the direct

17   purchasers because the direct purchasers don't allege they own

18   the 2.0 brewer.  This totally misunderstands the direct

19   purchasers' claim.  The 2.0 and related misrepresentations by

20   Keurig caused the retailers and distributors not to stock or

21   carry competitive cups, causing the direct purchasers, once

22   again, to pay more for their K-cups.  You don't have to own a

23   2.0 to have standing to complain about the misrepresentations

24   and unlawful conduct related to the 2.0.

25             Now, an important fact is that the *DDAVP* case is the

F79VKEUA

 1    standard in this circuit.  And that's reflected in a recent

 2    decision in the *Credit Default Swaps* case in September of 2014

 3    by Judge Cote in this Court.

 4              I'd like to have the next slide please.

 5              In that case, the direct purchasers who paid

 6    supercompetitive prices, overcharges, and the competitors who

 7    lost profits as a result of the antitrust violations, each were

 8    held to have antitrust standing, for each has "distinct

 9    injuries."  Denying direct purchasers standing in favor of

10    suits by competitors as held in the *Credit Default Swaps* case

11    "would be likely to leave a significant antitrust violation

12    unremedied."

13              As the *Credit Default Swaps* case makes clear*,* *DDAVP* is

14    the applicable standard here.  It's not limited to patent

15    cases.  We fully satisfied that under classic antitrust

16    standing principles.

17              Thank you, your Honor.

18              THE COURT:  Okay.  Thank you.

19              MR. BURT:  Your Honor, Thomas Burt for the indirect

20    purchasers.

21              And just briefly, the indirect purchaser plaintiffs

22    are here under state statutes where the states have

23    specifically decided as a matter of public policy to extend

24    standing to people who purchased through resellers.  So the

25    theory of injury, of course, is the classic antitrust theory

F79VKEUA

1    that Keurig made a product, and that because of their

2    anticompetitive conduct, they were able to impose an overcharge

3    on it, and the indirect purchasers purchased the product and

4    paid the overcharge.

5          Keurig looks to AGC analysis to knock out the indirect

6    purchasers on standing; but AGC, in the context of an Illinois

7    Brick repealer state, doesn't apply in one of two ways:  Either

8    the state has said, We don't import the federal doctrine

9    here -- and the best examples of that are Vermont and

10   California -- or the state, to the extent it looks to that sort

11   of analysis, looks to it only consistent with its own public

12   policy to allow these claims.

13         And if the Court needs to do a state-by-state

14   analysis, we have tables B and C to our opposition which go

15   state-by-state and talk about Keurig's authorities, the other

16   cases that have considered each state's position on this, the

17   ones where there's guidance from the courts, the ones where

18   it's merely an interpretation of the harmonization provision,

19   if the Court needs to do the state-by-state analysis.  And I

20   don't think the Court does, because I think these claims,

21   because of the way we've pleaded them, satisfy any standard.

22         Your Honor, what we pleaded in the complaint in

23   paragraphs 28 through 34 is the product came down to us from

24   Keurig in exactly the unadulterated form that Keurig made it,

25   and the packaging, through a very short trip through the

F79VKEUA

1    distribution chain.  And those factual pleadings make it a very

2    direct line to our claims.  And, therefore, while we are

3    bringing them as indirect claims under state laws that permit

4    exactly that, it's not a complicated analysis.

5            On the issue of whether there are other enforcers,

6    you've heard about that.

7            On *Paycom*, your Honor --

8            THE COURT:  Just briefly, are you saying because

9    you're more of a direct indirect purchaser that that -- what

10   are the cases that say that that's legally significant?  In

11   other words, I understand what you are saying that the line --

12   therefore, I don't need to look at each state-by-state.

13           What are the cases that say that?

14           MR. BURT:  It goes to all the cases that discuss --

15   the efficient enforcer factors discuss both the speculativeness

16   and apportionment factor.  The shorter and simpler the chain of

17   commerce, the shorter the chain of causation, and among other

18   things, CDS, it says.  The shorter and simpler the chain of

19   causation, the easier that analysis is to do.

20           Here, the chain of causation is very simpler and

21   there's no speculativeness.  It's simply an overcharge passed

22   in a product that's unadulterated from the time it comes out of

23   the manufacturer to the time the end user uses it.  There's no

24   speculation involved.

25           *Paycom*, for example, does actually provide us a view

F79VKEUA

of what a speculative theory of injury looks like.  And I

confess to finding *Paycom* somewhat fascinating.  I'll do this

really quick.

In *Paycom*, the theory was not that Paycom had paid an

overcharge, but, rather, that MasterCard only would do business

with Paycom on terms concerning how to apportion the risk of

chargebacks that were disadvantageous to it.  Paycom said, If

there had been more competition between MasterCard and other

national networks, then MasterCard would have had to compete

not on price, but by offering us different terms on those

aspects of this business that we found disadvantageous.

And the Court said, First, you can't know that; and

second, to the extent you can look at what actually happened in

the real world to tell you if that would have happened, we look

at a period during which Visa and MasterCard were on equal

footing, Visa had slightly different terms and MasterCard

didn't move to match them.  So to the extent the real world is

instructive on this, it doesn't match.  They are not paying an

overcharge, like plaintiffs are here; they are seeking to claim

that a nonprice term would have been done differently, which is

a speculative inquiry when one does the AGC analysis.

THE COURT:  Okay.  Thank you.

MR. BURT:  Thank you, your Honor.

MR. KAPLAN:  In *DDAVP*, there were indirect purchasers

also, so it wasn't just direct purchasers.

F79VKEUA

1          There have been a whole bevy of antitrust drug cases

2     where there are the generics who were in litigation with the

3     brand name, and the generics have antitrust counterclaims, and

4     there are direct purchasers and indirect purchasers, and they

5     all go forward together.  There have been a lot of cases like

6     that.

7          So there's a lot of precedent here with the

8     competitors and the direct and the indirect.

9          Thank you, your Honor.

10          THE COURT:  Thank you, Mr. Kaplan.

11          MS. BRANNON:  Your Honor?

12          THE COURT:  Yes.  Oh, yes, I'm sorry.

13          MS. BRANNON:  If I could just respond very briefly on

14     the points just made about standing.

15          *Paycom* did involve allegations of an overcharge.  This

16     is in the *Paycom* opinion under the heading "2, The Competitive

17     Programs Policy."

18          The allegation is that other payment card networks

19     were therefore unable to discipline MasterCard through

20     competition, leaving it free to impose higher interchange fees.

21          There was an alleged overcharge in *Paycom*.

22          The reason why the Court said that that was too

23     speculative is the same reason why it's too speculative here.

24     It's not because we're alleging that this is a component that

25     went through a long chain of production and distribution and

F79VKEUA

1    handoff.  That is often alleged in these cases, but it's not a

2    requirement, and *Paycom* is a good example of that.

3         The thing that is speculative is how the overcharge

4    came about.  And what *Paycom* was alleging is that the

5    overcharge came about because MasterCard took actions like

6    exclusive deals with banks that injured American Express and

7    Discover, made them less able to compete, that allowed

8    MasterCard to charge higher fees.

9         That is exactly what's being alleged here.

10        The speculativeness is the overcharge.  Plaintiffs

11   like to start and purchasers plaintiffs say there's an

12   overcharge.  But how did that overcharge come about.  And the

13   actions they have alleged are actions targeting the competitors

14   that they are alleging somehow rippled through a chain of

15   events that they don't describe to lead to higher prices being

16   charged for K-cups.

17        So that is the speculativeness.  This is on all fours

18   with *Paycom*.

19        In *DDAVP*, the competitors had not brought suit.

20        And in *Credit Default Swap*, the recent opinion that

21   was mentioned, the competitors were completely excluded.  Like

22   in *DDAVP*, they did not enter, it was not a theory of raising

23   their costs, but they were competing.  And no alternate

24   enforcer had filed suit.  Again, like *DDAVP*, there was no other

25   suit pending.

F79VKEUA

1          This is like *Paycom* because of the speculativeness of

2     the nature of the injury, how the alleged overcharge came

3     about, and because of the presence of alternative enforcers.

4          Thank you, your Honor.

5          THE COURT:  Okay.

6          MR. PERSKY:  Your Honor, I just wanted to briefly

7     state it doesn't take a rocket scientist to figure out what the

8     overcharges are here.  The prices went up during the period of

9     their anticompetitive activity.  We purchased those products

10    with the prices going up.  The prices would have been less had

11    there been real competition, which was suppressed by the

12    anticompetitive activities that we've been complaining about.

13    It's totally different than *Paycom*, where you have to try to

14    figure out whether if you change the rules here, what would the

15    new rules be and how would *Paycom* be benefited by it.  It's

16    nothing like the overcharges being sought here, which is

17    classic, standard antitrust doctrine.

18         THE COURT:  Okay.  All right.

19         I know that I reserved some time for miscellaneous

20    questions.  I think I'm going to forego the opportunity.

21    Unlike when I was in private practice, when I would never

22    forego the opportunity to stand up and say something, I'm going

23    to forego the opportunity, I think, at this stage to ask any

24    additional questions.  I think the parties have covered the

25    landscape and responded to my questions.

F79VKEUA

1           As a practical matter, I wasn't sure whether I was

2    going to mention this, but in the *Treehouse* complaint, there is

3    reference to reserving the right to add additional defendants.

4    Obviously we haven't gone too far.  The case has been pending

5    for a bit, but we haven't gone too far down the line in terms

6    of discovery and things like that.

7           And I don't know whether there's an actual intent to

8    add additional parties or whether that was something just in

9    there in an abundance of caution to preserve the right, but

10   I'll hear from Mr. Badini on that.  I'm not saying one way or

11   the other about what I'm -- I just noticed it and I was just

12   wondering -- and there were two, I think, particular parties

13   who were referred to specifically in that commentary, so I'll

14   hear from you on that.

15          And I apologize, I didn't give you fair warning.

16          MR. BADINI:  That's fine.

17          First of all, there is no present intent to add

18   parties.  It was in an excess of caution.  Lawyers try never to

19   say never.  I won't say never, but we have no intention at this

20   point.

21          THE COURT:  All right.

22          Yes, Mr. Cary.

23          MR. CARY:  Your Honor, just briefly, we started off

24   addressing two questions that your Honor posed.  The other side

25   has brought in a lot of the other miscellaneous issues that

F79VKEUA

1    were not specified by your question.

2              I would just briefly like to say that notwithstanding

3    all of that, all of those other allegations that they've now

4    thrown in, the bottom line is going to the high level, this

5    started out as a product design claim.  They said, We are

6    competing in this marketplace; you are changing from 1.0 to 2.0

7    to lock us out, and that's going to interrupt our growth,

8    that's going to interrupt our ability to compete.

9              We've now demonstrated that that's not interrupting

10   their ability to compete.  The allegations in the complaint

11   made very clear that they are competing, are effectively

12   competing; they haven't been substantially foreclosed.

13             So, again, going back up to the highest level, they

14   are trying to bring us into this antitrust case, keep us in

15   this antitrust case, impose millions of dollars of expense,

16   and, in fact, hinder competition in this marketplace, while at

17   the same time acknowledging in their complaint that they are

18   competing, are able to address customers, and are winning

19   business.  18,000 customers have reviewed their product on

20   Amazon, they allege in the complaint, JBR alleges in the

21   complaint.

22             So I just wanted to bring it back up to that top

23   level.  These allegations about the brands conspiring with each

24   other, for which there is no support whatsoever, the

25   allegations about tying arrangements, for which there is no

F79VKEUA

1    support even in the complaints whatsoever, all of those things

2    that were put on the chart that was put on the screen

3    balancing, which your Honor did not include in your questions,

4    the allegations in the complaint are not sufficient to get us

5    back to the fundamental point that these competitors are able

6    to address consumers, are alleging affirmatively that their

7    prices are 25 percent lower than Keurig's prices.

8         Competition is alive and well in the industry, your

9    Honor.

10        THE COURT:  Okay.  Thank you.

11        Anything else that we need to address today?

12        Okay.  Thank you very much for the papers -- although

13   it's a lot of paper, and I got some more today -- and for the

14   argument.

15                           *    *    *

16

17

18

19

20

21

22

23

24

25