UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                  :

IN RE:                            :

KEURIG GREEN MOUNTAIN SINGLE-  :          14-MD-2542 (VSB)
SERVE COFFEE ANTITRUST      :
LITIGATION                    :          **<u>OPINION & ORDER</u>**
                                  :

*This Document Relates to All Actions*  :
                                  :
------------------------------------------------------X

<u>Appearances</u>:

Daniel Johnson, Jr.
Dan Johnson Law Group
San Francisco, California
*Counsel for Plaintiff JBR, Inc.*

Aldo A. Badini
Susannah P. Torpey
Winston & Strawn LLP
New York, New York

Dan K. Webb
James F. Herbison
Winston & Strawn LLP
Chicago, Illinois

Diana L. Hughes
Winston & Strawn LLP
Los Angeles, California
*Counsel for Plaintiffs TreeHouse Foods, Inc.; Bay Valley
Foods, LLC; and Sturm Foods, Inc.*

Michael M. Buchman
John A. Ioannou
Alex R. Straus
Motley Rice LLC
New York, New York

Kellie Lerner
Meegan Hollywood
Robins Kaplan LLP
New York, New York

*Counsel for Direct Purchaser Plaintiffs and Interim Co-Lead Counsel for the Proposed Direct Purchaser Plaintiff Class*

Fred T. Isquith
Thomas H. Burt
Michael Liskow
Wolf Haldenstein Adler Freeman & Herz LLP
New York, New York

*Interim Co-Lead and Liaison Counsel for the Proposed Classes of Indirect Purchaser Plaintiffs*

Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Mario M. Choi
Matthew P. McCahill
Kaplan Fox & Kilsheimer LLP
New York, New York

Bruce L. Simon
Robert G. Retana
Aaron M. Sheanin
Pearson, Simon & Warshaw, LLP
San Francisco, California

*Interim Co-Lead Counsel for the Proposed Classes of Indirect Purchaser Plaintiffs*

Lev Dassin
George S. Cary
Leah Brannon
Elaine Ewing
Cleary Gottlieb Steen & Hamilton LLP
New York, New York

Wendelynne Newton
Buchanan Ingersoll & Rooney PC
Pittsburgh, Pennsylvania

*Counsel for Defendant Keurig Green Mountain, Inc.*

VERNON S. BRODERICK, United States District Judge:

Before me are four motions to dismiss filed by Defendant Keurig Green Mountain, Inc. ("Keurig" or "Defendant"),[1] formerly known as Green Mountain Coffee Roasters, Inc. and as successor to Keurig, Incorporated, in this multi-district litigation. This Opinion & Order addresses all pending motions, which seek dismissal of four separate amended complaints: (1) the First Amended and Supplemental Complaint of Plaintiff JBR, Inc. (d/b/a Rogers Family Company) ("Rogers"), a privately held roaster, packager, and seller of coffee products, which alleges that Keurig has engaged in anticompetitive practices that had the effect of excluding Rogers from the market for cups or pods used in Keurig's single-server brewer machines, (No. 14-CV-4242, Doc. 83 (the "Rogers Amended Complaint" or "Rogers AC")); (2) the Amended and Supplemental Complaint of Plaintiff TreeHouse Foods, Inc., a food manufacturer operating in the United States, as well as its wholly-owned subsidiaries Plaintiff Bay Valley Foods, LLC ("Bay Valley") and Plaintiff Sturm Foods, Inc. ("Sturm") (collectively, "TreeHouse"), which claims that Keurig's allegedly anticompetitive practices excluded TreeHouse from the same market, (No. 14-CV-905, Doc. 86; (the "TreeHouse Amended Complaint" or "TreeHouse AC")); (3) the Consolidated Amended Class Action Complaint of direct purchaser Plaintiffs Kenneth B. Burkley, Roger Davidson, Judy Hoyer, Benjamin Krajcir, James G. Long, Linda Major, Sally Rizzo, Henry A. Rocker, David Rosenthal, and Todd W. Springer (collectively, the "DPP Named Plaintiffs"), individually and on behalf of a class of direct purchaser plaintiffs, (collectively, the "DPPs"), which claims that Keurig's allegedly anticompetitive practices caused the DPPs to be overcharged for their purchases of cups or pods used in Keurig's single-server brewer machines,

---

[1] Keurig, Inc. became a wholly-owned subsidiary of Defendant Keurig Green Mountain, Inc. in 2006, which merged into Green Mountain Coffee Roasters, Inc. on December 31, 2013. (TreeHouse AC 1 n.1.) I will refer to Defendant as Keurig throughout this Opinion & Order whether referring to Defendant, Green Mountain Coffee Roasters, or Keurig, Inc. unless otherwise noted.

(Doc. 237 (the "DPP Amended Complaint" or "DPP AC")); and (4) the Second Consolidated Amended Class Action Complaint of indirect purchaser Plaintiffs Yelda Mesbah Bartlett, Lavinia Simona Biasell, Linda Bouchard, Bouchard & Sons Garage, Inc., Jessica Searles Cristani, Kathryn Pauline D'Agostino, Jonna Dugan, Michael J. Flanagan, Larry Gallant, Patricia Hall, Joseph Hurvitz, Jackson & Runyan, Certified Public Accountants, PLLC, Teena Marie Johnson, Darlene M. Kennedy, Lori Jo Kirkhart, John Lohin, Betty Ramey, Brier Miller Minor, David W. Nation, Patricia J. Nelson, Joyce E. Reynolds, Lauren Jill Schneider, Shirley Anne Schroeder, Rhett Montgomery Tanselle, Carey Rei Varnado, Constance Werthe, and Toni Williams (collectively, the "IPP Named Plaintiffs"), individually and on behalf of a class of indirect purchaser plaintiffs, (collectively, the "IPPs"), which claims that Keurig's allegedly anticompetitive practices caused the IPPs to be overcharged for their purchases of cups or pods used in Keurig's single-server brewer machines, (Doc. 238 (the "IPP Second Amended Complaint" or "IPP SAC")).[2]

The Rogers Amended Complaint, TreeHouse Amended Complaint, DPP Amended Complaint, and IPP Second Amended Complaint all allege violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Clayton Act, 15 U.S.C. § 14. (Rogers AC ¶¶ 294–331, 338–82; TreeHouse AC ¶¶ 569–602, 611–38; DPP AC ¶¶ 254–89; IPP SAC ¶¶ 251–94.) The Rogers Amended Complaint and TreeHouse Amended Complaint also allege claims for violations of the Lanham Act, 15 U.S.C. § 1125(a), (Rogers AC ¶¶ 383–88; TreeHouse AC ¶¶ 639–43), and for patent misuse, (Rogers AC ¶¶ 332–37; TreeHouse AC ¶¶ 603–10). The DPP

---

[2] The Rogers Amended Complaint was filed under seal; a redacted version was filed on the docket. (No. 14-CV-4242, Doc. 83.) The TreeHouse Amended Complaint was filed under seal; a redacted version was filed on the docket. (No. 14-CV-905, Doc. 86.) The DPP Amended Complaint was filed under seal; a redacted version was filed on the docket. (Doc. 237.) The IPP Second Amended Complaint was filed under seal; a redacted version was filed on the docket. (Doc. 238.) All references to documents filed on the docket are designated "Doc." and refer to the MDL Docket, No. 14-MD-2542, unless otherwise noted.

Amended Complaint alleges claims for common law unjust enrichment under the laws of the fifty states and the District of Columbia, (DPP AC ¶¶ 290–300), and the IPP Second Amended Complaint raises claims for common law unjust enrichment under the laws of seventeen states and the District of Columbia, (IPP SAC ¶¶ 481–516).

The Rogers Amended Complaint also alleges claims for violation of the California Cartwright Act, (Rogers AC ¶¶ 389–90), and for: (1) violation of the California False Advertising Law, (*id.* ¶¶ 393–97); (2) violation of the California Unfair Competition Law, (*id.* ¶¶ 398–406); (3) violation of California common law unfair competition, (*id.* ¶¶ 391–92); (4) intentional interference with prospective economic advantage under California law, (*id.* ¶¶ 407–11); and (5) intentional interference with contractual relations under California law, (*id.* ¶¶ 412–14). The TreeHouse Amended Complaint also alleges claims for violations of: (1) the Illinois Antitrust Act, (TreeHouse AC ¶¶ 569–602, 611–38, 650–53); (2) the Wisconsin Antitrust Act, (*id.* ¶¶ 569–602, 611–38, 654–57); (3) the New York Donnelly Act, (*id.* ¶¶ 577–84, 625–38, 644–45); (4) the Illinois Consumer Fraud and Deceptive Business Practices Act, (*id.* ¶¶ 639–43); (5) the New York Consumer Protection Act, (*id.*); (6) the Illinois Uniform Deceptive Trade Practices Act, (*id.* ¶¶ 639–43, 646–49); and (7) Wisconsin common law unfair competition, (*id.* ¶¶ 658–61). The TreeHouse Amended Complaint also alleges claims for negligent and intentional interference with business relations under New York law, (*id.* ¶¶ 662–70), tortious interference with contract under New York Law, (*id.* ¶¶ 671–77), tortious interference with contract under Wisconsin law, (*id.* ¶¶ 678–80), tortious interference with prospective business expectancy under Illinois law, (*id.* ¶¶ 681–84), and tortious interference with contract under Illinois law, (*id.* ¶¶ 685–91). The IPP Second Amended Complaint alleges violations of the antitrust and unfair competition laws of twenty-one states and the District of Columbia, (IPP

SAC ¶¶ 225–50, 295–447), and the consumer protection and unfair trade practices laws of six states, (*id.* ¶¶ 448–80). Keurig purports to move to dismiss the amended complaints in each action in their entirety under Federal Rule of Civil Procedure 12(b)(6).[3] I held oral argument on these motions on July 9, 2015.

For the reasons stated herein, Keurig's motions are granted in part and denied in part.

---

[3] Although Keurig moves to dismiss the amended complaints in their entirety, its briefing does not address every cause of action specifically. In this Opinion & Order, I address only those causes of action that have been briefed by the parties. Arguments concerning causes of action not addressed in Keurig's briefing are considered waived, and those claims survive.

## I.   Background[4]

### A.   *Keurig's Products and the Relevant Markets*

Keurig manufactures and sells Single Serve Brewers[5] and Portion Packs[6] in, among other places, the United States.  (Rogers AC ¶¶ 9, 82; TreeHouse AC ¶ 3; DPP AC ¶¶ 1, 7; IPP SAC ¶ 7.)  Keurig introduced the K-Cup Brewer,[7] the first commercially successful Single Serve Brewer, to the United States market in or around 1998.  (Rogers AC ¶ 19; *see also* IPP SAC ¶ 110.)  While Portion Packs come in many different forms, to be usable with a particular Single Serve Brewer, a Portion Pack must be compatible with that Single Serve Brewer.  (DPP AC ¶ 8.)  The same year it introduced the K-Cup Brewer, Keurig introduced its branded Portion Packs, or

---

[4] Unless otherwise noted, the facts set forth herein are drawn from the allegations of the various amended complaints.  I assume those allegations to be true for purposes of ruling on these motions.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).  My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.  In addition, this section is not an exhaustive review of the factual allegations made by the parties; rather, it merely provides a summary of the facts relevant to this case in general.  Therefore, to the extent necessary, additional facts are elaborated upon in the legal discussion below.

[5] For ease of reference, this footnote and the five that follow establish unifying definitions for certain types of products and/or technologies that are referred to by varying terms across the four amended complaints.  "Single Serve Brewers" refers to what Plaintiffs have referred to as "Single Serve Brewers," (Rogers AC ¶ 9 ("pressurized hot water brewing equipment that is capable of brewing at least a single serving of coffee or other hot beverages")), "Single-Serve Brewers," (TreeHouse AC ¶ 3 ("pressurized hot water brewing equipment that can be used to brew one or more servings at a time of coffee, tea, cider, hot cocoa, or other hot beverages or food products, such as soups and oatmeal, from a portion pack that is inserted into the brewer"); DPP AC ¶ 7 ("electronic low-pressure brewer which runs hot water through a disposable, single-use portion pack containing coffee and to a far lesser extent, other hot beverage components (like tea or hot chocolate) . . . to make beverages in small quantities (*i.e.*, one or two-serving cups)")), and "Portion Pack Brewers," (IPP SAC ¶ 5 ("machines designed to be capable of brewing a variety of hot beverages, such as coffee, tea, and hot chocolate, in predefined portions from sealed portion packs")).

[6] "Portion Packs" refers to what Plaintiffs have referred to as "Portion Packs."  (Rogers AC ¶ 9 ("disposable cartridges, capsules, pods, or packs containing pre-measured beverage portions that are used in Single Serve Brewers to prepare a wide variety of beverages and food products"); TreeHouse AC ¶ 3 ("disposable cartridges, capsules, pods, or packs containing prepared beverage or food product portions that are used in Single-Serve Brewers to make a wide variety of beverages and food products"); DPP AC ¶ 7 ("disposable, single-use portion pack containing coffee and to a far lesser extent, other hot beverage components (like tea or hot chocolate)").)  Although the IPPs do not use it as a defined term, they refer to "portion packs" as "cartridges, disks, or cups" that "hold[] coffee grounds and other material for brewing hot beverages" in a Single Serve Brewer.  (IPP SAC ¶¶ 5–6.)

[7] "K-Cup Brewer" refers to what Plaintiffs have referred to as "K-Cup Brewers," (Rogers AC ¶ 9 ("Single Serve Brewers manufactured or licensed by Keurig for use with K-Cups"); TreeHouse AC ¶ 3 (same); DPP AC ¶ 9 ("Keurig's most popular Single-Serve Brewer")), and "Keurig Portion Pack Brewers," (IPP SAC ¶ 7).

K-Cups,[8] which are compatible with and used in K-Cup Brewers. (*See* TreeHouse AC ¶¶ 3, 110.) Today, K-Cups also include Portion Packs licensed by Keurig that are compatible with K-Cup Brewers. (Rogers AC ¶ 31; TreeHouse AC ¶ 4; DPP AC ¶ 9; IPP SAC ¶ 9.)

K-Cups are not the only Portion Packs that are compatible with K-Cup Brewers. Keurig's competitors, including Rogers and TreeHouse, manufacture, distribute, and sell their own Competitor Cups,[9] which are Portion Packs that are compatible with K-Cup Brewers. (Rogers AC ¶ 31; TreeHouse AC ¶¶ 105–06; DPP AC ¶ 9; IPP SAC ¶¶ 8–11.) Compatible Cups[10]—Portion Packs that are compatible with K-Cup Brewers—thus include (i) K-Cups, and (ii) Competitor Cups. (Rogers AC ¶ 31; TreeHouse AC ¶¶ 105–06; DPP AC ¶ 9; IPP SAC ¶¶ 8–11.)

Since Keurig's initial introduction, Keurig has designed, manufactured, and sold a variety of different K-Cup Brewers marketed either for use in the individual consumer's home or for use outside the home at locations such as office buildings, hotels, and gas stations. (Rogers AC ¶ 19.) K-Cup Brewers are compatible only with Compatible Cups, and Portion Packs designed to work in other Single Serve Brewers are not compatible with K-Cup Brewers. (IPP SAC ¶ 93.)

---

[8] "K-Cups" refers to what Plaintiffs have referred to as "K-Cups," (Rogers AC ¶ 31 ("single-serve Portion Packs sold by Keurig under its brand name as well as those sold under its licensees' brand names"); TreeHouse AC ¶ 4 ("Compatible Cups that are made by, or under a license from, [Keurig]"); DPP AC ¶ 9 ("Portion Packs sold by Keurig under its brand name as well as those sold under its licensees' brand names")), and "Keurig K-Cups," (IPP SAC ¶ 9 ("Keurig Compatible Cups that are made or licensed by Keurig")).

[9] "Competitor Cups" refers to what Plaintiffs have referred to as "Competing Portion Packs," (Rogers AC ¶ 31 ("Portion Packs [compatible with K-Cup Brewers that are] manufactured, distributed and sold by Keurig's competitors")), "Competitive Cups," (TreeHouse AC ¶ 4 ("K-Cup-format Portion Packs made by [Keurig's] competitors"); IPP SAC ¶ 12 ("Portion packs made, distributed, or sold by Cup Competitors for use in Keurig Portion Pack Brewers")), and "Competitor Cups," (DPP AC ¶ 9 ("Portion Packs [that are compatible with K-Cup Brewers that are] manufactured, distributed and sold by Keurig Competitors")).

[10] "Compatible Cups" refers to what Plaintiffs have referred to as "Compatible Portion Packs," (Rogers AC ¶ 9 ("disposable pods or cups that are compatible with [K-Cup Brewers]")), "Compatible Cups," (TreeHouse AC ¶ 4 ("disposable pods or cups that are compatible with [K-Cup Brewers]"); DPP AC ¶ 9 ("Portion Packs that are compatible with the K-Cup Brewer")), and "Keurig Compatible Cups," (IPP SAC ¶ 8 ("The only type of portion packs that will work in the [K-Cup Brewer]")).

Keurig has dominated the markets for the design, manufacture, and sale of Single Serve Brewers, Portion Packs, and Compatible Cups. Specifically, in the United States, Keurig controls at least 89% of the market for Single Serve Brewers (the "Single Serve Brewer Market"), 73% of the market for Portion Packs (the "Portion Pack Market"), and 95% of the market for Compatible Cups (the "Compatible Cup Market"). (Rogers AC ¶¶ 27, 46, 59; TreeHouse AC ¶¶ 6, 83, 128, 151; DPP AC ¶¶ 9, 10; IPP SAC ¶¶ 69, 87.)

### B.    *Growing Competition Against Keurig*

Until 2012, Keurig had patents covering the filter technology used in its K-Cups ("K-Cup Filter Patents"). (TreeHouse AC ¶ 4; DPP AC ¶¶ 4, 15; IPP SAC ¶ 125.) Virtually all Compatible Cups on the market were K-Cups until 2010. (Rogers AC ¶ 34.) In 2010, TreeHouse decided to undertake a substantial investment in order to enter the Compatible Cup market, (TreeHouse AC ¶ 210), but because the K-Cup Filter Patents covering the use of filters in Portion Packs had not yet expired, TreeHouse decided to manufacture and sell Competitor Cups that did not contain filters. (*Id.* ¶ 214.) In August 2010, TreeHouse subsidiary Sturm introduced the first Compatible Cups for use in K-Cup Brewers that were neither sold by Keurig nor under a Keurig license. (*Id.* ¶ 215; Rogers AC ¶ 35; DPP AC ¶¶ 126–27; IPP SAC ¶ 128.)

In October 2011, Rogers introduced to the market its first Compatible Cups for use in K-Cup Brewers, in its proprietary OneCup format under its "San Francisco Bay" and "Organic Coffee Company" brands. (Rogers AC ¶ 36.) Rogers' initial version of OneCup reduced the environmental footprint and contained 30% to 35% less packaging than other Compatible Portion Packs. (*Id.*) In October 2013, Rogers introduced a unique 97% biodegradable Compatible Cup. (*Id.*) Rogers sells or has sold its packs through retailers such as Costco and

Amazon.  (*Id*. ¶¶ 70, 289.)  Sales of its OneCup Portion Pack account for more than 40% of

Rogers' business.  (*Id*. ¶ 277.)

When the K-Cup Filter Patents expired in 2012, a number of companies launched, or

announced plans to launch, Portion Packs compatible with K-Cup Brewers.  (TreeHouse AC

¶¶ 15, 216–18.)  TreeHouse launched its first filtered Competitor Cups in the Fall of 2012, which

were sold at a lower price than Keurig's filtered K-Cups.  (*Id.* ¶ 219.)  Between September 2012

and December 2013, TreeHouse subsidiary Bay Valley entered into supply arrangements with

dozens of retailers for filtered Competitor Cups.  (*Id.* ¶ 220.)

## C.    *Keurig's Anti-Competitive Conduct*

Threatened by this competitive pressure, Keurig took various steps to regain its

"complete control" of the market for Competitor Cups, including (i) filing baseless lawsuits

against Rogers and TreeHouse, (Rogers AC ¶¶ 158–75; TreeHouse AC ¶¶ 226–40; DPP AC

¶¶ 125–38; IPP SAC ¶¶ 124–35); (ii) entering into "non-competition," tying, and exclusive

dealing agreements and threatening companies who would do business with Compatible Cup

manufacturers, (Rogers AC ¶¶ 87–154; TreeHouse AC ¶¶ 225, 241–397; DPP AC ¶¶ 139–96;

IPP SAC ¶¶ 141–206); (iii) redesigning K-Cup Brewers and introducing the Keurig 2.0 K-Cup

Brewer (the "2.0 Brewer") to lock out Competitor Cups and misinforming customers about the

motivation for, and the abilities of, this lock-out technology, (Rogers AC ¶¶ 176–232;

TreeHouse AC ¶¶ 225, 398–458; DPP AC ¶¶ 221–35; IPP SAC ¶¶ 136–40); and (iv) maligning

Competitor Cups and otherwise interfering with competitors' business relationships, (Rogers AC

¶¶ 233–67; TreeHouse AC ¶¶ 225, 459–548; DPP AC ¶¶ 197–220).

### 1.  Patent Litigations

Within a matter of weeks after Sturm's introduction of its Competitor Cups, Keurig sued

Sturm for patent and trademark infringement and false advertising, (the "TreeHouse Litigation"). (Rogers AC ¶ 158; TreeHouse AC ¶¶ 228–30; DPP AC ¶ 128; IPP SAC ¶ 129.)  The District Court for the District of Delaware dismissed Keurig's patent claims on summary judgment, which Keurig appealed.  (Rogers AC ¶ 163; TreeHouse AC ¶ 235; DPP AC ¶¶ 131–33; IPP SAC ¶¶ 130–31.)  The Federal Circuit affirmed the District Court's ruling, reasoning that Keurig was attempting to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished," and that it was attempting "to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitor Cups] by invoking patent law."  (Rogers AC ¶ 170 (quoting *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013)); TreeHouse AC ¶¶ 236–37 (same); DPP AC ¶¶ 133, 137 (same); IPP SAC ¶ 131 (same).)

Similarly, in 2011, Keurig sued Rogers, just weeks after Rogers began selling its Competitor Cups.  (Rogers AC ¶ 158; TreeHouse AC ¶ 239; DPP AC ¶ 136; IPP SAC ¶ 133.)  In May 2013, the District Court for the District of Massachusetts granted Rogers' motion for summary judgment, holding that Rogers' designs were "sufficiently distinct" and quoted the district court's decision in the TreeHouse Litigation in admonishing Keurig for "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers."  (Rogers AC ¶ 321 (quoting *Keurig, Inc. v. JBR, Inc.*, No. 11-11941-FDS, 2013 WL 2304171, at *12 (D. Mass. May 24, 2013), *aff'd*, 558 F. App'x 1009 (Fed. Cir. 2014)); TreeHouse AC ¶ 239 (same); DPP AC ¶ 136; IPP SAC ¶ 134 (same).)  After Keurig appealed, the Federal Circuit Court affirmed the district court's grant of summary judgment in Rogers' favor.  (Rogers AC ¶¶ 171, 322; IPP SAC ¶ 135.)

Keurig pursued its claims relying on a theory of liability that had been previously rejected by the United States Supreme Court, as noted by the Federal Circuit in denying Keurig's appeal

of the District Court's ruling in the TreeHouse action. (Rogers AC ¶ 170; TreeHouse AC ¶ 236; DPP AC ¶ 133; IPP SAC ¶ 131.) Plaintiffs allege that Keurig's patent claims had no objective basis, and they imposed costs on competitors and cast a cloud over the legality and legitimacy of competitors' products, which impeded market acceptance of those products and deterred other competitors from entering the market. (Rogers AC ¶¶ 172–74; TreeHouse AC ¶¶ 238–40; DPP AC ¶ 138; IPP SAC ¶¶ 124–27.)

### 2. Exclusive and Restrictive Agreements

Plaintiffs allege that Keurig has entered into over 600 exclusive and restrictive agreements with various entities involved in the line of manufacture and distribution of Compatible Cups, as well as with potential competitors. For example, Keurig entered into exclusive agreements with, or otherwise coerced, suppliers of the machinery required to manufacture Compatible Cups; suppliers of the cups, lids, and filters required in Compatible Cups; and suppliers of the lock-out technology, a special taggant ink that is included on the lid of the Compatible Cup, incorporated in the 2.0 Brewer, to keep competitors from sourcing the technology. (Treehouse AC ¶¶ 2, 54, 143, 244–85, 401; DPP AC ¶¶ 169–91; IPP SAC ¶¶ 141–52.)

In addition, Keurig has locked up virtually all of the distributors who provide Compatible Cups for use outside of the home (the "Away-From-Home Market Segment") in long-term exclusive contracts. (Rogers AC ¶¶ 87–106; DPP AC ¶¶ 162–68; IPP SAC ¶¶ 173–200.) Keurig—in an apparent effort to foreclose the entry of or expansion by competitors in the home use market—entered into exclusive contracts with large retailers that serve the consumers who use Compatible Cups at home (the "At-Home Market Segment"), (Rogers AC ¶¶ 107–11; DPP AC ¶¶ 162–68; IPP SAC ¶¶ 173–200). That effort has been aided by Keurig's exclusive

contracts with numerous major coffee brands ("Roasters"), which limited the ability of Roasters to provide inputs to or enter into other agreements with Competitor Cup manufacturers, as well as prevent Roasters from entering the Single Serve Brewer Market.  (Rogers AC ¶¶ 112–54; Treehouse AC ¶¶ 286–330; DPP AC ¶¶ 139–61; IPP SAC ¶¶ 153–72.)  As of November 2014, Keurig admitted that it has "now signed the large majority of previously unlicensed portion pack volume to our system and we're in the process of transitioning these brands."  (Rogers AC ¶ 201 (quoting *Keurig Green Moutain's (GMCR) CEO Brian Kelley on Q4 2014 Results – Earnings Call Transcript*, Seeking Alpha (Nov. 20, 2014), http://seekingalpha.com/article/2697145-keurig-green-mountains-gmcr-ceo-brian-kelley-on-q4-2014-results-earnings-calltranscript?all=true&find=keurig).)  Keurig also eliminated potential competitors through acquisitions of competitors and previous licensees.  (Rogers AC ¶¶ 155–57; DPP AC ¶¶ 14–15, 122–24; IPP SAC ¶¶ 118–20.)

### 3.  False Advertising and Promotional Efforts

Keurig has engaged in false, deceptive, and/or misleading advertising and promotional efforts directed at consumers and retail customers regarding the key qualities and characteristics of its K-Cup Brewers, K-Cups, and Competitor Cups made by TreeHouse, Rogers, and others. (Rogers AC ¶ 233; TreeHouse AC ¶¶ 459–62; DPP AC ¶¶ 197–220.)  Those efforts were intended to and did drive up Keurig's own sales while eliminating or diminishing competition from Competitive Cup makers by sullying their reputations.  (TreeHouse AC ¶ 459.)

For example, despite learning that competitors had developed Compatible Cups that worked in the 2.0 Brewer, Keurig has continued to convey to purchasers of the 2.0 Brewers through the packaging and the promotional materials provided with the brewers that only Keurig brand cups would work with the 2.0 Brewer.  (*Id.* ¶ 471.)  The packaging of the 2.0 Brewer states

"Works only with Keurig Brand Packs," and the user manual warns consumers that their "Keurig 2.0 brewer will not work with packs that don't have the Keurig logo," among other misrepresentations.  (*Id.* ¶ 472.)  The 2.0 Brewer itself displays the misleading message that "[t]his pack wasn't designed for this brewer" when a consumer attempts to use a Competitive Cup in it.  (Rogers AC ¶ 251; *see also* TreeHouse AC ¶ 472.)  In addition, Keurig through its websites, social media, and customer service representatives, disseminated false and misleading messaging regarding quality and safety issues with respect to Competitor Cups.  (Rogers AC ¶¶ 246–47, 253; TreeHouse AC ¶ 473; DPP AC ¶¶ 199, 202–11.)  Such statements caused or likely will cause consumers to mistakenly believe that only K-Cups work with 2.0 Brewers, and therefore that they have to buy higher priced K-Cups rather than Competitor Cups to use their 2.0 Brewers.  (TreeHouse AC ¶ 478; DPP AC ¶¶ 218–20.)  Keurig has also made misstatements to consumers about quality and safety issues with the use of non-Keurig cups in the 2.0 Brewer, (Rogers AC ¶¶ 234–37, 240–42; TreeHouse AC ¶¶ 479–92), about how use of unlicensed Compatible Cups affects the brewer warranty, (Rogers AC ¶ 238; TreeHouse AC ¶¶ 493–99; DPP AC ¶¶ 213–15), as well as misrepresentations made to both consumers and retailers about compatibility and quality issues, (Rogers AC ¶¶ 256–67; TreeHouse AC ¶¶ 501–28.)

### 4.  2.0 Brewer

Keurig successfully implemented a plan, known as "Project Squid," to recapture market share lost to unlicensed Competitive Cup makers by designing a brewer that would only function with K-Cup and Keurig-licensed Compatible Cups.  (Rogers AC ¶¶ 176–91; Treehouse AC ¶¶ 398–403; *see also* DPP AC ¶¶ 221–35; IPP SAC ¶¶ 136–40.)  The new brewer, referred to as the "2.0 Brewer," was solely intended to further lock out competitors.  (Rogers AC ¶¶ 183, 190; TreeHouse AC ¶¶ 398, 401; IPP SAC ¶ 136.)

In or about July 2012, Keurig began working on an "authentication" mechanism with Sagentia, a global product development firm, that would enable Keurig to manufacture Single Serve Brewers that provide degraded or non-functionality when used with competitors' Portion Packs. (Rogers AC ¶ 177; Treehouse AC ¶ 400.) Keurig thus developed a "taggant," a special kind of ink, which could be identified by the 2.0 Brewer's sensors to authenticate that the Portion Pack was a Keurig or Keurig-licensed pack. (Rogers AC ¶ 184; TreeHouse AC ¶ 503.) Keurig announced the 2.0 Brewer in November 2013. (Rogers AC ¶ 192.) In connection with the rollout, Keurig knowingly made false representations that its lockout technology had consumer benefits, (id. ¶¶ 214–32; TreeHouse AC ¶¶ 404–31; DPP AC ¶ 271), and disparaged all Competitor Cups, including those of Rogers and TreeHouse, to retailers, distributors, consumers, and the general public, (Rogers AC ¶¶ 233–67; TreeHouse AC ¶¶ 463–548; DPP AC ¶¶ 197–220). Although advertised as a closed system with technology that would not allow the brewer to function with non-Keurig or Keurig-licensed Portion Packs, (Rogers AC ¶ 192), some competitors have reverse-engineered 2.0 Brewer-compatible Portion Packs, (id. ¶ 47; TreeHouse AC ¶¶ 457, 465).

## D. *Effects of Keurig's Anti-Competitive Conduct*

Keurig's anti-competitive conduct has negatively impacted competition in the Portion Pack Market, and the Compatible Cup Market. (Rogers AC ¶ 268; TreeHouse AC ¶ 549.) This has resulted in harm to manufacturers of Competitor Cups, including Rogers and TreeHouse, potential market entrants, distributors, retailers, and consumers. (Rogers AC ¶¶ 268–89; TreeHouse AC ¶¶ 551–68.)

More specifically, through its anti-competitive conduct, Keurig is able to sell its K-Cup Brewers at or below cost to create a captive base of consumers while at the same time selling its

K-Cups to those consumers at supra-competitive prices.  (TreeHouse AC ¶¶ 131, 196, 587; DPP AC ¶ 11; *see also* Rogers AC ¶ 314.)  Keurig's anti-competitive conduct has thus caused consumers to pay supra-competitive prices for K-Cups.  (IPP SAC ¶¶ 32–35.)  In particular, Keurig's conduct has had the effect of overcharging the DPPs, who are direct purchasers of K-Cups.  (*Id.* ¶ 30.)  Direct purchasers, in turn, passed these overcharges on to the IPPs, who are end-user consumers of K-Cups, either directly or through intermediaries.  (IPP SAC ¶ 30.)  The IPPs claim that because the distribution channel for K-Cups "is not complex, generally involving only one or two intermediaries between Keurig and the [IPPs]," and because K-Cups are individual products that remain unaltered through the distribution chain, "the chain of commerce for this market allows for the tracing of overcharges that have passed through the chain of commerce to [IPPs]."  (*Id.* ¶ 31.)

## II.  <u>Procedural History</u>

On February 11, 2014, TreeHouse filed a complaint against Keurig alleging antitrust and related violations.  (No. 14-CV-905, Doc. 2.)  Shortly thereafter, on March 13, 2014, Rogers filed its complaint in the Eastern District of California.  (No. 14-CV-4242, Doc. 1.)  The Rogers and TreeHouse lawsuits were two of many similar actions filed in early 2014 in federal district courts around the country alleging that Keurig engaged in unlawful anticompetitive conduct related to the 2.0 Brewer.[11]  Among those suits were numerous actions filed by individual direct purchasers and individual indirect purchasers.  On March 20, 2014, the named plaintiff in one of the related cases moved the Judicial Panel on Multidistrict Litigation ("JPML") to centralize all of the cases concerning the 2.0 in a single multidistrict litigation ("MDL") in this District.  (*See* Doc. 1.)  The proposed MDL encompassed three types of actions:  direct purchaser class actions,

---

[11] I refer to Rogers and TreeHouse collectively as the "Competitor Plaintiffs."

indirect purchaser class actions, and individual actions by Competitor Plaintiffs. (*Id.* at 1.) Although the Competitor Plaintiffs opposed centralization, (*id.*), the JPML concluded that all of the related actions, including those filed by the direct purchasers and indirect purchasers, raised "virtually identical factual questions concerning the conduct of Keurig." (*Id.* at 2.) On June 3, 2014, pursuant to 28 U.S.C. § 1407, the JPML transferred these related actions to this District and assigned the action to me for consolidated pretrial proceedings as part of the MDL. (*Id.* at 3.) On May 28, 2014, I appointed interim co-lead counsel for the Named Plaintiffs and proposed direct purchaser Plaintiff class. (No. 14-CV-1609, Doc. 19.) On June 26, 2014, I appointed interim co-lead counsel for the Named Plaintiffs and proposed indirect purchaser Plaintiff class. (Doc. 36.) On July 24, 2014, the DPPs filed a Consolidated Class Action Complaint, (Doc. 65), and the IPPs filed a Consolidated Amended Indirect Purchaser Class Action Complaint, (Doc. 61).

On August 11, 2014, Rogers filed a motion seeking a preliminary injunction. (Doc. 84.) I denied the motion on September 19, 2014, finding that Rogers had not made a clear showing that it is imminently likely to suffer irreparable harm in the absence of the requested injunction. (Docs. 145, 160.) On August 5, 2014, I issued an order setting the schedule for Keurig's anticipated motions to dismiss. (Doc. 70.) In accordance with that schedule, Keurig filed motions to dismiss the four consolidated actions, (Docs. 162, 165, 168, 171), on October 6, 2014.

Rogers filed its Amended Complaint on December 8, 2014, (No. 14-CV-4242, Doc. 83), TreeHouse filed its Amended Complaint on December 2, 2014, (No. 14-CV-905, Doc. 86), the DPPs served their Amended Complaint on November 25, 2014, (No. 14-CV-1609, Doc. 42), [12]

---

[12] The certificate of service of the DPP Amended Complaint was filed on one of the individual case's dockets. (No. 14-CV-1609.) The DPP Amended Complaint was filed under seal, and a redacted version was filed on the MDL docket on February 11, 2015. (Doc. 237.)

and the IPPs served their Second Amended Complaint on November 25, 2014, (Doc. 206).[13]

Thereafter, consistent with the briefing schedule proposed by the parties, (Doc. 215), on

February 2, 2015, Keurig filed its motions to dismiss (1) Rogers' Amended Complaint, (Docs.

226–28); (2) TreeHouse's Amended Complaint, (Docs. 223–25); (3) the DPPs' Amended

Complaint, (Docs. 229–30), and (4) the IPPs' Second Amended Complaint, (Docs. 231–32).  On

April 13, 2015, Rogers filed a memorandum in opposition to Keurig's motion to dismiss, (Doc.

253), as did TreeHouse, (Doc. 254), the DPPs, (Docs. 251–52), and the IPPs, (Doc. 255).[14]

Keurig filed replies in further support of its motion to dismiss the DPPs' Amended Complaint on

May 11, 2015, (Doc. 261), and in further support of its motions to dismiss the Rogers' Amended

Complaint, (Docs. 265–66), the TreeHouse Amended Complaint, (Doc. 264), and the IPPs'

Second Amended Complaint on May 13, 2015, (Doc. 267).  The parties have also submitted

various letters regarding supplemental authority.  (*E.g.*, Docs. 276–77, 282, 284, 292, 298–99,

362–63.)

### III.    <u>Legal Standard</u>

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  A claim will have "facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility

---

[13] The IPP Second Amended Complaint was filed under seal, and a redacted version was filed on the MDL docket on February 11, 2015.  (Doc. 238.)

[14] Rogers', TreeHouse's, the DPPs', and the IPPs' memoranda in opposition include redactions, permitted by my order of April 13, 2015.  (Doc. 249.)  Unredacted versions of the memoranda were filed under seal.

that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, though all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

Antitrust claims in particular must be reviewed carefully at the pleading stage because false condemnation of competitive conduct threatens to "chill the very conduct the antitrust laws are designed to protect." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004) (internal quotation marks omitted). However, "[t]here are no heightened pleading requirements for antitrust cases," *Commercial Data Servers, Inc. v. Int'l Bus. Machines Corp.*, No. 00CIV5008(CM)(LMS), 2002 WL 1205740, at *2 (S.D.N.Y. Mar. 15, 2002) (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)), and "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly," *Todd*, 275 F.3d at 198 (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

## IV.   Discussion

The claims brought by Rogers, TreeHouse, the DPPs, and the IPPs overlap to a significant degree, as do, in certain respects, the motions to dismiss those claims.  Rogers brings seventeen causes of action pursuant to (1) the Sherman Act Section 2, 15 U.S.C. § 2; (2) the Sherman Act Section 1, 15 U.S.C. § 1; (3) the Clayton Act, 15 U.S.C. § 14; (4) federal patent law; (5) the Lanham Act, 15 U.S.C. § 1125(a); (6) common law tort; and (7) California state antitrust and consumer protection laws.  (Rogers AC ¶¶ 294–414.)  TreeHouse's Amended Complaint raises twenty causes of action pursuant to (1) the Sherman Act Section 2, 15 U.S.C. § 2; (2) the Sherman Act Section 1, 15 U.S.C. § 1; (3) the Clayton Act, 15 U.S.C. § 14; (4) federal patent law; (5) the Lanham Act, 15 U.S.C. § 1125(a); and (6) various state laws. (TreeHouse AC ¶¶ 569–691.)  The DPPs' Amended Complaint raises six causes of action pursuant to (1) the Sherman Act Section 2, 15 U.S.C. § 2; (2) the Sherman Act Section 1, 15 U.S.C. § 1; (3) the Clayton Act, 15 U.S.C. § 14; and (4) common law unjust enrichment laws of the fifty states and the District of Columbia.  (DPP AC ¶¶ 254–300.)  The IPPs' Second Amended Complaint raises eleven causes of action pursuant to (1) the Sherman Act Section 1, 15 U.S.C. § 1; (2) the Sherman Act Section 2, 15 U.S.C. § 2; (3) the Clayton Act, 15 U.S.C. § 14; (4) the antitrust and unfair competition laws of twenty-one states and the District of Columbia;[15] (5) the consumer protection and unfair trade practices laws of seven states;[16] (6) and the common law unjust enrichment laws of seventeen states and the District of Columbia.[17]  (IPP SAC

---

[15] These states include Arizona, California, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

[16] These states include Arkansas, California, Massachusetts, Nebraska, New Mexico, North Carolina, and Vermont.

[17] These states include Arizona, Arkansas, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, New York, Oregon, South Dakota, Vermont, and Wisconsin.

¶¶ 225–516.)

Keurig moves to dismiss the amended complaints in their entirety with prejudice. (*See* Rogers Def. Mem. 2; TreeHouse Def. Mem. 3; DPP Def. Mem. 1; IPP Def. Mem. 2.)[18] For the sake of clarity and efficiency, where possible, I address the applicable law pertaining to the respective motions to dismiss together. Keurig also challenges the standing of the DPPs and the IPPs to raise the antitrust claims.

## A.    *Sherman Act Section 2 Claims*

Rogers, TreeHouse, and the DPPs bring four overlapping causes of action pursuant to Section 2 of the Sherman Act: (1) monopolization, (Rogers AC ¶¶ 294–303; TreeHouse AC ¶¶ 569–76; DPP AC ¶¶ 254–59); (2) exclusive dealing (Rogers AC ¶¶ 304–11; TreeHouse AC ¶¶ 577–84; DPP AC ¶¶ 260–67); (3) monopoly leveraging, (Rogers AC ¶¶ 312–17; TreeHouse AC ¶¶ 585–93; DPP AC ¶¶ 268–73); and (4) attempted monopolization in the alternative, (Rogers AC ¶¶ 377–82; TreeHouse AC ¶¶ 619–24; DPP AC ¶¶ 274–78). The IPPs bring causes of action seeking injunctive relief only for monopolization and attempted monopolization. (IPP SAC ¶¶ 277–94.) Rogers and TreeHouse bring three additional overlapping claims for: (1) sham litigation (Rogers AC ¶¶ 318–31; TreeHouse AC ¶¶ 594–602); (2) tying, (Rogers AC ¶¶ 338–53; TreeHouse AC ¶¶ 611–18); and (3) conspiracy to monopolize, (Rogers AC ¶¶ 363–69; TreeHouse AC ¶¶ 625–31). Rogers also asserts an eighth cause of action for anticompetitive product design, (Rogers AC ¶¶ 354–62), and the DPPs allege a fifth cause of action for

---

[18] "Rogers Def. Mem." refers to the Memorandum of Law in Support of Defendant's Motion to Dismiss First Amended and Supplemental Complaint filed by JBR, Inc. (Doc. 227.) "TreeHouse Def. Mem." refers to the Memorandum of Law in Support of Defendant's Motion to Dismiss Amended and Supplemental Complaint filed by TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (Doc. 224.) "DPP Def. Mem." refers to the Memorandum of Law in Support of Defendant's Motion to Dismiss the Direct Purchaser Plaintiffs' Consolidated Amended Class Action Complaint. (Doc. 230.) "IPP Def. Mem." refers to the Memorandum of Law in Support of Defendant's Motion to Dismiss the Indirect Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint. (Doc. 232.)

declaratory and injunctive relief, (DPP AC ¶¶ 279–89).

Section 2 of the Sherman Act, 15 U.S.C. § 2, ("Section 2"), makes it unlawful for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. To state a Section 2 claim of monopolization, a plaintiff must allege "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). To state a claim for attempted monopolization in violation of Section 2, a plaintiff must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc., v. McQuillan*, 506 U.S. 447, 456 (1993). To successfully plead a claim of conspiracy to monopolize in violation of Section 2, a plaintiff "must allege (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize." *Discover Fin. Servs. v. Visa U.S.A. Inc.*, 598 F. Supp. 2d 394, 405 (S.D.N.Y. 2008) (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997)).

Keurig raises myriad challenges to the Section 2 claims, which I analyze in turn below as related to each individual motion. However, before I reach Keurig's challenges to the Section 2 claims, I first address Keurig's challenge to the DPPs' and the IPPs' standing to raise these claims.

## 1. Standing

### a. Applicable Law

Standing is "a threshold, pleading-stage inquiry," and a complaint that fails to allege standing must be dismissed. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75–76 (2d Cir. 2013) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)). An antitrust plaintiff must establish constitutional standing under Article III as well as antitrust standing. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983) (hereinafter, "*AGC*"); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009). To plead antitrust standing, a plaintiff must allege more than just an injury causally linked to unlawful conduct. *Gatt*, 711 F.3d at 76. The Supreme Court has identified several factors that courts should consider in determining whether a plaintiff has antitrust standing: (1) the causal connection between the violation and the harm; (2) the presence of an improper motive; (3) the type of injury and whether it was one Congress sought to address; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex damage apportionment. *AGC*, 459 U.S. at 537–44.

The Second Circuit has applied the *AGC* factors using a two-pronged analysis. First, a plaintiff must allege that it suffered antitrust injury. *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005). Second, the plaintiff must demonstrate that it meets the "efficient enforcer" factors that make it a "proper antitrust plaintiff." *Id.*

To establish antitrust injury, a plaintiff must allege facts showing that it suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Courts in this circuit employ a three-step analysis to determine whether a plaintiff has

plausibly alleged antitrust injury. *Gatt*, 711 F.3d at 76. First, the plaintiff must identify the practice complained of and the reasons the practice is or might be anticompetitive. *Id.* Second, the court must identify the actual injury alleged by the plaintiff. *Id.* Third, the court must compare the anticompetitive effect of the practice at issue to the actual injury alleged by the plaintiff. *Id.*

It is not enough for a plaintiff to allege that it has suffered antitrust injury. It must also establish that it is an "efficient enforcer" of the antitrust laws. The four "efficient enforcer" factors require the court to consider:

> (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*In re DDAVP*, 585 F.3d at 688 (quoting *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 66 (2d Cir. 1988)).

Plaintiffs must demonstrate antitrust standing whether they seek monetary or injunctive relief. *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006). "The extent to which [the efficient enforcer] factors apply when plaintiffs sue for injunctive relief depends on the circumstances of the case." *Daniel*, 428 F.3d at 443; *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986) ("Thus, because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16."); *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 52 (2d Cir. 2010) ("In the antitrust context, courts have articulated several 'efficient enforcer' factors to avoid the 'duplicative recoveries' that would result from allowing 'every person tangentially affected by an

antitrust violation' to sue for treble damages." (quoting *Blue Shield of Va. v. McCready,* 457 U.S. 465, 475–77 & n.11 (1982)).  Because "one injunction is as effective as 100, and, concomitantly, . . . 100 injunctions are no more effective than one," *Standard Oil Co.*, 405 U.S. at 261, some of these factors are "not relevant" in suits for injunctive relief, *Cargill*, 479 U.S. at 111 n.6. Although the efficient enforcer factors related to damages may not be directly relevant to an action for injunctive relief, the principles underlying those factors still inform the analysis.  As District Court Judge Katherine Forrest articulated when applying the *AGC* factors to dismiss a claim by a class of indirect purchasers seeking injunctive relief in an antitrust case:

> In this regard, issues with complex and speculative damages concern the fact and nature of harm (that is, damage) as much as a calculation of dollars and cents.  Is determining the fact of damage complex?  Does remedying plaintiff's injury through injunctive relief present complex issues?

> Similarly, to assess the potential for duplicative recovery, the Court must reasonably ask not only whether there is another plaintiff who will recover a quantum that would account for monetary damage, but also whether the relief one plaintiff seeks more generally (such as injunctive relief), is being adequately pursued by another, better situated-party.  Thus, the *AGC* factors are reasonably applicable to actions in which only injunctive relief is sought.  Finally, in all cases the court is cautioned to be mindful the manageability of litigation.  That is, allowing actions to proceed in which plaintiffs seek overlapping relief and in which their presence provides no additional benefit may well add to manageability issues.

*In re Aluminum Warehousing Antitrust Litig.*, No. 13-md-2481 (KBF), 2014 WL 4277510, at *17–18 (S.D.N.Y. Aug. 29, 2014), *supplemented*, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016).

### b.  Application to DPPs

Here, the DPPs are direct purchasers of the defendant's product, the K-Cups, and allege that Keurig's anticompetitive conduct caused them to pay supra-competitive prices.  (DPP AC ¶¶ 5–6, 23–24.)  Such an injury plainly is "of the type the antitrust laws were intended to prevent."  *Brunswick Corp.*, 429 U.S. at 489.  Although the conduct of which the DPPs complain

largely targeted Keurig's direct competitors, such as TreeHouse and Rogers, the DPPs' alleged injury of overcharge was "inextricably intertwined" with the conduct's anti-competitive effects and thus "flow[ed] from that which makes defendants' acts unlawful." *McCready*, 457 U.S. at 484 (internal quotation marks omitted). The DPPs have therefore pled antitrust injury.

With regard to the "efficient enforcer" factors that bear on whether the DPPs are "proper" antitrust plaintiffs, each factor supports the DPPs' antitrust standing. With regard to the directness of the injury, Keurig argues, citing to specific allegations of Keurig's anticompetitive scheme aimed at its competitors, that the claims of harm are "attenuated." (DPP Def. Mem. 5–6.) Keurig's focus on the allegations related to the scheme is misplaced and misstates the DPPs' alleged harm: the payment of supra-competitive prices, set by Keurig, for K-Cups bought directly from Keurig or its agents. (DPP AC ¶¶ 245, 258.) As an initial matter, the DPPs' injury—like the direct purchaser plaintiffs in *DDAVP*—was that they were forced to pay "supra-competitive prices as a result of defendants' anticompetitive conduct" thereby preventing the competitive market entry of others and the lower prices that would have resulted for the direct purchasers. *In re DDAVP*, 585 F.3d at 688. The defendants in *DDAVP*—like Keurig here—argued that anticompetitive conduct targeted defendants' competitors and therefore the harm to the direct purchaser plaintiffs was too far removed. The Second Circuit rejected that argument. As was the case with the direct purchaser plaintiffs in *DDAVP*, even though the injuries to the DPPs were "derivative of the direct harm experienced by the defendants' competitors, harming competitors was simply a means for the defendants to charge the plaintiffs higher prices." *Id.* The directness of the injury to DDPs—the payment of supra-competitive prices—supports the DPPs' antitrust standing.

As to the second factor, motivation and alternative enforcers, Keurig argues that

TreeHouse and Rogers have filed lawsuits and are motivated to vindicate the public interest in antitrust enforcement. (DPP Def. Mem. 6.) Here, Keurig attempts to argue that TreeHouse and Rogers are more motivated than the DPPs and that, therefore, the DPPs should not enjoy antitrust standing. This misstates the law; the issue is not what plaintiff is the most motivated. "The second factor simply looks for a class of persons naturally motivated to enforce the antitrust laws . . . . Even if the competitors might be the most motivated, the plaintiffs are also significantly motivated due to their 'natural economic self-interest' in paying the lowest price possible." *In re DDAVP*, 585 F.3d at 689 (citing *Daniel*, 428 F.3d at 444). Moreover, because TreeHouse and Rogers are seeking lost profits while the DPPs are seeking overcharges, "[d]enying the plaintiffs a remedy in favor of a suit by competitors would thus be 'likely to leave a significant antitrust violation undetected or unremedied.'" *Id.* (quoting *AGC*, 459 U.S. at 542). The DPPs are motivated enforcers, and therefore this factor supports their antitrust standing.

Keurig argues further that the third and fourth factors, speculative nature of injury and difficulty of apportionment, weigh against the DPPs' standing because "[t]he injury DPPs allege is highly speculative, with alleged damages that would be nearly impossible to determine." (DPP Def. Mem. 7.) However, I find that the nature of the alleged injury—the overpayment for K-Cups purchased directly from Keurig or its agents—is not speculative. With regard to apportionment, lost profits—sought by Keurig's competitors—are separate from the overcharges the DPPs seek to recover. However, "[e]ven assuming some overlap between lost profits and overcharges . . . , the two are conceptually different measures that we think can be fairly apportioned in order to avoid duplicative recoveries." *In re DDAVP*, 585 F.3d at 689. These factors also weigh in favor of the DPPs' standing.

Therefore, all four efficient enforcer factors support the DPPs antitrust standing.[19]

c. <u>Application to the IPPs</u>

Although the IPPs assert only a claim for injunctive relief under the federal antitrust laws, they must still demonstrate antitrust standing to assert such a claim. *Paycom*, 467 F.3d at 290 (holding that private antitrust plaintiffs must demonstrate antitrust standing whether they seek monetary or injunctive relief). Unlike the DPPs, the IPPs fail to sufficiently allege that they are efficient enforcers, and therefore, they lack antitrust standing.

First, the IPPs' alleged injury is, by definition, indirect. The IPPs allege that they were "end-user[s]" who purchased Keurig K-Cups through distribution channels "generally involving only one or two intermediaries" between the IPPs and Keurig. (IPP SAC ¶ 28.) They do not allege that Keurig directly overcharged them, but rather that one or more intermediaries passed on overcharges to the IPPs. The Supreme Court clearly admonished the use of pass-on theories to establish standing in treble damages actions, in part due to the concern that "the massive evidence and complicated theories" involved in tracing the effect of an overcharge through the distribution chain would impose "burdens . . . on the effective enforcement of the antitrust laws." *Ill. Brick Co. v. Illinois*, 431 U.S. 720, 741 (1977) (internal quotation marks omitted). That concern is no less present in the context of an action for an injunction, as the question of whether a party several levels down in the distribution chain suffered an injury at all may be as complicated and indeed intertwined with quantifying the damages associated with the injury.

---

[19] Keurig also argues that the DPPs lack standing to bring claims related to the 2.0 Brewer because, in part, they do not allege they purchased the 2.0 Brewer and because, if the DPPs had issue with the limited choice of Compatible Cups afforded by the 2.0 Brewer, they simply need not buy it. (DPP Def. Mem. 7–8.) However, the DPPs allege that Keurig engaged in a multi-dimensional monopolization scheme designed to frustrate competition on the merits in order for Keurig to maintain, if not increase, the supra-competitive prices Keurig charges the DPPs for the K-Cups the DPPs purchased directly from Keurig. (DPP AC ¶¶ 245, 258.) Conduct related to the 2.0 Brewer is relevant to the DPPs' claims to the extent it allowed Keurig to maintain supra-competitive pricing.

Second, there are alternative enforcers that are better situated to bring suit, and have brought suit. The DPPs in particular seek injunctive relief that largely, if not completely, overlaps with the injunctive relief sought by the IPPs. (*Compare* DPP AC ¶ 302(f)–(h), *with* IPP SAC at 116.) Given the claims brought by the DPPs and the Competitor Plaintiffs, denying the IPPs' federal claims is not "likely to leave a significant antitrust violation undetected or unremedied." *AGC*, 459 U.S. at 542. Although it is true that an efficient enforcer need not be the "most motivated" enforcer, *In re DDAVP*, 585 F.3d at 689, the existence of the DPPs and the Competitor Plaintiffs "diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general," *AGC*, 459 U.S. at 542. This factor, therefore, weighs against a finding of antitrust standing.

Third, and related to the directness inquiry, the IPPs' alleged injury is speculative "because the claimed damages are too indirect and may have been produced by factors independent from any alleged overcharge." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *15 (C.D. Cal. Oct. 2, 2014). The IPP Second Amended Complaint alleges that "[t]he distribution channel for Keurig K-Cups is not complex, generally involving only one or two intermediaries between Keurig and the end-user consumer Plaintiffs," (IPP SAC ¶ 28), and that "Keurig's anticompetitive conduct resulted in direct purchasers being overcharged for Keurig K-Cups, and such overcharges were passed on by direct purchasers to Plaintiffs and the members of the Classes in whole or in part," (*id.* ¶ 30). These conclusory allegations fail to describe with sufficient factual detail the chain of distribution between Keurig and the IPPs, leaving numerous questions unanswered. Who were the intermediaries? How often was there one intermediary versus two or more? How does one know to what extent, if at all, any of the intermediaries passed on the overcharges to the next link in the chain? The IPPs'

Second Amended Complaint sheds no light on any of these questions, and thus, this factor weighs against a finding of antitrust standing. *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *22 (dismissing claims when "plaintiffs [were] one or more levels down the supply/distribution chain").

The IPPs emphasize that they "purchased the exact product sold by Keurig," but just not directly from Keurig. (IPP Def. Mem. 11–12.) However, the fact that the product did not change as it flowed down the line of distribution does not preclude the possibility that independent factors, such as costs for transportation, handling, storage, or any other service— rather than overcharges passed down from Keurig—could have led to the IPPs' purported damages. The vague allegation that "[t]he distribution channel for Keurig K-Cups is not complex," (IPP SAC ¶ 28), does not cure the speculative nature of the alleged harm. Moreover, if the allegation is accurate the IPPs should have provided the details of the distribution channel—including its length—with more specificity since the IPPs have had ample opportunities to do so.

Finally, while the difficulty in apportioning damages would not hinder a finding of antitrust standing in this action for injunctive relief, the IPPs do request relief that is largely duplicative of the relief requested by the DPPs, as discussed above. The IPPs' "roles as plaintiffs thus compounds manageability issues without providing any clear benefit." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *23.

Because each of the efficient enforcer factors weighs against the IPPs' federal antitrust standing, their federal antitrust claims are dismissed.[20] The DPPs, however, adequately pled

---

[20] I note that some courts analyze antitrust standing separately under Section 1 and Section 2. *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 360–65 (S.D.N.Y. 2016). Both Keurig and the IPPs conflate the analysis. (*See* IPP Def. Mem. 5–9; IPP Opp. 9–13.) At any rate, I find that, for the same reasons that the efficient enforcer factors

antitrust standing. As such, I will move on to address Keurig's remaining challenges to the federal antitrust claims of Rogers, TreeHouse, and the DPPs.

### 2. Monopoly Power

#### a. Applicable Law

Turning to the first prong of a Section 2 claim, "to make out an antitrust claim, '[a] plaintiff must allege a relevant product market in which the anti-competitive effects of the challenged activity can be assessed.'" *Commercial Data Servers*, 2002 WL 1205740, at *4 (quoting *Carrell v. The Shubert Org., Inc.*, 104 F. Supp. 2d 236, 264 (S.D.N.Y. 2000)). Monopoly power is the power to control prices or exclude competition in a given market. *Grinnell*, 384 U.S. at 571. It can be pled directly through allegations of control over prices or the exclusion of competition, or it may be inferred from a defendant's large share of the relevant market. *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). A plaintiff pleading monopolization, or attempted monopolization, generally must define the relevant market, because "without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition." *Spectrum Sports*, 506 U.S. at 455–56 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)). It is important to recognize that, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd*, 275 F.3d at 199–200 (citing *Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.")).

---

weigh against the IPPs' federal antitrust standing under Section 2, they also weigh against the IPPs' federal antitrust standing under Section 1, and their Section 1 claims are also dismissed.

### b. Application to the Competitor Plaintiffs and the DPPs

Keurig attacks the Section 2 claims of Rogers, TreeHouse, and the DPPs by arguing that they failed to allege monopoly power in a properly defined relevant market. (Rogers Def. Mem. 16–22; TreeHouse Def. Mem. 27–32; DPP Def. Mem. 18–24.) Rogers, TreeHouse, and the DPPs allege two separate relevant product markets in which Keurig's anticompetitive conduct arose: (1) the Single Serve Brewer Market; and (2) the Compatible Cup Market. (Rogers AC ¶ 17; TreeHouse AC ¶ 64; DPP AC ¶ 53.) The Competitor Plaintiffs also allege the Portion Pack Market as a third relevant product market. (Rogers AC ¶ 17; TreeHouse AC ¶ 64.)

#### i. *Single Serve Brewers Market*

Keurig attacks Plaintiffs' Single Serve Brewers Markets in several ways. First, with respect to Rogers' market—which it defines as the market for the design, manufacture, and sale of "pressurized hot water brewing equipment that is capable of brewing at least a single serving of coffee or other hot beverages," (Rogers AC ¶¶ 9, 17)—Keurig argues that Rogers does not define what "pressurized" means and, because "[a]ny brewer can brew 'at least one serving,' . . . [Rogers is] gerrymandering a market definition to suit its case," (Rogers Def. Mem. 16). However, as Rogers alleges, Keurig itself defines "competing systems" as Rogers does in defining Single Serve Brewers. Specifically, Keurig's licensing agreements describe "competing systems" as having the following characteristics: (1) "A brewing chamber designed to be pierced during the brewing process to allow hot water in and the brewed beverage out;" and (2) "[a] pressurized brewing process that takes place at pressures less than 30 psi inside the brewing chamber." (Rogers AC ¶ 13.) Further, in these agreements, Keurig clarifies that it does not compete with "hopper-based single-cup coffee systems" and "espresso pod-based systems," (*id.* ¶ 14), let alone standard drip brew coffee systems. In this vein, Rogers has sufficiently pled

a market for Single Serve Brewers. *See Todd*, 275 F.3d at 199–200.

Second, Keurig attempts to attack the market definition alleged by Rogers, TreeHouse, and the DPPs by highlighting their allegations that Keurig sells its Single Serve Brewers at or below cost, (Rogers Def. Mem. 16 (citing Rogers AC ¶ 314); *see also* TreeHouse Def. Mem. 27–28; DPP Def. Mem. 19 (citing DPP AC ¶ 193)), and arguing that "[n]o firm would price at or below cost unless it faced competition," (Rogers Def. Mem. 16 (citing Dennis W. Carlton & Jeffrey M. Perloff, *Modern Industrial Organization* 88 (4th ed. 2005) ("A monopolist . . . sets a price above marginal cost.")); *see also* DPP Def. Mem. 19). Keurig cites no case law, and I am aware of none, in which a court has found that a monopolist charging at or below cost forecloses Section 2 claims as a matter of law. Indeed, Keurig cites in support of its proposition *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), in which the court notes that "the differential between price and marginal cost is used as an indication of the degree of monopoly power," *id.* at 275 n.12, but immediately goes on to note that "high prices, far from damaging competition, invite new competitors into the monopolized market," *id.*

It is clear that, when there are allegations of monopolization of a tied market, a monopolist might in fact charge at or below cost for the tying product to extract monopoly surplus from the tied product. Monopolists may "evade price control in the tying product through clandestine transfer of the profit to the tied product." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 487 (1992) (Scalia, J., dissenting) (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 513–14 (1969) (White, J., dissenting)); *see Berkey Photo*, 603 F.2d at 272 ("It is not a defense to liability under § 2 that monopoly power has not been used to charge more than a competitive price . . . ."); *Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 539 (S.D.N.Y. 2009) (denying dismissal where sales were "at a low margin or a loss,

hoping to earn a profit through later [aftermarket] sales") ("*Xerox III*"); *see also* Rogers AC ¶¶ 131, 195–209; TreeHouse AC ¶¶ 131, 195–209, 587; DPP AC ¶ 192 ("Keurig's business model depends upon its ability to leverage its Single-Serve Brewer monopoly in order to restrain competition and extract monopoly profits from the K-Cups it sells in the Compatible Cup Market.").  In sum, pricing Single Serve Brewers at or below cost in no manner suggests that the Single Serve Brewer Market is somehow broader than defined, or that Keurig does not in fact enjoy monopoly power in that market.

Third, the DPPs allege a Single Serve Brewers Market that is distinct from traditional coffee in that it is more convenient and efficient.  Keurig argues that the DPPs' market definition fails because "a difference in process or convenience does not create a plausible inference that end products do not compete."  (DPP Def. Mem. 19.)  However, the DPPs do not simply allege a difference in process but describe a difference in fact—the DPP Amended Complaint details why traditional drip coffee machines are not interchangeable with and do not compete with Single Serve Brewers.  (*See* DPP AC ¶¶ 55–58.)  Further, Keurig's recitation of the law misses the mark because courts have found that functionality and consumer perspective is an important part of a market evaluation.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 562 F. Supp. 2d 392, 399 (E.D.N.Y. 2008) ("The contours of the relevant market track the cross-elasticity of demand:  the extent to which products or services are perceived by consumers to be reasonably interchangeable for the same purposes . . . . The cross-elasticity of demand analysis depends on information about consumer behavior and perceptions and is accordingly 'a deeply fact-intensive inquiry.'" (quoting *Todd*, 275 F.3d at 199)).[21]

---

[21]  Keurig also argues that the DPP Amended Complaint lacks allegations concerning the 2.0 Brewer specifically. (DPP Def. Mem. 20–21.)  These arguments are irrelevant to the definition of the Single Serve Brewer Market as all Keurig's Single Serve Brewers fit into this market definition, and the law does not require the DPPs to allege how much of that market is claimed specifically by the 2.0 Brewer.

Therefore, at this stage, Plaintiffs' plausibly allege a market covering Single Serve Brewers. For example, the Rogers Amended Complaint alleges that Keurig "controls approximately 89% of total unit sales and 93% of total dollar sales in the Single Serve Brewer Market." (Rogers AC ¶ 27.) Similarly, the TreeHouse Amended Complaint alleges that Keurig "controls approximately 93% of the Single-Serve Brewer Market." (TreeHouse AC ¶¶ 83, 87–88, 90–94.) The DPPs, in turn, allege that during the entire relevant time period,[22] Keurig has dominated the Single-Serve Brewer market with at least 88% market share. (DPP AC ¶¶ 9, 75, 101.) These allegations support an inference of a "substantial monopoly" and monopoly power. *See Grinnell*, 384 U.S. at 571 (87% is a "substantial monopoly"); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) ("over 80%" constitutes "a substantial monopoly"). Indeed, while unnecessary, *see Geneva Pharms.*, 386 F.3d at 500 ("Monopoly power . . . can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market."), the Competitor Plaintiffs go on to allege that Keurig has exercised this monopoly power to restrain competition in the Single Serve Brewer Market, (*see* Rogers AC ¶ 30; TreeHouse AC ¶ 89).

ii. *Compatible Cup and Portion Pack Markets*

Keurig also challenges the Plaintiffs' allegations of Keurig's monopoly power in the Compatible Cup and Portion Pack Markets and, relatedly, the Competitor Plaintiffs' allegations of a Portion Pack Market. In particular, Rogers alleges that, after taking steps to regain market share it lost to market entrants, as of November 2014, Keurig controls approximately 95% of the Compatible Cup Market. (Rogers AC ¶ 46.) According to Rogers, the alternative Portion Pack

---

[22] The DPPs define the Class Period as encompassing all persons or entities that purchased at least one K-Cup between September 7, 2010 and the present. (DPP AC ¶ 245.)

Market, in addition to Compatible Cups, includes portion packs that do not fit in or work with K-Cup Brewers. (*See id.* ¶ 53.) Rogers alleges that, "[a]s of early 2013, Keurig controls approximately 73% of the Portion Packs Market." (*Id.* ¶ 58.) TreeHouse alleges that in 2014, Keurig controlled 86% of the Compatible Cup Market and after taking steps to regain market share it lost to market entrants, Keurig now controls approximately 95% of the Compatible Cup Market. (TreeHouse AC ¶¶ 125–30.) TreeHouse also alleges the same alternative Portion Pack Market, (*see id.* ¶¶ 145–57), and similarly claims that Keurig "possesses and exercises monopoly power over the Portion Pack Market" and "controls over 73% of the Portion Pack Market," (*id.* ¶ 151). The DPPs allege that Keurig, through outright brand ownership or exclusive licensing, controlled, at its lowest point, an 86% share of the Compatible Cup Market, which has grown to a 95% share as a result of Keurig's purported anticompetitive conduct. (*See* DPP AC ¶¶ 105–07, 113, 169, 242.)

Keurig argues that both the Compatible Cup and Portion Pack Markets are "aftermarkets" for consumables, sold for use with the primary product, Single Serve Brewers, and therefore the allegations of market share alone are insufficient. (*See, e.g.*, DPP Def. Mem. 21–23.) Keurig relies upon the Court's holding in *Xerox III*, which provided that:

> [F]or a *nonmonopolist* producer of a durable good to be held to have monopoly power in the aftermarket for parts, service, or supplies, a plaintiff generally must show that (i) customers who own the good are "locked in" by the prohibitive costs of switching to an alternate product, and (ii) the lock-in permitted those customers to be exploited, either because (a) some limitation on information undermined their ability to know that the aftermarket goods and services were being sold at high prices, or (b) the defendant changed its aftermarket prices after the lock-in occurred.

*Xerox III*, 660 F. Supp. 2d at 547 (emphasis added). As is clear, this case applies only to a "nonmonopolist" producer in the primary market; in other words, for *Xerox III* to apply, the Single Serve Brewer Market must be competitive. As discussed above, Plaintiffs have clearly

alleged it is not.[23]  Applying the correct standard to Plaintiffs' allegations, they have clearly

alleged a plausible Compatible Cup Market and a plausible Portion Pack Market, in the

alternative.[24]

### 3.  Maintenance of Monopoly Power

#### a.  <u>Applicable Law</u>

As noted above, there are three elements to a claim for monopolization, the second of

which requires that a plaintiff allege "the willful acquisition or maintenance of [monopoly]

power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident."  *Grinnell Corp*., 384 U.S., at 570–71.  A monopolist's

conduct violates Section 2 if it "(1) tends to impair the opportunities of rivals, [and] also (2)

either does not further competition on the merits or does so in an unnecessarily restrictive way."

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 605 n.32 (1985) (internal

---

[23]  I also note that in *Eastman Kodak*, the Supreme Court expressly rejected "adopt[ing] any exception to the usual antitrust analysis" when assessing monopoly power in an aftermarket, noting that the Court has always "treat[ed] derivative aftermarkets as it has every other separate market."  504 U.S. at 479 n.29.

[24]  The Competitor Plaintiffs allege that because Portion Packs that do not work in K-Cup Brewers are not interchangeable with Compatible Cups, the Compatible Cup Market "is the appropriate relevant market in which to evaluate the harm caused by Keurig's unlawful and anticompetitive conduct to competition for the manufacturing, licensing, and sale of Portion Packs that compete with K-Cups, *i.e.*, Competing Portion Packs."  (Rogers AC ¶ 54; *see also* TreeHouse AC ¶ 149.)  For purposes of the current motion, it suffices that the Competitor Plaintiffs have plausibly alleged both Compatible Cup and Portion Pack Markets; discovery will illuminate which market is appropriate in which to analyze the alleged anticompetitive conduct.  *See Found. for Interior Design Educ. Research*, 244 F.3d at 531.

With respect to the DPPs, Keurig also argues that, because its competitors have enjoyed some growth, there is no dangerous probability of monopoly, an element for the claim of attempted monopolization.  (DPP Def. Mem. 23–24.)  This argument fails.  First, the DPPs have adequately alleged direct evidence of Keurig's market power and its exercise thereof.  (*See, e.g.*, DPP AC ¶ 103 ("Keurig has the power to exclude competition in the Single-Serve Brewer Market. Keurig has unlawfully exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.").)  Further, the presence of limited competitor growth does not, as Keurig states, "negate[]" any attempted monopolization claim.  *See Berkey Photo*, 603 F.2d at 273 n.11 ("The precipitous decline [of defendant's market share is] not dispositive.").  As discussed further below, the law does not require a complete lack of growth to sustain a Section 2 claim.  *See Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) (affirming monopoly maintenance where plaintiff's market share was increasing and market was expanding).

quotation marks omitted).

   Application to Rogers, TreeHouse, and the DPPs

Plaintiffs have pled similar facts relevant to these elements and, therefore, many of Keurig's challenges to those allegations overlap.

In particular, Rogers has pled facts showing that Keurig "has engaged and continues to engage in a scheme of anticompetitive acts to block independent competitors from the markets in which it operates." (Rogers AC ¶ 8.) Specifically, Rogers has alleged that Keurig has effectively restrained the Portion Pack and Compatible Cup Markets by (1) coercing distributors and retailers to enter into anticompetitive exclusive agreements that restrain market entry, exclude competitors, and unreasonably restrain competition; (2) conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output; (3) filing objectively and subjectively baseless litigations and appeals against manufacturers of Competitor Cups, including Rogers; (4) tying the purchase of K-Cups to the purchase of K-Cup Brewers in order to unreasonably restrain competition from Competitor Cup manufacturers; (5) interfering with Rogers' business relationships by making false and disparaging comments to customers and potential customers regarding Rogers' products; (6) threatening to unreasonably restrain competition through the introduction of technology that unnecessarily and unjustifiably excludes competitors from the Compatible Cup Market; (7) raising competitors' costs above those that would exist under competitive conditions by requiring the manufacturers of Competitor Cups to enter restrictive licensing agreements; and (8) making material misrepresentations to retailers, distributors, and consumers regarding the compatibility, performance, safety, and quality of Competing Portion Packs as compared to K-Cups. (Rogers AC ¶ 297.) TreeHouse and the

DPPs have asserted very similar, and often identical, allegations. (TreeHouse AC ¶¶ 2, 45, 572; DPP AC ¶¶ 8, 257.) To the extent that there are differences in the allegations among the three, I find the differences are not material to my consideration of this issue.

I review Keurig's challenges to the sufficiency of these allegations in turn.

i. *Product Design*

Keurig argues that Plaintiffs' product design claims fail to allege anticompetitive conduct. (*See, e.g.*, Rogers Def. Mem. 4–6.) Keurig notes that, "[w]hen it comes to product design, a firm 'may generally bring its products to market whenever and however it chooses,'" and that the only narrow exception to this "rule" would arise when a monopolist coerces consumers into buying a new product, (*id.* at 5 (quoting *Berkey Photo*, 603 F.2d at 287); *see also* DPP Def. Mem. 15–17). Rogers "cannot allege that consumers have been coerced into buying the 2.0 brewer here," according to Keurig, because "Keurig continues to make K-Cups that work in 1.0 brewers," and because Keurig did not and does not hide the fact that the 2.0 Brewer is designed to lock-out Competitor Cups. (Rogers Def. Mem. 5–6.) In connection with TreeHouse's allegations that the introduction of the 2.0 Brewer was intended to lock competitors out of the market for Compatible Cups and maintain its monopoly, to the detriment of consumers, (TreeHouse AC ¶¶ 10–13, 373, 385, 402–03, 422–32), Keurig also argues that it was not required to pre-disclose to its competitors how the 2.0 Brewer would function to facilitate their ability to reverse engineer Compatible Cups that would function with the machine and that it would be improper for me to consider whether the innovations in the 2.0 Brewer were necessary or if alternatives existed, (TreeHouse Def. Mem. 16–17).

"A monopolist, no less than any other competitor, is permitted and indeed encouraged to compete aggressively on the merits, and any success it may achieve solely through 'the process

of invention and innovation' is necessarily tolerated by the antitrust laws." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 544–45 (9th Cir. 1983), *overruled on other grounds as recognized in Chroma Lighting v. GTE Prods. Corp.*, 111 F.3d 653, 657 (9th Cir. 1997) (quoting *Berkey Photo*, 603 F.2d at 281). It follows then that, "[a]s a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001). However, "changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010). As recognized by the Second Circuit, "it is not the product introduction itself, but some associated conduct, that supplies the violation." *Berkey Photo*, 603 F.2d at 286 n.30. "[U]nder *Berkey Photo*, when a monopolist *combines* product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive under the Sherman Act." *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015), *cert. dismissed sub nom. Allergan PLC v. N.Y. ex. rel. Schneiderman*, 136 S. Ct. 581 (2015) (internal citations omitted).

With this law in mind, if Rogers, TreeHouse, and the DPPs had only alleged anticompetitive product design, such allegations would likely not withstand Keurig's motion to dismiss; however, the amended complaints are filled with allegations of "associated conduct"— including, for example, allegations of exclusive dealing, tying agreements, and product disparagement—the overall effect of which is to coerce customers to purchase K-Cups over Competitor Cups, rather than to compete on the merits.

Further, Plaintiffs' allegations detailing Keurig's intent in developing the 2.0 Brewer

support their product design claims.  Rogers' Amended Complaint alleges that a stated objective in redesigning its brewer in 2012 was to "redesign the K cup holders in new brewers to lock out the competitors."  (Rogers AC ¶ 183.)  TreeHouse's Amended Complaint points to Keurig's Project Squid and the "My K-Cup" redesign project, with the stated objective to "redesign the K-cup holders in new brewers to lock-out the competitors."  (TreeHouse AC ¶ 14.)  The DPP Amended Complaint alleges that a stated objective in redesigning the 2.0 Brewer in 2012 was to "redesign the K-cup holders and new brewers to lock out the competitors."  (DPP AC ¶ 228.)  While Keurig argues to the contrary, the Supreme Court has made clear that "intent is . . . relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'"  *Aspen Skiing*, 472 U.S. at 602.  "[C]onsiderations of subjective intent are sometimes essential," such as when "innovations both harm rivals and fail to benefit consumers."  3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651c2, at 115 (3d ed. 2008) ("The real question is what the innovator had in mind.").  At this stage, Plaintiffs' allegations that the 2.0 Brewer and its innovations were not intended to benefit consumers, but rather were intended to harm competition in the Compatible Cup Market, support their Section 2 monopolization claims.  (*See* Rogers AC ¶¶ 214–32; DPP AC ¶¶ 221–35; TreeHouse AC ¶ 398 ("[T]he 2.0 K-Cup Brewer was not developed for any purported consumer benefit; rather 'the new Keurig 2.0 brewer with its lock-out technology was developed solely for the purpose of locking out competition'" (quoting the Declaration of Andrew Gross in Support of Rogers' Motion for a Preliminary Injunction ¶ 8, attached as Ex. 12 to the Rogers Amended Complaint)).)

ii.  *Patent Litigation and Patent Misuse*

The Competitor Plaintiffs and the DPPs claim that the Patent Litigation constitutes illegal monopolization arising under Section 2 of the Sherman Act.  "A single lawsuit can violate

antitrust law as long as it is both an objective and subjective sham." *In re DDAVP*, 585 F.3d at

686. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could

realistically expect success on the merits . . . . [S]econd[,] the court should focus on whether the

baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a

competitor." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60

(1993) (internal quotation marks omitted).

Keurig argues that Plaintiffs fail to allege objective and subjective baselessness or

antitrust injury resulting from the Patent Litigation. I analyze each prong in turn.

First, the Competitor Plaintiffs have alleged that the Patent Litigation was objectively

baseless. *Id.*; *see* Rogers AC ¶¶ 174, 330 ("Keurig initiated the suits against Sturm and Rogers

knowing that it could not prove infringement due to patent exhaustion."); TreeHouse AC ¶ 41

("These Competitive Cups did not infringe any of [Keurig]'s patents because they did not

contain a filter. But that did not stop [Keurig] from pursuing a baseless lawsuit to try to keep

Competitive Cups off the market."), ¶¶ 43, 227–28, 230–31. In addition, contrary to Keurig's

argument, the DPPs do not merely allege "that Keurig lost the prior [patent infringement]

litigations." (DPP Def. Mem. 14.) Rather, the DPPs allege, consistent with their argument that

the Patent Litigation was objectively baselessness, that "[n]o reasonable litigant could have

realistically expected to succeed on the merits of such claims, and, thus, Keurig's complaint was

objectively baseless." (DPP AC ¶ 129.) The DPPs go on to detail the deficient bases for the

failed patent suits. (*See id.* ¶¶ 125–38.) For example, Keurig alleged that Sturm's Compatible

Cups infringed Keurig's patents directed at brewers and methods of brewing, not even asserting

any patents covering K-Cups themselves. (*See id.* ¶ 128.) These assertions are sufficient to

allege objective baselessness, and therefore Plaintiffs have met the first prong of stating a sham

litigation claim. While Keurig attempts to argue that Rogers' allegations fail because it did not file a motion to dismiss the Patent Litigation and because the Federal Circuit heard argument on the appeal, which it would not have done if the appeal were frivolous, (Rogers Def. Mem. 7), neither of these facts are fatal to a sham litigation claim, *see, e.g.*, *Mitsubishi Heavy Indus., Ltd. v. Gen. Elec. Co.*, 720 F. Supp. 2d 1061, 1067 (W.D. Ark. 2010) (concluding that defendant's failure to file a motion to dismiss does not indicate that the defendant thought that the action was not a sham because "[a] complaint can meet all the pleading requirements of the Federal Rules of Civil Procedure and still, as a factual matter, be frivolous").[25]

Second, the Competitor Plaintiffs allege that Keurig embarked upon the Patent Litigation in "an attempt to interfere *directly* with the business relationships of a competitor." *Prof'l Real Estate Inv'rs*, 508 U.S. at 60–61 (internal quotation marks omitted). Rogers alleges that:

> [R]ather than attempting to prove infringement, the real reason that Keurig initiated [the Patent Litigation] was to harm Rogers' and Sturm's ability to compete with Keurig's Compatible Portion Packs business by causing Rogers and Sturm to divert resources from marketing their respective Compatible Portion Packs businesses to defend against Keurig's claims and to incur substantial legal fees associated with their defenses, thereby increasing . . . the costs [of] Rogers' and Sturm's Compatible Portion Pack products. On information and belief, Keurig initiated these suits to harm Rogers' and Sturm Foods' ability to compete with Keurig's Compatible Portion Packs business also by creating confusion and doubt among Rogers' and Sturm's potential and existing customers about the commercial viability of Rogers' and Sturm's Compatible Portion Pack products, and by delaying Rogers' and Sturm's ability to grow their respective Compatible Portion Pack businesses.

(Rogers AC ¶ 174.) Similarly, TreeHouse alleges that the Patent Litigation:

> [W]as instituted in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup Market, to intimidate market entrants, to raise a rival's costs, to harm TreeHouse's reputation, to sow doubt and confusion as to the legality of

---

[25] Keurig has cited no case law, and I have found none, in which a court finds a sham litigation claim to fail as a matter of law when a court of appeals grants oral argument on an appeal, especially where, as here, the only decisions on the merits were the summary judgment decision which admonished Keurig that "patent holders may not invoke patent law to enforce restrictions on the postsale use of their patented products," *Keurig, Inc. v. JBR, Inc.*, 2013 WL 2304171, at *15, and the decision by the Federal Circuit summarily affirming the district court's grant of summary judgment, 558 F. App'x 1009 (Fed. Cir. 2014).

purchasing and selling Competitive Cups, and to deprive TreeHouse of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

(TreeHouse AC ¶ 238.) The DPPs also allege that Keurig filed the sham suits against its competitors "for the purpose of interfering with their ability to compete in the Compatible Cup Market." (DPP AC ¶ 257.) The Competitor Plaintiffs and the DPPs have therefore adequately pled objective baselessness and direct interference with their business relationships. *See Prof'l Real Estate Inv'rs*, 508 U.S. at 60.

In connection with the DPPs, Keurig also argues that the DPPs' allegations that the patent suits were subjectively baseless are conclusory. (DPP Def. Mem. 15.) However, the DPPs point specifically to language in the opinions of the district and circuit courts positing that Keurig was misusing patent law to improperly interfere with competitors and take control of the Compatible Cup Market. (*See* DPP AC ¶¶ 132, 137.) For example, the DPPs quote the Federal Circuit: "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Compatible Cups] by invoking patent law." (*Id.* ¶ 137 (quoting *Keurig, Inc. v. Sturm Foods*, 732 F.3d at 1374).)

Keurig next argues that the Competitor Plaintiffs and the DPPs failed to allege antitrust injury. (*See, e.g.*, Rogers Def. Mem. 8.) However, Rogers alleges that it "devoted significant resources to the defense against these baseless claims, including approximately $2 million in legal costs and fees," (Rogers AC ¶¶ 173, 329), and TreeHouse alleges that, "[a]s a result of this sham litigation and appeal, Plaintiffs were forced to incur three years' worth of litigation fees and costs, rather than use those resources to compete against [Keurig]. Competition in the market for Compatible Cups has thus been harmed," (TreeHouse AC ¶ 602). Litigation costs incurred in defending against a sham litigation are "a well recognized type of antitrust

injury . . . ." *Bio-Tech. Gen. Corp. v. Genentech, Inc*., 886 F. Supp. 377, 380 (S.D.N.Y. 1995), *aff'd*, 66 F.3d 344 (Fed. Cir. 1995). Additionally, the DPP Amended Complaint makes clear that Keurig filed the sham suits against its competitors "for the purpose of interfering with their ability to compete in the Compatible Cup Market." (DPP AC ¶ 257.) Therefore, the Competitor Plaintiffs, and the DPPs have adequately alleged antitrust injury in connection with this claim.[26]

Keurig also challenges the Competitor Plaintiffs' patent misuse claim for lack of a live controversy. Keurig argues that to state a claim for patent misuse, requires an "affirmative act" to enforce patents; a subjective fear of harm will not suffice. (Rogers Def. Mem. 8 (quoting *Prasco LLC v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1338–39 (Fed. Cir. 2008)).) Keurig also contends that because the Patent Litigation was resolved there is no live controversy to adjudicate, (TreeHouse Def. Mem. 26), and, to the extent the patent misuse claim arises from the introduction of the 2.0 Brewer, that TreeHouse has not alleged any attempted patent use or threat of patent litigation connected to the 2.0 Brewer, (*id.* at 27).

"Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant." *C.R. Bard, Inc. v. M3 Sys., Inc*., 157 F.3d 1340, 1372 (Fed. Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999); *see also Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703–04 (Fed. Cir. 1992). *Abrogated on other grounds*, 137 S. Ct. 15323 (2017) ("The concept of patent misuse arose to restrain practices that did not in themselves violate any law, but that draw anticompetitive strength from the patent right, and thus were deemed to be contrary to public

---

[26] Although its allegations are sufficient, Rogers also alleges that the Patent Litigation was designed to and did slow Rogers' entry into the market by casting a pall of illegitimacy over the Rogers products. (*See* Rogers AC ¶ 172 ("Moreover, the lawsuits were used by Keurig to sow doubt and confusion amongst consumers about the viability of Competing Portion Packs. On information and belief, Keurig used the existence of the lawsuit in order to convince distributors and third parties to stop doing business with Rogers and Sturm.").)

policy."). "Misuse is closely intertwined with antitrust law, and most findings of misuse are conditioned on conduct that would also violate the antitrust laws." *Linzer Prod. Corp. v. Sekar*, 499 F. Supp. 2d 540, 552 (S.D.N.Y. 2007) (internal quotation marks omitted). "The key inquiry under this fact-intensive doctrine is whether, by imposing [an express condition on the post-sale use of a patented product], the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (internal quotation marks omitted). A common example "of such impermissible broadening [is the use of] a patent which enjoys market power in the relevant market . . . to restrain competition in an unpatented product . . . ." *Id.* (citing 35 U.S.C. § 271(d)(5)).

The Competitor Plaintiffs allege that Keurig has sought to extend the protections afforded its K-Cup Brewer patents by restricting purchasers of Keurig's Single Serve Brewers from using Competing Portion Packs and that Keurig has engaged in patent misuse by tying unpatented products, K-Cups, to patented products, Keurig's Single Serve Brewers. (Rogers AC ¶ 336; TreeHouse AC ¶ 607.) They also allege that Keurig has monopoly power in the tying market, the Single Serve Brewer Market. (Rogers AC ¶ 27; TreeHouse AC ¶ 83); *see Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 43 (2006). This is an affirmative act and is, at this stage, sufficient to state a claim for patent misuse.

In sum, the Competitor Plaintiffs and the DPPs have stated a claim for sham litigation and for patent misuse, and Keurig's motions to dismiss these claims are denied.

### iii. *Exclusive Dealing and Substantial Foreclosure*

Keurig next argues that the exclusive dealing claims fail because the Competitor Plaintiffs and the DPPs have failed to allege substantial foreclosure required to support a Section

2 claim.  (Rogers Def. Mem. 8–12; TreeHouse Def. Mem. 6–15; DPP Def. Mem. 8–14.)[27]

To state a Section 2 claim based on exclusive dealing arrangements, a plaintiff "must allege as a threshold matter a substantial foreclosure of competition in the relevant market." *Commercial Data Servers*, 2002 WL 1205740, at *7 (internal quotation marks omitted); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (holding that the competition foreclosed must "constitute a substantial share of the relevant market").

As noted above, the DPPs allege two relevant markets, the Single Serve Brewer Market and the Compatible Cup Market.  The Competitor Plaintiffs allege the same, as well as a Portion Pack Market in the alternative to a Compatible Cup Market.  Rogers alleges that Keurig's exclusive agreements with "Keurig Authorized Re-Distributors" and large distributors foreclose Competitor Cup manufacturers' access to approximately 80% of the Compatible Cup Market sales to Away-From-Home customers, (Rogers AC ¶ 98); that Keurig has exclusive agreements with retailers and distributors for the At-Home Market Segment that prohibits them from marketing any Competitor Cups, (*id.* ¶¶ 107–08); and that Keurig has exclusive agreements with competitor brands and roasters that restrict them from selling products to, licensing brands to, or allowing Competitor Cup manufacturers to manufacture Competitor Cups for the brand, (*id.* ¶¶ 120–21).  TreeHouse alleges that Keurig "has entered into unduly restrictive, anticompetitive, and exclusionary agreements with companies at every level of the Compatible Cup distribution system" which "are not only unduly restrictive and unreasonable in length, but also serve the

---

[27] As Keurig notes, substantial foreclosure is an element of an exclusive dealing claim whether that claim is brought pursuant to Section 1 or Section 2 of the Sherman Act, or Section 3 of the Clayton Act.  (*See* Rogers Def. Mem. 9 n.9.; TreeHouse Def. Mem. 7 n.4; DPP Def. Mem. 8 n.8.)  Keurig's anticompetitive exclusive dealing conduct supports the following claims raised by Rogers:  claim 1 (monopolization); claim 2 (exclusive dealing); claim 3 (monopoly leveraging); claim 8 (conspiracy to monopolize); claim 9 (conspiracy and group boycott); claim 10 (attempted monopolization); claim 12 (violation of the Cartwright Act); claim 13 (unfair competition); and claim 15 (violation of California's Unfair Competition Law).  Additionally, TreeHouse alleges exclusive dealing in violation of Sections 1 and 2 of the Sherman Act, Section 3 of the Clayton Act, and Illinois, Wisconsin, and New York law. (TreeHouse AC ¶¶ 577–84.)

anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with."  (TreeHouse AC ¶¶ 241–42; *see also id.* ¶¶ 7, 185.)  The DPPs allege that Keurig dominates the Single Serve Brewer and Compatible Cup Markets, with an 88% and 95% share, respectively, of each.  (DPP AC ¶¶ 101, 107.)  The DPPs allege that:

> Keurig, at its lowest market-share point, controlled approximately 86% of the Compatible Cup Market.  The remaining 14% of the Compatible Cup Market was then composed of sellers of unlicensed and private label Competitor Cups. Responding to this market share loss to Competitor Cups, Keurig reinforced its anti-competitive scheme by, among other actions, furthering its web of exclusionary arrangements throughout the Compatible Cup supply and distribution chain.  As a result, Keurig has almost entirely recouped its lost market share and now controls roughly 95% of the Compatible Cup Market.

(*Id.* ¶ 107 (internal footnote omitted).)

These allegations notwithstanding, Keurig points to Plaintiffs' allegations that they and other competitors have continued selling Competitor Cups and, in some circumstances, have increased sales of Competitor Cups despite Keurig's alleged anti-competitive conduct.  (Rogers Def. Mem. 9; TreeHouse Def. Mem. 7; DPP Def. Mem. 8–9.)  Keurig argues that "courts in this Circuit and others have found no foreclosure where competitors experienced a 'sales increase,' and even where competitors simply 'remained in the market and successfully competed.'" (Rogers Def. Mem. 9 (quoting *CDC Techs. v. IDEXX Labs., Inc*., 186 F.3d 74, 80 (2d Cir. 1999) and *Bowen v. N.Y. News, Inc.*, 366 F. Supp. 651, 679 (S.D.N.Y. 1973), *aff'd in part and rev'd in part on other grounds*, 522 F.2d 1242 (2d Cir. 1975)); *see also* TreeHouse Def. Mem. 7; DPP Def. Mem. 8–9.)

This argument fails for two main reasons.  First, it ignores the allegations that Keurig's exclusionary contracts have substantially foreclosed competition in the Portion Pack and Compatible Cup Markets causing the Competitor Plaintiffs to lose significant sales and profits, Keurig's profits to increase, and the DPPs to pay supra-competitive prices for K-Cups.  (*See*

Rogers AC ¶ 310; TreeHouse AC ¶¶ 6, 130, 366–72; DPP AC ¶¶ 107, 112.) Second, it misreads

the law on substantial foreclosure, which does not require a complete lack of growth to sustain a

Section 2 claim. "Of course, the law has never required complete market exclusion as a

prerequisite to suit. Indeed, some successful § 2 plaintiffs have both grown their market shares

and earned high profits even through the period that the exclusionary practices were occurring."

3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651b5, at 108-09 (3d ed. 2008)

(citing *Conwood*, 290 F.3d at 784 (affirming monopoly maintenance where plaintiff's market

share was increasing and market was expanding)). "Under [Section 2] of the Sherman Act, it is

not necessary that all competition be removed from the market. The test is not total foreclosure,

but whether the challenged practices bar a substantial number of rivals or severely restrict the

market's ambit." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005), *cert.*

*denied* 546 U.S. 1089 (2006).

> Suppose an established manufacturer has long held a dominant position but is
> starting to lose market share to an aggressive young rival. A set of strategically
> planned exclusive-dealing contracts may slow the rival's expansion by requiring it
> to develop alternative outlets for its product, or rely at least temporarily on inferior
> or more expensive outlets. Consumer injury results from the delay that the
> dominant firm imposes on the smaller rival's growth.

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) (internal quotation marks

omitted).[28] The Competitor Plaintiffs and the DPPs have adequately alleged substantial

---

[28] The cases cited by Keurig in support of its argument that any growth of a competitor is fatal, as a matter of law, to any claims of substantial foreclosure, are easily distinguishable on their facts. In *CDC Technologies v. IDEXX Laboratories, Inc.*, which Keurig argues is "fatal to all of [Rogers'] exclusive dealing claims," (Rogers Def. Mem 9), the court found, on a motion for summary judgment, that plaintiff failed to show that the exclusive distributorship arrangements at issue had an actual adverse effect on competition in the market. 186 F.3d 74, 80 (2d Cir. 1999). Unlike the court in *CDC Technologies,* the motions before me are motions to dismiss not motions for summary judgment. Moreover, Rogers here alleges clearly adverse effects stemming from Keurig's exclusive dealing arrangements. In *Bowen v. New York News, Inc.*, after trial, the court determined that the defendant's exclusive agreements did not prevent alternative channels of access to the market. 366 F. Supp. 651, 679–80 (S.D.N.Y. 1973), *aff'd in part and rev'd in part on other grounds*, 522 F.2d 1242 (2d Cir. 1975). Here, at this stage of the litigation, I need not consider whether or not their might be alternative channels of access to the market by the Competitor

foreclosure from the relevant markets, and the Competitor Plaintiffs' allegations that they have managed to grow their businesses, as well as any suggestions that competitors may have still been able to reach consumers, are not fatal to these allegations. The extent to which competitors were excluded, and whether it is sufficient to support an antitrust claim, is fact-dependent and not properly disposed of on a motion to dismiss.[29]

Next, Keurig raises five specific challenges to Rogers', TreeHouse's, and the DPPs' allegations of substantial foreclosure, which overlap to some extent and to which I now turn.

1) Substantial Foreclosure Based on Licensing Agreements

Plaintiffs allege that Keurig's exclusive licensing agreements with various brand owners, including coffee roasters, food manufacturers, and celebrity chefs, are unlawful. (*See* Rogers AC ¶¶ 112–54; TreeHouse AC ¶¶ 286–339; DPP AC ¶¶ 139–61.) Keurig challenges the Plaintiffs' allegations by arguing that "alleging substantial foreclosure requires both a numerator (the partners allegedly locked up) and a denominator (all of the available partners)." (Rogers Def. Mem. 9 (citing *Wellnx Life Scis., Inc. v. Iovate Health Scis. Research, Inc.*, 516 F. Supp. 2d 270, 295 n.8 (S.D.N.Y. 2007)); *see also* TreeHouse Def. Mem. 8 (same); DPP Def. Mem. 9 (same).)

*Wellnx* does not support Keurig's argument. The court in that case noted, in the cited footnote, that "[t]he amended complaint contains no facts relating to the named distributors' shares of the consumer market. There are no allegations from which significant foreclosure could be reasonably inferred." 516 F. Supp. 2d at 295 n.8. Nowhere is there mention that a numerator and denominator must be alleged for a Plaintiff to survive a motion to dismiss a

Plaintiffs.

[29] I note also that allegations of substantial foreclosure have been upheld where a plaintiff alleges exclusion from two retailers. *See Commercial Data Servers, Inc. v. IBM Corp.*, No. 00-CV-5008, 2002 WL 1205740, at *7 (S.D.N.Y. Mar. 15, 2002) (finding that plaintiff's allegations of foreclosure from two resellers "may indeed be sufficient to substantially foreclose competition, depending on the particular facts relating to those resellers" and denying defendant's motion to dismiss based on lack of alleged substantial foreclosure).

Section 2 claim. At the motion to dismiss stage, such specific mathematical pleading is unnecessary. *See Xerox v. Media Scis. Int'l., Inc.*, 511 F. Supp. 2d 372, 390 (S.D.N.Y. 2007) ("*Xerox I*") (holding that plaintiff's allegations that it was "exclud[ed] from much of the market" was sufficient to allege substantial foreclosure and survive defendant's motion to dismiss); *see also E.I. DuPont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011) ("While Kolon did not allege a specific percentage of market foreclosure in its Counterclaim, it would be problematic to reject its Counterclaim, with its extensive factual allegations, solely on that basis at the pre-discovery, motion-to-dismiss stage, when Kolon likely has insufficient information to calculate a precise number."); *LePage's Inc. v. 3M*, 324 F.3d 141, 158–59 (3d Cir. 2003) (upholding a verdict despite the fact that plaintiff had not alleged specific percentage of foreclosure; it was sufficient that the dominant competitor had created the strong incentives for consumers to deal with it exclusively); *Synergetics USA, Inc. v. Alcon Labs., Inc.*, No. 08 Civ. 3669(DLC), 2009 WL 1564113, at *3 (S.D.N.Y. June 4, 2009) (holding that plaintiff asserting a tying claim need only "identi[fy] a plausible theory of impact on a substantial volume of commerce").

Next, Keurig argues that there are other brands with which competitors could partner, and that Rogers, TreeHouse, and the DPPs admit that having access to an established brand is not necessary to win business. (Rogers Def. Mem. 10; TreeHouse Def. Mem. 11; DPP Def. Mem. 12.) Similarly, Keurig maintains that there are no allegations that competitors are foreclosed from competing to work with Keurig's established partners, such as Kroger or BJ's, who contracted with Keurig after working with Rogers, (Rogers Def. Mem. 10), or Starbucks and Wolfgang Puck, with whom TreeHouse competed for deals, (DPP Def. Mem. 12), and that "[w]hen a plaintiff loses business due to competition, that loss is 'not of concern under the

antitrust laws,'" (Rogers Def. Mem. 10 (quoting *Cargill*, 479 U.S. at 116); *see also* TreeHouse Def. Mem. 12; DPP Def. Mem. 12). These arguments are irrelevant. As the Supreme Court in *Cargill* went on to clarify, "the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Cargill, Inc.*, 479 U.S. at 116. As discussed in detail, Plaintiffs have alleged various practices that run afoul of the antitrust laws and that Keurig has undertaken a scheme of various anticompetitive and unlawful acts to restrict the normal functioning of a healthy competitive market. (*See* Rogers AC ¶ 8; TreeHouse AC ¶ 2; DPP AC ¶ 13.)

## 2) Substantial Foreclosure Based on Input Contracts[30]

Keurig argues that TreeHouse and the DPPs improperly limit their allegations to domestic suppliers of inputs. (TreeHouse Def. Mem. 9; DPP Def. Mem. 9–10.) To the contrary, however, TreeHouse and the DPPs have plausibly alleged a national geographic market based on the "area to which consumers can practically turn for alternative sources of the product and in which the antitrust defendants face competition." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006). TreeHouse clearly alleges that:

> The relevant geographic market is the United States. To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States. Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

(TreeHouse AC ¶ 191.) TreeHouse further alleges, with regard to machinery, that "[b]eing

---

[30] Keurig opposes TreeHouse's and the DPPs' substantial foreclosure claims related to the inputs of Compatible Cups—at least in part—by arguing that such claims require Plaintiffs to allege a numerator and denominator. For the reasons stated above, that argument is unpersuasive and I will not repeat my analysis here.

forced unnecessarily to obtain large machinery from overseas . . . substantially raises TreeHouse's and other Competitive Cup makers' costs, thereby depriving Competitive Cup makers of fair competition on the merits." (*Id.* ¶ 256.) In sum, TreeHouse has adequately alleged a national geographic market.

Finally, Keurig challenges TreeHouse's and the DPPs' exclusive dealing claims by noting that although TreeHouse and other competitors had to expend resources to train suppliers when they were not able to contract with existing input suppliers, TreeHouse has no right to free-ride on Keurig's developments and investments, and that this does not harm competition generally. (TreeHouse Def. Mem. 9–10; DPP Def. Mem. 11.) First, Keurig indeed may seek to limit how competitors or potential competitors might free-ride on its investments. However, Keurig may not unlawfully restrict other parties in its manufacturing and distribution chain from contracting with competitors—TreeHouse and the DPPs allege that Keurig is not protecting against free-riding on its own investments, but is rather blocking competitors from accessing inputs and distribution networks that others created. (*See* TreeHouse AC ¶¶ 242, 581 (Keurig's exclusive dealing agreements "serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with [Keurig]"); DPP AC ¶ 170 ("Keurig restricts the ability of machinery manufacturers to sell machinery to Keurig competitors who intend to use it to make Compatible Cups, but allows machinery manufacturers to sell the same machinery for other purposes. Thus, these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.").)

Regardless, Keurig's arguments are premature; as Circuit Judge Frank H. Easterbrook has noted, "competitive and exclusionary conduct look alike." *Dial Corp. v. News Corp.*, 165 F.

Supp. 3d 25, 36 (S.D.N.Y. 2016) (quoting *On Identifying Exclusionary Conduct*, 61 Notre Dame

L. Rev. 972, 972 (1986)). The metes and bounds of when such behavior impermissibly crosses

the line from competitive to violative of the Sherman Act is a highly contextual analysis. *See*

*Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998).

Similarly, any procompetitive justification for such restrictions is not appropriately weighed on a

motion to dismiss. *See Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2014 WL

4988268, at *9 (S.D.N.Y. Sept. 29, 2014) ("[T]o survive a motion to dismiss they must plead

plausible allegations that, if true, would show such an adverse effect; if Plaintiffs then provide

evidence of anticompetitive effects, Defendant will later have the opportunity to show the

procompetitive effects of the agreements.").

### 3) Substantial Foreclosure Based on Distribution

Keurig next challenges Rogers's, TreeHouse's, and the DPPs' claims of substantial

foreclosure from distributors. Keurig argues that Rogers, TreeHouse, and other competitors

were able to utilize alternative channels of distribution to reach consumers, thereby precluding a

substantial foreclosure claim. (Rogers Def. Mem. 11–12; TreeHouse Def. Mem. 13–14; DPP

Def. Mem. 13–14.) Keurig further argues that Plaintiffs' allegations that Keurig locked up

distributors to the Away-From-Home Market Segment do not support a substantial foreclosure

claim because Plaintiffs failed to allege substantial foreclosure from the defined relevant market.

(Rogers Def. Mem. 11–12; TreeHouse Def. Mem. 13–14; DPP Def. Mem. 13–14.)

Exclusive dealing violates the law when it has the effect of raising rivals' costs by

foreclosing efficient means of distribution to actual or potential competitors. *Dentsply*, 399 F.3d

at 193–95. Contrary to Keurig's arguments, even if alternative means of reaching consumers are

"viable," that is not the test: the question is whether any alternative channels provide "effective

means of competition" and whether those alternative channels "pose a real threat to defendant's monopoly." *Id.* at 193 (internal quotation marks omitted). Further, the requisite foreclosure may be found even if only a segment of the market is foreclosed, such as the Away-From-Home Market Segment here. *See United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (upholding verdict for plaintiff based on foreclosure in a market "segment"); *United States v. Microsoft Corp.*, 253 F.3d 34, 70–71 (D.C. Cir. 2001) (finding Section 2 violated by substantial foreclosure of a "majority" of competition in only "one of the two major [distribution] channels"). Because Rogers and TreeHouse allege that no other viable means of distribution exist outside of those foreclosed by Keurig, (*see, e.g.*, Rogers AC ¶¶ 86, 97, 311; TreeHouse AC ¶¶ 186, 344, 346, 348), and the DPPs allege that "consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by competitor Compatible Cup manufacturers," (DPP AC ¶ 239; *see also id.* ¶¶ 162–68), and because foreclosure can be measured in a particular segment, Plaintiffs have adequately alleged substantial foreclosure of distribution.

### 4) Substantial Foreclosure Based on Retailers

Keurig challenges Rogers's, TreeHouse's, and the DPPs' substantial foreclosure allegations related to retailers. Keurig contends that Rogers and TreeHouse only allege purportedly exclusive agreements with two retailers, which is insufficient to support a substantial foreclosure argument. (Rogers Def. Mem. 12; TreeHouse Def. Mem. 14–15.) Keurig also argues that the DPPs' claim on this issue fails because Keurig's competitors were able to reach consumers, and because the DPPs fail to allege a denominator to determine the extent of alleged exclusion. (DPP Def. Mem. 13–14.)

As an initial matter, allegations of substantial foreclosure have been upheld where a

plaintiff alleges exclusion from only two retailers. *See Commercial Data Servers*, 2002 WL 1205740, at *7 (finding that plaintiff's allegations of foreclosure from two resellers "may indeed be sufficient to substantially foreclose competition, depending on the particular facts relating to those [resellers]" and denying defendant's motion to dismiss based on lack of alleged substantial foreclosure). Moreover, as discussed above, precise mathematical allegations are not required at the pleading stage. *See Xerox I*, 511 F. Supp. 2d at 390. Rogers', TreeHouse's, and the DPPs' allegations of substantial foreclosure from retailers are sufficient to warrant allowing the case to proceed.

### iv. *Marketing*

Keurig's final challenge to Rogers's, TreeHouse's, and the DPPs' Section 2 claims concerns allegations that Keurig's marketing violated Section 2. (Rogers Def. Mem. 13–16; TreeHouse Def. Mem. 19–23; DPP Def Mem. 17–18.)

"[A] plaintiff asserting a monopolization claim based on misleading advertising must 'overcome a presumption that the effect on competition of such a practice was *de minimis*.'" *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs., Div. of/& Am. Home Prod. Corp.*, 850 F.2d 904, 916 (2d Cir. 1988) (quoting *Berkey Photo*, 603 F.2d at 288 n.41). However, "courts recognize that false and misleading statements may provide a basis for antitrust claims." *Alternative Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 332 (E.D.N.Y. 2009) (citing *Ayerst*, 850 F.2d at 916 (stating that "[a]dvertising that emphasizes a product's strengths and minimizes its weaknesses does not, at least unless it amounts to deception, constitute anticompetitive conduct violative of § 2 [of the Sherman Act]")). The Second Circuit has adopted several factors for a court to consider in determining whether a plaintiff has overcome the presumption of de minimis effect. These include whether the representations "were (1)

clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to

buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not

readily susceptible of neutralization or other offset by rivals." *Ayerst*, 850 F.2d at 916 (internal

quotation marks omitted). The Second Circuit in *Ayerst* found that, at the motion to dismiss

stage, an allegation that the representation was "false and misleading in certain respects" was

sufficient "to go forward with the discovery process to substantiate its claim that the

[representation] was clearly false, clearly material, and clearly likely to induce reasonable

reliance." *Id*.

Although Keurig attacks certain specifics of the Competitor Plaintiffs' allegations, for

example by claiming that statements were not susceptible to neutralization, (Rogers Def. Mem.

13), that retailers are not buyers without knowledge of the subject matter, (*id.* at 14), and that

statements concerning how the 2.0 Brewer operates were not clearly false, (TreeHouse Def.

Mem. 23), these challenges are more appropriately raised on summary judgment, after discovery

has illuminated the truth or falsity of the statements in question, the time frame of their

dissemination, and whether the statements were susceptible to neutralization. Similarly,

Keurig's challenges to certain of the DPPs' allegations—including by claiming that the DPPs

concede that the statements are susceptible to neutralization, (DPP Def. Mem. 17–18), and that

statements that non-approved products may void the warranty are true, (*id.* at 18)—are more

properly addressed at summary judgment.[31]

Here, the Competitor Plaintiffs and the DPPs have sufficiently alleged that Keurig made

statements that were false and misleading to customers and that those statements have cost

---

[31] Keurig's argument that the DPPs concede the purported misstatements are susceptible to neutralization points
only to allegations that Rogers, "had the opportunity to take steps to neutralize many of the statements." (DPP Def.
Mem. 18.) This is insufficient to find, as a matter of law, that the statements were in fact susceptible to
neutralization.

competitors' businesses or had a supra-competitive effect.  (Rogers AC ¶¶ 268–73; TreeHouse AC ¶¶ 462, 459–548; DPP AC ¶¶ 197–220.)  Therefore, Plaintiffs are entitled to discovery in order to substantiate their disparagement claims.

### B.  *Sherman Act Section 1 Claims*

#### 1.  Applicable Law

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  "[A] plaintiff claiming a § 1 violation must first establish a combination or some form of concerted action between at least two legally distinct economic entities."  *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).  "If a § 1 plaintiff establishes the existence of an illegal contract or combination, it must then proceed to demonstrate that the agreement constituted an unreasonable restraint of trade either per se or under the rule of reason."  *Id*. at 542.  "In addition, a plaintiff must independently show antitrust injury, in order to ensure that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."  *Primetime 24 Joint Venture v. Nat'l Broad., Co*., 219 F.3d 92, 103 (2d Cir. 2000) (internal quotation marks omitted).

"Conduct considered illegal per se is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination."  *Capital Imaging*, 996 F.2d at 542 (internal quotation marks omitted).  However, "most antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant

business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

Conduct that stems from independent decisions is permissible under antitrust law, *see Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010), as are "independent responses to common stimuli," and "interdependence unaided by an advance understanding among the parties," *Twombly*, 550 U.S. at 556 n.4 (internal quotation marks omitted). To establish a conspiracy in violation of Section 1, then, proof of joint or concerted action is required. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984). Overall, "[c]ircumstances must reveal a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Id*. at 764 (internal quotation marks omitted).

"Because unlawful conspiracies tend to form in secret, such proof will rarely consist of explicit agreements. Rather, conspiracies 'nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators.'" *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012) (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012)). Therefore, to prove an antitrust conspiracy, "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764 (internal quotation marks omitted).

At the pleading stage, a complaint claiming conspiracy must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556; *accord In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007). This standard does not impose a "probability requirement"; a claim may survive a motion to dismiss even if a judge believes the chances of recovery to be very remote or unlikely. *Twombly*, 550 U.S. at 556; *see*

*also Anderson News*, 680 F.3d at 184 ("Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible. The choice between or among plausible inferences or scenarios is one for the factfinder." (internal citations omitted)).  It also does not require a plaintiff to show that the allegations suggesting agreement "are more likely than not true or that they rule out the possibility of independent action." *Anderson News*, 680 F.3d at 184.  "A court ruling on a motion to dismiss need not choose among plausible interpretations of the evidence."  *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d at 681 (citing *Anderson News*, 680 F.3d at 189–90).  A complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.

Antitrust law distinguishes vertical and horizontal price restraints.  "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).  "[C]ourts have long recognized the existence of 'hub-and-spoke' conspiracies in which an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (quoting *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)).  "These arrangements consist of *both* vertical agreements between the hub and each spoke and a horizontal agreement among the spokes 'to adhere to the hub's terms,' often because the spokes 'would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing.'" *Id*. (quoting VI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1402c (3d ed. 2010)).  "Existing case law makes clear that a hub-

and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016) (citing *United States v. Apple*, 791 F.3d at 314).

### 2. Application to Rogers and TreeHouse

The Competitor Plaintiffs allege that Keurig has violated Section 1 through its purported exclusive dealing, (Rogers AC ¶¶ 304–11; TreeHouse AC ¶¶ 577–84); tying arrangements, (Rogers AC ¶¶ 338–53; TreeHouse AC ¶¶ 611–18); conspiracy to monopolize, (Rogers AC ¶¶ 363–69; TreeHouse AC ¶¶ 625–31); and concerted refusals to deal and group boycott, (Rogers AC ¶¶ 370–76; TreeHouse AC ¶¶ 632–38). In short, the Competitor Plaintiffs allege that Keurig entered into horizontal and hub-and-spoke conspiracies to restrain competition with coffee brands, distributors, and retailers.

Keurig challenges the Competitor Plaintiffs' Section 1 claims, arguing that the Competitor Plaintiffs have not alleged any facts to support the existence of any unlawful horizontal agreements, nor the existence of any agreement among the spokes in the purported hub-and-spoke conspiracy. Further, as Keurig attempts to characterize the agreements at issue as vertical in nature, Keurig argues that any such vertical agreements were not unlawfully anticompetitive. (Rogers Def. Mem. 22–24; TreeHouse Def. Mem. 32–34.)

### a. Horizontal Conspiracy

The Supreme Court has held that parties can be horizontal competitors regardless of whether they currently compete in the same market. *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 46–48 (1990); *see also Otter Tail Power Co. v. United States*, 410 U.S. 366, 378 (1973). Here, Rogers has alleged that, through various anticompetitive agreements Keurig has removed the

potential for competition from the largest roasters and brands that would be the most likely to

compete against Keurig-branded Portion Packs.

> For example, the 2013 "Noncompetition Agreement Between Green Mountain
> Coffee Roasters, Inc. and Global Baristas, LLC" provides that [Keurig's brand]
> Tully's "will not, and will cause its respective subsidiaries and Affiliates not to,
> directly or indirectly, operate in the Coffee Business in [the] United States of
> America, Canada, Mexico and the Islands of the Caribbean" for five years.
> Although Global Baristas concurrently entered into a supply and license agreement
> for Keurig to supply K-Cups using the Tully's brand, the broad prohibition on
> competition is not reasonably necessary or tailored to achieve any procompetitive
> effects associated with that arrangement.

(Rogers AC ¶ 122 (internal citation omitted).)  Use of such agreements has permitted Keurig to

"eliminate[] competition with the largest roasters and brands that would otherwise have the most

financial incentives to enter into the Single Serve Brewer Market and to work with Competing

Portion Pack manufacturers to increase output or decrease prices."  (*Id.* ¶ 123.)

> Similarly, TreeHouse alleges that:

> [Keurig] itself is a roaster that owns its own brand names, [and therefore] would be
> a direct, horizontal competitor of other roasters and brands, but for its "Non-
> Competition" agreements with those companies. . . .  Specifically, licensed roasters
> and brands agree:  (1) not to sell beverage products to Competitive Cup makers; (2)
> not to license brands to Competitive Cup makers; and (3) not to permit Competitive
> Cup makers to manufacture Competitive Cups for the brand . . . .

(TreeHouse AC ¶¶ 287, 289.)  Further, TreeHouse alleges that by entering into an unlawful

scheme, "[Keurig] and its [Licensees] can limit competition from lower-priced Competitive Cups

by agreeing . . . not to do business with Competitive Cup manufacturers unless they also become

licensed and cede control of their pricing and output to [Keurig] in order to elevate prices."  (*Id.*

¶ 299; *see id.* ¶¶ 286–300.)

> Keurig challenges these allegations by pointing to case law that finds supply

agreements—such as those covering intellectual property, distribution, or manufacturing—to be

vertical rather than horizontal agreements.  (Rogers Def. Mem. 22 (citing *Elecs. Commc'ns*

*Corp. v. Toshiba Am. Consumer Prods. Inc.*, 129 F.3d 240, 243–44 (2d Cir. 1997); *AT&T Corp. v. JMC Telecom, L.L.C.*, 470 F.3d 525, 531 (3d Cir. 2006); *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999)); *see also* TreeHouse Def. Mem. 33 (same).) The Second Circuit held in *Toshiba* that, under the facts of that case, the distributor plaintiff and manufacturer defendant were party to vertical agreements even though they also happened to compete at the distribution level (the manufacturer distributed its products independently as well as through a distributor in a so-called "dual distribution" arrangement). 129 F.3d at 243. However, that is not what is alleged here. The Competitor Plaintiffs allege that Keurig entered into agreements with licensees who would otherwise compete in the Compatible Cup Market, and who would potentially seek to enter and compete in the Single Serve Brewer Market. (*See* Rogers AC ¶¶ 122–23; TreeHouse AC ¶¶ 286–300.) Such anticompetitive agreements are directly related to the competitive landscape in the Compatible Cup and Single Serve Brewer Markets, unlike in *Toshiba*, where the market in which the parties happened to compete was not relevant to the anticompetitive claims. While Rogers includes only one example of a specific agreement with a potential competitor, (Rogers AC ¶ 122), this, coupled with allegations that Keurig has entered into similar agreements with other potential competitors, is sufficient to state a claim for horizontal agreement in restraint of trade, as are TreeHouse's Section 1 claims based on purported unlawful horizontal agreements among competitors.

### b. Hub-and-Spoke Conspiracy

Next, Keurig challenges the Competitor Plaintiffs' allegations of a hub-and-spoke conspiracy, arguing that Rogers fails to allege any agreement among the "spokes" and that TreeHouse fails to allege agreement among the brand owners or any other possible "spokes." (Rogers Def. Mem. 23; TreeHouse Def. Mem. 33–34.) I find that the Competitor Plaintiffs

allege facts that support the conclusion that the "spokes" have agreed to enter into restrictive agreements with Keurig to keep prices at a supra-competitive level.

For example, Rogers alleges that an "expansive system of exclusionary and noncompetition agreements is orchestrated by Keurig, and coffee and other beverage brands that enter into a license or manufacturing agreement with Keurig do so with the express knowledge of Keurig's anticompetitive agreements with other competitor roasters and brands."  (Rogers AC ¶ 148.)  Beyond just "conscious parallelism," *see Mayor & City Council of Baltimore, Md. v. Citigroup, Inc*., 709 F.3d 129, 136 (2d Cir. 2013), Rogers alleges that the terms of Keurig's agreements with roasters and brands are well known within the market, and each company would have known that its competitors had entered into these agreements.  (Rogers AC ¶¶ 123, 128.) Further, Rogers alleges that "[c]o-conspirators entered into [multi-year exclusionary] agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations," thereby restraining the ability of Competitor Cup manufacturers to enter into their own agreements with distributors or other resellers.  (*Id.* ¶¶ 366–67.) TreeHouse alleges that "the coffee and beverage brands' agreements not to deal with Competitive Cup makers that could otherwise increase their product output and sales revenue and provide a back-up or second manufacturer or the like" can only be explained by a conspiracy to sustain supra-competitive prices for K-Cups by restraining price competition.  (TreeHouse AC ¶ 307.)

The Competitor Plaintiffs have sufficiently alleged "facts supporting the *inference* that a conspiracy existed."  *Mayor & City Council of Baltimore, Md.*, 709 F.3d at 136; *see also Starr*, 592 F.3d at 327 (referencing "behavior that would plausibly contravene each defendant's self-

interest in the absence of similar behavior by rivals" (internal quotation marks omitted)).  Given

that a plaintiff is not required to show, at the pleading stage, that the allegations suggesting

agreement "are more likely than not true or that they rule out the possibility of independent

action," *Anderson News*, 680 F.3d at 184, I find that the Rogers Amended Complaint and the

TreeHouse Amended Complaint allege "enough fact[s] to raise a reasonable expectation that

discovery will reveal evidence of illegal agreement," *Twombly*, 550 U.S. at 556.

### c.  Group Boycott and Concerted Refusal to Deal

The Supreme Court "has long held that certain concerted refusals to deal or group

boycotts are so likely to restrict competition without any offsetting efficiency gains that they

should be condemned as *per se* violations of § 1 of the Sherman Act."  *Nw. Wholesale*

*Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985).  A concerted refusal

to deal or group boycott is "an agreement to pressure a supplier or customer not to deal with

another competitor."  *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301,

318 (S.D.N.Y. 2003) (citing *Nw. Wholesale Stationers, Inc.*, 472 U.S. at 294).

The same allegations that support a conspiracy to restrain trade also support a claim for a

concerted refusal to deal or group boycott in violation of Section 1.  Specifically, Rogers alleges

that Keurig has restrained competition in the Portion Pack and Compatible Cup Markets by (1)

conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to

refuse to deal with Competitor Cup manufacturers; and (2) coercing distributors and retailers to

enter into anticompetitive agreements to refuse to deal with Competitor Cup manufacturers.

(Rogers AC ¶ 373; *see, e.g.*, *id.* ¶¶ 146–47.)  These allegations are sufficient to plausibly state a

group boycott claim.

TreeHouse alleges that Keurig secured a network of agreements from licensees (1) not to

deal with Competitor Cup makers themselves; and (2) to further require that licensees'

distributors likewise refuse to deal with Competitor Cup makers by becoming "Roaster

Nominated Keurig Authorized Distributor[s]"[32] bound by the same contractual prohibitions in

the direct Keurig Authorized Distributor agreements.  (TreeHouse AC ¶¶ 303–04; *see also id.*

¶¶ 4–5, 19–20, 244–51.)  TreeHouse adequately alleges a vertical group boycott that would

violate Section 1, even if the allegations were insufficient to support horizontal restraints.

"Vertical refusals to deal are agreements among persons or organizations at different levels of

the market structure not to deal with other market participants."  *Moccio v. Cablevision Sys.*

*Corp.*, 208 F. Supp. 2d 361, 378 (E.D.N.Y. 2002) (citing *United States v. Topco Assocs., Inc.*,

405 U.S. 596, 608 (1972)).   To the extent that TreeHouse alleges agreements in which licensees,

distributors, or manufacturers are vertically aligned with Keurig, as opposed to horizontally, the

TreeHouse Amended Complaint adequately alleges vertical group boycott claims.

  In sum, the Competitor Plaintiffs have adequately pled violations of Section 1 and

therefore Keurig's motions to dismiss their Section 1 claims are denied.[33]

---

[32] "Roaster Nominated Keurig Authorized Distributors" is defined by Keurig as "'A company that was nominated by a Licensed Roaster and has an effective distribution agreement with Keurig that specifies a geographical territory and channels of distribution.  These companies purchase Keurig Products from Keurig and exclusively the nominating Licensed Roaster's K-Cups from the nominating Licensed Roaster, KARDs, or Keurig for resale.'" (Treehouse AC ¶ 303.)

[33] Keurig also argues that the Competitor Plaintiffs' Section 1 claims fail because they do "not allege that [they have] been injured from any alleged elevation in prices."  (Rogers Def. Mem. 24; *see also* TreeHouse Def. Mem. 12.)  This argument fails.  The Competitor Plaintiffs allege antitrust injury and even assuming that they may be able to enjoy the effects of Keurig's conduct that results in supra-competitive pricing for Compatible Cups—something for which there is no evidence—this supposed "benefit" alone is insufficient to contradict the injury they allege. (*See, e.g.*, Rogers AC ¶ 343 (alleging antitrust injury in the form of restraints entry, consumer choice, and incentives to create new products, among others); TreeHouse AC ¶¶ 549–64 (alleging antitrust injury in the form of restraints in output, consumer choice, incentives to create new products, and price competition).)  *See also N.Y. MedScan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006) (finding that a plaintiff establishes antitrust injury "by alleging adverse effects on the price, quality, or output of the relevant good or service").  In support of its argument, Keurig cites from *Original Appalachian Artworks, Inc. v. Granada Electronics., Inc.*, 816 F.2d 68, 74 (2d Cir. 1987) ("*Artworks*").  The district court in *Artworks* found, and the Second Circuit agreed, that Granada's business model was only feasible because of the allegedly artificially inflated prices in the United States, because Granada was buying the cheap goods in Europe and selling them at a profit in the United States.  *See Original*

C.    *Lanham Act False Advertising Claims*

### 1.  Applicable Law

Section 43(a)(1) of the Lanham Act provides:

> Any person who, on or in connection with any goods or services . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).  To prevail on a false-advertising claim under § 43(a) of the Lanham Act, "a plaintiff must show that either:  1) the challenged advertisement is literally false, or 2) while the advertisement is literally true it is nevertheless likely to mislead or confuse consumers."  *Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992).  "[I]n addition to proving falsity, the plaintiff must also show that the defendants 'misrepresented an inherent quality or characteristic' of the product."  *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (quoting *Ayerst*, 850 F.2d at 917).  "This requirement is essentially one of materiality . . . ."  *Id.*

### 2.  Application to Rogers and TreeHouse

First, Keurig argues that Rogers' allegations concerning Keurig's statements to consumers relate to statements that are "soft" or true, (Rogers Def. Mem. 24–25), which are not actionable under the Lanham Act.  *See Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) ("Subjective claims about products, which cannot be proven either true or false, are not

---

*Appalachian Artworks, Inc. v. Granada Elecs., Inc.*, No. 85 Civ. 9064 (WCC), 1986 WL 2402 (S.D.N.Y. Feb. 20, 1986), *aff'd*, 816 F.2d 68 (2d Cir. 1987).  In other words, it was because of the allegedly artificially inflated prices that Granada was able to profitably conduct business.  The Competitor Plaintiffs businesses would exist without Keurig charging supra-competitive prices.  Keurig has not shown how the Competitor Plaintiffs' business model is comparable to the business model in that case, and *Artworks* therefore does not apply.

actionable under the Lanham Act." (internal quotation marks omitted)); *Nat'l Lighting Co. v. Bridge Metal Indus. LLC*, 601 F. Supp. 2d 556, 564–65 (S.D.N.Y. 2009) (granting motion to dismiss where allegations did not allege the statement was false and there was no indication that consumers would be misled). Keurig similarly argues that TreeHouse condemns only subjective statements of quality, performance, and safety. (TreeHouse Def. Mem. 35.)

The Rogers Amended Complaint and TreeHouse Amended Complaint detail numerous purported misrepresentations made in the course of advertising through a variety of traditional and social media advertising platforms. (Rogers AC ¶ 234; TreeHouse AC ¶¶ 417, 471, 473, 475, 487.) Keurig's argument that mere "suggestions" about differences in quality, or implications in advertising that Competitor Cups are of inferior quality are not actionable under the Lanham Act, is incorrect. *See Vidal Sassoon, Inc. v. Bristol-Myers Co*., 661 F.2d 272, 277 (2d Cir. 1981) ("Whether or not the statements made in the advertisements are literally true, [§] 43(a) of the Lanham Act encompasses more than blatant falsehoods. It embraces innuendo, indirect intimations, and ambiguous suggestions evidenced by the consuming public's misapprehension of the hard facts underlying an advertisement." (internal quotation marks omitted)). Similarly, although Keurig categorizes certain qualifiers used, such as "perfect," as "puffery," this characterization ignores the context in which the qualifiers were used. For example, the TreeHouse Amended Complaint alleges that consumers were misled about the necessity of using Keurig brand cups, as opposed to Competitor Cups that Keurig directly or by implication labeled of inferior quality, and the functioning of the lock-out technology introduced in the 2.0 Brewer. (*See* TreeHouse AC ¶ 640.) Such statements involve more than the mere use of qualifiers and cross the line into statements of direction or fact. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc*., 227 F.3d 489, 501–02 (5th Cir. 2000) (finding that in certain contexts, what

appears to be puffery "is no longer mere opinion, but rather takes on the characteristics of a statement of fact"). In any event, any challenge based on the actual truth or falsity of the statements, (*see* Rogers Def. Mem. 25–26), is not appropriately raised on a motion to dismiss. At the motion to dismiss stage, an allegation that the representation was "false and misleading in certain respects" is sufficient "to go forward with the discovery process to substantiate [plaintiff's] claim that the [representation] was clearly false, clearly material, and clearly likely to induce reasonable reliance." *Ayerst*, 850 F.2d at 916.

Keurig also argues that its statements to consumers who called to complain about the 2.0 Brewers are not "advertising" and cannot satisfy the dissemination requirement. (*See* Rogers Def. Mem. 26–27.) Similarly, Keurig argues that messages displayed on the 2.0 Brewer and messages in the 2.0 Brewer warranty cannot be considered advertising since those messages were received by consumers who had already purchased the brewer and thus were not made "for the purpose of influencing consumers to buy defendant's goods or services." (*Id*. (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57–58 (2d Cir. 2002)); *see also* TreeHouse Def. Mem. 36.)

The Second Circuit has adopted a three-part test to determine if the statements at issue are covered by the Lanham Act: the speech is covered if it is (1) commercial speech; (2) for the purpose of influencing consumers to buy defendant's goods or services; and, (3) "although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public." *Fashion Boutique of Short Hills*, 314 F.3d at 56. Under this standard, the Competitor Plaintiffs' allegations sufficiently state a claim for relief under the Lanham Act.

The Competitor Plaintiffs allege that the challenged statements made to consumers of the

2.0 Brewer are in fact intended to influence those consumers "to purchase defendant's goods," namely the Keurig-licensed K-Cups. For example, the Competitor Plaintiffs allege that, to discourage consumers from using Competitor Cups, Keurig warns customers that use of Competitor Cups may void their brewer warranties, even though Keurig honors brewer warranties when consumers use such cups, or stop the brewer from functioning. (*See* Rogers AC ¶¶ 238, 242; TreeHouse AC ¶¶ 493–99.) Furthermore, Keurig cites no case law, and I have found none, in which a court has held that warranty policies fall outside the scope of the Lanham Act as a matter of law. In fact, the Lanham Act does not define the metes and bounds of what qualifies as "commercial advertising or promotion."

Moreover, I note that certain of Keurig's statements were made to consumers by using Facebook and Amazon.com. Assuming, as Keurig asserts, that these statements were all made to consumers who had already purchased the brewer, they were made in the open. In other words, they were available to be viewed by not only consumers who owned brewers but also by consumers who were contemplating purchasing brewers. This type of communication is materially different from a one-on-one communication between a manufacturer and a consumer inquiring about the product owned by the consumer. Therefore, such statements are appropriately viewed as being made for consumption by a wider audience for the purpose of influencing other consumers to buy defendant's goods or services.

Finally, Keurig challenges Rogers' allegations of false or misleading statements made to retail customers. Specifically, Keurig argues that Rogers does not have standing to challenge the statements because it "does not explain how Keurig's allegedly inaccurate statements to retailers . . . about how the 2.0 [Brewer's] interactive technology works were the proximate cause of harm to [Rogers]," and Rogers has not pled materiality. (Rogers Def. Mem. 28.) However, Rogers

has sufficiently alleged that Keurig's misrepresentations are material and have caused injury. (Rogers AC ¶¶ 258–62, 270–74 (alleging that Keurig misrepresented the simplicity of the 2.0 Brewer, causing Rogers to lose business with companies such as Costco).)  Therefore, Rogers has standing and the claims survive.  *See Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014) ("To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations.").

### D.  *State Law and Common Law Claims*

#### 1.  **Rogers' State and Common Law Claims**

Rogers brings claims for violations of three California statutes—the Cartwright Act, the Unfair Competition Law, and the False Advertising Law—alleging tortious interference with contractual relationships under California law, intentional interference with prospective economic advantage, and common law unfair competition.

##### a.  The Cartwright Act

Rogers alleges that Keurig violated California's Cartwright Act, codified at California Business and Professions Code § 16720, which "prohibits, among other things, any combination '[t]o prevent competition in [the] sale or purchase of . . . any commodity' or to '[a]gree in any manner to keep the price of . . . [any] commodity . . . at a fixed or graduated figure.'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000) (quoting Cal. Bus. & Prof. Code § 16720(c) and (e)(2)).  "The Cartwright Act is modeled after Section 1 of the Sherman Act, and to state a claim under the Cartwright Act, plaintiffs must allege that (1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce." *In re Aluminum Warehousing Antitrust Litig.*, No. 13-

md-2481 (KBF), 2014 WL 4743425, at *3 (S.D.N.Y. Sept. 15, 2014) (internal quotation marks

omitted), *aff'd*, 833 F.3d 151 (2d Cir. 2016). Because I find that Rogers has adequately pled

violations of Section 1 of the Sherman Act, Rogers' Cartwright Act claim survives.

b. California Unfair Competition Law

Rogers alleges violations of California's Unfair Competition Law, Cal. Bus. & Prof.

Code §§ 17200, et seq., ("UCL"), which bans "any unlawful, unfair or fraudulent business act or

practice." *Id.* § 17200. To state a claim under the UCL, a plaintiff must show "a loss or

deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and

. . . that the economic injury was the result of, i.e. *caused by*, the unfair business practice."

*Allergan, Inc. v. Athena Cosmetics, Inc.*, 640 F.3d 1377, 1382 (Fed. Cir. 2011) (internal citation

marks omitted). "Under the 'unlawful' prong, 'the UCL borrows violations from other laws by

making them independently actionable as unfair competitive practices.'" *Merced Irrigation Dist.*

*v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 143 (S.D.N.Y.), *reconsideration denied*, 178 F.

Supp. 3d 181 (S.D.N.Y. 2016) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th

1134, 1143 (2003)). Courts in this district have allowed parties to plead UCL claims predicated

on antitrust violations. *Id.* (citing *In re LIBOR–Based Fin. Instruments Antitrust Litig.*, No. 11

MDL 2262NRB, 2015 WL 6243526, at *95 (S.D.N.Y. Oct. 20, 2015)).

Keurig argues that because Rogers' Sherman Act and Lanham Act claims should be

dismissed, the UCL claim should also fail. Because, as discussed above, Rogers' Sherman Act

and Lanham Act claims survive, the UCL claim also survives.

c. California False Advertising Law

Rogers alleges violations of California's False Advertising Law, which bans "untrue or

misleading" advertisements. Cal. Bus. & Prof. Code § 17500. Keurig contends that Rogers'

§ 17500 claim fails because its Lanham Act claim fails. (Rogers Def. Mem. 29 (citing *Appliance*

*Recycling Ctrs. v. JACO Envtl., Inc.*, 378 F. App'x 652, 654–56 (9th Cir. 2010)).)  Because I find that Rogers has adequately pled a Lanham Act claim, Rogers' § 17500 claim survives.

### d. Tortious Interference with Contractual Relations

To state a claim for tortious interference with contractual relations under California law, a plaintiff must plead:  "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Fresno Cmty. Hosp. & Med. Ctr. v. Souza*, No. CV F 07-0325 LJO SMS, 2007 WL 2120272, at *7 (E.D. Cal. July 23, 2007) (citing *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)).  Rogers alleges that Keurig's conduct supports a claim for tortious interference with contractual relations, and in response Keurig argues that Rogers fails to allege any specific contractual relationship with which Keurig interfered.  (Rogers Def. Mem. 29–30.)  Rogers counters that there is no requirement for a plaintiff to identify, in the pleadings, the specific contractual relationship disrupted and cites *Sebastian Int'l, Inc. v. Vincenzo Russolillo*, 162 F. Supp. 2d 1198, 1203–04 (C.D. Cal. 2001), in which the court noted that "under California law, the Plaintiff does not have to identify the specific contractual relations which have allegedly been disrupted."  The court went on to clarify that

> If a potential defendant was completely unaware of contractual relations with a third party, then it would be impossible to infer any intent to interfere on the defendant's part.  However, such intent can certainly be inferred if the defendant knows that contractual relations with a third party exist, but does not know the specific identity of the contractual party.

*Id.* at 1204.  Rogers' allegations are sufficient to infer that Keurig was aware of the existence of contracts with third parties.  Because Rogers alleges that Keurig's anticompetitive and unlawful actions compelled Kroger to cancel its private label program with Rogers, (Rogers AC ¶¶ 206–

12, 273), that other customers have followed suit, (*id.* ¶¶ 268–83), and that Keurig intended to interfere with competitors' relationships to monopolize the Compatible Cup Market, (*see, e.g.*, *id.* ¶¶ 8, 12), Rogers has stated a claim for tortious interference under California law.

e.  <u>Intentional Interference with Prospective Economic Advantage</u>

Finally, Keurig does not argue that Rogers has failed to allege the elements of an intentional interference with prospective economic advantage claim.  Rather, Keurig argues that it is entitled to a "competitor's privilege," and therefore the claim should be dismissed.  (Rogers Def. Mem. 30.)  Keurig cites in support of its argument *Orion Tire Corp. v. Gen. Tire, Inc.*, No. CV 92-2391AAH(EEX), 1992 WL 295224 (C.D. Cal. Aug. 17, 1992), in which the district court noted that "there exists a broad privilege afforded to a competitor to divert a prospective relationship to itself."  *Id.* at *3.  However, it is clear from *Orion Tire* that such a privilege does not defeat a claim when the plaintiff has already "effectively allege[d] that [the defendant] used fraud or any other unlawful means to accomplish its goal."  *Id.*  Because, as discussed, Rogers has plausibly alleged that Keurig engaged in a variety of anticompetitive conduct in order to interfere with Rogers' potential customers, (*see* Rogers AC ¶ 409), this claim survives.[34]

## 2.  TreeHouse's State Law Claims

The TreeHouse Amended Complaint alleges claims for violations of the Illinois, Wisconsin, and New York antitrust laws; the Illinois and New York false advertising laws; the Illinois and Wisconsin unfair competition laws; as well as claims for negligent and intentional interference with business relations under New York law, and for tortious interference under

---

[34] To the extent that Keurig argues that this claim should be dismissed because Rogers failed to allege under which state's laws it was asserting a claim for intentional interference with prospective economic advantage, I find this argument fails because it is clear from the context of the claim that Rogers asserts this claim under California law.  I note that all other common law claims raised by Rogers are under only California law and that the original complaint was filed in California.  Indeed, Keurig tacitly recognizes this because its argument for dismissal of this claim is based upon California case law.

New York, Wisconsin, and Illinois law.

### a. Illinois, Wisconsin, and New York Antitrust Laws

TreeHouse brings claims pursuant to Illinois, Wisconsin, and New York antitrust laws. As Keurig concedes, (Treehouse Def. Mem. 38), each of these state antitrust statutes apply Sherman Act standards. *See Gatt*, 711 F.3d at 81; *Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 69 (2005); *Olstad v. Microsoft Corp.*, 284 Wis. 2d 224, 246–47 (2004). Because I have found that TreeHouse's Sherman Act claims survive, the New York, Illinois, and Wisconsin antitrust claims also survive.

### b. Illinois and New York False Advertising Laws

TreeHouse's Illinois and New York false advertising claims, which are governed by the same standards as the Lanham Act, survive for the same reasons that the Lanham Act claims survive. *See Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007) (assuming without deciding that the standards for § 43(a) of the Lanham Act apply to Illinois false advertising claims); *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997) (stating that the "standards for bringing a claim under § 43(a) of the Lanham Act are substantially the same as those applied to" New York false advertising claims);*see also* TreeHouse Def. Mem. 39 n.27 (conceding that the Lanham Act standard applies to Illinois and New York false advertising claims).

### c. Illinois and Wisconsin Unfair Competition Laws

TreeHouse also alleges state unfair competition claims pursuant to Illinois and Wisconsin law. (TreeHouse AC ¶¶ 646–49, 658–61.) Keurig does not challenge TreeHouse's Illinois claim, and therefore that claim survives. *See In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13–MD–2450 (KMK), 2015 WL 7018369, at *39 (S.D.N.Y. Nov. 12, 2015). Keurig concedes that TreeHouse's Wisconsin claim survives if the Amended Complaint alleges conduct that is

"actionable under another statute or the common law."  (TreeHouse Def. Mem. 39 (quoting

*Thermal Design, Inc. v. Am. Soc'y of Heating Refrigerating, & Air-Conditioning Eng'rs, Inc.*,

No. 07-C-765, 2008 WL 1902010, at *8–9 (E.D. Wis. Apr. 25, 2008)).)  Because, as discussed

above, TreeHouse has adequately alleged violations of other statutes and common law, this claim

survives.  *Cf. Curtis-Universal, Inc. v. Sheboygan Emergency Med. Servs., Inc.*, 43 F.3d 1119,

1123 (7th Cir. 1994).

> d.  Negligent and Intentional Interference with Business Relations
>      Under New York Law

TreeHouse also alleges negligent and intentional interference with business relations in

violation of New York law.  (TreeHouse AC ¶¶ 662–70.)  A plaintiff asserting a claim for

tortious interference with business relations under New York law must plead "the defendant's

interference with business relations existing between the plaintiff and a third party, *either* with

the sole purpose of harming the plaintiff *or* by means that are dishonest, unfair or in any other

way improper."  *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F. Supp. 933, 945 (S.D.N.Y. 1983)

(internal quotation marks omitted).  A plaintiff's "valid antitrust claims . . . provide the unlawful

purpose and unjustifiable cause element of its claim of tortious interference with contract."

*Commodore Bus. Machs., Inc. v. Montgomery Grant, Inc.*, No. 90 Civ. 7498 (LMM), 1993 WL

14503, at *3 (S.D.N.Y. Jan. 13, 1993); *see also Martin Ice Cream*, 554 F. Supp. at 946 ("It is

beyond dispute that a conspiracy to unreasonably restrain trade or to monopolize trade would

constitute improper means.  Thus, if [plaintiff] is able to prove the antitrust violations . . . , it will

also be able to prove improper means.")

Keurig argues that a claim for tortious interference with business relations under New

York law cannot stand based on "actions taken in furtherance of 'normal economic self-

interest.'"  (TreeHouse Def. Mem. 39 (quoting *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d

514, 536 (S.D.N.Y. 2013)).).  Although Keurig argues that its conduct was indeed in furtherance

of its own normal, economic self-interest, TreeHouse's Amended Complaint alleges to the

contrary, and, as discussed above, states valid claims for conspiracy to restrain trade and to

monopolize; therefore, this exception to the application of New York law does not apply.  *See*

*JBCHoldings NY*, 931 F. Supp. 2d at 535–36.  Accordingly, TreeHouse has plausibly stated a

claim for negligent and intentional interference with business relations in violation of New York

law.

e.  <u>Tortious Interference Under New York, Illinois, and Wisconsin<br>Law</u>

Keurig also challenges TreeHouse's tortious interference with contract claims, brought

pursuant to New York, Illinois, and Wisconsin law.  (*See* TreeHouse AC ¶¶ 671–80, 685–91.)

Under New York law, "the elements of tortious interference with contract are (1) the existence of

a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the

contract; (3) the defendant's intentional procurement of the third-party's breach of the contract

without justification; (4) actual breach of the contract; and (5) damages resulting therefrom."

*Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (internal quotation marks

omitted).  Tortious interference with contract under Illinois and Wisconsin law require similar

showings.  *See A-Abart Elec. Supply, Inc. v. Emerson Elec. Co.*, 956 F.2d 1399, 1404 (7th Cir.

1992) (articulating substantially similar elements); *Sean Morrison Entm't, LLC v. O'Flaherty*

*Heim Egan & Birnbaum, Ltd.*, No. 13-cv-753-bbc, 2014 WL 896616, at *3 (W.D. Wis. Mar. 6,

2014) (same).

Keurig argues that "TreeHouse makes factual allegations of only one contract with a third

party," that "TreeHouse fails to allege Keurig knew of that contract," and that the only

statements alleged to have been made before that contract was terminated were statements

"about warranty, which are not alleged to be the but/for cause of termination." (TreeHouse Def. Mem. 40.) TreeHouse alleges that it had entered into a Co-Manufacturing Supply Agreement with Unilever on August 13, 2012, which Unilever terminated on December 27, 2012. (TreeHouse AC ¶ 296.) Thereafter, in March 2013, Unilever announced an agreement with Keurig by which it would become a licensee of the Keurig brand. (*Id.*) TreeHouse alleges

> [o]n information and belief, the contract entered into between [Keurig] and Unilever prohibited Unilever from proceeding with its co-manufacturing agreement with Sturm. On information and belief, Unilever's termination of the Sturm contract was the direct result of [Keurig's] interference with Sturm's business relations and [Keurig's] misleading and deceptive statements, including statements about the forthcoming 2.0 K-Cup Brewers, Sturm's ability to make Competitive Cups that would work in 2.0 K-Cup Brewers, and [Keurig's] threats that using Competitive Cups in [Keurig] K-Cup Brewers would void consumers' warranties, among other anticompetitive strong-arm tactics.

(*Id.*) This sufficiently states a claim for tortious interference with contract, but I note that this is the only contract alleged to have been terminated or breached due to Keurig's interference. Therefore, TreeHouse's state law tortious interference with contract claims survive solely related to this one contract. *See Leibowitz v. Cornell Univ.*, 445 F.3d 586, 591 (2d Cir. 2006) (at the pleading stage, "a plaintiff is required . . . to give a defendant fair notice of what the claim is and the grounds upon which it rests").

With regard to the claim for tortious interference under Illinois law, Keurig also argues that TreeHouse has failed to allege tortious interference with prospective business expectancy under Illinois law because "competition is a complete defense." (TreeHouse Def. Mem. 39.) However, this exception applies only if the "defendant's actions are not . . . anti-competitive," *E-One, Inc. v. Oshkosh Truck Corp.*, No. 06CV1391, 2006 WL 3320441, at *3 (N.D. Ill. Nov. 13, 2006). As discussed at length above, TreeHouse adequately alleges anti-competitive conduct. Therefore, Keurig cannot defeat this claim based upon this exception and it survives.

### 3. DPPs' Unjust Enrichment Claims

The DPPs allege that "[i]t would be inequitable under unjust enrichment principles in the District of Columbia and each of the fifty states for Keurig to be permitted to retain any of the overcharges for K-Cups derived from Keurig's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint." (DPP AC ¶ 296.) Keurig challenges these claims on three grounds: (1) that such claims "are not linked to any particular state"; (2) that such claims "are not premised on anything other than DPPs' deficient antitrust claims, and they must be dismissed along with those claims"; and (3) that the named DPPs lack constitutional standing to assert such claims "under the laws of the states where they neither reside nor purchased [the K-Cups]." (DPP Def. Mem. 24 & n.31.)

First, the DPPs have alleged unjust enrichment claims pursuant to particular state laws, specifically that of "the District of Columbia and each of the fifty states." (DPP AC ¶ 296.) "The laws governing claims for unjust enrichment vary from state to state. Some states recognize unjust enrichment as a separate free-standing claim, while others do not." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1163 (N.D. Cal. 2009) (internal quotation marks omitted).

Keurig has not undertaken a state-by-state analysis of the unjust enrichment laws of the fifty states, and, no challenge having been made by Keurig, I need not and decline to independently address the viability of these claims under each state's law at this stage. In addition, it is clear based on the foregoing that the DPPs' antitrust claims are sufficient.

Finally, while it is true that courts have held that "named plaintiffs lack standing to bring claims on behalf of a class under the laws of states where the named plaintiffs have never lived or resided," *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 50

(E.D.N.Y. 2014) (internal quotation marks omitted), it is also true that because class certification is logically antecedent to the question of standing to assert state-law claims, many courts in this district have deferred determination of the standing issue until the class certification issues have been fully resolved, *see, e.g.*, *In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213–14 (S.D.N.Y. 2012) ("[T]he issue 'is not whether the Named Plaintiffs have standing to sue Defendants—they most certainly do—but whether their injuries are sufficiently similar to those of the purported Class to justify the prosecution of a nationwide class action,' which is properly determined at the class certification stage, when this Court may consider commonality and typicality issues with respect to the named plaintiffs and other putative class members." (quoting *In re Grand Theft Auto Video Game Consumer Litig. (No. II)*, No. 06 MD 1739 (SWK)(MHD), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006))); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011) (finding that named plaintiffs' claims related to conduct "alleged to be the same no matter where any plaintiff resides," and deferring determination on standing until class certification). I will defer determination of standing related to the DPPs' unjust enrichment claims brought pursuant to the law of states where no named plaintiff resides or purchased a K-Cup.[35] Therefore, Keurig's motion to dismiss

---

[35] Keurig also moves to dismiss the IPPs' claims brought under the laws of states where no named plaintiff was harmed, arguing that *Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 64 (2d Cir. 2012), requires dismissal on this ground. (IPP Def. Mem. 9–10.) The Court in *Mahon* did not hold that it was necessary in all cases to determine the standing issue prior to the class certification issue. *See* 683 F.3d at 65 ("As such, we think the Court's 'logical antecedence' language is relevant when resolution of class certification obviates the need to decide issues of Article III standing." (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 612 (1997))). Rather, *Mahon* preserved the logical antecedence exception to the general rule that Article III standing is a prerequisite to class certification. *See Okla. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 986 F. Supp. 2d 412, 419 n.3 (S.D.N.Y. 2013) (explaining that the logical antecedence exception, while narrow, applies to "nation-wide class actions in which claims [are] brought under parallel provisions of different states' consumer protection or antitrust laws"). In addition, *Mahon* held that a plaintiff does not have standing to bring a class action against defendants that did not injure her. 683 F.3d at 65. Here, in the case of both the DPPs and IPPs, each named plaintiff has alleged that he or she has suffered an injury-in-fact as a result of Keurig's conduct. (DPP AC ¶¶ 25–35; IPP SAC ¶¶ 37–63.)

the DPPs' unjust enrichment claims is denied without prejudice.

### 4. IPPs' State Law Antitrust Claims

Keurig moves to dismiss the IPPs' first and ninth causes of action brought under the antitrust and unfair competition laws of twenty-two states.[36] (IPP Def. Mem. 8, 25–26, Tables A–E.) Keurig bases its motion on three grounds: 1) the IPPs have failed to plead antitrust standing under the laws of nineteen states that have adopted the *AGC* test for antitrust standing, (*id.* Tables A & B); 2) the IPPs have failed to plead the substantive elements of an antitrust claim under the laws of all twenty-two states because each state interprets its antitrust laws in parallel with, or more narrowly than, the federal antitrust laws, (*id.* at 25, Table C); and 3) the IPPs have failed to plead an antitrust claim under the laws of five states that require a specific nexus between defendant's conduct and intrastate commerce within those states, (*id.* at 26, Table E).

For the reasons set forth below, Keurig's motion is granted with respect to the IPPs' antitrust claims under the laws of Michigan, Mississippi, Nevada, New Hampshire, New Mexico, New York, and South Dakota. Their claims under the antitrust laws of the remaining fifteen states—Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Minnesota, Nebraska, North Carolina, North Dakota, Oregon, Tennessee, Vermont, West Virginia, and Wisconsin—survive Keurig's motion to dismiss.

### a. Antitrust Standing

Keurig argues that the IPPs' state antitrust claims for damages should be dismissed under the laws of nineteen of the twenty-two states under which the IPPs allege claims because those states have adopted the *AGC* test for antitrust standing, and the IPPs fail to satisfy that test. (IPP

---

[36] For ease of reference and solely for this Opinion & Order, I refer to and include the District of Columbia as a "state."

Def. Mem. Tables A & B; IPP Def. Reply 1–3.)[37]  The IPPs contend that they have standing

under *AGC*, and that even if they did not, each of the states to which Keurig objects has

determined to apply neither the bar against indirect purchaser claims in *Illinois Brick*, 431 U.S.

720, nor the federal standing analysis in *AGC*.  (IPP Opp. 5–13, Tables A & B.)

The role of a federal district court adjudicating a state law claim is to determine the

content of state law and apply it appropriately.  To do so, the court "look[s] to the state's

decisional law, as well as to its constitution and statutes."  *Santalucia v. Sebright Transp., Inc.*,

232 F.3d 293, 297 (2d Cir. 2000).  When the content of state law is unsettled, the court "is

obligated to 'carefully predict how the state's highest court would resolve the uncertainty or

ambiguity.'"  *Id.* (alterations omitted) (quoting *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d

114, 119 (2d Cir. 1994)).  The court must give the "fullest weight" to the pronouncements of the

state's highest court while giving "proper regard" to the rulings of the state's lower courts.  *Id.*

(internal quotation marks omitted).

Keurig contends that the IPPs have failed to allege antitrust standing under the laws of

nineteen states because those states apply the *AGC* factors to determine whether a plaintiff has

antitrust standing.[38]  (IPP Def. Mem. Table A.)  Keurig asserts that fourteen of those states have

expressly adopted the *AGC* test, citing both state and federal case law.[39]  (*Id.* Table B.)  For the

five remaining states that have not expressly adopted *AGC*, Keurig cites statutes and case law

---

[37] "IPP Def. Reply" refers to the Memorandum of Law in Support of Defendant's Motion to Dismiss the Indirect Purchaser Plaintiffs' Second Consolidated Amended Class Action Complaint, dated May 13, 2015.  (Doc. 267.)

[38] The states are Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Oregon, South Dakota, Vermont, West Virginia, and Wisconsin.

[39] The states are California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Nebraska, New Mexico, New York, North Dakota, Oregon, South Dakota, Vermont, and Wisconsin.

purportedly harmonizing state antitrust law with federal antitrust law.[40]  (*Id.*)  I address each state below.

i.   <u>Iowa and Nebraska</u>

Of the fourteen jurisdictions that Keurig claims have expressly adopted *AGC*, only two have decisional authority from the highest court in that state directly addressing the issue:  Iowa and Nebraska.  The highest courts of both states have held that the *AGC* factors apply to a determination of whether a plaintiff has antitrust standing.  *See Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 198 (Iowa 2007) ("[W]e apply the *AGC* factors to determine whether the plaintiffs may recover under Iowa law."); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 299 (Neb. 2006) ("We conclude that appellants lack standing under *Associated General Contractors* to seek recovery for Visa and MasterCard's alleged violation of the Junkin Act.").

The courts in *Southard* and *Kanne* dealt with essentially identical facts.  Both cases were brought against Visa and Mastercard by plaintiff classes of consumers who made purchases from merchants who accept Visa or Mastercard as a form of payment.  *Southard*, 734 N.W.2d at 194; *Kanne*, 723 N.W.2d at 295.  The plaintiffs brought the actions under the antitrust laws of both states, alleging that the defendants had engaged in tying arrangements that forced merchants to pay inflated fees for processing transactions, which the merchants then passed on to the plaintiff consumers.  *Southard*, 734 N.W.2d at 194–95; *Kanne*, 723 N.W.2d at 295–96.  The Iowa and Nebraska Supreme Courts both affirmed the dismissal of the plaintiffs' claims, applying the *AGC* factors to conclude that the plaintiffs lacked antitrust standing because their claims were too remote, in part because they were not purchasers of any goods or services provided by the defendants.  *Southard*, 734 N.W.2d at 199–200; *Kanne*, 723 N.W.2d at 297–99.

---

[40] The states are Arizona, Mississippi, Nevada, New Hampshire, and West Virginia.

The IPPs contend that *Southard* and *Kanne* should be limited to their facts. (IPP Opp. 8, Table B.) Based on both courts' discussions distinguishing earlier rulings of the Iowa and Nebraska Supreme Courts that granted antitrust standing to indirect purchasers without applying the *AGC* factors, *Southard*, 734 N.W.2d at 195–97 (citing *Comes v. Microsoft Corp.*, 646 N.W.2d 440 (Iowa 2002)); *Kanne*, 723 N.W.2d at 300–01 (citing *Arthur v. Microsoft Corp.*, 676 N.W.2d 29 (Neb. 2004)), the IPPs urge me to read the holdings in *Southard* and *Kanne* as limited to the proposition that the *AGC* factors apply to antitrust suits brought by non-purchasers, but not to antitrust suits brought by indirect purchasers. (IPP Opp. 8 n.10, Table B.) I decline to do so.

Both *Southard* and *Kanne* explicitly held that *Comes* and *Arthur* did not eliminate antitrust standing principles. The *Southard* court held that the decision in *Comes* stood only for the "narrow" holding "reject[ing] the federal rule barring claims by indirect purchasers" announced in *Illinois Brick*. *Southard*, 734 N.W.2d at 196. It did not read *Comes* to eliminate the need to determine antitrust standing for all suits brought by indirect purchasers. *See id.* ("[*Comes*] certainly did not, as suggested by the plaintiffs, determine there were *no* limits on who could sue under [Iowa's competition law]." (citing *Kanne*, 723 N.W.2d at 299–301)). Similarly, the *Kanne* court held that the decision in *Arthur* "addressed whether the *Illinois Brick Co.* bar against indirect purchaser suits should apply under the Consumer Protection Act; [the court] did not address the distinct antitrust standing requirements that bar claims based on derivative or remote injuries." 723 N.W.2d at 300. The *Kanne* court concluded that its "decision in *Arthur* [did] not eliminate antitrust standing requirements." *Id.* at 300–01.

Because the courts in *Southard* and *Kanne* both held that *AGC* set forth the appropriate test to determine antitrust standing, I conclude that the *AGC* factors apply to the IPPs' Iowa and Nebraska antitrust claims. It is not clear, however, whether the Iowa and Nebraska Supreme

Courts apply the *AGC* factors in the same way as do the federal courts. Both *Southard* and *Kanne* held that non-purchasers did not have antitrust standing, but they did not clarify the boundaries of antitrust standing for indirect purchasers, such as the IPPs. Given that both cases discuss and cite favorably *Comes* and *Arthur*, which held that the indirect purchaser plaintiffs in those cases had standing,[41] it is not apparent that the highest courts in Iowa and Nebraska would find that the IPPs lacked standing under *AGC*. I have found no subsequent decisions from any court in Iowa or Nebraska clarifying the application of the *AGC* factors to indirect purchaser claims. Accordingly, I cannot conclude that the highest courts in Iowa and Nebraska would apply the *AGC* factors strictly according to federal precedent.

### ii. California

Relying primarily on a 1995 case from a California intermediate appellate court, Keurig contends that the Cartwright Act, California's antitrust statute, requires application of the *AGC* factors. (IPP Def. Mem. Table B (citing *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811 (1995)).) The *Vinci* court observed that the Cartwright Act has "similar language" to the Sherman Act. 36 Cal. App. 4th at 1814. It noted that "[b]ecause the Cartwright Act has objectives identical to the federal antitrust acts, the California courts look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act." *Id.* at 1814 n.1. While the court recounted the five *AGC* factors, it did not perform a factor-by-factor analysis in determining whether the complaint adequately alleged antitrust standing. *Id.* at 1814–17.

---

[41] The plaintiff classes in both *Comes* and *Arthur* were consumers who had purchased computers pre-installed with the Windows 98 operating system. *Comes*, 646 N.W.2d at 441–42; *Arthur*, 676 N.W.2d at 31–32. As such, they were indirect purchasers of Windows 98 because they purchased the software indirectly through retailers or distributors rather than directly from Microsoft. Unlike the IPPs here, the plaintiff classes in *Comes* and *Arthur* had a direct relationship with Microsoft because they were end-user licensees of Microsoft as to Windows 98. *Comes*, 646 N.W.2d at 441–42; *Arthur*, 676 N.W.2d at 32. Nevertheless, *Comes* and *Arthur* are sufficiently analogous to the facts here to create doubt as to how the highest courts in Iowa and Nebraska would apply the *AGC* factors to the IPP Second Amended Complaint.

Although *Vinci* favorably cites *AGC*, subsequent cases from the Supreme Court of California cast doubt on the applicability of the *AGC* factors under California law. *See Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 877 (Cal. 2013) ("Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century."); *In re Cipro Cases I & II*, 348 P.3d 845, 872 (Cal. 2015) ("The Cartwright Act is broader in range and deeper in reach than the Sherman Act." (internal quotation marks omitted)); *see also Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1205 n.4 (9th Cir. 2014) (citing *Aryeh* for the proposition that it "is no longer the law in California" that "the interpretation of California's antitrust statute [is] coextensive with the Sherman Act"); *cf. Knevelbaard Dairies*, 232 F.3d at 987 (applying the *AGC* factors to perform the antitrust standing analysis under the Cartwright Act, but holding that "California law affords standing more liberally than does federal law"). I cannot conclude, therefore, that the Supreme Court of California would apply the *AGC* factors in accordance with federal precedents, if at all, to determine indirect purchaser antitrust standing under the Cartwright Act.

### iii.    District of Columbia

Keurig cites a trial court opinion of the D.C. Superior Court in support of the application of the *AGC* factors to the IPPs' D.C. antitrust claim. (IPP Def. Mem. Table B. (citing *Peterson v. Visa U.S.A., Inc.*, No. Civ.A. 03-8080, 2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005)).) At least one other trial court decision, however, rejected an interpretation of the D.C. Antitrust Act that places limitations on indirect purchaser antitrust standing. *See Holder v. Archer Daniels Midland Co.*, No. 96-2975, 1998 WL 1469620, at *5 (D.C. Super. Ct. Nov. 4, 1998) (holding that indirect purchasers had antitrust standing under the D.C. Antitrust Act without applying the

*AGC* factors).  Notably, in addressing the harmonization provision of the D.C. Antitrust Act—which provides that a court "may use as a guide interpretations given by federal courts to comparable antitrust statutes," D.C. Code Ann. § 28-4515 (West)—the *Holder* court held that "[s]ince the D.C. [Antitrust] Act was passed to distinguish D.C. antitrust law from federal law with respect to standing for indirect purchasers, there is no 'comparable' federal antitrust statute in this respect."  1998 WL 1469620, at *3 n.4.  Absent a pronouncement from the D.C. Court of Appeals or more trial court decisions definitively pointing in one decisional direction or another, there is no apparent reason to consider *Peterson* as more authoritative than *Holder*, and Keurig has provided none.  Keurig has failed to establish that the D.C. Court of Appeals would apply the *AGC* factors to the IPPs' D.C. antitrust claim.

iv.  <u>Kansas</u>

Keurig cites to no state court cases applying the *AGC* factors to determine antitrust standing under Kansas law.  (IPP Def. Mem. Table B.)  Rather, it cites three federal district court cases as support for its position.  (*Id.* (citing *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1094–95 (N.D. Cal. 2007); *Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211 (D. Kan. 1999), *aff'd sub nom. Orr v. BHR, Inc.*, 4 F. App'x 647 (10th Cir. 2001); *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09–md–02042, 2013 WL 1431756, at *9–10 (E.D. Mich. Apr. 9, 2013)).)

None of these cases provides a sufficient basis upon which to conclude that Kansas courts would apply the *AGC* factors.  *DRAM* relies upon two cases to support its application of the *AGC* factors.  The first case, *Wrobel v. Avery Dennison Corp.*, No. 05-cv-1296 (Kan. Dist. Ct. Feb. 1, 2006), is an unpublished trial court opinion.  The second case, *Orr*—also cited by Keurig—is a federal district court case that applies the *AGC* factors, reasoning only that it found "no Kansas cases to the contrary" and that federal precedent was "sufficiently persuasive to guide its

decision with regard to standing under Kansas law." *Orr*, 77 F. Supp. 2d at 1211–12. The third

case, *In re Refrigerant Compressors*, relies upon *Wrobel*, *DRAM*, and *Orr* for its conclusion.

2013 WL 1431756, at *9. These cases do not clearly lead to the conclusion that the Kansas

Supreme Court would apply the *AGC* factors in accordance with federal precedents.

The harmonization provision in the Kansas Restraint of Trade Act does not alter this

conclusion. Subsection (b) states, "Except as otherwise provided in subsections (d) and (e), the

Kansas restraint of trade act shall be construed in harmony with ruling judicial interpretations of

federal antitrust law by the United States supreme court." Kan. Stat. Ann. § 50-163 (West).

Subsection (d) states, "The Kansas restraint of trade act shall not be construed to prohibit . . .

actions or proceedings by indirect purchasers pursuant to [Kan. Stat. Ann. §] 50-161, and

amendments thereto . . . ." *Id.* Although it is plausible that the Kansas courts could interpret the

harmonization provision to repeal *Illinois Brick* but still require application of the *AGC* factors in

accordance with federal precedent, Keurig has provided no persuasive authority or argument

supporting that reading. Therefore, the IPPs' Kansas antitrust claim survives.

v.    <u>Maine</u>

Keurig cites a state trial court opinion in support of its position to dismiss the IPPs'

Maine antitrust claims on antitrust standing grounds. (IPP Def. Mem. Table B (citing *Knowles v.*

*Visa U.S.A., Inc.*, No. CIV.A. CV-03-707, 2004 WL 2475284 (Me. Super. Ct. Oct. 20, 2004)).)

The *Knowles* court held that "[i]t is probable that the Maine Law Court . . . would look to the

*Associated General Contractors* factors in determining standing under Maine's antitrust laws

and would apply those factors except to the extent those factors cannot be reconciled with the

legislature's adoption of the *Illinois Brick* repealer." 2004 WL 2475284, at *5. *Knowles*,

therefore, provides a reasonable basis to predict that the highest court in Maine would apply the

*AGC* factors.

However, a complete reading of *Knowles* makes apparent that its application of *AGC* is not in lockstep with federal precedents. In particular, the *Knowles* court held that "[i]n light of Maine's *Illinois Brick* repealer, the next factor—directness or remoteness of the asserted injury—should be disregarded entirely in any inquiry as to standing under Maine's antitrust laws." *Id.* at *6.[42] Given that the directness factor weighs particularly heavily against the IPPs' antitrust standing under *AGC*, I am unable to conclude that the highest court in Maine would apply *AGC* to preclude the IPPs' antitrust standing under Maine law.

### vi. Michigan and New Mexico

Keurig cites a state trial court decision and a state intermediate appellate court decision to contest antitrust standing with respect to the IPPs' Michigan and New Mexico antitrust claims respectively. (IPP Def. Mem. Table B (citing *Stark v. Visa U.S.A. Inc.*, No. 03-055030-CZ, 2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772 (N.M. Ct. App. 2012)).) The *Stark* and *Nass-Romero* courts analyzed the relevant statutory language and case law and concluded that the *AGC* factors should apply to the antitrust standing determination. *Stark*, 2004 WL 1879003, at *3–4; *Nass-Romero*, 279 P.3d at 780–81. The IPPs do not identify any contrary authority in the case law or statutes of Michigan or New Mexico, and in fact concede that "New Mexico appears to use federal precedent as a guide for interpreting its antitrust laws." (IPP Opp. Tables B–C.) As a result, I conclude that the Michigan Supreme Court and the New Mexico Supreme Court would apply the *AGC* factors. In addition, although the *Stark* court and the *Nass-Romero* court characterized the plaintiffs there as non-purchasers, *see Stark*, 2004 WL 1879003, at *4; *Nass-Romero*, 279 P.3d at 780, there is no

---

[42] Maine's *Illinois Brick* repealer statute, Me. Rev. Stat. Ann. tit. 10, § 1104(1), provides a private antitrust treble damage remedy for any person injured either "directly or indirectly in [his] business or property."

authority interpreting Michigan or New Mexico law to suggest that the courts' *AGC* analyses would be substantially different for indirect purchasers. Because the IPPs lack antitrust standing to assert federal antitrust claims, I conclude they also lack standing to assert antitrust claims under Michigan and New Mexico law.

### vii.   New York

Keurig cites a New York trial court decision applying the *AGC* factors to determine antitrust standing under the Donnelly Act to support its argument that the IPPs' Donnelly Act claim should be dismissed. (IPP Def. Mem. Table B (citing *Ho v. Visa U.S.A. Inc.*, 2004 WL 1118534 (N.Y. Sup. Ct. Apr. 21, 2004), *aff'd*, 16 A.D.3d 256 (1st Dep't 2005)).) Keurig also notes that "the Donnelly Act—often called a 'Little Sherman Act'—should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or legislative history justify such a result. *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1988). Although the *Ho* court did not engage in a thorough analysis of whether New York law requires application of the *AGC* factors, the First Department upheld the lower court's decision, and the IPPs do not identify any New York case law or statutory authority suggesting the *AGC* test should not be applied. Therefore, I "see no reason . . . to interpret the Donnelly Act differently than the Sherman Act with regard to antitrust standing," *Gatt*, 711 F.3d at 81, and I conclude that the IPPs fail to plausibly allege antitrust standing under the Donnelly Act.

### viii.   North Dakota

Keurig cites a North Dakota trial court case that purportedly applies the *AGC* factors to determine that plaintiffs did not have antitrust standing under North Dakota law. (IPP Def. Mem. Table B (citing *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144, at *3 (N.D. Dist. Ct. Aug. 23, 2004)).) It is not apparent from a reading of *Beckler* that it applies the

*AGC* factors. Rather, it cites *AGC* in passing in addressing an argument put forth by the defendants in that case. *Beckler*, 2004 WL 2115144, at *3 (citing to *AGC* in the context of the statement that "Defendants accepts [sic] [North Dakota's repeal of *Illinois Brick*], but argue the plaintiffs are not really 'indirect purchasers' and that despite the narrow rule of *Illinois Brick*, an anti-trust plaintiff must always have some legal 'standing' to bring, their claim"). The court's standing analysis does not apply the *AGC* factors, and its conclusion simply states "[a]s 'non-purchasers' of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services. Their alleged injury is simply too remote." *Id.* Because Keurig's only authority from North Dakota is a trial court decision that references *AGC* in passing but does not actually apply the *AGC* factors, I cannot conclude that the North Dakota Supreme Court would apply the *AGC* factors to determine an indirect purchaser's antitrust standing.

ix. Oregon

In support of dismissal of the IPPs' Oregon antitrust claim on antitrust standing grounds, Keurig cites a federal district court case which applies the *AGC* factors to the plaintiffs' Oregon antitrust claims. (IPP Def. Mem. Table B (citing *Or. Laborers-Empl'rs Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1170 (D. Or. 1998), *aff'd*, 185 F.3d 957 (9th Cir. 1999)).) However, as that court noted, "[n]either party [in that case] ha[d] suggested that the analysis for the Oregon antitrust claims should differ from that of the federal." *Or. Laborers-Empl'rs Health & Welfare Tr. Fund*, 17 F. Supp. 2d at 1176 n.2. The question of which standard to apply to determine antitrust standing, therefore, was not raised by the parties or analyzed by the court. Furthermore, the Oregon antitrust statute states that federal precedents are persuasive, but not binding. Or. Rev. Stat. Ann. § 646.715(2) (West) ("The decisions of federal courts in construction of federal law relating to the same subject shall be persuasive authority in the

91

construction of [Oregon's antitrust statute]."). Absent any authority from the Oregon state courts regarding the application of the *AGC* factors to determine antitrust standing under Oregon law, I cannot conclude that the Oregon Supreme Court would apply *AGC*.

x.   South Dakota

Keurig cites to an oral bench decision from a South Dakota trial court applying the *AGC* factors to dismiss antitrust claims under South Dakota law. (IPP Def. Mem. Table B (citing Tr. of Mot. Hr'g 54:4-55:1, *Cornelison v. Visa U.S.A., Inc.*, No. Civ. 03-1350 (S.D. Cir. Ct. Sept. 28, 2004)).) Although the decision itself constitutes less than two pages of the transcript, it followed extensive briefing and oral argument regarding the issue of which standard to apply to determine state antitrust standing. *See* Tr. of Mot. Hr'g 54:4-54:7, *Cornelison*, No. Civ. 03-1350 ("[T]he Court has considered the numerous authorities that you have presented and the briefs you have submitted as well as the at least an hour and a half of oral argument."). The decision is consistent with the instruction of the South Dakota Supreme Court that "great weight should be given to the federal cases interpreting the federal [antitrust] statute." *Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985). The IPPs have presented no South Dakota authority suggesting the *AGC* factors should not be applied. As such, I conclude that the South Dakota Supreme Court would apply *AGC* to determine antitrust standing under South Dakota law.

Although the reasoning of the *Cornelison* court is not extensive, it is apparent that the court placed great weight on the risk of duplicative recovery in dismissing plaintiffs' claim. Tr. of Mot. Hr'g 54:13–54:17, *Cornelison*, No. Civ. 03-1350 (holding that "this suit would only threate[n] to duplicate recovery"). Because the same risk exists here, *see supra* Part IV.A.1.c, I conclude that the South Dakota Supreme Court would apply the *AGC* factors to dismiss the IPPs' South Dakota antitrust claim.

xi.  <u>Vermont</u>

Keurig relies primarily on a Vermont trial court decision applying the *AGC* factors to support its argument that the IPPs lack antitrust standing under Vermont's antitrust statute, the Vermont Consumer Fraud Act ("VCFA").  (IPP Def. Mem. Table B (citing *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037, at *3 (Vt. Super. Ct. Dec. 27, 2004)).)  However, Keurig's argument is belied by an earlier decision by the Vermont Supreme Court holding that "[n]owhere in the [VCFA] is there any requirement that the definition of who may sue under the Act must be consistent with the definition of who may sue under federal antitrust law."  *Elkins v. Microsoft Corp.*, 817 A.2d 9, 17 (Vt. 2002).  Rather, "[t]he [Vermont] Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices.  This intent underlies a private remedy section that allows suits by 'any consumer' with no suggestion of a distinction between direct and indirect purchasers."  *Id.* at 13.  Because Keurig has provided no controlling authority contradicting *Elkins*, I conclude that the Vermont Supreme Court would not apply the *AGC* factors.[43]

xii.  <u>Wisconsin</u>

Keurig cites a Wisconsin trial court decision in support of its argument that the IPPs lack antitrust standing under Wisconsin law.  (IPP Def. Mem. Table B (citing *Strang v. Visa U.S.A., Inc.*, No. 03 CV 011323, 2005 WL 1403769 (Wis. Cir. Ct. Feb. 8, 2005)).)  Although the *Strang* court provides a reasoned analysis for why it applied the *AGC* factors, it ignores the opinion of the Wisconsin Court of Appeals—the state's intermediate appellate court—in *Obstetrical &*

---

[43] Even if *Fucile* controlled, it would not support Keurig's position.  The *Fucile* court clearly stated "that the Vermont Supreme Court would also draw upon the standing factors in *Associated General Contractors* for guidance, at least to the extent that these factors are consistent with allowing 'indirect purchaser' standing."  *Fucile*, 2004 WL 3030037, at *3.  Applying the *AGC* factors to dismiss an indirect purchaser suit would be inconsistent with allowing standing to indirect purchasers.  Even under *Fucile*, then, Keurig's position is unavailing.

*Gynecological Assocs. of Neenah, S.C. v. Landig*, 384 N.W.2d 719 (Wis. Ct. App. 1986). *See generally Strang*, 2015 WL 1403769 (failing to cite *Landig* and noting that "[t]he parties agree that [the issue of antitrust standing] is an issue of first impression in Wisconsin"). Three years after the United States Supreme Court's decision in *AGC*, the *Landig* court held:

> There is no need to make the direct–indirect distinction under [the Wisconsin antitrust statute]. Section 133.18(1) . . . explicitly allows any person injured directly *or indirectly* to sue upon this statute. Similar language is not found in the federal law. This, coupled with the legislature's instruction that we give the most liberal construction to achieve the aim of competition, compels us to the conclusion that an ultimate consumer who pays a higher price for goods and services indirectly due to a secret rebate comes within the ambit of the statute.

384 N.W.2d at 723–24. In deciding that the end-consumer plaintiff had standing, the *Landig* court did not consult the *AGC* factors. Instead, it noted that the state and federal statutes had different wording and refused to draw a distinction between direct and indirect consumers in determining antitrust standing. Because the trial court in *Strang* appears not to have considered the opinion of the appellate court in *Landig*, I cannot conclude as Keurig urges that the Wisconsin Supreme Court would adopt the analysis in *Strang*.

*****************

For the remaining states, Keurig concedes that they have not expressly applied *AGC*, but contends that they have provisions providing for harmonization in the interpretation of state antitrust law with federal antitrust law.[44] (IPP Def. Mem. Table B.) I address each in turn.

xiii.   <u>Arizona</u>

Arizona's harmonization provision permits, but does not require, interpretation of Arizona antitrust law in accordance with federal precedents. *See* Ariz. Rev. Stat. Ann. § 44-1412

---

[44] The states are Arizona, Mississippi, Nevada, New Hampshire, and West Virginia.

("[I]n construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes."). In 2003, the Arizona Supreme Court considered the question of antitrust standing, and it did not apply the *AGC* factors. *See Bunker's Glass Co. v. Pilkington PLC*, 206 Ariz. 9, 16–17 (2003) (refusing to apply federal precedents in finding that the Arizona antitrust statute grants standing to indirect purchasers). I conclude, therefore, that the Arizona Supreme Court would not apply the *AGC* factors.

### xiv. Mississippi

Keurig cites a Mississippi Supreme Court case in support of its argument that the IPPs' Mississippi antitrust claim should be dismissed on antitrust standing grounds. (IPP Def. Mem. Table B (citing *Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So. 2d 331 (Miss. 2004)).) *Owens Corning* assesses antitrust standing—specifically, whether plaintiff alleged antitrust injury—but does not review each of the *AGC* factors. *See* 868 So. 2d at 339–40. The fact that the court cites federal precedent to interpret "antitrust injury" does not mean that it would necessarily apply the *AGC* factors.

### xv. New Hampshire

Like Arizona, New Hampshire also has a permissive harmonization provision, N.H. Rev. Stat. Ann. § 356:14 ("In any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws."); however, the New Hampshire Supreme Court expressly adopted the *Illinois Brick* rule against indirect purchaser suits in *Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 838 (N.H. 2002) (holding that "it is sound to limit antitrust lawsuits to direct purchasers" and that "the trial court did not err in following the *Illinois Brick* rule when interpreting [the New Hampshire antitrust statute]"). The IPPs cite *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571 (N.H. 2007), to support their position that the New Hampshire Supreme Court would not apply the *AGC* factors. (IPP Opp. Table B.) However, the

question before the *LaChance* court was "whether consumers, as indirect purchasers, may bring a cause of action under the [New Hampshire Consumer Protection Act]." *Id.* at 575. The court acknowledged that the question of whether indirect purchasers had standing to bring claims under the state's antitrust statute was decided in *Minuteman*. *Id.* at 576 ("We have, however, held that indirect purchasers may not bring claims under the state antitrust statute." (citing *Minuteman*, 795 A.2d 833)). Because the IPPs bring their claim pursuant to the state antitrust statute, (IPP SAC ¶ 384 ("By reason of the conduct alleged herein, Keurig has violated New Hampshire Rev. Stat. §§ 356:1, *et seq.*")), they lack antitrust standing under the New Hampshire Supreme Court's holding in *Minuteman*.

### xvi.  Nevada

Keurig cites the harmonization provision of Nevada as a basis on which to dismiss the IPPs' Nevada antitrust claim. (IPP Def. Mem. Table B (citing Nev. Rev. Stat. Ann. § 598A.050).) The harmonization provision states "[t]he provisions of this chapter shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes." Nev. Rev. Stat. Ann. § 598A.050. The IPPs do not identify any Nevada authority supporting their position on standing. Given the mandatory language of Nevada's harmonization provision and the lack of any contravening state authority, I conclude that the Supreme Court of Nevada would apply the *AGC* factors in accordance with federal precedent. The IPPs, therefore, lack antitrust standing under Nevada law.

### xvii.  West Virginia

West Virginia's harmonization provision states that "[t]his article shall be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes." W. Va. Code Ann. § 47-18-16 (West). In 1990, the West Virginia Attorney General issued a legislative rule providing that "[a]ny person who is injured directly or indirectly by

96

reason of a violation of the West Virginia Antitrust Act may bring an action for damages." W. Va. Code R. § 142-9-2 (internal citations omitted). The legislative rule further provides that "[t]he purpose of this rule is to allow persons who are indirectly injured by violations of the West Virginia Antitrust Act to maintain an action for damages." *Id.* § 142-9-1. It requires that "[t]his rule shall be liberally construed to effectuate the beneficial purposes of the West Virginia Antitrust Act." *Id.*

The Supreme Court of Appeals of West Virginia has held that "[o]nce a disputed regulation is legislatively approved, it has the force of a statute itself. Being an act of the West Virginia Legislature, it is entitled to more than mere deference; it is entitled to controlling weight." *W. Va. Health Care Cost Review Auth. v. Boone Mem'l Hosp.*, 472 S.E.2d 411, 414 (W. Va. 1996). West Virginia's legislative rule permitting indirect purchaser antitrust suits, therefore, carries the force of a statute. Despite the mandatory language used in West Virginia's harmonization provision, the subsequent controlling legislative rule, liberally construed, suggests that the Supreme Court of Appeals of West Virginia would not apply *AGC*, or if it did, it would apply *AGC* more liberally than federal precedent would require.

*****************

To summarize, the IPPs lack antitrust standing with respect to their claims under the antitrust laws of Michigan, New Mexico, New York, South Dakota, New Hampshire, and Nevada. Keurig's motion to dismiss those claims is granted. For the remaining sixteen states, Keurig's standing-based argument fails because I cannot find that the states' highest courts

would apply the *AGC* factors.[45]  I therefore address Keurig's substantive challenges below.

b.  Substantive Challenges to State Antitrust Claims

Of the claims from the remaining sixteen states, Keurig contends that the courts in Arizona, Iowa, Maine, Minnesota, Nebraska, North Carolina, North Dakota, Oregon, Vermont, and West Virginia interpret their state antitrust laws "in parallel with" federal antitrust laws. (IPP Def. Mem. 25.)  The allegations in the IPP Second Amended Complaint overlap in relevant part with the allegations in the complaints of TreeHouse, Rogers, and the DPPs.  Because Keurig's motion to dismiss the federal antitrust claims in those complaints is denied, *see supra* Part IV.A–B, I conclude that Keurig's motion to dismiss the state antitrust claims in the IPP Second Amended Complaint under the laws of Arizona, Iowa, Maine, Minnesota, Nebraska, North Carolina, North Dakota, Oregon, Vermont, and West Virginia should also be denied.

Keurig contends the antitrust laws of certain states contain additional or narrower requirements than the federal antitrust laws, requiring dismissal of the IPPs' claims under the laws of those states.  (IPP Def. Mem. 25.)  Keurig argues that the IPPs' antitrust claims under the laws of California, Kansas, and Tennessee should be dismissed because those laws do not permit claims based on a defendant's unilateral conduct.  (*Id.* 25 n.32, Table D.)  The IPP Second Amended Complaint, however, adequately alleges concerted conduct in those states.  (*See, e.g.*, IPP SAC ¶ 316 (California:  "Keurig has entered into contracts, in concerted action with others, where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in California . . . ."); ¶ 340 (Kansas:  "Keurig entered into a trust, a combination of capital, skill, or acts, by two or more persons, for the following

---

[45] Keurig did not include Minnesota, North Carolina, or Tennessee in Table B, which identified the states in which the *AGC* factors should be applied.  I construe this omission as a concession that the IPPs have antitrust standing under the laws of Minnesota, North Carolina, and Tennessee.

purposes . . . ."); ¶ 431 (Tennessee:  "Keurig has entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations . . . .").)

Keurig further argues that the IPPs' antitrust claims under the laws of the District of Columbia, Tennessee, and Wisconsin all fail because the law in each of these states requires a specific nexus between defendant's conduct and intrastate commerce within those states.  (IPP Def. Mem. 26.)  Keurig contends that the IPPs have failed to plead allegations that establish a "substantial effect on intrastate commerce."  (*Id.*).

The courts of Tennessee and Wisconsin apply a "substantial effects" standard requiring that plaintiffs allege that a defendant's anticompetitive conduct had a "substantial effect" on intrastate commerce.  *See Meyers v. Bayer AG*, 735 N.W.2d 448, 461 (Wis. 2007) ("[A] complaint under the Wisconsin Antitrust Act . . . is sufficient if it alleges [anticompetitive conduct] that substantially affected the people of Wisconsin and had impacts in [Wisconsin].");  *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 522 (Tenn. 2005) ("[C]ourts must decide whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree.").  The analysis "does not involve mathematical nicety.  Rather, the test is pragmatic, turning on the particular facts of the case."  *Freeman Indus.*, 172 S.W.3d at 523 (internal citation and quotation marks omitted).

The IPPs have alleged that Keurig's anticompetitive conduct had substantial effects on intrastate commerce in Tennessee and Wisconsin.  Based on Keurig's internal documents for 2008, Keurig shipped at least forty-five brewers to a distributor in Tennessee and at least eighteen brewers to a distributor in Wisconsin over the span of less than a year.  (IPP SAC ¶¶ 432, 445.)  The same documents, the IPPs allege, list over 90 distributors of Keurig brewers in the Midwest region, which includes Wisconsin, and over seventy distributors of Keurig brewers

in the Southeast region, which includes Tennessee. (*Id.*) Over a period shorter than one year, Keurig shipped more than 6,600 brewers to these distributors collectively. (*Id.*) The IPPs also allege that numerous retail outlets sell K-Cups to consumers in both Tennessee and Wisconsin. (*Id.*) These allegations raise a sufficient inference that Keurig's allegedly anticompetitive conduct substantially affected intrastate commerce in Tennessee and Wisconsin over the span of the multi-year conspiracy alleged by the IPPs.

Keurig cites a federal decision of the District of Maryland to support its argument that the IPPs have failed to plead a "substantial effect on intrastate commerce" in the District of Columbia. (IPP Def. Mem. Table E (citing *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 740 F. Supp. 381, 396 (D. Md. 1990)).) *Sun Dun*, however, does not provide for a "substantial effects" standard, and Keurig has pointed to no relevant authority that does. Rather, the court in *Sun Dun* evaluated whether the plaintiff alleged a "sufficient nexus to the District of Columbia." 740 F. Supp. at 396. It held that the D.C. antitrust law applied because the plaintiff "asserted that it d[id] much of its business in the District of Columbia, and thus it [wa]s possible that plaintiff ha[d] suffered harm there." *Id.*

The IPPs have alleged a sufficient nexus to the District of Columbia. The IPPs allege that based on internal Keurig documents, thousands of brewers were shipped to the Mid-Atlantic region, which includes the District of Columbia, (IPP SAC ¶ 329), and many retailers sell K-Cups to people in the District of Columbia, (*id*). These allegations are sufficient to establish a nexus between Keurig's anticompetitive conduct and the District of Columbia.

Unlike Tennessee, Wisconsin, and the District of Columbia, the antitrust law of Mississippi focuses on the location where the anticompetitive conduct occurred rather than the effects of such anticompetitive conduct or the broader nexus between the conduct and the state in

question.  *See In re Microsoft Corp. Antitrust Litig.*, No. MDL 1332, 2003 WL 22070561, at *2 (D. Md. Aug. 22, 2003) (interpreting a Mississippi Supreme Court case, *Standard Oil Co. of Ky. v. State ex rel. Attorney Gen.*, 65 So. 468 (Miss. 1914), to hold that Mississippi law requires that "plaintiffs . . . allege[] at least *some* conduct by [defendant] which was performed wholly intrastate").  Both Keurig and the IPPs appear to agree with this interpretation of Mississippi law, (IPP Opp. Table E), as do I.

The IPPs contend that the IPP Second Amended Complaint "contains allegations of Keurig's significant activity in Mississippi."  (*Id.*)  However, the IPPs have failed to allege any intrastate conduct in Mississippi on the part of Keurig.  The sole allegations in the IPP Second Amended Complaint with respect to any of Keurig's activity in Mississippi describe that Keurig has distributors across the Southeast region, including in Mississippi, to which Keurig distributed numerous brewers, and that numerous retail outlets sell K-Cups in Mississippi.  (IPP SAC ¶ 367.)  These allegations suggest interstate activity on the part of Keurig that might involve Mississippi as part of the Southeast region, not intrastate.  The IPPs do not allege that Keurig itself manufactured or distributed any brewers or K-Cups from locations in Mississippi.  Nor do the IPPs allege that they bought any brewers or K-Cups directly from Keurig in Mississippi.  Moreover, any conspiracy alleged by IPPs is of an interstate nature:

> The scheme alleged [in the IPP Second Amended Complaint] was formulated in and emanated from Vermont.  Keurig, from its headquarters at 33 Coffee Lane in Waterbury, Vermont (where its principal executive offices, manufacturing, and distribution facilities are located), formulated, conceived of, and reached unlawful and anticompetitive agreements with its Roaster Competitors, Distributors, and Retailers that were intended to and did harm competition and consumers in every state and territory of the United States.

(*Id.* ¶ 109.)  Because Mississippi law requires "at least some conduct" by Keurig that was performed wholly intrastate, *In re Microsoft Corp.*, 2003 WL 22070561, at *2, I find that the

IPPs have failed to state an antitrust claim under Mississippi law.

******************

To summarize, Keurig's motion to dismiss the IPPs' ninth cause of action is granted with respect to claims brought under the laws of Michigan, Mississippi, Nevada, New Hampshire, New Mexico, New York, and South Dakota. Keurig's motion to dismiss the IPPs' first cause of action is denied, and its motion to dismiss the ninth cause of action is denied with respect to claims brought under the laws of Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Minnesota, Nebraska, North Carolina, North Dakota, Oregon, Tennessee, West Virginia, and Wisconsin.

### 5. IPPs' California Unfair Competition Law Claim

Keurig also moves to dismiss the IPPs' ninth cause of action as it relates to their claim under the California Unfair Competition Law. (IPP Def. Mem. 25–26.) Keurig argues that dismissal is required because the claim is based on the same conduct as the IPPs' antitrust claim, which it argues should be dismissed. (*Id.* (citing *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001) (holding that "the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers" under the California Unfair Competition Law)).) Because I have concluded that the IPPs have adequately pleaded that Keurig's conduct was an unfair restraint of trade, I also conclude that they have adequately pleaded that it was unfair under the California Unfair Competition Law. Keurig offers no other basis on which to dismiss the claim. As such, the IPPs' California Unfair Competition Law claim survives Keurig's motion to dismiss.

### 6. IPPs' State Consumer Protection Law Claims

Keurig seeks dismissal of the IPPs' tenth cause of action, (IPP Def. Mem. 27), brought under the consumer protection and unfair trade practices laws of six states: Arkansas, California, Massachusetts, Nebraska, New Mexico, and North Carolina, (IPP SAC ¶¶ 448–80). Keurig argues that because the IPPs have failed to allege conduct that violates the antitrust laws, they fail to state a claim under each state's consumer protection laws. (IPP Def. Mem. 27.) The IPPs contend that the state consumer protection laws are intended to be broadly construed to protect consumers and not to be limited by antitrust concepts. (IPP Opp. 15.)

Keurig does not explicitly state whether it takes the position that each state's consumer protection laws track, or should be interpreted to track, the antitrust laws of that state or the federal antitrust laws. (*See* IPP Def. Mem. 27.) Regardless, as discussed above, the IPPs' Second Amended Complaint is substantially similar to the complaints of TreeHouse, Rogers, and the DPPs, and so they have adequately alleged the substantive elements of an antitrust claim under both federal and state laws. *See supra* Part IV.A–B.[46] Therefore, the IPPs' tenth cause of

---

[46] Neither party has adequately addressed whether each state's consumer protection laws incorporate the principles of antitrust standing under either federal or state antitrust law. In a footnote, without citation, the IPPs assert that "[e]ach of [the six state laws under which they bring consumer protection claims] allows indirect purchasers to bring antitrust claims under their consumer protection laws." (IPP Opp. 15 n.17.) Keurig does not directly address this issue. Instead, Keurig cites to several cases to support the proposition that "[w]here conduct is alleged to harm consumers *through its impact on competition*, the conclusion that it does not violate the antitrust laws means that it does not harm consumers." (IPP Def. Mem. 27 (emphasis in original).) The IPPs in turn cite to several cases for the proposition that "the laws of each of these six states are intended to be broadly construed to protect consumers and not to be limited by the reach of traditional antitrust concepts." (IPP Opp. 15.) Only one of the cases cited by either party sheds light on whether any of the relevant states' consumer protection laws incorporate principles of antitrust standing. *See Meijer, Inc. v. Abbott Labs.*, 544 F. Supp. 2d 995, 1008 (N.D. Cal. 2008). According to the California federal court in *Meijer*, in order to state a claim under the North Carolina Unfair Trade Practices Act ("NCUTPA") a plaintiff must allege: "(1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) which proximately caused actual injury to the plaintiff or his business." *Id.* (quoting *Miller v. Nationwide Mut. Ins. Co.*, 435 S.E.2d 537, 542 (N.C. Ct. App. 1993)). The *Meijer* court applied a proximate cause standard to the plaintiff's NCUTPA claim. *Id.* (holding that the NCUTPA is a "comprehensive law designed to include within its reach the federal antitrust laws" (quoting *L.C. Williams Oil Co., Inc. v. Exxon Corp.*, 625 F. Supp. 477, 481 (M.D.N.C. 1985))).

action under the laws of Arkansas, California, Massachusetts, Nebraska, New Mexico, and North Carolina survives.

### 7. IPPs' State Unjust Enrichment Claims

Keurig seeks dismissal of the IPPs' third and eleventh causes of action, (IPP Def. Mem. 27–28), brought under the unjust enrichment laws of eighteen states,[47] (IPP SAC ¶¶ 245–50, 481–516). The elements required to plead an unjust enrichment claim are generally the same under the laws of each of the relevant states. A claim for unjust enrichment requires 1) a benefit conferred upon defendant; 2) appreciation or knowledge of the benefit by defendant; and 3) acceptance of the benefit by the defendant under circumstances that make such acceptance inequitable. *See, e.g.*, *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996); *Topaz Mut. Co. v. Marsh*, 839 P.2d 606, 613 (Nev. 1992); *Seegers v. Sprague*, 236 N.W.2d 227, 230 (Wis. 1975).

For each state under the laws of which the IPPs bring an unjust enrichment claim, the IPPs have sufficiently alleged the elements of an unjust enrichment claim. The IPPs allege that through their overpayments, they conferred a benefit upon Keurig, which Keurig knowingly accepted under circumstances that made such acceptance inequitable, namely that Keurig obtained the overpayments through unlawful and anticompetitive acts. (*See, e.g.*, IPP SAC ¶ 483.) Keurig argues that the IPPs' unjust enrichment claims fail because the IPPs have failed to allege an antitrust claim. (IPP Def. Mem. 27–28.) As discussed, the IPPs have adequately pled antitrust claims under both state and federal laws. Therefore, their unjust enrichment claims do not fail on that basis.

---

[47] The states are Arizona, Arkansas, the District of Columbia, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, New York, Oregon, South Dakota, Vermont, and Wisconsin.

Even if the IPPs had not alleged a viable antitrust claim, the sole authority on which

Keurig relies for the proposition that an unjust enrichment claim hinges on a successful antitrust

claim is a New York federal district court case interpreting New York law. (*Id.* at 28 (citing

*Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995)).)  At least one

subsequent New York federal district court has interpreted New York law to permit a standalone

unjust enrichment claim.  *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis

U .S. LLP*, No. 08-CV-0179 (SLT)(RER), 2012 WL 4336218, at *8 (E.D.N.Y. Sept. 17, 2012),

*report and recommendation adopted in part*, 20 F. Supp. 3d 305 (E.D.N.Y. 2014), *aff'd*, 806

F.3d 71 (2d Cir. 2015).  Keurig has provided no authority under the laws of any other state

supporting its position that the IPPs' unjust enrichment claims cannot survive without a viable

antitrust claim.  Therefore, even if the IPPs failed to allege an antitrust claim, their unjust

enrichment claims would survive.

   Keurig next argues that the IPPs' unjust enrichment claims should fail under the laws of

Arizona, the District of Columbia, Kansas, Maine, Massachusetts, Michigan, Minnesota,

Nevada, New York, and Wisconsin because those states require a direct relationship between the

allegedly enriched and injured parties.  (IPP Def. Mem. 28.)  I address that claim with regard to

each state in turn.

a. <u>Arizona</u>

   Keurig cites *City of Sierra Vista v. Cochise Enterprises, Inc.*, 697 P.2d 1125, 1131 (Ariz.

Ct. App. 1984), for the proposition that Arizona law requires a direct relationship between

Keurig and the IPPs.  That case is unavailing, as it simply states that a plaintiff must establish "a

connection between the enrichment and the impoverishment."  697 P.2d at 1131.  The case does

not include a direct relationship between a plaintiff and defendant among the elements for an

unjust enrichment claim.  *See id.* at 1131–32.  Moreover, other courts have noted that "Arizona

105

law does not require either a direct causal connection between the enrichment and the impoverishment, or the transference of a direct enrichment from the plaintiff to the defendant." *Doe v. Ariz. Hosp. & Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 1423378, at \*13 (D. Ariz. Mar. 19, 2009) (internal quotation marks omitted). Therefore, the IPPs have alleged a sufficient connection to preserve their claim. (IPP SAC ¶ 483.)

b. District of Columbia

Keurig's lone authority in support of dismissal of the IPPs' D.C. unjust enrichment claim on the basis of a lack of a direct relationship is *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1076 (D.C. 2008). *Fort Lincoln* holds that an unjust enrichment claim requires only that a plaintiff confers a benefit on a defendant, the defendant retains the benefit, and that retention was unjust. *Id.* This is nothing more than a recitation of certain of the elements of an unjust enrichment claim. It does not provide for a direct benefit requirement. *See In re Auto. Parts Antitrust Litig.*, 50 F. Supp. 3d 869, 898 (E.D. Mich. 2014) (rejecting that *Fort Lincoln* precludes indirect purchaser unjust enrichment claim under D.C. law). Therefore, the IPPs have sufficiently pled their unjust enrichment claim under D.C. law. (IPP SAC ¶ 487.)

c. Kansas

Keurig cites two cases in support of its argument that the IPPs' Kansas unjust enrichment claim should be dismissed for failure to allege a direct benefit. (IPP Def Mem. Table G (citing *Babcock v. Carrothers Constr. Co.*, No. 94,471, 2005 WL 3527117, at \*2–3 (Kan. Ct. App. Dec. 23, 2005); *Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269, 273–73 (10th Cir. 2008)).) The citation to each case is misplaced as neither supports the proposition for which it is cited. *Babcock*, an unpublished decision, does not stand for the proposition that an unjust enrichment claim requires a direct benefit. Rather, it holds that a sub-subcontractor may not bring an unjust enrichment claim against a contractor without privity of contract except in certain circumstances.

*Babcock*, 2005 WL 3527117, at *2–3.  Importantly, it relies upon a decision by the Kansas

Supreme Court explicitly acknowledging that a direct relationship is not necessary to establish an

unjust enrichment claim.  *See Haz-Mat Response*, 910 P.2d at 847 ("[T]he theory of quasi-

contract and unjust enrichment . . . does not depend on privity.").  Similarly, *Spires* is inapposite

because its holding relies on the court's conclusion that plaintiffs did not allege that they "had

actually conferred a benefit" on the defendant.  *Spires*, 289 F. App'x at 273.  Finally, other courts

interpreting Kansas law have held that failure to plead a direct benefit is not grounds for

dismissal of a Kansas unjust enrichment claim.  *See, e.g.*, *In re Processed Egg Prods. Antitrust

Litig.*, 851 F. Supp. 2d 867, 929–30 (E.D. Pa. 2012) (finding that "Kansas law does not mandate

the conferral of a direct benefit under an unjust enrichment" (citing *Peterson v. Midland Nat'l

Bank*, 747 P.2d 159, 166–67 (Kan. 1987))).  The IPPs have therefore adequately alleged an

unjust enrichment claim under Kansas law.  (IPP SAC ¶ 491.)

### d. Maine

Keurig relies primarily on two cases, one from the Maine Supreme Court and the other

issued by the Maine Superior Court (the trial court in Maine), to argue that Maine requires a

direct benefit to support an unjust enrichment claim.  (IPP Def. Mem. Table G (citing *Platz

Assocs. v. Finley*, 973 A.2d 743, 751 (Me. 2009); *Rivers v. Amato*, No. CIV. A. CV-00-131,

2001 WL 1736498, at *4 (Me. Super. Ct. June 22, 2001)).)  *Platz* is inapposite because the

court's ruling relied upon the lack of any evidence on summary judgment that the defendant had

actually received any benefit.  *Platz*, 973 A.2d at 751 ("Indeed, the statements of material facts

fail to demonstrate that [defendant] actually received and retained the architectural plans, and

thus fail to demonstrate the central element of unjust enrichment, a benefit conferred.").

*Rivers*, a trial court decision, could be read as being more supportive of Keurig's

argument, but I conclude that it does not require dismissal of the IPPs' Maine unjust enrichment

claim. In *Rivers*, the plaintiff had contracted to purchase a parcel of land from the defendants. 2001 WL 1736498, at *1. After the plaintiff consulted with a third-party developer, the developer offered to purchase the parcel from the defendants for a higher price than the plaintiff had offered. *Id.* The defendants took the developer's offer, repudiating their contract with the plaintiff. *Id.* The plaintiff brought an unjust enrichment claim, arguing that by informing the developer of the parcel of land, he had generated the interest that led to the defendants receiving a higher price to the plaintiff's detriment. *Id.* at *4. The court found that the plaintiff's "indirect benefit theory" was "based on speculation" and thus unpersuasive. *Id.* While the IPPs here allege an indirect theory of benefit based upon the alleged passing on of overcharges through multiple layers of the distribution channel, I find that the indirect nature of the plaintiff's claim in *Rivers* is different in kind from the IPPs' claim. Based on the trial court's decision in *Rivers*, I cannot conclude that Maine's highest court would dismiss the IPPs' unjust enrichment claim based on its indirect nature; therefore, the claim survives.

### e.  Massachusetts

Keurig cites to two cases in support of its argument that the IPPs' Massachusetts unjust enrichment claim fails for failure to allege a direct benefit.  (IPP Def. Mem. Table G (citing *Sweeney v. DeLuca,* No. 042338, 2006 WL 936688, at *8 (Mass. Super. Ct. Mar. 16, 2006); *Berry v. Greenery Rehab. & Skilled Nursing Ctr.*, No. CA923189, 1993 WL 818564, at *3 (Mass. Super. Ct. Oct. 29, 1993)).)  Neither case supports Keurig's position, as both decisions dismiss the unjust enrichment claims due to the failure to establish any benefit conferred whatsoever.  *See Sweeney*, 2006 WL 936688, at *8 ("The [plaintiffs] have not submitted any evidence indicating that [defendant] stood to benefit individually from the sale of the Woods Road Home."); *Berry*, 1993 WL 818564, at *3 (holding that plaintiff was "unlikely to be able to prove a necessary element of her unjust enrichment claim, namely, an uncompensated benefit

conferred on [defendant]").  The IPPs have alleged that Keurig actually benefited from the

profits resulting from overpayments by the IPPs, (IPP SAC ¶ 495), and therefore, their

Massachusetts claim survives.

### f.  Michigan

Keurig cites to an unpublished decision of the Michigan Court of Appeals—Michigan's

intermediate appellate court—to support its argument that the IPPs' Michigan unjust enrichment

claim must be dismissed.  (IPP Def. Mem. Table G (citing *A&M Supply Co. v. Microsoft Corp.*,

No. 274164, 2008 WL 540883, at *2 (Mich. Ct. App. Feb. 28, 2008)).)  The court in *A&M*

*Supply Co.* held that a class of indirect purchaser plaintiffs could not maintain a claim for unjust

enrichment under Michigan law because "there was no direct receipt of any benefit by defendant

here from the persons seeking class certification."  2008 WL 540883, at *2.  The court reasoned

that plaintiffs could point to no direct contact between the defendant and the class, nor could they

show any direct payments between the two.  *Id.*  The IPPs have presented no countervailing

authority from the Michigan courts.  Rather, they have pointed out that *A&M Supply Co.* is an

unpublished decision.  (IPP Opp. Table G.)  Although the decision is unpublished and not

binding precedent, I conclude that the opinion is a strong predictor of how the Michigan

Supreme Court would rule on the analogous facts presented here.  Therefore, the IPPs have

failed to allege an unjust enrichment claim under Michigan law.

### g.  Minnesota

Keurig cites to *Schumacher v. Schumacher*, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001),

to support its argument that the IPPs' Minnesota unjust enrichment claim fails.  (IPP Def. Mem.

Table G.)  However, *Shumacher* is inapposite because it does not state that a benefit conferred

must be direct.  As such, the IPPs have adequately alleged a Minnesota unjust enrichment claim.

### h. Nevada

Keurig's citations in support of its argument that the IPPs' Nevada unjust enrichment claim fails are similarly unpersuasive because neither requires a direct benefit. *See Topaz Mut. Co.*, 839 P.2d at 613 (acknowledging that jury's consideration of indirect benefits may increase amount owed to plaintiff on its unjust enrichment claim); *Jack v. Ringleader Boxing Mgmt. Co.*, No. 2:14-CV-00318-JAD-PAL, 2014 WL 6388845, at *2 (D. Nev. Nov. 14, 2014) (requiring "a benefit conferred on the defendant by the plaintiff," without stating that the benefit must be direct). The IPPs' Nevada unjust enrichment claim therefore survives.

### i. New York

Keurig relies on two federal court decisions from this district for its argument that the IPPs' New York unjust enrichment claims should be dismissed for failure to allege a direct relationship. (IPP Def. Mem. Table G (citing *Carmona v. Spanish Broad. Sys., Inc.*, No. 08 Civ. 4475(LAK), 2009 WL 890054, at *6 (S.D.N.Y. Mar. 30, 2009); *Redtail Leasing Inc. v. Bellezza*, No. 95 Civ. 5191(JFK), 1997 WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997)).) Both cases require plaintiffs to allege "direct dealings or an actual, substantive relationship" with defendants. *Carmona*, 2009 WL 890054, at *6 (internal quotation marks omitted); *Redtail Leasing*, 1997 WL 603496, at *8. *Carmona*, in turn, relies upon a New York Court of Appeals case that affirmed the dismissal of an indirect purchaser plaintiff class's unjust enrichment claim because "the connection between [the indirect purchaser plaintiffs and the defendant] is simply too attenuated to support such a claim." *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007). Given the direct authority from the highest court in New York on this issue, I conclude that the IPPs' alleged relationship with Keurig is similarly too attenuated to support a claim of unjust enrichment under New York law.

The IPPs' citation to *Cox v. Microsoft Corp.*, 8 A.D.3d 39, 40 (1st Dep't 2004), does not

alter this conclusion and does not negate the subsequent decision in *Sperry* from the Court of Appeals.  In addition, the First Department—the intermediate appellate court in New York—in the *Sperry* litigation explicitly declined to follow *Cox*, and that decision not to follow *Cox* was affirmed by the Court of Appeals.  *See Sperry v. Crompton Corp.*, 26 A.D.3d 488, 489 (2d Dep't 2006) ("We decline to follow the decision of the Appellate Division, First Department in *Cox* . . . ."), *aff'd*, 863 N.E.2d 1012.

### j. Wisconsin

Keurig cites to a Wisconsin Supreme Court case in support of its argument that the IPPs cannot maintain an unjust enrichment claim under Wisconsin law.  (IPP Def. Mem. Table G (citing *Seegers*, 236 N.W.2d at 231).)  *Seegers* does not stand for the proposition that a plaintiff must confer a direct benefit on a defendant in order to bring an unjust enrichment claim.  The court in *Seegers* concluded that the plaintiffs could not recover because the alleged conduct "ha[d] not left [defendant] enriched."  236 N.W.2d at 231.  Here, the IPPs have alleged that Keurig has been enriched by the IPPs' alleged overpayments.  (IPP SAC ¶ 515.)  Therefore, the IPPs' Wisconsin unjust enrichment claim stands.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In summary, Keurig's motion to dismiss the IPPs' unjust enrichment claims under the laws of Michigan and New York is granted.  Keurig's motion to dismiss the IPPs' unjust enrichment claims under the laws of Arizona, Arkansas, the District of Columbia, Iowa, Kansas, Maine, Massachusetts, Minnesota, Mississippi, Nevada, New Hampshire, New Mexico, Oregon, South Dakota, Vermont, and Wisconsin is denied.

### 8. Nationwide Application of Vermont Law

The IPPs bring their Vermont antitrust and unjust enrichment claims on behalf of a nationwide class.  (IPP SAC ¶¶ 225–50.)  Keurig failed to challenge in its opening brief whether consumers in states other than Vermont may bring claims under Vermont law, only raising the challenge it after the IPPs addressed the issue in their opposition.  (*See* IPP Def. Reply 6.)  Although "as a general rule, courts will not consider arguments raised for the first time in a reply brief," *Estate of Ungar v. Palestinian Auth.*, 451 F. Supp. 2d 607, 611 (S.D.N.Y. 2006), the IPPs clearly addressed the issue, and therefore were not prejudiced by Keurig's delayed assertion of the challenge in its reply.  Nevertheless, whether the IPPs may bring Vermont law claims on behalf of a nationwide class is more properly addressed at the class-certification stage, and thus, I reserve decision on that issue at this juncture.

### V.     Conclusion

For the reasons stated herein, Keurig's motions to dismiss:

(1) the Rogers Amended Complaint is DENIED;

(2) the TreeHouse Amended Complaint is DENIED;

(3) the DPP Amended Complaint is DENIED;

(4) the IPP Second Amended Complaint is DENIED with respect to the IPPs' First, Second, and Third Claims for Relief;

(5) the IPP Second Amended Complaint is GRANTED with respect to the IPPs' Fourth, Fifth, Sixth, Seventh, and Eighth Claims for Relief;

(6) the IPP Second Amended Complaint is DENIED with respect to the IPPs' Ninth Claim for Relief as to claims brought under the laws of Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Minnesota, Nebraska, North Carolina, North Dakota, Oregon, Tennessee, West Virginia, and Wisconsin;

(7) the IPP Second Amended Complaint is GRANTED with respect to the IPPs' Ninth Claim for Relief as to claims brought under the laws of Michigan, Mississippi, Nevada, New Hampshire, New Mexico, New York, and South Dakota;

(8) the IPP Second Amended Complaint is DENIED with respect to the IPPs' Tenth Claim for Relief;

(9) the IPP Second Amended Complaint is GRANTED with respect to the IPPs' Eleventh Claim for Relief as to claims brought under the laws of Michigan and New York; and

(10) the IPP Second Amended Complaint is DENIED with respect to the IPPs' Eleventh Claim for Relief as to claims brought under the laws of Arizona, Arkansas, the District of Columbia, Iowa, Kansas, Maine, Massachusetts, Minnesota, Mississippi,

Nevada, New Hampshire, New Mexico, Oregon, South Dakota, and Wisconsin.

SO ORDERED.

Dated: April 3, 2019
     New York, New York

Vernon S. Broderick
United States District Judge