1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


In re:                                :
                                         Docket #14md2542
 KEURING GREEN MOUNTAIN SINGLE-       : 1:14-md-02542-VSB-HBP
 SERVE COFFEE ANTITRUST LITIGATION
                                      : New York, New York
                                        May 22, 2019
------------------------------------:

PROCEEDINGS BEFORE
THE HONORABLE HENRY B. PITMAN
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff -         WINSTON & STRAWN LLP
Treehouse Foods, Inc.:  BY:  ALDO BADINI, ESQ.
                             SUSANNAH TORPEY, ESQ.
                        200 Park Avenue
                        New York, New York 10166


For Defendant -         BUCHANAN INGERSOLL & ROONEY PC
Keurig Green Mountain   BY:  WENDELYNNE NEWTON, ESQ.
Inc.:                        MACKENZIE BAIRD, ESQ.
                        301 Grant Street, 20th Floor
                        Pittsburgh, Pennsylvania 15219

                        CLEARY GOTTLIEB STEEN & HAMILTON LLP
                        BY:  LEAH BRANNON, ESQ.
                        2112 Pennsylvania Avenue, N.W.
                        Suite 1000
                        Washington, D.C.  20037




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

APPEARANCES (CONTINUED):

For Defendant - JBR, Inc.:     DAN JOHNSON LAW GROUP
                               BY:  MARIO MOORE, ESQ.
                               400 Oyster Point Boulevard
                               Suite 321
                               South San Francisco, CA  94080

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---|---|---|---|---|---|
| None | | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

1

```
 1                                                   4

 2            THE CLERK:  This is in re: Keurig Green Mountain

 3   Since-Serve Coffee Antitrust Litigation, docket 14md2542,

 4   counsel, your appearances for the record.

 5            MR. ALDO BADINI:  Good morning, Your Honor, Aldo

 6   Badini on behalf of the Treehouse plaintiffs from the law

 7   firm of  Winston & Strawn, LLP.

 8            MS. SUSANNAH TORPEY:  Good morning, Your Honor,

 9   Susannah Torpey of Winston & Strawn on behalf of the

10   Treehouse plaintiffs.

11            MR. MARIO MOORE:  Good morning, Your Honor,

12   Mario Moore of Dan Johnson Law Group on behalf of JBR.

13            MS. LEAH BRANNON:  Hi, Your Honor, Leah

14   Brannon from Clearly Gottlieb on behalf of Keurig.

15            MS. WENDELYNNE NEWTON:  Wendy Newton, Your

16   Honor, from Buchanan Ingersoll & Rooney on behalf of

17   Keurig defendant.

18            MS. MACKENZIE BAIRD:  Mackenzie Baird,

19   Buchanan Ingersoll & Rooney on behalf of Keurig.

20            THE COURT:  Anybody else?  No, okay. All

21   right, we are here today, I guess the first issue,

22   there's a letter I got yesterday which we will talk

23   about in a few moments, but the principal issue to be

24   discussed today is the issue raised in defendant's

25   letter of April 17 concerning JBR's assertion of privilege
```

```
 1                                                5
 2  with respect to certain communications with its
 3  attorney. In that regard, I have defendant's letter of
 4  April 17, Mr. Johnson's, I think it's -- oh, Mr. Moore's
 5  letter, excuse me, Mr. Moore's letter of April 24, and a
 6  second letter on behalf of defendant dated April 26.
 7              Let me cut to the chase here and just ask a
 8  question of, it's Mr. Moore, right?
 9              MR. MOORE:  Yes, Your Honor.
10              THE COURT:  Yes.  Mr. Moore, as I understand
11  it, with respect to the arbitration documents, once
12  you get an order from me you're good to turn those
13  over, is that right?
14              MR. MOORE:  Yes, Your Honor, with a couple of
15  caveats.  Some of the documents at issue in the
16  arbitration do involve privileged communications between
17  JBR's attorneys, Cobalt and, in particular, Ms. Abramson,
18  from 2013 through 2015.  The content of those
19  communications was at issue in that arbitration.
20              THE COURT:  And are those documents relating to
21  JBR's claim that it's, or JBR's use of packaging that
22  described its pods as biodegradable or compostable, or a
23  similar term?
24              MR. MOORE:  Yes, Your Honor, they do relate to
25  those type of claims.
```

```
 1                                                    6
 2            THE COURT:  All right.  Let me ask you another
 3   question, I'm looking at your April 24 letter, page 3,
 4   the paragraph that bridges pages 3 and 4, the paragraph
 5   beginning "however, in order to avoid an unnecessary
 6   dispute," are you agreeing to turn over the documents
 7   there that Keurig is seeking?
 8            MR. MOORE:  Your Honor, we would turn over the
 9   documents there that are not privileged. For example,
10   the opinion in that matter, we could turn that over in
11   redacted form.  We could turn over documents in that
12   matter that are not privileged. But what we, I think
13   we first need to address the larger issue --
14            THE COURT:  Hold on a second. I mean you say
15   JBR offered to disclose all communications with Cobalt
16   and Abramson regarding the use of biodegradable, no
17   plastic cup, and compostable. So if I understand what
18   you just said, you are still asserting privilege with
19   respect to some of those documents?
20            MR. MOORE:  Yes, we are now, because they
21   rejected our offer.  We offered to do it in the
22   context of 502(D) based on Your Honor's prior order
23   encouraging the parties to enter into 502(D) orders.
24            THE COURT:  All right.  Well why don't I hear
25   then from Keurig first, then I'll hear from Mr. Moore.
```

1

2  Okay, go ahead.

3          MS. BRANNON:  Thank you, Your Honor, this is

4  Leah Brannon or Keurig.  Keurig is seeking an order

5  compelling the production of two categories of

6  documents from JBR, both arbitration documents that

7  Your Honor just referenced and also the underlying

8  advice.  We don't understand JBR to have previously

9  offered to provide all of that advice, even under a

10  502(D) order, and we believe that a 502(D) order is

11  not appropriate here because JBR has intentionally and

12  selectively disclosed aspects of the advice and we

13  believe that creates a waiver.

14          Witnesses for JBR have testified affirmatively

15  about the advice they received from their counsel --

16          THE COURT:  Let me just ask you a question at

17  the outset here, your Lanham Act claim, your 43(A)

18  claim, is limited, am I correct in my understanding

19  that it's limited to the representations by JBR on its

20  packaging that its pods are biodegradable, or

21  compostable, or some other similar terms?

22          MS. BRANNON:  It is not limited to claims on

23  JBR's packaging.

24          THE COURT:  What other, what else are you

25  alleging in your 43(A) claim, how else are you

1

2 alleging that JBR violated 43(A)?

3    MS. BRANNON:  We are also challenging other

4 advertising claims that they made beyond their

5 packaging including --

6    THE COURT:  What other advertising claims?

7    MS. BRANNON:  They've made advertising claims

8 on their website --

9    THE COURT:  What are the substance of the

10 claims that you're challenging?

11    MS. BRANNON:  They've used different variants,

12 so it's not all the term biodegradable or compostable,

13 they've also called their products earth friendly,

14 greener, no plastic.

15    THE COURT:  No, but does it all relate to the

16 claimed characteristic that the pods will break down

17 and not last for 5 million years in a landfill?

18    MS. BRANNON:  Yes, generally it all related to

19 environmental --

20    THE COURT:  You're not saying they are

21 misrepresenting the calories or they're

22 misrepresenting the sugar content, or they're

23 misrepresenting the size of the cup or anything like

24 that, it all relates to the ability of the cup or the

25 characteristic of the cup to break down over time?

```
 1                                                    9
 2             MS. BRANNON:  That's correct.
 3             THE COURT:  Okay, go ahead.
 4             MS. BRANNON:  We have characterized this as
 5  green washing claims.
 6             THE COURT:  As what?
 7             MS. BRANNON:  As green washing, false
 8  environmental --
 9             THE COURT:  Okay.  All right, fair enough, go
10  ahead.
11             MS. BRANNON:  So as to the environmental
12  advertising advise, we do believe that JBR has waived
13  privilege in two independent ways, first by
14  intentional self-serving disclosure of portions of the
15  advice, and second, because of the good faith defense
16  that they've asserted to Keurig's counterclaims.
17             As far as the intentional disclosures and the
18  intentional waiver, JBR witnesses have intentionally
19  disclosed a portion advice, Jim Rogers, of the Rogers
20  family, and Tom Garber, both of whom are senior JBR
21  executives, repeatedly divulged the substance of
22  conversations with JBR's advertising attorney. Counsel
23  did not object to the questions that elicited these
24  responses or the substance when the witnesses gave
25  this testimony and this is exactly what the Courts in
```

10

1   this district have said creates a subject matter

2   waiver.

3           So Jim Rogers, for example, testified that

4   upon the advice of our attorney, which turned out to

5   be a disaster, she recommended we change it to

6   biodegradable. No please recall that we used the terms

7   biodegradable only after engaging an environmental

8   attorney who advised us to use that term.  Tom Garber

9   testified similarly that the lawyer said we could not

10  use compostable and that we should use biodegradable

11  and I believe we followed her advice.

12          JBR argues that that's not an intentional

13  waiver of privilege because one could readily discern

14  from its privilege logs that that is the advice the

15  attorney gave, we just don't think that's correct.

16  Privilege logs don't say what your attorney advised

17  you, they say advice from attorney regarding product

18  labeling, they don't say and the attorney told us to

19  advertise the product as biodegradable and not

20  compostable.

21          THE COURT:  And I mean also I guess sometimes

22  clients follow an attorney's advice, sometimes they

23  don't. I mean you can't really tell whether or not,

24  the fact that a party consults an attorney regarding

1                                                          11

2  an issue doesn't tell you whether the client is

3  following the attorney's advice or not.

4          MS. BRANNON:  That's right, Your Honor, I mean

5  we would agree with that.  And JBR is arguing that it

6  changed its labeling to begin using the term

7  biodegradable for the first time after consulting the

8  attorney. Again, we don't think that proves the

9  attorney's advice for the reason you noted, but also

10  we don't think that is factually accurate because

11  we've found through discovery evidence of them using

12  that term extensively prior to the time when they say

13  they engaged this attorney.

14          So we do believe that these were intentional

15  disclosures of a portion of the advice and the

16  disclosures, the undisclosed or withheld

17  communications concern the same subject matter. So the

18  advice that Mr. Moore is saying that they would like

19  to produce only under a 502(D) order and claim that

20  they haven't waived privilege over, is really the same

21  subject matter.

22          JBR witnesses say they were told to advertise

23  their products as biodegradable but the withheld

24  communications actually don't say that.  And we know

25  that, Your Honor, because we reviewed some of the

1

2  documents that JBR produced to us before JBR attempted

3  to claim privilege over them. And in light of Your

4  Honor's order dated May 7, we understand that we can

5  use the content of the documents to the extent we

6  became aware of it, before JBR asserted privilege.

7          THE COURT:  Let me ask you a question, I'm

8  looking at JBR's ninth affirmative defense which I

9  think was cited in one of your letters, and the ninth

10 affirmative defense reads as follows:  "The complaint

11 in each of the purported causes of action asserted

12 therein against JBR is broad in whole or in part

13 because at all times and places mentioned JBR acted

14 without malice and with a good faith believe in the

15 propriety of its conduct."

16          If, in support of that defense, defendant,

17 excuse me, JBR was not going to rely on the advice of

18 counsel, would there still be a waiver? I mean if they

19 were going to support that device by saying, you know,

20 one of our staff members took the cup, put it in his

21 compost pile, came back in six months and the cup was

22 gone, the cup had dissolved, in other words, they were

23 relying on a factual basis for the claim, not the

24 advice of counsel, would there still be a waiver?

25          MS. BRANNON:  Yes.

1

2          THE COURT:  Why?

3          MS. BRANNON:  And, well, two reasons. One is

4   that we believe they separately waived the affirmative

5   testimony, but if you --

6          THE COURT:  Okay, put that aside, put aside

7   the testimony and document production, if their good

8   faith defense was based on factual matters, factual

9   things, not the advice of counsel, would there still

10  be a waiver?

11         MS. BRANNON:  Yes.

12         THE COURT:  Why?

13         MS. BRANNON:  So even setting aside the

14  intentional disclosure --

15         THE COURT:  Right.

16         MS. BRANNON:  The good faith defense calls

17  into question JBR's saying it had a good faith belief

18  and the propriety of its actions.  And it's belief and

19  the propriety of its actions goes to its understanding

20  of the law.

21         THE COURT:  The facts, I guess.

22         MS. BRANNON:  Multiple parties in other cases

23  have tried to run this particular argument, that they

24  can assert a good faith defense without pulling in

25  their advice of counsel and the Courts have rejected

that.  So the Court in *Bilzerian,* Mr. Bilzerian wanted

to testify that he acted in good faith with his

disclosures, his securities disclosures, and he said

he could do that without getting into the advice from

his counsel and just talk about his own knowledge of

the law. And the Court said Bilzerian's testimony that

he thought his actions were legal would have put his

knowledge in the law and the basis of his

understanding of what the law required in issue. His

conversations with counsel regarding the legality of

his schemes would have been directly relevant in

determining the extent of his knowledge.

        The same is true in the *Chipotle Mexican Grill*

case that we cited.  Chipotle wanted to assert a good

faith defense to labor standards violations and they

wanted to argue good faith without disclosing advice

of counsel.  And the Court, again, rejected that. The

Court said where the defendant has clearly benefitted

from advice of counsel on the various issue on which

it asserts good faith, it puts its relevant attorney-

client communications at issue and thereby waives its

privilege.

        So there are multiple other cases that we've

cited but when a defendant in a claim asserts a good

1

2  faith defense in the propriety of its actions, it is

3  waiving, it has received advice of counsel on that

4  particular issue, it waives its privilege over those

5  communications because that goes to its good faith. If

6  their counsel told them, and we've seen some

7  communications where their counsel told them that they

8  were really concerned about the use of biodegradable

9  and that it was problematic, that goes to JBR's good

10 faith defense.

11        We don't think the documents suggest anything

12 like telling JBR to use the term biodegradable.

13 Counsel told JBR after seeing their biodegradable logo

14 I really do not think this will work. And counsel

15 explained that biodegradable claims were very

16 difficult to make and talked with JBR about some heavy

17 caveats on the use of the term, including that you

18 would need to disclose what you meant by it in close

19 proximity to the word, including what you mean, how

20 long would it take the product to break down, would it

21 break down in a reasonable period of time which the

22 Federal Trade Commission defines as one year, and

23 under what conditions would it break down when

24 disposed of in customary fashion.

25        So JBR's selective disclosures in the

1                                                          16

2  deposition and its good faith defense are both

3  independent reasons why it's waived privilege over the

4  subject matter of its environmental advice. And we

5  believe that if we did as Mr. Moore is suggesting and

6  had a 502(D) order and allowed them to continue

7  claiming privilege here, they would continue directing

8  their witnesses not to answer questions at depositions

9  beyond what they've chosen to disclose.

10         So, for example, they volunteered their view

11  that their attorney had told them to use the term

12  biodegradable and not compostable and then when asked

13  about caveats on that advice they were told not to

14  answer because the caveats would be privileged. And

15  that's exactly the sort of using privilege as both a

16  sword and shield, this is a quintessential example of

17  what the Courts don't permit and I think both choices

18  that JBR has made have waived privilege over this

19  advice.

20         THE COURT:  Okay, thank you.  Mr. Moore, could

21  you just tap the microphone and make sure it's, and

22  try to speak into it, please, to the extent you can.

23         MR. MOORE:  Yes, Your Honor.

24         THE COURT:  Thank you.  All right, let me ask

25  you to start with your ninth affirmative defense here,

1
2   the good faith, you had characterized it as good faith
3   belief. Assuming, without deciding that that's a
4   defense to a 43(A) claim, is your good faith defense
5   predicated on the advice of counsel?
6           MR. MOORE:  Your Honor, I don't think we've
7   taken a position on that yet.
8           THE COURT:  Well that's why I'm asking the
9   question.
10          MR. MOORE:  Well and the reason we haven't
11  taken a position on that yet is because they haven't
12  served any discovery on that point.
13          THE COURT:  I'm asking the question though, so
14  you have an obligation to answer my question whether
15  they've served discovery on that or not.
16          MR. MOORE:  Understood, Your Honor.  Your
17  Honor, we did not reference advice of counsel in the
18  affirmative defense.
19          THE COURT:  I can read.  I can read your
20  answer, so, so far you haven't told me anything I
21  don't already know.
22          MR. MOORE:  Yes, Your Honor.
23          THE COURT:  Are you predicating your good
24  faith defense on the advice of counsel, yes, no, we
25  don't know, maybe?

```
 1                                                    18
 2              MR. MOORE:  We don't know, maybe, is what I
 3    would say, because the parties have not yet reached a
 4    schedule on when they're going to reveal whether
 5    they're asserting advice of counsel as a basis for
 6    their claims or defenses.
 7              THE COURT:  Well isn't that what your
 8    witnesses have already testified to?
 9              MR. MOORE:  No, Your Honor.
10              THE COURT:  Really?
11              MR. MOORE:  These witnesses were not 30(B)(6)
12    witnesses. These witnesses were individual percipient
13    fact witnesses testifying --
14              THE COURT:  Were they managers, directors or
15    officers?  What's Jim Roger's position with JBR?
16              MR. MOORE:  He would be an officer.
17              THE COURT:  Yes. I mean he testified, "upon
18    the advice, of our attorney, which turned out to be a
19    disaster, she recommended we change it to
20    biodegradable."
21              MR. MOORE:  Your Honor, I think the point with
22    respect to what he's testifying is already revealed in
23    the record elsewhere.
24              THE COURT:  But that's not the relevant factor
25    with respect to whether or not there's a waiver based
```

1

2   on an advice of counsel defense. The fact that it

3   might be inferred from other documents in the record

4   doesn't mean there is no waiver.

5          MR. MOORE:  Yes, Your Honor, but the point

6   that JBR is making is that if we look at the

7   chronology, in non-privileged documents in the

8   production, Jim Rogers says, a week before he hires

9   counsel he says to one of his customers, this is a

10  complex area, biodegradable claims, compostable

11  claims, and we don't want to get in trouble so we're

12  going to look into it, we're going to hire an expert.

13  He then hires counsel to advise on that issue. Then a

14  label comes out a few months later that says

15  biodegradable.  Those are all independently known

16  facts that have nothing to do with the advice given.

17  And he is then --

18          THE COURT:  Well, no, but his testimony

19  expressly references the advice.  Which suggests that

20  that's what you were relying on.  I mean if you are

21  going to offer testimony in your defense that we were

22  concerned about whether we could use particular terms

23  on our packaging, we spoke to an attorney and after we

24  spoke to the attorney we used biodegradable, you are

25  circumstantially asserting the advice of counsel as a

```
 1
 2  defense.
 3          I mean the fact that, I don't think it makes,
 4  the fact that you're not expressly stating we spoke to
 5  the attorney and the attorney told us we could say X,
 6  Y and Z, the fact that you are not expressly
 7  articulating it that way, I don't think makes a
 8  difference.
 9          MR. MOORE:  Your Honor, I think it does make a
10  difference.
11          THE COURT:  Why?
12          MR. MOORE:  Because this is not 30(B)(6)
13  testimony, the cases they've cited relate to testimony
14  by individuals --
15          THE COURT:  No, but it's the testimony of an
16  officer.
17          MR. MOORE:  Or testimony in the context of --
18          THE COURT:  Rogers was an officer?
19          MR. MOORE:  He was, but his testimony is not
20  binding as to Rogers, as to Rogers' legal contentions.
21  He has no legal training. He's a fact witness giving
22  his own opinion which may very well be wrong.
23          THE COURT:  Well, no, that's incorrect. "Upon
24  advice of our attorney, our attorney which turned out
25  to be a disaster, she recommended we recommend we
```

21

change it to biodegradable. He's testifying to

historical facts there, he's not giving an opinion.

        MR. MOORE:  To me, he's giving an opinion --

        THE COURT:  Well that may be your view of it

but that's not what the language says, he's testifying

to historical facts, he is not opining. He's not.

You're telling me now black is white. I was born at

night, but not last night, and I think I've told

everybody that before.

        MR. MOORE:  Your Honor, he's testifying as to

his view, a view which was disagreed with by others.

        THE COURT:  He's testifying to historical

facts. That argument doesn't fly.

        MR. MOORE:  Well, Your Honor, with respect to,

even if one were to assume that he testified as to

advice given, the problem with Keurig's motion is that

it overreaches.

        THE COURT:  How does it overreach?

        MR. MOORE:  Because Keurig's motion is

unlimited in time, unlimited in scope. They're saying

he gave a little bit of testimony with respect to one

attorney's advice in 2013, and they want to say, based

on that, that there's a subject matter waiver for all

environmental labeling advice that any attorney has

1                                                                22

2  ever given?

3          THE COURT:  Well let me term to Ms. Torpey and

4  clarify that, I mean my understanding is that what

5  Keurig is seeking here are the attorney-client

6  communications regarding the use of biodegradable,

7  compostable or similar, let's call them

8  environmentally friendly terms, I think you called it

9  green washing, similar terms on the packaging.  I mean

10 is that what you're seeking or are you seeking

11 something beyond that?

12         MS. BRANNON:  We're seeking all of their

13 environmental advice related to their packaging,

14 including the advice they received from Ms. Abramson

15 and Cobalt Law. But their good faith defense is not

16 limited to good faith as to one aspect, they've

17 asserted a good faith defense as to the entirety of

18 Keurig's counterclaims. And --

19         THE COURT:  No, but your counterclaim, this is

20 why I asked you at the outset, your counterclaim is

21 limited to the environmental claims on their

22 packaging, not the calorie content or the caffeine

23 content or some other representation regarding their

24 product.

25         MS. BRANNON:  Yes, Your Honor, we are only

```
 1                                              23
 2   seeking their environmental advice regarding
 3   environmental advertising.
 4            THE COURT:  Okay, go ahead.
 5            MR. MOORE:  So, Your Honor, the problem with
 6   that is it's imprecise.  There was one attorney --
 7            THE COURT:  Is there environmental advertising
 8   that JBR engaged in besides this biodegradable
 9   representation on its packaging?
10            MR. MOORE:  Yes, Your Honor, the counterclaim
11   that Keurig has asserted basically takes issue with
12   every label that JBR has ever done for the last six
13   years, including the label that the attorney in
14   question, Ms. Abramson, advised on, but that was the
15   label back in 2013, that label changed in January,
16   2015.  Keurig's counterclaim covers ever label after
17   that.  so their request for subject matter waiver
18   extends to numerous other versions of the label that
19   have nothing to do with the advice given by Ms.
20   Abramson.  Ms. Abramson and her firm were no longer
21   representing JBR as of September of 2015. Their
22   proposed waiver would extend to Arnold & Porter which
23   came in after Ms. Abramson, and it would potentially
24   extend to other firms.  And so because it's not
25   limited to the particular --
```

1

2          THE COURT:  Well with respect -- with respect

3   to other packaging, beyond the packaging that Cobalt

4   advised you on, I mean are you relying on the advice

5   of counsel with respect to that other packaging?

6          MR. MOORE:  Not necessarily, Your Honor. One

7   thing I want to make clear is the affirmative defense

8   is based on many other factual circumstances. The

9   thing to remember is this is a federal Lanham Act

10  claim, this is not a claim under California state law.

11  The advice they're talking about that --

12         THE COURT:  My first question to your

13  adversary about the nature of their claim expressly

14  referenced Section 43(A) of the Lanham Act.  So I get

15  that.

16         MR. MOORE:  And the problem is the advice at

17  issue in the arbitration in California relates to a

18  California labeling law, that's not what is at issue

19  in the Keurig counterclaim.

20         THE COURT:  I mean it's the same packaging, is

21  it not?

22         MR. MOORE:  It is the same packaging, yes.

23         THE COURT:  Did you sue Cobalt for its advice

24  regarding compostable versus biodegradable?

25         MR. MOORE:  Yes, Your Honor.

```
 1
 2          THE COURT:  Okay.  For the life of me though I
 3  don't understand why you haven't put it at issue here
 4  given the defense. I mean if you want to tell me why
 5  it's not at issue I'm happy to hear you.
 6          MR. MOORE:  Yes, Your Honor, the defense, so
 7  the claim relates to the truthfulness of the
 8  advertising, and JBR has many factual predicates for
 9  the truthfulness of that advertising, particular
10  certifications that JBR obtained, as well as --
11          THE COURT:  You may have multiple
12  justifications but if one of them is the advice of
13  counsel then you're putting that advice in issue.
14          MR. MOORE:  But, Your Honor, I don't think we
15  have --
16          THE COURT:  I mean it's a closer case, I mean
17  I heard Ms. Torpey's argument, I mean it was a closer
18  case --
19          MS. BRANNON:  Ms. Brannon, Your Honor.
20          THE COURT:  I'm sorry?
21          MS. BRANNON:  Ms. Brannon.
22          THE COURT:  I'm sorry.
23          MS. BRANNON:  Sorry.
24          THE COURT:  My apologies. There's so many
25  talented attorneys here I lose track.  My apologies.
```

1

2   No, I mean, you know, I asked Ms. Brannon the

3   hypothetical of, you know, whether or not there would

4   still be a waiver if the defense was based on a

5   scientist at JBR, you know, putting a cup in his or

6   her compost pile and coming back six months later and

7   finding out that it was gone. And I understand her

8   argument. But if one of the predicates for your good

9   faith defense is advice of counsel, it's one of many,

10  I don't understand why that doesn't put it at issue,

11  why that doesn't put the advice at issue?

12          MR. MOORE:  Well, Your Honor, that would put

13  the advice at issue, but my point there is it's

14  premature. We haven't done that yet. They haven't

15  served a contention interrogatory and they haven't

16  served a 30(B)(6) notice asking for our contentions.

17  If they do that and then we respond and put it at

18  issue, then that would be putting it at issue. We

19  haven't done that.

20          THE COURT:  But it seems like based on Mr.

21  Roger's testimony, that horse has already left the

22  barn.

23          MR. MOORE:  Not necessarily, Your Honor, we

24  may very well put in other testimony from others with

25  knowledge of other facts that we would rely on

                                                            27

1

2   instead.

3           THE COURT:  Well what about her fallback

4   argument though that if you are doing that, the advice

5   of counsel is still in issue?

6           MR. MOORE:  No, Your Honor, I don't think it

7   is because he only testified as to that she advised

8   him whether it was biodegradable or compostable. And

9   the nature of that advice, what the statutes say, and

10  Ms. Brannon started to go into the details --

11          THE COURT:  The Lanham Act doesn't say

12  anything about biodegradable or compostable.

13          MR. MOORE:  Sorry, Your Honor?

14          THE COURT:  The text of the Lanham Act doesn't

15  say anything about biodegradable or compostable, you

16  reference what the statute says, the statute doesn't

17  say anything, doesn't reference those terms.

18          MR. MOORE:  Yes, Your Honor, but the, I think

19  in the non-privilege communication before Ms. Abramson

20  was hired, Jim Rogers had noted that there were

21  multiple laws at issues. There was FTC, I should say

22  there were multiple sets of regulations and guidelines

23  at issue, there were FTC guidelines at issue and there

24  were state laws potentially at issue.  And so to the

25  extent that he then hired an attorney to advise

1
2    regarding that, that advice, he already telegraphed in
3    a non-privileged communication that that's what he was
4    going to do.

5            THE COURT:  No, but that's not the operative
6    fact as to whether there's a waiver.  I mean it seems to
7    me, and you tell me if you have case authority to the
8    contrary, but is seems to me that is a party testifies I
9    was concerned about doing X, because I was concerned about
10   doing X I spoke to an attorney. After I spoke to the
11   attorney I felt reassured and I did X.  That's just, in my
12   mind that's just as much an assertion of the advice of
13   counsel as if the witness testified I spoke to the
14   attorney, I told the attorney X, Y and Z, the attorney
15   told me X, Y and Z doesn't violate the Lanham Act and that
16   I can do X, Y and Z. It would seem to me that those two
17   hypothetical situations are the same.

18           MR. MOORE:  No, Your Honor, I don't think
19   they're the same.

20           THE COURT:  Why not?  One you're doing it by
21   inference, one you're doing it by direct testimony,
22   but what's the difference?

23           MR. MOORE:  Well the problem here is that food
24   companies, beverage companies all the time ask for
25   advice of counsel with respect to their claims. And

1

2  one can infer that after they then changed the label

3  that that was based on advice of counsel.

4          THE COURT:  Why is that inference more

5  compelling than an inference that the client decided

6  to ignore the advice of counsel?  Clients sometimes

7  take attorneys' advice, sometimes they don't.

8          MR. MOORE:  And there is no evidence in the

9  record that any advice was ignored.

10          THE COURT:  Well, there is no evidence that it

11  was followed, either.

12          MR. MOORE:  Yes, Your Honor, that's true.

13          THE COURT:  So, I mean, if you want to argue

14  the inference that speaking with counsel resulted in

15  the client's following the advice of counsel, why are

16  they not entitled to explore that?  I mean that's the

17  inference you want to argue.

18          MR. MOORE:  They would be if we argue that, we

19  haven't argued that.

20          THE COURT:  Well Roger's testimony certainly

21  makes that assertion.

22          MR. MOORE:  And, Your Honor, the problem I

23  have with that is we're not, we haven't said that

24  we're going to rely on that.

25          THE COURT:  But when is discovery closed,

30

refresh my memory, when does discovery close here?

          MR. MOORE:  In November. And the point I would

make there is that no party has taken a position as to

what they were going to rely on. I don't know if

Keurig is going to rely on advice of counsel with

respect to anticompetitive intent as to what actions

it's taken.  So I don't think they have taken a

position on that or said that they are required to at

this point. So, similarly, I don't think Rogers is

required to at this point.

          THE COURT:  Well, there is some case authority

that I'm aware of in the patent context, I can't

remember the name of the case, there's a decision by

Judge McKelvie in the District of Delaware from about

20 years ago or so, which suggests that, at least in

the patent context, the determination of whether or

not an alleged infringer is going to rely on the

advice of counsel should be made toward the close of

discovery here. But it has to be made in sufficient

time for the adverse party to take discovery.  I mean

if the close of discovery here is six months away, and

usually the close of discovery is a very hectic

period, why is not now the appropriate time to make

that determination?

1

2          MR. MOORE:  It is if they serve an

3   interrogatory or 30(B)(6) notice on that point, but

4   they haven't done that yet.  And in the patent case

5   context, typically the parties will agree to a

6   schedule where if the defendant wants to rely on an

7   opinion of counsel, they will disclose it at a

8   particular point in time and the plaintiff will then

9   have the opportunity after that to take discovery on

10  that point.

11          The parties he could very well agree to a

12  schedule like that, but they haven't done so yet.  And

13  if they do so, then Rogers will comply with that, and

14  we would expect, likewise, Keurig would comply with

15  that with respect to disclosing any legal advice it

16  wishes to rely on with respect to intent issues as to

17  Rogers' claims against Keurig.

18          THE COURT:  The packaging that Cobalt gave you

19  advice on, JBR used that packaging from when to when,

20  or does it still use it?

21          MR. MOORE:  Yes, Your Honor, the packaging

22  came out around October of 2013. Then in January of

23  2015, a third party non-attorney contacted JBR as well

24  as JBR's customer, Costco, and asserted that that

25  packaging violated California law.

1

2          THE COURT:  Just give me those dates again,

3   was it October, 2013?

4          MR. MOORE:  Yes, October of 2013 was when the

5   97 percent biodegradable packaging was introduced.

6          THE COURT:  And it was used through when or

7   are you still using it?

8          MR. MOORE:  It was abandoned in early 2015.

9   And the reason it was abandoned is because a non-

10  attorney came to Rogers' customer, as well as Rogers,

11  and said, hey, we don't like this packaging, we think

12  you're in violation of California law.  Rogers then, in

13  an abundance of caution, stopped using the packaging.

14  It had nothing to do with any advice of counsel at

15  that time, it had to do with the factual assertion of

16  a third party non-attorney.

17         THE COURT:  All right.  I've asked you a lot

18  of questions, is there anything else you want to tell

19  me, I'll try not to interrupt you.  Go ahead.

20         MR. MOORE:  Your Honor, Ms. Brannon referenced

21  some documents that JBR inadvertently produced and

22  started to go into the content of those documents. I

23  would note that this reflects a change in Keurig's

24  position. Keurig did not include any of those

25  documents in its letter briefing and it simply

33

1

2  referenced them in oral argument for the very first

3  time without us having any opportunity to rebut that,

4  and, Your Honor, the documents aren't even before you.

5  So to the extent that they were going to rely on that

6  as part of the basis for the motion, there would need

7  to be further briefing on that issue.

8          THE COURT:  All right, anything else you want

9  to tell me?  Anything else you want to tell me?

10          MR. MOORE:  Your Honor, Ms. Brannon also

11  stated that the claims related to green washing and

12  focused on biodegradable and compostable. I would just

13  note that Keurig's counterclaim also includes claims

14  related to no plastic cup and claims related to more

15  recent versions of the labels and pat of the concern

16  about overreach is that their request for a subject

17  matter waiver would extend to those more recent

18  labels. They don't even have anything to do with

19  biodegradable or compostable.

20          THE COURT:  I just want to make sure I'm

21  clear, Cobalt only gave you advice with respect to the

22  packaging or gave your client advice with respect to

23  the packaging used from October '13 through early

24  2015, is that right?

25          MR. MOORE:  A couple of clarifications there.

34

Cobalt continued to be involved until September of 2015. So they did advice on one further round of packaging which was packaging relating to a no plastic cup package that was also used in 2015. And they then ceased to be involved shortly after the California District Attorneys sent a letter to JBR. At that point, JBR, as well as its customer, Costco, hired Arnold & Porter to defend JBR with respect to the claims asserted by the California District Attorneys. And shortly after Arnold & Porter was hired, Cobalt ceased to represent JBR.

And so the point there, Your Honor, is that any labels after September of 2015, Cobalt had nothing to do with.  So their waiver would extend to other counsel that had nothing to do with the advice that was discussed in deposition testimony of Jim Rogers and Tom Garber.

THE COURT:  All right, anything else?

MR. MOORE:  Thank you, Your Honor.

THE COURT:  Okay.  Ms. Brannon, let me ask you a question that I didn't ask you before, something that I touched upon with your adversary, there is, as I said, there is case authority at least in the patent context, because of the significance of asserting an

advice of counsel defense and the fact that it does

waive attorney-client privilege with respect to a

number of communications. There is some case authority

that that determination should be made toward the

close of discovery when all the other facts are known

and the parties are in a position to make an informed

decision as to whether to rely on the advice of

counsel defense.  Is a finding of waiver premature

here? I mean is this something that we should set a

schedule for both sides to formally commit to relying

on advice of counsel or not relying on the advice of

counsel?

    MS. BRANNON:  No, Your Honor.

    THE COURT:  Why not?

    MS. BRANNON:  It's not premature here for two

reasons, and I think we're mixing a bit the two

different independent bases for a finding of waiver

here. One is the intentional disclosures and

depositions, that does relate to Ms. Abramson and

Cobalt Law's advice. Those were selective, self-

serving representations, JBR chose not to testify or

answer questions about caveats on that advice. And

because --

    THE COURT:  Right, but if they don't rely on

36

it at trial or in a summary judgment motion, is
discovery on it appropriate?

          MS. BRANNON:  Yes, Your Honor.

          THE COURT:  Why?

          MS. BRANNON:  Discovery is appropriate here --

          THE COURT:  If they don't assert it, I mean if
they don't assert it as a defense, assuming it is a
defense, if they don't assert it as a defense, how is
discovery on it appropriate?

          MS. BRANNON:  Discovery is appropriate because
under Federal Rule of Evidence 502, when there is a
disclosure in a federal proceeding, that waives
privilege as to other withheld communications if the
waiver --

          THE COURT:  Yeah, but you've got Rule 26 which
says to take discovery it's got to be relevant to a
claim or defense.

          MS. BRANNON:  Sure, and the disclosure here --

          THE COURT:  I think it's also in Article 4 of
the Federal Rules of Evidence, but go ahead.

          MS. BRANNON:  The disclosure here, there's
three conditions, the disclosure has to be
intentional, it has to concern the same subject matter
as the undisclosed material --

37

THE COURT:  No, but my question is relevance which you are not addressing.  If they don't assert the advice of counsel as part of their affirmative defense, how is it relevant, if it's not relevant you never get to questions of privilege or waiver.

MS. BRANNON:  Well they have now put into the record their claim that they were given this advice, and we should, because they made, and the cases we've cited are very similar to this one in that there was a selective intentional disclosure of a portion of the advice and we should be --

THE COURT:  Well, *Bilzerian* at least was at trial, we're not at trial yet.

MS. BRANNON:  That's true.  But not all of the cases we sited were at trial, and they dealt with discovery. The *Chipotle* case, for example, that was, the Court ordered that --

THE COURT:  No, but come back to my question. Let's assume that a week from now JBR sends you a letter saying we've reviewed the matter and we have decided that we are not going to rely on the advice of counsel directly or indirectly in any way, shape or form in the defense, in our defense against your Lanham Act claim. Wouldn't that take the issue of the

1                                                           38

2  advice of counsel out of the case entirely?

3          MS. BRANNON:  No, Your Honor, well I would say

4  a couple of things.  We have more than Lanham Act

5  claims, we also have California law claims. If they

6  withdrew their entire good faith defense, then if that

7  were the only basis for waiver then that would end the

8  matter but we do have the independent intentional

9  disclosures.  They are asserting good faith. One

10 cannot assert a good faith defense that one had a good

11 faith belief in the propriety of their actions without

12 opening up advice of counsel. So they have already

13 asserted that defense affirmatively and under

14 *Bilzerian, Chipotle* and the other cases I've cited, we

15 are now entitled to see the remainder because of that

16 asserted good faith defense, even if they try to argue

17 that they weren't relying on advice of counsel.

18          I would point, Your Honor, to their letter --

19          THE COURT:  Are you though taking an

20 inconsistent position by also arguing that good faith

21 is immaterial?

22          MS. BRANNON:  No, Your Honor, be believe as a

23 matter of law that this is not a valid defense and we

24 do intend to argue that at summary judgment, but the

25 time for discovery is now.  And they have asserted --

39

1

2          THE COURT:  Well, no, I mean if it's legally

3   deficient you could make a Rule 12 motion.  I mean the

4   validity of your argument regarding whether it's a

5   defense is a matter of law, not a matter of fact, as I

6   understand it.

7          MS. BRANNON:  It's both. We both believe that

8   the facts --

9          THE COURT:  You're saying given some facts it

10  could be a valid defense to a 43(A) claim?

11         MS. BRANNON:  No, Your Honor, we believe

12  neither the law nor the facts support it and we want

13  discovery on the facts now because --

14         THE COURT:  No, but how does, your contention

15  that it's not a valid defense, does that turn on facts

16  or does that turn on law?

17         MS. BRANNON:  Both.

18         THE COURT:  How does it turn on facts? I mean

19  if you're saying it turns on facts, that suggests that

20  there is some factual circumstances in which it could

21  be a good defense to a 43(A) claim.

22         MS. BRANNON:  Oh, no, sorry, Your Honor, I

23  mean to say that we believe it is neither factually

24  nor legally supported, but we would like discovery on

25  the factual aspects of that. I would, in their letter

1                                                          40

2   of April --

3            THE COURT:  Is it fair though, I guess this is

4   sort of my concern, let's assume that I grant your

5   motion to compel and you get discovery on some of the

6   communications or some set of communications as to

7   which JBR is asserting privilege, and then later on

8   down the road you argue that, you make a Rule 12

9   motion or you make a Rule 56 motion arguing that good

10  faith is not a defense to a 43(A) false advertising

11  claim and you prevail on that, is that a fair result?

12  I mean then you've taken, you've successfully argued

13  that they can't assert the defense anyway but you

14  still proved their attorney-client communications with

15  respect to something which ultimately becomes a

16  nonissue in the case. Is that fair?

17           MS. BRANNON:  I believe it is, Your Honor.

18           THE COURT:  Why?

19           MS. BRANNON:  This is just not about their

20  good faith defense but their sort of broader story of

21  the case. Their witnesses volunteered at depositions

22  that they are good actors and that they were given bad

23  advice by their lawyer. This is something that they

24  affirmatively used but they are not trying to shield

25  the caveats on that advice. And even in their letter

```
 1                                         41
 2  of April 24 --
 3          THE COURT:  Let me interrupt you and ask Mr.
 4  Moore a question, is JBR claiming that the testimony
 5  that's cited by defendants in their letter was
 6  inadvertent?
 7          MR. MOORE:  No, Your Honor, we're not claiming
 8  it's inadvertent.
 9          THE COURT:  Okay.  All right, go ahead.
10          MS. BRANNON:  In their letter of April 24, Mr.
11  Moore says that they have not yet decided if they're
12  pointing to advice of counsel as a basis of their
13  belief in the propriety of their actions. And we think
14  under the law they can't set aside advice of counsel,
15  but their letter --
16          THE COURT:  I'm sorry, say that again, I just
17  didn't hear you.
18          MS. BRANNON:  So --
19          THE COURT:  I just didn't hear, I'm not
20  quibbling with what you said, I just didn't hear you.
21          MS. BRANNON:  Sure, you asked Mr. Moore if
22  they have taken a position on whether advice of
23  counsel contributed to the good faith belief and he
24  said they have not yet decided that.  We believe,
25  under the law, that when you assert a good faith
```

1

2  defense you open up discovery on advice of counsel you

3  received on that subject to see whether you listened

4  to it or not and how it informed your understanding of

5  the law.

6          But also, in their letter of April 24th on the

7  first page, the last complete paragraph, JBR, Mr.

8  Moore writes "JBR's managers realized in 2013 that the

9  law relating to these issues was not something that

10  JBR had expertise in, so they looked to hire an

11  attorney with that expertise. So they are pointing in

12  their own letter on this issue to their reliance on

13  their counsel, which is something that their witnesses

14  were affirmatively pushing. And as Your Honor said,

15  the horse is out of the barn, this is exactly under

16  the case law what creates a waiver.

17          And so we believe we are entitled to their

18  full advice. And Mr. Moore says Ms. Abramson only

19  advised on product labeling between 2013 and 2015.  We

20  don't think, well first their good faith defense is

21  not just as between 2013 and 2015, it's to all of our

22  claims, and we believe they've opened up their advice

23  on environmental law, environmental advertising

24  because of this defense across the full period. But

25  also their privilege log did not match those dates,

1   they had --

2

3          THE COURT:  I'm sorry, the privilege log did

4   not what?

5          MS. BRANNON:  Did not match the dates that Mr.

6   Moore just gave you. The privilege log that they had

7   produced to us claimed privilege over communications

8   with Ms. Abramson dated from 2011 through 2017.

9   Yesterday, without any explanation, we received a

10  revised privilege log from JBR and that changed the

11  dates on a bunch of the entries. So it now shortens

12  the period by changing all of the dates, it shortens

13  the period when they were communicating with Ms.

14  Abramson, in particular. We're still working to

15  understand the scope of their inexplicable revisions

16  to the log and we'll need to confer with them to

17  understand, it seems that there were very widespread

18  errors in their log. But again, even if you think that

19  Ms. Abramson's advice was more limited in time and

20  it's not at all clear that it was, they are asserting

21  a broad good faith defense across the period.

22          Also, we don't believe that Ms. Abramson's

23  advice was limited to biodegradable and compostable

24  because we've seen the documents and we didn't argue

25  about this in our letter because the issue of the

44

1

2  appropriate use of inadvertently produced documents

3  was still pending at the time. Your Honor issued an

4  order on that on May 7, clarifying that if a party

5  became aware of the document and reviewed the document

6  before the producing party claimed privilege,

7  therefore you could use it.

8       THE COURT:  Your Lanham Act, your 43(A) claim,

9  is this is, I come back to what I asked you early on

10 in your argument, your 43(A) claim, as I understand

11 it, and tell me if I'm wrong, is limited to the, let

12 me refer to it as the environmentally friendly

13 representations that you're saying JBR made on its

14 packaging.

15      MS. BRANNON:  Yes, Your Honor, she advised on

16 other types of environmental representations. And I

17 would, I think --

18      THE COURT:  But we agree, let me just

19 interrupt you and ask you a question, I mean do we

20 agree that if there is a waiver here, the waiver is

21 limited to advice that Cobalt gave with respect to

22 environmentally friendly representations?

23      MS. BRANNON:  As to the intentional

24 disclosures, yes, believe that it's limited to --

25      THE COURT:  No, I mean if that's the scope of

45

your 43(A) claim, I mean she advises them on non-environmental issues, I'm not sure how that's implicated in the 43(A) claim.

MS. BRANNON:  No, no, I was going in a different direction which is that as to their good faith belief and the propriety of their action defense, we believe that also waives as to Arnold & Porter's environmental advice.  So the intentional disclosures are a waiver, at least as to Cobalt Law's advice, but we believe, and there is case law suggesting, that once you waive on a subject like environmental advertising advice, you've waived as to the entirety of the subject. And there is, the Magistrate Judge has broad discretion.

THE COURT:  Hold on a second though, is there a claim though that their packaging after October 15 contained, was false regarding the environmental attributes of their cups?

MS. BRANNON:  Yes, they did not stop using the term biodegradable in 2015, Mr. Moore was incorrect about that.  We've asked their witnesses, we've seen their materials, they continued using that term, they are even using the term biodegradable in places. Today they use 100 percent compostable.  Today, they're

using a range of claims through today and starting as

early as 2011 they were using the term biodegradable,

not just, they've used different terms on their

labeling over time and they have also used different

terms in advertising to customers, to retailers, on

their website, and we believe that they have made

deeply misleading representations about the

environmental benefit of their packaging, including

that their products contain no plastic when they're

made of PLA, they're made of plastic, and representing

that they biodegrade and compost when disposed of in

customary fashion, which they don't. Their witnesses

have acknowledged that customers overwhelmingly throw

these in the trash and they don't biodegrade in the

landfill or compost.

THE COURT:  All right, why don't you finish

your comments then I've got -- well let me ask my

questions right now actually. Let's assume I issue an

order in your favor and then JBR responds by saying we

are withdrawing our ninth affirmative defense, would

you still be entitled to discovery on this issue?

MS. BRANNON:  Yes, Your Honor.

THE COURT:  Why?

MS. BRANNON:  Because of the intentional

47

1
2  disclosures, because the horse is out of the barn.

3          THE COURT:  No, but isn't it, you're

4  overlooking Rule 26 though, doesn't it have to be

5  relevant to be discoverable?

6          MS. BRANNON:  Yes, Your Honor.

7          THE COURT:  Whether it's privileged or not

8  it's got to be relevant.

9          MS. BRANNON:  We believe it is relevant to the

10  communications --

11          THE COURT:  My hypothetical is they've

12  withdrawn their ninth affirmative defense.

13          MS. BRANNON:  Yes, Your Honor.

14          THE COURT:  How is it relevant?

15          MS. BRANNON:  It's relevant to the -- so we

16  believe that the claims that they have made are

17  misleading, false and misleading to consumers, and we

18  believe that these communications reflect on how

19  misleading their advertising was.

20          THE COURT:  But my hypothetical, they're not

21  relying on good faith.

22          MS. BRANNON:  That's correct. We believe the

23  communications are relevant --

24          THE COURT:  So the truth or falsity, it's either

25  true or false regardless of what the attorney told them?

1

2          MS. BRANNON:  The advertising is, we believe

3    that the withheld materials are directly relevant to the

4    misleading nature of the advertising which is relevant to

5    our claims.

6          THE COURT:  Well, I mean either, the attorney's

7    comments are not going to make them more or less

8    biodegradable or compostable, or whatever term you want to

9    use, I mean how is it relevant then?

10         MS. BRANNON:  We believe that her, the

11   communications at issue go to consumers' understanding of

12   the claims and go to their misleading nature.  And we

13   believe that the --

14         THE COURT:  How does what the attorney says bear

15   on whether or not a consumer understands what

16   biodegradable means?

17         MS. BRANNON:  We believe that she was discussing

18   these issues with him including the Federal Trade

19   Commission's Green Guides and other issues that have to do

20   with the misleading nature of their advertising. And we

21   believe that JBR intentionally chose to disregard aspects

22   of that advice, very inconsistent with the testimony

23   they've given on the record, and we believe that that goes

24   to the fact that their advertising is deeply misleading.

25         THE COURT:  All right.  And let me ask you

49

another question which really has come up I guess in my

discussion with Mr. Moore, is Keurig contemplating relying

on the advice of counsel with respect to any of the

claims here, and, if so, should we not set a date for

Keurig to commit whether it's going to rely on advice

of counsel?

MS. BRANNON:  I don't believe Keurig has

asserted any affirmative defense of advice of counsel

or good faith.

THE COURT:  Is there any potential that it's

going to assert good faith or the advice of counsel in

the future?

MS. BRANNON:  I do not believe that Keurig is

planning to assert a good faith defense, advice of

counsel defense of the sort that JBR is asserting

here.

THE COURT:  Well should we set a deadline for

Keurig to commit on that one way or the other?

MS. BRANNON:  Yes, if Your Honor thinks that

is appropriate for all parties to have a deadline to

commit.

THE COURT:  All right.  Anything else you want

to tell me?

MS. BRANNON:  No, Your Honor.

1

2          THE COURT:  It's my practice to give both

3   sides an equal number of chances to be heard, so Mr.

4   Moore, if you want to say something in sur-reply, go

5   ahead.

6          MR. MOORE:  Yes, Your Honor.  Your Honor, I

7   just want to address a few of the assertions just

8   made. With respect to this notion the good faith

9   defense, I would note that the context here I think is

10  a little bit different, and Keurig's theory, the

11  problem I have with it is it involves a lot of

12  speculation.  They, in the patent case example that

13  you mentioned, or in the cases cited by Keurig, you

14  would have an opinion of counsel that the party would

15  then rely upon as a basis for its good faith. But

16  under Keurig's theory here, they're saying JBR is

17  going to rely on the advice of counsel, of an attorney

18  that JBR elsewhere called out for giving bad advice,

19  and so I think their theory just doesn't make any

20  sense factually.

21          THE COURT:  Well, no, I'm not sure that's

22  accurate. I mean in the patent context, if there is a

23  claim of intentional infringement, the advice of

24  counsel is usually relevant with respect to damages

25  and you only get to damages if the advice of counsel

51

1

2  was wrong. So I mean the fact that the advice of

3  counsel was wrong doesn't mean it comes out of the

4  case. I mean in the typical patent case, the accused

5  infringer will offer the advice of counsel as a

6  defense to damages for intentional infringement, not

7  to liability. I mean whether or not the accused

8  product infringes doesn't, is independent of the

9  advice of counsel.

10            So I mean the fact that the advice of counsel

11  turns out to be wrong or that even that JBR in this

12  case subsequently asserted malpractice claims against

13  the attorney, I'm not sure how that has anything to do

14  with anything.

15            MR. MOORE:  Well, Your Honor, I think it does

16  because in the typical instance where one would rely

17  on advice of counsel, one would rely on advice of

18  counsel if they wanted to assert the advice was

19  correct.  I don't think they've --

20            THE COURT:  Well, no, the advice of counsel

21  doesn't, you know, whether or not you violated the

22  Lanham Act, you can't offer testimony on an attorney

23  as to whether or not you violated the Lanham Act,

24  that's a decision for the fact finder.

25            MR. MOORE:  Yes, Your Honor.

1

2          THE COURT:  I mean, you know, take a typical

3   negligence case, plaintiff is run over by defendant's

4   vehicle, defendant can't call an attorney to say, oh, no,

5   the defendant wasn't negligence here, I've tried negligence

6   cases for 50 years and the defendant is not negligent, you

7   can't call an attorney to argue, to offer testimony on

8   liability. I mean not that I've ever seen.

9          MR. MOORE:  And, Your Honor, I think that goes

10  to the point is that they're assuming that we're going

11  to rely on advice of counsel for this good faith

12  defense when we have a number of factual predicates

13  that have absolutely nothing to do with advice of

14  counsel.

15         THE COURT:  Well what are the facts,

16  independent of advice of counsel, that you're relying

17  on in support of your good faith defense?

18         MR. MOORE:  Well, Your Honor, I think there

19  was a deposition just last week that Keurig took for a

20  full day of one of the people involved in the

21  labeling, and in that deposition it was noted that

22  this was kind of a new area of advertising, a new area

23  of law, it was very unsettled.  And JBR made very

24  diligent efforts in terms of obtaining certifications

25  and vetting each version of its advertising, each

1
2  version of its packaging.

3        THE COURT:  Yes, and in your letter, I mean

4  this is what Ms. Brannen cited, "in June, 2013, JBR

5  hired Cobalt LLP in California and began communicating

6  with the law firm concerning environmental packaging

7  language for its one cup product." I mean isn't that,

8  isn't what you've just described exactly the

9  consultation with counsel that's at issue here?

10        MR. MOORE:  No, it's not, what I'm referring

11  to is JBR made efforts, it went out to its suppliers,

12  it studied the different certifications that were

13  available, it had, it consulted with environmental

14  groups. It engaged in all sorts of efforts over many

15  years to vet its packaging that had nothing to do with

16  any advice it sought from any attorney.

17        THE COURT:  All right.

18        MR. MOORE:  So those would be the independent

19  predicates. With respect to the dates issue that Ms.

20  Brannon identified, we discovered after receiving

21  their reply letter that there were some data entry

22  errors in the privilege log, but I can represent,

23  based on having been involved in the separate

24  litigation against Cobalt, that the dates of the

25  representation were from June 7th of 2015, to late

```
 1                                                  54
 2  September -- sorry, June 7ᵗʰ of 2013, to late September
```

 1

 2  September -- sorry, June 7th of 2013, to late September

 3  of 2015.  And those are the correct dates.

 4         Ms. Brannon just noted that their proposed

 5  waiver would extend to all Arnold & Porter

 6  communications which would then sweep in an additional two

 7  and a half years of communications from August of 2015

 8  through 2018, because Arnold & Porter was involved in

 9  defending both JBR, as well as its customer, Costco,

10  in this negotiation with the California District

11  Attorneys.

12         THE COURT:  Well are you asserting good faith

13  with respect to the entirety of their packaging

14  claims? I mean I suppose you've got, among your

15  defenses to their 43(A) claim, I suppose you could

16  argue good faith which may or may not be a defense.

17  And I suppose you could also argue that your

18  representations are accurate.  Are you asserting good

19  faith with respect to the entirety of their 43(A)

20  claim?

21         MR. MOORE:  Your Honor, I think at the moment

22  our defense would cover the entirety of their claim,

23  yes.

24         THE COURT:  Okay.

25         MR. MOORE:  And so in terms of the dates,

1                                                                          55

2   their proposed waiver would basically extend to cover

3   all these Arnold & Porter communications over several

4   years as well as other firms.  And that would be

5   inappropriate in terms of the breadth because there

6   was no testimony, even if one assumes their theory

7   based on the testimony given, there was no testimony

8   given as to what Arnold & Porter advised JBR or any

9   other firm advised JBR with respect to environmental

10  labeling.

11          Ms. Brannon also asserted that we

12  misrepresented the dates of when the particular labels

13  stopped, so I want to clarify that point factually.

14  The label that was the subject of the testimony.  The

15  label that was at issue in the Cobalt matter was a

16  particular label that JBR had from October of 2013

17  through early 2015.

18          THE COURT:  Was it still in the retail

19  marketplace after 2015?

20          MR. MOORE:  Yes, Your Honor, the label was

21  phased out, which means that, and what's typical in

22  this industry, is not to go and pull every label --

23          THE COURT:  I presume that when JBR stops

24  using a label it's still in the marketplace for a sell

25  off period.

```
 1                                                    56
 2              MR. MOORE:  Yes, Your Honor. And so when she
 3    references that after 2015 there were still labels out
 4    there, well yes, some products sell slower than others
 5    do, and some customers forget to change their website
 6    so they might have five year old pictures on their
 7    website, but that doesn't change the fact that JBR, in
 8    terms of what was in its control, phased out that
 9    label in 2015.
10              THE COURT:  Anything else you want to tell me?
11              MR. MOORE:  Thank you, Your Honor.
12              THE COURT:  Okay, I'm going to reserve
13    decision on the waiver issue.  There was a letter that
14    I received yesterday from Winston & Strawn which I got
15    it yesterday afternoon, I'm not when defense counsel
16    got it here, I'm not sure if defense, if the defense
17    is in the position to address any of the issues in
18    there today or not.
19              MS. NEWTON:  Your Honor, we saw that it was
20    filed as we were walking out the door to head to the
21    airport to come here, so we are not prepared to
22    address the issues, although we would like an
23    opportunity, including as to those many issues that we
24    understood they were not raising, to respond to that
25    in a letter brief.
```

```
 1                                                    57
 2            THE COURT:  Well, don't respond to what
 3   they're not raising.
 4            MS. NEWTON:  I said that wrong.
 5            THE COURT:  I'll have plenty to read.
 6            MS. NEWTON:  Yes.  No, I said that wrong.  I
 7   mean they've accused us of spoliation, Your Honor, and
 8   I take that very seriously, and I want to respond to
 9   it.
10            THE COURT:  Well at this point I think they
11   just want to take discovery on that, they're not
12   making an application for sanctions.
13            MS. TORPEY:  Yes, Your Honor, that's correct.
14            THE COURT:  So I don't think there's any issue
15   there that's really ripe for determination now.
16            MS. NEWTON:  Well I agree, Your Honor, it's
17   not ripe for determination, but having put that on the
18   public record, Your Honor, I would like a little
19   latitude to respond to their misrepresentations,
20   please.
21            THE COURT:  To what end?
22            MS. NEWTON:  To correct the public record.
23   They've accused me, my firm --
24            THE COURT:  Well if you want to put on the
25   public record with the understanding that I'm not
```

1

2  going to read it, because there is no decision for me

3  to make, you know what I mean?

4          MS. NEWTON:  Yes.

5          THE COURT:  It sort of is a burden on the

6  Court to be reading things that don't require any

7  action.

8          MS. NEWTON:  If I understand Your Honor then,

9  you're saying that you wish Treehouse had not burdened

10  the Court by putting that --

11          THE COURT:  Yes, I mean if there is something

12  parties want to put before me for decision, that's one

13  thing, but, you know, to went moral indignation or

14  dissatisfaction with what the other side has said, I'm

15  not, you know, I read it and I get to the end of it

16  and I ask myself why did I read this.

17          MS. NEWTON:  I hear you, Your Honor, we may

18  just drop a footnote, but we'll try not to burden the

19  Court.

20          THE COURT:  Look, I'm not telling you, you can

21  put in anything you want, but it's just, you know,

22  from my point of view, when I get things that don't

23  require judicial action, as I say, when I get to the

24  end of the letter the question I ask myself is why did

25  I read this, why did I spend 20 minutes reading this

```
 1                                                   59
 2  or half an hour reading this.
 3            MS. TORPEY:  Your Honor, if I could just
 4  respond to that, I apologize if we burdened you in any
 5  way. We thought it was important to raise these issues
 6  now because we expect that we'll require further Court
 7  intervention on these issues in a quick manner.
 8            MS. NEWTON:  Can we take that letter off the
 9  record, Your Honor --
10            THE COURT:  There's no way to unfile
11  something, as far as I understand it.
12            MS. NEWTON:  Okay, me either, but I thought
13  I'd ask.
14            THE COURT:  All right, when do you want to
15  respond by?
16            MS. NEWTON:  A week from today?
17            THE COURT:  Fine.
18            MS. NEWTON:  Thank you.
19            THE COURT:  All right, so that's going to be
20  May 29, right, today is the 22nd?
21            MS. NEWTON:  I believe that's right, yes, Your
22  Honor.
23            THE COURT:  Okay.  Anything else we should be
24  considering from plaintiff's side?
25            MR. BADINI:  Your Honor, there are a handful
```

```
 1                                                    60
 2   of issues in that letter where we did seek Court
 3   intervention towards the end.
 4           THE COURT:  Right, no, I know that, but I
 5   think they're entitled to a time --
 6           MR. BADINI: Absolutely, I'm not, that's not
 7   what my point is.  My point is there were a number of
 8   statements and positions taken by Keurig today that I
 9   think implicate interrogatory number 8. And so I would
10   either like to supplement orally our points for a few
11   minutes, or be entitled to a short reply.
12           THE COURT:  All right, well why don't you
13   supplement your points orally so that we can, so the
14   defense will have everything in front of it when it
15   submits their letter, okay?
16           MR. BADINI:  Thank you, Your Honor. So
17   interrogatory number 8 relates to our sham litigation
18   claim that we have in this case. And the sham
19   litigation claim relates to two lawsuits that Keurig
20   brought shortly after competitive cups came into the
21   market in 2010, one against Treehouse and one against
22   Rogers.  Those lawsuits were quickly disposed of by
23   the District Courts and at least the Treehouse case
24   went up to the Federal Circuit and the Federal Circuit
25   said a number of things including the fact that
```

1

2   Keurig's theory was in direct violation of Supreme

3   Court precedent in the *Quanta* case, and said, and I

4   quote, "Keurig is attempting to impermissibly restrict

5   purchasers of Keurig brewers from using non-Keurig

6   cartridges by invoking patent law to enforce

7   restrictions on the post-sale use of its patented

8   product."  It called it a tactic that the Supreme

9   Court had explicitly admonished.

10          There is no question that this claim --

11          THE COURT:  Hold on a second, before you go on

12   could you just, I don't know if it's in your letter,

13   can you give me the cite for the Federal Circuit case

14   if you have it handy?

15          MR. BADINI:  I have the case, it's 732 Fed.3d

16   1370, *Keurig, Inc. v. Sturm Foods,* which is one of the

17   Treehouse plaintiffs.

18          THE COURT:  Okay.  All right, thank you, go

19   ahead.

20          MR. BADINI:  The standard for proving that

21   cause of action is simple, we, as plaintiff, have to

22   show in the sham litigation claim, that the litigation

23   which ended was brought in objective bad faith and

24   subjective bad faith. So it was objectively baseless

25   and subjectively baseless. There is no reasonable

1

2  debate that the subjectively baseless claim has

3  injected into that cause of action the good faith or

4  lack of good faith of Keurig in bringing that

5  litigation. That is now a part of this case.

6          And interrogatory number 8 simply asks the

7  question what facts are you relying on, or did you

8  rely on, in bringing that lawsuit, what historical

9  facts, to use Your Honor's term, and are you relying

10  on a legal opinion, yes or no?  They won't even tell

11  us if they're relying on a legal opinion, yes or no.

12          I heard Ms. Brannon today say that if you rely

13  on historical facts to support your intent, which they

14  have to tell us if they're doing or not in response to

15  our sham litigation claim, if you're relying on

16  historical facts you necessarily waive privilege as to

17  any legal opinions. So that's why we have to know if

18  there's any legal opinions and we have to know if

19  they're relying on any historical facts. If they are,

20  we can come back to Your Honor and argue the waiver

21  point.

22          But I think it's an excellent idea what the

23  Court suggested, that the Court set a deadline for

24  both sides to say are you relying on any attorney

25  opinions or attorney communications for any claim or

1                                                           63

2  defense in this case. And we encourage that order, but

3  I only hesitate to point out that that order doesn't

4  get us all the way home with interrogatory number 8.

5  Because not only do we want to know whether there's

6  any legal opinions, we need to know what facts are

7  they relying on in support of those lawsuits which

8  were summarily dismissed by the Federal Circuit.

9           And I guess the only point of my supplementing

10  today is to point out there has to be one set of rules

11  for both sides. If JBR has found to have been waived

12  legal opinions because they rely on facts, then the

13  same set of rules have to apply to Keurig. If they

14  rely on facts and there are legal opinions on the same

15  subject, in an attempt to show their good faith

16  they've waived.

17           THE COURT:  Well, I'm not sure that everything

18  you said follows. Let me just, I'm not sure we have a

19  disagreement here. I mean with respect to the 43(A)

20  claim that I was discussing earlier, I suppose there

21  are at least two defenses. One defense is my

22  advertising is 100 percent accurate, okay.  What I say

23  about my product is one of the true characteristics my

24  product has. A second defense, which may or may not be

25  a defense, the case law is, some may deem it unclear,

1                                                    64

2   is good faith.  If one is relying on historical facts,

3   we've done tests and our tests categorically show that

4   Ivory Soap is 99.44 percent pure, and our advertising

5   to that effect is accurate advertising, I don't think

6   by any stretch of the imagination relying on that type

7   of historical fact would implicate good faith.  Do you

8   disagree?

9            MR. BADINI:  Well that's not what Keurig said

10  today, I heard Ms. Brannon to say that in an assertion

11  of good faith if you rely on the, you used the example

12  of the pod in the compost heap, and if you rely on a

13  witness saying after six months or so the pod was

14  gone, does that waive legal opinions on that same

15  subject, I heard Ms. Brannon say yes. And all I'm

16  saying is if it's true --

17           THE COURT:  Well she said yes, whether or not

18  I find her argument persuasive is still up in the air.

19           MR. BADINI:  Okay.  But we don't need, at

20  least as far as --

21           THE COURT:  But let me come back to my

22  example, I mean if the claim were against Ivory Soap

23  and Ivory Soap in its defense says we have done a

24  bazillion lab tests and the lab tests all show that

25  Ivory Soap is, in fact, 99.44 percent pure, and that's

1
2    our defense to, you know, some other company's 43(A)
3    claim, would that defense by Ivory Soap implicate the
4    advice of counsel in any way, shape or form?
5             MR. BADINI:  Not necessarily, Your Honor. But
6    if you change the hypothetical to one that you used
7    earlier and say I spoke to my counsel and without
8    telling you what he or she said I felt more
9    comfortable --
10            THE COURT:  Now that I think clearly is an
11   indirect assertion that the attorney said was okay to
12   do whatever the conduct was. But, no, I mean if the
13   defense to a 43(A) claim is the objective accuracy of
14   the advertising, I don't think that gets into advice
15   of counsel in any way, shape or form.
16            MR. BADINI:  I think that's correct, Your
17   Honor.
18            THE COURT:  Okay.
19            MR. BADINI:  But I have a couple of points.
20            THE COURT:  Okay.
21            MR. BADINI:  One is I don't think you need to
22   reach from the Treehouse interrogatory 8 point, I
23   don't think you need to reach waiver yet. We haven't
24   briefed waiver. All we want is a response to our
25   interrogatory. And as part of that response they

66

should disclose the facts and whether there is a legal

opinion.  They can say there's a legal opinion but

we're not relying on it, that's fine, or they can say

there's a legal opinion and we are relying on it.

That's all, we just need to know one way or the other.

Thank you, Your Honor.

THE COURT:  All right.  And since that was in

the nature of supplementation of plaintiff's position,

I don't think I need a response now, that's something

you're going to respond to in your letter.  That was

effectively a response, a supplement to his letter of

yesterday.

MS. NEWTON:  That sounds, that's how I

understood it, Your Honor.

THE COURT:  Yes, okay.  All right, great.  All

right, anything else from plaintiff's side?

MR. MOORE:  No, Your Honor.

THE COURT:  Anything else from defendant's

side?

MS. BRANNON:  No, Your Honor.

THE COURT:  Do counsel, I just want to try to

anticipate, which may be a dangerous thing to do,

anticipate an issue, there were, the letter that I got

from Keurig on Friday referenced two depositions, is

67

there an issue with respect to allocation with respect

to, I think it was Staples was the other deposition?

MS. BRANNON:  Yes, Your Honor, there is.

THE COURT:  I'm inclined, well is there a

reason to depart from what I did yesterday with

respect to Office Essentials I think it was?

MS. BRANNON:  We believe there is, Your Honor.

THE COURT:  Go ahead.

MS. BRANNON:  And I would say on the Corporate

Essentials deposition obviously we read your order and

it is going forward this morning. We are disappointed,

there are nine lawyers who are actively taking

depositions for Keurig, three are in this courtroom

because we were scheduled to argue on pending issues,

one is on a plane to New Orleans for the Reilly Foods

deposition tomorrow in this matter, one is in South

Carolina for the Hartley deposition also in this

matter, two are in court on other matters, and one is

on call for jury duty. So that left Ms. Danzig, who

had to change her vacation plans and an international

flight to New York to handle the deposition. And we

certainly understand things happen. We do believe that

Federal Rule 32(A)(5) has a default minimum of 14 days

notice for good reason and we would note that the

68

1

2  parties here agreed to give 14 days notice, that

3  didn't happen here.

4           THE COURT:  Is there an issue with regard, I

5  mean what is your application with respect to Staples,

6  I thought the issue was allocation with respect to

7  Staples, is it something else?

8           MS. BRANNON:  No, it is allocation as to

9  Staples, I was just speaking to the Corporate

10 Essentials Deposition. We do think --

11          THE COURT:  Okay, but that I've already ruled

12 on, okay?

13          MS. BRANNON:  Okay.

14          THE COURT:  So that one is done. I realize,

15 you know, I realize, you know, the only thing I can do

16 where both sides leave happy are marriages, so go

17 ahead.

18          MS. BRANNON:  We believe with the close of

19 fact discovery six months out there is room for

20 professional courtesy and cooperation.

21          THE COURT:  But tell me about the allocation

22 issue on Staples, okay?

23          MS. BRANNON:  Okay.  So as to Staples, we

24 believe that it makes sense to split time evenly

25 between the two sides and we understand that as to

1

2  Corporate Essentials Your Honor's instruction is that

3  the plaintiff's side gets four and a half hours and

4  then Keurig will get two and half hours and then if

5  the witness chooses to say longer then Keurig can have

6  more time, if the witness chooses to call it a day

7  exactly at seven hours, then Keurig can come back to

8  the Court. And we understand that Your Honor may be

9  willing to order third parties to sit for more hours,

10  you know, Keurig does really want to minimize burden

11  on third parties. Corporate Essentials is not one of

12  our partners, we want to minimize burden on them, as

13  well, but we also want to minimize burden on our

14  partners.  Staples is an important partner. You know,

15  with all of these partners we don't want to be in a

16  position of motions practice and dragging them into

17  court if they don't want to sit for longer than seven

18  hours. So it's not a light thing to do.

19          We do believe that the best approach here

20  would be for the sides to cooperate and where both

21  sides need a substantial amount of time, the fair

22  approach would be to split that evenly. And in their

23  letter, plaintiffs said that there are five separate

24  groups and, therefore, they need more time. And we

25  didn't want to file the day before this hearing a long

70

point by point response to that. But to the extent

that there's variation between the cases, different

issues like class certification or damages, Keurig has

to respond to all five of those cases. So we believe

that these even split is fair, that's what Your Honor

did for the overall allocation of party deposition

time and we continue to think that makes sense.

Also, Your Honor's order focused on cross

examination and making sure that Keurig has adequate

time for cross examination on plaintiff's topics. But

with these witnesses, we do have affirmative testimony

that we seek that may be on topics that plaintiffs are

choosing not to explore because they're not good for

plaintiffs and we don't think two and a half hours

with Staples, which is a major partner referenced in

both of the competitor complaints, we don't think two

and a half hours allows us adequate cross examination

and affirmative testimony.

THE COURT:  Is Staples in a friendly

relationship with Keurig? The reason I ask the

question, I mean, I presume at some point a summary

judgment motion is going to be made in this case and,

you know, the law is a witness can't contradict in an

affidavit the witness' testimony given at a

1

2  deposition. If there's a conflict between a witness'

3  summary judgment affidavit and the deposition

4  testimony, the deposition testimony trumps the

5  affidavit.  But as far as I understand the law there's

6  no prohibition about submitting an affidavit from a

7  witness that goes beyond what the witness testified to

8  in her or her deposition. In other words, if a witness

9  is not asked about a topic at the deposition, as far

10  as I understand the law there's nothing that prohibits

11  a party from submitting an affidavit from the witness

12  addressing topics not addressed in the deposition.

13         MS. BRANNON:  I would not bank on anyone --

14         THE COURT:  But let me come back to my

15  question, I mean is Staples a friendly witness to

16  Keurig or --

17         MS. BRANNON:  I don't think they're either

18  friendly or actively hostile. I don't think that

19  they're prepared to do us favors or, they've been very

20  clear that they have no intent to sit beyond seven

21  hours and that they will do what they need to do to

22  protect their right. So if we go in and it's four and

23  a half hours for plaintiffs, two and a half hours for

24  Keurig, I think they're not going to choose to grant

25  extra time because they like us. I mean they'll make a

72

1
2  decision about how much motion practice will cost them
3  and what's in their interest, but I think they'll make
4  their own decision about that. But I would not want to
5  place a bet that they're going to necessarily give a
6  minute past seven hours.
7          THE COURT:  Well, you know, sort of the
8  practical realities are though, I mean, look, if you
9  get two and a half hours and you need another hour,
10  you know, look, Staples can do, the third parties, any
11  third party can do what it believes is appropriate.
12  But, you know, the transaction cost over a motion to
13  compel a third party to sit for another hour, just the
14  transaction cost of the motion is going to far exceed
15  whatever burden sitting for another hour would impose.
16  But Staples will make its own decision in that regard
17  I think.
18          MS. BRANNON:  Yeah, I think it's their own
19  decision and they're making a decision about whether
20  Keurig wants to pull them into Court. Does Keurig want
21  to go, you know, go into motion practice against their
22  partner. And so if the dynamic is whoever notices
23  first gets four and a half hours and the other party
24  gets two and a half and then gets to choose if they
25  want to take it to Court, you know, that sets up a

1

2  very bad dynamic, Keurig does not want to be --

3        THE COURT:  Is Corporate Essentials and

4  Staples pretty much in the same position? I mean with

5  respect to the litigation, with respect to this action

6  are Corporate Essentials and Staples pretty much

7  counterparts, do they play the same role in this

8  litigation?

9        MS. BRANNON:  No, I would put them in

10  different buckets.

11        THE COURT:  How are they different?

12        MS. BRANNON:  Corporate Essentials is a former

13  KAD, a former Keurig Authorized Distributor, they left

14  Keurig's network years ago and they're actively doing

15  what plaintiff's say is impossible which is they're

16  selling Keurig brewers and also other brewers and

17  Keurig portion packs without having a direct

18  relationship with Keurig. They're friendly with

19  plaintiffs.  Plaintiffs have been doing all the

20  interfacing with Corporate Essentials so they're, but

21  they're a distributor. When they left Keurig's network

22  they partnered up with another competitor who is not

23  in this litigation.  There are many portion pack

24  competitors who are not in this litigation, and so

25  they've been working with other multiple portion pack

74

competitors and they're also selling Keurig's packs.
So they're the distributor and Staples is, they
distribute but they are also a major retailer and --

THE COURT:  They distribute what?

MS. BRANNON:  They're a retailer, as well,
Staples has retail stores.

THE COURT:  No, but are they an authorized
distributor?

MS. BRANNON:  Staples, I believe, is still a
Keurig authorized, well maybe not, I can't tell, Mr.
Badini is shaking his head.  I think they are still a
Keurig partner.

THE COURT:  If Staples is not, are they then
in the same position as Corporate Essentials?

MS. BRANNON:  I believe Staples is still a
Keurig partner.

THE COURT:  Well, and when is the Staples
deposition scheduled for?

MS. BRANNON:  I believe it's June 7, but
someone can correct me about that one.

MR. MOORE:  It is June 7, Your Honor.

THE COURT:  June 7.  Well, all right, and
you're suggesting three and a half and three and a
half for Staples?

                                                                75

  1
  2                MS. BRANNON:  Yes, Your Honor.

  3                THE COURT:  All right, anything else you want

  4   to tell me about the allocation on the Staples'

  5   deposition?

  6                MS. BRANNON:  No, Your Honor.

  7                THE COURT:  Okay.

  8                MR. BADINI:  May I be heard on that issue,

  9   Your Honor?

 10                THE COURT:  Sure.

 11                MR. BADINI:  Your Honor has already rejected

 12   this even allocation proposal at least twice, perhaps

 13   three times.  The plaintiffs, the defendants, rather,

 14   are trying to have it both ways.  I don't believe

 15   they've noticed a single third party deposition, they

 16   can correct me if I'm wrong, and the reason they

 17   haven't done that is they don't want to annoy their

 18   partners, and most of these third parties are their

 19   partners.

 20                If Staples is really critical to them, they

 21   should have noticed it or cross-noticed it.  In cases

 22   where we've had partners or former partners that have

 23   been important to our case, we've noticed them or

 24   cross-noticed them. And then they can take, and then

 25   we can take the appropriate time. I find it personally

76

offensive to hear Ms. Brannon say that that we have

not cooperated with them.  I recently sat across from

her with a third party deposition who was an ex-

Treehouse employee. They noticed him, we knew he was

important to our case, so we cross-noticed him and we

asked him to be there for two days. Ms. Brannon

estimated she needed six hours of questioning, I

estimated I needed five, so I figured that she would

be done at the end of the first day and I would start

the morning of the second day. In fact, Ms. Brannon

went nine hours, I didn't start my cross examination

until lunch the second day. Actually, not my cross

examination, excuse me, my cross-noticed deposition.

And even though I had estimated five hours, I took two

and a half hours.  And I didn't cut her off at seven,

I didn't say you're done, because those aren't the

rules governing this case.

So we've been cooperating and I think an

arbitrary time limit is wrong. And if they really

think someone is important, they should cross-notice

the deposition or notice it in the first place.

MR. MOORE:  Your Honor, I'd also like to be

heard for JBR.

THE COURT:  Go ahead.

1                                                              77

2              MR. MOORE:  Since we were the ones who noticed

3    the Staples deposition.  With respect to just the

4    background as to the importance of this deposition and

5    whether Staples is friendly to Keurig, I would note

6    that Staples is a very important third party from the

7    perspective of Rogers as well as I think for the other

8    plaintiffs. Staples' relationship with Keurig dates

9    back over ten years. They have been both a KAD for

10   Keurig subject to an agreement that prevented them in

11   certain sales channels from selling any unlicensed

12   pods with respect to the office coffee services

13   market. So they're important with respect to that.

14              They're also important because they are a big

15   box retailer. They were presented with the Keurig 2.0

16   innovation rollout presentation back in 2014, and they

17   have remained a Keurig, they have remained a seller of

18   Keurig pods to this day. In 2017 the entered into an

19   extremely unusual agreement in which they agreed to stop

20   selling any unlicensed pods on the retail side, on the big

21   box side.  And so the deposition is intended to explore

22   the extent to which Keurig pressured Staples to enter into

23   this exclusive arrangement which happened while this

24   litigation was pending in a brand new agreement in late

25   2017, which then caused staples to tell Rogers that it

1

2  would no longer carry Rogers' one cup pods, and I think

3  any unlicensed pods.

4        So this is a very important deposition, it

5  covers a very long timeframe, and a number of

6  different agreements and a number of -- and multiple

7  market segments.  So when we noticed the deposition we

8  noticed it for 5.5 hours for all five plaintiffs

9  groups.  We then worked with Keurig and agreed to

10  lower our estimate to 4.5 hours for all five

11  plaintiffs groups with Keurig getting 2.5 hours and we

12  think that's fair because when we look at other

13  depositions of third parties that have occurred to

14  date, Keurig has typically taken an hour or two or

15  three less than plaintiffs to question the witness.  A

16  default rule here would likely just result in a

17  situation where plaintiffs, all five groups, get 3.5

18  hours, then Keurig decides to take an hour or two and

19  then plaintiffs are cut off.  And that's inappropriate

20  here, particularly for Staples, given the long

21  history.

22        We understand Staples is presenting the buyer

23  who has been on the account for over ten years and has

24  a very long timeframe of reference.  And so the notion

25  that Keurig isn't friendly with Staples when they

1                                                    79

2  recently negotiated an exclusive arrangement that

3  kicked out all the unlicensed pod makers, I think if

4  Keurig wanted to get further testimony from Staples

5  they certainly could.  Thank you.

6          THE COURT:  Okay.  Does plaintiff want to

7  offer anything, or defendant want to offer anything

8  further on this, excuse me?

9          MS. BRANNON:  Yes, Your Honor.  We would

10 propose that if we don't use, if Your Honor were to

11 split the time three and a half, split it evenly by

12 five and Keurig doesn't use the time, it would refer

13 it back to plaintiffs if they need more time and were

14 still within the seven hour deposition. I don't think

15 the fact that Keurig has used less time in third party

16 depositions is something to hold against us. I think

17 it shows that we're trying to be very efficient and

18 we're not wasting time. I mean plaintiffs have not

19 argued that we're asking duplicative or inefficient

20 questions. Mr. Badini did complain about me missing my

21 estimate in the deposition of Mr. Lemieux (phonetic)

22 but he didn't say any of the questions were

23 duplicative or unnecessary.  Plaintiffs have certainly

24 gone over the time they've estimated at numerous

25 Keurig depositions quite substantially. So, you know,

80

1

2  we're not planning to ask any questions that we don't

3  think are important but Staples is referenced in the

4  two competitor complaints and we need to defend

5  ourselves against these claims.

6         THE COURT:  Where is Staples being deposed?

7         MS. BRANNON:  Sorry?

8         THE COURT:  Where is Staples being --

9         MS. BRANNON:  I believe in Boston.

10        THE COURT:  Boston, okay.  So if there's an

11 application, in the absence of Staples' consent, an

12 application to extend the deposition will be made in

13 the district of Massachusetts?

14        MS. BRANNON:  I believe it can be, well I

15 believe we could come to you, Your Honor, or Staples

16 could go to the Court in Massachusetts --

17        THE COURT:  I mean was it issued as a Southern

18 District Subpoena or District of Massachusetts

19 subpoena or something else?

20        MR. MOORE:  It was issued as a Southern

21 District subpoena, Your Honor.

22        THE COURT:  Okay.  All right, I'm sorry, I

23 interrupted you, go ahead.

24        MS. BRANNON:  Thank you, Your Honor.

25        THE COURT:  Again, I like to give both sides

1

2  an equal number of chances to be heard, do plaintiffs

3  want to add anything?

4          MR. MOORE:  Your Honor, I would add, yes, so

5  Staples has been, although the subpoena was recently

6  noticed, Staples has been on the list of potential

7  deponents for several months so the raising of this

8  issue at this late date strikes me as suspect when

9  Keurig has obviously had plenty of time to ask its

10  major retail partner how it wants to split the time

11  allocation.

12          The counsel for Staples --

13          THE COURT:  I suspect Staples doesn't want to

14  split it at all, I suspect Staples doesn't want to be

15  deposed.

16          MS. BRANNON:  You're right, Your Honor.

17          MR. MOORE:  Well, Your Honor, Staples is

18  represented by Kirkland and Ellis and they did agree

19  to sit for a full day deposition and have noted they'd

20  be happy to start early if needed in the event that a

21  little more than seven hours was needed.

22          THE COURT:  Will Staples sit for eight.

23          MR. MOORE:  I don't know if they've said

24  they'll sit for eight.  I don't think they've taken a

25  position, but in any event, the issue to us appears to

82

1

2  be premature to hypothetically argue over how many

3  hours are needed when plaintiffs have already

4  indicated an intention to work with both Keurig and

5  Staples to make use of the day.

6       THE COURT:  How much time do you think you

7  need with Staples, Ms. Brannon?

8       MS. BRANNON:  I believe three and a half. And,

9  Your Honor, I think your prior order instructed us to

10 exchange time estimates as to nonparty depositions one

11 week in advance of the deposition. I think we're

12 exchanging our estimates and my understanding is that

13 Kirkland and Ellis, and I haven't spoken with them

14 directly, but my understanding is they've said they

15 are not willing to sit past seven hours. I can be

16 mistaken but I thought they had said they were willing

17 to do a full day seven hour deposition and that was

18 it.

19      THE COURT:  Allocating time at a deposition is

20 always a difficult thing to do, it's always going to

21 be somewhat arbitrary and a lot goes into how a

22 deposition goes forward. A lot depends on how quickly

23 the interrogating attorneys ask the questions, how

24 long the witnesses take to answer the questions,

25 whether or not the witness' testimony is surprising

83

1

2  and opens an area that counsel hadn't known about

3  before prompting further questions. A lot goes into

4  the timing of the deposition here.

5          You think you need three and a half and how

6  much time do the plaintiffs think they need, do you

7  think you need four and a half?

8          MR. MOORE:  That's correct, Your Honor.

9          THE COURT:  Well, all right, I'm not sure

10  there is any non-arbitrary way to really do this but I

11  think what I'm going to do with Staples is set the

12  presumptive limits at four and three, so both sides

13  are losing half an hour of what they think they need.

14  The presumptive limits are going to be four hours for

15  plaintiff, three hours for the defendant.

16          Again, I would suggest that, you know, again,

17  with the proviso that if there are areas that either

18  side doesn't get to cover within their presumptive

19  time limits they can make an application to extend the

20  deposition.  Again, you know, Kirkland and Ellis also

21  has an abundance of talented attorneys and I'm sure

22  they realize that the transaction cost of sitting for

23  another hour is far less than the transaction cost of

24  engaging in motion practice. So maybe if eight hours

25  is the aggregate time that both sides need, maybe

84

there can be an accommodation on the part of Staples

to have their witness sit for eight hours rather than

engage in motion practice. All right, so the

presumptive limits are four hours for plaintiff and

three hours for the defendant on the Staples

deposition.

       Okay, anything else from plaintiff's side?

       MR. MOORE:  No, Your Honor.

       THE COURT:  Anything else from defendant's

side?

       MS. BRANNON:  No, Your Honor, thank you.

       THE COURT:  Okay, thank you, all, have a good

one.

       (Whereupon the matter is adjourned.)

```
 1                                                        85

 2                   C E R T I F I C A T E

 3

 4          I, Carole Ludwig, certify that the foregoing

 5  transcript of proceedings in the United States District

 6  Court, Southern District of New York, In re: Keurig Green

 7  Mountain Single-Serve Coffee Antitrust Litigation, Docket

 8  #14md2542, was prepared using PC-based transcription

 9  software and is a true and accurate record of the

10  proceedings.

11

12

13

14
                             Carole Ludwig
15  Signature_____

16

17  Date:  May 30, 2019

18

19

20

21

22

23

24

25
```