**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————————— x

IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE
COFFEE ANTITRUST LITIGATION

*This Relates to the Indirect-Purchaser Actions*

:
:
:
:
:

x

No. 1:14-md-02542 (VSB)
No. 1:14-mc-02542 (VSB)

 

 

**THIRD CONSOLIDATED AMENDED INDIRECT PURCHASER**

**CLASS ACTION COMPLAINT**

<u>**DEMAND FOR JURY TRIAL**</u>

# TABLE OF CONTENTS

Page

I. NATURE OF THE ACTION .................................................................................................1

    A.    Portion Pack Brewers ...........................................................................................2

    B.    Keurig Compatible Cups .......................................................................................2

         (i)    Keurig K-Cups ........................................................................................2

         (ii)  Cup Competitors and Competitive Cups .................................................3

    C.    Coffee ....................................................................................................................4

    D.    Machinery and Components ..................................................................................5

    E.    Distribution and Retail .........................................................................................6

    F.    Effects ...................................................................................................................7

II. PARTIES .............................................................................................................................9

    A.    Plaintiffs ................................................................................................................9

    B.    Defendant ............................................................................................................18

    C.    Agents and Co-Conspirators ...............................................................................19

III. JURISDICTION AND VENUE .......................................................................................20

IV. RELEVANT MARKETS ..................................................................................................21

    A.    Relevant Product Market:  The Manufacture, Distribution, and Sale of Portion Pack Brewers .....................................................................................................21

    B.    Relevant Product Market: The Manufacture, Distribution, and Sale of Keurig Compatible Cups ...............................................................................................24

    C.    Relevant Geographic Market: The United States ...............................................27

V. INTERSTATE AND INTRASTATE COMMERCE .........................................................27

VI. FACTS BEHIND THE SCHEME TO CONTROL, RESTRAIN, EXCLUDE, AND ELIMINATE COMPETITION IN THE SALE OF KEURIG COMPATIBLE CUPS ................28

    A.    GMCR Acquired Control Over Keurig K-Cup Technology ................................28

    B.    Keurig Systematically Acquired Competing Major Coffee Brands for Use in Keurig Compatible Cups .....................................................................................29

    C.    Keurig Substantially Raised K-Cup Prices Twice in the Middle of an Economic Downturn for a Total Increase of Between 19% and 28% Without Sustaining Any Material Loss of Market Share ..................................................30

    D.    Keurig Used Patent Litigation as Part of Its Overall Plan To Monopolize and Restrain Competition ...................................................................................30

         (i)    The TreeHouse Patent Infringement Case ............................................30

         (ii)  The Rogers Family Patent Infringement Case ......................................31

    E.    Keurig Announces Lock-Out Technology That Will Prevent Competitive Cups from Working in Keurig Portion Pack Brewers ................................................32

VII. UNLAWFUL CONDUCT ...............................................................................................33

# TABLE OF CONTENTS

Page

A. Keurig Entered Into Exclusionary Agreements to Block Cup Competitors from Being Able to Enter or Meaningfully Compete in the Keurig Compatible Cup Market ................................................................................................... 33

    (i) Keurig Entered into Anticompetitive Agreements with Suppliers of Machinery Used To Manufacture Traditionally-Designed Keurig Compatible Cups ....................................................................................... 33

    (ii) Keurig Blocked Components Used To Manufacture Keurig Compatible Cups     34

B. Keurig Conspires with Its Horizontal Roaster Competitors to Preserve and Expand Keurig's Market Position by Restraining Competition and Foreclosing Competitors' Access to Roaster Competitors' Products, Business, and Distribution Channels ................................................................................. 35

C. Keurig Enters into Unlawful Agreements with Distributors and Retailers to Preserve and Expand Keurig's Market Position by Foreclosing Cup Competitors' Access to Distribution and Retail Channels .......................... 40

D. Keurig Uses Its Market Power in the Portion Pack Brewer Market to Coerce Purchasers of Keurig Portion Pack Brewers to Purchase Only Keurig K-Cups, or at Least to Not Purchase and Sell Competitive Cups ................................ 45

E. Keurig's Unlawful Conduct Has Harmed and Will Continue to Harm Competition and Consumers in the Keurig Compatible Cup Market ...................... 46

VIII. CLASS ALLEGATIONS ..................................................................................... 46

A. Nationwide Class Under the Laws of the State of Vermont for Monetary, Equitable, and Injunctive Relief, and Under Federal Law for Injunctive Relief Only .............................................................................................................. 47

B. State Law Indirect-Purchaser Classes ......................................................... 48

IX. CLAIMS FOR RELIEF ........................................................................................ 63

FIRST CLAIM FOR RELIEF ...................................................................................... 63

Vermont Antitrust Violations ...................................................................................... 63

SECOND CLAIM FOR RELIEF .................................................................................. 65

Vermont Unlawful Tying Violations ........................................................................... 65

THIRD CLAIM FOR RELIEF ..................................................................................... 67

Violation of Vermont Common Law Unjust Enrichment ............................................ 67

FOURTH CLAIM FOR RELIEF .................................................................................. 67

Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 .......................................... 67

FIFTH CLAIM FOR RELIEF ...................................................................................... 69

Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 .......................................... 69

SIXTH CLAIM FOR RELIEF ...................................................................................... 71

Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 3 of the Clayton Act, 15 U.S.C. § 14 ..................................................................................................... 71

# TABLE OF CONTENTS

Page

SEVENTH CLAIM FOR RELIEF ....................................................................................72

Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ..............................................72

EIGHTH CLAIM FOR RELIEF ......................................................................................74

Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 ..............................................74

NINTH CLAIM FOR RELIEF ........................................................................................75

Violation of Other State Antitrust and Unfair Competition Laws ....................................75

Arizona ..............................................................................................................................76

California ...........................................................................................................................77

District of Columbia ..........................................................................................................81

Iowa ...................................................................................................................................82

Kansas ...............................................................................................................................82

Maine .................................................................................................................................84

Michigan ............................................................................................................................85

Minnesota ..........................................................................................................................86

Mississippi .........................................................................................................................87

Nebraska ............................................................................................................................88

Nevada ...............................................................................................................................89

New Hampshire ..................................................................................................................90

New Mexico .......................................................................................................................91

New York ...........................................................................................................................92

North Carolina ...................................................................................................................93

North Dakota ......................................................................................................................94

Oregon ...............................................................................................................................95

Rhode Island ......................................................................................................................96

South Dakota ......................................................................................................................97

Tennessee ...........................................................................................................................97

West Virginia .....................................................................................................................99

Wisconsin .........................................................................................................................100

TENTH CLAIM FOR RELIEF .....................................................................................101

Violation of State Consumer Protection & Unfair Trade Practices Laws ......................101

Arkansas ...........................................................................................................................101

California ..........................................................................................................................102

Maine ...............................................................................................................................103

Massachusetts ..................................................................................................................103

# TABLE OF CONTENTS

Page

Missouri ........................................................................................................................104

Nebraska .......................................................................................................................105

New Mexico ..................................................................................................................106

North Carolina ..............................................................................................................106

Rhode Island .................................................................................................................107

ELEVENTH CLAIM FOR RELIEF ............................................................................108

Violation of State Common Law Unjust Enrichment Laws ..........................................108

Arizona .........................................................................................................................108

Arkansas .......................................................................................................................108

District of Columbia .....................................................................................................109

Iowa ..............................................................................................................................110

Kansas ...........................................................................................................................111

Maine ............................................................................................................................111

Massachusetts ...............................................................................................................112

Michigan .......................................................................................................................113

Minnesota ......................................................................................................................113

Mississippi ....................................................................................................................114

Missouri ........................................................................................................................115

Nevada ..........................................................................................................................115

New Hampshire .............................................................................................................116

New Mexico ..................................................................................................................117

New York ......................................................................................................................117

Oregon ..........................................................................................................................118

Rhode Island .................................................................................................................119

South Dakota .................................................................................................................119

Wisconsin ......................................................................................................................120

JURY TRIAL DEMAND ..............................................................................................122

Plaintiffs Wasif Bala, Yelda Mesbah Bartlett, Lavinia Simona Biasell, Linda Bouchard, Bouchard & Sons Garage, Inc., Luke Cuddy, Jonna Dugan, Erin Dunbar, Larry Gallant, Denise Gilmore, Patricia Hall, Jennifer Harrison,  Teena Marie Johnson, Lori Jo Kirkhart, Kori Lodi, Vivid Hair Studio LLC, Wauneta Dibbern, John Lohin, Angus Macdonald, Edgar Medina, Jennifer Mileikowsky, Brier Miller Minor, David W. Nation, Patricia J. Nelson, Julie Rainwater, Betty Ramey, Lauren Jill Schneider, Shirley Anne Schroeder, Jason and Amy Stratman, and Toni Williams ("Plaintiffs"), on their own behalf and on behalf of all others similarly situated, bring this action for damages and injunctive relief against Defendant Keurig Green Mountain, Inc. ("Keurig" or "Defendant").  Plaintiffs, by and through their undersigned counsel, allege as follows upon personal knowledge as to their own conduct, and upon information and belief as to all other matters, the bases of which are the investigation of their counsel, public filings, other publicly available documents, news reports, and documents filed in other cases now consolidated or coordinated into *In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, No. 14-MD-002542 (VSB) ("Related Actions").

## I. NATURE OF THE ACTION

1.    This case is about a company—Keurig—that has engaged in anticompetitive conduct that has harmed, and continues to harm, consumers who make hot beverages using Portion Pack Brewers manufactured and sold by Keurig.

2.    Keurig's anticompetitive conduct ranges from conspiring with its major horizontal competitors in the coffee roasting business, engaging in extensive contracts in restraint of trade throughout the supply chain, tying sales of its Portion Pack Brewers to sales of its portion packs, and monopolization.

3.    By entering into an extensive web of anticompetitive written agreements with co-conspirators and participants throughout the supply chain, Keurig has gained control over every aspect of the Keurig Compatible Cup Market (as defined below), enabling Keurig to exclude competition from this market.

4.      Keurig's anticompetitive conduct has limited, foreclosed, or otherwise harmed competition in the Keurig Compatible Cup Market, resulting in supracompetitive pricing to consumers and limiting consumer choice.

**A.     Portion Pack Brewers**

5.      Portion Pack Brewers ("Portion Pack Brewers") are machines designed to be capable of brewing a variety of hot beverages, such as coffee, tea, and hot chocolate, in predefined portions from sealed portion packs.  Unlike traditional hot-beverage brewers, Portion Pack Brewers are a speedy, convenient, and tidy way of brewing hot beverages.  For example, a user can make a cup of coffee in less than one minute without having to grind beans, measure coffee grounds, insert a filter, or clean up after this process.

6.      Portion Pack Brewers use a portion pack that holds coffee grounds and other material for brewing hot beverages.  Portion packs come in many different forms such as cartridges, disks, or cups.

7.      █████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████

**B.     Keurig Compatible Cups**

8.      The only type of portion packs that will work in the Keurig Portion Pack Brewer are referred to as "Keurig Compatible Cup(s)."

**(i)    <u>Keurig K-Cups</u>**

9.      Keurig Compatible Cups that are made or licensed by Keurig are referred to as "Keurig K-Cup(s)."

10.     Keurig presently dominates and controls approximately 95%,  of the United States market for the manufacture, distribution, and sale of Keurig Compatible Cups with its Keurig K-

Cups.  In the wake of the expiration of the patents Keurig held on its Keurig K-Cups, its share fell as low as 86%, but it has since risen sharply due in substantial part to the conduct complained of herein.

### (ii) Cup Competitors and Competitive Cups

11.     The remaining 5% of the market for Keurig Compatible Cups consist of "Cup Competitors," meaning persons or entities (other than Keurig, its licensees, or customers) that make, distribute, or sell Keurig Compatible Cups.

12.     Portion packs made, distributed, or sold by Cup Competitors for use in Keurig Portion Pack Brewers are referred to herein as "Competitive Cups."

13.     There are very few Cup Competitors, none of which also compete with Keurig for the sale of Portion Pack Brewers.

14.     While some Cup Competitors report that their Competitive Cups can cost substantially less than Keurig K-Cups, contain high-quality coffee, and offer other features that consumers may prefer,  Cup Competitors cannot obtain meaningful market share and are otherwise unable to discipline Keurig's supracompetitive prices due to Keurig's unlawful conduct and insurmountable cumulative illegal barriers to entry.

15.     The fact that Keurig is able to maintain its market share and supracompetitive prices in the face of lower-priced and high-quality alternatives exemplifies Keurig's market power and the effectiveness of its scheme to exclude competition from the Keurig Compatible Cup Market.

16.     As a result of Keurig's anticompetitive conduct, Cup Competitors have been substantially foreclosed from the Keurig Compatible Cup Market.

17.     But for Keurig's anticompetitive conduct, Cup Competitors would have been able to compete more effectively with Keurig and would have enjoyed a greater share of the Keurig Compatible Cup Market than they have presently, resulting in lower prices to consumers.

C.     **Coffee**

18.     Through its Green Mountain Coffee Roasters division (Keurig's original sole line of business), Keurig is and has been in the coffee-roasting and coffee-processing business, which involves, among other things, the purchase, roasting, and processing of coffee beans and other raw materials for packaging and sale of Keurig K-Cups to distributors, wholesalers, retailers, and consumers.

19.     In order to reduce and restrain competition in the business of roasting and supplying coffee for Keurig Compatible Cups, in recent years Keurig has systematically acquired many of its major coffee-roaster competitors, including, among others, Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LNH Holdings, Inc. (Van Houtte).

20.     In order to control and further reduce the threat of competition in the business of roasting and supplying coffee and other hot-beverage products for use in Keurig Compatible Cups, Keurig has negotiated multi-year exclusionary horizontal licensing and manufacturing agreements with most of the other major coffee-roaster and hot-beverage competitors ("Roaster Competitors") that it did not acquire ("Roaster Agreements"). These Roaster Competitors include, among others: Starbucks Corporation ("Starbucks"); The Folgers Coffee Company ("Folgers"); International Coffee & Tea, LLC d/b/a The Coffee Bean & Tea Leaf ("Coffee Bean"); Millstone Coffee, Inc. ("Millstone"); Dunkin Brands, Inc. ("Dunkin' Donuts"); Cinnabon, Inc. ("Cinnabon"); Wolfgang Puck Coffee ("Wolfgang Puck"); Newman's Own Organics ("Newman's Own"); The Hain Celestial Group ("Celestial Seasonings"); Twinings North America, Inc. ("Twinings"); Gloria Jean's Gourmet Coffees Corp. ("Gloria Jean's"); and Bigelow Tea ("Bigelow"). These horizontal agreements prohibit Keurig's Roaster Competitors from doing business with Cup Competitors.

21.     At least 27 brands of coffee are owned by Keurig or controlled by Keurig through restrictive horizontal Roaster Agreements; these brands include substantially all of the major

coffee brands in the United States.  As a result, Cup Competitors cannot manufacture and sell Competitor Cups containing coffee bearing any of these brand names.

22.     These brands include the top seven coffee brands, according to a well-recognized consumer preference survey.  Therefore, if a consumer wants to purchase one of these top seven brands of coffee to use in his or her Keurig Portion Pack Brewer, the consumer has no choice but to buy a Keurig K-Cup.

23.     Pursuant to Keurig's agreements with its Roaster Competitors, the parties agree not to do business with any of Keurig's Cup Competitors in a number of ways.  First, the Roaster Agreements prevent anyone other than Keurig from using Roaster Competitors' coffee (or other hot beverage products) or brand names in connection with Keurig Compatible Cups; in this way, these agreements serve as exclusive supply arrangements.  Second, these agreements prevent anyone other than Keurig from accessing the Roaster Competitors' own distribution networks. The purpose of the Roaster Agreements is to exclude and restrain competition in the Keurig Compatible Cup Market and to maintain supracompetitive Keurig K-Cup prices for the common benefit of Keurig and its Roaster Competitors.

**D.     Machinery and Components**

24.     Keurig enters into exclusive supply arrangements with manufacturers of equipment and suppliers of components needed to produce Keurig Compatible Cups in the traditional design, *i.e.*, consisting of a plastic cup and foil lid.  The purpose of such agreements is to prevent actual or potential Cup Competitors from accessing the machinery and components generally needed to enter the Keurig Compatible Cup Market, preventing or delaying potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market.  Although it may be possible to design a Competitive Cup that does not rely upon such machinery or inputs, doing so requires additional investments of time and money, delaying potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market.

E.      **Distribution and Retail**

25.      In addition to relying on third-party distributors and retailers, Keurig also has its own distribution and retail network that it uses to sell its own branded products as well as those of others.  Keurig has entered into exclusive agreements with most of its horizontal distributor competitors ("Distributor(s)") that restrict, restrain, and reduce competition in the Keurig Compatible Cup Market.  In these agreements, Keurig conditions the sale of Portion Pack Brewers on the Distributor's agreement to buy, distribute, and sell Keurig K-Cups as well as the agreement not to purchase or sell Competitive Cups.  These agreements prohibit Keurig's Distributors from doing business with Cup Competitors.  The purpose of these agreements is to restrict, restrain, and reduce competition in the Keurig Compatible Cup Market, which in turn enables Keurig to maintain supracompetitive Keurig K-Cup prices.

26.      Keurig has also entered into restrictive agreements with its horizontal competitors at the retail level.  Keurig makes direct sales to consumers of Keurig Portion Pack Brewers and Keurig K-Cups through its online retail store available at http://www.keurig.com/Keurig-Store.  Keurig has exclusionary agreements with many of the major retailers that sell Keurig Portion Pack Brewers and Keurig Compatible Cups ("Retailer(s)").  In these agreements, Keurig conditions the sale of Portion Pack Brewers on the Retailer's agreement to buy, distribute, and sell Keurig K-Cups as well as the agreement not to purchase or sell Competitive Cups.  The purpose of these agreements is to restrict, restrain, and reduce competition and maintain supracompetitive Keurig K-Cup prices.

**F.      Effects**

27.      Keurig has acquired, controlled, dominated, monopolized, and restrained the Keurig Compatible Cup Market, causing harm to consumers, through the following anticompetitive acts, among others:

       (a)      By entering into exclusive supply arrangements with manufacturers of equipment and suppliers of components needed to produce traditionally-designed Keurig Compatible Cups to deter or foreclose potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market;

       (b)      By entering into multi-year exclusive agreements with Roaster Competitors to lock up substantially all of their coffee (including tea, cocoa, and other hot-beverage products) for use in Keurig Compatible Cups and preventing them from doing business with Cup Competitors, collectively constituting a concerted refusal to deal with Cup Competitors (*i.e.*, a group boycott);

       (c)      By entering into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors; and

       (d)      By using its market power in the Portion Pack Brewer Market to coerce purchasers of Keurig Portion Pack Brewers to purchase only Keurig K-Cups, or at least not purchase Competitive Cups.

28.      The distribution channel for Keurig K-Cups is not complex, generally involving only one or two intermediaries between Keurig and the end-user consumer Plaintiffs.

29.      Keurig K-Cups are not component parts of a larger consumer product, but are separate products that remain unaltered and in their original packaging as they pass from Keurig to distributors or retailers and then to consumers.

30.     Keurig's anticompetitive conduct resulted in direct purchasers being overcharged for Keurig K-Cups, and such overcharges were passed on by direct purchasers to Plaintiffs and the members of the Classes in whole or in part.

31.     Because the distribution channel for Keurig K-Cups is not complex, generally involving only one or two intermediaries between Keurig and the end-user consumer Plaintiffs, and because Keurig K-Cups are separate products that remain unaltered as they pass from Keurig to consumers via a distributor or distributors, the chain of commerce for this market allows for the tracing of overcharges that have passed through the chain of commerce to Plaintiffs and members of the Classes.

32.     Keurig's anticompetitive conduct has harmed, and continues to harm, consumers by causing them to pay supracompetitive prices for Keurig K-Cups.

33.     Keurig's anticompetitive conduct has harmed, and continues to harm, consumers by limiting consumer choice, preventing them from meaningfully accessing high-quality, less-expensive, and more environmentally sustainable products.

34.     Keurig's anticompetitive conduct has also harmed, and continues to harm, consumers by restricting output.

35.     Absent redress, consumers will continue to be harmed.

36.     Plaintiffs and members of the Classes defined below indirectly purchased (i.e., from a retailer or distributor and not directly from Keurig) for their own use and not for resale at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers.  Plaintiffs bring this class action against Keurig for full consideration given, three times consideration given, damages, treble damages, other monetary relief, and equitable and injunctive relief under certain state antitrust, unfair competition, consumer protection, and unjust enrichment laws.  Plaintiffs also bring this action for injunctive relief for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.  This class action seeks to stop Keurig from continuing to monopolize, restrict, restrain, foreclose, and exclude competition, and to compensate Plaintiffs and the members of the

Classes of consumers who have been harmed by the anticompetitive and unlawful activities of Keurig.

## II. PARTIES

**A.     Plaintiffs**

37.     Wasif Bala ("Bala") is a resident and citizen of the State of Massachusetts, County of Suffolk.  During the Class Period (defined below), in Massachusetts, Bala indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for his own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Bala paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.

38.     Yelda Mesbah Bartlett ("Bartlett") is a resident and citizen of the State of California, County of Contra Costa.  During the Class Period (defined below), in California, Bartlett indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Bartlett paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.

39.     Lavinia Simona Biasell ("Biasell") is a resident and citizen of the State of Michigan, County of Oakland.  During the Class Period (defined below), in Michigan, Biasell indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Biasell paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Biasell still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Michigan.

40.     Linda Bouchard ("Bouchard") is a resident and citizen of the State of Vermont, County of Chittenden.  During the Class Period (defined below), in Vermont, Bouchard indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Bouchard paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Bouchard still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Vermont.

41.     Bouchard & Sons Garage, Inc. ("Bouchard & Sons") is a business headquartered and operating in the State of Vermont, County of Chittenden.  During the Class Period (defined below), in Vermont, Bouchard & Sons indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for its own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Bouchard & Sons paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Bouchard & Sons still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Vermont.

42.     Luke Cuddy ("Cuddy") is a resident and citizen of the State of Massachusetts, County of Essex.  During the Class Period (defined below), in Massachusetts, Cuddy indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for his own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Cuddy paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Cuddy while Cuddy's current brewer is broken, once replaced, Cuddy will continue to purchase Keurig K-Cups in Massachusetts.

43.     Wauneta Dibbern ("Dibbern") is a resident and citizen of the State of Nebraska, County of Hall.  During the Class Period (defined below), in Nebraska, Dibbern indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Dibbern paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Dibbern still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Nebraska.

44.     Jonna Dugan ("Dugan") is a resident and citizen of the State of New York, County of Westchester.  During the Class Period (defined below), in New York, Dugan indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Dugan paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Dugan still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in New York.

45.     Erin Dunbar ("Dunbar") is a resident and citizen of the State of Maine, County of Androscoggin.  During the Class Period (defined below), in Maine, Dunbar indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Dunbar paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Dunbar still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Maine.

46.     Larry Gallant ("Gallant") is a resident and citizen of the State of Nevada, County of Clark.  During the Class Period (defined below), in Nevada, Gallant indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for his own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Gallant paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Gallant still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Nevada.

47.     Denise Gilmore ("Gilmore") is a resident and citizen of the State of Missouri, County of Jackson.  During the Class Period (defined below), in Missouri, Gilmore indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result Keurig's anticompetitive conduct, Gilmore paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Gilmore still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Missouri.

48.     Patricia Hall ("Hall") is a resident and citizen of the State of Arizona, County of Pima.  During the Class Period (defined below), in Arizona, Hall indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Hall paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Hall still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Arizona.

49.     Jennifer Harrison ("Harrison") is a resident and citizen of the State of Mississippi, County of Hancock.  During the Class Period (defined below), in Mississippi, Harrison indirectly

purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result Keurig's anticompetitive conduct, Harrison paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Harrison still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Mississippi.

50.     Teena Marie Johnson ("Johnson") is a resident and citizen of the State of Missouri, County of Platte. During the Class Period (defined below), in Kansas and Missouri, Johnson indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Johnson paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Johnson still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Kansas.

51.     Lori Jo Kirkhart ("Kirkhart") is a resident and citizen of the State of Kansas, County of Sedgwick. During the Class Period (defined below), in Kansas, Kirkhart indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Kirkhart paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Kirkhart still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Kansas.

52.     Kori Lodi ("Lodi") is a resident and citizen of the State of New Hampshire, County of  Merrimack. During the Class Period (defined below), in New Hampshire, Lodi

indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Lodi paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Lodi still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in New Hampshire.

53.    Vivid Hair Studio, LLC ("Vivid Hair Studio") is a business headquartered and operating in the State of New Hampshire, County of Merrimack.  During the Class Period (defined below), in New Hampshire, Vivid Hair Studio indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for its own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Vivid Hair Studio paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Vivid Hair Studio still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in New Hampshire.

54.    John Lohin ("Lohin") is a resident and citizen of the State of Arizona, County of Maricopa.  During the Class Period (defined below), in Arizona, Lohin indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for his own use and not for resale.  As a direct and proximate result of Keurig's anticompetitive conduct, Lohin paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.  Lohin still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Arizona.

55.    Angus Macdonald ("Macdonald") is a resident and citizen of the State of Tennessee, County of  Shelby.  During the Class Period (defined below), in Tennessee,

Macdonald indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for his own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Macdonald paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Macdonald still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Tennessee.

56. Edgar Medina ("Medina") is a resident and citizen of the State of North Carolina, County of Guilford. During the Class Period (defined below), in North Carolina, Medina indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for his own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Medina paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Medina still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in North Carolina.

57. Jennifer Mileikowsky ("Mileikowsky") is a resident and citizen of the State of Rhode Island, County of Bristol. During the Class Period (defined below), in Rhode Island, Mileikowsky indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Mileikowsky paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Mileikowsky still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Rhode Island.

58. Brier Miller Minor ("Minor") is a resident and citizen of the State of Minnesota, County of Hennepin. During the Class Period (defined below), in Minnesota and Wisconsin,

Minor indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Minor paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Minor still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Minnesota.

59.     David W. Nation ("Nation") is a resident and citizen of the State of Maryland, County of Montgomery. Nation was previously a resident and citizen of the District of Columbia from the beginning of the Class Period through June 16, 2014. During the Class Period (defined below), in the District of Columbia, Virginia, Maryland, and New Mexico, Nation indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for his own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Nation paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct.

60.     Patricia J. Nelson ("Nelson") is a resident and citizen of the State of Iowa, County of Polk. During the Class Period (defined below), in Iowa, Nelson indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Nelson paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Nelson still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Iowa.

61.     Julie Rainwater ("Rainwater") is a resident and citizen of the State of Arkansas, County of _Faulkner. During the Class Period (defined below), in Arkansas, Rainwater indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its

subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result Keurig's anticompetitive conduct, Rainwater paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Rainwater still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Arkansas.

62.     Betty Ramey ("Ramey") is a resident and citizen of the State of Florida, County of Lake. During the Class Period (defined below), in Florida, Ramey indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Ramey paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Ramey still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Florida.

63.     Lauren Jill Schneider ("Schneider") is a resident and citizen of the State of Florida, County of Palm Beach. During the Class Period (defined below), in Florida, Schneider indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Schneider paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Schneider still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Florida.

64.     Shirley Anne Schroeder ("Schroeder") is a resident and citizen of the State of California, County of San Diego. During the Class Period (defined below), in California, Schroeder indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a

direct and proximate result of Keurig's anticompetitive conduct, Schroeder paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Schroeder still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in California.

65.     Jason and Amy Stratman ("the Stratmans") are residents and citizens of the State of Wisconsin, County of La Crosse. During the Class Period (defined below), in Wisconsin, the Stratmans indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for their own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, the Stratmans paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. The Stratmans still own a Keurig Portion Pack Brewer and do purchase and will continue to purchase Keurig K-Cups in Wisconsin.

66.     Toni Williams ("Williams") is a resident and citizen of the State of Michigan, County of Macomb. During the Class Period (defined below), in Michigan, Williams indirectly purchased at least one Keurig K-Cup that was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers for her own use and not for resale. As a direct and proximate result of Keurig's anticompetitive conduct, Williams paid supracompetitive prices for Keurig K-Cups, was harmed as a result, and will continue to sustain injury when purchasing Keurig K-Cups unless Keurig is enjoined from continuing its unlawful conduct. Williams still owns a Keurig Portion Pack Brewer and does purchase and will continue to purchase Keurig K-Cups in Michigan.

**B.     Defendant**

67.     Defendant Keurig Green Mountain, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business located at 33 Coffee Lane, Waterbury, Vermont and its corporate headquarters at 53 South Avenue, Burlington,

Massachusetts.  Until March 6, 2014, Keurig was known as Green Mountain Coffee Roasters, Inc. ("GMCR"), which was headquartered in Waterbury, Vermont.  Keurig is also the successor to Keurig, Inc., which, prior to its merger with GMCR on December 31, 2013, was a wholly owned subsidiary of GMCR organized under the laws of the State of Delaware with its principal place of business in Reading, Massachusetts.  On March 10, 2014, GMCR announced that it had changed its name to Keurig Green Mountain, Inc., simply referred to as "Keurig" herein.

68.     In 2015, Keurig Green Mountain was acquired by Dutch conglomerate JAB Holding Company.  In 2017, Keurig Green Mountain again became a publicly-traded corporation, and on July 19, 2018, Keurig Green Mountain acquired the Dr Pepper Snapple Group.  The subsequent parent company is now Keurig Dr Pepper Inc. with headquarters in Plano, Texas and Burlington Vermont.  Keurig Green Mountain now operates as a subsidiary of Keurig Dr Pepper Inc.

## C.     Agents and Co-Conspirators

69.     In every state and territory of the United States, various persons and entities other than Keurig have conspired in the violations alleged herein and have performed acts and made statements in furtherance of its unlawful scheme designed to maintain, expand, and abuse Keurig's market power and monopoly in the Relevant Markets (defined below).  These other persons and entities have facilitated, participated in, and aided and abetted the conspiracy.  The co-conspirators committed overt acts and communicated with others in the conspiracy to restrain, restrict, exclude, and foreclose competition in the Relevant Markets (defined below) in every state and territory of the United States.  The conspiracy's center of gravity is and was Vermont, where Keurig is headquartered.  Keurig's conduct in Vermont, and related conduct occurring in every other state and territory, substantially affected and continues to affect a substantial amount of trade and commerce and has injured consumers in *every* state and territory of the United States.  These co-conspirators include Roaster Competitors who have participated in Keurig's scheme to control, restrain, and exclude competition in the Keurig Compatible Cup Market by participating in and effectuating a group boycott of Cup Competitors.

### III. JURISDICTION AND VENUE

70.     Plaintiffs seek consideration given, damages, restitution, treble damages or three times consideration given by consumers of Keurig K-Cups, disgorgement, other monetary relief, injunctive and other equitable relief under state antitrust, consumer protection and unfair trade practices laws, and state unjust enrichment laws, as well as costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Keurig's violations of those laws.  This Second Consolidated Amended Indirect Purchaser Class Action Complaint ("SAC") is also filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief and to recover the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and all others similarly situated as a result of Keurig's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14.

71.     This Court has jurisdiction over the federal claims under Section 16 of the Clayton At, 15 U.S.C. § 26, as well as under 28 U.S.C. §§ 1331, 1337.  The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the same case or controversy.  Independently, this Court also has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1332 because the amount in controversy for each of the Classes exceeds $5,000,000 and there are members of some of the Classes who are citizens of a different state than Keurig.

72.     Venue is proper in this Judicial District because Keurig transacts a substantial amount of business in this District, conspires to exclude and restrain competition in this District, and continues to affect a substantial amount of trade and commerce in this District.

# IV. RELEVANT MARKETS

73.     There are two relevant markets: (1) the market for the manufacture, distribution, and sale of Portion Pack Brewers ("Portion Pack Brewer Market"); and (2) the market for the manufacture, distribution, and sale of Keurig Compatible Cups ("Keurig Compatible Cup Market").

74.     The geographic market affected by Keurig's illegal activities is the United States, including all of its states and territories.

**A.      Relevant Product Market:  The Manufacture, Distribution, and Sale of Portion Pack Brewers**

75.     The Portion Pack Brewer Market is a relevant product market.

76.     Portion Pack Brewers are a speedy, convenient, and tidy way for consumers to brew hot beverages such as coffee, tea, or hot chocolate.  These brewers use uniquely designed portion packs and introduce hot water at low pressures (less than 30 psi) into the brewing chamber to make a hot beverage in predefined portions in less than one minute without the need for consumers to grind beans, measure coffee, insert a separate filter, handle used filters, or clean up after brewing the beverage.

77.     To brew a hot beverage, consumers insert a portion pack—which can take the form of a cup, disc, cartridge, or other container filled with the product—into the brewer.  The brewer then forces hot water through the portion pack, and the hot beverage is delivered directly into a mug or small carafe.

78.     Portion packs must be designed specifically to work with a particular type of Portion Pack Brewer.

79.     Portion Pack Brewers are frequently referred to in the industry as "single serve brewers", a term of art which Keurig uses to exclude drip or "pod" systems that do not introduce water at pressure to the brewing chamber, and also to exclude systems using 30 or greater pounds per square inch of pressure, as espresso makers do.

80.     Portion Pack Brewers are distinct from and do not compete with traditional drip coffee makers so as to impose price discipline on Portion Pack Brewers.  Traditional drip coffee makers are not reasonable substitutes for Portion Pack Brewers because Portion Pack Brewers (1) do not require a filter separate from the portion pack; (2) do not require separate measurement of  pre-ground coffee; (3) more fully control mess within the partially or fully contained portion pack, greatly reducing or eliminating spilled coffee grounds and spilled water, and reducing disposal of used grounds and filters other than the a single portion pack, (4) eliminate the need to wash a coffee pot; (5) are faster to brew; (6) do not expose the beverage to a shared brewing chamber, which can cause flavor contamination; and (7) are generally less cumbersome and time consuming to operate, rendering them more appealing to busy consumers seeking the convenience of a Portion Pack Brewer. Similarly, Portion Pack Brewers do not compete with "pod" brewers that hold premeasured grounds in a mesh bag but introduce water by drip into an open brew chamber, such that pod brewers impose price discipline on Portion Pack Brewers.  Pod brewers lack many of the characteristics that differentiate Portion Pack Brewers from drip coffee makers.  Keurig's Roaster Agreements have exclusivity provisions that bar Roaster Competitors from working with makers of Portion Packs for any Portion Pack Brewer system, but do not bar the same Roaster Competitors from working with makers of high-pressure espresso makers, or makers of drip brewers.

81.     Because of the speed, convenience, and tidiness of Portion Pack Brewers, consumers are willing to pay a premium for Portion Pack Brewers above the price of traditional drip coffee makers.  For example, a traditional drip coffee maker is often sold for roughly $25 to $35, whereas a Portion Pack Brewer generally costs from $80 to several hundred dollars. Therefore, the price of traditional drip coffee makers does not significantly constrain prices for Portion Pack Brewers.

82.     A small but significant non-transitory increase in the price of Portion Pack Brewers would not substantially raise demand for traditional drip coffee brewers or pod-based coffee brewers.

83. 

84.     Keurig manufactures, distributes, and sells a number of different Portion Pack Brewers under the brand name "Keurig"—including Keurig K-Cup Brewers, Vue Brewers, and Rivo Brewers.  The price of Keurig Portion Pack Brewers ranges from $89.95 to $249.95. Keurig also licenses its Portion Pack Brewer technology to several brands, such as Cuisinart, Breville, and Mr. Coffee.

85.     Keurig Portion Pack Brewers use portion packs that are not physically compatible with other types of Portion Pack Brewers.  Similarly, Portion Pack Brewers manufactured by Keurig's Portion Pack Brewer competitors use portion packs that are not physically compatible with Keurig Portion Pack Brewers.  Other types of Portion Pack Brewers include Mars, Inc.'s "Flavia Single-Serve Brewers," Bosch's "Tassimo Single Brewers," and the Nespresso line of brewers.

86.     A potential entrant into the Portion Pack Brewer Market must either (1) design its own unique Portion Pack Brewer and unique portion pack, or (2) design a Portion Pack Brewer that can use portion packs currently on the market (presuming doing so would not violate intellectual property rights).

87.    For either approach, there are substantial entry barriers, including significant investments associated with research and development, and technological barriers associated with intellectual property.

88.    The vast installed base of Keurig Portion Pack Brewers also serves as a significant barrier to entry.  Keurig benefits from a significant first-to-market advantage in the Portion Pack Brewer Market.

89.    Keurig has sold more than 35 million Keurig Portion Pack Brewers and over 20 billion Keurig K-Cups.  The plastic cups from Keurig K-Cups sold in 2013 alone could reportedly encircle the Earth ten times; these plastic cups are almost entirely non-biodegradable. The ubiquity of Keurig Compatible Cups combined with the limited availability and selection of portion packs for other Portion Pack Brewers creates a formidable obstacle to marketing a Portion Pack Brewer that cannot use Keurig Compatible Cups.

90.    Even if such barriers could be overcome, Keurig has erected additional barriers to entry through its Roaster Agreements with horizontal Roaster Competitors, which ensure that substantially all of the major Roaster Competitors cannot do business with potential new entrants into the Portion Pack Brewer Market.

91.    Barriers to entry in the Portion Pack Brewer Market have proven effective: Non-Keurig Portion Pack Brewers hold less than 11% of the Portion Pack Brewer Market.

92.    The presence of these market participants is insufficient to discipline Keurig's unlawful use of market power.

**B.    Relevant Product Market: The Manufacture, Distribution, and Sale of Keurig Compatible Cups**

93.    The Keurig Compatible Cup Market is a relevant product market impacted by the unlawful conduct alleged in this SAC.

94.    Keurig's own Keurig Compatible Cup, referred to herein as the Keurig K-Cup(s), is a specific portion pack for use in Keurig Portion Pack Brewers.  Keurig extracts

supracompetitive prices from consumers on sales of Keurig K-Cups.  Keurig records, monitors, and reports its sales of Keurig K-Cups separately from other Keurig products.

95.     Keurig Compatible Cups can be found at a variety of locations, including convenience stores, restaurants, supermarkets, hospitals, hotels, bars, offices, big-box stores, coffee shops, and online.

96.     Keurig's ability to increase the price of its Keurig K-Cups above competitive levels is not constrained by portion packs used with non-Keurig Portion Pack Brewers because those portion packs do not work in Keurig Portion Pack Brewers, and the few brewers which use portion packs that are not compatible with Keurig Portion Pack Brewers have little market share compared to Keurig Portion Pack Brewers.

97.     As shown below, Keurig Compatible Cups are visually and physically distinct from portion packs for other Portion Pack Brewers.  Keurig Compatible Cups are only physically compatible with Keurig Portion Pack Brewers.   Likewise, portion packs made to work in other Portion Pack Brewers are not physically compatible with Keurig Portion Pack Brewers.

  

|              |                          |                |
| :----------: | :----------------------: | :------------: |
| **Keurig K-Cup** | **Flavia/Alterra Cartridge** | **Tassimo T-Disc** |

98.     As shown by the images above and below, Keurig Compatible Cups and other portion packs are not reasonably interchangeable.  Keurig Compatible Cups are not reasonably

  

|                   |                  |                   |
| :---------------: | :--------------: | :---------------: |
| **Keurig Brewer** | **Flavia Brewer** | **Tassimo Brewer** |

interchangeable with Flavia-style cartridges.  The opposite is also true: Flavia-style cartridges are not reasonably interchangeable with Keurig Compatible Cups.  Thus, consumers are locked into using only portion packs designed to work with their specific and unique Portion Pack Brewer.

99.     Once a consumer purchases a Keurig Portion Pack Brewer, the consumer is locked into purchasing Keurig Compatible Cups.  Other portion packs will not work with Keurig Portion Pack Brewers.

100.     Current consumers of Keurig Compatible Cups would face significant switching costs if they wanted to brew beverages using portion packs other than Keurig Compatible Cups because they would have to purchase a different type of Portion Pack Brewer, which would require an investment of $80 to several hundred dollars.  As a result, a small but significant non-transitory increase in the price of Keurig Compatible Cups would not substantially raise demand for portion packs other than Keurig Compatible Cups.

101.     Portion packs other than Keurig Compatible Cups do not constrain the price for Keurig Compatible Cups.

102.     Hot beverages sold in coffee shops or cafes are not reasonable substitutes for Keurig Compatible Cups because (1) consumers have to purchase the hot beverages away from home or work as opposed to having the convenience of brewing the beverage in the comfort of their home or workplace; and (2)  hot beverages in coffee shops or cafes are priced according to different factors than those brewed from a Keurig Compatible Cup.  Because of these significant differences, the price of hot beverages sold in coffee shops or cafes do not significantly constrain prices for Keurig Compatible Cups.

103.     Also, Keurig's ability to increase the price of Keurig K-Cups above competitive levels has not been reasonably constrained by the price of ground coffee.  Due to enhanced convenience and simplicity, consumers are willing to pay a substantial premium for coffee that can be brewed in Portion Pack Brewers.  For example, the *New York Times* stated that "Folgers [Keurig K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is

"even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."

**C.     Relevant Geographic Market: The United States**

104.    The relevant geographic market is the United States, including all its states and territories.  The United States is the geographic area of competition in which Keurig operates and to which Plaintiffs and the members of the Classes can practicably turn for supply of products in the Relevant Markets.

105.    Consumers in the United States typically purchase Portion Pack Brewers and Keurig Compatible Cups from local or regional distributors, retail locations in the areas where they reside or work, or online.  Even assuming that these products are sold outside of the United States for less money, consumers are unlikely to travel outside of the United States to purchase these products because the cost of doing so would outweigh any purported savings.  Similarly, even assuming that these products are sold on a foreign company's website for less money, consumers are unlikely to purchase such products because of additional fees and shipping expenses associated with international shipping.

106.    As a result, Keurig is able to increase the price of Keurig Portion Pack Brewers and Keurig K-Cups in the United States: (1) without large numbers of consumers quickly turning to alternative suppliers located outside of the United States; and (2) without manufacturers located outside of the United States flooding the United States with substitute supply.

**V. INTERSTATE AND INTRASTATE COMMERCE**

107.    Keurig manufactures and sells Keurig Portion Pack Brewers and Keurig K-Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including in this District.

108.    Keurig's business substantially affects interstate commerce in the United States, affects a substantial volume of trade and commerce in each state and territory of the United States, and has caused and continues to cause a substantial amount of economic harm and antitrust injury to the citizens of each state and territory of the United States.

109.    Keurig has manufacturing and distribution operations throughout the United States and sells or distributes throughout the United States.

110.    Keurig reported total net sales of $3.725 billion in the United States for fiscal year 2013; the majority of these sales were attributable to sales of Keurig K-Cups.

111.    Keurig has a significant presence throughout the United States, with its headquarters, executive offices, production, distribution, manufacturing, and research facilities centralized in Vermont, and large manufacturing and distribution facilities located in Vermont, Massachusetts, Tennessee, California, Virginia, and Washington.

112.    The activities of Keurig and those acting in concert with it, as alleged herein, were within the flow of, were intended to, and did have a substantial effect on the *intra*state and *inter*state commerce of the United States.

113.    The scheme alleged herein was formulated in and emanated from Vermont.  The conspiracy impacted and harmed consumers in every state and territory of the United States. Keurig, from its headquarters at 33 Coffee Lane in Waterbury, Vermont (where its principal executive offices, manufacturing, and distribution facilities are located), formulated, conceived of, and reached unlawful and anticompetitive agreements with its Roaster Competitors, Distributors, and Retailers that were intended to and did harm competition and consumers in every state and territory of the United States.  The effect of this conduct, emanating from Vermont, was to cause consumers to be deprived of product choice and to be charged supracompetitive prices for Keurig K-Cups and to pay more for Keurig K-Cups than their actual value in every state and territory of the United States.  Thus, Keurig's conduct substantially affected trade and commerce in each state and territory of the United States.

## VI. FACTS BEHIND THE SCHEME TO CONTROL, RESTRAIN, EXCLUDE, AND ELIMINATE COMPETITION IN THE SALE OF KEURIG COMPATIBLE CUPS

**A.    GMCR Acquired Control Over Keurig K-Cup Technology**

114.     In the 1990s, one of Keurig's predecessor entities, Keurig, Inc., developed Keurig Portion Pack Brewers and Keurig K-Cups and obtained patents for some of the technology used in those brewers and for some of the technology associated with the Keurig K-Cups.

115.     Keurig, Inc. licensed that technology to various coffee roasting companies, including GMCR, for the manufacture and sale of coffee in Keurig K-Cups.

116.     In 2002, Keurig introduced its Keurig Portion Pack Brewer for home use.

117.     GMCR, founded in Vermont as a café, became a public company headquartered in Vermont in 1993.

118.     In order to combine its coffee roasting business with the Portion Pack Brewer business of Keurig, Inc., GMCR bought 42% of the then small business for $15 million in 2002, and acquired the remaining 58% of Keurig, Inc. in 2006 for $104 million.  In early 2014, the Vermont-based company changed its name to Keurig Green Mountain, Inc., simply referred to as "Keurig" herein.

119.     Since its acquisition of Keurig, Inc., Keurig systematically made further acquisitions and acquired greater control over the Portion Pack Brewer Market and the Keurig Compatible Cup Market, eventually enjoying a 93% market share in the Portion Pack Brewer Market and a 95% share in the Keurig Compatible Cup Market.

120.     Keurig's headquarters located at 33 Coffee Lane, Waterbury, Vermont includes a 90,000 square-foot roasting and manufacturing facility, its corporate and professional headquarters, a research and development center, and distribution facilities.

**B.     Keurig Systematically Acquired Competing Major Coffee Brands for Use in Keurig Compatible Cups**

121.     After GMCR acquired a substantial interest in Keurig, Inc., Keurig began acquiring Roaster Competitors and entered into exclusive Roaster Agreements with other Roaster Competitors.

122.     In 2009, Keurig acquired Tully's Coffee Corporation and Timothy's Coffees of the World, Inc.

123.    In 2010, Keurig acquired Diedrich Coffee, Inc. and LNH Holdings, Inc. (Van Houtte).

**C.    Keurig Substantially Raised K-Cup Prices Twice in the Middle of an Economic Downturn for a Total Increase of Between 19% and 28% Without Sustaining Any Material Loss of Market Share**

124.    On September 7, 2010, Keurig announced a 10-15% price increase on Keurig K-Cups.

125.    Less than a year later, on June 8, 2011, Keurig announced another price increase of approximately 9% to 13% on all Keurig K-Cups.

126.    These price increases did not have a material impact on Keurig's market share in the Keurig Compatible Cup Market.

**D.    Keurig Used Patent Litigation as Part of Its Overall Plan To Monopolize and Restrain Competition**

127.    Keurig used patent litigation to prevent Cup Competitors from competing in the Keurig Compatible Cup Market.

128.    Keurig had two patents that purportedly protected certain aspects of Keurig's brewer technology and technology related to certain types of filtered Keurig K-Cups.  These patents were set to expire in 2012.

129.    Prior to the expiration of its patents, Keurig brought sham patent infringement lawsuits against two Cup Competitors, TreeHouse Foods, Inc.'s subsidiary Sturm Foods, Inc. (collectively, "TreeHouse") and The Rogers Family Co. ("Rogers Family") once they began competing against Keurig in the Keurig Compatible Cup Market.

130.    The lawsuits against TreeHouse and Rogers Family were found to be baseless; both were dismissed decisively, and both dismissals were affirmed by the Federal Circuit Court of Appeals.  In both cases, the Federal Circuit deemed Keurig's lawsuit an impermissible attempt to unlawfully expand the limitations of its patents and harm competition.

**(i)    The TreeHouse Patent Infringement Case**

131.    In 2010, TreeHouse began making unlicensed Keurig Compatible Cups without filters because Keurig's patents only applied to the filters.

132.    On October 1, 2010, Keurig sued TreeHouse in the United States District Court for the District of Delaware claiming patent infringement

133.    In September 2012, the District Court granted summary judgment against Keurig on the basis of non-infringement.  The District Court determined that Keurig was attempting to impose a "postsale restriction" in order to prevent TreeHouse's Compatible Cups from being used in Keurig brewers.

134.    In October 2013, the Federal Circuit affirmed on appeal, criticizing Keurig for trying to make an "end-run" around the proper use of the patent laws with "a tactic that the Supreme Court has explicitly admonished."  *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).  The Federal Circuit expressly found "***Keurig is attempting to impermissibly restrict purchasers of Keurig [Portion Pack Brewers] from using [Competitive Cups] by invoking patent law***."  *Id.*  (Emphasis added.)

**(ii)    The Rogers Family Patent Infringement Case**

135.    Keurig Cup Competitor Rogers Family began selling Competitive Cups in 2011.  Some of Rogers Family's Competitive Cups are 97% biodegradable, as compared to Keurig's, which are almost entirely non-biodegradable.

136.    In November 2011, Keurig sued Rogers Family in the United States District Court for the District of Massachusetts.  Keurig claimed that the sale of Rogers Family's Competitive Cups infringed on and induced infringement of the same utility patents that TreeHouse had allegedly infringed.  Keurig also asserted that Rogers Family had infringed a Keurig K-Cup design patent.

137.    In May 2013, the District Court of Massachusetts granted Rogers Family's Motion for Summary Judgment on the basis of non-infringement.  In that ruling, consistent with the Delaware District Court and quoting from that court's opinion, the court admonished Keurig for "***attempting to institute a postsale restriction that prevents non-Keurig cartridges from***

*being used in Keurig brewers.*" *Keurig, Inc. v JBR, Inc.,* No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D. Mass. May 24, 2013) (emphasis added).

138.    On March 12, 2014, the Federal Circuit affirmed the District Court of Massachusetts' grant of summary judgment in its entirety. *Keurig, Inc. v. JBR, Inc.*, 558 F. App'x 1009 (Fed. Cir. 2014).

**E.     Keurig Announces Lock-Out Technology That Will Prevent Competitive Cups from Working in Keurig Portion Pack Brewers**

139.    As alleged herein, anticipating competition from Cup Competitors in the Keurig Compatible Cup Market, Keurig announced on November 20, 2013 a plan to exclude all competition in the Keurig Compatible Cup Market with the introduction of the Keurig 2.0 Brewer, a brewer designed to be technologically incompatible with Competitive Cups.

140.    The Keurig 2.0 Brewer was released in September 2014 with the expectation that it would replace all Keurig Portion Pack Brewers on the market within one or two years.

141.    ████████████████████████████████████████████████████████

████████████████████████████████

142.    The Keurig 2.0 Brewer lock-out technology poses an additional and formidable barrier to entry in the Keurig Compatible Cup Market.

143.    Keurig has informed Distributors, Retailers, and consumers that the Keurig 2.0 Brewer will entirely replace the Keurig 1.0 Brewers and that Competitive Cups will not work with the Keurig 2.0 brewer.

## VII. UNLAWFUL CONDUCT

**A.     Keurig Entered Into Exclusionary Agreements to Block Cup Competitors from Being Able to Enter or Meaningfully Compete in the Keurig Compatible Cup Market**

144.     To foreclose potential Cup Competitors from manufacturing, distributing, and selling Competitive Cups, Keurig signed exclusive agreements with suppliers of the machinery and components typically used to make Competitive Cups.  These agreements were anticompetitive, as they were intended to restrain and exclude competition in the Keurig Compatible Cup Market.

**(i)     Keurig Entered into Anticompetitive Agreements with Suppliers of Machinery Used To Manufacture Traditionally-Designed Keurig Compatible Cups**

145.     ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ On information and belief, Keurig recently had or currently has exclusive agreements with the manufacturers accounting for 90% of the worldwide supply of machinery used to make Compatible Cups.

146.     By way of illustration, TreeHouse, one of only a few Cup Competitors, attempted to purchase a Spee-Dee Holmatic machine from R.A. Jones & Co. ("R.A. Jones") to manufacture non-filtered Competitive Cups (non-filtered because this would not infringe Keurig's then-effective patents).  According to TreeHouse, in response to its request, a Sales Manager for R.A. Jones wrote:  "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product."  Under "the rules," R.A. Jones agreed with Keurig that "if the cup goes into a Keurig brewer, [R.A. Jones]

cannot quote it."  But, R.A. Jones could still "build equipment for all types of packages, just not [Keurig] K-Cups or anything that goes into a Keurig brewer."

147.    TreeHouse was unable to find another supplier in the United States willing to sell it machinery used to make non-filtered Competitive Cups.

148.    Because R.A. Jones was free to supply the same equipment for purposes other than making Competitive Cups, the restriction placed on supplying equipment for the purpose of making Competitive Cups cannot be justified on the basis that it ensures a reliable supply of equipment for Keurig.

149.    The Keurig exclusive supply agreements with machine manufacturers restricted the ability of TreeHouse and other Cup Competitors to buy machinery needed to make traditionally-designed Keurig Compatible Cups for competition in the Keurig Compatible Cup Market.  Keurig's exclusionary supply agreements forced potential Cup Competitors to work with more expensive and less experienced suppliers or to incur additional research, design, and manufacturing costs.  Keurig's restrictive practices raised Cup Competitors' costs, delayed or precluded their entry into the market, and greatly reduced their ability to meaningfully compete against Keurig.  There were no procompetitive justifications for Keurig's exclusive agreements with machine suppliers.

**(ii)    Keurig Blocked Components Used To Manufacture Keurig Compatible Cups**

150.    Keurig similarly restrained competition and foreclosed Cup Competitors' access to the components used to make traditionally-designed Keurig Compatible Cups.  Traditionally-designed Keurig Compatible Cups have several components, including a plastic cup, a foil lid, and a filter.  Because such components must be custom-engineered for use in Keurig Portion Pack Brewers, there are very few suppliers of these components.

151.    Keurig entered into exclusive supply agreements with suppliers of Keurig Compatible Cup components, which according to TreeHouse, forced it to work with less experienced suppliers at a higher cost to TreeHouse.

152.     To illustrate, before TreeHouse attempted to enter the Keurig Compatible Cup Market, there were three main domestic suppliers of the plastic cups used in Keurig K-Cups: Winpak Ltd. ("Winpak"), Phoenix Cups, and Curwood, which at the time of Treehouse's entry into the market, collectively accounted for approximately 100% of plastic suppliers with the ability to manufacture the cup component used in traditionally designed Compatible Cups.

153.     To find a plastic cup supplier, TreeHouse approached all three companies (Winpak, Phoenix Cups, and Curwood), none of which would agree to provide plastic cups to TreeHouse for the purpose of manufacturing Competitive Cups.

154.     Any restriction prohibiting these plastic cup suppliers from selling plastic cups to TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of plastic cups for Keurig because all three companies were free to supply cups for use in products not intended for use in Keurig Portion Pack Brewers.  In fact, at that time, Winpak was already supplying TreeHouse with other types of cups and lids to make products that were not used in Keurig Portion Pack Brewers.

155.     The Keurig exclusive supply agreements with component suppliers restricted the ability of TreeHouse and other Cup Competitors to buy components needed to manufacture traditionally-designed Keurig Compatible Cups to meaningfully compete with Keurig in the Keurig Compatible Cup Market.  Keurig's exclusionary agreements forced potential Cup Competitors to work with more expensive and less experienced suppliers.  Keurig's restrictive practices raised Cup Competitors' costs, delayed or outright precluded their entry into the market, and greatly reduced their ability to meaningfully compete against Keurig.  There were no procompetitive justifications for Keurig's exclusive agreements with component suppliers.

**B.     Keurig Conspires with Its Horizontal Roaster Competitors to Preserve and Expand Keurig's Market Position by Restraining Competition and Foreclosing Competitors' Access to Roaster Competitors' Products, Business, and Distribution Channels**

156.     Since the 1990s, Keurig (including its predecessor GMCR) is and has been in the coffee-roasting and coffee-processing business.  This business involves the acquisition, roasting,

and processing of coffee beans and other raw materials for packaging and sale to distributors, wholesalers, and consumers.  As described above, Keurig has acquired a number of roasters. The bulk of Keurig's remaining Roaster Competitors, who are in the same coffee-roasting and coffee-processing business, have agreed with Keurig to stay out of the Keurig Compatible Cup Market, except with regard to certain licensing or manufacturing agreements they have with Keurig.

157.    As part of their agreements with Keurig, Roaster Competitors agree not to do business with Keurig's Cup Competitors.  These exclusive supply agreements suppress competition, and facilitate the group boycott as well as concerted refusals to deal with Cup Competitors by preventing Cup Competitors from: (i) having access to Roaster Competitors' coffee and other products for sale in Keurig Compatible Cups; (ii) having access to Roaster Competitors' brands to mark or market Competitive Cups; (iii) being able to enter into manufacturing agreements with Roaster Competitors for the manufacture of Keurig Compatible Cups on behalf of Roaster Competitors; and (iv) being able to access the Roaster Competitors' distribution and retail networks for the distribution and sale of Competitive Cups.

158.    In addition to denying Cup Competitors the right to sell Roaster Competitors' products in Competitive Cups, these agreements create insurmountable barriers to entry for potential and actual Cup Competitors, preventing them from being able to meaningfully compete against Keurig.

159.    These restrictive agreements with Roaster Competitors were not entered into when Keurig was a technology company.  At that time, Keurig, Inc. entered into non-exclusive agreements with roasters that allowed the roaster unrestricted sales of its product, including to Cup Competitors.  After GMCR, a roaster, acquired Keurig, Inc., this practice changed, and Keurig sought and secured from its Roaster Competitors long-term contractual agreements that foreclosed the Roaster Competitors from dealing with Keurig's Cup Competitors in the Keurig Compatible Cup Market.

160.    The Keurig agreement with Roaster Competitor Caribou Coffee Company, Inc. ("Caribou") provides insight into these anticompetitive horizontal agreements.  The duration of the Caribou agreement is five years with three, three-year automatic renewal periods. The agreement reads in relevant part:

> 3.2 <u>Supply</u>. Caribou shall sell to GMCR Caribou Coffee, Caribou Tea and Caribou Other Hot Beverage Products for the purpose of the manufacture of Caribou portion packs by or for [Keurig].
>
> * * *
>
> 4. Caribou ***portion pack Exclusivity***. Throughout the world Caribou ***shall not directly, or through any Person*** in which Caribou directly or indirectly owns an equity interest and, alone or with others, has control of such Person's operations, ***sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig portion packs or any other product intended for use in the Keurig Brewing System***. In addition, ***Caribou shall not license or permit to be licensed to any third party any Caribou Marks for use in connection with coffee products, Tea products or Other Hot Beverage Products, other than Caribou portion packs, intended for use with the Keurig Brewing System***.
>
> 5. <u>No Participation in Competing Systems</u>. While this Agreement is in effect, ***Caribou shall not directly or indirectly***: (a) install or solicit for installation, ***design or solicit for the design***, develop or solicit the ***development of any manufacturing line or system to manufacture single-cup, portion-pack cartridges for use in conjunction with a pressurized hot water system other than the Keurig Brewing System***; or (b) ***design, develop, or manufacture, or contribute in any way thereto, any single-cup, portion-pack products, including any brewer designed for use with single-cup, portion pack cartridges other than the Keurig Brewer***….
>
> * * *
>
> 14 2.3 If at the end of the 54th month of the Initial Term (the "Initial Term Trigger Date"), the volume of Caribou portion packs sold [quantity redacted] either Party may terminate this Agreement effective as of the end of the Initial Term by giving notice to the other Party within thirty (30) days of the Initial Term Trigger Date.
>
> (Emphasis added.)

161.    Keurig has entered into similar agreements with substantially all of its major Roaster Competitors to sell their coffee and hot-beverage products packaged in Keurig K-Cups.

162.     In February 2010, Keurig signed a multi-year Roaster Agreement with J.M. Smucker Company ("Smucker"), a leader in the retail coffee business, under which Keurig is the exclusive manufacturer of Keurig K-Cups under Smucker's Folgers and Millstone brands. Smucker sells the licensed Keurig K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on Smucker's website.  Smucker is precluded from doing business with Cup Competitors.

163.     In February 2011, Dunkin' Donuts, a market leader in the United States coffee business, entered into a Roaster Agreement with Keurig under which Keurig is the exclusive manufacturer of Dunkin' Donuts Keurig K-Cups.  The parties agreed that Dunkin' Donuts Keurig K-Cups would be sold exclusively at Dunkin' Donuts restaurants and not grocery stores, where Dunkin' Donuts sells its bagged coffee.  The parties also agreed that some Dunkin' Donuts restaurants would sell Keurig Portion Pack Brewers.  Dunkin' Donuts is precluded from doing business with Cup Competitors.

164.     In March 2011, Starbucks signed a multi-year Roaster Agreement to have Keurig manufacture, market, distribute, and sell Starbucks-branded Keurig K-Cups.  This was an important step in Keurig's plan to solidify its long-term control of the Relevant Markets, because Starbucks is the world's largest coffee retailer.  Starbucks and Keurig expanded their Roaster Agreement in May 2013 with a minimum five-year agreement, under which Starbucks is licensed as the exclusive, super-premium coffee brand for Keurig, and the Keurig Portion Pack Brewer is ''the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee."  Starbucks is precluded from doing business with Cup Competitors.

165.     The Starbucks-Keurig deal also allows Keurig to manufacture and sell Keurig K-Cups for Starbucks' other brands, including Seattle's Best.

166.     In May 2013, Coffee Bean signed a multi-year Roaster Agreement with Keurig. Coffee Bean is the largest privately held specialty coffee and tea retailer in the United States. This Roaster Agreement gives Keurig the right to sell Coffee Bean Keurig K-Cups through

multiple distribution paths beginning in the spring of 2014.  Coffee Bean is precluded from doing business with Cup Competitors.

167.    In July 2013, Cinnabon signed a multi-year Roaster Agreement with Keurig allowing Keurig to manufacture and sell Cinnabon Keurig K-Cups through a variety of distribution channels.  Cinnabon is precluded from doing business with Cup Competitors.

168.    Keurig has also locked up other major brands' coffee, tea, cocoa, and other hot beverages through anti-competitive Roaster Agreements with companies such as Wolfgang Puck, Gloria Jean's Gourmet Coffees Corp., Newman's Own, Celestial Seasonings, Twinings, Bigelow, and others.  Each of these Roaster Competitors is precluded from doing business with Cup Competitors.

169.    As of 2014, the Harris EquiTrend Study ("Harris Study") listed seven brands as the top coffee brands.  The Harris Study was comprehensive and scientific, purportedly using an academically vetted brand-equity model that took into account elements like familiarity, quality, and purchase considerations.  According to the study, the stronger the brand based on these factors, the greater the bond between consumers and the brand, rendering it difficult to displace these top brands in the eyes of consumers.

170.    The Harris Study analyzed the depth of the bond between consumers and brands and found that the following seven coffee brands had the strongest bond with consumers: (1) Dunkin Donuts;  (2) Green Mountain; (3) Folger's; (4) Seattle's Best; (5) Maxwell House; (6) Caribou; and (7) McCafe.  Of these, none is available to Cup Competitors.  Keurig owns the Green Mountain brand.  Dunkin Donuts and Folger's are J.M. Smucker's brands, subject to restrictive exclusive Roaster Agreements.  Seattle's Best is a Starbuck's product, likewise subject to a restrictive exclusive Roaster Agreement.  Caribou is also subject to a restrictrive exclusive Roaster Agreement.  McCafe, a McDonald's brand, is distributed in partnership with Kraft Foods, which in turn executed an exclusive Roaster Agreement with Keurig in August 2014, which makes McCafe coffee in Keurig Compatible Cups available only through a Keurig license

and therefore unavailable to Cup Competitors.  The same Kraft agreement also governs Maxwell House.

171.    As part of the agreements with Roaster Competitors, if a Roaster Competitor wants its products to be packaged in Keurig Compatible Cups for use in Keurig Portion Pack Brewers, the Roaster Competitor must agree to buy Portion Pack Brewers and Keurig Compatible Cups only from Keurig.

172.    The Roaster Competitors must agree not to sell their coffee or other products to Cup Competitors for sale in Competitive Cups and agree not to license their brand names to Cup Competitors.

173.    The Roaster Competitor must also agree not to purchase, distribute, or sell Competitive Cups.

174.    Roaster Competitors that wish to buy, distribute, or sell Keurig Portion Pack Brewers through their own distribution networks must agree to purchase Keurig K-Cups from Keurig and, at the very least, must agree not to purchase Competitive Cups.

175.    These agreements have restrained and excluded competition from Cup Competitors, resulting in reduced output, less innovation, reduced consumer choice, and higher prices in the Keurig Compatible Cup Market than there would have been in a competitive market.

**C.      Keurig Enters into Unlawful Agreements with Distributors and Retailers to Preserve and Expand Keurig's Market Position by Foreclosing Cup Competitors' Access to Distribution and Retail Channels**

176.    Keurig utilizes its market power with Distributors and Retailers to restrict or prevent them from doing business with Cup Competitors by threatening to terminate access to Keurig Portion Pack Brewers and Keurig K-Cups.

177.    Keurig's unlawful agreements with Distributors and Retailers, along with the other anticompetitive conduct alleged herein, substantially restrain and foreclose competition in the Relevant Markets.

178.    Keurig's ability to enter into anticompetitive agreements with Distributors and Retailers is enhanced by Keurig's anticompetitive agreements with substantially all of the major Roaster Competitors.

179.    If a Distributor or Retailer wants access to Keurig K-Cups containing major Roaster Competitors' popular products, they must do business with Keurig.

180.    Distributors' and Retailers' customers demand access to the major brands of Roaster Competitors' products controlled by Keurig.

181.    Due to the installed base of Keurig Portion Pack Brewers, many Distributors and Retailers have no choice but to comply with Keurig's demands.

182.    Keurig has roughly 500 agreements with Distributors, of which only a small number of Distributors control the bulk of sales.  These agreements are generally referred to as Keurig Authorized Distributor ("KAD") agreements.

183.    Under KAD agreements, Distributors distribute Portion Pack Brewers and Keurig K-Cups for commercial, non-residential purposes to work place/office, travel/hospitality, and food-service consumers.

184.    Distributors who enter into KAD agreements include office-supply distributors and food-service management companies who sell directly to end-user consumers.

185.    The Keurig K-Cup distribution channels are not complex, generally involving only one, or at most two, intermediaries between Keurig and the end-user consumer.

186.    Keurig K-Cups are not component products but are sold by Distributors just as they were produced and packaged by Keurig.

187.    Distributors do not alter or modify the Keurig K-Cups or packaging before selling the products to end-user consumers.

188.    Distributors and Retailers pass on most, if not all, of the overcharges associated with the sale of Keurig K-Cups to the end user consumers.

189.     Distributors enter into multi-year KAD agreements that include exclusive provisions prohibiting the Distributors from promoting, marketing, selling, or making available any Competitive Cups to their customers.

190.     Some or all of Keurig's KAD agreements contain provisions similar to the following three-year agreement:

*Paragraph 2.1 reads in part:*

> "<u>Keurig Products and Keurig Packs</u>.  GMCR hereby appoints Distributor and Distributor hereby accepts appointment as a non-exclusive ***KAD <u>to purchase and inventory Keurig Products [includes brewers] and <u>Keurig Packs</u></u>*** for promotion ***and direct sale***, lease, rent or loan to and only to Authorized Locations in the Territory for the exclusive use by such Authorized Locations and with respect to Keurig Packs, only…."

*Paragraph 3.2 reads:*

> "***<u>Keurig Loyalty</u>. <u>Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer</u>***, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs."

*Paragraph 3.3 reads:*

> <u>Keurig Pack Purchasing</u>. ***Distributor <u>shall order</u> and purchase Keurig Packs <u>directly from and only from GMCR</u>***, Licensed Partners or KARDs [Keurig Authorized Re-Distributor], unless otherwise agreed to in writing by GMCR. Nothing shall be construed within this Agreement, implied or not, to bind or require Licensed Partners or KARDs to sell Keurig Packs to Distributor.

> (Emphasis added).

191.    While the agreements feign non-exclusivity by permitting Keurig to essentially do business with whomever it wants, these agreements are fully exclusive as to the Distributors.  If a Distributor wants to purchase and distribute Keurig Portion Pack Brewers, it must agree to purchase Keurig Compatible Cups from Keurig only and must agree not to do business with Cup Competitors, including agreeing not to purchase or distribute Competitive Cups.

192.    These agreements between Keurig and Distributors constitute: (i) unlawful exclusive dealing agreements; and (ii) unlawful tying agreements.  In addition, these agreements further and strengthen Keurig's and the Roaster Competitors' unlawful concerted refusal to deal with Cup Competitors (*i.e.*, a group boycott against Cup Competitors).

193.    Keurig firmly enforces these unlawful agreements.  For example, on or about March 26, 2012, Keurig warned its KADs that they are subject to termination by Keurig if they market or sell Competitive Cups.

194.    Keurig has consistently and unabashedly continued to enforce its exclusionary agreements, notwithstanding the antitrust litigation against it.  For example, as recently as February 28, 2014 (which was after the first complaint was filed in the Related Actions by TreeHouse), one of Keurig's Senior Sales and Customer Relations Managers, David Smagala, threatened Fox Vending, Inc. ("Fox"), a KAD that was considering distributing Competitive Cups.  Fox's President was informed in writing by Keurig that if it wanted to renew its distributorship with Keurig, Fox would have to agree to an even stricter contract containing "a pretty detailed loyalty clause that would need to be adhered to as well.  Meaning our KAD's could only sell Keurig[] K-Cups ***no rouge [sic-rogue] packs could be sold or other brewers sold other than Keurig***."  (Emphasis added.)

195.    According to Fox, its relationship with Keurig was terminated, meaning it could no longer supply its customers with Keurig K-Cups and related supplies, including replacement Keurig Portion Pack Brewers, precluding Fox from being able to adequately meet the demands of its customers.

196.    Such exclusionary conduct keeps Cup Competitors from using these Distributors to distribute and market Competitive Cups.  For example, in early 2012, according to Rogers Family's sworn statements, its representatives met with some of the largest Distributors, but each of the Distributors told Rogers Family that they would not do business with Rogers Family because of the Distributors' exclusive agreements with Keurig.  As one Distributor wrote: "It was very nice meeting with you and learning about [Rogers Family].  Unfortunately *we cannot distribute any other form of [Keurig Compatible Cup] according to our contract with Keurig/Green Mountain*."  (Emphasis added.)

197.    Keurig's actions with Distributors and Retailers enforce its exclusive dealing and tying agreements, which simultaneously support and reinforce Keurig's agreements with Roaster Competitors to boycott Cup Competitors.

198.    According to one Distributor's sworn declaration filed in support of Rogers Family's Motion for Preliminary Injunction:

> Keurig uses these KAD agreements to cement its dominant market position … by forcing vendors to supply only licensed Keurig products, thereby locking customers into the [Keurig] K-Cup ecosystem. Distributors must sign a KAD agreement that includes a "loyalty agreement" that *requires the KAD to only sell Keurig-branded or authorized single-serve coffee brewers and compatible portion packs*.

> (Emphasis added.)

199.    Consumers who purchase supplies from office-service or food-service Distributors often get all of their consumable products from a single Distributor.

200.    Such consumers are completely foreclosed from being able to purchase Competitive Cups from their Distributors who have signed exclusive agreements with Keurig.

201.    Retailers have informed Rogers Family of the exclusive provisions in the Retailers' agreements with Keurig and have stated that Keurig has threatened to terminate access to Keurig K-Cup Branded portion packs if the Retailer purchases any Competitive Cups.  Rogers

Family also reports that some of the few Retailers that sell Competitive Cups have agreed with Keurig to impose other restrictions on the sale of Rogers Family's Competitive Cups.

202.     According to Rogers Family's sworn statements, although Staples found the coffee to be of good quality, "due to [Staples's] contractual agreements with [Keurig]," Staples is "locked in tight" and cannot sell Competitive Cups.

203.     Because a variety of brands—all controlled by Keurig through its web of restrictive agreements—are available at Retailers, such as Staples, consumers would not realize that they had no choice but to buy Keurig K-Cups at the point of sale if they purchase a Keurig Portion Pack Brewer and Keurig Compatible Cups at the same Retailer.

**D.     Keurig Uses Its Market Power in the Portion Pack Brewer Market to Coerce Purchasers of Keurig Portion Pack Brewers to Purchase Only Keurig K-Cups, or at Least to Not Purchase and Sell Competitive Cups**

204.     Keurig uses its market power in the Portion Pack Brewer Market to coerce Distributors and Retailers, as well as other purchasers of Portion Pack Brewers, to purchase only Keurig Compatible Cups manufactured by Keurig (*i.e.*, Keurig K-Cups), or at least to not purchase and sell Competitive Cups.

205.     As discussed above, Keurig enjoyed up to a 93% market share in the Portion Pack Brewer Market, has a massive installed base of those brewers, and controls the majority of major coffee brands who sell products for use in such brewers.

206.     Distributors and Retailers who purchase Keurig Portion Pack Brewers for resale have to be able to purchase and provide their customers with Keurig Compatible Cups for those brewers.  But the restrictive language in their contracts with Keurig requires that they provide their customers with only Keurig K-Cups; they are restricted from purchasing and providing Competitive Cups to their customers.

207.     In many of these contracts, Keurig prohibits the purchaser from contracting with Cup Competitors in the Keurig Compatible Cup Market.

208.    To illustrate, as discussed above, some of Keurig's contracts with Distributors prohibit the Distributor from selling "any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer."

209.    These restrictive agreements containing such provisions constitute an unlawful and per se tying agreement as alleged herein.

**E.    Keurig's Unlawful Conduct Has Harmed and Will Continue to Harm Competition and Consumers in the Keurig Compatible Cup Market**

210.    By the anticompetitive conduct alleged herein, including entering into an extensive web of anticompetitive written agreements with horizontal competitors (the Roaster Competitors), as well as with other participants throughout the supply chain, Keurig has gained control over every aspect of the Keurig Compatible Cup Market, enabling Keurig to exclude competition from this market.

211.    Because Keurig has restrained and excluded competition from Cup Competitors, there has been reduced output, less innovation, reduced consumer choice, and higher prices in the Keurig Compatible Cup Market than there would have been in a competitive market.

212.    Keurig's anticompetitive conduct has harmed competition in the Keurig Compatible Cup Market and has caused significant harm to consumers by reducing output, limiting consumer choice and causing them to pay supracompetitive prices for Keurig K-Cups and other Keurig Compatible Cups.

## VIII. CLASS ALLEGATIONS

213.    Plaintiffs bring this class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3), on their own behalf and as representatives of the Nationwide Class and Indirect-Purchaser State Classes (collectively, "Classes") as defined below with respect to claims  arising at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases (the "Class Period").[1]

---

[1]    Claims brought under Mississippi state law arise at any time between March 24, 2011 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases (the

**A.**     **Nationwide Class Under the Laws of the State of Vermont for Monetary, Equitable, and Injunctive Relief, and Under Federal Law for Injunctive Relief Only**

214.     The following "Nationwide Class" is sought to be certified for monetary, equitable, and injunctive relief under the laws of Vermont:

> All persons and entities in the United States and its various territories that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case.

215.     Vermont law applies to the Nationwide Class because: (i) the center of gravity of the unlawful conduct is Vermont where Keurig planned and orchestrated the unlawful activities alleged herein; (ii) a substantial amount of the research and development, marketing, manufacturing, and distribution of Keurig K-Cups sold to all indirect consumers in every state and territory of the United States originated from or had a substantial connection with Vermont; (iii) a substantial amount of the conspiratorial conduct alleged herein was orchestrated in and emanated from Vermont; (iv) Keurig and its predecessor entity GMCR are identified as a Vermont business; (v) the conduct that took place in Vermont had a substantial effect on trade and commerce in every state and territory of the United States; (vi)  a claim for relief under Vermont's laws exists for all victims of the violations of Vermont law, regardless of where a consumer is a resident or where they purchased the product; (vii) Vermont has a substantial interest in regulating Keurig's conduct because Keurig is headquartered in Vermont and has its largest operations and largest number of employees in Vermont; (viii) Vermont has a substantial

"Mississippi Class Period").

interest in deterring and punishing Keurig's unlawful conduct and ensuring that Vermont does not become either a base or a haven for Keurig to inflict nationwide injuries; (ix) Keurig was unjustly enriched and retains funds in constructive trust in Vermont, which were obtained from consumers in every state and territory of the United States; and (x) Vermont has a substantial interest in ensuring that money from sales that took place in other jurisdictions, but that flows into Vermont and contributes to Vermont's tax revenues, is not the result of violations of Vermont's laws.

216.    The following "Nationwide Injunctive Class" is sought to be certified for injunctive relief under the federal laws alleged herein:

> All persons and entities in the United States and its various territories that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case.

**B.    State Law Indirect-Purchaser Classes**

217.    Plaintiffs also seek to certify the following classes (collectively, the "Indirect-Purchaser State Classes") with respect to claims under the antitrust, consumer protection, or unfair trade practices statutes of each of those jurisdictions where applicable, and under common law principles of unjust enrichment where recognized in such jurisdictions:

(a)    **Arizona**:  All persons and entities in Arizona that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases.

Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Arizona Indirect-Purchaser Class").

(b)     **Arkansas**:  All persons and entities in Arkansas that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Arkansas Indirect-Purchaser Class").

(c)     **California**:  All persons and entities in California that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig

Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "California Indirect-Purchaser Class").

(d)     **District of Columbia**:  All persons and entities in the District of Columbia that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases.  Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "District of Columbia Indirect-Purchaser Class").

(e)     **Iowa**:  All persons and entities in Iowa that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions,

agencies and instrumentalities, and any judge or jurors assigned to this
case (the "Iowa Indirect-Purchaser Class").

(f)  **Kansas**:  All persons and entities in Kansas that indirectly purchased at
least one Keurig K-Cup, which was manufactured or licensed by Keurig,
its subsidiaries, affiliates, or joint venturers, for their own use and not for
resale, at any time between September 7, 2010 and such time as the
anticompetitive effects of Keurig's conduct alleged herein ceases.
Excluded from the Class are Keurig and its subsidiaries, parents, affiliates,
joint venturers, Roaster Competitors, and parties to any supply, retail, or
distribution contracts with Keurig relating to Keurig K-Cups or Keurig
Portion Pack Brewers, as well as all federal governmental entities and
instrumentalities of the federal government, states and their subdivisions,
agencies and instrumentalities, and any judge or jurors assigned to this
case (the "Kansas Indirect-Purchaser Class").

(g)  **Maine**:  All persons and entities in Maine that indirectly purchased at least
one Keurig K-Cup, which was manufactured or licensed by Keurig, its
subsidiaries, affiliates, or joint venturers, for their own use and not for
resale, at any time between September 7, 2010 and such time as the
anticompetitive effects of Keurig's conduct alleged herein ceases.
Excluded from the Class are Keurig and its subsidiaries, parents, affiliates,
joint venturers, Roaster Competitors, and parties to any supply, retail, or
distribution contracts with Keurig relating to Keurig K-Cups or Keurig
Portion Pack Brewers, as well as all federal governmental entities and
instrumentalities of the federal government, states and their subdivisions,
agencies and instrumentalities, and any judge or jurors assigned to this
case (the "Maine Indirect-Purchaser Class").

(h) **Massachusetts**:  All persons and entities in Massachusetts that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Massachusetts Indirect-Purchaser Class").

(i) **Michigan**:  All persons and entities in Michigan that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Michigan Indirect-Purchaser Class").

(j) **Minnesota**:  All persons and entities in Minnesota that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use

and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Minnesota Indirect-Purchaser Class").

(k)     **Mississippi**:  All persons and entities in Mississippi that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time during the Mississippi Class Period. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Mississippi Indirect-Purchaser Class").

(l)     **Missouri**:  All persons and entities in Missouri that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or

distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Missouri Indirect-Purchaser Class").

(m)   **Nebraska**:  All persons and entities in Nebraska that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Nebraska Indirect-Purchaser Class").

(n)   **Nevada**:  All persons and entities in Nevada that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions,

agencies and instrumentalities, and any judge or jurors assigned to this case (the "Nevada Indirect-Purchaser Class").

(o)   **New Hampshire**:  All persons and entities in New Hampshire that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases.  Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "New Hampshire Indirect-Purchaser Class").

(p)   **New Mexico**:  All persons and entities in New Mexico that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "New Mexico Indirect-Purchaser Class").

(q) **New York**:  All persons and entities in New York that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "New York Indirect-Purchaser Class").

(r) **North Carolina**:  All persons and entities in North Carolina that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "North Carolina Indirect-Purchaser Class").

(s) **North Dakota**:  All persons and entities in North Dakota that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use

- 56 -

and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "North Dakota Indirect-Purchaser Class").

(t)    **Oregon**:  All persons and entities in Oregon that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Oregon Indirect-Purchaser Class").

(u)    **Rhode Island**:  All persons and entities in Rhode Island that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between July 15, 2013 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates,

joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Rhode Island Indirect-Purchaser Class").

(v)     **South Dakota**:  All persons and entities in South Dakota that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "South Dakota Indirect-Purchaser Class").

(w)     **Tennessee**:  All persons and entities in Tennessee that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and

instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Tennessee Indirect-Purchaser Class").

(x) **Vermont**:  All persons and entities in Vermont that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Vermont Indirect-Purchaser Class").

(y) **West Virginia**:  All persons and entities in West Virginia that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "West Virginia Indirect-Purchaser Class").

(z)   **Wisconsin**:  All persons and entities in Wisconsin that indirectly purchased at least one Keurig K-Cup, which was manufactured or licensed by Keurig, its subsidiaries, affiliates, or joint venturers, for their own use and not for resale, at any time between September 7, 2010 and such time as the anticompetitive effects of Keurig's conduct alleged herein ceases. Excluded from the Class are Keurig and its subsidiaries, parents, affiliates, joint venturers, Roaster Competitors, and parties to any supply, retail, or distribution contracts with Keurig relating to Keurig K-Cups or Keurig Portion Pack Brewers, as well as all federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and any judge or jurors assigned to this case (the "Wisconsin Indirect-Purchaser Class").

218.    Each of the Classes is individually so numerous that joinder of all members is impracticable.  Even though the exact number of members of each of the Classes is unknown at this time, based on the nature of the trade and commerce involved, Plaintiffs reasonably believe that there are at least thousands of members in each of the Classes and that their identities can be readily ascertained from records in the possession of Keurig and third parties.

219.    Each of the Classes is readily ascertainable because: (i) the vast majority of Keurig K-Cups are purchased by consumers through a small number of large third-party vendors, Retailers, or Distributors who have detailed records of customer sales from purchase orders, invoices, on-line transaction records, membership programs, or loyalty-reward card records; (2) a substantial number of the members of the Classes have proof of their purchases by virtue of receipts or credit card statements, or other evidence; and (3) Keurig is in possession of data that identifies a substantial number of members of the Classes, including warranty data as well as other consumer data provided to Keurig by Distributors, Retailers, and other third-party vendors.

220.    Members of the Classes are geographically dispersed.  Members of the Nationwide Class and Nationwide Injunctive Class are dispersed throughout the United States and

its territories, and members of the State Indirect Purchaser Classes are dispersed throughout and beyond the states for which such Classes are defined herein.

221.    Plaintiffs' claims are typical of the claims of the other members of the Classes.

222.    Plaintiffs and the members of the Classes have all sustained damages during the applicable Class Period as a result of having purchased one or more Keurig K-Cups indirectly from Keurig at supracompetitive prices.  Keurig's anticompetitive conduct alleged herein, the impact of such conduct, and the relief sought are all issues or questions that are common to Plaintiffs and the Classes.

223.    Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel competent and experienced in class action and antitrust litigation.  Plaintiffs' interests are coincident with, and not antagonistic to, the interests of the Classes.

224.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual Class members.

225.    The questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether the Portion Pack Brewer Market is a relevant product market;

(b)    Whether the Keurig Compatible Cup Market is a relevant product market;

(c)    Whether the United States constitutes a relevant geographic market for the Portion Pack Brewer Market and the Keurig Compatible Cup Market;

(d)    Whether Keurig possesses market or monopoly power in the Portion Pack Brewer Market;

(e)    Whether Keurig possesses market or monopoly power in the Keurig Compatible Cup Market;

(f)    Whether Keurig and its alleged horizontal competitors (Roaster Competitors) agreed or combined to restrain competition and exclude competitors from the Keurig Compatible Cup Market;

(g)     Whether Keurig entered into concerted refusals to deal in order to
foreclose competition and exclude Cup Competitors from the Keurig
Compatible Cup Market;

(h)     Whether Keurig used its market power in the Portion Pack Brewer Market
to coerce purchasers who buy Portion Pack Brewers to purchase Keurig
K-Cups, or at least not to purchase Competitive Cups;

(i)     Whether Keurig combined or conspired to fix, raise, maintain, or stabilize
the price of Keurig K-Cups or otherwise restrain trade in the United
States;

(j)     Whether Keurig violated federal and state antitrust and consumer
protection laws;

(k)     Whether the conduct of Keurig, as alleged in this SAC, caused injury to
the business or property of Plaintiffs and the members of the Class;

(l)     The effect of Keurig's conduct on the prices of Keurig K-Cups sold in the
United States during the applicable Class Period;

(m)     The appropriate class-wide measure of damages; and

(n)     Whether the Classes are entitled to injunctive relief sought herein.

226.     A class action is superior to other available methods for the fair and efficient
adjudication of this controversy because joinder of all members of each Class is impracticable.

227.     The prosecution of separate actions by individual members of the Classes would
impose heavy burdens upon the courts and the parties, and it would create a risk of inconsistent or
varying adjudications of the questions of law and fact common to each of the members of the
Classes.  A class action would achieve substantial economies of time, effort, and expense, and it
would assure uniformity of decision as to persons similarly situated without sacrificing procedural
fairness.  There will be no material difficulty in the management of this action as a class action on
behalf of the Classes.  Though the laws of different states are implicated in the SAC, these laws

are substantially similar to one another and the common elements can be grouped together in readily manageable categories.

## IX. CLAIMS FOR RELIEF[2]

**FIRST CLAIM FOR RELIEF**
**Vermont Antitrust Violations**
**Violation of 9 V.S.A. §§ 2453, 2461, 2465 — Vermont Consumer Fraud Act**
**(Monopolization — Exclusive Dealing — Group Boycott)**
**On Behalf of the Nationwide Class**

228.    Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

229.    The Vermont Consumer Fraud Act ("VCFA"), 9 V.S.A. §§ 2453, *et seq.*, prohibits unfair and deceptive methods of competition in commerce and provides a private remedy for "***any consumer*** who . . . sustains damages or injury as a result of any false or fraudulent representations ***or practices prohibited by . . . this title***."  (Emphasis added.)

230.    Section 2461c(a) of the VCFA provides that: "No person, with the intent to harm competition, shall … maintain a monopoly or otherwise harm[] competition.  A violation of this subsection is deemed to be an unfair method of competition in commerce and a violation of section 2453 of this title."

231.    The VCFA gives any person the right to recover for harm sustained as a result of any violation of the VCFA, regardless of whether the person dealt directly with the defendant.

232.    The VCFA does not require that the person bringing the action be a resident of Vermont, nor does it require that the person bringing the action have purchased the product in Vermont.

---

[2] Plaintiffs continue to plead all Claims for Relief pleaded in the Second Amended Complaint in spite of This Court's Opinion and Order of April 22, 2019 (ECF No. 581) in order to preserve such claims in light of their Motion for Reconsideration (ECF No. 582) as well as for any future appeal.

233.   Keurig is and was a seller, solicitor, or other violator as those terms are used under Vermont law and, by the conduct alleged herein, intended to harm competition in the Keurig Compatible Cup Market.

234.   Plaintiffs and the Nationwide Class were subjected to supracompetitive pricing in the Keurig Compatible Cup Market while unaware that Keurig and its co-conspirators had restrained, and further threatened to restrain, competition in the Relevant Markets:

> (a)   By entering into exclusive supply arrangements with manufacturers of equipment and suppliers of components needed to produce traditionally-designed Keurig Compatible Cups to deter or foreclose potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market;
>
> (b)   By entering into multi-year exclusive agreements with Roaster Competitors to lock up substantially all of their coffee (and other hot-beverage products) for use in Keurig Compatible Cups and preventing them from doing business with Cup Competitors, collectively constituting a concerted refusal to deal with Cup Competitors (*i.e.*, a group boycott); and
>
> (c)   By entering into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors.

235.   By virtue of the conduct alleged herein, Keurig and those acting in concert with it entered into contracts where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in Vermont in violation of Section 2453, *et seq.*, of Vermont Title 9.

236.   Keurig's contract, combination, trust or conspiracy was centered in, carried out, and effectuated and perfected substantially within the state of Vermont.  Specifically, Keurig formulated in Vermont its practices designed to harm competition, and this conduct injured all

members of the Nationwide Class in every state and territory of the United States.  This claim for relief under Vermont law is brought on behalf of all members of the Nationwide Class, whether or not they are Vermont residents and whether or not they purchased their product in Vermont. Alternatively, this claim for relief is brought on behalf of only the Vermont Indirect-Purchaser Class.

237.    As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the Nationwide Class and the Vermont Indirect-Purchaser Class have been injured in their business or property by paying more for Keurig K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Keurig's violation of Section 2453, *et seq.*, of Vermont Title 9, Plaintiffs and the Nationwide Class seek the consideration given or the value thereof by the Nationwide Class for Keurig K-Cups (or damages in the alternative), and exemplary damages not exceeding three times the value of the consideration given by the Nationwide Class for Keurig K-Cups, as well as the costs of suit, including reasonable attorneys' fees, pursuant to Section 2465 of Vermont Title 9.

### SECOND CLAIM FOR RELIEF
**Vermont Unlawful Tying Violations**
**Violation of 9 V.S.A. §§ 2453, 2461, 2465, Vermont Consumer Fraud Act**
**On Behalf of the Nationwide Class**

238.    Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

239.    Keurig Portion Pack Brewers (tying products) and Keurig K-Cups (tied products) are separate and distinct products.

240.    Keurig coerced Distributors and Retailers, and other third-party purchasers of Keurig Portion Pack Brewers, into accepting Keurig K-Cups or at least into agreeing not to purchase Competitive Cups.

241.    Keurig has and had sufficient economic power in the Keurig Portion Pack Brewer Market to coerce Keurig Portion Pack Brewer purchasers' acceptance of Keurig K-Cups.

242.    Keurig's conduct has and had anticompetitive effects in the Keurig Compatible Cup Market.

243.    Keurig's conduct involved a "not insubstantial" amount of interstate commerce in the Keurig Compatible Cup Market.

244.    Plaintiffs and the Nationwide Class have been and will continue to be harmed by the conduct alleged herein because Keurig's conduct has and will continue to cause consumers to pay supracompetitive prices for Keurig K-Cups and has substantially foreclosed and will continue to restrict consumers' ability to have meaningful access to alternative less expensive, high-quality Competitive Cups.

245.    Keurig's conduct was a substantial factor in causing Plaintiffs' and the Nationwide Class's harm.

246.    Keurig's conduct alleged herein injured all members of the Nationwide Class in every state and territory of the United States.  Therefore, this claim for relief under Vermont law is brought on behalf of all members of the Nationwide Class, whether or not they are Vermont residents and whether or not they purchased their product in Vermont.  Alternatively, this claim for relief is brought on behalf of only the Vermont Indirect-Purchaser Class.

247.    As a direct and proximate result of Keurig's unlawful conduct, Plaintiffs and the members of the Nationwide Class and the Vermont Indirect-Purchaser Class have been injured in their business or property by paying more for Keurig K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.  As a result of Keurig's violation of Section 2453, *et seq.*, of Vermont Title 9, Plaintiffs and the Nationwide Class seek the consideration given or the value thereof by the Nationwide Class for Keurig K-Cups (or damages in the alternative), and exemplary damages not exceeding three times the value of the consideration given by the Nationwide Class for Keurig K-Cups, as well as the costs of suit, including reasonable attorneys' fees, pursuant to Section 2465 of Vermont Title 9.

### THIRD CLAIM FOR RELIEF
### Violation of Vermont Common Law Unjust Enrichment
### On Behalf of the Nationwide Class

248.     Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

249.     By virtue of the sale of Keurig K-Cups to Plaintiffs and the Nationwide Class, a benefit was conferred on Keurig.

250.     Keurig accepted the benefit.

251.     Keurig retained the benefit under such circumstances that it would be inequitable for Keurig not to compensate Plaintiffs and the Nationwide Class for the benefit conferred on Keurig.

252.     Plaintiffs and the Nationwide Class therefore seek a constructive trust, restitution, or disgorgement of profits or all monies conferred on Keurig as a result of Keurig K-Cup purchases made by Plaintiffs and the Nationwide Class.

253.     Keurig received and accepted a benefit from all members of the Nationwide Class in every state and territory of the United States.  Therefore, this claim for relief under Vermont law is brought on behalf of all members of the Nationwide Class, whether or not they are Vermont residents and whether or not they purchased their product in Vermont.  Alternatively, this claim for relief is brought on behalf of only the Vermont Indirect-Purchaser Class.

### FOURTH CLAIM FOR RELIEF
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### (Agreements Restraining Trade — Concerted Refusal to Deal — Group Boycott)
### Injunctive Relief Only

254.     Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

255.     Keurig entered into Roaster Agreements with its Roaster Competitors.  The Roaster Agreements, and their enforcement, constitute contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade in the Keurig Compatible Cup Market,

and harmed Plaintiffs and the Nationwide Injunctive Class thereby, in at least the following manners:

    (a)    The Roaster Agreements constitute concerted refusals to deal, in which the parties thereto refused to do business with Cup Competitors;

    (b)    The Roaster Agreements, alone and together with other restraints as pled herein, have as an end an intended consequence of coercing or pressuring Cup Competitors to become licensees of Keurig; and

    (c)    The Roaster Agreements constitute unlawful horizontal restraints on trade.

256.    The Roaster Agreements restrain a sufficiently substantial portion of the Keurig Compatible Cup Market to the detriment of competition.

257.    The Roaster Agreements had, and have at the time of the filing of this SAC, at least the following effects:

    (a)    To deprive all or substantially all Cup Competitors of significant sources of high-quality coffee for the purpose of inclusion in Competitive Cups;

    (b)    To deprive all or substantially all Cup Competitors of the use of substantially all major and recognizable brands of coffee;

    (c)    To deprive all or substantially all Cup Competitors of the ability to enter into manufacturing agreements with substantially all of the Roaster Competitors for the purpose of manufacturing Competitive Cups; and

    (d)    To deprive all or substantially all Cup Competitors of the ability to contract to access the retail or distribution networks of substantially all of the Roaster Competitors that have their own retail or distribution operations.

258.    The Roaster Agreements have created barriers to entry into the Keurig Compatible Cup Market, limited the output of Competitive Cups, limited the array of Competitive Cups available to consumers, and artificially raised and maintained the price paid by consumers in the Keurig Compatible Cup Market.

259.     Keurig is per se liable for the creation, maintenance, and enforcement of the Roaster Agreements.

260.     Plaintiffs and members of the Nationwide Injunctive Class were injured in their business or property by the Roaster Agreements alleged above which facilitated, enabled, assisted, or furthered Defendant's substantial foreclosure and exclusion of competition in the Relevant Markets.

261.     The contract, combination, and conspiracy is continuing, and will continue unless the injunctive relief prayed for herein is granted.

262.     Plaintiffs and the Nationwide Injunctive Class are entitled to an injunction against the Defendant, preventing and restraining the violations alleged herein.

**FIFTH CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Restraint of Trade)**
**Injunctive Relief Only**

263.     Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

264.     Keurig has entered into a series of agreements throughout the supply chain for the Keurig Compatible Cup Market that restrain trade:

(a)     By entering into exclusive supply arrangements with manufacturers of equipment, and suppliers of components, needed to produce traditionally-designed Keurig Compatible Cups to deter or foreclose potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market;

(b)     By entering into multi-year exclusive agreements with Roaster Competitors to lock up substantially all of their coffee (and other hot-beverage products) for use in Keurig Compatible Cups and preventing them from doing business with Cup Competitors; and

       (c)     By entering into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors.

265.    Some of Keurig's exclusionary agreements with Retailers and Distributors prohibit Retailers and Distributors from purchasing Competitive Cups.

266.    Keurig's exclusionary agreements with suppliers of the components necessary to manufacture traditionally-designed Keurig Compatible Cups (including Roaster Competitors and other suppliers of coffee or other hot-beverage products that are contained within Keurig Compatible Cups and suppliers of components used to make the Keurig Compatible Cups themselves) and with suppliers of the machinery necessary to manufacture traditionally-designed Keurig Compatible Cups prohibit these suppliers from supplying the same components and equipment to Cup Competitors for the purpose of manufacturing Competitive Cups.

267.    Keurig's exclusionary agreements with Retailers, Distributors, component suppliers, and machinery suppliers substantially foreclosed competition in the Keurig Compatible Cup Market by preventing Cup Competitors from accessing the inputs (*i.e.*, equipment, components, and coffee) and retail and distribution channels generally necessary to compete in the Keurig Compatible Cup Market.

268.    There is no procompetitive justification for these exclusionary agreements that outweighs their anticompetitive effects; namely, the foreclosure of competition in the Keurig Compatible Cup Market.  Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

269.    Keurig's exclusionary agreements with retailers, distributors, and suppliers injured, and continues to injure, Plaintiffs and members of the Nationwide Injunctive Class in their business or property by:

       (a)     Restricting output and limiting consumer choice in the Keurig Compatible Cup Market; and

       (b)     Forcing Plaintiffs and members of the Nationwide Injunctive Class to pay artificially high, supracompetitive prices for Keurig K-Cups.

270.    The injury to Plaintiffs and members of the Nationwide Injunctive Class was a direct, foreseeable, and proximate result of Keurig's exclusionary agreements with Retailers, Distributors, and suppliers.

271.    Plaintiffs and members of the Nationwide Injunctive Class have suffered irreparable harm and do not have an adequate remedy at law.  Accordingly, Plaintiffs and members of the Nationwide Injunctive Class seek injunctive and equitable relief.

**SIXTH CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**and Section 3 of the Clayton Act, 15 U.S.C. § 14**
**(Exclusive Dealing)**
**Injunctive Relief Only**

272.    Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

273.    Keurig has entered into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors.

274.    These exclusionary agreements generally involved Keurig's conditioning of sales to Distributors and Retailers on the Retailers and Distributors not dealing in the goods of Cup Competitors.

275.    These exclusionary agreements substantially foreclosed competition in the Keurig Compatible Cup Market by preventing Cup Competitors from accessing distribution and retail channels generally necessary to meaningfully compete with Keurig.

276.    There is no procompetitive justification for these exclusionary agreements that outweighs the anticompetitive effects of such agreements, namely the foreclosure of competition

in the Keurig Compatible Cup Market.  Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

277.    Keurig's exclusionary agreements injured and continues to injure Plaintiffs and members of the Nationwide Injunctive Class in their business or property by:

      (a)    Restricting output and limiting consumer choice in the Keurig Compatible Cup Market; and

      (b)    Forcing Plaintiffs and members of the Nationwide Injunctive Class to pay artificially high, supracompetitive prices for Keurig K-Cups.

278.    The injury to Plaintiffs and members of the Nationwide Injunctive Class was a direct, foreseeable, and proximate result of Keurig's exclusionary agreements.

279.    Plaintiffs and members of the Nationwide Injunctive Class have suffered irreparable harm and do not have an adequate remedy at law.  Accordingly, Plaintiffs and members of the Nationwide Class seek injunctive and equitable relief.

**SEVENTH CLAIM FOR RELIEF**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Monopolization)**
**Injunctive Relief Only**

280.    Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

281.    The relevant market is the Keurig Compatible Cup Market in the United States.

282.    Keurig has monopoly power in the Keurig Compatible Cup Market.

283.    Keurig has willfully acquired or maintained its monopoly in the Keurig Compatible Cup Market:

      (a)    By entering into exclusive supply arrangements with manufacturers of equipment and suppliers of components needed to produce traditionally-designed Keurig Compatible Cups to deter or foreclose potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market;

(b)    By entering into multi-year exclusive agreements with Roaster Competitors to lock up substantially all of their coffee (and other hot-beverage products) for use in Keurig Compatible Cups and preventing them from doing business with Cup Competitors; and

(c)    By entering into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors.

284.    Keurig's acquisition or maintenance of its monopoly in the Keurig Compatible Cup Market is not a result of growth or development as a consequence of a superior product, business acumen, or historic accident, but is the result of the unlawful conduct alleged herein.

285.    There is no procompetitive justification for Keurig's anticompetitive conduct that outweighs its anticompetitive effects; namely, the foreclosure of competition in the Keurig Compatible Cup Market. Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

286.    Keurig's willful acquisition or maintenance of its monopoly in the Keurig Compatible Cup Market injured, and continues to injure, Plaintiffs and members of the Nationwide Injunctive Class in their business or property by:

(a)    Restricting output and limiting consumer choice in the Keurig Compatible Cup Market; and

(b)    Forcing Plaintiffs and members of the Nationwide Injunctive Class to pay artificially high, supracompetitive prices for Keurig K-Cups.

287.    The injury to Plaintiffs and members of the Nationwide Injunctive Class was a foreseeable consequence of Keurig's willful acquisition or maintenance of its monopoly in the Keurig Compatible Cup Market.

288.    Plaintiffs and members of the Nationwide Injunctive Class have suffered irreparable harm and do not have an adequate remedy at law. Accordingly, Plaintiffs and members of the Nationwide Injunctive Class seek injunctive and equitable relief.

**EIGHTH CLAIM FOR RELIEF**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Attempted Monopolization)**
**Injunctive Relief Only**

289.    Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

290.    The relevant market is the Keurig Compatible Cup Market in the United States.

291.    Keurig has attempted to monopolize the Keurig Compatible Cup Market.

292.    Keurig has willfully engaged in predatory or anticompetitive conduct with the specific intent of monopolizing the Keurig Compatible Cup Market:

> (a)    By entering into exclusive supply arrangements with manufacturers of equipment and suppliers of components needed to produce traditionally-designed Keurig Compatible Cups to deter or foreclose potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market;

> (b)    By entering into multi-year exclusive agreements with Roaster Competitors to lock up substantially all of their coffee (and other hot-beverage products) for use in Keurig Compatible Cups and preventing them from doing business with Cup Competitors; and

> (c)    By entering into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors.

293.    The anticompetitive conduct described herein undertaken by Keurig creates a dangerous probability that Keurig will achieve monopoly power in the Keurig Compatible Cup Market.

294.    There is no procompetitive justification for Keurig's anticompetitive conduct that outweighs its anticompetitive effects; namely, the foreclosure of competition in the Keurig

Compatible Cup Market.  Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

295.    Keurig's predatory and anticompetitive conduct described herein, which was done with the intent of monopolizing the Keurig Compatible Cup Market, injured, and continues to injure, Plaintiffs and members of the Nationwide Injunctive Class in their business or property by:

> (a)    Restricting output and limiting consumer choice in the Keurig Compatible Cup Market; and
>
> (b)    Forcing Plaintiffs and members of the Nationwide Injunctive Class to pay artificially high, supracompetitive prices for Keurig K-Cups.

296.    The injury to Plaintiffs and members of the Nationwide Injunctive Class was a foreseeable consequence of Keurig's predatory and unlawful conduct, described herein, which was done with the intent of monopolizing the Keurig Compatible Cup Market.

297.    Plaintiffs and members of the Nationwide Injunctive Class have suffered irreparable harm and do not have an adequate remedy at law.  Accordingly, Plaintiffs and members of the Nationwide Class seek injunctive and equitable relief.

### NINTH CLAIM FOR RELIEF
### Violation of Other State Antitrust and Unfair Competition Laws

298.    Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

299.    Keurig K-Cups are distributed or sold in each of the below jurisdictions by at least one of the Roaster Competitors, Distributors, or Retailers.

300.    Keurig entered into unlawful agreements in each of the below jurisdictions.

**Arizona**

301.    By reason of the conduct alleged herein, Keurig has violated Arizona Rev. Stat. §§ 44-1401, *et seq*.

302.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Arizona.

303.    Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Arizona, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Keurig Compatible Cup Market.

304.    Keurig's violations of Arizona law were flagrant.

305.    Keurig's unlawful conduct substantially affected Arizona's trade and commerce. ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in Arizona.

306.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Arizona Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

307.    By reason of the foregoing, the Arizona Indirect-Purchaser Class is entitled to seek all forms of relief available under Arizona Revised Stat. §§ 44-1401, *et seq*.

**California**

308.    By reason of the conduct alleged herein, Keurig has violated California Bus. & Prof. Code §§ 16700, *et seq.* and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq.*

309.    Keurig entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of California Bus. & Prof. Code §§ 16700, 16720, *et seq.* In order to maintain the price of Keurig K-Cups at supracompetitive levels at the California Indirect-Purchaser Class's expense, Keurig has combined and conspired to restrain and exclude competition in the Keurig Compatible Cup Market.

310.    Keurig's anticompetitive conduct was knowing and willful and constitutes a flagrant violation of Section §§ 16700, *et seq.*

311.    Keurig has entered into a series of agreements throughout the supply chain for the Keurig Compatible Cup Market that restrain trade:

        (a)    By entering into exclusive supply arrangements with manufacturers of equipment and suppliers of components needed to produce traditionally-designed Keurig Compatible Cups to deter or foreclose potential Cup Competitors from entering and effectively competing in the Keurig Compatible Cup Market;

        (b)    By entering into multi-year exclusive agreements with Roaster Competitors to lock up substantially all of their coffee (and other hot-beverage products) for use in Keurig Compatible Cups and preventing them from doing business with Cup Competitors; and

        (c)    By entering into multi-year, exclusive dealing agreements with Distributors and Retailers who agreed not to do business or to severely limit the volume or scope of business they do with Cup Competitors.

312.    Keurig's exclusionary agreements with Retailers and Distributors prohibit or restrain Retailers and Distributors from purchasing Competitive Cups.

313.     Keurig's exclusionary agreements with suppliers of the components necessary to manufacture traditionally-designed Compatible Cups (including Roaster Competitors and other suppliers of coffee or other beverages that are contained within Keurig Compatible Cups and suppliers of components used to make the Keurig Compatible Cups themselves) and with suppliers of the machinery necessary to manufacture traditionally-designed Keurig Compatible Cups prohibit these suppliers from supplying the same components and equipment to Cup Competitors for the purpose of manufacturing Competitive Cups.

314.     Keurig's exclusionary agreements with Retailers, Distributors, component suppliers, and machinery suppliers substantially foreclosed competition in the Keurig Compatible Cup Market by preventing Cup Competitors from accessing the inputs (*i.e.*, equipment, components, and coffee) and retail and distribution channels generally necessary to compete in the Keurig Compatible Cup Market.

315.     There is no procompetitive justification for these exclusionary agreements that outweighs their anticompetitive effects; namely, the foreclosure of competition in the Keurig Compatible Cup Market.  Any possible procompetitive benefits for such conduct could have been obtained by less restrictive alternatives.

316.     Keurig's exclusionary agreements with Roaster Competitors, Distributors, Retailers, and suppliers injured, and continues to injure, Plaintiffs and members of the California Indirect-Purchaser Class in their business or property by:

        (a)     Restricting output and limiting consumer choice in the Keurig Compatible Cup Market; and

        (b)     Forcing members of the California Indirect-Purchaser Class to pay artificially high, supracompetitive prices for Keurig K-Cups.

317.     Injury to members of the California Indirect-Purchaser Class was a direct, foreseeable, and proximate result of Keurig's exclusionary agreements.

318.    Members of the California Indirect-Purchaser Class have suffered irreparable harm and do not have an adequate remedy at law.  Accordingly, members of the California Indirect-Purchaser Class seek injunctive and equitable relief.

319.    By virtue of the conduct alleged herein, Keurig has entered into contracts, in concerted action with others, where the effect of such contract was to substantially lessen competition or tended to create a monopoly in a line of trade or commerce in California in violation of Section 16720, *et seq.* ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in California.

320.    As a direct and proximate result of Keurig's unlawful conduct, the members of the California Indirect-Purchaser Class have been injured in their business or property by paying more for Keurig K-Cups than they otherwise would have paid but for Keurig's unlawful conduct. As a result of Defendant's violation of Section 16700, *et seq.*, the California Indirect-Purchaser Class seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a).

321.     By reason of the conduct alleged herein, as an independent basis for relief, Keurig has violated Section 16700, 16720, and 16727, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, because it has engaged in unlawful tying.

322.     Keurig Portion Pack Brewers (tying products) and Keurig K-Cups (tied products) are separate and distinct products.

323.     Keurig sells Keurig Portion Pack Brewers only if the buyers also purchase Keurig K-Cups or at least agree not to purchase Competitive Cups.

324.     Keurig sold Keurig Portion Pack Brewers and required or otherwise coerced buyers into also purchasing Keurig K-Cups or into agreeing not to purchase Competitive Cups.

325.     Keurig had market power in the Keurig Portion Pack Brewer Market, which enabled it to leverage and impose an appreciable restraint on competition for Keurig Compatible Cups by coercing purchasers into buying Keurig K-Cups or not purchasing Competitive Cups and thereby significantly reducing the volume of sales of Competitive Cups.  Keurig had sufficient economic power in the market for Keurig Portion Pack Brewers to coerce consumers into purchasing Keurig K-Cups.  The tying agreements entered into by Keurig have restrained competition for a substantial amount of sales, in terms of total dollar volume, of Competitive Cups.

326.     Members of the California Indirect-Purchaser Class have been and will continue to be harmed by the conduct alleged herein because Keurig's conduct has and will continue to force consumers to pay supracompetitive prices for  Keurig K-Cups and has foreclosed and will continue to foreclose consumers from being able to choose from alternative less-expensive, high-quality Competitive Cups.

327.     Keurig's conduct was a substantial factor in causing harm to the California Indirect-Purchaser Class.

328.     As a direct and proximate result of Keurig's unlawful conduct, the members of the California Indirect-Purchaser Class have been injured in their business or property by paying more for Keurig K-Cups than they otherwise would have paid but for Keurig's unlawful conduct.

As a result of Defendant's violation of Section 16720, *et seq.*, of the California Business and Professions Code, the California Indirect-Purchaser Class seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

**District of Columbia**

329.    By reason of the conduct alleged herein, Keurig has violated District of Columbia Code Ann. §§ 28-4501, *et seq.*

330.    Keurig entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within the District of Columbia.

331.    Keurig monopolized or attempted to monopolize a substantial part of trade or commerce within the District of Columbia.

332.    Keurig's unlawful conduct substantially affected the District of Columbia's trade and commerce. ██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in the District of Columbia.

333.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the District of Columbia Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

334.    By reason of the foregoing, the District of Columbia Indirect-Purchaser Class is entitled to seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

**Iowa**

335.    By reason of the conduct alleged herein, Keurig has violated Iowa Code §§ 553.1, *et seq.*

336.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Iowa.

337.    Keurig attempted to establish or established, maintained, or used a monopoly of trade or commerce in the Relevant Markets for the purpose of excluding competition, or controlling, fixing, or maintaining prices in the Keurig Compatible Cup Market, a substantial part of which occurred within Iowa.

338.    Keurig's unlawful conduct substantially affected Iowa's trade and commerce.



In addition, there are numerous retail outlets offering K-Cups for sale in Iowa.

339.    Keurig's conduct was willful or flagrant.

340.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Iowa Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

341.    By reason of the foregoing, the Iowa Indirect-Purchaser Class is entitled to seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

**Kansas**

342.    By reason of the conduct alleged herein, Keurig has violated Kansas Stat. Ann. §§ 50-101, *et seq.*

343.    Keurig entered into a trust, a combination of capital, skill, or acts, by two or more persons, for the following purposes:

    (a)    To create or carry out restrictions in trade or commerce, or to carry out restrictions in the full and free pursuit of competition in the Keurig Compatible Cup Market;

    (b)    To preclude free and open competition in the manufacture, making, transportation, sale, or purchase of Keurig Compatible Cups; or

    (c)    To make or enter into, or execute or carry out, a contract, obligation, or agreement by which the parties: (i) bound or had to bind themselves not to sell, manufacture, dispose of or transport Competitive Cups; or (ii) agreed to pool, combine, or unite any interest they may have in connection with the manufacture, sale, or transportation in the Keurig Compatible Cup Market, and the price of Keurig K-Cups was affected.

344.    Keurig entered into arrangements, contracts, agreements, trusts, or combinations with at least one other person with a view or which tend to preclude full and free competition in the importation, transportation, or sale of Keurig Compatible Cups in Kansas.

345.    Keurig's unlawful conduct substantially affected Kansas's trade and commerce.

████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in Kansas.

346.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Kansas Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

347.    By reason of the foregoing, the Kansas Indirect-Purchaser Class is entitled to seek all forms of relief available under Kansas Stat. Ann. §§ 50-101, *et seq*.

## Maine

348.    By reason of the conduct alleged herein, Keurig has violated Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

349.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Maine.

350.    Keurig attempted to monopolize or monopolized trade or commerce in the Relevant Markets for the purpose of excluding competition in the Keurig Compatible Cup Market, a substantial part of which occurred within Maine.

351.    Keurig's unlawful conduct substantially affected Maine's trade and commerce. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in Maine.

352.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Maine Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

353.    By reason of the foregoing, the Maine Indirect-Purchaser Class is entitled to seek all forms of relief available under Maine Rev. Stat. Ann. tit. 10, §§ 1101, *et seq*.

**Michigan**

354.    By reason of the conduct alleged herein, Keurig has violated Michigan Comp. Laws. Ann. §§ 445.771, *et seq*.

355.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Michigan.

356.    Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Keurig Compatible Cup Market, for the purpose of excluding or limiting competition or controlling or maintaining prices, a substantial part of which occurred within Michigan.

357.    Keurig's unlawful conduct substantially affected Michigan's trade and commerce. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in Michigan.

358.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Michigan Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

359.    By reason of the foregoing, the Michigan Indirect-Purchaser Class is entitled to seek all forms of relief available under Michigan Comp. Laws. Ann. §§ 445.771, *et seq*.

**Minnesota**

360.    By reason of the conduct alleged herein, Keurig has violated Minnesota Stat. §§ 325D.49, *et seq*.

361.    Keurig entered into a contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Minnesota.

362.    Keurig entered into a contract, combination, or conspiracy with Roaster Competitors refusing to deal with Cup Competitors.

363.    Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Keurig Compatible Cup Market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within Minnesota.

364.    Keurig's unlawful conduct substantially affected Minnesota's trade and commerce. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in Minnesota.

365.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Minnesota Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

366.    By reason of the foregoing, the Minnesota Indirect-Purchaser Class is entitled to seek all forms of relief available under Minnesota Stat. §§ 325D.49, *et seq*.

**Mississippi**

367.    By reason of the conduct alleged herein, Keurig has violated Mississippi Code Ann. §75-21-1, *et seq*.

368.    Keurig entered into a trust, combination, contract, understanding, or agreement, expressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, which was inimical to public welfare and the effect of which would be:

(a)    To restrain trade in the Keurig Compatible Cup Market;

(b)    To  increase the price  Keurig K-Cups;

(c)    To increase the production or output of Keurig Compatible Cups;

(d)    To hinder competition in the production, importation, manufacture, transportation, sale, or purchase of Keurig Compatible Cups;

(e)    To engross or forestall Competitive Cups; or

(f)    To unite or pool interest in the importation, manufacture, production, transportation, or price in the Keurig Compatible Cup Market, contrary to the spirit and meaning of Mississippi's antitrust laws.

369.    Keurig, with intent to accomplish the results prohibited or without such intent, accomplished such results to a degree inimical to public welfare, and thus:

(a)    Restrained or attempted to restrain the freedom of trade or production;

(b)    Monopolized or attempted to monopolize the production, control, or sale of Keurig Compatible Cups, or the prosecution, management, or control of any kind, class, or description of business; and

(c)    Engrossed, forestalled, or attempted to engross or forestall Keurig Compatible Cups.

370.    Keurig's unlawful conduct substantially affected Mississippi's trade and commerce. ████████████████████████████████████████████

████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] In addition, there are numerous retail outlets offering K-Cups for sale in Mississippi.

371.   As a direct and proximate cause of Keurig's unlawful conduct, the members of the Mississippi Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

372.   By reason of the foregoing, the Mississippi Indirect-Purchaser Class is entitled to seek all forms of relief available under Mississippi Code Ann. §§ 75-21-1, *et seq*.

## Nebraska

373.   By reason of the conduct alleged herein, Keurig has violated Nebraska Rev. Stat. §§ 59-801, *et seq*.

374.   Keurig entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Nebraska.

375.   Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Nebraska.

376.   Keurig sold Keurig Portion Pack Brewers and required or otherwise coerced buyers into also purchasing Keurig K-Cups or into agreeing not to purchase Competitive Cups.

377.   Keurig's unlawful conduct substantially affected Nebraska's trade and commerce.

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

████████████████████████████████████████████████

████████████████████████████████████████████

████████   In addition, there are numerous retail outlets offering K-Cups for sale in Nebraska.

378.   As a direct and proximate cause of Keurig's unlawful conduct, the members of the Nebraska Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

379.   By reason of the foregoing, the Nebraska Indirect-Purchaser Class is entitled to seek all forms of relief available under Nebraska Rev. Stat. §§ 59-801, *et seq*.

**Nevada**

380.   By reason of the conduct alleged herein, Keurig has violated Nevada Rev. Stat. Ann. §§598A.010, *et seq*.

381.   Keurig entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Nevada.

382.   Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Keurig Compatible Cup Market, for the purpose of affecting competition or controlling, fixing, or maintaining prices, a substantial part of which occurred within Nevada.

383.   Keurig entered contracts in which it conditioned the sale of Keurig Portion Pack Brewers on the purchase of Keurig K-Cups.

384.   Keurig's unlawful conduct substantially affected Nevada's trade and commerce.

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████     In addition, there are numerous retail outlets offering K-Cups for sale in Nevada.

385.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Nebraska Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

386.    By reason of the foregoing, the Nevada Indirect-Purchaser Class is entitled to seek all forms of relief available under Nevada Rev. Stat. Ann. §§ 598A.010, *et seq.*

### New Hampshire

387.    By reason of the conduct alleged herein, Keurig has violated New Hampshire Rev. Stat. §§ 356:1, *et seq.*

388.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within New Hampshire, which, among other things, had the effect of:

       (a)    Controlling or maintaining prices in the Keurig Compatible Cup Market;

       (b)    Controlling, maintaining, limiting, or discontinuing the production, manufacture, sale, or distribution of Competitive Cups; or

       (c)    Persuading or inducing Roaster Competitors, and other third-party vendors, to refuse to deal with Cup Competitors.

389.    Keurig established, maintained, or used monopoly power, or attempted to establish monopoly power over trade or commerce in the Relevant Markets, a substantial part of which occurred within New Hampshire, for the purpose of affecting competition or controlling, fixing, or maintaining prices in the Keurig Compatible Cup Market.

390.    Keurig's violations of New Hampshire law were knowing and willful.

391.    Keurig's unlawful conduct substantially affected New Hampshire's trade and commerce. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ In

addition, there are numerous retail outlets offering K-Cups for sale in New Hampshire.

392.    As a direct and proximate cause of Keurig's unlawful conduct, the members of

the New Hampshire Indirect-Purchaser Class have been injured in their business or property and

are threatened with further injury.

393.    By reason of the foregoing, the New Hampshire Indirect-Purchaser Class is

entitled to seek all forms of relief available under New Hampshire Rev. Stat. §§ 356:1, *et seq.*

**New Mexico**

394.    By reason of the conduct alleged herein, Keurig has violated New Mexico Stat.

Ann. §§ 57-1-1, *et seq.*

395.    Keurig entered into contract, agreement, combination, or conspiracy in restraint of

trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred

within New Mexico.

396.    Keurig established, maintained, or used a monopoly, or attempted to establish a

monopoly, of trade or commerce in the Keurig Compatible Cup Market, for the purpose of

affecting competition or controlling, fixing, or maintaining prices, a substantial part of which

occurred within New Mexico.

397.    Keurig's unlawful conduct substantially affected New Mexico's trade and

commerce. █████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████    In addition, there are numerous retail outlets

offering K-Cups for sale in New Mexico.

398.    As a direct and proximate cause of Keurig's unlawful conduct, the members of

the New Mexico Indirect-Purchaser Class have been injured in their business or property and are

threatened with further injury.

399.    By reason of the foregoing, the New Mexico Indirect-Purchaser Class is entitled

to seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1, *et seq.*

### New York

400.    By reason of the conduct alleged herein, Keurig has violated New York Gen. Bus.

Law §§ 340, *et seq.*

401.    Keurig entered into a contract or combination in the form of trust or otherwise, or

conspiracy in restraint of trade or commerce in the Keurig Compatible Cup Market, a substantial

part of which occurred within New York.

402.    Keurig entered into a contract, agreement, arrangement, or combination with at

least one other person whereby:

    (a)    A monopoly in the Keurig Compatible Cup Market, substantially affecting

           commerce in New York, was established or maintained;

    (b)    Competition or the free exercise of conduct in the Keurig Compatible Cup

           Market, substantially affecting commerce in New York, was restrained; or

    (c)    Competition was restrained for the purpose of establishing or maintaining

           a monopoly or unlawfully interfering with the free exercise of conduct in

           the Keurig Compatible Cup Market.

403.    Keurig's unlawful conduct substantially affected New York's trade and

commerce. █████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████ In addition, there are

numerous retail outlets offering K-Cups for sale in New York.

404.    As a direct and proximate cause of Keurig's unlawful conduct, the members of

the New York Indirect-Purchaser Class have been injured in their business or property and are

threatened with further injury.

405.    By reason of the foregoing, the New York Indirect-Purchaser Class is entitled to

seek all forms of relief available under New York Gen. Bus. Law §340, *et seq*.

**North Carolina**

406.    By reason of the conduct alleged herein, Keurig has violated North Carolina Gen.

Stat. §§ 75-1, *et seq*.

407.    Keurig entered into a contract or combination in the form of trust or otherwise, or

conspiracy in restraint of trade or commerce in the Keurig Compatible Cup Market, a substantial

part of which occurred within North Carolina.

408.    Keurig established, maintained, or used a monopoly, or attempted to establish a

monopoly, of trade or commerce in the Keurig Compatible Cup Market, for the purpose of

affecting competition or controlling, fixing, or maintaining prices, a substantial part of which

occurred within North Carolina.

409.    Keurig's unlawful conduct substantially affected North Carolina's trade and

commerce. ████████████████████████████

███████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████ In addition, there are numerous

retail outlets offering K-Cups for sale in North Carolina.

410.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the North Carolina Indirect-Purchaser Class have been or injured in their business or property and are threatened with further injury.

411.    By reason of the foregoing, the North Carolina Indirect-Purchaser Class is entitled to seek all forms of relief available under North Carolina Gen. Stat. §§ 75-1, *et seq.*

**North Dakota**

412.    By reason of the conduct alleged herein, Keurig has violated North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

413.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within North Dakota.

414.    Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within North Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Keurig Compatible Cup Market.

415.    Keurig's violations of North Dakota law were flagrant.

416.    Keurig's unlawful conduct substantially affected North Dakota's trade and commerce. ███████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in North Dakota.

- 94 -

417.     As a direct and proximate cause of Keurig's unlawful conduct, the members of the North Dakota Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

418.     By reason of the foregoing, the North Dakota Indirect-Purchaser Class is entitled to seek all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

## Oregon

419.     By reason of the conduct alleged herein, Keurig has violated Oregon Rev. Stat. §§ 646.705, *et seq.*

420.     Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Oregon.

421.     Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Oregon, for the purpose of excluding competition or controlling, fixing or maintaining prices in the Keurig Compatible Cup Market.

422.     Keurig's unlawful conduct substantially affected Oregon's trade and commerce. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████ In addition, there are numerous retail outlets offering K-Cups for sale in Oregon.

423.     As a direct and proximate cause of Keurig's unlawful conduct, the members of the Oregon Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

424.     By reason of the foregoing, the Oregon Indirect-Purchaser Class is entitled to seek all forms of relief available under Oregon Rev. Stat. §§ 646.705, *et seq.*

## Rhode Island

425.     By reason of the conduct alleged herein, Keurig has violated R.I. Gen. Laws § 6-36-1 *et seq.*

426.     Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Rhode Island.

427.     Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Rhode Island, for the purpose of excluding competition or controlling, fixing or maintaining prices in the Keurig Compatible Cup Market.

428.     Keurig's unlawful conduct substantially affected Rhode Island's trade and commerce.

429.     As a direct and proximate cause of Keurig's unlawful conduct, the members of the Rhode Island Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

430.     By reason of the foregoing, the Rhode Island Indirect-Purchaser Class is entitled to seek all forms of relief available under R.I. Gen. Laws § 6-36-11.

**South Dakota**

431.    By reason of the conduct alleged herein, Keurig has violated South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

432.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within South Dakota.

433.    Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within South Dakota, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Keurig Compatible Cup Market.

434.    Keurig's unlawful conduct substantially affected South Dakota's trade and commerce. ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in South Dakota.

435.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the South Dakota Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

436.    By reason of the foregoing, the South Dakota Indirect-Purchaser Class is entitled to seek all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq*.

**Tennessee**

437.    By reason of the conduct alleged herein, Keurig has violated Tennessee Code Ann. §§ 47-25-101, *et seq*.

438.    Keurig has entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of Keurig Compatible Cups imported into Tennessee.

439.    Competition in the Keurig Compatible Cup Market was restrained, suppressed, and eliminated throughout Tennessee.

440.    Keurig has entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations designed to, or which tend to, advance or control the price or the cost to producers or consumers in the Keurig Compatible Cup Market throughout Tennessee.

441.    Keurig's unlawful conduct affects Tennessee commerce to a substantial degree by causing Tennessee consumers to pay inflated prices for Keurig K-Cups and Keurig Compatible Cups and has deprived Tennessee consumers of the ability to choose from high-quality, less-expensive alternatives. ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ Further, there are numerous retail outlets offering K-Cups for sale in Tennessee.

442.    Roaster Competitors, Distributors, and Retailers who have operations in Tennessee have entered into anticompetitive unlawful agreements that were carried out in Tennessee.

443.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Tennessee Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

444.     By reason of the foregoing, the Tennessee Indirect-Purchaser Class is entitled to seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101, *et seq.*

### West Virginia

445.     By reason of the conduct alleged herein, Keurig has violated West Virginia Code §§ 47-18-1, *et seq.*

446.     Keurig entered into a contract, combination, or conspiracy between two or more persons, which, among other things, had the effect in West Virginia of:

     (a)    Fixing, controlling, or maintaining prices in the Keurig Compatible Cup Market ; or

     (b)    Fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, sale, or supply of Keurig Compatible Cups for the purpose or with the effect of fixing, controlling, or maintaining the prices, rates, or fees of Keurig K-Cups.

447.     Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within West Virginia, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Keurig Compatible Cup Market.

448.     Keurig's unlawful conduct substantially affected West Virginia's trade and commerce. ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in West Virginia.

449.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the West Virginia Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

450.    By reason of the foregoing, the West Virginia Indirect-Purchaser Class is entitled to seek all forms of relief available under West Virginia Code §§ 47-18-1, *et seq*.

**Wisconsin**

451.    By reason of the conduct alleged herein, Keurig has violated Wisconsin Stat. §§ 133.01, *et seq*.

452.    Keurig entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the Keurig Compatible Cup Market, a substantial part of which occurred within Wisconsin.

453.    Keurig established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the Relevant Markets, a substantial part of which occurred within Wisconsin, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the Keurig Compatible Cup Market.

454.    Keurig's unlawful conduct substantially affected Wisconsin's trade and commerce. ███████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ███████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in Wisconsin.

455.    As a direct and proximate cause of Keurig's unlawful conduct, the members of the Wisconsin Indirect-Purchaser Class have been injured in their business or property and are threatened with further injury.

456.     By reason of the foregoing, the Wisconsin Indirect-Purchaser Class is entitled to seek all forms of relief available under Wisconsin Stat. §§ 133.01, *et seq*.

## TENTH CLAIM FOR RELIEF
### Violation of State Consumer Protection & Unfair Trade Practices Laws

457.     Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC.

458.     Keurig's unfair, unconscionable, deceptive, false, or fraudulent acts or trade practices violated the state consumer protection and unfair trade practices statutes of the states listed below, causing direct and proximate harm to the money, business, or property of the members of the Indirect Purchaser State Classes for the states listed below.

### Arkansas

459.     During the Class Period, in Arkansas, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements and group boycotts.

460.     During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in Arkansas, who in turn distributed or sold Keurig K-Cups to members of the Arkansas Indirect-Purchaser Class, thus substantially affecting competition, commerce, and consumers in Arkansas. ██████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████ ███████████████████████████ ████████████████████████████ █████████████████████████████ ████████████████████████████ ███████████████████████ In addition, there are numerous retail outlets offering K-Cups for sale in Arkansas.

461.    The aforementioned conduct constitutes unconscionable, false, or deceptive acts or practices in violation of Ark. Code Ann. § 4-88-107(a)(10).

462.    Keurig's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Arkansas Indirect-Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

463.    Accordingly, members of the Arkansas Indirect-Purchaser Class seek actual damages and attorney's fees pursuant to Ark. Code Ann. § 4-88-113(f).

**California**

464.    During the Class Period, in California, Keurig knowingly engaged in anticompetitive conduct in the Keurig Compatible Cup Market, including entering into exclusionary agreements, entering into tying agreements, and group boycotts, in violation of Cal. Bus. & Prof. Code. §§ 16720 and 16727.

465.    During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in California, who in turn distributed or sold Keurig K-Cups to members of the California Indirect-Purchaser Class, thus, and as further alleged above, substantially affecting competition, commerce, and consumers in California.

466.    The aforementioned conduct constitutes unlawful, unfair, or fraudulent business acts or practices in violation of Cal. Bus. & Prof. Code § 17200.

467.    Keurig's unlawful, unfair, or fraudulent business acts or practices directly and proximately caused, and will continue to cause, members of the California Indirect-Purchaser Class to pay supracompetitive prices, causing them to suffer injury in fact and lose money or property.

468.    Accordingly, members of the California Indirect-Purchaser Class seek restitution pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204, and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5, as this action was brought to enforce an important right affecting the public interest for a large class of persons, the necessity and financial burden of private

enforcement are such as to make the award appropriate, and such fees should not in the interest of justice be paid out of the recovery, if any.

**Maine**

469.    During the Class Period, in Maine, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements and group boycotts.

470.    During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in Maine, who in turn distributed or sold Keurig K-Cups to members of the Maine Indirect-Purchaser Class, thus substantially affecting competition, commerce, and consumers in Maine.

471.    The aforementioned conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to 5 M.R.S. § 207.

472.    Keurig's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Maine Indirect-Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

473.    At least thirty days prior to asserting this claim, a written demand for relief in conformity with 5 M.R.S. § 213(1-A) was mailed to Keurig.

474.    Accordingly, members of the Maine Indirect-Purchaser Class seek up to treble damages, attorney's fees, and costs pursuant to 5 M.R.S. § 213.

**Massachusetts**

475.    During the Class Period, in Massachusetts, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements and group boycotts.

476.    During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in Massachusetts, who in turn distributed or sold Keurig K-Cups to members of the Massachusetts Indirect-Purchaser Class, thus substantially affecting

competition, commerce, and consumers in Massachusetts. ███████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

477.    The aforementioned conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to Mass. Gen. Laws 93A § 2(a).

478.    Keurig's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Massachusetts Indirect-Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

479.    At least thirty days prior to asserting this claim, a written demand for relief in conformity with Mass. Gen. Laws 93A § 9(3) was mailed to Keurig.

480.    Accordingly, members of the Massachusetts Indirect-Purchaser Class seek up to treble damages, attorney's fees, and costs pursuant to Mass. Gen. Laws 93A § 9(3) and (4).

**Missouri**

481.    During the Class Period, in Missouri, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements and group boycotts.

482.    During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in Missouri, who in turn distributed or sold Keurig K-Cups to members of the Missouri Indirect-Purchaser Class, thus substantially affecting competition, commerce, and consumers in Missouri.

483.    The aforementioned conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to § 407.020 R.S.Mo.

484.    Keurig's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Missouri Indirect-Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

485.    Accordingly, members of the Missouri Indirect-Purchaser Class seek damages, attorney's fees, and costs pursuant to § 407.025 R.S.Mo.

**Nebraska**

486.    During the Class Period, in Nebraska, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements, and group boycotts, in violation of Neb. Rev. St. §§ 59-1603, 59-1604, and 59-1605.

487.    During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in Nebraska, who in turn distributed or sold Keurig K-Cups to members of the Nebraska Indirect-Purchaser Class, thus, and as further alleged above, substantially affecting competition, commerce, and consumers in Nebraska.

488.    The aforementioned conduct constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of Neb. Rev. St. § 59-1602.

489.    Keurig's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Nebraska Indirect-Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

490.    Accordingly, members of the Nebraska Indirect-Purchaser Class seek actual damages, costs of suit, attorney's fees, and any other award of damages authorized by Neb. Rev. St. § 59-1609.

**New Mexico**

491.    During the Class Period, in New Mexico, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements, and group boycotts.

492.    During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in New Mexico, who in turn distributed or sold Keurig K-Cups to members of the New Mexico Indirect-Purchaser Class, thus, and as further alleged above, substantially affecting competition, commerce, and consumers in New Mexico.

493.    The aforementioned conduct constitutes unconscionable trade practices because the conduct results in a gross disparity between the value received by consumers and the price paid, in violation of N. M. Stat. Ann. §§ 57-12-2(E)(2) and 57-12-3.

494.    Keurig's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the New Mexico Indirect-Purchaser Class to pay supracompetitive prices, causing them to suffer a loss of money or property.

495.    Accordingly, members of the New Mexico Indirect-Purchaser Class seek the greater of $100 each or actual damages, the greater of $300 each or treble damages, attorney's fees, and costs pursuant to N.M. Stat. Ann. § 57-12-10(B), (C), and (E).

**North Carolina**

496.    During the Class Period, in North Carolina, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements, and group boycotts.

497.    During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in North Carolina, who in turn distributed or sold Keurig K-Cups to members of the North Carolina Indirect-Purchaser Class, thus, and as further alleged above, substantially affecting competition, commerce, and consumers in North Carolina.

498.     The aforementioned conduct constitutes unfair methods of competition in or affecting commerce or unfair or deceptive acts or practices in or affecting commerce in violation of N.C.G.S.A. § 75-1.1.

499.     Keurig's unconscionable, false, or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the North Carolina Indirect-Purchaser Class to pay supracompetitive prices, causing them injury.

500.     Accordingly, members of the North Carolina Indirect-Purchaser Class seek damages and treble damages pursuant to N.C.G.S.A. § 75-16.

### Rhode Island

501.     During the Class Period, in Rhode Island, Keurig knowingly engaged in anticompetitive conduct, including monopolizing the Keurig Compatible Cup Market, entering into exclusionary agreements, and entering into tying agreements and group boycotts.

502.     During the Class Period, Keurig distributed or sold Keurig K-Cups to Roaster Competitors, Distributors, or Retailers in Rhode Island, who in turn distributed or sold Keurig K-Cups to members of the Rhode Island Indirect-Purchaser Class, thus substantially affecting competition, commerce, and consumers in Rhode Island.

503.     The aforementioned conduct constitutes unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce and is therefore unlawful pursuant to R.I. Gen Laws § 6-13.1-1 *et seq.*.

504.     Keurig's unfair methods of competition or unfair or deceptive acts or practices directly and proximately caused, and will continue to cause, members of the Rhode Island Indirect-Purchaser Class to pay supracompetitive prices, injuring them in their business or property.

505.     Accordingly, members of the Rhode Island Indirect-Purchaser Class seek damages (including statutory damages), attorney's fees, and costs pursuant to § R.I. Gen Laws § 6-13.1-1.

## ELEVENTH CLAIM FOR RELIEF
### Violation of State Common Law Unjust Enrichment Laws

506.    Plaintiffs incorporate and re-allege the allegations set forth in paragraphs 1 through 225 of this SAC

507.    In the alternative to any of the other relief to which they may be entitled as a result of Keurig's conduct alleged herein, Plaintiffs and members of the following Indirect-Purchaser State Classes bring the following claims for common law unjust enrichment as follows:

### Arizona

508.    The facts set forth herein constitute a claim for unjust enrichment on behalf of the Arizona Indirect-Purchaser Class.

    (a)    Keurig was enriched by its unlawful acts, as alleged herein, through overpayments by the Arizona Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

    (b)    The Arizona Indirect-Purchaser Class was impoverished as a result of Keurig's conduct alleged herein.

    (c)    There is a connection between Keurig's enrichment and the Arizona Indirect-Purchaser Class's impoverishment.

    (d)    There is no justification for the enrichment and the impoverishment.

    (e)    There is no adequate remedy at law.

509.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Arizona Indirect-Purchaser Class.

### Arkansas

510.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the Arkansas Indirect-Purchaser Class.

(a)    Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the Arkansas Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

(b)    Keurig had knowledge of, voluntarily accepted, and retained these benefits.

(c)    As a direct and proximate result of Keurig's conduct, Keurig has been and continues to be unjustly enriched at the expense of, and to the detriment of, the Arkansas Indirect-Purchaser Class.

(d)    It would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Arkansas Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Arkansas Indirect-Purchaser Class, as the Arkansas Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

511.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Arkansas Indirect-Purchaser Class.

**District of Columbia**

512.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the District of Columbia Indirect-Purchaser Class.

(a)    As a result of Keurig's unlawful acts, as alleged herein, through overpayments by the District of Columbia Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments, the District of Columbia Indirect-Purchaser Class conferred a benefit on Keurig.

(b)    Keurig has retained that benefit.

(c)     As a direct and proximate result of Keurig's conduct, Keurig has been and
continues to be unjustly enriched and retains that benefit at the expense of,
and to the detriment of, the District of Columbia Indirect-Purchaser Class.

(d)     It would be inequitable for Keurig to be permitted to retain the benefit of
these overpayments that were conferred by the District of Columbia
Indirect-Purchaser Class and retained by Keurig.  The benefit held by
Keurig rightly belongs to the District of Columbia Indirect-Purchaser
Class, as the District of Columbia Indirect-Purchaser Class has paid
supracompetitive prices during the Class Period.

513.    In equity, Keurig should not be allowed to retain the economic benefit from its
improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment
interest to the District of Columbia Indirect-Purchaser Class.

**Iowa**

514.    The facts alleged herein constitute a claim for unjust enrichment on behalf the
Iowa Indirect-Purchaser Class.

(a)     Keurig benefited from its unlawful acts, as alleged herein, through
overpayments by the Iowa Indirect-Purchaser Class and through the
resulting profits enjoyed by Keurig as a direct result of such
overpayments.

(b)     As a direct and proximate result of Keurig's conduct, Keurig has been and
continues to be unjustly enriched at the expense of, and to the detriment
of, the Iowa Indirect-Purchaser Class.

(c)     It would be inequitable and unjust for Keurig to be permitted to retain the
benefit of these overpayments that were conferred by the Iowa Indirect-
Purchaser Class and retained by Keurig.  The benefit held by Keurig
rightly belongs to the Iowa Indirect-Purchaser Class, as the Iowa Indirect-
Purchaser Class has paid supracompetitive prices during the Class Period.

515.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Iowa Indirect-Purchaser Class.

### Kansas

516.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the Kansas Indirect-Purchaser Class.

> (a)    Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the Kansas Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

> (b)    Keurig had an appreciation or knowledge of, voluntarily accepted, and retained these benefits.

> (c)    It would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Kansas Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Kansas Indirect-Purchaser Class, as the Kansas Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

517.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Kansas Indirect-Purchaser Class.

### Maine

518.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the Maine Indirect-Purchaser Class.

> (a)    As a result of Keurig's unlawful acts, as alleged herein, through overpayments by the Maine Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such

overpayments, the Maine Indirect-Purchaser Class conferred a benefit on Keurig.

(b)    Keurig had an appreciation or knowledge of, voluntarily accepted, and retained these benefits.

(c)    It would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Maine Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Maine Indirect-Purchaser Class, as the Maine Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

519.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Maine Indirect-Purchaser Class.

## Massachusetts

520.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the Massachusetts Indirect-Purchaser Class.

(a)    Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the Massachusetts Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

(b)    Keurig had an appreciation or knowledge of, voluntarily accepted, and retained these benefits.

(c)    It would be unjust and inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Massachusetts Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Massachusetts Indirect-Purchaser Class, as the Massachusetts Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

521.     In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Massachusetts Indirect-Purchaser Class.

**Michigan**

522.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the Michigan Indirect-Purchaser Class.

> (a)     Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the Michigan Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

> (b)     It would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Michigan Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Michigan Indirect-Purchaser Class, as the Michigan Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

523.     In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Michigan Indirect-Purchaser Class.

**Minnesota**

524.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the Minnesota Indirect-Purchaser Class.

> (a)     Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the Minnesota Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

> (b)     Keurig knowingly accepted and retained these benefits.

(c)    It would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Minnesota Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Minnesota Indirect-Purchaser Class, as the Minnesota Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

525.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Minnesota Indirect-Purchaser Class.

**Mississippi**

526.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the Mississippi Indirect-Purchaser Class.

(a)    As a result of Keurig's unlawful acts, as alleged herein, through overpayments by the Mississippi Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments, Keurig is in possession of money, which in good conscience and justice it should not retain but should deliver to the Mississippi Indirect-Purchaser Class.

(b)    The money held by Keurig rightly belongs to the Mississippi Indirect-Purchaser Class, as the Mississippi Indirect-Purchaser Class paid supracompetitive prices during the Mississippi Class Period.

(c)    By reason of its unlawful conduct, Keurig has a duty to refund the money to the Mississippi Indirect-Purchaser Class to whom in good conscience it ought to belong.

527.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Mississippi Indirect-Purchaser Class.

**Missouri**

528.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the
Missouri Indirect-Purchaser Class.

> (d)     As a result of Keurig's unlawful acts, as alleged herein, through
> overpayments by the Missouri Indirect-Purchaser Class and through the
> resulting profits enjoyed by Keurig as a direct result of such
> overpayments, Keurig is in possession of money, which in good
> conscience and justice it should not retain but should deliver to the
> Missouri Indirect-Purchaser Class.

> (e)     The money held by Keurig rightly belongs to the Missouri Indirect-
> Purchaser Class, as the Missouri Indirect-Purchaser Class paid
> supracompetitive prices during the Missouri Class Period.

> (f)     By reason of its unlawful conduct, Keurig has a duty to refund the money
> to the Missouri Indirect-Purchaser Class to whom in good conscience it
> ought to belong.

529.     In equity, Keurig should not be allowed to retain the economic benefit from its
improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment
interest to the Missouri Indirect-Purchaser Class.

**Nevada**

530.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the
Nevada Indirect-Purchaser Class.

> (a)     As a result of Keurig's unlawful acts, as alleged herein, through
> overpayments by the Nevada Indirect-Purchaser Class and through the
> resulting profits enjoyed by Keurig as a direct result of such
> overpayments, the Nevada Indirect-Purchaser Class conferred a benefit on
> Keurig.

> (b)     Keurig has retained and appreciated that benefit.

(c)      It would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Nevada Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Nevada Indirect-Purchaser Class, as the Nevada Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

531.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Nevada Indirect-Purchaser Class.

### New Hampshire

532.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the New Hampshire Indirect-Purchaser Class.

(a)      Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the New Hampshire Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

(b)      It would be unconscionable to permit Keurig to retain the benefit of these overpayments that were conferred by the New Hampshire Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the New Hampshire Indirect-Purchaser Class, as the New Hampshire Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

533.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the New Hampshire Indirect-Purchaser Class.

**New Mexico**

534.    The facts alleged herein constitute a claim for unjust enrichment on behalf of the New Mexico Indirect-Purchaser Class.

>   (a)    Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the New Mexico Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments at the expense of the New Mexico Indirect-Purchaser Class.

>   (b)    Keurig knowingly accepted and retained these benefits.

>   (c)    It would be unjust for Keurig to be allowed to retain the benefit of these overpayments that were conferred by the New Mexico Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the New Mexico Indirect-Purchaser Class, as the New Mexico Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

535.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the New Mexico Indirect-Purchaser Class.

**New York**

536.    The facts alleged herein constitute a claim for unjust enrichment on behalf the New York Indirect-Purchaser Class.

>   (a)    Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the New York Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

>   (b)    As a direct and proximate result of Keurig's conduct, Keurig has been and continues to be unjustly enriched at the expense of, and to the detriment of, the New York Indirect-Purchaser Class.

(c)     It would be against equity and good conscience to permit Keurig to retain the benefit of these overpayments that were conferred by the New York Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the New York Indirect-Purchaser Class, as the New York Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

537.     In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the New York Indirect-Purchaser Class.

**Oregon**

538.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the Oregon Indirect-Purchaser Class.

(a)     Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the Oregon Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

(b)     Keurig had an awareness of, voluntarily accepted, and retained these benefits.

(c)     It would be unjust and inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Oregon Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the Oregon Indirect-Purchaser Class, as the Oregon Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

539.     In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Oregon Indirect-Purchaser Class.

**Rhode Island**

540.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the Rhode Island Indirect-Purchaser Class.

　　　　　　(d)     As a result of Keurig's unlawful acts, as alleged herein, through overpayments by the Rhode Island Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments, Keurig is in possession of money, which in good conscience and justice it should not retain but should deliver to the Missouri Indirect-Purchaser Class.

　　　　　　(e)     The money held by Keurig rightly belongs to the Rhode Island Indirect-Purchaser Class, as the Rhode Island Indirect-Purchaser Class paid supracompetitive prices during the Rhode Island Class Period.

　　　　　　(f)     By reason of its unlawful conduct, Keurig has a duty to refund the money to the Rhode Island Indirect-Purchaser Class to whom in good conscience it ought to belong.

541.     In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Rhode Island Indirect-Purchaser Class.

**South Dakota**

542.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the South Dakota Indirect-Purchaser Class.

　　　　　　(a)     As a result of Keurig's unlawful acts, as alleged herein, through overpayments by the South Dakota Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments, the South Dakota Indirect-Purchaser Class conferred a benefit on Keurig.

　　　　　　(b)     Keurig accepted or acquiesced in that benefit.

- 119 -

(c)     It would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the South Dakota Indirect-Purchaser Class and retained by Keurig.  The benefit held by Keurig rightly belongs to the South Dakota Indirect-Purchaser Class, as the South Dakota Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

543.     In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the South Dakota Indirect-Purchaser Class.

### Wisconsin

544.     The facts alleged herein constitute a claim for unjust enrichment on behalf of the Wisconsin Indirect-Purchaser Class.

(a)     Keurig benefited from its unlawful acts, as alleged herein, through overpayments by the Wisconsin Indirect-Purchaser Class and through the resulting profits enjoyed by Keurig as a direct result of such overpayments.

(b)     Keurig had an appreciation of the benefit conferred on it.

(c)     Keurig accepted and retained these benefits.

(d)     Under the circumstances alleged herein, it would be inequitable for Keurig to be permitted to retain the benefit of these overpayments that were conferred by the Wisconsin Indirect-Purchaser Class, and retained by Keurig, without payment to the Wisconsin Indirect-Purchaser Class.  The benefit held by Keurig rightly belongs to the Wisconsin Indirect-Purchaser Class, as the Wisconsin Indirect-Purchaser Class has paid supracompetitive prices during the Class Period.

545.    In equity, Keurig should not be allowed to retain the economic benefit from its improper conduct and should be ordered to disgorge profits or pay restitution and pre-judgment interest to the Wisconsin Indirect-Purchaser Class.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Classes hereby respectfully request that:

A.    The Court determine that the claims alleged herein under the state antitrust laws and unfair competition laws, state consumer protection laws and unfair trade practices laws, state common law unjust enrichment, and federal antitrust laws, may be maintained as a Class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.    Appoint Plaintiffs as Class Representatives for the Classes and their counsel of record as lead class counsel;

C.    The unlawful agreements, conduct, contracts, conspiracy, or combination alleged herein be adjudged and decreed to be:

1.    A restraint of trade or commerce in violation of Vermont's Consumer Fraud Act;

2.    A restraint of trade or commerce in violation of Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act;

3.    A restraint of trade or commerce in violation of state antitrust and unfair competition laws alleged herein;

4.    Violations of the state consumer protection and unfair trade practices laws alleged herein; and

5.    Violations of state common law unjust enrichment laws.

D.    Plaintiffs and the Classes recover consideration given by the Classes for Keurig K-Cups (or the value thereof), damages, other monetary relief, civil penalties, as well as treble

damages or up to three times the consideration given by the Classes, as provided by state laws, and that a judgment be entered in favor of Plaintiffs and the Classes against Keurig;

E.     Plaintiffs and the Classes obtain any penalties, punitive, or exemplary damages, or full consideration, where the laws of the respective states identified herein so permit;

F.     Keurig, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein; from entering into any other conspiracy alleged herein; from entering into any other contract, conspiracy, or combination having a similar purpose or effect; and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.     A constructive trust be declared for the benefit of the Plaintiffs and the Classes and/or Plaintiffs and the Classes be awarded restitution, and/or disgorgement of profits obtained by Keurig, where state law permits, as a result of its violations of unfair competition laws, consumer protection and unfair trade practices laws, and acts of unjust enrichment alleged herein;

H.     Plaintiffs and the Classes be awarded pre- and post-judgment interest at the highest legal rate accruing from the earliest date permitted by law;

I.     Plaintiffs and the Classes recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

J.     Plaintiffs and the Classes be afforded any additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: June 21, 2019
New York, New York

Respectfully Submitted,

/s/ Fred Taylor Isquith
Fred Taylor Isquith
Thomas H. Burt
**WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 686-0114
isquith@whafh.com
burt@whafh.com

*Interim Co-Lead and Liaison Counsel for the
Proposed Classes of Indirect Purchaser Plaintiffs*

Robert N. Kaplan
Richard J. Kilsheimer
Gregory K. Arenson
Mario M. Choi
Matthew P. McCahill
Lauren I. Dubick
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
rkaplan@kaplanfox.com
rkilsheimer@kaplanfox.com
garenson@kaplanfox.com
mchoi@kaplanfox.com
mmccahill@kaplanfox.com
ldubick@kaplanfox.com

Bruce L. Simon
Robert G. Retana
Benjamin E. Shiftan
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, CA 94104
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
bsimon@pswlaw.com
rretana@pswla.com
bshiftan@pswlaw.com

*Interim Co-Lead Counsel for the Proposed Classes*
*of Indirect Purchaser Plaintiffs*

Arthur N. Bailey
**ARTHUR N. BAILEY &
ASSOCIATES**
111 West Second Street
Jamestown, New York 14701
Telephone: (716) 664-2967
Facsimile: (716) 664-2983
artlaw@windstream.net

Thomas J. McKenna
**GAINEY McKENNA & EGLESTON**
440 Park Ave. South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
tjmlaw2001@yahoo.com

Alyson Oliver
Lisa Gray
**OLIVER LAW GROUP PC**
1647 Big Beaver Rd.
Troy, MI 48084
Tel: (248) 327-6566
Fax: (248) 436-3385
alyson@oliverlg.com

P. John Brady
Daniel D. Owen
G. Gabriel Zorogastua
**POLSINELLI**
900 W. 48th Place, Suite 900
Kansas City, MO 64112
Telephone: (816) 753-1000
Facsimile: (816) 753-1536
jbrady@polsinelli.com
dowen@polsinelli.com
gzorogastua@polsinelli.com

Gregory P. Hansel
Michael S. Smith
Anthony J. Manhart
Elizabeth F. Quinby
**PRETI, FLAHERTY, BELIVEAU
 & PACHIOS, LLP**
One City Center P.O. Box 9546
Portland, ME 04101-9546 One City

Patrick M. Ryan
William I. Edlund
Robert H. Bunzel
John F. McLean
**BARTKO, ZANKEL, BUNZEL & MILLER**
One Embarcadero Center, Suite 800
San Francisco, CA 94111
Telephone: (415) 956-1900
Facsimile: (415) 956-1152
pryan@bzbm.com
bedlund@bzbm.com
rbunzel@bztm.com
jmclean@bzbm.com

Pietro J. Lynn
**LYNN, LYNN & BLACKMAN, P.C.**
76 St. Paul Street, Suite 400
Burlington, VT 05401
Phone: 802-860-1500
Fax: 802-860-1580
plynn@lynnlawvt.com

Elizabeth C. Pritzker
Bethany L. Caracuzzo
Shiho Yamamoto
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone:  (415) 692-0772
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com
bc@pritzkerlevine.com
sy@pritzkerlevine.com

Scott N. Brown, Jr., BPR No. 1212
Joseph R. White, BPR No. 13459
Joseph A. Jackson II, BPR No. 30203
**SPEARS, MOORE, REBMAN
& WILLIAMS, P.C.**
801 Broad Street, Sixth Floor, P.O. Box 1749
Chattanooga, TN 37401-1749
Tel: (423) 756-7000
Fax: (423) 756-4801

Center Portland, ME 04101
Telephone: (207) 791-3000
Facsimile: (207) 791-3111
ghansel@preti.com
amanhart@preti.com
msmith@preti.com
equinby@preti.com

Steven A. Hart
Brian H. Eldridge
Kyle Pozan
**HART McLAUGHLIN &
ELDRIDGE**
22 W. Washington St., Suite 1600
Chicago, IL 60606
Telephone: (312) 955-0545
Facsimile: (312) 645-7711
shart@smsm.com
beldridge@smsm.com
kpozan@smsm.com

Thomas Thrash
Marcus Bozeman
**THRASH LAW FIRM, P.A.**
1101 Garland St.
Little Rock, AR 72201
Tel: (501) 374-1058
tomthrash@thrashlawfirmpa.com
mbozeman@thrashlawfirmpa.com

Michelle L. Kranz
David W. Zoll
**ZOLL & KRANZ, LLC**
6620 West Central Ave., Suite 100
Toledo, OH 43617
Tel: (419) 841-9623
Fax: (419) 841-9719
michelle@toledolaw.com
david@toledolaw.com

*Additional Counsel for the Proposed Classes of
Indirect Purchaser Plaintiffs*