

January 14, 2020

<u>**VIA CM/ECF**</u>

Hon. Sarah L. Cave, U.S.M.J.
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

   Re: *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, MDL No. 2542,
      Opposition Letter Brief Regarding Motion to Compel Discovery of Jim Rogers

Dear Judge Cave:

   I write on behalf of Plaintiff JBR in opposition to Keurig's request to re-depose Jim Rogers. The two-day deposition of JBR's now co-CEO Jim Rogers occurred on February 12-13, 2019. Keurig requests a second deposition due to JBR's production of documents from its prior malpractice action against its former advertising attorney Tsan Abrahamson of Cobalt Law ("Cobalt Arbitration") after the first deposition of Jim Rogers. The timing of both Jim Rogers' first deposition and the document production at issue, however, was a consequence of Keurig's own delay in propounding pertinent discovery requests. Keurig's request should be denied as cumulative, unduly burdensome, irrelevant, and contrary to the parties' past stipulations.

   The factors relevant to the Court's exercise of discretion to allow or preclude a second deposition under Rule 26(b)(2) include "whether the second deposition of the witness would be unnecessarily cumulative, whether the party requesting the deposition has had other opportunities to obtain the same information, and whether the burden of a second deposition outweighs its potential benefit." *See Ganci v. U.S. Limousine Service, Ltd.*, 2011 WL 4407461 (S.D.N.Y. Sep. 21, 2011), citing *Fresnius Med. Care Holdings, Inc. v. Roxane Laboratories, Inc*., No. 2:05–cv– 0889, 2007 WL 764302, at *2 (S.D. Ohio March 9, 2007); *Collins v. Int'l Dairy Queen*, 189 F.R.D. 496 (M.D. Ga.1999); *Keck v. Union Bank of Switzerland*, No. 94 Civ. 4912, 1997 WL 411931, at *3 (S.D.N.Y. July 22, 1997); *Hurley v. JARC Builders, Inc*., 164 F.R.D. 39 (E.D. Pa.1995). Also relevant to a request for a second deposition of a witness is the timing of the first deposition and any pertinent requests for production of documents, and particularly whether the first deposition took place before JBR had completed production of documents. *Eaton Corp. v. Weeks*, 2014 WL 700466, at *3 (E.D. Mich. Feb. 24, 2014) (it is within the Court's discretion to deny a second deposition even if "relevant documents are produced subsequent to the [first] deposition if the party taking the deposition either failed to request those documents in timely fashion or chose to

conduct the deposition prior to the completion of document discovery.") (citing *Fresenius Med. Care Holdings, Inc. v. Roxane Labs*., Inc., 2007 WL 764302, at *2 (S.D. Ohio Mar. 9, 2007)).

In this case, Keurig took the 2019 deposition of Jim Rogers ***prior to*** requesting the Cobalt Arbitration documents that Keurig now relies on to request a second deposition. Keurig elected to depose Mr. Rogers without first seeking ***any*** discovery relating to any litigations filed by JBR. Having never asked, Keurig cannot now complain that JBR never disclosed documents pertaining to the Cobalt Arbitration to Keurig prior to Jim Rogers' deposition. Moreover, despite learning of the Cobalt Arbitration within minutes of commencement of Jim Rogers's first deposition,[1] Keurig did not bother to pause the questioning to request documents relating to the arbitration, nor did Keurig serve any document requests directed to those materials prior to commencement of the second day of his first deposition. Ex. A. If Keurig had done so, the parties could have met and conferred as to whether the materials could be produced in advance of the second day of the deposition.[2] Similarly, Keurig failed to hold open the deposition for continuation at a later date. Having made the choice to seek — and complete — Jim Rogers' deposition before seeking the documents, Keurig waived any right to a second deposition based on documents it never requested.

Even after the Cobalt Arbitration documents were produced in July 2019, Keurig failed to pursue written discovery, document requests, or deposition testimony from any other knowledgeable witness relating to the Cobalt Arbitration.

This failure is not surprising because the actual content of the documents produced relates to legal advice that is nowhere tied to the parties' claims and defenses and is cumulative of points Jim Rogers already testified to. Jim Rogers testified at length about: (a) JBR's environmental labeling relating to biodegradability, (b) JBR's consultation with an attorney before introducing those labels, and (c) JBR's subsequent dissatisfaction with the attorney's advice after the California District Attorneys disagreed with the attorney's view of a California statute. Ex. A. JBR has already made clear in prior representations to the Court that it is not relying on that legal advice as a defense. ECF No. 641. Keurig has nowhere pointed to that legal advice as supporting Keurig's counterclaim. The arbitration explored that advice at great length, with the arbitrator ultimately concluding that the statute was ambiguous and that JBR had a reasonable argument for refuting the District Attorneys' position as to whether the California statute prohibited use of the word "biodegradable." It makes no sense to spend six hours in deposition revisiting the details of legal advice that the arbitrator found to be reasonable in context of an ambiguous statute that JBR hired her to comply with. Jim Rogers' further testimony would be cumulative.

---

[1]    JBR did not place any restrictions on Keurig's questioning, did not instruct the witness not to answer questions, and did not limit the amount of time Keurig could take in exploring the issues. Instead of questioning Jim Rogers in detail about the Cobalt Arbitration, Keurig elected to ask only a handful of questions and move on.

[2]    Notably, Rogers later offered to produce the documents withheld as privileged pursuant to Rule 502(d) (ECF. No. 586-7 at p. 2 of 10), but Keurig rejected the request because it wanted to move to compel based on the notion that JBR engaged in a broad subject matter waiver. ECF No. 575.

January 14, 2020
Page **3** of **3**

Keurig's attempt to characterize plaintiffs' depositions of Keurig witnesses as being in some way similar to Jim Rogers' first deposition misses the mark; the situations are not analogous.[3] Given that Jim Rogers is co-CEO, Keurig should depose other witnesses and take other forms of discovery before resorting to a second deposition that takes crucial time away from an executive critical to JBR's day-to-day senior-level management and sales functions.

Finally, Keurig specifically stipulated that leave of Court would be required before deposing *anyone* – let alone a current senior executive – a second time. ECF No. 493-1 at III.E.1. (p. 4 of 14). The stipulation was intended to prevent parties from deposing a witness early in discovery and then again at the end. Keurig's request should be denied in light of the case law, the procedural history, and the stipulation.

Respectfully submitted,

 */s/ Mario Moore*
Mario Moore

DAN JOHNSON LAW GROUP, LLP
mario@danjohnsonlawgroup.com
400 Oyster Point Blvd., Ste. 321
South San Francisco, CA 94080
(415) 604-4500

*Attorneys for Plaintiffs*
JBR, Inc. d/b/a/ Rogers Family Company

cc: Counsel of Record (via ECF and email)

---

[3]    In contrast to Keurig's request, plaintiffs' depositions have largely focused on ex-Keurig employees, who are the individuals most knowledgeable about Keurig's conduct during most of the events relevant to plaintiffs' cases. Because those individuals are no longer employed by Keurig, plaintiffs' depositions have imposed little — if any — burden on Keurig in terms of distracting Keurig's current senior management from their day-to-day responsibilities. Each plaintiffs' deposition of a current or former Keurig employee is relevant to up to five different plaintiffs' lawsuits against Keurig, and plaintiffs have minimized the burden by coordinating among one another so that each deposition covers five plaintiffs' cases, avoiding a situation in which a deponent is subject to multiple depositions. Plaintiffs' lawsuits involve over a dozen claims each, and a relevant time frame of at least eleven years (2009-present). By contrast, Keurig's request for a second deposition of Jim Rogers relates to a *single* claim by a *single* party and involves conduct over a six year time frame. Given this backdrop, Keurig's reference to depositions of a couple Keurig witnesses that lasted multiple days is misplaced, as those depositions are irrelevant to the question of whether a second deposition of a senior JBR executive is cumulative and overly burdensome.

**Exhibit A**

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 1

1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF NEW YORK
3
                                 )
4    In Re:  KEURIG GREEN MOUNTAIN   )
     SINGLE SERVE COFFEE ANTITRUST   )
5    LITIGATION.                     )
                                     )
6    JBR, INC., D/B/A ROGERS FAMILY  )
     COMPANY,                        )
7                                    )
                   Plaintiff,        )
8                                    )    Case No.
            vs.                      )    1:14-cv-04242
9                                    )    VSB-HBP
     KEURIG GREEN MOUNTAIN, INC.     )
10   F/K/A GREEN MOUNTAIN COFFEE     )
     ROASTERS, INC. AND AS SUCCESSOR )
11   TO KEURIG, INCORPORATED,        )
                                     )
12                 Defendant.        )
13   _____
14         CONFIDENTIAL - ATTORNEYS' EYES ONLY
15            VIDEOTAPED DEPOSITION OF
16            JAMES DWIGHT ROGERS, II
17             Sacramento, California
18          Tuesday, February 12, 2019
19                   Volume I
20            8:59 a.m. - 5:04 p.m.
      Total time on record: 6 hours 21 minutes
21
22   Reported by:
     LISA RICHARDSON, RPR, CRR, RMR
23   CSR No. 5883
24   Job No. 3205267
25   PAGES 1 - 274

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 2

1                    UNITED STATES DISTRICT COURT
2                    SOUTHERN DISTRICT OF NEW YORK
3
                                        )
4       In Re:  KEURIG GREEN MOUNTAIN    )
        SINGLE SERVE COFFEE ANTITRUST    )
5       LITIGATION.                      )
                                        )
6       JBR, INC., D/B/A ROGERS FAMILY   )
        COMPANY,                         )
7                                        )
                         Plaintiff,      )
8                                        )      Case No.
                 vs.                     )      1:14-cv-04242
9                                        )      VSB-HBP
        KEURIG GREEN MOUNTAIN, INC.      )
10      F/K/A GREEN MOUNTAIN COFFEE      )
        ROASTERS, INC. AND AS SUCCESSOR  )
11      TO KEURIG, INCORPORATED,         )
                                        )
12                       Defendant.      )
13      _____
14
15            Videotaped Deposition of JAMES DWIGHT
16      ROGERS, II, Volume I, taken on behalf of Keurig
17      Green Mountain, at 1 Capitol Mall, Sacramento,
18      California, beginning at 8:59 a.m., and ending at
19      5:04 p.m., on Tuesday, February 12, 2019, before
20      Lisa Richardson, Certified Shorthand Reporter No.
21      5883.
22                    VERITEXT LEGAL SOLUTIONS
                       MID-ATLANTIC REGION
23              1801 Market Street - Suite 1800
                    Philadelphia, PA  19103
24
25

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 3

```
 1     APPEARANCES:
 2
 3     On Behalf of the Rogers Family Company:
 4       DAN JOHNSON LAW GROUP
         By:  DANIEL JOHNSON, ESQ.
 5       400 Oyster Point Boulevard
         Suite 321
 6       South San Francisco, California 94080
         415.604.4500
 7       dan@danjohnsonlawgroup.com
 8     On Behalf of Keurig Green Mountain:
 9       CLEARY GOTTLEIB STEEN & HAMILTON LLP
         By:  LEAH BRANNON, ESQ.
10       By:  ALAN B. FREEDMAN, ESQ.
         2112 Pennsylvania Avenue, N.W.
11       Washington, D.C. 20037-3229
         609.558.1540
12       lbrannon@cgsh.com
13     On Behalf of TreeHouse, Sturm and Bay Valley:
14       WINSTON & STRAWN
         By:  EVAN MILLER, ESQ.
15       (Telephonic appearance)
         101 California Street
16       200 Park Avenue
         New York, New York 10166-4193
17       212.294.6728
         emiller@winston.com
18
       On Behalf of Direct Purchasers:
19
         ROBINS KAPLAN
20       By:  DAVID ROCHELSON, ESQ.
         (Telephonic appearance)
21       399 Park Avenue
         Suite 3600
22       New York, New York 10022
         212.980.7441
23       drochelson@robinskaplan.com
24
25
```

CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 4

```
 1    APPEARANCES (cont'd)
 2    On Behalf of Indirect Purchasers:
 3      PEARSON, SIMON & WARSHAW, LLP
        By:  ALEXANDER L. SIMON, ESQ.
 4      (Telephonic appearance)
        44 Montgomery Street
 5      San Francisco, California 94104
        415.400.7703
 6      asimon@pswlaw.com
 7
 8    Videographer:  John Macdonell
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                   Page 12
1                   JAMES DWIGHT ROGERS, II,
2       having been administered an oath, was examined and
3       testified as follows:
4                         EXAMINATION
5       BY MS. BRANNON:
6            Q    Good morning, Mr. Rogers.
7            A    Good morning.
8            Q    I'm Leah Brannon.  I represent Keurig Green
9       Mountain, and I will be asking you questions today.
10                Could you please state your full name for    09:00:24
11      the record?
12           A    Do you want the full formal name?
13           Q    Full formal name.
14           A    James Dwight Rogers, II.
15           Q    What is your business address?             09:00:33
16           A    The business address is 1731 Aviation
17      Boulevard, Lincoln, California.
18           Q    Have you had your deposition taken before?
19           A    I have.
20           Q    How many times?                            09:00:39
21           A    Twice before.
22           Q    Okay.  And what were those prior cases?
23           A    The first case was when Keurig sued us for
24      patent infringement.  The second one was in the
25      matter of a malpractice suit we filed against an      09:00:52
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 13

```
 1    attorney in, in Berkeley, California.

 2         Q    Which attorney was that suit against?

 3         A    It was against a woman named Tsan

 4    Abrahamson of Cobalt Law.

 5         Q    And when was that case filed, if you        09:01:04

 6    recall?

 7         A    I don't recall.

 8              THE WITNESS:  Do you recall, Dan?

 9              MR. JOHNSON:  No.

10    BY MS. BRANNON:                                       09:01:12

11         Q    Okay.  So you've done this before.  You've

12    had your deposition taken before.

13         A    Yes.

14         Q    You probably know a bit about the

15    procedures and obligations, but I thought I would     09:01:21

16    just quickly go over some rules so that we are all

17    on the same page --

18         A    Okay.

19         Q    -- if that's okay.

20         A    Hmm-hmm.                                    09:01:27

21         Q    So our conversation today will be recorded

22    by Ms. Richardson.

23              Do you understand that you need to speak up

24    and give verbal answers so that she can take them

25    down?                                                 09:01:36
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 101

1      A    No, not that I know of.

2      Q    You believe Costco in the Midwest carries

3    only Keurig?

4      A    I believe so, but I do not know that to be

5    a fact.                                          11:20:37

6      Q    What about Costco on the East Coast?  Do

7    they carry only Keurig?

8      A    I do, I do not know, but they don't, they

9    don't carry us.

10      Q    So you don't know whether they carry other  11:20:45

11    unlicensed portion packs?

12      A    I have not noticed any, but I can't say

13    definitively.

14      Q    And you said OneCups are still about 40

15    percent of JBR's business?                       11:20:59

16      A    That's correct.

17      Q    Are your total sales greater now than they

18    were in March of 2015?

19      A    No.  They are about the same.

20      Q    You said to the reporter that JBR's portion  11:21:10

21    packs are 97 percent biodegradable.  You said the

22    cup is a food grade plastic mesh.

23          Was that true at the time, that the cup was

24    a food grade plastic mesh?

25      A    There's no cup.  I -- can you rephrase      11:21:46

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 102

1    that?

2        Q    The article here quotes you as saying, "The

3    cup is a food grade plastic mesh stretched to the

4    exact porosity so coffee will brew correctly."

5        A    That's a typo.                              11:22:00

6        Q    So you don't think you said the word cup?

7        A    No.  We don't have a cup on our product.

8        Q    What do you call the plastic mesh?

9        A    Plastic mesh.

10       Q    Just plastic mesh?                          11:22:11

11       A    Yes.

12       Q    And you don't use the word cup?

13       A    No.

14       Q    Have you ever used the word cup?

15       A    No.                                         11:22:19

16       Q    You've never referred to the plastic mesh

17   that the OneCup is in as a cup?

18       A    No.

19       Q    Okay.  It says here, "Because the pods

20   aren't plastic, the coffee can go stale more         11:22:36

21   quickly."

22            Is that true?

23       A    That is true.  That's why we put them in

24   that, in that bag.

25       Q    Further down, you talk about the Freedom    11:22:48

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 244

1    changed much.  It's -- you know, the box has gone

2    through many iterations.

3            And, you know, say, my brother JR, John,

4    would have general oversight on the retail side,

5    grocery side, and I would have general oversight on    04:27:53

6    the club pack side.  What to say, things like that,

7    we do have, you know, advisors, etc.

8        Q    Who are your advisors?

9        A    Well, we had one, we had one -- we hired an

10   attorney when we first started making progress in      04:28:09

11   this direction.

12           We were very excited about it.  We were

13   very proud of it, because it was first to market.

14           And we hired an environmental attorney to

15   advise us as to what to say.                            04:28:19

16       Q    And who is that?

17       A    Her name is Tsan Abrahamson with Cobalt

18   Law.

19           MR. JOHNSON:  Spell the first name for the

20   court reporter.                                         04:28:29

21           THE WITNESS:  A-B-R -- I believe it's

22   A-H-A-M-S-O-N.

23           MR. JOHNSON:  Tsan is T-S-A-N.

24           THE WITNESS:  T-S-A-N.

25           We didn't want to be disingenuous.  We          04:28:43

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 245

1    wanted to say the right thing.

2    BY MS. BRANNON:

3        Q    Did you hire any other advisors to help you

4    with your environmental claims?

5        A    I do not recall.  We had an in-house          04:28:53

6    packaging design person at the time, who helped us

7    with the design and layout.

8        Q    Did you consult with any other lawyers

9    beyond Ms. Abrahamson?

10       A    I do not recall.  As far as the               04:29:08

11   environmental claims go, it was mostly just

12   Ms. Abrahamson.

13       Q    What do you understand the term

14   biodegradable to mean?

15       A    Well, I currently understand it to be much,  04:29:21

16   much different than I did several years ago.

17       Q    What is your current understanding of the

18   term?

19       A    Current understanding of the term is

20   something that will degrade under normal conditions,  04:29:29

21   but I don't -- I'm not, I'm not an expert.  I'm, I'm

22   just a layman.

23            It's -- you know, a much more pertinent

24   term for us is compostability, but we didn't know

25   that at the time.                                     04:29:47

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 246

1    Q    For something to be biodegradable, does it

2    need to degrade under normal conditions in a

3    particular period of time?

4    A    I don't really under -- I don't really

5    remember what the term is or what the specification    04:30:00

6    is.  I believe there are different standards, ATSM

7    6400, things like that, but I don't recall what the

8    specifications are.

9    Q    What does the term compostable mean to you

10   today?                                                04:30:17

11   A    Compostable means something that will --

12   within a certain time frame, will degrade back into

13   dirt, basically, or some kind of soil.

14   Q    What is that time frame?  Is it one year?

15   A    I don't know if it's specified.  I don't       04:30:36

16   know.  Again, you will have to look at the ATSM

17   standards.

18   Q    Do you have an understanding of the

19   distinction between home compostable and industrial,

20   industrially compostable?                            04:30:51

21   A    I have a general layman's understanding.

22   Q    What is your layman's understanding --

23   A    My layman's understanding is something that

24   is compostable in a commercial composting facility.

25   A commercial composting facility treats the matter    04:31:06

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 247

1    that they take in differently.  They do things like

2    chop it up.  They apply heat to it.  They turn it

3    regularly.

4           As far as home composting goes, I believe

5    you are familiar with home composters.  I believe       04:31:19

6    that it's something you throw into a home composting

7    bin and -- I don't know.  You turn it time to time,

8    and it turns into dirt.

9        Q    You mentioned the green bin earlier and

10   throwing your OneCups into the green bin.               04:31:34

11          What is a green bin?

12       A    Out here in California, many communities

13   have what we call a green bin, which is where you

14   put yard waste, branches, leaves, you know, you

15   know, plant matter that occurs in nature.  And those    04:31:55

16   are taken to industrial facilities and composted.

17       Q    Do you have any sense of what percent of

18   OneCup users have a green bin?

19       A    There's no way to say that.

20       Q    Do you know if, outside of California and       04:32:17

21   Seattle, anyone has a green bin?

22       A    I would have no way of knowing that.

23       Q    Within California, do some green bins

24   prohibit food products?

25          MR. JOHNSON:  Objection, calls for              04:32:38

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 248

1      speculation.

2              THE WITNESS:  I have no idea.

3      BY MS. BRANNON:

4          Q    Is the OneCup a food product?

5          A    I believe it is 100 percent compostable      04:32:48

6      inside and out.

7          Q    Do you throw your used OneCups at home into

8      a green bin?

9          A    I don't have one.  In my -- sorry.  In my

10     municipality, they don't have a green bin.          04:33:03

11         Q    Which municipality are you in?

12         A    It's in Placer County.

13         Q    So what do you do with your used OneCups?

14         A    I take them to work and put them in the

15     compost there.                                       04:33:17

16         Q    Do you have an industrial compost at work?

17         A    We have one -- we have the -- what we call

18     the dump, but they have a composting facility

19     nearby, yes.

20         Q    So you bring them to work and put them in    04:33:31

21     the dump, and then they are transported from there

22     to an industrial composting facility?

23         A    That's correct, but I don't know why what I

24     do has any import.

25         Q    Do you know what industrial composting       04:33:45

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 249

```
 1    facility those materials are taken to?

 2        A    No.

 3        Q    Do you know how a consumer could find an

 4    industrial composting facility near them?

 5            MR. JOHNSON:  Objection, calls for          04:34:06

 6    speculation.

 7            THE WITNESS:  There are, there are website

 8    locators real easy to find.  Type in your zip code.

 9    There they are.  That's all I know.

10    BY MS. BRANNON:                                     04:34:19

11        Q    And then if consumers don't have a green

12    bin that accepts food products, they would need to

13    mail their used OneCups to an industrial composting

14    facility?

15        A    I have no idea.  I mean, the fact that     04:34:32

16    there is a lack of an industrial composting facility

17    nearby does not change the nature of the fact that

18    this item is compostable.

19        Q    Do you have any sense of what percentage of

20    OneCups are actually composted?                     04:34:49

21        A    I would have no way of knowing.

22        Q    Do you know if there are green bins in

23    Sacramento?

24        A    I don't.  It's a different county.

25        Q    Were OneCups compostable when they first   04:35:06
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 250

1    launched?

2         A    They were not.

3         Q    When did you start using the term

4    compostable?

5         A    I don't remember the exact date.  You        04:35:22

6    probably have it there with your documents.  It was

7    a long road.  It took years and, and millions of

8    dollars to get to the point where we are now.

9              We, we, we were able to make certain

10   elements of that pod compostable piece by piece.     04:35:34

11   When it was completely compostable, we had to submit

12   it to a certification organization called BPI, where

13   they actually do the process.

14             They actually put it in for 90 days.  They

15   put it in -- I don't know -- a dirt bed and, and see 04:35:50

16   if it degrades over 90 days.

17        Q    So how does JBR currently recommend that

18   consumers dispose of their used OneCups?

19        A    We just say that they are compostable in an

20   industrial facility.  I don't, I don't recommend     04:36:04

21   what people do.

22        Q    Was there a time when JBR recommended that

23   consumers take the packs apart and compost the

24   grounds and throw the ring in the trash?

25        A    I believe there was a time, because there   04:36:18

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 251

```
 1    was one phase at one point in time when the mesh to

 2    which we have spoken before was the only element

 3    that was not compostable.

 4        Q    I think you said before that nobody really

 5    takes the packs apart.                           04:36:34

 6        A    It's something that you can do if you want

 7    to.  I'm sure there are people in Berkeley that do.

 8            MR. JOHNSON:  Wait a minute.

 9            THE WITNESS:  I'm sorry.  I went to

10    Berkeley.                                        04:36:43

11    BY MS. BRANNON:

12        Q    What percent of consumers do you think

13    actually took apart the JBR packs?

14        A    I would have no way of knowing.

15        Q    Have you done any study of how consumers  04:36:51

16    dispose of packs?

17        A    No.

18        Q    Are the OneCups that are sold today

19    recyclable?

20        A    I don't have any idea.  Recycling is a    04:37:04

21    completely different process, where

22    petrochemicals -- there are five or six different

23    types of petrochemicals -- are separated by the

24    little number around the arrows at the bottom.  They

25    are separated in different categories and recycled.  04:37:21
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 252

```
 1            This is an entirely different plastic

 2     matter, which is made from plants.  I don't know

 3     how -- if it would be recyclable.  If you tried to

 4     recycle it, it would turn into dirt.  So --

 5       Q    Do you know what happens if you put a used   04:37:34

 6     OneCup into the recycling?

 7       A    No idea.

 8       Q    If someone just throws the used OneCup in

 9     their trash can, does it biodegrade?

10       A    I don't know.  I think you are implying      04:37:49

11     that I am some kind of scientist that I am not.

12       Q    Would a OneCup biodegrade in a landfill

13     faster than a K-Cup?

14       A    I don't know.

15       Q    Who would be the best person at JBR to ask   04:38:08

16     questions about this?

17       A    I don't think anyone could answer those

18     kind of questions.  Those are scientific questions.

19     You'd probably need an expert.

20       Q    So has JBR ever retained an outside expert   04:38:20

21     to help it analyze its different environmental

22     claims?

23       A    We are very simple people.  We developed a

24     product that is compostable -- that has been

25     certified as compostable.  That's as far as we've    04:38:40
```

Page 253

1    gone.

2          What happens after they take it home, I

3    have no control.  I have no, no data.

4      Q    Do you recall when BPI certified your

5    OneCup as industrially compostable?                04:38:51

6      A    I don't recall the exact date, but I could

7    certainly find it.

8      Q    Prior to the BPI certification, had you

9    submitted OneCups to any environmental certification

10   body?                                              04:39:08

11     A    I don't understand the question.  You will

12   have to be more specific.

13     Q    Before you sought the BPI industrial

14   compost -- industrially compostable certification,

15   did you seek any other environmental certifications?  04:39:21

16     A    Such as?

17     Q    Such as home compostable from Vencott, or

18   to the extent that there were bodies certifying

19   biodegradability, marine biodegradability, or other

20   environmental terms, did you submit to any other   04:39:41

21   certification body?

22     A    I believe BPI was the first.  To my

23   knowledge, there are no certification agencies in

24   this country.

25          BPI is, I believe, in Belgium.  We got our  04:39:50

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 254

```
 1    certification from them.  They are renowned as the

 2    best.

 3          We also are working on our home

 4    compostability with Vencott.

 5    Q    You are currently working on that?          04:40:04

 6    A    That's correct.

 7    Q    And who at JBR is taking the lead on that?

 8    A    My brother Pete.

 9    Q    You said you are working on home

10    compostability.                                  04:40:23

11          Do you know if, at present, the OneCups

12    leach any contaminants into the soil?

13    A    I believe no, because there are -- part of

14    the BPI certification is, they -- I'm not sure what

15    they are, but after the, the, the pod has         04:40:38

16    decomposed -- is composted, they put seeds in there.

17          And a certain amount of those seeds have to

18    grow, which is a test for any kind of, any kind of,

19    you know -- I'm looking for the word.  I can't think

20    of it -- contamination.                           04:40:57

21    Q    JBR launched the OneCup bio product in

22    October of 2013.

23          How did the manufacturing process differ

24    between the first OneCup that you launched in --

25    around October 2011 and the OneCup bio that you    04:41:12
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 255

1    launched in October of 2013?

2        A    The OneCup bio had a -- and it turns out,

3    as I told you, we received the wrong advice.

4    Biodegradable was the wrong term to use.

5    Compostable would have been the right term to use.    04:41:28

6            By that point, two years later, as you, as

7    you referenced, the lid of our, of our pod and the

8    corn ring had become compostable, as well as the

9    mother bag in which the pods are placed.

10       Q    At that point, the plastic mesh was still    04:41:45

11   not compostable?

12       A    Correct.

13       Q    And then how has the design of the OneCup

14   changed between the OneCup bio product in October of

15   2013 and the one that you currently make today?    04:42:14

16       A    We finally found a material that we

17   could -- a PLA based compostable material from the

18   mesh that we could use in our, in our product.

19       Q    And do you recall when you launched the 100

20   percent compostable product?    04:42:29

21       A    I do not.  It would have been after our BPI

22   certification.

23       Q    Do you know if consumers have found JBR's

24   environmental marketing claims confusing?

25       A    I don't believe so.    04:42:49

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 256

1          MS. BRANNON:  Okay.  I'd like to mark an

2      e-mail from Lisa Smoot to you.  It's dated

3      September 9th, 2011.  And the Bates label is

4      ROG001885855.

5          This is Defendant's Exhibit 45.          04:43:09

6              (Exhibit 45 was marked.)

7          THE WITNESS:  Okay.

8      BY MS. BRANNON:

9          Q    This is an e-mail from Lisa Smoot.  That's

10     your sister?                                04:44:10

11         A    That's correct.

12         Q    And she's discussing some testing that JBR

13     did prior to launching the original OneCup in 2011?

14         A    The test she's referring to is a taste test

15     we did with a consumer panel.  It has nothing to do  04:44:25

16     with environmental responsibility, compostability,

17     or biodegradability.

18             At the time, in September of 2011, this was

19     a plastic product.  We are, we are just saying This

20     is a great product.  It was 30 percent less plastic.  04:44:39

21     What do we say?

22         Q    And the consumers were writing in these

23     answers that they liked the product, because it had

24     less packaging, less waste, no plastic, and so

25     forth?                                      04:44:58

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 257

1         A     Less plastic at the time.

2         Q     It looks like --

3         A     Less plastic.

4         Q     It looks like one of the consumers wrote no

5    plastic.                                        04:45:04

6         A     These are my, my sister's ideas, and some

7    of them are off base.

8               At this time, we were -- it was a plastic

9    product that used 30 percent less plastic.

10              We had a consumer test panel, 3 or 400    04:45:13

11   people that tried this product, and this is what --

12   to what she was referring.

13              Now we are talking about, "What can we call

14   this?  What do we say?  What do we do with this?"

15        Q     It looks like at least one consumer wrote   04:45:29

16   in "recyclable"?

17        A     I believe those are all my sister's ideas.

18   I'm not sure.

19              MS. BRANNON:  Okay.  You can set that one

20   aside.                                           04:45:42

21              I'd like to mark an e-mail from you to your

22   brother Pete, dated October 22nd, 2013.  Bates label

23   is ROG001732960.

24              This is Defendant's Exhibit 46.

25              (Exhibit 46 was marked.)              04:46:21

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 258

```
 1          THE WITNESS:  This is two years later.
 2     BY MS. BRANNON:
 3          Q    Yes.  I believe this is an online customer
 4     service chat.  And I'm guessing this relates to the
 5     OneCup bio?                                         04:46:42
 6          A    What happened with this was, the first
 7     element of our product that was compostable was the
 8     mother bag.  And so we called it compostable.
 9          Upon the advice of our, of our attorney,
10     which turned out to be a disaster, she recommended   04:46:57
11     we, recommended we change it to biodegradable.
12          So there was some confusion in this that
13     people were wondering if everything was compostable
14     or just the bag was compostable.
15          So I believe that we changed the bag           04:47:11
16     verbiage to say, "This bag is compostable."  I don't
17     really recall, but --
18          Q    In your e-mail here, you say, "We are
19     getting this a lot.  Can we change this to explain
20     better, like, this bag is compostable?"             04:47:27
21          A    As I just said.
22          Q    So it sounds like there was a fair amount
23     of consumer confusion about what was or was not
24     compostable?
25          MR. JOHNSON:  Objection, calls for             04:47:38
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 259

1    speculation, assumes facts not in evidence.

2    BY MS. BRANNON:

3        Q    Your e-mail says, "We are getting this a

4    lot."  What did you mean by that?

5        A    When people call customer service, you have  04:47:53

6    to, you have to think that there are probably other

7    people out there who are having the same issue.

8            So when I get a few of these, I'm

9    wondering, "What can we do about this?"

10           "We're getting this a lot" is to place      04:48:08

11   emphasis on, "Let's do something quickly."

12           There are people here like Chris Miller

13   that were like rolling a boulder uphill to get him

14   to move.

15           So that was, that was the intent of this.   04:48:19

16   What do we do about this?

17       Q    So you had seen multiple consumers asking

18   about what was compostable?

19       A    I would say more like a few.

20       Q    So you wrote, "We are getting this a lot,"  04:48:31

21   but you believe you actually only had a few

22   customers express confusion?

23       A    I only heard of a few.

24       Q    And you were writing -- you write, "We are

25   getting this a lot," because you wanted Chris Miller  04:48:47

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 260

```
 1    to do something about it, and you were worried --

 2        A    Right.

 3        Q    -- that if you just said, "We've had a few

 4    consumers ask questions," he wouldn't move fast

 5    enough?                                          04:48:58

 6        A    In my opinion, two is too many.  I don't

 7    want to get any complaints.

 8        Q    And your recollection is that you did, in

 9    fact, change the labeling, at least for a period of

10    time, to say --                                 04:49:12

11        A    I believe so.

12        Q    -- "This bag is compostable"?

13        A    I believe so.

14        Q    And then after that, you changed it to say

15    biodegradable at some point?                     04:49:19

16        A    Right.  On our attorney's advice.

17             MS. BRANNON:  Okay.  I'd like to mark

18    another e-mail.  This is from you to Emily

19    DiDomenico.  It's dated October 23rd, 2013.  And the

20    Bates label is ROG001732965.                     04:49:57

21             This is Defendant's Exhibit 47.

22                  (Exhibit 47 was marked.)

23             THE WITNESS:  Okay.

24    BY MS. BRANNON:

25        Q    I think you testified earlier that Emily    04:51:04
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 261

1    DiDomenico is the customer service rep who later

2    changed her name to Emily Eaton?

3        A    Emily Eaton is her married name, yes.

4        Q    Okay.  And is she often the first person to

5    speak with consumers who contact JBR?              04:51:19

6        A    Sometimes.

7        Q    Does she receive guidance or training on

8    how to interact with customers?

9        A    She does.

10       Q    How is that guidance developed?           04:51:28

11       A    Seat of the pants, mostly.  They are given

12   general direction.  I try and hire people who, who

13   are able to, you know, speak intelligently for

14   themselves and for us.

15       Q    And I think you said you sometimes review   04:51:41

16   the chat transcripts?

17       A    Yes.

18       Q    And provide guidance?

19       A    Yes.

20       Q    Here, the customer is asking whether they   04:51:52

21   could purchase a particular OneCup product in

22   biodegradable form, and Emily told the customer that

23   a 100 percent biodegradable version is not available

24   yet?

25       A    Correct.                                   04:52:12

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 262

```
 1        Q    And then it looks like eight minutes after
 2    you received the transcript, you followed up with
 3    her and Mr. Yamauchi and Lisa Wallach to say, "All
 4    are the same bio.  It is just that the box isn't
 5    calling it out yet."                          04:52:30
 6        A    Yes.  The same level of biodegradability,
 7    which was -- at the time, things were very confusing
 8    for us, what to say.  And so biodegradable was the,
 9    was the word of the moment.
10            What I, what I meant when I said that was,  04:52:43
11    all items offered the same biodegradability.  So
12    each -- the elements are all the same.
13            The things that are biodegradable are
14    biodegradable.  Things that are not, are not.  It
15    doesn't depend on the count.                  04:52:53
16        Q    And who is Lisa Walloch?
17        A    Lisa Walloch is also a customer service
18    representative.
19        Q    Is she still with the company?
20        A    She is.                             04:53:01
21        Q    And why was the box not -- why were the
22    boxes not using the same environmental wording?
23        A    I believe, at this time, we were testing,
24    and we didn't, we didn't want to call anything out.
25    And there's also the element that -- okay.     04:53:17
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 263

```
 1              Some of our fast moving items, we might be

 2      into the biodegradable elements.  Some of the slower

 3      things, like, you know, Decaf Hazelnut, there might

 4      be still plastic elements in there that -- so

 5      calling it out would be disingenuous.              04:53:30

 6         Q    Your advice is that all of the items

 7      actually are biodegradable to the same degree --

 8         A    Yes.

 9         Q    -- at that point?

10         A    The same level.  So the things that are     04:53:44

11      biodegradable are on all items -- on all count

12      items.  Okay?

13         Q    I see.

14         A    Like 12 count, 36 count, 80 count.

15         Q    I see.                                      04:53:54

16              So it could be that the Fog Chaser is not

17      yet biodegradable, but if a French Roast is

18      biodegradable, it's biodegradable in the 12 count

19      and the 120 count.

20         A    Exactly.  And we just elected not to call   04:54:03

21      anything out yet, until we were sure that everything

22      was, was at the same level.

23         Q    And then Emily writes back to you and says,

24      "So we are allowed to say that the 80 counts are

25      biodegradable.  The boxes just don't say it yet?"   04:54:18
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 264

```
 1            And you write back and say, "Yes.

 2     Everything is being manufactured the same."

 3            And then it looks like you forward that to

 4     your brother Pete and Olivia Ornales and say,

 5     "Right?"                                      04:54:34

 6        A    Yeah.  I don't recall what this referred

 7     to.  I, I thought I was pretty clear in telling

 8     everyone that all items of a particular coffee had

 9     the same level of biodegradability.

10            I think she got a little confused.  And my  04:54:50

11     response might have been equally confusing, because

12     we hadn't changed anything at the time, but there --

13     like I said, there was back stock of, say, old

14     things that were plastic, which is why we weren't

15     calling things out.                          04:55:03

16        Q    But you are telling Emily that all of the

17     80 counts are biodegradable, whether it calls it out

18     or not?

19        A    That's not what I meant.  I said everything

20     is being manufactured the same, whether it's 80    04:55:18

21     count, 12 count, 36 count, whatever.  They are all

22     the same.

23            So the ones that aren't biodegradable

24     aren't, and the ones that are, are.  So if I didn't

25     make that clear, that's my bad.              04:55:29
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 265

1        Q    And then you run this by Pete and Olivia

2    Ornelas to double-check --

3        A    Right.

4        Q    -- that you've given the right advice.

5             Do you recall whether they wrote you back    04:55:43

6    or what they said?

7        A    I don't recall.

8        Q    Do you recall when you first learned that

9    using the term biodegradable might not be lawful?

10       A    I recall the incident, but not the date.    04:56:03

11       Q    What was the incident?

12       A    A consumer who -- I can't remember the

13   organization she was affiliated with -- had said

14   that it might not be the right term to use.

15            MS. BRANNON:  Okay.  I will mark another    04:56:20

16   document here.  Actually -- so this is another

17   customer service transcript.  It's dated March 4th,

18   2015.  The Bates label is ROG001907665.

19            And this is Defendant's Exhibit 48.

20            (Exhibit 48 was marked.)                    04:56:55

21            THE WITNESS:  Thank you.

22            Okay.

23   BY MS. BRANNON:

24       Q    So was this customer service chat

25   transcript sent to you?                              04:57:52

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 266

```
 1        A    I believe it was.

 2        Q    Do you recall whether you reviewed it at

 3   that time?

 4        A    I'm sure I did.

 5        Q    It looks like a customer is asking about     04:57:58

 6   how to dispose of the OneCup properly and says that

 7   she's confused about what to do.

 8             She says, when she takes it apart, it's a

 9   huge mess.  "Am I, in fact, supposed to take it

10   apart?"                                                 04:58:21

11             And Emily writes her back and says, "By

12   simply disposing your pod in the trash, it will

13   degrade in the landfill completely within a year.

14   You do not need to take it apart."

15             Was that an accurate statement when Emily     04:58:35

16   made it?

17        A    I don't know.  I, I think that was our

18   belief at the time.  We were still learning this.

19   We were -- there was a lot of -- like I said, a lot

20   of confusion going on.  Didn't know what to say.       04:58:46

21             You know, did a lot of Google research,

22   things like that, and, you know, knowing what I know

23   now, probably not the right thing to say.

24        Q    Does the OneCup biodegrade in the landfill

25   completely within a year?                               04:59:01
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 267

1          A    I have no idea.

2          Q    Have you been told that it doesn't?

3          A    I haven't been told that it does or

4     doesn't.  Hence, the fact that I have no idea.

5          Q    Have you been told that plant based          04:59:14

6     plastics behave the same way as other plastics in

7     landfill?

8          A    I have not been told that.

9          Q    This particular consumer, Amber, seems to

10    be happy with the answer she received.                 04:59:45

11              And she goes on and says, "By the way,

12    everyone in the office is smiling and feeling so

13    much less guilty about using K-Cups."

14              What do you understand that to mean?

15              MR. JOHNSON:  Objection, calls for            05:00:00

16    speculation.

17    BY MS. BRANNON:

18         Q    What do you understand the consumer to

19    mean?

20         A    It sure seems pretty clear to me.             05:00:06

21         Q    What do you think --

22         A    I can read it back to you if you like, but,

23    you know, I'm just reading exactly what she says.  I

24    wasn't there.  I didn't talk to her.  So I don't

25    know.                                                  05:00:19

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 270

1          Q     You've never heard of this?

2          A     I, I can't, I can't answer your question.

3     I do -- you asked if I knew.  I do not know.

4          Q     What do you think the consumer means by so

5     much less guilty about using K-Cups?                    05:02:22

6               MR. JOHNSON:  Objection, calls for

7     speculation.

8               THE WITNESS:  Again, I, I don't know where

9     this is going.  I wasn't there.  I didn't talk to

10    them.  I can't draw conclusions.                         05:02:30

11    BY MS. BRANNON:

12         Q     Do you recall telling Emily that she can't

13    tell consumers to -- that OneCups will degrade in

14    the landfill completely within a year?

15         A     I believe I did after -- as a result of      05:02:59

16    this or after this.  Like I said, there was a lot of

17    confusion going on right now.  This is brand new

18    back in the day, brand new.

19         Q     When would you have delivered that message

20    to Emily?                                                05:03:10

21         A     I would have no idea.

22         Q     Do you have any sort of timeline, showing

23    how your environmental claims changed over time?

24         A     I could probably scratch something out.

25         Q     There's nothing you've created in the        05:03:38

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 271

1    ordinary course --

2        A    There might be.

3        Q    -- that keeps track?

4        A    There might be.  Do you know how many

5    documents I have on my computer?  About 20,000.        05:03:45

6        Q    If JBR had an ordinary course business

7    document that tracked its environmental claims, who

8    would keep that document?

9        A    I don't know if the document, document

10   exists.  So I don't know who would keep it.            05:04:03

11       Q    Who would be most likely to be responsible

12   for tracking marketing claims?

13       A    I still can't answer that question.

14            MS. BRANNON:  I see we are a little bit

15   past five o'clock.  Do you want to --                  05:04:27

16            MR. JOHNSON:  Sure.

17            MS. BRANNON:  -- break it off here and pick

18   up?

19            THE WITNESS:  Sure.  Let's do that.

20            MR. JOHNSON:  Let's take a quick break.        05:04:31

21            What's the hour?  Where are we at?  Are we

22   at five hours?

23            THE WITNESS:  Six.

24            THE VIDEOGRAPHER:  6 hours, 22 minutes, on

25   the record.                                            05:04:42

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 274

1          I, the undersigned, a Certified Shorthand

2      Reporter of the State of California do hereby

3      certify:

4          That the foregoing proceedings were taken

5      before me at the time and place herein set forth;

6      that any witnesses in the foregoing proceedings,

7      prior to testifying, were duly sworn; that a

8      verbatim record of the proceedings was made by me

9      using machine shorthand which was thereafter

10     transcribed under my direction; that the foregoing

11     transcript is an accurate transcription thereof.

12         I further certify I am neither financially

13     interested in the action nor a relative or employee

14     of any attorney or any of the parties.

15         IN WITNESS WHEREOF, I have this date

16     subscribed my name.

17

18     Dated:  February 26, 2019

19

20

21

22

       LISA RICHARDSON, RPR, CRR, RMR

23     CSR No. 5883

24

25

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 275

1          UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF NEW YORK
3
                                    )
4   In Re:  KEURIG GREEN MOUNTAIN   )
    SINGLE SERVE COFFEE ANTITRUST   )
5   LITIGATION.                     )
                                    )
6   JBR, INC., D/B/A ROGERS FAMILY  )
    COMPANY,                        )
7                                   )
                   Plaintiff,       )
8                                   )    Case No.
            vs.                     )    1:14-cv-04242
9                                   )    VSB-HBP
    KEURIG GREEN MOUNTAIN, INC.     )
10  F/K/A GREEN MOUNTAIN COFFEE     )
    ROASTERS, INC. AND AS SUCCESSOR )
11  TO KEURIG, INCORPORATED,        )
                                    )
12                 Defendant.       )
13  _____
14          CONFIDENTIAL - ATTORNEYS' EYES ONLY
15             VIDEOTAPED DEPOSITION OF
16              JAMES DWIGHT ROGERS, II
17               Sacramento, California
18          Wednesday, February 13, 2019
19                  Volume II
20           8:57 a.m. - 12:25 p.m.
21      Total time on record: 2 hours, 45 minutes
22  Stenographically Reported by:
    LISA RICHARDSON, RPR, CRR, RMR
23  CSR No. 5883
24  Job No. 3205277
25  PAGES 275 - 424

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 276

1          UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF NEW YORK
3
                                        )
4    In Re:  KEURIG GREEN MOUNTAIN    )
     SINGLE SERVE COFFEE ANTITRUST    )
5    LITIGATION.                       )
                                        )
6    JBR, INC., D/B/A ROGERS FAMILY    )
     COMPANY,                          )
7                                       )
                    Plaintiff,          )
8                                       )   Case No.
              vs.                       )   1:14-cv-04242
9                                       )   VSB-HBP
     KEURIG GREEN MOUNTAIN, INC.       )
10   F/K/A GREEN MOUNTAIN COFFEE       )
     ROASTERS, INC. AND AS SUCCESSOR )
11   TO KEURIG, INCORPORATED,          )
                                        )
12                  Defendant.          )
13   _____
14
15          Videotaped Deposition of JAMES DWIGHT
16   ROGERS, II, Volume II, taken on behalf of Keurig
17   Green Mountain, at 1 Capitol Mall, Sacramento,
18   California, beginning at 8:57 a.m., and ending at
19   12:25 p.m., on Wednesday, February 13, 2019,
20   before Lisa Richardson, Certified Shorthand Reporter
21   No. 5883.
22
23
24
25

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 277

```
 1      APPEARANCES:
 2
 3      On Behalf of the Rogers Family Company:
 4        DAN JOHNSON LAW GROUP
          By:  DANIEL JOHNSON, ESQ.
 5        By:  MARIO MOORE, ESQ. (Telephonic Appearance)
          400 Oyster Point Boulevard
 6        Suite 321
          South San Francisco, California 94080
 7        415.604.4500
          dan@danjohnsonlawgroup.com
 8
        On Behalf of Keurig Green Mountain:
 9
          CLEARY GOTTLEIB STEEN & HAMILTON LLP
10        By:  LEAH BRANNON, ESQ.
          By:  ALAN B. FREEDMAN, ESQ.
11        2112 Pennsylvania Avenue, N.W.
          Washington, D.C. 20037-3229
12        609.558.1540
          lbrannon@cgsh.com
13
        On Behalf of TreeHouse, Sturm and Bay Valley:
14
          WINSTON & STRAWN
15        By:  EVAN MILLER, ESQ.
          (Telephonic appearance)
16        101 California Street
          200 Park Avenue
17        New York, New York 10166-4193
          212.294.6728
18        emiller@winston.com
19      On Behalf of Direct Purchasers:
20        ROBINS KAPLAN
          By:  DAVID ROCHELSON, ESQ.
21        (Telephonic Appearance)
          399 Park Avenue
22        Suite 3600
          New York, New York 10022
23        212.980.7441
          drochelson@robinskaplan.com
24
25
```

CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 278

```
 1      APPEARANCES (cont'd)
 2      On Behalf of Indirect Purchasers:
 3        PEARSON, SIMON & WARSHAW, LLP
          By:  ALEXANDER L. SIMON, ESQ.
 4        (Telephonic Appearance)
          44 Montgomery Street
 5        San Francisco, California 94104
          415.400.7703
 6        asimon@pswlaw.com
 7

        Videographer:  John Macdonell
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
                                                        Page 282

 1        Sacramento, California, Wednesday, February 13, 2019

 2                         8:57 a.m.

 3                         --oOo--

 4              (Exhibit 49 was marked.)

 5              THE VIDEOGRAPHER:  Okay.  We are on the      08:57:51

 6        record.  It's 8:57 a.m. on February 13th, 2019.

 7              This is the deposition of James Rogers,

 8        Volume II.

 9              We are here in the matter of Keurig Green

10        Mountain Single-Serve Coffee Antitrust Litigation.   08:58:07

11              We are located at 1 Capitol Mall in

12        Sacramento, California.

13              I'm John Macdonell, the videographer, with

14        Veritext.

15              Mr. Rogers remains under oath.              08:58:19

16              Please proceed.

17                   JAMES DWIGHT ROGERS, II,

18        having been previously sworn, testified as follows:

19                         EXAMINATION

20        BY MS. BRANNON:                                   08:58:21

21           Q    Welcome back, Mr. Rogers.

22           A    Hello.

23           Q    We were talking yesterday afternoon about

24        JBR's environmental advertising.  And I asked if you

25        recalled when you first learned that using the term   08:58:32
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 283

```
 1      biodegradable might not be lawful.

 2              And I believe you testified that you recall

 3      the incident, but not the date.  And you said that a

 4      consumer affiliated with an organization raised the

 5      issue.                                           08:58:47

 6              Do you remember that testimony?

 7         A    I do.

 8         Q    So I've marked as Exhibit 49 -- sorry.

 9              MS. BRANNON:  I think we just had two more

10      joins on the phone line.                         08:58:56

11              Who joined?

12              MR. MOORE:  Good morning.  This is Mario

13      Moore, representing JBR.

14              MS. BRANNON:  Hi, Mario.

15              MR. MILLER:  And this is Evan Miller,      08:59:05

16      representing TreeHouse.

17              MS. BRANNON:  Great.

18      BY MS. BRANNON:

19         Q    So the court reporter has marked as

20      Exhibit 49, Defendant's Exhibit 49 to the Jim Rogers  08:59:13

21      deposition, an e-mail from Jim Zelinski to your

22      father, Jon Rogers.  It's dated September 24th,

23      2014.  And the Bates label is ROG001805753.

24              You've had a chance to look at this e-mail?

25         A    I have.                                  08:59:39
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 284

```
 1            Q    Do you recognize it?

 2            A    I do not.

 3            Q    Is this the incident that you were speaking

 4     of --

 5            A    It was not.                              08:59:45

 6            Q    Do you recall whether Californians Against

 7     Waste was the organization?

 8            A    It was not.

 9            Q    Do you recall the name of the organization?

10            A    My first, my first inkling of the fact that  08:59:59

11     we might have used the wrong term for our product

12     was in approximately January of 2015.

13                 It was a woman named -- I think it was --

14     her name was MacMillan.  And she was an advisor to a

15     panel for the California State Assembly on, I       09:00:21

16     believe, environmental issues.

17                 I, I was not privy to this e-mail, and I

18     was not involved in this conversation.  So I was --

19     I did not have any dealings with California Against

20     Waste at this time.                                 09:00:35

21            Q    Do you know if your father shared this with

22     anyone else at the company?

23            A    I do not know.

24                 MS. BRANNON:  Okay.  I'd like to mark

25     Defendant's Exhibit 50 to the Jim Rogers deposition.  09:00:55
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 285

1        This is an e-mail from you to your father, dated

2        January 27th, 2015.  The Bates label is

3        ROG001907402.

4                    (Exhibit 50 was marked.)

5                    THE WITNESS:  Thank you.                09:01:22

6               Okay.

7        BY MS. BRANNON:

8               Q    Is this the first time you learned about

9        the issue with the use of the term biodegradable?

10              A    Yes.                                      09:02:08

11              Q    And this is an e-mail being forwarded to

12       you by Costco?

13              A    Correct.

14              Q    Who is John Sullivan?

15              A    I believe he is counsel to Costco, to    09:02:20

16       Costco Wholesale.

17              Q    He's an in-house lawyer?

18              A    I believe so.

19              Q    Mr. Sullivan says that a consultant to a

20       legislative committee in California has communicated 09:02:29

21       her observation that the biodegradable claim on

22       OneCups is unlawful under California law, and Costco

23       asked you for a response as soon as possible.

24                    Your father calls this a typical

25       bureaucratic screw-up.                               09:02:49

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 286

1          And you reply and say, "It's not that.  I

2     got this."

3          What did you mean by that?

4     A    It wasn't a bureaucratic screw-up.  As I,

5     as I mentioned previously this morning, this is the    09:03:01

6     first I'd heard that there might be an issue with

7     using the term biodegradable.

8          Now, please recall that we used the term

9     biodegradable only after engaging an environmental

10    attorney, who advised us to use that term.              09:03:13

11         And we thought we were in the clear,

12    because of the extensive research we had done and

13    the extensive communication with this attorney.

14         So when I said I got this, first of all,

15    I'm the one who handles the Costco account.             09:03:26

16         And, second of all, I was offering to

17    contact this person and, and find out what the

18    problem was.

19         And this is the issue to which I referred

20    earlier this morning.                                   09:03:37

21    Q    When you say contact this person, do you

22    mean the legislative consultant?

23    A    That's correct.

24    Q    And did you speak with the legislative

25    consultant?                                             09:03:48

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 287

1       A    I did.

2       Q    And what did the legislative consultant

3   say?

4       A    She, she reiterated, reiterated what she

5   had said in this e-mail, that we are -- that using    09:03:55

6   the term biodegradable, even though it's an obsolete

7   law, was, was not lawful in California.

8       Q    What did you say to her?

9       A    You probably have e-mails regarding this,

10  but we had some discussions in January and into    09:04:15

11  February.

12          And at the time, I still was not aware that

13  we were in any kind of violation, but, nevertheless,

14  I offered to remove that from all packaging, which

15  we did.  And that removal occurred in February and    09:04:29

16  March of 2015.

17      Q    Did you talk with your environmental lawyer

18  at this time?

19      A    Certainly.

20      Q    Did you talk with any other lawyer at this    09:04:45

21  time to get a second opinion?

22      A    I did not.

23      Q    You said you removed the biodegradable

24  label in February and March of 2015?

25      A    That's when we began doing so, yes.    09:05:06

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 288

1          Q     How long did it take you to fully remove

2     the biodegradable label?

3          A     That's a difficult question to answer,

4     because we have stock of many, many boxes.  We

5     didn't feel at this time, and no one had advised us     09:05:19

6     at this time, that there was any degree of urgency

7     to doing so.

8                So we ran through what we had and made the

9     change as necessary.  So, obviously, the first one

10    that probably would have been changed is the box       09:05:31

11    going to Costco.

12               Like I said -- mentioned yesterday, you

13    have a lot of very slow moving items, like Decaf

14    Hazelnut, where it might have been, you know, some

15    time, but we began this process in February of 2015.   09:05:44

16         Q     When would the last biodegradable

17    advertising have stopped appearing on the market?

18         A     I can't give you a specific date, but,

19    certainly, by, I believe, April for Costco.  And,

20    and it trickled out through the rest of retail         09:06:04

21    throughout -- you know, through mid, mid 2015

22    probably.

23         Q     Do you think all of the biodegradable

24    advertising was gone by late 2015?

25         A     I can't tell you definitively, but I would  09:06:24

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 289

1     assume so.

2          Q    What did you replace the biodegradable

3     advertising with?

4          A    We replaced it with a very simple statement

5     that said, "No plastic cup.  Just great coffee."     09:06:39

6               Obviously, you've seen our pods, and there

7     is no plastic cup on our pods.

8          Q    Did you discuss the no plastic cup claim

9     with the legislative consultant?

10         A    I don't believe we did.  I believe her     09:06:54

11    concern was the biodegradable callout.  We might

12    have, but I -- you probably have an e-mail trail

13    there that can tell me more accurately.

14         Q    Did you prepare a written response for

15    Costco in response to their question here?          09:07:26

16         A    I don't recall exactly who I contacted at

17    Costco regarding this.

18              MS. BRANNON:  I'd like to mark a letter

19    dated August 11, 2015.  This is Defendant's

20    Exhibit 50 to the Jim Rogers deposition.  And --    09:07:51

21    50 -- sorry.  51, Defendant's Exhibit 51.  And the

22    Bates label is ROG001910499.

23              (Exhibit 51 was marked.)

24              THE WITNESS:  Thank you.

25              Okay.                                      09:08:48

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 290

```
1      BY MS. BRANNON:

2          Q    Do you recognize this document?

3          A    Intimately.

4          Q    What is this?

5          A    This is a letter we received from the      09:08:52

6      district attorney late in the month of August 2015.

7      If you will note at the very top of the letter, it

8      was sent to the wrong address, and we never received

9      a copy of it.  We didn't receive it until we got a

10     copy of it from Costco.                              09:09:05

11          This is when we first realized that we were

12     technically in violation of an archaic California

13     law, where you can't use -- you can't call a plastic

14     biodegradable.  It ignored the new generation of

15     plastics called PLAs.                                09:09:24

16         Q    This is addressed to your father, Jon, but

17     you took charge of responding to it?

18         A    I did.

19         Q    And the letter was sent on behalf of

20     15 district attorneys' offices?                      09:09:36

21         A    Correct.

22         Q    The letter says that both JBR's 97 percent

23     biodegradable and its no plastic cup claims violate

24     the law?

25         A    It does -- no plastic cup claim does not    09:09:48
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 291

1    violate the law.  It is a true statement.  The

2    district attorney who was handling this matter --

3    her name is Alyce Sandbach -- had a personal problem

4    with that statement.

5         Q    The letter says, "We have received          09:10:05

6    complaints regarding sales at Costco of Rogers

7    Family Company's OneCup cartridges, which contain

8    plastic, but which have been labeled and marketed

9    with statements such as no plastic cup and 97

10   percent biodegradable."                               09:10:21

11        The letter goes on to say, "We believe that

12   Rogers Family Company and Costco are in current

13   violation of the law.  California law prohibits

14   false and misleading statements in advertising to

15   consumers, including environmental marketing         09:10:38

16   claims."

17        And they have a citation to the Business

18   and Professions Code.

19        Did you read this letter as raising

20   concerns about both the 97 percent biodegradable and  09:10:48

21   the no plastic cup marketing?

22        A    Again, the no plastic cup was a personal --

23   she had a personal problem with it.  It is a

24   completely factual and true statement.  And we

25   didn't personally have a problem with it.             09:11:01

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 292

1          We realized at this time that the

2     biodegradable callout was, was against California

3     law, and we were already in the process of removing

4     it.  And if it hadn't been removed already, it was

5     very close to being removed.                    09:11:13

6          The no plastic cup, I just took off the

7     package entirely just to appease Ms. Sandbach, even

8     though it was a completely factual and true

9     statement.

10       Q    Do you think that in writing this letter,  09:11:26

11    Ms. Sandbach was expressing her personal opinion

12    about the no plastic cup marketing?

13       A    Yes.

14         MR. JOHNSON:  Objection.  That calls for

15    speculation and conjecture as to what she was       09:11:42

16    thinking.

17    BY MS. BRANNON:

18       Q    Ms. Sandbach says she's writing on behalf

19    of 15 district attorneys.  Isn't that right?

20       A    That's correct.                            09:11:51

21       Q    Did you consult with your environmental

22    attorney when you received this letter?

23       A    We did.

24       Q    Did you also consult a different attorney

25    in August of 2015?                                 09:12:06

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 293

1        A    I believe what happened was, we phased out

2    our original attorney, because we realized that her

3    advice was bad.

4             We retained a gentleman named Trent Norris

5    at Arnold Porter, who also works with Costco, to      09:12:20

6    advise us in this matter.

7        Q    And you think that happened around August

8    of 2015?

9        A    I wish I could be more precise.  I believe

10   it was around there.                                  09:12:35

11            MS. BRANNON:  I'd like to mark Defendant's

12   Exhibit 52 to the Jim Rogers deposition.  This is an

13   e-mail from Tom Garber to Alyce Sandbach.  It's

14   dated August 28th, 2015.  And the Bates label is

15   ROG002103404.                                         09:12:58

16                 (Exhibit 52 was marked.)

17            MR. JOHNSON:  52?

18            MS. BRANNON:  Yes.

19            THE WITNESS:  Thank you.

20            Okay.                                        09:14:20

21   BY MS. BRANNON:

22       Q    These are e-mails between JBR and

23   Ms. Sandbach?

24       A    It appears to be so.

25       Q    And she's asking JBR to send her support    09:14:31

Page 294

1      for the environmental claims on OneCups?

2           A    Yes.  These are called BPI certifications

3      for compostability.

4           Q    Did you have a BPI certification that the

5      entire pod was compostable at this point?          09:14:49

6           A    I do not believe so.

7           Q    Do you recall what BPI certifications you

8      had at this point?

9           A    I believe we had one for the pod ring.  We

10     had one for the lid.  And we had one for the mother  09:15:03

11     bag and also for the little valve we occasionally

12     use on the mother bag.

13          Q    In your e-mail to Ms. Sandbach, toward the

14     bottom of this chain, you said, "Hi, Alyce.  Thank

15     you for your time this morning."                    09:15:27

16               Did you talk with her by phone?

17          A    I did.

18          Q    That was on August 19th, 2015?

19          A    That's correct.

20          Q    What did you say to her?                  09:15:35

21          A    First of all, I told her that we had not

22     received her letter, because she had a ten-day

23     demand on it.

24               Second of all, I advised her that we --

25     that the components in this bag are -- or in this   09:15:47

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 295

1    pod are 97 percent biodegradable/compostable, the

2    only exception being the mesh.

3            And I tried to, I tried to schedule a

4    meeting with her to discuss this matter further.

5        Q    What did she say?                        09:16:02

6        A    I think she was fairly receptive to a

7    meeting.  She's -- I can't recall anything else that

8    happened during the, during the, during the

9    conversation.

10           I wanted to know that we had just received  09:16:17

11   the letter and that we were responding as soon as

12   possible.

13       Q    Did you tell her you were in the process of

14   removing the biodegradable claims and replacing it

15   with the no plastic cup advertising?               09:16:27

16       A    I did.

17       Q    Did she have -- I think you said she did

18   not like the no plastic cup advertising?

19       A    She personally.  I don't even believe her,

20   her partner, Ed Brown, had a problem with it.  She   09:16:40

21   was the only one who raised the issue.

22       Q    Did she say she had recently seen packages

23   with the illegal biodegradable labeling in Costco?

24       A    She may have, but those would have been at

25   the very end of a production run and probably in a   09:16:55

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 296

1    slower location, because we had not produced any

2    biodegradable callout product in quite some time.

3        Q    What would be the longest Costco would hold

4    OneCups in inventory?

5        A    That's almost impossible to say.          09:17:15

6        Q    How far out is the best by date?

7        A    A year.

8        Q    So, presumably, they wouldn't hold them for

9    more than a year?

10       A    I don't think so.                          09:17:27

11       Q    Did JBR recall any of the old packages and

12   replace them with new ones?

13       A    We did not.  We were not requested to.

14       Q    What was Ms. Sandbach's issue with the no

15   plastic cup labeling?                               09:17:47

16       A    I can't possibly tell you.  It was a true

17   and factual statement.

18       Q    Did she think that the curved plastic mesh

19   in the pod was a cup?

20       A    I have no idea what she thought.  I know    09:18:01

21   that she had an issue with the fact that we even

22   called our product a OneCup.

23            She said, "Why do you" -- she asked me why

24   we call it a OneCup.  I said, "That's our trademark,

25   and it makes one cup of coffee."  It's pretty easy   09:18:14

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 297

1      to figure out.

2          Q    So your view is that the OneCup does not

3      have a cup on the pod?

4          A    It -- you can plainly see that it does not,

5      and it never has.                                09:18:24

6          Q    Did Ms. Sandbach say that plant based

7      plastics behave the same way as other plastics in a

8      landfill?

9          A    Ms. Sandbach said things like that and

10     things like the fact that there are newspapers from   09:18:36

11     the '50s that are in landfills, but that doesn't

12     change the nature of this product.

13            It is compostable.  It is as we said it

14     was.  And if it's not treated properly, that's not

15     on us.  The fact remains that it is a compostable     09:18:47

16     product.

17            And if it's not treated in a manner that

18     allows it to compost, that's not what we are saying.

19     If you shoot it out into space, it's not going to

20     compost either, but it's still a compostable          09:18:59

21     product.

22         Q    You testified yesterday that early on, JBR

23     did a lot of Google research on environmental

24     issues.

25            At this point in 2015, with the DAs raising    09:19:11

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 298

```
 1    concerns, did you commission scientific research on

 2    how OneCups break down when disposed of in ordinary

 3    fashion?

 4         A    We, we had already done -- the BPI, the

 5    certification agency, does all that research.  They    09:19:30

 6    do actual tests of the product degrading over the

 7    period of time, which I believe is 90 days.

 8              So we rely on them for certification.  And

 9    we also relied on our manufacturers of the rings and

10    the lid to provide us with that information.          09:19:43

11         Q    Was BPI testing how the OneCups would break

12    down in an industrial composting facility?

13         A    I do not know how they test it, but they

14    are the most rigorous and most renowned

15    certification agency in the world.                    09:20:00

16         Q    Was BPI --

17              MR. JOHNSON:  Let's take a break for one

18    second.

19              THE WITNESS:  Okay.

20              MR. JOHNSON:  I think you need to correct    09:20:08

21    something.

22              THE WITNESS:  Okay.

23              THE VIDEOGRAPHER:  Off the record?

24              Okay.  We are off the record.  It's 9:20.

25              (Off the record.)                           09:20:21
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 299

```
 1              THE VIDEOGRAPHER:  Okay.  We are back on
 2      the record.  It's 9:21.
 3      BY MS. BRANNON:
 4          Q    Was there something that you wanted to
 5      clarify?                                      09:21:31
 6          A    There is.  I, I don't know what you would
 7      call BPI's facility, but it must be an industrial
 8      facility.  They have pictures of the degradation
 9      process over that period of time.
10              So I would, I would guess that yes, it is   09:21:43
11      an industrial facility.  And yes, they take
12      time-lapse pictures of the product as they are
13      breaking down in that facility.
14          Q    Does BPI do any testing of how a product
15      would break down in a landfill?               09:21:57
16          A    I do not know that.
17          Q    Did --
18          A    I believe that is not their, their scope of
19      their, of their certification process.
20          Q    Did JBR do, do or commission any scientific  09:22:06
21      research on how OneCups would break down when
22      disposed of in ordinary fashion in a consumer's
23      trash?
24              MR. JOHNSON:  At what, at what point in
25      time?                                          09:22:26
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

```
                                                    Page 300

 1              MS. BRANNON:  At any point in time.

 2              THE WITNESS:  I do not recall -- I don't,

 3         don't believe so, because that was not the focus of

 4         our efforts.

 5              MR. JOHNSON:  Jim, let's take another        09:22:33

 6         break.

 7              MS. BRANNON:  We are going off the record.

 8              THE VIDEOGRAPHER:  Okay.  We are off the

 9         record.  It's 9:22.

10              (Off the record.)                            09:24:27

11              THE VIDEOGRAPHER:  Okay.  We are back on

12         the record.  It's 9:24.

13         BY MS. BRANNON:

14         Q    Mr. Rogers, is there something you'd like

15         to clarify, based on your discussion with         09:24:42

16         Mr. Johnson?

17         A    I am not aware of any research we did of

18         how our, our product behaves in a landfill, per se.

19         There might be some research.

20              I know that my brother Pete has been         09:24:55

21         working with our local landfill, but I'm not aware

22         of, of that research.

23              And the focus of our efforts was on making

24         something compostable.

25         Q    Did JBR conduct or commission any research   09:25:11
```

CONFIDENTIAL-ATTORNEYS EYES ONLY

Page 306

1      Q    You've been working in the coffee industry

2    for about 30 years?

3      A    Hmm-hmm.

4           MS. BRANNON:  I'd like to mark Defendant's

5    Exhibit 53 to the Jim Rogers deposition.  This is an    09:30:35

6    e-mail from you to Clenden Bramhill.  It's dated

7    August 26, 2015.  And the Bates label is

8    ROG001437505.

9           (Exhibit 53 was marked.)

10           THE WITNESS:  Thank you.                          09:31:04

11    BY MS. BRANNON:

12      Q    You can read the whole thing if you'd like,

13    but I'm going to focus on the e-mail from you on

14    the --

15      A    I'd like to read --                               09:31:50

16      Q    -- third page.

17      A    I'd like to read the whole thing, please.

18      Q    Okay.

19      A    Okay.

20      Q    So in this e-mail thread, it looks like        09:32:52

21    Costco is asking JBR to supply a new product, the

22    Rainforest Organic.  Is that right?

23      A    That's correct.

24      Q    And you write to Ms. Ornelas and others and

25    say, "Hold off.  We cannot ship boxes to Costco with    09:33:07

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 307

1     the 97 percent bio callout.  Chris will have to

2     order no plastic cup boxes."

3              Is that right?

4        A    That's correct.

5        Q    So when you sent these e-mails in August of  09:33:18

6     2015, was JBR still sending boxes to some retailers

7     with biodegradable claims?

8        A    I don't believe so.  I believe at some

9     point during this time frame, we destroyed those

10    boxes.                                                09:33:37

11       Q    And you were actively trying to get the no

12    plastic cup advertising for Costco?

13       A    I was actively trying to not have the

14    biodegradable callout for Costco.  The no plastic

15    cup was our replacement term.  We were still using   09:33:51

16    that term, I believe, at that point in time.

17       Q    And your e-mail says, "This is of critical

18    importance.  All Costco product must have the no

19    plastic cup callout on it."

20              Is that correct?                            09:34:10

21       A    As opposed to the bio, yes?  We were --

22    like I said just a minute ago, we were currently

23    using the no plastic cup callout on our boxes.

24              We were phasing out the biodegradable.  I

25    wanted to make sure none of the biodegradable        09:34:21

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 308

1    material ended up at Costco especially.

2         Q    And this is after your conversation with

3    Ms. Sandbach and after you received the August 11,

4    2015 letter from 15 district attorneys, saying that

5    the no plastic cup advertising was illegal?        09:34:38

6         A    Yes.  The no plastic cup advertising was

7    not illegal.

8         Q    And you don't recall whether JBR destroyed

9    any of its old biodegradable packaging at this time?

10        A    We can find out when, but we ended up      09:35:00

11   destroying several hundred thousand dollars worth of

12   raw materials.

13        Q    Who would know when precisely that

14   happened?

15        A    I don't know who would have, who would     09:35:11

16   have -- I believe I have that information somewhere.

17        Q    If that information is not in your files,

18   would Mr. Miller be the best person to ask about it?

19        A    No.  He's no longer with us.

20        Q    Would Ms. Cuthbert be the right person to   09:35:35

21   ask about it?

22        A    I don't know if she was involved.  What we

23   did was, we destroyed the boxes and sent them to a

24   recycler, cardboard recycler.

25        Q    Would you have created documentation at the 09:35:47

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 309

1      time that you did that?

2          A     Absolutely.

3          Q     Where would you have kept that

4      documentation?

5          A     Like I said, I believe I have it on my        09:36:00

6      computer.

7          Q     Would it be in your e-mail?

8          A     Not in my e-mails.

9          Q     Would it be a Word document or an Excel

10     document?                                                09:36:11

11         A     Probably an Excel document.

12               MS. BRANNON:  I'd like -- you can set that

13     one aside.

14               I'd like to mark Defendant's Exhibit 54 to

15     the Jim Rogers deposition.  This is an e-mail from       09:36:26

16     you to rfc_all, and it's dated April 28th, 2016.

17     The Bates label on this one is ROG001452080.

18               (Exhibit 54 was marked.)

19               THE WITNESS:  Thank you.

20               Okay.                                          09:37:40

21     BY MS. BRANNON:

22         Q     Do you recognize this e-mail?

23         A     Of course.

24         Q     Is this an e-mail that you drafted and

25     sent?                                                    09:37:45

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 310

```
 1         A    As you can see, it is.
 2         Q    And I believe you testified yesterday that
 3    e-mails sent to rfc_all@rogersfamilyco.com go to the
 4    entire company?
 5         A    That's correct.                            09:37:58
 6         Q    So this e-mail was explaining company
 7    policies to the entire company.  Right?
 8         A    It was describing what to say to outside
 9    inquiries about the product.  There was some --
10    there was still a bit of confusion about that.       09:38:10
11         And because of the scrutiny that the
12    district attorney had placed us under, I wanted to
13    make sure that we did not misstep, because she was
14    looking at our website on a very -- on a, on a
15    continual basis, and she was, she was scrutinizing   09:38:25
16    us far above and beyond what I thought was
17    necessary.
18         You know, I, I just -- I still don't
19    understand why we were the guys -- the bad guys in
20    her, in her book, but that's her, her thing.         09:38:40
21         Q    And there was still confusion within the
22    company, which is why you sent this?
23         A    Well, there are 250 employees.  So I wanted
24    to make sure every single one understood what we
25    were trying to say and what we were trying to do.    09:38:54
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 311

1    Q    You said you didn't understand why the DAs

2    were so focused on JBR.

3         Did Ms. Sandbach ever use the term

4    greenwashing with you?

5    A    Yes, she did.                                    09:39:10

6    Q    What does that term mean to you?

7    A    It means that you are making false claims

8    about your product to try and appeal to people who

9    are environmentally conscious.  And I actually

10   personally was insulted by that.                      09:39:19

11   Q    In your e-mail to the company, you write,

12   "OneCups are not biodegradable."

13        You also write, "Make no claims about it

14   being okay to put our OneCups in a landfill, another

15   big issue for them."                                  09:39:39

16        Does them refer to the district attorneys?

17   A    It does.

18   Q    And the district attorneys told you that

19   OneCups do not biodegrade in a landfill?

20   A    They did not.  They, they have a problem         09:39:51

21   with anything you put in a landfill.  Their claim is

22   that nothing you put in a landfill will ever

23   biodegrade.  That is their claim.

24   Q    You also write, "Do not say that we do not

25   use plastic.  Our materials are technically           09:40:06

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 312

1      plastic."

2              Which parts of the OneCup are plastic

3      today?

4          A    Okay.  If you want to get very technical,

5      plastic is defined as any, any material that you can    09:40:21

6      mold by applying heat to it.

7              Even if you have these brand-new plastics,

8      which are plant based and which degrade and compost,

9      they are still technically, in California, called

10     plastic.                                               09:40:35

11             So that is, that is the reason for my

12     statement there.

13         Q    And which parts of the OneCup are currently

14     plastic by the definition?

15         A    All, all, all of our -- every component of     09:40:44

16     our OneCup is a PLA based plastic, which is

17     compostable.

18         Q    So that includes the ring and the lid and

19     the mesh?

20         A    Correct.                                       09:40:55

21         Q    Are there any other parts of the OneCup?

22         A    There is the mother bag that the pods go

23     into.  That is also compostable.

24         Q    And that's also plastic?

25         A    It is a PLA based compostable plastic.         09:41:05

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 313

1           MS. BRANNON:  Okay.  You can set that

2      document aside.

3           I'd like to mark Defendant's Exhibit 55.

4      This is an e-mail from you to Chris Miller.  It's

5      dated April 29, 2016.  And the Bates label is        09:41:20

6      ROG001912238.

7                (Exhibit 55 was marked.)

8           THE WITNESS:  Yes.

9      BY MS. BRANNON:

10          Q    Is this an e-mail following up on how to     09:41:49

11     describe OneCups?

12          A    No.

13          Q    What is this e-mail?

14          A    This is an e-mail regarding our website.

15     And our NAV, what it refers to, is our, our ERP        09:42:02

16     system, enterprise resource planning, forecasting,

17     manufacturing, etc.

18          Some of the products in our Navision system

19     still had the word bio in them, and I purged those

20     from the Navision system to reduce confusion.          09:42:19

21          Q    And were there also uses of the term

22     biodegradable on your consumer facing website at

23     this time?

24          A    Are you familiar with cached website pages?

25          Q    Yes.                                         09:42:35

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 314

1        A    Okay.  Some Google cache pages had that

2    reference, and I was trying to -- this does not

3    refer to that, but at the same time, I was trying to

4    remove those from the caches.

5        Q    Were any of JBR's products advertised as      09:42:44

6    biodegradable after April of 2016?

7        A    No.

8            MS. BRANNON:  Okay.  You can set that

9    document aside.

10           I'd like to mark an e-mail from you to Lee    09:43:07

11   Geary, dated June 15th, 2016.  The Bates label is

12   ROG001616055.  And this is Defendant's Exhibit 56 to

13   the Jim Rogers deposition.

14               (Exhibit 56 was marked.)

15           THE WITNESS:  Okay.                            09:44:23

16   BY MS. BRANNON:

17       Q    It looks like in this e-mail thread that

18   Mr. Geary is trying to change the images of the

19   OneCup packaging on Amazon.com to remove images that

20   use the word biodegradable.  Is that correct?          09:44:40

21       A    That is my understanding.

22       Q    And you tell Mr. Geary, "Please tell Amazon

23   that any reference to biodegradable on the packaging

24   is illegal and that a coalition of county district

25   attorneys will come after them for it.  The result     09:44:54

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 315

1    will be heavy fines."

2             Is that right?

3        A    That's right.

4        Q    Why was he having trouble getting Amazon to

5    change the images?                                    09:45:07

6        A    Obviously, you've never worked with Amazon.

7    It is almost impossible to get anything done there.

8             First of all, it is almost impossible to

9    have real people involved.  Everything is

10   computerized.  Everything is automated.              09:45:18

11            It's very, very difficult to work with

12   them.  And we were trying to get those packages

13   removed, because they were obsolete.

14       Q    And --

15       A    You could probably still find biodegradable 09:45:29

16   pictures somewhere on the web if you looked hard

17   enough.  It's almost -- it's really difficult.

18            And we were trying to be clean and trying

19   to be honest and trying to make things, you know --

20   how do I put this?                                    09:45:42

21            We were trying to represent our products

22   accurately.

23       Q    And Amazon's reason for pushing back and

24   refusing to change the images was that the images

25   they were using on their website matched the stock    09:45:56

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 316

1    they had.  Is that right?

2        A    I don't believe --

3             MR. JOHNSON:  Objection, calls for

4    speculation and conjecture as to what Amazon was or

5    wasn't going to do.                              09:46:05

6             THE WITNESS:  I, I can't answer for Amazon,

7    but I can, I can tell you that we hadn't shipped by

8    then, by June of 2016.  We hadn't shipped anything

9    biodegradable to Amazon in six months maybe.

10            So there's no way, in my opinion, that they  09:46:22

11   would be carrying 6,000 items that had the

12   biodegradable callout on it.

13   BY MS. BRANNON:

14       Q    Could you remind me who Jim Schuett is?

15       A    He's our art and web director, or he was at  09:46:34

16   the time.

17       Q    And he is reporting on a conversation that

18   he had with someone at Amazon?

19       A    Chemico is a -- we discussed fulfill by

20   Amazon third party last year.                    09:46:51

21            Chemico is a party that buys -- when --

22   basically, when we put something on sale, they buy a

23   pallet of it and sell it on Amazon.  They are a

24   third-party vendor.

25       Q    So your third-party vendor reported that    09:47:04

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 317

1    Amazon was pushing back on them, saying that the

2    images matches -- that the image matches the stock?

3         A    The image matches the fact that it is a 80

4    count box of that particular item.  It's very

5    difficult to work with them on that.                    09:47:26

6              And that's the reason for my, my last

7    e-mail, saying, "If you, if you keep, you know,

8    screwing around, you might have the district

9    attorney after you."

10        Q    Did this get their attention?                 09:47:34

11        A    I believe so, yes.

12        Q    You think they changed the images after

13   this?

14        A    If memory serves.

15        Q    Were any of JBR's OneCups advertised as      09:47:46

16   biodegradable after June of 2016?

17        A    Nope.  Never.

18        Q    Did JBR's brand partner, Oakland Coffee,

19   raise concerns about JBR's environmental

20   advertising?                                            09:48:06

21        A    No.

22             MS. BRANNON:  I'd like to mark another

23   document.  This is an e-mail from Kate Kaplan at

24   Oakland Coffee to you.  It's dated November 8th,

25   2016.  The Bates label is ROG001913868.                09:48:18

Page 318

1           This is Defendant's Exhibit 57.

2               (Exhibit 57 was marked.)

3           THE WITNESS:  Thank you.

4           Okay.

5      BY MS. BRANNON:                              09:49:13

6           Q    Who is Kate Kaplan?

7           A    Kate Kaplan is the director of Oakland

8      Coffee Works.

9           Q    Who is Michael Pearce?

10          A    Michael Pearce is one of their partners.   09:49:20

11          Q    And who is the Mike referred to in the

12     first sentence of the e-mail?

13          A    You know him as Mike Dirnt.  He's the basis

14     for the band Green Day.

15          Q    Ms. Kaplan writes that she, Michael, and   09:49:31

16     Mike, quote, are very concerned that the

17     environmental claims being used on the packaging

18     could be misleading.

19               Which claims was she concerned about?

20          A    I don't recall.                           09:49:45

21          Q    She writes, "Mike and Michael are both

22     really concerned about the claims that we make on

23     the pod packaging.  The disclaimer language that we

24     got from your lawyer starts with certified

25     compostable at an industrial composting facility."   09:50:06

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 319

```
 1              She appears to be concerned that this could
 2     be confusing or misleading to consumers.
 3              Do you recall discussing this with her?
 4        A    I do not.
 5        Q    Is the reference to your lawyer here a        09:50:26
 6     reference to Tsan Abrahamson?
 7        A    No.
 8        Q    Is it a reference to Trent Norris?
 9        A    It is.
10        Q    Would Mr. Garber have also been involved in  09:50:40
11     a discussion with Oakland about the environmental
12     advertising being used on Oakland's packaging?
13        A    Probably.  I'm trying to recall.  I
14     believe, at this point, it was a fully compostable
15     pod.  I don't recall exactly when that switch was    09:51:09
16     made, but believe me.  If Mr. Morris had any problem
17     with the, with the, with the verbiage, he would have
18     said so.  He's a very cautious man.
19              I will say also that Oakland Coffee Works
20     is extremely particular about how their package      09:51:34
21     looks.
22        Q    Oakland wants to be very careful about its
23     environmental claims?
24        A    Not only that, but just how the whole thing
25     looks.  And they don't like certain fonts and things 09:51:46
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 320

1    like that.  So I don't recall what this was about.

2              MR. JOHNSON:  Okay.

3              MS. BRANNON:  Okay.  You can set that

4    aside.

5              THE WITNESS:  Okay.                    09:51:58

6              MS. BRANNON:  I'd like to mark an e-mail

7    from Chris Miller to you.  It's dated July 21st,

8    2016.  The Bates label is ROG001466053.

9              And this is Defendant's Exhibit 58.

10             (Exhibit 58 was marked.)               09:52:19

11             THE WITNESS:  Thank you.

12             Okay.

13   BY MS. BRANNON:

14       Q    Was BPI testing the OneCups for

15   certification as 100 percent industrially         09:53:44

16   compostable in or around July 2016?

17       A    Are you referring to the components or the

18   finished product?

19       Q    I'm referring to the finished product of

20   the OneCup.                                        09:53:58

21       A    I do not recall.

22       Q    What do you recall this certification

23   process being about?

24       A    If memory serves, our components had

25   passed, but the finished product was still in      09:54:08

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 321

1    testing, but I do -- I cannot guarantee that that is

2    accurate.

3        Q    So you think this is about testing of the

4    full OneCup product as industrially compostable?

5        A    That's what I, that's what I believe it to      09:54:25

6    be, but I don't recall.

7        Q    Mr. Miller writes that certification

8    testing begins Monday, July 26th of 2016, with a 10

9    to 12-week lead time.

10            He says, "This is for Asahi product only."      09:54:49

11   Then he says, "We will need to submit again for our

12   pod with UrthPact material, 12- to 15-week lead

13   time."

14       A    Where are you seeing this?

15       Q    This is on the second page under PBI cert.      09:55:02

16   It's points 2 and 3.

17       A    Okay.

18       Q    So JBR was still several months away from

19   having certification as 100 percent compostable at

20   the time of this e-mail?                                 09:55:31

21       A    I don't recall.  I'm not involved in the

22   testing process at all.

23       Q    Well, Mr. Miller says that the testing is

24   beginning on July 26th, and he says it has a 10 to

25   12-week lead time.                                       09:55:42

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 322

```
 1              And he also says there is a need to submit

 2      the pod with UrthPact material, and he says that

 3      will involve a 12 to 15-week lead time.

 4         A    Okay.

 5         Q    So do you take from this that JBR is still    09:55:52

 6      several months away from having certification as

 7      compostable?

 8         A    Again, I don't recall, because we are

 9      testing products by different manufacturers as

10      components in the pod.  So that might be what this    09:56:04

11      is in reference to.

12         Q    In your e-mail back to Chris, you say, "By

13      law, you have 90 days to produce certification once

14      someone requests it.  If we are 100 percent good,

15      what do you think about going live 60 to 90 days      09:56:29

16      before we get the certs?"

17              And Chris writes back and says, "I am

18      comfortable with that approach."

19              Do you recall this?

20         A    I do.                                          09:56:44

21         Q    Were you suggesting that JBR start

22      advertising that OneCups were compostable 60 to

23      90 days before receiving third-party certification?

24         A    I was not.

25         Q    What were you suggesting?                      09:56:56
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 323

1        A    I was asking a question.

2        Q    What was your question?

3        A    The question -- I will read it back to you.

4            "By law, you have 90 days for product

5    certification.  If we are 100 percent good, what do    09:57:06

6    you think about going live before we get the certs?"

7            That's a question.

8        Q    And Mr. Miller said he was comfortable with

9    that?

10       A    Mr. Miller is a purchasing agent.  He is    09:57:17

11   not involved in product testing or in sales or in

12   administration.

13       Q    Do you know if JBR actually started

14   marketing OneCups as 100 percent compostable before

15   receiving BPI certification?    09:57:28

16       A    Not to my knowledge.

17       Q    Who would know for sure?

18       A    You can ask everybody else.  I don't know,

19   but not to my knowledge.

20       Q    Who ran point on dealing with BPI about the    09:57:37

21   certification?

22       A    Chris did at the time.  It was beyond

23   his -- how do we put this?

24           My brother Pete, I believe, took it over,

25   because it was just dragging.  And he -- that's not    09:57:54

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 324

1    his, his area of expertise.  He's basically a

2    purchasing agent.

3         Q    So Pete would likely know --

4         A    Yes.

5         Q    You can set this aside.                    09:58:08

6         A    Okay.

7         Q    Do you recall that JBR settled a case in

8    March of 2018 with several district attorneys in

9    California?

10        A    Yes.                                        09:58:19

11        Q    Were you involved in the settlement

12   discussions?

13        A    I was.

14        Q    Who initially proposed the settlement?

15        A    I believe the district attorney did.       09:58:29

16        Q    How was Costco involved in those

17   discussions?

18        A    Costco was held harmless.  They were not

19   involved in the discussions.

20        Q    Does that mean that JBR paid the full      09:58:39

21   $500,000 fine itself?

22        A    It does.

23             MR. JOHNSON:  Object to the use of the word

24   fine.

25        //                                              09:58:48

CONFIDENTIAL-ATTORNEYS' EYES ONLY

                                          Page 325

1      BY MS. BRANNON:

2          Q    Was Oakland Coffee Works involved in the

3      settlement?

4          A    No.

5          Q    So Oakland Coffee didn't pay any portion of  09:58:53

6      the $500,000?

7          A    No.

8          Q    You said a number of times that you believe

9      JBR received bad advice from its environmental

10     lawyer.  And you mentioned yesterday that you filed  09:59:07

11     a malpractice suit against her.

12              What court did you file that in?

13         A    I wouldn't know what court it was.

14         Q    Was it here in Sacramento?

15         A    I don't know what court it was.          09:59:25

16         Q    Does Mr. Johnson represent you in that

17     case?

18         A    He does.

19         Q    Did you specify the amount of damages that

20     you are seeking?                                 09:59:31

21         A    We have discussed the amount of damages

22     that we are seeking.

23         Q    Did you specify it in your complaint?

24         A    We delineated how we were damaged and to

25     what amount.                                     09:59:42

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 326

1        Q    Is that case still pending?

2        A    It is.

3             MS. BRANNON:  I'd like to mark another

4      exhibit.  This is an e-mail from Chris Miller to

5      you.  It's dated June 27th, 2016.  The Bates label      09:59:59

6      is ROG002227287.

7             And this is Defendant's Exhibit 59.

8                (Exhibit 59 was marked.)

9             THE WITNESS:  Thank you.

10            Okay.                                             10:00:45

11     BY MS. BRANNON:

12        Q    Is this an e-mail you sent?

13        A    Yes, it is.

14        Q    The who receives e-mails sent to rfc_supes?

15        A    The supervisors in our company, managers         10:00:52

16     and higher.

17        Q    And you write that the advice that you

18     received from the attorney, quote, was no good.  And

19     you say that you are trying to assess the total

20     damages to the company.                                  10:01:05

21            Is this the quantification that you were

22     just mentioning?

23        A    That's part of the quantification, just the

24     loss in material costs.  The fact that the advice

25     was no good is obvious.  She, she told us to say          10:01:14

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 327

```
 1        something that was against the law.  I mean, it's,

 2        it's not a belief.  It's a fact.

 3            Q    It's a fact that she gave you bad advice.

 4        And as a result, JBR used illegal advertising?

 5            A    Yes.  In California.                    10:01:28

 6            Q    Did you receive responses to this e-mail

 7        from all supervisors?

 8            A    The supervisors involved, yes.

 9            Q    What did you do with those responses?

10            A    I, I collated and combined reports of      10:01:48

11        expenses, based on labor, based on design, based on

12        destruction to product, and other things and put

13        them together in a document.

14            Q    Do you know if that document has been

15        produced in this litigation?                      10:02:05

16            A    I, I do not believe so.

17            Q    Are you aware of JBR's environmental claims

18        being investigated by any governmental entities,

19        other than district attorneys in California?

20            A    I am not aware.                           10:02:18

21            Q    Who at JBR would be aware if there were any

22        other investigations pending?

23            A    I would assume it would be me.

24                 MS. BRANNON:  Okay.  I'd like to mark

25        another exhibit.  This is the transcript of your   10:02:41
```

CONFIDENTIAL-ATTORNEYS' EYES ONLY

Page 424

1          I, the undersigned, a Certified Shorthand
2     Reporter of the State of California do hereby
3     certify:
4          That the foregoing proceedings were taken
5     before me at the time and place herein set forth;
6     that any witnesses in the foregoing proceedings,
7     prior to testifying, were duly sworn; that a
8     verbatim record of the proceedings was made by me
9     using stenographic machine shorthand which was
10    thereafter transcribed under my direction; that the
11    foregoing transcript is an accurate transcription
12    thereof.
13         I further certify I am neither financially
14    interested in the action nor a relative or employee
15    of any attorney or any of the parties.
16         IN WITNESS WHEREOF, I have this date
17    subscribed my name.
18
19         Dated: February 26, 2019
20
21
22
23              <%signature%>
                LISA RICHARDSON, RPR, CRR, RMR
24              CSR No. 5883
25