1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


In re:                              :
                                      Docket #14md2542
 KEURING GREEN MOUNTAIN SINGLE-     : 1:14-md-02542-VSB-SLC
 SERVE COFFEE ANTITRUST LITIGATION

                                    : New York, New York
                                      April 21, 2020
------------------------------------ :


PROCEEDINGS BEFORE
THE HONORABLE SARAH L. CAVE
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff -          WINSTON & STRAWN LLP
Treehouse Foods, Inc.:   BY:  KELLI LANSKI, ESQ.
                              JOHN ROSENTHAL, ESQ.
                         200 Park Avenue
                         New York, New York  10166

For Defendant -          CLEARY GOTTLIEB STEEN & HAMILTON LLP
Keurig Green Mountain    BY:  JOSEPH KAY, ESQ.
Inc.:                         CHRISTIAN J. MAHONEY, ESQ.
                         One Liberty Plaza
                         New York, New York  10006




Transcription Service: Carole Ludwig, *Transcription Services*
                       155 East Fourth Street #3C
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None    |        |       |           |          |       |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

1

```
 1                                                    3
 2            THE COURT:  Hi, good morning, this is
 3   Magistrate Judge Cave, this is a conference In re:
 4   Keurig Green Mountain Single-Serve Coffee Antitrust
 5   Litigation, case number 14md2542, may I have the
 6   appearances, please.
 7            MR. JOSEPH KAY:  Good morning, Your Honor, you
 8   have Joseph Kay on the line from Cleary, Gottlieb for
 9   Keurig, I'm planning on arguing today.  We have a few
10   other lawyers on the line from Cleary including CJ
11   Mahoney who submitted the declaration as the senior
12   attorney at Cleary focusing on e-discovery.
13            THE COURT:  Very good, thank you.  And who do
14   we have for Treehouse?
15            MS. KELLI LANSKI:  Hi, good morning, Your
16   Honor, this is Kelli Lanski of Winston & Strawn, I'll be
17   arguing for the Treehouse plaintiff.  My colleague, John
18   Rosenthal, who filed a declaration is planning to join
19   in.  John, I'm not sure if you're on the line yet?
20            MR. JOHN ROSENTHAL:  Good morning, Your Honor,
21   John Rosenthal.
22            THE COURT:  Okay, good morning. And for those
23   who are not speaking, if you would be so kind as to mute
24   your line so that we can minimize the feedback and
25   improve the quality of the recording, please.  I'll also
```

4

note, this is a housekeeping matter, we are recording

this call and it will be saved for five days only,

that's all the storage space that we have on the call

recording server. So if the parties wish to have this

recording saved so that it can be transcribed later by a

court reporter, you need to notify chambers in writing

by an email to the chambers email within five days of

today's call, so by the 26th.  Okay, Mr. Kay, would you

like to start?

MR. KAY:  Yes, thanks, Your Honor. So there are

really two main disputes between the parties.  The

first, the parties disagree on whether the order

requires a family custodian other field.  We think the

text of the order, the parties' course of conduct and

industry practice show it require a family level field

reflecting deduplicated documents.  And second, the

parties disagree over whether Nuix can generate family

level metadata for the custodian other field.

Mr. Mahoney and Mr. Marshall, who's a third

party working for the e-discovery vendor at Encoura

(phonetic), both say that the required metadata can be

provided with minimal burden imposed on Treehouse and

Treehouse does not directly dispute this.  Treehouse

says that it does not know how to safely generate the

1                                                                5

2   data and does not claim to have called this vendor or

3   tried.

4          But before turning to those issues I want to

5   address why Keurig needs the correct metadata and why

6   it's important that Treehouse be ordered to produce the

7   metadata now.  And in short, Keurig has concerns that

8   it's missing documents from Treehouse's productions.

9   Keurig has raised issues with Treehouse for many months

10  and Treehouse has denied any issues, including by citing

11  its noncompliant custodian other metadata as evidence

12  that it has made large productions from each of the

13  custodians who Keurig has identified.  Keurig's time to

14  resolve these disputes within fact discovery is coming

15  to a close and the parties need correct metadata to

16  resolve these ongoing disputes.

17         Just to highlight a few of the discovery

18  disputes that Treehouse's incorrect metadata has

19  hindered resolution of, Keurig's concerned that

20  Treehouse's productions from custodian Tom Rathers'

21  files are incomplete because Rathers was not placed

22  under a litigation hold before he left the company in

23  late 2014.  Treehouse produced only 236 unique documents

24  from his files, despite the fact that Mr. Rathers worked

25  at Treehouse on single-serve for more than four years

6

during the discovery period.  Treehouse's primary
response has been that it actually produced 20,000
documents from his files which is not true. Treehouse's
count relied on the custodian other metadata to inflate
the production total by multiple times. We provided an
example in our motion of a blank image file Mr. Rathers
received 2 copies of but was listed as a custodian on
nearly 4,000 times.  We had to do extensive manual work
to figure this out because Treehouse had not produced
the correct custodian of his information and was denying
that there were any concerns with Rathers' production.
Keurig included the relevant correspondence on this as
Exhibit 2 to its April 7th letter.

Keurig is also concerned that 10 other
Treehouse custodians did not receive litigation holds
until 2017 or 2018, which is several years after
Treehouse filed this lawsuit, even though the employees
held key roles in Treehouse's single-serve coffee
business much earlier than their hold dates.  Keurig
compared emails produced or deduplicated versus emails
sent to or from the particular custodian, showing in
some cases that custodial files contained less than 10
percent of relevant emails known to exist from other
sources. This is evidence of potential significant data

7

loss.  Treehouse refused to respond because it said

Keurig supposedly ignored its custodian other metadata.

Keurig includes this correspondence as Exhibit 3 and 4

to its letter.  The dispute regarding these 10

custodians missing documents, like our disagreement with

Treehouse regarding Mr. Rathers' documents, is still

pending.

Keurig also conducted a time intensive analysis

of Treehouse's productions through Craig Lemieux, who is

a senior executive at Treehouse and a witness on

Treehouse's initial disclosures.  Keurig learned that

Treehouse produced about 660 emails excluding families

from Mr. Lemieux' files between 2009 and 2013, even

though other files show Mr. Lemieux' center received at

least 18 times as many emails in the same time period.

Treehouse claimed that Keurig's numbers were wrong and

that it produced over 100,000 documents from Mr.

Lemieux' files in total. Treehouse's number again relies

on the inflated custodian other data, including one

Excel attachment Mr. Lemieux received approximately 560

copies of but that lists him as the custodian other on

more than 23,000 copies.  Keurig includes this

correspondence as Exhibit 5 to the letter.  Treehouse's

improper custodian other data is again masking problems

8

with its production in posing substantial burden on
Keurig and impeding resolution of this pending dispute.

As another example, Your Honor, in February of
this year Keurig deposed Adam Spratlin, a key Treehouse
witness who Treehouse did not place under a litigation
hold until 2017, even though Treehouse quoted one of Mr.
Spratlin's emails in its 2014 complaint.  Keurig sent a
letter to Treehouse that showed Mr. Spratlin's emails
and very few sent emails. This was consistent with Mr.
Spratlin's testimony that he regularly deleted his sent
emails before receiving a litigation hold in 2017.
Treehouse admitted last week that it had not produced
responsive emails from Mr. Spratlin's emails from a
particular source because of an unspecified technical
issue.  Given this and Mr. Spratlin's testimony, this is
another ongoing dispute about the adequacy of
Treehouse's preservation and collection efforts.

Keurig believes other Treehouse custodians have
likely been affected by similar preservation and
production problems, but it is extremely difficult and
inefficient to identify these problems without compliant
custodian other metadata.  Keurig needs the data now in
order to determine if any other problems have been
masked and to try to get to the bottom of any production

                                                              9

problems promptly.  Treehouse has not  --

          THE COURT:  Mr. Kay, can I just pause you

there, so how is the additional data going to help you

resolve the disputes?  In other words, what, it seems to

me like you are already suspicious of a number of the

custodians that, of the sufficiency of Treehouse's

production as to a number of custodians, so what is the

metadata, how is the metadata going to resolve that?

          MR. KAY:  Yes, Your Honor, and for a couple of

reasons. The first is that while Keurig has tried to

provide the Court and Treehouse estimates of the numbers

of documents produced from Treehouse custodians, they're

just estimates and it's impossible to actually come up

with accurate counts of the numbers of files produced

from particular Treehouse custodians until Treehouse

produces compliant metadata, you know.

          And the second thing, as a practical matter,

and Keurig's been raising these issues with Treehouse

now for months and Keurig really can't bring Treehouse

to the table on the issues.  In response now to multiple

correspondence, the parties have largely disagreed on

the methodology for determining the number of documents

produced from particular custodians which, in Keurig's

view, under the ESI order should be easy to calculate

1

2  and not a number that should be in dispute, because the

3  custodian other field combined with the custodian field

4  should provide it.

5       THE COURT:  Well my question though is even if

6  you have the metadata, you are still going to, aren't

7  you still going to have a problem with what Treehouse

8  has produced?  So I'm just struggling with why you don't

9  already have enough information to make whatever

10  argument, whether you're contemplating sanctions down

11  the road or whatever it is, I just, I don't see how it

12  makes a material difference in whatever position it is

13  you're taking as to or planning to take as to the

14  sufficiency of Treehouse's production.

15       MR. KAY:  Your Honor, in response to any motion

16  that we make down the road, just like in response to the

17  letters that we've sent Treehouse, and Treehouse might

18  raise as a defense that it produced X number of

19  documents, for example, with respect to Mr. Rathers that

20  they produced 20,000 documents and that there was no

21  prejudice to Keurig.  And we don't think that number

22  that they provide will be accurate, and so, you know,

23  there's an issue there.  And the other problem is that

24  the field, itself, you know, may mask additional, well

25  with respect to the issues before the Court, they may

11

mask additional problems.  Keurig, I understand, has

come up with estimates with respect to particular

custodians, but we can't eliminate all false hits that

the numbers, you know, in Treehouse's favor with respect

to, you know, all custodians because of these issues.

And so there are, at least with respect to live issues,

potentially even greater prejudice to Keurig than

Treehouse's numbers identify.

They've also used these numbers in opposition

to other requests that Keurig has actually made.  For

example, with respect to the Petski motion, they

represented that Petski's files weren't necessary

because they had produced some other custodians. And we

think that those numbers, we cited the numbers from Mr.

Corona were inflated, that number we think was inflated

through time.  So there's general just confusion about

these numbers as a result of Treehouse's noncompliance

that is a distraction in ongoing discussions about these

issues.

THE COURT:  Were you about to move to the Nuix

issue or do you have more on the first point?

MR. KAY:  Your Honor, well I can move onto the

Nuix issue if Your Honor would like. I was planning on

discussing the order next.

12

1

2          THE COURT:  Okay, that's fine, I wanted to,

3  before we get to the technicalities of Nuix I want to

4  hear from Treehouse, so why don't you go through your

5  arguments about the order and then I'll pause and hear

6  from Ms. Lanski before we go into the Nuix capabilities.

7  So please go ahead with respect to your arguments about

8  the order.

9          MR. KAY:  Okay.  And with respect to the order,

10  Keurig believes the text in section 9 of the order is

11  clear, it instructs Treehouse to produce a custodian

12  other field reflecting all custodians who were in

13  possession of the deduplicated documents. The phrase

14  deduplicated document can only refer to a family level

15  duplicate because deduplicating is defined on the family

16  level in the order which Treehouse concedes.  Treehouse

17  tries to rewrite this word as if it says duplicates, but

18  that's not what the order says, and the data Treehouse

19  provided elsewhere already provides superior data on

20  where duplicates of particular documents relied.

21          THE COURT:  Mr. Kay, which section do you say

22  describing documents at the family level, is that 9B?

23          MR. KAY:  Yeah, section 9B.

24          THE COURT:  Your Honor argument is that 9B

25  means that, deduplicated document means, refers to

13

having been deduplicated at the family level?

MR. KAY:  Yes, Your Honor.

THE COURT:  Okay, sorry I interrupted you, go ahead.

MR. KAY:  Second, Keurig's interpretation also is supported by the parties' course of conduct. Treehouse, as I mentioned, treated the custodian other field as representing the total number of documents produced from a particular custodian.  Treehouse claimed that Mr. Rathers, over 20,000 documents have Mr. Rathers as a custodian counting the number of documents reported in the custodian other field. The only justification for Treehouse using the custodian other field as a proxy for total number of documents produced from a particular custodian is that it believes that the field reflected the total number of documents from a particular custodian's files.  There is no reason why 4,000 copies that Mr. Rathers never received should be considered documents produced from him and indeed they were not, and Treehouse does not offer any explanation for its prior misleading representation, even though Keurig cited this example and others in its motion.

I also note, Your Honor, that Keurig populated its field the way that its saying Treehouse should

14

populate the field. And while Keurig hasn't spoken or

hasn't needed to speak with the other plaintiffs about

the field, we believe that both McLane and the other

competitor plaintiff, JBR, populated their field

correctly.

And the third point that supports Keurig's view

here is that Mr. Mahoney and Mr. Marshall each submitted

declarations referring to industry standard to populate

a custodian other field on a family level, Mr. Marshall

agrees with Keurig and Mr. Mahoney that it can generate

a proper field.  Mr. Marshall explained that the field

should be populated to match deduplication because this

provides the receiving party information on how the

records were stored in the ordinary course. And in

addition to the Encoura declaration from Mr. Marshall,

Mr. Mahoney communicated with Nuix about the subject as

he described in his declaration and Nuix confirmed --

Your Honor, actually I think you had mentioned that you

wanted to turn it over to Treehouse --

THE COURT:  Yes, before getting into that, yes,

into the Nuix.

MR. KAY:  So I'm happy to pause unless you have

questions.

THE COURT:  I don't right now, but I may after

1

2  Ms. Lanski speaks, but I think it's helpful if we just

3  hold off on the Nuix discussion for now.  So Ms. Lanski,

4  can you please respond to Mr. Kay's argument.

5          MS. LANSKI:  Yes, I'm happy to, thank you, Your

6  Honor.  So both today and in its filing, Keurig has

7  chosen to focus a lot of the time on making what amounts

8  to be spoliation type arguments to the Court. And not

9  only is this not the appropriate time for that because

10 there is a briefing scheduled for spoliation, but I

11 think it must be acknowledged that Keurig's efforts are

12 only coming on the heels of plaintiffs' identification

13 of very serious preservation failures by Keurig.

14         Keurig has undeniably lost data in this space.

15 Keurig has lost computers for several custodians, Keurig

16 cannot image computers for some custodians due to

17 physical damage that Keurig can't explain, and Keurig

18 cannot decrypt many custodian computers because it let

19 its access to its decryption database lapse.  Those

20 issues affect about half of Keurig's custodians.

21         So I do want to be clear, however, that we do

22 disagree with Keurig's arguments and their accusations

23 with respect to Treehouse's preservation. And frankly,

24 Keurig is guilty of all of the things that it accuses

25 Treehouse of doing, like failing to issue timely

1

2  litigation holds.  With that said, as we've been

3  receiving communications from Keurig, as discovery winds

4  down, we have been working in good faith to

5  (indiscernible) their questions and to respond.  And

6  what we have said to Keurig is, look, we have just

7  produced 2 million documents in this case, nearly 2

8  million I should say, it's some number over 1.9 million,

9  and if there are categories of documents that you think

10  you asked for that you don't have, then let us know and

11  we'll look into that. That's precisely what we've done

12  with Keurig, we've gone to Keurig and we said here are

13  these RFPs, we think that we are missing these documents

14  that we've asked for and will you produce them, and we

15  had that conversation.

16       We had that conversation about the substance of

17  the production. That is, by and large, a conversation

18  that Keurig has opted not to have with us in favor of

19  making this more procedural argument of, well, we think

20  there should be more documents, generally, therefore,

21  there must be spoliation.

22       Mr. Kay mentioned a number of custodians in

23  particular, we are looking into that, we are responding

24  to him. He mentioned Mr. Lemieux.  One of the points we

25  said to Keurig is, okay, you're arguing that Mr. Lemieux

didn't produce certain documents from 2009, well this
case was filed in 2014.  Keurig has conceded that there
is no preservation obligation in 2009, so what's the
issue?  From our perspective, there isn't one.

We did discussion Mr. Spratlin with Keurig last
week, we identified a technical issue relating to the
review of his documents.  Keurig asked us if we could
produce additional documents by tomorrow, that's a very
tight turnaround, we worked through the weekend, we
think we're going to be able to get that done.  We're
clearly working with them in good faith when we identify
a minor technical issue to resolve it and to get them
the documents that they've asked for.

You had asked Mr. Kay how the new metadata will
resolve their concerns, and the answer is that it will
not. They are really just trying to shortcut their
spoliation arguments by failing to address the substance
of the productions in favor of counting documents. And I
want to address the ESI order and then I want to go back
to this counting documents issue because the information
that they claim that they need from Treehouse's
production is information that Keurig metadata masks, to
use Mr. Kay's phrase.

But before I get there, the question before the

18

1

2  Court today is really very narrow and it's what does the

3  ESI order require with respect to the custodian other

4  metadata field.  And the answer is simple, nothing, the

5  custodian other field is optional. That's clear from

6  page 22 of the ESI order, that's section 6(I)(4)(h)

7  which I'll just refer to (4)(h) because that's a

8  mouthful, and I just want to talk about the relevance

9  here. It says that the order does not create any

10 obligation to create fields that are not automatically

11 generated by the processing of the ESI. That's precisely

12 what Keurig is asking Treehouse to do, to create a field

13 that doesn't exist in our processing tool.  And then as

14 if there were any doubt as to what (4)(h) is requiring,

15 it lists the fields that parties must produce. The

16 Custodian other field is not one of them.  So Treehouse

17 had no obligation to even populate this field and

18 Keurig's motion entirely ignored this entire provision

19 of the ESI order. And in its reply and even today,

20 Keurig ignores that (4)(h) lists the required fields and

21 custodian other is not one of them.

22        So we think that this provision alone should

23 dispose of Keurig's motion, and it illustrates why it

24 really should not have been filed in the first place.

25 Because Keurig isn't just arguing today that there's

1
2   some, and in its motion that there is some room for

3   interpretation here in the interpretation of the

4   custodian other field, Keurig is arguing that Treehouse

5   violated the ESI order, and that's a very serious

6   accusation. But section (4)(h) makes clear that it's an

7   accusation without merit. And that's not the only

8   provision of the ESI order that is relevant here and

9   that Keurig ignored either entirely or in part.

10          And so as I get to those, I just want to point

11  out for a minute that there are two distinct concepts at

12  play here and Keurig's motion is conflating the two.  So

13  first we've got the implication for production purposes,

14  and the parties agreed in this case that they would

15  deduplicate documents for production on a family level.

16  It means you don't need to produce multiple copies of

17  the same email family for multiple custodians if they're

18  duplicates, you just produce one. And that's reflected

19  in the first part of section 9(B) which is at page 25 of

20  the order.  And that's really for efficiency in

21  production and efficiency in the review of production.

22  Treehouse did that, Keurig does not dispute that.

23          And then, second, 9(B) continues to address

24  deduplication for metadata purposes.  And it states that

25  individual family members, meaning each document, will

1

2  be hashed separately. And so that distinguishes

3  documents that just look similar from those that,

4  technologically speaking, are actually duplicates. And

5  that's done on a document level. Keurig's motion

6  essentially ignores this second half of 9(B).

7         The provisions continue, 9(C) discusses the

8  hashing methods the parties should employ for those

9  individual family members, and then 9(D) states that all

10 custodians who are in possession of the deduplicated

11 documents are to be identified in the custodian other

12 field.  The reference there is to documents, not

13 families, which makes sense because that hashing is done

14 on a document level.  Keurig's motion didn't refer the

15 Court to 9(D) either.

16        And when we talk about the ESI order, we think

17 it's really important to remember that the ESI order was

18 heavily negotiated by the parties nearly six years ago

19 at this point, and it's been on the docket for almost

20 six years. And the parities were cognizant of the

21 complexity of this case, of the number of parties, of

22 the number of law firms, and of the array of e-discovery

23 tools that they might use.  And so the parties expressly

24 rejected imposing the unreasonable burden that Keurig

25 wants the Court to impose now.

1

2          The parties rejected the idea that everyone

3   needs to use the same e-discovery tool.  The parties

4   rejected the idea that any party would need to procure a

5   new tool or reconfigure its existing tool in order to

6   produce the metadata fields.  And in addition to section

7   (4)(h) this is also reflected in appendix 2, which is

8   focused on metadata, and it memorializes these ideas.

9   And the introduction to appendix 2 states that the

10  metadata field listed in that appendix need only be

11  provided to the extent that they are automatically

12  generated using the tools ordinarily employed by a

13  party.  Keurig's motion ignored this language, too, but

14  appendix 2 is really instructive here, especially when

15  we talk about Nuix, which I won't get to, I'll wait for

16  Mr. Kay's argument on that.

17          And then we also need to look at the definition

18  of custodian other, that's in appendix 2.  And that

19  field, which again is option, is defined as the name of

20  the person, their locations, in addition to the

21  custodian, from whose file the item may have been

22  deduplicated. So we see that that definition also refers

23  to a single document or an item.  Again, the parties

24  negotiated this and they choose to use item, not family.

25  An item means a single document, that's how the parties

1

2   use it, that's how Nuix uses it, that's even how

3   Keurig's paid declarant, Mr. Marshall of Encoura

4   Consulting uses items to refer to a single document.

5           So we think it's very clear from all of these

6   provisions that I just walked through that Keurig's

7   motion ignores that this field is to be defined and it's

8   to be populated on the item level. There is no reason to

9   do that except for the fact that these provisions are to

10  the contrary to the argument that they make now, and

11  also contrary to Keurig's own metadata, so let me just

12  touch on that and then I'll wrap up my comments.

13          So I just want to spend a moment on Keurig's

14  metadata because I think it highlights the inconsistency

15  of Keurig's arguments here. And as we discussed in our

16  opposition, I'm specifically talking here about Keurig's

17  metadata with respect to documents it produced from

18  Combalt (phonetic), and this is a central email

19  repository that Keurig maintained and we learned about

20  it in 2018.  This is after we approached Keurig because

21  their initial production started out as very clearly

22  deficient and ultimately Keurig admitted that they had

23  failed to collect Combalt emails. Combalt is where

24  Keurig stores emails for employees under litigation

25  holds and that necessitated delaying the discovery

23

schedule by about six months to let Keurig, to give

certain time to collect the emails, produce the emails.

What we learned in 2019, so the year after

that, is that when a user's emails are added to Combalt,

Combalt doesn't retain custodian metadata.  So rather

than acknowledging that and populating its custodian

information as custodian Combalt or as custodian Keurig,

which is the name Keurig uses to denote documents

produced from all of its other centralized repositories,

Keurig decided instead that if the custodian is in the

to, the from, the cc field of a document, then they

should be listed as a custodian of that document.  But

that ignores that Combalt only contains emails for a

given Keurig employee if that employee's mailbox was

added to Combalt by Keurig's IT Staff. And even then,

it's only as of the date that Combalt was activated.

So Keurig has told us that employee emails were

generally added to Combalt at the time they got a

litigation hold. They didn't keep records of when that

occurred, but that's what they think happened. So that

means that if a Keurig employee joined Keurig in 2012

and got a litigation hold for this case in let's say

2016, the earliest date any of their emails, that

custodian's emails would be in Combalt is 2016. So

1  Keurig's metadata ignores that.

2

3          So let's say that Keurig produced an email from

4  Combalt dated 2015, and that email was two custodians in

5  the cc field.  Custodian 1 had their documents added to

6  Combalt in 2014, so this March, 2015, is their copy, so

7  it's from their files. But the second custodian is the

8  one from my last example. So this person wasn't added to

9  Combalt until 2016.  So this isn't their custodian

10  email, and Keurig actually has no idea if custodian

11  number 2 preserved the email. They may have deleted that

12  email in 2015 right after they read it and, if so, it's

13  not their custodian document at the time of collection.

14  But Keurig's metadata masks that fact and obscures that

15  fact because Keurig lists both custodian number 1 who

16  was added to Combalt and custodian number 2 who was not

17  added to Combalt and may have, in fact, deleted this

18  document as a custodian or owner of the document.

19          And the end result of that is that it's

20  impossible for us to count the number of documents

21  produced from the files of any of Keurig's custodians.

22  Or in the words of Keurig's declarant, Mr. Marshall, it

23  means that Keurig's metadata obscured who owned the

24  document at the time of collection. And in response to

25  that, Keurig has said it doesn't matter. They say

whether a particular Keurig custodian actually preserved or deleted an email in Combalt is irrelevant.  Well if that's true for Keurig, it's true for Treehouse, there's no reason to treat the parties differently just because Keurig obscured the source of its emails in this way. And Keurig hasn't disputed to us the inconsistency of its argument, instead they said a couple of things. They said, well maybe you ended up getting more documents from Combalt, I don't know if that's true and really neither do they, because they didn't keep track of which custodians were added to Combalt and when.

        And the other thing they said is, well, we think you agreed that we could obscure the source of our emails in this way, and that is not true. We did not agree that Keurig could make its initial custodian assignments in this way, nor could we have because Keurig didn't disclose that to us until 2019, the year after we initially discussed Combalt.

        So with respect to Combalt and with respect to the motion that is currently before the Court, we think that it would be very inequitable to allow Keurig to continue to make this argument about the deficiency of Treehouse's production on the number of documents produced from a custodian's files because Keurig's

26

1
2 production metadata makes it impossible for us to assess
3 those numbers for Keurig's custodians.  And we think the
4 Court would be justified in ordering Keurig to reproduce
5 metadata for its Combalt documents as custodian Combalt
6 as discussed in our opposition, or as custodian Keurig
7 which would be consistent with Keurig's other production
8 from its central repository.
9           So I'll stop there, Your Honor, if you have
10 questions or if Mr. Rosenthal has anything he wanted to
11 add, my other comments are going to relate to Nuix in
12 response to Mr. Kay's argument.
13           THE COURT:  Okay, Mr. Rosenthal, anything you
14 wish to add?
15           MR. ROSENTHAL:  No.  No, I think my colleague
16 covered it all.
17           THE COURT:  Okay.
18           MR. ROSENTHAL:  I know you may have some
19 technical questions when we get to Nuix, I'm happy to
20 answer those.
21           THE COURT:  Okay, thank you.  Mr. Kay, can you
22 move to your points about whether Nuix can do what it is
23 you are asking the Court to order Treehouse to do?
24           MR. KAY:  Yes, Your Honor. So we think it can,
25 we submitted a declaration from Mr. Mahoney who spoke

1                                                      27

2  with Nuix and they confirmed that the program was

3  capable of generating a custodian other field, populate

4  it at the family level.  You know, we also submitted a

5  declaration from Mr. Marshall who has experience using

6  Nuix and, you know, works at a preeminent e-discovery

7  vendor, and his declaration confirms that, you know,

8  production of custodian other field or (indiscernible)

9  custodian field on the family level is standard practice

10  when documents are deduplicated at the family level, as

11  has (indiscernible) and is beautifully done here.

12          He also submitted, you know, a statement that

13  Nuix is capable of doing it.  Treehouse says that they

14  are using a five year old version of Nuix to process the

15  data. They haven't gone so far as to say they're still

16  using that five year old version of Nuix.  But even

17  assuming that they are, you know, Nuix has the

18  capability to do it and Mr. Rosenthal doesn't claim

19  otherwise in his declaration.  They solely claim that

20  it's not a built-in function.  And it's fairly common,

21  as Mr. Marshall says in his declaration, for e-discovery

22  tools to have to be supplemented, and here a proper

23  field could be produced using either of two programming

24  languages, a script, that a basic user of the script

25  could produce. That doing so would not be burdensome and

that that's common practice to have to produce scripts

like that.

You know, Treehouse's main argument appears to

be that they don't know what will happen if it tries to

correct a field, but it doesn't actually claim that it

made any effort to try.  And the risks it identifies

with respect to the database could be eliminated by

making a simple backup of its database, which it should

be doing in the ordinary course anyway.  So Keurig's

view is that Treehouse shouldn't be permitted to avoid

correcting its metadata field simply because, you know,

it closes its eyes and then says it can't see a

solution.

THE COURT:  This is a question for Mr. Mahoney

or Mr. Marshall, whoever prefers to answer, what are the

depths that would be involved of having the Nuix

regenerate the additional metadata?  It sounds like

there's some code that needs to be written and

implemented and then what, and how much time would it

take?

MR. MAHONEY:  Yes, this is Mr. Mahoney.  There

is some code that would either need to be written or

provided by a vendor or someone like Nuix. It's

relatively simple code that would go back to the

29

original unduplicated population and its metadata, would

pull certain data points from that metadata and

(indiscernible) that it generated, that it combined

document level hatches to create a family level hatch,

and then populated the custodian value on the standing

(indiscernible).

It's a pretty simple process. It's, according

to our expert, pretty easy code to write. And once

written, that code may test database, you would make

sure it's populating, okay, to create a new field rather

than overwriting and existing. And that would mitigate

any risk of corruption and would require relatively

little work.

THE COURT:  So would this be, it would not be

replacing the custodian other field, it's creating some

other field as a result of writing and implementing this

new code and then deploying it?

MR. MAHONEY: So in the processing database, the

way you would implement it is to create a new field and

not to overwrite the existing field. And this is just

something done in case there's any issues.  If there's

any issues that in writing the script you haven't

corrupted and existing field, you just have a new field

that you work with. But in providing the overlay to

30

Keurig, it would then be provided as a replacement.

THE COURT:  And on a population of about 2 million documents as we have here, how long would that process take?

MR. MAHONEY:  Not long.  As an automated script it would run for several hours. It would take more time to develop the script than to run it.  But such scripts are already in existence and it actually wouldn't take that much time to write either.

THE COURT:  Ms. Lanski, do you have a response?

MR. ROSENTHAL:  Good afternoon, Your Honor, it's John Rosenthal. So, yeah, I'm at a loss as to why we're even here.  There's a reason why there's a provision written in the ESI order which the parties agreed to and are bound by which says that we don't have to go out and create software and jump through hoops because it's not reasonable and it's not practical. What Mr. Mahoney said is almost fantastical and I can tell you he's not a software engineer, he's not done this himself and, frankly, doesn't know how to do this.

The reality is we are using a system that we have two ISO, 27,000 certified data centers in which we have over 300 terabytes of production data and culling data, where we have a Nuix installation that is tested,

31

retested, and secure and running across multiple cases.
What he wants us to do is go in, in the current
circumstances where we're operating remotely, pull out
our software, create a development environment, test the
script, the develop the script, then validate the
script, and then repopulate that across this dataset.

So we're going to be pulling our Nuix system
out of operations so we can try and design these scripts
for information that we are not required to do under the
express terms of the ESI order. And frankly, we have not
done in over the 2,000 or 3,000 cases where we've used
this Nuix system over the last, since 2011. And their
proposition that this is industry standard is
fantastical. Different engines, different versions of
engines do this different ways and that's just the
reality here.

They have the information they need, they have
access to all the documents, the documents got produced.
This is just a fishing expedition and, you know, this is
not some, yes, Nuix created the script. It created a
script not designed for this version of Nuix. So you're
asking us to take a script we didn't draft, put it into
our system, try and make it operate, make sure it
doesn't corrupt either this database or any other

1                                                        32

2  database or disrupt their environment. And then rerun

3  these fields or fields that we're not required to run

4  under the express terms of the order.

5          So, you know, the reality is that the order

6  calls for family level deduplication, they agreed to

7  that, that's what they got.  The order then provides

8  that we have to provide an other custodian field.  Now

9  we provided that. I'm sorry they don't agree with how

10 that's defined and how we've done that since 2011, and

11 how many vendors do that across the United States, but

12 that's just the reality. And here they haven't pointed

13 to anything specifically in this field that is causing

14 them an issue other than their speculation that they

15 believe that there is some kind of a document issue here

16 which they have not articulated any proof of.  And now

17 they want us to go in and reengineer our system with

18 some untested script that's going to put at risk our

19 system and this database, I just don't see how that's

20 warranted under the circumstances and under the express

21 terms of the order. Which make it abundantly clear under

22 that section that we are not required to go generate

23 metadata fields or information that do not exist.  And,

24 in fact, the parties expressly negotiated those fields

25 that they would have to go out there and create if they

33

1

2  did not exist, and this clearly is not one of them, and

3  for good reason.

4      THE COURT:  Mr. Kay or Mr. Mahoney, anything

5  you'd like to say?

6      MR. KAY:  Yes, Your Honor, if I could just

7  respond to a couple of the points that Ms. Lanski and

8  Mr. Rosenthal made.  You know, they cited, Ms. Lanski on

9  her opening cited a number of provisions of the ESI

10  order that she claims we ignored and that made clear

11  that this field is not required, custodian other field.

12  I mean they're all sort or red herrings.

13      The deduplication isn't actually required under

14  the order.  It's optional, everyone does it because it's

15  efficient.  But when you produce, you know, when you do

16  deduplicate, the order is very clear in 4(D) that you

17  have to produce, in 9(D), apologies, that you have to

18  produce a custodian other field.  The fact that it's not

19  listed in (4)(h) is totally consistent with that.  I mean

20  that field actually expressly references paper

21  documents. And what it's saying is that if you produce a

22  paper document from a source, the fact that the paper

23  document doesn't have metadata associated with it,

24  doesn't mean that you don't have to produce a custodian

25  field for the paper document.  But when you produce,

when you do deduplicate, the order requires in 9(D) that

you produce the custodian other field in the section

called deduplication and in the section that describes

the deduplication can only be done on the family level.

You know, Mr. Rosenthal and Ms. Lanski both

accuse Keurig of conflating that deduplication and the

custodian other fields. I mean they are clearly linked

in the order because the word deduplicate is used in

paragraph 9(D) that's defining the custodian other

metadata. And then Ms. Lanski cited to appendix 2 and

the definition of custodian other in appendix 2, and Ms.

Lanski said that we ignored in appendix 2 that the

custodian other field references that it has to identify

the name of persons and locations from whose files the

item may have been deduplicated.  She puts a lot of

weight on items, but the custodian other field has to be

populated for each document, each item that's produced.

That doesn't say anything about how the value is

supposed to be calculated.

So the fact that you have to produce a

custodian other field for every single item that is

produced doesn't mean that you can produce that value to

reflect document level duplicates. Our position is that

the rest of the order makes very clear that you have to

35

produce that field on a family level.

And then with respect to Mr. Rosenthal's claim that our request for this data is fantastical, you know, we have two declarations that say that it's not.  Mr. Marshall, you know, says that it's common practice to write a script like this.  Mr. Rosenthal is mischaracterizing our position a little bit in claiming that we have to, we're asking them to install a version 7 script, you know, into their database.

You know, we were pointing out that Nuix makes the sort of script that does this available publicly online for free.  And Treehouse, you know, in everything they've said today they haven't claimed once that they spoke with Nuix about how to do this.  You know, they haven't made any representations that they tried to accomplish this at all. They just keep saying that it's impossible in Version 6.2 of Nuix.  And they haven't made a representation that they're still using Version 6.2 of Nuix.  Mr. Marshall's declaration, you know, notes that later versions of Nuix actually have this feature built in. And so if Treehouse isn't still using Version 6.2 of Nuix, they may not even need to do, may not even write a basic script that, you know, it's common practice for e-discovery vendors who do this

36

professionally to write. And so, you know, I don't even
know if they need to write this script.

        And then, Your Honor, just to respond to Ms.
Lanski's points on Combalt, you know, it's really just a
distraction from the issue here.  There are a number of
reasons why their arguments aren't persuasive, but most
importantly, the Combalt emails that we produced were
actually sent overseas by the custodian that's indicated
in the field. They are fairly characterized as custodian
files.  Treehouse's custodian other field populates
custodian values on documents that the custodian
indisputably never received.

        And the second point is that each email that we
produced from Combalt was collected and produced because
it was sent or received by a particular custodian. So
the custodian field reflects the reason that Treehouse
received the email, it was sent or received by that
custodian.

        So if Treehouse wants to, you know, populate
with a Combalt field to reflect it's coming from
Combalt, but, you know, Treehouse also produced emails
from Enterprise Vault and didn't, you know, their own
email archive, and didn't identify any custodial field
that they came from and emailed back up on Enterprise

1
2  Vault as opposed to from the custodian's mailbox.  I

3  mean the custodian field doesn't mean that it came from

4  the mailbox, it means that it came from a particular

5  custodian.

6          And then, you know, if I can just make one more

7  point about prejudice, about where Keurig needs this

8  field.  Ms. Lanski suggested that this is a minor

9  technical issue and that Keurig is fishing for

10  information, this is totally wrong. It's an important

11  data field. It's required in, you know, in standard

12  practice, in litigation to permit deduplication, which

13  now is standard practice in litigation.  All the other

14  parties complied with the ESI order and listed

15  deduplicated documents as the order requires.  Because

16  Keurig complied, you know, Treehouse has an easy time,

17  you know, spotting issues in Keurig's production to the

18  extent they exist, but Treehouse inflated its counts in

19  a way that makes it hard to spot problems.

20          And just to put a practical point on this, you

21  know, there are two, Your Honor, with the Lemieux

22  example there are actually 23,000 documents that are

23  listed as Lemieux custodian documents, 22,500 of them he

24  never received. That's more than the total volume of Mr.

25  Rathers' productions that Treehouse claims it produced

1

2   which in itself is inflated. So it's a total custodian

3   production of, you know, of custodian other metadata

4   that doesn't actually reflect that documents came from

5   the particular custodian at issue.

6        And those are spread out over time. So if you

7   look at the Lemieux production using custodian other

8   metadata, you know, it looks like they produced

9   approximately 8,000 documents from Mr. Lemieux over the

10  period between 2009 to 2013, they actually produced 600.

11  Mr. Lemieux, you know, essentially led the single-serve

12  beverages business at Treehouse, (indiscernible) in

13  particular, from 2009 to 2013.  The fact that they only

14  had 600 emails from his custody is actually significant.

15  And Treehouse's field masked that issue.

16        If we get the metadata corrected now we can,

17  Treehouse won't be able to make claims that disagree

18  with the number of documents actually produced from

19  custodians. They won't be able to dispute that number

20  because the parties will be able to just cue a search,

21  it will take a couple of seconds and we'll know the

22  number. Right now Keurig has to go through and, it's a

23  burdensome process, we have it replicated for every

24  custodian, and then it involves, you know, actually

25  weeks or months of discussion with Treehouse which none

1
2  of them have gone anywhere, just to try to come up with

3  a field that the parties should be able to agree and,

4  cue and agree on in a couple of seconds.

5          So that I think is, that's the prejudice that

6  we're suffering here.  You know, we just want to get the

7  field, we don't think it's going to take, it will take

8  much work to actually generate the field.  Mr. Mahoney

9  mentioned it would take a couple of hours to write a

10  script. They may not need to even write the script

11  depending on what version of Nuix they have. And we can

12  resolve any remaining problems with litigation.

13          You know, I think Mr. Rosenthal said that we

14  don't have any evidence that there are problems in

15  Treehouse's productions and we're just fishing. But,

16  Your Honor, they've conceded that a dozen custodians

17  didn't receive litigation holds and it's really just a

18  question of prejudice and this is going to impeded the

19  ability to discuss that prejudice.

20          THE COURT:  Okay.

21          MS. LANSKI:  Your Honor, can I just respond to

22  a couple of the points, just to correct a couple of

23  inaccuracies.

24          THE COURT:  Go ahead.

25          MS. LANSKI:  Thank you.  So very quickly here,

40

1

2   I don't really think that what Mr. Kay has said has

3   really materially altered anything that we've said, but

4   I do want to point out a couple of things that I don't

5   believe are correct.  First, he said that (4)(h) relates

6   to paper documents, that's not accurate.  Section (4)(h)

7   of the ESI order states that it relates to production of

8   ESI, category (4), so the (4) or (4)(h) is production of

9   ESI, that's clear on page 21 of the order.

10       Again, Mr. Kay is conflating production versus

11  metadata in terms of deduplication.  And with respect to

12  the arguments more generally, I think the fact that

13  Keurig felt the need to go higher than third party

14  consultant to go beyond the ESI order and also to go out

15  and search the internet to find new software, makes

16  clear how their request is not proportional. And it

17  concerns our claim which is that this functionality is

18  not part of Nuix, it's not part of the tool that has

19  been ordinarily employed by us.

20       Mr. Kay suggests that we're obscuring from the

21  Court that maybe we're not using Version 6.2, we are

22  still using Nuix Version 6.2.  And the risks that Mr.

23  Rosenthal described are very clear, and we have talked

24  to Nuix and they can't confirm to us that devising the

25  script or using the script that Keurig identified on its

1
2   website would be able to run successfully across our

3   database and give Keurig this information they think

4   they need, or that it wouldn't corrupt the database or

5   alter the functionality of the database.  That is, in

6   fact, the reason why, as I understand from our e-

7   discovery team, we are still using Version 6.2. Because

8   even upgrading a database of this size or this

9   complexity runs the risk of corrupting it.  We need

10  access to our documents and we demand that we alter the

11  database, that we create new software, that we apply

12  that new software, is outside the scope of the ESI

13  order, it's beyond what the parties negotiated they

14  would do. And the bottom line is that this is not a

15  required field. The custodian other field is not

16  required.

17          The last point I want to make is just with

18  respect to Combalt.  Keurig says well Combalt emails,

19  our custodian information reflects that custodians sent

20  or received those emails, but as Keurig's declarant, Mr.

21  Marshall makes clear, the question is who is the owner

22  of those emails or of those documents. And so Keurig

23  can't represent that any of its Combalt emails were

24  actually preserved by any Keurig custodian or which one

25  preserved them.

42

1

2          In contrast, our email archive does preserve

3   custodian data. I have explained this to Keurig, I'm not

4   sure why Mr. Kay represented that we are aligned with

5   Combalt here, but it's not accurate.  So, you know,

6   along with all of the other points that we've made, we

7   think that there is no merit to Keurig's motion, we

8   think that their request is not proportional, especially

9   in light of the plain language of several provisions of

10  the ESI order that make clear that this field does not

11  require. But that even if it is required we have

12  populated it in accordance with how our e-discovery tool

13  populates this information and in accordance with the

14  plain language of the definition, which all refer to

15  that order, to that field, rather, on the item or the

16  document level.  Thank you, Your Honor.

17          THE COURT:  Okay, thank you. If there's nothing

18  further from the parties, I am going to take just a

19  little bit of time to consider the arguments that the

20  parties have made and we will issue a brief order

21  hopefully this afternoon, if not, tomorrow.  And then as

22  I said at the beginning, just as a reminder, we need a

23  request in writing from the parties within five days if

24  they want to preserve this recording or have it

25  transcribed.  Anything further from the parties today?

```
 1                                                    43

 2           MR. KAY:  Thank you, Your Honor. If I could

 3  just make one point, Ms. Lanski referenced that she

 4  spoke with Nuix, Nuix didn't put in a declaration for

 5  that.  And, you know, Nuix just said they weren't sure,

 6  the script did help it work in the earlier version, she

 7  didn't say that (indiscernible) solution, I would just

 8  like to make that clear. But other than that, nothing

 9  further from us, Your Honor.

10           THE COURT:  Okay.  All right, thank you very

11  much, we're adjourned and keep an eye out for a written

12  order from the Court.

13           MS. LANSKI:  Thank you, Your Honor.

14                 (Whereupon the matter is adjourned.)

15

16

17

18

19

20

21

22

23

24

25
```

44

C E R T I F I C A T E

          I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, In re: Keurig

Green Mountain Single-Serve Coffee Antitrust Litigation,

Docket #14md2542, was prepared using PC-based

transcription software and is a true and accurate record

of the proceedings.


Signature_____

Date:  April 28, 2020