```
                    UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK



In re:                             :
                                      Docket 1:14-md-02542-
 KEURIG GREEN MOUNTAIN SINGLE-     : VSB-SLC
 SERVE COFFEE ANTITRUST LITIGATION
                                   : New York, New York
                                     May 21, 2020
----------------------------------- :


                    PROCEEDINGS BEFORE
              THE HONORABLE SARAH L. CAVE,
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Keurig:                CLEARY GOTTLIEB
                           BY:  RAHUL MUKHI, ESQ.
                           One Liberty Plaza
                           New York, New York 10006
                           212-225-2790

For All Indirect
Purchaser Plaintiffs:      WOLF HALDENSTEIN ADLER FREEMAN &
                           HERZ LLP
                           BY:  FREDERICK T. ISQUITH, SR., ESQ.
                           270 Madison Avenue
                           New York, New York 10016
                           212-545-4600


For the Non-party,         STINSON
Microtrace, LLC:           BY:  KEVIN D. CONNEELY, ESQ.
                           50 South Sixth Street - Suite 2600
                           Minneapolis, Minnesota 55402
                           612-335-1500




Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Email:  Transcription420@aol.com

Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---|---|---|---|---|---|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

1

```
 1                          PROCEEDINGS                    3

 2              HONORABLE SARAH L. CAVE (THE COURT):  Hi, good

 3    morning.  This is Magistrate Judge Cave.  This is a

 4    conference in In Re Keurig Green Mountain Single-Serve

 5    Coffee Antitrust Litigation, case number 14-md-2542.

 6              May I have the appearances of counsel, please?

 7              MR. MUKHI:  Good morning, your Honor.  This is

 8    Rahul Mukhi from Cleary Gotlieb on behalf of Keurig.

 9              THE COURT:  Good morning.

10              MR. KEVIN CONNEELY:  Good morning, your Honor.

11    This is Kevin Conneely for non-party Microtrace.

12              THE COURT:  Good morning.

13              MR. FREDERICK ISQUITH:  Good morning, your Honor.

14    This is Fred Isquith from Wolf Haldenstein for the

15    indirects.

16              THE COURT:  Okay.  Good morning.

17              MR. ISQUITH:  Good morning.

18              THE COURT:  Anyone else who'll be speaking?  There

19    may be others listening, but if there's anyone else who will

20    be speaking?

21              All right.  Then we're here this morning on the

22    motion to quash the subpoenas to Microtrace that was

23    transferred to me by Judge Bowbeer.  And so I have read all

24    of the parties' papers as well as the transcript of the

25    argument in front of Judge Bowbeer but did just have a few
```

2  additional questions and was also hoping to possibly

3  facilitate a potential compromise with respect to the

4  subpoenas if at all possible.

5           So would you like to start, Mr. Conneely?  And

6  then I can jump in with my questions to the extent that you

7  don't answer them.  Like I said, I have read all the papers,

8  so you don't need to recap everything.  But if you wanted to

9  focus on the principal arguments with respect to the -- it

10 sounds like the overbreadth of the subpoena, the subpoena

11 continues to be an issue.

12          MR. CONNEELY:  Thank you, your Honor.  I will make

13 a few comments.  Of course, I'm most interested in what the

14 Court wants to hear, and so let me just make a couple of

15 opening comments to kind of set the stage.  It is

16 Microtrace's motion, and so we want to make sure that the

17 Court understands that Microtrace is willing to participate

18 in a reasonable scope of discovery and has been since it

19 received the subpoenas.  However, we have to protect

20 ourselves against both an unreasonable and burdensome scope.

21 And as the Court knows, Rule 45(d)(3) allows the Court to

22 quash a subpoena or part of it where it would be an undue

23 burden if someone wishes to comply.  But also under

24 (d)(3)(A) of Rule 45, where proprietary, trade secret and

25 confidential information's at stake, Keurig here has a

2  higher burden than just discoverable or potentially

3  relevant; it has to make a showing of substantial need for

4  the testimony or the material that can't otherwise be met

5  without undue hardship.  And I think that's important here

6  because the Court and federal courts in general recognize

7  the need to protect non-parties, both where they are pulled

8  into a dispute they are not part of and which they cannot

9  participate fully in, but also where the parties themselves

10  can fight over, negotiate and go to court over the scope of

11  discovery in a much more ready fashion.

12            And so the other thing I was going to say to set

13  the stage is that if you looked at the transcript -- and it

14  sounds like you did -- the flags in the ground for each

15  respective party before Magistrate Judge Bowbeer on this

16  motion were by Keurig what they're calling their narrowed

17  topics that they set forth in pages 6 and 7 of their

18  opposition brief.  And I think we've made a mess of the ECF

19  legends in this case, but it's ECF 945-7 in your Court --

20  and that's pages 7 and 8, ECF 945-7.  And so they have three

21  points out there.

22            THE COURT:  Yes.

23            MR. CONNEELY:  In contrast, we've set out our

24  proposed order to our court here, and we still stand by

25  that.  We think that is the right balance to strike to

1                          PROCEEDINGS                        6

2    protect a non-party's business-critical information but at

3    the same time allow a scope of discovery that lets Keurig

4    know some facts about how Microtrace operated with

5    TreeHouse.

6              And if I could just -- I was just going to say one

7    more thing about their narrow topics.  If I take them in

8    reverse order, because the last one's the hardest, in

9    reverse order they want from 2003 to the present, all

10   costs --

11             THE COURT:  Is that 13, I think?

12             MR. CONNEELY:  2013, yes.

13             THE COURT:  Right.

14             MR. CONNEELY:  2013.  All costs, fees and profits

15   for the work that Microtrace did for TreeHouse.  Well, the

16   fees is undisputed; it's been undisputed.  TreeHouse doesn't

17   object to us providing the invoices and the payment records.

18   And we've given Keurig a summary of every payment from 2013

19   through 2017.  So as far as what TreeHouse had to pay in

20   order to meet the challenge of the lockout, undisputed and

21   resolved.  What is in dispute, though, is our internal

22   accounting, our internal margins and costs, which are not

23   relevant.  Even if you take Keurig at their word that they

24   need to know if -- and I'm citing to their brief now -- let

25   me find it here -- in their brief, ECF 945-12 -- sorry

2    that's from the hearing -- in their brief it's 945-1, sorry,

3    at page 50, and they keep framing the question as though

4    it's could TreeHouse have more economically addressed the

5    lockout, the alleged lockout; could TreeHouse have done it

6    and spent less money or found some less expensive

7    alternative.  Well, that's all fine, but you don't think ask

8    what Microtrace's margins were, just as if the Court's quite

9    familiar, I'm sure, with attorney's fees awards.  And when

10   the parties come in and they say, "Well, our lawyers charged

11   us $500 an hour or $250," the Court doesn't say, "Well, I'm

12   going to check and see if that's a reasonable rate," by

13   looking into that firm's margin.  What the Court does and

14   what anybody does in economics is say, "What were the market

15   alternatives for TreeHouse at the time it engaged

16   Microtrace?" not, "Did Microtrace make a lot of money

17   relative to what Keurig thinks we should have made?"

18           So that's the third point, which is we've given

19   them the undisputed amounts paid, and Keurig knows that now.

20   And if that's what TreeHouse is going to claim as their

21   damages, then it's up to TreeHouse to defend the

22   reasonableness of the amounts they paid.  But it's not

23   appropriate to invade a non-party's financials of a small,

24   privately-held company, and say, "We need to know what your

25   costs and margins were."  So that's our argument on the

1                          PROCEEDINGS                    8

2   third point.  We've complied with what we think is within

3   the scope, reasonable scope; and that should be the end of

4   that.

5            With regard to the second point, we've already

6   resolved that, as well.  We produced all of our

7   communications with Sun and with Keurig over time.  We've

8   already done that.  And when I say "all," Mr. Mukhi might

9   question that; we haven't had any.  We've had, like, three

10  or five pages of documents we could find as far as

11  Microtrace communicating with either Sun Chemical or with

12  Keurig over time, and we've provided those, as well.

13           So, again in reverse order, the hardest one in

14  what they're calling the Keurig narrow topics is still way

15  too broad because they say we want to know everything about

16  Microtrace's work for TreeHouse in 2013 and 2014, and we

17  want to know all efforts by Microtrace to obtain an ink-

18  Taggant solution.  Well, I know it's a shorter sentence, but

19  it's actually much, much broader and hard to respond to than

20  in fact the original topics in their original subpoenas.

21  And so, as the Court knows, we were looking for some

22  certainty, we were looking for some way to figure out could

23  we present a witness.  And, unfortunately, the way we're

24  looking at Keurig's narrow topics now, we believe that they

25  haven't narrowed them at all, they've made them more vague,

1                          PROCEEDINGS                    9

2    they've made them more intrusive; and it would be very hard

3    not to have a fight over whether a question in a deposition

4    or a document request is within the scope of, quote, "work

5    for TreeHouse or all efforts by Microtrace."

6              So that's the difficulty we still have.  We

7    brought this motion.  We've put together a pretty detailed

8    proposed order to the magistrate judge in Minnesota

9    specifically so that everyone would know where we stood.

10   And we think we've struck the right balance.

11             I'm happy to talk about other issues with the

12   Court.  I do want to mention Sun Chemical only if the Court

13   has any questions about Sun Chemical.  It's really not a

14   good comparison, and the only reason that Sun Chemical, I

15   think, matters to this case is that it's one of those

16   market comparables that the parties and a finder of fact

17   could look to instead of trying to invade Microtrace's

18   internal financials.

19             I have other things to say, but I'd much rather

20   hear from the Court what your concerns are or questions.

21             THE COURT:  Yes.  Focusing on the first topic, so

22   I guess the last one that you've discussed, and trying to

23   better define or clarify and narrow the scope of what

24   Keurig would be asking you for, would there be -- would

25   Microtrace be able to provide that information through a

1

2  witness at a categorical level?  In other words, the work

3  that Microtrace did involved X number of people, Y number

4  of steps or tests, Z amount of hours, and just provide

5  that information at a high level, obviously, under -- you

6  know, using the confidentiality protection that we have in

7  the case -- and I know you have some issues with that, and

8  I'll get to that in a minute.  But would that be a

9  possible compromise for Microtrace to provide that

10 information without getting into details that might

11 compromise any trade secrets or proprietary information?

12 Would that be information that Microtrace could provide at

13 that kind of categorical high level?

14         MR. CONNEELY:  Yes, your Honor, it is.  And in

15 fact, Mr. Broger, Microtrace's president, whose

16 declaration is in the record, provides some of that

17 information.  And we would be willing to have him testify

18 about how long it took, how many people were involved, but

19 not "and here's the specific machinery and tests that we

20 used, and here's how we employed them," because now we're

21 getting into the secret sauce.

22         THE COURT:  Right, right.  Okay.  And I'll ask

23 Mr. Mukhi in a minute whether that would suffice from his

24 perspective.  But I just wondered if that might be a

25 way -- if you had that kind of guidelines for purposes of

2   gathering whatever remaining documents there are and

3   preparing Mr. Broger for his deposition, would that kind of

4   instruction from the Court provide you with sufficient

5   guidance to proceed?

6            MR. CONNEELY:  Well, we think so, but we can't

7   anticipate every question, of course.

8            THE COURT:  Right, right.

9            MR. CONNEELY:  But we think so, yes.

10            THE COURT:  Okay.  All right.  And then I guess

11   while I have you, let me ask you about -- I don't know if

12   Kelly Jahorich is a Ms. or a Mr., but --

13            MR. CONNEELY:  She's a "Miss," yes.

14            THE COURT:  A Miss.  Would you anticipate that she

15   would be testifying, as well, or would it just be

16   Mr. Broger?

17            MR. CONNEELY:  I guess that would depend on the

18   outcome of this, but also what level of detail Keurig

19   needs.  Because Ms. Jahorich is the person who put together

20   the invoice and payment summary.

21            THE COURT:  Okay, I see.

22            MR. CONNEELY:  And if there was more needed to lay

23   foundation for that, we could provide her.  But if -- we

24   could also just -- I don't think anyone's going to -- I

25   don't think anyone's going to dispute this.  And, by the

1                          PROCEEDINGS                    12

2   way, the same information exists at TreeHouse, the exact

3   same information.

4             THE COURT:  Right, right.  The other person that I

5   had that came up in the papers is related to the customer

6   relationship manager server.  Is that something that

7   Microtrace was willing to produce and did produce, or is

8   that a disputed topic, as well, or a disputed category of

9   documents at this point?

10            MR. CONNEELY:  Sure.  Thank you.  That server is

11  a -- we call it ACT, A-C-T, inside of Microtrace.  And in

12  ACT they record interactions with customers.  So where I

13  think that came into play is we were talking with Keurig's

14  counsel about duplicating the email production, and I said

15  there could be information as far as communications

16  between TreeHouse and Microtrace in ACT, and we would be

17  willing to search that.  But, of course, what we're going

18  to search for needs to be first defined.

19            THE COURT:  Right.

20            MR. CONNEELY:  We aren't going to search just for

21  our own internal ideas or thoughts that we record in ACT.

22  We would search there for things like I called Joe Smith

23  at TreeHouse to discuss Taggant inks or something like

24  that.

25            THE COURT:  Okay.  Okay.  So direct, essentially

1                         PROCEEDINGS                    13

2   recording direct communications to or from TreeHouse?

3             MR. CONNEELY:  That's right.

4             THE COURT:  Okay.  All right.  And then I think

5   my last question for the moment is with respect to the

6   confidentiality orders that we have in place in our case

7   and just -- I just wanted to make sure I'm understanding

8   what additional protections you're asking for.  And it

9   looks like the main issue seems to be getting advance

10  notice that any of Microtrace's production or transcripts

11  of its witnesses, that you would be given advance notice

12  of that before it's shared with any experts, mock jurors,

13  inhouse counsel or in the Keurig v. Sun arbitration; am I

14  understanding that right?

15            MR. CONNEELY:  I don't think so, your Honor.  And

16  I'm sorry if you got that impression.  Microtrace objects

17  to any disclosure of the secret way in which it reverse-

18  engineered.  And we pointed out the protective order's

19  limitations merely because it's this Court's obligation,

20  as you know, all federal courts, when it's a non-party,

21  you have to weigh the potential burdens and the potential

22  likelihood of harm to the non-party against the need and

23  the relevance.

24            And I guess if I can just describe that for a

25  little bit, Keurig really hasn't put forth an argument

1

2   about relevance, let alone a Rule 45(d) argument that you

3   have a substantial need for what Microtrace did that can't

4   otherwise be met without undue hardship.  And so for us

5   we're asking the Court to strike the balance in favor of

6   protecting the non-party by saying whatever we did to, not

7   the procedures as we were just discussing with the Court,

8   you know, the how many people and the months and all that.

9   That's fine.  But if they start asking for information

10  about what was the exact formulation, how did you get

11  there, what machines did you use, that sort of thing, we

12  think that should just be quashed and off limits.

13          THE COURT:  Right, right.  Okay.

14          MR. CONNEELY:  Okay.  Thank you.

15          THE COURT:  Yes, yes.  I wasn't sure if you were

16  asking for additional protections with -- even within the

17  bounds of whatever it is we negotiate or whatever

18  compromise we may be able to reach today.  You're not

19  asking for additional protections as to that scope with

20  respect to confidentiality?

21          MR. CONNEELY:  With respect to the things that

22  we've agreed to provide, that's right, your Honor.

23          THE COURT:  Yes.  Okay.  Okay.  All right.  That's

24  helpful.  Thank you for that, for that clarification.

25          Okay.  Mr. Mukhi, can I hear from you on the

2  points that I just discussed with Mr. Conneely?

3           MR. MUKHI:  Sure.

4           THE COURT:  And you can go in whatever order is

5  easiest for you.

6           MR. MUKHI:  Sure.  So why don't I start with the

7  last point that you were discussing with Mr. Conneely?  We

8  did reach out to Mr. Conneely earlier this week.

9  Judge Bowbeer had asked if we had had discussions about

10 any potential modifications to the protective order that

11 would satisfy Microtrace.  And we got the same answer that

12 I think Mr. Conneely just provided, which is no, there's

13 nothing that could practically be done to address the

14 concerns.  And, you know, that is not consistent with the

15 law, which is there is no absolute privilege for trade

16 secrets.  Even trade secrets are similar to confidential

17 information.  And that's been ruled upon by many courts.

18 We cited the (indiscernible) case in our briefing.  The

19 Supreme Court has held that.  So then you do get to, one,

20 what is the relevance of the information; and, two, the

21 purported injury to the party disclosing the information.

22 But you look at that injury that's asserted in the context

23 of the protective order.  And so here we have a very

24 stringent protective order; we have multiple levels of

25 classification, including outside counsel only.

1                           PROCEEDINGS                    16

2           And with respect to that -- and I wanted to

3  raise your Honor's aware from motion practice over the

4  last week, Keurig has agreed to produce its own 2.0 source

5  code information under the protective order in this case.

6  I understand that Microtrace is a third party, but that

7  information that Keurig produced is at least as sensitive as

8  Microtrace's work with respect to the 2.0.  We've designated

9  it outside counsel only under the protective order, and

10  information's been produced.  And so we think if it's

11  sufficient for Keurig to produce its source code

12  information under that designation, it's certainly

13  sufficient for Microtrace to protect whatever work it was

14  doing.  And, again, we're talking about 2013 and 2014, you

15  know, six and seven years ago, to reverse-engineer the same

16  2.0.  So, you know, we're talking about information that --

17  understand the assertion of confidentiality, understand

18  2013 and 2014, this was sensitive; but we have a protective

19  order, and it's now six or seven years later.

20           Let me describe a little bit, because

21  Mr. Conneely made some references to information that was

22  produced a little less than a week ago.  It's 65 pages so,

23  you know, not even 65 documents; we're talking about 65

24  pages.  It's basically a couple of contracts, two pages of

25  information, maybe a few more, but a handful of pages about

1                              PROCEEDINGS                        17

2   payments to Microtrace, and a couple of pages from the

3   customer ACT system that Mr. Conneely referenced, which

4   I'll get back to.  And this is a step back as to what other

5   similarly situated parties have produced and what

6   discovery's been taken from analogous third parties on

7   Keurig's side.  So Sun Chemical, that was obviously set

8   forth in our brief.  That was Keurig's ink provider at the

9   time of the 2.0.  They produced almost 2,700 documents they

10  got for a full-day deposition.  Flint Ink, which was the

11  ink provider Keurig used after Sun, was also subpoenaed.

12  They produced over 2,000 documents for a deposition in

13  February.  And then more recently, Exponent, which is

14  another outside engineering firm used by Keurig in

15  connection with the 2.0 in technology, they were subpoenaed

16  actually for much broader information, but it included

17  information analogous to what we're seeking here.  So this

18  is from Exponent; this is the more recent subpoena.  Some

19  of the topics included research related to Taggant and 2.0

20  cups, component parts, the technology completed on behalf

21  of KGM.  Again, this is to Exponent:  your work completed

22  for or on behalf of KGM related to Project Squid; any

23  communications concerning those topics to or from,

24  including some chemical in Keurig.  Again, they responded

25  and produced 2,700 documents.  And I believe there's a

1                          PROCEEDINGS                    18

2    deposition scheduled in that.

3           Just to compare that again, when Microtrace, I

4    believe when they produced the information, this is what is

5    responsive to their proposed order, which Mr. Conneely

6    cited, it's 65 pages.

7           And so it's really, although Mr. Conneely had

8    said we're willing to be reasonable and produce

9    information, it's such a limited set of information that's

10   being provided, it's not reasonable, in our view.  And if

11   Keurig's vendors are relevant, then in fairness and the

12   same logic, Microtrace should have to produce.

13          And to go to the relevance point, this is one of

14   the key issues in the case.  TreeHouse claims they were

15   locked out; they brought litigation on that basis; and then

16   they were actually able to get into the 2.0.  So how and

17   when they knew they could get in, that's relevant.  And

18   just to contextualize this again, Microtrace is doing this

19   work, including after TreeHouse brought the litigation.

20   And so if Keurig's 2.0 source code is relevant, then the

21   equivalent on the other side is also relevant, that how did

22   Microtrace reverse-engineer, in their words, 2.0

23   compatibility.  This is TreeHouse's agent that they engaged

24   to do this, the plaintiff in this case.

25          And with respect to communication, you know,

1                          PROCEEDINGS                    19

2  you've pointed out --

3              THE COURT:  Could I just keep you on --

4              MR. MUKHI:  Yes.

5              THE COURT:  -- could I just keep you on the first

6  issue?  So the suggestion that I offered to Mr. Conneely

7  and he seemed able, it seemed like they would be able to

8  accommodate, which was discussing what Microtrace did at a

9  categorical level, that is how long it took, the number of

10  people and other kind of broad descriptions of what they

11  did, what I'm still not understanding is why that level of

12  description is not sufficient for Keurig's purposes.  In

13  other words, the point of all of this I understand is

14  for -- TreeHouse is going to show or Keurig will show that

15  TreeHouse went out and had to engage an outside consultant

16  in order to do this.  The outside consultant took, you

17  know, X number of time; it involved such a number of

18  people; and the result was what they were able to

19  conclude.  What I don't understand is why the exact

20  mechanism and tests and whether it was algorithms or

21  particular scientific tests or anything like that, why

22  does that -- why does Keurig need that?

23              MR. MUKHI:  Well, so I think to answer, you know,

24  whether Keurig would think that could satisfy a request is

25  I agree with Mr. Conneely in that I think that the devil

1                              PROCEEDINGS                    20

2    is in the details on that because parties have obviously

3    had disputes over scope, and, you know, in our view,

4    Microtrace has taken, you know, exceedingly narrow views

5    of each of our requests, as demonstrated by the 65-page

6    production, which I believe Microtrace is saying complied

7    with their proposed order.  But on your question of why do

8    we need it, and we discussed it with Magistrate Judge

9    Bowbeer as an example, you know, for example, one of the

10   claims is both part of the antitrust claims but also

11   separate false advertising claim is that Keurig allegedly

12   made false statements about the 2.0 technology and whether

13   it was going to prevent competitor cups.  And we pointed

14   out this is intention with overall theory, but they've

15   alleged it, TreeHouse and other plaintiffs.  So the work

16   that -- and, by the way, you know, the 2.0 source code, to

17   the extent JBR and TreeHouse and the other plaintiffs are

18   looking at that to try to build up this argument about

19   Keurig's statements about the technology, well, what was

20   being done on the other side with respect -- and

21   particularly being done to reverse-engineer, hack, whatever

22   word you use into the Keurig 2.0, well, that's going to be

23   relevant because the lengths with which they potentially

24   had to go to reverse-engineer the 2.0, well, we think

25   that's potentially relevant to a defense of ours to say,

2    okay, you know, this is what they had to do to get in.  If

3    they had to do that, then we had a reasonable belief as to

4    our statement.  So that's, you know, an example.

5              And, you know, this issue, it's so central to so

6    many claims in the case, you know, cutting it back to such

7    a high level is going to, we think, constrain our defense

8    in a way that's not reasonable and constrain our ability to

9    get information that's relevant to a defense in claims

10   being asserted against Keurig.

11             So, you know, we're willing to discuss anything

12   that, of course, the Court proposes and have been willing

13   to discuss with Microtrace for months, since January,

14   narrowing the scope.  But we've gotten to the point where,

15   you know, we're now less than a month away from a third-

16   party deadline, and we think we've narrowed our topics,

17   we've made them high level, and that these are the ones

18   that should comply with.

19             And I just want to turn for a second -- unless

20   your Honor has more questions about that issue -- I was

21   going to turn to the ACT system.

22             THE COURT:  Please go ahead and turn to ACT.

23             MR. MUKHI:  Okay.  So your Honor saw in the

24   correspondence we, Mr. Conneely in discussions told us

25   about ACT.  And so what we said is, you know, we are

1                          PROCEEDINGS                        22

2  interested in that, and it sounds like it potentially would

3  contain responsive information.  The issue of just limiting

4  it to that is, without even seeing it, is that these

5  systems are used in different ways, as your Honor might

6  imagine and might have experience with.  There are some

7  companies and some individuals with companies who may log

8  every interaction in the system.  But then there are

9  occasions when people use it in other ways where it's not

10  really a true log.  So you might, for example, in our

11  experience, there might be companies who use that system to

12  log, you know, pure sales calls, so not sort of ordinary-

13  course communications once a relationship is established

14  but pre-relationship sales calls.  So we don't know how

15  complete of a set of documents and correspondence that

16  system might contain.  It does sound relevant, but we're

17  not confident, because we haven't seen anything, that it

18  would necessarily be a complete set of communications.  And

19  I don't think Mr. Conneely has ever disputed that there

20  would be internal email at Microtrace that wouldn't have

21  been provided to TreeHouse, for example, internal

22  analysis.  I think he's actually said that there is

23  information purely at Microtrace that never made its way

24  over to TreeHouse.  So that wouldn't be captured by the

25  ACT system as it's been described.

2           And I guess just finally I would just address

3    the cost information.  This actually is -- you know, in

4    particular, if you look at the protective order, the

5    parties anticipated that the outside counsel designation

6    would apply to information like that.  And so it's

7    referenced as information that would be covered by outside

8    counsel only.  And we think it's relevant.  We think it's

9    relevant to mitigation.  Like I said, TreeHouse had engaged

10   Microtrace using them during the course of the litigation.

11   And so, you know, examples of overpayment, potentially --

12   and, yeah, market tests can be one factor in that, and

13   that's a fair point that Mr. Conneely raised.  But what

14   overpayment, if any, TreeHouse made to Microtrace for the

15   technology that they're basing their alleged damages on, we

16   think that's relevant, and we can raise that as a

17   mitigation defense, among other things, at trial to say,

18   you know, they're not entitled to damages, they're not

19   entitled to treble damages when they could have mitigated,

20   as evidenced by the true costs of this work that they hired

21   Microtrace to do.

22           THE COURT:  I guess I don't understand why whether

23   Microtrace made or lost money on this engagement for

24   TreeHouse, how that has anything to do with the issues in

25   this case.  TreeHouse paid what it paid.  If you think they

1                                PROCEEDINGS                        24

2   overpaid, you can try to show that; but I don't see why --

3   I don't see how Microtrace's internal margin analysis,

4   that's entirely internal to Microtrace, and I'm not

5   understanding how that has any bearing on what you have to

6   prove or what TreeHouse has to prove.

7            MR. MUKHI:  Well, I think it goes to the point

8   that you just made.  So we can try to show the overpayment.

9   And having that information, we won't be able to -- if we

10  don't have that information, then we wouldn't, for example,

11  at trial be able to cross-examine TreeHouse's witness about

12  the true cost of the services that they hired Microtrace to

13  do if, you know, there's not a particular email that made

14  its way across the transom to TreeHouse.  Maybe they didn't

15  put it in email and tell TreeHouse that this is our cost,

16  but we should be able to test TreeHouse's reasonable belief

17  as to whether they were paying a reasonable amount.  And

18  their claiming damages and treble damages in this case, and

19  so we think we're entitled to the full amount of

20  information to try to defend ourselves against that,

21  including a mitigations defense.  And, yes, we'll use other

22  information to try to show that, but we think that this

23  information is also relevant to a defense in the case.

24            THE COURT:  All right, well, I disagree.  I don't

25  think that the -- Microtrace's internal cost analysis on

1                           PROCEEDINGS                    25

2    this work that it performed has anything to do with the

3    issues that the parties have to prove or disprove in this

4    case.  TreeHouse paid what it paid; Keurig -- no matter

5    what that number was, Keurig would argue that it's too

6    much.  So -- and unjustified -- so having to dig through

7    Microtrace's internal accounting functions to figure out

8    whether Microtrace made anything on this engagement -- I

9    assume -- I mean, Microtrace is a commercial establishment;

10   I assume that it made money on this project.  But how much

11   it made is really not any of the parties' business in this

12   case.

13            With respect to the communications, I just wanted

14   to ask Mr. Conneely, can you clarify for me has the

15   production that Mr. Mukhi was referring to of the 65

16   documents, does that include what Microtrace has found in

17   the course of its search for communications with Keurig and

18   Sun so far, or have you not yet undertaken to do that

19   search and production?

20            MR. CONNEELY:  Thank you, your Honor.  Microtrace

21   has produced every document it could find regarding its

22   communications with Sun Chemical and with Keurig.  So we

23   have produced everything in that category.

24            And I'd like to respond, but I also want to --

25   if the Court has other questions for Mr. Mukhi, I don't

PROCEEDINGS                    26

1

2  want to interrupt.

3          THE COURT:  No, go ahead, if you have other

4  responses at this time.

5          MR. CONNEELY:  So briefly, on the 65 documents,

6  if you could comply with a subpoena by producing 3,000

7  documents regardless of what they were, that would be a

8  strange test for discovery.  The fact is we have a series

9  of contracts with TreeHouse, and we provided them.  We've

10  summarized the payments and the invoices, and we provided

11  them.  We found every communication, every written

12  communication we can find with Sun or with Keurig, and we

13  provided them.  Saying that it's only 65 documents is a

14  fact, but it shouldn't move the Court one way or the

15  other.

16          The second point I want to make about non-parties

17  is, first of all, neither you, Judge, nor we have any way

18  to gauge how intrusive or how trusting Sun or Flint or

19  Exponent or any of these other people whose documents are

20  not part of the record because there was never any motion

21  practice.  The parties worked that out, apparently, and the

22  plaintiffs accepted a certain level of discovery and moved

23  on.  And so I think that to compare us to Sun is apples and

24  at least oranges, if not something else, or Flint or these

25  non-parties, these other non-parties.  But to compare us to

1                           PROCEEDINGS                    27

2    Keurig's source code is really a bad comparison for a

3    number of reasons.  Keurig is the party whose and the

4    accused anticompetitive conduct involves the source code.

5    So I think it's wrong to say, "In fairness. because other

6    parties have produced this or we, Keurig, have produced

7    that, just make Microtrace roll over and give us everything

8    we want."  That's not the test under Rule 45.  And I feel

9    like Keurig in their papers in Minnesota and also here

10   today, they skip right over the balance that has to be

11   shown between relevance and substantial need for some of

12   these documents.  For example, the false-advertising claim,

13   we learned about that in the hearing in Minnesota that that

14   was one of the reasons they want this.  Well, the truth or

15   falsity of the statement has nothing to do with Microtrace.

16   And the reasonableness of whatever alleged statement Keurig

17   made, that has nothing to do with Microtrace because

18   there's no nexus Keurig has between what it believed or

19   thought or said and anything it new about Microtrace;

20   there's just nothing there.  So the idea that somehow they

21   need to defense against a statement about their state of

22   mind or evidence about their state of mind by getting into

23   the most secret sauce of a non-party just doesn't make any

24   sense.  I need to make sure I said that.

25               The other thing that I wanted to mention -- and

2   we've heard it several times, we've seen it in their

3   papers -- this idea of hacking something.  I don't know if

4   that's a term that's used, but to me "hack" has a

5   pejorative connotation as though somehow Microtrace did

6   something wrong by applying its expertise to the products

7   in the market and reverse-engineering something.  Reverse-

8   engineering is part of the American way of life as long as

9   you're not violating someone's intellectual property.  And

10  so this idea that we somehow did something wrong or that

11  there's more to the Sun story than meets the eye, I think

12  the Court needs to disregard that because there's no facts

13  to support that.

14          And I guess the last thing I just wanted to say,

15  Mr. Mukhi said at trial we may want to show this.  Well,

16  that -- well, I think the Court already gets our argument

17  on that point about costs and margins.  The fact that he

18  said at trial we want to do X only heightens Microtrace's

19  concern about its most secret information, because, as the

20  Court knows, protective orders don't apply at trial in the

21  main.  In the main, trials are public.  They can protect

22  discovery, but they can't protect us at trial.  And so that

23  is another concern that we have regardless of whether the

24  protective order's in place for other purposes.

25          So I think I've captured what I wanted to say in

PROCEEDINGS                      29

2  response to Mr. Mukhi's points.

3          THE COURT:  Just one clarification on the

4  communications.  So, Mr. Conneely, the communications that

5  you haven't yet fully searched and produced about the ACT

6  system remains a category that you would need to fill,

7  search for and produce.  I think the recording of direct

8  communications between Microtrace and Keurig was the way

9  that I had phrased it.  But that is still stuff that you

10 would need to do and that you're willing to do, is that

11 correct, or --

12         MR. CONNEELY:  Then I apologize, your Honor.  I

13 thought you were saying between us and -- you were saying

14 between us and Keurig.  And we've satisfied and produced

15 everything as between Microtrace and Keurig and Microtrace

16 and Sun Chemical.  Those were the categories.  But with

17 regard to the larger issue, which is are we going to be

18 asked to redo the discovery or duplicate the discovery

19 that's already presumably been done with TreeHouse as far

20 as TreeHouse's communications with Microtrace, we haven't

21 searched anything in ACT for those, and we haven't

22 prepared for production, of course, any emails between

23 TreeHouse and Microtrace because of our point -- I'm

24 sounding like a broken record -- they should get it from

25 TreeHouse.

2            THE COURT:  Right.   Right.   But what I understood

3    you to be saying was that the ACT system may record

4    something like a call on July 13, 2014, between

5    Microtrace's project manager and someone from TreeHouse.

6    Am I misunderstanding what the system might reflect?

7            MR. CONNEELY:  No, you've got it right, your

8    Honor.   You've got it exactly right.

9            THE COURT:  Okay.  So --

10           MR. CONNEELY:  And I think we were -- we're still

11   prepared to produce from ACT the scope of discovery that

12   corresponds to -- that relates to our correspondence with

13   TreeHouse but not our internal work on behalf of TreeHouse.

14           THE COURT:  Okay.  I wasn't expanding it.  I

15   wasn't intending to expand it beyond what you've searched

16   for and produced other than to, in the category of ACT,

17   which it sounds like you had not yet looked for, for any

18   recordings or other instances of direct communications

19   between Microtrace and Keurig or Sun, correct?

20           MR. CONNEELY:  Okay, now I feel like I've

21   declarified the matter for the Court.  So let me try one

22   more time.

23           THE COURT:  Okay.

24           MR. CONNEELY:  Among the 65 documents are the sum

25   and substance of every communication, every document we

1

2  have about Sun or Keurig.  And those came out of the ACT

3  system.  We actually searched ACT and produced documents

4  from ACT about those very limited contacts.

5            THE COURT:  Okay.  But you haven't searched ACT

6  for communications between Microtrace and TreeHouse?

7            MR. CONNEELY:  That's correct, your Honor.

8            THE COURT:  Okay, but you're willing to do that?

9            MR. CONNEELY:  Well, we are willing -- if the

10 Court says that we should produce from our own files all

11 communications between us and TreeHouse?

12            THE COURT:  Yes.

13            MR. CONNEELY:  We would include ACT in our

14 search, just as we would in the outlook for the people

15 involved.

16            THE COURT:  Right.  Well, but as you said,

17 presumably, the emails would already be part of the

18 parties' production -- I hope that they are.  There's 2

19 million documents; I'm hoping that we've gotten everything

20 there.  But what I'm focused on is what might not be

21 reflected in the parties' production, which is some

22 recording of, whether it's a meeting or a phone

23 conversation, between Microtrace and TreeHouse that's

24 recorded in ACT but wouldn't have otherwise shown up in

25 emails.

1                          PROCEEDINGS                    32

2              MR. CONNEELY:  I understand.  And we are willing

3    to search that system if required to do so.  But, of

4    course, the caveat remains we don't think that we should

5    have to provide, even from ACT, anything that's internal

6    only to Microtrace.

7              THE COURT:  Okay.

8              MR. CONNEELY:  Meaning if it doesn't relate to a

9    communication with TreeHouse or if it would threaten the

10   disclosure of our secret information -- and I guess the

11   other point I wanted to make in that regard, just to

12   clarify for the Court -- and it's in the papers -- but the

13   people at TreeHouse don't know how we did what we did

14   exactly.  They know that we successfully did it.  And so

15   we'd even have to protect even there -- if there's an ACT,

16   some statement by a Microtrace person that would threaten

17   divulging that, we would have to protect that, as well.

18             THE COURT:  Well, that's why -- I understand --

19   that's why I was trying to fine it to evidence that would

20   show the instances of the communication directly between

21   TreeHouse -- between Microtrace and TreeHouse but excluding

22   totally internal Microtrace communications, as has already

23   been done.

24             MR. CONNEELY:  Thank you.

25             THE COURT:  Is that distinction -- is that

PROCEEDINGS                    33

distinction one that can be made in the course of your

search?

MR. CONNEELY:  It is.  It is.

THE COURT:  Okay.  But what I was intending was

that that limitation would be consistent with the

written -- what you've otherwise done with your searches.

Okay.  And --

MR. MUKHI:  Your Honor, if I could just clarify?

THE COURT:  Yes, go ahead.  Sure.

MR. MUKHI:  Because there is some confusion about

Microtrace's position.  So what they have produced is --

it's actually 62 pages.  It does not contain any -- and I

think you finally discussed this with Mr. Conneely -- it

does not contain any communications between Microtrace and

TreeHouse, whether from ACT or emails.  It also does not

contain any internal communications or external, for that

matter, from the email system.  So what we've got is just

ACT for Keurig and Sun.  Mr. Conneely is saying it

represent everything.  I don't think he's done any email

searches -- he can correct me if I'm wrong -- but I think

all that was done was Keurig and Sun within ACT, nothing

with respect to TreeHouse, nothing with respect to email,

whether internal or external.

MR. CONNEELY:  And respectfully, your Honor --

1                                 PROCEEDINGS                      34

2   oh, sorry, I didn't mean to interrupt.  Please go ahead.

3              MR. MUKHI:  No, go ahead, Mr. Conneely.

4              MR. CONNEELY:  That's incorrect.  We did search

5   email inside of Microtrace for any communications with

6   Keurig or with Sun Chemical.

7              MR. MUKHI:  Okay.  We didn't get any emails, so I

8   guess there was nothing responsive there.  But, as I said,

9   that's a helpful clarification.  Thank you.  So it sounds

10  like just nothing's been done with respect to TreeHouse's

11  communications or anything internal to Microtrace.  I just

12  wanted to make sure, and that was a helpful clarification

13  from Mr. Conneely.

14             THE COURT:  Okay.  That's as I understand it.

15  And so what I'm suggesting with respect to category No. 2

16  in Keurig's papers, the communications category that we've

17  been discussing, what I'm asking is that Mr. Conneely and

18  Microtrace search the ACT system for any direct

19  communications between Microtrace and TreeHouse and produce

20  any records of communications other than emails.

21             MR. MUKHI:  And just to be clear, your Honor, is

22  that category No. 1 in our three topics that Microtrace

23  has worked for TreeHouse?  I'm sorry there are a lot of

24  topics.

25             THE COURT:  Yes, so looking at the bottom, I

2   guess you could look at it as either part of one or as a

3   variation of No. 2.  So I was using it -- and so No. 2 is

4   communications related to Keurig and Sun Chemical.  And so

5   maybe the -- arguably, that's better in category No. 1

6   because it relates to the scope of the work, but in

7   any -- whether you put it in category No. 1 or you put it

8   in category No. 2, the order will refer to the ACT system

9   specifically.  Is there any concern -- I think it's been

10  referred to in the papers, but there's no concern about

11  referring to the ACT system in the Court's order, is

12  there?

13          MR. CONNEELY:  No, your Honor.  I think it's an

14  off-the-shelf product, actually.

15          THE COURT:  Okay.  Okay.  So -- all right.  And

16  then further on category No. 1, then, with respect to the

17  work, where I think we've landed is that the clarification

18  on this topic is that Microtrace will agree to search for

19  and produce and prepare a witness to testify at a

20  categorical level about the number of people who worked on

21  the project, the number of steps it involved, the number

22  of hours, how long it took, and the like, without being

23  required to refer to the specific scientific or technical

24  steps or machinations that it used as part of the process

25  that it performed for TreeHouse.  The parties obviously

1                              PROCEEDINGS                        36

2   know the specifics on this topic better than I do, and so

3   I would encourage you before Mr. Broger's deposition to

4   try to -- if there's any further clarification that needs

5   to happen, to try to work that out ahead of time.  If you

6   need to call the Court during the deposition, that's fine;

7   but it's less preferred because it slows everything down.

8   So I would prefer if you need the Court's assistance in

9   defining that or clarifying that topic any further,

10  obviously, we will specify it in the Court's order; but if

11  the parties need any further assistance, I'd encourage you

12  to reach out before the deposition so that the deposition

13  can go forward smoothly without having to take breaks and

14  reach out to the Court.

15          And then as to category 3, as I think I said

16  earlier, it sounds like Microtrace has fulfilled its

17  obligation to provide the information about its invoices

18  and payments and the summaries.  And I don't think that

19  Keurig has met -- or the Court finds that Keurig has not

20  met its burden under Rule 45(d)(3)(A) to require

21  Microtrace to produce anything further as to its internal

22  margins, costs or other analyses of its profits with

23  respect to the work that it performed for TreeHouse.  So

24  Microtrace will not be required to produce anything

25  further as to category 3 as it's described on page 7 of

1                            PROCEEDINGS                    37

2  Keurig's Memorandum in Opposition.

3            Is there any further clarification that the

4  parties request today?

5            MR. CONNEELY:  For Microtrace, we have one, your

6  Honor.

7            THE COURT:  Sure.

8            MR. CONNEELY:  So we had objected to reproducing

9  emails between Microtrace and TreeHouse.  And it sounds

10 like, from the Court's order, we are not going to be

11 obligated to do that at this time; we're only going to be

12 obligated to search the ACT system for those kinds of

13 direct communications?

14           THE COURT:  Correct.  And I'm glad you raised that

15 because there was a point about that I wanted to make

16 earlier.  I'm not sure if this will ever -- if this would

17 come up, but if there -- if -- what I would like to do is

18 not preclude Keurig from coming back here and saying,

19 "Well, either we know that there was this email that

20 existed but TreeHouse hasn't been able to find it for

21 whatever reason; you know, that custodian left before his

22 or her emails were archived," and they make a specific

23 narrow request for a particular email, I hope that you

24 would be able to accommodate that.  But you're correct that

25 otherwise I am not asking Microtrace to reproduce across

1                              PROCEEDINGS                    38

2   the board its email communications between TreeHouse and

3   Microtrace.

4            MR. CONNEELY:  Thank you for that clarification,

5   your Honor.  And, of course, if that kind of situation came

6   up, we would be happy to search for it if we have it.

7            THE COURT:  Okay.

8            MR. MUKHI:  Your Honor, just one clarification.

9            THE COURT:  Sure.

10           MR. MUKHI:  So I think, you know, one of the

11  concerns I had articulated earlier is we don't know how

12  complete the ACT system is.  We haven't seen it yet.  I

13  take it, your Honor, in the ruling you just articulated

14  that you're balancing Keurig's needs against the burden, of

15  course.  I would just ask if we could -- if the ruling

16  could be without prejudice --

17           THE COURT:  Yes.

18           MR. MUKHI:  -- to any additional arguments if, you

19  know, what we get is a very limited set.  Obviously, we

20  understand the Court's ruling and the intent of the ruling,

21  but if it -- thank you, your Honor.

22           THE COURT:  Yes, of course, without prejudice.

23  And my hope would be that once you do see whatever

24  Microtrace produces from the ACT system, that the parties

25  can, you know, talk it through and negotiate it.  But if

1                           PROCEEDINGS                   39

2     you're unable to resolve it, certainly Keurig can come back

3     and request further relief on that point.

4               MR. CONNEELY:  And I assume that's true for a non-

5     party like Microtrace, too?

6               THE COURT:  Yes.

7               MR. CONNEELY:  We're not going to be precluded

8     from that kind of issue-specific return if we need your

9     help?

10              THE COURT:  Yes.  If they want to ask and you want

11    to object, everybody is welcome.

12              MR. CONNEELY:  You're very kind, your Honor.

13              THE COURT:  All right, well, we will issue an

14    order that incorporates what I -- the rulings that I just

15    made.  I know that you will come back to me if there are

16    any clarifications that need to be made.  And, like I said,

17    leading up to the deposition if there's further assistance,

18    if the parties get to loggerheads on even more specific

19    questions or topics, it's much easier to deal with that

20    before the deposition starts, and I'm happy to get back

21    involved.  Okay?

22              MR. MUKHI:  Thank you very much, your Honor.

23              THE COURT:  Okay.

24              MR. CONNEELY:  Thank you, your Honor.

25              THE COURT:  All right.  Thank you, all.  We're

1                          PROCEEDINGS                        40

2   adjourned for today.

3            (Whereupon the matter is adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

41

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, In re: Keurig Green

Mountain Single-Serve Coffee Antitrust Litigation, Docket

#14md2542, was prepared using PC-based transcription

software and is a true and accurate record of the

proceedings.

Signature_____*Carole Ludwig*_____

Date:  May 27, 2020