**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

KEURIG GREEN MOUNTAIN SINGLE-
SERVE COFFEE ANTITRUST
LITIGATION

*This Document Relates to*
*Case No. 1:14-cv-00905 (VSB) (SLC)*
*Case No. 1:14-cv-04242 (VSB) (SLC)*

MDL No. 2542

Master Docket No. 1:14-md-02542 (VSB) (SLC)

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>KEURIG'S MOTION FOR SANCTIONS DUE TO SPOLIATION OF EVIDENCE</u>**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

LEGAL STANDARD ......................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I. THE COURT SHOULD IMPOSE SANCTIONS ON TREEHOUSE FOR FAILING TO PRESERVE ESI ................................................................................................................... 1

    A. TREEHOUSE HAD A DUTY TO PRESERVE IN FALL 2013 ...................................... 2

        1. TreeHouse Established "██████████" in October 2013 ............................. 2

        2. TreeHouse Begins Gathering Evidence For This Litigation With Outside Counsel ...... 3

        3. TreeHouse Begins Contacting Major Retailer Customers About the 2.0 Brewer .......... 5

    B. TREEHOUSE DID NOT TAKE REASONABLE STEPS TO PRESERVE EVIDENCE RELEVANT TO THIS LITIGATION ......................................................................... 6

        1. TreeHouse failed to preserve evidence from █████████████████, including material related to their pre-complaint conversations with customers ................... 6

        2. Treehouse failed to preserve information related to suppliers ....................................... 8

        3. TreeHouse failed to place key sales teams under hold ................................................ 10

        4. TreeHouse omitted key members from its AFH team from its holds ........................... 14

        5. TreeHouse failed to preserve Mr. Lemieux's pre-2014 files ....................................... 16

    C. THE COURT SHOULD SANCTION TREEHOUSE ................................................... 22

II. THE COURT SHOULD PRECLUDE JBR FROM OFFERING EVIDENCE ON THE ALLEGED JANUARY 31, 2014 MEETING WITH COSTCO ................................................... 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Alter v. Rocky Point Sch. Dist.*,
No. 13-1100(JS)(AKT), 2014 WL 4966119 (E.D.N.Y. Sep. 30, 2014) ...................................6

*Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*,
No. 15-cv-2926(DRH)(SIL), 2019 WL 5694256 (E.D.N.Y. July 22, 2019) ...........................6

*CAT3, LLC v. Black Lineage, Inc.*,
164 F. Supp. 3d 488 (S.D.N.Y. 2016) ....................................................................................22

*Chin v. PANYNJ*,
685 F.3d 135 (2d Cir. 2012) ...................................................................................................24

*Fujitsu Ltd. v. Federal Exp. Corp.*,
247 F.3d 423 (2d Cir. 2001) .....................................................................................................2

*In re WRT Energy Sec. Litig.*,
246 F.R.D. 185 (S.D.N.Y. 2007) ............................................................................................25

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
No. 15-cv-9363(ALC)(DF), 2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) ...................21, 23

*Man Zhang v. City of N.Y.*,
No. 17-CV-5415(JFK)(OTW), 2019 WL 3936767 (S.D.N.Y. Aug. 20, 2019) ........................1

*Mastr Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec., Inc.*,
295 F.R.D. 77 (S.D.N.Y. 2013) ................................................................................................2

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys., Div. of & Am. Home Prods. Corp.*,
850 F.2d 904 (2d Cir. 1988) .....................................................................................................7

*Ottoson v. SMBC Leasing & Finance, Inc.*,
268 F. Supp. 3d 570 (S.D.N.Y. 2017) ....................................................................................24

*Passlogix, Inc. v. 2FA Tech., LLC*,
708 F. Supp. 2d 378 (S.D.N.Y. 2010) ......................................................................................2

*Pension Comm. of the Univ. of Montreal v. Banc of Am. Sec., LLC*,
685 F. Supp. 2d 456 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v.
PANYNJ*, 685 F.3d 135 (2d Cir. 2012) ................................................................................2, 6

*Res. Funding Corp. v. DeGeorge Fin. Corp.*,
  306 F.3d 99 (2d Cir. 2002).................................................................................................1

*Sekisui Am. Corp. v. Hart*,
  945 F. Supp. 2d 494 (S.D.N.Y. 2013)..................................................................................9

*Stinson v. City of New York*,
  No. 10 Civ. 4228 (RWS), 2016 WL 54684 (S.D.N.Y. Jan. 5, 2016) ......................................9

*Taylor v. City of New York*,
  293 F.R.D. 601 (S.D.N.Y. 2013) ........................................................................................25

*West v. Goodyear Tire & Rubber Co.*,
  167 F.3d 776 (2d Cir. 1999)...............................................................................................25

*Zubulake v. UBS Warburg LLC*,
  220 F.R.D. 212 (S.D.N.Y. 2003) ......................................................................................2, 6

*Zubulake v. UBS Warburg, LLC*,
  229 F.R.D. 422 (S.D.N.Y. 2004) ..........................................................................................9

**Other Authorities**

2015 U.S. Order 0017 .............................................................................................................1

Fed. R. Civ. P. 26(b)(3)...........................................................................................................3

Fed. R. Civ. P. 37 ...................................................................................................................1

Defendant Keurig respectfully moves the Court under Federal Rule of Civil Procedure 37(e) for sanctions due to spoliation of evidence by Plaintiffs TreeHouse[1] and JBR, Inc. ("JBR").

## LEGAL STANDARD

Sanctions are traditionally available for spoliation when "(1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed 'with a culpable state of mind'; and (3) the destroyed evidence was 'relevant' to the party's claim or defense." *Res. Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).[2]  In 2015, Rule 37(e) was amended for electronically stored information ("ESI") so that the most severe sanctions of an adverse inference, presumption that the lost information was unfavorable, default judgment, or dismissal are available only on a showing that the spoliator had "intent to deprive another party of the information."  Fed. R. Civ. P. 37(e)(2).[3]  Under the new Rule, upon finding prejudice from loss of the ESI, the Court has discretion to craft a remedy to cure the prejudice, which can include orders forbidding a party from putting on evidence or providing any instruction other than an adverse inference.  *See* 2015 Advisory Committee Notes, Rule 37(e)(1) (range of curative measures is "quite broad" when necessary to cure prejudice).

## ARGUMENT

## I.   THE COURT SHOULD IMPOSE SANCTIONS ON TREEHOUSE FOR FAILING TO PRESERVE ESI

---

[1] TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (collectively, "TreeHouse")

[2] *See Man Zhang v. City of N.Y.*, No. 17-CV-5415 (JFK) (OTW), 2019 WL 3936767, at *4-5 (S.D.N.Y. Aug. 20, 2019) ("The traditional spoliation standards found in *Residential Funding* still apply to non-ESI evidence"; with respect to ESI, the amendments to Rule 37(e) replaced the "'culpable state of mind' element under *Residential Funding* with the more stringent 'intent to deprive'" but "did not otherwise significantly modify the traditional elements for spoliation").

[3] This case was pending when Rule 37 was amended in 2015.  The amended rule should apply in this case consistent with Chief Justice Roberts' transmittal Order.  *See* 2015 U.S. Order 0017 ("The foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern all proceedings in civil cases thereafter commenced, and, insofar as just and practicable, all proceeds then pending.").

TreeHouse should have started preserving relevant information ███████████ ███████████████. By October 2013, Keurig had announced plans for the 2.0 Brewer, which was designed to work only with Keurig licensed portion packs, and ███████████ ███████████████████████. But, as set forth below, TreeHouse waited months and in some cases *years* before implementing document holds, resulting in significant spoliation of critical evidence and significant prejudice to Keurig.

## A.  TREEHOUSE HAD A DUTY TO PRESERVE IN FALL 2013

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Federal Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001).  This obligation is triggered when an objective party would reasonably anticipate litigation.  *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 409 (S.D.N.Y. 2010); *Mastr Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec., Inc.*, 295 F.R.D. 77, 82 (S.D.N.Y. 2013).  "A plaintiff's duty is more often triggered before litigation commences, in large part because plaintiffs control the timing of litigation." *Pension Comm. of the Univ. of Montreal v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010), *abrogated on other grounds by Chin v. PANYNJ*, 685 F.3d 135 (2d Cir. 2012).  "Once a party reasonably anticipates litigation," it must takes steps to preserve data, including through a "litigation hold" to ensure the preservation of relevant documents. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003) ("*Zubulake IV*").

### 1.  TreeHouse Established "███████████" in October 2013

TreeHouse's preservation obligations started in fall 2013 ███████████████ ███████.  On October 24, 2013 ███████████████████████ ████████████████████████████████████████████.  Declaration

of Joseph M. Kay, dated April 19, 2021 ("Kay Decl."),[4] Ex. A (Letter from Sam Reed, Oct. 24, 2013, THS-004143807 at -3820). ██████████████████████████████████████

████████████████████████████ *Id.* ██████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████[5] ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████[6] TreeHouse's assertion

of work product protection is a concession that the letter was prepared "in anticipation of litigation"

as required by the doctrine.  Fed. R. Civ. P. 26(b)(3). ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████[7] ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ █ ████████

████████████████████████████████████████████

    **2.   TreeHouse Begins Gathering Evidence For This Litigation With Outside Counsel**

    By December 2013, TreeHouse retained its current counsel Winston & Strawn to assist it

---

[4] All exhibits cited in this Motion are to the exhibits attached to the Kay Declaration.

[5] Ex. A at -3820. Foley & Lardner were counsel of record to TreeHouse in the prior patent lawsuit brought by Keurig.

[6] Ex. B (Privilege Log Entry for THS-004143807). ████████████████████████████████
████████████████████████████████████████████████████████████████

[7] Ex. C (██████████████████████████████████████, THS-003437798 at -7800, 7802, 7804). ████████████
████████████████████████████████████████. *Id.* at -7820.

[8] *Id.* at -7805; *see also* Ex. D (TreeHouse (Vermylen) Dep. Tr. 258:1-8) (████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

Ex. E (██████████████████, Dec. 3, 2013, THS-003685058 at -5058-59).

in developing its complaint.  TreeHouse's Director of Engineering, Adam Spratlin, ███████ ████████████████████████████████ received an email from him in December 2013 saying R.A. Jones would not provide a quote to TreeHouse for a packaging machine due to its contract with Keurig.[9] ██████████████████████████████████████████████████ ████████████████████████████████████████████████████.[10]

At that time, TreeHouse had been in the portion pack business for three years, and already had a machine supplier.[11]  Yet Treehouse prominently featured the December 2013 email from R.A. Jones in its complaint along with unsupported claims that its inability to secure R.A. Jones machines in 2013 "caused" problems, as TreeHouse then "searched for, but was unable to find, a single other supplier in the United States" that "was willing to sell machinery to make non-filtered Compatible Cups."[12]  There is no evidence in the record TreeHouse conducted any such search in this timeframe.[13]

██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████.[14]

On February 6, ███████████████████████████████████████████

---

[9] Ex. F (Email, Dec. 19, 2013, THS-004099071 at -9071-72).  Mr. Spratlin testified that he spoke with ███████ ████████████████████████████.  Ex. G (Adam Spratlin Dep. Tr. 63:19-64:16 ("Spratlin Dep. Tr.")).

[10] A redacted copy of the forwarded email ████████████████ from TreeHouse's central files.  Ex. F. Mr. Spratlin was the only recipient at TreeHouse of the original email.

[11] Mr. Spratlin testified the ███████ packaging lines could manufacture both filtered and unfiltered product.  Ex. G (Spratlin Dep. Tr. 74:3-76:8).  ████████████████████████████████████.  Ex. F at -9072 (R.A. Jones is "██████████████████████████████████").

[12] TreeHouse Compl. ¶¶ 179-85, No. 14-cv-905, ECF No. 2-1 ("TreeHouse Compl.").

[13] ████████████████████████████████████████.  Mr. Reed testified TreeHouse could "add more capacity" as needed and did not have problems securing capacity.  Ex. H (Sam Reed Dep. Tr., Day 1, 151:8-153:5).

[14] The original email on the thread was sent by ████████████████████████████████████ ██████.  Ex. I (Email, Jan. 29, 2014, THS-003452868).

████████████████████████████████████████████████████████

████████ ,,[15] ████████████████████████████████████████

█████████████████████████████████████████████████ [16] There

is no evidence TreeHouse was conducting this outreach for business reasons.[17]  To the contrary,

TreeHouse was working to generate material for its complaint.

### 3.  TreeHouse Begins Contacting Major Retailer Customers About the 2.0 Brewer

In the three months TreeHouse was planning its complaint, its sales team ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ █ ████████████████████████████████

████████████████ █ ██████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[15] Ex. J (Email, Feb. 6, 2014, THS-003452715).  Mr. Jarona and Mr. Lemieux were placed under litigation hold on February 4, 2014, two days prior to the email.  But neither had received a hold for months prior and other important custodians, including Mr. Spratlin, did not receive a hold until years later.

[16] Ex. K (Email, Feb. 7, 2014, THS-003452707).

[17] ███████████████████████████████████████████████████ Ex. L (Email, July 15, 2014, THS-000949700).

[18] Ex. M (█████████████████████████████████, THS-004143881 at -3886).

[19] *Id.*  Other documents reflect that TreeHouse had anticipated meetings ████████████████████. Ex. N (████████████████████, THS-004139550, Slides 7-8).

[20] Ex. O (Email, Jan. 3, 2014, THS-003685043). ████████████████████████████
████████████████████████████████████████████████ *Id.*

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████[21]

### B.  TREEHOUSE DID NOT TAKE REASONABLE STEPS TO PRESERVE EVIDENCE RELEVANT TO THIS LITIGATION

Once a duty to preserve applies, it "extends to those employees likely to have relevant information—the 'key players' in the case." *Zubulake IV*, 220 F.R.D. at 218; *Alter v. Rocky Point Sch. Dist.*, No. 13-1100 (JS) (AKT), 2014 WL 4966119, at *9-10 (E.D.N.Y. Sep. 30, 2014) (key players include people present during critical events).  Relevance, in this context, requires a movant to "show that the evidence would have been helpful in proving its claims or defenses— *i.e.*, that the innocent party is prejudiced without that evidence." *Pension Comm.*, 685 F. Supp. 2d at 467.  When a party fails to timely institute "a formal litigation hold and . . . informally preserve ESI" from the key players in a case, the Court can conclude that it did not take reasonable steps to preserve ESI. *Capricorn Mgmt. Sys., Inc. v. Gov't Emps. Ins. Co.*, No. 15-cv-2926 (DRH) (SIL), 2019 WL 5694256, at *10 (E.D.N.Y. July 22, 2019).

#### 1.  TreeHouse failed to preserve evidence from ███████████████████, including material related to their pre-complaint conversations with customers

Despite actively working toward suing Keurig since October 2013, TreeHouse did not instruct any custodian regarding preservation obligations until February 4, 2014, one week before TreeHouse filed its 88-page complaint.[22]  This complaint was not written in one week.  As discussed above, Treehouse began working toward a complaint months earlier.  The small group

---

[21] Ex. P (Bob Baker Dep. Tr., Day 2, 377:4-78:7); Ex. Q (Bob Baker Dep. Tr., Day 1, 124:24-125:11) ("Baker Day 1 Dep. Tr.") (alleging a "scare tour" in the "beginning of 2014"); TreeHouse Compl. ¶¶ 258, 286, 313 (similar).

[22] Ex. R (Letter from S. Torpey, Feb. 6, 2018, at 1-2) (disclosing litigation hold dates).

of senior executives involved in TreeHouse's ███████████ and other key players should have been placed under a litigation hold to preserve relevant evidence as TreeHouse was crafting its lawsuit. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████. *See, e.g.*, Opinion & Order at 56-57, ECF No. 581 (citing *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Laboratories*, 850 F.2d 904, 916 (2d Cir. 1988)) (discussing elements of antitrust claim for alleged false and misleading speech).

But there are very few documents concerning the substance of TreeHouse's pre-complaint retailer outreach.  As noted above, TreeHouse produced only two sets of contemporaneous retailer meeting notes from the period before the complaint was filed, reflecting calls with Kroger and Wegmans.  These call notes reflect ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████.[23] ████████████████████████████████████████████████

█████████████████████████████████.[24]

TreeHouse should have been preserving documents from the employees having these and related conversations, including Mr. Reed, Mr. Sliva, and Mr. Ford (who coordinated Project Charter), its sales team, and all other personnel actively involved in customer outreach related to the 2.0 Brewer and TreeHouse's planned lawsuit.  But TreeHouse did not take steps to preserve documents for *any custodian* until the week prior to filing the complaint and details of critical retailer discussions do not appear in TreeHouse's document productions.

### 2.  Treehouse failed to preserve information related to suppliers

TreeHouse alleges in its complaint that it was harmed by R.A. Jones's decision not to offer a quote for a filling machine in December 2013, and cites the email sent by R.A. Jones to Mr. Spratlin. TreeHouse Compl. ¶¶ 179-182.  ████████████████████████████████

█████████████████████████████████████████████████████████████████

██████████████████████  Mr. Spratlin had primary responsibility for procuring filling machinery throughout the relevant period, including identifying suppliers, obtaining quotes, and negotiating prices.[27]  In addition to corresponding with R.A. Jones, Mr. Spratlin was also involved in deciding

---

[23] Ex. M (TreeHouse Board of Directors Meeting, Feb. 5-6, 2014, THS-004143881 at -3886).

[24] Ex. S (████████████████ Dep. Tr. 108:18-110:13). ████████████████████████████████
████████████████████████████████████ Ex. T (Expert Report of Keith R. Ugone, Figs. 2-4) (███████████████████████████).

[25] Ex. U (Expert Report of Lauren J. Stiroh ¶¶ 165-167).

[26] Ex. G (Spratlin Dep. Tr. 76:20-77:13, 113:15-114:10 (discussing benefits of ████████ over other suppliers); Ex. V (Email, July 21, 2011, THS-004302630) (██████████████████████████████████████████.

[27] Ex. G (Spratlin Dep. Tr. 87:24-88:5, 123:11-124:18).  Mr. Spratlin is the <u>only</u> custodian on 94.7% of his emails with ████████.  In telling Keurig it would not engage in any efforts to try to cure its data loss (except for one custodian if Keurig waived all its rights in advance), TreeHouse tried to equate its failure to place key custodians like Mr. Spratlin under litigation hold to Keurig custodians (Susan Cote, Don Holly and Suzanne DuLong) who were under holds even prior to this litigation being filed.

to buy machines from ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████.[28]

Despite being central to TreeHouse's input supply claims—indeed, the email Mr. Spratlin forwarded was quoted in TreeHouse's February 2014 complaint—*TreeHouse failed to put Mr. Spratlin under a litigation hold until January 25, 2017,* nearly three years after it filed its complaint *quoting Mr. Spratlin's email.*  This was inexcusable under the circumstances.  *See Zubulake v. UBS Warburg, LLC*, 229 F.R.D. 422, 433-34 (S.D.N.Y. 2004) (counsel must issue a litigation hold and communicate directly with "key players" at the outset of litigation); *Stinson v. City of New York*, No. 10 Civ. 4228 (RWS), 2016 WL 54684, at *2 (S.D.N.Y. Jan. 5, 2016) (holding that the spoliating party's litigation hold was "late and ineffective" when it failed to issue one for more than three years after it had notice that the evidence was relevant); *Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 507 (S.D.N.Y. 2013) (failure to implement a litigation hold was "inexcusable given that Sekisui is the plaintiff in this action and, as such, had full knowledge of the possibility of future litigation").

TreeHouse's failure caused Keurig to lose information relevant to its defenses.  Mr. Spratlin testified that he regularly deleted his sent emails until receiving a litigation hold in 2017.[29] While Mr. Spratlin claimed to save "relevant" emails to a folder structure, [30] Figure 1 shows that

---

[28] *Id.* at 227:6-20 (identifying ████████████████ as suppliers he may have spoken with); Ex. W (Email, Sept. 24, 2013, THS-001378308) (██████████████████████████████████).

[29] Ex. G (Spratlin Dep. Tr. 52:20-53:25).

[30] *Id.* at 57:20-58:19. TreeHouse made a supplemental production of certain folders identified in Mr. Spratlin's deposition on April 22, 2020, some two months after the deposition and just prior to the close of party fact discovery. TreeHouse only made this supplemental production after Keurig sent repeated emails identifying the gap in production and after TreeHouse adamantly denied any errors.  Ex. X (Email, May 11, 2020 at Mar. 11, 2020) ("[W]e do not appreciate your inappropriate multiplication of our legal fees by making repeated unfounded and inaccurate accusations when we have answered your questions in dozens of emails over the past several months.").  On April 14, TreeHouse acknowledged a technical issue and disclosed in a meet and confer that a .pst file on Mr. Spratlin's laptop had not been properly loaded into TreeHouse's database.  TreeHouse produced 1,600 additional Spratlin files as a result of correcting this issue, ████████████████████████████████████████

Mr. Spratlin's total email volume increases more than 16 times from 2014 (when Mr. Spratlin was not under a hold) to 2017 (when he was under a hold for the majority of the year), and Mr. Spratlin's *sent* email increased 63 times over the same period when he was finally put on a hold.[31]

**Figure 1 – Adam Spratlin**[32]



3. **TreeHouse failed to place key sales teams under hold**

TreeHouse claims that ████████████████████████████████████████

████████████████████████████████████████████.[33]  Yet TreeHouse failed to place either its primary sales person for ██████ or her supervisor under a hold until *2017*, years after the

---

████████.  As evidenced by Figure 1, which includes these files, this production did not significantly cure the loss of data.

[31] When Keurig raised this issue with Treehouse, it claimed that Keurig received sufficient email from Mr. Spratlin because thousands of sent messages were produced from 2016 and 2017, around the time Spratlin was placed on a litigation hold.  This is a non-sequitur given Keurig raised the loss of *earlier* emails that should have been preserved by putting Spratlin on a hold when TreeHouse anticipated litigation years earlier.

[32] Figure 1 is based on custodian and duplicate custodian metadata for emails produced by TreeHouse.  The blue bar shows Mr. Spratlin's custodial emails produced in a given year as a percentage of the total number of all of Mr. Spratlin's custodial emails.  The red bar reflects the same for emails sent by Mr. Spratlin.  The figures in this motion account for deduplication.  The figures also include only emails.  This method avoids noise that could be created by over counting email attachments (*e.g.*, a missing email that happens to have 5 attachments does not count as 6 missing files).  The Court previously held that Keurig had not shown good cause to require TreeHouse to reproduce its CustodianOther metadata.  But the Court did so in part precisely because "based on the metadata TreeHouse has produced, Keurig has been able to deduce several custodians as to whom it believes TreeHouse's document production is deficient."  ECF 921 at 5.  Keurig identified these deficient productions using the same methodology applied here, which focuses on unique emails and sets attachments and related noise aside.

[33] Ex. Y (Reply Report of Lauren J. Stiroh, Ex. 8A); *see also* TreeHouse Am. Comp ████████████████████ ████████████████████████████████████████████████████████

alleged loss and TreeHouse filing its complaint.[34]  The documents that were produced 

████████████████████████████████████████████████████████████████████████," [35]

Director of Sales Gretchen Crawford testified she was the sales lead for customers on the

████████████████████, from 2012 through 2017.[36]  Yet she was only placed under a litigation

hold on January 25, 2017.  *See* Ex. R.  As shown in Figure 2, TreeHouse produced 11,698 custodial

emails from Ms. Crawford between 2012 and 2016 prior to her hold, but 88.7% of those are emails

she sent, indicating she did not consistently retain other emails, including *incoming* emails she

received prior to being notified of a hold.  Consistent with this, in 2017, after she received the hold,

Ms. Crawford's document mix changes noticeably.

### Figure 2 - Gretchen Crawford [37]



Ms. Crawford's supervisor, Bobby Moorhead, was placed under a hold on March 20, 2017,

more than three years after TreeHouse filed its complaint.[38]  TreeHouse produced very few emails

---

[34] Ex. R (disclosing hold for Ms. Crawford); Ex. Z (Letter, Nov. 15, 2018) (disclosing hold for Mr. Moorhead).

[35] Ex. AA (████████████████████████████████, THS-002483240, Slide 2).

[36] Ex. AB (Crawford Dep. Tr. at 34:1-21) ("Crawford Dep. Tr.").

[37] Figure 2 is based on custodian and duplicate custodian metadata provided by TreeHouse.  The blue bar shows the total number of Ms. Crawford's custodial emails in which she was the sender based on metadata produced by TreeHouse.  The red bar shows the total number of other email files, such as received email, calendar appointments, and contacts, that were produced from Ms. Crawford's custodial files.

[38] Ex. AB (Crawford Dep. Tr. 32:16-32:25) (identifying Mr. Moorhead as supervisor); Ex. Z (disclosing hold date).

from him.  Figure 3 shows that from 2009-2015, TreeHouse produced just 790 emails from Mr.

Moorhead's files compared to 8,643 emails sent to or by him over that period as shown in other

custodians' files.  The volume of his responsive email produced from his files increased three-fold

the year he was put under a litigation hold.[39]

**Figure 3 – Bobby Moorhead[40]**



| Year | Custodial Emails | To/From Emails |
|------|------------------|----------------|
| 2009 | 2    | 51    |
| 2010 | 14   | 49    |
| 2011 | 38   | 264   |
| 2012 | 157  | 1,246 |
| 2013 | 220  | 1,529 |
| 2014 | 194  | 2,682 |
| 2015 | 165  | 2,822 |
| 2016 | 1,041 | 3,534 |
| 2017 | 9,150 | 9,572 |



Similar to ▮▮▮ TreeHouse claims ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[41]  ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[42]  And, in fact,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[39] TreeHouse has suggested other sales custodians are adequate substitutes for Ms. Crawford lost files.  But Ms. Crawford or her supervisor Mr. Moorhead were the *only* custodian on more than 52% of produced emails with Ahold. Mr. Baker, who supervised them until 2015, is a custodian on fewer than 9% of relevant produced emails with Ahold. The core sales-related documents for Ahold were not captured by other custodians.

[40] Figure 3 is based on metadata provided by TreeHouse.  The blue line and "Custodial Emails" column show the total number of emails produced from Mr. Moorhead's files based on custodian and duplicate custodian metadata.  The red line and "To/From Emails" column show the total number of emails produced from all custodians in which Mr. Moorhead was a sender or recipient based on metadata provided by TreeHouse.

[41] Ex. Y (Reply Report of Lauren J. Stiroh, Ex. 8.A); *see also* TreeHouse Am. Compl. ¶ 511.

[42] Ex. AC (Expert Report of Kevin M. Murphy, Ex. 57B).

████████████████████████████████.[43]   TreeHouse's Director of Sales Tom Rothers had

responsibility for the account at the time and spoke directly with ██████.[44]  He retired in August

2014, months after the lawsuit was filed and shortly after TreeHouse says ████████████████

████████████████████████████   Mr. Rothers *was not put under a litigation hold* before he

retired,[45] and TreeHouse produced few emails from his files.  TreeHouse also cannot locate Mr.

Rothers' work-issued laptop.[46]  Figure 4 shows the total number of emails TreeHouse produced

showing Mr. Rothers' custodial files prior to 2014 are significantly less than emails to or from him

contained across TreeHouse's productions; the emails produced after his 2014 retirement are

largely automated mass notifications.[47]

---

[43] Ex. AD ██████████████ Dep. Tr. 138:17-140:22, 266:13-269:8) (██████ Dep. Tr.").

[44] TreeHouse gave at least four internal TreeHouse emails from Mr. Rothers to
█████████████████████████.  In advance of ████████████ deposition, Keurig requested TreeHouse's
permission to share ████████████ *other* TreeHouse ordinary course documents related to ██████. Ex. AE (Email,
June 24, 2020).  Citing confidentiality, TreeHouse refused consent for Keurig to show ██████████
██████████ TreeHouse documents related to the ██████ business from six years prior.  Ex. AD ██████ Dep.
Tr. 176:8-79:5).  TreeHouse's refusal to allow Keurig to use at deposition even the few documents it received related
to sales to ██████ further compounded the prejudice caused by TreeHouse's spoliation.

[45] Ex. Z (disclosing as to Mr. Rothers).

[46] TreeHouse's loss of Mr. Rothers' work-issued laptop became clear after weeks of correspondence during which
TreeHouse made misrepresentations that the laptop *was not lost* but that TreeHouse had not agreed to produce it,
which itself was a separate misrepresentation.  In October 2018, TreeHouse agreed to add Mr. Rothers and three others
as "full custodians," which would have included productions from Mr. Rothers' work-issued laptop.  Ex. AF (Email,
Oct. 8, 2018).  When confronted with the fact that no laptop files were produced, TreeHouse claimed it never agreed
to produce them, despite the written correspondence.  Then, on October 8, 2019, TreeHouse stated it "did not lose or
discard Mr. Rothers computer."  Ex. AG (Email, Nov. 1, 2019, at Sept. 19 & 30, 2019, Oct. 1 & 9, 2019).  TreeHouse
finally admitted this was not true the following month:  "TreeHouse does not currently have a copy of his work-issued
computer, and at this time, we have no additional information concerning Mr. Rothers' document storage practices
while at TreeHouse."  *Id.* at Nov. 1, 2019.  No Rothers laptop files were ever produced.

[47] TreeHouse produced 139 emails with ██████ in 2014, but more than 2/3 involve logistics.  Laura Soller replaced
Mr. Rothers in 2015, but was not placed under a litigation hold until *January 25, 2017*.  Ex. R.  Comparing 2014 (the
critical time for TreeHouse's claims) to 2017 when Ms. Soller is placed under a hold, the number of produced emails
between TreeHouse sales and ██████ increases more than **27 times**, nearly all unique emails from Ms. Soller's files.

**Figure 4 – Tom Rothers[48]**



| Year | Custodial Emails | To/From Emails |
|------|------|------|
| 2009 | 4 | 32 |
| 2010 | 22 | 40 |
| 2011 | 20 | 320 |
| 2012 | 168 | 1,841 |
| 2013 | 164 | 1,718 |
| 2014 | 341 | 989 |
| 2015 | 1,098 | 200 |
| 2016 | 871 | 82 |
| 2017 | 63 | 3 |

### 4. TreeHouse omitted key members from its AFH team from its holds

TreeHouse's failure to take steps to preserve documents extended beyond its retail sales and procurement teams.  TreeHouse has claimed since its initial compliant in 2014 that Keurig's agreements with distributors to Away-From Home ("AFH") locations violate the antitrust laws. TreeHouse Compl. ¶¶ 111-120.  ███████████████████████████████████████████

██████████████████████████████████[49]  When it filed its complaint, TreeHouse had only one employee selling portion packs to AFH distributors, Sales Manager Robin Borchelt, who was supervised by Vice President of Sales and Marketing Gary Schachter.[50]  But Ms. Borchelt and Mr. Schachter were replaced in their roles after TreeHouse filed suit.  Mr. Schachter was replaced by Senior Vice President Judy Clark in October 2014, and Ms. Borchelt was replaced by Regional

---

[48] Figure 4 is based on metadata provided by TreeHouse.  The blue line and "Custodial Emails" column show the total number of emails produced from Mr. Rothers' files based on custodian and duplicate custodian metadata.  The red line and "To/From Emails" column show the total number of emails produced from all custodians in which Mr. Rothers was a sender or recipient based on metadata provided by TreeHouse.

[49] Ex. Y (Reply Report of Lauren J. Stiroh, Ex. 3.A Row U).

[50] TreeHouse initially stated that Ms. Borchelt received a hold notice in January 2017, but in 2020 TreeHouse revised that statement and said she had received a hold notice on April 19, 2014.

Sales Manager Greg Pollard in September 2015.[51]  <u>Neither Ms. Clark nor Mr. Pollard was placed</u>

<u>under a litigation hold until long after they began supervising a key channel in TreeHouse's suit</u>:

Ms. Clark received a hold notice on March 1, 2016, 1.5 years after stepping into this critical role,

and Mr. Pollard was placed under a hold almost one year after that, on January 25, 2017.[52]

As shown in Figure 5, for Ms. Clark, there were in total 32,533 custodial emails produced

between 2014 when she began in single serve, through the end of the discovery period.  In 2015

before she was under a litigation hold, TreeHouse produced about 5,700 emails from Ms. Clark

but approximately 89% of them appear to be calendar items.  Following the hold, from 2016 to

2017, this unusual pattern normalizes with only 2% of her emails made up of calendar items.

**Figure 5 – Judy Clark[53]**



The lack of emails from Ms. Clark is particularly prejudicial because her few documents

that were produced showed that Ms. Clark believed TreeHouse's lack of success in the Away From

Home channel was directly attributable to TreeHouse's lack of efforts.  Other TreeHouse

---

[51] Ex. AH (Greg Pollard Dep. Tr. 25:14-27:1, 31:7-32:4, 76:22-77:5); Ex. AI (Judy Clark Dep. Tr. 20:15-18).  Mr. Pollard's supervisors, Chris Van Rees and Jason Krause, are not custodians.

[52] Ex. R.  Evidence shows that ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████. Ex. AJ (Email, Sept. 2, 2016, THS-003634133).  Mr. Pollard's contact at ██████████ submitted a declaration in this case.

[53] Figure 5 is based on custodian and duplicate custodian metadata provided by TreeHouse.  The blue bar shows the total number of calendar items produced from Ms. Clark's custodial email.  The red bar shows the total number of other emails, such as sent emails, received emails, and contacts, that were produced from Ms. Clark's custodial email.

witnesses have tried to minimize Ms. Clark's views and have called her a "cry wolf."[54]  The failure

to produce the vast majority of her ordinary course documents for 2014, 2015, and early 2016 has

resulted in a loss of substantial material relevant to ██████████████ claims.[55]

### 5.   TreeHouse failed to preserve Mr. Lemieux's pre-2014 files

TreeHouse's failure to preserve extended to its top management and purported key

witnesses.  Craig Lemieux was TreeHouse's President of Beverages from 2015 to 2018.  Prior to

that, he was the General Manager for Sturm Foods (which was the single-serve manufacturer that

TreeHouse acquired) from 2011 to 2015 and Chief Operating Officer of Sturm Foods from 2008

to 2011.  TreeHouse's initial disclosures identified Mr. Lemieux ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████.[56]  Mr.

Lemieux testified that he was head of operations and made the decision to enter the business.[57]

Plainly, TreeHouse has known that Mr. Lemieux's role and responsibilities at TreeHouse made

him a key witness from the beginning of the case.[58]

TreeHouse placed Mr. Lemieux on a litigation hold for this case on February 4, 2014,

months after the complaint was anticipated by TreeHouse, and later explained that Mr. Lemieux

was one of several custodians who received "litigation holds from *Keurig, Inc. v. Sturm Foods,*

---

[54] Ex. AK (Harry Overly Dep. Tr., Day 2, 524:25-527:23); Ex. AL (Craig Lemieux Dep. Tr., Day 2, 46:11-47:4).

[55] TreeHouse has cited the fact that Aramark (another distributor referenced in TreeHouse's Complaint ¶ 349) produced 6,175 documents pursuant to a subpoena. ███████████████████████████████ ██████████████████████. Ex. AM (Email, April 4, 2017, ARA0014980).

[56] Ex. AN (TreeHouse's Initial Disclosures, Dec. 15, 2017).

[57] Ex. AO (Craig Lemieux, Day 1, Dep. Tr. 24:1-13).

[58] As further evidence of this, TreeHouse itself cross-noticed Mr. Lemieux for a second day of deposition to obtain affirmative direct testimony for its case-in-chief after Keurig noticed its own deposition of Mr. Lemieux.  Ex. AP (TreeHouse Cross-Notice of Deposition of Craig Lemieux, Apr. 26, 2019).

*Inc.*, No. 10-841 (D. Del.), which were in place dating from 2010 and covered documents relating to the single-serve coffee business."[59]   TreeHouse has said that it did not lift the litigation hold from *Sturm* before filing this case.[60]   Yet TreeHouse produced only 661 emails (excluding attachments) from Mr. Lemieux's custodial files for the five-year period spanning 2009 through 2013.   This does not make sense.   Mr. Lemieux has been on a continuous litigation hold since 2010.   During the same 2009-2013 period, Mr. Lemieux sent or received at least 11,865 emails (excluding attachments) that Keurig is aware of based on documents produced from other custodians.   Yet, as depicted in Figure 6, based on custodian metadata produced by TreeHouse, these documents were not collected from Mr. Lemieux's files, meaning he was exchanging relevant emails that were not preserved in his account.

**Figure 6 – Craig Lemieux[61]**

| Year | Custodial Emails | To/From Emails |
|------|------------------|----------------|
| 2009 | 0 | 179 |
| 2010 | 130 | 667 |
| 2011 | 193 | 1,853 |
| 2012 | 387 | 4,758 |
| 2013 | 378 | 4,574 |
| 2014 | 6,689 | 11,417 |
| 2015 | 7,841 | 12,400 |
| 2016 | 7,460 | 10,456 |
| 2017 | 9,150 | 12,640 |

Keurig raised this issue to TreeHouse during discovery and requested an explanation as to why there were so few emails from Mr. Lemieux's files from 2009-2013 when he had been under

---

[59] Ex. R.

[60] Ex. AQ (Email, Mar. 3, 2020) at Feb. 24, 2020 9:26 AM.

[61] Figure 6 is based on metadata provided by TreeHouse.  The "Custodial Emails" column shows the total number of emails produced from Mr. Lemieux's files based on custodian and duplicate custodian metadata.  The "To/From Emails" column shows the total number of emails produced from all custodians in which Mr. Lemieux was a sender or recipient based on metadata provided by TreeHouse.

a continuous litigation hold since before the instant litigation.  TreeHouse never answered.  Instead, TreeHouse stated: "TreeHouse collected, reviewed, and produced Mr. Lemieux's files consistent with its discovery obligations."[62]  Keurig again explained the issue, and TreeHouse told Keurig it was demanding information "beyond the scope of the obligations" in this case.[63]

But if Mr. Lemieux was under a litigation hold starting in 2010 for the *Sturm* litigation, and if that hold was not lifted before the litigation hold for the instant case went into effect as TreeHouse has represented to be the case, then there is no reason why Mr. Lemieux should have retained just 661 responsive emails for a five year period when he was leading Sturm's single-serve portion pack business, and he sent or received at least 11,865 responsive emails (excluding attachments) that Keurig is aware of based on documents from other custodians during the same period.  To this day, TreeHouse has not explained why so many emails from 2009-2013 appear to be missing from Mr. Lemieux's own files.

On March 3, 2020, Keurig suggested that TreeHouse could try to remedy the apparent data loss by producing Mr. Lemieux's files previously collected and produced in the *Sturm* litigation.[64] Two months later, TreeHouse said it would be willing to produce non-privileged documents from the *Sturm* case and sourced from Mr. Lemieux's files, but would do so *only* if Keurig agreed— prior to receiving any documents—to waive all rights to raise any future "preservation and/or spoliation concerns (or engage in motion practice) regarding Mr. Lemieux."[65]  Keurig agreed that if TreeHouse produced the documents, it would consider in good faith whether such a production resolved concerns, but that Keurig could not, of course, waive rights based on documents sight

---

[62] *Id.* at Dec. 13, 2019.

[63] *Id.* at Feb. 5, 2020.

[64] *Id.* at Mar. 3, 2020.

[65] Ex. AR (Letter from K. Lanski, May 11, 2020).

unseen.[66] TreeHouse refused to produce Mr. Lemieux's *Sturm* litigation documents without Keurig's advanced blanket waiver of rights.[67]

The position that TreeHouse took here is remarkable, and stands in stark contrast to the approach Keurig applied in producing its own documents. When TreeHouse raised concerns regarding Keurig's documents, Keurig never once demanded that TreeHouse waive all rights before Keurig would investigate or try to address the issue.

Here, the loss of Mr. Lemieux's data deprived Keurig of important evidence on a wide range of issues. For example, TreeHouse claims that there are high barriers to entry for would-be manufacturers of Keurig-compatible portion packs because there is "substantial technological know-how, research and design, and capital investment required." TreeHouse Compl. ¶¶ 81-83. This is critical to TreeHouse's claims that Keurig can exercise monopoly power over portion packs. *Id.* Mr. Lemieux is the *only* custodian that was involved in TreeHouse's decision to enter in the single-serve beverages business in 2009, but TreeHouse produced no emails from that year from his files.[68] Mr. Lemieux also would have been involved in setting the initial timeline for entry and his files would have been important in showing that TreeHouse was *not* delayed in entry in unfiltered portion packs due to Keurig's challenged agreements.[69] TreeHouse claims Keurig's conduct did delay its entry, but the available evidence does not support that claim. TreeHouse's Senior Director of R&D, Samantha Peskie, who was involved in the start-up of the project, testified

---

[66] Ex. AS (Email, May 13, 2020 at May 12, 2020).

[67] *Id.* at May 13, 2020.

[68] Sturm was acquired by TreeHouse in 2010, after Sturm began developing a Keurig-compatible portion pack. Mr. Lemieux is the most senior custodian of pre-merger Sturm. While a small number of other custodians worked at Sturm, none were involved in the decision to enter.

[69] ████████████████████████████████████████████████████████████ Ex. Y (Reply Report of Lauren J. Stiroh ¶¶ 133-138).

TreeHouse pushed back its launch date because its instant-coffee packs were not matching up to Keurig's quality in consumer testing.[70] ██████████████████████████

████████████████████████████████████████████████████████

███████████████████████████[71]   Mr. Vermylen, who was president of TreeHouse in 2010, testified that he would have directed TreeHouse to "work on . . . improving the product" before launching it in August 2010 had he been aware of the unaltered 2010 consumer testing results.[72]

TreeHouse appears to recognize that there is simply no support for its claim that Keurig delayed its entry based on the record developed during fact discovery.   ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████[74]   Ms. Rivers, too, was never disclosed and is not a document custodian.   Given TreeHouse's extraordinary efforts to manufacture an issue of fact even after fact discovery closed, the loss of Mr. Lemieux's documents is even more problematic.   ██████████████████

████████████████████████████████████████████████████████

---

[70] Ex. AT (Samantha Peskie Dep. Tr., Day 1, 96:2-98:10) (Q: "And do you have an understanding as to why the product launched in August 2010 as opposed to December 2009, as described here in your e-mail?"  A:  "We were doing our diligence to make sure that what we launched would be well received.").

[71] *Compare* Ex. AU ████████████████████████████████████████████████, THS-002432830, Slides 12, 18), *with* Ex. AV ████████████████ ████████████████, THS-003161769, Slide 15).

[72] Ex. AW (David Vermylen Dep. Tr. 247:21-249:15).

[73] Ex. AX (TreeHouse Am. Initial Disclosures, Apr. 24, 2020 & TreeHouse 2d Am. Initial Disclosures, May 8, 2020).

[74] Ex. AY (Michele Rivers Decl., Aug. 26, 2020, THS-004308978).

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████

\*       \*       \*

In sum, TreeHouse's failure to implement reasonable measures to preserve relevant documents has led to substantial document loss and prejudice to Keurig.  The evidence that *was* produced supports the inference that the documents lost by TreeHouse would support Keurig's defenses.  *See Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-cv-9363 (ALC) (DF), 2018 WL 1512055, at \*12-13, 17 (S.D.N.Y. Mar. 12, 2018) (granting sanctions where evidence suggests that "lost correspondence . . . may have been valuable" to the case).  The below chart summarizes the likely contents of spoliated evidence and how it would have been materially helpful to Keurig:

| Custodian | Likely Contents of Spoliated Evidence |
|---|---|
| **All custodians** through 2/4/2014 | TreeHouse customers did not "immediately" switch to Keurig because of the 2.0 Brewer.  Retailers assumed unlicensed suppliers would reverse engineer the 2.0 Brewer and knew 1.0 brewers were continuing to come into the market. |
| **Adam Spratlin** (through 1/25/17) | TreeHouse was satisfied with its relationships with its input suppliers.  TreeHouse stuck with ███████ for nearly a decade because ███████ makes excellent machines. |
| **Gretchen Crawford** (through 1/25/17) **Bobby Moorhead** (through 3/20/17) **Tom Rothers** (through 8/2014) | TreeHouse was told by ███████████ that the retailers had reasons unrelated to the 2.0 Brewer to award private label business to Keurig over other potential suppliers.  Internal TreeHouse documents reflect that ████ conveyed to TreeHouse that Keurig offered competitive pricing and merchandising opportunities.  ██████ worked with Keurig because of Keurig's lower price. |
| **Judy Clark** (through 3/1/16) | TreeHouse failed to meaningfully compete in the away from home channel by its own choice, even though other Keurig competitors built distributor networks. |
| **Craig Lemieux** (through 2/4/2014) | TreeHouse was not delayed by Keurig in launching its unfiltered packs.  TreeHouse was still working on formulation.  The ease of TreeHouse's entry, as likely evidenced in the missing emails from Mr. Lemieux, shows a lack of barriers to entry in the alleged portion pack market. |

## C.  THE COURT SHOULD SANCTION TREEHOUSE

The Court should sanction TreeHouse to correct for the fact that TreeHouse's own conduct has deprived Keurig of relevant evidence.  Keurig requests an Order precluding TreeHouse from affirmatively relying on the selective evidence that was preserved related to the spoliated topics. An order precluding a plaintiff from relying on specific evidence is an appropriate remedy to "protect[] defendants against any legal prejudice arising from the plaintiffs' conduct" that caused the spoliation.  *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 502 (S.D.N.Y. 2016). Specifically, the Order should preclude TreeHouse from affirmatively putting on evidence from:

- Any witness to the effect that Keurig's purported discussions with retailers in 2013 and early 2014 caused major retailers to switch private label suppliers to Keurig or reduce promotional activity of TreeHouse products.

- Any witness on a claimed difficulty obtaining inputs or machinery to manufacture portion packs prior to Mr. Spratlin being placed on a litigation hold.

- Mr. Rothers, Ms. Crawford, or Mr. Moorhead on their interactions with their respective retailer customers, ██████████████.

- Any witness on a claimed difficulty in selling in the away from home channel through March 2016 when TreeHouse began preserving documents from Ms. Clark.

- Mr. Lemieux and any other witness on claimed barriers to entry in the portion pack business before February 2014 when TreeHouse placed Mr. Lemieux under a hold for this litigation.

Keurig also respectfully requests an award of fees and costs from TreeHouse for the expense Keurig has incurred in attempting to remedy TreeHouse' discovery misconduct. TreeHouse had an avenue to try to address missing files for at least one custodian and possibly others but, rather than acting transparently to address the problem, chose to engage in gamesmanship and refused to look for missing documents unless Keurig agreed to waive all rights prior to TreeHouse's search.[75]  This is not how litigants should behave when such problems arise.

---

[75] Ex. AZ (Letter from J. Kay, Apr. 24, 2020); Ex. AR; Ex. AS.

Attorney's fees and costs are justified under these circumstances.  *Lokai Holdings*, 2018 WL 1512055, at *17 (awarding fees and costs).

## II.    THE COURT SHOULD PRECLUDE JBR FROM OFFERING EVIDENCE ON THE ALLEGED JANUARY 31, 2014 MEETING WITH COSTCO

According to JBR's complaint, at a meeting on January 31, 2014 Costco told JBR it would not expand JBR's distribution because of the Keurig 2.0 Brewer.  JBR Am. Compl. ¶ 271, ECF No. 83.[76]  Yet JBR has produced *no* documents corroborating its allegations.  Jim Rogers, the executive with primary sales responsibility for Costco, testified that he could not answer "definitively" whether the January 31 meeting took place at all, much less what happened, despite the allegations in the JBR's complaint.[77]  He also would not say whether he took notes during such a meeting but admitted it was his usual practice: "Usually, handwritten, followed up, thrown away."[78]  Even as of his deposition in 2019, *five years into this litigation*, he said he might still throw away responsive documents because he had "never been told not to."[79]  This is striking.  Jim Rogers is currently a co-president of JBR, he has been a senior executive of the family company for more than a decade, ██████████████████████████, and JBR highlighted its allegation related to Costco in its complaint.

Because Mr. Rogers would not have preserved any contemporaneous notes he took, and JBR has otherwise produced no documents corroborating its allegations concerning the alleged

---

[76]  JBR Am. Compl. ¶ 271 (JBR alleging "At a meeting between Rogers and Costco on January 31, 2014, Rogers was told that despite having prices lower than all other suppliers' Portion Packs – including Costco's Keurig-made private label – Costco would not be widening distribution for Rogers, or any other Competing Portion Pack supplier, until the Keurig 2.0 compatibility issue was resolved.  During this same meeting, Costco informed Rogers that it would be requiring Rogers to implement a design change to its Costco packaging to inform customers that Rogers' products were not compatible with the Keurig 2.0 Brewer.").

[77]  Ex. BA (Jim Rogers Dep. Tr., Day 1, 17:14-15, 196:2-196:24, 200:9-16).

[78]  *Id.* at 201:10-18.

[79]  *Id.* at 201:22-202:16.

January 31, 2014 meeting, Keurig requests that the Court preclude JBR from offering evidence about a purported loss of business at Costco.

*First*, JBR had an obligation to preserve any documents related to the January 31 meeting with Costco, yet it did not issue its first litigation holds until April 3, 2014, weeks *after* it filed its complaint.[80]  At the time of the meeting JBR reasonably anticipated litigation.  JBR's privilege log in this case shows that, on the day of the Costco meeting, ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████[81]  JBR filed this case about one month later.

*Second*, JBR had a culpable state of mind.  Jim Rogers, then a Senior Vice President of the company, being unaware of any obligation to retain evidence even while communicating personally with outside counsel in this case reflects culpable conduct by JBR.  Taken together with the fact that JBR was represented by counsel at the time, that JBR had prior experience with litigation and preservation obligations, and that Jim Rogers is a key senior executive responsible for JBR's largest customer, the failure to take steps to timely preserve was at least grossly negligent.  *See Chin*, 685 F.3d at 162; *Ottoson v. SMBC Leasing & Finance, Inc.*, 268 F. Supp. 3d 570, 581 (S.D.N.Y. 2017).

*Third*, the material is relevant.  JBR included allegations about this Costco meeting in its complaint.  Jim Rogers's notes may have been the only contemporaneous record of the alleged meeting with its largest customer regarding the 2.0 Brewer.  Jim Rogers does not remember the

---

[80] Ex. BB (Letter from Mario Moore, Feb. 6, 2018).

[81] Ex. BC (Privilege Log Entry for ROGPRIV_0000238 (Jan. 31, 2014)). ████████████████████████████████████████████████████████ *See id.* (Privilege Log Entry for ROGPRIV_0006804 (Jan. 21, 2014)).

meeting, and Costco also testified that it also did not recall the substance of the meeting.[82]   The only contemporaneous record of JBR's meeting would have been discarded by Jim Rogers, per his "usual" practice, even while he was actively communicating with outside counsel that same day about filing this very case.

JBR, *not Keurig*, should bear the consequences of JBR's failure to implement preservation procedures while preparing its complaint.   The Court should preclude JBR from affirmatively introducing testimony or using any evidence about Costco purportedly reducing its distribution of JBR's portion packs in 2014 as a result of any action by Keurig.   This would serve "to mitigate the specific prejudice that a party would otherwise suffer" and is consistent with the aims of spoliation sanctions.   *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y. 2007); *see Taylor v. City of New York*, 293 F.R.D. 601, 612 (S.D.N.Y. 2013); *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999).

## CONCLUSION

For the foregoing reasons, Keurig respectfully requests that the Court grant its Motion and such other relief that the Court deems just and proper.

---

[82] Ex. BD (Costco (Axthelm) Dep. Tr. 250:13-18).   Costco testified that it stocks a limited number of portion pack SKUs and that competition is fierce.   *Id.* at 158:19-161:22.   Costco looks to stock the "best seller, the best value, the quality, reliable manufacturer" that "stands behind all products and markets them."   *Id.*

Dated: April 19, 2021

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: */s/ Leah Brannon*
Leah Brannon
Carl Lawrence Malm
2112 Pennsylvania Avenue, NW
Washington, D.C. 20037
Telephone:  (202) 974-1500
*lbrannon@cgsh.com*
*lmalm@cgsh.com*

Rahul Mukhi
Joseph M. Kay
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
*rmukhi@cgsh.com*
*jkay@cgsh.com*

BUCHANAN INGERSOLL & ROONEY PC

By: */s/ Wendelynne J. Newton*
Wendelynne J. Newton
Mackenzie A. Baird
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
Telephone: (412) 562-8932
*wendelynne.newton@bipc.com*
*mackenzie.baird@bipc.com*

*Attorneys for Defendant Keurig Green
Mountain, Inc., f/k/a Green Mountain Coffee
Roasters, Inc., and as successor to Keurig,
Incorporated*