**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION | MDL No. 2542<br><br>Master Docket No. 1:14-md-02542 (VSB) (SLC) |
| JBR, INC. (D/B/A ROGERS FAMILY COMPANY),<br><br>Plaintiff/<br>Counterclaim Defendant,<br><br>v.<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>Defendant/<br>Counterclaim Plaintiff. | <u>**REDACTED PUBLIC VERSION**</u><br><br>*This Document Relates to*<br>*No. 1:14-cv-04242 (VSB) (SLC)* |

**MEMORANDUM OF LAW IN SUPPORT OF**
**KEURIG'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF**
**JBR EXPERT GARETH MACARTNEY, PH.D.**

# TABLE OF CONTENTS

I.  Expert Testimony Must Meet Standards of Reliability and Relevance ................................. 1

II.  Dr. Macartney's Damages Analysis Must Be Excluded Because It Is Unreliable ................ 2

    A.  Dr. Macartney's Damages Analysis Is Built on a Tainted and Dissimilar Benchmark.... 2

        1.  Dr. Macartney's use of a tainted benchmark renders his damages model unreliable............................................................................................................ 3

        2.  Dr. Macartney's use of a dissimilar benchmark renders his damages model unreliable............................................................................................................ 5

    B.  Dr. Macartney's Damages Model Does Not Distinguish Between Lawful and Unlawful Factors or Accurately Portray the But-For World ........................................... 7

        1.  Dr. Macartney's damages model is unreliable because it does not distinguish between losses due to lawful and unlawful conduct. ................................................ 7

        2.  Dr. Macartney's damages model is unreliable because it does not account for economic realities. ........................................................................................... 11

    C.  Dr. Macartney's Speculation that JBR Will Suffer Damages Through 2029 Is Not Supported by the Facts or Any Reliable Methodology ..................................................... 12

III.  Dr. Macartney's Liability Opinions Must Be Excluded Because They Are a Biased Factual Narrative Unsupported By Economic Analysis ...................................................... 16

    A.  Dr. Macartney Impermissibly Narrates and Interprets a Biased Selection of Record Evidence ............................................................................................................. 16

    B.  Dr. Macartney's Liability Opinions Are Unsupported by Economic Analysis ............. 20

    C.  Dr. Macartney's Opinions Extend Far Beyond His Training as an Economist ............. 24

IV.  Conclusion ....................................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Anderson News, L.L.C. v. Am. Media, Inc.*,
No. 09-cv-2227-PAC, 2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015) ............................16, 24

*Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*,
No. 16-cv-885-JPO, 2020 WL 1673687 (S.D.N.Y. Apr. 6, 2020) ...............................7, 20, 21

*Children's Broad. Corp. v. Walt Disney Co.*,
245 F.3d 1008 (8th Cir. 2001) .............................................................................................10

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).................................................................................................................9

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ....................................................................................7, 8, 12

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...................................................................................................... *passim*

*El Aguila Food Prods. Inc. v. Gruma Corp.*,
131 F. App'x 450 (5th Cir. 2005) .........................................................................................5

*El Aguila Food Prods. Inc. v. Gruma Corp.*,
301 F. Supp. 2d 612, 621-24 (S.D. Tex. 2003).......................................................................9

*Elcock v. Kmart Corp.*,
233 F.3d 734 (3d Cir. 2000)................................................................................................20

*Farmington Dowel Prods. Co. v. Forster Mfg. Co.*,
421 F.2d 61 (1st Cir. 1969).................................................................................................4

*Freeland v. AT&T Corp.*,
238 F.R.D. 130 (S.D.N.Y. 2006) ..........................................................................................2

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
No. 04-md-1628-RMB-MHD, 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009)................17, 20

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997).............................................................................................................7

*Gumwood HP Shopping Partners, LP v. Simon Prop. Grp., Inc.*,
221 F. Supp. 3d 1033 (N.D. Ind. 2016) ..............................................................................10

*Handicomp, Inc. v. USGA*,
No. 99-cv-5372, 2000 WL 426245 (3d Cir. Mar. 22, 2000)...................................................23

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
   392 U.S. 481 (1968) .................................................................................................12

*Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*,
   No. 05-cv-2164-MLB, 2007 WL 6215929 (D. Kan. Dec. 19, 2007) ...............................12, 13

*Highland Capital Mgmt., L.P. v. Schneider*,
   379 F. Supp. 2d 461 (S.D.N.Y. 2005) ........................................................................16

*Isaksen v. Vermont Castings, Inc.*,
   825 F.2d 1158 (7th Cir. 1987) .................................................................................10

*King-Ind. Forge, Inc. v. Millennium Forge, Inc.*,
   No. 1:07-cv-00341-SEB-DML, 2009 WL 3187685 (S.D. Ind. Sept. 29, 2009) ...................12

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ..................................................................................................2

*L.A. Land Co. v. Brunswick Corp.*,
   6 F.3d 1422 (9th Cir. 1993) .....................................................................................23

*L.A. Mem'l Coliseum Comm'n v. NFL*,
   791 F.2d 1356 (9th Cir. 1986) .................................................................................12

*In re LIBOR-Based Fin. Inst. Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ............................................................4, 16, 20, 24

*LinkCo, Inc. v. Fujitsu Ltd.*,
   No. 00-cv-7242-SAS, 2002 WL 1585551 (S.D.N.Y. July 16, 2002) ................................20

*Litton Systems, Inc. v. Honeywell, Inc.*,
   1996 WL 634213 (C.D. Cal. July 24, 1996) .................................................................9

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   32 F. Supp. 3d 453 (S.D.N.Y. 2014) .........................................................................16

*In re Lyondell Chem. Co.*,
   558 B.R. 661 (Bankr. S.D.N.Y. 2016) ......................................................................16

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) .....................................................................................21

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*,
   877 F.2d 1333 (7th Cir. 1989) .................................................................................20

*Minasian v. Std. Chartered Bank, PLC*,
   109 F.3d 1212 (7th Cir. 1997) .................................................................................24

*In re Mirena IUD Prods. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016)........................................................................24

*Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*,
358 F. App'x 643 (6th Cir. 2009) ........................................................................12, 15

*Murphy Tugboat Co. v. Crowley*,
658 F.2d 1256 (9th Cir. 1981) ...................................................................................11

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)........................................................................................2

*In re Rezulin Prod. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)..............................................................2, 15, 25

*Scentsational Techs., LLC v. Pepsi, Inc.*,
No. 13-cv-8645-KBF, 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) .......................7

*SMD Software, Inc. v. EMove, Inc.*,
945 F. Supp. 2d 628 (E.D.N.C. 2013).......................................................................24

*Tchatat v. City of New York*,
315 F.R.D. 441 (S.D.N.Y. 2016) ...............................................................................20

*Toscano v. PGA Tour, Inc.*,
201 F. Supp. 2d 1106 (E.D. Cal. 2002)..................................................................4, 11

*United States v. Cruz*,
363 F.3d 187 (2d Cir. 2004)........................................................................................24

*United States v. Kwong*,
69 F.3d 663 (2d Cir. 1995)...........................................................................................2

*USFL v. NFL*,
842 F.2d 1335 (2d Cir. 1988)...................................................................................7, 9

*In re Wholesale Grocery Prods. Antitrust Litig.*,
No. 09-md-2090-ADM/TNL, 2018 WL 3862773 (D. Minn. Aug. 14, 2018)..............3, 5, 7

*In re Wholesale Grocery Prods. Antitrust Litig.*,
946 F.3d 995 (8th Cir. 2019) .......................................................................................8

*In re Wireless Tel. Servs. Antitrust Litig.*,
385 F. Supp. 2d 403 (S.D.N.Y. 2005).........................................................................8

*Zimmer, Inc. v. Stryker Corp.*,
No. 3:14-cv-152-JD, 2018 WL 276324 (N.D. Ind. Jan. 3, 2018).............................8

**Rules**

Federal Rule of Evidence 403 .................................................................................1, 2, 20

Federal Rule of Evidence 702 .................................................................................1, 2, 20

**Other Authorities**

Gareth Macartney et al., "Antitrust Class Proceedings - Then And Now,"
    *The Law and Economics of Class Actions*, 2014, Vol. 26 ..........................................................5

The Court should exclude the expert reports and testimony of Dr. Gareth Macartney, JBR's damages and liability economist, under Federal Rules of Evidence 702 and 403 because his opinions are not the product of reliable principles properly applied to the facts of the case, and their admission would be far more prejudicial than probative.[1]

As to damages, Dr. Macartney uses an unreliable model to claim that JBR is entitled to damages of more than ████████, more than two-thirds of which will supposedly occur in the future.  His model predicts that the effects of Keurig's 2014 advertising of the launch of the 2.0 brewer (now discontinued) will continue and *ramp up* through 2029.  Dr. Macartney's model is also unreliable because he claims that JBR should have grown at Keurig's growth rate even though: (a) he says Keurig's growth rate was higher than it should have been *because of* the challenged conduct; and (b) there are significant lawful differences between Keurig and JBR that cause them to have different growth rates, but that Dr. Macartney simply ignores.

As to liability, Dr. Macartney offers no economic analysis and provides only an extended narrative reflecting his interpretation of a biased selection of documents and testimony.  This type of factual narrative is not permissible expert testimony.  In addition, Dr. Macartney offers conclusions well outside his expertise as an economist, for example regarding Keurig's intent and the claimed environmental benefits of JBR's plastic mesh cups.  The purpose of *Daubert* and Rules 702 and 403 is to prevent such improper and prejudicial testimony from reaching a jury.

## I.  Expert Testimony Must Meet Standards of Reliability and Relevance

A party may offer expert witness testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to

---

[1] Keurig brings this motion under both Rules 702 and 403 for efficiency reasons.  Keurig reserves the right to file other motions *in limine* at the appropriate time.

determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the

testimony is the product of reliable principles and methods; and (d) the expert has reliably

applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court has a

duty to act as "gatekeeper" and "ensure that any and all scientific testimony or evidence admitted

is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999);

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). JBR has the burden of

proving that Dr. Macartney's testimony is admissible by a preponderance of the evidence. *See*

*Freeland v. AT&T Corp.*, 238 F.R.D. 130, 145 (S.D.N.Y. 2006).

Expert testimony must also meet the requirements of Rule 403 "given the unique weight

that such evidence may have in a jury's deliberations." *Nimely v. City of New York*, 414 F.3d

381, 397 (2d Cir. 2005); *see also In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 545, 550

(S.D.N.Y. 2004). Even testimony that complies with Rule 702 may fail under Rule 403. *See*

*United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995) (affirming exclusion under Rule 403

even if testimony "passes muster under Rule 702").

## II.   Dr. Macartney's Damages Analysis Must Be Excluded Because It Is Unreliable

### A.   Dr. Macartney's Damages Analysis Is Built on a Tainted and Dissimilar Benchmark

Dr. Macartney's damages model uses a so-called benchmark analysis with Keurig as the

benchmark: it assumes that, in the but-for world without Keurig's challenged conduct, JBR's

sales would have grown at *Keurig's* annual revenue growth rate. Dr. Macartney breaks his

analysis into four sales channels and adds additional assumptions to magnify JBR's claimed

damages along the way: (1) in the "At-Home channel," if Keurig's revenue grew by ███ in

2018, Dr. Macartney opines that if JBR's revenues grew by any less than ███ then the

difference must all have been caused by the challenged conduct and reflects damages payable to

JBR; (2) in the "Amazon channel" his model uses the same approach; (3) in the "Away-from-Home channel," the model uses the inflated "but-for At Home" revenues from step 1 and multiplies them by *Keurig's* ratio of Away-from-Home to At Home sales; and (4) for the "JBR website channel," Dr. Macartney takes his inflated At-Home, Away-from-home, and Amazon revenues from steps 1-3 and multiplies them by *JBR's* historical ratio of website revenue to other revenue.  Ex. 1, Macartney Rpt., ¶¶ 253-56.  Dr. Macartney then takes his total damages estimate for 2019 across all four channels and projects that out at a compounding rate ten years into the future and claims that as "future damages."  *Id.* at ¶ 257.

Dr. Macartney acknowledges that, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮        Ex. 1, Macartney Rpt., ¶ 252; *cf. e.g.*, *In re Wholesale Grocery Prods. Antitrust Litig*., 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018), *aff'd*, 946 F.3d 995 (8th Cir. 2019) (the "foundational premise of [the] benchmarking model" is that the benchmark firm's "prices are a reliable predictor of [] but-for prices" of the injured firm).  Dr. Macartney ignores this foundational principle here.

### 1.    Dr. Macartney's use of a tainted benchmark renders his damages model unreliable.

Dr. Macartney opines that Keurig's challenged conduct helped Keurig's sales to grow.  Ex. 2, Macartney Tr. (Vol. I) at 53:11-20, 54:10-23, 58:5-15, 59:3-8, 59:23-60:9, 61:19-62:2.  If Dr. Macartney is right on liability, then using Keurig's growth rate is inappropriate for calculating damages because it inflates JBR's claimed harm by assuming that JBR would have had unlawfully fast growth.  In addition, Dr. Macartney opines that "absent Keurig's actions" JBR would have had the same proportion of Away-from-Home to At-Home revenue that Keurig

had.  Ex. 1, Macartney Rpt., ¶ 254.  But Dr. Macartney *also* opines that Keurig used exclusive

agreements to block all competitors from the Away-from-Home channel.  Ex. 1, Macartney Rpt.,

¶¶ 174-86.  If Dr. Macartney is right on liability, then Keurig's high proportion of Away-from-

Home sales cannot be the benchmark for JBR.  Nonetheless, Dr. Macartney takes ███████████

█████████████████████████████████████████████████████████████████████

███████████████████████████████████  Dr. Macartney's approach is equally

tainted, █████████████████████████████████████████████████████████.[2]

Courts exclude damages opinions that use impacted benchmarks because they are

"seriously undermined by [the] incorporation of data pervasively affected by that [challenged]

conduct."  *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, 299 F. Supp. 3d 430, 479 (S.D.N.Y.

2018).  The First Circuit has explained that using the defendant's sales would be "an

inappropriate yardstick" because the sales allegedly reflect the illegal conduct that the plaintiff

must prove "to be entitled to any damages" in the first place and, if liability is established, the

plaintiff is "no more entitled to the monopoly profit than" the defendant is.  *Farmington Dowel*

*Prods. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 82 n.48 (1st Cir. 1969); *see also Toscano v. PGA*

*Tour, Inc.*, 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002) ("[T]he antitrust plaintiff may not

benefit from the anticompetitive market effects that are the very basis for the suit.").

Use of a benchmark affected by the conduct at issue also violates widely accepted

economic principles, as Dr. Macartney himself admitted: "And sure, if you went to the academic

literature, you're not going to find something that says a benchmark is a good one if it's been

---

[2] Dr. Macartney uses JBR's ███████████████████████████████████████████████

████████████████████████████████.  *See, e.g.*, Ex. 3, JBR's

Responses to RFA Nos. 443-49, 470-76 (██████████████████████████████████████

██████████).  Dr. Macartney applies that ███████████████████████████████████

██████████████████████  *See* Ex. 1, Macartney Rpt., ¶¶ 232-33.

contaminated by what you're trying to measure."  Ex. 2, Macartney Tr. (Vol. I) at 64:21-65:12.

Dr. Macartney has acknowledged this core principle in his published work as well, explaining

that a court can validate a benchmark model by confirming that it is "unaffected by the

defendants' alleged actions."[3]  Yet he abandoned this accepted principle and selected a tainted

benchmark as the foundation for his entire damages model here.  In light of this departure from

reliable principles accepted in the field, Dr. Macartney's model should be excluded.  *See, e.g.,*

*Daubert*, 509 U.S. at 593 (discussing importance of a proffered technique comporting with

published academic literature subjected to peer review).

### 2.   Dr. Macartney's use of a dissimilar benchmark renders his damages model unreliable.

Dr. Macartney's benchmark model should be excluded for the independent reason that he

has not established reasonable similarity of the firms being compared.  "An antitrust plaintiff

who uses a yardstick method . . . bears the burden of demonstrating the reasonable similarity of

[that] business."  *El Aguila Food Prods. Inc. v. Gruma Corp.*, 131 F. App'x 450, 453 n.7 (5th

Cir. 2005) (affirming exclusion where expert made no effort to demonstrate "reasonable

similarity" of the firms being compared); *see also, e.g.*, *Wholesale Grocery Prods.*, 2018 WL

3862773, at *7-9 (excluding opinion because expert failed to show that large chain Stop & Shop

was a reliable benchmark for independent grocery stores).

Dr. Macartney cannot meet his burden of establishing reasonable similarity of the

compared firms here:  Keurig and JBR are vastly different in terms of their size, geographic

presence, business models, brand equity, and products.  Unlike Keurig, it is undisputed that JBR

is primarily a regional company that sells the majority of its products, including bagged coffee,

---

[3] Ex. 4, Gareth Macartney et al., "Antitrust Class Proceedings – Then And Now," *The Law and Economics of Class Actions*, 2014, Vol. 26, p. 112.

on the West Coast.[4]  Keurig invests in national marketing, whereas JBR admits it generally relies

upon word of mouth.[5]  Keurig's K-Cups are individually air-tight, whereas JBR's OneCups use

mesh plastic cups that for many customers raise concerns about sanitation and freshness.[6]

      In addition, Keurig has brand partnerships that are ███████████████████████

███████████████████████████████████.[7]  In contrast, JBR made a strategic decision *not* to

compete to supply portion packs to other brands and affirmatively turned away brands that

approached it seeking partnerships because JBR preferred to focus on its own brands and not

supply competitors.[8]  Accordingly, in the but-for world, JBR would not manufacture packs for

these partners.  Whether Dunkin' packs are manufactured by Keurig or Trilliant or Mother

Parkers does not materially affect *JBR's* revenue growth, other than in Dr. Macartney's

nonsensical model.  Under his model, if Keurig starts manufacturing a large volume of packs for

Dunkin', JBR is suddenly entitled to more damages.  Dr. Macartney's model benchmarking off

of Keurig's growth that includes sales by third party partners fails to acknowledge JBR's very

---

[4] *See, e.g.,* Ex. 5, Ugone Rpt., Figs. 2 & 3 (showing that JBR's bagged coffee sales, which JBR says are unaffected by Keurig's challenged conduct, are made primarily in the West); Ex. 6, Pete Rogers Tr. (Vol. I) at 130:8-11 (testifying San Francisco Bay brand is not "as well-known on the East Coast as it is on the West Coast"); Ex. 7, Wilkins Tr. at 91:4-16 (former Costco buyer and current consultant to JBR testifying "San Francisco Bay in and of itself doesn't really mean anything off the West Coast.").

[5] ████████████████████████████████  *See* Ex. 8, JBR 30(b)(6) (Giacomelli) Tr. at 69:9-70:22, 72:5-73:24 (██████████████████████); *cf.* Ex. 5, Ugone Rpt., ¶ 73 █████████████████████████████████████████████████ .

[6] *See, e.g.*, Ex. 3, JBR Responses to RFA Nos. 1864-67 █████████████████ ████████████████████████████████████████ ; Ex. 9, Aramark 30(b)(6) (Schwartz) Tr. at 196:10-22 (OneCups' mesh design presents a risk of coffee going stale); Ex. 10, Office Depot 30(b)(6) Tr. at 102:11-20 (OneCups' design causes sanitation concerns in a multi-user environment like an office).

[7] *See, e.g.*, Ex. 5, Ugone Rpt., ¶ 90 & Fig. 5 (████████████████████████████████████████ .

[8] Ex. 3, JBR Responses to RFA Nos. 642-44 ██████████████████████████████████████████ ████████████); *see also, e.g.*, Ex. 11, Jim Rogers Tr. (Vol. I) at 91:8-10 ("We are interested in growing our own brand and not putting competitors out on the market."); Ex. 12, John Rogers Tr. (Vol. I) at 30:4-24 ("I like to do our own thing . . . . I don't need to make it for Starbucks or Peet's or anybody.").

different strategy.  Ex. 2, Macartney Tr. (Vol. I) at 108:1-109:1.  The significant differences

between JBR and Keurig make the benchmark invalid and require exclusion of Dr. Macartney's

testimony.  *Wholesale Grocery Prods.*, 2018 WL 3862773, at *8 (An expert's "failure to validate

his competitive benchmark is, by itself, a sufficient basis for excluding his expert testimony.").

> **B.      Dr. Macartney's Damages Model Does Not Distinguish Between Lawful and Unlawful Factors or Accurately Portray the But-For World**

Dr. Macartney's "benchmark analysis is unreliable for the additional reason that it does

not control for non-conspiratorial [i.e., lawful] factors."  *Wholesale Grocery Prods.*, 2018 WL

3862773, at *8.  That is, the model does not distinguish whether JBR lost sales due to Keurig's

challenged conduct or lawful factors.  This "analytical gap" between the expert opinion and the

facts requires exclusion.  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *Bobcar Media,*

*LLC v. Aardvark Event Logistics, Inc.*, --- F. Supp. 3d ---, 2020 WL 1673687, at *4 (S.D.N.Y.

Apr. 6, 2020); *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *6 (S.D.N.Y. Apr.

18, 2018), *aff'd*, 773 F. App'x 607 (Fed. Cir. 2019); *see also Daubert*, 509 U.S. at 591 (damages

model should be excluded where it is not "sufficiently tied to the facts" to aid the jury).

> **1.      Dr. Macartney's damages model is unreliable because it does not distinguish between losses due to lawful and unlawful conduct.**

A damage model is inadmissible if it fails to "separate lawful from unlawful conduct."

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000); *see also USFL v.*

*NFL*, 842 F.2d 1335, 1378-79 (2d Cir. 1988) (plaintiff must separate losses caused by unlawful

conduct from "the amount of its losses caused by other factors, such as management problems, a

general recession or lawful factors").

First, Dr. Macartney's model fails because it makes *no* attempt to isolate Keurig's lawful

growth from growth supposedly flowing from challenged conduct.  When a damages expert does

"not separate lawful from unlawful conduct," this failure creates a deficiency "in the foundation

of the opinion, [making] the expert's resulting conclusions [] 'mere speculation.'" *Concord Boat*, 207 F.3d at 1057.  If there is any debate as to whether a factor might drive differences, that factor must be accounted for.  *See, e.g., In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1003 (8th Cir. 2019) ("It is the plaintiffs' burden to establish the reliability of the posited expert testimony, including a determination of whether other factors affected" the model.).  "[F]ailure to test for [] obvious and significant alternative explanations renders [an expert's] analysis 'essentially worthless'" and inadmissible.  *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005); *see also, e.g., Zimmer, Inc. v. Stryker Corp.*, 2018 WL 276324, at *3-4 (N.D. Ind. Jan. 3, 2018) (excluding report of expert who did not "distinguish lost profits that resulted from Defendants' alleged wrongdoing").  Here, Keurig's sales grew for many lawful reasons, including because Keurig marketed low-priced brewers and invested in building its brand.[9]  Indeed, the lower Keurig priced, the more business it won, and as a result, the more damages JBR claims.  But offering low prices is entirely lawful, and the fact that Dr. Macartney treats this as "damages" to JBR proves the unreliability of the model.

Second, on the flip side, Dr. Macartney's model fails because it does not isolate sales JBR *lost* due to its own business choices.  Ex. 2, Macartney Tr. (Vol. I) at 111:11-17.  JBR made many choices to forgo sales opportunities.  For example, JBR refused to submit bids at times.  *See* Ex. 11, Jim Rogers Tr. (Vol. I) at 170:1-171:3 ("I was basically getting tired of jumping through hoops for [BJ's] . . . . I just got tired of playing their game."); Ex. 13, Pete Rogers Tr. (Vol. II) 99:12-101:25 (agreeing it was not worth bidding on BJ's).  JBR refused to sell to Walmart, the largest retailer in the world.  *See* Ex. 14, Smoot (JBR) Tr. at 177:14-179:8 (Rogers

---

[9] Even other plaintiffs made some attempt, albeit insufficient, to account for brand value in their damages models, recognizing that it is a lawful factor in Keurig's success.  *See, e.g.*, ECF No. 1408 (Dr. French *Daubert*) at 8-10 (discussing attempt to use bagged coffee prices to control for brand value).

family disliked Walmart). 

▮▮▮. Ex. 15, ROG001056075 (

▮▮▮); Ex. 16, ROG001951770 (

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Dr. Macartney did not account for these factors.

*See, e.g.*, Ex. 2, Macartney Tr. (Vol. I) at 119:17-121:6 (no adjustment for not bidding at BJ's);

*id.* at 121:17-122:2 (no adjustment for choosing not to sell to Walmart). In short, under

Dr. Macartney's model, it does not matter why Keurig won sales or JBR lost them, and it does

not matter that Keurig aggressively pursued growth opportunities while JBR chose to forgo

them. If Keurig grew more than JBR did, for *any* reason, Dr. Macartney calls it antitrust

damages. *Id.* at 112:15-113:3, 119:17-121:6, 123:2-13.

Courts have rejected this approach. For example, in *El Aguila Food Prods. Inc. v. Gruma
Corp.*, the court excluded an expert who opined that the challenged conduct reduced the

plaintiff's shelf space because the testimony did not account for the fact that the plaintiffs "never

tried to obtain shelf space" and "refused, based on principle, to negotiate with retailers." 301 F.

Supp. 2d 612, 621-24 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005); *see also, e.g.*,

*USFL*, 842 F.2d at 1378-79 (damages not recoverable for management decisions).

Finally, Dr. Macartney's damages model also fails because it does not link particular

challenged conduct to claimed damages. "The first step in a damages study is the translation of

the *legal theory of the harmful event* into an analysis of the economic impact *of that event*."

*Comcast Corp. v. Behrend*, 569 U.S. 27, 38 (2013) (emphasis in original). An aggregated

damages model "leaves the jury without a reasonable basis for determining the amount by which

the plaintiff's damage model figure should be reduced in the event that one or more of the

challenged business practices are [] found to be [lawful]." *Litton Systems, Inc. v. Honeywell,*

*Inc.*, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996) (setting aside verdict based on aggregated damages model); *see also Gumwood HP Shopping Partners, LP v. Simon Prop. Grp., Inc.*, 221 F. Supp. 3d 1033, 1037-38 (N.D. Ind. 2016) (excluding damages model that "failed to evaluate *any* particular violation" or "isolate the effect of that particular violation" (emphasis in original)). Here, Dr. Macartney admits his model does not evaluate the effects of any particular violation: For example, it does not separate claimed damages for the purported sham litigation or for the challenged advertising.  Ex. 2, Macartney Tr. (Vol. I) at 170:4-7, 173:18-21, 175:20-176:10. Because Dr. Macartney uses an aggregated model, if the fact finder determines that just one of the challenged acts at one point in time was unlawful and *every other challenged act* was lawful, Dr. Macartney's model would still claim the same massive antitrust damages.

This "all or nothing" model is inadmissible.  Courts reject models that "conveniently add[] up to [the] same damages figure regardless of" the jury's findings.  *Gumwood*, 221 F. Supp. 3d at 1039.  Like Dr. Macartney, the plaintiff's expert in *Gumwood* asserted that "no matter what findings the jury makes as to [the defendant's] liability, the snowball effect would fill in the difference such that total damages would equal the same amount."  *Id.*  The court rejected this "essentially non-falsifiable opinion that the jury will be unable to tie to any particular facts in the case," as "the jury would have to take it on faith that, whatever the facts show at trial . . . , the direct and indirect effects of any anticompetitive conduct would have produced his same damages figures."  *Id.* at 1039-40.  "That sort of analytical gap is unacceptable."  *Id.* at 1039; *see also Children's Broad. Corp. v. Walt Disney Co.*, 245 F.3d 1008, 1018-19 (8th Cir. 2001) (vacating damages award because trial was tainted by damages opinion that "any or all of the alleged wrongful acts would have caused the exact same amount of damages"); *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) ("*Post hoc*

*ergo propter hoc* is not a valid methodology of damage calculation, especially when it is apparent that other causal factors are at work . . . . We do not allow antitrust plaintiffs [] to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct.").

> **2.    Dr. Macartney's damages model is unreliable because it does not account for economic realities.**

A damages model should be excluded when it fails to account for economic realities, including by not modeling competitive responses.  *See, e.g., Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262-63 (9th Cir. 1981) (vacating damages award based on model that made an unrealistic "assumption that [a competitor] would not cut its prices in reaction" to competition); *Toscano*, 201 F. Supp. 2d at 1125 (excluding damages model that ignored "competitive reaction[s]" in the but-for world).

Dr. Macartney fails to account for numerous basic economic realities here.  For example, he opines that: (1) in the but-for world, Keurig's prices would be lower, Ex. 2, Macartney Tr. (Vol. I) at 44:14-21; (2) JBR's OneCups and Keurig's K-Cups are substitutes, *id.* at 28:23-29:23; and (3) as a matter of basic economics, all else equal a price decrease on one product *decreases demand for a substitute*, *id.* at 29:11-30:17.  Yet his model assumes that Keurig's price will decrease and JBR will *not* cut its price in response.  *Id.* at 44:14-21, 45:21-46:5, 47:3-19.  Dr. Macartney's failure to model a competitive response by JBR or a decrease in its sales does not comport with basic economic realities.  *See Murphy Tugboat*, 658 F.2d at 1262.

Like the excluded model in *Toscano*, Dr. Macartney's model fails to account for increased competitive pressures in the but-for world.  Dr. Macartney opines that Keurig's conduct excluded rivals from entering. Ex. 1, Macartney Rpt., ¶¶ 28-30.  In his but-for world, then, there should be more competitors.  But his model does not account for any new entrants or

discuss how they would affect JBR's sales.  Ex. 2, Macartney Tr. (Vol. I) at 43:13-22.

Dr. Macartney also assumes, contrary to economic reality, that JBR could substantially increase its revenue in the but-for world without increasing sales and marketing expenses.  Ex. 2, Macartney Tr. (Vol. I) at 33:5-10, 51:9-11.  But JBR acknowledges that ████████████████ ████████████████████████████████.[10]  Dr. Macartney's model should have accounted for the additional expenses JBR would have incurred in the but-for world.  *See, e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 503-04 (1968) (damages model must account for additional expenses plaintiff would have incurred in the but-for world); *L.A. Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1367 (9th Cir. 1986) (vacating damages award because district court failed to account for additional costs plaintiff would have incurred in the but-for world).

Dr. Macartney's failure to make appropriate adjustments to account for these economic realities shows that his model cannot reliably estimate JBR's damages, and must be excluded.  *Concord Boat*, 207 F.3d at 1057 (excluding opinion that "did not incorporate all aspects of the economic reality of the . . . market").

### C.    Dr. Macartney's Speculation that JBR Will Suffer Damages Through 2029 Is Not Supported by the Facts or Any Reliable Methodology

Courts regularly exclude expert damages opinions about future damages that lack sufficient factual basis.  *See, e.g., Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 654 (6th Cir. 2009) (affirming exclusion of speculative future damages model); *Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*, 2007 WL 6215929, at *7 (D. Kan. Dec. 19, 2007) (excluding future damages model as speculative); *King-Ind. Forge, Inc. v. Millennium Forge, Inc.*, 2009 WL 3187685, at *2-3 (S.D. Ind. Sept. 29, 2009) (same).

---

[10] Ex. 17, Giacomelli Depo. Ex. 8, ROG001652333 (most of the nearly 100 unlicensed brands "are supported by significant marketing expenditures"); Ex. 18, Giacomelli Depo. Ex. 25, ROG001951775.

Dr. Macartney has provided no factual basis for his future damages period, which runs through 2029, twenty years from the earliest conduct alleged in the complaint, fifteen years from the filing of this lawsuit, and nearly ten years past the filing of his report. Dr. Macartney's future damages model is facially implausible. ██████████████████████████████ ██████████████████████████████████,[11] but Dr. Macartney does not plausibly explain how a brewer launched in 2014 and discontinued in 2017 could possibly cause damages to JBR through 2029. *See* Ex. 1, Macartney Rpt., ¶¶ 251-73; *cf. Heartland*, 2007 WL 6215929, at *7 (no explanation of how plaintiff would be harmed nine years after conduct *began*). To the contrary, the evidence shows that any harm to JBR resulting from the launch of the 2.0 would have been short-lived at most. Among other things: (1) JBR introduced a solution known as the Freedom Clip that allowed its packs to brew in the 2.0 in Fall 2014, not long after the brewer launched;[12] (2) JBR has offered packs with 2.0-compatible ink on their lids since early 2015;[13] (3) the 2.0 Brewer was discontinued in 2017;[14] and (4) the alleged private label deals that JBR asserts Keurig won as a result of the 2.0 ██████████████████████.[15] Moreover, JBR chose to stop competing for private label deals because industry prices were too low for JBR to match.[16]

---

[11] Ex. 1, Macartney Rpt., ¶ 33 ███████████████████████████████████████████████ ███████████████████████████████████████████████.

[12] Ex. 1, Macartney Rpt., ¶ 246 & Table 47 (████████████████████████████████████ ██████████████████████).

[13] Ex. 19, "Introducing the Freedom Ring" (Apr. 27, 2015) (cited in Macartney Rpt. backup materials).

[14] Ex. 20, Keurig Dr Pepper 2018 Annual Report, at 114.

[15] *See, e.g.*, Ex. 21, ██████████████████████ (KGM03125371) (████████████████████ ████); Ex. 22, █████████████████ (KGM01561132) (██████████████████████████); Ex. 23, ████████████████████████████ (KGM03781451) (█████████████████████).

[16] *See, e.g.*, Ex. 24, Hybsch (JBR) Tr. at 29:8-30:19 (JBR senior management instructed her to stop bidding for private label); Ex. 12, John Rogers Tr. (Vol. I) at 37:4-23, 44:9-11 (JBR stopped seeking

When asked why he used 2029 as the end date for damages, Dr. Macartney recognized that this choice was arbitrary: "[I]f you're saying, for example, well, . . . why not cut off in 2028 or, indeed, why not cut off in 2030 or 2031, you know, you have to stop the analysis at some point, and . . . 2029 seemed like the right cutoff."  Ex. 2, Macartney Tr. (Vol. I) at 189:9-22.  An arbitrary number is not analysis based in fact.

Further, Dr. Macartney calculates the amount of future damages ████████ ████████ based on a *press release* about a market research report that predicts the U.S. "coffee pods and capsules market" will grow at 3.1% per year through 2025.  Ex. 1, Macartney Rpt., ¶ 260.  Dr. Macartney chose to use the 3.1% growth rate from this press release as the core of his future damages model claiming that JBR is entitled to ████████████ ████.  But Dr. Macartney did not even *review* the actual research report.  Ex. 2, Macartney Tr. (Vol. I) at 191:2-23.  Dr. Macartney said the report was prepared by the "marketing analytics firm Research and Markets."  Ex. 1, Macartney Rpt., ¶ 260.  But ResearchAndMarkets.com is an online *store* selling the report, not an analytics firm.  The report was prepared by a company in India called Mordor Intelligence.[17]

Working off the ResearchAndMarkets.com press release alone, Dr. Macartney assumes: (1) ResearchAndMarkets.com accurately represented the results of another firm's report; (2) the predicted growth rate and underlying methodology are reliable; (3) Keurig-compatible packs will grow at the exact same rate as "coffee pods and capsules"; and (4) Keurig, JBR, and the

---

private label business because they were all about "price, price, price"); Ex. 11, Jim Rogers Tr. (Vol. I) at 163:8-20 (JBR didn't want to compete for deals where it was all about "price price price").

[17] Dr. Macartney would have known this if he had looked into the source.  ResearchAndMarkets.com describes itself as "The World's Largest Market Research Store."  If Dr. Macartney had clicked the link in the press release he cited, he would have been taken to a webpage that names Mordor Intelligence as the report author.  Astoundingly, Dr. Macartney took none of these steps before relying solely on the press release as the foundation for his entire future damages model.

differential between them will grow at that same rate.  Further, the press release predicts growth

only through 2025, but Dr. Macartney tacks on an extra four years to assume continued 3.1%

annual growth in damages through 2029.  Ex. 2, Macartney Tr. (Vol. I) at 190:20-23.

There are *no* facts or analyses supporting these assumptions.  Because Dr. Macartney did

not see the report or even know who wrote it, he does not know what assumptions its authors

made or whether they are reliable.  He does not know what products were studied or whether the

predicted growth rate applies to Keurig-compatible packs.  He also did not tailor the 3.1% rate

based on the facts here: He does not consider whether, for example, the damages from a 2014

launch of a since-discontinued brewer would compound at 3.1% annually through 2029.  His

reliance on this press release is "not based on scientific method but on the expediencies of this

particular litigation," and renders his future damages calculation inadmissible.  *See, e.g.*, *Rezulin*,

309 F. Supp. 2d at 562-63 (excluding testimony that relied on an unpublished source for which

expert "made no effort to ascertain" its reliability).

In *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc*., 358 F. App'x 643 (6th Cir. 2009),

the Sixth Circuit affirmed the exclusion of a future damages opinion similar to the one that

Dr. Macartney offers here.  As the Sixth Circuit explained, "[t]he district court hit the nail on the

head when it characterized this ten-year prediction about the fortunes of the American

automotive industry as utterly speculative." *Id.* at 654.  Dr. Macartney admits that is exactly

what he did with the press release here:

> Q.     And you're using this information to project ten years into the future the fortunes
>        of the U.S. single-serve coffee business?
>
> A.     That's right, yes.  That's what I'm doing.

Ex. 2, Macartney Tr. (Vol. I) at 194:12-16.  This is utter speculation, not expert testimony.

III.     **Dr. Macartney's Liability Opinions Must Be Excluded Because They Are a Biased Factual Narrative Unsupported By Economic Analysis**

A.     **Dr. Macartney Impermissibly Narrates and Interprets a Biased Selection of Record Evidence**

Expert testimony is inadmissible where the expert is "simply rehashing otherwise admissible evidence about which he has no personal knowledge." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005); *see also In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 32 F. Supp. 3d 453, 460 (S.D.N.Y. 2014) ("[A]n expert may not offer testimony that simply . . . constructs a 'factual narrative based on record evidence.'"). Experts who "merely recit[e] what is on the face of a document produced during discovery" "may be precluded on this basis alone." *Anderson News, L.L.C. v. Am. Media, Inc.*, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015); *see also LIBOR*, 299 F. Supp. 3d at 491 (expert "may not opine that event *x* in fact occurred, which remains for the trier of fact to determine"). As one court summed it up, the "selection, organization, and characterization of excerpts from the discovery record 'is no more than counsel . . . will do in argument' . . . [and such] cherry-picking and editorializing is exactly the type of 'factual narrative' that courts routinely exclude because it invades the province of the factfinder." *In re Lyondell Chem. Co.*, 558 B.R. 661, 668 (Bankr. S.D.N.Y. 2016).

Yet cherry-picking and editorializing to build a factual narrative is what Dr. Macartney did here. For 90 consecutive pages of his report, Dr. Macartney offers no economic analysis, but rather narrates a story based on his strained interpretation of a skewed set of documents and testimony. Over 112 paragraphs of rambling narrative, including 55 paragraphs telling a story about what he calls Keurig's "plan to reclose the [Keurig] system" with the 2.0 brewer, Dr. Macartney cites record evidence more than 400 times. Ex. 1, Macartney Rpt., ¶¶ 91-202. But not once in these 112 paragraphs does Dr. Macartney rely on economic reasoning, quantitative analysis, or econometric studies. A lay jury can draw its own conclusions from the

documents and testimony without hearing a factual narrative from JBR's economist.

Further, as Dr. Macartney's report makes clear, his narrative is based on a selective and biased set of record evidence. This, too, requires exclusion. *See, e.g.*, *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *8 (S.D.N.Y. Sept. 30, 2009) ("Failure to discuss the import of, or even mention, [certain] material facts . . . amounts to cherry-picking the facts . . . , and such selective use of facts fails to satisfy the scientific method and *Daubert*."). Dr. Macartney consistently ignores evidence highly relevant to his opinions when it would undermine his JBR-biased narrative. For example, Dr. Macartney claims JBR lost business at ████████████ due to the 2.0 Brewer, but fails to acknowledge evidence showing that other factors drove these retailers' decisions: Dr. Macartney fails to acknowledge documents and testimony—including from JBR itself—that ████████████████████████ ████████████████████████.[18] Dr. Macartney's entire central theme is that JBR lost retailers' business because of concerns about compatibility with the Keurig 2.0 brewer.

████████████████████████████████████████████
████████████████████████████████████████
████████████

████████████████████████████████████████
████████████████████████████████████████

Ex. 26, ROG001951775 (emphasis in original). This analysis ████████████████████

---

[18] *See, e.g.,* Ex. 25, ROG001922854 (███████████████████████████████ ████████████████); Ex. 12, John Rogers Tr. (Vol. I) at 39:14-23 (testifying that ███████████████████████████████, because it "was much cheaper than we [JBR] were").

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████. Yet Dr. Macartney fails to mention

███████████████████████████████████████████████████

███████████████. This omission is striking.

It is not Dr. Macartney's role as a purportedly independent economic expert to summarize documentary evidence at all, much less to summarize it in a one-sided way. Dr. Macartney's selective narrative also fails to acknowledge deposition testimony from *any* of the Rogers family members, even though they are the exclusive owners, senior executives, and decision makers at JBR. The family's testimony reveals many key facts that contradict Dr. Macartney's narrative, including that JBR decided not to bid for purported lost sales, Ex. 13, Pete Rogers (Vol. II) Tr. at 99:17-101:25; some of the claimed "lost sales" for which JBR seeks compensation from Keurig were actually awarded to other competitors that offered lower prices than JBR, Ex. 12, John Rogers Tr. (Vol. I) at 39:14-23; customers had sanitation concerns with JBR's mesh cups, Ex. 13, Pete Rogers Tr. (Vol. II) at 110:15-23; JBR chose not to do business with Walmart, Ex. 14, Smoot (JBR) Tr. at 177:14-179:8; JBR rejected partnerships with roaster brands, Ex. 11, Jim Rogers Tr. (Vol. I) at 85:2-87:11; and many other important facts. Dr. Macartney did not rely upon depositions of JBR's owners *even once* in his 208-page report reaching his opinions in this case. Ex. 1, Macartney Rpt. at Ex. B (Materials Reviewed and Relied Upon); Ex. 2, Macartney Tr. (Vol. I) at 160:18-161-4. Again this omission is striking.

Dr. Macartney's practice of drawing conclusions without regard to highly relevant but conflicting evidence is also exemplified in his reply to Dr. Kevin Murphy's Exhibit 51, showing the percentage of portion pack sales allegedly covered by exclusive customer contracts. Ex. 27,

Macartney Reply Rpt., ¶ 129, Table 27.  To rebut this evidence, Dr. Macartney does not use sales

data, contract analysis, or even deposition testimony.  Instead, he pulls ████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████  Ex. 28, KGM00409574.  Dr. Macartney says this ████████

███████████████████████████████████████████████████████  Ex.

27, Macartney Reply Rpt., ¶¶ 10, 129, Table 27.[19]  That reading ignores ████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████.  Ben Yoder, Keurig's former Vice President of Business Development, testified that

he ████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████.  Ex. 30, Yoder Tr. (Vol. I) at 177:12-178:5.

This testimony is confirmed by transactional data, which Dr. Macartney had but also did not

consider, that ████████████████████████████████████████████████████████

████████████████[20]  It is particularly striking that Dr. Macartney ignored the data—which after all

is what expert economists are supposed to consider—while relying on one number pulled out of

one draft slide that is contradicted by extensive evidence Dr. Macartney did not discuss.

     In short, Dr. Macartney is not acting as an economic expert.  Rather, he "does no more

than counsel for plaintiff will do in argument, *i.e.*, propound a particular interpretation of

---

[19] Plaintiff McLane's expert, Dr. Leitzinger, admits that this document does not provide enough
information to say anything about how much business was exclusive to Keurig.  Ex. 29, Leitzinger Tr.
191:24-192:9 ("████████████████████████████████████████████████████████████").

[20] Dr. Macartney suggested he was unaware that he had sales data showing unlicensed pack sales to
retailers.  *See* Ex. 31, Macartney Tr. (Vol. II) at 400:24-401:6.  In fact, sales data showing these
transactions was readily available.  Ex. 32, Murphy Rpt. Exs. 19, 23, 44, 52 (analyzing data).

defendant's conduct.  This is not justification for the admission of expert testimony."  *LinkCo, Inc. v. Fujitsu Ltd.*, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).  His biased factual narrative should be excluded because it "offers no analysis beyond highlighting aspects of the record that he finds important."  *Bobcar*, 2020 WL 1673687, at *3.

Dr. Macartney's testimony is not only unhelpful to the jury, which is capable of sorting through the facts itself, it is highly prejudicial to Keurig, as it would permit Dr. Macartney to lend his expert credentials to JBR's interpretation of the facts.  This is an independent reason for exclusion under Rule 403.  *Tchatat v. City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016) (excluding expert's factual recitation under Rule 403 as well as Rule 702 because any value of such testimony "is far outweighed by the danger that the jury would accord too much weight to such opinions because they come from the mouth of a [] professional"); *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000) (insufficiently supported testimony "would significantly increase the risk of misleading the jury and confusing the issues.").

### B.    Dr. Macartney's Liability Opinions Are Unsupported by Economic Analysis

Because an expert's role is to provide specialized knowledge and training to assist the fact-finder, an expert's testimony must be rejected if it "does not demonstrate any particular scientific expertise that can be assessed for reliability or that would ultimately assist the finder of fact."  *Fresh Del Monte*, 2009 WL 3241401, at *16 (rejecting testimony where expert did not establish that he performed a "reasoned economic analysis"); *LIBOR*, 299 F. Supp. 3d at 489-91 (rejecting testimony that "analyz[ed] documentary evidence" that did not require specialized knowledge to interpret); *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (rejecting expert testimony that did not "draw[] on the skills of an economist").  Similarly, an expert's opinion cannot consist of "arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language."  *LinkCo*, 2002 WL 1585551, at *2;

*see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("[E]xpert testimony should be excluded if it is speculative or conjectural" and "conclusory opinions are similarly inappropriate."); *Bobcar*, 2020 WL 1673687, at *3.

Here, Dr. Macartney failed to conduct any economic analysis to support his liability opinions.  In opining that there is a relevant market for single-serve brewers, for example, Dr. Macartney acknowledges that economists normally look at demand and supply-side substitutability and ease of entry.  Ex. 1, Macartney Rpt., ¶ 63.  However, Dr. Macartney does not perform *any* quantitative analyses to test brewer substitutability on the supply or demand sides, and he does not conduct any analysis of the feasibility of entry.  Dr. Macartney did not calculate the cross-price elasticity between single-serve brewers and other types of brewers.  *See* Ex. 1, Macartney Rpt., ¶¶ 63-70.  He did not perform an event study to determine whether consumers' brewer purchasing decisions were affected by a demand or supply shock changing the relative pricing of single-serve brewers as compared to other brewers.  *Id.*  Dr. Macartney did not even analyze the many companies that entered the single-serve brewer business or consider how they managed to do so.  *Id.*  Instead, Dr. Macartney rests his opinion that single-serve brewers are in a distinct relevant market on: (1) his personal view that single-serve brewer owners prefer these brewers because they often can brew coffee in less than one minute and require less clean-up, Ex. 1, Macartney Rpt., ¶ 64; and (2) selected Keurig documents and testimony in which the word "market" is used in discussing single-serve brewers, Ex. 1, Macartney Rpt., ¶ 69.  But market definition is a term of art in economics, and these two loose observations fall far short of an expert economic analysis to determine if single-serve brewers constitute a distinct relevant market for antitrust purposes.

Dr. Macartney also briefly opines that the price premium of portion packs over bagged

coffee indicates that there is low substitutability between the two coffee formats.  Ex. 1, Macartney Rpt., ¶¶ 66-67.  But the question of how pricing affects substitution is an empirical one:  If the price of single-serve systems increased, would enough consumers shift to other systems such that brewer pricing is constrained?  Dr. Macartney has not done this analysis.

Similarly, in opining that there is a relevant market for Keurig-compatible packs, Dr. Macartney again performed no economic analysis.  Ex. 31, Macartney Tr. (Vol. II) at 292:13-18.  He did not perform an event study to determine the effect of a relative change in pricing of one single-serve format on another.  *Id.* at 292:19-294:20.  Instead, Dr. Macartney's opinion is based on his personal views that "consumers are prone to sunk costs" generally and do not consider the price of portion packs.  Ex. 1, Macartney Rpt., ¶¶ 14, 26.  Dr. Macartney provides no evidence for these conclusory assertions.  For instance, he did not perform a study to determine the effects of "sunk costs" as applied to coffee.  Single-serve brewers can be purchased for as little as $30, which is hardly a significant sunk cost, and Dr. Macartney did not analyze how this affects portion pack buying, if at all.  Ex. 31, Macartney Tr. (Vol. II) at 300:20-301:7.  His conclusions are simply hypotheses couched as expert opinions, and are unhelpful to the trier of fact.

Dr. Macartney also fails to apply any specialized expertise in his discussion of Keurig's purported possession of monopoly power.  Dr. Macartney opines that Keurig has monopoly power in the alleged single-serve brewer and Keurig-compatible packs markets.  Ex. 1, Macartney Rpt., ¶¶ 24-27.  However, Dr. Macartney does not perform his own calculation to check whether Keurig has monopoly power.  Ex. 31, Macartney Tr. (Vol. II) at 281:5-13.  Instead, his discussion is limited to quoting record evidence that suggests various market shares for Keurig.  Ex. 1, Macartney Rpt., ¶¶ 24-27.  But, as a matter of law, high share is not the same

as monopoly power.[21]  There are well defined analyses that economic experts normally conduct

to determine whether a company has monopoly power, including analysis of whether there are

significant barriers to entry and other tests, none of which Dr. Macartney conducted here.

Dr. Macartney simply points to a couple of anecdotal examples (*e.g.*, two companies tried to

launch single-serve brewers in the early 2000s and failed, Ex. 1, Macartney Rpt., ¶ 69), without

any comprehensive analysis of the dozens of firms that launched single-serve brewers since then

and are still selling brewers today.[22]  Similarly, as to the alleged Keurig-compatible pack market,

Dr. Macartney does no quantitative analysis, and does not even acknowledge testimony that

more than a dozen competitors actually entered the business over the relevant period.[23]

Dr. Macartney further opines that Keurig's conduct was anticompetitive, Ex. 1,

Macartney Rpt. ¶¶ 246-350, but again he fails to support this opinion with any economic

analysis.  In criticizing Keurig's alleged exclusive private label agreements with some retailers,

Dr. Macartney did not analyze the share of sales from which Keurig's competitors were actually

foreclosed from competing.  *Id.*; *see also* Ex. 31, Macartney Tr. (Vol. II) at 390:22-392:4.  He

did not analyze or quantify the increased costs to JBR or any competitor supposedly caused by

---

[21] *See, e.g., L.A. Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1425 (9th Cir. 1993) (even a "100% market share does not demonstrate that [defendant] had the power to control prices or exclude competition"); *Handicomp, Inc. v. USGA,* 2000 WL 426245, at *3-4 (3d Cir. Mar. 22, 2000) (affirming summary judgment for lack of monopoly power where defendant had 72% market share and plaintiff did not prove substantial barriers).

[22] *See* Ex. 3, JBR Responses to RFA Nos. 1498-1505, 1507, 1513, 1515-16, 1522, 1537-41, 1548 ███████████████████████████████████████████████████████████████████████████████████); Ex. 8, JBR 30(b)(6) (Giacomelli) Tr. at 191:18-21 ("Q. So four or five years ago there were maybe eight companies manufacturing Keurig-compatible brewers and today there's at least 20 or 25? A. Oh there's at least, yes, correct."); Ex. 32, Murphy Rpt., Ex. 3.

[23] Ex. 2, Macartney Tr. (Vol. I) at 40:23-41:3 ("I'm saying that there were a lot of brands making compatible portion packs. There was a lot of entry, for instance, as soon as the – as soon as the patents . . . expired in 2012. There was a lot of entry at that point."); Ex. 33, ROG003144817 (████████████ ███████████████████████████████████).

Keurig's conduct.  Ex. 31, Macartney Tr. (Vol. II) at 318:14-20.  Dr. Macartney's analysis of the harm to competition resulting from Keurig's conduct is limited to two pages of vague and conclusory assertions about "limited consumer choice."  Ex. 1, Macartney Rpt., ¶¶ 203-06.

Dr. Macartney's repeated failure to support his opinions with economic analysis shows his report is nothing more than "vigorous assertion (much of it legal analysis in the guise of [economic] expertise), carefully tailored to support plaintiffs' position but devoid of analysis." *Minasian v. Std. Chartered Bank, PLC*, 109 F.3d 1212, 1216 (7th Cir. 1997).  These conclusory non-economic opinions are unhelpful to the trier of fact and should be excluded.

### C.     Dr. Macartney's Opinions Extend Far Beyond His Training as an Economist

It is also impermissible for an expert to opine beyond the scope of his expertise.  *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) ("[D]istrict courts, in their role as gatekeepers, must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise."); *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 485-86 (S.D.N.Y. 2016). Courts exclude expert opinions: (a) on parties' knowledge, motivations, and intent, *Anderson News*, 2015 WL 5003528, at *3; (b) that "impermissibly go to [] beliefs and states of mind," *LIBOR*, 299 F. Supp. 3d at 493; (c) that statements are true or false, *SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 639-40 (E.D.N.C. 2013); and (d) on whether facts are true, *LIBOR*, 299 F. Supp. 3d at 490-91.

Dr. Macartney is rife with impermissible opinions on these topics:

| Issue | Example Opinion Excerpts | |
|---|---|---|
| Parties' Knowledge | Keurig was ██████████████████ Reply Rpt., ¶ 122. | Ex. 27, Macartney |
| Motivation and Intent | Opining on ███████████████ Rpt., ¶ 121. | Ex. 1, Macartney |
| | ████████████████████████████████ Macartney Rpt., ¶ 148. | Ex. 1, |

| Issue | Example Opinion Excerpts |
|---|---|
|  | ████████████████████ Ex. 27, Macartney Reply Rpt., ¶ 95. |
| Veracity of Statements | ████████████████ Ex. 1, Macartney Rpt., ¶ 28; *see also* ¶ 246. ████████████ Ex. 1, Macartney Rpt., ¶ 171. |
| Fact-Finding | ████████████████ Ex. 1, Macartney Rpt., ¶ 200. |
| Other Sample Opinions Outside Scope of Expertise | ████████ Ex. 1, Macartney Rpt., ¶ 101. ████████████████ Ex. 1, Macartney Rpt., ¶ 210. ████████████████████ Ex. 27, Macartney Reply Rpt., ¶ 156. |

Dr. Macartney is an economist.  He is not a lawyer or a patent expert.  He is not an engineer.  He is not an expert on brewers or the coffee industry.  And he is certainly not a mind reader.  *See Rezulin*, 309 F. Supp. 2d at 547 ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony," as "the question of intent is a classic jury question and not one for the experts.").

It is not appropriate for Dr. Macartney to regurgitate JBR's version of the facts to the jury and put his imprimatur as a Ph.D. on that story.  His opinions stray well beyond his training as an economist and should be excluded.

**IV.   Conclusion**

For the foregoing reasons, Keurig respectfully requests that the Court exclude Dr. Macartney's expert reports and testimony in their entirety.

Dated: August 18, 2021

/s/ Leah Brannon
CLEARY GOTTLIEB STEEN & HAMILTON LLP
**George S. Cary**
**Leah Brannon**
**Kenneth S. Reinker**
**Carl Lawrence Malm**
**Alan B. Freedman**
gcary@cgsh.com
lbrannon@cgsh.com
kreinker@cgsh.com
lmalm@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:  202-974-1500
Facsimile:  202-974-1999

**Rahul Mukhi**
rmukhi@cgsh.com
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000

/s/ Gretchen L. Jankowski
BUCHANAN INGERSOLL & ROONEY PC
**Wendelynne J. Newton**
**Gretchen L. Jankowski**
**Mackenzie A. Baird**
wendelynne.newton@bipc.com
gretchen.jankowski@bipc.com
mackenzie.baird@bipc.com
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413
Telephone: 412-562-8800

*Attorneys for Defendant/Counterclaim Plaintiff
Keurig Green Mountain, Inc.*