## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| IN RE: | : | ECF Case |
| | : | |
| | : | MDL No. 2542 |
| KEURIG GREEN MOUNTAIN SINGLE | : | |
| SERVE COFFEE ANTITRUST LITIGATION | : | Master Docket No. 1:14-md-2542-VSB |
| | : | |
| *This document concerns all related actions.* | : | Hon. Vernon S. Broderick |
| | : | |
| | : | **<u>REDACTED PUBLIC VERSION</u>** |
| | : | |
| | x | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE THE PROPOSED TESTIMONY OF KEVIN MURPHY, PH.D.

# TABLE OF CONTENTS

Page

STANDARD OF LAW.................................................................................................... 1

ARGUMENT ................................................................................................................. 2

I.    Dr. Murphy's Opinions Should Be Excluded to the Extent They Do Not "Fit" The Appropriate Legal Framework................................................................................ 2

        A.    Dr. Murphy's Opinions as to the "Product" and "Relevant Markets" at Issue Fail to Comport with Controlling Law. ..................................................... 3

                1.    His Opinion that the Product is a "System" Flouts the Sturm Litigation Holding........................................................................... 3

                2.    His "Relevant Market" Analysis Ignores Controlling Supreme Court Authority. ........................................................................... 4

        B.    Various Other Opinions of Dr. Murphy Flout this Court's Prior Holdings.6

                1.    Dr. Murphy Unreliably Opines that Total Foreclosure is Necessary for Economic Harm........................................................................... 6

                2.    Dr. Murphy Unreliably Opines on Harm to Competition Caused by the Sham Litigations. ..................................................................... 9

                3.    Dr. Murphy Unreliably Opines on Monopoly Power. ................... 9

        C.    This is Not the First Time Dr. Murphy Has Ignored Controlling Court Opinions. ............................................................................................... 11

II.    Apart From Ignoring the Law, Dr. Murphy Failed to Conduct Any Systematic and Accepted Economic Analysis in Arriving at His Market Definition.................... 12

III.    Dr. Murphy's Opinions Ignore and Contradict the Factual Record..................... 18

        A.    Dr. Murphy's "System" Product is Factually Unsupported and Contradicted by the Well-Developed Evidentiary Record. ........................................... 18

        B.    Dr. Murphy's Relevant Market Definition is Factually Unsupported and Contradicted by the Well-Developed Evidentiary Record. ...................... 21

                1.    Dr. Murphy's Market Definition is Underinclusive in Failing to Include Non-Coffee Beverage Products. ...................................... 21

                2.    Dr. Murphy's Market Definition is Overinclusive in Including Products ███████████████. .................................. 22

i

CONCLUSION......................................................................................................................... 25

# TABLE OF AUTHORITIES

Page

**Cases**

*AFMS LLC v. United Parcel Serv. Co.*,
No. CV105830JGBAJWX, 2014 WL 12515335 (C.D. Cal. Feb. 5, 2014)............ 3, 15, 17, 22

*Allen v. Dairy Mktg. Servs., LLC*,
No. 5:09-CV-230, 2013 WL 6909953 (D. Vt. Dec. 31, 2013) ................................................. 6

*Allen–Myland, Inc. v. International Business Machines Corp.*,
33 F.3d 194 (3d Cir.1994)............................................................................................ 14

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946) .................................................................................................... 10

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)........................................................................................... 2

*Bailey v. Allgas, Inc.*,
284 F.3d 1237 (11th Cir. 2002) ............................................................................ 5, 21, 22

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)......................................................................................... 10

*Blessing v. Sirius XM Radio Inc.*,
No. 09 CV 10035 HB, 2011 WL 1194707 (S.D.N.Y. Mar. 29, 2011) ................................... 14

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)............................................................................................... 18, 25

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)........................................................................................... 2, 4, 5, 14

*Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
56 F.3d 359 (2d Cir. 1995)............................................................................................. 4

*Daubert v. Merrell Dow Pharms, Inc.*,
509 U.S. 579 (1993).............................................................................................. 1, 2, 25

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)............................................................................................. 4, 9, 14

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969).................................................................................................... 9

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) ........................................................ 16

*Geneva Pharms. Tech. Corp. v. Barr Labs Inc.*,
    386 F.3d 485 (2d Cir. 2004) ........................................................ 2, 10

*Gulf States Reorganization Grp., Inc. v. Nucor Corp.*,
    2010 WL 11561917 (N.D. Ala. Sept. 2, 2010) ........................................ 22

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) ............................................................ 2

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
    2009 WL 3241401 (S.D.N.Y. 2009) .................................................... 12

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (S.D.N.Y. 2019) ........................................... passim

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ............................................ 3, 22

*In re Visa*,
    2003 WL 1712568 (E.D.N.Y. April 1, 2003) .......................................... 4

*Jefferson Parish Hosp. Dist. v. Hyde*,
    466 U.S. 2 (1984) ........................................................................ 10

*Kentucky v. Marathon Petroleum Co. LP*,
    464 F. Supp. 3d 880 (W.D. Ky. 2020) ............................................. 6, 12

*Keurig, Inc. v. Sturm Foods, Inc.*,
    2012 WL 4049799 (D. Del. Sept. 13, 2012) ...................................... 3, 4

*Keurig, Inc. v. Sturm Foods, Inc.*,
    732 F.3d 1370 (Fed. Cir. 2013) .......................................................... 4

*Koppell v. N.Y. State Bd. of Elections*,
    97 F. Supp. 2d 477 (S.D.N.Y. 2000) ................................................. 12

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ....................................................................... 1

*Leverette v. Louisville Ladder Co.*,
    183 F.3d 339 (5th Cir. 1999) ........................................................ 2, 4, 5

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007) ......................................... 2, 4, 5, 25

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
   275 F.3d 762 (9th Cir. 1997) .................................................................... 16

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   720 F. App'x 24 (2d Cir. 2017) ................................................................. 6

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016) .................................... 6, 10, 12, 25

*Meredith Corp. v. SESAC LLC*,
   1 F. Supp. 3d 180 (S.D.N.Y. Mar. 3, 2014) ............................................ 15

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
   No. 13-cv-01054, 2015 WL 1399229 (C.D. Ill. Mar. 25, 2015)................. 8

*Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*,
   877 F.2d 1333 (7th Cir. 1989) .................................................................. 12

*New York v. Kraft Gen. Foods*,
   926 F. Supp. 321 (S.D.N.Y. 1995)............................................................. 3

*New York v. Microsoft Corp.*,
   224 F. Supp. 2d 76 (D.D.C. 2002) ............................................................ 11

*New York v. Microsoft Corp.*,
   373 F.3d 1199 (D.C. Cir. 2004) ................................................................ 11

*Olin Corp. v. Lamorak Ins. Co.*,
   2018 WL 1901634 (S.D.N.Y. Apr. 18, 2018)........................... 2, 4, 5, 25

*Park v. Thompson Corp.*,
   2007 WL 119461 (S.D.N.Y. Jan. 11, 2007) .............................................. 4

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)............................................................... 2, 25

*Pepsico, Inc. v. Coca-Cola Co., Inc.*,
   No. 98-cv- 3282(LAP), 1998 WL 547088 (S.D.N.Y. Aug. 27, 1998) ................... 8

*Robinson v. Sanctuary Rec. Grps., Ltd.*,
   826 F. Supp.2d 570 (S.D.N.Y. 2011)........................................................ 10

*Times–Picayune Pub. Co. v. United States*,
   345 U.S. 594 (1953).................................................................................. 15

*U.S. v. Microsoft*,
   253 F.3d 34 (D.C. Cir. 2001)...................................................................... 8

*U.S. v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003) .................................................................. 8

*United States v. Archer–Daniels–Midland Co.*,
   866 F.2d 242 (8th Cir.1988) ................................................................ 15

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005) .................................................................. 8

*United States v. Dentsply Int'l, Inc.*,
   546 U.S. 1089 (2006) ............................................................................ 8

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966) ............................................................................ 10

*United States v. H & R Block*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ................................................. 13, 16

*Xerox Corp. v. Media Sciences Int'l*,
   511 F.Supp.2d 372 (S.D.N.Y. 2007) ..................................................... 5

*Xerox Corp. v. Media Scis., Inc.*,
   660 F. Supp. 2d 535 (S.D.N.Y. 2009) ................................................. 10

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) .................................................................. 8

## Other Authorities

*Fed. Trade Comm'n & U.S. Dep't of Justice Horizontal Merger Guidelines* (2010),
   § 4.1.1 and 4.1.2 .......................................................................... 15, 16

## Rules

Federal Rule of Evidence 403 ........................................................................ 1

Federal Rule of Evidence 702 ..................................................................... 1, 2

Plaintiffs[1] request that the Court exclude the testimony of Defendant Keurig Green Mountain, Inc.'s ("Keurig") retained expert witness, Kevin Murphy, Ph.D., because Dr. Murphy's testimony does not satisfy Federal Rule of Evidence 702, the standards set forth in *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993), or Federal Rule of Evidence 403.

Dr. Murphy fails to undertake an economic analysis of the relevant market consistent with controlling law, either by analyzing the *Brown Shoe* factors or the comparable SSNIP test outlined in the DOJ/FTC Merger Guidelines.  This alone renders his market definition opinions unreliable.  Indeed, Dr. Murphy's opinions fail to "fit" the proper legal framework.  His opinions conflict with this Court's holdings in this case applying the governing law, and ████████████████ ████████████████████████████████████  This is not the first time he has ignored Court rulings and acted as a monopolist's mouthpiece rather than as an independent expert: he drew pointed criticism from a Federal District Court 19 years ago for precisely what he attempts again here.

Dr. Murphy's cherry-picked review of the purported facts has also caused him to fail to consider major swaths of evidence.  Nor did he conduct any peer-reviewed analysis for defining a relevant market.  His opinions are thus unreliable for failing to apply his economics background to the correct legal framework or the actual facts, and his opinions should be excluded.

## **STANDARD OF LAW**

The district court is the gatekeeper that ensures expert testimony is admissible if it "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).  To ensure reliability and relevance, expert

---

[1] "Plaintiffs" include TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (collectively, "TreeHouse"), Plaintiff JBR, Inc. (d/b/a Rogers Family Company) ("Rogers" or "JBR"), McLane Company, Inc. ("McLane") and Direct Purchaser Plaintiffs ("DPPs").

testimony must reflect that: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265-67 (2d Cir. 2002); *Daubert*, 509 U.S. at 589.

## ARGUMENT

### I. Dr. Murphy's Opinions Should Be Excluded to the Extent They Do Not "Fit" The Appropriate Legal Framework.

"Expert testimony . . . should be excluded when it applies the wrong legal standard." *Olin Corp. v. Lamorak Ins. Co.*, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018) (citing *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996)). Keurig agrees. *See* Ex. A [Keurig PI Presentation slide 105][2] ("Expert opinions are invalid where they fail to address the proper legal standard.") (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 572 (S.D.N.Y. 2007); *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 341-43 (5th Cir. 1999)). The United States Supreme Court set forth the appropriate framework for analyzing relevant markets in *Brown Shoe Co. v. United States*, where it delineated the factors to be considered in that analysis. 370 U.S. 294, 325 (1962). Courts have excluded market definition analyses that failed to engage in the analysis outlined in *Brown Shoe*. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 106 (2d Cir. 2002) (rejecting market definition where "none of the 'practical indicia' enunciated in *Brown Shoe*" supported the proposed definition); *Geneva Pharms. Tech. Corp. v. Barr Labs Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 994 (C.D.

---

[2] Unless otherwise specified, all cited exhibits are to the Declaration of Mario Moore in Support of Plaintiff's Motion to Exclude the Testimony of Kevin Murphy, Ph.D., filed herewith.

Cal. 2012) (excluding expert opinion "effectively predicated on the analysis of a single *Brown Shoe* factor" that ignored the remaining factors); *AFMS LLC v. United Parcel Serv. Co.*, No. CV105830JGBAJWX, 2014 WL 12515335, at *7 (C.D. Cal. Feb. 5, 2014) (excluding expert who did not "rely on the 'practical indicia' outlined in *Brown Shoe*").

This Court should do the same here.  Rather than using *Brown Shoe* or the well-established Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("DOJ/FTC Merger Guidelines") SSNIP test[3] to guide his analysis, ████████████████████████████ ████████████████████████████████████████████████ *See* Ex. B [Murphy Report] at fn. 261; *see* Ex. D [DOJ Press Release]; *see also* Ex. E [FTC Remarks] at p. 3.

Thus Dr. Murphy's relevant market opinions are unmoored from and ignore *Brown Shoe* and the FTC/DOJ Merger Guidelines.

### A. Dr. Murphy's Opinions as to the "Product" and "Relevant Markets" at Issue Fail to Comport with Controlling Law.

####  1. *His Opinion that the Product is a "System" Flouts the Sturm Litigation Holding.*

████████████████████████████████████████████████
████████████████████████████████████████████████
████████

The problem with this foundational opinion is not only that it ignores undisputed record evidence to the contrary,[4] but it is an effort to relitigate an issue that Keurig *conceded* over eight years ago in the sham *Sturm* litigation.  *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799, at *6 (D. Del. Sept. 13, 2012).  The district court there rejected Keurig's effort to avoid the application

---

[3] *See, infra* at 16-17. This Court has recognized that that "determination of the relevant product market" is informed by not only *Brown Shoe*, but also the FTC/DOJ Merger Guidelines.  *New York v. Kraft Gen. Foods*, 926 F. Supp. 321, 359-360 (S.D.N.Y. 1995).  "The Merger Guidelines organize the factors noted in Brown Shoe and its progeny in a two-step analysis." *Id.* at 359.

████████████████████████

of the longstanding patent exhaustion doctrine to its brewer sales to consumers, stating, "*[t]here is no dispute* that the brewers . . . are sold in a completed form in accordance with the [Keurig] patents." *Id.* at *5-6 (emphasis added). Affirming, the Federal Circuit held that any test relating to incomplete products was not applicable because the brewer Keurig sold was a completed product. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373-74 (Fed. Cir. 2013).

Dr. Murphy disregards this ruling, which has collateral estoppel effect on Keurig,[5] █████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ But, in addition to ignoring reality,[6]

Dr. Murphy's "system" product ignores the findings of the *Sturm* litigation courts and should be excluded for failing to "fit" these findings. *Louis Vuitton Malletier*, 525 F. Supp. at 572; *Olin Corp.*, 2018 WL 1901634, at *21; *Leverette*, 183 F.3d at 341-43.

### 2. *His "Relevant Market" Analysis Ignores Controlling Supreme Court Authority.*

Dr. Murphy fails to offer any economic analysis within the framework of the factors set out by the Supreme Court in *Brown Shoe Co. v. United States* to arrive at his market definition. Pursuant to *Brown Shoe*, the "practical indicia" factors to be used for analyzing the relevant product market are: (1) industry or public recognition of the submarket as a separate economic entity, (2) the product's peculiar characteristics and uses, (3) unique production facilities, (4)

---

[5] *See, e.g., Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995) (noting collateral estoppel bars relitigation of issues actually litigated and decided in prior proceeding).
[6] ███████████████████████████████████████████████████████████████ *see also* ECF No. 409 [Keurig Ans. to THS Am. & Supp. Compl.], ¶¶ 436, 438, 613 (admitting brewers and cups are sold separately); Ex. J [Howe Dep.] at 84:23-85:02 (testifying that brewers and cups did not need to be sold together); Ex. C at 287:17-288:07 (testifying that brewers and cups are purchased separately). The law is well-settled that complementary products are distinct products where they are sold separately as they are here. *See In re Visa*, 2003 WL 1712568, at *2-3 (E.D.N.Y. April 1, 2003); *Park v. Thompson Corp.*, 2007 WL 119461, at *3-4 (S.D.N.Y. Jan. 11, 2007); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462-63 (1992). ████████████████████████
████████████████████████████████████████████████████████████

distinct customers, (5) distinct prices, (6) sensitivity to price changes, and (7) specialized vendors. *Brown Shoe*, 370 U.S. at 325.  Dr. Murphy not only failed to perform economic analysis applying this legal framework, but he testified that he was not familiar with the *Brown Shoe* factors.  Ex. C at 275-276.  Instead, flying in the face of governing Supreme Court authority, Dr. Murphy ████

████████████████████████████████████████████████████████████████████████████████████

substitutes a vague, standardless method of defining the relevant market.[7]  By contrast, Plaintiffs' experts conducted thorough analyses using the *Brown Shoe* and the FTC/DOJ Merger Guidelines framework.[8]

In short, Dr. Murphy cast aside the need to conduct economic analysis consistent with the factors set out by the Supreme Court in *Brown Shoe* for defining a relevant market, such as the analysis conducted by Dr. Sibley, or the SSNIP test, ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  Indeed, Dr. Murphy relied on a standardless analysis that was unmoored from and incompatible with the governing case law.  This renders his market definition unreliable, irrelevant, and likely to cause juror confusion.  *See Louis Vuitton Malletier*, 525 F. Supp. 2d at 572; *Olin Corp.*, 2018 WL 1901634, at *21; *Leverette*, 183 F.3d at 341-43; *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1248 (11th Cir. 2002) (criticizing expert's

---

[7] Among other failings, Dr. Murphy fails to even consider that the consumables for drip coffee "systems" (that is, whole bean or ground coffee) are not interchangeable with the consumables for Keurig brewers (K-Cup comparable pods).  *See Xerox Corp. v. Media Sciences Int'l.*, 511 F.Supp.2d 372, 384 (S.D.N.Y. 2007) (assessing plaintiff's definition of relevant product market consisting of color ink sticks for printers, but excluding non-compatible consumables for other printer types, such as inkjet or toner cartridges and noting that "no other consumables are acceptable substitutes.  Solid ink sticks are, literally and technically, not interchangeable with other consumables.  [So the plaintiff] has defined a product market that is both plausible and bears a rational relationship to the rule of reasonable interchangeability.").

[8] For a comparison of how a thorough analysis using the Brown Shoe practical indicia provides for a reliable market definition, see Ex. F [Sibley Report], ¶¶ 31-80 and 84-111.  See also Ex. S [Macartney Report], ¶¶ 63-70.

failure to analyze historical prices charged by relevant industry players and "failure to address customer convenience and preference"); *Allen v. Dairy Mktg. Servs., LLC*, No. 5:09-CV-230, 2013 WL 6909953, at *9 (D. Vt. Dec. 31, 2013) (granting motion to exclude expert's opinions where his "two very different versions of an analysis purporting to be a SSNIP test" would be misleading and yield no reliable conclusions); *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 891 (W.D. Ky. 2020) (expert opinion on relevant market inadmissible where expert acknowledged hypothetical-monopolist test "provides a guide" to defining relevant market but failed to employ it or any other reliable methodology); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 643 (S.D.N.Y. 2016) ("[A]s with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or delay."), *aff'd*, 720 F. App'x 24 (2d Cir. 2017).

**B. Various Other Opinions of Dr. Murphy Flout this Court's Prior Holdings.**

In addition to their unreliability and failure to address the nature of the product at issue and market definition, Dr. Murphy's analyses are fully inconsistent with this Court's holdings as to the applicable law on substantial foreclosure, harm to competition, and the test for monopoly power.

**1. *Dr. Murphy Unreliably Opines that Total Foreclosure is Necessary for Economic Harm.***

In its Opinion & Order ("O&O") resolving Keurig's Motions to Dismiss Plaintiffs' complaints, this Court relied upon the long-standing legal doctrine that, under a substantial foreclosure analysis, "it is not necessary that all competition be removed from the market. **The test is not total foreclosure**, but whether the challenged practices **bar a substantial number of rivals or severely restrict the market's ambit**." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.* ("*In re KGM*"), 383 F. Supp. 3d 187, 236 (S.D.N.Y. 2019) (emphases added). Along the same lines, the Court rejected Keurig's argument that an increase in sales or

some successful competition by a competitor indicates a lack of foreclosure.  *Id*. at 235-36.

Dr. Murphy's opinions conflict with this legal standard and, indeed, his own prior writings.[9]  Instead of following the controlling standard, ███████████ an irrelevant, obsolete legal framework—a Department of Justice ("DOJ") report (*see* Ex. B, fn. 261) that was long ago ***withdrawn*** with an official statement by the DOJ that the report "will no longer be Department of Justice policy" and that "[c]onsumers, businesses, courts and antitrust practitioners should not rely on it as Department of Justice antitrust enforcement policy."  *See* Ex. D; *see also* Ex. E at p. 3.  Thus, although the DOJ withdrew the statement over a decade ago, ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ ██████████████████████████████

████████████████████████████████████████████

████████████████████████  Not only was Dr. Murphy unable to cite any standard supporting such opinions (Ex. C at 422:6-424:10), but both opinions rely on a distorted reading of the law that this Court has already rejected.  *See In re KGM*, 383 F. Supp. 3d at 235-36 & n.29 (rejecting Keurig argument and citing case law holding exclusion from just two retailers may be sufficient to substantially foreclose competition).

The absurdity resulting from Dr. Murphy's failure to fit his analyses to the relevant legal standards is evident, for example, when he refused to concede that, ████████████████

---

[9] Dr. Murphy did not previously suggest ████████████ that total foreclosure was necessary for economic harm, instead writing that exclusive agreements can be anticompetitive where a "*sufficient share* of distribution is controlled" such that competitors are prevented from *effectively* distributing their products." Ex. K ["How Exclusivity is Used to Intensify Competition" (2011)] at pp. 691, 694 and 698 (emphases added). Thus, not only does he fail to cite any economic literature supporting his "total foreclosure" standard, but his own writings contradict it.
[10] This Murphy Report also was marked as Plaintiffs' Dep. Exhibit 3137.

███████████████████████████████████████████████████████████████

████████████████████████████████ [11] then that would be sufficient to constitute foreclosure.

Ex. C at 479-81.  That is not consistent with well settled case law and the O&O of this Court.  *In re KGM*, 383 F. Supp. 3d at 235-40 (noting "the law on substantial foreclosure . . . does not require a complete lack of growth to sustain a Section 2 claim") (citing 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 651b5, at 108-09 (3d ed. 2008); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191, 193-95 (3d Cir. 2005), *cert. denied*, 546 U.S. 1089 (2006); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012)).

Similarly, Dr. Murphy refused to concede that ███████████████████████

███████████████████████████████████████████████████████████████

████████████████████████ then that would be enough to show substantial foreclosure. Ex. C at 543.  Again, this conflicts with governing case law relied upon by this Court.  *See U.S. v. Microsoft*, 253 F.3d 34, 70-71 (D.C. Cir. 2001) (Section 2 violated by substantial foreclosure of major competition in only one distribution channel); *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 240 (2d Cir. 2003) (foreclosure can occur in single market "segment"); *Dentsply Int'l, Inc.*, 399 F.3d at 191, 193-95 (foreclosure of efficient means of distribution resulting in raising rivals' costs constitutes exclusive dealing), *cert. denied*, 546 U.S. 1089 (2006); *see also Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 13-cv-01054, 2015 WL 1399229, at *4-7 (C.D. Ill. Mar. 25, 2015); *Pepsico, Inc. v. Coca-Cola Co., Inc.*, No. 98-cv- 3282(LAP), 1998 WL 547088, at *18 (S.D.N.Y. Aug. 27, 1998).

Dr. Murphy's failure to fit his opinions within the governing legal framework is fatal.  Dr. Murphy's opinions on substantial foreclosure, flouting this Court's rulings and based on a

---

[11] Ex. L [McGinn, "The Buzz Machine," *The Boston Globe* (Aug. 7, 2011)]; Ex. F, ¶¶ 373-381.

withdrawn statement that has been rejected by the federal antitrust authorities, should be excluded.

### 2. Dr. Murphy Unreliably Opines on Harm to Competition Caused by the Sham Litigations.

Dr. Murphy's opinions once again disregard this Court's O&O when he opines there was no harm to competition caused by the sham litigations[12] brought by Keurig against Sturm and Rogers. Ex. C at 254-56.  Indeed, as this Court previously held, "[l]itigation costs incurred in defending against a sham litigation are 'a well recognized type of antitrust injury.'"  *In re KGM*, 383 F. Supp. 3d at 232; Ex. M [Plt. Dep. Ex. 3147] at p. 53; Ex. C at 258-59.  Rogers and TreeHouse expended legal fees defending against Keurig's sham litigations, *see, e.g.,* JBR AC ¶¶ 173, 329; THS AC ¶ 602, a fact that is not disputed and was not considered by Dr. Murphy in reaching his opinion. Ex. C at 258.

### 3. Dr. Murphy Unreliably Opines on Monopoly Power.

Dr. Murphy's disregard of the legal standard makes his opinions on Keurig's monopoly power unreliable in at least two ways.

*First*, Dr. Murphy opines that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ this Court's articulation of the law: "a monopolist might in fact charge at or below cost for the tying product to extract monopoly surplus from the tied product."  *In re KGM*, 383 F. Supp. 3d at 226.  This Court recognized that monopolists may as an economic matter "evade price control in the tying product through clandestine transfer of the profit to the tied product."  *Id.* (citing *Eastman Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 487 (1992) (quoting *Fortner Enters., Inc. v. U.S. Steel Corp*., 394 U.S. 495, 513-14 (1969)); *Jefferson Parish Hosp. Dist. v.*

---

[12] JBR AC ¶¶ 174, 330  (ECF No. 83 in 14-cv-4242); THS AC ¶¶ 41, 43, 227-28, 230-31 (ECF No. 86 in 14-cv-905); DPP AC ¶ 129 (ECF No. 237).

*Hyde*, 466 U.S. 2, 12 (1984); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979); *Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 539 (S.D.N.Y. 2009); *see also In re KGM*, 383 F. Supp. 3d at 226 ("In sum, pricing Single Serve Brewers at or below cost in no manner suggests that the Single Serve Brewer Market is somehow broader than defined, or that Keurig does not in fact enjoy monopoly power in that market."). ██████████████████████

██████████████████████████████████ conflicts with the law of the case.  *Robinson v. Sanctuary Rec. Grps., Ltd.*, 826 F. Supp.2d 570, 575 (S.D.N.Y. 2011).

Second, Dr. Murphy ignores settled law relating to the market share that will give rise to an inference of monopoly power.  As this Court stated in its O&O, market share of 85% or more or the ability to control the market "support an inference of a 'substantial monopoly' and monopoly power."  *In re KGM*, 383 F. Supp. 3d at 227 (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966) (87% is a "substantial monopoly"); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) ("over 80%" constitutes "a substantial monopoly"); *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004).  Contrary to the O&O and Supreme Court precedent, Dr. Murphy defines a monopolist ████████████████████████████████ ██████████████████████████████████████████ That is inconsistent with the law and thereby infects his analyses and ultimate opinions.  Dr. Murphy admitted he did not consider this Court's recitation of the controlling legal standard when generating his opinions. Ex. M at p. 47; *see also* Ex. C at 385-86.  Dr. Murphy's extreme definition of what qualifies as a monopolist should be excluded for being in conflict with the law set out by this Court, and because it will likely confuse the jury about what it means to be a monopolist.  *See LVL XIII Brands*, 209 F. Supp. 3d at 643 ("[A]s with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion, or delay.").

**C.  This is Not the First Time Dr. Murphy Has Ignored Controlling Court Opinions.**

Dr. Murphy has previously been admonished for disregarding court rulings.  *See New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 151 (D.D.C. 2002), *aff'd*, 373 F.3d 1199 (D.C. Cir. 2004); Ex. N.  The district court found in that case that Dr. Murphy's opinion—that Microsoft's conduct had no anticompetitive effects—were of little value because they disregarded the factual record and liability conclusion of the district court, which were affirmed by the D.C. Circuit:

> Dr. Murphy concluded that Microsoft's anticompetitive conduct did not have a significant effect on Navigator, Java, or Microsoft's position in the market for Intel-compatible PC operating systems.  Murphy ¶¶ 92, 104, 157.  ***The Court finds that Dr. Murphy's conclusions as to the effect of Microsoft's conduct upon Navigator and Java are <u>factually in conflict with the conclusions of the appellate court</u> that gave rise to the findings of liability in this case***.  See Microsoft, 253 F.3d 34 … Dr. Murphy's conclusion that the anticompetitive conduct identified in this case had no effect upon Microsoft's monopoly ***can be seen to <u>undercut, if not directly contradict, the inference of causation necessary to the appellate court's imposition of liability</u>***.  Although Dr. Murphy has protested any assertion that his analysis ignores, contradicts, or second-guesses the findings of the appellate court, the Court disagrees.  See, e.g., Tr. at 4068 (Murphy).
>
> . . . .
>
> The Court harbors ***<u>serious concerns as to the usefulness</u> of Dr. Murphy's causation analysis***.  Most troubling to the Court in examining Dr. Murphy's analysis is the fact that many of the ***conclusions reached by Dr. Murphy cannot be reconciled logically with significant portions of the appellate court's opinion***. See supra Part III.E.2.b.i.  Based upon the Court's concerns as to the basis for Dr. Murphy's causation analysis, the Court ascribes little, if any, weight to this portion of Dr. Murphy's testimony.

*Microsoft*, 224 F. Supp. 2d at 151.  Despite those admonitions, Dr. Murphy has engaged in the same conduct here: issuing opinions conflicting with the law and prior orders of this Court.

Dr. Murphy's opinions thus are irrelevant and not useful in that they fail to fit within the governing legal framework.  Moreover, they create a substantial risk of confusing the jury in that they rely on legal conclusions that have already been rejected by this Court.  Dr. Murphy's opinions

should accordingly be excluded under Rule 702 for failing to assist the trier of fact as well as under Rule 403 because the risk of confusing and misleading the factfinder outweighs any probative value. *See LVL XIII Brands*, 209 F. Supp. 3d at 643 ("[A]s with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or delay.").

## II. Apart From Ignoring the Law, Dr. Murphy Failed to Conduct Any Systematic and Accepted Economic Analysis in Arriving at His Market Definition.

As Keurig itself has acknowledged, "it does not assist the jury for an economist to resolve disputed facts and draw conclusions without economic analysis." ECF No. 1408 at 25 (citing *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *16 (S.D.N.Y. 2009)). But Dr. Murphy does exactly that, disregarding the requirement that expert opinion must rely on the searching reasoned analysis reflective of the skills of someone in the expert's field of endeavor, not statements parroting counsel. *In re Fresh Del Monte Pineapples Antitrust Litig.*, 2009 WL 3241401, at *16 (rejecting testimony where expert did not perform a "reasoned economic analysis"); *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481-82 (S.D.N.Y. 2000) (similar); *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333, 1340 (7th Cir. 1989) (rejecting testimony that did not "draw[] on the skills of an economist"). Because Dr. Murphy did not use the tools in his expert toolkit, his analysis is unreliable.

Although ███████████████ the appropriate test for defining a relevant market is whether products are "sufficiently close substitutes" so that the pricing of one will constrain the prices of the other ███████████████ apart from his disregard of the applicable legal standard (discussed above) he does no economic analysis to see if this was the case as between, for example, drip coffee brewers and single-serve brewers (much less "systems"). *Marathon Petroleum Co. LP*, 464 F. Supp. 3d at 890 (excluding market definition opinion where not based

on reliable methods). ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ Dr.

Murphy used no well accepted methods to assess this.

For example, Dr. Murphy admittedly did not analyze how many consumers actually switched from bagged coffee to single serve or vice versa ██████████ and he did no analysis as to the effect the cost of a new brewer or the cost of the existing brewer would have on a consumer's purchasing behavior.  *Id.* at 174.[13]  Moreover, Dr. Murphy did not explain how his opinions can be reconciled ████████████████████████████████████

████████████████████████████████████████████

████████████ ████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Dr. Murphy's report does not cite to *any* authority—whether economic literature or even established legal principles provided to him by his counsel—that purports to use

---

[13] Contrary to Dr. Murphy's opinion, ██████████████████████
████████████████ does not prove they are in the same market whether as a matter of law or common sense.  As the *United States v. H & R Block* court noted in an analogous situation: "When the automobile was first invented, competing auto manufacturers took customers primarily from companies selling horses and buggies, . . . but that hardly shows that cars and horse drawn carriages should be treated as the same product market." 833 F. Supp. 2d 36, 55 (D.D.C. 2011) (citation and internal quotation marks omitted).

[14]
████████████████████████████████████████████████
████████████████████████████████████

this nameless method, and he could not provide any citation to any economic literature supporting his method during his deposition. Ex. C at 272-273.

Dr. Murphy's systems theory ignores the basic principle that products must be reasonably interchangeable for the same use in order to be in the same market. *Eastman Kodak CoU*, 504 U.S. at 482 ("[T]he outer boundaries of a relevant market are determined by reasonable interchangeability of use."); *Brown Shoe*, 370 U.S. at 325 (same); *Blessing v. Sirius XM Radio Inc.*, No. 09 CV 10035 HB, 2011 WL 1194707, at *7 (S.D.N.Y. Mar. 29, 2011); *Allen–Myland, Inc. v. International Business Machines Corp.*, 33 F.3d 194, 206 (3d Cir.1994) ("Interchangeability implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively."). Dr. Murphy's opinion ignores this controlling law and common sense: (1) the fact that a supplier of complementary products, like a printer manufacturer, may consider the pricing of its printers when it prices its ink does not mean printers and ink are in the same market—they do not have the same use; and (2) ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ Unsupported by peer reviewed literature or market definition case law and defying real life experience, Dr. Murphy's "method" is wholly unreliable—he fails to delineate which products are interchangeable for the same use.

Instead of his invented methodology, several accepted methodologies were available to Dr. Murphy to help him determine whether or not his purported products (single-serve "systems" and multi-cup "systems") were sufficiently close substitutes. But while Dr. Murphy acknowledged the usefulness of these analyses, he simply did not do any of them.

***No analysis of cross-elasticity of demand.*** Dr. Murphy states that it is a "well-known

principle in economics that the cross-elasticity . . . is a direct measure of the degree of substitutability" of products used to determine if they are in the same market. Ex. C at 159. The law recognizes the utility of cross-elasticity of demand. *Times–Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 (1953) (noting relevant market must be drawn narrowly to exclude products whose cross-elasticities of demand are small; that is, a product should be excluded where only a limited number of buyers will purchase it upon a reasonable variation in price). Despite admitting that cross-elasticity of demand is a "well known principle" used in market definition, Dr. Murphy does not perform such an analysis as to the products that fell within his purported "system" product definition. Ex. C at 309. Nor does he apply any other acceptable methodology, rendering his opinions subject to exclusion. *AFMS LLC*, 2014 WL 12515335, at *7 (excluding market definition expert who did not analyze cross-elasticity of demand or apply other accepted methodologies).

**No SSNIP test.** Dr. Murphy failed to conduct a SSNIP test to support his market definition. The SSNIP test is described in the DOJ and FTC Horizontal Merger Guidelines as a methodology for determining the scope of a relevant product market. *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 218 (S.D.N.Y. Mar. 3, 2014).[15] A market is "properly defined under the Guidelines when a hypothetical profit-maximizing firm selling all of the product in that market could charge significantly more than a competitive price, *i.e.*, without losing so many sales to other products that its price became unprofitable." *Id.*; DOJ Horizontal Merger Guidelines § 4.1.1; *see also United States v. Archer–Daniels–Midland Co.*, 866 F.2d 242, 248 (8th Cir.1988) (functionally interchangeable sweeteners were separate product markets because "a small change in the price of [one] would have little or no effect on the demand for [the other]"); *Lucas Automotive Engineering,*

---

[15] Keurig's economics expert Dr. Ugone has acknowledged that the tests set out in the DOJ Horizontal Merger Guidelines are commonly used to assess market definition in antitrust cases even outside the merger context. Ex. R [Ugone 3/17/21 Dep.] at 257:8-259:13.

*Inc. v. Bridgestone/Firestone, Inc*., 275 F.3d 762, 767 (9th Cir. 1997) ("The determination of what constitutes the relevant product market hinges, therefore, on a determination of those products to which consumers will turn, given reasonable variations in price.").  In short, the SSNIP test answers the question of whether a company could hypothetically raise prices 5% or more over a given set of products; if the answer is yes, then that product set constitutes the relevant market over which the entity has monopoly power.  *See United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 51-52 (D.D.C. 2011) (citing *Fed. Trade Comm'n & U.S. Dep't of Justice Horizontal Merger Guidelines* (2010), § 4.1.1 and 4.1.2).

SSNIP tests are particularly helpful because they are straightforward to conduct, and intuitive in their results, heavily aiding the trier of fact.  Ex. F, ¶ 112; Ex. S [Macartney Report], ¶¶ 11-12.  But even though Dr. Murphy claims that so-called drip coffee "systems" are in the same product market as so-called single-serve "systems" (such as the Keurig 2.0 Brewer), he did no SSNIP test to determine whether a small change in the price of the drip "system" would have any effect on the demand for the 2.0 Brewer "system."  This failure of analysis is contrary to his past practice.  *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (both Dr. Murphy and opposing expert did SSNIP test in aid of market definition).

████████████ the relevant market was Compatible Cups and that Keurig has monopoly power in that product market.  *See, e.g.*, Ex. F, ¶¶ 112, 156, 158-163, 205-214; Ex. S, ¶¶ 11, 64, 67.

Dr. Murphy's unsupported "qualitative" analysis—for which there is no peer reviewed standard or support to suggest that it is similar to a SSNIP analysis—should be excluded because it fails to meet the *Daubert* standards for peer review, reliability, and general acceptance in the scientific community.

*Ad-hoc treatment of high-pressure brewers.*  Similarly, while Dr. Murphy asserts that high pressure espresso type brewers (that can cost $5000 or more [Ex. C at 374:10-375:20]) are in the same market as Keurig brewers which are typically priced between $79 and $199,[16] he failed to do any analysis to determine whether low- and high-pressure brewers are appropriately included in the same market.  Ex. C at 365.  In fact, when confronted with examples of high-pressure brewers that sold for many multiples of the prices of Keurig brewers, ███████████████ ████████████████████████████████████████████████  But it is inappropriate for an expert to purport to define a market and then eliminate candidates from that market by mere *ipse dixit*, without analysis.  *AFMS LLC*, 2014 WL 12515335, at *7 (excluding market definition opinion that did "not apply any of the accepted methodologies" for defining a relevant market, and noting that "the vagueness of [the expert's] methodology is particularly troublesome in the antitrust arena where economic models and analysis are required").  Such an

───────────────────

█ ████████████████████████████████████████████

ad hoc approach to high-pressure brewers serves only to demonstrate the inappropriateness of the proposed defined market.

### III.  Dr. Murphy's Opinions Ignore and Contradict the Factual Record.

#### A.  Dr. Murphy's "System" Product is Factually Unsupported and Contradicted by the Well-Developed Evidentiary Record.

As noted above, Dr. Murphy proposes that two separate products—a brewer and beverage base, like coffee, tea, hot cocoa, or certain food products—are actually **one** product, a "system." Ex. B, ¶¶ 13, 16, 150.  But apart from being precluded by Keurig's admission and the holding in *Sturm* case (*see*, pp. 3-4, *supra*), Dr. Murphy's Frankenstein product is unsupported and contradicted by the record facts, and his own testimony reveals the illogic of his attempts to shoehorn two products into one.  Expert testimony that is contrary to the record facts is not useful to the jury. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242-43 (1993).



---

[17] Not only did Dr. Murphy not attempt to contact Keurig personnel about facts relating to issues relevant to his "analysis," Ex. C at 474-75, but he was unfamiliar with the roles of key Keurig executives, including CEO Brian Kelley, Mr. Kelley's predecessor, Keurig CEO Larry Blanford; Keurig U.S. Sale and Marketing Head John Whoriskey; former Keurig President Michelle Stacy; former Keurig head of consumer insights Bruce Godfrey; former head of AFH Dan Cignarella; SVP of Sales Ron DiFabio; and former Investor Relations head Suzanne DuLong.  *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

Under Dr. Murphy's "system" product theory one would predict that, as the price of one component of the "system" (*e.g.*, the Keurig brewer) decreases, the price of the complementary component (*e.g.*, the portion pack) increases, as he acknowledges.  Ex. B at ¶ 314; Ex. C at 305.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

The second basis for his "system" theory is likewise unsupported and contradicted by the facts. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

at 472-74.  Indeed, reflecting his cursory and incomplete review of Keurig's documents, Dr. Murphy could not name a single Keurig executive who served in senior management from February of 2010 to March 2021.  *Id.* at 474.

[REDACTED]

Underpinning Dr. Murphy's opinion that the product is a "system" that competes with other "systems" (like drip brewers) is the assumption that consumers calculate and compare the prices of these so-called "systems" when they make their purchase decisions. Ex. B, ¶¶ 150, 153-55. But Dr. Murphy cites no facts supporting this assumption, and he admitted that purchasers of single-serve brewers do not do a formal or specific calculation of the cost of the "system." Ex. C at 350.

[REDACTED]

[REDACTED] So there is no evidence that consumers even perform a calculation of even one component of Dr. Murphy's "system" (the cups), much less a life-cycle calculation of the "system" as a whole.[19]

Dr. Murphy's system theory also ignores common sense and practical consumer reality: as noted above, consumers may consider the prices of complementary products (*e.g.*, cars and gasoline) in making the purchase of a primary product even if those products are not in the same market. Ex. C at 356. And while there is no evidence that Keurig priced brewers and cups together, even if there were, Dr. Murphy is unable to cite to any economic literature, agency guideline or court opinion suggesting that this is a determinative or useful factor in defining a relevant market.

Given the lack of economic rationale and contradiction of the record evidence, it is perhaps

---

[18] [REDACTED]

[19] The lack of consumer life-cycle calculation as to "systems" is also evident from other undisputed facts: Keurig brewers are frequently sold in different sections of retail stores or received by consumers as gifts without any investigation by the gift giver or receiver of the overall life-cycle cost. Ex. C at 355.

not surprising that, in his deposition, Dr. Murphy was unable to name a single other case where the relevant product market was defined in terms of a "system." Ex. C at 150.  Similarly, here, the Court should not permit Dr. Murphy's unreliable opinion that the product at issue is a "system."

**B.    Dr. Murphy's Relevant Market Definition is Factually Unsupported and Contradicted by the Well-Developed Evidentiary Record.**

As shown above, the relevant product for market definition cannot be a "system" product comprised of both a brewer and a portion pack or some other means of delivering coffee.  However, even if such a product identification is accepted, Dr. Murphy's market definition is unreliable for several reasons.  Indeed, his market definition is both underinclusive and overinclusive.

*1.    Dr. Murphy's Market Definition is Underinclusive in Failing to Include Non-Coffee Beverage Products.*

Dr. Murphy states that ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████   Ex. B, ¶ 15.  But this market definition ignores beverage and food products that even Keurig admits are at issue, such as teas, ciders, and cocoas, contradicting the pleadings as well as Dr. Murphy's prior testimony.  An economist cannot define a market that eliminates products that the parties concede are at issue.  *Bailey*, 284 F.3d at 1247 (criticizing expert's "cursory assessment of reasonable substitutes for liquid propane gas" where expert had "acknowledged the existence of several alternative residential fuel sources, including electricity, coal, wood, and heating oil").

Keurig's Answer admits that the single-serve cups include beverages other than coffee (*e.g.*, tea and hot cocoa) (ECF No. 416 ¶¶ 20, 22), and ████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

21

███████ █████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███

In spite of all these admissions, Dr. Murphy maintains that he would not need to consider tea in his product definition analysis.  *Id.* at 157, 316.  Moreover, after ignoring beverage bases besides coffee, Dr. Murphy fails to ever calculate Keurig's share of his purported "coffee brewing systems" market, begging the question as to how he could conclude Keurig was not a monopolist. *Id.* at 432.  This was a fundamental omission.[21]  *Gulf States Reorganization Grp., Inc. v. Nucor Corp.*, 2010 WL 11561917, at *23 (N.D. Ala. Sept. 2, 2010) (noting that market definition analysis that fails to assess market share is "fundamentally flawed") (citing *Bailey*, 284 F.3d at 1250).

In short, Dr. Murphy's "coffee brewing systems" market is underinclusive because it fails to include products that are admittedly at issue in the case.

### 2. Dr. Murphy's Market Definition is Overinclusive in Including Products ████ █████████████████████

Dr. Murphy's market definition is also overinclusive.  ███████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[20] Dr. Murphy previously made the same admission at the preliminary injunction phase of this case, noting that the cups at issue could include a beverage base other than coffee (*e.g.*, tea). Ex. AA [PX 3145 - Murphy Decl.], ¶ 25; Ex. B, ¶ 25.

[21] Dr. Murphy's "no monopoly" opinion suffers from another fatal flaw:  he performs no analysis of prices for the relevant time period.  Specifically, he ignored 2010 when THS entered the market and 2011 when JBR entered the market, instead beginning his analysis with 2012.  Ex. C at 274.  To the extent Dr. Murphy purports to determine monopoly power by examining pricing in the market, his analysis is unreliable for ignoring two years of data.  *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 974 (C.D. Cal. 2012) (striking expert testimony that left out a years' worth of data completely from the regression model); *AFMS LLC*, 2014 WL 12515335, at *8 (excluding opinion and noting that "detailed examination of market data and a thorough economic analysis are required for admissibility of 'antitrust economics' opinions").

cup systems" such as drip brewers.  *Id.* ¶ 156. 

—even if that product definition is

accepted—competes with multi-cup drip brewers.



 Dr.

Murphy did not consider any of this evidence.

    Case law focusing on market definition often turns at the start (as *Brown Shoe* advises) to

the first *Brown Shoe* factor: the recognition of the market by industry participants.  But Dr.

Murphy's market definition improperly ignores all of the evidence as to what Keurig and others

considered to be the relevant market.  Murphy did not address any of Keurig's public statements

or internal business documents describing its high market share.  He includes both drip coffee

---



makers and high-pressure brewers, and—to make matters worse—he unilaterally and without guidance decides what particular machines are in and which ones are out, even though they fit his literal definition.  In short, Dr. Murphy's market definition is overinclusive and impermissibly vague and arbitrary, and therefore unreliable, and it should be excluded on this ground as well. What little evidence he has cherry-picked does not even support his analysis, which fails to set forth any reliable methodology, as opposed to an I'll-know-it-when-I-see-it approach to what is in and out of the market.  Thus, far from being of use in providing guiding principles or an applicable and scientifically tested or accepted methodology, Dr. Murphy's opinions should be excluded on the basis that they fail to fit the facts of the case, will not help the factfinder, are irrelevant and contrary to the governing legal framework and recognized market definition methodologies, and risk confusing the factfinder.  *Daubert*, 509 U.S. at 589; *Olin Corp*., 2018 WL 1901634, at *21; *Louis Vuitton Malletier*, 525 F. Supp. 2d at 572; *PepsiCo, Inc*., 315 F.3d at 106; *LVL XIII Brands*, 209 F. Supp. 3d at 643; *Brooke Grp. Ltd.*, 509 U.S. at 242-43.

## CONCLUSION

Dr. Murphy's opinions fail to apply the governing legal framework, including the law of the case, and fail to apply basic economic, peer-reviewed tools, instead using standardless *ipse dixit* pronouncements without a review of the core evidence–including admissions by Keurig itself–that undermine his analysis.  His opinions should therefore be excluded because they do not aid the trier of fact with reliable evidence supported by methods generally accepted in the scientific community and instead presents a danger of confusing the issues and misleading the fact finder.

Dated: August 18, 2021                    Respectfully submitted,


                            By:      _/s/ Daniel Johnson Jr._____
                                     Daniel Johnson Jr. (CA Bar No. 57409)
                                     Mario Moore (CA Bar No. 231644)
                                     Robert G. Litts (CA Bar No. 205984)
                                     Dan Johnson Law Group, LLP
                                     1350 Old Bayshore Highway, Suite 520,
                                     Burlingame, CA 94010
                                     Telephone: 415-604-4500
                                     Email: dan@danjohnsonlawgroup.com
                                     Email: mario@danjohnsonlawgroup.com
                                     Email: robert@danjohnsonlawgroup.com

                                     *Counsel for Plaintiff*
                                     *JBR, Inc. d/b/a Rogers Family Company*

                                     Aldo A. Badini
                                     abadini@winston.com
                                     Susannah P. Torpey
                                     storpey@winston.com
                                     WINSTON & STRAWN LLP
                                     200 Park Avenue
                                     New York, NY 10166-4193
                                     (212) 294-6700
                                     (212) 294-4700 (fax)

                                     Dan K. Webb
                                     dwebb@winston.com
                                     WINSTON & STRAWN LLP
                                     35 West Wacker Drive
                                     Chicago, IL 60601-9703
                                     (312) 558-5600

                                     Diana L. Hughes
                                     dhughes@winston.com
                                     WINSTON & STRAWN LLP
                                     333 South Grand Avenue
                                     Los Angeles, CA 90071
                                     (213) 615-1700

*Counsel for Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC and Sturm Foods, Inc.*

Alexander G. Brown
James C. Grant
Valarie C. Williams
B. Parker Miller
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Phone: 404-881-7000
Fax: 404-881-7777
alex.brown@alston.com
jim.grant@alston.com
parker.miller@alston.com
valarie.williams@alston.com

Steven L. Penaro
ALSTON & BIRD LLP
90 Park Avenue
15th Floor
New York, NY 10016-1387
Phone: 212-210-9400
Fax: 212-210-9444
steve.penaro@alston.com

*Counsel for Plaintiff McLane Company, Inc.*

William V. Reiss
David B. Rochelson
Matthew J. Geyer
399 Park Avenue, Suite 3600
New York, NY 10022
(212) 980-7400
wreiss@robinskaplan.com
drochelson@robinskaplan.com
mgeyer@robinskaplan.com

Michael M. Buchman
Michelle C. Clerkin
Jacob O. Onile-Ere
MOTLEY RICE LLC
777 Third Avenue, 27th Floor

27

New York, NY 10017
(212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com
jonileere@motleyrice.com

Robert G. Eisler
Deborah Elman
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com
delman@gelaw.com

*Counsel for Direct Purchaser Plaintiffs and Interim Co-Lead Counsel for the Proposed Direct Purchaser Plaintiff Class*