**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

———————————————————— x
                                                    :
                                                    :
                                                    :
                                                    :
In re: Keurig Green Mountain Single-Serve    :   Case No. 1:14-md-02542 (VSB)
Coffee Antitrust Litigation                  :   MDL No. 2542
                                                    :
                                                    :
                                                    :
*This document concerns all related actions.*  :   Hon. Vernon S. Broderick

                                                    **ORAL ARGUMENT REQUESTED**
———————————————————— x


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

LEGAL STANDARD ..................................................................................................1

    A.    Motions For Summary Judgment Under Federal Rule Of Civil
Procedure 56 .............................................................................................1

    B.    General Burdens Under Sections 1 And 2 Of The Sherman Act............................2

ARGUMENT ..........................................................................................................4

**I.**    **SUMMARY JUDGMENT MOTION FOR HORIZONTAL BRAND
COMPETITOR AGREEMENTS BOYCOTTING KEURIG
COMPETITORS** ............................................................................................**4**

KEURIG'S HORIZONTAL RESTRAINTS ON BRAND COMPETITORS .................................5

KEURIG'S HORIZONTAL AGREEMENTS WITH ITS BRAND COMPETITORS
UNREASONABLY RESTRAIN TRADE ............................................................................7

    A.    Keurig's Brand Competitor Agreements Are Per Se Unlawful.............................9

        1.    The Challenged Restraints In The Brand Competitor Agreements
Are Per Se Unreasonable Because They Facially Restrict
Competition And Decrease Output ............................................................10

            i.    The Boycott Clause Restricts Competition And Decreases
Output ...............................................................................................11

            ii.    The Variety Restriction Clause Restricts Competition And
Decreases Output ...............................................................................13

            iii.    The Market Allocation Clause Restricts Competition and
Decreases Output ...............................................................................14

            iv.    The Brand Non-Competition Clause Restricts Competition
and Decreases Output .........................................................................16

        2.    The Restraints In Keurig's Brand Competitor Agreement Facially
Restrict Competition And Are A Per Se Unreasonable
"Aggregation of Trade Restraints" ............................................................17

    B.    The Challenged Restraints In Keurig's Brand Competitor Agreements Are
Unreasonable Under A "Quick Look" Rule of Reason Analysis .........................18

        1.    The Quick Look Test Governs Any Rule Of Reason Analysis
Because The Anticompetitive Effects Of The Challenged
Restraints Are "Easily Ascertained".........................................................19

        2.    Keurig Fails To Carry Its "Heavy Burden" Of Demonstrating
Valid Procompetitive Justifications For The Various Restraints On
Competition............................................................................................22

II.     **SUMMARY JUDGMENT MOTION FOR SUPPLIER EXCLUSIVE DEALING** ........................................................................................**23**

KEURIG'S RESTRAINTS ON SUPPLIERS OF COMPETITIVE CUP INPUTS .................... 25

    A.     Keurig's Agreements With Competitive Cup Machine Suppliers ........................ 25

    B.     Keurig's Agreements With Suppliers Of Cups Used To Make Competitive Cups ................................................................................................................ 29

    C.     Keurig's Agreements With Suppliers Of Lids Used To Make Competitive Cups ................................................................................................................ 31

    D.     Keurig's Agreements With Suppliers Of Ink Used To Make Competitive Cups ................................................................................................................ 33

KEURIG'S SUPPLIER AGREEMENTS UNREASONABLY RESTRAIN TRADE ................ 34

    A.     Keurig Proffers Legally Invalid Justifications For Its ████████████ ████████████ With Suppliers ................................................................. 36

        1.     Industry Practice Is Not A Valid Procompetitive Justification ................ 36

        2.     The Record Evidence Indisputably Establishes That Keurig Did Not Use ██████████████████ To Increase "Competition for the Contract" ................................................................ 36

        3.     The Record Evidence Indisputably Establishes That Keurig Did Not Use ████████████████ To Protect Investments Or Trade Secrets ................................................................. 38

    B.     Keurig's Purported Procompetitive Justifications Could Be Achieved Through Less Restrictive Alternatives ......................................................... 39

        1.     Non-Disclosure Agreements ..................................................................... 39

        2.     Narrower Scope Of Covered Inputs Or Shorter Duration of Non-Competition ........................................................................................... 40

III.    **SUMMARY JUDGMENT MOTION FOR TYING AGREEMENTS** ........................**42**

KEURIG'S RESTRAINTS ON AFH DISTRIBUTOR CUSTOMERS ..................................... 43

KEURIG'S TYING AGREEMENTS UNREASONABLY RESTRAIN TRADE ....................... 44

    A.     Keurig's KAD And KARD Agreements Violate The Plain Text Of Section 3 Of The Clayton Act ..................................................................................... 44

    B.     Keurig's KAD And KARD Agreements Are Per Se Unlawful Under The Sherman Act ................................................................................................... 47

        1.     Keurig's Tying Affected A Substantial Amount Of Interstate Commerce ................................................................................................ 48

        2.     Single-Serve Brewers And Compatible Cups Are Distinct Products ........ 48

        3.     Keurig Contractually Tied The Sale Of K-Cups To Keurig AFH Brewers .................................................................................................... 50

4.      Keurig Has Market Power In The Single-Serve Brewer Market ............... 51

       i.      Keurig Has The Ability To Coerce Distributors And
Impose Its Desired Terms ............................................................. 52

       ii.     Keurig Has The Power To Exclude Competitors With The
Loyalty Clause ................................................................................ 54

       iii.    Keurig Profitably Raises Prices Without Losing Significant
Sales ................................................................................................ 55

       iv.     Keurig Leverages Its Unique Single-Serve Brewer ..................... 57

       v.      Keurig Admissions Establish Its Market Power ........................... 58

C.      Undisputed Evidence Establishes Antitrust Injury From The Tying
Agreements ............................................................................................... 59

D.      TreeHouse Is Entitled To Damages Pursuant to Section 4 Of The Clayton
Act .............................................................................................................. 60

E.      Plaintiffs Are Entitled To Injunctive Relief Under Section 16 Of The
Clayton Act ............................................................................................... 61

IV.     **SUMMARY JUDGMENT MOTION FOR IMPLEMENTING LOCK-OUT
TECHNOLOGY IN AN UNNECESSARILY RESTRICTIVE MANNER ............. 61**

KEURIG'S IMPLEMENTATION OF ITS LOCK-OUT TECHNOLOGY, CBT ...................... 63

CBT IMPAIRED RIVALS' OPPORTUNITIES IN AN UNNECESSARILY
RESTRICTIVE WAY WITHOUT JUSTIFICATION ............................................................. 66

A.      Keurig Could Have Achieved Its Proffered Justification For Implementing
CBT In A Less Restrictive Manner .......................................................... 66

1.      The Reed Switch Distinguished Between Different Sizes of Portion
Packs Without Locking Out Competitive Cups ............................. 67

2.      Keurig Considered And Rejected Less Restrictive Alternatives To
Achieve its Now Abandoned Justifications For CBT ..................... 69

       i.      Keurig Considered And Declined To Use Less Restrictive
Alternatives To CBT That Would Have Furthered
Purported Interests Of "Safety" And "Quality" ......................... 69

       ii.     Keurig Considered And Rejected Less Restrictive
Alternatives To CBT That Would Have Enabled The 2.0
Brewer To Recognize "Recipes" ................................................. 71

B.      Undisputed Evidence Shows CBT Did Not Further Competition On The
Merits ........................................................................................................ 73

1.      CBT Offered No Consumer Benefit ......................................... 73

2.      The Purported Benefits Of Ensuring Safety And Quality Were
Pretextual ..................................................................................... 75

3.    While Keurig Told Retailers And Consumers That The 2.0 Brewer Would Recognize "Recipes," Keurig Admitted This Was False And Thus Pretextual ...........................................................78

**V.    MOTION FOR SUMMARY JUDGMENT FOR FALSE ADVERTISING ..............79**

KEURIG'S FALSE ADVERTISING..................................................................................80

A.    Keurig Made, And Continues To Make, Statements That Competitive Cups Are Not Compatible With The 2.0 Brewer, Despite Knowledge Of Falsity...............................................................................................................80

B.    Keurig Knowingly Made False Statements That It Did Not Test Competitive Cups.......................................................................................82

C.    Keurig Made False Statements, Without Basis, That The Use Of Competitive Cups May Decrease The Brewer's Performance And Overall Life....................................................................................................................83

D.    Keurig Made False Statements, Without Basis, For At Least Seven Years That Competitive Cups Do Not Work Safely Or Effectively In Keurig Brewers ...........................................................................................................84

KEURIG IS LIABLE FOR ITS LITERALLY FALSE ADVERTISING....................................87

A.    Plaintiffs Are Entitled To Judgment For Keurig's Literally False Statements ......................................................................................................87

1.    Keurig's Statements Are Literally False.....................................88

2.    Keurig's Statements Were Material.............................................90

3.    Keurig's Statements Are Commercial Advertisements ...........91

4.    Keurig's Statements Appeared In Interstate Commerce...........92

B.    TreeHouse Is Entitled to Judgment As A Matter of Law Awarding TreeHouse Damages For Keurig's False Advertising .....................................93

C.    The Court Has Discretion To Enhance These Damages To Trebling ..................96

D.    Plaintiffs Are Entitled To Injunctive Relief On The Undisputed Facts................97

**VI.    SUMMARY JUDGMENT MOTION REGARDING KEURIG'S AFFIRMATIVE DEFENSES OF UNCLEAN HANDS AND IN PARI DELICTO ...............................................................................................................99**

A.    Unclean Hands And In Pari Delicto Are Not Defenses To Antitrust Claims......100

B.    Keurig's Defenses Are Inapplicable To Plaintiffs' False Advertising Claims .............................................................................................................102

VII.   **SUMMARY JUDGMENT ON MCLANE'S STATUS AS A DIRECT PURCHASER**...........................................................................................**104**

STATEMENT OF UNDISPUTED FACTS RELATED TO MCLANE'S STANDING............105

    A.   McLane Contracted With Keurig, Starbucks, And Smucker To Purchase K-Cups Directly From Each K-Cup Supplier........................................................105

    B.   McLane Sold And Distributed K-Cups To Walmart ...........................................106

    C.   McLane Was Subject To Market Forces Of Supply And Demand ....................108

    D.   McLane Sold K-Cups To A Limited Number Of Non-Walmart Customers.......109

ARGUMENT REGARDING MCLANE'S STANDING ...........................................................110

    A.   McLane Is A Direct Purchaser Of K-Cups And Therefore The Proper Party To Pursue Civil Antitrust Claims Against Keurig......................................111

    B.   Pursuant To Hanover Shoe, Only Direct Purchasers May Bring Civil Antitrust Claims, Even If They "Pass On" Overcharges Downstream...............112

    C.   The Narrow Cost-Plus Exception To The Direct Purchaser Rule Does Not Apply.................................................................................................................113

        1.   The Cost-Plus Exception Is Narrow, Requiring A Pre-Existing Fixed Quantity Contract............................................................................114

        2.   McLane Does Not Fit Within The Narrow Cost-Plus Exception Because McLane Did Not Order K-Cups Pursuant to A Pre-Existing, Fixed-Quantity Contract..........................................................115

## **TABLE OF AUTHORITIES**

**Cases**

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
  Case No. 7:20-cv-00039-MCR-GRJ, Doc. 118 (N.D. Fla. May 6, 2021) ..............................83

*Aamco Automatic Transmissions Inc. v. Tayloe*,
  407 F. Supp. 430 (E.D. Pa. 1976) ......................................................................48, 51

*Alden-Rochelle, Inc., v. Am. Soc. of Composers*,
  80 F. Supp. 888 (S.D.N.Y. 1948)............................................................................101

*Am. Home Products Corp. v. Johnson & Johnson*,
  436 F. Supp. 785 (S.D.N.Y. 1977).............................................................................98

*Am. Home Products Corp. v. Johnson & Johnson*,
  577 F.2d 160 (2d Cir. 1978).............................................................................93, 94

*Am. Home Products Corp. v. Johnson & Johnson*,
  654 F. Supp. 568 (S.D.N.Y. 1987).....................................................................89, 103

*Am. Lecithin Co. v. Rebmann*,
  2020 WL 4260989 (S.D.N.Y. July 24, 2020) .............................................1, 2, 99

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)......................................................................................8

*In re Androgel Antitrust Litig. (No. II)*,
  2018 WL 2984873 (N.D. Ga. June 14, 2018)..........................................................76

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
  2021 WL 1792394 (N.D.N.Y. May 5, 2021)................................................. *passim*

*Apex Oil Co. v. DiMauro*,
  713 F. Supp. 587 (S.D.N.Y. 1989)...........................................................................101

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*,
  792 F. Supp. 969 (S.D.N.Y. 1992).........................................................................103

*Arizona v. Maricopa Cty. Med. Soc.*,
  457 U.S. 332 (1982)...................................................................................................18

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)..............................................................................................3, 61

*Au New Haven, LLC v. YKK Corp.*,
  2019 WL 1437516 (S.D.N.Y. Mar. 31, 2019) .........................................................90

*Barber & Ross Co. v. Lifetime Doors, Inc.*,
810 F.2d 1276 (4th Cir. 1987) .......................................................................23

*Best Buy Co. v. Hitachi, Ltd. (In re Cathode Ray Tube (CRT) Antitrust Litig.)*,
MDL No. 1917, 2016 WL 7800819 (N.D. Cal. Nov. 15, 2016)............................112

*Black v. Magnolia Liquor Co.*,
355 U.S. 24 (1957).........................................................................51, 54, 59

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ........................................................................15

*In re Blue Cross Blue Shield Antitrust Litig.*,
308 F. Supp. 3d 1241 (N.D. Ala. 2018).........................................................14, 18

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982)...................................................................................60

*Blue Tree Hotels Inv (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
369 F.3d 212 (2d Cir. 2004).........................................................................59

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999).........................................................................19

*Boost Worldwide, Inc. v. Talk Til U Drop, Wireless, Inc.*,
2014 WL 5026777 (N.D.N.Y. Oct. 8, 2014) .........................................................98

*Broadway Delivery Corp. v. United Parcel Service of Am., Inc.*,
651 F.2d 122 (2d Cir. 1981).........................................................................58

*Brown v. C.I.L., Inc.*,
No. 94 C 1479, 1996 U.S. Dist. LEXIS 4917 (N.D. Ill. Jan. 28, 1996)...................92

*Brown v. Eli Lilly & Co.*,
654 F.3d 347 (2d Cir. 2011).......................................................................2, 73

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)..................................................................................110

*Bus. Foods Serv., Inc. v. Food Concepts Corp.*,
533 F. Supp. 992 (E.D.N.Y. 1982) .................................................................101

*In re Buspirone Patent & Antitrust Litig.*,
210 F.R.D. 43 (S.D.N.Y. 2002) .....................................................................113

*C=Holdings B.V. v. Asiarim Corp.*,
992 F. Supp. 2d 223 (S.D.N.Y. 2013).......................................................87, 88, 90

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ...................................................................................10, 19

*Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.*,
   996 F.2d 537 (2d Cir. 1993) .................................................................................42

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
   799 F.3d 202 (2d Cir. 2015) .........................................................................59, 61

*Castrol, Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993) .................................................................................89

*Castrol, Inc. v. Quaker State Corp.*,
   977 F.2d 57 (2d Cir. 1992) ...................................................................................89

*CDC Techs., Inc. v. IDEXX Labs., Inc.*,
   186 F.3d 74 (2d Cir. 1999) ...................................................................................32

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .........................................................................................1, 2

*Chanel, Inc. v. RealReal, Inc.*,
   449 F. Supp. 3d 422 (S.D.N.Y. 2020) ...........................................................88, 89

*Chapdelaine Corp. Sec. & Co. v. Depository Tr. & Clearing Corp.*,
   2006 WL 2020950 (S.D.N.Y. July 13, 2006) ......................................................60

*Chrysler Corp. v. General Motors Corp.*,
   596 F. Supp. 416 (D.C. 1984) ...........................................................................100

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
   843 F.3d 48 (2d Cir. 2016) .........................................................................90, 92

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
   No. 14-CV-585 AJN, 2015 WL 4002468 (S.D.N.Y. July 1, 2015) .........................92

*Clarett v. NFL*,
   306 F. Supp. 2d 379 (S.D.N.Y. 2004) ...........................................................4, 68

*Coca-Cola Co. v. Tropicana Prods.*,
   690 F.2d 312 (2d Cir. 1982) .........................................................................93, 94

*Columbia Nitrogen Corp. v. Royster Co.*,
   451 F.2d 3 (4th Cir. 1971) .................................................................................101

*Columbia Pictures Indus., Inc. v. Am. Broad. Cos., Inc.*,
   501 F.2d 894 (2d Cir. 1974) .............................................................................101

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
  No. 1:04-cv-3066-JEC, 2012 WL 12540321 (N.D. Ga. July 17, 2012) ...............................112

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013)......................................................................................92

*People ex rel. Daley v. Datacom Sys. Corp.*,
  146 Ill. 2d 1 (1991) .................................................................................................92

*Danone, US, LLC v. Chobani, LLC*,
  362 F. Supp. 3d 109 (S.D.N.Y. 2019)........................................................................92

*In re Dig. Music Antitrust Litig.*,
  321 F.R.D. 64 (S.D.N.Y. 2017) ...............................................................................100

*Dress for Success Worldwide v. Dress 4 Success*,
  589 F. Supp. 2d 351 (S.D.N.Y. 2008).......................................................................103

*Drone Racing League, Inc. v. DR1, LLC*,
  2018 WL 6173714 (S.D.N.Y. Nov. 26, 2018) .............................................................87

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992).......................................................................................... *passim*

*Edmiston v. Jordan*,
  1999 WL 1072492 (S.D.N.Y. Nov. 24, 1999) .............................................................88

*Elhannon LLC v. F.A. Bartlett Tree Expert Co.*,
  2018 WL 6040687 (D. Vt. Nov. 19, 2018)..................................................................104

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
  314 F.3d 48 (2d Cir. 2002)...................................................................................91, 92

*Fashion Originators' Guild of Am. v. FTC*,
  312 U.S. 457 (1941).......................................................................................... *passim*

*Fortner Enterprises v. U.S. Steel Corp.*,
  394 U.S. 495 (1969).......................................................................................... *passim*

*Freedom Holdings, Inc. v. Spitzer*,
  357 F.3d 205 (2d Cir. 2004)......................................................................................10

*FTC v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986)...................................................................................................19

*FTC v. Motion Picture Adver. Serv. Co.*,
  344 U.S. 392 (1953)...................................................................................................41

*Gary Friedrich Enters., LLC v. Marvel Enters.*,
   713 F. Supp. 2d 215 (S.D.N.Y. 2009) ................................................................87

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) ...........................................................................110

*Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*,
   386 F.3d 485 (2d Cir. 2004) ...................................................................... *passim*

*Gidatex S.r.L. v. Campaniello Imports*,
   82 F. Supp. 2d 126 (S.D.N.Y. 1999) ..............................................................103

*Goldstein v. Delgratia Min. Corp.*,
   176 F.R.D. 454 (S.D.N.Y. 1997) ...................................................................103

*Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*,
   880 F.2d 1514 (2d Cir. 1989) ..........................................................................48

*Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*,
   905 F. Supp. 169 (S.D.N.Y. 1995) ...................................................................92

*Goshen v. Mut. Life Ins. Co.*,
   98 N.Y.2d 314 (2002) .....................................................................................92

*H. & A. Selmer, Inc. v. Musical Instrument Exchange, Inc.*,
   154 F. Supp. 697 (S.D.N.Y. 1957) .................................................................101

*Halo Optical Prods. v. Liberty Sport, Inc.*,
   2017 WL 1082443 (N.D.N.Y Mar. 22, 2017) ..................................................96

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ................................................................................. *passim*

*Heldman v. U.S. Lawn Tennis Assoc.*,
   354 F. Supp. 1241 (S.D.N.Y. 1973) ...............................................................101

*Hill v. A-T-O Inc.*,
   535 F.2d 1349 (2d Cir. 1975) ....................................................................53, 54

*Ill. Brick Co. v. Ill.*,
   431 U.S. 720 (1977) ..............................................................110, 112, 113, 114

*Illinois Tool Works Inc. v. Independent Ink*,
   547 U.S. 28 (2006) .........................................................................................47

*Imig, Inc. v. Electrolux Home Care Prods., Ltd.*,
   2008 WL 905898 (E.D.N.Y. Mar. 31, 2008) ...................................................95

*Impax Labs., Inc. v. Fed. Trade Comm'n*,
   994 F.3d 484 (5th Cir. 2021) ..................................................... *passim*

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)..............................................................8

*Int'l Bus. Machines Corp. v. U.S.*,
   298 U.S. 131 (1936)........................................................................71

*Int'l Salt Co. v. U.S.*,
   332 U.S. 392 (1947)....................................................46, 52, 58, 61

*Jamsports & Entm't, LLC v. Paradama Prods.*,
   2005 WL 14917 (N.D. Ill. Jan. 3, 2005) ........................................4

*Jaramillo v. Weyerhauser Co.*,
   536 F.3d 140 (2d Cir. 2008).............................................................2

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984) ................................................................ *passim*

*Jeffreys v. City of New York*,
   426 F.3d 549 (2d Cir. 2005)............................................................2

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*,
   2006 WL 2128785 (S.D.N.Y. July 28, 2006) ........................94, 95

*Jordan v. Jewel Food Stores, Inc.*,
   743 F.3d 509 (7th Cir. 2014) ........................................................92

*Juno Online Servs., L.P. v. Juno Lighting, Inc.*,
   979 F. Supp. 684 (N.D. Ill. 1997) ...............................................91

*K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*,
   61 F.3d 123 (2d Cir. 1995).............................................................55

*Kan. v. Utilicorp United, Inc.*,
   497 U.S. 199 (1990)......................................................113, 114, 115

*Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016)..........................................................49

*Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*,
   392 Ill. App. 3d 1 (1st Dist. 2009) ...............................................97

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................... *passim*

*Keurig, Inc. v. Sturm Foods, Inc.*,
   2012 WL 4049799 (D. Del. Sept. 13, 2012)................................................49, 64, 83

*Keurig, Inc. v. Sturm Foods, Inc.*,
   732 F.3d 1370 (Fed. Cir. 2013).................................................................49, 64

*Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*,
   340 U.S. 211 (1951)...............................................................................100

*Klor's Inc. v. Broadway-Hale Stores, Inc.*,
   359 U.S. 207 (1959).................................................................................12

*Kurtz v. Kimberly-Clark Corp.*,
   321 F.R.D. 482 (E.D.N.Y. 2017)...............................................................97

*Laumann v. Nat'l Hockey League*,
   56 F. Supp. 3d 280 (S.D.N.Y. 2014).........................................................10

*Law v. NCAA*,
   902 F. Supp. 1394 (D. Kan. 1995)...................................................... *passim*

*Lefrak v. Arabian Am. Oil Co.*,
   487 F. Supp. 808 (E.D.N.Y. 1980) ...................................................114, 115

*Leider v. Ralfe*,
   387 F. Supp. 2d 283 (S.D.N.Y. 2005)...................................................80, 87

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
   306 F. Supp. 3d 629 (S.D.N.Y. 2018).......................................................103

*Mantikas v. Kellogg Co.*,
   910 F.3d 633 (2d Cir. 2018).......................................................................92

*Markel v. Scovill Mfg. Co.*,
   471 F. Supp. 1244 (W.D.N.Y. 1979) .......................................................102

*Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*,
   853 F. Supp. 837 (E.D. Pa. 1994) .............................................................18

*Maxon Hyundai Mazda v. Carfax, Inc.*,
   2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014)...........................................41

*MBIA Ins. Corp. v. Patriarch Partners VII, LLC*,
   842 F. Supp. 2d 682 (S.D.N.Y. 2012).......................................................99

*McDonald v. N. Shore Yacht Sales, Inc.*,
   134 Misc. 2d 910 (Sup. Ct. Nassau Cnty. 1987) .......................................97

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
    501 F. Supp. 517 (S.D.N.Y. 1980)................................................................80, 87

*McWane, Inc. v. FTC*,
    783 F.3d 814 (11th Cir. 2015) .....................................................................4, 37, 41

*Merck Eprova AG v. Gnosis S.p.A.*,
    901 F. Supp. 2d 436 (S.D.N.Y. 2012)............................................... *passim*

*Microbyte Corp. v. New Jersey State Golf Ass'n*,
    1986 WL 7231 (D.N.J. June 26, 1986) .......................................................48, 51

*Milkovich v. Lorain J. Co.*,
    497 U.S. 1 (1990).........................................................................................88

*Mitchell Group USA LLC v. Udeh*,
    2017 WL 9487193 (E.D.N.Y. Mar. 8, 2017)...........................................98

*Mobius Mgmt. Syst., Inc. v. Fourth Dimension Software, Inc.*,
    880 F. Supp. 1005 (S.D.N.Y. 1994)..........................................................96

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018)...........................................................................3, 7

*N. Pac. Ry. Co., v. U.S.*,
    356 U.S. 1 (1958)............................................................................. *passim*

*N.Y. v. Pullman, Inc.*,
    662 F.2d 910 (2d Cir. 1981).......................................................................104

*In re Namenda Direct Purchaser Antitrust Litig.*,
    No. 15 Civ. 7488 (CM), 2017 WL 2693713 (S.D.N.Y. June 21, 2017)......................112, 114

*Nat'l Ass'n of Pharmaceutical Mfrs., Inc., v. Ayerst Labs.*,
    850 F.2d 904 (2d Cir. 1988).......................................................................94

*Nat'l Soc'y of Prof'l Eng'rs v. U.S.*,
    435 U.S. 679 (1978)....................................................................................10, 78

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
    37 F. Supp. 3d 1126 (N.D. Cal. 2014) ....................................................3, 4, 42, 68

*NCAA v. Alston*,
    210 L.Ed.2d 314 (2021) ..............................................................................3

*NCAA v. Bd. of Regents*,
    468 U.S. 85 .................................................................................... *passim*

*In re Nine W. Shoes Antitrust Litig.*,
    80 F. Supp. 2d 181 (S.D.N.Y. 2000)......................................................................21

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985).........................................................................................11

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018)...........................................................................3, 18, 67, 69

*Optigen, LLC v. Int'l Genetics, Inc.*,
    777 F. Supp. 2d 390 (N.D.N.Y. 2011)...................................................................89

*Palmer v. BRG of Georgia, Inc.*,
    498 U.S. 46 (1990)...............................................................................10, 14, 15, 16

*Park v. Thomson Corp.*,
    2007 WL 119461 (S.D.N.Y. Jan. 11, 2007) ................................................. *passim*

*Peltz v. SHB Commodities, Inc.*,
    115 F.3d 1082 (2d Cir. 1997)............................................................................99

*Perma Life Mufflers v. Int'l Parts Corp.*,
    392 U.S. 134 (1968).......................................................................................100

*Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*,
    2004 WL 896952 (E.D.N.Y. Mar. 26, 2004) ...........................................................90

*Playtex Products LLC v. Munchkin, Inc.*,
    2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) ........................................................90

*PPX Enters. v. Audiofidelity Enters.*,
    818 F.2d 266 (2d Cir. 1987)............................................................................94

*Princeton Graphics Operating, L.P. v. NEC Home Electronics, Inc.*,
    732 F. Supp. 1258 (S.D.N.Y. 1990)...................................................................88

*Pritikin v. Liberation Publ'ns, Inc.*,
    83 F. Supp. 2d 920 (N.D. Ill. 1999) ...................................................................87

*Project Strategies Corp. v. Nat'l Commc'ns Corp.*,
    948 F. Supp. 218 (E.D.N.Y. 1996) ...................................................................103

*Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*,
    364 U.S. 656 (1961).......................................................................................12

*Redbox Automated Retail LLC v. Xpress Retail LLC*,
    2018 WL 950098 (N.D. Ill. Feb. 20, 2018) ........................................................102

*Republic of Iraq v. ABB AG,*
   768 F.3d 145 (2d Cir. 2014)..................................................................99

*Ringtown Wilbert Vault Works v. Schuylkill Mem'l Park, Inc.,*
   650 F. Supp. 823 (E.D. Pa. 1986) ....................................................51, 58

*Ritani, LLC v. Aghjayan,*
   880 F. Supp. 2d 425 (S.D.N.Y. 2012)....................................................87

*River Light V, L.P. v. Lin & J Intern. Inc.,*
   2015 WL 3916271 (S.D.N.Y. June 25, 2015) .......................................95

*Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC,*
   2016 WL 815205 (S.D.N.Y. Feb. 29, 2016)......................................92, 98

*Salon FAD v. L'Oreal USA, Inc.,*
   2011 WL 70591 (S.D.N.Y. Jan. 10, 2011) .............................................91

*Savory Pie Guy, LLC v. Comtech Indus.,*
   2016 WL 7471340 (S.D.N.Y. Dec. 28, 2016) .........................................1

*Schering Corp. v. Pfizer Inc.,*
   189 F.3d 218 (2d Cir. 1999)..................................................................93

*New York ex rel. Schneiderman v. Actavis PLC,*
   787 F.3d 638 (2d Cir. 2015).......................................................... *passim*

*Schwartzco Enters. LLC v. TMH Mgmt., LLC,*
   60 F. Supp. 3d 331 (E.D.N.Y. 2014) .....................................................91

*Simon v. KeySpan Corp.,*
   694 F.3d 196 (2d Cir. 2012)..................................................111, 114, 115

*Simply Lite Food Corp. v. Aetna Cas. & Sur. Co. of Am.,*
   666 N.Y.S.2d 714 (N.Y. App. Div. 1997) ......................................80, 87

*Solstein v. Mirra,*
   488 F. Supp. 3d 86 (S.D.N.Y. 2020).....................................................88

*Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC,*
   366 F. Supp. 3d 516 (S.D.N.Y. 2018)..................................................110

*New York ex rel. Spitzer v. Saint Francis Hosp.,*
   94 F. Supp. 2d 399 (S.D.N.Y. 2000)................................................14, 16

*Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.,*
   131 F.3d 874 (10th Cir. 1997) .............................................................113

*Spotless Enters., Inc. v. Carlisle Plastics, Inc.*,
56 F. Supp. 2d 274 (E.D.N.Y. 1999) ............................................................80, 87

*Standard Fashion Co. v. Magrane-Houston Co.*,
258 U.S. 346 (1922)........................................................................................44, 45

*Standard Oil Co. v. U.S.*,
221 U.S. 1 (1911)......................................................................................................3

*Standard Oil Co. v. U.S.*,
337 U.S. 293 (1949)..............................................................................44, 45, 46

*Suchanek v. Sturm Foods, Inc.*,
No. 3:11-cv-00565 (S.D. Ill. June 28, 2011), Dkt. No. 2....................................76

*Summit Health v. Pinhas*,
500 U.S. 322 (1991) ............................................................................................19

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
687 F. Supp. 832 (S.D.N.Y. 1988)....................................................................101

*The Apollo Theater Found., Inc. v. Western Int'l Syndication*,
2005 WL 1041141 (S.D.N.Y. May 5, 2005) ....................................................102

*Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*,
815 F.2d 1407 (11th Cir. 1987) ..........................................................................48

*Time Warner Cable, Inc. v. DIRECTV*,
497 F.3d 144 (2d Cir. 2007)..........................................................................88, 93

*Times-Picayune Pub. Co. v. U.S.*,
345 U.S. 594 (1953)........................................................................................44, 45

*Timken Roller Bearing Co. v. U.S.*,
341 U.S. 593 (1951)..............................................................................................18

*Top Mkts., Inc. v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998)....................................................................................2

*Trebuhs Realty Co. v. News Syndicate Co.*,
107 F. Supp. 595 (S.D.N.Y. 1952)..............................................................100, 101

*U.S. Airways, Inc. v. Sabre Holdings Corp.*,
2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) ...........................................22, 36

*U.S. Steel Corp. v. Fortner Enterprises, Inc.*,
429 U.S. 610 (1977)........................................................................................52, 57

*U.S. v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)...............................................................................3, 18, 19, 38

*U.S. v. Brown Univ.*,
  5 F.3d 658 (3d Cir.1993)...........................................................................................19

*U.S. v. Consol. Laundries Corp.*,
  291 F.2d 563 (2d Cir. 1961)..................................................................................14, 16

*U.S. v. Dentsply Int'l, Inc.*,
  277 F. Supp. 2d 387 (D. Del. 2003).................................................................. *passim*

*U.S. v. General Motors Corp.*,
  384 U.S. 127 (1966)...................................................................................................12

*U.S. v. Grinnell Corp.*,
  384 U.S. 563 (1966).....................................................................................................3

*U.S. v. Int'l Business Machines Corp.*,
  163 F.3d 737 (2d. Cir. 1998)....................................................................................47

*U.S. v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001) ............................................................................3, 4, 39

*U.S. v. Sealy, Inc.*,
  388 U.S. 350 (1967)..............................................................................................10, 18

*U.S. v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)...................................................................................................59

*U.S. v. Visa U.S.A., Inc.*,
  163 F. Supp. 2d 322 (S.D.N.Y. 2001)......................................................................13

*U.S. v. Visa U.S.A., Inc.*,
  344 F.3d 229 (2d Cir. 2003)............................................................................ *passim*

*United Shoe Machinery Corp. v. U.S.*,
  258 U.S. 451 (1922)...................................................................................................44

*USFL v. NFL*,
  842 F.2d 1335 (2d Cir. 1988)......................................................................59, 60, 101

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
  872 F. Supp. 52 (S.D.N.Y. 1994)..............................................................................34

*In re Visa Check/Mastermoney Antitrust Litig.*,
  2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ..................................................... *passim*

*Waldron v. British Petroleum Co.*,
    231 F. Supp. 72 (S.D.N.Y. 1964) ....................................................................101

*Walker v. Merrill Lynch & Co.*,
    181 F. Supp. 3d 223 (S.D.N.Y. 2016) ................................................................58

*Wurtz v. Rawlings Co. LLC*,
    2014 WL 4961422 (E.D.N.Y. Oct. 3, 2014) .......................................................91

*Xerox Corp. v. Media Sciences Intern., Inc.*,
    511 F. Supp. 2d 372 (S.D.N.Y. 2007) ................................................................59

*Yentsch v. Texaco, Inc.*,
    630 F.2d 46 (2d Cir. 1980) ...........................................................................48, 53

*Zenith Radio Corp. v. Hazeltine Research*,
    395 U.S. 100 (1969) ..........................................................................................59

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) ........................................................34, 35, 36, 41

**Statutes**

15 U.S.C.A. § 14 (1951) .........................................................................42, 44, 45

Clayton Act Section 3 .................................................................................. *passim*

Clayton Act Section 4 .................................................................................. *passim*

Clayton Act Section 16 ................................................................................43, 61

Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.* ...................................99, 101

Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/1 *et seq.*, 10/3(1)-(4) .........99

Illinois Consumer Fraud and Deceptive Brand Practices Act,
    815 Ill. Comp. Stat 505/1 *et seq.* ....................................................................80

Illinois Consumer Fraud and Deceptive Business Practices Act,
    815 Ill. Comp. Stat. §§ 505/1 *et seq.* ..............................................................99

Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 *et seq.* .........80, 87, 99

Lanham Act Section 43(a) ........................................................................... *passim*

N.Y. Gen. Bus. Law §§ 349(h), 350-e(3) .........................................................96

New York Consumer Protection Act, N.Y. Gen Bus. Law §§ 349-50 .........99

New York General Business Law §§ 349 and 350 .................................................80, 87

Sherman Act Section 1 ................................................................................. *passim*

Sherman Act Section 2 ..................................................................................1, 2, 3, 99

Wisconsin Antitrust Act, Wis. Stat. §§ 133.01 *et seq.*, 133.03(1)-(2) ........................................99

**Other Authorities**

C. Scott Hemphill, *Less Restrictive Alternatives in Antitrust Law*,
    116 Colum. L. Rev. 927 (2016) ..............................................................67, 69

Fed. R. Civ. P. 26 ..................................................................................................112

Fed. R. Civ. P. 56 ...................................................................................................1

Fed. R. Civ. P. 56(c)(1)(A) ....................................................................................2

Fed. R. Evid. 403 ...................................................................................................102

U.S. Dep't of Just. & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing
    of Intellectual Property* § 3.3 (2017) ..........................................................9

## GLOSSARY OF DEFINED TERMS

**1.0 Brewer**: Keurig's first generation of Keurig Brewers which were designed to brew K-Cups.

**2.0 Brewer**: All models, versions, and prototypes of the Keurig Brewer called the Keurig 2.0, including, but not limited to, the following models: K200, K250, K300, K350, K400, K425, K450, K475, K500, K525, K550, K757 and K560.

**AFH**: Away From Home.

**AFH Brewer**: Keurig's commercial brewers that need to be professionally installed and maintained because they are typically plumbed directly into a water line and designed to withstand much higher usage than AH Brewers.

**AFH Market**: The segment of the market for Keurig Brewers, Compatible Cups, and Portion Pack markets that covers Keurig Brewers and Compatible Cups purchased for use outside of the home.

**AH**: At Home.

**AH Brewer**: Keurig Brewers that are designed for lower-volume use, such as in a consumer's home.

**AH Market**: The segment of the market for Keurig Brewers, Compatible Cups, and Portion Pack markets that covers brewers and Compatible Cups purchased by consumers for use at home.

**Brand Competitors**: Coffee roasters and other beverage companies—such as Starbucks, Folgers, Bigelow, and Swiss Miss—that have contracted with Keurig to manufacture Compatible Cups containing their coffees, teas, hot chocolates, and other beverages bases.

**Brand Competitor Agreements**: Keurig's manufacturing, sales, and distribution agreements with Brand Competitors.

**Brand Non-Competition Clause**: A provision in Brand Competitor Agreements that prohibits Brand Competitors from making their products available in any single-serve format that competes with the Keurig format, such as Flavia or Tassimo, as well as from developing their own Single-Serve Brewers.

**Boycott Clause**: A provision in all Brand Competitor Agreements that prohibits Brand Competitors from working with anyone other than Keurig to make Compatible Cups, requiring Brand Competitors to boycott Compatible Cup manufacturers like TreeHouse and Rogers.

**CBT**: Consumer Benefit Technology, which is the set of components included in 2.0 Brewers and 2.0-compatible K-Cups and Vue Cups that consists of an optical reader that reads ink signatures on the lids of Compatible Cups and software that interpreted what was read.

**Compatible Cup**: A Portion Pack that is compatible with Keurig Brewers.

**Compatible Brewer**: A Single-Serve Brewer that that can be used to brew Compatible Cups.

**Competitive Cup**: Portion Packs made by Keurig's competitors that are either (1) compatible with Keurig Brewers; or (2) would be compatible with Keurig Brewers, but for the Lock-Out Technology designed to prevent Competitive Cups from working in 2.0 Brewers.

**KAD**: Keurig Authorized Distributor.

**KAD Agreement**: Keurig's standard agreement it requires Keurig Authorized Distributors to enter that contains a Loyalty Clause prohibiting the marketing or sale of Competitive Cups or otherwise making them available.

**KARD**: Keurig Authorized Re-Distributor.

**KARD Agreement**: Keurig's standard agreement that it requires re-distributors to enter that contains a Loyalty Clause prohibiting the marketing or sale of Competitive Cups or otherwise making them available.

**K-Cup**: A Compatible Cup that is manufactured or sold by Keurig or its partner or licensee.

**Keurig**: Keurig Green Mountain, Inc. (f/k/a Green Mountain Coffee Roasters, Inc.) and Keurig, Incorporated and all predecessors (including, but not limited to, Green Mountain Coffee Roasters, Inc. and Keurig, Inc.) and successors in interest.

**Keurig Brewer**: Any Single-Serve Brewer manufactured or licensed by Keurig, including, without limitation, K-Cup Brewers (including the 1.0 and 2.0 Brewer models) and Vue Brewers.

**Lock-Out Technology**: The technology that prevents, or is designed to prevent, Competitive Cups from working in any Keurig Brewer that has been referred to by Keurig as Keurig Benefit Technology and CBT.

**Loyalty Clause**: The provision in Keurig's KAD and KARD Agreements that distributor or re-distributor not "market, sell or otherwise make available [] any beverage base or portion pack product, other than K-Cups, for use in Keurig Brewers."

**Market Allocation Clause**: A provision in Brand Competitor Agreements that allocates the market between Keurig and its Brand Competitors by distribution channel, reserving customers in certain channels for the Brand Competitor and customers in other channels for Keurig that restrains competition between Keurig and the Brand Competitors.

**OCS**: Office Coffee Services.

**Portion Pack**: A disposable cartridge, capsule, pod, or pack containing prepared beverage or food product portions that are used in Single-Serve Brewers to make a wide variety of beverage and food products, including, but not limited to, Compatible Cups.

**Relevant Time Period**: 2009 to the present.

**Single-Serve Brewer**: Low-pressure (typically below 30 psi) hot water brewing equipment that can be used to brew one or more servings at a time of coffee, tea, cider, hot cocoa, or other hot beverages or food products, such as soups and oatmeal, from a Portion Pack that is inserted into the brewer.

███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████

**TreeHouse**: TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc.

**Variety Restriction Clause**: A provision in Brand Competitor Agreements that limits the variety of products that Keurig is willing and obligated to manufacture for each Brand Competitor.

**Vue Cups**: Portion Packs designed to work in Keurig's Vue brewers, which are a larger size and a different shape than K-Cups.

Pursuant to Federal Rules of Civil Procedure (the "Rules") 56(a) and Local Rules of the United States District Court for the Southern District of New York (the "Local Rules") 56.1, Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (collectively, "TreeHouse"), JBR, Inc. (d/b/a Rogers Family Company ("JBR"), McLane Company, Inc. ("McLane"), and Direct Purchaser Plaintiffs ("DPPs") (collectively, "Plaintiffs") by and through undersigned counsel, hereby respectfully file this Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (the "Motion"). For the reasons set forth below, TreeHouse, JBR and McLane are entitled to summary judgment regarding Keurig's horizontal agreements restraining its Brand Competitors (Section I); Plaintiffs are entitled to partial summary judgment regarding Keurig's agreements restraining Compatible Cup machine and input suppliers (Section II); TreeHouse, JBR and McLane are entitled to summary judgment regarding their tying claims (Section III); Plaintiffs are entitled to partial summary judgment regarding Keurig's implementation of Lock-Out Technology in its 2.0 Brewers (Section IV); TreeHouse and JBR are entitled to summary judgment regarding the literally false statements made by Keurig in its advertising (Section V); TreeHouse, JBR and McLane are entitled to summary judgment dismissing Keurig's affirmative defenses of unclean hands and *in pari delicto* (Section VI); and McLane is entitled to summary judgment regarding its standing as a direct purchaser (Section VII).

## LEGAL STANDARD

### A.  Motions For Summary Judgment Under Federal Rule Of Civil Procedure 56

Where "the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law … [t]he Court must grant a motion for summary judgment." *Savory Pie Guy, LLC v. Comtech Indus.*, 2016 WL 7471340, at *4 (S.D.N.Y. Dec. 28, 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *Am. Lecithin Co. v. Rebmann*, 2020 WL

4260989, at *4 (S.D.N.Y. July 24, 2020) (Broderick, J.). In the antitrust context, "summary judgment serves a vital function … by avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces." *Park v. Thomson Corp.*, 2007 WL 119461, at *2 (S.D.N.Y. Jan. 11, 2007) (citing *Top Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998)).

To meet its burden, the moving party need only establish "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once established, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); *Am. Lecithin Co.*, 2020 WL 4260989 at *4. Therefore, to defeat a motion for summary judgment, the non-moving party must support its assertions of genuine issues of material fact by "citing to particular parts of materials in the records … or [by] showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A); *Jaramillo v. Weyerhauser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

### B.  General Burdens Under Sections 1 And 2 Of The Sherman Act

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. "To prove a § 1 violation, a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic entities that (2) unreasonably restrains trade." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 506 (2d Cir. 2004).

Section 2 of the Sherman Act makes it an offense to "monopolize or attempt to monopolize … any part of the trade or commerce among the several States." 15 U.S.C. § 2; *New York ex rel.*

*Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015). A defendant violates Section 2 when it "willfully acquired or maintained" monopoly power through means distinguishable "from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

Unless an agreement is summarily struck down under the per se rule or a quick look,[1] Courts generally use the rule of reason to determine whether the defendant violated Sections 1 and/or 2 of the Sherman Act. *Standard Oil Co. v. U.S.*, 221 U.S. 1, 31 (1911); *Actavis PLC*, 787 F.3d at 652; *U.S. v. Microsoft Corp.*, 253 F.3d 34, 58-59 (D.C. Cir. 2001). Under the rule of reason, a plaintiff must first establish that the defendant's conduct is anticompetitive or exclusionary. *Actavis PLC*, 787 F.3d at 652. Conduct is anticompetitive or exclusionary if it "(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 229 (S.D.N.Y. 2019).

After a plaintiff makes a showing of anticompetitive conduct, the burden shifts to the defendant to show that "the restraint in fact serves a legitimate objective" by proving nonpretextual procompetitive justifications for the specific restraint at issue. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2291 (2018).[2] The defendant cannot assert just *any* justification; the justification must be supported by evidence, must actually increase competition, and must not be "an excuse to cover

---

[1] Courts apply the per se rule where restraints are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co.*, 356 U.S. at 5. Courts apply the "quick look" rule where the "anticompetitive effects [of the restraints] are easily ascertained." *U.S. v. Apple, Inc.*, 791 F.3d 290, 329-30 (2d Cir. 2015). Tying agreements are summarily struck down under Section 3 of the Clayton Act. *See, infra*, Section III.A.

[2] *See also Actavis PLC*, 787 F.3d at 652; *NCAA v. Alston*, 210 L.Ed.2d 314, 336 (2021); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1151-52 (N.D. Cal. 2014); *Law v. NCAA*, 902 F. Supp. 1394, 1410 (D. Kan. 1995).

up different and anticompetitive reasons." *McWane, Inc. v. FTC*, 783 F.3d 814, 841 (11th Cir. 2015); *Microsoft*, 253 F.3d at 59. Where justifications are pretextual or unsupported by the evidence, the court "need not weigh them against anticompetitive harms." *Actavis PLC*, 787 F.3d at 658; *see also U.S. v. Dentsply Int'l, Inc.*, 277 F. Supp. 2d 387, 453 (D. Del. 2003); *Jamsports & Entm't, LLC v. Paradama Prods.*, 2005 WL 14917, at *11 (N.D. Ill. Jan. 3, 2005).

However, even if the defendant successfully proves legitimate, procompetitive justifications that are supported by record evidence, the defendant will still be liable where a plaintiff proves by a preponderance that "the challenged restraint is not reasonably necessary to achieve the defendants' procompetitive justifications, or that those objectives may be achieved in a manner less restrictive of free competition." *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003); *see also Geneva Pharms. Tech. Corp.*, 386 F.3d 485, 507 (2d Cir. 2004); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d at 1151-52; *Clarett v. NFL*, 306 F. Supp. 2d 379, 410 (S.D.N.Y. 2004) (granting plaintiff summary judgment where "an alternative to the [challenged policy] exist[ed] that [was] less prejudicial to competition").

## ARGUMENT

## I.   SUMMARY JUDGMENT MOTION FOR HORIZONTAL BRAND COMPETITOR AGREEMENTS BOYCOTTING KEURIG COMPETITIVE CUP COMPETITORS

Keurig entered into more than 90 agreements with its horizontal, direct competitors that restrained competition, including by prohibiting Competitor Brands from: working with Competitive Cup manufacturers, like TreeHouse; making Compatible Brewers that could use Competitive Cups or otherwise working with Single-Serve Brewer competitors; adding new varieties as they independently saw fit; and choosing for themselves to whom to sell. By their terms, these agreements restrain competition and decrease output to the detriment of Competitive Cup manufacturers, Competitor Brands, Compatible Cup resellers, and consumers, among others.

## KEURIG'S HORIZONTAL RESTRAINTS ON BRAND COMPETITORS

Keurig makes K-Cups under its own and third-party brands. SUF ¶ 10. Brand Competitors are coffee roasters and other beverage companies—such as Starbucks, Folgers, Bigelow, and Swiss Miss—that have contracted with Keurig to manufacture Compatible Cups containing their various beverages. SUF ¶ 11. Keurig's relationships with its Brand Competitors are governed by agreements. SUF ¶ 27. Under the Brand Competitor Agreements, Keurig makes K-Cups for its Brand Competitors and retains the right to sell all or some of the K-Cups in competition with its Brand Competitors. SUF ¶ 13. Keurig has contracted with all major U.S. coffee brands. SUF ¶ 28. For instance, Starbucks, Dunkin' Donuts, Maxwell House (owned by Kraft), Folgers (owned by Smucker), Eight O'Clock, and Peet's Coffee & Tea—brands that controlled ███ of the U.S. market for bagged and canned coffee by 2012, SUF ¶ 101—are all Keurig Brand Competitors. *See* SUF ¶ 102.

Keurig's Brand Competitor Agreements contain several clauses that, separately and together, unreasonably restrain trade in violation of Section 1 of the Sherman Act. *First*, all Brand Competitor Agreements ████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████ SUF ¶ 29. ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████.″ SUF ¶ 35.[3] ███████████████████ ████████████████████████████████████████████████████. The

---

[3] ████████████████████████████████████████████████. Exs. 28-29. Citations to Exhibits (Ex.) refer to Exhibits to the Declaration of Aldo A. Badini, dated August 25, 2021.



████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████. For instance, the ████████████ specifies that ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████."

*Id*.████████████████████████████████████████

████████████████████████████████" *Id*.

 *Second*, a clause ████████████████████████████████████████

████████████████████████ appears in many Brand Competitor Agreements (the "████

████████████"). SUF ¶ 30. For instance, ████████████████████████████

████████████████████. SUF ¶ 38. Later, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████." *Id*.[4] The ████

████████████████████████████████████████████████████████

████████████████████████. SUF ¶ 40. ████████████████████████

████████████████. SUF ¶ 42.

 *Third*, for Brand Competitors who ████████████████████████, a clause

████████████████████████████████████████████████████████████████

████████████████████████████████████, such that Keurig

and the Brand Competitor are restraining competition with each other ████████████████████

(the "Market Allocation Clause"). SUF ¶ 31. In Keurig's words, "Brand owners typically retain

the rights to sell into the grocery, mass, club, and some online retail channels, while Keurig

---

[4] ████████████████████████████████████████████████████████████. Exs. 28-29.

typically licenses the rights to sell on Keurig.com and in the [AFH] and specialty retail channels."

SUF ¶ 32. For example, Keurig's ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████." SUF ¶ 46. The agreement

makes clear that ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████. *Id.*[5]

 *Fourth*, most of Keurig's Brand Competitor Agreements include a '████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████. SUF ¶ 33. ██████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████. SUF ¶ 52. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████. *See, e.g.*, SUF ¶ 48.

## KEURIG'S HORIZONTAL AGREEMENTS WITH ITS BRAND COMPETITORS UNREASONABLY RESTRAIN TRADE

 "[D]irect evidence of an illegal 'contract, combination, or conspiracy," as the Second

Circuit has recognized, "obvious[ly] … satisfies § 1's concerted-action requirement." *N. Am.*

---

[5] ████████████████████████████████████████████████████████████████. Exs. 28-29.
[6] ████████████████████████████████████████████████████████████████. Exs. 28-29.

*Soccer League, LLC*, 883 F.3d at 40; *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314-15 (3d Cir. 2010). While "conspiracies are rarely evidenced by explicit agreements," this is the rare case replete with explicit agreements. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012). Here, Keurig reduced to writing its anticompetitive agreements with each Brand Competitor. *See, e.g.*, SUF ¶¶ 34, 37, 39, 41, 43, 45, 47, 51; *Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 461-62, 464 (1941) ("*FOGA*") (per se unlawful group boycott evidenced by written agreements).

These agreements are horizontal "agreement[s] between competitors at the same level of the market structure." *Anderson News, L.L.C.*, 680 F.3d at 182. Keurig, a coffee roaster that also manufactures and sells K-Cups under its own brands and others' brands, competes horizontally against its Brand Competitors to sell K-Cups. SUF ¶ 15. In its most recent annual report to the U.S. Securities and Exchange Commission, Keurig specifically identified five "major competitors," which Keurig acknowledged were "also our partners and customers," including Smucker and Kraft. SUF ¶ 20. Keurig executives have admitted this competition. For example,



. SUF ¶¶ 21-22. The Brand Competitors have also admitted that they compete against Keurig and against one another. For example,

. SUF ¶¶ 23, 24.

. SUF ¶ 25. A former Dunkin' executive similarly testified that Dunkin', Keurig, and other coffee roasters are all competitors. SUF ¶ 26.

Keurig pursued Brand Competitor Agreements with these companies to restrain the competitive threat they presented. *See* SUF ¶¶ 64-5. Once these companies became contractually

bound Brand Competitors, Keurig viewed them as "non-threatening partners" or "frenemies." SUF ¶¶ 16-8.

As this Court has recognized, the fact that Keurig also makes K-Cups for its Brand Competitors does not diminish the competition between Keurig and its Brand Competitors or transform their relationship into a vertical one. *See In re Keurig*, 383 F. Supp. 3d at 244 (rejecting Keurig's argument that its agreements with brand partners are vertical rather than horizontal). This is consistent with the approach articulated by the federal antitrust agencies, which "treat a relationship between a licensor and its licensees, or between licensees, as having a horizontal component when they would have been actual or potential competitors … in the absence of the license, *even if a vertical relationship also exists*." U.S. Dep't of Just. & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* § 3.3 (2017) (emphasis added).

The restraint on horizontal competition is clear on the face of the agreements, which: ██

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████   As discussed below, each horizontal Brand Competitor Agreement amounts to an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

### A.  Keurig's Brand Competitor Agreements Are Per Se Unlawful

"[B]ecause of their pernicious effect on competition and lack of any redeeming virtue," agreements such as Keurig's Brand Competitor Agreements "are conclusively presumed to be unreasonable and therefore [per se] illegal without elaborate inquiry as to the precise harm they

have caused or the business excuse for their use." *N. Pac. Ry. Co. v. U.S.*, 356 U.S. 1, 5 (1958).

At a minimum, the restraints should be reviewed under a quick-look rule of reason analysis as "no elaborate industry analysis is required to demonstrate the anticompetitive character" of the agreements. *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 692 (1978)).[7]

### 1.   The Challenged Restraints In The Brand Competitor Agreements Are Per Se Unreasonable Because They Facially Restrict Competition And Decrease Output

Any restraint of trade that "facially appears to be one that would always or almost always tend to restrict competition and decrease output" is per se unreasonable under Section 1 of the Sherman Act. *NCAA v. Bd. of Regents*, 468 U.S. 85, 100 (citation omitted). The per se rule applies to the types of restraints at issue here. To begin, "output limitation[s] are ordinarily condemned as a matter of law under an 'illegal per se' approach because the probability that these practices are anticompetitive is so high." *Bd. of Regents*, 468 U.S. at 100. Another "classic example[] of a *per se* violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (citation omitted). This comes as no surprise, as "raising price, reducing output, and dividing markets" generally have "the same anticompetitive effects." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 225 (2d Cir. 2004) (citation omitted); *see also U.S. v. Sealy, Inc.*, 388 U.S. 350, 357 n.5 (1967). In addition, "often listed among the classes of economic activity that merit

---

[7] Because there is extensive direct evidence of horizontal agreements in restraint of trade (the Keurig Brand Competitor Agreements themselves) there is no need to also rely on indirect evidence of such agreement including, for example, where entry into such an agreement by one brand, without acquiescence of most or all of the other brands, would harm the individual economic interests of the brands. *See Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 306 (S.D.N.Y. 2014). However, ample indirect evidence exists as well. Smucker, for example, had to note in its annual filing with the Securities and Exchange Commission that the use of Keurig as a "single-source supplier" meant that "it could be difficult to find an alternative supplier for such goods on commercially reasonable terms, which could have a material adverse effect on our results of operations." SUF ¶ 72.

per se invalidation under § 1" are group boycotts or concerted refusals to deal. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293 (1985).

Keurig's Brand Competitor Agreements check all the boxes for per se treatment. The restraints on their face "always or almost always tend to restrict competition and decrease output," *Bd. of Regents*, 468 U.S. at 100, whether by agreeing to boycott those competing with Keurig to manufacture Compatible Cups, limiting the Compatible Cup choices available to resellers and consumers, allocating the Compatible Cup Market between Keurig and its Brand Competitors to restrain competition for one another's customers, or prohibiting Brand Competitors from competing against Keurig Brewers and K-Cups.

### i.   The Boycott Clause Restricts Competition And Decreases Output

The ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████   *See, e.g.*, SUF ¶ 35. On its face, this clause represents a per se unreasonable group boycott of Keurig's Compatible Cup manufacturing competitors.

Courts have condemned as per se unlawful "joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'" *Nw. Wholesale*, 472 U.S. at 294 (citation omitted). "In these cases, the boycott often cut[s] off access to a supply, facility, or market necessary to enable the boycotted firm to compete, and frequently the boycotting firms possessed a dominant position in the relevant market." *Id.* (citations omitted). For instance, the Supreme Court invalidated a group boycott as per se unreasonable in *FOGA*, where garment makers orchestrated a group boycott of manufacturers offering lower priced "pirated" copies. 312 U.S. at 461. The Court found that the "necessary tendency" of the group boycott was "the direct

11

suppression of competition from the sale of … copied designs." *Id*. at 465. Here, too, the "necessary tendency" of the agreements is to destroy competition from competitors that seek to make Competitive Cups in competition with Keurig's K-Cups.

The Supreme Court has repeatedly applied the per se rule to group boycotts. Eighteen years after *FOGA*, in *Klor's Inc. v. Broadway-Hale Stores, Inc.*, it condemned as per se illegal an agreement between various appliance manufacturers and a retailer providing that the manufacturers would not deal with the plaintiff retailer. 359 U.S. 207, 209, 213 (1959). Consistent with per se treatment, the Court refused to consider any purported procompetitive justifications, including the possibility of lowering prices or increasing competition. *Id*. at 210. Rather, the Court cited other Supreme Court authority holding that such arrangements would be condemned on their face. *Id*. at 212. Several years later, faced with a case where an association and its members agreed they would not sell a necessary input, gas, to a manufacturer of gas burners, the Court described the "conspiratorial refusal to provide gas" to the competitor as falling within "one of the classes of restraints which from their nature or character (are) unduly restrictive," and therefore a per se violation of Section 1. *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 659-60 (1961) (per curiam) (quotation marks omitted). And, in *U.S. v. General Motors Corp.*, General Motors and a group of car dealerships entered into group boycott agreements that denied competing discount dealerships access to General Motors cars. 384 U.S. 127, 148 (1966). The Court there described the group boycott as "a classic conspiracy in restraint of trade," also finding a per se Section 1 violation. *Id*. at 140.

Keurig's conduct squarely fits the pattern of these Supreme Court cases. Each ███

████████████████████████████████████████████████████████████████

██████████████████, to make Competitive Cups in competition with Keurig and the other Brand

Competitors. This is a plain facial restriction of competition and limitation on output that is per se unreasonable under Section 1. Keurig and its Brand Competitors similarly engaged in a concerted refusal to deny Keurig's Competitive Cup competitors access to the inputs necessary to compete against Keurig. *See* SUF ¶ 35 ████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████ Indeed, Keurig's former President, Michelle Stacy, admitted that ████████████████████████████████████████████ ██████████████████████████████████████████████████████. SUF ¶ 82. Needless to say, such restraint on competition has an adverse effect on the market and harms consumers and competition. *See U.S. v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 379 (S.D.N.Y. 2001) (exclusionary policy excluding competitors "weaken[s] competition and harm[s] consumers" by limiting output and depriving consumer choice).

### ii. *The Variety Restriction Clause Restricts Competition And Decreases Output*

The Variety Restriction Clause ███████████████████████████████████ ████████████████████████████████. *See* SUF ¶ 36. In some cases, it imposes further restrictions, such as ████████████████████████████████████ ██████████████████. *See, e.g.*, SUF ¶ 38. Read together with the Boycott Clause—which ██████████████████████████████████████████████████████ ████████████████████████████—the Variety Restriction Clause serves to limit not only the varieties a Brand Competitor can have *Keurig* manufacture but the number of varieties it can produce *in total*, regardless of manufacturer. Because ████████████████████████ ██████████████████, *see, e.g.*, SUF ¶ 86, the combination of these two clauses necessarily limited the total market output of Compatible Cups. *See Bd. of Regents*, 486 U.S. at 99 & n. 19.

13

As Dunkin' confirmed, 

." SUF ¶ 76 (emphasis added). Indeed,

. On its face, the Variety Restriction Clause (by itself and in combination with the Boycott Clause) decreases output by limiting Brand Competitors to the output of Keurig and by limiting beverage varieties that Brand Competitors may offer.[8]

### iii.  *The Market Allocation Clause Restricts Competition And Decreases Output*

The Market Allocation Clause, found in all Brand Competitor Agreements governing how Brand Competitors sell their K-Cups alongside Keurig, allocates the market between the Brand Competitor and Keurig. A market allocation agreement among competitors is so plainly anticompetitive that the Supreme Court has recognized it as "[o]ne of the classic examples of a per se violation of § 1." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49 (1990) (citation omitted). Market allocation can take various forms, encompassing agreements to divide products, territories, and customers. *See U.S. v. Consol. Laundries Corp.*, 291 F.2d 563, 574-75 (2d Cir. 1961); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 416 (S.D.N.Y. 2000) (granting summary judgment on plaintiff's per se market allocation claim where hospitals allocated patients and divided the market for services). Market allocation is per se unlawful "regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Palmer*, 498 U.S. at 49-50.[9]

---

[8] Although evidence of actual market effects of the output restriction is not necessary given the facial restriction in the clause itself, various retailers have testified about the "empty shelves," out of stock, and service problems they experienced when Keurig was regularly unable to meet their customer demand and fill K-Cup orders. SUF ¶¶ 86, 88.

[9] "[H]orizontal market allocations between competitors lower output and raise prices because '[a] firm that is free from effective competition will reduce its output below the competitive level ....'" *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1259 (N.D. Ala. 2018) (citation omitted). Because market allocation effectively

Keurig's Market Allocation Clause is a per se unreasonable restraint of trade. Keurig ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████ *See, e.g.*, SUF ¶ 46. ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

*Id.* The facial purpose and effect of this naked market allocation is to restrain competition. For

example, ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ SUF ¶ 84. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████. SUF ¶ 85.

Keurig's market allocation strategy dates back as far as the early 2000s. At the time, Keurig

only sold brewers in the AFH Market, while all K-Cups were manufactured and sold by Brand

Competitors. SUF ¶ 77. ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████ SUF ¶ 78. █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ SUF

¶ 79. To assuage this fear, Keurig ██████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

eliminates competition, it is even more detrimental to competition than price-fixing. *See Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) ("It would be a strange interpretation of antitrust law that forbade competitors to agree on what price to charge, thus eliminating price competition among them, but allowed them to divide markets, thus eliminating all competition among them.").

███████ SUF ¶ 81. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

Keurig's desire "not … to be in competition" with its Brand Competitors does not excuse its naked market allocation agreements, which continue to this day.[10] Because the Market Allocation Clause is a naked market allocation clause among competitors, it is a per se unreasonable restraint of trade in violation of Section 1 of the Sherman Act. *See Palmer*, 498 U.S. at 49; *Consol. Laundries Corp.*, 291 F.2d at 574-75; *New York ex rel. Spitzer*, 94 F. Supp. 2d at 416.

### iv. The Brand Non-Competition Clause Restricts Competition And Decreases Output

The Brand Non-Competition Clause, present in nearly all Brand Competitor Agreements, restrains Brand Competitors from competing against Keurig Brewers and K-Cups. With limited grandfathered exceptions, Brand Competitors ██████████████████████████████ ████████████████████████████████. SUF ¶ 29. This means, for instance, that consumers who prefer Krispy Kreme coffee will not find those Portion Packs for their Flavia or Tassimo Single-Serve Brewers. To enjoy their favorite coffees in single-serve format, these consumers must use a Keurig Brewer or one of the few other Compatible Brewers, which Keurig also restrains: 1) by ████████████████████████████████████; and 2) by prohibiting distributors from selling or placing Compatible Brewers. *See* SUF ¶ 33; *see also, infra*,

---

[10] Over time, Keurig began reserving the AFH channel for itself as well. At present, "[b]rand owners typically retain the rights to sell into the grocery, mass, club, and some online retail channels, while Keurig typically licenses the rights to sell on Keurig.com and in the away-from-home and specialty retail channels." SUF ¶ 32.

Section III. Brand Competitors also cannot develop other Single-Serve Brewers that compete with Keurig's Brewer.[11] SUF ¶ 33.

On its face, the Brand Non-Competition Clause restricts competition from Keurig's Brand Competitors to make and sell competing Single-Serve Brewers, which "is, by definition, anticompetitive." *Impax Labs., Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 493 (5th Cir. 2021). It also decreases output by precluding Brand Competitors from ███████████████████████

████████████████████████████████████████████████

███████████████. The reduction in output is even more tangible when considering Brand Competitors that negotiated grandfathered exceptions into their Brand Non-Competition Clauses.

████████████████████████████████████████████████

████████████████████████████████████████████  SUF ¶ 48.

████████████████████████████████████████████████

███████████, *see* SUF ¶ 49, and Starbucks' Tassimo-compatible Portion Packs disappeared from the market, depriving consumers of a popular brand that was once available. SUF ¶ 92. The tendency of the Brand Non-Competition Clause to restrict competition and decrease output on its face renders the restraint per se unlawful. *See Impax Labs., Inc.*, 994 F.3d at 493.

### 2. The Restraints In Keurig's Brand Competitor Agreement Facially Restrict Competition And Are A Per Se Unreasonable "Aggregation of Trade Restraints"

Each of the four challenged restraints in Keurig's Brand Competitor Agreements, on its own, imposes a per se unlawful restraint on competition in violation of Section 1. The unlawful nature of the restraints, however, comes into even sharper focus when viewed collectively.

---

[11] ████████████████████████████████████████████████

████████████████████████████████████████. Keurig's former President testified that "an espresso maker" which "brews at much higher pressure" is "not a competitive brewer." SUF ¶ 50.

Courts have long recognized that the "aggregation of trade restraints" is per se unlawful. *See Timken Roller Bearing Co. v. U.S.*, 341 U.S. 593, 598 (1951) ("Our prior decisions plainly establish that agreements providing for an aggregation of trade restraints such as those existing in this case [including market allocation and price-fixing] are illegal under the [Sherman] Act."). In *Sealy*, for instance, the Supreme Court condemned a market allocation arrangement as per se illegal when it was part of "an aggregation of trade restraints." 388 U.S. at 357-58.[12]

As just one example of the anticompetitive nature of aggregating restraints, the Variety Restriction and Boycott Clauses, while illegal in isolation, have a magnified effect on competition in tandem. Brands are limited in their output by Keurig and are simultaneously prevented from getting those excluded varieties made by anyone else, such as TreeHouse.

## B. The Challenged Restraints In Keurig's Brand Competitor Agreements Are Unreasonable Under A "Quick Look" Rule of Reason Analysis

As shown above, the restraints in Keurig's Brand Competitor Agreements are per se unreasonable under Section 1, whether individually or in the aggregate. In the alternative, however, the so-called "quick look" application of the rule of reason applies because the "anticompetitive effects [of the restraints] are easily ascertained." *U.S. v. Apple, Inc.*, 791 F.3d 290, 329-30 (2d Cir. 2015). Under this analysis, Keurig's restraints are unreasonable.

"[T]he rule of reason requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 343 (1982). This analysis often considers the restraint's "actual effect on competition." *Am. Express*, 138 S. Ct. 2274, 2284 (citation omitted). However,

---

[12] *See also In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1258 (N.D. Ala. 2018) (no need to assess each restriction "in isolation"); *Mass. Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 853 F. Supp. 837, 840-41 (E.D. Pa. 1994) (issuing guidance on discovery that would allow the court to "assess whether the challenged accreditation standards are, individually or in the aggregate, unreasonable restraints on competition").

"not every case that requires rule of reason analysis 'is a candidate for plenary market examination.'" *Apple, Inc.*, 791 F.3d at 329 (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779 (1999)). "[T]he Supreme Court has applied an abbreviated version of the rule of reason—otherwise known as 'quick look' review—to agreements whose anticompetitive effects are easily ascertained." *Id.* at 329-30. Under a quick look review, the inquiry proceeds "directly to a consideration of the defendant's procompetitive justifications" for the restraint. *Id.* at 330; *Law v. NCAA*, 902 F. Supp. 1394, 1410 (D. Kan. 1995) (summary judgment for plaintiff where defendant failed to establish procompetitive justification). If the defendant succeeds in showing a procompetitive justification, the court proceeds to "weigh the overall reasonableness of the restraint using a full-scale rule of reason analysis." *Bogan v. Hodgkins*, 166 F.3d 509, 514 n.6 (2d Cir. 1999) (quoting *U.S. v. Brown Univ.*, 5 F.3d 658, 669 (3d Cir.1993)).

### 1. The Quick Look Test Governs Any Rule Of Reason Analysis Because The Anticompetitive Effects Of The Challenged Restraints Are "Easily Ascertained"

A quick look review is appropriate when "no elaborate industry analysis is required to demonstrate the anticompetitive character of [the challenged] agreement," *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986), as the "anticompetitive effects are easily ascertained," *Apple*, 791 F.3d at 330. The Supreme Court recognizes, however, that "under the Sherman Act, liability may be established by proof of *either* an unlawful purpose or an anticompetitive effect." *Summit Health v. Pinhas*, 500 U.S. 322, 330 (1991). While either will suffice, a brief review of unrefuted record evidence demonstrates both the unlawful purpose *and* the anticompetitive effects of Keurig's restraints, meriting quick look review at most.

Keurig pursued a strategy of locking Brand Competitors into restrictive agreements for the unlawful purpose of combating price erosion and protecting its market share. ██████

████████████████████████████████████████████████████████

19

███████████████████████████████████████████████

███████████████████████████████████████████████

Former Keurig President Michelle Stacy confirmed that ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██ Keurig's cost structure, however, tended to increase roasters' manufacturing costs. ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

     To ensure stable prices for Keurig while subjecting Brand Competitors to increased manufacturing costs, Keurig imposed restraints on competition. █████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████ SUF ¶ 64; *see also* SUF ¶ 96 (acknowledging that other Competitive Cup manufacturers offered lower prices than Keurig). ███████████████████████████████████████

█████████████████████████████████████████ The Boycott Clause and Brand Non-Competition Clause ensured Keurig's Brand Competitors would not have the option to accept more attractive offers from Competitive Cup manufacturers.

     Keurig's restraints were successful in achieving its desired anticompetitive effects. ████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████ And Keurig's restraints had a negative impact on output, consumer choice, and price. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████; *see also* SUF ¶ 94 (explaining Starbucks sought additional SKUs "for more latitude or flexibility … to grow our business")). ████████████████████████████

████████████████████████████████ As bad as they were, the variety restrictions imposed on Starbucks were less restrictive compared to those imposed by Keurig on others. Keurig's contract with Caribou Coffee, for example, provided that "neither GMCR nor Keurig shall be obligated to produce, market or sell any particular quantity or variety of Caribou K-Cups." SUF ¶ 44. There is no question, as Peet's has explained, that variety is important to single-serve owners. SUF ¶ 95. Yet, as a result of Keurig's restrictions, consumers have been deprived of additional variety in Compatible Cups and the option to purchase many familiar beverages in Competitive Cups or other brewer formats.

The restrictions in Keurig's Brand Competitor Agreements have had the effect of running counter to the "primary objective of antitrust … to protect consumers—to prevent firms from engaging in conduct that causes harm by increasing prices, reducing output, or diminishing consumer choice." *In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 2d 181, 187 (S.D.N.Y. 2000).

### 2. Keurig Fails To Carry Its "Heavy Burden" Of Demonstrating Valid Procompetitive Justifications For The Various Restraints On Competition

Defendant bears "a heavy burden of establishing an affirmative defense which competitively justifies [an] apparent deviation from the operations of a free market." *Bd. of Regents*, 468 U.S. at 113. Keurig cannot meet this burden. Indeed, the only purported justifications Keurig has offered throughout the litigation—which are limited to a defense of its Boycott and Brand Non-Competition Clauses—are invalid, unsupported, and pretextual.

*First*, Keurig has attempted to justify its restraints on competition by falsely asserting that ███████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Even if this were true, however, "[t]hat other competition-reducing restraints may also be present in the marketplace does not excuse a defendant's anti-competitive behavior." *U.S. Airways, Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709, at *17 (S.D.N.Y. Mar. 21, 2017).

*Second*, Keurig's proffered expert on antitrust liability, Dr. Kevin Murphy, has opined that ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████████ But Dr. Murphy cites no support for these speculations. Not only does Keurig have *no support* for this justification,[13] but the undisputed facts prove the opposite. Keurig viewed its restrictive agreements as a way to *combat* price erosion and protect its market share—not to lower prices for consumers. *See* SUF ¶ 62. Brand Competitors such as ███████████████████████████████████████████████████████████████████ ████████████████████, and that other Competitive Cup manufacturers offered lower prices. SUF ¶¶

---

[13] Keurig did not offer this purported justification in its interrogatory response. *See* Ex. 30 at 5-7. Dr. Murphy does not cite to any supporting evidence for this statement. *See* Ex. 67, ¶ 228.

70, 96. Keurig's purported justification based on a hypothetical lower consumer price is thus plainly pretextual.

*Finally*, Keurig has claimed that ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 30, p. 6; *see also* Ex. 67, ¶¶ 229, 232. However, record evidence reveals this to be pretextual in nature. Keurig did not teach its Brand Competitors how to roast coffee, blend tea, or develop a loyal customer base. Keurig explicitly recognized it was the other way around: ████████████████████████████████

████████ SUF ¶ 98. Many of Keurig's Brand Competitors have iconic brands—such as Folgers, Maxwell House, Dunkin', and Starbucks—and ████████████████████████████████

██████████████████████████████████████████████.

Because the record demonstrates that "[a]ll of Defendants' procompetitive justifications … are pretextual" or invalid as a matter of law, they must be rejected. *Actavis PLC*, 787 F.3d at 658; *Barber & Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1280 (4th Cir. 1987) (rejecting justifications that were a "pretext for … anticompetitive intentions").

## II.   SUMMARY JUDGMENT MOTION FOR SUPPLIER EXCLUSIVE DEALING

Keurig entered into dozens of agreements with suppliers that contained ████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████ The

clear contract language ████████████████████████████████████████████████████

In most cases, ████████████████████████████████████████████████████

██████████████████████████████████████████

The , rendering implausible and pretextual any putatively procompetitive justifications Keurig could assert. Although suppliers did not want to be subjected to Keurig's terms, In a testament to Keurig's monopoly power, more than however, all acquiesced to Keurig's anticompetitive demands.

These facts are undisputed and unprecedented. Plaintiffs are aware of no case in which a manufacturer has entered into exclusive dealing agreements with this number of suppliers, for this broad a scope, for this lengthy a duration, surviving for this long after the term of the contracts.

Under the rule of reason, (a) Keurig cannot satisfy its burden to prove that the "in fact serves any legitimate" and "non-pretextual" procompetitive objective; and (b) even if Keurig had proffered such a justification, it is possible to meet any such objective in "less restrictive" ways. 7 Areeda & Hovenkamp ¶ 1504b; *Actavis PLC*, 787 F.3d at 652 (2d Cir. 2015); *Visa*, 344 F.3d at 238; *Law*, 902 F. Supp. at 1410. There are no legitimate procompetitive effects that justify the breadth, length, and number of Keurig's restrictions. There are numerous other narrowly tailored options that Keurig could have used to achieve those purported benefits that would be "less restrictive of free competition," including entering into non-disclosure agreements, narrowing the area of non-competition to any components Keurig had actually co-developed, and shortening the durations of the non-competition, including by

eliminating economically punitive post-termination exclusivity requirements. *Visa*, 344 F.3d at

238. Indeed, Keurig itself had used less restrictive means in the past and has also ███████████

████████████████████████████████████████████████████ since this litigation was filed.

## KEURIG'S RESTRAINTS ON SUPPLIERS OF COMPETITIVE CUP INPUTS

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Keurig's contracts with

suppliers of those inputs contained ████████████████████████ that prohibited the suppliers

from working with Competitive Cup suppliers, in many cases for decades.

### A. Keurig's Agreements With Competitive Cup Machine Suppliers

Keurig had agreements with ████ suppliers for packaging and filling machines: ██████████

████ and ████. SUF ¶ 108. Keurig's agreements restricted them from supplying competitors

with machines used to make Competitive Cups. SUF ¶ 148. The length of the ████████████

████████████████ typically ranged from ████████████████. SUF ¶ 149.

████████, Keurig's only ████ based machine supplier, was subject to an agreement that

restricted ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.[14] Keurig's

subsequent agreements with ████████ contained similarly restrictive ████████████████

████████ that lasted for ██████—for example, agreements from ██████ and ██████ contained ████████

████████████████████████████████████████████████████ SUF ¶¶ 115,

---

[14] The ████ agreement between ████████ and Keurig contained the following ████████████████

████████████████ … ." SUF ¶ 112 (emphasis added).

118; agreements from ▆▆ and ▆▆ contained ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. [15] SUF ¶¶ 121, 123. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆, by either ▆▆▆▆▆▆ or by Keurig, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. SUF ¶¶ 113, 116, 119, 124, 150. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. *Id.*

These provisions were not paper tigers: ▆▆▆▆▆▆, for instance, believed that Keurig would enforce the ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and declined to supply machines to Competitive Cup manufacturers because of them. ▆▆▆▆▆▆ told TreeHouse in 2010 that it was unable to retool existing ▆▆▆▆▆ equipment that TreeHouse already owned due to the agreement. SUF ¶¶ 210, 221. When TreeHouse again reached out to ▆▆▆▆ in 2011 and 2012, ▆▆▆▆▆ told TreeHouse that it "could not sell any equipment" to TreeHouse "due to noncompete clauses." SUF ¶¶ 222-25.[16] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. SUF ¶ 227.

▆▆▆▆▆' corporate designee noted that his employer had previously asked Keurig to be released from the exclusivity clause, and that he was "always being asked" about what he could do to shorten exclusivity period. SUF ¶ 205. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆

---

[15] ▆▆▆▆▆ underwent several mergers and acquisitions during this period and was known by several names including ▆▆▆▆▆▆▆▆▆▆▆. SUF ¶ 110. Keurig signed Master Services Agreements with each entity. SUF ¶¶ 111, 114, 117, 120, 122, 125.

[16] In 2013, ▆▆▆▆ initially agreed to quote a machine for the assembly of unfiltered Compatible Cups to TreeHouse, believing unfiltered cups to be outside the ▆▆▆▆▆▆▆▆▆▆▆▆. SUF ¶ 225. However, ▆▆▆▆ ultimately had to decline to quote TreeHouse due to "risk." *Id.* ▆▆▆▆▆ was aware of Keurig refusing to do business with another supplier because Keurig believed it had supplied a competitor and did not want to "poke that bear" by attempting to supply to TreeHouse. SUF ¶ 219.

It was only in █████, after this litigation, that Keurig altered its ████████████████████ █████ provision in its ████████ agreements. SUF ¶ 126. The amendment "███████████████ ████████████████████████████████████████████" and ████████████████████████████████████ ████, thereby retaining an unreasonable competitive advantage for Keurig. SUF ¶¶ 126, 127 (emphasis added). The ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

█████ SUF ¶ 126.

There were no procompetitive justifications for these provisions. Keurig could not identify any patents or trade secrets relating to ██████ machines. SUF ¶ 270. █████ testified that Keurig's purported "investment" in the machinery was nothing more than tuning what ██████ had "done forever" to the customer specifications used to make cups. SUF ¶ 269. In fact, ████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████████." SUF ¶ 203.

Foreign suppliers were subjected to a ██████████████████████ as well. █████, an █████ manufacturer, was restricted from "███████████████████████████████████ ███████████████████████████████████████████████████████████████. SUF ¶¶ 129, 132, 135, 138. The ████████████████████████████ was identical to the ████████████████████. SUF ¶¶ 112, 129. Subsequent █████ agreements contained or affirmed the same ████████████████████████. SUF ¶¶ 132, 135, 138. As was the case with ████████, there is no evidence of investments or intellectual property that Keurig supplied to █████ To the contrary, █████ wrote to Keurig about the "██████████████████

27

██████████████ .” SUF ¶ 271. Despite █████ investments, ████████████████████
████████████ . However, ███████████████████████████████████████████
███████████████████████████████████████████ . *See* SUF ¶¶ 129, 138. In
October 2013, ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ . SUF ¶ 211.

      Keurig's ████ agreement with █████ , a machine manufacturer based in ███████ , also
contained a ████████████████████ that ██████████████████████████████

███████████████████████████████████████████

█████████████████████ . SUF ¶ 141. ████████████████████████████

███████████████████████████████████████████

███████████████████████████ . SUF ¶¶ 144, 147.

      In 2010, ████████ wrote to ████████████ that it had "███████████████████

███████████████████████████████████████████

██████ " SUF ¶ 234. █████████████

████ , which was unlicensed at the time. SUF ¶ 236. When Keurig found out, it ███████████

███████████████████████████████████████████

██████████████ . SUF ¶¶ 235-240. Later, in ████████████████████████

███████████████ SUF ¶ 244. ██████████████████████████████

███████████████████████████████████████████

███████████████████████████ . SUF ¶¶ 213, 245-49. ████████████████

███████████████████████████████████████████ , noting
that "████████████████████████████████████████ " and that "████████

████████████████████████████████████████████████████████

████████████████████████████ ." SUF ¶ 213. ██████ stated that, by ████████████████

████████████████████████████████████████████████████████

████████████████████████████ *Id.*

Keurig statements recount the objective behind these agreements. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ " SUF ¶ 200.

Suzanne DuLong, Keurig's Director of Investor Relations, was quoted in a newspaper article saying that, as of 2011, there were "only two companies in the world making K-Cup packaging equipment … and they're both under contract." SUF ¶ 196.

### B. Keurig's Agreements With Suppliers Of Cups Used To Make Competitive Cups

Keurig's agreements with its cup suppliers also contained ████████████████████

████████ that required those suppliers "████████████████████████████████

████ ," and for as long as ████████████████████ . SUF ¶¶ 151-52, 169-71.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ . SUF ¶¶ 154, 157, 160, 164, 167, 169. ████

████████████████████████████████████████████████ from the supplier. SUF ¶¶ 154, 155, 157, 160-61, 164-65, 167, 168, 170-71.

████████████████████████ was ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ . SUF ¶ 154. As in the case with Keurig's contracts with machine

manufacturers, ███████████████████████████████████████

███████. SUF ¶¶ 155, 157.[17] ██████████████████████ to Keurig that "█████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████." SUF ¶ 215. Keurig ██████████████

████████████████████████. SUF ¶ 216. While ██████ ultimately capitulated, the ████████

representative reiterated that he "█████████████████████████████████████████

████████████████████████████████████████████████

██████████████." SUF ¶ 217.

    Another cup supplier, █████████████████████, was also restricted from ████████

████████████████████████ used to make Competitive Cups for as long as ████████

████████. SUF ¶¶ 164, 167. █████████████ agreement with Keurig contained a clause like that

of ████████████████████████████████████████████

████████████████████████████████████████████. SUF ¶ 164.

████████████████ agreement's ████████████████████████ contained a ████████████████

████████████████████████████████, *see* SUF ¶ 167, but the clause itself ████████

████████████████████. SUF ¶ 168.

---

[17] Keurig's ██████ agreement with ██████ contained the following ████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████.... SUF ¶ 154 (emphasis added).
A subsequent ██████ agreement also contained a ████████████████████ for a term of ████ years after the
term of the agreement. SUF ¶ 157.

The ███████████████████████████ were included in the agreements despite Keurig's confirmation that it purchased an "*off-the-shelf*" cup from ████ and was unaware of adjustments done to the cups. SUF ¶ 272 (emphasis added). Again, Keurig could not identify any trade secrets regarding Keurig's purported work with ████ or ████ on the cups, acknowledging that any details on dimensions, chemical composition or oxygen barrier would not be a trade secret. SUF ¶ 278.

Indeed, far from the cups being developed by Keurig, ████ catalog advertised cups that would fit into the Keurig Brewer as a stock item. SUF ¶ 275. TreeHouse had previously purchased those cups from ████ for other uses, such as salad dressing. SUF ¶ 276. It is telling that ████ agreement with Keurig—before any Competitive Cup manufacturers entered the market and ██ years before the filtered patent expiration—did not contain any ████████ ██████████, demonstrating that the clauses were not necessary to achieve any procompetitive justifications. SUF ¶ 291.

Keurig's third cup supplier, ████, was likewise prohibited from supplying "████ ███████████████████████████████████████. SUF ¶ 160. Like the ████ and ████ agreements, the ████████████████████████ in ████████████████████████████████ ████████ *Id.* As in the case with all the other suppliers, Keurig could not identify any of its investments or trade secrets relating to ████ cups. SUF ¶ 277.

### C.  Keurig's Agreements With Suppliers Of Lids Used To Make Competitive Cups

Keurig's agreements with its lid suppliers ████████████████████ ████████████████████ also contained ████████████████████ ████████████████████████████████ ████████████████████████████████. SUF

¶¶ 172-73. Keurig's 2012 agreement with ███████████ contained the identical ██████████ ███████████████ that Keurig used with its machine and cup suppliers that extended for 10 years post-termination.[18]

Other lid suppliers were under the same restrictions. In a ██████ agreement, ████████ ████████ was restricted from supplying Competitive Cup manufacturers with "████████████ ████████████████████████████████████████████████████. SUF ¶ 154. A similar clause of ██ years was included in the ██████ agreement with ██████. SUF ¶ 182. Likewise, Keurig's █████ agreement with ████████ restricted ██████████ from ████████ ████████████████████████████████████████████ following termination or expiration of the agreement. SUF ¶ 179.



Like most of Keurig's supply agreements, the terms of the lid agreements were effectively evergreen in that the ███████████████████████ renewed automatically. Early contract termination was permitted only in limited circumstances, such as material breach, business closure, or insolvency. Even if a supplier were to terminate, the ████████████████████ survived termination. SUF ¶¶ 177, 180, 185. The suppliers were not free to "switch allegiance with ease" and supply cups to Competitive Cup manufacturers, such as TreeHouse. *CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 81 (2d Cir. 1999) (quotation omitted).

Keurig has failed to come forward with evidence that it invested expertise, money, or intellectual property into the lid technology. To the contrary, Keurig was unaware of any

---

[18] SUF ¶ 176 ("██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ … .) (emphasis added); *see also* SUF ¶ 177.

modifications it made to the stock lids it purchased from ████. SUF ¶ 279. Keurig's lid suppliers

████ and ███ worked on lidding with no input or support from Keurig. *See* SUF ¶ 283.

Keurig's corporate designee was also unable to identify any patents or trade secrets relating to its

lid technology. SUF ¶ 280 ("Q. Does Keurig have any trade secrets relating to its lid technology?

[Objection] A. Not to my knowledge.")).

### D.  Keurig's Agreements With Suppliers Of Ink Used To Make Competitive Cups

Keurig's ████████████ extended to agreements with suppliers of

other inputs, including ██████. When Keurig created the 2.0 Brewer, it obtained its █████

██ from ██████. SUF ¶ 187. Keurig's agreement with ████████ contained a █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ SUF

¶ 188. The ████████████████████ prevented ████████ from supplying █████

to any Competitive Cup manufacturer, SUF ¶ 189, despite the fact that the technology was ███

████████ intellectual property. SUF ¶ 284.[19]

Keurig typically purchased ink used on Keurig's 2.0 lids indirectly through its lid supplier

instead of contracting directly with an ink supplier. SUF ¶ 190. Thus, Keurig did not need to restrict

any ink suppliers to make its 2.0 lids. Nonetheless, in ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[19] In fact, the agreement between ████████ and Keurig gave Keurig the right ████████████

████████████████████████. SUF ¶ 188.

 In short, Keurig's interest in restricting Flint was motivated by its desire to thwart competition.

Accordingly, Keurig entered into an agreement with ▮▮▮ in ▮. SUF ¶ 193. That agreement, too, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ SUF ¶ 194. The Keurig restriction had its intended effect. ▮

▮, which had previously been TreeHouse's ink supplier through ▮▮▮, had to stop supplying TreeHouse after it signed Keurig's agreement. SUF ¶ 254.

## KEURIG'S SUPPLIER AGREEMENTS UNREASONABLY RESTRAIN TRADE

Plaintiffs bear the initial burden to demonstrate that a defendant's exclusive dealing has had an "adverse effect on competition" based on the "competitive characteristics of the relevant market." *Geneva Pharms. Tech. Corp.*, 386 F.3d at 508-509.[20] As part of its prima facie case, a plaintiff must prove that the defendant has entered into "an agreement to deal exclusively." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 65 (S.D.N.Y. 1994) (exclusive dealing claim requires "(1) an agreement and (2) an unreasonable restraint of trade or commerce").

Keurig may not defend exclusive dealing agreements with post hoc "litigation inspired justification[s]" that are not supported by contemporaneous record evidence. *See, supra*, pp. 3-4

---

[20] Under the rule of reason, "[t]here is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, …, substantial foreclosure, …, contracts of sufficient duration to prevent meaningful competition by rivals, …, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects. Courts will also consider whether there is evidence that the dominant firm engaged in coercive behavior …, and the ability of customers to terminate the agreements." *ZF Meritor*, 696 F.3d 254 at 271–72.

(citing *Dentsply*, 277 F. Supp. 2d at 453). Where, as here, the defendant is unable to support legitimately procompetitive justifications that in fact increase competition, the fact finder is spared the exercise of having to balance procompetitive and anticompetitive effects of the restraints. *See, supra*, p. 4 (citing *Actavis PLC*, 787 F.3d at 658). Even where the defendant *can* support such justifications, the restraints still violate the Sherman Act where, as here, the defendant could have used less restrictive alternatives to serve the objectives. *See, supra*, at p. 4. The Court should grant partial summary judgment on the agreement, justification, and less restrictive alternatives aspects of Plaintiffs' supplier exclusive dealing claims because there is no genuine issue of material fact as to these issues. *See, supra*, pp. 1-2. Indeed, these issues can largely be resolved based on the face of Keurig's supplier agreements themselves. SUF ¶¶ 111-85.

Keurig entered into agreements from at least  through the present for suppliers of

*See* SUF

¶¶ 111-85. These agreements contain express provisions that have

. *See id*. The parties themselves understood the agreements to prevent them from working with Competitive Cup manufacturers and operated under that understanding. *See, e.g.*, SUF ¶¶ 173, 189, 218-54. Keurig expected to work on an exclusive basis with all of its suppliers. *See* SUF ¶¶ 201, 207. These facts are sufficient to satisfy the exclusive agreement element of Plaintiffs' prima facie case. *See ZF Meritor*, 696 F.3d at 270.

### A. Keurig Proffers Legally Invalid Justifications For Its ██████████ ████████ With Suppliers

Keurig has proffered three justifications for its ███████████████████: (1) industry practice, (2) "competition for the contract," (3) investments and trade secrets. Ex. 30, p. 8; Ex. 68, ¶ 411; Ex. 86, 22:20-23:2. Each of these should be rejected as a matter of law.

#### 1. *Industry Practice Is Not A Valid Procompetitive Justification*

Keurig first asserts that ███████████████████ like Keurig's ████████ ██████████████." Ex. 30, p. 8. There is no evidence that any of Keurig's competitors had agreements with similar restrictions spanning decades. But, even if that were the case, the actions of others in an industry have never been a defense to an antitrust violation.[21] Therefore, Keurig's "industry practice" justification fails. *See Actavis PLC*, 787 F.3d at 658 (court need not weigh justifications against anticompetitive harms where justifications fail as a matter of law). Further, to the extent Keurig is seeking to assert some sort of unclean hands or *in pari delicto* defense, these are not legitimate defenses to Keurig's antitrust violations, as discussed *infra* at Section VI.

#### 2. *The Record Evidence Indisputably Establishes That Keurig Did Not Use ████ ████████████████ To Increase "Competition For The Contract"*

Keurig next asserts that Keurig's contracts with suppliers "████████████████████ ████████████████████████ Ex. 67, ¶ 411. This purported objective is nothing more than the *post hoc*, "litigation inspired justification" provided by Keurig's expert. *Dentsply*, 277 F. Supp.2d at 453. Setting aside the illogical and counterfactual argument that prohibiting suppliers from dealing with Competitive Cup manufacturers for many years—including for years *after*

---

[21] *See, e.g.*, *Bd. of Regents*, 707 F.2d at 1154 (noneconomic justifications are not a valid justification for anticompetitive conduct); *U.S. Airways Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709, at *17 (S.D.N.Y. Mar. 21, 2017) ("That other competition-reducing restraints may also be present in the marketplace does not excuse a defendant's anti-competitive behavior."); *see also ZF Meritor, LLC*, 696 F.3d at 288 (disregarding that other exclusive agreements existed in the industry).

contract termination—somehow *increases* competition to switch contracts, Keurig's corporate representative, Jim Martin, did not identify this as a justification for Keurig's ███████████. SUF ¶ 286. There is also zero record support for the proposition that Keurig added these clauses to its contracts in order to *increase* competition.

Keurig's own documents are self-incriminating. According to Keurig's CEO, Keurig entered into exclusive contracts with suppliers not to protect its purported investments, but to create a ████████ for competitors that would result in █████ capacity and lower market share. SUF ¶ 200. Keurig wanted to ensure that competitors "[c]an't obtain equipment or material to manufacture" Competitive Cups. *Id*. These documents show that any justifications are pretextual and "merely … an excuse to cover up different and anticompetitive reasons." *McWane, Inc.*, 783 F.3d at 841; *Actavis PLC*, 787 F.3d at 658.

Keurig makes the conclusory assertion that suppliers were given "improved terms" in return for the ████████████████, Ex. 30 at 8,[22] but the evidence points to the opposite—Keurig's suppliers were subject to the one-sided ███████████████████████ on a take-it-or-leave-it basis and received less favorable prices than TreeHouse suppliers that were not subject to such agreements. *See* SUF ¶¶ 255-68. Had suppliers not been locked into long-term contracts with Keurig, Competitive Cup manufacturers as well could have competed to purchase more supplies on more favorable terms. The "competition for the contract" justification thus fails as a matter of law. *See Actavis PLC*, 787 F.3d at 658.

---

[22] Notably, the deposition testimony and documentary evidence that Keurig cites for this proposition does not support that suppliers were given "improved terms" in exchange for exclusivity. SUF ¶ 286.

### 3. *The Record Evidence Indisputably Establishes That Keurig Did Not Use* ███████  ██████████████████████ *To Protect Investments Or Trade Secrets*

The only purported "investments" in its suppliers that Keurig could identify were its general investments into the "system" of Keurig Brewers and Compatible Cups for those Brewers, *see* Ex. 67, p. 33, rather than investments in the creation of inputs.[23] Such investments are irrelevant as a matter of law. In an analogous case, this Circuit has recognized that technological innovations embedded into the iPad were unrelated to Apple's anticompetitive agreements with book publishers. *Apple, Inc.*, 791 F.3d at 335.

Nor can Keurig assert that the ███████████████████████ were necessary to protect its intellectual property, because Keurig *had no intellectual property* covering the inputs it purchased. Keurig could not identify a single Keurig-owned patent or trade secret relating to plastic cups, lids, or packaging lines. SUF ¶¶ 270-78, 281. Keurig's relationship with ████████ is likewise bereft of any recognition of any Keurig intellectual property in taggants; in fact, the ██████████████████████████████████████████████████████████████████ ███████████████. SUF ¶ 285. And there is no evidence that ink or paper sold to Keurig by its suppliers contained Keurig intellectual property. As a matter of law, Keurig therefore cannot genuinely assert that protection of its intellectual property in those components was a procompetitive benefit justifying its restraints. *See Bd. of Regents*, 468 U.S. at 114-15 (purported justification not supported by the record); *Actavis PLC*, 787 F.3d at 658.

---

[23] *See* SUF ¶ 269 (Keurig's "investment" into filling and packaging machinery was nothing more than "tuning it to the application."); SUF ¶ 272 (Keurig purchased an off-the-shelf cup from ██████ and was unaware of any modifications done to the cups; SUF ¶ 283 (lid suppliers ██████ and ███ worked together on lidding with no input or support from Keurig).

### B. Keurig's Purported Procompetitive Justifications Could Be Achieved Through Less Restrictive Alternatives

Even if the Court were to assume, contrary to the record, that Keurig's █████████

████████████ in fact achieve procompetitive benefits, the Court should still grant partial

summary judgment as to the existence of less restrictive alternatives such as: (1) non-disclosure

agreements; and (2) agreements with narrower scope or shorter duration.

#### 1. Non-Disclosure Agreements

To the extent any protection of purported intellectual property was needed, that protection

could have been achieved by a non-disclosure agreement ("NDA"). An NDA could have prevented

Keurig's purported trade secrets from being disclosed or used and could have prevented

competitors from free riding on any investments Keurig had purportedly made, while still allowing

Competitive Cup manufacturers to compete for contracts with suppliers.

Before TreeHouse entered the market, Keurig's ████ agreement with ████ did not

contain any █████████████████. SUF ¶ 291. The agreement did, however, ████

███████████████████████████████████████████████████

█████████.[24] SUF ¶ 290. There is no contemporaneous evidence that Keurig was concerned that

NDAs were not sufficient to protect Keurig. SUF ¶ 288. Rather, Keurig's Manager of Quality

Assurance testified that Keurig did not move forward with NDAs merely because it wanted "a

higher form of commitment and loyalty than a nondisclosure agreement," SUF ¶ 292, and that

"exclusivity was considered to be more valuable than just an NDA." SUF ¶ 293. But keeping

suppliers "commit[ted] and loyal[]" is not a procompetitive goal at all and is pretextual in any

event. *See Microsoft Corp.*, 253 F.3d at 72 ("As we explained before, however, keeping developers

---

[24] Given that Keurig purchased an off-the-shelf cup from ████ and was unaware of any modifications to the cups, SUF ¶ 272-73, the record is undisputed that the ████████████████ was not necessary in any event to protect any of Keurig's investments.

focused upon Windows—that is, preserving the Windows monopoly—is a competitively neutral goal."); *Dentsply*, 399 F.3d at 197, 185 ("The record amply supports the District Court's conclusion that Dentsply's alleged justification was pretextual" and "designed expressly to exclude its rivals from access to dealers.").

### 2. *Narrower Scope Of Covered Inputs Or Shorter Duration Of Non-Competition*

Even if Keurig needed to use ███████████████████ to achieve its procompetitive goals, the scope and length of those clauses could have been narrowly tailored to achieve those benefits without locking out competitors. The restraints were overbroad and prohibited suppliers from ███████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

The ████████████████████ could have been limited to the specifications that Keurig had purportedly co-developed with suppliers, which would allow other suppliers the opportunity to source their own products with their own specifications. Moreover, the clauses could have ended after the contract was terminated or survived only for a short period of time thereafter. Instead, Keurig's ████████████████████ were overbroad, lengthy, and effectively perpetual. *See* SUF ¶¶ 148-150, 169-71, 183-85.

A ██████████████████████ with a narrower scope to cover only the products Keurig had purportedly co-developed or of a shorter duration that did not restrict suppliers for decades would be a less restrictive alternative to serve the same objectives. And there is no evidence in the record to dispute this "'fairly obvious' observation." *See Impax Labs., Inc. v. FTC*, 994 F.3d 484, 499, 500 (5th Cir. 2021) (internal citation omitted). In fact, Plaintiffs' counsel has been unable to find *any* case in which the terms of exclusivity for supplier of inputs for a

commercial product are as broad or have extended as long as Keurig's, making Keurig's ████████
████████████████ truly "unprecedented." *See ZF Meritor, LLC*, 696 F.3d at 265.

Keurig's conduct shows it does not even deem decades-long post-termination exclusivity
to be necessary. After this litigation was filed, ████████████████████████████████████
████████████████████████████████████████████. The most recent ██████████
agreement, amended in ██████, allows ████████████████████████████████████
████████████████████████████████. SUF ¶ 126. The current agreement further
confirms that ████████████████████████████████████████████████
████████████████████ was not needed to protect any Keurig IP or investments in those
products. *Id*. And Keurig has now ████████████████████████████████████
████████████████████████████████, *see, e.g.*, SUF ¶ 167
████████████████████████████████████████████████████████
████████████████████████ were completely unnecessary.[25] *See*

*Visa*, 344 F.3d at 238; *Geneva Pharms. Tech. Corp.*, 386 F.3d at 507. As set forth above, the record
evidence likewise shows that eliminating or shortening exclusivity periods would have been viable
alternatives from the suppliers' perspective. *See, e.g.*, SUF ¶ 205 ██████████ asking to be released
from or shorten exclusivity period); SUF ¶ 213 (██████ expressing "████████████████" about
"████████████████" of the ████████████████████████ SUF ¶¶ 215, 217 (██████

---

[25] To be clear, these agreements are still anticompetitive and without justification. Courts have routinely condemned
contracts with exclusivity periods of terms shorter than those still in effect between Keurig and its suppliers. *See FTC
v. Motion Picture Adver. Serv. Co.*, 344 U.S. 392, 393-96 (1953) (condemning exclusivity contracts ranging from 2
to 5 years); *Maxon Hyundai Mazda v. Carfax, Inc.*, 2014 WL 4988268, at *10-11 (S.D.N.Y. Sept. 29, 2014). In
addition, courts have repeatedly endorsed findings of substantial foreclosure where a defendant's exclusivity
agreements foreclose the most efficient suppliers or force competitors to rely on inferior sources. *See, e.g.*, *ZF Meritor*,
696 F.3d at 271; *McWane, Inc.*, 783 F.3d at 837-38 (substantial foreclosure where program tied up "key dealers").
The current agreements still cannot be justified where the evidentiary record does not support Keurig's purported
procompetitive justifications and Keurig's true purpose was to prevent competitors from accessing those suppliers.
*See, e.g.*, *Actavis PLC*, 787 F.3d at 658; *McWane, Inc.*, 783 F.3d at 841.

stating ███████████████████████████████████████

██████████████████████ ).

The record confirms not only that these alternatives exist but that they could practically effectuate Keurig's purported objectives while being "less prejudicial to competition as a whole" and "less restrictive of free competition." *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993); *Visa*, 344 F.3d at 238. By contrast, Keurig's ████████

████████████████████ were "not even arguably tailored to serve such [a procompetitive] interest." *Bd. of Regents*, 468 U.S. at 119. The Court should therefore grant Plaintiffs partial summary judgment that less restrictive means exist to achieve Keurig's purported objectives. *See In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d at 1151-52; *Impax Labs., Inc.*, 994 F.3d at 497-500; *Geneva Pharms. Tech. Corp.*, 386 F.3d at 507.

## III.    SUMMARY JUDGMENT MOTION FOR TYING AGREEMENTS

Plaintiffs move for summary judgment as to liability, fact of damage, and injunctive relief on their federal tying antitrust claims. Keurig entered into more than ████ agreements with office coffee and foodservice distributors that expressly conditioned the ability to purchase Keurig Brewers for use AFH locations on those distributors' agreement to buy K-Cups and not to promote, market, or sell Competitive Cups. These agreements violate the plain text of Section 3 of the Clayton Act, which makes it unlawful to make a sale or contract for sale of goods on the condition that the purchaser "*shall not use or deal in the goods ... of a competitor or competitors*" where the effect *may* substantially lessen competition. 15 U.S.C.A. § 14 (1951). Courts routinely grant summary judgment for plaintiffs where, as here, the tie is explicit on the face of a contract. Keurig's agreements are also per se unlawful under Section 1 of the Sherman Act and Supreme Court precedent because Keurig, with market power over Single-Serve Brewers, tied the sale of two

separate products (Keurig AFH Brewers and K-Cups). Keurig's unremitting policy of tying threatened to unreasonably restrain competition with Competitive Cups, supporting injunctive relief under Section 16 of the Clayton Act, and restrained competition on the merits, supporting damages under Section 4 of the Clayton Act in an amount to be proven at trial.

### KEURIG'S RESTRAINTS ON AFH DISTRIBUTOR CUSTOMERS

Keurig sells its AFH Brewers and K-Cups to KADs, who then provide these products to their own AFH customers such as offices, restaurants, and healthcare and hospitality facilities. Keurig also sells its AFH Brewers and K-Cups to KARDs, who then sell these and related products to KADs. Keurig refers to this sales channel as the "AFH distribution channel." SUF ¶ 299.

Keurig required distributors and re-distributors to sign standard KAD and KARD Agreements, respectively, in order to "purchase, sell, or make available" Keurig's AFH Brewers, which are designed for high-volume use in offices or foodservice locations. SUF ¶¶ 337-38, 353-54. These agreements explicitly require that as a "precondition" to selling or making available Keurig Brewers, the distributor or re-distributor agrees not to "market, sell or otherwise make available [] any beverage base or portion pack product, other than K-Cups, for use in Keurig Brewers" (the "Loyalty Clause"). SUF ¶¶ 337-38, 341-43, 346-47.

The Loyalty Clause has been a standard provision in every KAD and KARD Agreement from 2009 to present. SUF ¶¶ 354-56.[26] Keurig entered into more than ▇ of these agreements with the largest re-distributors and distributors in the nation, such as ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇. SUF ¶¶ 328, 377, 490. Keurig has made hundreds of millions of dollars in annual sales of AFH Brewers and K-Cups to KADs and KARDs subject to the Loyalty Clause. SUF ¶¶

---

[26] Beginning in 2013, the Loyalty Clause further required that distributors not "sell or otherwise make available … any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs." SUF ¶¶ 328, 347-48.

483-88. Keurig's National Director of AFH Field Sales testified that, as of April 2016, Keurig had

a market share of over ▮▮ such that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." SUF ¶¶ 468-69.

### KEURIG'S TYING AGREEMENTS UNREASONABLY RESTRAIN TRADE

### A. Keurig's KAD And KARD Agreements Violate The Plain Text Of Section 3 Of The Clayton Act

Section 3 of the Clayton Act states:

> It shall be unlawful for … [to] make a sale or contract for sale of goods … on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect … may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C.A. § 14 (1951). The Supreme Court has long held that the "Sherman Act and the Clayton

Act provide different tests of liability." *United Shoe Machinery Corp. v. U.S.*, 258 U.S. 451, 459

(1922). Because the Sherman Act sometimes resulted in "unsatisfactory results so far as the

purpose to maintain free competition was concerned," the "Clayton Act sought to reach the

agreements embraced within its sphere in their incipiency" and instituted "specific[ ]tests of its

own." *Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 356 (1922); *see also United

Shoe*, 258 U.S. at 460. Thus, the Clayton Act is less "stringent" than Section 1 of the Sherman Act.

*Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 609-610 (1953).[27]

The Supreme Court has explained that "[w]hen the seller enjoys a monopolistic position in

the market for the 'tying' product, *or* if a substantial volume of commerce in the 'tied' product is

restrained, a tying arrangement violates the narrower standards expressed in [Section] 3 of the

Clayton Act because from either factor the requisite *potential* lessening of competition is inferred."

---

[27] As the Supreme Court observed, "[i]t seems hardly likely that, having … set up an express prohibition against a practice …, Congress meant … to reestablish the necessity of meeting the same tests of detriment to the public interest as that [Sherman] Act had been interpreted as requiring." *Standard Oil Co. v. U.S.*, 337 U.S. 293, 312-14 (1949).

*Times-Picayune*, 345 U.S. at 608-09 (emphases added). The Supreme Court later clarified that a monopolistic position is not required to trigger an inference based on power in the tying market. *N. Pac. Ry.*, 356 U.S. at 11 ("application of the rule of per se unreasonableness to tying arrangements" does not require "anything more than sufficient economic power" in the tying market, assuming that "a 'not insubstantial' amount of interstate commerce is affected").[28] Thus, liability is supported when tying agreements read on the prohibited acts on the face of the Clayton Act and the defendant either has "sufficient economic power" in the tying market or "a substantial volume of commerce in the 'tied' product is restrained," either one of which supports an inference that the effect "***may be*** to substantially lessen competition ***or tend to*** create a monopoly in any line of commerce." 15 U.S.C. § 14 (emphasis added); *Standard Oil Co. of Cal. v. U.S.*, 337 U.S. 293, 311 (1949) ("To interpret that section as requiring proof that competition has actually diminished would make its very explicitness a means of conferring immunity upon the practices which it singles out."); *see also Standard Fashion Co.*, 258 U.S. at 357 (Section 3 "was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition.").

Keurig's more than ███ KAD and KARD Agreements "make a sale or contract for sale of goods … on the condition, agreement or understanding that the [KAD or KARD] shall not use or deal in the goods ... of a competitor or competitors of the … seller,"[29] making their terms fall squarely within the prohibition of the Clayton Act. Keurig's agreements explicitly require that

---

[28] "[T]he vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not." *N. Pac. Ry.*, 356 U.S. at 11. Although not required to support liability under Clayton Act Section 3, Keurig admissions easily establish that it has sufficient economic power with respect to the tying product.

[29] *See, e.g.*, SUF ¶¶ 335, 339 ██████████████████████████████████████████████

distributors agree not to " 

.[30] SUF ¶¶ 341-45. In the words of Keurig's Vice President of AFH, if a KAD "wanted to purchase Keurig brewers, it had to also purchase K-Cups and was prohibited from purchasing unlicensed cups." SUF ¶ 345. This tying arrangement is indistinguishable from the one in *FOGA*, which the Supreme Court held violated Section 3. 312 U.S. at 468.[31]

Nor can there be any dispute that the more than ▮ agreements affect a substantial volume of the tied product in interstate commerce. The Supreme Court has repeatedly found sums of around $200,000 and $500,000 to be "not insubstantial." *Fortner Enterprises v. U.S. Steel Corp.*, 394 U.S. 495, 501-02 (1969) ("*Fortner I*") ($200,000 not insubstantial).[32] There is no doubt that this is met here, as Keurig's sales of K-Cups subject to the Loyalty Clause are worth hundreds of millions of dollars annually and totaled over ▮ from 2011 through 2019. SUF ¶¶ 483-90. Thus, consistent with Supreme Court precedent, Keurig's tying clauses should be held to violate Section 3 of the Clayton Act. *Standard Oil*, 337 U.S. 293 at 314; *Int'l Salt Co. v. U.S.*, 332 U.S. 392, 393-96 (1947) (affirming summary judgment for the plaintiff where approximately 909 "standard form [contracts] containing the tying clause" covered $500,000 of sales).

---

[30] Keurig further requires KARDs to agree "▮▮▮▮▮▮▮▮▮" KADs who, as discussed, have agreed not to sell Competitive Cups. SUF ¶¶ 328, 350.

[31] As discussed above, the defendant in *FOGA* required its members to agree that (i) "textiles shall be sold to garment manufacturers only upon the condition and understanding that the buyers will not use or deal in textiles which are copied from the designs of … members;" and (ii) "garment manufacturers shall sell to retailers only upon the condition and understanding that the retailers shall not use or deal in such copied designs." *Id*. at 464.

[32] *See also Standard Oil*, 337 U.S. at 305 (finding sales of $58,000,000 (6.7% of sales) to be substantial); *Int'l Salt*, 332 U.S. at 395-96 (finding $500,000 not insubstantial).

### B.  Keurig's KAD And KARD Agreements Are Per Se Unlawful Under The Sherman Act

Supreme Court precedent also requires per se condemnation of Keurig's tying agreements under Section 1 of the Sherman Act. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 9-10 (1984) ("[C]ertain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'"); *N. Pac. Ry.*, 356 U.S. at 12 (striking down contractual "preferential routing" tying clauses). Per se condemnation, meaning "condemnation without inquiry into actual market conditions," is "appropriate if the existence of forcing is probable," as it is here. *Illinois Tool Works Inc. v. Independent Ink*, 547 U.S. 28, 37 (2006). "'[F]orcing' is present" where a seller can exploit "control over the tying product to force the buyer into the purchase of a tied product that the buyer … might have preferred to purchase elsewhere on different terms." *Jefferson Parrish*, 466 U.S. at 12.

Keurig's own admissions, documents, and undisputed direct evidence establish that Plaintiffs have met each required element of a per se tying violation under Section 1 of the Sherman Act: (1) the tying arrangement affects a substantial amount of interstate commerce; (2) the two products (Keurig AFH Brewers and Compatible Cups) are distinct; (3) Keurig actually tied the sale of the two products; and (4) Keurig has appreciable market power in the tying market. *In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003).[33]

First, there is no dispute that Keurig's agreements affect hundreds of millions of dollars in tied interstate K-Cup sales. *Supra*, § III.A. Second, Keurig cannot reasonably dispute Single-Serve Brewers and Compatible Cups are separate products. *Infra*, at § III.B.2; ECF No. 1475 (Murphy Daubert Mot.) at 3-4. Third, the Loyalty Clause is a tie on its face. *Infra*, at § III.B.3.

---

[33] ("*Visa*"); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62 (1992) (applying same four elements for a per se claim); *U.S. v. Int'l Business Machines Corp.*, 163 F.3d 737, 741 (2d. Cir. 1998) (same).

Finally, Keurig has market power in the Single-Serve Brewer market that allows it to: require purchasers to accept terms that could not be extracted in a competitive market; exclude competitors; leverage its unique brewers to restrain sales of Competitive Cups; and raise K-Cup prices. *Infra*, at § III.B.4. Such tying agreements are per se unlawful because they "deny competitors free access to the market for the tied product" and thus "buyers are forced to forego their free choice between competing products." *N. Pac. Ry.*, 356 U.S. at 6.

### 1. *Keurig's Tying Affected A Substantial Amount Of Interstate Commerce*

There can be no dispute that Keurig's tying arrangement affected a substantial amount of interstate commerce. *See, supra*, § III.A. Courts considering tying claims under Section 1 of the Sherman Act have consistently found that sales of just hundreds of thousands of dollars or less are enough to satisfy this element. *See, e.g.*, *Fortner I*, 394 U.S. at 502 (sales of over $2,300,000 not "insubstantial"); *Gonzalez v. St. Margaret's House Housing Dev. Fund Corp.*, 880 F.2d 1514, 1518 (2d Cir. 1989) ("$600,000 of commerce clearly meets any test of substantiality").[34] Keurig's sales of K-Cups subject to the Loyalty Clause totaled over ███████ from 2011 through 2019. *See, supra*, § III.A; *see also N. Pac. Ry.*, 356 U.S. at 7 & n.6 (affirming summary judgment where a "large numbers of purchasers," approximately 1,167 in total, had agreed to tying clauses).

### 2. *Single-Serve Brewers And Compatible Cups Are Distinct Products*

"Whether two products are distinct for the purposes of a tying claim 'turns not on the functional relation between them, but rather on the character of the demand for the two items.'" *Visa*, 2003 WL 1712568, at *2 (citing *Jefferson Parish*, 466 U.S. at 19); *see Kodak*, 504 U.S. at 462-63. Following Supreme Court precedent, the Second Circuit determines whether there are two

---

[34] *See also Yentsch v. Texaco, Inc.*, 630 F.2d 46, 58 (2d Cir. 1980); *Tic-X-Press, Inc. v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1419-20 (11th Cir. 1987) ($10,091.07 is not de minimis); *Aamco Automatic Transmissions Inc. v. Tayloe*, 407 F. Supp. 430, 436 (E.D. Pa. 1976) ($50,000 is not insignificant); *Microbyte Corp. v. New Jersey State Golf Ass'n*, 1986 WL 7231, at *5 (D.N.J. June 26, 1986) ($27,264 is de minimis).

distinct products under the "consumer demand test." *Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016). Under this test, the question is "whether the nature of the demand is such that [the products] could be offered separately." *Visa*, 2003 WL 1712568 at \*3. The frequent separate sale of products is determinative. *See id*., at \*2-3 (granting summary judgment where products were often sold separately); *see Park*, 2007 WL 119461 at \*3-4 (granting summary judgment where "numerous sellers offer" only one of the two products at issue); *see also Kodak*, U.S. at 462-63.

While Keurig's expert has described brewers and Compatible Cups as incomplete products that are part of a "system," Keurig did not dispute that the products were separate in the sham *Sturm* Litigation, resulting in the district court finding (affirmed on appeal) that the brewer itself was a complete product. *See Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799, at \*6 (D. Del. Sept. 13, 2012); *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373-74 (Fed. Cir. 2013); Murphy Daubert Mot. at 3-4. The "system" argument is also contrary to Supreme Court precedent that has "often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." *Jefferson Parish*, 466 U.S. at 19 n.30 (citing numerous examples including "heating system and stoker switch," "salt machine and salt," and "ice cream transportation package and coolant").[35]

District courts have followed suit. For example, defendants in *Park* tied their state bar prep courses to multistate prep courses, which it argued was a "single, functionally integrated package of services." 2007 WL 119461 at \*3-4. The court rejected this argument, noting that "[w]here the items have been sold separately, distinct products exist." *Id*. The court found it dispositive that "numerous sellers offer" only one of the two products, which "answers the question as to whether

---

[35] The fact that Keurig Brewers and Compatible Cups are designed to work together does not make them one product. *Kodak*, 504 U.S. at 463 ("By that logic, we would be forced to conclude that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires.").

there is separate demand." *Id.* at *3. The defendants in *Visa*, similarly, sought to coerce merchants to accept debit cards along with credit cards. 2003 WL 1712568 at *3. The court relied on evidence that industry participants often sold these products separately and found that "no rational juror could fail to conclude that the products are distinct." *Id.*

Here, there is likewise no dispute that Single-Serve Brewers and Compatible Cups are sold separately. SUF ¶ 310. Keurig's liability expert, Dr. Kevin Murphy, admitted that the brewer and cups are typically sold separately. SUF ¶ 320. Dr. Murphy further admitted that he would not consider toasters and bread one product because they are sold separately. SUF ¶ 321. From 1998 until 2006, even Keurig *only* sold Single-Serve Brewers and *did not even make or sell K-Cups*. SUF ¶¶ 313-19. Nearly all of Keurig's competitors sell only Compatible Cups or only Single-Serve Brewers. SUF ¶¶ 322-27; *see Visa*, 2003 WL 1712568, at *3 (the "proper question is not whether it was more efficient" to offer products together, but whether they "could be offered separately"); *Park*, 2007 WL 119461 at *3-4. For example, TreeHouse sells Compatible Cups yet has never sold Single-Serve Brewers. SUF ¶¶ 322-24. Keurig also recognizes it competes with Single-Serve Brewer manufacturers that do not sell Compatible Cups. SUF ¶¶ 326-27.

### 3.  *Keurig Contractually Tied The Sale Of K-Cups To Keurig AFH Brewers*

The third element of a per se tying claim requires the actual tying of the sale of two products. Actual tying is established either by selling "one product but only on the condition that the buyer also purchases a different (or tied) product, or … agrees that he will not purchase that product from any other supplier." *N. Pac. Ry.*, 356 U.S. at 5-6; *Kodak*, 504 U.S. at 463. Keurig's tie is evident from the face of more than ███ agreements. *Supra*, Section § A; *Kodak*, 504 U.S. at 463; *N. Pac. Ry.*, 356 U.S. at 7 (granting summary judgment where defendant entered hundreds

of tying agreements); *Visa*, 2003 WL 1712568, at *2.[36] As Keurig's former Vice President of AFH admitted, if a KAD "wanted to purchase Keurig brewers, it had to also purchase K-Cups and was prohibited from purchasing [Competitive Cups]." SUF ¶ 345. Mr. Howe further admitted that if "Keurig terminated the contract with a KAD, they would not have the ability to buy brewers." SUF ¶ 346. Courts routinely grant summary judgment where, as here, such an unremitting policy of conditioned sales is evidenced by the face of the agreements. *See N. Pac. Ry.*, 356 U.S. at 7 (granting summary judgment where defendant entered hundreds of tying agreements); *Visa*, 2003 WL 1712568, at *2; *Park*, 2007 WL 119461, at *4. Keurig admits the existence and effect of these tying terms in its own agreements. SUF ¶¶345-46, 370, 419 ("█████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████.").

### 4. *Keurig Has Market Power In The Single-Serve Brewer Market*

The final element of a per se tying claim is the defendant's possession of appreciable market power in the tying product. *Kodak*, 504 U.S. at 461-62; *see also N. Pac. Ry.*, 356 U.S. at 6 (tying agreements "are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product"). Market power can be shown by direct evidence of the ability to "force [merchants] to do something that [they] would not do in a competitive market," such as accepting tying provisions; to exclude competitors from the market; or to control prices. *Visa*, 2003 WL 1712568, at *4; *Kodak*, 504 U.S. at 481; *Fortner I*, 394 U.S. at 504; *Black v. Magnolia Liquor Co.*, 355 U.S. 24, 26 (1957). An inference of market power also arises where there is evidence that

---

[36] *See also Ringtown Wilbert Vault Works v. Schuylkill Mem'l Park, Inc.*, 650 F. Supp. 823, 827 (E.D. Pa. 1986) (defendant's sale of grave lots was "expressly conditioned on the sale of the burial vault"); *Microbyte Corp.*, 1986 WL 7231, at *2 (defendant made a subscription to a computer handicapping system "a condition of full participation in" its golf tournaments); *Automatic Transmissions*, 407 F. Supp. at 435-36.

the defendant sells a unique product or has an advantage not shared by competitors with respect to the tying product. *See Fortner I*, 394 U.S. at 498-99; *U.S. Steel Corp. v. Fortner Enterprises, Inc.*, ("*Fortner II*"), 429 U.S. 610, 619-21 (1977). Market power can also be shown by indirect evidence of the seller's market share. *Kodak*, 504 U.S. at 464. Keurig's market power is shown by: 1) its ability to impose tie-in terms on an appreciable number of buyers that would not agree to them in a competitive market; 2) the ability to exclude competitors; 3) Keurig's ability to profitably raise prices; 4) Keurig's unique brewers it leverages; and 5) Keurig admissions as to its market share.

    *i.    Keurig Has The Ability To Coerce Distributors And Impose Its Desired Terms*

    Keurig has the ability to impose terms that would not have been agreed to in a competitive market. The Supreme Court has explicitly held that the "ability to impose [ ] burdensome terms such as a tie-in with respect to any appreciable number of buyers" itself supports market power. *See Fortner I,* 394 U.S. at 504; *Visa*, 2003 WL 1712568, at *4; *Jefferson Parish*, 466 U.S. at 14. The ▮▮▮ KAD and KARD Agreements with the Loyalty Clause are an even greater number than the 1,167 tying agreements found by the Supreme Court in *Northern Railway Pacific* to be itself "compelling evidence of market power." 356 U.S. at 7 n.6, 12 ("The very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power."); *see also Int'l Salt*, 332 U.S. at 394, 402 ("tendency of the arrangement to accomplishment of monopoly seems obvious" with approximately 909 tying agreements).

    Keurig also cannot dispute that its policy of tying is "unremitting," as Keurig executives admit that distributors have to enter KAD and KARD Agreements containing the Loyalty Clause to purchase and sell or make available Keurig Brewers. *See* SUF ¶¶ 353-61. The Loyalty Clause was in *every* KAD and KARD Agreement and was not subject to negotiation. *See* SUF ¶¶ 353-56, 361. The record evidence shows that Keurig had the power to "force" the Loyalty Clause on

distributors that wanted freedom to purchase Competitive Cups.[37] *See* SUF ¶¶ 368-75, 419. As Keurig's office coffee services leadership team admitted, distributors are "███████████████████████████ ███████████████ which creates ████████████████████████████████████████ ██████." SUF ¶ 419 (emphasis added). Coercion thus is demonstrated, and Plaintiffs need not present proof of individualized coercion.[38] *See Park*, 2007 WL 119461, at *4 ("When a policy of conditioned sales is demonstrated, proof of coercion on an individual basis is unnecessary."); *see also AngioDynamics*, 2021 WL 1792394, at *23 (same).

Although not needed for summary judgment given Keurig's unremitting tying policy, the undisputed evidence further shows that Keurig was able to unilaterally impose its Loyalty Clause on the nation's largest distributors, who acquiesced to the Loyalty Clause despite their stated opposition.[39] *See* SUF ¶¶ 368-74. For example, ███████████████████████████████ ████████, stated its KARD Agreement was ███████████████████ yet ██████ remains a KARD to this day.[40] SUF ¶¶ 369-70, 382. Additionally, Canteen and Aramark, ████████████████ ████████ both unsuccessfully sought to get rid of the Loyalty Clause (████████████████████████████ ██████). *See* SUF ¶¶ 371-74. While Keurig was well aware of distributors' demands to remove the Loyalty Clause, Keurig not only refused to do so, it *expanded* the Loyalty Clause in 2013 by

---

[37] SUF ¶ 347 ("███████████████████████████████████████████████ ████████████████████████████████████████

[38] The Second Circuit requires "evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product." *Yentsch*, 630 F.2d at 56–57. However, this element is satisfied here, where Keurig has market power in the tying product that shows its "unremitting policy" of tying constitutes "actual coercion" as a matter of law in the Second Circuit. *See Hill v. A-T-O Inc.*, 535 F.2d 1349, 1355 (2d Cir. 1975); *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2021 WL 1792394, at *23-24 (N.D.N.Y. May 5, 2021) (same).

[39] There is also extensive evidence from Keurig's partners discussing Keurig's *monopoly* power over Single-Serve Brewers, far exceeding the level required for a tying claim. *See* SUF ¶¶ 454-59; *cf. Fortner I*, 394 U.S. at 504.

[40] Indeed, Vistar testified that it was not aware of any other manufacturer besides Keurig that demanded that Vistar not buy competitors' products. SUF ¶ 369.

prohibiting distributors from selling or placing Compatible Brewers that could be used with Competitive Cups. *See* SUF ¶¶ 347, 374-376.

Keurig's ability to impose and even expand the Loyalty Clause despite distributor objections is "itself compelling evidence of [Keurig's] great power." *N. Pac. Ry.*, 356 U.S. at 7. This is precisely the sort of market power that the Second Circuit has explained shows an "unremitting policy" of tying constitutes "actual coercion" as a matter of law. *See, supra*, § III.B.4.i (citing *Hill*, 535 F.2d at 1355; *AngioDynamics*, 2021 WL 1792394, at *23-24). While this is more than sufficient for the Court to grant summary judgment on Plaintiffs' tying claim, Plaintiffs further prove Keurig's market power in several additional ways below.

ii.   *Keurig Has The Power To Exclude Competitors With The Loyalty Clause*

While the standard for market power for tying purposes is less than the test for monopoly power,[41] the undisputed evidence shows that Keurig's tying agreements had the power to exclude competitors. Thus, this is *a fortiori* evidence of its market power sufficient to impose an illegal tie. *See Kodak*, 504 U.S. at 481 (*monopoly* power can be shown through the power to control prices or exclude competitors from the market); *Black*, 355 U.S. at 26 ("The tie-in sales … seem to run afoul of [Sherman Act] policy, since the retailer is coerced into buying [the tied products] he would otherwise not have purchased at that time, and *other sellers of the products are, to that extent, excluded from the market that would exist when the demand arose*.") (emphasis added).

For example, Keurig licensee Peet's Coffee & Tea explained prior to entering an agreement with Keurig that it was " ███████████████ " the OCS channel for Competitive Cups as a result of Keurig's " ███████████████████████████████████████████ ."

---

[41] *Fortner I*, 394 U.S. at 510 (discussing that it is not necessary to show monopoly power or dominance in the tying market, only sufficient power to impose an appreciable restrain in the tied product).

SUF ¶ 406.[42] Bigelow, another Keurig licensee, testified that due to Keurig's KAD Agreements, Bigelow did not believe it would be able to sell into the OCS or Food Service channels if it selected a company other than Keurig to make its Compatible Cups. SUF ¶ 407. Unilever also testified to this power to exclude, explaining that Keurig could offer Unilever "███████████████," where Keurig had at least a ███████ of the market. SUF ¶¶ 408, 465.

Keurig's inclusion of the Loyalty Clause in its agreements with ███ alone is sufficient evidence of the power to exclude competitors, as ████████████████████████████████ the AFH distribution channel.[43] SUF ¶¶ 385-388. This is far above the level courts require to demonstrate power to exclude competitors. *N. Pac. Ry.*, 356 U.S. 1 (tying claim does not require "anything more than sufficient economic power" in the tying market); *Fortner I*, 394 U.S. at 502-503 ("economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers").

### iii. *Keurig Profitably Raises Prices Without Losing Significant Sales*

Keurig's ability to raise prices without a significant loss of business also supports market power. *Visa*, 2003 WL 1712568, at *4; *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 61 F.3d 123, 129 (2d Cir. 1995) (market power is "the ability to raise price significantly above the competitive level without losing all of one's business"). This Court has already acknowledged that monopolists may "evade price control in the tying product through clandestine transfer of the profit to the tied product." *See In re Keurig*, 383 F. Supp. 3d at 226; *see also Kodak*, 504 U.S. at 487;

---

[42] Indeed, while Vistar was the exclusive OCS distributor of Peet's bagged coffee, it could not sell Peet's Competitive Cups because of the Loyalty Clause. SUF ¶ 405. The ability to exclude Peet's, TreeHouse, and others from selling Competitive Cups to an entire distribution channel that they rely on to sell other products that do not compete with Keurig is direct evidence of Keurig's monopoly power.

[43] As OCS broker DeMitri Chesapeake Sales, Inc. explained, "unless we have distribution through Vistar our opportunities to sell product are going to be very limited if not impossible." SUF ¶ 309. Even Canteen, Keurig's second largest OCS distributor, confirmed that Vistar is "the most efficient channel of distribution." SUF ¶¶ 307, 842-43.

*Jefferson Parish*, 466 U.S. at 13 & n.19 (same). Thus, Keurig's market power can be proven through evidence that Keurig profitably raised prices of the tied product (K-Cups) without losing significant sales. *See Visa*, 2003 WL 1712568, at *3 (no evidence merchants switched to other payment devices despite increases in fees).

Notably, Keurig's power to unilaterally raise prices on distributors is clear from the face of its contracts that commit distributors to pay brewer *and* K-Cup prices " ███████████████ ███████ " in its ███████████ and which Keurig had the ██████████████████████ [44] SUF ¶¶ 422-23. Keurig's head of U.S. sales further admitted that Keurig frequently raised prices on distributors, and that these price increases did not cause Keurig to lose sales. SUF ¶¶ 424-26. Keurig raised Portion Pack prices "a number of times," *including times when* ██████████ ██████████ , and that Keurig maintained " ████████████████████████ ████████████████████████ . SUF ¶¶ 242-26.

Direct evidence from Keurig's distributors further confirms Keurig's power to repeatedly raise AFH prices without distributors switching away from Keurig. SUF ¶¶ 427, 429-30, 432, 434-35. For example, Atlantic Coffee's Vice President noted that Keurig raised prices on numerous occasions, and there was "certainly displeasure, but never negotiating ... on any price increases from Keurig." SUF ¶ 435.[45] The President of a former KAD also explained: "[e]veryone in the OCS business knew that Keurig was increasing prices, and squeezing KADs' margins, simply because they could." *See* SUF ¶ 427.

---

[44] Keurig's market power to raise both cup *and* brewer prices without losing sales volume is further ██████████████ ████████████████ SUF ¶¶ 422-23, 429-30.

[45] *See also* SUF ¶¶ 428-29 (████████████████████████ ████████████████████████ ).

As the transactional data shows, Keurig █████████████████████████████████
████████████████████ after TreeHouse entered the market. SUF ¶¶ 436-38. Keurig again
██████████████████████████████████████████████████████. SUF ¶ 439.
████████████████████████████████████████████████████████████
███████████████████████████████████████ SUF ¶¶ 437-43.[46] Thus, Keurig's
admissions, data, and direct evidence from distributors indisputably demonstrate that Keurig has
the power to raise prices without losing significant sales.

   *iv. Keurig Leverages Its Unique Single-Serve Brewer*

   Market power can further be inferred where the seller has a unique product or advantage
relating to the tying product. *See Fortner I*, 394 U.S. at 498-99; *Fortner II*, 429 U.S. at 619-21.
Keurig's admissions demonstrate that its AFH Brewers are highly desired by its customers and,
therefore, that demand provides Keurig an advantage over Competitive Cup manufacturers that
Keurig can leverage by threatening to withhold its brewers if distributors sell Competitive Cups.
*See* SUF ¶¶ 448-49, 463, 466 (admitting "████████████████████████████████████
█████████████████████████████████"); *see also* SUF ¶ 465 (Keurig had "Best in class
Brewers, tied to K-Cup contracts to lock out competitors and ensure a return on the brewer
investment through K-Cup sales."). Keurig's licensees and KADs have similarly confirmed the
uniqueness of Keurig's Brewer. SUF ¶¶ 454-59. Indeed, Keurig documents admit that it explicitly
leveraged its unique brewers to exclude competition from Competitive Cups. SUF ¶ 845 ("███
███████████████████████████████████"); SUF ¶ 466 (Keurig "threatened to cut off
[AVA's] access to Keurig brewers … if [they] continued buying [TreeHouse cups].").

---

[46] ██████████████████████████████████████████████████████████████
████ *. See* Murphy Daubert Mot. at 16-17. ██████████████████████████████████
███ SUF ¶¶ 440-43.

> v.     *Keurig Admissions Establish Its Market Power*

In addition to all of the direct evidence of market power discussed above, market power can also be inferred from market share. *See Kodak*, 504 U.S. at 464. Courts have generally found that market power for tying purposes may be presumed where defendant has a market share roughly in the 30% range. *See, e.g.*, *Walker v. Merrill Lynch & Co.*, 181 F. Supp. 3d 223, 235 (S.D.N.Y. 2016).[47] Keurig executives admitted that Keurig's market share for Single-Serve Brewers in the United States and specifically in the AFH market is ███████ SUF ¶¶ 467, 469.[48] Keurig further testified that it had around ██████████████████████████████ ████████ SUF ¶¶ 478, 481.

These admitted shares are much higher than is required to meet the market power test for per se tying and, in fact, would meet the even more demanding standard for monopoly power in the Second Circuit. *See Broadway Delivery Corp. v. United Parcel Service of Am., Inc.*, 651 F.2d 122, 128 (2d Cir. 1981) ("a share above 70% is usually strong evidence of monopoly power"). Thus, Keurig's market share, as admitted by Keurig executives "easily qualifies as appreciable market power for purposes of the per se rule." *Visa*, 2003 WL 1712568, at *4 (share of 43-60 percent "easily qualifies as appreciable market power for purposes of the per se rule"); *Ringtown*, 650 F. Supp. at 825-26; *see also Int'l Salt*, 332 U.S. at 394 (granting summary judgment for plaintiff based on contracts and defendants' admissions). In short, Keurig's market power in the

---

[47] *See also Visa*, 2003 WL 1712568, at *4. In some circumstances, courts have found a market share as low as 10% sufficient for a per se tying claim. *See Ringtown*, 650 F. Supp. at 825 (holding that a 10% market share, coupled with the "unique nature of the [defendant's] product," was sufficient market power of the tying product to find a per se tying violation).

[48] Further, as of December 2013, Keurig estimated that it had a "███████████████████████████ ██████" SUF ¶ 474. Keurig's former President of U.S. Sales admitted that, as of November 30, 2015, Keurig's estimated share of Single-Serve Brewers ██████████ SUF ¶¶ 468, 473.

tying (brewer) product can be shown by direct evidence in *any one* of the four ways set forth above or with indirect evidence of market share based on admissions by Keurig's executives.

### C.  Undisputed Evidence Establishes Antitrust Injury From The Tying Agreements

Proving antitrust injury in the Second Circuit requires that Plaintiffs show "(1) an injury-in-fact; (2) that has been caused by the violation; and (3) that is the type of injury contemplated by the statute." *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 214 (2d Cir. 2015) (citations omitted); *Blue Tree Hotels Inv (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 220 (2d Cir. 2004). Where a competitor's loss of sales stems from the conduct preventing customers from obtaining a desired product, or from the inability to reach those customers due to exclusion from certain retailers, antitrust injury is established. *AngioDynamics*, 2021 WL 1792394, at *37; *Xerox Corp. v. Media Sciences Intern., Inc.*, 511 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2007); *see also Black*, 355 U.S. at 26. Moreover, such injury need only be minimal to establish liability. *See USFL v. NFL*, 842 F.2d 1335, 1377 (2d Cir. 1988).[49]

TreeHouse (and other Keurig competitors) lost sales and distributors' customers and consumers in turn lost access to desired products as a direct result of the Loyalty Clause.[50] TreeHouse sells numerous other products through the AFH distribution channel, including coffee related products such as nondairy creamer. SUF ¶¶ 410-11. This includes sales to Vistar, Aramark, Sysco, and several other major national distributors. *Id*. Yet, because of the Loyalty Clause, TreeHouse is unable to sell Competitive Cups to these very same customers. *Compare id.*; SUF ¶

---

[49] *Accord Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 114 n.9 (1969); *U.S. v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 219 (1940) ("That other factors also may have contributed [to injury] is immaterial.").

[50] For example, the Butler Survey shows ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 203; Ex. 6, ¶ 150. As Dr. Sibley explained, this is consistent with Anthony Sarno's testimony that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." Ex. 201, ¶ 4 & n.3. There is also no reasonable dispute that McLane was similarly harmed as a direct result of the Loyalty Clause, which restricted competition in the AFH market and caused elevated prices of K-Cups in the overall market.

412; *Chapdelaine Corp. Sec. & Co. v. Depository Tr. & Clearing Corp.*, 2006 WL 2020950, at *4 (S.D.N.Y. July 13, 2006); *N. Pac. Ry.*, 356 U.S. at 6. Indeed, large distributors, such as Canteen and Atlantic Coffee, began purchasing Competitive Cups from TreeHouse until Keurig forced them to stop by enforcing the Loyalty Clause. SUF ¶ 463, 500-01. Distributors also testified that they would have purchased TreeHouse Competitive Cups if not for the Loyalty Clause. SUF ¶¶ 491-98. The Loyalty Clause thus restrained competition on the merits for Competitive Cups and for distributors. SUF ¶¶ 364, 495. This is precisely the type of antitrust injury the Clayton Act was intended to remedy, where companies who have sought to enter the field have found that the markets have been preempted, which is "injurious to the small dealers, to the manufacturers, and grossly unfair to those who seek to enter the field of competition and to the millions of consumers." *Jefferson Parish*, 466 U.S. 10 n.15 (quotation omitted).

### D.  TreeHouse Is Entitled To Damages Pursuant To Section 4 Of The Clayton Act

Section 4 of the Clayton Act allows the recovery of damages by "any person who shall be injured in his business or property *by reason of anything* forbid[d]en in the antitrust laws." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472 (1982) (emphasis in original). Under Section 4, a "plaintiff need only demonstrate proof of some damage flowing from the unlawful [conduct]; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *AngioDynamics, Inc.*, 2021 WL 1792394, at *32 (quotation omitted); *see* ECF No. 1472 (Ugone Daubert Mot.), p. 13. While TreeHouse will prove the amount of damages arising from illegal tying at trial, there can be no genuine dispute that TreeHouse has established the fact of damages as a result of Keurig's Loyalty Clause. *See USFL*, 842 F.2d at 1377; SUF ¶¶ 491-501; *see also, supra*, § III.C.

### E.  Plaintiffs Are Entitled To Injunctive Relief Under Section 16 Of The Clayton Act

Under Section 16 of the Clayton Act, "injunctive relief is available to plaintiffs who show a threat of antitrust injury that, if it occurred, would be an injury under Section 4 of the Clayton Act." *Cash & Henderson Drugs, Inc.*, 799 F.3d at 214 (citations and quotations omitted). Injunctive relief is warranted based on the clear threat of antitrust injury resulting from Keurig's Loyalty Clauses, which remain in effect today. *See FOGA*, 312 U.S. at 468.[51] Keurig's Loyalty Clause will continue to pose a threat of anticompetitive harm, and indeed to continue to restrain competition, so long as it remains in place.[52] For the reasons set forth above, TreeHouse is entitled to summary judgment for liability, the fact of damages, and injunctive relief on its tying claim.

## IV.   SUMMARY JUDGMENT MOTION FOR IMPLEMENTING LOCK-OUT TECHNOLOGY IN AN UNNECESSARILY RESTRICTIVE MANNER

Plaintiffs move for partial summary judgment relating to Keurig's implementation of CBT, Keurig's Lock-Out Technology, in 2.0 Brewers, which indisputably "impair[ed] the opportunities of rivals, ... [did] not further competition on the merits," and was "unnecessarily restrictive." *Aspen Skiing Co.*, 472 U.S. at 605 & n.32. The undisputed record evidence establishes that Keurig could have achieved, and in fact did achieve, its purportedly procompetitive objective using less restrictive alternatives. Plaintiffs seek summary judgment that, as a matter of law, Keurig's implementation of CBT was anticompetitive, had no legitimate, non-pretextual procompetitive justifications, and that, even if it did, Keurig had less restrictive alternatives to accomplish any purported justifications.

---

[51] *See also Cash & Henderson Drugs, Inc.*, 799 F.3d at 215; *AngioDynamics, Inc.*, 2021 WL 1792394, at *48; *Int'l Salt*, 332 U.S. at 400 (the court "is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do"); *N. Pac. Ry.*, 356 U.S. 4, 12 (affirming "order enjoining the defendant from enforcing the existing 'preferential routing' clauses or from entering into any future agreements containing them").

[52] Indeed, Keurig rejected the OCS Leadership Team's request to remove the Loyalty Clause on the basis that 15%-25% of its K-Cup sales would go to Competitive Cup manufacturers if the clause were removed. SUF ¶¶ 418-19.

The 2.0 Brewer launched by Keurig in August 2014 had what Keurig pretextually called "CBT." SUF ¶ 526. According to Keurig's Mechanical Engineering expert, CBT consisted of an ▮▮▮▮▮ that ▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮ SUF ¶ 527. CBT was designed to ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. SUF ¶¶ 560, 567-68, 525. Therefore, the 2.0 Brewer was designed so that any Competitive Cups would not work in the 2.0 Brewer unless those Competitive Cups had ▮▮▮▮▮▮▮ ▮▮▮▮ CBT. The formulation was supplied to Keurig by a third-party ink manufacturer, Sun Chemical, and was meant to remain confidential and exclusive to Keurig. SUF ¶¶ 689-91.

Keurig had alternatives less restrictive than CBT to accomplish its purported procompetitive goal: to distinguish between K-Cups and larger format cups. Indeed, the 2.0 Brewer already included technology other than CBT that distinguished between different sizes of cups. This technology, called a ▮▮▮▮▮ was installed in the 2.0 Brewer for that very purpose, and the 2.0 Brewer would have functioned using the ▮▮▮▮ just the same as it did using CBT—except, of course, that the ▮▮▮▮ did not give Keurig any ability to lock out Competitive Cups. *See infra* § V.A. The fact that CBT was not necessary was proven by Keurig itself when it eventually ***removed the*** ▮▮▮▮ ***from the 2.0 Brewer***, without telling the public, and continued to market and sell those ▮▮▮▮▮ machines as 2.0 Brewers. Keurig's expert admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. SUF ¶ 564.

Keurig also could have used less restrictive alternatives to CBT to accomplish several other purported goals that Keurig had previously identified but has since abandoned. Keurig has stated that it included CBT for vague "safety" and "quality" reasons. But Keurig considered and rejected

alternatives to locking out competitors, such as  . Keurig also falsely told retailers and consumers that CBT was included

in the 2.0 Brewer to recognize "recipes." Keurig has since admitted, however, that the 2.0 Brewer

never did any such thing. Even if one were to accept, *counterfactually*, that CBT was included to

recognize the contents of the cups to permit custom brewing, Keurig at the time decided not to use

simple barcode technology,[53] which was then commonplace in supermarkets to determine the

contents of containers. But while barcode technology could determine the contents Portion Packs,

it did not further Keurig's goal of locking out Competitive Cups. In short, Keurig had less

restrictive alternatives to further any purported procompetitive goals. *See, infra*, § IV.A.

In any event, Keurig's purported procompetitive justifications for including CBT were

illegitimate and pretextual. Keurig knew before it launched the 2.0 Brewer that ████████████

█████ CBT. And Keurig has been unable to tie any purported concerns about alleged "safety" and

"quality" issues with Competitive Cups to the 2.0 Brewer design. In short, the purpose and effect

of CBT was to restrain competition, lock out Competitive Cups, and maintain Keurig's monopoly

share of the market for Compatible Cups. *See, infra*, § IV.B.

### KEURIG'S IMPLEMENTATION OF ITS LOCK-OUT TECHNOLOGY, CBT

Before the anticipated expiration of patents on aspects of its K-Cups, Keurig began

discussing  . At least as early

as 2008, Keurig was confronting what it viewed as a problem—███████████. Keurig discussed

internally how it must ████████████████████████

---

[53] The word "barcode" in this brief generally references various two-dimensional ink codes that are widely used, including UPC codes (commonly scanned with an optical reader at checkout counters to determine the identity and price of a purchased item at a grocery store, for example), QR codes (a graphical code that is made of black markings arranged in a square grid on a white background), and "data matrix" codes (sometimes used on Keurig's K-Cup lids).

SUF ¶¶ 504-08. Keurig considered ██████████████████████████████████████████████████████████████████████████████

██████████████ SUF ¶¶ 504-08.

Keurig began contacting ████████████████████████████ that could achieve its goals. For example, Keurig contacted ████████████████████████████ ██████ Keurig requested that ██████████████████████████████ ████████████████████████████████████. SUF ¶¶ 511-13.

While TreeHouse launched an unfiltered Compatible Cup in the Fall of 2010, not covered by any Keurig cup patents,[55] Keurig continued thereafter to explore ████████████████ in anticipation of the expiration of its filter-cup patent in the Fall of 2012. Along those lines, in 2011 and 2012, Keurig communicated with ████████████████████████████████████ ████████████████████████████ to ensure that Competitive Cups would not be able to brew in the new planned brewer. SUF ¶ 516. Keurig requested ██████████████████ ████████████████████████████████ SUF ¶ 516.

Meeting notes from a July 2012 meeting between ████████ and Keurig ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████ SUF ¶ 521. Keurig and ██████████ ████████████████████████████████████████████████████████████████████

---

[54] Defined as "Radio Frequency Identification," RFID was a ████████████████████████████ ████████████████████████. SUF ¶ 509.

[55] See *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799, at *6 (D. Del. Sept. 13, 2012); *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373-74 (Fed. Cir. 2013).

████████████████████████████████ SUF ¶ 522. Sagentia expressly recognized that Keurig was not developing this technology to serve a procompetitive objective. To the contrary, it admitted in July 2012 that "████████████████████████████████████ ████████████████████████████." SUF ¶ 519.

Soon after this meeting, in September 2012, Keurig went ███████████ on what it called ██████████ a code name for one of the ████████████████████ ██████████ SUF ¶ 524. Eventually, Keurig implemented ███████████████ in the 2.0 Brewer. While TreeHouse was able to reverse-engineer the taggant ink system to make 2.0-Compatible Cups, the 2.0 Brewer launch injured TreeHouse, JBR, and other Keurig competitors.[56] Apart from the costs associated with the reverse engineering and taggant ink, TreeHouse sales of its Competitive Cups plummeted after the 2.0 Brewer launch in the wake of a campaign by Keurig telling retailers that Competitive Cups would not work. SUF ¶¶ 570-71, 590.

In the lead up to the 2.0 Brewer, Keurig told the public and its business partners that the "interactive technology" between the cup and the brewer would permit the 2.0 Brewer to recognize "recipes" and "optimize brew settings." SUF ¶¶ 576, 580, 616, 620. Without citing any support, Keurig also said CBT was necessary for "performance and safety" reasons. SUF ¶¶ 576, 578, 580. However, Keurig has failed to adduce evidence that any alleged quality or safety issues with Competitive Cups were the basis for Keurig's implementation of CBT. To the contrary, Keurig's CEO at the time the 2.0 Brewer was introduced testified that Keurig "████████████████████

---

[56] The supply contract between Keurig and Sun Chemical that memorialized the intention to keep the taggant ink formulation confidential and exclusive to Keurig is now the subject of a lawsuit brought by Keurig against Sun Chemical. Among other things, Keurig claims in that case that Sun Chemical breached the terms of the agreement because Keurig competitors, including TreeHouse, were able to develop Competitive Cups that CBT would permit to be brewed in 2.0 Brewers. SUF ¶¶ 574, 689-91.

███████████████████████" and testified that Keurig "██████████████████████

████████████████████." SUF ¶ 696.

Keurig launched the 2.0 Brewer with CBT in August 2014. Despite claiming that CBT was necessary for "performance" and/or "safety" reasons, Keurig never launched any brewer—including the 2.0 Brewer—equipped with CBT that was designed for use in offices or workplaces (i.e., the "Away-From-Home" or "AFH" market).[57] SUF ¶ 680. It has repeatedly admitted in this case that the 2.0 Brewer could never recognize "recipes." SUF ¶¶ 625-26. In addition, from the time of launch, Keurig included in the 2.0 Brewer a ███████ that Keurig admits was more reliable than CBT in distinguishing among different cup sizes. Keurig removed the ███████ ███████████████████████ without informing consumers, SUF ¶¶ 534, 536, 538, and Keurig's expert admitted that such █████████████████████████. SUF ¶ 606. When Keurig ███████████████████, the brewers continued to be able to recognize and brew different sizes of cups. SUF ¶¶ 541, 544-46.

## CBT IMPAIRED RIVALS' OPPORTUNITIES IN AN UNNECESSARILY RESTRICTIVE WAY WITHOUT JUSTIFICATION

### A. Keurig Could Have Achieved Its Proffered Justification For Implementing CBT In A Less Restrictive Manner

As shown in Section IV.A.2, *infra*, Keurig has never articulated a legitimate, non-pretextual procompetitive justification for including CBT in 2.0 Brewers. However, the Court need not reach that issue to grant this motion. *See Impax*, 994 F.3d at 497 (declining to evaluate asserted procompetitive benefits where less restrictive alternatives were available). Even if Keurig could

---

[57] AH Brewers differ from Keurig's AFH Brewers in a number of ways. ████████████████████████████
████████████████████████████████████████████████████████████████
Keurig itself distinguishes its AFH Brewers from AH Brewers in its filings to the SEC. SUF ¶ 683. As noted, Keurig never implemented CBT in AFH Brewers even though Keurig claimed CBT was necessary for "safety." SUF ¶ 680.

demonstrate such a justification (which it cannot), Keurig's restraint was unreasonable as the purported procompetitive benefit "could be reasonably achieved through less anticompetitive means." *Id.* (quoting *Am. Express*, 138 S. Ct. at 2284). Accordingly, this is a claim for which "[f]ocusing on the existence of less restrictive alternatives may allow [the] [C]ourt[] to avoid difficult balancing of anticompetitive and procompetitive effects and to 'smoke out' anticompetitive effects or pretextual justifications for the restraint." *Impax*, 994 F.3d at 497-98 (quoting C. Scott Hemphill, *Less Restrictive Alternatives in Antitrust Law*, 116 Colum. L. Rev. 927, 937-42 (2016)).

### 1. The ███████████ *Distinguished Between Different Sizes of Portion Packs Without Locking Out Competitive Cups*

Keurig has admitted that the only function that CBT performed in 2.0 Brewers was to distinguish between different cup sizes. SUF ¶¶ 554, 558, 626, 563.[58] But the ████████████ ██████████████████████████, already did this. SUF ¶¶ 541-42, 544-47, 549-53. Keurig testified that both the ████████ and CBT (1) told the brewer whether a K-Cup or Vue Cup was inserted and (2) displayed "the menu that the cup needed." SUF ¶ 550. Kevin Sullivan, Keurig's former Chief Technology Officer, similarly testified that the ████████ sensed whether the inserted cup was a K-Cup or a Vue Cup. SUF ¶ 551.

Keurig's own engineers recognized that the ████████ was actually *better* at distinguishing between different cup sizes than CBT. SUF ¶ 533. Keurig recognized before the 2.0 Brewer launch that ████████████████████████████████████. SUF ¶¶ 528, 533. A CBT and 2.0 Brewer team leader and engineer explained that ████████████████

---

[58] A certain size and shape of Portion Pack, which Keurig named the "K-Cup," was designed to brew in Keurig's 1.0 Brewers. Keurig also manufactured and sold Portion Packs that were designed for Keurig's "Vue" brewers. These Vue Cups are a larger size and different shape than K-Cups.



. SUF ¶ 533. The testimony of Mr. Sullivan was consistent,

SUF ¶ 531.

CBT coexisted with the ███████ in 2.0 Brewers ███████████████████████ it began selling in the Spring of 2017. SUF ¶¶ 534-35, 540. Even after ████████████████████ remained in Keurig Brewers labeled "2.0" and sold as such thereafter. SUF ¶¶ 536, 538-40, 549. Keurig admits that 2.0 Brewers ████████ ████████████████████████████████████████. SUF ¶¶ 541-42, 544-46. Thus, the ██████████████████ confirms that neither the ████████ nor taggant ink on cups was necessary for 2.0 Brewers to recognize and brew different sizes of Portion Packs. SUF ¶¶ 541, 542, 544-46. Indeed, Keurig's Mechanical Engineering Expert explained that from a consumer perspective, ████████████████████████████████████████████████ ████████ SUF ¶¶ 557, 564.[59] These facts are confirmed by Keurig's documents. SUF ¶ 553.

Because Keurig could have relied on the ████████ to distinguish between different sized cups (which would not have led to lost Competitive Cup sales or imposed additional costs on rivals to make Competitive Cups work in 2.0 Brewers), the ████████ was a viable less restrictive alternative to CBT. *See Clarett v. NFL*, 306 F. Supp. 2d 379, 410 (S.D.N.Y. 2004) (granting summary judgment for plaintiff where alternative was "less prejudicial to competition"); *In re NCAA N&L*, 37 F. Supp. 3d at 1151-52 (challenged restraint not justified given less restrictive

---

[59] Indeed, when Keurig's Mechanical Engineering Expert, Thomas Fedorka, was directly asked to ████████ ████████████████████████████████████████████████████████████████ he testified ████████████████████ SUF ¶ 564.

alternative); *Am. Express Co.*, 138 S. Ct. at 2284 (restraint unreasonable when benefits "could be reasonably achieved through less anticompetitive means"); *Impax*, 994 F.3d at 497-98 (entity engages in an unlawful restraint even where there is a "purported benefit to competition" if the benefit "could be achieved with less damage to competition"); Hemphill, *Less Restrictive Alternatives*, *supra*, at 929 (when a less restrictive alternative "dominates the defendant's conduct along both dimensions of interest—that is, when the alternative is both less restrictive and equally effective—the conduct is worse without recourse to any tradeoff. In such cases, the court can condemn the conduct without further ado").

### 2. Keurig Considered And Rejected Less Restrictive Alternatives To Achieve Its Now Abandoned Justifications For CBT

While Keurig has abandoned any other purported procompetitive justifications for including CBT in the 2.0 Brewer (apart from distinguishing cup sizes), it had asserted that CBT was necessary for safety reasons, to avoid ██████████████████████████████████, and also to enable the 2.0 Brewer to recognize "recipes." Even if Keurig could still maintain these purported justifications (it cannot), less restrictive alternatives were available to achieve them.

### i. Keurig Considered And Declined To Use Less Restrictive Alternatives To CBT That Would Have Furthered Purported Interests Of "Safety" And "Quality"

Keurig told the public and retailers that it needed CBT for "performance and safety" and "quality" reasons. SUF ¶¶ 576, 578, 580, 591-95. Keurig suggested that Competitive Cups would clog or damage Keurig's Brewers, not brew correctly, or injure consumers. SUF ¶¶ 591-95. Keurig has since abandoned these "quality" and "safety" pretexts. Keurig told the ███████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████ without referencing safety or quality. SUF ¶¶ 698-700. Furthermore, the pretextual nature of Keurig's purported safety and quality justifications for including CBT is demonstrated by, among other things, Keurig's utter failure to provide the Court, despite multiple

opportunities, with a *single document* showing that CBT was motivated by concerns about quality or safety. SUF ¶ 686; *see* § II.B. Keurig's executives also disavowed the "safety and quality" pretext in depositions. Keurig's CEO responsible for the 2.0 Brewer launch, Brian Kelley, admitted under oath that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of the 2.0 Brewer.[60] SUF ¶ 598. Keurig's experts Dr. Murphy and Mr. Fedorka similarly acknowledged that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮. SUF ¶¶ 605-06. Dr. Murphy also denied that ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶ 607.

But even if Keurig had not abandoned its purported safety and quality justifications for CBT, less restrictive alternatives were available to achieve these goals. *First*, as discussed above, the ▮▮▮▮ was a reliable ▮▮▮▮▮▮▮ already built into 2.0 Brewers that could (and did) ▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶¶ 541-42, 544-46. Removing CBT did not ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶ 548. The 2.0 Brewer thus brewed beverages (whether K-Cup-sized cups or Vue Cup-sized cups) the same way whether the cup size was indicated by CBT or ▮▮▮▮▮▮. SUF ¶¶ 541-42, 544-46, 549-50, 560.

*Second*, to the extent Keurig's purported quality or safety concerns related to Competitive Cups purportedly "malfunctioning" or injuring consumers, Keurig admitted that it considered alternatives like ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[60] *Compare* the contrary impression Keurig made to this Court in opposing JBR's motion for a preliminary injunction when it ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶ 599. It is ironic and telling that, despite making this statement, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶ 601, and a Keurig executive who was deposed in this case, David Manly, left Keurig to serve as CEO, and then Chairman of the Board, of a company that manufactured and sold a cannabis-pod based brewer. SUF ¶ 602.

███████████████████. SUF ¶¶ 611-13. This would have given Keurig the ability to ███

████████████████████████████████████████████████████████████████████████

██████████ while still permitting the 2.0 Brewer to brew those Competitive Cups. Any purported

██████████████████ (identified after the fact by Keurig's liability expert, *see* Ex. 68), would

have been solved by reminding consumers they were not using a Keurig-brand cup, while

preserving competition and consumer choice. *Cf. Int'l Bus. Machines Corp. v. U.S.*, 298 U.S. 131,

139-40 (1936) (appellant not prevented from "proclaiming virtues of its own cards" which would

protect good will without suppressing competition).

> ## ii. Keurig Considered And Rejected Less Restrictive Alternatives To CBT That Would Have Enabled The 2.0 Brewer To Recognize "Recipes"

Keurig's statements that CBT would permit the 2.0 Brewer to recognize recipes were

pretextual, as demonstrated by Keurig's belated admissions during this case that these statements

were false. Keurig acknowledged that the 2.0 could never recognize recipes, whether based on the

ink on a cup or otherwise. SUF ¶ 625. Ben Yoder, who was involved in the 2.0 Brewer's

development, admitted that Keurig never had a brewer that could recognize recipes. SUF ¶ 625.

Mark Wood, who was also involved in various aspects of the 2.0 Brewer's development and

launch, admitted that "the taggant ink didn't detect or not detect a recipe. That wasn't its function."

SUF ¶ 625. Because Keurig has admitted that CBT never recognized "recipes," the Court need not

go on to consider whether there were any less restrictive alternatives to this non-existent benefit.

*See, e.g.*, *Bd. of Regents*, 468 U.S. at 113-20 (affirming liability where defendant failed to offer

legitimate procompetitive justification); *Law*, 902 F. Supp. at 1410.

Even if Keurig had a genuine justification to have the 2.0 Brewer recognize "recipes,"

Keurig could have used a less restrictive alternative, such as ubiquitous image recognition

technology like barcodes. Keurig K-Cups even had printed on their lids a data matrix code that

Keurig admitted is ███████████████████████████████████. SUF ¶ 630. Keurig

admitted that it ███████████████████████████████████████████████████

███████████████████████████ SUF ¶¶ 627-28. ██████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ SUF ¶¶ 633-34.

Before Keurig developed CBT, barcodes could carry the necessary information to permit

a brewer to brew a specific recipe based on the contents of the Portion Pack. A Keurig executive

testified that, "[i]f you put a serialized bar code, … you could do far more [than other recognition

methods], including translate recipes back to the brewer and so forth." SUF ¶ 629. Indeed, a Single-

Serve Brewer was already on the market that did just that. Keurig was aware in 2008, more than

five years *before* the launch of the 2.0 Brewer, that Braun's Tassimo brewer used barcodes to offer

forty-one different varieties with customized brewing parameters. SUF ¶ 638. In 2012, Mr.

Sullivan also advised Keurig management about a ██████████████████████████████

██████████████████████████████████████████. SUF ¶ 640.

TreeHouse's engineering expert, Dr. Castleman, analyzed the technical literature covering

barcode technology at the time of the 2.0 Brewer development, and testified that it was

commercially available, at a reasonable cost, and could have been implemented in Keurig's 2.0

Brewer. SUF ¶ 647. This testimony is unrebutted. Keurig's expert, Mr. Fedorka, ████████████

████████████████████████████, SUF ¶ 643, ████████████████████████████████

█████████████████ SUF ¶ 644.[61] Any speculation that a less restrictive alternative may not have

---

[61] It is not surprising that Mr. Fedorka does no analysis, and offers no opinion, on the ██████████████████
████████████ Keurig was paying its taggant ink supplier $354,166.66 per month in royalties just for the right to use the ink (without factoring in material costs). SUF ¶ 575. By contrast, there is no evidence that available barcode technology would be anything but royalty-free to Keurig.

been viable is thus insufficient to withstand summary judgment. *See Brown*, 654 F.3d at 358 (respondent cannot avoid summary judgment by raising "unsubstantiated speculation").[62]

From Keurig's perspective, the problem with barcode technology was unrelated to cost or the ability to recognize "recipes"; the problem was it would not lock-out Competitive Cups. As

████████████████████████████████████████████████ SUF ¶ 636.

Indeed, Dr. Castleman's unrebutted testimony was that "barcode technology … would have been easy for competitors to defeat and would not have allowed Keurig to tell customers and retailers that the brewers would only work with licensed Portion Packs." SUF ¶¶ 641-42.

In short, Keurig was aware before CBT that barcodes were a viable alternative used by another brewer manufacture to enable recipes but chose not to use them because they would not lock out competitors. SUF ¶¶ 641-47l; *see also* n. 57 & SUF ¶¶ 574, 689-91.

**B.  Undisputed Evidence Shows CBT Did Not Further Competition On The Merits**

Even if there were no viable less restrictive alternatives, Keurig's purported procompetitive justifications are pretextual and cannot justify implementing CBT in a manner that "impedes competition." *Actavis PLC*, 787 F.3d at 652, 655; *Bd. of Regents*, 468 U.S. at 113-20; *Law*, 902 F. Supp. at 1410 (where defendant unable to meet burden of establishing legitimate, procompetitive objective, plaintiff need not demonstrate a less restrictive alternative).

**1.  *CBT Offered No Consumer Benefit***

CBT did not offer *any* consumer benefit, let alone a benefit that outweighs the anticompetitive harm of CBT. This was candidly admitted by Keurig's Senior Director of Core

---

[62] Indeed, after the close of expert discovery in this case, Keurig launched a new brewer with so-called "BrewID" technology that recognizes the contents of the cup and suggests recommended brewing parameters based on that content. TreeHouse's expert has confirmed that the technology used in this new brewer does not depend on any taggant ink but instead is simple optical image recognition technology that was widely available at the time Keurig was developing the 2.0 Brewer.  Ex. 372; SUF ¶¶ 850-52.

Business Systems: ██████████████████████████████████████████

██████████████████ SUF ¶ 562. The record evidence demonstrates that: (1) prior to

launch of the 2.0 Brewer, Keurig conducted ████████████████████████████████

████████████████████████████; and (2) Keurig executives ████████████████

████████████████.

   Keurig's pre-launch consumer research unequivocally showed that ████████████

██████████████████. Keurig ████████████████████████████████

██████████████████████ and interpreted it as Keurig ████████████████

██████████████████ SUF ¶ 656. Keurig's V.P. and General Manager of AFH and

Digital Divisions said his take away from the research was that ██████████████████

████████ with consumers. SUF ¶ 649. A pre-launch Keurig report also showed that ████████

████████████████████████████ over the 1.0 Brewer. SUF ¶ 651. Prior to

launch of the 2.0 Brewer, Bruce Godfrey, Keurig's Director of Consumer Insights, explained that:

██████████████████████████████████████████████████

██████████████████████████████ SUF ¶ 653. As Mr.

Godfrey testified, consumers did not want █████████████████████████████

██████████████████████ SUF ¶ 654.

   Mr. Godfrey testified that, despite Keurig's research ████████████████████

████████ Keurig ████████████████████████████ as Brian Kelley, Keurig's

President and CEO, had ██████████████████████████████████

████████████████████ SUF ¶¶ 657-58. Simply put, when Mr. Kelley was shown

██████████████████████████████████████████████████



█████████████████████████████████████ SUF ¶¶ 657-61 (emphases added).

Keurig executives ████████████████████████████. John Whoriskey, Keurig's President of U.S. Sales, asked █████████████████████████████, stating soon after that he ████████████████████████████████ and that he believed that Keurig instead needed to ████████████ ████████████████ SUF ¶ 664. Keurig's Consumer Insights executives were also ████████ about the ████████ benefit of CBT and ████████████████████████ was at all. SUF ¶¶ 666-68.

Even after Keurig ████████████████████, Keurig executives continued to recognize that ████████████████████████████████████ ████████████████████████. Indeed, Keurig's Senior Manager of Consumer Care noted that CBT removal is ████████████████████████████████ ███████████████████ the 2.0 Brewer with CBT for the 2.0 Brewer ████████. SUF ¶¶ 538-39. Keurig's expert admitted that there was ████████████ ████████████████████████████████████. SUF ¶ 564.[63]

### 2.   *The Purported Benefits Of Ensuring Safety And Quality Were Pretextual*

Keurig's purported "safety" and "quality" reasons for CBT were pretextual. Keurig has failed to point to *any* documentary evidence, despite two invitations from the Court to do so, to support the notion that the design of the 2.0 Brewer was driven by any concerns about "safety" or

---

[63] Counsel for Keurig similarly stated on the record in this case that the 2.0 Brewer ████████████ sold beginning in Spring of 2017 "still had the key features of the 2.0 Brewer" even though it "did not include [CBT]." SUF ¶ 549.

"quality." SUF ¶ 686. Indeed, to the contrary, Keurig's executives and experts have ███████

███████████████████████████████. *See, supra*, § IV.A.2.i.

In May 2018, Keurig made a discovery motion seeking documents from a lawsuit against TreeHouse concerning the labeling of the TreeHouse unfiltered Grove Square coffee Compatible Cups. *See generally* Compl., *Suchanek v. Sturm Foods, Inc.*, No. 3:11-cv-00565 (S.D. Ill. June 28, 2011), Dkt. No. 2. Keurig's stated rationale was that the *unproven allegations* in that case showed that "TreeHouse sells low quality portion packs," ECF No. 427 at 1, and that this was purportedly relevant to Keurig's motivation in designing "its new 2.0 coffee brewer as a 'closed' system to work only with Keurig licensed portion packs." *Id.* at 3. When Judge Pitman asked Keurig to cite to any contemporaneous document showing that the design of the 2.0 Brewer was motivated by such quality concerns, Keurig was unable to do so. SUF ¶ 686. Finding a lack of any nexus between quality concerns and the design of the 2.0, Judge Pitman denied Keurig's motion. ECF No. 434.

Keurig later renewed its attempt to obtain that discovery from TreeHouse. Keurig attempted to draw a connection between what counsel called ████████████████

██████████████████████████████████████████████

████████████████████ SUF ¶ 685. The Court again denied the motion on the ground that then (as before) Keurig was unable to "identify documents in its possession demonstrating that the specific product at issue in the *Suchanek* litigation [the TreeHouse unfiltered Grove Square product] played a role or was considered in the design of any Keurig Brewer 2.0." SUF ¶ 686; *see also* ECF No. 652. Keurig was unable to show (despite two opportunities) that the quality of the TreeHouse unfiltered cups had anything to do with the 2.0 Brewer design in general or CBT in particular. *Cf. In re Androgel Antitrust Litig. (No. II)*, 2018 WL 2984873, at *11 (N.D. Ga. June

14, 2018) (denying summary judgment for defendant when justification could be found by jury to be a post hoc justification).[64]

Multiple Keurig executives have admitted that ███████████████████████████

████████████████████████████████████████████████████████████████████████

████████████. *See* § I.B.i. Indeed, despite Keurig's claims that CBT was necessary to enhance the quality and safety of the 2.0 Brewer, █████████████████████████████████████

████████████. SUF ¶ 534. Further, Keurig only launched the 2.0 Brewer with CBT in the AH Market and not the AFH Market. SUF ¶ 680. As Chris Howe, Keurig's former Vice President of AFH, testified, █████████████████████████████. SUF ¶ 681. If Keurig was legitimately concerned about safety and quality, and if CBT was actually needed to ensure safety and quality, CBT would have been equally needed in AFH Brewers used in offices as well.

Keurig has been unable to come forward with *any* research it conducted showing in the lead up to the 2.0 Brewer that consumers were reporting higher levels of complaints regarding the safety or quality of Competitive Cups relative to K-Cups that served as a basis for its decision to lock-out Competitive Cups. SUF ¶ 669. The record also contains no evidence that Keurig, in advance of the launch of the 2.0 Brewer, conducted tests showing the use of Competitive Cups in Keurig Brewers would cause any injury to consumers, much less relative to Keurig. SUF ¶ 676. Keurig's CEO was not aware of a single instance where █████████████████████████

████████████████. SUF ¶ 677.[65] To the contrary, Keurig informed distributors that they were

████████████████████████████████████████████████████████████████████████

---

[64] Keurig has fared no better with respect to the quality of the TreeHouse *filtered* cups, first launched in late 2012. Keurig's Quality and Safety Expert could not ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ SUF ¶ 687.

[65] Indeed, Keurig's CEO at the time the 2.0 Brewer was introduced testified that Keurig "often looked at good brands in the market" and acknowledged that Keurig "would consider … buying the Grove Square brand." SUF ¶ 696.

███ . SUF ¶ 702. Keurig ultimately conceded that █████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████        SUF ¶ 679; *see also* SUF ¶ 671.

Moreover, Keurig's attempt to justify locking out Competitive Cups by pointing to "quality" or "safety" issues with such products (which are unfounded) is irreconcilable with the basic policy of the Sherman Act. *See Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 695 (1978) (defendant imposing views of costs and benefits of competition—including quality and safety determinations—in place of consumer decision making is tantamount to "frontal assault on the basic policy of the Sherman Act"). The free market, not Keurig, should determine quality.

### 3. While Keurig Told Retailers And Consumers That The 2.0 Brewer Would Recognize "Recipes," Keurig Admitted This Was False And Thus Pretextual

Another proffered benefit of CBT, that it could read recipes, was pretextual because the 2.0 Brewer could not, in fact, read recipes. Both prior to and after the launch of the 2.0 Brewer, Keurig proclaimed to retailers and consumers that CBT would enable the 2.0 Brewer to read recipes. SUF ¶¶ 616, 618, 620, 622, 624. But, contrary to Keurig's repeated statements, the record contains numerous admissions from Keurig that the 2.0 Brewer was never actually able to read recipes. Keurig's corporate deponent, Jim Martin, claimed that "in the future" CBT would be able to tell the difference between K-Cups, but admitted that the future never came. SUF ¶ 626. Keurig executive, Ben Yoder, testified that Keurig ████████████████████████████████████, (SUF ¶ 625), while another Keurig executive, Suzanne DuLong, testified that ██████████ ████████████████████████████████████████████████ . SUF ¶ 625. Another Keurig executive, Mark Wood, also testified that the 2.0 Brewer did not read recipes. SUF ¶ 625. Even Keurig's Mechanical Engineering expert █████████████████████████ ███████████████████████████ . SUF ¶ 627.

As shown above, Keurig's attempts to proffer "reading recipes" as a consumer benefit of CBT were mere pretext. Keurig's own documents in the record reveal this to be the case and when faced with evidence in the record, Keurig has now itself conceded that reading recipes was not a benefit that CBT provided. Accordingly, this Court should rule that, as a matter of law, Keurig's proffered justifications for the introduction of CBT were pretextual and, even if not, any legitimate procompetitive goals could have been accomplished with less restrictive alternatives.

## V.   MOTION FOR SUMMARY JUDGMENT FOR FALSE ADVERTISING

Keurig made the following literally false statements in connection with commercial advertisements of its K-Cups and Keurig Brewers: (i) Competitive Cups were not compatible with the 2.0 Brewer; (ii) Keurig did not test Competitive Cups; (iii) Competitive Cups do not work well or safely with Keurig Brewers; and (iv) the use of Competitive Cups damaged the performance and overall life of Keurig Brewers. Plaintiffs are thus entitled as a matter of law to a finding of liability under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and various state-law statutes as to these categories of statements.[66]

Under the Lanham Act, once liability is found on the basis that a statement is literally false, the damages analysis becomes relatively straightforward, as deception is presumed as a matter of law. TreeHouse calculated unjust enrichment damages based on that legal framework, and while Keurig (incorrectly) questions the applicable law, it has offered no alternative damages estimate, and its critiques cannot defeat TreeHouse's damages claim. TreeHouse is thus entitled to judgment as a matter of law awarding damages to TreeHouse in accordance with its calculation and is entitled to enhanced damages, given that Keurig knew that statements were false when made and to fully compensate TreeHouse. In addition, this Court should issue an appropriate injunction.

---

[66] JBR joins this motion as to liability and injunctive relief only.

## KEURIG'S FALSE ADVERTISING

### A.  Keurig Made, And Continues To Make, Statements That Competitive Cups Are Not Compatible With The 2.0 Brewer, Despite Knowledge Of Falsity

Keurig made numerous public statements, from at least August 2014 to the present, that the 2.0 Brewers worked only with Keurig's K-Cups. *See* Ex. 306. For example, the packaging for its 2.0 Brewers stated that the brewer "works only with Keurig brand packs" or "works only with Keurig brand cups" from its launch in August 2014 through at least spring 2016. *Id*. Keurig's website and social media pages also "contained messaging indicating that 2.0 Brewers worked only with Keurig Portion Packs" from at least August 2014 through May 2017.[67] *See* Ex. 306.

This same messaging appeared on retailer websites—including those of JCPenney, Amazon Canada, Staples, and Walmart—through today.[68] *See* Ex. 306. For example, Kohl's webpage for the K350 2.0 Brewer states that "this brewer is compatible with Keurig K-Cup & K-Carafe Pods only," and the Sam's Club webpage for the K460 2.0 Brewer states, "Your brewer works with only Green Mountain Keurig Brand Packs." *See id*.

Though not necessary to prove liability,[69] the fact that Competitive Cups worked in the 2.0 Brewer should have come as no surprise to Keurig, as Keurig had direct evidence demonstrating Competitive Cups successfully working in the 2.0 Brewer beginning three months before the 2.0

---

[67] Keurig has admitted that it communicates with consumers through its website and social media and that many consumers visit its website and like its Facebook page. *See* ECF No. 409, ¶ 473.

[68] Keurig has admitted that product feature language on retailer websites about Keurig products was authored by Keurig. *See* SUF ¶ 836.

[69] Section 43(a) of the Lanham Act and New York General Business Law §§ 349 and 350 are strict liability statutes. As such, knowledge of falsity is not required to show liability. *See Spotless Enters., Inc. v. Carlisle Plastics, Inc.*, 56 F. Supp. 2d 274, 278 (E.D.N.Y. 1999); *McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517, 529 (S.D.N.Y. 1980); *Leider v. Ralfe*, 387 F. Supp. 2d 283, 292 (S.D.N.Y. 2005); *Simply Lite Food Corp. v. Aetna Cas. & Sur. Co. of Am.*, 666 N.Y.S.2d 714, 714 (N.Y. App. Div. 1997). However, Keurig's knowledge that its statements were false goes to liability for TreeHouse's claims under the Illinois Consumer Fraud and Deceptive Brand Practices Act, 815 Ill. Comp. Stat 505/1 et seq., and Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1 et seq. The Court should also consider Keurig's knowledge of falsity with respect to the Court's discretionary enhancement of damages. *See* Statement of Facts § B, *infra*.

Brewer was even released. In May 2014, Keurig received a video of employees of Bed Bath & Beyond ███████████████████████████████████████████ *See* SUF ¶ 732. In July 2014, Club Coffee, a Competitive Cup manufacturer, released a video demonstrating its Compatible Cup successfully brewing in a 2.0 Brewer, ███████████████████████████████ ████████. *See* SUF ¶ 733. Just one month later, TreeHouse publicly announced that it had "successfully developed new single serve coffee products that will work in both existing and next generation [Keurig] coffee makers," and TreeHouse sent Keurig a video showing a TreeHouse Competitive Cup successfully brewing in a 2.0 Brewer, along with a letter advising Keurig to stop falsely claiming that Competitive Cups were not compatible in the 2.0 Brewer. *See* SUF ¶ 734.[70] Nonetheless, Keurig persisted in making the false statements.

Keurig developed additional knowledge of the falsity of its statements immediately after the launch of the 2.0 Brewer. In the fall of 2014, Keurig ██████████████████████████████ ██████████████████████████████████████████ *See* SUF ¶¶ 718-19. These tests demonstrated to Keurig by no later than ████████████████████████████████ ████████████████████████████████████████████. *See id*. In the spring of 2015, Keurig and ████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████ *See* SUF ¶ 730.





[70] Keurig ███████ ████████████████████████. *See* SUF ¶¶ 721-22. Keurig was ██████████████████████ *See* SUF ¶¶ 723-28. As early as ████████████ *ee* SUF ¶ 725. Similarly, around the time of the 2.0 Brewer launch, ████████████████████████████████ █████████, *See* SUF ¶ 727-28.

Yet, despite the fact that Keurig knew no later than the Fall of 2014 that its packaging was false, causing it to propose a redesign of its 2.0 Brewer packaging in January 2015, ████████ ████████████████████████████████████████████████████████ SUF ¶ 735. Instead, ████████, Keurig continued to pack 2.0 Brewers in boxes it knew had false statements throughout the entirety of 2015 and into the spring of 2016. SUF ¶ 735. Despite the false box statements, Keurig did not recall any packaging, did not apply any stickers to its boxes (or supply retailers with any such stickers)[71] to correct or cover up the false statements, and cannot confirm whether the packaging with these false statements was completely out of the marketplace by even the end of 2017, at the time of the discovery cutoff. SUF ¶ 736-38, 740.

The incompatibility lies continued and were compounded after Keurig itself ████████



SUF ¶ 8-9, 534-36, 538, 741. Not only had Competitive Cups been working in the 2.0 Brewer for years but the ████████████████ ████████████████████████████████████████████████████ ████████████████████████ SUF ¶ 543. Keurig continues to make false statements regarding compatibility on its website and retailer websites to this day. *See* Ex. 306.

### B. Keurig Knowingly Made False Statements That It Did Not Test Competitive Cups

Keurig made various public statements from at least 2013 through 2019 that it did not test Competitive Cups. *See* Ex. 306. For example, Keurig has stated on its website and its Facebook page, "We do not make or test [the] other brands." *Id*. Keurig was aware that these statements were false, as it is undisputed that Keurig tested Competitive Cups beginning as early as October 2010.

---

[71] A Keurig executive testified that ████████████████████████████████████ SUF ¶ 739.

Numerous tests were conducted over the course of many years. For example, Keurig admitted that it ran tests of Competitive Cups, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. *See* ECF No. 409, ¶ 429; SUF ¶ 745. In October 2010, "around the time the [TreeHouse] product first came to market," Keurig's quality group tested samples of TreeHouse Competitive Cups in the ordinary course of business, demonstrating that those cups brewed "successfully." SUF ¶ 720, 747. Keurig's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. *See* SUF ¶ 751.[72]

In addition, Keurig ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮. *See* SUF ¶ 749. By Keurig's own admission, TreeHouse ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. *See* SUF ¶ 750. As discussed above, Keurig ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮. *See, supra*, § V.A.

### C. Keurig Made False Statements, Without Basis, That The Use Of Competitive Cups May Decrease The Brewer's Performance And Overall Life

Keurig made various statements throughout the relevant period that the use of Competitive Cups decreases the overall life and performance of Keurig Brewers. *See* Ex. 306. Keurig has admitted it told consumers that "unapproved portion packs" could "damage your Keurig brewing system" and "decrease the brewer's performance and overall life." *See id*. These statements were

---

[72] In addition to the ordinary-course-of-business testing conducted by Keurig, Keurig conducted tests on TreeHouse's Portion Packs for and during the *Sturm* Litigation. TreeHouse plans to move *in limine* to prevent Keurig from relying on these tests, given that, among other things, they were not done in the ordinary course of business. *See In re 3M Combat Arms Earplug Prods. Liab. Litig.*, Case No. 7:20-cv-00039-MCR-GRJ, Doc. 118 (N.D. Fla. May 6, 2021) (granting motion *in limine* to exclude evidence from tests conducted for purposes of litigation rather than in the ordinary course of business). However, the fact that these tests occurred at all is further undisputed evidence of the literal falsity of Keurig's statements that it does not test Competitive Cups.

made by various means, including Facebook, Twitter, YouTube, in packaging, and Keurig's official consumer call center script used to respond to consumers. *See id.*

Keurig also falsely told retailers that Competitive Cups would damage Keurig Brewers. For example, the Customer Strategy Innovation Manager of The Kroger Co. confirmed that Keurig made numerous statements disparaging Competitive Cups, including statements that TreeHouse Competitive Cups would explode and cause damage to Keurig Brewers, without providing any supportive evidence. SUF ¶¶ 767-69. Similarly, the Buyer of Kitchen Electrics and Housewares for Kohl's Corporation recalled Keurig indicating that Competitive Cups were breaking Keurig Brewers, but he never heard any corroborating information either. SUF ¶¶ 770-72.

Keurig has admitted it was not aware of ***any evidence*** of damage to the Keurig Brewer ever caused by TreeHouse Competitive Cups. *See, e.g.*, SUF ¶ 773-77. More broadly, in January 2012, Kathleen Kelley-Straube, former Senior Director of Consumer Care, stated that Keurig had ██ ████████████████████████████████████████████████████ SUF ¶ 777. Indeed, Keurig admitted it would have been impossible for it to determine whether Competitive Cups damaged the Keurig Brewer, absent actually inspecting a brewer where the Portion Pack was still in the Keurig Brewer or by interviewing the customer.[73] SUF ¶ 778.

### D. Keurig Made False Statements, Without Basis, For At Least Seven Years That Competitive Cups Do Not Work Safely Or Effectively In Keurig Brewers

Keurig does not dispute that it made various statements from at least December 2010 through March 2017 that Competitive Cups do not work safely or effectively in Keurig Brewers.

---

[73] In contrast to the utter lack of evidence that Competitive Cups caused damage to Keurig Brewers, Keurig has had significant quality and safety issues with its brewers. For example, the Keurig Mini-Brewer, which Keurig sold from 2009 to 2014, had been the subject of consumer injury complaints since at least February 2010 and was later the subject of a U.S. Consumer Product Safety Commission ("CPSC") recall due to a "burn hazard." SUF ¶¶ 781-83. The settlement agreement that Keurig ultimately entered into with the CPSC indicates that Keurig started receiving "incident reports of hot water, coffee, and coffee grounds spraying out of the Brewers" from February 2010. SUF ¶ 784. A Keurig executive admitted that these recitals were consistent with her understanding of the facts. SUF ¶ 785.

Keurig's public statements in 2010 and 2011 included false claims that TreeHouse Competitive Cups "do not work safely or effectively."[74] *See* Ex. 306. Suzanne DuLong, former Vice President of Global Corporate Communications for Keurig, confirmed that Keurig's statements to investors to that effect ████████████████████████████████████████████████████████ ████████ *See* SUF ¶ 788. Indeed, Keurig has admitted that it also made similar statements on Facebook, from March 2014 through at least January 2015, and on Keurig's website, in at least 2014 and 2017. *See* Ex. 306.

Keurig also made it a practice to ██████████████████████████████ ████████████████████████████████████ Keurig's former Senior Vice President of U.S. Hot Beverages testified that Keurig ████████████████████████ ███████████████████████████████████████████████████████ *See* SUF ¶¶ 794-95.

Despite repeatedly stating that Competitive Cups did not work well or safely, Keurig has been unable to point to any ordinary-course-of-business evidence in support of these statements. The former Keurig Senior Manager of Consumer Insights testified that ████████████████ ████████████████████████████████████████████████████████████ █████████████████████████████████████. *See* SUF ¶ 797. Moreover, Keurig has not ███████████████████████████████████████████ █████████████████████████████████. *See* SUF ¶¶ 800-01, 833. Indeed, the former Quality Manager at Keurig testified that he did not have any data comparing the percentages of complaints Keurig received relating to K-Cups to those relating to Competitive

---

[74] Keurig made similar statements to investors in June 2014, focusing on the safety and performance of Competitive Cups in 2.0 Brewers and noting that "it is critical for performance and safety reasons that the [2.0] system only brew Keurig brand licensed packs." *See* SUF ¶ 838.

Cups. *See* SUF ¶ 800; *see also* Ex. 307. Keurig therefore had no ordinary-course-of-business basis for stating that such complaints were more frequent with TreeHouse Competitive Cups than with K-Cups. *See* SUF ¶ 801.[75]

There is also extensive evidence of K-Cups causing serious injury to consumers in 2009 and 2010, ***before Competitive Cups were on the market, such that the injuries are necessarily attributable to Keurig and its products***. SUF ¶¶ 801-06, 811-28. For example, in ▮▮▮▮▮▮, a consumer complained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ SUF ¶ 821. In 2009 and 2010, other consumers complained that they were ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶¶ 812, 825-26.

Even earlier, in July 2007, Keurig received an email from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮—well before any Competitive Cups were on the market. SUF ¶ 828.

Additionally, Keurig representatives, including Ms. DuLong, falsely told consumers that

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SUF ¶ 830. This

---

[75] Although Keurig's expert G. Richard Slovenko included some cherry-picked consumer complaint calls (selected by Keurig's counsel) regarding TreeHouse Competitive Cups, he did not compare these to the number of complaints received with respect to Keurig's K-Cups, nor did he do any systematic analysis of the Keurig call center database, and he did not know of any such analysis done by Keurig. SUF ¶¶ 805, 807-08. Indeed, all the complaints directed to Competitive Cups highlighted by Mr. Slovenko ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and he conceded in his deposition that ▮▮▮ SUF ¶ 809. Keurig executives also repeatedly conceded that issues of taste should be left to the individual consumer and did not necessarily indicate a lack of quality. *See, e.g.*, SUF ¶ 810. By contrast, TreeHouse's expert, Sarah Butler, conducted a thorough analysis of safety complaints to the Keurig call center and found that, while there were no mentions of safety issues pertaining to TreeHouse Competitive Cups, approximately 18% of sampled calls referenced safety issues with K-Cups. *See* Ex. 310, V.d.i-iii (Butler Ex. 16).

was one lie layered on top of another. As set forth above, Keurig had no evidence that Competitive

Cups did not brew safely and effectively. Moreover, contrary to Ms. DuLong's representation to

consumers that the 2.0 Brewer could ██████████████████████████████████████████

both Keurig and its experts have admitted that the 2.0 Brewer had no such capability. SUF ¶ 831.

## KEURIG IS LIABLE FOR ITS LITERALLY FALSE ADVERTISING

### A.  Plaintiffs Are Entitled To Judgment For Keurig's Literally False Statements

Plaintiffs are entitled to summary judgment because (1) Keurig's statements are literally

false (or likely to mislead or confuse consumers), (2) Keurig's statements are material, (3) Keurig's

statements are commercial advertisements, and (4) Keurig's statements appeared in interstate

commerce. Once literal falsity is established, the remaining elements are typically considered a

low hurdle, and other elements—namely, consumer deception—are presumed. *See C=Holdings*

*B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 242 (S.D.N.Y. 2013).[76] To establish liability, it is not

necessary to prove that the defendant knowingly or intentionally deceived consumers. A "false

advertising claim under the Lanham Act requires no intent to deceive," as there is "a regime of

strict liability with regard to false advertising claims." *Spotless Enters., Inc. v. Carlisle Plastics,*

*Inc.*, 56 F. Supp. 2d 274, 277-78 (E.D.N.Y. 1999).[77]

---

[76] *See also Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 449-50 (S.D.N.Y. 2012); *Ritani, LLC v. Aghjayan*, 880 F. Supp. 2d 425, 444 (S.D.N.Y. 2012).

[77] *See also McNeilab, Inc. v. Am. Home Prods. Corp.*, 501 F. Supp. 517, 529 (S.D.N.Y. 1980) (finding that "intent is not an element of a cause of action under 43(a) of the Lanham Act"). The standard for the claims under the New York General Business Law is substantially the same as that under the Lanham Act, including the fact that there is no intent element. *See, e.g.*, *Drone Racing League, Inc. v. DR1, LLC*, 2018 WL 6173714 at *5 (S.D.N.Y. Nov. 26, 2018); *Leider*, 387 F. Supp. 2d at 292 (finding that a plaintiff asserting a claim under New York's consumer protection laws "need not demonstrate that defendant acted intentionally or with scienter"); *see also Simply Lite Food Corp.*, 666 N.Y.S.2d at 714 (finding that "violations of General Business Law §§ 349 and 350 . . . do not require proof of intentional or even reckless conduct"). The standard for claims under the Illinois Consumer Fraud and Deceptive Business Practices Act and Illinois Uniform Deceptive Trade Practices Act is also substantially the same as that under the Lanham Act, with the exception of its intent requirement. *Pritikin v. Liberation Publ'ns, Inc.*, 83 F. Supp. 2d 920, 924 (N.D. Ill. 1999); *Gary Friedrich Enters., LLC v. Marvel Enters.*, 713 F. Supp. 2d 215, 231 (S.D.N.Y. 2009). As set forth below, TreeHouse has established the intent element as well.

### 1.   *Keurig's Statements Are Literally False*

Keurig's statements regarding the compatibility of Competitive Cups in the 2.0 Brewer; the testing, safety, and effectiveness of Competitive Cups; and the effect of Competitive Cups on Keurig Brewers all meet the standard for literal falsity. Literal falsity may be proved by implication: "if the words or images, considered in context, necessarily imply a false message, the advertisement is literally false." *C=Holdings*, 992 F. Supp. 2d at 242 (quoting *Time Warner*, 497 F.3d at 158). A district court may determine whether the claim is literally false "based on its own common sense and logic in interpreting the message." *Edmiston v. Jordan*, 1999 WL 1072492, at *9 (S.D.N.Y. Nov. 24, 1999). Keurig's statements are "susceptible of being proved true or false," and "a reasonable factfinder could conclude" that they state or imply an assertion of fact. *See Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20-21 (1990); *Solstein v. Mirra*, 488 F. Supp. 3d 86, 98 (S.D.N.Y. 2020) ("opinion was based on … a statement of fact that may be proven or disproven").

Courts have found that statements similar to each of the categories of statements made by Keurig are literally false. First, statements regarding product authenticity and compatibility can be literally false and subject to liability. In *Princeton Graphics Operating, L.P. v. NEC Home Electronics, Inc.*, this court found Lanham Act liability based on defendant's advertising claims that its products worked with a specific computer monitor when, in fact, they did not. 732 F. Supp. 1258, 1261-62 (S.D.N.Y. 1990). The Court's holding in *Chanel, Inc. v. RealReal, Inc.* is also on point. 449 F. Supp. 3d 422, 443-44 (S.D.N.Y. 2020). There, this Court granted a preliminary injunction based on defendant's literally false claim that its products were "authentic" and "100% the real thing." The *Chanel* Court did not require the plaintiff to prove that *all*, or even *most*, of the products in question were inauthentic—only that *some* were. *Id*. Similarly, TreeHouse need not prove that *all*, or even *most*, Competitive Cups worked in the 2.0 Brewer—only that *some* did, contrary to Keurig's statement that the 2.0 Brewer would work "only" with Keurig brand packs.

*See, e.g.*, *id*. Here, there are numerous examples, known to Keurig, that prove the falsity of the statements. *See* SUF ¶ 719. Even testing commissioned by Keurig itself demonstrated the literal falsity of its incompatibility claims. *See, supra*, § V.A.

Second, false claims regarding product testing have been held to be literally false. In *Castrol, Inc. v. Quaker State Corp.*, the court granted a permanent injunction against the defendant for making the false claim that "tests prove" that its product "protects better than any other" comparable product, when in fact the tests conducted "did not establish the proposition for which they were cited." 977 F.2d 57, 63 (2d Cir. 1992); *Optigen, LLC v. Int'l Genetics, Inc.*, 777 F. Supp. 2d 390, 405-06 (N.D.N.Y. 2011) (defendant may be held liable for statements on its website that its products do not infringe patents when this may in not be true). Keurig's claims that it did not test Competitive Cups were clearly literally false. *See, supra*, § V.B.

Third, false statements claiming a competitor's product may cause damage to or decrease performance of another product can be held to be literally false. In *Castrol, Inc. v. Pennzoil Co.*, the court affirmed a permanent injunction against an oil manufacturer for making literally false claims that its product "outperforms any leading motor oil against viscosity breakdown" and provides "longer engine life and better engine protection." 987 F.2d 939, 941 (3d Cir. 1993). Similarly, Keurig has falsely claimed that Competitive Cups decreases the overall life and performance of Keurig Brewers, despite having no such evidence. *See* Statement of Facts § II.C.

Fourth, statements regarding product safety and efficacy have been held literally false. In *Am. Home Products Corp. v. Johnson & Johnson*, the Court found violations of the Lanham Act through the defendant's false claims regarding the safety and efficacy of the plaintiff's products. 654 F. Supp. 568, 591 (S.D.N.Y. 1987); *see also Castrol, Inc.*, 987 F. 2d at 947 (affirming permanent injunction based on literally false statements that implied "Pennzoil outperforms the

other leading brands … protecting against engine failure"). These statements are analogous to Keurig's claims that only K-Cups would work safely or effectively in Keurig Brewers, despite the fact that undisputed evidence—including tests conducted by Keurig and 30(b)(6) testimony from Keurig—shows that Keurig had no basis for these claims. *See, supra*, § V.D.

The Court can also find Keurig's statements to be literally false based on Keurig's admissions that it has no basis for the statements. *Pfizer, Inc. v. Y2K Shipping & Trading, Inc.*, 2004 WL 896952, at *8 (E.D.N.Y. Mar. 26, 2004) (holding statements literally false as a matter of law and granting plaintiff summary judgment on the basis that "defendants admit that no tests or documents exist to support their claims"). *See, supra*, §§ V.C-D.

### 2. Keurig's Statements Were Material

In assessing materiality, courts consider whether the statement either is "likely to influence purchasing decision" or concerns an "inherent quality or characteristic of a product." *See, e.g.*, *Au New Haven, LLC v. YKK Corp.*, 2019 WL 1437516, at *19 & nn. 177-79 (S.D.N.Y. Mar. 31, 2019). The threshold for materiality requires "only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) (quotation omitted) (upholding materiality for false statement regarding medical capabilities of product).

Statements regarding whether a product is compatible with another product have been found to be material as a matter of law, without requiring reliance on survey or other materiality evidence extrinsic to the statements themselves. *See, e.g.*, *Playtex Products LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *4 (S.D.N.Y. Mar. 29, 2016) (granting summary judgment for plaintiff on claims regarding whether defendant's product would work with plaintiff's product); *C=Holdings B.V.*, 992 F. Supp. 2d at 243 (defendant's promotion of inauthentic products as authentic on its website was a material falsehood).

90

This Court has also held that a statement is material as a matter of law when it goes to inherent product qualities or characteristics. *Salon FAD v. L'Oreal USA, Inc*., 2011 WL 70591, at *6 (S.D.N.Y. Jan. 10, 2011) (false statements material where they relate to an inherent and material characteristic of the product"). The record here more than supports this finding as to the relevant statements. Former Keurig executive Kevin Sullivan testified that elements of a Portion Pack's functionality, including the pressure at which a product brews, are "inherent to the portion pack." SUF ¶ 834. Similarly, former Keurig executive Mark Wood testified that █████████████████ ████████████████████████████████████████████████████████████████ ███████████. SUF ¶ 796. Keurig's experts do not dispute that the compatibility, functionality, and safety of Competitive Cups are all inherit qualities or characteristics of the products.

### 3. Keurig's Statements Are Commercial Advertisements

The commercial advertising element of a false advertising claim is established if "the contested representations are part of an organized campaign to penetrate the relevant market;" "[p]roof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).[78] The Second Circuit has adopted a three-prong test: to be commercial advertising the statement must be (1) commercial speech; (2) for the purpose of influencing consumers to buy the defendant's goods or services; and (3) disseminated sufficiently to the relevant purchasing public. *Fashion Boutique*, 314 F.3d at 58. If the above elements are met, a

---

[78] The consumer-oriented element of New York General Business Law claims has "been construed liberally" and has been defined as "conduct that potentially affects similarly situated consumers." *Wurtz v. Rawlings Co. LLC*, 2014 WL 4961422, at *7 (E.D.N.Y. Oct. 3, 2014); *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 359 (E.D.N.Y. 2014). Under the Illinois statutes, "trade" and "commerce" have been defined to mean "the advertising, offering for sale, sale, or distribution of any services and any property … and any other article, commodity, or thing of value." *Juno Online Servs., L.P. v. Juno Lighting, Inc.*, 979 F. Supp. 684, 692 (N.D. Ill. 1997).

statement will be considered commercial advertising for the purposes of the Lanham Act, regardless of the specific channel through which the statement is made. *Id*. at 57.

There is no dispute that Keurig's statements appeared on its packaging, on its website, and on its social media channels. *See, supra*, §§ V.A-D. Courts have found that statements in categories similar to those of Keurig's false statements are commercial advertising:

- **Packaging**: The Second Circuit has held that statements on product packaging to be commercial advertising. *See, e.g.*, *Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 119 (S.D.N.Y. 2019) (product label); *Mantikas v. Kellogg Co.*, 910 F.3d 633, 638 (2d Cir. 2018) (packaging labels false under New York General Business Law); *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmbH*, No. 14-CV-585 AJN, 2015 WL 4002468, at \*22 (S.D.N.Y. July 1, 2015) (Lanham Act false advertising for packaging labeling).

- **Websites**: The Second Circuit has acknowledged that statements on a party's website can be considered advertisements. *See Church & Dwight Co.*, 843 F.3d at 68 (statements made on defendant's website and through other means were advertisements).

- **Social Media**: "[C]ommercial advertisements" can include statements on social media. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 518 (7th Cir. 2014). This Court previously held that Keurig's statements to consumers on sites like Facebook and Amazon are "appropriately viewed as being made for consumption by a wider audience for the purpose of influencing other consumers to buy defendant's goods or services"—in other words, commercial advertising or promotion. *See In re Keurig*, 383 F. Supp. 3d at 249.

- **Statements to Retailers**: This Court has held that statements to retailers can constitute commercial advertising as contemplated by the Lanham Act. *See Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 180 (S.D.N.Y. 1995).

#### 4. Keurig's Statements Appeared In Interstate Commerce

Posting statements to the internet places them in interstate commerce, as does conducting business in interstate commerce. *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2016 WL 815205, at \*7 (S.D.N.Y. Feb. 29, 2016).[79] It is not disputed that Keurig posted its statements

---

[79] For claims under the New York General Business Law, the "transaction in which the consumer is deceived must occur in New York." *Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 324-25 (2002); *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 122-24 (2d Cir. 2013). Keurig has admitted that it competed with TreeHouse for the sale of Compatible Cups in New York. SUF ¶ 322. For the Illinois claims, the statutes require only that the activity "directly or indirectly affected the people of Illinois." *People ex rel. Daley v. Datacom Sys. Corp.*, 146 Ill. 2d 1, 29-30 (1991); *Brown v. C.I.L., Inc.*, No. 94 C 1479, 1996 U.S. Dist. LEXIS 4917, at \*66 (N.D. Ill. Jan. 28, 1996). Keurig has admitted that it

online and that it sells products in interstate commerce. *See* Ex. 306; ECF No. 409, ¶ 192. As such, there is no dispute that these statements appeared in interstate commerce.

### B. TreeHouse Is Entitled To Judgment As A Matter of Law Awarding TreeHouse Damages For Keurig's False Advertising

When an advertisement is shown to be literally or facially false, consumer deception is presumed and "the court may grant relief without reference to the advertisement's [actual] impact on the buying public." *Am. Home Products*, 577 F.2d at 165; *Merck Eprova AG*, 760 F.3d at 257 (2d Cir. 2014).[80] "This is because plaintiffs alleging a literal falsehood are claiming that a statement, on its face, conflicts with reality, a claim that is best supported by comparing the statement itself with the reality it purports to describe." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999).

While Keurig has criticized several aspects of the consumer surveys conducted by TreeHouse's experts, Sarah Butler and Hal Poret, relating to various Keurig false and misleading statements, these criticisms are beside the point for the purposes of this Motion. The case law is clear that survey evidence is not required to establish entitlement to damages in cases of literal falsity. "[W]here a defendant's advertising of products is literally false, a Lanham Act plaintiff need not provide evidence of actual consumer confusion by resort to witness testimony, *consumer surveys*, or other such evidence in order to establish entitlement to damages under the Lanham Act." *Merck Eprova AG*, 760 F.3d at 256-57 (emphasis added) (because of the "factual finding of literal falsity, the district court was correct to presume consumer confusion"); *accord Time Warner*, 497 F.3d at 153 ("When an advertisement is shown to be literally or facially false, consumer

---

competed with TreeHouse for the sale of Compatible Cups in Illinois. SUF ¶ 322. Indeed, Keurig recently settled a coordinated indirect-purchaser class case, which included residents of Illinois. Order & Final J., ECF No. 1394.

[80] *See also Time Warner Cable, Inc. v. DIRECTV*, 497 F.3d 144, 153 (2d Cir. 2007); *Coca-Cola Co. v. Tropicana Prods.*, 690 F.2d 312, 317 (2d Cir. 1982) (same).

deception is presumed, and the court may grant relief without reference to the advertisement's actual impact on the buying public."); *see also PPX Enters. v. Audiofidelity Enters.*, 818 F.2d 266, 273 (2d Cir. 1987) (plaintiff was not required to show evidence of actual consumer confusion to establish entitlement to Lanham Act damages); *Tropicana*, 690 F.2d at 317 (2d Cir. 1982); *Am. Home Products*, 577 F.2d at 165. Thus, compensatory and unjust enrichment damages in the case of literal falsity do not require proof of deception but only a reasonable approximation of damages from the false advertisement. *Merck Eprova AG*, 920 F. Supp. 2d at 428, 431 (accepting plaintiff's "reasonable approximation" of lost profits damages noting a "court may award recovery of a defendant's profits on a discretionary basis upon a finding that the defendant acted in bad faith").

In his expert report, Treehouse's expert Dr. Mohan Rao provided an estimate of both lost profit and unjust enrichment damages based on the assumption that the statements would be found to be literally false, thus giving rise to the legal presumption of consumer deception, and that materiality would be found as a matter of law because the statements all pertained to inherent characteristics of the product.[81] Under Section 43(a) of the Lanham Act, while a plaintiff may recover its own lost profits, it also has the option to recover the defendant's profits "as a proxy for its own damages" if it has shown "willful conduct or bad faith on the part of the defendant." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 2006 WL 2128785, at *4 (S.D.N.Y.

---

[81] Dr. Rao also set forth other damages calculations relevant to Keurig's false or misleading statements not at issue in this Motion. TreeHouse does not move at this time for summary judgment on the other false statements at issue in this case which, though they may or may not be literally false, are at least materially misleading, and it intends to pursue liability and damages on those statements at trial. Similarly, it does not move on liability or damages for any false statements under various antitrust laws, which provide an independent basis for liability, reserving such proof for trial. *See, e.g.*, *Nat'l Ass'n of Pharmaceutical Mfrs., Inc., v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988). Nonetheless, ruling for TreeHouse on this motion will simplify the trial evidence on such claims. *See, e.g.*, *id.* (elements of liability for a commercial statement include that the statement is "clearly false" and "clearly material").

July 28, 2006);[82] *see also Imig, Inc. v. Electrolux Home Care Prods., Ltd.*, 2008 WL 905898, at

*19-20 (E.D.N.Y. Mar. 31, 2008) (granting award of counterclaim defendant's profits for a false

advertising claim noting "a court may award a plaintiff its adversary's profits, without any showing

of actual damages, where the evidence shows that the defendant acted in bad faith"). Willful

conduct or bad faith has typically been found where statements are made over an extended period

of time, with knowledge of their falsity, a standard TreeHouse meets here. *Id*. at *20 (finding

defendants "acted willfully" by making claims that "were knowingly false"); *Johnson & Johnson*

*Vision Care*, 2006 WL 2128785, at *4 ("refus[al] to withdraw the advertising claim for some

weeks" after it had been repudiated could indicate defendant acted willfully or in bad faith).

Under Dr. Rao's calculations, based on the assumptions set forth above, Keurig's unjust

enrichment on account of the literally false statements at issue is ███████.[83] Dr. Rao

calculated this unjust enrichment number by analyzing Keurig's false statements and calculating

Keurig's profits on its Portion Pack sales made during the relevant period, factoring in his

assessment of the number of consumers exposed to those statements based on their channels of

exposure.[84] *See* Ex. 308, Expert Report of Mohan Rao, Ph.D., August 28, 2020, § VI.C. While

Keurig's expert Dr. Ugone (incorrectly) disputed the legal standard,[85] his only substantive criticism

---

[82] In the alternative, TreeHouse may receive damages for lost profits. Under Dr. Rao's calculations, based on a presumption of consumer deception and materiality, TreeHouse's lost profits on account of these four statements are ███████, before enhancement. *See* Ex. 309, ¶ 8, Tab 4.

[83] *See* Ex. 309, Tab 4.

[84] For example, the literally false statement that Competitive Cups were not compatible with the 2.0 Brewer were disseminated the most widely, including by Keurig's statements to the press, on Facebook, Keurig's website and the product box. *See* Ex. 309, Tab 4. The other statements had fewer channels of distribution. *Id.*

[85] Specifically, Dr. Ugone argued that Dr. Rao should have reduced his calculation of unjust-enrichment damages by accounting for sales that Keurig made that would have gone to Keurig's competitors other than TreeHouse. Ex. 7, § XXI.C. However, this is incorrect as a matter of law, as the unjust-enrichment remedy applies to *all* of the defendant's profits attributable to the anticompetitive conduct, with no reduction on account of a plaintiff's market share or calculation of which percentage of profits could have gone to the plaintiff. *See River Light V, L.P. v. Lin & J Intern. Inc.*, 2015 WL 3916271, at *7 (S.D.N.Y. June 25, 2015).

of Dr. Rao's unjust enrichment calculation (relating to Keurig's incremental margin) was fully addressed and accounted for by Dr. Rao in his Reply Report. *See* Ex. 309, ¶ 8, n. 2. Moreover, Dr. Ugone testified that he was not providing an estimate of TreeHouse's damages as an alternative to those presented by TreeHouse's experts. *See* SUF ¶ 835. Thus, if TreeHouse is correct as to the applicable legal standard, its unjust enrichment calculations for these four statements are undisputed.[86] Accordingly, because of Keurig's bad-faith actions in knowingly disseminating false statements, TreeHouse is entitled to damages based on Keurig's unjust enrichment.[87] *See, supra*, §§ V.A-D.

### C. The Court Has Discretion To Enhance These Damages To Trebling

Under the Lanham Act and New York General Business Law, the Court (not the jury) has discretion to enhance these damages up to trebling.[88] *See, e.g.*, *Merck Eprova AG*, 920 F. Supp. 2d at 428 (Lanham Act provides up to discretionary trebling); N.Y. Gen. Bus. Law §§ 349(h), 350-e(3). The Court may enhance damages when the violations were "willful" or made in "bad faith," which is normally established by demonstrating that the defendant knew of the falsity of the statements when made. *See Mobius Mgmt. Syst., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1025 (S.D.N.Y. 1994); *Merck Eprova AG*, 920 F. Supp. 2d at 430. In fact, the "willful or intentional conduct of defendant is the usual basis for increasing awards." 1 Charles E. McKenney & George F. Long III, Federal Unfair Competition: Lanham Act 43(a) § 10:10.

---

[86] Because the literally false compatibility statements received the widest distribution, a showing by TreeHouse that these statements alone were literally false would entitle TreeHouse to the full amount of Keurig's unjust enrichment of ▮▮▮▮▮, without needing to prove literal falsity with respect to the other three categories of statements. *See* Ex. 309, Tab 4. Of course, in the unlikely event that the Court determines that the compatibility statements were not literally false, Dr. Rao has set forth the unjust enrichment applicable to the other categories of statements as well. *Id*.

[87] If the Court determines that issues of the quantum of damages, but not liability, raise materially disputed issues of fact, then the Court should decide liability as a matter of law and put the issue of damages only to the jury. *See Halo Optical Prods. v. Liberty Sport, Inc.*, 2017 WL 1082443 (N.D.N.Y Mar. 22, 2017) (granting motion for partial summary judgment on Lanham Act liability but reserving a ruling on monetary damages until trial).

[88] The relevant Illinois statutes do not provide for trebled damages.

Here, TreeHouse has established that Keurig willfully and intentionally made the above-described false statements, while knowing they were false. *See, supra*, §§ V.A-D. As set forth above, Keurig continued to make false statements regarding the compatibility of Competitive Cups in the 2.0 Brewers, its testing of Competitive Cups, the effect of Competitive Cups on Keurig Brewers, and the safety and efficacy of Competitive Cups despite either direct knowledge that these statements were false or a complete lack of evidence to support the statements in each of these categories. *Id*. Accordingly, TreeHouse requests that the Court treble the requested ██████████████████████████████████████████████████████

██████████████████████████.

### D. Plaintiffs Are Entitled To Injunctive Relief On The Undisputed Facts

In order to obtain a permanent injunction under the Lanham Act, a plaintiff must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Merck Eprova AG*, 920 F. Supp. 2d at 432.[89] Each of these elements is established based on the undisputed facts.

First, to show irreparable harm, a plaintiff must show "(i) that the parties are competitors in the relevant market, and (ii) that there is a logical causal connection between the alleged false

---

[89] The relevant sections of the New York General Business Law "explicitly encourage[] injunctive relief" for "[a]ny person who has been injured by reason of any violation of this section." *Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 546-47 (E.D.N.Y. 2017). Such relief may be granted by showing "that irreparable injury will result absent injunctive relief and that the equities balance in his favor." *McDonald v. N. Shore Yacht Sales, Inc.*, 134 Misc. 2d 910, 913 (Sup. Ct. Nassau Cnty. 1987). The Illinois statutes similarly allow for injunctive relief for plaintiffs who "show that the defendant's conduct will likely cause it to suffer damages in the future"; this is the only relief available under the Deceptive Practices Act. *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 9 (1st Dist. 2009).

advertising and its own sales position." *Id*. The Court can reach this conclusion based on the undisputed facts in this Motion. Keurig has admitted that it competes with TreeHouse. SUF ¶ 322.

Similarly, the second and third elements can be met based on the fact that "damages cannot compensate [plaintiff] for the enviable market position – and the corresponding decline in its own market position – that [defendant] has acquired thanks to its false advertising." *Merck Eprova AG*, 920 F. Supp. 2d at 432. TreeHouse's market position has declined in light of Keurig's significant market share throughout the relevant time period. *See* Ex. 136, at figs. 10, 11. This supports the fact that damages alone are insufficient to compensate TreeHouse for the harm caused by Keurig's false statements. *See, e.g.*, *Mitchell Group USA LLC v. Udeh*, 2017 WL 9487193, at *4, *8 (E.D.N.Y. Mar. 8, 2017) (plaintiffs entitled to injunctive relief when false advertising of competing products harmed plaintiffs' reputation and business).

In any event, the fact that Keurig's behavior is continuing alone justifies an injunction. *See Boost Worldwide, Inc. v. Talk Til U Drop, Wireless, Inc.*, 2014 WL 5026777, at *3 (N.D.N.Y. Oct. 8, 2014) (granting permanent injunction because, without it, "defendants are likely to continue their infringing conduct"). Keurig has a long record of refusing to self-correct its false statements after the statements have been shown to be false. *See, supra*, § V.A.

Finally, the public would be served by enjoining Keurig from continuing to make its false statements, which have continued through today. *See Mitchell Group USA, LLC*, 2017 WL 9487193, at *4, *8 (granting plaintiffs' request for permanent injunction regarding continuing false advertising); *Am. Home Prods.*, 436 F. Supp. at 803-04 (granting permanent injunction based on evidence that "consumers have been and will continue to be deceived"); *see also Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2016 WL 815205, at *10 (S.D.N.Y. Feb. 29, 2016).

## VI.  SUMMARY JUDGMENT MOTION REGARDING KEURIG'S AFFIRMATIVE DEFENSES OF UNCLEAN HANDS AND *IN PARI DELICTO*

Keurig raises the affirmative defenses of unclean hands and *in pari delicto*.[90] *See* ECF No. 409, Keurig's Affirmative or Alternative Defenses ¶¶ 6, 7. Such defenses are not available as a bar to antitrust claims and are inapplicable to Plaintiffs' false advertising claims as a matter of law.[91] The Court should therefore grant summary judgment for Plaintiffs on both affirmative defenses.

The defenses of unclean hands and *in pari delicto* are similar and often used interchangeably by courts. "The doctrine of unclean hands applies when the complaining party shows that the offending party is guilty of immoral, unconscionable conduct and even then only when the conduct relied on is directly related to the subject matter in litigation …." *Am. Lecithin Co.*, 2020 WL 4260989, at *21 (internal citations omitted); *MBIA Ins. Corp. v. Patriarch Partners VII, LLC*, 842 F. Supp. 2d 682, 712 (S.D.N.Y. 2012). As for *in pari delicto*, courts have recognized the defense where the plaintiff shares at least substantially equal responsibility for the underlying illegality to that of an active, voluntary participant in the unlawful activity that is the subject of the suit. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 168-69 (2d Cir. 2014); *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1089-90 (2d Cir. 1997) ("The *in pari delicto* defense is used sparingly, and is narrowly defined in litigation ….").

---

[90] McLane joins this motion only with respect to the antitrust claims.

[91] Plaintiffs' antitrust claims include those brought pursuant to Sherman Act Sections 1 and 2, 15 U.S.C. §§ 1, 2; 15 U.S.C. § 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/1 *et seq.*, 10/3(1)-(4); the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01 *et seq.*, 133.03(1)-(2); the Donnelly Act, N.Y. Gen. Bus. Law § 340 *et seq.*; and Wisconsin common-law unfair competition. Plaintiffs' false advertising claims include Plaintiffs' claims brought pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §§ 505/1 *et seq.*; the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. §§ 510/1 *et seq.*; and the New York Consumer Protection Act, N.Y. Gen Bus. Law §§ 349-50.

### A.  Unclean Hands And *In Pari Delicto* Are Not Defenses To Antitrust Claims

It is well established that "neither the unclean hands doctrine nor the *in pari delicto* defense may be asserted as a bar against damages [or liability] in an antitrust suit." *In re Dig. Music Antitrust Litig.*, 321 F.R.D. 64, 95 (S.D.N.Y. 2017); *see Trebuhs Realty Co. v. News Syndicate Co.*, 107 F. Supp. 595, 599 (S.D.N.Y. 1952) (refusing to apply the unclean hands defense). The inapplicability of these defenses to antitrust claims is long-standing. In *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons*, the Supreme Court held that the defendant's allegation that the petitioner played a part in the conspiracy was not a defense to Sherman Act claims. 340 U.S. 211, 214 (1951) (alleged illegal conduct of a petitioner does not legalize defendants' unlawful conduct).

The Supreme Court subsequently reaffirmed this doctrine almost two decades later: "We … hold that the doctrine of *in pari delicto* … is not to be recognized as a defense to an antitrust action." *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 138-40 (1968) (noting that traditional legal and equitable doctrines such as unclean hands and variations of *in pari delicto* should not be applicable to antitrust claims); *see also Chrysler Corp. v. General Motors Corp.*, 596 F. Supp. 416, 418-19 (D.C. 1984) ("The public interest in preventing anticompetitive injury would be dampened tremendously if defendants were allowed to raise the defense of unclean hands in private antitrust actions."). In so holding, the Court noted that there was "nothing in the language of the antitrust acts which indicates that Congress wanted to make the common-law *in pari delicto* a defense to treble-damage actions." *Perma Life*, 392 U.S. at 138. For public policy reasons, "a plaintiff in an antitrust suit [can]not be barred from recovery by proof that he engaged in an unrelated conspiracy to commit some other antitrust violation." *Id.* (citing *Kiefer-Stewart Co.*, 340 U.S. 211). This public policy remains in effect today.

The Second Circuit has also routinely recognized that unclean hands and *in pari delicto* are not available defenses to antitrust actions, with one court noting that the defenses have been

"virtually abolished … in private antitrust actions." *Waldron v. British Petroleum Co.*, 231 F. Supp. 72, 91-92 (S.D.N.Y. 1964); *U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1369 (2d Cir. 1988) ("plaintiff's own anticompetitive conduct generally cannot be raised as a defense to liability in an antitrust action."); *Trebuhs Realty Co.*, 107 F. Supp. at 599 (bar of unclean hands defense in antitrust cases applies equally in actions both at law and in equity); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 604-05 (S.D.N.Y. 1989) (striking unclean hands defense and noting that "the law has remained consistent that unclean hands is not a defense to an antitrust action"); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 841 (S.D.N.Y. 1988).[92]

Further, courts in the Second Circuit have noted that the unclean hands doctrine is not a defense at the injunction stage in an antitrust case. *See Columbia Pictures Indus., Inc. v. Am. Broad. Cos., Inc.*, 501 F.2d 894, 901-02 (2d Cir. 1974). Courts have further stated that the unclean hands doctrine "may provide no defense to an antitrust action when the merits are being decided," as is the case here. *Heldman v. U.S. Lawn Tennis Assoc.*, 354 F. Supp. 1241, 1249 (S.D.N.Y. 1973). Therefore, it is immaterial what relief is being sought by plaintiffs so long as the defense is being asserted against antitrust claims.

Notably, the contentions to which Keurig points for these defenses do not even support the limited exception that some courts have recognized permitting the unclean hands and *in pari delicto* defenses for antitrust claims.[93] *See* Ex. 345 (asserting defenses apply based on purported

---

[92] Apart from not being recognized as a defense to claims brought pursuant to the Sherman and Clayton Acts, the prohibition against the unclean hands doctrine also applies to the state-law antitrust claims brought by Plaintiffs. *See e.g.*, *Bus. Foods Serv., Inc. v. Food Concepts Corp.*, 533 F. Supp. 992, 997 (E.D.N.Y. 1982) (refusing to recognize unclean hands as an affirmative defense in a case involving both Sherman Act and Donnelly Act claims because plaintiff was not equally responsible for creating and implementing an illegal scheme).

[93] Some courts have permitted unclean hands or *in pari delicto* defenses to antitrust actions in limited circumstances where the plaintiff and defendant were both parties to the same illegal conspiracy. *See Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3, 15-16 (4th Cir. 1971); *H. & A. Selmer, Inc. v. Musical Instrument Exchange, Inc.*, 154 F. Supp. 697, 698-99 (S.D.N.Y. 1957); *Alden-Rochelle, Inc., v. Am. Soc. of Composers*, 80 F. Supp. 888, 899 (S.D.N.Y. 1948). Keurig does not (and cannot) assert that TreeHouse participated in the conspiracies alleged in the Complaint.

fact that ███████████████████████████████████████████████████████████

██████████████████████).[94] While TreeHouse disputes these contentions, that dispute is immaterial to this Motion. Even if the Court assumes, counterfactually, that Keurig's version of the facts is true, those facts as a matter of law cannot sustain these defenses.

Accordingly, Keurig's asserted defenses of unclean hands and *in pari delicto* to TreeHouse's antitrust claims should therefore be dismissed as a matter of law.

### B.  Keurig's Defenses Are Inapplicable To Plaintiffs' False Advertising Claims

In general, unclean hands[95] is not an available defense to false advertising claims unless there has been unconscionable conduct on the part of the plaintiff related to the matter being litigated, which Keurig has not alleged (and cannot allege) here.[96] Courts have recognized that there is a strong public interest in the prevention of misleading advertisements and, as such, have limited the defenses of unclean hands to cases "where some unconscionable act" of the party seeking relief "has immediate and necessary relation" to the matter being litigated. *Markel v. Scovill Mfg. Co.*, 471 F. Supp. 1244, 1255 (W.D.N.Y. 1979) (citation omitted); *The Apollo Theater Found., Inc. v. Western Int'l Syndication*, 2005 WL 1041141, at *16 (S.D.N.Y. May 5, 2005) ("[m]isconduct that is 'unrelated to the claim to which it is asserted as a defense,' however, 'does

---

[94] The factual bases asserted by Keurig in its Answer do not seem to have any connection to the following claims asserted by Plaintiffs: negligent and intentional interference with business relations and tortious interference with contract under New York law, tortious interference with contract under Wisconsin law, and tortious interference with prospective business expectancy and tortious interference with contract under Illinois law. Even if Keurig could show some relevance to the antitrust and false advertising claims, the fact that the evidence was applicable only to some claims and not others creates the risk of jury confusion, and such evidence should be excluded under Federal Rule of Evidence 403. Plaintiffs reserve the right to so move at trial if this Motion is not granted in its entirety.

[95] Because the concept of *in pari delicto* does not fit the fact pattern of a false advertising claim, Plaintiffs have been unable to find any case law addressing, much less recognizing, the defense of *in pari delicto* in a false advertising context. Accordingly, Keurig should not be permitted to assert this defense to false advertising claims.

[96] The refusal to recognize unclean hands as a defense to false advertising claims applies equally to the state-law false advertising claims alleged by Plaintiffs, as well as Lanham Act claims. *See, e.g.*, *Redbox Automated Retail LLC v. Xpress Retail LLC*, 2018 WL 950098, at *1, *4-6 (N.D. Ill. Feb. 20, 2018) (prohibiting an unclean hands defense in a false advertising case with both federal- and state-law claims).

not constitute unclean hands'") (citation omitted); *Am. Home Prods.*, 654 F. Supp. at 590-91. "'[M]isconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands.'" *Project Strategies Corp. v. Nat'l Commc'ns Corp.*, 948 F. Supp. 218, 227 (E.D.N.Y. 1996) (citation omitted); *see also Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 645-46 (S.D.N.Y. 2018).

The limited instances in which courts have found unclean hands applicable to false advertising claims are where the plaintiff engaged in "unconscionable conduct," which is limited to severe wrongdoing like perjury and fraud on the court.[97] Such unconscionable behavior must be related to the matter at issue in the litigation. *Gidatex S.r.L. v. Campaniello Imports*, 82 F. Supp. 2d 126, 131 (S.D.N.Y. 1999). Additionally, the burden of proving such unconscionable conduct falls on the party asserting the defense. *Dress for Success Worldwide*, 589 F. Supp. at 364.

As with the antitrust claims, the facts to which Keurig points to for its unclean hands defense do not support the limited exception that permits the unclean hands defense for Lanham Act claims. *See* Ex. 345 (stating that the defense applies based on the purported fact that

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████. While TreeHouse disputes these facts, that dispute is again immaterial to this Motion, as the facts cannot sustain this defense as a matter of law.

Apart from its legal infirmity, permitting an unclean hands defense in the false advertising context would lead to jury confusion. To do so would lead to a series of minitrials in which the

---

[97] *See, e.g.*, *Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 364-65 (S.D.N.Y. 2008); *cf. Goldstein v. Delgratia Min. Corp.*, 176 F.R.D. 454, 458 (S.D.N.Y. 1997); *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F. Supp. 969, 970 (S.D.N.Y. 1992).

jury is set out to determine whether the plaintiff ever made false statements to consumers rather than whether the alleged violation against the defendant occurred. *See Elhannon LLC v. F.A. Bartlett Tree Expert Co.*, 2018 WL 6040687, at *3 (D. Vt. Nov. 19, 2018); *see also N.Y. v. Pullman, Inc.*, 662 F.2d 910, 915 (2d Cir. 1981). Accordingly, Keurig's asserted defense of unclean hands to Plaintiffs' false advertising claims should therefore be dismissed.

## VII.   SUMMARY JUDGMENT ON MCLANE'S STATUS AS A DIRECT PURCHASER

There is no material dispute that McLane purchased K-Cups directly from Keurig and the McLane-named co-conspirators, J.M. Smucker Company ("Smucker") and Starbucks (collectively "Co-Conspirators"). Despite this fact and well-established law to the contrary, Keurig has taken the position that McLane should not be permitted to recover damages resulting from its K-Cup purchases. In its brief in Opposition to Direct Purchasers' Motion for Class Certification, Keurig boldly claims that, even if it had engaged in anticompetitive conduct, McLane is "a direct purchaser that benefitted from the challenged conduct." *See* ECF No. 1420 at 29-30. While Keurig admits that McLane is a direct purchaser, it argues that, "[i]f Keurig charged McLane a higher price, McLane earned more money because it received a fixed percentage markup on a higher base." *Id*. Similarly, in its motion to exclude McLane's expert Dr. Philip Johnson's testimony, Keurig argues that Dr. Johnson's testimony is unreliable because he failed to deduct the alleged "benefit" to McLane from Keurig's anticompetitive behavior. *See* ECF No. 1454 at 22-24.

The law on this is well-established. Direct purchasers of products are entitled to recover the full overcharge caused by anticompetitive conduct, and it is not a defense that the victim of that anticompetitive conduct "passed on" the overcharge to a customer. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489 (1968) (holding that a direct purchaser "is equally entitled to damages if he raises the price for his own product" because "[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows."). There is

arguably one narrow exception to this rule and it does not apply here. As demonstrated below, McLane purchased K-cups based on forecasted demand, not based on any quantities contained in a contract with Walmart. Therefore, McLane is entitled as a matter of law to a finding that (*i*) as a direct purchaser, McLane is the proper party to bring suit against Keurig, and that (*ii*) Keurig cannot assert a "pass-on" defense based on the cost-plus exception to *Illinois Brick*, or otherwise deduct from McLane's damages any amount that may have been passed on to Walmart or other customers. Granting this Motion would resolve McLane's standing in this matter, moot the irrelevant question of McLane's purported "passing on" of overcharges (or as Keurig calls it, benefitting from Keurig's anticompetitive conduct), and narrow the legal and factual issues for the jury's consideration.

### STATEMENT OF UNDISPUTED FACTS RELATED TO MCLANE'S STANDING

### A.  McLane Contracted With Keurig, Starbucks, And Smucker To Purchase K-Cups Directly From Each K-Cup Supplier

McLane is one of the largest food and beverage distributors in the United States. In 2012, one of McLane's long-standing customers, Walmart, requested McLane's services for the purchase and distribution of K-Cups. *See* SUF ¶ 857. Having already established a supplier agreement with Smucker, *see* SUF ¶ 859, McLane negotiated supplier agreements with Keurig and Starbucks specifically for the distribution of K-Cups to Walmart. *See* SUF ¶ 858. While negotiating the supplier agreements, McLane was particularly weary of bearing the costs and exposure of overstocked,[98] excess product. Despite its efforts otherwise, McLane was unable to fully shift overstock liability to any of the K-Cup suppliers. *See* SUF ¶ 864.

---

[98] "Overstocks" refers to excess product not consumed by demand that has aged at least 16 weeks.  *See* SUF ¶ 861. "Understocks" refer to situations in which McLane's inventory was below demand, resulting in low "service levels." SUF ¶ 898.  McLane experienced both overstocks and understocks when supplying Walmart K-Cups, evidencing its vulnerability to market influences of supply and demand. SUF ¶¶ 896-98.

With three supplier contracts established, McLane began purchasing K-Cups directly from Keurig and the Co-Conspirators for distribution to Walmart in the fall of 2012.[99] Under the agreements, McLane would place K-Cup orders with Keurig and the Co-Conspirators, who then shipped the product to McLane's distribution centers. SUF ¶ 867. McLane then paid the suppliers,[100] taking ownership of the K-Cups. *See* SUF ¶¶ 866-67 (Ex. 396, Heller Dep. 43:22-44:20 (testifying that McLane purchased K-Cups and resold them to Walmart)); *see also* SUF ¶¶ 860-65 (describing ███████████████ in McLane's supplier agreements). With K-Cups purchased and inventories stocked, McLane was ready to break down, sell, and distribute K-Cups directly to Walmart. *See* SUF ¶ 872.

## B. McLane Sold And Distributed K-Cups To Walmart

McLane is more than a freight service. *See* SUF ¶ 873. McLane provided Walmart with crucial order management, break-packing, repackaging, storage, and distribution services. *Id.* Of these, McLane's break pack and repack services were especially important to Walmart as McLane dismantled the larger cases of K-Cups and "repacked" them into custom sizes.[101] *See id.* (Ex. 384, KGM00183250 at 52 (Pls. Dep. Ex. 1636) (Keurig noting that ███████████████ ███████████)). This modification of K-Cup cases allowed Walmart to place more products on store shelves, increasing the variety offered to its customers at a given time. *See* SUF ¶ 875 (Ex. 401, Rosencranz Dep. 95:25-97:10 (discussing Walmart's ability to increase the variety of K-Cups offered on shelves due to McLane's break pack services)). As former Keurig employee John Heller

---

[99] Between August 2012 and December 31, 2018, (the "Damages Period") McLane purchased over $1.4 billion worth of K-Cups (approximately $840 million from Keurig and $640 million from Co-Conspirators Smucker and Starbucks, who were at the time partner licensees of Keurig). *See* SUF ¶¶ 868-70.

[100] *See* SUF ¶ 866 (Ex. 399, Robinson Dep. 32:22-33:1 ("The vendor told us what they were going to charge us and we paid it.")).

[101] Put simply, Walmart stores could order one box of K-cups at a time rather than being forced to order and store master cases.

testified, "Walmart wanted McLane to be their single-serve distributor in order to allow for better inventory management and in-store presence because of our master case count." *See* SUF ¶ 874 (Ex. 396, Heller Dep. 49:3-49:18). Mr. Heller further testified that McLane's break pack services likely increased the sales by Walmart. *See* SUF ¶ 875 (Ex. 396, Heller Dep. 60:3-13).

In return for McLane's services, Walmart paid McLane a fee for services equal to ███████ of the cost of the product plus any ██████████████████████████[102] *See* SUF ¶ 876; *see also id.* (Ex. 408, Mueller Dep. 197:19-198:8 (characterizing McLane's cost to Walmart as a "service fee" or a "percent of delivery," it "wasn't really a . . . markup")). While McLane had an existing 2011 distribution agreement with Walmart,[103] the parties deviated from that agreement when McLane ████████████████████████████████. SUF ¶¶ 882-83. Specifically, McLane ████████████████████████████████████████ ████████████████. *See* SUF ¶ 883 (Ex. 409, MCLANE00326222 at 248 (McLane 30(b)(6) Dep. Ex. 4) (showing ██████████████████████████████ ████████████████████)). As McLane's 30(b)(6) testimony explained, "████████████████████████████████████████████████ ████████████████████████" SUF ¶ 883 (Ex. 393, McLane 30(b)(6) Dep. (by Ross), at 27:3-28:14).

---

[102] Cash discount equalization ("CDE") refers to a ████████ discount McLane ████████████████ ████████████████ in the event McLane pays an invoice within an agreed amount of time. *See* SUF ¶ 877. Keurig ████████, so McLane ████████████████ CDE for Keurig K-Cups SUF ¶ 878. Smucker offered ████████, so McLane ████████ CDE SUF ¶ 879. Starbucks, however, offered ████████████████████. SUF ¶ 880. McLane ████████████ of CDE on Starbucks K-Cups as a result. SUF ¶ 881.

[103] *See* SUF ¶882 (describing Exhibits 409-10, 2011 Walmart-McLane Distribution Contract and Addendum)).

## C.  McLane Was Subject To Market Forces Of Supply And Demand

While providing its services to Walmart, McLane was like most direct purchasers in that it was subject to the market forces of supply and demand because *at no time in the Damages Period did Walmart place K-Cup orders with McLane through a fixed-quantity contract. See* SUF ¶ 885. Rather, McLane collaborated with Keurig to make market-based K-Cup purchasing decisions by estimating Walmart's demand. SUF ¶ 889. This was a complex, evolving process that involved assessing projected forecasts and data points, such as available inventory and seasonality. *See id*.

Because McLane placed orders off of *estimates* of demand, McLane's 30(b)(6) testimony explained that it was impossible to " ███████████████████████ " SUF ¶ 892 (Ex. 393, McLane 30(b)(6) Dep. (by Ross) 157:17-158:18). As Keurig's Senior Director of Demand Planning acknowledged, measuring Walmart's demand for K-Cups was often "highly volatile." *Id.* (Ex. 421, Conlon Dep. 33:23-34:9). As a result, McLane " ███████████████ ███████████████████████████ " in order to " ██████████████████ ██████ " SUF ¶ 893 (Ex. 393, McLane 30(b)(6) Dep. (by Ross) 157:17-158:18); *see also* SUF ¶ 894 (Ex. 396, Heller Dep. 70:8-25 (acknowledging the need for excess inventory to support demand, as well as inherent risks of that inventory becoming dated)). But holding inventory to cover demand came with risks. In particular, when Walmart's demand dropped, McLane was often left with excess K-Cup inventory ("overstocks"). *See* SUF ¶¶ 894-95. Keurig was well aware of this. *See* SUF ¶¶ 895-96. Keurig's Product Supply Lead, Brad Tidwell, monitored inventories both at Walmart stores and McLane's distribution centers. SUF ¶ 896 (Ex. 432, Tidwell Dep. 10:6-12). And Mr. Heller explained how Walmart's decision to stop carrying a Keurig product affected McLane: "[F]or the SKUs that got deleted, … they'll no longer be available on the shelf at Walmart and therefore if any inventory is sitting in McLane, … McLane's only selling to Walmart, it has no opportunity to get sold." *See* SUF ¶ 895 (Ex. 396, Heller Dep. 143:3-24). When asked if

"McLane is just stuck with [the inventory] at that point," Mr. Heller answered, "That would be the case." *Id*.

Because no supplier completely protected McLane from the effects of overstocks, McLane's only recourse was to request permission from Walmart to "push" additional K-Cups beyond Walmart's actual demand. SUF ¶ 899. While Walmart obliged at times, pushes of overstocks were never guaranteed. *See* SUF ¶ 900.

Aside from demand, McLane was also vulnerable to effects of supply in the form of understocks. SUF ¶¶ 897-98. Keurig often reduced ("cut") McLane's orders after they were placed, resulting in lost sales to Walmart. *See* SUF ¶¶ 897-98. As Keurig's Director of Supply Planning testified, Keurig could go from making millions of one K-Cup to millions of a different K-Cup on two weeks' notice based on consumer demand. *See* SUF ¶ 897 (Ex. 421, Conlon Dep. 47:4-47:9). Another Keurig employee, John Heller, testified that Keurig would simultaneously cut McLane K-Cup orders while simultaneously inserting additional supplies to meet internal sales goals. SUF ¶ 897 (Ex. 396, Heller Dep. 92:19-93:19).

### D. McLane Sold K-Cups To A Limited Number Of Non-Walmart Customers

Between 2012 and 2018, the vast majority of McLane's Keurig K-Cup sales were to Walmart as Keurig's supplier agreement included an addendum requiring McLane only sell K-Cups to Walmart. *See* SUF ¶ 901. The same was true with McLane's distribution of Co-Conspirator's K-Cups. Only later would Keurig allow McLane to sell to other, limited customers, such as convenience stores.[104] Through all relevant sales, however, McLane remained the direct purchaser of K-Cups and provided its distribution services for a fee based on the price of the

---

[104] Keurig allowed McLane to sell Keurig K-Cups to convenience stores starting in 2014 and to K-Mart in 2015. *See* SUF ¶ 902. Notably, Keurig actively delayed McLane's ability to sell to K-Mart and blocked McLane entirely from expanding its K-Cup business to other channels, such as Target and the military, despite specific requests from McLane's customers. *See* SUF ¶ 904.

product. ***No contract McLane signed provided a fixed-quantity buying provision for K-Cups***. *See* SUF ¶ 905 (Ex. 440, Voelter Dep. 113:12-113:17 (testifying that McLane charged convenience stores Keurig's list price plus a contractual markup)).

## ARGUMENT REGARDING MCLANE'S STANDING

Under Section 4 of the Clayton Act, 15 U.S.C. § 15(a), "a plaintiff alleging antitrust claims must establish antitrust standing in addition to constitutional standing under Article III." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 543 (S.D.N.Y. 2018). As a result, a plaintiff must show both antitrust injury *and* that it "is a proper party to bring a private antitrust action." *Id*. (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d Cir. 2016)).

It is the second criteria that McLane seeks to settle with the present Motion.[105] As a direct purchaser, McLane is the proper party to bring this antitrust action against Keurig. Despite this fact, Keurig has already attempted to undermine McLane's standing, having boldly claimed that, "[i]f Keurig charged McLane a higher price, McLane earned more money because it received a fixed percentage markup on a higher base." *See* ECF No. 1420 at 29-30. This proposition is legally faulty and patently false. Direct purchasers maintain standing, even if they structure their prices to "pass on" some or even all overcharges downstream to their customers. *See Hanover Shoe*, 392 U.S. at 494 (rejecting use of a "passing on defense" to undermine direct purchasers' standing); *see also Ill. Brick Co. v. Ill.*, 431 U.S. 720, 728 (1977) (rejecting use of "pass-on" to establish standing for an indirect purchaser). While exceptions to the direct purchaser

---

[105] At trial, McLane will prove the first criteria of antitrust standing. This Court has already found that, as a matter of law, the forced payment of supra-competitive prices for K-Cups as a result of Keurig's anticompetitive conduct sufficiently establishes antitrust injury. *See In re Keurig*, 383 F. Supp. 3d at 221 (allegations "that Keurig's anticompetitive conduct caused [direct purchasers] to pay supra-competitive prices" is "plainly . . . 'of the type the antitrust laws were intended to prevent.'") (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Discovery has proven that Keurig did in fact engage in illegal anticompetitive behavior, inflicting an antitrust injury upon McLane in the form of supra-competitive prices for K-Cups as a result. McLane's Damages Expert, Dr. Philip Johnson, found that those supra-competitive prices amounted to an average of ███████ per cup, totaling ███████ in illegal overcharges over the period. *See* SUF ¶ 871.

rule exist—such as the narrow "cost plus" exception—none apply to McLane. Because the record is settled and there exists no genuine dispute of material fact, the issue of McLane's status as the proper party to bring its claims against Keurig is ripe for the Court's final judgment.

### A. McLane Is A Direct Purchaser Of K-Cups And Therefore The Proper Party To Pursue Civil Antitrust Claims Against Keurig

It is axiomatic that, "[g]enerally, only direct purchasers have standing to bring civil antitrust claims." *Simon v. KeySpan Corp.*, 694 F.3d 196, 201-02 (2d Cir. 2012). McLane initiated this action against Keurig as one such direct purchaser of K-Cups, and Keurig does not dispute that McLane is a direct purchaser. *See* Keurig's Opposition to DPP's Class Certification, ECF No. 1420 at 29-30 ("McLane is another example of a direct purchaser…"). Between August 2012 and December 2018, McLane purchased a total of $1,484,873,778 in K-Cups *directly from* Keurig and its Co-Conspirators pursuant to the supplier agreements it signed with each supplier. *See* SUF ¶¶ 868-70.[106] As John Heller, Keurig's Vice President of Supply Chain Services, wrote in an email and confirmed in his testimony, "███████████████████████████████████████

█████████████" *See* SUF ¶ 866 (Ex. 395, KGM11686319 at 19 (Pls. Dep. Ex. 1366); Ex. 396, Heller Dep. at 179:5-179:23).[107] Keurig's Senior Vice President of U.S. Sales, Ron DiFabio was also clear in his testimony: "McLane was a customer of ours that we shipped to directly." *See* SUF ¶ 866 (Ex. 397, DiFabio Dep. 361:10-361:14, Feb. 12, 2012). Even McLane's customer, Walmart, acknowledged McLane's status as the direct purchaser as Carli Rosencranz, senior buyer of hot beverages at Walmart, testified that Walmart bought K-Cups "technically through McLane." SUF ¶ 872 (Ex. 397, Rosencranz Dep. 99:18-100:2).

---

[106] *See also* SUF ¶ 866.

[107] Chad Collett, the Keurig employee responsible for sales to McLane put it simply in his testimony, stated that McLane worked under a vendor agreement like "pretty much every customer that we ship to as a matter of course in retail." *See* SUF ¶ 867 (Ex. 394, Collett Dep. 260:1-260:9, Feb. 26, 2020).

It is true that, after purchasing K-Cups, McLane then charged Walmart a percentage-based markup for its order management, break-packing, repackaging, storage, and distribution services. *See* SUF ¶¶ 873-74, 876. But any focus on how that fee "passes on" an alleged overcharge on K-Cups is a red herring. As a direct purchaser, McLane's damages accrued from the purchase of K-Cups at Keurig's supra-competitive prices.

### B.  Pursuant To *Hanover Shoe*, Only Direct Purchasers May Bring Civil Antitrust Claims, Even If They "Pass On" Overcharges Downstream

Pursuant to *Hanover Shoe*, a direct purchaser is the proper plaintiff to bring an antitrust claim *even if* it passed on that overcharge to its customers. 392 U.S. at 489, 493–94. In that case, the Supreme Court rejected the same "passing-on defense" that Keurig signals it will pursue in this litigation. *Id*. at 494; *see also* ECF No. 1420 at 29–30. In doing so, the Court definitively held that a direct purchaser "is equally entitled to damages if he raises the price for his own product." *Hanover Shoe*, 392 U.S. at 489. "As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows." *Id*.

The *Hanover Shoe* direct purchaser rule has only strengthened over time. Roughly a decade later, the Supreme Court reaffirmed *Hanover Shoe* in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Numerous federal courts since *Hanover Shoe* and *Illinois Brick* have reaffirmed that there is no "pass-on" defense, going so far as to find that downstream data is not even relevant, and therefore not discoverable under the lenient standard of Federal Rule of Civil Procedure 26. *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig*., No. 15 Civ. 7488 (CM) (JCF), 2017 WL 2693713, at *7-8 (S.D.N.Y. June 21, 2017). Courts have also consistently excluded evidence of a plaintiff's downstream profitability from trial. *See, e.g., Best Buy Co. v. Hitachi, Ltd. (In re Cathode Ray Tube (CRT) Antitrust Litig.)*, MDL No. 1917, 2016 WL 7800819, at *8-9 (N.D. Cal. Nov. 15, 2016); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, No. 1:04-cv-3066-JEC,

2012 WL 12540321, at *1 (N.D. Ga. July 17, 2012) ("Plaintiff's activities are almost wholly irrelevant"). Unsurprisingly, the Southern District of New York has followed suit, agreeing that it is no exception to the *Hanover Shoe* rule if a direct purchaser experienced benefits from the alleged monopoly. *See In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 59-60 (S.D.N.Y. 2002) (rejecting argument that plaintiffs' economic injury was overstated considering benefits accrued from the alleged anticompetitive conduct) (citing *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 884-85 (10th Cir. 1997) (rejecting exception to the *Hanover Shoe* rule when anticompetitive behavior allegedly "redounded to [the plaintiff's] benefit as it similarly protected [the plaintiff] from competition.").

### C.  The Narrow Cost-Plus Exception To The Direct Purchaser Rule Does Not Apply

To moot McLane's standing under clear Supreme Court precedent, Keurig must show some exception to *Hanover Shoe* and *Illinois Brick*. Exceptions to the rule that bar defendants from asserting the pass-on defense are, however, purposefully narrow and limited. In fact, the Supreme Court has continually rejected "attempts to carve out exceptions to the *Hanover Shoe* rule." *Ill. Brick Co.*, 431 U.S. at 744; *Kan. v. Utilicorp United, Inc.*, 497 U.S. 199, 217 (1990) (finding "it an unwarranted and counterproductive exercise to litigate a series of exceptions."); *In re Buspirone*, 210 F.R.D. at 60 (noting Supreme Court has rejected other exceptions where they "reintroduced the need to assess the effects of an overcharge on the purchaser's prices, costs, sales, and profits."). The Supreme Court has only indicated the *possibility* of an exception where a direct purchaser is party to a pre-existing, fixed-quantity cost-plus contract.  *See Utilicorp United, Inc.*, 497 U.S. at 218 (noting the Court does not endorse or otherwise alter its past "observations about *the possibility* of an exception for cost-plus contracts") (emphasis added).   Even if such an exception exists, the facts of this case foreclose this avenue to Keurig as a matter of law.

### 1.   *The Cost-Plus Exception Is Narrow, Requiring A Pre-Existing Fixed Quantity Contract*

In *Hanover Shoe*, the Supreme Court indicated in *dicta* the possibility of a "cost plus" exception to the general bar to indirect purchaser standing. The Court "recognize[d] that there might be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present." *Hanover Shoe*, 392 U.S. at 494. The Court again alluded to the possibility of such an exception in *Illinois Brick*, but also reiterated that any exceptions to the direct purchaser rule are limited in scope:

> In [a cost-plus contract] situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.

431 U.S. at 736. To date, the Supreme Court has yet to officially sanction the existence of a cost-plus exception. *See Utilicorp United, Inc.*, 497 U.S. at 218. It has therefore been up to the lower courts to flesh out the existence (if any) of such a carve out.

For its part, the Second Circuit has allowed the possibility of a "cost plus" exception to the *Hanover Shoe* direct purchaser rule, but it has followed the Supreme Court's warnings and purposefully kept the exception limited to cost-plus contracts where "the indirect purchaser has agreed ***in advance*** to purchase ***a fixed quantity***, paying the direct purchaser's costs plus a predetermined additional fee." *Simon*, 694 F.3d at 202 (emphasis added); *see also In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 2693713, at *7 (noting that the cost-plus contract exception is limited to pre-existing contracts with a fixed quantity that entirely insulate a direct purchaser from any decrease in profit); *Lefrak v. Arabian Am. Oil Co.*, 487 F. Supp. 808, 819 (E.D.N.Y. 1980) (defining cost-plus contracts as a "a fragile principle" requiring fixed-

quantity purchase commitments).

### 2. McLane Does Not Fit Within The Narrow Cost-Plus Exception Because McLane Did Not Order K-Cups Pursuant To A Pre-existing, Fixed-Quantity Contract

For the cost-plus exception to apply, there must be a fixed-quantity contract that pre-exists the damages. *See Simon*, 694 F.3d at 202 (stating that "the contract quantity must be determined *prior* to the overcharge") (emphasis added). The 2011 McLane-Walmart distribution agreement did not institute fixed-quantity ordering. *See* SUF ¶ 885; *see also Utilicorp United, Inc*., 497 U.S. at 218 (denying the application of a cost-plus exception where "[t]he utility customers made no commitment to purchase any particular quantity of gas, and the utility itself had no guarantee of any particular profit"); *see also Lefrak*, 487 F. Supp. at 822 (rejecting the application of the cost-plus exception, even where the contract gave the "approximate quantities to be purchased"). In fact, McLane's ordering process for K-cups was the exact opposite of a fixed-quantity agreement. McLane's K-Cup orders were a result of a collaborative effort between Keurig, Walmart, and McLane with the sole goal of *estimating Walmart's demand* through several data sources.[108] *See* SUF ¶ 889. Those sources included "██████████████████████████████ ██████████████" SUF ¶ 889 (Ex. 416, MCLANE00241309 at 10).

Nor was the 2011 distribution agreement "pre-existing" as it did not pre-date Keurig's unlawful conduct. Keurig had already engaged in a campaign of anticompetitive acquisitions[109] and sham patent litigation between 2009 and 2010. *See* SUF ¶ 887. Therefore, by the time McLane and Walmart negotiated and entered into the 2011 distribution agreement, Keurig had already rigged the market in its favor to cement its supra-competitive pricing. Accordingly, for the reasons set forth above, McLane's Motion for Partial Summary Judgment should be granted.

---

[108] In fact, Keurig and McLane engaged in heated debates as to how a party can most accurately measure Walmart's customer demand. *See* SUF ¶ 892 (Ex. 422, MCLANE00103653 at 53).

[109] *See* SUF ¶ 886 (describing series of licensing agreements).

Dated: New York, New York
      August 25, 2021

Respectfully submitted,
WINSTON & STRAWN LLP


By: /s/ *Aldo A. Badini*

Aldo A. Badini
abadini@winston.com
Susannah P. Torpey
storpey@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
(212) 294-6700
(212) 294-4700 (fax)

Dan K. Webb
dwebb@winston.com
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600

Diana L. Hughes
dhughes@winston.com
WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 615-1700

*Counsel for Plaintiffs TreeHouse
Foods, Inc., Bay Valley Foods, LLC
and Sturm Foods, Inc.*


Daniel Johnson Jr. (CA Bar No. 57409)
Mario Moore (CA Bar No. 231644)
Robert G. Litts (CA Bar No. 205984)
DAN JOHNSON LAW GROUP, LLP
1350 Old Bayshore Highway, Suite 520,
Burlingame, CA 94010
Telephone: 415-604-4500
Email: dan@danjohnsonlawgroup.com
Email: mario@danjohnsonlawgroup.com
Email: robert@danjohnsonlawgroup.com

*Counsel for Plaintiff JBR, Inc. (d/b/a Rogers Family Company)*

Alexander G. Brown (*Pro Hac Vice*)
James C. Grant (*Pro Hac Vice*)
Valarie C. Williams (*Pro Hac Vice*)
B. Parker Miller (*Pro Hac Vice*)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Phone: 404-881-7000
Fax: 404-881-7777
alex.brown@alston.com
jim.grant@alston.com
valarie.williams@alston.com
parker.miller@alston.com

Steven L. Penaro
ALSTON & BIRD LLP
90 Park Avenue
15th Floor
New York, NY 10016-1387
Phone: 212-210-9400
Fax: 212-210-9444
steve.penaro@alston.com

*Counsel for Plaintiff McLane Company, Inc.*

Michael M. Buchman
Michelle C. Clerkin
Jacob O. Onile-Ere
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
(212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com
jonileere@motleyrice.com

Robert G. Eisler
Deborah A. Elman
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017

(646) 722-8500
reisler@gelaw.com
delman@gelaw.com

William V. Reiss
David B. Rochelson
Matthew Geyer
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
(212) 980-7400
wreiss@robinskaplan.com
drochelson@robinskaplan.com
mgeyer@robinskaplan.com

*Counsel for Direct Purchaser Plaintiffs*