**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

IN RE: KEURIG GREEN MOUNTAIN
SINGLE-SERVE COFFEE ANTITRUST
LITIGATION

---

This Document Relates to: All Cases

MDL No. 2542

Master Docket No. 1:14-md-02542 (VSB) (SLC)

**REDACTED PUBLIC VERSION**

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF**
**KEURIG'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BRIEF HISTORY OF THE CASE AND PARTIES ............................................................... 7

LEGAL STANDARD............................................................................................................ 13

ARGUMENT ......................................................................................................................... 14

I.  Keurig Is Entitled to Summary Judgment on Liability on All Claims ................. 14

    A.  All Antitrust Claims Fail For Lack of Harm to Competition ......................... 14

    B.  Plaintiffs' Claims Fail For Lack of Monopoly Power................................... 23

        1.  Plaintiffs Cannot Establish That Keurig Has Monopoly Power in the Purported Single-Serve Brewer Market.................................................................... 26

        2.  Plaintiffs Cannot Establish that Keurig Has Monopoly Power in the Purported Keurig-Compatible Portion Pack Market............................................... 29

        3.  Plaintiffs' Attempted Monopolization and Monopoly Leveraging Claims Fail Because There is No Dangerous Probability of Monopoly Power ........................ 34

    C.  Plaintiffs' Antitrust Claims All Fail For Additional Reasons ......................... 36

        1.  Plaintiffs' Product Design Claims Fail For Lack of Coercion ............................... 36

        2.  Plaintiffs' Exclusive Dealing Claims Fail For Lack of Substantial Foreclosure .... 45

        3.  Plaintiffs' Conspiracy Claims Fail Because Keurig's Relationships and Agreements Are Lawful................................................................................... 56

        4.  Plaintiffs' Attempts to Recast Other Claims as Tying Fail Because Brewers and Portion Packs Were Sold Separately......................................................... 61

        5.  Plaintiffs' Sham Litigation Claims Fail Because the Prior Suits Were Not Baseless, and No Antitrust Injury Resulted ............................................... 66

        6.  Plaintiffs' Patent Misuse Claims Fail Because No Patent Is Asserted................... 73

        7.  Plaintiffs' Claims Based on Old Acquisitions Fail for Lack of Timeliness, Standing, and Merit ......................................................................................... 74

        8.  McLane's Business Grievances Are Not Antitrust Claims .................................... 77

        9.  Plaintiffs' Sherman Act Advertising Claims Fail As a Matter of Law .................. 79

    D.  Keurig is Entitled to Summary Judgment on Competitor Plaintiffs' Lanham Act Claims, Which Fail for Lack of Evidence ....................................................... 83

    E.  Keurig Is Entitled to Summary Judgment on All State Law Claims, Which  Fail for Same Reasons as Federal Claims and for Lack of Required Elements......................... 85

        1.  TreeHouse's Tortious Interference Claims Fail Because Keurig Lawfully Competed and Did Not Induce Breach ............................................................. 85

        2.  JBR's Tortious Interference Claims Fail Because Keurig Lawfully Competed and No Contracts Were Breached................................................................... 88

3. Competitor Plaintiffs' State Law Antitrust and False Advertising Claims Fail for Same Reasons As Parallel Federal Claims ............................................................. 90

4. DPPs' and McLane's Unjust Enrichment Claims Fail Because They Rely on Other Failed Claims and Cannot Stand Alone ........................................................ 92

II. Keurig is Entitled to Summary Judgment on Damages and Relief ........................................ 93

A. No Plaintiff Offers a Reliable Estimate of Damages Caused by the Challenged Conduct .................................................................................................................. 94

B. Competitor Plaintiffs Are Not Entitled to Damages for "Lost Customers" that Switched to Get Lower Prices, Higher Quality, and Better Service ............................. 97

1. TreeHouse's "Lost Customers" Resulted from Competition .................................. 98

2. JBR's Business Decisions Caused Its Purported "Losses" ................................... 102

C. Competitor Plaintiffs' Future Damages Are Highly Speculative, Warranting Summary Judgment ................................................................................................ 103

D. Competitor Plaintiffs Are Not Entitled to Damages on Business Tort Claims ............ 106

1. There Is No Evidence of Damages Related to JBR's Claims of Intentional Interference with Contract under California Law .................................................. 106

2. TreeHouse Admits It Has Already Been Made Whole on Its Claim of Tortious Interference with Contract ................................................................................... 106

E. TreeHouse's Damages for Costs Incurred Are Inflated ............................................... 107

F. Keurig Is Entitled to Summary Judgment on Competitor Plaintiffs' Requests for Unjust Enrichment ................................................................................................... 109

G. Plaintiffs Are Not Entitled to Injunctive or Declaratory Relief .................................. 110

CONCLUSION ............................................................................................................................ 112

## TABLE OF AUTHORITIES

**Federal Cases**

*AD/SAT v. Assoc. Press*,
181 F.3d 216 (2d Cir. 1999)............................................................. 35-36, 59

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ..................................................................48, 51

*Allied Orthopedic v. Tyco Health Care Grp.*,
592 F.3d 991 (9th Cir. 2010) ....................................................... *passim*

*Alpha Lyracom Space Commc'ns, Inc. v. Comsat Corp.*,
968 F. Supp. 876 (S.D.N.Y. 1996).........................................................98

*Am. Banana Co. v. J. Bonafede Co., Inc.*
407 F. App'x 520 (2d Cir. 2010) ..............................................................72

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery*,
323 F.3d 366 (6th Cir. 2003) ...................................................................82

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal and Pro. Serv., Inc.*,
108 F.3d 1147 (9th Cir. 1997) .................................................................82

*Amerinet Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992) ................................................. 64, 98-99

*Anderson News, LLC v. American Media, Inc.*,
899 F.3d 87 (2d Cir. 2018).........................................................17, 21, 73

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)................................................................................13

*Apotex v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016).............................................80-81, 83-84

*Apple v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal 2008) ..............................................30

*Apple iPod iTunes Antitrust Litig.*,
No. C 05-00037 JW, 2009 WL 10678940 (N.D. Cal. Oct. 30, 2009) ....................62

*Appliance Recycling Ctrs. Of Am., Inc. v. JACO Env't, Inc.*,
   378 F. App'x 652 (9th Cir. 2010) ...................................................................................83, 92

*Arcesium, LLC v. Advent Software, Inc.*,
   No. 1:20-cv-04389 (MKV), 2021 WL 1225446 (S.D.N.Y. March 31, 2021) ........................79

*Argus Inc. v. Eastman Kodak Co.*,
   801 F.2d 38 (2d Cir. 1986).............................................................................................14, 86

*Astiana v. Hain Celestial Grp., Inc.*,
   783 F.3d 753 (9th Cir. 2015) ...............................................................................................93

*AstraZeneca v. Glenmark Generics Ltd.*,
   No. 14-665-GMS, 2014 WL 5366050 (D. Del. Oct. 9, 2014) ................................................73

*AstraZeneca v. Mylan Labs Inc.*,
   No. M-21-81 (BSJ), 2010 WL 2079722 (S.D.N.Y. May 19, 2010) ........................................69

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)..........................................................................................19, 21, 77

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016)...................................................................................................67

*B & H Med., LLC v. ABP Admin., Inc.*,
   526 F.3d 257 (6th Cir. 2008) ...............................................................................................20

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997).............................................................................................73

*Bailey v. Allgas, Inc.*,
   284 F.3d 1237 (11th Cir. 2002) ...........................................................................................26

*Balaklaw v. Lovell*,
   14 F.3d 793 (2d Cir. 1994)....................................................................................19, 21, 49

*Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*,
   750 F.2d 903 (Fed. Cir. 1984)...............................................................................................69

*Barr Lab'ys. Inc. v. Abbott Labs.*,
   978 F.2d 98 (3d Cir. 1992)....................................................................................................35

*Belfiore v. New York Times*,
   826 F.2d 177 (2d Cir. 1987)..................................................................................................21

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)........................................................................ *passim*

*Berni v. Barilla S.P.A.*,
  964 F.3d 141 (2d Cir. 2020)....................................................................110

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
  142 F. Supp. 2d 296 (E.D.N.Y. 2001), *aff'd* 35 F. App'x 29 (2d Cir. 2002)....................57-58

*Bio-Tech Gen. Corp. v. Genentech, Inc.*,
  886 F. Supp. 377 (S.D.N.Y. 1995)...........................................................72

*BOC Int' v. FTC*,
  557 F.2d 24 (2d Cir. 1977).....................................................................76

*Borger v. Yamaha Int'l Corp.*,
  625 F.2d 390 (2d Cir. 1980)...................................................................109

*Broadway Delivery Corp. v. UPS*,
  651 F.2d 122 (2d Cir. 1981)....................................................................28

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)...........................................................................14, 17

*Brooks Furniture Mfg., Inc. v. Dutalier Int'l, Inc.*,
  393 F.3d 1378 (Fed. Cir. 2005)................................................................68

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977).......................................................................... *passim*

*Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*,
  769 F.2d 919 (2d Cir. 1985)..................................................................13, 57

*Burndy Corp. v. Teledyne Indus., Inc.*,
  584 F. Supp. 656 (D. Conn. 1984), *aff'd*, 748 F.2d 767 (2d Cir. 1984) ........................ *passim*

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Ass'n*,
  996 F.2d 537 (2d Cir. 1993)................................................................. *passim*

*Cardinal Motors, Inc. v. H&H Sports Protection USA, Inc.*,
  No. 1:20-cv-0899-PAC, 2021 WL 1758881 (S.D.N.Y. May 4, 2021)..............................92, 98

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
  479 U.S. 104 (1986).............................................................................20

*CDC Techs., Inc. v. IDEXX Lab'ys, Inc.*,
  7 F. Supp. 2d 119 (D. Conn. 1998), *aff'd*, 186 F.3d 74 (2d Cir. 1999) .......................... *passim*

*City of New York v. Grp. Health Inc.*,
  No. 06 Civ. 13122 (RJS), 2010 WL 2132246 (S.D.N.Y. May 11, 2010), *aff'd*, 649
  F.3d 151 (2d Cir. 2011)........................................................................................26

*City of Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) ............................................................................94

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir. 1994) ..............................................................................92

*Clorox Co. v. Sterling Winthrop*,
  117 F.3d 50 (2d Cir. 1997)............................................................................ 14-15

*Com. Data Servers, Inc. v. IBM Corp.*,
  262 F. Supp. 2d 50 (S.D.N.Y. 2003).......................................................................47

*Com. Data Servers, Inc. v. IBM Corp.*,
  No. 00CIV5008(CM)(LMS), 2002 WL 1205740 (S.D.N.Y. Mar. 15, 2002).........................47

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ............................................................................24

*Conwood Co., L.P.v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ......................................................................... 32-33

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ............................................................................94

*Cromeens v. AB Volvo*,
  349 F.3d 376 (7th Cir. 2003) ..............................................................................87

*Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*,
  159 F.3d 129 (3d Cir. 1998)................................................................................35

*Culberson Inc. v. Interstate Elec. Co., Inc.*,
  821 F.2d 1092 (5th Cir. 1987) ............................................................................61

*Curtis v. Cerner Corp.*,
  621 B.R. 141 (S.D. Tex. 2020) .......................................................................78, 93

*Davis v. Avvo, Inc.*,
    345 F. Supp. 3d 534 (S.D.N.Y. 2018) ..................................................................81

*De Jesus v. Sears, Roebuck & Co., Inc.*,
    87 F.3d 65 (2d Cir. 1996) .................................................................................62

*Dessert Beauty, Inc. v. Fox*,
    568 F. Supp. 2d 416 (S.D.N.Y. 2008), *aff'd*, 329 F. App'x 333 (2d Cir. 2009).....................87

*Determined Productions v. R. Dakin*,
    514 F. Supp. 645 (N.D. Cal. 1979), *aff'd*, 649 F.2d 866 (9th Cir. 1981) ...............................53

*Doctor's Data, Inc. v. Barrett*,
    No. 10 C 03795, 2011 WL 5903508 (N.D. Ill. Nov. 22, 2011) ..............................................91

*Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*,
    472 F. Supp. 2d 385 (E.D.N.Y. 2007) ...............................................................96-97

*DSM Desotech Inc. v. 3D Sys. Corp.*,
    No. 2013-1298, 2014 WL 1509012 (Fed. Cir. Apr. 18, 2014) ................................................31

*DSM Desotech Inc. v. 3D Sys. Corp.*,
    No. 08-cv-1531, 2013 WL 389003 (N.D. Ill. Jan. 31, 2013) ..................................................91

*E & L Consulting, Ltd. v. Doman Indus. Ltd.*,
    472 F.3d 23 (2d Cir. 2006) .................................................................27, 77, 79

*Eastman v. Quest Diagnostics Inc.*,
    724 F. App'x 556 (9th Cir. 2018) ....................................................................76

*Egyptian Goddess, Inc. v. Swisa, Inc.*,
    543 F.3d 665 (Fed. Cir. 2008) (en banc) ..............................................................71

*Eisai Inc. v. Sanofi Aventis U.S., LLC*,
    821 F.3d 394 (3d Cir. 2016) ............................................................................82

*El Aguila Food Products, Inc. v. Gruma Corp.*,
    131 F. App'x 450 (5th Cir. 2005) ...............................................................22, 94, 109

*Elecs. Commc'n v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997) .................................................................57, 60, 77

*Emigra Grp., LLC v. Fragomen LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009) .............................................................25, 28

*Empire Volkswagen Inc. v. World-Wide Volkswagen Inc.*,
   814 F.2d 90 (2d Cir. 1987)............................................................................3, 46, 51

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
   No. 14, cv-748-wmc, 2017 WL 4386456 (W.D. Wis. Sept. 29, 2017) ...................91

*Expert Masonry, Inc. v. Boone County Ky*,
   440 F.3d 336 (6th Cir. 2006) ...................................................................52, 78

*Farmington Dowel Products Co. v. Forster Mfg. Co.*,
   421 F.2d 61 (1st Cir. 1969)................................................................................95

*Ferguson v. Greater Pocatello Chamber of Commerce, Inc.* ,
   848 F.2d 976 (9th Cir. 1988) .............................................................................49

*Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*,
   414 F.3d 325 (2d Cir. 2005).............................................................................93

*Ford Piano Supply Co. v. Steinway & Sons*,
   No. 85 Civ. 1284-CSH, 1988 WL 3488 (S.D.N.Y. Jan. 13, 1988).........................48

*Foremost Pro Color v. Eastman Kodak*,
   703 F.2d 534 (9th Cir.1983) ................................................................... *passim*

*Freeland v. AT&T Corp.*,
   238 F.R.D. 130 (S.D.N.Y. 2006) .........................................................................65

*FTC v. Steris Corp.*,
   133 F. Supp. 3d 962 (N.D. Ohio 2015)................................................................76

*Gallagher v. Funeral Source One Supply and Equip. Co., Inc.*,
   No. 14-cv-115-PB, 2015 WL 6738733 (D.N.H. Nov. 4, 2015)................................93

*Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*
   838 F. Supp. 2d 141 (S.D.N.Y. 2011), *aff'd* 508 F. App'x 31 (2d Cir. 2013).................83

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
   711 F.3d 68 (2d Cir. 2013)....................................................................3, 19, 91

*Glass Equip. Dev., Inc. v. Besten, Inc.*,
   174 F.3d 1337 (Fed. Cir. 1994)..........................................................................69

*Gmurzynska v. Hutton*,
   355 F.3d 206 (2d Cir. 2004)...............................................................................84

*Grappone, Inc. v. Subaru of New England, Inc.*
   858 F.2d 792 (1st Cir. 1988) (Breyer, J.)................................................................62

*Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*,
   998 F.2d 391 (7th Cir. 1993) ................................................................................98

*Harrison Aire, Inc. v. Aerostar Intern., Inc.*,
   423 F.3d 374 (3d Cir. 2005)................................................................................29

*H&B Equip. Co., Inc. v. Int'l Harvester Co.*,
   577 F.2d 239 (5th Cir. 1978) ..............................................................................98

*H-W Tech, LC v. Overstock.com Inc.*,
   973 F. Supp. 2d 689 (N.D. Tex. 2013) ................................................................74

*H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*,
   672 F. Supp. 724 (S.D.N.Y. 1987)................................................................59, 61

*Hack v. President and Fellows of Yale College*,
   237 F.3d 81 (2d Cir. 2000)................................................................................31

*Handicomp, Inc. v. U.S. Golf Ass'n*,
   No. 99-5372, 2000 WL 426245 (3d Cir. March 22, 2000)....................................25

*Harris County Texas v. MERSCORP, Inc.*,
   791 F.3d 545 (5th Cir. 2015) ..............................................................................92

*Hertz Corp. v. Avis, Inc.*,
   867 F. Supp. 208 (S.D.N.Y. 1994)......................................................................83

*Huawei Tech, Co, Ltd. v. Samsung Elec. Co, Ltd.*,
   340 F. Supp. 3d 934 (N.D. Cal. 2018) ................................................................72

*ILC Peripherals Leasing Corp. v. IBM Corp.*,
   458 F. Supp. 423 (N.D. Cal. 1978) ...................................................................106

*Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*,
   806 F.2d 722 (7th Cir. 1986) ..............................................................................59

*IMAF, S.p.A. v. J.C. Penney Co., Inc.*,
   No. 86 CV 9080 (KMV), 1991 WL 66892 (S.D.N.Y. Apr. 24, 1991) ..................108

*In re Digital Music Antitrust Litig.*,
   812 F. Supp. 2d 390 (S.D.N.Y. 2011)..................................................................93

*In re Elysium Health-Chromadex Litg.*,
   354 F. Supp. 3d 330 (S.D.N.Y. 2019)..................................................................................66-67

*In re Fresh Del Monte Pineapple Antitrust Litig.*,
   No. 04MD1628(RMB)(MHD), 2007 WL 64189 (S.D.N.Y. Jan. 4, 2007).............................67

*In re Gen. Motors LLC Ignition Switch Litig.*,
   No, 14-MD-2543 (JMF), 2017 WL 3382071 (S.D.N.Y. Aug. 3, 2017).................................93

*In re Inclusive Access Course Materials Antitrust Litig.*,
   No. 20 MDL No. 2946 (DLC), 2021 WL 2418333 (S.D.N.Y. June 14, 2021).....................59

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   14-MD-2542 (VSB), 2021 WL 621222 (S.D.N.Y. Feb. 16, 2021).......................................69

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   No. 14-CV-4242, 2014 WL 12778832 (S.D.N.Y. Sept. 19, 2014)...............................2, 38, 43

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019)............................................................................ *passim*

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018)...................................................................................95

*In re Terazosin Hydrochloride Antitrust Litig.*,
   335 F. Supp. 2d 1336 (S.D. Fla. 2004) .................................................................................69

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
   868 F.3d 132 (3d Cir. 2017).................................................................................................73

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   No. 09-MD-2090 ADM/TNL, 2018 WL 3862773 (D. Minn. Aug. 14, 2018)....................109

*In re Wireless Tel. Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005)............................................................................63, 65

*In re Zinc Antitrust Litig.*,
   155 F. Supp. 3d. 337 (S.D.N.Y. 2016).................................................................................59

*Innovation Sciences, LLC v. Amazon.com, Inc.*,
   842 F. App'x 555 (Fed. Cir. 2021) ......................................................................................68

*Int'l Constr. Products LLC v. Caterpillar Inc.*,
   No. 15-108-RGA, 2016 WL 264909 (D. Del. Jan. 21, 2016)...............................................50

*Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*,
    192 F.3d 724 (7th Cir. 1999) ................................................................88

*Intimate Bookshop, Inc. v. Barnes & Noble, Inc.*,
    No. 98 Civ. 5564, 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003) ................................94, 106

*Ironshore Insurance, Ltd. v. W. Asset Mgmt. Co.*,
    No. 11 Civ. 5954, 2013 WL 2051863 (S.D.N.Y. May 15, 2013) ............................................52

*JBCHoldings NY, LLC v. Pakter*,
    931 F. Supp. 2d 514 (S.D.N.Y. 2013) ....................................................................87

*JBR, Inc. v. Keurig Green Mountain, Inc.*
    618 F. App'x 31 (2d Cir. 2015) ................................................................2, 38

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ............................................................48, 52, 54, 62

*Jensen Ent., Inc.  v. Oldcastle Precast, Inc.*,
    375 F. App'x 730 (9th Cir. 2010) ................................................................18

*Jones v. Hardy*,
    727 F.2d 1524 (Fed. Cir. 1984) ................................................................70

*K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995) ............................................................3, 18, 44

*Kason Indus., Inc. v. Allpoints Foodservice Parts & Supplies, LLC*,
    No. 3:17-cv-26-TCB, 2018 WL 1980370 (N.D. Ga. March 6, 2018) ................................94

*Kaufman v. Time Warner Cable, Inc.*,
    836 F.3d 137 (2d Cir. 2016) ............................................................ 64-65

*Klayman v. Judicial Watch, Inc.*,
    628 F. Supp. 2d 112 (D.D.C. 2009) ................................................................81

*Knight v. U.S. Fire Ins. Co.*,
    804 F.2d 9 (2d Cir. 1986) ................................................................13

*Kolon Indus., Inc. v. E.I. du Pont*,
    No. 3 :11CV6222012 WL 1155218 (E.D. Va. Apr. 5, 2012), *aff'd*, 748 F.3d 160 (4th
    Cir. 2014) ................................................................50

*Kramer v. Pollock-Krasner Foundation*,
   890 F. Supp. 250 (S.D.N.Y. 1995)...................................................................................78, 93

*Lexmark Int'l v. Impression Prods.*,
   816 F.3d 721 (Fed. Cir. 2016), *overruled by Impression Prods. Inc. v. Lexmark Int'l,*
   *Inc.,* 137 S. Ct. 1523 (2017).........................................................................................70

*LG Electronics, Inc. v. Bizcom Electronics, Inc.*,
   453 F.3d 1364 (Fed. Cir. 2006).....................................................................................69

*Linzer Prod. Corp. v. Sekar*,
   499 F. Supp. 2d 540 (S.D.N.Y. 2007)...........................................................................17

*Los Angeles Land Co. v. Brunswick Corp.*,
   6 F.3d 1422 (9th Cir. 1993) ......................................................................................23, 25

*MacDermid Printing Solutions v. Cortron Corp.*,
   833 F.3d 172 (2d Cir. 2016)......................................................................................41, 80

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
   287 F. Supp. 2d 355 (S.D.N.Y. 2003)...........................................................................81

*Mathews v. Lancaster Gen. Hosp.*,
   87 F.3d 624 (3d Cir. 1996)............................................................................................18

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)............................................................................................ *passim*

*Max Impact, LLC v. Sherwood Grp., Inc.*,
   No. 09 Civ. 902 (LMM), 2011 WL 507600 (S.D.N.Y. Feb. 14, 2011)............................73-74

*Mazda v. Carfax, Inc.*,
   No. 13-cv-2680 (AJN) 2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016), *aff'd sub nom.*,
   726 F. App'x 66 (2d Cir. 2018) ...................................................................................46, 48

*McGlinchy v. Shell Chemical Co.*,
   845 F.2d 802 (9th Cir. 1988) .....................................................................................95, 104

*Mercatus Grp., LLC  v. Lake Forest Hospital*,
   641 F.3d 834 (7th Cir. 2011) .......................................................................................72

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010)......................................................................................................110

*Multimatic, Inc. v. Faurecia Interior Systems USA, Inc.*,
  358 F. App'x 643 (6th Cir. 2009) ................................................................. 105-106

*Multivideo Labs, Inc.v. Intel Corp.*,
  No. 99 CIV. 3908 (DLC), 2000 WL 12122 (S.D.N.Y. Jan. 7, 2000) ............................... 80-81

*Murphy Tugboat Co. v. Crowley*,
  658 F.2d 1256 (9th Cir. 1981) ...............................................................................96

*Muy v. IBM Corp.*,
  No. 4:19CV14-MW/CAS, 2019 WL 8161749 (N.D. Fla. Nov. 25, 2019)............................94

*Mylan Pharms. Inc. v. Warner Chilcott*,
  838 F.3d 421 (3d Cir. 2016)........................................................................27, 41

*Name.Space, Inc. v. ICANN*,
  795 F.3d 1124 (9th Cir. 2015) ...............................................................................91

*Nat'l Ass'n of Review Appraisers and Mortgage Underwriters, Inc. v. Appraisal Found.*,
  64 F.3d 1130 (8th Cir. 1995) ...............................................................................98

*Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*,
  850 F.2d 904 (2d Cir. 1988)........................................................................ 79-80, 83

*Nationwide Sales and Servs. Inc. v. Steel City Vacuum Co.*,
  16-cv-06223 (DRH) (ST), 2021 WL 982867 (E.D.N.Y. Feb. 16, 2021)................................74

*Netbula, LLC v. Bindview Dev. Corp.*,
  516 F. Supp. 2d 1137 (N.D. Cal. 2007) ...............................................................................89

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)........................................................................ 36-37, 41, 44

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016)........................................................................110

*Nifty Foods Corp. v. Great Atl. & Pac. Tea Co., Inc.*
  614 F.2d 832 (2d Cir. 1980)........................................................................48

*Nnydens Int'l v. Textron Aviation, Inc.*,
  No. CV 18-9455-DMG (SKx), 2020 WL 7414732 (C.D. Cal. June 11, 2020)......................89

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
  670 F. Supp. 1313 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) ........................... 63-65

*Nova Designs, Inc. v. Scuba Retailers Ass'n*,
    202 F.3d 1088 (9th Cir. 2000) ...............................................................................92

*nSight Inc. v. PeopleSoft, Inc.*,
    No. C-04-3836MMC, 2005 WL 3299164 (N.D. Cal. 2005) ..................................35

*Octane Fitness LLC v. ICON Health and Fitness, Inc.*,
    572 U.S. 545 (2014).......................................................................................68, 72

*O.S.C. Corp. v. Apple*,
    792 F.2d 1464 (9th Cir. 1986) ...............................................................................78

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018).......................................................................................23, 26

*Omega Environmental, Inc. v. Gilbarco, Inc.*
    127 F.3d 1157 (9th Cir. 1997) ...................................................................... *passim*

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013)...................................................................................91

*Paddock Publ'ns, Inc.v. Chicago Tribune Co.*,
    103 F.3d 42 (7th Circ. 1996)......................................................................49, 53, 56

*PepsiCo, Inc. v. Coca-Cola Co.*,
    114 F. Supp. 2d 243 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002) .................... *passim*

*Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*,
    No. 16-665, 2017 WL 4235773 (E.D. Pa. Sept. 25, 2017)....................................94

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
    No. 11-CV-00726 , 2014 WL 12769275 (E.D.N.Y. Sept. 17, 2014) ........................... 104-106

*POURfect Prods. v. KitchenAID*,
    No. CV-2009-02660-PHX-GMS, 2010 WL 1769413 (D. Ariz. May 3, 2010)......................82

*POURfect Products v. KitchenAid*,
    No. CV-2009-02660-PHX-GMS, 2010 WL 3488269 (D. Ariz. Aug. 31, 2010) ...................30

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010)...................................................................... 73-74

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) ...............................................................................18

*Professional Real Estate Inv., Inc. v. Columbia Pictures, Indus. Inc.*,
   508 U.S. 49 (1993) ................................................................................... 66-67, 69

*Prostar Wireless Grp., LLC v. Domino's Pizza, Inc.*,
   360 F. Supp. 3d 994 (N.D. Cal. 2018) ...................................................................90

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
   104 F.3d 811 (6th Cir. 1997) ...................................................................... 31-32

*Quadro Enterprises, Inc. v. Avery Dennison Corp.*,
   No. 97 C 5402, 2000 WL 1029176 (N.D. Ill. July 26, 2000) ................................88

*Quanta Comput., Inc. v. LG Electronics*,
   553 U.S. 617 (2008) ...................................................................................... 69-71

*Reed Constr. Data Inc. v. McGraw-Hill Cos.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014) ................................................................ 81-82

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
   28 F.3d 1379 (5th Cir. 1994) ........................................................................25, 64

*RPost Holdings, Inc. v. Trustifi Corp.*,
   No. CV 10-1416, 2012 WL 12952728 (C.D. Cal. May 11, 2012) .........................84

*Ruotolo v. Fannie Mae*,
   933 F. Supp. 2d 512 (S.D.N.Y. 2013) ...................................................................91

*Ryko Mfg. Co. v. Eden Servs.*,
   823 F.2d 1215 (8th Cir. 1987) .............................................................................51

*S.N. Sands Corp. v. British Pacific Aggregates Ltd.*,
   No. C 01-1966, 2002 WL 1941158 (N.D. Cal. Aug. 19, 2002)............................89

*Savory Pie Guy, LLC v. Comtec Indus., Ltd.*,
   No. 14 CV 7527, 2016 WL 7471340 (S.D.N.Y. Dec. 28, 2016)......................... 14, 24-25, 35

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989) ...............................................................................80

*Seaboard Supply Co. v. Congoleum, Corp.*,
   770 F.2d 367 (3d Cir. 1985)...........................................................................78

*Signify N. Am. Corp. v. Reggiani Lighting USA, Inc.*,
   No. 18 Civ. 11098, 2020 WL 1331919 (S.D.N.Y. Mar. 23, 2020) .......................74

*Smith Mach. Co. v. Hesston Corp.*,
    878 F.2d 1290 (10th Cir. 1989) ...............................................................64

*SMS Systems Maint. Servs., Inc. v. Digit. Equip. Corp.*
    188 F.3d 11 (1st Cir. 1999)..............................................................29, 31

*SourceOne Dental, Inc. v. Patterson Cos.*,
    328 F. Supp. 3d 53 (E.D.N.Y. 2018) .............................................. 84-85

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993).........................................................................14, 34

*Spinelli v. NFL*,
    96 F. Supp. 3d 81 (S.D.N.Y. 2015).................................................49, 79

*Spinner Consulting LLC v. Stone Point Cap. LLC*,
    843 F. App'x 411 (2d Cir. 2021) ...............................................................91

*Sterling Merch., Inc. v. Nestle, S.A.*,
    656 F.3d 112 (1st Cir. 2011)............................................................ *passim*

*Sterling Merch., Inc. v. Nestle, S.A.*,
    724 F. Supp. 2d 245 (D.P.R. 2010), *aff'd.*, 656 F.3d 112 (1st Cir. 2011) ...................... *passim*

*Stokes v. Village of Wurtsboro*,
    818 F.2d 4 (2d Cir. 1987) ...............................................................111

*Suchanek v. Sturm Foods, Inc.*
    764 F.3d 750 (7th Cir. 2014) ........................................................ *passim*

*Susser v. Carvel, Corp.*
    332 F.2d 505 (2d Cir. 1964)............................................................53, 56

*Suture Express, Inc. v. Owens & Minor Distrib., Inc.*,
    851 F.3d 1029 (10th Cir. 2017) ...............................................................18

*Swift v. Pandey*,
    No. 13-650, 2014 WL 3362370 (D.N.J. July 8, 2014) ..........................................94

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961).........................................................................45

*Tenneco, Inc. v. FTC*,
    689 F.2d 346 (2d Cir. 1982)........................................................ 75-76

*Terhune v. Bd. of Educ.*,
  No. 12 C 7865, 2013 WL 623603 (N.D. Ill. Feb. 20, 2013)...................................108

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ...........................................................................24

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010)..................................................................................83

*Todorov v. DCH Healthcare Auth.*,
  921 F.2d 1438 (11th Cir. 1991) ..........................................................................95

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998)........................................................................... *passim*

*Toscano v. PGA Tour, Inc.*,
  201 F. Supp. 2d 1106 (E.D. Cal. 2002)................................................................95

*Turbon Int'l, Inc. v. HP*,
  769 F. Supp. 2d 262 (S.D.N.Y. 2001)..................................................................81

*Twin City Bakery Workers and Welfare Fund v. Astra Aktiebolag*,
  207 F. Supp. 2d 221 (S.D.N.Y. 2002)..................................................................66

*U.S. Steel Corp. v. Fortner Enterprises, Inc.*,
  429 U.S. 610 (1977)........................................................................................ 64-65

*United States v. Siemens Corp.*,
  621 F.2d 499 (2d Cir. 1980).............................................................................75-76

*United Indus., Inc. v. Eimco Process Equip. Co.*,
  61 F.3d 445 (5th Cir. 1995) ................................................................................22

*United States v. Apple, Inc.*,
  791 F.3d 290 (2d Cir. 2015)................................................................................60

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ..............................................................................24

*U.S. Healthcare, Inc. v. Healthsource Inc.*,
  986 F.2d 589 (1st Cir. 1993) ...............................................................................52

*USFL v. NFL*,
  842 F.2d 1335 (2d Cir. 1988)....................................................................... *passim*

*VBS Distrib., Inc. v. Nutrivita Lab'ys, Inc.*,
   811 F. App'x 1005 (9th Cir. 2020) ......................................................................84

*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*,
   890 F. Supp. 2d 398 (S.D.N.Y. 2012)................................................................110

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004)............................................................................. 34-36, 111

*Viacom Int'l Inc. v. TCI*,
   No. 93 Civ. 6658, 1994 WL 561377 (S.D.N.Y. Oct. 12, 1994) .............................72

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   257 F.3d 256 (2d Cir. 2001)................................................................................36

*Virgin Atl. Airways Ltd. v. British Airways PLC*,
   69 F. Supp. 2d 571 (S.D.N.Y. 1999), *aff'd* 257 F.3d 256 (2d Cir. 2001) ...............13

*Walgreen Co. v. AstraZeneca Pharms., L.P.*,
   534 F. Supp. 2d 146 (D.D.C. 2008) ..............................................................42, 44

*Watkins & Son Pet Supplies v. Iams Co.*,
   254 F.3d 607 (6th Cir. 2001) ..............................................................................78

*Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*,
   No. 14-cv-7529, 2016 WL 5414979 (S.D.N.Y. Mar. 18, 2016)...................86, 107

*Western Parcel Express v. UPS*,
   190 F.3d 974 (9th Cir. 1999) ...................................................................24-25, 33

*Will v. Comprehensive Acct. Corp.*,
   776 F.2d 665 (7th Cir. 1985) (Easterbrook, J.)....................................................65

*Winter v. NRDC*,
   555 U.S. 7 (2008).............................................................................................111

*Wright v. Undercover Officer #84*,
   No. 15-CV-4498, 2018 WL 4042101 (S.D.N.Y. Aug. 22, 2018) (Broderick, J.)...................13

*Xerox Corp. v. Media Scis., Inc.*,
   660 F. Supp. 2d 535 (S.D.N.Y. 2009)........................................................ *passim*

*Yentsch v. Texaco, Inc.*,
   630 F.2d 46 (2d Cir. 1980)..................................................................................62

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ........................................................................75

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971)........................................................................104

**State Cases**

*AMG Vanadium LLC v. Glob. Advanced Metals U.S.A., Inc.*,
    C.A. No. N17C-03-1637 MMJ [CCLD], 2020 WL 1233752 (Del. Super. Ct. Feb. 6,
    2020) ........................................................................93

*Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Vill. Square Venture Partners*,
    52 Cal. App. 4th 867 (1997) ........................................................ 88-90

*Colton v. New York Hosp.*,
    98 Misc. 2d 957 (N.Y. Sup. Ct. 1979) ........................................................86

*Erwin v. Mendenhall*,
    433 P.3d 1090 (Alaska 2018)........................................................................93

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    470 P.3d 571 (Cal. 2020) ........................................................................89

*Kirchhoff v. Rosen*,
    592 N.E.2d 371 (Ill. App. Ct. 1992) ........................................................86

*Ladas v. Cal. State Auto. Ass'n*,
    19 Cal. App. 4th 761 (1993) ........................................................................107

*Lewis v. Lead Indus. Ass'n, Inc.*,
    793 N.E.2d 869 (Ill. App. Ct. 2003) ........................................................94

*Merisel, Inc. v. Weinstock*,
    117 A.D.3d 459 (N.Y. App. Div. 1st Dep't 2014)................................................87

*Roy Allan Slurry Seal, Inc.v. Am. Asphalt S., Inc.*,
    388 P.3d 800 (Cal. 2017) ........................................................ 89-90

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
    42 Cal. App. 4th 507 (1996) ........................................................................89

**Docketed Cases**

Final Approval Order, *Suchanek v. Sturm Foods, Inc.*,
    No. 3:11-cv-00565-NJR (S.D. Ill. Apr. 21, 2020), ECF No. 463 ............................................11

**Federal Statutes**

Clayton Act, 15 U.S.C. §§ 14, 15 ....................................................................... *passim*

Lanham Act, 15 U.S.C. § 1125 ............................................................................. *passim*

Sherman Act, 15 U.S.C. §§ 1, 2 ........................................................................... *passim*

35 U.S.C. § 271(d) ....................................................................................................74

35 U.S.C. § 285 ....................................................................................................68-69

**State Statutes**

Cal. Civ. Code § 1550 ...............................................................................................89

Cal. Com. Code § 2201(1) ........................................................................................89

Cal. Bus. and Prof. Code § 17200 ............................................................................92

California Cartwright Act ..................................................................................... 91-92

Donnelly Act ............................................................................................................91

Illinois Antitrust Act ................................................................................................90

Illinois Consumer Fraud and Deceptive Business Practice Act................................90

Illinois Uniform Deceptive Trade Practices Act.......................................................90

Wisconsin Antitrust Act............................................................................................91

## PRELIMINARY STATEMENT

Keurig developed an innovative, easy-to-use coffee brewing system consisting of a brewer and compatible single-serve portion packs.  Over the years, Keurig invested heavily in improving the system and marketing its benefits to consumers.  Keurig also offers a range of compatible portion packs, which it branded as K-Cups.  For years, Keurig had patent protection on the filters inside of its K-Cups.  In 2012, however, Keurig's short-filter patent expired, and, as Walmart put it, "everybody and their brother" started selling Keurig-compatible packs.

This is fundamentally not an antitrust case.  Keurig did not drive its competitors out of a market protected by high barriers to entry.  To the contrary, the undisputed facts show that, since 2012, *more than a dozen competitors* entered the Keurig-compatible pack business.  By the end of the discovery period in 2019, these unlicensed competitors had grown to selling *2.5 billion* compatible packs per year.  Keurig did not reduce industry output and raise prices: ███████
████████████████████████████████████████████████.

The undisputed facts preclude all of Plaintiffs' claims.  This litigation was thought up by a successful competitor, followed by some copy-cat complaints, all looking for a windfall not supported by fact or law.  TreeHouse, the original plaintiff, ████████████████████████
█████████████████ and free rides on Keurig's investment in developing and marketing the Keurig brewing system.  Successful free riding is not illegal, but it also does not give rise to an antitrust claim.  TreeHouse told this Court in its complaint that its sales were dropping "precipitously" because of monopolization by Keurig.  But discovery has shown that TreeHouse's 2019 sales were █████ of its 2012 sales, and TreeHouse has sold more than ██ ████ Keurig-compatible packs to date, making ██████████████ dollars in profits.  Similarly, JBR, the other Competitor Plaintiff, told this Court that Keurig's 2.0 Brewer would cause it irreparable injury and might destroy its entire operation.  Seven years later, JBR's pack

sales are ███████████. Unlike TreeHouse and JBR, the dozen other pack competitors did not join this lawsuit. They are simply competing, not imposing litigation costs on a competitor, hundreds of third parties, and the court system, all in pursuit of an undeserved jackpot.

The other plaintiffs here include a purported direct purchaser class represented by six consumers who purchased a small quantity of K-Cups on Keurig.com for personal consumption and who now purport to represent the largest retailers and distributors in the country. And the plaintiffs include McLane, a middleman that distributed K-Cups to Walmart for a few years, and that now says it was overcharged. But Walmart paid McLane its full costs of buying K-Cups *plus* a fixed percentage markup. McLane, like the other plaintiffs here, seeks treble damages on losses it did not suffer.

As this Court will recall, when this litigation began in 2014 the case centered on Keurig's forthcoming 2.0 Brewer. JBR sought a preliminary injunction to block the launch of the 2.0, which it said would "lock out" its packs and might cause it to default on its loans, destroying the company. This Court denied the motion, finding that it was "wholly uncertain" whether the 2.0 would be successful at all, much less cause the imminent harm JBR claimed. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2014 WL 12778832, at *5-6 (S.D.N.Y. Sept. 19, 2014); *aff'd JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31 (2d Cir. 2015).

Seven years later, the facts are in, and the Court was right. The massive harm JBR said was imminent did not materialize. The Court was right about the 2.0 Brewer's uncertain success too. The brewer was not a commercial success, and Keurig decided to discontinue it in 2017. Moreover, around the time the preliminary injunction was denied, competitors including JBR "hacked" the 2.0 Brewer and were not locked out of the new machine after all.

Nonetheless, Plaintiffs continued their case, retaining their counterfactual attack on the 2.0 Brewer and amending their complaints to expand their claims. Plaintiffs challenge many aspects of Keurig's business, including its agreements with suppliers, brand partners, distributors, and retailers, as well as its advertising, all of which Plaintiffs say are nefarious attempts to exclude unlicensed packs from the market in violation of the Sherman Act, 15 U.S.C. §§ 1 and 2, the Clayton Act, *id.* § 14, the Lanham Act, *id.* § 1125(a), and the laws of all 50 states and the District of Columbia. All of Plaintiffs' claims fail as a matter of law.

**Antitrust Claims**: Plaintiffs' monopolization claims are the heart of this case. To prove monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, a plaintiff must show: (i) anticompetitive conduct; (ii) that creates or maintains monopoly power in a properly defined relevant market; and (iii) causes harm to overall competition resulting in antitrust injury to the plaintiff. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002); *Gatt Commc'ns v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75-78 (2d Cir. 2013). Plaintiffs also allege that Keurig engaged in illegal exclusive dealing and tying agreements as well as conspiracies in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 3 of the Clayton Act, 15 U.S.C. § 14, both of which require, among other things, a showing of prohibited agreements and "an *actual* adverse effect on competition as a whole in the relevant market" causing antitrust injury. *K.M.B. Warehouse v. Walker Mfg.,* 61 F.3d 123, 127-28 (2d Cir. 1995) (Sherman Act Section 1); *see also Empire Volkswagen v. World-Wide Volkswagen*, 814 F.2d 90, 97 (2d Cir. 1987) (Clayton Act Section 3). All of Plaintiffs' antitrust claims fail as a matter of law.

*First*, Plaintiffs cannot establish harm to competition as required for all of their antitrust claims. An antitrust claim requires proof of harm to *competition as a whole* through increased market-wide prices or reduced industry output. As the Second Circuit has explained, "Antitrust

3

law is not intended to be as available as an over-the-counter cold remedy, because were its heavy power brought into play too readily it would not safeguard competition, but destroy it." *Capital Imaging v. Mohawk Valley*, 996 F.2d 537, 539 (2d Cir. 1993).  Accordingly, to fulfill the purpose of the antitrust laws to protect overall competition, an antitrust plaintiff bears the "burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Id.* at 543.  Plaintiffs cannot make this showing here.

*Second*, Plaintiffs' monopolization claims fail because Keurig does not have monopoly power in the alleged relevant markets.  To demonstrate monopoly power, a plaintiff must show significant barriers to entry protecting the relevant markets because, without such barriers, even a firm with a high share of sales cannot exercise monopoly power.  In light of extensive entry into both the single-serve brewer and compatible pack businesses, Plaintiffs cannot prove significant barriers to entry, which precludes a finding of monopoly power.

*Third*, while the lack of harm to competition and lack of barriers to entry each defeat the antitrust claims and warrant summary judgment for Keurig without any need to proceed further, Plaintiffs' antitrust claims also fail because they cannot show anticompetitive conduct as defined under well-established law:

- <u>Product Design</u>.  Plaintiffs claim that the 2.0 Brewer was a predatory product design. But the 2.0 was an innovative new product that consumers were free to choose or not. Other single-serve brewers, including 1.0 brewers, remained on the shelves for consumers to buy if they wished.  Plaintiffs cannot establish that consumers were coerced into buying the new product.

- <u>Exclusive Contracts with Retailers</u>.  Plaintiffs assert that competitors have been foreclosed from selling unlicensed packs due to exclusive contracts between Keurig and retailers.  Following discovery, it is now undisputed that retailers are free to buy unlicensed packs and stock them on their shelves.  Some retailers awarded some of their compatible pack business (their own private label sales) under short term manufacturing contracts but, even for that business, unlicensed competitors competed to win, and often did.  Plaintiffs cannot show any foreclosure at all, much less the substantial foreclosure required for an exclusive dealing claim.

4

- <u>Exclusive Contracts with Office Distributors.</u>  Plaintiffs at one point claimed that Keurig foreclosed competitors from selling in a claimed office coffee market through exclusive contracts with distributors.  But Plaintiffs' experts did not opine that there is a relevant market for office coffee and, in any case, discovery has shown that these contracts are nonexclusive, and distributors are free to sell competing brewing systems, including single-serve ones.  Moreover, these contracts cover a small fraction of compatible pack sales and do not create substantial foreclosure.

- <u>Exclusive Contracts for Inputs.</u>  Some plaintiffs claim Keurig blocked would-be portion pack competitors from securing inputs needed to enter, ranging from machines to foil lids.  Plaintiff JBR does not bring this claim, and the undisputed facts show that more than a dozen competitors actually obtained everything they needed to enter and did so.  This precludes any claim that competitors were frozen out of obtaining inputs.

- <u>Conspiracy with Coffee Brands.</u>  Some plaintiffs claim Keurig conspired with coffee brands such as Starbucks and Dunkin' by manufacturing packs for them.  But Competitor Plaintiffs themselves manufactured packs for other brands in a practice known as "co-packing," which is common across the food and beverages industry.  Vertical agreements like these increase the choices available to consumers and do not support a conspiracy claim.

- <u>Tying</u>.  Plaintiffs try to reframe some of their claims as "tying," but all plaintiffs concede, as they must, that Keurig sells brewers and packs separately, precluding Plaintiffs from showing the required elements of a tying claim.

- <u>Advertising</u>.  Plaintiffs claim Keurig engaged in false advertising, attacking statements from Keurig "brews a Perfect Cup" to the 2.0 Brewer has "game-changing performance."  The challenged statements were not clearly false and clearly material to consumer purchasing decisions, and there is no genuine dispute that the statements were all susceptible to neutralization by competitors who could (and did) counter-advertise.

Plaintiffs raise a grab-bag of other alleged antitrust claims regarding old lawsuits, old acquisitions, and ancillary grievances by McLane (*e.g.*, that it bought expensive equipment in its role as a middleman distributing to Walmart, for which it was not compensated when ███████ ███████████████████).  These also fail as a matter of law.

**Non-Antitrust Claims:** Plaintiffs' other claims fail for many of the same reasons.

- <u>Lanham Act</u>.  TreeHouse and JBR try to repurpose their deficient advertising antitrust claims as Lanham Act violations, but to survive summary judgment on a Lanham Act claim requires a showing that statements were: (i) false; (ii) material

to consumers' purchasing decisions; and (iii) caused Competitor Plaintiffs harm. Plaintiffs cannot meet that test.

- <u>State Law Claims</u>.  TreeHouse and JBR repackage their other claims under a variety of state antitrust, consumer protection, and business tort laws.  DPPs and McLane similarly re-allege their antitrust claims under state unjust enrichment common law.  Those attempts all fail for the same reasons as the parallel federal claims and in light of the record.

**Damages and Other Relief:**  Keurig is entitled to summary judgment for the independent reason that no Plaintiff has offered a reliable estimate of damages, and Plaintiffs have not established any basis for relief.

*        *        *

Plaintiffs received vast amounts of discovery in this litigation.  This included extensive data, more than 3.8 million Keurig documents (more than 11 million pages) from 54 custodians and hundreds of non-custodial sources, *plus* millions more documents reproduced from prior litigations.  In 2015 more than 900 nonparties received preservation notices related to this litigation, and Plaintiffs ultimately served more than 250 document and deposition subpoenas on nonparties over years of discovery.  At Plaintiffs' demand, Magistrate Judge Pitman allowed 1,600 hours of depositions.  Plaintiffs all sought and received multiple extensions of fact discovery, which ran for years.  ECF Nos. 481 (six month extension), 650 (additional four month extension), 808 (additional two month extension).  In total, discovery led to the production of 10 million documents, terabytes of data, and more than 200 depositions of parties and nonparties.

After this avalanche of discovery, the dust has settled and it is clear that Plaintiffs cannot establish multiple required elements of their claims.  It is undisputed that more than a dozen competitors entered both the single-serve brewer and Keurig-compatible packs businesses, output of single-serve brewers and compatible packs has expanded, and prices have fallen.  No amount of obfuscation or misdirection can change that.  After seven years of heavy litigation

expense, it is time for this case to come to an end.  In light of the undisputed facts and settled

law, the Court should grant Keurig's motion for summary judgment.

## BRIEF HISTORY OF THE CASE AND PARTIES

**Procedural History.**  TreeHouse filed the first lawsuit in this Court in February 2014.

JBR filed its suit in the Eastern District of California a month later.  These two competitor suits

along with numerous purported direct purchaser plaintiff ("DPP") and indirect purchaser plaintiff

("IPP") cases were all consolidated in this Court by the United States Judicial Panel on

Multidistrict Litigation in June 2014.  ECF No. 1.[1]  In early 2019, a putative DPP class member,

McLane, filed its own complaint.[2]  In August 2020, Keurig executed a settlement agreement with

the putative class of IPPs that was subsequently approved by this Court.  ECF No. 1394.  In July

and August 2021, more than seven years after this case began, three other putative DPP class

members, all represented by the same law firm, filed suit in the Eastern District of New York and

have been noticed as tag-alongs in this MDL.

**Keurig.**  Keurig introduced its first K-Cup brewing system in 1998.  (¶ 1.)  This system

helps coffee drinkers "make individual portions of fresh-brewed coffee in a tidy, flavorful, easy,

and relatively inexpensive way."  *Suchanek v. Sturm Foods*, 764 F.3d 750, 752 (7th Cir. 2014).

The brewer was initially designed for office use, and Keurig partnered with distributors to pitch

offices on why they should try out a single-serve brewer instead of a traditional drip brewer in

their employee break rooms.  (¶ 2.)  Later, Keurig developed single-serve brewers that it

marketed for at-home ("AH") use by consumers.  (¶ 3.)  Keurig was not the first company to

---

[1] These complaints were subsequently amended.  TreeHouse Am. & Supp. Compl., ECF No. 86 ("TreeHouse Compl."); JBR First Am. & Supp. Compl., ECF No. 83 ("JBR Compl."); Direct Purchaser Plaintiffs' Consol. Am. Class Action Compl., ECF No. 237 ("DPP Compl.").

[2] McLane Am. Compl, ECF Nos. 695 and 695-1 ("McLane Compl.").

offer a single-serve brewer, with other earlier entrants including Flavia and Nespresso, (¶ 4.) but Keurig's system has become one of the most popular, with an estimated 30 million Keurig brewers in use in the United States at the end of the discovery period in 2019.[3]  Keurig brewers are available for as little as $49 at retail, and single-serve brewers, including Keurig-compatible ones, are available from other manufacturers at even lower prices.  (¶ 68.)  Firms that entered the alleged "single-serve brewer market" after Keurig include Mr. Coffee, Cuisinart, Bunn, Hamilton Beach, Black & Decker, Grindmaster, and many others.  (¶ 63.)

Around the time of Keurig's short-filter patent expiration in late 2012, there was an explosion of entry into the Keurig-compatible packs business.[4]  Entrants included not just Competitor Plaintiffs but also many other companies, including Trilliant, Mother Parkers, Westrock, Cameron's, Club Coffee, and Massimo Zanetti, to name just a few.  (¶ 8.)

Over the years, Keurig made a number of strategic decisions and investments, many of which Plaintiffs benefited from but now complain about:

*Away-From-Home Sales:*  Keurig sells low-priced brewing systems for Away-From-Home ("AFH") use.[5]  Many distributors entered into contracts with Keurig to be Keurig Authorized Distributors ("KADs") of these systems.  These agreements are not exclusive:  KADs are free to sell other brewing systems to their customers.  (¶ 41.)  Most KADs sell systems by Flavia, Bunn, and other competitors.  (¶ 42.)  However, if a distributor wants to be a KAD, it

---

[3] *Suchanek*, 764 F.3d at 752 (Keurig coffee machines are one of the most popular single-serve coffeemakers on the market.  To prepare a cup of freshly brewed coffee, the Keurig user need only drop a small pod (known as  K-Cup) filled with ground coffee into the machine, push a button, and wait a few moments.  The machines are not only quick and easy to use; surveys show that its users appreciate the quality of the coffee they produce."); *see also* (¶ 14.).

[4] The short filter holds up to 11 grams of coffee.  Patent protection continues on Keurig's long-fluted filter, which can hold 13 grams of coffee and enables Keurig to offer K-Cups with a bolder flavor, and is used for certain varieties where more coffee is needed to create the desired flavor profile.  (¶ 7.)

[5] AFH use can include use by offices, hotels, restaurants, and other away-from-home locations.  (¶ 39.)

agrees not to sell unlicensed Keurig compatible packs.  Keurig's business model is to provide

distributors with subsidized brewers and other support and make money on sales of portion

packs, and distributors' model is likewise generally to place brewers for free and make money on

sales of coffee.  (¶ 43.)  This model of system competition is employed by other firms in the

coffee industry, as well as many other industries.  (¶ 44.)

*At-Home Sales:*  Keurig also sells brewers and packs to retailers, including grocery

stores, mass retailers, and club stores, for resale to consumers.  ██████████████

██████████████████████████████████████████████████████  (¶ 54.)[6]

Keurig has invested heavily in advertising its brewing system to consumers to support AH

adoption.  (¶ 57.)  AFH customers can and do buy portion packs from "AH" sellers, including

from brick-and-mortar retailers and from online retailers.  (¶ 48.)

*Brand partnerships:*  When Keurig released its first brewer in 1998, it offered a smaller

number of coffee brands than it offers today.  Over time, the Keurig system has expanded to

offer hundreds of varieties of coffee and other hot beverages in K-Cups, under a wide range of

brands.  (¶ 5.)

- <u>Owned Brands</u> are brands that Keurig owns.  (¶ 15.)  Green Mountain is the highest selling Owned Brand. (¶ 16.)

- <u>Licensed Brands</u> are brands Keurig does not own but which it has licensed for use on K-Cups, for example Newman's Own.  (¶ 17.)  Keurig manufactures and distributes these packs and pays the brand owner a royalty for use of its brand. (¶ 18.)

- <u>Partner Brands</u> are brands like Starbucks, for which Keurig manufactures packs in exchange for a manufacturing fee, also referred to as a "tolling fee."  (¶ 19.)  In most channels (*e.g.*, mass retail), ███████████████████████████ ████████████████████████████.  (¶ 19.)  In a few channels accounting for a

---

[6] Walmart and a former employee of Kroger testified that even as to private label packs they had no contract with Keurig and instead bought "on a purchase order basis."  (¶ 55.)

small fraction of sales (*e.g.*, Keurig.com, specialty stores), ███████████
██████████████████████████████. (¶ 20.)

- <u>Private Label Brands</u> are retailer-owned store brands, *e.g.,* Costco's "Kirkland Signature" brand, where Keurig manufactures packs in exchange for a tolling fee (wholesale price) negotiated with the retailer. (¶ 21.)

**Plaintiffs.  TreeHouse** is a publicly-traded company. (¶ 83.)  It is one of North America's largest manufacturers of private label packaged foods and beverages, with $4 billion in revenue in 2020, manufacturing everything private label, from soup to nuts. (¶ 84.) TreeHouse began selling Keurig-compatible packs in late 2010 ████████████████████ ██████████████████████████████████.[7]  While the Keurig-compatible portion packs that TreeHouse launched in 2010 looked like K-Cups on the outside, they had no filters inside and were filled with instant coffee. (¶ 89.)  TreeHouse's packaging said the packs made a "fresh, delicious cup" and did *not* state that the contents were "instant coffee." (¶ 90.)[8]  Keurig received a deluge of consumer complaints blaming Keurig for the "terrible" and "abysmal" new

---

[7] ████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████  *See, e.g.,*
*Suchanek*, 764 F.3d at 752-53 (noting that TreeHouse/Sturm "executives discussed their plan to gain a first-mover advantage" in the sale of Keurig-compatible packs after the short-filter patent expired "by selling [a] filter-less product before the patent's expiration…. The lack of a filter created a quandary for Sturm: it made the use of fresh coffee grounds impossible.  Sturm decided to put instant coffee into the cups—essentially, small chunks of freeze-dried brewed coffee that dissolve and are reconstituted when hot water is added to them.  That is not the kind of premium product that Keurig customers expected, as Sturm's marketing surveys confirmed.").  As the Seventh Circuit explained, TreeHouse wanted to enter "once patent protection expired, but they jumped the gun" in a way that consumers in separate litigation claimed was deceptive.  *Suchanek*, 764 F.3d at 752; *see also* (¶¶ 87-88.)

[8] *See also id.* at 753 (TreeHouse's "packaging stated in small font that it contained 'naturally roasted soluble and microground Arabica coffee'; it never explained that soluble coffee is instant coffee.  Nor did it mention that the GSC pods contained over 95% instant coffee with only a tiny bit of microground coffee mixed in.  The rest of the GSC packaging was mute about the true nature of the product, except insofar as it implied that these were genuine K-Cups like those Keurig users had come to expect" and packaging variously claimed to deliver a "fresh, delicious cup" and described contents as "simply fresh, hot and delicious").

Grove Square Coffee packs.  (¶¶ 91, 305.)[9]  In one of its contemporaneous emails, JBR ███

██████████████████████████████████████████████████████████

███████  (¶ 92.)  Consumers sued TreeHouse for false advertising.  (¶ 379.)[10]  TreeHouse

paid to settle the claims.  (¶ 379.)[11]

In 2012, the day Keurig's short filter patent expired, TreeHouse began manufacturing

Keurig-compatible portion packs with filters.  (¶ 264.)  TreeHouse boasted to its investors about

its "success" and "double-digit growth" in compatible packs.  (¶ 93.)  ████████████

███████████████████████████, consistent with its business model.[12]

Over time, ████████████████████████████████████████

███████████████████████████████  in 2013  to  ████  in 2019.  (¶¶ 105-06.)

When Keurig began competing with it for private label sales in 2014, TreeHouse's President told



---

[9] *Accord id.* at 754 ("The public response after the release of [TreeHouse's unfiltered packs] was awful");
*id.* ("Sturm put a lot of money and thought into marketing GSC [Grove Square Coffee].  In addition to
following its consultants' warning against using the term 'instant coffee,' Sturm conducted focus-group
testing to determine whether participants would notice anything amiss about GSC.  One test comparing
reactions to GSC and licensed Keurig K-Cups containing ground coffee and filters concluded that the
participants did not 'notice[ ] any difference between the single serve cups [i.e., between the GSC product
and licensed K-Cups] with respect to weight and none noticed [that] the [GSC] cup emitted a distinct
rattle when shaken…. Sturm also priced GSC at near-premium levels, about 10% less than Keurig
products.  This had the dual benefit of reaping a high profit and forestalling consumer suspicions.").

[10] *See also id.* at 753-54  ("The public response after the release of GSC was awful . . . .  One retailer,
Discount Coffee, informed Sturm that '[GSC] has been the poorest performing introductory product that
we have had in our 12 year history.'  . . . . Customers who complained, including named plaintiff Deborah
DiBenedetto, were told that GSC was 'not instant coffee' but rather 'a high quality coffee bean pulverized
into a powder so fine that [it] will dissolve,' which was false except for the 'microground' coffee that
constituted less than 5% of GSC . . . .  To mitigate the negative reviews, Sturm encouraged employees to
write fictitious favorable reviews online; the marketing department even offered to supply the
language.").

[11] *Suchanek v. Sturm Foods, Inc.*, No. 3:11-cv-00565-NJR (S.D. Il.), ECF No. 463 (approving settlement).

[12] This includes more than 80 percent of TreeHouse's total portion pack sales that are retailers' private
label sales, with the remainder mostly made up by sales of "control brands" that are similar to private
label in that there is generally very little investment in advertising.  (¶¶ 108-09.)

the company's Board that ██████████████████████████████████. (¶¶ 101-03.)  The sales

TreeHouse lost to competition form the basis for its claims here.

**JBR** is a privately held coffee roaster based in California.[13]  It began selling bagged

coffee in 1979 and, in 2011, started selling coffee in "OneCup" packs for use in Keurig brewers.

(¶ 122.)  Instead of using an airtight plastic cup like a K-Cup, JBR's OneCup uses a plastic mesh

cup that is not airtight (¶ 123.), which JBR markets as environmentally friendly (¶ 124.).  In

2018, JBR settled claims by 25 California district attorneys that its environmental advertising

was "untrue and misleading."  (¶ 130.)

**DPPs**' complaint is modeled on the TreeHouse and JBR complaints.  DPPs purport to

represent a class of all persons or entities that purchased branded coffee K-Cups directly from

Keurig since October 1, 2012, excluding Keurig's partners that paid tolling fees.  The DPPs

allege that the putative class paid an overcharge for K-Cups.  All six DPP representatives are

end-user consumers who purchased some K-Cups directly on Keurig.com for personal use.

(¶ 179.)  They purport to represent a class that includes the world's largest retail chains, club

stores, office superstores, food service vendors, and distributors, all of which negotiate their

pricing individually with Keurig and made more than 90% of the claimed class purchases.

**McLane** is a distributor of tobacco products and candy to retailers.  (¶ 161.)  In 2012, it

began distributing K-Cups to Walmart: ████████████████████████████████████

████████████████████████. (¶ 163.) ████████████████████████████████████

████████████████████. (¶¶ 163-64.)  Like the DPPs, McLane seeks monetary damages for a

purported overcharge. ████████████████████████████████████████

████████. (¶ 164.)

---

[13] JBR Compl. ¶5.

## LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the non-movant bears the burden of proof at trial, the "burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support" one or more necessary elements of non-movants' claims. *PepsiCo*, 315 F.3d at 105 (quotation omitted) (affirming summary judgment for defendant based on absence of evidence supporting key elements of plaintiff's antitrust claims).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Specifically, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). The non-moving party must show that admissible evidence supports its claim. *Burlington Coat v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985). "[A] party 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial.'" *Wright v. Undercover Officer #84*, 2018 WL 4042101, at *3 (S.D.N.Y. Aug. 22, 2018) (Broderick, J.) (quoting *Burlington Coat*, 769 F.2d at 924). "If the [plaintiff's] evidence is merely colorable . . . or is not significantly probative" that is insufficient to defeat summary judgment for the defendant. *Anderson*, 477 U.S. at 249-50.

A party also cannot "rely on mere speculation or conjecture . . . to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). "[E]xpert testimony without…a factual foundation cannot defeat a motion for summary judgment." *Virgin Atl. v. British Airways*, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999), *aff'd Virgin Atl. v. British Airways*, 257 F.3d 256, 264 (2d Cir. 2001). Nor can a plaintiff avoid summary judgment by

making "self-serving statements" or pointing to "naked conclusion[s]" of an expert.  *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42, 46 (2d Cir. 1986).

As the Second Circuit has held, in antitrust cases, "summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces."  *PepsiCo*, 315 F.3d at 104; *Savory Pie Guy v. Comtec Indus.*, 2016 WL 7471340, at *5 (S.D.N.Y. Dec. 28, 2016) (same). "Although all reasonable inferences are drawn in the nonmovant's favor, in an antitrust case, those inferences must be reasonable in light of competing inferences of acceptable conduct."  *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95 (2d Cir. 1998) (citing *Matsushita*, 475 U.S. at 588) (summary judgment in antitrust cases "avoid[s] wasteful trials and prevent[s] lengthy litigation that may have a chilling effect on pro-competitive market forces.").

## ARGUMENT

### I.  Keurig Is Entitled to Summary Judgment on Liability on All Claims

Keurig is entitled to summary judgment on all of Plaintiffs' claims.  First, Plaintiffs cannot establish harm to competition, which ends the inquiry on all antitrust claims.  Second, Plaintiffs' antitrust claims fail for the added reason that the undisputed facts show Keurig does not have monopoly power in the alleged relevant markets.  Third, Plaintiffs' antitrust claims fail for additional reasons unique to each claim.  Fourth, Plaintiffs' Lanham Act claims fail for lack of evidence.  Finally, the state law claims fail for the same reasons as parallel antitrust claims.

### A.  All Antitrust Claims Fail For Lack of Harm to Competition

"It is axiomatic that the antitrust laws were passed for the protection of competition, not competitors."  *Brooke Grp. v. Brown & Williamson Tobacco*, 509 U.S. 209, 224 (1993) (quotation omitted); *see also Spectrum Sports v. McQuillan,* 506 U.S. 447, 458 (1993). Accordingly, to pursue an antitrust claim, a plaintiff must establish that challenged conduct

14

"significantly harm[s] competition as a whole." *Clorox Co. v. Sterling Winthrop*, 117 F.3d 50, 57 (2d Cir. 1997). This requirement to prove harm to overall competition "cannot be overemphasized and is especially essential when a successful competitor, as here, alleges antitrust injury at the hands of a rival." *Id*.

Where there is no harm to overall competition, there is no antitrust claim. Courts grant summary judgment to defendants where plaintiffs fail to show that "the market has suffered a reduction in output or an increase in consumer prices," and where a competitor plaintiff's sales "increased during the relevant period," because these facts show "no antitrust injury exists." *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121-23 (1st Cir. 2011); *see also, e.g.*, *Capital Imaging*, 996 F.2d at 543, 547 (summary judgment for defendant where plaintiff did not show a genuine issue of fact as to harm to overall competition).

***All Plaintiffs' Antitrust Claims Fail Because There is No Harm to Competition.*** Here, all Plaintiffs' antitrust claims turn on a theory that Keurig unlawfully excluded competitors from the claimed Keurig-compatible packs market. Plaintiffs say Keurig unlawfully used a single-serve brewer monopoly (*e.g.*, by launching a new brewer), and used unlawful exclusive contracts, sham litigation, and false advertising to *exclude competitors* from the "compatible pack market," which in turn led to reduced output of Keurig-compatible packs and raised prices.

These claims fundamentally do not fit with the facts, which show that more than a dozen unlicensed compatible pack manufacturers entered the alleged market, including not just the two Competitor Plaintiffs but also Trilliant, Mother Parkers, Westrock, Massimo Zanetti, and many more. (¶¶ 8-9.) ████████████████████████████████

███████████████████████████████████████████████

(¶ 79.)  During the same period, as the dotted line shows, average retail prices of compatible

packs ████████████████████.  (¶ 73.)



TreeHouse and JBR themselves experienced tremendous growth.

**Table 1: Competitor Plaintiffs' Sales Growth**

|  | TreeHouse | | JBR | |
|---|---|---|---|---|
|  | Units sold | Net sales | Units sold | Net sales |
| **2012** | ████ | ████ | ████ | ████ |
| **2019** | ████ | ████ | ████ | ████ |
| **Increase** | ██ | ██ | ██ | ██ |
| **Total (2012-2019)** | ████ | ████ | ████ | ████ |

Source: Murphy Report Exhibits 20, 22 (citing TreeHouse and JBR transaction data).

(¶¶ 76, 94, 128-29.)  This growth belies the Competitor Plaintiffs' claim that they were excluded,

much less that there was harm to competition.  *See, e.g., Sterling Merch.*, 656 F.3d at 122-23

("[T]hat [plaintiff's] sales, profits, and market share have increased during the relevant period provides further indication that no antitrust injury exists here.").

Plaintiffs argue that, but for Keurig's challenged conduct, TreeHouse and JBR could have sold *even more* than the ███████ of Keurig-compatible packs they actually sold. That is pure speculation. But, even if credited, *it would not establish harm to competition*. TreeHouse and JBR successfully entered and grew, and there are more than a dozen other unlicensed compatible pack competitors who also entered, as well as declining prices and increasing output. Whether TreeHouse's and JBR's sales were higher or lower is "of no moment to the antitrust laws if competition is not injured." *Brooke Grp.*, 509 U.S. at 224.

Plaintiffs offer no evidence that an increase in TreeHouse's or JBR's shares would lead to better outcomes for consumers. *Sterling Merch.*, 656 F.3d at 119-22 (summary judgment for defendants where plaintiff argued it "would have gained more market share" absent challenged conduct, because plaintiff still "ha[d] not shown the market has suffered a reduction in output or an increase in consumer prices"). Plaintiffs also offer no evidence that the many other unlicensed pack competitors were less efficient competitors due to Keurig's challenged conduct. Plaintiffs took almost no discovery of these competitors, and Plaintiffs' experts conducted *no* analysis of the effect of the alleged conduct on their costs. (¶ 489.) Having focused on just two out of more than a dozen admitted competitors, Plaintiffs are unable to demonstrate harm to competition as a whole. *See, e.g., Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 555 (S.D.N.Y. 2007) (where conduct "might raise costs of production" for some competitors but not others, there is "no harm to competition … or to the consumers of th[e] product.").

Here, TreeHouse launched this litigation on a theory that Keurig and the 2.0 Brewer hurt competition by locking out compatible pack competitors to restrict output and keep pack prices

high.  All Plaintiffs—not just JBR—copied that theory.  Now, the undisputed facts show that portion pack competitors entered, compatible pack output increased, and pack prices decreased. This is fatal to *all* Plaintiffs' antitrust claims.  *See, e.g.*, *Anderson News v. American Media, Inc.*, 899 F.3d 87, 114-16 (2d Cir. 2018) (summary judgment for antitrust defendant where alleged injuries did not arise from market-wide harm); *Capital Imaging,* 996 F.2d at 547 (summary judgment for defendant where plaintiff "has not shown that defendants' activities have had any adverse impact on price, quality, or output"); *K.M.B. Warehouse*, 61 F.3d at 128 (summary judgment for defendant where plaintiffs had not shown adverse market-wide effect on price or quality); *Suture Express v. Owens*, 851 F.3d 1029, 1045 (10th Cir. 2017) (summary judgment for defendants where decrease in prices and growth of regional competitors showed a "market that is becoming more, not less, competitive"); *Omega Environmental v. Gilbarco*, 127 F.3d 1157, 1164-65 (9th Cir. 1997) (judgment for defendants as no jury could "reasonably infer probable injury to competition even in [a] highly concentrated market where the undisputed evidence shows increasing output" and "decreasing prices"); *Procaps v. Patheon*, 845 F.3d 1072, 1085 (11th Cir. 2016) (summary judgment for defendant where plaintiff did not prove "prices were actually higher" or "output was actually decreased"); *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 641 (3d Cir. 1996) (summary judgment for defendant where market included increasing number of competitors); *Jensen Enters. v. Oldcastle*, 375 F. App'x 730, 732-33 (9th Cir. 2010) (summary judgment for defendant where plaintiff did not raise a genuine issue as to whether alleged conduct caused harm to competition).

***TreeHouse's Claimed Injury Does Not Flow from Harm to Competition***.  TreeHouse's antitrust claims fail for an additional reason:  TreeHouse cannot show that *its* claimed injury flows from harm to competition.  In addition to showing harm to competition overall, an antitrust

18

plaintiff must show that it has suffered "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). And, as the Second Circuit has noted, an antitrust plaintiff must also establish antitrust standing, which takes into account "the causal connection between the alleged antitrust violation and the harm to the plaintiff," the "directness of the connection between the injury and alleged restraint," "the speculative nature of the damages," and whether the plaintiff has an "improper motive," such as harassing a competitor or seeking a windfall. *Balaklaw v. Lovell*, 14 F.3d 793, 797 n.9 (2d Cir. 1994). These threshold requirements are critical, as without them the "potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition." *Gatt*, 711 F.3d 68 at 75-80 ("The requirement that plaintiffs demonstrate antitrust injury when bringing a private antitrust action 'ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.'"); *Atlantic Richfield v. USA Petroleum,* 495 U.S. 328, 342-43 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.").

Here, TreeHouse's sales and claimed damages are primarily private label sales. (¶ 108-09, 460.) TreeHouse's damage model is premised on the claim that, in the but-for world, customers such as ███████████ would have bought private label packs from TreeHouse rather than Keurig. (¶ 457.)[14] But TreeHouse does not claim private label prices would have been lower in the but-for world. To the contrary, its experts say private label prices were *already*

---

[14] Most of TreeHouse's claimed lost sales concern retailers' private label business. (¶ 460.)

competitive in the actual world and *would not change* in the but-for world.  (¶¶ 461-62.)[15]  That

is fatal to TreeHouse's claims.  Because private label prices were competitive and would not

decrease in the but-for world, there is no harm to customers, and thus no harm to competition.

*Capital Imaging*, 996 F.2d at 546 (summary judgment for defendants where plaintiff conceded

that whether or not it was excluded by the conduct, prices would remain the same); *B & H v.*

*ABP*, 526 F.3d 257, 263-64 (6th Cir. 2008) (summary judgment for defendant where "the record

was devoid of evidence that *competition as a whole* has suffered") (emphasis in original).

TreeHouse's real complaint is *not* that customers were worse off, but rather that Keurig

won sales and *TreeHouse* was worse off.  Keurig began broadly competing for private label

opportunities in 2014. (¶ 101.) ███████████████████ (¶¶ 102-03.) ███████████

███████████████████████████████████████████████████████

███████████ (¶¶ 104-07.)  TreeHouse's President told the company's Board of

Directors that ███████████████████. (¶ 103.) ███████████████

███████████████████████████████████ (¶¶ 103-07.)  From

2013 to 2017, average private label retail prices ███████████████████. (¶ 80.)

Walmart's wholesale prices ███████████████████████████████

███████████████. (¶ 187.)  Kroger's prices ████████████████████

████████████████████████. (¶ 208.) ███████████████

████████████████████████████████████████████████

---

[15] TreeHouse's damages expert has also conceded that Keurig's private label prices would be the same in the but-for world.  (¶ 462.)  In fact, TreeHouse's damages expert opined that TreeHouse's prices may have been even *higher* in the but-for world because TreeHouse would not have needed to ██████████ ███████████. (¶ 463.)  TreeHouse thus clearly complains about the need to compete with Keurig, not conduct that harmed competition.  *See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 117 (1986) (lost profits due to "possible price competition" is not antitrust injury).

██████. (¶¶ 457, 466.).  TreeHouse's desire to retain sales at prices higher than or even equivalent to Keurig's is not harm to competition.  *Atl. Richfield*, 495 U.S. at 337-38; *Belfiore v. New York Times*, 826 F.2d 177, 181 (2d Cir. 1987) (summary judgment for defendant where "Plaintiffs' real complaint is that competition from [defendant] is pressuring them to lower their prices.").

***JBR's Claimed Injury Was Not Caused By Harm to Competition.***  JBR lacks antitrust standing because it cannot show that its claimed harm was caused by Keurig conduct that harmed competition.  *See, e.g., Balaklaw*, 14 F.3d at 797 n.9 (in assessing whether a plaintiff has antitrust standing, courts consider, among other things, "the causal connection between the alleged antitrust violation and the harm to the plaintiff"); *Anderson News*, 899 F.3d 114-16 (summary judgment where plaintiffs lacked antitrust standing because alleged lost profits were "unrelated to the anticompetitive aspects of the [conduct] alleged").

JBR was successful, and could have been even more so but for its own choices and business strategies.  As shown in Table 1, in 2012, JBR sold ███████ portion packs, ██████ ████████████████████████ packs.  In 2019, however, JBR sold ████████, whereas TreeHouse sold ████████ packs.  TreeHouse's 2019 sales are roughly ████████ of its 2012 sales, ███████████████████████████. ████████████████████████ ████████████████████ cannot be blamed on Keurig because the same alleged conduct affected both companies.  JBR's growth to "only" ████████ units reflects its choices.  Other compatible pack sellers ████████████████████████████████ ██████. (¶ 82.)



It is undisputed that JBR chose to offer a product in a mesh cup that was not airtight, which raises concerns about freshness and sanitation for some customers.  (¶¶ 123, 125-27, 250-

52.)  It is undisputed that JBR chose to pay above-market rates for coffee that drove up its costs.

(¶ 150.)  It is undisputed that JBR lost bids ████████ because its price was too high due to

its higher coffee costs.  (¶ 151.)  It is undisputed that JBR ████████████████████████████

████████ (¶ 158.), and lost sales to other retailers by offering them much higher prices than it

gave to Amazon and Costco, disadvantaging other retailers in comparison (¶ 149.).  It is

undisputed that JBR chose not to compete for many retail sales, including by refusing to sell to

Walmart (¶ 153.), by refusing to pay slotting fees and other incentives that retail customers

demanded (¶¶ 145, 155.), by refusing co-packing business opportunities (¶ 29.), and by refusing

to bid for other significant business such as BJ's private label business (¶¶ 152, 159.).  Given

these facts, JBR cannot prove that any sales it claims it lost flowed from conduct by Keurig as

opposed to JBR's own choices.  *See, e.g., El Aguila Food v. Gruma Corp.*, 131 F. App'x 450,

453-55 (5th Cir. 2005) (judgment for defendant in light of plaintiff's "refusal even to seek shelf

space in some retail outlets" and its "failure to compete for shelf space on the terms sought by

retailers"); *cf. USFL v. NFL,* 842 F.2d 1335, 1377-79 (2d Cir. 1988) ("[A]n antitrust plaintiff

must prove that its injury was, in fact, caused by the defendant's violation of the antitrust laws"

not, *e.g.*, management decisions, economic conditions, or competition.).  JBR's claim that Keurig

is to blame for JBR growing more slowly than others in the industry is highly speculative and

insufficient to establish antitrust standing.  *United Indus. v. Eimco Process Co.*, 61 F.3d 445,

448-49 (5th Cir. 1995) (summary judgment for defendant where plaintiff lacked antitrust

standing because it failed to bid).[16]

In sum, the purpose of the antitrust laws is "to ensure competition in general, not …

---

[16] It is also undisputed that ████████████████████████████████████ when it was
forced to remove its core environmental advertising claims following a settlement with two dozen
California district attorneys.  (¶ 160)

protect individual competitors," *Capital Imaging*, 996 F.2d at 543, and "It is inimical to the purposes of these laws to award damages for the type of injury claimed here." *Brunswick Corp.*, 429 U.S. at 488. The Court should grant summary judgment to Keurig on all antitrust claims.

### B. Plaintiffs' Claims Fail For Lack of Monopoly Power

Plaintiffs' monopolization claims fail for the additional reason that the undisputed facts preclude the required finding of monopoly power. Monopoly power is the ability to control prices by restricting output. *See PepsiCo*, 315 F.3d at 107; *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2287-88 (2018) (market power is "the ability to raise price profitability by *restricting output*") (emphasis in original). But controlling prices by restricting output is impossible where a market is not protected by significant barriers to entry. *See, e.g.*, *Tops Markets*, 142 F.3d at 99 (summary judgment for defendant where "relative ease of competitive entry" precluded finding of monopoly power). Without significant barriers to entry, other firms will enter and defeat an attempt to restrict output. *See, e.g., Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993) (even a "100% market share does not demonstrate that [defendant] had the power to control prices or exclude competition in the absence of any evidence that it could prevent entry of other market participants").

Here, Plaintiffs cannot establish significant barriers to entry. Plaintiffs concede that, in both alleged relevant markets, numerous competitors actually entered: *More than a dozen competitors* entered the purported single-serve brewer market (¶ 63.), and *more than a dozen competitors* entered the purported Keurig-compatible pack market (¶ 8-9, 64.). TreeHouse itself not only entered but has now sold more than ███████ Keurig-compatible packs. (¶ 97.)[17]

---

[17] As of 2019, TreeHouse had reached a run rate of around ████████████████████████
████████████████████. (¶ 96.) TreeHouse told its investors that its pack sales continued

Given extensive and undisputed evidence of successful entry, no reasonable jury could find that there are significant barriers to entry into either alleged relevant market.

The Second Circuit has held that the successful entry of a single competitor refuted that there were barriers inhibiting entry into the market. *Tops Markets*, 142 F.3d at 99; *see also Savory Pie Guy,* 2016 WL 7471340, at *9 (summary judgment for defendant where "the fact that [competitor] began manufacturing and selling its own [products] demonstrates the relevant market lacks significant barriers to entry"). Other Circuits have held the same. *See, e.g., United States v. Syufy*, 903 F.2d 659, 665-66 (9th Cir. 1990) (judgment for defendant where entry of competitor was "conclusive" evidence there were no barriers to entry); *Concord Boat v. Brunswick*, 207 F.3d 1039, 1059 (8th Cir. 2000) (judgment for defendant where plaintiffs failed to show existence of significant barriers to entry where one competitor "had entered the market recently"); *Western Parcel Exp. v. UPS*, 190 F.3d 974, 976 (9th Cir. 1999) (no evidence of market barriers where competitors entered during relevant time period).

Plaintiffs try to distract attention away from the lack of entry barriers by arguing Keurig has high market share. Plaintiffs are wrong as a matter of law in how they count "Keurig's" share because they include sales made by other brands for whom Keurig manufactures packs.[18] Contrary to their litigation position, in the ordinary course ███████████████

████████████████████████████████████████████████████

---

at even stronger rates in 2020, which would have put TreeHouse over the ██████ pack mark by early 2021. (¶ 97.)

[18] Plaintiffs include as "Keurig's" market share sales made by partner brands, *e.g.*, Starbucks and Kraft, that use Keurig for manufacturing (¶ 449), and that indisputably compete against Keurig for sales (¶¶ 19, 22-24, 335.). *See Thurman v. Pay 'N Pak Stores*, 875 F.2d 1369, 1374 (9th Cir. 1989) (competitors include all "sellers or producers who have actual or potential ability to deprive each other of significant levels of business").

███████████████████████████████.[19]  Indeed, JBR generally avoided co-packing

because it did not want to bring *more competitors* into the business. (¶ 30.)

But, regardless of this foundational error, without proof of significant barriers to entry,

high share just reflects consumer choice, not monopoly power:  If the defendant tried to restrict

output, competitors would enter and fill the gap.  *See, e.g.*, *Los Angeles Land Co.*, 6 F.3d at 1425

(even a "100% market share does not demonstrate that [defendant] had the power to control

prices or exclude competition"); *Handicomp, Inc. v. U.S. Golf Ass'n*, 2000 WL 426245, at *3-4

(3d Cir. Mar. 22, 2000) (summary judgment for defendant for lack of market power where

defendant had 72% market share but plaintiff was unable to prove significant barriers to entry).

In short, Plaintiffs *must* show significant barriers to entry to succeed on their antitrust claims.

*See, e.g.*, *Western Parcel Exp.*, 190 F.3d at 975 (summary judgment for defendant where plaintiff

could not demonstrate significant barriers to entry); *Handicomp*, 2000 WL 426245, at *3-4

("Absent [barriers to entry], there is no violation of the [antitrust laws]."); *Roy B. Taylor v.

Hollymatic*, 28 F.3d 1379, 1388 (5th Cir. 1994) (judgment for defendant where "there was no

evidence of significant barriers to entry"); *Savory Pie Guy*, 2016 WL 7471340, at *9 (summary

judgment for defendant where evidence of low barriers to entry prevented "the conclusion that

defendant can control prices or exclude competition"); *Emigra Grp., LLC v. Fragomen LLP*, 612

F. Supp. 2d 330, 362 (S.D.N.Y. 2009) (summary judgment for defendant because "lack of

barriers to entry … require[s] the conclusion that [plaintiff] had failed to raise a genuine issue of

material fact as to [monopoly power]"); *CDC Techs., Inc. v. IDEXX Lab'ys, Inc.*, 7 F. Supp. 2d

---

[19] As JBR's co-president explained, JBR does not count sales by its partner brand as part of JBR's market share because "It's not my market.  It's not my brand."  (¶ 444.) █████████████████████████████

███████████████████████████████████████████ (¶ 450.)

119, 130-31 (D. Conn. 1998) (summary judgment for defendant where there was no evidence of monopoly power because there were no barriers to entry), *aff'd*, 186 F.3d 74 (2d Cir. 1999).

The undisputed facts make clear that Plaintiffs cannot meet their burden of showing barriers to entry here.

### 1. Plaintiffs Cannot Establish That Keurig Has Monopoly Power in the Purported Single-Serve Brewer Market

Some of Plaintiffs' claims involve a theory that Keurig used an alleged single-serve brewer monopoly to exclude competitors from the Keurig-compatible packs market, for example by launching the 2.0 Brewer or "tying" K-Cups to brewers. All of these brewer-based claims fail because the facts preclude a finding that Keurig has monopoly power in the claimed single-serve brewer market.[20] Plaintiffs' experts offer no analysis of single-serve brewer output or prices and make no suggestion that output has been reduced or that prices have increased. In fact, it is undisputed that sales of single-serve brewers, like sales of Keurig-compatible packs, *increased* during the relevant period.[21] This is inconsistent with monopolization. *See American Express,* 138 S. Ct. 2274, 2287-88 (2018) (market power "is the ability to raise price profitably by restricting output" and finding "no such evidence" where "output of credit-card transactions grew dramatically from 2008 to 2013, increasing 30%"); *E & L Consulting, Ltd. v. Doman Indus.*

---

[20] Plaintiffs allege Keurig monopolized a purported market for single-serve brewers. TreeHouse Compl. ¶ 3; JBR Compl. ¶ 9; DPP Compl. ¶ 12; McLane Compl. ¶ 12. McLane, however, abandoned this market through its expert and no longer even claims a brewer market much less a monopolized one. (¶ 482.) McLane's "inability to proffer any evidence in support of ... the market defined by its own Complaint is fatal to its claims" relating to that market. *City of New York v. Grp. Health Inc.,* 2010 WL 2132246, at *5 (S.D.N.Y. May 11, 2010), *aff'd*, 649 F.3d 151 (2d Cir. 2011) (granting summary judgment for defendant and rejecting plaintiff's alleged market definition where it was not supported by its own expert); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002) ("Construction of the relevant market ... must be based on expert testimony."); *Sterling Merch., Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 252 n.3 (D.P.R. 2010) (rejecting market definition not supported in plaintiff's expert's report).

[21] For example, sales of single-serve brewers grew from ███████ in 2008 units to ███████ units in 2013. (¶ 70.)

*Ltd.*, 472 F.3d 23, 30 (2d Cir. 2006) ("A monopolist manufacturer of a product restricts output of the product in order to maximize its profits.").

It is also undisputed that Keurig is not charging monopoly prices on brewers. To the contrary, Plaintiffs acknowledge that, to compete with other brewing systems, Keurig sells brewers at around cost. (¶ 71.) It is undisputed that Keurig-compatible brewer prices ███████ ████████████████████████████████████████████████████████████. (¶ 69.) Low margins, output growth, and declining prices in brewers disprove monopoly power. *See Mylan Pharms. v. Warner Chilcott*, 838 F.3d 421, 434-435 (3d Cir. 2016) (summary judgment for defendant where plaintiff failed to show price-cost margins "were abnormally high").[22]

Plaintiffs' failure to put forward material evidence showing substantial barriers to entry requires that summary judgment be granted for Keurig.[23] This litigation included more than 250 subpoenas to non-parties, yet Plaintiffs could not build any factual record on barriers.[24] *See, e.g.*,

---

[22] In opposing Keurig's motion to dismiss, TreeHouse argued that in theory a monopolist could charge very low prices on the monopolized product but harm competition by evading regulated price control in a tying product through clandestine transfer of profit to a tied product. TreeHouse Mem. of Law in Opp'n to Mot. to Dismiss at 32 n. 59, ECF. No. 254 ("TreeHouse Opp'n to MTD") (stating that "monopolists may 'evade price control'") (quoting *Kodak* (Scalia, J. dissenting)). The undisputed facts, however, preclude the application of that theory here. There are no facts showing that coffee is a regulated industry with price controls, and Plaintiffs admit that brewers are sold separately from portion packs. (¶¶ 6, 62.) TreeHouse also cited *Xerox III* as a case *denying dismissal* where sales were at a low margin. *See* TreeHouse Opp'n to MTD at 32 n.59. In fact, in *Xerox III* the court *granted summary judgment* for the defendant. 660 F. Supp. 2d 535, 550 (S.D.N.Y. 2009). Although Xerox sold roughly 97% of Xerox-compatible ink, the Court found monopoly power lacking. *Id.* at 549.

[23] In their expert reports, two of Plaintiffs' economists speculated that factors such as capital costs, brand recognition, and economies of scale are barriers to entry for brewer manufacturers. (¶¶ 478.) They also speculated that access to coffee brands is a barrier to entry for brewers. (¶ 479.) But Plaintiffs failed to develop material evidence supporting these claims, and the speculation is contradicted by actual undisputed entry by numerous competitors during the course of this litigation, which Plaintiffs' experts do not engage with or explain. Further, Plaintiffs' experts concede that the claimed "brand barrier" does nothing to prevent entry into the alleged single-serve brewer market with a Keurig-compatible brewer. (¶ 480.) Further, marquee Keurig brand partners like Starbucks, Peet's, and Dunkin' could and did partner with other single-serve systems. (¶ 24.)

[24] Plaintiffs subpoenaed at least four third parties that manufacture single-serve brewers (International Coffee and Tea, Touch Coffee, Kraft, and Starbucks), but did not seek discovery from any of them on barriers to entry. And Plaintiffs subpoenaed Walmart, which launched a private label single-serve brewer

*Tops Markets*, 142 F.3d at 99 (summary judgment for defendant because lack of evidence of barriers to entry meant plaintiffs could not establish monopoly power); *Emigra Grp.*, 612 F. Supp. at 362 (absence of admissible evidence of entry barriers meant plaintiff failed to raise a genuine issue as to monopoly power).

But the record in this case shows more than just an absence of evidence establishing barriers to entry:  it shows *extensive actual entry*.  As Plaintiffs concede, more than a dozen firms actually entered the single-serve brewer business since 2012.  These include well-known appliance manufacturers like Hamilton Beach, Cuisinart, Black & Decker, Grindmaster and others that launched Keurig-compatible single-serve brewers.  (¶ 63.)  For example, in 2014, when the 2.0 Brewer launched, at least five manufacturers (Hamilton Beach, Remington, Bunn, Chefman, and Tru) were manufacturing unlicensed Keurig-1.0-style brewers.  (¶ 65.)  Entrants also include non-Keurig compatible single-serve brewers, including pod-based brewers by Mr. Coffee, Bunn, Hamilton Beach, Newco, and others.  (¶ 66.)  Plaintiffs do not analyze this entry or explain how so many firms managed to enter.  Conclusory assertions of barriers are not sufficient at summary judgment.  *See, e.g.*, *Tops Markets*, 142 F.3d at 99 (rejecting claim of entry barriers); *cf. Broadway Delivery v. UPS*, 651 F.2d 122, 131 (2d Cir. 1981) (evidence "clearly insufficient to establish a jury issue as to whether defendants possessed monopoly power" in light of lack of barriers to entry).  Here, substantial actual entry precludes a finding of barriers to entry, defeating Plaintiffs' claims that Keurig has a brewer monopoly.  All of

---

made by Esio Beverage Co. under Walmart's "Mainstays" brand.  (¶ 67.)  Starbucks and Walmart were both deposed through a total of *five* different witness but, again, Plaintiffs did not ask a single question about these companies' brewers or any barriers to entry they faced.  (¶ 481.)  Plaintiffs chose not to seek discovery from numerous other entrants into the single-serve brewer business including Bunn, Newco, Hamilton Beach, Black & Decker, Cuisinart, Grindmaster and Mr. Coffee.  (¶ 483.)

Plaintiffs' claims that depend on Keurig having a single-serve brewer monopoly, including product design, monopoly leveraging, and tying, fail as a matter of law.[25]

### 2. Plaintiffs Cannot Establish that Keurig Has Monopoly Power in the Purported Keurig-Compatible Portion Pack Market

Plaintiffs separately allege that Keurig monopolized a relevant market for portion packs compatible with Keurig brewers.[26]  This claim fails as a matter of law in two different ways. First, Plaintiffs are alleging monopoly power in an "aftermarket" for goods compatible with a particular "primary" product, here a Keurig-compatible brewer, but Plaintiffs cannot meet the requirements for showing monopoly power in an aftermarket.  Second, even setting aside the aftermarket case law, Plaintiffs cannot establish monopoly power due to lack of entry barriers.[27]

*Absence of Aftermarket Monopoly Power.*  As in any market, courts analyzing claims of monopolization of an aftermarket consider whether the defendant has the power to restrict output, but this analysis is also "informed by additional factors" common to aftermarket cases. *Xerox Corp. v. Media Scis.*, 660 F. Supp. 2d 535, 543, 547 (S.D.N.Y. 2009) ("*Xerox III*") ("cases involving aftermarkets are *sui generis*").  In particular, courts consider whether the plaintiff has shown monopoly power in the foremarket.  *See, e.g., id.* at 549; *SMS Systems v. Digit. Equip. Corp.*, 188 F.3d 11, 16-17 (1st Cir. 1999); *Harrison Aire v. Aerostar Intern.* 423 F.3d 374, 381-

---

[25] TreeHouse Compl. ¶ 572(g) (product design), ¶¶ 585-93 (monopoly leveraging), ¶¶ 611-18 (tying); JBR Compl. ¶¶ 312-17 (monopoly leveraging), ¶¶338-53 (tying) ¶¶ 354-62 (product design); DPP Compl. ¶ 226 (tying), ¶ 221-35 (product design), ¶¶ 268-73 (monopoly leveraging); McLane Compl. ¶ 260 (tying); ¶¶ 299-304 (monopoly leveraging).

[26] TreeHouse Compl. ¶ 3; JBR Compl. ¶ 9; DPP Compl. ¶ 12; McLane Compl. ¶ 12.

[27] Some plaintiffs suggested an alternative "all portion packs" market as an alternative to "Keurig-compatible packs market."  This argument does not help Plaintiffs:  Because there are not significant barriers to entry in the purported Keurig-compatible pack market, there are no significant barriers to entering a purported broader market.  *Cf. PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000) ("Obviously, the narrower the market defined by plaintiffs, the easier it is to show possession of monopoly power in the relevant market."), *aff'd*, 315 F.3d 101 (2d Cir. 2002).  Plaintiffs also abandoned these alternative alleged markets through their experts.  (¶ 477.)

82 (3d Cir. 2005).  If the foremarket is competitive there can be no monopoly power in an aftermarket unless, among other requirements:

> (i) customers who own the [primary] good are 'locked in' by the prohibitive costs of switching to an alternate product, *and* (ii) the lock-in permitted those customers to be exploited, either because (a) some limitation on information undermined their ability to know that the aftermarket goods and services were being sold at high prices, or (b) the defendant changed its aftermarket prices after the lock-in occurred.

*Xerox III*, 660 F. Supp. 2d at 547 (emphasis added).  On the motion to dismiss, this Court found that Plaintiffs had plausibly alleged Keurig has a monopoly in the foremarket for single-serve brewers.  *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 228 (S.D.N.Y. 2019) ("at this stage, Plaintiffs plausibly allege a market covering Single Serve Brewers" and that Keurig has monopoly power therein).  As discussed above, however, many years, millions of documents, and 200 depositions later, the undisputed evidence precludes a finding that Keurig has a monopoly in single-serve brewers.

Plaintiffs also cannot meet the other requirements for monopoly power in an aftermarket: First, they cannot show that brewer owners are "locked in" by prohibitive switching costs, which in itself defeats an aftermarket monopolization clam.  Single-serve brewers are priced starting around $30.  (¶ 68.)  Single-serve brewers do not involve prohibitively high cost.  *Xerox III*, 660 F. Supp. 2d at 547.  Indeed, in *Xerox III* the court determined that a $3,100 cost to switch to a non-Xerox printer was not sufficient to cause lock in.  *Id.*; *see also POURfect Products v. KitchenAid*, 2010 WL 3488269 at *3 (D. Ariz. Aug. 31, 2010) (granting motion to dismiss because plaintiff's failure to allege high switching costs associated with KitchenAid stand mixers meant it failed to establish defendant's power in aftermarket); *Apple v. Psystar Corp.*, 586 F.

Supp. 2d 1190, 1197 n.3, 1201 (N.D. Cal 2008) (granting motion to dismiss claim Apple dominated an aftermarket for Mac OS computers in absence of prohibitive switching costs).[28]

Second, Plaintiffs also cannot show that consumers were unable to see pack pricing.  It is undisputed that prices for portion packs are posted online and on retail shelves where consumers can find them.  (¶ 58.)[29]  Consumers' ability to see prices precludes a claim of monopolization of the purported aftermarket because consumers can make informed choices about which system to select at the time of their foremarket purchase.  *See, e.g.*, *Hack v. President and Fellows of Yale College*, 237 F.3d 81, 88 (2d Cir. 2000) (no lock-in where "Yale's housing policies were fully disclosed long before plaintiffs applied for admission"); *SMS Systems.* 188 F.3d 18-19 (1st Cir. 1999) (summary judgment for defendant where no "information deficits" as to aftermarket prices); *cf. Xerox III*, 660 F. Supp. 2d at 549 (summary judgment for defendant where there was no evidence ink stick prices were not available); *DSM Desotech v. 3D Sys.*, 2014 WL 1509012 (Fed. Cir. Apr. 18, 2014) (summary judgment for defendant where aftermarket prices were available because customers could "shop around" when making their initial purchase); *PSI Repair v. Honeywell*, 104 F.3d 811, 820-21 (6th Cir. 1997) (summary judgment for defendant where defendant's aftermarket policy was "generally known," even if calculating lifecycle costs was difficult).

Third, there is no evidence that Keurig changed any policy after consumers bought brewers to the detriment of locked-in customers.  "[T]he absence of such a change weighs against any inference that [defendant] possesses monopoly power."  *Xerox III*, 660 F. Supp. 2d at

---

[28] KitchenAid mixers and Apple computers cost more than single-serve brewers.  Additionally, office customers who use distributors can switch brewing systems for free.  (¶ 46.)

[29] Plaintiffs further concede that many consumers buying Keurig brewers are repeat purchasers, who already have a history of actually buying packs.  (¶ 72.)

550 (summary judgment for defendant); *PSI Repair*, 104 F.3d at 822 (summary judgment for defendant where plaintiff failed to show defendant changed policy).[30]

 ***Absence of Significant Barriers to Entry.***  Plaintiffs' claim that Keurig has monopoly power in a Keurig-compatible packs market fails for the independent reason that Plaintiffs cannot show barriers to entry in light of substantial and undisputed actual entry.[31]  As noted, during the period when Plaintiffs say Keurig was excluding competitors, more than a dozen firms actually entered the compatible packs business.  (¶ 9.)  Unlicensed manufacturers grew from selling around ███████ packs in 2012, the year Keurig's short filter patent expired, to around ██████ packs in 2019.  (¶ 74.)[32]  This precludes a finding of significant barriers to entry and monopoly power.

 Some courts have suggested that the law does not require a *complete* lack of growth to sustain an antitrust claim.  *Cf. Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002).  But the record here shows a great deal more than limited growth by a single competitor.  To put this case in context, it is helpful to consider the facts in *Conwood*.  There, the court noted that the fact of the plaintiff's share increasing did not negate monopoly power.  Critically, however, the court noted that plaintiff Conwood had grown "*slightly*," by just *2.5% in 9 years*.  290 F.3d at 789 (emphasis added).  Moreover, the court noted that in those same nine years "no

---

[30] In *Xerox,* the court rejected the claim that defendant's three price increases could be considered a "change in policy" that exploited customers.  660 F. Supp. 2d at 549.

[31] Plaintiffs' experts fleetingly allege that upfront capital costs, brand recognition, and economies of scale are barriers to entry for portion pack manufacturers.  (¶ 485.)  They provide no analysis of any of these supposed barriers, which are refuted by the fact of undisputed and extensive entry of competitors.

[32] This figure underestimates actual sales by unlicensed competitors because it does not include sales in all channels.  Collectively, unlicensed Keurig-compatible pack manufacturers ████████████████ ████████████████████████████████████.  (¶ 78.)

new firm had entered the moist snuff market." *Id.* at 790.  The absence of any entry, despite the profitability of the moist snuff market, was particularly telling.  *Id.*

In contrast, here TreeHouse alone sells ████████████ Keurig-compatible packs per year.  It is undisputed that TreeHouse's sales grew by a great deal more than 2.5%.  Its retail sales volume grew by █████ over nine years (2011-2019).  (¶ 75.)[33]  TreeHouse ███████ ████████████████ retail compatible pack sales share during the period it was allegedly being excluded.  (¶ 77.)[34]  Moreover, unlike in *Conwood*, where there was no entry whatsoever over a nine year period, here Plaintiffs acknowledge that there has been extensive entry into the purported Keurig-compatible pack market in the past nine years.  (¶¶ 8-9.)  This case shows even stronger entry than *Tops Markets*, in which the Second Circuit affirmed summary judgment for the defendant where successful entry by a single competitor "itself refutes any inference of the existence of monopoly power that might be drawn from [defendant's] market share."  142 F.3d at 99; *see also, e.g., Western Parcel Exp.*, 190 F.3d at 976 (summary judgment for defendant where plaintiff grew by 160% and competitors entered).

While the fact of entry alone defeats monopoly power, the undisputed evidence *also* shows ████████████████████████ (¶¶ 73, 80.), ████████████████ (¶ 79.).  Each of these facts precludes a finding of monopoly power.

In sum, Keurig is entitled to summary judgment on all monopolization claims because Plaintiffs cannot establish the required "possession of monopoly power in the relevant market."  *In re Keurig*, 383 F. Supp. 3d at 219 (quoting *PepsiCo, Inc.*, 315 F.3d at 105).  Because there is

---

[33] Using 2011 as the base sweeps in TreeHouse's first full year of compatible pack sales.

[34] In opposing the motion to dismiss, TreeHouse insisted that the Court take heed of its allegation that its sales were "precipitously" declining.  TreeHouse Opp'n to MTD at 6 n.4 (quoting TreeHouse Compl. ¶ 542).  This bare assertion cannot save TreeHouse at summary judgment:  TreeHouse Foods is a behemoth that has experienced massive growth in its sales of Keurig-compatible packs. (¶ 86.)

no genuine issue of fact as to entry barriers and monopoly power in the relevant markets, Keurig is entitled to summary judgment on Plaintiffs' monopolization claims, including: product design,[35] exclusive dealing,[36] conspiracy to monopolize,[37] sham litigation,[38] patent misuse,[39] acquisitions,[40] tying,[41] and disparagement.[42]  Keurig is also entitled to summary judgment on Plaintiffs' claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act because, for the same reasons, Plaintiffs cannot show substantial market power.

### 3. Plaintiffs' Attempted Monopolization and Monopoly Leveraging Claims Fail Because There is No Dangerous Probability of Monopoly Power

Plaintiffs allege that Keurig attempted to monopolize a Keurig-compatible packs market or brewer market, and some plaintiffs say Keurig "leveraged" monopoly power in brewers to monopolize a Keurig-compatible packs market.[43]  Plaintiffs' attempted monopolization claims fail because:  "[t]o state an attempted monopolization claim, a plaintiff must establish … 'a dangerous probability of achieving monopoly power.'"  *PepsiCo*, 315 F.3d at 105, 109 (quoting *Spectrum Sports*, 506 U.S. at 456) (summary judgment for defendant because plaintiff failed to establish that defendant "has monopoly power or a dangerous probability of achieving it").

---

[35]  JBR Compl. ¶¶ 354–62.

[36]  JBR Compl. ¶¶ 304–11; TreeHouse Compl. ¶¶ 577–84; DPP Compl. ¶¶ 260–67; McLane Compl. ¶¶ 290-98.

[37]  JBR Compl. ¶¶ 363–69; TreeHouse Compl. ¶¶ 625–31; McLane Compl. ¶¶ 305-12.

[38]  JBR Compl. ¶¶ 318–31; TreeHouse Compl. ¶¶ 594–602.

[39]  JBR Compl. ¶¶ 332–37; TreeHouse Compl. ¶¶ 603–10.

[40]  DPP Compl. ¶¶ 15, 122–24; McLane Compl. ¶¶ 15, 126–28.

[41]  JBR Compl. ¶¶ 338–53; TreeHouse Compl. ¶¶ 611–18.

[42]  JBR Compl. ¶¶ 214–67; TreeHouse Compl. ¶¶ 457–548; DPP Compl. ¶¶ 197–220; McLane Compl. ¶¶ 232–4.

[43]  DPP Compl. ¶¶ 268-78; TreeHouse Compl. ¶¶ 585-93, 619-24; JBR Compl. ¶¶ 312-17, 377-82. McLane Compl. ¶¶ 299-304, 325-29.  Though McLane alleged attempted monopolization of a brewer market in its complaint, McLane Compl. ¶¶ 326-27, its expert Dr. Leitzinger has not identified such a relevant market.  (¶ 482.) McLane has thus abandoned this claim.

Plaintiffs fare no better by relabeling their claims as "monopoly leveraging." The Supreme Court has explained that such relabeling does not "dispense[] with a requirement that there be a 'dangerous probability of success'" that the defendant will monopolize the second market. *Verizon v. Trinko*, 540 U.S. 398, 883 n.4 (2004).[44]

  Plaintiffs cannot prove a "dangerous probability" for the same reason they cannot prove monopolization: without significant barriers to entry, there cannot be either monopoly power or a dangerous probability thereof. *See e.g.*, *AD/SAT v. Assoc. Press*, 181 F.3d 216, 229-30 (2d Cir. 1999) (summary judgment for defendant on attempted monopolization claim in light of "low barriers to market entry" which preclude plaintiff from proving "an essential element of its attempted monopolization claim" – that there is a "dangerous probability" that the defendant "will achieve monopoly power"); *Barr Lab'ys. v. Abbott Labs.*, 978 F.2d 98, 113-15 (3d Cir. 1992) (summary judgment for defendant on attempted monopolization claim where "continued entry" defeated allegations of "high barriers to entry" and tended to show "no reasonable probability of success in any attempt to monopolize"); *Savory Pie Guy*, 2016 WL 7471340, at *11 (summary judgment for defendant on attempted monopolization claim because "a jury could not reasonably find there was a dangerous probability that defendant would monopolize the market" given that "[d]uring the time period in question, at least one competitor—InLine Pie— was able to enter the market"); *nSight Inc. v. PeopleSoft*, 2005 WL 3299164, at *1 (N.D. Cal. 2005) ("Even where a defendant has a high market share, a dangerous probability of achieving monopoly power cannot exist in the absence of barriers to new entry or expansion."); *Crossroads v. Orange*, 159 F.3d 129, 141-42 (3d Cir. 1998) (dismissal of attempted monopoly claim in

---

[44] The "leveraging" claims also fail for the additional reason that Plaintiffs fail to establish that Keurig has a single-serve brewer monopoly to leverage in the first place. *See supra* Section I.B.1.

absence of alleged barriers); *Virgin Atl. Airways v. British Airways*, 257 F.3d 256, 269 (2d Cir. 2001) (affirming summary judgment for defendant on attempted monopoly claim, noting "practices presumptively should not be viewed as an attempt to monopolize when the practices have been ongoing for several years" and rivals have nonetheless managed to profit and new entry has occurred).

DPPs are the lone plaintiff to claim attempted monopolization of *brewers*.[45]  This claim fails for similar reasons:  The undisputed evidence shows low barriers to entry.  (¶ 63, 65-67, 484.)  *AD/SAT*, 181 F.3d at 227-30 (dismissing attempted monopoly claim for lack of dangerous probability where there are "low barriers to entry").[46]

### C.    Plaintiffs' Antitrust Claims All Fail For Additional Reasons

For the reasons noted above, Keurig is entitled to summary judgment on all of Plaintiffs' antitrust claims.  Plaintiffs' antitrust claims also fail for reasons specific to each claim.  As the Supreme Court has explained, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."  *Trinko*, 540 U.S. at 407.  Here, Plaintiffs cannot show that any of the conduct they challenge is anticompetitive as that is defined under controlling case law.

### 1.    Plaintiffs' Product Design Claims Fail For Lack of Coercion

The Court should grant summary judgment to Keurig on Plaintiffs' product design claims.  "As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes."  *New York ex rel. Schneiderman v.*

---

[45] Keurig understands that McLane has abandoned its claim for attempted monopolization of the brewer market, through its expert.  To the extent that is not the case, McLane's claim would fail for the same reasons as the DPPs.

[46] Keurig also earns low margins on brewers.  (¶ 71.)

36

*Actavis PLC*, 787 F.3d 638, 652 (2d Cir. 2015); *see also Foremost Pro Color v. Eastman Kodak*, 703 F.2d 534, 544-45 (9th Cir.1983).  As a threshold matter, as discussed above, Plaintiffs cannot show Keurig has monopoly power in single-serve brewers.  Indeed, McLane's expert abandoned its allegations of a brewer market altogether.[47]  If Keurig does not have a brewer monopoly in the first place, then its introduction of a new brewer cannot be unlawful monopoly maintenance.  *Actavis*, 787 F.3d at 651 (plaintiff challenging new product as an antitrust violation must prove "that the defendant possessed monopoly power in the relevant market"); *Allied Orthopedic v. Tyco Health Care Grp.*, 592 F.3d 991, 1002 (9th Cir. 2010) (summary judgment for defendant on claims that it maintained a monopoly by designing a new monitor to be incompatible with rivals' sensors because the market for monitors was competitive).

As discussed below, Plaintiffs' product design claims also fail because a new product cannot violate the antitrust laws if consumers are free to choose or reject it, *i.e.*, consumers are not coerced into buying it.  Consumers are not coerced when the alleged monopolist's old product remains on the market such that consumers can choose which product to buy.  *Actavis*, 787 F.3d at 653-54.  In *Actavis*, the Second Circuit held that defendant's "hard switch" of patients to its new drug by removing the old one from the market coerced consumers in violation of Sherman Act Section 2.  But, where a defendant launches a new product *without* removing its old one from the market then "the free choice of consumers is preserved" and consumers can choose the product they want.  *Id.* at 654-55 (quoting *Berkey Photo v. Eastman Kodak*, 603 F.2d 263, 287 (2d Cir. 1979)); *see also, e.g.*, *Allied Orthopedic*, 592 F.3d at 1002 (summary judgment for defendant because "Plaintiffs have provided no evidence that [defendant] used its monopoly power to force consumers…to adopt its new OxiMax technology.").

---

[47] *See supra* n. 43.

The fact that consumers were not coerced into buying the 2.0 Brewer ends the inquiry and avoids the Court or a jury evaluating product innovation.  Nonetheless, the undisputed facts now confirm that the 2.0 Brewer was a new product that some consumers preferred.

        **i.**        **Plaintiffs Cannot Establish Consumer Coercion Because Consumers Have Always Been Free To Use Keurig 1.0 Brewers**

When JBR moved for a preliminary injunction in 2014, it told this Court that the 2.0 Brewer would cause it irreparable injury by destroying its sales at Costco, and possibly even destroying its overall operation.  *In re Keurig*, 2014 WL 12778832, at *5 (S.D.N.Y. Sept. 19, 2014).  The Court allowed discovery, conducted an evidentiary hearing, and reached a number of conclusions.  In denying JBR's motion, the Court found that: "It is wholly uncertain at this early date whether the Keurig 2.0 will be commercially successful."  *Id*. at *6 (noting that a prior Keurig brewer, the Vue, had not been a commercial success).  The Court further explained: "Keurig brewers, like many consumer products, are designed to last for several years" and "a substantial proportion of 2.0 purchasers in the near term will likely be converting from traditional drip coffee brewers rather than from 1.0 brewers that remain in good working order." *Id*.; *see also JBR v. Keurig Green Mountain*, 618 F. App'x 31 (2d Cir. 2015) (affirming denial of preliminary injunction).

The Court was right.  Seven years later, JBR is still in business and its portion pack business is going strong, including at Costco.  (¶¶ 128-29, 216, 283.)  Consumers did not rush to the stores to replace their 1.0 brewers.  (¶¶ 285-86.)  Where the 2.0 brewer was offered, it was generally sold alongside the 1.0 as well as other brewers.  (¶¶ 284, 287-88.)

In opposing Keurig's motions to dismiss, JBR told the Court that the 2.0 brewer would "result[] in coercion of existing users of 1.0 brewers" to move to the 2.0 Brewer in light of the

"phasing out of the 1.0 Brewer."  JBR Mem. of Law in Opp'n to Mot. to Dismiss at 13, ECF No.

253 ("JBR Opp'n to MTD").  JBR said:

> Keurig's reliance on *Berkey* is fundamentally misplaced … [I]n *Berkey*, Kodak
> continued to market both [old] style films and cameras after the release of the new
> [system], and **consumers were allowed to choose between the competing
> systems**.  *See Berkey*, 603 F. 2d at 286-87.  Here, Keurig has denied customers
> that choice, by discontinuing production of all Keurig 1.0 reservoir brewers and
> widely announcing that the Keurig 2.0 would replace the current lineup of
> compatible 1.0 brewers.  FAC ¶212.

*Id*. at 13 n. 5 (emphasis in original).  In resolving the motions, the Court assumed these

allegations to be true.  *In re Keurig*, 383 F. Supp. 3d at 210 n.4.  At the summary judgment stage,

however, the Court has the benefit of extensive undisputed facts.

    *1.0 Brewers were not discontinued.*  There is no dispute that 1.0 brewers were *not*

discontinued, and Keurig sold them at all times through the present.  (¶¶ 114, 131, 134, 284.)

Consumers in fact *were* allowed to choose between the competing 1.0 and 2.0 systems, contrary

to Plaintiffs' claims.  From the launch of the 2.0 in 2014 through the end of discovery in 2019,

1.0 Brewers generally made up ████████████████████████████.  (¶ 286.)  It is

also undisputed that, from the launch of the 2.0 Brewer onward, there have been 1.0-style

brewers manufactured by companies other than Keurig that work with K-Cups and compatible

packs.  In 2014, when the 2.0 Brewer launched, at least five manufacturers (Hamilton Beach,

Bella, Bunn, Chefman, and Tru) were selling unlicensed 1.0 brewers.  (¶ 287.)  ████████

████████████████████████████████████████

██████████████████  (¶ 288.)  No consumer was forced to buy a 2.0.

    *1.0-compatible portion packs were not discontinued.*  Keurig's 2.0-compatible portion

packs were also backwards compatible with 1.0 brewers.  (¶ 289.)  Consumers who owned 1.0

brewers did not face any pressure to abandon their existing machines and buy a new machine in

order to have access to portion packs.  *Cf. Berkey*, 603 F. 2d at 287 ("Kodak did not remove any

other films from the market" when it launched its new system, and "[u]nless consumers desired to use the [new] camera for its own attractive qualities, they were not compelled to purchase" it).

***Despite the lack of coercion, some consumers chose to buy 2.0 Brewers.***  It is also undisputed that some consumers *chose* to buy 2.0 Brewers even though 1.0 Brewers (and many other brewers) were available, and were less expensive than the 2.0.  (¶ 290.)  As many courts have noted, absent coercion, "the only rational inference that can be drawn from some consumers' adoption of [a new product] is that they regarded it to be a superior product."  *Allied Orthopedic*, 592 F.3d at 1002; *see also, e.g., Berkey*, 603 F. 2d at 287 ("If a monopolist's products gain acceptance in the market, therefore, it is of no importance that a judge or jury may later regard them as inferior").

***Portion pack competitors hacked the 2.0 Brewer.***  Unlicensed competitors were promptly able to manufacture packs compatible with the 2.0 Brewer. (¶ 291.)  TreeHouse ████████████████████████████████████████████████████████ ████████████████████████████████████████████████.  (¶¶ 292-93.)  JBR ran a promotion related to its 2.0 hack (the "Freedom Clip") that was so successful its website crashed under the heavy volume of consumer orders.  (¶ 140.)  JBR's co-President told the Sacramento Bee:

> When we put up [the free Freedom Clip offer] on our website, we expected 10,000 or 15,000 people to respond.  We've had many, many times that, more than we expected.  After CNN Money, Fox News, Huffington Post picked up stories about the Freedom Clip, our website crashed and we had to hire a beefier Web server . . . We'd never experienced anything like that before.  It was crazy.[48]

---

[48] Indeed, JBR experienced these record sales even while appealing this Court's decision finding that JBR had not established irreparable injury from the 2.0 Brewer launch. (¶ 294.)

The undisputed fact that competitors were able to make their packs work in the 2.0 Brewer stands in stark contrast to the facts of other product design cases (including the few successful ones), in which competitors actually *are* locked out of selling their generic aftermarket products to consumers who buy a defendant's new product.  *See, e.g., Xerox III*, 660 F. Supp. 2d at 540 (Xerox's changes to printer feed chute made generic ink sticks not function properly); *Allied Orthopedic*, 592 F.3d at 1000 (defendant "made its new [] system incompatible with generic sensors"); *Actavis*, 787 F.3d at 655 (generic competitors were prevented from competing).  In contrast, here consumers could choose the 2.0 Brewer if they wanted it *and* have their unlicensed "Cake Boss" cups too.

　　　*All* of these facts—including the simple fact that 1.0 Brewers remained available for consumers to choose—preclude a finding that consumers were coerced into buying the 2.0, which is fatal to Plaintiffs' product design claims.  *MacDermid Printing Solutions v. Cortron*, 833 F.3d 172, 186 (2d Cir. 2016) (fact that "consumers continued to buy" defendant's old product demonstrated that consumers were not coerced to buy the new one); *Berkey Photo*, 603 F.2d at 286-87 (manufacturer's advertising of new product did not coerce consumers because they were "not compelled to purchase" the new product).  That Keurig discontinued the 2.0 further highlights that Keurig lacked the power to compel its purchase.  As this Court noted in its decision on JBR's motion for a preliminary injunction, Keurig's Vue brewer was also discontinued, again showing Keurig lacks power to force consumers to take a new brewer.

　　　Courts outside the Second Circuit likewise reject antitrust liability where, as here, there is no coercion of consumers to buy the new product.  *See, e.g., Mylan Pharms. Inc. v. Warner Chilcott Pub.*, 838 F.3d 421, 440 (3d Cir. 2016) (summary judgment for defendants where there was no consumer coercion, because generic versions of the old product formulation remained on

the market even after defendants' product reformulation); *Allied Orthopedic Appliances*, 592

F.3d at 1002 (summary judgment for defendant because "Plaintiffs have provided no evidence

that [Defendant] used its monopoly power to force consumers … to adopt its new OxiMax

technology") (citing *Berkey*, 603 F.2d at 287); *Walgreen Co. v. AstraZeneca Pharms.*, 534 F.

Supp. 2d 146, 151-52 (D.D.C. 2008) (dismissing product design claim where defendant did not

"eliminate[] any consumer choices" and in fact "added choices" by introducing a new product to

compete with an "already-established" one).

Plaintiffs said in 2015 that this case was unlike *Berkey*, because in *Berkey* "*consumers*

*were allowed to choose between the competing systems,*" *see* JBR Opp'n to MTD at 13 n.5, ECF

No. 253 (emphasis in original), and Plaintiffs argued that product design cases are usually

resolved in favor of defendants on *summary judgment*, not a motion to dismiss.  *See id.* at 9.[49]

Summary judgment has now come, and Plaintiffs can no longer use the liberal pleading standard

as a shield.  It is undisputed that here, as in *Berkey*, consumers "were allowed to choose between

the competing systems."  The Court should grant summary judgment for Keurig.

      **ii.**      **The 2.0 Brewer Was A New Product**

Plaintiffs' failure to show that consumers were coerced into buying the 2.0 Brewer ends

the inquiry into their product design claim.  The consumer coercion test provides an important

threshold that helps courts avoid unnecessarily entangling themselves in a company's product

design decisions.  The Ninth Circuit explained this point well in *Allied Orthopedic*:

> To weigh the benefits of an improved product design against the resulting
> injuries to competitors is not just unwise, it is unadministrable.  There are no
> criteria that courts can use to calculate the "right" amount of innovation,

---

[49] Plaintiffs all cited the *Xerox* litigation and emphasized that the court denied a defendant's motion to dismiss product design claims before later granting summary judgment to the defendant.  *Id.* at 9; *see also, e.g.,* TreeHouse Opp'n to MTD at 32 n. 59 (citing *Xerox III* decision granting summary judgment to defendant but describing the decision as a denial of a motion to dismiss); DPPs' Mem. of Law in Opp'n to Mot. to Dismiss, ECF Nos. 251-52 at 23.

which would maximize social gains and minimize competitive injury. A seemingly minor technological improvement today can lead to much greater advances in the future…. Our precedents and the precedents we have relied upon strongly counsel against such a test. *See CalComp*, 613 F.2d at 744; *Foremost*, 703 F.2d at 545-46; *Berkey Photo*, 603 F.2d at 286-87. Although one federal court of appeals has nominally included a balancing component in its test, it has not yet attempted to apply it. …. **Absent some form of coercive conduct by the monopolist**, the ultimate worth of a genuine product improvement can be adequately judged only by the market itself.

592 F.3d at 1000 (citing *Berkey Photo*, 603 F.2d at 287) (emphasis added).

While the merits of the 2.0 Brewer are not relevant in the absence of coercion, the undisputed facts show the 2.0 was a new product. (¶ 295.)

***Some consumers chose the 2.0 Brewer.*** The 2.0 Brewer cost more than 1.0 Brewers, yet many consumers chose the 2.0 notwithstanding its higher price tag. Unlike the 1.0, the 2.0 Brewer used more powerful piston pump technology that delivered a stronger, more flavorful cup of coffee. Indeed, the stronger pressure in the 2.0 led ████████████████████████████ ███████████████████████████. (¶¶ 293, 296.) The 2.0 also offered "consumers the ability to brew a carafe of coffee in addition to a single cup." *In re Keurig*, 2014 WL 12778832, at *2. As this Court found following the evidentiary hearing on the preliminary injunction:

> In developing the 2.0's carafe brewing function, Keurig responded in part to market research showing that consumers who had not purchased Keurig brewers had not done so because they wanted the ability to brew larger quantities of coffee. (Johnson Decl. Ex. 16, at 32.) Thus, "the primary audience for Keurig 2.0 is [the] new customer to the Keurig system who will appreciate the added benefits of the functionality of the system." (Johnson Decl. Ex. 8, at 260.)

*Id.* at *6. In addition, Keurig obtained multiple patents on the 2.0 Brewer. (¶ 297.) *Allied Orthopedic Appliances*, 592 F.3d at 1000-01 ("existence of a patent on a new product design" suggests the product is "an improvement" over prior products).

The 2.0 Brewer ██████████████████████████████████████████████████ ████████████████. (¶ 298.) Of course, many consumers preferred to keep their 1.0 Brewers or

chose other new brewing systems, but "[a] product that commends itself to many users because [it is] superior in certain respects may be rendered unsatisfactory to others by flaws they considered fatal." *Berkey Photo*, 603 F.2d at 286-87.[50]  In the absence of consumer coercion, the "inference that can be drawn from some consumers' adoption of [a new product] is that they regarded it to be a superior product." *Allied Orthopedic Appliances*, 592 F.3d at 1002; *cf. Actavis PLC*, 787 F.3d at 652.

In 2017, Keurig decided to discontinue the 2.0 Brewer. (¶ 299.)[51]  Keurig has launched new 1.0-style brewers, for example the K35, which retails in the $49-$59 range at Walmart (or less on sale).  (¶ 68.)  Keurig also launched a more advanced 1.0 brewer called the Duo that brews both a single cup and a carafe (this time using ground coffee, rather than a specialized portion pack), in Keurig's continuing quest to win drip brewer users.  (¶ 300.)[52]

Under well-established case law, antitrust liability does not turn on the product preferences of a court or jury.  *See, e.g., Walgreen*, 534 F. Supp. 2d at 151 ("Courts and juries are not tasked with determining which product among several is superior").  Where consumers are not coerced to buy a new product the market decides whether it will be successful.  As

---

[50] Witnesses in this case consistently recognized that different consumers have different preferences. (¶ 494.)

[51] On the motions to dismiss, Plaintiffs also argued Keurig's intent to lock out competition was sufficient to suggest that plan might be effective.  JBR Opp'n to MTD at 2-3, ECF No. 253.  The Court held that "[a]t this stage" Plaintiffs' allegations were sufficient.  *In re Keurig*, 383 F. Supp. 3d at 231.  Now, with the record formed, Plaintiffs can no longer speculate about competitive effects.  *K.M.B. Warehouse v. Walker Mfg. Co*., 61 F.3d 123, 130 (2d Cir. 1995) (evidence of anticompetitive intent is relevant "only to 'help courts interpret the effects' of defendants' actions.  Like market power, anticompetitive intent is not by itself sufficient to meet the adverse-effect requirement.").

[52] https://www.keurig.com/K-Duo%E2%84%A2-Single-Serve-%26-Carafe-Coffee-Maker/p/K-Duo-Single-Serve-Carafe-Coffee-Maker:Black_color.  Even Plaintiffs concede that the Duo is a good thing for portion pack competitors because it expands the installed base of brewer owners.  (¶ 301.)

witness after witness in this case testified, consumers "vote with their dollars." (¶ 302.)  The

Second Circuit summed this up in *Berkey Photo*:

> [T]he question of product quality has little meaning.  A product that commends
> itself to many users because superior in certain respects may be rendered
> unsatisfactory to others by flaws they considered fatal … .  [N]o one can
> determine with any reasonable assurance whether one product is "superior" to
> another.  Preference is a matter of individual taste.  The only question that can be
> answered is whether there is sufficient demand for a particular product to make its
> production worthwhile, and the response, so long as the free choice of consumers
> is preserved, can only be inferred from the reaction of the market.

603 F. 2d at 286-87.

Here, "[u]nless consumers desired to use the [2.0 Brewer] for its own attractive qualities,

they were not compelled to purchase [it] especially since [Keurig] did not remove any other

[brewer] from the market when it introduced the new one."  *Berkey Photo*, 603 F.2d at 287.  The

consumers who chose to buy the 2.0 Brewer were the ones who saw value in it.  The Court

should grant summary judgment for Keurig.

### 2.    Plaintiffs' Exclusive Dealing Claims Fail For Lack of Substantial Foreclosure

Plaintiffs claim Keurig's relationships with retailers, distributors, and others are exclusive

deals that violate the antitrust laws.  The undisputed facts show that Plaintiffs cannot come close

to establishing substantial foreclosure in violation of the antitrust laws.  Exclusive sales contracts

are "presumptively legal," *CDC Techs. v. IDEXX Labs.*, 186 F.3d 74, 80 (2d Cir. 1999), and

cannot violate the antitrust laws unless they "foreclose competition in a substantial share of the

line of commerce affected."  *Tampa Elec. v. Nashville Coal*, 365 U.S. 320, 327 (1961).[53]

Plaintiffs cannot establish that Keurig substantially foreclosed competitors from the

---

[53] Plaintiffs must demonstrate substantial foreclosure for their exclusive dealing claims brought under
Section 1 or Section 2 of the Sherman Act or Section 3 of the Clayton Act.  *Id.*, at 335.

purported Keurig-compatible packs market here given the fact that more than a dozen competitors entered and grew to sales of 2.5 billion compatible packs per year.[54]  No reasonable jury could find substantial foreclosure on those facts.  *See, e.g., Sterling Merch*, 724 F. Supp. 2d 245, 265-66 (D.P.R. 2010), *aff'd*, 656 F.3d 112 (1st Cir. 2011) (summary judgment for defendant where there was recent entry, overall volume had grown, and plaintiff's revenues had increased because, on that record, "substantial foreclosure cannot be demonstrated"); *CDC Techs.*, 186 F.3d at 80-81 (summary judgment for defendant where competitors experienced a "sales increase[]"); *Omega*, 127 F.3d at 1164  (judgment for defendant where competitor increased "from approximately 6% to 8%" share).

While that undisputed evidence alone resolves the exclusive dealing claims, the Court should also grant summary judgment to Keurig on the claims because Plaintiffs cannot show exclusive agreements creating substantial foreclosure.  *Empire v. World-Wide Volkswagen,* 814 F.2d 90 (2d Cir. 1987); *Mazda v. Carfax,* 2016 WL 7231941, at *10-11 (S.D.N.Y. Dec. 9, 2016), *aff'd sub nom.*, 726 F. App'x 66 (2d Cir. 2018) ("Summary judgment in exclusive dealing cases is appropriate when a plaintiff fails to offer evidence that exclusive agreements foreclosed a large enough share of the market to raise a reasonable inference that the agreements harmed competition"); *Allied*, 592 F.3d at 998 (similar).  In *CDC Techs.,* the court granted summary judgment for defendant where it had foreclosed 50 percent of a claimed distributor market for lack of substantial foreclosure.  7 F. Supp. 2d 119, 129 (D. Conn. 1998), *aff'd* 186 F.3d 74 (2d Cir. 1999).  Similarly, in *Omega Environmental,* the Ninth Circuit granted judgment for the defendant because 38 percent share covered by exclusivity was not substantial foreclosure.  127 F.3d at 1162.  Under established law, "foreclosure levels are unlikely to be of concern where

---

[54] *See supra* Section I.B.

46

they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy." *Sterling Merch.*, 656 F.3d at 124. [55] Plaintiffs' exclusive dealing claims fail for additional reasons as well.

### i. Claims Based on Retailer Contracts Fail For Lack of Exclusive Contracts

Plaintiffs' complaints alleged that Keurig has exclusive contracts with retailers including Costco, Staples, OfficeMax, and Meijer barring retailers from carrying unlicensed packs. [56] But the undisputed evidence, including the sales data, testimony, and the terms of the contracts (where they existed) show this is wrong. Plaintiffs have not created a genuine issue of material fact in support of their allegation that Keurig has exclusive retailer contracts substantially foreclosing competitors from retail shelves.

Most of Keurig's sales to retailers are not subject to any contractual commitment at all, including sales to major retailers like ███████████████████████. (¶¶ 55, 182, 205, 214.) [57] Sales are routinely made through individual purchase orders. (¶ 181.) ███████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ (¶ 61.) Even Plaintiffs' experts acknowledge that ██████████████████████████ ██████████████████████████████████████████████████

---

[55] This Court denied Keurig's motion to dismiss the exclusive dealing claims. *In re Keurig*, 383 F. Supp. 3d at 236, 240 (citing *Commercial Data Servers, Inc. v. IBM Corp.*, 2002 WL 1205740, at *7 (S.D.N.Y. Mar. 15, 2002)). While *Commercial Data Servers* denied a motion to dismiss under the "liberal pleading requirements," 2002 WL 1205740, at *7, the court went on to grant summary judgment to the defendant because, after discovery "no reasonable trier of fact could find a substantial foreclosure of competition." *Com. Data Servers, Inc. v. IBM.*, 262 F. Supp. 2d 50, 77 (S.D.N.Y. 2003).

[56] JBR Compl. ¶¶ 108-10; TreeHouse Compl. ¶¶ 366-72; DPP Compl. ¶ 116; McLane Compl. ¶ 121.

[57] The data confirms that ████████████████████████████████████████████████████ ███████████████████████████████ (¶ 183.)

47

█████ [58] The data confirms that unlicensed suppliers sold packs across all retailers.  (¶ 81.)
As for the specific retailers Plaintiffs alleged in their complaint were exclusive with Keurig, ███

████████████████████.  (¶¶ 218, 220-23, 500.)[59]  Keurig is entitled to summary
judgment.  *Aerotec Int'l*, 836 F.3d at 1182 (no foreclosure without exclusive deals).

As to private label agreements to supply store brand packs for a retailer, these are *not*
exclusive contracts foreclosing competitors because the retailer remains free to sell competitors'
other compatible portion packs.  Rather, these are short term deals that some retailers use when
awarding the manufacturing contract to supply packs under their store brand (e.g., ██████████

████████).  Moreover, even aggregating all contracts where Keurig had a short term
exclusive contract to supply store brand packs to a particular retailer, those contracts covered
██████████ of the compatible pack market Plaintiffs alleged.  (¶ 56.)  That is nowhere near
the 30-40% foreclosure required as a bare minimum for a substantial foreclosure claim.[60]

Moreover, even as to the ████████ of pack sales made under exclusive private label
manufacturing contracts, these were ████████████████████████████████████

████████████.  (¶¶ 59-60.)  "Short-term or at-will exclusive dealing contracts
generally do not threaten competition because when they expire, a firm's rivals can bid to take
over the contract."  *Mazda*, 2016 WL 7231941, at *5; *Omega,* 127 F.3d at 1164-65 ("short

---

[58] For example, ████████████████████████████████████.  (¶¶ 216-17.)

[59] ████████████████████████████████ (¶ 220.)

[60] Plaintiffs have not alleged, nor have their experts opined, that there is a separate private label pack market.  (¶ 487.)  *See, e.g., Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984) (rejecting claims of alleged foreclosure from a "market that has not been defined"); *Ford Piano Supply Co. v. Steinway & Sons*, 1988 WL 3488, at *2 (S.D.N.Y. 1988) (similar).  In fact, it would be improper to do so.  *See Nifty Foods  v. Great Atl. & Pac. Tea Co*., 614 F.2d 832, 840-41 (2d Cir. 1980) (no private label submarket existed because branded and private label products were not qualitatively different) (citing cases).

duration and easy terminability of [] agreements negate substantially their potential to foreclose competition") (citing cases).  Competitors were free to compete for private label deals, and "[i]t also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."  *Balaklaw*, 14 F.3d at 799 (summary judgment for defendant where "opportunities for competition remain[ed]" because a contract had a term of "only" three years and could be terminated with six-months' notice); *Spinelli v. NFL*, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015) (dismissing claims because exclusive contracts that were re-bid every three years are "not anticompetitive as a matter of law").  "Competition-for-the-contract is a form of competition that antitrust laws protect" because it benefits consumers.  *Paddock v. Chicago Tribune*, 103 F.3d 42, 45, 47 (7th Circ. 1996)  (dismissing exclusive dealing claims and noting plaintiff "should try to outbid [defendants] in the marketplace, rather than to outmaneuver them in court"); *Ferguson v. Greater Pocatello*, 848 F.2d 976, 982 (9th Cir. 1988) (no foreclosure where producers had opportunity to bid on six-year exclusive deal on a six-year interval).  It is undisputed that ███████████████████████████████████████████████ ████████████████████████.  (¶¶ 152, 354.)  As JBR's co-President explained, "private label wasn't good business.  It's a price, price, price business, and we are not a price, price, price guy."  (¶ 355.)  It is likewise undisputed that TreeHouse ████████████████ ████████████████████████████████████████████████████████████████████ ██████████████.  (¶ 203-04, 223, 225, 227, 241.)  That is not substantial foreclosure.  It is competition.

   **ii.**  **Claims Based on Distributor Contracts Fail for Lack of Market Power and Foreclosure**

  Plaintiffs allege that Keurig had exclusive contracts with AFH distributors.  These distributors serve customers like hotels, restaurants, and offices.  In discovery, Plaintiffs placed

heavy focus on "office coffee" subsegment of AFH customers, and specifically the subsegment

of the office subsegment that buys coffee through distributors.[61]  Plaintiffs have not alleged any

separate relevant product market for "office coffee," however.[62]  As DPPs' expert explained,

offices "can buy from sources other than the distributors in their channel, and do."  (¶ 472.)  And

offices that buy through the distributors at issue can typically ███████████████████████████

further preventing market power in compatible packs.  (¶ 46.).

Keurig's pack sales to AFH distributors, including for resale to offices, hotels,

restaurants, and other AFH locations, account for ████████████████████████████████████

████████████████████████████, the last year for which third party competitors produced sales

data.  (¶ 499.)[63]  That is far below the level required to show substantial foreclosure.  Moreover,

---

[61] Office distributors place coffee brewing systems (and often other products) in offices.  Traditionally, these companies place brewers in offices for free and make money on the coffee, and often also provide services like machine repair.  (¶¶ 43, 45.)  This traditional business model had already been used by the industry for many years when Keurig entered.  (¶ 44.)

[62] All four Plaintiffs' liability economists testified at deposition that they had not identified any relevant market for AFH or office coffee.  (¶ 476.)  Months after the depositions, however, TreeHouse tried to cloud the waters by altering Dr. Sibley's testimony in errata.  At his deposition Dr. Sibley testified that he only identified two relevant markets in this case: single-serve brewers and Keurig-compatible portion packs.  (¶446.)  Indeed, Dr. Sibley testified that defining sales channels as different markets "would be the wrong market definition."  (¶ 447.)  Nearly two months after the deposition, however, TreeHouse tried to insert an AFH "distribution channel market" into his testimony via extensive errata.  (¶ 448.)  TreeHouse's gerrymandering fails not just because it is untimely but also because of the case law, which makes clear that foreclosure of a channel or submarket "does nothing to reveal the amount of foreclosure in the market as a whole."  *Kolon Indus*, 2012 WL 1155218, at *14.  Courts reject such "gerrymandering of markets attempting to artificially show high levels of foreclosure."  *Sterling Merch.*, 724 F. Supp. 2d at 252 n.3, 264 (plaintiff's attempt to claim foreclosure in sub-segments was an "improper attempt to reformulate" claimed markets).  *Accord Omega*, 127 F.3d at 1162 (plaintiffs' "focus on [a] subset of the relevant market is misplaced" because foreclosure must be measured across "the full range of selling opportunities reasonable open to rivals"); *Int'l Constr. v. Caterpillar Inc.,* 2016 WL 264909, at *8 (D. Del. Jan. 21, 2016) (dismissing exclusive dealing claims because plaintiff "cannot simply gerrymander markets, without supporting facts, where it deems it advantageous"); *Kolon Indus., Inc. v. E.I. du Pont*, 2012 WL 1155218, at *14 (E.D. Va. Apr. 5, 2012), *aff'd*, 748 F.3d 160 (4th Cir. 2014) (summary judgment for defendant where plaintiffs analyzed foreclosure in subsegments rather than the whole market).

[63]  Plaintiffs' experts do not dispute these shares.

because the contracts at issue are with distributors, there is even less concern: even "exclusive dealing arrangements imposed on distributors rather than end-users are generally less cause for anticompetitive concern" because, as here, competitors can often "reach the ultimate consumers of the product" in other ways. *Omega Environmental*, 127 F.3d at 1162 (citing *Ryko Mfg. v. Eden*, 823 F.2d 1215, 1235 (8th Cir. 1987)) ("Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of 'substantial foreclosure.'"); *CDC Techs.*, 186 F.3d at 80-81 (summary judgment for defendant where plaintiff increased sales to consumers despite alleged distributor foreclosure).

It is also undisputed that Keurig's agreements with distributors were all ████████ ███████████████████████████, which further disproves harm. (¶¶ 52-53.). *See supra* Section I.C.2.i.

### iii.   Claims Based on *All* Keurig Sales Fail For Lack of Exclusive Contracts

Some of Plaintiffs' experts' reply reports came up with a new theory: all of Keurig's sales "foreclosed" competitors regardless of whether the sales were covered by a contract at all because a sale made by Keurig is a sale not made by a competitor.[64]  This theory is contrary to black letter law.  As the courts have explained "a prerequisite to any exclusive dealing claim is an agreement to deal exclusively."  *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) (summary judgment for defendant where plaintiff failed to show that sales were pursuant to exclusive contracts).  Plaintiffs cannot concoct high "foreclosure" numbers based on sales they know were not made under exclusive contracts.  *Empire*, 814 F.2d at 97

---

[64] Experts for TreeHouse and McLane in their reply reports calculate foreclosure shares using all of Keurig's portion pack sales.  (¶¶ 490-91.)  JBR's expert also calculates a share that he admits included sales that "happened outside of the exclusive contracts."  (¶ 443.)

(summary judgment for defendant where plaintiff "failed entirely to demonstrate the existence of an exclusive dealing arrangement" because defendant did not prohibit dealers from selling competitors' products); *cf. Expert Masonry v. Boone*, 440 F.3d 336, 347-48 (6th Cir. 2006) ("To allow any … bidding, or other competitive sales process to be challenged whenever one potential supplier is distraught because it did not win the sale would be to outlaw competition. … For the courts to entertain such antitrust cases would require the courts themselves to substitute their own business judgment for that of the companies involved.").[65]

#### iv.    Claims Based on Input Foreclosure Fail For Lack of Foreclosure

TreeHouse, DPPs, and McLane claim that Keurig foreclosed competition through contracts with its suppliers of machinery and portion pack inputs (*e.g.*, foil lids).  JBR does not bring this claim, and it is undisputed that more than a dozen firms obtained the inputs they needed to enter (¶¶ 253-55.).  Plaintiffs also offer a variant of this input foreclosure claim related to brands.  All of these claims fail.  As a threshold matter, the law of exclusive dealing as to inputs is different.  The relevant question is not whether, for example, 60% of foil lid suppliers are available, the question is whether an entrant can secure or was "deprive[d] . . . of access" to inputs it needed to enter.  *Jefferson Par. Hosp. v. Hyde*, 466 U.S. 2, 45-46 (1984) (O'Connor, J., concurring); *see also US Healthcare, v. Healthsource*, 986 F.2d 589, 596 (1st Cir. 1993) (rejecting claim defendant foreclosed rivals from access to doctors where "foreclosure [did not] impair[] the ability of new [entrants] to operate").  Plaintiffs cannot meet this test.

***Input Foreclosure: Manufacturing Inputs.***  More than a dozen firms found all the inputs they needed, sourcing from a large number of different suppliers.  (¶¶ 253-60.)  Summary

---

[65] Plaintiffs' reply report "every sale Keurig makes is foreclosed to someone else" theory is also untimely. *Ironshore v. W. Asset*, 2013 WL 2051863, at *2 (S.D.N.Y. May 15, 2013) (reply report "is not an opportunity for the correction of any oversights in the plaintiff's case in chief").

judgment for Keurig is warranted because "plaintiffs failed to prove that [competitors] were foreclosed from alternate sources of supply."  *Susser v. Carvel*, 332 F.2d 505, 517-18 (2d Cir. 1964) (judgment for defendant); *Paddock*, 103 F.3d at 42 (dismissal where alternative inputs were available).

Plaintiffs' economists have *not* opined that Keurig raised marginal input costs for all the unlicensed pack entrants by locking up the best-priced inputs.  (¶ 492.)  JBR does not even claim its *own* costs were raised by Keurig.  TreeHouse says its costs were raised by a minimal amount but, even if that were true (and it is not), the small increment TreeHouse says it paid did not prevent it from competing profitably, and there are many other competitors whose costs Plaintiffs have not claimed were raised.  (¶ 492.)  TreeHouse's underlying theory that it was entitled to use suppliers Keurig had already developed is legally unsupported:  Nothing in the antitrust laws gives TreeHouse a right to freeride off Keurig's investments in its suppliers. *Determined Productions v. R. Dakin*, 514 F. Supp. 645, 648 (N.D. Cal. 1979), *aff'd*, 649 F.2d 866 (9th Cir. 1981) (summary judgment for defendant on input supply claim where "suppliers can be developed with training and supervision supplied by the buyer").[66]

Some of the complaints alleged that Keurig's supply agreements delayed competitors' entry.[67]  But there is now no genuine dispute that TreeHouse launched its unfiltered pack in 2010 on an aggressive timeline, ██████████████████████████████████████.  (¶¶ 262-63.)[68]  TreeHouse also concedes that it launched its filtered portion packs ██████████████

---

[66] *See id*. ("It may well be true, as plaintiffs argue, that [defendant] has succeeded in tying up the best, most efficient and cheapest source of supply" but still rejecting argument "that the antitrust laws require a firm to share with its competitors the fruits of its superior acumen and industry" which, "if accepted, would undermine the purpose of the antitrust laws which is to protect competition, not competitors").

[67] TreeHouse Compl. ¶ 141; DPP Compl. ¶ 4; McLane Compl. ¶ 2.

[68] Samantha Peskie, involved in R&D for the unfiltered product, testified that ██████████████████████

███████████.  (¶¶ 264-66.)  JBR does not allege any delay in launching.  (¶ 267.)  And, perhaps most important, Plaintiffs cannot establish that other competitors were delayed. Plaintiffs' experts offer no opinion that *any* other competitor was delayed in entering.  (¶ 268.) Some of the complaints also suggested competitors had limited capacity[69] but there is no genuine issue of fact as to this assertion, either.  (¶¶ 269-70.)  There is no evidence that there was any industry-wide shortage of capacity, and there is ██████████████████████

████████████████████████████████

████████████████████████████████

███████.  (¶¶ 271-72.)  There is no dispute that unlicensed competitors secured the inputs needed to expand sales from 300 million packs in 2012 to 2.5 billion packs in 2019, an increase of more than 800%.  (¶¶ 273-74.)  No jury could find for Plaintiffs on their input foreclosure claims on the undisputed record.

 ***Input Foreclosure: Brand Licenses.***  Plaintiffs' complaints alleged one last variant on their input foreclosure claims:  Keurig's agreements with brands foreclosed competitors from access to brand licensing deals they need to compete.[70]  But no plaintiff has defined a market for brand licensing.  (¶ 486.)  Plaintiffs cannot establish substantial foreclosure of a "market that has not been defined." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29 (1984).  Plaintiffs have not established that brands are a necessary input at all, or that Keurig's brand contracts

---

██████████  (¶¶ 263, 380.)  *Suchanek*, 764 F.3d 752 ("The defendants, Sturm Foods Inc., and TreeHouse Foods, Inc., wanted to enter the market for Keurig-compatible pods … but they jumped the gun in a way that the plaintiffs … believe was deceptive and in violation of the consumer protection laws of a number of states.").

[69] TreeHouse Compl. ¶ 44.

[70] TreeHouse Compl. ¶¶ 286-330; JBR Compl. ¶¶ 112-54; DPP Compl. ¶¶ 139-61; McLane Compl. ¶¶ 143-172.

foreclosed unlicensed pack competitors from competing in any market.[71]

The two Competitor Plaintiffs here both admittedly *chose* not to pursue brand licensing for their own business reasons.  TreeHouse is a private label company.  ███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████  (¶ 100.)  When opportunities arose to compete for a brand licensing deal, ██ ████████████████████████████████████████████████████ ███████████████████.  (¶¶ 275-76.)  JBR, for its part, declined to pursue brand licensing because JBR wanted to focus on its own brands.  (¶ 157.)

Nor did Plaintiffs establish a shortage of brands.  It is undisputed that there are thousands of brands available that can be used for coffee.  (¶ 277.)  Unlicensed competitors that wanted to license brands did so, including ███████████████████████████████████████ ███████████████████.  (¶ 281.)  Massimo Zanetti Beverages likewise bought or licensed various brands, including Chock Full o'Nuts, Hills Bros., and Kauai Coffee.  (¶ 282.)  Other competitors launched their own new brands.  (¶ 278.)  As a TreeHouse witness acknowledged, Amazon's ability to launch the successful "Happy Belly" brand shows the ease of turning almost any name into a new brand.  (¶ 280.)  And the record shows that brands can be created not just by traditional coffee roasters and retailers, but also by any restaurant, celebrity chef, movie star,

---

[71] Plaintiffs in their complaints also refer to Keurig's co-packing relationships, but have not defined a separate market for co-packing deals or explained any theory of foreclosure.  Co-packing deals primarily involve manufacturing products for a brand owner, typically with the brand owner handling the bulk of distribution.  (¶ 26.)  ████████████████████████████████████  (¶ 27.)  JBR generally refused to co-pack for others, and turned down nearly every brand that approached it, though it did have a rock star exception, and currently co-packs for Oakland Coffee, a brand created by the rock group Green Day.  (¶¶ 29-30.)

reality TV star, or rock star who wishes to do so.  (¶ 279.)  Plaintiffs cannot establish that competitors were foreclosed from necessary access to brands.  *See Susser*, 332 F.2d at 517-18 (exclusive supply agreements not unlawful where "plaintiffs failed to prove that they were foreclosed from alternate sources of supply"); *Paddock*, 103 F.3d at 44 (exclusive agreements between news distribution services and newspapers not unlawful where there "are hundreds, if not thousands, of [features]").  In short, Plaintiffs did not develop evidence that *any* pack competitor was foreclosed from competing due to lack of brands.  The Court should grant summary judgment for Keurig on all exclusive dealing claims.

### 3. Plaintiffs' Conspiracy Claims Fail Because Keurig's Relationships and Agreements Are Lawful

TreeHouse, JBR, and McLane claim that Keurig colluded with partner brands like Starbucks to maintain supracompetitive prices, restrict output, allocate markets, and exclude competition, in violation of Section 1 of the Sherman Act.[72]  Plaintiffs have two main conspiracy theories, neither of which can withstand summary judgment: (1) Plaintiffs say Keurig is manufacturing packs for partner brands, but these are ordinary vertical agreements; and (2) Plaintiffs say the brands conspired with one another in a "hub and spokes" conspiracy, but the record is utterly lacking in support for this theory.

At summary judgment on Section 1 conspiracy claims, the Supreme Court has explained that "antitrust law limits the range of permissible inferences from ambiguous evidence" and "conduct as consistent with permissible competition as with illegal conspiracy" is insufficient. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 588 (1986).  Or, as the Second Circuit put

---

[72] TreeHouse Compl. ¶¶ 45, 286, 301, 307, 572, 625-31; JBR Compl. ¶¶ 146-53, 297, 365; McLane Compl. ¶¶ 184, 308.  DPPs do not allege conspiracy claims.  *See* Keurig's Mot. to Dismiss DPPs' Compl. at p. 12 n.12, ECF No. 230; DPPs' Mem. of Law in Opp'n to Mot. to Dismiss, ECF. 251-52 ("DPP Opp'n to MTD") (not denying conspiracy claims abandoned); *In re Keurig*, 383 F. Supp. 3d at 241-46 (conspiracy was pleaded by JBR and TreeHouse).

it: "An antitrust plaintiff may not, therefore, in opposing a motion for summary judgment, rest on conclusory assertions of conspiracy when the defendants have proffered substantial evidence supporting a plausible and legitimate explanation of their conduct." *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 923 (2d Cir. 1985). Here, there is substantial evidence supporting a legitimate explanation for the challenged agreements: Keurig makes high quality packs at competitive prices. (¶ 25.) Plaintiffs thus cannot avoid summary judgment by asking the Court to infer collusion. Competitor Plaintiffs also lack standing to claim that a brand conspiracy raised pack prices, and Plaintiffs' cursory claim of conspiracies with counterparties other than brands (distributors, retailers, input suppliers) are attacks on vertical agreements that fail for lack of substantial foreclosure, as previously discussed.

**Dual-distribution is common and lawful.** Plaintiffs attack Keurig's agreements with partner brands like Starbucks, under which partners used Keurig to manufacture K-Cups for them. ████████████████████████████████████ (¶ 19.), ████████████████ ████████████████████████ (¶ 20.). These are classic dual distribution agreements, which are common and lawful vertical arrangements. *See, e.g., Elecs. Commc'n v. Toshiba*, 129 F.3d 240, 243-44 (2d Cir. 1997) (vertical agreements are not *per se* illegal conspiracies "even if the distributor and manufacturer also compete at the distribution level, where, as here, the manufacturer distributes its products through a distributor and independently (so-called 'dual distribution' arrangements)").[73]

Plaintiffs say these dual distribution agreements are *per se* illegal horizontal agreements

_____

[73] *Accord Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 302 (E.D.N.Y. 2001), *aff'd* 35 F. App'x 29 (2d Cir. 2002) ("A manufacturer … which sells its own products at the same market level as other corporations selling the manufacturer's products under their own names is said to be acting as part of a 'dual distributorship.").

because they prevent partner brands from competing.[74] 

(¶¶ 28, 141.)  Moreover, Plaintiffs' allegations that partner brands do not compete with Keurig are not supported by the discovery record, which shows that partner brands compete aggressively for sales.  (¶¶ 22-24.) Co-packing agreements, like the ones that Keurig had with its partners and ████████████

████████████████████████████████████████████████████████████████

██████████████, and other compatible pack manufacturers have with their co-packing partners all result in more brands for consumers to choose from, more efficient distribution, more efficient and lower cost manufacturing, and more competition.

A firm like Starbucks or Dunkin' or Community Coffee or Gaviña can make its own "make vs. buy" decision, and decide if it wants to license its brand, build new manufacturing facilities, or pay a tolling fee for another firm to manufacture a product for it to sell under its own brand.  (¶ 32.)[75]  And, likewise, a company can decide to handle its own distribution in some channels where it is well positioned and have another firm handle its distribution in other channels.  *Beyer Farms*, 142 F. Supp. 2d at 304-305 (E.D.N.Y. 2001) (dismissing Section 1 claim attacking "agreement between [co-manufacturer and customer] not to compete for certain routes").  (¶ 35.)  Plaintiffs took discovery of numerous brand partners and every one of them said ███████████████████████████████████████████████████████████

---

[74] TreeHouse Compl. ¶ 287; TreeHouse Opp'n to MTD at 25-26, ECF No. 254; JBR Compl. ¶ 118; JBR Opp'n to MTD at 21-22, ECF No. 253; McLane Compl. ¶¶ 144, 324.

[75] ████████████████████████████████████████████████████████████████████
████████████████████████████████████  (¶ 33.)  As to tolling fees in particular, ██.
(¶ 34.)

███████████████.  (¶ 31.)

Plaintiffs' conclusory assertion of a brand conspiracy cannot withstand summary judgment.  *AD/SAT v. Associated Press*, 181 F.3d 216, 235 (2d Cir. 1999) (summary judgment for defendants because conduct was as consistent with "legitimate, independent business interests as with an illegal combination in restraint of trade").  Brands had independent interests in working with Keurig.  (¶ 31.)  Plaintiffs cannot show evidence that tends to exclude procompetitive conduct, and this warrants summary judgment.  *Matsushita*, 475 U.S. at 588.[76]

***Relabeling the same conduct a "hub and spoke conspiracy" adds nothing.***  Nor can Plaintiffs survive summary judgment by restyling these same allegations as a hub-and-spoke conspiracy.[77]  "[A] hub-and-spoke theory is cognizable under Section 1 only if there are both vertical agreements between the hub and each spoke, and also a horizontal agreement among the various spokes with each other."  *In re Keurig*, 383 F. Supp. 3d at 242-43 (quotation omitted).  Here, brands testified that ████████████████████████████████ ██████████████████████████████████████████████████████████████.

Plaintiffs have failed to adduce evidence of agreement among any alleged "spokes."  Plaintiffs cannot show, for example, that Steven Oakland at Smucker (its CEO during the relevant period)

---

[76] Plaintiffs have argued that Keurig communicating with its co-manufacturing partners is proof of conspiracy, but communications are necessary between two firms engaged in business to manufacture a product, and courts do not interpret such conversations as evidence of conspiracy.  *See H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 672 F. Supp. 724, 737 (S.D.N.Y. 1987) (rejecting antitrust claims and noting "it [is] inevitable that a certain amount of information-sharing will exist between a manufacturer and its distributors"); *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 806 F.2d 722, 726 (7th Cir. 1986) ("In any chain of distribution discussions of price will be frequent—and … beneficial too.").

[77] Because Plaintiffs cannot establish a Section 1 conspiracy, their conspiracy to monopolize claims necessarily fail.  *See In re Zinc Antitrust Litig.*, 155 F. Supp. 3d. 337, 383 n.40 (S.D.N.Y. 2016) (noting "great deal of redundancy between conspiracy claims brought under Sections 1 and 2"); *In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2418333, at *13 (S.D.N.Y. June 14, 2021) (dismissing conspiracy to monopolize claims "for the same reason [as] claims brought under § 1" because "courts routinely apply the same analysis under both Sections 1 and 2.").

conspired with Howard Schultz at Starbucks.  (¶¶ 333-34.)  ████████████████████

████████████████████████████████████████████████████████

(¶¶ 230-31, 241.)  There is no evidence Community found using Keurig attractive only if other brands used Keurig, or that it was in constant communication with other brands regarding its negotiations with Keurig, or that Keurig coordinated phone calls between all of the brands to persuade them collectively to sign with Keurig.  *Cf. United States v. Apple*, 791 F.3d 290, 316-19 (2d Cir. 2015) (concluding based on extensive communications between publishers about whether to all sign up with Apple simultaneously that there was sufficient evidence to infer a hub-and-spoke conspiracy).  Plaintiffs have nothing close to the evidence required to support a hub-and-spoke conspiracy.

*Plaintiffs Also Lack Standing To Pursue These Conspiracy Claims.*  TreeHouse and JBR also lack standing to pursue the alleged conspiracy claims.  A competitor can *never* "recover damages for any conspiracy . . . to charge higher than competitive prices … [because competitors] stand to gain from any conspiracy to raise the market price."  *Matsushita*, 475 U.S. at 582-83.  If Keurig and the brands had actually conspired and raised prices, restricted output, or allocated markets, TreeHouse and JBR would have benefitted.  Thus they lack standing to pursue these brand conspiracy claims.  *Brunswick Corp.*, 429 U.S. at 489.

*Keurig's Relationships With Other Business Partners Are Lawful Vertical Relationships.*  Plaintiffs make a final, cursory claim that Keurig's agreements with distributors, retailers, and input suppliers are horizontal conspiracies to refuse to do business with unlicensed pack manufacturers in violation of Section 1.  These horizontal theories fail because each such arrangement is vertical.  *Elecs. Comm'cns Corp.*, 129 F.3d at 243.  And, as challenges to vertical exclusive agreements, the claims fail for the reasons previously discussed.  *See supra* Section

I.C.2.  In a record with 10 million documents, Plaintiffs point to ██████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████.  (¶ 336.)  ████████████████████████████

████  is a very long way from the level of evidence required to survive a motion for summary

judgment.  *H.L. Hayden Co. of New York*, 672 F. Supp. at 738 (S.D.N.Y. 1987) ("[N]ot only are

dealer complaints insufficient, standing alone, to raise an inference of conspiracy, but a

manufacturer's actions '*in response to*' such complaints are also insufficient.  Unilateral action,

even if it is in response to dealer complaints, does not constitute a section 1 violation.");

*Culberson v. Interstate Elec. Co.*, 821 F.2d 1092, 1093-94 (5th Cir. 1987) (summary judgment

for defendant where distributors had coordinated with other distributors to complain to a

manufacturer about subdistribution policy).  Plaintiffs received vast discovery in this case and do

not have the evidence required for conspiracy claims to proceed past summary judgment.

### 4.   Plaintiffs' Attempts to Recast Other Claims as Tying Fail Because Brewers and Portion Packs Were Sold Separately

Plaintiffs restyle some of their other claims as unlawful tying:  First, they allege that the

2.0 Brewer "technologically t[ied] the purchase of K-Cups to the purchase of K-Cup Brewers."[78]

Second, TreeHouse and JBR claim Keurig's KAD agreements with AFH distributors are

unlawful ties.[79]  Both versions of this claim fail.  The law of tying requires, among other things,

---

[78] DPP Compl. ¶ 226; McLane Compl. ¶ 260 (similar); JBR Compl. ¶ 339 (similar); and TreeHouse Compl. ¶ 618 (similar).

[79] TreeHouse Compl. ¶¶ 612, 617; JBR Compl. ¶¶348, 353.  TreeHouse and JBR also alleged that Keurig's agreements with its suppliers and retailers are illegal ties.  TreeHouse Compl. ¶ 612; JBR Compl. ¶ 348.  TreeHouse alleges the same for Keurig's agreements with branded partners.  TreeHouse Compl. ¶ 129.  Plaintiffs appear to have abandoned these theories, and there is no tying present in these relationships.  Plaintiffs also allege a tying theory as part of their patent misuse claims.  That is invalid because there is no tying of two products there, either.  *See infra* Section I.C.6.

"a tying and a tied product," evidence the seller "forced the buyer to accept the tied product" which was not available separately; market power in the tying product, and anticompetitive effects. *Yentsch v. Texaco, Inc.*, 630 F.2d 46, 56-59 (2d Cir. 1980) (judgment for defendant on tying claim where there was insufficient evidence of tying product market power); *De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir. 1996) (same elements under Clayton Act Section 3); *Charych v. Siriusware, Inc.*, 790 F. App'x 299 (2d Cir. 2019) (similar under Sherman Act Section 2). Plaintiffs' claims fail on all elements.

      **Claims that the 2.0 Brewer "Technologically Tied" Fail.** Plaintiffs' claim that Keurig technologically tied the 2.0 Brewer to K-Cups is without merit. The law on product design applies, and there was no coercion of consumers to buy the 2.0 Brewer in the first place. Moreover, it is undisputed that *unlicensed packs worked in the 2.0 Brewer*. (¶ 135-36, 291.) *See Foremost*, 703 F.2d at 542-43 (dismissing tying claim in absence of coercion); *cf. Apple iPod iTunes Antitrust Litig.*, 2009 WL 10678940, at *5-6 (N.D. Cal. Oct. 30, 2009) (judgment for defendant because "consumers remained free at all times to purchase one or the other without purchasing both"). These claims also fail because the alleged tying product, the 2.0 Brewer, did not have "sufficient economic power … to appreciably restrain free competition in the market for the tied product." *Jefferson Parish Hosp.*, 466 U.S. at 34. Economic power must be significant. *Grappone v. Subaru of New England*, 858 F.2d 792, 796 (1st Cir. 1988) (Breyer, J.) (reversing judgment for plaintiffs because plaintiffs "have not provided evidence that [defendant] could raise prices significantly above the competitive level"). Keurig did not have market power in single-serve brewers at all, *see supra* Section I.B.1., and certainly the 2.0 Brewer did not have "significant" market power. There are many non-Keurig brewer manufacturers (¶¶ 63, 65-67.), Keurig continued selling 1.0 brewers at all times so consumers always had the choice to buy a

1.0 brewer instead of a 2.0 (¶ 10.), the 2.0 was sold at or near cost (¶ 71.), when 2.0 brewers were introduced there was already an existing installed base of ████████ 1.0 brewers (¶ 11.).██ ████████████████████████████████████████████████████████ (¶ 12.), and Keurig decided to discontinue the 2.0 in 2017 because consumers did not buy it in sufficient quantities to justify continuation (¶ 13.).  *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 417-23 (S.D.N.Y. 2005) (summary judgment for defendant where evidence of market power in tying good was lacking).

     ***Keurig's Agreements With Distributors Are Not Unlawful Ties***.  TreeHouse and JBR press the theory that "Keurig Authorized Distributor" contracts are unlawful ties.[80]  There is no tie, and Plaintiffs also cannot show the requisite coercion, market power, or anticompetitive effects.  "[N]o tying arrangement exists if there is freedom to choose whether to buy the two products separately or as a unit."  *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1325 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987).  The challenged provisions apply only to distributors who *choose to become Keurig Authorized Distributors in order to take advantage of the benefits* of being an authorized distributor, including subsidized brewers.

     Plaintiffs' "tying" claims fail as a matter of law.  Plaintiffs seem to be arguing that the tying product is the brewer.  But a distributor is free to choose not to be a KAD and to purchase Keurig brewers and packs separately elsewhere, including from Keurig.com, third-party websites, or stores.[81]  (¶ 6, 50.)  Former KADs testified that, ███████████████████ ██████████████████████████████████████████████.  (¶ 50.)  As one distributor explained it, █████████████████████████████████████████

---

[80] *See* TreeHouse Compl. ¶¶ 612, 617; JBR Compl. ¶¶ 348, 353.

[81] This includes commercial brewers like the K3000, which has been available on Amazon since at least 2012, and commercial brewers on Keurig.com as reflected in Keurig's sales data.  (¶ 51.)

████████████████████████████████████████

███████████████████████████ (¶ 50.)  The separate availability of purportedly tied goods

warrants summary judgment for Keurig.  *Nobel Sci. Indus.*, 670 F. Supp. at 1325 (summary

judgment for defendant on tying claim where "the items could be bought separately" from the

defendant or other suppliers); *Amerinet v. Xerox*, 972 F.2d 1483, 1500-01 (8th Cir. 1992)

(summary judgment for defendant on tying claim where customers could buy alleged tying

product separately).[82]

What Plaintiffs complain about is a distributor choice, not a tie.  Other brewing systems

selling to AFH distributors provide similar discounts for their systems.  (¶ 47.)

Moreover, a purported tie that applies only to distributors is not actionable if end

customers have other ways to purchase the allegedly tied product.  "Ties that constrain only

dealers … create relatively little danger to competition, provided consumers may purchase the

two goods separately."  *Roy B. Taylor*, 28 F.3d at 1383; *see Smith Mach. Co. v. Hesston Corp.*,

878 F.2d 1290, 1294, 1297 (10th Cir. 1989) (summary judgment for defendant on tying that

affected only dealers).  Here, AFH customers can purchase brewers and packs separately from a

variety of sources including retail stores and online.  (¶ 6, 48-49.)

Plaintiffs cannot establish that Keurig has significant market power in the tying product

(whether that is supposedly single-serve brewers, AFH single-serve brewers), because Keurig

did not "raise price and restrict output."  *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir.

2016) (dismissing tying claim that failed to plausibly allege market power).  Keurig sells brewers

to AFH distributors at low prices.  *U.S. Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610,

---

[82] For this same reason, the tying claims also fail if Plaintiffs change course and argue that the tying
product is K-Cups and the tied products are brewers.

621-22 (1977) (reversing judgment for plaintiff and rejecting inference of market power where "the evidence merely shows that [the alleged tying product is] unique because the seller is willing to accept a lesser profit … than its competitors").  It is also undisputed that there are many competing AFH single serve brewers, including Flavia, Grindmaster, Newco, bean to cup single-serve brewers, and others, and Plaintiffs cannot establish significant barriers to entry. (¶ 40, 63.)  *Nobel Sci. Indus.*, 670 F. Supp. at 1328 (holding that defendant did not have market power where there were "many machines that are interchangeable" with the defendant's).

Nor can Plaintiffs show anticompetitive effects.  *In re Wireless*, 385 F. Supp. 2d at 424 (summary judgment for defendants on independent ground that plaintiffs failed to "demonstrate that the tie as it actually operates in the market harmed competition").  "To prevent recovery of windfall damages, injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined market value."  *Freeland v. AT&T Corp.*, 238 F.R.D. 130, at 150 (S.D.N.Y. 2006).[83]  Plaintiffs have not attempted to show that the price of the allegedly tied products—brewers and packs—exceeds the combined individual prices.  *Fortner*, 429 U.S. at 618 (even "[p]roof that [plaintiff] paid a higher price for the tied product is consistent with the possibility that the [tying product] was unusually inexpensive and that the price for the entire package was equal to, or below, a competitive price").  None of Plaintiffs' experts analyze this issue, and Plaintiffs have not developed evidence on it.  *Freeland*, 238 F.R.D. at 150 (faulting expert report where "there is no way to know … whether the increases in [the tied product] price, assuming they are real, have not been offset by a reduction

---

[83] This unmet requirement also shows Plaintiffs' failure to show market power, because "the best way" to plead market power in a tying case "is to allege facts that, if proven, 'establish directly that the price of the tied package is higher than the price of components sold in competitive markets.'"  *Kaufman v. Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016) (quoting *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 671-72 (7th Cir. 1985) (Easterbrook, J.) (holding that tying claim should not have gone to jury)).

in the price of [the tying product]").  The Court should grant summary judgment in Keurig's

favor on any remaining tying claims.

**5.      Plaintiffs' Sham Litigation Claims Fail Because the Prior Suits Were Not Baseless, and No Antitrust Injury Resulted**

Keurig has a constitutional right to defend its intellectual property through litigation.  To

protect this right, there is a high bar for antitrust claims based on alleged sham litigation:

"Those who petition government for redress are generally immune from antitrust liability."

*Professional Real Est. Inv., Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49, 56 (1993) ("*PRE*").

Here, Plaintiffs' sham litigation claims fail for two reasons.

First, Plaintiffs cannot meet their burden of proving the *Sturm* and *Rogers* suits were

"objectively baseless in the sense that no reasonable litigant could realistically expect success on

the merits."  *PRE*, 508 U.S. at 60; *In re Elysium Health.*, 354 F. Supp. 3d 330, 336 (S.D.N.Y.

2019) (plaintiff bears burden to prove suit was baseless).  Baselessness considers what a

reasonable litigant would expect at the time a case was brought—not after the fact, under the

scrutiny of hindsight.  *PRE*, 508 U.S. at 64-65.  A suit is not baseless if it "was arguably

'warranted by existing law' or at the very least was based on an objectively 'good faith argument

for the extension, modification, or reversal of existing law.'"  *Id.* at 65 (quoting Fed. R. Civ. P.

11).  Plaintiffs attack Keurig's patent claims that TreeHouse and JBR infringed its patented

brewing methods by selling compatible packs, but in both cases those claims turned on the

defense of exhaustion, which is a quagmire even the nation's foremost patent experts—the

Federal Circuit Court of Appeals—could not readily navigate.  Discovery Order, ECF No. 1166

at 7 (Magistrate Judge Cave noting "patent law jurisprudence is not without examples of the

reversal of long-standing precedent").  Baselessness also turns on whether a lawsuit in its

entirety is a sham, not whether some claims ultimately failed.  *Twin City v. Astra*, 207 F. Supp.

66

2d 221, 224 (S.D.N.Y. 2002); *Avaya v. Telecom Labs*, 838 F.3d 354, 414 (3d Cir. 2016).  Here, Keurig obtained a favorable settlement on all non-patent claims in *Sturm*.  For both reasons, the suits were not baseless.[84]

Second, Plaintiffs' claims independently fail for lack of antitrust injury.  *PRE*, 508 U.S. at 61.  TreeHouse and JBR did not exit the market after the suits were filed.  The courts did not enjoin their sales.  To the contrary, both companies' sales grew.  And both TreeHouse and JBR admit that ███████████████████████████████████████████.  The Court should grant summary judgment for Keurig on Plaintiffs' sham litigation claims.

i.    **The Litigation Conduct of the Parties in Sturm and Rogers Demonstrates That Keurig's Claims Were Not Baseless**

Keurig asserted nine non-patent claims in *Sturm*, including a claim that TreeHouse advertised its packs as offering high-quality freshly-brewed coffee when in fact they contained instant coffee.  (¶ 378.)  Consumers later brought similar false advertising claims against TreeHouse, which TreeHouse paid to settle.  (¶ 379.)  The court in *Sturm* decided all non-patent summary judgment motions in Keurig's favor.  (¶¶ 385-86.)  ███████████████████ ███████████████████████████████████████████████████████ ███████████████████████.  (¶ 387.)  "[S]ettlement of a purportedly objectively baseless lawsuit constitutes a favorable outcome" and "insulates the activity from application of the sham exception."  *Elysium*, 354 F. Supp. 3d at 337-38; *see also In re Fresh Del Monte Pineapple*, 2007 WL 64189, at *19 (S.D.N.Y. Jan. 4, 2007) (settlement is not "consistent with plaintiffs' contention [that the] lawsuit, or any of its claims, was a sham").

---

[84] The suits also were not subjectively baseless, but the Court need not address that.  *PRE*, 508 U.S. at 60 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.").

The district court granted summary judgment for TreeHouse on Keurig's patent claims. (¶ 384.)  In a precedential opinion, the Federal Circuit affirmed.  (¶¶ 388-89.)  The Court rejected Keurig's position, but did not call it baseless or anything close to it.  Judge O'Malley concurred in judgment only and, importantly, agreed with Keurig's position on a central issue Keurig advanced with amicus support from a prominent Patent Law Association.  (¶¶ 392, 407-08.)  The panel's decision to issue a precedential opinion indicates the case was complex or important— for example, because it raised an issue that had not been decided, as TreeHouse's counsel conceded at oral argument.  (¶¶ 390-91.)  Nothing in the record suggests the litigation was baseless.  *Cf.* ECF No. 1166 at 6-7 (Judge Cave observing that "Keurig's lawsuit against TreeHouse … survived a motion to dismiss, involved cross-motions for summary judgment, and an appeal to the Federal Circuit that resulted in a signed opinion.").

As to JBR, Keurig sued on three patents, only one of which it had asserted in *Sturm*. (¶¶ 394-96.)  The court granted summary judgment for JBR, but said the case raised a "recent, but not entirely novel, inquiry" citing only the *Sturm* district court opinion as similar.  (¶ 398.) Keurig appealed as to the '488 Patent (asserted in *Sturm*) and the '362 Patent, but promptly withdrew its appeal as to the '488 Patent after the Federal Circuit's *Sturm* decision, and the *Rogers* appeal proceeded only as to the '362 Patent. (¶¶ 399-401.)  The Federal Circuit affirmed. (¶ 402.)[85]  Nothing in the record suggests Keurig's claims against JBR were baseless.[86]

---

[85] That the court "decided to affirm without opinion under Rule 36 has no bearing on the strength or weakness" of a party's legal position.  *Innovation Sciences, LLC v. Amazon.com, Inc.*, 842 F. App'x 555, 558 (Fed. Cir. 2021).

[86] Neither TreeHouse nor JBR sought attorneys' fees under 35 U.S.C. § 285 (¶ 416), despite saying their fees were "substantial."  JBR Compl. ¶ 323, TreeHouse Compl. ¶¶ 42-43, 236.  Reasonable fees are available to a prevailing party under 35 U.S.C. § 285 for "objectively baseless" litigation brought with "subjective bad faith."  *Brooks v. Dutailier*, 393 F.3d 1378, 1381-82 (Fed. Cir. 2005), *abrogated by Octane Fitness v. ICON*, 572 U.S. 545, 554 n.6, 555 (2014) ("objective unreasonableness" and "subjective bad faith" remain relevant factors for a Section 285 fee award).  That neither company sought, much less

### ii.        Key Patent Law Issues Were Unsettled At the Time

Under the Supreme Court's *Noerr-Pennington* doctrine, a litigant has antitrust immunity when it petitions for relief even where its legal position is not squarely endorsed by precedent. *PRE*, 508 U.S. at 65 (litigant may sue if it "could have perceived some likelihood of success."); *In re Keurig*, 2021 WL 621222, at *5 (S.D.N.Y. Feb. 16, 2021) ("[T]here is nothing that prevents a litigant from attempting to prevail on a novel litigation strategy in different courts, as Keurig did.").  When the law is unsettled, *Noerr-Pennington* immunity is especially important to preserve a litigant's freedom to defend its rights.  *PRE*, 508 U.S. at 64-65; *cf. AstraZeneca v. Mylan Labs.*, 2010 WL 2079722, at *4 (S.D.N.Y. May 19, 2010).  When Keurig litigated *Sturm* and *Rogers*, the law of patent exhaustion (the basis of TreeHouse and JBR's affirmative defense) was unsettled, and it continued to evolve after the litigations ended.  The Federal Circuit recognized exceptions to the prohibition against post-sale restrictions on use of a patented product, and, before 2008, had held for two decades that sale of an article, like brewers, could *never* exhaust a patent method claim like the brewing method claims Keurig asserted.  *See LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1370 (Fed. Cir. 2006) ("[T]he sale of a device does not exhaust a patentee's rights in its method claims."); *Glass Equip. Dev., Inc. v. Besten, Inc.*, 174 F.3d 1337, 1341 n.1 (Fed. Cir. 1994) ("first sale doctrine is inapplicable" to method claims); *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 924 (Fed. Cir. 1984).

When the Supreme Court issued its landmark ruling in *Quanta Computer. v. LG Electronics*, 553 U.S. 617 (2008), it had been 66 years since the Court's last guidance on patent

---

prevailed in obtaining, Section 285 fees is probative of the sham litigation claims.  *In re Terazosin*, 335 F. Supp. 2d 1336, 1358-59 (S.D. Fla. 2004).

exhaustion.  (¶ 403.)[87]  The Court reversed the Federal Circuit and held that the sale of an article may exhaust a patented method if the article "substantially embodies" the method because the article "ha[s] no reasonable noninfringing use and include[s] all the inventive aspects of the patented methods."  *Id.* at 638.  After TreeHouse and JBR raised exhaustion as a defense, Keurig argued that, under *Quanta*, the sale of brewers did not exhaust method claims if the brewers had reasonable noninfringing uses.  Keurig showed that its brewers were capable of use that would not practice the inventive piercing steps of its brewing methods, for example when brewing ground coffee using a reusable "My K-Cup" insert, and indeed the brewer alone could not perform the piercing step, which required a cup to pierce.  (¶¶ 393, 404.)  TreeHouse and JBR argued the substantial embodiment test did not apply because a brewer is a "complete" article.  But *Quanta* does not say the test applies only when a patent holder sells an "incomplete" article, the *Rogers* court explicitly recognized that neither the Supreme Court nor the Federal Circuit had "addressed … at what point a product becomes 'complete.'"  (¶ 405.)  Keurig's claims also raised another unsettled issue as to whether exhaustion turns on specific patent claims or the patent as a whole because some claims (like the piercing step) were clearly not exhausted with the sale of the brewer.[88]  (¶ 406.)  In *Sturm*, the Boston Patent Law Association (over TreeHouse's objection) submitted an amicus brief arguing exhaustion should be analyzed claim-

---

[87] Amicus Br. of the United States at 6, *Quanta* ("Since this Court last squarely addressed the doctrine in [the 1942 *Univis* case], the doctrine has evolved in the Federal Circuit in a manner that appears to conflict with this Court's patent-exhaustion cases, thereby creating uncertainty" for litigants).

[88] Several courts had applied patent exhaustion using a claim-by-claim analysis, and Keurig relied on those opinions.  *See, e.g.*, Br. of Plaintiff-Appellant Keurig, Inc. at 29-31, *Keurig v. Sturm.*, No. 2013-1072 (Fed Cir. 2013), ECF No. 19.  Federal Circuit precedent also held that "each claim must be considered as defining a separate invention."  *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984).  Keurig argued that, unlike *apparatus* claims, Keurig's inventive *method* claims were not exhausted with the sale of the brewer.  Keurig's reading of the scope of *Quanta* was by no means baseless in light of the consistent limitations the Federal Circuit had placed on the exhaustion doctrine, including in a post-*Sturm* case.  *Lexmark Int'l. v. Impression Prods.*, 816 F.3d 721, 726 (Fed. Cir. 2016), *overruled by Impression Products, Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523 (2017).

by-claim as Keurig said.  (¶¶ 407-08.)  When the opinion issued, Judge O'Malley wrote

separately and noted the merit of Keurig's argument.  *Sturm*, 732 F.3d at 1375 (O'Malley, J.,

concurring in judgment) ("There could be instances where assessing exhaustion on a claim-by-

claim basis—the same way we conduct almost every analysis related to patent law—would be

necessary and appropriate.").

     Keurig's argument in *Rogers* was also governed by new law.  In *Egyptian Goddess, Inc.

v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc) the Federal Circuit held that infringement

of a design patent turns on "whether an ordinary observer, *familiar with the prior art*, would be

deceived into thinking that the accused design was the same as the patented design."  *Id.* at 672

(emphasis added).  The court explained: "If the accused design has copied a particular feature of

the claimed design that departs conspicuously from the prior art, the accused design is naturally

more likely to be regarded as deceptively similar to the claimed design, and thus infringing."  *Id.*

at 677.  Keurig identified similarities between features of its patented design and JBR's OneCup

that departed significantly from the prior art.  (¶ 409.)  The district court agreed there were

similarities, but chose not to consider prior art and held JBR did not infringe.  (¶¶ 410-11.)  In

light of *Egyptian Goddess*, it was reasonable to argue the court should consider prior art, and

reasonable to expect possible success: even JBR's patent expert agreed OneCups and Keurig's

patented design had elements "in common that are not reflected in [prior art]."  (¶ 412.)

     Plaintiffs suffer from the fallacy of hindsight:  While Keurig's arguments did not prevail,

that does not mean they were baseless when made.  Patent law is complex, as Plaintiffs' experts

concede.  (¶ 413.)  Judges often disagree.  (¶ 414.)  When the Supreme Court issues a landmark

opinion like *Quanta*, there is uncertainty as to how lower courts will apply it.  (¶ 415.)  Here, the

Court articulated a new test for exhaustion, but did not limit its application as TreeHouse and

JBR argued it should be limited.  Allowing antitrust suits against a litigant for not correctly divining how new law will be applied would immeasurably chill the rights of patent holders. *Octane Fitness*, 572 U.S. at 556 (the purpose of the *Noerr-Pennington* doctrine is to "avoid chilling the exercise of the First Amendment right to petition the government"); *Mercatus v. Lake Forest*, 641 F.3d 834, 847 (7th Cir. 2011) (courts must "not transform the Sherman Act into a means by which to chill vital conduct protected under the First Amendment").  A reasonable litigant could have expected to win.

### iii.    The Litigations Did Not Cause Antitrust Injury

Plaintiffs' sham claims separately fail because Plaintiffs were not excluded from the market and the litigation costs they incurred are insufficient to create antitrust injury.  *Brunswick Corp*, 429 U.S. at 489.  TreeHouse and JBR cannot claim the litigations prevented or delayed their entry.  *Cf. Am. Banana v. J. Bonafede Co.*, 407 F. App'x 520, 523-24 (2d Cir. 2010) (no antitrust injury where alleged conduct did not delay market entry).  In fact, both entered before the suits and continued to sell portion packs at all times.  (¶ 417.)  Plaintiffs' allegations were deemed sufficient on Keurig's motion to dismiss, presumably as the impact on competition was a factual issue.  *In re Keurig*, 383 F. Supp. 3d at 233 (citing *Bio-Tech v. Genentech*, 886 F. Supp. 377, 380 (S.D.N.Y. 1995)).  But, at summary judgment, the undisputed facts do not support antitrust injury.  TreeHouse claims it had litigation costs, but that is not harm to overall competition.  It is now undisputed that ███████████████████████████████ ████████.  TreeHouse says it spent █████████ in legal fees in *Sturm* but admits ███ ███████████████████████████████████████████████████████████ ███████████████████  (¶¶ 418-19.)  JBR incurred less than █████████ in legal fees in *Rogers* and admits ███████████████████████████.  (¶¶ 420-21.)  Neither has shown antitrust injury.  *Viacom v. TCI.*, 1994 WL 561377, at *5 (S.D.N.Y. Oct. 12, 1994); *Huawei v.*

*Samsung*, 340 F. Supp. 3d 934, 956 (N.D. Cal. 2018) (summary judgment for lack of antitrust injury as litigation costs only harm a competitor, not consumers); *AstraZeneca v. Glenmark*, 2014 WL 5366050, at *1 n.1 (D. Del. Oct. 9, 2014) (defense of "patent infringement lawsuit is purely personal and cannot establish an antitrust injury on its own").  And, because the suits did not affect competitors' variable costs, DPPs and McLane cannot show overcharges caused by the litigations.  *In re Wellbutrin XL*, 868 F.3d 132, 164-65 (3d Cir. 2017) (summary judgment for defendant because purchasers "must show that the harm they say they experienced—[higher prices]—was caused by the" challenged litigation).  TreeHouse also makes a last ditch argument that it lost some sales opportunities but lacks admissible evidence supporting that claim and, again, losing a few sales opportunities is harm to a single competitor, not harm to competition. *See, e.g.*, *Anderson News*, 899 F.3d at 115 (summary judgment on claims for "lost profits from sales [competitor] would have made" for lack of antitrust injury).

### 6.   Plaintiffs' Patent Misuse Claims Fail Because No Patent Is Asserted

Plaintiffs' patent misuse claims fail as a matter of law for multiple reasons.[89]  First, patent misuse is a *narrow equitable defense* that provides limited relief: a declaration that a specific asserted patent is unenforceable until its misuse is "purged."  *B. Braun Med. v. Abbott Labs.*, 124 F.3d 1419, 1427 (Fed. Cir. 1997).  Patent misuse can only arise when patents are being asserted, and the party raising the doctrine seeks to prevent enforcement of the patent in suit.  *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1329 (Fed. Cir. 2010) ("There is no such thing as 'misuse in the air.'  The misuse must be of the patent in suit") (quotation omitted); *Max Impact v.*

---

[89] Only TreeHouse and JBR assert patent misuse.  *See* TreeHouse Compl. ¶¶ 603-10; JBR Compl. ¶¶ 332-37.

*Sherwood*, 2011 WL 507600, at *5 (S.D.N.Y. Feb. 14, 2011) (rejecting misuse claim seeking damages).  Here, there is no patent being asserted, thus no patent misuse.

Second, even if Plaintiffs were defending a patent case and asking that the patent in suit be declared invalid, this would fail for lack of misuse.  Plaintiffs said Keurig extended its brewer patents by tying brewers to K-Cups, but the facts do not support this.  *See infra supra* Section I.C.4.  And even tying is not patent misuse merely because a patented product is involved.  Rather, the courts generally require a specific type of tying through conditioning of a license to the patent in suit on purchase of a separate product.  *Princo*, 616 F.3d at 1331-34 (patent misuse applies where "conditions have been placed *in patent licenses* to require licensees to agree to anticompetitive terms going beyond the scope of the patent grant") (emphasis added).  There is no such patent licensing condition here.

Third, Plaintiffs cannot state a patent misuse defense by relabeling faulty sham litigation claims.  Where, as here, a misuse claim is based on an infringement suit that ended, "any alleged misuse has already been purged and … claims for unenforceability no longer provide grounds for relief."  *Nationwide v. Steel City*, 2021 WL 982867, at *4 (E.D.N.Y. Feb. 16, 2021); *H-W Tech. v. Overstock.com*, 973 F. Supp. 2d 689, 697 (N.D. Tex. 2013) (collecting cases).[90]

### 7.    Plaintiffs' Claims Based on Old Acquisitions Fail for Lack of Timeliness, Standing, and Merit

DPPs and McLane assert that Keurig's acquisitions of four coffee roasters back in 2009 and 2010—Tully's, Timothy's, Diedrich, and Van Houtte—were anticompetitive.[91]  These

---

[90] The suits at issue never included a patent misuse defense in the first place, nor could they have as the suits were not a sham.  35 U.S.C. § 271(d) ("No patent owner … shall be … deemed guilty of misuse … [for seeking] to enforce his patent rights against infringement"); *Signify N. Am. Corp. v. Reggiani Lighting USA, Inc.*, 2020 WL 1331919, at *8-9 (S.D.N.Y. Mar. 23, 2020) (striking patent misuse defense where suit was not a sham).

[91] TreeHouse and JBR have not stated a claim as to acquisitions, describing them only in passing.  *See* TreeHouse Compl. ¶¶ 201-03; JBR Compl. ¶¶ 155-57.  As competitors, TreeHouse and JBR lack standing

roasters were part of Keurig's system at the time of the transactions.  Plaintiffs' position is that, but for the acquisitions, the roasters would have abandoned the Keurig system when Keurig's short filter patent expired in 2012 and thus were "potential competitors."[92]  But the claims related to Tully's and Timothy's are time-barred.  The statute of limitations for civil antitrust claims is four years.  15 U.S.C. § 15b.  The Tully's and Timothy's acquisitions closed in March and November 2009.  (¶ 36.)  The first DPP action was filed more than four years later on March 10, 2014.  (¶ 180.)  *Z Techs. v. Lubrizol*, 753 F.3d 594, 598-99 (6th Cir. 2014) (suit time barred because "in a merger-acquisition case … the cause of harm is the merger itself").

The claims also fail because there are no facts supporting Plaintiffs' speculative theory that any of these transactions substantially reduced competition.  To the contrary, there has been extensive entry since 2012, precluding any claim that these roasters were unique potential competitors.  Plaintiffs say, absent the acquisitions in 2009 and 2010, these four roasters would decide in 2012 to sell unlicensed packs.[93]  That is, Plaintiffs argue the deals would have had anticompetitive effects starting years after they closed.  Plaintiffs have done nothing to support this theory.  To challenge an acquisition of a potential competitor, a plaintiff must show, among other things: (1) entry of the potential competitor was likely, (2) few other firms could enter, and (3) the competitor's entry would have "a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects."  *Tenneco v. FTC*, 689

---

to challenge acquisitions.  *Brunswick v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 487-88 (1977) (barring competitor's antitrust claims because injury from rivals' merger was "not of the type that [antitrust law] was intended to forestall") (quotation omitted); *Matsushita*, 475 U.S. at 583 (conduct that increases prices or limits output "actually *benefit[s]* competitors by making supracompetitive pricing more attractive").

[92] *See* DPP Compl, ¶¶ 15, 122-24; McLane Compl. ¶¶ 15, 126-28.

[93] DPP Compl. ¶¶ 15, 122-23 (alleging that Keurig acquired licensed roasters to "eliminat[e] potential competitors when Keurig's patents expired"); McLane Compl. ¶¶ 15, 126-27 (same).

F.2d 346, 352, 354 (2d Cir. 1982); *U.S. v. Siemens Corp.*, 621 F.2d 499, 509 (2d Cir. 1980).
Plaintiffs fail to meet any of these elements.

First, Plaintiffs' theory of "eventual entry" is too speculative to support a claim.  *BOC v.
FTC*, 557 F.2d 24, 28-29 (2d Cir. 1977).  There is no evidence these roasters would have decided
to sell unlicensed packs as Plaintiffs hypothesize.  Plaintiffs' "uncabined speculation cannot be
the basis" for their claims.  *Id.; Marine Bancorp.*, 418 U.S. 602, 622-23 n.22 (1974).

Second, the roasters were not among "few … firms that can enter effectively."  *FTC v.
Steris*, 133 F. Supp. 3d 962, 966 (N.D. Ohio 2015); *Siemens*, 621 F.2d at 509 (rejecting potential
competition claim due to lack of evidence "potential entrant is one of but a few likely entrants.").
When Keurig's short filter patent expired in 2012, more than a *dozen* firms entered with
unlicensed packs.  *See supra* Sections I.A-B.

Third, the undisputed facts contradict any claim that these four roasters had "substantial
likelihood of ultimately producing deconcentration of the market or other significant
procompetitive effects."  *Tenneco*, 689 F.2d at 352.  These roaster brands combined accounted
for only around ███████████████████████ during the relevant period.  (¶ 37.)[94]  *See
Eastman v. Quest Diagnostics*, 724 F. App'x 556, 559 (9th Cir. 2018) (dismissing
monopolization claim based on acquisitions that were "relatively insubstantial, increasing
[defendant's] market share by only 6.6 percent").

McLane's old acquisitions claim fails for the additional reason that ███ of the packs it
distributed ██████████████████████ .  (¶¶ 166, 174.)  McLane's focus on licensed
distribution means it *benefitted* from more brands being in the Keurig system because that

---

[94] ████████████████████████████████████████████████████████
█████████████  (¶ 38.)

resulted in more K-Cups it could sell.  McLane actually distributed ███████████ ███████████████████████████████████████████ (¶176.), which McLane would not have done if those brands had not belonged to Keurig.  McLane cannot bring an antitrust claim against conduct that benefitted it.  *See Atlantic Richfield*, 495 U.S. at 337 (summary judgment on antitrust claim because the alleged conduct "would have worked to [the plaintiff's] advantage").

### 8.   McLane's Business Grievances Are Not Antitrust Claims

For a time, ███████████████████████████████████████████ ███████████████.  (¶ 162.) ███████████████████████████ ██████████████████████████████████████████████ ███████ (¶¶ 163-64.) ███████████████████████████████ ███████████████████████ (¶¶ 167-69.)[95]  McLane's complaint mirrors DPPs', but McLane peppers its claims with a few extra grievances.  McLane's real issue is that █ ███████████████████, but neither this nor its other grievances are antitrust claims. *Elecs. Commc'ns v. Toshiba*, 129 F.3d 240, 245 (2d. Cir. 1997) (dismissing antitrust complaint because terminating one distributor does not "affect[] the market as a whole"); *E & L v. Doman*, 472 F.3d 23, 31 (2d Cir. 2006) (dismissing antitrust claim by terminated distributor because, as a matter of black letter law, terminating a distributor does not cause "an actual adverse effect on competition as a whole.").[96]  McLane's unjust enrichment claim fails for the same reason.[97]

---

[95] █████████████████████████████████████████ (¶ 170.)

[96] *Accord, e.g.*, *Seaboard Supply v. Congoleum*, 770 F.2d 367, 374 (3d Cir. 1985) (summary judgment for defendant becasue "[t]he unilateral decision of a single manufacturer to rearrange its distribution structure … does not violate the Sherman Act."); *O.S.C. Corp. v. Apple*, 792 F.2d 1464, 1466, 1467-69 (9th Cir. 1986) (summary judgment for defendant on claim it blocked mail order distributors); *Watkins & Son v. Iams Co.*, 254 F.3d 607, 616 (6th Cir. 2001) (as to "termination of its distributorship, … while a contract or tort claim might lie, an antitrust claim does not.").

[97] As discussed in Section I.E.4., McLane's unjust enrichment claim is entirely parasitic on its antitrust claims.  *See* McLane Compl. ¶ 344 (defining unjust enrichment benefit as "profits resulting from unlawful overcharges and monopoly profits").  Such parasitic claims fail with the underlying claims.  *Kramer v.*



(¶ 169.) (emphasis added).

(¶ 168.)  This was procompetitive.  *Expert Masonry v. Boone*, 440 F.3d 336, 347 (6th Cir. 2006) (summary judgment for defendants because one firm losing an opportunity does not harm competition).  McLane has suffered no antitrust injury.

McLane's ancillary grievances likewise do not sound in antitrust:

- **Forecasting**.  McLane alleged Keurig caused it to order too much or too little, resulting in inventory issues.[98]  Even if true—and it is not—that would not harm competition.[99] *Arcesium, LLC v. Advent*, 2021 WL 1225446, at *9 n.8 (S.D.N.Y. Mar. 31, 2021) (dismissing antitrust claims premised on alleged breach of contract).

- **■■■■■■■**.  McLane alleges Keurig caused it to ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■[100]  Even if true—and it is not—buying equipment to serve a customer does not harm competition.[101] *Spinelli v. NFL*, 96 F. Supp. 3d 81, 108-09 (S.D.N.Y. 2015) (antitrust injury requires

---

*Pollock-Krasner*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) ("[B]ecause [plaintiff's] unjust enrichment claim hinges on practices claimed … to be illegal, and because [those claims] fail, the unjust enrichment claim [fails].").  Also, McLane cannot bring a standalone unjust enrichment claim under Texas law. *Curtis v. Cerner Corp.*, 621 B.R. 141, 176-77 (S.D. Tex. 2020) (unjust enrichment "is not an independent cause of action" in Texas).

[98] McLane Compl. ¶¶ 22, 271.

[99] It is undisputed that under the relevant contract ■■■■■■■■■■■■■■■■■■■■■■■■■■■, which renders the claim even more nonsensical.  (¶ 171.)

[100] McLane Compl. ¶ 271.

[101] It is undisputed that McLane bought the machinery based on a mutual understanding with *Walmart*. (¶ 172.)

harm to competition such as "loss . . . from acts that reduce output or raise prices to consumers" and rejecting antitrust claim based on "personal economic loss").

- **Inability to Distribute Unlicensed Packs.**  McLane alleged in its complaint that it was not able to distribute unlicensed packs.[102]  But it is now undisputed that McLane *was* free to distribute unlicensed Keurig-compatible packs, **and actually did so**.  (¶ 175.)

- **Business Opportunities Not Provided.**  McLane says Keurig should have used it as a middleman to distribute "K-Cups to its other valued customers."[103]  But customers, not Keurig, decide whether to use and pay for a middleman.  (¶ 178.)  That other customers did not use McLane reflects their choice and has no effect on overall competition.  And even if Keurig had decided not to use McLane for distribution, that would not be an antitrust violation.  *E & L Consulting*, 472 F.3d at 31 (dismissing antitrust claim by terminated distributor because, as a matter of black letter law, terminating a distributor does not cause "an actual adverse effect on competition as a whole").

With these miscellaneous claims removed, McLane has no unique claims and is not entitled to any of the windfall it wishes for here.

### 9.     Plaintiffs' Sherman Act Advertising Claims Fail As a Matter of Law

There is a presumption against antitrust claims based on advertising.  *Nat'l Ass'n of Pharm. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).  Even if advertising is "false or misleading or incomplete or just plain mistaken, the remedy is not antitrust litigation but more speech—the marketplace of ideas."  *Schachar v. Acad. of Ophthalmology,* 870 F.2d 397, 399-400 (7th Cir. 1989).  Courts set a high bar for such claims and grant summary judgment for defendants when plaintiffs fail to show statements "harmed consumers."  *MacDermid Printing* 833 F.3d at 186-87.[104]  The facts preclude such a showing here.  The statements were not "(1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to

---

[102] McLane Compl. ¶ 275.

[103] McLane Compl. ¶ 22.

[104] *Accord Berkey Photo*, 603 F.2d at 287-88, n. 41 ("Sherman Act is not a panacea for all evils that may infect business life."); *Xerox I.*, 511 F. Supp. at 382 (statements did not affect "competition generally"); *Multivideo Labs v. Intel*, 2000 WL 12122, at *15 (S.D.N.Y. Jan. 7, 2000) (summary judgment for defendant on disparagement claims).

buyers without knowledge . . . (5) continued for prolonged periods," and were "(6) readily susceptible of neutralization" by rivals.  *Ayerst*, 850 F.2d at 916.  On the motions to dismiss, the Court held that "these challenges are more appropriately raised on summary judgment."  *In re Keurig*, 383 F. Supp. 3d at 240-41.  Keurig is entitled to summary judgment now for the reasons noted below and in Appendix A, which lists each of the challenged statements, and selected reasons why, as a matter of law, it does not support Plaintiffs' claims.[105]

   ***General Principles.***  The law is clear that courts must analyze a statement by looking at it in its context.  *Apotex v. Acorda*, 823 F.3d 51, 63 (2d Cir. 2016) ("the relevant context of the advertisement is the overall message conveyed").  Plaintiffs point to snippets of statements.  Appendix A puts those snippets in context as required.

   ***Not False.***  For a statement to be false it must have an "unambiguous message" that is susceptible to only "one reasonable interpretation" and that message "conflicts with reality."  *Apotex*, 823 F.3d at 63 (summary judgment for defendant on Lanham Act claim for lack of falsity); *Reed v. McGraw-Hill*, 49 F. Supp. 3d 385, 412, 421 (S.D.N.Y. 2014) ("To survive the *Ayerst* presumption, a plaintiff must do more than prove that the challenged statement is literally false ….").  Plaintiffs here attack many vague statements, *e.g.*, that Keurig brews the "perfect cup" and other "subjective statement[s] … that cannot be proven true or false."  *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 541-42 (S.D.N.Y. 2018).  Such statements are not actionable.  *Id.* (claims with "no definite meaning," like "the best," are puffery); *Malaco v. Promotion in Motion*, 287 F. Supp. 2d 355, 379 (S.D.N.Y. 2003); *Multivideo*, 2000 WL 12122, at *16;

---

[105] The at-issue statements are listed in Appendix A, but relate to (1) pack quality; (2) brewer warranty; (3) compatibility of unlicensed packs; (4) Keurig's plans regarding the 1.0 Brewer; and (5) the 2.0 Brewer.  *See* TH Compl. ¶¶ 457-548; JBR Compl. ¶¶ 214-67; DPP Compl. ¶¶ 197-220; McLane Compl. ¶¶ 232-54.

*Appliance Recycling v. JACO*, 378 F. App'x 652, 654 (9th Cir. 2010) ("general, subjective claim[s]" are puffery).  TreeHouse itself uses a "perfect cup" slogan for its Caza Trail control brand. ███████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████  (¶¶ 303-04.)

Plaintiffs also challenge statements as insufficiently supported or only partially supported, for example that the "2.0 brewer will not work with packs that don't have the Keurig logo," but this, too, is legally insufficient to establish that a statement is clearly false.  *Turbon v. HP*, 769 F. Supp. 2d 262, 265-68 (S.D.N.Y. 2001) (claim that unlicensed cartridges "*will not work*" and "*will affect … quality*" of printing *were not false* even though some such cartridges worked).  Finally, courts consider whether a statement was clearly false as of the time it was printed or made.  *Klayman v. Judicial Watch*, 628 F. Supp. 2d 112, 150 (D.D.C. 2009).

***Not Material***.  Plaintiffs must show that each "specific misrepresentation" they challenge "was likely to influence consumers' purchasing decisions."  *Apotex*, 823 F.3d at 68 (summary judgment for defendant on Lanham Act claim for lack of materiality); *Reed Constr. Data Inc.*, 638 F. App'x 43, 46 (2d Cir. 2016) ("failure to establish materiality [under the] Lanham Act … *a fortiori* defeats [a] Sherman Act claim").  Here, consumers can independently evaluate portion packs.  (¶ 493.)  This is fatal to all Plaintiffs' advertising-based claims.  *Id.* at 45-46 (summary judgment for defendant on Lanham Act and Sherman Act claims because customers "conducted independent evaluations" of products).  Retailers and distributors likewise can and do evaluate claims themselves.  (¶ 312.)  Brands are also sophisticated and evaluate claims themselves. (¶ 313.)  This is not a case where a defendant advertised that a competitor's medical device caused death, and consumers could not test that.  This case is about coffee.  A consumer can

judge for herself whether a pack makes good coffee.  Likewise, consumers were able to check statements that unlicensed packs would not work with the 2.0, and consumer work-arounds began appearing on YouTube "in ten minutes" after the 2.0 Brewer launch.  (¶ 314.)

*Susceptible to Neutralization.*  The statements were susceptible to neutralization as competitors had an opportunity to challenge them.  *Reed Constr. Data*, 49 F. Supp. 3d at 422 (summary judgment for defendant because statements were susceptible to neutralization).  For example, in *Podiatric Physicians*, the court granted summary judgment to a defendant because plaintiffs "could easily cure" the issue by sending mailings to customers to counter-advertise.  *Am. Council v. Am. Bd. of Podiatric Surgery*, 323 F.3d 366, 372 (6th Cir. 2003).[106]  Likewise in *Eisai*, the court affirmed summary judgment for the defendant because competitors could "have corrected [] misstatements by supplying [customers] with accurate information."  *Eisai  v. Sanofi Aventis*, 821 F.3d 394, 407 n.40 (3d Cir. 2016); *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace*, 108 F.3d 1147, 1152 (9th Cir. 1997) ("[T]he test refers to 'susceptible to neutralization' not 'successful in neutralization.'").  Here, competitors could rebut statements they disagreed with via direct communications with customers, press releases, and other outlets.  TreeHouse and JBR ███████████████████████████████████████ (¶¶ 112, 133.), and TreeHouse even ████████ ████ (¶ 113.).  TreeHouse publicly announced a 2.0 solution (¶ 110.), ██████████████ (¶ 111.).  JBR also advertised its 2.0 compatible packs.  (¶¶ 137-38.)  JBR's ad campaign for its 2.0 solution gained national media attention and created "record-breaking" sales, crashing JBR's website.  (¶¶ 139-40.)

---

[106] *Accord EpiPen Antitrust Litig.*, 2020 WL 8374137, at *56 (D. Kan. Dec. 17, 2020) (no reasonable jury could infer plaintiff was "incapable of responding to" marketing because it had "sales representatives" that engaged in marketing); *POURfect Prods. v. KitchenAID*, 2010 WL 1769413, at *1, *5 (D. Ariz. May 3, 2010) (dismissing claim because plaintiff could offset statements "about [plaintiff's] product quality).

***Other Shortcomings.***  Plaintiffs' claims also fail for lack of proof that Keurig made certain of the challenged statements at all, let alone to "buyers without knowledge of the subject matter," or "for prolonged periods."  Appendix A; *Ayerst*, 850 F.2d at 916.

### D.  Keurig is Entitled to Summary Judgment on Competitor Plaintiffs' Lanham Act Claims, Which Fail for Lack of Evidence

TreeHouse and JBR bring a non-antitrust variant on their advertising claims, under the Lanham Act.  Under this statute, TreeHouse and JBR must prove that each challenged statement is commercial advertising, literally or impliedly false, material, and caused them injury.  *Apotex Inc.*, 823 F.3d at 63; *Appliance Recycling*, 378 F. App'x at 654 (same).

Plaintiffs' claims fail for lack of literal falsity and materiality as described above and in Appendix A.  For the subset of statements challenged as impliedly false, Plaintiffs must show "a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged" ad, *Tiffany v. eBay*, 600 F.3d 93, 113 (2d Cir. 2010), and do so through systematic analysis, generally using "reliable consumer surveys."  *Hertz v. Avis*, 867 F. Supp. 208, 213 (S.D.N.Y. 1994); *Gameologist v. Sci. Games Int'l*, 838 F. Supp. 2d 141, 165 (S.D.N.Y. 2011), *aff'd.* 508 F. App'x 31 (2d Cir. 2013).  Plaintiffs also must produce reliable extrinsic evidence that the statements influenced purchasing decisions.  *SourceOne Dental v. Patterson*, 328 F. Supp. 3d 53, 65 (E.D.N.Y. 2018) (plaintiff must produce extrinsic evidence of materiality, usually based on survey evidence).  Finally, Plaintiffs must prove they were "injured by the false statement."  *Id.* at 61; *VBS v. Nutrivita*, 811 F. App'x 1005, 1007 (9th Cir. 2020) ("actual evidence of some injury resulting from the deception is an essential element of the plaintiff's case").  Plaintiffs cannot meet these requirements.

JBR only attempted to support its implied falsity claim as to a *single* statement, the 2.0 Brewer's screen that stated "Oops, this pack wasn't designed for use with this brewer," which is

the only one its survey expert, Brian Sowers, tested.  (¶ 316.)[107]  He tried to measure consumers' "altered perception" related to the screen (¶ 317.), but admits he *did not try* to measure whether the screen altered purchase behavior (¶ 318.).  JBR's damages expert, Gareth Macartney, likewise offered no evidence to link altered perception to altered purchase behavior.  (¶ 319.) JBR lacks the systematic evidence required to show that *any* statement influenced purchasing. *Apotex,* 823 F.3d at 68; *SourceOne Dental*, 328 F. Supp. 3d at 64.

TreeHouse likewise developed no admissible evidence to support its claim.  Its experts tested only four statements for altered consumer perceptions.  Hal Poret tested no statements. Sarah Butler tested four.  (¶¶ 320-21.)  One was from a Keurig regulatory filing quoted in a *Chicago Tribune* news article (¶ 322), which is not actionable commercial speech.  *RPost Holdings, Inc. v. Trustifi Corp.*, 2012 WL 12952728, at *7 (C.D. Cal. May 11, 2012) (summary judgment for defendant because "statements to potential investors [were] not actionable under the Lanham Act"); *Gmurzynska v. Hutton*, 355 F.3d 206, 210-11 (2d Cir. 2004) (dismissing because journalism is not commercial speech).  As to the other three statements, TreeHouse's attempt to show altered perception and altered purchase behavior fails for the reasons stated in Keurig's motions to exclude the testimony of Ms. Butler and Mr. Poret.  *Apotex Inc.,* 823 F.3d at 68 (summary judgment for defendant because plaintiff failed to produce sufficient evidence that literally false claims were "likely to influence consumers' purchasing decisions"); *SourceOne Dental*, 328 F. Supp. 3d at 64-65 (summary judgment for defendant for lack of materiality). TreeHouse also lacks any evidence as to purported damages from alleged false advertising given the inadmissibility of Dr. Rao's damage model, as explained in Keurig's *Daubert* motion.  *See*

---

[107] This screen only appeared to 2.0 Brewer owners who used packs without a 2.0 solution.  The 2.0 was launched in late August 2014 and JBR launched its 2.0 solution in fall 2014.

*generally* ECF No. 1441.

    **E.**    **Keurig Is Entitled to Summary Judgment on All State Law Claims, Which Fail for Same Reasons as Federal Claims and for Lack of Required Elements**

    **1.**    **TreeHouse's Tortious Interference Claims Fail Because Keurig Lawfully Competed and Did Not Induce Breach**

The Court should grant Keurig summary judgment on TreeHouse's claims of tortious interference with contract and prospective business relations.[108]  With respect to tortious interference with contract, TreeHouse's co-manufacturing agreement with Unilever is the sole basis of its claims.  *In re Keurig*, 383 F. Supp. 3d at 253 (Unilever is "the only contract alleged to have been terminated or breached due to Keurig's interference," and TreeHouse's "interference with contract claims survive solely related to this one contract.").  But the Unilever contract was terminated ███████████████████████████████████.  There was no breach.  TreeHouse's claim for interference with prospective business relations fails because it cannot show that it had a reasonable expectation of future business, and Keurig lawfully competed.

    ***Interference with Contract: Unilever Did Not Breach Its Contract.***  TreeHouse alleges that Keurig tortiously interfered with TreeHouse's supply agreement with Unilever.  ███
████████████████████████████████████████████████.  (¶¶ 339, 342.)  ██████
███████████████████████████████████████████████████████████████
██████████████████████████████████  (¶¶ 340, 346.)[109]  A voluntary agreement to terminate is not a breach, instead it "discharges an existing obligation" because "[t]he

---

[108] TreeHouse alleges tortious interference with contract under New York law, negligent and intentional interference with business relations under New York law, tortious interference with contract under Wisconsin law, tortious interference with contract under Illinois law, and tortious interference with prospective business expectancy under Illinois law.  TreeHouse Compl. ¶¶ 662-91.

[109] TreeHouse does not allege that any Unilever conduct prior to the termination constituted a breach. TreeHouse Compl. ¶296.

consideration for the release acts as a substitute for performance under the prior obligation."[110]

*See Colton v. New York Hosp.*, 98 Misc. 2d 957, 965 (N.Y. Sup. Ct. 1979); *Kirchhoff v. Rosen*, 592 N.E.2d 371, 376 (Ill. App. Ct. 1992) (same under Illinois law).  Without a breach, TreeHouse's claims of tortious interference with contract fails.  *Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, 2016 WL 5414979, at *3, *6-7 (S.D.N.Y. Mar. 18, 2016) (summary judgment for defendant under New York law where "evidence in the record does not show that [third party] breached th[e] contract"); *In re Keurig*, 383 F. Supp. 3d at 252-53 ("Tortious interference with contract under Illinois and Wisconsin law require similar showings.").[111]  Thus, TreeHouse's claims for tortious interference with contract under New York, Illinois, and Wisconsin law all fail.  The claims fail for additional reasons as well, including that TreeHouse cannot show damages.[112]

### *Interference with Prospective Business Relations Fails Due To Competition.*

TreeHouse's claim of tortious interference with prospective business relations fails because it is undefined, speculative, and based on competition.  TreeHouse does not say which prospective relations Keurig allegedly tortiously interfered with.  *See, e.g., Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 429 (S.D.N.Y. 2008) (summary judgment for defendant because "customers at large are far too general to constitute a specific third party for purposes of a tortious interference claim"), *aff'd*, 329 F. App'x 333 (2d Cir. 2009).  Its damages expert assumes "once [TreeHouse] has a customer, [it] is able to keep a customer."  (¶ 459.)  But TreeHouse cannot survive

---

[110] ███████████████████████████████████████ (¶ 341.)

[111] Additionally, TreeHouse's tortious interference with contract claim under Wisconsin law fails for the same reasons that its claims of tortious interference with prospective business relations fail, which are discussed in the next section.  *Cf. Roumann Consulting Inc. v. Symbiont Constr*, 2019 WL 3501527 (E.D. Wis. Aug. 1, 2019); *Metso Mins. Indus. v. FLSmidth-Excel,* 2010 WL 55845 (E.D. Wis. Jan. 5, 2010).

[112] *See infra* Section II.D.2.  *See, e.g.*, *Wellington*, 2016 WL 5414979, at *3 (requiring "damages resulting [from breach]")

summary judgment on a prospective business relations tort claim by citing its expert's speculative assumption of future business. *Argus*, 801 F.2d at 42, 46 (plaintiff cannot avoid summary judgment by pointing to "naked conclusion[s]" of an expert); *Merisel, Inc. v. Weinstock*, 117 A.D.3d 459, 459-60 (N.Y. App. Div. (1st Dep't 2014)) (summary judgment for defendant where "[plaintiffs] failed to demonstrate that [] lost clients would have entered into an economic relationship with plaintiffs but for the [] defendants' wrongful conduct").

Competition is a complete defense to a tort claim based on prospective business relations, and Keurig was indisputably competing. TreeHouse says Keurig "interfered" by winning private label business, *see supra* Section I.A., which concedes the competition defense. *JBCHoldings v. Pakter*, 931 F. Supp. 2d 514, 535-36 (S.D.N.Y. 2013) (dismissal where plaintiff complained of defendant's "competitive behavior"); *Cromeens v. AB Volvo*, 349 F.3d 376, 399 (7th Cir. 2003) (summary judgment for defendant who "encouraged [] customers to buy products from [it] rather than from the [plaintiffs]"). The claim also fails because a plaintiff cannot have an "expectancy of future business" when business is up for bid. *Quadro Enterprises, Inc. v. Avery Dennison Corp.*, 2000 WL 1029176, at *10 (N.D. Ill. July 26, 2000).

TreeHouse also claims it lost prospective business based on KAD agreements under which KADs agreed not to sell unlicensed Keurig compatible packs. These are lawful, ███

███████████████████████████████████████████████████████████████

███████, as discussed above. *See supra* Section I.C.2.ii.[113] This is competition, which, while "sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system." *Int'l Mktg. v. Archer-Daniels-Midland*, 192 F.3d 724, 731-32 (7th Cir. 1999) (dismissing tortious interference claims brought under Illinois law based on competition)

---

[113] ████████████████████████████████████████████ (¶¶ 98-99.)

(quotation omitted).

### 2. JBR's Tortious Interference Claims Fail Because Keurig Lawfully Competed and No Contracts Were Breached

The Court should grant Keurig summary judgment on JBR's interference with contract claim because JBR produced no evidence of enforceable contracts. JBR's claim for interference with prospective economic advantage separately fails because JBR cannot show that it had a non-speculative probability of future economic benefits, and Keurig lawfully competed.[114]

***Interference with Contract: JBR Produced No Evidence of Contracts That Were Breached.*** JBR's claim for interference with contract fails because no enforceable contract was breached.[115] *See, e.g., Bed, Bath & Beyond of La Jolla, Inc. v. La Jolla Village Square*, 52 Cal. App. 4th 867, 879 (1997) ("California law "requires an underlying enforceable contract" for a tortious interference claim); *S. N. Sands Corp. v. British Pacific Aggregates Ltd.*, 2002 WL 1941158, at *4 (N.D. Cal. Aug. 19, 2002) (summary judgment for defendant because tortious interference claim was not "based on an underlying, enforceable contract").

████████████████████████████████████████████

████████████████████████████ (¶ 350.) Thus, JBR and its customers did not reach "mutual assent … on definite or complete terms," including quantity of packs to be sold or duration of the agreement, required for contract formation. *Netbula, LLC v. Bindview Corp.*, 516 F. Supp. 2d 1137, 1155-57 (N.D. Cal. 2007) (summary judgment for defendant for lack of mutual assent to definite terms); Cal. Civ. Code § 1550. An agreement for the sale of goods over $500 is not enforceable without a signed writing, ████████████████████. *Nnydens Int'l*

---

[114] JBR asserts claims for interference with prospective economic advantage and contractual relations under California law. JBR Compl. ¶¶ 407-14 (Counts 16 & 17).

[115] JBR lists several customers who allegedly breached contracts, but there is no evidence of a contract or breach for any of them. JBR's Supp Responses to Keurig's Second Set of Interrogatories at 19-20.

*v. Textron Aviation*, 2020 WL 7414732, at *5-7 (C.D. Cal. June 11, 2020) (summary judgment for defendant because contract was "unenforceable" under the statute of frauds); *Bed, Bath*, 52 Cal. App. 4th at 875-77 (same); Cal. Com. Code § 2201(1).  At most, JBR had at-will supply arrangements that cannot sustain an interference with contract claim because customers were free to terminate.  (¶ 351.)  *Ixchel Pharma v. Biogen*, 470 P.3d 571, 579-80 (Cal. 2020) ("An at-will contract may be terminated, by its terms, at the prerogative of a single party….").

### *Interference with Prospective Economic Advantage: Keurig Competed To Supply.*

JBR's interference with prospective economic advantage claim fails because it produced no evidence Keurig interfered with business relations that "contained the *probability* of future economic benefit."  *Westside v. Safeway*, 42 Cal. App. 4th 507, 522 (1996); *Roy Allan v. Am. Asphalt*, 388 P.3d 800, 805 (Cal. 2017) ("[A] cause of action for tortious interference [fails] when either the economic relationship with a third party is too attenuated or the probability of economic benefit too speculative.").  JBR claims interference with "prospects." (¶ 361.)  It says retailers were "interested" in doing business with it (¶ 362.), but "expressions of interest are insufficient."  *Prostar Wireless v. Domino's Pizza*, 360 F. Supp. 3d 994, 1017 (N.D. Cal. 2018) (summary judgment for defendant).  Likewise, JBR says it lost private label opportunities (¶ 363.), but retailers chose suppliers through bidding so JBR cannot show a "probability" of winning as a matter of law.  *See Roy Allan*, 388 P.3d at 804-08.  Moreover, JBR admits it refused to participate in some private label bids (¶ 352.), and, when it bid, ██████████████ ████████████████ (¶ 353.).  Other times, as at ████████████████ ██████████████████████████ ████████████ (¶ 209.)  Finally, JBR's claim Keurig caused it to not gain nationwide portion pack distribution at Costco is beyond speculative: ████████████████

████████████, and JBR makes no claim Keurig is to blame for that.  (¶ 219.)  JBR's claim

also fails because Keurig was competing for business for itself.  *Bed, Bath*, 52 Cal. App. 4th at

880-82 (summary judgment for defendant where defendant was competing).

### 3. Competitor Plaintiffs' State Law Antitrust and False Advertising Claims Fail for Same Reasons As Parallel Federal Claims

Competitor Plaintiffs allege violations of state antitrust and false advertising laws, based

entirely on conduct alleged to have violated the Sherman and Lanham Acts, TreeHouse under

Illinois, Wisconsin, and New York law; JBR under California law.[116]  Because these state laws

generally apply Sherman and Lanham Act standards,[117] they fail with the federal claims.

TreeHouse: Illinois Antitrust Act ("IAA"); Illinois Consumer Fraud and Deceptive

Business Practice Act ("ICFA"); Illinois Uniform Deceptive Trade Practices Act ("IUDPTA").

Sherman Act standards apply to IAA claims.  *DSM v. 3D Sys.*, 2013 WL 389003, at *10-14

(N.D. Ill. Jan. 31, 2013) (summary judgment for defendants on IAA applying Sherman Act

standards).  Likewise, Lanham Act standards apply to claims brought under the ICFA and

IUDPTA.  *Doctor's Data v. Barrett*, 2011 WL 5903508, at *8 (N.D. Ill. Nov. 22, 2011)

(dismissing plaintiff's ICFA and IUDPTA claims because Lanham Act claims failed).

TreeHouse: Wisconsin Antitrust Act and common law unfair competition.  Federal courts

apply Sherman Act standards to claims brought under the Wisconsin Antitrust Act: "Wisconsin

antitrust claims rise and fall with […] federal claims."  *Epic Sys. v. Tata*, 2017 WL 4386456, at

*3, n.2 (W.D. Wis. Sept. 29, 2017) (dismissing antitrust counterclaims).  TreeHouse's Wisconsin

common law claims are based on claimed violations of other statutes.  *In re Keurig*, 383 F. Supp.

3d at 252.  Because the underlying Sherman and Lanham Act claims fail, the common law claim

---

[116] TreeHouse Compl. ¶¶ 569-661, JBR Compl. ¶¶ 389-406.

[117] *See generally In re Keurig*, 383 F. Supp. 3d at Part D.

fail as well.  *Cf. Thermal Design*, 2008 WL 1902010, at *9 (common law unfair competition

claim dismissed along with parallel claims).

TreeHouse: New York Donnelly Act and Consumer Protection Act.  The Donnelly Act

"should generally be construed in light of Federal precedent."  *Ruotolo v. Fannie Mae*, 933 F.

Supp. 2d 512, 521 n.3 (S.D.N.Y. 2013) (dismissing antitrust claims).  Federal courts reject

Donnelly Act claims where Sherman Act claims fail.  *Gatt*, 711 F.3d at 81 (affirming such

dismissal).  Courts apply Lanham Act standards to New York Consumer Protection Act claims.

*See ONY v. Cornerstone*, 720 F.3d 490, 498 (2d Cir. 2013) (affirming dismissal).

JBR:  California Cartwright Act, False Advertising Law, Unfair Competition Law, and

common law unfair competition.  The Cartwright Act is patterned after the Sherman Act, with

the same standards.  *Name.Space v. ICANN*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) ("the

analysis under the Cartwright Act . . .  is identical to that under the Sherman Act"); *Spinner v.

Stone Point*, 843 F. App'x 411, 412 (2d Cir. 2021) (affirming dismissal because "[i]n antitrust

actions brought under the Cartwright Act, we look to interpretations of . . . the Sherman Antitrust

Act").  Cartwright Act claims based on Keurig's unilateral conduct fail because the Cartwright

Act "does not have any provisions parallel to Sherman Act section 2."  *Freeman v. San Deigo

Ass'n of Realtors*, 77 Cal. App. 4th 171, 202 (Cal. Ct. App. 1999).  Cartwright Act claims based

on purported agreements fail with JBR's parallel federal claims.  *See Nova Designs, Inc. v.

Scuba Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000).  If conduct is not a Sherman or

Lanham Act violation, it is not a common law or statutory unfair competition or False

Advertising Law violation.  *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994)

(summary judgment because "common law claims of unfair competition and actions pursuant to

California Business and Professions Code § 17200 are 'substantially congruent' to claims made

under the Lanham Act"); *Cardinal Motors v. H&H Sports*, 2021 WL 1758881, at *6 (S.D.N.Y.

May 4, 2021) (dismissing plaintiff's California common law unfair competition and UCL claims

for the same reasons as Lanham Act claims); *Appliance Recycling*, 378 F. App'x at 656 (same as

to False Advertising Law, affirming summary judgment for defendant).

> ### 4.    DPPs' and McLane's Unjust Enrichment Claims Fail Because They Rely on Other Failed Claims and Cannot Stand Alone

The DPPs and McLane bring claims for unjust enrichment, seeking restitution for "profits

resulting from unlawful overcharges and monopoly profits."[118]  As an initial matter, McLane

cannot allege an unjust enrichment claim.  McLane is a Texas corporation with its principal place

of business in Texas,[119] and it is undisputed that it purchased all of its K-Cups in that state.

(¶ 165.)  Texas law governs.[120]  Under Texas law, unjust enrichment "is not an independent

cause of action."  *Curtis v. Cerner*, 621 B.R. 141, 176-77 (S.D. Tex. 2020); *see also Harris*

*County Texas v. MERSCORP*, 791 F.3d 545, 561 (5th Cir. 2015) (same).

Separately, McLane's and the DPPs' unjust enrichment claims fail because they are

parasitic of other failed claims.[121]  "Parasitic claims are those in which 'the unjust enrichment is

---

[118] DPP Compl. ¶¶ 290-300; McLane Compl. ¶¶ 341-350.

[119] McLane Compl. ¶ 24.

[120] New York choice of law rules apply to McLane's unjust enrichment allegations.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3382071, at *7 (S.D.N.Y. Aug. 3, 2017) (noting MDL courts generally apply choice of law rules of the "originating jurisdiction"—here, New York, where McLane chose to file).  Under either New York's "center of gravity" or "interest analysis" tests, Texas is the forum whose laws are properly implicated by McLane's claim.  *See Finance One Public Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, 414 F.3d 325, 336-37 (2d Cir. 2005) (describing New York choice of law tests).  And even if McLane argues that Texas choice of law rules should apply, the outcome would be the same.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 3382071, at *15-16 (describing Texas "most significant relationship test").

[121] DPPs' self-styled claims for unjust enrichment under the laws of Texas, Alaska, California, Delaware, and New Hampshire fail for the additional reason that those states do not recognize unjust enrichment claims at all.  *See Erwin v. Mendenhall*, 433 P.3d 1090, 1095 n.10 (Alaska 2018) ("Unjust enrichment is not a freestanding claim and is a prerequisite for restitution."); *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) ("[I]n California, there is not a standalone cause of action for 'unjust enrichment…'"); *AMG Vanadium LLC v. Global Advanced Metals U.S.A., Inc.*, 2020 WL 1233752, at

based upon a predicate wrong, such as … an antitrust violation.' *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 411-12 (S.D.N.Y. 2011) (citations omitted).  Plaintiffs' unjust enrichment claims are wholly based on their antitrust and false advertising claims, alleging that Keurig retained "unlawful overcharges and monopoly profits" and that the economic benefit at issue is "derived by Keurig through charging supra-competitive and artificially inflated prices for K-Cups [which] is a direct and proximate result of Keurig's unlawful practices."[122]  Unjust enrichment claims therefore fail with those underlying claims.  *See Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) (dismissing unjust enrichment claim on grounds that it "hinges on practices claimed … to be illegal, and because [those claims] fail").[123]

## II.  Keurig is Entitled to Summary Judgment on Damages and Relief

For all of the reasons discussed above, Keurig is entitled to summary judgment on the merits, and the Court need not reach Plaintiffs' requests for relief.  As detailed below, however,

---

*17 (Del. Super. Ct. Feb. 6, 2020) ("Unjust enrichment is not a standalone claim [in Delaware]."); *Gallagher v. Funeral Source One Supply and Equip. Co., Inc.*, 2015 WL 6738733, at *9 (D.N.H. Nov. 4, 2015) ("Unjust enrichment is a narrow equitable remedy, and generally does not form an independent basis for a cause of action [in New Hampshire].") (citations omitted); *Curtis* , 621 B.R. at 176-77 (Under Texas law, "unjust enrichment . . . is not a claim on which relief can be granted").

[122] McLane Compl. ¶¶ 344-45; DPP Compl. ¶¶ 293-94.

[123] Georgia, Florida, Illinois, New Jersey, Pennsylvania, and Washington law recognize unjust enrichment only as an alternative theory of recovery for proven violations of law.  These claims necessarily fail because Keurig is entitled to summary judgment on DPPs' antitrust claims.  *Muy v. IBM.*, 2019 WL 8161749, at *3 (N.D. Fla. Nov. 25, 2019) ("Plaintiff must have another 'actionable wrong' independent from the unjust enrichment claim" under Florida law); *Kason Indus., Inc. v. Allpoints Foodservice Parts & Supplies, LLC*, 2018 WL 1980370, at *3 (N.D. Ga. March 6, 2018) ("A claim for unjust enrichment [in Georgia] is not a tort, but an alternative theory of recovery") (cleaned up); *Lewis v. Lead Indus. Ass'n*, 793 N.E.2d 869, 877 (Ill App. Ct. 2003) (unjust enrichment is not a separate cause of action in Illinois); *Swift v. Pandey*, 2014 WL 3362370, at *3 (D.N.J. July 8, 2014) ("New Jersey does not recognize unjust enrichment as an independent tort cause of action."); *Plumbers' Local Union No. 690 Health Plan v. Apotex Corp.*, 2017 WL 4235773, at *10 (E.D. Pa. Sept. 25, 2017) (under Pennsylvania law, absent a contract claim, "an unjust enrichment claim may be pled as a companion, not an alternative, to a claim of unlawful or improper conduct as defined by law"); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1041 (9th Cir. 2010) ("Unjust enrichment [in Washington State] is essentially another way of stating a tort claim and, consequently, once the underlying tort claim is dismissed, so is the unjust enrichment claim.").

Keurig is separately entitled to summary judgment on damages and relief.

### A.   No Plaintiff Offers a Reliable Estimate of Damages Caused by the Challenged Conduct

At summary judgment, a plaintiff must provide a reasonable, non-speculative measure of its claimed damages that flow from the challenged conduct.  *See, e.g., USFL v. NFL*, 842 F.2d 1335, 1378-79 (2d Cir. 1988) (plaintiff must provide "a reasonable basis upon which to estimate the amount of its losses caused by" challenged conduct); *Vernon v. S. Cal. Edison*, 955 F.2d 1361, 1371-72 (9th Cir. 1992) (a flawed damages model is "an independent reason to grant summary judgment"); *El Aguila*, 131 F. App'x at 453-54; *Berkey Photo*, 603 F.2d at 297.

Here, Plaintiffs' damages experts failed in this basic task.[124]  Regardless of the admissibility of their testimony, speculative and illogical damages models like the ones here warrant summary judgment for the defendant.  *See, e.g.*, *El Aguila*, 131 F. App'x at 453-54 ("[E]ven if [plaintiff's damages expert's] testimony had been admitted, it would not have provided a sufficient basis on which the jury could have arrived at a reasonable and just estimate of actual damages."); *McGlinchy v. Shell*, 845 F.2d 802, 808 (9th Cir. 1988) (summary judgment for defendant where plaintiffs failed sufficiently to "establish the amount, causation, or fact of damages").  Keurig is entitled to summary judgment because Plaintiffs' damages models are unreliable:

> ***JBR claims it is entitled to alleged monopoly growth.***  JBR's damages model is premised on the notion that JBR should have grown at the same rate that Keurig did.  JBR compares its

---

[124] Plaintiffs' damages experts ignore basic tenets of economics and should be excluded.  *See* ECF No. 1458 at 2-5 (JBR); ECF No. 1462 at 12-21 (TreeHouse); ECF No. 1454 at 21 (McLane); ECF No. 1408 at 17-18 (DPPs).  *Cf. The Intimate Bookshop v. Barnes & Noble*, 2003 WL 22251312, at *7 (S.D.N.Y. Sept. 30, 2003) (granting summary judgment to defendant after excluding plaintiff's damages expert because "[o]nly expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct, and not because of lawful competition or other factors").

actual growth rate to Keurig's and treats *any difference* as damages.  (¶¶ 438-41.)  But JBR asserts—indeed, its entire case is premised on—a claim that Keurig *grew faster because of* the challenged conduct.  (¶ 442.)  If JBR prevails on liability then it loses on damages because it is no more entitled to an unlawfully fast growth rate than Keurig is.  *Todorov v. DCH Healthcare*, 921 F.2d 1438, 1453-54 (11th Cir. 1991) (summary judgment for defendant where claimed damages were based on defendant's actual sales).  A benchmark damages model requires a benchmark that reflects competition, but JBR has chosen a benchmark (Keurig) that, according to JBR, is contaminated by the very conduct at issue in this case.  This violates established case law,[125] and JBR admits it is contrary to accepted principles of economics, too.  As JBR's economist testified: "And sure, if you went to the academic literature, you're not going to find something that says a benchmark is a good one if it's been contaminated by what you're trying to measure."  (¶ 445.)  *See* ECF No. 1458 at 2-5 (Macartney *Daubert*).

**TreeHouse's damages model is premised on selling more packs** because of Keurig's **lower prices.**  It is undisputed that, ███████████████████████████████████████ ████████████████████████████████.  (¶ 469.)  TreeHouse says in the but-for world Keurig's branded pack prices would decrease.  (¶ 467.)  But TreeHouse's damages model assumes that after Keurig lowers its prices, TreeHouse will *not* lower its prices in response. (¶ 468.)  This makes no sense, ██████████████████████████████████████████████████ ██████████████████████████████████████.[126]  This is a nonsensical model that ignores both accepted principles of economics (when the price of a good decreases, demand for a

---

[125] *See, e.g., Farmington Dowel v. Forster*, 421 F.2d 61, 82 (1st Cir. 1969); *Toscano v. PGA Tour,* 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002); *In re LIBOR*, 299 F. Supp. 3d 430, 479 (S.D.N.Y. 2018).

[126] ████████████████████████████████████████████████████████ ████████████████████████████████.  (¶¶ 464-65.)

substitute decreases) and commercial reality, which shows extensive price reaction by

TreeHouse.  *See Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1260-63 (9th Cir. 1981)

(judgment for defendant where plaintiff ignored competitive responses).[127]

      ***McLane seeks damages based on estimated harm to the average direct purchaser but***

***McLane did not pay average prices,*** ████████████████████████████.  McLane's damages

model purports to measure an average industry-wide "overcharge" by measuring the difference

between Keurig's average pack prices and those of two competitors.  (¶ 473.)  But McLane did

not pay market-wide average prices, ███████████████████████████████████████████

████████████████████████.  (¶ 475.)  Putting forward a market-wide average overcharge is

insufficient as a matter of law because it requires a jury to speculate as to what fraction of the

purported average overcharge applied ████████████████████████████████████████

██████.  (¶ 474.)  *See Drug Mart. v. Am. Home Prods.*, 472 F. Supp. 2d 385, 428-29 (E.D.N.Y.

2007) (summary judgment for defendant because "[t]he application of a general damages

calculation representing harm to a class of individuals or entities, and then attempting to apply

that same calculation to a specific individual or institution, offends the rule requiring an

individualized damages determination").

      ***DPPs have no estimate of damages for any individual class member.***  DPPs put forward

no estimate at all of damages to members of the purported class.  In fact, it is undisputed that the

DPPs would need to put forward *new damages models*—possibly varying for *each* class

member—to estimate damages for individual class members.  As DPP's expert put it, his model

"was not designed to estimate anything for an individual customer. … If I was trying to estimate

---

[127] These issues are more fully explained, with application of a different legal standard, in Keurig's *Daubert* motion.  ECF No. 1462.  The same issues independently result in a failure on summary judgment.

for an individual customer, I'd have to … specify a different model than I have here."  (¶¶ 470-71.)  Regardless of DPPs' class certification arguments, an estimate of aggregate class-wide damages does not suffice at summary judgment:  Plaintiffs must put forward evidence of *individual damages*.  *Drug Mart*, 472 F. Supp. 2d at 428-29 (trying to apply a general damages calculation to a specific individual "offends the rule requiring an individualized damages determination").

### B.   Competitor Plaintiffs Are Not Entitled to Damages for "Lost Customers" that Switched to Get Lower Prices, Higher Quality, and Better Service

Competitor Plaintiffs' damages models fail for the independent reason that they are premised on alleged profit losses that are not limited to those *caused by* unlawful conduct. Courts "must always be mindful lest the Sherman Act be invoked perversely in favor of those who seek protection against the rigors of competition." *Berkey Photo*, 603 F.2d at 273. TreeHouse and JBR cannot claim "damages" for losses they suffered based on factors such as TreeHouse's uncompetitive pricing, low quality, and poor service, and JBR's uncompetitive pricing, mesh cup design, and refusal to invest in marketing.  Yet both plaintiffs' damages claims indisputably violate this cardinal rule.  TreeHouse and JBR have not met their burden of reliably "separat[ing] out the amount of losses *caused by* [unlawful acts] from the amount caused by other factors."  *USFL*, 842 F.2d at 1378-79 (emphasis added).  This requires summary judgment for Keurig.  *Alpha v. Comsat*, 968 F. Supp. 876, 890 (S.D.N.Y. 1996) (summary judgment for defendant where plaintiff failed to show injury was caused by challenged conduct).[128]

---

[128] *Accord Nat'l Ass'n of Appraisers v. Appraisal Found.*, 64 F.3d 1130, 1135 (8th Cir. 1995) (summary judgment for defendant where plaintiff's "missteps and other considerations" contributed to claimed harm); *Rockford v. Shell Oil*, 998 F.2d 391, 402 (7th Cir. 1993) (summary judgment for defendant where plaintiffs' damages model failed to control for "numerous intervening economic and market factors which [defendants] argue may have been the actual cause of the plaintiffs' injuries"); *H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 247 (5th Cir. 1978) (judgment for defendant where plaintiff's damages model relied on "shaky assumption" that it would have won business in the but-for world)

### 1. TreeHouse's "Lost Customers" Resulted from Competition

TreeHouse purports to identify specific customers that were "lost" due to Keurig's conduct, and asserts that those customers should have belonged to TreeHouse for all time. (¶ 459.)  Damages cannot be established when challenged conduct is "one factor among many" driving a customer's decision making.  *Amerinet v. Xerox*, 972 F.2d at 1496-98 (summary judgment for defendant where challenged conduct was one of several factors in customers' decision); *USFL*, 842 F.2d at 1378-79; *H&B Equip. Co.*, 577 F.2d at 246-47.  Without a way to identify the damages due to the challenged conduct, summary judgment must be granted as to damages:

> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, **the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage**.  This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts.

*Amerinet*, 972 F.2d at 1497-98 (emphasis added).  For TreeHouse's "lost customers" the record shows they were lost based on multiple factors including price, quality, and service—that is, competition.  For example:[129]



. (¶ 184.)

---

[129]  TreeHouse has failed to produce evidence excluding the reality that lawful factors, including Keurig's quality and pricing, contributed to all of TreeHouse's "lost customers," and TreeHouse's damages model improperly attributes the loss of all of these customers to Keurig's challenged conduct with *no effort* to disentangle the importance of lawful factors from the purported effect, if any, of challenged conduct. This same central flaw applies to TreeHouse's other claimed "lost customers," such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (¶¶ 183, 215, 218, 223-27, 242-49, 369-76.) *See also* Ex. C-16, Ugone Rpt. Ex. 8. Further, TreeHouse's damages expert did not disclose any opinions on lost sales to some customers until her reply report. *Compare* Ex. C-20, Stiroh Rpt. Ex. 6.A, *with* Ex. C-21, Stiroh Reply Rpt. Ex. 8.A. Keurig reserves the right to file motions *in limine* including related to Plaintiffs' failures to timely disclose expert opinions.



(¶¶ 185-86) ██████████████████████████

██████████████████████████

█████ (¶ 187.) ████████████████████████

██████████████████████████████

(¶ 188.) Consumers benefitted directly from █████████████

████████ . ████████████████████████████

████████████████████ (¶ 189.), ███████████████

███████████████████████████████ This

defeats TreeHouse's attempt to claim its lost sales to ███████ as antitrust damages.

Notably, TreeHouse's model does not just claim lost sales at ████████ in late 2014 at the

time of the switch, it claims continuing "lost sales" at ████████ for *every year thereafter*.

(¶¶ 453, 458.) But it is undisputed that, ████████████████████████

████████████████ . (¶ 190.) Once again, it is undisputed that ██████████████

███████████████████████ . (¶ 191.) ████████████████

████████████████████ (¶¶ 192-94.) It is also undisputed that ████████████

███████████████████████ . (¶ 195.) In short, ████████████████

███████████████████ , yet TreeHouse nonetheless claims antitrust damages.

██████████████████████████████████

████████████████ (¶ 196.), ████████████████████████



█████████████████ (¶¶ 197-98.).[130] █████████████████████████

████████████████████████████ (¶ 199.)[131]  TreeHouse's attempt to claim

antitrust damages is, again, a serious misuse of the antitrust laws.

███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

(¶¶ 229-30.) ████████████████████ (¶ 231.) ████████████████

████████████████████████████████████

██████████████[132] ██████████████████████████

███████████████████████████████████ (¶ 228.) █

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████ (¶¶ 235-38.) ██████████████████████

████████████████████████████████████

██████████████████ (¶ 85.)  It is also undisputed that, ██████████████

---

[130] ██████████████████████████████████████
(¶¶ 200-02.)

[131] ██████████████████████████████████████
███████████ (¶¶ 203-04.)

[132] ████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████ (¶ 232.) ██████████████████████████
███████████████████████████████████████
████████████████████ (¶¶ 233-34.)

████████████████████████████████████████████████. (¶¶ 239-41.)

Again, this is manifestly competition at work.  Incredibly, TreeHouse seeks damages *from*

*Keurig* for ████████████████████████████.  (¶¶ 454, 458.)  TreeHouse's

decision to spend seven years litigating in pursuit of a treble damages windfall on business it lost

due to competition is an abuse of the court system.



██████  It is undisputed that an important factor in ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████. (¶ 206.)  ████████████

████████████████████████████████████████████████

██████████  (¶ 207.)  ████████████████████████████████

████████████████████████████  (¶¶ 210-13), ████████████████

████████████████████████████  (¶ 212.).  TreeHouse cannot create a genuine issue

of material fact with ████████████████████████████████████

████████████████.  (¶ 497.)  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

(¶ 498.)

    In sum, TreeHouse's damages model fails to reliably calculate sales lost due to Keurig's

challenged conduct.  The model simply makes no effort to disentangle lawful factors in customer

decisionmaking from allegedly unlawful ones.  It simply takes all customers TreeHouse claims

to have lost, assumes they were lost due *only* to Keurig's challenged conduct, and assumes that

but for Keurig's conduct they would have belonged to TreeHouse for all time rather than, say,

switching to Trilliant, Westrock, Mother Parkers or any of the other portion pack competitors

that actually won business from these customers in the real world.  This unreliable model does not meet the summary judgment test.

### 2.    JBR's Business Decisions Caused Its Purported "Losses"

JBR's damages model also fails because, like TreeHouse's model, it is premised on losses that are not limited to those *caused by* unlawful conduct.  JBR says its losses were overwhelmingly caused by the 2.0 Brewer advertising and launch.  But, at the direction of its founder and CEO, ████████████████████████████████████████████████ ████████████████████████████████████.  (¶ 143.)  The answer was clear:

████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████

(¶ 144.)  JBR's own documents demonstrate that ████████████████████████████████ ██████████████████.  ████████████████████████████████████████████  (¶¶ 144-48.)  Among other things:  JBR refused to bid for business that it believed would be awarded based on price (¶ 152.); JBR refused to sell to Walmart, the largest retailer in the world, out of personal animosity (¶ 153.); ██████████████████████████████████████████████ ████████████████████ (¶ 154.); ████████████████████████████████ (¶ 156.); and JBR used a mesh cup design that many customers did not like because it creates staleness and sanitation concerns (¶¶ 250-52.).  That JBR's portion pack sales have grown over time shows JBR has managed to succeed in spite of itself.

In sum, it is undisputed that both TreeHouse and JBR are claiming damages for losses that were not caused by Keurig's challenged conduct. Both competitors lost business based on their own choices from uncompetitive pricing to lack of business strategy to quality issues. There is no evidence indicating that the challenged conduct was the major reason for any of this lost business, which means that, as a matter of law, these plaintiffs are not entitled to damages and their proffered damages models fail. The Court should grant summary judgment to Keurig.

### C.   Competitor Plaintiffs' Future Damages Are Highly Speculative, Warranting Summary Judgment

***JBR Speculates About Mounting Damages Through 2029.*** JBR's damages model fails for yet one more reason: Nearly 70% of its demanded damages are based on speculation about sales it will supposedly lose in the future, and how much it thinks Keurig will be unjustly enriched in the future, through 2029. (¶¶ 436-37.) But speculation on damages *cannot* survive summary judgment. *Zenith v. Hazeltine*, 401 U.S. 321, 339 (1971) ("[F]uture damages that might arise from the conduct sued on are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable."); *McGlinchy v. Shell*, 845 F.2d at 806-09 (summary judgment for defendant where plaintiff's experts speculated about damages); *Point 4 Data v. Tri-State*, 2014 WL 12769275, at *9 (E.D.N.Y. Sept. 17, 2014) (summary judgment for defendant where plaintiff "has not demonstrated that it could calculate lost profits [over the next ten years] without undue speculation").

JBR claims that Keurig's launch of the 2.0 brewer in August 2014 and related marketing caused JBR to lose sales for seven years after launch—including four years after the brewer was discontinued—*and* that the purported harm from the discontinued brewer will continue and *ramp up* through 2029. (¶ 434.) This defies common sense and the record. JBR admits it had a 2.0 Brewer hack by the fall of 2014, not long after the 2.0's launch in August 2014. (¶¶ 135-37.)

JBR even piggybacked on the 2.0 launch, running a "Freedom Clip" promotion highlighting its hack that generated national press coverage and so many sales JBR's website crashed.  (¶¶ 138-40.)  Consistent with these facts, JBR says its "damages" in one sales channel dropped to **zero** by 2016.  (¶¶ 431-32.)  Incredibly, JBR says damages due to the 2.0 Brewer then *reappeared* in 2017 and ramped up thereafter.  (¶ 433.)  JBR takes claimed 2019 damages and projects them out into the future at a compounding rate.  (¶ 434.)  This is nonsense.  Had JBR projected its *2016* damages estimate through 2029, its model would suggest many millions of dollars in *negative* future damages.[133]  JBR's damages model is fundamentally speculative and implausible.

JBR says decade-long future damages are justified because Keurig's conduct supposedly caused JBR to miss out on attracting millennial consumers.  *See* Macartney Rpt. ¶¶248-50, 257.  This made up theory is contrary to the facts.  Millennials are more likely than other generations to shop online, where JBR's packs are readily available.  (¶ 422.)  In late 2014 JBR's "Freedom Clip" hack and related promotion achieved unprecedented exposure and a flood of new purchasers to JBR's website.  (¶ 139.)  JBR's expert conceded he had not investigated whether JBR has few millennials as customers, or studied the effect of the challenged conduct on millennials.  (¶¶ 142, 423-24.)  Mere speculation, untethered to analysis, cannot support future damages.  *See, e.g.*, *Point 4 Data*, 2014 WL 12769275 at *9.

The rate at which JBR's damages grow into the future is also purely speculative.  For the growth rate, JBR relies solely on a press release from ResearchAndMarkets.com touting a report that (while JBR's expert did not know it) is from an outfit in India called "Mordor Intelligence."  (¶¶ 426, 429-30.)  The press release says the report says the U.S. "coffee pods and capsules

---

[133] The choice of ending the future damages model in 2029 is similarly arbitrary, and it is undisputed that it would be just as reasonable to cut off damages in 2028—or earlier, for that matter.  (¶ 435.)

market" will grow at 3.1% through 2025. (¶¶ 427-28.) JBR's expert did not purchase or review the underlying report, so there is nothing in the record that a jury could rely on to determine that this rate is accurate and reliable.[134] JBR's expert admits he relied solely on this press release referencing sales growth of a different product market through 2025 to "project ten years into the future the fortunes of the U.S. single-serve coffee business." (¶ 425-26, 437.); *cf. Multimatic v. Faurecia*, 358 F. App'x 643, 654 (6th Cir. 2009) (rejecting as "utterly speculative" future damages based on a "ten-year prediction about the fortunes of the American automotive industry"). JBR's "mere speculation and guess work" does not create a factual issue as to damages. *See Intimate Bookshop*, 2003 WL 22251312, at *7.

JBR's future damages are also impermissibly speculative because they are premised on conjecture that Keurig might launch future brewers that will somehow harm JBR. Macartney Rpt. ¶¶32, 257. JBR has not asserted that any new Keurig brewer would not brew its packs, nor does it explain its decade of future damages. The Court should grant summary judgment to Keurig. *See, e.g.*, *ILC v. IBM*, 458 F. Supp. 423, 436 (N.D. Cal. 1978) (judgment for defendant because "there is not substantial damage evidence present on which reasonable jurors could base a verdict for [plaintiff] that would not be speculation or guesswork").

***TreeHouse Speculates About Damages through 2024***. TreeHouse also inappropriately seeks more than $175 million in future damages based on conduct that happened more than a decade earlier, using another methodology that projects out 2019 "damages." (¶¶ 451-52.) These future damages carry forward on the wildly implausible assumption discussed above that "TreeHouse, once it has a customer, is able to keep a customer" *forever*. (¶ 459.) But Keurig did

---

[134] JBR's damages expert does not even know that the underlying report was not drafted by ResearchAndMarkets.com, as he says. In fact, it was drafted by a company in India called Mordor Intelligence. (¶ 430.)

not keep the customers forever.  For example, ██████████████████████████████

█████████████████████████████████.  (¶¶ 241, 456.)  Yet TreeHouse insists that

even after these customers switched to unlicensed competitors—or even *back to TreeHouse*—

TreeHouse is entitled to damages from Keurig for years into the future.  Summary judgment is

appropriate.  *Point 4 Data*, 2014 WL 12769275, at *9; *Multimatic*, 358 F. App'x at 654.

### D.    Competitor Plaintiffs Are Not Entitled to Damages on Business Tort Claims

#### 1.    There Is No Evidence of Damages Related to JBR's Claims of Intentional Interference with Contract under California Law

JBR claims that nine companies breached contracts with JBR for compatible packs

because of Keurig's conduct.  (¶ 360.)  But it is undisputed that these purported agreements ██

████████████████████████████████████████████████████████████████

████  (¶¶ 356-59.)  Again, there were no enforceable contracts at all.  *See supra* Section I.E.2.

Moreover, even when there is an actual contract, if, as here, the terms are unclear or amorphous

there is "no rational method for … computing damages" which warrants summary judgment for

the defendant.  *Ladas v. Cal. State Auto.*, 19 Cal. App. 4th 761, 770-71 (1993).

#### 2.    TreeHouse Admits It Has Already Been Made Whole on Its Claim of Tortious Interference with Contract

TreeHouse's tortious interference claim is limited to just one contract: an agreement to

manufacture packs for Unilever.  *In re Keurig*, 383 F. Supp. 3d at 253 ("TreeHouse's state law

tortious interference with contract claims survive solely related to this one contract [with

Unilever]."); 3/6/20 Tr. at 79-80.  TreeHouse admits ███████████████████████████

████████.  (¶ 342.)  There was no breach and, in any case, TreeHouse admits it suffered no

harm.  (¶¶ 341, 343-44.)  ███████████████████████████████████████

████████████████████████████████████████████████████████████████

████  (¶¶ 345-47.)  █████████████████████████████████████  (¶ 339.)

TreeHouse then told its Board ███████████████████████████████████████

███████████████████████████████████ (¶¶ 343-44.) ███████████████████████

███████████████████████████████████████████████████ (¶ 338.) ██████████

███████████████████████████████████████████████████████

██████████████████████ (¶ 348.)  TreeHouse cannot recover damages when it is

undisputed that it did not suffer any harm.  This is fatal to TreeHouse's tortious interference

claim under the laws of all three states it has brought claims under.  *Wellington v. Breakwater*,

2016 WL 5414979, at *3 (S.D.N.Y. Mar. 18, 2016) (New York law requires "damages resulting

[from breach]"); *In re Keurig*, 383 F. Supp. 3d at 252-53 (similar under Illinois and Wisconsin

law).  That TreeHouse even asserts this claim again shows TreeHouse's attempt to use this

litigation to pursue a windfall, after already having been given "free money."  Indeed, TreeHouse

even magnifies its demand by asserting it would have retained Unilever as a customer forever.

(¶ 459.).  The purportedly breached contract ██████████████████████████████.

(¶ 337.)[135]  But a party may not recover damages for tortious interference with contract beyond

when the contract would otherwise end.  *See IMAF v. J.C. Penney*, 1991 WL 66892, at *6

(S.D.N.Y. Apr. 24, 1991); *Terhune v. Bd. of Educ. of Zion*, 2013 WL 623603, at *3 (N.D. Ill.

Feb. 20, 2013).

    **E.    TreeHouse's Damages for Costs Incurred Are Inflated**

    TreeHouse seeks to recover its costs for ██████████████████████████

████████████. (¶ 121.) ████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[135] In the actual world, ████████████████████████████████████████████████

██████████████████ (¶ 349.)



██████ (¶ 115.) ██████████████████████████████

███████████████████████████ (¶¶ 116-18.) ████████████

████████████████████████████████████████████

███████████████████████ (¶¶ 95, 119-20.) ████████████

██████  TreeHouse now demands treble damages for this cost it chose to pay to secure a competitive advantage, and offers no way for a fact-finder to determine the value of that advantage, which would need to be subtracted from any damages.  *USFL v. NFL*, 842 F.2d 1335, 1378-79 (2d Cir. 1988).  Antitrust plaintiffs also have a duty to mitigate, *see, e.g.*, *Borger v. Yamaha*, 625 F.2d 390, 399 (2d Cir. 1980), and ████████████████████████ is not a damages-mitigating choice.

TreeHouse also seeks damages for its spending on filling machines, plastic cups, and foil lids based on the difference between what it paid and what Keurig paid.  Stiroh Rpt. ¶¶164-71.  But there is no evidence that in the but-for world TreeHouse would have had costs identical to Keurig.  TreeHouse is not entitled to free-ride off of Keurig by using its suppliers.  Before relying on Keurig as a benchmark, TreeHouse needed to "validate the foundational premise … that [Keurig's] prices are a reliable predictor of [TreeHouse's] but-for prices."  *In re Wholesale Grocery Prods. Antitrust Litig.*, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018) (summary judgment for defendant because plaintiff's expert did not validate benchmark); *El Aguila*, 131 F. App'x at 453 (judgment for defendant when plaintiff "made no effort to demonstrate the reasonable similarity" of its benchmark).  TreeHouse performed no such validation here.

**F.    Keurig Is Entitled to Summary Judgment on Competitor Plaintiffs' Requests for Unjust Enrichment**

TreeHouse and JBR seek unjust enrichment damages for their false advertising claims.[136] This remedy is "rarely granted" and "limited to situations in which the defendant's profits represent unjust enrichment derived from *diversion of business that clearly would otherwise have gone to the plaintiff*." *Burndy v. Teledyne, Inc.*, 748 F.2d 767, 772 (2d Cir. 1984) (emphasis added). That is, the plaintiff must show that *all* profits the defendant earned from the challenged conduct came entirely at plaintiff's expense and *not* at the expense of other firms. As a matter of law, this requirement *cannot* be fulfilled when the defendant "engaged simply in false advertising of the defendant's own product." *Burndy*, 748 F.2d at 772. Indeed that two competitors are seeking unjust enrichment here confirms the futility of the demand. Given the large number of pack competitors, more than a dozen firms could all claim that in the but-for world Keurig's sales would have been theirs. (¶¶ 9, 64.) Unjust enrichment is impermissible where, as here, it could be sought by more than one competitor. *Burndy*, 748 F.2d at 772.

Here it is undisputed that Keurig's profits were not diverted entirely from either TreeHouse or JBR. (¶¶ 364-65.) Recognizing this, JBR requests an allocation of purported unjust enrichment based on but-for market shares that its expert puts forward. Macartney Rpt. ¶¶265, 273. This, too, is contrary to law. In *Burndy*, the Second Circuit affirmed the district court's rejection of allocating unjust enrichment among various competitors. *Burndy v. Teledyne*, 584 F. Supp. 656, 668 (D. Conn. 1984), *aff'd*, 748 F.2d 767 (2d Cir. 1984). Separately, while JBR seeks unjust enrichment based on brands partnering with Keurig instead of JBR, Macartney Rpt. ¶266, it is undisputed that JBR eschewed brand partnerships because it

---

[136] JBR also seeks recovery for "the costs of corrective advertising," but it has not put forward any evidence—expert or otherwise—of those costs.

did not want to "help competitors get into [] business."  (¶ 157.)  JBR cannot say brands were diverted from JBR when JBR had no interest in working with brands in the first place.  *Burndy*, 748 F.2d at 772-73.

### G.    Plaintiffs Are Not Entitled to Injunctive or Declaratory Relief

Injunctive relief is a "drastic and extraordinary remedy."  *Monsanto v. Geertson Seed*, 561 U.S. 139, 165 (2010).  It is available only to plaintiffs who can "establish a real or immediate threat of injury."  *Nicosia v. Amazon*, 834 F.3d 220, 239 (2d Cir. 2016).  Past injuries "do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way."  *Nicosia*, 834 F.3d at 239; *Berni v. Barilla*, 964 F.3d 141, 146-47 (2d Cir. 2020) ("[A] plaintiff cannot rely on past injury.").  The same is true of declaratory relief, which is available only where a litigant needs "an *immediate and definite* determination of [] legal rights."  *Velvet Underground v. Andy Warhol Found.*, 890 F. Supp. 2d 398, 408 (S.D.N.Y. 2012).  Time can moot the need for declaratory relief even if the plaintiff "may have had a viable claim … at the time their suit was filed."  *Stokes v. Wurtsboro*, 818 F.2d 4, 5 (2d Cir. 1987).

The only injunctive relief plaintiffs have articulated with anything close to the level of specificity required by Fed. R. Civ. P. 65(d) is against the "lock out feature" of the 2.0 Brewer and Keurig's related marketing.[137]  But it is undisputed that the 2.0 brewer has been discontinued.  (¶ 13.)  The challenged statements were last made years ago.  (¶ 332.)[138]  There is simply nothing to enjoin, and mere speculation about products Keurig *could* launch or statements Keurig *could* make at some unidentified point in the future does not support injunctive or

---

[137] JBR Compl. ¶ 301; TreeHouse Compl. at 183-84; DPP Compl. ¶ 302.

[138] Appendix A.

declaratory relief.  *See Burndy*, 748 F.2d at 773-74 (injunctive relief "wholly unnecessary" after product design was revised).

Further, an injunction that prohibited Keurig from launching hypothetical brewer designs in the future would not serve the public interest.  *Winter v. NRDC*, 555 U.S. 7, 23-24 (2008) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").  Any such injunction would diminish Keurig's ability to innovate, damaging the public interest that the antitrust laws were designed to protect.  *Cf., e.g.*, *Verizon v. Trinko*, 540 U.S. at 407 (Sherman Act is intended to "safeguard the incentive to innovate"); *Berkey Photo*, 603 F.2d at 285 (courts must exercise "caution against [granting] a decree that might stifle future innovation").  That is a very real danger here, where Plaintiffs ask the Court to play central planner and determine on a hypothetical basis which future brewer innovations are appropriate and which are not.  Such speculation would harm competition, not further it.  Summary judgment is appropriate.

Plaintiffs' other vague requests for relief fail for additional reasons as well.  For example:

- **Portion Pack Inputs.**  TreeHouse claims Keurig foreclosed access to portion pack inputs, but it is undisputed that more than a dozen competitors—including TreeHouse and JBR— have in fact entered the market and increased their sales over time.  (¶ 64.)  An injunction to permit entry is unnecessary when it is undisputed that entry is occurring.

- **Distribution Contracts.**  Plaintiffs allege Keurig prohibited its customers from distributing K-Cups unless the customer agreed not to distribute unlicensed Keurig-compatible packs. This ignores that ███████████████████████████████████████, without making any such agreement.  (¶ 173.)  ████████████████████████████████ ██████  (¶ 366.)  Injunctive relief is unsupported.

111

- **Tying.** Plaintiffs say Keurig ties portion packs and brewers—that is, it prohibits customers from purchasing one but not the other. It is undisputed that ███████████████████ ████████████████████████████████████████. (¶¶ 177, 367.) It is undisputed that TreeHouse, JBR, and other unlicensed pack manufacturers sold billions of compatible packs to customers that bought Keurig brewers. (¶¶ 368, 377.)

Keurig is entitled to summary judgment on all requests for injunctive and declaratory relief.

## CONCLUSION

In antitrust cases "summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces." *PepsiCo*, 315 F.3d at 104. It is undisputed that, since Keurig's short-filter patent expired in 2012, more than a dozen unlicensed portion pack manufacturers have entered the Keurig-compatible packs business. ████████ ████████████████████████████████ These are not signs of a monopolized market foreclosed to competitors—they are hallmarks of thriving competition. Plaintiffs have had much more than their day in court. They have had years' worth of discovery, at great expense to Keurig, third parties, and the Court system. No amount of obfuscation can save their claims. Based on established law and the undisputed facts, Plaintiffs' hunt for a windfall should end here. For all of the foregoing reasons, Keurig respectfully requests that the Court grant summary judgment to Keurig.

Dated: August 25, 2021

/s/ Leah Brannon
CLEARY GOTTLIEB STEEN & HAMILTON LLP
**Leah Brannon**
**George S. Cary**
**Kenneth S. Reinker**
**Carl Lawrence Malm**
**Lisa M. Danzig**
lbrannon@cgsh.com
gcary@cgsh.com
kreinker@cgsh.com
lmalm@cgsh.com
ldanzig@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Telephone:  202-974-1500
Facsimile:  202-974-199

**Rahul Mukhi**
rmukhi@cgsh.com
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000

/s/ Wendelynne J. Newton
BUCHANAN INGERSOLL & ROONEY PC
**Wendelynne J. Newton**
**Gretchen L. Jankowski**
**Mackenzie A. Baird**
wendelynne.newton@bipc.com
gretchen.jankowski@bipc.com
mackenzie.baird@bipc.com
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219-4413
Telephone: 412-562-8800

*Attorneys for Defendant Keurig Green Mountain, Inc.*

**Appendix A: Challenged Statements & Selected Reasons for Dismissal**

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| | **Quality, Safety, Performance of Unlicensed Packs** | |
| Statements to two JBR customers in Spring 2012 (*See* DPP ¶¶ 200, 204; McLane ¶ 235; JBR ¶ 238) | JBR's OneCup will "gum up" Keurig brewers. | ***Not Commercial Advertising***:  A statement made to two out of many customers is not widely disseminated, and thus not commercial advertising.  *See* Br. 83.<br><br>***Not Prolonged***:  JBR offers no evidence as to the period during which the statement was allegedly made.  *See* Br. 82, n.106 (citing *EpiPen Antitrust Litig.*, 2020 WL 8374137, at *56 (D. Kan. Dec. 17, 2020)).<br><br>***Not False***:  OneCups had known failures and complaints at the time.  (¶¶ 305-06.)<br><br>***Not Material***:  The customers "laughed about" Keurig's alleged statement, and "didn't think [JBR's] product would gum up a machine." (¶ 310.)<br><br>***Susceptible to Neutralization***:  JBR performed its own quality testing on OneCups and shared the results with customers.  (¶ 308.) |
| 10-K, quoted in February 12, 2011 Chicago Tribune article (*See* Butler Cup Rpt. ¶ 45) | Sturm pods "do not work safely or effectively." | ***Not Commercial Advertising***:  The statement was not made to customers for the purpose of proposing a commercial transaction; a journalist quoted it from a Keurig 10-K filing describing litigation.  (¶ 322.)  Statements to investors and journalists are not actionable.  *See* Br. 84 (citing *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004); *RPost v. Trustifi*, 2012 WL 12952728, at *7 (C.D. Cal. May 11, 2012)).<br><br>***Not Prolonged***:  TreeHouse identifies a single statement made one time.  *See* Br. 82 n.106 (citing *POURfect Prods. v. KitchenAID*, 2010 WL 1769413, at *5 (D. Ariz. May 3, 2010) (one month is not prolonged)).<br><br>***Not False***: The statement was repeated in a Chicago Tribune article in February 12, 2011.  Sturm pods had known failures and complaints at the time.  (¶¶ 305-06.)<br><br>***Susceptible to Neutralization***: TreeHouse tests its own packs and can share results with customers. (¶ 308.) |

---

[1] Quotations reflect Plaintiffs' allegations.  Keurig does not concede the statements were made or that Plaintiffs' allegations are complete or accurate.

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| Unspecified social media statements (*See* JBR ¶ 236) | JBR packs contained "stale coffee" and were exposed to oxygen | ***No Evidence / Not Commercial Advertising***: JBR alleged this statement "on information and belief" and has not produced admissible evidence attributing it to Keurig. JBR also has not produced evidence that the statement was widely disseminated and proposed a commercial transaction. *See* Br. 83-84 (citing *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004).<br><br>***Not False***: OneCups are not individually wrapped, and when the OneCup bag is opened, the OneCups are exposed to air and begin to stale. (¶¶ 125-26.) OneCups do not have a solid barrier surrounding the plastic mesh cup, ███████████████ ████████████████████████. (¶ 250.) TreeHouse believed OneCups would stale faster than its own packs and ████████████ ████████████████████████ (¶ 127.) |
| Keurig website; customer call script (*See* TH ¶¶ 483, 492, 496, 499; JBR ¶¶ 234-37, 243 Butler Cup Rpt. ¶ 45) | "The Keurig Brewed seal is our promise that the coffee you love is inside. Every product with the seal has passed rigorous testing, assuring the quality, taste and safety you expect from Keurig. We recommend you only use products with the Keurig Brewed seal as these meet the Keurig standards for taste, quality and safety and are tested to perform in the Keurig Brewer. We do not make or test the other brands. Also, using unapproved portion packs or accessories may decrease your brewer's performance, overall life and may affect its warranty." | "The relevant context of the advertisement is the overall message conveyed" by the advertisement. *See* Br. 80 (quoting *Apotex Inc. v. Acorda*, 823 F.3d 51, 63 (2d Cir. 2016)). The overall message conveyed is that Keurig tests and guarantees K-Cups for quality, safety, and performance in Keurig Brewers. It does not perform the same testing, and therefore cannot recommend or guarantee, unlicensed packs.<br><br>***Not False***<br><br>• Recommending consumers use Keurig K-Cups, and referring to "Keurig quality" and "seal of approval" is subjective and puffery. *See* Br. 80-81.<br><br>• It is true that Keurig did not make unlicensed packs. There is no evidence that Keurig subjected unlicensed portion packs to the same rigorous, ongoing quality control testing it applies to K-Cups. (¶ 307.)<br><br>• Unlicensed packs had known quality issues, including ████████ ███████████████████████████████████████████████ ███████████████████████████ (¶¶ 305-06.)<br><br>• TreeHouse and JBR each criticized the quality of the other's packs. ████ ███████████████████████████████████████████████ ████████████████████████████████████████ |
| Retailer presentation (*See* TH ¶ 521) | "If it doesn't have the Keurig logo, it's not that the Keurig quality"; the Keurig logo is "the only mark of Keurig quality" | |
| "Keurig Brewed" (*See* JBR ¶¶ 93, 235, 237) | Keurig cannot "ensure the quality, consistency, and safety" of non-Keurig packs | |

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| Facebook status update (*See* Butler Cup Rpt. ¶ 45) | "Look for the Keurig Brewed seal, our commitment to you! Only products with the Keurig brewed seal meet Keurig standards for taste, quality, and safety. Using products without the seal may damage your Keurig brewing system." | ███████████████████ (¶ 92.) ███████ (¶ 127.) █████<br><br>***Not Material***<br>• Manufacturers often tout their product quality, but purchasers conduct their own quality assessments, particularly of an inexpensive product like coffee, which is easy for customers and consumers to try.  (¶¶ 312, 313, 493.)<br><br>***Susceptible to Neutralization***<br>• TreeHouse and JBR are capable of advertising quality of their packs and can present their own quality testing and consumer reviews to customers. (¶¶ 308-09.)<br>• As one example of counter-advertising, TreeHouse ██████████ , even though the underlying consumer study that TreeHouse relied on actually showed ███████████. (¶ 496.)<br>• To take another example, ██████████████████████ ██████████████. (¶ 323.)<br>██████████████ (¶ 324.) |

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| | **Keurig's Brewer Warranty** | |
| Tweet (*See* JBR ¶ 240) | "For best performance and warranty protection, we suggest using Keurig Brewed products in your brewer." | The overall message conveyed is that Keurig recommends its own products, and damage caused by the use of unlicensed packs my not be covered by warranty.  The warranty statements further the message above that Keurig cannot guarantee products that it does not make. |
| 1.0 & 2.0 Brewer warranty language (*See* TH ¶ 495) | "Any damage to or malfunction of your Brewer resulting from the use of non-Keurig Brewed K-Cup brand packs and accessories may not be covered by this warranty or may result in a service fee if the damage or malfunction is determined to be caused by such use . . . . Nor does this warranty cover damages caused by use of non-Keurig Brewed K-Cup brand packs or accessories" | *Not False*:  Keurig retained the right not to honor the warranty on brewers if they were damaged by unlicensed packs or accessories.  (¶ 311.)  The fact that Keurig usually honored the warranty does not render the statement false.

*Not Material*:  Plaintiffs have adduced no extrinsic evidence that specific representations concerning Keurig's brewer warranty were material to customers' or consumers' purchasing decisions.

*Susceptible to Neutralization*:  TreeHouse and JBR were capable of challenging statements about quality of unlicensed packs, including whether they would work well in Keurig brewers.  (¶¶ 308-09.) |
| Facebook post (*See* TH ¶ 496; DPP ¶¶ 199, 202; McLane ¶ 234) | "We do not endorse using any product in or with our brewers other than those that carry the Keurig or Keurig Brewed logos …. We also want to note that using unapproved portion packs may decrease your brewer's performance, overall life and may affect its warranty." | |
| Statements by TreeHouse / JBR customers (*See* TH ¶¶ 497-98; DPP ¶¶ 205-07; McLane ¶¶ 239-41) | Grove Square is "not approved by Keurig" and could "void the warranty"

OneCups do not have Keurig's "seal of approval" and could damage brewers and "void warranty" | *No Evidence / Not Commercial Advertising / Not Prolonged*:  These are statements by TreeHouse or JBR customers.  Plaintiffs offer no evidence that these specific statements were made by Keurig.  *See* Br. 83-84 (citing *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d Cir. 2004).

The statements also fail for the same reasons noted above that apply to the other alleged brewer warranty statements. |

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| | **Keurig's Plans for 1.0 Brewers** | |
| Retailer presentations from October 29, 2013 to March 2014 (*See* TH ¶ 524) | 1.0 Brewers would be discontinued by Spring 2015 | TreeHouse challenges isolated and short-lived statements about Keurig's future plans to transition its brewer lineup, which were true when made.<br><br>***Not False***:  Keurig originally anticipated that the 2.0 would replace the 1.0 and Vue brewers. (¶ 325.)<br><br>***Not Material***:  Even if Keurig had discontinued the 1.0 Brewer, there was an installed base of ▓▓▓▓▓ 1.0 Brewers in which consumers could continue to use K-Cups and unlicensed Keurig-compatible portion packs.  (¶ 11.)  Other brewer manufacturers were selling 1.0-style brewers, so consumers knew they would continue to have choice in brewers and compatible packs.  (¶¶ 287-88.)  Keurig never stopped supplying the 1.0 Brewer.  (¶ 10.) |
| November 2013 financial analyst call (*See* TH ¶ 527) | Keurig "will replace [its] current lineup of both K-Cup and Vue brewers" with 2.0 K-Cup Brewers and "will be transitioning [its] lineup of Keurig brewers over fiscal 2014 and early 2015." | ***Readily Susceptible to Neutralization***:  TreeHouse told customers that 1.0 brewers from Keurig would be on the market for more than a year at least, and the large installed base of 1.0 Brewers would continue after introduction of the 2.0 Brewer.  (¶ 114.)  JBR did as well.  (¶ 134.)<br><br>***Not Continued for Prolonged Periods***:  Statements allegedly made well before the 2.0 Brewer was released.  *See* TH Compl. ¶¶524, 525, 527. |

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| **2.0 Brewer Mechanics & Features** | | |
| Various (*See* TH ¶¶ 16, 417, 432, 489; JBR ¶ 221; Butler Cup Rpt. ¶ 45) | "It's critical for performance and safety reasons that our new system includes this technology." <br> "It's critical for performance and safety reasons that the [2.0] system only brews Keurig brand license packs." | ***Not False*** <br> • The 2.0 worked with both Vue Cups and K-Cups, and the brewer would read the lid of each pack inserted and then return the correct user interface for a simple, one-button-push brew with the correct amount of water. (¶ 326.)  Given that functionality, it is not clearly false to say that 2.0 reads "recipes" and "optimizes" defaults. |
| Investor presentation (*See* TH ¶ 490) | Ink is needed to "deliver the consumer benefit in a safe way." | • The 2.0 Brewer offered at least 250 varieties and 40 brands.  (¶ 5.) <br><br> • Subjective claims of product quality, such as statements about the "perfect cup," are not false. |
| October 5, 2014 Media statement (*See* TH ¶ 490) | "We remain confident that only Keurig-designed and produced and/or licensed beverage-optimized packs with the Keurig Brewed seal will allow the Keurig 2.0 brewer to perform consistently at its optimum level." | • As to safety, when Keurig first launched the new brewer, it used a failsafe approach:  Unlike prior brewers, the 2.0 brewed different pack sizes and offered one touch brewing of different water volume.  The ink technology was part of a two-step check before the brewer would default to dispensing a carafe full of hot water, by checking both for a V-Cup and confirming the carafe attachment was in place.  (¶ 327.) |
| Investor Day Slides, User manual, website video (*See* TH ¶¶ 405, 487-488, 492) | The 2.0 K-Cup Brewer reads the lids of 2.0-compatible K-Cups in order "to provide the perfect beverage"; "to deliver on the promise of excellent quality beverages"; to "provide the perfect brew settings" | ***Not Material***: <br> • Manufacturers often tout the quality of their products, but retailers, distributors, and brands are sophisticated purchasers that conduct their own quality assessments and give little weight to Keurig's statements that the 2.0 brewed the "Perfect Cup," read "recipes," or "optimized" settings.  (¶¶ 312, 313, 493.) |
| Investor Day Slides (*See* TH ¶ 405) | 2.0 has "Game-changing performance." | • Brands are also sophisticated and evaluate claims themselves.  (¶ 313.) |

6

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| press event talking points; script; Keurig website (*See* TH ¶¶ 490, 492; JBR ¶¶ 215, 218, 221, 253, 261-62) | "To make brewing a carafe possible, and to continue to deliver everything Keurig lovers already enjoy – high-quality beverages, simplicity, and variety – our new Keurig 2.0 system will feature specially designed interactive technology allowing the brewer to read information about the inserted Keurig pack. [T]his interactive capability … allow[s] the brewer to optimize its default settings and brew the beverage perfectly …. It's critical for performance and safety reasons that our new system includes this technology." | • Consumers evaluated products for themselves by trying them. (¶ 493.)<br><br>***Susceptible to Neutralization***<br>• TreeHouse and JBR counter-advertised that the 2.0 Brewer did not offer consumer benefits.  TreeHouse "███████████████ ██████ to dispute the benefits of the 2.0 Brewer in its meetings with retailers months before launch, (¶ 112.) and used a public relations firm to generate bad press for the 2.0 Brewer.  (¶ 113.)<br><br>• TreeHouse itself also claimed that it in fact had the perfect cup, with the phrase appearing in TreeHouse's tag line for Caza Trail.  *See* Br. 80-81, (¶ 303.). |
| Various (*See* JBR ¶ 246) | Keurig 2.0 has "250+ varieties" and "40+ brands." | |
| January 2014 presentation to Kroger (*See* JBR ¶ 259) | "SIMPLICITY: Portion Pack Informs Brewer."<br>"SIMPLICITY – Just push BREW!" | |

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| | **Compatibility of Unlicensed Portion Packs** | |
| Keurig website support page FAQ (*See* Butler Cup Rpt. ¶ 45) | The Keurig 2.0 brewer will only function with Keurig brand pods. That means the Keurig 2.0 brewer will brew both K-cup and Vue pods and the new K-Carafe pods. Keurig brand pods have been specially designed to work with the Keurig 2.0 Brewing Technology in the Keurig 2.0 system, which guarantees a perfect brew every time. Look for the Keurig Brewed seal on your favorite K-Cup pod and K-Carafe pod varieties to ensure a delicious cup every time. Keurig cannot guarantee that pods without the Keurig Brewed logo will work in the Keurig 2.0 brewer. | The overall message conveyed is to inform consumers that the 2.0 Brewer was designed as a closed system to work only with Keurig Brand packs, so consumers could make an informed choice about whether to buy the 2.0 or a different brewer. Plaintiffs claim these statements became false after unlicensed compatible pack sellers developed 2.0-compatible packs, however at that point the claims were not material given that the world knew the 2.0 Brewer had been hacked. (¶ 314.) Plaintiffs were also able to neutralize the statements through their own advertising. Some unlicensed competitors continued to make packs that might not work in the 2.0 Brewer, or might not do so consistently.  (¶ 315.)  *See* Br. at 81 (citing *Turbon v. HP*, 769 F. Supp. 2d 262, 265-68 (S.D.N.Y. 2001) (claim that unlicensed cartridges "will not work" and "will affect quality" of printing *were not false* even though some such cartridges worked)).<br><br>*Not False*<br>• The 2.0 Brewer was designed to be a closed system.  (¶ 329)<br>• Statements about unlicensed pack incompatibility were not false when made to retailers in October 2013 to April 2014 when no unlicensed supplier had demonstrated its packs could be used in a 2.0 Brewer.  (¶ 330)<br>• Plaintiffs argue the "Oops" message was false because some unlicensed packs were designed to work in the 2.0 Brewer.  TreeHouse has not pressed this claim because it knows the statement was true, given that some unlicensed packs (including TreeHouse's own) had to be redesigned in order to brew properly in the 2.0 Brewer given the 2.0 Brewer's stronger piston pump engine.  (¶ 293)  Moreover, if unlicensed packs were successfully designed to work in the 2.0, consumers would not see the Oops screen.  (¶ 331)<br><br>*Not Material*<br>• Both JBR and TreeHouse told customers that the 2.0 Brewer was a non-event because the large installed base of 1.0 Brewers would still exist after the introduction of the 2.0.  (¶¶ 114, 134.) |
| Packaging, retail signs, video, Keurig.com / Facebook, customer script (*See* TH ¶¶ 471-76;  Butler Cup Rpt. ¶45) | 2.0 "Works only with Keurig Brand Packs."<br>"Keurig 2.0 brewer will only function with Keurig brand packs." | |
| User manual (*See* TH ¶ 471, 487) | "2.0 brewer will not work with packs that don't have the Keurig logo." | |
| 2.0 Brewer Oops message (*See* (TH ¶ 472; Sowers Rpt. ¶ 7; JBR ¶¶ 250-51) | "This pack wasn't designed for this brewer. Please try one of the hundreds of packs with the Keurig logo." | |

| Source, Compl. | Alleged Statement[1] | Selected Reasons for Dismissal |
|---|---|---|
| Presentations to retailers October 2013 to April 2014 (*See* TH ¶¶ 503-516) | "Unlicensed products will not work in all Keurig 2.0 K-Cup [brewers]" | • It was common knowledge among customers and consumers that the 2.0 could be hacked soon after it was launched.  Jim Rogers testified that videos showing how to hack the 2.0 reader using a Post-It note began appearing on YouTube "in ten minutes" after the 2.0 launch.  (¶ 314) |
| Retailer presentation (*See* TH ¶ 540) | "Only packs with the Keurig logo work with 2.0." | ***Susceptible to Neutralization***<br><br>• TreeHouse and JBR developed workarounds to make their portion packs work in the 2.0 Brewer, and used multiple avenues to rebut statements about compatibility, including direct communications with customers, press releases, their websites, news media, this antitrust litigation, and TreeHouse's public relations firm. |
| Retailer presentations (*See* TH ¶ 518) | Even if unlicensed packs develop workarounds, those packs would not work in future iterations. | • TreeHouse announced its 2.0 compatibility solution on August 7, 2014, (¶ 110) and immediately told customers.  (¶ 111) |
| Various (*See* TH ¶¶ 16, 405, 539) | 2.0 reads "recipes" to adjust brewing process and provide "perfect beverage" | • JBR told customers and retailers the 2.0 Brewer would fail to lock out competition.  (¶ 133)<br>• JBR told its customers in 2014 that it was working on making portion packs that were 2.0 compatible, (¶ 132) and by September 2014, posted "alternative methods" for using unlicensed portion packs in 2.0 brewers on its website.  (¶ 135) |
| Promotional event/QVC (*See* TH ¶ 491) | Ink informs the 2.0 of the beverages contained in those packs and further instructs the 2.0 how to brew those specific beverages. | • JBR announced through its website and news media that its Freedom Clip made JBR's packs 2.0-compatible.  (¶ 137) |
| Presentations to retailers October 2013 to April 2014 (*See* TH ¶¶ 503-516) | The 2.0 K-Cup lids contained "proprietary ink" and make use of "interactive technology that is proprietary and exclusive to GMCR in beverage applications"; brewers used "currency anti-counterfeiting technology" | • JBR's Freedom Clip advertising campaign received national media attention and created a "record-breaking week" for JBR, including the biggest day and biggest week ever in sales.  (¶¶ 138, 139, 140) |
| Retailer presentations (*See* JBR ¶¶ 206, 208, 211) | "PORTION PACKS MUST HAVE INTERACTIVE TECHNOLOGY TO BREW." | |