**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | Case No. 1:14-md-02542 (VSB) MDL No. 2542 |
| *This document concerns all related actions.* | Hon. Vernon S. Broderick |
| | **ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**KEURIG'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................... 1

BRIEF HISTORY OF THE CASE.................................................................. 9

LEGAL STANDARD.................................................................................... 10

ARGUMENT ................................................................................................ 11

I.   Keurig Is Not Entitled To Summary Judgment On Liability..............................11

   A.  Disputed Issues Of Material Fact Exist As To Keurig's Monopoly Power In
       The Compatible Cup And Single-Serve Brewer Markets.............................11

       1.  Direct Evidence Of Keurig's Monopoly Power Precludes Summary
           Judgment.........................................................................................15

       2.  Market Entry or Growth Does Not Preclude a Section 2 Claim Especially
           Where the Defendant Has Maintained a Persistent, Durable Monopoly ..............23

       3.  Extensive Record and Economic Evidence Supports High Barriers to
           Entry................................................................................................25

       4.  No Special "Aftermarkets" Test Applies or Precludes Monopoly Power ............28

       5.  Disputed Issues Of Material Fact Exist As To Keurig's Attempted
           Monopolization and Monopoly Leveraging ........................................30

   B.  Disputed Issues of Material Fact Exist As To Harm To Competition ........................30

       1.  Keurig's Exclusionary Conduct Caused Supracompetitive Prices ......................31

       2.  Keurig's Exclusionary Conduct Decreased Output ................................32

       3.  Keurig's Exclusionary Conduct Decreased Variety, Consumer Choice, and
           Quality.............................................................................................33

       4.  Keurig's Anticompetitive Conduct Raised Rivals' Costs......................36

       5.  Keurig Harmed the Competitive Process and Competition on the Merits............36

   C.  TreeHouse's and JBR's Claimed Injuries Flow from Harm to Competition..............37

   D.  DPPs' and McLane's Claimed Injuries Flow From Harm To Competition ...............41

   E.  Keurig's Additional Arguments As To Plaintiffs' Antitrust Claims All Fail.............41

1.  Disputed Issues of Material Fact Exist As To Keurig's Use of Lock-Out Technology To Maintain Its Monopolies .............................................................41

2.  Disputed Issues Of Material Fact Exist As To Substantial Foreclosure ..............47

    i.  Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Retail Agreements .........................................................................................50

    ii.  Keurig Has Failed to Rebut Plaintiffs' Foreclosure Calculation Based on All Branded and Private Label Sales Restrained by Contract in the AH Market ..............................................................................................54

    iii.  Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Distributor Agreements ...............................................................................56

    iv.  Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Brand Agreements ........................................................................................58

    v.  Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Supplier Agreements ...................................................................................60

3.  Disputed Issues Of Material Fact Exist As To Plaintiffs' Conspiracy Claims To The Extent They Are Not Resolved In Plaintiffs' Favor ...................61

    i.  Keurig's Boycott And Brand Non-Competition Clauses Are Not Dual-Distribution Agreements ............................................................................63

    ii.  Keurig Restrains Horizontal Competition With A Hub-and-Spoke Conspiracy ...................................................................................................65

    iii.  TreeHouse And JBR Have Standing To Challenge Keurig's Brand Restrictions .................................................................................................69

    iv.  Other Keurig Business Partners Agreed To Unreasonably Restrain Trade ...........................................................................................................70

4.  Plaintiffs Have Established Their Tying Claims As A Matter of Law ................72

    i.  Keurig's Unremitting Tying Policy Constitutes Actual Coercion .................72

    ii.  Plaintiffs Showed Keurig Has Market Power in Several Ways......................74

    iii.  Per Se Tying Claims Do Not Require Showing Anticompetitive Effects .........................................................................................................75

    iv.  Keurig Technologically Tied the 2.0 Brewer to K-Cups.................................75

5.  Disputed Issues Of Material Fact Exist As To Keurig's Serial Sham Litigations ....................................................................................................76

ii

i.   Keurig Has Failed To Rebut That It Engaged In A Series Of Sham Litigations ...................................................................................76

ii.   Disputed Issues Of Material Fact Exist As To Objective Baselessness, Even Under The *PRE* Standard.........................................................77

a.   Disputed Issues Of Material Fact Exist As To A Good Faith Factual Or Legal Basis For Keurig's Non-Patent Claims.........................78

1.   Keurig's Limited Non-Patent Claim Discussion Is Misleading ..........78

2.   Disputed Issues Of Material Fact Exist As To The Baselessness Of Keurig's Other Non-Patent Claims..................................................79

3.   TreeHouse's Settlement Of The Non-Patent Claims Does Not Compel A Finding Of Objective Merit .............................................81

b.   Disputed Issues Of Material Fact Exist As To Keurig's Factual or Legal Basis for Keurig's Patent Claims....................................................81

6.   Disputed Issues Of Material Fact Exist As To Keurig's Patent Misuse ...............84

7.   DPPs' and McLane's Claims Regarding Keurig's Anticompetitive Acquisitions Are Timely And Raise Genuine Issues of Material Fact.................85

8.   McLane Brings Antitrust Claims, Not "Business Grievances" Claims................87

F.   Disputed Issues Of Material Fact Exist As To Competitor Plaintiffs' Lanham Act Claims And Sherman Act Advertising Claims ......................................................89

1.   Keurig Is Not Entitled To Summary Judgment On Lanham Act Claims .............89

i.   Keurig's False Statements.................................................................90

ii.   Keurig's Statements Were Material .................................................93

iii.   Remaining Lanham Act Elements ..................................................93

2.   Disputed Issues of Material Fact Exist As To Plaintiffs' Sherman Act Claims Based On False Advertising ......................................................94

G.   Disputed Issues of Material Fact Exist As To Plaintiffs' State Law Claims ..............95

1.   Competitor Plaintiffs' Tortious Interference Claims ..............................95

2.   Competitor Plaintiffs' State Law Antitrust And False Advertising Claims ..........97

3.   DPPs' And McLane's Unjust Enrichment Claims Survive Summary Judgment...................................................................................98

II.  Keurig is Not Entitled to Summary Judgment on Damages ...........................................100

    A.  Disputed Issues Of Material Fact Exist As To Plaintiffs' Estimates Of Damages Caused By The Challenged Conduct ........................................................100

        1.  JBR Does Not Claim "Monopoly Growth" ......................................................101

        2.  TreeHouse's Damages Model .............................................................................101

        3.  DPPs' Damages Model ......................................................................................103

        4.  McLane's Damages Model .................................................................................104

    B.  Disputed Issues Of Material Fact Exist As To The Cause Of Competitor Plaintiffs' Damages .................................................................................................105

        1.  TreeHouse's "Lost Customers" .........................................................................105

        2.  Keurig, Not JBR's Business Decisions, Caused JBR's "Losses" .......................107

    C.  Competitor Plaintiffs' Future Damages Are Not Speculative ...................................108

    D.  Disputed Issues of Material Fact Exist As To TreeHouse's Loss of Money It Was Guaranteed Under The Unilever Contract Due To Keurig's Interference.........110

    E.  TreeHouse's Damages for Costs Incurred Are Not Inflated......................................111

    F.  Keurig Is Not Entitled to Summary Judgment on Unjust Enrichment ......................112

    G.  Disputed Issues Of Material Fact Exist As To Plaintiffs' Entitlement to Injunctive And Declaratory Relief..........................................................................112

        1.  Keurig's Exclusionary Contracts With Distributors, Input Suppliers And Co-Manufacturers Constitute Immediate And Ongoing Threats To Competition.......................................................................................................113

        2.  Disputed Issues Of Material Fact Exist As To The Threat to Competition From Keurig's Ongoing Anticompetitive Brewer Redesigns...............................114

CONCLUSION................................................................................................................. 115

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Actrade Fin. Techs., Ltd.*,
424 B.R. 59 (Bankr. S.D.N.Y. 2009) ........................................................................96

*Adams v. Burke*,
84 U.S. 453 (1873) .....................................................................................................82

*Aereotec Int'l v. Honeywell Int'l Inc.*,
836 F.3d 1171 (9th Cir. 2016) ...................................................................................56

*AlarMax Distribs., Inc. v. Tyco Safety Prods. Canada Ltd.*,
2008 WL 2622899 (W.D. Pa. June 27, 2008) ......................................................40, 69

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) ...................................................................................109

*Allen v. Dairy Farmers of Am., Inc.*,
748 F. Supp. 2d 323 (D. Vt. 2010)..............................................................................30

*Allstate Ins. Co. v. Martinez*,
2012 WL 1379666 (D. Conn. Apr. 20, 2012) ...........................................................113

*Alt. Electrodes, LLC v. Empi, Inc.*,
597 F. Supp. 2d 322 (E.D.N.Y. 2009) ........................................................................25

*Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp.*,
93 F. App'x 1 (5th Cir. 2004) .....................................................................................26

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.*,
2005 WL 1515399 (S.D.N.Y. June 23, 2005) ....................................................*passim*

*Am. Pipe & Const. Co. v. Utah*,
414 U.S. 538 (1974).....................................................................................................86

*Am. Tobacco v. U.S.*,
328 U.S. 781 (1946).......................................................................................12, 22, 25

*Amerinet, Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992) ....................................................................................74

*Anderson News, LLC v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012)...................................................................................62, 64

v

*Anderson v. Liberty Lobby, Inc.*,
　477 U.S. 242 (1986)................................................................................11

*AngioDynamics, Inc. v. C.R. Bard, Inc.*,
　2021 WL 1792394 (N.D.N.Y. May 5, 2021).........................................37

*Ashley Meadows Farm, Inc. v. Am. Horse Shows Ass'n, Inc.*,
　617 F. Supp. 1058 (S.D.N.Y. 1985).....................................................112

*Astra Aktiebolag v. Kremers Urban Dev. Co.*,
　2001 WL 1807917 (S.D.N.Y. Oct. 26, 2001).........................................85

*Atl. Richfield v. USA Petroleum*,
　495 U.S. 328 (1990)........................................................................38, 87

*Au New Haven, LLC v. YKK Corp.*,
　2019 WL 1437516 (S.D.N.Y. Mar. 31, 2019)........................................93

*Avery Dennison Corp. v. Acco Brands, Inc.*,
　2000 WL 986995 (C.D. Cal. Feb. 22, 2000)..........................................24

*Baker v. Jewel Food Stores, Inc.*,
　355 Ill. App. 3d 62 (Ill. App. Ct. 2005) ...............................................98

*Balaklaw v. Lovell*,
　14 F.3d 793 (2d Cir. 1994)....................................................................54

*Barber & Ross Co. v. Lifetime Doors, Inc.*,
　810 F.2d 1276 (4th Cir. 1987) ..............................................................65

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*,
　468 U.S. 85 (1984).................................................................................65

*Beckman Instruments, Inc. v. Tech. Dev. Corp.*,
　433 F.2d 55 (7th Cir. 1970) ..................................................................84

*Bedrock Stone & Stuff, Inc. v. Mfrs. & Traders Tr. Co.*,
　2006 WL 890993 (E.D. Pa. Mar. 31, 2006)..........................................109

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
　603 F.2d 263 (2d Cir. 1979)............................................................85, 86

*Betances v. Fischer*,
　403 F. Supp. 3d 212 (S.D.N.Y. 2019)..................................................103

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
　142 F. Supp. 2d 296 (E.D.N.Y. 2001), *aff'd* 35 F. App'x 29 (2d Cir. 2002).........................64

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946) .................................................................................................101, 111

*Bio-Tech. Gen. Corp. v. Genentech, Inc*.,
   886 F. Supp. 377 (S.D.N.Y. 1995), *aff'd*, 66 F.3d 344 (Fed. Cir. 1995) ...............................37

*Black v. Magnolia Liquor Co.*,
   355 U.S. 24 (1957) ...................................................................................................................16

*Blue Shield of Va. v. McCready*,
   457 U.S. 465 (1982) .................................................................................................................70

*Bohack Corp. v. Iowa Beef Processors, Inc.*,
   715 F.2d 703 (2d Cir. 1983) ...................................................................................................106

*Brit. Telecomms. PLC v. Prodigy Commc'ns Corp.*,
   217 F. Supp. 2d 399 (S.D.N.Y. 2002) ......................................................................................82

*Broadview Chem. Corp. v. Loctite Corp.*,
   417 F.2d 998 (2d Cir. 1969) ...................................................................................................113

*Brown v. 3M*,
   265 F.3d 1349 (Fed. Cir. 2001) ...............................................................................................77

*Brulotte v. Thys Co.*,
   379 U.S. 29 (1964) ...................................................................................................................84

*Brunswick Crop. v. Pueblo Bowl-O-Mat Inc.*,
   429 U.S. 477 (1977) .................................................................................................................69

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
   485 U.S. 717 (1988) .................................................................................................................64

*Byars v. Bluff City News Co.*,
   609 F.2d 843 (6th Cir. 1979) ...................................................................................................16

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
   157 F.3d 1340 (Fed. Cir. 1998) ...............................................................................................45

*C=Holdings B.V. v. Asiarim Corp.*,
   992 F. Supp. 2d 223 (S.D.N.Y. 2013) ............................................................................89, 93, 94

*Cal. Motor Trans. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) .................................................................................................................76

*Cap. Imaging v. Mohawk Valley*,
   996 F.2d 537 (2d Cir. 1993) ...................................................................................................32

*Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*,
  403 F. Supp. 3d 191 (S.D.N.Y. 2019)................................................................11, 57

*Casper Sleep, Inc. v. Mitcham*,
  204 F. Supp. 3d 632 (S.D.N.Y. 2016)......................................................................98

*In re Catfish Antitrust Litig.*,
  908 F. Supp. 400 (N.D. Miss. 1995)......................................................................100

*CDC Technologies, Inc. v. IDEXX Laboratories*,
  186 F.3d 74 (2d Cir. 1999)......................................................................................47

*CDC Techs., Inc. v. IDEXX Labs, Inc.*,
  7 F. Supp. 2d 119 (D. Conn. 1998)....................................................................14, 47

*Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal.4th 163 (Cal. 1999).....................................................................................98

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................87

*Chambers v. TRM Copy Centers Corp.*,
  43 F.3d 29 (2d Cir. 1994)......................................................................................106

*Chapdelaine Corp. Secs. & Co. v. Depository Trust & Clearing Corp.*,
  2006 WL 2020950 (S.D.N.Y. July 13, 2006)......................................................30, 37

*Charych v. Siriusware, Inc.*,
  790 F. App'x 299 (2d Cir. 2019)..............................................................................72

*Chemical Bank v. Paul*,
  614 N.E.2d 436 (Ill. App. Ct. 1993).......................................................................96

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GMBH*,
  843 F.3d 48 (2d Cir. 2016).................................................................................89, 90

*City of New York v. Group Health Inc.*,
  2010 WL 2132246 (S.D.N.Y. May 11, 2010), *aff'd*, 649 F.3d 151 (2d Cir.
  2011)........................................................................................................................11

*Clarett v. NFL*,
  306 F. Supp. 2d 379 (S.D.N.Y. 2004)......................................................................70

*Coca-Cola Co. v. Tropicana Prods, Inc.*,
  690 F.2d 312 (2d Cir. 1982)...................................................................................112

*CollegeNet, Inc. v. Common Application, Inc.*,
  355 F. Supp. 3d 926 (D. Or. 2018)..........................................................................26

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ........................................................................14

*Cont'l Ore Co. v. Union Carbide Corp.*,
  370 U.S. 690 (1962)...............................................................................56, 95

*Conwood Co. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ........................................................................25

*In re Credit Default Swaps Antitrust Litig.*,
  2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014)...................................................85, 86

*CSX Transp., Inc. v. Gilkison*,
  2012 WL 5906716 (N.D. W.V. Nov. 26, 2012) ................................................81

*D.O.C.C. Inc. v. Spintech Inc.*,
  1994 WL 872025 (S.D.N.Y. Aug. 15, 1994).....................................................82

*De Jesus v. Sears, Roebuck & Co., Inc.*,
  87 F.3d 65 (2d Cir. 1996) .............................................................................72

*Del. & Hudson Ry. Co. v. Consol. Rail Corp.*,
  902 F.2d 174 (2d Cir. 1990)...........................................................................12

*Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*,
  654 F. Supp. 1195 (N.D.N.Y. 1987)................................................................85

*Delgado v. Ocwen Loan Servicing, LLC*,
  2017 WL52017079 (E.D.N.Y. Nov. 9, 2017)....................................................99

*Dependable Sales & Service, Inc. v. Truecar, Inc.*,
  377 F. Supp. 3d 337 (S.D.N.Y. 2019).............................................................94

*Dial Corp. v. News Corp.*,
  165 F. Supp. 3d 25 (S.D.N.Y. 2016)............................................................ *passim*

*Dial Corp. v. News Corp.*,
  314 F.R.D. 108 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb.
  9, 2016) ..................................................................................................101, 103

*Discover Fin. Servs. v. Visa U.S.A., Inc.*,
  582 F. Supp. 2d 501 (S.D.N.Y. 2008).............................................................106

*Drug Mart Pharmacy Corp. v. American Home Products Corp.*,
  472 F. Supp. 2d 385 (E.D.N.Y. 2007) .......................................................103, 104

*E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*,
  2005 WL 535065 (S.D.N.Y. Mar. 8, 2005) ......................................................2

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir.2011) ..................................................................30

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992) .............................................................. *passim*

*Egyptian Goddess, Inc. v. Swisa*,
    543 F.3d 665 (Fed. Cir. 2008) ..............................................................83

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods. Inc.*,
    129 F.3d 240 (2d Cir. 1997) .................................................................63

*In re Electronic Books Antitrust Litigation*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) ....................................................71

*Elledge v. Friberg-Cooper Water Supply Corp.*,
    240 S.W.3d 869 (Tex. 2007) .................................................................99

*Emigra Grp., LLC v. Fragomen LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009) ..........................................14, 26

*Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*,
    814 F.2d 90 (2d Cir. 1987) ..................................................................56

*In re EVIC Class Action Litig.*,
    2002 WL 1766554 (S.D.N.Y. July 31, 2002) ........................................12

*Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*,
    2004 WL 6044760 (S.D. Fla. July 1, 2004) .........................................109

*Expert Masonry, Inc. v. Boone Cty., Ky.*,
    440 F.3d 336 (6th Cir. 2006) ...............................................................56

*Fashion Originators' Guild of Am. v. FTC*,
    312 U.S. 457 (1941) ............................................................................62

*Fisher v. Kelly*,
    105 F.3d 350 (7th Cir. 1997) ...............................................................81

*FTC v. AbbVie Inc.*,
    976 F.3d 327 (3d Cir. 2020) ................................................................81

*FTC v. Actavis, Inc.*,
    570 U.S. 136 (2013) ............................................................................63

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ........................................................26

x

*FTC v. Sysco Corp.*,
   113 F. Supp. 3d 1 (D.D.C. 2015) ...................................................................26

*Gabriel Tech. Corp. v. Qualcomm Inc.*,
   2013 WL 410103 (S.D. Cal. Feb. 1, 2013) .....................................................77

*Gelita, LLC v. 133 Second Ave., LLC*,
   2014 WL 278408 (N.Y. Sup. Ct. 2014) ...........................................14, 50, 52, 96

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
   810 F.2d 795 (8th Cir. 1987) .........................................................................12

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
   386 F.3d 485 (2d Cir. 2004) ................................................................ *passim*

*GFI Brokers, LLC v. Santana*,
   2009 WL 2482130 (S.D.N.Y. Aug. 13, 2009) ...............................................111

*Glaberson v. Comcast Corp.*,
   2006 WL 2559479 (E.D. Pa. Aug. 31, 2006), *rev'd in part on other grounds*,
   2006 WL 3762028 (E.D. Pa. Dec. 19, 2006) ............................................85, 86

*Graco Inc. v. PMC Global, Inc.*,
   2012 WL 762448 (D.N.J. Mar. 6, 2012) ..........................................................52

*Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*,
   2016 WL 4129111 (S.D.N.Y. Aug. 3, 2016) .................................................103

*Handicomp, Inc. v. U.S. Golf Ass'n*,
   2000 WL 426245 (3d Cir. Mar. 22, 2000) ......................................................14

*Hanover Shoe v. United Shoe Mach. Corp.*,
   392 U.S. 481 (1968) ......................................................................................87

*Harris County Texas v. MERSCORP*,
   791 F.3d 545 (5th Cir. 2015) .........................................................................99

*Harrison Aire, Inc. v. Aerostar Int'l Inc.*,
   423 F.3d 374 (3d Cir. 2005) ..........................................................................29

*ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*,
   249 F. Supp. 2d 622 (E.D. Pa. 2003), *amended*, 268 F. Supp. 2d 448 (E.D. Pa.
   2003) ..........................................................................................................109

*IMAF v. J.C. Penney Co.*,
   1991 WL 66892 (S.D.N.Y. Apr. 24, 1991) ..............................................96, 111

*Image Tech. Servs. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ................................................................26, 27

*Impax Labs., Inc. v. F.T.C.*,
   994 F.3d 484 (5th Cir. 2021) ........................................................................63

*Impression Prods., Inc. v. Lexmark Int'l, Inc.*,
   137 S. Ct. 1523 (2017)....................................................................................82

*Inamed Corp. v. Kuzmak*,
   275 F. Supp. 2d 1100 (C.D. Cal. 2002) ......................................................85

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010).........................................................................62

*Insight Equity v. Transitions Optical, Inc.*,
   252 F. Supp. 3d 382 (D. Del. 2017)...................................................108, 109

*Int'l Salt Co. v. U.S.*,
   332 U.S. 392 (1947).......................................................................................74

*Internet Pipeline, Inc. v. Aplifi, Inc.*,
   2011 WL 4528340 (E.D. Pa. Sept. 29, 2011) ...........................................85

*J. Truett Payne Co. v. Chrysler Motors Corp.*,
   451 U.S. 557 (1981)..............................................................................100, 111

*Jack's Cookie Co. v. Du-Bro Foods, Inc.*,
   145 Misc. 2d 699 (N.Y. Civ. Ct. 1989)........................................................98

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)............................................................................22, 24, 38

*Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vt., Inc.*,
   845 F.2d 404 (2d Cir. 1988)..........................................................................26

*Kellogg v. Shushereba*,
   82 A.3d 1121 (Vt. 2013)................................................................................99

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   383 F. Supp. 3d 187 (S.D.N.Y. 2019).................................................. *passim*

*Keurig, Inc. v. JBR, Inc.*,
   2013 WL 2304171 (D. Mass. May 24, 2013)........................................77, 83, 84

*Keurig, Inc. v. JBR, Inc.*,
   558 F. App'x 1009 (Fed. Cir. 2014) ...........................................................83

*Keurig, Inc. v. Sturm Foods, Inc.*,
  2012 WL 4049799 (D. Del. Sept .13, 2012) ................................................................ *passim*

*Keurig, Inc. v. Sturm Foods, Inc.*,
  732 F.3d 1370 (Fed. Cir. 2013) ...............................................................................83

*Knoll Pharm. Co., Inc. v. Teva Pharm. USA, Inc.*,
  2001 WL 1001117 (N.D. Ill. Aug 24, 2001) ..........................................................77

*Kustom Auto. Recovery, Inc. v. Vill. of Lyons*,
  1998 WL 887076 (N.D. Ill. Dec. 11, 1998) ..........................................................105

*L.A. Land Co. v. Brunswick Corp.*,
  6 F.3d 1422 (9th Cir. 1993) ....................................................................................14

*Ladopoulos v. PDQ Food Stores, Inc.*,
  2002 WL 927616 (Wis. Ct. App. 2002) ................................................................111

*Landmarks Holding Corp. v. Bermant*,
  664 F.2d 891 (2d Cir. 1981) .............................................................................77, 79

*LaSalle Bank Nat'l Assoc. v. Paramont Props.*,
  588 F. Supp. 2d 840 (N.D. Ill. 2008) ...................................................................111

*Laumann v. NHL*,
  907 F. Supp. 2d 465 (S.D.N.Y. 2012) ................................................30, 41, 67, 72

*Learning Care Grp., Inc. v. Armetta*,
  2016 WL 3248178 (D. Conn. June 12, 2016) ...............................................108, 109

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  762 F.3d 1114 (10th Cir. 2014) ..............................................................................30

*Lenzi v. Systemax, Inc.*,
  944 F.3d 97 (2d Cir. 2019) ......................................................................................10

*Leonard v. Abbot Labs., Inc.*,
  2012 WL 764199 (E.D.N.Y. Mar. 5, 2012) ............................................................79

*LePage's, Inc. v. 3M*,
  324 F.3d 141 (3d Cir. 2003) ................................................................2, 49, 56, 109

*Licci v. Lebanese Canadian Bank, SAL*,
  672 F.3d 155 (2d Cir. 2012) ...............................................................................98, 99

*Lorain Journal Co. v. U.S.*,
  342 U.S. 143 (1951) ................................................................................................16

*MacDermid Printing Solutions v. Cortron*,
   833 F.3d 172 (2d Cir. 2016)................................................................42

*Mad Rhino, Inc. v. Best Buy Co.*,
   2008 WL 8760854 (C.D. Cal. Jan. 14, 2008) ...................................103

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008)...............................................................63

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*
   475 U.S. 574 (1986)...........................................................................69

*Maxon Hyundai Mazda v. Carfax*,
   2014 WL 4988268 (S.D.N.Y. Sept. 29, 2014)...................................54

*Maxon Hyundai Mazda v. Carfax, Inc.*,
   2016 WL 7231941 (S.D.N.Y. Dec. 9, 2016) .....................................54

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013)...............................................................65

*McGahee v. N. Propane Gas Co.*,
   858 F.2d 1487 (11th Cir. 1988) .........................................................30

*McKinley Assocs., LLC v. McKesson HBOC, Inc.*,
   110 F. Supp. 2d 169 (W.D.N.Y. 2000)............................................111

*In re McWane, Inc.*,
   2012 WL 5375161 (F.T.C. Aug. 9, 2012) .........................................47

*McWane, Inc. v. FTC*,
   783 F.3d 814 (11th Cir. 2015) ................................................. *passim*

*Media Glow Digital, LLC v. Panasonic Corp.*,
   2019 WL 1055527 (S.D.N.Y. Mar. 6, 2019) .....................................55

*Merck Eprova AG v. Gnosis S.P.A.*,
   760 F.3d 247 (2d Cir. 2014)...........................................90, 93, 94, 112

*Metro. Life Ins. Co. v. Cotter*,
   984 N.E.2d 835 (Mass. 2013) ...........................................................99

*Meyer v. Fanelli*,
   266 A.D.2d 361 (2d Dep't 1999) ......................................................96

*Mobil Oil Corp. v. Flores*,
   175 F. Supp. 2d 1080 (N.D. Ill. 2001) ............................................111

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1982) ................................................................................................66, 67

*Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*,
  152 U.S. 425 (1894) ........................................................................................................82

*Estate of Mortner v. Thompson*,
  182 A.3d 1260 (N.H. 2018) .............................................................................................99

*Move, Inc. v. Real Estate Alliance Ltd.*,
  2008 WL 11338568 (C.D. Cal. Dec. 22, 2008) ...............................................................77

*Mueller Co. v. U.S. Pipe & Foundry Co.*,
  351 F. Supp. 2d 1 (D.N.H. 2005) ....................................................................................80

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2017) ..............................................................................................62

*N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*,
  430 F. Supp. 2d 140 (S.D.N.Y. 2006) .............................................................................31

*Nat'l Assoc. of Pharma. Mfgs, Inc. v. Ayerst Labs.*,
  850 F.2d 904 (2d Cir. 1988) ..................................................................................43, 94, 95

*Nat'l Soc. of Prof'l Eng'rs v. U.S.*,
  435 U.S. 679 (1978) ........................................................................................................22

*Nespresso U.S. v. Ethical Coffee Co.*,
  2016 WL 11697058 (D. Del. Sept. 7, 2016) ....................................................................27

*In re Neurontin Antitrust Litig.*,
  2009 WL 2751029 (D.N.J. Aug. 28, 2009) ......................................................................81

*Neutrik AG v. Switchcraft, Inc.*,
  2001 WL 286722 (S.D.N.Y. Mar. 23, 2001) ....................................................................80

*In re Nine W. Shoes Antitrust Litig.*,
  80 F. Supp. 2d 181 (S.D.N.Y. 2000) ...............................................................................31

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
  670 F. Supp. 1313 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987) .................................74

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ....................................................................................................83

*Omega Eng'g, Inc. v. Eastman Kodak Co.*,
  30 F. Supp. 2d 226 (D. Conn. 1998) ...............................................................................79

*Omega Envtl., Inc. v. Gilbarco, Inc.*,
  127 F.3d 1157 (9th Cir. 1997) ........................................................47

*Paddock Publ'ns, Inc. v. Chi. Tribune Co.*,
  103 F.3d 42 (7th Cir. 1997) ........................................................54, 61

*Pennwalt Corp. v. Metro. Sanitary Dist. of Greater Chi.*,
  368 F. Supp. 972 (N.D. Ill. 1973) ........................................................96

*PepsiCo, Inc. v. The Coca-Cola Co.*,
  1998 WL 547088 (S.D.N.Y. Aug. 27, 1998)........................................13, 16, 57, 58

*PepsiCo, Inc. v. The Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002)........................................................11

*Perez v. DirecTV Group Holdings, LLC*,
  2019 WL 6362471 (C.D. Cal. July 23, 2019) ........................................................81

*Perma Life Mufflers v. Int'l Parts Corp.*,
  392 U.S. 134 (1968)........................................................106

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
  2021 WL 1199363 (S.D.N.Y. Mar. 30, 2021) ........................................................69, 70

*Playtex Products LLC v. Munchkin, Inc.*,
  2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) ........................................................93, 94

*In re Polygram Holding, Inc.*,
  2003 WL 25797195 (Jul. 24, 2003)........................................................63

*Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*,
  2014 WL 1784082 (D. Conn. May 3, 2014)........................................................109

*Primetime 24 Joint Venture v. NBC*,
  219 F.3d 92 (2d Cir. 2000)........................................................76

*Princo Corp. v. Int'l Trade Comm'n*,
  616 F.3d 1318 (Fed. Cir. 2010)........................................................84

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
  508 U.S. 49 (1993)........................................................ *passim*

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012)........................................................11, 105

*Quanta Computer, Inc. v. LG Elec. Inc.*,
  553 U.S. 617 (2008)........................................................82

*R.C. Bigelow, Inc. v. Unilever N.V.*,
  867 F.2d 102 (2d Cir. 1989)......................................................................................112, 115

*Realtime Data, LLC v. Stanley*,
  897 F. Supp. 2d 146 (S.D.N.Y. 2012)...................................................................................11

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
  899 F.2d 951 (10th Cir. 1990) ...............................................................................................13

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .................................................................................................75

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*,
  63 F. Supp. 2d 1218 (E.D. Cal. 1999)....................................................................................13

*Reddy v. Puma*,
  2006 WL 2711535 (E.D.N.Y. Sept. 21, 2006) ..............................................................31, 37

*Reed Const. Data Inc. v. McGraw-Hill Cos.*
  638 F. App'x 43 (2d Cir. 2016) .............................................................................................93

*In re Refco Inc. Sec. Litig.*,
  2011 WL 13243784 (S.D.N.Y. Mar. 28, 2011) .....................................................................11

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
  335 F.R.D. 1 (E.D.N.Y. 2020)..............................................................................................103

*River Light V, L.P. v. Lin & J Int'l. Inc.*,
  2015 WL 3916271 (S.D.N.Y. June 25, 2015) ......................................................................112

*RMD, LLC v. Nitto Ams., Inc.*,
  2012 WL 5398345 (D. Kan. Nov. 5, 2012) ..........................................................................109

*Rodriguez v. It's Just Lunch, Int'l*,
  300 F.R.D. 125 (S.D.N.Y. 2014) ...........................................................................................99

*Rogoz v. City of Hartford*,
  796 F.3d 236 (2d. Cir. 2015)..................................................................................................10

*Rome Ambulatory Surgical Ctr., LLC v. Rome Mem. Hosp., Inc.*,
  349 F. Supp. 2d 389 (N.D.N.Y. 2004)....................................................................................48

*Rosenthal Collins Grp., LLC v. Trading Techs. Int'l., Inc.*,
  2005 WL 3557947 (N.D. Ill. Dec. 26, 2005)..........................................................................85

*Ross v. Bank of Am., N.A. (USA)*,
  524 F.3d 217 (2d Cir. 2008).............................................................................................30, 41

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ........................................................................63

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
  28 F.3d 1379 (5th Cir. 1994) ........................................................................14

*Salon FAD v. L'Oreal USA, Inc.*,
  2011 WL 70591 (S.D.N.Y. Jan. 10, 2011) ...............................................93, 94

*Savory Pie Guy, LLC v. Comtec Indus., Ltd*,
  2016 WL 7471340 (S.D.N.Y. Dec. 28, 2016) ............................14, 24, 26, 30

*New York ex. rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)............................................................... *passim*

*People ex. rel. Scott v. Convenient Food Market, Inc.*,
  21 Ill. App. 3d 97 (Ill. App. Ct. 1974) ........................................................98

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*,
  2018 WL 7197233 (S.D.N.Y. Dec. 26, 2018) .............................................103

*Shaw v. JAR-Ramona Plaza LLC*,
  2017 WL 1157841 (C.D. Cal. Mar. 27, 2017) ...............................................2

*Singleton Mgmt., Inc. v. Compere*,
  243 A.D.2d 213 (1st Dep't 1998) .................................................................111

*Sitts v. Dairy Farmers of Am., Inc.*,
  417 F. Supp. 3d 433 (D. Vt. 2019)................................................................30

*Smith v. City of New York*,
  2015 WL 4643125 (S.D.N.Y. Aug. 5, 2015) .................................................11

*Smolka Co. v. Cent. Foundry Co.*,
  52 F.R.D. 248 (S.D.N.Y. 1971) ...................................................................100

*SMS Sys. Maint. Servs. v. Digit. Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999)............................................................................29

*Sourceone Dental, Inc. v. Patterson Cos., Inc.*,
  310 F. Supp. 3d 346 (E.D.N.Y. 2018) ...................................................99, 101

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)......................................................................................30

*In re SRAM Antitrust Litig.*,
  2010 WL 5141861 (N.D. Cal. Dec. 13, 2010) .............................................100

*Standard Oil Co. of N.J. v. U.S.*,
  221 U.S. 1 (1911)..........................................................................................22

*Standard Oil Co. v. U.S.*,
  337 U.S. 293 (1949)..................................................................................56, 60

*Starr v. Sony BMG Music Entertainment*,
  592 F.3d 314 (2d Cir. 2010)................................................................65, 66, 72

*Sterling Merch., Inc. v. Nestle, S.A.*,
  656 F.3d 112 (1st Cir. 2011)......................................................................32

*Sterling Merch. Inc. v. Nestle, S.A.*,
  724 F. Supp. 2d 245 (D.P.R. 2010)..............................................................47

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*,
  373 F.3d 57 (1st Cir. 2004)..........................................................................56

*Susser v. Carvel Corp.*,
  332 F.2d 505 (2d Cir. 1964)....................................................................60, 61

*Tampa Elec. Co. v. Nashville Coal Co.*,
  365 U.S. 320 (1961)..................................................................................47, 60

*Tang v. C.A.R.S. Protection Plus, Inc.*,
  301 Wis.2d 752 (Wis. Ct. App. 2007) .......................................................96

*Tenneco, Inc. v. F.T.C.*,
  689 F.2d 346 (2d Cir. 1982)....................................................................58, 86

*Terhune v. Bd. of Ed. of Zion Elementary School District 6*,
  2013 WL 623603 (N.D. Ill. Feb. 20, 2013) ..............................................111

*Teva Pharma v. Abbott Labs.*,
  580 F. Supp. 2d 345 (D. Del. 2008)............................................................81

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007)..........................................................................93

*Times-Picayune Pub. Co. v. U.S.*,
  345 U.S. 594 (1953)........................................................................................72

*Todorov v. DCH Healthcare Auth.*,
  921 F.2d 1438 (11th Cir. 1991) ..................................................................101

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)..................................................................13, 14, 30

*Toys "R" Us, Inc. v. FTC,*
   221 F.3d 928 (7th Cir. 2000) ...............................................................66

*Trendsettah USA, Inc. v. Swisher Int'l Inc.,*
   2016 WL 6822191 (C.D. Cal. Jan. 21, 2016) ........................................13

*Tucker v. Apple Comput., Inc.,*
   493 F. Supp.2d 1090 (N.D. Cal. 2006) .................................................98

*Turbon Int'l, Inc. v. Hewlett-Packard Co.,*
   769 F. Supp. 2d 262 (S.D.N.Y. 2011).....................................................91

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,*
   676 F.2d 1291 (9th Cir. 1982) .............................................................47

*U.S. v. Realty Multi-List, Inc.,*
   629 F.2d 1351 (5th Cir. 1980) .............................................................63

*U.S. Football League v. NFL,*
   842 F.2d 1335 (2d Cir. 1988)..................................................101, 104

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Works Local Union No. 3, AFL-CIO,*
   2002 WL 91625 (S.D.N.Y. Jan. 23, 2002) ............................................71

*U.S. v. Addyston Pipe & Steel Co.,*
   85 F. 271 (6th Cir. 1898) ....................................................................63

*U.S. v. Apple, Inc.,*
   791 F.3d 290 (2d Cir. 2015)................................................................67

*U.S. v. Chi. Tribune-N.Y. News Syndicate,*
   309 F. Supp. 1301 (S.D.N.Y. 1970)......................................................63

*U.S. v. Dentsply Int'l, Inc.,*
   399 F.3d 181 (3d Cir. 2005)....................................................... *passim*

*U.S. v. Grinnell,*
   384 U.S. 563 (1966).....................................................................12, 87

*U.S. v. Koppers Co.,*
   652 F.2d 290 (2d Cir. 1981)................................................................63

*U.S. v. McKesson & Robbins,*
   351 U.S. 305 (1956)............................................................................63

*U.S. v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001) (en banc) ........................................ *passim*

*U.S. v. Siemens Corp.*,
  621 F.2d 499 (2d Cir. 1980)..................................................................58, 86

*U.S. v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ...............................................................14

*U.S. v. Univis Lens Co.*,
  316 U.S. 241 (1942).............................................................................82

*U.S. v. Visa USA*,
  344 F.3d 229 (2d Cir. 2003)........................................................30, 41, 65

*Union Carbide Corp. v. Montell N.V.*,
  944 F. Supp. 1119 (S.D.N.Y. 1996)......................................................27

*United Shoe Mach. Corp. v. U.S.*,
  258 U.S. 451 (1922).............................................................................72

*USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*,
  31 F.3d 800 (9th Cir. 1994) .............................................................44, 47

*Vandervelde v. Put & Call Brokers & Dealers Ass'n*,
  344 F. Supp. 118, *supplemented*, 344 F. Supp. 157 (S.D.N.Y. 1972) ...................106

*In re Verizon Ins. Coverage Appeals*,
  222 A.3d 566 (Del. 2019) ....................................................................99

*Versata Software, Inc. v. SAP Am., Inc.*,
  717 F.3d 1255 (Fed. Cir. 2013).............................................................109

*In re Visa Check/Mastermoney Antitrust Litig.*,
  2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) .........................................73

*VKK Corp. v. Nat'l Football League*,
  244 F.3d 114 (2d Cir. 2001)..................................................................96

*Waugh Chapel South, LLC v. United Food and Com. Workers Union Local 27*,
  728 F.3d 354 (4th Cir. 2013) ...........................................................77, 79

*In re Wellbutrin SR Antitrust Litig.*,
  749 F. Supp. 2d 260 (E.D. Pa. 2010) ...................................................80

*Westphal v. Cantwell-Peterson Clinic*,
  57 Wis. 2d 402 (1973) ........................................................................111

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007).............................................................................26

*In re Wireless Tel. Servs. Antitrust Litig.*,
    385 F. Supp. 2d 403 (S.D.N.Y. Aug. 29, 2005)................................................................27

*Xerox Corp. v. Media Scis., Inc.*,
    660 F. Supp. 2d 535 (S.D.N.Y. 2009).............................................................28, 29

*Xerox Corp. v. Media Scis. Int'l, Inc.*,
    511 F. Supp. 2d 372 (S.D.N.Y. 2007)................................................................37

*Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*,
    224 F. Supp. 2d 657 (S.D.N.Y. 2002)............................................................. *passim*

*Yentsch v. Texaco*,
    630 F.2d 46 (2d Cir. 1980)................................................................72

*Z Techs. v. Lubrizol*,
    753 F.3d 594 (6th Cir. 2014) ................................................................86

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    395 U.S. 100 (1969)................................................................100

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971)................................................................96

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012)................................................50, 56, 60

*In re Zyprexa Prod. Liab. Litig.*,
    671 F. Supp. 2d 397 (E.D.N.Y. 2009) ................................................................103

**Statutes**

35 U.S.C. § 285................................................................83

Cartwright Act ................................................................98

Clayton Act ................................................................ *passim*

Donnelly Act................................................................98

Illinois Antitrust Act ................................................................98

Illinois Consumer Fraud and Deceptive Business Practices Act................................97

Illinois Uniform Deceptive Trade Practices Act................................................................97

Lanham Act................................................................ *passim*

Magnuson-Moss Warranty Act, 15 U.S.C. § 2302(c)................................................................44

New York Consumer Protection Act ....................................................................98

New York Donnelly Act ......................................................................................98

Robinson-Patman Act ........................................................................................103

Sherman Act............................................................................................... *passim*

Wisconsin Antitrust Act......................................................................................97

**Other Authorities**

Fed. R. Civ. P. 56................................................................................................11

Fed. R. Civ. P. 56(a) ...........................................................................................10

Fed. R. Civ. P. 57..............................................................................................113

Fed. R. Civ. P. 408..............................................................................................81

## PRELIMINARY STATEMENT

Keurig's motion is a work of fiction. Keurig is right that there have been many depositions and documents, but disingenuously ignores them. Keurig confirms ████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████. While "████████████████████████████████████ ███████████████████████████████, that never came to pass because of Keurig's anticompetitive acts that had the purpose and effect of excluding competition, raising prices, protecting Keurig's margins, recapturing unlicensed share, and maintaining Keurig's monopolies. As a result, Keurig's shares of both the relevant cup and brewer markets have persistently exceeded the 80% share the Supreme Court holds to be strong evidence of a "substantial monopoly."

Competitors have been unable to disrupt Keurig's durable monopolies because they entered to find that Keurig had already preempted these markets with more than ████████████ that erected barriers and prohibited market participants from working with Keurig's competitors at every level of the supply chain. In addition, Keurig repeatedly sued to exclude competitive products from the market, publicly challenging the "quality" of those products before they had even tested them, all the while privately acknowledging █████████████████████. These exclusionary tactics worked, enabling Keurig ████████████████████████████████ to try to exclude TreeHouse from the market. When those suits were rejected by the courts, Keurig implemented Lock-Out Technology in its dominant brewers to coerce the nation's largest retailers to pull Competitive Cups from their shelves. Keurig falsely told customers it had already stopped making brewers without Lock-Out Technology, would no longer sell brewers without Lock-Out Technology, and that Competitive Cup manufacturers would be unable to reverse engineer its technology such that retailers had no choice but to either switch manufacturers or abandon their single-serve cup programs altogether. Having already blocked competitors' access to the Away-

1

From-Home ("AFH") channel, Keurig's monopoly maintenance plan worked, enabling Keurig to again raise prices soon after releasing the 2.0 Brewer.

There has perhaps been no case in which a defendant has engaged in so many anticompetitive acts of monopoly maintenance and collusion for the express purpose of inhibiting competitors' growth and blocking sales of competitive products that customers wanted. Apart from the stack of declarations from would-be customers and competitors detailing how Keurig's monopolistic conduct harmed competition on the merits,[1] the evidence from Keurig's own files and witnesses is already stronger at summary judgment than many successful antitrust plaintiffs have presented at trial, including in landmark cases like *Kodak*, *Geneva*, *eBooks*, *Microsoft*, *Dentsply*, and *LePage's*. Plaintiffs' evidence reveals numerous types of unlawful conduct, including tying, exclusive dealing, product disparagement, anticompetitive product redesign, group boycotts, tortious interference, and other exclusionary conduct—"the overall effect of which is to coerce customers to purchase K-Cups over Competitor Cups, rather than to compete on the merits." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 230 (S.D.N.Y. 2019) (hereinafter, "MTD Order").

While Keurig tries to "tightly compartmentalize" Plaintiffs' evidence, "courts must look to the monopolist's conduct taken as a whole, rather than considering each aspect in isolation." *LePage's, Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (citing *Cont'l Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 699 (1962)). Thus, all of Plaintiffs' claims should proceed to trial together. In any event, the evidence for each claim is compelling and, at a minimum, more than sufficient

---

[1] Plaintiffs have submitted declarations from 21 individuals, most of whom have already committed to testify at trial. *See* Exs. 54, 141-42, 145-46, 197-98, 228, 261-62, 380, 499, 554, 561, 664, 889, 910, 978, 1119-20, 1123, 1128. Courts have repeatedly found that evidence set forth in sworn declarations is sufficient to create a genuine material issue of disputed fact. *See, e.g.*, *E-Z Bowz, L.L.C. v. Pro. Prod. Rsch. Co.*, 2005 WL 535065, at *7 (S.D.N.Y. Mar. 8, 2005) (finding evidence relied upon, including sworn declaration, "admissible and sufficient to create a genuine material issue of disputed fact"); *Shaw v. JAR-Ramona Plaza LLC*, 2017 WL 1157841, at *4 (C.D. Cal. Mar. 27, 2017) (plaintiff's declaration demonstrated a material issue of disputed fact).

to raise issues of material fact. Just a small sampling of admissions and direct evidence from Keurig and its partners lays bare Keurig's disingenuous game of make believe:

### *Keurig and Its Partners Admit Keurig Has Substantial Cup and Brewer Monopolies*



- Keurig ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[2]

- Keurig's partners agree that Keurig ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[3]

- Keurig partners also explained that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" and that Keurig's "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[4]

### *Keurig and Its Partners Admit Keurig Has Monopoly Power*

- Keurig admits it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[6]

- Keurig admits that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[7]

- Keurig admits that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[8]

- Keurig admits that it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[9]

- Keurig's partners agree that Keurig can ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

---

[2] PSUF 909-10, 916-18; *see also* PSUF 911-12, 191-20, 1045-60, 1101.

[3] *See* PSUF 1064-65, 1073-74, 1077, 1085 (quoting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[4] *See* PSUF 973, 985 (quoting ▮▮▮▮▮▮▮▮▮▮).

[5] *See, e.g.,* PSUF 1917 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"), 1920 ("▮▮▮▮▮▮▮▮▮▮"); *see also infra* §I.B1.

[6] *See, e.g.,* PSUF 914-15 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"), 1022 (Keurig ▮▮▮▮▮▮▮▮▮▮▮▮); *see also infra* §I.A.1.

[7] *See, e.g.,* PSUF 1029, 1161, 1030, 1189 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); *see also infra* at §I.B.2.

[8] *See, e.g.,* PSUF 1916 ("▮▮▮▮▮▮▮▮▮▮▮▮"), 1918 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 1167 (Keurig "▮▮▮▮▮▮▮▮▮").

[9] *See, e.g.,* PSUF 1919 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), 1922 ("▮▮▮▮▮▮▮▮▮▮▮").

[10] *See, e.g.,* PSUF 1084 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 1082 (▮▮▮▮▮▮▮▮▮), 963 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).



█████████████████████████████████████████████████ [14]

***Keurig Admits It Erected Barriers to Entry and Expansion to Restrain Competition***

- Keurig admits there been █████████████████████████████████ and that █████████████████████████████████████ PSUF 200, 1925.

- Keurig also admits that "██████████████████████████████ … ███████████████████████████████████████ PSUF 1033.

- Keurig also admits that it created contractual barriers to entry and expansion, for example, by "██████████████████████████████████████████ and by ██████████████████████████████████████████ PSUF 1032, 1137.

- Keurig also admits that it created a "████████████████ that its "███ ██████████████████████ and that Keurig sought to ███ ████████ and create a █████████████████████ in order to give Keurig a █████████████ PSUF 1039, 1062, 1171, 521-22, 506-08, 516.[15]

***Keurig Admits It Used Non-Competition Agreements with Competitor Brands to Boycott Competitive Cups and Brewers to Maintain Keurig's Monopolies***

- Keurig admits that it ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████." PSUF 1044,1165-66.[16] This strategy includes getting █████████████████████████████████ PSUF 1927.

- As Keurig admits, it has ██████████████████████████████ █████████████████████ PSUF 60. The admitted ██████████ ████████████ PSUF 1189.[17]

---

[11] *See, e.g.*, PSUF 1000.
[12] *See, e.g.*, PSUF 1000 ("███████████████████████████████████████").
[13] *See, e.g.*, PSUF 1124 ("████████████████████████████████
███████████████████).
[14] *See, e.g.*, PSUF 1087, 1923 (██████████████████████).
[15] Others have also identified barriers to entry. *See, e.g.*, PSUF 1993 ████████████████████████
██████████ 1153 (█████
███████████████, 1034 (████
██████████████.
[16] *See also* PSUF 1926 (admitting Keurig uses ██████████
████████████████████████████████████.
[17] Keurig admits that its "██████████████████████████████
████████ PSUF 1928. This strategy includes "██████████████
████████████████" PSUF 1929, and restraining their brand partners' ability to compete freely

### *Keurig Admits it Used Lock-Out Technology to Maintain Keurig's Monopolies*

- Keurig admits that it developed Lock-Out Technology known as "CBT" to: ██████████████████████████████████████████████ ███████████████ " PSUF 1027; " ████████████████████████████████████████████ ██████████████████████████████████████████ ," PSUF 974; to ███████ Keurig's control over the ██████████████████████████, " PSUF 62, 1184; to ensure that ████████████████████████████████████████████████████████ " PSUF 1944; and that Keurig " ████████████████████████████████████████ ████████████████████ " PSUF 559-60.[18]

- Keurig employees also admitted that 2.0 Brewer ███████████████████████████ ████████████ " PSUF 1908; that the " ██████████████████████ ████████████████████████████████████████████████████████████ ██████████, PSUF 525; and that CBT " ██████████████████ ████████████ " PSUF 562.[19]

### *Keurig Admits that CBT Enabled Keurig to Combat Unlicensed Share by Coercing Brands and Retailers to Enter Exclusionary Agreements That Maintained Keurig's Monopolies*

- Keurig admits that it used CBT to ████████████████████████████████ ████████████████████████████████ " PSUF 1972.[20] Keurig entered into retailer ████████ agreements to ████████████████████████████████████ and, by 2014, " ████████████████████████████████ " PSUF 1343. Keurig's prior concern that ██████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████ " PSUF 1169.

- Keurig also admits that its plan worked in that CBT " ████████████████████████ ██████████████████ ," PSUF 1625, 1843, and that " ████████████████████████ ████████████████████████████████████████████████████████████████████

---

against Keurig by limiting the SKUs, varieties, and volume they can sell, as well as the customer and channels to which they can sell. *See* PSUF 1185, 1930 ████████████████████████████████████████ ████████████████████████████████████████████████████████████████, 1931 (" ██████ ████████████████████████ ); *infra* §I.E.3.

[18] *See also* PSUF 930 (CBT used to ████████████████████████████████████ "), 1044 ████████ ██████████████████████████████ ), 1910 ████████████████████████████████████████████████ ", 1995 ( ████████████████████████████████████████████████████████████████████ ).

[19] Keurig's business partners likewise understood that CBT was implemented to restrain competition and not to benefit consumers. *See, e.g.,* PSUF 513 (Keurig asked supplier to " ██████████████████████████████████████████████████████ ██████ "), 1706 (Keurig partner admitted the " ████████████████████████████████████████ ████████████ ), 1969 (Costco admitted " ██████████████████████████████ ████████████████████████ ).

[20] *See also* PSUF 1627 (Keurig used Lock-Out Technology to " ██████████████████████████ ██████████████████████████████████ ). By pursuing ██████████████████████ ████████████████████████████████████████████████ " PSUF 1907, 1880 (Lock-Out Technology was ████████████████████ ██████████████████████████ or both partner and retail private label agreements); *see also* PSUF 1971 ( ██████████████████████████████████████████████████████████████ ██████████████████████, 1996 (entering private label would ████████ ████████████████████ ).

██████████████████████████████████████████████████████████ " PSUF 75.[21]

- Keurig admits that customers and consumers have been harmed by its takeover of private label accounts: ████████

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████

PSUF 1973.[22]

- Customers understood that Keurig was taking a ' █████████████████████████
█████████████ '" PSUF 1273.[23] But " ██████████████████████████████████████
██████████████████████████████████████████████████████████ ".

PSUF 975, 978.[24]

### *Keurig Admits It Used Exclusive Supplier Agreements to Maintain Its Monopolies*

- Keurig admits that in 2011, there were "only two companies in the world making K-Cup packaging equipment … and they're both under contract," PSUF 196, such that "Keurig's ' ████████████████████████████████████████████████████████████████████████████████
██████████████ " PSUF 200, 1031.

- Keurig admits that it enters into contracts for the ' █████████████████████████ " so that competitors " █████████████████████████████████████ " Competitive Cups. PSUF 1061.[25]

---

[21] PSUF 1341, 1844, 1880 (Lock-Out Technology was the ████████████████████████████████
██████████████ ).

[22] *See also* PSUF 1317, 932 (discussing development of Lock-Out Technology to ████████████████ ). Customers and consumers were also harmed by the loss of new products. *See, e.g.*, PSUF 1656 (' ██████████████████████
██████████ ).

[23] PSUF 1630 ████████████████████████████████████████████████████████████
████████████████████████████████████ , 1845 ████ ██████████████ , 1317, 932 (
████████████████ ).

[24] *See, e.g.*, PSUF 969 ██████████████████████████████████████
██████████ ), 1140 (' ████████████████████████████████ ).

[25] Keurig documents show it has at times had no interest in supplier relationships unless they were supplying competitors. *See* PSUF 192. In that case, Keurig would " ████████████████████████████████████████
██████████████████████████████████████████████████████████ "

PSUF 1932, 1933 ( ████ work was shut down). Keurig's contracts last from ████ to ██ or more years with restrictions that ████████████████████████████ . *See* PSUF 108-89, 193-94. Suppliers acquiesced to restrictions even over objections as to their legality under the antitrust laws. *See* PSUF 213, 215-17; PMSJ at 28-29.

### *Keurig Used Tying Agreements with Competitor Distributors to Boycott*
### *Competitive Cups and Brewers to Maintain Keurig's Monopolies*

- Keurig admits that ███████████████████████████████████████████████████████████████████████████████████████████████" PSUF 912.

- Keurig also admits that if a KAD "████████████████████████████████████████████ PSUF 345.

- Keurig's OCS Leadership Team admitted that the Loyalty Clause ███████████████████████████████████████████ PSUF 840.[26]

- Keurig's partners admit that "██████████████████████████ because Keurig ████████████████████████████" PSUF 406.

• Distributors admit that Keurig harmed competition by "increas[ing] prices, and squeez[ing] KADs' margins, simply because they could" because "KADs had nowhere else to turn for access to Keurig Brewers and K-Cups," PSUF 427; by "restricting [distributors] ability to sell unlicensed products that we can potentially drive sales from," PSUF 1804; by prohibiting distributors from *"giv[ing]* our customers what they asked for when Keurig did not even offer some of the types of products our customers were requesting, such as cocoa and ciders," PSUF 953; and by putting them "at a competitive disadvantage," PSUF 1803.[27]

### *Keurig Has Made False Claims About Competitive Cups for Years*
### *Despite Knowing Those Claims Were False*

• Keurig's documents show that Keurig willfully made false claims about Competitive Cups when they knew the falsity of those statements. *See, e.g.*, PSUF 1914 ("████████████████████████████████████████████████████████████████████████████████████████████████████); PSUF 1915 (██████████████████████████████████████████████████████████████████████████████████████████████.[28]

---

[26] Keurig also admits that ████████████████████████████████████████████ PSUF 345-346.

[27] *See also* PSUF 935 (Vistar, which is blocked from dealing with competitors by its Loyalty Clause, is "the most efficient channel of distribution," "optimal" and "the best option," █████████████████████████████████), 1947 (Essendant: "████████████████████████████████████████████████████████), PSUF 1945 ("KARDS are unable to sell any unlicensed cups into the Away from Home Channel."), 954 (███████████████████████████████").

[28] Keurig further admits that at least some of the statements it has disseminated to large national retail customers are in fact *false*. PSUF 618, 620, 624-25, 627, 576, 578, 580, 622, 789-96, 721-22, 724-25, 727-28, 30, 732-33, 734.

Keurig's motion fares no better on the law. After contending for years that brewers and cups constitute one "system" product (as Keurig's liability expert opined), it has now reversed course, *admitting* they are separate products and thus capable of being tied. Mot. at 63. Keurig does not move for summary judgment on market definition with respect to any Section 1 claims based on Keurig's indisputable web of exclusionary agreements—nearly all of which have been committed to writing—such that these issues will proceed to trial. The overarching theme of Keurig's motion is that this Court should rule as a matter of law that Keurig is exempt from the antitrust laws based on arguments that conflict with the facts and legal rulings already made by this Court. Keurig's core arguments disregard the law of the case and the precedents on which it relies to again argue that:

- an exclusive dealing claim requires total foreclosure to succeed, Mot. at 45-56;
- market entry, competitors' growth, or expanding markets preclude antitrust claims as a matter of law, Mot. at 15-17, 28, 34-36, 53-54, 72;
- aftermarkets cannot be monopolized as a matter of law unless special and inapplicable tests are met, Mot. at 29-31;
- product redesign is immune from the antitrust laws, Mot. at 36-38;
- anticompetitive agreements are immune from the antitrust laws if any aspect of a relationship is vertical, Mot. at 56-59; and
- that settlement immunizes a monopolist from sham litigation claims and related litigation costs do not constitute an antitrust injury, Mot. at 67.

The Court has already rejected each of these flawed interpretations of the antitrust laws,[29] and Keurig provides no explanation as to why it believes the Court should change course now and contradict the prior guidance on which the parties have relied throughout discovery.

The facts revealed in discovery have only added to the compelling evidence that the Court previously held sufficient to support Plaintiffs' claims. Plaintiffs themselves and all single-serve coffee consumers have been harmed, but so has the competitive process. There is extensive

---

[29] MTD Order at 187, 228, 230-31, 233 236, 243-44.

evidence that Keurig prevented brands, distributors, and retailers from creating new products of their own with Competitive Cup manufacturers, including lower-priced Competitive Cups in flavors and varieties that Keurig would not or could not provide. Plaintiffs respectfully submit that it would be reversible error to prevent a jury from hearing this case.

## BRIEF HISTORY OF THE CASE

**Procedural History**. Numerous Plaintiffs, including competitors, Direct Purchasers ("DPPs"), and Indirect Purchasers ("IPPs")[30] have sued Keurig for its multifaceted scheme to maintain its monopolies in the Single-Serve Brewer ("SSB") and Compatible Cup markets.[31] On April 22, 2019, this Court sustained all claims brought by DPPs, JBR, and TreeHouse.[32]

**The Case Against Keurig**. Since 1998, Keurig has developed and maintained its unrivaled dominance in the SSB and Compatible Cup markets. In 2019, *seven* years after the expiration of Keurig's filter patent, Keurig sold approximately ███ of all Compatible Cups in the At-Home ("AH") distribution channel[33] and, as recently as last year, it controlled *approximately* ███ of the Compatible Cup market. *See* Sibley Rpt. ¶251; *see also* PSUF 467, 469 (███ in AFH).[34]

Faced with the prospect of losing at least ████████████████████████████ ████████████,[35] Keurig protected its stranglehold on the Compatible Cup market through

---

[30] Plaintiffs include or have included TreeHouse Foods, Inc. ("TreeHouse"), JBR, Inc. d/b/a Rogers Family Co. ("JBR"), and numerous DPPs and IPPs. Individual DPPs include McLane Co., Inc. ("McLane"), BJ's Wholesale Club, Inc., Winn-Dixie Stores, Inc., and Bi-Lo Holding, LLC. *See BJ's Wholesale Club v. Keurig Green Mountain, Inc.*, No. 1:21-cv-07493-VSB, EFC No. 11 (transfer order); *Winn-Dixie Stores, Inc. v. Keurig Green Mountain Inc*, No. 1:21-cv-07504-VSB, ECF No. 6 (transfer order). Keurig settled with IPPs in August 2020 and this Court approved the settlement on June 7, 2021. *See* ECF No. 1394.
[31] Unless noted otherwise, defined terms as used herein have the same meaning as set forth in Plaintiffs' Motion for Summary Judgment. ECF No. 1495 ("PMSJ").
[32] MTD Order at 273.
[33] Ex. 6 (Expert Report of David S. Sibley, Ph.D., corrected version, dated Sept. 11, 2020, ¶¶263-264 (Table 7)) (hereinafter, "Sibley Rpt."). Unless otherwise noted, citations to ("Ex.") refer to the Exhibits attached to the Declaration of Aldo A. Badini, dated Aug. 25, 2021, in support of PMSJ and the Declaration of Aldo A. Badini, dated Oct. 27, 2021, in support of Plaintiffs' Opposition to Keurig's Motion for Summary Judgment.
[34] Citations to PSUF refer to Plaintiffs' Statement of Undisputed Material Facts, ECF No. 1491, and Plaintiffs' Counterstatement of Disputed Facts, dated Oct. 27, 2021.
[35] Ex. 598 (Expert Report of Gary L. French, Ph.D., dated Aug. 28, 2020) (hereinafter, "French Rpt.") ¶41.

a series of anticompetitive acts. This conduct includes (i) a ███████████████████ ; (ii) entering into exclusionary agreements with Brand Competitors, suppliers and distributors; (iii) designing the 2.0 Brewer to "lock out" Competitive Cups; (iv) creating "fear, uncertainty or doubt" concerning Competitive Cups, 2.0 Brewers, and even "future innovation" to deter purchases of Competitive Cups; and (v) threatening to void brewer warranties if Competitive Cups were used.

Calling its conduct an "investment," Keurig contends that Plaintiffs "benefited" from these tactics, *id*. at 8, but the evidence is to the contrary. In the AFH Market, for instance, Keurig concedes that ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ . *Id*. at 9.[36] Keurig similarly coerced retailers.[37] As Plaintiffs will prove at trial, Keurig erected barriers to entry, raised rivals' costs, and restrained competition, with the specific goal of maintaining its share and K-Cup prices at a supracompetitive level—and it succeeded.

## LEGAL STANDARD

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court must "constru[e] the evidence in the light most favorable to the non-moving party" and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 (2d Cir. 2019) (quotations and citations omitted). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d. Cir. 2015) (quotation marks and citations omitted). A genuine

---

[36] Keurig claims that it provides KADs with "subsidized" brewers but offers no evidence to suggest that KADs did not in fact pay for the brewers. Mot. at 9. French Rpt. ¶283; *see infra* §I.E.4.
[37] French Rpt. ¶¶342-347; *see infra* § I.E.2.

issue of fact exists where there is sufficient "evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).[38] As in other types of cases, the Court should apply the threshold protections of Rule 56 and "deny" summary judgment for antitrust claims "[w]hen faced with genuine disputes of material fact[.]"[39]

## ARGUMENT

## I.   KEURIG IS NOT ENTITLED TO SUMMARY JUDGMENT ON LIABILITY

### A.   Disputed Issues Of Material Fact Exist As To Keurig's Monopoly Power In The Compatible Cup And Single-Serve Brewer Markets

Keurig does not move for summary judgment on market definition or on market power as to all of Plaintiffs' Section 1 claims.[40] Therefore, these issues will go to trial.[41] Keurig instead argues that market entry by some competitors proves there are no barriers to entry and that Keurig's low brewer margins preclude monopoly power as a matter of law.[42] These arguments must be

---

[38] Expert testimony can raise a genuine dispute of facts precluding summary judgment. *See Realtime Data, LLC v. Stanley*, 897 F. Supp. 2d 146, 153 (S.D.N.Y. 2012) ("[W]hen there are dueling experts, both of whom have put forward opinions in contradiction with each other, and when those opinions are important to resolution of a material factual dispute, summary judgment may not be appropriate."); *In re Refco Inc. Sec. Litig.*, 2011 WL 13243784, at *16, n.21 (S.D.N.Y. Mar. 28, 2011) (declining to grant summary judgment because of a battle of experts); *Smith v. City of New York*, 2015 WL 4643125, at *5, n.6 (S.D.N.Y. Aug. 5, 2015) (same).

[39] *Caruso Mgmt. Co. v. Int'l Council of Shopping Ctrs.*, 403 F. Supp. 3d 191, 203 (S.D.N.Y. 2019); *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 28-29 (S.D.N.Y. 2016). Although *PepsiCo, Inc. v. The Coca-Cola Co.*, cited by Keurig (Mot. at 14), instructs that summary judgment may be "favored" for certain types of antitrust cases, this is not such a case. 315 F.3d 101, 104 (2d Cir. 2002). In a case such as this, where evidence of anticompetitive conduct abounds, "summary judgment is not a substitute for trial." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (weight of competing permissible inferences as to entitlement to relief remains exclusively within the jury's province). As this Court has clarified, *PepsiCo*'s "tilt in favor of granting summary judgment…is best understood" by the limits substantive antitrust law places on permissible inferences drawn from ambiguous evidence. *See Caruso*, 403 F. Supp. 3d at 201 (citation omitted). But these concerns evaporate and "broader inferences are permitted" where plaintiffs present unambiguous anticompetitive agreements and an "economically sensible" antitrust theory supported by a "totality" of direct and indirect evidence, as Plaintiffs do here. *In re Publ'n Paper*, 690 F.3d at 63-64.

[40] TreeHouse, JBR and McLane bring claims pursuant to Section 1 of the Sherman Act.

[41] While Keurig argues it lacks monopoly power, Section 1 claims require only market power, which is a lower threshold. *See, e.g.*, *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461-62, 481 (1992) ("*Kodak*").

[42] Keurig also argues that McLane abandoned its claims that Keurig monopolized the SSB market. Mot. at 26, n.20. Keurig is wrong. No court in the Second Circuit has required expert testimony to prove a relevant market. Keurig's authority does not find otherwise. In *City of New York v. Group Health Inc.*, the Court dismissed a claim because the plaintiff's own expert *contradicted* the relevant market defined in the complaint. 2010 WL 2132246, at *5 (S.D.N.Y. May 11, 2010), *aff'd*, 649 F.3d 151 (2d Cir. 2011). Indeed, the court in that case recognized the lower evidentiary bar to prove a relevant market, noting the plaintiff's "inability to proffer *any evidence* in support of reduced competition in the market defined by its own Complaint is fatal to its claims." *Id.* (emphasis added); *cf. Kodak*, 504 U.S. at 451 (finding, without any expert testimony, a triable issue as to whether there was a relevant product market for parts and

rejected given Keurig's admitted and persistent "substantial monopoly" shares in both the SSB and Compatible Cup markets and extensive direct evidence showing that Keurig excluded competitors and repeatedly raised prices despite competitive entry.

Monopoly power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a large percentage share of the relevant market."[43] On Keurig's motion to dismiss, this Court correctly held that Plaintiffs' allegations, if proven, supported "an inference of a 'substantial monopoly' and monopoly power"[44] because the existence of monopoly power, which is "the power to control prices or exclude competition," "ordinarily may be inferred from the predominant share of the market." *Grinnell*, 384 U.S. at 571. Plaintiffs have that proof. Keurig has maintained persistently high market shares in both the Compatible Cup and SSB markets that are "more than adequate to establish a prima facie case of [monopoly] power." *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 188-89 (3d Cir. 2005) (monopoly power in light of "persistently high market share between 75%-80%").[45] Transactional data and expert analysis show that "Keurig holds shares in excess of ▮▮ in [each] market." Sibley Rpt. §IV.C., *e.g.*, ¶251. These shares are confirmed by numerous admissions from senior Keurig executives (including by its CEOs, 30(b)(6) witness, President of U.S. Sales, National Director of AFH Sales, and Chief Marketing Officer) with respect to *both* the Compatible Cup and SSB

---

service for Kodak equipment); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 806 (8th Cir. 1987) (concluding that there was sufficient evidence to establish the relevant market despite lack of expert testimony).

[43] *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500-01 (2d Cir. 2004) (reversing summary judgment where monopoly power inferred from high market share); *see also* MTD Order at 225.

[44] MTD Order at 227 (citing *U.S. v. Grinnell*, 384 U.S. 563, 571 (1966) (87% is a "substantial monopoly"); *Am. Tobacco v. U.S.*, 328 U.S. 781, 797 (1946) ("over two-thirds" or "over 80%" is "a substantial monopoly")).

[45] *See also Kodak*, 504 U.S. at 481 (summary judgment of no monopoly power reversed with 80-95% of tied market); *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 179 (2d Cir. 1990) (reversing summary judgment for defendant on monopolization due to 66% share); *Dial*, 165 F. Supp. 3d at 35-36 (denying summary judgment for defendant due to 79% share which was "strong evidence of monopoly power"); *In re EVIC Class Action Litig.*, 2002 WL 1766554, at *14 (S.D.N.Y. July 31, 2002) ("share above 70% is usually strong evidence of monopoly power").

markets.[46] As even Keurig's cases state, the "higher a market share, the stronger is the inference of monopoly power."[47] Keurig's market shares are sufficient to defeat summary judgment.[48]

Keurig argues that "Plaintiffs *must* show significant barriers to entry to succeed on their antitrust claims" and that barriers to entry cannot be shown because competitors have entered the market. Mot. at 23-25. This argument ignores the law and the facts. As to the law, Keurig ignores numerous cases that have denied summary judgment to antitrust defendants even in markets with a substantial number of entrants where there was other evidence of monopoly power.[49] *First*, as this Court previously held, in addition to inferring monopoly power from market shares, "while unnecessary," monopoly power can also be proven "'directly through evidence of control over prices or the exclusion of competition.'" MTD Order at 227 (quoting *Geneva*, 386 F.3d at 500). Although Keurig's cases recite this same standard,[50] it is conspicuously absent from Keurig's motion—undoubtedly because Keurig knows that the relief it seeks is inappropriate given the

---

[46] *See, e.g.*, PSUF 909 (CEO: "we have 86% of the system"), 910 (30(b)(6) confirming Keurig having "▮▮▮▮▮▮▮▮▮▮▮▮▮" which referred to "▮▮▮▮▮▮▮▮▮▮▮▮▮"), 917 (CMO: "▮▮▮▮▮▮▮▮▮▮▮▮▮"), 918 (CEO: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮", 916 (U.S. Sales President: Keurig had ▮▮▮▮▮▮▮▮▮▮▮▮), 911-12, 919-20.

[47] *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 98 (2d Cir. 1998) (citation and quotation marks omitted).

[48] Keurig argues Plaintiffs are wrong in how they count Keurig's share but fails to cite a single case in support. The sole case cited contains no discussion of counting market shares. Mot. at 24 n.18 (citing *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989)). Keurig's argument must be rejected because Keurig has measured its own share the same way as Plaintiffs. *See* PSUF 909-12, 916-20; *see, e.g.*, *Red Lion Med. Safety, Inc. v. Ohmeda, Inc.*, 63 F. Supp. 2d 1218, 1227-28 (E.D. Cal. 1999) (71% share based defendant's internal documents and testimony). This measurement is appropriate as an economic matter; Keurig controls production, volume, output, SKUs, varieties, channel sales, and marketing *and* influences the end cost both indirectly with royalties and tolling fees and *directly for many sales by setting prices for partner brands. See infra* §I.A.1; Sibley Rpt. ¶214; Sibley Reply ¶¶164-77; PSUF 1004-07, 1175-76, 1177-81, 1185, 1370-72, 1812-15, 1838-39, 2001; Bartolini Decl. ¶¶14-15, 23-47.

[49] *See supra* n.45; *McWane, Inc. v. FTC*, 783 F.3d 814, 830-32 (11th Cir. 2015) (entry and growth insufficient to undercut high share); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 971-73 (10th Cir. 1990) (rejecting argument that roughly *200* competitors demonstrated entry barriers were insubstantial where "no other entrant remotely approached [defendant's] domination of the market"); *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, 2016 WL 6822191, at *6-7 (C.D. Cal. Jan. 21, 2016) (market shares between 55% and 65% precluded summary judgment even where 30 competitors entered).

[50] *PepsiCo*, 315 F.3d at 107-08 (discussing *Tops Mkts.*, 142 F.3d at 98) ("[A] company that can exclude competition can sustain its ability to control prices …. The pertinent inquiry … is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition ….").

extensive direct evidence supporting monopoly power.[51] Direct evidence of monopoly power obviates the need for indirect evidence of market shares or barriers to entry; indeed, direct evidence indicates that barriers to entry must be present, without which a monopolist could not profitably raise prices or exclude competitors.[52] *Second*, as this Court has held, neither competitors' market entry nor growth precludes monopoly power. *See* MTD Order at 228 n.24, 235-36. This is particularly true where, as here, the defendant continues to maintain persistently high market shares. *See infra* §I.A.2. *Third*, the record contains extensive evidence of barriers to entry creating triable issues of fact. *See infra* §I.A.3. *Finally*, the Supreme Court and this Court have rejected Keurig's argument that there is a special "aftermarkets" test that can negate direct evidence of monopoly power, which would not apply in any event. *See infra* §I.A.4.[53]

Keurig also ignores the evidence. Specifically, it ignores: (i) extensive direct evidence; (ii) Plaintiffs' expert analyses supporting barriers to entry;[54] and (iii) the inability of market entry to

---

[51] *See, e.g.*, Sibley Rpt. §IV.B; *id.* ¶¶201-249; Ex. 629 (Expert Rpt. of Gareth Macartney, Ph.D., dated Aug. 28, 2020) (hereinafter, "Macartney Rpt.") §VI; French Rpt. §V.B; Ex. 1094 (Expert Rpt. of Jeffrey J. Leitzinger, Ph.D., dated Aug. 28, 2020) ("Leitzinger Rpt.") §VI.E.

[52] *See Geneva*, 386 F.3d at 500-01 (analyzing direct evidence; not entry barriers); *Savory Pie Guy*, 2016 WL 7471340, at *7 (cited by Keurig) (only "[w]here direct evidence is unavailable or inconclusive" does a court consider factors such as barriers to entry to determine whether "monopoly power may be inferred from high market share").

[53] Keurig's cited cases are not on point. *Tops Markets* reversed summary judgment for plaintiff on attempted monopolization given a market share supported by nothing more than one affidavit and where plaintiff had not alleged "that other supermarkets were excluded from the market" or any other adverse effects. 142 F.3d at 96-101; *see also Savory Pie Guy v. Comtec Indus, Ltd.*, 2016 WL 7471340, at *7 (S.D.N.Y. Dec. 28, 2016) (50% market share "insufficient"); *Emigra Grp., LLC v. Fragomen LLP*, 612 F. Supp. 2d 330, 362 (S.D.N.Y. 2009) (plaintiff had "not even tried" to offer evidence to permit inference of monopoly power); *CDC Techs., Inc. v. IDEXX Labs, Inc.*, 7 F. Supp. 2d 119, 130-31 (D. Conn. 1998) (expert "had not measured market power"); *see also L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1424-26 (9th Cir. 1993) (went to trial; defendant only had high share for months); *Handicomp, Inc. v. U.S. Golf Ass'n*, 2000 WL 426245, at *3 (3d Cir. Mar. 22, 2000) (market shares of 75% sufficient to be monopolistic); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1381 (5th Cir. 1994) (went to trial; plaintiff did not even provide a "rough estimate" of market share); *U.S. v. Syufy Enters.*, 903 F.2d 659, 666 (9th Cir. 1990) (went to trial; defendant's market share declined to 39%); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1044-47, 1058-63 (8th Cir. 2000) (went to trial; discounts did not state monopolization claim).

[54] Plaintiffs have also adduced record evidence of barriers to expansion in the relevant markets, which, as Keurig's own case law recognizes, is relevant to monopoly power analysis on the same footing as barriers to entry. *See Emigra Grp.*, 612 F. Supp. 2d at 362 (noting barriers to "entry *or* expansion" are relevant to monopoly power analysis) (emphasis added) (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶501, at 110 (2007)).

disrupt Keurig's durable monopolies as a result of Keurig's anticompetitive conduct.[55] This demonstrates Keurig's power to: (i) exclude competition from both the Compatible Cup and SSB markets; (ii) control prices; and (iii) restrict output, variety, and consumer choice. *See infra* §I.A.1.

### 1. Direct Evidence Of Keurig's Monopoly Power Precludes Summary Judgment

There is "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Sibley Rpt. ¶250.[56] And market participants and analysts █████████████████████████████████████████.[57]

*Keurig has the power to exclude competition from brewer and cup markets.*[58] Keurig entered into thousands of agreements that prohibit suppliers, brands, distributors, and retailers from working with its competitors.[59] When Keurig's business partners tried to work with competitors, Keurig exercised its power to exclude competition by prohibiting: (i) the purchase and/or resale of Competitive Cups;[60] and (ii) the sale or placement of Competitive Brewers.[61] Keurig also



---

[55] For example, Dr. Sibley analyzed extensive record evidence of barriers to entry and expansion in both the brewer and cup markets across 18 pages titled "████████████████████████████████████████████████████████████" Sibley Rpt. §IV.C.ii; *see also* Macartney Rpt. ¶80 (███████████████████████████████████████████████); French Rpt. ¶¶140-45; Leitzinger Rpt. ¶¶62-85.

[56] *See* Sibley Rpt.§IV ("Keurig's Monopoly Power"); Macartney Rpt. §C.1; French Rpt. §V & ¶¶140-150.

[57] *See, e.g.,* Sibley Rpt. ¶184, ¶¶185-186 ███████████████████████████████████████████████████████████████████████████████"), ¶194, ¶200.

[58] *See* Sibley Rpt. §IV. B.ii ("████████████████████████████████████████████████████████").

[59] Sibley Rpt. §IV.C.ii, V & Appendices C-F; PSUF 25-49, 51-52, 102, 108-122, 128-150, 153-189.

[60] *See, e.g.*, PSUF 938 ("███████████████████████████████████████████████"), 942 (████████████████████████████████████████████████████████████████████████"), 954 ("████████████████████████████████████████████"); *see also, e.g.*, PSUF 943-49, 951.

[61] *See, e.g.*, Sibley Rpt. ¶216 (███████████████████████████████████████████████████████████████████████████████████████████████").

█████████████████████████████████,[62] which were also ███████████████

█████████████████████.[63] As Kroger's buyer stated, "[b]ecause Keurig's monopoly of the

brewer market was so strong, we had no choice [but] to move our private label business to Keurig,

or we would risk watching our private label…program fall apart entirely."[64]

These tactics are exclusionary, have maintained Keurig's monopoly shares, and protected

Keurig from "████████████."[65] As in *Microsoft* and *Dentsply*, Keurig "has been able to exclude

competitors from the dealers' network" and the "most efficient channel" for AFH sales, as well as

major AH retail sales channels. *Dentsply*, 399 F.3d at 190; *U.S. v. Microsoft Corp.*, 253 F.3d 34,

70 (D.C. Cir. 2001) (en banc).[66] Keurig's power to exclude was well understood by other market

participants. For example, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████." PSUF 1001-02. Keurig's current parent company, JAB,

---

[62] *See, e.g.*, PSUF 964 ███████████████████████████ ), 967 (███████████████████████████ "), 971 ███████████████████████████ ").

[63] *See, e.g.*, PSUF 1140 █████████████████████████████████████████████████ , 969 (" ██████████████████ , 970, 975, 977.

[64] PSUF 975; *see also* PSUF 977 ("Q. Is everything in your declaration true and correct? A. Yes").

[65] PSUF 64, 67, 924, 980; Sibley Rpt. §IV.B.i., Figs. 7 & 8; Stiroh Rpt. Ex. 10; *see Black v. Magnolia Liquor Co.*, 355 U.S. 24, 26 (1957) ("The tie-in sales…run afoul of [Sherman Act] policy, since the retailer is coerced into buying [the tied products] he would otherwise not have purchased at that time, and other sellers of the products are, to that extent, excluded from the market that would exist when the demand arose."); *Lorain Journal Co. v. U.S.*, 342 U.S. 143, 149-55, 183-84 (1951) (defendant "violated §2" by "attempt[ing] to regain its monopoly…by forcing [companies] to boycott" a market entrant by threatening to terminate contracts with anyone that dealt with the new competitor); *PepsiCo, Inc. v. The Coca-Cola Co.*, 1998 WL 547088, at *18 (S.D.N.Y. Aug. 27, 1998) ("Extraction of an agreement not to deal with any competitor—or the equivalent, refusing to deal with buyers who do—can be exclusionary and particularly damaging where the buyers cannot do without the seller's product or service.") (citation omitted); *see Byars v. Bluff City News Co.*, 609 F.2d 843, 858 (6th Cir. 1979) ("a monopolist['s] refus[al] to deal with customers who deal with its rivals" is "inherently anticompetitive").

[66] *See, e.g.*, PSUF 935 ███████████████████████████ , 958, 984, 991-99, 1142-43; Sibley Rpt. §V.B.; Sibley Reply §V.E.ii.; ECF No. 1544 at 14-16.

admitted, at the time, that "███████████████████████████████████████████."

PSUF 1003. Keurig itself noted "███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████." PSUF 1144. Keurig also recognizes it excludes

competitors from sales channels, noting, "███████████████████████████████████

███████████████████," PSUF 1916;

PSUF 1918; ███████████████████████████████" PSUF 1166.

Without actually citing any facts, Keurig argues that the "facts preclude a finding that

Keurig has monopoly power in the claimed [SSB] market." Mot. at 26. The record, however, is

replete with direct evidence that Keurig has the power to exclude brewer competitors by restraining

their entry and expansion ███████████████████████████████████

███████████████████      ████████████      █████████████.[71] Keurig admits that it

---



[67] PSUF 1145; *see also* PSUF 1146 ("██████████████████████████████████████
████████████████████████████████████████████████████████).

[68] PMSJ §1.A (discussing facial output restrictions of competing brewers and Compatible Cups); Sibley Rpt. §V.B.iii.b, ¶¶270-276, 279-290, 312-16; Sibley Reply ¶¶286-291; PSUF 1370-72 (████████████████████████████████████████████

██████████████████████); PSUF 1004-06, 1181 ("████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████"), 1370, 1372; Ex. 697 (KGM Resp. to THS 3d Set Interrogs. No. 17, Appx. B); *see also infra* §I.C.

[69] *See* PSUF 1148 (████████████████████████████████████████████████…").

[70] Sibley Rpt. ¶¶297-308; PSUF 952, 982 (███████████████████████████████████

████████████████████████

[71] Sibley Rpt. ¶¶277-278; *see, e.g.,* PSUF 1009 ("████████████████████████████████████

████████████████████████████████████████), 1149 (same as to █████████████████████████

█████████), 1010 (same as to ██████████). Monopoly power in the brewer market is also supported by Keurig's control over brewer prices, *infra* at 20-22, and admissions of its monopoly share of the SSB market, *supra* n.46, which are further buttressed by evidence of barriers to entry, *infra* §I.C; *see, e.g.,* KSUF 297; *New York ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 647 n.16 (2d Cir. 2015) (patents are barriers to entry); *see* PSUF 1150 ("we own a host of proprietary [IP]…surrounding…brewer technology").



[REDACTED]. PSUF 1137. [REDACTED]

[REDACTED].[72]

Keurig's exclusionary agreements hindered brewer competition. Although Tassimo made a competing brewer that used a different pack format than Compatible Cups and had originally partnered with Starbucks, [REDACTED]

[REDACTED].[73] Tassimo's exit was by Keurig's design. Before signing its agreement with Starbucks, [REDACTED]

[REDACTED]," and that [REDACTED]

[REDACTED]." PSUF 1151, 1189. Soon after JM Smucker Company ("Smucker") became a Keurig licensee, the Black & Decker Home Café Brewer with which Smucker had participated likewise exited the market. And while Smucker tried to work with other brewer competitors because of frustration with Keurig's marketing restrictions, [REDACTED]

[REDACTED]

[REDACTED]. *See* PSUF 1152 (Bartolini Decl. ¶¶34-49).[74] When new brewers began to enter the AFH channel, [REDACTED]

[REDACTED]

[REDACTED]." PSUF 347-49. The end result of Keurig's restraints on the SSB market was that many brewers, including Touch, have failed to succeed in

---

[72] *See, e.g.*, Sibley Rpt. ¶¶192, 224, 332, 519.
[73] PSUF 1016 [REDACTED]
1017 ("[REDACTED]
[74] PSUF 1153. TreeHouse also tried to co-promote with a new brewer but was not successful because Remington faced challenges getting distribution as a result of the "leverage" Keurig "would exert on customers." PSUF 966.

the market such that, as described by Canteen (a retailer and food service company), ███████████████████

███████████████████████████████████████████ ."[75]

Keurig's power to extract and enforce exclusionary provisions across a network of more than a thousand contracts far exceeds the limited incidents found sufficient to support monopolization verdicts (not to mention withstand summary judgment).[76] Keurig customers testified that ███████████████████████████████████████████████

███████████████████████████████████████████ .[77] For example, the former Vice President of Sales and Marketing for ███████████████████████████ stated that "███████████████████████████████████████████████

███████████████████████████████████████████ " PSUF 984. "Under [Supreme Court] precedents, this evidence would be sufficient to entitle [plaintiffs] to a trial." *Kodak*, 504 U.S. at 465, 483-86 (affirming denial of summary judgment where purchasers "switched to Kodak service even though they preferred [competitors] service"). As in *Dentsply*, Keurig's own evidence further shows that "the company's share of the market would diminish should [the Loyalty Clause] no longer be in effect." *Dentsply*, 399 F.3d at 191. Keurig's OCS

---

[75] PSUF 936; ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

[76] *See, e.g., Dentsply*, 399 F.3d at 190 (ten incidents in which Dentsply required an agreement not to work with a competitor); *see also* PMSJ §III; Sibley Rpt. §§IV.C.ii., V.B.; Ex. 202 (Expert Report of Lauren J. Stiroh, Ph.D., dated August 28, 2020, §III.D) (hereinafter "Stiroh Rpt."); PSUF 27-52, 328-29, 347-49.

[77] *See, e.g.*, PSUF 984 ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Leadership ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████).")[78] In short, the "record of long duration of the

exclusionary tactics and anecdotal evidence of their efficacy make it clear that power existed and

was used effectively" to prevent competition in the Compatible Cup and SSB Markets. *Id.* at 191.

      ***Keurig has the power to control prices and output.***[79] Keurig's transactional data shows

that "█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████." Sibley Rpt. ¶¶203, 205, 207 & Figs. 7, 8. ████████████

████████████████████████████████████████████.[80] Similarly, ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. PSUF 1110; *see*

*also* Sibley Rpt. ¶¶205-206. Keurig's CEO admitted that ████████████████████████

████████████████████████████████████" PSUF 1022. Keurig's President of U.S. Sales

likewise testified that ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████"[81]

    ████████████████████████████████████████████████████████

████████████████████████████████████



---

  ■ PSUF 418-19, 1021; Sibley Rpt. ¶890; Sibley Reply ¶422; *see also* PSUF 974, 1307, 1317, 1336.

[79] *See* Sibley Rpt. §IV.B.i (" ████████████ ").

[80] Ex. 536 (Expert Reply Report of Lauren J. Stiroh, Ph.D., dated Feb. 1, 2021) (hereinafter "Stiroh Reply"), ¶23.

[81] PSUF 914-15; Sibley Rpt. ¶¶211-13; Stiroh Reply ¶¶151-52, Fig. 9; *see also* Macartney Rpt. Fig. 1, ¶13 ████████

████████████████████████████████████████).

[82] *See, e.g.*, Sibley Rpt. ¶490 & n.864.



█████ PSUF 1184; *see also* PSUF 1185 (Bartolini Decl. ¶¶23, 24, 26, 29). Keurig's AFH customers felt that ████████████████████████████████████████████████████ ██████████████████████████████████████████████████" PSUF 963. "████████ ████████████████████████████████████████████████████ ███████████████.[84] PSUF 960. As in *Dentsply*, the record reflects a defendant "that sets prices with little concern for competitors, 'something a firm without a monopoly would have been unable to do.'" 399 F.3d at 191 (quoting *Microsoft*, 253 F.3d at 58).

Keurig argues that "Plaintiffs' experts offer no analysis of SSB output or prices and make no suggestion that output has been reduced or that prices have increased." Mot. at 26. That is false. As Dr. Sibley opined, "████████████████████████████████████████████████ ████████████████████████████████."[85] Evidence shows that ███ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ Sibley Reply n.533. At times, Keurig chose to earn profits on its brewers. Sibley Rpt. ¶853. At others,



██████████████████████████████████████████████████████████

████████████████████████████████████████████████" PSUF 1156, 1187-88. Regardless,

absent Keurig's anticompetitive conduct, ████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████.[86] As the Court previously held, "pricing [SSBs] at or

below cost in no manner suggests that … Keurig does not in fact enjoy monopoly power in that

[SSB] market."[87]

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████."[88] Keurig exercised this power

██████████████████████████████████████.[89]

*Record evidence also shows that Keurig's anticompetitive conduct has reduced output of*

*both cups and brewers*.[90] ████████████████████████████████████

█████████████████████████████████████████████████ █████████████

---

[86] ████████████████████████████. *See* PSUF 507-08, 513, 516, 525, 1908, 1912; *see also* PMSJ at 61-78.
[87] MTD Order, at 226 ("[A] monopolist might in fact charge at or below cost for the tying product to extract monopoly surplus from the tied product" and "may 'evade price control in the tying product through clandestine transfer of the profit to the tied product.'") (quoting *Kodak*, 504 U.S. at 487; citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979) ("It is not a defense to liability under §2 that monopoly power has not been used to charge more than a competitive price….")); *see also Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 13 n.19 (1984). Indeed, to hold otherwise would impermissibly create an implied exemption from Section 2 of the Sherman Act for "common" lifetime value or razor/razor blade business models. *See* PSUF 921; *see Nat'l Soc. of Prof'l Eng'rs v. U.S.*, 435 U.S. 679, 688-90, 692, 696 (1978) (the antitrust laws are "subject to exceptions defined by statute"); *Standard Oil Co. of N.J. v. U.S.*, 221 U.S. 1, 65 (1911) ("restraints of trade within the purview of the statute…[can] not be taken out of that category by indulging in general reasoning"). In any event, "[n]either *proof of exertion* of the power to exclude nor proof of *actual exclusion*…is essential to sustain a charge of monopolization under the Sherman Act." *Am. Tobacco*, 328 U.S. at 810 (emphases added). The *ability* to exclude is sufficient.
[88] Sibley Rpt. ¶850 ("██████████████████████████████████████"); PSUF 242-226, 422-423, 429-430; PMSJ at 42-61.
[89] PSUF 1000, 936 (██████████████████████████████████).
[90] *See, e.g.*, Sibley Rpt. §V.B.iv.c ("████████████████████████
[91] *See, e.g.*, Sibley Rpt. ¶¶214, 491.



### 2. *Market Entry or Growth Does Not Preclude a Section 2 Claim Especially Where the Defendant Has Maintained a Persistent, Durable Monopoly*

In 2010, the federal antitrust agencies clarified that "entry into the relevant market will alleviate concerns about adverse competitive effects *only if such entry will deter or counteract any competitive effects of concern*" and that "[e]ntry by firms operating at a smaller scale" may be significant only "*if such firms are not at a significant competitive disadvantage*." *Horizontal Merger Guidelines* §§9 & 9.3 (2010) (emphases added). All but one case Keurig cites to suggest entry can be used to rebut evidence of monopoly power on summary judgment predates this

---

92 *See, e.g.,* Sibley Rpt. ¶¶249, 599, 772 n.1412, 1058.
93 *See, e.g.,* Sibley Rpt. ¶¶484-485, 597-599.
94 *See, e.g.,* Sibley Rpt. ¶344 ("███████████████████████████████

███████████████████████████████████████████████████████████████ .
95 *See, e.g.,* Sibley Rpt. ¶546.
96 *See, e.g.,* Sibley Rpt. ¶341 ("████████████████████████████████████████████████
97 Sibley Reply ¶433; PSUF 1029, 1030, 1161.
98 PSUF 1029, 1161, 1030; *see also* Sibley Reply ¶¶433, 436 ███████████████████

██████████████████████████████████████████████████████); Sibley Rpt. ¶434.
99 Stiroh Reply ¶190; *see also* PSUF 1029, 1161.

antitrust agency guidance.[100] As this Court has explained, "[t]he fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers. If the output or capacity of the new entrant is insufficient to take significant business away from the predator, they are unlikely to represent a challenge to the predator's market power," as here.[101]

The competitors that did enter did so at a "significant competitive disadvantage" in the form of thousands of contractual restrictions at every level of the supply chain, sometimes resulting in their exiting the market. *See supra* §I.A.1.[102] Contrary to Keurig's argument, Plaintiffs' experts *did* analyze competitive entry, but found that market entrants' small collective share has been unable to counteract Keurig's dominance.[103] Keurig entered into agreements to "███" co-manufacturing competitors like TreeHouse "█████████████████" they need to compete,[104] and Keurig noted that its "██████████████" is a "███████████████"[105]

Keurig concedes that a plaintiff's share increases does not "negate monopoly power," as

---

[100] In the sole case on point decided after 2010, the defendant merely declined to do business with a plaintiff whose expert did not "rely on any sales data in concluding that defendant had market share of at least 50%" of the relevant market. *Savory Pie Guy, LLC*, 2016 WL 7471340, at *7.

[101] *Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 673 (S.D.N.Y. 2002) (citation omitted) (quoting *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995) (same)).

[102] *Cf. Jefferson Parish*, 466 U.S. at 10 n.15 (Clayton Act enacted to provide a remedy for dealers who enter a market only to find the markets have been preempted by exclusionary agreements).

[103] *See, e.g.*, Sibley Rpt. ¶¶207-08. For example, Dr. Sibley analyzed competitors' small share and explained that entry of "fringe" competitors has not been able to counteract Keurig's dominance. *See* Sibley Rpt. Tables 6 & 7; PSUF 1162 (█████████████████████████████████████████████████); *see also, e.g.*, PSUF 1163 (noting "five out of six new entrants in any industry fail"); PSUF 1164 (reciting evidence of failed attempts to enter the Compatible Cup Market); ECF No. 1538 at 20 & n.18; *accord Avery Dennison Corp. v. Acco Brands, Inc.*, 2000 WL 986995, at *17-18 (C.D. Cal. Feb. 22, 2000) (dominant firm's continuing high margins and not lowering prices in response to entrants suggests insufficient ability to challenge dominant firm).

[104] PSUF 1165, 1337; *supra* at §I.A.1; *see also* PSUF 927 (Keurig President testifying that "████████████████████████████████████████████████████████████████████████████████████████████████████████████).

[105] PSUF 1166. Keurig admits that it has the power to ████████████████████████████████████████████████████████████████" PSUF 1167; *see also* PSUF 1168 ██████████████.

24

this Court has already held.[106] As in *Conwood*, the evidence shows that TreeHouse's and other competitors' sales would have grown more absent Keurig's anticompetitive conduct.[107] As Dr. Stiroh observed, "██████████████████████████████████████

██████████████████████████████████████████████████████████████████████"

Stiroh Reply ¶10. In contrast, Keurig's "█████████████████████████████████████

███████████████████████████ *Sibley Rpt.* ¶208. Critically, "███████████████

███████████████████████████████[108] *Cf. Dentsply*, 399 F.3d at 190-91 (monopoly power where defendant's "profit margins have been growing" despite competition from rivals).

As the *Dentsply* court noted, citing case law relied on by Keurig, "[i]n evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share." *Id.* at 188-89 (emphasis in original) (citing *Syufy Enters.*, 903 F.2d at 665-66). All competitors together have been unable to disrupt Keurig's persistent "substantial monopoly" shares exceeding 80% of both the brewer and cup markets, even though TreeHouse entered the market more than a decade ago in 2010.[109] Where a defendant like Keurig holds such a persistently high market share, summary judgment as to monopoly power is inappropriate. *Supra* nn. 45 & 49.

### 3. *Extensive Record and Economic Evidence Supports High Barriers to Entry*

Keurig argues that "Plaintiffs cannot meet their burden of showing barriers to entry." Mot.

---

[106] Mot. at 32; MTD Order, at 235-36 & n.24 (citing *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) (affirming monopoly maintenance where plaintiff's market share was increasing and market was expanding); MTD Order at 235-36 ("a complete lack of growth [is not needed] to sustain a Section 2 claim"; "successful §2 plaintiffs have both grown their market shares and earned high profits even through the period [of] exclusionary practices") (citing 3 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶651b5, at 108-09 (3d ed. 2008); *Conwood*, 290 F.3d at 784).

[107] *Conwood*, 290 F.3d at 789-91; *see Geneva*, 386 F.3d at 494 (monopolist unlawfully obtained "unfair advantage as an entrenched first-mover, even after competitors eventually entered the market"); *Alt. Electrodes, LLC v. Empi, Inc.*, 597 F. Supp. 2d 322, 329 (E.D.N.Y. 2009) (monopolist "artificially creat[ed] barriers to entry") (citation omitted); *see also* Leitzinger Rpt. ¶ 71 (showing Keurig's ability to block competitors' access to retailers).

[108] *See* Sibley Rpt. ¶¶207-08; *but see* Stiroh Rpt. Ex. 13.

[109] *See* Sibley Rpt. ¶256 & Tables 4, 5; ¶263 & Tables 6, 7; Sibley Reply ¶178 & Table 4; *Am. Tobacco Co.*, 328 U.S. at 797 ("over 80%" is "a substantial monopoly"); PSUF 1172, 1193.

at 26. Plaintiffs, however, have no such burden. Rather, Keurig has failed to meet *its* burden to *rebut* monopoly power with undisputed "persuasive evidence" showing that entry would be "so easy" that Keurig "could not profitably raise price or otherwise reduce competition."[110] Indeed, Keurig does not even acknowledge, much less rebut, the extensive direct and indirect evidence of monopoly power and barriers to entry.[111] As set forth above, Plaintiffs are entitled to show monopoly power with direct evidence without regard to barriers to entry.[112] And just as market entry does not preclude a finding of monopoly power, it likewise does not preclude a finding of significant barriers to entry or expansion. *See Kelco Disposal, Inc. v. Browning-Ferris Indus. Of Vt., Inc.*, 845 F.2d 404, 408 (2d Cir. 1988) (jury could have found "barriers to entry were, indeed, not at all low" despite entry).[113]

In any event, Keurig's exclusionary agreements, as well as high capital costs, patent protection, and network effects, all constitute well recognized barriers to entry.[114] The record is replete with admissions by Keurig that it purposefully created barriers to restrain competition:

- Keurig's CEO, Larry Blanford, admitted that " ███████████████████████████

---

[110] *See, e.g.*, *Horizontal Merger Guidelines* §§2.1.3 & 9 (market shares create a presumption of power that can be *rebutted* by "persuasive evidence" entry is "sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern"); *see also Kodak*, 504 U.S. at 469 (defendant's "substantial burden" to rebut).

[111] *See, e.g.*, Sibley Rpt. §§IV.B (addressing direct evidence); IV.C (addressing indirect evidence); IV.C.ii (" ████████ ███████████████████████████████"); Leitzinger Rpt. ¶¶ 48-87 (addressing indirect and direct evidence of Keurig's market power).

[112] *See Geneva*, 386 F.3d at 500-01 (recognizing that only "[w]here direct evidence is unavailable or inconclusive" does a court consider factors such as barriers to entry to determine whether "monopoly power may be inferred from high market share"); *Savory Pie Guy, LLC*, 2016 WL 7471340, at *7 (cited by Keurig) (same); *Microsoft*, 253 F.3d at 51 (monopoly power is clear upon evidence firm profitably raised prices above the competitive level, which is "direct proof" of market power).

[113] *See also Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (finding monopoly power despite entry where there was "evidence of entry barriers sufficient to prevent Kodak's monopoly share from self-correcting"); *CollegeNet, Inc. v. Common Application, Inc.*, 355 F. Supp. 3d 926, 959 (D. Or. 2018) (entry "does not defeat" barriers to entry); *Yankees Ent. & Sports Network*, 224 F. Supp. 2d at 673 (entry does not preclude entry barriers); *Emigra Grp.*, 612 F. Supp. 2d at 362 (barriers to entry or to *expansion* are relevant to monopoly power).

[114] Courts recognize contracts create entry barriers. *Geneva*, 386 F.3d at 499; *Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp.*, 93 F. App'x 1, 8 (5th Cir. 2004); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312 (2007); Sibley Rpt. ¶¶270-290, 292-296, 309-311; Sibley Reply ¶189 (collecting literature discussing contract barriers to entry); *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 80-81 (D.D.C. 2015) (capital investment and labor are entry barriers); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1086-87 (D.D.C. 1997) (sunk costs are entry barriers); *McWane, Inc.*, 783 F.3d at 831 (large capital outlays are entry barriers); Sibley Reply n.309.



PSUF 200.

- Keurig

  *See* PSUF 1137 (

  [115]

- Keurig

  PSUF 1039; *see also* PSUF 1171 (

  ); PSUF 923, 1027-28,1061, 1170.

- Keurig

  .

- Keurig has also admitted that

  PSUF 1033.

- Keurig's former CEO admitted

  .[118] PSUF 200, 1031. Keurig's President also admitted

  PSUF 1042. As she further testified,

  .[119]

By entering into exclusionary agreements with all major brands, Keurig created network effects and barriers to entry and expansion that perpetuated its dominance. *See* Sibley Rpt. ¶¶312-16; *Microsoft*, 253 F.3d at 54-56. "In markets characterized by network effects, one product or standard tends towards dominance." *Microsoft*, 253 F.3d at 49 (citation omitted). As Keurig explained, "

." PSUF 1174.

---

[115] Keurig's brand agreements created a barrier to entry for actual or potential Competitive Cup manufacturers and SSB manufacturers that could not gain access to those brands. *See, e.g., Geneva*, 386 F.3d at 497-98 ("Customers that have remained with [the branded product] clearly do not perceive generics to be a reasonable substitute for it"); *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 420 (S.D.N.Y. Aug. 29, 2005) ("Entrenched buyer preferences for established brands can also create significant barriers to entry."); *Image Tech. Servs.*, 125 F.3d at 1208 (finding entry barriers existed where, inter alia, Kodak had brand name power).

[116] *See Nespresso U.S. v. Ethical Coffee Co.*, 2016 WL 11697058 at *1 n.2 (D. Del. Sept. 7, 2016) (citing *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) ("technological obstacles" can be a barrier)).

[117] *See, e.g., Actavis PLC*, 787 F.3d at 647 n.16 (patents are barriers to entry); *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1126 (S.D.N.Y. 1996); *Image Tech. Servs.*, 125 F.3d at 1208; *see* KSUF 7, 297.

[118] Sibley Rpt. ¶¶309-311; *Nespresso*, 2016 WL 11697058 at *1 n.2 (high capital costs are a barrier to entry).

[119] PSUF 1173; *see also* PSUF 1034.

27

### 4.  No Special "Aftermarkets" Test Applies or Precludes Monopoly Power

Keurig argues that the Compatible Cup market is an "aftermarket" for the brewer market and that there are unique "requirements for monopoly power in an aftermarket." Mot. at 30. Keurig is wrong. As this Court observed, "the Supreme Court expressly rejected 'adopt[ing] any exception to the usual antitrust analysis' when assessing monopoly power in an aftermarket, noting that the Court has always 'treat[ed] derivative aftermarkets as it has every other separate market.'" MTD Order at 228 n.23 (quoting *Kodak*, 504 U.S. at 479 n.29). The defendant in *Kodak* similarly argued that the Supreme Court should presume as a matter of law that it could not have the power to raise aftermarket prices because doing so would "lead to a disastrous drop in [Kodak] equipment sales." *Kodak*, 504 U.S. at 472. The Court rejected this argument, holding that "[i]t is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so." *Id*. at 477.[120] Likewise in this case, Keurig has repeatedly raised K-Cup prices while growing sales of K-Cups and brewers. *See supra* §I.A.1. Indeed, as Keurig's President explained, Keurig's "lifetime value" business model is premised on the understanding that it will be able to grow brewer sales and "drive the installed base" so that it can "recoup[ ] that loss of money for driving the installed base" and "get a return from the recurring revenue" on cup sales.[121] *Cf.* MTD Order at 226.

Keurig's case law notes that "evidence that a single firm controls a large share of a relevant market is generally sufficient to establish a reasonable inference of monopoly power at summary judgment." *Xerox Corp. v. Media Scis., Inc.*, 660 F. Supp. 2d 535, 544 (S.D.N.Y. 2009). *Xerox*'s

---

[120] The Court further noted that "[e]ven if Kodak could not raise the [aftermarket] price…one cent without losing equipment sales, that fact would not disprove market power…. The sales of even a monopolist are reduced when it sells goods at a monopoly price, but the higher price more than compensates for the loss…." *Kodak*, 504 U.S. at 470.
[121] PSUF 921; *see also* PSUF 926 ███████████████████████████████████████.

additional "flexible inquiry" factors also only apply where, unlike here: (i) the defendant is a "nonmonopolist" in a "competitive primary market;" and (ii) there is a "*single-brand* aftermarket" in which the aftermarket products are compatible with only a single brand of equipment.[122] But here, there are "others that launched Keurig-compatible [SSBs]," as Keurig admits. Mot. at 28.

In any event, Keurig cannot rebut Plaintiffs' showing that it possesses monopoly power. One consideration is whether consumers can "inform themselves of the total cost of the package"—i.e., the brewer and cups—at the time of purchase, known as "lifecycle pricing." *Kodak*, 504 U.S. at 473. As the Supreme Court observed, "lifecycle pricing" is complex and requires sophisticated analysis of information that "may be impossible to acquire at the time of purchase," as is the case here.[123] Even Keurig's economist could not say how much the Keurig "system" costs and admitted that, in order to calculate that, a consumer would need to know "the life of the brewer and how long you are going to use it" at the time of purchase.[124] Keurig's AFH customers are also locked-in, have "nowhere else to turn," and are at the mercy of Keurig's unilateral price increases. *See supra* §I.A.1.[125] In any event, Keurig admitted it has no evidence that consumers actually engage in lifecycle pricing. PSUF 1942; Sibley Reply ¶94.Thus, Keurig cannot carry its "substantial burden" of rebutting the direct and indirect evidence of its power to exclude competition and control prices.

---

[122] *Xerox*, 660 F. Supp. 2d at 545-47 (emphasis added). All of the cases on which Keurig relies features *single brand* aftermarket products. *See Xerox*, 660 F. Supp. 2d at 544 (ink sticks specific to *Xerox* printers); *SMS Sys. Maint. Servs. v. Digit. Equip. Corp.*, 188 F.3d 11, 16 (1st Cir. 1999) (aftermarket for servicing *DEC* servers); *Harrison Aire, Inc. v. Aerostar Int'l Inc.*, 423 F.3d 374, 384-85 (3d Cir. 2005) (replacement fabric for *Aerostar* balloons).

[123] *Kodak*, 504 U.S. at 473. Notably, Xerox's primary market share was 24%, and the plaintiff conceded that "Xerox lacks market power in the primary market." *Xerox*, 660 F. Supp. 2d at540.

[124] PSUF 1940 (Murphy Dep. 288:14-289:3); *see also* Sibley Reply ¶94 (cannot say system price ████████████████████████████); PSUF 1035 ("They are at an incredible distance in the average Walmart. I like to say they're a football field away…."); PSUF 1941 ("███████████████████████████████████████████).

[125] Indeed, distributors' customers generally have Keurig brewers plumbed directly into office waterlines such that they could not easily switch brewers. PSUF 1186.

**5.  *Disputed Issues Of Material Fact Exist As To Keurig's Attempted Monopolization and Monopoly Leveraging***

Keurig contends the Court can conclude as a matter of law that there are no issues remaining for trial as to Keurig's dangerous probability of achieving monopoly power, but such a determination is "a particularly fact-intensive inquiry.'"[126] "Critical to deciding the dangerous probability prong … is defendant's economic power in the relevant market," *Tops Mkts.*, 142 F.3d at 99-100, and a defendant's market share is "the primary indicator of the existence of a dangerous probability of success."[127] Summary judgment here would thus be improper given Keurig's admissions that its shares exceed 80%.[128] Keurig again argues that no barriers to entry exist, Mot. at 35, but ignores the law[129] and the evidence, discussed above, demonstrating: (i) Keurig *already has* monopoly power (*see supra* §I.A.1); and (ii) significant barriers to entry and expansion exist, which Keurig has used to its advantage (*see supra* §I.A.3).[130]

**B.  Disputed Issues of Material Fact Exist As To Harm To Competition**

Harm to competition can be supported by adverse impact on price, output, variety, consumer choice, or quality; defendant's raising of competitors' costs; or harm to the competitive process itself.[131] Keurig harmed competition by: (i) raising and maintaining supracompetitive

---

[126] *Microsoft*, 253 F.3d at 80; *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

[127] *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 341 (D. Vt. 2010) (citation and quotation marks omitted).

[128] *See supra* §I.A. Keurig's argument in footnote 44 that Plaintiffs' monopoly leveraging claims fail because Plaintiffs purportedly do not "establish that Keurig has a [SSB] monopoly to leverage in the first place" is disingenuous as Keurig itself estimated that its [SSB] market share was above 85%. *See, e.g.*, PSUF 474, 467-69, 473.

[129] *See, e.g.*, *McGahee v. N. Propane Gas Co.*, 858 F.2d 1487, 1505 & n.43 (11th Cir. 1988) (A "dangerous probability [of monopoly power] not negated by…[a] plaintiff's market share increase."); *see also Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1130 (10th Cir. 2014) (plaintiff survived summary judgment based on the same evidence of monopoly power and barriers to entry); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 453 (4th Cir.2011); *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 478 (D. Vt. 2019).

[130] Keurig's cases in contrast lack direct evidence, sufficient market share, and barriers to entry. *See, e.g.*, *Savory Pie Guy*, 2016 WL 7471340 (market share was only 50%).

[131] *See* MTD Order at 235-36, 246 & n.33; *Chapdelaine Corp. Secs. & Co. v. Depository Trust & Clearing Corp.*, 2006 WL 2020950, at *4 (S.D.N.Y. July 13, 2006) (harm to competition shown by inflated prices, decreased alternative products, and decreased quality); *see also Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008) (reductions in "consumer choice" and quality of service); *Dentsply*, 399 F.3d at 193-95 (harm to competition shown by increasing competitors' costs); *U.S. v. Visa USA*, 344 F.3d 229, 243 (2d Cir. 2003) (restraints that discourage firms from designing "products more competitively" can harm competition); *Laumann v. NHL*, 907 F. Supp. 2d 465,

pricing (§I.B.1); (ii) restraining interbrand competition and output (§I.B.2); (iii) eliminating competition from Competitive Cup products, thereby reducing variety, quality, and consumer choice of lower-priced cups and protecting Keurig from margin erosion (§I.B.3); (iv) raising rivals' costs and foreclosing access to inputs and distribution channels (§I.B.4); and (v) harming the competitive process itself (§I.B.5). In response, Keurig argues there is no harm to competition because *some* prices went down and *some* output went up. Mot. at 15. Applying the proper legal standard, there are disputed issues of material fact precluding summary judgment.[132]

### 1. *Keurig's Exclusionary Conduct Caused Supracompetitive Prices*

Keurig asserts that prices of Compatible Cups decreased over time. Mot. at 15. This is neither accurate nor relevant. Keurig's experts admit that the appropriate measure of harm to competition is not price trends over time in the actual world, but a comparison of real-world prices to what would have prevailed in the *but-for* world absent anticompetitive conduct.[133] The evidence shows that Keurig *raised* prices without losing sales, kept AFH and AH prices elevated, increased its margins overall, and that customers would have purchased lower-priced cups had they been available.[134] In its disingenuous attempt to show prices went down, Keurig begins its trend analysis in 2012, *ignoring years of the relevant time period when Keurig had already secured exclusionary contracts and filed sham litigations*. Mot. at 15-16; Murphy Report Fig. 2. But as the full picture below shows, ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪

---

484 (S.D.N.Y. 2012) ("Reduced consumer choice"); *Reddy v. Puma*, 2006 WL 2711535, at *4-5 (E.D.N.Y. Sept. 21, 2006) (displacing a competitor leading to decline in output or quality is antitrust harm); *N.Y. Medscan LLC v. N.Y. Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 148 (S.D.N.Y. 2006) ("decline in quality" is an antitrust injury).
[132] *Geneva*, 386 F.3d at 509-10 (role of the jury to weigh the evidence regarding harm to competition).
[133] *See In re Nine W. Shoes Antitrust Litig.*, 80 F. Supp. 3d 181, 190 (S.D.N.Y. 2000); Sibley Reply Table 1; Ex. 1107.
[134] Sibley Rpt. ¶¶156-175, Fig. 6; *supra* §I.A.1; *see, e.g.*, PSUF 430 (▪▪▪▪▪▪▪▪▪▪▪▪), 957 ("▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪"), 1385 (TreeHouse "▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪"), 364, 495; *see also* Sibley Reply ¶¶224, 433 ▪▪▪▪▪▪;
PSUF 1132-35; Sibley Rpt. ¶93, 203-208, Fig. 7 & Fig. 8; Sibley Reply ¶¶78, 433; *supra* §I.A.1.



Keurig also ignores expert analysis showing Keurig's prices are higher than they would be in the *but-for* world[135] and argues that "private label prices were competitive and would not decrease in the but-for world." Mot. at 20-21. But neither Plaintiffs nor Keurig suggests there is a separate market for private label cups. As Dr. Stiroh explained, Keurig's *branded* pricing comprised most of Keurig's sales and would have needed to come down likely by 10% to meet unrestrained competition. Stiroh Rpt. ¶116; Stiroh Reply Table 2.[136]

### 2. *Keurig's Exclusionary Conduct Decreased Output*

Keurig reduced output of Compatible Cups and SSBs compared to the but-for world. Even Keurig executives admitted that brewer output would have been higher without Keurig's restraints. *See, e.g.*, *supra* §I.A.1. Distributors sought to remove the Loyalty Clause to support market growth,

---

[135] Sibley Reply ¶¶211-228 (showing Keurig's prices in all channels were higher than they would be if competition was not restrained); Sibley Reply ¶¶156-175, Fig. 6 (providing extensive analysis demonstrating how Keurig raised prices and maintained its prices above competitive levels through Keurig's margin maintenance strategy). The cases cited by Keurig are thus all inapposite. *Sterling Merch., Inc. v. Nestle, S.A.*, 656 F.3d 112, 121-23 (1st Cir. 2011) (expert failed to provide evidence that prices increased and did not analyze prices); *Cap. Imaging v. Mohawk Valley*, 996 F.2d 537, 546 (2d Cir. 1993) (plaintiffs conceded that prices would remain the same in but-for world).
[136] Other experts have found K-Cup overcharges as well. *See* Johnson Rpt. §V(B); French Rpt ¶ 438, Ex. 27.

but Keurig instead restrained brewer output further by prohibiting placements of Competitive Brewers.[137] Keurig also explicitly intended to, and did, "prevent" and reduce brewer output through its Brand Competitor Non-Competition Clause.[138]

As to Compatible Cups, the restriction of output compared to the but-for world is apparent from the face of Keurig's agreements alone.[139] As the President of B.C. Coffee explained, without the Loyalty Clause and "[i]n free competition, B.C. Coffee would sell far more [Competitive Cups] than K-Cups, *and its overall portion pack sales would increase*." PSUF 495 (emphasis added). Canteen similarly testified that it would have made "additional sales" if Keurig did not prevent it from selling Competitive Cups. PSUF 939. As Dr. Stiroh opined, a more competitive environment with market prices around 10% lower would have caused substantial increases in Compatible Cup sales in the AH and AFH Market segments. Stiroh Rpt. ¶116.

### 3. Keurig's Exclusionary Conduct Decreased Variety, Consumer Choice, and Quality

Keurig reduced not only total output, but specifically of lower-priced, higher-quality products by prohibiting the sale of Competitive Cup varieties that Keurig often did not even provide. As the President of one vendor explained, "In the absence of the 'Loyalty' clause, Alpine Valley would have purchased and sold Competitive Cups. *These products were often of a higher quality and included more grams of coffee* than Keurig's K-Cups." PSUF 364 (emphasis added).[140] Keurig documents also admit that TreeHouse made higher quality hot chocolate, but Keurig

---

[137] PSUF 370 (Vistar objected to being prohibited from selling non-KGM products); PSUF 37 (KAD complaining Keurig is "restricting/regulating free distributor supply chain" and arguing "to free up the restrictions" to instead support growth); PSUF 375; PSUF 347-349; *see also* Sibley Reply ¶433.

[138] *Supra* §I.A.1 & n.68; *see also* Sibley Rpt. §VII.

[139] *See supra* §I.A.1; PMSJ §1.A; *see, e.g.*, PSUF 38 (███████████████████); PSUF 40 (██████████████); PSUF 36 (█████████████████████); *see also* Sibley Rpt. §V.B.iv.c (providing examples of Keurig eliminating Competitive Cups); PSUF 1368 (observing Starbucks "introduced numerous innovations" in ready-to-drink coffee format that "never made it to single-serve coffee"), 1812-13 (██████████████████████████████████), 1813 (Bartolini Decl. ¶¶15, 23, 24, 26, 37, 47) (███████████████████████████████████████████████).

[140] *See also* PSUF 1235-36; *see also* Sibley Rpt. §V.B.iv.c; PMSJ §1.A.

prohibited customers from buying it even when Keurig had technical difficulties making its own "inferior" cocoas.[141] Another vendor explained that Grove Square's hot chocolate product was a "superior product" to Keurig's on both quality and price, but that Keurig "aggressively" enforced its Loyalty Clause to prevent the sale of TreeHouse's product. PSUF 1237. Keurig also succeeded in keeping Touch Brewer, which could make a stronger cup of coffee, out of the market. PSUF 1878-79.

Keurig also prevented brands, distributors, and retailers from creating new products of their own with Competitive Cup manufacturers, including lower-priced private label cups. PSUF 1385-88. Keurig repeatedly suppressed the availability of lower-priced Competitive Cups, including at times when Keurig did not provide the same product, such as for hot cocoa, cappuccino, or cider.[142] For example, Crystal Rock partnered with TreeHouse to try to launch the first private label products in the AFH channel, but ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████. PSUF 1387. Essendant likewise asked TreeHouse to manufacture cups for it, but then could not move forward because of Keurig's contractual prohibitions. PSUF 1388. Stater Brothers too was about to launch its first private label cups, but had to abandon the launch

---

[141] *See, e.g.*, PSUF 1731, 996-97 ("KAD agreement prohibited Alpine Valley from selling Grove Square, even though our customers were demanding hot chocolate for their Keurig Brewers."); PSUF 988-90 (AVB's customer forced to stop purchasing TreeHouse products, including hot cocoa and cappuccino, by Keurig); PSUF 123 (B.C. Coffee was forced to stop purchasing TreeHouse's hot cocoa, despite customer satisfaction, due to Keurig enforcing Loyalty Clause); PSUF 1239 (█████████████████████████████████████████████████████████████████████ ████████). Although Keurig now offers the self-serving allegation that it was blamed for the "terrible" taste of TreeHouse's coffee, Mot. at 10, internally, Keurig acknowledged Competitive Cups ███████████████████ ████████████████████████████████. PSUF 678-79, 833. ████████. PSUF 687.

[142] PSUF 500-501 (Microsoft offices specifically requested that TreeHouse's Grove Square French Vanilla Cappuccino, Caramel Cappuccino, and Hot Chocolate Cappuccino be added to Canteen's national catalogue, but sales of TreeHouse's Competitive Cups were excluded from Canteen's national catalogue because of Keurig's enforcement of its Loyalty Clause); PSUF 953-56 (Keurig "threatened to cut off [AVA's] access to Keurig brewers, K-Cups, and associated rebates if [they] continued buying Grove Square" despite that "Keurig did not even offer some of the types of products our customers were requesting, such as cocoas and ciders.").

because of the 2.0 Brewer.[143] Bed, Bath & Beyond was also "planning to add the private label K-Cup from TreeHouse's Sturm Foods division," but had to abandon its plans.[144] If not for Keurig's exclusionary conduct, Kroger too could have sold consumers different coffee flavors, hot cocoa, and cappuccinos that Keurig did not offer. PSUF 1284. ███████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████.[145]

Finally, the record shows that Keurig constrained capacity.[146] Even for the few SKUs Keurig allowed under its brand agreements, Keurig limited the number of cups it would produce. PSUF 1838. This resulted, for example, in ████████████████████████████████

████████████████████████████████████████████. PSUF 1839 (Bartolini Decl. ¶39). As another example, Keurig's President admitted that Keurig "could not supply enough hot chocolate to meet all of our accounts' demands,"[147] and while TreeHouse could have co-manufactured additional hot chocolate cups as a second supplier, Keurig's restrictions prevented it from doing so. PSUF 1816, 1824-26.

---

[143] PSUF 1656 (testifying that "TreeHouse and Stater Bros. would have moved forward with the private label program if Stater hadn't learned about the 2.0 [Brewer and] what it was purportedly going to be doing"); PSUF 1661.

[144] PSUF 1281-83; Sibley Rpt. ¶772 n.1412.

[145] PSUF 1185 (Bartolini Decl. ¶¶23, 24, 26, 29). Keurig's restraint on varieties Keurig did not only harm consumers, but also resellers that wanted to compete by offering different products. *See, e.g.*, PSUF 940 (Canteen would have had a competitive advantage to be able to sell different varieties of TreeHouse cups to its customers).

[146] *See e.g.*, PSUF 200 (Keurig admitting there were ███████████████████████
████████████████████"), 1031 ("the cost of K-Cup packaging machinery [is] a significant barrier" and Keurig's agreements with suppliers meant that competitors' "capacity would be very limited – so how much market share could they really capture"), 1837 (████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████, 1992 (████████████████████████████
██████████████████████, 1104; *see also* Sibley Rpt. ¶421.
████████████████████████████████████████. *See* PSUF 1838 (Bartolini Decl. ¶42-3).

[147] PSUF 1840; *see also* PSUF 88 ("Keurig was repeatedly failing to fulfil orders and had put Kroger on allocation for Keurig's branded products. Our team used to joke about going to the aisle and laying down on the shelves where Keurig's products were supposed to be to take a nap, because the shelves were empty.").

### 4. *Keurig's Anticompetitive Conduct Raised Rivals' Costs*

Keurig raised rivals' costs through foreclosure of input suppliers, foreclosure of the AFH Market, and through its 2.0 Lock-Out Technology. *See, e.g.*, Stiroh Rpt. §IV.A.2; Sibley Rpt. ¶240.[148] For example, TreeHouse was forced to purchase equipment from outside the country due to Keurig's exclusive dealing agreements.[149] ███████████████████████████

████████████████████████████████████. Ex. 1111. Keurig foreclosed the most efficient means of distribution through KARD and KAD Agreements. *See infra* §I.E.2.

Keurig also harmed competition with its Lock-Out Technology. As Dr. Sibley explained, "Keurig's control of the SSB Market allowed it to invest in a 'secure ink' to lock out Competitive Cups, and while it was reverse engineered by competitors, it needlessly raised costs and created a further barrier to entry for those seeking to enter the market."[150] This inhibited TreeHouse's growth because it had "to stop and now defend and figure out a solution to" the 2.0 Brewer, rather than "develop categories and launch new products."[151]

### 5. *Keurig Harmed the Competitive Process and Competition on the Merits*

Keurig also harmed the competitive process by insulating itself from competition on the merits.[152] For example, Keurig's scare tactics related to the Lock-Out Technology in the 2.0 Brewer disrupted the normal bidding process,[153] distorted competition for co-manufacturing with

---

[148] *See, e.g.*, PSUF 1711, 629, 935; *see also* Sibley Reply ¶¶445-449; Stiroh Rpt. §IV.A.2; Sibley Rpt. ¶993; Ex. 232, Expert Report of Kenneth R. Castleman, Ph.D. (hereinafter, "CR") at ¶¶48, 55, 86; Ex. 235, Reply Expert Report of Kenneth R. Castleman, Ph.D. (hereinafter, "CRR") at ¶135; Sibley Rpt. ¶301.
[149] *See, e.g.*, PSUF 1794 (Adam Spratlin ███████████████████████████████████████████████████
███████████████████████████████████████████████"), 1796-98, 1203-05.
[150] *See* PSUF 1711, 570, 506-508, 553, 559-60, 566-67; *see also* Sibley Rpt. ¶311.
[151] PSUF 1712-13; Sibley Reply ¶449.
[152] *See, e.g.*, Sibley Rpt. §VII; Sibley Reply §VI.A.ii.
[153] PSUF 1638 ("The decision to switch over the French Roast private label cups to Keurig was not in any way a cost decision – any financial incentives offered by TreeHouse would not have made a difference, as my concern was with having a private label entirely incompatible with the K2.0 Brewer."), 184, 975.

brands,[154] and enabled Keurig to coerce retailers into reducing or eliminating Competitive Cups from shelves.[155] In addition, Keurig's sham litigations likewise inhibited competition on the merits from nascent competitors and caused them to incur increased costs. *See infra* §I.E.5.iii.[156]

Keurig's conduct, interfering with competition on the merits by using the 2.0 to create urgency and then locking up agreements to protect its margins,[157] "is exactly "the type [] of conduct the antitrust laws were intended to prevent."[158] As even Keurig's economist admits, "consumers may be worse off by this competitive process when they lose the ability to purchase their preferred brand at their chosen retailer."[159] Contrary to Keurig's conclusory suggestion, this is not simply a case of harm to one or a handful of competitors. Rather, Keurig's conduct harmed competition as a whole and the competitive process for *all* Competitive Cup manufacturers as well as brands.[160]

## C. TreeHouse's and JBR's Claimed Injuries Flow from Harm to Competition

The Court fully vetted Plaintiffs' allegations of harm to competition resulting from Keurig's exclusion of Competitive Cup manufacturers. MTD Order at 234-36.[161] TreeHouse's and

---

[154] PSUF 980, 1079, 1842-43; Sibley Rpt. §VII; Sibley Reply §VI.A.ii.

[155] Sibley Reply §VI.A.ii; *see also* PSUF 1344, 1353, 1611, 1862-64.

[156] This Court previously held that litigation "costs incurred in defending against a sham litigation" are "a well recognized type of antitrust injury…." MTD Order at 233; *Bio-Tech. Gen. Corp. v. Genentech, Inc*., 886 F. Supp. 377, 380 (S.D.N.Y. 1995), *aff'd*, 66 F.3d 344 (Fed. Cir. 1995).

[157] PSUF 1627 (Keurig developed Lock-Out Technology ██████████████████), 1880 ████████████████████████; *see also* PSUF 1627, 1342, 1844, 1630 ████████████████████

██████████,1845 (████████████████████████), 1317, 932 (████████████████████████████████).

[158] *Chapdelaine*, 2006 WL 2020950, at *3-4 ("[F]oreclos[ure] from competing in the relevant market, thus decreasing the number of alternatives available to consumers of such products," constitutes antitrust injury.); *Reddy*, 2006 WL 2711535, at *4-5 (displacement of plaintiff from market leading to decline in qualified services is antitrust injury).

[159] Ex. 1112 (K. Murphy, Exclusive Dealing Intensifies Competition for Distribution, at 443).

[160] *See e.g.*, PSUF 62 (████████████████████████████████████████████████ ████████████████████████████); *see also, e.g.*, PSUF 74-75, 1184; *see also* Sibley Rpt. ¶¶323-330.

[161] *See also AngioDynamics, Inc. v. C.R. Bard, Inc.*, 2021 WL 1792394, at *37 (N.D.N.Y. May 5, 2021); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 382-8 (S.D.N.Y. 2007) (antitrust injury is established where a competitor's loss of sales stems from the conduct preventing customers from obtaining a desired product, or from the

JBR's injuries stem from "competition-reducing aspect[s] or effect[s]" of Keurig's behavior. PSUF 1985, 2002-03. *See Atl. Richfield v. USA Petroleum*, 495 U.S. 328, 342-43 (1990). As just a few examples:



- Kroger ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████." PSUF 1256.

- JBR's third-party broker testified that ████████████████████████ ████████████████████████. PSUF 1758, 1776.[162]

- Another JBR broker was notified that ████████████████████████ ████████████████████████. PSUF 1672, 1758, 1774-75.

- ████████████████████████████████████████████████████████████ ████████████████ PSUF 846.

- ████████████████████████████ PSUF 491.

- ████████████████████████████████████████████████████ PSUF 1752-55.

- ████████████████████████████████████████████████████████[163]

Keurig claims that TreeHouse did not suffer antitrust injury, as private label prices went down due to Keurig competing for those sales.[164] *See* Mot. at 19-20. But this is not a case about price erosion—Keurig's own expert admitted that TreeHouse is not claiming damages from lower

---

inability to reach those customers due to exclusion from certain retailers); *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 10 n.15 (1984) (The Clayton Act was intended to remedy situations where companies that have sought to enter the field "have found that the markets have been preempted.").

[162] For BJ's and Safeway, Keurig argues that retailers chose not to buy JBR for other reasons, but there are disputed issues of fact. Keurig never deposed BJ's or presented testimony from any Keurig witness to say why BJ's chose Keurig for its private label. Certainly, Keurig did not come forward with any countervailing testimony to suggest 2.0 Brewer was not a concern on the part of BJ's. And BJ's has now sued Keurig on grounds that 2.0 compatibility issues did indeed mislead consumers and retailers into choosing K-Cups over Competitive Cups, such as JBR's OneCup.

[163] JBR has identified over 20 examples of retailers and distributors influenced by Keurig's anticompetitive conduct to not purchase JBR's OneCups, including at least 14 potential AFH customers who cited exclusivity clauses or the 2.0 Brewer compatibility as the reasons for foregoing business with JBR. PSUF 1774, 1781-82. Keurig did not bother to rebut any of those examples with testimony to show JBR was not harmed as to those specific customers.

[164] Keurig claims that TreeHouse's damages are solely focused on lost private label business, Mot. at 19, but this entirely ignores the record evidence and Plaintiffs' expert analyses showing that TreeHouse was almost entirely excluded from the AFH market segment as a result of Keurig's Loyalty Clauses in its KAD and KARD Agreements and that TreeHouse was foreclosed from competing for co-manufacturing business of major non-private label brands by Keurig's vast web of exclusive agreements. *See* Ex. 558; PSUF 1285-1312; Sibley Rpt. §VI.A; Sibley Reply ¶174; *see also* PSUF 1985, 2002-03.

prices. Ex. 1107 (Ugone Tr. 218:15-19). Rather, TreeHouse's expert Dr. Stiroh opined that *brand prices*, and thus *market prices generally*, would be lower in the but-for world.[165] As set forth above, TreeHouse's injuries flow directly from exclusionary, competition-reducing aspects of Keurig's conduct. Keurig's disingenuous argument that TreeHouse sought to retain sales at prices *higher* than Keurig's is also without merit as TreeHouse's prices are not higher or equivalent to Keurig's.[166] Keurig entered private label to prevent price and margin erosion by excluding TreeHouse from the shelves in order to control both branded and private label prices. Sibley Rpt. ¶¶728-772; *supra* §I.B.1. TreeHouse does not "benefit" from being excluded from sales and does not earn higher profits when it cannot make the sale in the first place.[167] Indeed, it is Keurig's exclusionary conduct that *enabled* Keurig to keep brand prices—which comprise the substantial majority of its sales—higher than they should have been. *See, e.g.*, Sibley Reply ¶226, Fig. 3. Thus, TreeHouse's injury resulting from Keurig's anticompetitive conduct excluding it from competition on the merits in private label (amongst TreeHouse's other injuries), results from harm to competition as a whole.[168]

---

[165] As Dr. Stiroh explained, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ " Stiroh Reply ¶15. "█████████████████████████████████████████████████ " Stiroh Rpt. ¶116; Stiroh Reply Table 2; PSUF 1917 ("PL is too small").

[166] Stiroh Rpt. Figure 1; Stiroh Reply Figures 3-5; Sibley Rpt. Figure 11.

[167] Sibley Reply ¶692 ████████████████████████████████████████████████████████████████████████████ ); Stiroh Reply ¶10 ("██████████████████████████████████████████████ "). The Court has already held that even if Competitor Plaintiffs were able to enjoy the effects of conduct resulting in supracompetitive pricing, "this supposed 'benefit' alone is insufficient to contradict the injury they allege." MTD Order at 246 & n.33. Nonetheless, the record shows that Plaintiffs enjoyed no such benefit, as their harm results from market exclusion. *See* Sibley Reply Table 6, ¶¶556-562; (████████████████████████████████████████████████████████████████████████████ ); Stiroh Reply ¶9-10 (████████████████████████████████████████████████████ ).

[168] *See, e.g.*, *Dentsply*, 399 F.3d at 191 ("[a] set of strategically planned exclusive dealing contracts [that] may slow the rival's expansion by requiring it to develop alternative outlets … or rely … on inferior or more expensive outlets" harms competition); *Microsoft*, 253 F.3d 34, 70-71 (restricting access to most efficient distribution channel harms

Keurig further improperly invites the Court to determine disputed issues of fact when it suggests customers may have bought other Portion Packs instead of JBR cups for reasons other than its conduct. Customers liked JBR's mesh cup precisely because it was different; sanitation or freshness concerns did not cause customers to choose other pods.[169] JBR's cost structure for coffee was no different than other higher quality Portion Packs, and its prices were similar to other pods of comparable quality. *See* PSUF 1784. JBR's supposed weakness in selling to Amazon and Costco gave it national exposure useful for sales at all retailers and distributors. PSUF 156, 1766.

Finally, Keurig argues that TreeHouse and JBR have not shown harm to competition because they did not entirely exit the market, their sales were not enjoined by the sham litigation courts, and their litigation fees did not affect their pricing. *See* Mot. at 67. This argument fares no better and again flouts this Court's prior rulings. As this Court has recognized, antitrust injury flowing from sham litigation may take many forms beyond forced exit from a market or an injunction on sales. MTD Order at 233.

Keurig concedes that the litigations drove up TreeHouse's and JBR's costs, which this Court has already found to constitute harm to competition.[170] Mot. at 72-73. Moreover, Keurig overlooks other forms of competitive harm. For instance, the litigations clouded TreeHouse's and JBR's ability to sell their products and caused customers to avoid doing business with them for fear of being sued by Keurig. *See, e.g.*, PSUF 1454-63, 1526-62, 1972. Keurig told its customers it would " ███████████████████████████████████████████████████

█████████████████████████ " PSUF 1419. As a result, multiple customers elected not to

---

competition); *AlarMax Distribs., Inc. v. Tyco Safety Prods. Canada Ltd.*, 2008 WL 2622899, at *4 & n.5 (W.D. Pa. June 27, 2008) (competitor did not stand to gain from exclusive dealing raising prices; loss of customer and restraint of competition on merits sufficient).

[169] Macartney Reply ¶¶195-200; Macartney Rpt. §VII.A.2; PSUF 1783.

[170] While Keurig contends "that is not harm to overall competition," it cites no case law to support this contention. Mot. at 72-73. And this Court has already held to the contrary, finding that "[l]itigation costs incurred in defending against a sham litigation are 'a well-recognized type of antitrust injury.'" MTD Order at 233.

purchase Competitive Cups "[b]ased on these litigation concerns."[171] Between lost business and costs from defending the sham suit, TreeHouse's expert estimated TreeHouse's economic damages, just during the period in which the *Sturm* Litigation was ongoing, at ███████. Stiroh Rpt. ¶6. Keurig's sham litigations also harmed consumers by depriving them of greater choices in flavors and lower-cost alternatives.[172] McLane and DPPs also both offered extensive evidence that the sham litigations harmed competition and led to overcharges.[173]

### D.  DPPs' and McLane's Claimed Injuries Flow From Harm To Competition

Keurig's conduct also resulted in supracompetitive K-Cup prices and deprived customers of competitive choice. Keurig's exclusive contracts, acquisitions of competitors, sham patent litigation, development of the K2.0 brewer with "lockout" technology, and disparagement of competitors "created barriers to . . . entry," restraining competition, while impeding the "expansion of rival sellers."[174] This allowed Keurig to maintain its monopoly power, charge artificially inflated prices, and enjoy supracompetitive profits, resulting in harm to DPPs and McLane. *Id.*

### E.  Keurig's Additional Arguments As To Plaintiffs' Antitrust Claims All Fail

#### 1.  *Disputed Issues of Material Fact Exist As To Keurig's Use of Lock-Out Technology To Maintain Its Monopolies*

Keurig argues that its use of Lock-Out Technology in 2.0 Brewers was not coercive because consumers could still buy *some* 1.0 brewers that stayed on the market, which Keurig's own documents acknowledge were not comparable to standard brewer models. Mot. at 39-40.[175]

---

[171] *See, e.g.*, PSUF 1462-63 ("The fact that Keurig was suing Sturm was a non-starter for Kohl's…..."); *see also* PSUF 1454-1461, 1465, 1483, 1526-1562, 1967-1968.

[172] *See, e.g.*, *Ross v. Bank of Am.*, 524 F.3d 217, 226 (2d Cir. 2008) (concluding that reductions in "consumer choice" and the "equality of [] services offered" are antitrust injuries); *U.S. v. Visa USA, Inc.*, 344 F.3d 229, 243 (2d Cir. 2003) (explaining that restraints that discourage firms from "design[ing]…their products more competitively" can give rise to antitrust injury); *Laumann*, 907 F. Supp. 2d at 484 ("Reduced consumer choice…when [it is] the result of an anticompetitive practice, constitute[s] antitrust injury."); *see also* PSUF 1989.

[173] *See, e.g.*, PSUF 1961, Johnson Report ¶¶ 85-86; PSUF 1962, French Report ¶¶ 163-173.

[174] French Rpt. ¶¶ 151, 158-64, 174, 198, 235-36, 301-16, 348, 360; Johnson Rpt. ¶¶ 10-134, Figure 6, Figure 8.

[175] *See* PSUF 1439, 1473-74 (CPSC violation and fine for mini brewers that were left on the market burning consumers); 1897 (████████████████████████████████████████████████████

Keurig's arguments rewrite history and rely on precisely the type of disfavored "formalistic distinctions" that ignore "actual market realities."[176] As one of Keurig's suppliers noted, "



PSUF 1899 (emphasis added).[177]

Keurig did not simply launch a new product and let consumers choose on the merits if they wanted to buy K-Cups or Competitive Cups. Rather, Keurig preempted that choice before consumers could make it. In addition to using its

that raised rivals' costs *after* it hit the market,[178] Keurig lied to consumers about the compatibility of Competitive Cups after they became compatible with the 2.0 Brewer and also deployed its coercive force *before* the 2.0 Brewer launch as an integral part of Keurig's multifaceted plan to secure                                             in order to exclude competitors, maintain its monopolies, and raise prices.[179]

As it was preparing to introduce its 2.0 Brewer, Keurig began a campaign to coerce retailers into discontinuing Competitive Cups (thereby restricting consumers' access to them) by telling

---

), 1898

"); *see also generally* 1578-1618. Forcing consumers to choose between full-size 2.0 brewers and mini brewers with known safety issues itself is coercive, even if Keurig had not further restrained the freedom to purchase Competitive Cups on the merits. *See also* PMSJ n.73.

[176] *Kodak*, 504 U.S. at 466-67; *see also infra* §I.A.4.

[177] *See also* PSUF 1900 ("We were also forced to buy only Approved Keurig Kcups ….").

[178] *See* PSUF 1037, 1062, 1171.

[179] *Cf.* MTD Order at 230 ("As recognized by the Second Circuit, 'it is not the product introduction itself, but some associated conduct, that supplies the violation.") (quoting *Berkey Photo*, 603 F.2d at 286 n.30). This is precisely the case here, where Keurig has combined the implementation of its Lock-Out Technology "with some other conduct, the overall effect of which is to coerce consumers ration than persuade them on the merits, and to impede competition, [such that] its actions are anticompetitive under the Sherman Act."); *id.* (citing *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015); MTD Order at 230 (recognizing Plaintiffs' "allegations of exclusive dealing, tying agreements, and product disparagement—the overall effect of which is to coerce customers to purchase K-Cups over Competitor Cups, rather than to compete on the merits"). *MacDermid Printing Solutions v. Cortron*, which is misleadingly cited by Keurig, is wholly inapposite, did not involve product redesign, followed trial, and held that a single press release relating to the plaintiff's supplier did not harm competition. 833 F.3d 172, 186 (2d Cir. 2016).

retailers that (i) 2.0 Brewers would not work with Competitive Cups,[180] (ii) 2.0 Brewers would "replace" 1.0 brewers,[181] and (iii) 1.0 brewers were being discontinued.[182] Keurig's documents show the purpose of this campaign was to ▮▮▮▮ retailers into not carrying Competitive Cups.[183] While Keurig's representations about discontinuing its 1.0 brewers were lies,[184] nobody had the capability of proving them false until it was too late.[185] As market analysts reported, the "▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮[186]

Keurig argues competitors were not "locked out" because they modified their products to be 2.0-compatible, Mot. at 40-41, but the Court was already aware of this when it previously

---

[180] *See, e.g.*, PSUF 1885 (Keurig President of U.S. Sales: ▮▮▮▮▮▮), 1667 (noting language in presentations about the 2.0 Brewer to retailers such as ▮▮▮▮), 1669 (▮▮▮▮).

[181] *See, e.g.*, PSUF 1612 ▮▮▮▮, 1596 (Keurig to Ahold in February 2014: ▮▮▮▮), 1598 (same as to Wakefern in February 2014), 1600 (Keurig to HyVee in March 2014: ▮▮▮▮), 1604 (same as to Costco in April 2014).

[182] *See, e.g.*, PSUF 1596 (Keurig to Ahold: ▮▮▮▮), 1598 (same as to Wakefern), 1608 (Keurig told ▮▮▮▮); *see also generally* 1578-1612, 1668.

[183] *See, e.g.*, PSUF 1913 ("▮▮▮▮ 1901 ▮▮▮▮), 1902 ("▮▮▮▮"); *cf.* PSUF 1669 (Keurig to Ahold: ▮▮▮▮.

[184] *See, e.g.*, PSUF 1886 (Keurig admitted that its ▮▮▮▮ was false), 1670-1671.

[185] *See, e.g.*, PSUF 1892 (▮▮▮▮, 1758, 1776 (▮▮▮▮, 1638 ▮▮▮▮), 1656 ▮▮▮▮, 1661, 1672 (noting further examples of retailers' decisions not to work with JBR or TreeHouse because of the 2.0 Brewer); *see also* Stiroh Rpt. ¶¶58-77; *Nat'l Assoc. of Pharma. Mfgs, Inc. v. Ayerst Labs.*, 850 F.2d 904 (2d Cir. 1988).

[186] PSUF 1902; *see also* Ex. 1112 (Kevin Murphy, Exclusive Dealing Intensifies Competition for Distribution, at 443).

rejected Keurig's arguments. MTD Order at 215 (noting reverse-engineering). Further, even after Competitive Cups were made compatible, Keurig told consumers a host of lies including that Competitive Cups were not compatible with the 2.0 Brewer, that they would void brewer warranties, and that they were unsafe.[187]

While Keurig replays its argument that the 2.0 Brewer was a "new" product exempt from the antitrust laws, Mot. at 42-45, there is no such antitrust immunity, as this Court already held. MTD at 230. In any event, the Lock-Out Technology was not reasonably necessary to achieve any purportedly procompetitive objective advanced by Keurig, including to enable the 2.0 Brewer to brew a carafe—to the contrary, Keurig "                                        " PSUF 1702 (emphasis added); PMSJ §IV.A. Keurig's use of Lock-Out Technology is thus exclusionary under Supreme Court precedent (noticeably absent from Keurig's motion) holding that "a monopolist's conduct violates Section 2 if it '(1) tends to impair the opportunities of rivals, [and] also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.'"[188]

As this Court also noted, the Supreme Court has made clear that 'intent is … relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" MTD Order at 231 (quoting *Aspen Skiing*, 472 U.S. at 602). Plaintiffs have developed extensive evidence of Keurig's exclusionary intent. The former Keurig scientist whose

---

[187] PMSJ §§V.A, V.D; PSUF 1667, 1673-77, 1681-85, 1903

1679                                    ), 1680 (                                    , 1990 ("                ), 1991 (                                    ), 1681-85; *but see* PSUF 1677 (                , 1682 (Keurig                                    ); *contra* Magnuson-Moss Warranty Act, 15 U.S.C. § 2302(c).

[188] MTD Order at 229 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985)).

declaration was quoted by the Court in its MTD Order, for example, confirmed at his deposition that " ███████████████████████████████████████████████████████████

███████████████████████." PSUF 1025.[189] As Keurig's Senior Director of Consumer Insights

explained to Keurig's CEO, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████ " even though

consumers understood Keurig to be "trying to restrict what can be used so [Keurig] can charge

more.'" PSUF 1908. Similarly, Keurig's Senior Director of Product Marketing ███████████████

███████████████████████████████████████████████████████████████████████

███████████."[190] Consistent with the CEO's motivation, the President of U.S. Sales reportedly

also ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████ PSUF 974. As later reiterated by Keurig's former CEO, "████████████████████

███████████████████████████████████ PSUF 62.

Keurig argues that the 2.0 Brewer was procompetitive because it allowed consumers to

brew a carafe. When a defendant argues that its conduct is an innovation, a threshold question

arises as to whether the product is truly procompetitive or a pretext to lock out competition.[191] The

Lock-Out Technology in the 2.0 Brewer was not necessary to allow a carafe to brew.[192] To the

---

[189] *See also* PSUF 1905 ( ███████████████████████████████████████████████████████

███████████████████████████ "); 78:5-83:12 (testifying redesign made all but two SKUs taste worse;
with no known consumer benefits; and was not needed to distinguish between K-Cup and Carafe cup); 89:13-90:21
( ███████████████████████████████████████████████████████████████████████████████████

███ [190] PSUF 562; *see also* PMSJ §IV.B.1; *see also, e.g.*, PSUF 1909 ████████████████████████████████

███████████████).

[191] *Actavis*, 787 F.3d at 658 ("The record is replete with evidence showing that Defendants were … "trying to . . . put
up barriers or obstacles" to generic competition. . . ."); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1382 (Fed. Cir.
1998) (rejecting claim of pro-competitive justification where "there was substantial evidence that Bard's real reasons
for modifying the gun were to raise the cost of entry to potential makers of replacement needles, to make doctors
apprehensive about using non-Bard needles, and to preclude the use of 'copycat' needles"); *see infra* 63.
[192] *See* PSMJ §IV.A.1. Rather, a mechanical switch was present in the 2.0 Brewer to indicate whether a large format
VUE cup or a small K-cup was inserted. PSUF 1699 (" ███████████████████████████████████████████ In

contrary, Keurig executives candidly admitted that ███████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ PSUF 1702.

The real reason for the 2.0 Brewer appears throughout Keurig's documents: to prevent Competitive Cups from being used in Keurig Brewers. The evidence that Keurig had anticompetitive intent and that its justifications for CBT were a pretext is extensive, as was the case in *Actavis*. A sampling of the evidence appears below:

- November 24, 2008 Presentation to Keurig's Board of Directors that Keurig ████████
████████████████ PSUF 1703; *see also* PSUF 1704.

- June 21, 2011 Presentation by Sagentia, Keurig's consultant, stating Keurig "███████
████████████████████████████████████████████████ PSUF
1705.

- July 23, 2012 Sagentia stating that the ████████████████████████████████████
████████████████████████████ " PSUF 1706.

- July 24, 2012 meeting minutes stating that the "█████████████████████████████████
████████████████████████████████
███ " PSUF 1707.

- September 20, 2012 email explaining that the opportunities of the ████████████████████
██████ PSUF 1708.

- March 1, 2013 email stating that ████████████████████████████████████████████████
████████████████████████████████████ PSUF 1910.

- October, 21, 2013 leadership call notes stating that ████████████████████████████████
████████████████ PSUF 1911.

- November 21, 2013 email stating that "████████████████████████████████████████
████████████████████████████████████████████████

---

fact, after Keurig removed the lockout functionality (ink reader) in 2017 (without notice to consumers), that switch detected the different sizes of cups. PSUF 1700 ("████████████████████████████████ "), 167:13-22 ("██
████████████████ ), 1701
████████ *see also* CR ¶¶ 52-53.█████████ .



PSUF 1912.[193]

Thus, the purpose and effect of the 2.0 Brewer and its CBT technology was to block competition, not provide a better product. Indeed, as Keurig's former CEO admitted, "

" PSUF 1625.

### 2. *Disputed Issues Of Material Fact Exist As To Substantial Foreclosure*

Keurig's substantial foreclosure argument similarly fails for two reasons. *First*, undeterred by the Court's previous direction, Keurig again "misreads the law on substantial foreclosure." MTD Order at 235. Keurig contends that because "more than a dozen competitors entered and grew [their] sales," "[n]o reasonable jury could find substantial foreclosure." Mot. at 45; *but see* §I.A.2. But Keurig once again erroneously insists on "*total foreclosure*"—not merely *substantial*—foreclosure.[194] For foreclosure from exclusive dealing to be "substantial," it typically must exceed 20% to 40% of the market.[195] Plaintiffs may show an even "lesser degree of

---

[193] *See also, e.g.*, PSUF 928-931, 1026-1028, 1038-1039, 1169-1171, 1709-10, 1995.

[194] MTD Order at 236 (quoting *Dentsply*, 399 F.3d at 191); *see also* MTD Order at 235 ("[S]uccessful §2 plaintiffs have both grown their market shares and earned high profits...."). Keurig's case law is also inapposite. *Compare Sterling Merch. Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245, 264 (D.P.R. 2010) (27% foreclosure) *with infra* n.199 (foreclosure rates from 38%-100%). As this Court noted, in *CDC Technologies, Inc. v. IDEXX Laboratories*, the plaintiff failed to show "an actual adverse effect on competition" in a case where distributors merely provided leads instead of reselling products, had "never been critical" for sales, and the plaintiff achieved nationwide distributor coverage and could reach defendants' customers. MTD Order at 236, n.28 (citing 186 F.3d 74, 80-81 (2d Cir. 1999)); *contra* §I.A (agreements raise prices, exclude competition, and restrain output). The *Dentsply* court also found *CDC* distinguishable because, as in *Omega*, also cited by Keurig, the contracts were "of short duration." *Dentsply*, 399 F.3d at 194 n.2 (citing *CDC Techs.*, 186 F.3d at 81); *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997); *In re McWane, Inc.*, 2012 WL 5375161, at *23 (F.T.C. Aug. 9, 2012) (increasing share did not provide sole basis for *Omega* decision, which recognized need to examine range of evidence).

Sibley Rpt. ¶340; PMSJ at 35; PSUF 48-49, 148-50, 152, 167-71, 183-85, 1012, 1014-15, 1362, 1365.

[195] *See, e.g.*, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961) (substantiality determined by fact-intensive broad inquiry of "probable effect" on competition); *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1298 n.5 (9th Cir. 1982) (violation based on approximately 24% foreclosure and other

foreclosure" when the "defendant is a monopolist." *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 837 (11th Cir. 2015) (citation omitted). In addition to failing to address Supreme Court precedent that makes it unlawful for a monopolist to condition sales on an agreement not to deal with competitors regardless of exclusivity, *supra* n.65, Keurig also fails to address the "majority" rule "stating that the Clayton Act [Section 3] requires a smaller showing of anticompetitive effects" such that Plaintiffs' claims relating to Keurig's retailer agreements must proceed to trial in any event. *Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, 2005 WL 1515399, at *10 (S.D.N.Y. June 23, 2005).[196]

Keurig argues that Plaintiffs cannot establish foreclosure of a market that has not been defined, but is well aware that Plaintiffs have defined not only SSB and Compatible Cup Markets but have *also* defined "Input Product Markets" and "Relevant Product Markets by Distribution Channel," which include the "AH Market" and the "AFH Market" "segments" or "channels." Sibley Rpt. §III.B, §V.B(ii)(b).[197] In any event, Keurig has not moved with respect to market definition and thus these issues should proceed to trial. Further, consistent with the Court's prior holding that "the requisite foreclosure may be found even if only a segment of the market is foreclosed, such as the AFH Market segment here,"[198] Plaintiffs provided extensive foreclosure

---

anticompetitive conduct); Areeda & Hovenkamp, Antitrust Law (1998 ed.) ¶1821c, pp. 159-165 (setting 20% as floor for significant foreclosure); *Rome Ambulatory Surgical Ctr., LLC v. Rome Mem. Hosp., Inc.*, 349 F. Supp. 2d 389, 410 (N.D.N.Y. 2004) ("40% foreclosure is likely an unreasonable restraint").

[196] *See infra* n.277.

[197] ███████████████████████████████████████████████████████████████ Sibley Rpt. §III.B. Contrary to Keurig's argument that "Plaintiffs' experts did not opine that there is a relevant market for office coffee," Mot. at 5, ██████████████████ ██████████. *See, e.g.*, Sibley Rpt. ¶141 ("██████████████████████████████████ ██████████████").

[198] MTD Order at 239 (citing *Visa*, 344 F.3d at 240 (plaintiff verdict upheld with market "segment" foreclosure); *Microsoft*, 253 F.3d at 70-71 (Section 2 violated by substantial foreclosure of a "majority" of competition in only "one of the two major [distribution] channels")).

analyses that specified the percentages foreclosed of these market segments.[199] Plaintiffs also included *further* detail and foreclosure percentages at each *level* of the AFH Market segment,[200] as well as with respect to the specific distribution channels *within* these segments, including the names of specific retailers and distributors from which Plaintiffs have been excluded and in many cases even *their* specific foreclosure shares.[201] This far exceeds what is required to support substantial foreclosure.[202] This evidence easily raises a triable issue.[203] In any event, the former "quantitative substantiality test" that used to "focus[] almost exclusively on the amount of the market foreclosed" has since been replaced with a fact-intensive "qualitative test." *Am. Express Travel*, 2005 WL 1515399, at *2.



[199] *See, e.g.*, Sibley Rpt. ¶448 (                                    ; Sibley Reply ¶466 & Figs. 8, 9 (

                                                                          ; Sibley Rpt. §V.B.f

                                                                              ); Sibley Rpt.

¶660                                                    Sibley Reply ¶205

                                    ).

[200] Sibley Rpt. ¶649

                                        ¶¶302, 304

                                    ; ¶661

                                        ; ¶150

                                    .

[201] *See, e.g.*, Sibley Rpt. ¶

        ¶¶637-657

                                                                          .

[202] MTD Order at 236, n.29 (exclusion "from two resellers" sufficient to support substantial foreclosure) (citing *Com. Data Servers, Inc. v. IBM Corp.*, 2002 WL 1205740, at *7 (S.D.N.Y. Mar. 15, 2002); *see also McWane Inc. v. FTC*, 783 F.3d at 838 (FTC did not quantify foreclosure percentage where two largest companies had "tied up the key dealers"); *LePage's*, 324 F.3d at 158-59 (specific percentage of foreclosure unnecessary).

[203] *See, e.g.*, PSUF 416 (Keurig AFH executive testifying

                ; PSUF 1847                                                                      );

*infra* §I.E.2.i-v.

*Second*, Keurig again ignores that Keurig's conduct has "caus[ed] the Competitor Plaintiffs to lose significant sales and profits." MTD Order at 235; Stiroh Rpt. ¶¶78-97; Macartney Rpt. §VII. The record is replete with examples of AH retailers and AFH distributors stating they would have purchased from TreeHouse and JBR if not for Keurig's exclusionary agreements.[204] Indeed, after Keurig used the 2.0 Brewer to coerce customers to enter exclusionary agreements, *e.g.*, PSUF 1321, TreeHouse "lost half [of its] business" and "its profits were cut approximately in half."[205]

### i. Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Retail Agreements

Keurig argues that because TreeHouse continued to bid and sometimes won private label deals and JBR's products continued to be sold in *some* stores, there can be no substantial foreclosure. Mot. at 49.[206] This, too, is wrong as a matter of law. "[J]ust as total foreclosure is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer."[207] In 2013, Keurig expressed concern with the initial rate of growth of unlicensed brand sales at retail driven "⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" PSUF 1849-50. Keurig's leadership team recommended attacking this perceived threat to Keurig's monopoly ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" PSUF 1851.[208] By ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, Keurig could "⬛⬛⬛⬛

---

[204] PSUF 346, 491, 494, 498, 846-47, 957, 984, 986-89, 993-97, 1141, 1236.
[205] PSUF 1713, 1848; Stiroh Reply ¶10. In a testament to Keurig's monopoly power, Keurig was able to coerce exclusivity provisions from major retailers over their demands to remove the exclusivity provisions. *See* PSUF 1322-1326; Sibley Rpt. ¶¶731-38; *see also* PSUF 1315-18, 1336-39.
[206] Indeed, all of Keurig's cited case law involved the opportunity for competitors to bid on an even playing field, Mot. at 49, but no such even playing field was present here. *See supra* §I.A.
[207] *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 283 (3d Cir. 2012) (citations and quotations omitted).
[208] Stated another way, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛" *See* PSUF 1337; *see also* PSUF 1316, 1336-39 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛), 1318 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

███████████████████████████████████ ██ ” PSUF 1852. Keurig explained that ‘██

████████████████████████████████ ██ ,” Keurig would be able ‘████████████████████

████████████████████████████████████████████████████████████████████

███████████████ PSUF 1853. As this Court previously noted, "the Supreme Court has made clear that 'intent … is relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" MTD Order at 231 (quoting *Aspen Skiing*, 472 U.S. at 602). Keurig's unlawful purpose is clear—to exclude Competitive Cup manufacturers, restrain their growth, protect Keurig's margins, and subject competitors' customers to exclusivity provisions explicitly intended to '████████████████████████ ” in order to maintain Keurig's monopolies.[209] Suffice it to say, the plan worked. *See supra* §I.A.

Keurig argues that the exclusivity on the face of the contracts relates to private label so they were not really exclusive. This is incorrect for several reasons. *First*, Keurig itself believed the agreements were "exclusive." By February 2014, Keurig understood that '████████

████████████████████████████████████████████ ” PSUF 1859. By its own admission, Keurig had already secured exclusivity by this time from █████████████████████████████████

██████████. PSUF 1860. Keurig went on to secure exclusive agreements from ████████████████

███████████████████████████████████, as well. Sibley Rpt. ¶¶746-47. Keurig called



████████████████████████████████████████ ). Keurig could minimize margin dilution ███████

███████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████ PSUF 1854-55. Keurig ████████████████████████████████████

███████████████████████████████████ ” PSUF 1856. Keurig also ████████████████████████████

████████████████████████████████████████████████ ” PSUF 1857, 1996; *see also* Sibley Reply ¶¶224-28 & Fig. 3 ("█████████████████

████ ").

[209] PSUF 1858; *see also, e.g.*, Sibley Reply ¶213 (████████████████████████████████████████

████████████████████████████████ .

these the "significant" or key retailers sufficient to support substantial foreclosure.[210]

*Second*, given that TreeHouse's sales to these entities were overwhelmingly in the form of manufacturing cups for their private label programs, the "practical effect" of the exclusivity was to exclude TreeHouse, which had been Keurig's goal from the start. *Supra* §I.B-C. It was economically infeasible for a retailer to simply switch back to TreeHouse based on competition on the merits,[211] particularly considering the expense and ramp up time required to switch private label providers.[212] The economic coercion placed on retailers was exacerbated by Keurig's high market share, dominant brewer, threats that Competitive Cups would not work in forthcoming brewers, strategy of ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████[213] As courts recognize, the use of coercion to secure exclusive dealing arrangements is anticompetitive.[214] As in *Dentsply*, Keurig's high market share and insistence on exclusivity make the economic practical effect of the arrangements too coercive to avoid. 399 F.3d at 189.

---

[210] PSUF 1983; *McWane Inc. v. FTC*, 783 F.3d at 838 ("tied up the key dealers"); *supra* §I.E.2.i. While Keurig disputes that it had exclusive agreements with Walmart and Kroger, it ignores significant evidence showing it entered into verbal exclusivity agreements. *See infra* §II.B.1.

[211] Once a retailer incurred the costs of developing a private label brand with Keurig, the threat of re-incurring such costs to switch to TreeHouse or JBR insulated the risk of Keurig losing such business. *See* PSUF 1330 (██████ █████████████████████████████████████████████████, 1861 (" ██ "), 1609.

[212] *Am. Express Travel*, 2005 WL 1515399, at *7 (the focus is on "the 'practical effect' of the agreement," not merely its form," including the "high costs" a "merchant must incur to switch completely from one brand to another" that makes "it very difficult for a supplier to dislodge a competitive brand from an exclusively dealing merchant") (citing *Tampa Elec.*, 365 U.S. 320); *McWane, Inc. v. FTC*, 783 F.3d at 819, 834-38; *see also* PSUF 1327-28 ("██████ ████████████████").

[213] PSUF 1864; *see also* PSUF 1862 ("████████████████████ "), 1863 (██ ███████████████████), 1866 (showing ███████████████████████████████, 1865; Sibley Rpt. 1214-15. Keurig's leveraging of the 2.0 Brewer so distorted competition on the merits that █████████ would not have even let TreeHouse continue supplying private label cups that TreeHouse offered to produce for them for *free*. PSUF 1266.

[214] *Graco Inc. v. PMC Global, Inc.*, 2012 WL 762448, at *13 (D.N.J. Mar. 6, 2012) ("If a party is coerced into an exclusive dealing agreement[,] that may indicate the party perceived the agreement as anticompetitive and support an identical jury finding.").

*Third*, the impact of Keurig's restrictions, both directly through the retailers and indirectly through its Brand Competitor agreements, had the practical effect of blocking not only private label sales, but branded sales as well.[215] As Dr. Sibley opined, Keurig's contention that there was little retail foreclosure "█████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████."[216] As in other cases, the "economic reality" demonstrates that "through the use of exclusive contracts with key dealers, [Keurig] foreclosed competitors from a substantial percentage of available opportunities for product distribution." *Dentsply*, 399 F.3d at 189-90 (quoting *Kodak*, 504 U.S. at 466-67). "Antitrust policy requires the courts to see the economic substance of an arrangement, not merely its form." *Id*. at 189 (citation omitted). Here, the economic reality is that Competitive Cup competitors were foreclosed from ███% of the AH Market.[217]

Finally, there is a disputed issue of material fact as to whether the term of the agreements were "short" or terminable at will.[218] Contracts of two years, and indeed even shorter, have been held to unreasonably restrain trade, even where they are terminable at will.[219] However, just as the

---

[215] Keurig argues that for a time TreeHouse continued selling Grove Square branded cups to ██████ after Keurig excluded TreeHouse from the private label program. But it does not tell the Court that the intent of the agreement was that *Keurig was also going to replace Grove Square*, but just needed time to try to copy the innovative TreeHouse product for ██████ given that Keurig had no comparable product. PSUF 1867 ("█████████████████████ , 1868 (██████████), 1869-70. Although Keurig's attempt to produce a satisfactory replacement product (███████) failed, the remaining Grove Square product was moved to the less desirable bottom shelf and eventually discontinued. PSUF 1871 (Keurig discussed with ██████ separating Competitive Cups on the shelf or removing them entirely), 1872 ("███████████████████"), 1873-74 ("██████████████████████"). These facts show harm to competition as another example of a popular product that was killed by Keurig without a replacement. *See supra* §I.B.

[216] Sibley Reply ¶¶267-68, *see also id*. ¶¶269-94.

[217] Sibley Reply ¶466 & Fig. 9; *see also infra* at §I.E.2.ii.

[218] Even Keurig stops short of arguing the exclusive agreements are "terminable at will," arguing only that *some* are "terminable without penalty." Mot. at 48.

[219] *See, e.g.*, *McWane, Inc. v. FTC*, 783 F.3d at 819, 834-38 (rejecting argument that "short-term and voluntary" exclusive dealing arrangement could not harm competition and, instead, assessing "market realities" to determine potential anticompetitive effects).

share of foreclosure alone is not dispositive as a matter of law under the governing qualitative substantiality analysis, "[a]n agreement's duration, [too], is not dispositive" and "courts have held that even if an exclusive dealing contract is terminable at will, it can still operate as an unreasonable restraint on trade." *Am. Express Travel*, 2005 WL 1515399, at *6. Indeed, major retailers like Kroger have never switched away from Keurig because of fears of a possible 3.0 brewer, *see, e.g.*, PSUF 1331, and retailers are subjected to Keurig's use ███████████████ that have the effect of extending the facial term of the exclusivity arrangements. *See* Sibley Rpt. ¶751 n.1376.[220] In short, no "single factor" can "outweigh all of the other factors the Court must consider," and in exclusive dealing cases, the "factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited" under the rule of reason.[221]

### ii. Keurig Has Failed to Rebut Plaintiffs' Foreclosure Calculation Based on All Branded and Private Label Sales Restrained by Contract in the AH Market

TreeHouse's expert "



." Sibley Reply ¶465; *id.* ¶¶458, 464. As noted above, these percentages are consistent with Keurig's internal calculations that "[█████████ ██████████████████████████████████████████████" as of February 2014.

---

[220] *See, e.g.*, PSUF 1011-12, 1984 (███████████████████████████████), 1365 (████████ ███████████████████), 1374-75 (same), 1014-15 (similar); *see also* Sibley Rpt. ¶751 n.1376.

[221] *Am. Express Travel*, 2005 WL 1515399, at *7 (citing *Am. Motor Inns, Inc. v. Holiday Inns, Inc.* 521 F.2d 1230, 1252 (3d Cir. 1975); *K.M.B. Warehouse Distribs. v. Walker Mfg. Co.*, 62 F.3d 123, 127 (2d Cir. 1995)). Even in Keurig's chosen case, *Maxon Hyundai Mazda v. Carfax, Inc*., the court recognized that certain features of the "exclusivity appearing on the face of a contract may not tell the whole story if switching to a competitor would prove costly for other reasons." 2016 WL 7231941, at *5 (S.D.N.Y. Dec. 9, 2016). Indeed, the *Mazda* court had earlier recognized that "[e]xclusive-dealing arrangements that run for three years are not so short that the potential for harm to competition can be wholly disregarded…or that procompetitive outcomes can be presumed." *Maxon Hyundai Mazda v. Carfax*, 2014 WL 4988268, at *11 (S.D.N.Y. Sept. 29, 2014) (citation omitted). *Balaklaw v. Lovell*, too, is inapposite because, unlike here, the competing anesthesiology groups had a strong incentive to continually improve their care and were "free at the end of six months to enter into a new arrangement." *Am. Express Travel*, 2005 WL 1515399, at *6 (declining to dismiss based on term and terminability at will after distinguishing *Balaklaw*, 14 F.3d 793 (2d Cir. 1994); *see also Paddock Publ'ns, Inc. v. Chi. Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1997) ("annual (or more frequent) right to negotiate new terms or change partners" and either side may terminate on notice).

*Supra* I.E.2.i; Leitzinger Rpt. ¶71. While Plaintiffs' original foreclosure analyses are more than sufficient to support a triable issue of fact, TreeHouse and McLane's experts provided even more extensive analysis to confirm these shares in response to Keurig's expert's critiques.[222]

Keurig is wrong on both the law and economics to argue Keurig's branded sales are not "covered by a contract" and therefore should not be considered with Keurig's private label retailer agreements to assess the practical effect of Keurig's exclusionary conduct. It is irrelevant as an economic matter if the source of the restraint is a Boycott Clause in a Brand Competitor contract or an agreement made directly with the retailer itself.[223] The economic reality is the same: competitors cannot co-manufacture either the branded cups sold on one side of the aisle, or the private label cups sold on the other. Even where the face of the agreement referenced private label or there was no written contract, Keurig and the retailers viewed the exclusivity as extending to branded cups as well as private label. *See supra, e.g.*, 53 & n.208. For example, in correspondence to ███████ demanding exclusivity, Keurig ████████████████████████████████████ ████████████████████████████████████████:



. PSUF 1949 (emphasis added).

Consistent with this demand, ██████████████████████████████████████████ ████████████████" PSUF 1950. As a legal matter, "courts *must* look to the monopolist's

---

[222] Given the consistency of the analysis and results to the percentages disclosed in the initial report, Keurig is wrong to suggest that these analyses are untimely, which were disclosed on schedule in advance of expert depositions in any event. *Media Glow Digital, LLC v. Panasonic Corp.*, 2019 WL 1055527, at *6 (S.D.N.Y. Mar. 6, 2019).
[223] It is undisputed that Keurig's exclusive brand agreements are "covered by a contract." Mot. at 51; PSUF 27.

conduct taken as a whole rather than considering each aspect in isolation."[224] This principle extends to the Court's assessment of foreclosure by analyzing restrictions in the aggregate. *See Standard Oil Co. v. U.S.*, 337 U.S. 293, 295 (1949) (industry arrangements in the aggregate foreclosed 65% of market); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 66 (1st Cir. 2004) ("other existing foreclosures" in the market must be taken into account); *Am. Express Travel*, 2005 WL 1515399, at *5 & n.3 (rejecting argument that foreclosure shares across agreements should not be aggregated).

### iii. Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Distributor Agreements

Keurig's Loyalty Clause restrictions in more than ██████ distributor agreements have enabled Keurig to exercise monopoly power in the AFH Market. As set forth in Plaintiffs' Motion, these agreements are per se unlawful tying agreements. In addition, Keurig's more than ████ Loyalty Clauses prohibiting distributors from purchasing Competitive Cups substantially forecloses the AFH Market. PSUF 328, 377-400; *see supra* at §I.E.2. Keurig's own admissions establish that it controls about ██████ of the Compatible Cup market within the AFH Market and Workplace/OCS channel.[225] Plaintiffs' experts conservatively opined that "[b]y any reasonable calculation, the share of AFH sales in all channels covered by restrictive agreements is well over

---

[224] *LePage's*, 324 F.3d at 162 (citing *Cont'l Ore*, 370 U.S at 699) (emphasis added); *see ZF Meritor*, 696 F.3d at 270; *see also Continental Ore Co.*, 370 U.S. at 699 ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."); *Dentsply*, 399 F.3d at 189. Keurig's cited case law is inapposite because Plaintiffs *have* identified specific agreements requiring Exclusivity and Non-Compete agreements with Keurig. *See Aereotec Int'l v. Honeywell Int'l Inc.*, 836 F.3d 1171, 1180-81 (9th Cir. 2016) (plaintiff "cannot sustain its burden by offering broad allegations and complaints that are unhinged from any specific agreement); *Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*, 814 F.2d 90, 97 (2d Cir. 1987) ("[N]o material dispute that [defendant] did not require [plaintiff] to purchase only [defendant's] products"); *Expert Masonry, Inc. v. Boone Cty., Ky.*, 440 F.3d 336, 347-48 (6th Cir. 2006) (plaintiff did not identify an exclusive agreement or other challenge to the competitive sales process).

[225] *See* PSUF 1244, 469; *see also* Sibley Reply ¶367. Even the least foreclosed distribution channel within the AFH Market, the Foodservice channel, is substantially foreclosed with Keurig locking up the ████████████████████████ ████████████████████. Sibley Rpt. ¶678; PSUF 1245, 1249.

30%, and likely well over 60%."[226] Even by Dr. Murphy's calculation, Keurig's AFH Brewers

"█████████████████████████████████████," Murphy Report ¶213, thereby

exceeding the percentage at which courts routinely find substantial foreclosure. *Supra* n.195.

    In response, Keurig contends that Plaintiffs failed to allege a "separate relevant product

market for 'office coffee.'" Mot. at 50 & n.62; *supra* at §I.A.1. Keurig is wrong.[227] There is more

than enough record evidence and expert analysis for a jury to determine that an AFH Market and

OCS channel within that market exists.[228] Indeed, Plaintiffs' well-defined AFH Market segment

and Workplace/OCS channel is consistent with Keurig's own characterization of the market.[229]

    Keurig also argues that there cannot be foreclosure of the AFH Market because the number

of K-Cup sales made to AFH distributors is small in comparison to the overall Compatible Cup

market.[230] Mot. at 50 & n.53. This argument contravenes the law of the case that foreclosure can

---

[226] Sibley Reply ¶370 & n.519; *see also supra* at n.201-03.

[227] The well-defined "WorkPlace Channel" *is* the OCS market, a distribution channel in the AFH Market segment. *Supra* nn.197, 201, 203; *see also* Sibley Rpt. ¶141 ("██████████████████████████████████
████████). Keurig's argument that Plaintiffs are somehow "gerrymandering" a market through a surprise disclosure in Dr. Sibley's errata is absurd, given Dr. Sibley has an entire sub-section in his opening report titled "[AFH] Market." Sibley Rpt. §III.b.ii. Nor did Dr. Sibley testify that he had not identified a market for AFH or office coffee. During Dr. Sibley's deposition, he told Keurig's counsel that he wanted to be "precise" and thus have access to his report, which counsel repeatedly denied. Ex. 748 (Sibley Tr. (Apr. 6, 2021) 31:08-32:08, 32:17-24, 33:16-20).

[228] *See* PSUF 294-309; Sibley Rpt., §V.B.iv.a, iv.f (collecting evidence). In any event, because market definition and foreclosure are inherently fact-intensive disputes, Keurig cannot avoid trial by simply ignoring evidence contradicting its flawed narrative. *See Caruso*, 403 F. Supp. 3d at 207, 209 (denying summary judgment because "market definition…passes sufficient muster for now to create a genuine dispute of material fact on these largely factual questions" and substantial foreclosure argument "largely encompass[es] the considerations that go into defining the relevant market in the first instance"); *Dial Corp.*, 165 F. Supp. 3d at 33-4 ("Market definition is a highly factual one best allocated to the trier of fact" and finding questions of fact as to whether contracts "substantially foreclose" rivals should be resolved by a jury); *see also* ABA Section on Antitrust Law, *Antitrust Law Devs.* 620 (6th ed. 2007).

[229] *See* PSUF 302 (█████████████████████████████████████████████████
███).

[230] According to Keurig, the distributor agreements are of little antitrust concern because offices could purchase products through other sources. Mot. at 51. However, foreclosure from distributors alone can give rise to antitrust liability. *See PepsiCo*, 1998 WL 547088, at *2 (plaintiff sufficiently alleged that "'virtually every major foodservice distributor in America today' has an agreement with [defendant] to distribute [its] fountain products"). Keurig further argues that offices that buy through the distributors can typically switch brewing systems for free, preventing market power in Compatible Cups. Mot. at 50. However, this raises a disputed issue of fact as the evidence suggests otherwise. *See* PSUF 1414 (when asked whether customers "ever switch systems because their [] costs in using one system went up," Mr. Magner testified, "I've got to say not that often."); PSUF 422-43; Sibley Reply, ¶326. Keurig also ignores the economic penalty that distributors would face by switching from Keurig and losing access to K-Cup sales, and further ignores the effect of Keurig's Loyalty Clause, which prohibited placement of Compatible Brewers as they

be found even if only in part of a market, such as "the Away-From-Home Market Segment." *Supra* §I.A.2; MTD Order at 235-36 (citing authorities).[231] Keurig's argument also disregards Dr. Sibley's opinion that because other distribution channels were not viable alternatives to reach large offices, the AFH distributors' share of the overall market is irrelevant. Sibley Reply, ¶¶329-34, 368-72. Indeed, as Keurig's President admitted, Keurig's AFH business "model was premised on the understanding that OCS customers would purchase K-Cups only from distributors as opposed to other channels." PSUF 1881.

### iv. Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Brand Agreements



As Keurig admits, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" PSUF 100. "With deals in place with all major U.S. coffee brands, market share loss is no longer a risk," PSUF 1168, because these agreements preclude all major brands from working with Competitive Cup manufacturers and "lock up" a substantial share of the Compatible Cup Market.[232] Despite Keurig's explicit admissions that its Brand Competitor restrictions insulate Keurig from competition, *supra* §I.E.2.ii, Keurig contends there is no harm because TreeHouse and JBR purportedly simply "*chose not to pursue brand licensing.*" Mot. at 55. Such conjecture, however, is belied by the evidence, including TreeHouse's attempt to enter into a co-manufacturing relationship with ▮▮▮▮▮▮ to make and license ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮—an effort that died on the vine due to Keurig's tortious interference. PSUF 1288-89; *see infra* §I.G.1.[233] Indeed, TreeHouse pursued numerous co-

---

became available, inhibiting alternative potential sources of growth for Competitive Cups. *See* PSUF 1249, 461; *see also* Sibley Reply, ¶¶327-28. As such, that DPPs' expert acknowledged offices can buy from sources other than distributors has little relevance. *See* Mot. at 52.

[231] *See PepsiCo*, 1998 WL 547088, at *2 (foreclosure of major distributors sufficient to show substantial foreclosure); *Tenneco, Inc. v. F.T.C.*, 689 F.2d 346, 351 (2d Cir. 1982); *U.S. v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980).

[232] *See* Mot. at 54-56; PSUF1877.

[233] Indeed, the record is replete with examples of TreeHouse seeking to continue working with or seeking new opportunities to co-manufacture for brands, as it does in other categories. For example, TreeHouse co-manufactures

manufacturing opportunities with brands, but was repeatedly foreclosed by Keurig's anticompetitive conduct, including relating to the 2.0 lock-out (e.g., ███████████████), Brand Competitor Exclusivity restrictions (e.g., ███████████████ █████), distributor Loyalty Clauses (e.g., ███████████████), and exclusive dealing arrangements with suppliers.[234] For example, TreeHouse discussed co-manufacturing for ███████████████ but could not move forward because of capacity constraints caused by Keurig's exclusive dealing agreements with suppliers. PSUF 1301. Given the centrality of co-manufacturing to TreeHouse's business model, *see, e.g.*, PSUF 1824 (Bartolini Decl. ¶35), it is disingenuous for Keurig to argue that TreeHouse just was not interested in the opportunities that Keurig blocked[235] or that Plaintiffs somehow failed to allege a market encompassing co-manufacturing. As Keurig knows, TreeHouse alleged a Compatible Cup Market that includes the "design, *manufacture*, and sale of Compatible Cups." THS Am. Compl. ¶105.

It is further undisputed that all of Keurig's Brand Competitor agreements had Exclusivity clauses prohibiting them from working with Competitive Cup manufacturers. *See* Mot. at 54-56. Keurig's Brand Competitor agreements, alone, foreclosed approximately ███████████ ████████████████████████████████████████████████████ ████████████████████████████████████████



---

beverage products for Starbucks, but is precluded from doing so with respect to single-serve cups as a result of Keurig's Brand Competitor Exclusivity provisions. *See, e.g.,* PSUF 1821-25 (Bartolini Decl. ¶¶ 29, 35); *see* Sibley Rpt. ¶¶323, 468, 481; *see also supra* at §I.E.3.iii; PSUF 1288-1310.

[234] PSUF 1288-1310. TreeHouse was also denied the business of brands that initially manufactured their own products but then switched to Keurig. PSUF 1308-10. For instance, Peet's stated that "█ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████." PSUF 1924, 1380, 1383. Peet's was also "unable to get [distributors] to distribute the single-cup product" in the OCS channel because of the distributors' exclusionary agreements with Keurig. PSUF 1382; *see also* PSUF 1814-17, 1824-25 (Bartolini Decl. ¶¶ 29, 32-33, 35, 44-46); *supra* §I.B.

[235] *See Dentsply*, 399 F.3d at 189 ("The apparent lack of aggressiveness by competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy.").

████████████████████████████████████████. PSUF 101. Keurig's

argument that there is no "shortage of brands" is thus misleading and reflects another instance of

Keurig insisting on *total*—as opposed to *substantial*—foreclosure. Thus, triable issues of fact exist

as to whether there was substantial foreclosure in the Compatible Cup Market caused by Keurig's

exclusionary Brand Competitor agreements.

### v.   Disputed Issues Of Material Fact Exist As To Keurig's Exclusionary Supplier Agreements

Keurig entered into dozens of agreements with suppliers that contained standard non-

competition clauses preventing suppliers from selling Compatible Cup inputs, such as machines,

cups, or lids, to Competitive Cup manufacturers. PMSJ at 23-44. The contracts often spanned

decades and contained exclusionary clauses that survived termination, making the non-

competition provisions effectively perpetual. *Id.*

Keurig advances the baseless argument that "the law of exclusive dealing as to inputs is

different" in that it requires the complete exclusion of rivals. Mot. at 52. This Court has already

thoroughly rejected that argument, MTD Order at 235-36, and Keurig ignores decades of precedent

consistently applying the rule of reason to exclusive dealing, including for input contracts.[236]

Keurig goes on to argue that summary judgment is warranted because "more than a dozen

firms found all the inputs they needed."[237] Mot. at 52. The cases Keurig cites are irrelevant.[238]

---

[236] *See, e.g.*, *Geneva*, 386 F.3d at 495, 501 (summary judgment not appropriate where evidence that exclusive arrangement for supply of inputs excluded competitors or entrants from supply and reduced the supply of the input available to manufacturers); *see Standard Oil*, 337 U.S. 293 (supply agreement); *Tampa Elec.*, 365 U.S. 320 (supply agreement); *ZF Meritor*, 696 F.3d at 270-71 (supply agreement).

[237] Keurig also implies that Plaintiffs must show an *industry-wide* shortage of capacity for substantial foreclosure. It cites no law for this proposition, and at least one court has permitted claims to continue where there was a reduction in the suppliers' output. *See Geneva*, 386 F.3d at 495, 509. In any event, Keurig's own admissions support just that. PSUF 200 ████████████████████████████████████

████ "). TreeHouse itself experienced supplier-related capacity constraints, *see* PSUF 1212-13, that "slow[ed] the rival's expansion," MTD Order at 236 (quoting *ZF Meritor*, 696 F.3d at 271), and suppliers too had to turn down business due to exclusivity clauses, leading to reduced output (therefore affecting all competitors' supply). PSUF 211.

[238] The *Susser v. Carvel Corp.* court dealt with whether a franchisor could prevent a franchisee, with which the franchisor was not even in competition, from purchasing inputs directly from suppliers. 332 F.2d 505, 517 (2d Cir.

Moreover, the evidence here is sufficient for a jury to find that competitors were substantially foreclosed from the market by "requiring [a competitor] to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets."[239]

Keurig's remaining arguments are unavailing. Keurig has no basis to dispute that its exclusive contracts with suppliers for numerous inputs prevented them from dealing with its competitors for *decades*. Nor can it dispute that those contracts covered the key, if not all, suppliers of the relevant inputs, *see* PMSJ at 23-34; PSUF 107-189; *see also, e.g.*, PSUF 196 (Keurig's Director of Investor Relations admitting in 2011 that there were "only two companies in the world making K-Cup packaging equipment…and they're both under contract"). And Keurig makes only a half-hearted suggestion that those contracts were necessary to protect Keurig investments; it cites no evidence in that regard, and for good reason, given the undisputed evidentiary record showing that these products reflected the IP and expertise of suppliers, not Keurig. *See* PMSJ at 34-39; PSUF 269-293. In short, Keurig provides no expert testimony to rebut TreeHouse's expert opinion that these contracts, when combined with each other and with other market forces, led to substantial foreclosure with no economic justification for those provisions. *Compare* Sibley Rpt. §B.ii *with* Macartney Rpt. §§V.C.4, VIII.B.1.

### 3. Disputed Issues Of Material Fact Exist As To Plaintiffs' Conspiracy Claims To The Extent They Are Not Resolved In Plaintiffs' Favor

Plaintiffs have established that Keurig's Brand Competitor Agreements contain restrictions

---

1964). Contrary to Keurig's misleading altered quotation, that case did not address input contracts in which a supplier was precluded from providing products to the defendant's competitor. *Id. Paddock Publ'ns v. Chi. Tribune Co.* serves Keurig no better—that court granted a motion to dismiss where plaintiffs' complaint belied any exclusivity. 103 F.3d 42, 44 (7th Cir. 1996) (finding complaint acknowledged that "there's plenty for all" in inputs).

[239] MTD Order at 236 (quoting *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) (quoting Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶1802c, at 64 (2d ed. 2002))). TreeHouse had to develop suppliers to make cups, for instance, instead of purchasing off-the-shelf cups that were being supplied to it for other purposes. *See* PSUF 276, 1215; *see also* PSUF 1195, 1220, 1224. And, in any case, that inability to find input suppliers meant that TreeHouse (the first competitor to enter) was delayed in entering the market. *See, e.g.*, PSUF 1211.

that, separately and together, violate Section 1 of the Sherman Act. *See* PMSJ 4-23. The record also contains additional evidence apart from the agreements that Keurig and its Brand Competitors conspired to unlawfully restrain trade. *See, e.g.*, PSUF 53-56, 1751. The evidence of conspiracy is far from "ambiguous" and requires no "inferences," as Keurig claims. Here, Keurig reduced the illegal agreements to writing.[240] "[D]irect evidence of an illegal 'contract, combination, or conspiracy,'" as the Second Circuit has recognized, "obvious[ly]…satisfies §1's concerted-action requirement."[241] While "conspiracies are rarely evidenced by explicit agreements," this is just such a rare case.[242]

Keurig entered into more than 90 Brand Competitor Agreements with entities it admits are its direct competitors. PMSJ 4, 14-26; KSUF 22, 335. These agreements prohibit Brand Competitors from: working with Competitive Cup manufacturers; making Compatible Brewers that could use Competitive Cups or otherwise working with SSB competitors; adding new varieties as they independently saw fit; producing as many cups as they wanted in response to customer demand; choosing for themselves to whom to sell; and even ceding control of pricing their own products in some channels. PMSJ 4-23[243] These agreements allowed Keurig to allocate markets, restrain output, restrain price competition, and exclude competitors. PMSJ 4-23; *supra* §I.A.

Keurig argues that Plaintiffs "have two main conspiracy theories"—one that "manufacturing packs for partner brands" with "ordinary vertical agreements" is illegal and one that is a "hub-and-spoke" conspiracy. Mot. at 56. In doing so, Keurig ignores the facially unlawful

---

[240] *See, e.g.*, PSUF 34, 37, 39, 41, 43, 45, 47, 51, 1305.

[241] *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 40 (2d Cir. 2017); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314-15 (3d Cir. 2010).

[242] *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012); *see also Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 461-62, 464 (1941) ("FOGA") (group boycott evidenced by written agreements).

[243] By their terms, these agreements restrain competition and decrease output to the detriment of Competitive Cup manufacturers, Brand Competitors, Compatible Cup resellers, and consumers, among others. PMSJ 4; *see also* PSUF 1183, 1812-19 (Bartolini Decl. at ¶¶ 23, 24, 26, 29, 37).

agreements that effectuate a group boycott as well as record evidence and legal authority establishing that Keurig's horizontal restraints on Brand Competitors—and on the competitors the brands are prohibited from dealing with—violate the Sherman Act.[244] All of Keurig's arguments as to the "2.0 Brewer," its brand, retailer, and distributor agreements, and its "relationships" with partners should be rejected as a matter of law for failing to address the "specific restraint[s] at issue," as required by law.[245] For example, Keurig cannot defend the *Lock-Out Technology* in the 2.0 Brewer by noting that the *brewer* could make a carafe size portion or the *Boycott Clause* based on a *relationship*. Under the doctrine of ancillary restraints, where the specific restraint "exceeds the necessity presented by the main purpose of the contract" or procompetitive objective, the restraint is "void." *U.S. v. Addyston Pipe & Steel Co.*, 85 F. 271, 282-83 (6th Cir. 1898) (Taft, J.). That is the case here, and Keurig's failure to even defend its restrictions head-on is dispositive.[246]

### i. Keurig's Boycott And Brand Non-Competition Clauses Are Not Dual-Distribution Agreements

Keurig disingenuously attempts to recharacterize its facially anticompetitive Boycott and Brand Non-Competition Clauses as vertical "dual-distribution" agreements to avoid per se condemnation under Section 1 of the Sherman Act. Mot. at 57-58. This Court, however, has already rejected that notion.[247] As this Court held, the restrictions are not vertical because they

---

[244] *See, e.g.*, PMSJ 4-23.

[245] *FTC v. Actavis, Inc.*, 570 U.S. 136, 153-54 (2013) (citation omitted) (e.g., a reverse payment, not the settlement).

[246] *See, e.g.*, *Impax Labs., Inc. v. F.T.C.*, 994 F.3d 484, 493 (5th Cir. 2021); PMSJ at 42. A defendant has the burden to prove that the *specific* restraint being challenged is "merely ancillary to the main purpose of a lawful contract" or broader course of conduct such that it is "reasonably necessary to the accomplishment of the legitimate goals and narrowly tailored to that end." *U.S. v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1375 & n.49 (5th Cir. 1980); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227-28 (D.C. Cir. 1986); *In re Polygram Holding, Inc.*, 2003 WL 25797195, at *23 (Jul. 24, 2003); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 338-40 (2d Cir. 2008) (Sotomayor, J., concurring).

[247] MTD Order at 244 (distinguishing *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods. Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997)); *see, e.g.*, *U.S. v. Chi. Tribune-N.Y. News Syndicate*, 309 F. Supp. 1301, 1307-08 (S.D.N.Y. 1970 (denying motion to dismiss and holding that government should be allowed to prove at trial that the territorial scope of exclusivity agreement was 'arbitrary and unreasonably broad'); *U.S. v. McKesson & Robbins*, 351 U.S. 305, 313 (1956) ("Congress thus made as plain as words can make it that, without regard to categories or labels, the crucial inquiry is whether the contracting parties compete with each other."); *U.S. v. Koppers Co.*, 652 F.2d 290, 294-97 (2d

63

"are directly related to the competitive landscape in the Compatible Cup and [SSB] Markets." MTD Order at 244. To the contrary, Keurig's agreements are horizontal "agreement[s] between competitors at the same level of the market structure." *Anderson News*, 680 F.3d at 182.[248] Keurig itself *admits* that it competes directly with its licensed Brand Competitors, falling squarely within the law of horizontal restraints.[249] Indeed, the fact that Keurig competes with Brand Competitors *was the explicit reason why Keurig entered into them—to gain control over which competitors can enter the Compatible Cup and SSB markets*. PSUF 1044, 1137.

That Keurig also makes K-Cups for its Brand Competitors does not transform the relationship into a vertical one, MTD Order at 244,[250] or the Boycott and Brand Non-Competition Clauses into dual-distribution agreements. There is no "dual-distribution." Starbucks is not a distributor of *Keurig's* K-Cups. There is no procompetitive justification for Keurig to restrict the number of SKUs or varieties *Starbucks* can make or the channels or customers to which *Starbucks* can sell. There is no plausible procompetitive justification served by limiting *interbrand* competition by preventing other brands from working with other co-manufacturers as a second supplier to increase output, variety, and consumer choice. *See* PSUF 1823 (Bartolini Decl. ¶29). In any event, Keurig has not restrained *its own* ability to choose for *itself* how many SKUs or

---

Cir. 1981) (horizontal bid-rigging conspiracy is not transformed into vertical relationship warranting rule of reason treatment where vertical features of the arrangement become more prominent).

[248] Even the court in *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, on which Keurig relies, explains that if the parties at issue "are seen as competitors on the same level of the market, this agreement would be viewed as a horizontal agreement…something that would constitute a per se violation of §1." 142 F. Supp. 2d 296, 301 (E.D.N.Y. 2001), *aff'd* 35 F. App'x 29 (2d Cir. 2002).

[249] *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints…."); *see also* PSUF 14-26; Sibley Rpt. §V.B.(iii)(a)(2) ( ███████████████████████████ ) (collecting evidence).

[250] The legal pronouncement by this Court is consistent with the approach articulated by the federal antitrust agencies, which "treat a relationship between a licensor and its licensees, or between licensees, as having a horizontal component when they would have been actual or potential competitors…in the absence of the license, *even if a vertical relationship also exists*." U.S. Dep't of Just. & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* §3.3 (2017) (emphasis added).

contract manufacturers *it* can have, demonstrating that at a minimum, any such restriction it places on competitors is not reasonably necessary to achieve any legitimate procompetitive objective. *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 243 (2d Cir. 2003). As explained in Plaintiffs' Motion, these horizontal agreements check all the boxes for per se condemnation. *See* PMSJ 5-8, 11. Even if the per se rule did not apply, the documented anticompetitive purpose and effect of these agreements precludes summary judgment in Keurig's favor. PMSJ 19-21.[251]

### ii.   Keurig Restrains Horizontal Competition With A Hub-and-Spoke Conspiracy

Plaintiffs have demonstrated that each Boycott and Brand Non-Competition Clause in Keurig's Brand Competitor Agreements is horizontal and not reasonably necessary to achieve any legitimate objective and thus should be summarily struck down as per se unlawful.[252] However, even if the brand agreements were characterized as vertical in nature, Keurig acts as a "hub" to coordinate them in a manner that restrains horizontal competition by requiring "the spokes 'to adhere to the hub's terms.'" MTD Order at 242 (quoting *U.S. v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015)). On the motion to dismiss, this Court found that "Competitor Plaintiffs allege facts that support the conclusion that the 'spokes' have agreed to enter into restrictive agreements with Keurig to keep prices at a supra-competitive level." MTD Order at 244.

The facts support a conspiracy among the brands.[253] Keurig's Brand Competitors limited their ability to compete against Keurig and each other by agreeing: to limit the number of SKUs

---

[251] Keurig has failed to carry its "heavy burden" of demonstrating valid procompetitive justifications for the restrictions in its Brand Competitor agreements. The only purported justifications Keurig has offered throughout the litigation are invalid, unsupported, and/or pretextual. PMSJ 22-23; *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 113 (1984); *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015); *Barber & Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1280 (4th Cir. 1987).

[252] *See, e.g.*, PMSJ 11-13, 16-17; *see also* Sibley Rpt. §§V.B(iii) & V.C(ii).

[253] The Court held that Plaintiffs "alleged 'facts supporting the inference that a conspiracy existed'" based on (i) Keurig's coordination of an expansive system of noncompetition agreements entered into with the brands' knowledge that other competitors likewise enter into exclusive agreements; and (ii) the economic irrationality absent a conspiracy of entering into agreements that limit a brand's sales by prohibiting use of additional Competitive Cup manufacturers as a back-up or second manufacturer. *Id.* (citing *Mayor & Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013); *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 327 (2d Cir. 2010).

and varieties they would produce; not to sell to particular customers or channels; not to make competing brewers; not to use additional co-manufacturers to ensure a steady supply of cups to their customers; and in some cases not to price their own products.[254] This conduct supports an inference of agreement among the brands because it is economically irrational but for a "unity of purpose or a common design and understanding" across all Brand Competitors. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1982); *Starr*, 592 F.3d at 327 (referencing "behavior that would plausibly contravene each defendant's self-interest in the absence of similar behavior by rivals"); *see also Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935, 936 (7th Cir. 2000).[255] Indeed, being restricted to only one supplier placed brands at such risk that Smucker concluded it was obligated to disclose in its SEC filings that "Keurig [being] unable to supply K-Cup® packs to us for any reason…could have a material adverse effect on our results of operations."[256] Another brand, ▮▮▮, described its situation as being "▮▮▮▮▮▮▮▮▮▮." PSUF 1309.

Keurig made brands aware that the Boycott and Brand Non-Competition Clauses were standard at the time they entered agreements.[257] In doing so, Keurig expressly informed the Brand Competitors that Keurig did not "want to be in competition with our roaster partners" and "will

---

[254] *See* PMSJ 4-23; Sibley Rpt. ¶¶463-529, App. E; *see also* PSUF 1812-13, 1816-19 (Bartolini Decl. at ¶¶ 15, 23, 24, 26, 29, 33, 37, 44-47, 49).

[255] Sibley Rpt. §V.B(iii)(a)(3)("The Agreements Reflect a Collusive and Common Commitment to Restrain Competition from Unlicensed Competitors").

[256] PSUF 72 (Smucker's Form 10-K (June 23, 2014), at 7), 1820 (Bartolini Decl. at ¶29) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[257] PSUF 1394. For example, in an email from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮." PSUF 1394 (emphasis added). Likewise, Keurig informed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* (emphasis added). Keurig also issued press releases when it entered into new agreements with brands making public the fact that they were exclusive. PSUF 1396-1410. Brands also discussed the restrictions among themselves. PSUF 1815 (Bartolini Decl. ¶32).

not be aggressive competitors." PSUF 1394, 1826. This too supports an inference of conspiracy.[258]

While the above is sufficient, as the Court held, to support an inference of an agreement, there is also direct "evidence that [further] reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 764; *see also Apple*, 791 F.3d at 314-320 (finding hub-and-spoke conspiracy among publishers applying *Monsanto*). The testimony of Keurig's former President, for example, makes clear that other brands joined in Keurig's unlawful objective to restrain competition from other brands, and particularly from lower-priced brands. As she admitted, in exchange for "███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████ PSUF 82, 1827. As Keurig recognizes, restraining output in this way harms consumers because, in addition to restraining consumer choice, it further provides "the ability to control prices by restricting output." Mot. at 23 (citations omitted).

Other brands as well shared in this conscious commitment to restrain competition from unlicensed brands and even put provisions in their contracts that would trigger penalties for Keurig if Keurig failed to keep unlicensed share below certain thresholds.[259] Consistent with this common, unlawful objective, ████████████████████████████████████████████

---

[258] *Laumann v. NHL*, 907 F. Supp. 2d 465, 486-87 (S.D.N.Y. 2012) (parties had "knowledge that other market participants are bound by identical agreements, and their participation is contingent upon that knowledge," "may be considered participants in a horizontal agreement").

[259] For example, Keurig's agreement with ████████████████████████████████████████ ,
PSUF 1392. Keurig's agreement with ███████████████████████
████████████████████. PSUF 58.



PSUF 56.

. *Id.*

In a December 2014 email,

." PSUF 1395, 1749.

*See, e.g.,* PSUF 1751. This is compelling evidence that "the 'spokes' agreed to enter into restrictive agreements with Keurig to keep prices at a supra-competitive level." MTD Order at 244.

Keurig claims that there can be no hub-and-spoke conspiracy because "brands made their own decisions about co-packing, and *no* brand said that it selected its co-packer based on an agreement with other brands to collectively use Keurig." Mot. at 59. But Brand Competitors agreed to partner with Keurig, against their own economic self-interest, because they were unable to enter the Compatible Cup market with other cup manufacturers (like TreeHouse or JBR) due to Keurig's anticompetitive restraints. For example, as referenced above,

---

[260] PSUF 1001, 1079; *see supra* §I.A.1.

68

██████████████████    ████████████████████████████████

█████████████████████████████████████████████████████████ [262]

Likewise, ██████ agreed to partner with Keurig because of the ████████████████ despite already having successful self-manufacturing facilities in place.[263]

### iii. TreeHouse And JBR Have Standing To Challenge Keurig's Brand Restrictions

Keurig argues that TreeHouse and JBR lack standing to pursue conspiracy claims because TreeHouse and JBR would have benefitted from a conspiracy to raise prices. But Plaintiffs' conspiracy claims are based on a conspiracy to *exclude competitors*, not only a conspiracy to raise prices. *See supra* §I.B, n.166; *see also* PMSJ 44-61. TreeHouse and JBR cannot benefit from increased sales as a result of higher brand prices when their products have been blocked from distribution.[264] Keurig's Boycott Clause prohibited brands from using a co-manufacturer like TreeHouse to serve as a second supplier and restrained TreeHouse's ability to increase its output, growth, and scale by co-manufacturing for brands, as it routinely does for other products, including other beverage products for brands like Starbucks. PSUF 1824, 1825 (Bartolini Decl. ¶35); *see also* PSUF 1312. Indeed, Keurig used the 2.0 Brewer as leverage to coerce Unilever to stop using

---

[261] PSUF 1380, 1383.

[262] Peet's CEO Dave Burwick noted that "█████████████████████████████████████████
████████████████." PSUF 70.

[263] PSUF 1828 (Brian Kelley to Dino Bianco of Kraft, ████████████████████████████████
██████████████████████████████████ "); PSUF 1829 (██████████████████████████
██████████████████████████████████████████).

[264] *See, e.g.*, *AlarMax Distribs., Inc. v. Tyco Safety Prods. Canada Ltd.*, 2008 WL 2622899, at *4 & n.5 (W.D. Pa. June 27, 2008) (competitor did not stand to gain from exclusionary conduct, which raised prices, led to lost customers, and restrained competition on the merits). Because TreeHouse and JBR are not pursuing claims based on a conspiracy to exclude competitors, Keurig's cited cases, which do not involve such exclusion, are inapposite. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.* 475 U.S. 574, 585-86 (1986); *see also Brunswick Crop. v. Pueblo Bowl-O-Mat Inc.*, 429 U.S. 477, 489 (1977); *cf. PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 2021 WL 1199363, at *12-13 (S.D.N.Y. Mar. 30, 2021) (antitrust standing when competitor alleged that defendants had conspired to exclude plaintiff from the market); *Yankees Ent. & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp. 2d 657, 669-70 (S.D.N.Y. 2002) (same); *supra* n.166.

TreeHouse to co-manufacture its Compatible Cups, maintaining "████████." *See*

*supra* §I.B; I.F.1.i. Record evidence further disproves any suggestion that Keurig's conduct has

enabled TreeHouse to raise its prices as a result of Keurig and its Brand Competitors raising their

prices.[265] As this Court has already noted, Keurig's anticompetitive conduct "largely targeted

Keurig's direct competitors, such as TreeHouse and [JBR]." MTD Order at 221-22.[266] As such,

TreeHouse and JBR have standing to pursue these claims.[267]

### iv.  Other Keurig Business Partners Agreed To Unreasonably Restrain Trade

Keurig does not dispute that it has entered into thousands of agreements with distributors,

retailers, and suppliers that contained clauses prohibiting them from working with Competitive

Cup manufacturers, but makes an ipse dixit argument that these are "lawful vertical" agreements

without offering a single procompetitive justification for the exclusionary provisions. Even if they

were purely vertical, that would not immunize the restrictions as a matter of law. Exclusive dealing

and tying are typically vertical in nature, but can be unlawful nonetheless, particularly where, as

here, there were less restrictive alternatives entitling *Plaintiffs* to summary judgment.[268]

In any event, Keurig's argument fails to account for the fact that, in many instances, Keurig

competes directly with these partners.[269] As one distributor notes, "Keurig's Operators and re-

---

[265] *See* Sibley Rpt. Fig. 7, Fig. 8, Fig. 11, Stiroh Rpt. Fig. 1 & ¶116.

[266] Recognizing the very real harm alleged by TreeHouse and JBR in its motion to dismiss DPPs' antitrust claims, "Keurig attempt[ed] to argue that TreeHouse and JBR are more motivated than the DPPs" to "vindicate the public interest in antitrust enforcement." *Id*. at 26-27. That prior position is inconsistent with Keurig's argument now that TreeHouse and JBR would only benefit from the conduct at issue.

[267] *Blue Shield of Va. v. McCready*, 457 U.S. 465, 472-73 (1982) ("Consistent with congressional purpose, we have refused to engraft artificial limitations on the §4 remedy."); *see also PharmacyChecker.com, LLC*, 2021 WL 1199363, at *12-13; *Yankees Ent. & Sports Network*, 224 F. Supp. 2d at 669-70.

[268] PMSJ 24-25, 34-35, 39-42; *see, e.g.*, *Clarett v. NFL*, 306 F. Supp. 2d 379, 410 (S.D.N.Y. 2004).

[269] PSUF 1834, 1835 ("KADS feel we compete."); PSUF 1954 (██████████████████████████); *see also* Sibley Rpt. §V.B.iv.e(1) ("Keurig and Its Distributors Are Horizontal Competitors") (collecting evidence). While Keurig contends distributor agreements are purely vertical, even Keurig stops short of arguing that its sales of branded K-Cups do not compete head-to-head with retailers selling private label cups. Indeed, its primary attack on TreeHouse's damages hinges on its argument that lowering branded K-Cup prices would cause consumers to choose additional branded cups over private label cups. Mot. at 95.

distributors are competing head to head with Keurig for the same sale." PSUF 1830. Acknowledging a material issue of disputed fact, Keurig provides its own interpretation of a meeting in which multiple distributors met with Keurig to collectively make "█████████ ████████████████████████████"[270] While counsel paints the meeting as one about "promotional spending," it neglects to reveal *Keurig's* characterization of that meeting as one in which Keurig and multiple distributors collectively "████████████████████████ ███████████████████" noting Keurig "████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████" PSUF 1299, 1231, 1832 (emphasis added). Thus, here there is *direct evidence* of Keurig and distributors entering into an *agreement* to enforce the Loyalty Clause against Competitive Cup manufacturers. This direct evidence far exceeds the mere "inferences" drawn "from the behavior of the alleged conspirators" that are typically relied on to support concerted action.[271] Even without such a clear agreement, seeking assurance that ████████████████████████████████████████ █████████████ also supports an inference of a horizontal agreement because it indicates that the "only condition on which a [distributor] would agree to [Keurig's] terms was if it could be sure its competitors were doing the same thing." *eBooks*, 859 F. Supp. 2d at 685.

Keurig also ignores additional evidence that distributors agreed among themselves and with Keurig to boycott Competitive Cup manufacturers.[272] For example, Keurig communicated to distributors in negotiations that "████████████████████████████████████████

---

[270] PSUF 1230, 1232. Keurig knew this was a broader issue than the three KADs that wrote the letter. PSUF 1833.

[271] *In re Electronic Books Antitrust Litigation*, 859 F. Supp. 2d 671, 681 (S.D.N.Y. 2012); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Works Local Union No. 3, AFL-CIO*, 2002 WL 91625, at *4 (S.D.N.Y. Jan. 23, 2002).

[272] *See, e.g.*, Sibley Rpt. §V.B.iv.e(2) ("Keurig and Its Distributor Competitors Agreed Not to Deal with Competitive Cup Manufacturers") (collecting evidence).

██████████████████████████████████████████████████████

████████ ."[273] Distributors also routinely engaged in concerted conduct by ███████

██████████████████████████████████████████████████████

██████████████ .[274] As Keurig's VP of AFH testified, distributors "would rat out other distributors" for selling Competitive Cups, which then "obligated" Keurig to "uphold" the "rules for everybody."[275] Absent an agreement that others would not gain a competitive advantage by selling lower-priced and additional cups that gave distributors a better margin, it would not be in each distributor's individual self-interest not to do so. *Starr*, 592 F.3d at 327; *see supra* §I.A.1.[276]

### 4. *Plaintiffs Have Established Their Tying Claims As A Matter of Law*

Plaintiffs have established their tying claims against Keurig as a matter of law and the undisputed facts. PMSJ §3. Keurig entered into more than 1,700 agreements that conditioned the distributors' ability to purchase Keurig Brewers for use in AFH locations on their agreement to buy K-Cups and not to promote, market, or sell Competitive Cups. These agreements violate Section 3 of the Clayton Act and Section 1 of the Sherman Act.[277] Consequently, Keurig's summary judgment motion on tying should be denied and judgment entered for Plaintiffs.

### i. **Keurig's Unremitting Tying Policy Constitutes Actual Coercion**

Keurig's argument that Keurig Brewers and K-Cups could be purchased separately, Mot.

---

[273] PSUF 1836; *see also Laumann*, 907 F. Supp. 2d at 486-87; *supra* at §I.E.2.iii.

[274] PSUF 1228; *see also* PMSJ 44-61; *infra* §I.E.4.

[275] PSUF 959.

[276] But to be clear, while the evidence establishes a horizontal group boycott, each of Keurig's Loyalty Clauses in its distributor agreements further constitutes a per se unlawful tying agreement as well. PMSJ §III.

[277] Contrary to Keurig's contention that the elements are the same, Mot. at 62, the Supreme Court has long held that the "Sherman Act and the Clayton Act provide different tests of liability." *United Shoe Mach. Corp. v. U.S.*, 258 U.S. 451, 459 (1922). PMSJ at §III.A. The cases cited by Keurig do not dictate otherwise. *See Yentsch v. Texaco*, 630 F.2d 46 (2d Cir. 1980) (analyzing only a Sherman Act 1 claim); *Charych v. Siriusware, Inc.*, 790 F. App'x 299 (2d Cir. 2019) (declining to address Clayton Act claims). As to *De Jesus v. Sears, Roebuck & Co., Inc.*, any suggestion that the elements of tying were the same under the Sherman and Clayton Acts was pure *dicta* as the court summarily held that both tying claims failed "at the threshold" for the inability to identify both a tying and tied product, a requirement under either of the Acts. 87 F.3d 65, 71 (2d Cir. 1996); *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594, 608-09 (1953).

at 63-66, *concedes* the first element of a *per se* Sherman Act Section 1 tying claim.[278] Keurig contends that its KAD and KARD Agreements do not constitute tying arrangements, but cannot rebut Keurig's VP of AFH testimony admitting that if a KAD "wanted to purchase Keurig brewers, it had to also purchase K-Cups and was prohibited from purchasing [Competitive Cups]."[279] Further, as noted, Keurig's argument is belied by the fact its business model "was premised on the understanding" distributors could *not* buy elsewhere.[280] Indeed, although distributors opposed Keurig's tying arrangement, they felt they had no choice but to agree in order to obtain access to AFH Brewers.[281] Even Keurig's own OCS leadership team admitted that the restriction preventing distributors from selling Competitive Cups created "███████████████████████████ ████████████████████" PSUF 419. This is textbook tying forced by market power.

In any event, it has never been a defense to a tying claim that the tie has been applied to less than 100% of the market. The fact that Keurig may not tie *all* sales in *all* channels does not mean that Keurig does not tie sales for KADs and KARDs, who are not permitted to purchase Portion Packs elsewhere pursuant to their contracts.[282] Even if the products could be purchased

---

[278] In order to establish a tying claim under Section 1, a plaintiff must show: (1) the tying arrangement affects a substantial amount of interstate commerce; (2) the two products (here, AFH Brewers and Compatible Cups) are distinct; (3) the defendant tied the sale of the two products; and (4) the defendant has appreciable market power in the tying market. *In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003) ("*Visa*"). Keurig does not contest that the tying arrangement impacted a substantial amount of commerce. Mot. at 62.
[279] PSUF 345; *see also see* PMSJ 62. In any event, the record confirms that AFH Brewers were not even available outside the KAD Agreement at all until 2012, at which point most distributors had built up a large installed base of AFH Brewers (literally plumbed into office sinks) that were tied to Keurig's K-Cups through the Loyalty Provisions, which ███████ of the agreement. Mot. at 63 & n.81 (citing KSUF 6, 50, 51) (showing earliest availability of commercial brewer outside KAD Agreement was a single model on Amazon beginning in June 2012).
[280] PSUF 1881. Keurig also ignores that the █████████████████████ in the KAD and KARD Agreements █████████, which further coerced distributors to remain tied to Keurig. Sibley Reply ¶¶335-40; PSUF 1417, 155.
[281] *See, e.g.*, PSUF 461, 1000, 936, 369-70, 382 (Peet's CEO confirmed that Keurig had a monopoly on SSBs and noted that "They were the one brewer."), 369-70, 382 (Vistar, the nation's largest and most powerful redistributor, stated its KARD Agreement was "█████████████," yet Vistar remains a KARD to this day).
[282] While Keurig argues that foreclosure from distributors is of little concern to the antitrust laws when end customers purportedly have alternative paths to access the product, Mot. at 64, this Court has already held that liability can be proven where an established manufacturer enters exclusive agreements requiring inferior or more expensive outlets to reach customers. *See infra* §I.B. In any event, Keurig sold different brewers in different market segments. PSUF 682, 1186.

separately to a limited extent by others not bound by contract, the cases on which Keurig relies, Mot. at 62, acknowledge that an illegal tying arrangement may still be shown if the defendant's policy makes the purchase of the tying and tied product together the only practical economic option.[283] So it is here, where offices rely on distributors to purchase in bulk to deliver efficiencies to the offices.[284] Signing the KAD Agreement was the only viable efficient option for distributors to continue to sell Keurig Brewers and K-Cups. *See* Sibley Reply ¶331; PSUF 305-09, 1946-47.

### ii.  Plaintiffs Showed Keurig Has Market Power in Several Ways

Plaintiffs have provided evidence of Keurig's market power in a number of ways, including: (i) Keurig's ability to impose tie-in terms on an appreciable number of buyers that would not agree to them in a competitive market;[285] (ii) Keurig's ability to exclude competitors; (iii) Keurig's ability to profitably raise prices; (iv) Keurig's leveraging of its brewers; and (v) Keurig's admissions as to its market share. *See* PMSJ 52; *see supra* §I.A.

Keurig argues that Plaintiffs cannot show market power in the tying product because Keurig did not "raise price and restrict output" and Keurig sells brewers to AFH distributors at low prices. Mot. at 64-65. However, this Court already rejected this argument.[286] In addition, Keurig, yet again, ignores the record evidence that shows that it repeatedly *did* raise prices and restrict output, varieties, and consumer choice. *See supra* §§I.A.1, I.B.1-2; I.B.2-3.

Keurig further argues that Plaintiffs fail to show market power because: (i) there are other

---

[283] *See Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1500-01 (8th Cir. 1992); *Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1325 (D. Md. 1986), *aff'd*, 831 F.2d 537 (4th Cir. 1987).

[284] *See* Sibley Reply ¶331 (explaining larger offices use distributors because of significant economies of scale and that scope in distribution and the number of people employed in large offices make it highly impractical for office coffee to be purchased from retailers); *see also* PSUF 307, 935, 1412 ("████████████████████████████████ ████████████████████"), 1411 ("In general, the large offices were serviced by a coffee distributor.").

[285] For example, Keurig imposed tie-in terms in over ████ KAD and KARD Agreements, which is itself "compelling evidence of [market] power." *See* PMSJ 52 (quoting *Northern Pac. Ry. Co. v. U.S.,* 356 U.S. 1, 8 (1958)); *see also Int'l Salt Co. v. U.S.*, 332 U.S. 392, 394, 402 (1947) ("tendency of the arrangement to accomplishment of monopoly seems obvious" with approximately 909 tying agreements).

[286] MTD Order at 226; *Kodak*, 504 U.S. at 487 (quotation omitted); *supra* at §I.A.1, B.1-2.

SSBs sold in the AFH channel and other Keurig-compatible SSBs; and (ii) Plaintiffs cannot establish significant barriers to entry. Mot. at 65. Each of these arguments fails. Plaintiffs have shown that Keurig has monopoly power that its competitors have been unable to impact.[287] Indeed, the relevant SSB market (and cup market, for that matter) is *undisputed* by Keurig in its Motion despite promises to this Court throughout this litigation that it would show that Keurig competes with every possible way of delivering coffee to a consumer. Thus, Keurig's market power in the SSB Market is effectively conceded. As for barriers to entry, Plaintiffs have established such barriers. *See supra* §I.A.3.[288]

### iii.  Per Se Tying Claims Do Not Require Showing Anticompetitive Effects

Plaintiffs need not show anticompetitive effects for a per se tying claim. *See* PMSJ §III.A. Yet, Plaintiffs have shown such anticompetitive effects in several ways, including that: (i) Keurig substantially foreclosed Competitive Cups from being able to achieve growth to challenge Keurig's monopoly; (ii) Keurig raised and maintained K-Cup prices above competitive levels;[289] (iii) Keurig reduced Compatible Cup output; and (iv) there was a loss of Compatible Cup variety. *See infra* §I.B.

### iv.  Keurig Technologically Tied the 2.0 Brewer to K-Cups

As in *Microsoft*, the facts underlying Plaintiffs' technological tying claim overlaps with the monopoly maintenance claim such that the material issues of fact as to the redesign of the 2.0

---

[287] THS Opp'n to Mot. to Exclude Dr. Sibley (ECF No. 1544) at 12; *Yankees Ent. & Sports Network*, 224 F. Supp. 2d at 673 (citation omitted); *supra* at §I.A.1.

[288] In any event, where direct evidence establishes market power, evidence of barriers to entry is irrelevant. *See, e.g.*, *Microsoft*, 253 F.3d at 51; *Rebel Oil Co.*, 51 F.3d at 1434.

[289] Keurig argues that Plaintiffs have not attempted to show the price of the tied products exceeds the combined individual prices. Mot. at 65 & n.83. This is not true. The transactional data shows that Keurig charges substantially more for its cups than TreeHouse so that the combined price of AFH Brewers and K-Cups is necessarily more than the combined price of AFH Brewers and TreeHouse cups. *See, e.g.*, Sibley Rpt. ¶689 ("An important competitive effect of the Loyalty Clauses was that customers paid higher prices than they would otherwise have. As shown in Figure 11, Competitive Cups have been consistently less expensive than K-Cups.").

Brewer also preclude summary judgment with respect to technological tying. *See supra* §I.A and §I.E.1. Plaintiffs have established that although Keurig had considered less restrictive alternatives, it "withheld from consumers the ability" to override the lock-out, making this issue one that should go to a jury—*if* the Court does not find for Plaintiffs on summary judgment. *Microsoft*, 253 F.3d at 84-85; PMSJ §IV.A.ii.

### 5. *Disputed Issues Of Material Fact Exist As To Keurig's Serial Sham Litigations*

#### i. **Keurig Has Failed To Rebut That It Engaged In A Series Of Sham Litigations**

Keurig has failed to demonstrate a lack of any genuine dispute of material fact as to Plaintiffs' Sham Litigation claims. Where only a single litigation is alleged to constitute a sham, the challenged litigation must be: (1) "objectively baseless, in the sense that no reasonable litigant could realistically expect success on the merits;" and (2) subjectively, "an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process."[290] Where, as here, plaintiffs allege a *series* of sham legal proceedings, the test is more holistic and focuses not on success (which, in any event, Keurig did not have) but on an analysis of the policy underlying the lawsuits.[291]

Keurig's motion wholly ignores the governing *California Motors* standard that applies to a series of sham lawsuit. Its motion should be denied on that basis alone. *See* Mot. at 66-73. Not only do Plaintiffs marshal significant evidence that Keurig's suits against Sturm and JBR were objectively baseless, *see infra* §I.E.5.ii, but those suits were pursuant to a "████████████" strategy designed to thwart competition, which manifested itself not only in cases against Sturm

---

[290] *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*").

[291] *Cal. Motor Trans. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972). As the Second Circuit stated: "[I]t is immaterial that some of the claims might, 'as a matter of chance,' have merit. The relevant issue is whether the legal challenges 'are brought pursuant to a *policy* of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.'" *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 101 (2d Cir. 2000) (quoting *USS-POSCO Indus. v. Contra Costa Cty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 811 (9th Cir. 1994)) (emphasis added).

and JBR, but Kraft and Touch as well, at a minimum. PSUF 1418.[292] Keurig also sent customers

statements threatening to "███████████████████████████████████████████

████████████████████████," which the court held inapplicable to TreeHouse.

PSUF 1419. Indeed, Keurig confirmed the sham nature of its claims when it admitted that it would

have pursued legal action against Sturm regardless of whether there actually was infringement.

PSUF 1450.

### ii. Disputed Issues Of Material Fact Exist As To Objective Baselessness, Even Under The *PRE* Standard

There is material evidence that Plaintiffs satisfy even the *PRE* test. Under the *PRE*

objective baselessness prong, the inquiry is whether a reasonable litigant would expect at the time

a case was brought to succeed on the merits. 508 U.S. at 64-65.[293] A lack of pre-suit probable cause

demonstrates a suit's objective baselessness. *PRE*, 508 U.S. at 58 ("[T]he institution of legal

*proceedings 'without probable cause'* will give rise to a sham") (citing *Cal. Motor Transp. v.*

*Trucking Unlimited*, 404 U.S. 508, 512 (1972)) (emphasis added).[294]

Keurig's litigations against Sturm and JBR were objectively baseless both at the time

---

[292] In addition to their evidence as to the cases against Sturm and JBR, Plaintiffs have adduced significant evidence that the *Kraft* and *Touch* Litigations, too, were shams. For instance, Keurig's suit against Kraft was based on a patent that it secured by means of inequitable conduct by failing to disclose its knowledge of invalidating prior art, i.e., the Kenco Single cartridges that Kraft had sued for years before. PSUF 1934; *Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) (holding invention anticipated by prior art where "every element and limitation of the claimed invention [was] found in a single prior art reference, arranged as in the claim"). And there is evidence from Touch's former CEO that Keurig's lawsuit against Touch was also a sham and that the actual infringing party was Keurig, not Touch. PSUF 1989.

[293] Courts applying *PRE* also consider litigation activity after commencement. For example, in the *JBR* Litigation, JBR offered to stay the case pending resolution of Keurig's appeal in the *Sturm* Litigation, but Keurig refused, despite the overlapping patent law issues. PSUF 1464. *See, e.g.*, *Waugh Chapel South, LLC v. United Food and Com. Workers Union Local 27*, 728 F.3d 354 (4th Cir. 2013); *Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 896-97 (2d Cir. 1981) (meritless appeals, in conjunction with other bad-faith conduct, can support conclusion of sham); *Gabriel Tech. Corp. v. Qualcomm Inc.*, 2013 WL 410103, at *3-4 (S.D. Cal. Feb. 1, 2013) (finding suit to be objectively baseless on review of full record, including evidence of subjective baselessness).

[294] *See also Move, Inc. v. Real Estate Alliance Ltd.*, 2008 WL 11338568, at *2 (C.D. Cal. Dec. 22, 2008) (defendants could not reasonably expect success on merits because they knew patents at issue were invalid or not infringed); *Knoll Pharm. Co., Inc. v. Teva Pharm. USA, Inc.*, 2001 WL 1001117, at *4 (N.D. Ill. Aug 24, 2001) (objective baselessness because alleged infringer sent letter stating patent claims were invalid and unenforceable prior to filing of suit).

Keurig brought them and as Keurig vexatiously pressed them through appeal. *Fatal to its summary judgment motion, Keurig itself admitted that it would not have had a factual or legal basis for either the patent or non-patent claims against Sturm before the Sturm cups were on the market, yet it is undisputed that Keurig brought the lawsuit a week before the Sturm cups even hit retailer shelves.* PSUF 1470. Keurig had no legal or factual basis to bring its non-patent claims challenging the quality of Sturm cups, because Sturm's cups were not commercially available (and thus were not in Keurig's possession) at the time Keurig filed suit. Nor did Keurig have any factual or legal basis to bring its patent claims against Sturm or JBR as those patent claims contravened long-established precedent showing that Keurig had no viable claim. *See infra* §I.E.5.ii.b.

### a. Disputed Issues Of Material Fact Exist As To A Good Faith Factual Or Legal Basis For Keurig's Non-Patent Claims

Keurig relegates any discussion of the non-patent claims it asserted against Sturm to a single paragraph.[295] Mot. at 67. This is perhaps not surprising given that, had TreeHouse known then what Keurig kept hidden, *see infra* §I.E.5.ii.a.2, which was only revealed in discovery in this action, TreeHouse would have moved for sanctions based on Keurig's fraud on the *Sturm* Court. The evidence that Keurig's claims were a sham and, indeed, a fraud, is overwhelming.

### 1. Keurig's Limited Non-Patent Claim Discussion Is Misleading

Keurig discusses only the substance of one non-patent claim, false advertising, but defends it not on the basis of what it asserted in the *Sturm* complaint, but on the basis of manufactured allegations it never brought. Mot. at 67. Specifically, Keurig fails to present any evidence to substantiate "that TreeHouse advertised its packs as offering high-quality freshly-brewed" coffee.

---

[295] Based primarily on the alleged poor quality of Sturm's Compatible Cups, Keurig asserted non-patent law claims for trademark infringement, false designation of origin, trade dress infringement, false advertising, dilution, unfair competition, and unjust enrichment. PSUF 1936.

Mot. at 67. TreeHouse never advertised its coffee as "high-quality"[296] or as "freshly brewed."[297] Thus, Keurig provides no basis for its false advertising claim.

### 2. Disputed Issues Of Material Fact Exist As To The Baselessness Of Keurig's Other Non-Patent Claims

Keurig's other non-patent claims, which Keurig ignores, were largely premised on arguments that Sturm's cups were "poor quality" and thus purportedly impaired Keurig's goodwill. PSUF 1936-37. But Keurig sued when it had *no knowledge* of the quality of Sturm's cups.[298] In September 2010, Keurig admitted that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ with respect to a potential lawsuit against TreeHouse; yet Keurig filed the lawsuit without more evidence than it had in September. PSUF 1516, 1517. Keurig was not even in possession of Sturm cups at the time it filed the complaint, leading its outside counsel to send Sturm a letter three days *after* filing seeking samples to test. PSUF 1423. Keurig has even admitted that Sturm cups *were not* on retail shelves until *a week after filing the complaint*. PSUF 1424, 1444. And Keurig further admits that it did not conduct its first tests on Sturm cups until almost two weeks after the complaint was filed. PSUF 1426. Keurig's non-patent claims attacking the quality of TreeHouse cups thus were objectively baseless "at the time [the] case was brought." Mot. at 66 (citing *PRE*, 508 U.S. at 64-65).[299]

---

[296] Even if it had, advertising claims regarding "high quality" are non-actionable puffery. *See, e.g.*, *Leonard v. Abbot Labs., Inc.*, 2012 WL 764199, at *22 (E.D.N.Y. Mar. 5, 2012) ("General statements about compliance with safety and quality standards are non-actionable 'puffery' where, as here, they fail to identify specific requirements or standards") (citation omitted); *Omega Eng'g, Inc. v. Eastman Kodak Co.*, 30 F. Supp. 2d 226, 247-48 (D. Conn. 1998) (finding statement that product was "perfect" for specific application was puffery).

[297] Keurig also omits that TreeHouse modeled its product and labeling—"soluble and microground"—after the Starbucks VIA product, a licensee of Keurig. PSUF 34, 45, 47, 1420-21. Yet it is telling that Keurig never accused Starbucks of false advertising for its labeling, identical to the TreeHouse labeling, and Keurig confirmed that it did not view the VIA product as being low quality but that instead it was "good instant coffee." PSUF 1422.

[298] Keurig also did not know that any alleged infringement of Keurig's patents had occurred. *See infra* §I.E.5.ii.b.

[299] Keurig is incorrect to suggest that at filing is the only time baselessness is measured. Instead, as set forth above, *see supra* §I.E.5.ii, a plaintiff may base a claim on misconduct occurring during the course of a litigation, such as by defrauding a court or pursuing a meritless appeal. *See Waugh Chapel South, LLC v. United Food and Commercial Workers Union Local 27*, 728 F.3d 354 (4th Cir. 2013) (condemning appeal asserting same frivolous arguments as before lower court); *Landmarks Holding Corp. v. Bermant*, 664 F.2d 891, 896-97 (2d Cir. 1981).

When Keurig finally did test Sturm's cups, the test was not done in the ordinary course of business or pursuant to any protocol, and was not consistent with the methods followed in tests of its own cups. PSUF 1427. Keurig also knew (but did not disclose to Sturm or the Court) that ███

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███.[300] Subsequent to Keurig's failure to disclose these safety issues the court denied Sturm's motion for summary judgment on the non-patent law claims, a result that might have been different had Keurig been candid about its brewer safety issues.[301]

Keurig also alleged that Sturm violated trademark law by including language on packaging that Sturm cups were "For use by owners of Keurig® coffee makers." PSUF 1436. But, as Keurig's own executives have acknowledged, the nominative fair use doctrine explicitly authorizes a company to advertise its products "for use with" another company's product.[302] Keurig admitted the challenged statement was in fact true, conceding that TreeHouse Portion Packs "had no other use" than for use in Keurig Brewers and were in fact "designed…to be used in Keurig coffeemakers." PSUF 1521, 1522. Keurig thus lacked any basis for any of its non-patent claims.[303]

---

[300] PSUF 1432, 1475. Keurig's Mini-Brewer was later revealed to be the subject of a Consumer Product Safety Commission Recall as a "burn hazard." PSUF 779, 783. Keurig presented its internal testing of the Sturm cups to the court without disclosing any of the serious safety issues caused by its own brewer. PSUF 1431-32, 1475. In a declaration supporting its motion for a preliminary injunction, Keurig's executive even ████████████████████████████████████████████████████████████████████████████████. *Compare* PSUF 1428, *with* PSUF 1430.

[301] *Keurig, Inc. v. Sturm Foods, Inc.*, 2012 WL 4049799 at *12 (D. Del. Sept .13, 2012). Separate and apart from any harm to Sturm and TreeHouse, Keurig's decision to keep the "Mini-Brewer" defects under wraps for years led to many consumer injuries that could have been avoided had Keurig been forthright with the court and the Consumer Product Safety Commission. PSUF 782, PSUF 782.

[302] PSUF 1437, 1438; *see also Neutrik AG v. Switchcraft, Inc.*, 2001 WL 286722, at *3-4 (S.D.N.Y. Mar. 23, 2001) ("[C]laiming that one's product is compatible with…another's product is a common method of advertising that encourages competition."); *Mueller Co. v. U.S. Pipe & Foundry Co.*, 351 F. Supp. 2d 1, 2-3 (D.N.H. 2005) (no confusion flowed from defendant's sale of parts for use with plaintiff's fire hydrants).

[303] While none of Keurig's non-patent claims had objective merit, a sham litigation claim may proceed even if some of the claims were not a sham. *See, e.g., In re Wellbutrin SR Antitrust Litig.*, 749 F. Supp. 2d 260, 266 (E.D. Pa. 2010).

### 3. TreeHouse's Settlement Of The Non-Patent Claims Does Not Compel A Finding Of Objective Merit

Keurig asserts that the fact the non-patent claims were settled shows they were not a sham. This is a misstatement of the law.[304] Parties routinely settle cases for various reasons unrelated to the merits,[305] and most settlements—including the one at issue here—incorporate clauses providing no admission of fault.[306] By Keurig's logic, its settlement with IPPs is Keurig's admission that the IPP claims (including sham litigation claims) were meritorious.[307] Finally, Sturm has presented evidence it was fraudulently induced into the settlement of the non-patent claims by Keurig's fraud on the court suggesting that the Sturm cups were of low quality when, in fact, any alleged "defective" brews were likely due to Keurig's dangerous brewer which was causing second- and third-degree burns to consumers.[308] In short, Sturm's decision to settle has no bearing on whether the non-patent claims in the *Sturm* Litigation were objectively baseless.

### b. Disputed Issues Of Material Fact Exist As To Keurig's Factual or Legal Basis for Keurig's Patent Claims

Keurig also did not have any factual basis to bring its patent claims against Sturm or JBR. Keurig knew that it had no protection against the Sturm or JBR cups (PSUF 1441, 1442), so it asserted *brewer* method patents despite knowing that Sturm and JBR have never manufactured or

---

[304] *See, e.g.*, *FTC v. AbbVie Inc.*, 976 F.3d 327, 367-68 (3d Cir. 2020) ("Even if the settlement was favorable…that is not dispositive, since the record is clear that…[the defendant] settled for reasons 'independent of the merits,'" including cost); *CSX Transp., Inc. v. Gilkison*, 2012 WL 5906716, at *7 (N.D. W.V. Nov. 26, 2012) (finding settlement does not establish lawsuit was not objectively baseless); *see also In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *22 (D.N.J. Aug. 28, 2009); *Teva Pharma v. Abbott Labs.*, 580 F. Supp. 2d 345, 365 (D. Del. 2008).

[305] The Court has previously admonished Keurig for its attempt to rely upon settlements. *See* Tr. of July 15, 2019 Hr'g at 84:21-85:7, *In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 14-MD-2542 (S.D.N.Y. July 17, 2019), ECF No. 643 ("MS. BRANNON: The last time we brought this motion, [the] Suchanek litigation was still pending. TreeHouse recently settled it …."); (THE COURT: And what does Rule 408 tell us about settlements?").

[306] *See, e.g.*, PSUF 1938 ("This Agreement does not constitute, and shall not be construed to be, an admission of liability by any party hereto."); *see also Fisher v. Kelly*, 105 F.3d 350, 353 (7th Cir. 1997) (noting parties settle for reasons wholly unrelated to the substance and issues involved in the litigation).

[307] *See generally* ECF No. 1114-1; *cf.* PSUF 80, 784, 785.

[308] *See supra* I.E.5.ii.a; *see Perez v. DirecTV Group Holdings, LLC*, 2019 WL 6362471, at *8 (C.D. Cal. July 23, 2019) (fact that defendants fraudulently coerced plaintiff to settle does not prevent application of sham exception).

81

sold SSBs. PSUF 1440. Keurig's patent claims posited the absurd theory that *consumer purchasers* of brewers infringed when they used the Sturm and JBR cups in Keurig Brewers. PSUF 1443.

Keurig admits that it filed suit *before* the Sturm cups were commercially available. PSUF 1444. Even when Keurig obtained Sturm's cups (more than a week *after* filing suit, *see supra* §I.E.5.A.1.b), Keurig did not know whether there was infringement or not because only certain Keurig brewers were covered by the patent and Keurig had no evidence that any consumers had used those particular brewer models with Sturm cups. PSUF 1447. And if there was no infringement by consumers, there could be no contributory infringement by Sturm, regardless of exhaustion principles.[309] This alone confirms that Keurig's patent claims were objectively baseless "at the time a case was brought." *PRE*, 508 U.S. at 64-65.

Keurig's patent claims were also barred by the patent exhaustion doctrine. Contrary to Keurig's suggestion that the patent law issues were "unsettled," Mot. at 69-72, an 1894 Supreme Court opinion held that, when a patented technology (such as a Keurig Brewer) is used with an unpatented "perishable" article (such as an unfiltered Portion Pack), the patentee cannot restrict the sale of the unpatented article.[310] The Supreme Court also confirmed the sale of a completed product (like the brewer) exhausts *all* patent rights practiced in the device.[311]

Recognizing these longstanding principles, the *Sturm* court granted summary judgment in

---

[309] *See, e.g.*, *Brit. Telecomms. PLC v. Prodigy Commc'ns Corp.*, 217 F. Supp. 2d 399, 405 (S.D.N.Y. 2002) ("Absent proof of direct infringement, there can be no contributory infringement or inducement of infringement."); *D.O.C.C. Inc. v. Spintech Inc.*, 1994 WL 872025, at *16 (S.D.N.Y. Aug. 15, 1994) (defendant "not liable for contributory or induced infringement because plaintiff has offered no proof of direct infringement by actual users"); PSUF 1470 (admitting that "the actual product…being sold in market to consumers" was necessary factual prerequisite to filing *Sturm* Litigation).

[310] *See Morgan Envelope Co. v. Albany Perforated Wrapping Paper Co.*, 152 U.S. 425, 433, 435 (1894).

[311] *See, e.g.*, *Quanta Computer, Inc. v. LG Elec. Inc.*, 553 U.S. 617, 633-38 (2008).; *see also U.S. v. Univis Lens Co.*, 316 U.S. 241, 248-52 (1942); *Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 137 S. Ct. 1523, 1527 (2017); *Adams v. Burke*, 84 U.S. 453, 456 (1873). Keurig did not cite *any* authority before the district court, the appellate court, or this Court for its contention that Supreme Court precedent did not address whether the substantial-embodiment test applies only to incomplete products and that the distinction between complete and incomplete products under that precedent is unclear. Mot. at 70. Nor did Keurig cite support for its position that the issue of whether to apply patent exhaustion on a claim-by-claim basis was unsettled. Mot. at 70-71.

Sturm's favor on the patent claims—explaining that Keurig was "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers." *Keurig*, 2012 WL 4049799, at *6. The Federal Circuit affirmed, admonishing Keurig's naked attempt to "impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law" in an "end-run around [patent] exhaustion" that would have allowed Keurig to assess multiple royalties for the same patent. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013). And the Federal Circuit condemned Keurig's anticompetitive "tactic *that the Supreme Court has explicitly admonished*."[312] *Keurig*, 732 F.3d at 1374.

Even after the *Sturm* court ruled against Keurig, Keurig continued to press the same baseless theory in the *JBR* Litigation, subjecting JBR to another two years of litigation, signaling to the market that Keurig was trying to keep JBR and other Competitive Cups off store shelves and causing partners to seek indemnification in the event they were sued. PSUF 1454-1463, 1465, 1483, 1526-1562, 1967-1968. The *JBR* court granted summary judgment on exhaustion grounds on Keurig's patent claims, noting Keurig's argument *was not seeking a novel extension of existing law*.[313] The Federal Circuit affirmed. *Keurig, Inc. v. JBR, Inc.*, 558 F. App'x 1009, 1010 (Fed. Cir. 2014).

Keurig next argues that its design-patent claim against JBR required the district court to consider prior art before concluding that JBR's cups were plainly dissimilar to the designed claimed in Keurig's patent. Critically, this is contrary to the *en banc* opinion joined by Keurig's own expert in *Egyptian Goddess, Inc. v. Swisa*, 543 F.3d 665, 678 (Fed. Cir. 2008). *See* PSUF

---

[312] Keurig also asserts its patent claims must not have been baseless because "[n]either TreeHouse nor JBR sought attorneys' fees under 35 U.S.C. §285." Mot. at 68-69 n.86. However, Plaintiffs are aware of no authority, and Keurig does not cite any, establishing that seeking fees for a successful defense in a patent action is a prerequisite to filing a sham litigation claim. In fact, the two standards are not interchangeable. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014) (sham litigation standard developed in *PRE* "makes little sense in the context of determining whether a case is so 'exceptional' as to justify an award of attorney's fees in patent litigation").
[313] *Keurig, Inc. v. JBR, Inc.*, 2013 WL 2304171, at *5-9 (D. Mass. May 24, 2013).

1786. In fact, the Federal Circuit *could have* required the district court to consider the prior art, or

considered the prior art *sua sponte*, *but did not* and, instead, summarily affirmed. PSUF 1787.

Neither Keurig's expert analysis nor its Motion cite to any cases to support the argument that the

prior art should have necessarily been considered. Keurig now seeks to recast both litigations as

asserting claims "not squarely endorsed by precedent" because "[p]atent law is complex."[314] Mot.

at 69-72. But Keurig's position would confer *Noerr-Pennington* immunity to all suits.[315]

### 6. Disputed Issues Of Material Fact Exist As To Keurig's Patent Misuse

Keurig's improper use of expired and unenforceable patents to demand royalties from

competitors as a condition for the right to sell Competitive Cups is patent misuse.[316] If the royalties

were indeed based on Keurig's patents covering cups, one would expect the fees to decrease in

2012 when the short filter patent expired—but the evidence shows that they did not (and, in fact,

Keurig *increased* its royalties for at least one brand).[317] Indeed, Keurig's former President

arrogantly asserted that the royalty fees Keurig received from brands were not based on any Keurig

intellectual property,[318] but rather were for the "████████████████████." PSUF 1573.

Despite Keurig's contention, patent misuse claims may be pursued even if there is no active

enforcement of the patents (as there was here, as shown above) where the anticompetitive conduct

---

[314] Keurig points to Magistrate Judge Cave's opinion noting that the claims "survived a motion to dismiss, involved cross-motions for summary judgment, and an appeal to the Federal Circuit," to argue that the *Sturm* and *JBR* Litigations were not objectively baseless. Mot. at 68. But Magistrate Cave's opinion merely concluded, based on a limited factual record and in the context of assessing a legal privilege claim, that Keurig's theory of patent exhaustion "did not rise to the level of a fraud on the courts." ECF No. 1166 at 7. That is a different standard. The Court did not assess a sham litigation claim, whether under the *California Motors* or the *PRE* standard.

[315] The *Sturm* and *JBR* Litigations are not like the safe harbor the Supreme Court recognized in *PRE*, where a litigant advocated a position that might have been viable in other circuits. 508 U.S. at 64-65. Rather, Keurig does not cite any contemporaneous (or subsequent) opinions showing its claims had merit.

[316] *See Brulotte v. Thys Co.*, 379 U.S. 29, 30-34 (1964); *Beckman Instruments, Inc. v. Tech. Dev. Corp.*, 433 F.2d 55, 61 (7th Cir. 1970).

[317] *See* PSUF 1572; *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1327-28 (Fed. Cir. 2010) (collecting royalties after patent expiration is misuse).

[318] Nor can the royalty fees be explained by any ███████████████████████ ████████████████████. PSUF 106; 1574. Brands preferred that their cups *not* have the Keurig brand, PSUF 1575, but Keurig refused to let retailers sell them without the brand. PSUF 1577, 1939 (Bartolini Decl. ¶14).

is causing the plaintiff injury.[319] In any event, as Keurig acknowledges, affirmative claims of patent

misuse are permissible where plaintiffs are seeking declaratory relief, as here.[320]

### 7. DPPs' and McLane's Claims Regarding Keurig's Anticompetitive Acquisitions Are Timely And Raise Genuine Issues of Material Fact

Contrary to Keurig's arguments, the fact that certain of Keurig's anticompetitive

acquisitions preceded the limitations period does not render DPPs' and McLane's antitrust claims

untimely.[321] In addition, the record confirms that the acquisitions were in fact anticompetitive.

In a Section 2 case where a defendant's antitrust violations are continuing in nature, a

purchaser's cause of action accrues "each time a plaintiff is injured by an act of the defendant[]."[322]

As a result, a "purchaser suing a monopolist for overcharges paid within the previous four years

may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken

before the limitations period." *Berkey*, 603 F.2d at 295. In *Glaberson v. Comcast Corp.*, the court

considered—and rejected—an argument identical to the one Keurig makes here.[323] There, the

defendants asked the court to reject plaintiffs' claims because the claims turned, in part, on

anticompetitive acquisitions made prior to the limitations period. 2006 WL 2559479, at *14. The

court refused to compartmentalize plaintiffs' claims in that way, noting that the acquisitions were

part of a "continuing course of conduct" that injured plaintiffs during the limitations period.[324]

---

[319] *See Astra Aktiebolag v. Kremers Urban Dev. Co.*, 2001 WL 1807917, at *1 (S.D.N.Y. Oct. 26, 2001).

[320] *See, e.g.*, *Rosenthal Collins Grp., LLC v. Trading Techs. Int'l., Inc.*, 2005 WL 3557947, at *6 (N.D. Ill. Dec. 26, 2005); *Internet Pipeline, Inc. v. Aplifi, Inc.*, 2011 WL 4528340, at *3 (E.D. Pa. Sept. 29, 2011); *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100, 1124 (C.D. Cal. 2002); *see also* Mot. at 73.

[321] Keurig challenges the timeliness as to two of four roasters. It does not dispute that the Diedrich and Van Houtte acquisitions occurred less than four years before DPPs filed the 2014 complaint. *See* Mot. at 75.

[322] *Berkey Photo*, 603 F.2d at 295 (citation omitted); *In re Credit Default Swaps Antitrust Litig.*, 2014 WL 4379112, at *15 (S.D.N.Y. Sept. 4, 2014) (hereinafter, "*CDS*") (date of plaintiffs' injury, not defendants' conduct" that starts statute of limitations).

[323] 2006 WL 2559479, at *14 (E.D. Pa. Aug. 31, 2006), *rev'd in part on other grounds*, 2006 WL 3762028 (E.D. Pa. Dec. 19, 2006).

[324] 2006 WL 2559479, at *14; *see also CDS*, 2014 WL 4379112, at *15. Similarly, in *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, the court refused to strike "portions" of plaintiff's claim addressing pre-limitations conduct because "such a piecemeal approach to an antitrust claim is improper." 654 F. Supp. 1195, 1204-05 (N.D.N.Y. 1987) (citing *Cont'l Ore*, 370 U.S. at 697) (in monopolization cases, "plaintiffs should be given the full benefit of

85

Even if the timing of the conduct—rather than the injury—were relevant, the court concluded that plaintiffs' claims were timely because the acquisitions were "merely alleged to have contributed" to a scheme that occurred "primarily" within the limitations period. *Id.*

So too here. As a result of Keurig's continuing antitrust violations, DPPs and McLane paid overcharges on K-Cup purchases from 2012—well within four years of the initial March 10, 2014 DPP complaint (the "Initial Complaint"), Case No. 14-cv-1609, ECF No. 2—to the present.[325] Keurig's acquisitions of Tully's & Timothy's were just two of a series of anticompetitive acts Keurig took to perpetuate its monopoly power, the vast majority of which occurred in 2010 and later.[326] The fact that a small portion of Keurig's anticompetitive scheme preceded the limitations period does not render DPPs' and McLane's claims untimely so long as the overcharges resulting from the anticompetitive conduct occurred within the limitations period.[327]

Further, the record confirms that Keurig's acquisitions were anticompetitive. *See supra* §§I.E.1-I.E.2.i.[328] Like any other exclusionary conduct, a dominant market player's acquisition of a potential competitor can be an "unlawful and exclusionary practice[]" that supports a Section 2

---

their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each").

[325] *See* French Rpt. ¶¶361-440; Johnson Rpt. ¶¶99-134. While McLane filed its initial complaint on January 11, 2019, *see* Case No. 19-cv-00325, ECF No. 1, its acquisition claims are timely because the statute of limitations was tolled as of the filing of DPPs' Initial Complaint. *See Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 551 (1974).

[326] *See* French Rpt. ¶¶151-360; Johnson Rpt. ¶¶11-69.

[327] Keurig cites a single out-of-circuit case in support of its argument that DPPs' claims concerning certain of Keurig's acquisitions are time-barred. Mot. at 75 (citing *Z Techs. v. Lubrizol*, 753 F.3d 594, 598-99 (6th Cir. 2014)). But *Z Techs* involved a merger-to-monopoly claim, in which the plaintiff did not allege any other anticompetitive conduct. 753 F.3d at 599. The court expressly distinguished those facts from instances where, like here, "a party already possesses a monopoly and takes action to preserve the monopoly." *Id.* (citations omitted). Thus, the Sixth Circuit's decision is entirely consistent with settled law in this Circuit that the limitations period commenced each time DPPs and McLane paid an overcharge resulting from Keurig's multifaceted monopolization scheme. *Berkey*, 603 F.2d at 295; *CDS*, 2014 WL 4379112, at *15.

[328] Ignoring the law of the case, Keurig relies exclusively on two cases involving Section 7 challenges to acquisitions by *acquiring* companies that were not participants in the relevant markets. *Tenneco*, 689 F.2d at 351; *Siemens*, 621 F.2d 499. Here, Keurig was *already* dominant before it acquired the coffee roasters. Further, unlike the Section 7 claims at issue in *Tenneco* and *Siemens*, DPPs' and McLane's Sherman Act claims do not turn *solely* on the acquisitions. *See* Areeda ¶912 (explaining that acquisition of a nascent rival is more likely to be condemned under Sherman Act Section 2 than under Clayton Act Section 7).

claim.[329] Keurig acquired the four coffee roasters at issue to protect its market power and impair competition. Keurig decided to preclude this nascent competition by making ██████████ ██████████████ ██ ████████████████████████████████████████████ ██████████████ Eliminating competition was also Keurig's intent. The acquisitions eliminated an important route by which competition could have increased. Before Keurig acquired the roasters—each of which had its own packaging machinery—it was the *only* other U.S. manufacturer of K-Cups.[332] Even if Keurig were correct that the roasters' successful market entry was uncertain, Keurig, not Plaintiffs, must "suffer the uncertain consequences of its own undesirable conduct."[333] *Microsoft*, 253 F.3d at 79 (citation omitted).

### 8. *McLane Brings Antitrust Claims, Not "Business Grievances" Claims*

Keurig's Motion briefly argues that McLane's "business grievances" are not antitrust claims. Mot. at 77-79. Keurig's argument is easily disposed of because it does not seek summary judgment on an "unsupported claim[] or defense[]"—"[o]ne of the principle purposes of summary judgment."[334] Instead, Keurig simply points to factual allegations that it believes are inadequate to prove an antitrust violation. But here is the rub: McLane does not bring claims for damages

---

[329] *Grinnell*, 384 U.S. at 576; *see also* Areeda ¶912 (acquisition of a nascent rival "eliminates an important route by which competition could have increased" and "bears a very strong presumption of illegality").
[330] PSUF 1986; French Rpt. ¶157.
[331] PSUF 1987; French Rpt. ¶157.
[332] French Rpt. ¶¶152-54, 158.████████████████████████████████████ PSUF 1988; *id.* at 322: 3-6 ("Q: You're telling me why you wanted to get 100 percent of the roaster brands. A: Correct.")); French Rpt. ¶¶152-156. Keurig suggests that the four roasters "accounted for only ████████ of Keurig-compatible pack sales." Mot. at 76. But this number misleadingly refers to the period after Keurig converted the companies into zombie brands operating under the Keurig umbrella, rather than the period before the acquisitions.
[333] Keurig stresses that *other* competitors entered in 2012, *see* Mot. at 76, but the Court has already held that such entry does not absolve Keurig of liability. *See* MTD Order at 228 n.24, 235-36; *see also supra* §I.A.2. Keurig also claims that "McLane's old acquisitions claim fails for the additional reason that ████ of the packs it distributed ████████████████████" Mot. at 76-77. However, whether or not McLane "benefitted" from brands entering is irrelevant. As the Supreme Court held in *Hanover Shoe v. United Shoe Mach. Corp.*, "[a]s long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows." 392 U.S. 481, 489 (1968). Keurig's support is inapposite. *Atlantic Richfield Co. v. USA Petroleum Co.* does not address a direct purchaser and addressed a conspiracy to set minimum prices, which has not been alleged in this case. 495 U.S. 328, 337 (1990).
[334] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

stemming solely from the conduct Keurig terms "business grievances," such as McLane's elimination from the Walmart K-Cup business, Keurig's frustration of forecasting methodologies, Keurig's supply cuts, or McLane's denied business opportunities. Rather, McLane brings antitrust claims for its actual injury of paying supracompetitive prices for K-Cups stemming from illegal anticompetitive behavior as a direct purchaser.[335] Keurig therefore identifies no claim or defense on which the Court could grant summary judgment.

McLane's purported "business grievances" provide additional evidence of Keurig's monopoly power. It is axiomatic that a monopoly's effect on competition can include suppressed innovation, increased prices, reduced quality, and reduced outputs. *See supra* §I.B. And each of McLane's factual allegations provides evidence of Keurig's ill-gotten dominance. For example, Keurig's inability to supply McLane (not to mention its other customers) with enough product to satisfy demand for Compatible Cups, which in turn demonstrates how Keurig's suppression of unlicensed competitors decreased overall output of Compatible Cups below competitive levels. *See id.*; PSUF 897.

Further evidence of Keurig's unlawful monopoly is limiting McLane's ability to distribute unlicensed Compatible Cups. McLane alleges that, "[a]s a direct and proximate result of Defendant's multi-dimensional anticompetitive scheme, McLane has been deprived of a meaningful choice to purchase high-quality, less-expensive, and environmentally friendly Competitor Cups and forced to pay supracompetitive prices for K-Cups." McLane Compl. ¶20. It is uncontroversial that illegal monopolies stonewall competition and, in doing so, arrest consumer demand that otherwise would have spread across various competitors within the market. *See Microsoft*, 253 F.3d at 65. So, while it is true that McLane was not contractually prohibited from

---

[335] *See* McLane Am. Compl, ECF Nos. 695 and 695-1 ¶¶285-350 ("McLane Compl.").

purchasing unlicensed Compatible Cups, the fact remains that Keurig's illegal conduct artificially lowered demand for unlicensed Compatible Cups, forcing McLane to purchase K-Cups at supracompetitive prices. *See* Leitzinger Rpt. ¶¶51, 84-85, Fig. 12.

Keurig also blocked McLane's expansion of its K-Cup business. Customers requested McLane's services for distribution of K-Cups, yet Keurig denied McLane and its customers the opportunity to do so. *See* PSUF 904. This again supports the fact that Keurig's monopoly captured demand that would have otherwise gone to unlicensed Compatible Cups. The fact that McLane's customers made requests for K-Cups directly contradicts Keurig's assertion "[t]hat other customers did not use McLane reflects their choice and has no effect on overall competition." *See* Mot. at 79. Neither McLane nor its customers had a choice but to weather the whims of Keurig. Insulated from competition, Keurig was able to deny customers' request for McLane's offered market efficiencies, resulting in reduced customer choice and inferior service.

### F. Disputed Issues Of Material Fact Exist As To Competitor Plaintiffs' Lanham Act Claims And Sherman Act Advertising Claims

#### 1. *Keurig Is Not Entitled To Summary Judgment On Lanham Act Claims*

To prevail on a Lanham Act claim, a plaintiff must establish that the message is (1) either literally false or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff.[336] Once literal falsity is established, the remaining elements are a low hurdle, and consumer deception is presumed.[337] As established in Plaintiffs' Motion for Summary Judgment, many of Keurig's statements are literally false. PMSJ 88-90.

The statements are also material. *Id.* at 90-91. Materiality is established by showing that

---

[336] *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GMBH*, 843 F.3d 48, 65 (2d Cir. 2016).
[337] *See C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 242 (S.D.N.Y. 2013).

the false statement misrepresented "an inherent quality or characteristic of the product."[338]

Plaintiffs have shown that Keurig made literally false and material statements in advertising and

have established damages of ▮▮▮▮▮ as to such claims based on the undisputed facts, which

damages should be enhanced to ▮▮▮▮▮ based on the undisputed evidence that the statements

were made with knowledge of falsity. PMSJ 87-97. Thus, Plaintiffs are entitled to summary

judgment with respect to such literally false statements. Even if that motion is not granted,

Plaintiffs have established triable issues of fact as to both the literally false statements and other

Keurig advertising that is at least materially misleading. Just as Keurig, Plaintiffs append Exhibit

A that catalogs the false statements in more detail. The evidence is summarized below.

### i.   Keurig's False Statements

Incompatibility Statements: From late 2013 until 2016, Keurig made statements to retailers,

on its brewer boxes, and in its social media that the 2.0 Brewer would only work with K-Cups.[339]

Though intent is not an element of a Lanham Act violation, Plaintiffs developed evidence that

Keurig knew at the time it was making these statements (as well as others below) that they were

false.[340] By the time of the launch, Keurig had seen a video of Treehouse's Competitive Cup

---

[338] *Merck Eprova AG v. Gnosis S.P.A.*, 760 F.3d 247, 255 (2d Cir. 2014). Stated another way: "If consumers, faced with the choice to purchase either the plaintiff's product or the defendant's, are likely to prefer the defendant's product by reason of the defendant's false advertising, the falsity of defendant's advertising is material to the plaintiff's Lanham Act claim." *Church and Dwight*, 843 F.3d at 71.

[339] *See* Ex. 306; Mot., Ex. A. Before the launch of 2.0 Brewer, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See, e.g.*, PSUF 1667, 1636-37, 1655, 1657, 1672.

▮▮▮▮▮▮▮▮▮▮. PSUF 1678-79. Despite the false box statements, Keurig did not recall any packaging and did not apply any stickers to its boxes (or supply retailers with any such stickers) to correct or cover up the false statements. PSUF 736-38, 740. As late as 2016, Keurig posted on its Facebook: "[i]f you purchase unlicensed pods and attempt to brew them with Keurig 2.0, the system will not operate and call out an error message." PSUF 1680. Similar messaging still appears on retailer websites based on information from Keurig. *See* PMSJ 80.

[340] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by placing a white piece of paper over the lid (PSUF 1665), ▮▮▮▮▮▮▮▮▮▮▮ (PSUF 1666).

brewing in a 2.0 Brewer.[341] And, 

███████████████████████████████████████████.[342] PSUF 730, 1675. ████████

███████████████████████████████████████████████████████████[343]

But Keurig continued to make the false incompatibility statements. *See, e.g.*, PSUF 1667.

Oops Statement: Keurig programmed its 2.0 Brewer to state the following if ink could not be found: "Oops! This pack was not designed for this brewer. Please try one of the hundreds of packs with the Keurig® logo."[344] PSUF 1686. The evidence showed that Competitive Cups were designed to be compatible with Keurig brewers. *See, e.g.*, PSUF 1687; *see also supra* §I.E.5.ii.a.2.

Testing Statements: From at least 2013 through 2019, Keurig made public statements that it did not test Competitive Cups.[345] However, it is undisputed that ████████████████

████████████████████████████████████████████████████████████████

████████████████████████"[346] Keurig also worked with third parties, including ████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████. PSUF 749-50.

Safety Statements: From at least December 2010 through March 2017, Keurig suggested that Competitive Cups were unsafe.[347] There is no evidence that Competitive Cups posed any

---

[341] PSUF 734, 1673. The same month, ███████████████████████████████████████████████.
PSUF 727, 1674.

[342] That same month, JBR introduced its Freedom Clip that allowed any Portion Pack to brew. PSUF 1676.

[343] PSUF 718-19, 1677. *Turbon Int'l, Inc. v. Hewlett-Packard Co.*, cited by Keurig, does not provide a defense. 769 F. Supp. 2d 262 (S.D.N.Y. 2011). The court focused on public advertisements that made vague generalizations that toner cartridges *sometimes* do not work as well. *Id.* at 265, 268. The more analogous statements—that cartridges "will not work"—were made in private letters to a single hospital in Thailand and were therefore not considered. *Id.* Keurig made definitive public statements that Competitive Cups would not work in the 2.0 Brewer. *See* PMSJ 80.

[344] A survey commissioned for this case revealed that the message conveyed to consumers that (1) only packs with the Keurig logo would work in the 2.0 Brewer (false); and (2) only packs with the Keurig logo would work in any Keurig Brewer (1.0 or 2.0) was false. Ex. 1105 (Expert Report of Brian Sowers ¶11).

[345] *See* Ex. 306; Mot., Ex. A. For instance, Keurig stated on Facebook and its website, "We do not make or test [the] other brands." *Id.*

[346] *See* ECF No. 409, ¶429; PSUF 720, 745, 747.

[347] *See, e.g.*, Ex. 306; PSUF 1688, 1689.

safety risks; indeed, Keurig admitted it had no evidence that any TreeHouse cup ever injured any consumer (in contrast to Keurig's brewers).[348] Indeed, Keurig has not set forth any data comparing the percentages of complaints Keurig received relating to K-Cups to those relating to Competitive Cups, and Keurig's former Quality Manager testified that he did not have any such data.[349]

Brewer Damage Statements: From 2012 to at least September 2014, Keurig suggested that the use of Competitive Cups may damage the brewer.[350] These statements were made through various channels, including social media such as Facebook, in packaging, and Keurig's official consumer call center scripts. *Id.* ███████████████████████████████████

███████████████████████. PSUF 767-69. ██████████████████████████████

███████████████████████. In fact, ███████████████████████████████████

███████████████████████████████████. PSUF 778.

Warranty Statements: From 2013 until at least September 2014, Keurig stated that use of Competitive Cups would or could void their brewer warranty. PSUF 1681, 1684, 1904. Not only did Keurig *never deny* warranty service based on use of Competitive Cups, it *never had any capability* to determine if Competitive Cups were a basis for denying service. PSUF 1682, 1683.

Recipe Statements: In the run-up and at the launch of the 2.0 Brewer, Keurig advertised that the brewers could detect different beverages (such as coffee or tea), and brew them according to different recipes. PSUF 1695, 1697. But Keurig has repeatedly belatedly admitted in this case that the 2.0 Brewer did no such thing. PSUF 624, 627, 1698.

---

[348] *See* PSUF 797, 800-01, 833, 1691.
[349] PSUF 800-01, 833. David Manly, former Senior Vice President of New Business Creation at Keurig, admitted it was a "business risk," not a safety risk, that concerned Keurig. PSUF 1884.
[350] *See, e.g.*, PSUF 152, 1684; *see also* Ex. 306.
[351] PSUF 773-77, 1685, 1693, 1694.

### ii. Keurig's Statements Were Material

Each of Keurig's false statements concerns an inherent quality of the Competitive Cups and is likely to cause a consumer to purchase K-Cups without such alleged shortcomings.[352] Keurig argues that the false statements were not material because consumers and retailers could evaluate the claims themselves. Mot. 81. But that is not the test for materiality.[353] The only support Keurig cites for that proposition is an unpublished opinion, which, in any event, does not set forth that standard. *See Reed Const. Data Inc. v. McGraw-Hill Cos.* 638 F. App'x 43, 46 (2d Cir. 2016) (evidence that other companies "discounted" the representations based on their own "independent evaluations"). Here, there is substantial evidence that potential customers shunned Competitive Cups due to the false statements of Keurig. PSUF 1672, 195, 331.

### iii. Remaining Lanham Act Elements

Keurig does not seriously claim Plaintiffs have not established the remaining two Lanham Act elements.[354] As set forth above, customers shunned Competitive Cups based on the false statements, causing direct harm to TreeHouse and JBR. Finally, given Keurig made false statements long after it knew they were false, Keurig's conduct was willful, meaning Plaintiffs are entitled to an unjust enrichment remedy and enhanced damages without a specific showing of

---

[352] *Salon FAD v. L'Oreal USA, Inc.*, 2011 WL 70591, at *6 (S.D.N.Y. Jan. 10, 2011); *Playtex Products LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *4 (S.D.N.Y. Mar. 29, 2016); *C=Holdings B.V.*, 992 F. Supp. 2d at 243; *see also* Sibley Rpt. ¶¶1104-07.

[353] *See, e.g., Au New Haven, LLC v. YKK Corp.*, 2019 WL 1437516, at *19 & nn.177-79 (S.D.N.Y. Mar. 31, 2019) (in assessing materiality, courts consider whether the statement either is likely to influence purchasing decision or concerns an "inherent or material quality of the product"); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014) (assessing whether "defendants misrepresented an inherent quality or characteristic of the product" in determining materiality for false advertising claims).

[354] Keurig admits it markets its products in interstate commerce and directs its advertising nationwide. PMSJ 91-93. As to harm, injury is presumed because Keurig competes with JBR and TreeHouse in the market for Portion Packs and the false statements compared K-Cups to Competitive Cups. *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007).

injury.[355] Keurig's motion with respect to its Lanham Act claims should be denied.

### 2. Disputed Issues of Material Fact Exist As To Plaintiffs' Sherman Act Claims Based On False Advertising

As the Court knows, false advertising may in certain circumstances also give rise to Sherman Act liability.[356] Keurig's sole argument against such claims is that Plaintiffs purportedly cannot overcome the presumption of *de minimis* effect on competition from the false advertising. To the contrary, the evidence rebuts that presumption. *See* Sibley Rpt. ¶¶1131-60. As summarized below, Plaintiffs have presented strong evidence on each of the factors *Ayerst* directs a fact finder to consider in evaluating whether false statements create antitrust liability.

- Clearly False: Most of the false statements were plainly and literally false. *See* PMSJ 88-90.

- Clearly Material: Keurig's false statements went to the core issues of whether Competitive Cups worked in Keurig brewers and were safe, and Keurig executives testified to their materiality. PSUF 796, 834.

- Clearly Likely to Induce Reasonable Reliance: Because the false statements went to the central issue of whether Competitive Cups would function or were safe, and suggested the brewer had groundbreaking functionality, the statements were clearly likely to induce reasonable reliance.[357]

- Made to Buyers Without Knowledge of the Subject Matter: Keurig's statements to consumers were made to buyers that had little or no ability to evaluate the products for compatibility, safety, or damage to the brewer. Sibley Rpt. ¶¶1104-7. That brands and retailers "panicked" and switched supports the conclusion they also did not have the ability to reliably evaluate the brewer claims. PSUF 969.

- Continued for Prolonged Periods: False statements continued for over a decade. *See* Ex. 306.

- Not Readily Susceptible to Neutralization or Offset: Keurig's false statements to retailers were not susceptible to neutralization because they were made in private meetings with retailers. *See, e.g.*, PSUF 1667-68. False statements to consumers were not susceptible to neutralization because many were made privately, PSUF 1914, and Keurig was the well-known maker of the brewer, enjoying superior name recognition and credibility when describing its own brewers.

---

[355] *Dependable Sales & Service, Inc. v. Truecar, Inc.*, 377 F. Supp. 3d 337, 354-55 (S.D.N.Y. 2019); *see also Merck*, 760 F.3d at 251 ("where willful deception is proved, a presumption of injury may be used to award a plaintiff damages in the form of defendant's profits, and may, in circumstances such as those present here, warrant enhanced damages.").
[356] *See Nat'l Assoc. of Pharma. Mfgs, Inc. v. Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988).
[357] *See Salon FAD*, 2011 WL 70591, at *6; *Playtex Products LLC*, at *4 (S.D.N.Y. Mar. 29, 2016); *C=Holdings B.V.*, 992 F. Supp. 2d at 243; Sibley Rpt. ¶¶ 1100-03.

Finally, while the *Ayerst* presumption is relevant when false advertising alone is alleged to be sufficient for a Sherman Act violation, Keurig's false statements are simply one facet of its anticompetitive scheme. Keurig's statements must be considered with all other anticompetitive conduct by Keurig. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

### G. Disputed Issues of Material Fact Exist As To Plaintiffs' State Law Claims

#### 1. *Competitor Plaintiffs' Tortious Interference Claims*

***Disputed Issues Of Material Fact Exist As To Whether Keurig Improperly Induced Unilever's Breach Of Contract.*** In



. PSUF 1714. Approximately four months later, before the Portion Packs had even launched,

. PSUF 1721. Unbeknownst to TreeHouse at the time, after the agreement's execution,

. PSUF 1716-20.

. [358]

PSUF 1719. All the while, TreeHouse continued to expend resources toward what it believed would be a launch with Unilever. PSUF 1715-17.

There is a material dispute of fact that Keurig induced Unilever's breach of its contract with TreeHouse.[359] Keurig argues that it cannot be liable because the parties purportedly "mutually

---

[358]                . PSUF 969, 1289-91, 1723.

[359] Keurig does not dispute the first two elements of TreeHouse's claim—that a valid contract between TreeHouse and Unilever existed and that Keurig knew of the agreement. Nor could it, as

" *See* PSUF 1718.

agreed to cancel" and thus discharged any liability on Keurig's part.[360] Keurig is wrong on the law. Any discharge of an existing cause of action only applies to the parties to that release.[361] Neither of the cases cited by Keurig says that a release protects a *nonparty* from a claim for tortious interference.[362] In fact, another case cited by Keurig, *IMAF v. J.C. Penney Co.*, expressly acknowledges that recovery in a tort action may be allowed for "additional damages which were not covered in [a] contract action."[363] Keurig was not a party to the termination agreement. PSUF 1722. Nor does the agreement suggest that it protected Keurig from liability for its intentional tort—which makes sense as TreeHouse was unaware at the time that Keurig induced the breach.[364]

**Competition Is Not A Defense To Tortious Interference With Prospective Business Claims.** TreeHouse and JBR also allege that Keurig improperly interfered with prospective business relations with all of their lost retail private label and AFH distribution customers.[365] Discovery has shown that Keurig targeted all of TreeHouse's and JBR's lost retail private label customers to induce those customers to switch their business to Keurig through misrepresentations about the 2.0 Brewer, and TreeHouse's and JBR's distributor customers, who stopped purchasing Competitive Cups because of Keurig's enforcement of the Loyalty Clause. *See supra* §I.C.

Keurig rehashes its argument that "competition" provides a defense to this tort, Mot. at 86-

---

[360] Keurig argues in passing that TreeHouse does not allege that any Unilever conduct prior to the termination constituted a breach. Mot. at 85, n.109. Unilever's concerted conduct with Keurig violated the duty of good faith and fair dealing implied in every contract under New York law, which may be breached where a party "acts in a manner that, *although not expressly forbidden by any contractual provision*, would deprive the other party of the right to receive the benefits under their agreement." *Gelita, LLC v. 133 Second Ave., LLC*, 2014 WL 278408, at *2 (N.Y. Sup. Ct. 2014) (quotation omitted; emphasis in original); *see also Tang v. C.A.R.S. Protection Plus, Inc.*, 301 Wis.2d 752, 781 (Wis. Ct. App. 2007); *Chemical Bank v. Paul*, 614 N.E.2d 436, 442 (Ill. App. Ct. 1993).

[361] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 347 (1971); *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 130 (2d Cir. 2001).

[362] *See* Mot. at 86 (citing *Colton*, 98 Mis. 2d at 965; *Kirchhoff v. Rosen*, 592 N.E.2d 371, 376 (Ill. App. Ct. 1992) (considering effect of rescission only between the parties)). Keurig does not cite any Wisconsin law. *See* Mot. at 86.

[363] 1991 WL 66892, at *6 (S.D.N.Y. Apr. 24, 1991).

[364] *See id.* Courts consistently hold that general releases do not release unknown claims as to third parties. *Meyer v. Fanelli*, 266 A.D.2d 361, 361-62, (2d Dep't 1999); *see also In re Actrade Fin. Techs., Ltd.*, 424 B.R. 59, 72 (Bankr. S.D.N.Y. 2009); *Pennwalt Corp. v. Metro. Sanitary Dist. of Greater Chi.*, 368 F. Supp. 972, 979 (N.D. Ill. 1973).

[365] THS Am. Compl. Counts 16 & 19; JBR Am. Complaint, Counts 16 and 17.

87, which the Court rejected because "valid antitrust claims…provide the unlawful purpose and unjustifiable cause element of [plaintiff's] claim of tortious interference." MTD Order at 252-53. Keurig argues that TreeHouse's claim fails because it is based on Dr. Stiroh's speculative assumption of future business. Mot. at 86-87. Far from being speculative, or a "naked conclusion," Dr. Stiroh's analysis is supported by substantial evidence from both the parties and TreeHouse's lost customers.[366] *See, e.g.*, Stiroh Rpt., ¶¶58, 60. Keurig similarly argues that JBR cannot establish probability of future economic benefit, but there is widespread evidence that retailers were scared into pausing or cancelling sales of Competitive Cups. For example, ███████████████████

████████████████████████████████████████

███████████████████████████████. *See supra* §I.C. ███████

████████████████████████████████████████

███████.[367] Thus, there are questions of fact regarding causation that the jury must weigh at trial.

### 2. *Competitor Plaintiffs' State Law Antitrust And False Advertising Claims*

Keurig argues that Plaintiffs' state law antitrust and false advertising claims must fail for the same reasons as the federal statutes. However, Plaintiffs have established at least a triable fact as to their federal claims, so the state law claims survive for the same reason.[368]

Moreover, not all of TreeHouse's state law claims are tethered to its federal claims.[369]

---

[366] Keurig's argument that TreeHouse "does not say which prospective relations Keurig allegedly tortiously interfered with" is likewise meritless. Mot. at 86. Plainly, Keurig interfered with the same customers extensively outlined in Dr. Stiroh's expert reports as part of TreeHouse's antitrust claims. *See* Stiroh Rpt. Ex. 6.A; Stiroh Reply Ex. 8.A.

[367] PSUF 1752-55. Keurig also incorrectly argues that JBR has no contracts. Because ████████████████████████████████████████████████████████████████████████████. PSUF 1752-53, 1780, 1883.

[368] Keurig concedes that Plaintiffs' state law claims survive if its federal claims survive. Mot. at 91.

[369] Plaintiffs concede that claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act, the Illinois Uniform Deceptive Trade Practices Act, and the Wisconsin Antitrust Act would be unlikely to survive should the corresponding federal claims fail.

Claims under the Illinois Antitrust Act are not inherently bound to federal antitrust law.[370] Similarly, TreeHouse's claims under the New York Donnelly Act may survive even if its Sherman Act claims do not,[371] and the failure of a false advertising claim under the Lanham Act does not automatically merit failure under the New York Consumer Protection Act.[372] JBR's state law claims also survive. Keurig's claim that the Cartwright Act does not address monopolization takes the cited case out of context and is at odds with more recent precedent.[373] And whether the Cartwright Act covers acts of monopolization is a distinction without a difference because California's unfair competition statute covers unilateral acts of monopolization.[374]

### 3. DPPs' And McLane's Unjust Enrichment Claims Survive Summary Judgment

Keurig's motion for summary judgment on DPPs' and McLane's Unjust Enrichment claims should be denied. First, Keurig mistakenly assumes that, under New York's choice of law analysis, the Court should look to the law of the place of injury—i.e., where the purchase of K-Cups took place. Mot. at 92. But DPPs and McLane bring an unjust enrichment claim rooted in allegations of anticompetitive conduct, which is a "conduct-regulating rule."[375] In this situation, courts in New York look to "the law of the jurisdiction where the tort occurred…because that

---

[370] *See Baker v. Jewel Food Stores, Inc.*, 355 Ill. App. 3d 62, 69 (Ill. App. Ct. 2005) (courts "are not required to follow federal antitrust decisions" when enforcing Illinois antitrust law, although they "may do so if [they] find them persuasive"); *People ex. rel. Scott v. Convenient Food Market, Inc.*, 21 Ill. App. 3d 97, 106-07 (Ill. App. Ct. 1974).

[371] *See Jack's Cookie Co. v. Du-Bro Foods, Inc.*, 145 Misc. 2d 699, 701 n. 1 (N.Y. Civ. Ct. 1989) (while the Donnelly Act "is construed in light of Federal precedent," it can be interpreted differently "where State policy, divergent statutory language or legislative history warrant that such be done"). Further, by the time of trial, the Donnelly Act may be far broader than the Sherman Act based on proposed revisions, which is in committee with the N.Y. Senate. *See* S.B. S8700A (N.Y. 2020), *available at* https://www.nysenate.gov/legislation/bills/2019/s8700/amendment/a.

[372] *See Casper Sleep, Inc. v. Mitcham*, 204 F. Supp. 3d 632, 644 (S.D.N.Y. 2016) ("nothing inconsistent" about allowing a false advertising claim to proceed under New York law even if substantially dismissed under Lanham Act).

[373] *Tucker v. Apple Comput., Inc.*, 493 F. Supp.2d 1090, 1102 (N.D. Cal. 2006) ("Typically, if a plaintiff can maintain a Sherman Act claim, he or she can maintain a similar Cartwright Act claim").

[374] "When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act invokes section 17200, the word 'unfair' means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws…." *Cel-Tech Comm'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 187 (Cal. 1999).

[375] "Conduct-regulating rules are those that 'people use as a guide to governing their primary conduct[.]'" *Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d Cir. 2012) (quotation omitted).

jurisdiction has the greatest interest in regulating behavior within its borders." *Licci*, 672 F.3d at 158. Because DPPs and McLane base their unjust enrichment claims on Keurig's antitrust conspiracy, the Court should look to the state(s) Keurig operated in.[376] Here, Keurig's conduct during the relevant time occurred in both Vermont and Massachusetts. *See* PSUF 854-56. Because both Vermont and Massachusetts are similar to New York in that they recognize claims for unjust enrichment,[377] no conflict exists and the Court can apply New York law.[378]

Even if the Court should look to the place of injury, Keurig is wrong when it states Texas does not recognize a claim for unjust enrichment.[379] While it is true that ***some*** Texas intermediate appellate courts have questioned whether unjust enrichment is a cause of action or a theory of relief, those courts have not come to a single conclusion and the Texas Supreme Court has yet to consider the question directly.[380] Without a clear consensus from Texas's courts, federal courts in the Second Circuit have allowed plaintiffs to proceed with unjust enrichment claims. *Id.*[381]

Keurig has no other argument aside from stating that, because DPPs' and McLane's unjust enrichment claims are "parasitic" to their antitrust allegations, they rise or fall with the antitrust claims. For the reasons above, none of Plaintiffs' antitrust claims warrant summary judgment. As a result, the Court should not strike down DPPs' and McLane's unjust enrichment claims.

---

[376] *See id.* (holding that the law of where the plaintiff was domiciled and where the injury was felt "do not govern where, as here, the conflict pertains to a conduct-regulating rule"); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 135 (S.D.N.Y. 2014) (holding that the law of the state where misrepresentations were made governs).

[377] *See Kellogg v. Shushereba*, 82 A.3d 1121, 1133 (Vt. 2013); *Metro. Life Ins. Co. v. Cotter*, 984 N.E.2d 835, 850 (Mass. 2013).

[378] *See Sourceone Dental, Inc. v. Patterson Cos., Inc.*, 310 F. Supp. 3d 346, 366 (E.D.N.Y. 2018) ("If there is no actual conflict, New York courts apply New York law.").

[379] *See Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 869 (Tex. 2007).

[380] *See Delgado v. Ocwen Loan Servicing, LLC*, 2017 WL52017079, at *14-15 (E.D.N.Y. Nov. 9, 2017). Keurig's cite to *Harris County Texas v. MERSCORP*, 791 F.3d 545, 561 (5th Cir. 2015), does not help. While the Fifth Circuit stated unjust enrichment is a theory of recovery, it noted "[a] party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Id.* (quotation omitted). DPPs and McLane have alleged undue advantages in the form of illegal, anticompetitive conduct.

[381] Keurig is also wrong in stating that Delaware and New Hampshire do not recognize an unjust enrichment claim. *See In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 577 (Del. 2019) (defining elements of an unjust enrichment claim); *Estate of Mortner v. Thompson*, 182 A.3d 1260, 1265-66 (N.H. 2018) (same).

## II. KEURIG IS NOT ENTITLED TO SUMMARY JUDGMENT ON DAMAGES

Keurig challenges Plaintiffs' experts' damages methodologies (which should be reserved for *Daubert* motions and cross-examination), argues its case from a disputed factual record, and fails to identify relevant undisputed issues. Heavily disputed issues of material fact, impacting the amount of damages Plaintiffs may recover, preclude summary judgment on damages,[382] particularly as "[c]ourts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages."[383] Indeed, "calculating damages in antitrust cases is not an exact science," *id.*, as "damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts."[384] Courts are thus "willing[] to accept a degree of uncertainty in these cases" and look unfavorably upon a wrongdoer that "insist[s] upon specific and certain proof of the injury which it has itself inflicted."[385]

### A. Disputed Issues Of Material Fact Exist As To Plaintiffs' Estimates Of Damages Caused By The Challenged Conduct

For a damages claim to survive summary judgment, a plaintiff need only show a triable issue of fact—for instance, as here, "whether some, all, or none of [Keurig's] conduct is anticompetitive," and whether claimed damages "flow from conduct the jury finds anticompetitive." *Dial*, 165 F. Supp. 3d at 38 (denying defendant's motion for summary judgment on damages). A plaintiff need not prove the amount of its damages on summary judgment,[386] as

---

[382] The one exception is Plaintiffs' motion for a finding of liability and damages as to Keurig's literally false claims, as the law creates presumptions in favor of plaintiffs where, as here, the evidence is undisputed that the statements at issue were literally false. Therefore, for the reasons set forth in Plaintiffs' motion, summary judgment for liability and damages should be awarded to Plaintiffs and against Keurig as to these claims. *See* PMSJ at 87-98.

[383] *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 38 (S.D.N.Y. 2016) (quoting *U.S. Football League v. NFL*, 842 F.2d 1335, 1378 (2d Cir. 1988)).

[384] *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969).

[385] *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981).

[386] *See In re SRAM Antitrust Litig.*, 2010 WL 5141861, at *3 (N.D. Cal. Dec. 13, 2010) (rejecting argument that "an amount of damages must be presented in order for a plaintiff to survive summary judgment"); *In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 410 (N.D. Miss. 1995) (noting proof of damages amount is not required on summary judgment); *Smolka Co. v. Cent. Foundry Co.*, 52 F.R.D. 248, 252 (S.D.N.Y. 1971) ("[T]he fact that the damages are not set forth on this motion does not permit, much less necessitate, a grant of summary judgment for the defendant.").

Keurig claims, and Keurig's cited cases do not say otherwise.[387] *See* Mot. at 94.

Keurig rehashes its *Daubert* motions, challenging damages models that *have not been excluded*. Mot. at 94-97. For the reasons discussed in the response to Keurig's *Daubert* motions, those attacks have no merit. Even if they did, however, "that would not prevent [Plaintiffs] from establishing damages through fact-witness testimony."[388] Keurig's challenges to Plaintiffs' damages models—even if valid (which they are not)—cannot support summary judgment.

### 1.  *JBR Does Not Claim "Monopoly Growth"*

JBR's use of branded K-Cups' growth rate in its damages calculation is sound because that rate was consistent with the growth of the market.[389] JBR's damages model is conservative given JBR's sales often grew at a faster rate than K-Cup sales—and ███████████████████████████ ██████████████████████ in the AH Channel just prior to the 2.0 launch.[390] When a defendant monopolizes a market, the fact that a more ideal benchmark is not available is not a reason to reject the damages model.[391] Keurig may not escape liability simply because its scheme succeeded.[392]

### 2.  *TreeHouse's Damages Model*

To quantify damages, TreeHouse expert Dr. Lauren J. Stiroh constructs a "but-for world"

---

[387] In *U.S. Football League v. NFL*, the Second Circuit set forth the standard for proving the amount of damages *at trial*, making no mention of summary judgment. 842 F.2d 1335, 1378-79 (2d Cir. 1988).

[388] *SourceOne Dental, Inc. v. Patterson Cos.*, 310 F. Supp. 3d 346, 365-66 (E.D.N.Y. 2018) (citing Fed. R. Evid. 701, advisory committee note).

[389] Keurig myopically fixates on the use of K-Cups' 3.1% annual growth rate in JBR's damages model. In reality, that growth rate had little to do with the ultimate conclusions in JBR's damages model because JBR's expert merely applied that growth rate to Dr. Macartney's estimate of annual sales that JBR lost as a result of Keurig's acts. Even if Dr. Macartney had assumed a zero-growth rate, damages would have amounted to hundreds of millions of dollars.

[390] JBR's AH Market growth in 2013 was ████ compared to that of K-Cups, which was ████ for the same year. Macartney Reply 147, Table 43 (describing how Keurig's expert, Dr. Ugone, concealed this fact). From 2011 to 2012, JBR grew in the AH Market by ████ compared to K-Cups, which grew at ████. *Id.* On Amazon, JBR ████ ██ K-Cups before the launch of the 2.0 Brewer. *Id.*

[391] *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015), *amended*, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016).

[392] *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946). Keurig's cited case involves a damages model that assumed that the plaintiff would enter into a conspiracy with the other defendants and enjoy the same profits as the other defendants. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1453-54 (11th Cir. 1991). Nothing in JBR's model capitalizes on some assumed profits flowing from participating in an anticompetitive conspiracy.

free of Keurig's anticompetitive conduct, in which Keurig is forced to compete on the merits. Stiroh Rpt. ¶98. Unable to "depend on its exclusionary contracts, lockout technology, and misinformation campaign to protect its high prices" in the but-for world, Dr. Stiroh assumes "Keurig would have had to reduce its prices ***to meet other competitors' prices***." Stiroh Reply ¶19 (emphasis added). TreeHouse, by contrast, already competes on the merits and charges competitive prices. Dr. Stiroh accordingly assumes "TreeHouse's net prices would have been the same [in the but-for world] as in the actual world." Stiroh Rpt. ¶133. In a but-for world with "lower prices offered in a more competitive environment," Dr. Stiroh predicts that more Compatible Cups would have been sold, meaning the market would have been larger. *Id*. ¶107. Further, Dr. Stiroh predicts that TreeHouse—whose prices would have been lower than Keurig's even in the but-for world— would have captured a larger share of the larger market in the but-for world. *Id*. ¶¶123, 131.[393]

Keurig's sole argument against Dr. Stiroh's damages model is that it "makes no sense" for TreeHouse to maintain its competitive prices and increase its market share while Keurig's own prices come down to competitive levels. Mot. at 95. Not only does Keurig disregard the variety of anticompetitive acts *unrelated to price* that depressed demand and made it harder to sell Competitive Cups, like false statements, but Keurig's insistence that "TreeHouse must either lower its prices to compete or else lose sales" is economically and logically nonsensical. *Id*. A central principle of microeconomics is that competitor prices will converge in a competitive market.[394] Thus, it makes perfect economic sense that the gap between TreeHouse and Keurig prices in the but-for world will narrow. Keurig's argument that TreeHouse must lower its already competitive prices or lose sales to be *worse off* in the but-for world also defies common sense. It is akin to an

---

[393] A detailed discussion of Dr. Stiroh's opinions can be found in TreeHouse's opposition to Keurig's *Daubert* motion challenging Dr. Stiroh's opinions, ECF No. 1538, at Argument §§II.A.1, A.2, and A.4.
[394] Ex. 1113 (David Besanko et al., Microeconomics 546-48 (4th ed. 2010)).

argument that, if a champion marathon runner taking performance-enhancing drugs is forced to compete drug-free, all other runners must slow down to ensure the "champion" preserves his margin of victory in the race.

### 3. *DPPs' Damages Model*

Keurig does not dispute that DPPs' damages estimate is "just and reasonable." Instead, it seeks to impose on DPPs a heightened standard, requiring DPPs to now calculate the amount of damages that *each member* of the class would ultimately be entitled to recover. Mot. at 96-97. However, "[t]he use of aggregate damages calculations is well established in federal court and implied by the very existence of the class action mechanism itself."[395] Individual damages in a class action are appropriately reserved for the claims administration process or special damages proceedings.[396] As detailed in DPPs' class certification papers and the accompanying reports of their expert, Dr. Gary French, DPPs present robust common evidence demonstrating that all or nearly all class members suffered injury and damages. ECF No. 1360. This evidence suffices to defeat summary judgment for much the same reasons it supports certification of the class.

---

[395] *In re Zyprexa Prod. Liab. Litig.*, 671 F. Supp. 2d 397, 449 (E.D.N.Y. 2009) (quoting *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009); *see also Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, 2018 WL 7197233, at *15 (S.D.N.Y. Dec. 26, 2018); DPPs' Class Cert. Br. at 21 n.79 (ECF No. 1360); 8 Julian O. Von Kalinowski, Peter Sullivan, and Maureen Mcguirl, Antitrust Laws and Trade Regulation §171.02[5] (2d Ed. 2012). The sole case Keurig relies on, *Drug Mart Pharmacy Corp. v. American Home Products Corp.*, 472 F. Supp. 2d 385 (E.D.N.Y. 2007), is wholly inapposite. Unlike DPPs' claims here, *Drug Mart* was brought under the Robinson-Patman Act, which prohibits price discrimination among different purchases that require a "singularly individualistic analysis." *Mad Rhino, Inc. v. Best Buy Co.*, 2008 WL 8760854, at *4 (C.D. Cal. Jan. 14, 2008) (citations omitted). The decision in *Drug Mart* rejecting plaintiffs' attempt to demonstrate aggregated lost profits under Robinson-Patman, 472 F. Supp. 2d at 429, has no bearing on DPPs' case alleging violations of Sherman Act §2. Actions seeking recovery for overcharges resulting from a defendant's monopolistic conduct—like DPPs' claims here—are routinely certified because injury and damages sustained by direct purchasers in monopoly cases frequently can be proven with common evidence. *See, e.g.*, *Dial*, 314 F.R.D. at 116, 119.

[396] *See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 31 (E.D.N.Y. 2020) (claims administration process including individualized damages calculations); *Betances v. Fischer*, 403 F. Supp. 3d 212, 237 (S.D.N.Y. 2019) ("not uncommon to have class treatment for certain aspects of damages while leaving individual-specific damages issues to alternative mechanisms"); *Gulino v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, 2016 WL 4129111, at *1 (S.D.N.Y. Aug. 3, 2016) (individual damages calculations).

### 4. *McLane's Damages Model*

McLane's damages flow directly from Keurig's and its Co-Conspirators' anticompetitive conduct.[397] McLane's damages expert provides, *at a minimum*, a just and reliable estimate of McLane's overcharge damages. Due to Keurig's anticompetitive conduct, McLane had extremely limited purchases from Competitive Cup makers (*see, e.g.*, PSUF 1743) and there was not enough McLane-specific data to allow Dr. Johnson's regression model to estimate overcharges using only McLane purchase data. Because of this, Dr. Johnson estimates overcharges in the AH Market. However, Dr. Johnson was able to run a sensitivity analysis which shows that his model supports a near-identical overcharge estimate for McLane compared to the AH Market (███████ versus ██████). Johnson Rpt. ¶130. In short, Dr. Johnson's regression analysis properly accounts for McLane-specific damages and reasonably measures McLane's overcharges. *Id.* ¶¶130-131.

Keurig's unsupported assertion that Walmart and McLane were somehow insulated from its anticompetitive conduct misapplies basic economics. Manipulation of the market, such as here by Keurig and its Co-Conspirators, robs the most powerful buyers of the full advantage they should have. Further, Keurig fails to cite a single case in support of its argument that it was improper for McLane, as a direct purchaser, to put forth a market-wide average overcharge here.[398] Mot. at 96. The Second Circuit has explained that plaintiffs have "*considerable latitude* in proving the amount of damages" and that "[p]roof of amount of damages thus *need not conform to a particular theory or model*, and *exact proof of the amount of damages is not required*." *U.S. Football League*, 842 F.2d at 1378 (internal citations omitted) (emphases added). Regardless, McLane lacked even the power to get Keurig to agree to price competitively. During negotiation of a 2012 Supplier Agreement, Keurig *specifically struck* contractual language that would have required ███████

---

[397] *See* ECF No. 1536 at 2-3, 5-8.
[398] The one case that Keurig relies upon, *Drug Mart v. Am. Home Prods.*, is inapposite. *See supra* §II.A.3.

 pricing. PSUF 1746. Specifically, McLane sought to include the following language in Section 3.1(a) of its 2012 Supplier Agreement with Keurig:

PSUF 1744-45 (emphasis added). Keurig edits to McLane's draft state in pertinent part: ▮▮▮ ▮▮▮ PSUF 1746.

### B. Disputed Issues Of Material Fact Exist As To The Cause Of Competitor Plaintiffs' Damages

Keurig claims it is entitled to summary judgment on damages because TreeHouse's and JBR's damages models are purportedly "premised on alleged profit losses that are not limited to those *caused by* unlawful conduct." Mot. at 97. Keurig's attempt to argue over a "hotly contested" factual record is "an abuse of the summary judgment process."[399]

#### 1. *TreeHouse's "Lost Customers"*

Dr. Stiroh conducts a lost customer analysis "quantif[ying] the sales volumes that TreeHouse lost for select customers due to Keurig's anticompetitive conduct from 2010 to 2019." Stiroh Rpt., App'x 1. Keurig argues it is entitled to summary judgment on damages because "[t]here is no evidence indicating that [Keurig's] challenged conduct was *the major reason* for any of [TreeHouse's] lost business." Mot. at 103 (emphasis added). Keurig is wrong.

To begin, Keurig is wrong on the law. An antitrust plaintiff need not show that the defendant's unlawful conduct was "the major reason" for its injury. *Id.* So long as the conduct was "a substantial or materially contributing factor," *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66 (2d Cir. 2012), "[t]he Plaintiff need not show that the illegality was a more substantial cause

---

[399] *Kustom Auto. Recovery, Inc. v. Vill. of Lyons*, 1998 WL 887076, at *4 n.1 (N.D. Ill. Dec. 11, 1998).

than any other."[400] Keurig is likewise wrong to suggest "[d]amages cannot be established when challenged conduct is 'one factor among many' driving a customer's decision making." Mot. at 98. A plaintiff may prove causation "even though other factors may also have contributed significantly."[401] Indeed, if a jury finds Keurig's actions "taken as a whole" to violate the antitrust laws, "disaggregating the monopolist's lawful actions from its unlawful actions for the purpose of calculating damages may be 'unnecessary, if not impossible.'" *Dial*, 165 F. Supp. 3d at 38 (citation omitted). Keurig is also wrong on the facts. Of the 27 lost customers included in Dr. Stiroh's analysis, Keurig identifies only three customers—Walmart, Community Coffee, and Kroger—that purportedly left TreeHouse for reasons *other* than Keurig's anticompetitive conduct. In each case, the evidence as to causation is, at a minimum, hotly contested.[402]

**Walmart.** Keurig claims Walmart moved its business from TreeHouse to Keurig because Keurig offered a "lower price." Mot. at 98-99. The evidence contradicts this assertion. Keurig's own contemporaneous business documents and testimony confirm: "



" PSUF 1629; *see also* PSUF 1274 ("

"). Even when TreeHouse proposed giving its products to Walmart *for free*, Walmart refused to change course. PSUF 1266 ("And I said, Well, what if I gave you the pods for free, I didn't charge you anything? And [Walmart] said, We still wouldn't make the change.").

**Community Coffee.** Keurig claims Community Coffee left TreeHouse purportedly to seek

---

[400] *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 144 (1968) (White, J., concurring); *see also Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 711 (2d Cir. 1983).

[401] *Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 504 (S.D.N.Y. 2008) (citation omitted); *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 145 ("That other factors may also have contributed to the damage of which plaintiffs complain, will not bar recovery."), *supplemented*, 344 F. Supp. 157 (S.D.N.Y. 1972).

[402] *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."); *see also* PSUF 1985 (providing examples of causation evidence just from TreeHouse files), 2002-03 (examples of direct causation evidence).

a better price and quality from Keurig. Mot. at 100. But Keurig's own documents show that the "2.0…allowed KGM to convince…Community Coffee" to switch. PSUF 75. Community Coffee explained it was ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████.

PSUF 1651. Community Coffee itself confirmed that a motivation for its switch was so it "could be assured that the cups that [Keurig] would produce would function in those brewers."[403]

   **Kroger.** Keurig claims Kroger switched to Keurig for a purportedly lower price. Mot. at 101. But Keurig ignores evidence that Kroger switched due to its fear of being locked out of the 2.0 Brewer and fear of Keurig's potential future lockout efforts. Kroger buyer Rossana Klawon recalled internal meetings about "need[ing] to find a solution so [Kroger] items would work in the 2.0." PSUF 1893. She recalls, "We were concerned for being locked out and upsetting our customers." PSUF 1894. Keurig had even instilled fears about future lockouts. As Ms. Klawon explained, "Keurig has come up with 2.0 and the thought was they'll – they'll control that market and then it – once some people break that code, they'll move on to another, so they continue to control the market." PSUF 1895. Kroger management expressed its fear to TreeHouse that Keurig "will always be developing a next step to thwart private label & other competitors," and its concern about "[w]hat comes after [the] 2.0 since there will be something." PSUF 1896; *see also* 1892-95.

   ## 2.  *Keurig, Not JBR's Business Decisions, Caused JBR's "Losses"*

   Keurig's attempt to challenge JBR's damages claim fails. Keurig overgeneralizes from one email discussing a ████████████████████████████████████████ to make sweeping statements about JBR's conduct over the entire discovery period. Keurig ignores the voluminous evidence that JBR employees had no access to—testimony and documents about customers like

---

[403] PSUF 1632; *see also* PSUF 1649.

███████████████ who said they avoided Competitive Cups, including JBR's pod, because of compatibility worries.[404] Keurig also ignores the testimony regarding specific potential customers who would have done business with JBR but for Keurig's exclusivity contracts. *See supra* §I.B.

Keurig makes much of a few lines in an email to argue that JBR's refusal to pay slotting fees caused it to lose sales, instead of such losses being due to the nationwide coverage of Keurig's exclusivity provisions that blocked JBR's sales. The reality was that slotting fees did not cause JBR's lost sales; when JBR paid slotting fees, grocery chain distribution did not improve due to the same exclusivity provisions that blocked JBR and other Competitive Cup manufacturers.[405] PSUF 1763-74. Regardless, JBR's prior "reluctance did not prevent [JBR] from doing business with ██████████████████████████." PSUF 1764. Similarly, JBR's business decisions were rendered irrelevant by the 2.0 compatibility scare caused by Keurig, making any bids to ████ ████████ futile in the years immediately after the 2.0 Brewer was introduced to the market and gained substantial market share. PSUF 970, 1269, 1274-76. Keurig may disagree with all this evidence, but its argument rests on factual disputes, not issues ripe for summary judgment.

## C. Competitor Plaintiffs' Future Damages Are Not Speculative

Keurig seeks summary judgment on future lost profits but does not challenge the need to estimate future lost profits. Antitrust plaintiffs are entitled to lost profits "until the plaintiff has fully recovered from the exclusion." Areeda & Hovenkamp, *Antitrust Law* ¶397a.

***JBR's Damages Through 2029 Are Appropriate.*** Damages models using past profit, competitive positioning, and market data to calculate future lost profits are commonplace.[406]

---

[404] PSUF 1672, 1758, 1774-75 (AAFES: "how SF Bay Coffee [JBR] plans to transition their kcups to coincide with Keurig's 2.0 launch"; "we will only be purchasing kcups that will fit in the Keurig 2.0 brewers").

[405] There is no support for Keurig's hyperbole about JBR's sales suffering as a result of its design. *See supra* §I.C.

[406] *Insight Equity v. Transitions Optical, Inc.*, 252 F. Supp. 3d 382, 395-96 (D. Del. 2017) (damages premised on competitive positioning indicating that plaintiff would have achieved 20% share); *Learning Care Grp., Inc. v. Armetta*, 2016 WL 3248178, at *4 (D. Conn. June 12, 2016) ("The mere fact that the lost profit calculations here are based on future contracts does not render them speculative, particularly where … relying on past profit data.").

Likewise, damages models extending lost profits many years into the future are perfectly appropriate when supported by the data.[407] Future lost profits must be shown to a reasonable likelihood, not a mathematical certainty.[408] In *LePage's*, an antitrust damages model premised on past sales data was extrapolated into future lost profits premised on the plaintiff maintaining the market share it would have had in the but-for world absent defendant's anticompetitive conduct.[409]

There is ample support for JBR's lost profits claim such as JBR's early mover advantage, its eco-friendly soft pod, its perceived quality, its branding, its pricing, and its marketing effort.[410] JBR has continued to achieve high market share at several major retailers, including ███████ ███████ JBR's availability and success at national retailers was a positive marketing attribute further enhancing its appeal in the market.[412] OneCup's strengths in the marketplace would have continued but for Keurig's conduct.[413] Due to Keurig's conduct, JBR missed out on making sales at a key time and failed to develop brand loyalty as a result. PSUF 1767. Keurig's exclusive contracts continue, and Keurig has never corrected its false statements.[414]

Keurig's criticism of JBR's damages model for excluding Amazon sales in 2016 but including them in subsequent years is similarly misplaced. Dr. Macartney noted that JBR's sales

---

[407] *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1266-67 (Fed. Cir. 2013) (upholding lost profits premised on but-for profits from 2003 to 2011 premised on earlier sales); *RMD, LLC v. Nitto Ams., Inc.*, 2012 WL 5398345, at *6-7 (D. Kan. Nov. 5, 2012) (allowing lost profits projected into future); *Bedrock Stone & Stuff, Inc. v. Mfrs. & Traders Tr. Co.*, 2006 WL 890993 at *15-16 (E.D. Pa. Mar. 31, 2006) (allowing 10 years of future lost profits); *Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co.*, 2004 WL 6044760, at *11-12 (S.D. Fla. July 1, 2004) (plaintiff's theory including 10 years of projected lost profits is issue for jury).

[408] *See Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 971-72 (9th Cir. 2013) ("[F]uture profits are often an approximation. The law does not require … mathematical precision.") (citation and quotation marks omitted); *Learning Care Grp., Inc. v. Armetta*, 2016 WL 3248178, at *4 (D. Conn. June 12, 2016); *Powerweb Energy, Inc. v. Hubbell Lighting, Inc.*, 2014 WL 1784082, at *9 (D. Conn. May 3, 2014) (same); *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 692 (E.D. Pa. 2003), *amended*, 268 F. Supp. 2d 448 (E.D. Pa. 2003).

[409] 324 F.3d 141, 164-66 (3d Cir. 2003).

[410] *Insight Equity*, 252 F. Supp. 3d at 395-96 ("[D]etermining a firm's likely market position based on product offerings, past performance, and extrinsic evidence of how a competitor perceived the market … is reliable….").

[411] Macartney Rpt. Figs. 25 & 26.

[412] PSUF 156; PSUF 1765-66.

[413] For example, JBR's damages theory focuses on JBR's strength in attracting millennials. PSUF 142; PSUF 1770. Market research shows that single-serve portion packs are particularly popular with Millennials. PSUF 1771.

[414] PSUF 353-56, 376, 380, 501, 708-75, 740-41.

were growing dramatically until the 2.0 launch, and then JBR's sales growth halted. PSUF 1772. Dr. Macartney accounted for those trends by restarting the damages model in 2017 to account for the years when JBR would have benefitted from continued sales growth but for Keurig's conduct. PSUF 1773. JBR's damages model was well supported. JBR's theory is that JBR would have sold more in 2019 than all but eight brands of K-Cups, just three places higher in the but-for world than in the actual world—a sanity check that shows the conservative nature of JBR's model.

**TreeHouse's Future Damages Are Appropriate.** Keurig's argument on TreeHouse's future damages is devoid of reference to any undisputed fact, making it entirely inappropriate for summary judgment. As expressly stated, Dr. Stiroh estimates TreeHouse's but-for sales to each customer "from 2010 to 2019." Stiroh Rpt. App'x 1. She makes no assumption that any customer would have stayed with TreeHouse "*forever*." Mot. at 105. Rather, Dr. Stiroh uses TreeHouse's but-for sales from 2010 to 2019 to estimate TreeHouse's but-for market shares over the same time period, then quantifies TreeHouse's lost profits—both past (i.e., 2010-2019) and future (i.e., 2020-2024)—using her estimates of but-for market size, but-for market share, and but-for cost. Stiroh Rpt., App'x 1; *see id.* ¶¶ 98, 104-54. Further, even when estimating the sales TreeHouse would have made in the past in the but-for world, Dr. Stiroh's "relevant consideration[]" was "whether TreeHouse is successful in maintaining customers *for several years*"—not, as Keurig suggests, "*forever*." Ex. 753 (Stiroh Tr. 186:5-187:3 (emphasis added)). To the extent Keurig disagrees with Dr. Stiroh's methodology, its remedy is through cross-examination, not summary judgment.

### D. Disputed Issues of Material Fact Exist As To TreeHouse's Loss of Money It Was Guaranteed Under The Unilever Contract Due To Keurig's Interference

Keurig argues TreeHouse was not harmed by Unilever's breach, Mot. at 106-7, but admits

████████████████████████████████████████████████

████████. *Id.* Thus, at a minimum, TreeHouse was harmed by the balance under the contract,

apart from any additional damages (such as lost profits) that Keurig's tort caused.[415] But for

Keurig's interference, Unilever would not have canceled the agreement. ██████████████

████████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████.[416] Any TreeHouse settlement with Unilever does

not bar or diminish a claim for the full amount of damages from a third party.[417]

### E. TreeHouse's Damages for Costs Incurred Are Not Inflated

Keurig argues that TreeHouse presents inflated damages for costs on the asserted ground

that TreeHouse failed to mitigate its damages. Mot. at 107-08. But issues like whether TreeHouse

could have saved money on a net basis in responding to the 2.0 Lock-Out by purchasing "true

taggant" ink for only some customers and "far less expensive 2.0 ink" for other customers—

especially given the confusion and inventory challenges involved with dealing with two different

types of TreeHouse Competitive Cups—are inherently disputed issues of fact. Keurig's nit-picking

at costs does precisely what the Supreme Court sought to prevent defendants from doing: "to profit

by [its] wrongdoing at the expense of [its] victim."[418] It "does not 'come with very good grace' for

[Keurig] to insist upon specific and certain proof of the injury which it has itself inflicted."[419]

---

[415] *GFI Brokers, LLC v. Santana*, 2009 WL 2482130, at *1-2 (S.D.N.Y. Aug. 13, 2009) (victim of breach entitled to liquidated damages); *see also McKinley Assocs., LLC v. McKesson HBOC, Inc.*, 110 F. Supp. 2d 169, 182-84 (W.D.N.Y. 2000); *Mobil Oil Corp. v. Flores*, 175 F. Supp. 2d 1080, 1088-89 (N.D. Ill. 2001); *Ladopoulos v. PDQ Food Stores, Inc.*, 2002 WL 927616, at *3 (Wis. Ct. App. 2002). Despite the uninformed belief of certain executives, who had no knowledge of Keurig's conduct to lock Unilever into an exclusive agreement, ████████████████████ ████████████████████████████████████████████████████████. PSUF 1720. As Unilever admitted, at the time of the agreement, TreeHouse was "hoping to maintain a good relationship with Unilever…with the hope of [Unilever] doing business with them in the future." *See* PSUF 1724. Indeed, ██████ ████████████████████████████████ PSUF 1716-19.

[416] *See* Stiroh Rpt. App'x 1 at 4, Ex. 6.A. Keurig's argument that a party may not recover damages for tortious interference beyond what the contract provides is wrong. Mot. at 107; *IMAF*, 1991 WL 66892, at *6 (permitting additional damages not covered by contract). *Terhune v. Bd. of Ed. of Zion Elementary School District 6* says nothing under Illinois law about limiting damages to the term. 2013 WL 623603, at *3 (N.D. Ill. Feb. 20, 2013).

[417] *See, e.g., LaSalle Bank Nat'l Assoc. v. Paramount Props.*, 588 F. Supp. 2d 840, 859 (N.D. Ill. 2008) (holding duty of good faith and fair dealing can only be waived expressly); *see also Singleton Mgmt., Inc. v. Compere*, 243 A.D.2d 213, 218, (1st Dep't 1998); *Westphal v. Cantwell-Peterson Clinic*, 57 Wis. 2d 402, 406-07, (1973).

[418] *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946).

[419] *J. Truett Payne Co.*, 451 U.S. at 566-67.

### F.  Keurig Is Not Entitled to Summary Judgment on Unjust Enrichment

Keurig argues Treehouse and JBR cannot claim unjust enrichment damages due to lack of proof of injury. Keurig is wrong. In the case of willful Lanham Act violations, like those here, injury to competitors is presumed.[420] In *Merck*, the Second Circuit upheld the district court's finding that an "award of profits was necessary to deter future unlawful conduct, prevent [defendant's] unjust enrichment, and compensate [plaintiff] for the business it lost as a result of the false advertising that" misled [plaintiff's] customers. *Id*. at 262. That presumption of injury to competitors applies even when there is more than one competitor in the marketplace.[421] Further, an award for damages based on unjust enrichment applies to *all* of defendant's profits attributable to the anticompetitive conduct, with no reduction for a plaintiff's market share or calculation of which percentage of profits could have gone to any individual plaintiff.[422] Even if proof of harm were required, Keurig's argument cannot be resolved on summary judgment due to disputed issues with respect to the harm caused by Keurig's conduct. *See supra* §I.C.

### G.  Disputed Issues Of Material Fact Exist As To Plaintiffs' Entitlement to Injunctive And Declaratory Relief

To defeat summary judgment on injunctive relief claims, a plaintiff need only show they have "raised a genuine issue of material fact sufficient to show a threat of antitrust injury."[423] The standard for injunctive relief is liberal.[424] Plaintiffs' claim for declaratory judgment should proceed because "the judgment will serve a useful purpose in clarifying and settling the legal relations in issue" and "it will terminate and afford relief from the uncertainty, insecurity, and controversy

---

[420] *Merck Eprova AG v. Gnonsis S.P.A.*, 760 F.3d 247, 251, 260-61 (2d Cir. 2014), *id*. at 251 ("[I]n a case where willful deception is proved, a presumption of injury may be used to award a plaintiff damages in the form of defendant's profits, and may, in circumstances such as those present here, warrant enhanced damages.").
[421] *See, e.g.*, *Coca-Cola Co. v. Tropicana Prods, Inc*., 690 F.2d 312, 317 (2d Cir. 1982).
[422] *See River Light V, L.P. v. Lin & J Int'l. Inc.*, 2015 WL 3916271, at *7 (S.D.N.Y. June 25, 2015).
[423] *R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir. 1989).
[424] *Ashley Meadows Farm, Inc. v. Am. Horse Shows Ass'n, Inc.*, 617 F. Supp. 1058, 1063 (S.D.N.Y. 1985).

giving rise to the proceeding."[425] The Court should deny Keurig's summary judgment motion as to injunctive and declaratory relief,[426] as the record evidence shows that, at minimum, genuine issues of material fact are in dispute regarding Keurig's continuing anticompetitive conduct.[427]

### 1. Keurig's Exclusionary Contracts With Distributors, Input Suppliers And Co-Manufacturers Constitute Immediate And Ongoing Threats To Competition

Keurig ignores evidence of continuing harm from its *ongoing* exclusionary agreements, as set forth above, with KADs and KARDs, input suppliers, roasters and brands and retailers, which serve to insulate Keurig from competition on the merits. *See supra* §I.E.2. Keurig argues that a limited number of distributor customers, including ███████████████████████,[428] were not forced to enter into Keurig's anticompetitive agreements. Mot. at 111. This argument is misplaced; it does not suggest any reason why injunctive relief is unsupported, but instead attempts to argue the merits of Plaintiffs' antitrust claims.[429] Keurig further contends that injunctive relief is not warranted as to claims that Keurig has foreclosed necessary inputs because a limited number of competitors have entered the market.[430] Mot. at 11. But, as set forth above, this argument is

---

[425] *Broadview Chem. Corp. v. Loctite Corp.*, 417 F.2d 998, 1001 (2d Cir. 1969). Keurig uses the phrase "declaratory relief" four times in its motion purporting to seek dismissal of all of Plaintiffs' requests for that relief and Keurig presents no argument to support its request. Mot. at 110-112. The existence of another adequate remedy does not preclude declaratory relief, Fed. R. Civ. P. 57, and thus the fact Plaintiffs may recover damages or injunctive relief does not affect declaratory relief. *Allstate Ins. Co. v. Martinez*, 2012 WL 1379666, at *9 (D. Conn. Apr. 20, 2012).

[426] Keurig incorrectly suggests that Plaintiffs only seek injunctive relief as to the 2.0 Brewer Lock-Out Technology, and that their "other" requests for injunctive relief are "vague." Mot. at 110-112. This is wrong. Plaintiffs expressly seek such relief for Keurig's continuing anticompetitive conduct relating to exclusivity and tying arrangements and product redesign, as well as continuing harm resulting from Keurig's false statements. THS Am. Compl. at 184, ¶¶K, M, N (continuing violations of Sherman Act, including exclusivity and tying agreements, and Lanham Act).

[427] Keurig's motion ignores injunctive relief sought as to false advertising. Plaintiffs maintain that they are entitled to such relief based on irreparable harm caused by Keurig's false statements, which are ongoing. *See* PMSJ at 97-98.

[428] Keurig ignores the testimony of absent class members in this case who unambiguously testified that they do not like, benefit from, nor wish to be bound by Keurig's exclusive dealing/loyalty provisions. *See, e.g.*, PSUF 1810; *see also* PSUF 1800-04. Additional absent Class member testimony demonstrates that Class members: (i) did not benefit from the exclusivity provision; (ii) did not want the exclusivity restriction in their contract; (iii) felt it put them at a competitive disadvantage by restricting the additional sale of unlicensed Compatible Cups; or (iv) limited selection or choice of options that their customers wanted. *See* PSUF 1811; *see also* PSUF 1805-09.

[429] Keurig argues it did not engage in tying but this, too, is an argument on the merits, which alone mandates dismissal. Mot. at 112. Keurig does not dispute that, if Plaintiffs prevail on their claims, injunctive relief would be appropriate.

[430] Sibley Rpt. ¶322; *see also id.* ¶¶363-462.

contrary to the law articulated by this Court in its motion to dismiss decision. MTD Order at 235-36. Keurig's continuing restrictive agreements prevent full competition by competitors that have entered the market and any competition from would-be competitors that are precluded from entering the market at all. *See supra* §I.E.2.

### 2. *Disputed Issues Of Material Fact Exist As To The Threat to Competition From Keurig's Ongoing Anticompetitive Brewer Redesigns*

Keurig contends that injunctive or declaratory relief is not warranted because: (i) the 2.0 Brewer with Lock-Out Technology has been discontinued; and (ii) any injunctive relief issued would be against a hypothetical brewer design or impair potential innovation.[431] Mot. at 110-11. Keurig's arguments are entirely inconsistent with market realities. Even after introducing the 2.0 Brewer with its Lock-Out Technology, Keurig's continued aim in brewer development has been preventing Competitive Cups from working (or working the same as K-Cups) in Keurig brewers,[432] and to spread "[c]lear messaging to Partners and customers of [an] innovation evolution," which means Keurig's development of "advanced CBT."[433] PSUF 1353. Conspicuously absent from Keurig's brief is any reference to Keurig's new K-Supreme Plus Smart Brewer with BrewID technology ("Smart Brewer"), launched in July 2021.[434] According to Keurig, the new device contains BrewID technology, which recognizes the specific **Keurig** brand, and unlocks and applies the right brew setting from a library of approximately 900 K-Cup varieties in order to "optimally" brew the recognized *Keurig* K-Cup. If a Competitive Cup is inserted, the

---

[431] Sibley Rpt. ¶¶941-1160.
[432] PSUF 1353, 1611, 1862, 1863, 1864, 1974-75, 1966.
[433] *See* PSUF 1974 (Keurig working in 2016 to "screen out a substantial percentage of unlicensed K-cups" and decrease the share of unlicensed "from 15% to 5%"), 1975 (2016 sensor can perform "more precise taggant signature detection" to "allow discrimination against the majority of non-licensed K-Cups"), 1611 (Keurig telling Kroger in 2016 "[n]o other manufacturer can guarantee compatibility with Keurig's future pod and brewer innovation pipeline."), 1862 (Keurig used its "[i]nnovation pipeline as leverage in future negotiations"), 1863, 1864 (Keurig uses "system sell" "to leverage … access to future brewer innovation; contingent on Keurig manufacturing the retailers private label.").
[434] *See* https://www.keurig.com/content/K-Supreme-Plus-SMART-Coffee-Maker (last visited Oct. 22, 2021).

brewer employs generic brewing parameters which brew at a less than optimal level.[435]

TreeHouse's expert, Dr. Castleman, tested the Smart Brewer and concluded that the brewer's recognition technology requires connecting the Smart Brewer to Keurig's databases over the internet. *See id.*, Appx. B ¶¶5-6. Thus, this new Keurig brewer provides for two-way communication and data collection by Keurig from consumers, thereby providing Keurig with the ability to upload new code or software which could, as the 2.0 Brewer did, lock out Competitive Cups. The Smart Brewer release and its functionality demonstrate that, at minimum, Keurig intends to continue releasing technology that will treat Competitive Cups differently and raises the threat that Keurig will either lock-out Competitive Cups again or use that as a threat to coerce additional exclusionary agreements. *See, e.g.*, *id.* ¶¶16-17; PSUF 1997-2000.

Keurig's continued development of anticompetitive technology together with its past practices show that, absent an injunction, Keurig will continue to either lock out or disadvantage Competitive Cups and continue to use the threat of a lockout, real or not, to coerce customers into believing that consumers must use Keurig products rather than competing on the merits. Injunctive relief prohibiting the use of "lockout technology" in the future is wholly appropriate and required to remedy Keurig's anticompetitive conduct. *See R.C. Bigelow*, 867 F.2d at 107.

## CONCLUSION

For the reasons above, the Court should deny Keurig's motion for summary judgment.

---

[435] Ex. 372 (Suppl. Expert Decl. of Kenneth R. Castleman, Ph.D., dated Aug. 25, 2021, ¶¶ 16-17).

Dated: October 27, 2021
      New York, New York

Respectfully submitted,
WINSTON & STRAWN LLP

By: */s/ Aldo A. Badini*

    Aldo A. Badini
    abadini@winston.com
    Susannah P. Torpey
    storpey@winston.com
    Lauren E. Duxstad
    lduxstad@winston.com
    **WINSTON & STRAWN LLP**
    200 Park Avenue
    New York, NY 10166-4193
    (212) 294-6700
    (212) 294-4700 (fax)

    Dan K. Webb
    dwebb@winston.com
    **WINSTON & STRAWN LLP**
    35 West Wacker Drive
    Chicago, IL 60601-9703
    (312) 558-5600

    Diana L. Hughes
    dhughes@winston.com
    **WINSTON & STRAWN LLP**
    333 South Grand Avenue
    Los Angeles, CA 90071
    (213) 615-1700

    *Counsel for Plaintiffs TreeHouse*
    *Foods, Inc., Bay Valley Foods, LLC*
    *and Sturm Foods, Inc.*

    Daniel Johnson Jr. (CA Bar No. 57409)
    Mario Moore (CA Bar No. 231644)
    Robert G. Litts (CA Bar No. 205984)
    **DAN JOHNSON LAW GROUP, LLP**
    1350 Old Bayshore Highway, Suite 520,
    Burlingame, CA 94010
    (415) 604-4500
    dan@danjohnsonlawgroup.com
    mario@danjohnsonlawgroup.com
    robert@danjohnsonlawgroup.com

    *Counsel for Plaintiff JBR, Inc.*

*(d/b/a Rogers Family Company)*

Alexander G. Brown (*Pro Hac Vice*)
James C. Grant (*Pro Hac Vice*)
Valarie C. Williams (*Pro Hac Vice*)
B. Parker Miller (*Pro Hac Vice*)
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000
(404) 881-7777 (fax)
alex.brown@alston.com
jim.grant@alston.com
valarie.williams@alston.com
parker.miller@alston.com

Steven L. Penaro
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, NY 10016-1387
212-210-9400
212-210-9444 (fax)
steve.penaro@alston.com

*Counsel for Plaintiff McLane Company, Inc.*

Michael M. Buchman
Michelle C. Clerkin
Jacob O. Onile-Ere
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
(212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com
jonileere@motleyrice.com

Robert G. Eisler
Deborah A. Elman
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com

117

delman@gelaw.com

William V. Reiss
David B. Rochelson
Matthew Geyer
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
(212) 980-7400
wreiss@robinskaplan.com
drochelson@robinskaplan.com
mgeyer@robinskaplan.com

*Counsel for Direct Purchaser Plaintiffs*