**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: Keurig Green Mountain Single-Serve Coffee Antitrust Litigation | Case No. 1:14-md-02542 (VSB) MDL No. 2542 |
| *This document concerns all related actions.* | Hon. Vernon S. Broderick **ORAL ARGUMENT REQUESTED** |

**REPLY IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

ARGUMENT ...................................................................................................................... 3

I.   KEURIG'S BRAND COMPETITOR RESTRICTIONS ARE PER SE ILLEGAL ..........3

A.  Keurig's Agreements Are Per Se Illegal Restraints On Interbrand Competition .........3

1.  The Boycott Clause Is Per Se Unlawful ..................................................................6

2.  The Brand Non-Competition Clause Is Per Se Unlawful .......................................8

3.  The Market Allocation Clause Is Per Se Unlawful .................................................9

4.  The Variety Restriction Clause Is Per Se Unlawful ..............................................10

5.  The Agreements And Individual Provisions Are Also Unlawful Under A
    Quick Look Analysis ............................................................................................11

B.  TreeHouse And JBR Have Standing To Challenge The Brand Agreements ...............12

II.  PARTIAL SUMMARY JUDGMENT IS APPROPRIATE FOR PLAINTIFFS'
     SUPPLIER EXCLUSIVE DEALING CLAIM .................................................................13

A.  Keurig Entered Into Exclusive Arrangements With Input Suppliers ..........................13

B.  Keurig Fails to Support Its Purported Procompetitive Justifications ..........................14

1.  Keurig Made Minimal, If Any, Investments Into Compatible Cup Inputs ...........14

2.  Industry Practice Is Not a Legitimate Procompetitive Justification .....................16

C.  Keurig Confirms The Availability of Viable Less Restrictive Alternatives ...............17

III. KEURIG UNLAWFULLY TIES BREWERS AND COMPATIBLE CUPS ...................18

A.  Keurig's KAD And KARD Agreements Violate Section 3 Of The Clayton Act ........19

B.  Proof of Anticompetitive Effects Is Not Required For A Per Se Claim .....................20

C.  Plaintiffs Have Proved Each Element Of A Per Se Tying Claim ...............................21

1.  Keurig Contractually Ties Sales Of K-Cups To AFH Brewers ............................21

2.  Keurig Fails To Counter Plaintiffs' Direct Evidence Of Keurig's Market
    Power ....................................................................................................................22

3.  Keurig Fails To Counter Plaintiffs' Indirect Evidence Of Keurig's Market
    Power ....................................................................................................................24

D. Plaintiffs Have Proved Antitrust Injury ...................................................25

E. Plaintiffs Are Entitled To Partial Summary Judgment On The Fact Of Damages.................................................................................................26

IV. KEURIG IMPLEMENTED 2.0 TECHNOLOGY IN AN UNNECESSARILY RESTRICTIVE WAY AND WITHOUT A PROCOMPETITIVE JUSTIFICATION.....26

A. Keurig Misstates the Law ........................................................................27

B. CBT Was Unnecessarily Restrictive And Lacked Any Procompetitive Justification............................................................................................28

V. KEURIG'S CHALLENGED ADVERTISING WAS LITERALLY FALSE, MATERIAL, AND DAMAGED PLAINTIFFS................................................31

A. Keurig Is Liable For Its Literally False Statements ....................................31

1. Keurig Does Not Defend Its Literally False Incompatibility Statements.............32

2. Keurig Does Not Defend Its Literally False Testing Statements..........................34

3. Keurig Does Not Defend Its Literally False Brewer Performance Statements.........................................................................................35

4. Keurig Does Not Defend Its Literally False Safety Statements ...........................36

B. Keurig's Statements Are Presumed To Have Caused Confusion And Were Material .........................................................................................37

C. Plaintiffs Were Injured By Keurig's Statements .........................................38

D. Plaintiffs Are Entitled To Damages And Injunctive Relief...........................40

VI. UNCLEAN HANDS AND IN PARI DELICTO ARE NOT APPLICABLE DEFENSES....................................................................................42

VII. KEURIG IS JOINTLY AND SEVERALLY LIABLE FOR DAMAGES CAUSED BY ITS CO-CONSPIRATORS' SUPRACOMPETITIVE K-CUP PRICES...45

VIII. KEURIG ADMITS MCLANE HAS DIRECT PURCHASER STANDING.............45

IX. THERE IS NO BASIS TO PRECLUDE THE NON-PARTY DECLARATIONS .........47

A. Keurig Waived Any Argument That The Declarations Are Untimely .......................47

B. Keurig Fails To Meet Its Preclusion Burden ................................................48

C. Plaintiffs' Conduct Was Both Justified And Harmless................................49

CONCLUSION.................................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alexander v. Smith County Sherriff's Office*,
  2020 WL 5225675 (E.D. Tex. July 27, 2020) ........................................................41

*Alvarado v. GC Dealer Servs. Inc.*,
  511 F. Supp. 3d 321 (E.D.N.Y. 2021) .................................................................6

*Alzawahra v. Albany Med. Ctr.*,
  546 Fed. Appx. 53 (2d Cir. 2013).......................................................................48

*Am. Express Travel Related Servs. Co. v. Visa U.S.A.*,
  2005 WL 1515399 (S.D.N.Y. June 23, 2005) ....................................................20

*Amerinet v. Xerox*,
  972 F.2d 1483 (8th Cir. 1992) ............................................................................21

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)..................................................................................4

*Apollo Theater Found., Inc. v. W. Int'l Syndication*,
  2005 WL 1041141 (S.D.N.Y. 2005)..............................................................43, 45

*Apotex Inc. v. Acorda Therapeutics*,
  823 F.3d 51 (2d Cir. 2016)......................................................................31, 35, 38

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985)................................................................................1, 27, 28

*AT&T Corp. v. JMC Telecom, LLC*,
  470 F.3d 525 (3d Cir. 2006)..................................................................................4

*Au New Haven, LLC v. YKK Corp.*,
  2019 WL 1437516 (S.D.N.Y. Mar. 31, 2019) ....................................................38

*Avis Rent A Car Sys. v. Hertz*,
  782 F.2d 381 (2d Cir. 1986)..........................................................................34, 37

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)................................................................................27

*Berman v. Royal Knitting*,
  86 F.R.D. 124 (S.D.N.Y. 1980) ..........................................................................13

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
142 F. Supp. 2d 296 (E.D.N.Y. 2001), *aff'd* 35 F. App'x 29 (2d Cir. 2002)............................4

*Brown v. Eli Lilly & Co.*,
654 F.3d 347 (2d Cir. 2011)........................................................................27, 30

*Burndy Corp. v. Teledyne Indus.*,
748 F.2d 767 (2d Cir. 1984)....................................................................41

*In re Buspirone Patent & Antitrust Litig.*,
210 F.R.D. 43 (S.D.N.Y. 2002) ............................................................46

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999)...........................................................................11

*Cal. v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011) ..............................................................28

*Calpetco 1981 v. Marshall Expl., Inc.*,
989 F.2d 1408 (5th Cir. 1993) ..............................................................28

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993).............................................................22, 25

*Castrol Inc. v. Pennzoil Co.*,
987 F.2d 939 (3d Cir. 1993)............................................................36, 38

*Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*,
2018 WL 3618243 (S.D. Cal. July 30, 2018) ..........................................44

*Chanel, Inc. v. RealReal, Inc.*,
449 F. Supp. 3d 422 (S.D.N.Y. 2020)....................................................33

*Charych v. Siriusware, Inc.*,
790 F. App'x 299 (2d Cir. 2019) ..........................................................20

*Chevron v. Donziger*,
2013 WL 4045326 (S.D.N.Y. Aug. 9, 2013) ............................................6

*Coca-Cola Co. v. Tropicana Prods., Inc.*,
690 F.2d 312 (2d Cir. 1982)................................................................43

*Colon v. N.Y. City Hous. Auth.*,
2019 WL 4291667 (S.D.N.Y. Sept. 11, 2019)..........................................28

*Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*,
40 F. Supp. 2d 109 (E.D.N.Y.1999) ......................................................25

*Copy-Data Sys. Inc. v. Toshiba Am., Inc.*,
  663 F.2d 405 (2d Cir. 1981)......................................................................................4, 8

*Cowley v. Braden Indus.*,
  613 F.2d 751 (9th Cir. 1980) ........................................................................................4

*In re Crude Oil Commodity Futures Litig.*,
  913 F. Supp. 2d 41 (S.D.N.Y. 2012)...........................................................................22

*D'Iorio v. Winebow, Inc.*,
  68 F. Supp. 3d 334 (E.D.N.Y. 2014) .............................................................................4

*Davis v. Avvo, Inc.*,
  345 F. Supp. 3d 534 (S.D.N.Y. 2018)..........................................................................34

*De Jesus v. Sears, Roebuck & Co., Inc.*,
  87 F.3d 65 (2d Cir. 1996) ............................................................................................20

*Dependable Sales & Serv. v. TrueCar, Inc.*,
  394 F. Supp. 3d 368 (S.D.N.Y. 2019)..........................................................................39

*Dextone Co. v. Bldg. Trades Council*,
  60 F.2d 47 (2d Cir. 1932) ............................................................................................45

*Dress for Success Worldwide v. Dress 4 Success*,
  589 F. Supp. 2d 351 (S.D.N.Y. 2008)..........................................................................45

*Dupry v. Gehrig*,
  2009 WL 2579055 (W.D. La. Aug. 20, 2009)..............................................................41

*Eastman Kodak Co. v. Image Tech. Servs.*,
  504 U.S. 451 (1992)...................................................................................................9, 28

*Ebewo v. Martinez*,
  309 F. Supp. 2d 600 (S.D.N.Y. 2004)..........................................................................49

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) .............................................................46

*In re Elec. Books Antitrust Litig.*,
  859 F. Supp. 2d 671 (S.D.N.Y. 2012)............................................................................5

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods. Inc.*,
  129 F.3d 240 (2d Cir. 1997).........................................................................................4

*In re Eur. Rail Pass Antitrust Litig.*,
  166 F. Supp. 2d 836 (S.D.N.Y. 2001)..........................................................................25

*Fashion Originators' Guild of Am., Inc. v. Fed. Trade Comm'n*,
312 U.S. 457 (1941) ........................................................................6, 7, 20, 23

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
394 U.S. 495 (1969) ................................................................................23, 24

*Freeland v. AT&T Corp.*,
238 F.R.D. 136 (S.D.N.Y. 2006) ....................................................................24

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) ..........................................................................6

*FTC v. Actavis, Inc.*,
570 U.S. 136 (2013) ........................................................................................5, 28

*FTC v. H.J. Heinz Co.*,
246 F.3d 708 (D.C. Cir. 2001) ........................................................................28

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020) ..........................................................................27

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013) ......................................................................12, 42

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
810 F.2d 795 (8th Cir. 1987) ............................................................................9

*Gen. Leaseways v. Nat'l Truck Leasing Ass'n*,
830 F.2d 716 (7th Cir. 1987) ..........................................................................42

*Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*,
386 F.3d 485 (2d Cir. 2004) ..........................................................................22

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
82 F. Supp. 2d 126 (S.D.N.Y. 1999) ..............................................................43

*In re Glumetza Antitrust Litig.*,
2020 WL 3498067 (N.D. Cal. June 29, 2020), *motion for relief from judgment
denied*, 2020 WL 4362247 (N.D. Cal. July 22, 2020) ....................................46

*In re Glumetza Antitrust Litig.*,
2021 WL 3773621 (N.D. Cal. Aug. 25, 2021) ................................................46

*Green v. Kadilac Mortg. Bankers, Ltd.*,
936 F. Supp. 108 (S.D.N.Y. 1996) ....................................................................4

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ................................................................................46, 47

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)............................................................................46, 47

*Illinois Tool Works Inc. v. Independent Ink*,
   547 U.S. 28 (2006)....................................................................................21

*In re Impax Labs.*,
   2019 WL 1552939 (F.T.C. Mar. 28, 2019).................................................28

*Impax Labs., Inc. v. F.T.C.*,
   994 F.3d 484 (5th Cir. 2021) (cert. denied) ...............................................5

*It's My Party v. Live Nation*,
   811 F.3d 676 (4th Cir. 2016) ..............................................................21, 22

*Jackson v. Fed. Exp.*,
   766 F.3d 189 (2d Cir. 2014)........................................................................6

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)...................................................................................8, 20

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
   77 F. Supp. 2d 446 (S.D.N.Y. 1999)..........................................................49

*Joyce Beverages of N.Y. v. Royal Crown Cola Co.*,
   555 F. Supp. 271 (S.D.N.Y. 1983)...............................................................8

*Klor's v. Broadway-Hale Stores*,
   359 U.S. 207 (1959).....................................................................................7

*Kovaco v. Rockbestos-Surprenant Cable Corp.*,
   834 F.3d 128 (2d Cir. 2016)........................................................................6

*Laugh Factory v. Basciano*,
   608 F. Supp. 2d 549 (S.D.N.Y. 2009)........................................................43

*Laumann v. NHL*,
   907 F. Supp. 2d 465 (S.D.N.Y. 2012)........................................................45

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
   551 U.S. 877 (2007).....................................................................................5

*Lima v. Hatsuhana of USA*,
   2014 WL 177412 (S.D.N.Y. Jan. 16, 2014) ................................................5

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
   791 F.2d 1356 (9th Cir.1993) ...................................................................46

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)......................................................................5, 8, 27

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
  287 F. Supp. 2d 355 (S.D.N.Y. 2003)..................................................................34

*Markel v. Scovill Mfg. Co.*,
  471 F. Supp. 1244 (W.D.N.Y. 1979)....................................................................43

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) ............................................................................25

*Meadowbrook-Richman, Inc. v. Assoc. Fin. Corp.*,
  253 F. Supp. 666 (S.D.N.Y. 2003)......................................................................48

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247 (2d Cir. 2014)..........................................................................37, 38

*Merck Eprova AG v. Gnosis S.p.A.*,
  901 F. Supp. 2d 436 (S.D.N.Y. 2012)..................................................................37

*Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*,
  208 F.3d 655 (8th Cir. 2000) ..................................................................................7

*Motorola Credit Corp. v. Uzan*,
  561 F.3d 123 (2d Cir. 2009)..................................................................................43

*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958)............................................................................................21, 23

*N. Tex Specialty Physicians v. FTC*,
  528 F.3d 346 (5th Cir. 2008) ................................................................................28

*In re Namenda Direct Purchaser Antitrust Litig.*,
  2017 WL 2693713 (S.D.N.Y. June 21, 2017) ......................................................46

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)..............................................................................................8, 16

*In re NCAA Student-Athlete Name & Likeness Licensing Litig.*,
  37 F. Supp. 3d 1126 (N.D. Cal. 2014) ..................................................................13

*Neshewat v. Salem*,
  365 F. Supp. 2d 508 (S.D.N.Y. 2005)....................................................................4

*Netherlands Ins. Co. v. Selective Ins. Co. of Am.*,
  2016 WL 866348 (S.D.N.Y. Mar. 3, 2016) ............................................................6

*New Hampshire v. Maine*,
532 U.S. 742 (2001)................................................................................9

*New York v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015)..........................................................15, 28

*New York v. Hendrickson Brothers, Inc.*,
840 F.2d 1065 (2d Cir. 1988).............................................................46

*New York v. Julius Nasso Concrete Corp.*,
202 F.3d 82 (2d Cir. 2000)...................................................................26

*Nike, Inc. v. Rubber Mfrs. Ass'n*,
509 F. Supp. 919 (S.D.N.Y. 1981).....................................................43

*Nixon v. TWC Admin. LLC*,
2019 WL 1428348 (S.D.N.Y. Mar. 29, 2019) ...................................49

*Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*,
670 F. Supp. 1313 (D. Md. 1986)........................................................21

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
472 U.S. 284 (1985)................................................................................7

*NYNEX Corp. v. Discon*,
525 U.S. 128 (1998)................................................................................7

*Optigen, LLC v. Int'l Genetics, Inc.*,
877 F. Supp. 2d 33 (N.D.N.Y. 2012)...................................................37

*Palmer v. BRG of Georgia*,
498 U.S. 46 (1990)..................................................................................9

*Paper Sys. v. Nippon Paper Indus. Co.*,
281 F.3d 629 (7th Cir. 2002) ...............................................................45

*Parkhurst v. Pittsburgh Paints, Inc.*,
2006 WL 8430945 (D. Wyo. May 17, 2016).......................................41

*Patsy's Italian Rest., Inc. v. Banas*,
575 F. Supp. 2d 427 (E.D.N.Y. 2008) ................................................43

*Patterson v. Balsamico*,
440 F.3d 104 (2d Cir. 2006).................................................................49

*Perma Life Mufflers v. Int'l Parts Corp.*,
392 U.S. 134 (1968)........................................................................42, 43

*Peterson v. Pan Am Railways, Inc.*,
  2015 WL 2451227 (N.D.N.Y. May 21, 2015) .......................................................49

*Playtex Prod., LLC v. Munchkin, Inc.*,
  2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) .......................................................37

*In re Polygram Holding, Inc.*,
  2003 WL 25797195 (F.T.C. Jul. 24, 2003) ..........................................................5

*POM Wonderful LLC v. Coca Cola Co.*,
  166 F. Supp. 3d 1085 (C.D. Cal. 2016) ..............................................................43

*PPX v. Audiofidelity*,
  818 F.2d 266 (2d Cir. 1987) ..............................................................................37

*Radiant Burners v. Peoples Gas*,
  364 U.S. 656 (1961) ..........................................................................................7

*Rasmussen v. City of New York*,
  766 F. Supp. 2d 399 (E.D.N.Y. 2011) ...............................................................13

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
  899 F.2d 951 (10th Cir. 1990) ..........................................................................25

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................................24

*Republic of Iraq v. ABB AG*,
  768 F.3d 145 (2d Cir. 2014) .........................................................................42, 43

*Retina Assocs., P.A. v. S. Baptist Hosp.*,
  105 F.3d 1376 (11th Cir. 1997) ........................................................................12

*Rexall Sundown, Inc. v. Perrigo Co.*,
  651 F. Supp. 2d 9 (E.D.N.Y. 2009) ...................................................................38

*Reyes-Herrera v. Flaitz*,
  2021 WL 1929176 (W.D.N.Y. May 13, 2021) ......................................................4

*River Light V, L.P. v. Lin & J Int'l., Inc.*,
  2015 WL 3916271 (S.D.N.Y. June 25, 2015) ......................................................41

*Rivera v. United Parcel Serv.*,
  325 F.R.D. 542 (S.D.N.Y. 2018) ...................................................................48, 50

*Rizzo v. Amerada Hess Corp.*,
  26 F. App'x 51 (2d Cir. 2001) ..........................................................................32

*Roland Mach. v. Dresser Indus., Inc.*,
 749 F.2d 380 (7th Cir. 1984) ............................................................8

*Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*,
 349 F. Supp. 2d 389 (N.D.N.Y. 2004) ............................................11, 15

*Rossi v. Standard Roofing, Inc.*,
 156 F.3d 452 (3d Cir. 1998).............................................................8

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
 792 F.2d 210 (D.C. Cir. 1986) .........................................................5

*Ryko Mfg. Co. v. Eden Services*,
 823 F.2d 1215 (8th Cir. 1987) ..........................................................8

*Salon FAD v. L'Oreal USA, Inc.*,
 2011 WL 70591 (S.D.N.Y. Jan. 10, 2011) .......................................38

*Sargent Mfg. Co. v. Cal-Royal Prods.*,
 2012 WL 3101691 (D. Conn. July 27, 2012) ..................................4

*Savory Pie Guy, LLC v. Comtec Indus., Ltd.*,
 2016 WL 7471340 (S.D.N.Y. Dec. 28, 2016) ..................................22

*SEC v. Credit Bancorp, Ltd.*,
 738 F. Supp. 2d 376 (S.D.N.Y. 2010)..............................................32

*In re Sept. 11th Liab. Ins. Coverage Cases*,
 243 F.R.D. 114 (S.D.N.Y. 2007) ....................................................48

*Shop & Save Food Mkts. v. Pneumo Corp.*,
 683 F.2d 27 (2d Cir. 1982)...............................................................21

*Siderpali, S.P.A. v. Judal Indus.*,
 833 F. Supp. 1023 (S.D.N.Y. 1993)..................................................4

*New York ex rel. Spitzer v. Saint Francis Hosp.*,
 94 F. Supp. 2d 399 (S.D.N.Y. 2000).............................................6, 9

*Standard Fashion Co. v. Magrane-Houston Co.*,
 258 U.S. 346 (1922).........................................................................19

*Standard Oil Co. of Cal. v. U.S.*,
 337 U.S. 293 (1949).........................................................................19

*State v. Cedar Park Concrete Corp.*,
 1997 WL 306909 (S.D.N.Y. Mar. 21, 1997) ..................................26

*Strougo v. Bea Assocs.*,
    188 F. Supp. 2d 373 (S.D.N.Y. 2002) ...................................................48

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2017) .............................................................44

*In re Sulfuric Acid Antitrust Litig.*,
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ....................................................5

*Sullivan v. NFL*,
    34 F.3d 1091 (1st Cir. 1994) .............................................................42

*Summit Health v. Pinhas*,
    500 U.S. 322 (1991) ....................................................................6, 9

*Tex. Indus. v. Radcliff Materials*,
    451 U.S. 630 (1981) .....................................................................45

*Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*,
    160 Cal. App. 4th 528 (2008) ...........................................................44

*Times-Picayune Publ'g Co. v. United States*,
    345 U.S. 594 (3d Cir. 2005) .............................................................20

*Tolbert v. Queens Coll.*,
    242 F.3d 58 (2d Cir. 2001) ...............................................................5

*Trendsettah USA, Inc. v. Swisher Int'l Inc.*,
    2016 WL 6822191 (C.D. Cal. Jan. 21, 2016) .............................................25

*Turbon Int'l, Inc. v. Hewlett-Packard Co.*,
    769 F. Supp. 2d 262 (S.D.N.Y. 2011) ..........................................33, 34, 44

*U.S. Healthcare v. Healthsource*,
    986 F.2d 589 (1st Cir. 1993) ..............................................................7

*U.S. v. Addyston Pipe & Steel Co.*,
    85 F. 271 (6th Cir. 1898) .................................................................5

*U.S. v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015) ..........................................................11, 14

*U.S. v. Dentsply*,
    399 F.3d 181 (3d Cir. 2005) ..............................................................7

*U.S. v. Gen. Motors Corp.*,
    384 U.S. 127 (1965) ....................................................................6, 7

*U.S. v. Joyce*,
   895 F.3d 783 (9th Cir. 2018) ...........................................................................................8

*U.S. v. Koppers Co.*,
   652 F.2d 290 (2d Cir. 1981)...........................................................................................5

*U.S. v. McKesson & Robbins*,
   351 U.S. 305 (1956) .......................................................................................................5

*U.S. v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ...............................................................................24, 28

*U.S. v. Realty Multi-List, Inc.*,
   629 F.2d 1351 (5th Cir. 1980) .......................................................................................5

*U.S. v. Visa U.S.A., Inc.*,
   344 F.3d 229 (2d Cir. 2003)....................................................................................6, 14

*United Shoe Mach. Corp. v. U.S.*,
   258 U.S. 451 (1922)......................................................................................................20

*US Airways, Inc. v. Sabre Holdings Corp.*,
   2016 WL 11751936 (S.D.N.Y. July 21, 2016) ............................................................46

*VBS Distrib. v. Nutrivita Labs., Inc.*,
   811 F. App'x 1005 (9th Cir. 2020) ..............................................................................39

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
   956 F.2d 1245 (2d Cir. 1992).........................................................................................3

*In re Visa Check/Mastermoney Antitrust Litig.*,
   2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ........................................................21, 24

*Walker v. City of Walker*,
   2018 WL 1686102 (E.D.N.Y. Mar. 30, 2018) ...............................................................4

*Walls v. City of New York*,
   2021 WL 1812634 (E.D.N.Y. May 6, 2021) .................................................................4

*Yentsch v. Texaco*,
   630 F.2d 46 (2d Cir. 1980)...........................................................................................20

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)...................................................................................13, 14

**Statutes**

15 U.S.C.A. § 14 (1951) ......................................................................................................19

Cal. Bus. & Prof. Code § 17200 .................................................................................44

**Other Authorities**

1 Charles E. McKenney & George F. Long III, Federal Unfair Competition:
Lanham Act 43(a) § 10:10 ...............................................................................41

Alex Moyer, *Throwing Out the Playbook: Replacing the NCAA's Anticompetitive
Amateurism Regime with the Olympic Model*, 83 Geo. Wash. L. Rev. 761
(2015)................................................................................................................29

*The Assertion of the In Pari Delicto Defense Against a Lawbreaking Plaintiff and
Innocent Successors*, 44 HOFSTRA L. REV. 781 (2016) ........................................42

David Grenardo, *The Blue Devils in the Details: How a Free Market Approach to
Compensating College Athletes Would Work*, 46 Pepp. L. Rev. 203 (2019) ...................28, 29

Fed. R. Civ. P 26..............................................................................................................47

Fed. R. Civ. P 37(a)(1).....................................................................................................49

*Manufacturer-imposed Requirements*, FTC, https://www.ftc.gov/tips-
advice/competition-guidance/guide-antitrust-laws/dealings-supply-
chain/manufacturer-imposed...............................................................................5

Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law §19.04
(4th Edition, 2022-1 Supp. 2011) ........................................................................6

Plaintiffs are entitled to summary judgment on the claims and issues set forth in their Motion. Keurig's Opposition ignores the law of the case, the record, and the actual issues at hand. Keurig makes the same legal arguments this Court already rejected in holding that:

- Keurig's restrictions on Brand Competitors are horizontal (*see* MTD Order at 244; §I);

- A monopolist's anticompetitive and exclusionary conduct is governed by the Supreme Court *Aspen Skiing* standard (MTD Order at 228-31; §IV);

- The test for an exclusive dealing claim is substantial foreclosure, not *total* foreclosure (MTD Order at 236); and

- Competitor Plaintiffs have standing, even if sales increased (MTD Order at 235-236; §V).

Keurig also ignores the evidence. For example, while Keurig accuses Plaintiffs of ignoring relevant "context" for Keurig's literally false statements, it is Keurig that fails to dispute their falsity. *See infra* §V. Keurig also ignores the admissions of its own executives, including testimony from its former President, that Keurig's restrictions on Brand Competitors enabled Keurig to block commercialization of competitive products. PSUF 82, 1827; PMSJ at 20; *infra* §I.

Once Keurig's diversions are set aside, it is clear that Plaintiffs' Motion should be granted based on Keurig's admissions or failure to dispute the material facts:

- Keurig's agreements with its Brand Competitors are per se illegal based on Keurig's admissions that it ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

- Keurig's exclusive dealing agreements with its input suppliers are illegal on the undisputed facts: ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[REDACTED]

- Keurig's KAD and KARD agreements covering the AFH Market contain tying provisions that are per se unlawful on their face under both the Clayton and Sherman Acts on the undisputed facts that: [REDACTED]

- Keurig engaged in exclusionary conduct by implementing the lock-out CBT "feature" in its 2.0 Brewer. The undisputed evidence shows that [REDACTED].

- Keurig fails to defend its literally false advertising: [REDACTED]

- With respect to McLane, Keurig admits that McLane has standing as a direct purchaser.

Accordingly, for the reasons as set forth in Plaintiffs' Motion and further below, Plaintiffs' Motion should be granted.

# ARGUMENT

## I.  KEURIG'S BRAND COMPETITOR RESTRICTIONS ARE PER SE ILLEGAL



Keurig admits it entered into more than ███ agreements with direct competitors.[1] Keurig also admits that these Brand Competitors agreed with Keurig not to ███████████████████ ███████████████████████████.[2] In addition to (1) prohibiting Brand Competitors from ███████████████████████████████████████████████████████████████████, the challenged restrictions *further* prohibit Brand Competitors from: (2) ███████████████████████ ███████████████████████████; (3) ████████████████████████████████████ ████████████████████████████████; and (4) making competitive products ████████████████████████████████████████████████. PMSJ at 6-7, 13-17. Keurig does not dispute that these terms are in its agreements.[3] Separately and together, these restrictions are facially anticompetitive horizontal restraints of trade that are illegal per se. PMSJ at 5-25. They have enabled Keurig to maintain its control and dominance over Compatible Cups and SSBs.[4] Keurig has failed to raise a genuine issue of fact to show that the challenged restraints were reasonably necessary to achieve—and thus "ancillary" to—a legitimate, procompetitive objective. Indeed, ████████████████████████████████████████████████ ████████████████████████████████████████. PSUF 1044, 1137.

### A.  Keurig's Agreements Are Per Se Illegal Restraints On Interbrand Competition

Keurig seeks to repackage the Brand Competitor restraints as vertical, dual-distribution agreements. Opp'n at 13. But this Court already rejected that argument.[5] After reviewing the *actual*

---

[1] Resp. to PSUF 14, 15, 27. Resp. to PSUF refers to ECF No. 1569. Resp. to KSUF refers to ECF Nos. 1568.

[2] *Id*. at 29; PMSJ at 5-6, 11-13. PMSJ refers to ECF No. 1495. PSJO refers to ECF No. 1564.

[3] Resp. to PSUF 27, 35, 36, 38, 46, 48, 49, 52, 58.

[4] *Id*.; PSUF 62, 64-67, 1044, 1137. Capitalized terms have the same meaning as in Plaintiffs' Motion. Citations to "Ex." are to Badini Declaration Exhibits of ECF No. 1497, ECF No. 1565, and accompanying this filing.

[5] Rearguing previously decided legal issues is sanctionable conduct. *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1254-55 (2d Cir. 1992) (upholding sanctions for resubmitting the same arguments for dispositive

*contractual restrictions* at issue (which were incorporated by reference, quoted in, and attached to the Amended Complaint), the Court held that the agreements are horizontal because they "are directly related to the competitive landscape in the Compatible Cup and [SSB] Markets." MTD Order at 244.[6] This legal conclusion is now the law of the case.[7]

The Second Circuit law on which Keurig relies has already been properly distinguished by this Court.[8] Dual-distribution is where "the manufacturer distributes *its* products through a distributor and independently" such that the agreement "involves *one* manufacturer's product" and "the way *one product* is distributed, a question of *intrabrand* competition." *Elecs. Commc'ns*, 129 F.3d at 244 (emphasis added).[9] Keurig's agreements are not vertical dual-distribution agreements involving *Keurig's own products*, such as Green Mountain K-Cups; they restrict how Keurig's *admitted competitors* make and sell their *competing products*. Keurig cites no intervening law to justify a departure from the Court's ruling, and "labeling an agreement a vertical arrangement will

---

judgment); *Neshewat v. Salem*, 365 F. Supp. 2d 508, 528 (S.D.N.Y. 2005) (imposing sanctions for rearguing same issues); *Green v. Kadilac Mortg. Bankers, Ltd.*, 936 F. Supp. 108, 118 (S.D.N.Y. 1996) (same); *Siderpali, S.P.A. v. Judal Indus.*, 833 F. Supp. 1023, 1029, 1036 (S.D.N.Y. 1993) (same).

[6] *See also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012); PSJO at 63-65. *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, on which Keurig relies, explains that if the parties "are seen as competitors on the same level of the market, this agreement would be viewed as a horizontal agreement … something that would constitute a per se violation of §1." 142 F. Supp. 2d 296, 301 (E.D.N.Y. 2001), *aff'd* 35 F. App'x 29 (2d Cir. 2002).

[7] Because the Court based its ruling on the actual agreements, Keurig's distinction between pre-discovery and post-discovery motions is inapt. Opp'n at 7-8 & n.9; *Reyes-Herrera v. Flaitz*, 2021 WL 1929176, at *9 (W.D.N.Y. May 13, 2021) ("When a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.") (citations and quotations omitted); *see also D'Iorio v. Winebow, Inc.*, 68 F. Supp. 3d 334, 359 (E.D.N.Y. 2014) (the law of the case doctrine "counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons"). If Keurig believed this ruling was in error, it could have moved for reconsideration but it did not and has waived its ability to relitigate this issue. *Walls v. City of New York*, 2021 WL 1812634, at *24 (E.D.N.Y. May 6, 2021) ("Defendants did not seek reconsideration … and it is the law of the case"); *see also Sargent Mfg. Co. v. Cal-Royal Prods.*, 2012 WL 3101691, at *5 (D. Conn. July 27, 2012); *Walker v. City of Walker*, 2018 WL 1686102, at *3 (E.D.N.Y. Mar. 30, 2018).

[8] MTD Order at 243-44 (distinguishing *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods. Inc.*, 129 F.3d 240, 243-44 (2d Cir. 1997)).

[9] *See also Copy-Data Sys. Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 411 (2d Cir. 1981) (supplier of *Toshiba* copiers set distribution area for *Toshiba's* machines); *Beyer Farms, Inc*, 142 F. Supp. 2d at 302 ("an agreement not to compete between a manufacturer and *one of its distributors* is judged by the rule of reason") (emphasis added); *Cowley v. Braden Indus.*, 613 F.2d 751, 754 (9th Cir. 1980) (applying rule of reason to a policy imposed by the manufacturer of *Aeromotor* windmills on its distributors relating to sales of only one product, *Aeromotor* windmills); *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006) (noting "the relationship was primarily vertical" and describing a dual-distribution arrangement as one between a "distributor and a manufacturer"); PSJO at 64-65; PMSJ 5-8, 11.

not save it from antitrust scrutiny when there is evidence of anticompetitive horizontal effects."[10] No agreement in Keurig's cases contains anything close to the aggregation of restraints here, which Keurig executives and documents have confirmed were added for anticompetitive purposes.[11]

Even if Keurig's arrangements with Brand Competitors could properly be considered dual-distribution agreements, that would not immunize the provisions at issue from per se condemnation because the "specific restraint[s] at issue" must still be assessed. *FTC v. Actavis, Inc.*, 570 U.S. 136, 153-54 (2013) (citation omitted) (scrutinizing the reverse payment, not the settlement agreement overall). A facially restrictive provision that "exceeds the necessity presented by the main purpose of the contract" is a naked restraint on trade. *U.S. v. Addyston Pipe & Steel Co.*, 85 F. 271, 282-83 (6th Cir. 1898).[12] Keurig has failed to present any evidence that the clauses are reasonably necessary to achieve any legitimate, procompetitive objective, much less one that could not be achieved through less restrictive means.[13] Indeed, Keurig has not restrained *its own* ability

---

[10] *Manufacturer-imposed Requirements*, FTC, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/dealings-supply-chain/manufacturer-imposed; *see, e.g., In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 685-86 (S.D.N.Y. 2012); Competitor Collaboration Guidelines at 13 ("nature of the conduct, not its designation, is determinative"); *see also U.S. v. McKesson & Robbins*, 351 U.S. 305, 313 (1956) ("crucial inquiry is whether the [ ] parties compete"); *U.S. v. Koppers Co.*, 652 F.2d 290, 294-97 (2d Cir. 1981).

[11] *See* PSUF 82; PMSJ at 17-18. Keurig's admitted goal ███████████████████████████████████████████████████████████. PSUF 65-67, 89, 1189; *see also Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) (cartel "that decreases output or reduces competition in order to increase price [is] per se unlawful"); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 869 (N.D. Ill. 2010) (same).

[12] *See, e.g., Impax Labs., Inc. v. F.T.C.*, 994 F.3d 484, 493 (5th Cir. 2021) (cert. denied); PMSJ at 42. A defendant has the burden to prove that the *specific* restraint is "merely ancillary to the main purpose of a lawful contract" such that it is "reasonably necessary to the accomplishment of the legitimate goals and narrowly tailored to that end." *U.S. v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1375 & n.49 (5th Cir. 1980); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227-28 (D.C. Cir. 1986); *In re Polygram Holding, Inc.*, 2003 WL 25797195, at *23 (F.T.C. Jul. 24, 2003); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 338-40 (2d Cir. 2008).

[13] Keurig fails to present evidence that it could not achieve its purported procompetitive purpose through a less restrictive means and has thus waived any such argument, as Keurig itself admits. Opp'n at 48 (citing *Lima v. Hatsuhana of USA*, 2014 WL 177412, at *1 (S.D.N.Y. Jan. 16, 2014) ("issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Tolbert v. Queens Coll.*, 242 F.3d 58, 76 (2d Cir. 2001) ("defendants' single perfunctory sentence … does not properly present the … issue for review [and] has thus been waived")); *see also* PMSJ at 42; PSJO at 63 & n.246. For instance, Keurig admits that the Brand Non-Competition Clause could have been rewritten to allow participation in "brewing systems that competed with the Keurig system." Opp'n at 36. Keurig also admittedly could—but did not—impose minimum order quantities to ensure that any business was sufficiently profitable to pursue without restricting Competitor Brands. Opp'n at 11.

to choose for *itself* how many SKUs or contract manufacturers *it* can have, demonstrating that any such restriction it places on competitors is not reasonably necessary to achieve any legitimate procompetitive objective. *U.S. v. Visa U.S.A., Inc.*, 344 F.3d 229, 243 (2d Cir. 2003) (finding no procompetitive justification where defendants were not under the same restrictions). Each clause thus must be evaluated apart from any vertical manufacturing elements and should be summarily struck down as per se unlawful. PMSJ at 17-18 n.12, 22-23; *see also* PSJO at 64-65.

### 1. The Boycott Clause Is Per Se Unlawful

Keurig's agreements contained a Boycott Clause that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. PMSJ at 11-13. Keurig does not even attempt to argue that the Boycott Clause serves any procompetitive purpose. Nor could it, given Keurig's President's admission (ignored by Keurig) that the goal of the Boycott Clause was "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." PSUF 82, 1827.[14] Keurig has thus waived any argument that the clause is reasonably necessary to achieve any legitimate, procompetitive objective.[15]

Nor can Keurig's more than ▓▓ agreements with its direct competitors, boycotting Competitive Cup manufacturers that Keurig admits produced lower priced cups,[16] reasonably be



---

[14] Keurig has admitted that it sought ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ to cement its hold over the market, stating that its intent was to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." PSUF 1926 (emphasis added). Courts have struck down such facially anticompetitive horizontal restraints on competition. *See, e.g.*, *Summit Health v. Pinhas*, 500 U.S. 322, 330 (1991) (unlawful purpose establishes liability); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 416-18 (S.D.N.Y. 2000) (rejecting defendants' arguments that agreements were ancillary and applying per se rule to grant summary judgment for plaintiffs on liability); *see also Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1151, 1154 (9th Cir. 2003) (challenged restraint not reasonably ancillary" to the proffered procompetitive purpose); Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law §19.04 (4th Edition, 2022-1 Supp. 2011) ("Once a restraint is classified as "naked," condemnation follows almost as a matter of course").

[15] *See Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (partial opposition implies abandonment of defenses); *Netherlands Ins. Co. v. Selective Ins. Co. of Am.*, 2016 WL 866348, at *7 (S.D.N.Y. Mar. 3, 2016) (defendant abandoned arguments it failed to address in its response); *Alvarado v. GC Dealer Servs. Inc.*, 511 F. Supp. 3d 321, 362–63 (E.D.N.Y. 2021) (failure to address argument in summary judgment opposition results in abandonment); *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 144 (2d Cir. 2016) (same); *Chevron v. Donziger*, 2013 WL 4045326, at *1 n.3 (S.D.N.Y. Aug. 9, 2013) ("[Plaintiff] has waived this argument by failing to develop it.").

[16] *See* Resp. to PSUF 96; *cf. U.S. v. Gen. Motors Corp.*, 384 U.S. 127 (1965) (group boycott of discounters was per se illegal); *Fashion Originators' Guild of Am., Inc. v. Fed. Trade Comm'n*, 312 U.S. 457 (1941) ("*FOGA*") (same).

compared to vertical agreements with customers,[17] particularly where Keurig made clear to Brand Competitors that the Boycott Clause was non-negotiable.[18] Courts routinely condemn such collective efforts to "deny relationships the competitors need in the competitive struggle." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985); PMSJ at 11. Keurig's brand agreements ███████████████████████████████████████ ██████████████ PMSJ at 11-13. Keurig has admitted as much. PSUF 100 █████████ ████████████████████████████████████████████████████████████████ ███████████████ Keurig erroneously asserts that TreeHouse and JBR chose not to pursue brand partnerships. Opp'n at 18. Yet undisputed evidence establishes that TreeHouse *did* pursue co-manufacturing relationships with brands but was denied access because of Keurig's agreements. PSJO at 58-59 & n.234; PSUF 1308-1312.[19] In any event, the degree of success that TreeHouse had entering into co-manufacturing agreements is not a defense to a per se claim assessed on the face of Keurig's contracts.[20]

Keurig likewise cannot defend its per se unlawful Group Boycott Clause on the basis that "overall output" expanded. Opp'n at 12. This flouts the Court's prior holding, *see* PSJO at 47-48,

---

[17] Keurig cites only inapposite and out-of-circuit case law—in contrast to Plaintiffs' binding Supreme Court precedent, *see* PMSJ at 11-12, to argue that Plaintiffs' position would transform every agreement by a distributor with a manufacturer to carry only that manufacturer's brand into an illegal group boycott of other manufacturers. Opp'n at 16. But this ignores that Keurig's agreements are with its direct competitors. *See supra* §I.A. *U.S. Healthcare v. Healthsource* involved a purely vertical agreement that did not prohibit providers from partnering with other insurers. 986 F.2d 589, 592, 594 (1st Cir. 1993). Similarly, there was no boycott in *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.* because neither party "stopped dealing with nurse anesthetists." 208 F.3d 655, 659 (8th Cir. 2000).

[18] PSJO at 66-67, n. 257; PSUF 1394, 1396-1410. Keurig asserts that *Klor's v. Broadway-Hale Stores*, 359 U.S. 207, 209 (1959), *FOGA*, 312 U.S. at 461, and *Gen. Motors*, 384 U.S. 127, do not apply as there is no horizontal agreement among the partner brands. Opp'n at 17, n. 18. But *each* agreement between *Keurig* and *each brand* is horizontal and this also ignores evidence of agreements among the brands as well. *See* PSJO at 67-68; PSUF 1395, 1749, 1751. The Boycott Clause prohibits Brand Competitors from ████████████████████████████████████████████ . PMSJ at 12-13. This case is distinguishable from *NYNEX Corp. v. Discon*, 525 U.S. 128 (1998) for the same reason.

[19] Even where TreeHouse initially succeeded in entering into agreements with brands, Keurig cut those relationships short. PSUF 1288-1312; *see also* PSJO at 59.

[20] *U.S. v. Dentsply*, 399 F.3d 181, 189 (3d Cir. 2005) ("apparent lack of aggressiveness by competitors is not a matter of apathy, but a reflection of the effectiveness of [defendant's] exclusionary policy"). Keurig's attempt to distinguish *Radiant Burners v. Peoples Gas*, 364 U.S. 656 (1961) because Plaintiffs "have been able to compete," Opp'n at 19, fails for this reason.

and is also irrelevant: *as Keurig's expert admits*, Ex. 1292 (Murphy Tr. 520:7-12), the proper

comparison is to the but-for world where, absent Keurig's restrictions, overall output would have

increased further still. PSJO at 32-35.[21] Keurig's argument is also irrelevant because Plaintiffs do

not have to prove actual anticompetitive effects to invalidate a per se unlawful provision such as

the Group Boycott clause.[22]

### 2. *The Brand Non-Competition Clause Is Per Se Unlawful*

Keurig once again seeks to defend its Brand Non-Competition Clause with admitted

competitors as mere vertical exclusive dealing agreements, such as those with distributors.[23] But

as made clear from *Keurig's* characterization in its *own* agreements,[24] these "Non-Competition"

provisions work just as their name suggests they were intended—to restrain Brand Competitors'

ability to compete with Keurig by ██████████████████████████████████████████,

thereby restraining competition and brewer output. PMSJ at 16-17.[25] Brand Non-Competition

---

[21] Keurig ignores the various products that were terminated as a result of the Boycott Clause. *See, e.g.*, PSUF 1813 (Keurig's agreement prevented ███████████████████████████████████████████). 1363 ████████████████████████████████████████████████████████████████). 48-49 (Starbucks' Tassimo-compatible Portion Packs disappeared from the market ███████████████████████████████████████████), 1841 (Keurig failed to fulfill orders and put Kroger on allocation for its products). Keurig's invocation of *Major League Baseball* is inapposite because Plaintiffs here have substantiated that more products would exist in the but-for world. 542 F.3d at 340.

[22] *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 15-16, n.25 (1984). (the "rationale for per se rules in part is to avoid a burdensome inquiry into actual market conditions"); *see also U.S. v. Joyce*, 895 F.3d 783, 677 (9th Cir. 2018); *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464 (3d Cir. 1998) (because per se analysis applied, anticompetitive effect is presumed); *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 86 (1984) ("the absence of proof of market power does not justify a naked restriction on price or output").

[23] The exclusive dealing cases Keurig cites are inapposite as they do not deal with agreements among horizontal competitors. *Ryko Mfg. Co. v. Eden Services* involved an exclusive dealing arrangement between a manufacturer and distributor. 823 F.2d 1215 (8th Cir. 1987). In fact, the court in *Ryko* suggested that if "an agreement restricts a distributor who also competes with the supplier in the manufacture of certain products in the relevant market," as here, the restriction *would be horizontal. Id.* at 1231. Likewise, *Joyce Beverages of N.Y. v. Royal Crown Cola Co.* involved a manufacturer-distributor arrangement and, unlike Keurig, the defendant was "neither a dominant nor a leading firm." 555 F. Supp. 271, 279 (S.D.N.Y. 1983). *Roland Mach. v. Dresser Indus., Inc.* also involved a manufacturer-distributor exclusive dealing agreement, instead of a horizontal group boycott agreement among competitors. 749 F.2d 380, 395 (7th Cir. 1984); *see also supra* n.9 (distinguishing *Bus. Elecs.* and *Copy-Data*).

[24] PSUF 33, 48 (██████████████████████████████████████); 49 (████████████); 52 (█████████████████████████); 1371 (██████████████); 1372 (█████████████); 1370 (███████████████████████████).

[25] As already briefed in Plaintiffs' Opposition to Keurig's Motion for Summary Judgment, Keurig is wrong to argue that McLane abandoned its claims that Keurig monopolized the SSB market. PSJO at 11-12, n. 42; Opp'n at 22. No

Clauses thus harm Competitive Cup manufacturers because they ensure that Keurig maintains its dominance over SSBs and its power to exclude Competitive Cup manufacturers.[26]

Keurig argues that its Brand Non-Competition Clauses were actually intended to "increase interbrand competition." Opp'n at 19-20. Keurig's own statements belie this counterintuitive argument. As Keurig's documents show, the Brand Non-Competition Clause with ▮▮▮▮▮ was entered into for the express anticompetitive purpose '▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮' and to '▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.'' PSUF 1151, 1189; *see also* PSJO 18-19, 34.[27] Thus, while Plaintiffs need not show actual anticompetitive effects, Keurig's admission as to the unlawful purpose and effect of the Brand Non-Competition Clauses further supports application of the per se rule. *Summit Health*, 500 U.S. at 330; *Spitzer*, 94 F. Supp. 2d at 416-18.

### 3. The Market Allocation Clause Is Per Se Unlawful

Keurig's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.
PMSJ at 14-16. Such naked market allocations among competitors are per se unlawful, *id.*, and reflect that Keurig "d[id] not want to be in competition with [brand] partners." PMSJ at 15-16.[28] In a desperate effort to argue that output was not reduced by the Market Allocation Clause, Keurig

---

court in the Second Circuit has required expert testimony to prove a relevant market. *Cf. Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) (finding, without any expert testimony, a triable issue as to whether there was a relevant product market); *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 806 (8th Cir. 1987) (concluding that there was sufficient evidence to establish the relevant market despite lack of expert testimony).

[26] Keurig has argued that Competitive Cup manufacturers benefit from increased brewer sales because those lead to increases in the sales of cups. Opp'n at 22. Under Keurig's logic, then, a restraint on brewer sales will harm Plaintiffs by leading to a decline in cup sales. Keurig cannot have it both ways and should be judicially estopped from arguing that a restraint on brewer sales does not harm Plaintiffs. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

[27] While ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮PMSJ at 16; PSUF 1370 (▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[28] Keurig's attempt to distinguish *Palmer v. BRG of Georgia* fails. 498 U.S. 46 (1990). As in *Palmer*, Keurig and Brand Competitors agreed that they "would not compete" in the different channels of distribution and Keurig ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 47.

presents a misleading graphic purporting to show single cup options at Walmart. Opp'n at 15. While irrelevant, as Plaintiffs are not required to show market effects on a per se claim, *see supra* n.22, Keurig's graphic omits that products such as McCafé, Tully's, New England Coffee, Caribou, and Peet's are all Keurig-owned or Keurig-licensed brands for which Keurig earns a ██████████████████████████████████████. Resp. to PSUF 19. In fact, out of the 38 brands currently indicated as offering breakfast blend Compatible Cups available in-store at Walmart, *only one*—Walmart's Great Value private label brand—is unlicensed. Opp'n at 15. Keurig does not even attempt to offer a similar example in the AFH Market—in which it had exclusive agreements with all major distributors—because *the only* K-Cups available for office purchase from a KAD or a KARD are those of a Keurig owned, licensed, or partner brand. PMSJ at 43-44.

### 4. The Variety Restriction Clause Is Per Se Unlawful

Keurig's agreements cap the number of product varieties that Keurig would make for its Brand Competitors and prohibit the Brand Competitors from working with Competitive Cup manufacturers on additional varieties or quantities that Keurig refused to produce. *See supra* §I.A.1; PMSJ at 11-14. The provisions restrict output, which is per se unlawful. PMSJ at 13-14.

Keurig argues that "defining the number of *varieties* to be manufactured does not cap output." Opp'n at 11. But that is only half the story. Keurig ignores that even when brands "decide[d] the quantity of K-Cups they want to buy," Keurig was unable or unwilling to "manufacture[] according to the *brands'* decisions," Opp'n at 12 (emphasis in original); PSUF 88, 1840. Nonetheless, Keurig ██████████████████████████████████ to make what Keurig could not or would not make itself.[29] In short, having manufacturing limitations is

---

[29] For example, despite Keurig ███████████████████████████████████████████████████████████████ PSUF 1839; *see also id.* 1841 (same for Kroger). Keurig's President admitted that "████████████████████████████████████████████████" *Id.* 1840. Keurig has further conceded that it was unable to meet consumer demand of an "endless number of new product varieties." Opp'n at 10. This stifled innovation. Starbucks,

one thing; restricting brands from turning elsewhere to fulfill their needs is another.

Keurig next argues that the Variety Restriction Clause resulted in "lower prices" because "defining the number of SKUs in advance allows the parties to negotiate a lower price based on a common understanding of expected cost." Opp'n at 11. Keurig cannot rely on such a factually unsupported "benefit."[30] In fact, Keurig's former President admitted the opposite: that Keurig's brand agreements ███████████████████████████████████████████. PMSJ at 20.

### 5. The Agreements And Individual Provisions Are Also Unlawful Under A Quick Look Analysis

Because the restrictions in Keurig's Brand Competitor agreements are per se unlawful, Plaintiffs need not show anticompetitive effects. Nonetheless, the evidence confirms that, even under the quick look standard, the agreements are unlawful. *See, e.g.*, *Cal. Dental Ass'n v. FTC* 526 U.S. 756, 759, 770 (1999). Plaintiffs have shown that the restraints' anticompetitive effects— increased prices and decreased output—are not only "intuitively obvious" and "easily … ascertained," but actually occurred.[31] Keurig also admitted that it could not meet customer demand for all product varieties and quantities but nonetheless prohibited brand partners from using other Competitive Cup manufacturers to fulfill such demand. Opp'n at 10; *see also supra* n.29. Indeed, brands have noted that signing up with Keurig resulted in ████████████████████████████ ███████████████████. PSUF 70.

---

for example, introduced numerous innovations in ready-to-drink coffee format that Keurig never adapted to single-serve. PSUF 1368.

[30] *Rome Ambulatory Surgical Ctr., LLC v. Rome Mem'l Hosp., Inc.*, 349 F. Supp. 2d 389, 410–11 (N.D.N.Y. 2004) (rejecting defendant's purported procompetitive benefits because they were not factually supported in the record).

[31] Keurig asserts that its Brand Competitor Agreements are not anticompetitive under a quick look because the brand partners decided to work with Keurig due to its purported "ability to manufacture high-quality packs at competitive prices." Opp'n at 23. But the Brand Competitors' motivations for joining the horizontal conspiracy are immaterial. *See, e.g.*, *U.S. v. Apple, Inc.*, 791 F.3d 290, 317-18 (2d Cir. 2015) ("'Antitrust law has never required identical motives among conspirators' when their independent reasons for joining together lead to collusive action."). As for Keurig's intent, Keurig has admitted that it ███████████████████████████████████████████ ███████████████. PSUF 65-67.

Record evidence further rebuts Keurig's hypothetical procompetitive justifications for the provisions at issue.[32] For the Brand Non-Competition Clause, discovery confirms Keurig was ████████████████████████████, PMSJ at 23, and thus Keurig has provided no evidence that it was protecting its purported investments. Opp'n at 24. For the Market Allocation Clause, Keurig's so-called "████████████████" are irrelevant. Opp'n at 14. Keurig does not dispute that Peet's had its own distribution network for AFH bagged coffee, PMSJ at 54-55, but Keurig became ████████████████████████████████████. Resp. to KSUF 929. And discovery confirms that the Variety Restriction Clause (and the Boycott Clause) are *not* "standard, lawful terms that commonly appear in manufacturing agreements," Opp'n at 11, as evidenced by TreeHouse's agreements. Resp. to KSUF 910.

### B. TreeHouse And JBR Have Standing To Challenge The Brand Agreements

Keurig argues that TreeHouse and JBR lack standing to challenge the brand agreements because they would have *benefitted* from a conspiracy to reduce output and increase prices. Opp'n at 20, 24-25. But Plaintiffs' claims are based on Keurig's horizontal conspiracy to *exclude competitors*[33] and TreeHouse and JBR *cannot possibly benefit* from having their products blocked from distribution. PSJO at 69-70.[34] Without the Non-Competition Clause, for example, Brand Competitors ████████████████████████████████████ ████████████ without being subjected to the Boycott Clause. *See* PSUF 1818. The record evidence shows that Keurig's anticompetitive agreements caused TreeHouse to lose sales and its

---

[32] Keurig fails to proffer any procompetitive justification for the Boycott Clause. *See* Opp'n at 16-19.

[33] In fact, this Court has already noted that Keurig's anticompetitive conduct "largely targeted Keurig's direct competitors, such as TreeHouse and [JBR]." MTD Order at 221-22. TreeHouse pursued numerous co-manufacturing opportunities with Keurig's brand partners but was repeatedly foreclosed by Keurig's conduct. PSJO at 58-59 & n.234.

[34] Thus, Keurig's case law is inapposite. The plaintiff in *Gatt Communs., Inc. v. PMC Assocs., L.L.C.* was an "admitted past participant in the purported [anticompetitive] scheme" and thus not a direct victim of the conspiracy. 711 F.3d 68, 76-78 (2d Cir. 2013). Similarly, the plaintiff in *Retina Assocs., P.A. v. S. Baptist Hosp.*, unlike TreeHouse and JBR here, "st[ood] to benefit" from the conspiracy because the plaintiff was *not excluded* from the market and could raise its price or capitalize on its lower prices." 105 F.3d 1376, 1383 (11th Cir. 1997).

profits to decline.[35] Contrary to Keurig's assertion that "no Plaintiff has a cognizable claim regarding alleged limits on brewer competition," Opp'n at 22, TreeHouse has brought and substantiated a brewer leveraging claim. THS Am. Compl. ¶¶ 585-593; PSJO at 30; MTD Order at 219. TreeHouse and JBR therefore have standing to pursue their claims. PSJO at 70 & n.267.

## II. PARTIAL SUMMARY JUDGMENT IS APPROPRIATE FOR PLAINTIFFS' SUPPLIER EXCLUSIVE DEALING CLAIM

Plaintiffs are entitled to summary judgment on several elements of their exclusive dealing claim regarding input suppliers: (1) the existence of exclusive dealing agreements; (2) the lack of procompetitive justifications; and (3) the availability of less restrictive alternatives. Mot. at 35. Keurig does not dispute the existence and exclusive nature of the agreements. Further, not only do Keurig's purported procompetitive justifications fail as a matter of law, Keurig does not raise material facts to dispute that less restrictive alternatives were available to achieve those justifications. Ruling on these elements will expedite the adjudicative process by removing undisputed matters from the jury's consideration.[36]

### A. Keurig Entered Into Exclusive Arrangements With Input Suppliers

Keurig does not dispute that it entered into agreements containing Supplier Non-Competition Clauses with machine, cup, lid, and ink suppliers that extended for ███████████ ███████████████.[37] Thus, the Court should grant summary judgment on exclusivity.[38]

---

[35] *See* Sibley Rpt. Fig. 7, Fig. 8, Fig. 11; Stiroh Rpt. Fig. 1 & ¶ 116.

[36] Keurig ignores case law where the court did exactly that, ruling on specific elements of exclusive dealing without adjudicating the entire claim. *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 37 F. Supp. 3d 1126, 1146-1153 (N.D. Cal. 2014) (ruling on purported procompetitive justifications in an exclusive dealing case). Keurig cites to only inapposite non-antitrust cases to argue against partial summary judgment. *Rasmussen v. City of New York* was a criminal case where the defendants asked the court for partial summary judgment on specific aspects of the arrest, despite the jury having to rule on whether the arrest as a whole constituted excessive force. 766 F. Supp. 2d 399, 404 (E.D.N.Y. 2011). *Berman v. Royal Knitting* was a breach of contract case, where the court noted that "a full trial on the merits is required to determine if the goods were defective … ." 86 F.R.D. 124, 127 (S.D.N.Y. 1980).

[37] *Compare* Mot. at 23-34 *with* Resp. to PSUFs 108-147, 153-168; Opp'n at 25-37.

[38] *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). Keurig instead disputes whether those agreements created substantial foreclosure, which is a separate element from the existence of the exclusive

### B. Keurig Fails to Support Its Purported Procompetitive Justifications

Keurig misrepresents the law that applies to its exclusive dealing agreements, asserting that Plaintiffs need to prove "the lack of procompetitive justification." Opp'n at 34. To the contrary, Keurig has the burden of proving a procompetitive justification.[39] Because Keurig fails to meet *its* burden, summary judgment is also appropriate on the lack of procompetitive justifications.

In any event, there is extensive record evidence demonstrating that there were no procompetitive justifications for Keurig's Supplier Non-Competition Clauses. Mot. at 36-38. Keurig relies only on two purported justifications: (1) its purported investments into input suppliers; and (2) industry practice.[40] As shown, below, both of these fail as a matter of law.

#### 1. *Keurig Made Minimal, If Any, Investments Into Compatible Cup Inputs*

Keurig did not have any intellectual property protected by the supplier agreements. Mot. at 38; PSUF 270-78, 281. Keurig half-heartedly argues that its admissions that Keurig did not have such patents or trade secrets was limited to ████████████████, *see* Resp. to PSUF 277, 280, 281, or a single manufacturer's product, *see id*. 278, but fails to offer *any* evidence showing that Keurig did, in fact, have patents or trade secrets covering *any* of the inputs at issue.

Keurig vaguely argues that it invested "money, time, and resources into its partnerships," citing purported investments in ████████████████████. Opp'n at 30. But the cited evidence shows that the investments either did not exist or were limited to testing a product Keurig purchased, which is hardly an investment.[41] Even if the Court would consider these

---

arrangement. *See id*. at 270. Plaintiffs need not belabor why Keurig's argument—that there can be no substantial foreclosure if a competitor entered the market—is a losing one. *See* PSJO at 47-48, 60-61.

[39] *Visa U.S.A.*, 344 F.3d at 238 (defendants "must provide a procompetitive justification for the challenged restraints").

[40] Keurig abandons its prior arguments that its non-competition clauses led to increased investment in the Keurig "system" and competition for contracts. *See, e.g.*, PSUF 160, 164. Thus, the Court should not consider them. *See supra* n.15. In any event, such investments are irrelevant. Mot. at 38, 37-38; *Apple*, 791 F.3d at 335.

[41] R.A. Jones testified that Keurig's "investment" was nothing more than "tuning [the machinery] to the application." PSUF 269. ████████████████████████████████████, which were "a bad design" prompting R.A. Jones to use its own platform instead. Resp. to KSUF 940. As for cups, ██████

to be investments, they cannot justify Supplier Non-Competition Clauses covering *any* product to be purchased by Competitive Cup manufacturers—including products Keurig did not even purchase, much less invest in. Furthermore, Keurig does not dispute or otherwise fails to address that it did not make any investments into other suppliers with exclusivity, such as ██████████. Mot. at 23-34; Opp'n at 30; Resp. to PSUF 271, 284.

Keurig argues that "protecting investments by preventing free riding is a legitimate procompetitive justification." Opp'n at 31-32. However, Keurig fails to cite any evidence showing Keurig implemented exclusivity to prevent "free-riding." *Id.* The Court should reject this belatedly raised pretext. *New York v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015) (rejecting "pretextual" justifications where the record shows defendant was trying to put up barriers to competition). Far from "free riding," TreeHouse vigorously competed by innovating and providing better prices and service. *See* PSUF 1973. TreeHouse should have been able to use its own existing suppliers to obtain inputs, especially when Keurig had not made investments warranting exclusivity.[42]

Finally, even if Keurig made "investments" (which the evidence does not show), Keurig fails to substantiate its claim that the Supplier Non-Competition Clauses "helped to protect the results of those investments." Opp'n at 31. It cites only two pieces of evidence for this assertion. The first is testimony by *TreeHouse* that exclusivity could "protect proprietary knowledge, R&D investment [and] capital investment." Resp. to PSUF 939. First, Keurig mischaracterizes the

---

██████. PSUF 275-276. With respect to ██████████, which are not the K-Cup format that is the subject of Plaintiffs' Motion. KSUF 945. Finally, as to ██████████ PSUF 254.

[42] Keurig's characterization of TreeHouse's business model as being that of "free riding," Opp'n at 32, ignores the innovation, better pricing, and flexibility that Competitive Cup manufacturers, such as TreeHouse, bring to customers and consumers that Keurig documents admit to be competitive benefits. *See* Resp. to KSUF 957 (TreeHouse's strategy is making "something that is equivalent or better" than the national brand); PSUF 1973 ██████████."); *see Rome Ambulatory*, 349 F. Supp. 2d at 411 (rejecting free-riding as a procompetitive justification where no evidence in support).

testimony which, in any event, was not about Keurig's agreements, but about the much more limited TreeHouse agreements. *See* §II.B.2 *infra*. Moreover, the quotation is beside the point as Keurig has presented no evidence that it provided suppliers with proprietary knowledge or R&D or capital investment. Indeed, the evidence is to the contrary. *See* PSUF 269-86. The second piece of evidence is a snippet of vague and conclusory testimony about due diligence Keurig employed to ensure that the suppliers were "████████████████████████████████████████ ████████" Resp. to PSUF 947. This is devoid of evidence of any specific investment and does not establish that the Supplier Non-Competition Clauses were necessary to help Keurig with due diligence. Keurig has failed to present any material evidence that it made investments in suppliers or that its Supplier Non-Competition Clauses were necessary to protect any such investments.

### 2. *Industry Practice Is Not a Legitimate Procompetitive Justification*

Keurig relies on alleged "industry practice" to attempt to defend its Supplier Non-Competition Clauses but industry practice is not a valid procompetitive justification. Mot. at 36.[43] Even if it were, Keurig has provided no evidence that any competitor, much less the industry as a whole, "commonly" entered into such broad and lengthy non-competition clauses. Mot at 36.

Keurig provides evidence of only one competitor, TreeHouse, using limited exclusivity. In doing so, Keurig quotes only a portion of the testimony of TreeHouse's Director of Procurement, who actually testified that TreeHouse used exclusivity clauses when it "develop[s] a specific product *and [needs] to protect [its] supply chain from disruption* … . [W]e use exclusivity to ensure that we have a continuous supply for *a specific product* that was developed [either] internally or jointly with the supplier *for a specific period of time for a specific quantity*."[44] There is no

---

[43] *Bd. of Regents v. Nat'l Collegiate Athletic Ass'n*, 707 F.2d 1147, 1154 (10th Cir. 1983), aff'd, 468 U.S. 85 (noneconomic justifications are not a valid justification for anticompetitive conduct).

[44] *See* Resp. to KSUF 937 (emphasis added). Keurig nowhere asserts that its exclusive agreements were justified by the need to assure a steady supply of product. Rather, ████████████████████████████████████████████

comparison between TreeHouse's narrowly tailored agreements and those of Keurig.[45]

Keurig further mischaracterizes testimony to claim that exclusivity was an alleged "common" provision. For example, the Bemis corporate representative, whose testimony Keurig cites, KSUF 937, testified that the exact opposite was the case: that Bemis "typically would not include" an exclusivity provision in its contracts and would "resist or avoid" exclusivity requests from customers. Resp. to KSUF 937. Keurig also ignores the concerns of ████████████████ █████████████████████████████████████████████. Mot. at 27-30; PSUF 213, 215, 217. In short, even if relevant, Keurig has failed to produce any material evidence that its Supplier Non-Competition Clauses were common industry practice.

### C. Keurig Confirms The Availability of Viable Less Restrictive Alternatives

There is no material dispute that there were less restrictive alternatives to the Supplier Non-Competition Clauses.[46] Mot. at 39-42. Keurig does not dispute that its agreements prohibited suppliers from providing *any* components that could be used to produce Portion Packs for a Keurig Brewer. Mot. at 40; Opp'n at 36. ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. Opp'n at 36. But this is not "narrowly tailored" at all; it admittedly blocks suppliers from selling necessary inputs to Keurig's competitors rather than protecting Keurig's purported investment. Mot. at 40. In fact, ███████████████████████████

█████████——the least restrictive out of its dozens of agreements——are the examples given in

---

████████████████████████████████████████████. *Id*. For example, Keurig bound █████████████

█████████████████████████████████. PSUF 135, 210.

████████████████████████████████████████████████████████

[45]

Resp. to KSUF 937. TreeHouse's agreement with ████████████████████████████

██████. *Id*. Indeed, ██████████ supplies machines to other Competitive Cup manufacturers, including Trilliant. *Id*.

[46] For example, Keurig could have prohibited only the sale of products with the specifications that Keurig purports to have co-developed or could have prohibited the sale of products for one to two years at a time or for as long as Keurig purchased a minimum amount of the product.

*Plaintiffs'* Motion as proof that less restrictive alternatives existed.[47] Keurig thus at the very least fails to contest that agreements from before ███ were not narrowly tailored.

Keurig also argues, without support, that the duration of exclusivity was individually negotiated. Opp'n at 35-36. But Keurig does not dispute that Keurig's contracts contained Supplier Non-Competition Clauses that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. Mot. at 27-30; Resp. to KSUF 937.

Keurig argues that non-disclosure agreements (NDAs) were not a realistic alternative to its Non-Competition Clauses because they "████████████████████████████████

████████████████████████." Opp'n at 35. However, the cited evidence references ████████████. Resp. to PSUF 956.[48] In fact, ████████████████

████████████████████████████████████████

████████████████████████████████. Under the terms of Keurig's agreements, ████████████████████████████████████████

████████████████████████████████████████.

## III. KEURIG UNLAWFULLY TIES BREWERS AND COMPATIBLE CUPS

Keurig's Opposition fails to address (and thus concedes) that (i) its KAD and KARD Agreements read literally on the face of Section 3 of the Clayton Act's prohibited tying conduct; and that (ii) "a substantial volume of commerce in the 'tied' product is restrained." This is all that

---

[47] Mot. at 41. While Plaintiffs give the 2017 agreements as examples of less restrictive alternatives to Keurig's earlier 20-year agreements covering all inputs for Competitive Cups, Plaintiffs are also challenging these agreements as being unduly restrictive as the agreements were still overbroad. *Id.* at n.25.
[48] In fact, the ████████████████████████████████████████████████████████████. Resp. to PSUF 956. Keurig does not dispute that ████████████████████. Resp. to PSUF 284. To the extent that Keurig made any investment at all, such as ████████████████, Resp. to PSUF 273, such investments could have been protected through NDAs that covered Keurig's specifications.

is required for Plaintiffs to show a per se violation of the Clayton Act. *Standard Oil Co. of Cal. v. U.S.*, 337 U.S. 293, 311 (1949).[49] Keurig has also failed to raise a material issue of fact sufficient to overcome the evidence supporting liability for a per se tying claim under Section 1 of the Sherman Act. Keurig concedes the first two elements—that the tie affected a substantial amount of interstate commerce and that SSBs and Compatible Cups are distinct products. Opp'n at 38-39. Keurig's concessions and undisputed evidence demonstrate the remaining elements: (i) an "actual tie" of two products; and (ii) Keurig's market power.

## A. Keurig's KAD And KARD Agreements Violate Section 3 Of The Clayton Act

Keurig does not dispute that its KAD and KARD Agreements are "a sale or contract for sale of goods … on the condition, agreement or understanding that the [KAD or KARD] shall not use or deal in the goods ... of a competitor or competitors of the … seller," making their terms fall squarely within the statutory prohibition of the Clayton Act, which Keurig ignores. 15 U.S.C.A. § 14 (1951); Opp'n at 38-39.[50] The facts admitted by Keurig easily satisfy these elements. Keurig admits that (1) the challenged provisions "apply [ ] to customers who [ ] become [KADs]," Opp'n at 42; (2) Keurig has contracts with all of its "████████████████" containing the Loyalty Clause, Resp. to PSUF 353; (3) ████████████████████████████████ ████████," *id*. 354-55; (4) ████████████████████████████████████ ████████████, *id*. 351; (5) by 2007, ████████████████████████████ ██████████████████," *id*. 347; (6) "████████████████████████████ ████████████████████████████████," *id*. 399; (7) as "of 2015, Keurig had KAD Agreements with approximately ██ active KADs," *id*. 400; and (8) Keurig's sales to ████████████████████████████, *id*. 486. The court need

---

[49] *See also Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 356-57 (1922).
[50] Keurig's failure to respond to Plaintiffs' argument constitutes a waiver. *See supra* n.15.

not undertake any further analysis to find a violation of Section 3. PMSJ at 44-45.[51]

Keurig's only "defense" is to urge this Court to disregard long-established Supreme Court precedent that the "Sherman Act and the Clayton Act provide different tests of liability." *United Shoe Mach. Corp. v. U.S.*, 258 U.S. 451, 459 (1922); PMSJ at §III.A. But Keurig fails to cite any case law overturning the Supreme Court authority. Keurig first suggests that this Supreme Court case law was abrogated by *Ill. Tool Works v. Indep. Ink*, but omits that the case did not even involve claims brought under Section 3.[52] *See* 547 U.S. 28, 32-33 (2006); Opp'n at 38 & n.34. Keurig also relies on *dicta* from *De Jesus v. Sears, Roebuck & Co., Inc.*, but ignores that the court summarily held that the tying claims failed "at the threshold" for the inability to identify both a tying and tied product, a requirement under both Acts.[53] Indeed, this Court has continued to follow the "majority" rule that Section 3 of the Clayton Act "requires a smaller showing of anticompetitive effects" long after *De Jesus. Am. Express Travel Related Servs. Co. v. Visa U.S.A.*, 2005 WL 1515399, at *3, n.1 (S.D.N.Y. June 23, 2005). Keurig has shown no basis for departing from long-standing Supreme Court precedent establishing that Keurig's actions violate Section 3 of the Clayton Act.

**B. Proof Of Anticompetitive Effects Is Not Required For A Per Se Claim**

As the Supreme Court has explained, "[i]t is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'" *See Jefferson Parish*, 466 U.S. at 9-10 (1984). Nevertheless, Keurig argues that Plaintiffs' tying claims must fail as Plaintiffs have not proven anticompetitive effects, ignoring case law demonstrating that anticompetitive effects

---

[51] *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 609-610 (3d Cir. 2005); *FOGA*, 312 U.S. at 468.

[52] In any event, the court's holding was limited to whether plaintiffs are entitled to a presumption of market power from a patent, which Plaintiffs have not argued here and is not at issue in this case. *Id*. at 32-33.

[53] 87 F.3d 65, 71 (2d Cir. 1996). Nor do Keurig's other cases, Opp'n at 43, suggest that the Second Circuit has departed from Supreme Court precedent. *See Yentsch v. Texaco*, 630 F.2d 46 (2d Cir. 1980) (analyzing only a Sherman Act 1 claim); *Charych v. Siriusware, Inc.*, 790 F. App'x 299 (2d Cir. 2019) (declining to address Clayton Act claims). Even if a conflict did exist, it is axiomatic that the Second Circuit cannot overturn Supreme Court precedent.

are not required under the per se standard. Opp'n at 47-48; PMSJ at 46-47.[54] Anticompetitive effects (while shown in abundance) are thus not relevant.[55]

### C. Plaintiffs Have Proved Each Element Of A Per Se Tying Claim

Plaintiffs have set forth unrebutted evidence proving each element of a per se tying claim: (1) the tying arrangement affects a substantial amount of interstate commerce; (2) AFH Brewers and Compatible Cups are distinct products; (3) Keurig tied the sale of the two products; and (4) Keurig has appreciable market power in the tying market. PMSJ at 47-59. As noted above with respect to the Clayton Act, Keurig concedes the first two elements.[56] As to the remaining elements, Keurig fails to raise material issues of fact sufficient to prevent summary judgment.

#### 1. *Keurig Contractually Ties Sales Of K-Cups To AFH Brewers*

Keurig does not dispute that all of its KAD and KARD agreements have a Loyalty Clause, which prohibits Keurig distributors that purchase AFH Brewers from purchasing Competitive Cups. PMSJ at 45 & n.29. Instead, Keurig makes the diversionary argument that Keurig does not tie the sales of *other* entities that *do not* enter into KAD or KARD agreements with Keurig. Opp'n at 42-44. Keurig's argument fails for several reasons.

First, it has never been a defense to a tying claim that the tie has not been applied to every single customer. Market power for per se tying claims is typically inferred from a market share of around only 30%.[57] The fact that Keurig may not tie *all* sales in *all* channels is no defense to its

---

[54] Keurig's cases considered tying claims brought under the rule of reason as opposed to a per se claim. Opp'n at 44-45. However, tying arrangements are reviewed under a *per se* analysis where, as here, a firm has market power because "the existence of forcing is probable." *Illinois Tool Works Inc. v. Independent Ink*, 547 U.S. 28, 37 (2006); *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); PMSJ at 47.

[55] Nonetheless, Plaintiffs proved such effects in opposition to Keurig's summary judgment motion. *See* PSJO §I.A-B.

[56] *See* KMSJ at 62, 63-66 ("a distributor is free to [purchase] Keurig brewers and packs separately"); PSJO at 72-73.

[57] *See Visa*, 2003 WL 1712568, at *4. Keurig's cases acknowledge that it is not merely product availability, but the *viability* of purchasing the products separately that is key to the inquiry. *See Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1325-26 (D. Md. 1986); *Amerinet v. Xerox*, 972 F.2d 1483, 1500-01 (8th Cir. 1992). Keurig's other cited cases are inapposite. In *Shop & Save v. Pneumo*, there was no denial of access to, nor higher prices in, the tied market, as there is here. 683 F.2d 27, 30-31 (2d Cir. 1982). *It's My Party v. Live Nation*

imposition of an illegal tie on all KADs and KARDs.[58] Second, even if *some* of the products could be purchased separately by others not bound by contract,[59] agreeing to the "unremitting tying policy" of the KAD Agreement was the only viable option for distributors to sell Keurig Brewers and K-Cups. *See* PSUF 305-09, 935, 1411-12, 1946-47. Indeed, Keurig's business model "was premised on the understanding" that *distributors* could *not* buy elsewhere. PSUF 353-61, 1881.

### 2. Keurig Fails To Counter Plaintiffs' Direct Evidence Of Keurig's Market Power

Rather than having to rely on Keurig's market share in a relevant market,[60] Plaintiffs have provided direct evidence of Keurig's market power in a number of ways, which Keurig has failed to counter, including Keurig's ability to: (i) impose tie-in terms on buyers that would not agree to them in a competitive market; (ii) exclude competitors; (iii) profitably raise prices; and (iv) leverage its brewers to help maintain its cup monopoly. *See* PMSJ at 52-57.[61] Keurig has failed to raise a genuine issue for trial disputing that Keurig had sufficient economic power in the tying product to appreciably restrain free competition for the tied product. PMSJ at 51-52.

*First*, with respect to Keurig's power to impose restrictive tie-in terms, Keurig admits that the Loyalty Clause was in *every* KAD and KARD Agreement; that Keurig had no fewer than ▮▮▮

---

[58] involved products that were bundled as part of a single package, whereas AFH Brewers and K-Cups are purchased separately. 811 F.3d 676, 686-87 (4th Cir. 2016). Keurig's cases are also all out of circuit.

[58] Keurig admits that the challenged contract provisions "apply [ ] to customers who [ ] become [KADs]," Opp'n at 42, and, as Keurig's VP of AFH admitted, if a KAD "wanted to purchase Keurig brewers, it had to also purchase K-Cups and was prohibited from purchasing [Competitive Cups]." PSUF 345; *see* PMSJ 46.

[59] AFH Brewers were not available outside the KAD Agreements until 2012 (Resp. to KSUF 6), at which point most distributors had built up a large installed base of AFH Brewers (literally plumbed into office sinks) that were tied to K-Cups through the Loyalty Clauses, which ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. PMSJ at 66 & n.57.

[60] As this Court held, market power can be proven "'directly through evidence of control over prices or the exclusion of competition.'" MTD Order at 227 (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 500 (2d Cir. 2004)); *see also Savory Pie Guy, LLC v. Comtec Indus., Ltd.*, 2016 WL 7471340, at *7 (S.D.N.Y. Dec. 28, 2016) (cited by Keurig) (only "[w]here direct evidence is unavailable or inconclusive" does a court consider factors such as barriers to entry to determine whether "monopoly power may be inferred from high market share").

[61] *See also* PSJO §I.A; *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993) (a plaintiff may show a "harmful effect on competition" "without 'detailed market analysis' by offering 'proof of actual detrimental effects'"); *In re Crude Oil Commodity Futures Litig.*, 913 F. Supp. 2d 41, 51 (S.D.N.Y. 2012).

KAD agreements;[62] and that the Loyalty Clause prohibited distributors from purchasing Competitive Cups. *See* PSUF 353-56, 361, 382, 399, 400. Keurig also admits that despite distributor pushback, Keurig made the Loyalty Clause ███████████████████████████████

███████████████. PMSJ at 43 and n.26; PSUF 328, 347-48.[63] Keurig's ability to *impose the Loyalty Clause* in so many agreements, over distributors' opposition, provides compelling direct evidence of Keurig's market power.[64]

Keurig attempts to defend its tie by pointing to the purported "benefits" of being a KAD including "████████████." Opp'n at 44. However, courts do not consider purported justifications in evaluating a per se claim, rendering any supposed "███████" (which Keurig fails to support) irrelevant.[65] Indeed, distributors opposed the Loyalty Clause and proposed several alternatives that Keurig rejected. PSUF 373, 456-461.[66] Keurig could not have secured such

---

[62] While Plaintiffs produced a composite exhibit consistent with the Federal Rules showing that the Loyalty Clause is contained in more than ███ Keurig agreements, Keurig unreasonably refused to admit to the full number. Resp. to PSUF 328-29. Keurig should not be entitled to avoid liability on the basis that its anticompetitive conduct was so pervasive that it was too burdensome to review and admit to the full number, which exceeds the number of agreements that warranted summary judgment in prior tying cases. *N. Pac. Ry. Co.*, 356 U.S. at 7 & n.6.

[63] Although Keurig disputes in part the definition of Competitive Cups and tries to argue that the Loyalty Clause does not extend to brewers with a different format like Flavia, it does not dispute that the Loyalty Clause was expanded to prohibit sales, placement, or marketing of competing brewers that are compatible with Compatible Cups other than Keurig licensed brewers. *See* Resp. to PSUF 347-350.

[64] *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969) (the power to impose "burdensome terms such as a tie-in with respect to any appreciable number of buyers" itself supports market power); *N. Pac. Ry. Co.*, 356 U.S. at 7 & n.6 (finding 1,167 tying agreements itself "compelling evidence of market power"); *see also* PMSJ §III.B.4.iv. Notably, Keurig does not address Plaintiffs' argument that it leveraged its unique brewers to force acceptance of the Loyalty Clause. PMSJ §III.B.4.iv. As such, any counter argument should be deemed waived. *See supra* n.12.

[65] *See FOGA*, 312 U.S. at 461-62, 464-65 (refusing to consider justifications for tying arrangement); *N. Pac. Ry. Co.*, 356 U.S. at 5 (courts apply per se rule where restraints are "conclusively presumed to be unreasonable"). The evidence Keurig cites regarding purported "benefits"—a mere four examples out of hundreds of KADs, Resp. to PSUF 967—does nothing to counter the evidence that Keurig unilaterally imposed the Loyalty Clause on distributors, without offering an option to remove it (despite substantial pushback). *See, e.g.*, PSUF 348-349, 373-75, 419.

[66] *See, e.g.*, PSUF 461, 1000, 936, 369-70, 382, 1077 (██████████████████████████████████████ ████████████████████), 369-70, 382 ██████████████████████████████████████████████████████████████ ████████████████████████████). The nation's largest distributors all failed to get the Loyalty Clause removed noting Keurig's refusal to negotiate. PSUF 369-74, 382. Keurig's OCS leadership team admitted that the Loyalty Clause created "███████████████████ ████████████████████" PSUF 1832.

lopsided terms in a competitive market.[67]

*Second*, Keurig suggests Plaintiffs are "confused" in citing evidence of ▆▆▆ market share to show *Keurig's* market power, Opp'n. at 41-42, but this is a disingenuous distraction from what the unrebutted evidence shows: that Keurig's agreement with ▆▆▆ alone enabled Keurig to exclude both SSB and Compatible Cup competitors from the market, as they were unable to rely on ▆▆▆ for distribution. PMSJ §III.B.4.ii, 53.[68] Keurig also ignores the fact that it had exclusive KAD Agreements with every major national distributor. PMSJ at 53.

*Finally*, Keurig failed to respond to Plaintiffs' argument that market power can be shown through Keurig's ability to raise K-Cup prices without a significant loss of business. PMSJ §III.B.4.iii.[69] Aside from improperly arguing about anticompetitive effects, Opp'n at 45, Keurig only attempted to rebut Plaintiffs' evidence showing Keurig *announced* price increases but ignored the transactional data showing Keurig *actually* profitably raised prices.[70] Keurig has failed to raise any genuine issues of material fact to counter Plaintiffs' evidence of Keurig's market power.[71]

---

[67] *See In re Visa Check/Mastermoney Antitrust Litig.*, 2003 WL 1712568, at *4 (E.D.N.Y. Apr. 1, 2003) (ability to impose "burdensome terms such as a tie-in with respect to any appreciable number of buyers" supports market power).

[68] Keurig incorrectly argues that Plaintiffs did not define an OCS market, despite clear expert analysis doing so. PSJO at 57; Sibley Rpt. §III.b.ii & ¶41.

[69] Keurig argues that harm to competition requires a plaintiff to "establish[] that payments for both the tied and tying products *exceeded* their combined market value," but this is not a requirement for showing market power in a per se tying claim, nor is harm to competition considered at all. *See* Opp'n at 45. Indeed, the court in *Freeland v. AT&T Corp.*, cited by Keurig, explicitly dismissed the per se tying claims but allowed the rule of reason tying claims to proceed, resulting in an analysis of harm to competition not required here. 238 F.R.D. 136, 136 (S.D.N.Y. 2006). And in *Fortner*, cited by Keurig, the court was clear that the Supreme Court's focus was on "whether the seller has the power … to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market." 429 U.S. at 620. Nowhere did the court suggest a combined pricing analysis was required to prove a per se tying claim. *Id.*

[70] *Compare* Opp'n at 45; *with* PMSJ at 57. While Keurig contends that it charges less for K-Cups in AFH than in AH channels, Opp'n at 45, this is based on a flawed analysis that does not consider all SKUs, ignoring private label. Sibley Reply ¶6. The comparison is also irrelevant. The proper test requires an analysis of whether Keurig profitably raised K-Cup prices within the AFH market. Sibley Reply at 38, Table 1; *Visa*, 2003 WL 1712568, at *3 (no evidence merchants switched to other devices despite increases in fees).

[71] Given the unrebutted direct evidence of market power, Keurig's argument that Plaintiffs did not establish barriers to entry is irrelevant. *See U.S. v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). In any event, Plaintiffs have established barriers to entry. *See* PSJO at §I.A.3.

### 3. *Keurig Fails To Counter Plaintiffs' Indirect Evidence Of Keurig's Market Power*

Given the direct evidence, the Court need not even reach the issue of indirect evidence of Keurig's market power. *See supra* n.22. However, Keurig is wrong in arguing that Plaintiffs cannot prevail on a per se tying claim without also moving on market definition. Opp'n at 39. As courts in the Second Circuit have observed, "it is well settled that plaintiff is excused from defining the relevant product market" where the claim is "governed by per se analysis."[72] Moreover, Keurig has failed to refute Keurig documents and executive testimony admitting that Keurig maintained control of █████ of the market for SSBs, which far exceeds the 30% share that courts routinely find sufficient to support market power. PMSJ at 58-59.

Keurig further argues that Plaintiffs fail to show market power because competitors entered the market. Opp'n. at 39-42. However, such market entry is irrelevant, as Keurig has failed to raise a genuine issue of fact to counter the conclusion that Keurig's competitors have been unable to impact Keurig's share or market power.[73]

Finally, Keurig argues that Plaintiffs' evidence "has nothing to do with the purported tying good market."[74] Opp'n at 41. Keurig again ignores Keurig's admissions to the contrary (*see* PMSJ at 58), including, for example, that Keurig's former National Director of AFH Field Sales admitted that, as of April 2016, "████████████████████████████████████ ████████████████████████" PSUF 469 (emphasis added); *see also* PSJO at 3, 12-13.

---

[72] *In re Eur. Rail Pass Antitrust Litig.*, 166 F. Supp. 2d 836, 844 (S.D.N.Y. 2001) (citing *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan of Greater New York, Inc.*, 40 F. Supp. 2d 109, 116 (E.D.N.Y.1999)); *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993). In any event, Plaintiffs have defined relevant markets for the SSB market and for SSBs sold through the AFH channel. *See* PMSJ at 15-16, 58, 66; *see also* PSJO at 48. Indeed, the SSB market is *undisputed* by Keurig in its summary judgment motion. *Id.*

[73] Opp'n to Mot. to Exclude Dr. Sibley (ECF No. 1544) at 11-12; *supra* at §I.A.1; PSJO at 13 & n.49; *McWane, Inc. v. FTC*, 783 F.3d 814, 830-32 (11th Cir. 2015) (entry and growth insufficient to undercut high share); *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 971-73 (10th Cir. 1990) (entry of 200 competitors did not show lack of barriers); *Trendsettah USA, Inc. v. Swisher Int'l Inc.*, 2016 WL 6822191, at *6-7 (C.D. Cal. Jan. 21, 2016).

[74] Despite Keurig's contention that "Plaintiffs' citations say nothing about how Keurig's SSBs sales compare to those by Mars/Flavia" or other competitors, Plaintiffs' Motion discussed, and record evidence shows, that, as of January 2013, Keurig held a "████████████████████████████████████" across all workplaces." PMSJ at 58.

### D. Plaintiffs Have Proved Antitrust Injury

Keurig does not even acknowledge, much less attempt to distinguish, the case law explaining that exclusion from the market is a well-established form of harm to competition. Opp'n at 45-46; *cf.* PMSJ at 59-60. Nor does Keurig counter the evidence that Plaintiffs were excluded from selling Competitive Cups in the AFH Market as a result of Keurig's KAD and KARD Agreements and that distributors were also harmed in their ability to compete with each other because they were unable to purchase Competitive Cups. PMSJ at 59-60.[75] Instead, Keurig again misstates the law, which does not require total foreclosure to show harm to competition, and misleadingly states that "average prices of portion packs have declined over time," ignoring two full years of undisputed data showing a profitable ███ AFH K-Cup price increase beginning when TreeHouse entered the market in 2010 through 2012. Opp'n at 45-46; PSJO at 31-32; PMSJ at 57.

### E. Plaintiffs Are Entitled To Partial Summary Judgment On The Fact Of Damages

Courts consistently award partial summary judgment on the fact of damages by "proof of *some* damage flowing from the unlawful [conduct]."[76] Plaintiffs have set forth evidence that Keurig's tying has damaged them (PMSJ at 60; PSUF 491-501) and Keurig fails to cite any evidence or precedent to suggest that awarding Plaintiffs summary judgment would not simplify trial by avoiding an unnecessary step and review of undisputed evidence. Opp'n. at 45-46.

## IV. KEURIG IMPLEMENTED 2.0 TECHNOLOGY IN AN UNNECESSARILY RESTRICTIVE WAY AND WITHOUT A PROCOMPETITIVE JUSTIFICATION

Keurig's implementation of so-called "CBT" technology in its 2.0 Brewer was unnecessarily restrictive. *See* PMSJ at 66-73. In addition, Keurig's purported procompetitive

---

[75] *See also* PSUF 418-19 (Keurig rejected the OCS Leadership Team's request to remove the Loyalty Clause on the basis that ███ % of its K-Cup sales would go to Competitive Cup manufacturers if the clause were removed); PSUF 1029, 1161, 1030, 1189 (removing Loyalty Clause ████████████████ ).

[76] *State v. Cedar Park Concrete Corp.*, 1997 WL 306909, at *9 (S.D.N.Y. Mar. 21, 1997); *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 88 (2d Cir. 2000).

justifications for CBT have either been abandoned or were pretextual. *See* PMSJ at 73-79. Thus, the implementation of CBT was an exclusionary practice because it "[did] not further competition on the merits or [did] so in an unnecessarily restrictive way."[77]

In its response, Keurig misstates the law and ignores the facts. As to the law, Keurig suggests this Court should disregard its previous rulings and the governing Supreme Court *Aspen Skiing* standard for exclusionary conduct and urges the Court to incorrectly immunize product redesign from antitrust liability. On the facts, Keurig concedes that less restrictive alternatives performed the same functions as CBT (but without any lock-out feature) and fails to come forward with evidence, as it must, to dispute Plaintiffs' evidence of less restrictive alternatives to CBT.[78]

## A. Keurig Misstates the Law

This Court has already held that exclusionary conduct is governed by the Supreme Court *Aspen Skiing* standard. *See* MTD Order at 228-31. Remarkably, Keurig's Opposition does not even mention *Aspen Skiing*,[79] and thus ignores the legal standard: whether CBT "either does not further competition on the merits or does so in an unnecessarily restrictive way." 472 U.S. at 605 n.32. Instead, Keurig dusts off its failed argument that product redesign is immune from antitrust scrutiny, citing to *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979)—a Second Circuit case that *predates Aspen Skiing.* Opp'n at 47, 50-53. But this Court has already held that no such blanket immunity exists. MTD Order at 230.

Keurig also ignores the specific feature at issue, *CBT*, arguing instead that the *2.0 Brewer as a whole* conferred a procompetitive benefit.[80] The relevant inquiry is whether the "*specific*

---

[77] *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985); MTD Order at 228-31.
[78] *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).
[79] Any argument against *Aspen Skiing* is waived in light of Keurig's failure to acknowledge it. *See supra* n.15. If Keurig disagreed that *Aspen Skiing* applied, Keurig could have sought reconsideration. *See supra* n.7.
[80] *Major League Baseball*, 542 F.3d at 339 ("restraint must have a reasonable procompetitive justification, related to the efficiency-enhancing purposes of the [conduct at issue]"); *see also N. Tex Specialty Physicians v. FTC*, 528 F.3d

*restraint at issue* has the potential for [] adverse effects on competition." *Supra* n.12; PSJO at 62-63 & n.246. Thus, whether the 2.0 Brewer offered consumer benefits is beside the point.[81]

Keurig also interjects diversionary issues not before the Court. Plaintiffs move for *partial* summary judgment on the basis that CBT was not reasonably necessary to achieve a legitimate procompetitive justification and, in the alternative, that any such justification could have been achieved in a less restrictive manner. PMSJ at 63-79. As such, coercion[82] and harm to competition are not at issue in this motion and the Court need not address those tangential issues.[83]

**B. CBT Was Unnecessarily Restrictive And Lacked Any Procompetitive Justification**

Keurig's implementation of CBT was unnecessarily restrictive, and Keurig concedes that CBT offered no procompetitive benefit.[84] Instead, Keurig points to speculative, hypothetical, and never-realized ███████████████████████.[85] Opp'n at 51-57. But hypothetical future benefits do not count. *See* PMSJ at 52-54.[86] Keurig cites no case, and Plaintiffs

---

346, 368 (5th Cir. 2008); *Eastman Kodak Co. v. Image Tech Servs.*, 504 U.S. 451, 481-483 (1992); *U.S. v. Microsoft Corp.*, 253 F.3d at 58-59; *FTC v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

[81] *See, e.g.*, *Actavis, Inc.*, 570 U.S. at 154; *N. Tex. Specialty Physicians*, 528 F.3d at 354, 368-70 (finding restraint not logically connected to benefit); *In re Impax Labs.*, 2019 WL 1552939, at *36-38 (finding defendant failed to tie benefit to specific restraint and thus "conduct constitutes an unreasonable restraint of trade" without further analysis).

[82] Keurig also misstates the law, suggesting that coercion can only be shown where a prior product is taken off the market. Opp'n at 49. But *Actavis* only requires the overall effect of a defendant's conduct to be to coerce consumers, not that there be product withdrawal. 787 F.3d at 653-54. As this Court has already acknowledged, "it is not the product introduction itself, but *some associated conduct*, that supplies the violation." MTD Order at 230 (emphasis added). Here, there is extensive evidence of Keurig's coercive conduct. PSJO at 41-47.

[83] Partial summary judgment will effectively narrow the issues for trial by eliminating entire elements of the *Aspen Skiing* framework. *See Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993).

[84] *See* PMSJ 73-75; PSUF 562 ("████████████████████████████████████ "), 649, 651, 656-661, 664, 666-668; Opp'n at 51-54.

[85] Keurig says it "wanted to be able to" ████████████████████████████████████████ ███. Opp'n at 56. But CBT never provided any such features. Keurig's argues that its corporate representative's testimony that the 2.0 Brewer was never able to determine more than whether a cup was a K-Cup or a Vue Cup was outside the scope of 30(b)(6) testimony. However, Mr. Martin was designated to testify on, among other things, "2.0 K-Cup Brewer ink reader technology" and "2.0 K-Cup Brewer ink reader technology and material changes, if any, made to that technology during the Relevant Time Period." Resp. to KSUF 972-73. The testimony is well within the scope of these topics, and Keurig's counsel did not object as to scope during the deposition, thereby waiving the argument. *See Colon v. N.Y. City Hous. Auth.*, 2019 WL 4291667, at *3 (S.D.N.Y. Sept. 11, 2019) ("a party waives an objection 'by failing to note the objection at the taking of the deposition'") (citation omitted).

[86] *Cal. v. Safeway, Inc.*, 651 F.3d 1118, 1160 (9th Cir. 2011) ("chain of contingencies … renders … procompetitive benefits" of restraint "purely speculative"); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 721 (D.C. Cir. 2001) (court should not credit "mere speculation and promises"); David Grenardo, *The Blue Devils in the Details: How a Free Market*

are aware of none, where it was undisputed that a restraint offered no benefit in the present and the defendant justified the restraint with the hope that some benefit might materialize in the future.

Further, Keurig's purported concerns about the safety or quality of Competitive Cups remain unsupported and, in any event, no evidence suggests that such concerns motivated the 2.0 Brewer design (or CBT, as required)—a showing Keurig *twice* failed to make before Judge Pitman and that it fails again to make now. ECF Nos. 434, 652; Opp'n at 53. Nor does Keurig genuinely dispute the evidence demonstrating that Keurig has abandoned its safety and quality justifications and that they were pretextual in any event. PMSJ at 70; PSUF 598, 605-607, 696, 680.

Even if legitimate, Keurig's justifications were achievable with less restrictive means.

**The reed switch did the same thing as CBT without locking out Competitive Cups.** Keurig concedes that CBT did nothing more than ████████████—the same function that the reed switch served more reliably. Opp'n at 55; Resp. to PSUF 535, 536, 538-46. Indeed, the reed switch ████████████████████████████████████████████████████████████████████ ████████ and, at that time, according to Keurig, "the reed switch sufficed." Opp'n at 59.

**Barcode technology would have allowed the 2.0 Brewer to recognize recipes without locking out Competitive Cups.** Prior to launch, Keurig claimed that CBT would permit the 2.0 Brewer to recognize "recipes." PSUF 576, 580, 616, 620. Although Keurig has now admitted this was false, the undisputed evidence shows that barcode technology was a less restrictive means to achieve that never realized "benefit." PMSJ at 71-73. Keurig does not dispute that barcode technology could have been used to deliver beverage-specific recipes. *See* Resp. to PSUF 629, 638, 641, 642, 645. Instead, Keurig argues without support that the technology would have been

---

*Approach to Compensating College Athletes Would Work*, 46 Pepp. L. Rev. 203, 215 n.66 (2019) ("speculative, unsubstantiated, or uncertain" justifications insufficient); Alex Moyer, *Throwing Out the Playbook: Replacing the NCAA's Anticompetitive Amateurism Regime with the Olympic Model*, 83 Geo. Wash. L. Rev. 761, 786 (2015) (same).

too expensive and that an "orientation" issue would prevented proper scanning. Opp'n at 56-58.

Keurig fails to support its arguments. As to cost, Keurig presents no evidence showing Keurig concluded that barcode technology was too expensive.[87] Nor does Keurig present any evidence to counter Plaintiffs' expert opinion that the technology was a viable, cost-effective alternative at the time of the 2.0 Brewer design.[88] As to the orientation issue, Keurig fails to dispute that this "problem" could be solved via the use of a notched cup (which Keurig had patented) or through the use of camera technology that was widely available at the time.[89]

**_Brewer display messages could have advised consumers of Keurig's purported safety and quality concerns while leaving to consumers the choice to use Competitive Cups._** Keurig fails to dispute that using brewer display messages to advise consumers that they were brewing Competitive Cups would have been less restrictive than CBT in addressing Keurig's purported safety and quality concerns. Not only does Keurig fail to support any safety or quality justification but, even if this Court considers that justification, Keurig cites no evidence, as it must, to suggest that messaging would not have been a viable, less restrictive alternative.[90] Instead, Keurig feigns ignorance of such messages despite Keurig documents and testimony to the contrary.[91]

Keurig also argues—without evidence—that displaying messages "would not prevent compatibility and quality problems." Opp'n at 58. But Keurig cannot rely on compatibility as a

---

[87] Keurig does not dispute that barcode technology would have been royalty free to Keurig (compared to paying its taggant ink supplier, ▮▮▮▮▮▮▮▮ PMSJ at 72 & n.61; PSUF 575). Keurig argues that the fee paid to Sun Chemical was "▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮" Resp. to PSUF 575, but this does not raise a genuine dispute. As Keurig admits, the "intellectual property" being licensed was "required to use the ▮▮▮▮." Resp. to PSUF 689.

[88] Keurig cites testimony of its Chief Technology Officer, Mr. Sullivan, but it does not indicate that barcode technology would have been too expensive to implement. Resp. to PSUF 646.

[89] PSUF 647; Ex. 235 (Castleman Reply ¶¶ 101-113).

[90] Keurig attempts to shift the burden to Plaintiffs to "cite any case that requires a manufacturer to make its new product design open to all comers subject only to unspecified warnings," but it is Keurig's burden to come forward with evidence to dispute Plaintiffs' evidence of less restrictive alternatives. _See Brown_, 654 F.3d at 358 (non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact").

[91] PMSJ at 70-71; PSUF 611-613, 614; _see also_ PSUF 609. For example, Keurig considered using language like "This portion pack not compatible with Keurig 2.0" but allowing the cup to brew anyway. PSUF 611, 613-14.

30

justification for the *very restraint that caused those compatibility problems*.[92] Moreover, messages would have warned consumers they were using Competitive Cups but would have left the choice up to them.[93] In any event, Keurig admits that it considered display messages and other options to advise the 2.0 Brewer user that a Competitive Cup was inserted. *See, e.g.*, Resp. to PSUF 609-614. But Keurig rejected those alternatives in favor of CBT and cites no evidence they were not viable.

## V. KEURIG'S CHALLENGED ADVERTISING WAS LITERALLY FALSE, MATERIAL, AND DAMAGED PLAINTIFFS

Plaintiffs are entitled to summary judgment on the Keurig statements at issue[94] because they are (1) literally false (2) material (3) commercial advertisements (4) that appeared in interstate commerce. Mot. at 87-93. Keurig largely fails to challenge the last two prongs of this analysis and its arguments as to the others fail to defeat summary judgment.

### A. Keurig Is Liable For Its Literally False Statements

Keurig misdirects the Court from its literally false statements. Keurig asserts that Plaintiffs "paraphrase what they think Keurig might have said,"[95] Opp'n at 60-61, ignoring Keurig's admissions that it made the statements at issue. *See, e.g.*, Ex. 306. Set forth below are just some examples of the undisputed evidence of literally false statements, compared to what Keurig would like the Court to consider instead:

| Representative Statement | Publication Support | Statement Keurig Addresses in Brief |
|---|---|---|
| "Works only with Keurig brand packs." | Keurig's 2.0 Brewer packaging. *See* Ex. 306; PSUF | "If you don't see the Keurig logo, the beverage pod is not |

---

[92] Keurig's response ignores that implementing CBT caused the poor consumer experience about which Keurig claims it was concerned and put profits over the quality and reliability of brews. Resp. to KSUF 977, 978 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[93] Keurig executives have admitted under oath that "quality is judged by the consumer" and that consumers themselves can "decide [] what's good or bad." PSUF 688.

[94] Plaintiffs' motion is only brought as to Keurig's literally false statements, reserving the right to try before a jury the statements that are misleading but not necessarily literally false. PMSJ at n.81. Keurig does not dispute that Plaintiffs' parallel state claims should succeed if its Lanham Act claims succeed. Opp'n at 61, n.50.

[95] Despite Keurig's claims to the contrary, Plaintiffs clearly delineate these "specific misrepresentation[s]" in their motion. *See* Mot. at 80-87; Ex. 306; *see also Apotex Inc. v. Acorda Therapeutics*, 823 F.3d 51, 68 (2d Cir. 2016).

|  | 707-708 (citing KGM Responses to THS's 2d Set of RFAs, Nos. 166, 185, and 190). | guaranteed to work in the Keurig 2.0 system." Opp'n at 64. |
|---|---|---|
| "We do not make or test the other brands." | Keurig's social media pages. *See* Ex. 306; PSUF 744. | "Keurig's packs … meet the Keurig standards for taste, quality and safety." Opp'n at 71. |
| "Using unapproved portion packs or accessories may decrease your brewer's performance, overall life, and may affect its warranty." | Keurig's website. *See* Ex. 306; PSUF 757 (citing KGM Responses to THS's 2d Set of RFAs, No. 151). | "Look for the Keurig Brewed seal, our commitment to you! Only products with the Keurig Brewed seal meet Keurig standards for taste, quality, and safety." Opp'n at 73. |

Keurig's failure to even try to defend the actual statements at issue compels summary judgment in Plaintiffs' favor.[96]

### 1. *Keurig Does Not Defend Its Literally False Incompatibility Statements*

Keurig made public statements beginning as early as August 2014 that the 2.0 Brewers worked only with K-Cups, despite knowing that these statements were false. Keurig fails to address any of those statements, including the statement on the 2.0 Brewer box that the Brewer "works only with Keurig brand packs." Mot. at 80; *cf.* Opp'n at 63-65. This failure means that literal falsity is admitted as a matter of law. *See supra* nn. 13, 96.

Keurig recharacterizes its lies as statements that "convey that the 2.0 Brewer was ██████ ███████████████████████████████████████████." Opp'n at 60. But the challenged statements say nothing of the sort. Rather than referencing what the 2.0 Brewer was *designed* to do, Keurig repeatedly and unequivocally told consumers that the 2.0 Brewer "*will not operate*" with Competitive Cups, "*worked only* with Keurig Portion Packs," "*works only* with Keurig brand

---

[96] *See supra* n.13. Keurig's failure to engage on these material facts deems these facts admitted. *Rizzo v. Amerada Hess Corp.*, 26 F. App'x 51, 52 (2d Cir. 2001) ("Any facts set forth in the Statement of Material Facts shall be deemed admitted unless *specifically controverted*") (quotations omitted); *SEC v. Credit Bancorp, Ltd.*, 738 F. Supp. 2d 376, 392 (S.D.N.Y. 2010) ("nonmoving party cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts") (quotations omitted).

packs" and cups, "is compatible with Keurig K-Cup & K-Carafe Pods *only*," "*works with only Green Mountain Keurig Brand Packs*," and "will only function with Keurig brand pods." Ex. 306 (emphasis added).[97] Keurig does not—and cannot—defend these untruths.

Keurig admits that "falsity is assessed at the time statements are made," Opp'n at 64, yet only attempts to defend the alleged truth of the incompatibility statements *prior* to the 2.0 Brewer launch, *id.*, ignoring false statements made *after* the launch. Ex. 306. It is therefore no defense to the falsity of the post-launch statements that Keurig's pre-launch statements may not have been false.[98] Failing to dispute the falsity of the incompatibility statements made beginning in August 2014, Keurig has waived any argument otherwise. *See supra* nn.13, 96.

Keurig weakly suggests that only "*some* unlicensed pack suppliers … developed compatible packs." Opp'n at 65. But Keurig cites no facts to support its suggestion that there were any Competitive Cups that would not work in the 2.0 Brewer.[99] More fundamentally, its argument fails to defend the actual statements Keurig made. Keurig did not say "*may not* work with non-Keurig cups" or "to guarantee compatibility, use only Keurig cups." Instead, Keurig was unequivocal: saying that the 2.0 Brewer "*works only with Keurig brand cups*." Ex. 306 (emphasis added). This was literally false.[100]

---

[97] Contrary to Keurig's argument Plaintiffs took Keurig's statements out of context, *Keurig* is the one that has done so. For example, Keurig quotes only its statement that "[i]f you don't see the Keurig logo, the beverage pod is not guaranteed to work in the Keurig 2.0 system," Opp'n at 64, cutting off the final sentence: "If you purchase unlicensed pods and attempt to brew them with Keurig 2.0, *the system will not operate* and call out an error message." Ex. 306 (emphasis added). There was no "context" to the statement the 2.0 "works only with Keurig brand packs." *Id.*

[98] In any event, the pre-launch period shows that Keurig already had significant concerns that its statements at launch would be false. *See, e.g.*, PSUF 1665, 1666. ███████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████████ PSUF 724, 727, 728.

[99] Indeed, it is undisputed that JBR's "Freedom Clip," which was launched shortly after the 2.0 Brewer launch, allowed *all* Competitive Cups to work in the 2.0 Brewer. PSUF 1676; *see also* KSUF 993.

[100] *See, e.g.*, *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 443-44 (S.D.N.Y. 2020) (defendant's claims that its products were "authentic" and "100% the real thing" were literally false when *some* of the products at issue were inauthentic). *Turbon Int'l, Inc. v. Hewlett-Packard Co.*, cited by Keurig, is inapposite. 769 F. Supp. 2d 262 (S.D.N.Y. 2011). The court there dealt with vague generalizations that competitive toner cartridges *sometimes* do not work as

### 2. *Keurig Does Not Defend Its Literally False Testing Statements*

For years, Keurig publicly stated that it did not test Competitive Cups, despite undisputed evidence that it tested Competitive Cups as early as October 2010. *See* Ex. 306. Understandably, Keurig fails to contest the falsity of its statement, which again is a waiver. *See supra* nn. 13, 96.

Instead, Keurig argues that because the testing statements were sometimes accompanied by language that "products with the 'Keurig Brewed' seal … meet the Keurig standards for taste, quality and safety and are tested to perform in the Keurig Brewer" this somehow changes the plain meaning of the statement that "[w]e do not make or test the other brands." Opp'n at 70. Keurig ignores the fact that its testing statements often came without such "context." For example, in January 2014, Keurig told a consumer, "We do not make or test the other brands. Using unapproved portion packs may decrease your brewer's performance [and] affect its warranty." *See* Ex. 306 (alteration in original). There was no additional "context."

Keurig also tries to discount its admitted testing as "ad hoc tests." Opp'n at 70. But the Keurig advertising did not say "we do not systematically test unlicensed portion packs."[101] Opp'n at 70. The challenged statement literally states Keurig performed *no tests*.[102] Keurig further claims it "makes no claim of test-proven superiority." Opp'n at 72.[103] Keurig may now have abandoned

---

well. *Id*. at 265, 268. The more analogous statements—that cartridges "will not work"—were not made in advertising and were therefore not considered by the court. *Id*.

[101] *Avis Rent A Car Sys. v. Hertz* does not help Keurig. 782 F.2d 381 (2d Cir. 1986). There, the Second Circuit found that the statement at issue ("Hertz has more new cars than Avis has cars") was ambiguous because it was unclear if Hertz was referencing *rental* cars or cars in the companies' *fleets*. *Id*. at 383-84. Hertz also presented extrinsic evidence showing that most consumers interpreted the statement as referring to *rental* cars, which would make the statement true. *Id*. at 385. Here, there is no facial ambiguity in the statement "[w]e do not make or test the other brands," nor has Keurig presented any evidence that consumers interpret this as meaning "[w]e do not *systematically* test other brands."

[102] Even Keurig's hypothetical statement is literally false as it hired Exponent to do a number of systematic tests on Competitive Cups, with the result that TreeHouse met or exceeded all Keurig criteria for quality. PSUF 749-50, 756.

[103] Keurig further argues that its statements that it did not test Competitive Cups were "puffery" and that *no reasonable consumer* would rely on them. Opp'n at 72. But the cases cited by Keurig do not involve claims of product testing. *See Malaco Leaf, AB v. Promotion in Motion, Inc.*, 287 F. Supp. 2d 355, 379 (S.D.N.Y. 2003) (holding that "subjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act as mere puffing" (internal quotations omitted)); *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 541-42 (S.D.N.Y. 2018) (same).

such claims after discovery in this case proved them false, but Keurig repeatedly made such claims, including in the *Sturm* Litigation. PSUF 1426-35. Further, Keurig's corporate witness admitted that the testing conducted by Keurig, including the 30-Cup Test conducted in 2010, provided the basis for Keurig's public quality claims. Resp. to KSUF 994.[104] And, contrary to its claim, Keurig explicitly made false statements of test-proven superiority, including █████████████████████████

████████████████████████████████████████████████████████.[105]

### 3. *Keurig Does Not Defend Its Literally False Brewer Performance Statements*

Keurig made false statements Competitive Cups decrease the overall life and performance of Keurig Brewers,[106] despite the fact that the undisputed █████████████████████████████

███████████████████████.[107] Keurig pretends there was some uncertainty in this regard, Opp'n at 73, but Keurig fails to provide *any* evidence of *any* brewer damage ever caused by a Competitive Cup. Further, Keurig admitted, consistent with other record evidence, that it was "██████████████

███████████████████████████████████" PSUF 773-775, 777-778.

Keurig repeats its familiar sleight of hand by asserting that there is "no dispute that [Competitive Cups] have resulted in customer complaints and product withdrawals" and alludes to a "range of quality issues with" Competitive Cups. Opp'n at 73, 75.[108] There are at least two

---

[104] Indeed, Keurig's expert admitted that Keurig's testing provided a basis for Keurig's false claims about the comparative quality of TreeHouse cups. Expert Report of Thomas Fedorka, Dec. 7, 2020, ¶ 27, 48, Ex. 669.

[105] *See* Resp. to KSUF 994; *see also* PSUF 593-94, 769, 772. *Apotex, Inc. v. Acorda Therapeutics, Inc.*, relied on by Keurig, is inapposite. 823 F.3d 51, 65 (2d Cir. 2016). There, the court found there was no evidence that defendant's sales representatives relied on any tests or studies in claiming superiority. *Id.* The same cannot be said of Keurig.

[106] Keurig argues that Plaintiffs "paraphras[ed]" and "distort[ed]" Keurig's statements, Opp'n at 73, but Plaintiffs included the entirety of the language verbatim in Ex. 306. Once again, it is Keurig who distorts. Keurig asserts that "the statements disclaim Keurig's responsibility for any damage that may occur by use of unlicensed packs." Opp'n at 74. But Plaintiffs' Motion does not challenge Keurig's claim that the use of Competitive Cups may void the warranty of the Keurig Brewer—though there is ample evidence to show that this claim, too, was false. *See* PSJO Ex. A.

[107] *See* PSUF 773-777, 1685, 1693-94. In fact, ████████████████████████████████████████
████████████████████. PSUF 778.

[108] There is a logical disconnect between this argument and Keurig's argument that it did not make any claims based on comparative testing. Opp'n at 71-72. If not, then what is Keurig's statement about Competitive Cups' "unacceptable failure rates" based upon? Claiming a failure rate is "unacceptable" necessarily implies a comparison with K-Cups.

problems with this argument. First, Keurig is wrong to suggest that any issues with Competitive Cups were any greater than the issues Keurig had with its own K-Cups; ███████████ ███████.[109] Second, and more fundamentally, even if these alleged incidents with Competitive Cups occurred, Keurig does not proffer any evidence to support the actual statement at issue: that these purported failures *had any effect whatsoever on the life or performance of Keurig Brewers,* which is what Keurig asserted in the challenged advertising. Opp'n at 73-74.

Keurig attempts to distinguish *Castrol Inc. v. Pennzoil Co.*, but ignores that the claims there—that defendant's product provided "longer engine life and better engine protection"—are directly analogous to Keurig's statements that "using unapproved portion packs *may decrease your brewer's performance, overall life*," that "[u]sing products without the [Keurig Brewed] seal may damage your Keurig brewing system," and that "[o]nly the use of Keurig Brewed K-Cup brand packs and accessories will guarantee the proper functioning and lifetime of your brewer."[110] It is disingenuous to suggest Keurig's advertising statements "do not assert superiority." Opp'n at 74.

### 4. *Keurig Does Not Defend Its Literally False Safety Statements*

Keurig's statements that Competitive Cups "do not work safely or effectively" and that it is "critical for performance and safety reasons that [the 2.0 Brewer] system includes" Lock-Out Technology are both literally false. Ex. 306. Keurig claims that its statements that TreeHouse Portion Packs "do not work safely or effectively" are not actionable because they were made in SEC filings. Opp'n at 76. However, Keurig ignores the admission by its Vice President of Global Corporate Communications that Keurig made statements consistent with this messaging to the public through its public relations firm and in the press. *See* PSUF 788.

---

[109] *See* Resp. to KSUF 305. Keurig conveniently ignores the evidence showing that its own K-Cups ████████████ ██████████. PSUF 797, 800-06, 811-28, 833.
[110] 987 F.2d 939, 941 (3d Cir. 1993) (quotation marks omitted); Ex. 306 (emphasis added).

Second, Keurig claims this statement is true because "consumers had begun complaining by October 2010 that the packs did not work in Keurig brewers." Opp'n at 76-77.[111] But this ignores Keurig's lie that TreeHouse's Portion Packs did not work *safely*. Keurig does not address this statement because it knows that it has no evidence to show that it is—or ever was—true.[112]

## B. Keurig's Statements Are Presumed To Have Caused Confusion And Were Material

After making contrary economic and legal arguments, Keurig finally *concedes that consumer confusion is presumed* when a statement is literally false. Opp'n at 62.[113] Indeed, even the Second Circuit *Avis* case, which Keurig relies upon, states the long-recognized legal principle that "if a statement is actually false, relief can be granted on the court's own findings *without reference to the reaction of the buyer or [the] consumer of the product*." 782 F.2d at 386 (emphasis added). This belated concession finally abandons the indefensible position taken by Keurig's expert, Dr. Ugone, who took issue with this (as well as other) assumptions by TreeHouse's expert, Dr. Rao, calling the 100% confusion rate assumption "███████████████████████████ ████████████████████████████████████████████████████████████████" Ex. 7 (Ugone Rpt. ¶¶ 292-93). The case law is clear that reliance on survey evidence is unnecessary in the case of literally false statements, as ultimately admitted by Keurig's counsel.[114]

Each of Keurig's false statements concerns an inherent quality of Competitive Cups, making them presumptively material as a matter of law.[115] Mot. at 90-91. While Keurig relies on

---

[111] This claim is also untrue and unsupported by the evidence Keurig cites. *See* Pls. Resp. to KSUF 998.

[112] PSUF 676-77, 801, 1690; *see also infra* §V.C. Indeed, the evidence shows that *Keurig's* Brewers and K-Cups ███ ███████████████████████. PSUF 797, 800-06, 811-28, 833.

[113] *Citing PPX v. Audiofidelity*, 818 F.2d 266, 273 (2d Cir. 1987) (plaintiff "should not have been required to provide evidence of actual consumer confusion" in light of literally false statement); *see also* ECF 1592 at 3.

[114] ECF 1592 at 3 (Keurig admitting "the case law presumes that literally false statements caused consumer confusion (*i.e.*, 100% confusion)"); *see, e.g.*, *Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 449-50 (S.D.N.Y. 2012); *Playtex Prod., LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *10 (S.D.N.Y. Mar. 29, 2016) ("injury may be presumed given the literal falsity of the claim"); *Optigen, LLC v. Int'l Genetics, Inc.*, 877 F. Supp. 2d 33, 45 (N.D.N.Y. 2012) (granting partial summary judgment to plaintiff on literally false statements without analysis of consumer deception).

[115] Mot. at 90-91 (citing cases); *see also* Sibley Rpt. ¶¶ 1104-07, Ex. 6.

*Apotex*'s remark that a plaintiff must show that the statements are "likely to influence purchasing decisions," it omits that case's statement that materiality is shown by a demonstration that the "representation involved an inherent or material quality of the product."[116] Keurig fails to address the testimony from its own executives that the qualities at issue were "inherent" and "material." Mot. at 91. Thus, there is no requirement that a plaintiff use survey evidence to prove materiality. Notwithstanding the presumption, Plaintiffs provided ample evidence of materiality, including survey results, showing purchasing behavior was altered based on Keurig's false statements.[117]

## C. Plaintiffs Were Injured By Keurig's Statements

Keurig argues that injury may be presumed only when literally false statements directly reference a competitor's product in a two-player market. Opp'n at 63. However, *Merck Eprova AG v. Gnosis S.p.A.*, cited by Keurig, does not stand for that proposition, instead noting that the Second Circuit has "never required a finding of extrinsic evidence of injury to consumers or to the plaintiff" for cases in which literal falsity has been found.[118] In any event, Keurig's statements *are* comparative.[119] Keurig's statements are analogous to those in *Castrol*, in which the defendant made statements that implied "Pennzoil outperforms the other leading brands … protecting against engine failure." 987 F.2d at 947. *Castrol* demonstrates that one does not need to identify the competitors by name in order to make the statement "comparative."

Keurig's attempts to dispute "fact of injury" for each category of false statements fail:

---

[116] 823 F.3d at 68; *see also Salon FAD v. L'Oreal USA, Inc.*, 2011 WL 70591, at *6 (S.D.N.Y. Jan. 10, 2011).

[117] *See* ECF 1528 at III.A.1 (Butler Daubert Opp'n); ECF 1523 at III (Poret Daubert Opp'n); PSUF 1882, 1980-81. While Keurig argues its false statements were not material because consumers and retailers could evaluate the claims, Opp'n at 79, that is not the test for materiality. *See, e.g., Au New Haven, LLC v. YKK Corp.*, 2019 WL 1437516, at *19 & nn.177-179 (S.D.N.Y. Mar. 31, 2019) (in assessing materiality, courts consider whether the statement concerns "an inherent or material quality of [a] product"). In any event, Plaintiffs presented unrebutted evidence customers shunned Competitive Cups due to Keurig's false statements. PSUF 195, 331, 1672; Resp. to KSUF 312.

[118] 760 F.3d 247, 259 (2d Cir. 2014); *see also Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 40 (E.D.N.Y. 2009) ("even if the product is not mentioned by name, [injury] can be presumed where, given the nature of the market, it would be obvious to a viewing audience that the advertisement is targeted at the plaintiff, even though the plaintiff is not identified by name.") (internal quotations omitted).

[119] Indeed, Keurig continues to make directly comparative statements in its briefing. *See* KSUF 957, 977, 979, 980.

***Incompatibility statements***: Keurig argues there was no injury because Plaintiffs' sales "increased substantially" during the relevant time period. Opp'n at 69. This argument ignores the law of the case and common sense. MTD Order at 235-36 (holding that Competitor Plaintiffs may be injured by Keurig's conduct even if they have "continued selling Competitor Cups and, in some circumstances, have increased sales of Competitor Cups"). Furthermore, the undisputed evidence shows that TreeHouse's ███████ following the numerous false incompatibility statements Keurig made in connection with the launch of the 2.0 Brewer. *See* PSJO at 25 & n.167.[120]

***Testing statements***: Keurig asserts that Plaintiffs "have no systemic evidence that they lost sales because Keurig said it does not test unlicensed packs to ensure their quality and can only guarantee its own products." Opp'n at 72. But this again focuses on the incorrect statements: Plaintiffs moved on Keurig's literally false statements that it does not *test* Competitive Cups, not that it does not *offer guarantees* on Competitive Cups. *See supra* §V.A.2. Second, the cases Keurig cites for the proposition that Plaintiffs must "demonstrate injury" are inapposite because none of them involved literally false statements. *Id.*[121]

***Brewer performance statements***: Keurig claims Plaintiffs have failed to show injury because Plaintiffs rely on analysis from Dr. Rao, which Keurig claims is "unreliable." Keurig argues that Dr. Rao "offers no evidence [as to consumers' exposure to the brewer performance statements] … independent of inadmissible inputs from Ms. Butler." Opp'n at 75. Apart from the fact that Keurig's *Daubert* motions directed to Ms. Butler and Dr. Rao are baseless, Keurig never challenged the reliability of the *exposure* survey results obtained by Ms. Butler and then used by Dr. Rao. Contrary to Keurig's assertion, Dr. Rao does not "skip" any steps in his damages analysis

---

[120] There is also ample evidence that retailers expressed concern about Competitive Cups based on Keurig's false statements about compatibility and safety. PSUF 1275, 1282-83, 1608, 1610, 1621, 1623-24, 1629-39, 1661-64.

[121] Opp'n at 73 (citing *Dependable Sales & Serv. v. TrueCar, Inc.*, 394 F. Supp. 3d 368 (S.D.N.Y. 2019) and *VBS Distrib. v. Nutrivita Labs., Inc.*, 811 F. App'x 1005 (9th Cir. 2020)).

by providing a damages estimate presuming legal findings of confusion and materiality.

*Safety and efficacy statements*: In arguing that Plaintiffs have not demonstrated injury based on Keurig's false statements regarding the safety and efficacy of Plaintiffs' Portion Packs, Keurig continues to misrepresent the statements at issue. *See supra* §V.A.4. For example, Keurig suggests that its advertising that Competitive Cups did not work "safely or effectively" was true because some "consumers had begun complaining by October 2010 that the packs *did not work* in Keurig brewers." Opp'n at 76-77. But this is apples and oranges; even if it were true that some packs did not work in Keurig's Brewers, that forms no basis for a claim that those packs are unsafe.

Apart from these specific problems with Keurig's arguments for each of these literally false statements, Keurig ignores for all of them its concession that consumer confusion is presumed where statements are literally false, Opp'n at 62, as well as the fact that Keurig's statements were material because they concerned inherent product qualities. *See supra* V.B.[122]

### D.  Plaintiffs Are Entitled To Damages And Injunctive Relief

Plaintiffs are entitled to monetary damages and injunctive relief based on Keurig's literally false statements. TreeHouse is entitled to single damages, based on unjust enrichment, in the amount of ████████. Mot. at 95. Those damages should be enhanced to the amount of ██ ████ based on Keurig's "bad faith," which is shown when a party publishes statements known to be false. Mot. at 96-97. Keurig does not challenge the key elements of this damages estimate: the dates of publication for its literally false statements, consumer exposure to the statements,[123] and the calculations applied by Dr. Rao. Instead, Keurig argues that unjust enrichment is inappropriate as a matter of law, that damages cannot be awarded because of a purported lack of

---

[122] As discussed in Plaintiffs' opposition to Keurig's *Daubert* motion, Dr. Rao offers alternative damages models that can be applied based on legal or factual findings of confusion and materiality. ECF 1530 at II.D (Rao Daubert Opp'n).
[123] As discussed *supra* §V.C, Keurig has conceded that Dr. Rao examined exposure and, in any event, Keurig failed to offer any material facts supporting an alternative measure of exposure, thereby waiving the right to do so.

materiality, that damages should not be trebled, and that Plaintiffs are not entitled to injunctive relief. Opp'n at 80-82. Each of these arguments fails.

First, unjust enrichment requires disgorgement of *all* of the defendant's profits attributable to the anticompetitive conduct, with no reduction on account of an individual plaintiff's market share or calculation of which percentage of profits could have gone to the plaintiff.[124] While Keurig argues that unjust enrichment for false advertising claims is "rarely granted,"[125] it ignores that *Burndy* states that unjust enrichment is appropriate "if the defendant is unjustly enriched, if the plaintiff sustained damages from the infringement, or if an accounting is necessary *to deter a willful infringer from doing so again*." *Id*. at 771 (internal quotations omitted) (emphasis added). This is precisely the type of willful conduct Plaintiffs have established. Mot. at 96-97.[126]

Second, Keurig again tries to claim that damages based on a presumption of materiality are inappropriate. Opp'n at 80-81. This argument fails as a matter of law.[127] *See supra* §V.B.

Third, Keurig inaccurately argues that Plaintiffs "fail[] to cite any case" supporting trebled damages. Opp'n at 81. The cases cited by Plaintiffs demonstrate that the Court has discretion to enhance damages up to trebling when the defendant knew statements were false when made. Mot. at 96. Such "willful or intentional conduct of defendant is the usual basis for increasing awards."[128]

---

[124] *See River Light V, L.P. v. Lin & J Int'l., Inc.*, 2015 WL 3916271, at *7 (S.D.N.Y. June 25, 2015). Keurig claims that the fact that JBR did not join TreeHouse's request means that it "recognizes that Plaintiffs are not entitled to summary judgment." Opp'n at 80. Case law consistently supports the premise that a similarly situated party's decision not to join a motion does not speak to the merits of that motion. *See, e.g.*, *Alexander v. Smith County Sherriff's Office*, 2020 WL 5225675, at *4 (E.D. Tex. July 27, 2020); *Parkhurst v. Pittsburgh Paints, Inc.*, 2006 WL 8430945, at *5 (D. Wyo. May 17, 2016); *Dupry v. Gehrig*, 2009 WL 2579055, at *4 (W.D. La. Aug. 20, 2009).

[125] Opp'n at 80 (citing *Burndy Corp. v. Teledyne Indus.*, 748 F.2d 767, 772 (2d Cir. 1984)).

[126] Further, by calling this case "the poster child" for *Burndy*, Keurig appears to concede that it "engaged simply in false advertising of [its] own product," Opp'n at 80, although this concession ignores that Keurig's statements went beyond puffing up its own product and instead disparaged competitors. *See supra* §V.A.

[127] Even in the unlikely event that the Court concludes (contrary to the law) that materiality must be proven through survey evidence, Dr. Rao has presented an alternative damages calculation based on such evidence of materiality. ECF 1530 at II.D (Rao Daubert Opp'n).

[128] 1 Charles E. McKenney & George F. Long III, Federal Unfair Competition: Lanham Act 43(a) § 10:10. Plaintiffs provided extensive evidence Keurig was aware its statements were false at the time they were made. *See* PSJO Ex. A.

Finally, despite Keurig's claims that "none of [the challenged statements] has been made for years," the evidence shows that many of these statements are ongoing through today and continue to injure Plaintiffs. *See* Mot. at 97-98; PSJO §II.G; Exs. 1293-96.

## VI. UNCLEAN HANDS AND *IN PARI DELICTO* ARE NOT APPLICABLE DEFENSES[129]

### A. *In Pari Delicto* and Unclean Hands Are Inapplicable To Plaintiffs' Antitrust Claims

The Court should grant summary judgment that Keurig's defenses of *in pari delicto* and unclean hands do not apply to Plaintiffs' antitrust claims. Keurig only contests Plaintiffs' Motion with respect to one defense, *in pari delicto*, as it relates to one antitrust claim, exclusive dealing, and has thus abandoned its defenses outside of this narrow application. *See supra* n.15. Even with respect to the *in pari delicto* defense, the Supreme Court has been clear, without exception or qualification, that "[t]he doctrine of *in pari delicto* ... is not to be recognized as a defense to an antitrust action."[130] And while some courts have suggested that *in pari delicto* may apply to antitrust claims in certain very limited circumstances—i.e., where the plaintiff shared responsibility at least *equally for the underlying antitrust illegality*—those circumstances require more than a mere assertion that a plaintiff engaged in *similar* conduct with respect to *other transactions* at some point in history.[131] Rather, as Justice Harlan's opinion in *Perma Life*, on

---

[129] Keurig fails to respond to Plaintiffs' Motion with respect to their state law claims and therefore summary judgment should be granted in Plaintiffs' favor. *See supra* n.15.

[130] *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 140 (1968). Ignoring the Supreme Court's pronouncement in *Perma Life*, Keurig instead cites to its *concurring* opinions. Opp'n at 85. But each of the concurrences expressly noted that *in pari delicto* should apply only where the plaintiff "bear[s] substantially equal responsibility for [the] injury." *Perma Life*, 392 U.S. at 146; *id*. at 148 ("[P]etitioners here are not co-adventurers or partners … ."); *id*. at 151 ("[A] plaintiff who has actively sought to bring about illegal restraints on competition for his own benefit [cannot] be permitted to demand redress … from a partner who is no more responsible for the existence of the illegality").

[131] *See id.*; *The Assertion of the In Pari Delicto Defense Against a Lawbreaking Plaintiff and Innocent Successors*, 44 HOFSTRA L. REV. 781, 801 (2016). Keurig's case law is in accord. *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 168-69 (2d Cir. 2014) ("[T]he *in pari delicto* doctrine requires that the plaintiff be an active, voluntary participant in the unlawful activity … ."); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 80-81 (2d Cir. 2013) (Second Circuit has not "applied the *in pari delicto* defense in private antitrust litigation'"); *Gen. Leaseways v. Nat'l Truck Leasing Ass'n*, 830 F.2d 716, 720-22 (7th Cir. 1987) ("fault-based defense" where plaintiff involved "in the entire scheme"); *Sullivan v. NFL*, 34 F.3d 1091, 1108 (1st Cir. 1994) (plaintiff "actively supported" unlawful conduct).

which Keurig relies, states, *in pari delicto* should be permitted only where the plaintiffs have "violated the law *in cooperation with the defendant*." 392 U.S. at 153 (emphasis added).

Even assuming the doctrine applies, Keurig does not assert (and cannot establish) that Plaintiffs have violated the antitrust laws in cooperation with Keurig. *See, e.g.*, *Republic of Iraq*, 768 F.3d at 168; *Perma Life*, 392 U.S. at 156. Keurig points only to the fact that TreeHouse had two contracts containing some type of exclusivity provisions. Opp'n at 86. But these agreements are wholly unrelated to Plaintiffs' claims here and do not reflect Plaintiffs' cooperation with Keurig to restrain competition—failing to meet even Keurig's proposed standard.

## B.  Keurig's Defenses Are Inapplicable To Plaintiffs' False Advertising Claims[132]

Recognizing the strong public interest in preventing false advertisements, courts routinely permit the unclean hands defense "only where [plaintiff committed] some *unconscionable* act [that] has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation,"[133] and the "plaintiff's conduct was '*egregious*' … or 'clear, unequivocal and convincing.'"[134] The requisite unconscionable conduct includes only severe wrongdoing, such as perjury or fraud on the court.[135] Keurig bears the burden of proving the unconscionable misconduct,[136] but has failed to come forward with evidence to satisfy this high standard.

First, Keurig relies on the fact that TreeHouse was *sued* on a false advertising claim that it

---

[132] Keurig does not contest that the *in pari delicto* defense does not apply to false advertising claims. *See* Opp'n at 83-85. Thus, the Court should issue summary judgment on that defense as to such claims. *See supra* n.15.

[133] *Markel v. Scovill Mfg. Co.*, 471 F. Supp. 1244, 1255 (W.D.N.Y. 1979) (quotation omitted) (emphasis added); *see also* PMSJ at 102-03; *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982).

[134] *Patsy's Italian Rest., Inc. v. Banas*, 575 F. Supp. 2d 427, 461 (E.D.N.Y. 2008) (emphasis added); *Nike, Inc. v. Rubber Mfrs. Ass'n*, 509 F. Supp. 919, 926 (S.D.N.Y. 1981). The plaintiffs' conduct must be connected to the false advertising at issue. *Apollo Theater Found., Inc. v. W. Int'l Syndication*, 2005 WL 1041141, at *16 (S.D.N.Y. 2005).

[135] *See* PMSJ at 103 & n.97 (collecting cases). Keurig's case law is not to the contrary. Apart from not involving any false advertisement claim, *Motorola Credit Corp. v. Uzan* showcases the very unconscionable conduct that is necessary for the defense to apply. 561 F.3d 123, 127 (2d Cir. 2009) ("persistently endeavored to evade the lawful jurisdiction of the [court]"). *Laugh Factory v. Basciano* likewise did not involve false advertising. 608 F. Supp. 2d 549, 560 (S.D.N.Y. 2009). And *POM Wonderful LLC v. Coca Cola Co.* held defendant must show plaintiff's "'wrongfulness, willfulness, bad faith, or gross negligence.'" 166 F. Supp. 3d 1085, 1097 (C.D. Cal. 2016).

[136] *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 82 F. Supp. 2d 126, 130 (S.D.N.Y. 1999) (citation omitted).

settled.[137] But neither the lawsuit nor the settlement constitute evidence.[138] Second, Keurig does

not support its assertion that Treehouse "falsified consumer survey results ... and presented those

falsified results to retailers and distributors." Opp'n at 83-84. The evidence shows that the results

were prepared by a *third* party, not TreeHouse. Resp. to KSUF 263, 496. And Keurig has not

shown that any such representation was false[139] or that the representation was made to "retailers

and distributors;" rather, Keurig's evidence is that it was made to one distributor, Vistar. KSUF

496. Thus, the statement does not even qualify as advertising under Keurig's own case law.[140]

Keurig's arguments regarding JBR's environmental advertising are similarly unfounded.[141]

JBR's settlement with California District Attorneys is inadmissible and, in any event, involved no

admission of liability. Resp. to KSUF 130. Separately, Keurig asserts that JBR engaged in false

advertising with various claims but offered no proof that those claims were false; in fact, the record

shows otherwise.[142]

---

[137] Keurig contends TreeHouse's unfiltered cup packaging was misleading because it referred to its contents as "soluble and microground Arabica coffee," but contained "instant coffee." Opp'n at 84. TreeHouse modeled its product and labeling—"soluble and microground"—after the Starbucks VIA product, a licensee of Keurig. PSUF 34, 45, 47, 1420-21. Keurig has never accused Starbucks of false advertising for its identical labeling. Keurig also quotes the Seventh Circuit on appeal of a class certification order, in which the court merely recited—and accepted as true, as it must—the class plaintiffs' description of their claims. *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 753 (7th Cir. 2017). This proves nothing as to the merits.

[138] The Court has previously admonished Keurig for attempting to rely upon settlement materials relating to this same case against TreeHouse in contravention of Federal Rule of Evidence 408. *See* PSJO at 81, n.305.

[139] In fact, the statements were not false as they were consistent with industry standard practice. Resp. to KSUF 496. Keurig has not presented any evidence to the contrary. And Keurig has asserted no false advertising counterclaims against TreeHouse, though permitting this defense would lead to a confusing "mini-trial" on whether TreeHouse's statements (unrelated to any of Keurig's false advertising statements) were true. Resp. to KSUF 496.

[140] *See* Opp'n at 65 (citing *Turbon Int'l, Inc. v. Hewlett-Packard Co.*, 769 F. Supp. 2d 262, 268 (S.D.N.Y. 2011)) (statements made to one customer in a private letter not considered as advertising).

[141] Keurig also argues that JBR made false statements about quality but cites no evidence in support. Opp'n at 83. Apart from the lack of evidence, Keurig's unclean hands defense does not apply to JBR's California state law claims as a matter of law. *See Certified Nutraceuticals, Inc. v. Avicenna Nutraceutical, LLC*, 2018 WL 3618243, at *5 (S.D. Cal. July 30, 2018) ("Unlike a Lanham Act claim, the unclean hands doctrine is not available as a defense to bar claims for unfair business practices act violations under Cal. Bus. & Prof. Code § 17200 et seq.") (citing *Ticconi v. Blue Shield of Cal. Life & Health Ins. Co.*, 160 Cal. App. 4th 528, 543 (2008) ("Courts have long held that [unclean hands] is not a defense to an unfair trade or business practices claim based on violation of a statute.")).

[142] Keurig's own expert admitted JBR's product was compostable in an industrial composting facility and therefore can be labeled as compostable, a term commonly used in the industry. *See* ECF No. 1609, Ex. F at 20:7-22:14, 22:23-24:5, 23:6-10, 24:14-25:11, 26:6-28:24, 51:23-52:5, 94:19-96:3, 95:5-11; ECF No. 1486, Ex. E at 67-68. Keurig's expert Dr. Hillmyer agreed that JBR's product is made of PLA in its current form, and is eco-friendly or Earth-friendly,

The bases for Keurig's unclean hands arguments are inadmissible, not probative, and do not rise to the level of unconscionability sufficient to justify excusing Keurig's misconduct.[143]

## VII.   KEURIG IS JOINTLY AND SEVERALLY LIABLE FOR DAMAGES CAUSED BY ITS CO-CONSPIRATORS' SUPRACOMPETITIVE K-CUP PRICES

McLane can recover from Keurig the overcharges it paid to Co-Conspirators Starbucks and Smucker for K-Cups. Contrary to Keurig's assertion, this is no "sleight of hand," but a fundamental principle of antitrust law. Opp'n at 111. "[E]ach member of a conspiracy is [jointly and severally] liable for all damages caused by the conspiracy's entire output."[144] Indeed, each co-conspirator "is liable for everything done during the period of its existence regardless of the exact time at which he becomes a member or the extent of his participation."[145] It follows that a plaintiff need not join every co-conspirator to recover its full amount of damages. *Laumann*, 907 F. Supp. 2d at 483, n.97 ("The fact that numerous [other parties] are not joined as defendants is not a problem"). Because Keurig engaged in an antitrust conspiracy with Starbucks and Smucker, McLane can recover from Keurig *all* damages it sustained as a result of that conspiracy—including for overcharges on K-Cups purchased from Keurig's co-conspirators.[146]

## VIII.   KEURIG ADMITS MCLANE HAS DIRECT PURCHASER STANDING

Keurig admits McLane has standing as a direct purchaser. Opp'n at 87. Thus, under settled law, McLane is entitled to recover from Keurig the full amount of the overcharge it paid to Keurig.

---

like other PLA products. ECF No. 1609, Ex. F at 34:11-35:2, Tr. 33:1-12. JBR used the term biodegradable after the product was certified by the Biodegradable Product Institute; biodegradable is a commonly used term in the scientific literature to refer to the PLA material that JBR's product is made of. ECF No. 1606 at pp. 7-9, n. 10. Finally, Keurig refers to JBR's "no plastic cup" claim, which is exactly the way Keurig's own employees and CEO described JBR's soft pod product format in testimony and internal emails. ECF No. 1486, Ex. E ¶ 79, n. 32.

[143] *Apollo Theater*, 2005 WL 1041141, at *16-17; *Dress for Success Worldwide v. Dress 4 Success*, 589 F. Supp. 2d 351, 364-65 (S.D.N.Y. 2008).

[144] *Laumann v. NHL*, 907 F. Supp. 2d 465, 483 n.97 (S.D.N.Y. 2012) (quoting *Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002)); *Tex. Indus. v. Radcliff Materials*, 451 U.S. 630 (1981).

[145] *Dextone Co. v. Bldg. Trades Council*, 60 F.2d 47, 48 (2d Cir. 1932).

[146] *See* McLane Am. Compl., ECF Nos. 695 and 695-1 ¶¶ 2–6, 56-72, 313-20; PSJO at 61-69; PSUF 56, 72, 1392, 1394-1410, 1812-23, 1826.

McLane, as a direct purchaser, has suffered an injury in the "*[full] amount of the overcharge [it paid,]*" even if it passed on that overcharge to its customers.[147]

Keurig conflates two very different issues: whether upstream costs that would have been incurred in the but-for world should be deducted from damages (courts have said yes), and whether any alleged benefit gained by the antitrust victim in passing on the overcharge to its customers should be deducted from damages (courts have definitively said no). Keurig relies upon cases, including *Hanover Shoe*, that deduct upstream costs existing in the but-for world to determine the true overcharge—that is, the difference between the price paid and the price that would have been paid absent the illegal anticompetitive conduct.[148] Courts have emphasized that *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356 (9th Cir.1993), a lost profits case Keurig relies upon, does not minimize *Hanover Shoe*'s holding, which "militate[s] strongly against" acceptance of offsets similar to those Keurig now proposes. *See In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *18 (S.D.N.Y. Mar. 28, 2014). In truth, the argument that "a direct purchaser otherwise benefitted from an overcharge amounts to little more than a subtle variation of the pass-on defense" that *Hanover Shoe* squarely rejected.[149] This distinction makes sense

---

[147] *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489, 493-94 (1968) (emphasis added); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745-46 (1977) (a direct purchaser is "permitted to recover the full amount of the overcharge" and "spared the burden of litigating the intricacies of pass-on"); *see also id*. at 734-35 ("[W]e understand *Hanover Shoe* as resting on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it.").

[148] *See Hanover Shoe, Inc.*, 392 U.S. at 503-04 (reducing from overcharge estimate the costs of purchasing the very machines that the plaintiff claimed it was illegally forced to lease); *see also US Airways, Inc. v. Sabre Holdings Corp.*, 2016 WL 11751936, at *2 (S.D.N.Y. July 21, 2016) (allowing possibility of deducting costs existing in but/for world).

[149] *In re Glumetza Antitrust Litig.*, 2021 WL 3773621, at *7-8 (N.D. Cal. Aug. 25, 2021) (quotation marks omitted); *see also New York v. Hendrickson Brothers, Inc*., 840 F.2d 1065, 1079 (2d Cir. 1988); *In re Buspirone Patent & Antitrust Litig.*, 210 F.R.D. 43, 59-61 (S.D.N.Y. 2002). This is why district courts regularly bar downstream discovery entirely. *See e.g.*, *In re Glumetza Antitrust Litig.*, 2020 WL 3498067, at *14 (N.D. Cal. June 29, 2020), *motion for relief from judgment denied*, 2020 WL 4362247 (N.D. Cal. July 22, 2020) (rejecting request for discovery of the wholesalers' downstream data as contrary to *Hanover Shoe* and *Illinois Brick*); *In re Namenda Direct Purchaser Antitrust Litig.*, 2017 WL 2693713, at *7 (S.D.N.Y. June 21, 2017) (rejecting the defendant's attempt to get discovery on whether the plaintiffs have contracts that pass on the overage with a percentage markup).

considering one of the main rationales for barring the pass-on defense in the first place—its complexity. *See Hanover Shoe*, 392 U.S. at 493. Any reduction of damages that is in any way based on the increase in prices charged by the victim to its customers would need to be offset by the corresponding lost volume caused by the higher prices. These are the "intricacies" of the pass-on defense that *Hanover Shoe* and *Illinois Brick* have spared us.

## IX. THERE IS NO BASIS TO PRECLUDE THE NON-PARTY DECLARATIONS

In addition to the evidence of illegality developed from Keurig itself, Plaintiffs obtained discovery from third parties who attested to Keurig's antitrust violations. This discovery included 21 sworn declarations from a variety of distributors and retailers who detailed Keurig's repeated threats and punitive actions that caused them to stop selling Competitive Cups, Keurig's false claims regarding how using Competitive Cups could cause damage to Keurig Brewers and void Keurig's warranties, and how Keurig's sham litigation prevented them from purchasing TreeHouse cups,[150] among other things. Unable to deal with this evidence on the merits, Keurig seeks to preclude nine of these declarations (the "Declarations") on the ground that Plaintiffs did not disclose the declarants under Fed. R. Civ. P 26. That is incorrect. Nevertheless, by not timely raising this issue, Keurig waived any such argument. In addition, Keurig's arguments in support of preclusion under Rule 37(c)(1) are illogical and belied by its own conduct.

### A. Keurig Waived Any Argument That The Declarations Are Untimely

The timeliness of the Declarations is a discovery dispute, which should have been raised through meet and confers between the parties and, if necessary, a letter motion to the Court.[151] The Second Circuit has consistently declined to rule on discovery disputes raised for the first time at

---

[150] *See, e.g.*, PSUF 341, 361, 364, 385, 427, 460, 466, 494-98, 595, 770-71, 848, 953-58, 983-85, 996-97, 1141-43, 1237, 1462-63, 1555-56.

[151] *See* Individual Practices In Civil Cases, Magistrate Judge Sarah L. Cave, §II.C.

summary judgment.[152] The Court should not consider Keurig's untimely argument to exclude the Declarations, which Keurig has raised for the first time in its Opposition.

### B. Keurig Fails To Meet Its Preclusion Burden

"The party seeking Rule 37 sanctions bears the burden of showing that the opposing party failed to timely disclose information." *Rivera v. United Parcel Serv.*, 325 F.R.D. 542, 546 (S.D.N.Y. 2018). That burden includes showing that the opposing party acted with a "culpable state of mind," i.e., either negligently or in bad faith.[153] Keurig has shown neither.

All of the declarants testified in their capacity as employees or former employees of companies who suffered harm from Keurig's anticompetitive conduct. Plaintiffs identified five of these companies in their *December 2017* Initial Disclosures (30 months before the close of fact discovery) and the remaining four in their *April 2020* Amended Disclosures, several months before the close of third-party discovery.[154] Plaintiffs intended to notice their depositions, but three months before the close of discovery, Keurig asked this Court to reduce the hours available for third-party depositions by two-thirds, ECF No. 860, and represented to the Court that it did not intend to seek any additional non-party deposition testimony. ECF No. 886 at 3. In response, the Court reduced the available hours by half. ECF No. 888. However, Keurig then used dozens of the remaining hours with depositions that it noticed or cross-noticed. *See* ECF No. 998 at 2. Faced with this blocking tactic, Plaintiffs obtained important testimony via declarations and produced all but three of the Declarations in advance of the *initial* close of third-party fact discovery.[155]

---

[152] *See Alzawahra v. Albany Med. Ctr.*, 546 Fed. Appx. 53, 55 (2d Cir. 2013) (declining to rule on discovery disputes raised for first time in opposition to summary judgment); *Strougo v. Bea Assocs.*, 188 F. Supp. 2d 373, 380 (S.D.N.Y. 2002) (same); *Meadowbrook-Richman, Inc. v. Assoc. Fin. Corp.*, 253 F. Supp. 666, 680 (S.D.N.Y. 2003) (same).

[153] *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (quotation omitted).

[154] The 2017 Disclosures included AVA Coffee, Master Wholesale, Kohl's, Alpine Valley, and B.C. Coffee. ECF No. 1347-09. The 2020 Disclosures included Atnip, AVB, Thayer, and Price Chopper. ECF No. 1298-40.

[155] The Court extended the close of third-party discovery in response to Plaintiffs' motion for specifically enumerated depositions to July 14. ECF No. 1024; 14-cv-00905, ECF No. 151. The three Declarations which were produced after June 17 were all produced before July 14. Keurig made no attempt to take depositions of these declarants.

## C.  Plaintiffs' Conduct Was Both Justified And Harmless

As set forth above, there was no violation of Rule 26(a)(1)(A). In any event, the remedy Keurig seeks is not appropriate because any purported violation was both justified and harmless.[156] *See* Fed. R. Civ. P 37(a)(1). Each of the factors that courts in the Second Circuit consider in deciding whether to preclude evidence under Rule 37 weighs against preclusion.[157]

*First*, the disclosures were all made and six of the Declarations themselves provided before the initial close of fact discovery. If Keurig believed it needed more time to depose the witnesses, it could have made an appropriate discovery motion but did not. Keurig should not be rewarded by its own inaction and affirmative efforts to impede relevant third-party testimony.[158]

*Second*, the testimony contained in the Declarations is important, providing additional evidence of Keurig's anticompetitive conduct. The Declarants include employees of six companies that would have been TreeHouse customers but for Keurig's anticompetitive conduct.[159] Indeed, Keurig's counsel has argued that discovery relating to *each of the customers* for which TreeHouse alleges damages is important.[160] The Declarants also include distributors and brokers who were foreclosed from selling Competitive Cups.[161] Central issues to this case include the degree of market foreclosure due to Keurig's anticompetitive conduct.[162] The scope of Keurig's scheme resulted in a large number of witnesses in possession of relevant information, so Keurig's statistics

---

[156] It is well recognized that "preclusion of evidence pursuant to Rule 37(c)(1) is a drastic remedy and should be exercised with discretion and caution." *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004) (citation omitted); *see also Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 459 (S.D.N.Y. 1999).

[157] *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) ("(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony …; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.").

[158] *See Peterson v. Pan Am Railways, Inc.*, 2015 WL 2451227, at *5 (N.D.N.Y. May 21, 2015) (refusing to preclude testimony where opposing party contributed to delay in disclosure).

[159] *See* PSUF 466, 494-98, 848, 953-57, 984, 996-97, 999, 1143, 1227, 1237-38.

[160] Feb. 4, 2020 Hr'g Tr. at 14 ("So each customer is important, and documents about the particularities about why customers are complaining about quality, why they potentially left TreeHouse, those are [substantially important.]").

[161] *See* PSUF 491-94, 848, 986-90, 1235-36.

[162] *See Nixon v. TWC Admin. LLC*, 2019 WL 1428348, at *2 (S.D.N.Y. Mar. 29, 2019) (declining to preclude evidence that was "central to [the] case").

regarding the amount of discovery in this case are not a basis for precluding the Declarations when that breadth is due to the pervasiveness of Keurig's own misconduct.

*Third*, Keurig's claim that it was prejudiced is not colorable. Apart from the identification of the companies at issue in Plaintiffs' disclosures well before the close of fact discovery, Keurig was independently aware of these witnesses and the information they possessed long before that time. Four of the declarants are current or former KADs or KARDs,[163] and two are Competitive Cup brokers to which *Keurig issued subpoenas* over a year before the close of fact discovery.[164] In any event, Keurig will have the opportunity to depose any witness named on Plaintiffs' trial witness lists who was not previously deposed in advance of trial. ECF No. 493-1 at 4-5.

*Fourth*, if Keurig determined it was unable to depose these individuals within the remaining discovery period, it could have easily requested a brief extension. It failed to do so.[165] The reality is that Keurig never expressed any interest in deposing the declarants, as it recognized the devastating effect of their testimony, so Keurig strenuously argued near the end of fact discovery *against* allowing any more non-party depositions.[166] In short, Keurig's gamesmanship involves first exhibiting no interest whatsoever in taking any of these depositions, knowing full well that the evidence would only hurt its case, and now crying "prejudice" for failing to do anything in that regard. Keurig should be estopped from seeking preclusion of the Declarations.

## CONCLUSION

For the reasons set forth in Plaintiffs' motion and above, the Court should grant Plaintiffs' motion for summary judgment.

---

[163] Keurig forced two of these KADs to stop selling Competitive Cups and terminated its relationship with another when Keurig refused to modify its anticompetitive policies. *See* PSUF 364, 466, 494, 497, 953-56, 984.
[164] Keurig issued subpoenas for documents to Atnip and AVB on April 10, 2019.
[165] Such a continuance would not have caused any delay to the case schedule. *See Rivera*, 325 F.R.D. at 548 (re-opening fact discovery to depose declarants). Indeed, when Keurig received Declarations of Timothy Descoteaux and Rossana Klawon, shortly before it received the Declarations at issue, it quickly obtained those declarants' depositions.
[166] *See* June 11, 2020 Hr'g Tr. at 27 (Keurig Counsel: "It's time for nonparty discovery to end.").

Dated: December 15, 2021
        New York, New York

Respectfully submitted,
WINSTON & STRAWN LLP

By: */s/ Aldo A. Badini*

Aldo A. Badini
abadini@winston.com
Susannah P. Torpey
storpey@winston.com
Lauren E. Duxstad
lduxstad@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166-4193
(212) 294-6700
(212) 294-4700 (fax)

Dan K. Webb
dwebb@winston.com
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600

Diana L. Hughes
dhughes@winston.com
**WINSTON & STRAWN LLP**
333 South Grand Avenue
Los Angeles, CA 90071
(213) 615-1700

*Counsel for Plaintiffs TreeHouse
Foods, Inc., Bay Valley Foods, LLC
and Sturm Foods, Inc.*

/s/ *Daniel Johnson Jr.*
Daniel Johnson Jr. (CA Bar No. 57409)
Mario Moore (CA Bar No. 231644)
Robert G. Litts (CA Bar No. 205984)
**DAN JOHNSON LAW GROUP, LLP**
1350 Old Bayshore Highway, Suite 520,
Burlingame, CA 94010
(415) 604-4500
dan@danjohnsonlawgroup.com
mario@danjohnsonlawgroup.com
robert@danjohnsonlawgroup.com

*Counsel for Plaintiff JBR, Inc.*
*(d/b/a Rogers Family Company)*


/s/ *Alexander G. Brown*
Alexander G. Brown (*Pro Hac Vice*)
James C. Grant (*Pro Hac Vice*)
Valarie C. Williams (*Pro Hac Vice*)
B. Parker Miller (*Pro Hac Vice*)
**ALSTON & BIRD LLP**
1201 West Peachtree Street
Atlanta, GA 30309
(404) 881-7000
(404) 881-7777 (fax)
alex.brown@alston.com
jim.grant@alston.com
valarie.williams@alston.com
parker.miller@alston.com

Steven L. Penaro
**ALSTON & BIRD LLP**
90 Park Avenue
15th Floor
New York, NY 10016-1387
212-210-9400
212-210-9444 (fax)
steve.penaro@alston.com

*Counsel for Plaintiff McLane Company, Inc.*


/s/ *Michael M. Buchman*
Michael M. Buchman
Michelle C. Clerkin
Jacob O. Onile-Ere
**MOTLEY RICE LLC**
777 Third Avenue, 27th Floor
New York, NY 10017
(212) 577-0050
mbuchman@motleyrice.com
mclerkin@motleyrice.com
jonileere@motleyrice.com

Robert G. Eisler

Deborah A. Elman
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500
reisler@gelaw.com
delman@gelaw.com

William V. Reiss
David B. Rochelson
Matthew Geyer
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
(212) 980-7400
wreiss@robinskaplan.com
drochelson@robinskaplan.com
mgeyer@robinskaplan.com

*Counsel for Direct Purchaser Plaintiffs*