UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE KEURIG GREEN MOUNTAIN SINGLE-SERVE
COFFEE ANTITRUST LITIGATION.

CIVIL ACTION NO.: 14 MD 2542 (VSB) (SLC)

**OPINION & ORDER**

**SARAH L. CAVE**, United States Magistrate Judge.

## I. INTRODUCTION

Before the Court are Plaintiffs' motion for spoliation sanctions against Defendant Keurig (ECF No. 1282 ("Plaintiffs' Motion")),[1] and Keurig's motion for spoliation sanctions against Plaintiffs TreeHouse and JBR, Inc. ("JBR") (ECF No. 1289 ("Keurig's Motion")) (together, the "Motions")).

## II. BACKGROUND

### A.  Factual Background

The Court assumes familiarity with the factual background in this MDL litigation, which has been set forth in numerous prior orders.  See, e.g., In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., No. 14 MD 2542 (VSB) (SLC), 2020 WL 8465433, at *1 (S.D.N.Y. Oct. 30, 2020).   As previously summarized by the Honorable Henry B. Pitman in his Opinion and Order at ECF No. 636, a principal feature of Keurig's coffee makers is their use of small, disposable plastic

---

[1] Plaintiffs' Motion is asserted by TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. (collectively "TreeHouse"), McLane Company, Inc. ("McLane"), and the Direct Purchaser Plaintiffs ("DPPs") only.  (ECF Nos. 1282; 1290 at 5 n.1; 1632 at 1).

cups, usually containing ground coffee.[2]  After a cup is inserted into Keurig's coffee maker—most relevant here, the Keurig 2.0 Brewer—heated water is passed though it and coffee drips into a coffee cup placed below.  In addition to manufacturing and selling coffee makers, Keurig also manufactures and sells the disposable cups ("K-Cups").  Plaintiffs manufacture and sell disposable cups that can be used in Keurig's coffee makers and compete with Keurig's K-Cups in that market.

In general terms, Plaintiffs allege that Keurig violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Clayton Act, 15 U.S.C. § 14, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and multiple state statutes by: (1) filing baseless lawsuits against two of the Plaintiffs; (2) entering into "non-competition," tying, and exclusive dealing agreements; (3) threatening companies who would do business with Keurig's competitors; (4) re-designing its coffee makers to render competitors' cups unusable in Keurig's machines; and (5) maligning competitors and interfering with their business relationships.  See In re Keurig, 2020 WL 8465433, at *1.

Additional factual background pertinent to each of the Motions is set forth in Sections IV.B.1, IV.C.1, and IV.D, below.

**B.  Procedural Background**

**1.  Fact Discovery Schedule**

On February 11, 2014, TreeHouse filed its complaint.  (Complaint, Treehouse Foods, Inc. et al. v. GMCR, et al., No. 14 Civ. 905 (VSB) (S.D.N.Y. Feb. 11, 2014), ECF No. 2 (the "TreeHouse Complaint")).  At a status conference on June 19, 2014, Judge Broderick set schedules for filing the consolidated amended complaints, and briefing motions for expedited discovery and to

---

[2] Before 2014, Keurig was known as Green Mountain Coffee Roasters, Inc. ("GMCR").  (ECF No. 1284-11 at 2).

dismiss, among other topics.  (ECF min. entry June 19, 2014).  As to document preservation pending resolution of the anticipated motions, Judge Broderick stated, that he "hope[d] that all parties, the plaintiffs and defendants, have done what they need to do vis-à-vis their clients on document preservation[,]" and encouraged the parties to meet and confer to submit a proposed protocol for electronically stored information ("ESI").  (ECF No. 33 at 4, 37–38),

On July 1, 2014, Judge Broderick adopted the parties' joint ESI stipulation.  (ECF No. 41 (the "ESI Order")).  Pursuant to the ESI Order, the parties agreed to "take reasonable steps in good faith to prevent the loss, destruction, alteration, overwriting, deletion, shredding, incineration, or theft of any document or data the party knows, or reasonably should know, falls within the scope of Federal Rule of Civil Procedure 26(b)(1)."  (Id. at 4).  As of the date of the ESI Order, TreeHouse and Keurig (among other parties) each represented that they had "implemented a data preservation plan, issued preservation memoranda to relevant employees, and [] confirmed with IT personnel that auto-deletions are suspended and that measures have been implemented to prevent the manual deletion of email by individual custodians."  (Id. at 5; see id. at 8 (confirming that parties had issued "preservation or 'litigation hold' communications to all individuals reasonably identified as having information that may be potentially relevant")).  The parties also agreed "to ask each of their document custodians whether he or she maintains potentially responsive documents or data in any of the electronic or hard-copy sources listed [in the ESI Order], whether at the custodian's office, home, or online."  (Id. at 16).  If a party concluded that a source of information listed in the ESI Order was "inaccessible or that collection from or search of any of those sources would be unduly burdensome," the parties agreed to meet and confer to attempt to resolve the issue.  (Id.)

On July 23, 2014, Judge Broderick granted Plaintiffs limited expedited document and deposition discovery on eight topics relating to the Keurig 2.0 Brewer, including user manuals, design specifications, marketing materials, and the "Lock-Out" feature.  (ECF No. 57 at 3–4).  Discovery otherwise remained stayed pending resolution of Keurig's motions to dismiss.  (Id. at 5).  Despite the stay, Plaintiffs served third-party subpoenas on several former Keurig employees, whose obligation to respond was suspended during the stay.  (ECF No. 1284-4 at 2).[3]

On July 23, 2014, the consolidated amended class action complaints on behalf of indirect purchasers and the DPPs, respectively, ("CACs") were filed.  (ECF Nos. 61, 65).  On August 31, 2016, TreeHouse served its first set of document requests on Keurig.  (ECF No. 1693-1 at 29).

By order dated September 27, 2016, Judge Broderick directed the parties, within fourteen and 30 days of the ruling on the motions to dismiss, respectively, to fulfill their custodian obligations under ¶ VI.H.1 of the ESI Order and their search term obligations under ¶ VI.E of the ESI Order.  (ECF No. 345 (the "Sept. 2016 Order") at 1; see ECF No. 1699-1 at 106).  On November 29, 2017, Judge Broderick largely denied Keurig's motion to dismiss and ordered discovery to commence, with all deadlines under the Sept. 2016 Order beginning to run on December 1, 2017.  (ECF No. 379).  See In re Keurig, 383 F. Supp. 3d 187 (S.D.N.Y. 2019).  Pursuant to the Sept. 2016 Order, by the end of 2017, the parties were to have identified custodians and search terms pursuant to the ESI Order.  (ECF No. 41 ¶¶ VI.E, VI.H.1).  Of the original 29 Agreed Custodians for Keurig the parties identified in late 2017 and early 2018, 23 were former

---

[3] Plaintiffs served subpoenas on former Keurig employees Mark Baynes, Kristin Cefalo, Suzanne DuLong, Brian Kelley, Nick Lazaris, Peter Leemputte, Lizzie Manganiello, Fran Rathke, Kevin Sullivan, Ian Tinkler, Scott Vogel, and John Whoriskey.  (ECF No. 1284-4 at 2).  Of these, Plaintiffs' Motion alleges spoliation as to DuLong, Rathke, Tinkler, and Whoriskey.  (See ECF Nos. 1286 at 11 n. 5–6, 12 n.9, 16 n.17; 1287-1; 1287-5; 1391-1).

employees, and of an additional 25 Agreed Custodians identified during fact discovery, 21 were former employees.  (ECF No. 1699-1 at 107).  An order dated May 10, 2018 required Keurig to produce documents related to the <u>Sturm</u> Litigation, but "[t]he time period for which all other documents are to be collected and produced [was] January 1, 2009 through December 31, 2017." (ECF No. 434 at 2).[4]

Pursuant to the Preliminary Case Management Plan and Scheduling Order, the initial deadline for completion of "substantial productions of all documents" for the Agreed Custodians was April 30, 2018.  (ECF Nos. 354-1 ¶¶ 7(i), 7(k); 379 at 4).[5]  Pursuant to a joint stipulation and order dated December 12, 2018, the Court extended until January 4, 2019 the deadline for TreeHouse, JBR, and Keurig to substantially complete document production for the initial Agreed Custodians, as well as twelve additional Keurig custodians, five additional TreeHouse custodians, and one additional JBR custodian.  (ECF No. 484 (the "Production Deadline Order") at 1).  The Production Deadline Order also set January 11, 2019 as the deadline for substantial production in response to TreeHouse's subpoenas to Keurig's former employees.  (<u>Id</u>. at 2).

On May 20, 2020, the parties completed fact discovery.  (ECF No. 887 at 1).[6]

### 2.  <u>The Motions</u>

Pursuant to a schedule adopted by the Court, the Motions were filed on April 19, 2021, and briefing was completed by June 7, 2021.  (ECF Nos. 1160; 1171; 1282; 1289).  The crux of

---

[4] The "<u>Sturm</u> Litigation" refers to Keurig's patent and trademark infringement and false advertising lawsuit against TreeHouse subsidiary Sturm Foods, Inc. ("Sturm"), following Sturm's August 2010 introduction of cups competitive with the K-Cups.  (ECF No. 581 at 10–11).  <u>See</u> <u>Keurig, Inc. v. Sturm Foods, Inc.</u>, 732 F.3d 1370, 1374 (Fed. Cir. 2013) (affirming summary judgment dismissing Keurig's patent claims).

[5] Keurig's 54 Agreed Custodians are listed in ECF No. 1287-1.

[6] Non-party discovery was completed by May 18, 2020.  (ECF No. 839 at 1).

both Motions is alleged spoliation of relevant evidence.  Plaintiffs' Motion is based on Keurig's

alleged: (i) failure to conduct proper and timely custodian interviews; (ii) loss of hard drives for

nine custodians; (iii) inability to access hard drives for 15 custodians; (iv) destruction of hard copy

notes; (v) failure to collect emails from its litigation hold repository; and (vi) delayed production

of correct transactional data for experts' use.  (ECF No. 1286 at 6; see infra § IV.B).  As remedies

for Keurig's alleged spoliation, Plaintiffs ask the Court to preclude Keurig from introducing

evidence on certain issues, deliver an adverse inference instruction, and award Plaintiffs

attorneys' fees and costs they incurred in bringing Plaintiffs' Motion, investigating Keurig's

production deficiencies, challenging Keurig's privilege designations, and investigating the

incorrect transactional data.  (ECF No. 1286 at 30).

Keurig's Motion is directed at TreeHouse and JBR.  (ECF Nos. 1289; 1290).  Keurig argues

that TreeHouse failed to preserve ESI starting in the fall of 2013 when it began contemplating

suit against Keurig, and instead waited months or years to implement litigation holds, leading to

the "spoliation of critical evidence and significant prejudice to Keurig."  (ECF No. 1290 at 6).

Keurig asks the Court to preclude TreeHouse from "relying on the selective evidence that was

preserved related to the spoliated topics[,]" as well as an award of attorneys' fees and costs "for

the expense Keurig has incurred in attempting to remedy TreeHouse'[s] discovery misconduct."

(Id. at 26).  Keurig argues that JBR has failed to produce any documents corroborating JBR's

allegation that "at a meeting on January 31, 2014 Costco told JBR it would not expand JBR's

distribution because of the Keurig 2.0 Brewer."  (Id. at 27).  Keurig asks the Court to "preclude

JBR from affirmatively introducing testimony or using any evidence about Costco purportedly

reducing its distribution of JBR's portion packs in 2014 as a result of any action by Keurig." (Id. at 29).

At a conference on August 3, 2021, the Court asked the parties whether they could jointly submit "a very basic timeline . . . of the preservation notices laid against the key events" pertaining to the Motions. (ECF No. 1506 at 12:4–9). The parties agreed to consider the request and advise whether it was "achievable or not." (Id. at 15:17–21). On August 5, 2021, the Court issued an order outlining the topics for a stipulated set of facts as to both Motions, informing the parties that any stipulation "must contain citations to the relevant exhibit(s) accompanying the Motions[,]" and set a deadline of September 30, 2021 for the parties to notify the Court whether they would in fact submit any stipulations. (ECF No. 1434 (the "Aug. 5 Order") at 1). On September 30, 2021, the parties filed a joint update as to the status of their efforts to agree on sets of stipulated facts relating to the Motions, and requested clarification about certain topics in the Aug. 5 Order. (ECF No. 1553). On October 1, 2021, the Court issued an order setting November 19, 2021 as the deadline for any stipulated sets of facts on the Motions, including, inter alia, "citations to the relevant exhibits accompanying the Motions." (ECF No. 1554 (the "Oct. 1 Order") at 1 (emphasis added)). The Court also instructed the parties that, "[t]o the extent that the parties cannot otherwise stipulate to a fact requested in the Aug[.] 5 Order, the Stipulations shall set forth each parties' position as to that fact without argument[.]" (Id. at 2 (emphasis added)).

On November 19, 2021, the parties filed stipulated sets of facts pertaining to the Motions. (ECF No. 1632 (the "Stipulations")). The Court held conferences with the parties on November 24, 2021 to discuss the Stipulations (ECF Nos. 1644; 1649), and on December 16, 2021

to discuss the format of oral argument on the Motions.  (ECF Nos. 1432; 1665).  On January 11 and 12, 2022, the Court heard nearly ten hours of oral argument on the Motions via videoconference.  (ECF Nos. 1432; 1698-1; 1698-2; ECF min. entries Jan. 11–12, 2022).

### III. LEGAL STANDARDS

#### A.  The Court's Authority

This action has been referred to me for general pretrial management pursuant to 28 U.S.C § 636(b) and Fed. R. Civ. P. 72(a).  (ECF No. 419; ECF min. entry Oct. 14, 2019).  Accordingly, I have broad authority to impose discovery sanctions.  See Doubleline Cap. LP v. Odebrecht Fin., Ltd., No. 17 Civ. 4576 (GHW) (BCM), 2021 WL 1191527, at *4 (S.D.N.Y. Mar. 30, 2021); Man Zhang v. City of New York, No. 17 Civ. 5415 (JFK) (OTW), 2019 WL 3936767, at *4 (S.D.N.Y. Aug. 20, 2019). Orders imposing discovery sanctions "are ordinarily considered non-dispositive, and therefore fall within the grant of Rule 72(a), 'unless the sanction disposes of a claim.'"  Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16 Civ. 1318 (GBD) (BCM), 2017 WL 3671036, at *16 (S.D.N.Y. July 18, 2017) ("Joint Stock Co. I") (quoting Seena Int'l v. One Step Up, Ltd., No. 15 Civ. 1095 (PKC) (BCM), 2016 WL 2865350, at *10 (S.D.N.Y. May 11, 2016)), adopted by, 2017 WL 4712639 (S.D.N.Y. Sept. 28, 2017).  "A magistrate judge's authority to order (rather than recommend) a discovery sanction does not depend on the relief requested, but rather depends on the 'sanction the magistrate judge actually imposes.'"  Charlestown Cap. Advisors, LLC v. Acero Junction, Inc., 337 F.R.D. 47, 59 (S.D.N.Y. 2020) (quoting Joint Stock Co. I, 2017 WL 3671036, at *16 (internal citation omitted)).

Here, neither Plaintiffs nor Keurig seek case-dispositive sanctions (see supra §§ IV.A–D), and as set forth below, the discovery sanctions awarded do not "'fully dispose of a claim or

defense.'" Seena Int'l, 2016 WL 2865350, at *11 (quoting Oracle USA, Inc. v. SAP AG, 264 F.R.D. 541, 546 (N.D. Cal. 2009)). Accordingly, under the referral for general pretrial supervision, it is appropriate for me to resolve the Motions "in the first instance." Lokai Holdings LLC v. Twin Tiger USA LLC, No. 15 Civ. 9363 (ALC) (DF), 2018 WL 1512055, at *7 (S.D.N.Y. Mar. 12, 2018). If any objections are filed, Judge Broderick would then review my rulings on a "clearly erroneous" or "contrary to law" standard. Fed. R. Civ. P. 72(a); see 28 U.S.C. § 636(b)(1)(A).

**B. Legal Standards for Spoliation**

As one District Judge of this Court aptly explained:

> In an era where vast amounts of electronic information is available for review, discovery in certain cases has become increasingly complex and expensive. Courts cannot and do not expect that any party can meet a standard of perfection. Nonetheless, the courts have a right to expect that litigants and counsel will take the necessary steps to ensure that relevant records are preserved when litigation is reasonably anticipated, and that such records are collected, reviewed, and produced to the opposing party. . . . By now, it should be abundantly clear that the duty to preserve means what it says and that a failure to preserve records—paper or electronic—and to search in the right places for those records, will inevitably result in the spoliation of evidence.

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685 F. Supp. 2d 456, 461 (S.D.N.Y. 2010), abrogated on other grounds, Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135 (2d Cir. 2012).

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). For spoliation "sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed." Farella v. City of New York, Nos. 05 Civ. 5711 & 05 Civ. 8264 (NRB), 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007); see La Belle v. Barclays Cap. Inc., No. 19

Civ. 3800 (JPO) (GWG), 2022 WL 121065, at *6 (S.D.N.Y. Jan. 13, 2022) (explaining that "a party

seeking spoliation sanctions must necessarily show that the evidence at issue actually existed").

Plaintiffs seek spoliation sanctions under both Rules 37(b) and 37(e) (ECF Nos. 1286 at

19–20; 1693-1 at 6; 1699-1 at 23).[7]  Keurig seeks spoliation sanctions solely under Rule 37(e).

(ECF Nos. 1290 at 5; 1699-1 at 202; 1699-4 at 3–4).

1.  **Rule 37(b)**

Where a party breaches its court-ordered discovery obligations, the court supervising

discovery is permitted to "issue further just orders," including, as relevant here, an order: "(i)

directing that the matters embraced in the order or other designated facts be taken as

established for purposes of the action, as the prevailing party claims; [or] (ii) prohibiting the

disobedient party from supporting or opposing designated claims or defenses, or from

introducing matters in evidence . . . ."  Fed. R. Civ. P. 37(b)(2)(A); see Karsch v. Blink Health Ltd.,

No. 17 Civ. 3880 (VM) (BCM), 2019 WL 2708125, at *14 (S.D.N.Y. June 20, 2019); (explaining that

Rule 37(b) sanctions are appropriately imposed for non-compliance with a court order directing

compliance with discovery requests).  "Even in the absence of a discovery order, a court may

impose sanctions on a party for misconduct in discovery under its inherent power to manage its

---

[7] During oral argument, Plaintiffs also invoked the Court's inherent authority to award discovery sanctions. (ECF Nos. 1693-1 at 6; 1699-21 at 23).  "A 'particularized showing of bad faith' is necessary to justify exercising that power[,]" and the Court analyzes Keurig's intent in § IV.B.2.d, infra.  CAT3, LLC v. Black Lineage, Inc., 164 F. Supp. 3d 488, 501 (S.D.N.Y. 2016) (quoting United States v. Int'l Brotherhood of Teamsters, 948 F.2d 1338, 1345 (2d Cir. 1991)); see West, 167 F.3d at 779 (explaining that most severe sanctions under the court's inherent authority require showing of "willfulness, bad faith, or fault").

own affairs."  <u>Residential Funding Corp. v. DeGeorge Fin. Corp.</u>, 306 F.3d 99, 106–107 (2d Cir. 2002).

A party seeking an adverse inference sanction under Rule 37(b) must establish:

(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

<u>Residential Funding Corp.</u>, 306 F.3d at 107 (quoting <u>Byrnie v. Town of Cromwell</u>, 243 F.3d 93, 107–12 (2d Cir. 2001)).  "[A] showing of prejudice is not required."  <u>Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.</u>, 328 F.R.D. 100, 120 (S.D.N.Y. 2018).

The culpable state of mind for purposes of spoliation sanctions under Rule 37(b) requires a finding that the party acted knowingly in bad faith, through gross negligence, or through ordinary negligence.  <u>See</u> <u>Residential Funding Corp.</u>, 306 F.3d at 108, 113.  "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." <u>In re Pfizer Inc. Secs. Litig.</u>, 288 F.R.D. 297, 314 (S.D.N.Y. 2013) (internal citations omitted).  Failing to institute a litigation hold is not gross negligence <u>per se</u>, but a factor the court should consider, along with "whether the party implemented good document or evidence preservation practices. . . ."  <u>Alter v. Rocky Point Sch. Dist.</u>, No. 13 Civ. 1100 (JS) (AKT), 2014 WL 4966119, at *11 (E.D.N.Y. Sept. 30, 2014) (internal citation omitted).  Under Rule 37(b)(2), both "intentional or grossly negligent <u>destruction</u> of evidence in bad faith" as well as "intentional or grossly negligent acts that hinder discovery . . . <u>even if</u> those acts are not ultimately responsible for the unavailability of the evidence[,]" may "support an inference that the destroyed evidence was

harmful to the destroying party[.]"  <u>Residential Funding Corp.</u>, 306 F.3d at 110 (explaining that "purposeful sluggishness" may support an inference that spoliated evidence was "likely harmful" to party that failed to preserve).

### 2.  Rule 37(e)

The 2015 amendments to the Federal Rules of Civil Procedure replaced former Rule 37(e) with new language that specifically addresses spoliation of ESI, providing that, "[i]f [ESI] that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court" may, on a finding of prejudice, "order measures no greater than necessary to cure the prejudice[.]"  Fed. R. Civ. P. 37(e)(1).[8]  On a "finding that the party acted with the intent to deprive another party of the information's use in the litigation[,]" the court may: "(A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment."  Fed. R. Civ. P. 37(e)(2).

Rule 37(e) thus requires the following three-part analysis:

> "The first is to decide if the rule applies at all – that is, if a party failed to take 'reasonable steps' to preserve [ESI] 'that should have been preserved in the anticipation or conduct of litigation.'  Fed. R. Civ. P. 37(e).  If so, then the second step is to decide if there has been 'prejudice to another party from loss of the information,' in which case the Court 'may order measures no greater than necessary to cure the prejudice.'  Fed. R. Civ. P. 37(e)(1).  Lastly, the third step to consider – regardless of prejudice to any other party – is whether the destroying party 'acted with the intent to deprive another party of the information's use in the litigation,' in which event a court may consider whether to impose the most

---

[8] The parties agree that the 2015 Amendments to Rule 37(e) apply to the Motions.  (ECF Nos. 1286 at 19–20; 1290 at 5 n.3).

severe of measures such as mandatory presumptions or instructions that the lost information was unfavorable or the entry of default judgment."

Doubleline Cap., 2021 WL 1191527, at *4–5 (quoting Coan v. Dunne, 602 B.R. 429, 437 (D. Conn. Apr. 16, 2019)).

### a.  Duty to preserve and reasonable steps

As to the first step, "[t]he obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001).  As explained in the seminal case of Zubulake v. UBS Warburg LLC:

> "While a litigant is under no duty to keep or retain every document in its possession[,] . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."

220 F.R.D. 212, 217 (S.D.N.Y. 2003) ("Zubulake IV") (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).  Thus, the duty to preserve arises "when a party should have known that the evidence may be relevant to future litigation."  Kronish v. United States, 150 F.3d 112, 126 (2d Cir. 1998).  "[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents."  Treppel v. Biovail Corp., 249 F.R.D. 111, 118 (S.D.N.Y. 2008) (quoting Zubulake IV, 220 F.R.D. at 218).   "Relevance," for purposes of Rule 37(e), "is 'an extremely broad concept.'"  Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 436 (S.D.N.Y. 2010) (quoting Condit v. Dunne, 225 F.R.D. 100, 105 (S.D.N.Y. 2004)).

Once the duty to preserve attaches, a party and its counsel must "take reasonable steps to preserve" relevant evidence.  Moody v. CSX Transp., Inc., 271 F. Supp. 3d 410, 426 (W.D.N.Y.

2017); see Fed. R. Civ. P. 37(e)(1).  Counsel's "obligations extend further than simply advising her clients as to what documents might be necessary in the litigation . . . .  Counsel has an obligation to 'become fully familiar with her client's document retention policies, as well as the client's data retention architecture.'"  Cruz v. G-Star, Inc., No. 17 Civ. 7685 (PGG), 2019 WL 4805765, at *12 (S.D.N.Y. Sept. 30, 2019) (quoting Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Zubulake V")).  To meet that obligation "will invariably involve speaking with information technology personnel, who can explain system-wide backup procedures and the actual (as opposed to theoretical) implementation of the firm's [document retention] policy."  Zubulake V, 229 F.R.D. at 432.  Counsel must also "take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched."  Id.  Parties and their counsel likewise "have a duty to make sure that discoverable information is not lost."  Id. at 433.

### b.  Prejudice

As to the second step, sanctions under Rule 37(e)(1) "may only be imposed [on] a finding of prejudice to the moving party[.]"  Lokai Holdings, 2018 WL 1512055, at *7; see id. at *12.  Neither party has "a burden of proving or disproving prejudice," and Rule 37(e) "leaves judges with discretion to determine how best to assess prejudice in particular cases."  Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend.  Some courts have found prejudice based on the moving party's showing that the spoliated evidence "would be helpful to them in connection with establishing several elements of their [] claims."  Doubleline Cap., 2021 WL 1191527, at *7.  While the moving party need not establish the loss of a "smoking gun," "[i]t is sufficient if the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case."  Karsch, 2019 WL 2708125, at *21 (quoting Coan, 2019 WL 1620412, at *7); see Moody, 271 F.

Supp. 3d at 432 (finding that moving party established prejudice by making "plausible, concrete suggestions as to what [the destroyed] evidence might have been").

"Proof of relevance[,]" however, "does not necessarily equal proof of prejudice." Karsch, 2019 WL 2708125, at *20 (quoting Best Payphones, Inc. v. City of New York, Nos. 1-CV-3924, 1-CV-8506, & 3-CV-192 (JG) (VMS), 2016 WL 792396, at *5 (E.D.N.Y. Feb. 26, 2016) (internal citation omitted)). The moving party must come forward with "plausible, concrete suggestions as to what [the destroyed] evidence might have been." Moody, 271 F. Supp. 3d at 432 (internal citations omitted); see Karsch, 2019 WL 2708125, at *21 ("It is sufficient if the existing evidence plausibly 'suggests' that the spoliated ESI could support the moving party's case.") (quoting Coan, 2019 WL 1620412, at *7). "Where the discovery violation involves spoliation or withholding of evidence, the absence of prejudice can be shown by demonstrating, for example, that the other parties were able to obtain the same evidence from another source, or that during discovery they never asked for the evidence later shown to have been spoliated." R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 25 (S.D.N.Y. 2010); see Fed. R. Civ. P. 37(e) (permitting sanctions for spoliation of ESI only if "it cannot be restored or replaced through additional discovery"). Emails sent to or from a custodian are not "permanently lost or unrecoverable" if they are replaceable through other custodians. Karsch, 2019 WL 2708125, at *17 n.21; see Morgan v. Art Found. Ltd v. McKenzie, Nos. 18 Civ. 4438 & 18 Civ. 8231 (AT) (BCM), 2020 WL 5836438, at *19 (S.D.N.Y. Sept. 30, 2020) (holding that deleted emails obtainable from other parties and non-parties were not "permanently lost"); GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc., 282 F.R.D. 346, 359 (S.D.N.Y. 2012) (explaining that spoliation sanctions are not warranted if "the information was preserved in other locations") (citing Orbit One, 271 F.R.D. at 442); Fed. R. Civ. P. 37(e) adv. comm. n. to 2015 amend. ("Because

[ESI] often exists in multiple locations, loss from one source may often be harmless when substitute information can be found elsewhere.")

### c.   Intent to deprive

As to the third step, the intent standard for imposing the "particularly harsh" sanctions under Rule 37(e)(2), Lokai Holdings, 2018 WL 1512055, at *8, "is both stringent and specific." Doubleline Cap., 2021 WL 1191527, at *8.  Rule 37(e)(2) contemplates "not merely the intent to perform an act that destroys ESI but rather the intent to actually deprive another party of evidence."  Leidig v. Buzzfeed, Inc., No. 16 Civ. 542 (VM) (GWG), 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017).  If an intent to deprive is found, "no separate showing of prejudice is required, because 'the finding of intent [to deprive] . . . support[s] . . . an inference that the opposing party was prejudiced by the loss of information.'"  Doubleline Cap., 2021 WL 1191527, at *5 (quoting Lokai Holdings, 2018 WL 1512055, at *8).

The moving party bears the burden of showing "that the spoliating party acted with the intent to deprive, not merely the intent to destroy."  Doubleline Cap., 2021 WL 1191527, at *8.  "An intent to deprive can be found either from a conscious act of destruction or a 'conscious dereliction of a known duty to preserve electronic data.'"  Fashion Exch. LLC v. Hybrid Promotions, LLC, No. 14 Civ. 1254 (SHS) (OTW), 2019 WL 6838672, at *5 (S.D.N.Y. Dec. 16, 2019) (quoting Ungar v. City of New York, 329 F.R.D. 8, 13 (E.D.N.Y. 2018)).  In addition, the moving party must show that the spoliating party had "the intent of depriving [its adversary] in this litigation of that evidence."  Doubleline Cap., 2021 WL 1191527, at *8; see Johnson v. L'Oreal USA, No. 18 Civ. 9786 (LGS), 2020 WL 5530022, at *4 (S.D.N.Y. Sept. 15, 2020) (denying request for adverse inference in absence of "evidentiary basis for Plaintiff's allegations that [the

defendant] acted with an intent to deprive Plaintiff of relevant ESI <u>in</u> <u>this</u> <u>litigation</u>") (emphasis added).  Courts in this Circuit have considered four factors in determining whether a party acted with the intent to deprive:

> "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator."

<u>Charlestown Cap. Advisors.</u>, 337 F.R.D. at 67 (quoting <u>Moody</u>, 271 F. Supp. 3d at 431 (citation omitted)).

### 3.  <u>Burden of proof</u>

Courts in this Circuit have "divided with respect to the appropriate standard of proof to apply to a claim of spoliation.  Some utilize the preponderance of the evidence standard applicable in most contexts in civil litigation.  Others require that the more demanding 'clear and convincing' standard be met." <u>CAT3, LLC v. Black Lineage, Inc.</u>, 164 F. Supp. 3d 488, 498 (S.D.N.Y. 2016) (internal citation omitted).  Here, the Court will apply the "appropriate standard of proof [] depend[ing], in part, on the specific issue to be decided." <u>Berger v. N.Y.C. Police Dep't</u>, No. 13 Civ. 6084 (VSB), 2016 WL 11706217, at *3 n.9 (S.D.N.Y. 2016).  With respect to prejudice, the Court will apply the preponderance of the evidence standard.  See <u>CAT3</u>, 164 F. Supp. 3d at 499. Bad faith and intent to deprive must be shown by "clear and convincing evidence."  <u>Lokai Holdings</u>, 2018 WL 1512055, at *8; <u>see</u> <u>Europe v. Equinox Holdings, Inc.</u>, No. 20 Civ. 7787 (JGK) (KHP), 2022 WL 832027, at *4 (S.D.N.Y. Mar. 21, 2022) (requiring "clear and convincing evidence" of intent to deprive to support award of sanctions under Rule 37(e)(2)); <u>CAT3</u>, 164 F. Supp. 3d at 499 (same).

Under either standard, "speculative assertions as to the existence of documents do not suffice to sustain a motion for spoliation of evidence." Dilworth v. Goldberg, 3 F. Supp. 3d 198, 202 (S.D.N.Y. 2014) (quoting Tri-County Motors, Inc. v. Am. Suzuki Motor Corp., 494 F. Supp. 2d 161, 177 (E.D.N.Y. 2007)).  The parties must:

> set forth, with . . . specificity, the materials which would have been helpful in prosecuting [their] claims.  Relevance cannot be established solely on the basis of conjecture.  Nor can a finding of relevance be grounded solely on the basis that some evidence in the custody of key witnesses no longer exists.  [Each movant] has the burden of articulating what that evidence is with some degree of factual detail.

Alter, 2014 WL 4966119, at *12.  Similarly, the moving party must show that the lost information "was not only probative, but that it would affirmatively support the movant's claim." Ungar, 329 F.R.D. at 15 (internal citations omitted); see Man Zhang, 2019 WL 3936767, at *6 (requiring moving party to "'adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed . . . evidence would have been' favorable to its case") (quoting Khatabi v. Bonura, No. 10 Civ. 1168 (ER), 2017 WL 10621191, at *7 (S.D.N.Y. Apr. 21, 2017).  In short, "sanctions are not warranted unless there is proof that some information of significance has actually been lost." Orbit One, 271 F.R.D. at 431.

### 4. Types of sanctions

"In situations where sanctions are warranted, district courts have broad discretion in 'crafting [a proper] sanction for spoliation.'" Alter, 2014 WL 4966119, at *5 (quoting West, 167 F.3d at 779); see Daval Steel Prod. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991) (collecting cases describing courts' "wide discretion" to select appropriate sanctions); Europe, 2022 WL 832027, at *3 (explaining that district courts have "broad discretion to fashion appropriate corrective measures").  The Second Circuit has listed four factors for district courts to consider in

exercising this discretion: "(1) the willfulness of the non-compliant party or the reason for the noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance." S.N.E. Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 144 (2d Cir. 2010) (citation omitted). "[T]hese factors are not exclusive and they need not each be resolved against the sanctioned party." Syntel Sterling, 328 F.R.D. at 120. The Court may consider "the full record in the case in order to select the appropriate sanction." S.N.E. Tel. Co., 624 F.3d at 144 (citation omitted).

When determining the appropriate remedy for a violation of Rule 37(b), a court "should impose the least harsh sanction" that will "serve as an adequate remedy; the range of sanctions, from the least harsh to the harshest, include further discovery, cost-shifting, fines, special jury instructions, preclusion, entry of default judgment, and dismissal." Slovin v. Target Corp., No. 12 Civ. 863 (HB), 2013 WL 840865, at *6 (S.D.N.Y. Mar. 7, 2013); see Grammar v. Sharinn & Lipshie, P.C., No. 14 Civ. 6774 (JCF), 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016) (explaining that courts "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future"). "Ultimately, 'it is always preferable for issues to be adjudicated on the merits, rather than pursuant to discovery sanctions.'" Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd., 330 F.R.D. 134, 139 (S.D.N.Y. Jan. 18, 2019) (quoting Black v. Bowes, No. 05 Civ. 108 (GEL), 2006 WL 3771097, at *7 (S.D.N.Y. Dec. 21, 2006)). In addition, the Court "must" award "reasonable expenses, including attorney's fees caused by the failure" to

comply with court orders under Rule 37(b), "unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).

The sanctions available under Rule 37(e)(1)—on a showing of prejudice—also may be "no greater than necessary to cure the prejudice[.]"  Fed. R. Civ. P. 37(e)(1).  If the prejudice were additional time and expense incurred in obtaining discovery, "monetary sanctions may be a sufficient cure."  Doubleline Cap., 2021 WL 1191527, at *5.  More "serious measures" include preclusion of evidence, "permitting the parties to present evidence and argument to the jury regarding the loss of information," and instructions to the jury as to how to consider such evidence.  Id. (quoting Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend).

As noted above, the "particularly harsh" sanctions in Rule 37(e)(2), including adverse inference instructions—which Plaintiffs seek against Keurig (see ECF No. 1286 at 29–30)—require proof of an "intent to deprive," a showing that on its own "support[s] . . . an inference that the opposing party was prejudiced by the loss of information[,]" and therefore does not require an independent showing of prejudice.  Lokai Holdings, 2018 WL 1512055, at *8 (quoting Fed. R. Civ. P. 37(e) adv. comm. n. to 2015 amend.).  An adverse inference instruction permits the jury to make "an inference that the evidence would have been unfavorable to the party responsible for its destruction."  Zubulake IV, 220 F.R.D. at 216 (citation omitted).  The adverse inference is meant to restore a prejudiced party to the "position [it] would have been in absent the wrongful destruction of evidence by the opposing party."  Kronisch, 150 F.3d at 126.  An adverse inference instruction is "an extreme sanction and should not be imposed lightly."  Treppel, 249 F.R.D. at 120.  "[W]ithout some proof that the [spoliating party]'s actions created an unfair evidentiary

imbalance, an adverse inference is not appropriate."    <u>Richard Green (Fine Paintings) v.</u>
<u>McClendon</u>, 262 F.R.D. 284, 291 (S.D.N.Y. 2009).

Finally, in addition to any other sanctions imposed under Rule 37(e), "a court has the
discretion to award attorneys' fees and costs to the moving party, to the extent reasonable to
address any prejudice caused by the spoliation." <u>Lokai Holdings</u>, 2018 WL 1512055, at *9. As the
Second Circuit has explained, "a party that disregards its [discovery] obligations may create a
reasonable suspicion that further investigation is warranted, and thereby imposes costs on its
adversary that would never been incurred had the party complied with its obligations in the first
instance[,]" and an award of monetary sanctions compensates the adversary "for costs it should
not have had to bear." <u>Klipsch Grp., Inc. v. ePro E-Com. Ltd.</u>, 880 F.3d 620, 634 (2d Cir. 2018).

## IV. <u>DISCUSSION</u>

### A. <u>The Stipulations</u>

The parties failed to follow the Court's instructions in the Aug. 5 and Oct. 1 Orders in two
respects. First, contrary to the Court's instruction that the stipulated facts—and any opposing
facts—be set forth <u>without</u> <u>argument</u>, the parties have used the Stipulations as a vehicle to
expand or add to the arguments in their memoranda of law. (<u>See</u> ECF Nos. 1434; 1554 at 2). For
example, one reads no further than the second page of the Stipulations before Keurig presents a
"preliminary statement," and Plaintiffs present their "[p]osition with [r]espect to [r]eplies," a
reference to Keurig's replies to the numerous instances in which Plaintiffs, instead of setting forth
the alternative version of a particular fact with citation to an exhibit "accompanying" the
Motions, advance arguments about why they cannot agree to Keurig's proposed stipulated fact
or other grounds of disagreement. (ECF No. 1632 at 2). Another example of Plaintiffs' failure to

comply with the Court's direction not to include argument is proposed stipulated fact #11, in which "Plaintiffs stipulate to the fact that Ms. Cote's employment ended in March 2014" and that she "did not receive a preservation notice for this litigation," but then argue at length why they "do not have sufficient knowledge and information" to agree to other aspects of Keurig's proposed stipulated fact #11, and add various other limitations on the fact to which they supposedly just stipulated.  (Id. at 6 ¶ 11).  The Stipulations contain myriad other examples in which the Plaintiffs, and to a lesser extent Keurig, abused the Court's invitation to clarify and narrow the facts in dispute on the Motions, and instead further argue with each other and muddle the factual record.  (See, e.g., id. at 7 ¶ 13, 9 ¶ 17, 11 ¶ 25, 15 ¶ 43, 16 ¶ 45).  Accordingly, the Court has disregarded all portions of the Stipulations that constitute argument.

Second, despite the Court's instructions in the Aug. 5 and Oct. 1 Orders that the Stipulations were to contain "citations to the relevant exhibits accompanying the Motions," (ECF Nos. 1434 at 1; 1554 at 1 (emphasis added)), Plaintiffs, without first seeking leave, filed with the Stipulations more than three dozen additional exhibits totaling over 400 pages that did not originally accompany Plaintiffs' Motion (the "New Exhibits").  (ECF Nos. 1635; 1636; 1638).  Keurig asked "the Court to strike or disregard these additional documents [] outside the [M]otions record."  (ECF No. 1632 at 2).  Citing Second Circuit precedent inviting a district court to consider the "full record" to determine appropriate sanctions, Plaintiffs argue that the Court should consider the New Exhibits.  (ECF No. 1699-1 at 16; see ECF No. 1693-1 at 4).  Plaintiffs also assert that Keurig knew Plaintiffs intended to submit additional exhibits but did not raise the issue with the Court, and thus "waive[d] [] any objections to additional evidence."  (ECF No. 1699-1 at 17).

The problem with Plaintiffs' argument is that they submitted the New Exhibits <u>before</u> oral argument and <u>without</u> first seeking permission.  Keurig objected to and thus has not responded to the New Exhibits.  (ECF No. 1632 at 2).  The Second Circuit's recognition that the Court "is free to consider 'the full record in the case in order to select the appropriate sanction'" does not explain Plaintiffs' failure to seek leave of Court first, before simply adding exhibits to support their Motion months after briefing was completed.  <u>S.N.E. Tel. Co.</u>, 624 F.3d at 144 (citing <u>Nieves v. City of New York</u>, 208 F.R.D. 531, 535 (S.D.N.Y. 2002)).  (<u>See</u> ECF No. 1693-1 at 4 (citing <u>S.N.E. Tel. Co.</u>)).  Plaintiffs' reliance on <u>Syntel Sterling</u> is also misplaced, because the court in that case "entered an order requiring certain supplemental submissions from the parties."  328 F.R.D. at 117.  (<u>See</u> ECF No. 1693-1 at 4).  No such order was entered here, and as noted above, the Court's orders specified that any stipulations of fact contain citations to exhibits "accompanying the Motions."  (ECF Nos. 1434 at 1; 1554 at 1).  If Plaintiffs concluded that they could not adequately respond to the topics the Court listed in the Aug. 5 Order, it was incumbent on <u>Plaintiffs</u> to request permission to submit additional exhibits to support of their Motion.

Instead, Plaintiffs have submitted what is, in effect, an unauthorized sur-reply, which neither the Court's Local Civil Rule 6.1(b), nor the Court's Individual Practices, nor the briefing schedule on the Motions, contemplated.  <u>See</u> <u>Lawtone-Bowles v. U.S. Bank Nat'l Ass'n</u>, No. 19 Civ. 5786 (PMH), 2021 WL 1518329, at *1 n.3 (S.D.N.Y. Apr. 16, 2021) ("'Local Civil Rule 6.1(b) does not contemplate the filing of a sur-reply.'") (quoting <u>Sachs v. Matano</u>, No. 15-CV-6049 (JFB) (AKT), 2016 WL 4179792, at *2 n.5 (E.D.N.Y. July 15, 2016), <u>adopted by</u>, 2016 WL 4186708 (E.D.N.Y. Aug. 4, 2016)).  (<u>See</u> ECF Nos. 1160; 1171).  "The Court need not consider a sur-reply [] where permission was neither sought nor granted."  <u>Lawtone-Bowles</u>, 2021 WL 1518329, at *1

n.3; see Bisesto v. Uher, No. 19 Civ. 1678 (KMK), 2019 WL 2537452, at *2 (S.D.N.Y. June 20, 2019)

(collecting cases declining to consider unauthorized sur-reply submissions); Anthropologie, Inc.

v. Forever 21, Inc., No. 07 Civ. 7873 (RJS) (MHD), 2009 WL 690239, at *5 n.2 (S.D.N.Y. Mar. 13,

2009) (declining to consider additional exhibits submitted without court permission and noting

that such a "manner of proceeding, besides being contemptuous of court rules, deprives the

other side of an opportunity to respond"]).

The Court finds that Plaintiffs' submission of the New Exhibits without prior court

permission was improper, and therefore declines to consider the New Exhibits in deciding

Plaintiffs' Motion.

**B.  Plaintiffs' Motion**

   **1.  Factual Background**

      **a.  Keurig's Document Policies**

Pursuant to Keurig's Acceptable Use of Assets Corporate Policy (the "Acceptable Use

Policy"), employees were instructed to save company documents not to their local drives ("C:"),

which were not backed up, but rather on network or "share" drives ("K:", "H:", or "X:"), which

were backed up.  (ECF Nos. 1340-6 at 6; 1284-11 at 5; 1391-3 at 7).[9]  Custodians Ron DiFabio and

Ian Tinkler, for example, testified that they followed this instruction.  (ECF Nos. 1340-9 at 3; 1340-

2 at 8)).  Other employees apparently did not.  (See, e.g., ECF No. 1393-10 at 3 (Chad Collett

---

[9] TreeHouse refers to the K: drive as "the home share My Documents folder."  (ECF No. 1699-1 at 54).  It is undisputed that the K: drive was a network storage location, separate from an employee's hard (C:) drive.  (Id. at 143–44, 146).  In 2017, Keurig replaced the home share with "OneDrive" as the default network storage location.  (ECF Nos. 1340-1 at 16; 1340-4 at 5).  Keurig employees could save documents to the X: and H: drives that would be accessible to other employees.  (ECF No. 1699-1 at 145).  The Court uses the term "network drive" to include the K:, X:, or OneDrive network storage locations.

testifying that he stored "all of [his] work, as a course of habit, on the computer," and that he was "aware" of the network drive but "did not use it")).  When employees left Keurig, they were required to confirm that they had "returned" all documents, devices, and media "relating in any way to" Keurig's business, and had deleted "any other company property" from their personal devices.  (ECF No. 1340-37 at 5; <u>see</u> 1340-33 ¶ F; 1340-30 ¶ F; 1340-42 ¶ 8.E).  Several Keurig custodians testified that they complied with that instruction.  (<u>See</u>, <u>e.g.</u>, ECF Nos. 1340-11 at 5 (Dwight Brown); 1340-21 at 3 (Donald Holly); 1340-22 at 4 (Michelle Stacy); 1340-23 at 3 (Bruce Godfrey); 1340-16 at 5 (Tom Ferguson)).  Others did not.  (ECF Nos. 1284-16 at 5–10; 1284-31 at 2 (Donald Barberio)).  Keurig also preserved ESI of a departing employee by running a computer script that "package[d] up their data," and saving it in a folder labeled with the employee's name on a network share drive, which was collected for this litigation (ECF No. 1340-4 at 10–11).  Keurig's IT department also checked whether the employee was on a legal hold, and if they were, stored either the whole computer or the hard drive.  (<u>Id.</u> at 3, 8–9).

### b.  Hard Drives

When a Keurig employee's computer was upgraded, Keurig migrated data from the old computer to the new computer.  (ECF No. 1340-4 at 5; 1340-7 at 6; 1340-8 at 3).  If an employee left with a Keurig-issued computer, after 30 days Keurig removed that computer from its domain, <u>i.e.</u>, that computer was no longer connected to Keurig's network.  (ECF No. 1340-4 at 43–48).

Before April 2019, Keurig did not have a centralized asset management system to keep track of devices issued to its personnel.  (ECF No. 1287-4 at 4–5).  Instead, it had a "ticketing system" that had been in place since 2013 or 2014 ("Remedy"), but when Keurig transitioned to a new system in 2019 ("Service Now"), it did not retain the information that had been in Remedy.

(Id. at 6-7, 10–11, 13).  When Remedy was in place, a departing employee would turn in his or her computer to the location where he or she had worked; former employees' computers were generally not sent to a centralized legal hold site, and computers subject to a legal hold during the Remedy phase were kept in a "well-marked" container.  (Id. at 15–16).

In 2014, when this litigation started, Keurig did not have a litigation hold software, and used a service called CommVault to store email.  (ECF No. 1287-4 at 17–18).  Keurig did not "take any steps at that point in time to determine which devices Keurig had issued to an individual [were] under litigation hold."  (Id. at 17–18).  Keurig's IT department also did not at that time check storage locations of devices to see if any were under litigation hold.  (Id. at 18).

The computers Keurig issued to its employees were encrypted, meaning they could only be accessed using an encryption key.  (ECF No. 1287-4 at 19–20).  Keurig used two encryption systems: McAfee from 2009 until 2012 or 2013, and Bitlocker thereafter.  (ECF No. 1287-4 at 20–22).  Both systems use a server to manage encryption by creating encryption keys and issuing an encryption command to the computer to encrypt the device.  (Id. at 20).  In 2012, Keurig (then GMCR) drafted but did not implement an Encryption Key Management Standard, and Keurig's current procedures for managing encryption keys are not documented.  (ECF Nos. 1287-9; 1287-4 at 27).

The McAfee encryption server contained the unlock code for locked devices, and kept track of the PC name, host name, and other information about the device. (ECF No. 1287-4 at 23, 28).  At some point, Keurig removed all active computers from McAfee encryption, but kept the McAfee encryption server in case it needed decryption keys for drives on litigation holds.  (Id. at 24).  Over time, the number of Keurig IT employees with access to the McAfee encryption server

dwindled to zero; after that, no one at Keurig knew the password, how to use McAfee, or where the encryption keys were stored.  (Id. at 25).  There was a period in 2018 that Keurig could not access the McAfee encryption server at all.  (Id. at 25–26).  By April 2018, Keurig asserts that it regained access to the McAfee encryption server.  (ECF No. 1632 at 68 ¶ 137 (citing ECF No. 1284-17 at 4 (indicating that Keurig IT was provided with "all available McAfee decryption files on 4/17/2018")).  As a result of this litigation, Keurig relearned the McAfee processes and "cracked the code" to regain access to the McAfee encryption server sometime before 2019, after which Keurig regained access to the vault of encryption keys in the McAfee encryption server.  (ECF No. 1287-4 at 25–26).  But not all encryption keys were successful at decrypting drives that had been encrypted using the McAfee system.  (Id. at 26).  Keurig reached out to McAfee, but it was unable to help.  (Id.)

The encryption server that Keurig used after McAfee was called Bitlocker.  (ECF No. 1287-4 at 22).  The "trust" between a computer and the Bitlocker encryption server lapsed after 30 days, after which the hard drive from that computer could no longer be inserted into a new Keurig computer and accessed, but it could be imaged, decrypted, and produced.  (ECF No. 1340-4 at 45–49).  Although Keurig does not now have a documented system for managing encryption keys, (ECF No. 1287-4 at 27), both the McAfee and Bitlocker encryption servers kept some, but not all, encryption metadata.  (ECF No. 1340-4 at 41–42).

### c.  CommVault

Starting in 2011 (ECF No. 1340-4 at 12), "once a Keurig employee was placed on a litigation hold, his or her emails were journaled in an email archive developed by CommVault[,]" which holds the data until the litigation hold is released.  (ECF No. 1287-19 at 3).  "Keurig utilized

CommVault to archive email until it transitioned to Office 365 in 2016[,]" at which time it began using the "'litigation hold' feature of Office 365 to preserve email communications for individuals placed on a litigation hold." (Id.; see ECF No. 1699-1 at 108, 112-13).[10]  CommVault also backed up servers and emails.  (ECF No. 1340-4 at 12). Keurig produced over one million emails from CommVault.  (ECF No. 1336 at 13).

On August 6, 2018, Keurig discovered that the CommVault emails for most of the initial 29 Agreed Custodians were not collected, processed, or produced.  (ECF No. 1287-19 at 3).  By October 31, 2018, Keurig had collected and produced documents from CommVault.  (ECF No. 1693-1 at 39; 1699-3 at 67).

### d.  Transactional Data

In the Fall of 2019, the parties discovered that a "material" amount of data was missing from Keurig's transactional data production.  (ECF No. 1284-51 at 3–4; see ECF Nos. 808-2; ECF Nos. 769).[11]  By the time the error was discovered, "Plaintiffs had already invested months of work and significant resources into analyzing Keurig's incorrect data." (ECF No. 1286 at 19).[12] The Court ordered Keurig to complete reproduction of its transactional data by March 19, 2020, which was later extended to April 20, 2020.  (ECF Nos. 839, 887).  Plaintiffs do not contend that Keurig spoliated any transactional data.  (ECF No. 1699-1 at 58).

---

[10] Before 2016, Keurig's email platform was Microsoft Exchange.  (ECF No. 1699-1 at 111).
[11] Transactional data "refers to financial data on sales of portion packs and brewers, which typically includes, among other things, quantity, price, product information, and customer information."  (ECF No. 1676 at 2).
[12] TreeHouse also made a supplemental production of SAP transactional data on March 19, 2020.  (ECF No. 1340-24; 1340-25).  McLane did not timely produce its sales data for 2018–2019.  (ECF No. 1340-44; 1340-45).

### 2.  **Analysis**

#### a.  **Duty to Preserve**

Keurig's duty to preserve documents arose on February 4, 2014, when TreeHouse filed its complaint.  (TreeHouse Complaint).  See Kronisch, 150 F.3d at 126 (noting that "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed"); Richard Green, 262 F.R.D. at 289 (holding that duty to preserve "arose no later than" date complaint was filed).  Keurig's obligation to preserve extended to ESI of custodians identified in the pleadings, Initial Disclosures, and the Agreed Custodian list.

#### b.  **Reasonableness of Preservation and Collection Efforts**

Plaintiffs argue that Keurig's preservation and collection efforts were not reasonable because, ultimately, data from at least 23 custodians was lost or irretrievable.  (ECF No. 1286 at 22; 1391-1).  They contend that Keurig lost the hard drives of at least nine custodians, was unable to decrypt the data from nine custodians, and could not image computers of six custodians due to physical damage.  (ECF No. 1286 at 21–22 (citing ECF No. 1284-48; 1287-4 at 31–33, 35–38)).  By Plaintiffs' count, Keurig did not produce hard copy documents for nine custodians.  (ECF Nos. 1693-1 at 70).

"To fulfill its obligation to preserve evidence 'a litigant must take affirmative steps to prevent inadvertent spoliation.'"  Raymond v. City of New York, No. 15 Civ. 6885 (LTS) (SLC), 2020 WL 1067482, at *9 (S.D.N.Y. Mar. 5, 2020) (quoting R.F.M.A.S., 271 F.R.D. at 24).  "Discovery from 'key players' in the litigation should be preserved."  Id. (quoting Alter, 2014 WL 4966119, at *9).  "At the outset of the litigation, each party must identify all sources of potentially relevant

evidence and implement a 'litigation hold' suspending any routine document destruction or other processes involved in the ordinary course of business that might result in the destruction of potentially relevant evidence." R.F.M.A.S., 271 F.R.D. at 24. "Counsel cannot just implement a litigation hold and then sit on his [or her] hands, hoping that parties retain and produce all relevant information." Ryan v. Rock Grp., NY. Corp., No. 18 Civ. 2600 (GHW), 2019 WL 6841874, at *4 (S.D.N.Y. Dec. 16, 2019). Rather, the Federal Rules of Civil Procedure "obligate counsel to monitor compliance so that all sources of discoverable information are identified and searched." Id.; see Richard Green, 262 F.R.D. at 290 ("Attorneys must take responsibility for ensuring that their clients conduct a comprehensive and appropriate document search.") (citation omitted); Zubulake V, 229 F.R.D. at 432 ("Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched."). Thus, at a minimum, then, Keurig was obligated to: (i) issue litigation holds at the outset of this litigation; (ii) communicate directly with custodians identified in Keurig's initial disclosures; and (iii) instruct all employees to produce copies of their electronic files and safely store backup media. See Zubulake V, 229 F.R.D. at 433–34.

Applying these principles, the Court examines Keurig's preservation and collection efforts as to (i) litigation holds and custodian interviews, (ii) hard drives, and (iii) hard copy documents.

### i.   Litigation Holds and Custodian Interviews

"Within six days" of TreeHouse's filing of its complaint in this action, Keurig issued litigation hold notices to over 400 employees, and over time, to an additional 300. (ECF Nos. 1336 at 12; 1699-1 at 106, 109). Six custodians did not receive litigation hold notices at all: Ken Crites, Don Holly, Steve Smits, and Chris Stevens, who left before TreeHouse's Complaint was filed;

Susan Cote, who left in March 2014; and Brad Tidwell, who left in August 2015, before the McLane complaint was filed.  (ECF No. 1632 at 6 ¶ 11, 7 ¶ 13, 11 ¶ 25, 15 ¶ 43, 19 ¶ 47, 19 ¶¶ 48–49).   On November 26, 2019, Keurig informed Plaintiffs that it had "conducted custodial interviews of the former employees" it was able to contact, and offered to advise Plaintiffs which former employees it could not reach if Plaintiffs would do the same.  (ECF Nos. 1284-2 at 2; 1284-4 at 5; 1632 at 26 ¶ 64).   The parties do not appear to have reached a consensus on how documents were collected from their respective former employees.

Plaintiffs argue that Keurig did not timely interview eleven custodians to determine whether they had any relevant documents:  ten former employees, and one (Ben Yoder) who was still an employee in 2018, when discovery commenced.  (ECF Nos. 1287-1 at 11; 1284-4 at 2; 1287-5; 1632 at 22–23 ¶¶ 61–62).[13]   For example, Michelle Stacy, Keurig's former President, and Tom Ferguson, former Vice President of US Hot Beverages and Senior Vice President, Sales for Grocery/Drug/Club, testified that Keurig's counsel first contacted them in October or November 2019, more than five years after this action commenced.  (ECF Nos. 1284-5 at 3; 1284-7 at 3; 1287-1 at 5, 9; see ECF No. 1632 at 34 ¶ 78, 42 ¶ 95).   Don Holly, Former Vice President of Beverage Quality, testified that Keurig's counsel did not contact him about preservation of documents at all, although Keurig contends that it did ask Holly whether he had any responsive documents.  (ECF Nos. 1393-7 at 3; 1287-1 at 6; 1340-1 at 16).

Keurig notes that it did interview Yoder, albeit not until September or October of 2019 in anticipation of his deposition, following which it collected and produced notebooks he had still

---

[13] The eleven custodians are: Don Barberio; Larry Blanford; Dwight Brown; Ron DiFabio; Tom Ferguson; Steve Ferreira; Bruce Godfrey; Don Holly; Bob McCall; Michelle Stacy; and Ben Yoder.  (ECF Nos. 1287-5; 1632 at 22 ¶ 60).

retained.  (ECF No. 1336 at 25; see ECF No. 1340-7 at 5).  As to the remaining ten custodians, Keurig asked them whether they had documents, and produced those documents. (ECF No. 1340-1; see, e.g., 1340-20 (Tom Jarona)).  Keurig asserts that the remaining employees testified that they did not retain any documents when they left the company.  (ECF Nos. 1340-11 at 3–4 (Brown); 1340-21 at 3 (Holly); 1340-22 at 4 (Stacy); 1340-23 at 3–4 (Godfrey); 1340-17 at 4 (Barberio); 1340-16 at 5 (Ferguson)).  Keurig produced over 675,000 documents from the custodial files of the eleven custodians whom Plaintiffs allege Keurig did not timely interview. (ECF No. 1336 at 26–27).

Keurig's obligation to distribute litigation hold notices and "oversee compliance with" the preservation instructions was well-settled at the time TreeHouse filed its Complaint. Zubulake V, 229 F.R.D. at 431–32.  Keurig's recognition of these obligations is in fact memorialized in the ESI Order, pursuant to which Keurig committed to "take reasonable steps" to preserve information and "ask each of [its] document custodians" whether and where they maintained potentially responsive documents.  (ECF No. 41 at 4, 16).  Yet, as noted above, out of the 54 Agreed Custodians, Keurig did not timely interview eleven, or about 20%, and failed to send a litigation notice at all to six, or about 11%.  Not until months after the January 4, 2019 deadline for substantial completion of production did Keurig interview seven Agreed Custodians about whether they had responsive documents.  (ECF Nos. 1632 at 27–28 ¶ 66 (Barberio), 29 ¶ 69 (Blanford), 31 ¶ 72 (Brown), 33 ¶ 75 (DiFabio), 34 ¶ 78 (Ferguson), 42 ¶ 95 (Stacy); 1340-1 at 16 (Holly)).

That some of these custodians were no longer employees did not mitigate Keurig's preservation obligations.  Courts have "insist[ed] that corporations, at the very least, ask their

former employees to cooperate before asserting that they have no control over documents in former employees' possession." Export-Import Bank of U.S. v. Asia Pulp & Paper Co., 233 F.R.D. 338, 341 (S.D.N.Y. 2005).   Here, Keurig asserted that documents in the custody of former employees "were no longer within the possession, custody or control of Keurig."  (ECF No. 1284-4 at 3).  While Plaintiffs served multiple third-party subpoenas on former Keurig employees during the stay, (ECF No. 1284-4 at 2), Keurig nevertheless had the obligation to ensure that these former employees continued to preserve potentially responsive documents in the meantime. See Sekisui Am. Corp. v. Hart, 945 F. Supp. 2d 494, 507–08 (S.D.N.Y. 2013) (finding plaintiff grossly negligent for taking six months to notify IT vendor of obligation to preserve documents pursuant to litigation hold, resulting in destruction of "the ESI of at least two significant former [] employees"); see also F.D.I.C. v. Horn, No. CV-12-5958 (DRH) (AKT), 2015 WL 1529824, at *8 (E.D.N.Y. Mar. 31, 2015) (holding that defendant had obligation to preserve potentially relevant emails of former employees).

Accordingly, the Court finds that Keurig's failure to distribute litigation holds to six custodians and timely interview eleven custodians constitutes a failure to comply with the ESI Order under Rule 37(b)(2)(A), as well as a failure to take "reasonable steps" to preserve ESI under Rule 37(e).  See Charlestown Cap. Advisors, 337 F.R.D. at 61–62 (holding that counsel's failure to oversee compliance with litigation hold notices resulted in spoliation).

### ii.   **Hard Drives**

TreeHouse contends that Keurig spoliated the hard drives of 23 custodians through loss, inability to decrypt, damage, or a combination thereof.  (ECF Nos. 1286 at 9–12, 20; 1287-5).[14]

Keurig collected over 90 hard drives and laptops, from which it collected and produced data, but "did not locate hard drives used by Bruce Godfrey, Don Barberio, or Chris Stevens." (ECF No. 1284-11 at 6; <u>see</u> ECF No. 1699-1 at 117).[15]  Of the 70 collected, at least 62 were from Bitlocker-encrypted devices.  (ECF No. 1402-1 at 87; 1699-3 at 18).  As noted above, Keurig did not, however, "take any steps" when this action commenced "to determine which devices Keurig had issued to an individual [were] under litigation hold."  (ECF No. 1287-4 at 17–18).  Keurig's IT department also did not at that time check storage locations of devices to locate and collect any drives were under litigation hold.  (<u>Id.</u> at 18).

Hard drives for the following custodians could not be decrypted due to lost or inoperable encryption keys: John Wettstein, Steve Ferreira, Tom Novak, Dave Manly, Susan Cote, Ken Crites, Ian Tinkler, Dwight Brown, and Ron DeFabio (two hard drives).  (ECF Nos. 1284-17 at 4–5; 1340-4 at 46–48).  Keurig engaged a vendor, D4, to attempt to access three Bitlocker-encrypted hard drives.  (ECF Nos. 1284-17; 1340-4 at 39, 48).  Due to physical damage, D4 was unable to image hard drives for Michelle Stacy, Jimmy Huang, Fran Rathke, Jim Shepard, Susan DuLong, and Will Billings.  (ECF No. 1284-17 at 2–3).

---

[14] The 23 custodians are: Don Barberio; Will Billings; Dwight Brown; Susan Cote; Ken Crites; Ron DiFabio; Suzanne DuLong; Steve Ferreira; Bruce Godfrey; Don Holly; Jimmy Huang; Sherry Hurley; David Manly; Joe Mueller; Tom Novak; Fran Rathke; Jim Shepard; Steve Smits; Michelle Stacy; Chris Stevens; Brad Tidwell; Ian Tinkler; and Jon Wettstein.  (ECF No. 1287-5).

[15] Keurig was initially unable, but ultimately able, to locate Sweeney's hard drive, from which it produced twelve unique documents.  (ECF Nos. 1340-12 at 2; 1340-1 at 28).

Keurig offered Plaintiffs remediation efforts for the lost (Stevens, Godfrey, Barberio) or inaccessible hard drives (Billings, Brown, Cotes, Crites, DiFabio, DuLong, Ferreira, Huang, Manly, Novak, Rathke, Shepard, Stacy, Tinkler, Wettstein), as follows: (1) provide a Keurig Rule 30(b)(6) witness on preservation and collection that would not count against Plaintiffs' Rule 30(b)(6) topic and hour limits; (2) produce chain of custody records and summary of its vendor's efforts; (3) allow TreeHouse's vendor to try to image or decrypt devices at Keurig's expense (if the vendor was able to access them). (ECF No. 1284-45 at 3). Keurig facilitated a call between D4 and Plaintiffs' vendor, and thereafter, TreeHouse took possession of five hard drives to be analyzed by its vendor. (ECF No. 1284-40).[16]

In October 2019, TreeHouse's vendor confirmed that it had been unable to recover data from hard drives for Shepard, Billings, DuLong, Rathke and Stacy, and Plaintiffs elected not to try to access Huang's. (ECF No. 1284-40 at 3–4, 9). Plaintiffs chose to send Stacy's and Rathke's hard drives to a data recovery center for further analysis. (Id. at 3). Through these additional measures, Rathke's drive yielded eleven unique documents, (ECF No. 1284-30 at 2), and Stacy's hard drive yielded about 4,600 additional emails. (ECF Nos. 1340-10 at 2; 1632 at 93 ¶ 174).[17] Plaintiffs deposed Stacy three months after these emails were produced, but did not question her about any of them. (ECF No. 1340-1 at 26).

---

[16] These hard drives were for custodians Billings, DuLong, Shepard, Rathke, and Stacy. (ECF No. 1284-40 at 2–4).

[17] The parties dispute whether the additional 4,600 emails were duplicative. (ECF No. 1632 at 94 ¶ 175).

Despite these efforts, six hard drives could not be imaged,[18] and ten could not be decrypted across 15 custodians.  (ECF No. 1336 at 16).[19]  As discussed further below, Keurig produced documents from network drives for all 15 custodians, (ECF Nos. 1336 at 16; 1340-1; 1699-1 at 128), and from later-in-time hard drives for ten of these custodians (Cote, DiFabio, Ferreira, Huang (two hard drives),[20] Manly, Novak, Rathke (two hard drives), Stacy, Tinkler, and Wettstein).  (ECF Nos. 1336 at 16; 1340-1; 1632 at 71 ¶ 143, 85 ¶ 163, 87 ¶ 166).  For the remaining five (Crites, DuLong, Billings, Brown, and Shepard), Keurig produced documents from alternative sources.  (See § IV.B.2.c, infra).

Keurig was unable to locate nine hard drives for custodians Barberio, Godfrey, Holly, Hurley, Mueller, Smits, Stevens, Tidwell, and Wettstein; all except Holly, Smits, and Stevens (who left Keurig in 2013) had received preservation notices, and all had left Keurig by the time discovery commenced in early 2018.  (ECF Nos. 1287-1 at 9; 1336 at 16 n.20; 1632 at 10–11 ¶¶ 24–25, 15 ¶¶ 42–43, 18 ¶¶ 46–47; 1699-1 at 131–32).

Altogether, 16 hard drives, although preserved, were inaccessible, and nine hard drives were lost altogether for 23 Agreed Custodians whose files were required to be preserved and searched.  Even if the Court infers that these 25 hard drives were lost or became inaccessible due to the passage of time or in the ordinary course of Keurig's business, Keurig's failure to preserve this ESI was, at least, a negligent violation of the ESI Order under Rules 37(b)(2)(A) and

---

[18] The six custodians with damaged hard drives were Billings, DuLong, Huang, Rathke, Shepard, and Stacy. (ECF No. 1632 at 76 ¶ 149).
[19] The fifteen custodians were Billings, Brown, Cote, Crites, DiFabio, DuLong, Ferreira, Huang, Manly, Novak, Rathke, Shepard, Stacy, Tinkler, and Wettstein.  (See ECF No. 1340-1).
[20] Huang also testified that he transferred everything from his computer to the share drive ("OneDrive"). (ECF No. 1340-39 at 4; 1632 at 84 ¶ 162).

a failure to take reasonable steps under Rule 37(e).  See Learning Care Grp., Inc. v. Armetta, 315 F.R.D. 433, 438 (D. Conn. 2016) (finding that plaintiff's failure to save laptop from destruction in ordinary course "was careless"); Hawley v. Mphasis Corp., 302 F.R.D. 37, 49 (S.D.N.Y. 2014) (finding that defendant's failure to preserve former employee's laptop from "regular information technology operations protocols" was "at a minimum" gross negligence).

### iii.    Hard copy documents

Plaintiffs' Motion argues that hard copy documents are missing from two custodians: Don Barberio and Tom Ferguson.  (ECF Nos. 1286 at 14–15; 1287-5 at 2, 9).  At oral argument, Plaintiffs alleged that hard copy documents were also missing for three additional custodians, John Whoriskey, Suzanne DuLong, and Ron DiFabio.  (ECF Nos. 1693-1 at 33–35, 37; 1699-1 at 45–47).

Keurig's non-production of hard copy documents came to light in August 2019, when Plaintiffs were scheduled to take the deposition of Bob McCall, former Senior Vice President of Engineering at Keurig who was involved in the design and testing of the Keurig 2.0 Brewer and portion packs and whom Keurig listed in its December 15, 2017 Initial Disclosures.  (ECF No. 1284-22 at 2).  McCall left his employment at Keurig on May 31, 2017.  (ECF Nos. 1284-22 at 3; 1284-24 at 2).  In response to a non-party subpoena Plaintiffs served on McCall on July 25, 2019, shortly before his deposition was to occur, he produced 20 handwritten notebooks that Keurig had not previously produced, resulting in the adjournment of McCall's deposition.  (ECF Nos. 1284-22 at 2–3; 1284-24 at 2–3).  Keurig reimbursed Plaintiffs for half the costs that one of Plaintiffs' attorneys incurred for McCall's adjourned deposition, or about $1,100.  (ECF Nos. 1284-23 at 2; 1284-24 at 4).

Similarly, in September 2019, the deposition of Ben Yoder, Keurig's Vice President of Business Development, was adjourned when, two days before the scheduled date, Keurig informed Plaintiffs that it had learned of 21 handwritten notebooks in Yoder's possession that had not yet been produced. (ECF Nos. 1284-25 at 2; 1284-26 at 3; 1632 at 21 ¶ 56). After Plaintiffs demanded confirmation that Keurig had asked all custodians whether they possessed hard copy documents or notebooks, Keurig produced hard copy documents from five additional custodians. (ECF Nos. 1284-26 at 2–3; 1284-27 at 2; 1284-28 at 2; 1284-29 at 2; 1284-30 at 2). At a conference on September 23, 2019, Judge Pitman noted that the notebooks were "documents that really should have been produced long ago had a search for responsive documents been done with the appropriate level of diligence[,]" and ordered Keurig to reimburse TreeHouse $2,469 for the costs of Yoder's rescheduled deposition. (ECF No. 691 at 43).

Don Barberio, Keurig's former Vice President of At-Home Sales, testified that he kept a yellow binder that may have contained notes of meetings with Giant Eagle, Wakefern, Kroger, Ahold, and others, but, despite having received a litigation hold notice in February 2014, threw the binder away when he cleaned out his office on his departure from Keurig in June 2014. (ECF Nos. 1284-16 at 5–10; 1284-31 at 2; 1632 at 3 ¶¶ 2–3). On his departure, Barberio turned in his Keurig-issued laptop and telephone to Human Resources. (ECF No. 1284-16 at 9). Plaintiffs contend that Barberio's notes would have been relevant to their allegations that Keurig lied about the quality of TreeHouse's cups, among other topics, to convince customers to adopt the Keurig 2.0 Brewer. (ECF No. 1286 at 15). For example, Barberio met with Publix's president on January 29, 2014, but the only record of the discussion during that meeting is an email to Tom Ferguson (Keurig's SVP of Grocery, Club, and Drug) stating that Publix was aware that its brand

of cup would not function in the Keurig 2.0 Brewer, which the broker characterized as "Mission accomplished."  (ECF No. 1287-14 at 2).

Suzanne DuLong, Keurig's former Vice President of Global Communications who received a litigation hold notice on March 31, 2016, testified that she left any hard copy documents at Keurig when her employment ended December 2016.  (ECF Nos. 1632 at 8–9 ¶¶ 16–17; 1340-35 at 7).

John Whoriskey, Keurig's former Vice President, At Home and Head of U.S. Sales and Marketing who received a litigation hold notice on February 17, 2014 and left Keurig in December 2015, testified that he did not keep a notebook and after a meeting, discarded any notes he might have taken during that meeting.  (ECF Nos. 1393-16 at 3–4; 1632 at 20–21 ¶¶ 54–55).

Tom Ferguson, who left Keurig in April 2016 and was added as a custodian in December 2017, testified that it was "very possible" that he never took notes in meetings with retailers, but did not "recall exactly whether or not [he] did[.]"  (ECF Nos. 1393-5 at 3; 1287-1 at 5; 1632 at 9 ¶ 18).  Ferguson also participated in meetings with prospective customers, during which "consumer safety" was discussed.  (ECF No. 1664-4 at 3–6).

As to the fifth custodian, Ron DiFabio, Plaintiffs asserted at oral argument that he testified that he left any hard copy documents at Keurig when he left in March 2016.  (See ECF Nos. 1693-1 at 35; 1632 at 8 ¶ 14).

Keurig disputes that any hard copy documents were spoliated.  As to McCall and Yoder, Keurig ultimately produced their notebooks, and reimbursed TreeHouse for the costs associated with the late production.  (ECF Nos. 1284-26 at 2; 1284-27 at 2; 691 at 43; 1284-24 at 4; 1632 at 116–17 ¶ 211).  As to Barberio, Keurig points out that he described himself as not "a big note

taker," and stated that anything important "would go to Tom Ferguson" with "meeting highlights." (ECF No. 1340-17 at 5–6). Keurig also notes that later in his testimony, Barberio said he did not hold onto notes. (ECF No. 1340-17 at 8 ("I think it was thrown out the next day, after the meeting. I didn't hold on to scratches on a pad.")). Similarly, Whoriskey testified that he did not have notebooks, and if he took notes he would discard them after meeting and anything he "felt like retaining would have ultimately been on [his] computer." (ECF No. 1340-18 at 3). Keurig asserted that it "checked again" for DuLong's hardcopy documents after her June 19, 2019 deposition but did not locate any. (ECF No. 1699-1 at 148). As to Ferguson, Keurig notes his testimony was ambiguous as to whether he took notes during meetings. (ECF No. 1340-16 at 3).

Of the five custodians for whom Keurig has not produced hard copy documents, the Court finds that Plaintiffs have shown that Keurig failed to take reasonable steps to preserve relevant hard copy documents for one, Barberio. Barberio, Keurig's former Vice President of At Home Sales, participated in meetings with customers in late 2013 and early 2014 during which, Plaintiffs allege, Keurig told customers that the 2.0 Brewer would not be compatible with customers' cups. (ECF Nos. 1287-13 at 3; 1286 at 15; 1287-8; see TreeHouse Complaint, ¶ 27). Although it is undisputed that Keurig sent a litigation hold notice to Barberio on February 17, 2014, Barberio did not recall receiving it and Keurig's counsel did not contact him until the summer of 2019 to ask whether he had any potentially responsive documents. (ECF Nos. 1632 at 3 ¶ 3; 1284-16 at 5, 7, 10). Although he said he was not "a big note taker," (ECF No. 1340-17 at 5), he also testified that he kept a yellow binder containing any notes he had taken of meetings with customers including Giant Eagle, Wakefern, Kroger, and Ahold, but threw it out when he left Keurig in June 2014. (ECF No. 1284-16 at 8; see ECF No. 1632 at 3 ¶ 2). Thus, because Keurig failed to take

reasonable steps to confirm that Barberio had received and complied with the litigation hold notice, identifiable, potentially responsive documents were lost.  See Zubulake V, 229 F.R.D. at 432 (discussing counsel's obligation to "oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents").

Plaintiffs have not made this showing as to the other four custodians.  DuLong received a litigation hold notice on March 31, 2016, and, as Keurig's policy required, left hard copy documents in her office when her employment at Keurig ended in December 2016.  (ECF Nos. 1632 at 8–9 ¶¶ 16–17; 1340-35 at 7; see ECF Nos. 1340-37 at 5, ¶ F; 1340-33 at 4, ¶ F; 1340-30 at 4 ¶ F; 1340-42 at 9 ¶ 8.E).  Plaintiffs, however, did not ask DuLong in her deposition about the nature of the hard copy documents she left in her office, and thus have not shown that Keurig failed to preserve any potentially relevant documents, let alone any documents that would have been adverse to Keurig as would justify an adverse inference sanction.  See Turner, 142 F.R.D. at 77 (denying request for adverse inference where plaintiff failed to show that destroyed maintenance records would have been unfavorable to defendants).  Further, Keurig produced over 106,000 documents for DuLong, including documents from one of her hard drives and shared drives, which was the location where, she testified, she saved "[j]ust about everything[.]" (ECF No. 1340-35 at 4).

Ferguson did not testify that he had a practice taking notes, and instead stated that he could not "recall specifically when [he] might have taken notes[,]" and was "honestly not sure" whether he disposed of any handwritten notes after he left Keurig.  (ECF No. 1664-4 at 8–10). Similarly, Whoriskey testified that he "may have" taken notes during meetings, but did not keep a notebook and "[a]nything that [he] felt like retaining would have ultimately been on [his]

computer." (ECF No. 1340-18 at 3). Plaintiffs therefore have not shown that Ferguson and Whoriskey had kept any notes relevant to Plaintiffs' claims, let alone that Keurig failed to preserve them. See Orbit One, 271 F.R.D. at 438 ("Sanctions are not warranted merely because information is lost; the evidence must be shown to have been 'relevant.'").

As to the fifth custodian, DiFabio, Plaintiffs represented at oral argument that he testified that he left any hard copy documents at Keurig when he left in March 2016, but this testimony was not included in any exhibit that accompanied Plaintiffs' Motion. (See ECF No. 1693-1 at 35).[21] Even if the Court were to consider their representation as to DiFabio's testimony, Plaintiffs have not shown that DiFabio left behind any relevant notes of Keurig's meetings with customers about the 2.0 Brewer in late 2013 and early 2014: to the contrary, DiFabio does not appear on the list of Keurig employees who gave presentations about the 2.0 Brewer to customers, and although he was copied on an email summarizing the status of meetings with customers, the summary does not indicate him as having attended any of those meetings. (See ECF Nos. 1287-8; 1287-13). Plaintiffs have therefore not shown that Keurig failed to preserve any relevant hard copy documents for DiFabio. See Chin, 685 F.3d at 162 (requiring, for adverse inference, proof "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense").

Accordingly, the Court finds that Plaintiffs have demonstrated that Keurig violated Rule 37(b)(2)(A) by failing to preserve, as required by the ESI Order, relevant hard copy documents for Barberio, but not for DuLong, Ferguson, Whoriskey, or DiFabio.

---

[21] The parties submitted excerpts from DiFabio's deposition testimony, but the pages Plaintiffs cited during oral argument were not contained in any exhibit to the Motions. (Compare ECF No. 1693-1 at 35 with ECF Nos. 1287-3 and 1340-9).

###### c. **Prejudice**

The Court must evaluate whether Plaintiffs have been prejudiced by Keurig's failure to preserve hard drives for the 23 custodians listed above (see § IV.B.2.b.ii & n.14, supra), in which case the Court "may order measures no greater than necessary to cure the prejudice[.]"  Fed. R. Civ. P. 37(e)(1).[22]  The Court's "evaluation of prejudice from the loss of information necessarily includes evaluation of the information's importance in the litigation."  Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend.  Where Plaintiffs have been able to obtain discovery from alternative sources, the evaluation of prejudice shifts "from one of kind to one of degree."  Coan, 602 B.R. at 440.

The Court must consider the "full record" in determining prejudice and corresponding sanctions.  S.N.E. Tel. Co., 624 F.3d at 144.   In evaluating Plaintiffs' assertions of prejudice, the Court therefore begins at the macro level.  In this eight-year multidistrict litigation consolidating over 30 related actions, Keurig: (i) issued litigation hold notices to over 700 custodians; (ii) collected documents from 54 Agreed Custodians as well as non-custodial sources agreed by the parties; (iii) produced 3.8 million documents equating to over 11 million pages; (iv) preserved and collected 99 hard drives, of which 93 were successfully imaged and over 70 were successfully decrypted; and (v) produced seven million pages of documents from prior litigations.   (ECF No. 1336 at 6; 1699-3 at 16, 18).  In addition, Plaintiffs deposed 23 of the 30 custodians whose information Keurig allegedly spoliated, served dozens of non-party subpoenas on Keurig's former employees and the customers and suppliers at issue in this litigation, and participated in dozens

---

[22] As noted in §III.B.1, supra, a showing of prejudice is not required for sanctions under Rule 37(b) for Keurig's failure to comply with the ESI Order.

of meet-and-confers with Keurig as well as 17 discovery conferences with me (in addition to several more with Magistrate Judge Pitman).  (ECF No. 1699-3 at 16).  This is not, therefore, a case in which Plaintiffs are bereft of evidence to support their claims.

Turning to the micro level, the Court will now examine each of the 23 custodians for whom hard drives were lost or inaccessible to determine whether Plaintiffs have been prejudiced by Keurig's conduct.[23]

### i.   Don Barberio

Don Barberio, former Vice President of At-Home Sales, worked at Keurig from June 1996 until June 2014.  (ECF No. 1632 at 3 ¶ 3).  In his role, he participated in meetings with customers whom TreeHouse alleges were lost to Keurig after the roll-out of the 2.0 Brewer, including Giant Eagle, Wakefern, Ahold, and Kroger.  (ECF Nos. 1287-13 at 3; 1286 at 15; 1287-8; see TreeHouse Complaint, ¶ 27).  Barberio testified that he would call or email Tom Ferguson with any "highlights" of customer meetings.  ECF No. 1340-17 at 6–7).

Barberio received a litigation hold notice on February 17, 2014 (ECF No. 1632 at 3 ¶ 3), and when he left Keurig in June 2014, he met with Tom Ferguson and an individual from Human Resources to turn in his phone and laptop.  (ECF Nos. 1284-16 at 9; 1340-17 at 3).  Despite Ferguson's presence when Barberio returned his devices and the litigation hold, Barberio's laptop was lost, which Keurig knew by January 2019.  (ECF Nos. 1287-5 at 2; 1284-11; 1340-2 at 3; 1632 at 44 ¶ 99).  Barberio testified that he did not use a share drive, and "had no idea what a share drive" was.  (ECF No. 1340-17 at 3).   Keurig did not find or produce any documents from Barberio's share drive.  (ECF No. 1284-11 at 6).

---

[23] See n.14, supra.

Keurig produced over 21,000 emails for Barberio, and nearly 81,000 emails for Ferguson, to whom Barberio sent customer meeting updates, and, on failing to locate Barberio's hard drive, and added as a custodian Barberio's supervisor (Jim Travis), for whom Keurig produced 25,813 documents.  (ECF Nos. 1336 at 17; 1284-11 at 6; 1340-1 at 3; 1699-3 at 33).[24]  Still, Keurig produced essentially <u>no</u> non-email documents for Barberio.  His testimony that he did not know what a share drive was leads to the reasonable inference that any documents he saved were saved to his hard drive only.  Given his central role in meetings with Keurig's key customers about the 2.0 Brewer in late 2013 and early 2014, the Court finds that Plaintiffs were prejudiced by Keurig's failure to preserve Barberio's hard drive.

### ii.    **Will Billings**

Will Billings, Keurig's former Senior Director of Project Management, left Keurig on November 5, 2015.  (ECF Nos. 1287-1 at 2; 1632 at 3 ¶ 4).  Plaintiffs anticipated that he would have "knowledge of private label sales, [Keurig]'s marketing to retailers, and the Keurig 2.0 Brewer[,]" as well as "communications relating to Keurig's key brand licensees," such as Unilever, Starbucks, Dunkin' Donuts, and J.M. Smucker.  (ECF Nos. 1287-5 at 3; 1391-1 at 9).  He received a litigation hold notice on February 17, 2014 and was added as a custodian on October 3, 2018.  (ECF Nos. 1287-1 at 2; 1632 at 3 ¶ 5).  Billings' hard drive was damaged and could not be imaged, a fact that Plaintiffs contend Keurig knew by September 2018 but did not disclose until May 20, 2019.  (ECF Nos. 1340-1 at 4; 1284-17 at 3; 1693-1 at 39, 133; 1284-45 at 3).  Keurig provided

---

[24] In the Motions and the Stipulations, the parties largely dispute each other's representations as to the number of documents produced for each custodian.  (<u>See</u> ECF Nos. 1632 at 52–63 ¶¶ 106–29, 149-54 ¶¶ 1–12; 1699-1 at 132–33, 234; 1699-2 at 33–34).  The Court is unable to independently verify these figures, and, accordingly, has taken each party at their word and adopted their representations as to their own productions.

Billings' hard drive to TreeHouse, whose vendor attempted but was still unable to recover any data.  (ECF No. 1284-40 at 3).  Plaintiffs chose not to depose Billings, but state that they "may have" done so "if documents from his hard drive had been produced."  (ECF 1391-1 at 9–10). Keurig produced over 105,000 documents from Billings' custodial files, including 1,122 documents from his share drive spanning the entire period of his employment.  (ECF No. 1391-1 at 9).

The fact that Keurig produced over 1,100 documents from Billings' share drive gives rise to the reasonable inference that his practice was to store documents in a central location, not on his hard drive, in compliance with Keurig's Acceptable Use Policy.  (ECF Nos. 1340-6 at 6; 1284-11 at 5; 1391-3 at 7).  In addition, these documents span the entire period of his employment, and supplement more than 90,000 other documents that Keurig produced from Billings' custodial file.  Despite having over 105,000 documents for Billings, whom Plaintiffs claim was a key witness relating to Keurig's dealings with customers and licensees, Plaintiffs chose not to depose him and offer nothing more than speculation to support their assertion that unique documents existed on his hard drive but were not produced.  Accordingly, the Court finds that Plaintiffs have failed to show prejudice from the inability to access Billings' hard drive.  See Rhoda v. Rhoda, No. 14 Civ. 6740 (CM), 2017 WL 4712419, at *4 (S.D.N.Y. Oct. 3, 2017) (denying request for adverse inference sanction where "the likelihood of prejudice to Defendant [was] a nullity" where plaintiffs had produced over 30,000 other documents relevant to the issues and "[d]efendant's counsel, for whatever reason, failed to ask [a plaintiff] any questions concerning the deleted emails during her deposition").

### iii. __Dwight Brown__

Dwight Brown was a Senior Vice President of the Marketing Center of Excellence and Vice President of Consumer Marketing.  (ECF Nos. 1287-1 at 2–3; 1632 at 5 ¶ 8).  He received the "Degnan Email" (see § IV.B.2.d.iv, infra) as well as a litigation hold notice on February 17, 2014 and was added as a custodian on October 3, 2018.  (ECF Nos. 1287-1 at 2; 1287-15 at 3; 1632 at 5 ¶ 9).  Brown left Keurig on August 29, 2014.  (ECF Nos. 1287-1 at 2; 1632 at 5 ¶ 8).

Brown testified at his deposition that he saved "the majority" of documents relating to Keurig's business on his share drive.  (ECF No. 1340-11 at 5, 8).  He initially testified that the only documents he saved on his hard drive were "confidential personnel documents or something personal . . . [his] resume, for example. . . ."  (Id. at 5).  After Plaintiffs' counsel showed him a June 2011 email chain in which he asked for help extracting a presentation for a business meeting that he had saved only to his laptop and not to the share drive, Brown acknowledged that he had saved this presentation only to his hard drive on his laptop, but reiterated that "the share drive is where the majority of [his] documents that [he] saved would sit."  (Id. at 8–9).  The email noted that a "Keurig org. folder" had been retrieved from Brown's laptop hard drive, and contained Brown's comment that he had learned "a valuable lesson" from not saving the presentation to his share drive.  (Id. at 7, 9).

Keurig was unable to decrypt Brown's hard drive, and although its vendor, D4, was able to image the hard drive, D4 was unable to access it due to lack of an encryption key.  (ECF Nos. 1340-1 at 5–6; 1284-17 at 4; 1632 at 69 ¶ 140).  Keurig produced over 101,000 documents from Brown's custodial file, including 221 unique documents from his share drive.  (ECF No. 1340-1 at 6).  Included in his share drive documents were the presentation and the Keurig org. folder

referenced in the June 2011 email.  (Id.)  This gives rise to the reasonable inference that, even if Brown had saved documents to his laptop hard drive <u>before</u> June 2011, <u>after</u> that time, he saved them to the share drive, from which Keurig produced his documents, including the two that were initially saved on his laptop hard drive.  Accordingly, the Court finds that, like Billings, Plaintiffs have failed to demonstrate prejudice from Keurig's inability to decrypt Brown's hard drive.

### iv.   <u>Susan Cote</u>

Susan Cote was the Senior Category Director for Specialty Coffee at Keurig.  (ECF Nos. 1632 at 5 ¶ 10; 1287-1 at 3).  She left Keurig in March 2014 and did not receive a litigation hold notice.  (ECF Nos. 1632 at 6 ¶ 11; 1284-31 at 3).  Due to her involvement with the Roaster Advisory Council, which Plaintiffs allege shows collusion among roasters who had agreements with Keurig, Plaintiffs identified Cote as a custodian in their Second Amended Initial Disclosures in October 2018.  (ECF Nos. 1287-1 at 3; 1391-1 at 18-19; 1287-5 at 5–6).

Keurig preserved three hard drives for Cote, from two of which, including her last-in-time hard drive, Keurig produced documents dated through the end of her employment in March 2014.  (ECF Nos. 1391-1 at 18; 1284-48 at 2).  Cote's third hard drive was McAfee-encrypted, but Keurig's vendor determined that the encryption key was invalid.  (ECF No. 1284-17 at 4).  Keurig sought McAfee's help, but McAfee was not able to "troubleshoot a decryption key . . . ."  (ECF No. 1340-4 at 28–30).  Keurig produced over 89,000 documents for Cote, including from the two other hard drives, as noted, as well as over 2,500 documents from her network drive, which contained documents from January 2009 through February 2014.  (ECF Nos. 1391-1 at 18; 1632 at 71 ¶ 143; 1699-3 at 28).  The fact that her more recent hard drives contained documents dating to January 2010 is consistent with Keurig's policy to migrate data from older to newer hard drives.

48

(ECF No. 1340-4 at 5–6).  Plaintiffs chose not to depose Cote, asserting prejudice from "the lack of documents produced" relating to the Roaster Advisory Council.  (ECF No. 1391-1 at 19; 1632 74–75 ¶ 147).

Based on the number of documents Keurig produced for Cote, including from her more recent hard drives and network drives, the Court finds that Plaintiffs have not shown prejudice from Keurig's inability to access her older, McAfee-encrypted hard drive.  Plaintiffs had tens of thousands of documents relating to Cote and spanning her entire employment, which was plenty of fodder for deposition questioning.  That Plaintiffs chose not to depose her is more reflective of their assessment of her lesser importance to their claims than of prejudice.

### v.    Ken Crites

Ken Crites was the Senior Category Director, Category.  (ECF Nos. 1287-1 at 3; 1632 at 7 ¶ 12).  He left Keurig in March 2013, before TreeHouse filed its Complaint, and so did not receive a litigation hold notice.  (ECF Nos. 1287-1 at 3; 1632 at 7 ¶ 13).  Plaintiffs added Crites as a custodian in October 2018.  (ECF No. 1287-1 at 3).  In May 2019, Keurig disclosed to Plaintiffs that it was unable to access Crites' hard drive due to an invalid encryption key.  (ECF No. 1284-45 at 3).  Keurig's vendor, D4, tried but was also unable to access the hard drive.  (ECF No. 1284-17 at 4–5).

Keurig produced over 50,000 documents for Crites, including 85 documents from his network drive dated from February 2009 until February 2013.  (ECF Nos. 1391-1 at 22–23; 1699-3 at 28).  Keurig's production for Crites also included thousands of documents related to Bigelow, one of the customers TreeHouse alleged it lost to Keurig.  (ECF Nos. 1391-1 at 23; 1287-5 at 6–7).

Plaintiffs did not depose Crites, and therefore did not ask him whether he saved to his hard drive any documents that might have been favorable to Plaintiffs.  See Rhoda, 2017 WL 4712419, at *4 (finding no prejudice where defendants' counsel failed to ask plaintiff about allegedly deleted documents or otherwise "prove that the substance of the missing emails would have been favorable" to defendant "and thus unfavorable to Plaintiffs").  Accordingly, the Court finds that Plaintiffs have not been prejudiced by the inability to access Crites' hard drive.

### vi.   Ron DiFabio

Ron DiFabio was the Senior Vice President of At-Home Sales from September 2008 until March 2016.  (ECF Nos. 1632 at 8 ¶ 14; 1287-1 at 4).  He received a litigation hold notice on February 17, 2014.  (ECF Nos. 1632 at 8 ¶ 15; 1287-1 at 4).  Keurig designated him as a witness with knowledge of Keurig's relationship with retailers, the Keurig 2.0 brewer, K-cups, and McLane, and Plaintiffs assert that he "was heavily involved in day-to-day and high-level communications with and about retailers" whom TreeHouse alleges it lost as customers.  (ECF No. 1287-5 at 7).  For example, DiFabio testified that although WalMart would not enter "a duration commitment," it was willing to "continue with [Keurig] as a private-label supplier . . . ."  (ECF No. 1287-3 at 5).  DiFabio testified that everything he and his "direct reports did were always saved on a share drive."  (ECF No. 1340-9 at 3).

Keurig preserved five hard drives from DiFabio's computers.  (ECF No. 1284-48 at 2).  Keurig did not have an encryption key for two of DiFabio's hard drives, and as a result, Keurig's vendor, D4, was unable to access the data.  (ECF No. 1284-17 at 4–5).  Keurig decrypted and produced documents from the other three hard drives, including his last-in-time hard drive, which contained documents dating through the end of his employment.  (ECF No. 1284-48 at 2;

1391-1 at 26; 1632 at 71 ¶ 143).  In total, Keurig produced over 280,000 documents for DiFabio, including over 3,700 documents from his network drive, which were dated over his entire employment period, and documents from the "rdifabio" share folder and other folders he and his team used.  (ECF No. 1391-1 at 26).  Plaintiffs appear not to have asked DiFabio in his deposition whether any agreement with WalMart was put in writing, and if so, where he stored it. (ECF Nos. 1287-3; 1340-9; 1391-1 at 27).  Another Keurig witness, Joe Mueller, and a WalMart representative testified that there was no such agreement.  (ECF No. 1340-13 at 3–4; 1340-14 at 3–4).

Given DiFabio's testimony that he saved all documents to the share drive, combined with Keurig's production from his last-in-time hard drive (as well as tens of thousands of other documents), the Court finds that Keurig's inability to access two, older hard drives did not prejudice Plaintiffs.

### vii.    Suzanne DuLong

Keurig's preservation efforts concerning DuLong are summarized above.    (See § IV.B.2.b.i–ii, supra).   Keurig was unable to image one of DuLong's two hard drives.  (ECF No. 1287-5 at 8).  Keurig's vendor, D4, tried but was also unable to image the hard drive due to possible physical damage.  (ECF No. 1284-17 at 3).  Keurig provided DuLong's hard drive to TreeHouse, which was also unable to access it.  (ECF Nos. 1699-3 at 19; 1284-40 at 3-4).

Keurig produced over 106,000 documents for DuLong, including from her other hard drive and thousands of documents from the "suz" and corporate communications share drives to which, she testified, she saved "[j]ust about everything." (ECF Nos. 1340-35 at 4; 1699-3 at 40;

1391-1 at 31–34).   Given DuLong's testimony and Keurig's production, the Court finds that

Keurig's inability to access one of her hard drives did not prejudice Plaintiffs.

<div align="center">

**viii.   <u>Steve Ferreira</u>**

</div>

Steve Ferreira was Keurig's Vice President of Finance, Business Analytics, Demand

Planning and Strategy from April 2004 until April 2016.   (ECF Nos. 1287-1 at 5; 1287-5 at 10; 1632

at 9 ¶ 20).   Ferreira received a litigation hold notice on February 16, 2015, and was under a pre-

existing litigation hold relating to other matters.   (ECF Nos. 1287-1 at 5; 1632 at 10 ¶ 21).   In its

Amended Initial Disclosures, Keurig designated Ferreira as having knowledge of development and

expansion of the 2.0 Brewer.   (ECF Nos. 1287-5 at 10; 1284-43 at 6).

In July 2018, TreeHouse raised with Keurig concerns about deficiencies in the production

with respect to Ferreira (and other custodians).   (ECF No. 1287-24 at 12).   By September 2018,

Keurig had determined that it was unable to decrypt one of Ferreira's hard drives, but did not

disclose that fact to Plaintiffs until May 2019.   (ECF Nos. 1284-17; 1284-45 at 3).   Keurig provided

D4 with an encryption key for Ferreira's hard drive, but D4 determined the encryption key was

invalid.   (ECF No. 1284-17 at 4).

Keurig produced over 141,000 documents for Ferreira, including from three of his four

hard drives and 141 documents from his network drive.   (ECF Nos. 1340-1 at 12–13; 1284-48;

1391-1 at 37–39; 1632 at 71 ¶ 143).   Ferreira also produced to Plaintiffs in response to a

subpoena three documents he had saved on his home computer.   (ECF Nos. 1699-3 at 55; 1393-

6 at 3).   The latest document produced from Ferreira's network drive was dated October 2014,

and the latest document from his hard drives was dated October 22, 2015.   (ECF Nos. 1284-48 at

2; 1391-1 at 37–38).   Because of this nearly six-month gap in the documents Keurig produced for

Ferreira, the Court finds that Plaintiffs have been prejudiced by Keurig's failure to preserve a valid encryption key for Ferreira's hard drive.

### ix.    Bruce Godfrey

Bruce Godfrey worked for Keurig from September 2010 until April 2017, most recently as Director of Market Research.  (ECF Nos. 1287-1 at 5; 1632 at 10 ¶ 22).  Godfrey received a litigation hold notice on February 17, 2014.  (ECF No. 1287-1 at 5; 1632 at 10 ¶ 23).  When Godfrey left Keurig in April 2017, he returned his laptop and cellphone.  (ECF No. 1340-23 at 6–7).  Plaintiffs allege that Godfrey's submission in June 2016 of a memo in which he voiced his opinion that "consumers did not want the so-called 'benefits' of the 2.0 Brewer" led to his termination two months later.  (ECF No. 1287-5 at 11–12; see ECF No. 1287-7 at 3).  Godfrey testified that he and his Consumer Insights Group were "trying to put everything" on a shared drive.  (ECF No. 1340-23 at 7–8).  Despite his return of his laptop, which was subject to a litigation hold, Keurig was unable to locate Godfrey's hard drive, a fact that Keurig did not disclose to Plaintiffs until after Godfrey's deposition.  (ECF Nos. 1284-11 at 6; 1632 at 44 ¶ 99).

Keurig produced over 109,000 documents for Godfrey, including over 3,000 documents from his network (X:) drive that span his entire employment, and another 3,700 from additional share drives, including the research libraries the Consumer Insights Group maintained.   (ECF Nos. 1699-3 at 34, 48; 1391-1 at 42–43).  Keurig also collected and produced Godfrey's June 2016 memo from three sources, including multiple copies that were attachments in Godfrey's emails. (ECF Nos. 1699-1 at 137; 1699-3 at 36, 48; 1391-1 at 44).

Although Keurig's failure to preserve Godfrey's hard drive represents a greater degree of negligence, given that he expressly turned in his laptop in April 2017, well after Keurig's

preservation obligation arose, the Court also finds that because Keurig's production of Godfrey's documents from the network drives spans his entire employment and included multiple copies of the June 2016 memo, Plaintiffs have not been prejudiced by Keurig's failure to preserve the hard drive.

### x.   Don Holly

Don Holly worked at Keurig from July 2001 until October 2013, most recently as Vice President of Beverage Quality.  (ECF Nos. 1632 at 10 ¶ 24; 1287-1 at 6).  Because he left Keurig before TreeHouse filed its Complaint, Holly did not receive a litigation hold notice for this litigation, but he turned in his laptop when he left.  (ECF Nos. 1632 at 11 ¶ 25; 1393-7 at 3).  Keurig designated Holly as a person with information about Keurig's supplier relationships and the quality of K-cups.  (ECF Nos. 1284-43 at 7; 1287-5 at 12).  Plaintiffs allege that Holly "signed and negotiated the supply agreements" with the suppliers of K-cup components, thus "block[ing] TreeHouse's access to work with those suppliers on its single-serve products."  (ECF Nos. 1287-5 at 13; Amended and Supplemental Complaint, Treehouse Foods, Inc. et al v. GMCR, et al., No. 14 Civ. 905 (VSB) (S.D.N.Y. Dec. 2, 2014), ECF No. 86 ¶¶ 262–78 ("TreeHouse Amended Complaint")). In response to a motion by TreeHouse, in February 2020, the Court ordered Keurig to "produce Don Holly's custodial documents regarding the negotiation of the supplier agreements between Keurig and Curwood, Phoenix Cups, and Winpak[,]" which was the first time Holly was added as a custodian.  (ECF Nos. 733; 1287-1 at 6).  Plaintiffs assert (without citation to an exhibit

accompanying the Motions[25]) that Holly received a litigation hold notice in connection with the Sturm litigation.  (ECF No. 1287-5 at 13).

Keurig was unable to locate the hard drive from Holly's laptop.  (ECF Nos. 1632 at 44 ¶ 99; 1391-1 at 46–47).  In response to the Court's order, Keurig collected over 250,000 documents from Holly's email, network drive, and archived email from CommVault, and produced 288 documents in response to the Court's order, including communications with Curwood, Phoenix Cups, and Winpak, and over 8,900 documents for which Holly was a custodian.  (ECF Nos. 1340-38; 1632 at 56–57 ¶¶ 112–14; 1391-1 at 47–48).  Plaintiffs also received documents from Grupo Phoenix in response to a subpoena, but Holly did not appear on those documents.  (ECF No. 1699-1 at 134).

Because Holly left Keurig before its preservation obligation relating to this litigation arose, Holly was added as a limited custodian in February 2020, and Keurig produced almost 300 documents from a collection of 250,000 from his network drive and email, the Court finds that Plaintiffs have not been prejudiced by Keurig's inability to locate his hard drive.  See Rhoda, 2017 WL 4712419, at *4.

### xi.    Jimmy Huang

Jimmy Huang has worked at Keurig as Senior Director of Engineering since January 2005.  (ECF Nos. 1287-1 at 6; 1632 at 12 ¶ 26).  He received a litigation hold notice on April 17, 2014.  (ECF Nos. 1287-1 at 6; 1632 at 12 ¶ 27).  Keurig designated Huang as a person with knowledge "regarding the development of the 2.0 Brewer software" and the supplier of the 2.0 Brewer's ink

---

[25] Plaintiffs cite a "Mar. 11, 2020 S. Southall Email," but did not submit it as an exhibit to the Motion.  (ECF No. 1287-5 at 13; see ECF Nos. 1284; 1287; 1391; 1393).

technology.  (ECF No. 1287-5 at 13; see ECF No. 1284-43 at 4).  Huang was the custodian of the source code for the 2.0 Brewer.  (ECF No. 952 at 2–3).  Huang testified that "all the files" on his computer were "transferred to the OneDrive."  (ECF No. 1340-39 at 4).

In July 2018, TreeHouse raised concerns about deficiencies in Keurig's production for Huang.  (ECF No. 1287-24 at 13–14).  Specifically, TreeHouse asserted that Huang's production included only five communications with the ink supplier, less than 650 documents concerning the 2.0 Brewer, and few documents from before 2014.  (ECF No. 1287-24 at 13).  Keurig had learned in March 2018 that the older of the two hard drives that Keurig collected for Huang was physically damaged and made a "clicking" noise, "which is indicative of a mechanical failure," such that Keurig and D4 were unable to image it using "ordinary means."  (ECF No. 1632 at 76 ¶ 149; 1284-40 at 9; 1284-17 at 2; 1340-40 at 7).  TreeHouse, McLane, and the DPPs elected not to analyze Huang's hard drive.  (ECF No. 1284-40 at 9).  JBR's post-fact discovery attempt to access the hard drive, with which Keurig cooperated, was also unsuccessful.  (ECF No. 1340-40 at 3).

Keurig produced approximately 85,000 documents from Huang's files, including over 1,500 documents from OneDrive, and from his last-in-time hard drive.  (ECF Nos. 1632 at 83–84 ¶ 161; 1391-1 at 49–51; 1699-3 at 40).  Based on Huang's testimony that he transferred all the files from his hard drive to OneDrive, and Keurig's production of documents from his last-in-time hard drive, the Court finds that Plaintiffs were not prejudiced by Keurig's failure to prevent damage to Huang's older hard drive.

xii.   **Sherry Hurley**

Sherry Hurley worked at Keurig from August 2011 until June 2018, and was the Collaborative Planning, Forecasting and Replenishment Manager.  (ECF Nos. 1287-1 at 6; 1632 at

12 ¶ 28).  She was on the Customer Focused Team for WalMart, one of the customers whom TreeHouse alleges it lost.  (ECF Nos. 1287-5 at 14; 1287-20 at 34).  Hurley received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 6; 1632 at 12 ¶ 29).  She was added as a custodian at McLane's request in May 2019.  (ECF Nos. 1391-1 at 54; 1281-5 at 6; 1632 at 58 ¶ 115).

Keurig was unable to locate a hard drive for Hurley.  (ECF Nos. 1287-5 at 14; 1632 at 44 ¶ 99).  Keurig produced over 109,000 emails and attachments from Hurley's files, 62,000 of which related to WalMart.  (ECF Nos. 1632 at 58 ¶ 116; 1391-1 at 54; 1699-3 at 37).  Keurig also produced over 44,000 documents from Hurley's supervisor, Brad Tidwell, including 419 from his share drive.  (ECF No. 1632 at 59 ¶ 117).  Keurig does not appear to have produced any documents from Hurley's network drives.  (See ECF Nos. 1693-1 at 66, 72; 1699-3 at 33; 1391-1 at 54).  Plaintiffs did not depose Hurley.  (ECF No. 1632 at 59 ¶ 118).

Although Keurig failed to preserve Hurley's hard drive and has not explained its non-production of documents from her network share drives, given her late addition as a custodian, the production of documents from an alternative custodian, and McLane's decision not to depose her, the Court finds that Plaintiffs were not prejudiced by Keurig's failure to preserve.  See Rhoda, 2017 WL 4712419, at *4.

### xiii.    David Manly

David Manly worked for Keurig from December 2002 until September 2014 and was the Senior Vice President of Innovation and Vice President and General Manager of Away-From-Home.  (ECF Nos. 1287-1 at 7; 1632 at 12 ¶ 30).  From September 2014 until July 2015, Manly worked as an independent contractor focusing on Keurig's cold-beverage appliance.  (ECF

Nos. 1632 at 12 ¶ 30; 1340-8 at 3–6).  Keurig designated Manly as a person with discoverable information regarding Keurig's relationships with distributors, marketing of the 2.0 Brewer and K-cups, customer inquiries, competition, and the Away-From-Home Office Coffee.  (ECF No. 1287-5 at 14).  Plaintiffs assert that Manly also sent violation notices to distributors and was involved in developing the 2.0 Brewer.  (ECF No. 1287-5 at 14–15).  Manly is also mentioned in TreeHouse's Amended Complaint.  (TreeHouse Amended Complaint, ¶¶ 189, 490, 521; see ECF No. 1287-1 at 7).  Manly received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 7; 1632 at 13 ¶ 31).  At his deposition, Manly testified that information from his older laptops were transferred to his new laptops.  (ECF No. 1340-8 at 3, 6).

Keurig preserved three hard drives for Manly, but was unable to decrypt one of them. (ECF No. 1284-48 at 2–3).  The two that Keurig was able to decrypt and produce included his last-in-time hard drive.  (ECF Nos. 1284-48 at 2; 1699-3 at 28; 1632 at 71 ¶ 143).  Keurig produced over 150,000 documents for Manly, including the documents from his last-in-time hard drive and over 2,800 documents from his network drive.  (ECF No. 1391-1 at 55–56).  Keurig also produced from CommVault emails for Manly dating back to May 2011.  (ECF No. 1340-1 at 19).  In response to a subpoena from Plaintiffs, Manly produced documents from his personal laptop, to which he had downloaded files when he retired from Keurig.  (ECF Nos. 1340-8 at 3–5; 1391-1 at 56).

Based on Keurig's production of documents from Manly's last-in-time hard drive and his network drive, and Manly's production of additional documents in response to Plaintiffs' subpoena, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to access Manly's older hard drive.

<div align="center">

xiv.   **Joe Mueller**

</div>

Joe Mueller worked for Keurig from October 2013 until March 2015, and was Senior Vice of Sales.  (ECF Nos. 1287-1 at 8; 1632 at 13 ¶ 34).  Mueller reported to DiFabio and "was responsible for all the interaction between" Keurig and Walmart, one of the customers whom TreeHouse alleges it lost.  (ECF Nos. 1284-47 at 3–4; 1287-20 at 34).  He received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 8; 1632 at 13 ¶ 35).  Mueller was added as a custodian in May 2019 for the McLane case.  (ECF Nos. 1287-1 at 8; 1391-1 at 63; 1632 at 59 ¶ 119).

Keurig was unable to locate Mueller's hard drive.  (ECF Nos. 1287-5 at 17; 1284-48 at 3; 1632 at 44 ¶ 99).  Keurig searched Mueller's network drive, "which contained no documents." (ECF No. 1391-1 at 63).  Keurig produced over 34,000 emails for Mueller.  (ECF Nos. 1340-1 at 21; 1391-1 at 63; 1632 at 59 ¶ 120).  DiFabio, to whom Mueller reported, testified that he and his direct reports saved everything to network drives.  (ECF No. 1340-9 at 3).

Because Keurig only produced emails for Mueller, and produced no network drive documents notwithstanding DiFabio's assertion that his team saved all documents there, the Court finds that there is a gap in Keurig's production as to Mueller that has prejudiced Plaintiffs.

<div align="center">

xv.   **Tom Novak**

</div>

Tom Novak worked at Keurig from November 2007 to May 2017, and was the Senior Vice President for Beverage Research & Development.  (ECF Nos. 1287-1 at 8; 1632 at 14 ¶ 36).  He received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 8; 1632 at 14 ¶ 37). Keurig identified Novak as having discoverable information about the development of the 2.0 Brewer and Keurig's relationship with Sagentia.  (ECF Nos. 1284-43 at 8; 1287-5 at 17).

<div align="center">

59

</div>

Keurig preserved four hard drives for Novak, including his older McAfee-encrypted hard drive, which it was unable to decrypt.  (ECF Nos. 1284-48 at 3; 1284-45 at 3).  Keurig's vendor, D4, attempted to decrypt Novak's McAfee-encrypted hard drive, but found the encryption key to be invalid.  (ECF No. 1284-17 at 4).  In July 2018, TreeHouse raised concerns about deficiencies in Keurig's production for Novak, and Keurig learned by September 2018 that Novak's McAfee-encrypted hard drive was inaccessible.  (ECF Nos. 1284-17 at 3; 1287-24 at 11).

Keurig produced over 76,000 documents for Novak, including documents from his other three more recent, Bitlocker-encrypted hard drives and 606 documents from his network drive. (ECF Nos. 1340-1 at 22; 1284-48 at 2; 1632 at 72 ¶ 143).  Although Plaintiffs press the point that the latest document from his other three hard drives was dated November 12, 2015 (ECF No. 1391-1 at 64), Plaintiffs do not dispute that the inaccessible McAfee-encrypted hard drive was Novak's oldest hard drive, and that Keurig produced documents from his network drive, among other sources.  Accordingly, the Court finds that Plaintiffs have not been prejudiced from Keurig's inability to access Novak's older, McAfee-encrypted hard drive.

### xvi.   Fran Rathke

Fran Rathke worked at Keurig from October 2003 until December 2015, and served as Chief Financial Officer.  (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 38).  Rathke received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 39).  Keurig identified Rathke as having discoverable information about corporate finance, and as one of the individuals involved in the decision to file the Sturm litigation.  (ECF Nos. 1284-43 at 8; 1284-52 at 5–6).

Keurig preserved three hard drives for Rathke, but was unable to image the oldest of the three.  (ECF Nos. 1284-45 at 3; 1284-48 at 3; 1632 at 76 ¶ 149).  D4 was unable to image Rathke's

oldest hard drive due to "read errors" caused by "possible physical damage." (ECF No. 1284-17 at 3). Keurig knew this by March 2018, but did not disclose it until May 20, 2019, one day after Plaintiffs deposed Rathke. (ECF Nos. 1284-45 at 3; 1284-17 at 3; 1287-5 at 18–19). Keurig provided the inaccessible hard drive to TreeHouse, which sent it to one vendor who was unsuccessful and then to a data recovery center that recovered eleven documents from it. (ECF Nos. 1284-40 at 3; 1340-1 at 23; 1340-31 at 4). In addition to those eleven documents, Keurig produced over 108,000 documents for Rathke, including documents from her two other hard drives—one of which was her last-in-time hard drive and contained documents through the end of her employment—and over 3,000 documents from her network drive. (ECF Nos. 1391-1 at 69; 1284-48 at 3). Plaintiffs took Rathke's deposition and did not seek to re-open her deposition following the recovery of the additional eleven documents. (See ECF No. 1340-31). The Court finds that Plaintiffs incurred and are entitled to recover the costs of the data recovery center's efforts to retrieve the additional documents from the oldest hard drive, for which Keurig declined to pay (ECF No. 1340-31 at 2–3), but, given the sources and volume of Keurig's production for Rathke, Plaintiffs were not otherwise prejudiced by Keurig's inability to access the older hard drive.

### xvii.   Jim Shepard

Jim Shepard worked at Keurig from July 2005 until September 2016, and was a Senior Director of Engineering. (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 40). Shepard received a litigation hold notice on April 17, 2014. (ECF Nos. 1287-1 at 9; 1632 at 14 ¶ 41). Keurig did not designate Shepard in its Amended Initial Disclosures (ECF No. 1284-43), but TreeHouse asserted that Shepard had discoverable information about the 2.0 Brewer and Keurig's "anticompetitive

conduct," including "Keurig's attempts to design technology that would lock out competition." (ECF No. 1287-5 at 19).

Neither Keurig nor D4 were able to image Shepard's hard drive, possibly due to physical damage, a fact that Keurig knew by September 2018 but did not disclose to Plaintiffs until May 2019. (ECF Nos. 1284-17 at 3; 1284-45 at 3). Keurig provided Shepard's hard drive to TreeHouse, whose vendor was also unable to access it. (ECF No. 1284-40 at 3).

Keurig produced more than 156,000 documents for Shepard, including from his network (X:) drive and other folders that he and the brewer engineering group accessed. (ECF No. 1391-1 at 72). In addition, in response to a non-party subpoena from Plaintiffs, Shepard produced over 2,200 documents from an external hard drive he had kept when he left Keurig. (ECF Nos. 1391-1 at 72; 1632 at 90 ¶ 170). Plaintiffs chose not to depose Shepard, so there is no testimony to suggest there were documents on his inaccessible hard drive that were not otherwise produced by Keurig or Shepard himself. Accordingly, the Court finds that Plaintiffs have not been prejudiced by Keurig's inability to access Shepard's hard drive.

xviii.    **Steve Smits**

Steve Smits worked at Keurig from January 2012 to July 2013, and was a Vice President of At-Home Sales. (ECF Nos. 1287-1 at 9; 1632 at 15 ¶ 42). Smits had left Keurig by the time TreeHouse filed its Complaint and therefore did not receive a preservation notice. (ECF Nos. 1287-1 at 9; 1632 at 15 ¶ 43). Keurig identified Smits in its Amended Initial Disclosures as having discoverable information about Keurig's relationships with WalMart, Sam's Club, and McLane and the sale of the Keurig 2.0 Brewer and K-cups, but Plaintiffs did not add him as a custodian

until the McLane complaint was filed in 2019.  (ECF Nos. 1284-43 at 9; 1287-1 at 9; 1391-1 at 75; 1632 at 60 ¶ 122).

Keurig was unable to locate Smits' hard drive.  (ECF Nos. 1284-48; 1632 at 44 ¶ 99).  Keurig produced approximately 13,000 documents for Smits, including 606 documents from his network drive that spanned his entire employment.  (ECF No. 1391-1 at 75–76).  Plaintiffs contend that Keurig's failure to preserve Smits' hard drive has resulted in irreparable loss of records of meetings with customers (ECF No. 1391-1 at 76), but Smits left months before Keurig's meetings with customers about the 2.0 Brewer in late 2013 and early 2014 that Plaintiffs allege were anti-competitive.  (ECF Nos. 1287-8; 1287-13; <u>see</u> ECF No. 581 at 10).  Accordingly, the Court finds that Plaintiffs have not been prejudiced by Keurig's failure to preserve Smits' hard drive.

### xix.   <u>Michelle Stacy</u>

Michelle Stacy was employed at Keurig from November 2008 until March 2014, and was the President of Keurig, Inc.  (ECF Nos. 1287-1 at 9; 1632 at 16 ¶ 44).  Stacy announced her departure from Keurig in August 2013, at which time she "was no longer in the office" and was not actively working after August 30, 2013.  (ECF Nos. 1632 at 16 ¶ 45; 1340-22 at 3).  Stacy did not receive a litigation hold notice, but left her files at Keurig, and her transition agreement required her to leave her devices behind as well.  (ECF Nos. 1287-1 at 9; 1632 at 16 ¶ 45; 1340-22 at 4; 1340-42 ¶ 8.E).  Keurig designated Stacy in December 2017 as having discoverable information regarding Keurig's relationships with customers, suppliers, distributors, and brands, and company strategy.  (ECF No. 1284-43 at 9).  Keurig also identified Stacy as participating in the decision to file the <u>Sturm</u> litigation, such that Plaintiffs argue she would have had additional documents relevant to their sham litigation claim.  (ECF Nos. 1284-52 at 6; 1699-1 at 70).

Keurig preserved three hard drives for Stacy, one of which neither Keurig nor D4 was able to image and access due to possible physical damage.  (ECF Nos. 1284-17 at 2; 1284-45 at 3). Keurig knew the hard drive was inaccessible by March 2018, but did not disclose that fact to Plaintiffs until May 2019.  (ECF Nos. 1284-17 at 2; 1284-45 at 3).  Keurig provided the hard drive to TreeHouse, whose vendor was unable to recover any additional documents through ordinary means, but was able to recover some additional documents through extraordinary means at TreeHouse's expense.  (ECF Nos. 1699-3 at 42; 1340-31 at 2–3; 1391-1 at 77–78).

Keurig produced over 125,000 documents from Stacy's files, including documents from three of her hard drives, including her last-in-time hard drive, which contained documents dated through September 5, 2013.   (ECF Nos. 1284-48; 1632 at 92 ¶ 173; 1391-1 at 76–77).  Following the extraordinary efforts by TreeHouse's vendor, 4,600 documents were produced from Stacy's fourth hard drive, although the parties dispute whether these documents were duplicates of emails Keurig had previously produced in a different format.  (ECF Nos. 1340-10 at 2; 1632 at 93– 94 ¶¶ 174–75; 1699-3 at 43).  Keurig does not appear to have produced any documents from Stacy's network drive.  (ECF No. 1693-1 at 73).  Plaintiffs deposed Stacy three months after receiving the documents from the fourth hard drive, but did not question her about them.  (ECF Nos. 1391-1 at 78–79; 1699-3 at 43).   Plaintiffs incurred and are entitled to recover the costs of the data recovery center's efforts to retrieve the additional documents from Stacy's fourth hard drive, for which Keurig declined to pay (ECF No. 1340-31 at 2–3), but, as with Rathke, given the sources and volume of Keurig's production for Stacy, Plaintiffs were not otherwise prejudiced by Keurig's inability to access the fourth hard drive.

### xx.   Chris Stevens

Chris Stevens worked for Keurig from February 1996 until April 2013, and was Vice President for Corporate Relations and Customer Development.  (ECF Nos. 1287-1 at 9; 1632 at 18 ¶ 46).  Stevens left Keurig before TreeHouse filed its Complaint, and did not receive a litigation hold notice.  (ECF Nos. 1287-1 at 9; 1340-43; 1632 at 18 ¶ 47).  Plaintiffs added Stevens as a custodian in December 2017, asserting that he had discoverable information concerning Keurig's anti-competitive conduct.  (ECF No. 1287-5 at 21).

Keurig was unable to locate Stevens' hard drive.  (ECF Nos. 1632 at 44 ¶ 99).  Keurig produced over 59,000 documents for Stevens, including over 1,100 documents from his network drive that span his employment.  (ECF Nos. 1391-1 at 80; 1632 at 61 ¶ 124).  Plaintiffs did not depose Stevens, so there is no testimony to suggest that he saved documents on his hard drive rather than on the network drive as required by Keurig's policy.  (ECF No. 1632 at 61 ¶ 125).  Particularly given Stevens' departure before this action commenced, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to locate Stevens' hard drive.

### xxi.   Brad Tidwell

Brad Tidwell worked for Keurig from August 2013 until August 2015, and was the Supply Chain Lead.  (ECF Nos. 1287-1 at 10; 1632 at 19 ¶ 48).  Tidwell was not designated as a custodian until May 2019, after the McLane action was filed, and did not receive a litigation hold notice. (ECF Nos. 1287-1 at 9; 1632 at 19 ¶ 49; 1391-1 at 84).  In its Amended Initial Disclosures, Keurig designated Tidwell as having discoverable information about the company's supply chain and

McLane.  (ECF No. 1284-43 at 9).  Plaintiffs represent that Tidwell testified that he monitored Keurig's inventory levels at WalMart.  (ECF No. 1287-5 at 22).[26]

Keurig was unable to locate Tidwell's hard drive.  (ECF Nos. 1284-48 at 3; 1632 at 44 ¶ 99).  Keurig produced almost 45,000 documents for Tidwell, including over 400 documents from his network drive.  (ECF Nos. 1391-1 at 84-85; 1632 at 59 ¶ 117, 61 ¶ 127).  Because of the volume of documents produced for Tidwell, including hundreds of documents from his network drive, and the absence of other evidence that he saved unique documents only to his hard drive, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to locate Tidwell's hard drive.

### xxii.   Ian Tinkler

Ian Tinkler worked for Keurig from March 2005 until August 2015, and was Vice President for Research and Development/Brewer Engineering.  (ECF Nos. 1287-1 at 10; 1632 at 20 ¶ 50).  Tinkler received a litigation hold notice on April 17, 2014.  (ECF Nos. 1287-1 at 10; 1632 at 20 ¶ 51).  Keurig and TreeHouse both designated Tinkler in their first sets of Initial Disclosures, and in its Amended Initial Disclosures, Keurig listed Tinkler as having discoverable information about the design of the 2.0 Brewer and the Sturm litigation.  (ECF Nos. 1287-1 at 10; 1287-5 at 23; 1284-43 at 9).[27]

Keurig preserved three hard drives for Tinkler, including his last-in-time hard drive.  (ECF No. 1284-48 at 3).  Keurig did not have a valid decryption key for Tinkler's oldest, McAfee-encrypted hard drive.  (ECF Nos. 1284-17 at 4; 1632 at 65 ¶ 132).  Keurig knew it was unable to

---

[26] In ECF No. 1287-5, Plaintiffs quote from Tidwell's deposition transcript, but did not include any excerpts from his deposition transcript as an exhibit accompanying the Motions.
[27] In ECF No. 1287-5, Plaintiffs again quote from a deposition transcript but have not included excerpts from the deposition transcript as an exhibit accompanying their Motion.

decrypt Tinkler's McAfee-encrypted hard drive by September 2018, but did not notify Plaintiffs until May 2019.  (ECF Nos. 1284-17 at 3–4; 1284-45 at 3).

Keurig produced over 201,000 documents for Tinkler, including from his other two hard drives, one of which was his last-in-time and contained documents through the end of his employment in August 2015.  (ECF Nos. 1391-1 at 85–88; 1632 at 71–72 ¶¶ 143–44; 1284-48 at 3).  Keurig also produce over 600 documents from Tinkler's network drive, which is location to which, he testified, he saved electronic files.  (ECF Nos. 1340-2 at 7; 1391-1 at 86).  Because of the volume of documents Keurig produced for Tinkler, including from his network drive and his last-in-time hard drive, the Court finds that Plaintiffs were not prejudiced by Keurig's inability to decrypt his older, McAfee-encrypted hard drive.

### xxiii.   Jon Wettstein

Jon Wettstein worked for Keurig from April 1993 until May 2014, and was Vice President of Operations.  (ECF Nos. 1287-1 at 11; 1632 at 20 ¶ 52).  He received a litigation hold notice on February 17, 2014.  (ECF Nos. 1287-1 at 11; 1632 at 20 ¶ 53).  Keurig identified Wettstein as having discoverable information about its relationship with suppliers.  (ECF No. 1287-5 at 24).

Wettstein had five hard drives, four of which Keurig preserved, including his last-in-time hard drive, and a laptop, from which the hard drive had been removed.  (ECF Nos. 1284-48 at 4; 1632 at 44 ¶ 99; 1284-17 at 3).  D4 was unable to decrypt one of the four hard drives that were preserved.  (ECF No. 1284-17 at 4).  Keurig knew that fact by September 2018, but did not disclose it to Plaintiffs until May 2019.  (Id.; ECF No. 1284-45 at 3).

Keurig produced over 61,000 documents for Wettstein, including from the four accessible hard drives, one of which was his last-in-time and contained documents through the end of his

employment in May 2014.  (ECF Nos. 1287-1 at 11; 1284-48 at 4; 1632 at 62 ¶¶ 128–29, 71 ¶ 143).

Keurig also produced documents from Wettstein's network drive.  (ECF No. 1699-3 at 28).  Based

on Keurig's production of documents from Wettstein's four other hard drives, including his last-

in-time, and from his network drive, the Court finds that Plaintiffs were not prejudiced by Keurig's

failure to preserve the hard drive from his laptop and inability to access the older hard drive.

<p style="text-align:center">*     *     *</p>

In sum, the Court finds that Plaintiffs were prejudiced by Keurig's failure to preserve ESI

on hard drives for Barberio, Ferreira, and Mueller, and, as to Rathke and Stacy, were prejudiced

to the extent that Plaintiffs incurred the costs of undertaking additional measures to recover

discoverable information from their damaged hard drives.

### d.  <u>Intent</u>

As set forth in § III.B.2.c, <u>supra</u>, the Court may not award the harsher sanctions for

spoliation of ESI under Rule 37(e)(2) unless Plaintiffs have shown by clear and convincing

evidence that Keurig had "the intent of depriving [Plaintiffs] <u>in</u> <u>this</u> <u>litigation</u> of that evidence."

<u>Doubleline Cap.</u>, 2021 WL 1191527, at *8 (noting that "[i]t is the movant's burden to demonstrate

that the spoliating party acted with the intent to deprive, not merely the intent to destroy"); <u>see</u>

<u>Lokai Holdings</u>, 2018 WL 1512055, at *7 ("Absent a showing of 'intent to deprive another party

of the information's use in the litigation, the sanctions enumerated under subsection (2) of

Rule 37(e) are not available."); <u>CAT3</u>, 164 F. Supp. 3d at 495; Fed. R. Civ. P. 37(e)(2) (requiring

"finding that the party acted with the intent to deprive another party of the information's use in

the litigation").

In the first instance, this case is distinguishable from those in which the allegedly spoliating party exhibited "persistent non-responsiveness . . . to discovery requests" with "no adequate explanation." Cordius Trust v. Kummerfeld, No. 99 Civ. 3200 (DLC), 2008 WL 113664, at *2–4 (S.D.N.Y. Jan. 11, 2008) (awarding adverse inference sanction after finding that defendants "withheld the requested documents intentionally and in bad faith" over eight years). Rather, "in the context of the entire discovery process in this case," the Court finds that Keurig largely "did comply with its discovery obligations[.]" In re Pfizer, 288 F.R.D. at 317. Keurig's efforts, as detailed above (see § IV.B.2.b–c, supra), "may not have been perfect," but Keurig "did endeavor to meet all its obligations" as Plaintiffs inquired about perceived gaps for certain custodians (see ECF No. 1287-24), as Keurig and its vendor determined that hard drives were inaccessible (see ECF No. 1284-17), and as information was produced from alternative sources (see ECF Nos. 1699-3 at 23, 28, 33, 40). In re Pfizer, 288 F.R.D. at 318. If, as Plaintiffs argue, Keurig had engaged in "intentional destruction" to "gain[] an advantage in the litigation," then "one would assume" the record would show loss, destruction, or inaccessibility of all hard drives, rather than the isolated gaps the Court has found. Europe, 2022 WL 832027, at *7.

In addition, the Court is not prepared to find that Keurig "acted unreasonably in assuming that its employees complied with [the] policy" that instructed them to save documents to network drives rather than local hard drives, despite Plaintiffs' "claim that employees frequently violated the policy." La Belle, 2022 WL 121065, at *8. (See ECF Nos. 1340-6 at 6; 1284-11 at 5; 1391-3 at 7). While "it is a better practice for a company to make a searching inquiry of all relevant employees to determine whether they violated a company policy regarding use of devices[,]" the Court finds that Keurig did not act "unreasonably in assuming the policy was

followed and limiting its document search . . . until the issue was brought to its attention."  La Belle, 2022 WL 121065, at *8.

Plaintiffs seek to prove Keurig's intent by pointing to "circumstantial evidence" of Keurig's "[c]onscious dereliction of a known duty to preserve" electronic data.  (ECF No. 1286 at 24; see ECF Nos. 1693-1 at 98; 1390 at 4).  See Ungar, 329 F.R.D. at 13.  This circumstantial evidence includes Keurig: (i) failing to interview custodians promptly (ECF Nos. 1286 at 8–9; 1284-5 at 3; 1287-3 at 3; 1664-4 at 9); (ii) allowing its access to the McAfee encryption server lapse (ECF No. 1286 at 10–12; see § IB.B.1.b, supra); (iii) failing to maintain the hard drive ticketing system (ECF Nos. 1286 at 13; 1287-4 at 6–7); (iv) asking custodians, in the 2012 Degnan Email, to engage in a ███████████████████████████████ (ECF Nos. 1286 at 16; 1287-15 at 2–3; 1390 at 3–4; see § IV.B.2.d.iv, infra); (v) representing that its productions were substantially complete when it was aware of its inability to access 16 hard drives, and waiting until May 2019 to notify Plaintiffs about the hard drives (ECF Nos. 1286 at 25; 1284-8 at 2; 1284-17 at 2–5; 1284-45 at 3–4); and (v) waiting until the last day of party discovery to notify Plaintiffs of "material" errors in its transactional data (ECF Nos. 1286 at 19; 1284-51 at 3).  The Court considers each category of circumstantial evidence in turn.

### i.   Interviews

As discussed in § IV.B.2.b.i, supra, Keurig failed to interview multiple custodians until shortly before their depositions in 2019 and 2020, instead of contemporaneous with the date the custodians received litigation hold notices.  (See ECF Nos. 1393-3 at 5–6 (Barberio); 1393-4 at 3 (Brown); 1393-5 at 4 (Ferguson); 1393-6 at 3 (Ferreira); 1393-7 at 3 (Holly); 1391-2 at 3 (Stacy)).  Although the ESI Order did not set an express deadline for the parties to interview custodians

(ECF No. 41 at 16–17), Keurig's failure to interview custodians in a timely manner resulted in the loss of Barberio's hard copy notes and hard drive, which appeared to contain unique discoverable information. (See §§ IV.B.2.b.ii–iii & IV.B.2.c.1, supra). Keurig had over three months between the date when Barberio received the litigation hold notice and the date his employment ended to interview him about his custodial documents. (ECF Nos. 1287-1 at 2; 1632 at 3 ¶¶ 2–3). Indeed, as he was leaving, Barberio met with Ferguson and an HR representative to turn in his phone and laptop, and yet, neither his laptop nor the materials he recalled leaving in his office was preserved. (ECF Nos. 1284-16 at 8–9; 1340-17 at 3).

Numerous courts in this Circuit have confirmed that parties and their counsel must timely monitor compliance with litigation holds, and that the failure to do so constitutes, at a minimum, negligence. See, e.g., Herman v. City of New York, 334 F.R.D. 377, 385 (E.D.N.Y. 2020) (finding that defendants' use of "'self-collection' practices without monitoring compliance was grossly negligent"); Richard Green, 262 F.R.D. at 290 (finding that defendant and her counsel "were at least negligent" in failing to implement litigation hold and search for responsive documents) (internal citation omitted); Zubulake V, 229 F.R.D. at 432 ("Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched.")

The Court finds that Keurig's counsel's failure to conduct a timely interview of Barberio specifically, and of its custodians generally, was negligent, and with respect to Barberio, perhaps grossly negligent, but does not conclude that these actions constitute clear and convincing evidence of an intent to deprive Plaintiffs of favorable information in this litigation. Unlike cases in which courts have found intent where a party did not issue a litigation hold at all, Keurig cast

a wide net in timely issuing litigation holds to over 700 custodians.  See, e.g., Ottoson v. SMBC Leasing & Fin., Inc., 268 F. Supp. 3d 570, 583–84 (S.D.N.Y. 2017) (granting adverse inference where plaintiff intentionally deleted and made no attempts to preserve key emails).  Here, Keurig sloppily implemented that litigation hold by not following up with certain of its custodians sooner to make sure that net was capturing what was required under the ESI Order.  That conduct, under this Court's precedent, constitutes negligence, not an intent to deprive.  See Raymond, 2020 WL 7055572, at *12 (finding that failure to preserve monthly reports was "negligent conduct" that did "not rise to the level of intent to destroy evidence"); see also Alter, 2014 WL 4966119, at *11 (finding that counsel's failure to "directly oversee or engage" in document collection efforts following issuance of litigation hold constituted negligence, but not "an intent to spoliate material evidence").

### ii.    Access to McAfee Encryption Server

Plaintiffs argue that Keurig "knowingly" allowed its access to the McAfee encryption server to lapse, and that in doing so, Keurig "willfully violated" its obligations under the ESI Order sufficient to satisfy the "intent to deprive" standard under Rule 37(e)(2).  (See ECF Nos. 1286 at 10–12; 1693-1 at 99).  As Keurig points out, however, it stopped using McAfee in 2012 or 2013, before this litigation, and transitioned its encryption to Bitlocker.  (ECF No. 1340-4 at 22–25; see § IV.B.1.b, supra).  Keurig performed a "rolling implementation" of the transition from McAfee to Bitlocker to minimize "the risk of corrupting the drive when [] switch[ing] encryption from one to another."  (ECF No. 1340-4 at 25).  As one would expect with an encryption system—the purpose

of which is to avoid improper interception and tampering[28]—Keurig limited access to the McAfee encryption server to "a list of IT people", who, over time, left Keurig such that there were no longer any active employees with the password.  (ECF No. 1340-4 at 27).  When Plaintiffs sought production of the hard drives with McAfee encryption in 2018, Keurig "relearn[ed]" the processes to access the McAfee encryption server, and by April 17, 2018, "cracked the code" to regain "access to the vault of keys in the system," which it provided to D4 to assist in accessing the hard drives.  (ECF Nos. 1340-4 at 27–28; 1284-17 at 5).  When Keurig learned that "[n]ot all of [the] encryption keys were successful at decrypting those drives," Keurig sought McAfee's help in "troubleshoot[ing]" the problem of encryption keys that did not work.  (ECF No. 1340-4 at 28–29; see ECF No. 1632 at 63–65 ¶ 130).  Using this process, Keurig was able to decrypt eleven McAfee-encrypted drives, but several remained inaccessible.  (ECF Nos. 1699-3 at 18; 1632 at 65 ¶ 132).[29]  Keurig offered to Plaintiffs several remedial measures, including production of a Rule 30(b)(6) witness, production of chain of custody records, and allowing TreeHouse's vendor to try to image or decrypt the devices, with "reasonable fees" paid by Keurig.  (ECF No. 1284-45 at 3).  As set forth above, Keurig also produced tens of thousands of documents from alternative

---

[28] See, e.g., KCG Holdings, Inc. v. Khandekar, No. 17 Civ. 3533 (AJN), 2020 WL 1189302, at *2 (S.D.N.Y. Mar. 12, 2020) (discussing use of encryption to limit the individuals who are capable of decrypting and viewing its contents); United States v. Zak, No. 16-CR-65-V, 2017 WL 4358140, at *4 (W.D.N.Y. Oct. 2, 2017) (noting that failure to use encryption rendered data "vulnerable to both interception and tampering by third parties as it was transmitted over the internet").

[29] In the Stipulations, the parties agreed that "Keurig was unable to decrypt seven McAfee-encrypted hard drives preserved from seven custodians: Susan Cote, Ken Crites, Steve Ferreira, Dave Manly, Tom Novak, Ian Tinkler, and Jon Wettstein."  (ECF No. 1632 at 65 ¶ 132).  During oral argument, Keurig represented that "10 could not be decrypted," but did not identify the three additional custodians.  (ECF No. 1699-3 at 18).  From the record, the Court infers that Dwight Brown is one of these custodians.  (ECF Nos. 1391-1 at 12; 1284-45 at 3).

sources for each of the custodians whose hard drives could not be decrypted.  (See ECF No. 1699-3 at 23, 28, 33, 40).

The Court has little difficulty concluding that Keurig's conduct with respect to the McAfee encryption server was not the behavior of a party intending to deprive its adversaries of relevant documents favorable to the adversaries' claims.  Employees change jobs, memories fade, and technology does not always work as expected, but the loss of access to evidence in the ordinary course of business does not by itself demonstrate intent.  See Rothman v. City of New York, No. 19 Civ. 225 (CM) (OTW), 2019 WL 6210815, at *4 (S.D.N.Y. Nov. 21, 2019) (finding that destruction of video footage "in the course of business and pursuant to a pre-existing retention policy" did not evidence "intent to deprive plaintiff of evidence"); Fashion Exch., 2019 WL 6838672, at *5 (finding that, although plaintiff exhibited "lackadaisical approach to its discovery obligations," evidence lost due to "server crash" was not deliberate).  The steps that Keurig took to restore access to the McAfee encryption server, as well as the remedial efforts it undertook (and offered to take) after informing Plaintiffs of the encryption issue, were reasonable.  See Man Zhang, 2019 WL 3936767, at *7 (finding that defendants did not act with intent to deprive plaintiff of evidence where they investigated and reported the destruction of video footage once ordered by the court and produced evidence from alternative sources).  While one might envision different steps Keurig could have taken to ensure that an encryption server no longer in use remained accessible, the Court finds that its failure to do so amounts to, at most, ordinary negligence, far from the intent to deprive required for the severe sanctions under Rule 37(e)(2).  See Doubleline Cap., 2021 WL 1191527, at *8 (denying request for adverse inference sanction where plaintiff failed to establish that defendants' destruction of encryption keys was done "with

the intent of depriving <u>plaintiffs</u> <u>in</u> <u>this</u> <u>litigation</u> of that evidence"); <u>Berger</u>, 2016 WL 11706217, at *5 (finding that failure to preserve room in same condition in which plaintiff had worked was negligent).

### iii.   <u>Ticketing System</u>

Plaintiffs argue that Keurig's failure to maintain the Remedy ticketing system, which was operative from 2014 to 2019, resulting in the inability to locate nine custodians' hard drives, is evidence of Keurig's intent.  (ECF Nos. 1286 at 9–10, 12–13; 1390 at 6; 1632 at 95 ¶ 178).[30]  Keurig no longer has access to the tickets that were contained in Remedy.  (ECF No. 1287-4 at 7, 11). Keurig maintains that Remedy was not a chain-of-custody system, but rather a work ticket system for assigning tasks to IT personnel.  (ECF Nos. 1336 at 22; 1699-1 at 157–58; 1632 at 95 ¶¶ 179–80).  During oral argument, Plaintiffs appeared to concede this point, acknowledging that Remedy was the system that showed "who in HR initiated a repossession ticket for IT to start the off-boarding process for an employee and prompts them to collect their computer."  (ECF No. 1699-1 at 30–31).

The Court finds that Keurig did not act negligently, let alone intentionally, in failing to maintain the tickets in the Remedy system.  The record reflects that Remedy's purpose was to track IT work assignments, not custody of computers, and was maintained by an outside provider, not by Keurig.  (ECF Nos. 1287-4 at 10–11; 1340-4 at 43).  A Remedy work ticket was closed once the IT employee completed the task as to a computer and returned it to the operator.  (ECF No. 1340-4 at 43–44).  Plaintiffs fail to explain how this information is relevant, let alone how it

---

[30] The nine custodians Plaintiffs identify are Barberio, Godfrey, Holly, Hurley, Mueller, Smits, Stevens, Tidwell, and Wettstein.  (ECF No. 1286 at 9 n.2).

would be favorable to their case.  See Chin, 685 F.3d at 162.  For preservation purposes, Keurig kept computers subject to a litigation hold in a secured office or storage closet marked by asset-tag stickers, and had several means to determine a computer's user.  (ECF No. 1287-4 at 7–8). While Keurig now has an asset management system that does a better job of tracking computers to users, Plaintiffs do not point to any case demonstrating that the failure to have such a system constitutes negligence, let alone an intent to deprive.  (See ECF Nos. 1286 at 12–13; 1390 at 6–7).

### iv.   Degnan Email

Plaintiffs argue that an email Keurig's in-house counsel sent in 2012 evidences Keurig employees' intentional deletion of documents.  (ECF Nos. 1286 at 16–17; 1390 at 4 & n.5; 1693-1 at 85, 92, 129, 135).  On September 26, 2012, Keurig's in-house counsel, Michael J. Degnan, sent an email asking employees to ████████████████████████████████████████ ███████████████████████████████████████████████████  (ECF No. 1287-15 at 3 (the "Degnan Email"); see ECF No. 1693-1 at 129).  The Degnan Email circulated internally at Keurig, with the instruction, ████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████  (ECF No. 1287-15 at 2 at 2).

Plaintiffs criticize Keurig for not explicitly telling employees to "preserve" data, and instead using the word ██████ and ask the Court to find that ███████████████████ ████████████████████████████████████  (ECF No. 1286 at 16).  Plaintiffs assert

that all six recipients of the Degnan Email have spoliation issues, further evidencing Keurig's intent to deprive Plaintiffs of favorable evidence.  (ECF No. 1693-1 at 92, 116).[31]

Keurig points out that it ███████████████████████████████████ ██████ from both custodial and non-custodial sources, and therefore Plaintiffs have not been deprived of any evidence.  (ECF No. 1336 at 11).  One of the recipients, Ian Tinkler, for example, testified that he did not "destroy anything" in response to the Degnan Email, (ECF No. 1340-2 at 6), and another, Bob McCall, testified that he did not direct any of his reports to "clean up their PC."  (ECF No. 1340-3 at 3).  Kevin Campbell, Keurig's Rule 30(b)(6) witness on document preservation, also testified that Keurig's 2012 document collection effort involved collecting copies and preserving the data in its original form or at its original source.  (ECF No. 1340-4 at 50).  Keurig also argues that Plaintiffs briefed and argued the theory that the Degnan Email █████ █████████████████████ in connection with their motion to compel additional discovery as to Degnan, which the Court denied without prejudice, Judge Broderick affirmed, and Plaintiffs never renewed.  (ECF No. 1336 at 10; see ECF Nos. 706; 716; 750; 811; 871; 1081).

The Court finds that the Degnan Email does not support a finding that Keurig failed to take reasonable preservation steps or destroyed any evidence.  The Court thoroughly considered Plaintiffs' theory in denying their motion to compel Keurig to produce documents about Project Squid from Degnan's custodial file and produce Degnan for a deposition, and Judge Broderick found that conclusion neither "contrary to law [n]or clearly erroneous."  (ECF Nos. 750 at 1–2; 1081 at 4).  The Court invited Plaintiffs to renew their application if they found Degnan's

---

[31] The six recipients were: Dwight Brown, Brian McCall, Ian Tinkler, John Whoriskey, Richard Sweeney, and Kevin Sullivan.  (ECF Nos. 1286 at 16 n.17; 1693-1 at 116; 1287-15 at 3).

testimony "necessary as to a discrete issue or issues material to the claims or defenses in this action," but Plaintiffs did not do so.  (ECF No. 750 at 2).  In addition, Plaintiffs' theory that the Degnan Email ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████ (ECF No. 1287-15 at 2).

Finally, as to the six recipients of the Degnan Email, the Court has already determined that Plaintiffs did not suffer prejudice as to Brown, Tinkler, and Whoriskey.  (See §§ IV.B.2.b.iii, IV.B.2.c.iii, IV.B.2.c.xxii, supra).  As to McCall, Keurig did produce his notebooks (albeit belatedly), his deposition was rescheduled, and Keurig offered to defray the costs of the rescheduled deposition, an offer that JBR chose not to accept.  (ECF Nos. 1284-24 at 3; 1699-3 at 60).  As to Sweeney, Keurig produced over 123,000 documents from his custodial file, including from his laptop.  (ECF Nos. 1391-1 at 82; 1632 at 109 ¶ 200).  For Sullivan, Keurig produced over 110,000 documents, and searched his network drive but found no responsive documents.  (ECF Nos. 1391-1 at 81; 1284-11 at 6 n.8).  The volume and scope of Keurig's production for each of the six recipients of the Degnan Email belies any inference that Keurig intended to deprive Plaintiffs of these custodians' documents.  See Karsch, 2019 WL 2708125, at *22 (declining to find intent to deprive under Rule 37(e)(2) where server that plaintiff failed to preserve "contained some of the emails sent and received by some of the witnesses in this action" but "did not contain all or even most of their potentially relevant communications"); Casale v. Kelly, 710 F. Supp. 2d 347, 366 (S.D.N.Y. 2010) (where plaintiffs had not shown selective production, finding that failure to produce small number of documents did not support a finding of intent); Phoenix Four, Inc. v. Strategic Res. Corp., No. 05 Civ. 4837 (HB), 2006 WL 1409413, at *7 (S.D.N.Y. May 23, 2006)

(declining to award adverse inference instruction where defendants produced, albeit late, large volume of additional ESI).

<div align="center">

**v.    Delayed Notification**

</div>

Plaintiffs complain that Keurig's failure to provide earlier notice of document preservation issues.  (ECF Nos. 1286 at 18–19; 1390 at 10–11; 1693-1 at 42; 1699-1 at 48-49).  Plaintiffs point to Keurig's delays in disclosing the CommVault emails, in reproducing the transactional data, and its inability to locate or access the 23 custodians' hard drives as further evidence to support a finding that Keurig acted with intent to deprive Plaintiffs of information favorable to their claims. (ECF Nos. 1286 at 18–19; 1390 at 10–11).

The Court declines to draw Plaintiffs' requested inference.  First, as Keurig points out, the issue concerning CommVault was not preservation, but rather collection, of emails.  (ECF No. 1699-3 at 67).  The week after the April 30, 2018 initial deadline for substantial production of documents, Keurig notified Plaintiffs that it had substantially completed its obligations.  (ECF Nos. 354-1 at 3; 1284-9 at 2).  Three months later, in early August 2018, Keurig notified Plaintiffs that it had not gathered archived emails from CommVault for most of the initial 29 Agreed Custodians.  (ECF No. 1287-19 at 3).  By the end of October 2018, Keurig had collected and produced documents from CommVault.  (ECF Nos. 1693-1 at 39; 1699-3 at 67).  The Court also extended until January 4, 2019 the deadline for TreeHouse, JBR, and Keurig to substantially complete their productions for the Agreed Custodians.  (ECF No. 484 at 1).  Indeed, McLane and TreeHouse also supplemented their productions following the substantial completion deadline. (ECF No. 1699-3 at 67).  Plaintiffs point to no lost information or prejudice from the delayed

<div align="center">79</div>

production of the CommVault data, and accordingly, this issue does not support a finding of intent.

The Court reaches a similar conclusion as to the delayed production of the transactional data.  In February 2020, Plaintiffs raised issues about the completeness of Keurig's transactional data production, and Keurig subsequently determined that rows of data were in fact missing. (ECF No. 769).  Following a conference with the parties, the Court ordered Keurig to reproduce its data by March 19, 2020, and Keurig did so by March 17, 2020.  (ECF Nos. 839; 1693-1 at 41; 1699-3 at 66).  The Court also extended the expert discovery deadline to mitigate any prejudice. (ECF Nos. 839; 1286 at 19).

Third and finally, the Court cannot conclude, from the timing of Keurig's disclosures about the hard drives for 23 custodians, that Keurig intended to deprive Plaintiffs of information favorable to their case.  At oral argument, the Court asked Plaintiffs the direct question when Keurig should have notified them about the lost, undecrypted, or inaccessible hard drives.  (ECF Nos. 1699-1 at 26–27; 1693-1 at 131).  Pointing to the "as soon as possible" language in the ESI Order, Plaintiffs argued that Keurig should have notified Plaintiffs within "several weeks, months even, but at the very latest . . . before the initial deadline for substantial completion of documents . . . ."  (ECF No. 1699-1 at 48–49).  The document on which Plaintiffs rely for the assertion that Keurig knew several of the hard drives were inaccessible is a letter from D4 to Keurig dated June 3, 2019.  (ECF No. 1284-17).  That document reflects that Keurig provided four hard drives (for Stacy, Huang, Rathke, and Wettstein) to D4 in March 2018, and an additional thirteen hard drives (for Shepard, DuLong, Billings, Wettstein, Ferreira, Novak, Manly, Cote, Crites, Tinkler, Brown, and DiFabio (two)) in September 2018.  (ECF No. 1287-17 at 2–4).  The letter is unclear,

however, when D4 determined that its efforts to access these hard drives were unsuccessful and communicated that determination to Keurig.  From the excerpts of the deposition of Keurig's Rule 30(b)(6) document preservation witness (Campbell), Plaintiffs did not ask <u>when</u> Keurig became aware that D4's efforts were unsuccessful.  (<u>See</u> ECF Nos. 1287-4; 1340-4; 1391-3).  The failure to ask that question is curious, given the ferocity with which Plaintiffs have argued that Keurig withheld information about the hard drives.  While Keurig might have been able to notify Plaintiffs a few months earlier, even had it done so, the record does not demonstrate what additional evidence might have been saved.  Indeed, once Keurig notified Plaintiffs of the problems with the hard drives, TreeHouse ultimately chose to deploy extraordinary measures to recover documents from only two of the hard drives, for Stacy and Rathke.  (ECF No. 1340-31 at 2–3).

In sum, the Court finds that Plaintiffs' proffered circumstantial evidence is, at best, "inconclusive on the issue of [] spoliative intent."  <u>Coan</u>, 602 B.R. at 440; <u>Bursztein v. Best Buy Stores, L.P.</u>, No. 20 Civ. 76 (AT) (KHP), 2021 WL 1961645, at *8 (S.D.N.Y. May 17, 2021) (finding that plaintiff had not met burden of showing intent by clear and convincing evidence where record was "unclear" whether defendants' conduct in losing relevant evidence "intentionally deprive[d]" plaintiff of evidence or was "simply the product of incompetence").  The Court is not convinced that Keurig acted "for the specific purpose of gaining an advantage in this litigation[.]"  <u>Karsch</u>, 2019 WL 2708125, at *22.  Rather, Keurig's negligence in executing its preservation obligations falls in line with cases where courts have found similar degrees of negligence and incompetence but, like here, an absence of evidence to show an intent to deprive Plaintiffs of information for use in this litigation.  In <u>Fashion Exch. LLC v. Hybrid Promotions, LLC</u>, for example,

the court found that plaintiff's "stunning" level "of negligence and/or incompetence" still was not "akin to an intent to deprive," even though plaintiff's "lackadaisical approach to its discovery obligations ha[d] certainly wasted" the parties' and the court's "time in attempting to ascertain what documents exist and could be produced."  2019 WL 6838672, at *5.  Similarly, in <u>Leidig v. Buzzfeed, Inc.</u>, notwithstanding "plaintiffs' misleading and contradictory explanations for their failure to properly preserve evidence[,]" the court found "insufficient evidence that plaintiffs acted with an intent to deprive [defendant] of the" spoliated ESI.  2017 WL 6512353, at *11–12. In <u>Charlestown Capital Advisors LLC v. Acero Junction Inc.</u>, defendants made numerous "obfuscations and misdirections" about spoliated emails before disclosing the issue one month before the end of fact discovery, leading to four discovery extensions, but the court nevertheless did not find that defendants' "actions were taken 'for the specific purpose of gaining an advantage in this litigation,'" and declined to award sanctions under Rule 37(e)(2).  337 F.R.D. at 67 (quoting <u>Karsch</u>, 2019 WL 2708125, at *22).

Although Plaintiffs promote the inference that there was a pattern of spoliation as to the Degnan Email recipients and WalMart-related custodians (<u>see</u> ECF Nos. 1390 at 2–4; 1693-1 at 94, 120), the Court's custodian-by-custodian review reveals no pattern in the custodians whose hard drives were lost or inaccessible, or whose emails or notes were not preserved, nor any evidence that Keurig selectively failed to preserve any ESI.  <u>See</u> <u>Man Zhang</u>, 2019 WL 3936767, at *7 (finding defendants did not act with intent where, <u>inter alia</u>, "nothing in the record suggests that Defendants selectively destroyed evidence" and sufficient other evidence existed supporting plaintiffs' claims); <u>Casale</u>, 710 F. Supp. 2d at 366 (same).  For example, four of the six WalMart-

related custodians that Plaintiffs highlight were not added as custodians until May 2019,[32] and Keurig's productions for each were substantial, including tens of thousands of documents pertaining to communications with WalMart.  (See § IV.B.2.c, supra; ECF No. 1632 at 103 ¶ 192 (indicating that Keurig produced over 447,000 documents from Whoriskey's custodial files)).  Plaintiffs chose not to depose Hurley (ECF No. 1632 at 59 ¶ 118), and the Court has determined that Plaintiffs were prejudiced only by the inability to access Mueller's hard drive. (See § IV.B.2.c.xiv, supra).  Similarly, the Court has rejected Plaintiffs' argument that spoliation issues with the Degnan Email recipients supported an inference of Keurig's intent to deprive. (See § IV.B.2.d.iv, supra).

The cases in which courts have found clear and convincing evidence of intent to deprive, and on which Plaintiffs rely to support a finding of Keurig's intent, are distinguishable.  (ECF Nos. 1286 at 30 & n.42; 1390 at 3–4 & n.4; 1693-1 at 107–08).  In Ottoson v. SMBC Leasing & Finance, Inc., the plaintiff "produced no documents or emails concerning her communications with" affiants whose statements she submitted in support of her claims, destroyed evidence of a report that completely undermined her claims, and "admitted that she deleted emails during times when she had a duty preserve them" and that she did not make "any attempt to preserve" other key emails.  268 F. Supp. 3d at 581–83.  As a result of the plaintiff's failure to take reasonable steps to preserve any email communications with her witnesses, the defendants were unable to inspect those communications and had no alternative source of "this critical evidence." Id. at 584.  Keurig's productions were robust by contrast (see § IV.B.2.c, supra), and Plaintiffs had

---

[32] Tidwell, Hurley, Mueller, and Smits were added in May 2019, while DiFabio and Whoriskey were original Agreed Custodians.  (See ECF No. 1287-1).

numerous sources of information on which to question Keurig's witnesses during the depositions Plaintiffs chose to take. Even Plaintiffs have not gone so far as to argue that Keurig made no attempt to preserve discoverable information.[33]

In <u>Sekisui American Corp. v. Hart</u> (<u>see</u> ECF Nos. 1693-1 at 154–55; 1286 at 27), the court found intent where plaintiff did not implement a litigation hold until 15 months after it notified defendants of its intent to sue, did not notify its ESI vendor of the duty to preserve until three months after plaintiffs filed its complaint, and instructed its ESI vendor to delete multiple email boxes for key custodians. 945 F. Supp. 2d 494, 499–500, 506–08 (S.D.N.Y. 2013). The court specifically found that the deletion of the "ESI was intentional: not only was potentially relevant ESI destroyed at the behest of [plaintiff's] employee after the duty to preserve had attached but such direction was given with <u>at least</u> the knowledge of [plaintiff's] then-President [], if not his outright approval." <u>Id.</u> at 507. Given that plaintiff had "willfully and permanently destroyed the ESI of at least two key players in this litigation[,]" the court found that an adverse inference instruction was warranted. <u>Id.</u> at 508. There is simply no evidence that Keurig willfully and intentionally deleted ESI on the level that arose in <u>Sekisui</u>. Likewise, Keurig did not exhibit the "'aggressively willful'" violation of court orders regarding the production of ESI that they had "mislaid" and then engaged in "a near-constant stream of factual misdirection that significantly delayed – and nearly derailed – [defendant's] efforts to obtain highly probative ESI that plaintiffs

---

[33] Plaintiffs' reliance on cases from outside the Second Circuit to support their intent argument, (<u>see</u>, <u>e.g.</u>, ECF Nos. 1693-1 at 107–09; 1390 at 4 & n.4), is unnecessary, given the substantial precedent in the Second Circuit for analysis of sanctions under Rules 37(b) and 37(e), and in some cases, is incorrect where the cases employ an analysis not deployed by courts in this Circuit. <u>See</u>, <u>e.g.</u>, <u>CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n</u>, No. 14-CV-1191 (JLS) (KSC), 2019 WL 6527951, at *10 (S.D. Cal. Dec. 4, 2019) (following Ninth Circuit precedent permitting intent under Rule 37(e)(2) by preponderance of the evidence, not clear and convincing evidence).

were twice ordered to produce." Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC,

No. 16 Civ. 1318 (GBD) (BCM), 2019 WL 4727537, at *26–28, 32 (S.D.N.Y. Sept. 26, 2019) ("Joint

Stock Co. II").  (ECF No. 1286 at 30 n.42).

Accordingly, the Court finds that Plaintiffs have not met their burden of showing by clear

and convincing evidence that Keurig intended to deprive them of favorable evidence in this

litigation.

### e.  Remedies

The Court has determined that Keurig failed to comply with Rule 37(b) and 37(e) by:

(i) failing to issue litigation holds to six custodians and failing to interview eleven custodians

(§ IV.B.2.b.i, supra); (ii) failing to preserve 25 hard drives (§ IV.B.2.b.ii, supra); and (iii) failing to

preserve Barberio's hard copy documents (§ IV.B.2.b.iii, supra).  The Court has also found that

Plaintiffs were prejudiced by Keurig's failure to preserve hard drives for Barberio, Ferreira, and

Mueller, and that TreeHouse was prejudiced by having to incur the costs of additional measures

to recover relevant documents from the damaged hard drives of Rathke and Stacy.  (§ IV.B.2.c,

supra).  The Court must now determine the appropriate sanctions under Rules 37(b) and 37(e).

Having determined that the record does not contain clear and convincing evidence that

Keurig acted "with the intent to deprive [Plaintiffs] of the information's use" in this action, the

more severe sanction of an adverse inference under Rule 37(e)(2) is not appropriate.  Fed. R. Civ.

P. 37(e)(2); see Europe, 2022 WL 832027, at *6 (finding that, where only one month of data was

missing, "the prejudice is not great" and therefore harsher sanctions under Rule 37(e)(2),

including adverse inference, were not warranted); Charlestown Cap. Advisors, 337 F.R.D. 47, 52

(finding that, despite failure to produce discoverable ESI, record did "not contain clear and

convincing evidence that" defendants acted with intent to deprive and therefore declining to impose Rule 37(e)(2) sanctions); Lokai Holdings, 2018 WL 1512055, at *16 (declining to impose Rule 37(e)(2) sanctions where "evidence [of state of mind was] capable of more than one interpretation" and court would "not make a finding of intent to deprive on the basis of suspicion alone").  Instead, under Rule 37(e)(1), the sanctions must be "no greater than necessary to cure the prejudice" to Plaintiffs.  Fed. R. Civ. P. 37(e)(1); see Coan, 602 B.R. at 440 (after finding prejudice, considering "what measures are necessary to cure this prejudice").  The Court may, however, continue to consider the sanctions of preclusion and adverse inference for Keurig's violations of the ESI Order under Rule 37(b)(2)(A).  See Xiao Hong Zheng v. Perfect Team Corp., 739 F. App'x 658, 661 (2d Cir. 2018) ("Rule 37(b)(2)(A)(i) expressly permits adverse inference sanctions[.]"); Slovin, 2013 WL 840865, at *6 (noting that sanctions available under Rule 37(b)(2)(A) include "special jury instructions" and "preclusion").

### i.   Attorneys' Fees and Costs

Under Rule 37(b)(2)(C), a court "must" award expenses, including attorneys' fees, caused by a party's failure to comply with court orders "unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  Rule 37(e)(1) authorizes a court to award attorneys' fees and costs to the moving party to the extent reasonably necessary to remediate any prejudice caused by the spoliation.  Fed. R. Civ. P. 37(e)(1); see Karsch, 2019 WL 2708125, at *26; Lokai Holdings, 2018 WL 1512055, at *9; CAT3, 164 F. Supp. 3d at 502.

The Court finds that an award of attorneys' fees and costs to Plaintiffs is warranted under both Rules 37(b)(2)(C) and 37(e)(1).  Keurig represented on May 7, 2018 that it had substantially

completed its production for the Agreed Custodians.  (ECF No. 1284-9).  Keurig knew at the time, however, that it had been unable to access at least four hard drives for Agreed Custodians, and had engaged D4 to assist in extracting information from those hard drives.  (ECF No. 1284-17 at 2–3).  In the interim, Plaintiffs discerned deficiencies in Keurig's productions for eight custodians, and in July 2018, raised concerns with Keurig.  (ECF No. 1287-24).  Over the next several months, the parties met and conferred and Keurig made additional document productions, until, in May 2019, Keurig offered various remedial measures for the 25 hard drives that were lost or inaccessible.  (ECF No. 1284-45 at 2–3).  Plaintiffs incurred not only the expense of investigating the deficiencies but also of continued efforts to confirm the nature, scope, and volume of information that was not preserved.  Although the Court has determined that actual prejudice extended to only a handful of custodians, Plaintiffs did incur "expenses associated with prodding" Keurig into confirming which hard drives were lost or inaccessible, and with identifying where possible gaps in Keurig's production remained.  Karsch, 2019 WL 2708125, at *26; see Learning Care Grp., Inc. v. Armetta, 315 F.R.D. 439, 440-41 (D. Conn. 2016) (awarding attorneys' fees and costs where delayed notification of missing emails and destroyed laptop "hindered discovery").

The Court does not intend that every expense related to document discovery, or even every expense related to Keurig's violations of the ESI Order, be imposed on Keurig, because Rule 37(b)(2)(C) limits the award to "reasonable" expenses "caused by" Keurig's violations of court orders, and Rule 37(e)(1) requires tailoring to "ameliorate[] the economic prejudice imposed on" Plaintiffs.  CAT3, 164 F. Supp. 3d at 502.  While a precise determination of reimbursable attorneys' fees and expenses would follow Plaintiffs' submission of a fee application with supporting documentation, the Court contemplates that reasonable attorneys'

fees and expenses for the following periods and categories would be permitted: (i) Plaintiffs' efforts from May 7, 2018 to July 25, 2018 to determine deficiencies in Keurig's productions for Agreed Custodians (see ECF Nos. 1284-9; 1287-24); (ii) preparing for and participating in meet-and-confer communications and calls concerning Keurig's productions for the Agreed Custodians between July 25, 2018 and May 20, 2019 (see ECF Nos. 1287-24; 1284-45); (iii) undertaking additional measures with respect to the hard drives for Rathke and Stacy that TreeHouse selected to send to its vendor (see ECF No. 1284-40); (iv) investigating discrepancies in Keurig's CommVault productions (see ECF No. 1287-10); (v) investigating discrepancies in Keurig's transactional data from February 7, 2019 until February 2020 (see ECF No. 769); (vi) Plaintiffs' experts' costs while working with Keurig's deficient transactional data between February 7, 2019 and February 2020 (see ECF Nos. 769; 769-2; 839); and (vii) preparing the Motion and presenting oral argument.  Reimbursable expenses under this instruction would not include expenses Keurig has already paid or been ordered to pay.  (See, e.g., ECF Nos. 1284-23 at 2; 1284-24 at 4).

The Court expects the parties to meet and confer to reach agreement on Plaintiffs' expenses that fall within these instructions. If they are unable to reach an agreement, Plaintiffs may make an application to the Court for the calculation of reasonable attorneys' fees and costs. See Karsch, 2019 WL 2708125, at *26, 28 (instructing parties on categories of reimbursable expenses under Rules 37(b)(2)(C) and 37(e)(1) and permitting subsequent application accompanied by supporting documentation).

### ii.    Presentation of Evidence

As an additional sanction, Plaintiffs will be permitted to present evidence to the jury concerning Barberio's hard copy documents that were not preserved, and the gaps left by the

failure to preserve hard drives for Barberio, Ferreira, and Mueller, and the jury will be permitted to consider that evidence, along with the other evidence in the case, in evaluating Plaintiffs' claims and Keurig's defenses in their deliberations.  <u>See</u> <u>Europe</u>, 2022 WL 832027, at *7 (as remedy for Rule 37(e)(1) violation, permitting plaintiff to "present evidence to the jury" about lost data).  "Such a sanction (as distinguished from a mandatory or permissive adverse inference instruction) is permitted under Rule 37(e)(1) without any predicate finding of intent to deprive." <u>Karsch</u>, 2019 WL 2708125, at *27 (citing Fed. R. Civ. P. 37(e)(1) adv. comm. n. to 2015 amend.); <u>see</u> <u>Leidig</u>, 2017 WL 6512353, at *14 (permitting party to "present evidence to the jury" that the opposing party lost ESI that should have been preserved).

The Court finds that this remedy is appropriate for three reasons.  First, this sanction recognizes that, apart from the expenses Plaintiffs incurred in following up on gaps in Keurig's production and bringing their Motion, Plaintiffs suffered prejudice from the loss of evidence that should have been preserved.  This sanction will thus "help 'rectify the evidentiary imbalance'" that Keurig created "by spoliating relevant ESI" as well as Barberio's hard copy documents. <u>Karsch</u>, 2019 WL 2708125, at *27 (quoting <u>Linde v. Arab Bank, PLC</u>, 706 F.3d 92, 102 (2d Cir. 2013)).  Second, this sanction "provides the jury, as finder of fact, with context for that evidentiary imbalance, which is itself relevant evidence going to the parties' credibility and other factual issues."  <u>Id</u>.  Third, this sanction does not encroach on Judge Broderick's authority to determine the scope of any spoliation evidence to be presented at trial and "to craft any related jury instructions on a full evidentiary record."  <u>Id.</u>; <u>see</u> <u>Europe</u>, 2022 WL 832027, at *7–8 (declining to order specific jury instruction for Rule 37(e)(1) violation because the "trial judge will

be in the best position to instruct the parties on the introduction of evidence and arguments that can be made and then determine the precise language of any necessary jury instruction").

Accordingly, Plaintiffs may present evidence on Keurig's failure to preserve Barberio's hard copy documents and hard drives for Barberio, Ferreira, and Mueller, and may request that Judge Broderick deliver a jury instruction informing the jury "that it may consider that evidence, along with all the other evidence in the case, in making its decision." Fed. R. Civ. P. 37(e) adv. comm. n. to 2015 amend.; see Lokai Holdings, 2018 WL 1512055, at *17 (granting, under Rule 37(e)(1), moving party permission to seek spoliation jury instruction in form to be approved by district judge).

### iii.   **Other Sanctions**

The Court finds that Plaintiffs' other requested sanctions of preclusion of evidence or adverse inferences "are not commensurate with" Keurig's conduct. Syntel Sterling, 328 F.R.D. at 128. First, contrary to Plaintiffs' broad assertions, the Court's examination has shown that the prejudice to Plaintiffs is limited to the loss of hard copy documents for one custodian (Barberio), and the loss of ESI as to three custodians (Barberio, Ferreira, and Mueller). (See §§ IV.B.2.b–c, supra). Plaintiffs' financial prejudice with respect to Rathke's and Stacy's hard drives will be ameliorated by the Court's award of costs. (See § IV.B.2.e.i, supra). This narrow range of prejudice "weigh[s] against imposing the harsh sanctions that [Plaintiffs] seek." Syntel Sterling, 328 F.R.D. at 123.

Second and similarly, the preclusion and adverse inferences that Plaintiffs seek are not "congruous with the misconduct at issue." Syntel Sterling, 328 F.R.D. at 123. (ECF Nos. 1286 at 29–30; 1693-1 at 115). The Court has not failed to observe that Plaintiffs ably completed fact

and expert discovery, and have submitted summary judgment papers supported by voluminous exhibits, undermining any inference that Keurig's discovery conduct prevented them from gathering sufficient evidence to support their claims.  (See ECF Nos. 1497; 1565; 1656).  To award the preclusions and adverse inferences that Plaintiffs seek would run afoul of "the well-settled preference in this Circuit for courts to resolve litigation disputes on their merits rather than through discovery sanctions."  Syntel Sterling, 328 F.R.D. at 123; see Black, 2006 WL 3771097 at *7.  Accordingly, the Court denies Plaintiffs' request for preclusion and adverse inference instructions.

## C.  Keurig's Motion as to TreeHouse

Keurig claims that TreeHouse failed to implement litigation holds on a timely basis, resulting in the spoliation of five categories of discoverable evidence: (i) documents related to Project Charter and communications with TreeHouse's customers about the launch of the 2.0 Brewer; (ii) Adam Spratlin's documents; (iii) information from TreeHouse's Ahold and Kroger sales teams; (iv) documents for Judy Clark and Away From Home ("AFH") sales; and (v) Craig Lemieux's documents.  (ECF Nos. 1290 at 6–25; 1699-4 at 3).  A review of the timeline regarding the launch of the Keurig 2.0 Brewer leading up to this litigation is therefore necessary to analyze Keurig's Motion.

### 1.  Factual Background

On September 10, 2013, during an "Investor Day" call, Keurig announced the release of the 2.0 Brewer, but acknowledged that it had not yet determined or disclosed whether unlicensed K-Cups would function in the new machine.  (ECF Nos. 1632 at 118–19 ¶ 1; 1342-5 at

22).  In mid-October 2013, Keurig was continuing to consider "several options on how to program the 2.0 brewers."  (ECF Nos. 1342-6 at 3; 1342-7 at 2).

On October 24, 2013, TreeHouse's Chairman, Sam Reed, sent a letter to the TreeHouse board reviewing results for the third quarter of 2013, projecting results for 2014, and discussing strategic challenges to TreeHouse's products, including the "strategic risk" posed by Keurig's introduction of the 2.0 Brewer.  (ECF No. 1298-1 at 15 (the "Reed Letter"); see id. at 12–13).  Reed described that TreeHouse had undertaken a "comprehensive defense agenda" executed by external and in-house counsel working with its single-serve beverage ("SSB") team, and led by a consultant, Bill Ford (the "Steering Group"), which "kicked off" on October 21, 2013.  (Id. at 15; 1298-3 at 24–25).  TreeHouse initially asserted the attorney-client privilege and work product protection over the Reed Letter, (ECF No. 1298-2 at 2), but later produced it, subject to the Rule 502(d) Order, and has since withdrawn the assertion of work product over the Reed Letter.  (ECF Nos. 1338 at 14 n.8; 1388-1 at 2; 1699-1 at 260-61; 1699-2 at 12; see ECF No. 571).

On October 29, 2013, Keurig's CEO, Brian Kelley, was quoted in a USA Today article as saying that "we're still deciding on exactly how we will handle the unlicensed pod."  (ECF Nos. 1632 at 119 ¶ 2; 1298-3 at 5).

On November 15, 2013, the Steering Group, which also included TreeHouse's General Counsel, Tom O'Neill, and one of its external counsel, Jo Osborn, met to discuss a "Defense Approach" in response to the "Potential Threat from" Keurig, the first prong of which was "Legal Action."  (ECF Nos. 1298-3 at 9, 23; 1298-4 at 3; 1632 at 120 ¶ 3; 1699-2 at 16; 1693-2 at 31).  One of the Steering Group members who attended the November 15, 2013 meeting, David Vermylen, testified that, at that time, TreeHouse was consulting with outside counsel about a

potential legal action against Keurig. (ECF No. 1284-4 at 4). On December 3, 2013, H+K Strategies sent a memorandum to O'Neill detailing possible strategies in response to Keurig's launch of the 2.0 Brewer, and offered to "[p]rovide litigation support to [TreeHouse] if a suit [were] filed against" Keurig. (ECF No. 1298-5 at 3).

In a December 19, 2013 email, Adam Spratlin, TreeHouse's Director of Engineering, discussed with an employee of R.A. Jones, which supplied TreeHouse with machines for making unfiltered products, that R.A. Jones' non-compete agreement with Keurig precluded it from providing TreeHouse a quote for packaging supplies. (ECF No. 1298-6 at 3 (the "Spratlin Email")). After the Spratlin Email circulated internally within TreeHouse over the next few weeks, on January 28, 2014, O'Neill forwarded the Spratlin Email to Winston & Strawn LLP, whom TreeHouse had recently engaged to represent it in potential litigation against Keurig. (ECF Nos. 1298-6 at 2; 1699-4 at 15–16; see 1693-2 at 49 (reflecting that the "[f]irst privilege log entry for Winston & Strawn lawyers is January 20, 2014")). The same day, Winston & Strawn requested "[f]actual [f]ollow [u]p" from TreeHouse for use in drafting TreeHouse's complaint. (ECF Nos. 1298-9 at 2–3; 1342 ¶ 2). In its Complaint, TreeHouse cited the Spratlin Email in support of the allegation that it was unable to secure machines from R.A. Jones in 2013 or thereafter find another supplier "willing to sell it machinery used to make non-filtered Compatible Cups." (TreeHouse Complaint, ¶¶ 179–85).

By mid-January 2014, TreeHouse had discussed the Keurig 2.0 Brewer with at least four of its customers. (ECF No. 1298-14 at 9–10). At least one of these customers decided to "stay the course," i.e., not to upgrade its products to the Keurig 2.0 Brewer. (ECF Nos. 1298-15 at 2; 1298-14 at 10). The Steering Group continued its efforts throughout January 2014 as well. (ECF

No. 1298-14 at 17 ("Update for 01/09/14"); id. at 4 ("Update for 01/13/14"); id. at 5 (showing meetings in January 2014)).  The slides for the January 9, 2014 meeting show that Project Charter's "legal" and "PR" tasks were "[o]n standby."  (ECF No. 1298-14 at 17).

TreeHouse "sent its first round of litigation hold notices to employees on February 4, 2014."  (ECF No. 1632 at 120 ¶ 4; see ECF Nos. 1298-18; 1342 ¶ 3).  This first round of employees included Harry Overly, Chief Customer Officer (ECF No. 1342-1 at 3), Craig Lemieux, President of the Beverages Division (ECF No. 1342-2 at 3), Martin Reynolds, head of marketing for single-serve beverages (ECF No. 1342-3 at 3), and Tom Jarona, Director of Procurement (ECF No. 1347-4 at 3).  (See ECF No. 1298-18).  Spratlin, however, did not receive a litigation hold notice until January 25, 2017.  (ECF No. 1298-18 at 3).

On February 5, 2014, Keurig's CEO Brian Kelley stated in an earnings call that the Keurig 2.0 Brewer would use "proprietary interactive capabilities so that the brewer can identify the inserted Keurig pack . . . ."  (ECF Nos. 1632 at 120 ¶ 5; 1347-8 at 6).

By the time its Board of Directors met on February 5 and 6, 2014, TreeHouse had spoken with at least six of its customers about the impact of the Keurig 2.0 Brewer.  (ECF No. 1298-13 at 7).  During this meeting, the Board continued "to consider alternatives to litigation[.]"  (ECF No. 1342 ¶ 4).  TreeHouse's production includes contemporaneous notes from two of the six customer meetings.  (ECF No. 1298-15 at 2–3).

In early February 2014, TreeHouse contacted suppliers to inquire about contractual restrictions against "selling any materials to anyone for Keurig type products."  (ECF No. 1298-11 at 2; see ECF No. 1298-10 at 2).  For example, TreeHouse's Director of Procurement, Tom Jarona, contacted a representative of Boyd Technologies on February 6, 2014 seeking specifications for

a project involving "coffee filter paper alternative[,]" saying that "[t]ime [was] of the essence[.]" (ECF No. 1298-12 at 2–4).  Jarona ultimately did not provide Boyd with the information it requested to respond to TreeHouse's request.  (Id.)

On February 11, 2014, TreeHouse filed its Complaint.  (TreeHouse Complaint).  As noted above, on July 1, 2014, the Court entered the ESI Order.  (ECF No. 41).  On December 2, 2014, TreeHouse filed an amended complaint, (TreeHouse Amended Complaint), and on February 2, 2015, Keurig moved to dismiss, during the pendency of which discovery was stayed.  (ECF Nos. 223; 329).  After Judge Broderick denied Keurig's motion to dismiss on November 29, 2017, discovery commenced, and by December 15, 2017, the parties exchanged initial disclosures and lists of proposed custodians.  (ECF Nos. 379; 1347-9; 1347-10; 1347-11).

While Keurig's motion to dismiss was pending, TreeHouse's counsel "continued to investigate sources of relevant information . . . and supervised the issuance of additional holds to other employees as soon as it was notified of an employee's relevance or discovered that an employee rotated into a relevant role."  (ECF No. 1342 ¶ 6).  TreeHouse sent additional litigation hold notices as follows:

- Judy Clark received a litigation hold on March 1, 2016 after she rotated into the role of Senior Vice President of Food/Away From Home Sales & Marketing, and was added as a custodian on December 15, 2017.  (ECF Nos. 1298-18 at 2; 1347-12 at 4; 1632 at 149 ¶ 1).

- Gretchen Crawford, Director of Sales, received a litigation hold on January 25, 2017, and was added as a custodian on December 15, 2017.  (ECF Nos. 1298-18 at 2; 1347-12 at 4).

- Adam Spratlin, Director of Engineering, received a litigation hold on January 25, 2017, and was added as a custodian on December 15, 2017.  (ECF Nos. 1298-18 at 3; 1347-12 at 4).

- Bobby Moorhead, part of the primary sales team for Ahold, received a litigation hold on March 20, 2017, and was added as a custodian in October 2018.  (ECF Nos. 1298-26 at 2; 1347-13; 1632 at 152 ¶ 7).

TreeHouse states that it has produced nearly two million documents from 35 custodians and central databases.  (ECF No. 1338 at 10).

### 2.  Analysis

#### a.  Duty to Preserve

Keurig argues that TreeHouse's duty to preserve arose in the Fall of 2013, "when it began preparing to file this lawsuit."  (ECF No. 1290 at 6; see ECF No. 1699-4 at 6–9).  As proof that TreeHouse contemplated litigation in the Fall of 2013, Keurig points to TreeHouse's assertion that the October 30, 2013 Reed Letter was subject to the work product protection, discussion of legal action at the November 15, 2013 Project Charter Meeting, consideration of potential class plaintiffs in December 2013, the December 19, 2013 Spratlin Email, and engagement of Winston & Strawn in early January 2014.  (ECF Nos. 1290 at 6–8; 1699-4 at 6–17).

TreeHouse counters that its duty to preserve began "no earlier than February 5, 2014, when its Board began considering the possibility of litigation against Keurig (among other alternatives)."  (ECF No. 1338 at 13).  TreeHouse asserts that the Reed Letter "relates to defensive reverse engineering issues, not offensive litigation[.]"  (Id. at 13–14 (quoting ECF No. 1298-1)).  TreeHouse maintains that the litigation it anticipated in late 2013 and early January 2014 was an intellectual property infringement action by Keurig, given the precedent of the Sturm Litigation.  (ECF No. 1693-2 at 28; see ECF No. 1298-1 at 12 (Reed referring to TreeHouse "hav[ing] prevailed against GMCR's various legal actions" in the past)).  TreeHouse also states that the October 30, 2013 privilege log entry referring to the "Foley & Lardner" litigation does not refer to this action,

in which TreeHouse is represented by Winston & Strawn, but rather a defense against possible intellectual property or false advertising litigation Keurig might initiate.  (ECF Nos. 1298-2; 1693-2 at 29; 1699-1 at 260).

The Second Circuit has rejected the suggestion that simply being on notice of potential injury that might give rise to litigation triggers a duty to preserve.  See Fujitsu Ltd. v. Fed. Expr. Corp., 247 F.3d 423, 436 (2d Cir. 2001) (affirming denial of spoliation sanctions where, after plaintiff informed defendant of damage to its container of silicon wafers, defendant "destroyed the container and wafers").  In the case of alleged spoliation by a plaintiff, the preservation obligation is deemed to arise on the date the plaintiff sent a demand letter or notice of claim, or filed the complaint.  See Tomassini v. FCA US LLC, No. 3:14-CV-1226 (MAD/ML), 2020 WL 1938834, at *3 (N.D.N.Y. Apr. 22, 2020) (holding that "[c]ertainly, following the filing of his complaint, Plaintiff [] had a duty to preserve all evidence relevant to the litigation," including evidence he had previously removed from subject vehicle); Karsch, 2019 WL 2708125, at *18 (finding that plaintiff's duty to preserve arose on the date he sent "demand letter . . . threatening legal action"); Ottoson, 268 F. Supp. 3d at 581 (finding plaintiff had "an obligation to preserve [evidence] from . . . the date that her counsel sent a demand letter to Defendants threatening litigation and requesting Plaintiff's personnel file").  The preservation trigger in each of these cases was the date a plaintiff "decided" to sue the defendant.  Best Payphones, 2016 WL 792396, at *4 (holding that plaintiff's obligation to preserve arose on date it filed its first litigation against same defendants).

In the cases Keurig cites, the courts recognized that a party's obligation to preserve relevant documents arose when litigation was filed or, at least, ostensibly threatened. (ECF

Nos. 1290 at 6; 1384 at 5).  In Passlogix Inc. v. 2FA Technology, LLC, the court found that the defendant's duty to preserve arose on the date the plaintiff filed its complaint, such that the defendant's deletion of relevant emails six months later was a breach of that duty.  708 F. Supp. 2d 378, 413 (S.D.N.Y. 2010).  In Mastr Adjustable Rate Mortgage Trust 2006-OA2 v. UBS Real Estate Securities Inc., the court similarly held that the filing of related litigation put the plaintiff on notice of the "creditable probability of litigation."  295 F.R.D. 77, 84 (S.D.N.Y. 2013).  One court set the trigger even later, when the pending litigation was transferred to this District, where the requirements under Zubulake IV and Zubulake V were clearly established.  Pension Comm., 685 F. Supp. 2d at 476.  And in Capricorn Management Systems, Inc. v. Government Employees Insurance Co., the court based its conclusion that the plaintiff's duty to preserve arose six months before it filed the complaint on specific testimony and email correspondence with counsel showing that the plaintiff had in fact decided to file a lawsuit against the defendant six months before it filed the complaint.  No. 15-CV-2926 (DRH) (SIL), 2019 WL 5694256, at *9 (E.D.N.Y. July 22, 2019).

Here, Keurig has not provided evidence that TreeHouse decided to sue Keurig any earlier than the very end of January or early February 2014, when TreeHouse engaged Winston & Strawn, who then began drafting the Complaint.  Therefore, the Court finds that TreeHouse's distribution of litigation hold notices starting on February 4, 2014, a week before it filed the Complaint, reasonably complied with its obligations under precedent in the Second Circuit and this District.

### b.  Reasonableness of Steps Taken and Alternative Sources

The Court's analysis turns to the reasonableness of the steps TreeHouse took to preserve

evidence.  TreeHouse has summarized the steps it took to preserve ESI as follows:

- TreeHouse issued litigation hold notices to 99 employees, including to 21 employees on February 4, 2014, before the original Complaint was filed.  (ECF Nos. 1632 at 138–48; 1693-2 at 7).

- TreeHouse's document retention policy required employees to save materials "they believed to be relevant to potential litigation" regardless of whether they had received a litigation hold notice.  (ECF Nos. 1338 at 10; 1342-8 at 2; 1342-9 at 2; 1342-10 at 153).

- TreeHouse had implemented the Enterprise Vault system in September 2013 to archive all employees' emails.  (ECF Nos. 1342-10 at 154–55; 1342-9 at 6).  Since at least April 2014, TreeHouse has used the "litigation hold" feature of Microsoft Exchange.  (ECF No. 1342-9 at 4).

- TreeHouse's email and file servers were not enabled to perform automatic deletions since 2009, when it entered the single-serve business.  (ECF Nos. 1298-18 at 3; 1693-2 at 88).

- TreeHouse "conducted an early round of hard drive collections," although when this occurred is not in the record. (ECF No. 1342 ¶ 5; see ECF No. 1699-1 at 264-65).

TreeHouse argues that, other than Lemieux, none of the six custodians that are the

subject of Keurig's Motion were "key players, and, in any event, Keurig has failed to show

spoliation of any of their documents."  (ECF No. 1338 at 16).  The Court examines TreeHouse's

efforts as to each of these custodians.[34]

_____

[34] The Court notes that Keurig has attempted to show TreeHouse's spoliation through several graphs purporting to indicate that the volume of emails produced from custodians' files increased after they were placed under litigation holds.  (ECF Nos. 1290 at 14–21; 1699-1 at 225–32, 242–43).  TreeHouse rejects these "document counting" graphs.  (ECF Nos. 1693-2 at 71; 1699-2 at 33–34).  As noted previously (see n.24), the Court observes that, throughout the Motions, the parties have disputed each other's document counting methods, and as with many other aspects of this litigation, refuse to cede an inch to the other's position.  In any event, Keurig has not adequately explained its methodology for comparing custodians'

### i.   **Bobby Moorhead**

Bobby Moorhead has worked at TreeHouse since 1995, as a Director of Sales/Team Leader for Private Brands.  (ECF No. 1632 at 152 ¶ 7).  He supervised Gretchen Crawford, TreeHouse's sales team lead for customers such as Ahold.  (ECF Nos. 1298-28 at 3; 1699-1 at 236).  Moorhead received a litigation hold notice on March 20, 2017.  (ECF Nos. 1632 at 152 ¶ 7; 1298-26 at 2).  He was not designated as a custodian until October 2018.  (ECF Nos. 1298-26 at 2; 1347-13 at 2; 1693-2 at 58).

Keurig contends that TreeHouse "produced very few emails from him," noting that TreeHouse's production included 790 emails from Moorhead's files but 8,643 emails he sent or received in other custodians' files.  (ECF No. 1290 at 15–16).

TreeHouse responds that Moorhead, like other TreeHouse employees, was subject to the automatic email archiving process in Enterprise Vault since September 2013.  (ECF Nos. 1693-2 at 54; 1342-10 at 154–55).  TreeHouse also contends that Harry Overly was in fact "the key customer contact for TreeHouse's single-serve business[,]" and "Moorhead would have been in contact with" him and Bob Baker, to whom Moorhead reported.  (ECF No. 1338 at 17; 1347-24 at 3).  Overly and Baker were issued litigation holds on February 4, 2014, and Keurig deposed them both, but did not depose Moorhead.  (ECF Nos. 1298-18; 1342-1; 1342-13).  TreeHouse notes that it produced over 61,000 documents from 2014 to 2017 on which Moorhead is a custodian.  (ECF No. 1338 at 22; 1298-44 at 4 n.3).  Finally, TreeHouse points out that, despite

---

email volume before and after litigation holds, offered any expert testimony supporting its methodology, or pointed to any judicial precedent supporting the use of such a comparison to analyze spoliation.  Cf. CAT3, 164 F. Supp. 3d at 494–95 (discussing forensic expert's analysis of deleted emails).  (See ECF Nos. 1699-1 at 225–32, 242–43; 1699-2 at 87).  Accordingly, the Court has not considered Keurig's email volume comparison graphs in determining whether TreeHouse's preservation efforts were reasonable.

Keurig's association of Moorhead with Ahold, Keurig has not identified any Ahold meetings for which notes were not produced and, in any event, Ahold was not part of the Steering Group's retailer meeting plan.  (ECF Nos. 1693-2 at 69 (citing ECF No. 1298-3 at 14)).

The Court finds that the steps TreeHouse took with respect to Moorhead were reasonable.  First, his emails were automatically archived through Enterprise Vault.  Second, while the parties dispute the number of documents produced for Moorhead, it is clearly more than 10,000.  (ECF Nos. 1632 at 152 ¶ 8; 1699-4 at 35).  Third, Baker and Overly, Moorhead's supervisors, were included in the first round of litigation hold notices on February 4, 2014.  Fourth, Keurig chose not to depose Moorhead, and has not demonstrated that TreeHouse failed to preserve any of his discoverable ESI.

### ii.    Tom Rothers

Tom Rothers worked at TreeHouse from July 1992 through his retirement in October 2014, and was Director of Retail Sales.  (ECF Nos. 1632 at 152 ¶ 9; 1347-13 at 2).  Keurig contends that Rothers was responsible for TreeHouse's sales to Kroger.  (ECF No. 1699-1 at 236).  Rothers did not receive a litigation hold notice.  (ECF No. 1632 at 152 ¶ 9).  Rothers was added as a custodian by October 2018.  (ECF Nos. 1632 at 159 ¶ 12; 1347-13 at 2).

TreeHouse responds that "Rothers retired in 2014 and, as such, his responsibilities were winding down when the case was filed."  (ECF No. 1338 at 17).  On November 1, 2019, TreeHouse informed Keurig that it did not "have a copy of his work-issued computer" and, despite several efforts to reach him, had "no additional information concerning [his] document storage practices while at TreeHouse."  (ECF No. 1298-33 at 2; see ECF No. 1342-30 at 6).  After searching his email and documents from his share drive, TreeHouse produced over 25,000 documents on which

Rothers was a primary or duplicate custodian.  (ECF Nos. 1632 at 152–53 ¶ 10; 1342-30 at 5–6; 1298-33 at 8–9).  As alternative custodians, TreeHouse points to Harry Overly, who spoke with Kroger's "entire private-brand team" about the Keurig 2.0 Brewer (ECF No. 1342-1 at 11), and Bob Baker, Vice President of Retail Sales and later Grocery & Dollar Sales, who also supervised Rothers, received a litigation hold notice on February 4, 2014, and was deposed by Keurig.  (ECF Nos. 1338 at 17; 1298-18 at 2; 1342-13; 1342-30 at 4–5; 1632 at 164 ¶ 21; ECF No. 1699-1 at 262).  TreeHouse notes that Keurig did not request Rothers as a custodian until August 2018, and ultimately did not depose him.  (ECF Nos. 1342-61 at 4; 1338 at 23).  Keurig responds that Overly testified that he had conversations with Kroger, but not "primary responsibility."  (ECF No. 1384 at 7; 1342-1 at 11).  TreeHouse also notes that Keurig deposed a key Kroger executive.  (ECF No. 1347-60).

The Court finds that TreeHouse's preservation efforts for Rothers were reasonable.  First, like the other custodians, Rothers' emails were archived through Enterprise Vault.  Second, the record reflects that TreeHouse made multiple attempts to contact Rothers about his documents, albeit without success.  Third, TreeHouse produced tens of thousands of documents for Rothers, as well as documents from suitable alternative custodians.  Finally, Keurig deposed Kroger's representative and thus had the opportunity to hear directly from Kroger about its relationship with TreeHouse, while choosing not to depose Rothers.

### iii.   Gretchen Crawford

Gretchen Crawford has worked for TreeHouse from June 2006 to the present, in several roles including as Supply Chain Manager for WalMart, Senior Manager for Customer Supply Chain for WalMart and Target, Business Development Manager – East Coast, and Director of Retail

Sales.  (ECF Nos. 1632 at 150 ¶ 3; 1298-28 at 4).  Crawford testified that, while she was a Business Development Manager, Ahold was also one of the accounts she handled.  (ECF No. 1298-28 at 4). Moorhead was Crawford's supervisor.  (ECF Nos. 1298-28 at 3; 1699-1 at 236).  Crawford received a litigation hold notice on January 25, 2017.  (ECF Nos. 1298-18 at 2; 1632 at 139).

Crawford also testified that her computer was imaged, and that she maintained no hard copy files, transposed any handwritten notes into emails, and complied with the litigation hold notice.  (ECF No. 1347-24 at 4–5).  TreeHouse points to its production of over 82,000 documents on which Crawford was a custodian, as well as over 1,454 documents to or from Ahold.  (ECF No. 1338 at 22; 1298-44 at 8).  In addition, TreeHouse points to Overly, Baker, Kelly, and Lemieux as custodians who also had responsibilities relating to Ahold, were issued litigation hold notices on February 4, 2014, and, like Crawford, were deposed by Keurig.  (ECF No. 1338 at 18).

The Court finds that TreeHouse's preservation efforts for Crawford were reasonable. First, Crawford was also subject to the Enterprise Vault archiving process.  Second, although Keurig deposed Crawford, it has not pointed to any testimony that she kept notes that were not preserved; to the contrary, she transposed any notes to emails, and TreeHouse produced her emails "dating back to her initial contact with Ahold."  (ECF No. 1298-44 at 8).  Third, Ahold was not included in the Retailer Meeting Plan the SSB was undertaking in the Fall of 2013 and early 2014, mitigating any suggestion that TreeHouse failed to preserve notes of such a non-existent meeting.  Finally, TreeHouse sent litigation hold notices to other Ahold salespeople on February 4, 2014, and produced their documents as well.

### iv.   **Judy Clark**

Judy Clark worked at TreeHouse from September 2007 through December 2018, and her roles included Senior Director – Business Architecture, Vice President – Supply Chain Planning, SAP Implementation Leader, Senior Vice President – Logistics and Consumer Solutions, Senior Vice President and General Manager – AFH Sales and Marketing, and Senior Vice President of Sales, AFH, Canada, Condiments, and Meals.  (ECF No. 1632 at 149 ¶ 1).  During part of her tenure, she oversaw single-serve beverages, but no longer did so by the time TreeHouse filed its Complaint.  (ECF Nos. 1388-4 at 8; 1342-30 at 4; 1632 at 164 ¶ 22).  Clark received a litigation hold notice on March 1, 2016, after Clark took on a new role in the AFH business, and was not named as a custodian until December 2017.  (ECF Nos. 1298-18 at 2; 1347-12 at 4; 1632 at 149 ¶ 1).

TreeHouse's productions included over 116,000 documents on which Clark was a custodian, including from her hard drive.  (ECF Nos. 1632 at 149 ¶ 2; 1693-2 at 60).  Keurig used as exhibits during Clark's deposition several documents from her files to press the point that TreeHouse's failure to win AFH business was for reasons other than Keurig's conduct.  (ECF Nos. 1342-38; 1342-39; 1342-40; 1342-41; see ECF No. 1338 at 29 n.26).  Keurig did not, however, ask Clark any questions about other documents she might have had.  TreeHouse also noted that it produced almost 30,000 documents that refer to Office Coffee, Office Coffee Services, or OCS (the term for AFH cup sales).  (ECF Nos. 1342 ¶ 8; 1632 at 149 ¶ 2).  TreeHouse points to Gary Schachter, Robin Borchelt, Harry Overly, and Bill Ritcey as alternative custodians—all of whom Keurig deposed—who were involved in the AFH division, which included "lots of products that had nothing to do with single-serve beverages."  (ECF Nos. 1338 at 18, 28–29; 1632 at 149 ¶ 2).

TreeHouse also produced nearly 27,000 documents relating to customers whose AFH business it alleges was lost to Keurig.  (ECF No. 1342 ¶ 9).  Although TreeHouse identified several brokers and seven other TreeHouse employees involved in the sale of portion packs in the AFH and OCS markets, Keurig did not depose any of them.  (ECF No. 1342-37 at 17–18).  Keurig also deposed TreeHouse's Rule 30(b)(6) designee on the AFH market.  (ECF No. 1342-10).

The Court finds that TreeHouse's preservation efforts as to Clark were reasonable.  First, as with the other custodians, Clark was subject to the Enterprise Vault archive as of September 2013.  (ECF No. 1342-10 at 154–55).  Second, notwithstanding the parties' disagreement on the exact volume of Clark's documents, TreeHouse produced an amount in the high tens of thousands, if not more than 100,000.  Third, TreeHouse produced documents pertaining to the AFH business from at least four other custodians whom Keurig deposed, in addition to an AFH Rule 30(b)(6) witness.  Finally, Keurig did not elicit from Clark any documents that she had that were not preserved or that documents arising from her role in the single-serve business before March 1, 2016 (when she received the litigation hold notice) were not preserved and produced.

### v. __Adam Spratlin__

Adam Spratlin has worked for TreeHouse from January 2012 to the present, as Director of Engineering and Senior Director of Engineering.  (ECF No. 1632 at 153 ¶ 11).  Spratlin had "primary responsibility for procuring filling machinery throughout the relevant period, including identifying suppliers, obtaining quotes, and negotiating prices."  (ECF No. 1290 at 12; see ECF No. 1298-7 at 11–12).  Spratlin was on the "R&D / Engineering" team for Project Charter.  (ECF No. 1298-3 at 24).  As discussed above (§ see IV.C.1, supra), TreeHouse cited the Spratlin Email in support of the allegation that it was unable to secure machines from R.A. Jones in 2013 or

thereafter find another supplier "willing to sell machinery to make non-filtered Compatible Cups." (TreeHouse Complaint, ¶¶ 179–85). Spratlin received a litigation hold notice on January 25, 2017, and was designated as a custodian on December 15, 2017. (ECF Nos. 1298-18 at 3; 1632 at 153 ¶ 11; 1347-12 at 5). Treehouse collected his hard drive on February 23, 2017. (ECF No. 1693-2 at 96). During his deposition, Spratlin testified that his practice had been to save incoming emails in project folders, and to periodically delete his sent email box. (ECF No. 1298-7 at 3–4). Keurig contends that Spratlin's missing documents would likely have shown that "TreeHouse was satisfied with its relationships with its input suppliers." (ECF No. 1290 at 25; see ECF No. 1699-1 at 224).

On April 14, 2020, after Spratlin's deposition, TreeHouse discovered that, due to a "technical issue," it had not properly processed and reviewed Spratlin's emails, and subsequently made a supplemental production of 1,600 additional documents, including copies of the Spratlin Email. (ECF No. 1298-24 at 2, 5; see ECF No. 1290 at 13 n.30; 1632 at 155–56 ¶¶ 4–6). TreeHouse contends that, despite the technical issue, it produced at least ten versions of the Spratlin Email from multiple custodians, including employees who "were managing and more regularly involved in TreeHouse's procurement activities than [] Spratlin." (ECF No. 1338 at 19 & n.10, 25; 1632 at 154 ¶ 12; see ECF Nos. 1342-14; 1342-15; 1342-16; 1342-17; 1342-18; 1342-19; 1342-20; 1342-21; 1342-22; 1342-23; 1342-24 at 4–5; 1347-4 at 3–6). TreeHouse produced over 67,000 documents on which Spratlin is a primary or duplicate custodian. (ECF No. 1338 at 25; 1693-2 at 53; 1632 at 154 ¶ 12). In addition to Spratlin, Keurig deposed Reed, Jarona, Overly, Reynolds, Lemieux, and Peskie, all of whom worked on TreeHouse's roll-out of its single-serve cups. (ECF Nos. 1338 at 28; 1342-24; 1347-4; 1342-1; 1342-2; 1342-3; 1342-4; 1342-50).

The Court concludes that TreeHouse should have sent Spratlin a litigation hold notice in February 2014.  TreeHouse relied on the Spratlin Email for a key allegation in its Complaint, and Spratlin's participation in Project Charter should have put TreeHouse on notice that he was a key custodian whose ESI needed to be preserved as of February 2014.  See Charlestown Cap. Advisors, 337 F.R.D. at 61–62 (finding defendants' failure to take reasonable steps to preserve relevant ESI by failing to provide litigation hold memo to key custodian).

The Court finds, however, that other steps TreeHouse took were reasonable and mitigated the potential loss of any of Spratlin's ESI.  First, as of September 2013, through Enterprise Vault, Spratlin's emails were archived, such that any sent emails he deleted were preserved, reviewed, and produced.  (ECF Nos. 1342-10 at 154–55; 1699-1 at 265).  Second, as noted above, the Spratlin Email was produced multiple times.  (See ECF Nos. 1693-2 at 51; 1342-14 through 1342-23).  Third, Spratlin's communication with the vendor referenced in the Spratlin Email began as a telephone call, suggesting that no email Spratlin sent is missing.  (ECF Nos. 1298-7 at 6; 1693-2 at 52).  Fourth, TreeHouse produced documents from at least seven other custodians who were involved in procurement or received the Spratlin Email, six of whom Keurig deposed.  (ECF Nos. 1298-18; 1342-15 at 2).  Accordingly, notwithstanding TreeHouse's delayed litigation hold notice to Spratlin, the Court finds that the other steps TreeHouse took with respect to Spratlin were reasonable and prevented the spoliation of his ESI.

### vi.   **Craig Lemieux**

Craig Lemieux worked at TreeHouse from March 2011 through December 2018, and his titles included Executive Vice President/Chief Operating Officer, Senior Vice President/General Manager – Sturm, and President of Beverages.  (ECF Nos. 1632 at 150–51 ¶ 5; 1298-40 at 4).  He

participated in TreeHouse's decision to develop portion packs.  (ECF No. 1298-41 at 3).  Lemieux

was under a litigation hold relating to the <u>Sturm</u> Litigation since 2010, and received a litigation

hold notice for this litigation on February 4, 2014.  (ECF Nos. 1298-18 at 3; 1298-43 at 7; 1632 at

150–51 ¶ 5; 1699-1 at 258; 1699-2 at 40).

      Keurig contends that Lemieux is the "<u>only</u> custodian that was involved in TreeHouse's

decision to enter in the single-serve beverage business in 2009, but TreeHouse produced no

emails from that year from his files."  (ECF No. 1290 at 23).  Keurig calculates that TreeHouse

produced only 661 emails from Lemieux's custodial files for 2009 to 2013 but produced 11,865

emails sent to or from him from others' files during the same period.  (ECF No. 1298-43 at 2, 5).

Keurig posits that Lemieux's documents would have shown that "TreeHouse was not delayed by

Keurig in launching its unfiltered packs."  (ECF No. 1290 at 25).

      TreeHouse responds that it offered to produce Lemieux's files produced in the <u>Sturm</u>

litigation if Keurig would drop any spoliation argument, which Keurig declined, and the Court

subsequently denied twice Keurig's motions to compel production of documents TreeHouse

produced in the <u>Sturm</u> Litigation.  (ECF Nos. 1298-44 at 7; 1338 at 25; 688; 1002).  Aside from

Lemieux, TreeHouse maintains that Reed, Vermylen, Overly, Reynolds, Jarona, and Peskie, all of

whom Keurig deposed, were also involved in TreeHouse's decision to enter the single-serve

business.  (ECF No. 1338 at 25 n.18).  TreeHouse produced over 132,000 documents for which

Lemieux was the primary or duplicate custodian.  (ECF No. 1632 at 151 ¶ 6).  TreeHouse also

preserved and searched Lemieux's hard drive, but did not identify any responsive, non-privileged

documents.  (ECF No. 1298-33 at 3; 1632 at 165 ¶ 24).

The Court finds that TreeHouse's steps to preserve Lemieux's ESI were reasonable.  First, Lemieux's emails, like other custodians,' were archived in Enterprise Vault.  Second, he was in the first round of custodians to receive a litigation hold notice for this litigation in February 2014, and Keurig does not, and cannot, contend that TreeHouse had a preservation obligation for this litigation dating back to October 2010 when Sturm began selling single-serve cups.  (ECF No. 1347-44 ¶ 24).  Third, the volume of TreeHouse's production of documents for Lemieux rebuts any suggestion of spoliation, and Keurig has not pointed to any testimony or other evidence showing that Lemieux had ESI that was not preserved and reviewed.  Fourth, TreeHouse produced documents for other custodians, whom Keurig deposed, involved in the decision to enter the single-serve business; that those custodians' recollections of a ten-year old decision may have been foggy does not lead to an inference that Lemieux's ESI was lost.  (See ECF Nos. 1384 at 8; 1388-5 at 4; 1388-7 at 5–6; 1388-23 at 5–8).

*     *     *

In sum, as to each of the custodians and categories of ESI about which Keurig complains, the Court finds that TreeHouse's preservation efforts were reasonable, and Keurig has failed to show spoliation of ESI that would have been favorable to Keurig's defenses or unfavorable to TreeHouse's claims.  See Khatabi v. Bonura, No. 10 Civ. 1168 (ER), 2017 WL 10621191, at *7 (S.D.N.Y. Apr. 21, 2017) (explaining that, "for sanctions to be warranted, there must be extrinsic evidence to demonstrate that the destroyed evidence . . . would have been unfavorable to the destroying party") (internal quotation and citation omitted).

### c.   **Prejudice & Remedies**

For similar reasons, Keurig "has not established prejudice." Rothman, 2019 WL 6210815, at *5 (denying spoliation sanctions motion).  "[P]rejudice cannot be grounded on the basis that some evidence no longer exists."  Capricorn Mgmt. Sys., Inc. v. Gov't Emp. Ins. Co., No. 15-CV-2926 (DRH) (SIL), 2019 WL 5694256, at *12 (E.D.N.Y. July 22, 2019).  Here, Keurig has simply not established that ESI existed that TreeHouse failed to preserve, let alone that Keurig suffered prejudice as would justify sanctions under Rule 37(e)(1).  Having failed to establish prejudice, a required element for an award of sanctions under Rule 37(e)(1), the Court declines to consider further Keurig's requested "'severe'" sanction of a preclusion order.  Joint Stock Co. II, 2019 WL 4727537, at *30.  Accordingly, Keurig's Motion as to TreeHouse is DENIED.

### D.   **Keurig's Motion as to JBR**

Keurig asks for preclusion sanctions against JBR as a result of JBR's failure to preserve relevant evidence concerning a January 31, 2014 meeting between JBR and Costco (the "Costco Meeting").  (ECF No. 1290 at 27; see ECF No. 1699-1 at 251).

As alleged in JBR's Amended Complaint:

> At a meeting between [JBR] and Costco on January 31, 2014, [JBR] was told that despite having prices lower than all other suppliers' Portion Packs – including Costco's Keurig-made private label – Costco would not be widening distribution for [JBR], or any other Competing Portion Pack supplier, until the Keurig 2.0 compatibility issue was resolved.  During this same meeting, Costco informed [JBR] that it would be requiring [JBR] to implement a design change to its Costco packaging to inform customers that [JBR's] products were not compatible with the Keurig 2.0 Brewer.

(First Amended and Supplemental Complaint, JBR, Inc. v. Keurig Green Mountain, Inc., No. 14 Civ. 4242 (VSB) (S.D.N.Y. Dec. 8, 2014), ECF No. 83 ¶ 271).  Jim Rogers was the only JBR representative at the Costco Meeting.  (ECF No. 1699-2 at 75).  In connection with JBR's motion for a preliminary

injunction ("PI") in this action (the "PI Proceeding"), Jon Rogers, then JBR's President, CEO and

Founder, submitted a declaration that discussed the Costco Meeting as follows:

> I am aware that on January 31, 2014, [JBR] met with representatives from Costco's Small Appliances Department, including Claudine Adamo, VP and General Merchandise Manager, Deirdre Bondarev, Assistant General Merchandise Manager, and Shannon Axthelm, Buyer to discuss [JBR's] business with Costco.  At this meeting, Costco's representatives explained that Costco would not be widening distribution for any portion pack suppliers until the Keurig 2.0 issue was resolved.  Thus, despite having lower prices than all of the other portion packs available for use in Keurig brewers, [JBR] would not be able to expand its availability of OneCup products at any additional Costco stores.  At this same meeting, [JBR] was told that it would be required to implement a design change to its Costco packaging that would make clear that [JBR] products were not compatible with Keurig 2.0 brewers or Vue brewers.

(ECF No. 86 ¶ 38 (the "Jon Rogers Declaration")).  The basis for Jon Rogers' statements was a

meeting he had with JBR's executives, including Jim Rogers and CFO Mike Sarina.  (ECF No. 1699-

2 at 58–59).  Attached to the Jon Rogers Declaration was a copy of the packaging modification,

which stated that the OneCup was "NOT compatible" with the 2.0 Brewer and which Costco

approved.  (ECF No. 86-6 at 2).   In addition, Sarina submitted a declaration in the PI Proceeding

attesting that:

> When [JBR's] representatives met with Costco in January 2014, [JBR] was told that it would be required to label its boxes to state that its OneCups were not compatible with the 2.0 [Brewer].  However, no date for commencing the labeling was defined by Costco at that time because Costco was uncertain as to the release date of the 2.0 [Brewer].  When Keurig accelerated its release date to August of [2014], Costco then requested that we sticker all boxes with non-compliance [sic] labels in order to be consistent with the timing of Keurig's release date.

(ECF No. 131 ¶ 11; see ECF No. 127-17 (excerpts of Sarina's deposition testimony)).  After the

Costco Meeting, Costco employees who had attended communicated with each other about the

2.0 Brewer.  (ECF No. 1348-9 at 2).

Keurig cited Sarina's statements in opposing JBR's PI motion.  (ECF No. 124 at 10 n.3, 17, 19, 28, 33).  Judge Broderick also cited Sarina's statements in finding that, in February 2014, "Costco had already told JBR that it would be required to 'inform customers that [its] products were not compatible with the Keurig 2.0 [B]rewer[.]'"  (ECF No. 160 at 14 (quoting ECF No. 92 at 19 and citing ECF No. 127-17 at 166:19–167:24)).[35]

The same day as the Costco Meeting, Jim Rogers sent an email to Jon Rogers referencing advice from outside counsel about "antitrust litigation against Keurig," a communication over which JBR has asserted work product protection (the "Rogers Email").  (ECF No. 1298-55).  On March 13, 2014, JBR filed its original complaint in this case (Complaint, JBR, Inc. v. Keurig Green Mountain, Inc., No. 14 Civ. 4242 (VSB) (S.D.N.Y. Mar. 13, 2014), ECF No. 1).

When asked during his February 2019 deposition whether he remembered the Costco Meeting, Jim Rogers testified that he did not "recall that specific meeting," but recalled the topic of labeling JBR's cups as non-compatible with the Keurig 2.0 Brewer.  (ECF No. 1298-53 at 5).  Rogers testified that "sometimes" he took notes of in-person meetings with Costco, and if he had any notes of the Costco Meeting, he would have "followed up" and "thrown [them] away." (Id. at 6–7).  Jim Rogers also testified that he had not been asked to preserve any documents.  (Id. at 7).

Keurig argues that "JBR has otherwise produced no documents corroborating" the Costco Meeting, and asks the Court to preclude JBR from "offering evidence about a purported loss of business at Costco."  (ECF No. 1290 at 27–28).  JBR responds that Keurig itself failed to seek

---

[35] With the Stipulations, JBR submitted additional evidence relating to the Costco Meeting, (see, e.g., ECF No. 1696-1 at 11–18 (citing ECF No. 1638)), but the Court declines to consider these exhibits, which did not accompany the Motions, for the reasons set forth above.  (See § IV.A, supra).

discovery regarding the Costco Meeting, and in any event, contemporaneous evidence of the Costco meeting does exist, and Keurig has not shown prejudice.  (ECF Nos. 1345 at 9–14; 1696-1 at 4–11).[36]

### 1.   Duty to Preserve

JBR filed its complaint on March 13, 2014, and therefore had a duty to preserve no later than that date.   See Tomassini, 2020 WL 1938834, at *3 (holding that plaintiff had duty to preserve as of filing of complaint); Best Payphones, 2016 WL 792396, at *4 (holding that plaintiff's obligation to preserve arose on date it filed its first litigation against same defendants); Passlogix, Inc. v. 2FA Tech., LLC, 708 F. Supp. 2d 378, 413 (S.D.N.Y. 2010) (holding that plaintiff's duty to preserve "attached, at a minimum" on the date it filed its original complaint); Turner, 142 F.R.D. at 73 (holding that plaintiff's preservation obligation arises "at least by the time the complaint [is] served").

As with TreeHouse, Keurig argues that JBR's preservation obligation arose earlier, on the date of the Costco Meeting in January 2014.  (ECF No. 1290 at 28).  For the same reasons the Court declined to impose an earlier preservation obligation on TreeHouse (see § IV.C.2.a, supra), the Court declines to impose such an obligation on JBR.  While the Rogers Email suggests that JBR may have been considering in January 2014 bringing an action against Keurig (ECF No. 1298-55), Keurig has not shown any evidence that JBR "decided it was going to bring an action against" Keurig as of the date of the Costco Meeting.  Best Payphones, 2016 WL 792396, at *4.  Keurig has not offered any other evidence establishing that JBR decided to sue earlier than the date it filed

---

[36] JBR's additional argument that Keurig's Motion is untimely (ECF No. 1345 at 14) lacks merit given the Court-ordered schedule for the parties' submission of spoliation motions.  (See § II.B.2, supra).

its complaint, and therefore, the Court finds that JBR's preservation obligation arose on March 13, 2014.

### 2.  **Reasonableness of Steps Taken**

JBR stores hard copy documents in a storage facility.  (ECF No. 1348-2 at 4).  Emails are stored on a server and are not automatically deleted, although employees are able to delete. (ECF No. 1348-2 at 5–6).  Before 2018, JBR used Evault to store emails, and in 2019 began using the Barracuda Archiver platform.  (ECF No. 1348-2 at 6–7).  Although JBR does not have policies for retaining data of departing employees, departing employees' data was generally retained. (ECF No. 1348-2 at 8).

On December 7, 2011, in connection with Keurig's patent lawsuit against JBR, JBR issued a litigation hold notice.  (ECF No. 1348-3 at 2; see ECF No. 1348-1).  The record does not reflect who received this notice or what documents JBR instructed custodians to preserve.  In "early 2014," JBR discussed internally and with its external counsel collecting and retaining electronic and hard copy documents related to this litigation.  (ECF No. 1348 ¶ 12).  JBR issued a litigation hold notice with respect to this action on April 3, 2014, more than one month after the Costco Meeting and three weeks after filing its complaint.  (ECF No. 1298-54 at 3–4).

During fact discovery, JBR produced to Keurig over 1.3 million documents, including 40,866 documents from Jim Rogers' custodial files, and 52,834 emails he sent or received.  (ECF No. 1348 ¶ 13).  On February 12 and 13, 2019, Keurig deposed Jim Rogers, following which Keurig asked JBR to search for and produce several categories of documents he had referenced.  (ECF Nos. 1298-53; 1348-4).[37]  The categories Keurig asked JBR to search did not include documents

---

[37] Jon Rogers became ill during this litigation and was unable to be deposed.  (ECF No. 1699-2 at 66).

related to the Costco Meeting.  (ECF No. 1348-4).  Keurig acknowledges that JBR produced at least 23 emails relating to the Costco Meeting.  (ECF No. 1699-1 at 253-54).

Given that JBR's duty to preserve documents arose no later than March 13, 2014, the Court finds that was at least negligent in waiting until April 4, 2014 to issue its first litigation hold notice related to this action.  See Mastr Adjustable Mortgages Rate Trust, 295 F.R.D. at 85 (finding that failure to initiate litigation hold at inception of related litigation "was at least negligent"). While JBR refers to preservation notices sent in relation to Keurig's patent litigation in 2011, JBR has not explained who received these notices or what was preserved, and therefore, the Court cannot find that these earlier preservation notices assured that JBR was maintaining documents for this litigation.  Although JBR represents that, in "early 2014" it discussed with its outside counsel "collecting and retaining electronic and hard copy documents relevant to the litigation," (ECF No. 1348 ¶ 12), JBR has not shown what actions it took at that time to preserve relevant documents, and fails to explain why, despite being aware of its duty to preserve in "early 2014," it failed to issue litigation hold notices until April 4, 2014.  Accordingly, the Court finds that JBR was negligent in failing to issue litigation hold notices no later than March 13, 2014.

### 3.  Alternative Sources and Prejudice

Keurig contends that JBR included allegations about the Costco Meeting in its complaint, yet failed to preserve what "may have been the only contemporaneous record of the alleged meeting with [JBR's] largest customer regarding the 2.0 Brewer."  (ECF No. 1290 at 28).  JBR responds that Keurig cannot seek preclusion sanctions because it failed to investigate and seek discovery from "obvious sources of information that would pertain to the" Costco Meeting.  (ECF No. 1345 at 9).  JBR notes that Jim Rogers was the only witness whom Keurig questioned about

the Costco Meeting, but TreeHouse did not show him any emails, the Jon Rogers Declaration, or any other documents to refresh his recollection about the date or attendees of the Costco Meeting.  (ECF Nos. 1345 at 12; 1699-2 at 67–68).

In May 2018, Plaintiffs subpoenaed Costco, and Keurig did so in January 2019.  (ECF Nos. 1348 ¶ 14; 1348-6).  Keurig's subpoena did not specifically request documents relating to the Costco Meeting.  (ECF No. 1348-6 at 10–11).  On June 12, 2020, Costco produced 846 documents.  (ECF No. 1348-7).  On June 17, 2020, Keurig deposed Costco's representative, Shannon Axthelm, but did not ask any questions about the Costco Meeting.  (ECF No. 1298-56; 1348-8).  Keurig did not depose Bondarev or Adamo, two Costco employees who attended the Costco Meeting, and did not ask Sarina during either of his depositions about the Costco Meeting. (ECF Nos. 1696-1 at 5, 18; 1699-2 at 61–62).

The Court concludes that Keurig has not shown that JBR's delay in issuing a litigation hold notice impeded Keurig's ability to defend against JBR's claims in this action.  First, Keurig has not shown that Jim Rogers took any notes at the Costco Meeting that JBR subsequently failed to preserve.  (See ECF No. 1699-2 at 55, 71–72).  Jim Rogers testified that "sometimes" he took notes of meetings with Costco, but Keurig neither refreshed his recollection about the date and circumstances of the Costco Meeting at issue, nor elicited testimony showing that he took notes at that meeting that he subsequently threw away.  Because the record does not support a finding that notes of the Costco Meeting "ever existed," the Court "cannot find that [JBR] had a duty to preserve them."  Man Zhang, 2019 WL 3936767, at *7; see Mastr Adjustable Rate Mortgages Trust, 295 F.R.D. at 87 (denying sanctions motion as to documents that "either never existed or were not destroyed").

Second, even if the Court were to infer that Jim Rogers took and discarded notes of the Costco Meeting, Keurig has not "affirmatively demonstrate[d] that a reasonable trier or fact could find that the missing evidence would support" Keurig's defenses against JBR's claims.  Orbit One, 271 F.R.D. at 439 (cleaned up); see Capricorn Mgmt. Sys., 2019 WL 5694256, at *12 (denying request for sanctions where defendants had not shown "with some degree of specificity how the purported missing e-mails would have been helpful" to their defense or counterclaims).  To the contrary, as Judge Broderick has already found, during the Costco Meeting, Costco told JBR that JBR "would be required" to change its packaging to inform customers about the incompatibility of OneCups with the 2.0 Brewer, and it is undisputed that Costco subsequently approved JBR's revised packaging.  (ECF Nos. 160 at 14; 86-6 at 2).  While the significance of these facts as to JBR's claims and Keurig's defenses has yet to be finally resolved, the occurrence and the substance of the Costco Meeting are not in dispute, such that the more likely inference is that any notes Jim Rogers might have taken would have harmed, rather than helped, Keurig's defenses.

Third, Keurig is simply wrong that "we have no record of what happened" during the Costco Meeting.  (ECF No. 1699-1 at 251).  As Keurig acknowledged during oral argument, JBR produced 23 documents pertaining to the Costco Meeting.  (ECF No. 1699-1 at 253–54).  These documents were not the only source of evidence of what was discussed during the Costco Meeting.  Keurig also had, through documents that Costco produced in response to the parties' subpoenas, and through deposition testimony of JBR's and Costco's witnesses, additional sources of evidence about the Costco Meeting.  (See pp.110–12, 116, supra).  That Keurig did not elicit more detail about what Jim Rogers and the Costco employees discussed during the Costco

Meeting appears to have been Keurig's conscious choice rather than a lapse on the part of JBR. (See ECF No. 1696-1 at 18). See Indem. Ins. Co. of N. Am. v. Liebert Corp., No. 96 Civ. 6675 (DC), 1998 WL 363834, at *5 (S.D.N.Y. June 29, 1998) (finding that defendants did not show "substantial prejudice" where they were able to depose third party witnesses with relevant knowledge); see also Pension Comm., 685 F. Supp. 2d at 479 (noting that defendants had "gathered an enormous amount of discovery—both from documents and witnesses[,]" and requiring defendants to "show through extrinsic evidence that the loss of the documents has prejudiced their ability to defend the case").

Because prejudice is a required element of sanctions under Rule 37(e)(1), and Keurig has failed to demonstrate prejudice from JBR's delayed issuance of litigation hold notices, the Court finds that there is no basis for sanctions against JBR.  Accordingly, Keurig's Motion as to JBR is DENIED.

### V. CONCLUSION

For the reasons set forth above:

1.  Plaintiffs' Motion is GRANTED IN PART and DENIED IN PART as follows:

     a.  Plaintiffs are entitled to recover reasonable attorneys' fees and expenses for the following periods and categories: (i) Plaintiffs' efforts from May 7, 2018 to July 25, 2018 to determine deficiencies in Keurig's productions for its Agreed Custodians; (ii) preparing for and participating in meet-and-confer communications and calls concerning Keurig's productions for its Agreed Custodians between July 25, 2018 and May 20, 2019; (iii) additional measures with respect to the hard drives for Rathke and Stacy that TreeHouse sent to its

vendor; (iv) investigating discrepancies in Keurig's CommVault productions; (v)

investigating discrepancies in Keurig's transactional data from February 7,

2019 until February 2020; (vi) Plaintiffs' experts' costs while working with

Keurig's deficient transactional data between February 7, 2019 and February

2020; and (vii) preparing the Motion and presenting oral argument.  The

parties are expected to meet and confer and reach an agreement on Plaintiffs'

attorneys' fees and expenses that fall within these instructions.  If they are

unable to agree, by **June 1, 2022**, Plaintiffs may request a conference with the

Court to discuss a schedule for filing an application for attorneys' fees and

expenses pursuant to this Opinion and Order;

b.  At trial, Plaintiffs may present evidence regarding Keurig's failure to preserve

(i) Barberio's hard copy documents, and (ii) hard drives for Barberio, Ferreira,

and Mueller, and may request that Judge Broderick deliver a jury instruction

informing the jury that it may consider that evidence, along with all the other

evidence in the case, in their deliberations;

c.  Plaintiffs' requested sanctions of preclusion of evidence or adverse inferences

under Rule 37(e)(2) are DENIED;

2.  Keurig's Motion as to TreeHouse is DENIED; and

3.  Keurig's Motion as to JBR is DENIED.

Dated:      New York, New York                    SO ORDERED.
            April 11, 2022

_____
SARAH L. CAVE
United States Magistrate Judge