# EXHIBIT A

NOTIFY

5|24    137

NOTICE SENT (6)
05·26·22 DC

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                                                                      SUPERIOR COURT
                                                                                 Civil No. 19-1101-BLS1

KEURIG GREEN MOUNTAIN, INC.[1]
                                    Plaintiff

vs.

SUN CHEMICAL CORPORATION
                                    Defendant

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case arises from a License and Supply Agreement ("LSA") between Keurig Green Mountain, Inc. ("Keurig"), which sells single-serving coffee brewing systems, and Sun Chemical Corporation ("Sun"), which makes machine-readable taggant ink. Under the LSA, Keurig licensed Sun's taggant ink technology, with the hope that only Keurig-approved portion packs that contained the proprietary taggant ink could be used in its brewers. After other manufacturers designed portion packs that could be used in Keurig's brewers, this case followed. Each party alleges the other breached the LSA. I now have two motions for summary judgment before me: Keurig seeks summary judgment on Sun's counterclaims;[2] and Sun seeks summary judgment on its counterclaims and Keurig's claims. For the following reasons, Keurig's motion is allowed and Sun's motion is allowed in part and denied in part.

---

[1]   Formerly known as Green Mountain Coffee Roasters, Inc.

[2]   Keurig submitted two motions for summary judgment in violation of the page limits in Superior Court Rule 9A(b)(5). Sun moved to strike them both. At the hearing, Keurig opted not to pursue its motion for summary judgment on Count III of its complaint.

## BACKGROUND

The following facts are undisputed. Some facts are reserved for the discussion.

On or about July 15, 2012, Keurig and Sun entered into a Joint Development Agreement ("JDA") under which Sun was to develop (i) taggant ink to be used on the lids of Keurig portion packs, and (ii) a taggant sensor device (also known as a reader) for use in the Keurig 2.0 Brewer. As the parties envisioned, the reader would be designed to perceive the invisible taggant in the ink on the lid of a Keurig portion pack, recognize the pack as a Keurig pack, and only then allow the brewer to brew the pack's contents. The purpose of both the taggant ink and the reader was to ensure that the Keurig 2.0 Brewer could be used only with Keurig or Keurig-licensed portion packs.

After several months of negotiation, the parties entered into the LSA, which was dated August 2, 2013 (the "Effective Date"). Under the LSA, Sun agreed to provide Keurig with an exclusive license to use the taggant ink technology that Sun developed pursuant to the JDA in exchange for a monthly royalty fee. Sun also agreed to supply taggant ink to Keurig's "Converters," which printed the lids of Keurig or Keurig-licensed portion packs. The LSA commenced on July 23, 2013, and was to be for a five-year term, unless earlier terminated.

In August 2014, Treehouse Foods ("Treehouse") announced that it had developed portion packs that Keurig had not licensed, which were compatible with the Keurig 2.0 Brewer. A few months later, in October 2014, another manufacturer, Club Coffee, which was not licensed by Keurig, released a video claiming that its portion packs were also compatible with the Keurig brewer. In the Spring of 2015, Keurig ran a series of tests and determined that a variety of non-licensed portion packs were readable in its brewers. Sun's own analysis of a

2

Treehouse-branded lid determined that the dye Treehouse used was chemically equivalent to dye in Sun's taggant ink.[3]

In September 2017, Keurig filed this case. It claimed that Sun breached Sections 4(viii), 8(iii)(a), and 12(i)(c) of the LSA (Counts I-III) and sought money damages. In response, Sun asserted counterclaims against Keurig, alleging that Keurig breached Sections 9 and 4(iii) of the LSA and seeking damages (Counts I and II) and an injunction (Count III).

On March 20, 2018, Keurig gave Sun written notice that it did not intend to renew the LSA past its five year term. The LSA has now expired.

## DISCUSSION

### I. The Summary Judgment Standard

"Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Helfman v. Northeastern Univ., 485 Mass. 308, 314 (2020), quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 118-119 (2010). "The moving party bears the burden of demonstrating the absence of a triable issue of fact on every relevant issue." Scholz v. Delp, 473 Mass. 242, 249 (2015). Once the moving party satisfies this burden, "the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact." Barron Chiropractic & Rehab., P.C. v. Norfolk & Dedham Grp., 469 Mass. 800, 804 (2014). "Bare assertions made in the nonmoving party's opposition will not defeat a motion for summary judgment." Id.

In deciding a motion on summary judgment, I must "consider[ ] evidence presented in the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits,"

---

[3] The parties later learned that in April 2014, Treehouse had hired Microtrace, a Sun competitor, to develop a taggant ink that would duplicate the properties of the taggant ink on the lids of Keurig-manufactured portion packs.

3

O'Connor v. Redstone, 452 Mass. 537, 550 (2008), and draw all reasonable inferences in favor of the party opposing the motion. Borden Chem., Inc. v. Jahn Foundry Corp., 64 Mass. App. Ct. 638, 645 (2005).

Applying this standard, I conclude that Sun is entitled to summary judgment on Keurig's claims and that Keurig is entitled to summary judgment on Sun's counterclaims.

## II. Contract Interpretation Principles

The parties' arguments turn in large part on the interpretation of various provisions in the LSA. Thus, at the outset, I set forth the applicable interpretive principles under Delaware law, which both parties agree applies to the LSA. See LSA § 23. The Delaware Supreme Court has explained:

> Delaware adheres to the objective theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party. [The court] . . . read[s] a contract as a whole and . . . give[s] each provision and term effect, so as not to render any part of the contract mere surplusage. [The court does] not read a contract to render a provision or term meaningless or illusory. . . .
>
> When the contract is clear and unambiguous, [the court] . . . give[s] effect to the plain-meaning of the contract's terms and provisions. On the contrary, when [the court] may reasonably ascribe multiple and different interpretations to a contract, [the court] will find that the contract is ambiguous. An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.

Estate of Lucille Osborn v. Kemp, 991 A.2d 1153, 1159-1160 (2010) (internal quotes and footnoted citations omitted).

## III. Keurig's Claims

### A. LSA § 4(viii) – Count I

Section 4(viii) of the LSA provides: "SUN shall implement chain of custody procedures to ensure that prior to Delivery to COMPANY [Keurig] the Product is supplied in the Field of

· 4

Use exclusively to COMPANY or COMPANY's Converters in accordance with Section 4(iii) hereof." LSA § 4(viii) (underline in original). "Product" is defined as "collectively, SUN's taggant inks meeting the Product Specifications and the Product Formulation." Id. § 1. "Field of Use" is defined as "any Brewer, Pack or Brewing System." Id.

Count I alleges that Sun breached Section 4(viii) "by failing to ensure that [the] taggant ink specially created for [Keurig] [was] supplied exclusively to [Keurig] and its authorized Converters." Complaint ¶ 18. In support of this claim, Keurig points to emails indicating that a third party came into possession of slides presented during a conference sponsored by Sun's parent company that discuss Keurig's 2.0 Brewer and the parties' taggant ink efforts. See Joint Appendix to Sun's Motion ("Sun J.A."), Exs. 68-71. It also points to an email sent in April 2015 in which an employee criticized Sun's chain of custody procedures. Id. at Ex. 72. This evidence does not establish that Sun violated Section 4(viii).

To establish a breach of Section 4(viii), Keurig was required to prove either that Sun failed to implement any chain of custody procedures, or that it implemented a deficient chain of custody procedure that resulted in the Product (i.e., ink) coming into the possession of someone other than Keurig or its Converters. There is no evidence of either circumstance. Sun is entitled to summary judgment on Count I.

### B. LSA § 8(iii)(a) – Count II

Section 8(iii)(a) of the LSA provides: "Until one year following the termination or expiration of this Agreement in accordance with Section 2 or upon expiration of the Term, SUN shall not supply to any third party for use in the Field of Use: (x) any Product, Product Technology or other taggant inks; or (y) Reader Technology, readers, or Optical Quality Assurance Systems." LSA § 8(iii)(a) (underline in original). "Term" is defined as "the period

commencing on the Start Date [January 23, 2013] and terminating on the earlier of the conclusion of the Initial Term [five years from the Start Date], any Renewal Term or other termination in accordance with Section 2." LSA § 1 (underline in original). See also Id. § 2(i).

Count II alleges that Sun breached Section 8(iii)(a) by "intentionally or unintentionally, making or causing to be available, and therefore supplying, to unauthorized third parties the taggant ink specially created for and intended for [Keurig's] exclusive use." Complaint ¶ 22. Keurig argues that at the very least there is a genuine dispute as to whether Sun breached Section 8(iii)(a) by developing and marketing taggant inks to other manufacturers through an initiative known as Project Juarez. Specifically, it points to an email dated September 5, 2019, which states that Sun was "trying to sell . . . 2.0 compatible inks to as many Keurig competitors as possible." Sun J.A., Ex. 73. Keurig also points to deposition testimony from Sun's Director of Research and Development, Dr. Mohammad Farahat, in which he states that the initiative was launched in 2018 or 2019. Id. at Ex. 52, 504: 4-6. Lastly they point to an email sent on December 11, 2018, recommending "a couple of UV varnishes to be tested on top of the Juarez ink for Treehouse."

This evidence, however, does not create a genuine dispute as to whether Sun breached Section 8(iii)(a). At best, it demonstrates that Sun desired to sell ink to others and was preparing to do so, not that Sun, in fact, "suppl[ied] . . . Product, Product Technology or other taggant inks" to a third party in violation of Section 8(iii)(a). Because Keurig has offered no evidence that Sun supplied its taggant inks during the exclusivity period to a third party, Sun is entitled to summary judgment on Count II.

### C. LSA § 12(i)(c) – Count III

Section 12(i) of the LSA provides:

6

> SUN hereby represents, covenants and warrants to COMPANY [Keurig] <u>as of the Effective Date</u> [August 2, 2013], and in the case of clauses (f) through (j), through the Tail Period, that: (a) SUN has the full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms hereof; (b) its performance pursuant to this Agreement will not violate any agreement or obligation between SUN and a third party; <u>(c) the Product is uniquely optically verifiable in the Field of Use using the Reader Technology, the Handheld Readers and the Optical Quality Assurance Systems</u>; (d) provided that (x) COMPANY'S Converters comply with the OQAS Instructions, the Product Storage and Application Instructions and the Tagged Lid Storage Instructions, and (y) the Product passes the Wet Ink Test, the Product will meet the Lid Success Percentage; (e) SUN shall comply with the applicable storage provisions on the Product Storage and Application Instructions; (f) the Product supplied to COMPANY and COMPANY'S Converter shall conform in all respects to the Product Formulation and the Product Specifications; (g) the Product does not contain any synthetic fungicides, preservatives or fumigants which are prohibited in packaging materials, and storage containers or bins for use in the handling of any organically produced agricultural product pursuant to 7 CFR 205.272(b)(1); (h) neither the Licensed Materials nor the Product will infringe upon the intellectual property rights or misappropriate the trade secrets of any third party; (i) all of the Product shall be manufactured in a good and workman-like manner; and (j) all Product (1) shall be free from all material defects (it being understood that the failure of the Product to meet the Product Formulation or the Product Specifications is a material defect); (2) shall not be adulterated or misbranded within the meaning of any applicable federal, state or municipal law, rule or regulation; and (3) shall be free from conflict minerals as defined in Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended.

LSA § 12(i) (emphasis added). "Tail Period" is defined as two years after termination of the Agreement. LSA § 2(vii). As noted above, Product is defined as "collectively, SUN's taggant inks meeting the Product Specifications and the Product Formulation," LSA § 1, and "Field of Use" is defined as "any Brewer, Pack or Brewing System." Id. Keurig asserts that Sun's taggant ink was not uniquely optically verifiable as of the Effective Date, and that therefore Sun breached Section 12(i)(c) of the LSA, because at least one unlicensed manufacturer was able to

produce portion packs that could be used with Keurig 2.0 Brewers during the LSA's term (i.e., in 2014).

Keurig's argument presumes that the phrase "as of the Effective Date" in Section 12(i) is prospective and means beginning on the Effective Date and extending through the LSA's term. Under Keurig's interpretation of the phrase, Section 12(i)(c)'s warranty of unique optical verifiability was operative throughout the term of the LSA, i.e., until July 23, 2018. Sun, however, maintains that the scope of the warranty is far narrower. Sun argues that "as of the Effective Date" as used in clause (c) means on August 2, 2013, and not necessarily thereafter. Based on this interpretation, it asserts that Count III fails because it is undisputed that on August 2, 2013, its taggant ink was "uniquely optically verifiable." I agree with Sun. Reading the phrase "as of the Effective Date" in the context of clause (c), the provision as a whole, and the LSA in its entirety indicates that Keurig's interpretation is not reasonable.[4]

As an initial matter, Keurig's interpretation renders Section 12(i)(c) grammatically contorted. Under its interpretation, the provision would read as follows: "SUN hereby represents, covenants and warrants to COMPANY . . . [beginning on the Effective Date and through the term of the LSA] . . . that . . . the Product is uniquely optically verifiable in the Field of Use . . . ." LSA § 12(i) (emphasis added). If Keurig was correct, the phrase "will be" or

---

[4] In deciding Sun's motion to dismiss Count III of the complaint, the Court (Billings, J) concluded that Section 12(i) was potentially ambiguous and therefore "unripe for a dismissal." Docket No. 12 at 4-12. After careful review of the summary judgment record and the arguments of counsel, I disagree with Judge Billings and conclude that Section 12(i) is not ambiguous when read in light of the LSA in its entirety.

something similar would have been more appropriate. The verb "is" in clause (c), when read with its ordinary meaning, represents a state at a fixed moment.[5]

The validity of Sun's interpretation is further supported by the use of the phrase "as of the Effective Date" in Section 12(ii), which immediately follows Section 12(i). It provides:

> COMPANY hereby represents, covenants and warrants to SUN <u>as of the Effective Date, and in the case of clauses (b) through (d), through the Term</u> that: (a) COMPANY has the full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms hereof; (b) the use by SUN of the Brewers and Packs supplied by COMPANY hereunder, in the manner contemplated by this Agreement and COMPANY's performance pursuant to this Agreement will not violate the rights of any third party and will not give rise to any claim for such violations . . .; (c) COMPANY shall cause the Optical Quality Assurance Systems to be calibrated at least once per Contract Year; and (d) Company shall comply with the Tagged Lid Storage Instructions.

LSA § 12(ii) (emphasis added). The parties' choice to use the phrase "through the Term" in Section 12(ii), but not in Section 12(i) suggests that the meaning of "as of the Effective Date" in Section 12(i) is not intended to be prospective. Keurig's interpretation of the phrase "as of the Effective Date," if applied in Section 12(ii), would render the phrase "through the Term" superfluous to the extent it applies to Section 12(ii)(b)-(d).

"As a general rule of construction, Delaware law gives the same word or phrase the same meaning throughout the contract absent countervailing reasons." Unwired Planet, Inc. v. Microsoft Corp., 193 F. Supp. 3d 336, 343-344 (D. Del. 2016), citing In re Mobilactive Media, LLC, 2013 WL 297950, at *19 (Del. Ch. Jan. 25, 2013); State v. Highfield, 152 A. 45, 52 (Del. 1930) ("[I]t is a general rule of construction that where the same word or phrase is used on more than one occasion in the same instrument, and in one instance its meaning is definite and clear

---

[5] Sections 12(i)(a) and 12(i)(g) of the LSA both also use the present tense. Neither requires the interpretation of "as of the Effective Date" put forward by Keurig to make sense.

9

and in another instance it is susceptible of two meanings, there is a presumption that the same meaning was intended throughout such instrument."). There is nothing in either Section 12(i) or Section 12(ii) that signals that the parties intended "as of the Effective Date" to have different meanings in each subsection.

The LSA also makes clear that the parties foresaw the distinct possibility that a competitor might create a taggant ink that would work in the Keurig brewer, further supporting the notion that the warranty provided in Section 12(i)(c) did not extend through the LSA's five-year term. For example, Section 2(iii)(e) gives Keurig the right to terminate the LSA if "any third party producing products in the Field of Use (A) obtains the Product, reverse engineers the Product or otherwise obtains taggant inks optically verifiable by the Reader, and (B) commences commercial production and sale of Packs that are compatible with any one or more of COMPANY's Brewers." LSA § 2(iii)(e). Section 8(iii)(b) gives Sun the right, but not the obligation, to enforce its intellectual property rights if "any third party producing products within the Field of Use obtains, reverse engineers or recreates the Product, the Product Technology or other taggant inks optically verifiable by the Reader or the Reader Technology." LSA § 8(iii)(b). These remedies suggest that the parties recognized the risk and anticipated the possibility that a competitor might be able to reverse engineer Sun's technology. In this context, it would have made little sense for Sun to provide a warranty of unique optical verifiability spanning the full term of the LSA.

Keurig's arguments against Sun's interpretation are without merit. First, it contends that the interpretation is belied by the fact that some (but not all) dictionary sources define the words "as of" as meaning the time from which something begins. However, the words "as of" in the LSA must be read in context, not in isolation. As noted above, reading the words in context of

10

the entire LSA supports Sun's interpretation. Second, Keurig argues that Sun's interpretation would render the phrase "in the Field of Use using the Reader Technology" in Section 12(i)(c) mere surplusage given that at the time of the agreement, the 2.0 Brewer was still in development. See LSA § 3. This argument, too, supports Sun's position, not Keurig's. It would make little sense for Sun to provide an ongoing warranty that only the Keurig portion packs with the Sun taggant ink would work in Keurig's brewers when the brewers – and the sensitivity of the sensors – had not yet been finalized.[6] Lastly, Keurig argues that Sun's interpretation is commercially unreasonable. Again, I disagree. As described above, the LSA expressly anticipated that reverse engineering could render the taggant ink not "uniquely optically verifiable" and provided Sun and Keurig recourse to address such a change in circumstances. In light of these remedies, Keurig's interpretation that Sun warranted that the product would be uniquely optically verifiable in the field of use during the entire term of the LSA is not reasonable. Sun is entitled to summary judgment on Count III.

## IV. Sun's Counterclaims

### A. LSA § 9(iii) – Count I

Section 9 of the LSA provides: "In consideration of the Licenses, COMPANY shall pay a royalty of $354,166.66 (the "***Royalty Fee***") in the aggregate per month commencing on the Start Date and ending upon the later of the end of the Term or the Tail Period, if any." LSA § 9(iii)

---

[6] Because I find Section 12(i)(c) unambiguous, extrinsic evidence is not needed. It bears noting, however, that it would have been unreasonable for Sun to have agreed to warrant that its taggant ink would be "uniquely optically verifiable" through the LSA's full term because Keurig had ultimate control of the reader's parameters in the 2.0 Brewer by which the taggant ink on the individual portion packs would be authenticated. This control was significant. Wide parameters would make it easier for counterfeit packs to function in the 2.0 Brewers. Keurig in fact set wide parameters for its brewers to enhance its customers' experience and to minimize the risk that Keurig brew packs would be rejected by its brewers for a variety of reasons.

11

(emphasis in original). Count I of Sun's counterclaim alleges that Keurig breached Section 9(iii) by failing to pay Royalty Fees due to Sun for the use of its technology. Sun seeks monthly Royalty Fees from Keurig from July 31, 2017 to the end of the LSA's term, July 23, 2018. It also seeks Royalty Fees for the period after the LSA's expiration – July 23, 2018 to the present – on the theory that Keurig continues to use the licensed technology.

Sun's claim to Royalty Fees under Section 9(iii) is barred by the plain language of Section 2(ii) of the LSA, which provides Sun's sole remedy for a breach by Keurig. Section 2(ii) provides in relevant part: "Either Party may terminate this Agreement due to . . . a Material Breach of this Agreement by the other party which is not cured by the breaching Party within sixty (60) days of notice from the non-breaching Party; provided that SUN's sole remedy for a breach of Section 9 shall be as set forth in Section 2(iv)." LSA § 2(ii) (underline in original). Section 2(iv) provides:

> If COMPANY is in material breach of Section 9 and fails to cure such breach within ten (10) days following receipt of written notice thereof from SUN, SUN may at any time after the expiration of such ten (10)-day period suspend the performance of its obligations hereunder until such time as COMPANY cures the breach; provided, however, that the right of suspension described herein will not apply to claims of breach that COMPANY disputes in good faith.

LSA § 2(iv) (underline in original). Thus, Sun's sole remedy for Keurig's failure to pay Royalty Fees was to suspend its performance under the LSA, e.g., to stop supplying ink to Keurig.

Sun argues that the "sole remedy" of suspension applies only "until such time as COMPANY cures the breach." Id. Specifically, it claims that Section 2(iv) necessarily contemplates a cure by Keurig and that therefore, the sole remedy provided for in Section 2(ii) applies only to that time period until, after notice, Keurig cures its breach of nonpayment of an invoice. According to Sun, where, as here, there was no cure, Section 2(iv) does not limit Sun's

12

remedies. Sun further argues that a different interpretation is commercially unreasonable because it would permit Keurig to have a perpetual, royalty-free license if it so chooses.

Sun's interpretation is inconsistent with the plain language of Section 2(iv). The phrase "until such time as COMPANY cures the breach" is fairly read as a temporal limitation upon Sun's suspension, not a limitation on the exclusivity of the remedy. There is no language in Section 2(iv) expressly limiting the applicability of Section 2(ii)'s sole remedy language. Section 2(ii) itself contains no limiting language; to the contrary, Section 2(ii) emphasizes Sun's sole remedy is an exception to each party's power to terminate the LSA in the event of a "Material Breach."[7]

The "sole remedy" provision does not allow Keurig to use Sun's technology with impunity. An attempt by Keurig to continue to use the technology without properly compensating Sun, and thereby circumvent the LSA, would constitute a breach beyond the failure to pay royalties under Section 9, permitting Sun to seek injunctive relief as a remedy. Indeed, Keurig does not argue that the "sole remedy" provision bars Sun's claim for injunctive relief under Count III of the counterclaim.

"Delaware law respects contractual freedom and requires parties . . . to adhere to the contracts they freely enter." Related Westpac LLC v. JER Snowmass LLC, 2010 WL 2929708 at *1 (Del. Ch. July 23, 2010) (court cannot impose remedy inconsistent with plain terms of sole

---

[7] In denying Keurig's motion to dismiss Sun's counterclaims, the Court (Howe, J.) concluded that Sections 2(ii) and 2(iv) are potentially ambiguous. See Docket No. 21 at 5-6. Neither Sun nor Keurig, both of which move for summary judgment on the claim, now argue these provisions are ambiguous. To the extent the provisions could be viewed as ambiguous, I note that Sun has not produced extrinsic evidence supporting its interpretation. In fact, Sun concedes its "outside counsel who negotiated the LSA . . . confirmed that Sun's sole remedy for a breach of Section 9 of the LSA (non-payment of royalties) is to 'suspend services and not provide the product.'" Consolidated Statement of Facts in Support of Keurig's Motion at No. 42.

remedy provision). Sun and Keurig, both sophisticated parties, negotiated the LSA over the course of several months. Sun freely agreed to the risk that the sole remedy clause presented. I cannot now disturb the LSA's allocation of risk simply because Sun regrets the choice it made. Id. at *7 ("The Operating Agreements clearly spell out [plaintiff]'s sole remedy, which it was free to exercise. What [plaintiff] cannot do is avoid its own express contractual promise about the remedy that would exclusively govern these situations."). See also, e.g., 3M Co. v. Neology, Inc., 2019 WL 2714832 at *8 (Del. Super. Ct. June 28, 2019) (upholding "unequivocal" exclusive remedy clause); JCM Innovation Corp. v. FL Acquisition Holdings, Inc., 2016 WL 5793192 at *7 (Del. Super. Ct. Sept. 30, 2016) (upholding exclusive remedy provision; plaintiff was neither unsophisticated nor lacking in bargaining clout).

**B.      LSA § 4(iii) – Count II**

Section 4(iii) of the LSA provides: "Subject to the limitations hereinafter set forth, SUN shall sell to COMPANY or COMPANY's Converter, and COMPANY or COMPANY's Converter shall purchase from SUN, one hundred percent (100%) of COMPANY's requirements for the Product for use in the production of Tagged Lids for sale worldwide." LSA § 4(iii). As noted above, "Product" is defined as "collectively, SUN's taggant inks meeting the Product Specifications and the Product Formulation." Id. § 1. "Tagged Lids" is defined as "Pack lids bearing an ink marking made from the Product, which lids shall be adhered to K-Cup® Packs and such other Packs determined by COMPANY, and manufactured by or on behalf of COMPANY or any one or more licensees of COMPANY." Id.

In Count II of its counterclaim, Sun alleges that Keurig breached Section 4(iii) "by failing to purchase 100 percent of its requirements of taggant ink from Sun Chemical." Counterclaim ¶ 22. In support, Sun points to a Manufacturing Supply Agreement that Keurig and Flint Group

14

North America Corporation ("Flint") entered into on September 27, 2017, under which Flint supplied ink to Keurig's Converters. Sun asserts that this ink was taggant ink.

Count II fails for two reasons. First, Section 4(iii) did not require, as Sun asserts, that Keurig buy all its taggant ink from Sun. As the definition of "Product" makes clear, the provision required Keurig to buy all of its requirements for "<u>SUN's</u> taggant inks" from Sun. LSA § 1 (emphasis added). At most, under Section 4(iii), Keurig was prohibited from purchasing counterfeit versions of Sun's ink from others.[8] Section 4(iii) does not prevent Keurig from purchasing other taggant ink from other companies.

Second, even if Sun's interpretation of the provision were correct, Sun has presented no evidence that Flint sold Keurig any taggant ink. Sun has put forward an affidavit from Dr. Farahat in support of its contention that such sales transpired, but that affidavit does not explicitly aver that Flint sold Keurig taggant ink.[9] See Joint Appendix to Keurig's Motion ("Keurig J.A."), Ex. 40. In contrast, Keurig has put forward affidavits that expressly aver that the ink supplied to Keurig was not taggant ink. See <u>Id.</u> at Ex. 3; Sun J.A., Ex. 78. Keurig is entitled to summary judgment on Count II.

### C. Request for an Injunction under LSA § 16 – Count III

In Count III, Sun asserts that Keurig continues to use its technology although the LSA expired, and seeks injunctive relief under Section 16 of the LSA. Section 16 provides:

> Each Party acknowledges that monetary damages shall be an
> inadequate remedy in the event of a breach by either Party of its

---

[8] There is no evidence that Keurig ever purchased counterfeit Sun taggant ink from anyone.

[9] In connection with its motion for summary judgment on Sun's counterclaims, Keurig moved to strike an affidavit from Mohammad Farahat that Sun served with its opposition. In light of my ruling on the cross-motions for summary judgment, I deny Keurig's motion to strike as moot.

15

> obligations under <u>Sections 7, 8, 11, 14</u> or <u>15</u> of this Agreement and that any such breach by a Party will cause the other Party irreparable injury and damage. Accordingly, each Party acknowledges that the other Party shall be entitled, without waiving any additional rights or remedies otherwise available to it at law, in equity or by statute, to injunctive and other equitable relief in the event of a breach or intended or threatened breach by a Party of such obligations.

LSA § 16 (underline in original).

This claim fails for several reasons. First, to the extent Sun is specifically invoking Section 16 of the LSA, it appears to be inapplicable. Sun argues that Section 16 applies because Section 8 of the LSA includes the Reader Technology License and the Product Technology License.[10] However, it fails to explain how or why Section 8 has been violated. Second, Sun has provided no evidence that Keurig continues to use its technology and that therefore an injunction is required either pursuant to Section 16 or on equitable grounds.

Sun argues that an injunction is required because "Keurig engaged Flint Group to create an ink that would work in the 2.0 Brewer" and "the ink that Flint created is properly characterized as taggant ink." Sun's Opposition to Keurig's Motion ("Sun Opp.") at 20. This argument fails because Keurig was not required to purchase all taggant ink from Sun under the LSA, and even if it was so required, Sun has failed to produce evidence that Flint manufactures taggant ink for Keurig. See, <u>supra</u>, at 14-15.

Finally, Sun clarified at oral argument that it was seeking an injunction because Keurig continues to use its optical reader technology. See Sun's Opp. at 19. For evidence, it cites deposition testimony from Jim Martin, Keurig's quality manager, in which he testified that Keurig was not selling its 2.0 Brewer, which incorporated Sun's reader, in the 2018-2019 time

---

[10] Among other things, Section 8 of the LSA grants the licenses to Keurig and describes the scope of those grants.

16

period.[11] Mr. Martin's testimony does not support the proposition that Keurig continues to sell brewers with Sun's optical reader technology or that it intends to do so in the future. Sun actually concedes that Keurig does not currently market or sell the 2.0 Brewer. Keurig is entitled to summary judgment on Count III.[12]

### ORDER

Keurig Green Mountain, Inc.'s Motion for Summary Judgment Re: Sun Chemical Corporation's Counterclaims (M.R.C.P. 56) (Docket #105) is **ALLOWED**. Sun Chemical Corporation's Motion for Summary Judgment (Docket #119) is **ALLOWED** as to plaintiffs' claims, but **DENIED** as to its counterclaims. Judgment shall enter accordingly with each party bearing its own costs.

Dated: May 19, 2022

Peter B. Krupp
Justice of the Superior Court

---

[11] Specifically, Martin testified as follows:

Q: So when you— when Keurig stopped selling the [Keurig] 2.0[ ] [brewers], it was not selling any brewers that would brew a Vue Cup?
A: Correct.
Q: And that was in the 2018-2019 time period?
A: To the best of my recollection, yes. The last brewer was called a "K200."

Keurig J.A., Ex. 38 at 182:6-12.

[12] In its briefing, but not its counterclaim, Sun seeks a declaration that Keurig is obligated to pay Sun Royalty Fees for each month that Keurig used its technology without authority. As discussed above, the LSA's sole remedy provision bars such a declaration. See, supra, at 12-14. In its counterclaim, but not in its briefing, Sun seeks a declaration that the LSA is terminated. The parties agree the LSA is no longer in effect. The issue is moot.