**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION | Case No. 1:14-md-02542-VSB |
| *This Document Relates to:* | [Related Case No. 1:21-CV-7493] |
| BJ'S WHOLESALE CLUB, INC., | |
| Plaintiff, | **REDACTED PUBLIC VERSION** |
| -against- | |
| KEURIG GREEN MOUNTAIN, INC., | |
| Defendant. | |

**BJ'S OPPOSITION TO KEURIG'S MOTION TO EXCLUDE THE EXPERT REPORTS AND TESTIMONY OF BJ'S EXPERT PHILLIP M. JOHNSON, PH.D.**

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

BACKGROUND ......................................................................................................... 1

LEGAL STANDARD ................................................................................................ 3

I.      DR. JOHNSON'S MODELS ARE PROPERLY SPECIFIED ........................ 5

    A.      Keurig's Logo ███████████████ .................................... 6

    B.      Dr. Johnson Did Not Have to Further Control For JBR's Mesh Cup Design. ............ 8

    C.      Dr. Johnson Did Not Have To Control for Undefined JBR "Business Strategies"... 10

II.     DR. JOHNSON'S BRANDED REGRESSION MODEL APPROPRIATELY
    ACCOUNTS FOR BRAND VALUE ................................................................. 11

III.    DR. JOHNSON'S MODELS DO NOT USE A FLAWED BENCHMARK .................. 14

IV.     DR. JOHNSON'S OVERCHARGES FIT THE CASE ...................................... 15

V.      DR. JOHNSON'S BRANDED REGRESSION MODEL DOES NOT PRODUCE
    IMPLAUSIBLE RESULTS ................................................................................ 18

CONCLUSION ......................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bazemore v. Friday*,
    438 U.S. 385 (1987)............................................................5, 6

*Bickerstaff v. Vassar Coll.*,
    196 F.3d 435 (2d Cir. 1999)..................................................6

*Bigelow v. RKO Radio Pictures, Inc.*,
    327 U.S. 251 (1946)...........................................................14, 15

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir. 1996) ...................................................4, 6, 20

*Cannon v. BP Prods. N. Am., Inc.*,
    2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) ........................6

*Cedar Petrochems, Inc. v. Dongbu Hannong Chem Co.*,
    769 F. Supp. 2d 269 (S.D.N.Y. 2011)...................................4, 14

*Daubert v. Merrell Dow Pharms, Inc.*,
    509 U.S. 527 (2013) ......................................................... *passim*

*Dial Corp. v. News Corp.*,
    314 F.R.D. 108 (S.D.N.Y. 2015) .........................................14

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
    2019 WL 1515231 (E.D.N.Y. Feb. 21, 2019).................... *passim*

*EEOC v. Morgan Stanley & Co.*,
    324 F. Supp. 2d 451 (S.D.N.Y. 2004)...................................6, 8, 10, 11

*Freeland v. AT&T Corp.*,
    238 F.R.D. 130 ( S.D.N.Y. 2006) .........................................6

*In re High Pressure Laminates Antitrust Litig.*,
    2006 WL 931692 (S.D.N.Y. Apr. 7, 2006)............................5, 12

*In re Keurig Green Mtn. Singleserve Coffee Antitrust Litig.*,
    383 F. Supp. 3d 187 (2020) .................................................16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)............................................................4, 13, 18

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Kurtz v. Costco Wholesale Corp.*,
   818 F. App'x 57 (2d Cir. 2020) .................................................................................6

*In re Libor-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 43 (S.D.N.Y. 2018)........................................................................15

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1378 (Fed. Cir. 2003)........................................................................4, 8, 17

*In re Namenda Indirect Purchaser Antitrust Litig.*,
   2021 WL 2303727 (S.D.N.Y. June 11, 2021) ..........................................................4

*Palmer v. Schultz*,
   815 F.2d 84 (D.C. Cir. 1987)....................................................................................5

*In re Processed Eggs Products Antitrust Litig.*,
   312 F.R.D. 171 (E.D. Pa. 2015)........................................................................14, 19

*Sobel v. Yeshiva Univ.*,
   839 F.2d 18 (2d Cir. 1988)............................................................................ *passim*

*Weiner v. Snapple Beverage Corp.*,
   2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ...........................................................6

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   2018 WL 3862773 (D. Minn. Aug. 14, 2018) ........................................................15

*In re Wireless Tel. Servs. Antitrust Litig.*,
   385 F. Supp. 2d 403 (S.D.N.Y. 2005)......................................................................6

**Other Authorities**

Rule 702 of the Federal Rules of Evidence ....................................................................3

Dr. Phillip M. Johnson, an economist who specializes in econometric and statistical analysis, used commonly accepted statistical techniques to determine overcharges resulting from the anticompetitive conduct by Keurig.  Keurig neither disputes Dr. Johnson's qualifications nor his use of generally accepted techniques.  Instead, it argues that Dr. Johnson's models should include additional variables, should use a benchmark other than unlicensed compatible cups (which it fails to identify), and that certain of his results when disaggregated and re-estimated with substantially reduced data are not plausible.  These arguments repeat and/or repurpose Keurig's prior baseless arguments direct to Dr. Johnson in the McLane matter and fail for the same reasons-i.e. they largely assume disputed facts and are directed to the weight of Dr. Johnson's overcharge results, not the admissibility of his methodologies.  *See Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 527, 596 (2013).  Because Keurig's motion has failed to justify the extreme relief it seeks, Keurig's Motion should be denied.

## BACKGROUND

Dr. Johnson was retained by BJ's to: (1) "Analyze the likely impact of the challenged conduct on K-Cup prices and form an opinion regarding the likely impact on BJ's"; (2) "Estimate the overcharges on the products purchased by BJ's which resulted from Keurig's alleged anticompetitive conduct"; and (3) "Calculate BJ's overcharge damages on its purchases of Compatible Cups from Keurig."  Keurig Ex. 1 (Johnson Rpt.) ¶9.  Dr. Johnson first analyzes the alleged conduct and explains how it would likely impact BJ's and other purchasers in the market.  Id.  ¶¶11-100.  He then estimates the resulting price elevation on both branded and private label purchases. Id. ¶104, *see id*. ¶¶101-144.  Finally, Dr. Johnson calculates damages to BJ's for branded and private label purchasing separately.  Id. ¶¶145-147.  Keurig's motion is directed to (2), Dr. Johnson's estimate of overcharges.  *See* Mot. at 1.

Dr. Johnson reviewed extensive transactional data, documents, and testimony,

correspondence between the parties, and academic literature. *See* Johnson Rpt. Ex. 2. Dr. Johnson's overcharge models draw upon this material as well as on his prior work for Plaintiff McLane.  Ex. 1., Excerpts of the March 21, 2023 Deposition of Phillip M. Johnson, Ph.D. ("Johnson Dep."), 215:11-216:1.  As before, Dr. Johnson analyzes the "At Home" market segment, which includes BJ's and other retailers. Johnson Rpt. ¶118; *see also* ECF 1535, at 3.

To determine whether Keurig raised prices above but-for levels (i.e. "overcharges"), Dr. Johnson specified two regression models, one for "branded" and one for "private label" Keurig-compatible cups.  Johnson Rpt., Figs. 8 & 9.  The structure of Dr. Johnson's branded regression model is largely the same as his regression model for McLane.  Johnson Dep. 215:11-215:1.  As previously described, Dr. Johnson estimates overcharges on branded compatible cups with a yardstick model using available JBR OneCups and Mother Parkers Compatible Cups as the benchmark.  *See* ECF No. 1535, at 2; Johnson Rpt. ¶126.  He also controls for non-conduct related factors, year-quarter fixed effects, cost, brand value, beverage-type, package size, roast type, special blends, and whether the coffee is organic, decaf and/or flavored.  *See* ECF 1535, at 2-3; Johnson Rpt. ¶¶119-126.[1]

Dr. Johnson uses bagged coffee prices, which vary over time, as a proxy variable for quality and "to account for brand differences." Johnson Rpt. ¶122; *see also* Johnson Dep. 79:8-80:18.  Dr. Johnson further includes in his regression model an interaction variable to allow for overcharges to be related to brand value.  Johnson Rpt. ¶¶127, 132; *see also*  ECF 1535, at 2-3.  The branded model produces an average estimated overcharge of ███████████ at a statistically significant

---

[1]  Keurig misleadingly asserts that Dr. Johnson's model only includes (1) bagged coffee, (2) manufacturing costs, and (3) "irrelevant product characteristics such as dark roast or light roast."  *See*  Mot. at 3. As to the latter, Keurig does not explain the basis of its assertion that product characteristics are irrelevant and it does not move to exclude Dr. Johnson's opinions on this basis. Similarly, Keurig throughout the Motion refers to Dr. Johnson's overcharge results as "price differences" again without explanation and without offering this as a basis to exclude any part of the opinion. *See, e.g.,* Mot. at 11.  The Court should ignore these gratuitous characterizations as unsupported and unrelated to the merits of Keurig's arguments as presented.

level.  Johnson Rpt., ¶¶131-132 & Fig. 8.

Dr.  Johnson's private label regression model is similar to his branded regression model except that it uses TreeHouse's private label products instead of JBR and Mother Parker's branded products as the benchmark.  Johnson Rpt. ¶¶126, 129. Moreover, the bagged coffee "brand" and interaction variable is not included.  Id. ¶129; Johnson Dep. 27:19-28:7.  Keurig's Motion does not challenge Dr. Johnson's private label model on account of these differences.  The private label model produces an average overcharge of ███████ at a statistically significant level.  *Id.* ¶¶131-132 & Fig. 9.

Dr. Johnson tested the reliability, robustness, and plausibility of both his branded regression and his private label regression results with statistical techniques.  ¶¶135-144 & Figs. 10-12; Johnson Dep. 185:1-186:15; *id.* 215:11-216:1 (explaining that differences in the robustness and sensitivity checks performed in the McLane and BJ's matters are attributable to differences in the available data and criticisms made by Keurig's experts).  As before, Dr. Johnson used Keurig's margins data to perform a plausibility check that further supported his results. Johnson Rpt. ¶133; *see* ECF 1535, at 3. Dr. Johnson considered and responded to the various criticisms made by Keurig's experts, in some cases performing additional statistical and other checks which he found to be consistent with his earlier conclusions.  *See* Keurig Exhibit 2, Johnson Reply Report ("Reply Rpt.") ¶¶13-85. These statistical tests and analyses supported Dr. Johnson's conclusion that his models are properly specified and produce plausible overcharge results attributable to Keurig's conduct.  Johnson Rpt. ¶144; Reply Rpt. ¶152.

## LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence as guided by *Daubert* requires the Court to examine (1) an expert's qualifications; (2) the reliability of an expert's methodology; and (3) the helpfulness of the opinions to the trier of fact.  *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S.

527, 529 (2013).  The focus is on the appropriateness of the expert's methodologies and not the factual sufficiency of the assumptions or correctness of the conclusions.  *Id.* at 595; *see Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("Although expert testimony should be excluded if it is speculative or conjectural, or it is based on assumptions that are so unrealistic as to suggest bad faith or be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of testimony"); *Cedar Petrochems, Inc. v. Dongbu Hannong Chem Co.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) (same). It is not the role of the Court to resolve disputed facts.  *See, e.g., Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1378, 1392  (Fed. Cir. 2003)  ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony.").  If an expert's testimony is within "the range where experts might reasonably differ," the jury decide[s] among the conflicting views of different experts." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999); *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2303727, at *13 (S.D.N.Y. June 11, 2021) (stating that a "battle of the experts" is not a *Daubert* issue).

## **ARGUMENT**

Keurig does not—and cannot—argue that Dr. Johnson lacks qualifications to render an opinion on overcharges.  Nor does it—or could it—argue that Dr. Johnson's yardstick models are inappropriate methodologies for measuring overcharge.  It instead argues that the models should have been modified to add additional variables, should have used a benchmark other than unlicensed compatible cups, and that certain of the results when disaggregated from the models are not plausible. These arguments repeat and/or repurpose Keurig's prior baseless arguments directed to Dr. Johnson in the McLane matter and fail for the same reasons – i.e. they largely

assume disputed facts and are directed to the weight of Dr. Johnson's overcharge results, not the admissibility of his methodologies. *See Daubert*, 509 U.S. at 596.

## I.    DR. JOHNSON'S MODELS ARE PROPERLY SPECIFIED

Dr. Johnson regressions includes supply and demand factors and other non-conduct related differences, including cost, brand, size, and product characteristics. Johnson Rpt. Id. ¶¶119-126. Keurig argues that Dr. Johnson's models are nevertheless so fundamentally flawed as to be worthless because it was not specified to additionally include: (1) "the possibility that consumers *might* attribute value to the *Keurig* brand," (2) "that they *might* prefer 'Keurig's airtight pack design . . . over the packs used in the [branded] benchmark," or (3) "numerous other lawful factors that *might* explain prices" which Keurig in the Motion argues as "different business approaches" between Keurig and JBR. Mot. at 3, 7 (emphasis added).

In any regression analysis there are always additional variables that could be considered and federal courts do not require a regression analysis to account for every conceivable factor to be admissible. *Bazemore v. Friday*, 438 U.S. 385, 400 (1987) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility"); *see e,g., In re High Pressure Laminates Antitrust Litig.*, 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) (noting that an argument that the expert "fails to account for relevant explanatory variables impacting price" is "specifically the kind of objection[s] that can be raised to a jury during cross-examination.").

Where a party challenges a regression for failure to include a variable, that party must first "make a showing of relevance for each particular variable it contends plaintiffs ought to include." *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 24 (2d Cir. 1988); *Palmer v. Schultz*, 815 F.2d 84, 101 (D.C. Cir. 1987) ("[A] defendant cannot rebut statistical evidence . . . without *introducing evidence* to support the [inclusion] of the missing factor.") (emphasis added).  It must also show that inclusion of the variable is realistically "measurable" or "quantifiable." *Bazemore*, 478 U.S. at 400 (Brennan

J., concurring and joined by all members of the Court); *EEOC v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 457-58 (S.D.N.Y. 2004). Finally, the omitted variable must be so significant or "major" that without it the results of the regression necessarily lack probative value. *Sobel*, 839 F.2d at 36. Keurig's authorities are in accord. *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 428 (S.D.N.Y. 2005) (noting that expert failed to "introduce *any* independent variables into his analysis"); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 145 ( S.D.N.Y. 2006) (explaining that while questions of variables ordinarily go the weight, the absence of a "major" variable may in some cases rise to the level of making the outcome of the regression irrelevant).[2]

As described below, Keurig does little to establish the relevance of any putatively omitted variables and is silent as to their significance or how they could be incorporated. These arguments do not rise to the level or supporting a finding that Dr. Johnson's results are "speculative or conjectural" or based on assumptions "so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *See Boucher*, 73 F.3d. at 21.

A.  **Keurig's Logo** ▌███████████████

Keurig argues that in addition to controlling for coffee brand value, Dr. Johnson should have also controlled for the potential incremental value of the Keurig logo. Mot at 5. Keurig's experts have not offered any means by which to reduce this purported brand value to a regression. This argument is necessarily directed to weight rather than admissibility. *Sobel*, 839 F.3d at 36.

Dr. Johnson explained why he determined ████████████████████████ that customers associated with the Keurig logo on compatible cups:

---

[2] *See also Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 449-50 (2d Cir. 1999) (regression omitted a readily available, significant, measurable and major variable); *Cannon v. BP Prods. N. Am., Inc.*, 2013 WL 5514284, at *7 (S.D. Tex. Sept. 30, 2013) (expert analysis depended on unsupported assumptions and contained a structural modeling error); *Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010) (discussing "four page skeletal" report proposing at class certification potential approaches that could be used for damages). To the extent that Keurig relies *Freeland* for any other standard or burden that reliance is misplaced and against the weight of the authority. *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62-63 (2d Cir. 2020) (rejecting pre-trial "omitted variable' challenge under the *Bazemore* standard); *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 2019 WL 1515231, at *11 (E.D.N.Y. Feb. 21, 2019) (same); *E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 457 (S.D.N.Y. 2004) (denying *Daubert* where moving party "agrees that the variables it identifies as missing are not objectively quantifiable")..



Johnson Rpt. ¶125.  In fact, the evidence was to the contrary.  Dr. Johnson cited to numerous

Keurig documents in the record in which ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ *Id.* at

n.252 (*inter alia* ████████████████████████████████

██████████████████████████████████ ; *see* also Reply Rpt. ¶¶51-71;

ECF No. 1535, at 11-12.

  .      Keurig simply ignores this, offering nothing but purported "admissions" by BJ's experts to

the effect that ██████████████████ *See* Mot. at 5.  But these statements referenced

*brewers* and not portion packs.  *See* Mot. at 5 █████████████████████

███████████████████████████████████████████

(emphasis added); Keurig Ex. 3, Leitzinger Rpt. ¶25 ("Second, evidence indicates that ████

█████████████████████████████████ (emphasis added).

For his part, BJ's witness simply responded to ████████████████████



█████████████████████████ Dr. Johnson in the cited passages explained that █████

███████████████████████████████████ does not automatically translate to a price

premium for portion packs.  Johnson Reply Rpt. ¶65 (explaining that a ███████████ "is not

the same thing as a brand premium for Compatible Cups"); Keurig Ex. 5, Johnson Dep. 139:21-

23 ("I don't think you can make a general statement that any logo on a product has some value

that's associated with that logo that's substantial."); *see also* Reply Rpt. ¶67 (discussing evidence

of ██████████████████████████████████████ These non-Keurig

"admissions" are wholly insufficient to establish the existence of a significant Keurig brand value

over █████████████████████████ *See Sobel*, 839 F.2d at 34.

Moreover, Keurig does nothing to explain its assertion that any value consumers attributed

to the Keurig logo resulted from lawful conduct by Keurig.  Dr. Johnson's analysis shows that █

████████████████████████████████████████████████████████

██████ Johnson Rpt. ¶125.  As this Court is aware, part of Keurig's allegedly anticompetitive

conduct includes ████████████████████████████████████████████

████████████████████ *See* ECF No. 1564, at 90-91, *e.g.* PSUF 1667 ███████

████████████████████████ To the extent consumers viewed the Keurig

logo ████████████████████████████████████████████ any

associated premium would not be lawful. This is a factual matter for the jury to decide. *See Micro*

*Chem.,* 317 F.3d at 1392.

 Finally, Keurig does not even attempt to argue that its brand value (if it existed at all) was

"significant" or "major" or that it could be measured or quantified. Dr. Johnson's models are

reliable and admissible.  *See* EEOC 324 F. Supp. 2d at 457-58.

### A.    Dr. Johnson Did Not Have to Further Control For JBR's Mesh Cup Design

Keurig repeats its prior arguments that Dr. Johnson should have accounted for differences

in the cup design between Keurig and JBR. Mot. at 6; *see* ECF No. 1535, at 12-13. This argument applies only to Dr. Johnson's branded regression model. Here, Dr. Johnson controlled for manufacturing costs which accounts for the different design on price. Johnson Rpt. ¶122. This variable also relates to differences in product quality. Id. Dr. Johnson has explained that it would neither be possible nor necessary to further control for the fact that JBR's cup uses mesh instead of plastic. Johnson Dep. 61:2-9; 58:17-60:15 (explaining that there are some "advantages and disadvantages" to the JBR product, but the JBR One Cups look and perform similar and in the end "[t]hey still go in the same Keurig brewer and produce the same – or the same class of product out of that."); Reply Rpt. ¶66 ██████████████████████████████████████████

██████████████████████████████████████████████████████████

Keurig does not argue that Dr. Johnson's manufacturing cost variable inadequately captures design or quality differences. And as before, Keurig makes no showing that this design difference is a measurable, quantifiable, significant, or major aspect to the price of cups over and above the cost and quality which Dr. Johnson included. Its support consists only of marketing materials in which ████████████████████████████████████████

████ *See* Mot. at 6. As previously established, Keurig itself █████████████████████

███████████████████████ *See* ECF No. 1535, 12-13. To the contrary, Keurig recognized ███

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████ Johnson

Rpt; ¶¶113-114; Reply Rpt. ¶¶66-67; *see* ECF No. 1535, at 13-14. Keurig even ██████████

█████████████████████ *See* ECF 1624, Ex. 939

███████████████████████ at slides 9 & 15. Keurig's argument that Dr. Johnson should have further controlled for JBR's mesh design lacks any empirical support and goes to the weight and

not the admissibility of the opinion.  *See* EEOC 324 F. Supp. 2d at 457-58.

**B.**     **Dr. Johnson Did Not Have To Control for Undefined JBR "Business Strategies"**

Keurig previously argued that features of JBR and Mother Parker's sales made them inappropriate as benchmarks.  *See* ECF 1454, at 10-11.  It now instead raises for the first time that Dr. Johnson should have *controlled for* JBR's different "business strategies" as applicable to Dr. Johnson's branded regression model.  Mot. at 7.  The nature of this putative business strategy is unclear and Keurig offers no explanation of either JBR's or Keurig's respective business strategies. It instead points predominantly to data from the McLane case presented in the context of its former yardstick argument showing that ███████████████████████████████ and the statement that ███████████████████ Id.  It also asserts that "JBR is primarily a West Coast brand" on the basis that JBR, which is based in San Francisco, was better known there. Id. at 1.  Keurig's own expert did not advance a "business strategy" variable or assert one could be measured, quantified or would affect Dr. Johnson's model.  The Court cannot find a significant omitted variable on this showing.  *Sobel*, 839 F.2d at 24.

Dr. Johnson previously explained the lack of significant differences between JBR and Keurig for purposes of JBR as a yardstick and his response to Keurig's assertions of JBR's appropriateness as a yardstick there and the lack of a significantly different product design here suffice to establish that differences ███████████████ are not a significant or major factor necessary to keep the regression from being "worthless."  These reasons (as above) are that ███ █████████████████████████████████████████████████████████ █████████████████████ Johnson Rpt;¶¶113-114; Reply Rpt. ¶¶66-

67; *see also* ECF No. 1535, at 13-14; ECF 1624, Ex. 939 (███████████████████)[3]

As with its other "omitted variable" arguments, Keurig here offers no means by which to conclude that this purported business strategy difference exists, that is it is relevant, that it is significant, and/or that it can be reduced to a measurable and quantifiable regression variable. Keurig's arguments go to weight and not admissibility and are for the jury to decide. *See EEOC* 324 F. Supp. 2d at 457-58.

## II.   DR. JOHNSON'S BRANDED REGRESSION MODEL APPROPRIATELY ACCOUNTS FOR BRAND VALUE

Dr. Johnson's branded regression model uses a bagged coffee variable as well as costs to account for coffee brand value. Johnson Rpt. ¶122. Dr. Johnson in his report explained his inclusion of the bagged coffee variable and its statistical significance in the regression. Johnson Rpt. ¶¶122-124, 130. In his reply, he addressed in detail various criticisms and performed additional statistical tests on the model from which he concluded that "my overcharge analysis controls appropriately for roaster brand value." Reply Rpt. ¶¶34-51, & Figs. 6-11. In particular, Dr. Johnson performed tests to contrast the actual and predicted but-for prices relative to bagged coffee prices in the model. Reply Rpt. ¶38 & Figs. 7 & 8. As with a similar test in the McLane matter, a comparison of the results revealed differences in the Keurig brand prices relative to others and support the inclusion of the bagged coffee variable and the results of the regression. Id.; *see* ECF No.1535, at 18-19. Based on these additional analyses, Dr. Johnson concluded that

---

[3] Additionally, according to Keurig's motion in the McLane matter, its expert there did not identify ██████ as JBR's largest customers; instead he identified ███████████" as JBR's largest customers. *See* ECF No. 1455, at 11 (emphasis added). As Keurig well knows, ████ is an east coast retailer and was a large customer of both JBR and Keurig before Keurig's introduction of the 2.0 brewer. *See* Johnson Rpt. ¶6; Keurig Ex. 6 (Murphy Ex. 27 showing ████ purchases). It is telling that Keurig now seeks to remove this evidence of similar "business strategy" and sales on the east coast from its arguments, particularly an example that shows that JBR's sales distribution if different than Keurig's is at least in part attributable to Keurig's conduct and not to any business strategy by JBR. *See* ECF No. 2102, at 5; PSUF 2022-2024.

the bagged coffee variable was appropriate and should continue to be used. Id. ¶122 ("As detailed throughout this report, my bottom line conclusion of overcharges to BJ's survives this barrage of tests."); *see also* n.55 (noting that "I prefer to use the bagged coffee variable as it is not derived from Compatible Cup prices.").

Keurig asserts that Dr. Johnson's bagged coffee control performs "poorly."  Mot. at 8.  It then argues that a "new purported control" based on brands tiers that is introduced by Dr. Johnson as a "fix" for this "problem" is itself inadequate. Mot. at 9.  These arguments by definition go to the weight and not the admissibility of the model.  *See In re High Pressure Laminates*, 2006 SL 931692, at *1 (an argument that the expert "fails to account for relevant explanatory variables impacting price" is reserved for the jury).  Keurig moreover mischaracterizes the nature of Dr. Johnson's brand tier regression alternative.

In the first place, Dr. Johnson in no way abdicated or sought to fix his branded regression model.  Second, Keurig's assertion that bagged coffee is a "poor" control derives from its own expert's opinion, based on his use of a statistical technique in which he removed control variables sequentially and then baselessly concluded that the lack of significant change to the overcharge coefficient from the absence of a variable meant the control lacked value.  *See* Ex. 2, Dec. 19, 2022 Expert Report of Keith R. Ugone, Ph.D. ("Ugone Rpt."), ¶95 n.108.  In doing so, Dr. Ugone ignored the instruction from the authors of this technique which advised that the lack of significant change to the coefficient means the control has value, an error already identified in one of the numerous *Daubert* motions directed to Dr. Ugone in this MDL.  *See* ECF No. 2089, at 3-5.[4]  Dr.

---

[4] In a footnote, Keurig also asserts the bagged coffee control as inappropriate because it is not perfectly correlated with prices for compatible cups.  Mot. at n.2. Dr. Johnson found statistically that bagged coffee and compatible cup prices were correlated.  Johnson Rpt. Fig. 9; John Reply ¶44. Keurig offers neither evidence that the variables are not correlated nor authority supporting that the control must be perfectly coordinated.  And such an argument by definition goes to the weight of the regression's results and not its inadmissibility, as explained above.

Johnson additionally rebutted this conclusion with his own statistical tests.  Reply Rpt. ¶38 & Figs. 7 & 8.  Keurig does not argue that these test were inappropriate or erroneous and it raises only a "battle of the experts" in any event.  *See Kumho Tire* 526 U.S. at 153  (re "battle of the experts").

Dr. Johnson also ran a sensitivity test using a brand tier control instead of the bagged coffee control.  Id. ¶122; Johnson Dep. 187:24-189:9 (". . .and so I put it in this model to say, okay, let's use a different way of looking at brand value and see if the results, the damages are sensitive to that change.  And so this is a sensitivity . . . .).  Dr. Johnson reviewed Keurig documents which revealed that Keurig business people tiered brands by price and considered brands within each tier "to be competitive and roughly comparable."  Reply Rpt. ¶¶ 47-50.  Dr. Johnson used Keurig's pricing approach to create brand tiers "consistent with the brand tiers featured in Keurig's documents."  Id. ¶47; Johnson Dep. 192:11-194:2 ("The tiers – this approach was, you know, based on a way that Keurig seemed to categorize them in some documents. . . .").   Contrary to Keurig's suggestion (at 9), Dr. Johnson did not assume that brands within tiers had equal value. Id.  Dr. Johnson found that the alternative test produced "results [which] are consistent with and support the overcharges I found using the bagged coffee variable."  Reply Rpt. ¶51.

While Keurig summarily questions the conclusions Dr. Johnson reaches based on his brand tier approach, it does not overtly assert that the tiered alternative is an inappropriate concept or methodology.  Instead, it criticizes Dr. Johnson for not having a subjective opinion about the individual brand values.  Mot. at 9.  Keurig offers no evidence or explanation that any brand in any tier is not fairly comparable, incorrectly placed as based on price, or inappropriate as a control. Its argument instead presumes that licensed and unlicensed products could not possibly be comparable to consumers, an assumption disproven by Keurig's own internal methodology and documents and by other evidence regarding the comparative prices of bagged coffee, which show

that where there is competition licensed bagged coffee is often comparable to or higher priced than Keurig and Keurig-licensed brands. Johnson Reply Rpt. ¶¶54, 80.  Regardless, criticisms such as these go to the factual basis for an expert's application of the methodology and are quintessentially for the jury to decide.  *See Cedar Petrochems,* 769 F. Supp. 2d. at 286.

## III.   DR. JOHNSON'S MODELS DO NOT USE A FLAWED BENCHMARK

Dr. Johnson's benchmark data comes from available transactional data involving the sale of unlicensed compatible cups which competed with Keurig and its licensed partners for use in Keurig brewers.  Johnson Rpt. ¶¶106-119.  Keurig argues that the use of unlicensed compatible cups as a benchmark is categorically unreliable because of the potential effect on competitors by Keurig's own conduct.  Mot. at 10.  But benchmarks do not have to be perfect and finding a perfectly comparable benchmark is often "impossible" where, as here, "the alleged monopoly prevents comparable firms from operating within its market."  *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015).  As a matter of policy, Keurig's argument also proves too much, giving anticompetitive actors a free pass whenever their conduct has impacted competition, which is when redress is most needed.  *See Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)).  For these reasons, objections to a benchmark are properly addressed to weight and not admissibility of the regression model.  *DPWN Holdings (USA), Inc. v. United Air Lines*, 2019 WL 1515231, at *10 n.6 (E.D.N.Y. Feb. 20, 2019).

In any event, the fact that Keurig's conduct affected pricing market-wide means that calculated overcharges are *understated* – not *unreliable*.  *See* Johnson Rept. at n.208 (discussing "umbrella effect" in which competitors price higher than they would have but for the anticompetitive conduct) (citing Roman Inderst, Frank Maier-Rigaud, and Ulrich Schwalbe, "Umbrella Effects," *Journal of Competition Law & Economics* 10 (2014)); *see, e.g., In re*

*Processed Eggs Products Antitrust Litig.*, 312 F.R.D. 171, 195 (E.D. Pa. 2015) (rejecting the argument that competitor data is inappropriate as "tainted" where the effects would make the results more conservative, if anything).  The cases cited by Keurig are unavailing.  *See In re Libor-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 43, 437 (S.D.N.Y. 2018) (discussing non-Yardstick models which found "backwards" results – i.e. harm in clean periods and no harm in harm periods); *In re Wholesale Grocery Prods. Antitrust Litig.*, 2018 WL 3862773, at *8 (D. Minn. Aug. 14, 2018) (rejecting benchmark for model where expert "failed to validate the foundational premise of his benchmarking model" that the benchmark firm had prices similar to that of the defendants).

Keurig's experts to-date have not proposed or suggested any other benchmark that is available or could be used. Keurig's arguments go to the weight of the unlicensed compatible cups as the benchmark and not reliability of the model.  *DPWN Holdings*, 2019 FL 1515231, at *10. To hold otherwise, would allow Keurig to escape liability merely because its anticompetitive scheme succeeded.  *See Bigelow*, 327 U.S. at 264.

## IV.   DR. JOHNSON'S OVERCHARGES FIT THE CASE

Keurig next argues that Dr. Johnson made "no attempt to understand the facts of BJ's purchases or to ensure that his opinions are 'sufficiently tied to the facts of the case.'" Mot. at 11. This argument is first belied by Dr. Johnson's own assignment and report, over half of which is dedicated to analyzing BJ's allegations and purchases and which addresses the likely impact on the market generally and BJ's specifically.   Johnson Rpt. ¶¶11-104.  From this analysis, Dr. Johnson concluded that "but for the alleged conduct, Keurig would have been on a more level field with competitors and its prices would have been lower." Id. ¶104.  He then constructed a regression model to measure the anticompetitive conduct he saw, using unlicensed manufacturers without monopoly power as the benchmark.  Id.

Keurig does not challenge this analysis, but instead compares results from a disaggregation of Dr. Johnson's model over time to its own non-expert calculation of purported price trends based solely on BJ's purchases, and then argues that Dr. Johnson's opinions are unreliable because he stated at his deposition that he was not retained to tell an overcharge story with annual overcharges or with this evidence in this manner.  Mot. at 11-12.  Indeed, Keurig's statement that "when **Dr. Johnson** runs his models separately for each year" they get different results is completely false as Keurig cites to its own expert's disaggregation.  *Id.* (citing Keurig Ex. 6, Ugone Rpt.) (emphasis added).  Dr. Johnson has explained that he finds such disaggregation "misleading and inappropriate" because the results necessarily differ based on the different data used when disaggregated and the model was not designed to compute year-specific overcharge estimates. Johnson Dep. 127:4-131:21; 175:7-180:3.  In any event, Keurig can neither impose an obligation on Dr. Johnson to disaggregate his overcharge results or change his model nor require that he attempt to tell a story based on such a robustness check.

Keurig's argument is moreover legally erroneous because it asserts as the lack of "fit" the existence of an increasing overcharge during a ███████████████ Keurig of course presents no authority for the proposition that ████████████████ negates the possibility of overcharges. This Court has already explained that the relevant inquiry is not prices as they were, but prices as they would have been. *See In re Keurig Green Mtn. Singleserve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 215-216 (2020) ) (stating that the nature of the injury is paying higher prices "than they would have paid in the absence of the conspiracy"). Indeed, Keurig's own documents discuss ██████████████████████████████████████████████████████ *See* ECF No. 2202, at 13-14, PSUF 1914, 1915.  In one example, Keurig even explicitly explains that ███████████████████████████████████████████



Nor does Keurig explain how it is wholly impossible that overcharges could have ████

████████ It asserts as a lack of "fit" that overcharges could not plausibly ███

██████ because "much of the alleged conduct took place prior to 2015."  Mot. at 11-12.

Keurig offers no explanation or authority for the proposition that conduct must have an immediate

effect on the market.  Keurig does not dispute that there are allegations of anticompetitive conduct

beyond 2015, such as Keurig's success in ███████████████████████████

████████████████ ECF No. 2202, at 5-6; PSUF 2033, 2034.  This example

is not meant to suggest that the premise of Keurig's argument has any merit, but is offered to

demonstrate why Keurig's argument necessarily relies on undeveloped and/or disputed factual

assertions which are inappropriate for resolution by the Court.  *See, e.g., Micro Chem.*, 317 F.3d

at 1392  (Fed. Cir. 2003).

Finally, if the above deficiencies were not enough, Keurig does not even offer probative

evidence of price trends.  Keurig here relies on the same misleading, erroneously calculated, and

overly simple comparison of BJ's average purchase prices in 2012 and in 2019 that it presented in

support of summary judgment. *See* ECF No. 2202, at 8-19.  As explained there, this comparison

not only seeks to disguise the ███████ between those dates, but it also fails to account for

17

the difference in price attributable to the different product mix (i.e. differences in average price due to differences in what was purchased as distinct from changes in average price that reflect a change in the purchase price of similar purchases).  Id.  For that very reason, Keurig's own export would not endorse this "evidence."  *See* id. and id. Ex. 30 (Ugone Dep.) (explaining that ████

████████████████████████████████████████████████████████████████████████

██████████████████████  Here, Keurig's argument is legally and factually erroneous in numerous respects, including its attempt to attribute an opinion to Dr. Johnson that he did not offer. The probative value of Dr. Johnson and Dr. Ugone's respective work and conclusions is for the jury to decide. *See Daubert*, 509 U.S. at 596; *Kumho Tire* 526 U.S. at 153 (re "battle of the experts.").

## V.   DR. JOHNSON'S BRANDED REGRESSION MODEL DOES NOT PRODUCE IMPLAUSIBLE RESULTS

Finally,  Keurig makes two last-ditch arguments that two isolated aspects of Dr. Johnson's results are not plausible when disaggregated from his model and viewed in isolation by its own expert.  These arguments are both directed to Dr. Johnson's branded regression model and not his private label model.  This disaggregation is the same one that Dr. Johnson has explained and which is laid out above that change the output and present the results in a way he finds misleading. Johnson Dep. 127:4-131:21; 175:7-180:3.  Here again, Keurig's argument presents a "battle of the experts" directed to the weight and not the admissibility of Dr. Johnson's opinion.  *See DPWN Holdings,* 2019 WL 1515231, at *8 (Arguments that a "model leads to impossible results . . . goes to its weight and not admissibility.").

Keurig first claims that Dr. Johnson's results are implausible as to Mother Parker's compatible cups.  Mot. at 12.  Dr. Johnson however did not find an overcharge on Mother Parker's compatible cups, Keurig's expert Dr. Ugone did when he attempted to disaggregate the model and

thereby changed the results. *See* Id. (citing Ugone Rept. ¶¶72-74). Even then, this "overcharge" is very small compared to Keurig which has an overcharge four times larger and the effect of this overcharge if it could be said to exist in Dr. Johnson's model has the effect of understating the amount of any calculated overcharge. Johnson Reply Rpt. ¶¶21-25 & Fig. 4; *see* Johnson Rept. at n.208 (discussing "umbrella effect" in which competitors price higher than they would have but for the anticompetitive conduct). As discussed above in Keurig's similar "tainted benchmark" argument, Keurig has offered no other benchmark and it is appropriate to include market participants potentially affected by the alleged conduct in these circumstances. *See, e.g., In re Processed Eggs*, 312 F.R.D. at 195 (rejecting argument that competitor data inappropriate as "tainted" where the effects if anything would make the results more conservative). Keurig's experts have not offered any alternative.

Keurig also summarily asserts as "implausible" the very idea that in a but-for world of free competition its Green Mountain branded cups might have a lower relative price than unlicensed cups like Brown Gold. Mot. at 13. It relies here on its expert's disaggregation of Dr. Johnson's results which shows a distribution of overlapping prices in which some Keurig brands are on average above competitor brands and some are on average below competitor brands. *See* Keurig Ex. 6, Ugone Fig. 4. Setting aside the fact that this disaggregation alters the results, Dr. Johnson has explained that he would "expect" this result in a but for world in which Keurig and its unlicensed competitors have prices that are more similar. Reply Rpt. ¶80. He even explained that based on his review, a number of competitor brands of bagged coffee, including Brown Gold, sold at prices that were higher than numerous Keurig brands and that it is therefore "not unrealistic that, but for the anticompetitive conduct, some competitor cups would have sold for more than Keurig cups." Reply Rpt. ¶81. Keurig does not even try to explain its argument to the contrary.

Nor does Keurig even attempt to explain how or why either of these "implausible" results condemn the models.  Its arguments appear to implicitly rely on the same unsupported assumption that the Keurig logo and/or licensed brands are necessarily better quality and or higher priced than unlicensed brands which underlie its previous omitted variable arguments.  Neither of these arguments rise to the level of asserting that Dr. Johnson's results are "speculative or conjectural" or based on assumptions "so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."  *See Boucher*, 73 F.3d. at 21.  As with its other arguments, Keurig does not raise issues appropriate for resolution by *Daubert* but at most factual issues and assumptions for the jury which go to the weight of the opinions.  *See DPWN Holdings*, 2019 WL 1515231, at *8.

## CONCLUSION

For the foregoing reasons, Keurig's Motion should be denied.

Dated: Aug. 11, 2023

COUNSEL FOR PLAINTIFF
BJ'S WHOLESALE CLUB, INC.:

**CADWALADER, WICKERSHAM
& TAFT LLP**

By*: /s/ Philip J. Iovieno*
**Philip J. Iovieno**
200 Liberty Street
New York, NY 10281
Telephone: (212) 504-6000
*philip.iovieno@cwt.com*

**Gregory W. Langsdale
Kristen J. McAhren**
700 Sixth Street, NW
Washington, DC 20001
Telephone: (202) 862-2200
*gregory.langsdale@cwt.com*
*kristen.mcahren@cwt.com*