**Exhibit K**

# HOW EXCLUSIVITY IS USED TO INTENSIFY COMPETITION FOR DISTRIBUTION— REPLY TO ZENGER

Benjamin Klein
Kevin M. Murphy*

In a recent article in this *Journal*,[1] Hans Zenger extends our model where distributors, acting as agents for their customers, obtain price discounts by having suppliers competitively bid for exclusivity.[2] Zenger modifies our model by assuming that relative consumer product preferences are not "symmetrical" and therefore that competing suppliers are not of equal size, claiming that in these more common circumstances the procompetitive effect of competition for exclusive distribution is reduced; and in some limited cases, when one supplier's products are overwhelmingly dominant, Zenger's model indicates that the procompetitive efficiency gains from competition for exclusivity may vanish and result in lower consumer surplus.

Zenger's analysis accepts but does not fully take account of the primary economic insight of our article—that distributors without market power often have the ability to shift the share of sales in a product category in favor of one or another supplier. Because of this ability to "cancel out" individual consumer product preferences and induce some consumers to purchase a particular supplier's product, suppliers face an increased elasticity of demand and distributors therefore can negotiate lower prices. The simple, symmetrical product preferences model we presented in our article was used to illustrate these fundamental economic forces, not to describe all the circumstances where these forces operate.

---

* The authors are, respectively, Professor Emeritus of Economics, UCLA, and Senior Consultant, Compass Lexecon; and George J. Stigler Distinguished Service Professor of Economics, University of Chicago.

[1] Hans Zenger, *When Does Exclusive Dealing Intensify Competition for Distribution*, 77 Antitrust L.J. 205 (2010).

[2] Benjamin Klein & Kevin M. Murphy, *Exclusive Dealing Intensifies Competition for Distribution*, 75 Antitrust L.J. 433 (2008).

When consumer product preferences are asymmetrical, it often will be in the distributor's interest not to set up the competition for distribution as head-to-head bidding for a full exclusive since a small supplier, whose products are preferred by relatively few consumers, will not be able to bid effectively for 100 percent of the distributor's sales. However, there is no reason for a distributor that has the ability to shift sales between suppliers to tie its hands and set up the bidding for distribution in this way. The distributor can do even better for its customers by arranging the competition between suppliers in a way that takes account of asymmetries, specifically by having suppliers bid for an exclusive over the incremental sales that the distributor can most easily shift between suppliers. The distributor may do this, for example, by having competing suppliers bid not for exclusive distribution but for exclusive distributor promotional efforts; alternatively, the distributor may have only the larger firm bid for exclusive distribution while the smaller firm competes for increased distributor efforts that result in a similar amount of incremental sales and hence a greater sales share.

All of the specific contractual arrangements described in detail in our article involved these types of distributor exclusivity commitments regarding incremental sales, which have the effect of converting asymmetrical consumer preference cases to the symmetrical preferences case we explicitly modeled. Our economic analysis of the procompetitive effects of exclusive distribution arrangements therefore is broadly applicable in a wide variety of asymmetrical preference cases.

## I. THE ABILITY OF DISTRIBUTORS TO SHIFT SALES

The fundamental economic effect we describe in our article, where distributors act as bargaining agents for their customers by committing to move significant incremental sales between suppliers in exchange for price discounts, requires that distributors have a significant group of loyal customers who will shift their purchases to the distributor's chosen supplier. This ability to shift incremental sales and thereby negotiate lower prices for their customers does not mean that the distributor possesses any market power; in fact, distributors in highly competitive distribution markets often possess this ability.

For example, supermarkets actively compete with one another for customers in terms of their prices, product variety, service, and locational convenience and face highly elastic demands with regard to this overall product package. But because there are not an infinite number of stores supplying every possible package combination, supermarkets do not face perfectly elastic demand curves. Each supermarket's customers obtain varying, often significant, amounts of consumer surplus from shopping at their preferred supermarket. Therefore, it is unlikely that many consumers will switch the supermarket at which they do most of their shopping merely because their

particular preferred brand of one product, e.g., spices, is not carried by the supermarket.

In these circumstances supermarkets have the ability to shift some or all of their customers' purchases to a chosen spice supplier. This is what occurred in *McCormick*,[3] one of the cases discussed in our original article, where in return for McCormick's price discounts supermarkets made the partial exclusivity commitment of devoting a large share (in some cases as much as 90 percent) of the shelf space they allocated to spices to McCormick products.

## II. ASYMMETRICAL PRODUCT PREFERENCES

*McCormick* is an example that appears to fit Zenger's assumption of asymmetrical product preferences. McCormick was the dominant supermarket spice supplier at the time of the FTC investigation, with its various well-known brands "accounting for the majority of [supermarket] sales nationally" and facing "competition in such sales from only one other national firm . . . and several much smaller independent regional or local firms."[4] Figure 1, based on Zenger's Figure 2 where α (the degree of asymmetry) is assumed equal to 0.5, illustrates this asymmetrical case, with A representing McCormick products and B representing the smaller spice manufacturing firms' products. Individual consumer preferences of product A relative to product B, $V_A$-$V_B$, rather than ranging from our article's symmetrical assumption of +$1.00 to –$1.00, now have an assumed range of +$1.50 to –$0.50. Therefore, if A and B are sold at the same price (e.g., $2.00, the non-exclusive price in our symmetrical preferences case), McCormick products would be preferred by 75 percent of consumers while other spice brands would be preferred by 25 percent of consumers.[5]

In this case of grossly unequal consumer preferences described by Figure 1, A can be expected to win competition for an exclusive. B will not be able to bid as effectively as A for 100 percent of the supermarket's sales since most consumers do not prefer B's products. Even if B dropped its price to marginal cost of $1.00, A would win the retailer's exclusive with a price only slightly below $1.50. This illustrates that when preferences are asymmetrical, bidding by suppliers for an exclusive will result in the larger, preferred product supplier winning the exclusive and also likely result in an increase in consumer

---

[3] McCormick & Co., FTC File No. 961-0050 (2000).

[4] FTC Complaint at 2, McCormick & Co., FTC File No. 961-0050 (2000), *available at* http://www.ftc.gov/os/2000/05/mccormickcmp.htm.

[5] Zenger's non-exclusive relative sales equilibrium in this asymmetrical case is 58 percent for A and 42 percent for B because the prices of A and B are not the same. In equilibrium A takes advantage of the greater consumer preference for its products to increase its price to $2.17, while the price of B is reduced to $1.83.




FIGURE 1: ASYMMETRIC PREFERENCES

surplus.[6] But under asymmetrical preference conditions the distributor generally can do even better for its customers by not having A and B both bid head-to-head for a full exclusive.

## III. COMPETITION FOR EXCLUSIVE INCREMENTAL SALES

When there are asymmetrical product preferences, an obvious thing a distributor may do to place A and B on a more equal footing, and therefore increase competition for distribution, is have A and B bid for an exclusive on the incremental sales the distributor can most easily share shift. These incremental sales are illustrated in Figure 1 by the cross-hatched "last 50 percent" of sales.[7] The competition between A and B for an exclusive over these incremental sales is totally analogous to the symmetrical preferences case we de-

[6] Zenger, *supra* note 1, at 210 n.13, concludes that consumer surplus increases under A exclusivity unless α, the degree of asymmetry, is greater than about 1.4. If α is greater than 1.0, every consumer prefers product A to product B; α equal to 1.4 involves the highly asymmetrical case where the range of individual consumer preferences, $V_A–V_B$, moves to +$2.40 to +0.40, so that every consumer significantly prefers product A to product B.

[7] These incremental sales are sometimes described as the "contestable" (as opposed to the "non-contestable") portion of sales.

scribed in our original article, with relative consumer preferences for A compared to B for these sales ranging from +$0.50 to −$0.50. And, under the assumptions of our original article, we could expect the price for these incremental sales to be driven down to the competitive price of $1.00.[8]

This competition for an exclusive over incremental sales is fully consistent with what occurred in the four supermarket cases we discussed in detail in our article. In two of the cases, *Harmar*[9] and *RJR*,[10] competition for exclusive incremental sales involved suppliers competing for a supermarket exclusive with regard to promotional sales. Specifically, *Harmar* involved competition by Coca-Cola and Pepsi-Cola for exclusives for a limited period over supermarket promotional activities, including exclusive price promotions, exclusive promotional shelf space (such as end-of-aisle shelving), as well as exclusive in-store displays and newspaper advertising. The supermarkets were not offering to exclusively stock either Coke or Pepsi (or R.C. Cola), which obviously would not have served the interests of their customers. The suppliers were bidding solely for the incremental sales to customers who did not have a very strong preference for either Coke or Pepsi, and who therefore could be induced to shift their normal purchases in response to a lower price and other supermarket promotional activity.

Similarly, *RJR* involved competition between Philip Morris and other cigarette manufacturers for promotional shelf space and signage in the display behind the checkout counter. Philip Morris was not offering discounts for supermarkets to exclusively carry, for example, Marlboro cigarettes. Instead, its Retail Leaders Program offered an increasing schedule of discounts based on the amount of advantageous (centrally located, eye-level) display and signage space provided. In many cases this program had the effect of inducing retailers to allocate all their prime display and signage space to Philip Morris products.

---

[8] There will also be downward pressure on the price of A's inframarginal sales. If B wins the competition for incremental sales, A will not be able to make the remaining 50 percent of inframarginal sales without reducing price to $1.50. The full equilibrium, including A's potential reaction and the distributor's response, depends on the assumptions made regarding the constraints of the contracting environment, the analysis of which is beyond the scope of this note. However, even if the distributor is assumed to be constrained to offer A a pricing arrangement in which A earns as much profit on inframarginal sales as it did previously, the distributor and its customers will still be significantly better off.

[9] Coca-Cola Co. v. Harmar Bottling Co., 218 S.W.3d 671 (Tex. 2006), *rev'g* 111 S.W.3d 287 (Tex. App. 2003).

[10] RJ Reynolds Tobacco Co. v. Philip Morris, Inc., 199 F. Supp. 2d 362 (M.D.N.C. 2002), *aff'd per curiam*, 67 F. App'x 810 (4th Cir. 2003).

Competition in the other two cases we discussed in our article, *Gruma*[11] *and McCormick*, resulted in a large fraction of the relevant supermarket shelf space and sales being allocated to the winning bidder. Specifically, Gruma bid for and obtained a large share of a supermarket's shelf space devoted to tortillas; and, as noted above, McCormick obtained a large share of a supermarket's shelf space devoted to spices. The court in *Gruma* emphasized that supermarket contracts with regard to the shelving of tortillas were continually open for competitive bidding and that the plaintiffs lost the competition due to their "own failure to compete for shelf space on the terms sought by retailers."[12] However, in *Gruma*, as well as in *McCormick*, there is no evidence that supermarkets would not have considered and accepted competitive bids by smaller rival brands for additional shelf space; and it was certainly in the supermarkets' interests to use the possibility of such competitive alternatives to obtain better contract terms from the winning bidder.

## IV. POSSIBLE ANTICOMPETITIVE EFFECTS

In all the cases we examined in our article, supermarkets received significant price discounts as well as lump-sum and other promotional payments contingent on specific supermarket commitments of either a minimum purchase share and/or shelf space allocation. Given competition among supermarkets, we can expect that a significant portion of these payments for partial exclusivity accrued to the benefit of consumers.

As recognized in the economic literature, however, competition by a dominant supplier for exclusivity sometimes may result in harm to consumers. Specifically, if a dominant firm obtains a sufficient share of efficient distribution so that rivals are essentially foreclosed from the market, this may lead to higher prices of A because B no longer exists to place a competitive constraint on A's pricing. These ultimate anticompetitive effects therefore may be A's financial motivation to bear the initial costs of paying for exclusive distribution.[13]

Zenger makes the point that the cost borne by A to obtain exclusive distribution, that is, the price discount A must offer to distributors in return for

---

[11] El Aguila Food Prods. v. Gruma Corp., 301 F. Supp. 2d 612 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005).

[12] *Gruma*, 131 F. App'x at 453. This may have been a case closer to symmetrical preferences because most consumers may not have had any specific tortilla brand preferences. However, although Gruma won the bidding for the exclusive by offering a category management contract where they made stocking decisions, Gruma decided to stock some of the products of other popular tortilla brands on shelves next to Gruma's brands. *Gruma*, 301 F. Supp. 2d at 630.

[13] Thomas G. Krattenmaker & Steven C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power over Price*, 96 YALE L.J. 209 (1986); Eric B. Rasmussen, J. Mark Ramseyer & John S. Wiley Jr., *Naked Exclusion*, 81 AM. ECON. REV. 1137 (1991).

exclusive dealing, decreases as asymmetry increases. The price A can charge and still win the competition with B for exclusivity is higher if fewer consumers prefer product B to product A. For example, in our original case of symmetrical individual consumer product preferences that range from +$1.00 to –$1.00, A must reduce price to $1.00, or marginal cost, to obtain exclusive distribution; alternatively, if there are asymmetrical consumer preferences as described in Figure 1 that range from +$1.50 to –$0.50, A need only reduce price to $1.50 for exclusive distribution.

However, the cost to a firm to obtain all of a distributor's sales with the use of an exclusive contract, rather than by simply reducing price enough to win all sales, does not decrease as asymmetry increases. An exclusive permits a supplier to obtain all of a distributor's sales at a lower cost than simply lowering product price because with an exclusive the supplier need only offer a better deal to consumers on average. In contrast, obtaining all of a distributor's sales with a lower price requires the supplier to offer a better deal to every individual consumer. Specifically, to obtain all of a distributor's sales with an exclusive when preferences are symmetrical requires a price of $1.00 rather than a non-exclusive product price of $0.00 that otherwise would be necessary to obtain all of a distributor's sales, a saving to the supplier of $1.00 associated with use of an exclusive contract. When preferences are asymmetrical as assumed in Figure 1, for a supplier to obtain all of a distributor's sales requires an exclusive price of $1.50 compared to a non-exclusive product price of $0.50, or the same supplier saving associated with using an exclusive contract of $1.00.

The presence of asymmetry (a stronger firm A and a relatively weaker firm B in terms of consumer preferences) does imply that it is easier for A to win all sales from its rival. Compared to symmetrical preferences, A can win all sales with higher prices, both when it uses exclusivity and when it does not. However, this cost saving advantage to A from to the presence of asymmetry is the same ($0.50) whether A uses an exclusive contract or an across the board price reduction to achieve its goal. Exclusive dealing is not less costly for a firm to use relative to price reductions when product preferences are asymmetrical.

While stronger suppliers attempting to obtain all of a distributor's sales will prefer to use an exclusive rather than merely reduce price, this ignores our major point––that the distributor need not have suppliers compete for a full exclusive. In fact, when there are significant asymmetrical preferences, there is no reason why the distributor, acting as an agent for its customers, would tie its hands by requiring suppliers to compete in this way. As described above, in these circumstances it will be in the distributor's interest to set up the competition between suppliers in terms of competition for an exclusive with regard to incremental sales. It is more profitable for a distributor if suppliers

compete for this type of partial exclusive than for a full exclusive so that B remains as a fully effective competitor to A.

This does not mean that an anticompetitive effect can never occur. In some cases a supplier with dominant consumer preferences may be able to force the distributor to accept full exclusive dealing terms on a "take it or leave it" basis. In contrast to the usual case we have been discussing, where firm A offers the distributor two alternatives: (1) a non-exclusive price at which the distributor can buy as much as it wants; or (2) a lower price if the distributor agrees to purchase a larger (possibly exclusive) share of its sales from A, a dominant firm may make an all-or-nothing offer of exclusive distribution.

An indirect way in which a dominant firm may impose exclusivity by making such an all-or-nothing offer is by artificially increasing its first non-exclusive price option significantly above the profit-maximizing level before offering the second option of a discount contingent on the acceptance by the distributor of exclusivity. These alternative prices may not always present the distributor with an effective choice of accepting or not accepting a discount in return for incremental sales, but rather amount to a requirement that the distributor purchase exclusively from A if it wishes to purchase any quantity from A at all. This will be the case when the price difference is great enough that B could not economically make any counteroffer that would lead the distributor to choose option one.[14]

Evaluating the anticompetitive effects of exclusivity in such a case involves the normal way we evaluate explicit exclusive dealing contracts—by determining if a sufficient share of distribution is controlled so that A's rivals are anticompetitively prevented from effectively distributing their products. The courts in *Harmar*, *RJR*, and *Gruma* rejected anticompetitive claims because of insufficient evidence that the exclusive distribution contracts anticompetitively foreclosed rivals in this way.[15] The fact that the FTC brought *McCormick* as a secondary line price discrimination case under the Robinson-Patman Act, and not as a Section 1 or Section 2 exclusive dealing case, similarly suggests that the FTC likely did not have evidence that McCormick's exclusivity discounts covered a large enough fraction of supermarket distribution to foreclose McCormick's rivals from the market.

---

[14] One possible way to determine if B could not make any economic counteroffer is to use an "attributed price" test where, when allocating all discounts to the contestable incremental sales, the implied net price of incremental sales is less than the dominant firm's costs. *See* Cascade Health Solutions v. PeaceHealth, 502 F.3d 895 (9th Cir. 2007). This was the necessary condition used by the European Commission in evaluating Intel's CPU discounts. Case COMP/C-3/37. 990—Intel, Commission Decision (May 13, 2009), *available at* http://ec.europa.eu/competition/sectors/ict/intel.html.

[15] Klein & Murphy, *supra* note 2, at 439–42.

The economic advantages achieved by McCormick, Coca-Cola, Philip Morris, and Gruma in providing price discounts in return for a large share of a supermarket's sales in all of these cases did not depend on anticompetitive market effects. The advantages merely depended on the existence of joint gains from trade between companies that had the ability to earn significant additional profit by reducing price on incremental sales, on the one hand, and individual supermarkets that had the ability to shift sales between competing brands in response to price discounts to the benefit of consumers, on the other hand. Rather than relying on anticompetitive market foreclosure effects, the contractual arrangements can be fully explained by these pervasive competitive economic forces.

## V. CONCLUSION

The fundamental procompetitive motivation described in our original article, where distributors negotiating on behalf of their customers use exclusivity arrangements as a way to increase supplier competition and generate price discounts, is applicable to many cases where consumer preferences are asymmetrical. Zenger has provided a valuable contribution by modeling how asymmetrical consumer preferences influence the equilibrium when suppliers compete for a full distributor exclusive. However, when consumer preferences are asymmetrical, there is no reason the distributor, in setting up competition between suppliers to obtain a better deal for itself and its customers, must require the competition to involve all suppliers bidding for a full exclusive. Zenger's analysis highlights why distributors in such circumstances are more likely to adopt limited exclusivity contractual arrangements covering only incremental or contestable sales, the type of arrangements that were in fact used in the supermarket exclusive distribution cases we analyzed.