# Exhibit B


Proving
Antitrust
Damages
Legal and
Economic Issues
Third Edition
ANTITRUST
LAW
Defending Liberty
Pursuing Justice

# Proving Antitrust Damages

## Legal and Economic Issues

Third Edition

Section of Antitrust Law
Promoting Competition Protecting Consumers

American Bar Association
Defending Liberty Pursuing Justice

Cover design by ABA Design.

The materials contained herein represent the opinions of the authors and/or the editors, and should not be construed to be the views or opinions of the law firms or companies with whom such persons are in partnership with, associated with, or employed by, nor of the American Bar Association or the Section of Antitrust Law unless adopted pursuant to the bylaws of the Association Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book is intended for educational and informational purposes only.

© 2017 American Bar Association. All rights reserved.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. For permission contact the ABA Copyrights & Contracts Department, copyright@americanbar.org, or complete the online form at http://www.americanbar.org/utility/reprint.html.

Printed in the United States of America.

21 20 19 18 17 5 4 3 2 1

ISBN: 978-1-63425-975-0

e-ISBN: 978-1-63425-976-7

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 N. Clark Street, Chicago, Illinois 60654-7598.

www.shopABA.org

CHAPTER 4

# QUANTIFYING DAMAGES

Once a private antitrust plaintiff has shown that it has sustained antitrust injury, the law tends to be less demanding with respect to the damages methodology a plaintiff uses to quantify its damages. In practice, courts have applied a “reasonableness” standard which accommodates the reality that the quantification of damages is necessarily subject to greater uncertainty than simply proving the fact of injury. This chapter will discuss the standard of proof for antitrust damages, the but-for premise that underlies antitrust damage analysis, quantification methodologies, and mitigation.

## A. The Standard of Proof for Proving Antitrust Damages

Before being entitled to damages, the private antitrust plaintiff must establish that a violation of the antitrust laws occurred, that the plaintiff sustained antitrust injury, and that the plaintiff has “standing” under the antitrust laws to seek monetary damages.[1] Throughout this chapter, and the remainder of this handbook, the discussion will assume that these bars have been met and will refer to “violations” rather than “alleged violations.” Damages experts likewise assume liability for the purpose of analysis, often before liability is in fact established. The damages analysis will

come into play if and only if liability is established. While proving the existence of antitrust injury may be an exacting task, "a lesser level of proof is needed to support the amount of damages[.]"[2]

The "level of proof" needed to prove the quantum of antitrust damages suffered by a plaintiff was set in a trio of cases decided by the Supreme Court in the first half of the twentieth century: *Eastman Kodak Co. v. Southern Photo Materials Co.*,[3] *Story Parchment Co. v. Paterson Parchment Paper Co.*,[4] and *Bigelow v. RKO Radio Pictures*.[5] They remain the leading cases on this point.[6] In *Eastman Kodak*, the Court was unmoved by defense contentions that "plaintiff's damages were purely speculative" and "not of an amount susceptible of expression in figures[.]"[7] The Court reasoned that "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible."[8] The Court held that "[d]amages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate."[9]

The Court echoed its *Eastman Kodak* holding in *Story Parchment*, observing that "it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts."[10] Thus, while "damages may not be determined by mere speculation or guess, it will be enough if the evidence shows the extent of the damages as a matter of just and reasonable inference, although the result be only approximate."[11]

In *Bigelow*, the Court added: "[a]ny other rule would enable the wrongdoer to profit by his wrongdoing at the

expense of his victim."[12] To avoid the injustice of allowing the defendant to improperly retain its illicit profits, a jury is allowed to make a "just and reasonable" estimate of damages based on either direct or inferential proof.[13]

Given these circumstances, damages may be awarded despite imperfect proof. Judges must "observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries[.]"[14] A damages analysis based on assuming away the defendant's violation is inherently uncertain because "the vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."[15] Nevertheless, courts will continue to apply a low threshold because "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."[16]

# B. The "But-For" Premise

A fundamental step in computing antitrust damages is to envision the manner in which a particular market would have developed, assuming that the antitrust violation did not occur and holding every other feature of the actual world constant. The purpose of this analysis is to isolate the effects of the challenged conduct so as to ascertain what would have happened "but for" the defendant's unlawful activities.[17] Then, antitrust damages can be quantified by comparing the plaintiff's actual profits (in a lost profits case), purchase prices (in an overcharge case), or the like, against what the plaintiff would have enjoyed absent the illegal conduct.[18]

Applying the "but-for" analysis can take a variety of forms, depending on the plaintiff bringing the claim and type of relief sought. For instance, a plaintiff who is a direct

purchaser of products whose prices are artificially inflated due to anticompetitive conduct would typically seek overcharge damages, which are measured as the difference between the price the plaintiff actually paid and the price that would have prevailed in the absence of the antitrust violation (the “but-for” price), multiplied by the quantity of the product that was actually purchased.[19] This difference between the price that actually prevailed and the price that would have prevailed in the but-for world is called the “overcharge.”[20] In contrast, for competitors prevented from fully competing in the marketplace by anticompetitive conduct, applying the but-for premise may require comparing the competitor-plaintiff’s actual profits versus the profits the plaintiff would have earned in a world free of the market restraint—as was the case in *Eastman Kodak*, *Story Parchment*, and *Bigelow*. In addition, to the extent that an impaired competitor seeking lost profits enjoyed profits or benefits in the actual world that it would not have received but for the violation, some courts have required an offset.[21] A potentially different analysis may be required to establish the amount of overcharge paid by a plaintiff suing under state law as an *indirect purchaser* of the good in question (that is, who is suing as a purchaser of a product from an entity or person other than the claimed antitrust violator or entity in league with the antitrust violator). In such a case, the damages computation, depending upon the data available and the market or markets at issue, may involve, in part, an assessment of how much of the overcharge was “passed on” to the indirect purchaser.

The but-for premise requires some conceptualization of the actions in which the defendant might have engaged in the but-for world, instead of committing the violation. For certain types of violations, such as unlawful terminations by suppliers, the usual assumption is that the termination did not occur, leaving the supply relationship intact.[22] For other

types of violations, such as overcharges caused by exclusionary conduct or cartel behavior, it is necessary to construct a but-for price that the evidence shows likely would have prevailed absent the violation.[23] Importantly, it is not relevant that the defendant or defendants could theoretically have caused the same harms through lawful means; what matters is what they did and likely would have done.[24] For instance, if the violation is cartel behavior and the claimed harm artificially inflated prices, it is not relevant that a member of the cartel could theoretically have raised prices acting alone absent the cartel, unless it could be shown that such a cartelist would have done so regardless.

## C. Methods for Quantifying Damages

Plaintiffs may rely on one or more of a number of methodologies to quantify the damages arising from anticompetitive conduct. In every case, however, courts require that the economic model used must isolate the effect of the anticompetitive conduct.[25] The process of separating out effects of the challenged conduct from other unrelated factors is typically accomplished by comparing the experience in the actual world and the experience the plaintiff likely would have had in a but-for world free of the challenged anticompetitive conduct, holding all other factors the same.

A variety of models can be used to re-construct the but-for world, including “Before-During-After” models, “Yardstick” models, Projection-based models, and Cournot or Bertrand simulation models. These are described in more detail in later chapters, but an overview is provided here.

*Before-During-After Models*. These models seek to isolate harm flowing from the challenged anticompetitive conduct

by comparing the plaintiff's experience in the same market before, or after, the misconduct with its experience during the time the conduct was ongoing, which is sometimes referred to as the "damages period." The "Before-During" model acknowledges the likelihood that for a plaintiff who participated in the *same* market before or after the damages period, its actual experience in the time period before the violation may serve as a proxy for the plaintiff's but-for experience during the damages period.[26] A similar logic applies to the "During-After" model, where, the plaintiff's actual experience after the damages period may serve as a proxy.[27]

*Yardstick Models.* These models seek to isolate harm flowing from the challenged anticompetitive conduct by comparing the experience of the plaintiff in a market subject to anticompetitive conduct to the experience of the plaintiff, or another firm, in a comparable market unaffected by the defendant's violation.[28] The yardstick employed must be comparable to the industry and firm in question.[29] The yardstick method is particularly useful where the before-during-after approach is inappropriate, for example where the plaintiff is a start-up that never began operations in the affected market,[30] or where data for the market free of the antitrust violation are not available. The yardstick approach often requires data about the proxy market participant's sales and profits, or prices paid. These data serve as a proxy to reflect what the plaintiff's experience would have been but for the illegal conduct and, as such, when compared to the plaintiff's actual experience can provide a means to measure the damages suffered.

In either the before-during-after approach or the yardstick approach issues of comparability may arise. In the former, changes in market conditions during the damages period may raise doubts about the direct comparability of the damages period prices or profits to prices and profits before

or after. With respect to a yardstick approach, differences in the yardstick and the market subject to anticompetitive conduct may raise questions about their comparability. However, a perfect comparator is not required, and adjustments may be used to account for differences.[31] Thus, while in some cases the proxy may be so lacking in comparability that the court will reject it,[32] whether the proxy is reasonably comparable is usually a question for the trier of fact.[33] This is because only a reasonable approximation is necessary for damages, so a proxy can be applied even if it does not fully correspond to the plaintiffs' situation.[34]

Because the before-during-after approach looks outside the damages period in the same market, and the yardstick approach looks to a different market, one may need to examine changes in economic conditions over time or across markets, the plaintiff's circumstances, or other variables which could affect prices, sales, and profits. One tool widely used by economists to account for such changes in economic conditions is a statistical technique known as multiple regression analysis.[35] In the context of antitrust damages, multiple regression analysis is useful because it allows an expert to control for variables *other* than the anticompetitive conduct that may change between the damages period, or the market in question, and the benchmark or yardstick used to model the but-for world. Regression analyses are discussed in greater detail in Chapter 6.

*Projection-Based Models.* Courts have also accepted internal business projections by market actors of expected prices, sales, or profits for the damages period, formulated before the violation was known or anticipated, as the basis for but-for predictions.[36] As one court has noted:

> [I]nternal projections for future growth often serve as legitimate bases for expert opinions. Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections. As such, experts frequently use a plaintiff's business plan to estimate the plaintiff's expected profits in the absence of the defendant's misconduct.[37]

However, if a defendant shows that actual events and conditions during the damages period (unrelated to the violation) departed substantially from the assumptions underlying the projections, an inference that the plaintiff failed to achieve its projected performance solely because of the violation may be undermined or weakened.[38]

*Cournot and Bertrand Models.* Cournot and Bertrand models provide another means to predict the prices that would have prevailed in the but-for market, and hence damages in private antitrust actions. They can be particularly useful in cases where before-during-after models and yardsticks may be unavailable or difficult to derive. The Cournot and Bertrand models are structure-based models with assumptions made regarding non-cooperative strategic interaction among the firms absent conspiratorial behavior. The Cournot model assumes that interaction among firms sets quantities and their customers pay the prices determined by the total output.[39] The Bertrand model assumes that interaction among firms sets prices and their customers choose quantities at the prices set.[40] In the Bertrand and Cournot approaches to quantifying damages, but-for prices are simulated based on the theoretical relationship between price and factors such as market-concentration, demand elasticity, and marginal cost.[41]

The Department of Justice and the Federal Trade Commission use Cournot and Bertrand models routinely in evaluating prospective mergers to predict what prices would exist if two firms merged.[42] These agencies rely on these techniques because, as the agencies are attempting to forecast the implications of merger that has not been consummated and whose price effects are as yet unknown, data are not available to construct a before-during-after model. Bertrand and Cournot models can similarly be used to predict but-for prices in private antitrust actions where before-during-after methods are not available.[43] As with other types of predictive constructs, Bertrand and Cournot models must be rooted in the facts of the case.[44] Indeed, because Bertrand and Cournot models are frequently based on data which is specific to the market which is subject to the misconduct, they may have an advantage over yardstick models that rely on entirely different markets.[45]

* * *

The use of any of the above models is not required, and the plaintiff may instead build its but-for world based on other relevant data and economic theory.[46] In that case, however, it may be challenging for the plaintiff to establish that the difference between the custom-built but-for plaintiff and the plaintiff's actual experience is attributable to the violation.[47] A simpler approach might be to estimate the profits the plaintiff would have made on sales to specific customers lost because of the violation.

Several courts have further held that a plaintiff must disaggregate the effects of the violation from other, lawful causes of plaintiffs' harm. If the model on its face indistinguishably includes effects of lawful and unlawful conduct, and it is impossible to distinguish the effect of each on prices and profits, then it may be vulnerable to attack.[48] Also, a defendant may attempt to show that independent

causal factors other than the violation explain at least some substantial part of the difference between the but-for plaintiff's experience and that of the actual plaintiff.[49] However, the antitrust plaintiff need not prove the violation was the only cause of its damages; proof that the violation was a material cause of its damages is sufficient, as discussed in prior chapters.[50] Thus, a plaintiff is entitled to recover damages caused jointly by lawful and unlawful means. In addition, where two or more wrongdoers cause a harm to the plaintiff that is incapable of division, then damages should not be apportioned, and each wrongdoer is liable for the entirety of the harm done.[51]

While the focus is often on whether the plaintiff's damages model has adequately isolated the effects of the violation, occasionally the plaintiff's but-for world is rejected on its face as not credible. For example, the posited but-for competitor plaintiff may be unrealistically successful, indicating that the calculated damages are inflated. Astronomical rates of return claimed by a plaintiff seeking lost profits, for example, will likely cast doubt on the reasonableness of the plaintiff's quantification, regardless of how it was derived.[52] Another potential failing of a plaintiff's damages theory may arise if, when applied in a context in which there is no misconduct, it nonetheless yields positive damages.[53]

Similarly, the quantification will be weakened if the defendant can show that it conflicts with basic economic forces. For example, an impaired competitor plaintiff may claim that absent the illegal conduct, it could have charged higher prices—prices higher than any of its competitors. Absent an explanation of how it could have maintained such high prices for a sustained period without inviting price competition, expansion, or new entry, such a damages model may defy economic theory. Moreover, an assumption that the but-for plaintiff would charge higher prices than

those the plaintiff actually charged, while maintaining or increasing sales volume, would require further examination as to whether and how such a claim can conform to basic economic theory.[54]

# D. Mitigation

After an antitrust plaintiff has demonstrated the impact of the violation, some courts have held that it must take reasonable measures to minimize its damages.[55] Failure to take reasonable steps to mitigate damages may be a reason to reduce, or even eliminate altogether, damages claimed by the plaintiff.

The defendant has the burden to prove that the plaintiff did not mitigate its antitrust damages, and that the plaintiff's conduct in failing to take steps to mitigate was unreasonable and aggravated the harm.[56] The plaintiff does not have an absolute obligation to pursue an alternative course of conduct.[57] Hindsight should not be used to gauge whether the plaintiff should have adopted an alternative that, as it turns out, would have been beneficial.[58] The test is whether it was unreasonable under the circumstances for the plaintiff to forgo the mitigation opportunity, not simply whether the opportunity was the next best alternative available.[59]

The plaintiff must be shown to have failed to take reasonable steps to avoid its damages.[60] For instance, in the case of a terminated distributor pursuing a refusal to deal theory, the plaintiff may not recover for the loss of its business if it "bypasse[d] an obviously adequate alternative supplier[.]"[61] However, in cases where the affected product was not available from another source (as is often the case for a purchaser of a product subject to a price-fixing conspiracy), the purchaser plaintiff may be relieved of a duty to mitigate.[62] Moreover, where the violators concealed

their wrongdoing, the plaintiff cannot be expected to mitigate or otherwise offset damages that the plaintiff does not know it is incurring.[63]

Actual mitigation efforts by the plaintiff may affect its recoverable damages in a number of ways. Whether or not the efforts are successful, reasonable expenditures pursuing them are recoverable.[64] Even if the mitigation proves successful, the disruption suffered while the plaintiff pursued mitigation also may support a recovery of damages.[65] On the other hand, a plaintiff seeking redress for lost profits may find its damage claims barred if mitigation frees up resources that produce greater returns than would have been earned in the absence of the violation.[66]

Quantifying the effect of a failure to mitigate may produce a role reversal for the plaintiff and the defendant. To implement a failure to mitigate defense, the defendant will need to construct a new hypothetical world, one in which the plaintiff pursues the reasonable mitigation opportunity that it did not pursue in the real world.[67] The recoverable damages would be the difference between the plaintiff's hypothetical experience absent the violation and the plaintiff's hypothetical experience if it had mitigated.[68]

---

1. Associated Gen. Contractors v. Cal. State Council of Carpenters (*AGC*), 459 U.S. 519, 536 (1983) (only certain "part[ies] injured by an antitrust violation may recover treble damages"). For a fuller discussion of antitrust injury and which plaintiffs may recover damages, see American Antitrust Institute, Private Enforcement of Antitrust Law in the United States 64-94 (2012).

2. Los Angeles Mem'l Coliseum Comm'n v. NFL, 791 F.2d 1356, 1360 (9th Cir. 1986). *See also In re* Scrap Metal Antitrust Litig., 527 F.3d 517, 533 (6th Cir. 2008) ("Once

liability is established . . . a plaintiff's proof of damages is evaluated under a more lenient standard.").

3. 273 U.S. 359 (1927).

4. 282 U.S. 555 (1931).

5. 327 U.S. 251 (1946).

6. The Supreme Court has recently reaffirmed this line of precedent, observing in the antitrust context that damages "calculations need not be exact." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013) (citing *Story Parchment*, 282 U.S. at 563).

7. *Eastman Kodak*, 273 U.S. at 378.

8. *Id.* at 379.

9. *Id*. (internal quotes omitted).

10. *Story Parchment*, 282 U.S. at 563.

11. *Id.*

12. *Bigelow*, 327 U.S. 251, 264 (1946).

13. *Id*.

14. Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 123 (1969).

15. J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981).

16. *Bigelow*, 327 U.S. at 265. *See also Story Parchment*, 282 U.S. at 563-65 (holding that where violation "preclude[s] the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts"); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379 (1927) ("a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible").

17. *See, e.g.*, *Bigelow*, 327 U.S. at 259, 263 (referring to proof of competitor plaintiff's profits "in the absence of" the restraints, or "if the restraints had not been imposed"); LePage's Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003) (damage model should "measur[e] what, hypothetically, would have happened 'but for' the defendant's unlawful activities").

18. *See, e.g.*, *LePage's*, 324 F.3d at 165; Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc., 502 F.3d 91, 107 (2d Cir. 2007) (damages could be measured as "the difference between the but-for fee and the actual fee paid"); New York v. Julius Nasso Concrete Corp., 202 F.3d 82, 88 (2d Cir. 2000) (holding, in a price-fixing case, the measure of damages is "the difference between the price actually paid by the [plaintiff] on the contracts and the price it would have paid absent the conspiracy").

19. *See* Howard Hess Dental Labs v. Dentsply Int'l, 424 F.3d 363, 374 (3d Cir. 2005) ("the standard method of measuring damages in price enhancement cases is overcharge, . . . [that is] 'the difference between the actual price and the presumed competitive price multiplied by the quantity purchased'"); PHILLIP E. AREEDA, ET AL., ANTITRUST LAW ¶ 392a (2013) (an overcharge "is the difference between the illegal price that was actually charged and the price that would have been charged 'but for' the violation multiplied by the number of units purchased"). The plaintiffs' overcharge injury is deemed complete at the time it paid the overcharge on its actual purchases. Illinois Brick Co. v. Illinois, 431 U.S. 720, 724 (1977) ("a direct purchaser suing for treble damages under § 4 of the Clayton Act is injured within the meaning of § 4 by the full amount of the overcharge paid by it"); Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 303 (D.D.C. 2007) ("[a]ntitrust injury is considered complete when the direct purchaser pays

an illegal overcharge”). Thus, overcharges are computed on products a direct purchaser actually bought at the allegedly artificially inflated price, even if the plaintiff might have made fewer purchases in the but-for world. *See In re* Niaspan Antitrust Litig., No. 13-MD-2460, 2015 WL 4197590, at *1 (E.D. Pa. July 9, 2015) (rejecting argument that damages must be offset “by the amount of any purchases . . . that would not have been made in a ‘but for’ world”); *In re* Prograf Antitrust Litig., No. 11-2242, 2014 WL 7641156, at *4 (D. Mass. Dec. 23, 2014); *In re* Skelaxin (Metaxalone) Antitrust Litig., No. 12-MD-2343, 2014 WL 2002887, at *5 (E.D. Tenn. May 15, 2014); Teva Pharm. USA, Inc. v. Abbott Labs., 252 F.R.D. 213, 230-31 (D. Del. 2008) (“[d]efendants . . . enmesh the idea of a ‘but for’ world with a ‘but for’ price . . . plaintiffs only are required to show that they, in fact, did purchase TRICOR® at a higher price once an antitrust violation and causal relationship are established”); *In re* Relafen Antitrust Litig., 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004).

20. *Illinois Brick*, 431 U.S. at 724-725; Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 489 (1968).

21. *See, e.g., Los Angeles Mem’l Coliseum Comm’n,* 791 F.2d at 1367.

22. *See, e.g.*, DeLong Equip. Co. v. Wash. Mills Elec. Minerals Corp., 990 F.2d 1186, 1203 (11th Cir. 1993), *amended per curiam*, 997 F.2d 1340 (11th Cir. 1993). The amount of damages suffered will depend on how long the wrongfully terminated relationship would otherwise have continued. *See, e.g.*, Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18 (1st Cir. 1999).

23. *See, e.g., Cordes*, 502 F.3d at 107 (where conspiracy allegedly led to enhanced prices, overcharge damages could be measured as “difference between the but-for fee and the actual fee paid”); Berkey Photo v. Eastman

Kodak Co., 603 F.2d 263, 297-98 (2d Cir. 1979) (monopolization overcharge damages are "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market").

24. *See*, *e.g.*, Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931). In *Story Parchment*, the plaintiff was permitted to seek damages based on the entire difference between prevailing prices before and after the alleged predation, despite defendants' claim that they could have lowered prices anyway by independent (and hence lawful) means. *See id.* at 561-62. So long as "the old prices were reasonable, and that they would not have changed by reason of any economic condition, but would have been maintained except for the unlawful acts" of the defendants, the jury might base damages on the difference between the old price and the new one. *Id. See also* H.J., Inc. v. ITT Corp., 867 F.2d 1531, 1550 (8th Cir. 1989) (defendant may not challenge damage model's assumption of prices at levels before defendant's predatory price cutting by asserting that defendant could have competed with lower but non-predatory prices).

25. *See*, *e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013); *see also infra* n.45 ("a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible").

26. *See, e.g.*, Bigelow v. RKO Radio Pictures, 327 U.S. 251, 259-64 (1946) (comparison of plaintiff's profits before the conspiracy to its profits during the conspiracy); *Story Parchment*, 282 U.S. at 561-62 (comparison of plaintiff's prices before a predatory pricing conspiracy to

prices during the conspiracy); Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 376-79 (1927) (comparison of plaintiff's profits before its unlawful termination to profits after the termination); *In re* Mushroom Direct Purchaser Antitrust Litig., No. 06-0620, 2015 WL 5767415, at *7 (E.D. Pa. July 29, 2015) ("The purpose of separating conduct free periods and conduct periods is to create a benchmark conduct free period as an evidentiary foundation for inferring what the prices would have been in the [conduct] period[s] but for the [alleged] illegal activity.") (internal quotes omitted).

27. *See, e.g.*, Independence Tube Corp. v. Copperweld Corp., 691 F.2d 310, 330-31 (7th Cir. 1982), *rev'd on other grounds*, 467 U.S. 752 (1984).

28. *See, e.g.*, *Bigelow*, 327 U.S. at 251-52 (comparison of plaintiff's profits during the conspiracy to those of a comparable competitor not affected by the conspiracy). *See also LePage's*, 324 F.3d at 165 ("an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities."); Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002) (yardstick is among "generally accepted methods for proving antitrust damages").

29. Eleven Line v. N. Tex. State Soccer Ass'n., 213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow.").

30. *See, e.g.*, Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir. 1974) (yardstick method available to plaintiff "who is driven out of business before he is able to compile an earnings record").

31. *See, e.g.*, Blue Cross & Blue Shield United v. Marshfield Clinic, 152 F.3d 588, 592-94 (7th Cir. 1998). A lack of comparability may cut either way: the proxy may understate the success the plaintiff would have achieved but for the violation, making the damages estimate conservative, or may overstate the plaintiff's but-for success, inflating the damages. Defendants will naturally focus on the latter possibility to the exclusion of the former. Because a proxy methodology is a necessarily imprecise way to isolate the effects of an antitrust violation, its sufficiency, at least as an initial matter, should rest on a standard of overall reasonableness, subject to more detailed rebuttal. *See, e.g.*, National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1294-97 (8th Cir. 1988), *amended*, 878 F.2d 1118 (8th Cir. 1989).
32. *See, e.g.*, Eleven Line v. N. Tex. State Soccer Ass'n, 213 F.3d 198, 206-09 (5th Cir. 2000) (average of plaintiff's experience in other markets not shown to be comparable is insufficient).
33. *See, e.g.*, Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1221 (9th Cir. 1997); *In re* Prograf Antitrust Litig., No. 11-2242, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) ("[i]t was for the jury to consider [plaintiff's] arguments about the [differences between the yardstick and the but-for world] on the validity of comparison and to adjust its damage award accordingly") (internal quotes and citation omitted; alterations in original).
34. *See, e.g.*, *National Farmers' Org.*, 850 F.2d at 1295 (affirming use of yardsticks despite "many defects" and although they may not be "perfect").
35. *See*, *e.g.*, Conwood Co. v. U.S. Tobacco Co., 290 F.3d at 768, 793-95 (6th Cir. 2002); City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 566 (11th Cir. 1998)

(regression analysis is among "well-established and reliable methodologies" for proving antitrust damages); *In re* High Pressure Laminates Antitrust Litig., No. 00 MDL 1368 (CLB), 2006 WL 931692, at *1 (S.D.N.Y. Apr. 7, 2006) (refusing to exclude regression damages model).

36. *See, e.g.*, H.J., Inc. v. ITT Corp., 867 F.2d 1531, 1549-50 (8th Cir. 1989); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1099, 1160-66 (7th Cir. 1983); Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 563-67 (2d Cir. 1970).

37. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 292 (3d Cir. 2012) (internal quotes and citations omitted). *See also* LePage's Inc. v. 3M, 324 F.3d 141, 165 (3d Cir. 2003) (affirming damage award that used, inter alia, projections as basis for computing extent of injuries); *Autowest,* 434 F.2d 566 (holding that damages testimony was admissible because the financial projections on which the testimony was based "were the product of deliberation by experienced businessmen charting their future course"). *Cf. In re* Nifedipine Antitrust Litig., 246 F.R.D. 365, 371 (D.D.C. 2007) (defendants' projections that prices would have been lower for purchasers in but for world were among "powerful and compelling" proof of plaintiffs' injuries).

38. *See, e.g.*, ILC Peripherals Leasing Corp. v. IBM, 458 F. Supp. 423, 434-36 (N.D. Cal. 1978) (failure to "adjust these forecasts to reflect the results of actual experience" rendered damages evidence speculative), *aff'd per curiam sub nom.* Memorex Corp. v. IBM, 636 F.2d 1188 (9th Cir. 1980). *See also ZF Meritor*, 696 F.3d at 292 (affirming exclusion of damage model based on projection due to lack of information of circumstances under which projection was created and the assumptions it relied upon).

39. *See* Dennis W. Carlton and Jeffrey M. Perloff, Modern Industrial Organization 161-70 (4th ed. 2005).

40. *Id.* at 171-76.
41. *See* James A. Brander and Thomas W. Ross, *Estimating Damages from Price-Fixing*, in LITIGATING CONSPIRACY 349-351 (Stephen Pitel, ed. 2006).
42. See Andrew R. Dick, Merger Policy Twenty-Five Years Later: Unilateral Effects Move to the Forefront, ANTITRUST 25 (Fall 2012), at 26-27.
43. *See, e.g.*, Castro v. Sanofi Pasteur Inc., No. 11-7178, 2015 WL 5770381, at *11 (D.N.J. Sept. 30, 2015) (allowing use of Bertrand model in computing damages); Ticketmaster Corp. v. Tickets.com, Inc., No. 99-7654, 2003 WL 25781900, *3 (C.D. Cal. Jan. 27, 2003) (refusing to exclude Cournot model of private antitrust damages).
44. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000). In *Concord Boat*, the district court had upheld "the soundness of the Cournot model as a fundamental, time-tested economic tool that has been widely accepted for years by reputable economists," and noted that "the Cournot model provides the theoretical underpinnings for the Department of Justice's Horizontal Merger Guidelines and the widely used Herfindahl-Hirschman Index (the 'HHI')." Concord Boat Corp. v. Brunswick Corp. 21 F. Supp.2d 923, 934 (E.D. Ark. 1998). The Court of Appeals did not take issue with the acceptability of Cournot models generally, but found that the specific model offered by the plaintiffs was "not grounded in the economic reality" of the market because it assumed competitors were identical and would have each have 50 percent share in hypothetical market, but ignored that competitors were not symmetric and that defendant's share exceeded 50 percent even before it began engaging in the alleged anticompetitive conduct. *Concord Boat*, 207 F.3d at 1056-57.

45. *See*, *e.g.*, *Castro*, 2015 WL 5770381, at *12 (discussing ways in which Bertrand model may be superior to other damage models).

46. As the Fifth Circuit held in *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 668 (5th Cir. 1974), the plaintiff's method of proving damages may be "specially tailored" to fit its case. For examples of such damages models, see DeLong Equip. Co. v. Wash. Mills Elec. Minerals Corp., 990 F.2d 1186, 1203-06 (11th Cir.), *amended per curiam*, 997 F.2d 1340 (11th Cir. 1993); Dolphin Tours v. Pacifico Creative Serv., 773 F.2d 1506 (9th Cir. 1985) (estimated but-for market share based on survey of customers); Park v. El Paso Bd. of Realtors, 764 F.2d 1053, 1066-68 (5th Cir. 1985); Southern Pac. Commc'ns Co. v. AT&T, 556 F. Supp. 825, 1073-90 (D.D.C. 1983), *aff'd*, 740 F.2d 980 (D.C. Cir. 1984).

47. *See, e.g.*, *Southern Pac. Commc'ns*, 556 F. Supp. at 1092-93 (stating that difference between financial performance of but-for and actual plaintiff "due at least in substantial part to a number of factors wholly unrelated to any conduct (lawful or unlawful) of defendants"); *In re* IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 1019-21 (N.D. Cal. 1979) (holding that "arbitrary" adjustments to account for "other causative factors" were insufficient), *aff'd sub nom.* Transamerica Computer Co. v. IBM, 698 F.2d 1377 (9th Cir. 1983). A custom-built model survived similar attacks in *Litton Systems v. AT&T*, 700 F.2d 785, 822-25 (2d Cir. 1983).

48. *See, e.g.*, Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013) (holding plaintiffs failed to present viable classwide damages approach where the damage model was tied to multiple theories of liability, but only one theory was triable); MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1161-64 (7th Cir. 1983). *But see* LePage's Inc.

v. 3M, 324 F.3d 141, 165-66 (3d Cir. 2003) (stating that given that 3M's conduct taken as a whole violated Section 2, disaggregation was "unnecessary, if not impossible."); National Farmers' Org. v. Assoc. Milk Producers, 850 F.2d 1286, 1307 (8th Cir. 1988) (the fact that defendants' actions were "composed of lawful and unlawful conduct so tightly intertwined as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct should not diminish the recovery" and that "the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct," and that in that case "the fact that lawful conduct contributed to additional injury should not prohibit recovery for that injury"); Spray-Rite Serv. Corp. v. Monsanto, 684 F.2d 1226, 1242-43 (7th Cir. 1982) (defendant had not demonstrated that disaggregation was possible or necessary, and that "[w]e will not deprive Spray-Rite of this recovery merely because the jury may have found that Monsanto combined lawful conduct with unlawful conduct making it impossible to determine which portion of the total damages was caused by the unlawful conduct."), *aff'd*, 465 U.S. 752 (1983).

49. *See, e.g.*, *Southern Pac. Commc'ns*, 556 F. Supp. at 1090-91.

50. *See* Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9 (1969). *See also* Chapter 1, Section B for a discussion of the material cause standard.

51. Discover Fin. Servs. v. Visa USA, Inc., 598 F. Supp. 2d 394, 410-12 (S.D.N.Y. 2008).

52. *See* Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 381-83 (7th Cir. 1986).

53. *See, e.g.*, *In re* Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244 (D.C. Cir. 2013). In *Rail Freight*, the

court held that the presence of such "false positives" left the damages methodology subject to criticism. *See id*. at 253-55.

54. *See*, *e.g.*, Gray v. Shell Oil Co., 469 F.2d 742, 749-50 (9th Cir. 1972).

55. *See*, *e.g.*, Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 (5th Cir. 1981) (observing that under contract law, injured party need only pursue "reasonable" efforts to mitigate damages).

56. *See*, *e.g.*, *Malcolm*, 642 F.2d at 863. *See also* Litton Sys., Inc. v. AT&T Co., 700 F.2d 785, 820 n.47 (2d Cir. 1983) (mitigation is an affirmative defense which defendant must plead and prove).

57. *Cf*. RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981).

58. *See, e.g.*, Veranda Beach Club v. W. Surety Co., 936 F.2d 1364, 1386 (1st Cir. 1991).

59. *See* Fishman v. Estate of Wirtz, 807 F.2d 520, 556-60 & n.34 (7th Cir. 1986) (holding that mitigation doctrine does not necessarily require plaintiff to undertake the risks of the next best alternative to an unlawfully foreclosed investment).

60. *Malcolm*, 642 F.2d at 863.

61. *Id.*

62. *See In re* TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2012 WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012) ("the Court declines to hold that defendants may assert mitigation as a defense to Dell's horizontal price-fixing claim"); *In re* Airline Ticket Comm'n Antitrust Litig., 918 F. Supp. 283, 286 (D. Minn. 1996) ("[i]n a horizontal price-fixing case, . . . mitigation and offset generally do not affect the ultimate measure of damages."); Westman Comm'n Co. v. Hobart Corp., 541 F. Supp. 307, 314-15 (D. Colo. 1982) (refusal-to-deal case; the "argument that [plaintiff] failed to mitigate its damages . . . is ridiculous. This argument implicitly

assumes that [defendant] was guilty of a continuing violation of the antitrust laws, yet attempts to place the onus of stopping that violation on [plaintiff] . . . . [A] defendant [cannot] claim immunity from damages caused by its illegal actions because a plaintiff could have stopped them . . . .”).

63. *See, e.g.,* Home Indem. Co. v. Lane Powell Moss & Miller, 43 F.3d 1322, 1329 (9th Cir. 1995) (“[T]he duty to mitigate damages does not arise until the party upon whom the duty is impressed is aware of facts making the duty to mitigate necessary.” (citation omitted)); Ford Motor Credit Co. v. Hairston, No. 4:06CV00004, 2006 WL 2850615, at *4 (W.D. Va. 2006) (“[I]t would be an absurd misapplication of the rule for mitigation of damages to expect the Plaintiff to minimize injury before the discovery of the breach.”).

64. *See* Cont’l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 508 (4th Cir. 2002) (costs of finding alternatives to mitigate damages qualify as antitrust injury); Lee-Moore Oil Co. v. Union Oil Co., 599 F.2d 1299, 1306 (9th Cir. 1979).

65. *See* Pierce v. Ramsey Winch Co., 753 F.2d 416, 436-37 (5th Cir. 1985).

66. *See id .* at 436.

67. *See* Roger D. Blair & William H. Page, *“Speculative” Antitrust Damages*, 70 Wash. L. Rev. 423, 456-57 (1995) (explaining that to account for a failure to mitigate, “the plaintiff’s actual condition must be adjusted for rational mitigation efforts before it is compared with the but-for condition”).

68. *See* Malcolm v. Marathon Oil Co., 642 F.2d 845, 863 (5th Cir. 1981).

# CHAPTER 8

## OVERCHARGES

This chapter provides an overview of the legal and economic issues involved in estimating damages associated with anticompetitive price increases or "overcharges." Such overcharges are commonly asserted as injuries in price-fixing cases under Section 1 of the Sherman Act[1] or Section 4 of the Clayton Act,[2] and less frequently in monopolization cases under Section 2 of the Sherman Act,[3] as well as under state statutes. The overcharge usually reflects the difference between the price actually charged and the price that would have prevailed in the absence of the anticompetitive conduct (i.e., the "but-for" price under the "counterfactual"[4]). Damages, at least for a direct purchaser, would then be the overcharge times the volume of sales. Measuring the amount of this overcharge is particularly relevant when the plaintiff is a purchaser rather than a foreclosed competitor. In the latter case, which is more common under Section 2, lost profits resulting from the foreclosure present a more appropriate measure of damages.[5]

This chapter first discusses some general considerations applicable to most overcharge damages analyses: construction of the economic model and estimation of the overcharge. It then discusses the application of these principles to specific types of antitrust claims—such as price fixing, bid rigging, monopolization, and tying—highlighting the unique issues that arise in those situations. Finally, it discusses special cases that may arise in some or all of these types of situations.

# A. Construction of the Economic Model

One of the central challenges of an overcharge analysis is determining the counterfactual or but-for scenario that would have existed had the anticompetitive conduct not occurred. While actual prices generally are known, but-for prices are not observable and thus must be estimated. Furthermore, even when the contested conduct is clearly defined, the behavior of firms and the resulting market outcomes in the absence of that conduct generally are not easy to estimate, as they are the result of complex interactions under different economic conditions than those that were actually observed. Estimating the but-for prices generally requires the construction of an economic model that accounts for the various factors that influence price, including the anticompetitive behavior. The relationship between prices and other factors usually is described in the form of a mathematical equation or set of equations.[6]

A sound economic model should be capable of distinguishing between the effects of lawful activities and events that influence supply and demand (and hence prices) from the effects of the alleged anticompetitive conduct. In doing so, the model should capture all of the essential economic relationships and factors that are likely to influence prices. For example, if costs significantly rose or government regulations materially changed during the relevant period, a sound model should account for those events because they presumably would have occurred regardless of the anticompetitive activities and influenced prices. If the model is incomplete and omits important explanatory factors, it may be unable to explain price movements or it may attribute incorrectly the effects of

relevant omitted factors to the anticompetitive conduct, producing biased results.[7]

A sound economic model should also reflect a plausible relationship between liability and the calculated overcharge.[8] For example, it is necessary to articulate an economic basis for assuming industry-wide impact in the overcharge analysis if the defendants were accused of fixing prices to a single large customer because the experience of a single customer (even though large) need not be representative of all customers in the relevant market.

Additionally, a sound economic model should rely on parameters that describe the specific instances of anticompetitive behavior and its legal or regulatory context. For example, the economic model would require a delineation of the relevant product(s) and the relevant time period. These parameters may be derived from the factual record, legal or regulatory guidance (e.g., a statute of limitations), or economic analysis; alternatively, they may be unsupported assumptions. There is not necessarily a bright line demarcating the boundaries of the relevant time period. When there are allegations of cartel behavior, for instance, it would be important to consider whether the cartel was immediately effective, whether the agreement was enforced, and the way in which the agreement broke down. In some instances, the effect of making a particular assumption may be testable in the process of estimating the overcharge—for example, by estimating the model using an alternative assumption, or through the use of econometric techniques.

# B. Estimation of the Overcharge

Most overcharge models are designed to determine the relevant product prices that would have prevailed but for the anticompetitive behavior and compare these but-for

prices to the actual prices paid. The overcharge is typically calculated as the difference between the price actually charged and the but-for price, after controlling for all factors that may affect supply and demand of the relevant product.[9] The estimated overcharge is then multiplied by the relevant quantity to determine damages (before trebling, if appropriate).

Typically, the relevant quantity—or volume of commerce—to which the overcharge is applied is taken to be the actual quantity purchased, the determination of which may itself present a challenge. There are at least three potential challenges in determining the relevant volume of commerce: (1) factual questions about the scope of the anticompetitive behavior; (2) data limitations; and (3) jurisdictional issues. First, there are often questions about the breadth of the conduct. For example, the start and end dates of the conduct or the products and industry participants affected. Second, the relevant quantity may need to be inferred from imperfect data when, for example, the available data do not extend sufficiently far into the past. Third, jurisdictional issues and complications relating to where the sales were made are also possible. In the price-fixing context, the treatment of foreign sales can be the subject of particularly vigorous disputes.

A host of theoretical and practical issues arise in the course of estimating but-for prices. To begin, there may be several methods to estimate overcharges based on the substantive law governing the injury, the type of economic model, and the nature of the available data.[10] The expert must make reasoned choices grounded in the facts of the case.

On the theoretical side, the overcharge model must make assumptions concerning what the world would have looked like in the absence of the anticompetitive behavior. For example, should the model assume that absent a cartel

there would have been a "perfectly competitive" market, where each firm prices at marginal cost, prices are known to all buyers and sellers, and no single firm has much effect on market prices? Or should the model assume there would have been an oligopolistic market with relatively few firms who may strategically interact with each other, and if so, how that would differ from an actual cartel?[11] In a perfectly competitive market, but-for prices are likely to be lower (and estimated overcharges higher) than in an oligopolistic market.[12] Similarly, in a predatory pricing case, since overcharges only occur in the recoupment period, the model must consider whether and when rivals would have exited the market without the predation. Indeed, in attempted monopolization cases where the anticompetitive conduct failed or had not yet achieved its intended effect, there may be no overcharges to measure (though there may be other types of cognizable antitrust damages suffered).[13]

On a practical level, the difficulties of obtaining sufficient and reliable data complicate the process of modeling the but-for world. Even apart from the fact that there will be no data from the but-for world (which never existed), the data that exist from the actual world often have severe limitations. For models that are predicated on comparing the relevant time period to a different period that was not influenced by the anticompetitive conduct, it may be difficult to distinguish between such periods under some circumstances. Some relevant data, such as changes in certain costs or changes in capacity, might not be available or might not be measured accurately. With respect to sales data, for example, there may be time gaps in the data record, it may not be sufficiently detailed, or it may exclude relevant transactions or components of the price. Furthermore, there may be several methods to estimate the overcharge, for example, by using various econometric techniques such as multiple regression analysis. These

alternative estimation methods may rely on different assumptions (which should be verified), and have different capacities to address data limitations and different degrees of accuracy and precision.

Nevertheless, most of these issues can be addressed in the construction of an appropriate economic model to estimate overcharges. Methods of constructing these models are discussed at length in Chapter 6. Typically, experts employ a “reduced form” model in which price is expressed as a function of demand and supply-side variables.[14] The explanatory (or independent) variables are assumed to represent the major influences on price. These variables can include quantitative data, such as costs, prices of substitutes, inflation, and other indicators of supply and demand. In addition, “dummy variables” (which take on the values of one or zero) also can be used to control for other significant events, such as raw material shortages, plant interruptions, seasonality, and changes in government regulations. When properly specified, the model provides an estimate of the average price given specific values of the independent variables and their estimated coefficients.[15] The following section, discusses how such an economic model might be constructed and overcharges estimated for a typical price-fixing case.

# C. Horizontal Price Fixing

The measure of damages that is commonly used in price-fixing cases is the overcharge multiplied by the relevant purchased quantity.[16] Simply put, the overcharge is the difference between the actual price paid and the competitive price, or the price that would have been charged absent the illegal agreement. Early on, the Supreme Court recognized the overcharge as the principal

measure of harm in price-fixing cases.[17] Several methods are commonly used to estimate the overcharge.[18]

# 1. Before-During-After Model

The most conceptually straightforward method for estimating the cartel overcharge is through a "before-during-after" model.[19] This model is premised on the assumption that prices before and after, but not during, the relevant period were set free of any illegal cartelization. Using data from both the before and after time periods as nonconspiracy benchmarks, a model is constructed to estimate the but-for prices during the relevant period.[20] Overcharges are then estimated as the difference between the actual prices charged and the prices the model predicts would have been charged during the relevant period.[21] As noted in Chapter 6, when sufficient data for the period after the anticompetitive behavior are not available, a variation of the before-during-after model—the before-during model—may be used, where the nonconspiracy benchmark is restricted to the period before the alleged conspiracy.[22]

The simplest form of the before-during-after model assumes that the weighted average prices from *outside* the relevant period are a reasonable approximation of the prices *during* the relevant period absent the conspiracy. Put differently, this approach assumes that the entire price difference between the conspiracy period and nonconspiracy period was due to the alleged anticompetitive conduct. While this strong assumption could hold in some circumstances, it is rarely justified, especially for lengthy conspiracy periods. First, the before-during-after model assumes that prices from the benchmark period are a good approximation of long-run equilibrium prices. It is important, however, to examine the economic conditions in the before and after periods for entry or exit, surpluses or

shortages, or factors that would indicate that the market had not reached long-run equilibrium. For example, if price wars give rise to a cartel, then preconspiracy prices would not reflect long-run equilibrium prices.[23] Second, the assumption that but-for prices would have been constant during the relevant period generally implies that there were also no changes in the economic factors that normally determine prices—for example, changes in demand, changes in costs,[24] entry or exit of firms, or capacity constraints.[25] Third, the use of aggregate average prices from the benchmark period would produce inaccurate overcharge estimates for individual customers if their prices would have differed, for example, due to individualized negotiations and variation in bargaining power.

These limitations may be addressed through more rigorous methods that apply econometric techniques to estimate the but-for prices—such as dummy variable models and prediction models—while controlling for other factors that may have affected prices. Econometric techniques can be used to evaluate data relating to competing theories of the relationship between a variable of interest—such as price—and a number of explanatory variables, as well as the magnitude of the effect of the explanatory variables on the variable of interest.[26] The use of econometric techniques should be guided by a sound economic model. Otherwise, the techniques may produce spurious results, estimates that do not reflect the counterfactual accurately or perhaps at all. Econometric techniques must also be used with appropriate data to produce reliable results.[27]

Dummy variable and prediction models are two different approaches to implement a before-during-after analysis, both of which allow one to control for factors that change over time and explain some of the observed price differences.[28] In a dummy variable model, price is related to

various explanatory factors including a “dummy variable” to account for the influence of a conspiracy. A dummy variable takes on the value of one for observations during the conspiracy and zero for observations outside the conspiracy period.[29] The estimated coefficient of conspiracy period dummy variables provides an estimate of the average overcharge due to the price-fixing activity[30] on either a dollar or percentage basis.[31] The dummy variable model is an econometric technique for estimating the before-during-after model, and thus here it is also essential to address whether the benchmark period prices are a good reflection of long-run equilibrium prices.[32]

In some cases, however, the use of a dummy variable to estimate the impact of the conspiracy on prices yields a negative coefficient for the dummy variable, suggesting that collusive prices were *lower* than competitive prices.[33] This apparently surprising result does not necessarily mean that the use of the dummy variable approach was incorrect; it may be an artifact of a variety of data and other econometric issues. A negative coefficient for the dummy variable, however, may actually be consistent with the economic model and suggest that: (1) the alleged conspiracy never occurred; (2) it triggered price wars; (3) it was ineffectual; or (4) it was outweighed by other events that took place during the relevant time period that exerted downward pressure on prices. In contrast, estimated results that do not comport with the underlying economic model—such as an estimated coefficient that has the wrong sign or one that should be, but is not, statistically significant—generally could indicate problems with the econometric approach. For example, the prices of substitutes included as explanatory variables may also be influenced by the dependent variable. In such circumstances, the expert may need to rely upon more advanced econometric approaches.[34]

An alternative to the dummy variable model is the prediction (or residuals) model, which could be used, for example, where the alleged conspiracy affected prices in ways that are not captured by one or more "conspiracy" dummy variables. The prediction model involves using data from the nonconspiracy period to econometrically estimate the coefficients for the independent variables, and then applying those coefficient estimates to the actual values of independent variables during the conspiracy period to predict nonconspiracy prices during the conspiracy period. The differences or "residuals" between the predicted (nonconspiracy) prices and the actual (conspiracy) prices yield an estimate of the overcharge.[35] Unlike the dummy variable model, this model uses price data solely from outside the conspiracy period. Whether it is appropriate to pool pre- and post-conspiracy price data depends on the economic characteristics of those periods. Because pooling may have a significant effect on econometric results, it should be carefully considered.

Applying estimates of preconspiracy or postconspiracy prices to the conspiracy period is known as *forecasting*; forecasting based on post-conspiracy data alone is sometimes referred to as *backcasting*. There are many techniques for forecasting as well as many types of information that may be forecasted. Both approaches may involve assumptions that should be carefully validated, as should the performance of the regression model in forecasting outside the benchmark period. For example, it is possible to forecast the changes in prices from the pre-conspiracy period into the conspiracy period based on the underlying changes in another economic factor—such as costs—during the conspiracy period. However, this method of forecasting for use in calculating overcharges assumes that margins from the preconspiracy period are identical to those during the conspiracy period. Econometric techniques

may be used to estimate the error in forecasting. The most appropriate method of forecasting the but-for prices may depend on the dynamics of the economic markets at issue as well as the available data.

## 2. Benchmark Method

An alternative method for estimating overcharges is the benchmark or "yardstick" method.[36] This method seeks to estimate the but-for prices using data from analogous geographic markets or industries that are not affected by the conspiracy as a benchmark. More generally, the term "benchmark" is used to refer to any market, geographic area, or time period that may serve as a basis for estimating the overcharge. Thus, the term benchmark is also commonly used to describe the before or after periods in the before-during-after model described above. For example, if the plaintiffs allege a conspiracy in the Northeast, pricing trends from the Northeast could be compared with prices in other parts of the country, which presumably were not affected by the alleged cartel.[37] Regardless of the estimation approach used, however, it is important to ensure that the approach controls for any differences between the benchmark used and the relevant market and time frame under consideration.[38]

## 3. Difference-in-Differences Method

If data are available, the benchmark and before-during-after methods may be combined in a difference-in-differences model, which compares the changes in the prices in the relevant market to the changes in the benchmark market.[39] Accordingly, this method requires data for both the market of concern and the benchmark area or

industry, both during the period of the conspiracy and in an unaffected period. To the extent that the benchmark market provides a valid counterfactual for how the affected market would have evolved but for the anticompetitive conduct, this method can provide a more reliable estimate than either before-during-after or benchmark models alone.[40]

# 4. Cost-based Method

Another method that has been used to estimate overcharges is the “cost-based” or “margin” method. This approach uses the difference between profit margins in the actual and but-for worlds to estimate overcharges. But-for prices are taken to be the estimated unit cost of production plus a “normal” competitive profit margin.[41] There are a number of limitations to this approach. First, it assumes that costs and price-cost margins would be constant during the relevant period. Second, if cost and profitability estimates are derived from the nonconspiracy period, the method assumes that costs and profitability would be determined in similar ways during and outside of the conspiracy period.[42] Third, it may be difficult to determine the competitive profit margin that is appropriate for the industry of interest and reflects an economic (rather than accounting) measure of profitability. The cost-based method is often implemented in a similar fashion to before-during-after or benchmark models, thus some of the same issues raised in the context of those methods apply here as well.[43]

# 5. Implementation of a Damages Model

We provide here an illustrative example that demonstrates some of the decisions and challenges in

building a damages model. The example focuses on the before-during-after method, though many of the challenges apply to all of the methods. To begin, the before-during-after approach can be conceptualized with the aid of Figure 1, which depicts hypothetical prices for the product at issue between 1980 and 2001.




**Figure 1**

The first issue that must be addressed in calculating damages under all of the methods is the definition of the relevant conspiracy period, but this is particularly important for the before-during-after method because it identifies the price effect by comparing prices during the conspiracy to prices outside of the conspiracy period. In many antitrust cases, the beginning and ending points of a conspiracy may be determined based on the extrinsic evidence establishing liability, such as evidence of meetings to set prices or testimony by witnesses. In some cases, however, a plaintiff may simply pick a point in time, claiming that the conspiracy began "at least" that early. To the extent that the conspiracy was in operation and effective prior to that point, however, any before-during-after model will underestimate damages.

In Figure 1, we have assumed that the conspiracy began in 1990 and ended in 1995. Using these dates, the average "competitive" price was approximately $50 in both the preconspiracy and postconspiracy periods, and almost $80 in the conspiracy period. Suppose instead, however, that the cartel actually started in 1981 and did not end until 1997. Using these dates, the average competitive price remains almost $50, but the average price during the conspiracy is only approximately $60. As this example shows, before-during-after models can be highly sensitive to the designation of the beginning and ending dates.

More importantly, if the conspiracy started in 1981 and led to prices above those that otherwise would have prevailed, the large price increase that occurred in the early 1990s would no longer be "correlated" with the onset of the conspiracy, suggesting that some other factor—not explicitly accounted for by the model—was responsible for the large price increase. Alternatively, some factor not accounted by the model may explain why conspiracy prices were not above historical "competitive" prices until 1990. Thus, $50 would be unlikely to be a good estimate of the competitive price in the early 1990s.

Because the designation of the beginning and ending dates of the conspiracy is so important, courts have been careful to ensure that they are chosen based on the evidence or well-established economic theory, and not based on the normative judgments of economic experts or their counsel. For example, in *In re Aluminum Phosphide Antitrust Litigation*,[44] the court rejected the plaintiffs' expert's proposed conspiracy period, finding that there was "no scientific or theoretical basis" for the chosen ending date. The expert had acknowledged that the conspiracy had ended in late 1991, but had used only data after 1993 in building his model. The expert had sought to justify this on the grounds that a lag time was necessary for prices to

return to normal levels. The court rejected this approach, noting that there was no scientific basis that would allow an expert to "opine with any reasonable degree of economic or scientific certainty that a 15-month lag time was necessary or sufficient for prices to return" to normal levels.[45]

Once the beginning and ending dates are chosen, the next step is to construct a model based on data from the nonconspiracy period that can be used to estimate prices during the conspiracy period. The simplest model would be merely to calculate the average price in the preconspiracy and postconspiracy periods and compare the result to the average price during the conspiracy period. In the example above, the average prices in the preconspiracy and postconspiracy periods were approximately $50, while the price during the conspiracy period was almost $80. It would be easy to convince a jury that the prices in the conspiracy period were significantly higher than during the preconspiracy and postconspiracy periods. But is the overcharge the entire $30 difference?

Simply comparing the average collusive price to the average nonconspiracy price may be deficient if there are other factors that influence supply or demand and, thus, explain some of the differences in prices across these periods. Suppose, for example, the cost of a significant raw material doubled during the relevant period. Or suppose that a significant competitor went bankrupt and ceased production at the start of the relevant period, greatly reducing the available supply of the product. A model that fails to account for these factors could not provide a reasonably accurate estimate of actual overcharge, and thus damages. Depending on the nature of the omitted factors, the model may overestimate or underestimate actual damages.

Some courts have excluded damages estimates that are premised on the unsupported assumption that all of the

price increases during the relevant period were caused by the conspiracy.[46] Assuming that all of the price increases were caused by the antitrust violation raises two interrelated issues. First, other economic factors may be at least partly responsible for the price increase. Second, there may be lawful aspects of the defendants' conduct that contributed to the price increase. Indeed, numerous courts have held that plaintiffs must provide disaggregated damages estimates that distinguish between the effects of the unlawful conduct on the one hand and any lawful conduct on the other.[47] As the Seventh Circuit explained:

> For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence . . . . *Post hoc ergo propter hoc* will not do; nor the enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge. The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor . . . from the damages that resulted from particular forms of misconduct allegedly committed by that competitor.[48]

To determine how much, if any, of the observed price increase was due to collusion, rather than legitimate supply and demand factors, economic experts generally use multiple regression models. As one court explained, a regression model is technically "an equation that seeks to account for the major independent influences on the dependent variable—the variable that is estimated or forecast by the model—in order to arrive at a reliable

prediction of the dependent variable."[49] In spite of various theoretical difficulties,[50] regression analysis of overcharges in price-fixing cases, which is discussed in detail in Chapter 6, has become the standard mode of analysis used by both plaintiffs and defendants.[51]

# 6. Some Caveats for Overcharge Calculations in General

A host of potential problems are likely to arise in practice, but only a few will be discussed here. First, it is often unlikely that the conspiracy will function smoothly at all times. To the extent that there are episodes of cheating on the collusive agreement, some competitive prices will be intermingled with the collusive prices. If these outbreaks of competition can be identified clearly, they can be used to provide further information on the competitive benchmarks. If they cannot, then the sporadic competition may make damages harder to estimate or result in underestimated damages.

Second, the analyst often cannot obtain observations on the true variables of interest. For example, one may want a measure of marginal cost but have to settle for average variable cost. Marginal cost is the additional cost the firm would have to spend to make an additional unit of sales, beyond its current level. By contrast, average variable cost is calculated as total variable cost divided by sales volume. Except for special circumstances, average variable cost is unlikely to equal marginal cost. Similarly, one may use the Consumer Price Index or Producer Price Index to control for inflation generally, when industry-specific factors are quite different. In other words, in practice one must rely on proxies for the variables of interest—variables that are correlated with the variables of interest. If the proxies are

highly correlated with the variables of interest, estimation problems are reduced, but this is largely unobservable. In any event, proxies are necessarily somewhat imperfect measures of the true variables. As a result, some bias may be introduced into the estimation.[52]

Third, the values of some independent variables may have been influenced by the conspiracy. For example, the conspirators may agree on price, but compete on advertising and promotion.[53] As firms scramble for market share at the inflated collusive price, expenditures on promotion may rise above the level that they would have reached but for the collusion. Similarly, the absence of competition could lead to reduced efforts at cost control.[54] To the extent that these costs are used in predicting price, their inflation due to the conspiracy leads to a downward bias in the damage estimate.

Fourth, over time, demand and supply conditions change from what they were during the estimation period. As a result, if one uses the prediction model to estimate the but-for price, one is likely forecasting outside the sample range and, as a result, the standard error may be high. Thus, it may be hard to determine how much of any observed price differential is due to collusion and how much is due to changes in demand and supply conditions.[55]

Fifth, the variables in the model may be trending in similar ways such that the observed relationship is merely due to their similar changes over time. If this data problem, known as “nonstationarity,” is not addressed, the regression results may be spurious.[56]

# D. Bid-Rigging Cases

Bid rigging is a classic price-enhancement antitrust violation that arises when competitors reach an agreement concerning the prices or terms that each will offer in a

particular bidding contest or series of contests for the award of a business contract. For example, contractors typically bid for the opportunity to supply state and federal governments with goods and services. These procurement bids can encompass a range of dimensions, including price, technical specifications, service terms, and time table for deliverables, all of which can affect the likelihood that the bid is selected. Thus, because a contract can have multiple dimensions and is typically unique, determining overcharges in bid-rigging cases can, in practice, be more difficult than determining overcharges in typical price fixing cases in commodity markets.[57]

In principle, however, determining overcharges is no different in a bid-rigging case than in a typical price-fixing case. In either situation, the goal is to estimate the but-for price as compared to the actual price of the winning contract. Bid-rigging cases specifically require an assessment of what the winning bid would have been but for the conspiracy.

One way of estimating the but-for winning bid would be to analyze the documentary evidence to determine whether the conspirators had raised their bids after reaching an agreement and the degree to which they were raised. In the absence of such evidence, however, various statistical techniques could be used to estimate the amount by which the actual winning bid exceeded the but-for winning bid.[58] There are three primary methods: (1) the yardstick method, in which prices or margins on conspiratorial bids are compared to non-conspiratorial bids; (2) the prediction model, which seeks to determine what the likely bid would have been based on cost and other variables; and (3) the cost-based method, which compares costs of similar rigged and unrigged bids. These methods, which are similar to those discussed above in the section on horizontal price-

fixing, are discussed briefly below and in more detail in chapter 6.

Under the yardstick method, econometric models can be used to estimate the but-for winning bid. In this case, the explanatory variables could include at least a cost estimate, the number of bidders, and the dummy variable—which is equal to one if the job is rigged and zero otherwise—along with a disturbance term. The dependent variable is the winning bid. The model is estimated over the entire sample of rigged and unrigged bids. To estimate damages for any particular contract using this model, the dummy variable is set at zero, while the other variables remain the same, and a predicted competitive bid is generated.[59] This model allows more factors to be taken into account than does the bid-to-estimate ratio approach, but it assumes that the structural parameters are the same across rigged and unrigged contracts, and this assumption may not always be true.[60]

A second econometric method is the prediction model. It is similar to the yardstick method, except that the dummy variable indicating whether the individual contracts were collusively determined is omitted, and the model is estimated over the subsample of unrigged jobs only. Thus, the regression explains winning bids on the basis of cost estimates, number of bidders, and possibly other relevant variables. By then substituting observed values of the independent variables on rigged jobs into the estimated equation, predicted winning bids in the absence of collusion are generated. These would be the presumed competitive prices and would be subtracted from the actual bids to determine damages.[61] This approach allows more factors to be taken into account than either of the other statistical methods, but tends to be data-intensive. Which of the two econometric methods will be better will depend upon the circumstances of the individual case.[62]

A third method of calculating damages is to conduct a cost analysis of rigged and unrigged jobs that are comparable in design. After adjustments are made for minor cost differences, the difference between the bid price on the competitive job and the bid price on the rigged job would provide a measure of damages. This approach becomes difficult as the number of rigged jobs increases, for it becomes hard to find sufficient comparable unrigged jobs and expensive to perform the analysis when comparable jobs are found.

In some instances, the contracting authority or purchaser may itself develop cost estimates that can be used to develop damages models. If these estimates were developed in a consistent way, one can calculate the average ratio of the winning bid to the cost estimate either for rigged and unrigged jobs separately, or for all jobs.[63] When unrigged jobs can be identified with confidence, it is not necessary for the jobs to be comparable, for ratios are being compared, not the jobs themselves. The damage estimate would be the ratio of winning bid to cost estimate for the rigged job minus the average ratio for unrigged jobs, multiplied by the cost estimate for the rigged work. Equivalently, the damage measure would be the cost estimate for the rigged job multiplied by the ratio for unrigged jobs, subtracted from the rigged bid.

Basing damage estimates on cost estimates of contracting authorities has certain drawbacks. Such estimates are based on historic average costs, whereas a bidder calculates its bid on the basis of its marginal cost at the relevant time, which takes into account various fluctuating demand and supply factors, such as capacity utilization, expected number of bidders, and likelihood of winning other jobs. The marginal cost may be above or below average cost. The estimated cost generally should include the costs of production and inventories, which may

affect the opportunity cost of performing the work. Thus, the economic costs may fluctuate with business cycles.[64] In addition, by basing an estimate on historic data, the estimator may be incorporating collusive price increases that pervaded the earlier period.[65]

The approach implicitly assumes that the bid-to-estimate ratio will be the same for all competitive contracts; however, that is unlikely to be true. The number of bidders and other factors besides cost estimates and bid rigging might influence bidding behavior.[66] Moreover, this method assumes that the impact of collusion is fully reflected in the bid-to-estimate ratios, when in fact the ratios may differ from one collusive bid to another.

An additional complication that may arise in bid rigging cases is the need to determine whether some or all members of the bidding conspiracy (or ring, as it is sometimes called) would have bid for the contract in the first instance. This was an issue raised by the defendants, for example, in the recent private equity litigation, where the plaintiffs alleged that the private equity defendants agreed not to outbid each other to the detriment of the shareholders of various companies involved in leverage buyouts.[67] The defendants argued that they would not have individually bid on the deals in the first instance—if anything they would have group bid because of the size of the deals.[68]

# E. Other Causes of Action

## 1. Single Firm Monopoly Pricing

The offense of monopolization requires possession of monopoly power and exclusionary conduct, or conduct that excludes rivals on some basis other than efficiency.[69] When

a direct purchaser of an illegal monopolist sues, the obvious measure of damages is the monopoly overcharge. Conceptually, monopoly overcharge damages can be calculated in the same way as cartel overcharge damages, by determining a hypothetical competitive price, subtracting it from the actual price, and multiplying the resulting price differential by the quantity purchased. The only conceptual difference between monopolization and a cartel in applying this calculation is that, instead of a group of firms conspiring to charge a supracompetitive price, a single firm charges the monopoly price.

In practice, however, the determination of a hypothetical competitive price may be more difficult in the case of monopolization than in that of a cartel. Depending upon the scope of the monopoly, a benchmark or yardstick (firm or geographic area) may be difficult to find. To the extent that monopolies are more durable than cartels, periods of competition before, after, or during the span of monopoly pricing are apt to be harder to identify, and may be less likely to yield useful data.

Moreover, the analysis is complicated when the monopolist's power is not solely derived from its impermissible exclusionary conduct. One court has held that "a purchaser may recover only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct."[70] The court was concerned with the firm that acquired a lawful monopoly through superior efficiency or foresight, then preserved or strengthened its position by the use of exclusionary practices. The disaggregation rule assumes that part of a monopoly overcharge may be attributable to market power lawfully acquired and part to market power unlawfully obtained. In applying this rule, the task imposed on the analyst is to ascertain the price that the monopolist would have charged absent the exclusionary conduct, a price that,

due to the exercise of lawful market power could be greater than the competitive price but less than the actual price.[71] If the entire monopoly overcharge could have been extracted by virtue of legitimate monopoly power, regardless of exclusionary conduct, the plaintiff would be entitled to no damages, for the antitrust violation would have caused no marginal harm.

## 2. Overcharge Incident to Exclusion

Suppose a group of suppliers conspired to drive a more efficient competitor out of the market or, equivalently, to prevent a more efficient supplier from entering the market. The excluded firm would have a claim for antitrust damages based on lost profits, as discussed in Chapter 9.[72] Purchasers from the conspirators also would have antitrust claims if they paid higher prices as a result of the exclusionary practice.[73] The basic measure of their damages would be the same as the measure used in typical collusion cases, namely, the difference between the price actually paid and the price that would have been paid absent collusion, multiplied by the quantity purchased. However, there can be differences due to the possibility that the excluded competitors would have been more efficient than the defendants. First, unlike in the case of collusion, in the case of exclusion, the but-for price may be below the marginal cost of the actual supplier. That is because but for exclusion, the supplier might have been an entrant that is more efficient than the incumbents in the market, and the more-efficient entrant might charge prices below the incumbents' costs. Second, in the typical collusion case, but for the overcharge, the plaintiff would have purchased from the defendants at the competitive price, while in the exclusion case, but for the defendants' exclusion of more

efficient rivals, purchasers would have shifted at least some of their business to these rivals.

Although these differences pose no theoretical bar to recovery in the exclusion case, they do imply unique theoretical and practical difficulties. For example, it may be difficult to prove that a supplier who did not enter the market would have done so but for the exclusionary activity. Moreover, proving how the excluded firm would have influenced the competitive price had it entered the market can be difficult. For example, a firm entering a market with a cost advantage may set a price just below that of its rivals, not necessarily at its own cost.

In the long run, as long as the cost advantage of the excluded firm could be duplicated by other firms, competition would eventually force the market price down towards the marginal cost of the more efficient firms. Indeed, the conspirators themselves might switch to the more efficient technology. New entry and switching technologies typically take time, as the capacity of the low-cost supply is ramped up to meet market demand. A theoretically sound damages calculation should take account of the fact that, even absent the defendants' unlawful conduct, the plaintiffs may not have been able to make all of their purchases immediately from low-cost, excluded suppliers. Rather, the but-for price may have decreased gradually as additional low-cost capacity entered the market.

In *In re Lower Lake Erie Iron Ore Antitrust Litigation*,[74] the Third Circuit affirmed an award of damages based on the theory that defendants conspired to exclude more efficient suppliers in three vertically related markets.[75] The court allowed the steel companies to recover damages based on the lower prices they would have paid to the truckers.[76] However, the *Keogh* doctrine was held to bar any claim that

they would have paid lower rail transport rates absent the conspiracy.[77]

One can also imagine hybrid cases in which firms collude to both fix prices above their marginal costs and to exclude more efficient rivals. Overcharge calculations in such cases should reflect both the immediate effect on price that elimination of the price-fixing conspiracy would have had and the gradual effect from preventing the entry of more efficient rivals.

## 3. Umbrella Effects

In general, if a group of firms collectively has a sufficiently large share of a market and entry into the market and expansion are impeded, the group can exercise market power through express or tacit collusion even though the group does not include all of the suppliers in the market.[78] The group can raise price collusively, though not by as much as it could absent the competitive fringe. In response to such collusion, a rational nonparticipant, who was and remains a price taker, will also raise prices. This phenomenon has been called the “umbrella effect,” in that the competitive firm raises its prices under the protection of the price umbrella unfurled by the cartel. A buyer that purchases from such a competitive firm in a cartelized market therefore will pay more for the product than it would have paid absent collusion. This overcharge poses two principal questions: Can nonparticipants practically be distinguished from participants when all firms in the market are charging supracompetitive prices, and may the buyer recover overcharge damages for purchases made from a nonparticipant? The first question will generally go to liability, while the second is a question solely of damages.

As to the first question, sometimes, direct evidence may indicate which firms were and were not conspiring, as when

documentary evidence reveals a pattern of price communication among a distinct subset of firms in a market. Even absent such evidence, there is a theoretically simple empirical test to distinguish participants from nonparticipants: during the period of price enhancement, the market shares of nonparticipants should increase.[79] The rationale of this test is straightforward: participating firms will increase price by reducing output. Assuming nonparticipants have upward-sloping marginal cost curves, they will increase output to the point where their marginal costs equal the new price. The shape of their marginal cost curves, or collectively the short-run supply curve of the competitive fringe, implies that nonparticipants can profitably expand output if market price increases, but only to a point. Of course, over time, long-run supply responses in the form of new entry and expansion by the competitive fringe that is only profitable in the long run may force price back to the competitive level. But the immediate effect of the differing supply actions of participants and nonparticipants will be a shift in market share from the former to the latter, and that will not only serve to distinguish between the two, but also help to identify the beginning of the collusive period.[80]

Other methods of identifying nonparticipants are no doubt possible. For example, the increase in profits should be greater for nonparticipants than for participants, and one could attempt to measure the profits of all firms directly.[81] No matter how sound an econometric test is in theory, however, its usefulness is constrained by practical problems of measurement and data availability, including the difficulties of obtaining data from nonparticipants who are not parties to the litigation. These problems may render some tests, like an analysis of profits, wholly unavailable, and they may even make a test as simple and elegant as the market shares test harder to apply than one would

predict. Assuming, however, that nonparticipants can be identified, the question remains as to whether those who purchase from them may be, and ought to be, able to recover damages.

Arguably, a price increment that is paid for a product because suppliers have colluded satisfies the basic requirement of actual causation, as well as the rudiments of antitrust injury and antitrust standing, regardless of whether the seller participated in the conspiracy.[82] Determining the overcharge on purchases made from nonparticipants may be a relatively straightforward economic exercise when the participants and nonparticipants sell the same, homogeneous product. It will be more complex when the firms sell substitute or differentiated products. As the price of the cartelized product increases, demand will shift to the substitute product, causing the price of that product to rise. Though determining the increment in price caused by a collusive increase in price of a related product is likely to require calculations that control for more variables than would be necessary in the case of a single product, the task is no different in kind. Whether the task would be prohibitively different in degree will depend upon the facts of each case.

Whatever the economic merit, courts have split on whether to allow purchasers from nonparticipants to recover from participants,[83] with the recent trend against permitting umbrella theory damages.[84] Courts that have refused to allow recovery have done so on various grounds. Some have reasoned that damages for amounts paid to third parties are inherently speculative and that determining the existence and level of overcharge paid as a result of the defendants' conspiracy would involve the litigation complexity the *Illinois Brick* Court sought to avoid.[85] Similarly, some courts have pointed to the antitrust injury requirements of *Associated General Contractors* as prohibiting such

speculative damages.[86] Others have expressed reluctance to impose liability on defendants who have received no direct benefit from the plaintiffs' purchase.[87] This concern is related to a deterrence objective of antitrust damages only in the sense that, assuming liability is certain, depriving the defendants of the fruits of their illegal activity will ordinarily be sufficient to deter it. Other courts have permitted recovery, though not often in recent years.[88] (See part G of this chapter.)

## 4. *Vertical Price Fixing (Resale Price Maintenance)*

In 2007, the Supreme Court removed resale price maintenance, which is also referred to as vertical price fixing, from the per se rule.[89] Because such claims may still be upheld under the rule of reason, however, they may still result in liability and damages.[90] Assessing potential damages from vertical price fixing under the rule of reason requires an analysis of the reasons for the restraint, which in theory can serve either to enhance efficiency or to facilitate supracompetitive pricing.[91] In general, if prices are raised, customer plaintiffs likely will suffer compensable injury that can be calculated with acceptable precision. Plaintiffs who are present or excluded participants in the restraint are less likely to be able to prove damages.

A number of reasons, some anticompetitive and some efficiency-enhancing, have been suggested for why firms might want to use resale price maintenance.[92] One often proposed anticompetitive motivation is to facilitate a dealers' cartel or a suppliers' cartel.[93] When the resale price maintenance scheme facilitates cartel pricing, a customer of a dealer would suffer overcharge damages that are analytically identical to the damages suffered by a direct

purchaser from an ordinary horizontal cartel.[94] Accordingly, damages would be calculated in the same way.

The most widely accepted efficiency-enhancing explanation for resale price maintenance is the "free rider," or "special services" theory.[95] In this theory, the supplier recognizes that sales will be maximized only if dealers provide costly presale services. Some dealers provide the services, incurring the attendant costs, but others do not. Customers use the services provided by full-service dealers, then buy the product from free-riding dealers, who can afford to charge a lower price because they have not incurred the costs of service. Eventually full-service dealers refuse to incur costs that result in no return, and presale services cease to be offered. By setting a minimum resale price at the level necessary for dealers to offer presale services and make a profit, the supplier can induce the optimal amount of services. Dealers no longer have the ability to free ride on others, for if they do not provide services they will lose business to dealers who do, and the agreement prevents them from capturing sales by offering a lower price.[96]

If a customer sues a manufacturer over a vertical price-fixing arrangement that increases efficiency, such as by eliminating the free rider problem, the customer likely will not be able to assert a sensible theory of damages. Although the price will be higher than the price that would have prevailed absent the agreement, the package of product and service sold will also be different and better. Indeed, an efficiency-enhancing restriction will result in greater consumer surplus than would have been enjoyed absent the restraint. The restraint, therefore, far from causing injury, benefits the plaintiff.

Arguably a restraint that increases the level of services and thereby benefits some customers might harm other customers. The demand for services may vary among

customers. Because the supplier is interested in maximizing profits, it is concerned with the demand of the marginal customer. Thus, a supplier might impose a vertical restraint that would induce a level of service desired by the marginal consumer but not by infra-marginal consumers.[97] A consumer who did not want the services induced by a vertical restraint could be worse off. To date, no one has demonstrated that this theory of welfare loss can be used in practice to identify harmful resale price maintenance. Consumers wishing to prove damages would have to show that the value of the services to them was less than the cost of the price increase, but demonstrating the value of those services likely would be very difficult. Moreover, that consumer preferences for services differ is a necessary but not a sufficient condition for customers to be worse off due to the vertical restraint. Although some individual consumers would have preferred less service at a lower price, their losses may be less than the benefits to customers who put a higher value on service.[98] Even if a consumer could prove to have suffered this kind of individual injury, that would not prove there was an aggregate welfare loss and thus an antitrust injury.[99]

Possible plaintiffs in resale price maintenance cases include not only consumers but also dealers who refuse to comply and are consequently cut out of the distribution chain. If the system of resale price maintenance increases efficiency by eliminating free riding, then the dealer's claim amounts to an assertion that the dealer was entitled to earn whatever profits were available from free riding on the investments of others in the distribution chain. Courts have rejected the argument. As one court explained: "The prevention of free riding is not, as yet anyway, a defense to a charge of resale price maintenance; but neither is being prevented from taking a free ride on another dealer's efforts

a form of antitrust injury compensable by a damage award."[100]

If instead the vertical price-fixing arrangement facilitates collusion, the premise of the injured dealer's claim is different. Suppose, for example, that the injured dealer was driven from business by the refusal to supply if it reduced prices. Under these circumstances, the dealer may have a damages claim due to the loss of profits that it would have earned in a competitive market. The usual measure of damages asserted is the profits that would have been earned had the dealer been allowed to price freely, rather than an overcharge.[101] Lost profits damages are discussed in Chapter 9. One issue concerning the calculation of those damages should be noted here. Because of the collusion, prices prevailing in the market may include an overcharge. That overcharge should not be included in calculating the dealer's damages. The loss of profits made possible by an antitrust violation does not constitute antitrust injury.[102]

Immediately after the Supreme Court decided that resale price maintenance cases would be determined under the rule of reason, some questioned how many such cases would be brought,[103] and in fact such cases now seem rare. A Lexis search from 2007 until October 2013 found only two such cases where courts seriously considered issues of damages calculation. Both cases involved customer classes as plaintiffs. In one case, the Kansas Supreme Court considered only various methods of estimating overcharges and did not consider whether consumers had received additional services due to the restraint.[104] In the other case, the plaintiffs' economic expert argued at the class certification stage that the resale price maintenance was imposed by a dominant retailer to protect it from potential entrants and did not result in any additional services. Thus, damages could be calculated based only on the

computation of the overcharge.[105] The court certified the class, and the case later settled.[106]

# 5. Tying Arrangements

A tying arrangement can be defined as the sale of one product (the "tying" product) on the condition that the purchaser buys a second product (the "tied" product") from the seller (or not from anyone else).[107] Tying arrangements are said to be per se illegal, although the per se rule is qualified in that it does not apply unless the seller has market power in the tying product, uses that power to force a customer to purchase a separate product, and thereby causes an anticompetitive effect in the tied product market.[108] Indeed, in *Illinois Tool Works v. Independent Ink*,[109] the Supreme Court sharply limited the application of the per se rule by making it clear that substantial market power—something that cannot be presumed even by the existence of a patent monopoly—must be shown in order to invoke the rule.[110] A full economic analysis of tying arrangements is complex, controversial, and beyond the scope of this volume.[111] The explanations for these arrangements will be noted here only as they relate to damage analysis.

A tying arrangement can injure either competitors of the defendant in the supply of the tied product or purchasers of the tied package. The former kind of injury, exclusionary by nature, is addressed in Chapter 9. Injury to purchasers, however, is in theory a type of overcharge harm, the subject of this chapter.

Courts use two basic methods to measure damages in tying cases. One method is the "tied product" approach, in which damages reflect the difference between the price actually paid for the tied product and the price for which the

item could have been purchased on the open market. The second approach is the "package" measure, which would award damages only to the extent that the plaintiff overpaid for the *combination* of the tied and tying products.[112]

In many of the common explanations of tying arrangements, whatever else may be true, the tied product is sold at a price that exceeds the price at which the same or a similar product could be purchased in the absence of the tie.[113] In particular, many tying arrangements appear to be methods of price discrimination. For example, the tied product may be used to meter the intensity of use of the tying product, and the tie may allow the seller to extract higher revenue from those who place a higher value on the tying product, as demonstrated by their more intense use. When the tie is used for this purpose, the price of the tied product must exceed the competitive price, though only by a little. As a result, the purchaser might claim damages measured by the difference between the competitive price of the tied product and the actual price, multiplied by the quantity purchased.[114] The amount is likely to be easy to calculate, much easier than the amount of overcharge in a price-fixing case, because a contemporaneous market price for the tied product is likely to exist.

But, to the extent that the tying arrangement is designed to maximize profits that are available from sale of the tying product, a different and higher price would very likely have been charged for the tying product in the absence of the tie. Thus, in the but-for world of overcharge damage calculation, the simple difference between the actual and market prices for the tied product presents a skewed picture. The court realized this point in *Kypta v. McDonald's Corp.*,[115] and held that "injury resulting from a tie-in must be shown by establishing that payments for both the tied and tying products exceeded their combined fair market value."[116] Of course, when the tying and tied products are

complementary and used in fixed proportions, no greater profit can be extracted from use of a tie than could be earned by sale of the tying product alone at the monopoly price.[117] The implication is that a purchaser could never prove that the price of the tied package exceeded the price that would have been paid for the tying and tied products purchased separately. Even when the products are used in variable proportions, the price for the tied package may be lower than the combined price of the tying product sold at a monopoly price and the tied product sold competitively.[118]

The analysis of products used in fixed proportions does assume that the seller in practice could have extracted the same profit through pricing of the tying product absent the tie. When a tying arrangement is used as a metering mechanism, the question is whether a different metering device would have been lawful and practical.[119] Thus, for example, a piece of paper may be combined with a unit of mechanical copying service to provide one copy. A tie between the machine and paper might allow the seller to charge intense users more than light users. If the supplier could lease the machine and charge rent that varied with the amount of use, no customer could claim that he or she paid more for the tied package of machine and paper than would have been paid for the products acquired separately.

If instead direct metering is impossible or separately illegal, then the purchaser might or might not have been better off absent the tie. Moreover, a tie involving products used in variable proportions can also function to price discriminate. In any case where the tying arrangement is a method of price discrimination and the alternative to the tie is a single, monopoly price for the tying product, or at least a less perfect form of price discrimination, some consumers are likely to be made better off by the tie and others worse off.[120] The plaintiff’s ability to satisfy the *Kypta* standard presumably will depend upon a showing that he or she

would have fared better under the defendant's best alternative to the tying arrangement.

Whether the plaintiff can satisfy the *Kypta* standard when the tying arrangement serves some function other than price discrimination will depend upon the function involved and the plaintiff's identity and proof. Thus, for example, a tie might be used to avoid price regulation in the tying product market.[121] Though one might question whether an antitrust sanction is appropriate for regulatory evasion,[122] the plaintiff presumably would be able to show that he or she paid a higher price for the package than would have been lawfully charged absent the tie. A tie designed to protect the supplier's goodwill by insuring the quality of technologically interdependent products is likely to result in a higher price for the package, but the package will consist of higher quality components. An appropriate calculation will adjust for quality, and the plaintiff may be unable to show harm.

# F. Special Circumstances

Certain circumstances may complicate the calculation of the overcharge. Two of these, non-price collusion and price regulation, are discussed below.

## 1. Non-price Collusion

The standard overcharge measure implicitly assumes that the product, understood to mean the bundle of product and service attributes involved, sold by the cartel is the same product that would have been sold in competition, except that the price is higher and consequently the volume smaller. A cartel, however, may agree to restrict product dimensions other than price or quantity. In situations where these product dimensions influence purchasing decisions, the agreement may harm consumers, and damages

equivalent to overcharge damages can be calculated. But such agreements are not always amenable to overcharge analyses.

For instance, in *Catalano, Inc. v. Target Sales*,[123] beer wholesalers agreed to refuse to extend trade credit to retailers. Prior to the agreement, wholesalers had extended credit without interest up to the limits permitted by state law, in actual amounts that varied among individual retailers. The Court found that the agreement constituted per se illegal price fixing. If, however, wholesalers continued to compete on list price, so that lower list prices were quoted in lieu of credit, then the net price would not have been affected by the agreement; indeed, if the agreement reduced transaction costs, as by lowering retailer search costs, the agreement might have resulted in lower net prices. In that event, no overcharge could rationally be calculated.

In the absence of evidence that list prices were fixed, one might ask why a cartel would bother restricting credit terms. A cartel might be able to engage in tacit collusion with respect to list prices, and list prices may be readily ascertainable, thereby allowing the collusive price to be policed. Credit terms may be inherently more difficult to verify, and so an agreement to eliminate credit may serve to stabilize the collusive arrangement by limiting competition to one easily verifiable dimension.[124] It is therefore theoretically possible that an agreement to restrict some dimension of competition other than price or output may result in an overcharge that can be calculated by use of conventional means. It is also possible for such agreements to result in no anticompetitive harm.

One also could imagine a horizontal agreement to restrict the variety of product attributes available in the market. For example, suppose brewers agreed to supply beer only in bottles. If the agreement facilitated collusion, one would

expect the price of beer in bottles to be higher while the agreement is in effect. The overcharge can be calculated even though it would understate the true measure of lost consumer surplus, because consumers who prefer cans (and would be offered them in a competitive market) would be denied the opportunity to buy them. If price is not higher, however, a court might nevertheless hold that the agreement, by limiting the choices available, constitutes an antitrust violation. The monetary value of the harm caused by such a violation would be difficult or impossible to calculate.[125]

Limited collusion may also involve agreements that effectively raise purchasers' search costs, for example, through restrictions on advertising, hours of operation, or information about product price and quality. Although this form of collusion does not entail agreements to raise price, restrict output, or divide markets, it may reduce competition and ultimately result in higher prices.[126] For example, members of the Detroit Auto Dealers Association entered into an agreement to restrict their hours of operation by closing Saturdays and most weeknights.[127] The agreement made shopping significantly more difficult for consumers, which ultimately led to increased prices. The National Society of Professional Engineers promulgated an ethical code that forbade members from discussing price until immediately before contracts were signed.[128] Customers typically made a considerable investment of time working with the engineers to specify the project in detail. Prices, however, were not revealed until after the specification process was complete and the engineer was initially selected. Although a customer could refuse to engage the engineer after learning of her rates, the customer's ability to comparison shop based upon the prices of engineering services was severely impaired.[129]

## 2. Regulated Prices

Collusion may occur in regulated industries. When it is not explicitly or implicitly immunized, it can constitute an antitrust violation. Overcharge damages stemming from regulated prices, in theory, can be calculated the same way they are calculated in unregulated settings, except that the analyst must assess whether the hypothetical competitive prices would have been permitted by the regulatory authority. That question involves an analysis of the agency's power to regulate rates and of any statutory constraints imposed on the agency, such as that approved rates may not be discriminatory.

Despite the theoretical possibility of calculating overcharge damages in regulated industries, whether treble damages can be recovered is uncertain. In *Keogh v. Chicago & Northwestern Railway Co*,[130] the Supreme Court held that a shipper cannot recover damages for railroad rates inflated by a price-fixing agreement when the rates are approved by the Interstate Commerce Commission.[131] Though acknowledging the validity of criticism of the *Keogh* doctrine, the Court affirmed the doctrine in *Square D Co. v. Niagara Frontier Tariff Bureau*,[132] largely based on longstanding implicit Congressional approval of it. Proper application of the "filed rate doctrine," as it is sometimes called in contexts other than motor and rail carriage, is difficult to determine. The intricacies of this area are beyond the scope of this volume.[133]

# G. Suit by Indirect Purchasers[134]

The first purchaser of a price-fixed product (the direct purchaser) will often resell that product to an indirect

purchaser, which may itself resell that product to still another indirect purchaser, and on down the line until the product reaches the end consumer. In such cases, at least some of the overcharge will be passed on by the direct purchaser to the indirect purchaser(s) in the form of a higher price for the good.[135] One or more of these indirect purchasers, then, almost always can legitimately claim to have suffered overcharge harm as a result of a successful price-fixing conspiracy. But, with some exceptions explored below, federal law will not permit these indirect purchasers any recovery. However, indirect purchasers still may play a large role in many damage actions, because state antitrust laws frequently do permit such plaintiffs to recover.

# 1. Indirect Purchaser Standing Under Federal Law

In *Illinois Brick Co. v. Illinois*,[136] the Supreme Court held that indirect purchasers may not recover under Section 4 of the Clayton Act[137] for any part of the overcharge harm sustained. The Court began its analysis by addressing its prior holding in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*[138] that an antitrust defendant may not assert against a direct purchaser plaintiff that part of the overcharge was passed on and that the plaintiffs' damages should be reduced accordingly.[139] If such defensive use of the pass-on theory was impermissible but indirect purchasers were allowed to recover through offensive use of the doctrine, the defendant would be exposed to multiple and overlapping liability. The Court also identified the basis of the *Hanover Shoe* rule as a desire to simplify and control the costs of antitrust litigation, thereby conserving judicial resources and promoting the private treble-damage action as an effective deterrent to anticompetitive conduct. The litigation

complexity that was avoided by disallowing the pass-on defense was equally at stake in the offensive use context, and so the reasoning of *Hanover Shoe* similarly argued for rejecting the claim. The Court therefore was obliged either to overrule *Hanover Shoe* and allow both defensive and offensive use of the theory, or to hold in *Illinois Brick* that offensive use, like defensive use, is impermissible.

The Court opted to reject use of pass-on in both contexts. It was concerned that an alternative rule would make antitrust litigation dramatically more complex, as all parties in a distribution chain would have to participate in the litigation, and amounts of the overcharge passed on to various levels would have to be calculated. The Court also believed that concentrating recovery in the direct purchasers, by allowing them to recover the entire overcharge regardless of the proportion passed on, would encourage private suits by increasing the potential payoff and therefore would promote the deterrence objective of antitrust enforcement.

The *Illinois Brick* Court rejected the argument that exceptions to the pass-on rule should be carved out for particular markets where the direct purchaser is likely to pass on substantially all of the overcharge. The Court noted that classifying market situations according to the amount of pass-on likely to be involved would entail the very problems of litigation complexity that the *Hanover Shoe* rule was meant to avoid. In *Hanover Shoe*, however, the Court did "recognize that there *might* be situations—for instance, when an overcharged buyer has a pre-existing 'cost-plus' contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing-on defense not be permitted in this case would not be present."[140] And in *Illinois Brick,* the Court reiterated this potential exception to the rule precluding offensive and defensive use of passing-on arguments:

> In such a situation, the purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price. The effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.[141]

The Court also noted, "[a]nother situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer."[142] However, this exception has been narrowly construed, particularly in the absence of a parent-subsidiary relationship.

In *Kansas v. Utilicorp United*,[143] the Court reaffirmed the principle of *Hanover Shoe* and *Illinois Brick* and, without conceding that it would recognize any exception to the rule, demonstrated that any such exception would be very narrow.[144] In that case, a group of natural gas producers and a pipeline company allegedly fixed prices. The gas was resold to a regulated utility, which resold to consumers. The utility and other direct purchasers sought damages for both the amount overcharged and the decrease in sales caused by the overcharge. The indirect purchasers—consumers, who were represented by two states in their capacity as parens patriae, and the states as representatives of governmental entities who themselves purchased gas—also sued. The defendants asserted that the direct purchasers had not been harmed because they had passed on the entire overcharge pursuant to the mandates of state rate regulation. The indirect purchasers, meanwhile, claimed that they should be allowed to recover the entire overcharge because, given regulatory strictures, they had absorbed all

of it, and they argued that the direct purchasers should be allowed to recover only for lost business.

The Court rejected the defendants' argument that the direct purchasers had not been injured, and it refused to allow the indirect purchasers' suit.[145] In short, the Court declined to establish an exception to the pass-on rules for cases involving utilities, even when the demand for a product is inelastic and, because of government regulation, the direct purchaser increases the price to indirect purchasers by the exact amount of the overcharge. The Court acknowledged "the possibility of an exception for cost-plus contracts," but found that any such exception would be narrower than the one sought in that case for utilities generally.[146]

Despite this strong language, some courts have recognized exceptions to the *Illinois Brick* bar beyond those the Supreme Court decisions explicitly authorize. A string of Ninth Circuit cases, for example, has permitted indirect purchasers to sue if the supplier from which they purchase is owned or controlled by a defendant.[147] Other courts have rejected standing on similar theories.[148]

The pass-on rules of *Hanover Shoe* and *Illinois Brick* have evoked a lively scholarly debate.[149] Moreover, political opposition to that part of the doctrine that precludes indirect purchaser suits has been substantial. Bills have been introduced in Congress to overturn all or part of the rule.[150] The Antitrust Modernization Commission (AMC) recommended that Congress overrule the Supreme Court decisions in *Illinois Brick* and *Hanover Shoe* to the extent necessary to allow both direct and indirect purchasers to recover for their injuries.[151] This would eliminate the "windfall" to purchasers who have passed on the overcharge, while providing relief to the purchasers who have actually borne the overcharge. The AMC also recommended allowing removal of state indirect purchaser

actions to federal court, and consolidation of all direct and indirect purchaser actions in a single federal forum for both pretrial and trial proceedings.[152]

## 2. Indirect Purchaser Standing Under State Law

Various states have adopted rules that permit indirect purchasers to recover under state antitrust laws, so-called *Illinois Brick* repealers.[153] Indirect purchaser suits can be authorized either by explicit statutory provision or by judicial interpretation of statutes that are ambiguous on the issue. At least twenty-five states and the District of Columbia now permit indirect purchaser standing either through *Illinois Brick* repealers or judicial decision.[154]

In *California v. ARC America Corp.*,[155] the Supreme Court held that federal antitrust law, as interpreted in *Illinois Brick*, does not preempt state rules that allow recovery by indirect purchasers.

## 3. Possibility of Duplicative Recovery

When plaintiffs at different levels of a distribution chain assert antitrust claims under state laws, whether in conjunction with federal claims or independently, the proportion of an overcharge incurred by a direct purchaser and the proportion passed on to indirect purchasers may have to be determined.[156] This presents a risk that the defendants may face multiple recovery—paying damages to a direct purchaser (who, under *Hanover Shoe* is entitled to 100 percent of any overcharge) as well as the indirect purchasers buying from that direct purchaser. The risk is potentially exacerbated because as a constitutional matter, a state may reject the symmetry the Supreme Court found

compelling in *Illinois Brick* and allow the direct and indirect purchasers each to recover the whole overcharge, thereby condoning multiple liability. In *ARC America*, the Court said: "Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law . . . and no clear purpose of Congress indicates that we should decide otherwise in this case."[157] As a result, theoretically an antitrust defendant could be required to pay the entire overcharge in damages to the direct purchaser in a federal action and the same amount to the indirect purchaser (or many indirect purchasers) in a state action.[158] While acknowledging that duplicative recovery may occur as a result of the patchwork of legal rights, courts have to date not offered much of an explicit remedy.[159] As discussed in the next section, the consideration of pass-on evidence in calculating damages to indirect purchasers may be a partial solution to the problem of duplicative recovery.

## 4. Calculating Damages to Indirect Purchasers

The estimation of overcharges suffered by indirect purchasers is considerably more complex and requires significantly more information than does the estimation of direct purchasers' overcharges.[160] Analysis of pass-on requires information on downstream market dynamics, which may involve complex distribution channels and multiple stages of distribution.[161] Depending on the characteristics of demand, direct purchasers may pass on all, some, or none of the overcharges to intermediaries in the distribution chain, and those intermediaries in turn may pass on all, some, or none of their share of the overcharge to end consumers.

Generally, estimation of the damages to indirect purchasers will begin by estimation of the damages to the direct purchaser, i.e., the overcharge.[162] Then the analysis will shift to how such an overcharge was "passed on" down the distribution chain, which will often be expressed in terms of a percentage (i.e., "100 percent pass-on" or "50 percent pass-on"). The harm to any particular plaintiff can therefore be calculated as the product of the overcharge and the pass-on from those entities above the plaintiff in the distribution chain ("upstream pass-on") and, if any, below the plaintiff in the distribution chain ("downstream pass-on").

An additional complication is that in some cases the plaintiffs may be indirect purchasers in the actual world yet would have been direct purchasers in the but-for world.[163]

Several approaches have been suggested for estimating the share of the overcharge that is passed on to indirect purchasers. One approach would be to rely on the theory that because firms operate in competitive markets, they do not make economic profits, and thus need to raise price to recover any cost increase they suffer due to an overcharge. The assumption that markets are so competitive that firms must raise prices to pass on any cost increase often is questionable, however, and thus by itself may not be sufficient to establish damages.[164] Another approach, which is informed by tax incidence analysis, estimates passing on based on the price elasticities of parties in the chain of distribution; this analysis requires estimating those elasticities and assuming that distributors and retailers do not act strategically.[165] Courts have greeted the use of tax incidence analysis with skepticism due to its assumptions and the difficulties in measuring elasticities of demand.[166]

The share of the overcharge passed on to indirect purchasers may also be estimated using econometric methods similar to those used to estimate the overcharge to

direct purchasers.[167] For example, in one case, the indirect purchasers' economic expert estimated regressions using costs at the start of the distribution chain and prices at the end of the chain as variables.[168] Two approaches were used. One looked only at the cost at the start of the chain and the price to the final consumer. The other looked at the passing on of overcharges separately at each level of the distribution chain.[169] Econometric studies of the passing on of overcharges to indirect purchasers require a great deal of care as differences in the specification of the model may have a large effect on the final results.[170]

# H. Deadweight Loss

It is the fundamental law of demand that as the price of a product increases, the amount purchased decreases. A collusive price increase, therefore, will result in a reduction in the quantity of the good purchased. The reduction can take the form of smaller quantities bought by those who purchase as well as the failure to purchase any quantity by those who would have purchased positive amounts at lower prices. For the purposes of economic analysis, these categories of purchasers are indistinct, but the difference may play a practical role in proving damages, as the discussion below will illustrate. The volume not purchased because of an anticompetitive price increase represents a loss of allocative efficiency because it implies that consumers would have derived more value from having those units of the good than it would have cost suppliers to produce them. Of course, consumers who do not purchase at the anticompetitive price may purchase substitute products but the value derived from the substitutes will be less than the value they would have derived from the price-fixed product.[171]

The loss in allocative efficiency due to anticompetitive acts is in theory a component of the optimal penalty, and like the overcharges associated with umbrella pricing, it satisfies requirements of causation and antitrust injury. In practice, calculation of private damages based on deadweight loss is problematic. First, there are obvious practical problems associated with proving what purchases would have been but were not made. In this respect, the difference between a purchaser who buys less and one who does not buy at all may be significant. Direct evidence that the volume purchased was decreased is likely to be more substantial and probative than evidence that a nonpurchaser would have purchased.

Second, the overcharge is not readily usable in theory as a measure of the loss of allocative efficiency. The difference between the price charged and the competitive price (or the price that would have been charged absent the illegal agreement), when multiplied by the quantity actually purchased, is an accurate measure of the wealth transfer from consumers to producers resulting from the violation.[172] However, the price differential multiplied by the quantity that could have been profitably supplied but was not sold overstates the deadweight loss. The reason is that if the cartel had increased its output to the efficient level, each additional unit would have been valued at a steadily decreasing rate by consumers. The price that suppliers could have charged to extract that value from consumers would have gradually fallen as production increased; the price would not have remained at the observed cartel price. Thus, even if it could be plausibly determined how much more of the product would have been sold at the competitive price, multiplying that amount by the difference between the actual price and the presumed competitive price would result in damages in excess of the deadweight loss. An accurate theoretical measure would require a

downward adjustment, and that adjustment would depend upon the shape of the demand curve.[173] In the end, no tolerably precise adjustment has proven feasible.

In *Montreal Trading v. AMAX, Inc.*,[174] the court held that one who never purchases a product because the defendants limit production as part of a price-fixing conspiracy cannot recover damages. The court found three considerations dispositive. First, the *Illinois Brick* court[175] expressed the view that the treble damage remedy is designed in part to deprive violators of the fruits of their illegality, and conspirators gain no fruits on non-sales, except to the extent that volume had to decline in order to earn monopoly profits on the quantity sold. Second, a grant of standing might result in potentially outsized recoveries by those only tenuously hurt. Third, the fact of a party's injury, as opposed to the amount, may be inherently speculative.[176] The court did comment, however, that damages might be permitted when "the nonpurchaser can show a regular course of dealing with the conspirator."[177]

Given the view that theoretically accurate damages for the quantity not sold cannot be measured,[178] the choice appears to be either to permit excessive recovery or to impose inadequate liability. This choice, however, assumes that the damage multiple simply reflects the probability of liability being incurred. If that probability is in fact greater than 33 percent, then three times the overcharge on the quantity sold may be an accurate measure of the optimal penalty. If, on the other hand, the probability is equal to or less than 33 percent, then excluding damages for the quantity not sold will result in inadequate deterrence, and permitting recovery of these damages may not be excessive.[179]

---

1. 15 U.S.C. § 1.
2. 15 U.S.C. § 4.

3. Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice § 17.5a (4th ed. 2011).
4. Robert N. Strassfeld, *If . . .: Counterfactuals in the Law*, 60 Geo. Wash. L. Rev. 339 (1992).
5. Roger D. Blair & Christine A. Piette, *Antitrust Injury and Standing in Foreclosure Cases*, J. Corp. L. 401, 413 (2006). *See also* Chapter 9 for a discussion of damages from foreclosure.
6. Econometric issues involved in estimating these models are discussed in Chapter 6.
7. For a more extensive discussion of economic and econometric modeling, see Chapter 6. Econometric modeling is also discussed in Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* Reference Manual on Scientific Evidence 181 (2d ed. 2000); An Introduction to Regression Analysis, in Chicago Lectures in Law & Economics 1 (E. Posner ed.) (Foundation Press: 2000); Econometrics: Legal, Practical, and Technical Issues, American Bar Association Editors, 2014; [hereinafter *Econometrics*] Franklin M. Fisher, *Multiple Regression in Legal Proceedings*, 80 Colum. L. Rev. 702 (1980); Jonathan B. Baker & Daniel L. Rubinfeld, *Empirical Methods in Antitrust Litigation*, 1 Am. L. & Econ. Rev. 386 (1999); John E. Lopatka & William H. Page, *Economic Authority and the Limits of Expertise in Antitrust Cases*, 90 Cornell L. Rev. 617 (2005).
8. This is particularly important in light of the Supreme Court's decision in *Comcast Corp. v. Behrend*. *See, e.g.*, *In re* Rail Freight Surcharge Antitrust Litig., 725 F.3d 244, 252-55 (D.C. Cir. 2013) (holding that overcharge model that "also detects injury where none could exist" cannot sustain class certification).
9. In a monopoly case, the Second Circuit defined the measure of damages as "the price increment caused by the anticompetitive conduct that originated or

augmented the monopolist's control over the market" as distinguished from "the entire excess of the monopolist's price over that which would prevail in a competitive market." *See* Berkey Photo v. Eastman Kodak, 603 F.2d 263, 297-98 (2d Cir. 1979).

10. For a discussion of economic issues in estimating overcharges in antitrust matters, see James F. Nieberding, *Estimating Overcharges in Antitrust Cases Using a Reduced-Form Approach: Methods and Issues,* 9 Journal of Applied Economics 2 (2006) and Douglas Zona, *Structural Approaches to Estimating Overcharges in Price Fixing Cases,* 77 Antitrust Law Journal 2, 1011.Economic analysis may provide methods of estimating price elevation that are beyond the scope of antitrust damages under the law. *See* Robert E. Hall & Victoria A. Lazear, *Reference Guide on Estimation of Economic Losses in Damage Awards, in* Reference Manual on Scientific Evidence 322 (2d ed. 2000).

11. Depending on the overcharge model, it may not be necessary to make any assumptions about the structure of the market in the but-for world.

12. Timothy Bresnahan, *The Oligopoly Solution Concept is Identified*, 10 Econ. Letters 87 (1982); Hovenkamp, *supra* note 3.

13. *See, e.g.*, Taylor Publ'g Co. v. Jostens, Inc., 216 F.3d 465, 474-75 (5th Cir. 2000) ("[I]n an attempt case we focus on the harm that potentially might have been caused by the conduct in light of the state of the market."); *In re* Air Passenger Computer Reservation Sys., 727 F. Supp. 564, 568-69 (C.D. Cal. 1989) ("Only when the defendants achieve a monopoly and are in a position to harm consumers by engaging in monopoly overcharging, is there harm to the consumers.").

14. A "reduced form" model is a single equation that describes prices (the dependent variable) as a function

of various exogenous factors thought to influence supply and demand (such as costs, prices of substitutes, etc.). In principle, prices (and quantities) are the solution to a system of structural equations informed by economic theory, one equation for supply and one for demand. A reduced form model combines these relationships into a simpler expression by using the equilibrium condition that supply equals demand. A drawback to using a reduced-form equation is that it makes it more difficult to separate movements along the supply curve caused by anticompetitive behavior from shifts in the demand or supply curves caused by exogenous factors. *See Econometrics,* supra note 7, Chapter 3; Baker & Rubinfeld, *supra* note 7 (discussing class certification overcharge models in *In re* Propylene Carpet Antitrust Litigation, 996 F. Supp. 18 (N.D. Ga. 1997)).

15. If the average overcharge is not the most appropriate measure of the overcharge, in some circumstances the economic model may be constructed in a manner that yields estimates of overcharges for individual plaintiffs or groups of plaintiffs and for specific subperiods.

16. The precise calculation will depend on the construction of the overcharge model, which might for example estimate the overcharge as a percentage increase or as dollars per unit.

17. *See* Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 396 (1906) (affirming an award of damages based on "the difference between the price paid and the market or fair price that the city would have had to pay under natural conditions had the combination been out of the way").

18. Other methods have been proposed. For example, Douglas Zona proposes structural modeling to identify but-for prices and overcharges. See J. Douglas Zona,

*Structural Approaches to Estimating Overcharges in Price-Fixing Cases*, 77(2) Antitrust L. J. (2009).

19. *See also* Chapter 6 for a discussion of Before-During-After models.

20. *See* Conwood Co. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002) (before-during-after and regression analyses are "generally accepted methods for proving antitrust damages").

21. Unit charges may be lower than posted prices because customers are awarded credits or qualify for discounts.

22. *See In re* Auction Houses Antitrust Litig., No. 00-cv-0648, 2001 U.S. Dist. LEXIS 1713 (S.D.N.Y. 2001) (price-fixing overcharges estimated using the period before the conspiracy as the nonconspiracy period). In theory, the reverse may also be possible: a during-after model where the nonconspiracy benchmark is restricted to the period after the conspiracy.

23. In the lysine matter, the plaintiffs' model was challenged on the grounds that the but-for world would have reflected oligopoly pricing instead of perfectly competitive pricing, and the alleged conspiracy period may have reflected normal seasonal pricing. *See* Lawrence J. White, *Lysine Price Fixing: How Long? How Severe?*, 81 Rev. Indus. Org. 23 (2001).

24. The cartel may affect the price of an input, and failure to recognize this effect may lead to biased results. *See* Halbert White, Pauline Kennedy, and Robert Marshall, *The Measurement of Economic Damages in Antitrust Civil Litigation*, Economics Committee Newsletter, American Bar Association, Section of Antitrust Law, Spring, (2006), pp. 17-22.

25. *See In re* Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 976-79 (C.D. Cal. 2012) (finding expert's before-and-after model was unreliable because it failed to control for "changes in concert quality during the

relevant time period.”); Stein v. Pac. Bell, No. 00-CV-2915, 2007 WL 831750, at *12 (N.D. Cal. Mar. 19, 2007) (“Courts have consistently rejected ‘before-and-after’ models when experts failed to perform regression analysis or otherwise account for variables in the marketplace.”); Blue Dane Simmental Corp. v. Am. Simmental Ass’n, 178 F.3d 1035, 1040-41 (8th Cir. 1999) (finding expert’s before-and-after model was unreliable due to a failure to identify or examine other independent variables).

26. For more extensive discussions of econometric modeling, *see Econometrics;* supra note 7; Rubinfeld, *supra* note 7 and Chapter 6.

27. *See In re* Plastic Cutlery Antitrust Litig., No. 96-cv-728, 1998 U.S. Dist. LEXIS 3628, at *22-23 (E.D. Pa. 1998) (as it pertains to generalized proof of impact in class certification, “[t]he court of appeals has noted that multiple regression analysis is reliable when based upon complete and accurate data”).

28. For more discussion of dummy variable and prediction models, *see* Chapter 6.

29. *See In re* Chocolate Confectionary Antitrust Litig., 289 F.R.D. 200, 212 (M.D. Pa. 2012) (describing dummy variable approach to measuring overcharge). The economic model must be built on an understanding of the product market and what variables are affected by the conspiracy. *See*, Robert C. Marshall and Leslie M. Marshall, The Economics of Collusion: Cartels and Bidding Rings (2012).

30. *See* Justin McCrary and Daniel Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation,* 3 Journal of Econometric Methods 1 (2014). If more than one dummy variable is used, their values may be established to distinguish different subperiods within the conspiracy period. This may provide a more accurate estimate of

overcharges if the effectiveness of the conspiracy varied over time or if there would have been important changes in the economic conditions affecting prices in the but-for world that could not otherwise be captured by the model. In class action cases where class membership varies over time, estimating an overcharge for various subperiods may lead to a more accurate estimate of overcharges for specific class members than would an estimate of the average overcharge over the entire relevant time period.

31. The coefficient of the conspiracy period dummy variable is the average overcharge expressed in the same units as the price for linear models; for example, where the price variable is expressed in dollars (often referred to as price "level"), the overcharge is also in dollars. If the price variable reflects the natural logarithm of the prices, the conspiracy dummy variable coefficient (multiplied by 100) is approximately the percentage overcharge.

32. *See In re* Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 256 F.R.D. 82 (D. Conn. 2009) (order granting motion for class certification and approving use of dummy variable).

33. *See In re* Aluminum Phosphide Antitrust Litig., 893 F. Supp. 1497, 1503 n.14 (D. Kan. 1995) (noting that for two of the four defendant companies, the dummy variable analysis indicated that "defendants' prices were actually *lower* than would have been expected during the conspiracy period."); *In re* Chicken Antitrust Litig., 560 F. Supp. 963, 993 (N.D. Ga. 1980) (noting that regression yielded negative coefficient for the collusion dummy variable).

34. See the discussion of more advanced econometric techniques in Chapter 6. See also similar discussions in *Econometrics,* supra note 7; Zona, *supra* note 10; Fisher,

*supra* note 7; William H. Greene, Econometric Analysis Chapter 8 (7th ed. 2012); ABA Section of Antitrust Law, Econometrics (2005). An alternative econometric model to the commonly used models is presented in Yuliya Bolotova, John Connor and Douglas Miller, *The Impact of Collusion on Price Behavior: Empirical Results from Two Recent Cases*, 26(6) International Journal of Industrial Organization 1290-1307 (2008).

35. In principle, one could also estimate the equation using data from the conspiracy period and reverse the procedure as Fisher did to illustrate the problems with a different model used in *In re* Corrugated Container Antitrust Litigation, 441 F. Supp. 921 (S.D. Tex. 1977). *See* Franklin Fisher, *Statisticians, Econometricians and Adversary Proceedings*, 81 J. Am. Statistics Assoc. 394 (1986).

36. The benchmark method is also discussed in Chapters 4 and 6.

37. *See In re* Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 974-75 (C.D. Cal. 2012) (describing "Yardstick" methodology of comparing damages by comparing prices charged by allegedly monopolizing defendants to prices charged by companies other than defendants); *In re* Plastic Cutlery Antitrust Litig., No. 96-cv-728, 1998 U.S. Dist. LEXIS 3628, at *23 (E.D. Pa. 1998) (the yardstick or benchmark model involves comparison of the plastic cutlery industry with the characteristics of a comparable, or "yardstick" industry that is not affected by the price-fixing conspiracy).)

38. *See In re* OSB Antitrust Litig., No. 06-826, 2007 U.S. Dist. LEXIS 56617, at *27 (E.D. Pa. 2007) (rejecting argument in class certification context that plaintiffs' expert "'didn't need to' account for any variables other than the increased cost" of the relevant product).

39. The difference-in-differences method is discussed in more detail in Chapter 6.

40. Econometric methods may be used to adjust for observable differences in the benchmark and affected markets within a difference-in-differences approach. *See* Chapter 6.

41. *See, e.g.*, *In re* High Pressure Laminates Antitrust Litig., No. 00-md-01368, 2005 U.S. Dist. LEXIS 20317, at *6 (S.D.N.Y. Apr. 27, 2005) (expert employed cost/price ratio to determine extent of overcharge).

42. *See In re* Industrial Silicon Antitrust Litig., No. 95-cv-2104, 1998 U.S. Dist. LEXIS 20464 (W.D. Pa. 1998) (order denying plaintiff's motion to preclude expert testimony); ABA Section of Antitrust Law, *supra* note 34 at 173-77 (margin model used to estimate price-fixing overcharges did not control for market factors that might influence prices and margins, and thus could not accurately predict out-of-sample prices).

43. *See In re High Pressure Laminates*, at 11-13.

44. 893 F. Supp. 1497, 1503 (D. Kan. 1995).

45. *Id.* at 1502-03. *But see In re* Mushroom Direct Purchaser Antitrust Litig., No. 06-CV-0620, 2015 WL 5775600 (E.D. Pa. Aug. 5, 2015) ("[G]enerally criticisms of potential benchmark years go to the weight of opinions and not their admissibility") (quotation and internal ellipses deleted). The choice of beginning and ending dates for the conspiracy in econometric models is discussed in Chapter 6.

46. *See Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. at 1504 (noting that an expert's assumption that "the conspiracy was the sole cause of the price difference between the conspiracy period and the normative period" is "not a scientifically valid assumption, and the economic literature on the 'before and after' model conclusively refutes it"). *Cf.* Comcast v. Behrend, 133 S.

Ct. 1426, 1433 (2013) ("We start with an unremarkable premise. If respondents prevail on their claims, they would be entitled only to damages resulting from reduced overbuilder competition, since that is the only theory of antitrust impact accepted for class-action treatment by the District Court. It follows that a model purporting to serve as evidence of damages in this class action must measure only those damages attributable to that theory.").

47. *See In re* Rail Freight Fuel Surcharge Antitrust Litig. 725 F.3d 244, 254-55 (D.C. Cir. 2013); *Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. at 1504 ; MCI Commc'ns Corp. v. AT&T, 708 F.2d 1081, 1162-63 (7th Cir. 1982) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage . . . . To allow otherwise would force a defendant to pay treble damages for conduct that was determined to be entirely lawful."). *See generally* M. Sean Royall, *Disaggregation of Antitrust Damages*, 65 Antitrust L.J. 311 (1997).

48. Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410, 415-16 (7th Cir. 1992). *See also In re* Live Concert Antitrust Litig., 863 F. Supp. 2d 966, 977 (C.D. Cal. 2012) (rejecting expert's damages model because it did not "attempt to account for other probable causes" for alleged price increase).

49. *In re* Polypropylene Carpet Antitrust Litig., 93 F. Supp. 2d 1348, 1359 (N.D. Ga. 2000).

50. *See also* Fisher, *supra* note 7 (arguing that there is no way to determine the but-for values of the regression coefficients, which theoretically would reflect the effect of the cartel, from a single set of data).

51. See *Econometrics,* supra note 7, Chapter 12.

52. The econometric techniques commonly used to address this problem are discussed in Chapter 8 of Greene (2012), *supra* note 34.

53. *See*, *e.g.*, George J. Stigler, *Price and Nonprice Competition*, 72 J. Pol. Econ. 149 (1968) and Marco A Haan and Bastiaan M. Overvest, *Price Fixing and Non-Price Competition*, 2 Journal of Economics Review 26 (2008).

54. See Harvey Leibenstein, *Allocative Efficiency v. 'X-inefficiency*,' 56 Am. Econ. Rev. 392 (1966), for the classic article on this issue. For a skeptical view, see George J. Stigler, *The Xistence of X-Efficiency*, 66 Am. Econ. Rev. 213 (1976).

55. *See* Fisher, *supra* note 7, at 729.

56. *See* Chapter 6 for a discussion of nonstationarity and some commonly used solutions to this problem. See also Chapter 21 of Greene (2012), *supra* note 34; Finkelstein & Levenbach, *supra* note 51, at 165-68 (taking first differences of the data, using autoregressive and moving average terms in models).

57. *See* Jeffrey H. Howard & David Kaserman, *Proof of Damages in Construction Industry Bid-Rigging Cases*, 34 Antitrust Bull. 359 (1989); John M. Kuhlman & S.R. Johnson, *Estimating Damages on Highway Construction Contracts*, 29 Antitrust Bull. 719 (1984); Martin Pesendorfer, *A Study of Collusion in First-Price Auctions*, 67 Rev. Econ. Stud. 381 (2000).

58. *See* John Asker, *A Study of Internal Organization of a Bidding Cartel*, 100 American Economic Review 724 (2010). Kenneth Hendricks and Robert H. Porter, *An Empirical Perspective on Auctions*, 2073-2143 in 3 Handbook of Industrial Organization, (M. Armstrong and R. Porter eds., 2007). *Bidding, Bid Rigging, and School Milk Prices: Ohio v. Trauth (1994)*, 211-232 in The

Antitrust Revolution: Economics, Competition and Public Policy, (J.E. Kwoka, Jr. and L.J. White eds., 4th ed. 2004).

59. A variation of this method is to estimate the model over various subsamples (e.g., rigged and nonrigged bids), then to statistically test the differences in the estimated coefficients. *See* Pesendorfer (2000), *supra* note 57, at 401.

60. *See* Howard & Kaserman, *supra* note 57, at 377-79.

61. See the application of this method in Kwon Lee & Kyungdong Hahn, *Bid-Rigging in Auctions for Korean Public-Works Contracts and Potential Damage*, 21 Rev. Indus. Org. 73, 82 (2002).

62. Howard & Kaserman, *supra* note 57, at 379-81.

63. Though not addressing damages, the court in *United States v. Anderson*, 326 F.3d 1319, 1323-24 (11th Cir. 2003), did find relevant the engineers' estimates of the project cost. It is unclear to what extent the cost estimate would account for the normal economic profit of the winning bidder in the but-for world.

64. *See* Srabana Gupta, *The Effect of Bid-Rigging on Prices: A Study of the Highway Construction Industry*, 19 Rev. Indus. Org. 453 (2001).

65. Howard & Kaserman, *supra* note 57, at 371-72.

66. *See* Kuhlman & Johnson, *supra* note 57, at 728-31; Howard & Kaserman, *supra* note 57, at 375-77.

67. Fifth Amended Class Action Complaint for Violations of the Federal Antitrust Laws, *In re:* Kirk Dahl v. Bain Capital Partners, Lead Case No. 1:07-cv-12388-EFH (June 14, 2012).

68. *See* Declaration of Edward A. Snyder, Kirk Dahl v. Bain Capital Partners, No. 1:07-cv-12388-WGY (Jan. 24, 2014).

69. *See* United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985).

70. Berkey Photo v. Eastman Kodak Co., 603 F.2d 263, 297 (2d Cir. 1979). The holding is criticized on a number of grounds in James R. McCall, *The Disaggregation of Damages Requirement in Private Monopolization Actions*, 62 Notre Dame L. Rev. 643 (1987).

71. The *Berkey* court expressly declined to comment on how the burden of proving the causal relationship between misconduct and damages, or lack of it, should be allocated once the plaintiff makes a preliminary showing of persistent monopoly power and a substantial history of anticompetitive conduct. *Berkey*, 603 F.2d at 298 n.58.

72. Methods of estimating lost profits are also discussed in Chapter 5. *See also* Roger D. Blair and Christine A. Piette, *Antitrust Injury and Standing in Foreclosure Cases,* 31 J. Corp. Law 2, (2006).

73. However, if the exclusionary practice is predatory pricing, purchasers would benefit from lower prices in the short run.

74. 998 F.2d 1144 (3d Cir. 1993). For a related case, see *Pinney Dock and Transport Corp. v. Penn Central Corp.*, 838 F.2d 1445 (6th Cir. 1988).

75. Specifically, the steel companies alleged that the defendant railroads, which also owned and operated docks, conspired to prevent the introduction of a more efficient method of transporting iron ore across the Great Lakes and over land to steel plants. The defendants were found to have delayed the entry of more efficient self-unloading vessels into the lake transport market, thereby preserving the need for the railroads' less efficient dock operations. They also were found to have delayed the entry of trucks into the market for land transportation of ore, thereby forcing steel companies to use less efficient rail transportation. *See Lower Lake Erie*, 998 F.2d at 1169-70.

76. The steel companies were allowed to recover for the difference between dock handling charges actually paid and the charges that would have been paid had more efficient dock operators not been excluded. They were also allowed to recover the overcharge on lake transport caused by the exclusion of self-unloaders. See *Lower Lake Erie*, 998 F.2d at 1168-69.

77. The *Keogh* doctrine is discussed *supra* note 133 and accompanying text. In *Keogh v. Chicago & Northwestern Railway Co*, 260 U.S. 156 (1922), the Supreme Court held that a shipper cannot recover damages for railroad rates inflated by a price-fixing agreement when the rates are approved by the Interstate Commerce Commission. *Id.*, at 162-63.

78. A residual demand curve can be calculated for the group, which represents the market demand curve minus the supply curve of the nonparticipating suppliers, and a profit-maximizing, supracompetitive price for the group can be ascertained. *See* Dennis W. Carlton & Jeffrey M. Perloff, Modern Industrial Organization 147-149 (4th ed. 2005).

79. *See* Roger D. Blair & Richard E. Romano, *Identifying Participants in a Price-fixing Conspiracy: Output & Market Share Tests Reexamined—Reply*, 12 Review of Industrial Organization 2, (1997). An equivalent test is that the output of nonparticipants will increase whereas the output of participants will contract, relative to the respective outputs of the firms in the absence of collusion. The advantage of expressing the test in terms of market share is that it is determinative even if demand is increasing, when the outputs of both may increase, though at different rates. *See id.* at 291.

80. A version of this test reportedly was accepted by the court in *E.W. French & Sons v. General Portland*, Civ. No. 78-1928-TJH (C.D. Cal. Oct. 2, 1985). The decision is

discussed in Roger D. Blair & Richard E. Romano, *Distinguishing Participants from Nonparticipants in a Price-Fixing Conspiracy: Liability and Damages*, 28 Am. Bus. L.J 33, (1990) at 41 & n.16.

81. *See* Blair & Romano, *supra* note 80, at 41 & n.16.

82. *See* William H. Page, *The Scope of Liability for Antitrust Violations*, 37 Stan. L. Rev. 1445, 1465-67 (1985); Roger Blair & Virginia Maurer, *Umbrella Pricing and Antitrust Standing: An Economic Analysis*, 1982 Utah L. Rev. 763 (1982).

83. *See* Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 247a, ¶ 247b (3d ed. 2006), ¶ 337.3 (hereinafter Areeda & Hovenkamp). The possibility of recovery from members of a cartel for purchases from competitors of the cartel is conceptually distinct from the issue of recovery from cartel members for purchases from coconspirators who are not named as defendants. Given that the Supreme Court has held that antitrust defendants have no right of contribution, *Texas Industries v. Radcliff Materials*, 451 U.S. 630 (1981), lower courts have had no trouble allowing recovery for purchases from nondefendant coconspirators. *See, e.g.*, Paper Sys. v. Nippon Paper Indus. Co., 281 F.3d 629, 632 (7th Cir. 2002) ("If Nippon Paper was among those conspirators, then it is responsible for the entire overcharge of *all five manufacturers*—and any direct purchaser from any conspirator can collect its own portion of damages (that is, the damages attributable to its direct purchases) from any conspirator.").

84. *See In re* TFT-LCD (Flat Panel) Antitrust Litig., No. 07-1827, 2012 WL 6708866, at *6 (N.D. Cal. 2012) ("Although some federal courts have allowed antitrust claims to proceed under the umbrella theory, most federal courts in recent years have rejected these claims."); *In re* Vitamins Antitrust Litig., No. 99-cv-0197,

2001 WL 855463, at *4 (D.D.C. 2001) ("The overwhelming majority of recent court decisions that have addressed the viability of the 'umbrella' theory after Associated General have rejected 'umbrella' claims."); Garabet, M.D., Inc. v. Autonomous Technologies Corp., 116 F. Supp. 2d 1159, 1168-69 (C.D. Cal. 2000) ("[T]he weight of recent authority using the nuanced antitrust analysis outlined in Associated General Contractors, has found against allowing 'umbrella' standing to plaintiffs"); *but see In re* Arizona Dairy Products Litig., 627 F. Supp. 233 (D. Ariz. 1985) (post-*Associated General* case accepting "umbrella" theory, but relying on pre-*Associated General* precedent).

85. *See, e.g.*, Mid-West Paper Prods. Co. v. Cont'l Group, 596 F.2d 573, 584-87 (3d Cir. 1979) ("The outcome of any attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy would at the very least be highly conjectural."); *In re* Folding Carton Antitrust Litig., 88 F.R.D. 211, 220 (N.D. Ill. 1980) ("In light of the Supreme Court's overriding concern with the burdensome proof in *Illinois Brick* and the similar complications in this case . . . plaintiffs do not have standing to sue the defendants from whom they did not purchase"); *In re* Coordinated Pretrial Proceedings in Petrol. Prods. Antitrust Litig., 691 F.2d 1335, 1340-41 (9th Cir. 1982), *rev'd on other grounds*, 906 F.2d 432 (9th Cir. 1990). Although the *Petroleum Products* court expressly reserved the question of whether it would recognize the umbrella theory in a situation involving a "single class of direct purchasers from non-conspiring competitors of the defendants," *id*. at 1340, it expressed concern over the complexity of making the necessary determinations in umbrella pricing cases that would be germane in even

that simple context. The court noted, "the result of any attempt to ascertain with reasonable probability whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy . . . would be speculative to some degree." *Id.* at 1341 (footnote omitted).

86. *See, e.g.*, *Flat Panel Antitrust Litig.*, 2012 WL 6708866, at *6; FTC v. Mylan Laboratories, Inc., 62 F. Supp. 2d 25, 38-40 (D.D.C. 1999) (considering both pre- and post-*Associated General* precedents and ruling against "umbrella" theory liability); Gross v. New Balance Athletic Shoe, Inc., 955 F. Supp. 242, 246–47 (S.D.N.Y. 1997) (rejecting "umbrella" theory based on *Associated General*).

87. *See, e.g.*, *Folding Carton Antitrust Litig.*, 88 F.R.D. at 220. In one case, the plaintiff claimed that the defendants' conspiracy to suppress price induced the defendants' competitors to increase price, and it sought overcharge damages based on purchases from those competitors. Reading Indus. v. Kennecott Copper Corp., 477 F. Supp. 1150, 1154 (S.D.N.Y. 1979), *aff'd*, 631 F.2d 10 (2d Cir. 1980). Though in denying standing the court called the plaintiffs' arguments "respectable," it may have been influenced by the lack of any plausible economic basis for the claim.

88. *See, e.g.*, *In re* Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993) (rejecting argument that plaintiff's "damages are . . . barred . . . because these damages resulted from amounts paid to non-conspiring competitors of the defendant."); *In re* Beef Indus. Antitrust Litig., 600 F.2d 1148, 1166 n.24 (5th Cir. 1979) ("It is enough if, as alleged, the conspirators' activities caused a general depression in wholesale prices and the intermediary purchasing from a plaintiff based his pricing decision on the depressed wholesale beef

price.”); *In re* Uranium Antitrust Litig., 552 F. Supp. 518, 525 (1982) (“Once it is established that nonconspirators have charged more than competitive prices, the inference that the cost increase was caused by the cartel is inescapable.”); *In re* Bristol Bay Salmon Fishery Antitrust Litig., 530 F. Supp. 36, 39 (W.D. Wash. 1981) (“Since the sales by the fishermen to conspirators and non-conspirators were all direct, the computation of damages is no more complex for one than for the other.”); Strax v. Commodity Exch., 524 F. Supp. 936, 938-41 (S.D.N.Y. 1981); Pollock v. Citrus Assocs. of the N.Y. Cotton Exch., 512 F. Supp. 711, 718-19 (S.D.N.Y. 1981) (“Regardless of whether the plaintiffs ultimately purchased offsetting contracts from the defendants or from other traders with a long position, the price throughout the market allegedly rose as a result of the defendants’ activities.”); Wall Prods. Co. v. Nat’l Gypsum Co., 357 F. Supp. 832, 840 (N.D. Cal. 1973) (“[I]t is clear that the defendants are not only liable for overcharges sustained from purchases from them, but also for overcharges resulting from purchases made from non-conspirators”); Washington v. Am. Pipe & Constr. Co., 280 F. Supp. 802, 807 (W.D. Wash. 1968) (“[Defendant] is liable for damages sustained on all sales which were affected by the elimination of competition. The identity of the pipe seller, whether conspirator or not, is irrelevant.”).

89. Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877 (2007).

90. *See* Babyage.com v. Toys “R” Us, Inc., 558 F. Supp. 2d 575, 584 (E.D. Pa. 2008).

91. Paul Joskow, *Vertical Integration, in* Handbook of New Institutional Economics, (C. Menard and M. Shirley, eds., 2005).

92. Kenneth G. Elzinga & David E. Mills, *The Economics of Resale Price Maintenance, in* 3 Issues In Antitrust Law And Economics, (Wayne D. Collins, ed., 2008); Patrick Rey and Thibaud Verge, *Resale Maintenance and Interlocking Relationships,* 58 The Journal of Industrial Economics 4 (2010); and Bruno Jullien and Patrick Rey, *Resale Price Maintenance and Collusion,* 38 Rand Journal of Economics 4 (2007).
93. *See, e.g.*, Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717 (1988); Richard A. Posner & Frank H. Easterbrook, Antitrust: Cases, Economic Notes, And Other Materials 211-12 (2d ed. 1981); Pauline M. Ippolito, *Resale Price Maintenance: Empirical Evidence from Litigation*, 34 J.L. & Econ 263, 292 (1991); Pauline M. Ippolito & Thomas R. Overstreet, Jr., *Resale Price Maintenance: An Economic Study of the Federal Trade Commission's Case Against the Corning Glass Works*, 39 J. Law & Econ. 285 (1996).
94. The parallel between resale price maintenance and cartel pricing is discussed in Frank Mathewson & Ralph Winter, *The Law and Economics of Resale Price Maintenance*, 13 Rev. Indus. Org. 57, 65-66 (1998).
95. *See* Continental TV v. GTE Sylvania, 433 U.S. 36, 49 (1977); Lester Telser, *Why Should Manufacturers Want Fair Trade?*, 3 J. Law & Econ. 86 (1960); Lester Telser, *Why Should Manufacturers Want Fair Trade II?,* 33 J. Law & Econ. 409 (1990). Though the special services theory is used in this section in the explication of damage principles, the conclusions are similar regardless of the source of the efficiency.
96. *See* Isaksen v. Vt. Castings, 825 F.2d 1158 (7th Cir. 1987).
97. *See* William S. Comanor, *Vertical Price-Fixing, Vertical Market Restrictions, and the New Antitrust Policy*, 98 Harv. L. Rev. 983 (1985).

98. The "economics literature is replete with procompetitive justifications for a manufacturer's use of resale price maintenance." *See* Leegin Creative Leather Prods. v. PSKS, Inc., 551 U.S. 877, 889 (2007) (noting the possible procompetitive benefits of resale price maintenance). The possible procompetitive benefits of resale price maintenance are also discussed in Ippolito, *supra* note 93 ; Ippolito & Overstreet, *supra* note 93; Mathewson & Winter, *supra* note 94; Howard P. Marvel & Stephen McCafferty, *Resale Price Maintenance and Quality Certification*, 15 Rand J. Econ. 340 (1984).

99. *See* Roger D. Blair & James Fesmire, *The Resale Price Maintenance Policy Dilemma*, 60 S. Econ. J. 1043 (1994).

100. *Isaksen*, 825 F.2d at 1165.

101. For a general discussion of damages in resale price maintenance litigation, see Ippolito, *supra* note 93; Ippolito & Overstreet, *supra* note 93; Mathewson & Winter, *supra* note 94.

102. *See* Local Beauty Supply v. Lamaur Inc., 787 F.2d 1197, 1202-03 (7th Cir. 1986) *and* Frank H. Easterbrook, *Treble What?*, 55 Antitrust L.J. 95, 98-99 (1986).

103. ABA Section Of Antitrust Law, Proving Antitrust Damages 236 (2d ed. 2010).

104. O'Brien v. Leegin Creative Leather Products, Inc., (2012) 294 Kan. 318, 339.

105. McDonough v. Toys "R" Us, 638 F. Supp. 2d 461, 493 (E.D. Penn 2009).

106. *Id;* Ted Frank, *"Babies "R" Us baby products antitrust class action settlement: McDonough v. Toys "R" Us,"* Center for Legal Policy at the Manhattan Institute (April 18, 2011), *available at* http://www.pointoflaw.com/archives/2011/04/babies-r-us-bab.php.

107. *See* Northern Pac. Ry. v. United States, 356 U.S. 1, 5-6 (1958).

108. *See, e.g.*, Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 9-18, 34 (1984) (O'Connor, J., concurring); *In re* Visa Check/MasterMoney Antitrust Litig., No. 96-5238, 2003 WL 1712568, at *2-7 (E.D.N.Y. 2003).

109. 547 U.S. 28 (2006).

110. *I d.* at 45-46.

111. For a useful survey, see Keith K. Wollenberg, Note, *An Economic Analysis of Tie-In Sales: Re-examining the Leverage Theory*, 39 Stan. L. Rev. 737 (1987). The analysis of tying arrangements is also discussed in Robert H. Bork, The Antitrust Paradox: A Policy at War with Itself 375-81 (1978); Richard A. Posner, Antitrust Law: An Economic Perspective 171-84 (1976); F.M. Scherer & David Ross, Industrial Market Structure and Economic Performance 565-69 (3d ed. 1990); Carlton & Perloff, *supra* note 78, at 319-35; Ward S. Bowman, Jr., *Tying Arrangements and the Leverage Problem*, 67 Yale L.J. 19 (1957); Ward S. Bowman, Jr., Patent and Antitrust Law 163-82 (1973); M.L. Burstein, *The Economics of Tie-In Sales*, 42 Rev. Econ. & Stat. 68 (1960); M.L. Burstein, *A Theory of Full-Line Forcing*, 55 Nw. U. L. Rev. 62 (1960); Richard S. Markovits, *Tie-ins, Reciprocity, and the Leverage Theory*, 76 Yale L.J. 1397 (1967); Louis Kaplow, *Extension of Monopoly Power Through Leverage*, 85 Colum. L. Rev. 515 (1985); Charles J. Smaistrla, Note, *An Analysis of Tying Arrangements: Invalidating the Leveraging Hypothesis*, 61 Tex. L. Rev. 893 (1983). For a more recent discussion, see Jean Tirole, *The Analysis of Tying Cases: A Primer*, 1 Competition Policy International 1-25 (2005); Dennis Carlton and Michael Waldman, *How Economics Can Improve Antitrust Doctrine towards Tie-In Sales: Comment on Jean Tirole's "The Analysis of Tying Cases"*, 1 Competition Policy International 27-40 (2005); Barry Nalebuff, *Tied and True Exclusion: Comment on Jean*

*Tirole's "The Analysis of Tying Cases"*, 1 Competition Policy International 41-53 (2005); David Evans and Michael Salinger, *The Role of Cost in Determining When Firms Offer Bundles and Ties,* 56 J Ind Econ 143-169 (2008); Patrick Rey and Jean Tirole, Economics of Vertical Restraints, in Handbook of antitrust economics, ed. By Paulo Bucciorossi, MIT Press, Cambridge, 2010; Denis Carlton, Joshua Gans and Michael Waldman, *Why Tie a Product Consumers Do Not Use?* 2 Am Econ j Mic. 85-105 (2010).

112. *See* Sheet Metal Workers Nat. Health Fund v. Amgen Inc., No. 07-CV-5295 (D.N.J. Aug. 13, 2008) (recognizing circuit split while adopting package approach for purposes of case); Freeland v. AT&T Corp., 238 F.R.D. 130, 149-50 (S.D.N.Y. 2006) (same); *In re* Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 142-43 (2d Cir. 2001) (noting, but not resolving, conflict and citing cases); *see also* Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, 677 F.2d 1045, 1054 (5th Cir. 1982) (tied product approach); Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1133 (6th Cir. 1981) (tied product approach); Northern v. McGraw Edison Co., 542 F.2d 1336, 1347 (8th Cir. 1976) (tied product approach); Will v. Comprehensive Accounting Corp., 776 F.2d 665, 673 (7th Cir. 1985) (package approach); Kypta v. McDonald's Corp., 671 F.2d 1282, 1285 (11th Cir. 1982) (package approach); Siegel v. Chicken Delight, Inc., 448 F.2d 43, 52-53 (9th Cir. 1971) (package approach).

113. Tying agreements sometimes obligate the buyer to purchase the tied product from the seller only so long as the seller charges no higher price than is available in the market. *See, e.g.*, International Salt Co. v. United States, 332 U.S. 392 (1947). These arrangements might be devices by which the seller can gather information from buyers about the prices other sellers are charging,

perhaps for competitive purposes or perhaps to deter secret price cutting by members of a cartel. *See* John L. Peterman, *The* International Salt *Case*, 22 J.L. & Econ. 351, 361 (1979). If use of an inferior tied product in combination with the tying product impairs the performance of the tying product and damages the seller's reputation, the seller may insist upon purchase of high quality tied product from it. In such a case, the price of the tied product is likely to be higher than the market price of a similar product, but that similar product will be of lower average quality.

114. *See, e.g.*, Bell v. Cherokee Aviation Corp., 660 F.2d 1123, 1133 (6th Cir. 1981) (overcharge measured by difference between price of tied product and its fair market value).

115. *Kypta*, 671 at 1285. *See also Freeland*, 238 F.R.D. at 149-50 (S.D.N.Y. 2006) ("Under the tied product method, a plaintiff is deemed injured, and may recover, to the extent that the price of the tied product has increased, regardless of whether that increase was completely offset, or even exceeded, by a reduction in price of the tying product.").

116. *Kypta*, 651 F.2d at 1285.

117. *See* Bowman, *Tying Arrangements*, *supra* note 111, at 21-22.

118. For a helpful illustration, see Wollenberg, *supra* note 111, at 747 n.81.

119. For a discussion of tying and metering, see Brief of Professors Barry Nalebuff et al. as Amici Curiae in Support of Respondent, Illinois Tool Works v. Independent Ink, 547 U.S. 28 (2006) (No. 04-1329), 2005 WL 2427646, at *5.

120. In the aggregate, price discrimination is likely to increase allocative efficiency relative to a single price monopoly. This does not imply that price discrimination

benefits every purchaser. *See* Jonathan B. Baker, *Competitive Price Discrimination: The Exercise of Market Power Without Anticompetitive Effects (Comment on Klein and Wiley)*, 70 Antitrust L.J. 643 (2003).

121. *See* Bowman, *Tying Arrangements*, *supra* note 111, at 19-36.

122. *See* Bork, *supra* note 111, at 381.

123. 446 U.S. 643, 648-50 (1980).

124. For a similar explanation, see Daniel L. Rubinfeld & Peter O. Steiner, *Quantitative Methods in Antitrust Litigation*, 46 Law & Contemp. Probs. 69, 117 (1983). The authors analyze FTC and private actions challenging a basing point freight system employed by plywood producers. *Id*. at 111-26. They point out that delivered prices to buyers could be competitively determined despite an agreement among producers to charge a price for freight calculated from the same basing point if competition on mill prices is unbounded.

125. Though not a conspiracy case, the Ninth Circuit's decision in *Somers v. Apple*, 729 F.3d 953 (9th Cir. 2013), provides an example of the difficulty of establishing antitrust harm to consumers in the absence of an overcharge. In that case, the plaintiff alleged that the inclusion of digital rights management ("DRM") encoding that restricted the use of digital media files was part of an anticompetitive monopolization scheme. The Ninth Circuit agreed with the district court that the plaintiff's "diminution in value" theory was insufficient to support a claim. *Id*. at 962-63.

126. *See* Robert H. Lande & Howard P. Marvel, *The Three Types of Collusion; Fixing Prices, Rivals, and Rules*, 5 Wisc. L. Rev. 941, 941-43 (2000).

127. *See* Detroit Auto Dealers, 111 F.T.C. 417 (1989).

128. National Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679 (1978).

129. *See id.*; Lande & Marvel, *supra* note 126, at 941-42.
130. 260 U.S. 156 (1922).
131. *Id.* at 162-63.
132. 476 U.S. 409, 419 (1986).
133. For a recent treatment, *see* Royal Mile Co., Inc. v. UPMC, No. 10-cv-1609, 2013 WL 5436925, at *13-25 (W.D. Pa. 2013) (holding that filed rate doctrine bars antitrust claims against insurer and hospital because rates were filed with state insurance regulator); *see also* County of Stanislaus v. Pac. Gas & Elec. Co., 114 F.3d 858 (9th Cir. 1997) (discussing filed rate doctrine); Marcus v. AT&T, 138 F.3d 46 (2d Cir. 1998) (same); Texas Comm'l Energy v. TXU Energy, 413 F.3d 503 (5th Cir. 2005) (same). For a useful summary of cases, see Areeda & Hovenkamp, *supra* note 83. For a scholarly attack on *Keogh*, see Stevan E. Bunnell, Note, *The Use of Hypothetica1 Rates in Antitrust Damages Calculations: Reforming the Keogh Doctrine*, 38 Stan L. Rev. 1141 (1986).
134. *See* part B of Chapter 2.
135. The overcharge will stick with the direct purchaser (or any subsequent indirect purchaser) if demand for the product is perfectly elastic, but demand curves are rarely, if ever, horizontal in practice. *See* George Kosicki and Miles B. Cahill, *Economics of Cost Pass Through and Damages in Indirect Purchaser Antitrust Cases*, 51 The Antitrust Bulletin, 599 (2006); William M. Landes & Richard A. Posner, *Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of* Illinois Brick, 46 U. Chi. L. Rev. 602 (1979). For other issues that may arise in pass through, see Fei Deng, John H. Johnson, and Gregory K. Leonard, *Economic Analysis in Indirect Purchaser Class Actions*, 26 Antitrust 51 (2011).
136. 431 U.S. 720, 737-38 (1977).

137. 15 U.S.C. § 15.
138. 392 U.S. 481 (1968).
139. *Id.* at 488.
140. *Hanover Shoe*, 392 U.S. at 494 (emphasis added).
141. *Illinois Brick*, 431 U.S. at 736.
142. *Id .* at n.16.
143. 497 U.S. 199 (1990).
144. *Id .* at 208.
145. The Court was not asked to consider the propriety of the direct purchasers' claim for damages based on lost sales.
146. *Utilicorp United*, 497 U.S. at 418.
147. *In re* ATM Fee Antitrust Litig., 686 F.3d 741, 756-57 (9th Cir. 2012); Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1145-46 (9th Cir. 2003); Royal Printing Co. v. Kimberly-Clark Co., 621 F.3d 323, 326 (9th Cir. 1980).
148. *See In re* Vitamin C Antitrust Litig., 279 F.R.D. 90, 100 (E.D.N.Y. 2012); *In re* Industrial Diamonds Antitrust Litig., 119 F. Supp. 2d 418, 421-22 (S.D.N.Y. 2000); *In re* Refrigerant Compressors Antitrust Litig., No. 09-md-02042, 2012 WL 2071767, at *4-5 (E.D. Mich. 2012).
149. *See, e.g.*, Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 269 (1979); William M. Landes & Richard A. Posner, *The Economics of Passing on: A Reply to Harris and Sullivan*, 128 U. Pa. L. Rev. 1274 (1980); Landes & Posner, *supra* note 135; John Cirace, *Price-Fixing, Privity, and the Pass-On Problem in Antitrust Treble-Damage Suits: A Suggested Solution*, 19 Wm. & Mary L. Rev. 171 (1977); George J. Benston, *Indirect Purchasers' Standing to Claim Damages in Price Fixing Antitrust Actions: A Benefit/Cost Analysis of Proposals to Change the* Illinois Brick *Rule*, 55 Antitrust L.J. 213 (1986); Herbert Hovenkamp, *The Indirect-Purchaser Rule and Cost-Plus Sales*, 103 Harv. L. Rev.

1717 (1990); Jeffrey L. Harrison, *The Lost Profits Measure of Damages in Price Enhancement Cases*, 64 Minn. L. Rev. 751 (1980); ABA Section of Antitrust Law, *Report of the Indirect Purchaser Task Force*, 63 Antitrust L.J. 993 (1995); Ronald W. Davis, *Indirect Purchaser Litigation:* ARC America*'s Chickens Come Home to Roost on the* Illinois Brick *Wall*, 65 Antitrust L.J. 375 (1997); Chris S. Coutroulis & D. Matthew Allen, *The Pass-on Problem in Indirect Purchaser Class Litigation*, 44 Antitrust Bull. 179 (1999); Andrew I. Gavil, *Federal Judicial Power and the Challenges of Multijurisdictional Direct and Indirect Purchaser Antitrust Litigation*, 69 Geo. Wash. L. Rev. 860 (2001); John E. Lopatka & William H. Page, *Indirect Purchaser Suits and the Consumer Interest*, 48 Antitrust Bull. 531 (2003); Edward D. Cavanagh, Illinois Brick*: A Look Back and a Look Ahead*, 17 Loy. Consumer L. Rev. 1 (2004); Ian Simmons & Charles E. Borden, *The Defense Perspective: The Class Action Fairness Act of 2005 and State Law Antitrust Actions*, Antitrust, Fall 2005 19; Bruce V. Spiva & Jonathan K. Tycko, *Indirect Purchaser Litigation on Behalf of Consumers After CAFA*, Antitrust, Fall 2005 12.

150. *See* Benston, *supra* note 149, at 214.

151. Antitrust Modernization Commission, Report And Recommendations vi (April 2007). The Antitrust Modernization Commission Act of 2002 authorized the creation of the AMC to conduct a comprehensive review of U.S. antitrust law to determine whether it should be modernized.

152. *Id.* at 267.

153. *See, e.g.*, Ala. Code § 6-5-50(a); Ark. Code Ann. § 4-75-212 and § 4-75-315; Cal. Bus. & Prof. Code § 16750(a); Colo. Rev. Stat. § 6-4-108; D.C. Code Ann. § 28-4509(A); Haw. Rev. Stat. § 480-14(c); Idaho Code. Ann. § 48-108; 740 Ill. Comp. Stat. Ann. 10/7(2); Kan. Stat. Ann. § 50-

161; Me. Rev. Stat. Ann. tit. 10, § 1104(1); Md. Code. Ann. Com. Law II § 11-209(b)(2); Mich. Comp. Laws Ann. § 445.778; Minn. Stat. Ann. § 325D.57; Miss. Code Ann. § 75-21-9; Neb. Rev. Stat. § 59-821; Nev. Rev. Stat. §§ 598A.160, 598A.210; N.M. Stat. Ann. § 57-1-3; N.Y. Gen. Bus. Law § 340(6); N.D. Cent. Code § 51-08.1-08; Or. Rev. Stat. § 646.775; R.I. Gen. Laws § 6-36-12(g); S.D. Codified Laws Ann. § 37-1-33; Utah Code Ann. § 76-10-919; Vt. Stat. Ann. tit. 9, § 2465; W. Va. Legis Rule 142 C.S.R. Series 9; Wis. Stat. Ann. § 133.18(1)(a).

154. Kevin J. O'Connor, *Is the* Illinois Brick *Wall Crumbling?*, Antitrust, Summer 2001, at 34-35.

155. 490 U.S. 93, 101-02 (1989).

156. For a discussion of the problem, see John Cirace, *Apportioning Damages Between Direct and Indirect Purchasers in Consolidated Antitrust Suits:* ARC America *Unravels the* Illinois Brick *Rule*, 35 Vill. L. Rev. 283 (1990); ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook 132-46 (2007).

157. *ARC America*, 490 U.S. at 105 (citations omitted).

158. *See* Areeda & Hovenkamp, *supra* note 83, ¶ 337.4.

159. *See, e.g.*, *In re* TFT-LCD (Flat Panel) Antitrust Litig., No. 07-md-1827, Dkt. No. 5795 (N.D. Cal. 2012) ("Should defendants wish to challenge any allocation of damages, they are free to do so post-trial.").

160. A predicate question is whether pass-on evidence is admissible for even indirect purchaser claims, or whether state laws will apply the general rule of *Hanover Shoe* entitling even indirect purchasers to the full amount of the overcharge. Courts have generally assumed that at least *upstream* pass-on evidence (i.e., pass-on to the plaintiff) is relevant. The question of whether *downstream* pass-on evidence can be introduced is more in dispute. *See* Clayworth v. Pfizer Inc., 165 Cal. App. 4th 209 (Cal. App.), *as amended by*

2008 Cal. App. LEXIS 1325 (Cal. App. 2008) (availability of pass-on defense to defendants accused of price fixing); *In re* TFT-LCD (Flat Panel) Antitrust Litig., No. 07-md-1827, 2012 WL 6709621 (N.D. Cal. 2012) (holding that downstream pass-on should be considered for indirect purchaser claims brought under Florida, California, New York, Minnesota, and Michigan law).

161. *See* ABA Section of Antitrust Law, *supra* note 156, at 132-33. *See also* Ronald Cotterill et al., *Beyond* Illinois Brick*: The Law and Economics of Cost Pass-Through in the ADM Price-Fixing Case*, 18 Rev. Indus. Org. (2001) (discussing plaintiffs' overcharges model for high fructose corn syrup used in carbonated soft drinks).

162. ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook 144-46 (2007).

163. This situation may arise in industries with complex distribution systems where the product of interest is sold through different distribution channels in the actual and but-for worlds. An example is matters involving retail pharmacy plaintiffs and branded pharmaceutical manufacturer defendants where wholesalers are the primary direct purchasers of the branded version of the drug in the actual world, retailers are the primary purchasers of the generic version of the drug in the but-for world, and both the branded and generic versions of the drug are purchased during the relevant period. Here, some wholesalers may be "bypassed" by retailer purchasers in the but-for world. This was an issue in several recent cases: *In re* Brand Name Prescription Drug Antitrust Litig., 123 F.3d 599, 614 (7th Cir. 1997); *In re* Relafen Antitrust Litig., 360 F. Supp. 2d 166 (D. Mass. 2005); *In re* Cardizem CD Antitrust Litig., 200 F.R.D. 297, 317 (E.D. Mich. 2001).

164. ABA Section of Antitrust Law, Indirect Purchaser Litigation Handbook 175-76 (2d ed. 2016).

165. *Id.* at 176-77.
166. *Id.*
167. *Id.* at 178-87.
168. *See In re* Cathode Ray Antitrust Litig., No. 07-5944, Dkt. No. 1950, at 10 (N.D. Cal. 2013).
169. *Id.*
170. Trial Transcript at 2810, 3058 *In re* TFT-LCD (Flat Panel) Antitrust Litig., No. 7-1827, (N.D. Cal. 2013)
171. *See* Page, *supra* note 82, at 1465.
172. *See* Thomas A. Lambert, *Tweaking Antitrust's Business Model*, 85 Tex. L. Rev. 153 (2006). For simplicity, this analysis assumes constant marginal costs. If instead the short-run supply curve is upward sloping, as the cartel restricts quantity, marginal costs drop. At the supracompetitive price, marginal cost is less than it is at the competitive price. One could say that the wealth transfer from consumers to producers is the difference between actual price and the marginal cost of producing the restricted quantity. The associated increment of wealth, however, is not surplus that consumers would have gained in a competitive market. That increment would have been producer surplus. *See* Carlton & Perloff, *supra* note 78, at 71-73, 95-99.
173. When the demand and supply curves are linear, the difference between actual price and competitive price multiplied by the quantity not sold will equal twice the deadweight loss. *Cf.* Frank H. Easterbrook, *Detrebling Antitrust Damages*, 28 J.L. & Econ. 445, 455 (1985) (when the demand and supply curves are linear, the overcharge on the quantity sold equals twice the deadweight loss). One could imagine a rule that allowed damages before trebling equal to one half the overcharge on volume not purchased. However, such a rule would be problematic since it is difficult to prove damages for purchases that would have been—but were

not—made, and the rule relies on the assumption that demand and supply curves are linear, which is often not the true.

174. 661 F.2d 864, 867-68 (10th Cir. 1981)., For a more recent treatment, *see* Lambert v. Board of Com'rs of Orleans Levee Dist., No. 05-CV-59312009 WL 152668, at *7 (E.D. La. Jan. 22, 2009) ("Allowing nonpurchasers to recover would unduly broaden the spectrum of potential plaintiffs with price fixing and monopolization claims.").

175. *See* Illinois Brick Co. v. Illinois, 431 U.S. 720, 736 (1977).

176. *See Montreal Trading*, 661 F.2d at 868.

177. *Id.*

178. *See* Lambert, *supra* note 77. *But see* Melanie W. Havens et al., *Consumer Welfare Loss: The Unawarded Damages in Antitrust Suits*, 15 U. Dayton L. Rev. 457, 462-63 (1990) (arguing that calculating deadweight loss typically would be easy).

179. *See* Carlton & Perloff, *supra* note 78, at 639; William M. Landes, *Optimal Sanctions for Antitrust Violations*, 50 U. Chi. L. Rev. 652 (1983).

# CHAPTER 9

# DAMAGES IN EXCLUSIONARY CONDUCT CASES

In an exclusionary conduct case, the defendant has been accused of engaging in activities designed to prevent the entry of, force the exit of, or weaken its rivals with the goal of lessening the competition it faces. Examples of exclusionary conduct are predatory pricing and anticompetitive foreclosure through exclusive dealing, bundling, or tying. Assuming antitrust liability has been found, a plaintiff in an exclusionary conduct case may seek damages as compensation for injury it sustained as a result of the exclusionary conduct. For the purposes of this chapter, we assume that the conduct at issue has been found to be anticompetitive, and we refer to such anticompetitive conduct as “exclusionary conduct.”

Two different types of parties may have been injured by exclusionary conduct: the defendant’s rivals that were the target of the conduct and customers for whom competition in the relevant market decreased as a result of the conduct.[1] Thus, exclusionary conduct cases may be brought by either a rival or a customer (or class of customers). In this way, exclusionary conduct cases differ from price-fixing cases, in which competitors to the price-fixing conspirators typically do not have a claim to antitrust injury.[2]

In principle, the same basic methods used to calculate damages in other types of antitrust cases can be applied to

exclusionary conduct cases. In practice, however, the facts of an exclusionary conduct case may present challenges to the application of some of these methods.

# A. Exclusionary Practices Can Harm Both Competitors and Customers

Although exclusionary practices can harm both competitors and customers, the nature of the harm and the nature of the damages calculation differ between these two groups. The typical way in which exclusionary conduct might harm a competitor is to cause it to lose profits. Thus, the law permits an injured competitor to recover as damages its *lost profits* caused by the unlawful conduct.[3] In contrast, the typical way in which exclusionary conduct might harm a customer is by lessening competition in the relevant market. Thus, the law permits an injured customer to recover, for example, the amount of any *overcharge* attributable to the unlawful conduct.[4]

Although two potential groups of injured economic actors with different types of harm exist, the harms flow from the same unlawful conduct. This suggests a certain level of consistency should exist in their respective theories of liability and in certain aspects of their respective damages calculations. However, conflicts may still arise. For example, a theory of liability may allege an increase in market price as a result of an alleged exclusionary conduct, which would be consistent with an overcharge theory of customer damages. This theory, however, may ultimately imply lower competitor damages because the competitor may have benefited from the higher prices within the relevant market caused by the unlawful conduct.

# B. The Appropriate Damages Methodology

There exist several recognized methodologies for calculating damages in antitrust cases, including the "before-during-after" method, the benchmark or "yardstick" method, structural models involving simulation methods, and structural models based on business projections.[5] This chapter will discuss these methodologies in the context of exclusionary conduct cases. The key issue in determining the overcharge or amount of lost profits is identifying what would have happened in the "but-for" world, in the absence of the unlawful exclusionary conduct.

## 1. Before-During-After Method

Where there is an appropriate time period before or after the period in which the exclusionary conduct occurred, that is unaffected by the exclusionary conduct (a "clean period"), a before-during-after approach can be an appropriate approach to assess damages.[6] Under this approach, an economic outcome of interest (such as the price paid by a customer or the revenues, share, or profits of a competitor) in the unaffected period is used to estimate what that outcome would have been during the period affected by the exclusionary conduct (the "affected period") in the absence of that conduct. For example, in a pharmaceutical patent case in which a generic manufacturer enters following a period of exclusionary conduct, the actual experience following entry may be used as a proxy for an earlier but-for world in which the same entry had not been delayed.

Even where an unaffected period exists, however, there may be differences between the unaffected period and the affected period in economic conditions (other than the

exclusionary conduct) that play a role in determining the economic outcome of interest. For example, costs may have been different in the unaffected period than the affected period, which suggests that prices would have been different in the unaffected period than in the affected period even absent the exclusionary conduct. Given this possibility, when modeling the affected period absent the exclusionary conduct, it may be necessary to adjust the economic outcome of interest in the unaffected period to account for differences in costs or other economic factors. Changes in regulatory conditions could also affect the reliability of a before or after comparison.

More so than in price-fixing cases, exclusionary conduct cases often present difficulties in identifying an appropriate unaffected period.[7] For example, in a case where the exclusionary conduct artificially maintained the pre-existing status quo, the before period (i.e., the status quo) may not provide an appropriate basis for modeling the affected period absent the exclusionary conduct.[8] Similarly, the before period may not provide a valid basis for assessing the affected period absent the exclusionary conduct in cases involving practices that have always been part of the defendant's strategy, such as a refusal to deal case in which there was no history of previous dealing between the plaintiff and the defendant, or a tying case where the products have always been sold together.

In markets with rapidly changing economic conditions (e.g., the high technology sector), the differences between an unaffected period and the affected period in terms of economic conditions other than the alleged conduct may be too great to be controlled for reliably. For example, in the case of a high technology industry, the market before the exclusionary practice may have been in its infancy and thus may not provide a reliable basis to model the but-for world in a more mature phase.[9]

The after period also may be an inappropriate benchmark because the harm from successful exclusionary conduct may continue well after the practice is ended. For instance, successful exclusion may dissuade other potential competitors from entering the market and thus allow the defendant to enjoy monopoly profits after the exclusionary practice has subsided.[10] This can be the case with successful predation, for example, in which the anticompetitive harm (monopoly pricing) follows the anticompetitive practice (below-cost pricing). Moreover, the after period may not provide an appropriate benchmark whenever the alleged exclusionary practice has the enduring effect of preventing the entry or expansion of a competitor. For example, damages actions may be coincident with or lag only slightly behind a claim for injunctive relief, so the anticompetitive practice may still be in place or it may have stopped only very recently. In these circumstances, there may be no suitable after period upon which to base the damage analysis. This contrasts with many price-fixing cases, in which damages actions often lag a governmental finding of price fixing. In light of the per se illegality and criminal nature of price-fixing violations, it may be safe to assume that the beginning of a grand jury investigation marks the end of the conspiracy and the beginning of the after period. In contrast, the defendant in an exclusionary practices case where liability is uncertain may continue the challenged conduct until a violation is found or an injunction is issued.

## 2. Yardstick or Benchmark Method

In the absence of a before or after period that can serve as a valid basis for modeling the but-for world, a second approach is to look for a market or business that is free from the exclusionary conduct at issue to use as a “comparable”

for the market or business at issue.[11] As with the before-during-after approach, an economic outcome of interest for the unaffected yardstick (such as the price paid by a customer or the revenues, share, or profits of a competitor) is used to estimate what would have happened in the affected market in the but-for world.

This so-called benchmark or yardstick approach, however, may be problematic if there are significant differences in economic conditions between the proposed yardstick and the market or business at issue and if it is not possible to make adjustments to account reliably for these differences. In short, any market or business selected as the yardstick must be sufficiently comparable to the market or business at issue, or reliable adjustments must be possible, to permit nonspeculative conclusions.[12]

In addition to comparability, it is important to verify that the defendant's exclusionary conduct had no effect on the market or business chosen as a yardstick. For example, if a potential yardstick company in fact benefited from the defendant's exclusionary conduct, it may not be an appropriate yardstick unless appropriate adjustments could be made.[13]

## 3. Structural Models Involving Simulation Methods

A third method recently has been proposed that potentially can be useful when no suitable unaffected benchmark exists for estimating antitrust damages from exclusionary conduct. This method involves using a structural model of the market to simulate economic outcomes in the absence of the exclusionary conduct and has its counterpart in the simulation models often used by government antitrust enforcement authorities to assess

unilateral effects from a merger.[14] As with a merger analysis, where the but-for (postmerger) world cannot be observed, the structural model employs information from the current state of the market to infer basic parameters of supply and demand that can then be used to model the unobserved but-for world.[15]

Because the structural model requires information describing market supply and demand, this method may allow an expert to determine all the needed market data inputs from the period of the alleged anticompetitive acts. However, the structural model should be applied with caution, as it is predicated on the availability of sufficiently reliable market information, and can be sensitive to assumptions about the shape of the demand curve and the form of competition in the market, including whether firms compete in prices (Bertrand competition) or in quantities (Cournot competition).[16]

# 4. Structural Models Based on Business Projections

A fourth approach to assessing damages in exclusionary conduct cases is to model the but-for world based on projections or forecasts of the economic outcomes of interest that were made by a knowledgeable party under the assumption of no exclusionary conduct.[17] Such projections are sometimes available in documents produced in the normal course of business of the parties. For example, in making its strategic decision as to whether to implement the exclusionary conduct, the defendant may have made projections of the market prices and shares that would result if it did not implement the conduct. These projections may provide a reasonable basis for modeling what market prices and shares would have been in the but-for world. Of

course, it may be necessary to make adjustments to projections and forecasts to account for unanticipated changes in market conditions that occurred after the projections and forecasts were made. For example, if the projections did not anticipate a subsequent economic recession that weakened demand in the relevant market, it may be necessary to decrease the projected prices to accurately reflect what would have happened in the but-for world.

# C. Establishing Competitor Damages from Exclusionary Conduct

In this section, we discuss legal and economic issues in establishing competitor damages from exclusionary conduct. Many, but not all, of these issues also arise in the context of customer damages claims, which we discuss in the next section.

## 1. Legal Issues

### a. Tension in Guidance

There is some tension in the legal standards applicable to antitrust damage methodologies. On one hand, there is a recognition that the nature of evidence in antitrust cases may introduce some uncertainty in the calculation of damages. As the Supreme Court stated long ago in *Story Parchment Co. v. Paterson Parchment Paper Co.*,[18] a court should preclude uncertain damages only if it is unclear whether those damages, as a whole, resulted from the violation.[19] If absolute certainty with respect to the amount of damages were required, private enforcement of the

antitrust laws could be curtailed because "the vagaries of the marketplace usually" could deny plaintiffs "sure knowledge of what [their] situation would have been in the absence of the defendant's antitrust violation."[20] This principle may apply to exclusionary practices cases. The Supreme Court has explained that the wrongdoer, not the victim of a violation, shall bear "the risk of the uncertainty which his own wrong has created."[21] Thus, even if the amount of damages caused by an antitrust violation is uncertain, "it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result may be only approximate."[22]

On the other hand, courts recognize that damages in exclusionary conduct cases, like all other cases, must be supported by evidence and cannot be based on "pure speculation and guesswork."[23] In this regard, the defendant does not bear the burden of disproving damages. The evidence proffered by the plaintiff must provide the jury a "reasonable basis of computation" for determining the amount of damages.[24] Otherwise, the evidence of damages is insufficient as a matter of law.[25] If there is no reasonable basis to determine the extent of the plaintiff's injury, the jury should not award any damages to the plaintiff.[26]

## b. Disaggregation of Antitrust Damages

The plaintiff's recovery of antitrust damages is also affected by the related doctrine of disaggregation, which limits the antitrust plaintiff to recovery only for harm caused by the defendant's antitrust violation, as opposed to harm caused by other factors.[27]

Where other factors contributed to the plaintiff's financial condition in the actual world besides the defendant's antitrust violation, the plaintiff must provide the jury with "a reasonable basis upon which to estimate the amount of its

losses caused by other factors."[28] Put another way, the plaintiff's damages claim must include only those losses caused by the exclusionary conduct and thus must exclude losses caused by other factors. In the context of exclusionary conduct, examples of such other factors may include: (1) the defendant's lawful practices, including the defendant's practices that the plaintiff claimed to be unlawful but that were determined by the court not to violate the antitrust laws;[29] (2) the defendant's practices that are protected under an antitrust immunity, such as the *Noerr-Pennington* doctrine;[30] (3) the plaintiff's own conduct, such as poor management or missed opportunities;[31] or (4) other marketplace factors, such as changes in customers' demand, entry by other competitors, or changes in product technology.

A damage calculation that fails to separate out losses attributable to factors other than the defendant's antitrust violation invites the jury to engage in speculation and guesswork in determining the amount of damages and is therefore insufficient for the purposes of proving the amount of damages under Section 4 of the Clayton Act.[32] Disaggregation of damages goes to the issue of causation of damages. Being required to separate losses caused by the defendant's antitrust violation from losses caused by other factors, the plaintiff cannot meet its obligations by showing an amount of losses that do not reflect the actual damages caused by the antitrust violation.[33]

Where a plaintiff fails to disaggregate damages, a court may reverse an award of damages and order a retrial on the damages issue.[34] In other cases, however, where the plaintiff's damages study is irreparable and there is no other competent evidence that could support a disaggregation of damages, courts have dismissed a plaintiff's claims.[35]

## c. Mitigation of Damages

The plaintiff's recovery of antitrust damages also is affected by the doctrine of mitigation of damages, which requires a plaintiff to use reasonable efforts to reduce the amount of damages caused to it by reason of the defendant's antitrust violation.[36] Because the plaintiff could divert resources to other lines of its business, the plaintiff's damages in such a case must be reduced by the amount by which the plaintiff's "profits from the sale of other products increased as a result of its diverted emphasis or would have increased had reasonable efforts been taken."[37]

An antitrust plaintiff has a duty to mitigate its damages, and it is not entitled to recoup any losses resulting from its own inaction in the face of anticompetitive conduct.[38] Moreover, in the context of exclusionary practices, a plaintiff is required not only to mitigate its damages in the line of business directly affected by the defendant's conduct, but also in its other lines of business.[39]

The actions required of a plaintiff to mitigate, however, must be reasonable. For example, the duty to mitigate damages does not require a plaintiff to take undue risks.[40] Additionally, a plaintiff may recover damages where it can prove some losses attributable to the period between the antitrust violation and the earliest it reasonably could have diverted its resources to an alternative line of business or new business, or where it can show that the future profits from the business from which it was unlawfully foreclosed would have been greater than the profits from the alternative to which the plaintiff diverted its resources in response to the defendant's antitrust violation.[41] In such cases, the damages must be limited to the losses that could not have been avoided through reasonable mitigation efforts.[42]

In some cases, a defendant may be able to show that the plaintiff's business improved after the violation. Such an improvement, however, may not necessarily preclude a recovery of damages for exclusionary conduct either because: (1) the plaintiff may have suffered injury before it was able to divert its business to a profitable alternative; or (2) the plaintiff might have earned even greater profits but for the alleged conduct.[43]

Related to mitigation of damages in an exclusionary conduct case is the issue of opportunity costs, which must be taken into consideration in the computation of damages.[44] For example, one court held that it was appropriate to pierce the corporate veil to determine the opportunity costs of individual investors if the plaintiff's business that was formed to purchase a new business "was not funded and has never been more than an empty shell."[45] The court maintained that, for purposes of determining the amount of an adjustment to the plaintiff's damages attributable to the opportunity cost of an alternative equity return, the plaintiff may use the same cost of equity investment as the cost of the plaintiff's debt.[46] This conclusion reflected the court's view that, while "undue risk may not be forced on a victim of wrongdoing," the plaintiff should not be permitted to understate its opportunity costs based on risk-free investments, such as treasury bills.[47]

## d. Future Lost Profits

An excluded competitor may recover for future lost profits if it can establish that, but for the defendant's violation, it would have earned profits in future periods. Generally, a cause of action for any injury, including future losses, accrues at the time of the violation causing that injury. A cause of action entitles the plaintiff to recover not only

those damages suffered as of the date of accrual, but also those damages the plaintiff reasonably is expected to suffer in the future. Future damages, however, raise the prospect of speculation in the damages calculation, and the risk of speculativeness may be heightened the further into the future the plaintiff attempts to establish damages. If by the time of trial the fact of future losses is speculative or their amount and nature are unprovable, then a cause of action for those future losses has not yet accrued. Under these circumstances, a cause of action for future losses accrues only when they are suffered.[48]

Lost future profits are typically an issue when the plaintiff has been forced to exit from or prevented from entering a market because of the antitrust violation or when the violation has continuing effects on the plaintiff's business. When the plaintiff continues in business and injunctive relief is to be granted, a court must take care to ensure that the plaintiff is not awarded a recovery duplicating the benefits of the injunctive relief.[49]

Lost future profits may be calculated by the same methods for calculating lost profits in past periods. In applying a damages methodology, the damages calculation must account for reasonably foreseeable future changes in the marketplace. In addition, an award of damages for future lost profits must be discounted to present value using an appropriate risk-adjusted discount rate.[50]

As an alternative to a lost future profits calculation, an excluded competitor may seek to recover the "going concern" or "goodwill" value of its business that it would have experienced but for the defendant's anticompetitive conduct. Because the value of the plaintiff's business is based on the present value of anticipated future profits, a plaintiff may not recover both future lost profits and its going-concern value.[51] Where a plaintiff's business has been harmed by the defendant's anticompetitive conduct prior to

its destruction, its profit history may be adjusted to reflect lost past profits before calculation of going concern value.[52]

## 2. Economic Issues

The economic analysis of antitrust damages addresses the economic impact of the anticompetitive conduct. This analysis starts with the translation of the legal theory of harm into economic effects, which requires a comparison of the economic situation of the plaintiff with (the actual world) and without (the but-for world) the anticompetitive conduct.

### a. Quantification

With respect to competitors who are affected by exclusionary conduct, the difference in their economic situation between the but-for and actual worlds is determined by three elements: (1) effects on the price they could charge (P); (2) effects on their output (Q); and (3) effects on their costs (C). These damages typically are given by the following formula:[53]

$$\text{Damages} = [(P_{\text{but-for}} - C_{\text{but-for}}) \times Q_{\text{but-for}}] - [(P_{\text{actual}} - \text{Cost}_{\text{actual}}) \times Q_{\text{actual}}]$$

where the first term represents the but-for profit the plaintiff would have earned and the second term represents the actual profit the plaintiff would have earned.

Much of the difficulty of estimating damages has to do with the fact that the various effects often go in opposite directions. For example, it is common for the plaintiff to allege that the defendant has engaged in exclusionary conduct that has increased the plaintiff’s cost of doing business and that this has reduced the quantity sold by the plaintiff, resulting in higher prices to purchasers. In this case, while higher costs and lower quantities tend to

increase the damages to competitors, the higher prices tend to mitigate damages. These effects—price effects, quantity effects, and cost effects—are discussed in more detail below.[54]

### *(1) Price Effects*

Successful exclusion of competitors may result in higher prices to consumers. In fact, the prospect of higher prices may be the primary motivation for anticompetitive exclusionary conduct. In an antitrust case based on exclusionary conduct, the theory of harm to competition is typically that the exclusionary conduct permitted the defendant to achieve or maintain monopoly power—i.e., the ability to price above competitive levels. Such a liability theory necessarily implies that prices in the but-for world would be *lower* than those in the real world for some customers after the point in time where the defendant's rival was forced to exit, stopped from entering, or weakened.[55] In the presence of successful foreclosure of competitors, the prevailing market price is likely to overstate the price the foreclosed competitors would have been able to charge in the but-for world. In this situation, a simple calculation of lost profits based on real-world prices would overstate the excluded competitor's damages and would be inconsistent both with the plaintiff's theory of liability and with the analysis of damages to purchasers from the same exclusionary conduct.[56] The analysis of damages to customers typically establishes higher prices to those customers—that is, an overcharge—that should be deducted from the calculation of lost profits when analyzing damages to competitors.

### *(2) Quantity Effects*

Similar to the price effects, one needs to consider the effect of the alleged practice on the total quantity sold in the market. A basic tenet of economic theory is that higher prices tend to result in lower quantities sold.[57] Thus, if an exclusionary practice can be shown to have raised prices, it also likely reduced output. Likewise, if an exclusionary practice reduced market output, this means that the conduct is likely to have raised prices.[58] Therefore, it is reasonable to expect that, absent the anticompetitive conduct, market sales volumes would have been higher.

Quantity effects need to be taken into account if the "market share" method is applied to estimate antitrust damages to a competitor. In the first step of this method, the lost market share caused by the defendant's exclusionary conduct is determined. In the second step, the lost market share is multiplied by the market quantity to obtain the competitor's lost sales (and the resulting loss of profit). The appropriate market quantity to use in the second step is the market quantity in the but-for world, which would have been greater than the market quantity in the actual world as a result of the lower prices in the but-for world. However, in previous cases, the actual world market quantity has been widely used in the second step.[59] The implicit assumption of doing so is that any price effect (overcharge) would not have had significant effects on total market quantity. That is, demand is assumed to be very inelastic. If, in fact, market demand is elastic, then the application of the market share method may result in an understatement of the damages.[60]

### *(3) Cost Effects*

If a competitor plaintiff alleges that it lost sales as a result of the defendant's exclusionary conduct, the damages analysis should account for the incremental costs the

plaintiff would have incurred in order to expand its sales in the but-for world.

In most cases, the plaintiff would have incurred greater costs at the higher sales volume it would have achieved but for the exclusionary conduct than it did at the lower volume of sales achieved in the actual world.[61] The additional costs required to make the higher but-for volume of sales are often referred to as *incremental costs*. The amount of incremental costs typically can be determined using the companies' financial information. The extent of incremental costs depends on the size of the quantity effect and the amount of time the plaintiff has to make adjustments. Variable cost categories, such as raw materials, tend to require incremental expenditures even for small quantity increases. Fixed cost categories, such as capital equipment and general and administrative costs, may require incremental expenditures only if the quantity increase is relatively large. Whether a given cost category would have required incremental expenditures is a question that depends on the facts of the case at hand.

Another important question is whether the plaintiff had sufficient capacity to make the claimed lost sales in the but-for world. Capacity in this context can refer to production capacity, marketing capacity, distribution capacity, et cetera. To the extent that the plaintiff's actual world capacity along one or more of these dimensions was insufficient to allow it to make the claimed lost sales, the plaintiff must demonstrate that it could have expanded its capacity sufficiently (and include the costs required to do so among the incremental costs) or the lost sales must be reduced to the level that the plaintiff's capacity would allow.[62] Moreover, expansion of capacity can take time. Thus, even where the plaintiff is able to demonstrate that it could have increased capacity, time may have elapsed

before it would have been able to do so, limiting the amount of lost sales during the interim.

In an exclusionary conduct case, the conduct may have been directly aimed at increasing the plaintiff's costs. For example, if the defendant is alleged to have foreclosed the plaintiff by increasing the price of an input, the plaintiff's input costs would have been lower in the but-for world than in the actual world. In this case, the cost effect compounds the price effect and is an additional source of damages to the plaintiff.

## b. Distinctions Between Going Out of Business versus Failure to Enter

In cases where a defendant's exclusionary practices damaged a competitor's business, drove a more efficient competitor out of the market, or prevented a more efficient competitor from entering the market, the excluded competitor "would have a claim for antitrust damages based on lost profits."[63]

### *(1) Going Out of Business*

Where the value of the plaintiff's business has diminished as a result of the defendant's unlawful exclusionary conduct, the plaintiff may recover actual lost profits and diminution in the value of its business.[64] Where a plaintiff has gone out of business by reason of the defendant's unlawful exclusionary conduct, the plaintiff may recover a "going concern" value of its business in addition to the actual lost profits.[65] "The going-concern value is what a willing buyer given all available information would have paid a willing seller,"[66] which is often based in large part on the future profits the business is expected to generate, properly discounted to present value. Going concern value must be

determined reasonably close to the date when the business ceased to be a going concern.[67] Determining the value at a date far removed from the date the business stopped being a going concern may be considered too speculative.[68] Not surprisingly, the plaintiff cannot obtain *both* a going concern value of its business as of a certain date and lost profits for the period after the business ceased to be a going concern —such recovery would be duplicative because future lost profits are a major element in determining the "going concern" value.[69]

### *(2) New Business Ventures*

A plaintiff is entitled to recover damages if the defendant's violations thwart the plaintiff's attempt to enter into a new business venture or line of business. More is required, however, than a bona fide intent to enter. It is not sufficient that a plaintiff might, at some future time, have marshaled the resources and capacity to have entered the business. A plaintiff who claims that it was foreclosed from engaging in a new business or from expanding an existing business must prove that it had an intention to enter the business and that it had taken concrete steps to prepare to do so.[70] Some of the factors that may be relevant to determining whether or not a plaintiff has demonstrated the requisite intention and preparedness to enter include: (1) the background and experience of the principals and employees of the plaintiff; (2) the ability of the plaintiff to finance the business and to purchase the necessary facilities and equipment; and (3) concrete and discernable steps taken by the plaintiff to enter the new business.

Several courts have adopted a "futility exception" to the preparedness requirement.[71] Under this exception, an antitrust plaintiff need not take steps to show preparedness to enter a new market that had already been rendered futile

by the alleged monopolist.[72] In one case, however, a court rejected the plaintiff's argument that it should be excused from performing "the most basic preparatory steps" that the defendant had not rendered futile.[73] According to the court, a more expansive view of the futility exception would eliminate the standing requirement that the plaintiff show an antitrust injury to its business or property.[74] The court noted that the plaintiff could have taken initial steps to determine whether there was a market for the product, what price the customers were willing to pay, the exact nature of its potential supply, what its cost of production would be, and whether it would be profitable to enter this business.[75] The Eleventh Circuit in *Thompson v. Metropolitan Multi-List, Inc.*[76] formulated the futility exception in terms of the reasonableness of the plaintiff's efforts to enter a new market: "As long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations that create barriers to that market."[77]

# D. Establishing Customers' Damages from Exclusionary Conduct

This section discusses the claims made by *customers* that exclusionary conduct has enabled the defendant to charge prices above the competitive price. Where it is determined that a defendant has engaged in illegal exclusionary practices, customers have sought to recover any overcharges resulting from the exclusionary practices.[78]

As discussed above, a damages claim by a plaintiff should flow from the plaintiff's theory of liability. Even with a solid liability theory, however, it may be difficult as a practical matter to determine an appropriate yardstick or to identify

before or after period market conditions to serve as a benchmark in estimating damages in exclusionary conduct cases brought by customers. The difficulties in overcoming these obstacles that are discussed in part C of this chapter with respect to competitor damages claims also generally apply to customer damages claims. In principle, the customer-plaintiff must develop an economically sound model of a but-for world in which competitors of the alleged monopolist are not subject to the exclusionary conduct. The prices generated by the model would be the but-for prices and the overcharge would be the difference between the actual prices and the but-for prices.

## 1. Consistency with Liability Theory

As with competitor damages claims, the methodology for determining customer damages depends on the type of exclusionary conduct alleged in the plaintiff's liability theory. In contrast to a claim brought by an excluded competitor, a claim by a customer—or a class of customers—is likely to require an analysis of the defendant's prices in the but-for world. In some cases, these prices may be assumed to be the same as those of the excluded competitor's but-for prices. However, differences between the products sold by the defendant and the excluded competitor (as well as differences in service, branding, or other factors) may result in different but-for prices for the defendant and the excluded competitors. For example, assuming the existence of a competing generic drug in the but-for world, the manufacturer of the branded drug likely would be able profitably to charge a higher price to brand-loyal customers than the generic manufacturer would be able to charge to price-sensitive customers. In such a case, a reliable damages model should account for such price differences.

The damages analysis for a customer may differ from that of a competitor along other dimensions in exclusionary conduct cases in which the liability theory is based on pricing conduct by the defendant.[79] For example, predatory pricing cases present different damages issues for competitors and customers. If a competitor was driven from the market as a result of the defendant's predatory pricing, damages could be divided into two periods: (1) the predatory pricing period; and (2) the postpredatory pricing period when the defendant may be recouping lost profits from the predatory period. A competitor's damages expert would have to develop a model to estimate lost profits during each period.

In contrast, customers likely will not be entitled to damages during the predatory period because, under the liability theory, the price paid by the customer during that period was *below* the price that would have prevailed absent the predatory conduct. The customer generally will be entitled to damages only in the post-predatory pricing period. The but-for price for this period may be based on competitive prices that prevailed prior to the predatory period, if such a before period were available. The aggregate overcharge would be the difference between the actual post-predatory price and the but-for price, multiplied by the number of units purchased by the customer. The assessment of the but-for price should account for other factors, not attributable to the defendant's exclusionary conduct, that were determinants of price in the postpredatory period, such as input costs or supply and demand conditions that were independent of the alleged conduct.

## 2. Tying and Bundling Damages

Tying or bundled pricing claims can present particularly challenging issues to customer-plaintiffs. The tying product is the monopoly product and the tied product is the competitive product. The general presumption is that the monopolist lowers the price of the tying product by a sufficient amount to "force" the customer to buy the tied product at a price higher than the competitive price. If illegal tying has been proven, the damages expert for the plaintiff must establish the but-for price not only for the tied product but also for the tying product. In the absence of bundling, the price of the monopoly tying product may have been higher and the price of the competitive tied product may have been lower. In the but-for world, these offsetting effects would have to be taken into account.[80] In an exclusionary conduct case in which the alleged conduct involves a reduced price as a method to exclude competitors—such as a predatory or bundled pricing case or a tying case—it is entirely possible that customers' damages could be small or even zero, even though the defendant's conduct successfully excluded competitors.

# E. Cases Involving Competitor Exclusion

Damages proceedings and awards in recent exclusionary conduct cases are instructive with respect to the application of the foregoing principles. This section will describe highlights from five such cases: *Masimo Corp. v. Tyco Health Care Group*;[81] *ZF Meritor LLC v. Eaton Corp*;[82] *Weyerhaeuser Co. v. Ross-Simmons Hardwood*;[83] *McKenzie-Willamette Hospital v. PeaceHealth*;[84] and *LePage's, Inc. v. 3M*.[85] In each of these cases, the plaintiff claimed that the defendant used its monopoly power illegally to foreclose the plaintiff from the relevant market. This section describes the

different damages methods used and highlights damage issues that came under scrutiny.[86]

# 1. Masimo Corp v. Tyco Health Group

Masimo—a manufacturer of pulse oximetry systems—alleged that Tyco, a competing manufacturer of these systems, engaged in the following anticompetitive acts: (1) provided loyalty or market-share discounts to hospitals that did not purchase more than a specified share of pulse oximetry systems from its competitors; (2) entered into sole-source exclusive dealing arrangements with Group Purchasing Organizations (GPOs), which foreclosed its competitors from selling the products at issue to GPO hospitals; (3) offered bundled discounts whereby discounts on products at issue were tied to discounts on unrelated products sold by Tyco; (4) entered into co-marketing agreements with OEMs that prevented OEMs from manufacturing monitors that were compatible with the technology of pulse oximetry products supplied by the plaintiff and other competitors; and (5) entered into equipment financing programs that resulted in financial penalties if a hospital switched to competing monitors before the expiration of the financing agreements.

The plaintiff's expert calculated damages stemming from the anticompetitive conduct as a whole based on a yardstick approach. The yardstick was a given portion of the pulse oximetry market—specifically, oximetry monitor sales made to defibrillator manufacturers—that was not subject to the defendant's anticompetitive conduct. The expert estimated damages based on the relative performance of Tyco and Masimo in this particular segment of the market. Specifically, the expert estimated that Masimo achieved an average market share of roughly 50 percent in the yardstick segment over the first four years. Based on this information, the expert calculated that Masimo would have sold 8

percent of all new oximetry monitors in the first year of sales, 25 percent in the second year, and 50 percent in the next two years.

The defendant argued that the particular yardstick used by the plaintiff's expert was problematic. The oximetry monitor sales to defibrillator manufacturers comprised only 4 percent of the overall oximetry market, and the defendant argued that the plaintiff's expert's methodology did not account for differences in industry conditions between this particular segment and the remaining 96 percent of the market. The defendant explained that Masimo's oximetry monitor sales in the small defibrillator segment were primarily to one of two main defibrillator manufacturers in the market, Zoll Medical Corporation. The defendant's expert claimed that Masimo's success in the defibrillator segment was due to Zoll's breakthrough technological innovation during the period at issue, which was unique to the segment, and that it was inappropriate to extrapolate Masimo's experience in the small segment to the rest of the market. As such, the defendant claimed that the plaintiff's expert overstated damages.

Additionally, the defendant argued that the plaintiff's expert provided no basis for disaggregating damages to each contested business practice, and that there were problems with the proposed approach for disaggregation of damages. Defendant also argued that damages attributed to exclusive dealing arrangements were based on an erroneous conclusion about the share of sales associated with Tyco's sole source contracts.

Notwithstanding these arguments, the jury awarded the plaintiff a damages award of $140 million for four of the five alleged anticompetitive acts, $57 million of which were apportioned to Tyco's market share discount practices, another $57 million to the sole source exclusive dealing arrangements with GPOs, and the remaining $26 million to

bundled discount practices and co-marketing agreements. The jury found that the equipment financing programs were lawful. The jury also found that all damages occurred prior to July 2001.

Given the defendant's criticisms of the plaintiff's expert's damages methodology, however, the district court concluded that the damages awards for two of the four business practices "did not lie within the range sustainable by the proof."[87] Specifically, the district court sustained the jury's liability verdict with respect to only the market share discount agreements and exclusive dealing arrangements with GPOs. The court also granted the defendant's motion for a new trial on damages restricted to only these two business practices, for the period prior to July 2001.

In the new trial, the cut-off date of July 2001 for the damage calculation came under significant scrutiny. Masimo argued that damages ought to be calculated for conduct prior to July 2001, which would affect not only sales and profits prior to that date but also sales and profits after July 2001 that were tied to contracts that Tyco entered into before July 2001. As explained by Masimo, the pulse oximetry market includes sockets (monitors) and consumables, which include sensors and patient cables, and the sales of consumables flow from the placement of sockets over the lifespan of those sockets. After weighing arguments from both parties about the lifespan of the sockets and how that would affect damages after July 2001, the district court accepted the defendant's expert's opinion on the "residual life" of Tyco's installed base of sockets.

The court awarded damages in the amount of $14.5 million, $7.2 million of which were lost profits on sales of sockets and consumables prior to July 2001, and the remaining $7.3 million were lost profits after July 2001 on lost sales of consumables that stemmed from lost socket sales prior to July 2001.[88]

## 2. ZF Meritor LLC v. Eaton Corp.

ZF Meritor LLC, a manufacturer of heavy duty (HD) transmissions with plans to expand in North America, alleged that Eaton, a competing manufacturer, monopolized the market for HD transmissions and foreclosed competition through the use of de facto exclusive contracts with distributors in the market. The plaintiffs' expert's initial damage calculation of $606-$824 million was based on estimates from a ZF Meritor business plan, which contained projections of profit, sales volume, and market share. Damages included both an assessment of lost profits over the period at issue and an assessment of lost enterprise value of the plaintiff's HD transmission business.

The plaintiffs' expert used an econometric model to estimate lost profits, which were calculated as the difference between the plaintiffs' incremental revenues absent the defendant's conduct and incremental costs that the plaintiffs would have incurred in making those sales. The plaintiffs' expert presented several damages calculations using different assumptions on but-for profit margins and market shares, from ZF Meritor's business plan. The lost profit estimate was then derived by averaging these different damages calculations.

The district court excluded the plaintiffs' expert's opinion on the basis that the data underlying his calculation—which were derived from the plaintiffs' plan for its new line of business—were not sufficiently reliable.[89] The plaintiffs then requested that their expert be permitted to submit an alternate calculation based on other data also present in his report. This alternative calculation was based on other data, such as the number of heavy-duty trucks built and sold in North America, information on consumer confidence in the US, the average wholesale price of oil in the US, and interest rates, that were used to econometrically predict market

share. Specifically, the plaintiffs argued that the expert would use market share estimates derived from the econometric model contained in his report and profit margin estimates based on the plaintiff's actual sales from a "before" period. The district court did not allow the expert to amend his report and submit alternate damage calculations.[90]

The Court of Appeals held that the district court was correct in excluding the expert's damages testimony but concluded that the district court erred by not allowing the expert to submit an amended report with alternate damages calculations based on data that were already contained in the expert's initial report.[91]

The district court on remand found that the plaintiff's expert's model using a different data source was admissible. The district court rejected the defendant's claims that the plaintiffs' expert had: (1) failed to disaggregate business losses due to factors other than the anticompetitive conduct; (2) improperly projected future damages and going concern value; and (3) failed to factor every potentially relevant variable into his econometric analysis. The district court's finding of admissibility was largely driven by the "'generous principle[s]' that apply to the calculation of damages by antitrust plaintiffs, especially those whose businesses were new when they suffered antitrust injury . . . ."[92] Eaton ultimately agreed to pay $500 million to settle the case shortly before the scheduled damages trial.[93]

# 3. Weyerhaeuser

In *Weyerhaeuser*, the jury found that Weyerhaeuser had illegally used its monopsony power in the purchase of sawlogs to foreclose Ross-Simmons Hardwood and other Weyerhaeuser competitors from the downstream sawmill market in the Pacific Northwest.[94] The jury awarded Ross-

Simmons Hardwood $26.3 million in damages, which was trebled to $78.8 million. In its appeal to the Ninth Circuit, Weyerhaeuser argued that Ross-Simmons' damages analysis was speculative. The court, however, upheld the award of damages, concluding that the damages models used by the plaintiff provided a reasonable basis for calculating damages and were not speculative.[95]

The court stated that the plaintiff's damages models "properly relied upon the fundamental assumptions that Weyerhaeuser maintained artificially high costs in the sawlog market during the damages period."[96] The court concluded that the following elements of the plaintiff's damages models provided a reasonable basis for calculating damages: (1) the calculation of Weyerhaeuser's average profit margin prior to the predatory period; (2) the calculation of Weyerhaeuser's loss in profits during the damages period due to higher sawlog prices; and (3) the assumption that, through Weyerhaeuser's control of sawlog pricing, Weyerhaeuser could have maintained the same profit margin relative to the price of finished lumber during the predatory period that it maintained prior to the predatory period. In addition, the models accounted for lower demand and prices for finished lumber and other changing market conditions. The methodology described above provided a basis for calculating but-for sawlog prices during the damages period, which, in turn, provided a basis for calculating Ross-Simmons' profits during the damages period that would have occurred but for Weyerhaeuser's conduct.

Ross-Simmons' district court victory in April 2003 spurred additional suits by other Pacific Northwest sawmill competitors of Weyerhaeuser. In 2004, Weyerhaeuser settled two cases with five sawmill plaintiffs for a total of $49 million.[97] In 2005, Weyerhaeuser settled a suit by five additional sawmill plaintiffs for $13 million.[98] In settling

these suits, Weyerhaeuser paid $62 million in total to ten sawmill competitors.[99] In 2005, a jury awarded plaintiff Washington Alder trebled damages of $16 million,[100] a decision that Weyerhaeuser appealed to the Ninth Circuit and that was later stayed pending the Supreme Court decision in *Weyerhaeuser Co. v. Ross-Simmons Hardwood*.[101] In 2007, the Supreme Court rejected the liability theory underlying in *Weyerhaeuser Co. v. Ross-Simmons Hardwood*.[102] Following this decision, the Ninth Circuit vacated the judgment in *Washington Alder* and remanded the case to the U.S. District Court.[103] Weyerhaeuser and Washington Alder subsequently reached a settlement that resulted in an after-tax charge of $3 million in 2007 for Weyerhaeuser.[104]

# 4. McKenzie-Willamette

In *McKenzie-Willamette*, the jury found that the defendants had violated Section 2 of the Sherman Act by the bundled pricing of their products and services.[105] The jury awarded McKenzie-Willamette $5.4 million based on its finding that PeaceHealth attempted to monopolize the hospital health care market in Lane County, Oregon in violation of Section 2 of the Sherman Act.[106] The ensuing judgment for the plaintiff was reversed on liability grounds; thus, the appellate court did not review the damage methodology.

At trial, the plaintiff’s economic expert provided three damages estimates based on McKenzie-Willamette’s alleged illegal exclusion from the preferred provider plans of Regence Blue Cross Blue Shield of Oregon (Regence) and the Providence Health Plan (Providence). Two of the damages estimates ($7.7 million and $5.4 million) were based on the exclusion from both plans over two different

time periods. The third estimate ($5.6 million) was based on exclusion from just the Regence plan over the longer of the two time periods.[107] To estimate damages, the plaintiff's expert used a lost profits model based on McKenzie-Willamette's estimated share of 25 percent of the acute care hospital business in Lane County.

The defendant argued that the damages calculation by the plaintiff's expert was invalid because the jury had found that the defendant's preferred provider contracts were lawful. In particular, the defendant argued that the plaintiff's damages calculation was based only on the plaintiff's exclusion from the defendant's lawful preferred provider contracts.[108] The lower court disagreed, concluding that the jury had substantial grounds for awarding damages based on the jury's finding of attempted monopolization of the hospital health care market.

> The evidence from which this conclusion could be drawn and damages could be based includes defendant employing one-third of the doctors in Lane County, the use of non-compete provisions in employment contracts; the purchase and closing of competing hospitals; entering into preferred provider contracts that are lawful but exclusionary; seeking restrictive covenants on property to deter hospital construction; and plans to locate a new hospital near a competitor's hospital.[109]

The Ninth Circuit vacated the jury's verdict that PeaceHealth had engaged in attempted monopolization of the hospital health care market and stayed further proceedings until it received a response to a question that it certified to the Oregon Supreme Court.[110] The parties later settled the dispute and the Ninth Circuit vacated its certification to the Oregon Supreme Court.[111]

# 5. LePage's

In *LePage's*, the jury found that the defendants had violated Section 2 of the Sherman Act by the bundled pricing of their products and services.[112] The jury awarded LePage's $22.8 million in damages, which was subsequently trebled to $68.5 million. The damages model in *LePage's* was a lost profits model based on lost market share and lost profit margin.[113] LePage's expert estimated damages of $36 million over the period 1993 to 2000 due to 3M's alleged exclusionary conduct. This damages estimate was based on estimates of LePage's lost sales and profit margin. Lost sales were calculated as the difference between estimated but-for sales[114] and actual sales. The estimated lost profit margin was based on LePage's actual profit margin adjusted to account for declining prices and decreased efficiency caused by reduced sales.[115]

3M did not challenge LePage's expert's methodology to calculate damages. Rather, 3M challenged the assumptions underlying the damages model[116] and claimed that LePage's expert failed properly to disaggregate LePage's losses due to 3M's exclusionary conduct from LePage's losses due to other factors. The courts ruled against 3M on both arguments.[117]

---

1. *See* Ethypharm SA France v. Abbott Labs., 707 F.3d 223, 233 (3d Cir. 2013). It should be noted that in certain circumstances, courts have permitted parties other than customers or competitors to maintain claims where the injury suffered was "inextricably intertwined" with the antitrust violation. *See* Hanover 3201 Realty, LLC v. Village Supermarkets, Inc., 806 F.3d 162, 166-67 (3d Cir. 2015).
2. *See* Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 583, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986); Freedom Holdings, Inc. v. Cuomo, 624 F.3d 38, 52 (2d Cir.2010).

3. *See, e.g.*, ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 291-92 (3d Cir. 2012).; Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp., 604 F.3d 1291, 1305-06 (11th Cir. 2010).

4. This derives directly from § 4 of the Clayton Act, which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). In addition, some states permit indirect purchasers to recover damages on the basis of some measure of overcharge. *See generally* part B of Chapter 2 and part E of Chapter 8.

The issues in connection with tracing overcharges to indirect purchasers, which can arise in state law claims in "*Illinois Brick* repealer" states, are generally beyond the scope of this volume, which focuses on proving antitrust damages under federal antitrust law.

5. Chapter 8 discusses some of these methodologies in the context of overcharges, and Chapter 6 discusses the use of econometric methods in some of these methodologies.

6. The before-during-after method gained acceptance in *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (1927). *See* Molly L. Zohn, *How Antitrust Damages Measure Up with Respect to the* Daubert *Factors*, 13 Geo. Mason L. Rev. 697, 700 (2005) for a discussion of the application of this approach with respect to share.

7. As one court explained, the before-during-after method may be used only when "there has been some showing that the market conditions in the two periods were

similar but for the impact of the violation." Sun Microsystems, Inc. v. Hynix Semiconductor Inc., 608 F. Supp. 2d 1166, 1207-08 (N.D. Cal. 2009) (quoting Pacific Coast Agric. Exp. Ass'n v. Sunkist Growers, 526 F.2d 1196, 1206-07 (9th Cir. 1975)). Alternatively, as discussed in the text, it may be possible to adjust reliably for differences in other economic conditions unrelated to the exclusionary conduct.

8. In referencing a "before" period, the plaintiff is not entitled to assume "favorable aspects of an anticompetitive market," such as "limited competition from third parties because of the difficulty of entering the market." *See* Toscano v. PGA Tour, Inc., 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002) (quoting Dolphin Tours v. Pacifico Creative Serv., 773 F.2d 1506, 1512 (9th Cir. 1985)).

9. For an analysis of the problems involved in estimating damages from exclusionary practices in high-technology industries, see John E. Lopatka, *Overcharge Damages for Monopolization of New Economy Markets*, 51 Antitrust Bull. 453 (2006).

10. *See* David Kreps & Robert Wilson, *Reputation and Imperfect Information*, 27 J. Econ. Theory 253 (1982); Paul Milgrom & John Roberts, *Predation, Reputation, and Entry Deterrence*, 27 J. Econ. Theory 280 (1982).

11. In 1946, the Supreme Court accepted this technique in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946). *See also* Chapter 6 (discussing benchmark approach to damages).

12. *See, e.g.*, CDW LLC v. NETech Corp., 906 F. Supp. 2d 815, 824 (S.D. Ind. 2012). ("[O]nce the plaintiff shows relative comparability between his hypothetical firm and the unaffected yardstick firm, [it] is allowed to borrow liberally from the firm's experience.") Fishman v. Estate of Wirtz, 807 F.2d 520, 555-56 (7th Cir. 1986).

13. *See, e.g.*, Farmington Dowel Prods. v. Forster Mfg. Co., 421 F.2d 61, 81 (1st Cir. 1970).
14. *See* Gregory K. Leonard & J. Douglas Zona, *Simulation in Competitive Analysis*, ABA Section of Antitrust Law, Issues in Competition Law and Policy 1405 (2008).
15. *Id.*
16. Differing assumptions about the form of the demand schedule may result in significant differences in estimated damages. This is because the types of demand schedule most frequently employed (e.g., linear, isoelastic, logit, "almost ideal demand system") tend to be more or less "curvy," and thus to result in a larger or smaller price effect for a given estimated quantity effect (or, respectively, they result in a larger or smaller quantity effect for any given estimated price effect). For a non-technical discussion, see Gregory J. Werden, Luke M. Froeb, & David T. Scheffman, *A* Daubert *Discipline for Merger Simulation*, Antitrust, Summer 2004, at 89. Differing assumptions about costs and the form of market competition can also have significant effects on damage estimates, as the level of the but-for prices (or quantities) depends on costs and the way firms interact and compete (e.g., on the basis of quantity, on the basis of prices, by engaging in bilateral bargaining with buyers; or by selling via auctions mechanisms). *See* Carl Shapiro, *Theories of Oligopoly Behavior*, *in* 1 Handbook of Industrial Organization 329, 343-48 (1989). These assumptions about demand, cost, and the nature of competition should be made explicit and subjected to tests of reasonableness or sensitivity analysis, and the court should exercise its gatekeeping function rigorously before permitting such a model to serve as a basis for a treble damages recovery.
17. *Compare* Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 566 (2d Cir. 1970) (allowing damages analysis based on

business projections where evidence showed projections "were the product of deliberation by experienced businessmen charting their future course") *with* ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 293 (3d Cir. 2012) (affirming exclusion of damages estimate based on "one page of financial projections for a nascent company, the assumptions underlying which were relatively unknown").

18. 282 U.S. 555 (1931).
19. *Id.* at 562.
20. J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 566 (1981).
21. *Bigelow*, 327 U.S. 265.
22. *Story Parchment*, 282 U.S. at 563.
23. Eleven Line v. North Texas State Soccer Ass'n, 213 F.3d 198, 209 (5th Cir. 2000).
24. *Story Parchment*, 282 U.S. at 563.
25. *Eleven Line*, 213 F.3d at 209.
26. *See* 5 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 3.06a, at 3-61 (2d ed. 2003). Some courts have held that the plaintiff is entitled at least to nominal damages when it has proffered sufficient evidence establishing the fact of injury but has been unable to provide any relevant evidence allowing the jury to determine, by reasonable inference and estimation, the approximate amount of the plaintiff's damages. *See, e.g.*, Morning Pioneer v. Bismarck Tribune Co., 493 F.2d 383, 388 (8th Cir. 1974) (awarding plaintiff nominal damages where plaintiff established that it lost one-third of its grocery advertising by reason of defendant's antitrust violation, but failed to provide any evidence that could be used to calculate the amount of damages).
27. *See* Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1433 (2013); Concord Boat Corp. v. Brunswick Corp., 207 F.3d

1039, 1054 (8th Cir. 2000).

28. U.S. Football League v. NFL, 842 F.2d 1335, 1378-79 (2d Cir. 1988); MCI Commc'ns v. AT&T, 708 F.2d 1081, 1162 (7th Cir. 1983) ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage.").

29. *See, e.g.*, Image Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1224 (9th Cir. 1997) ("When a § 2 monopolization claim has been dismissed or adjudicated against a plaintiff, damages attributable to that claim must be disaggregated."); Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1371-73 (9th Cir. 1991) (affirming summary judgment where plaintiff failed to submit a damages study that disaggregated between allegedly unlawful conduct and acts that were found by the court to be lawful); *MCI Commc'ns*, 708 F.2d at 1163 (rejecting damages study premised on the assumption that all twenty-two of the acts charged were unlawful, where liability was established with respect to only seven of those alleged acts and the study did not disaggregate any losses attributable to the lawful acts); *see also* Infusion Res. v. Minimed, Inc., 351 F.3d 688, 695-96 (5th Cir. 2003) (affirming dismissal of non-antitrust claims on ground that plaintiff failed to disaggregate alleged damages attributable to those claims from damages for its antitrust claims, which were rejected on summary judgment).

30. Eastern R.R. Presidents Conf. v. Noerr Motor Freight, 365 U.S. 127 (1961); United Mine Workers v. Pennington, 381 U.S. 657 (1965).

31. *U.S. Football League*, 842 F.2d at 1378-79.

32. *See, e.g.*, Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1056-57 (8th Cir. 2000) (excluding damage

expert's testimony where expert's model "did not incorporate all aspects of the economic reality of the . . . market and because it did not separate lawful from unlawful conduct"); *Image Tech. Servs.*, 125 F.3d at 1222 (reversing damage award in favor of one plaintiff where evidence showed that plaintiff's exit from the market was caused by factors other than defendant's conduct); Farley Transp. Co. v. Santa Fe Trail Transp. Co., 786 F.2d 1342, 1352 (9th Cir. 1985) ("Farley's utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme to deviate from the tariff rate requires reversal of the verdict and remand for a new trial on the amount of damages."); *MCI Commc'n*s, 708 F.2d at 1163 ; Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1353 (3d Cir. 1975) ("In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition."). *But see* Litton Sys. v. AT&T, 700 F.2d 785, 825 (2d Cir. 1983) (upholding a damage award even though plaintiff's damage study failed to segregate damages from lawful and unlawful practices, explaining that the expert did not assume the absence of other factors—he attempted disaggregation, but found results unfruitful).

33. In contrast to the requirement that a plaintiff segregate damages flowing from the defendant's unlawful conduct from losses attributable to other factors, a number of courts have held that a plaintiff is not required to disaggregate damages flowing from separate unlawful acts. *See, e.g.*, *MCI Commc'ns*, 708 F.2d at 1161 ("Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of

unlawful acts intertwined with one another."); Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226, 1242-43 (7th Cir. 1982) ("A plaintiff claiming injury caused by more than one of the defendant's unlawful practices need not prove the amount of damage caused by each illegal practice if the plaintiff shows that disaggregation is impracticable.") , *aff'd*, 465 U.S. 752 (1983).

34. *See, e.g.*, *Image Tech. Servs.*, 125 F.3d at 1224 ; Blue Cross & Blue Shield United v. Marshfield Clinic, 65 F.3d 1406, 1416 (7th Cir. 1995); *Farley Transp.*, 786 F.2d at 1352; *MCI Commc'ns*, 708 F.2d at 1174.

35. *See, e.g.*, Vernon v. S. Cal. Edison, 955 F.2d at 1373 (affirming district court's grant of summary judgment for defendant where "the serious flaws in the only damage study which could be proffered to the jury placed Vernon in the position of having no proper proof of damages at all"); McGlinchy v. Shell Chem. Co., 845 F.2d 802, 809 (9th Cir. 1988) (granting summary judgment for defendant where plaintiffs' damages study did not disaggregate damages attributable to the alleged antitrust violation from losses attributable to other factors, the study gave no reasonable basis for the jury to conclude that plaintiffs suffered damages, plaintiffs failed to submit additional evidence to rebut defendants' challenge to plaintiffs' damages study, and the study could not be modified to disaggregate the damages caused by unlawful acts and by other factors).

36. Borger v. Yamaha Int'l Corp., 625 F.2d 390, 399 (2d Cir. 1980); Golf City, Inc. v. Wilson Sporting Goods Co., 555 F.2d 426, 436 (5th Cir. 1977).

37. *Borger*, 625 F.2d at 399.

38. *See, e.g.*, *Golf City*, 555 F.2d at 436.

39. *Id.* at 436.

40. *Fishman*, 807 F.2d at 558.

41. *See, e.g.*, Pierce v. Ramsey Winch Co., 753 F.2d 416, 436-437 (5th Cir. 1985).
42. For a further discussion of mitigation of damages, see Part B of Chapter 5.
43. *See, e.g.*, *Pierce*, 753 F.2d at 436-37.
44. *Id.*
45. *Fishman*, 807 F.2d at 557.
46. *Id.* at 559.
47. *Id.* at 559-60. The court in *Fishman* concluded that the profits from risk-free investments may be used for computation of opportunity costs only for an *initial period* after an investment opportunity has been foreclosed by the defendant's antitrust violations to account for a reasonable period necessary for the plaintiff to find an alternative business investment. Following this initial period, the plaintiff is expected to find an investment yielding reasonable equity return. The *Fishman* court also noted, however, that it believed "this estimate should, if anything, err on the side of conservatism since the alternative may be to force undue risks on a victim of a wrongdoing." *Id.* at 559.
48. *See generally* Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 338-40 (1971).
49. *See* Los Angeles Mem'l Coliseum Comm'n v. NFL, 791 F.2d 1356 (9th Cir. 1986).
50. The concepts of discounting and present value are discussed in Chapter 5.
51. *See* Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18, 27 (1st Cir. 1999) ("Where plaintiff has been forced out of business . . . it is awarded its going-concern value or its projected future lost profits, but not both.").
52. *See* Pines Chrysler-Plymouth v. Chrysler Corp., 826 F.2d 1360, 1363-64 (4th Cir. 1987).

53. This formula represents the case in which a competitor sells a single product at a single price and faces a single cost to sell incremental units (in each state of the world: *but-for* and *actual*). It can be generalized to more complex situations.
54. Other technical issues involved in estimating firms' lost profits are discussed in Chapter 5.
55. It is important to note, however, that under some types of exclusionary conduct, prices may have been higher in the but-for world than in the actual world for some customers at some point in time. For example, under a predatory pricing theory, the incumbent firm provides lower prices to some customers for a period of time in order to force the exit or deter the entry of a rival. This point can have important implications for the analysis of whether to certify a class of direct or indirect purchasers. *See*, *e.g.*, John H. Johnson & Gregory K. Leonard, *Economics and the Rigorous Analysis of Class Certification in Antitrust Cases*, 3 J. Comp. L & Econ. 341 (2007).
56. *See* Fed. Judicial Ctr., Reference Manual on Scientific Evidence 498 (3d ed. 2011), *available at* http://www.fjc.gov/public/pdf.nsf/lookup/SciMan3D01.pdf/$file/SciMan3D01.pdf.
57. *See, e.g.*, Hal R. Varian, Intermediate Microeconomics ch. 6 (7th ed. 2005).
58. If the defendant's practice caused injury to competitors because of more efficient, output-enhancing competition, then the plaintiff has not suffered antitrust injury. *See, e.g.*, Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977).
59. Zohn, *supra* note 4, at 705-06.
60. A simple analysis of damages based on real-world prices and quantities would simultaneously have the potential to overestimate damages (because it would not

consider that prices would be lower in the but-for world) and also potentially underestimate damages (because it would not consider that overall market sales would be higher in the but-for world). Although these two effects go in opposite directions, there is no reason to believe they would be similar in magnitude or that they would necessarily offset one another. *See* Zohn, *supra* note 4, at 716.

61. Fed. Judicial Ctr., *supra* note 36, at 449-450.

62. *Id.* at 489.

63. Howard Hess Dental Labs. v. Dentsply Int'l, 424 F.3d 363, 374 (3d Cir. 2005); Fishman v. Estate of Wirtz, 807 F.2d 520, 551 (7th Cir. 1986) ("It is well settled that an antitrust plaintiff is entitled to recover 'in full for the preventable and established loss sustained by reason of tortious or proscribed acts.'") (citation omitted).

64. *See, e.g.*, Coastal Fuels of P.R. v. Caribbean Petrol. Corp., 175 F.3d 18, 27 (1st Cir. 1999) (citing Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561-67 (1931)).

65. *See, e.g.*, *Coastal Fuels*, 175 F.3d at 27.

66. *Coastal Fuels*, 175 F.3d at 25 n.4.

67. Farmington Dowel Prods. Co. v. Forster Mfg. Co., 421 F.2d at 81 n.46. (1st Cir. 1969).

68. *Coastal Fuels*, 175 F.3d at 27.

69. *Farmington Dowel*, 421 F.2d 61, 80-82, n.46; *Coastal Fuels*, 175 F.3d at 30.

70. *See, e.g.*, Jayco Sys. v. Savin Bus. Mach. Corp., 777 F.2d 306, 314 (5th Cir. 1985); Hayes v. Solomon, 597 F.2d 958, 973 (5th Cir. 1979); Ovitron Corp. v. Gen. Motors Corp., 512 F.2d 442, 443 (2d Cir. 1975).

71. *See, e.g.*, Ashley Creek Phosphate Co. v. Chevron USA, Inc., 315 F.3d 1245, 1258-59 (10th Cir. 2003); Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1572 (11th Cir. 1991); Fleer Corp. v. Topps Chewing Gum, Inc., 415 F.

Supp. 176, 180 (E.D. Pa. 1976) ("It would be inconsistent with one purpose of the Clayton Act—to protect the business interests of the victims of monopolistic practices—to require an antitrust plaintiff to pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture.").

72. *Ashley Creek*, 315 F.3d at 1258.

73. *Id.*

74. *Id.*

75. *Id.* at 1259.

76. 934 F.2d 1566 (11th Cir. 1991).

77. *Id.* at 1572.

78. In cases where a plaintiff competitor has prevailed on an exclusionary practice theory, subsequent plaintiff cases filed by customer classes based on the same liability theory are often settled without a trial. *See, e.g.*, Bradburn Parent Teacher Store v. 3M, No. 02-7676, 2005 U.S. Dist. LEXIS 5315 (E.D. Pa. 2005) (following determination of liability in *LePage's*, 3M settled the customer claims for $39.75 million); Meijer Inc. v. 3M, No. 04-5871, 2005 U.S. Dist. LEXIS 13995 (E.D. Pa. 2005) (following determination of liability in *LePage's*, 3M settled the customer claims for $28.9 million). The district court judge who presided over the *LePage's* case also presided over the *Bradburn* and *Meijer* cases. The *Bradburn* class included only commercial purchasers of branded tape from 3M whereas the *Meijer* class included commercial purchasers of both branded and private label tape from 3M.

Following the district court decision against Weyerhaeuser, a class action suit was filed in 2004 on behalf of purchasers of finished alder lumber even though the jury in the Weyerhaeuser case had found that the downstream output market was broader than

finished alder lumber and that Weyerhaeuser had not monopolized or attempted to monopolize this broader hardwood lumber market. *See* Morelock Enters. v. Weyerhaeuser Co., No. CV-04-583-PA, 2004 U.S. Dist. LEXIS 28270 (D. Or. 2004) (order granting motion for class certification). In April 2008, the jury awarded damages to the plaintiffs in the amount of $27.98M. Verdict, Morelock Enters. v. Weyerhaeuser Co., No. CV-04-583-PA (D. Or. Apr. 28, 2008). Weyerhaeuser moved for judgment as a matter of law or for a new trial. Renewed Motion for Judgment as a Matter of Law and, In the Alternative, Motion for New Trial, *Morelock Enters.*, No. CV-04-583-PA (D. Or. May 15, 2008). In August 2009, the court approved a settlement agreement and vacated its earlier verdict. Final Approval Order and Judgment, *Morelock Enters.*, No. CV-04-583-PA (D. Or. Aug. 10, 2009).

79. The *Bradburn* and *Meijer* cases were both based on 3M's bundled pricing of a broad range of products sold by 3M to office supply stores and other large retailers. In approving the final settlement in *Bradburn*, the court stated that the $39.75 million settlement represented between 41-48% of the damages calculated by the Plaintiff's expert and resulted in an award of more than 18.5% of the Class's transparent tape purchases from 3M during the 7-year period. Bradburn Parent Teacher Store v. 3M, 513 F. Supp. 2d 322, 327 (E.D. Pa. 2007). In approving the final settlement in *Meijer*, the court stated that the $28.89 million settlement resulted in an award of about 2% of the Class's transparent tape purchases from 3M during the Class period. Meijer, Inc. v. 3M, No. 04-5871, 2006 U.S. Dist. LEXIS 56744, at *9-10 (E.D. Pa. 2006).

80. *See e.g., In re* Payment Card Interchange Fee and Merchant Discount, No. 05-MD-1720, 2013 WL 6510737

(E.D.N.Y.2013) (noting, in approving a settlement, that even if credit card interchange fees would have been lower in the but-for world, a damage award might need to be offset by the costs associated with the diminished value of credit cards to users.)

81. 350 Fed. Appx. 95 (9th Cir. 2009).

82. LLC v. Eaton Corp., 696 F.3d 254 (3d Cir. 2012).

83. 549 U.S. 312 (2007).

84. No. 02-6032-HA, 2003 U.S. Dist. LEXIS 16203 (D. Or. 2003), *vacated and remanded sub nom.* Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008). The Ninth Circuit stayed further proceedings until the Oregon Supreme Court resolved a question certified to it by the Ninth Circuit concerning Oregon's price discrimination law. The parties later settled the dispute, and the Ninth Circuit vacated its certification to the Oregon Supreme Court. Cascade Health Solutions v. PeaceHealth, 542 F.3d 668 (9th Cir. 2008).

85. Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003).

86. Note that it is not the purpose of this section to evaluate the legal and economic merits of the liability theories advanced by the parties and accepted or rejected by the juries and federal courts in these matters.

87. Masimo Corp. v. Tyco Health Care Group, L.P., No. CV 02-4770 MRP, 2006 U.S. Dist. LEXIS 29977, at *40-41 (C.D. Cal. 2006).

88. Masimo Corp. v. Tyco Health Care Group, L.P., No. CV 02-4770 MRP (AJWx), 2007 U.S. Dist. LEXIS 98990, at *21 (C.D. Cal. 2007). The Court of Appeals affirmed the district court's findings. Masimo Corp. v. Tyco Health Care Group, L.P., 350 Fed. Appx. 95, 96-98 (9th Cir. 2009).

89. ZF Meritor LLC v. Eaton Corp., 646 F. Supp. 2d 663, 666-67 (D. Del. 2009).

90. ZF Meritor LLC v. Eaton Corp., 800 F. Supp. 2d 633, 637 (D. Del. 2011).
91. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 290-300 (3d Cir. 2012).
92. ZF Meritor LLC v. Eaton Corp., No. 06-623-SLR, 2013 U.S. Dist. LEXIS 178890, at *14 (D. Del. 2013).
93. *See* Press Release, Eaton Corp., Eaton and Meritor Announce Settlement of Litigation: Eaton to Pay Meritor $500 Million (June 23, 2014), *available at* http://www.eaton.com/Eaton/OurCompany/ NewsEvents/ NewsReleases/PCT_1118090.
94. Ross-Simmons alleged that Weyerhaeuser had engaged in predatory overbidding by paying more for sawlogs than necessary. In February 2007, the Supreme Court vacated the Ninth Circuit's decision upholding the verdict for the plaintiff. *See Weyerhaeuser*, 549 U.S. at 312. The Supreme Court concluded that the *Brooke Group* test for predatory pricing cases also applies to cases in which predatory overbidding is alleged.
95. *See* Confederated Tribes v. Weyerhaeuser Co., 411 F.3d 1030, 1035, 1045-46 (9th Cir. 2004). Following the remand to the district court, Weyerhaeuser and Ross-Simmons Hardwood reached a settlement which resulted in an after tax charge of $11 million in 2007 for Weyerhaeuser. *See* Weyerhaeuser Co., Annual Report (Form 10-K), at 95 (Feb. 28, 2008).
96. While the plaintiff's damages model was based on a liability theory that was ultimately rejected by the Supreme Court, the discussion in this section focuses on the plaintiff's damages methodology assuming the liability theory was valid.
97. Weyerhaeuser Co., Annual Report (Form 10-K), at 71 (Mar. 3, 2005).
98. Weyerhaeuser Co., Annual Report (Form 10-K), at 84 (Mar. 1, 2007).

99. *See* Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 325-26 (2007) (holding "predatory bidding" theory invalid absent showing that bids brought the pricing of the alleged predator's outputs below-cost and that the predator would have a "dangerous probability of recouping" losses caused by bidding strategy and noting that the plaintiff "has conceded that it has not satisfied the [announced] standard").

100. Washington Alder LLC v. Weyerhaeuser Co., No. CV 03-753-PA, 2004 U.S. Dist. LEXIS 29851 (D. Or. 2004).

101. *See* Washington Alder v. Weyerhaeuser Co., Nos. 04-35717, 04-36125, Dkts. 33 & 37 (9th Cir. Dec. 2, 2005 & July 10, 2006).

102. 549 U.S. 312, 325-26 (2007) (holding "predatory bidding" theory invalid absent showing that bids brought the pricing of the alleged predator's outputs below-cost and that the predator would have a "dangerous probability of recouping" losses caused by bidding strategy and noting that the plaintiff "has conceded that it has not satisfied the [announced] standard").

103. Washington Alder v. Weyerhaeuser Co., Nos. 04-35717, 04-36125, 2007 U.S. App. LEXIS 12806 (9th Cir. 2007).

104. *See* Weyerhaeuser Co., Annual Report (Form 10-K), at 95 (Feb. 28, 2008).

105. In *McKenzie-Willamette*, the bundled discount pricing concerned tertiary hospital services such as intensive neonatal care and invasive cardiology surgery services that PeaceHealth combined with general acute care hospital services offered to two health plans providing coverage in Lane County, Oregon. McKenzie-Willamette offered only general acute care hospital services. McKenzie-Willamette argued that the bundled discount pricing of tertiary hospital services with general acute

care hospital services was an exercise of monopoly power by PeaceHealth. *See McKenzie-Willamette*, No. 02-6032-HA, 2003 U.S. Dist. LEXIS 16203, at *16-*17. The Ninth Circuit reversed a jury verdict in favor of the plaintiff alleging that "bundled" hospital services constituted attempted monopolization under federal antitrust laws. Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 891 (9th Cir. 2008).

106. The district court subsequently trebled this damages award to $16.2 million. The jury also awarded McKenzie-Willamette $5.4 million based on its finding that PeaceHealth violated Oregon's anti-price discrimination law and $5.4 million based on its finding that PeaceHealth tortiously interfered in McKenzie-Willamette's business relations. In addition, the jury awarded McKenzie-Willamette $9.2 million in punitive damages based on the tortious interference claim. McKenzie-Willamette Hosp. v. PeaceHealth, No. 02-6032-HA, 2004 U.S. Dist. LEXIS 21050, at *2 (D. Or. Sept. 30, 2004); *vacated and remanded sub nom.* Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2008).

107. *See* Transcript of Record at 70-71, *McKenzie-Willamette Hosp.*, 2004 U.S. Dist. LEXIS 21050 (No. 358); Transcript of Record at 30-31, *McKenzie-Willamette Hosp.*, 2004 U.S. Dist. LEXIS 21050 (No. 362). The two time periods used by plaintiff's expert were January 1998 to October 1, 2003 and February 1, 2000 to October 1, 2003. According to the defendant, these two health plans accounted for 15% of commercial lives in Lane County. In a motion for a new trial, the defendant argued that the plaintiff's expert "could not explain why plaintiff was foreclosed from competing when eighty-five percent of the commercial market was still available to plaintiff." The district court, however, concluded that there was "sufficient evidence that plaintiff was excluded from

significantly more than fifteen percent of the market of patients who could pay through insurance benefits or otherwise." *See McKenzie-Willamette Hosp.*, 2004 U.S. Dist. LEXIS 21050, at *16-17.

108. *Id.* at *24-26.

109. *Id.* at *26-27.

110. *See* Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 890 (9th Cir. 2008).

111. Cascade Health Solutions v. PeaceHealth, 542 F.3d 668 (9th Cir. 2008).

112. In *LePage's*, the bundled pricing concerned a broad array of products sold by 3M to office supply stores and other large retailers. LePage's primarily sold private label transparent tape to large retailers. LePage's argued that 3M's bundled discount pricing in conjunction with 3M's monopoly power in the sale of branded transparent tape was intended to foreclose LePage's from selling private label transparent tape to large retail outlets. *See LePage's*, 324 F.3d at 141.

113. *See* LePage's, Inc. v. 3M, 324 F.3d 141, 145, 164-66 (3d Cir. 2003).

114. To determine LePage's but-for sales for each year of the damages period, LePage's expert relied on the following data: (1) actual and projected total U.S. sales of transparent tape; (2) private-label tape's share of total U.S. sales of transparent tape, which was estimated to grow by 1% per year over the damages period; and (3) LePage's shares of total U.S. sales of branded-label tape and private-label tape, which were estimated to remain constant over the damages period. *LePage's*, 324 F.3d at 165.

115. For a general discussion of the estimation of lost profits, see Chapter 5.

116. For example, 3M challenged the assumption of LePage's damages expert that 3M did not want to

succeed in the private-label market because it would lower the profitability of 3M's premier Scotch brand tape. The court of appeals noted that the district court had rejected 3M's argument on this point, stating that LePage's expert's "assumptions were grounded in the past performances of Scotch, Highland [a lower-priced 3M branded tape] and LePage's tapes, as well as 3M's own internal projections for future growth." *LePage's*, 324 F.3d at 165.

117. *Id.* at 165-66.