# Exhibit G

[Areeda, Phillip]

**Herbert Hovenkamp**
*Ben V. & Dorothy Willie*
*Professor of Law*
University of Iowa

**Volume XI**

RECEIVED
Law Library

OCT 30 1998

Univ of WI
Madison, WI 53706

# Antitrust Law

## An Analysis of Antitrust Principles and Their Application

*Formerly published by*
*Little, Brown and Company*

**ASPEN LAW & BUSINESS**
A Division of Aspen Publishers, Inc.

UW-Madison Law Library
975 Bascom Mall
Madison, WI 53706

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional person should be sought.

— From a *Declaration of Principles* jointly adopted by a Committee of the American Bar Association and a Committee of Publishers and Associations.

Copyright © 1998 by Aspen Law & Business

All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording or any information storage and retrieval system, without permission in writing from the publisher. Requests for permission to make copies of any part of this publication should be mailed to:

Permissions
Aspen Law & Business
A Division of Aspen Publishers, Inc.
1185 Avenue of the Americas
New York, NY 10036

Printed in the United States of America

Library of Congress Catalog Card No. 77-15710
ISBN 0-7355-0196-3 (Vol. XI)

This material may be protected by Copyright law (Title 17 U.S. Code)


*Second,* the exclusive dealing arrangement would not have its intended anticompetitive effect unless the result were to make it significantly more difficult and expensive for rival pattern manufacturers to sell their patterns in Iowa City. If Iowa City contained robust competition among numerous stores selling patterns, exclusive dealing with any one of them would not have this effect. Rather, the arrangements imposed by the defendant manufacturer would have to be sufficiently numerous to cover enough Iowa City stores so that the remaining stores would not be able adequately to handle the supply of rival manufacturers.[25]

*1821b2. Output contract.* While the output contract operates differently from the requirements contract, the analysis is generally the same. Suppose, for example, that an Iowa City retailer enters into an output contract with Standard Fashion under which SF promises to sell all its Iowa City output of patterns to that retailer. If the retailer is only one among many in Iowa City, SF is not likely to enter into such an agreement if it anticipates the effect will be that the retailer will assess a monopoly markup on SF's patterns; it would prefer to sell the patterns to numerous retailers who would compete among themselves to lower the markup and enlarge the manufacturer's volume. At the same time, SF's output contract with the Iowa City retailer would not deny access to patterns to other Iowa City retailers if SF were only one among numerous pattern makers, and the other retailers could readily enter their own exclusive or nonexclusive contracts with SF's rivals.

**1821c. Minimum standards for prima facie illegality.** *1. General standards for requirements contracts.* Under the rule of reason applied in exclusive dealing cases, structural evidence is decisive only when the numbers are small, thus indicating that the restraint is legal. When the numbers are large enough to be threatening they establish an inference of prima facie illegality, shifting the burden to

25. Recommended market shares and percentages are given in ¶c1. Cf. the now-withdrawn Justice Department Vertical Restraints Guidelines, §3.22 (1985):

> [F]or exclusive dealing to facilitate anticompetitive exclusion, the following market conditions normally must be met:
> (1) The "nonforeclosed market" is concentrated and leading firms in the market use the restraint;
> (2) The firms subject to the restraint control a large share of the "foreclosed market"; and
> (3) Entry into the "foreclosed market" is difficult.
> Anticompetitive exclusion is not likely to result from exclusive dealing arrangements if any of these conditions is absent.

50 Fed. Reg. 6263, 6267 (1985).

the defendant to show that exclusive dealing is justified under the circumstances.[26]

Picking the correct number is somewhat arbitrary, but single firm foreclosure percentages of less than 20 percent would seem harmless to competition, at least when there is no indication of upstream collusion or oligopoly using exclusive dealing as an entry deterrence device.[27] When exclusive dealing is used to facilitate collusion the percentage foreclosure by any single firm might be less, but then the relevant question becomes the aggregate foreclosure imposed by the upstream firms in the collusive group.

At higher percentages generalization is much more difficult, with a tendency on the part of courts to require stronger proof of offsetting efficiencies as the foreclosure percentage becomes higher. Percentages higher than 50 percent are routinely condemned,[28] and cases preceding *Jefferson Parish*[29] in 1984 often condemned significantly lower percentages.[30] However, even relatively high percent-

26. See ¶1822.

27. See, e.g., *Retina Assocs. v. Southern Baptist Hospital of Florida*, 105 F.3d 1376 (11th Cir. 1997) (15 percent foreclosure insufficient); *Barr Laboratories v. Abbott Laboratories*, 978 F.2d 98, 110-111 (3d Cir. 1992) (15 percent insufficient where manufacturer needed assurance of outlets); *Ryko*, note 23, 823 F.2d at 1234 (8 to 10 percent insufficient); *Satellite Television & Associated Resources v. Contractual Cablevision*, 714 F.2d 351 (4th Cir. 1983), cert. denied, 465 U.S. 1027 (1984) (8 percent insufficient); *Magnus Petroleum Co. v. Skelly Oil Co.*, 599 F.2d 196, 204 (7th Cir. 1979) (one percent insufficient); *American Motor Inns v. Holiday Inns*, 521 F.2d 1230, 1252 (3rd Cir. 1975) (14.7 percent insufficient); *Cornwell Quality Tools Co. v. CTS Co.*, 446 F.2d 825, 831 (9th Cir. 1971), cert. denied, 404 U.S. 1049 (1972) (10 to 15 percent insufficient); *Hendricks Music Co. v. Steinway*, 689 F. Supp. 1501, 1506-1507 (N.D. Ill. 1988) (1.75 percent of acoustic pianos insufficient; rejecting claim of relevant submarket of "concert grand pianos," in which Steinway's share was 48 percent); *TAM v. Gulf Oil Corp.*, 553 F. Supp. 499, 505-506 (E.D. Pa. 1983) (7 percent of sales; 5 percent of outlets insufficient); *JBL Enterprises v. Jirmack Enterprises*, 509 F. Supp. 357, 379 (N.D. Cal. 1981) (less than 5 percent insufficient); *Beltone Electronics Corp.*, 100 F.T.C. 68, 184 (1982) (7 to 8 percent foreclosure insufficient). Some decisions approve significantly higher percentages. E.g., *Sewell Plastics v. Coca-Cola Co.*, 720 F. Supp. 1196, 1213-1214 (W.D.N.C. 1989), aff'd in part, 912 F.2d 463 (4th Cir. 1990), cert. denied, 498 U.S. 1110 (1991).

The now-withdrawn Department of Justice Vertical Restraints Guidelines, 50 Fed. Reg. 6263, 6269 (1985) would find a relatively absolute "safe harbor" for foreclosure percentages of 10 percent or lower.

28. E.g., *Oltz v. St. Peter's Community Hosp.*, 656 F. Supp. 760, 763 (D. Mont. 1987), aff'd, 861 F.2d 1440 (9th Cir. 1988) (84 percent unlawful, but computed in a local supply market); *United States v. Dairymen*, 1985-1 Trade Cas. ¶66,638, at 66,156, 758 F.2d 654 (6th Cir.), cert. denied, 474 U.S. 822 (1985) (50 percent unlawful); *Kohler Co. v. Briggs & Stratton Corp.*, 1986-1 Trade Cas. ¶67,047 (E.D. Wis.) (62 percent sufficient; preliminary injunction).

29. See note 20.

30. E.g., *FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392 (1953) (40 percent unlawful); *Twin City Sportservice v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298 (9th Cir.), cert. denied, 459 U.S. 1009 (1982) (24 percent unlawful when contracts were for long term); *Luria Bros and Co. v. Federal Trade Commission*, 389 F.2d 847 (3d Cir.), cert. denied, 393 U.S. 475 (1968) (condemning both 21 percent and 34 percent, depending on market definition). See also *Adolph Coors Co.*, 83 F.T.C. 32 (1974), aff'd, 497 F.2d 1178 (10th Cir.), cert. denied, 419 U.S. 1105 (1974) (suggesting that if upstream market power is found, any amount of foreclosure is unlawful).

ages are not necessarily illegal, for there is no "per se" rule condemning any specific percentage.[31] Finally, although the Federal Trade Commission once condemned exclusive dealing without any showing that a specific percentage of a downstream market had been foreclosed,[32] its *Beltone* decision[33] rejected those earlier cases and assessed competitive injury—and presumably foreclosure—requirements analogous to those applied by the courts.

But even high foreclosure percentages are permissible when the upstream market is competitive. Justice O'Connor's concurring opinion in *Jefferson Parish* observed as much. At issue was exclusive dealing between an anesthesiological firm and a hospital whose patient admissions were about 30 percent of admissions in the area.[34] But 30 percent would be the correct number for analyzing the exclusive dealing claim only if anesthesiological firms sold their services to hospitals in the same relatively small geographic market in which the hospital served patients. If the market for anesthesiological services was significantly larger, however, then the foreclosure percentage could have been much smaller. As Justice O'Connor observed:

> A firm of four anesthesiologists represents only a very small fraction of the total number of anesthesiologists whose services are available for hire by other hospitals, and East Jefferson is one among numerous hospitals buying such services. Even without engaging in a detailed analysis of the size of the relevant markets we may readily conclude that there is no likelihood that the exclusive dealing arrangement challenged here will either unreasonably enhance the hospital's market position relative to other hospitals, or unreasonably permit [the anesthesiologist who has the exclusive agreement] to acquire power relative to other anesthesiologists.[35]

31. See, e.g., *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (even 50 percent okay if there were only "limited anticompetitive effects"); *Sewell Plastics*, note 27, 720 F. Supp. at 1212-1214 (40 percent insufficient); *Servicetrends v. Siemens Medical Systems*, 870 F. Supp. 1042 (N.D. Ga.), amended, 1995-1 Trade Cas. ¶70,901 (N.D. Ga. 1994) (even 38 percent insufficient in the presence of business justifications); *Kuck v. Bensen*, 647 F. Supp. 743 (D. Mo. 1986) (37 percent lawful); *Gonzalez v. Insignares*, 1985-2 Trade Cas. ¶66,701, at 63,335 (N.D. Ga. 1985) (40 percent coverage of exclusive contract for anesthesia services not necessarily unreasonable; court expresses doubt about geographic market definition, noting that plaintiff himself provided services outside the defined market).

32. *Brown Shoe Co.*, 62 F.T.C. 679, 714 (1963), rev'd, 339 F.2d 45 (9th Cir. 1964), rev'd, 384 U.S. 316, 319 (1966); see ¶1801j. See also *L.G. Balfour Co. v. FTC*, 442 F.2d 1 (7th Cir. 1971) (following *Brown Shoe*; no need to measure foreclosure under FTCA §5, although it would be required under Clayton §3).

33. See note 27.

34. See *Jefferson Parish*, note 20, at 7.

35. Id. at 46.

Other cases condemning foreclosure by hospitals, at apparently much higher percentages, have neglected this observation. In *Oltz*,[36] for example, the hospital (St. Peter's) entered into an exclusive dealing contract with specific anesthesiologists after advertising in a national publication, thus excluding plaintiff Oltz, a nurse anesthetist. The court accepted as a premise that there was a national market for anesthesiologial services, but stated:

> The M.D. anesthesiologists, the hospital, and Oltz operated in both markets. Thus, the exclusive arrangement potentially affected both markets, and both were relevant to the search for competitive harm. Even if we accept St. Peter's contention that the job market was national and competition in it suffered no injury, the analysis could not have ended there. An evaluation of the impact on competition in the patient market for anesthesia service was required.[37]

But the court then identified the competitive harm in this local market as (1) the denial of patient choice of anesthesiologist, and (2) the denial of hospital access by rival anesthesiologists.[38]

However, antitrust is not concerned with denial of access in the abstract, but only with denial of access that foreseeably results in an output reduction and attendant increase in price. If St. Peter's Hospital could contract for anesthesiologists in a competitive market for such services, why would it select a particular anesthesiologist exclusively if the anticipated result were higher prices for anesthesiological services—an effect that would limit its own patient volume without giving it any monopoly profits that it did not already obtain by virtue of its position as the dominant hospital in its service area?[39]

36. See note 28.
37. *Oltz*, note 28, 861 F.2d at 1446.
38. Ibid.:

> The contract affected consumers who elected to have surgery at the defendant hospital by foreclosing the option of selecting, or having their surgeon select, the plaintiff or others to administer anesthesia. The contract affected providers of anesthesia services because it precluded the hospital from offering staff privileges to anyone but the exclusive group of anesthesiologists.

39. See ¶1802d3. The plaintiff also alleged and the Ninth Circuit approved a finding of a horizontal boycott among the hospital's staff anesthesiologists and hospital directed against the plaintiff; that agreement is more plausible in a local market, although the willingness of the hospital to be a participant must be explained, given that the hospital is vertically related to anesthesiology and stands to benefit from low anesthesiology prices. See *Oltz*, note 28, 861 F.2d at 1444-1445. The horizontal agreement—but not the exclusive dealing agreement—would explain the district court's finding that anesthesiology prices rose as a result of the restraint. Presumably high-priced anesthesiologists excluded lower-priced nurse anesthetists. See id. at 1448. On the hospital as participant in an anticompetitive conspiracy of its staff, see ¶¶1471'-1472' in the Supplement.

By contrast, in *Collins*[40] the Seventh Circuit noted that pathologists competed for jobs in a national market.[41] The court concluded:

> As the district court noted, in the present case, St. John's [Hospital] is in the position of Tampa Electric and APL [the provider under the exclusive dealing arrangement] is in the position of the supplying coal company. In determining whether this exclusive arrangement forecloses competition, the focus is upon competition between pathologists for the right to practice at St. John's. So the contract must be viewed in light of its effect on pathologists competing for work, not from the effect on patients at St. John's whose options are limited.[42]

Suppose, for example, that anesthesiological services are sold nationally in a competitive market. The feared consequence of exclusive dealing is that the upstream firm denies rivals access to the downstream firm, thereby excluding the upstream firm from the market, raising its costs, or limiting its ability to expand. But if the upstream market is competitive none of these consequences will result, no matter how large the percentage of foreclosure in the downstream market.

To be sure, one might posit that the anesthesiological firm enters exclusive dealing with the hospital, thus denying alternative anesthesiologists access to hospital consumers in the local market, and consumers access to alternative anesthesiologists. This denial of opportunity could certainly occur, but *all* contracts, even those in highly competitive markets, deny opportunities to rivals in this fashion. For example, the market for both the production of tomatoes and the grocery stores retailing tomatoes may be highly competitive. But if Farmer Brown agrees to sell his tomatoes to Mom & Pop's Grocery for one season, and the grocery agrees to purchase only from Farmer Brown, then (a) alternative farmers are excluded from Mom & Pop as a customer, and (b) Mom & Pop's own customers are denied access to alternative tomato growers.

If the market in which anesthesiologists sell their services to hospitals is large and competitive, not even a hospital that is a monopolist in its own service area will enter an anticompetitive exclusive dealing contract. *First*, the hospital's ability to charge

40. See note 23.
41. The court noted as evidence of a national market that advertising for positions appeared in nationally published medical journals, including the New England Journal of Medicine; that the College of American Pathologists ran a national placement list; and that the plaintiff himself had previously practiced in Brooklyn, New York; Chicago, Illinois; and San Leandro, California.
42. Id., 844 F.2d at 479-480, referring to 676 F. Supp. at 1395.

monopoly prices depends entirely on its own market position and has nothing to do with any exclusive contracts imposed on it from above. *Second,* even the monopoly hospital has every incentive to purchase from the best or lowest cost supplier,[43] and has no interest in having imposed on it an exclusive dealing contract tending to exclude anesthesiologist rivals and resulting in high anesthesiologist prices to the hospital first, and then to its customers.

Thus the upstream market must be sufficiently concentrated, and the defendant sufficiently powerful, to warrant an inference that it is in a position to impose anticompetitive exclusive dealing injuring the downstream firm as well as consumers. Once again, picking an appropriate number is very difficult, but we suggest a minimum standard of upstream market concentration of 1800 measured by the HHI[44] and a defendant's market share of 20 percent.

To summarize, then, the first part of a prima facie "structural" case for anticompetitive exclusive dealing requires a showing of at least 20 percent foreclosure in the downstream market, and a "concentrated" upstream market with an HHI exceeding 1800 and a defendant's market share of at least 20 percent. At that point the plaintiff's prima facie case is still not complete, for the other factors developed in ¶d must be addressed.

*1821c2. Output contract.* The output contract case is generally the requirements contract turned upside down. For example, suppose that a dominant can maker such as American Can obtains contracts from the makers of canmaking machinery requiring the latter to sell their full output of machinery to American Can.[45] The feared injury is that competing can makers will not be able to obtain sufficient machinery to compete effectively with American Can, thus facilitating higher can prices. However, American Can will not be able to impose such agreements on the makers of can machinery unless it has some power in the buying market for the machinery. The machinery makers generally profit when can output is maximized, and thus lack any incentive to participate in a program designed to reduce can output for the profit of one can maker.

43. See ¶1802d3 and its accompanying Figure 1.
44. On the HHI and its measurement, see ¶930a (rev. ed.).
45. See *United States v. American Can Co.*, 230 F. 859 (D. Md. 1916), appeal dismissed, 256 U.S. 706 (1921); and ¶1801a.

Once again, we suggest that the minimum condition for such a strategy is a concentrated downstream market of at least 1800 HHI, and that American Can have a market share of at least 20 percent, thus warranting an inference of at least minimal power vis-à-vis can makers.[46] Further, the strategy succeeds only if American Can is able to deny effective access to can machinery to its canmaking rivals, which we suggest requires foreclosure of at least 20 percent, and even that number seems rather small. As in the case of requirements contracts, when these percentages have been shown the plaintiff still has not made out its complete prima facie case. It must also show that the other factors enumerated in ¶d suggest that anticompetitive exclusive dealing is plausible.

**1821d. Factors determining anticompetitive potential of "significant" foreclosure percentage.** 1. *Generally.* Although low foreclosure percentages are decisive for the defendant, higher percentages are seldom decisive in and of themselves. Rather, they provide the jumping-off point for further analysis.[47] We term a foreclosure percentage "significant" if, when combined with the other factors described here, the requisite anticompetitive threat appears.

Thus in proving a prima facie case the plaintiff's logical first step is to establish market structure, market share, and foreclosure percentages as outlined in ¶c. Then examination of the factors enumerated here provides additional evidence concerning the plausibility of anticompetitive exclusive dealing.

*1821d2. Actual exclusion.* Even a high foreclosure percentage creates no injury to competition if no one is being excluded in fact by the challenged arrangement. For example, suppose that milk is wholesaled in a relatively small regional market because of perishability, and the grocery retailing market encompasses the same

46. See *Paddock Pub. v. Chicago Tribune Co.*, 103 F.3d 42, 43-44 (7th Cir.), cert. denied, 117 S. Ct. 2435 (1997) (output contract between news service and newspaper could not be anticompetitive when news service market had numerous alternative suppliers); *Holmes Products Corp. v. Dana Lighting*, 958 F. Supp. 27 (D. Mass. 1997) (lamp buyer who insisted that supplier not deal with rival did not engage in unlawful "exclusive dealing" [in fact, an exclusive output contract] where there were hundreds of rival lamp manufacturers).

47. E.g., see *Beltone*, note 27, at 204, 209:

> If, as the precedents seem to suggest, the degree of foreclosure caused by the exclusivity indicates without serious doubt that the party imposing exclusive contracts possesses substantial market power, then that foreclosure will be a more significant factor of the case against the restraint. Where the degree of foreclosure is less substantial, other measures of market performance are more likely to determine the overall effect of the restraint on competition.