UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                    :

IN RE:                               :

                                      :

KEURIG GREEN MOUNTAIN SINGLE-    :
SERVE COFFEE ANTITRUST        :          14-MD-2542 (VSB)
LITIGATION                        :

                                      :         **<u>OPINION & ORDER</u>**

*This order relates to all cases*      :

                                      :
------------------------------------------------------------X

<u>VERNON S. BRODERICK</u>, United States District Judge:

I.  Legal Standards ........................................................................... 2

  A.  Admissibility of Expert Testimony .................................. 2

  B.  Exclusion of Relevant Evidence for Prejudice Under Rule 403 ......................... 8

II.  Discussion ........................................................................... 8

  A.  Hon. Arthur Gajarsa (Ret.) (Doc. 1220).............................. 8

  B.  Hon. James Ware (Ret.) and Hon. Randall Rader (Ret.) (Doc. 1449) ............... 13

  C.  Dr. Gareth Macartney (Doc. 1456) ................................. 13

  D.  Dr. Gary L. French (Doc. 1406)..................................... 31

  E.  Hal Poret (Doc. 1442) ............................................... 40

  F.  Sarah Butler (Doc. 1445) ............................................. 1

  G.  Dr. Mohan Rao (Doc. 1439)......................................... 55

  H.  Dr. Phillip Johnson ("Johnson I") (Doc. 1452)................... 62

  I.  Dr. Lauren J. Stiroh (Doc. 1460)................................... 77

  J.  Dr. David Sibley (Doc. 1464) ....................................... 82

  K.  Dr. Keith Ugone ("TMJ Motion") (Doc. 1470) ................... 88

  L.  Dr. Kevin Murphy (Doc. 1474)..................................... 102

  M.  Mark Wood (Doc. 1478) ............................................. 105

  N.  Dr. Marc Hillmyer (Doc. 1484) ................................... 107

  O.  Dr. Keith Ugone ("Ugone Motion") (Doc. 2078) ............... 110

  P.  Dr. Phillip Johnson ("Johnson II") (Doc. 2083)................. 110

  Q.  Dr. Martin Asher (Doc. 2086)....................................... 116

  R.  Drs. Keith Ugone & Kevin M. Murphy ("Ugone-Murphy") (Doc. 2089)........ 121

III.  Conclusion ........................................................................... 125

This Opinion & Order addresses nineteen Rule 702 motions seeking to exclude expert testimony that are currently pending in this matter.[1]  I assume familiarity with the underlying facts and procedural history of this multidistrict litigation, which focuses on antitrust claims brought against Keurig Green Mountain, Inc. ("Keurig"), and is discussed in more detail in my Opinion & Order of April 3, 2019.  (Doc. 581.)  Where additional background is necessary, I address it in the context of the specific motion being considered.

## I.    **Legal Standards**

### A.  *Admissibility of Expert Testimony*

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.*  I note that Rule 702 was "amended in two respects."  Fed. R. Evid. 702 Advisory Committee cmt. 2023.  First, Rule 702 was amended to "clarify and emphasize" that proffered expert testimony must meet Rule 702's admissibility requirements by a preponderance of the evidence. *See id*.  Second, Rule 702(d) was amended "to emphasize that each expert opinion must stay

---

[1] There are nineteen motions delineated by gavels on the docket; however, two of them are duplicative.  (*See* Docs. 1470, 2237.)

within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." *Id.* The amendment did not substantively change Rule 702. Instead, the Advisory Committee sought to clarify the Rule to provide guidance to district courts that were misapplying it. *See id.* ("[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).").

The Rule 702 amendment, which was announced on April 24, 2023, and became effective on December 1, 2023, occurred after the submission of most of the briefing here. *See* U.S. S.Ct. Order § 2 (Apr. 24, 2023) (available online at: https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf). The amendment governs all proceedings pending at the time it became effective "insofar as just and practicable." *Id.* at 3. As the amendment did not change the meaning of Rule 702 and will not affect the outcome of the analysis in this Opinion & Order, I find that it is just and practicable to apply the current version of Rule 702 to the parties' existing arguments. *Cf. Maldonado v. Town of Greenburgh*, No. 18-CV-11077, 2024 WL 4336771, at *10 n.14 (S.D.N.Y. Sept. 26, 2024) ("The Court need not decide which version of [Rule 702] should apply as the amendment would not change the outcome here." (internal quotation marks omitted)).

Courts in this Circuit frequently distill Rule 702 down to a three-part test that requires the proponent of expert evidence to show "that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." *Nike, Inc. v. StockX LLC*, No. 22-CV-0983, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024) (citing *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)). Rule 702 thus imposes on the trial judge a "basic gatekeeping obligation" to ensure that all expert

testimony admitted at trial is relevant and reliable, regardless of whether the expert testimony is on scientific, technical, or other specialized matters. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999). A court cannot bypass this gatekeeping responsibility and pass it off to the jury by declaring "questions of the sufficiency of an expert's basis, and the application of the expert's methodology, [to be] questions of weight and not admissibility." Fed. R. Evid. 702 Advisory Committee cmt. 2023.

Expert testimony must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (citations omitted). "While an expert opinion 'is not objectionable just because it embraces an ultimate issue,' Fed. R. Evid. 704(a), it remains impermissible for experts 'to offer opinions embodying legal conclusions.'" *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 612 (S.D.N.Y. 2020) (quoting *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012)), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021). "[A]lthough an expert may give an opinion to help the jury decide an issue in the case, he or she may not tell the jury what result to reach." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

"The party proffering expert testimony 'bears the burden of establishing these admissibility requirements.'" *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-01570, 2023 WL 3116763, at *2 (S.D.N.Y. Apr. 27, 2023) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016)). This showing must be made by a preponderance of the evidence. *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 430 (S.D.N.Y. 2023) (citing *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020)). In other words, the proponent must show

each of the three reliability components of Fed. R. Evid. 702, *i.e.*, Fed. R. Evid. 702(b)–(d), by a preponderance of the evidence.  *See* Fed. R. Evid. 702 Advisory Committee cmt. 2023 ("The [2023] amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.").

Ultimately, "a 'district court's decision to admit or exclude expert testimony [is reviewed] under a highly deferential abuse of discretion standard." *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d 113, 122 (2d Cir. 2020) (quoting *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998)).  "Thus, the trial judge has broad discretion in determining 'what method is appropriate for evaluating reliability under the circumstances of each case.'" *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).[2]

### 1.  Qualification

A court must address the "threshold question of whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or education' to render his or her opinions" before addressing the relevance or reliability of that witness's proposed testimony.  *Nimely*, 414 F.3d at 396 n.11 (quoting Fed. R. Evid. 702).  "To determine whether an expert is qualified

---

[2] "[T]he Court may police the opinions of expert witnesses sua sponte," *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2019 WL 1254763, at *13 n.88 (S.D.N.Y. Mar. 19, 2019), objections overruled, No. 1:15-CV-3411-GHW, 2019 WL 2992016 (S.D.N.Y. July 8, 2019), particularly if an expert's opinion appears unreliable or if the issue is of particular importance.  *See, e.g., Ajala v. W.M. Barr & Co., Inc.*, No. 16-CV-2615, 2018 WL 6322147, at *2 (S.D.N.Y. Dec. 4, 2018) ("Nor does it appear to the Court that [an expert's] opinion is unreliable under Daubert so as to trigger exclusion sua sponte."); *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 421 n.16 (S.D.N.Y. 2016) ("Although Plaintiffs did not raise this issue [with an expert's testimony], it seems important enough for the Court to address sua sponte.")  However, the 2023 Advisory Committee note to Fed R. Evid. 703 is clear that a court is not obligated to assess reliability in the absence of an objection.  *See* Fed. R. Evid. 702 Advisory Committee cmt. 2023 ("Nor does the amendment require that the court make a finding of reliability in the absence of objection.").  Accordingly, I have addressed the parties' evidentiary objections as well as any issues I considered important to raise sua sponte.  Where I have not raised issues concerning the qualification or reliability of an expert sua sponte, it is because I have found no issue or no issue of sufficient import to merit sua sponte consideration.

'courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Conti v. Doe*, No. 17-CV-9268, 2020 WL 6162104, at *7 (S.D.N.Y. Oct. 21, 2020) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004)).

Just "because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields." *Nimely*, 414 F.3d at 399 n.13 (citation omitted). "[D]istrict courts, in their role as gatekeepers, must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise." *United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004). Expert testimony that strays outside the expert's area of qualified expertise must be excluded. *See, e.g.*, *Colon v. Metro-N. Commuter R.R. Co.*, 778 F. App'x 7, 12 (2d Cir. 2019) (summary order) ("[T]he district court did not abuse its discretion in precluding [an expert] from testifying about certain subjects that were either outside of his area of expertise or lay matters that the jury was capable of deciding without expert assistance.").

## 2. Reliability

The Court's inquiry into reliability "is fluid and will necessarily vary from case to case." *Amorgianos*, 303 F.3d at 266. Rule 702 requires both that an expert use "reliable principles and methods," and that "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. *Daubert* lists a series of four factors courts may consider when evaluating reliability:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication, (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation, and (4) whether a particular technique or

> theory has gained general acceptance in the relevant scientific
> community.

*Amorgianos*, 303 F.3d at 266 (citing *Daubert*, 509 U.S. at 593–94).  At the same time, *Daubert* did not "presume to set out a definitive checklist or test," *Daubert*, 509 U.S. at 593, and subsequent cases recognize that "the gatekeeping inquiry must be 'tied to the facts' of a particular 'case,'" *Kumho Tire Co.*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 150).  For instance, "[f]lexible methodologies . . . can be implemented in multiple ways; despite the fact that the methodology is generally reliable, each application is distinct and should be analyzed for reliability."  *In re Acetaminophen - ASD-ADHD Prods. Liab. Litig.*, 707 F. Supp. 3d 309, 337 (S.D.N.Y. 2023) (quoting *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017)).

There is a two-sided cumulative element to a court's review of a method's reliability.  On the one side, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."  Fed. R. Evid. 702 Advisory Committee cmt, 2023.[3]  On the other side, "there are only so many questions of weight that can be tolerated; as each flaw in a [method] diminishes its reliability and probative value, and correspondingly increases the risk of jury confusion and prejudice, eventually the cumulative effect of the flaws mandates exclusion."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 612 (S.D.N.Y. 2007).

---

[3] The existence of divergent opinions between parties' experts is not license for a court to abandon the gatekeeping function.  In several places, the parties' papers suggest that when experts disagree, this "battle of the experts" obviates the need for the court to conduct this gatekeeping function. (*See, e.g.*, Doc. 1535 at 1.)  However, appeals to avoid a "battle of the experts" is inapposite in the context of a Rule 702 motion where the court has yet to determine who is a qualified expert and what expert opinions are admissible.  Once experts are qualified, then "trial courts should not arrogate the jury's role in evaluating the evidence and the credibility of expert witnesses by simply choosing sides in the battle of the experts" in a context like summary judgment. *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1135 (2d Cir. 1995) (cleaned up).  However, Rule 702's gatekeeping function would be eviscerated if a court could simply abandon the gatekeeping function once the unevaluated opinions of two sides experts diverged.

Courts tasked with applying this standard have offered numerous insights into the reliability inquiry as it relates to specific scientific fields and practices.  I discuss these as appropriate below in the context of a particular party's Rule 702 motion.

### B.  *Exclusion of Relevant Evidence for Prejudice Under Rule 403*

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403." *Nimely*, 414 F.3d at 397.  Rule 403 permits courts to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  "Exclusion under Rule 403 is appropriate where the testimony clouds the issue for the jury, wastes time by diverting attention from the relevant evidence, or would induce the jury to decide the case on a purely emotional basis." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *2 (internal quotation marks omitted).

"The trial court has broad discretion in determining whether proffered evidence should be admitted, and in general in the absence of a significant showing of unfair prejudice, evidence with substantial probative value should not be excluded." *Martell v. Boardwalk Enters., Inc.*, 748 F.2d 740, 747 (2d Cir. 1984) (internal quotation marks omitted).

### II.    Discussion

### A.  *Hon. Arthur Gajarsa (Ret.) (Doc. 1405)[4]*

Keurig retained the Honorable Arthur Gajarsa (Ret.) to provide an expert opinion "in connection with Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc. ("Treehouse"), JBR, Inc. d/b/a Rogers Family Company (hereinafter "JBR" or "Rogers"), McLane Company, Inc. ("McLane"), and the Direct Purchaser Plaintiffs' ("DPPs") sham

---

[4] "Doc." in each header references the relevant motion.

litigation claims against Keurig." (Doc. 1223, Ex. 1 ¶ 1.) The sham litigation claims involve two separate lawsuits: *Keurig Inc. v. Sturm Foods Inc.*, 1:10-cv-000841 (D. Del. filed Oct. 1, 2010) (hereinafter "Sturm Litigation"), and *Keurig Inc. v. JBR Inc. d/b/a Rogers Fam. Co.*, 1:11-cv-1194 (D. Mass. filed Nov. 2, 2011) (hereinafter "Rogers Litigation") (collectively the "Sturm and Rogers Litigations" or the "Litigations").

Keurig proffers Judge Gajarsa's expert opinion to "explain[] the patent process, the practice of patent litigation, and complex patent issues [which] will be important in helping the lay jury understand how a litigant goes about deciding whether and how to enforce its patent rights." (Doc. 1524 at 1.) Plaintiffs move to exclude this testimony as "improperly usurp[ing] the role of the Court by opining on the intellectual property law underlying Keurig's claims against Treehouse and Rogers in the sham litigations and asserting legal conclusions regarding the purported basis that Keurig had for bringing and maintaining these claims." (Doc. 1223 at 2.) In addition, Plaintiffs assert that Judge Gajarsa's "conclusions fail to delineate a methodology that would allow the court to assess the reliability of his opinions." (*Id.* at 3.)

Although Keurig attempts to disguise the core of Judge Gajarsa's expert opinion by claiming that his opinions merely seek to "explain[] the patent process, the practice of patent litigation, and complex patent issues [which] will be important in helping the lay jury understand how a litigant goes about deciding whether and how to enforce its patent rights," (Doc. 1524 at 1), Judge Gajarsa's opinion would usurp the role of the fact finder since he opines on the very question at issue—namely, whether Keurig had a reasonable basis to file the Litigations, *see Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.,* 219 F.3d 92, 100 (2d Cir. 2000). Specifically, he purports to offer "an objective assessment of the Litigations based on the underlying patents and applicable intellectual property legal principles," (Doc. 1223, Ex. 1 ¶ 11),

and finds that "Keurig had a reasonable basis to enforce its patent rights," (*id.* ¶ 12); (*see also id.* ¶ 176 ("[B]ased on my experience, the record in the Sturm Litigation detailed above is not typical of a meritless lawsuit.  Instead, it is consistent with a Litigation in which the parties vigorously pursued their claims.")).

The Second Circuit has "consistently held [ ] that expert testimony that usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's."  *Nimely*, 414 F.3d at 397 (internal quotation marks omitted); *see also Doe v. Colgate Univ.*, 760 F. App'x 22, 29 (2d Cir. 2019) (summary order) (excluding expert opinion "that the University breached its contract with John Doe by failing to follow its own procedures [finding that it is] unhelpful because it usurps the jury's role in applying the law to the facts").

"To establish 'sham' . . . judicial proceedings, a plaintiff must show that the litigation in question is:  (i) 'objectively baseless,' and (ii) 'an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.'"  *Primetime,* 219 F.3d at 100 (quoting *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993)).  With these elements in mind, courts in several circuits have consistently declined to permit experts to testify as to the baselessness or reasonableness in antitrust cases involving sham litigation claims*.  See, e.g., In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-MD-1628, 2009 WL 3241401, at *13 (S.D.N.Y. Sept. 30, 2009) (excluding a legal expert's testimony on sham litigation because it would usurp the role of the court and jury), *aff'd sub nom. Am. Banana Co. v. J. Bonafede Co.*,

407 F. App'x 520 (2d Cir. 2010) (summary order); *Puerto Rico Tel. Co., Inc. v. San Juan Cable Co. LLC*, 196 F. Supp. 3d 248, 321 (D.P.R. 2016) (declining to admit expert testimony "regarding questions of law and objective reasonableness" in a sham litigation case), *aff'd sub nom. Puerto Rico Tel. Co., Inc. v. San Juan Cable LLC*, 874 F.3d 767 (1st Cir. 2017); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2020 WL 6887885, at *40 (E.D. Pa. Nov. 24, 2020) ("As one of the key issues in this case is whether Defendant's Citizen Petition was factually and legally baseless and used entirely for anticompetitive purposes, I find that [the expert's] opinion is a legal opinion that usurps the jury's role in applying the law to the facts."); *In re Wellbutrin SR Antitrust Litig.*, No. 04-CV-5525, 2010 WL 8425189, at *6 (E.D. Pa. Mar. 31, 2010) (excluding expert testimony "because large portions of each report contain explanations of specific areas of patent law . . . and conclusions of law—including whether [defendant] had an objectively reasonable basis to file its [] patent infringement suits"); *King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, No. 2:06-CV-1797, 2015 WL 6750899, at *18 (E.D. Pa. Nov. 5, 2015) (finding, in a case involving sham litigation claims, that "[t]he proposed experts are attorneys who are evaluating the merits of a legal argument by applying the facts to the law, which invades the jury's role"); *see also VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 427 n.4 (W.D. Pa. 1998) (noting, in the context of sham litigation claims, "that lack of objective baselessness is not the sort of issue that lends itself to expert testimony under Fed. R. Evid. 702 and 704"), *aff'd*, 187 F.3d 627 (3d Cir. 1999).

The cases Keurig relies on, including *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152 (S.D.N.Y. 2018), and *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785, 2020 WL 1164869, at *1 (D. Kan. Mar. 10, 2020), are inapposite because they did not involve an expert's assessment of the objective

reasonableness of a case in a sham litigation matter.  Although there is no blanket prohibition on legal experts summarizing complex case histories or expanding the background of U.S. patent law, as occurred in *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d at 185–86, nothing in the cases Keurig relies on suggests that an expert may opine on the objective reasonableness of a lawsuit where such a conclusion speaks to the ultimate outcome of a sham litigation claim.

Here, Judge Gajarsa opines on precisely this question:  whether Keurig had a reasonable basis to file the Litigations.  *See Primetime,* 219 F.3d at 100.  He purports to offer "an objective assessment of the Litigations based on the underlying patents and applicable intellectual property legal principles," (Doc. 1223, Ex. 1 ¶ 11), and finds that "Keurig had a reasonable basis to enforce its patent rights," (*id.* ¶ 12); (*see also id.* ¶ 176 ("[B]ased on my experience, the record in the Sturm Litigation detailed above is not typical of a meritless lawsuit.  Instead, it is consistent with a Litigation in which the parties vigorously pursued their claims.")).  Even though he briefly summarizes U.S. patent law and discusses the Litigations, he does so merely to provide context for his ultimate conclusion that the litigations were objectively reasonable.

Such testimony would completely usurp the role of the jury.  *See Nimely*, 414 F.3d at 398 (finding that the trial judge erred in not striking expert opinion where expert "was permitted not only to state his belief that the officers were not lying, but also to give to the jury a series of rationales for that belief"); *Bobcar Media, LLC*, 554 F. Supp. 3d at 613 ("Roberts offers no analysis beyond highlighting aspects of the record that he finds important and demonstrating how it satisfies the legal standards he sets out. Because the jury would be engaging in the same process when assessing Bobcar's claims, this is impermissible ipse dixit testimony.")  Accordingly, Judge Gajarsa's opinion is excluded.

### B. *Hon. James Ware (Ret.) and Hon. Randall Rader (Ret.) (Doc. 1449)*

To rebut the proffered testimony of Judge Gajarsa, TreeHouse and McLane retained Judge Randall Rader (ret.) to provide his expert opinion "regarding whether various litigations brought by Defendant [Keurig] had an objective basis." (Doc. 1249, Ex. 1 ¶ 3.) JBR retained Judge James Ware (ret.) for the same purpose. (Doc. 1249, Ex. 2 ¶ 16.) However, "Plaintiffs have offered the testimony of Judge Rader and Judge Ware under protest and to protect their rights to provide such testimony at trial to the extent that the Court permits testimony regarding the objective baselessness of Keurig's sham litigations." (Doc. 1539 at 5.) Based on this assertion, I understand that Plaintiffs do not intend to use either Judge Ware or Judge Rader as an expert witness if Judge Gajarsa is not admitted as an expert. Therefore, because I grant Plaintiffs' motion to exclude the expert testimony of Judge Gajarsa, I need not reach Defendant's arguments concerning the admissibility of Judge Rader or Judge Ware's expert testimony. *See, e.g., Nisanov v. Black & Decker (U.S.) Inc.*, No. 05-CV-5911, 2008 WL 11434465, at *3 (E.D.N.Y. Nov. 18, 2008) (denying plaintiffs' motion to exclude expert testimony as moot where the court previously found that the basis of his testimony inadmissible.") Keurig's motion to exclude the rebuttal expert testimony of Judge Ware and Judge Rader is therefore denied as moot.

### C. *Dr. Gareth Macartney (Doc. 1456)*

Keurig seeks to exclude the expert opinion of JBR's proposed liability and damages expert Dr. Gareth Macartney ("Dr. Macartney"). In discharging the responsibility to exclude unreliable expert testimony, "a court may exclude an expert's testimony as to some issues but permit it as to others." *Granite Ridge Energy, LLC v. Allianz Glob. Risk U.S. Ins. Co.*, 979 F. Supp. 2d 385, 390 (S.D.N.Y. 2013); *see also Hunt v. City of Portland*, 599 F. App'x 620, 621

(9th Cir. 2013) (affirming the district court's decision to allow an expert witness to testify as to damages causation while excluding his liability opinion); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 611 (E.D. Pa. 2002) (permitting an expert witness's testimony as to the fact of damages in part and excluding it in part where different aspects of the expert opinion address "entirely different issue[s]"). After reviewing Dr. Macartney's analysis and noting that the issue of liability generally precedes the issue of damages, *see Guzman v. City of Chicago*, 689 F.3d 740, 745 (7th Cir. 2012) ("liability must be resolved before the question of damages is reached") (emphasis omitted), I find that Dr. Macartney's liability and damages opinions do not rise and fall together. For the reasons that follow, Keurig's motion to exclude Dr. Macartney's expert opinion is denied as to the liability opinion and granted as to the damages opinion.

### 1. Liability Conclusions

Keurig objects to Dr. Macartney's liability opinions on the grounds that (1) it impermissibly narrates record evidence, (Doc. 1458 at 16–20); (2) that the resulting opinions are unsupported by economic analysis, (*id.* at 20–24); and (3) that his opinions go beyond his training as an economist, (*id.* at 24–25). I find that these objections do not warrant the exclusion of Dr. Macartney's liability analysis.

With regard to Keurig's first objection, "[u]nlike lay witnesses, experts may give background information, but even that information must help the jury decide the case." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *19 (citing *Daubert*, 509 U.S. at 592). Experts may explain background material to the extent it is relevant to their analyses and useful to the jury, but should not be used as a conduit for otherwise inadmissible evidence or as a mouthpiece to highlight irrelevant factual details. *See Rotman v. Progressive Ins. Co.*, 955 F.

Supp. 2d 272, 283 (D. Vt. 2013) (concluding that expert who merely repeated testimony of a lay witness was "not testifying as an expert witness based upon specialized knowledge, but rather [was] acting as a conduit for another witness's testimony in the guise of an expert's opinion"). Although I do not find that Dr. Macartney is being "presented to the jury solely for the purpose of constructing a factual narrative," unnecessary factual narration can be limited at trial. *Anderson News, LLC v. Am. Media, Inc.*, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015).

Keurig's objection to the lack of economic analysis in Dr. Macartney's opinion is without merit. "[E]xpert witnesses are 'permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.'" *Bank of New York Mellon Tr. Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 640 (S.D.N.Y. 2012) (quoting *Daubert*, 509 U.S. at 592)). However, "proffered expert testimony should be excluded if it is speculative or conjectural" and the "admission of expert testimony based on speculative assumptions is an abuse of discretion." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (internal quotation marks omitted). "Similarly, conclusory opinions—often referred to as ipse dixit—fail to provide a methodology that would allow a court to assess reliability." *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645, 2018 WL 1889763, at *3 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom. ScentSational Techs. LLC v. PepsiCo, Inc.*, 773 F. App'x 607 (Fed. Cir. 2019).

Courts also reject expert testimony, including economist testimony, "to the extent that it 'does not demonstrate any particular scientific expertise that can be assessed for reliability or that would ultimately assist the finder of fact.'" *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-MD-1628, 2009 WL 3241401, at *16 (S.D.N.Y. Sept. 30, 2009) (quoting *Kennedy v. Joy Tech., Inc.*, 269 Fed. App'x. 302, 312 (4th Cir. 2008)), *aff'd sub nom. Am. Banana Co. v. J.*

15

*Bonafede Co.*, 407 F. App'x 520 (2d Cir. 2010). Expert opinion testimony is appropriate when it goes beyond what a lay juror would be able to comprehend from evidence in the record. *See, e.g.*, *City of Almaty v. Ablyazov*, No. 15-CV-5345, 2021 WL 5154110, at *11 (S.D.N.Y. Nov. 5, 2021) (permitting an expert "assessment [that] goes beyond a lay juror's understanding of the evidence at issue").

At the same time, however, Rule 702's inherent flexibility permits experts to opine using a wide range of sources and methods. In *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, for example, a court admitted expert testimony on brand value notwithstanding defendant's objections that the expert "relied on articles about brand value and deposition testimony without performing any analysis of her own" and engaged in qualitative, rather than quantitative analysis. 97 F. Supp. 3d 485, 505 (S.D.N.Y. 2015); *see also In re N. Sea Brent Crude Oil Futures Litig.*, No. 13-MD-02475, 2016 WL 1271063, at *7 (S.D.N.Y. Mar. 29, 2016) (finding that an expert's "reliance on literature and his background is permissible" as a basis for opinion testimony, notwithstanding objections that the opinion was not based on "rigorous economic testing"), *aff'd sub nom. Prime Int'l Trading, Ltd. v. BP P.L.C.*, 784 F. App'x 4 (2d Cir. 2019); *see also Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006) ("[G]enerally, an economist's role in an antitrust case is not to prove facts, but to opine on economic theory.").

Finally, although an expert's opinion cannot be devoid of factual support, the opinion is not unreliable simply because another expert's opinion better accounts for the factual record or because experts disagree on the proper interpretation of the record. *See City of Almaty, Kazakhstan*, 2021 WL 5154110, at *11 ("To the extent [opponent] argues that [one expert's]

report better accounts for the factual record than does [another's], that also does not justify exclusion of [an expert's] testimony.").

Dr. Macartney's liability opinions are not so speculative, conclusory, or unsupported that exclusion is required. Keurig objects to various of his opinions on the grounds that Dr. Macartney has not performed certain economic tests such as event studies to test his opinions, (Doc. 1458 at 21), or conducted an assessment of sunk costs as applied to various single-serve brewer systems, (*id.* at 22). However, over the course of 268 pages, Dr. Macartney develops a conception model for assessing anticompetitive behavior based on a cross-section of academic sources and case law, (Doc. 1459, Ex. 1 ¶¶ 9–22), assesses the relevant market and Keurig's position in it, again based on a wide range of sources including case-specific deposition and discovery material produced in this case, (*id.* ¶¶ 34–86), including, contrary to Keurig's argument, several pieces of original analysis conducted by Dr. Macartney, (*see, e.g., id.* ¶ 82), and applies that conceptual framework to assess Keurig's alleged anticompetitive behavior (*id.* ¶¶ 88–202.) He then describes the harms to competition and consumer choice that resulted. (*Id.* ¶¶ 203–206.)

Given this, Dr. Macartney's opinions are not the kind of unsupported speculative or conclusory *ipse dixit* opinions that are properly excluded. Dr. Macartney has expounded an economic framework, reviewed a broad range of documents, conducted certain analyses, and based the application of those analyses and reviews to his framework, rendered an opinion. Contrary to Keurig's assertion, his conclusions are not "simply hypotheses couched as expert opinions." (Doc. 1458 at 22.) Rather, Dr. Macartney's opinions are adequately supported and developed on a basis similar to the ones found admissible in *Louis Vuitton Malletier S.A.*, 97 F. Supp. 3d at 505, and *In re N. Sea Brent Crude Oil Futures Litig.*, 2016 WL 1271063, at *7.

Finally, Keurig's objection that Dr. Macartney has opined on topics outside the scope of his expertise are properly addressed in the same manner as its objections about factual narration. Keurig objects that Dr. Macartney opines on areas outside of his expertise such as the parties' subjective knowledge, motivation, and intent, as well as on areas such as JBR's cup design. (Doc. 1458 at 24–25.) The overall objection is that "[i]t is not appropriate for Dr. Macartney to regurgitate JBR's version of the facts to the jury and put his imprimatur as a Ph.D. on that story." (*Id.* at 25.)

Courts routinely decline to allow experts to comment on a party's state of mind. *See, e.g.*, *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18-CV-9011, 2023 WL 2307179, at *30 (S.D.N.Y. Mar. 1, 2023); *Noel v. City of New York*, No. 15-CV-5236, 2023 WL 3170430, at *5 (S.D.N.Y. Apr. 28, 2023). However, "an expert can testify to whether a given practice is consistent with a given state of mind." *In re Term Commodities Cotton Futures Litig.*, No. 12-CV-5126, 2020 WL 5849142, at *23 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks omitted).[5] Dr. Macartney similarly may not opine as to parties' state of mind and as already noted, excessive factual narration can be curtailed at trial. Beyond this, however, the statements Keurig objects to are the kind of background information an expert may permissibly provide.

### 2. The Use of Keurig-Associated Brands as a Benchmark

Keurig's first objection to Dr. Macartney's damages opinion is that he fails to use the proper benchmark, thereby rendering his analysis unreliable. The two most common approaches to measuring damages in antitrust cases are the "before-and-after" approach and the "yardstick" approach. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996).

---

[5] Given this, I need not address Keurig's argument that such testimony should alternatively be excluded pursuant to Fed. R. Evid. 403 or based on the fact that they would be unhelpful to the fact finder. (Doc. 1458 at 20.)

"The before and after theory compares the prices plaintiff paid during the period the violation continued with prices paid prior to the beginning of the violation or after its termination.  The yardstick approach compares profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation."  *Id.* (quoting ABA Antitrust Section, Antitrust Law Developments (3d ed. 1992) at 669–73); *see also* Herbert J. Hovenkamp, *A Primer on Antitrust Damages* 30 (February 28, 2011); University of Iowa Legal Studies Research Paper, available at https://ssrn.com/abstract=1685919 (noting that the before-and-after and yardstick approaches "have been used by courts not only to estimate overcharges but also to estimate lost profits in competitor antitrust suits").[6]

Although the yardstick method has been the subject of critique, *see, e.g.,* Molly L. Zohn, Comment, *How Antitrust Damages Measure Up With Respect to Daubert Factors*, 13 Geo. Mason L. Rev. 697 (2005), the Supreme Court approved the method in *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 257 (1946), and the methodology has been used and accepted by courts in this Circuit as a means for calculating damages in antitrust cases, *see, e.g.*, *Iowa Pub. Emps.' Ret. Sys.*, 2022 WL 2829880, at *25 ("Courts in this Circuit have recognized the yardstick method for calculating damages as an accepted means of measuring damages in an antitrust action." (cleaned up)) (collecting cases); *see also U.S. Football League v. Nat'l Football League*, No. 84-CV-7484, 1986 WL 10620, at *32 (S.D.N.Y. July 31, 1986) (describing "the 'yardstick' approach that is sometimes used to prove damages in antitrust cases").

---

[6] Somewhat confusingly, the "before-and-after" approach is sometimes also referred to as the "benchmark" approach.  *See, e.g.*, Justin McCrary & Daniel L. Rubinfeld, *Measuring Benchmark Damages in Antitrust Litigation*, 3 J. Econometric Methods 63, 63 (2014), available at https://www.law.berkeley.edu/files/mccrary_and_rubinfeld2014_JEM.pdf.  However, cases discussing the yardstick approach sometimes refer to the firm or market used in the analysis as the "benchmark" for the yardstick analysis. *See, e.g.*, *Iowa Pub. Employees' Ret. Sys. v. Bank of Am. Corp.*, No. 17-CV-6221, 2022 WL 2829880, at *25 (S.D.N.Y. June 30, 2022), *report and recommendation adopted as modified sub nom. Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith*, No. 17-CIV-6221, 2024 WL 5004632 (S.D.N.Y. Dec. 6, 2024).

Despite its broad acceptance, a common problem arises with the use of the yardstick method when the market or firm used as the benchmark is tainted by a defendant's alleged anticompetitive conduct. In these cases, courts have split on how to proceed. Some courts have declined to permit the use of such benchmarks because they would allow plaintiffs to claim artificially high damages. For example, in *Farmington Dowel Prod. Co. v. Forster Mfg. Co.*, the court noted that "[defendant] would be an inappropriate yardstick of comparison . . . because [its] sales and profits after that time reflected the illegal monopolization and discriminatory sales . . . Clearly [plaintiff] was no more entitled to the monopoly profit than [defendant] was." 421 F.2d 61, 82 n.48 (1st Cir. 1969). Other courts, however, have declined to exclude expert damages opinions based on the calculation of damages using the yardstick method using firms or markets that may have been affected by alleged anticompetitive conduct. *See, e.g.*, *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 40–42 (S.D.N.Y. 2016).

Even still, it would create an unworkable and unfair standard to require that any benchmark be completely unaffected by a defendant's anticompetitive conduct or that the yardstick selected perfectly reflect the affected company but for the anticompetitive conduct. "The selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone." *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006) (citation omitted). Indeed, there will be cases where "the selection of perfectly comparable benchmark firms . . . is impossible where [a monopolist's] alleged monopoly prevents comparable firms from operating within the market." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015), *amended*, No. 13-CV-6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016). Therefore, precluding reasonable damage calculations in such cases "would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by

rendering the measure of damages uncertain." *Bigelow*, 327 U.S. at 264. Thus, as with all experts, once a yardstick is found to be sufficiently reliable to meet the threshold admissibility requirements, any additional criticisms of the benchmark go to weight. *See, e.g.*, *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 43 (E.D. Pa. 2019) ("Arguments about what factors an expert should have controlled for in conducting a yardstick analysis generally go to the weight, rather than the admissibility, of the expert's testimony." (internal quotation marks omitted)), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020).

However, there comes a point where the proposed benchmark is so different from the plaintiff that it cannot serve as the "corresponding data for a firm or in a market unaffected by the violation" necessary to support the yardstick analysis. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 521 (internal quotation marks omitted). *See also Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-CV-6201, 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015) ("[I]t is axiomatic that, when designing an experiment to test whether an observed result was caused by given variable, the control or benchmark group must lack that variable. That is the whole point of a control group."). Courts have addressed this issue by permitting the use of other comparable firms in the relevant market besides the alleged monopolist firm, *see, e.g.*, *Dial Corp.*, 2015 WL 4104624, at *10 (permitting expert opinion based on a selection of 20 non-anticompetitive firms); *Malibu Boats, LLC v. Natique Boat Co., Inc.*, No. 3:13-CV-656, 2015 WL 11017799, at *6 (E.D. Tenn. Jan. 26, 2015) (permitting the use of a single comparable non-anticompetitive firm); *In re Suboxone Antitrust Litig.*, 421 F. Supp. 3d at 43 (permitting expert opinion based on the market share of four comparable products), or market-wide prices, *see, e.g.*, *Hyland v. HomeServices of Am., Inc.*, No. 05-CV-612, 2012 WL 12995647, at *6–9 (W.D. Ky.

July 3, 2012) (expert used average national rates provided by a consulting firm); *Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-CV-0852, 2016 WL 3579953, at *10–11 (E.D. Wis. June 24, 2016) (expert used class-wide pricing data); *Allen v. Dairy Mktg. Servs., LLC*, No. 09-CV-230, 2013 WL 6909953, at *15–16(D. Vt. Dec. 31, 2013) (permitting the use of certain geographic markets as benchmarks to calculate damages). At least one court has also permitted the use of a defendant's products in a separate market from the one being challenged. *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *23 (E.D. Pa. Oct. 19, 2015).

Using other firms besides the firm engaged in the alleged anticompetitive conduct is also more likely to be approved where it makes the resulting estimates more conservative. *See, e.g.*, *Fond Du Lac Bumper Exch., Inc.*, 2016 WL 3579953, at *9 (noting that anticompetitive conduct would make expert's damages estimate more conservative); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 171, 195 (E.D. Pa. 2015) ("any anticompetitive activity during the benchmark period would make [expert's] results conservative"); *see also In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 675 (E.D. Pa. 2007) ("[A]ssuming that the benchmark period was not perfectly competitive, [expert's] damages calculation actually becomes a more conservative estimate.").

### 3.  Modeling of the But-For World

Keurig's second damages objection is that Dr. Macartney's model (1) fails to separate lawful from unlawful conduct, (2) does not account for "economic realities," and (3) unrealistically speculates about damages. (Doc. 1458 at 7–15.)

"[C]ourts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages" after proof of injury causation was established. *U.S. Football League v. Nat'l Football*

*League*, 842 F.2d 1335, 1378 (2d Cir. 1988).  "The 'willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.'"  *Discover Fin. Servs. v. Visa U.S.A. Inc.*, No. 04-CV-7844, 2008 WL 4067445, at *2 (S.D.N.Y. Aug. 26, 2008) (quoting *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981)) (alteration adopted).

However, "damages awarded must be traced to some degree to unlawful acts."  *U.S. Football League*, 842 F.2d at 1378 (citation omitted).  "When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage."  *Id.* (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162 (7th Cir. 1983)).  Thus, the Second Circuit has recognized that some courts have held that "damage studies are inadequate when only some of the conduct complained of is found to be wrongful and the damage study cannot be disaggregated."  *Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 825 (2d Cir. 1983) (citations omitted); *accord MCI Commc'ns Corp.*, 708 F.2d at 1161 ("It is essential . . . that damages reflect only the losses directly attributable to unlawful competition.").

It is not, however, similarly necessary for a damages model to fully disaggregate the damages associated with each unlawful act, particularly where the various unlawful acts are interconnected.  *See, e.g.*, *MCI Commc'ns Corp.*, 708 F.2d at 1161 ("Not requiring strict disaggregation of damages among the various unlawful acts of the defendant serves to prevent a defendant from profiting from his own wrongdoing and makes sense when damages arise from a series of unlawful acts intertwined with one another."); *LePage's Inc. v. 3M*, 324 F.3d 141, 166

(3d Cir. 2003) ("[I]t would be extremely difficult, if not impossible, to segregate and attribute a fixed amount of damages to any one act as the theory was not that any one act in itself was unlawful, but that all the acts taken together showed . . . [an antitrust] violation." (citing *Bonjorno v. Kaiser Aluminum & Chem Corp.*, 752 F.2d 802, 812 (3d Cir. 1984)).[7]

A damages model must also account for economic conditions affecting a plaintiff's damages such as "a general recession," *U.S. Football League*, 842 F.2d at 1378–79, sums that plaintiffs would have been required to expend if not for the anticompetitive conduct, *see, e.g.*, *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1368 (9th Cir. 1986) (finding that "[p]lacing plaintiff in the position it would have been, absent the antitrust violation, thus required deducting from gross damages the amounts plaintiff would have expended if" that conduct had not occurred); *Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1262 (9th Cir. 1981) (damage calculation was unreasonable where "no jury could reasonably find that [defendant] could not significantly have cut its prices, in an attempt to protect its market share"), and damages attributable to plaintiffs' "management problems" or business decisions rather than any anticompetitive conduct, *U.S. Football League*, 842 F.2d at 1378–79.

---

[7] Keurig suggests that strict disaggregation is necessary based on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). This overstates the findings in *Comcast*. *Comcast* dealt with a class certification motion under Fed. R. Civ. P. 23 where an expert produced a damages model to assess class commonality, "assumed the validity of all four theories of antitrust impact initially advanced by respondents" and did not attribute specific damages to any one theory of antitrust impact. *Id.* at 36. However, at the time of the *Comcast* decision, all but one of these four theories of anticompetitive impact had been dismissed. *Id.* at 31. Thus, the failing of the damages model was not that it failed to precisely disaggregate damages across valid theories of antitrust liability—as *Comcast* noted, "[c]alculations need not be exact," *id.* at 35, and the proposed "methodology might have been sound, and might have produced commonality of damages, if all four of those alleged distortions remained in the case," *id.* at 37. Rather, the issue was that the damages model was based, at least in part, on claims that had explicitly been dismissed. The damages model did not examine whether the one remaining theory of anticompetitive conduct, standing alone, established damages "susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. *Comcast* thus establishes that predominance cannot be shown through a damages model that includes theories of anticompetitive conduct already dismissed from the case, but does not require that damages be precisely disaggregated across each remaining theory of liability.

Finally, an expert's damages model may not be too speculative. "Damages are speculative where countless other market variables could have intervened to affect pricing and the theory of antitrust injury depends upon a complicated series of market interactions." *Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 99 (2d Cir. 2022) (cleaned up). "A district court should not be required to entertain multiple layers of speculation and create an alternative universe to calculate damages." *Id.* (cleaned up). The length of time the damages model projects into the future may affect how speculative the model is. *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 293 (3d Cir. 2012) (affirming trial court's exclusion of expert opinion on a nine-year damages projection where the underlying data was unreliable); *Heartland Surgical Specialty Hosp. LLC v. Midwest Div. Inc.*, No. 05-CV-2164, 2007 WL 6215929, at *7 (D. Kan. Dec. 19, 2007) (excluding expert opinion on damages where "future damages [were] based on 2006 volume estimates, which would be far too speculative to be carried forward for six additional years without any analysis of forecasted market conditions"); *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 654 (6th Cir. 2009) ("The district court hit the nail on the head when it characterized this ten-year prediction about the fortunes of the American automotive industry as utterly speculative."). However, a model is not speculative simply because its projections run numerous years in the future so long as those projections are adequately supported. *See, e.g.*, *Aetna, Inc. v. Blue Cross Blue Shield of Michigan*, No. 11-15346, 2015 WL 1497826, at *4 (E.D. Mich. Mar. 31, 2015) (permitting expert opinion on a nine-year damages period); *In re Blood Reagents Antitrust Litig.*, No. 09-2081, 2015 WL 6123211, at *11–12 (E.D. Pa. Oct. 19, 2015) (permitting expert testimony on a damages period running roughly eight years).

#### 4.  The Collective Issues with Dr. Macartney's Report

Considered collectively, Keurig's objections raise too many methodological concerns to ignore and require the exclusion of Dr. Macartney's opinion.

I find that using Keurig as a benchmark is problematic.  Dr. Macartney determined that "a reliable benchmark to compare Rogers' experience is one based on the set of Compatible Portion Packs owned or licensed by Keurig."  (Doc. 1459, Ex. 1 ¶ 252.)  This includes all of the brands licensed by Keurig, including ones that do not bear the Keurig label.  (Doc. 1531 at 4 n.4) (summarizing exhibits.)  Dr. Macartney justifies this comparison on the fact that JBR and Keurig's products "were sold in the same market" but "the products in the Keurig system were not subjected to the alleged anticompetitive practices that Keurig engaged in and that caused Rogers to suffer lost sales."  (Doc. 1459, Ex. 1 ¶ 252.)  He also argues that JBR "was an early mover," further making it a comparable firm to Keurig.  (*Id.*)  Keurig disputes each of these assertions.  Based on the opinions of its own expert, Keurig argues that it and JBR are "vastly different in terms of their size, geographic presence, business models, brand equity, and products" because, among other things, "JBR is primarily a regional company," relies on "word of mouth" for advertising, uses a different single-serve cup design[8], and lacks the "brand partnerships" that Keurig enjoys.  (Doc. 1458 at 5–6.)  JBR, through Dr. Macartney, contests each of these conclusions.  (*See* Doc. 1531.)

Dr. Macartney's report suggests that from 2013 to 2019, Keurig held an overwhelmingly dominant market share across numerous categories of single-serve cup sales.  (Doc. 1459, Ex. 1 ¶¶ 81–87.)  Although other non-licensed brands existed, they represented a small and

---

[8] Across the different briefing papers, parties use various terms to describe single-serve coffee cup products.  For ease of reference, I use "single serve cup" to refer to the generic product and use alternative or brand-specific terms and terminology only as necessary or when a quoted source uses that terminology.

diminishing component of overall market share, which is allegedly attributable to Keurig's anticompetitive conduct.  (*Id.*)  Under these circumstances, virtually any yardstick will have issues, and venturing outside the single-serve cup market to an alternative product or industry will raise questions about the comparability of the firm or market selected.  Using a selection of other unlicensed firms as a benchmark would still result in a comparison tainted by anticompetitive conduct and would, assuming Plaintiffs' allegations have merit, suppress damage amounts since all of these firms would have had their market share and revenue suppressed by the anticompetitive conduct as well.

As in *Dial Corp.*, when the alleged anticompetitive conduct has skewed the field of possible comparison companies, a court must account for that in its assessment of reliable comparators.  Moreover, the decision to use Keurig as the benchmark means that, assuming Plaintiffs' theories of the case are correct, Keurig was favorably affected by the anticompetitive conduct, which raises the risk that using it as the benchmark could result in overly generous damages figures.[9]  This result cuts against the prevailing trend of using of benchmarks that are likely to render more conservative estimates.  *See, e.g.*, *Fond Du Lac Bumper Exch., Inc.*, 2016 WL 3579953, at *9; *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. at 195; *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d at 675.  Although a plaintiff is not required to generate a conservative estimate, it raises concerns when a litigant not only fails to use a conservative benchmark, but selects the benchmark firm or market most likely to be favorably affected by the anticompetitive conduct.

---

[9] Dr. Macartney's reply report asserts that the damages calculation is a conservative estimate of damages because its initial growth from 2012 to 2013 was greater than Keurig's.  (*See, e.g.*, Doc. 1459, Ex. 27 ¶¶ 179–180.)  This, however, is somewhat misleading because, as Dr. Macartney admits, 2012 was JBR's first full year of sales, resulting in 4000 percent growth rate, followed by a 36 percent growth rate the next year.  (Doc. 1459, Ex. 1 ¶ 253.) This is an unrealistically artificial baseline against which to measure growth.

Finally, I would have greater confidence permitting the use this methodology if it were tested with other methods. For example, in *Bigelow* the court was presented with both the before-and-after and yardstick methods by comparing receipts of the plaintiff and competitor, and by examining receipts from the pre- and post-anticompetitive conduct period. 327 U.S. at 257–58. Other courts have acknowledged that a plaintiff is not restricted to these two methods and may devise alternative ones so long as the estimates are based on reliable data. *See, e.g.*, *Eleven Line, Inc. v. N. Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 207 (5th Cir. 2000) ("While the two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures of lost profits, a plaintiff may prove damages by a different measure tailored to the facts of the case, so long as the estimates and assumptions used rest on adequate data."). Having a set of estimates based on multiple methods would provide a cross-check on the yardstick method. Alternatively, selecting a second benchmark market or firm as a comparison could provide additional confidence that the estimates yielded are not unduly favorable.[10]

This issue also adds weight to Keurig's argument that Dr. Macartney's model fails to disaggregate lawful and unlawful conduct. However, JBR correctly notes that strict disaggregation and distribution of damages across the various theories of antitrust harm is not required, particularly where, unlike in *Comcast Corp.*, 569 U.S. at 37, the damages are not premised on a dismissed theory of harm. *See, e.g.*, *Pearlstein v. BlackBerry Ltd.*, No. 13-CV-7060, 2021 WL 253453, at *23 (S.D.N.Y. Jan. 26, 2021) (finding no requirement that a damages model disaggregate damages for each anticompetitive act for class certification); *Menaldi v.*

---

[10] In this regard, *Bigelow* is instructive. In *Bigelow*, the yardstick method yielded damages of $115,982.34 and the before-and-after method yielded damages of $125,659.00, a $9,676.66 or roughly 8 percent difference. 327 U.S. at 258. This spread, while not inconsequential, locates damages within a relatively circumscribed spread of possibilities. The jury—and it bears remembering that the goal here is to give the jury a "just and reasonable" basis on which to award its damages—settled on the midpoint of this range, or $120,000.00.

*Och-Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 99 (S.D.N.Y. 2018) (finding that *Comcast Corp.* did not preclude the use of a model that failed to "disaggregate the stock drop caused by the alleged misstatements from the stock drop caused by government fines" for class certification); *see also Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (finding that the *Comcast Corp.* standard was satisfied notwithstanding the failure to disaggregate harms associated with a range of factors all encompassed within the plaintiffs' theory of liability for class certification).

Moreover, in most use cases for the yardstick method, there would be little merit to Keurig's claim that a damages model must disaggregate the benchmark comparator's (*i.e.*, Keurig's) lawful and unlawful conduct, (Doc. 1458 at 7–8), because the whole point of the yardstick method is that the "corresponding data for a firm or in a market" used as the benchmark is "unaffected by the [antitrust] violation." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. at 521 (citation omitted). Thus, there is no need to disaggregate lawful and unlawful conduct with the comparator because all conduct consists of lawful competitive practices. Here, however, the benchmark contains both lawful and unlawful conduct and there is insufficient evidence that Dr. Macartney properly segregated out the unlawful conduct in calculating JBR's damages.[11]

---

[11] Some commentators have been particularly critical of approving damages models that fail to disaggregate lawful and unlawful conduct. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), *cert. denied*, 537 U.S. 1148 (2003), for example, has come under particular scrutiny for its dismissal of concerns that a model did not discriminate between lawful and unlawful conduct and simply measured a plaintiff's market share. *See, e.g.*, Hovenkamp, *supra* at 52 (describing the *Conwood* decision as "indefensible"); Joshua D. Wright, *Antitrust Analysis of Category Management: Conwood v United States Tobacco Co*, 17 S. Ct. Econ. Rev. 311, 334 (2009) ("Conwood's damages analysis was inherently incapable of measuring any potential antitrust injury associated with UST's illegal conduct, and commentators have uniformly agreed that the testimony should have been precluded by *Daubert*.") It is thus appropriate for a court to be particularly on-guard against a damages benchmark that strongly risks commingling lawful and unlawful conduct.

In short, the issue with the Keurig benchmark is not merely that it is an imperfect comparison, but that it is likely the benchmark that is most affected by the anticompetitive conduct, and in a way that is most likely to be favorable to JBR's damages estimation.

This issue is compounded by the problems with the end date of 2029 that Dr. Macartney selected for modeling damages. The problem is not merely, as JBR suggests, that there is a long damages period. Courts have permitted damages projections well into the future so long as they are adequately supported. *See, e.g.*, *Aetna, Inc.*, 2015 WL 1497826, at *4. Rather, it is that, as Dr. Macartney's deposition indicates, there was no particular reason behind choosing 2029—it could as easily have been 2028 or 2031. (Doc. 1459, Ex. 2 at 189:9-17.)[12] As Keurig notes, much of JBR's claimed damages stem from conduct involving the 2.0 Brewer, which was discontinued in 2017. (Doc. 1458 at 13) (summarizing exhibits.) As noted, it is not impossible that with adequate support a damages model could project future damages out for more than a decade, but there must be some support, beyond an expert's bald assertion, to justify a damages projection stretching to 2029, when it appears most of the relevant conduct occurred prior to 2017.

I find that Keurig's remaining objection about the failure to model the impact of various JBR business decisions warrants less consideration. (Doc. 1458 at 8–9.) JBR fairly objects that those business decisions were either accounted for or irrelevant. (Doc. 1531 at 11–13.) This is the kind of granular dispute over the impact of comparatively minute issues that goes to the weight of the analysis rather than its admissibility.

---

[12] "[I]f you're saying, for example, well, why not cut off in 2029 -- why not cut off in 2028 or, indeed, why not cut off in 2030 or 2031, you know, you have to stop the analysis at some point, and you have to pick a natural time to stop it, given that the harm would have persisted through that period and beyond. And so it was reasonable for the purposes of the calculation to go out ten years."

As discussed, the pervasive problem is that Dr. Macartney, while selecting a potentially viable methodology, chose a particularly flawed benchmark. Using Keurig as the benchmark basis for a yardstick analysis creates a strong risk of a model tainted by anticompetitive conduct and likely to commingle lawful and unlawful conduct. This issue is compounded by the use of a long damages period without adequate support for the end date of that period. These compounding concerns diminish the reliability Dr. Macartney's damages opinion to the point that exclusion is required. *See Price, Inc.*, 2020 WL 4937464, at *5–8.

### D.  *Dr. Gary L. French (Doc. 1406)*

Keurig moves to exclude the expert opinions regarding class certification, damages, and liability offered by the DPP's[13] expert Dr. Gary French ("Dr. French"). (Doc. 1408 at 1.) For the reasons that follow, Keurig's motion is granted in part and denied in part.

In his report, Dr. French (i) defines Keurig's relevant markets; (ii) assesses the extent of Keurig's monopoly power in those markets and the harm to competition caused by Keurig's conduct; (iii) assesses the impact of Keurig's alleged wrongdoing on members of the DPP Class; and (iv) quantifies the overcharge damages to the DPP Class. (Doc. 1362, Ex. 2 at 4–5.) Keurig argues that Dr. French's testimony should be excluded on three main grounds: (1) that Dr. French's regression model is flawed because it fails to account for certain variables, uses an inappropriate benchmark, produces implausible results, and improperly uses averages (collectively, the "Regression Model Objections"); (2) that Dr. French's damages calculation is unreliable; and (3) that Dr. French's liability opinions are inadmissible because they lack

---

[13] The Direct Purchaser Plaintiffs are also the proposed class representatives and include Kenneth B. Burkley, Roger Davidson, James G. Long, Sally Rizzo, Henry Rocker, and Todd W. Springer. (Doc. 1360 at 1 n.1; Doc. 1469 at 1 n.1.)

economic analysis, contain impermissible factual narration, and opine on motivations and intent (collectively, the "Liability Opinion Objections"). I address each argument in turn.

### 1. Regression Model Objections

The Regression Model Objections are not grounds to exclude Dr. French's opinion. Dr. French proffers a regression model comparing the prices of Keurig's K-Cups to the competitor product "OneCup" that is sold by Rogers. (Doc. 1362, Ex. 2 at 193–200.) Dr. French's model uses ten years of Keurig and eight years of Rogers transaction data that was reviewed, cleaned, and standardized. (*Id.* at 201.) The model also sources data from reputable sources including Information Resources Inc. ("IRI") and Nielsen. (*Id.* at 201–02.) Keurig argues that Dr. French's regression model is "fundamentally flawed and inadmissible" because it failed "to control for numerous lawful factors." (Doc. 1408 at 3.) These factors include Keurig's brand value, other coffee brands' portion pack brand premium, the physical cup design, and brand-specific events. (*Id.* at 5–13.)

"Normally, failure to include variables [in a regression analysis] will affect the analysis' probativeness, not its admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986) (Brennan, J. concurring). "Where a study accounts for the 'major factors' but not 'all measurable variables,' it is admissible. *Gruber v. Gilbertson*, No. 16-CV-9727, 2021 WL 2482109, at *10 (S.D.N.Y. June 17, 2021) (quoting *Bazemore*, 478 U.S. at 400). However, "[t]here may, of course, be some regressions so incomplete as to be inadmissible as irrelevant." *Bazemore*, 478 U.S. at 400 n.10. "[W]here significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is unreliable and therefore inadmissible." *Gruber*, 2021 WL 2482109, at *10 (citing *Bickerstaff v. Vassar College*, 196 F.3d 435, 449 (2d Cir. 1999)). However, such challenges will generally face a high bar and even the "fail[ure] to consider some

arguably significant variables" will generally go to a model's "probativeness rather than its admissibility." *Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 62 (2d Cir. 2020).

"Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that the major factors have been accounted for in a regression analysis." *United States v. Teva Pharms. USA, Inc.*, No. 13-CV-3702, 2019 WL 13244252, at *2 (S.D.N.Y. July 1, 2019) (internal quotation marks omitted). "At the same time, a defendant challenging a regression analysis must at least identify the significant, missing variables." *Id.* (citing *Sobel v. Yeshiva Univ.*, 839 F.2d 18, 34 (2d Cir. 1988). "While the burden to show relevance and admissibility always rests with the proponent, a "mere conjecture or assertion on the defendant's part" is insufficient." *Id.* (quoting *Sobel*, 839 F.2d at 34). Rather, "such an attack should be specific and make a showing of relevance for each particular variable it contends plaintiffs ought to include." *Sobel*, 839 F.2d at 34.

Dr. French's model includes explanatory variables beyond illegal conduct, such as cost difference, brand premium, and sub-channels. He thoroughly explains why and how he selected these variables. (Doc. 1362, Ex. 2 at 202–06.) He has thus sufficiently demonstrated that he has incorporated all important explanatory variables into his model. To the degree Keurig believes other factors ought to have been included, it can raise the matter on cross examination.

Keurig's second Regression Model Objection is that Dr. French did not choose a reliable benchmark. (Doc. 1408 at 13–15.) I have discussed the law governing the use and selection of benchmarks in Section II.C.1. Dr. French explains that he selected JBR's OneCup product as a benchmark because the product is compatible with the Keurig brewer, sold in the same channels, and has sufficient sales data to analyze and compare. (Doc. 1362, Ex. 2 at 193–95.) Although Keurig maintains that the OneCup is not reasonably similar to the Keurig K-Cup, I find that the

OneCup is "sufficiently comparable" to the Keurig K-Cup "to permit a degree of reliable comparison," and therefore may be used as a benchmark. *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, No. 15-CV-5440, 2018 WL 2172667, at *5 (E.D.N.Y. May 10, 2018); *see also Allen v. Dairy Mktg. Servs., LLC*, No. 5:09-CV-230, 2013 WL 6909953, at *15 (D. Vt. Dec. 31, 2013) (permitting expert testimony because imperfect proposed benchmarks, "when coupled with an appropriate regression analysis," will still "assist in a reasonable estimate of damages").

Keurig's third Regression Model Objection is that the model produces "implausible results." (Doc. 1408 at 15.) To generate these "implausible results," Keurig had an expert of its own, Dr. Laila Haider, apply Dr. French's model to new contexts. (*See, e.g.*, Doc, 1410, Ex. 2 ¶¶ 100–13.) Using Dr. Haider's application of Dr. French's model, Keurig identifies a number of proposed absurdities including overcharges within JBR's own brands (Doc. 1408 at 1), illogical prices in a hypothetical but-for world, (*id.* at 16), and the failure to predict actual prices, (*id.*).

In effect, all these critiques attack the robustness of Dr. French's model. The "robustness" of a model speaks to "whether regression results are sensitive to slight modifications in assumptions." David L. Rubinfeld, *Reference Manual on Scientific Evidence: Reference Guide on Multiple Regression* (3rd ed. 2011), 2011 WL 7724257, at *11. "Robustness testing . . . that produces contradictory or otherwise implausible results strongly suggest that a methodology has been insufficiently tested . . . ." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 468 (S.D.N.Y. 2018). As discussed in greater detail in Section II.K.1, robustness testing is a reliable means by which a rebuttal expert can challenge another expert's findings.

The question here, however, is when one expert's model must be struck based on another expert's robustness testing. It cannot be the case that a model must survive all tests under all circumstances—any model may be bent until it breaks. Rather, a model is only insufficiently robust when it is sensitive to even small changes. *See, e.g.*, *In re Pork Antitrust Litig.*, No. CV 18-1776, 665 F. Supp. 3d 967, 993 (D. Minn. 2023) ("robustness testing . . . ask[s] whether the models are sensitive to *small changes*") (emphasis added)); *In re Elysium Health-ChromaDex Litig.*, No. 17-CV-7394, 2022 WL 421135, at *22 (S.D.N.Y. Feb. 11, 2022) (noting that the question of robustness turns on "whether regression results are sensitive to *slight modifications*" (internal quotation marks omitted)).

Dr. Haider's alterations to Dr. French's model are not minor. She replaces benchmark variables, (Doc. 1410, Ex. 2 ¶¶ 98–99), and applies his model to different coffee brands, (*id.* ¶ 100). As discussed at length here and in Section II.D.1, the selection of a benchmark is a major modeling consideration, as is the determination of what variables to include in a model. Dr. Haider may modify these variables as part of her own robustness testing, and Keurig may use those results to challenge Dr. French, but findings based on such major modifications do not demonstrate that a model is so unreliable as to warrant exclusion.

Keurig's fourth Regression Model Objection is that Dr. French's model should be excluded because it uses averages. (Doc. 1408 at 17.) Keurig maintains that a model that uses averages will not assist the Court on the issue of class certification in particular because it cannot establish whether nearly all class members were injured. (*Id.* at 18.) At the class certification stage, the *Daubert* inquiry is "limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Ge Dandong v. Pinnacle Performance Ltd.*, No. 10-CV-8086, 2013 WL 5658790, at *13 (S.D.N.Y. Oct. 17, 2013) (internal quotation marks omitted).

"Plaintiffs seeking certification of a Rule 23(b)(3) damages class action must first establish numerosity, commonality, typicality, and adequacy of representation, and then predominance of common questions of law or fact and the superiority of a class action over other procedures." *Scott v. Chipotle Mexican Grill, Inc*., 954 F.3d 502, 512 (2d Cir. 2020) (citing Fed. R. Civ. P. 23(a), (b)(3)).  It is not the case that "plaintiffs must be prepared at the certification stage to demonstrate through common evidence the precise amount of damages incurred by each class member.  But we do expect the common evidence to show all class members suffered some injury." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (quoting *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252 (D.C. Cir. 2013)).  While I need not yet determine whether the DPPs have made that showing, I do not find that Dr. French's model is methodologically incapable of making such a showing.  *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.,* No. 06-MD-1175, 2014 WL 7882100, at *64 (E.D.N.Y. Oct. 15, 2014) (allowing damages estimate which used averages at class certification stage), *report and recommendation adopted,* No. 06-MD-1775, 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

Dr. French relied on four types of evidence to reach his common impact opinion:  (1) documents and testimony demonstrating barriers to competition that affected all or nearly all class members, (2) his regression model showing "statistically significant, large and pervasive overcharges," (3) empirical analyses of Keurig's price structure, and (4) record evidence such as price lists and testimony showing that Keurig raised prices simultaneously.  (Doc. 1469 at 15–16.)  Accordingly, I do not find that Dr. French's common impact opinions fails for lack of fit.

Keurig also asserts that the model does not assist with class certification because it does not distinguish harms attributable to specific claims.  (Doc. 1408 at 17.)  However, as already noted in Section II.C.2, a model does not need to strictly disaggregate the harms associated with

each unlawful act that has been properly maintained in the action; it needs to avoid accounting for lawful acts and acts where the associated cause of action has been dismissed.

Dr. French testified that his "model is not designed to estimate any effect of a single activity or a single type of conduct.  It's designed to indicate the overcharge from the exercise of monopoly power that was caused initially by the legitimate patents and maintained thereafter by a series of conduct over time."  (Doc. 1410, Ex. 1 at 178:4-9.)  Keurig does not allege that any of the anticompetitive conduct Dr. French models is based on a cause of action that has been dismissed, and there is no requirement that Dr. French specifically disaggregate the impact of various types of unlawful conduct for the reasons already discussed in Section II.C.2. Accordingly, I decline to exclude his testimony on these grounds.

### 2.  Damages Objections

Keurig disputes the reliability of Dr. French's damages calculation for the same reasons it disputes his regression model.  (Doc. 1408 at 19.)  For the reasons explained above, Dr. French's regression model is sufficiently reliable and will not be excluded.  Keurig also argues that Dr. French's decision to extrapolate certain data makes his damages calculation unreliable.  (*Id.*)  I again disagree.  Dr. French either extrapolated or estimated values for 30 percent of brands based on data from the remaining 70 percent that had available data.  (Doc. 1469 at 22–23.)  "Trained experts commonly extrapolate from existing data."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Dr. French performed additional economic analysis to confirm that the extrapolations were appropriate.  (*Id.* at 23.)  "[A]nalogy, inference and extrapolation can be sufficiently reliable steps to warrant admissibility so long as the gaps between the steps are not too great."  *In*

37

*re Ephedra Prods. Liab. Litig.*, 393 F. Supp. 2d 181, 189 (S.D.N.Y. 2005).  Here, I find that these gaps are not too great.

### 3.  Liability Objections

Keurig's first Liability Opinion Objection is that Dr. French relies on insufficient economic analysis.  (Doc. 1408 at 20.)  Specifically, Keurig challenges Dr. French's opinions on the relevant market for single-serve brewers and the effects of Keurig's challenged conduct.  (*Id.* at 21.)  I disagree that Dr. French's opinions are "just *ipse dixit*."  (*Id.*)  Determining a relevant market requires that the expert take a "pragmatic, factual approach" and "not a formal, legalistic one."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).  This determination can be based at least in part "on qualitative evidence."  *Park West Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 327 (S.D.N.Y. 2009).  In *Brown Shoe*, the Supreme Court recognized certain indicia of the boundaries of a submarket for antitrust purposes, such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  370 U.S. 294, 325 (1962) (hereafter collectively the "*Brown Shoe* Indicia").

To assess the relevant market, Dr. French applies the *Brown Shoe* Indicia along with the small but significant and non-transitory increase in price test (the "SSNIP Test")[14] from the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines ("DOJ/FTC

---

[14] *See also F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) ("To facilitate this [market] analysis, the Department of Justice and the FTC developed a technique called the SSNIP ('small but significant non-transitory increase in price') test . . . In the SSNIP method, one asks whether a hypothetical monopolist controlling all suppliers in the proposed market could profit from a small price increase. . . . If a small price increase would drive consumers to an alternative product, then that product must be reasonably substitutable for those in the proposed market and must therefore be part of the market, properly defined." (citing Horizontal Merger Guidelines § 1. 11, 57 Fed. Reg. at 41,560–61)); *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (recognizing the SSNIP method); *Kentucky Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 918 (6th Cir. 2009) ("The use of this [SSNIP Test] technique has been recognized in antitrust caselaw.").

Merger Guidelines"). (Doc. 1362, Ex. 2 ¶¶ 82–113 (*Brown Shoe* Indicia); *id.* ¶¶ 114–32 (SSNIP

Test).) Dr. French also relies on his regression model to explain the impacts of Keurig's

challenged conduct. (*See id.* 193–95.) "This is not a case in which an expert is unable to

articulate a rationale for his methodology; nor is it a case where the proffered rationale is

patently flawed or unreasonable." *In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *8

(E.D.N.Y. Dec. 21, 2012). Rather, Dr. French's model is based on sufficient data and reliably

applies accepted economic principles and methods to permit him to give a reliable opinion.

Finally, Keurig objects that Dr. French performs improper factual narration, (Doc. 1408

at 22–25), and impermissibly opines on motive and intent. (*Id.* at 25.) I have already indicated

that excessive factual narration can be objected to and curtailed by the trial judge if appropriate.

Section II.C.4. Additionally, there are a few instances where Dr. French opines on what Keurig

"believed" and "intended." (*See, e.g.*, Doc. 1362, Ex. 2 at 83, 89, 161.) The trial judge should

not permit experts to offer opinions on a party or its representatives' state of mind or intent.

*Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (holding

that expert may not opine on a party's subjective intent, state of mind, and knowledge); *In re:*

*Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2015 WL 9480448, at *5 (S.D.N.Y.

Dec. 29, 2015) ("[T]he Court agrees . . . that [expert] may not offer opinions regarding

[defendant's] knowledge or beliefs, both because he is not qualified to give such opinions and

because such testimony would impermissibly tread on the role of the jury."); *In re Mirena IUD*

*Prod. Liab. Litig.*, 169 F. Supp. 3d at 486 ("It is impermissible for experts to opine on the state of

mind or motives of corporations or regulatory bodies."); *see also Scott.*, 315 F.R.D. at 45

("[E]xperts may not offer opinions regarding the intent or motive of parties as part of their

analysis.") Accordingly, Keurig's motion to exclude Dr. French is denied, except that Dr.

French's opinions on the motive or intent of others, including that "Keurig did not believe the 2.0 brewer offered a consumer benefit," (Doc. 1362, Ex. 2 at 83), are excluded.

### E.  *Hal Poret (Doc. 1445)*

Keurig seeks to exclude the expert testimony of Mr. Hal Poret.  Plaintiff TreeHouse offers Mr. Poret's opinions primarily for the purpose of showing that Keurig statements misled consumers into believing that the 2.0 Brewer worked only with Keurig's K-Cups, and to provide an additional basis for TreeHouse's false advertising damages expert, Dr. Mohan Rao, to rely on when estimating Lanham Act damages resulting from Keurig's incompatibility statements. (Doc 1523 at 4.)  Keurig argues that Mr. Poret's testimony should be excluded because the survey suffers from methodological flaws that render it "scientifically invalid and inherently unreliable."  (Doc. 1444 at 1.)

"[C]ourts have long held that consumer surveys are the most persuasive evidence of secondary meaning."  *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 123 (S.D.N.Y. 2022) (internal quotation marks omitted), *motion to certify appeal denied*, No. 19-CV-1422, 2022 WL 3137131 (S.D.N.Y. Aug. 5, 2022).  "To evaluate the validity and reliability of a survey, a court should consider whether:  (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts."  *Id.* (quoting *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 449–50 (S.D.N.Y. 2017)). Although there is a strong presumption of favoring admissibility of surveys, *id*. at 225, surveys can be excluded under Rule 403 if "the survey is so far out of the realm of relevance that a jury

should not even be permitted to consider it," *Friesland Brands, B.V. v. Vietnam National Milk Co.*, 221 F. Supp. 2d 457, 460 (S.D.N.Y. 2002).  A "survey suffer[ing] from substantial methodological flaws . . . will be excluded under both Rule 403 and Rule 702."  *Malletier*, 525 F. Supp. 2d at 581.  However, as noted, courts generally favor the admissibility of survey evidence. *Id.* at 580.

Keurig challenges the admissibility of Mr. Poret's survey (the "Poret Survey") on the following grounds:  (1) failure to test any false or misleading statements; (2) lack of controls in the method; (3) inclusion of improper questions; and (4) unrepresentative universe of respondents.  I address each challenge in turn in light of the standards below and find Keurig's challenges to be unpersuasive.

### 1.  False and Misleading Statements

Keurig argues that Mr. Poret not using the allegedly false or misleading statements, as alleged in the Complaint, renders his consumer survey fatally unreliable.  (Doc. 1444.)  This argument fails because although surveys "must 'be designed to examine the impression presented to the cosumer,'" *Capri Sun GmbH*, 595 F. Supp. 3d at 126 (quoting *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253 (S.D.N.Y. 1999)), there is no obligation that the survey use the exact language challenged, or mirror the advertising conditions exactly, *id.*  Indeed, "any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions."  *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp 2d 723, 738 (S.D.N.Y. 2011) (internal quotation marks omitted).

In his consumer survey, Mr. Poret interviewed consumers about "what they did and why, and encompass[ed] the entirety of whatever happened in the marketplace."  (Doc. 1448, Ex. 24 at 21:18-22:9.)  His expert report addressed the broader question of why consumers had not

purchased competitor's single-serve cups, and not only the effect of the allegedly false or misleading statements made by Keurig in their advertising campaign.  (Doc. 1523.)  Mr. Poret's choice to not show the allegedly false or misleading statements identified in the complaint does not automatically render the entire survey unreliable, because he is allowed to use other acceptable survey methodologies in his study.  Since Mr. Poret utilized survey methodology that is well accepted in the survey field, I find that the failure to use the allegedly false or misleading statements in the Poret Survey does not render it inadmissible.

### 2.  Lack of Control Group

Keurig alleges that the Poret Survey should be excluded because it lacks a test and control group.  Keurig asserts that because the Poret Survey measures causation between Keurig's allegedly false or misleading statements and the reduction in Keurig 2.0 owners' purchases of Competitive Cups, his survey must include a control group to be methodologically sound.  (Doc. 1444 at 7–11.)

Control groups are not the universal and inflexible requirement of survey research as Keurig seeks to portray them.  Control groups may be particularly useful when there is a need "not simply to describe attitudes or beliefs or reported behaviors, but to determine the source of those attitudes or beliefs or behaviors."  Federal Judicial Center, *Reference Manual on Scientific Evidence* 397 (3d ed. 2011) ("RMSE"), https://perma.cc/L48R-438Q.  For example, in a survey to assess whether a commercial misleads consumers, "if consumers already believe, before viewing the commercial, that Product A is a superior pain reliever, a survey that simply records consumers' impressions after they view the commercial may reflect those preexisting beliefs rather than impressions produced by the commercial."  *Id.*  Additionally, the value of a control group is increased where the survey seeks to "test directly the influence of [a] stimulus" such as

a commercial. *Id.* 26. *See also Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242, 2020 WL 1503452, at *7 (S.D.N.Y. Mar. 30, 2020) ("The [expert's] Survey aimed to analyze whether Defendants' advertisements caused consumer confusion, and is, therefore, a causal study warranting a control group." (emphasis omitted)).

However, a control group may not be necessary if the risk of simply recording pre-existing values is not as great. For example, "a control group is not required for a survey that purports only to understand what developers *perceive* as relatively more or less important factors in their decision-making process." *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743116, at *9 (N.D. Cal. May 2, 2016) (emphasis in original).

Mr. Poret states his objective as "what consumers perceived as factors in their decisions not to purchase [competitors' single-serve cups]." (Doc. 1523 at 10.) In light of this objective, I find the need for a control group to be less than compelling. The survey did not seek to directly test the impact of a stimulus (*i.e.*, the allegedly misleading statements) so the need for a control is less pressing. In the absence of a clear need for a control group, the lack of such a group does not undermine the reliability of Mr. Poret's testimony.

### 3. Inclusion of Improper Questions

Keurig alleges that the Poret survey design is unscientific because it uses biased closed-ended and leading questions. I have reviewed the allegedly improper questions and find that the issues regarding whether the questions are biased and leading are not sufficient to affect the admissibility of the report. "[Q]uestions that make up a survey instrument may be open-ended, closed-ended, or a combination of both." RMSE, *supra*, at 391. There are legitimate reasons to use closed-ended questions in a consumer survey—indeed, there are occasions where closed-ended questions are "more suitable" in a consumer survey than open-ended questions. *Id.* at *23.

("Open-ended questions are more appropriate when the survey is attempting to gauge what comes first to a respondent's mind, but closed-ended questions are more suitable for assessing choices between well-identified options or obtaining ratings on a clear set of alternatives."). Courts in this District have also approved the use of close-ended questions in consumer surveys. *See, e.g.*, *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188, 200 (S.D.N.Y. 2011).

Dr. Poret was tasked to "design and conduct a scientific survey to reliably assess the extent to which Keurig 2.0 owners did not purchase[] non-licensed pods due to a concern that non-licensed pods would not work, or would not brew well or safely, in the Keurig 2.0 as a result of Keurig's false or misleading advertising."  (Doc. 1448, Ex. 21 at 5.)  To do so, he noted that both licensed and unlicensed pods existed, (*id.* at 10–11), and for certain survey respondents, asked them to choose from a list of reasons that they did not purchase unlicensed pods, (*id.* at 13).  Some of these choices favor Plaintiff's position (*e.g.*, "I heard or read that the Keurig 2.0 brewer works only with Keurig brand or licensed pods") but some did not (*e.g.*, "I prefer the taste of Keurig or Keurig-licensed brands."), (*id.* at 14).  Determining consumers preferences on these kinds of clearly defined alternatives is the kind of task for which close-ended questions are frequently more appropriate.  RMSE, *supra*, at 392.  The use of this method thus provides no grounds to strike Dr. Poret's survey.

### 4. Unrepresentative Survey Participants

Keurig argues that the universe of survey participants chosen for the Poret Survey is unrepresentative because Mr. Poret "imposed near-equal age distribution within his sample survey," creating an underinclusive universe of respondents whose ages matched neither the

population of Keurig users nor the population of the United States.  (Doc. 1444 at 18.)  I disagree.

The population of interest in the Poret Survey was Keurig 2.0 Brewer owners, because the study was about the reaction of Keurig 2.0 Brewer owners to Keurig's statements about the incompatibility of competitor cups.  (Doc. 1523 at 23.)  Keurig's own survey expert agrees that owners of the Keurig 2.0 Brewers were the proper population to survey.  (*Id.*)  Furthermore, a consumer survey performed for the purpose of "determining actual confusion must encompass a universe of potential consumers who use the product."  *Lon Tai Shing Co. v. Koch+Lowy*, No. 90-CV-4464, 1992 WL 18806, at *3 (S.D.N.Y. Jan. 28, 1992) (quoting *Universal City Studios, Inc. v. Nintendo Co*., 746 F.2d 112, 118 (2d Cir. 1984)).  Thus, I do not find that the makeup of the survey participants warrants the exclusion of Mr. Poret's testimony.

Because Keurig's challenges to the admissibility of Mr. Poret's survey are insufficient to warrant the exclusion of Mr. Poret's testimony, Keurig's motion with regard to Mr. Poret is denied.

### F.  *Sarah Butler (Doc. 1445)*

Keurig moves to exclude the testimony of TreeHouse expert Sarah Butler.  It seeks to exclude Ms. Butler's testimony on the basis that "she is completely unqualified to testify" regarding Keurig's testing of competitor cups as her "training is in consumer surveys, not laboratory testing of physical products."  (Doc. 1447 at 1.)  Keurig also objects to Ms. Butler's testimony on surveys that she "designed, fielded, and conducted."  (*Id*.)  Ms. Butler conducted two surveys:  (1) evaluating how consumers who purchased competitor cups for use at home (the "At-Home" segment) perceived certain quality, safety, performance, and warranty claims associated with competitor cups (the "At-Home Survey"); and (2) evaluating the buying

preferences of customers who purchased competitor cups for use outside the home, primarily customers in charge of office or business coffee supplies (the "Away-From-Home Survey" of the "Away-From-Home" segment).

Defendants assert that "[b]oth surveys are so methodologically flawed" that they are rendered inadmissible.  (Doc. 1447 at 1.)  They assert that in the At-Home Survey, Ms. Butler "manipulates her control group for one survey measure and completely abandons her control group for another to reach her conclusions."  (*Id.*)  As to the Away-from-Home Survey, Defendant asserts that Ms. Butler surveys "the wrong population of individuals" and does not use a control group.  (*Id.*)  Her surveys were conducted using commonly used survey designs and methodologies, the validity of which Defendant has not challenged.[15]  Instead, Keurig challenges the control group chosen, the wording of the survey questions, and the representativeness of the survey population.

I do not find Keurig's challenges to be persuasive.  Therefore, its motion is denied.  I begin by addressing the qualification objections, and then turn to the objections to Ms. Butler's surveys.

### 1.  Qualifications

Ms. Butler is qualified to opine on whether Keurig's comparisons between K-Cups and competitive cups adhered to "specific research standards and methodology."  (Doc. 1528 at 1.) Although an expert's testimony should be excluded if it "could stray from the scope of a witness' expertise," *Cruz*, 363 F.3d at 194, Keurig takes an unreasonably narrow view of what expertise would permit Ms. Butler to opine on its cup-testing practices.

---

[15] Indeed, in moving to exclude another expert, Keurig states that an experimental design survey is "the method best suited for the study of causal relationships."  (Doc. 1444 at 8 n.8 (citation omitted)).

Ms. Butler's evaluation of the cup testing reports and testimony on the reliability of the surveys relates to research standards and methodology generally, and not merely to "product testing." (Doc. 1447 at 4.) Therefore, her experience and education are sufficient to qualify her to opine on whether the methodology of a research study allows for statistically valid conclusions to be drawn. Ms. Butler is a Managing Director at NERA Consulting, an economic consulting firm that specializes in applying economic, finance, and quantitative principles to legal challenges. (*See* Doc. 1448, Ex. 1 ¶¶ 1–7.) She is an expert in the fields of survey research, market research, sampling, and statistical analysis, with decades of experience in these fields, has published more than 20 articles on these topics, and has been qualified as an expert in more than sixty cases. (*Id*.) Ms. Butler's testimony concerns whether the cup testing conducted by Keurig followed "generally accepted research standards for comparative product tests—such as objectivity, sufficient sample size, use of control groups where appropriate, and testing protocols—necessary for reliable statistical analyses," (Doc. 1528 at 4), and therefore aligns with her experience, training, and expertise.

### 2. Survey Control Group

Keurig proffers two objections to Ms. Butler's surveys. First, it asserts that her At-Home Survey "botches the control group," making it scientifically invalid. (Doc. 1447 at 9 (alterations omitted).) Its main objection is that Ms. Butler's use of a corrected or adjusted control group "inflates the degree to which respondents appear to have altered perceptions" because of allegedly misleading statements made by Keurig. (*Id.* at 11.) Second, it asserts that her Away-From-Home Survey did not utilize a control group at all. (Doc 1447 at 20.)

In response to Keurig's objection on control group adjustments in the At-Home Survey, TreeHouse responds that the adjustments Keurig complains of were made to ensure that

"respondents who had previously been exposed to Keurig's false advertising campaign were controlled for." (Doc. 1528 at 1.) In devising her survey, Ms. Butler also noted her concern that "the rates in the Control group may be driven by past exposures to statements made by Keurig about the unreliability of Competitive Cups." (Doc. 1448, Ex. 5 ¶ 83.) Mitigating the impact of preexisting beliefs on survey feedback is a sound objective in survey research. *See* RMSE, *supra*, at 397 ("[I]f consumers already believe, before viewing the commercial, that Product A is a superior pain reliever, a survey that simply records consumers' impressions after they view the commercial may reflect those preexisting beliefs rather than impressions produced by the commercial."). Indeed, failure to control for the impact of preexisting beliefs can render a survey unreliable. *See Procter & Gamble Co. v. Ultreo, Inc*., 574 F. Supp. 2d 339, 351 (S.D.N.Y. 2008).

In circumstances where a control group without preexisting beliefs is unavailable, social scientists sometimes employ statistical weights or adjustments to the control groups, or the construction of an artificial "synthetic control" group. *See, e.g.*, Janet Bouttell et al., *Synthetic Control Methodology as a Tool for Evaluating Population-Level Health Interventions,* 72 J. Epidemiol Cmty. Health 673, 673–74 (2018) ("Synthetic control methodology (SCM) allows the construction of a counterfactual by selecting a weighted average of the outcome variable from a group of units similar to the treated unit."); Alberto Abadie, *Using Synthetic Controls: Feasibility, Data Requirements, and Methodological Aspects*, 59 J. Econ. Lit. 391, 391 (2021) ("Synthetic control methods . . . have become widely applied in empirical research[.]"). Given the threat that preexisting views pose to survey validity and the broad use of far more intensive methods of control group weighing in modern econometric methods, I do not agree with Keurig that there is no scientific justification for Ms. Butler's modification of the control group.

The second objection may be disposed of quickly since I have already discussed the law and theory on the use of control groups in surveys, *see supra* § II.F.2, the key takeaway of which is that a control group is less necessary where a researcher does not seek to directly test the impact of a stimulus on a survey respondent to establish a causal relationship. That is the case here, since the Away-From-Home Survey targets "individuals responsible for beverage supplies or contracts with beverage suppliers for their office or business location to evaluate the impact of Keurig's relationships with Distributors[] on purchasing behaviors in the Away-From-Home Market." (Doc. 1448, Ex. 5 ¶ 10.) Ms. Butler does not seek to test the impact of a particular stimulus or statement on these individuals. Since she is not attempting to assess the impact of a particular stimulus on a group, the lack of a control group does not materially impact the reliability of Ms. Butler's analysis and resulting opinion so as to require exclusion.

### 3. Inclusion of Improper Questions

Keurig's next objection is to Ms. Butler's purportedly improper use of leading and closed-ended questions in her At-Home Survey. (Doc. 1447 at 17.) I have already discussed the law and theory governing the use of close-ended questions. *See supra* § II.E.3. The takeaway is that closed-ended questions do not render a survey per se unreliable and can be a suitable method for obtaining ratings of various clear alternatives. On other hand, courts have frequently found surveys to be unreliable where they use leading questions. *See, e.g.*, *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *2 ("To be admissible, a survey generally must, among other things . . . use precise, non-leading questions."); *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, No. 06-CV-550, 2007 WL 2258688, at *7 (S.D.N.Y. Aug. 6, 2007) (finding that a survey lacked probative value in part because it "employed a format that failed to approximate real world conditions and was impermissibly leading."); *see also Universal City Studios, Inc. v.*

*Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) (reasoning that a survey included an "obvious leading question" because the inquiry "suggested its own answer").

Because the use of close-ended questions is not itself an indicium of unreliability, the issue turns on whether Ms. Butler's survey used inappropriate leading questions. Keurig objects in particular to the development of a false dichotomy between "licensed" and "unlicensed" pods as well as the use of words like "unapproved" that it deems biased. (Doc. 1447 at 13–14.) It also objects that Ms. Butler employed stronger warranty language than Keurig itself used. (*Id.*) In support, Keurig had a rebuttal expert conduct a survey along its proposed lines which yielded substantially different results. (Doc. 1447 at 15.)

Having reviewed Ms. Butler's survey questions, (Doc. 1448, Ex. 5 at 135–40),[16] I do not find them to be biased or leading. In some cases, the wording of the questions is strictly necessary. Keurig objects to the overemphasis of the word "unapproved," but its own materials use that term, (*id.* 135), so TreeHouse may fairly ask about the impact of that language on consumers. Nor do any of the other questions Keurig complains of credibly "suggest[] its own answer," *Nintendo*, 746 F.2d at 118, in such a way as to be an impermissible leading question.[17] Similarly, although there are differences between "affecting" a warranty and "voiding" a warranty, none are so strong that exclusion of the survey is warranted or that it becomes more likely than not that Ms. Butler's opinion is unreliable. Although Keurig's survey produced different results, this is to be expected—surveys conducted in different ways produce different

---

[16] The pages numbers in this citation and similar citations to this document refer to the PDF pagination.

[17] As one example, Ms. Butler asks, "If you knew that other brand pods/unapproved portion packs without the Keurig Brewed seal were safe for your Keurig machine, would you . . . [(1)] Purchase only other brand pods/unapproved portion packs; [(2)] Purchase only pods with the Keurig Brewed seal; [(3)] Purchase a mix of pods with the Keurig Brewed seal and other brand pods/unapproved portion packs; [(4)] Don't know/unsure." (Doc. 1448, Ex. 5 at 135.) Nothing in that initial question prompt suggests that any one of the four options is the "correct" one. Ms. Butler's other questions are similarly formatted.

results.  In the absence of issues with Ms. Butler's questions, the existence of countervailing survey findings is grist for cross-examination but not grounds for exclusion.

### 4.  Unrepresentative Survey Population

Keurig mounts two challenges to the survey populations on which Ms. Butler relies. First, it argues that the Away-From-Home Survey should have used only Keurig's distributors and redistributors because that is "the relevant population for purposes of assessing the at-issue contracts between Keurig and its (re)-distributors," but instead inappropriately relied on end-users who purchased beverage supplies.  (Doc. 1447 at 18.)

TreeHouse does not dispute that "Ms. Butler's survey was directed at measuring the purchasing behavior of end-user consumers" rather than Keurig's distributors and redistributors. (Doc. 1528 (emphasis omitted).)  Given this, there is no actual objection as to "survey population"—Ms. Butler sought to survey end-user purchasers and no one disputes that this is precisely what she did.  To the degree that Keurig objects that the end-users have no relevant insight, that objection is properly addressed under Federal Rule of Evidence 401, which provides that "[e]vidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the action." "Rule 401 imposes a relatively low bar of relevance."  *United States v. Ray*, 585 F. Supp. 3d 445, 459 (S.D.N.Y. 2022) (internal quotation marks omitted).  Keurig does not address the relevance of end users, but at least one court has found that end-user customers' perception of products is relevant even when those products are purchased through intermediary distributors.  *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-CV-618, 2018 WL 1782724, at *5 (S.D. Cal. Apr. 12, 2018) ("Ultimately, end consumers decide what Marketquest products to purchase; that they do so

through intermediaries does not render their perception of the products and marks irrelevant.")
Accordingly, this does not provide grounds to strike Ms. Butler's testimony.

Keurig makes a separate population-based argument to the Away-From-Home Survey
that the people surveyed are not representative of those who actually order beverages for
companies, in particular because survey population appears to include a large portion of senior
executives.  (Doc. 1447 at 20–21.)  Yet Keurig offers no evidence why this would not be the
case.  Ms. Butler's survey was restricted to respondents who "indicate[d] that they were
responsible for beverage supplies" for their business—the exact population she sought to survey.
(Doc. 1448, Ex. 5 ¶ 122.)  Thus, something more than speculation on Keurig's part is necessary
to mount a credible challenge to the survey's representativeness.  *See, e.g.*, *Loussier v. Universal
Music Grp., Inc.*, No. 02-CV-2447, 2005 WL 5644439, at *4 (S.D.N.Y. Aug. 24, 2005)
(declining to exclude a purportedly unrepresentative survey because the challenger opponent had
provided no data to suggest that the survey was unrepresentative).

Keurig similarly objects that the universe of survey participants chosen for the At-Home
Survey is unrepresentative because it "skews much older than the general population of Keurig
brewer purchasers."  (Doc. 1447 at 16.)  Keurig's objection on this point is similarly without
merit.  Ms. Butler describes a rigorous survey respondent screening process designed to capture
present and prospective future owners of Keurig brewing systems.  (Doc. 1448, Ex. 5 ¶¶ 27–45.)
Keurig objects that this system did not produce a sample that comports with two of its own
surveys or with United States Census Bureau numbers.  (Doc. 1447 at 16 (summarizing
evidence)).  TreeHouse responds that Keurig's samples are unrepresentative because one sample
included non-Keurig owners and was limited to a particular income range, while the other

excluded Keurig customers who purchased through various channels such as online sales.  (Doc. 1528 at 19–20.)

"[I]n practice, it is difficult to select a perfect sample.  Sometimes, surveys are overinclusive in that the sample includes people whose opinions are irrelevant to the issue in the litigation . . . On the other end of the spectrum sit underinclusive surveys, which are flawed because they fail to capture a portion of the relevant respondents." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 498 (S.D. Ohio 2020).  Thus, a survey becomes "unreliable" only if it is "over- or underinclusive to a significant degree." *Id.*  Otherwise, issues with representativeness are the kind of "'errors in survey methodology [that] usually go to the weight of the evidence' and do not warrant wholesale exclusion." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 125 (S.D.N.Y. 2022) (quoting *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010)).  Even crediting Keurig's arguments about Ms. Butler's survey sample would only mean that her survey participants are older than might be desirable. That might go to the weight her survey is due, but it does not suggest the kind of significant issue that merits wholesale exclusion.  Moreover, given the rigor of Ms. Butler's survey selection methodology, and the issues identified with Keurig's demographic evidence, I find that issues with representativeness do not undermine the reliability of Ms. Butler's survey evidence such that exclusion is required.

### 5. Recall-Based Measures

Keurig challenges the use of "recall-based measures" (*i.e.*, questions about past purchasing decisions) in Ms. Butler's At-Home Survey, on the grounds that "[i]t is widely recognized that recall-based measures do not yield reliable responses."  (Doc. 1447 at 21.) "[R]ecall bias, which recognizes the potential for inaccurate responses due to fading memories

over time," is a known issue with survey reliability. *Jimenez v. Allstate Ins. Co.*, No. 10-CV-8486, 2019 WL 13088814, at *6 (C.D. Cal. May 13, 2019). "Potential issues with recall bias or imperfect recall," however, "go to the weight of [an expert's] findings and are appropriate to bring up on cross-examination, or through the introduction of other admissible evidence." *Oracle Am.*, 2016 WL 1743116, at *8. *See also Medlock v. Taco Bell Corp.*, No. 07-CV-01314, 2015 WL 8479320, at *5 (E.D. Cal. Dec. 9, 2015) ("[A]ny issues of recall bias and different experiences of respondents during the class period are appropriate questions for cross examination or their own evidence and go to the weight to be ascribed to the survey.").

Issues with recall bias may undermine a survey's reliability when the events at issue happened a very long time ago or when survey respondents are asked to recall highly specific events. *Compare In re Autozone, Inc.*, No. 10-MD-02159, 2016 WL 4208200, at *19 (N.D. Cal. Aug. 10, 2016) (finding a survey inadmissible where, among other issues "the survey asks respondents to recall very specific events that occurred between three and a half and eleven years ago"), *with GlaxoSmithKline LLC v. Glenmark Pharms. Inc.*, No. 14-CV-877, 2017 WL 8948975, at *11 (D. Del. May 30, 2017) (finding that a recall-based survey was not inadmissible where it "questioned physicians as to their treatment of . . . patients in the aggregate over the period from 2007–2015"); *see also Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, No. 11-CV-775, 2014 WL 12623025, at *4 (M.D. Fla. May 29, 2014) ("Asking a person for the reason behind their purchase is completely different than asking someone how much time they spent doing something over a period of years."). Moreover, the existence of a "don't know" survey response option can help mitigate the effect of recall bias. *GlaxoSmithKline*, 2017 WL 8948975, at *11 ("[I]f the physicians did have trouble recalling the details relevant to the survey questions, they could respond with 'don't know.'").

Keurig does not identify any specific issues with Ms. Butler's survey stemming from questions that ask consumers to recall the reasons they did or did not purchase particular single-serving cups or the sources of information they used in making that decision. Moreover, the questions Ms. Butler asked were broad questions about aggregated purchasing preferences that, as noted in *GlaxoSmithKline*, limited the effect of recall bias. *See* 2017 WL 8948975, at *11. The impact of recall bias is further limited by the consistent inclusion of a "Don't know/unsure" option in the relevant survey questions. (Doc. 1448, Ex. 5 at 135–40.) Ms. Butler's use of recall-based questions therefore does not undercut the reliability of her testimony, and I decline to preclude her testimony concerning the At-Home Survey on this basis.

## G. *Dr. Mohan Rao (Doc. 1439)*

Keurig moves to exclude the expert testimony of Dr. Mohan Rao ("Dr. Rao"), an expert for Treehouse whose proffered testimony relates to damages under the Lanham Act. (*See* Doc. 1439.) For the reasons that follow, this motion is denied.

Keurig seeks the exclusion of Dr. Rao's testimony because: (1) it relies on inadmissible survey data from Mr. Poret and Ms. Butler; (2) it uses an unreliable damages model that double-counts data, fails to provide statistical measures like confidence intervals, and relies on unsupportable assumptions (collectively the "Method Objections"); and (3) his opinions are outside the scope of his expertise (the "Expertise Objection"). (*See* Doc. 1441 at 1.) I have already determined that the expert opinions provided by Mr. Poret and Ms. Butler are admissible, so exclusion of Dr. Rao's testimony on those bases is unwarranted. *See supra* §§ II.E–F; *cf. Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir. 2000) ("[A]n expert may rely on data that she did not personally collect.").

The Method Objections do not provide a basis to exclude Dr. Rao's opinion.  Keurig's first Method Objection is that Dr. Rao artificially inflates his damages assessment by double-counting damages inputs from both Ms. Butler and Mr. Poret.  (Doc. 1592 at 4.)  Dr. Rao developed two damages estimates that are relevant here.  The first estimate sought "[t]o determine what sales TreeHouse would have made 'but for' Keurig's alleged false advertising related to the quality, safety, performance, and warranty implications of" alternative single-serve cups.  (Doc. 1448, Ex. 30 ¶ 96.)  For this, Dr. Rao relied on Ms. Butler's survey findings of the number of customers exposed to Keurig's statements, (*id.* ¶ 98), and changes in those customers' purchasing habits, (*id.* ¶¶ 99, 101, 102).  The result was an estimate of profits lost due to alleged false advertising on quality, safety, performance, and warranty issues.  (*Id.* ¶ 106.)  The second estimate sought "[t]o determine what sales TreeHouse would have made 'but for' Keurig's alleged false advertising related to the compatibility of [competitors' single-serve cups] with the 2.0 Brewer."  (*Id.* ¶ 107.)  For this, Dr. Rao relied on information from Mr. Poret's survey of 2.0 Brewer owners.  (*Id.* ¶¶ 109, 110.)  Based on this information, Dr. Rao arrived at an estimate of profits lost due to alleged false advertising on compatibility issues.  (*Id.* ¶ 115.)

Keurig does not argue that these two estimates include the same group of people—inflating damages by, for example, counting the damages incurred as to someone from Ms. Butler's survey population and functionally the same the damages incurred as to someone from Mr. Poret's survey population.  (*See* Doc. 1441 at 8.)  As TreeHouse notes, and Keurig does not contest, Dr. Rao segregated the populations for each of the separate estimates.  (Doc. 1530 at 10.)  Rather, Keurig's double-counting argument is based on the claim that both Ms. Butler and Mr. Poret's surveys dealt with "safety" and "performance" issues related to alternative single-serve cups.  It argues this is improper because only Ms. Butler should have addressed safety and

performance while Mr. Poret should have restricted himself to "compatibility questions."  (Doc. 1441 at 4.)  In essence, Keurig's argument boils down to the assertion that Mr. Poret's questions result in an overly broad measurement of compatibility, that, by extension, inflate his damages.

This argument is without merit.  It is not "double counting," because Dr. Rao segregated the survey populations so that compatibility issues were assessed first based on Mr. Poret's data and only the residual population was assessed based on the safety and quality data provided by Ms. Butler.  (*See* Doc. 1530 at 10.)  Thus, TreeHouse could, at most, be giving itself a "second bite at the apple" by asking consumers who answer in the negative to the first survey a similar question in hopes of capturing them in the second survey, but each consumer is captured once. Even if this were Keurig's argument, it would be unavailing.  Conceptually, it is reasonable that consumers' ability to safely use alternative single-serve cups in the 2.0 Brewer will influence their perception of whether those alternative cups are compatible with the 2.0 Brewer.  There may also be consumers who view the issues of safety and compatibility as separate issues.  It is perfectly reasonable to construct a survey to catch these different populations.

Keurig's second Method Objection is that Dr. Rao "cherry-picked" higher values from Ms. Butler's and Mr. Poret's surveys, artificially inflating his damages estimates.  (Doc. 1441 at 9–11.)  Ms. Butler's and Mr. Poret's surveys provided two estimates of how Keurig's statements altered consumers' views of alternative single-serve cups; Keurig objects that Dr. Rao selected the higher of each estimate.  (*Id.*)  This is not grounds for exclusion.  I have already determined that the expert opinions of Ms. Butler and Mr. Poret, and by extension their survey data, meet the admissibility requirements of Fed. R. Evid. 702.  *See supra* §§ II.E–F.  Since this data is admissible, it provides an adequate foundation for Dr. Rao's conclusions.  Any further critiques about Dr. Rao's data selection practices speak to the weight a jury should give his analysis, not

the threshold admissibility of his opinion.  *See, e.g.*, *Capri Sun*, 595 F. Supp. 3d at 135 (explaining that so long as there is an adequate factual basis for an expert's opinion, "cherry-picking" arguments go to weight, not admissibility); *Pearlstein v. Blackberry Ltd.*, No. 13-CV-7060, 2021 WL 4131646, at *7 (S.D.N.Y. Sept. 10, 2021) (same).

Keurig's third Method Objection—that the lack of a confidence interval or margin of error statistic undermines the reliability of Dr. Rao's testimony—is similarly without merit.  The confidence level "indicates the percentage of the time that intervals from repeated samples would cover the true value."  RMSE, *supra*, at 247.  It is based primarily on three numbers:  the size of the sample, the variability of the item being assessed, and the confidence level—*i.e.*, the percentage—selected by the researcher.  *See id*. at 381.  Importantly, the confidence level does not express "the chance that repeated estimates" from the same sample "would fall into the confidence interval."  *Id.* at 247.  There are cases, such as in nonprobability-based survey sample research, where confidence intervals should not be calculated or would have limited value in understanding the research findings.  *Id*. at 382.  Confidence intervals are also vulnerable to misinterpretation.  The *Reference Manual on Scientific Evidence* devotes a footnote to the misinterpretation of confidence interval information by courts.  *See id.* at 247 n.91.  Scholarly commentary has also questioned the broad-based use of confidence intervals, suggesting that this use is based on "a folk understanding rather than a principled understanding of [confidence interval] theory" and that these intervals "can provide severely misleading inferences."  Richard D. Morey, et al., *The Fallacy of Placing Confidence in Confidence Intervals*, 23 Psychonomic Bull. & Rev. 103, 103–04 (2016).

Given this, Keurig's attempt to frame the lack of a confidence interval or margin of error as per se disqualifying is unavailing.  Even accepting the value of confidence intervals as a

measure of reliability, the value of this statistical measure will vary based on the circumstances. In some cases, the lack of a confidence interval reflects other methodological issues. For instance, in *Price v. L'Oreal USA, Inc.*, the court noted an expert's failure to provide a confidence interval indicated that his opinion was unreliable. No. 17-CV-614, 2020 WL 4937464, at *8 (S.D.N.Y. Aug. 24, 2020). That failure to provide a confidence interval, however, was symptomatic of the more problematic issue of the expert's impermissibly small sample size—just 105 individuals—because sample size is one of the three key determinants of the size of a confidence interval. *See id.*; RMSE, *supra*, at 381. The real issue in *Price* was thus not the absence of a confidence interval, but the deficient sample size, which was highlighted by the lack of a confidence interval measure.[18] If Keurig pointed to similar errors in Dr. Rao's work, those errors and the absence of a confidence interval might make a case for exclusion, but the mere absence of a statistical measure of highly variable value is not *per se* grounds for exclusion.[19]

Keurig's final Method Objection relates to the assumptions Dr. Rao uses in modeling damages based on Keurig's allegedly false statements. (Doc. 1441 at 12–14.) Dr. Rao

---

[18] Keurig cites two additional cases on this point: *Gonzales v. Harley-Davidson Motor Company Group, Inc.*, No. CV-04-23, 2005 WL 8160757 (D. Ariz. Aug. 23, 2005), and *Gabbard v. Linn-Benton Housing Authority*, 219 F. Supp. 2d 1130 (D. Or. 2002). These cases discuss the error rate of an expert's technique and provide no insight into the use of confidence intervals or levels in statistical analysis. Confidence intervals and rates of error are not comparable terms. Rate of error as used in these cases and *Daubert* refers to how often a research method produces an erroneous result. *Daubert*'s discussion of rate of error, for example was based on an assessment of how often voice identification techniques misidentified a voice. 509 U.S. at 594 (1993) (citing *United States v. Smith*, 869 F.2d 348, 353–354 (7th Cir. 1989)). Conversely, "[t]he confidence level does not express the chance that repeated estimates would fall into the confidence interval" or "give the probability that the unknown parameter lies within the confidence interval." RMSE, *supra*, at 247. The same is true for "margin of error" which, despite the similar name, is just an alternative name for half the confidence interval, not an estimate of how likely it is that a statistical analysis has produced an incorrect result. *Id.* at 247 n.91.

[19] Keurig suggests that had Dr. Rao included confidence intervals he would have found "wide margins of error" that would show his estimates to be unreliable. (Doc. 1441 at 12.) Keurig does not provide sufficient evidence to allow me to assess this claim with reliably. Such specificity is essential in assessing the implication of a confidence interval for reliability. *See, e.g.*, RMSE, *supra*, at 248 ("[T]ake a 95% confidence interval for a damage claim. An interval that runs from $34 million to $44 million is one thing, but –$10 million to $90 million is something else entirely.").

calculated three damages models: one that makes no assumptions about consumer deception or materiality, instead drawing on Ms. Butler and Mr. Poret's surveys, (Doc. 1448, Ex. 30 ¶¶ 6–7); one that assumes that 100 percent of consumers would be deceived or confused by Keurig's statements but relies on survey data to assess the materiality of those statements (*i.e.*, whether those statements would change consumer behavior), (*id.* ¶ 7 n.2); and one that assumes both deception and materiality (*i.e.*, that 100 percent of consumers exposed to the allegedly false statements would be confused and deceived and 100 percent would change their consumer behaviors as a result, (*id.* ¶ 7 n.3).

Keurig objects to this third model on the ground that an assumption of 100 percent materiality is unsupported by law or economic theory. (Doc. 1441 at 12–14; Doc. 1592 at 3.) In support, Keurig cites *Apotex Inc. v. Acorda Therapeutics, Inc.*, in which the Court of Appeals observed that even where literal falsity is proven, a plaintiff must show those false statements were likely to influence consumer purchasing decisions in order to state a claim under the Sherman Act. 823 F.3d 51, 67–68 (2d Cir. 2016). *Apotex*, however, does not stand for the principal that a plaintiff is legally barred from demonstrating a statement influenced 100 percent of consumers exposed to it, only that a plaintiff must prove both falsity and materiality. *See id.*

Regardless of how likely it is that TreeHouse can prove 100-percent materiality, courts routinely permit experts to model various damages scenarios based on facts to be proven at trial. *See, e.g.*, *Fed. Trade Comm'n v. Vyera Pharms., LLC*, No. 20-CV-706, 2021 WL 5279465, at *5 (S.D.N.Y. Nov. 12, 2021) (permitting an expert to model "several counterfactual scenarios" and noting that "[t]o the extent any assumption on which [the expert] relied is unsupported by the record developed by the parties at trial, then his model will be of diminished relevance."); *AU New Haven, LLC v. YKK Corp.*, No. 15-CV-3411, 2019 WL 1254763, at *17 (S.D.N.Y. Mar. 19,

2019) (admitting expert opinions on damages based on several different hypothetical negotiation outcomes); *see also Rosario v. City of New York*, No. 18-CV-4023, 2021 WL 1930293, at *5 (S.D.N.Y. May 13, 2021) ("[E]xperts may provide opinions tailored to different factual scenarios that the jury may consider"); *United States v. Asare*, No. 15-CV-3556, 2019 WL 5693477, at *5 (S.D.N.Y. Nov. 4, 2019) ("Experts regularly provide opinions based on facts they assume to be true.").

Although "expert testimony should be excluded . . . if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith," *Electra v. 59 Murray Enterprises, Inc.*, 987 F.3d 233, 254 (2d Cir. 2021), Dr. Rao's assumptions are not contradictory and it is not unrealistic to model a party's best-case scenario so long as the assumptions underlying that scenario are disclosed and other scenarios are modeled that appropriately contextualize those best-case results.  This Method Objection also does not warrant exclusion.

Keurig's Expertise Objection is also without merit.  Keurig asserts that Dr. Rao testified outside of his area of expertise in opining on:  (1) the truth or falsity of statements made by Keurig about alternative single-serve cups, (Doc. 1441 at 15–16); and (2) exposure and altered consumer behavior based on those statements, (*id.* 16–17).

With regard to the first ground, I find Keurig's objection to be based on a misstatement of Dr. Rao's testimony.  Having reviewed his report, reply report, and deposition transcript, I find that Dr. Rao is consistently clear that he is not actually evaluating the truth or falsity of various Keurig statements, but rather making various assumptions regarding the truth or falsity of these statements as part of his damages calculations.  TreeHouse also expressly disclaims any possibility that Dr. Rao seeks to testify on the actual truth or falsity of these statements, (Doc. 1503 at 21), and Dr. Rao's expert report consistently notes that the statements are only alleged to

be false.  (*See, e.g.*, Doc. 1448, Ex. 30 ¶¶ 5, 21.)  If Dr. Rao attempts to testify as to the actual

truth or falsity of these statements later, Keurig may object at the appropriate time.

As to Keurig's second argument, I find that Dr. Rao's opinions about exposure and

altered consumer behavior are within the scope of his expertise.  Although Keurig objects that

Dr. Rao cannot opine on consumer exposure or perception without conducting his own

independent analysis, (Doc. 1441 at 16–17), courts in this District regularly permit experts to

offer opinions based on materials they have not personally prepared, such as other expert

opinions and reports, so long as the ultimate opinion is their own.  *See, e.g.*, *Redcell Corp. v. A.

J. Trucco, Inc.*, No. 20-CV-0018, 2022 WL 3700148, at *12 (S.D.N.Y. Aug. 26, 2022); *United

States v. Paracha*, No. 03-CR-1197, 2006 WL 12768, at *20 (S.D.N.Y. Jan. 3, 2006) (permitting

an expert to opine based on a review of a secondary sources and original documents).

Dr. Rao has sufficient expertise to provide expert opinions on consumer surveys,

particularly as part of using them as inputs as part of economic damages calculations.  (Doc.

1448, Ex. 32 at 16:3-29:22).   Keurig's motion to exclude the expert testimony of Dr. Rao is

therefore denied.

### H.  *Dr. Phillip Johnson ("Johnson I") (Doc. 1452)*

Keurig seeks to exclude the expert report of Dr. Phillip Johnson ("Dr. Johnson"), the

damages expert for McLane.  For the reasons that follow, this motion is denied.

As a preliminary matter, Keurig argues that Dr. Johnson's damages model produces

implausible results because it finds price overcharges by entities not accused of anticompetitive

conduct.  (Doc. 1454 at 12–13.)  However, as McClane points out, (Doc. 1535 at 17–18), and

Keurig does not contest in its reply, this is not a finding from Dr. Johnson's model.  Rather, it is

an argument made by Keurig's own expert based on a modified version of Dr. Johnson's model.

It would be illogical to strike Dr. Johnson's opinion on the basis of a damages model that he did not create, and I decline to do so.

### 1. Failure to Account for Significant or Lawful Factors

Keurig's first set of objections center on Dr. Johnson's failure to model or otherwise account for significant or lawful factors in his damages estimate, which is derived from a yardstick model developed using regression analysis. In basic terms, regression analysis "determines the effect of two or more explanatory variables on a variable to be explained, called the dependent variable." *Actava TV, Inc. v. Joint Stock Co. "Channel One Russia Worldwide"*, No. 18-CV-06626, 2023 WL 2529115, at *6 (S.D.N.Y. Mar. 15, 2023) (internal quotation marks omitted). The yardstick method, as noted *supra* § II.C.1, is a widely accepted method for calculating antitrust damages. However, Keurig argues that the regression model Dr. Johnson employs in his yardstick analysis fails to isolate the effects of anticompetitive conduct in his damages model, (Doc. 1454 at 3), fails to account for lawful factors that contribute to the pricing differences he observes, (*id.* 4–10), and incorporates an unreliable control variable into his model, (*id.* 13). These objections are unfounded.

Beginning with Keurig's first argument, Dr. Johnson's model sufficiently disaggregates lawful conduct from unlawful conduct in his damages analysis. As noted *supra* § II.C.2, antitrust plaintiffs may only recover damages for harms that "flow[] from the distortion of the market caused by the monopolist's anticompetitive conduct." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) (internal quotation marks omitted). Thus, damages studies that fail to disaggregate lawful and unlawful conduct are inadequate. *See Litton Sys.*, 700 F.2d at 825. Dr. Johnson's report, however, explicitly notes that he employed a regression model designed to "disentangle[] the effect of the alleged anticompetitive conduct from the effects of

other factors that affect price differences." (Doc. 1455, Ex. 2 ¶ 102.) He also details the various variables used to control for pricing effects unrelated to the anticompetitive conduct. (*See, e.g.*, Doc. 1455, Ex. 2 ¶¶ 118–19, 122, 123.)

Given this, Keurig's objection that Dr. Johnson fails to disaggregate lawful and unlawful conduct is without merit. *Weiner v. Snapple Beverage Corp.*, to which Keurig cites as support for its argument, is inapposite. No. 07-CV-8742, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010). In *Weiner*, an expert's opinion had numerous systemic issues including the failure to identify specific data that would be used to formulate the opinion or the methodology that the expert would use to formulate his opinion. *Id.* Conversely, Dr. Johnson has sufficiently explained how he has structured his model and what variables he selected in order to disaggregate lawful from unlawful conduct to meet the threshold for admissibility. Any issues with his method for not further disaggregating lawful and unlawful conduct go to weight of his opinions.

Keurig's objections about the failure to include important variables are also without merit. As discussed at length *supra* § II.D.1, the question of whether all important variables have been accounted for in a model is an important one, affecting, at minimum, the model's probativeness, *Bazemore*, 478 U.S. at 400, and potentially its admissibility, *Gruber*, 2021 WL 2482109, at *10.

Keurig's argument rests on Dr. Johnson's purported failure to include variables that account for "major differences, including the value that consumers place on buying genuine Keurig K-Cups for their Keurig brewers, K-Cups's different cup design, and K-Cups' quality." (Doc. 1454 at 6.) More specifically, Keurig claims that Dr. Johnson's model assumes that Keurig has no brand value (*id.* 7–9), and that it ignores the differences between JBR's

"OneCups," which are not airtight, and Keurig's "K-Cups," which are, (*id.* at 9).  Conversely, McClane, through Dr. Johnson, asserts that the differences between K-Cups and OneCups are not significant, (Doc. 1535 at 12–13), and that Keurig's brand lacked sufficient value to merit inclusion in Dr. Johnson's model, (*id.* 11–12).

Dr. Johnson's opinions regarding Keurig's lack of brand premium are sufficiently well-supported to permit his exclusion of Keurig's brand value as a variable in his model.  Keurig points to sections of Dr. Johnson's expert report, as well as an additional expert report by McLane liability expert, Dr. Jeffrey J. Leitzinger, indicating that the Keurig brand was well-known.  (*See, e.g.*, Doc. 1454 at 7 (citing Doc. 1455 ¶ 76 ("I do not dispute any of the material . . . about Keurig being a well-known manufacturer of coffee machines or even that the name 'Keurig' is well-known.")).  However, as Dr. Johnson points out, the fact that a brand is well-known is not the same as a brand having a premium value that might influence prices—Dr. Johnson found that "the 'Keurig Brewed' tag line on K-Cup packaging added little to no premium in the minds of consumers."  (Doc. 1455 ¶ 76.)  This determination was based on internal Keurig documents produced during discovery, (*id.* ¶¶ 66–75), the review of which led Dr. Johnson to conclude that "single serve customers shop by brand and the 'Keurig Brewed' adds little or no value to a product" (*id.* ¶ 77).  (*See also id.* ¶ 71 ("Keurig-brewed is important but not the brand shoppers are looking for.").)

This review gave Dr. Johnson sufficient grounds to exclude evidence of Keurig's brand value from his model and meet the burden of admissibility.  "Not all possible variables that might influence the dependent variable can be included if the analysis is to be successful; some cannot be measured, and others may make little difference."  RMSE, *supra*, at 314.[20]  Dr.

---

[20] Regression models frequently include some kind of measure explaining the amount of variation in the dependent

Johnson determined that the inclusion of Keurig's brand value added little explanatory power to his model. This determination might lack credibility if, for example, "a preliminary analysis shows the unexplained portion of the multiple regression to be unacceptably high" or there was evidence of "[f]ailure to include a major explanatory variable that is correlated with the variable of interest in a regression model." *Id.* In *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, for example, an analysis was found to be unreliable where there was evidence that an omitted variable was "highly negatively correlated" with another variable of interest. 49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014). The documents and evidence presented by the parties here provide no similar evidence that Keurig's brand value is a variable of sufficient importance to render a model unreliable without it.

Similarly, the design differences between the airtight K-Cups and the porous OneCups used by JBR are not an important design difference requiring incorporation into Dr. Johnson's model. Dr. Johnson's model already includes numerous product characteristics including "package-size, roast-type, special blends, flavored beverage" and similar factors. (Doc. 1455. Ex. 2 ¶ 119.) Despite this, the parties pepper the record with opposing quotes from depositions suggesting that various companies did or did not prefer the K-Cup to the OneCup based on this design attribute. (*Compare* Doc. 1454 at 9–10, *with* Doc. 1535 at 13.) Nothing in these conflicting deponent opinions suggests that cup design is so strongly correlated with price as to render it a "significant" variable. *Gruber*, 2021 WL 2482109, at *10. Moreover, nothing in the

---

variable (*i.e.*, the one being studied) accounted for by the various other variables included in the model. For example, "R-square ($R^2$) is a statistic that measures the percentage of variation in the dependent variable that is accounted for by all the explanatory variables." RMSE, *supra*, at 345. "A very low R-square ($R^2$) is one indication of an unexplained portion of the multiple regression model that is unacceptably high." *Id.*, at 314 n.31. In that case, it is more likely that important variables have been omitted that might help better explain the behavior of the dependent variable. Of course, as is always the case with statistical models, "the inference that one makes from a particular value of $R^2$ will depend, of necessity, on the context of the particular issues under study and the particular data set that is being analyzed" and "a low R2 does not necessarily imply a poor model (and vice versa)." *Id.*

parties' papers suggests that Dr. Johnson's model is so lacking in explanatory power that it is likely that important variables are missing, RMSE, *supra*, at 314, and that, by extension, cup design is significant enough to provide that explanatory power.

Keurig also objects to Dr. Johnson's inclusion of bagged ground coffee as a proxy variable to account for the value of various coffee roasters' brands. (Doc. 1454 at 13–15.) "Occasionally when attempting to estimate and quantify the relationship between a dependent variable and explanatory variables using a multiple linear regression one or more of the explanatory variables may be unobservable, impossible to quantify, or the data may be missing." *Garg Tube Exp. LLP v. United States*, 569 F. Supp. 3d 1202, 1217 (Ct. Int'l Trade 2022) (internal citations omitted). "In those cases, a proxy variable may be used in place of the explanatory variable that the creator of the linear regression would like to control for. A proxy variable is a variable correlated with the unobservable explanatory variable." *Id.* (internal citations omitted). "If a proxy measure is used in place of a direct measure of the variable, the proxy is judged on the basis of how closely it is related to the variable of interest and what kind of distortions use of the proxy might introduce." *Trout v. Garrett*, No. 73-0055, 1990 WL 96640, at *13 (D.D.C. Mar. 30, 1990).

Dr. Johnson's model acknowledges that "[b]rand can matter to consumers for a variety of reasons, e.g., as a signal of quality." (Doc. 1455, Ex. 2 ¶ 120.) To address this, as one of the model's "product characteristic" variables, Dr. Johnson included "the average price of bagged ground coffee sold at the retail level by brand which should also reflect the way other less tangible aspects of branding translate into price differences." (*Id.*) Keurig's objects that bagged coffee is not a reliable variable and is built with cherry-picked data. Dr. Johnson's reply report, however, demonstrates that there is a positive correlated relationship between brand value as

measured by his bagged coffee variable and price, particularly for unlicensed single-serve cup brands. (Doc. 1455, Ex. 4 ¶¶ 98–99.) As there is a correlated relationship between bagged coffee prices and brand value and no party has identified any meaningful distortions that would be introduced by the use of bagged coffee, I find that the use of this variable does not materially impact the reliability of Dr. Johnson's analysis such that exclusion is required.

### 2. Use of JBR and Mother Parkers as a Benchmark

Keurig's objections to Dr. Johnson's use of JBR and Mother Parkers[21] as benchmarks for his yardstick damages analysis are without merit.[22] Dr. Johnson selected these firms to provide an average price for single-serve market in a but-for world not affected by anticompetitive conduct in order to determine how much McClane was overcharged as a result of anticompetitive conduct. (Doc. 1454 at 10–12.) Keurig objects that both proposed benchmark firms were affected by the alleged anticompetitive conduct and that they have different business strategies. Accordingly, Keurig argues that neither JBR nor Mother Parkers's prices can accurately represent a but-for world where the single-serve cup market is not affected by anticompetitive conduct.

I have already stated the law governing a court's assessment of a proposed benchmark firm in the context of a yardstick analysis. *See supra* § II.C.1. Based on those standards, I find Keurig's objection to these benchmarks without merit. As the Court noted in *Dial Corp.*, a court may account for the fact that the alleged anticompetitive conduct has made it impossible for comparable firms to operate when assessing the viability of a given benchmark. 165 F. Supp. 3d

---

[21] Mother Parkers is another producer of single-serve cups that did not license its products to Keurig. (Doc. 1454 at 1.)

[22] Although Keurig focuses on the issue of JBR and Mother Parkers as unreliable benchmarks, (Doc. 1454 at 10), Dr. Johnson includes both of these firms in his analysis, (Doc. 1455, Ex. 2 ¶¶ 103, 115), as well as incorporating TreeHouse data as a quality check, (*id.* ¶ 126).

at 40–41.  This accommodation is necessary, as any alternative formulation "would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain."  *Bigelow*, 327 U.S. at 264.

Accordingly, as noted, although courts may be properly skeptical of the use of data from industries affected by the anticompetitive conduct, *see, e.g.*, *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 479 (S.D.N.Y. 2018), they have permitted the use of benchmarks from industries potentially affected by the anticompetitive conduct, particularly where the use of those industries is more likely to result in a conservative estimate of damages. *See supra* § II.C.1.

Dr. Johnson selected JBR and Mother Parkers as benchmarks.  Both firms are makers of competitor single-serve cup products, and Dr. Johnson selected them based on the relative comparability of their single-serve cups, the availability of sufficient data to make reliable comparisons, and the existence of internal Keurig documents suggesting that Keurig viewed unlicensed cup manufacturers like Mother Parkers as competitors.  (*See* Doc. 1535 at 14 (summarizing Dr. Johnson's selection process with citations to the report and underlying data).)

This is sufficient to meet the preponderance of evidence standard for reliability.  A reliable benchmark need not be a "perfect clone."  *Celebrity Cruises*, 434 F. Supp. 2d at 189.  It only needs to be "sufficiently comparable to permit a degree of reliable comparison," *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, No. 15-CV-5440, 2018 WL 2172667, at *5 (E.D.N.Y. May 10, 2018).  Once the threshold of reliability is met, further questions about the comparability of the benchmarks go to the weight of the testimony, not its admissibility.  *Cf. DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-0564, 2019 WL 1515231, at *10 n.6 (E.D.N.Y. Feb. 21, 2019) ("Plaintiff objects to defendants' choice of benchmark airlines.

This choice—which airlines to compare—goes to the weight, not the admissibility of Dr. Moore's opinion.").

Given this, Keurig's objections that JBR and Mother Parkers have different business practices from its own and that these firms are affected by anticompetitive conduct are unavailing. As noted *supra* § II.C.1, a firm being affected by anticompetitive conduct is not a per se bar to its use as a benchmark, particularly where the impact of the anticompetitive conduct is likely to result in a more conservative damages estimate. Taking Plaintiffs' allegations as true, Keurig's anticompetitive conduct could have caused competitors' prices across the relevant market, including at JBR and Mother Parkers, to increase, which in turn would lower the amount of the estimated overcharge due to anticompetitive conduct. The overarching effect of this would be to make Dr. Johnson's overcharge damages estimate somewhat more conservative. (See Doc. 1455, Ex. 2 ¶ 101 n.208.) Permitting the use of this benchmark thus aligns with the prevailing legal trends in benchmark selection. *See supra* § II.C.1. Keurig's remaining objections to the differences between these firms' business practices and itself are similarly without merit. (Doc. 1454 at 11.) Although the differences in these firms' business strategies may be suitable grounds for cross examination, nothing Keurig describes is so unusual as to render either firm an unreasonable benchmark.

### 3. Reliability of Dr. Johnson's Data

Keurig proffers two related arguments concerning the purported unreliability of Dr. Johnson's data. First, it argues that the data Dr. Johnson relied on from Mother Parkers is incomplete and that Dr. Johnson's efforts to fill the gaps in that data make it unreliable. (Doc. 1454 at 15–17.) Second, Keurig argues that when that problematic data is removed, Dr.

Johnson's results become statistically insignificant.  (*Id.* at 17–20.)  These arguments are without merit.

"[T]o be admissible, a regression analysis must examine an appropriate selection of data."  *Reed Const. Data*, 49 F. Supp. 3d at 400; *see also Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (excluding expert opinion in part because the expert "concede[d]" his calculations were based on "unreliable and inaccurate data").

The basic issue is that the Mother Parkers data Dr. Johnson uses is "missing product descriptions (or any information to identify product features such as brand, whether a private label, or package size), as well as customer names or channel information."  (Doc. 1455, Ex. 2 ¶ 152.)  To address this, Dr. Johnson integrated data from another company, European Roasterie, that sold Mother Parkers products during the period under study.  (*Id.* ¶ 152; Doc. 1535 at 21 n.20.)  Data across the two sets was matched using product numbers.  Additionally, although Keurig asserts that this matching technique inappropriately mixed sales from different market segments, (*see* Doc. 1454 at 21), Dr. Johnson restricted his dataset to the residential at-home sales market segment, (Doc. 1455, Ex. 2 ¶¶ 39(ii), 116).

There is nothing that is per se inappropriate about integrating data from different sources.  Combining, integrating, or blending data from various sources is frequently a necessity in modern social scientific research.  *See generally, e.g.*, Panel on Improving Fed. Stat. for Pol'y and Soc. Sci. Rsch., *Federal Statistics, Multiple Data Sources, and Privacy Protection* 15–22 (Robert M. Groves & Brian A. Harris-Kojetin eds., 2017), https://perma.cc/5JEB-AWBJ (describing the increasing need for datasets produced by different sources).

Keurig also objects that Dr. Johnson used only 31 percent of the data provided by Mother Parkers.  (Doc. 1454 at 20.)  Here again, missing data is an inescapable element of research in numerous fields.  *See, e.g.*, *Best Practices in Quantitative Methods* 214 (Jason W. Osborne ed. 2008) ("Missing data is a prevalent issue in many fields[.]").  Missing data can undermine the reliability of the study if, for example, "the missing data are likely to differ in some systematic way from the data that are collected."  RMSE, *supra*, at 224.  Keurig, however, has not identified, and I do not find, any systemic issues with the missing Mother Parkers data.  In the absence of evidence that the missing Mother Parkers data could translate into other methodological problems, I do not find that the mere existence of missing data makes Dr. Johnson's model unreliable, nor do I find that the use of a blended data set undermines Dr. Johnson's model so as to warrant exclusion.

 Accordingly, I need not address Keurig's other argument on the statistical significance of Dr. Johnson's model, as that argument is based on results derived from excluding the Mother Parkers data.

### 4.  Dr. Johnson's Modeling Assumptions

Keurig's final set of arguments focus on the modeling choices Dr. Johnson made in the development of his model.  First, Keurig objects that Dr. Johnson unreasonably applied an average estimate of anticompetitive overcharges to Walmart, which unjustifiably fails to account for differences in the price Walmart would pay from the average price estimated.  (Doc. 1454 at 21–22.)  Second, Keurig objects that Dr. Johnson failed to account for the net effect of Keurig's conduct on McClane by discounting the benefits that accrued to McClane as a result of Keurig's anticompetitive conduct.  (Doc. 1454 at 22–24.)  I find that Dr. Johnson's modeling choices do not undermine the reliability of his opinion such that exclusion is warranted.

Keurig objects that Dr. Johnson created an average overcharge estimate for the at-home market segment and then applied that overcharge estimate to the overcharge paid by Walmart, "McLane's one and only significant portion pack customer." (*Id.* at 10.) Keurig further objects that Dr. Johnson failed to assess whether it was reasonable to apply this average overcharge estimate to the overcharge that would have been paid by Walmart. (*Id.* at 21.) In support, Keurig cites *In re Wholesale Grocery Prod. Antitrust Litig.*, in which a court questioned the use of an expert's model which assumed that both larger and smaller retailers' behavior would follow similar patterns. No. 09-MD-2090, 2018 WL 3862773, at *7 (D. Minn. Aug. 14, 2018). There, however, the expert's own analysis "show[ed] that the independent grocers' prices did not follow the same trajectory as [a major grocer's] before the" anticompetitive behavior at issue. *Id.* Dr. Johnson, however, ran a sensitivity analysis[23] that found little variability in the overcharge rates regardless of the use of several customer specific and market specific attributes in his model. (Doc. 1455, Ex. 2 ¶¶ 125, 130.) Given the lack of evidence of variability in the overcharge rates across the market, it was reasonable to apply the overcharges Dr. Johnson developed to Walmart.

Keurig's last objection is that Dr. Johnson failed to account for the benefits of the alleged anticompetitive conduct that accrued to McLane under McLane's theory of liability. (Doc. 1454 at 22–24.) These purported benefits are increased sales of Keurig products by McLane due to the suppression of non-Keurig products, (*id.* at 22–23), and the increased profits resulting from overcharges, (*id.* at 23–24). In effect, Keurig argues that Dr. Johnson calculates McLane's gross damages, when that law requires him to calculate the net damages.

---

[23] A sensitivity analysis refers to the process of "[a]nalyzing data in different ways to see how results depend on methods or assumptions." RMSE, *supra*, at 296. Here, Dr. Johnson ran his model using several different inputs and variable interactions to test if and how overcharges might vary depending on a model's inputs. (Doc. 1455, Ex. 2 ¶ 125.)

Keurig's objection to the inclusion of damages resulting from overcharges is without merit.  In *State of New York v. Hendrickson Brothers*, the Second Circuit noted that generally, "the person who has purchased directly from those who have fixed prices at an artificially high level in violation of the antitrust laws . . . may recover the entire amount of the illegal overcharge even if some or all of the overcharge may have been passed on to others."  840 F.2d 1065, 1079 (2d Cir. 1988) (citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 491–94 (1968); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734–35 (1977)).[24]  Although this rule may put a direct purchaser plaintiff in a position to recover more in damages than it may have borne in antitrust harms, the determination to apportion overcharge damages in this way "rest[s] on the judgment that the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it."  *Illinois Brick*, 431 U.S. at 735.  In *Hanover Shoe*, the Supreme Court also recognized that attempting to further account for the harms and benefits that accrue due to anticompetitive overcharges would require litigants to come up with "virtually unascertainable figures," particularly "in the real economic world rather than an economist's hypothetical model."  392 U.S. at 493.  Permitting the overcharged direct purchaser to obtain the entire amount of the illegal overcharge prevents "[t]reble-damage actions" from "requir[ing] additional long and complicated proceedings involving massive evidence and complicated theories."  *Id.*

---

[24] It is not contested that, assuming McClane's theory of liability is true, it would be a direct purchaser under antitrust law.  (*See, e.g.*, ECF No. 1420 at 29 (noting, in Keurig's motion for summary judgment, that "plaintiff McLane is another example of a direct purchaser that benefitted from the challenged conduct.").)

Accordingly, the full overcharge amounts paid by McClane are properly included as damages. In arguing against this result, Keurig proffers the following hypothetical:

> Imagine a hypothetical 10% overcharge was combined with the 6% McLane markup on Keurig KCups. In the but-for world, McLane buys K-Cups from Keurig for $1000 and sells them to Walmart for $1060 (McLane's cost plus 6%). In the world with a 10% overcharge, those K-Cups cost McLane $1100 (the but-for price plus 10%) and are resold to Walmart for $1166. That is, McLane marked up the overcharge of $100 by 6%, and pocketed an extra $6. That $6 is a bonus McLane received in the real world that it would not receive in the but-for world, and any reliable damages calculation must deduct it.

(Doc. 1598 at 9 n.11.) This is contrary to *Hanover Shoe*, which dictates that the direct purchaser is entitled to recover the entire cost of the overcharge. *See* 392 U.S. at 491–94. The $6 Keurig describes as a "bonus" is part of the alleged overcharge. If, in a but-for world, Walmart would have paid $1060 for single-serve cups, and due to anticompetitive conduct, it pays $1166, then the whole of that extra $106 must be accounted for because that is "the difference between the prices actually paid and the prices that would have been paid absent the conspiracy." *Hendrickson Bros.*, 840 F.2d at 1077 (citing, *inter alia*, *Hanover Shoe*, 392 U.S. at 489). If McClane did not charge that $6 (*i.e.*, if it charged Walmart $1160 rather than $1166), then it would be receiving roughly a 5.45 percent mark-up on cost ($1100) rather than the 6 percent mark-up to which it was entitled. Thus, in Keurig's model, McClane would be effectively subsidizing the alleged antitrust violation by reducing its contractually agreed-upon mark-up.

Keurig's broader argument that McClane must reduce its damages estimate to account for only net harms by subtracting out benefits from increased sales due to anticompetitive conduct must be rejected as unduly speculative. "[A]n antitrust defendant may not alter [a] well-settled measurement of damages by speculatively raising potential offsets, even when those offsets are directly related to the goods at issue." *In re Elec. Books Antitrust Litig.*, No. 11-MD-2293, 2014 WL 1282293, at *17 (S.D.N.Y. Mar. 28, 2014); *see also Iowa Pub. Employees' Ret. Sys. v. Bank*

*of Am. Corp.*, No. 17-CV-6221, 2022 WL 2829880, at *24 (S.D.N.Y. June 30, 2022) ("Any argument, however, about which Class Members would or would not have elected to join a platform in the but-for world is too speculative to undermine Plaintiffs' damages model."). Thus, for example, while *Hanover Shoe* approved offsetting a damages award by easily ascertainable capital costs that plaintiff would have expended but for the anticompetitive conduct, *see* 392 U.S. at 504, the Court in *Electronic Books* "rejected" as "shot-through with conjecture" an offset based on which customers would or would not have made purchases but for the anticompetitive conduct, 2014 WL 1282293, at *20. Condoning the defeat of damages models based on such speculation would defeat the Supreme Court's admonishment to avoid damage assessments that require "additional long and complicated proceedings involving massive evidence and complicated theories." *Hanover Shoe*, 392 U.S. at 493; *see Elec. Books*, 2014 WL 1282293, at *20.

Keurig's proposed offset more closely resembles the conjectural sales of *Electronic Books* than the defined capital offsets in *Hanover Shoe*. It proposes that because of a broad array of alleged anticompetitive harms inflicted by Keurig on unspecified competitors, McClane was able to sell more Keurig K-Cups to Walmart. Keurig also argues that these increased sales must be offset against damages in Dr. Johnson's model given that McClane "overwhelmingly chose to sell K-Cups." (Doc. 1454 at 22.) It is not inconceivable that McClane might have sold fewer K-Cups but for this conduct, but McClane might also have sold more competitor cups in place of those extra cups, or might have sold an equal number of K-Cups but at a lower price. There is simply too much speculation and conjecture inherent in the development of any such but-for world to require that it be included as an offset in Dr. Johnson's model.[25] For all of these

---

[25] This does not mean, as discussed *supra* § II.K.4, that any discussion of netting damages, particularly offered in

reasons, the motion to exclude Dr. Johnson's opinion based on the failure to offset overcharge amounts is denied.

## I. *Dr. Lauren J. Stiroh (Doc. 1460)*

Keurig moves to exclude expert opinions regarding damages offered by TreeHouse's expert Dr. Lauren Stiroh ("Dr. Stiroh").  (Doc. 1462 at 1.)  Dr. Stiroh opines on whether Keurig's alleged actions caused economic injury to Treehouse, and estimates the economic damages to TreeHouse resulting from Keurig's allegedly anticompetitive conduct.  Keurig argues that Dr. Stiroh should be excluded on two major grounds:  (1) that Dr. Stiroh's analysis improperly relies on an invalid record and would usurp the role of the jury, and (2) that her model ignores economic theories.

### 1.  Damages Objections

Keurig's first objection is that Dr. Stiroh's opinions about TreeHouse's purported lost customers is not based on sufficient data and would usurp the role of jury.  (*Id.* 4.)  Keurig argues that Dr. Stiroh relied on a "one-sided set of evidence provided to her by TreeHouse's counsel," and that she "consistently chose to rely on a biased selection of documents from counsel, and either did not review or did not account for evidence reflecting the procompetitive reasons why customers chose Keurig."  (Doc. 1462 at 4, 6.)  In support, Keurig cites Dr. Stiroh's failure to cite to Walmart's Fed. R. Civ. P. 30(b)(6) testimony, and her purported overreliance on the declaration of a former Kroger employee named Rosanna Klawon, which Keurig asserts was contradicted by Ms. Klawon's later deposition testimony.  (*Id.* 4–6.)  For the reasons that follow, this objection is without merit.

---

rebuttal is out of bounds for an expert, only that an expert's refusal to account for speculative netting is not a reason to strike his or her testimony.

Dr. Stiroh had access to the entire record, and spent hundreds of hours reviewing deposition testimony, declarations, and other information in the record on which to base her analysis.  (Doc. 1463–2 ¶ 3.)  She is not obligated to review and independently sort through "all of the discovery in a case in order to determine the relevant evidence." *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018).  Nor is failure to use every relevant piece of information in the record a basis for exclusion. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* No. 05-MD-1720, 2022 WL 14814183, at *21 (E.D.N.Y. Oct. 26, 2022).

Indeed, addressing every single piece of discovery and record evidence in a case of this size with millions of pages of discovery produced would be virtually impossible and inefficient.  Thus, issues regarding the failure to use certain pieces of data arise only when there is a systemic problem with the data used or discarded, such as when an expert "cherry-picks" the data used for their opinion. *See, e.g.*, *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 296 (S.D.N.Y. 2018) (describing an expert's "cherry-picking approach . . . [as being] at odds with principles of sound science").  Even then, such critiques will frequently go to the weight of the expert's opinion rather than require admissibility so long as there remains a sufficiently reliable factual basis for the expert's opinion. *See, e.g.*, *Capri Sun*, 595 F. Supp. 3d at 135 (explaining that a defendant "is at liberty to impeach [an expert] . . . for cherry-picking among sales data").  Dr. Stiroh has more than sufficient information to render a reliable opinion, and the issues Keurig has with her use of a few specific pieces of evidence are not the kind of systemic data issue that would merit exclusion.  Rather, as in *Capri Sun*, Keurig's objections to the weaknesses in any particular source relied upon by Dr. Stiroh are properly addressed through cross-examination, not the wholesale exclusion of her opinions.  595 F. Supp. 3d at 135.

Turning to Keurig's next objection, Dr. Stiroh does not "usurp" the fact finder's role by opining on customers' states of mind.  Keurig argues that Dr. Stiroh's "lost customer" methodology is "nothing more than a review of record evidence to draw conclusions about what she thinks customers were thinking," and that her analysis is merely a "factual narrative that does not draw technical or scientific conclusions."  (Doc. 1462 at 7.)  In support, Keurig wrongly[26] asserts that Dr. Stiroh testified that she is better suited than jurors to find facts because she is "better at reading documents, depositions, and declarations" than jurors are.  (*Id.*)  This argument is similarly without merit.  Dr. Stiroh assesses whether Keurig's alleged actions caused economic injury to TreeHouse, and estimates the economic damage to TreeHouse resulting from Keurig's allegedly anticompetitive conduct by analyzing "ordinary course [of] business documents, deposition testimony, declarations, and transactional data."  (Doc. 1463, Ex. 4 at ¶ 29.)  Based on this review, she claims to have identified a "direct causal link between the conduct alleged by TreeHouse in its Amended Complaint and TreeHouse's economic outcomes" and claims that "Keurig's alleged misconduct resulted in economic damage to TreeHouse in the form of lost profits arising from lost revenue, higher costs and hampered growth."  (*Id.* ¶ 6.i.)[27]  This type of economic analysis does not speak to customers' state of mind and therefore is not impermissible expert testimony.

---

[26] Keurig misrepresents Dr. Stiroh's deposition testimony.  Dr. Stiroh did not say she was "better at reading documents, depositions, and declarations" than jurors, but that she had "more experience than the jurors in reviewing the types of information that [she] reviewed and assessing the importance of the economic content that is in that information."  (Doc. 1463, Ex. 1 at 25:19-25.)  In other words, Dr. Stiroh merely provides her opinions as an expert to assist the jurors as fact finders.

[27] Keurig again cites Dr. Stiroh's deposition testimony to argue that she "admitted" she would tell the jury "why customers made the decision they did based on her interpretation of the record."  (Doc. 1462 at 8.)  This framing is not consonant with Dr. Stiroh's testimony that she would "opine that the conduct at issue caused the lost sales in [her] report, including the lost sales to Kroger", and that it was "part of [her] damages analysis."  (Doc. 1463, Ex. 1 at 232:10-18.)  To the extent that Dr. Stiroh does attempt to testify "why customers made the decision they did based on her interpretation of the record," Keurig is free to object to such testimony during any trial.

Keurig further argues that Dr. Stiroh's testimony should be excluded because she relies on a "biased set of evidence provided by TreeHouse's counsel" to quantify the value of TreeHouse's purported lost sales, and that she conducted no independent analysis to verify the figures from their document. (Doc. 1462 at 9.) TreeHouse agrees that the figures were drawn from a document prepared by the Boston Consulting Group (the "BCG Document") and TreeHouse internal estimates, but argues that these are reliable facts and data that experts would reasonably rely on, and that Dr. Stiroh "independently verified the estimates presented" in the documents. (Doc. 1463 at 7.) TreeHouse is correct.

As an initial matter, Keurig's objections to Dr. Stiroh's use of the BCG Document and similar sources is undercut by her independent verification of these sources. (Doc. 1463, Ex. 2 ¶ 105.)[28] Certainly, "[a] company's study of damages, prepared for litigation" is not generally the most desirable basis for an expert report. RMSE, *supra*, at 484. However, given that these figures have been independently verified, I do not agree with Keurig's assertion that these materials provide an insufficient basis for Dr. Stiroh's opinion. I decline to exclude her testimony on this basis.

## 2. Modelling of Market Prices and Sales in the But-For World

Keurig's second major set of objections is that Dr. Stiroh's model "ignores economics and relies on speculative assumptions." (Doc. 1462 at 12.) None of these objections are grounds for the wholesale exclusion of Dr. Stiroh's testimony.

---

[28] Keurig suggests that this verification is inappropriate because it occurred after the fact, and cites cases such as *Compania Embotelladora Del Pacifico, S.A.*, 650 F. Supp. 2d at 320. I disagree. Ultimately, data underlying an analysis either is or is not reliable. Although sloppiness in data verification may speak to other issues regarding an expert's methodology, reliable data does not become unreliable simply because an expert does a safety-check later than is sensible.

Having reviewed Dr. Stiroh's modelling of market prices and sales in the but-for world, I find that her methodology is admissible and in line with economic theory and practices. Therefore, I find Keurig's arguments unpersuasive, and go to weight rather than admissibility.

As summarized *supra* § II.C.2, antitrust plaintiffs necessarily have considerable latitude in proving damages given the challenges inherent in measuring the impact of anticompetitive conduct. Despite this, Keurig argues that Dr. Stiroh's failure to account for the possibility that "customers would substitute TreeHouse with lower priced competitors" renders her testimony "inconsistent with economic theory." (Doc. 1462 at 13.)

However, Dr. Stiroh accounts for competitive economic responses in developing her model, (Doc. 1463, Ex. 1 at 143:11-24), which includes not just the substitution effects that Keurig feels should be incorporated, but a lack of anticompetitive conduct by Keurig and the interaction of these and numerous other economic effects, (*id.* at 144:25–145:3) ("[T]he price effect alone is not a valid consideration. It is considering the price effect in conjunction with also removing the conduct at issue.")). Indeed, Dr. Stiroh spent a substantial amount of time during her deposition explaining how her model operated and how she accounted for competitive pressures and the influence of anticompetitive conduct to develop her model. (*See id.* at 135:1–146:2.)

Keurig objects that Dr. Stiroh's model does not account for "basic principles" of economics because "as the price of a good decreases, the quantity demanded of that good increases while the quantity demanded of substitute goods decreases." (Doc. 1462 at 12.) Dr. Stiroh testified that this is true only when "all else [is] equal." (Doc. 1463, Ex. 1 at 129:6-9.) However, as she immediately clarified, all else in her model is not necessarily equal, because one must also account for the impact of removing Keurig's anticompetitive conduct. (*Id.* at 129:17–

130:8.)  Thus, while economic models are suspect when they fail to account for any competitive responses in the but-for world, *see, e.g.*, *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1125 (E.D. Cal. 2002), and but-for worlds must be "constructed in a reasonable way," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 560, once a reasonable effort has been made to construct that world, there is a limit to how much one is required to credit complaints that an economist's imaginary world is too imaginary.  Dr. Stiroh has adequately explained her model and accounted for the factors courts traditionally require to meet the necessary standard of reliability.[29]  Accordingly, neither this nor the other reasons proffered by Keurig provide a reason to exclude Dr. Stiroh's testimony.

### J.  *Dr. David Sibley (Doc. 1464)*

Keurig moves to exclude Plaintiff's expert Dr. David Sibley ("Dr. Sibley") on the grounds that he:  (1) offers biased factual narrative; (2) opines on matters outside his area of expertise; and (3) presents testimony that would be more prejudicial than probative.  (Doc. 1466 at 1.)  For the reasons stated below, this motion is granted in part and denied in part.

Keurig's first objection is that Dr. Sibley "impermissibly narrates a biased selection of evidence."  (Doc. 1466 at 2.)  Although Dr. Sibley's report is lengthy, the factual background is not mere narration but rather is necessary information to assess the reliability of his economic analysis.  (*See* Doc. 1467, Ex. 2 ¶¶ 21–180 (describing the processes of assessing and determining the relevant market and applying that methodology)).  As previously discussed in Sections II.C.4 and II.D.3, the trial judge will curtail unnecessary factual testimony at any trial,

---

[29] For the same reason, I do not credit Keurig's arguments that Dr. Stiroh could not explain how she accounted for competitive reactions.  (Doc. 1462 at 22.)  A review of her deposition, (Doc. 1463, Ex. 1 at 135:1–146:2), and expert report, (Doc. 1463, Ex. 4 ¶¶ 104–43), provides a fulsome explanation for how she constructed her but-for world and accounted for the impact of substation, changes in pricing, and changes in demand.  This is not the kind of *ipse dixit* failure to explain that renders an expert's opinion unreliable.  *Scentsational Techs.*, 2018 WL 1889763, at *3.

and no expert will be permitted to offer testimony that is merely "constructing a factual narrative based upon record evidence." *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227, 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018).

Keurig asserts that Dr. Sibley offers opinions on legal conclusions.  (Doc. 1466 at 23–24).  "Experts may testify on questions of fact as well as mixed questions of fact and law." *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993).  However, it is improper for experts to testify on "issues of law."  *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).  Thus, an expert in an antitrust case may "testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in case at hand."  *SourceOne Dental, Inc. v. Patterson Companies, Inc.*, No. 15-CV-5440, 2018 WL 2172667, at *1 (E.D.N.Y. May 10, 2018).  However, an expert may not "testify to whether a party's conduct was 'anticompetitive' or 'unlawful' under the Sherman Act."  *Id.* at *1; *see DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-564, 2019 WL 1515231, at *7 (E.D.N.Y. Feb. 21, 2019) (prohibiting an expert from testifying "that defendants' conduct was anticompetitive or unlawful, [or] . . . that defendants did or did not engage in a price-fixing scheme, because that is the ultimate determination for the jury to make").

Dr. Sibley offers several impermissible legal conclusions in his report.  For example, he asserts that that "Keurig has undertaken anticompetitive actions in both the [At-Home] and [Away-From-Home] Markets to maintain its monopoly power in those markets and/or to conspire to monopolize those markets."  (Doc. 1467, Ex. 2 ¶ 1359; *see also id.* ¶ 1271 ("Keurig engaged in other anticompetitive conduct aimed at maintaining its monopoly share of the Compatible Cup Market"); *id.* ¶ 1286 ("[M]y opinion is that Keurig's conduct in threatening to remove funding from retailers unless they pulled Competitive Cups away from Keurig product in

the retailers' own merchandising displays constitutes another instance of Keurig's anticompetitive conduct.").)  This explicit classification of acts as "anticompetitive" is an impermissible legal conclusion, and such testimony will be excluded.

There is a more complicated question where Dr. Sibley's opinions touch on the factors set forth in *National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories*, 850 F.2d 904 (2d Cir. 1988) ("*Ayerst*").  Specifically, *Ayerst* sets out a set of six factors (the "*Ayerst* Factors") used to assess when advertising and other representations rises to the level of anticompetitive conduct.  *See id.* at 916.  These factors are whether "representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals." *Id.* (internal quotation marks omitted).

Dr. Sibley opines concerning the *Ayerst* Factors in several ways, some permissible, others not.  He first discusses whether TreeHouse would be harmed if the *Ayerst* Factors were satisfied. (Doc. 1467, Ex. 2 ¶¶ 1054–89.)  He then addresses each of the six factors.  (*See, e.g.*, Doc. 1467, Ex. 2 ¶¶ 1090–114; *id.* ¶ 1108 (discussing whether Keurig's conduct occurred over a prolonged period.))  This is permissible given that an expert may "testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in case at hand." *SourceOne Dental*, 2018 WL 2172667, at *1.  In other places, however, Dr. Sibley takes the ultimate step by distilling his evaluation of these factors into a legal conclusion about Keurig's conduct.  (*See, e.g.*, Doc. 1467, Ex. 2 ¶ 1115 ("[M]y opinion is that the evidence is consistent with Keurig's statements that unlicensed cups would not be and are not compatible in the 2.0 Brewer meet the standard of anticompetitive conduct as

set out in *Ayerst*.")  Dr. Sibley may opine, for example, on whether a particular statement is "clearly material" as described in *Ayerst*, but may not render an ultimate conclusion that a particular representation is anticompetitive under *Ayerst*.  Such an opinion would "usurp either the role of the trial judge in instructing the jury as to the applicable law . . . [and] the role of the jury in applying that law to the facts before it," and thus must be excluded.  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

Additionally, Dr. Sibley may not opine on Keurig's motives or intentions.  As discussed in Section II.D.3, such testimony is outside the proper scope of an expert and transgresses the role of the factfinder.  Dr. Sibley crosses this boundary by opining that Keurig "claim[ed] safety benefits for the 2.0 Brewer that it knew did not exist," (Doc. 1467, Ex. 2 ¶ 895), what Keurig's "purpose and intended effect of its agreements" were, (*id.* ¶ 477), and how "Keurig did not expect to prevail on the merits of its lawsuit," (*id.* ¶ 913).  Such opinions are improper and must be excluded.

Keurig also challenges certain opinions of Dr. Sibley on patents and product design as being outside of his areas of expertise.  (Doc. 1466 at 21–23.)  "[W]here an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case."  *Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013); *see also Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015) ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702." (citations omitted)).

Dr. Sibley is an economics professor at the University of Texas at Austin who holds a Ph.D. in economics from Yale. (Doc. 1467, Ex. 2 ¶¶ 1, 3.) Dr. Sibley has served as the Deputy Assistant Attorney General for Economic Analysis in the Antitrust Division of the U.S. Department of Justice. (*Id.* ¶ 2.) He analyzed materials including sales transaction data, business records, contracts, communications, academic literature, and deposition transcripts in order to evaluate Plaintiffs' claims from an economic perspective. (*Id.* ¶ 5.)

Given this background Dr. Sibley's opinions on patent litigation, (Doc. 1467, Ex. 2 ¶¶ 896–933), are excluded both under Rule 702 and Rule 403. There are several issues with his opinion on this point. First, it incorporates certain state-of-mind opinions that I have already excluded. (*See, e.g.*, Doc. 1467, Ex. 2 ¶ 913.) Second, it does not appear to rest on economic considerations in any meaningful way and what economic assertions it makes appear to be incorrect. For example, Dr. Sibley opines that "[w]ithout a reasonable expectation of success, a firm acting competitively could not conclude that the benefits of filing a lawsuit would outweigh the costs." (*Id.* ¶ 913.) He cites nothing to connect this opinion to economic theory and, at a very basic level, it appears to be dubious. Imagine a party is deciding whether to bring a lawsuit that has only a 0.01 percent chance of prevailing but that will yield $1,000,000,000 recovery.[30] The expected value of this lawsuit would be $100,000. Even if the cost to bring the lawsuit was $10,000, it is not unreasonable to think that at least a few rational actors would conclude, miniscule chances of success notwithstanding, that it was economically worth initiating that suit. Indeed, commentators have theorized that as the use of litigation finance increases, "the number of high-value frivolous claims could very easily increase, as such claims might offer sufficient

---

[30] Also assume (Parties' experience with litigation notwithstanding) that the lawsuit will be finally decided instantaneously.

potential for reward." Jeremy Kidd, *To Fund or not to Fund: The Need for Second-Best Solutions to the Litigation Finance Dilemma*, 8 J.L. Econ. & Pol'y 613, 628 (2012).

In addition, Dr. Sibley is not a lawyer or a litigator,[31] so he lacks the expertise necessary to accurately quantify the risks associated with litigation or any non-economic factors (e.g., the cultivation of a reputation for defending intellectual property) that might lead a firm to bring cases with only a limited chance of success. This is particularly true once impermissible components of his opinion, such as opinions on Keurig's state of mind, are stripped from the opinion. Taken together, these issues render Dr. Sibley's opinion unreliable because it is outside the scope of his expertise and otherwise without a reasonable basis. Indeed, even if this were not the case, I would find that his opinion on this score is more prejudicial than probative such that in must be excluded under Federal Rule of Evidence 403.

The same analysis does not apply to Dr. Sibley's opinions on the use of design changes in the 2.0 brewer. (Doc. 1467, Ex. 2 ¶¶ 941–1050.) Keurig objects that these opinions fall outside the scope of Dr. Sibley's expertise because he does not have an engineering degree or first-hand experience with the brewer. (Doc. 1466 at 22–23.) Dr. Sibley, however, is not opining on the technical implementation of this technology or the in-depth operation of these systems, but on the economic impact of these technologies on competition in the marketplace and on Keurig's market share. (*See, e.g.*, Doc. 1467, Ex. 2 ¶¶ 942–43.) This is the type of economic analysis for which Dr. Sibley is qualified.

Finally, except as otherwise noted above, I see no reason to exclude Dr. Sibley's testimony pursuant Federal Rule of Evidence 403. Keurig argues that exclusion under Rule 403

---

[31] His role at the Department of Justice was as an economic advisor supervising economic analysis, not as a lawyer or litigator. (*See, e.g.*, Doc. 1467, Ex. 2 ¶ 2.)

is necessary because his narrative is inflammatory, unnecessarily cumulative of other information that will be introduced, and impermissible because it usurps the jury's role. I have already excluded testimony that would usurp the fact-finder's role or that is otherwise outside the scope of Dr. Sibley's expertise, and I have also indicated that the trial judge should curtail extensive narrative testimony at trial. A decision on whether testimony is "unnecessarily cumulative[] is a determination that requires a contextual underpinning that only trial can provide." *United States v. Gotti*, No. 02-CR-743, 2004 WL 2423799, at *5 (S.D.N.Y. Oct. 29, 2004) (citing *Medallic Art Co. v. Novus Mktg., Inc.*, No. 99-CV-502, 2004 WL 396046, at *2 (S.D.N.Y. Mar. 2, 2004)). Given this and the testimony I have excluded, I do not find that the remaining topics on which Dr. Sibley may opine on are more prejudicial than probative. Accordingly, Keurig's motion to exclude the testimony of Dr. Sibley is granted in part and denied in part.

### K. *Dr. Keith Ugone ("TMJ Motion") (Docs. 1470 & 2237)*

Plaintiffs TreeHouse, McClane, and JBR (collectively for the purposes of this section, the "TMJ Plaintiffs") move to strike certain opinions of rebuttal expert Dr. Keith R. Ugone ("Dr. Ugone"). This motion is granted in part and denied in part.

A part of this motion can be resolved by applying the same logic I used in connection with my rulings concerning other experts. The component of the motion that seeks to exclude Dr. Ugone's opinion that McClane's damages must by offset by part of the alleged overcharge is granted. (*See* Doc. 1546 at 8–10.) The parties' dispute here is essentially the inverse of the dispute over Dr. Johnson's refusal to exclude those offsets covered in Section II.H.4. "Expert testimony also should be excluded when it applies the wrong legal standard," although not when "the legal or factual sustainability of a party's theory has not yet been decided." *Olin Corp. v.*

*Lamorak Ins. Co.*, No. 84-CV-1968, 2018 WL 1901634, at *21 (S.D.N.Y. Apr. 18, 2018).

Having held that overcharges amounts are not properly offset from McClane's damages, Dr.

Ugone's opinion on this point is excluded.

### 1. Dr. Ugone's Adjusted Models

The TMJ Plaintiffs seek to strike Dr. Ugone's opinions concerning their experts' (Drs.

Stiroh and Johnson) damages model on the basis "adjustments" Dr. Ugone made to those models

made to illustrate that the models are unreliable. (Doc. 1472 at 3–6.) These objections are

without merit.

Rebuttal experts must meet the same thresholds for qualification and reliability of opinion

as other experts. *See Scott*, 315 F.R.D. at 44. However, "robustness testing of an expert's

methodology—by applying that methodology to different data or with different assumptions and

examining the results produced by the methodology so applied—is not an impermissible

challenge to the expert's results." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F.

Supp. 3d 430, 468 (S.D.N.Y. 2018). Indeed, "[t]he issue of robustness—whether regression

results are sensitive to slight modifications in assumptions (e.g., that the data are measured

accurately)—is of vital importance." Rubinfeld, 2011 WL 7724257, at *11; *see also Reed Const.*

*Data Inc.*, 49 F. Supp. 3d at 407 (S.D.N.Y. 2014) ("[W]here, as here, very minor changes in

arbitrarily selected model parameters can entirely alter the model's conclusions, that model is

insufficiently robust to withstand the scrutiny of Rule 702. Scientific conclusions cannot depend

upon the arbitrary choice of parameters.").

Thus, a rebuttal expert may properly engage in robustness testing of an opposing expert's

model by exploring if the results from a regression model change substantially or produce

unreasonable or absurd results when small changes are made to the model's assumptions or

parameters.  It is no bar to admitting an expert's opinions that the findings or model created as a result of this robustness testing are also unreliable—the entire point of robustness testing is to demonstrate the unreliability of the original model by showing that small changes to that model result in a (perhaps more self-evidently) unreliable model and result.  To the extent that *In re Cathode Ray Tube (CRT) Antitrust Litigation* suggests that a rebuttal expert should not be allowed to opine on the results of their robustness test to demonstrate the fallacy of the underlying model, I do not find it compelling. No. 07-5944, 2017 WL 10434367, at \*2–3 (N.D. Cal. Jan. 23, 2017).[32]

Dr. Ugone's opinions fall within bounds permitted when describing the results of robustness testing.  Dr. Ugone made several adjustments to Drs. Johnson's and Stiroh's damages models and observed the changes in results based on those adjustments.  (*See, e.g.*, Doc. 1547, Ex. A at 45:10–46:19 (explaining that Dr. Stiroh's "model is unreliable given the wide swing in damages, given the change in certain underlying assumptions"); Doc. 1547, Ex. B at 62:20–63:9 (describing how attempting various adjustments to Dr. Johnson's model led Dr. Ugone to conclude that the model is unreliable)).  Based on this, Dr. Ugone opines that the models of Dr. Stiroh and Dr. Johnson and the estimates produced by those models are unreliable.  Dr. Ugone does not, however, opine that the estimates created as a result of this robustness testing are actual estimates of damage, so his opinion reaches the threshold of admissibility under Rule 703.  (*See,*

---

[32] It would be another matter if a rebuttal expert sought to affirmatively present the results of their robustness test as the "true" measure of the variable being tested.  To put it in concrete terms, imagine a rebuttal expert offering an opinion on expert-created model that shows a party is entitled to $1 billion in damages.  The rebuttal expert then makes a minor adjustment to the model during robustness testing and damages decrease to $10.  The rebuttal expert can point to the massive decrease in damages from $1 billion to $10 to suggest that the model under examination is unreliable.  The expert could not opine that the true amount of damages from this apparently unreliable model was $10—one party is no more entitled to the fruits of an unreliable model than another.

*e.g.*, Doc. 1547, Ex. A at 37:17–24; *see also id.* at 45:17–20 ("I'm not giving the opinion, as you asked, that damages are, you know, negative.").)

I also find that there are no grounds to exclude Dr. Ugone's opinion under Federal Rule of Evidence 403.  The TMJ Plaintiffs posit a series of questions jurors would ask if they heard Dr. Ugone's testimony to suggest the confusion that would result from his opinion.  (Doc. 1472 at 6.)  Neither these questions nor the general concept of robustness testing suggest that confusion will likely result from Dr. Ugone's opinion.  To illustrate through a more basic example, children frequently confront their parents with the argument that "all their friends" are engaged in some undesirable course of action, to which the parent invariably responds "if everyone jumped off a bridge, would you?"  This is a basic form of robustness testing:  take a decision model, modify the parameters, and see if the model continues to produce reliable results.  In this illustration, no reasonable person would interpret the parent to be advocating their child jump off a bridge.  Similarly, it is unlikely that a reasonable juror will confuse Dr. Ugone's proffer of absurd results from his modified model as an endorsement of this flawed model.[33]  To merit exclusion under Rule 403, the probative value of testimony must be "substantially outweighed" by the danger of confusion.  I do not find any meaningful risk of confusion, much less a serious one that would merit exclusion.

### 2.  Use of the Appropriate Statistical Test

The component of the motion that seeks to exclude Dr. Ugone's opinions about the statistical significance of Dr. Johnson's damages model is denied.  (Doc. 1472 at 9–10.)  Dr. Ugone opines that "when Mother Parkers is removed from the regression, the coefficients of

---

[33] At any trial a curative instruction could also be given concerning the scope and parameters of Dr. Ugone's opinion.

interest are no longer statistically significant" based on the results from a "t-test," a statistical test applied to Dr. Johnson's model. (Doc. 1455, Ex. 3 ¶ 42.) TMJ Plaintiffs, however, assert that a joint test called an "f-test" is the proper measure of statistical significance and that Dr. Ugone's use of the t-test merits the exclusion of his opinion. (*See* Doc. 1472 at 10.)

T-tests and f-tests are classes of statistical tests used in the context of regression analysis to assess the models against the "null hypothesis"—"that the results observed in a study with respect to a particular variable are no different from what might have occurred by chance." Rubinfeld, 2011 WL 7724257, at *33.[34]  The f-test assesses the assertion "that there is no linear association between the dependent variable and any of the explanatory variables." *Id.* at *28. The t-test, is "[a] test of the null hypothesis that a regression parameter takes on a particular value, usually 0." *Id.* at *34.

There are cases where the nature of the data to be tested makes it inappropriate to assess a model using a t-test or an f-test. For example, a "t-test is strictly valid only if a number of important assumptions hold." *Id.* at *10 n.46. Neither party has proffered any evidence that the necessary assumptions for these tests are not met. Absent that, researchers commonly use both tests (and others) as part of a battery of tests designed to assess the reliability and import of finding from given statistical model. *See generally*, Greenfield et al., *A Statistics Primer: Tests for Continuous Data*, 25 The American Journal of Sports Medicine 882–83 (1997) (summarizing an array of statistical tests, including the f-test and t-test, and their uses); *see also Gutierrez v. Johnson & Johnson*, No. 01-5302, 2006 WL 3246605, at *8 (D.N.J. Nov. 6, 2006) ("[T]he Chow

---

[34] The discussion in this section is necessarily a simplification of these tests which have broad application outside their use in multiple regression.

test, fixed effects models, f-tests, and t-tests are all standard, peer-reviewed tests with acknowledged reliability.")

I have determined that Dr. Johnson's model should not be excluded based on its use of the Mother Parkers data. *See supra* Section II.H.3. In the absence of evidence that a particular statistical test may not be reliably employed, evidence of the weakness of Dr. Johnson's data or the vulnerability of his findings to given statistical tests is the type of "presentation of contrary evidence" that is properly used to challenge expert opinions that have met the threshold for reliability. *Daubert*, 509 U.S. at 596 (1993).

The TMJ Plaintiffs have also not offered any evidence that admitting Dr. Ugone's opinion on this point would "cloud[] the issue for the jury" or "waste[] time by diverting attention from the relevant evidence." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *4 (cleaned up). They assert that the admission of this testimony could be confusing, (Doc. 1472 at 9), but offer no explanation for why weighing the impact of information yielded by two different statistical tests is likely to be particularly confusing for the jury.

### 3. Causation Opinions

The TMJ Plaintiffs seek to exclude a portion of Dr. Ugone's opinion on the ground that it attacks Dr. Stiroh's analysis based on the wrong legal standard for causation. (Doc. 1472 at 11.) For the reasons that follow, this aspect of the motion is denied.

The TMJ Plaintiffs object that Dr. Ugone "posit[s] that a plaintiff establishes causation by (1) showing that the defendant's bad act was 'the determinative or the primary reason' for the plaintiff's injury, 'and/or' (2) 'rul[ing] out all other potential reasons' for the plaintiff's injury." (Doc. 1472 at 12 (quoting Doc. 1473, Ex. D at 85:23-87:25) (second alternation in original)).

This, the TMJ Plaintiffs assert, is the wrong legal standard under which to assess causation. (Doc. 1472 at 12.)

I do not find this to be an accurate statement of Dr. Ugone's opinion. The comments the TMJ Plaintiffs identify emerge from a somewhat confused portion of Dr. Ugone's deposition but the test to which TMJ Plaintiffs object appears nowhere in Dr. Ugone's expert report. (*See* Doc. 1473, Ex. A.) Moreover, to the extent that the TMJ Plaintiffs object that this misstates the standard for causation in antitrust liability determinations, (Doc. 1472 at 13–14), that is beside the point. Dr. Ugone is opining as a rebuttal expert on the issue of damages, and specifically, on flaws in Dr. Stiroh's damages model, not the question of Keurig's liability. (Doc. 1473, Ex. B ¶ 4 ("I have been asked by counsel for Keurig to evaluate TreeHouse's claimed monetary remedies as presented in the Stiroh Report.").

Accordingly, Dr. Ugone's critiques of Dr. Stiroh's model focuses on the failure to account for various economic factors and modeling decisions that, in his opinion, would reduce TreeHouse's damages if properly accounted for, such as the failure to account for new entrants into the marketplace absent the anticompetitive conduct, (*id.* ¶¶ 107–10), the overstatement of the impact of certain patent litigation, (*id.* ¶¶ 127–31), and the impact of various business decisions made by TreeHouse, (*id.* ¶¶ 132–41). He also opines that "Dr. Stiroh appears to not have considered factors unrelated to Keurig's alleged conduct that contributed to TreeHouse's limited success in the [Away-From-Home] segment, and which would have been present in the but-for world as well" such as the fact that "TreeHouse does not offer brewers to [Away-From-Home] customers." (*Id.* ¶ 167.)

Accordingly, while "[e]xpert testimony . . . should be excluded when it applies the wrong legal standard," *Olin Corp.*, 2018 WL 1901634, at *21, it is a permissible critique of an expert's

damages opinion that the expert failed to account for losses that resulted from non-anticompetitive factors. "A plaintiff's proof of amount of damages . . . must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by other factors, such as management problems, a general recession or lawful factors." *U.S. Football League*, 842 F.2d at 1378–79. In *U.S. Football League*, for example, the Court of Appeals upheld a nominal damages award of $1.00 after finding that the jury could have properly credited evidence of "self-destructive" management decisions made by the plaintiff in reducing damages to a nominal award. *Id.* at 1377. Cases cited by the TMJ Plaintiffs, such as *In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 66 (2d Cir. 2012), are thus inapposite because they deal with the question of causation for liability purposes, not the question of how damages should be calculated.

I thus find no basis to exclude Dr. Ugone's opinion regarding whether Dr. Stiroh has adequately accounted for lawful factors that might impact the jury's assessment of damages.

### 4. Benefit Deduction

The branch of the TMJ Motion seeking to strike Dr. Ugone's opinions concerning Dr. Stiroh's failure to deduct certain amounts from her damages is also denied. Dr. Ugone opines that Dr. Stiroh's damages model is flawed because she fails to account for how TreeHouse's profits would have declined in a but-for world without the alleged anticompetitive conduct. (Doc. 1472 at 18–20.) Specifically, Dr. Ugone opines that, among other things, if Keurig had been forced to offer lower prices on K-Cups, then it would not have needed to invest as much in advertising and selling brewers. If it made fewer investments in selling brewers, then there would have been less demand for TreeHouse's products and a concomitant decline in profits for which Dr. Stiroh should have accounted. (Doc. 1473, Ex. B ¶¶ 23–25, 101–105.) Dr. Ugone

argues that Dr. Stiroh also failed to account for the entry of new competitors into the market in the absence of anticompetitive conduct. (*Id.* ¶ 25.)

Courts both in this District and others have found that the benefits a plaintiff receives, such as from a defendant's anticompetitive conduct, may be properly considered in the calculation of net antitrust damages. *See, e.g.*, *Nypl v. JP Morgan Chase & Co.*, No. 15-CV-9300, 2022 WL 819771, at *4 (S.D.N.Y. Mar. 18, 2022) ("That plaintiffs in an antitrust action may recover only for their net injury is a common-sense and well-established principle."); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 563 (S.D.N.Y. 2017) ("[A]ny damages would need to be netted out as to each plaintiff to offset any benefit from defendants' manipulation in other transactions."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262, 2016 WL 7378980, at *18 (S.D.N.Y. Dec. 20, 2016) ("[P]laintiffs may ultimately recover only to the extent of their net injury, given that plaintiffs may well have benefited from [Defendants'] suppression in the same transaction or in a different transaction."); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 676 F. Supp. 486, 488 (S.D.N.Y. 1987) ("Defendants' 'offset' argument has considerable force. Under most circumstances, it is clear that a plaintiff both injured and enriched by illegal activity cannot choose to recover for his injuries yet retain his windfall. This principle has been applied . . . [in] antitrust actions."); *see also Los Angeles Mem'l Coliseum Comm'n*, 791 F.2d at 1367 ("An antitrust plaintiff may recover only to the 'net' extent of its injury; if benefits accrued to it because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct."); *Farmington Dowel Prod. Co.*, 421 F.2d at 82 n.48 ("[Defendant's] sales and profits after that time reflected the illegal monopolization and discriminatory sales which [Plaintiff] had

to show in order to be entitled to any damages.  Clearly [Plaintiff] was no more entitled to the monopoly profit than [Defendant] was.").[35]

Indeed, even lawful competition by a defendant convicted of antitrust violations should be properly accounted for in a damages calculation, *see, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1168 (7th Cir. 1983) ("[Plaintiff] need not disaggregate its proof of damages among individual unlawful acts which have caused financial loss, but [Plaintiff] must be able to rationally separate these damages from those losses (or reductions in profit) which are caused by the purely lawful competitive actions of [Defendant]."), as may factors unassociated with the anticompetitive acts such as "a general recession." *U.S. Football League*, 842 F.2d at 1379.

Accordingly, courts in this District have permitted rebuttal experts to identify benefits from the anticompetitive conduct that accrued to the plaintiff and that are properly excluded from their damages. *See, e.g.*, *Nypl*, 2022 WL 819771, at *3–4.  So long as such offsets are not merely speculative, *In re Elec. Books Antitrust Litig.*, 2014 WL 1282293, at *17, they may properly be considered by a jury in the damages calculation.  Moreover, rebuttal experts have "no burden to produce models or methods of their own; they need only attack those of the plaintiffs' experts." *Scott*, 315 F.R.D. at 44 (internal quotation marks omitted).  Dr. Ugone's opinion is thus a permissible critique that Dr. Stiroh failed to properly account for the lawful competition that might have resulted but for the anticompetitive conduct or any benefits to TreeHouse that may have accrued as a result.

I also find no evidence that the probative value of Dr. Ugone's testimony is substantially outweighed by the risk of confusion to the jury such that exclusion under Rule 403 is

---

[35] None of this disturbs the more specific rules associated with overcharges damages discussed in Section II.H.4.

appropriate.  When courts decline to exclude an expert's opinion on damages, that opinion may have "significant probative value to the jury's consideration of damages in the event the jury finds liability."  *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 356 (S.D.N.Y. 2023).  Indeed, in many cases where exclusion under Rule. 403 is merited, it has been the case that the testimony was of questionable reliability.  In *Shatkin v. McDonnell Douglas Corporation*, for example, the excluded expert testimony was "so unrealistic and contradictory as to suggest bad faith."  727 F.2d 202, 208 (2d Cir. 1984).  No comparable flaw exists here.  Moreover, the calculation of antitrust damages may properly include numerous factors such that Dr. Ugone's testimony may have substantial probative value to the jury if it is credited.  Accordingly, I find exclusion under Rule 403 unwarranted.

### 5.  Survey Opinions

The portion of TMJ Plaintiffs' motion seeking to exclude certain of Dr. Ugone's opinions related to surveys is denied.  The TMJ Plaintiffs take issue with certain opinions in which Dr. Ugone criticizes how Dr. Rao uses survey inputs from Mr. Poret and Ms. Butler to build his model.  (Doc. 1472 at 21 (citing Doc. 1473, Ex. B ¶¶ 43, 259–61, 277, 287).)  Dr. Ugone's understanding of the flaws in these survey inputs is based on his discussions with a separate Keurig expert, Dr. Peter Rossi.  (*See, e.g.*, Doc. 1473, Ex. B ¶ 57.)

An "expert witness must in the end be giving his *own* opinion.  He cannot simply be a conduit for the opinion of an unproduced expert."  *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (emphasis in original).  However, "expert witnesses are entitled to rely on facts, opinions and data developed or prepared by another so long as the expert in the end gives his or her own opinion instead of simply aggregating or reciting the opinions of others," *Bocoum v. Daimler Trucks N. Am. LLC*, No. 17-CV-7636, 2022 WL 902465, at *20

(S.D.N.Y. Mar. 28, 2022) (cleaned up), so long as the expert at least "understand[s] the materials or methods underlying the other expert's opinions," *U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015).[36]  Thus, in *Solid Oak Sketches, LLC v. 2K Games, Inc.*, for example, one expert's "reliance in part on [another expert's] survey results, which . . . have not been excluded, [was] not improper."  449 F. Supp. 3d 333, 353 (S.D.N.Y. 2020).

Dr. Ugone's challenged opinions fall into the category approved of in *Solid Oak Sketches, LLC*, 449 F. Supp. 3d at 353.  The gravamen of his opinion is that Dr. Rao relied on various survey inputs from Ms. Butler and Mr. Poret in the development of his damages model, (Doc. 1473, Ex. B ¶ 260 (listing survey inputs from Ms. Butler), ¶ 277 (noting the use survey inputs from Mr. Poret)), and that, based on Dr. Rossi's opinion that the survey inputs from Ms. Butler and Mr. Poret were flawed, (*id.* ¶¶ 261, 277), Dr. Rao's damages model is also, by extension, flawed.  Nowhere does Dr. Ugone suggest based on his own expertise that the surveys are flawed.  Dr. Ugone's critique is thus not a survey critique or a "conduit" for Dr. Rossi's opinions nor is he simply reciting them.  Rather, he uses Dr. Rossi's opinion as a basis for his own, separate opinion about Dr. Rao's purported failure to use appropriate data to model economic damages.  No one contests that Dr. Ugone is sufficiently qualified as an economic damages expert, (*see id.* ¶¶ 51–55 (reciting his qualifications)), or that he consulted sufficiently

---

[36] This should not be taken to mean, and I have found no authority for, the proposition that "understanding" requires that the expert who relies upon another expert's opinion to have had sufficient expertise to themselves qualify as an expert on the material they seek to rely on.  *U.S. Bank National Association*, for example, did not find that one expert "failed to understand [another expert's] work or incorporate it properly in formulating his own conclusions" despite the fact that the expert relying on that work had not overseen the other expert's work, verified the underlying data behind it, or ensured the second expert's method was properly implemented.  112 F. Supp. 3d at 131.  Much as lawyers may be able to understand and explain expert materials they would not themselves be qualified to prepare, experts may comprehend and use other expert materials in fields outside of their own area of expertise so long as they sufficiently understand it.

with Dr. Rossi to understand Dr. Rossi's critiques enough to rely on them in rendering his ultimate opinion, (*id.* ¶ 57).

However, Dr. Ugone may not simply recite Dr. Rossi's critique of Ms. Butler and Mr. Poret's surveys.  If Dr. Ugone's testimony at trial appears to be merely a conduit for Dr. Rossi's opinions, upon objection the trial judge should consider limiting it accordingly.

### 6.  Consumer Perception Opinions

The TMJ Plaintiffs seek to exclude Dr. Ugone's opinions on "consumer and retailer perception of JBR and unlicensed portion packs and whether those portion packs were compatible with Keurig 2.0 brewers" on the grounds that Dr. Ugone lacked sufficient data to make these statements.  (Doc. 1472 at 22 (citing Doc. 1473, Ex. C ¶¶ 136–39, 183–85.)  For the reasons stated below, this component of the motion to exclude is denied.

The opinions that the TMJ Plaintiffs seek to exclude are best classified as critiques of the variables selected in a damages model, for which Dr. Ugone has the requisite qualifications and supporting data, rather than consumer perception, for which his opinions might rest on less sound footing.  As discussed in Section II.D.1, variable selection refers to the process of deciding what inputs to include in a particular analysis.  Consumer perception addresses issues such as "whether Defendant's alleged misstatement and omission would be important to consumers." *Passman*, 2023 WL 3195941, at *4.

The opinions the TMJ Plaintiffs seek to exclude fall into the category of variable selection rather than consumer perception.  The first class of opinions the TMJ Plaintiffs seek to exclude relate to the extent to which consumers would be confused by false statements allegedly made about and disseminated through the 2.0 Brewer.  Dr. Ugone asserts that Dr. Macartney erred by calculating damages based on the assumption that all Keurig-brewer owners would have

been confused by statements about the 2.0 brewer even if they did not own a 2.0 brewer. (Doc. 1473, Ex. C ¶¶ 136–39.) More specifically, Dr. Ugone opines "prior purchasers of JBR's products would have known their brewers were compatible with JBR's portion packs . . . only owners of 2.0 Brewers would have been exposed to the 'Oops' message 2.0 Brewers displayed when using cups not compatible with 2.0 Brewers; and . . . JBR launched its very popular 'Freedom Clip' in Fall 2014 and 2.0-compatible lids in January 2015, further limiting consumer exposure to the 'Oops' message." (*Id.* ¶ 136.)[37] He also opines, based on sales data, (*id.* ¶ 139), that "owners of 1.0 Brewers are unlikely to have changed their purchasing decisions based on statements about a brewer that they did not own," (*id.* ¶ 138).

These statements speak to the methodological soundness of Dr. Macartney's damages model rather than consumers' perception of a message such as the "oops message." The thrust of Dr. Ugone's opinion is that the broad Keurig-brewer owners segment included both people who owed a 2.0 Brewer, and people who did not. Dr. Ugone could properly question whether Dr. Macartney erred in his treatment of a potentially important variable as a monolithic block given that even basic exposure to allegedly misleading statements like the "oops message" could vary based on whether a consumer possessed a 2.0 brewer. No one disputes that Dr. Ugone is qualified to opine on the treatment of variables in economic modeling, nor, given his qualifications, would I credit such objections. (*Id.* ¶¶ 28–32.)

The second set of opinions the TMJ Plaintiffs seek to exclude focus on other factors Dr. Ugone proffers that might have led brands not to partner with JBR. (*Id.* ¶¶ 183–85.) These opinions, again, are not about how these brands perceived JBR, but concern Dr. Macartney's

---

[37] The "oops message" refers to an allegedly anticompetitive statement by Keurig in which the 2.0 brewer displays a message indicating that using certain unlicensed single-serve cups will damage the brewer, and blaming Keurig competitors for this outcome. (Doc. 1473, Ex. C ¶ 42.)

purported failure to consider possible alternative explanations for why various brands did not partner with JBR and, by extension, why the failure to consider these brands renders Dr. Macartney's model unreasonably generous. Dr. Ugone cites sufficient information so that it is more than a "mere conjecture or assertion" that these variables may influence damages. *Teva Pharms. USA, Inc.*, 2019 WL 13244252, at *2 (internal quotation marks omitted). Opining on these deficiencies in variable selection is again within the scope of his expertise as a rebuttal damages expert, and I decline to preclude Dr. Ugone's testimony on this basis.

### L.  *Dr. Kevin Murphy (Doc. 1474)*

TreeHouse moves to exclude the testimony of Keurig's expert Dr. Kevin Murphy under *Daubert* and Federal Rules of Evidence 702 and 403 on the grounds that (1) his opinions do not "fit" the appropriate legal framework; (2) he failed to conduct economic analysis in arriving at his market definition; and (3) he ignores and contradicts the factual record. (*See* Doc. 1475.) Keurig and plaintiffs BJ's Wholesale Club, Inc., Winn-Dixie Stores, Inc., and Bi-Lo Holding LLC, also adopted the papers and arguments in favor of and against exclusion in their own action, also pending in this multidistrict litigation by stipulation. (Doc. 2075.) My holding as to Dr. Murphy in this section therefore applies to that action as well save to the extent set out in paragraph three of that stipulation. (*See id.* ¶ 3.)

TreeHouse's first objection to Dr. Murphy's testimony is that it does not comport with controlling law or my prior holdings. (Doc. 1475 at 3–9.) Expert opinions that conflict with controlling law are not helpful to the jury. *In re Payment Card*, 2022 WL 15053250, at *23; *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-CV-6201, 2015 WL 640875, at *3 (S.D.N.Y. Feb. 16, 2015) ("Defendants' interpretation of [the statute] is incorrect as a matter of

law, and conclusions drawn therefrom cannot 'help the trier of fact ... to determine a fact in issue.'") (quoting Fed. R. Evid. 702)).

In his report, Dr. Murphy performs a market definition analysis wherein he determines that the relevant market should be defined in terms of brewing systems. (Doc. 1418, Ex. C ¶¶ 149–55.) TreeHouse argues that Dr. Murphy's opinion that the relevant market is "brewing systems" is contrary to controlling law. (Doc. 1475 at 3–4.) Specifically, TreeHouse asserts that this opinion is inconsistent with the *Keurig, Inc. v. Sturm Foods, Inc.* holding that the Keurig brewer was a completed product (the "*Sturm* Ruling"). *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373–74 (Fed. Cir. 2013). In *Sturm,* the court determined that the patent exhaustion doctrine did not apply because the brewers were sold in a completed form. *Id.* The court was not opining on what the proper comparator market was for the Keurig brewer—and, indeed, does not mention a comparator market at all. Because the *Sturm* Ruling was specifically related to the applicability of the patent exhaustion doctrine, and not the boundaries of a market for antitrust purposes, Dr. Murphy's opinion is not precluded by the *Sturm* Ruling.

TreeHouse also challenges the fact that Dr. Murphy arrives at his opinion on Keurig's market without utilizing the *Brown Shoe* indicia or the SSNIP test. (Doc. 1475 at 4–6.) Rather than apply these tests, Dr. Murphy considers factors such as Keurig's product pricing choices and consumer adoption decisions. (*See, e.g.*, Doc. 1418, Ex. C ¶¶ 150–51, 153–55.) The closest that Dr. Murphy comes to engaging with these tests is to critique Plaintiffs' experts' application of them which, as TreeHouse correctly notes, (Doc. 1615 at 4), is not the same as performing the tests himself. However, it is not required that Dr. Murphy use any specific test when performing a market analysis, because "emphasis always is on the actual dynamics of the market rather than rote application of any formula." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d

485, 496 (2d Cir. 2004). "A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered.'" *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (*citing United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). Dr. Murphy's analysis considers economic factors, such as consumer substitution patterns and Keurig's pricing decisions, therefore I will not exclude his market definition opinion.

Next, TreeHouse claims that Dr. Murphy's opinions flout this Court's prior holdings. (Doc. 1475 at 6–11.) I disagree. None of the opinions by Dr. Murphy that TreeHouse points to are inconsistent with my prior opinions. For example, although TreeHouse argues that Dr. Murphy unreliably opines that total foreclosure is necessary for economic harm, (Doc. 1475 at 6), his report clearly and repeatedly applies the "substantial foreclosure" standard, (*see* Doc. 1418, Ex. C ¶¶ 194, 198–99), that I referenced in my Opinion & Order resolving Keurig's Motions to Dismiss, (Doc. 581).

TreeHouse also claims that Dr. Murphy's opinions related to the purported sham litigation are inconsistent with my prior opinions. (Doc. 1475 at 9.) Here again, I disagree. In my Opinion & Order resolving Keurig's Motion to Dismiss, I explained that Plaintiffs alleged an antitrust injury by pleading that they incurred costs through sham litigation because "[l]itigation costs incurred in defending against a sham litigation are 'a well recognized type of antitrust injury.'" (Doc. 581 at 44–45 (citation omitted).) That statement of law does not preclude Keurig from arguing that Plaintiff's experts have not established that Keurig's alleged sham lawsuits harmed competition. (Doc. 1418, Ex. C ¶¶ 342–50.)

TreeHouse's final objection to Dr. Murphy's report is that his opinions ignore and contradict the factual record. (Doc. 1475 at 18–25.) Dr. Murphy explains his methodology for

reaching his opinions and cites to the factual evidence upon which he relies to support his

opinions.  (*See, e.g.*, Doc. 1418, Ex. C ¶¶ 121, 154, 164–66.)  The fact that TreeHouse has

identified evidence to the contrary of certain opinions is grounds for cross-examination, not

exclusion.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary

evidence, and careful instruction on the burden of proof are the traditional and appropriate means

of attacking shaky but admissible evidence.")  Accordingly, TreeHouse's motion to exclude Dr.

Murphy is denied.

### M. *Mark Wood (Doc. 1478)*

JBR moves to strike certain opinions of rebuttal expert Mark Wood ("Mr. Wood").

Keurig offers Mr. Wood to rebut JBR's proffered industry expert, Bob Giacomelli.  Keurig

offers the expert testimony of Mr. Wood concerning competition in the coffee industry, and to

rebut Mr. Giacomelli's conclusion that consumers do not view Keurig-compatible packs as

"interchangeable with any other form of coffee—including whole bean, pre-ground, or other

single-cup formats."  (Doc. 1518, Ex. 1 ¶ 17.)  Mr. Wood responds that "Keurig works hard to

compete with other forms of coffee," whether that coffee is "brewed from whole bean, ground

coffee, or portion packs."  (*Id.* ¶ 34.)

Plaintiff JBR argues that Mr. Wood's testimony should be excluded because he is

unqualified as an expert in the coffee industry due to his experience being "solely in single-serve

coffee," (Doc. 1480 at 1), and because his findings are based on an insufficient factual record,

(*id.* at 10–14).  This argument understates Mr. Wood's experience and the data supporting his

opinion.  He has 18 years of experience in the coffee industry, has held positions across different

product lines (including Keurig's whole bean and ground coffee lines), (Doc. 1516 at 3), and

senior management positions overseeing "Keurig's entire coffee business, including its product

launch of bagged ground coffee in 2018," (*id.* at 4).  Mr. Wood also served for five years as a Director for the National Coffee Association, a trade organization that serves the coffee industry in the United States.  (*Id.*)  Similarly, JBR's argument that Mr. Wood's expertise is largely based on his MBA, (*see* Doc. 1480 at 12), misses the mark given his substantial practical, hands-on experience applying his business training to various roles in the coffee industry.

Mr. Wood's testimony is also based on reliable data.  He is a long-term employee at Keurig who has significant knowledge of Keurig's documents, and by JBR's own admission, "had access to any Keurig documents he wished for, including any of the ten million pages of documents Keurig produced in this litigation."  (*Id.*)  However, the fact that an expert has access to millions of documents does not, as JBR intimates, make it a requirement that millions of documents be cited or that Mr. Wood use whatever documents JBR believes are most appropriate.  JBR's last objection is simply a more specific version of this critique:  that Mr. Wood's analysis did not incorporate testimony from certain Keurig and Walmart executives developed in the course of Federal Rule of Civil Procedure 30(b)(6) depositions.  (*See* Doc. 1480 at 12–13.)

These objections are misplaced because Federal Rule of Evidence 702(b) requires only that expert testimony be based "on sufficient facts or data."  Thus, when "the underlying data is not inherently unreliable," *Better Holdco, Inc.*, 666 F. Supp. 3d at 360, or "highly relevant to [the expert's] conclusion," *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 242 (S.D.N.Y. 2018), *aff'd sub nom. Mirena II*, 982 F.3d 113 (2d Cir. 2020), "a contention that an expert did not weigh a certain piece of evidence adequately does not take an expert opinion into the realm of speculative or conjectural." *In re Omnicom Grp. Inc. Erisa Litig.*, No. 20-CV-4141, 2022 WL 18674830, at *10 (S.D.N.Y. Dec. 23, 2022) (cleaned up).

Rather, once an expert has sufficient sources, "the method to contest the factual underpinning of expert opinion is vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof." (*Id.*) (cleaned up).

I see no evidence that the sources JBR identifies are so highly or self-evidently relevant that they materially undermine the reliability of Mr. Wood's opinion such that exclusion is required. Rather, JBR provides its interpretation of a selection of deposition quotes, (Doc. 1480 at 12–13), and Keurig provides a separate plausible interpretation of those deposition quotes, (Doc. 1516 at 7–8). Nothing in the parties' dueling interpretations suggests that the sources JBR proffers are the kind of vital information whose absence renders Mr. Wood's opinion inherently unreliable. Thus, Mr. Wood's experience and the information underlying his opinion are more than sufficient to demonstrate reliability by a preponderance of the evidence, and JBR's motion to strike aspects of Mr. Wood's opinion is denied.

## N. *Dr. Marc Hillmyer (Doc. 1484)*

JBR moves to exclude Dr. Marc Hillmyer[38] as an expert. Keurig's counterclaim against Plaintiff JBR alleges that JBR's products are misleadingly advertised as biodegradable, compostable, and eco-friendly. (*See* Doc. 416.) In support of its counterclaim, Keurig offers the expert testimony of Dr. Marc Hillmyer regarding his scientific opinion on JBR's OneCup, (*see* Doc. 1522 ¶ 1), which it claims has no plastic and is 97% biodegradable and compostable, (*see* Doc. 416 at 38).

---

[38] JBR hired Dr. Joseph P. Greene "to provide [his] scientific opinion on the biodegradability and compostability of the OneCup single serve coffee portion pack or pod" and to "review and opine in response to the opinions and data contained in the expert report of Dr. Marc A. Hillmyer." (Doc. 1522, Ex. 5 ¶¶ 2, 19.) Dr. Hillmyer filed an expert report in response to the assertions made by Dr. Greene, (Doc. 1522, Ex. 6), but Keurig did not file a *Daubert* motion to exclude Dr. Greene as an expert in this case.

JBR moves to exclude Dr. Hillmyer's testimony because his expertise "simply does not match the scientific questions at issue in Keurig's claim against JBR" and is therefore "unreliable and without sufficient foundation." (Doc. 1485 at 1.) Specifically, JBR asserts that Dr. Hillmyer "has no expertise in measuring or analyzing the rate and timing of degradation of bioplastics in soil, landfills, compost, or even lab simulations" and did not do any degradation studies of JBR's OneCup. (*Id.*) In opposition, Keurig argues that "Dr. Hillmyer is not required to undertake JBR's preferred methodology" and "take JBR's OneCups, bury them in a compost pile or a landfill, wait years or decades, and confirm that the packs had not degraded." (Doc. 1519 at 2.)

In analyzing the OneCup, Dr. Hillmyer identified three main components: (1) the lid; (2) the ring; and (3) the mesh filter cup. (Doc. 1522, Ex. 2 ¶ 10.) Dr. Hillmyer first provides the definitions for biodegradation based on various scientific works and outlines the findings of a 2012 study entitled "Assessment of anaerobic degradation of Ingeo™ polylactides under accelerated landfill conditions" evaluating the biodegradation of polylactide. (*Id.* ¶¶ 18–22.) After discussing biodegradation, Dr. Hillmyer discusses the definition of compostability and the EPA's finding that "[t]here are currently no [American Society for Testing Materials] standard test methods in place for evaluating the ability of a plastic to compost in a home environment." (*Id.* ¶¶ 28–33.)

Dr. Hillmyer then evaluated the composition of each of the three components and determined that each contained materials that "will not significantly biodegrade in a landfill, an industrial composting facility, or a typical home composting environment for decades." (*Id.* ¶¶ 55, 65, 71.) The lid contains polyactide, which "requires hydrolysis and long times to significantly degrade under simulated landfill conditions where the temperatures are relatively low, and the conditions are anaerobic." (*Id.* ¶ 53.) In addition to polyactide, the lids also contain

common plastics such as polyethylene and polyethylene terephthalate "that have not been established as compostable" and "are highly resistant to natural degradation." (*Id.* ¶ 55.) The ring is made from DaniMer 15120-UrthPact, and Dr. Hillmyer opined that based on the order of the components of DaniMer 15120-UrthPact, "the principal component is likely polyactic acid."[39] (*Id.* ¶ 60.) As previously stated in his analysis of the lid, polyactide "will not significantly biodegrade in a landfill or typical home composting environment, over the course of many years." (*Id.* ¶ 62.)

Lastly, the mesh filter cup consists of polyethylene terephthalate plastic, (*id.* ¶ 69), which is a "traditional plastic" that is "highly resistant to natural degradation," (*id.* ¶ 71). The bio filter of the mesh filter cup contains polylactide, which Dr. Hillmyer again opines "will not significantly biodegrade in a landfill or typical home composting environment, over the course of many years." (*Id.* ¶ 72.) In order to assess JBR's claim that 97% of the coffee-filled OneCup is biodegradable, Dr. Hillmyer analyzed and weighed 20 individual cups. (*Id.* ¶ 77.) After finding that the lid, ring, and mesh filter make up at least 20% of the weight of a No Waste OneCup that is filled with coffee, Dr. Hillmyer opined that in "no version of the coffee-filled OneCup will 97% of the coffee-filled OneCup biodegrade in the natural environment, a landfill, or a typical home composting environment within one year." (*Id.* ¶ 78.)

I find that Dr. Hillmyer's approach is admissible under Rule 702. First, I find that Dr. Hillmyer is qualified as an expert on the biodegradation and compostability of plastics. While recognizing the importance of not allowing expert testimony that could "stray from the scope of [a witness's] expertise," *United States v. Dukagjini*, 326 F.3d 45, 56 (2d Cir. 2003), JBR's assertion that this case requires a specific expertise in "measuring or analyzing the rate and

---

[39] Polyactic acid is also sometimes referred to as polylactide. (*See* Doc. 1522 ¶ 59.)

timing of degradation of bioplastics in soil, landfills, compost, or [] lab simulations" is too narrow, (Doc. 1485 at 1).  JBR's assertion speaks more to its arguments regarding methodology than to Dr. Hillmyer's actual expertise.  Dr. Hillmyer's experience qualifies him as an expert in the field of sustainable polymers, including the preparation, chemical recyclability, biodegradation, and reprocessing of polymers.

Second, his proposed opinion is based on reliable data and his methodology involved utilizing the reliable data in order to evaluate the OneCup based on its composition.  *See* Fed. R. Evid. 702(c)–(d).  I agree with Keurig's assertion that JBR's preferred methodology of conducting degradation studies on the OneCups specifically, (*see* Doc. 1485 at 1), is not the only appropriate method.  Furthermore, as Keurig points out, JBR's assertion that Dr. Hillmyer should have tested the product is undermined by the fact that "no one—neither Dr. Hillmyer, nor anyone else—has tested the OneCup or any similar product in real world conditions to assess its rate of degradation in landfills, industrial compost conditions, or home compost conditions."  (Doc. 1519 at 6 n.10.)  Finally, I find that Dr. Hillmyer's proposed testimony would be helpful to the trier of fact in evaluating Keurig's allegation that JBR's claim that its OneCups have "No Plastic" and are "97% biodegradable" and "compostable" are false and misleading.  (*See* Doc. 416 at 38.)

## O.  *Dr. Keith Ugone ("Ugone Motion") (Doc. 2078)*

Plaintiff BJ's Wholesale Club, Inc. ("BJ's") seeks to exclude certain opinions of Dr. Ugone.  (Doc. 2078.)  For the reasons that follow, this motion is denied.

BJ's seeks to exclude Dr. Ugone's opinions on the grounds that he presents unreliable "adjustments" to the damages model of BJ's expert, Dr. Johnson, (Doc. 2079 at 5–6), and that, even if admissible under Rule 703, Dr. Ugone's opinion should be excluded under Rule 403, (*id.*

6–7).  In essence, BJ's arguments against Dr. Ugone's opinions are the same as the ones asserted by the TMJ Plaintiffs regarding Dr. Ugone's "adjustments" to their experts' models, including BJ's reliance on *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 2017 WL 10434367.  For the reasons explained in Section II.K.1, Dr. Ugone may engage in this kind of robustness testing without offending the requirements of Rules 702 and 403.  As explained *supra* at footnote 34, such robustness testing only becomes unreliable when an expert presents the results of robustness testing of an unreliable model as reliable results.  Although BJ's attempts to frame Dr. Ugone's presentation along these lines, Dr. Ugone's expert report makes clear that he is not presenting his adjustments as reliable damages estimates.  (*See, e.g.*, Doc. 2079, Ex. A ¶ 164 ("For illustrative purpose only, I provide in Table 21 how Dr. Johnson's claimed overcharges amount is impacted by adjusting his regression models to address certain (but not all) of the deficiencies present in his regression models.  Even with these select adjustments, Dr. Johnson's regression models remain unreliable.").)  Dr. Ugone also adhered to this position in his deposition.  (*See* Doc. 2079, Ex. B at 222:15–16 ("I am not proffering these as alternative damage numbers.").)  Accordingly, the Ugone Motion is denied.

### P. *Dr. Phillip Johnson ("Johnson II") (Doc. 2083)*

Keurig moves to exclude the testimony of Dr. Johnson, BJ's damages expert.  (Doc. 2083.)  Keurig asserts that Dr. Johnson's opinion (1) fails to isolate the effect of Keurig's purportedly unlawful conduct because it does not account for significant lawful factors such as brand value, (Doc. 2084 at 5, 8–10), cup design differences, (*id.* at 6), and business practices, (*id.* at 7); (2) uses a flawed benchmark (unlicensed portion packs), (*id.* at 10–11); (3) is inconsistent with evidence, (*id.* at 11–12); and (4) produces implausible results, (*id.* at 12–13.)  For the following reasons, this motion is denied.

Three of Keurig's arguments I address here with reference to my previous rulings in this Opinion & Order.  First, Keurig's objections to Dr. Johnson's use of unlicensed single-serve cup manufacturers Mother Parkers, TreeHouse, and JBR as benchmarks, (*id.* at 10–11), is without merit.  I explained why Dr. Johnson's use of a comparable benchmark analysis involving the same companies does not render his analysis unreliable in Section II.H.2.  Keurig proffers no argument to undermine the application of that argument to Dr. Johnson's opinion here.

Second, Keurig objects that Dr. Johnson failed to account for the value of Keurig's brand or the impact of the companies' different cup designs.  (*See* Doc. 2089 at 5–6.)  These objections are also without merit.  Keurig raised similar objections in *Johnson I*, and I found that Dr. Johnson had a sufficient factual basis to determine that Keurig's brand value was not a necessary variable that had to be incorporated into his model to render it admissible.  *See supra* § II.H.1.  Here, Dr. Johnson has similarly identified a sufficient factual basis to discount Keurig's brand value in his evaluation of BJ's damages.  (*See* Doc. 2090, Ex. 1 ¶¶ 125, 125 n.252 (summarizing the bases for this determination).)  I similarly found that Keurig had made no showing that cup design was a substantial variable that Dr. Johnson had to control for in his model.  *See supra* § II.H.1.  The parties' dispute over Dr. Johnson's BJ's analysis involved a similar exchange of dueling documents as over the relative merits of JBR's versus Keurig's cup design.  (*Compare* Doc. 2084 at 6, *with* Doc. 2112 at 8–9.)  As before, this dispute does not suggest that cup design is the kind of "significant" variable whose absence merits the exclusion of Dr. Johnson's model. *Gruber*, 2021 WL 2482109, at *10.

Third, Keurig objects that Dr. Johnson's model is inconsistent with evidence in the record because it shows that, during the relevant time period in this case, overcharges increased even as prices decreased, and that price changes continued to increase after most of the alleged

112

anticompetitive conduct ceased.  (Doc. 2084 at 11–12.)   As in the *Johnson I* motion, Keurig's argument on this point is based not on Dr. Johnson's model, but on a modified model created by its own expert to evaluate Dr. Johnson's model.  (*Id.* (citing Doc. 2090, Ex. 6, Ex. 19).)  As Dr. Johnson explained, the results from his model might change when run using a modified model drawing on a different data analysis method.  (Doc. 2111, Ex. 1 at 127:4-129:20.)  As I previously noted in Section II.H, I will not strike an expert's opinion on the basis of a model misattributed to that expert which that expert did not create.

### 1.   Failure to Account for Significant or Lawful Factors

Keurig lodges two objections based on Dr. Johnson's failure to account for significant or lawful factors in his damages estimate.  I do not find that these objections suggest unreliability in Dr. Johnson's opinion sufficient to warrant exclusion.  Keurig first objects that Dr. Johnson's model fails to account for differences between Keurig's business practices and JBR's business practices.  (Doc. 2084 at 7.)  Keurig hypothesizes that "JBR's choice to prioritize a couple of customers that buy in bulk at lower prices likely resulted in a price difference between JBR's packs and genuine K-Cups, which are not so heavily tilted toward these channels."  (*Id.*) However, although Keurig cites support for the fact that JBR sold through different channels, (*id.*), there is no support that these business practices actually resulted in price differentials or inflated Dr. Johnson's estimates.  This is the kind of "conjecture or assertion" that is insufficient to demonstrate a model is unreliable for failure to include a specific variable.  *Teva Pharms. USA, Inc.*, 2019 WL 13244252, at *2 (internal quotation marks omitted).  Indeed, if this type of conjecture was sufficient to mount a missing variable challenge, it is unlikely that any regression model could survive Rule 702 review.

Keurig's second objection is that Dr. Johnson has inappropriately controlled for the value of coffee brand value, first by using bagged coffee as a proxy variable, and then by using an alternative "brand tier" method of controlling for coffee brand value. (Doc. 2084 at 8–10.) I have previously found in *Johnson I* that bagged coffee may be used as a proxy variable for brand value so long as it is related to the variable of interest and does not distort the model's results. *See supra* § II.H.1. Similarly, here, Dr. Johnson concluded that bagged coffee prices can represent a viable proxy variable for brand value given consumers' association with common brands in the bagged coffee and single serve coffee markets, and the correlations between bagged coffee prices and single-service coffee costs. (Doc. 2090, Ex. 1 ¶¶ 122–24.) Moreover, this proxy variable had a statistically significant role in explaining price differentials. (*Id.* ¶ 130.) Thus, I find this objection without merit for the same reasons previously found in Section II.H.1.

Keurig's objection to Dr. Johnson's alternative "brand tier" methodology is similarly without merit. (Doc. 2084 at 9–10.) As a sensitivity test,[40] Dr. Johnson ran a model using, as an alternative to bagged coffee, a variable based on "brand tiers," in which various brands were sorted into two tiers, and a variable was created to reflect this sorting. (Doc. 2090, Ex. 2 ¶¶ 47, 50, Fig. 10.) The brand sorting was based on Keurig documents suggesting that Keurig follows a similar "brand tier" strategy in pricing and product placement. (*Id.* ¶¶ 48–49.) The results from models using this brand tier variable are consistent with the results produced when bagged coffee is used. (*Id.* ¶ 51.) Given that both proxy variables produce consistent results and do not evidence any distortive effects in the model, I find that the use of these proxies does not render Dr. Johnson's model unreliable.

---

[40] The process of sensitivity testing is described *supra* at Section II.H.4 footnote 24.

## 2. Production of Implausible Results

Keurig's final objection is that Dr. Johnson's model produces implausible results. It identifies two such purported improbabilities. (Doc. 2084 at 12–13.) The first is that Dr. Johnson's model shows overcharges even for companies not alleged to have engaged in anticompetitive conduct. (*Id.* at 12–13.) These results were created not by Dr. Johnson, but by Keurig's expert, Dr. Ugone, who applied Dr. Johnson's model to Mother Parkers and found that Mother Parkers similarly showed an "anticompetitive overcharge" for three of four Mother Parkers brands Dr. Ugone tested. (Doc. 2090, Ex. 6 ¶¶ 72–74.) Keurig cites the Palgrave Handbook of Econometrics, which describes this methodology as an "anti-test," or a "placebo test," a robustness testing methodology that "appl[ies] a model or identification strategy in a context where no effect should be detected." (Doc. 2090, Ex. 10 at 574 (*Applied Econometrics*, Palgrave Handbook of Econometrics 2 (Terence C. Mills & Kerry Patterson eds., 2009)).) Put another way, Keurig proposes to undermine the reliability of Dr. Johnson's model by showing that it produces false positives, *i.e.*, overcharges, in a situation where none should be found— here, the prices of a competitor not alleged to have engaged in anticompetitive conduct. However, as Dr. Johnson explains, the model he developed was not designed to be used to assess pinpointed, disaggregated prices for individual brands during a specific time period. (Doc. 2111, Ex. 1 at 175:7-177:6.) Although Keurig's experts are free to make modifications to Dr. Johnson's model, either by applying it to different scenarios, or using it for different purposes than it was designed, the further these modifications take the model from its original function and inputs, the less weight the critique deserves in assessing the model's reliability. In other words, if Dr. Johnson has built a car, that car is not unreliable because Keurig shows that it

makes a poor boat.  Keurig's arguments on this point thus fail to suggest Dr. Johnson's opinion is unreliable.

Second, Keurig asserts that the results are implausible because Dr. Johnson's model "illogically finds that, in the but-for world, genuine K-Cups with leading coffee brands would be sold at prices *lower* than those of unlicensed packs with little-known coffee brands."  (Doc. 2084 at 13 (emphasis in original).)  Dr. Ugone suggests that "[t]his result is inconsistent with the economic evidence in support of a Keurig brand premium and the premium value of many K-Cup brands."  (Doc. 2090, Ex. 6 ¶ 119.)  As has been discussed at length, *see supra* §§ II.H.1, II.P, the question of whether a Keurig brand premium exists, and the impact of that brand premium, if any, is not so clear as to render fluctuations and differentiations in value across different brands the kind of issue that bring the reliability of an expert's opinion below the threshold for admissibility.  If Keurig wishes to litigate the issue of its brand value at trial, it is free to do so, but given the limited evidence of brand value's impact, such attacks go to weight, not admissibility.  *See* Fed. R. Evid. 702 Advisory Committee cmt. 2023 ("[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.").

### Q.  *Dr. Martin Asher (Doc. 2086)*

Keurig moves to exclude the testimony of Plaintiff Winn-Dixie Stores Inc.'s ("Winn-Dixie") damages expert, Dr. Martin A. Asher.  For the reasons that follow, this motion is denied.

Several of Keurig's objections to Dr. Asher's analysis may be addressed briefly in light of my prior holdings in this Opinion & Order.  Indeed, Keurig explicitly aligns several of its critiques of Dr. Asher with critiques previously made concerning Dr. Johnson, (Doc. 2087 at 1), and notes that in many places, Dr. Johnson's and Dr. Asher's analyses are virtually identical, (*id.*

at 2, 5, 11, 12).  Specifically, Keurig objects that Dr. Asher has failed to account for Keurig's

brand value, (*id.* at 5–6), differences in cup design, (*id.* at 6–7), differences in Keurig and JBR's

business practices, (*id.* at 7–8), the use of bagged coffee as a proxy variable for brand value, (*id.*

at 8–9), the use of JBR, TreeHouse, and Mother Parkers as benchmarks, (*id.* at 10–11), and the

implausibility of his results relating to overcharges and price differentials across brands, (*id.* at

13–14).

    I have considered and rejected Keurig's virtually identical arguments on these grounds in

the context of Dr. Johnson's opinion.  *See supra* §§ II.H.1, II.P, II.P.1 (declining to credit

objections based on the failure to account for Keurig's brand value, differences in cup design, or

differences in Keurig and JBR's business practices); §§ II.H.1, II.P.1 (approving the use of

bagged coffee as a proxy variable); §§ II.H.2, II.P (approving the use of JBR, TreeHouse, and

Mother Parkers as benchmarks); § II.P.2 (finding objections to the implausibility of Dr.

Johnson's results relating to overcharges and price differentials across brands to be without

merit).  Although comparable objections to an expert's methodology may lead a court to

different results when that methodology varies across experts, that is not the case here.  Indeed,

Keurig asserts that the analyses of Dr. Johnson and Dr. Asher are virtually identical in numerous

material aspects, (Doc. 2087 at 2, 5, 11, 12), and, having reviewed the bases for Dr. Asher's

opinion, I agree.  Given that I have rejected comparable objections to comparable methods

previously in this Opinion & Order, I do so again here for the same reasons previously

articulated.

### 1.  Nature of Claimed Overcharges

    Keurig objects that Dr. Asher's overcharge assessment is merely a price differential that

does not differentiate between the effects of Keurig's anticompetitive conduct and

procompetitive conduct. (Doc. 2087 at 9–10.) To capture the effect of Keurig's anticompetitive conduct, Dr. Asher created a binary variable called "challenged conduct," based on whether the relevant product is sold by Keurig. (Doc. 2114, Ex. 1 at 36:4-10.) The yardstick model then estimates a price differential based on this challenged conduct variable after controlling for various other effects on prices. (*Id.* at 38:2-18.) Keurig objects that this is insufficient to separate out the price impact of its procompetitive acts from any anticompetitive acts. (Doc. 2087 at 9.) It further notes that, the model might need to be reconsidered if the fact-finder rejects any of Winn-Dixie's allegations. (*Id.* at 10.)

These objections are insufficiently substantiated to merit the exclusion of Dr. Asher's opinion. As Dr. Asher notes in his reply report, the price differentials he finds are not merely the difference between licensed and unlicensed cups as Keurig suggests, but that differential accounting for several control variables and based on the use of benchmark comparators not alleged to have engaged in anticompetitive conduct. (Doc. 2090, Ex. 13 ¶¶ 11, 19–22.) Although the model does not disaggregate the damages associated with each alleged competitive act, such disaggregation, as noted *supra* in Section II.C.3, is not necessary where no allegations have been rejected. Indeed, Dr. Asher's model and method, as Keurig repeatedly notes, (Doc. 2087 at 2, 5, 11, 12), is similar to the model and method I have approved when employed by Dr. Johnson.

Moreover, although Keurig suggests the possibility that these price differentials might be the result of procompetitive conduct, it offers no concrete evidence of how to account for such conduct. This kind of challenge based on the failure to include purportedly significant factors cannot survive unless it is "specific" and makes a particular "showing of relevance." *Sobel*, 839

F.2d at 34.  Keurig's generalized assertions about the failure to account for procompetitive conduct are thus insufficient.

## 2. Consistency with Undisputed Evidence

Keurig asserts that Dr. Asher's opinion is inconsistent with undisputed evidence because his model finds increased overcharges even as unlicensed single-serve cup prices declined and Winn-Dixie's purchase of unlicensed cups increased.  (Doc. 2087 at 12–14.)  This objection is without merit in light of Dr. Asher's bases for his opinion.  As he explained at this deposition, even if Winn-Dixie purchased more unlicensed single-serve cups, the overcharges are based on increasing levels of anticompetitive activity by Keurig over time, (Doc. 2114, Ex. 1 at 67:1–68:7), which he asserts had a cumulative effect on the overcharges paid by Winn-Dixie, notwithstanding increased purchases of unlicensed single-serve products not affected by the anticompetitive conduct, (*id.* 69:7–15).  Winn-Dixie also disputes Keurig's broader premise that prices uniformly declined during the relevant period.  (*See* Doc. 2114 at 14 (summarizing evidence)).

The Advisory Committee on the Federal Rules of Evidence caution that "[w]hen facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts."  Fed. R. Evid. 702 Advisory Committee cmt. 2000.  However, Rule 702(b)'s emphasis on "'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  *Id.* Rather, so long as there are "sufficient facts or data," "it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003); *see also Richardson v. Corr. Med. Care, Inc.*, No. 22-210, 2023 WL 3490904, at *3 (2d Cir. May 17, 2023) ("In excluding [expert's]

opinion, the district court strayed from its role as the gatekeeper of reliable and relevant expert evidence into the realm of resolving contested issues of fact.").

Thus, while Keurig may cross Dr. Asher on the factual bases for his opinion, the fact that Dr. Asher and Keurig disagree on the interpretation and weighing of various facts in the record does not render his opinion the sort that is "not grounded in the economic reality" because it "ignored inconvenient evidence." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000). Rather, such factual disputes are the kind of issues that go to weight and that are therefore properly considered by the fact-finder.

### 3. Testimony on Starbucks and Smucker Damages

Keurig finally objects that Dr. Asher's opinion on damages based on Winn-Dixie's purchases of K-Cups from companies such Starbucks and Smucker is irrelevant because these damages are indirect and therefore not recoverable pursuant to *Illinois Brick Company v. Illinois*, 431 U.S. 720, 736 (1977). (*See* Doc. 2087 at 14.) Both parties cite to their own summary judgment briefing in their arguments on this issue. (*See* Doc. 2129 at 10 (citing to Doc. 2120 at 9–10); Doc. 2114 at 20 (citing to Doc. 2102 at 23–25)). The parties' arguments thus turn on my determination of this legal issue. Courts in this District similarly faced with Rule 702 objections that would require them to prejudge the legal merits of a party's argument have, instead, denied motions on those grounds with leave to renew in the event that subsequent rulings merit such renewal. *See, e.g.*, *Bozick v. Conagra Foods, Inc.*, No. 19-CV-4045, 2022 WL 4561779, at *39 (S.D.N.Y. Sept. 28, 2022) (granting parties leave to renew objections to expert testimony given that "the parties' arguments as to the relevancy of certain of this testimony and its admissibility under Rule 702 are likely to change substantially" following a ruling narrowing which causes of action were triable); *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075,

2022 WL 2757643, at *3 (S.D.N.Y. July 14, 2022) (denying *Daubert* motions with leave to renew where "[t]he *Daubert* motions—particularly those pertaining to Plaintiffs' damages expert—present several questions related to damages that raise legal questions that may shape the way the parties present their cases").

I similarly decline to address a Rule 702 motion that would require me to prejudge the legal sufficiency of arguments raised by parties in a pending summary judgment motion. To the degree that later holdings render Dr. Asher's opinion on Starbucks and Smucker-based damages irrelevant, Keurig may renew its motion as to this objection.

### R. *Drs. Keith Ugone & Kevin M. Murphy ("Ugone-Murphy") (Doc. 2089)*[41]

Winn-Dixie moves to exclude the testimony of Drs. Ugone and Murphy. Winn-Dixie proffers numerous objections to these experts' opinions, none of which merit the exclusion of these opinions.

#### 1. Variable Testing

Winn-Dixie's first objection is that one of Dr. Ugone's methods of testing the reliability of Dr. Asher's model is unsupported by econometric literature. (Doc. 2089 at 3–6.) Specifically, Winn-Dixie objects that the use of a test Dr. Ugone ran on Dr. Asher's model, which was derived from the textbook *Quantitative Techniques for Competition and Antitrust Analysis*, is contradicted by that source. (*Id.* at 3–4.) Setting aside whether it would be appropriate to strike an expert's opinion based on divergent interpretations of a properly-implemented economic method, Winn-Dixie's argument overstates the import of the source. The basic dispute is that Dr. Ugone implemented a data testing method from a particular textbook,[42] in which an analyst

---

[41] Winn-Dixie also suggests that these opinions should be excluded under Rule 403, but offers no substantial analysis as to why. Accordingly, I decline to exclude any testimony on these grounds.

[42] Peter Davis and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis* 361 (Princeton

removes all variables from a model and then interactively adds them back in to assess how the variable of interest (e.g., anti-competitive conduct) responds.  This textbook notes that if the variable of interest does not appear to respond to changes in which variables are added, that may suggest that the model is properly capturing that variable's effect.  (Doc. 2090, Ex. 1 at 361.)  However, as Dr. Ugone explained in his deposition, an alternative explanation when a variable is added to a model and does not do anything is that this variable has no effect on the outcome of interest.  (Doc. 2089, Ex. 3 at 129:17–24.)  Commonsense confirms the intuition:  if one created a model with a variable of interest designed to capture anti-competitive conduct, but then introduced non-sensical or unrelated "control variables" such as the number of SDNY law clerks hired in 2024, the value that the variable of interest failed to change in response to a non-sensical variable could as easily suggest that the model is not being properly developed as it could that the variable of interest is properly identified.  This is the thrust of Dr. Ugone's objection to the control variables employed by Winn-Dixie's experts:  that they are not actually capturing anything related to anticompetitive conduct, and his variable testing method is a permissible way of demonstrating this proposition.

### 2.  Cherry-Picking

Winn-Dixie next objects to Dr. Ugone opining that their expert's model is flawed based on tests he ran on Mother Parkers data.  (Doc. 2089 at 6–9; *see also supra* §§ II.P.2, II.Q (discussing Keurig's objections based on Mother Parkers data).)  It asserts that Dr. Ugone is engaged in "data mining" or "data snooping" (effectively "cherry-picking" favorable data) by selectively testing Mother Parkers data and not running similar tests on other data.  (Doc. 2089 at 7.)  This is wrong.

---

University Press, 2010), located at Doc. 2090, Ex. 1.

"When constructing a benchmark statistic, the regression analyst may not 'cherry-pick' the time-frame or data points so as to make her ultimate conclusion stronger." *Reed Const. Data Inc.*, 49 F. Supp. 3d at 400; *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17-CV-4188, 2021 WL 4037820, at *5 (S.D.N.Y. Sept. 3, 2021) ("An expert must not cherry-pick from the scientific landscape and present the Court with what he believes the final picture looks like." (internal quotation marks omitted)), *aff'd*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023). Here, Dr. Ugone did not "pick" Mother Parkers—Plaintiffs did. Once Plaintiffs decided to put Mother Parkers data at issue, Dr. Ugone was entitled to test the reliability of that data and findings derived from it.

It is of no account that Dr. Ugone did not run similar tests on TreeHouse or JBR data. (*See* Doc. 2089 at 8.) As a rebuttal expert he does not need to produce comprehensive models or methods, only to attack Plaintiffs' models, *Scott*, 315 F.R.D. at 44, and he can do this by attacking only specific components of the analysis or data Plaintiffs have put forward, *see, e.g.*, *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 193 (S.D.N.Y. 2006) ("[T]here is nothing inappropriate about accepting the majority of that expert's analysis and demonstrating the consequence of changing certain variables.").

Winn-Dixie similarly accuses Dr. Murphy of selection bias or "data snooping." (Doc. 2089 at 15–18.) Winn-Dixie's critique on this point is not entirely coherent, and I do not find it provides any basis to exclude Dr. Murphy's opinion. Winn-Dixie does not specifically identify which brands or data Dr. Murphy uses to engage in selection bias, and this kind of "mere conjecture or assertion on [Winn-Dixie's] part is insufficient," as a basis to strike an expert's opinion. *Teva Pharms. USA, Inc.*, 2019 WL 13244252, at *2 (internal quotation marks omitted). In any case, I have approved robustness testing, the assessment of an expert's model by

"applying that methodology to different data or with different assumptions and examining the results produced," *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d at 468, for the reasons discussed *supra* in Section II.K.1, and Dr. Murphy's robustness testing of Dr. Asher's model by using different comparison brands constitutes this kind of permissible robustness testing.

### 3. Brand Value and Bagged Coffee

Winn-Dixie's next objection is an inverse of Keurig's criticism on brand values:  Winn-Dixie objects that the opinions of Dr. Ugone and Murphy that the failure to account for Keurig's brand value renders Plaintiffs' experts' opinion unreliable is, itself, unreliable.  (Doc. 2089 at 9–11.)  It also objects to these experts' opinion that bagged coffee is not a reliable proxy variable for brand value and should be excluded.  (Doc. 2089 at 12–13.)

I have found that Plaintiffs' experts had sufficient reason to determine that Keurig's brand value was not a variable so important that its exclusion rendered their models unreliable. *See supra* §§ II.H.1, II.P.1.  However, "[w]hen a trial court . . . rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."  *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 229 (internal quotation marks omitted).  It merely means that it is "more likely than not that the admissibility requirement has been met" and that any further attacks go only to the weight a fact-finder should give the expert opinion, not its admissibility. Fed. R. Evid. 702 Advisory Committee cmt. 2023.

Although plaintiff experts have marshalled a sufficient body of evidence to suggest that Keurig brand-value is not relevant, and that bagged coffee is a proper proxy variable, Keurig has also mustered evidence suggesting that their brand has value that ought to have been considered in these experts' opinions, (Doc. 2115 at 7–9 (summarizing record evidence)), and that the

explanatory value of bagged coffee as a proxy variable is marginal, (*id.* at 10 (summarizing evidence)).  The dispute between these comparably reliable bodies of evidence over the value of Keurig's brand and the factual connection of bagged coffee to broader brand value is the kind of factual dispute properly left to the fact finder.  *Richardson,* 2023 WL 3490904, at *3.

### 4.  Regression Control Variables

Winn-Dixie's final objection is that Dr. Ugone should not be able to critique their selection of regression variables because those variables contribute to the ability of their expert's model to explain price differences in the market.  (Doc. 2089 at 13–15.)  Winn-Dixie submits no authority for the proposition that the inclusion of certain proper variables in a model immunizes an expert's opinion from rebuttal critiques that other variables would have been more appropriate or rendered a more accurate model, and courts have permitted rebuttal experts to attack an opposing expert's model even if that model meets the baseline requirements for admissibility. *See, e.g.*, *Capri Sun GmbH*, 595 F. Supp. 3d at 135–42 (permitting a rebuttal expert to critique admitted expert testimony).  Given this, and the lack of any countervailing authority shared by Winn-Dixie, I do not find this objection a sufficient reason to exclude Dr. Ugone's critique of Dr. Asher's variable selection.

### III.  <u>Conclusion</u>

For the reasons stated, IT IS HEREBY ORDERED that

- The motion to exclude the testimony of the Hon. Arthur Gajarsa (ret.) is GRANTED.

- The motion to exclude the testimony of the Hon. James Ware (ret.) and the Hon. Randall Rader (ret.) is DENIED as moot.

- The motion to exclude the testimony of Dr. Gareth Macartney is GRANTED in part and DENIED in part.

- The motion to exclude the testimony of Dr. Gary French is GRANTED in part and DENIED in part.

- The motion to exclude the testimony of Hal Poret is DENIED.

- The motion to exclude the testimony of Sarah Butler is DENIED.

- The motion to exclude the testimony of Dr. Mohan Rao is DENIED.

- The Johnson I motion to exclude the testimony of Dr. Phillip Johnson is DENIED.

- The motion to exclude the testimony of Dr. Lauren Stiroh is DENIED.

- The motion to exclude the testimony of Dr. David Sibley is GRANTED in part and DENIED in part.

- The TMJ Motion to exclude the testimony of Dr. Keith Ugone is GRANTED in part and DENIED in part.

- The motion to exclude the testimony of Dr. Kevin Murphy is DENIED.

- The motion to exclude the testimony of Dr. Mr. Mark Wood is DENIED.

- The motion to exclude the testimony of Dr. Marc Hillmyer is DENIED.

- The Ugone Motion to exclude the testimony of Dr. Keith Ugone is DENIED.

- The Johnson II motion to exclude the testimony of Dr. Phillip Johnson is DENIED.

- The motion to exclude the testimony of Dr. Martin Asher is DENIED.

- The Ugone-Murphy motion to exclude the testimony of Drs. Keith Ugone and Kevin M. Murphy is DENIED.

Because this Opinion & Order was decided based on sealed materials not filed on the public docket, the Opinion & Order will be filed under seal. The parties are directed to meet and confer with regard to proposed redactions, and to propose redactions to me within the next thirty days. I will then review the proposed redactions and, if appropriate, implement them before

publicly filing the Opinion & Order.  If the parties do not submit proposed redactions within thirty (30) days, I will file the Opinion & Order in its current form on the public docket.

The Clerk of Court is respectfully directed to close the motions at Docs. 1220, 1406, 1439, 1442, 1445, 1449, 1452, 1456, 1460, 1464, 1470, 1474, 1478, 1484, 2078, 2083, 2086, 2089, and 2237.

SO ORDERED.

Dated: January 3, 2025
      New York, New York

Vernon S. Broderick
United States District Judge