# Exhibit A

**(Redacted)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X
                                                       :
IN RE:                                                 :
                                                       :           14-MD-2542 (VSB)
KEURIG GREEN MOUNTAIN SINGLE-        :           14-MC-2542 (VSB)
SERVE COFFEE ANTITRUST                       :
LITIGATION                                             :
                                                       :           **OPINION & ORDER**
*This Document Relates to All Actions*         :           *Filed Provisionally Under Seal*
                                                       :
---------------------------------------------------------X

Appearances:

Michael M. Buchman
John A. Ioannou
Alex R. Straus
Motley Rice LLC
New York, New York

Kellie Lerner
Meegan Hollywood
Robins Kaplan LLP
New York, New York

*Counsel for Direct Purchaser Plaintiffs and*
*Interim Co-Lead Counsel for the Proposed*
*Direct Purchaser Plaintiff Class*

Lev Dassin
George S. Cary
Leah Brannon
Elaine Ewing
Cleary Gottlieb Steen & Hamilton LLP
New York, New York

Wendelynne Newton
Buchanan Ingersoll & Rooney PC
Pittsburgh, Pennsylvania

*Counsel for Defendant Keurig Green Mountain, Inc.*

VERNON S. BRODERICK, United States District Judge:

Before me is the Direct Purchaser Plaintiffs' ("Plaintiffs" or "DPPs") motion for class certification, which seeks to certify a class of all persons and entities that purchased at least one branded single serve cup, called a K-Cup, from Defendants Keurig Green Mountain Inc., Green Mountain Coffee Roasters Inc., and Keurig Incorporated ("Defendants" or "Keurig") from October 1, 2012 to present.[1] For the reasons that follow, Plaintiffs' motion for class certification is DENIED.

I.    **Background**[2]

Keurig manufactures and sells single-serve beverage brewers, as well as portion packs, the disposable pods that are inserted into single-serve brewers to make coffee and other beverages in individual quantities in under a minute. (Doc. 237 ("DPP Amended Complaint" or "DPP AC") ¶ 7.) Although portion packs come in many different forms, a portion pack must be compatible with a particular single-serve brewer to be usable with that brewer. (Id. ¶ 8.) Keurig's most popular brewer is the Single-Serve K-Cup Brewer, which is compatible with portion packs sold by Keurig under its brand name as well as those sold under its licensees' brand names ("K-Cups"), as well as some portion packs manufactured and sold by Keurig's competitors. (Id. ¶ 9.)

Until September 2012, Keurig's K-Cup filter technology was patented. (Id. ¶ 13.) Almost all portion packs that were compatible with Keurig brewers were K-Cups, with the

---

[1] Plaintiffs seek to certify a class of customers who purchased K-Cups from any of the three Defendants, collectively referred to as Keurig. The opposition brief is signed by attorneys for "Defendant Keurig Green Mountain, Inc." Defendants Green Mountain Coffee Roasters Inc. and Keurig Incorporated did not file separate opposition briefs. For consistency, I refer to Defendants jointly throughout the brief.

[2] The facts are taken from the parties' pleadings, in addition to the class certification briefing and accompanying declarations. *See Reynolds v. Giuliani*, 118 F. Supp. 2d 352, 388 (S.D.N.Y. 2000) ("[A] court may consider material outside the pleadings in determining the appropriateness of class certification.").

exception of some filter-free alternatives introduced by TreeHouse Foods, Inc. ("TreeHouse")

and JBR, Inc. ("Rogers") in 2010. (No. 14-CV-4242, Doc. 83 ("Rogers AC") ¶¶ 34–36.) After

the K-Cup filter patents expired in 2012, multiple companies launched, or announced their intent

to launch, filtered portion packs that were compatible with Keurig brewers, some of which were

priced lower than K-Cups. (No. 14-CV-905, Doc. 86 ("TreeHouse AC") ¶¶ 15, 216–20.)

Recognizing the filter patent expiration as a threat to Keurig's dominance in the portion

pack market, Keurig responded with a "multi-dimensional scheme to exclude competition."

(DPP AC ¶ 13.) Plaintiffs claim this scheme included (i) filing sham patent infringement

lawsuits against competitors TreeHouse and Rogers; (ii) entering into exclusive agreements with

suppliers to limit competitors' ability to manufacture portion packs; (iii) disparaging portion

packs made by competitors, including by making baseless claims that non-Keurig portion packs

degraded the operability of Keurig brewers; and (iv) launching a successor brewer, the 2.0 K-

Cup Brewer, designed with technology intended to ensure that the brewer only works with

Keurig-designed K-Cups. (*Id.* ¶¶ 16–19.) The DPPs allege that as a result of Keurig's anti-

competitive conduct, they have been deprived of a meaningful choice when purchasing portion

packs and forced to pay supra-competitive prices for K-Cups. (*Id.* ¶ 20.)

## II.    Procedural History

On February 11, 2014, TreeHouse filed a complaint against Keurig alleging antitrust and

related violations in the Southern District of New York. (No. 14-CV-905, Doc. 2.) Shortly

thereafter, on March 13, 2014, Rogers filed its complaint in the Eastern District of California.

(No. 14-CV-4242, Doc. 1.) In addition to the Rogers and TreeHouse lawsuits, many similar

actions were filed in early 2014 in federal district courts around the country alleging that Keurig

engaged in unlawful anticompetitive conduct related to the 2.0 Brewer. Among those actions

were lawsuits filed by individual direct purchasers and individual indirect purchasers.  On March

20, 2014, the named plaintiff in one of the related cases moved the Judicial Panel on Multidistrict

Litigation ("JPML") to centralize all of the cases concerning the 2.0 Brewer in a single

multidistrict litigation ("MDL") in this District.  (*See* Doc. 1.)  The proposed MDL encompassed

three types of actions:  direct purchaser class actions, indirect purchaser class actions,[3] and

individual actions by competitor companies to Keurig.  (*Id.* at 1.)  The JPML concluded that all

of the related actions, including those filed by the direct purchasers, raised "virtually identical

factual questions concerning the conduct of Keurig." (*Id.* at 2.)  On June 3, 2014, pursuant to 28

U.S.C. § 1407, the JPML transferred these related actions to this District and assigned the action

to me for consolidated pretrial proceedings as part of the MDL.  (*Id.* at 3.)  On May 28, 2014, I

appointed interim co-lead counsel for the proposed direct purchaser class.  (No. 14-CV-1609,

Doc. 19.)  On July 24, 2014, the DPPs filed a Consolidated Class Action Complaint.  (Doc. 65.)

On May 24, 2021, the DPPs moved to certify the following class ("Direct Purchaser

Class"):

> All persons or entities that purchased between October 1, 2012 and the date on
> which the Court certifies the Class (the "Class Period") at least one branded coffee
> K-Cup directly from Keurig.  Excluded from the Class are Defendants and their
> employees, affiliates, parents, and subsidiaries; persons or entities that paid tolling
> fees to Keurig and did not otherwise purchase K-Cups directly from Keurig; as well
> as all federal governmental entities and instrumentalities of the federal government,
> states, and their subdivisions, agencies and instrumentalities.

(Doc. 1359-1 at 1.)  With the DPPs' motion for class certification, (Doc. 1359), they submitted a

memorandum of law, (Doc. 1361 ("DPP Mem.")), and a declaration, (Doc. 1363 ("Buchman

Decl.")).  On July 9, 2021, Keurig submitted a memorandum of law in opposition to DPPs'

motion for class certification, (Doc. 1419 ("Opp'n")) supported by a declaration, (Doc. 1417).

---

[3] I approved the settlement of the indirect purchaser class actions on June 7, 2021.  (Doc. 1394.)

On August 18, 2021, the DPPs submitted a reply memorandum.  (Doc. 1481 ("Reply").).

### III.    Legal Standard

To certify a class action, plaintiffs must "affirmatively demonstrate [their] compliance with" Federal Rule of Civil Procedure 23.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  To do so, plaintiffs must first show that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a); *see also In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 290 (2d Cir. 1992).

In addition to satisfying the four prerequisites of Rule 23(a), a class action must also "satisfy through evidentiary proof" the requirements of at least one of the three types of class actions listed in Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Here, plaintiffs assert that their proposed class qualifies for certification under both Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," and Rule 23(b)(3), which applies when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(2)–(3).  When considering whether a class action meets the standard of Rule 23(b)(3), courts consider:  "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against

5

class members; (C) the desirability or undesirability of concentrating the litigation of the claims

in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ.

P. 23(b)(3)(A)–(D).

Plaintiffs bear the burden of making each Rule 23 showing by a preponderance of the

evidence. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196,

202–03 (2d Cir. 2008). In determining whether a putative class meets the requirements for

certification under Rule 23, the court must resolve any factual disputes connected with this

determination. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006).

Frequently, there will be "some overlap" between a class certification determination and the

merits of the underlying claim because the "class determination generally involves

considerations that are enmeshed in the factual and legal issues comprising the plaintiff[s'] cause

of action." *Wal-Mart*, 564 U.S. at 351 (internal quotation marks omitted).

## IV. Discussion

### A. *Rule 23(a)*

#### 1. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is

impracticable." Although Plaintiffs do not quantify the exact number of class members, they

note that there are 395 unique purchasers from the Keurig.com website in a single year of the

class period, (DPP Mem. 8), which satisfies the numerosity requirement, s*ee Shahriar v. Smith &

Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) ("[N]umerosity is presumed where

a putative class has forty or more members" (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47

F.3d 473, 483 (2d Cir. 1995))); *see also D.S. ex rel. S.S. v. N.Y.C. Dep't of Educ.*, 255 F.R.D. 59,

71 (E.D.N.Y. 2008) ("Precise quantification of class members is not necessary, so long as

plaintiffs reasonably estimate the number to be substantial.").  Keurig does not address the issue of numerosity.  (*See generally* Opp'n.)  The Direct Purchaser Class satisfies the numerosity requirement of Rule 23(a)(1).

### 2.  Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to" the Direct Purchaser Class.  Commonality is a "low hurdle."  *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 204 (S.D.N.Y. 2022).  "[N]umerous courts have held that allegations concerning the existence, scope, and efficacy of an alleged antitrust conspiracy present important common questions sufficient to satisfy the commonality requirement of Rule 23(a)(2)."  *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 264 (D. Vt. 2011) (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 509 (S.D.N.Y. 1996)) (collecting cases).  Questions such as market definition or market power satisfy the commonality requirement in this case, which Keurig does not dispute.  (*See* Opp'n 20 (Keurig only addresses commonality once in its opposition, stating "DPPs say they have shown common issues sufficient to fulfill the commonality requirement of Rule 23(a), but that says nothing about predominance under Rule 23(b), which DPPs do not satisfy." (citation omitted)).)

### 3.  Typicality

Plaintiffs assert that the claims of the named plaintiffs ("Named Plaintiffs") are typical of the class they represent because, despite minor differences, each class member's claims arise from Keurig's anticompetitive conduct and would be remedied by the same injunctive relief and overcharge damages.  (DPP Mem. 10–11.)  Keurig argues that the claims of the Named Plaintiffs, individual consumers who bought K-Cups from Keurig's website at listed prices, are atypical because the majority of claimed class purchases were made by large corporations that

negotiated pricing directly with Keurig and purchased different types of products than the

Named Plaintiffs.[4]  (Opp'n 32–35.)  The facts of this case raise a close question as to whether

Plaintiffs can satisfy Rule 23(a)(3).

"Typicality requires that the claims of the class representatives be typical of those of the

class, and is satisfied when each member's claim arises from the same course of events, and each

class member makes similar legal arguments to prove the defendant's liability." *Barrows v.

Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (internal quotation marks omitted).  "The purpose of

the typicality requirement is to ensure that class representatives 'have the incentive to prove all

the elements of the cause of action which would be presented by the individual members of the

class were they initiating individualized actions.'"  *Floyd v. City of New York*, 283 F.R.D. 153,

175 (S.D.N.Y. 2012) (quoting *NASDAQ Mkt.-Makers*, 169 F.R.D. at 512).  Thus, the claims of

the named representatives and all class members need not be identical.  *See In re Oxford Health

Plans, Inc.*, 191 F.R.D. 369, 375 (S.D.N.Y. 2000).

"[I]n the Second Circuit, the typicality prerequisite is a low, flexible bar."  *Aley v.

Lightfire Partners, LLC*, No. 22-CV-330, 2024 WL 4007345, at *4 (N.D.N.Y. Aug. 30, 2024).

The purpose of the requirement is to ensure that "the named plaintiff's claim and the class claims

---

[4] Plaintiffs dispute this characterization, noting that "more than 99.8% of Class members are individuals and entities who, like the [N]amed Plaintiffs, purchased through the direct-to-consumer channel."  (Reply 18 n.37.) Plaintiffs are correct that the majority of Class members are individual purchasers.  (*See* Doc. 1362-3 ("French Reply Report") ¶ 371 n.512 ("Of the ███████ unique 'sold to' customer numbers found in Keurig's PeopleSoft data, all but ████ are DTC customers.").)  Keurig is correct that the majority of claimed class purchases were made by large corporate buyers, whose purchasing volume far outstripped individual consumers.  (*See* Doc. 1410-2 ("Haider Report") Ex. 6 (noting that the top 25 K-Cup purchasers, who are all corporate buyers, account for over ██████████ of Keurig's total K-Cup sales of approximately ██████████ between October 2012 and 2019).). Although the parties disagree on the precise percentages, they seem to agree on this basic dynamic.  (*See, e.g.*, French Reply Report ¶ 371 n.512 ("Rather than looking at the number of unique purchasers, [Plaintiffs' expert] Dr. Haider emphasizes the volume of commerce associated with each customer."); Haider Report Appendix I.4 (noting that the French Report counts customers in the class definition at around 2 million Direct to Consumer ("DTC") customers, compared to 507 Away-From-Home customers, 146 At-Home Grocery customers, 197 At-Home Specialty Customers, 3 At-Home Club Customers, and 20 At-Home Mass/Other customers).)

are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.* at *3 (quoting *Lowe v. NBT Bank, N.A.*, No. 19-CV-1400, 2022 WL 4621433, at *4 (N.D.N.Y. Sept. 30, 2022)). Generally, "typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violations by the defendants." *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241 (E.D.N.Y. 1998) (alteration adopted and internal quotation marks omitted); *see also Allen*, 279 F.R.D. at 272.

However, there is a subset of antitrust cases in which courts have found that there is too great a gulf between named plaintiffs and other portions of a direct purchaser class to meet the typicality requirement. For instance, the *In re Optical Disk Drive Antitrust Litigation* court found an "acute" disparity defeating typicality between named plaintiffs, three small companies and four individuals who paid "nonnegotiable, list prices" for a defendant's products, and the major distributors who accounted for the majority of the alleged damages of the direct purchaser class, who "typically negotiated prices." 303 F.R.D. 311, 317–18 (N.D. Cal. 2014); *see also In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489 (N.D. Cal. 2008) (finding named plaintiffs atypical where the terms of the named plaintiffs' purchases were nonnegotiable but the putative class "include[d] wholesale purchasers who collectively comprised over 99.5% of defendants' business" and who purchased a wider array of products "on individually negotiated terms"); *In re Intel Corp. Microprocessor Antitrust Litig.*, No. CV-05-485, 2014 WL 6601941, at *11 (D. Del. Aug. 6, 2014) (finding that direct purchaser class could not meet the typicality requirement "when the representatives do not also include both individual and enterprise customers"); *In re Auto. Parts Antitrust Litig.*, No. 12-00501, 2019 WL 626143, at *9–11 (E.D. Mich. Jan. 7, 2019) (finding lack of typicality where plaintiffs did not show that similar evidence would prove antitrust violations as to smaller customers, who served as named

plaintiffs, and larger absent class members).

Similarly, the named plaintiffs were not typical of the direct purchaser class in *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, where direct purchasers "had significantly different purchasing volumes, preferred different [] products, and operated under materially different contract terms" from each other, and "not a single distributor serves as a named plaintiff despite the fact that distributors account for about half of the [] sales" at issue in the case. 247 F.R.D. 156, 178 (C.D. Cal. 2007). In *Deiter v. Microsoft Corp.*, the Fourth Circuit affirmed the district court's holding that the claims of the named plaintiffs, who purchased individual copies of Microsoft Windows at fixed prices, were not typical of the claims of the claims of class members who had purchased Windows in large quantities at negotiated prices. 436 F.3d 461, 467–68 (4th Cir. 2006). *Cf. Miami Prods. & Chem. Co. v. Olin Corp.,* No. 19-CV-00385, 2023 WL 8946114, at *19–20 (W.D.N.Y. Dec. 28, 2023) (finding that direct purchaser class failed to demonstrate typicality when it did not meaningfully address evidence that the three largest members of the proposed class had not been injured by defendant's price increase announcements).

The underlying logic behind the holdings in each of these cases is that the class representatives have such divergent purchasing habits and bargaining power from absent class members that they lack "the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions." *Floyd*, 283 F.R.D. at 175 (internal quotation marks omitted). Here, as in *Deiter*, *Intel*, and *Allied Orthopedic*, no distributor or large corporation will be a named plaintiff in the proposed class. As in *Optical Disk Drive* and *Graphics Processing Units*, individual customers who purchased small quantities of products at nonnegotiable prices would serve as named

plaintiffs for large corporate entities that individually negotiated pricing for bulk purchases with the Defendants. As in *Allied Orthopedic*, Defendants have introduced evidence that individual customers purchased, at least to some extent, different types of products than large corporate buyers. (*See* Opp'n 4–5 (noting that some retailers buy only K-Cups, some buy K-Cups and brewers, and some buy private label K-Cups, which are not included in the class definition because they are not sold on Keurig.com and thus no class representative could have purchased one).)

The DPPs' attempt to rebut this case law by citing to *In re Air Cargo Shipping Services Antitrust Litig.* is unavailing. No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014), *report and recommendation adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015). *Air Cargo Shipping* arose from allegations that domestic and foreign airlines providing airfreight-shipping services to and from the United States "conspired to develop and implement an industry-wide index for calculating fuel and security surcharges," allowing them to charge supra-competitive rates — in short, price-fixing. *Id.* at *1. The court rejected the argument that individual negotiations precluded a finding of typicality, stating that the "the heart of the cause of action is the defendants' alleged fixing of surcharge prices, not any subsequent negotiations on base rates." *Id.* at *32 (internal quotation marks omitted). However, in doing so, the *Air Cargo Shipping* court explicitly distinguished *Deiter*, noting that in the latter case "some plaintiffs could negotiate rates, while others could not [and] the two groups had purchased different products, through different means, and under materially different contractual terms." *Id.* Thus, the difference between the two groups in *Deiter* "strikes at the heart of the respective causes of action." *Id.* (quoting *Deiter*, 436 F.3d at 467). In contrast, the "entire class" in *Air Cargo Shipping* "purchased essentially the same service and shared the opportunity to negotiate." *Id.*

The other cases cited by Plaintiffs do not provide any more support to rebut the holdings in *Deiter*, *Intel*, *Allied Orthopedic, Optical Disk Drive,* and *Graphics Processing Units*.  (*See* Reply 19 n.38 (citing *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 214 (S.D.N.Y. 2018) (finding that presence of three large national wholesalers did not defeat typicality in direct purchaser class where the crux of the antitrust claims lay in defendants' alleged conspiracy to block generic competition for a drug, which impacted all class members); *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015) (finding that "minor variations" or differences in class members' purchasing patterns, such as when they purchased a product and the geographic market they purchased it in, do not defeat typicality (quoting *Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993)); *Oxford Health Plans, Inc.*, 191 F.R.D. at 372  ("Typicality does not require that the situations of the named representatives and the class members be identical" (citing *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y. 1992))); *In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 134–35 (E.D. Pa. 2015) (finding typicality satisfied "despite differing purchasing methods and prices, provided that the alleged misconduct applies across the array of methods and prices")).)  Each of these cases finds that differences in purchasing power or habits between named plaintiffs and other class members do not defeat typicality because they are "minor variations" that do not go to the crux of the antitrust claims at issue.  *Robidoux*, 987 F.2d at 937.

However, where the differences between the named plaintiffs and other class members do go to the heart of the claims, the typicality requirement is not met because the named plaintiffs lack "the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions."  *Floyd*, 283 F.R.D. at 175 (internal quotation marks omitted).  There are three basic elements of an antitrust

claim:  (1) a violation of antitrust law; (2) antitrust injury and causation; and (3) damages.  *See*

*Dial Corp.*, 314 F.R.D. at 114.  In order for absent class members with vast purchasing and

negotiating power such as Costco, Amazon, and Office Depot to make out an antitrust claim

here, they would have to show that despite the evidence of significant price negotiation, they

nonetheless were overcharged for K-Cups.  This would be necessary to establish both the second

element—antitrust injury and causation—and the third element—damages.  The question of

whether large companies negotiated away overcharges is foundational to the claims of such class

members, yet it would not be relevant at all for the Named Plaintiffs, who had no opportunity to

negotiate.  Thus, it cannot be said that the differences between Named Plaintiffs and certain

absent class members are "minor," as the differences call into question the incentive and ability

of the Named Plaintiffs to prove all the elements of the absent class members' claims.

Plaintiffs argue that each member of the class paid for K-Cups based on price lists, even

if some class members engaged in subsequent negotiation.  (Reply 5–6.)  Plaintiffs point to

evidence of the existence of price lists, including internal Keurig slide decks showing target price

increases, (*see id.* at 3 n.5 (citing Doc. 2294 ("Buchman Reply Decl."), Ex. C (Keurig slide deck

from 2010 stating that there is a "target 10% list price increase across all k-cup items and all

channels"); Buchman Decl., Ex. I (Keurig slide deck proposing a 2015 price increase "across all

brands and price tiers")), as well as deposition testimony from a former Keurig Vice President

that a key objective was to avoid "channel conflict" in pricing of K-Cups, (*see id.* (citing

Buchman Reply Decl., Ex. D at 275)).  Price lists do suggest a somewhat closer alignment

between Named Plaintiffs and other class members because the alleged existence of a pricing

structure would be a central issue to the entire class.  However, it is uncontested that the Named

Plaintiffs, who purchased through a Direct-to-Consumer ("DTC") channel, paid nonnegotiable

prices on Keurig's website, (*see* Opp'n 3; Doc. 1410-1 ("French Dep. Tr.") 205:16-24), whereas it would need to be proved at trial that the starting point for all price negotiations for non-DTC plaintiffs involved a price list.[5]  More fundamentally, even if plaintiffs could show that price lists provided the starting point for negotiations, the existence of price lists does not obviate the fundamental question of whether non-DTC plaintiffs negotiated away any overcharge.  *See In re Flash Memory Antitrust Litig.*, No. 07-0086, 2010 WL 2332081, at *8 (N.D. Cal. June 9, 2010).  It is the fact that these questions would have to be addressed at trial to prove only non-DTC class members' claims, and not the potential answers to these questions, that creates a typicality issue.  S*ee Kurtz v. Kimberly-Clark Corp.*, 321 F.R.D. 482, 533 (E.D.N.Y. 2017) (noting that "disputed issues of law or fact must occupy essentially the *same degree of centrality* to the named plaintiff[s'] claim as to that of other members of the proposed class" to demonstrate typicality (emphasis in original) (internal quotation marks omitted)).

    Nonetheless, this is an exceedingly close call.  The Second Circuit has not squarely addressed arguments about typicality akin to those made here, where class representatives in a non-price-fixing antitrust case have such divergent purchasing habits and bargaining power from absent class members that there are real questions about Named Plaintiffs' incentive to prove all the elements of the cause of action of absent class members.  To the contrary, the Second Circuit has emphasized that typicality is considered a "low, flexible bar."  *Aley*, 2024 WL 4007345, at *4.  Although there are common issues shared between the proposed class, *see supra* Section IV.A.2, there are significant differences between Named Plaintiffs and absent class members, which arguably go to the heart of the claims at issue.  *See Deiter*, 436 F.3d at 467.  Since I find

---

[5] One way to prove this would be testimony or documentary evidence from non-DTC class members showing that their negotiations all began with a price list.  Plaintiffs have not pointed to such evidence in their briefing, and I am unaware of any such evidence.

that class certification must be denied on predominance grounds, *see infra* Section IV.B.1, I need

not rule on the typicality questions raised by this case. "It is safe to say, at a minimum, that

plaintiffs do not comfortably clear the Rule 23(a)[3] hurdle." *Accord In re Aluminum*

*Warehousing Antitrust Litig.*, 336 F.R.D. 5, 40 (S.D.N.Y. 2020); *In re Indus. Diamonds Antitrust*

*Litig.*, 167 F.R.D. 374, 381 (S.D.N.Y. 1996) ("Because of the conclusions that we reach below in

our discussion of the predominance requirement, we need not reach a conclusion about whether

plaintiffs are inadequate representatives of the proposed class on this basis. Instead, we simply

note our concern on this point.").

### 4. Adequacy

Rule 23(a)(4) asks whether "the representative parties will fairly and adequately protect

the interests of the class." "Adequacy is twofold: the proposed class representative must have

an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic

to the interests of other class members." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d

Cir. 2006). As to the first prong, "courts consider whether the class representative has adequate

incentive to pursue the class's claim, and whether some difference between the class

representative and some class members might undermine that incentive." *In re Payment Card*

*Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 231 (2d Cir. 2016). As to the

second prong, courts ask whether a conflict, if identified, is "fundamental." *Denney*, 443 F.3d at

268 (internal quotation marks omitted). Plaintiffs must show that "plaintiff[s'] attorneys are

qualified, experienced and able to conduct the litigation." *In re Flag Telecom Holdings, Ltd.*

*Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Keurig does not assert any concerns about the

qualifications or ability of plaintiffs' counsel, nor do I have any such concerns. The issue,

therefore, is whether Named Plaintiffs have an adequate incentive to vigorously pursue the

claims of absent class members, and whether any conflicts of interest exist.

Named Plaintiffs' incentive to vigorously pursue the claims of absent class members merges with the typicality analysis, *see supra* Section IV.A.4.  *See Francisco v. NY Tex Care, Inc.*, No. 19-CV-1649, 2022 WL 900603, at *9 n.15 (E.D.N.Y. Mar. 28, 2022) ("[T]he typicality and adequacy inquiries 'tend to merge.'" (quoting *Wal-Mart*, 564 U.S. at 350 n.5)); *Kinkead v. Humana at Home, Inc.*, 330 F.R.D. 338, 348 (D. Conn. 2019) (similar).  Here, I found that there are significant concerns about whether Named Plaintiffs have "the incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions.'"  *Floyd*, 283 F.R.D. at 175 (internal quotation marks omitted).  That conclusion applies equally to Plaintiffs' ability to satisfy the adequacy requirement of Rule 23(a).

## B.  *Rule 23(b)(3) – Common Questions of Law or Fact Predominate & Class Action Superior to Other Methods of Adjudication*

To certify a class under Rule 23(b)(3), the court must conduct a "rigorous analysis," *Comcast*, 569 U.S. at 33 (internal quotation marks omitted), to ensure "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).  The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  Thus, the proposed class must show that "resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and [that] these particular issues are more substantial than the issues subject only to individualized proof." *Mazzei v. Money Store*,

829 F.3d 260, 272 (2d Cir. 2016) (quoting *Myers*, 624 F.3d at 547).

In particular, "[t]o certify a class in an antitrust action, Plaintiffs must demonstrate that the elements of their underlying claims can be proven by common evidence. Those elements include: '(1) a violation of antitrust law; (2) injury and causation; and (3) damages.'" *Dial Corp.*, 314 F.R.D. at 114 (quoting *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons*, 502 F.3d 91, 105 (2d Cir. 2007)), *amended on other grounds*, No. 13-CV-6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016).

### 1. Antitrust Injury

The parties do not dispute that the first element, a violation of antitrust law, is susceptible to proof by common evidence. Antitrust injury, also referred to as antitrust impact, requires a showing that plaintiffs suffered "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) (internal quotation marks omitted). The injury requirement asks only whether plaintiffs were harmed, not by how much. *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 115 (S.D.N.Y. 2010). Plaintiffs generally must show that "all class members suffered some injury as part of the predominance inquiry." *In re Int. Rate Swaps Antitrust Litig.*, No. 16-MD-2704, 2023 WL 8675625, at *8 (S.D.N.Y. Dec. 15, 2023) (internal quotation marks and emphasis omitted). "Common antitrust injury exists only if any 'individual class member could have relied on that same evidence in an individual action.'" *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 553 (S.D.N.Y. 2021) (quoting McLaughlin on Class Actions § 5:23 (17th ed.)).

Here, the antitrust injury takes "the form of overcharges that resulted from Defendants' anticompetitive conduct." (DPP Mem. 16.) To demonstrate antitrust injury, Plaintiffs rely on

the expert reports of economist Dr. Gary L. French ("Dr. French").  (*See* Docs. 1362-2 ("French Report"), 1362-3 ("French Reply Report").)[6]  Plaintiffs submit that "Dr. French's reports establish that Keurig's conduct caused all or nearly all members of the Class to suffer an overcharge on at least one K-Cup purchase."[7]  (DPP Mem. 2.)  In particular, Plaintiffs rely on Dr. French's econometric model, which purports to determine the overcharges paid by various categories of Keurig purchasers due to Keurig's allegedly anticompetitive conduct, thereby showing that all class members were impacted.  (*See* French Report ¶¶ 368–70.)  Keurig submitted an expert report by economist Dr. Laila Haider rebutting Dr. French's analysis.  (*See* Doc. 1410-2 ("Haider Report").)

Dr. French's model measures pricing from 2012, the beginning of the class period, to 2019, the last full year of data preceding the issuance of Dr. French's report.  The model divides the DPP class into various channels and sub-channels:  (1) the Direct to Consumer channel, made up of consumers who buy directly from Keurig; (2) the Away From Home channel ("AFH"), made up of distributers who provide K-Cups for outside-the-home use, such as in offices, hotels, hospitals, and cafeterias; and (3) the At Home channel ("AH"), made up of retailers who sell K-Cups to consumers for home use, subdivided into (i) AH Club; (ii) AH Grocery; (iii) AH Mass Retailer/Other; and (iv) AH Specialty.  (French Report ¶¶ 21, 23.)

Dr. French performs a regression analysis, which is "a commonly accepted statistical tool used to examine 'the effect of independent variables on a dependent variable.'"  *Freeland v. AT*

---

[6] In my Opinion & Order dated January 3, 2025 addressing the parties' *Daubert* motions, I denied Keurig's motion to exclude Dr. French's expert opinions, except to the extent Dr. French opined "on the motive or intent of others, including that 'Keurig did not believe the 2.0 brewer offered an economic benefit.'"  (Doc. 2375 at 39–40.)  Any such testimony regarding a party or its representatives' state of mind or intent is excluded.  (*Id.*)

[7] I note that although Dr. French's reports predate Plaintiffs' motion for class certification, Dr. French utilizes the same class definition as the motion for class certification, which is narrower than the class definition in Plaintiffs' Amended Complaint.  (*See* French Report ¶ 8.)

& T Corp., 238 F.R.D. 130, 144 (S.D.N.Y. 2006) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)). (*See also* French Report ¶ 400.) Dr. French's model attempts to test the proposition that "Keurig's prices are statistically higher than [industry competitor] Rogers's prices after controlling for differences in cost and brand value."[8] (French Report ¶ 402.) Thus, the model attempts to measure the impact of factors that might influence price differences, such as supply and demand factors and channel of sales (the independent variables), and the difference in prices between Keurig's and Rogers's (the dependent variable). (*Id.* ¶¶ 402, 405.) Dr. French's analysis found statistically significant differences between Keurig's and Rogers's prices for each of the channel or sub-channel categories during each year from 2012 to 2019. (*Id.* ¶ 437.) The average overcharge ranged from a low of 2.0 cents per cup in the AH Mass Retailer/Other sub-channel in 2018 to a high of 19.2 cents per cup in the DTC channel in 2015. (*Id.* Ex. 27.)

Put simply, Dr. French's model shows the average overcharges over the years for six categories of purchasers. (*See* French Dep. Tr. 138:9-11 (explaining that the model is "designed to estimate the aggregate overcharges to the class of customers, class of purchasers, direct purchasers").) It is not designed to measure the individual overcharge for any given purchaser. As Dr. French explained in his deposition: "The model was . . . not designed to estimate anything for an individual customer." (*Id.* 137:15-22) "If I was trying to estimate for an

---

[8] Dr. French defines brand premium as "the additional price that customers are willing to pay to consume a product over that of a competitor." (French Report ¶ 423.) Dr. French assumes that Keurig's brand premium is only attributable to customers' perception of the quality of the coffee used in the single-serve cup, and therefore calculates the brand premium variable based on customer preference data for Keurig bagged coffee brands over Rogers' San Francisco Bay bagged coffee. (*Id.*) Keurig disputes that this is a valid way to measure their brand premium, pointing out that it does not account for Keurig's high brand recognition and goodwill and noting that Dr. French adduces no evidence that bagged coffee value correlates in any way to single-serve cup value. (Opp'n 16.) Although Keurig's objections on this point may be well-founded, the data used for the brand value variable is not a fundamental methodological issue in this case. Instead, it "fall[s] into the category of issues that could be raised on cross-examination at trial, and that would go to the weight a trier of fact might assign to the opinions." *Optical Disk Drive*, 303 F.R.D. at 321.

individual customer, I'd have to run – specify a different model than I have here." (*Id.* 138:6-19.)

Although "it is common practice to use averages to determine whether class members suffered a common antitrust injury in direct purchaser actions," issues arise when there is a "meaningful concern that the use of averages masks uninjured class members and individual inquiry is [] required to establish injury in fact across the class." *In re Actos Antitrust Litig.*, No. 13-CV-09244, 2024 WL 4251891, at *36 (S.D.N.Y. Aug. 9, 2024) (internal quotation marks omitted) (finding use of averages appropriate where there was little evidence that averages masked uninjured class members), *report and recommendation adopted*, 2024 WL 4345568 (S.D.N.Y. Sept. 30, 2024); *see also Aluminum Warehousing*, 336 F.R.D. at 49 ("A flawed model may result in denial of class certification for failure reliably to establish the preponderance of common issues, . . . [including where the model] masks uninjured class members by using an 'averaging' mechanism to allocate injury across the class."). In such cases, there is a concern that averaging mechanisms of this sort cannot "provide common answers" to the question of whether class members "were in fact harmed," without a more tailored analysis of antitrust impact. *Aluminum Warehousing*, 336 F.R.D. at 56–57. This "lack of analysis" can be fatal to the predominance inquiry under Rule 23(b)(3). *See Lamictal,* 957 F.3d at 192 (Plaintiffs failed to demonstrate "that common issues predominated by a preponderance of the evidence" when aggregated model "mask[ed] individualized injury").

Such a concern exists here.[9] It is uncontested that although DTC customers paid

---

[9] In my January 30, 2025 Opinion & Order resolving the parties' *Daubert* motions, I declined to exclude Dr. French's expert opinions. (*See* Doc. 2375 at 31–40.) In response to Keurig's argument in its *Daubert* briefing that a model relying on averages would be insufficient to show common antitrust injury, I noted that there are circumstances in which averages-based models can demonstrate common injury at the class-certification stage. I stated: "While I need not yet determine whether the DPPs have made [a] showing [of common antitrust impact], I

nonnegotiable prices, many purchasers in the AFH and AH channels individually negotiated

pricing with Keurig.  (*See* French Dep. Tr. 206:18-207:6 (acknowledging that wholesalers and

retailers "had some ability to negotiate pricing" before entering into agreements with Keurig;

Doc. 1418-8 (Canteen Rule 30(b)(6) Deposition Transcript or "Canteen Dep. Tr.") 376:9-22

(after Keurig announced a price increase in August 2014, Canteen not only negotiated away the

increase but negotiated a net price decrease); Haider Report ¶ 49 n.42 (Costco employee noted

"[t]his is where using the [wholesale] leverage comes in" after negotiating price decrease with

Keurig); Haider Report ¶ 49 n.42 (████████████████████████████████████████████████

████████████████████████████████████).)  Even among customers with the power

to negotiate pricing, some customers had more bargaining power and better negotiating skills

than others.  (*See, e.g.*, French Dep. Tr. 206:8-17 (stating that certain retailers have "more

purchasing power because of their volume"); Doc. 1418-10 (Tess Wilkins Deposition Transcript)

98:5-11 ("Costco is the best" at negotiating down costs "because Costco's got so much volume,

they just carry a bigger stick.").)  Dr. French's model does not take into account whether some

customers were able to negotiate away the purported overcharges, and if so, by how much.

In his deposition, Dr. French admitted that his model is only "designed to estimate the

aggregate overcharges to the class of customers" and that it could not rule out that some

customers suffered no overcharge.  (French Dep. Tr. 136-38.)  Exhibit 27 of Dr. French's Report

---

do not find that Dr. French's model is methodologically incapable of making such a showing."  (*Id.* at 36.)
Accordingly, I declined to exclude Dr. French's report under *Daubert*.  However, my finding that Dr. French's
report is admissible does not mean that Plaintiffs have automatically carried their burden to show antitrust impact at
the class-certification stage because Dr. French purports to do so in his report.  *See In re IPO*, 471 F.3d at 42 ("[W]e
. . . disavow the suggestion . . . that an expert's testimony may establish a component of a Rule 23 requirement
simply by being not fatally flawed.  A district judge is to assess all of the relevant evidence admitted at the class
certification stage and determine whether each Rule 23 requirement has been met."), *decision clarified on denial of
reh'g by* 483 F.3d 70 (2d Cir. 2007); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d
430, 471 (S.D.N.Y. 2018) ("[A] conclusion that proffered expert evidence is sufficiently reliable and relevant to pass
*Daubert* muster does not end the inquiry on class certification." (quoting McLaughlin on Class Actions § 3:14 (14th
ed.))).

estimates the average overcharge in each sub-channel for each year from 2012 to 2019. For instance, Exhibit 27 of Dr. French's Report states that the average overcharge in the At-Home Mass Retailer/Other category for 2018 was 2 cents per cup. In his deposition, Dr. French was asked to consider that same 2-cent-per-cup overcharge in a hypothetical scenario where there were 20 total customers for the At-Home Mass Retailer/Other sub-channel in 2018. When asked "[based] on your model, you cannot rule out that there were four customers that paid a 10-cent overcharge and 16 that paid none, because that would still average to 2 cents per cup; correct?", Dr. French replied, after clarifying the question: "I couldn't rule it out, but I don't rule it in, either." (*Id.* 136:23-37:14.) In other words, Dr. French admits that he cannot "rule [] out" that some customers suffered no injury.

The prevalence of individual negotiations renders Dr. French's model, which relies on averages, insufficient to demonstrate class-wide antitrust injury. *See In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 194 (3d Cir. 2020) ("[T]he acceptability of averages [to show antitrust injury] depends largely on the answer to several factual predicates, most importantly . . . whether the market is characterized by individual negotiations."); *Flash Memory*, 2010 WL 2332081, at *8 ("As a general matter, antitrust claims predicated on negotiated transactions, as opposed to purchases based on list prices, often entail consideration of individualized proof of impact."); *In re Indus. Diamonds*, 167 F.R.D. at 382–84 (finding that individual questions predominated as to claims by purchasers who individually negotiated pricing). I agree with the court's finding in *Optical Disk Drive*, another case in which a putative direct purchaser class offered Dr. French's analysis to support class certification, "[w]hile Dr. French calculates [the amount of] the overcharge . . . in the aggregate, nothing in the regression methodology attempts to show that all or nearly all purchasers were overcharged in that amount,

or in any amount at all."  303 F.R.D. at 321 (finding that plaintiffs failed to prove antitrust injury).

Perhaps recognizing the negotiated-pricing issue, Dr. French argues that "[g]iven Keurig's ability to achieve such high overcharges overall, even if a particular customer has buyer power, it is unlikely that such a customer would be able to completely avoid the overcharge." (French Report ¶ 368.)  Plaintiffs relatedly assert that negotiated prices are "not an impediment to class certification if, as here, Plaintiffs can prove at trial that the range of prices charged was higher as a result of Keurig's unlawful conduct than it would have been in the but for world." (DPP Mem. 18.)  However, the only empirical evidence cited in support of this point is Dr. French's econometric model, (*see id.*; French Report ¶ 368), which does not purport to establish individual pricing.  Thus, it cannot prove that the bottom end of the range of prices charged by Keurig reflected supra-competitive pricing because that would necessitate looking beyond the average data to analyze the lowest individual prices.  Although it is true that "[a] large average overcharge . . . might make it more likely that every direct purchaser was overcharged to some degree," *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827, 2012 WL 555090, at *5 (N.D. Cal. Feb. 21, 2012) (addressing *Daubert* issues, not predominance), such a consideration does not suffice to carry Plaintiffs' burden as to antitrust impact in the absence of any evidence that large-format purchasers with bargaining power did indeed suffer an overcharge, *see Graphics Processing Units*, 253 F.R.D. at 502 ("Plaintiffs must show not that market conditions are favorable for impact but that there is a common, formulaic method of proving that [the direct purchaser plaintiffs] paid an overcharge.") (internal quotation marks omitted).  *Cf. Allied Orthopedic Appliances, Inc.*, 247 F.R.D. at 167 n.14 (rejecting Plaintiffs' argument that "it defies economic logic to assume that any but the most insignificant purchasers would have been better

off in the actual world than the but-for world" as "poorly reasoned and conclusory").

Plaintiffs also point to a pricing structure, including price lists, that exists within Keurig's different customer channels to show antitrust impact. (DPP Mem. 17–18.) Dr. French cites to internal slide decks showing that Keurig planned to raise prices in 2010 and 2014, including a planning document indicating that there was a "target 10% list price increase across all k-cup items and all channels" in 2010 and testimony from a former Vice-President at Keurig stating that "brand for brand, cup for cup should have been the same [price increase], roughly, on a per-cup basis across channels" in 2014.[10]  (French Report ¶ 372.)  Plaintiffs, however, cite no empirical evidence showing that these proposed price increases in fact impacted all direct purchasers, or that even if they were enacted equally across all channels, that some direct purchasers did not negotiate them away.  Relatedly, the existence of price lists alone does not suffice to show that the majority of direct purchasers paid prices based on price lists in the face of evidence that individual price negotiations were common.  *See Flash Memory*, 2010 WL 2332081, at *8 ("[N]either the possibility that a price list was the starting point for a negotiation nor the existence of centralized decision making process obviates the fact that the ultimate purchase price was the result of an individualized negotiation between a particular Defendant and a particular direct purchaser." (emphasis omitted)).

---

[10] Karen Gallagher, Keurig's former Vice President of Sales, further explained this dynamic as follows:  "The price sometimes was a little bit lower per cup if the quantity was higher.  On a club, for instance, with a 50-count box might have been slightly lower than the same coffee brand in an 18 count in a different channel, but on par.  I mean, it wasn't – you know, you've got to discount for quantity, basically – very mild discount, but there was some tiering that went on." (Buchman Reply Decl, Ex. D at 269:7-18.)  Gallagher was also asked whether Keurig's suggested retail pricing for products was the pricing used in retail stores, and she stated:  "Maybe.  I mean, that's entirely [retailers'] call.  The manufacturer can only suggest a retail." (*Id.* at 274:20-24)  When asked whether the K-Cup pricing on Keurig's website reflected the suggested retail pricing, she stated:  "Yeah, I honestly don't know. . . . But my assumption is that the direct site wants to be comparable to retail so that there's no conflict between the two." (*Id.* at 274:25-275:19.)

As for the 2014 price increase, Keurig's 30(b)(6) witness was asked about the price increase planning documents and stated:  "I'm aware that we increased the price of our pods.  The exact timing of that I'm not aware." (Buchman Reply Decl., Ex. G at 231:13-21.)

As support for the argument that there was an interconnected pricing structure, Dr. French also points out that DTC pricing is tied to end-pricing in the AFH and AH segments because if one segment was significantly cheaper, customers would all flock to that segment. (French Report ¶ 376.)  Even assuming without deciding that this premise is true, it is irrelevant. This is because the price paid by end-customers in the AFH and AH segments is not necessarily indicative of what the direct purchasers paid.  In other words, the fact that a K-Cup retails for a similar value on Keurig.com, Amazon, and a local grocery store does not mean that a Keurig.com customer paid the same amount for that K-Cup as Amazon and the grocery store did, nor does it mean that Amazon and the grocery store paid the same amount as each other.  Lastly, Dr. French again relies on averages to show that there is a pricing structure that tracks across channels and sub-channels, obscuring potentially important differences in the prices individual direct purchasers paid.  (*Compare* French Report Ex. 19, *with* Haider Report Ex. 44.)

To be sure, *Indus. Diamonds* supports Plaintiffs' argument that price lists, even if only a starting point for negotiations, can provide common evidence of antitrust injury in some instances.  167 F.R.D. 374.  In *Indus. Diamonds*, purchasers of industrial diamond products alleged that three major distributors in the diamond industry, who sold thousands of types of industrial diamond products, were conspiring to fix prices.  *Id.* at 377.  Defendants set list prices for certain products but not for others, and individual negotiation was common for both categories of products.  *Id.* at 377, 383.  The court found that common proof of antitrust impact was possible on behalf of purchasers who bought list-price products, even if they subsequently negotiated pricing, but not on behalf of non-list-price products.  *Id.* at 383–84.  The court relied on plaintiffs' expert's economic analysis, which purportedly showed that "individual negotiations for discounts, credits and rebates were based, at least in part, on the applicable list

price," although there was a dispute between the parties about the methodology and accuracy of the analysis. *Id.* at 383. The court found that since "it is for the jury to evaluate this conflicting evidence," it did not wade into the merits of this dispute, stating that "[a]t this juncture, it is sufficient for our purposes that plaintiffs have demonstrated that they can produce some evidence that the list prices set by defendants formed the basis for subsequent individualized price negotiations." *Id.* at 384.

But *Indus. Diamonds* is not persuasive here for multiple reasons. Most importantly, *Indus. Diamonds* predated the Supreme Court's decision in *Comcast*, 569 U.S. at 33. *Comcast* clarified that courts must conduct a "rigorous analysis" to determine whether a model supporting a bid for class certification indeed "satisf[ies] through evidentiary proof" the dictates of Rule 23(b), even when that analysis entails overlap with the merits of the underlying claims. *Id.* at 33; *see also Aluminum Warehousing*, 336 F.R.D. at 46 ("[A]s a review of *Comcast* and its progeny reflect, where an expert's model is the basis for a plaintiff's claim of classwide impact and causation, a court is obliged to rigorously examine the soundness of that model at the class certification stage."). Thus, it is no longer the case that plaintiffs can satisfy the antitrust impact prong by demonstrating that they "can produce some evidence" to support their theory, even when there are unresolved questions about accuracy and methodological soundness. Here, after a rigorous analysis of Dr. French's model, I do not find that Plaintiffs have shown through evidentiary proof that common issues predominate as to antitrust impact for the entire class. Relatedly, Plaintiffs do not utilize Dr. French's analysis to show that prices rose in an

abnormally significant way during the time periods in which Keurig allegedly raised list prices,[11] which would have provided some evidence for an argument that "list price increases had, in general, an upward effect on the transaction prices paid by purchasers." *Indus. Diamonds*, 167 F.R.D. at 384. Finally, the inference that list prices propped up negotiated prices for listed products was stronger in *Indus. Diamonds* because there was a category of products for which defendants set list prices and a category for which they did not, and evidence showed that the latter category tended to include the most individualized, negotiable products. *Id.* In contrast, here there are allegedly list prices available for all Keurig products, even though some plaintiffs engaged in significant negotiations.

In addition to Dr. French's empirical model, Plaintiffs cite to evidence in Dr. French's report of common acts taken by Keurig against class members to raise barriers to entry in the portion pack market, including forcing competitors to incur costs to develop the Keurig 2.0 brewer workarounds and fight Keurig's sham patent litigations, locking major coffee brands into exclusive agreements, and demanding exclusivity with dealers and input suppliers. (DPP Mem. 17.) Although this evidence is probative of a violation of antitrust law, it is not direct evidence that customers paid an overcharge for Keurig products. In other words, it is evidence of the first element of an antitrust claim, but not the second. *See Dial Corp.*, 314 F.R.D. at 114 (explaining that "[t]o certify a class in an antitrust action, Plaintiffs must demonstrate that the elements of

---

[11] Dr. French states that "[i]n 2010 and 2014 Keurig implemented price increases." (French Report ¶ 372.) Dr. French also portrays the average price by channel (DTC, At-Home, and Away-From-Home) from January 2009 to September 2019 on a graph. (*See* French Report Ex. 19.) However, Dr. French does not clarify when in 2010 and 2014 these price increases took effect, and it is not clear from Exhibit 19 that the average prices in these three channels went up or down together in 2010 or 2014. For instance, between May 2014 and September 2014 there is a steep drop in DTC prices, yet a moderate rise in At-Home and Away-From-Home prices. Plaintiffs do not point to a time where prices across each channel rose in tandem due to the introduction of a new price list. Furthermore, Dr. Haider casts doubt on the utility of Exhibit 19, which represents average prices across three channels, by juxtaposing the averages in Exhibit 19 with the monthly average prices for Keurig's top 50 K-Cup customers. (*See* Haider Report Ex. 44.) As Dr. Haider's graph demonstrates, the channel averages obscure the massive amounts of underlying price variability within the non-DTC channels. (*See id.*)

their underlying claims can be proven by common evidence . . . includ[ing] (1) a violation of antitrust law; (2) injury and causation; and (3) damages" (internal quotation marks omitted)). Although "industry characteristics" like those described by Dr. French and Plaintiffs "may be preconditions for any colorable case of class-wide impact, they do not establish such impact." *Optical Disk Drive*, 303 F.R.D. at 320.

### 2. Damages

Even if the antitrust impact prong were not dispositive here, the DPPs would also have to show that "the damages resulting from any antitrust injury are measurable on a class-wide basis through use of common methodology" in order to certify the proposed class. *Dial Corp.*, 314 F.R.D. at 118 (citing *Comcast*, 569 U.S. at 30). Although "[i]t used to clearly be the case that individual damages determinations would not defeat class certification," *id.*, some courts have conducted a more rigorous analysis after the Supreme Court's decision in *Comcast*, which reversed the certification of an antitrust class action based on a damages model that could not disaggregate four theories of impact, only one of which was accepted by the district court as colorable, *see Comcast*, 569 U.S. at 35–38.

Dr. French's damages model estimates aggregate overcharge damages, using Rogers as a benchmark, across six channels and sub-channels (DTC, AFH, AH Club, AH Grocery, AH Mass Retailer/Other, and AH Specialty) from 2012 to 2019. (*See* French Report Exs. 28, 29.) The use of a benchmark is common in antitrust cases, *see Dial Corp.*, 314 F.R.D. at 118, as is the use of aggregate damages, *see Oliver v. Am. Express Co.*, No. 19-CV-566, 2024 WL 100848, at *10 (E.D.N.Y. Jan. 9, 2024), *amended in part*, 2024 WL 217711 (E.D.N.Y. Jan. 19, 2024). However, plaintiffs seeking to use aggregate damages must show that the damages "roughly reflect the aggregate amount owed to class members." *Seijas v. Republic of Arg.*, 606 F.3d 53,

58–59 (2d Cir. 2010); *see also Hickory Sec. Ltd. v. Republic of Arg.*, 493 F. App'x 156, 159 (2d Cir. 2012) (summary order); *Actos*, 2024 WL 4345568, at *10. Here, Dr. French subdivides the damages across the six identified channels and sub-channels, which surely helps to support the argument that the damages "roughly reflect" the true amount owed to different direct purchasers. However, the issues identified in the context of antitrust impact in Section IV.C.1, *supra*, apply to damages as well. *Accord Comcast*, 569 U.S. at 35 ("[A]t the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." (internal quotation marks omitted)). To the extent that there are uninjured members of the class, the existence of such individuals could easily skew the proportionality of the proposed damages within the six subcategories proposed by Dr. French. Given that the antitrust injury prong is dispositive as to whether a class action can be maintained under Rule 23(b)(3), I need not determine whether the issues identified in Section IV.C.1, *supra*, also prevent certification on the basis that damages are not ascertainable through a common methodology.

### C. *Rule 23(b)(2) – Injunctive Relief Appropriate for Entire Class*

Rule 23(b)(2) provides for certification of a class when a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Accordingly, a finding that that relief is not "proper for each and every member of the group" will defeat class certification under Rule 23(b)(2). *Berni v. Barilla S.p.A.*, 964 F.3d 141, 146 (2d Cir. 2020).

Plaintiffs' Amended Complaint seeks the following injunctive relief:

(f) Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Keurig from continuing the unlawful acts in violation the Sherman Act and requiring it to ship

all 2.0 K-Cup Brewers with any "lock-out" technology turned off;
(g) Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Keurig from implementing the announced 2.0 K-Cup Brewer "lock-out" technology that threatens to block Competitor Cups from working in 2.0 K-Cup Brewers;
(h) Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Keurig from tying the sale of 2.0 K-Cups to 2.0 K-Cup Brewers.

(DPP AC ¶ 302.)  In sum, the DPPs seek an injunction to prevent Keurig from deploying the "lock-out" technology that would prevent a Keurig 2.0 brewer from functioning with a non-Keurig made portion pack and from tying sales of Keurig 2.0 brewers to 2.0 K-Cups.  DPPs argue that "[t]his relief would create more free and unrestrained competition at virtually every level of Keurig's business and cause greater competition resulting in lower prices."  (DPP Mem. 23.)

Plaintiffs seek an injunction pursuant to Section 16 of the Clayton Act, which allows private parties to obtain injunctive relief "against threatened loss or damage by a violation of the antitrust laws," 15 U.S.C. § 26, including the Sherman Act.  The Supreme Court has held that "in order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986) (internal quotation marks omitted).  In other words, plaintiffs must allege antitrust injury, or at a minimum, "a significant threat of injury from an impending violation of the antitrust laws."  *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969); *see also Freeland*, 238 F.R.D. at 156 ("Proof of antitrust injury is required of a plaintiff seeking injunctive relief from a Sherman Act violation." (citing *Cargill*, 479 U.S. at 113)).

Here, Plaintiffs encounter the same obstacle that stood in the way of certification of a Rule 23(b)(3) class, which is that they cannot prove classwide antitrust injury or an imminent threat of classwide antitrust injury.  As "plaintiffs have provided no methodology by which

antitrust injury could be proven on a classwide basis[,] [a]ntitrust injury will thus have to be proven on an individual basis for a class member to be afforded injunctive relief." *Freeland*, 238 F.R.D. at 156–57.  Thus, Plaintiffs have not carried their burden to show that an injunction "would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360.

## V.  <u>Conclusion</u>

For the foregoing reasons, the DPPs' motion to certify a class action is hereby DENIED.

Due to references to sealed filings, this Opinion & Order is being issued temporarily under seal.  The parties are directed to meet and confer and submit any proposed redactions to me within thirty days of this Opinion & Order.  If the parties do not submit proposed redactions within thirty days, I will direct the Clerk of Court to file the Opinion & Order in its current form on the public docket.

SO ORDERED.

Dated: October 27, 2025
        New York, New York

Vernon S. Broderick
United States District Judge

31