**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION | MDL No. 2542 <br><br> Master Docket No. 1:14-md-02542 (VSB) (SLC) |
| JBR, INC. (D/B/A ROGERS FAMILY COMPANY), <br><br> Plaintiff/ Counterclaim Defendant, <br><br> v. <br><br> KEURIG GREEN MOUNTAIN, INC., <br><br> Defendant/ Counterclaim Plaintiff. | **Oral Argument Requested** <br><br> *This Document Relates to* <br> *No. 1:14-cv-04242 (VSB) (SLC)* |

**MEMORANDUM OF LAW IN SUPPORT OF KEURIG'S MOTION TO EXCLUDE**
**THE AMENDED EXPERT REPORTS AND RELATED TESTIMONY OF**
**JBR EXPERT GARETH MACARTNEY**

**TABLE OF CONTENTS**

I.     Expert Testimony Must Meet Standards of Reliability and Relevance.................................3

II.    Dr. Macartney's Benchmarks Are Unreliable..................................................................4

   A.   The "full market" benchmark is "tainted" and unreliable. .............................................5

   B.   Dr. Macartney's "lost customer" model takes the flaws in the "full market" model and compounds them, making it also unreliable...........................................................................7

   C.   The Amazon benchmark improperly assumes that JBR's sales in the "at-home" channel—i.e., brick-and-mortar stores—should have grown at the same rate as its sales on Amazon...............................................................................................................................10

III.   Dr. Macartney's Damages Models Still Use an Arbitrary Damages End Date...............12

IV.    Conclusion.......................................................................................................................13

i

## TABLE OF AUTHORITIES

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ............................................................................................ 3

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) .......................................................................................................... 3

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
  301 F. Supp. 2d 612 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005) .................... 9

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
  131 F. App'x 450 (5th Cir. 2005) ...................................................................................... 12

*In re Elec. Books Antitrust Litig.*,
  2014 WL 1282298 (S.D.N.Y. Mar. 28, 2014) .................................................................... 11

*In re LIBOR Antitrust Litig.*,
  801 F. Supp. 3d 330 (S.D.N.Y. 2025) ......................................................................... 3, 10-11

*In re LIBOR Antitrust Litig.*,
  299 F. Supp. 3d 430 (S.D.N.Y. 2018), *superseded on other grounds*, 801 F. Supp. 3d
  330 (S.D.N.Y. 2025) .......................................................................................................... 4

*In re Live Concert Antitrust Litig.*,
  863 F. Supp. 2d 966 (C.D. Cal. 2012) .............................................................................. 11

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .......................................................................................................... 3

*Lithuanian Com. Corp. v. Sara Lee Hosiery*,
  179 F.R.D. 450 (D.N.J. 1998) ............................................................................................ 7

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
  708 F.2d 1081 (7th Cir. 1983) ............................................................................................ 6

*Mut. of Omaha Mortg., Inc. v. Waterstone Mortg. Corp.*,
  2024 WL 1346980 (M.D. Fla. Mar. 29, 2024) ............................................................... 12-13

*United States v. Kwong*,
  69 F.3d 663 (2d Cir. 1995) ................................................................................................ 3

*USFL v. NFL,*
  842 F.2d 1335 (2d Cir. 1988) ................................................................................5-6, 11

*Zimmer, Inc. v. Stryker Corp.,*
  2018 WL 276324 (N.D. Ind. Jan. 3, 2018) ........................................................... 7

**Rules**

Federal Rule of Evidence 403 ................................................................................... 1, 3

Federal Rule of Evidence 702 ................................................................................... 1, 3

Dr. Gareth Macartney's new opinions regarding JBR's purported damages should be excluded for the same reasons that this Court excluded his prior opinions. Dr. Macartney's amended expert reports and related testimony do not satisfy the requirements of Federal Rules of Evidence 702 and 403.[1]

Dr. Macartney offers three damages models: a "full market" model, which is substantially similar to his previously excluded Keurig benchmark; a "lost customer" model, which assumes that but for Keurig's challenged conduct JBR should have retained all of its sales to a set of customers for more than a decade; and an "Amazon benchmark" model, which assumes that JBR's sales in brick-and-mortar stores should have grown at the rate that its sales grew on Amazon.com, even though Amazon as a platform grew dramatically faster than other outlets. All three models are fatally flawed and prejudicial.

**"Full Market" Model.** The Court excluded Dr. Macartney's initial damages model because Dr. Macartney assumed that JBR should have grown at *Keurig's* growth rate while also asserting that Keurig's growth rate was inflated due to the challenged conduct. ECF No. 2367 at 31 ("Order"). Dr. Macartney's "full market" model perpetuates this same error: It assumes that JBR should have grown at the rate of the "full market," of which Keurig allegedly accounts for 70-90%. Ex. 1, Macartney 2026 Tr. at 37:15-20; Ex. 2, Ugone Suppl. Rebuttal Rpt., Ex. 8.[2] Going from a Keurig benchmark to an "80% Keurig" benchmark does not solve the problem. Further, benchmarking JBR's sales against sales by other unlicensed competitors also allegedly affected by Keurig's conduct does not show "damages" that Keurig owes to JBR. That JBR's

---

[1] Keurig reserves the right to file motions *in limine* at the appropriate time.

[2] Keurig uses Dr. Macartney's terminology for clarity in discussing his models, but it disagrees with his position that the relevant market is limited to Keurig-compatible pods.

sales grew less than those of other competitors affected by the same Keurig conduct simply shows that JBR's lower sales are due to something *other than* Keurig. In short, the "full market" model is not a valid or reliable damages benchmark.

**"Lost Customer" Model**. Dr. Macartney's lost customer model is similarly unreliable because it assumes that (1) any customer that reduced its purchases from JBR after 2013 was unlawfully "lost" solely due to Keurig's conduct; (2) JBR failed to regain any of these customers for more than a decade solely due to Keurig's conduct; and (3) JBR's sales at the "lost" customers should have grown at a rate faster than those retailers' actual growth rates. None of these assumptions is grounded in the facts of the case, and the model is fundamentally unreliable.

**"Amazon Benchmark" Model**. Dr. Macartney's Amazon model uses JBR's growth on Amazon.com as a benchmark for the growth Dr. Macartney says JBR should have had in all other channels but for Keurig's challenged conduct. As Dr. Macartney's data shows, however, Amazon as a sales platform grew by more than 500% from 2012 to 2019 while other channels experienced nothing like this growth. Thus, taking JBR's sales growth rate on Amazon and assuming that JBR's sales should have grown at that same rate everywhere else is not a reliable scientific approach.

Finally, all three of Dr. Macartney's damages models lack support for the duration of damages. In excluding Dr. Macartney's prior model, the Court noted that it claimed damages through 2029, even though "it appears most of the relevant conduct occurred prior to 2017." Order at 30. The new model shortens this period to 2025, or around 8 years past 2017. But none of Dr. Macartney's damages models includes a justification for damages persisting until June 2025. Having data that runs through June 2025, as Dr. Macartney does, is not a justification for

asserting damages through that date, and none of Dr. Macartney's damages models includes any justification for damages persisting until June 2025.

All three models are unreliable and prejudicial, including for reasons that the Court already identified. The Court should again exclude Dr. Macartney's opinions on damages.

## I.    Expert Testimony Must Meet Standards of Reliability and Relevance

The Court has a "gatekeeping obligation" to ensure that expert evidence "is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Under Rule 702, a party may offer expert witness testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The party offering the expert's testimony has the burden to show admissibility. *See In re LIBOR Antitrust Litig.*, 801 F. Supp. 3d 330, 366 (S.D.N.Y. 2025). If any step is unreliable, "the expert's testimony [is] inadmissible" as a whole. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

Expert testimony must also be admissible under Rule 403: "its probative value" must not be "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay

3

witnesses."). Testimony can be excluded under Rule 403 even if it "passes muster under Rule 702." *United States v. Kwong*, 69 F.3d 663, 668 (2d Cir. 1995).

## II.    Dr. Macartney's Benchmarks Are Unreliable

Dr. Macartney's models all attempt to use benchmarks. As Dr. Macartney has acknowledged, a valid benchmark is one that is not affected by the challenged conduct but that is otherwise as similar as possible to the market at issue. *See* ECF No. 2260-1, Macartney Initial Rpt., ¶ 252 (benchmark must "be in a similar situation regarding supply and demand forces as the injured company or product, except that they were not subject to the anticompetitive conduct"); *In re LIBOR Antitrust Litig.*, 299 F. Supp. 3d 430, 479 (S.D.N.Y. 2018) (a benchmark model "would be seriously undermined by [its] incorporation of data pervasively affected by that very conduct"), *superseded on other grounds*, 801 F. Supp. 3d 330 (S.D.N.Y. 2025).

As discussed below, however, Dr. Macartney does not follow his own guidance for a valid benchmark here: As in his previously excluded model, Dr. Macartney selects benchmarks that were affected by the challenged conduct. This is fatal because, as this Court previously explained, "the whole point of the yardstick method is that the corresponding data for a firm or in a market used as the benchmark is unaffected by the antitrust violation." Order at 29.

As in his initial report, Dr. Macartney calculates damages in four channels: "at home," "away from home," Amazon.com, and JBR's website. Ex. 3, Macartney Corrected Am. Rpt., ¶ 28. Each model starts by calculating lost sales in the "at-home" channel, which Dr. Macartney generally defines to include all retail stores and websites except Amazon and JBR's own website, which Dr. Macartney chooses to treat separately. *See id.* ¶¶ 29, 34, 42; ECF No. 2260-1, Macartney Initial Rpt., ¶ 187. The models then mechanically estimate lost sales in the other channels by comparison to the "at home" channel such that any issue in the calculation of

4

damages in the "at home" channel is carried over to other channels.  *See* Ex. 3, Macartney Corrected Am. Rpt., ¶¶ 30-32, 37-39, 43-44.

### A.    The "full market" benchmark is "tainted" and unreliable.

An expert's benchmark is unreliable "when the market or firm used as the benchmark is tainted by a defendant's alleged anticompetitive conduct," Order at 20, because "the whole point of the yardstick method is that the corresponding data for a firm or in a market used as the benchmark is unaffected by the violation," *id*. at 29.  The Court excluded Dr. Macartney's prior model because it assumed that JBR should have grown at the same rate that Keurig grew in the very market supposedly affected by the challenged conduct.  *Id*. at 31.  That benchmark was invalid because, under JBR's theory of the case, it was "tainted by anticompetitive conduct."  *Id*.

Dr. Macartney's new model makes the same exact error.  He simply replaces the Keurig benchmark with what he calls the "full market," again using the very market at issue in this case. According to JBR, Keurig's sales are between 70-90% of the total market.  *See* Ex. 2, Ugone Suppl. Rebuttal Rpt., Ex. 8; *see also* Ex. 1, Macartney 2026 Tr. at 37:15-20 (Dr. Macartney testifying that Keurig's share is "between 80 and 90 percent" of his "full market").  Switching from a 100% Keurig benchmark to an 80% Keurig benchmark fixes nothing.  The benchmark is still manifestly affected by the challenged conduct.

Dr. Macartney asserts that including unlicensed competitors in the market at issue "fixes" any taint.  *See* Ex. 1, Macartney 2026 Tr. at 34:1-22.  It does not.  First, the benchmark still inflates damages because it overwhelmingly consists of Keurig's sales.  Second, Dr. Macartney admits that Keurig's challenged "conduct affected unlicensed companies generally."  *Id*. at 51:14-15.  Because the unlicensed competitors were affected by the same challenged conduct, looking at their sales compared to JBR's does not isolate the effects of challenged conduct,

5

which is the whole point of a valid benchmark.  Order at 29; *USFL v. NFL*, 842 F.2d 1335, 1378-79 (2d Cir. 1988) (plaintiff must separate losses allegedly caused by unlawful conduct from "the amount of its losses caused by other factors").  Instead, Keurig's challenged conduct is a common factor across all of these unlicensed competitors.

The unlicensed competitors in Dr. Macartney's benchmark performed significantly better than JBR did.  Specifically, from 2013 to 2019, JBR's sales slightly decreased, whereas sales of the other unlicensed competitors *tripled*.  *See* Ex. 2, Ugone Suppl. Rebuttal Rpt., Ex. 13.  Indeed, every competitor in Dr. Macartney's "full market" other than JBR grew.  *Id*.  Dr. Macartney says JBR was "damaged" by Keurig's conduct to the extent that it grew slower than rivals did.  But these rivals all faced the same Keurig conduct:  Their superior performance thus must reflect something ***other than Keurig's conduct***—whether that is superior packaging, smarter management decisions, more investment in sales and marketing, or any number of other factors.  None of these factors is damages to JBR caused by Keurig.  *See USFL*, 842 F.2d at 1378-79 (plaintiff must separate losses caused by unlawful conduct from losses "caused by other factors, such as management problems, a general recession or lawful factors"); *see also, e.g.*, *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983) ("It is essential . . . that damages reflect only the losses directly attributable to unlawful competition.").

In short, Dr. Macartney's "full market model" does not compare the real world to a but-for benchmark unaffected by the challenged conduct in order to isolate damages.  Instead, it reflects (1) Keurig's sales, which the Court has already explained are affected by the challenged conduct and cannot be used as a benchmark; and (2) the higher growth of other competitors, which is also not damages to JBR caused by Keurig.  The "full market" benchmark is fundamentally flawed and unreliable.

6

**B.    Dr. Macartney's "lost customer" model takes the flaws in the "full market" model and compounds them, making it also unreliable.**

Dr. Macartney's lost customer model identifies seven customers whose purchases from JBR decreased after 2013 and asserts that all of them left JBR solely because of Keurig's conduct. Ex. 3, Macartney Corrected Am. Rpt., ¶ 34. Dr. Macartney assumes that but for Keurig's conduct, not only would JBR have kept all of these customers for more than a decade, its sales to each would have grown substantially over time. This model is untethered to the facts of the case and is unreliable.

*First,* Dr. Macartney assumes that in the but-for world, all of these retailers would have continued buying pods from JBR. *See id.* ¶ 34 & tbl. 21; Ex. 2, Ugone Suppl. Rebuttal Rpt., ¶ 138(b). But the record in this case—including as to the specific "lost customers"—shows that retailers regularly switch Keurig-compatible pod brands and suppliers. *See, e.g.*, Ex. 2, Ugone Suppl. Rebuttal Rpt., ¶¶ 139, 150; Ex. 4, Jim Rogers Tr. at 406:11-20 (BJ's put its private label business out to bid every year). An expert cannot simply assume that the plaintiff would maintain customer relationships. *See, e.g.*, *Lithuanian Com. Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 460 (D.N.J. 1998) (excluding expert opinion that in the but-for world, the plaintiff's distributorship would have continued for 20 more years because there was no reliable evidence to back up that assumption); *Zimmer, Inc. v. Stryker Corp.*, 2018 WL 276324, at *4 (N.D. Ind. Jan. 3, 2018) (excluding expert testimony assuming that if a revenue stream was wrongfully lost, *all* of the lost profits would be attributable to the defendant's wrongful conduct, "without ever considering the possibility that [they] flowed from other non-actionable events").

*Second*, Dr. Macartney assumes that Keurig's conduct is the sole reason why JBR did not *regain* sales to any of these customers for more than a decade. But again, customers regularly

7

change pod suppliers and JBR could have competed to win back sales. JBR can claim damages for its failure to win back sales only if that failure was due to Keurig's challenged conduct. Yet Dr. Macartney provides no basis to believe that was the case and does not address the record evidence—including from JBR itself—showing other reasons for JBR's failures.

Dr. Macartney made no attempt to account for the extensive record evidence of other reasons why JBR might have lost this business and failed to win it back. As an example, the two largest "lost" customers in Dr. Macartney's model are BJ's and Safeway, which together account for 96% of the damages under this model. Ex. 2, Ugone Suppl. Rebuttal Rpt., tbl. 12. As to BJ's, JBR testified that it repeatedly chose not to bid for opportunities because it did not want to participate in a "lowball auction" where the retailer cared only about price, not quality: JBR's CEO testified that JBR declined to participate in BJ's auction process in 2015 and "chose not to put in a bid at all" in 2016 and 2017. Ex. 4, Jim Rogers Tr. at 406:11-20.[3] As to Safeway, JBR's sales manager responsible for the account testified that, although JBR bid on the business one time, "we didn't bid low enough," and "we declined" "other opportunities" to bid in subsequent years. ECF No. 2278-25, Schmitt Tr. at 176:2-9. JBR can choose not to compete for business, but it cannot later demand treble damages from Keurig for its own choices.

---

[3] *See also, e.g.*, Ex. 5, Emails between [CEO] Jim Rogers and Pete Rogers (Feb. 23, 2016) ("'BJ's has invited us to bid on their Private Label Single Serve. Should we even bother?' . . . . 'I say, "&&$(;::()$&@@" them. No way. Bastards are worse than Safeway. This is like Lucy, the football and Charlie Brown. Tell them to **************.'"); ECF No. 2260-13, Pete Rogers Day 2 Tr. at 100:19-25 ("Q. And you believed that JBR had zero chance of getting the BJ's business because BJ's was just looking for the lowest price? A. That is correct. Didn't care about farmers; didn't care about social programs; didn't care about anything. Quality. Quality was not important to them."); *id.* 100:15-18 ("Why should we try to bid on a piece of business where we have zero chance of ever getting it? Makes no sense.").

As another example, a 2015 report for JBR's then-CEO analyzing why customers were reducing purchases from JBR found that "*no customer*" said that Keurig was to blame, and instead said that customers reported not buying from JBR due to JBR's "[l]ack of marketing support" for its pods, "refusal to pay slotting [fees]," "[p]oor movement" of JBR's pods "in stores previously stocking" them, and JBR's practice of offering dramatically lower prices to its favored customer, Costco, such that other retailers could not match the "low retail price at Costco."  ECF No. 2260-18, Email from Bob Giacomelli to Jon Rogers (July 2, 2015) (summarizing study).

Experts cannot simply ignore evidence that plaintiffs were "hindered by their own conduct."  *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 621 (S.D. Tex. 2003), *aff'd*, 131 F. App'x 450 (5th Cir. 2005).  In *El Aguila*, the court excluded an expert who failed to account for evidence that plaintiffs "never tried to obtain shelf space" and sometimes "refused . . . to negotiate with retailers."  *Id*.  Here, Dr. Macartney fails to account for similar behavior by JBR that caused "a self-inflicted wound."  *Id*.

*Third*, Dr. Macartney makes the unsupported assumption that JBR's sales at these customers would have grown at the same rate as the overall market.  *See* Ex. 3, Macartney Corrected Am. Rpt., ¶ 34.  The model thus suffers from the same problem as the "full market" model and should be excluded for the same reasons.  Moreover, JBR's claimed lost customers were already selling significant volumes of Keurig-compatible pods by 2013, and Dr. Macartney offers no basis to assume that they would have increased their pod sales at the same rate that the overall market grew.  In fact, the record evidence shows the opposite.  Again, BJ's is the largest "lost customer" in Dr. Macartney's analysis, and Dr. Macartney assumes that JBR's sales to BJ's would have doubled from 2013 to 2019, while in reality Dr. Macartney's data shows that BJ's

compatible pod sales decreased between 2013 and 2019. *See id.* tbl. 16; Ex. 2, Ugone Suppl. Rebuttal Rpt., Ex. 19.

Dr. Macartney's "lost customer" model stacks a series of unsupported assumptions, including that JBR lost business solely due to Keurig, that it failed to regain any of this business over more than a decade again solely due to Keurig, and that its sales to those customers would have grown at a rate that far outstrips their actual growth rates. Because Dr. Macartney offers no basis for the multiple implausible assumptions underlying his model, the model must be excluded as unreliable and prejudicial.

**C.     The Amazon benchmark improperly assumes that JBR's sales in the "at-home" channel—i.e., brick-and-mortar stores—should have grown at the same rate as its sales on Amazon.**

Dr. Macartney's Amazon benchmark assumes that JBR's sales across all channels should have grown at the rate JBR's sales grew on Amazon.com in the 2010s. Ex. 3, Macartney Corrected Am. Rpt., ¶ 41. That makes no sense from the get-go: Keurig's challenged conduct including the 2.0 Brewer allegedly affected all sales channels, including Amazon. Dr. Macartney also needed to account for obvious non-Keurig differences between growth on Amazon.com and other channels. *See In re LIBOR*, 801 F. Supp. 3d at 455-56 (benchmark model must control for "obvious" differences between the benchmark and the sales it aims to predict). One obvious factor is the massive growth of Amazon as a sales platform. Another is Dr. Macartney's testimony that Amazon shoppers are more likely to buy JBR's products than other shoppers. Yet Dr. Macartney makes no attempt to control for either of these factors.

As to Amazon's massive growth, Amazon's sales of Keurig-compatible pods increased six-fold from 2013 to 2019 from 122 million in 2013 to 664 million in 2019, in line with the six-fold increase in sales of all products on Amazon. *See* Ex. 3, Macartney Corrected Am. Rpt., tbl.

10

1; *see also* Ex. 2, Ugone Suppl. Rebuttal Rpt., fig. 14 (Amazon sales grew from $10 billion in 2013 to $60 billion in 2019). In contrast, Dr. Macartney's "at-home" and "away-from-home" channels grew by just 50% during that same period. Ex. 3, Macartney Corrected Am. Rpt., tbl. 17 (at-home and away-from-home "full market" grew from 8 billion in 2013 to 12 billion in 2019).

Yet Dr. Macartney assumes that JBR should have grown in all channels at the rate it grew on Amazon. That is, he attributes *all* of the difference between JBR's faster growth rate on Amazon and its slower growth in brick-and-mortar stores to Keurig's challenged conduct, even though Amazon as a platform was growing dramatically faster than other outlets. This "failure to test [and account] for obvious and significant alternative explanations renders [his] analysis essentially worthless." *In re LIBOR*, 801 F. Supp. 3d at 455. Courts routinely exclude damages analyses of this sort. To take another example, in *In re Live Concert Antitrust Litigation*, an expert purported to estimate overcharges on concert tickets from 2000 to 2006, but the court excluded the damages model because it ignored "major variables" that affected prices including "the emergence of digital downloading." 863 F. Supp. 2d 966, 978 (C.D. Cal. 2012); *see also, e.g.*, *USFL*, 842 F.2d at 1379 ("When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage."); *In re Elec. Books Antitrust Litig.*, 2014 WL 1282298, at *10 (S.D.N.Y. Mar. 28, 2014) (excluding damages analysis that "fail[ed] to control for systematic factors"). By ignoring Amazon's dramatically faster growth rate, Dr. Macartney fails to account for obvious differences between his benchmark and the market at issue, and so his model must be excluded.

11

Dr. Macartney also fails to account for *additional* significant differences between Amazon and other channels.  For example, he asserts that consumers who shop on Amazon are *more* likely to purchase JBR products than are consumers who shop in other channels.  Ex. 1, Macartney 2026 Tr. at 165:12-15 (testifying that JBR's pods are particularly "popular amongst the sort of people that buy on Amazon"); *id.* at 157:13-16 (Amazon shoppers especially like JBR's pods because of their "branding, the eco-friendly pod and all of that is very popular on Amazon").  If JBR's pods are more popular on Amazon than elsewhere, using Amazon as a benchmark provides an "unduly favorable" or inflated measure of damages.  Recons. Op. at 5; *see also El Aguila*, 131 F. App'x at 453 n.7.

Dr. Macartney's Amazon benchmark is fundamentally unreliable because it assumes that Keurig owes JBR damages across the "full market" based on JBR's sales at a retailer with a growth rate far outstripping the market and with consumers who disproportionately prefer JBR's product.  For all of these reasons, the Amazon model should be excluded.

III.    **Dr. Macartney's Damages Models Still Use an Arbitrary Damages End Date**

In excluding Dr. Macartney's prior damages model, the Court explained that a damages period cannot be arbitrary:  An expert must provide "some support, beyond an expert's bald assertion," to justify the damages period.  Order at 30.  Dr. Macartney did not and just admitted that the end date was arbitrary.  ECF No. 2260-2, Macartney 2021 Tr. at 189:9-22 ("[Y]ou know, you have to stop the analysis at some point, and . . . 2029 seemed like the right cutoff.").  But as the Court explained, "most of the relevant conduct occurred prior to 2017," Order at 30—with the 2.0 brewer launching in 2014 and being discontinued starting in 2017, *see* Ex. 2, Ugone Suppl. Rebuttal Rpt., ¶ 10—yet Dr. Macartney claimed damages through 2029.  The Court concluded Dr. Macartney had improperly used "a long damages period without adequate support

12

for the end date of that period." Order at 31; *see also Mut. of Omaha Mortg., Inc. v. Waterstone Mortg. Corp.*, 2024 WL 1346980, at \*4 (M.D. Fla. Mar. 29, 2024) (explaining that an expert's opinions "are suspect [when] they do not identify any evidentiary support," "beyond their own speculative opinions," "for the time duration included in their opinions").

In Dr. Macartney's new damages models, this same issue persists. Specifically, Dr. Macartney asserts that damages continued through June 2025, more than a decade after the 2.0 brewer launched and 8 years after it was discontinued. *See* Ex. 3, Macartney Corrected Am. Rpt., ¶ 3. In fact, Dr. Macartney's three damages models show JBR's damages purportedly *increasing* every year, even as the challenged conduct fades further and further into the past.

Dr. Macartney still fails to provide support for this long damages period. The only apparent basis for choosing June 2025 is that he has JBR's sales data through that date. *See id.* ("All three approaches calculate lost profits through June 2025, which is the last month that Rogers has supplied me with data for this Amended Report."). But the fact that JBR provided sales data through a particular date does not mean that JBR is still suffering damages through that time. Dr. Macartney needs to provide a "particular reason" why the alleged effects continued through the date selected. Order at 30. Yet he offers none. Because the arbitrary end date is used in all three of Dr. Macartney's models, all three should be excluded for the same reason that the Court excluded his prior models. *See, e.g.*, *id.*

## IV. Conclusion

For these reasons, as well as all the reasons in the Court's prior decision excluding Dr. Macartney's original opinions on damages, Keurig respectfully requests that the Court exclude Dr. Macartney's amended expert reports and related testimony.

13

Dated: March 20, 2026

/s/ Leah Brannon
CLEARY GOTTLIEB STEEN & HAMILTON LLP
**Leah Brannon**
**Kenneth S. Reinker**
**Carl Lawrence Malm**
**Alan B. Freedman**
lbrannon@cgsh.com
kreinker@cgsh.com
lmalm@cgsh.com
afreedman@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 974-1500

**Rahul Mukhi**
rmukhi@cgsh.com
One Liberty Plaza
New York, NY 10006
(212) 225-2000

BUCHANAN INGERSOLL & ROONEY PC
**Wendelynne J. Newton**
**Mackenzie A. Baird**
wendelynne.newton@bipc.com
mackenzie.baird@bipc.com
Union Trust Building
501 Grant Street, Suite 200
Pittsburgh, PA 15219
(412) 562-8932

*Attorneys for Defendant/Counterclaim Plaintiff*
*Keurig Green Mountain, Inc.*

14

**Local Rule 7.1(c) Certificate of Compliance**

The undersigned, counsel of record for Keurig Green Mountain, Inc., certifies that this brief contains 4,062 words, which complies with the word limit of Local Rule 7.1.

Dated: March 20, 2026

/s/ Leah Brannon
CLEARY GOTTLIEB STEEN & HAMILTON LLP
**Leah Brannon**
lbrannon@cgsh.com
2112 Pennsylvania Avenue, NW
Washington, DC 20037

*Attorney for Defendant/Counterclaim Plaintiff*
*Keurig Green Mountain, Inc.*