# Exhibit 3

Redacted Pursuant to Letter Motion

# CORRECTED AMENDED EXPERT REPORT
# OF
# GARETH MACARTNEY, Ph.D.

**In the matter of**

***JBR, Inc. (D/B/A ROGERS FAMILY COMPANY) v.***
***KEURIG GREEN MOUNTAIN, INC. (F/K/A GREEN MOUNTAIN COFFEE ROASTERS, INC. AND AS SUCCESSOR TO KEURIG, INC.)***
**ECF CASE 1:14-md-2542-VSB-HBP**

OnPoint
Analytics

**OnPoint Analytics, Inc.**

**Highly Confidential**
**Pursuant to Protective Order**

**November 5, 2025**

# TABLE OF CONTENTS

**I. INTRODUCTION** ..... **1**

**II. THE EVIDENCE CONFIRMS THE DAMAGES CAUSED BY THE ALLEGED CONDUCT** ..... **3**

A. ROGERS WAS POSITIONED TO BE HIGHLY SUCCESSFUL IN THE SINGLE-SERVE MARKET ..... 3

B. DOCUMENTS AND TESTIMONY CONFIRM ROGERS WAS HARMED BY THE ALLEGED CONDUCT ..... 11

C. SALES DATA CONFIRMS ONGOING HARM TO ROGERS ..... 13

*1. Away-From-Home* ..... *14*

*2. At-Home* ..... *15*

*3. eCommerce* ..... *20*

**III. FULL MARKET GROWTH BENCHMARK APPROACH** ..... **22**

**IV. CUSTOMER-BY-CUSTOMER APPROACH** ..... **31**

**V. ANALYSIS USING ROGERS'S AMAZON EXPERIENCE AS A BENCHMARK** ..... **38**

**VI. LANHAM ACT DAMAGES** ..... **42**

**VII. CONCLUSION** ..... **44**

**APPENDIX A: LOST CUSTOMERS (AWAY-FROM-HOME)** ..... **A-1**

**APPENDIX B: LOST CUSTOMERS (AT-HOME)** ..... **B-1**

# I. INTRODUCTION

1. I am a Senior Economist, Chief Executive Officer, and President of OnPoint Analytics, Inc., an economic and statistical consulting firm. I have been retained by counsel for Plaintiff JBR, Inc., d/b/a Rogers Family Company (hereafter, "Rogers") to analyze several issues relating to Defendant Keurig Green Mountain, Inc.'s (hereafter, "Keurig") alleged anticompetitive behavior and its impact on Rogers. Specifically, I have been asked by Rogers to submit this report (hereafter the "Amended Macartney Report" or "my Amended Report") in response to the Court's order dated June 30, 2025, granting leave to file an amended report.[1]

2. I previously submitted an expert report on August 28, 2020[2] which concluded that Keurig had monopoly power in the Single-Serve Brewer Market[3] and the Compatible Portion Pack Market,[4] and that Keurig engaged in anticompetitive behavior which harmed Rogers, causing it to suffer lost profits.[5] I quantified those lost profits, as well as the amount by which Keurig was unjustly enriched by its anticompetitive behavior.[6] In response to my Initial Report, Keurig's counsel submitted expert reports by Dr. Kevin Murphy, Dr. Keith Ugone, and Mr. Mark Wood, on December 7, 2020.[7] After reviewing and evaluating Dr. Murphy's report, Dr.

---

[1] Opinion & Order, filed June 30, 2025, at p. 10.

[2] On the same date, Keurig submitted the Expert Report of Peter E. Rossi, Ph.D., August 28, 2020 (hereafter, "Rossi Report") in support of Keurig's counterclaims. I was asked by counsel for Rogers to evaluate the Rossi Report and did so in the Expert Rebuttal Report of Gareth Macartney, Ph.D., December 7, 2020 (hereafter, "Macartney Rossi Rebuttal Report" or "my Rossi Rebuttal Report").

[3] "Single Serve Brewer" refers to coffee brewers that can make individual portions of coffee.

[4] "Portion Packs" refers to pre-portioned coffee packs that can be used in Single Serve Brewers. "Compatible Portion Packs" refers to Portion Packs that are compatible with Keurig's K-Cup Brewers.

[5] Expert Report of Gareth Macartney, Ph.D., August 28, 2020 (hereafter, "Initial Macartney Report" or "my Initial Report"), at §IV.

[6] Initial Macartney Report, at §§IV.D, VIII.

[7] Expert Report of Kevin M. Murphy, December 7, 2020 (hereafter, "Murphy Report"); Rebuttal Expert Report of Keith R. Ugone, December 7, 2020 (hereafter, "Ugone Report"); Expert Report of Mark Wood, December 7, 2020 (hereafter, "Wood Report").

Ugone's report, and Mr. Mark Wood's report, I submitted an expert reply report on February 1, 2021.[8]

3. On August 18, 2021, Defendant Keurig filed a motion to exclude my opinions and testimony.[9] On January 3, 2025, the Court issued an order rejecting Keurig's arguments regarding liability and the impact of Rogers's business decisions, but finding the benchmark used in my analysis "problematic," with the Court then excluding my lost profits analysis.[10] The Court had two concerns: 1) that my benchmark of growth that Rogers should have experienced (absent Keurig's challenged conduct) was based on Keurig's branded, partnered and licensed "K-Cups" and that this benchmark could potentially be tainted by Keurig's anticompetitive conduct (because "K-Cups" were, by definition, not subject to Keurig's alleged exclusionary conduct); and, 2) that my projection of lost profits through 2029 lacked support.[11] In this Amended Report, I address the Court's concerns. I implement three alternative models, none of which could reasonably be argued as being tainted by Keurig's anticompetitive conduct. The *first* approach uses growth of the *full* market for Compatible Portion Packs as a benchmark for the growth that Rogers would have experienced absent Keurig's alleged conduct. The *second* approach is based on specific customers that the record evidence (documents, sworn declarations, and sworn deposition testimony) demonstrates Rogers lost because of Keurig's behavior. The *third* approach uses Roger's growth in the Amazon channel (which was affected by Keurig's conduct, but less so than other channels), as a benchmark for the growth Rogers would have achieved in its other channels, absent Keurig's alleged conduct. All three approaches calculate lost profits through June 2025, which is the last month that Rogers has supplied me with data for this

---

[8] Expert Reply Report of Gareth Macartney, Ph.D., February 1, 2021 (hereafter, "Macartney Reply Report" or "my Reply Report").
[9] Keurig's Notice of Motion to Exclude the Expert Reports and Testimony of JBR Expert Gareth Macartney, Ph.D., August 18, 2021; Memorandum of Law in Support of Keurig's Motion to Exclude the Expert Reports and Testimony of JBR Expert Gareth Macartney, Ph.D., August 18, 2021.
[10] Opinion & Order, filed January 3, 2025, at pp. 26-31.
[11] Opinion & Order, filed January 3, 2025, at pp. 26-30.

Amended Report. Thus, none of the approaches project lost profits into the future. The updated data that Rogers has provided me through June 2025, confirms my opinion that Rogers suffered lost sales and sales opportunities, and that its sales have not recovered from Keurig's alleged conduct, as I will also describe in this Amended Report.

4. The rate charged for my time spent on this matter remains unchanged from my Initial Report. Again, I was supported in my work by the staff of OnPoint Analytics, Inc., and their time was billed at the same rates as for my Initial Report. An updated version of my *curriculum vitae* is attached as Exhibit A, including a list of my expert testimony and reports. The materials I have reviewed and relied upon since my Initial and Reply Reports are listed in Exhibit B.

## II. THE EVIDENCE CONFIRMS THE DAMAGES CAUSED BY THE ALLEGED CONDUCT

5. The evidence in this matter confirms that Rogers was harmed by Keurig's alleged conduct. Rogers had several advantages that made it well positioned to succeed in the Compatible Portion Pack Market. Despite these advantages, documents and testimony demonstrate that Rogers lost actual and potential sales due to Keurig's alleged conduct. Further, an analysis of Rogers's sales data confirms the impact of these lost sales.

### *A. Rogers Was Positioned to be Highly Successful in the Single-Serve Market*

6. Rogers had several advantages that should have led to it being highly successful in the Compatible Portion Pack market.[12] *First*, Rogers had an early mover advantage with introduction of its OneCup product in 2011.[13] *Second*, Rogers had an eco-friendly soft pod which was preferred by many customers.[14] *Third*, Rogers's OneCup was a quality product[15] with an

[12] Initial Macartney Report, at §VII.A.
[13] Initial Macartney Report, at §VII.A.1.
[14] Initial Macartney Report, at §VII.A.2.
[15] Initial Macartney Report, at §§VII.A.3-4.

appealing brand.[16] *Fourth*, Rogers's pricing was significantly lower than that of other brands in the market.[17] *Fifth*, Rogers made a substantial marketing effort to obtain sales.[18]

7. Rogers, with its OneCup product, was one of the very first suppliers of Compatible Portion Packs.[19] Introducing its OneCup in 2011, Rogers was able to gain significant distribution with customers looking for an alternative to Keurig's K-Cups.[20] In 2012, the first full year after its OneCup product was released, Rogers was the 10th largest Single-Serve coffee brand in the U.S. retail sector by sales revenue (with the top 9 largest brands being Keurig-branded Single-Serve coffee brands (*e.g.*, Starbucks Keurig, Caribou Coffee Keurig))[21] and was already recognized as a threat by Keurig, in a September 2013 Keurig presentation.[22]

8. Along with being one of the first suppliers, Rogers also had an advantage because OneCup was an eco-friendly pod. Consistent with its use of an eco-friendly pod, Rogers was recognized in 2014 "as one of the nation's most environmentally responsible coffee companies," by Store Brands magazine.[23] This was commercially significant because, as Mark Woods, former Chief Product Officer for Hot Systems at Keurig,[24] testified, "recyclability, biodegradability, compostability -- those are all important attributes to consumers."[25] Further, Big Cat Coffee, a Keurig Authorized Dealer reported that "when there are recyclable and biodegradable options available, [they] contribute to negative perception of Keurig brand. The public is mad that Keurig has not corrected this issue and many people boycott the brand. By not

---

[16] Initial Macartney Report, at §VII.A.4.
[17] Initial Macartney Report, at §VII.A.5.
[18] Initial Macartney Report, at §VII.A.6.
[19] Deposition of Robert Giacomelli, November 18, 2019, Volume I, at 69:4-17.
[20] Deposition of Robert Giacomelli, November 18, 2019, Volume I, at 69:4-17.
[21] Nielsen 2012 US Total Food Single-Serve Portion Packs sales revenue and units data (ROG003144733).
[22] Green Mountain Coffee Roasters Inc., *Capturing Unlicensed K-Cup Coffee Share*, September 2013 (Exhibit 1316 to Deposition of Mark Wood, October 18, 2019), at slides 9, 11, and 13.
[23] Rogers Family Company, "Rogers Coffee – Awarded One of Nation's Most Environmentally Responsible Coffee Companies," press release, November 5, 2014, accessed February 6, 2018, at https://www.rogersfamilyco.com/index.php/rogers-coffee-awarded-one-nations-environmentally-responsible-coffee-companies/.
[24] Deposition of Mark Wood, October 17, 2019, at 16:20-22.
[25] Deposition of Mark Wood, October 18, 2019, at 405:1-20.

having a biodegradable or recyclable option we turn off a growing number of potential single serve customers."[26]

9. Rogers also benefited by having a quality product and an established brand. Unlike Keurig's K-Cup, the OneCup does not have any sort of plastic container to hold the filter[27] and Rogers's products use only Arabica beans rather than Robusta beans, as Robusta beans are "cheaper and harsher tasting."[28] Consistent with these features, Rogers reported that "[c]onsumers agree that OneCup™ delivers better taste and more aroma," based on an at-home taste test conducted by the food and beverage developer Mattson.[29] This quality is paired with Rogers's brand, which as Rogers's Robert Giacomelli describes it: "we have a history of -- a brand history for JBR, Rogers Family, San Francisco Bay brand, where, you know, we have a real quality story, a sustainability story, the relationships that we have with our farmers, where we pay them more for their cost of production to make sure they get a fair return on their coffee."[30] Consistent with both the quality of the product and the established brand, Rogers was able to break into difficult retailers to appeal to, such as Costco.[31]

10. In addition to having the advantages of being early, eco-friendly, a quality product and an appealing brand, Rogers was also competitively priced. As described in my Initial Report, Figure 1 (Figure 28 in my Initial Report) "compares the average *retail* price of Rogers's OneCup (in orange) to the *retail* prices of the top ten Single-Serve Portion Packs that are either Keurig-owned or Keurig licensed/partnered during the year the Keurig 2.0 launched, based on Nielsen

---

[26] Keurig, *Why FY15 Workplace Sales are different from FY14 sales*, KGM08381385-1411, at -1395.
[27] *See* Initial Macartney Report, at §V.A.6.
[28] Rogers Family Company, "Rogers Bucks the Coffee Industry 'Robusta' Trend," June 19, 2012, accessed February 6, 2018 at https://www.rogersfamilyco.com/index.php/rogers-bucks-the-coffee-industry-robusta-trend/; Rogers, "SF Bay Coffee," accessed June 17, 2020 at https://sfbaycoffee.com/.
[29] Rogers Family Company, *Private Label Single Serve Coffee & Tea Capabilities*, November 2013, ROG001288572, at slide 12.
[30] Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 38:9-39:4.
[31] Initial Macartney Report, at ¶217.

scanner data for sales of Single-Serve coffee."[32] In 2014, Rogers was cheaper than all of the ten top Keurig brands by at least 22%.[33]

***Figure 1. Rogers Family Company and Top 10 Keurig Owned or Licensed Brands Average Price (2014)***[34]




11. Drilling down channel by channel further confirms that Rogers was competitively priced. Figure 2 through Figure 5 compare the average price of Rogers's OneCup (in orange) to Keurig's Single-Serve Portion Packs (green) by channel. For every year, 2011 through 2019, and every channel, Rogers was substantially cheaper than Keurig. In fact, Rogers was on average 26% cheaper in the At-Home channel, 14% cheaper in the Away-From-Home channel, 27% cheaper in the Amazon channel, and 17% cheaper in the Website channel.[35] This analysis suggests both that absent Keurig's alleged conduct Rogers would have been successful and that

[32] Initial Macartney Report, at ¶219.
[33] 22%= ($0.50-$0.39)/$0.50; comparing Rogers to Eight O' Clock.
[34] Initial Macartney Report, at Figure 28; Nielsen 2014 Total US xAOC Ground Coffee Single-Serve Portion Packs Item Rank Report (ROG003144852); Keurig Transaction Data.
[35] *See* my workpapers.

even in the but-for world, Rogers would not lose market share even if Keurig were to lower its prices.

*Figure 2. Rogers Versus Keurig At-Home Price*[36]




[36] *See* my workpapers.

*Figure 3. Rogers Versus Keurig Away-From-Home Price*[37]




*Figure 4. Rogers Versus Keurig Amazon Price*[38]




[37] *See* my workpapers.
[38] *See* my workpapers.

***Figure 5. Rogers Versus Keurig Website Price***[39]




12. Not relying on just the advantages described above, Rogers also made a substantial marketing effort. This is reflected in Rogers's marketing spend relative to sales. As described in my Initial Report, "Rogers and Keurig engaged in a comparable amount of marketing effort intensity, relative to their sales"[40] as shown in Figure 6 (Figure 30 in my Initial Report), which presents Rogers's direct marketing spend for OneCups versus Keurig's trade spend for K-Cups, as a percentage of sales.

[39] *See* my workpapers.
[40] Initial Macartney Report, at ¶221.

***Figure 6. Rogers Direct Spend Versus Keurig Trade Spend on Portion Packs***[41, 42]

[redacted]

13. The comparable marketing spend by Rogers can also be seen in Figure 7 (Figure 31 in my Initial Report), which "presents Rogers's direct marketing spend plus indirect marketing spend allocated to OneCups again versus Keurig's trade spend for K-Cups, as a percentage of sales."[43]

[41] Initial Macartney Report, at Figure 30; JBR, Inc., P&L by Salesperson and Division, JBR, Inc., using rows "Direct Marketing Exp." and "Gross Sales," fiscal years ended March, U.S. Dollars, ROG002327159, ROG002327248, ROG002327391, ROG002327464, ROG003144874; Keurig, P&Ls, using row "GROSSREVENUE - Gross Revenue," in sheet "Total Pods" and row "TRADESPEND - Trade Spend" in sheet "Total Pods," aggregated to match Rogers fiscal years ended March, U.S. Dollars, KGM08087165, KGM08087166, KGM11698658, KGM11698659, KGM11698660.

[42] The trade spend percentage is calculated by dividing trade spend by gross sales of Portion Packs. Rogers trade spend is obtained from the Rogers P&L category "Direct Marketing Exp.," which is the sum of the general ledger expense accounts that are available by customer, including spend on rebates and discounts. Any expenses not specific to Portion Packs are allocated in part to Portion Packs based on the customer's gross sales by Rogers in creating the P&L (Letter dated March 31, 2020, from Mario Moore to Alan B. Freedman, containing Rogers's answers to Keurig's questions, answers to questions 3, 4.b, and 5.c.xvii).

[43] Initial Macartney Report, at ¶222.

***Figure 7. Rogers Direct plus Indirect Spend Versus Keurig Trade Spend on Portion Packs***[44, 45]

[redacted]

### *B. Documents and Testimony Confirm Rogers was Harmed by the Alleged Conduct*

14. Despite the advantages described above, Rogers lost sales and potential sales because of Keurig's alleged conduct, as confirmed by the evidence. As detailed in my Initial Report, Keurig attempted to "reclose" the Keurig system with its "2.0" brewer, which was designed to only accept Keurig K-Cups.[46] Keurig's actions also included disparagement of rival products such as those produced by Rogers,[47] and exclusive relationships with retailers, distributors,

[44] Initial Macartney Report, at Figure 31; JBR, Inc., P&L by Salesperson and Division, JBR, Inc., using rows "Direct Marketing Exp.," "Aloc. Other Mkt. Exp.," and "Gross Sales," fiscal years ended March, U.S. Dollars, ROG002327159, ROG002327248, ROG002327391, ROG002327464, ROG003144874; Keurig, P&Ls, using row "GROSSREVENUE - Gross Revenue," in sheet "Total Pods" and row "TRADESPEND - Trade Spend" in sheet "Total Pods," aggregated to match Rogers fiscal years ended March, U.S. Dollars, KGM08087165, KGM08087166, KGM11698658, KGM11698659, KGM11698660.

[45] The trade spend percentage is calculated by dividing trade spend by gross sales of Portion Packs. Rogers trade spend is obtained from the Rogers P&L categories "Direct Marketing Exp." and "Alloc. Other Mkt. Exp.," which represent the direct and indirect trade spend amounts respectively. "Direct Marketing Exp." is the sum of the general ledger expense accounts that are available by customer, including spend on rebates and discounts. Any expenses not specific to Portion Packs are allocated in part to Portion Packs based on the customer's gross sales by Rogers in creating the P&L. "Alloc. Other Mkt. Exp." is the sum of the general ledger expense accounts related to indirect marketing (Letter dated March 31, 2020, from Mario Moore to Alan B. Freedman, containing Rogers's answers to Keurig's questions, answers to questions 3, 4.b, 5.c.xvii, 5.c.xviii).

[46] Initial Macartney Report, at §VI.C.

[47] Initial Macartney Report, at §VI.D.

machine manufacturers, coffee roasters and brands, to exclude competing Compatible Portion Packs.[48]

15. As shown in Appendix A and Appendix B of this Amended Report, documents and/or testimony specifically tie Rogers's loss of sales and potential sales to Keurig's alleged conduct, particularly its efforts to reclose the Keurig system and its use of exclusive relationships. For example, as shown in Appendix A and Appendix B, the evidence shows that lost sales and lost sales opportunities in both the At-Home and Away-From-Home sales channels were linked to purported compatibility issues with Keurig's 2.0 brewers, specifically for customers Action Sales and Marketing, Carver Brothers, Army and Air Force Exchange Service, Big Y, BJ's, Kroger, Safeway, and Wakefern (ShopRite, Price Rite).[49] As seen in Appendix B, as Robert Giacomelli (Rogers) testified in connection with Safeway, "[Safeway] identified their discomfort or concern that Keurig 2.0 was coming and that our pods would not work in their machines."[50] Likewise, in an email dated March 24, 2014, from Susan Mathers (Army and Air Force Exchange Service) to Jo Wilkens (Rogers), Rogers was informed that "As of now, we will only be purchasing kcups that will fit in the Keurig 2.0 brewers."[51]

16. Appendix A also shows that Rogers lost sales and sales opportunities in the Away-From-Home channel due to Keurig's exclusive relationship deals, specifically with ADM Vending, Associated Coffee Services, Bob Carrell Coffee, Canteen Services, Coffee Distributing Corporation, Coffee Pause, Coffee Wholesale USA, Compass Group, Diamond Rock Spring Water, Evans Coffee Co., One Cup Coffee, Sodexo, Staples, U.S. Coffee, United Stationers, and Vistar.[52] For example, Michael Sarina (Rogers) testified that "Staples will not carry anything

[48] Initial Macartney Report, at §VI.E.
[49] Appendix A; Appendix B.
[50] Deposition of Robert Giacomelli, November 19, 2019, Volume II, at 256:18-257:4.
[51] AAFES000047.
[52] Appendix A.

other than 2.0-compatible products, and they were not going to risk their office distribution business because they to have [sic] a loyalty agreement [with Keurig] that they need to comply with."[53] Similarly, Robert Giacomelli (Rogers) testified that the reason for failed sales talks with Vistar was due to an exclusivity agreement with Keurig,[54] which is consistent with the testimony of David Burwick (Peet's, which joined with Keurig in 2018),[55] who testified "that Vistar was balking at carrying [Peet's] K-Cups in that channel" and it was his understanding that it was because "they had a relationship as an authorized dealer with Keurig and under that agreement…they were obligated to sell only a certain type of K-Cups."[56]

### *C. Sales Data Confirms Ongoing Harm to Rogers*

17. In my Initial Report, I demonstrated, by graphing Rogers's sales data (which showed precipitous drops when the Keurig 2.0 was launched or complete strangulation in the case of the channel most affected by Keurig's exclusive deals, namely Away-From-Home), the effect of Keurig's alleged conduct on Rogers across sales channels, Away-From-Home, At-Home, and eCommerce (both on Amazon and Rogers's own website).[57] As explained in my Initial Report, each of these channels was negatively affected.[58] This is consistent with Keurig's alleged conduct as described above. In my Initial Report, submitted in 2020, I opined that Rogers's sales would not fully recover from Keurig's conduct because Rogers missed out on the opportunity to establish brand loyalty, particularly among Millennials, during the initial growth phase of the Single-Serve Market,[59] and because of the continued use by Keurig of exclusivity agreements,[60]

[53] Deposition of Michael Sarina, August 26, 2014, at 110:24-111:9.
[54] Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:18-20.
[55] Initial Macartney Report, at ¶36.
[56] Deposition of David Burwick, May 29, 2020, at 24:3-17.
[57] Initial Macartney Report, at §§VII.B.1-3.
[58] Initial Macartney Report, at §§VII.B.1-3.
[59] Macartney Reply Report, at ¶237; Initial Macartney Report, at ¶¶248-250.
[60] Macartney Reply Report, at ¶238; Initial Macartney Report, at ¶257, citing Email correspondence dated October 26-30, 2017, between Sales Express and Megan Gillon, et al., attaching Essendant and Keurig Green Mountain Dealer Agreement between Keurig Green Mountain, Inc., and [redacted] ESND0016327-328, at -328; Email correspondence dated October 31-November 2, 2017, between Jerry Novak and Katy Carter, et al., attaching Essendant and Keurig Green Mountain Dealer Agreement between [redacted] and Essendant Co.,

as well as the potential launch of another Keurig brewer with functionality only for its K-Cups.[61] For this Amended Report, Rogers has provided me with further sales data through June 2025. Below I provide updated figures with this data, which confirm my prior opinion of Rogers's ongoing harm and which are consistent with the documents and evidence identified in Appendix A and Appendix B concerning Rogers losing sales and sales opportunities.

### *1. Away-From-Home*

18. Figure 8 below, which is an updated version of Figure 33[62] from my Initial Report, demonstrates the impact of Keurig's actions on Rogers's Away-From-Home sales with additional data through 2024 (the last full year for which Rogers has updated its data). As can be seen in Figure 8, Rogers's Away-From-Home sales revenue barely got off the ground and continued its downward trend towards zero in 2024. This is consistent with the documentary evidence in Appendix A concerning Keurig's exclusive deals with Away-From-Home distributors.

---

ESND0016287-293, at -292; Email correspondence dated November 28-29, 2017, between Jerry Novak and Express KAD, et al., attaching Essendant and Keurig Green Mountain Dealer Agreement between [redacted] and Essendant Co., ESND0012338-341, at -340; Email correspondence dated November 20-December 1, 2017, between Sales Express and Express KAD, et al., attaching Essendant and Keurig Green Mountain Dealer Agreement between [redacted] and Essendant Co., ESND0031766-770, at -769; Email dated March 1, 2017, from Kata Gillespie to Cynthia Hester and Beth MacIver, attaching Non-Exclusive Re-Distributor Agreement between Keurig Green Mountain, Inc., and Essendant Co., ESND0053942-958, at -944; Non-Exclusive Distributorship Agreement between Keurig Green Mountain, Inc., and Compass Group USA, Inc., dated as of March 9, 2018, CANTEEN-0001943-954, at -944; Non-Exclusive Distributorship Agreement between Keurig Green Mountain, Inc., and Vistar, dated as of January 1, 2017, PFGKCUP0000812-832, at -813.

[61] Macartney Reply Report, at ¶239; Initial Macartney Report, at ¶257, citing Keurig Dr Pepper, *Q2 2020 Earnings Call Transcript*, July 30, 2020, at p. 8.

[62] Initial Macartney Report, at ¶230, Figure 33.

***Figure 8. Updated Initial Macartney Report*[63]**
***Figure 33. Rogers Annual Sales Revenue – Away-From-Home Channel-Updated***




### 2. *At-Home*

19. As described in Appendix B, Rossana Klawon (Kroger) stated in a declaration that "we had no choice but agree to partner with Keurig. Our decision to make the switch to Keurig was entirely based on Keurig's lock-out technology."[64] Figure 9 below is an updated version of Figure 35 of my Initial Report.[65] As can be seen in Figure 9, consistent with my Initial Report and the documentary evidence described in Appendix B, additional data shows that Rogers annual sales to Kroger dropped to zero in 2020 and never recovered.

---

[63] Rogers Sales Data.
[64] Declaration of Rossana Klawon, May 8, 2020, at ¶¶42-43.
[65] Initial Macartney Report, at ¶233, Figure 35.

***Figure 9. Updated Initial Macartney Report***[66]
***Figure 35. Rogers Annual Sales Revenue – Kroger-Updated***




20. As described in Appendix B, Robert Giacomelli (Rogers) testified that "[Safeway] identified their discomfort or concern that Keurig 2.0 was coming and that our pods would not work in their machines."[67] Figure 10 below, an updated version of Figure 36 from my Initial Report,[68] shows that Rogers's sales to Safeway dropped to zero in 2015 and never recovered.

[66] Rogers Sales Data.
[67] Appendix B; Deposition of Robert Giacomelli, November 19, 2019, Volume II, at 256:18-257:4.
[68] Initial Macartney Report, at ¶235, Figure 36.

***Figure 10. Updated Initial Macartney Report*[69]**
***Figure 36. Rogers Annual Sales Revenue – Safeway-Updated***




21. As described in Appendix B, Jon Rogers (Rogers) stated in a declaration that “Keurig met with BJ executives to discuss the 2.0 brewer and emphasized that our pods would not work with the new brewer.”[70] Figure 11 below, an updated version of Figure 37 from my Initial Report,[71] shows that Rogers’s sales to BJ’s never recovered after the launch of the Keurig 2.0 and have remained at zero ever since.

---

[69] Rogers Sales Data.
[70] Declaration of Jon Rogers in Support of Plaintiffs’ Motion for a Preliminary Injunction, August 11, 2014, ¶44
[71] Initial Macartney Report, at ¶236, Figure 37.

***Figure 11. Updated Initial Macartney Report*[72]**

***Figure 37. Rogers Annual Sales Revenue – BJ's-Updated***




22. The cumulative effect of these losses can be seen in Figure 12 below, an updated version of Figure 38,[73] which shows that the decline in Rogers annual sales revenue for the At-Home channel continued after 2018 through 2023.

---

[72] Rogers Sales Data.

[73] Initial Macartney Report, at ¶240, Figure 38.

***Figure 12. Updated Initial Macartney Report.***[74]
***Figure 38. Rogers Annual Sales Revenue – At-Home Channel-Updated***




23. As explained in my Initial Report, the At-Home sales Rogers continued to maintain were largely due to its strong relationship with Costco.[75] Figure 13 below is an updated version of Figure 39 of my Initial Report,[76] showing Rogers's annual At-Home sales revenues excluding Costco. In Figure 13, the additional more recent data shows that Rogers's annual At-Home sales continued to decline and have never recovered.

[74] Rogers Sales Data.
[75] Initial Macartney Report, at ¶241.
[76] Initial Macartney Report, at ¶241, Figure 39.

*Figure 13. Updated Initial Macartney Report*[77]
*Figure 39. Rogers Annual Sales Revenue – At-Home Channel, Costco Removed-Updated*




### 3. *eCommerce*

24. In my Initial Report, I analyzed the eCommerce channel by reviewing two online platforms, Amazon and the website operated by Rogers. As described in my Initial Report, Rogers had strong business on Amazon with Rogers's OneCup being highly rated and a top seller in 2014 and 2016.[78] Figure 14 below, an updated version of Figure 41 from my Initial Report,[79] shows that after a rapid increase, sales stagnated following the launch of the 2.0 and Keurig's alleged false claims and did not recover their earlier growth rate.

---

[77] Rogers Sales Data.
[78] Initial Macartney Report, at ¶213.
[79] Initial Macartney Report, at ¶243, Figure 41.

***Figure 14. Updated Initial Macartney Report[80]***
***Figure 41. Rogers Annual Sales Revenue – Amazon-Updated***




25. Figure 15 below, an updated version of Figure 42 from my Initial Report,[81] shows stagnation and decline in sales on Rogers's website following the release of the 2.0 and Keurig's alleged false claims and such sales have remained stagnant.

[80] Rogers Sales Data.
[81] Initial Macartney Report, at ¶244, Figure 42.

*Figure 15. Updated Initial Macartney Report*[82]
*Figure 42. Rogers Annual Sales Revenue – Website-Updated*




## III. FULL MARKET GROWTH BENCHMARK APPROACH

26. In this section, I amend my analysis of the lost profits Rogers suffered as a result of Keurig's alleged anticompetitive behavior, using a different benchmark and updated Rogers transactional data through June 2025. In my Initial Report, I used the set of Compatible Portion Packs owned or licensed by Keurig as the benchmark.[83] Here, I use the full set of Compatible Portion Packs (hereafter "Full Market") as a benchmark. For the period 2012 through 2019, I add together detailed transactional data for companies comprising most of the market and which produced data in this litigation, including Keurig, Rogers, Berrie House, Caffé D'arte, Kraft,[84] Mother Parkers, S&D Coffee, Treehouse, Trilliant,[85] Westrock, and White Coffee. For the period

[82] Rogers Sales Data.
[83] Initial Macartney Report, at §VIII.
[84] In order to avoid double counting of Kraft sales, I exclude sales of cups by Keurig to Kraft that appear in Keurig's data.
[85] Trilliant has not produced any transactional data, but I estimated their sales using Keurig's estimate of Trilliant sales in 2017 and applied the annual growth rate of the market as a whole to derive Trilliant sales for other years. Key Competitor Capacity and Sales Volume, KGM10268634, at slide 1.

2020 through June 30, 2025, I use IRI MULO data[86] restricted to Compatible Portion Packs, but across all available brands, as an estimate of the Full Market and its growth. Data from IRI and Rogers is available through June 30, 2025, which enables me to estimate damages through half of 2025 based on historical data. Unlike in my Initial Report, I do not forecast damages out through 2029, instead stopping in June 2025, the last month for which I have data.

27. Growth of the Full Market is a reliable benchmark to compare Rogers's experience, given that Compatible Portion Packs were sold at the same time as Rogers's OneCup, in the same geography, and were designed to work with the same brewer. Also, growth of the Full Market is not specific to Keurig and is not therefore tainted by the alleged anticompetitive conduct. Also, I use the growth rate in the number of Compatible Portion Packs sold, not the dollar growth. This means that the benchmark growth rate I use does not involve Keurig's prices (or any other company's prices) lest it be argued that those prices were tainted by the anticompetitive conduct. Put simply, this benchmarking approach assumes that Rogers should have at least grown with the market, which reflects increasing demand for Compatible Portion Packs by consumers. Any argument that the number of Compatible Portion Packs may have grown faster absent Keurig's conduct (because perhaps it would have been forced to lower prices) merely makes my approach conservative. Further, any argument that absent Keurig's conduct, it may have lowered its prices and stolen business back from Rogers, is negated by the fact that Rogers's prices were so much lower than Keurig's anyway, as described in Section II.A. So, even if Keurig's prices had been 10% lower, Roger's prices were still substantially lower than that.

[86] Information Resources, Inc. ("IRI"), now known as Circana, provides scanner data for Multi-Outlet ("MULO") stores, which include Grocery/Food stores, Drug stores, Mass merchandisers, Walmart, Club stores (excluding Costco), Dollar stores, and Military commissaries.

28. Like my Initial Report, the following analysis calculates damages for four categories of Rogers's sales: the At-Home channel, the Away-From-Home channel, Amazon sales, and direct sales through Rogers's website. Keurig and Rogers provided channel information on a transaction-by-transaction basis, which allows for precise allocation of volume to each channel. I created a lookup file based on Rogers and Keurig data, to assign customers to a channel if they appear in Kraft, Treehouse, Westrock and White Coffee data. S&D Coffee provided a business segment field that flagged customers in the Away-From-Home channel. For the remaining transactions where the customer was not associated with a channel in the data or did not appear as a customer in Rogers or Keurig data, I conducted research to assign their transactions to the correct channel. When the customer is not specified or there is no public information sufficient to understand the channel it operates in, I assign the sales to a channel based on the aggregate share of sales of each channel on an annual basis where observed elsewhere in the data.

29. Table 16 shows my analysis of the lost revenues suffered by Rogers in the At-Home channel, using the Full Market in the At-Home channel (Column A) as a benchmark. Absent the launch of the Keurig 2.0 brewer in 2014, Rogers's At-Home OneCup volume would have grown at least at the same rate of growth as the Full Market in the same channel (Column B). I understand that Keurig has stated that it will not augment its production in this matter to produce sales transaction data past 2019. So, for the period 2020 through June 30, 2025, I rely on annual product level IRI MULO single cup coffee data, which I restrict to Compatible Portion Packs for all brands (Column C).[87] I model that Rogers's At-Home channel OneCup volume over the period 2020 through June 30, 2025 would have grown at least at the IRI MULO Compatible Portion Packs growth rate (Column D). I apply these annual growth rates to Rogers's actual At-Home OneCup volume in 2013 (before the launch of the Keurig 2.0) through June 30, 2025 to

[87] To do so, I make use of the information available in IRI, including product number, product description, brand, manufacturer, and packaging along with information in the public domain to ascertain brewer compatibility.

arrive at Rogers's but-for At-Home OneCup sales (Column F). Subtracting Rogers's actual At-Home OneCup sales (Column E) from its but-for At-Home OneCup sales (Column F) results in my estimate of Rogers's At-Home lost OneCups sales (Column G). I assume that Rogers's pricing (which was significantly lower than Keurig's) would have been the same in the but-for world as it was in the actual world. So, I convert Rogers's lost OneCups into lost dollar sales using Rogers's actual sales price per OneCup, resulting in my estimate of Rogers's At-Home revenue loss of $435 million through June 2025 (Column H).[88]

***Table 16. Rogers At-Home Damage Calculation***

| | **A** | **B= (A-A)/A** | **C** | **D = (C-C)/C** | **E** | **F = prev. F * 2014-2019: (1+B) 2020-2024:(1+D)** | **G = F-E** | **H = G * Rogers Actual Price** |
|---|---|---|---|---|---|---|---|---|
| **Year** | **Full Market AH in Cups** | **Full Market AH Growth Rate in Cups** | **IRI MULO Cup Sales of All Compatible Single Cup Coffee** | **IRI MULO YoY Change** | **Rogers Actual AH Sales in Cups** | **Rogers But-For AH Cups** | **Rogers AH Lost Cups** | **Rogers Lost AH Sales in Dollars** |
| **2010** | 1,281,927,576 | | 572,194,537 | | | | | |
| **2011** | 3,196,725,990 | 149.4% | 1,374,799,500 | 140.3% | 2,824,716 | | | |
| **2012** | 4,689,987,030 | 46.7% | 2,752,287,522 | 100.2% | 131,286,888 | 131,286,888 | | |
| **2013** | 6,394,191,207 | 36.3% | 4,178,157,194 | 51.8% | 189,896,266 | 189,896,266 | | |
| **2014** | 8,052,954,056 | 25.9% | 5,529,012,036 | 32.3% | 207,785,948 | 239,158,614 | 31,372,666 | $8,488,818 |
| **2015** | 8,383,909,179 | 4.1% | 7,998,558,284 | 44.7% | 136,718,852 | 248,987,401 | 112,268,549 | $31,262,854 |
| **2016** | 9,182,098,042 | 9.5% | 8,936,727,148 | 11.7% | 187,987,335 | 272,692,210 | 84,704,875 | $22,046,288 |
| **2017** | 9,736,338,587 | 6.0% | 11,771,744,468 | 31.7% | 194,273,934 | 289,152,183 | 94,878,249 | $23,828,013 |
| **2018** | 10,237,138,167 | 5.1% | 10,585,828,184 | -10.1% | 183,474,596 | 304,025,052 | 120,550,456 | $29,189,892 |
| **2019** | 10,408,279,529 | 1.7% | 8,751,130,079 | -17.3% | 155,347,196 | 309,107,650 | 153,760,454 | $40,609,815 |
| **2014-2019 Total** | | | | | | | | **$155,425,681** |
| **2020** | | | 7,914,215,850 | -9.6% | 155,600,379 | 279,546,143 | 123,945,764 | $31,488,338 |
| **2021** | | | 8,282,947,961 | 4.7% | 120,590,400 | 292,570,509 | 171,980,109 | $45,524,817 |
| **2022** | | | 8,060,188,575 | -2.7% | 98,389,501 | 284,702,196 | 186,312,695 | $52,922,019 |
| **2023** | | | 7,792,600,858 | -3.3% | [redacted] | 275,250,456 | [redacted] | [redacted] |
| **2024** | | | 7,825,780,109 | 0.4% | [redacted] | 276,422,414 | [redacted] | [redacted] |
| **2025[89]** | | | | 0.4% | [redacted] | 138,799,681 | [redacted] | [redacted] |
| **2014-2025 Total** | | | | | | | | **$434,658,967** |

[88] This growth rate approach is equivalent to a market share approach, where Rogers's market share for the years 2014 on in the At-Home channel remain fixed at its 2013 value. *See* my workpapers.
[89] Lost revenue shown here is through June 30, 2025. I assume that the IRI MULO growth for the first half of 2025 is the same as that observed for 2024, and then the resulting but-for units are divided by two to reflect the half-year.

30. In my Initial Report, I described how Rogers was prevented from gaining any foothold in the Away-From-Home channel by Keurig's exclusionary tactics, particularly its exclusive agreements with distributors that predated the launch of the Keurig 2.0, causing Rogers's lost Away-From-Home sales from 2012 onwards.[90] That this exclusion has persisted through today is confirmed by my analysis in Section II.C.1 of this Amended Report. Table 17 shows my estimation procedure for Rogers's lost sales revenue in the Away-From-Home channel. Because Rogers's barely achieved any sales in the Away-From-Home channel, I use a ratio approach to estimate what it would have sold in that channel, as suggested by my estimate of its sales in the but-for world in the At-Home channel. Specifically, I estimate that, absent Keurig's conduct, Rogers would have achieved Away-From-Home OneCup sales (Column F) at the same ratio as the Full Market's Away-From-Home to At-Home sales (Column C), applied to my estimate of Rogers's At-Home OneCup sales in the but-for world (Column E, copied from Table 16).[91] Subtracting Rogers's actual Away-From-Home OneCup sales (Column D) from its but-for Away-From-Home OneCup sales (Column F) results in my estimate of Rogers's Away-From-Home OneCup sales loss (Column G). Again, I convert Rogers's lost OneCups to lost dollar sales using Rogers's actual sales price per OneCup, resulting in my estimate of Rogers's Away-From-Home revenue loss of $265 million through June 2025 (Column H).

[90] Initial Macartney Report, at §VII.B.1.

[91] Given that Keurig and other companies have not produced updated transaction data for this matter, I extend this ratio for the years 2020 through 2025 using the last year for which such data was produced, 2019.

*Table 17. Rogers Away-From-Home Damage Calculation*

| | **A** | **B** | **C = B / (A+B)** | **D** | **E** | **F = E * C/(1-C)** | **G = F - D** | **H = G * Rogers Actual Price** |
|---|---|---|---|---|---|---|---|---|
| **Year** | **Full Market AH in Cups** | **Full Market AFH in Cups** | **Full Market AFH Share of (AH + AFH)** | **Rogers Actual AFH Sales in Cups** | **Rogers But-For AH Cups** | **Rogers But-For AFH Cups** | **Rogers Lost AFH Cups** | **Rogers Lost AFH Sales in Dollars** |
| **2010** | 1,281,927,576 | 615,878,586 | 32.5% | | | | | |
| **2011** | 3,196,725,990 | 971,857,113 | 23.3% | | | | | |
| **2012** | 4,689,987,030 | 1,329,210,861 | 22.1% | 340,488 | 131,286,888 | 37,208,623 | 36,868,135 | $13,095,278 |
| **2013** | 6,394,191,207 | 1,629,306,121 | 20.3% | 537,496 | 189,896,266 | 48,387,535 | 47,850,039 | $16,590,205 |
| **2014** | 8,052,954,056 | 1,949,350,867 | 19.5% | 501,404 | 239,158,614 | 57,892,302 | 57,390,898 | $18,792,551 |
| **2015** | 8,383,909,179 | 1,932,481,520 | 18.7% | 893,632 | 248,987,401 | 57,391,312 | 56,497,680 | $19,851,764 |
| **2016** | 9,182,098,042 | 2,118,003,416 | 18.7% | 4,590,186 | 272,692,210 | 62,900,987 | 58,310,801 | $19,675,698 |
| **2017** | 9,736,338,587 | 2,005,192,531 | 17.1% | 3,635,178 | 289,152,183 | 59,550,702 | 55,915,524 | $18,958,179 |
| **2018** | 10,237,138,167 | 1,872,078,869 | 15.5% | 2,411,200 | 304,025,052 | 55,597,460 | 53,186,260 | $18,332,443 |
| **2019** | 10,408,279,529 | 1,950,492,691 | 15.8% | 1,530,056 | 309,107,650 | 57,926,213 | 56,396,157 | $19,733,380 |
| **2012-2019 Total** | | | | | | | | **$145,029,497** |
| **2020** | | | 15.8% | 762,240 | 279,546,143 | 52,386,440 | 51,624,200 | $18,432,979 |
| **2021** | | | 15.8% | 673,422 | 292,570,509 | 54,827,182 | 54,153,760 | $20,173,974 |
| **2022** | | | 15.8% | 492,544 | 284,702,196 | 53,352,675 | 52,860,131 | $22,821,957 |
| **2023** | | | 15.8% | [redacted] | 275,250,456 | 51,581,436 | [redacted] | [redacted] |
| **2024** | | | 15.8% | [redacted] | 276,422,414 | 51,801,059 | [redacted] | [redacted] |
| **2025[92]** | | | 15.8% | [redacted] | 138,799,681 | 26,010,808 | [redacted] | [redacted] |
| **2012-2025 Total** | | | | | | | | **$265,322,401** |

31. Table 18 shows my damages calculation for Rogers's Amazon channel. Absent the launch of the Keurig 2.0 Brewer in the fall of 2014 with its associated exclusionary characteristics, I estimate that Rogers's but-for Amazon OneCup sales (Column F) would have grown at the same rate as that of the Full Market's Amazon sales (Column B) using the data produced in this case through 2019. For the period 2020 through June 30, 2025, I rely on annual product level IRI MULO data, which I restrict to Compatible Portion Packs (Column C). I model that Rogers's Amazon channel cup volume over the period 2020 through June 30, 2025 would have grown at least at the IRI MULO Compatible Portion Packs growth rate (Column D), which

[92] Lost revenue shown here is through June 30, 2025.

is conservative. I apply these annual growth rates to Rogers's actual Amazon OneCup sales in 2013 through June 30, 2025 to arrive at Rogers's but-for Amazon OneCup sales (Column F). Subtracting Rogers's actual Amazon OneCup sales (Column E) from its but-for Amazon OneCup sales (Column F) results in my estimate of Rogers's Amazon OneCup sales loss (Column G). Again, I convert Rogers's lost OneCups sales into lost dollar sales using Rogers's actual sales price per OneCup, resulting in my estimate of Rogers's Amazon revenue loss of $363 million through June 2025 (Column H).

***Table 18. Rogers Amazon Damage Calculation***

| | **A** | **B= (A-A)/A** | **C** | **D = (C-C)/C** | **E** | **F = prev. F * 2014-2019: (1+B) 2020-2024:(1+D)** | **G = F - E** | **H = G * Rogers Actual Price** |
|---|---|---|---|---|---|---|---|---|
| **Year** | **Full Market Amazon in Cups** | **Full Market Amazon Growth Rate in Cups** | **IRI MULO Cup Sales of All Compatible Single Cup Coffee** | **IRI MULO Single Cup Coffee Cups YoY Change** | **Rogers Actual Amazon Sales in Cups** | **Rogers But-For Amazon Cups** | **Rogers Amazon Lost Cups** | **Rogers Lost Amazon Sales in Dollars** |
| **2010** | 20,444,552 | | 572,194,537 | | | | | |
| **2011** | 43,240,985 | 111.5% | 1,374,799,500 | 140.3% | 207,972 | | | |
| **2012** | 76,096,310 | 76.0% | 2,752,287,522 | 100.2% | 13,738,308 | 13,738,308 | | |
| **2013** | 121,984,544 | 60.3% | 4,178,157,194 | 51.8% | 45,405,976 | 45,405,976 | | |
| **2014** | 180,143,402 | 47.7% | 5,529,012,036 | 32.3% | 59,129,412 | 67,054,290 | 7,924,878 | $2,229,781 |
| **2015** | 278,888,234 | 54.8% | 7,998,558,284 | 44.7% | 95,945,780 | 103,809,810 | 7,864,030 | $2,343,496 |
| **2016** | 258,747,610 | -7.2% | 8,936,727,148 | 11.7% | 97,759,458 | 96,312,921 | (1,446,537) | -$403,844 |
| **2017** | 373,882,464 | 44.5% | 11,771,744,468 | 31.7% | 109,141,658 | 139,169,255 | 30,027,597 | $8,597,628 |
| **2018** | 484,399,473 | 29.6% | 10,585,828,184 | -10.1% | 71,160,066 | 180,306,701 | 109,146,635 | $44,646,949 |
| **2019** | 663,811,291 | 37.0% | 8,751,130,079 | -17.3% | 83,775,680 | 247,088,676 | 163,312,996 | $54,304,329 |
| **2014-2019 Total** | | | | | | | | **$111,718,338** |
| **2020** | | | 7,914,215,850 | -9.6% | 109,182,844 | 223,458,353 | 114,275,509 | $34,828,575 |
| **2021** | | | 8,282,947,961 | 4.7% | 111,822,694 | 233,869,526 | 122,046,832 | $37,944,708 |
| **2022** | | | 8,060,188,575 | -2.7% | 95,031,336 | 227,579,901 | 132,548,565 | $45,919,911 |
| **2023** | | | 7,792,600,858 | -3.3% | [redacted] | 220,024,546 | [redacted] | [redacted] |
| **2024** | | | 7,825,780,109 | 0.4% | [redacted] | 220,961,364 | [redacted] | [redacted] |
| **2025[93]** | | | | 0.4% | [redacted] | 110,951,086 | [redacted] | [redacted] |
| **2014-2025 Total** | | | | | | | | **$363,496,860** |

[93] Lost revenue shown here is through June 30, 2025. I assume that the IRI MULO growth for the first half of 2025 is the same as observed for 2024, and then the resulting but-for units are divided by two to reflect the half-year.

32. In Table 19 below, I show the remaining portion of Rogers's non-Amazon eCommerce damages, namely those derived from lost sales on its own website. I estimate that Rogers's website OneCup sales but-for Keurig's conduct would have been in line with its historical ratio relative to OneCup sales through its other channels. Therefore, I apply Rogers's website OneCup sales as a share of its total actual OneCup sales (Column D) to the estimated Rogers's but-for OneCup sales for the At-Home, Away-From-Home and Amazon channels (Column C) to calculate Rogers's but-for website OneCup sales (Column E). Subtracting Rogers's actual website OneCup sales (Column A) from its but-for website OneCup sales (Column E) results in my estimate of Rogers's website OneCup sales loss (Column F). Again, I convert Rogers's lost OneCup sales into lost dollar sales using Rogers's actual sales price per OneCup, resulting in my estimate of Rogers's website revenue loss of $76 million through June 2025 (Column H).

***Table 19. Rogers Website Damage Calculation***

| | **A** | **B** | **C** | **D=A/B** | **E = C * (D/(1-D))** | **F = E - A** | **G = F * Rogers Actual Price** |
|---|---|---|---|---|---|---|---|
| **Year** | **Rogers Actual Website Sales in Cups** | **Rogers Actual Total Cups (AH + AFH + Amazon + Website)** | **Rogers But-For Cups (AH + AFH + Amazon)** | **Website Cups as Share of Rogers Total Actual Cups** | **Rogers But-For Website Cups** | **Rogers Website Lost Cups** | **Rogers Lost Website Sales in Dollars** |
| **2014** | 3,375,845 | 270,792,609 | 364,105,206 | 1.2% | 4,596,430 | 1,220,586 | $537,612 |
| **2015** | 13,428,843 | 246,987,107 | 410,188,524 | 5.4% | 23,584,511 | 10,155,668 | $4,358,617 |
| **2016** | 14,909,294 | 305,246,273 | 431,906,118 | 4.9% | 22,179,108 | 7,269,814 | $3,003,203 |
| **2017** | 11,952,165 | 319,002,935 | 487,872,140 | 3.7% | 18,990,763 | 7,038,598 | $2,935,067 |
| **2018** | 17,087,616 | 274,133,478 | 539,929,213 | 6.2% | 35,892,828 | 18,805,212 | $7,114,622 |
| **2019** | 13,257,794 | 253,910,726 | 614,122,538 | 5.2% | 33,832,582 | 20,574,788 | $8,686,769 |
| **2014-2019 Total** | | | | | | | **$26,635,891** |
| **2020** | 11,179,631 | 276,725,094 | 555,390,936 | 4.0% | 23,382,307 | 12,202,676 | $5,208,685 |
| **2021** | 11,501,822 | 244,588,338 | 581,267,217 | 4.7% | 28,683,050 | 17,181,228 | $7,288,341 |
| **2022** | 11,288,016 | 205,201,557 | 565,634,772 | 5.5% | 32,926,500 | 21,638,484 | $9,536,672 |
| **2023** | [redacted] | [redacted] | 546,856,438 | 4.8% | 27,838,895 | [redacted] | [redacted] |
| **2024** | [redacted] | [redacted] | 549,184,837 | 5.2% | 30,172,897 | [redacted] | [redacted] |
| **2025[94]** | [redacted] | [redacted] | 275,761,575 | 5.9% | 17,274,210 | [redacted] | [redacted] |
| **2014-2025 Total** | | | | | | | **$76,316,195** |

[94] Lost revenue shown here is through June 30, 2025.

33. Table 20 combines the lost sales revenue from the preceding tables for the period 2012 through June 30, 2025 and applies Rogers's adjusted annual OneCup gross profit margin (Column E) to Rogers's total lost sales revenue (Column D) to calculate Rogers's lost profits for the 2012 through June 30, 2025 period of $314 million (Column F). This profit adjustment takes into account sales discounts, rebates and returns as well as the cost of goods sold and direct marketing expenses.[95] Recognizing that an increase in Rogers's sales volume will require additional machinery, I further reduce lost profits to reflect an expenditure for additional machinery. By August 2014, Rogers had invested $11 million in OneCup machinery financed over a 60-month term,[96] and I estimate Rogers will have an additional $11 million in machinery costs. I estimate this additional machinery investment will be financed over a 60-month term at Rogers's weighted average cost of capital, resulting in a finance cost of $16.3 million. The final row in Table 20 presents the sum of lost profits for 2012 through June 30, 2025, less Rogers's estimated additional machinery cost, resulting in a total lost profits estimate of $298 million.

[95] Rogers provided updated profit and loss statements for the years 2019 through 2024. This profit adjustment is more conservative than using Rogers's actual reported gross margin, because it adds additional direct marketing expenses that would be expected to increase as Rogers's OneCup sales volume increases. The precise calculation is detailed in my workpapers provided with the Initial Report, but in short I model that, other than marketing expenses that directly increase with greater sales (such as sales commissions, for examples) Rogers would have increased its marketing efforts by 50% (in terms of additional salespeople, for example) in order to achieve these greater sales. This is conservative, considering that Rogers was expending significant marketing effort in order to sell its product in the face of Keurig's anticompetitive conduct and would have enjoyed a higher return on marketing, absent that conduct.

[96] Declaration of Michael Sarina in Support of Plaintiffs' Motion for a Preliminary Injunction, August 11, 2014, at ¶4.

***Table 20. Rogers Lost Profits Calculation***

| | **A** | **B** | **C = B - A** | **D = C * Rogers Actual Price** | **E** | **F = D * E** |
|---|---|---|---|---|---|---|
| **Year** | **Rogers Actual Total Cups** | **Rogers But-For Total Cups** | **Rogers Total Lost Cups** | **Rogers Total Lost Revenue** | **Rogers Adjusted Gross Profit Margin** | **Rogers Lost Profits** |
| **2012** | 145,800,514 | 182,668,649 | 36,868,135 | $11,141,933 | 37.8% | $4,211,651 |
| **2013** | 237,538,365 | 285,388,404 | 47,850,039 | $13,812,326 | 28.9% | $3,991,762 |
| **2014** | 270,792,609 | 368,701,637 | 97,909,028 | $26,940,454 | 25.4% | $6,842,875 |
| **2015** | 246,987,107 | 433,773,035 | 186,785,927 | $55,010,818 | 28.0% | $15,403,029 |
| **2016** | 305,246,273 | 454,085,226 | 148,838,954 | $40,923,651 | 23.7% | $9,698,905 |
| **2017** | 319,002,935 | 506,862,903 | 187,859,968 | $50,796,492 | 29.3% | $14,883,372 |
| **2018** | 274,133,478 | 575,822,040 | 301,688,563 | $88,955,349 | 23.0% | $20,459,730 |
| **2019** | 253,910,726 | 647,955,121 | 394,044,395 | $116,421,459 | 28.7% | $33,412,959 |
| **2012-2019 Total** | | | | | | **$108,904,284** |
| **2020** | 276,725,094 | 578,773,243 | 302,048,149 | $84,974,893 | 29.0% | $24,642,719 |
| **2021** | 244,588,338 | 609,950,267 | 365,361,929 | $107,279,679 | 28.9% | $31,003,827 |
| **2022** | 205,201,557 | 598,561,272 | 393,359,715 | $126,628,733 | 27.6% | $34,949,530 |
| **2023** | [redacted] | 574,695,333 | [redacted] | [redacted] | [redacted] | $36,341,470 |
| **2024** | [redacted] | 579,357,734 | [redacted] | [redacted] | [redacted] | $50,626,906 |
| **2025[97]** | [redacted] | 293,035,786 | [redacted] | [redacted] | [redacted] | $27,474,246 |
| **2012-2025 Total** | | | | | | **$313,942,982** |

| | |
|---|---|
| **Additional Machinery Cost** | $16,338,742 |
| **Lost Profits Less Machinery Costs** | **$297,604,240** |

## IV. CUSTOMER-BY-CUSTOMER APPROACH

34. In this section, I use a customer-by-customer approach to estimate Rogers's lost profits. As presented in Appendix A (for the Away-From-Home channel) and Appendix B (for

[97] Lost revenue shown here is through June 30, 2025. I assume that Rogers's adjusted gross profit margin for the first half of 2025 is the same as that observed for fiscal year 2024.

the At-Home channel) of this Amended Report, there is clear record evidence (in terms of documents, sworn declarations, and sworn deposition testimony) that Rogers lost specific customers because of Keurig's alleged conduct. For the customer examples in the At-Home channel, Rogers had made substantial sales in 2013 and, to an extent, in 2014 (*see* Appendix B), but these sales dropped precipitously and eventually fell to zero for each of these customers. I model that, absent Keurig's conduct, Rogers's sales to these specific customers would have continued at their 2013 or 2014 (for Kroger, *see* Figure 9) levels, growing at a rate consistent with the IRI MULO data restricted to Compatible Portion Packs, but covering all brands. Rogers's lost sales revenue in this channel is then the difference between these estimated but-for sales, and the small amount of sales Rogers's did manage to make to these customers, before they dropped to zero (these lost sales by customer are reported in Appendix B). Because this approach uses only Rogers's data, at Rogers's prices (untainted by Keurig's conduct), the analysis is conducted in revenue terms.[98] This approach is inherently conservative, because the overall evidence supports that Rogers would have lost other customers that are just not explicitly documented and because the approach requires that Rogers made at least some prior sales for customers to be included in the analysis (that is, the approach does not reflect lost potential customers).

35. For the Away-From-Home channel, although there is substantial record evidence of customers that turned away from Rogers because of Keurig's alleged conduct (Appendix A), that conduct was so effective that Rogers barely made any sales in that channel at all (*see* Figure 8 above). As such, there is no information on Rogers's actual sales to project, and so I use the same ratio approach I use in the model in Section III above, where I assume that Rogers would have made Away-From-Home sales in the but-for world relative to its but-for At-Home sales in

---

[98] Aside from the IRI MULO growth, which uses units, rather than dollars.

the same proportion as the Full Market did. I use similar ratio approaches for eCommerce (Amazon and Rogers's own website) because those sales are direct to consumers, for which there is not documentary evidence consumer-by-consumer on their reasons for reducing purchases of Rogers' OneCups (although the evidence is clear that many did, because of Keurig's alleged conduct).

36. Table 21 below summarizes Rogers At-Home lost revenue. Column A presents Rogers actual At-Home sales revenue. Column B presents the summation of the customer-by-customer lost sales (*see* Appendix B) through June 2025, and Column C presents Rogers's but-for At-Home sales revenue under this approach (Column A plus Column B).

***Table 21. Rogers At-Home Damages: Customer-by-Customer Approach***

| | **A** | **B** | **C = A + B** |
|---|---|---|---|
| **Year** | **Rogers Actual AH Sales in Dollars** | **Rogers AH Lost Dollars** | **Rogers But-For AH Sales in Dollars** |
| **2010** | | | |
| **2011** | $1,011,090 | | $1,011,090 |
| **2012** | $39,721,915 | | $39,721,915 |
| **2013** | $54,111,689 | | $54,111,689 |
| **2014** | $56,222,736 | $9,361,060 | $65,583,796 |
| **2015** | $38,071,406 | $34,371,435 | $72,442,842 |
| **2016** | $48,927,797 | $39,139,007 | $88,066,804 |
| **2017** | $48,790,550 | $52,598,500 | $101,389,050 |
| **2018** | $44,426,242 | $47,443,807 | $91,870,049 |
| **2019** | $41,028,891 | $39,428,401 | $80,457,291 |
| **2014-2019 Total** | **$277,467,622** | **$222,342,211** | **$499,809,832** |
| **2020** | $39,530,171 | $35,679,952 | $75,210,124 |
| **2021** | $31,921,459 | $37,333,522 | $69,254,981 |
| **2022** | $27,947,484 | $36,336,511 | $64,283,995 |
| **2023** | [redacted] | [redacted] | $62,107,224 |
| **2024** | [redacted] | [redacted] | $54,362,794 |
| **2025[99]** | [redacted] | [redacted] | $28,641,729 |
| **2014-2025 Total** | **$433,711,234** | **$419,959,446** | **$853,670,679** |

[99] Lost revenue shown here is through June 30, 2025.

37. Table 22 shows my estimation procedure for Rogers's lost revenue in the Away-From-Home channel under this approach. Specifically, I estimate that, absent Keurig's conduct, Rogers would have achieved Away-From-Home OneCup sales revenue (Column F) at the same ratio as the Full Market's Away-From-Home to At-Home sales (Column C), applied to my estimate of Rogers's At-Home OneCup sales revenue in the but-for world (Column E, copied from Table 21).[100] Subtracting Rogers's actual Away-From-Home sales revenue (Column D) from its but-for Away-From-Home sales revenue (Column F) results in my $213 million estimate of Rogers's Away-From-Home sales revenue loss through June 2025 (Column G).

***Table 22. Rogers Away-From-Home Damages***

| | A | B | C = B /(A+B) | D | E | F = E * C/(1-C) | G = F - D |
|---|---|---|---|---|---|---|---|
| **Year** | **Full Market's AH Sales in Dollars** | **Full Market AFH Sales in Dollars** | **Full Market AFH Share of (AH + AFH)** | **Rogers Actual AFH Sales In Dollars** | **Rogers But-For AH Dollars** | **Rogers But-For AFH Dollars** | **Rogers AFH Lost Dollars** |
| **2010** | $465,793,733 | $197,126,050 | 29.7% | | | | |
| **2011** | $1,347,024,358 | $372,273,254 | 21.7% | | $1,011,090 | $279,432 | $279,432 |
| **2012** | $2,021,319,516 | $540,313,267 | 21.1% | $120,939 | $39,721,915 | $10,617,954 | $10,497,015 |
| **2013** | $2,678,866,203 | $658,052,007 | 19.7% | $186,357 | $54,111,689 | $13,292,305 | $13,105,948 |
| **2014** | $3,248,604,782 | $771,735,284 | 19.2% | $164,184 | $65,583,796 | $15,580,021 | $15,415,837 |
| **2015** | $3,433,429,631 | $791,577,695 | 18.7% | $313,998 | $72,442,842 | $16,701,708 | $16,387,709 |
| **2016** | $3,488,460,042 | $875,962,318 | 20.1% | $1,548,857 | $88,066,804 | $22,113,827 | $20,564,970 |
| **2017** | $3,423,292,216 | $813,073,385 | 19.2% | $1,232,508 | $101,389,050 | $24,081,128 | $22,848,619 |
| **2018** | $3,420,884,142 | $734,274,605 | 17.7% | $831,102 | $91,870,049 | $19,719,418 | $18,888,316 |
| **2019** | $3,408,600,463 | $761,943,136 | 18.3% | $535,377 | $80,457,291 | $17,985,059 | $17,449,683 |
| **2012-2019 Total** | | | | | | | **$135,158,098** |
| **2020** | | | 18.3% | $272,166 | $75,210,124 | $16,812,131 | $16,539,965 |
| **2021** | | | 18.3% | $250,871 | $69,254,981 | $15,480,945 | $15,230,074 |
| **2022** | | | 18.3% | $212,652 | $64,283,995 | $14,369,754 | $14,157,102 |
| **2023** | | | 18.3% | [redacted] | $62,107,224 | $13,883,168 | [redacted] |
| **2024** | | | 18.3% | | $54,362,794 | $12,152,013 | |
| **2025[101]** | | | 18.3% | | $28,641,729 | $6,402,443 | |
| **2012-2025 Total** | | | | | | | **$213,019,801** |

[100] Given that Keurig and other companies have not produced updated transaction data for this matter, I extend this ratio for the years 2020 through 2025 using the last year for which such data was produced, 2019.
[101] Lost revenue shown here is through June 30, 2025.

38. Table 23 presents my damages calculation for Rogers's Amazon channel. I model that in the but-for world, Rogers would have sold in the Amazon channel relative to its sales in the At-Home channel, in the same proportion as it did in the actual world (shown in Column C). I apply that proportion to my estimate of Rogers's but-for At-Home sales (Column E, copied from Table 22), to get Rogers's but-for Amazon sales (Column F). Subtracting Rogers's actual Amazon revenue (Column A) from its but-for Amazon revenue (Column F) results in my estimate of Rogers's Amazon revenue loss through June 2025 of $397 million (Column G).

***Table 23. Rogers Amazon Damages***

| | A | B | C = A /(A + B) | D | E = D * C /(1-C) | F = E - A |
|---|---|---|---|---|---|---|
| **Year** | **Rogers Actual Amazon Sales in Dollars** | **Rogers Actual AH Sales in Dollars** | **Rogers Amazon Share of (Amazon + AH) Dollars** | **Rogers But-For AH Sales in Dollars** | **Rogers But-For Amazon Dollars** | **Rogers Amazon Lost Dollars** |
| **2010** | | | | | | |
| **2011** | $75,464 | $1,011,090 | 6.9% | $1,011,090 | $75,464 | |
| **2012** | $3,995,729 | $39,721,915 | 9.1% | $39,721,915 | $3,995,729 | |
| **2013** | $13,462,468 | $54,111,689 | 19.9% | $54,111,689 | $13,462,468 | |
| **2014** | $16,636,931 | $56,222,736 | 22.8% | $65,583,796 | $19,406,973 | $2,770,042 |
| **2015** | $28,592,021 | $38,071,406 | 42.9% | $72,442,842 | $54,405,326 | $25,813,304 |
| **2016** | $27,292,473 | $48,927,797 | 35.8% | $88,066,804 | $49,124,649 | $21,832,176 |
| **2017** | $31,249,898 | $48,790,550 | 39.0% | $101,389,050 | $64,938,753 | $33,688,855 |
| **2018** | $29,108,363 | $44,426,242 | 39.6% | $91,870,049 | $60,193,854 | $31,085,491 |
| **2019** | $27,856,828 | $41,028,891 | 40.4% | $80,457,291 | $54,626,993 | $26,770,165 |
| **2014-2019 Total** | | | | | | **$141,960,034** |
| **2020** | $33,276,446 | $39,530,171 | 45.7% | $75,210,124 | $63,311,784 | $30,035,337 |
| **2021** | $34,765,994 | $31,921,459 | 52.1% | $69,254,981 | $75,426,324 | $40,660,329 |
| **2022** | $32,922,503 | $27,947,484 | 54.1% | $64,283,995 | $75,727,389 | $42,804,887 |
| **2023** | [redacted] | [redacted] | [redacted] | $62,107,224 | $87,317,032 | [redacted] |
| **2024** | [redacted] | [redacted] | [redacted] | $54,362,794 | $104,039,716 | [redacted] |
| **2025**[102] | [redacted] | [redacted] | [redacted] | $28,641,729 | $38,912,825 | [redacted] |
| **2012-2025 Total** | | | | | | **$396,664,281** |

[102] Lost revenue shown here is through June 30, 2025.

39. In Table 24 below, I estimate that Rogers's website revenue but-for Keurig's conduct would have been in line with its historical actual ratio relative to sales through its other channels. In Column D, I calculate Rogers's actual website sales as a share of its total actual sales through the At-Home, Away-From-Home, Amazon, and website channels. I then apply this proportion to my estimated Rogers but-for sales for the At-Home, Away-From-Home and Amazon channels (Column C) to calculate Rogers's but-for website sales revenue (Column E). Subtracting Rogers's actual website sales revenue (Column A) from its but-for website sales revenue (Column E) results in my estimate of Rogers's website revenue loss of $76 million through June 30, 2025 (Column F).

***Table 24. Rogers Website Damages***

| | A | B | C | D = A/B | E = C * D/(1-D) | F = E-A |
|---|---|---|---|---|---|---|
| **Year** | **Rogers Actual Website Sales in Dollars** | **Rogers Actual Total Sales in Dollars (AH + AFH + Amazon + Website)** | **Rogers But-For Sales in Dollars (AH + AFH + Amazon)** | **Website Revenue as Share of Rogers Total Actual Dollars** | **Rogers But-For Website Dollars** | **Rogers Website Lost Dollars** |
| **2014** | $1,486,906 | $74,510,756 | $100,570,789 | 2.0% | $2,047,814 | $560,908 |
| **2015** | $5,763,401 | $72,740,826 | $143,549,875 | 7.9% | $12,352,452 | $6,589,051 |
| **2016** | $6,159,117 | $83,928,244 | $159,305,280 | 7.3% | $12,616,572 | $6,457,455 |
| **2017** | $4,984,006 | $86,256,962 | $190,408,931 | 5.8% | $11,676,691 | $6,692,685 |
| **2018** | $6,464,800 | $80,830,506 | $171,783,321 | 8.0% | $14,933,560 | $8,468,761 |
| **2019** | $5,597,501 | $75,018,596 | $153,069,344 | 7.5% | $12,342,153 | $6,744,652 |
| **2014-2019 Total** | | | | | | **$35,513,513** |
| **2020** | $4,772,000 | $77,850,784 | $155,334,038 | 6.1% | $10,143,219 | $5,371,218 |
| **2021** | $4,879,116 | $71,817,440 | $160,162,250 | 6.8% | $11,674,182 | $6,795,066 |
| **2022** | $4,974,937 | $66,057,637 | $154,381,138 | 7.5% | $12,573,715 | $7,598,778 |
| **2023** | [redacted] | [redacted] | $163,307,424 | 7.2% | $12,716,327 | [redacted] |
| **2024** | [redacted] | [redacted] | $170,554,523 | 7.4% | $13,715,340 | [redacted] |
| **2025[103]** | [redacted] | [redacted] | $73,956,998 | 8.1% | $6,480,295 | [redacted] |
| **2014-2025 Total** | | | | | | **$76,396,534** |

[103] Lost revenue shown here is through June 30, 2025.

40. Table 25 combines the analysis in the preceding tables for the years 2012 through June 30, 2025 and applies Rogers's adjusted annual OneCup gross profit margin (Column D) to Rogers's total lost revenue (Column C) to calculate Rogers's lost profits for the 2012 through June 30, 2025 period of $313 million (Column E). Again, this profit adjustment takes into account sales discounts, rebates and returns as well as the cost of goods sold and direct marketing expenses. Recognizing that an increase in Rogers's sales volume will require additional machinery, I further reduce lost profits to reflect an expenditure for additional machinery. I estimate this additional machinery investment is equivalent to a finance cost of $16.3 million, as before. The final row in Table 25 contains the sum of lost profits for 2012 through June 30, 2025, less Rogers's estimated additional machinery cost, resulting in a total lost profits estimate of $296 million.

***Table 25. Rogers Lost Profits: Customer-By-Customer Approach***

| | A | B | C = B - A | D | E = C * D |
|---|---|---|---|---|---|
| **Year** | **Rogers Actual Total Sales in Dollars** | **Rogers But-For Total Sales in Dollars** | **Rogers Total Lost Dollars** | **Rogers Adjusted Gross Profit Margin** | **Rogers Lost Profits** |
| **2012** | $44,062,430 | $54,335,598 | $10,273,168 | 37.8% | $3,883,257 |
| **2013** | $68,567,498 | $80,866,461 | $12,298,963 | 28.9% | $3,554,400 |
| **2014** | $74,510,756 | $102,618,603 | $28,107,847 | 25.4% | $7,139,393 |
| **2015** | $72,740,826 | $155,902,327 | $83,161,501 | 28.0% | $23,285,220 |
| **2016** | $83,928,244 | $171,921,852 | $87,993,608 | 23.7% | $20,854,485 |
| **2017** | $86,256,962 | $202,085,622 | $115,828,660 | 29.3% | $33,937,797 |
| **2018** | $80,830,506 | $186,716,881 | $105,886,375 | 23.0% | $24,353,866 |
| **2019** | $75,018,596 | $165,411,497 | $90,392,901 | 28.7% | $25,942,763 |
| **2012-2019 Total** | | | | | **$142,951,182** |
| **2020** | $77,850,784 | $165,477,257 | $87,626,473 | 29.0% | $25,411,677 |
| **2021** | $71,817,440 | $171,836,432 | $100,018,992 | 28.9% | $28,905,489 |
| **2022** | $66,057,637 | $166,954,853 | $100,897,216 | 27.6% | $27,847,632 |
| **2023** | [redacted] | $176,023,752 | [redacted] | [redacted] | $29,554,578 |
| **2024** | [redacted] | $184,269,863 | [redacted] | [redacted] | $40,733,981 |
| **2025**[104] | [redacted] | $80,437,292 | [redacted] | [redacted] | $17,188,548 |
| **2012-2025 Total** | | | | | **$312,593,087** |
| **Additional Machinery Cost** | | | | | $16,338,742 |
| **Lost Profits Less Machinery Costs** | | | | | **$296,254,346** |

[104] Lost revenue shown here is through June 30, 2025. I assume that Rogers's adjusted gross profit margin for the first half of 2025 is the same as observed for fiscal year 2024.

## V. ANALYSIS USING ROGERS'S AMAZON EXPERIENCE AS A BENCHMARK

41. Roger's OneCups fared somewhat better in the Amazon channel because it was less encumbered by some of Keurig's conduct such as its exclusive contracts with distributors and misrepresentations to retailers. Although, as I have shown in my Initial Report, Rogers's Amazon sales still suffered, following the launch of the 2.0 and Keurig's alleged false claims, which would have put consumers off buying OneCups.[105] Nevertheless, in this section I use Rogers's growth (albeit still suppressed by Keurig's conduct) on Amazon as a benchmark for the growth Rogers would have achieved in the but-for world in its other channels. This approach is conservative because it assumes no lost profits for Rogers in the Amazon channel, even though the evidence supports that there were lost profits in that channel as well.

42. Table 26 below summarizes Rogers's At-Home lost revenue under this approach. Column D calculates Rogers but-for At-Home sales revenue by growing its revenue in that channel in 2013 by Rogers's growth rate in the Amazon channel (Column C). Rogers's lost revenue is then calculated by subtracting its actual sales in the At-Home channel (Column A) from this but-for sales revenue (Column D), as presented in Column E. This results in my estimate of lost sales revenue in the At-Home channel of $976 million through June 2025 (Column E).

[105] Initial Macartney Report, at §VII.B.3.

***Table 26. Rogers At-Home Damages: Rogers Actual Growth on Amazon Approach***

| | A | B | C | D = prev. D * C | E = D - A |
|---|---|---|---|---|---|
| **Year** | **Rogers Actual AH Sales in Dollars** | **Rogers Actual Amazon Sales in Dollars** | **Rogers Actual Amazon Growth Rate in Dollars** | **Rogers But-For AH Cups Based on Growth of Rogers Amazon in Cups** | **Rogers Lost AH Sales in Dollars** |
| **2010** | | | | | |
| **2011** | $1,011,090 | $75,464 | | | |
| **2012** | $39,721,915 | $3,995,729 | | $39,721,915 | |
| **2013** | $54,111,689 | $13,462,468 | | $54,111,689 | |
| **2014** | $56,222,736 | $16,636,931 | 23.58% | $66,871,281 | $10,648,545 |
| **2015** | $38,071,406 | $28,592,021 | 71.86% | $114,924,144 | $76,852,737 |
| **2016** | $48,927,797 | $27,292,473 | -4.55% | $109,700,677 | $60,772,879 |
| **2017** | $48,790,550 | $31,249,898 | 14.50% | $125,607,342 | $76,816,792 |
| **2018** | $44,426,242 | $29,108,363 | -6.85% | $116,999,551 | $72,573,309 |
| **2019** | $41,028,891 | $27,856,828 | -4.30% | $111,969,073 | $70,940,183 |
| **2014-2019 Total** | | | | | **$368,604,445** |
| **2020** | $39,530,171 | $33,276,446 | 19.5% | $133,752,948 | $94,222,776 |
| **2021** | $31,921,459 | $34,765,994 | 4.5% | $139,740,109 | $107,818,650 |
| **2022** | $27,947,484 | $32,922,503 | -5.3% | $132,330,289 | $104,382,805 |
| **2023** | [redacted] | [redacted] | 15.0% | $152,125,474 | [redacted] |
| **2024** | [redacted] | [redacted] | -3.8% | $146,356,757 | [redacted] |
| **2025[106]** | [redacted] | [redacted] | -18.7% | $59,513,443 | [redacted] |
| **2014-2025 Total** | | | | | **$976,179,852** |

43. Table 27 presents my estimation procedure for Rogers's lost revenue in the Away-From-Home channel under this approach. Specifically, I estimate that, absent Keurig's conduct, Rogers would have achieved Away-From-Home OneCup sales revenue (Column F) at the same ratio as the Full Market's Away-From-Home to At-Home sales (Column C), applied to my estimate of Rogers's At-Home OneCup sales revenue in the but-for world (Column E, copied

[106] Rogers provided transaction data through June 30, 2025. Rogers's actual Amazon growth rate for 2025 is obtained by assuming Rogers's revenue in the second half of 2025 is equal to that observed in the first half of 2025 in order to obtain an annual growth rate. Lost revenue shown here is through June 30, 2025.

from Table 26).[107] Subtracting Rogers's actual Away-From-Home sales revenue (Column D) from its but-for Away-From-Home sales revenue (Column F) results in my $338 million estimate of Rogers's Away-From-Home sales revenue loss through June 2025 (Column G).

***Table 27. Rogers Away-From-Home Damages***

| | A | B | C = B / (A+B) | D | E | F = E * C /(1-C) | G = F-D |
|---|---|---|---|---|---|---|---|
| **Year** | **Full Market AH in Dollars** | **Full Market AFH in Dollars** | **Full Market AFH Share of (AH + AFH) Dollars** | **Rogers Actual AFH Sales in Dollars** | **Rogers But-For AH in Dollars** | **Rogers But-For AFH in Dollars** | **Rogers Lost AFH Dollars** |
| **2010** | $465,793,733 | $197,126,050 | 29.7% | | | | |
| **2011** | $1,347,024,358 | $372,273,254 | 21.7% | | | | |
| **2012** | $2,021,319,516 | $540,313,267 | 21.1% | $120,939 | $39,721,915 | $10,617,954 | $10,497,015 |
| **2013** | $2,678,866,203 | $658,052,007 | 19.7% | $186,357 | $54,111,689 | $13,292,305 | $13,105,948 |
| **2014** | $3,248,604,782 | $771,735,284 | 19.2% | $164,184 | $66,871,281 | $15,885,874 | $15,721,690 |
| **2015** | $3,433,429,631 | $791,577,695 | 18.7% | $313,998 | $114,924,144 | $26,495,778 | $26,181,780 |
| **2016** | $3,488,460,042 | $875,962,318 | 20.1% | $1,548,857 | $109,700,677 | $27,546,154 | $25,997,297 |
| **2017** | $3,423,292,216 | $813,073,385 | 19.2% | $1,232,508 | $125,607,342 | $29,833,266 | $28,600,757 |
| **2018** | $3,420,884,142 | $734,274,605 | 17.7% | $831,102 | $116,999,551 | $25,113,332 | $24,282,230 |
| **2019** | $3,408,600,463 | $761,943,136 | 18.3% | $535,377 | $111,969,073 | $25,029,060 | $24,493,684 |
| **2012-2019 Total** | | | | | | | **$168,880,402** |
| **2020** | | | 18.3% | $272,166 | $133,752,948 | $29,898,529 | $29,626,363 |
| **2021** | | | 18.3% | $250,871 | $139,740,109 | $31,236,872 | $30,986,001 |
| **2022** | | | 18.3% | $212,652 | $132,330,289 | $29,580,514 | $29,367,862 |
| **2023** | | | 18.3% | [redacted] | $152,125,474 | $34,005,441 | [redacted] |
| **2024** | | | 18.3% | [redacted] | $146,356,757 | $32,715,928 | [redacted] |
| **2025**[108] | | | 18.3% | [redacted] | $59,513,443 | $13,303,366 | [redacted] |
| **2012-2025 Total** | | | | | | | **$338,382,301** |

44. In Table 28 below, I estimate that Rogers's website revenue but-for Keurig's conduct would have been in line with its historical actual ratio relative to sales through its other channels. In Column D, I calculate Rogers's actual website sales as a share of its total actual sales through the At-Home, Away-From-Home, Amazon, and website channels. I then apply this proportion to

[107] Given that Keurig and other companies have not produced updated transaction data for this matter, I extend this ratio for the years 2020 through 2025 using the last year for which such data was produced, 2019.
[108] Lost revenue shown here is through June 30, 2025.

my estimated Rogers but-for sales for the At-Home, Away-From-Home and Amazon channels (Column C) to calculate Rogers's but-for website sales revenue (Column E). Subtracting Rogers's actual website sales revenue (Column A) from its but-for website sales revenue (Column E) results in my estimate of Rogers's website revenue loss of $99 million through June 30, 2025 (Column F).

***Table 28. Rogers Website Damages***

| | A | B | C | D=(A/B) | E = C * (D / (1-D)) | F = E - A |
|---|---|---|---|---|---|---|
| **Year** | **Rogers Actual Website Sales in Dollars** | **Rogers Actual Total Dollars (AH + AFH + Amazon + Website)** | **Rogers But-For Dollars (AH + AFH + Amazon)** | **Website Share of Rogers Total Actual Dollars** | **Rogers But-For Website Dollars** | **Rogers Website Lost Dollars** |
| **2014** | $1,486,906 | $74,510,756 | $99,394,086 | 2.0% | $2,023,854 | $536,949 |
| **2015** | $5,763,401 | $72,740,826 | $170,011,943 | 7.9% | $14,629,510 | $8,866,110 |
| **2016** | $6,159,117 | $83,928,244 | $164,539,304 | 7.3% | $13,031,093 | $6,871,977 |
| **2017** | $4,984,006 | $86,256,962 | $186,690,506 | 5.8% | $11,448,661 | $6,464,655 |
| **2018** | $6,464,800 | $80,830,506 | $171,221,245 | 8.0% | $14,884,698 | $8,419,898 |
| **2019** | $5,597,501 | $75,018,596 | $164,854,962 | 7.5% | $13,292,441 | $7,694,940 |
| **2014-2019 Total** | | | | | | **$38,854,528** |
| **2020** | $4,772,000 | $77,850,784 | $196,927,923 | 6.1% | $12,859,274 | $8,087,274 |
| **2021** | $4,879,116 | $71,817,440 | $205,742,975 | 6.8% | $14,996,549 | $10,117,433 |
| **2022** | $4,974,937 | $66,057,637 | $194,833,306 | 7.5% | $15,868,379 | $10,893,442 |
| **2023** | [redacted] | [redacted] | $223,978,269 | 7.2% | $17,440,610 | [redacted] |
| **2024** | [redacted] | [redacted] | $215,484,837 | 7.4% | $17,328,463 | [redacted] |
| **2025**[109] | [redacted] | [redacted] | $87,623,181 | 8.1% | $7,677,759 | [redacted] |
| **2014-2025 Total** | | | | | | **$98,605,505** |

45. Table 29 combines the analysis in the preceding tables for the years 2012 through June 2025 and applies Rogers's adjusted annual OneCup gross profit margin (Column D) to Rogers's total lost revenue (Column C) to calculate Rogers's lost profits for the 2012 through June 2025 period of $407 million (Column E). Once again, I further reduce lost profits to reflect an expenditure for additional machinery using a finance cost of $16.3 million. The final row in

[109] Lost revenue shown here is through June 30, 2025.

Table 29 presents the sum of lost profits for 2012 through June 2025, less Rogers's estimated additional machinery cost, resulting in a total lost profits estimate of $391 million.

***Table 29. Rogers Lost Profits: Rogers Actual Growth on Amazon Approach***

| | A | B | C = B - A | D | E = C * D |
|---|---|---|---|---|---|
| **Year** | **Rogers Actual Total Dollars** | **Rogers But-For Total Dollars** | **Rogers Total Lost Dollars** | **Rogers Adjusted Gross Profit Margin** | **Rogers Lost Profits** |
| **2012** | $44,062,430 | $56,359,452 | $12,297,022 | 37.8% | $4,648,274 |
| **2013** | $68,567,498 | $95,495,971 | $26,928,473 | 28.9% | $7,782,329 |
| **2014** | $74,510,756 | $101,417,940 | $26,907,184 | 25.4% | $6,834,425 |
| **2015** | $72,740,826 | $184,641,453 | $111,900,626 | 28.0% | $31,332,175 |
| **2016** | $83,928,244 | $177,570,397 | $93,642,153 | 23.7% | $22,193,190 |
| **2017** | $86,256,962 | $198,139,167 | $111,882,205 | 29.3% | $32,781,486 |
| **2018** | $80,830,506 | $186,105,943 | $105,275,437 | 23.0% | $24,213,351 |
| **2019** | $75,018,596 | $178,147,403 | $103,128,806 | 28.7% | $29,597,967 |
| **2012-2019 Total** | | | | | **$159,383,197** |
| **2020** | $77,850,784 | $209,787,198 | $131,936,413 | 29.0% | $38,261,560 |
| **2021** | $71,817,440 | $220,739,524 | $148,922,084 | 28.9% | $43,038,482 |
| **2022** | $66,057,637 | $210,701,685 | $144,644,048 | 27.6% | $39,921,757 |
| **2023** | [redacted] | $241,418,879 | [redacted] | [redacted] | $47,799,818 |
| **2024** | [redacted] | $232,813,300 | [redacted] | [redacted] | $56,656,228 |
| **2025**[110] | [redacted] | $95,300,940 | [redacted] | [redacted] | $22,063,825 |
| **2012-2025 Total** | | | | | **$407,124,869** |

| | |
|---|---|
| **Additional Machinery Cost** | $16,338,742 |
| **Lost Profits Less Machinery Costs** | **$390,786,127** |

## VI. LANHAM ACT DAMAGES

46. I am advised by counsel that 15 U.S.C. § 1117(a) provides three different damages bases for Lanham Act false advertising claims: (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.[111] I also understand that this statutory provision provides the following: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."[112]

[110] Lost revenue shown here is through June 30, 2025.
[111] 15 U.S.C. § 1117(a).
[112] 15 U.S.C. § 1117(a).

Table 30 shows Keurig's total net sales subject to profit disgorgement, gross profit, and operating profit for the period October 2013 through June 2025. For the years 2013 through 2019 I estimate these metrics using the same methodology as in my Initial Report.[113] For the period January 2020 onwards for which Keurig transactional data was not produced, I use the growth rate in Compatible Portion Pack revenue observed in the IRI MULO data, using 2019 net sales as the starting point. I understand that the actual award is subject to the Court's discretion, but according to the statute, I have been informed that the net sales numbers are the starting point.

***Table 30. Keurig's Total Net Sales, Gross Profit, and Operating Profit Resulting from Lanham Act Violations (October 2013 through June 2025)***

| | Net Sales | Gross Profit | Operating Profit |
|---|---|---|---|
| Licensed | $1,931,592 | $955,056 | $498,204 |
| Partner | $2,936,415,451 | $1,586,159,375 | $600,778,386 |
| Private Label | $2,567,111,700 | $1,101,347,886 | $418,513,377 |
| **Total** | **$5,505,458,743** | **$2,688,462,317** | **$1,019,789,966** |
| Full Market Growth Method: Rogers Share of Total (11.4%)[114] | $627,640,357 | $306,493,523 | $116,259,401 |
| Customer-by-Customer Method: Rogers Share of Total (10%)[115] | $550,843,294 | $268,991,470 | $102,034,088 |
| Amazon Growth Method: Rogers Share of Total (10.7%)[116] | $588,720,314 | $287,487,829 | $109,050,144 |

47. I am also advised that this same statute states: "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case."[117] Because this case involves multiple parties that were damaged by the false

[113] Initial Macartney Report, at Tables 50-52.
[114] As an alternative for the but-for world, I calculate the increase in market size that would occur assuming a 10% price decrease and based on the elasticity of demand for K-cups in the At-Home channel (-1.5) and Away-From-Home channel (-2.8). GMCR Hot Platform Strategy preliminary-draft, March 11, 2013, Portion Pack Elasticity of Demand, K-Cup, KGM01405693, at slide 45. Under this alternative, Rogers's share is 9.9%, net sales are $545,932,923, gross profits are $266,593,605, and operating profits are $101,124,528.
[115] Again, under an alternative incorporating a market size increase, Rogers's share is 8.7%, net sales are $478,153,426, gross profits are $233,495,069, and operating profits are $88,569,561.
[116] Again, under an alternative incorporating a market size increase, Rogers's share is 9.3%, net sales are $511,548,212, gross profits are $249,802,633, and operating profits are $94,755,362.
[117] 15 U.S.C. § 1117(a).

statements of Keurig, I also provide my calculation of the sales and profits of Keurig, adjusted based on the market share of Rogers compared to the unlicensed market as a whole in the but-for world as I did in my Initial Report, which the Court may view as a reasonable division of Keurig's profits to Rogers specifically. Because I conclude that Rogers had approximately 11.4%, 10%, or 10.7% of the unlicensed market in the but-for world (depending on which of the three damages models I present in this Amended Report), I present in Table 30 the sales and profits that would be due to Rogers if the Court used market share to guide its award, or at least used that as a starting point for exercising its discretion.

48. Finally, I have been advised that this same statute states "Such sum in either of the above circumstances shall constitute compensation and not a penalty."[118] I believe my calculations based on market share of Rogers are compensation and so adjusted the award is compensatory (as a proxy for Rogers's actual damages that are difficult to quantify because they are based on decisions made by third parties) and does not constitute a penalty amount.

## VII. CONCLUSION

49. Inasmuch as discovery in this case is not yet complete, I reserve the right to revise or supplement my opinions as additional information becomes available. Exhibits to be used in support of the opinions stated in this Amended Report include all of the tables, graphics and information contained herein as well as the Exhibits. Additional demonstrative exhibits based upon this same information may be prepared for trial and used to support my opinions.

November 5, 2025

Respectfully submitted,

[signature]

Gareth Macartney, Ph.D.

[118] 15 U.S.C. § 1117(a).

# APPENDIX A: LOST CUSTOMERS (AWAY-FROM-HOME)

| Company | Reason | Evidence |
|---|---|---|
| Action Sales and Marketing | 2.0 Incompatibility | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 137:25-138:10**<br>Q. Okay. Sure. Let's walk through the list and try to get the name of the distributor contacted, the dates if you have them, and the names if you have them.<br><br>A. Okay, the first one is Action Sales and Marketing. The contact was Steve Eldridge. I don't have a date. His concern was 2.0 compatibility. |
| ADM Vending | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 138:7-10**<br>A. The next one is ADM, Adam Darryl Martha, Vending. The contact is Daniel Mendenhall. He declined due to exclusivity agreement, threat letter from Keurig.<br><br>**Declaration of Kathy Hybsch in Support of Plaintiff's Motion for a Preliminary Injunction (Rogers), August 11, 2014 (hereafter, "Hybsch Declaration"), at ¶9**<br>These agreements with exclusivity provisions have directly impacted my relationships with customers and potential customers through the loss of sales of OneCups. Specifically…ADM Vending, Coffee Pause, Evans Coffee Co., One Cup Coffee, and U.S. Coffee are all potential customers that explained that they were unable to purchase Rogers' OneCups as a result of the loyalty provisions in their KAD agreements with Keurig. Multiple of these companies have explained that Keurig threatened to terminate their contracts and deny them access to Keurig's products if they violated the loyalty provisions. |
| Associated Coffee Services | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 138:12-14**<br>A. Associated Coffee Services. Tom Steuber, S-t-e-u-b-e-r. He rejected due to exclusivity agreement. |
| Bob Carrell Coffee | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 138:19-20**<br>A. The next one is BC – that's Bob Carrell -- Coffee; reason for decline, exclusivity agreement. |
| Canteen Services | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:16-17**<br>A. The next one is Canteen Services, no contact; the reason is exclusivity agreement.<br><br>*Canteen Services is affiliated with Compass Group. See Compass Group for more information.*<br>**Deposition of Christopher Howe, April 30, 2019, at 275:12**<br>A. Compass is part of Sodexo/Canteen. |
| Carver Brothers | 2.0 Incompatibility | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 138:21-22**<br>A. The next one is Carver Brothers, no contact; 2.0 compatibility concerns. |

## APPENDIX A: Lost Customers (Away-From-Home)

| Company | Reason | Evidence |
|---|---|---|
| Coffee Distributing Corporation | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 138:23-25**<br>A. The next one is Coffee Distributing Corp., no name; they declined due to exclusivity agreement.<br><br>**Hybsch Declaration, at ¶6**<br>After CDC's legal department reviewed "the contract they have with GMCR to see if they [could] work with [Rogers,]" CDC determined that its contract would not allow it to do business with Rogers and thus, solely as a result of CDC's KAD agreement with Keurig, Rogers was foreclosed from doing business with one of the largest office supply distributors in the Northeast with 85 route trucks and approximately 20,000 customers."<br><br>**Email thread containing email dated April 25, 2012, from Robert Fidler (CDC) to Kathy Hybsch (Exhibit 1 to Hybsch Declaration)**<br>"Hopefully, we will be able to use your product depending on legal obligations. The price was a little less expensive then GMCR."<br><br>**Deposition of Michael Sarina, August 26, 2014, at 111:10-112:8**<br>THE WITNESS: So within the last few months, Kathy Hybisch, our East Coast sales manager, has met with Coffee Distributing Corporation, and again we were told specifically by them, through emails, that they did not want to violate the loyalty provision with the CAD agreement. She met with Diamond Rock, who is an office supply distributor on the East Coast, and again was told that they were not going to risk violating the Keurig loyalty agreement. Staples was through a representative by the name of JM Overton, and again they were told they were not about to break the loyalty provision within, within their, their, their Keurig arrangement. We've talked to Evans Coffee and Pulse Coffee and got similar results. And those are the -- at least what I have at this point in time with office coffee. We have had similar results with big private label. You have asked me about private label. |
| Coffee Pause | Exclusivity Agreement | **Hybsch Declaration, at ¶9**<br>These agreements with exclusivity provisions have directly impacted my relationships with customers and potential customers through the loss of sales of OneCups. Specifically…ADM Vending, Coffee Pause, Evans Coffee Co., One Cup Coffee, and U.S. Coffee are all potential customers that explained that they were unable to purchase Rogers' OneCups as a result of the loyalty provisions in their KAD agreements with Keurig. Multiple of these companies have explained that Keurig threatened to terminate their contracts and deny them access to Keurig's products if they violated the loyalty provisions. |
| Coffee Wholesale USA | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:1-3**<br>A. The next one is Coffee Wholesale USA, David Mueller, M-u-e-l-l-e-r, and Robert Morris. They declined due to a threat letter from Keurig. |
| Compass Group | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:4-5**<br>A. The next one is Compass Group, no contact; reason exclusivity agreement.<br><br>**Deposition of Ali Yousefpour 30(b)(6) (Compass Group), June 16, 2020, at 136:22-138:13**<br>Q. And the 2010 agreement required each franchisee who shall become a party hereto to join the agreement by signing a distribution -- a Distributorship Joinder Agreement, correct? |

# APPENDIX A: Lost Customers (Away-From-Home)

| Company | Reason | Evidence |
|---|---|---|
| | | A. Yes.<br>Q. Okay.· And if you look at page 4 of the agreement, you'll find the K-Cup/Keurig Loyalty Provision?<br>A. Yes.<br>Q. Which, at this time --<br>A. Section 3 --<br>Q. -- has been -- Section 3.2 --<br>A. Yes.<br>Q. -- on the bottom of page 4, going to page 5. And at this time, the K-Cup/Keurig Loyalty Provision has been expanded to also prohibit the use of accessories to Keurig brewers that are not approved by Keurig, correct?<br>MS. BAIRD:· Objection; form.<br>A.· Yes, excludes any accessories to the Keurig brewers that are not approved by Keurig.<br>BY MS. TORPEY:<br>Q. Okay.· So you still can't purchase or sell competitive cups, correct?<br>MS. BAIRD:· Objection; form.<br>A. As part of this agreement, yes. |
| Diamond Rock Spring Water | Exclusivity Agreement | **Hybsch Declaration, at ¶7**<br>Similarly, in May 2012, I had a very promising meeting with office supply distributor, Diamond Rock Spring Water ("Diamond Rock"). However, following the meeting Diamond Rock informed me: "It was very nice meeting with you and learning about your company. Unfortunately, we cannot distribute any form of kcup according to our contract with Keurig/Green Mountain."<br><br>**Email thread containing email dated May 14, 2012, from Rich Picinich (Diamond) to Kathy Hybsch (Exhibit 2 to Hybsch Declaration)**<br>"Unfortunately we cannot distribute any other form of kcup according to our contract with Keurig/Green Mountain."<br><br>**Deposition of Michael Sarina, August 26, 2014, at 111:10-112:8**<br>THE WITNESS: So within the last few months, Kathy Hybisch, our East Coast sales manager, has met with Coffee Distributing Corporation, and again we were told specifically by them, through emails, that they did not want to violate the loyalty provision with the CAD agreement. She met with Diamond Rock, who is an office supply distributor on the East Coast, and again was told that they were not going to risk violating the Keurig loyalty agreement. Staples was through a representative by the name of JM Overton, and again they were told they were not about to break the loyalty provision within, within their, their, their Keurig arrangement. We've talked to Evans Coffee and Pulse Coffee and got similar results. And those are the -- at least what I have at this point in time with office coffee. We have had similar results with big private label. You have asked me about private label. |

## APPENDIX A: Lost Customers (Away-From-Home)

| Company | Reason | Evidence |
|---|---|---|
| Evans Coffee Co. | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:6-7**<br>A. The next is Evans Coffee, Jim Evans; reason, exclusivity agreement.<br><br>**Hybsch Declaration, at ¶9**<br>These agreements with exclusivity provisions have directly impacted my relationships with customers and potential customers through the loss of sales of OneCups. Specifically…ADM Vending, Coffee Pause, Evans Coffee Co., One Cup Coffee, and U.S. Coffee are all potential customers that explained that they were unable to purchase Rogers' OneCups as a result of the loyalty provisions in their KAD agreements with Keurig. Multiple of these companies have explained that Keurig threatened to terminate their contracts and deny them access to Keurig's products if they violated the loyalty provisions.<br><br>**Deposition of Michael Sarina, August 26, 2014, at 111:10-112:8**<br>THE WITNESS: So within the last few months, Kathy Hybisch, our East Coast sales manager, has met with Coffee Distributing Corporation, and again we were told specifically by them, through emails, that they did not want to violate the loyalty provision with the CAD agreement. She met with Diamond Rock, who is an office supply distributor on the East Coast, and again was told that they were not going to risk violating the Keurig loyalty agreement. Staples was through a representative by the name of JM Overton, and again they were told they were not about to break the loyalty provision within, within their, their, their Keurig arrangement. We've talked to Evans Coffee and Pulse Coffee and got similar results. And those are the -- at least what I have at this point in time with office coffee. We have had similar results with big private label. You have asked me about private label.<br><br>**Deposition of Kathy Hybsch, March 6, 2019, at 145:19-147:1**<br>Q. And with Evans, do you think -- after they said, We can't sell OneCups due to our contract, do you think you had a follow-up with them a year or two years, three years later?<br>A. I know I had a conversation with them again after that because they were looking for some possibilities in some other ways to work with us that wouldn't violate their contract. So I do believe there were follow-up conversations with Evans specifically. |
| One Cup Coffee | Exclusivity Agreement | **Hybsch Declaration, at ¶9**<br>These agreements with exclusivity provisions have directly impacted my relationships with customers and potential customers through the loss of sales of OneCups. Specifically…ADM Vending, Coffee Pause, Evans Coffee Co., One Cup Coffee, and U.S. Coffee are all potential customers that explained that they were unable to purchase Rogers' OneCups as a result of the loyalty provisions in their KAD agreements with Keurig. Multiple of these companies have explained that Keurig threatened to terminate their contracts and deny them access to Keurig's products if they violated the loyalty provisions. |

# APPENDIX A: Lost Customers (Away-From-Home)

| Company | Reason | Evidence |
|---|---|---|
| Sodexo | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:8-9**<br>A. The next one is Sodexo, S-o-d-e-x-o, no contact name. Exclusivity agreement is the reason.<br><br>*Sodexo is affiliated with Compass Group. See Compass Group for more information.*<br>**Deposition of Christopher Howe, April 30, 2019, at 275:12**<br>A. Compass is part of Sodexo/Canteen. |
| Staples[119] | Exclusivity Agreement | **Hybsch Declaration, at ¶8**<br>I was told that during the broker's multiple attempts to gain Staple's business – and as recently as July 2014 – that "Staple[s] is making an active decision not to carry anything non-KCup branded." I also worked with the broker to market Rogers' OneCup product to Staples' small business delivery and contract division and Quill – an office supply company owned by Staples – but was told that they were "locked in tight with [Keurig] who was doing a lot of servicing for the coffee programs, (with equipment and supplies, etc)."<br><br>**Email thread containing email dated October 7, 2013, from John Overton to Kathy Hybsch (Exhibit 3 to Hybsch Declaration)**<br>"As for Staples, I spoke with Shelly Scanlan who is in charge of the Office Breakroom supply and at this point they are unwilling to take on another single serve coffee sku due to the additional services that Green Mountain is providing, (ie. Providing their customers with the equipment and servicing, etc.)."<br><br>**Deposition of Michael Sarina, August 26, 2014, at 110:24-111:9**<br>Q Do you know if your sales team has approached office products distributors?<br>A Yeah. Kathy Hybisch, our salesperson in the East Coast, has approached Staples, who also sells office products. Discussions were moving forward, and we were recently told that Keurig will not -- excuse me, Staples will not carry anything other than 2.0-compatible products, and they were not going to risk their office distribution business because they to have a loyalty agreement that they need to comply with. |
| U.S. Coffee | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:10-11**<br>A. The next is U.S. Coffee Services, no contact; exclusivity agreement is the reason.<br><br>**Hybsch Declaration, at ¶9**<br>These agreements with exclusivity provisions have directly impacted my relationships with customers and potential customers through the loss of sales of OneCups. Specifically…ADM Vending, Coffee Pause, Evans Coffee Co., One Cup Coffee, and U.S. Coffee are all potential customers that explained that they were unable to purchase Rogers' OneCups as a result of the loyalty provisions in their KAD agreements with Keurig. Multiple of these companies have explained that Keurig threatened to terminate their contracts and deny them access to Keurig's products if they violated the loyalty provisions. |

[119] Staples has no recorded sales until 2015.

## APPENDIX A: Lost Customers (Away-From-Home)

| Company | Reason | Evidence |
|---|---|---|
| United Stationers | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:12-15**<br>A. The next one is United Stationers. The contact is Tony DeCrispino. That's D as in David, e as in Edward, C as in Charlie, r-i-s, p as in Paul, i-n-o; the reason is exclusivity agreement.<br><br>**Deposition of Jeffrey Bobroff, November 7, 2019, at 104:8-14; Exhibit 1716 to Deposition of Jeffrey Bobroff, November 7, 2019**<br>Q. And then it says, "Green Mountain's ·agreement with KADs prohibits them from selling non-licensed cups." What did you mean by that?<br><br>A. While I don't know explicitly at this time what the language was in those KAD agreements, there was language in KAD agreements that stated they could not sell non-licensed cups. [Referencing Exhibit 1716]. |
| Vistar | Exclusivity Agreement | **Deposition of Robert Giacomelli 30(b)(6), April 28, 2020, at 139:18-20**<br>A. And the final one is Vistar, V-i-s-t-a-r. The contact is Jerry Keene; the reason is exclusivity agreement.<br><br>**Deposition of David Burwick, May 29, 2020, at 24:3-17**<br>A. It did come to my attention that Vistar was balking at carrying our K-Cups in that channel.<br>Q. And what was your understanding of the reason why they were balking?<br>A. My understanding is they had -- they had a relationship as an authorized dealer with Keurig and under that agreement, which I obviously never saw, they were obligated to sell only a certain type of K-Cups. |

# APPENDIX B: LOST CUSTOMERS (AT-HOME)

| Company | Reason | Evidence | 2013 Sales | Total Lost Sales Revenue 2014-2025 (with Growth) |
|---|---|---|---|---|
| Army and Air Force Exchange Service | 2.0 Incompatibility | **Email thread containing email dated July 24, 2014, from Susan Matthews (AAFES) to Jorge Montano (A.M. Marketing), AAFES000195-196, at -195**<br>"We will not be adding kcups that do not fit the Keurig 2.0."<br><br>**Email thread containing email dated December 1, 2014, from Greg Dutton (Keurig) to Susan Matthers (AAFES), AAFES000359**<br>"I cannot speak to how any other companies products' work (or don't work) with our technology other than without the Keurig Brewed logo on the beverage packaging, the new Keurig 2.0 Brewer will not brew that beverage. We refer to the technology as Consumer Benefit Technology (CBT)."<br><br>**Email thread containing email dated February 3, 2014, from Susan Matthers (AAFES) to Jorge Montano (A.M. Marketing), AAFES000021**<br>"Can you tell me how SF Bay Coffee plans to transition their kcups to coincide with Keurig's 2.0 launch in September?<br><br>**Email thread containing email dated March 24, 2014, from Susan Matthers (AAFES) to Jo Wilkens (Rogers Family Co), AAFES000047**<br>"As of now, we will only be purchasing kcups that will fit in the Keurig 2.0 brewers."<br><br>**Email thread containing email dated October 29, 2014, from Susan Matthers (AAFES) to Bob (Statestreet Snacks), AAFES000331**<br>"We have had the opportunity of buying from the Rogers Family Company by purchasing kcup shippers. Due to the new Keurig 2.0 launch, we have had to change strategies regarding | $52,001 | $1,211,969 |

**APPENDIX B: Lost Customers (At-Home)**

| Company | Reason | Evidence | 2013 Sales | Total Lost Sales Revenue 2014-2025 (with Growth) |
|---|---|---|---|---|
| | | our kcup assortment. At this time, we are only carrying kcups that will fit in all of our single serve machines to include the Keurig 2.0." | | |
| Big Y | 2.0 Incompatibility | **Declaration of Michael Sarina in Support of Plaintiffs' Motion for a Preliminary Injunction, August 11, 2014, at ¶6**<br>In the past year, Rogers has been selected to develop new private label products for multiple grocers, including Wakefern and Big Y, only to have the retailers delay or cancel the projects after meeting with Keurig and expressing concern that non-licensed products like Rogers' will not work with Keurig's forthcoming Keurig 2.0 brewers. | $112,476 | $2,621,412 |
| BJ's | 2.0 Incompatibility | **Declaration of Jon Rogers in Support of Plaintiffs' Motion for a Preliminary Injunction, August 11, 2014, ¶44**<br>BJ's Wholesale, Rogers' second largest customer, signed a private label deal with Keurig around June 2014. We understand that Keurig met with BJ executives to discuss the 2.0 brewer and emphasized that our pods would not work with the new brewer.<br><br>**Corporate Brands Supply Agreement between BJ's and Green Mountain Coffee Roasters, effective January 2014, BWCI0437696 (Exhibit 3213 to Deposition of Bob Ultsch, June 29, 2022), at 1(f)**<br>Except as set forth herein, BJ's agrees that during the term of this Agreement, it will not sell or license any BJ's Trademarks to any other party to manufacture or sell any other BJ's private label brand of single-serve portion packs that are compatible with Keurig branded brewers.<br><br>**Email thread containing email dated October 13, 2014, from Robert Eddy (BJ's) to Austin Brooks, BWCI0031019**<br>"Any K-Cup Pack that is Keurig Brewed (GMCR brand, Donut House, Donut Shop, Newman's and Wellsley Farms) will work perfectly in the 2.0 brewer. | $12,473,316 | $278,884,876 |

## APPENDIX B: Lost Customers (At-Home)

| Company | Reason | Evidence | 2013 Sales | Total Lost Sales Revenue 2014-2025 (with Growth) |
|---|---|---|---|---|
| | | Folgers and Starbucks are also OK. Maxwell House will be OK if not already. It depends on when they contracted with GMCR.<br>Only San Franciso will not work. Thay are challenging the GM restrictions in court."<br><br>**Deposition of Bob Ultsch (Keurig), June 29, 2022, at 244:10-18 (Regarding Keurig's communication with BJ's)**<br>Q. … The focus of the safety communication to customers was that the products that Keurig sold were produced by Keurig, and they had been tested to work safely with the Keurig system. Do I have that right?<br>A. You do.<br><br>**Deposition of Bob Ultsch (Keurig), June 29, 2022, at 94:5-14**<br>Q. So as long as BJ's was working with Keurig on the private label K-cups, whatever new brewer innovation that Keurig came out with, those BJ's private label cups would work with that brewer?<br>A. They would have the opportunity to be part of that platform.<br><br>**Deposition of Bob Ultsch (Keurig), June 29, 2022, at 102:22-103:8**<br>Q And if a K-cup pod didn't have the proprietary ink on the pack, it would not brew in the brewer. That's what Keurig was telling BJ's, right?<br>A It appears, yeah, that we're demonstrating that a message could appear if it wasn't a Keurig pack.<br>Q And the message was, Keurig 2.0 brewers can only brew packs with the Keurig logo, right?<br>MS. BAIRD:· Objection. Form.<br>A That's what's stated on the page. | | |

## APPENDIX B: Lost Customers (At-Home)

| Company | Reason | Evidence | 2013 Sales | Total Lost Sales Revenue 2014-2025 (with Growth) |
|---|---|---|---|---|
| | | **Deposition of Scott Williams (BJ's), September 16, 2022, at 477:9-11**<br>A. I believe there was conversation about using Keurig licensed pods would be safer or increase the safety of the use. | | |
| Kroger | 2.0 Incompatibility | **Declaration of Jon Rogers in Support of Plaintiffs' Motion for a Preliminary Injunction, August 11, 2014, ¶43**<br>It is my understanding that Kroger's decision to switch to Keurig for its private label portion pack products starting in January or February 2015 was made after Kroger and Keurig had a meeting to discuss the incompatibility of non-licensed portion packs with the Keurig 2.0 brewer.<br><br>**Deposition of Robert Baker (TreeHouse), March 21, 2019, at 222:11-18**<br>Q. But it was on the market in Q4 2014 just like you said it would be, right?<br><br>A. But the damage was done. The damage was already done. So in this time period, we lost Kroger, Ahold, Wakefern, Stater Brothers, Giant Eagle, because we could not show that our cup worked in a 2.0 machine because there was no 2.0 machine to be had.<br><br>**Declaration of Rossana Klawon (Kroger re TreeHouse), May 8, 2020, at ¶¶42-43**<br>Ultimately, we had no choice but agree to partner with Keurig. Our decision to make the switch to Keurig was entirely based on Keurig's lock-out technology and our fear of being shut out of the private label single-serve beverage market….If not for the threat of being locked out of the market, I am 100% certain we would have continued our business with TreeHouse, as switching to a new manufacturer is an expensive undertaking, and we had no reason to mess with the exponential private label sales growth we had experienced with TreeHouse. | $82,253 (and $369,794 in 2014) | $5,632,067 |

## APPENDIX B: Lost Customers (At-Home)

| Company | Reason | Evidence | 2013 Sales | Total Lost Sales Revenue 2014-2025 (with Growth) |
|---|---|---|---|---|
| Safeway | 2.0 Incompatibility | **Deposition of Robert Giacomelli, November 19, 2019, Volume II, at 256:18-257:4**<br>Q. Okay. Why do you think that JBR lost the Safeway business in 2013?<br><br>A. Again, it wasn't my account, I wasn't calling on them, but what I had heard from the sales manager that called on the account was that Safeway was very concerned about the pending introduction of Keurig 2.0. They came to us and asked us if we -- how -- you know, they -- no. Let me rephrase that. I want to make sure I get this correct. They identified their discomfort or concern that Keurig 2.0 was coming and that our pods would not work in their machines. | $5,473,712 | $123,166,148 |
| Wakefern (ShopRite, Price Rite) | 2.0 Incompatibility | **Hybsch Declaration, at ¶12**<br>It is my understanding that the impetus for Wakefern's delay in moving forward with the private label product was a meeting between Keurig representatives and Wakefern representatives in which Keurig discussed non-licensed portion packs' incompatibility with the Keurig 2.0 brewer.<br><br>**Declaration of Michael Sarina in Support of Plaintiffs' Motion for a Preliminary Injunction, August 11, 2014, at ¶6**<br>In the past year, Rogers has been selected to develop new private label products for multiple grocers, including Wakefern and Big Y, only to have the retailers delay or cancel the projects after meeting with Keurig and expressing concern that non-licensed products like Rogers' will not work with Keurig's forthcoming Keurig 2.0 brewers.<br><br>**Deposition of Robert Baker (TreeHouse), March 21, 2019, at 222:11-18**<br>Q. But it was on the market in Q4 2014 just like you said it would be, right? | $405,809 | $7,025,713 |

**APPENDIX B: Lost Customers (At-Home)**

| Company | Reason | Evidence | 2013 Sales | Total Lost Sales Revenue 2014-2025 (with Growth) |
|---|---|---|---|---|
| | | A. But the damage was done. The damage was already done. So in this time period, we lost Kroger, Ahold, Wakefern, Stater Brothers, Giant Eagle, because we could not show that our cup worked in a 2.0 machine because there was no 2.0 machine to be had.<br><br>**Deposition of Harry Overly (TreeHouse), July 12, 2019, at 459:10-22**<br>Q. Did Wakefern say it was moving its business away from TreeHouse solely because of the 2.0 brewer?<br>MS. TORPEY: Objection; foundation.<br>THE WITNESS: I mean, what was communicated to us is what I've said. They were concerned because they had been told by Green Mountain that we were not going to be able to develop a solution, and therefore, their private-brand program would be locked out.<br><br>**Email dated August 4, 2014, from Bob Baker (Bay Valley Foods) to Bobby Moorhead (Bay Valley Foods) (draft email from Wakefern to Treehouse), THS-004193386**<br>"Decision has been made to move the single serve beverage business to GMCR….This decision is not about pricing - quality - lack of confidence in Bay Valley Foods."<br><br>**Private Label Manufacturing and Supply Agreement between Wakefern and Keurig, February 19, 2015, KGM03146046, at ¶19**<br>Keurig Brewing System Exclusivity: During the Term, Wakefern will not directly or indirectly design, develop or manufacture any single-cup, portion pack brewer designed for use with single-cup, portion pack cartridges. This section 19 contemplates a brewing chamber designed to pierce a beverage capsule during the brewing process to allow hot water in and the brewed beverage out. | | |

**APPENDIX B: Lost Customers (At-Home)**

| Company | Reason | Evidence | 2013 Sales | Total Lost Sales Revenue 2014-2025 (with Growth) |
|---|---|---|---|---|
| Albertsons | 2.0 Incompatibility | **Interview with Bob Giacomelli, September 11, 2025**<br><br>***See* Safeway**[120] | $69,447 | $1,417,261 |

[120] Safeway acquired Albertsons in 2015. PR News, "Albertsons and Safeway Complete Merger Transaction," press release, January 30, 2015, accessed October 28, 2025, at https://www.prnewswire.com/news-releases/albertsons-and-safeway-complete-merger-transaction-300028412.html.