**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE:<br><br>KEURIG GREEN MOUNTAIN SINGLE SERVE COFFEE ANTITRUST LITIGATION | x<br>: ECF Case<br>:<br>: MDL No. 2542<br>:<br>: Master Docket No. 1:14-md-2542-VSB-SLC<br>:<br>:<br>x |
| JBR, Inc. (D/B/A ROGERS FAMILY COMPANY),<br><br>     Plaintiff/<br>     Counterclaim Defendant,<br><br>     v.<br><br>KEURIG GREEN MOUNTAIN, INC. (F/K/A GREEN MOUNTAIN COFFEE ROASTERS, INC. AND AS SUCCESSOR TO KEURIG, INC.),<br><br>     Defendant/<br>     Counterclaim Plaintiff. | :<br>: 1:14-cv-04242-VSB-SLC<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>x |

**JBR'S OPPOSITION TO KEURIG'S MOTION TO EXCLUDE THE AMENDED EXPERT REPORT AND RELATED TESTIMONY OF JBR EXPERT GARETH MACARTNEY**

**TABLE OF CONTENTS**

I.     INTRODUCTION AND BACKGROUND ........................................................... 1

II.    THE LAW .......................................................................................................... 3

III.   ARGUMENT ...................................................................................................... 5

        A.     Use of the Growth of the Full Market of Keurig-Compatible Pods Is a Reasonable Benchmark, Especially Given the Skewed Market Caused by Keurig Anticompetitive Conduct ................................................................................ 5

        B.     Macartney's Lost Customer Damages Analysis is Sound and Reliable ................. 9

        C.     Macartney's Use Of JBR's Amazon Experience as a Benchmark Is Reasonable and Reliable ......................................................................................................... 13

        D.     The Combination of the Three Macartney Analysis Scenarios Validates Their Reliability .......................................................................................................... 15

        E.     There is Nothing Arbitrary or Speculative About Macartney's Estimate of Damages Through 2025 ..................................................................................... 16

           1.    JBR's Product Was Poised to be a Success in the Rapidly Growing Product Market of Compatible Portion Packs ..................................................... 16

           2.    Keurig's Conduct Decimated JBR's Nascent Growth and It Never Recovered ... 17

IV.   CONCLUSON ................................................................................................... 19

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Dairy Farmers of America, Inc.*,
   No. 5:09–cv–230, 2013 WL 6909953, at *15 (D. Vt. Dec. 31, 2013) ...................................14

*Bazemore v. Friday*,
   478 U.S. 385 (1976)........................................................................................................19

*Bigelow v. RKO Radio Pictures*,
   327 U.S. 251 (1946)...........................................................................................3, 4, 6, 15

*Celebrity Cruises Inc. v. Essef Corp.*,
   434 F. Supp. 2d 169 (S.D.N.Y. 2006)..................................................................................6

*D Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*,
   249 F. Supp. 2d 622 (E.D. Pa.), amended, 268 F. Supp. 2d 448 (E.D. Pa.
   2003) ...............................................................................................................................11

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)......................................................................................................8, 11

*Dial Corp. v. News Corp.*,
   *165 F. Supp. 3d 25* ..........................................................................................................4

*Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*,
   No. 09-cv-0852, 2016 WL 3579953 (E.D. Wis. June 24, 2016) ...........................................14

*In Re: Google Digital Advertising Antitrust Litigation*,
   21-md 3010 (PKC), 21-cv-7001 (PKC), 21-cv-7034 (PKC), 2025 WL
   3562687 (S.D.N.Y. Dec 12, 2025).....................................................................................7, 8

*Hyland v. Home Services of Am., Inc.*,
   No. 05-cv-612, 2012 WL 12995647 (W.D. Ky. July 3, 2012) ...............................................14

*In re LIBOR-Based Fin. Inst. Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018)..................................................................................15

*In re Linerboard Antitrust Litig.*,
   497 F. Supp. 2d 66 (E.D. Pa. 2007) ...................................................................................15

*Malibu Boats, LLC v. Natique Boat Co., Inc.*,
   No. 13-CV-656, 2015 WL 11017799 (E.D. Tenn. Jan. 26, 2015).........................................14

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ...................................................................................3

*In re Processed Egg Products Antitrust Litigation*,
    312 F.R.D. 171 (E.D. Pa. 2015) ..................................................................................14

*Sourceone Dental, Inc. v. Patterson Companies, Inc.*,
    15-cv-5440 (BMC), 2018 WL 2172667 (E.D.N.Y. May 10, 2018) .......................................12

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019) ...............................................................4, 7, 11

*U.S. Football League v. Nat'l Football League*,
    No. 84-CV-7484, 1986 WL 10620 (S.D.N.Y. July 31, 1986) ....................................................3

*U.S. Information Systems, Inc. v. International Broth. of Elec. Workers Local No. 3*,
    313 F.Supp.2d 213 (S.D.N.Y. 2004)...............................................................................19

*United States v. Jones*,
    No. S4 15-CR-153 (VSB), 2018 WL 2684101 (S.D.N.Y. June 5, 2018), *aff'd*,
    965 F.3d 149 (2d Cir. 2020).....................................................................................11

**Other Authorities**

Rule 702 ..............................................................................................................8, 12

JBR, Inc. (D/B/A Rogers Family Company) ("JBR") opposes Keurig's Motion to Exclude the Amended Expert Report and Related Testimony of JBR Expert Gareth Macartney.

## I.    INTRODUCTION AND BACKGROUND

In its January 3, 2025, Order, the Court excluded portions of the damages opinion of JBR's expert Gareth Macartney ("Macartney") because the Court found Macartney's reliance on Keurig's growth rate as a benchmark for what JBR's growth rate would have been absent Keurig's misconduct was not reliable.  The Court found that Keurig's growth rate was the benchmark most impacted by the illegal conduct, and therefore, not a reliable benchmark on which to assess JBR's likely growth absent the misconduct. Order of January 3, 2025 at 30 ("Order) ("the issue with the Keurig benchmark is not merely that it is an imperfect comparison, but that it is likely the benchmark that is most affected by the anticompetitive conduct, and in a way that is most likely to be favorable to JBR's damages estimation").

However, the Court recognized "it would create an unworkable and unfair standard to require that any benchmark be completely unaffected by a defendant's anticompetitive conduct or that the yardstick selected perfectly reflect the affected company but for the anticompetitive conduct."  Order at 20.  The Court further recognized the often impossibility of identifying such a benchmark when a defendant has manipulated the market to a great extent by its anticompetitive conduct *Id.* ("Indeed, there will be cases where "the selection of perfectly comparable benchmark firms . . . is impossible where [a monopolist's] alleged monopoly prevents comparable firms from operating within [the] market.") (*quoting Dial Corp. v. News Corp.*, 314 F.R.D. 108, 119 (S.D.N.Y. 2015), amended, No. 13-CV-6802, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016)). Generally, arguments that there are weaknesses in the benchmark at that point go to weight not

1

admissibility. *Id.* at 21 ("once a yardstick is found to be sufficiently reliable to meet the threshold admissibility requirements, any additional criticisms of the benchmark go to weight").

The Court also indicated that it would have found Macartney's benchmark more reliable if he had presented alternative methodologies that validated his approach. Order at 28 ("I would have greater confidence permitting the use this methodology if it were tested with other methods.").

Macartney's amended report addresses the concerns raised by the Court's Order. First, rather than using Keurig's growth rate as the benchmark for JBR's growth in a "but for" world, Macartney uses the growth rate for the <u>entire market</u> of Keurig-compatible pods. While Keurig's misconduct affected the distribution of the market <u>among</u> the participants, there is no reason to believe that the overall growth of the entire market was affected by the misconduct. Moreover, as discussed above, given Keurig's misconduct resulted in it having 80-90% of the market, choosing a benchmark true to the relevant market, but not affected by the misconduct, would be impossible. Keurig apparently believes that situation of its own making insulates it from any liability for its misconduct, but that is not the law.

Moreover, Macartney's amended report presents two alternative methodologies to validate (double-check) his "full market" benchmark. He looked at customers that JBR specifically lost due to Keurig's misconduct and estimated what JBR's profits would have been absent that loss in business. Finally, he analyzed JBR's sales growth through the Amazon channel (one of the few channels that Keurig's anticompetitive conduct was unable to foreclose to JBR). He used that growth rate as a benchmark to estimate what JBR's profits would have been in absence of Keurig's misconduct. Those methodologies validated the reliability of Macartney's whole market benchmark.

Any criticisms that Keurig has about whether there were other reasons that JBR lost business (whether the Amazon growth is representative, etc.), go to weight, and Keurig is free to advance its views through cross-examination or rebuttal testimony. Such arguments do not justify exclusion of Macartney's report or testimony.

Finally, Macartney explained how Keurig's misconduct disrupted JBR's business at a critical time, such that JBR's business has not yet been able to recover, and he has now shown that JBR's business indeed did not recover, using data through June 2025. He explained that this fact pattern justifies his estimated damages through 2025. Again, Keurig can criticize Macartney's analysis at trial, but there is no basis to exclude it.

## II.    THE LAW

The two most common approaches to measuring damages in antitrust cases are the "before-and-after" approach and the "yardstick" approach. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996). "The 'before and after' theory compares . . . the prices [plaintiff] paid during the period the violation continued with . . . prices paid prior to the beginning of the violation or after its termination. The 'yardstick' approach compares profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation." *Id.* (*quoting* ABA Antitrust Section, *Antitrust Law Developments* (3d ed. 1992) at 669–73).

The "yardstick" or "benchmark" approach is the subject of the current motion and is used to estimate profits lost by a competitor due to anticompetitive conduct by a defendant. Use of the "yardstick" test has been approved by the Supreme Court and used by Courts in this Circuit. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 257 (1946); *U.S. Football League v. Nat'l Football*

3

*League*, No. 84-CV-7484, 1986 WL 10620, at \*32 (S.D.N.Y. July 31, 1986) (describing "the 'yardstick' approach that is sometimes used to prove damages in antitrust cases").

Ideally, the benchmark selected is one not unduly affected by the anticompetitive conduct. But Courts have recognized that is often impossible, especially where the monopolist has manipulated the market to the extent that no such benchmark exists. Therefore, Courts in this District do not require perfection, but have approved the yardstick method where markets were chosen that were not immune from the anticompetitive conduct. *E.g., Dial Corp. v. News Corp., 165 F. Supp. 3d 25, 40-42.* This Court has recognized the same principle. Order at 20. As the Supreme Court recognized, requiring a perfect benchmark where the defendant has so manipulated the market to render no such benchmark available, would reward bad conduct that the antitrust laws were enacted to constrain. *Bigelow*, 327 U.S. at 264 ("would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain").

As long as the benchmark is explained and rational under the circumstances, concerns about how closely it reflects the "but for" question go to weight and are addressed through cross-examination and rebuttal testimony. *See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 43 (E.D. Pa. 2019) ("Arguments about what factors an expert should have controlled for in conducting a yardstick analysis generally go to the weight, rather than the admissibility, of the expert's testimony." (internal quotation marks omitted)), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020).

4

## III.    ARGUMENT

### A.    Use of the Growth of the Full Market of Keurig-Compatible Pods Is a Reasonable Benchmark, Especially Given the Skewed Market Caused by Keurig Anticompetitive Conduct

Macartney used the "full set of Compatible Portion Packs (hereafter "Full Market") as a benchmark" to estimate JBR's lost profits.  Macartney Amended Report at ¶ 26[1].  This includes Keurig owned or licensed packs as well as portion packs compatible with Keurig devices sold by unlicensed pod makers.  Macartney explains why this is a reliable benchmark as follows:

> Growth of the Full Market is a reliable benchmark to compare Rogers's experience, given that Compatible Portion Packs were sold at the same time as Rogers's OneCup, in the same geography, and were designed to work with the same brewer.  Also, growth of the Full Market is not specific to Keurig and is not therefore tainted by the alleged anticompetitive conduct.  I use the growth rate in the number of Compatible Portion Packs sold, not the dollar growth.  This means that the benchmark growth rate I use does not involve Keurig's prices (or any other company's prices) lest it be argued that those prices were tainted by the anticompetitive conduct.  Put simply, this benchmarking approach assumes that Rogers should have at least grown with the market, which reflects increasing demand for Compatible Portion Packs by consumers.

*Id.* at ¶ 27.  Simply put, there are two buckets into which compatible portion packs makers fall: (1) Keurig owned and licensed brands (those whose growth was spurred by the anticompetitive conduct) and unlicensed makers (those whose growth was inhibited by the anticompetitive conduct).  This is consistent with the logic expressed by the Court, that "Keurig was favorably affected by the anticompetitive conduct," but that "unlicensed firms . . . would have had their market share and revenue suppressed by the anticompetitive conduct" (Order at 27).  But collectively, those two buckets reflect the growth in the markets for compatible portion packs generally, and the rate at which JBR's growth would have occurred but for Keurig's misconduct, as Macartney has described (Macartney 3/2/2026 Trn, at 35:13-37:7).  This is the benchmark that

---

[1] References to "Macartney Amended Report" refer to the November 5, 2025 Corrected Amended Expert Report of Gareth Macartney, Ph.D., previously filed by Keurig at ECF No. 2451-3.

5

Macartney uses to estimate what JBR's growth would have been in the absence of Keurig's anticompetitive behavior.   It is a reasonable benchmark, and in fact, the most reasonable benchmark under the circumstances.

Keurig's motion uses a divide and conquer approach that defies reality.  First, admitting that Keurig maintained 80-90% of the market at all times, Keurig argues that "[s]witching from 100% Keurig to an 80% Keurig benchmark fixes nothing."  Motion at 5.  As far as unlicensed portion packs go, Keurig says "[b]ecause the unlicensed competitors were affected by the same challenged conduct, looking at their sales compared to JBR's does not isolate the effects of the challenged conduct." *Id.*  As an initial matter, notice this argument is exactly the type of argument that the Supreme Court warned about: making "wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain." *Bigelow*, 327 U.S. at 264.  According to Keurig, neither Keurig packs or unlicensed packs are a good benchmark, therefore, there must not be a benchmark, and JBR cannot recover damages.  Obviously, something like carbonated beverages (a totally different product with different consumers), or bagged coffee (which has been around for decades and was not seeing growth like single use pods) would not be appropriate benchmarks.  On the other hand, using the full market growth rate is a reasonable estimate of what growth would have been for a given competitor (had that market participant not be aided or impeded by the illegal conduct).

As this Court noted in *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 189 (S.D.N.Y. 2006), "[t]he selection of comparators will seldom approach the 'Utopian ideal' of identifying the perfect clone."  However, what Keurig never acknowledges (or at least never comes to terms with) is that the collective Keurig and unlicensed portion packs is a measure of the growth of the market for Keurig-compatible packs as a whole.  That is a very reliable benchmark for what

6

JBR's growth would have been but for Keurig's interference in the market.  That is the benchmark Macartney uses to calculate JBR's damages, and it is a reliable benchmark (indeed, the most reliable benchmark available).  There is no basis to exclude Macartney's report or testimony based on use of that benchmark.

Next, Keurig complains that some unlicensed sellers performed better than JBR.  Motion at 6.  Because the benchmark is reliable (in fact, the most reliable one available), any such arguments of Keurig go to weight not admissibility.  *See, e.g., In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 43 (E.D. Pa. 2019) ("Arguments about what factors an expert should have controlled for in conducting a yardstick analysis generally go to the weight, rather than the admissibility, of the expert's testimony." (internal quotation marks omitted)), *aff'd sub nom.  In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020).  Keurig is free to cross-examine Macartney, or have its expert rebut Macartney's opinions on that basis.  Unlike *Suboxone*, neither of the cases cited on page 6 of Keurig's motion concern admissibility of expert testimony.  Also, by focusing on growth percentages rather than actual sales amounts, Keurig exaggerates the performance of other unlicensed companies relative to JBR.  The growth percentages just reflect the smaller base from which some of these new entrants started (Macartney 3/2/2026 Trn. 60:2-61:3: "Barrie House, for example, it's got a high percentage growth, probably entered in 2013.  It only has 700,000 pods, so sure it increased to 54 million pods, but that is still only about a quarter of what Rogers managed to sell in 2018").  Also "if you look at where Rogers ranks with respect to [other unlicensed companies] in terms of its actual quantity of sales relative to their quantity of sales, Rogers is still ranked highly throughout this period." (*Id.*, at 58:14-60:1).

7

Just a few months ago, this Court rejected a similar challenge to a benchmark in an antitrust case. *In Re: Google Digital Advertising Antitrust Litigation*, 21-md 3010 (PKC), 21-cv-7001 (PKC), 21-cv-7034 (PKC), 2025 WL 3562687 (S.D.N.Y. Dec 12, 2025). This Court said "Google's disagreement with Elhauge's conclusions go to the weight of the evidence, not his methodology, and do not identify the type of "apples and oranges" comparisons that warrant exclusion under Daubert." *Id.* at *8. The *Google* Court relied heavily on precedent from this Circuit in reaching its conclusion. The Court noted that "'[i]t is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions.'" *Id.* at *9 (*quoting United States v. Napout*, 963 F.3d 163, 167 (2nd Cir. 2020)). Continuing, the "'trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison. By contrast, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" *Id.* (*quoting Restivo v. Hessemann*, 846 F.3d 547, 577 (2nd Cir. 2017)). Similarly, in this case, Macartney chose a reasonable bench (entire market for compatible portion packs) that is not speculative or conjectural. Nor it is an "apples and oranges" comparison; rather, it is the most rational selection given Keurig near total monopolization of the market. *Google* further counsels for the denial of Keurig's motion to exclude.

At bottom, Keurig's criticism of Macartney's full market benchmark is merely, as they put it, for "again using the very market at issue in this case" (Motion at 5). To Keurig, no data from the single-serve coffee market can reliably be used for damage estimation. This position is untenable, particularly given the Court's guidance that "venturing outside the single-serve cup market to an alternative product or industry will raise questions about the comparability of the firm or market selected" (Order at 27). Further, excluding Macartney's model just because it uses data

from the "market at issue" would necessitate the exclusion of Stiroh's model of damages, which the Court has already accepted (Order at 77-82). Stiroh's damage model uses "the unit sales in each market segment of TreeHouse, Keurig, Rogers, Mother Parkers, Trilliant, Barrie House, Caffé D'Arte, European Roasterie, Kraft, S&D Coffee, Westrock, and White Coffee" (Stiroh Report, at ¶ 106). This is the exact same data that Macartney uses ("I add together detailed transactional data for companies comprising most of the market and which produced data in this litigation, including Keurig, Rogers, Berrie House, Caffé D'arte, Kraft, Mother Parkers, S&D Coffee, Treehouse, Trilliant, Westrock, and White Coffee," Amended Macartney Report, at ¶ 26). Indeed, Macartney's use of this data is similar to Stiroh's. She uses it to obtain TreeHouse's but-for sales by multiplying her estimate of TreeHouse's At-Home but-for market share by the but-for size of the At-Home market segment each year going forward (Stiroh Report, at ¶ 125). While, with the same data, Dr. Macartney uses a growth approach, rather than a market share approach, he described that the two approaches are equivalent ("This growth rate approach is equivalent to a market share approach, where Rogers's market share for the years 2014 on in the At-Home channel remain fixed at its 2013 value," Amended Macartney Report, at ¶29, n. 88).

### B.    Macartney's Lost Customer Damages Analysis is Sound and Reliable

As another method of estimating JBR's damages (and in accordance with this Court's suggestion of a "methodology . . . tested with other methods," Order at 28), Macartney looked at JBR customers that had provided JBR substantial business, but decreased or stopped that business due to the Keurig's campaign to disparage JBR's portion packs as not being compatible with Keurig's new 2.0 brewer, and its use of exclusive agreements. He then estimated what JBR's profits would have been if JBR had not been deprived of that business by Keurig's improper conduct. Macartney Amended Report at ¶¶ 34-40, Appendix A, B.

Macartney engages in no speculation or conjecture about why the customers reduced or ceased their business with JBR. Rather, in Appendices A and B, Macartney cites record evidence of customers diminishing/ending their business with JBR due to Keurig's conduct. *E.g.*, Macartney Amended Report, Appendix A at 1 (Action Sales and Marketing, "His concern was 2.0 compatibility"), 2 (Coffee Distributing Corporation, "declined due to exclusivity agreement"), Appendix B at 1 (Army and Air Force Exchange Services, "we will not be adding kcups that do not fit the Keurig 2.0"), 5 (Safeway "was very concerned about the pending introduction of Keurig 2.0" and expressed "concern that Keurig 2.0 was coming and that [JBR's] pods would not work."). Macartney then estimates the sales that JBR would have made, and the profits it would have achieved, if Keurig's improper actions had not caused this loss of business. *Id.* at ¶¶ 34-40. Keurig does not, and cannot, argue that Macartney's analysis of lost customers is tainted by the challenged conduct.  Also, Keurig does not, and cannot, argue that using record evidence to identify lost customers is an unreliable method.  Macartney's lost customer approach is very similar to Stiroh's (Stiroh Report, at Appendix 1, p. 1, "I quantify lost sales on a customer-by-customer basis, based on my review of documents in the record"); this Court rejected similar arguments Keurig made against her analysis to those that Keurig now makes against Macartney's (Order at 77-82).

Keurig's response is that there might have been other reasons that JBR lost that business. That is speculation.  So too is Keurig's argument that JBR may have lost these customers at some future date anyway (belied by the fact that JBR had previously been selling millions of dollars' worth each year to the likes of Safeway and BJ's, and by the fact that even with Keurig's conduct JBR maintained millions of dollars of sales each year to Costco through to the present).  But what is clear from the record evidence is that business was specifically lost due to Keurig' actions. Macartney Amended Report, Appendices A, B.  As Macartney notes, his approach is actually

10

conservative for two important reasons.  First, it only includes actual customers where there is record evidence of lost sales.  *Id.* at ¶ 34.  It does not include customers who decided not to continue to do business with JBR due to Keurig's conduct, but the customers never articulated that to JBR.  Nor does it include potential customers of JBR who never became customers because of Keurig's 2.0 brewer marketing or exclusive contracts.

Of course, if Keurig or its expert wants to challenge Macartney's opinions based on proposing other reasons that customers may have left JBR, they are free to do so.  But that is no basis for excluding Macartney's testimony.  Indeed, the Court has already rejected Keurig's argument about there being other reasons why JBR might have lost this business, stating that "the impact of various JBR business decisions warrants less consideration" and finding that "JBR fairly objects that those business decisions were either accounted for or irrelevant" (Order at 30).  The Court found that "[t]his is the kind of granular dispute over the impact of comparatively minute issues that goes to the weight of the analysis rather than its admissibility" (*Id.* at 30).  Instead of excluding expert testimony, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of addressing a party's concerns about the opposing parties' expert opinions.  *United States v. Jones*, No. S4 15-CR-153 (VSB), 2018 WL 2684101, at *12 (S.D.N.Y. June 5, 2018), *aff'd*, 965 F.3d 149 (2d Cir. 2020), quoting *United States v. Morgan*, 675 F. App'x 53, 55 (2d Cir. 2017) and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).  This is particularly the case when another expert interprets the evidence differently or weights evidentiary factors differently.  *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 43 (E.D. Pa. 2019) ("Arguments about what factors an expert should have controlled for in conducting a yardstick analysis generally go to the weight, rather than the admissibility, of the expert's

testimony." (internal quotation marks omitted)), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020); *D Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 692 (E.D. Pa.), amended, 268 F. Supp. 2d 448 (E.D. Pa. 2003) ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in [Rule 702] on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."), quoting Rule 702, Advisory Committee Notes.

Keurig also accuses Macartney of "simply ignore[ing] evidence" (Motion at 9). But the Court dismissed Keurig's similar arguments against Stiroh, stating that an expert "is not obligated to review and independently sort through 'all of the discovery in a case in order to determine the relevant evidence,'" and "[n]or is failure to use every relevant piece of information in the record a basis for exclusion" (Order at 78). And, Macartney *has* analyzed Keurig's supposed contrary evidence extensively: he has a section over 20 pages long in his Reply Report dedicated to analyzing such evidence, including the evidence Keurig cites in its Motion (Macartney Reply Report, at §IV.A.2, pp. 162-183). Keurig now also points to a July 2, 2015 email by JBR's Bob Giacomelli summarizing a study Keurig claims shows JBR lost customers for reasons other than the Keurig 2.0 (Motion at 9). But Macartney explained that this study was of customers who "have yet to purchase OneCup" (Macartney 3/2/2026 Trn., at 136:18-137:15). Therefore, these are not the lost customers that are the basis for his lost customer model.

As the Eastern District of New York succinctly stated in *Sourceone Dental, Inc. v. Patterson Companies, Inc.*, 15-cv-5440 (BMC), 2018 WL 2172667, *5 (E.D.N.Y. May 10, 2018):

> The benchmarks Dr. Leitzinger selected are sufficiently comparable to permit a degree of reliable comparison, and therefore do not render his damages calculation

12

inadmissible. . . .    Defendants will have an opportunity to cross-examine Dr. Leitzinger on both his selection of benchmark companies and his decision to take the simple average of their endorsement rates. . . .    The weaknesses defendants identify are not the kind of deep-seated methodological flaws that can preclude an expert's testimony. If defendants believe that Dr. Leitzinger has insufficiently discounted his conclusion because of dissimilarities between his benchmarks and plaintiff, they or their experts can make that point at trial.

Macartney estimated lost profits based on the evidence that certain of JBR's active customers ceased to do business with JBR subsequent to being exposed to Keurig's representations that JBR's portion packs would not work with 2.0 brewers and/or learning that Keurig agreement prevented the customer from doing business with JBR.  That is a rational basis on which to base damages, and there is no basis for excluding Macartney's opinions.

## C.    Macartney's Use Of JBR's Amazon Experience as a Benchmark Is Reasonable and Reliable

Because Amazon is an open marketplace, Keurig was unable to foreclose JBR's participation in that marketplace through its exclusive dealing agreements.  JBR's business grew in the Amazon channel while in the other channels impacted by Keurig's exclusive agreements, JBR's business collapsed.  Therefore, quite reasonably, Macartney provided yet a third damages analysis using the growth rate for JBR's business at Amazon as an estimate of the growth rate that JBR's business as a whole would have experienced if not for Keurig's misconduct.  Macartney Amended Report at ¶¶ 41-45.

Keurig complains that Amazon's "massive growth" "as a sales platform" generally means that it is not a reliable benchmark.  Keurig's Motion at 10.  This is mere speculation.  Macartney testified at his deposition, Amazon platform growth "doesn't mean that each individual product on Amazon benefits … not every product in this period of time experienced growth in Amazon," rather "[t]here was just more products in Amazon."   (Macartney Trn. at 162:14-163:12). Macartney also noted that only 6 percent of all compatible portion packs were sold on Amazon

13

(*Id.*, at 148:12-149:25).  Macartney specifically analyzed the reasons behind *JBR's* success on Amazon, including its high ranking, branding, and eco-friendly pod and based on his review of all factors, concluded that it was "just not growth on Amazon because it's Amazon," and not "just an Amazon effect" (*Id.*, at 164:22-165:16).  Concerning JBR's success, Macartney found that "before the challenged conduct, [JBR] … had something like 37 percent of all of the portion pack sales in Amazon," and JBR "was ranked four or five stars by 89 percent of the people that purchased it on Amazon" (*Id.*, 156:11-18).  (Keurig misleadingly states that Keurig's portion packs increased six-fold in line with the six-fold growth of the Amazon platform from 2013 to 2019, Motion at 10.  But Macartney uses *JBR's* (not Keurig's) Amazon sales as a benchmark, and they increased from $13,462,468 in 2013 to $27,856,828 in 2019, just a two-fold increase, Amended Macartney Report, at Table 26, Column B).

Of course, Keurig ignores that Keurig's false marketing that JBR's portion packs would not work in Keurig 2.0 brewer doubtless hurt JBR's sales at Amazon.  That fact counsels for a conclusion that the benchmark would tend to underestimate damages.  In other words, like almost any benchmark, the Amazon sales growth is not going to be a perfect benchmark.  But that does not mean it does not form a reasonable basis for a damages analysis.  *See Hyland v. Home Services of Am., Inc.*, No. 05-cv-612, 2012 WL 12995647, at *8 (W.D. Ky. July 3, 2012) (denying Daubert challenge to economist's testimony because "[a]lthough the Real Trends data is not a perfect benchmark, due to its inclusion of . . . markets . . . which may be affected by anti-competitive activity . . .  it provides a sufficiently reliable benchmark to support a just and reasonable inference of damages" (citation omitted)); *see also Fond Du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., Ltd.*, No. 09-cv-0852, 2016 WL 3579953, at *9 (E.D. Wis. June 24, 2016) (similar); *In re Processed Egg Products Antitrust Litigation*, 312 F.R.D. 171, 195 (E.D. Pa. 2015) (rejecting

14

challenge to benchmark tainted by anticompetitive conduct); *Malibu Boats, LLC v. Natique Boat Co., Inc.*, No. 13-CV-656, 2015 WL 11017799, at \*4-5 (E.D. Tenn. Jan. 26, 2015) (similar); *Allen v. Dairy Farmers of America, Inc.*, No. 5:09–cv–230, 2013 WL 6909953, at \*15 (D. Vt.) (similar); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 66, 675 (E.D. Pa. 2007) (similar).[2]

### D.    The Combination of the Three Macartney Analysis Scenarios Validates Their Reliability

Using the whole market as a benchmark for Roger's growth without illegal interference by Keurig yields a lost profits value of $298 million.  Macartney Amended Report at ¶ 33.  Using the Customer-by-Customer approach, the lost profits analysis yields $296 million, clearly validating and providing a double-check of the reliability of the whole market benchmark.  Macartney Amended Report at ¶ 40.  As Dr. Macartney explained in deposition "The results generally corroborate each other… They're basically within half a percent of each other" (Macartney 3/2/2026 Trn., at 30:17-25). Providing guidance on the usefulness of corroborating models, the Court cited *Bigelow*, a case in which an expert provided two methods that produced damage results within 8% of each other (Order at 28), a margin much greater than 0.5%.  Similarly, the Amazon business benchmark yields a lost profits damages estimate of $390 million (Macartney Amended Report at ¶ 45), validating first two scenarios as quite conservative as discussed above. These three scenarios provide the type of validation by alternative methodologies that the Court previously recognized as bolstering reliability.  Order at 28 ("I would have greater confidence permitting the use this methodology if it were tested with other methods.").

---

[2] Keurig's reliance on *In re LIBOR-Based Fin. Inst. Antitrust Litig.*, 299 F. Supp. 3d 430, 479 (S.D.N.Y. 2018) is misplaced.  In *LIBOR*, the court rejected plaintiffs' chronological benchmark, the so-called "clean" period before the conspiracy rendered prices artificial, because defendant's expert had shown that even this clean period suffered from artificiality at least 29% of the time, under plaintiffs' assumptions.  299 F. Supp. 3d 430 at 479.

15

**E.      There is Nothing Arbitrary or Speculative About Macartney's Estimate of Damages Through 2025**

Macartney estimates damages through 2025 because that is what the evidence compels. Macartney explains that evidence in detail in his report, which is summarized as follows: (1) in 2011-2012, JBR was well-positioned to be a tremendous success in the compatible portion pack market due to a high quality product, that was environmentally friendly, and marketed at a highly competitive price point; (2) JBR's business was growing quickly in that period; (3) until Keurig's anticompetitive conduct (e.g., Keurig 2.0) took hold; and (4) caused JBR's business to flounder and never recover to this day.  On the other hand, for channels where Keurig's conduct was less effective (Amazon and JBR's own website), JBR's business continues to grow and thrive to this day, albeit still having been curtailed by Keurig's conduct.  Collectively, this data shows the causation of harm to JBR through 2025, and the reasonableness of Macartney's opinions.

**1.      JBR's Product Was Poised to be a Success in the Rapidly Growing Product Market of Compatible Portion Packs**

JBR had positioned itself well to take advantage of rapid growth in the portion pack business, starting in 2011.  First, JBR was an early entrant to the market, giving it a major advantage over those that joined the market later.  Macartney Amended Report at ¶ 6.  Second, JBR had an eco-friendly soft pod, which was preferred over plastic pods by many customers.  *Id.* Third, JBR had established a reputation for a quality product. *Id.* Fourth, JBR's product was attractively priced.  *Id.*  Fifth, JBR had made substantial investments in marketing its products that were yielding positive results.  *Id.*  Macartney explains these facts in detail in his report, supported by record evidence.  *Id.* at ¶¶ 6-13.  There is nothing arbitrary or speculative about the analysis.

16

### 2.    Keurig's Conduct Decimated JBR's Nascent Growth and It Never Recovered

Keurig conduct (particularly its aggressive enforcement of its exclusive dealing agreements, and its implementation and marketing of its 2.0 brewer as incompatible with JBR's products) put an end to JBR's promising growth trends. Macartney shows that in graphs in his report. For the away home market, Figure 8 (*id.* at ¶ 18) shows that just as JBR was getting a toehold in the away from home market, Keurig's conduct squashed JBR's business and it failed to recover even through 2025.



The situation was even more dramatic in the at-home market. The evidence shows that JBR experienced explosive growth in 2012-2014, until Keurig's 2.0 related conduct reduced its market share dramatically, and it has not recovered until this day. Figures 10 and 11 (*id.* at ¶¶ 20, 21), for example, show these results with Safeway and BJ's (sales plummeting from millions of dollars per year to zero). Figure 12 shows the at home market as a whole and Figure 13 shows the at home market but with Costco (the only retailer JBR managed to maintain significant sales with, although they too fell) removed (*id.* at ¶¶ 22, 13)

17



The results are unambiguous.  JBR's sales were growing dramatically in the 2012-2014, then, as a result of Keurig's conduct, were decimated and have never recovered (even through 2025).  Then Macartney looked at JBR's growth rate in two channels less affected by Keurig's conduct, the Amazon channel (Figure 14) and sales at JBR's own website (Figure 15).  The results were dramatically different, and showed that JBR's business in those channels has continued to grow to this day (even if that growth was also curtailed by Keurig, although to a lesser extent):



18

Macartney Report at ¶¶ 24, 25. To review, in channels where Keurig's unlawful conduct was prevalent, JBR's growth was stifled through 2025, and for those channels where Keurig's conduct was less effective, JBR's growth continued through 2025.

This evidence is the basis for Macartney's projection of damages through 2025. It is not speculative nor arbitrary. It is based on the <u>evidence</u>. Macartney cites the evidence, explains it, and explains how it supports his opinions. As to *why* this harm continued, Macartney has described (with evidence) that it happened because JBR "missed out on the opportunity to establish brand loyalty, particularly among Millennials, during the initial growth phase of the Single-Serve Market, and because of the continued use by Keurig of exclusivity agreements…" (Macartney Amended Report, at ¶ 17) and because when Keurig "stopped the ink recognition in 2017, that was kind of done secretly. It just removed it. It didn't announce it to the market" and "Keurig didn't come along and correct… all of that stuff [it] said before about safety issues, about quality issues…about Rogers not working in the 2.0 brewer" (Macartney 3/2/2026 Trn., at 87:14-24).

Of course, Keurig is free to offer another explanation for this data. But that is a subject for trial, not a proper topic in a motion to exclude. This "battle of the experts" is not a proper basis for excluding expert testimony. *Bazemore v. Friday*, 478 U.S. 385, 400 (1976); see also *U.S. Information Systems, Inc. v. International Broth. of Elec. Workers Local No. 3*, 313 F.Supp.2d 213, 229 (S.D.N.Y. 2004) ("The fact that the defendants' experts would draw contrary inferences from the same data does not render either expert's testimony inadmissible, nor does it speak to the reliability of the methodology.").

## IV.    CONCLUSON

Keurig's attempt to exclude Macartney's report and testimony basically attempts to leave JBR without a damages case because of the "success" of Keurig anticompetitive conduct in

manipulating the marketplace and destroying JBR's business to the point it could not recover. First, Keurig wants to deprive JBR of a damages case because it dominated the market with its anticompetitive conduct to such an extent that, allegedly, no meaningful yardstick or benchmark of growth without that misconduct is available. Keurig's position is clear from its criticism of Macartney's full market benchmark merely for "again using the very market at issue in this case" (Motion at 5). This position is untenable, particularly given the Court's guidance that "venturing outside the single-serve cup market to an alternative product or industry will raise questions about the comparability of the firm or market selected" (Order at 27). Moreover, Keurig's position is not consistent with the law and is additionally not true. Macartney uses the whole market growth rate for compatible portion packs as the benchmark for JBR's growth had Keurig not intervened with anticompetitive conduct. That full market growth rate includes market participants who benefited from the anticompetitive conduct (Keurig-affiliated companies) and participants who were hurt by it (unlicensed competitors). But collectively, it represents the entire growth of the market, a fair and reasonable benchmark of growth without Keurig's interference. After that, Macartney validated that approach by looking at two alternative methodologies to estimate lost profits. First, he looked at customers for which specific evidence exists to show lost business due to Keurig's conduct. He then estimated the profits that JBR would have earned had that business not been lost. Next, he looked at JBR's growth rate in the Amazon channel, which was less affected by Keurig's conduct because of the absence of exclusive dealing arrangements in that channel. He used that growth rate to estimate JBR's profits in the absence of Keurig's illegal conduct. The lost profits calculated by these methods were similar to the lost profits estimated using the whole market growth rate method, validating the three approaches as reliable and reasonable.

20

Next, Keurig takes issue with Macartney for calculating through June 2025, which it claims is an arbitrary end point. But Keurig ignores the evidence cited by Macartney that JBR was positioned to be very successful in the compatible portion packs market until Keurig's conduct decimated JBR's business to the point it has not recovered despite the passage of time. This analysis is not arbitrary; it is supported by facts and data clearly set out by Macartney. It is not a future projection; it is based on historical data and, therefore, on what has actually happened to JBR's business because of the challenged conduct.

Keurig can disagree with Macartney's analysis and can try and rebut it. However, there is no basis to exclude it. Keurig's motion to exclude Macartney's report and testimony should be denied.

Dated: April 10, 2026                             Respectfully submitted,


By:      _/s/ Daniel Johnson Jr._____
         Daniel Johnson Jr. (CA Bar No. 57409)
         Mario Moore (CA Bar No. 231644)
         **DAN JOHNSON LAW GROUP, LLP**
         100 Pine Street, Suite 1250
         San Francisco, CA 94111
         Telephone: 415-604-4500
         Email: dan@danjohnsonlawgroup.com
         Email: mario@danjohnsonlawgroup.com

21

**Local Rule 7.1(c) Certificate of Compliance**

The undersigned, counsel of record for JBR, Inc. (d/b/a Rogers Family Company), certifies that this brief contains 6,371 words, which complies with the word limit of Local Rule 7.1

Dated: April 10, 2026                    Respectfully submitted,


                                         By:     _/s/ Daniel Johnson Jr._
                                                 Daniel Johnson Jr. (CA Bar No. 57409)
                                                 Mario Moore (CA Bar No. 231644)
                                                 **DAN JOHNSON LAW GROUP, LLP**
                                                 100 Pine Street, Suite 1250
                                                 San Francisco, CA 94111
                                                 Telephone: 415-604-4500
                                                 Email: dan@danjohnsonlawgroup.com
                                                 Email: mario@danjohnsonlawgroup.com

22