**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION<br><br>*This Document Relates to*:<br><br>BJ'S WHOLESALE CLUB, INC.,<br><br>        Plaintiff,<br><br>   against-<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>        Defendant.<br><br>AND<br><br>WINN-DIXIE STORES, INC.; and BI-LO HOLDING, LLC,<br><br>        Plaintiff,<br><br>   against-<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>        Defendant. | MDL No. 2542<br><br>Master Docket No. 1:14-md-02542 (VSB) (SLC<br><br>Related Case Nos. 1:21-cv-7504; 1:21-cv-7493<br><br><br><br>**REDACTED PUBLIC VERSION** |

**KEURIG'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT IN THE *BJ'S* AND *WINN-DIXIE***
**ACTIONS**

1

Pursuant to Federal Rule of Civil Procedure 56, Local Civil Rule 56.1, and Individual Rule of Practice 4(e), Defendant Keurig Green Mountain, Inc. ("Keurig") hereby presents the following statement of material facts as to which there is no genuine issue to be tried.

1. Keurig introduced its first brewing system in 1998.[1]

2. Keurig has invested in research and development and advertising to support adoption of Keurig brewers.[2]

3. Keurig was awarded a patent on the short-filter technology that it developed for its K-Cup portion packs.[3]

4. In September 2012, Keurig's short filter patent expired.[4]

5. Walmart testified that "everybody and their brother" started selling Keurig-compatible packs around the time Keurig's short filter patent expired in 2012.[5]

6. Unlicensed portion pack manufacturers made packs that could be used in the 2.0 Brewer.[6]

---

[1] Ex. 1, Nick Lazaris (Keurig) (Day 1) Tr. 20:24-21:8 ("Keurig was a portion pack system. We launched in 1998.").

[2] Ex. 2, Bob Giacomelli (JBR) (Day 1) Tr. 180:13-182:3 ("I remember seeing James Corden on TV commercials. Q. Was it a good ad campaign from your perspective? A. Very creative and funny.… I'd say a campaign like that has to be at least $10 million…. [T]he fact that Keurig had spent this money on an ad campaign was not only good for Keurig, but it was also good for San Francisco Bay because our products would work in the Keurig brewers"); Ex. 3, David Vermylen (TreeHouse) Tr. 180:6-181:22 (a private label company like TreeHouse will "definitely want a category where you have brand leaders, whether it's one or two or three, who are investing in building consumer awareness, investing in innovation, and driving category growth. I mean, if everyone -- you know, a rising sea lifts all ships."; "Q. So if the brand is investing heavily in promoting the category, TreeHouse rides along with that? A. It's a good thing for the category. Q. Including TreeHouse? A. Including TreeHouse."); Ex. 4, Expert Report of Dr. Kevin Murphy (BJ's and Winn-Dixie actions) ("Murphy Rpt.") Ex. 31 (showing Keurig's Research and Development, as well as Variable Marketing, spending between 2010 and 2016).

[3] Ex. 5, U.S. Patent No. 5,325,765 (issued July 5, 1994).

[4] Ex. 5, U.S. Patent No. 5,325,765 (issued July 5, 1994) (expired on September 16, 2012); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 204:21-24 ("Q. Do you recall that Keurig's short-filter patent expired in September 2012? A. I was aware that there was a patent expiring for Keurig in the fall of 2012, yes."); Ex. 7, Expert Report (BJ's) of Dr. Jeffrey Leitzinger ("Leitzinger Rpt. (BJ's)") ¶ 47 (short filter patent expired in September 2012); Ex. 8, Expert Report (Winn-Dixie) of Dr. Jeffrey Leitzinger ("Leitzinger Rpt. (Winn-Dixie)") ¶ 47 (same).

[5] Ex. 9, Walmart (Rosencranz) 30(b)(6) Tr. 40:11-17 ("Q. [W]hich other partners approached Walmart relating to the sale of pods around the time that Keurig's patent was expiring? A. Around this time, it seems like everybody and their brother had a pod that they wanted to offer.").

[6] Ex. 10, Winn-Dixie's Amen. Resp. to RFA No. 142 ("Plaintiffs state that eleven potential suppliers that submitted information in response to the [October 2014] RFI represented that their Portion Packs were compatible with the 2.0 machine."); Ex. 11, WD0276752 (Winn-Dixie (Rice) 30(b)(6) Dep. Ex. 12) (Email from Bobby Moorhead, dated Nov. 7, 2014) (TreeHouse: "We have shown you in person with a

2

7. In 2017, Keurig decided to discontinue producing the 2.0 Brewer.[7]

8. Winn-Dixie is one of the largest supermarket chains in the Southeast United States.[8]

9. Winn-Dixie began selling Keurig-compatible portion packs in 2010.[9]

10. By 2012, when Keurig's short-filter patent expired, "a lot" of Keurig-compatible pack suppliers sought space on Winn-Dixie's shelves.[10]

11. Winn-Dixie regularly reviewed its portion pack choices and adjusted its assortment.[11]

---

2.0 machine hot off the press that our cups function in this new technology"); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 168:16-169:2 ("Q. TreeHouse had demonstrated to Winn-Dixie in person that TreeHouse's portion packs worked in the 2.0 brewer? A. Yes. Q. When did that demonstration happen? A. I can't say for certain, but it would have happened between mid-September 2014 and this date of November 7th, 2014."), 145:17-22 ("Q. Okay. And with respect to Massimo Zanetti, Mother Parkers, Barrie House-slash-Hometown, and TreeHouse, Winn-Dixie's testing of those portion packs did not reveal any packs that did not work in the 2.0 brewer? A. Correct."); Ex. 13, BJ's 30(b)(6) (Day 2) Tr. 466:4-13 ("Q. So BJ's asked portion pack suppliers that participated in the 2016 private-label portion pack bid whether their packs were 2.0-compatible? A. We did. Q. Okay. And portion pack suppliers indicated to BJ's that their packs were 2.0-compatible at that time; right? [objection] A. They did.").

[7] Ex. 14, Keurig Dr. Pepper, 2018 10-K Annual Report, December 31, 2018, at 114, https://www.sec.gov/Archives/edgar/data/1418135/000141813519000007/kdp-10kx12312018.htm ("In August 2017, the Company determined due to shifting demand and strategic priorities that it would stop producing and selling its Keurig K2.0 brewer models."); Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 202:22-25 ("Q. Are you aware that the 2.0 brewer has been discontinued? A. … I do understand that, yes.").

[8] Ex. 16, "About Us," *Southeastern Grocers*, https://www.segrocers.com/aboutus ("Southeastern Grocers Inc. (SEG), parent company and home of . . . Winn-Dixie grocery stores, is an omnichannel retailer and one of the largest conventional supermarket companies in the U.S., serving customers . . . throughout Alabama, Florida, Georgia, Louisiana and Mississippi.").

[9] *See* Ex. 17, Expert Report of Martin A. Asher (Winn-Dixie) ("Asher Rpt.") ¶ 190 (summarizing Winn-Dixie's claimed purchases).

[10] Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 204:7-24 ("a lot of people were coming to [Winn-Dixie] with new opportunities" around the time Keurig's patent expired in 2012), 208:10-15; Ex. 18, ROG001177688 (Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Dep. Ex. 9) (Email from Jo Wilkens, dated Aug. 22, 2012) (Winn-Dixie did not have much interest in JBR's portion packs "with all activity around [Keurig's] patent expiring," and JBR's sales manager acknowledged Winn-Dixie would "have many vendors to choose from as the patents expire"); Ex. 19, ROG001180390 (Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Dep. Ex. 10) (Email from Jo Wilkens, dated Oct. 11, 2012) (JBR's sales manager acknowledging in 2012 that "many companies are now coming out with Single Serve coffee items that will work in Keurig machines"); Ex. 20, ROG001195100-101 (Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Dep. Ex. 12) (Email from Louis Archer, dated Aug. 14, 2013) (Winn-Dixie "expanded the single serve coffee section" in Winn-Dixie and Bi-Lo stores but declined to add JBR's San Francisco Bay and Organic Coffee Co. brand packs).

[11] Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 64:23-65:9 (Winn-Dixie was "regularly reviewing the performance of different items to be able to determine which items were not performing and possibly eliminate to make room for new items."), 65:14-19 ("Q. And in addition to the category reviews, is Winn-

3

12. Winn-Dixie testified that it would "have to take something out to put something in.  So [Winn-Dixie was] regularly reviewing the performance of different items" to determine what options it wanted to cut "to make room for new items."[12]

13. Winn-Dixie declined to buy Keurig-compatible portion packs that suppliers offered to sell to Winn-Dixie.[13]

14. Winn-Dixie's professional buyers received training to help them negotiate with suppliers.[14]

---

Dixie always examining the performance of products in its coffee category? A. Yes, the category manager responsible for the category would review on a regular basis the performance of the category and the items within it."); Ex. 21, Richard Sturgill (Winn-Dixie) Tr. 217:11-25 ("Q. When you were the category manager there were a lot of new portion pack product coming into the category; right? A. Yes. Q. So part of the reason for resetting the coffee category so frequently was to take stock of all the new portion pack products that were on the market? A. Yes, we would need to review the portion packs."), 73:14-16 ("Q. And the variety of portion packs has increased over time? A.  Yes. And you need to allocate additional space to those categories"); Ex. 22, Orlando Leon (Winn-Dixie) Tr. 246:16-247:7 ("Q. You're saying it's not an unusual thing for Winn Dixie to discontinue a portion pack product? A. Exactly. Q. And it's not unusual for Winn Dixie to bring in a new portion pack? A. It's not."); Ex. 23, ROG001992460 (Orlando Leon (Winn-Dixie) Dep. Ex. 13) (Email from Orlando Leon, dated Nov. 14, 2014) ("We discontinued and bring items in everyday. That's what most retailers do.").

[12] Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 64:23-65:9 ("Q. And why did Winn-Dixie look at the total sales of the new portion pack item relative to other items in the category?  A.  To see where the item would rank.  As you continue to get new offerings within the category, space would be limited, unless you were able to find additional space.  So you would have to take something out to put something in. So we were regularly reviewing the performance of different items to be able to determine which items were not performing and possibly eliminate to make room for new items.").

[13] Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 69:21-70:8 ("Q. Okay. So Winn-Dixie met with portion pack suppliers, but those meetings did not always result in Winn-Dixie stocking the portion pack supplier's items? A. Correct."), 222:11-14 (Winn-Dixie chose to stock other unlicensed packs instead of JBR's packs); Ex. 20, ROG001195100-101 (Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Dep. Ex. 12) (Email from Louis Archer, dated Aug. 14, 2013) (Winn-Dixie declined to carry JBR's packs in its banner stores); Ex. 10, Winn-Dixie's Amen. Resp. to RFA Nos. 201-204 (Admitting Winn-Dixie declined to buy packs that TreeHouse offered under the Torani, Skinny Girl, Guy Fieri, and Cake Boss brands because Winn-Dixie did not need additional variety); Ex. 21, Sturgill (Winn-Dixie) Tr. 238:1-240:7 ("Q. Do you know if you ended up purchasing any of these portion packs? A. We did not purchase them, no. Q. Why was that? A. We did not feel that they were necessary at the time. [….] Q. You didn't need to carry any additional portion pack SKUs in the assortment? A. Right. [Objection to form]").

[14] Ex. 21, Sturgill (Winn-Dixie) Tr. 19:3-20:1 ("Q. Did you receive any training for your position as category manager? A. I did, yes. Throughout the years I did, yes. Q. What kind of training?  A. [… ] It was negotiation skills. . . . Q. Did Winn-Dixie use an outside consultant to prepare that training for you? A. They did. . . . Q. Was that negotiation skills training something that all category managers at Winn Dixie received to your knowledge? A. Yes.").

15. Winn-Dixie has negotiated with portion pack suppliers to reduce Winn-Dixie's costs for portion packs.[15]

16. Winn-Dixie has negotiated with portion pack suppliers to obtain increased marketing funds to support retail promotions on portion packs.[16]

17. Winn-Dixie's Keurig-compatible pack suppliers provided promotional funding.[17]

18. In November 2012, Winn-Dixie introduced private label Keurig-compatible portion packs under its Winn & Lovett brand.[18]

---

[15] Ex. 4, Murphy Rpt. ¶ 108, Ex. 28 (cont.) (showing Winn-Dixie's average costs decreasing from $.51 to $.40 per cup from 2012 to 2019); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 64:25-65:9 ("Q. Did Winn-Dixie negotiate with portion pack suppliers to try to secure lower wholesale costs? A. Yes.  Q. Was Winn-Dixie effective in negotiating lower wholesale costs for its private-label portion packs? A. Yes."); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 59:23-60:5 ("Q. Did Winn-Dixie's negotiations with portion pack suppliers lead to lower net costs for Winn-Dixie with respect to portion packs? . . . A. Yes, they did."), 72:16-21 ("Q. Did Winn-Dixie's net costs for portion packs decrease over time? [Objection] A.  Collectively –. . . they did, yes."); Ex. 21, Sturgill (Winn-Dixie) Tr. 38:5-20 ("Q. So what would you negotiate with portion pack suppliers? A. The cost.").

[16] Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 238:3-8 ("[Q.] When you were the director, did you observe that Winn-Dixie was able to negotiate lower prices to Winn-Dixie on portion packs? [Objection] A. Winn-Dixie would be able to negotiate lower net cost through promotional funding."), 256:5-257:15 ("Q. So Winn-Dixie successfully negotiated with Kraft to increase promotional funding on the Kraft portion packs sold at Winn-Dixie. A. For this event, yes. Q…. By achieving the lower promotional funding from Kraft, did that allow Winn-Dixie to secure a higher margin on the Kraft portion packs reflected in this email? A. Yes, for this promotion, it did.").

[17] Ex. 22, Leon (Winn-Dixie) Tr. 262:6-12 ("Q. Was there ever any branded supplier of portion packs that did not provide at least some amount of promotional funding? [objection] A. To my recollection there was none. They all provided promotional funding."); Ex. 21, Sturgill (Winn-Dixie) Tr. 51:11-15 ("Q. Pretty much every week at Winn Dixie stores portion packs were on a promoted reduced retail price? A. There was always something promoted."), 52:22-53:16 ("Q. Can you think of some examples of national brand portion packs that you negotiated funding with? A. Just about every national brand I negotiated…. Green Mountain. I mean we've done a lot of promotions with them. Done a lot with the Smuckers brands, Starbucks. I mean all the major players.").

[18] Ex. 10, Winn-Dixie's Amen. Resp. to RFA No. 109 ("Plaintiffs state that TreeHouse may [sic] first shipped the Private Label Portion Packs in late 2012 or early 2013."); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 99:20-24 ("Q. When did Winn-Dixie first launch its private-label portion packs? [objection] A. At the end of 2012, first part of 2013."); Ex. 24, WD0475630 at 5 (Presentation titled "Bi-Lo Holdings, LLC 2013 Strategic Supplier Business Planning Meeting") (TreeHouse presentation noting Bi-Lo branded packs "shipped Nov 2012"); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 131:24-133:20 ("Q. Did Winn-Dixie consider launching private-label coffee portion packs that didn't have a filter? A. No, I don't believe so…. Q. So the Winn & Lovett portion packs that Winn-Dixie launched sometime in late 2012 had a filter in the portion pack; right? A. That is correct.").

19. TreeHouse supplied all of Winn-Dixie's Winn & Lovett brand private label portion packs from the time they were launched to the time they were discontinued and Winn-Dixie transitioned to its consolidated SE Grocers private label brand portion packs.[19]

20. In 2014, Winn-Dixie rejected Keurig's offer to supply Winn-Dixie's private label portion packs.[20]

21. In October 2014, Winn-Dixie issued a Request for Information ("RFI") from suppliers to supply its private label portion packs, and eleven different Keurig-compatible portion pack suppliers, including Keurig, participated.[21]

22. After its 2014 RFI, Winn-Dixie eliminated Keurig and other suppliers from consideration and did not invite them to participate in the Request for Proposals ("RFP"), the second round of Winn-Dixie's private label selection process.[22]

---

[19] Ex. 10, Winn-Dixie's Amen. Resp. to RFA No. 110 ("TreeHouse supplied all of the Winn & Lovett Private Label Portion Packs from the time they were launched until they were discontinued."); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 117:20-118:1 ("Q. Was TreeHouse Winn-Dixie's only supplier of portion packs under the Winn & Lovett brand? A. Yes, they were."). TreeHouse also supplied the Bi-Lo private label brand "Southern Home" portion packs. Ex. 10, Winn-Dixie's Amen. Resp. to RFA Nos. 111 ("TreeHouse supplied the Southern Home Private Label Portion Packs when they were launched in 2014."), 112 ("TreeHouse supplied all of the Southern Home Private Label Portion Packs from the time they were launched until they were discontinued."); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 50:2-24 (Winn-Dixie transitioned from its Winn & Lovett and Southern Home private label brand portion packs to the consolidated SE Grocers private label brand portion packs in 2017).

[20] Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 388:16-23, 393:14-17 ("Q. Okay. Mr. Archer did not accept Keurig's [2014] offer that Keurig would be the exclusive supplier of Winn-Dixie's private-label portion packs; correct? A. Correct."), 391:13-392:9 ("Q. Winn-Dixie continued to sell TreeHouse-supplied private-label portion packs under its private-label brands; correct? A. Yes, that is correct.").

[21] Ex. 10, Winn-Dixie's Amen. Resp. to RFA No. 141 ("Plaintiffs state that eleven potential suppliers submitted information in response to the [October 2014] RFI."); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 136:7-20 ("Q. Eleven out of 13 participating suppliers submitted responses for single cup coffee; right? A. Yes. Q. And those suppliers are Massimo Zanetti, Hometown Coffee, Mother Parkers, L&K, CLR, Cameron's, Westrock, Distant Lands, Trilliant, Bay Valley, and Green Mountain. Is that right? A. Yes. Q. These 11 suppliers were interested in supplying Winn-Dixie's private-label pack business? A. Yes. Q. These 11 suppliers were competing to supply Winn-Dixie's private-label portion pack business? A. Yes."); Ex. 26, WD0332484 (Winn-Dixie (Rice) 30(b)(6) Dep. Ex. 6A & B) (Presentation titled "2014 Coffee RFI," dated Oct. 30, 2014).

[22] Ex. 10, Winn-Dixie's Amen. Resp. to RFA No. 145 ("Winn-Dixie issued an RFP for its Private Label coffee business in November 2014."); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 121:1-5 ("Q. Winn-Dixie issued the RFP for the private label coffee business in November 2014; right? A. Yes."), 127:4-6 ("Q. Keurig was eliminated between the 2014 RFI and the 2014 RFP. A. Correct."); Ex. 26, WD0332484 at 492 (Winn-Dixie (Rice) 30(b)(6) Dep. Ex. 6A & B) (Presentation titled "2014 Coffee RFI," dated Oct. 30, 2014) (recommending suppliers to drop from selection process).

23. From 2014 to 2016, TreeHouse continued to be Winn-Dixie's sole private label Keurig-compatible pack supplier.[23]

24. In 2016, Winn-Dixie chose Barrie House to replace TreeHouse as the supplier of its private label Keurig-compatible packs.[24]

25. Winn-Dixie calculated that switching from TreeHouse to Barrie House to supply its private label portion packs would reduce Winn-Dixie's costs by 26%.[25]

26. Barrie House's product received a better ranking in Winn-Dixie's quality-assurance evaluation than TreeHouse's product.[26]

---

[23] Ex. 10, Winn-Dixie's Amen. Resp. to RFA No. 110 ("TreeHouse supplied all of the Winn & Lovett Private Label Portion Packs from the time they were launched until they were discontinued."); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 117:20-118:1 ("Q. Was TreeHouse Winn-Dixie's only supplier of portion packs under the Winn & Lovett brand? A. Yes, they were."); Ex. 10, Winn-Dixie's Resp. to RFA Nos. 111 ("TreeHouse supplied the Southern Home Private Label Portion Packs when they were launched in 2014."), 112 ("TreeHouse supplied all of the Southern Home Private Label Portion Packs from the time they were launched until they were discontinued."); Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 391:24-392:9 ("Q. From 2012 through some point in 2017 Winn-Dixie continued to . . . sell TreeHouse-supplied private-label portion packs …. A. Yes, that is correct. Q. At no point during that time did Winn-Dixie sell a Keurig-supplied private-label portion pack; correct? A. That is correct."); Ex. 4, Murphy Rpt. Ex. 28 (cont.) (showing that Winn-Dixie purchased private label portion packs only from TreeHouse in 2014 to 2016).

[24] Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 211:24-213:12, 232:18-233:5 ("Q. Just to recap, then: After the RFP process that extended through 2016, Winn-Dixie awarded its private-label portion pack business with Barrie House; right? A. Yes."); Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 513:8-17 ("Q. Now, Mr. Mullinax, at one point in time Barrie House won the private-label portion pack business at Winn-Dixie; correct? A. Yes, that is correct. Q. And so Winn-Dixie replaced TreeHouse with Barrie House as its supplier of private-label portion packs; correct? A. Yes, that is correct. Q. And that happened sometime in 2017? A. Yes, thereabouts."); Ex. 10, Winn-Dixie's Amen. Resp. to RFA Nos. 113 ("Barrie House supplied Winn-Dixie's Private Label Portion Packs beginning in 2017."), 155 ("Winn-Dixie entered into a two-year agreement with Barrie House for the supply of Private Label Portion Packs effective August 1, 2017.").

[25] Ex. 27, WD0270560 at 4 (Winn-Dixie (Rice) 30(b)(6) Dep. Ex. 23) (Email from Shea Clark, dated Jan. 3, 2017) (attachment showing savings of $1,054,326 (26%) on portion pack costs by switching to Barrie House); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 231:3-23 ("Q… [S]ince you validated the costs, then does that mean that you are confident the cost savings are accurate? A. Yes."), *see also id.* at 226:18-22 ("Q. Comparing TreeHouse's wholesale price offer to Barrie House's wholesale price offer, for every SKU that was included in the RFP, Barrie House bid a lower wholesale price to Winn-Dixie; is that right? A. Yes."); Ex. 4, Murphy Rpt., ¶ 110 (in 2016, Winn-Dixie paid an average of ███ for TreeHouse private label portion packs; in 2017, Winn-Dixie paid an average of about $.22 for Barrie House private label portion packs).

[26] Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 209:22-211:2 ("Q. TreeHouse was ranked fifth out of five samples that were included in the quality-assurance evaluation? A. Yes. Q. Barrie House had a better ranking than TreeHouse in the Green Mountain Breakfast Blend match analysis? A. Yes. … Q. Moving to the Green Mountain Donut Shop match: TreeHouse's sample ranked third out of four samples? A. Yes. Q. Barrie House had a better ranking than the TreeHouse sample? A. Yes."); Ex. 28, WD0275685 at 86-

7

27. Keurig has never supplied Winn-Dixie's private label portion packs.[27]

28. Between 2012 to 2019, Winn-Dixie bought portion packs from at least 15 unlicensed suppliers.[28]

29. In 2019 Winn-Dixie bought approximately 48% of its portion packs from unlicensed suppliers and approximately 38% from Keurig partner brands.[29]

30. In 2019, Winn-Dixie bought less than 14% of its Keurig-compatible portion packs from Keurig.[30]

---

87 (Winn-Dixie (Rice) 30(b)(6) Dep. Ex. 16) (Email from Isabelle Zaffke, dated Dec. 16, 2015) (email attaching results of quality assurance evaluation report).

[27] Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 245:12-14. ("Q. Winn-Dixie has never entered into a private-label contract with Keurig for portion packs; is that right? A. That is correct. Q. Keurig has never supplied Winn-Dixie with private-label portion packs? A. That is correct."); Ex. 21, Sturgill (Winn-Dixie) Tr. 114:17-20 ("Q. So to your knowledge has Winn Dixie ever partnered with Keurig as a private label supplier for its portion packs? A. To my knowledge they have not."); Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 391:24-392:9 ("Q. From 2012 through some point in 2017 Winn-Dixie continued to . . . sell TreeHouse-supplied private-label portion packs …. A. Yes, that is correct. Q. At no point during that time did Winn-Dixie sell a Keurig-supplied private-label portion pack; correct? A. That is correct."), 524:4-8 ("Q. Since Barrie House won the private-label portion pack business at Winn-Dixie in 2017, has it continuously supplied those portion packs to this day? A. Yes, it has."); Ex. 4, Murphy Rpt. Ex. 28 (showing that Keurig never supplied private label portion packs to Winn-Dixie); Ex. 29, Leitzinger (Mar. 17, 2023) Tr. 127:3-14 ("Q. Are you aware that Winn-Dixie never used Keurig to supply private-label portion packs? [Objection] A. I think I am aware of that, yes. I think I heard that from my team. Q. And you can see that in the transactional data being reflected here; correct? There's no private-label purchase by Winn-Dixie from Keurig; correct? [Objection] A. It's true, I don't see any licensed private label in the Keurig box, that's correct.").

[28] Ex. 4, Murphy Rpt. Ex. 28 (Winn-Dixie purchase data show that it bought unlicensed packs from Barrie House, TreeHouse, Distant Lands, Massimo Zanetti, Jammin Java, Barnie's, Copper Moon, Two Rivers, JBR, Gavina, Red Diamond, Westrock, CLR Roaster, Melitta, and also from Kraft, New England, and Reily when they had no relationship with Keurig). *See also* Ex. 10, Winn-Dixie's Amen. Resp. to RFA Nos. 34-35, 38-40, 44 (suppliers include: TreeHouse, Barrie House, Massimo Zanetti, JBR, Distant Lands, Westrock); Ex. 30, Winn-Dixie Resp. to Interrogatory No. 1 (Single Cups, Gesol, Coffee Bean International); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 34:17-19, 38:8-9, 39:13-15 (TreeHouse, JBR, Distant Lands); Ex. 22, Leon (Winn-Dixie) Tr. 108:24-109:6, 110:6-11, 110:17-21, 115:16-20 (Mother Parkers, Trilliant, Barrie House, Massimo Zanetti, Barnie's Coffee); Ex. 21, Sturgill (Winn-Dixie) Tr. 93:8-11 (Copper Moon).

[29] Ex. 4, Murphy Rpt. ¶ 418, Ex. 28 (cont.) (showing that in 2019, Winn-Dixie purchased 72,002,000 portion packs in total, and that 34,620,000 of those purchases were from unlicensed portion packs. 34,620,000 / 72,002,000 = 48.1%), (showing that 27,478,000 of Winn-Dixie's 2019 purchases were from Partner brands. 27,478,000 / 72,002,000 = 38.16%).

[30] Ex. 4, Murphy Rpt. Ex. 28 (cont.) (showing that, in 2019, Winn-Dixie purchased 72,002,000 portion packs in total, and that 9,905,000 of those purchases were from Keurig. 9,905,000 / 72,002,000 = 13.76%).

31. BJ's Wholesale Club is a warehouse club that operates more than 230 stores and makes nearly $20 billion in annual revenue.[31]

32. BJ's chose a limited SKU business model under which it offers a limited selection of products within each category, and aims to sell those products at high volume.[32]

33. BJ's members pay a fee to shop at BJ's and expect to pay lower prices when they shop there.[33]

34. BJ's offers large package sizes ("club packs") to try to provide savings to BJ's shoppers.[34]

35. BJ's strategy of selling fewer SKUs allows it to secure lower costs from suppliers.[35]

---

[31] Ex. 31, BJ's Wholesale Club Holdings, 2023 10-K Annual Report, January 28, 2023, at 8, 36, https://investors.bjs.com/financials-and-filings/sec-filings/sec-filings-details/default.aspx?FilingId=16496197 (showing total revenues of $19,315,165,000 for the fiscal year ending Jan. 28, 2023, and stating that "[a]s of January 28, 2023, [BJ's] operated 235 clubs.").

[32] Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 102:13-103:6, 121:3-4 ("We're a limited-SKU environment, so if a new SKU comes in, an old SKU goes out."); Ex. 33, Melissa O'Brien (BJ's) Tr. 80:13-81:11 ("Q. Does a warehouse club typically carry fewer SKUs than a grocery store? [Objection] A. Yes.  Q. Is that true for the coffee category in particular? [Objection] A. Yes. Q. Its BJ's' goal to sell each SKU at a high volume? A. Yes. Q. Selling a narrower assortment of SKUs at a higher volume is part of BJ's business model? [Objection] A. Yes."); Ex. 34, Michael Coppola (BJ's) Tr. 48:9-17 ("Q. Okay. So BJ's sells a narrower range of SKUs than a grocery store? A. Yes. Q. Does it aim to sell each SKU at a high volume? A. Yes. Q. Selling fewer SKUs at a higher volume is part of BJ's business model? A. Yes.").

[33] Ex. 34, Coppola (BJ's) Tr. 119:8-15 ("Q. BJ's club members pay a membership fee in order to shop at BJ's; right? A. Yes."); Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 113:21-23 ("[Q.] BJ's members expect better value in return for their membership fee?  A. They do.").

[34] Ex. 35, Mark Griffin (BJ's) Tr. 58:17-25 ("Q Let's take a step back. So BJ's offers portion packs in a high count size, like 100 count portion packs; is that right? A. Correct. Q. And earlier you mentioned that grocery stores tend to offer smaller count size portion packs. Did I get that right? A. Correct."), 61:2-18 ("[Q.] So when you're referring to the club, the store is trying to offer value to members, that's a lower price to the member for the item relative to what they would get at a grocery store? A. I think relative to, yeah, what they could get anywhere, yes. Q. Anywhere else, not just grocery stores? A. Yes. Q. And so is that part of BJ's business model, to offer high count or bulk size items in order to offer a price that is a value compared to other channels? A. I -- my opinion, yes, that is a premise that BJ's strives for."); Ex. 36, "Investor Relations," *BJ's*, https://investors.bjs.com/home/default.aspx ("[BJ's delivers] significant value to members, consistently offering 25% or more savings on a representative basket of manufacturer-branded groceries compared to traditional supermarket competitors.").

[35] Ex. 13, BJ's 30(b)(6) (Day 2) Tr. 286:6-287:23 ("Q…[I]n terms of different strategies for negotiating with coffee suppliers. You said through assortment could be one strategy. Right? A. Yes. Q. As an example of using assortment to negotiate with suppliers, did BJ's offer a greater SKU assortment to a specific supplier in exchange for lower wholesale price to BJ's for those products? [Objection] A. We have, yes. Q. Okay. So an example with respect to portion packs would be if a supplier currently had one portion pack SKU in BJ's assortment and it wanted to introduce a second SKU in BJ's portion pack assortment. Would that be an example of using assortment to negotiate with suppliers? [Objection] A.

36. A traditional supermarket like Winn-Dixie carries hundreds of portion pack varieties, but BJ's typically carries twenty or fewer.[36]

37. BJ's vice president who oversaw portion pack sales believed that ███████████ ████████████████████████████████████████████████████[37]

38. BJ's has successfully negotiated with Kraft to reduce BJ's costs for portion packs.[38]

---

That is an example, yes."; "Q. What would BJ's expect in terms of wholesale pricing from that supplier? [Objection] A. We would expect a total value across the portfolio from the vendor. Q. What do you mean by 'total value across the portfolio'? A. So it can be either lower cost, it could be more promotional activity, it could be off-invoice. There's a couple of different ways we could look at the total value.").

[36] Ex. 37, WD0036240 at 44 (Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Dep. Ex. 17) (Email from Cassie McGill, dated Apr. 1, 2016) (spreadsheet showing Winn-Dixie's assortment of more than 190 portion packs); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 251:2-11 ("Q. So this spreadsheet shows more than 190 different portion pack SKUs in Winn-Dixie's coffee assortment at the time of this K-Cup Bonanza; right? A. Yes, it would appear so. Q. That's a large variety of portion packs. Would you agree? [Objection] A. It's -- I mean, there are a lot of items here, yes."); Ex. 38, BWCI0038939 (Email from Colin Galle, dated July 5, 2017) ("[E]ach [BJ's] club has a minimum of 14 k-cup slots (12 aisle and an additional 2 endcap) with 99 clubs having 20 k-cup slots."); Ex. 33, O'Brien (BJ's) Tr. 80:13-21 ("Q. Does a warehouse club typically carry fewer SKUs than a grocery store?  [objection] A. Yes.  Q. Is that true for the coffee category in particular?  [objection] A. Yes."); *see also* Ex. 39, Coppola (BJ's) Dep. Ex. 6 at 6 (BJ's Wholesale Club Holdings, 2022 10-K Annual Report, January 29, 2022, https://investors.bjs.com/financials-and-filings/sec-filings/sec-filings-details/default.aspx?FilingId=15665011) ("Warehouse clubs offer a relatively narrow assortment of food and general merchandise items within a wide range of product categories.  In order to achieve high sales volumes and rapid inventory turnover, merchandise selections are generally limited"), *id.* at 7-8 (BJ's "limit[s] the items offered in each product line to fast selling styles, sizes and colors, carrying approximately 7,000 core active stock keeping units ('SKUs') . . . By contrast, supermarkets normally carry an average of 40,000 SKUs, and supercenters may stock 100,000 SKUs or more.").



[37] Ex. 40, BWCI0233236 (Coppola Dep. Ex. 15) ███████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ Ex. 34, Coppola (BJ's) Tr. 207:15-208:13 ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

[38] Ex. 33, O'Brien (BJ's) Tr. 109:1-14 ████████████████████████████████████████████ ████████████████████ 110:5-14 █████████████████████████████████████████████████████ ████████████████████ 117:1-16 █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████ ████████████████████ Ex. 41, BJ's Resp. to RFA No. 189 ████████████████████████████ ████████████████████████████████████████████████████████████████████████████████

39. BJ's monitored sales performance and replaced lower performing portion packs with better performing packs.[39]

40. BJ's negotiated with at least 20 suppliers of Keurig compatible portion packs.[40]

41. BJ's hired the Boston Consulting Group to help BJ's professional buyers negotiate better deals with portion pack suppliers and to help BJ's choose which portion packs to include in its assortment.[41]



Ex. 41, BJ's Resp. to RFA No. 190

Ex. 13,

BJ's 30(b)(6) (Day 2) Tr. 355:9-14

356:6-17

357:19-24

[39] Ex. 33, O'Brien (BJ's) Tr. 77:24-78:7 ("Q. And how did you attempt to increase sales volume? A. By optimizing the assortment of products that we sold. Q. What do you mean by 'optimizing the assortment'? A. So ensuring that we were selling the most productive items, replacing low-performers with better-performing items."), 78:11-18 ("Q. If BJ's can replace a low-performing item with a higher-performing item, it would do that? [objection] A. Yes. Q. Did you, in fact, do that when you were the category merchant for coffee? A. Yes."), 112:12-15 ("Q. How did BJ's decide that it might make major discontinuations in its coffee assortment? A. We would look at sales performance and profitability."), 188:15-21 ("Q. Why would BJ's discontinue a product that has poor sales performance? A. To replace it with a more – a better performing item."); Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 119:7-13 ("Q. Based on the characteristics of that coffee item in particular, if it is not meeting sales expectations, then BJ's would discontinue it? [objection] A. That would be a factor, yes.").

[40] Ex. 42, BJ's Resp. to Interrogatory No. 1 (BJ's "regularly interacted and negotiated with": Abstract Coffee, Bucks County Coffee, Café Vittoria, Cameron's Coffee, Cascade Coffee, Comfort Foods, IMS Int'l/Trilliant, Intelligent Blends, Massimo Zanetti, Mother Parker's Coffee, Roger's Family Coffee, Tree House/Bay Valley, White Coffee Corporation, Private Label Coffee, Specialty Java, Sollo Cup, Empire Coffee, Paramount Roasters, S & D Coffee, Club Coffee, Conagra); *see also* Ex. 41, BJ's Resp. to RFA Nos. 1-18, 24-26, 28-32, 34-37 (portion pack suppliers include: Abstract Coffee, Bucks County Coffee, Café Vittoria, Cameron's Coffee, Cascade Coffee, Trilliant, Intelligent Blends, Massimo Zanetti, Mother Parker's Coffee, JBR/Roger's Family Coffee, Tree House, White Coffee, Private Label, Specialty Java, Sollo Foods, Inc., Empire Coffee Co., Paramount Roasters, S&D Coffee, Eximius, Papa Nicholas, Distant Lands, Java Hill, Joe's Garage, TazzaPronto, Magnum Coffee Roastery, Westrock Coffee, Two Rivers Coffee, Barrie House, Pod Pack International, F. Gavina & Sons); Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 96:8-19 (at least 16 unlicensed firms entered between September 2010 and August of 2014).

[41] Ex. 41, BJ's Resp. to RFA Nos. 167-68 ("Plaintiff admits that Boston Consulting Group at times has provided information to BJ's in relation to its coffee assortment."); Ex. 33, O'Brien (BJ's) Tr. 103:5-11 ("Q. So BCG would provide information to help BJ's make decisions as part of its category review? A. Yes. Q. BCG would provide information to BJ's to help BJ's decide on the assortment of coffee products it offered? A. Yes."); Ex. 13, BJ's 30(b)(6) (Day 2) 289:1-9 Tr. ("Q. Did BJ's work with outside

42. BJ's used Boston Consulting Group's assistance to successfully secure lower portion pack prices.[42]

43. BJ's considered discontinuing a portion pack from its assortment if the supplier did not meet BJ's requirements on price.[43]

44. BJ's considered reducing the assortment of portion packs it offers from a supplier if the supplier did not negotiate with BJ's on promotional funding of portion packs.[44]

45. .[45]

46. ███████████████████████████████████████████.[46]

---

consultants to prepare for negotiations with portion pack suppliers? [Objection] A. Yes. Q. Which outside consultants? A. Boston Consulting Group.").

[42] Ex. 13, BJ's 30(b)(6) (Day 2) Tr. 289:15-290:6 ("Q. This support [from the Boston Consulting Group] helped BJ's negotiate lower wholesale prices from coffee suppliers? [objection] A. It helped negotiate total value from suppliers. A. And by 'total value' you're referring to lower wholesale prices in part; right? [objection] A. Yes, that would be a component. Q. And another component of negotiating better total value from coffee suppliers would be increased promotional funding from coffee suppliers; right? A. Yes. Q. And another component of negotiating better total value from coffee suppliers could include off-invoice discounts to BJ's; right? A. Yes.").

[43] Ex. 33, O'Brien (BJ's) Tr. 158:6-9 ("Q. Was it true that BJ's would consider dropping the ████████ ████████████████ did not make the cost improvements that BJ's requested? A. Yes."); Ex. 44, BWCI0302962 at 964 (O'Brien (BJ's) Dep. Ex. 10) (Email from ████████, dated June 7, 2017) ("If ████████████████████████████████████████████████████████ Ex. 34, Coppola (BJ's) Tr. 51:20-24 ("Q. Will BJ's replace an item within its coffee category assortment if it finds a product at a better price and quality combination? [objection] A. Yes."); Ex. 43, BWCI0060333 at 343 (Coppola (BJ's) Dep. Ex. 2) (Email from Julie Kozeracki, dated Dec. 11, 2015) ("In order to remain competitive with other vendors, Keurig Green Mountain must improve the profitability of its remaining national brand SKUs, or face discontinuation.").

[44] Ex. 33, O'Brien (BJ's) Tr. 69:4-9 ("Q.…with respect to all of the other promotions that we've discussed, BJ's wants suppliers to fund as much as the supplier is willing to fund? [objection] A. Yes."), 75:1-7 ("Q. If a supplier refused to negotiate with BJ's on promotional funding, would BJ's consider reducing the assortment of products that it offers from that supplier? [objection] A. Yes.").

[45] Ex. 33, O'Brien (BJ's) Tr. 160:22-161:3 ("Q. ████████████████████████████████ ████████████████ A. Yes. Q. At this point in the negotiations, you were ████████████ ████████████████████████

[46] Ex. 33, O'Brien (BJ's) Tr. 170:21-171:5 ("Q. Do you think that the deal that you negotiated with ████████████ was a success? [Objection] A. Yes. Q. Why was it a success? A. ████████████ ████████████████████████

47. BJ's has successfully negotiated with Keurig to reduce BJ's costs for portion packs.[47]

48. From 2012 to 2019, BJ's average cost for Keurig-compatible portion packs decreased from $.43 to $.36 per portion pack.[48]

49. From 2012 to 2019, Winn-Dixie's average costs for Keurig-compatible portion packs decreased from $.51 to $.40 per portion pack.[49]

50. BJ's experienced "tremendous growth" in its Keurig-compatible portion pack sales.[50]

51. In 2014 BJ's launched its own private label Wellsley Farms portion packs, which were manufactured by Keurig.[51]

52. In 2015, BJ's purchased ▮▮▮▮▮▮ private label portion packs from Keurig, and its purchases more than doubled the following year.[52]

53. BJ's replaced national brand portion packs with BJ's private label packs.[53]

---

[47] Ex. 33, O'Brien (BJ's) Tr. 216:24-217:11 ("Q. Were you effective in negotiating price with Keurig regarding private-label portion packs that it supplied to BJ's? [Objection] A. Yes. Q. You negotiated the price down for BJ's private-label portion packs that were supplied by Keurig? [Objection] A. Yes.").

[48] Ex. 4, Murphy Rpt. ¶ 102, Ex. 27 (showing BJ's average portion pack costs decreasing from $.43 to $.36 from 2012 to 2019).

[49] Ex. 4, Murphy Rpt. ¶ 108, Ex. 28 (showing Winn-Dixie's purchase volume increasing from 9 million to 72 million portion packs and average cost per pack decreasing from $.51 to $.40); Ex. 29, Leitzinger (Mar. 17, 2023) Tr. 44:18-25 ("Q. Winn-Dixie's average cost per portion pack fell from 51 cents in 2012 to 40 cents in 2019; correct? A. Again, consistent, as we were discussing before, with the BJ's exhibit, I haven't gone behind the numbers here. I will say that that's what – it is correct that that's what Dr. Murphy reports in this -- in this exhibit."); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 72:16-21 ("Q. Did Winn-Dixie's net costs for portion packs decrease over time? [Objection] A. . . . they did, yes.").

[50] Ex. 44, BWCI0302962 at 964 (O'Brien (BJ's) Dep. Ex. 10) (Email from John Rehm, dated June 7, 2017) ("the single-serve coffee category has seen tremendous growth at BJ's"); Ex. 33, O'Brien (BJ's) Tr. 155:15-156:3 (testifying that single-serve coffee at BJ's grew 17% in the prior two years (approx. 2014 to 2016), and over 35% in the prior four years (approx. 2012 to 2016)).

[51] Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 144:2-4 ("Q. BJ's launched private-label portion packs under the brand name Wellsley Farms? A. We did."); Ex. 4, Murphy Rpt. Ex. 27 (showing BJ's Private Label sales started in 2014 with Keurig as the manufacturer). *See also* Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 182:4-12 ("Q. BJ's selected Keurig as the supplier for BJ's private-label portion packs by August 2013? A. We did.").

[52] *See* Ex. 4, Murphy Rpt. Ex. 27 (showing that BJ's purchased ▮▮▮▮▮▮ private label portion packs in 2015, and nearly ▮▮▮▮▮ in 2016). *See also* Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 98:9-14 ("[Q.] Has BJ's unit sales of portion packs increased over time? A. During the relevant period, my understanding would be we sold more portion packs at the end of the period than at the start of the period.").

[53] Ex. 34, Coppola (BJ's) Tr. 190:9-192:21, 196:16-197:5 (BJ's Wellsley Farms private label portion packs won sales away from Keurig's Green Mountain brand portion packs); Ex. 45, BWCI0059688 (Coppola (BJ's) Dep. Ex. 20) (Email from Peter Poutre, dated Oct. 27, 2015) ("This will also allow us to

54. In 2016, BJ's held an auction in which ███ suppliers competed to supply its private label portion packs.[54]

55. From 2014 to 2019, the price BJ's paid for private label packs from Keurig decreased by ███.[55]

56. The volume of Keurig-compatible portion packs sold has tripled between 2012 and 2019.[56]

57. From 2012 to 2019, average retail prices of Keurig-compatible portion packs have decreased by 20 percent from $0.62 to $0.47.[57]

---

replace [National Brand] items with the line extension adding up to more savings for the category"); Ex. 34, Coppola (BJ's) Tr. 242:22-243:8 ("Q. So BJ's was planning to replace national-brand portion packs with its extended line of private-label portion packs? A. That would be a fair assumption."); Ex. 33, O'Brien (BJ's) Tr. 114:17-21 ("Q. Does BJ's private-label brand portion packs compete against Maxwell House portion packs? [objection] A. Yes."); Ex. 46, BWCI0335423 (O'Brien (BJ's) Dep. Ex. 15) (Email from Melissa O'Brien, dated Apr. 5, 2016) ("[Wellsley Farms ("WF")] Columbian replaces G Mtn Columbian, WF Breakfast Blend replaces G Mtn Donut House, WF Hazelnut / French Vanilla replaces Grove Square Flavored Rotation, … WF Newmans Knock off will replace Grove Square Cappucino").

[54] Ex. 47, Lisa Morton (BJ's) Tr. 58:6-18 ("Q. So there are ███ suppliers that participated in the [2016] RFP process? A. Yes."), 68:7-69:8 (testifying that Keurig made price offers to BJ's, so a total of ███ suppliers made price offers to BJ's for its private label portion packs in 2016), 139:21-140:5 (same); Ex. 48, BWCI0008064-65 (Morton (BJ's) Dep. Ex. 1) (Email and attached spreadsheet from Lisa Morton, dated Mar. 21, 2016) (showing ████████████████████████████████████████ ██████████████████████████████████████████ .

[55] Ex. 4, Murphy Rpt. Ex. 60 (showing that BJ's paid an average of ████ for Keurig's private label portion packs in 2014 and ████ in 2019).  *See also* Ex. 33, O'Brien (BJ's) Tr. 216:24-217:11 ("Q. Were you effective in negotiating price with Keurig regarding private-label portion packs that it supplied to BJ's? [Objection] A. Yes. Q. You negotiated the price down for BJ's private-label portion packs that were supplied by Keurig? [Objection] A. Yes."); Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 250:5-9 ("Q. So as part of the negotiation for this 2016 agreement with Keurig for private-label portion packs, BJ's secured a lower wholesale price from Keurig; right? A. Correct. Q. In addition to securing a lower wholesale price, BJ's negotiated to have that lower price effective earlier than before the contract terminated? [Objection] A. Yes.").

[56] Ex. 4, Murphy Rpt. Figure 2 (showing unit sales of compatible packs increasing from 2012 to 2019); Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 80:8-17 ("Q. Murphy figure 2 also shows output of Keurig compatible portion packs increasing from a little bit over 3 billion cups per year in 2012 to nearly 12 billion cups per year in 2019. Do you see that? A. Yes. Q. Is it fair to say that output of Keurig compatible cups has nearly quadrupled between 2012 and 2019? A. Yes.").

[57] Ex. 4, Murphy Rpt. Figure 2 (showing average retail prices of Keurig-compatible portion packs decreasing from 2012 to 2019); Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 79:10-22 ("Q. [Murphy] Figure 2 shows average Keurig compatible portion pack prices falling from around $.62 per cup in 2012 to around $.47 per cup in 2019. Do you see that? A. Yes. Q. Do you have reason to dispute the data presented in Murphy figure 2? A. No, I – I don't … they seem generally consistent with – with what I understand to have happened both to volumes and cup prices … over time.").

14

58. From 2012 to 2019, Winn-Dixie's annual purchasing volume increased from approximately 9 million to approximately 72 million portion packs.[58]

59. From 2012 to 2019, BJ's annual purchasing volume increased from approximately 196 million to approximately 306 million.[59]

60. More than a dozen unlicensed suppliers secured all the inputs they needed to manufacture Keurig-compatible portion packs. [60]

61. Sales of unlicensed Keurig-compatible portion packs expanded from around 300 million packs in 2012 to around 2.5 billion Keurig-compatible packs in 2019.[61]

62. Winn-Dixie has only used unlicensed suppliers to produce its private label brands.[62]

---

[58] Ex. 4, Murphy Rpt. ¶ 108, Ex. 28 (showing Winn-Dixie's purchase volume increasing from 9 million to 72 million portion packs and average cost per pack decreasing from $.51 to $.40); Ex. 29, Leitzinger (Mar. 17, 2023) Tr. 44:9-13 ("Q. Winn-Dixie's purchases of Keurig-compatible portion packs grew from roughly 9 million packs in 2012 to approximately 72 million Keurig-compatible portion packs in 2019; correct? A. Yes."); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 72:2-5 ("Q. Did Winn-Dixie's portion pack sales increase over time? [Objection] A. Yes, they did."); Ex. 22, Leon (Winn-Dixie) Tr. 40:5-16 ("Q. So Winn Dixie's portion pack sales increased over time? A. Yes."); Ex. 21, Sturgill (Winn-Dixie) 47:24-48:1 ("But you did increase the portion pack sales at Winn Dixie when you were the category manager? A. Yes.").

[59] Ex. 4, Murphy Rpt. ¶ 102, Ex. 27 (showing BJ's purchase volume increasing from 196.8 million to 306.6 million); Ex. 31, BJ's 30(b)(6) Tr. (Day 1) 98:9-14 ("[Q.] Has BJ's unit sales of portion packs increased over time? A. During the relevant period, my understanding would be we sold more portion packs at the end of the period than at the start of the period."); Ex. 29, Leitzinger (Mar. 17, 2023) Tr. 42:25-43:9 ("Q. As you sit here today, do you have any reason to dispute that the prices BJ's paid for portion packs decreased from 2012 to 2019? [Objection] A. No, I don't. Q. And as you sit here today, do you have any reason to dispute that the volume of Keurig-compatible portion packs that BJ's purchased increased from 2012 to 2019? A. No, I don't.").

[60] Ex. 4, Murphy Rpt. ¶ 78 ("There are at least 20 different unlicensed suppliers that have supplied portion packs after the expiration of Keurig's short-filter patent."); Ex. 4, Murphy Rpt. Ex. 36 (showing unlicensed retail sales of 250 million in 2012 and 2.5 billion in 2019); Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 96:8-19 (at least 16 unlicensed firms entered between September 2010 and August of 2014).

[61] Ex. 4, Murphy Rpt. Ex. 36 (showing unlicensed retail sales of 250 million in 2012 and 2.5 billion in 2019).

[62] Ex. 21, Sturgill (Winn-Dixie) Tr. 114:21-24 ("Q. To your knowledge Treehouse and Barrie House are the only portion pack suppliers to provide private label portion packs to Winn Dixie? A. Correct."); Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 391:24-392:9 ("Q. From 2012 through some point in 2017 Winn-Dixie continued to . . . sell TreeHouse-supplied private-label portion packs …. A. Yes, that is correct. Q. At no point during that time did Winn-Dixie sell a Keurig-supplied private-label portion pack; correct? A. That is correct."), 524:4-8 ("Q. Since Barrie House won the private-label portion pack business at Winn-Dixie in 2017, has it continuously supplied those portion packs to this day? A. Yes, it has.").

63. For a 52-week period ending August 19, 2015, Winn-Dixie's private label portion packs had the highest dollar sales of any portion pack sold by Winn-Dixie.[63]

64. From 2016 to 2019, Winn-Dixie purchased more private label portion packs each year than any other brand of portion pack in Winn-Dixie's assortment.[64]

65. JBR declined to bid in BJ's 2016 private label auction and called BJ's process a "lowball auction."[65]

66. After BJ's 2016 private label auction, BJ's decided to move forward to the tasting evaluation with the "top three to five" suppliers.[66]

---

[63] Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 301:23-303:10 ("Q. Winn-Dixie's private-label portion packs had the highest dollar sales of any portion pack sales at Winn-Dixie banner stores for [the 52-week period leading up to August 19, 2015]; is that right? [Objection] A. That's what the data would indicate. . . . Q. Do you have any reason to doubt that that is accurate? [Objection] A. I have no reason to doubt."); Ex. 49, WD0414195 at 198 (Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Dep. Ex. 24) (Email from Scott Cummings, dated Oct. 28, 2015) (showing that Winn-Dixie's own brand private label portion pack had $4,159,188 in sales in the 52-week period leading up to August 19, 2015, higher than any other portion pack in Winn-Dixie's assortment – *see* "Own Brand" entry under "Single Serve – Coffee" in table); *see also* Ex. 22, Leon (Winn-Dixie) Tr. 162:18-164:10 ("[Q.] From the time period of the 21 weeks ending December 21, 2014 by every metric the Winn & Lovett private label portion packs were outselling every other brand of portion pack? [Objection] [A.] That's what it shows, yes.").

[64] Ex. 4, Murphy Rpt. Ex. 28 (showing that: (a) in 2016, Winn-Dixie purchased a higher number of TreeHouse-supplied private label portion packs than any other portion packs sold by Winn-Dixie); (b) in 2017, Winn-Dixie purchased more private label portion packs (from TreeHouse and Barrie House) than from any other portion pack brand; and (c) in 2018 and 2019, Winn-Dixie purchased more private label portion packs from Barrie House than any from any other brand.).

[65] Ex. 41, BJ's Resp. to RFA No. 276 ("Plaintiff admits that JBR did not participate in BJ's 2016 Private Label RFP."); Ex. 50, ROG001924426 at 426-27 (Morton (BJ's) Dep. Ex. 12) (Email from Jim Rogers, dated Mar. 1, 2016) ("[W]e do not participate in auctions.… We will not produce 'me too' products, and will not participate in a 'lowball' auction. So … we must respectfully decline your RFP."); Ex. 47, Morton (BJ's) Tr. 104:9-13 (discussing ROG001924426) ("Q. So Rogers decided not to participate in BJ's private-label RFP process in March 2016? [Objection] A. It seems like he declined to participate in the RFP."); *see also* Ex. 51, Jim Rogers (JBR) (Feb. 12, 2019) Tr. 163:8-20 (BJ's asks "the bidders who are still in the [BJ's RFP] process to compete online and, and, basically, lowball you. They -- you start bringing your price down, down, down, down, until they will choose someone. They don't take into account distribution, quality, anything else. It's just price, price, price.").

[66] Ex. 13, BJ's 30(b)(6) (Day 2) 319:2-320:15 ("Q. And because BJ's would have to do multiple cuttings with that many samples at that time, you recommended narrowing down the field of suppliers that were in consideration before doing the cutting; is that right? A. I did. Q. And did BJ's in fact narrow down the suppliers that were under consideration before performing that cutting? A. I believe we did."); Ex. 52, BWCI0003726 (Morton (BJ's) Dep. Ex. 18) (Email from Scott Willliams, dated Mar. 8, 2016) ("Based on the number of samples in my office we will need to do a cutting to narrow down the field. We can not cut this many coffees (palate fatigue). I think we should run the auction, narrow the field to the top 3-5 and then cut them."); Ex. 47, Morton (BJ's) Tr. 163:14-164:6 (discussing BWCI0003726) ("Q. What is palate fatigue? A. I believe what Scott was referring to is if you taste too many of one thing, it becomes muddied and you may not be making the best judgments on overall flavor and quality. Q. So so many

67. Keurig's K-Cup portion packs designed for use with the 2.0 Brewer were fully compatible with 1.0 brewers.[67]

68. Keurig never stopped selling 1.0 brewers.[68]

69. Winn-Dixie did not enter into any exclusive contract with Keurig.[69]

70. BJ's did not enter into any contract with Keurig that prevented it from selling national brand portion packs.[70]

71. Under BJ's 2016 private label agreement with Keurig, BJ's could use other suppliers to manufacture portion packs under BJ's Wellsley Farms private label.[71]

---

suppliers participated in the RFP that there were too many products for BJ's to sample? [Objection] A. I believe that's what he's saying there, because if eight suppliers participated times four types of coffee, that's a lot to lay out and to sample. Q. And because of that, Mr. Williams recommended narrowing down the contenders before going forward with the tasting? [Objection] A. That is what he said in the email, yes.").

[67] Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 203:1-4 ("Q. Are you aware that 2.0 compatible cups work backwards compatible to work in 1.0 brewers? A. Yes, . . . I believe that's right."); Ex. 7, Leitzinger Rpt. (BJ's) ¶ 13 n. 25 ("I understand that pods designed for K 2.0 brewers were backwards compatible with K 1.0 brewer."); Ex. 8, Leitzinger Rpt. (Winn-Dixie) ¶ 13 n. 28 (same).

[68] Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 202:13-21 ("Q. Your report figure 3 on page 8 shows sales of Keurig brewers from 2010 through 2018. A. Yes. Q. This figure shows that the 1.0 brewer was sold continuously from 2010 through 2018; correct? A. Yes. Q. To your knowledge, is the 1.0 brewer still being sold to this day? A. As -- as far as I know, it is, yes. Q. Are you aware that the 2.0 brewer has been discontinued? A. Yes, I think I -- I did -- I do understand that, yes."); Ex. 7, Leitzinger Rpt. (BJ's) ¶ 14 ("the first-generation brewers (K 1.0) were Keurig's biggest seller during the 2010-2019 period."); Ex. 8, Leitzinger Rpt. (Winn-Dixie) ¶ 14 (same); Ex. 4, Murphy Rpt. Ex. 2 (2.0 Brewer was only 27% of all brewers sold by Keurig from 2014 through 2019).

[69] Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 246:21-24 ("Q. So Winn-Dixie did not have any agreement with Keurig that prevented Winn-Dixie from stocking any other portion pack; is that right? A. Correct."), 164:19-165:5 ("Q. Okay. Winn-Dixie has never entered into exclusive agreement for private-label portion packs? A. No . . . We have not entered into an agreement that is exclusive with one supplier on portion packs."), 167:1-4 ("Q. Winn-Dixie was able to reject portion pack suppliers' requests for exclusivity? [objection] A. Yes."); Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 393:14-17 ("Q. Okay. Mr. Archer did not accept Keurig's offer that Keurig would be the exclusive supplier of Winn-Dixie's private-label portion packs; correct? A. Correct.").

[70] Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 189:13-190:21 ("[Q.] This agreement had no effect on BJ's ability to sell national-brand coffee in any format; right? [Objection] A. It doesn't appear to. Q. This agreement did not prevent BJ's from selling any national-brand portion pack; right? [Objection] A. I don't see that it mentions national brands at all.").

[71] Ex. 41, BJ's Resp. to RFA No. 219 ("Plaintiff admits that Keurig did not provide all of BJ's Private Label SKUs between January 2016 and June 2017."); Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 251:19-253:1 (BJ's used two suppliers for its private label portion packs beginning in 2016), 255:1-21 (2016 private label agreement with Keurig did not include an exclusivity provision).

72. Plaintiffs have not identified any potential portion pack supplier that would have entered the compatible portion pack business but did not because it could not find an input supplier.[72]

73. Winn-Dixie did not sell Keurig brewers.[73]

74. Since 2012, BJ's general merchandise division has been responsible for buying coffee brewers, and a different division, BJ's food division, has been responsible for buying portion packs.[74]

75. The court dismissed or granted summary judgment for Keurig on all four of Sturm's counterclaims in the *Keurig v. Sturm* litigation.[75]

---

[72] Ex. 29, Leitzinger (Mar. 17, 2023) Tr. 79:6-15 ("Q. Did you identify any potential competitor that would have entered the compatible-cup business but did not do so because it could not find an input supplier? [Objection] A. No, I don't have any specific would-be -- would-be cup manufacturers, that is, a potential competitor that I could identify for you that chose not to enter ultimately because it couldn't find an input supplier.").

[73] Ex. 25, Winn-Dixie (Mullinax) 30(b)(6) (Day 2) Tr. 356:2-9 ("Q. Sitting here today, you're not aware of Winn-Dixie selling any type of coffee brewer other than a drip coffee brewer; is that right? A. Yes. Q. Have you heard of the Keurig 2.0 brewer? A. Yes, I have. Q. Did Winn-Dixie sell the Keurig 2.0 brewer? A. Not to my knowledge."); Ex. 22, Leon (Winn-Dixie) Tr. 85:14-25 ("Q. Did Winn Dixie sell any Keurig brewers to your knowledge? A. Not while I was there we did not have in the assortment….Q. So from when you started in the coffee category in early 2014 through the time that you left the coffee category in 2015 Winn Dixie did not sell Keurig brewers? A. Not to my recollection."); Ex. 21, Sturgill (Winn-Dixie) Tr. 68:11-15 ("Q. And you said that to your knowledge Winn Dixie never sold brewers, coffee brewers? A. Correct. Not to my knowledge. Maybe years and years ago they may have had a Mr. Coffee or something but nothing else.").

[74] Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 27:11-28:9 ("Q. Within the general merchandise division of BJ's, is there a small appliances category? A. Yes. Q. Do coffee brewers fall under that small appliances category? A. They do."; "Q. Okay. And does coffee fall under the food division of BJ's? A. It does."; "[Q.] So am I correct in understanding that there is a different merchant team responsible for buying coffee brewers than the merchant team responsible for buying coffee? [objection] A. Yes."); Ex. 34, Coppola (BJ's) Tr. 25:16-26:1 (portion packs fell under BJ's grocery division; "[Q.] Does BJ's have a general merchandise division? A. Yes. Q. Would coffee brewers fall under general merchandise, if you know? A. Correct. Q. So brewers were handled by a different merchant team than the … teams that you would oversee? A. Correct."); Ex. 35, Griffin (BJ's) Tr. 108:23-109:10 ("Q. … am I right to assume that the brewer sales fell under that general merchandise division of BJ's? A. … Yes, I believe that's accurate. Q… the general merchandise side of BJ's business made the decisions with respect to coffee brewers? A. Correct."); *see also* Ex. 15, Leitzinger (Apr. 2, 2021) Tr. 208:6-19 ("Q. Is it your view that Keurig brewers and K-Cups are sold separately? A. I – it's certainly in a -- in a very -- in the sense that you do go buy them and pay for them separately, that's my understanding, yes. Generally, they are not sold -- with an exception, as I understand it, of some relatively small demonstration kinds of packs, they are not sold together.").

[75] Ex. 53, Memo. Op. at 11-17, 27, *Keurig, Inc. v. Sturm Foods Inc.*, Case No. 1:10-cv-00841- SLR-MPT (D. Del. 2010) ("*Sturm*"), ECF No. 337 ("defendant lacks standing to sue on counterclaim IV"), ("[T]he court grants summary judgment for [Keurig] to the extent that the statements placed at issue are not literally false."), (granting "[Keurig's] motion to dismiss for lack of standing"; granting "[Keurig's] cross

76. The court denied Sturm's motion for summary judgment on Keurig's non-patent claims.[76]

77. Sturm paid Keurig ███████ to settle Keurig's non-patent claims, released its counterclaims, and agreed to change its packaging to disclose that its coffee packs were filled with instant coffee.[77]

78. BJ's and Winn-Dixie do not accept portion pack suppliers' statements about their portion packs as true without conducting their own independent evaluation of the portion packs.[78]

79. BJ's and Winn-Dixie sample suppliers' portion packs to form their own opinion about the quality of the portion packs.[79]

---

motion for summary judgment on non-patent issues . . . to the extent that its advertising is deemed to be not literally false").

[76] Ex. 53, Memo. Op. at 17, 21, 25-26, *Sturm*, ECF No. 337 (Keurig's trademark, false designation, unfair competition, trade dress, and false advertising claims survived Sturm's motion for summary judgment).

[77] Ex. 54, *Sturm* Settlement Agreement at 4-8



[78] Ex. 32, BJ's 30(b)(6) (Day 1) Tr. 163:19-164:2 ("Q. Does BJ's take suppliers' statements about their own portion packs at face value? A. No.  Q. BJ's does its own research on portion packs? [objection] A. Yes, we would on all products.  Q. Including portion packs?  A. Yes."); Ex. 34, Coppola (BJ's) Tr. 50:23-51:2 ("Q. So you wouldn't just ask a supplier to tell you if the product is high quality and take that representation as true?  A. Correct."); Ex. 47, Morton (BJ's) Tr. 128:3-18 (BJ's sourcing manager would not accept claim that a portion pack has "100 percent better taste"; she would taste the pack and decide for herself), 183:21-184:8 ("a lot of suppliers believe they have the best coffee" but BJ's made its own determinations as to the quality of different coffees from different suppliers); Ex. 10, Winn-Dixie's Amen. Resp. to RFA Nos. 248 (Admitting that Winn-Dixie does not accept as true without independent verification a Portion Pack supplier's claims about that supplier's Portion Packs.), 249 (Admitting that Winn-Dixie did not accept as true Massimo Zanetti's claim that its PurPod was "100% Better Taste"), 250 (Admitting that Winn-Dixie did not accept as true Trilliant's claim that it offered "the highest quality coffee."); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 208:23-209:1 ("Q. Did Winn-Dixie accept that quality claim as true? A. Winn-Dixie makes their quality assessments on their own accord.").

[79] Ex. 13, BJ's 30(b)(6) (Day 2) Tr. 317:2-318:19 (When sampling portion packs to award BJ's private label business, BJ's conducted blind taste tests so the BJ's employees testing the samples did not know which supplier made the samples); Ex. 33, O'Brien (BJ's) Tr. 58:2-19 ("Q. And did you receive samples of products from potential suppliers of portion packs?  A. Yes. Q. Did you try those products yourself? A. Yes.…Q. And you would brew a cup of coffee from a portion pack that a potential supplier sent you? A. Yes.  Q. Would you form an opinion about the product from your testing of it?  A. Yes."), 59:11-

80. Winn-Dixie has its own quality control team dedicated to ensuring the quality of portion packs it buys and sells.[80]

81. BJ's uses an outside vendor that has laboratories to ensure the quality of portion packs it buys and sells.[81]

82. Winn-Dixie and C&S Wholesale Grocers (on behalf of Winn-Dixie) purchase Starbucks Keurig-compatible portion packs from Starbucks, and they purchase Smucker portion packs from Smucker – **not directly from Keurig**.[82]

---

60:18, 84:20-22 (BJ's employees conducted blind testings of portion pack samples so BJ's could evaluate packs "without any knowledge of the vendor"), 62:1-10 ("[Q.] Do you feel that you made assessments about potential suppliers' products based on the merit of the product? A. Yes."), 185:5-14 (BJ's buyer considered stocking TreeHouse's Caza Trail brand portion packs but decided not to buy them based on her view that Caza Trail was "terrible"); Ex. 6, Winn-Dixie (Mullinax) 30(b)(6) (Day 1) Tr. 62:22-64:9 (Winn-Dixie verifies quality claims by sampling portion packs. Through sampling, Winn-Dixie formed its own opinions on the quality of portion packs); Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 78:7-79:15 (Winn-Dixie does not just rely on a supplier's self-reported quality; Winn-Dixie has "a quality-control team that does their own independent testing" of portion packs for quality), 155:10-156:13 (Winn-Dixie "always verif[ies] all quality through [its] quality-control process."), 250:14-20 (claims that a portion pack is "100 percent better taste" is "subjective" and Winn-Dixie would have tested that claim).

[80] Ex. 12, Winn-Dixie (Rice) 30(b)(6) Tr. 78:7-79:15 (Winn-Dixie does not just rely on a supplier's self-reported quality; Winn-Dixie has "a quality-control team that does their own independent testing" of portion packs for quality), 155:10-156:13 (Winn-Dixie "always verif[ies] all quality through [its] quality-control process.").

[81] Ex. 47, Morton (BJ's) Tr. 117:15-20 ("Q. Does BJ's work with an outside vendor that has laboratories? A. Yes. Q. And that outside vendor helps BJ's to run quality tests on potential products? A. Yes.").

[82] Ex. 55, Asher (Apr. 12, 2023) Tr. 91:19-23 (Winn-Dixie purchases "directly from Starbucks and Smucker"), 92:25-93:11 (Winn-Dixie buys "Starbucks from Starbucks" and "Smucker from Smucker") 181:5-7 ("Keurig doesn't sell Starbucks and Smucker to grocery stores. Starbucks and Smucker do."); Ex. 56, Reply Rpt. of Martin A. Asher ¶ 65 ("Keurig does not sell partner brands into what is called the 'Stream 1' channel (which includes retail grocery customers like Winn-Dixie)"); Ex. 57, Sur-Reply Rpt. of Martin A. Asher ¶ 10 (Winn-Dixie purchase data shows "it purchases directly from Starbucks and Smucker").