UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                               :

IN RE:KEURIG GREEN MOUNTAIN      :

SINGLE-SERVE COFFEE ANTITRUST   :          14-MD-2542 (VSB)

LITIGATION                           :          14-MC-2542 (VSB)

                               :

*This Document Relates to All Actions*    :          **AMENDED**[1]
---------------------------------------------------------X     **OPINION & ORDER**

Appearances:

Daniel Johnson, Jr.
Mario Moore
Dan Johnson Law Group, LLP
San Francisco, CA

*Counsel for Plaintiff JBR, Inc.*

Leah Brannon
Carl Lawrence Malm
Alan B. Freedman
Rahul Mukhi
Cleary Gottlieb Steen & Hamilton LLP
Washington, DC & New York, NY

Wendelynne J. Newton
Mackenzie A. Baird
Buchanan Ingersoll & Rooney PC
Pittsburgh, PA

*Counsel for Defendant Keurig Green Mountain, Inc.*

---

[1] The previous version of this Opinion & Order was sent to the parties and filed under seal on June 8, 2026 with language in the conclusion indicating that "[d]ue to potential references to sealed filings and information, this Opinion & Order is being issued temporarily under seal.  By July 8, 2026, the parties are directed to submit any proposed redactions to this Opinion & Order."  (Doc. 2474.)  I have received no proposed redactions from the parties and thus issue this unredacted Amended Opinion & Order, which omits that language regarding sealing from the conclusion of the Opinion & Order.  This change does not otherwise modify the conclusion of my original Opinion & Order.

VERNON S. BRODERICK, United States District Judge:

Before me is the motion of Defendant Keurig Green Mountain Inc. ("Defendant" or "Keurig") to exclude the amended expert report and related damages testimony of JBR Inc.'s expert Gareth Macartney, Ph.D ("Dr. Macartney" or "Macartney").  For the reasons that follow below, the motion is GRANTED IN PART and DENIED IN PART.

## I.      Background and Procedural History

On August 28, 2020, Dr. Macartney submitted his initial expert report.  (Doc. 1459-1.) Macartney advanced opinions regarding market definition, monopoly power, anticompetitive behavior, injury, and damages.  (*Id.*)  In other words, Dr. Macartney offered opinions on both liability and damages.  On August 18, 2021, Keurig moved to exclude Dr. Macartney's liability and damages opinions.  (Doc. 1456.)  Keurig's motion was accompanied by a memorandum of law, (Doc. 1457), and a declaration from Matthew Pilsner, (Doc. 1459).  On September 29, 2021, JBR, Inc. ("JBR" or "Rogers") filed its memorandum of law in opposition to Keurig's motion, (Doc. 1532), accompanied by a declaration from Mario Moore, (Doc. 1533).  Keurig filed its reply on November 10, 2021, (Doc. 1601), and a declaration from Lisa M. Danzig in support, (Doc. 1602).

On January 2, 2025, I issued an Opinion & Order related to eighteen motions to exclude various expert reports and related opinions, including Keurig's motion to exclude Dr. Macartney's expert report and opinions.  I granted Keurig's motion to exclude Dr. Macartney's damages opinions but denied the motion as to Dr. Macartney's liability opinion.  (Doc. 2366 ("Daubert Opinion" or "Daubert Op.") at 13–31.)  I found that Dr. Macartney's damages model, which used Keurig as a benchmark for how JBR would have performed in the but-for world absent Keurig's allegedly anticompetitive conduct, "raise[d] too many methodological concerns

to ignore and require[d] the exclusion of Dr. Macartney's opinion."[2]  (*Id.* at 26.)

On January 15, 2025, JBR filed a motion for reconsideration of part of the Daubert Opinion, (Doc. 2368), along with a memorandum of law in support, (Doc. 2369), and requested, in the alternative, leave to file an amended damages report.  On January 29, 2025, Keurig filed a memorandum of law in opposition to JBR's motion.  (Doc. 2371.)  JBR filed a reply on February 5, 2025.  (Doc. 2377.)  On June 30, 2025, I denied reconsideration, but granted JBR leave to file an amended damages report.  (Doc. 2389 ("Reconsideration Opinion" or "Reconsideration Op.").)

On November 5, 2025, JBR issued the Corrected Amended Expert Report of Gareth Macartney, Ph.D.  (Doc. 2451-3 ("Amended Macartney Report" or "Amended Macartney Rep.").)  On March 20, 2026, Keurig filed a motion to exclude the Amended Macartney Report, (Doc. 2449), accompanied by a memorandum of law, (Doc. 2450 ("Mem.")), and a declaration of Alan B. Freedman, (Doc. 2451).  On April 10, 2026, JBR filed its response in opposition to Keurig's motion.  (Doc. 2458 ("Opp'n").)  On April 24, 2026, Keurig filed its reply.  (Doc. 2465 ("Reply").)

## II.    **Legal Standard**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[2] The details concerning Dr. Macartney initial expert report and the basis for my exclusion of that report are contained in the Daubert Opinion, (Daubert Op. 13–31), and I only summarize those conclusions here.

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Courts in this Circuit frequently distill Rule 702 down to a three-part test that requires the proponent of expert evidence to show "that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact." *Nike, Inc. v. StockX LLC*, No. 22-CV-0983, 2024 WL 3361411, at *2 (S.D.N.Y. July 10, 2024) (citing *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005)). Rule 702 thus imposes on the trial judge a "basic gatekeeping obligation" to ensure that all expert testimony admitted at trial is relevant and reliable, regardless of whether the expert testimony is on scientific, technical, or other specialized matters. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). A court cannot bypass this gatekeeping responsibility and pass it off to the jury by declaring "questions of the sufficiency of an expert's basis, and the application of the expert's methodology, [to be] questions of weight and not admissibility." Fed. R. Evid. 702 Advisory Comm. cmt. 2023.

Expert testimony must not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). "While an expert opinion 'is not objectionable just because it embraces an ultimate issue,' Fed. R. Evid. 704(a), it remains impermissible for experts 'to offer opinions embodying legal conclusions.'" *Bobcar Media, LLC v. Aardvark Event Logistics, Inc.*, 554 F. Supp. 3d 606, 612 (S.D.N.Y. 2020) (quoting *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012)), *aff'd*, 839 F. App'x 545 (Fed. Cir. 2021). "[A]lthough an expert may give an opinion to help the jury decide an issue in the case, he

4

or she may not tell the jury what result to reach." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (citing *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)).

"The party proffering expert testimony 'bears the burden of establishing these admissibility requirements.'" *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-01570, 2023 WL 3116763, at *2 (S.D.N.Y. Apr. 27, 2023) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253 (2d Cir. 2016)).  This showing must be made by a preponderance of the evidence, *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020), as to each of the three reliability components of Fed. R. Evid. 702, *see* Fed. R. Evid. 702 Advisory Comm. cmt. 2023 ("The [2023] amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.").

Ultimately, "a 'district court's decision to admit or exclude expert testimony [is reviewed] under a highly deferential abuse of discretion standard." *In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 982 F.3d 113, 122 (2d Cir. 2020) (per curiam) (quoting *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998)).  "Thus, the trial judge has broad discretion in determining 'what method is appropriate for evaluating reliability under the circumstances of each case.'" *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)).

The Court's inquiry into reliability "is fluid and will necessarily vary from case to case." *Amorgianos*, 303 F.3d at 266.  Rule 702 requires both that an expert use "reliable principles and methods," and that "the expert's opinion reflects a reliable application of the principles and

methods to the facts of the case." Fed. R. Evid. 702(c)–(d).  The Supreme Court in *Daubert*

listed four factors that courts may consider when evaluating reliability:

> (1) whether a theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication,' (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation,'; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community.

*Amorgianos*, 303 F.3d at 266 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579,

593–94 (1993)).  At the same time, *Daubert* did not "presume to set out a definitive checklist or

test," *Daubert*, 509 U.S. at 593, and subsequent cases recognize that "the gatekeeping inquiry

must be 'tied to the facts' of a particular 'case,'" *Kumho Tire Co.*, 526 U.S. at 150 (quoting

*Daubert*, 509 U.S. at 591).  For instance, "[f]lexible methodologies . . . can be implemented in

multiple ways; despite the fact that the methodology is generally reliable, each application is

distinct and should be analyzed for reliability." *In re Acetaminophen - ASD-ADHD Prods. Liab.

Litig.*, 707 F. Supp. 3d 309, 337 (S.D.N.Y. 2023) (quoting *In re Zoloft (Sertraline

Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 795 (3d Cir. 2017)).

There is a two-sided cumulative element to a court's review of a method's reliability.  On

the one side, "once the court has found it more likely than not that the admissibility requirement

has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R.

Evid. 702 Advisory Comm. cmt, 2023.  On the other side, "there are only so many questions of

weight that can be tolerated; as each flaw in a [method] diminishes its reliability and probative

value, and correspondingly increases the risk of jury confusion and prejudice, eventually the

cumulative effect of the flaws mandates exclusion." *Malletier v. Dooney & Bourke, Inc.*, 525 F.

Supp. 2d 558, 612 (S.D.N.Y. 2007).

### III.     Discussion

The Amended Macartney Report offers three "approaches" not previously articulated in Dr. Macartney's initial report to calculating damages:  (1) a benchmark approach that uses "the full set of Compatible Portion Packs as a benchmark" rather than Keurig itself, (Amended Macartney Rep. 22 (cleaned up)); (2) a "customer-by-customer approach" that estimates Keurig's losses based on specific customers that JBR lost because of Keurig's alleged conduct, which are then extrapolated on a going-forward basis by the market growth rate calculated using the first approach, (*id.* at 32 ("I model that, absent Keurig's conduct, Rogers's sales to these specific customers would have continued at their 2013 or 2014 levels, growing at a rate consistent with the IRI MULO data restricted to Compatible Portion Packs, but covering all brands." (citation omitted))); and (3) an Amazon-based approach that uses JBR's growth in the Amazon channel as a benchmark for the growth that it would have experienced in its other channels to estimate lost sales revenue for JBR, (*id.* at 38).

For the reasons that follow, Keurig's motion to exclude Dr. Macartney's opinions based upon the first two "approaches" is GRANTED, but the motion is DENIED as to Dr. Macartney's opinions based on the third "approach," which extrapolates JBR's profits from the Amazon segment of the marketplace to the other segments of the market.

#### A.     *Full Market Benchmark*

A yardstick or benchmark "us[es] data from analogous geographic markets or industries that are not affected by the conspiracy as a benchmark" to model a but-for world in which more competitive conditions prevail.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 801 F. Supp. 3d 330, 450 (S.D.N.Y. 2025), *appeal dismissed sub nom. In re Libor-Based Fin. Instruments Antitrust Litig. v. The Royal Bank of Scotland PLC*, No. 25-2756, 2025 WL 4092207

(2d Cir. Dec. 10, 2025) (quoting ABA Section of Antitrust Law, *Proving Antitrust Damages: Legal and Economic Issues* § III.8.C.2 (3d ed. 2017)).

There are two ways in which yardsticks or benchmarks are typically used in antitrust cases. In *Dial Corp. v. News Corp.*, for example, the expert modeled the prices of a purported monopolist against non-monopolizing firms to calculate an estimated overcharge attributable to the alleged anticompetitive conduct. *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 118 (S.D.N.Y. 2015) (expert selected "benchmark firms," "used the average of these benchmark margins for each year in the damages period to estimate declines in [Defendant's] monopoly pricing," and "then proposes to apply that monopoly overcharge to prices paid by individual putative class members to calculate individual damages"), *amended*, 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016); *see also In re Google Digital Advert. Antitrust Litig.*, No. 21-CV-7001, 2025 WL 3562687, at *8 (S.D.N.Y. Dec. 12, 2025) ("Elhauge compares the 20% take rate that Google charged to publishers that transacted on the AdX platform with the 10% take rate that Google charged to mobile-app developers that transacted on Google's analogous auction platforms through non-Google products. . . . and concludes that class-wide damages should be awarded"). In other cases, particularly those brought by competitors, an expert will use a firm unaffected by the alleged anticompetitive conduct as a comparator for what an affected firm's profits would have looked like in a but-for world without the purported monopoly. *See, e.g.*, *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974) ("[T]he yardstick test is sometimes employed [to calculate lost profits.] It consists of a study of the profits of business operations that are closely comparable to the plaintiff's."), *cert. denied*, 420 U.S. 929 (1975).

As I explained in the Reconsideration Opinion, "a benchmark—even one simply measuring lost-profits market share—is only useful if it provides a meaningful metric against

which to measure the change wrought by the allegedly anticompetitive conduct."

(Reconsideration Op. 4.)  This means that the touchstone for analysis of any yardstick, whether

evaluating lost profits or a purported overcharge, is reasonable comparability, which must be

shown by the party proffering the damages model.  *See Loeffel Steel Prods., Inc. v. Delta Brands,*

*Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) ("Absent the requisite showing of comparability,

a damage model that predicts either the presence or absence of future profits is impermissibly

speculative and conjectural."); *amended*, 2005 WL 8178971 (N.D. Ill. Sept. 8, 2005); *Lehrman*,

500 F.2d at 667 ("[T]he business used as a standard must be as nearly identical to the plaintiff's

as possible.").

Dr. Macartney fails to make this reasonable comparability showing with regard to his

first approach, in which he tries to introduce the novel concept of a "full market benchmark,"

incorporating an average of quantities sold from the "Compatible Portion Packs" market, i.e., the

allegedly monopolized market, for use as a benchmark for how JBR would have performed but

for Keurig's alleged monopoly.  (Opp'n 5; *see also* Amended Macartney Rep. 23.)  In other

words, Macartney takes the "growth rate in the number of Compatible Portion Packs sold"

between 2014 and 2025 and applies it uniformly to JBR's business without making any

adjustments.  (Amended Macartney Rep. 23–25.)  This approach runs up against a number of

insurmountable hurdles.

The yardstick model "is typically used when comparing profitability between similar

firms, or to compare profit margins within the same company in differently situated markets."

*Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880, 892 (W.D. Ky. 2020) (citing *MM*

*Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 851–52 (5th Cir. 2015) and *Conwood Co., L.P.*

*v. U.S. Tobacco Co.*, 290 F.3d 768, 794 (6th Cir. 2002)).  Some courts take issue with the

9

composite yardsticks inflexibly molded on to particular market circumstances without individualized adjustments. *See Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 895 (8th Cir. 1978) (use of profits from a composite "hypothetical theatre" created merely by halving the receipts of two competitors and presuming comparability was a "foundational infirmit[y]" in the yardstick model); *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17-CV-50107, 2024 WL 1363544, at *7 (N.D. Ill. Mar. 29, 2024) ("[T]he selection of the pharmaceutical market as a whole as the relevant yardstick [] is fundamentally unreasoned."). Nonetheless, some courts have allowed experts to use specific composites, where thought is given as to the comparability of the component parts to the but-for world in the absence of the alleged anti-competitive conduct. For example, in *Dial Corp.*, where the Court acknowledged that "the selection of perfectly comparable benchmark firms aside from News Corp. [was] impossible," it proceeded to reject a motion to exclude a damages model that benchmarked an overcharge with a selection of "companies likely to be as profitable as News Corp. in a market unaffected by monopolization." *Dial Corp.*, 314 F.R.D. at 118–19.

However, in addition to being "fundamentally unreasoned," *City of Rockford*, 2024 WL 1363544, at *7, selection of the entire market presents an inherent problem when it comes to "separating out the amount of [Plaintiff's] losses caused by the [Defendant's] wrongful acts from the amount caused by other factors," *see U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1377–78 (2d Cir. 1988). Although "courts have allowed antitrust plaintiffs considerable latitude in proving the amount of damages," *see id.*, an expert may not simply "opine[] without evidence" and automatically attribute all of the alleged injury suffered to anticompetitive conduct, *In re LIBOR*, 801 F. Supp. 3d at 460 ("[I]t is [the expert's] responsibility to provide sufficient facts and data to distinguish between competing explanations,

10

rather than relying on *ipse dixit*." (internal quotation marks omitted)).  "If the plaintiff's expert's damages study cannot segregate lawful from unlawful practices, then no damages may be awarded on the basis of that study."  Philip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 657b. In other words, "studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment."  *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) (collecting cases).  However, here, Dr. Macartney does not correct for any "salient factors," *id.*, or provide any downward adjustments to account for the possibility of lawful practices.  By its very own terms, the full market benchmark model presumes that "Rogers should have at least grown with the market," (Amended Macartney Rep. 23), and that any failure to grow with the market is attributable only to Keurig's allegedly anticompetitive conduct rather than any other market factor.  By virtue of the way that the full market benchmark model is designed, it cannot "account for [the] economic conditions affecting a plaintiff's damages."  (Daubert Op. 24 (collecting cases).)  A benchmark model that tethers JBR's growth rate to the market as a whole does not "segregate lawful from unlawful practices," or make "adjustments" to account for "differences" between the yardstick and conditions that would purportedly prevail absent the anticompetitive conduct, *see* Areeda & Hovenkamp, *Antitrust Law* ¶ 395b3, so Dr. Macartney's full market benchmark fails the reliability inquiry under Rule 702, as an expert's damages model "must provide the jury with a reasonable basis upon which to estimate the amount of losses caused by other factors," such as lawful competition on the merits.  *U. S. Football League*, 842 F.2d at 1378–79.

Dr. Macartney's use of the full market benchmark essentially repackages the same problematic damages model that I already excluded as methodologically unsound in the Daubert

Opinion.  (*See* Daubert Op. 13–31.)  Because it is predicated on a benchmark not only "tainted by [Keurig's] anticompetitive conduct," but also "favorably affected by the anticompetitive conduct," there is an unacceptable risk that the figures yielded by the model "could result in overly generous damages figures."  (*Id.* at 27.)  Although I indicated in the Daubert Opinion that "virtually any yardstick will have issues, and venturing outside the single-serve cup market to an alternative product or industry will raise questions about the comparability of the firm or market selected," I suggested that "[u]sing a selection of other unlicensed firms as a benchmark," could result in a more conservative damages estimate more likely to pass muster under Rule 702.  (*Id.*) I also explained that, because Keurig was selected as the benchmark, there was more of a "need to disaggregate lawful and unlawful conduct," or else risk assigning to JBR, in a but-for world purportedly modeling competitive conditions, not only competitive profits free of the alleged monopoly, but also Keurig's monopoly rents unfairly inflated by the very conduct at the heart of this suit.  (*Id.* at 29.)

However, here JBR does not use a benchmark free of Keurig's economic market influence.  Indeed, in its opposition brief to Keurig's motion, JBR concedes that the full market benchmark consists of 80-90% Keurig sales, and can only argue in response that "given Keurig's misconduct resulted in it having 80-90% of the market, choosing a benchmark true to the relevant market, but not affected by the misconduct, would be impossible."  (*See* Opp'n 6.)[3] Therefore, Dr. Macartney's model is still not only "tainted" by the anticompetitive conduct, but also imputes to JBR a growth rate that is undisputedly still primarily composed of Keurig's own sales.  As I found in the Daubert Opinion, "plaintiff [i]s 'no more entitled to the monopoly profit

---

[3] Of course, if choosing an appropriate yardstick is "impossible," then the appropriate remedy is not permitting an unreliable yardstick to go before the jury, but rather to exclude it under Rule 702.  *See* Areeda & Hovenkamp, *Antitrust Law* ¶ 395b3 ("Similar adjustments must be made for any other differences as well.  If there is an important difference that is beyond adjustment, th[e yardstick] approach will have to be abandoned.").

than defendant [i]s.'" (Daubert Op. 20 (quoting *Farmington Dowel Prod. Co. v. Forster Mfg. Co.*, 421 F.2d 61, 82 n.48 (1st Cir. 1969).)  The fact that Dr. Macartney uses a growth rate rather than a lost profits model cannot save his analysis.  Dr. Macartney's best estimate of how JBR would have performed in the absence of the alleged monopoly still tracks almost exactly the performance of Keurig.  Further, Plaintiffs' suit is not a pure overcharge case—Plaintiffs also allege that Keurig's monopolization reduced output and quality, (Doc. 1141-1 ("Sibley Rep.") §§ V.B.iv.c.; VII), so using growth rate rather than profit margin does not correct for the alleged anticompetitive conduct.

The only response that Dr. Macartney offers is the conclusory assertion that "[a]ny argument that the number of Compatible Portion Packs may have grown faster absent Keurig's conduct (because perhaps it would have been forced to lower prices) merely makes my approach conservative."  (Amended Macartney Rep. 23.)  The fact that we have nothing more than this cursory and unevidenced claim highlights the very problem with Dr. Macartney's approach, which is that it fails to address or account for including Keurig in the benchmark.[4]  At bottom, Dr. Macartney is merely speculating that the inflationary impact of Keurig's allegedly anticompetitive conduct on its own growth in the real world and the deflationary impact of the allegedly anticompetitive conduct on a sampling of unlicensed brands that are not JBR in the real world will average out to make the perfect benchmark on which to base JBR's antitrust injury in the but-for world without any scientific or economic support.  (*Id.* ("[T]his benchmarking approach assumes that Rogers should have at least grown with the market, which reflects

---

[4] For example, one might anticipate a situation in which Keurig's conduct repressed the growth rate of its competitors but caused its own sales to expand.  Dr. Macartney presents no evidence or proof that the degree to which competitor sales were restricted balanced out with any acceleration of Keurig's own sales during the relevant time period such that unthinkingly averaging the growth rates of Keurig and its competitors could result in an appropriate benchmark, much less be conservative.

13

increasing demand for Compatible Portion Packs by consumers.").)  This type of unsupported

analysis cannot survive the *Daubert* inquiry.  *See In re Gen. Motors LLC Ignition Switch Litig.*,

No. 14-CV-5810, 2017 WL 6729295, at *9 (S.D.N.Y. Dec. 28, 2017) ("[P]ure speculation,

untethered to the facts in the record, is not a proper basis for reliable scientific testimony."); *Lara*

*v. Delta Int'l Mach. Corp.*, 174 F. Supp. 3d 719, 729 (E.D.N.Y. 2016) ("[W]here an expert's

testimony is bottomed upon nothing more than mere speculation and guesswork, or otherwise

constitutes nothing more than junk science, the flexible *Daubert* inquiry gives the district court

the discretion needed to ensure that the courtroom door remains closed." (internal quotation

marks omitted)).[5]  In sum, Dr. Macartney offers nothing more than his word that the composite

full market makes for an appropriate benchmark and he fails to put forth any explanation,

analysis, or adjustment to account for the effect of Keurig's anticompetitive conduct, which

undisputedly taints the yardstick used, to model the but-for world.  This failure alone merits

exclusion.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996) (per curiam)

("Admission of expert testimony based on speculative assumptions is an abuse of discretion.");

*Elcock v. Kmart Corp.*, 233 F.3d 734, 754–56 (3d Cir. 2000) (finding an abuse of discretion

where the trial court admitted expert testimony which "relied on several empirical assumptions

---

[5] In the Daubert Opinion, I suggested that "[u]sing a selection of other unlicensed firms as a benchmark," although still tainted by the anticompetitive conduct, might make for a more useful comparator for what JBR's growth would have looked like absent specific anticompetitive conduct directed specifically at JBR versus its other similarly situated competitors. (Daubert Op. 27.)  Dr. Macartney does not explain why he did not use such a sampling to try to model such a reasonably comparable benchmark.  In its motion, Keurig points out JBR has failed to explain why "[t]he unlicensed competitors in Dr. Macartney's benchmark performed significantly better than JBR did." (Mem. 6.)  JBR's only response to this point is speculation in its opposition brief that "[t]he growth percentages [for the unlicensed brands] just reflect the smaller base from which some of these new entrants started." (Opp'n 7.)  Not only is this claim not supported by any analysis done by Dr. Macartney about why Keurig's anticompetitive conduct would have impacted new entrants less than long-standing players in the market, it is also directly at odds with JBR's allegations that Keurig erected extensive barriers to entry that prohibited the growth of new entrants just as well as competitors already in the market.  (*See* Sibley Rep. §§ IV.B; IV.C.ii.)  Of course there is another, and more likely, explanation for why the other brands succeeded whereas JBR did not—namely that JBR, in particular, failed on the merits rather than as a result of Keurig's anticompetitive conduct, an outcome that I have already found that the full market benchmark fails to account for. *See supra* at 10–11.

14

that were not supported by the record").

As noted, the barometer of a valid benchmark is that it is "reasonably comparable." *In re LIBOR*, 801 F. Supp. 3d at 450 (citing Areeda & Hovenkamp, *Antitrust Law* ¶ 392 and *Boucher*, 73 F.3d at 21).  The burden to show reasonable comparability is on the party proffering the damages model.  *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 175 (S.D.N.Y. 2006) ("The proponent of the testimony bears the burden of demonstrating its admissibility by a preponderance of the evidence." (collecting cases)).  JBR has failed to show how its full market benchmark can be considered reasonably comparable to how JBR would have performed in the but-for world absent Keurig's allegedly anticompetitive conduct.

As I stated in the Daubert Opinion, "[d]espite its broad acceptance, a common problem arises with the use of the yardstick method when the market or firm used as the benchmark is tainted by a defendant's alleged anticompetitive conduct."  (Daubert Op. 20.)  Such an issue is particularly acute where the yardstick selected by an antitrust plaintiff is the defendant itself because then the allegedly unlawful gains that are the subject of the monopoly suit are included in the damages model posited.  (*Id.* at 30 ("[T]he issue with the Keurig benchmark is not merely that it is an imperfect comparison, but that it is likely the benchmark that is most affected by the anticompetitive conduct, and in a way that is most likely to be favorable to JBR's damages estimation.").)  The but-for world becomes not one in which perfect competition is modeled, but rather one in which an alternative monopolist is hypothesized—in this case, JBR.

Dr. Macartney's amended report fails to adequately address or solve this problem and, indeed, doubles down on the inclusion of Keurig as 80 to 90 percent of the composite benchmark selected as an appropriate comparator in terms of growth during the relevant period.  For this reason and the others outlined above, Keurig's motion to exclude the full market benchmark

15

damages model is GRANTED.

### B.    *Lost Customer Approach With Full Market Benchmark Growth Rate*

Dr. Macartney's purported "lost customer" approach fares little better than his full market benchmark. As the Second Circuit has held, "[t]o warrant admissibility [] it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. *Daubert* and its progeny require "that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—mean[ing] that *any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible.*" *Id.* (emphasis in original) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir.1994)). This means that one unreliable step in an expert's methodology which is a necessary predicate to their conclusions can render the whole analysis inadmissible, even if other portions of the methodology are generally reliable and economically sound. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming exclusion when, among other things, the expert failed to "provide support for every necessary link" for their model and there was "simply too great an analytical gap between the data and the opinion proffered" (internal quotation marks omitted)).

Dr. Macartney's "lost customer" approach presents such a concern. In the Daubert Opinion, I held that Dr. Lauren Stiroh, Plaintiff TreeHouse's damages expert, could testify concerning a lost customer damages model. (Daubert Op. 81 ("Having reviewed Dr. Stiroh's modelling of market prices and sales in the but-for world, I find that her methodology is admissible and in line with economic theory and practices. . . . Keurig's arguments [are] unpersuasive, and go to weight rather than admissibility.").) JBR seeks admission of an alternative "approach" to its full market benchmark that, at least at first blush, appears analogous

16

to modeling put forward by Dr. Stiroh.  However, upon more searching analysis, it is clear that the "lost customer" model here is little more than an attempt to rebrand and repackage a methodology that retains all the essential flaws of Dr. Macartney's "full market benchmark."

Dr. Macartney's "lost customer" model estimates that JBR lost approximately $9,361,060 dollars in sales in the at-home channel of the coffee market in 2014 based on evidence in the record.  (Amended Macartney Rep. 33.)  Dr. Macartney then extrapolates that number through 2025 based on the exact same growth rate from the full market benchmark approach that consists primarily of Keurig's growth rate during this time period.  (Amended Macartney Rep. 32 ("I model that, absent Keurig's conduct, Rogers's sales to these specific customers would have continued at their 2013 or 2014 levels, growing at a rate consistent with the IRI MULO data restricted to Compatible Portion Packs, but covering all brands.").)  Dr. Macartney's estimates for damages in the away-from-home channel under this approach are based the "same ratio approach" used with the full market benchmark, assuming that Rogers would behave the same way in the away-from-home segment without any tailoring or adjustments for differences between the two segments.  (*Id.* at 32–33.)  By virtue of the way that Dr. Macartney's but-for figure in the away-from-home segment is calculated, (*see id.* at tbl. 22), therefore, it is also predicated on the full market benchmark's growth rate.  Dr. Macartney also used a similar approach with regard to the remaining two channels:  Amazon and website sales.  (*Id.* at 35–37.)

Although, on the surface, this model imitates Dr. Stiroh's model, which I have already determined was sufficiently reliable to survive challenge under Rule 702, (*see* Daubert Op. 82 ("Dr. Stiroh has adequately explained her model and accounted for the factors courts traditionally require to meet the necessary standard of reliability.")), the methodology here is predicated on an assumption that I have already found fails the reliability inquiry of Rule 702—

17

that absent Keurig's allegedly anticompetitive conduct, JBR would have grown at precisely the same rate as the "Compatible Portion Pack Market," which is based on nothing more than Dr. Macartney's own say-so and fails to account for market realities.  As I found above, the use of the growth rate from the Compatible Portion Packs market is not sufficiently reliable under Rule 702 to survive a motion for exclusion.  *See supra* § III.A.  Unlike Dr. Stiroh's lost customer methodology, which did not include Keurig's growth rate, or a growth rate analogous to the one that Keurig experienced, during the modeled time frame, (*see generally* Doc. 1141-2), Dr. Macartney's "lost customer" analysis presumes that in a but-for world, JBR would have grown at the rate of the market (a market that was admittedly composed of 80 to 90 percent Keurig).  (*See* Opp'n 6.)  The use of this growth rate warrants the exclusion of the "lost customer" approach since it is a critical component of Dr. Macartney's methodology.  *See Domingo*, 289 F.3d at 607 ("The reasoning between steps in a theory must be based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field.").

This issue is not merely a question of Dr. Macartney using imperfect inputs or data.  *See In re Int. Rate Swaps Antitrust Litig.*, No. 16-MD-2704, 2023 WL 8675625, at *4 (S.D.N.Y. Dec. 15, 2023) ("[T]he question for *Daubert* purposes is not whether the expert employed the best possible input data to form her testimony, but whether 'the testimony is based on sufficient facts or data.'" (quoting Fed. R. Evid. 702)).  Rather, the use of the Compatible Portion Pack Market's growth rate goes to the very heart of Dr. Macartney's "approach" or methodology.  Use of the same growth rate that I have already held is unreliable under Rule 702, *see supra* § III.A, results in $5,473,712 in 2013 sales to Safeway ballooning up to $123,166,148 in lost sales over a ten-year period or the $12,473,316 in 2013 sales to BJ's resulting in $278,884,876 in purported damages over the same span.  (*See* Amended Macartney Rep. App'x B.)  Here, the use of the

growth rate of the Compatible Portion Pack Market drives the proposed damages figures posited by Dr. Macartney. This means that Dr. Macartney's second "approach" is predicated on the same flawed foundation as his first "approach" since it assumes that JBR would have grown at the same rate at the full market benchmark, absent the allegedly anticompetitive conduct.

Indeed, it is no surprise, as Keurig points out in its reply, that the Dr. Macartney's "lost customer" model returned nearly the same result in terms of damages that its full market benchmark did when the only delta between the two models is that the "lost customer" approach substitutes in customers that "represent a large portion of JBR's overall sales" for "all JBR sales," (Reply 5–6), and presumes, based on nothing but Dr. Macartney's *ipse dixit*, that, but for Keurig's anticompetitive conduct, these figures would have grown at approximately the same rate that Keurig did. It is axiomatic that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 365 (S.D.N.Y. 2023) (quoting *Kumho Tire Co.*, 526 U.S. at 157). This means that the "lost customer" approach cannot survive Keurig's motion to exclude.

Moreover, because the "lost customer" approach is effectively the same methodology as Dr. Macartney's full market benchmark approach, it suffers from the additional infirmities I noted above, all of which would merit exclusion on their own. Because the model presumes that JBR would grow at the same rate as the rest of the at-home market and then uniformly superimposes that growth rate on the other segments of the market, it fails to account for market realities or the impacts of competition on the merits as to the competitors' success or failure. *See Weiner v. Snapple Beverage Corp.*, No. 07-CV-8742, 2010 WL 3119452, at *7 (S.D.N.Y. Aug. 5, 2010) (excluding model when the expert did "not explain how his approach would isolate the

19

impact of the [allegedly anticompetitive conduct] from the other factors that purportedly affect" market conditions).  Dr. Macartney fails to address other reasons why customers might have switched away from JBR and to Keurig or other competitors or reasons why JBR might have failed to expand its sales to customers in a manner directly proportional to the Compatible Portion Pack Market over the time period between 2013 and 2025.  For this reason, too, the "lost customer" approach warrants exclusion.  *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 975 (C.D. Cal. 2012) (excluding damages model that "simply assume[d]—without further examination" that difference in prices between Defendants' products and the market average was "due entirely to Defendants' allegedly anticompetitive conduct").

Therefore, Dr. Macartney's "lost customer" approach fails the reliability inquiry of Rule 702.  This approach does nothing to address the fatal flaw that doomed Dr. Macartney's initial report and testimony.  (*See* Daubert Op. 30 ("[T]he issue with the Keurig benchmark is not merely that it is an imperfect comparison, but that it is likely the benchmark that is most affected by the anticompetitive conduct, and in a way that is most likely to be favorable to JBR's damages estimation.").)  By relying on the growth rate of the Keurig Compatible Portion Pack Market, which is a composite that is made up of 80 to 90 percent Keurig sales, (*see* Opp'n 6), to model JBR's growth in the but-for world, Dr. Macartney's model still does little more than replace one monopolist with another.  The model continues to do nothing to separate out procompetitive conduct from anticompetitive conduct or segregate the impact of the alleged monopolization in the marketplace.

Ultimately, because the "lost customer" approach posited by Dr. Macartney bears the same hallmarks and flaws as the full market benchmark I rejected above, *see supra* § III.B, and indeed the "monopolist" benchmark used in the initial Macartney Report which I rejected in the

20

Daubert Opinion, (*see* Daubert Op. 27–31), this approach must be excluded. Keurig's motion to exclude is GRANTED as it related to the "lost customer" approach.

### C.    *Amazon Benchmark*

JBR's final attempt to proffer a damages model that can survive the Rule 702 inquiry is through the use of Amazon sales. (Amended Macartney Rep. 38–44.) Dr. Macartney claims that JBR's Amazon sales were "less encumbered by some of Keurig's conduct such as its exclusive contracts with distributors and misrepresentations to retailers," and so he can use the growth in its Amazon sales between 2013 and 2025 as a model for how JBR's sales in the other channels would have grown during the same time frame. (*Id*. at 38–39.) In opposition, Keurig raises at least two issues with this approach: first, that the allegations in the complaint claim that Keurig's conduct affected all channels, including Amazon sales;[6] and second, that there are more logical explanations for why JBR's growth was higher on Amazon than in the other channels, including the "massive growth of Amazon as a sales platform" during that time frame. (Mem. 10–11.) Although these critiques have some merit, I find, even though it is a close question, that they go to weight, not admissibility, and that JBR may proceed with its so-called "Amazon approach."

In the first instance, Dr. Macartney and JBR argue that Keurig's allegedly anticompetitive exclusive dealing contracts did not impact JBR's position in the Amazon segment of the market in the same way as the other market segments. (Amended Macartney Rep. 38; Opp'n 13.) If anything, to the extent that Keurig's anticompetitive conduct also impacted the Amazon segment of the market, this would actually be "likely to render more

---

[6] Indeed, Dr. Macartney's other approaches estimated damages in the Amazon channel in the but-for world. (*See* Amended Macartney Rep. Tbls. 18, 26)

conservative estimates," (Daubert Op. 27), for damages, ameliorating concerns about lack of comparability with regard to the Amazon segment.  As I previously explained in the Daubert Opinion, a benchmark tainted by the anticompetitive conduct is "more likely to be approved where it makes the resulting estimates more conservative."  (*Id.* at 22 (collecting cases).)  As the Supreme Court has cautioned, "damages issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 123 (1969).  Therefore, a damages model must only provide enough information that "the finder of fact can make 'a just and reasonable inference' of damages based on the proof available." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000) (citing *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1077 (2d Cir. 1988)).  I find that that here, there is enough evidence in the record for the jury to make such a "just and reasonable inference" that the Amazon channel was somewhat less impacted by the allegedly anticompetitive conduct than the other channels of sales and so makes for a reasonable benchmark.  (*See, e.g.*, Doc. 2459-2 ("Macartney Tr.") at 162:14-163:15 (Dr. Macartney testifying that Amazon "still provides a useful benchmark in the third model because it wasn't subject to all of that conduct.  It wasn't subject to exclusive deals, for instance").)

Keurig's second critique merits closer scrutiny.  As Keurig explains, Amazon sales, in general, grew nearly "six-fold" from 2013 to 2019, (Mem. 10), and another, perhaps more plausible, explanation for why JBR's sales grew more quickly in the Amazon channel than elsewhere is because of this external factor on the market generally.  To support exclusion, Keurig relies on *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, in which Judge Buchwald excluded a yardstick analysis that suffered from two flaws—first it chose benchmarks that were not reasonably comparable, 801 F. Supp. 3d at 455 ("plaintiffs' experts' 'comparable'

22

benchmarks are not, in fact, 'comparable,'"), and second, it failed "to account for an alternative explanation for the divergence between" the benchmark and the real world, "namely, the global financial crisis." *Id.*  Here, Dr. Macartney's use of JBR's Amazon sales as a benchmark fits comfortably within the generally accepted practice of "compar[ing] profit margins within the same company in differently situated markets." *Marathon Petroleum Co.*, 464 F. Supp. 3d at 892.  Therefore, Keurig's argument based on *LIBOR* carries less weight than it did with regard to the full market benchmark, as discussed previously.  *See supra* at 10, 14.

Additionally, JBR and Dr. Macartney claim in response that "[n]ot every product on Amazon grew just because they were on Amazon.  Rogers grew on Amazon—growth on Amazon is supported by the advantages in its product: that it was highly rated and that as an individual product was successful in Amazon." (Macartney Tr. 162:14-163:15; *see also id.* at 164:22-165:16 ("So this isn't just—that's just not growth on Amazon because it's Amazon. That's growth because it's a product that is increasingly popular, and it was popular amongst the sort of people that buy on Amazon.  It's not just an Amazon effect, right.").)  To be sure, as I noted above, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Better Holdco, Inc.*, 666 F. Supp. 3d at 365 (quoting *Kumho Tire Co.*, 526 U.S. at 157). However, I am also mindful that "the inquiry under *Daubert* is limited, and '[a] minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible.'" *Rinaldi v. SCA La Goutte, D'Or*, No. 16-CV-1901, 2021 WL 4553850, at *3 (S.D.N.Y. Sept. 30, 2021) (quoting *Amorgianos*, 303 F.3d at 267).  Thus, "because the federal rules emphasize liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *United*

*States v. Jakobetz*, 955 F.2d 786, 797 (2d Cir. 1992) (internal quotation marks omitted). Here, whether the difference in JBR's growth on the Amazon channel and its other sales channels is attributable to Keurig's conduct or Amazon's growth is ultimately a question for cross-examination and the finder of fact.

"[T]he pervasive problem" with Dr. Macartney's initial report was that he "chose a particularly flawed benchmark," in Keurig, because it reflexively conveyed to JBR not only the purported harms visited upon it by the anticompetitive conduct but also the excessive sales that Keurig was alleged to have obtained through that very same conduct. (Daubert Op. 31.) The Amazon benchmark, unlike the other two approaches in the Amended Macartney Report to establish a damages model, does, in fact, solve this problem through the selection of a reasonably comparable benchmark in a segment purportedly less affected by the anticompetitive conduct rather than one that incorporates the allegedly unlawful gains of the monopolist itself.

Although I still have concerns about the fact that the quantum of damages that the "Amazon approach" yields is approximately the same as that produced by the methodologically unsound "full market benchmark" and "lost customer" approaches, it is black letter law that the inquiry under Rule 702 must be focused "solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Swanson v. Schindler Elevator Corp.*, No. 21-CV-10306, 2024 WL 967331, at *7 (S.D.N.Y. Mar. 6, 2024) (quoting *Boucher*, 73 F.3d at 21). It is not my role to step into the shoes of the finder of fact and adjudicate whether JBR's growth in sales on Amazon in relation to the platform as a whole is attributable to external market forces or the impact of Keurig's alleged conduct on that channel. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence,

24

and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").  As the court in *Jakobetz* noted, "the jury is intelligent enough, aided by counsel, to ignore what is unhelpful in its deliberations."  955 F.2d at 797 (emphasis omitted) (internal quotation marks omitted).  It is for precisely this reason that "[e]xpert testimony should not be rejected simply because the conclusions reached by the witness seem subjectively improbable."  *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007).  Therefore, I find that Keurig's critiques go more to the weight to be afforded Dr. Macartney's analysis than to its admissibility.

In sum, Keurig's contentions about the growth of the Amazon platform more broadly carry both intuitive and economic appeal, (*see* Mot. 10–12), and Keurig is free to make these arguments before the finder of fact and test them against the reasonably comparable yardstick that Dr. Macartney has selected by using the Amazon segment of JBR's sales.  *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, No. 17-CV-4576, 2024 WL 1115944, at *6 (S.D.N.Y. Mar. 14, 2024) ("[I]n a close case, a court should permit the testimony to be presented at trial, where it can be tested by cross-examination and measured against the other evidence in the case." (internal quotation marks omitted)).  "As the Second Circuit has noted, district courts should presume expert evidence is reliable."  *UMG Recordings, Inc. v. Lindor*, 531 F. Supp. 2d 453, 456 (E.D.N.Y. 2007) (citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)).  Here, Keurig has not rebutted that presumption.

Therefore, JBR may proceed with its Amazon benchmark theory of damages, but not its full market benchmark or "lost customer" approach.  Keurig's motion to exclude this third "approach" to calculating damages is DENIED.

25

### D. *Use of 2025 End Date*

I also find that Dr. Macartney's decision to use 2025 as an end date for his damages model is not so speculative that it fails the reliability inquiry under Rule 702 and so I deny Keurig's motion to the extent it seeks to exclude Dr. Macartney's testimony on that ground. As I held in the Daubert Opinion, "[t]he problem" with Dr. Macartney's initial selection of 2029 as an end date for his model was that it was fundamentally unreasoned. (*See* Daubert Op. 30 ("Courts have permitted damages projections well into the future so long as they are adequately supported." (citing *Aetna, Inc. v. Blue Cross Blue Shield of Michigan*, No. 11-15346, 2015 WL 1497826, at *4 (E.D. Mich. Mar. 31, 2015)).)

In his amended report, Dr. Macartney uses the available data "through June 30, 2025," (Amended Macartney Rep. 23), which permits him to estimate damages through 2025. "Unlike in [his] Initial Report, [he] do[es] not forecast damages out through 2029, instead stopping in June 2025, the last month for which" he had data. (*Id.*) Keurig argues that because the damages still run through "more than a decade after the 2.0 brewer launched and 8 years after it was discontinued," that the "same issue persists." (Mem. 13.) However, the launch and use of the 2.0 brewer is not the only conduct that JBR alleges harmed competition during the relevant time period and damaged its bottom line. Indeed, JBR argues other conduct, such as Keurig's "aggressive enforcement of its exclusive dealing agreements," "reduced [JBR's] market share dramatically, and it has not recovered until this day." (Opp'n 17.) I find that Keurig's renewed critique of Dr. Macartney's end date, now cut off to align with the end date for the evidence in the record, is a criticism that goes to weight, and not admissibility. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or

26

accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.") (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 351 (5th Cir. 2007), *aff'd*, 564 U.S. 91 (2011)).  Whether the finder of fact determines that these allegations are supported by the evidence in the record is a question for another day, but I find that this basis alone is not sufficient to warrant exclusion under Rule 702.  *See In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 34 (E.D. Pa. 2019) (Rule 702 "does not require the party proffering the expert to demonstrate the correctness of the expert's opinion.  Rather, the party need only demonstrate by a preponderance of the evidence that the expert's opinion bears adequate indicia of reliability." (internal quotation marks omitted)), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020).  Therefore, to the extent that Keurig's motion is predicated on the end date of JBR's damages model, the motion is DENIED.

## IV.    Conclusion

For the reasons outlined above, Keurig's motion to exclude Dr. Macartney's testimony is GRANTED IN PART and DENIED IN PART.  JBR may proceed with a damages model based on the Amazon benchmark, which Keurig is free to attack through cross-examination and competing evidence.  The other benchmarks, which retain the same problem of incorporating the allegedly unlawful gains of the purported monopolist into the but-for world that is supposed to model more competitive market conditions, cannot survive the reliability inquiry under Rule 702 and are hereby excluded.

The Clerk of Court is respectfully directed to terminate the motion pending at Doc. 2449.

SO ORDERED.

Dated:      July 10, 2026
            New York, New York

_____
Vernon S. Broderick
United States District Judge

28