UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: KEURIG GREEN MOUNTAIN SINGLE-SERVE COFFEE ANTITRUST LITIGATION<br><br>*This Document Relates to:*<br><br>BJ'S WHOLESALE CLUB, INC.,<br><br>Plaintiff,<br><br>-against-<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>Defendant.<br><br>AND<br><br>WINN-DIXIE STORES, INC.; and BI-LO HOLDING, LLC,<br><br>Plaintiffs,<br><br>-against-<br><br>KEURIG GREEN MOUNTAIN, INC.,<br><br>Defendant. | 14-MD-2542 (VSB)<br><br>Related Cases:<br>21-CV-7504<br>21-CV-7493<br><br>**OPINION & ORDER** |

Appearances:

Philip J. Iovieno
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
New York, NY

*Counsel for Plaintiffs BJ's Wholesale Club, Inc; Bi-Lo Holding, LLC; and Winn-Dixie Stores, Inc.*

Patrick Ahern
Ahern and Associates, P.C.
Chicago, IL

Theodore B. Bell
Sultzer & Lipari, PLLC
Poughkeepsie, NY

*Counsel for Plaintiffs Bi-Lo Holding, LLC and Winn-Dixie Stores, Inc.*

Kristen J McAhren
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Washington, DC

Mark Andrew Singer
Michael Edward Petrella
Nicholas A. Gravante, Jr
Sean F. O'Shea
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
New York, NY

*Counsel for Plaintiff BJ's Wholesale Club, Inc.*

Lev Dassin
George S. Cary
Leah Brannon
Elaine Ewing
Cleary Gottlieb Steen & Hamilton LLP
New York, New York

Wendelynne Newton
Buchanan Ingersoll & Rooney PC
Pittsburgh, Pennsylvania

*Counsel for Defendant Keurig Green Mountain, Inc.*

VERNON S. BRODERICK, United States District Judge:

Before me is Defendant Keurig's motion for summary judgment against Plaintiffs BJ's Wholesale Club, Inc. ("BJ's"), Winn-Dixie Stores, Inc. and Bi-Lo Holding, LLC, ("Winn-Dixie"). (Doc. 2062 ("Mot.").) For the reasons that follow, Keurig's motion is GRANTED IN PART and DENIED IN PART.

## I. Procedural History

The BJ's action, (No. 21-CV-7493, "BJ's Action"), and the Winn-Dixie action, (No. 21-CV-7504, "Winn-Dixie Action"), were initiated on July 30, 2021 by BJ's (No. 21-CV-7493, Doc. 1), and on August 6, 2021 by Winn-Dixie, (No. 21-CV-7504, Doc. 1). On September 8, 2021, the BJ's Action was transferred in from the Eastern District of New York and consolidated into the multidistrict litigation before me. (No. 21-CV-7493, Doc. 12.) On September 10, 2021, the Winn-Dixie Action was transferred from the Eastern District of New York and consolidated into the multidistrict litigation before me. (No. 21-CV-7504, Doc. 7.)

On August 25, 2021, the other plaintiffs in this multidistrict litigation, including TreeHouse, JBR, and MacLane, filed a motion for summary judgment, (Doc. 1489), along with a Rule 56.1 statement, (Doc. 1490), a memorandum of law in support, (Doc. 1495), and a declaration of Aldo A. Baldini, which attached 441 exhibits, (Doc. 1497). On the same day, Keurig filed its motion for summary judgment, (Doc. 1493), along with a memorandum of law in support, (Doc. 1494), a Rule 56.1 statement, (Doc. 1496), and seven declarations from Lisa M. Danzig that attached 352 exhibits, (Docs. 2277–83). On October 27, 2021, Plaintiffs filed their memorandum of law in opposition to Keurig's motion for summary judgment, (Doc. 1563), along with a declaration of Aldo A. Baldini, which attached 808 exhibits, (Doc. 1565), and its counterstatement to Plaintiffs' Rule 56.1 Statement, (Doc. 1568). On the same day, Keurig filed

its memorandum of law in opposition to Plaintiffs' motion for summary judgment, (Doc. 1567), along with a counterstatement to Keurig's Rule 56.1 Statement, (Doc. 1569), and five declarations from Alan B. Freedman that attached 265 exhibits, (Docs. 2286–90). On December 15, 2021, Keurig filed its reply memorandum in support of its summary judgment motion, (Doc. 1659), along with a response to Plaintiffs' counterstatement under Rule 56.1, (Doc. 1660), and a declaration from Lisa Danzig that attached fifty-five exhibits, (Doc. 2293). On the same day, Plaintiffs filed a reply memorandum in support of their summary judgment motion, (Doc. 1653), along with a response to Keurig's counterstatement under Rule 56.1, (Doc. 1655), and a declaration of Aldo A. Baldini, which attached forty-two exhibits in support, (Doc. 1656). I filed an Opinion & Order under seal on these motions (the "Cross-Motions") on September 18, 2026, (Doc. 2551 ("Opinion" or "Op.")), and sent the Opinion to the parties by email requesting that the parties provide proposed redactions by October 19, 2026.

On February 7, 2022, I granted the parties' request to proceed through a single case management plan for the BJ's Action and the Winn-Dixie Action, and ruled that the discovery already conducted in the multidistrict litigation could be used by the parties to the Winn-Dixie and BJ's Actions. (Doc. 1707.) Fact Discovery in the BJ's and Winn-Dixie Actions closed on September 16, 2022, and Expert Discovery completed on April 12, 2023. (Doc. 2028.)

On May 15, 2023, the parties to the BJ's and Winn-Dixie Actions stipulated that BJ's and Winn-Dixie joined arguments II, III, IV, and VI made in the Cross-Motions and that Keurig would rely on the corresponding sections of its opposition to those arguments. (Doc. 2040.) These arguments were addressed and ruled on in my September 18, 2026 ruling on the Cross-Motions for summary judgment. (Op.) The parties also agreed in the May 15, 2023 stipulation that "[w]ithin 21 days of the Court's ruling on the sections of the Prior MSJ that comprise BJ's

and Winn-Dixie's motion for summary judgment, Keurig, BJ's, and Winn-Dixie will meet and confer and submit a joint status update and proposed order(s) regarding how the Court's ruling affects the claims asserted by BJ's and Winn-Dixie." (Doc. 2040.)

On June 13, 2023, Keurig filed a motion for summary judgment in the Winn-Dixie and BJ's Actions, (Mot.), along with an accompanying memorandum of law, (Doc. 2063 ("Mem.")), a declaration from Zach Tschida in support, (Doc. 2065), and Keurig's Rule 56.1 Statement, (Doc. 2064 ("DSUMF")). On July 28, 2023, Winn-Dixie and BJ's filed a memorandum of law in opposition, (Doc. 2102 ("Opp'n")), along with a counterstatement to Keurig's Rule 56.1 Statement, (Doc. 2100 ("PCSUMF")), and a declaration of Kristen McAhern in support, (Doc. 2101). On August 29, 2023, Keurig filed a reply memorandum of law in support of its motion, (Doc. 2121 ("Reply")), along with a declaration of Zach Tschida in support, (Doc. 2122), and a response in support of its Rule 56.1 Statement, (Doc. 2123 ("DRISOSUMF")). On September 5, 2023, Winn-Dixie and BJ's requested leave to file a sur-reply, (Doc. 2125), which I granted on September 14, 2023, (Doc. 2136). The sur-reply was filed on September 15, 2023. (Doc. 2138 ("Sur-Reply").)

## II. Factual Background[1]

Keurig began manufacturing single server brewers in 1998. (PCSUMF ¶ 1.) Until 2012, Keurig had a patent on its short filter technology used to manufacture its compatible single use coffee cups ("K-cups"). (*Id.* ¶ 3.) The volume of sales of Keurig-compatible single-serve coffee

[1] The following factual summary is drawn from the parties' Rule 56.1 submissions, declarations, depositions, and exhibits. The facts in this section are substantively undisputed unless otherwise noted, either explicitly or by attributing the fact to only one party. I recount here only the information necessary for my decision on the pending motions. The parties have also incorporated by reference the material facts from the Cross-Motions for summary judgment filed at Docs. 1490, 1496, 1568, 1568, 1660 and 1665. (PCSUMF 36 ("Plaintiffs incorporate by reference Nos. 1-907 of the Statement of Undisputed Fact filed as part of the Motion for Summary Judgment which Plaintiffs have by consent joined. Plaintiffs also incorporate by reference Nos. 908-2008 of Plaintiffs' Response and Counterstatement to Keurig Green Mountain, Inc.'s Rule 56.1 Statement of Undisputed Fact." (internal citations omitted")).) I addressed the factual background derived from these submissions in the Opinion. (Op. § I.)

cups rose between 2012 and 2019, and the price decreased. (DSUMF ¶¶ 56–57.) "Keurig maintained an 80% or higher market share for compatible cups between 2010 and 2019," including sales of Starbucks, Kraft, and Smucker K-cups packed and designed by Keurig. (PCSUMF ¶ 2035.)

Winn-Dixie began selling K-cups and other Keurig-compatible single-serve coffee cups in 2010. (DSUMF ¶ 9.) Winn-Dixie introduced private label Keurig-compatible single-serve coffee cups in November 2012, which were supplied by TreeHouse until 2016. (*Id.* ¶¶ 18–19, 24.) In October 2014, Winn-Dixie issued a request for information ("RFI") "from suppliers to supply its private label portion packs, and eleven different Keurig-compatible portion pack suppliers, including Keurig, participated." (*Id.* ¶ 21; PCSUMF ¶ 21.) In 2016, Winn-Dixie selected Barrie House as the supplier of its private label compatible portion packs. (DSUMF ¶ 24.) Winn-Dixie did not sell Keurig brewers. (*Id.* ¶ 73.) Winn-Dixie purchases Starbucks and Smucker Keurig compatible-portion packs from Starbucks and Smucker. (*Id.* ¶ 82.)[2]

"BJ's is a club store that typically carries less [stock keeping units ("SKUs")] than traditional grocery stores." (PCSUMF ¶ 36.) In 2014, BJ's introduced private label Keurig-compatible single-serve coffee cups, which were manufactured by Keurig. (DSUMF ¶¶ 51–52.) In 2016, BJ's held an auction related to private label Keurig-compatible single-serve coffee cups, and Keurig won three SKUs even though it did not participate in the auction. (*Id.* ¶ 54; PCSUMF ¶ 54.) JBR did not participate in this auction. (DSUMF ¶ 65.) BJ's private label agreement did not restrict Keurig from selling other Keurig-compatible single-serve coffee cups to consumers. (*Id.* ¶ 70.) The private label contract with BJ's did not permit BJ's to develop a

[2] Winn-Dixie and BJ's object to this fact because "it offers a legal conclusion" and argue that "Keurig coerced branded Portion Pack suppliers, including Smucker and Starbucks, to enter into exclusive agreements," but do not contest that there is no formal relationship of privity between either Winn-Dixie or BJ's, and Keurig, as to these purchases. (PCSUMF ¶ 82.)

competitive brewer or use other suppliers for private label Keurig-compatible single-serve coffee cups. (PCSUMF ¶ 2015.) BJ's was [redacted]. (*Id.* ¶ 2028; Doc. 2511-21; Doc. 2511-5.) [redacted] was a "point of negotiation in BJ's private label negotiations with Keurig for 2018." (PCSUMF ¶ 2033.)[3]

When Keurig introduced the 2.0 Brewer in 2014, it continued to sell the 1.0 Brewer. (DSUMF ¶ 68; PCSUMF ¶ 68.) In July 2014, BJ's received information that unlicensed single-serve coffee cups could be used in the 2.0 Brewer. (Doc. 2501-16–2501-18.) JBR publicly announced the launch of compatible single-serve coffee cups for the 2.0 Brewer less than a month after the launch of the 2.0 Brewer. (Doc. 2501-19.)

On October 1, 2010, Keurig sued Sturm, a subsidiary of TreeHouse, for patent infringement. *Keurig, Inc. v. Sturm Foods, Inc.*, No. CV-10-841, 2012 WL 4049799, at *1 (D. Del. Sept. 13, 2012), *judgment entered*, No. CV-10-841, 2012 WL 12896333 (D. Del. Nov. 2, 2012), *and aff'd*, 732 F.3d 1370 (Fed. Cir. 2013). On September 13, 2012, the District Court for the District of Delaware granted summary judgment to Sturm as to the patent claims, but denied Stern's motion for summary judgment on the non-patent claims alleged in the suit. (DSUMF ¶¶ 75–76; *see also Sturm* 2012 WL 4049799, at *12–13.) On February 19, 2013, Keurig and Sturm settled the non-patent claims, with the terms of the settlement dictating that Sturm was to pay Keurig [redacted] and stipulating to dismissal. (DSUMF ¶ 77; Doc. 2494-54.) The Federal Circuit affirmed the District Court's summary judgment decision on October 17, 2013. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1375 (Fed. Cir. 2013).

[3] Keurig objects to this fact because "it does not affect the outcome of Keurig's Motion" and "[t]he cited documents show that BJ's extracted *a lower price from Keurig* through its negotiations." (DRISOSUMF ¶ 2033 (emphasis in original).) Neither of these contentions change the substantive fact asserted by Plaintiffs.

With regard to statements made by Keurig regarding its products and those of competitors: "BJ's does not always take suppliers' marketing statements about their own portion packs at face value." (PCSUMF ¶ 78; *see also* Doc. 2494-6; Doc 2494-10; Doc. 2494-32; Doc. 2494-34.) BJ's and Winn-Dixie conduct testing of portion pack samples to evaluate their quality. (PCSUMF ¶¶ 79–81; *see also* Doc. 2494-2; Doc. 2494-6; Doc. 2494-12; Doc. 2494-13; Doc. 2494-33; Doc. 2494-47.) Keurig had a "conversation" with BJs "about [how] using Keurig licensed pods would be safer or increase the safety of the use." (Doc 2511-2.) On August 1, 2013, a representative from Keurig emailed representatives from BJs extolling the benefits of Keurig products, including "[a]ssurance of the 3 core pillars of all Keurig Brewed product: Taste, Quality, Safety," and "[i]nclusion in future innovation and technology advancements." (PCSUMF ¶¶ 2010, 2012; *see also* Doc. 2511-10.) On December 13, 2013, Keurig told BJ's that "packs must have interactive technology to brew," with the new 2.0 Brewer. (PCSUMF ¶¶ 2013–14; *see also* Doc. 2511-11, Doc. 2511-9.) On September 9, 2014, a representative from Keurig stated in an internal email that the 1.0 Brewer "was being closed out . . . at BJ's." (PCSUMF ¶¶ 2016–17; *see also* Doc. 2511-15; Doc. 2511-9.) The representative said that this was because of "'BJ's strategy' of selling only one Keurig brewer in its stores." (DRISOSUMF ¶¶ 2016–17; Doc. 2511-9.)

## III. Legal Standard

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A fact is “material” if it “might affect the outcome of the suit under the governing law,” and “[f]actual disputes that are irrelevant or unnecessary will not be counted.” *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to “set forth specific facts showing that there is a genuine issue for trial,” *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party “must do more than simply show that there is some metaphysical doubt as to the material facts.” *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). “A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials. . . .” Fed. R. Civ. P. 56(c)(1)(A). In the event that “a party fails . . . to properly address another party’s assertion of fact as required by Rule 56(c), the court may,” among other things, “consider the fact undisputed for purposes of the motion” or “grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.” Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, a court must “view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party.” *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citation and

quotation marks omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

"In the context of antitrust litigation the range of inferences that may be drawn from ambiguous evidence is limited; the non-moving party must set forth facts that tend to preclude an inference of permissible conduct." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). Nonetheless, "broader inferences are permitted, and the tends to [pre]clude standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (internal quotation marks omitted).

## IV. <u>Discussion</u>

### A. *Antitrust Injury*

As in its cross-motion for summary judgment, Keurig claims it is entitled to summary judgment on antitrust injury grounds as "it is undisputed that prices decreased and output expanded." (Mem. 10.) With respect to BJ's and Winn-Dixie, "Winn-Dixie paid decreasing prices for Keurig-compatible portion packs [] and its sales volume increased" (*id.* at 12 (citing DSUMF ¶¶ 49, 58)), and the same was true for BJs, (*id.* (citing DSUMF ¶¶ 48, 59)). These arguments fail for the reasons I outlined in the Opinion: "Keurig's arguments about price and output are predicated on a misleading framework that ignores that it had a patent that distorted competitive market conditions prior to 2012." (Op. at 27.) The fact that Keurig had a patent on its short filter coffee cups is antithetical to Keurig's claim that antitrust injury can be measured strictly by focusing on the growth in output or reduction in price in the time period after the

expiration of that patent. *See In re Zyprexa Prods. Liab. Litig.*, No. 04-MD-1596, 2008 WL 2696916, at *31 (E.D.N.Y. July 2, 2008) (noting that when patent protection expires, costs "will undoubtedly sharply decrease"); *In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 209 (2d Cir. 2006) ("If the patent holder loses its patent monopoly . . . it will likely lose some substantial portion of the market[.] . . . The patent holder might also (but will not necessarily) lower its price in response to the competition."), *abrogated by F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013).[4] In other words, output growth and price reduction are an entirely predictable result of the expiration of a patent, not proof that plaintiffs, including Winn-Dixie and BJ's, were not injured by Keurig.

Plaintiffs raise a genuine dispute of material fact concerning whether, absent Keurig's anticompetitive conduct, their returns and sales would have been greater. *See United States v. Live Nation Ent., Inc.*, No. 24-CV-3973, 2026 WL 456804, at *28 (S.D.N.Y. Feb. 18, 2026) ("[N]o part of this analysis requires the plaintiff to show *actual* changed prices, output, or quality." (emphasis in original)), *reconsideration denied*, No. 24-CV-3973, 2026 WL 563024 (S.D.N.Y. Feb. 27, 2026). Plaintiffs prove that there is a triable issue concerning whether Keurig's conduct, including its agreements with nascent competitors like Starbucks and Dunkin' who would have entered the market to compete with Keurig but for (1) these agreements, ("Roaster Agreements"), *see* Op. 59; (2) its exclusive agreements with suppliers of materials for the manufacture of single-serve compatible cups to lock in these products and prevent their

[4] *See also* Ramon A. Klitzke, *Patents and Monopolization: The Role of Patents Under Section Two of the Sherman Act*, 68 Marq. L. Rev. 557, 560 n.18 (1985) ("The United States Supreme Court has long recognized the patent grant as a 'legal monopoly.'" (citing *Bement v. National Harrow Co.*, 186 U.S. 70, 91 (1902) ("The very object of [the patent] laws is monopoly") and *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 (1964) ("The grant of a patent is the grant of a statutory monopoly") and collecting cases)); *see also Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.,* 441 U.S. 1, 28 (1979) (Stevens, J., dissenting) ("[A] patent[] is a statutory grant of monopoly privileges.").

competitors from gaining access to them, ("Supplier Agreements"), *see* Op. 78; and (3) its agreements with authorized distributors and redistributors to coerce them into purchasing cups and brewers through the Keurig system rather than independently, ("Distributor Agreements"), *see* Op. 80, caused harm to Plaintiffs in this suit, including Winn-Dixie and BJ's. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 659 (2d Cir. 2015) ("eliminating generic competition" sufficed to demonstrate anticompetitive harm, in part because the underlying conduct "ma[d]e[] sense only because it eliminate[d] competition.") (citing *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014), *as corrected* (June 19, 2014)); *Int'l Television Prods. Ltd. v. Twentieth Century-Fox Television Div. of Twentieth Century-Fox Film Corp.*, 622 F. Supp. 1532, 1538 (S.D.N.Y. 1985) ("[A]n injury suffered by one competitor by virtue of a conspiracy engaged in by another competitor is, if not prototypical, certainly the kind of injury about which the antitrust laws are concerned.").

Furthermore, as did the other plaintiffs in their opposition to Keurig's motion for summary judgment, Winn-Dixie and BJ's demonstrate that there is a disputed fact issue concerning whether Keurig's "anticompetitive conduct reduced quality and consumer choice in the market, including by limiting the varieties of brands that could be used in the Keurig infrastructure." (Op. 34.) Here, Winn-Dixie and BJ's claim that Keurig artificially limited the number of SKUs that BJ's was able to stock of [redacted]. (*See* PCSUMF ¶ 2028.) These allegations raise at least a genuine dispute of material fact as to whether Keurig's allegedly monopolistic conduct anticompetitively reduced quality in the single-serve compatible coffee cup market. *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1045 (D.C. Cir. 2019) ("Vertical mergers can create harms beyond higher prices for consumers, including decreased product quality and reduced innovation."); *Fed. Trade Comm'n v. Sanford*

*Health, Sanford Bismarck*, No. 17-CV-0133, 2017 WL 10810016, at *7 (D.N.D. Dec. 15, 2017) ("[S]econd-stage competition generally focuses on non-monetary factors which include, e.g., clinic hours, convenience of location, available services, technology, and quality."); *see also* Hillary Greene, *Muzzling Antitrust: Information Products, Innovation and Free Speech*, 95 B.U. L. Rev. 35, 73 (2015) ("Anticompetitive harms include increases in price (adjusting for quality changes) or reductions in quality, variety, or innovation, while procompetitive benefits include lower prices or increases in quality, variety, or innovation."); Nikolas Guggenberger, *Moderating Monopolies*, 38 Berkeley Tech. L. Rev. 119, 135 (2023) ("As the network-effect-induced value gap between the incumbent [firm] and its rivals becomes an insurmountable market entry barrier, the quality of the service and innovation lose import: the advantages of size trump other features.").

Therefore, Keurig's motion for summary judgment on antitrust injury grounds is DENIED.

### B. *Monopoly Power*

Keurig also echoes its arguments from the Cross-Motions in arguing that Winn-Dixie and BJ's "cannot show significant barriers to entry here," because "[i]t is undisputed that more than a dozen competitors entered the alleged relevant market." (Mem. 13.) As I explained in the Opinion, the "overly simplistic assertion" that since there was purportedly entry in the single serve coffee market, there can be no monopoly power, "does not hold true as a matter of law." (Op. 40.) Plaintiffs do not "pretend that these entrants . . . do not exist," (*Cf.* Mem. 13), but rather point out that "the fact of competitive entry . . . alone proves neither a lack of barriers to entry nor a lack of monopoly power," (Opp'n 15). Plaintiffs are correct.

Courts do not "reflexively insist on putting plaintiffs to task in demonstrating that there has been no entry into a market at the summary judgment phase of litigation, provided that an antitrust plaintiff has put forward a sufficient measure of competent proof to demonstrate durable monopoly power." (Op. 42; *see also Fed. Trade Comm'n v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 52 (D.D.C. 2024) ("*Meta I*") (summary judgment denied even though "chief rival" was growing rapidly and the evidence showed that "companies outside of the [relevant] market c[ould] pivot to compete with" the alleged monopolist.").)[5] Plaintiffs have adduced significant evidence that Keurig was able to and did maintain a high market share above the typical threshold for monopoly power. (Op. 41–42.) Additionally, in contrast to a case like *Tops Markets*, *Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (Wegmans "quickly gained a respectable share of the market," after opening a nearby store), there was no well-financed large competitor that was able to serve as a check on Keurig's monopoly power and restore competitive balance to the market. Here, Plaintiffs have raised a triable issue regarding monopoly power through evidence that "Keurig's market share has remained remarkably durable over the course of 2010s after the expiration of its patent, maintaining market shares upwards of seventy-five percent throughout the past decade." (Op. 41.) Courts routinely hold that such evidence suffices to defeat summary judgment. *See, e.g.*, *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1124 (10th Cir. 2014) ("durable" market power shown by control of "62% to 97–98% of the" market over a four-year period gives rise to reasonable

[5] Because I find that Winn-Dixie and BJ's have raised a genuine dispute of material fact concerning whether Keurig had monopoly power, I need not address the arguments raised in Keurig's motion that Winn-Dixie and BJ's have failed to raise a genuine dispute of material fact concerning whether Defendant has obtained and/or maintained the lesser quantum of "substantial market power" or a "dangerous probability" of obtaining market share. (*See* Mem. 14–16; *see also* Op. 61–62 ("[S]ince I concluded that Plaintiffs raised a genuine dispute of material fact as to whether Keurig had monopoly power in the single-serve brewer market I have little trouble concluding that Plaintiffs raise a triable issue as to whether it possesses the lesser quantum of "appreciable economic power" in this tying market for the purposes of a tying claim.") (internal citations omitted).)

inference that "market dominance was sufficient to impede competition"); *United States v. Google LLC*, 747 F. Supp. 3d 1, 119 (D.D.C. 2024) ("*Google I*") ("80% share since at least 2009 . . . is a durable dominant share by any measure.").

Keurig's motion for summary judgment on monopoly power grounds is accordingly DENIED.

### C. *2.0 Brewer Claims*

Keurig argues that Winn-Dixie and BJ's claims regarding the 2.0 Brewer cannot survive summary judgment. (Mem. 17–18.) I agree. As I explained in the Opinion, "the antitrust laws do not permit firms to dictate how other firms design their products, even monopolists." (Op. 82.) Accordingly, courts require evidence of coercion in order for claims based on product redesign to move past summary judgment. *See Actavis*, 787 F.3d at 652 ("Well-established case law makes clear that product redesign is anticompetitive when it coerces consumers and impedes competition"); *Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*, 838 F.3d 421, 440–41 (3d Cir. 2016) ("[C]ertain insignificant design or formula changes, combined with other coercive conduct, could present a closer call with respect to establishing liability in future cases," particularly in cases "where there is evidence of extreme coercion."). In this case, the undisputed evidence reveals that Keurig never phased out the 1.0 Brewer, and, indeed, discontinued the 2.0 Brewer by 2018 at the latest. (*See* Op. 13, 83.) Therefore, Plaintiffs' allegations add up to, at best, conduct analogous to what is called a "soft switch" in the pharmaceutical context, and which the Second Circuit has held is not anticompetitive as a matter of law. *Actavis*, 787 F.3d. at 654 (explaining that "persuad[ing] patients and their doctors to switch from [an old product] to [a new product] while both were on the market" is not anticompetitive, but that a "hard switch,"

i.e., removing the old product from circulation, "crosses the line from persuasion to coercion and is anticompetitive").

Winn-Dixie and BJ's arguments to the contrary are unavailing. BJ's may have phased out the 1.0 Brewer, but the record reveals that this choice was attributable to "BJ's strategy of having one brewer available for single-serve," not Keurig's having removed the 1.0 Brewer from the market. (Doc. 2511-9 at 19–23.) With respect to coercion, Keurig and BJ's can only gesture at statements made by Keurig to BJ's and Winn-Dixie regarding the compatibility of unlicensed single-serve coffee cups with the 2.0 Brewer. However, the record reveals that both BJ's and Winn-Dixie were sophisticated actors capable of testing compatibility, quality, and other features of the unlicensed packs. (PCSUMF ¶¶ 78–81; *see also* Doc. 2494-6; Doc 2494-10; Doc. 2494-32; Doc. 2494-34; Doc. 2494-2; Doc. 2494-6; Doc. 2494-12; Doc. 2494-13; Doc. 2494-33; Doc. 2494-47.) Furthermore, there is no indication that Keurig coerced BJ's, Winn-Dixie, or any customer, to use the 2.0 Brewer over the 1.0 Brewer, or made it difficult to access or purchase the earlier model in a way that could theoretically be cognizable under the antitrust laws. "Absent the withdrawal of the old product, there is no coercion, no distortion of competitive conditions, and no antitrust violation." (Op. 84–85 (quoting Areeda & Hovenkamp ¶ 776 (explaining that "product improvement without more is protected and beyond antitrust challenge" and only creates competitive concerns where "the defendant's position in the dominant product is so substantial that the market for the older technology is eliminated not by consumer choice but by the defendant's withdrawal").

Keurig's motion for summary judgment on claims related to introduction of the 2.0 Brewer are GRANTED.

### D. *Exclusive Dealing Claims*

Nothing in the parties' briefing on Winn-Dixie and BJ's exclusive dealing claims dissuades me from the conclusion I reached in the Opinion, namely that exclusive dealing claims predicated on the Roaster Agreements, Supplier Agreements, and Distribution Agreements survive summary judgment, but that there is insufficient evidence that the private label agreements between Keurig and various retailers, including BJ's ("Retail Agreements"), were exclusive and anticompetitive for this last category of agreements to proceed to trial. (*See* Op. § IV.D.1.) In its brief, Keurig advances parallel arguments to those it put forward in its motion for summary judgment. (*Compare* Doc. 1494 at 52 ("it is undisputed that more than a dozen firms obtained the inputs they needed to enter"), *with* Mem. 19 ("more than a dozen unlicensed suppliers secured all the inputs they needed to enter and therefore were not foreclosed from the market").) These arguments are no more persuasive here than they were previously, given the requirement that I aggregate competitive harms and substantial foreclosure pursuant to the Supreme Court's ruling in *Continental Ore Co. v. Union Carbide & Carbon Corp*, 370 U.S. 690, 699 (1962). (*But see Op.* 76 ("[W]hen determining substantial market foreclosure '[a]ggregating the harms resulting from each of [Defendant's] categories of exclusionary conduct' is the appropriate way to perform such an analysis." (quoting *Reiss v. Audible, Inc.*, No. 24-CV-05923, 2025 WL 1654643, at *9 (S.D.N.Y. June 11, 2025))); *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303 (9th Cir. 1982) (explaining that "it was proper for the district court to have aggregated [Defendant's] contracts in the relevant market in order to assess the Sherman Act violations resulting from these contracts"); *United States v. Google LLC,* 778 F. Supp. 3d 797, 857 (E.D.Va 2025) ("*Google II*") ("A holistic assessment of whether a monopolist's conduct harm[ed] the competitive process and thereby

harm[ed] consumers is thus the touchstone for determining whether a monopolist alleged to have engaged in an exclusionary campaign violated Section 2 of the Sherman Act." (internal quotation marks omitted)).)

To the extent Keurig argues that because the contract between BJ's and Keurig itself was not exclusive, the exclusive dealing claims necessarily fail, this assertion is misplaced. (*But see* Mem. 19 ("BJ's never had an exclusive contract with Keurig for branded products and, when BJ's wanted a non-exclusive private label contract with Keurig, it got one").) For example, none of the competitor plaintiffs who filed the Cross-Motions for summary judgment are themselves alleged to have signed an exclusive dealing contract directly with Keurig, yet they may still pursue claims that Keurig's exclusive contracts with other entities caused them antitrust injury by substantially foreclosing the market, in aggregate. (*See* Op. § IV.D.1.) Whether or not BJ's contract with Keurig was itself exclusive is unrelated to whether BJ's and Winn-Dixie's exclusive dealing claims are cognizable.

However, I maintain my ruling that Plaintiffs, including BJ's and Winn-Dixie, have failed to put forward sufficient evidence to show that the Retail Agreements tend to exclude competition, and thus claims based on these contracts cannot survive summary judgment. (*See* Op. 73 ("I do not find that the retail agreements that Keurig signed with its distributors were de facto exclusive dealing arrangements. This is because the contracts in question did not differ materially from those utilized as a general matter by other competitors in the industry and did not preclude partners from stocking unlicensed competitors.").) If anything, the facts adduced by the parties in the Winn-Dixie and BJ's Actions reinforce this conclusion as it is undisputed that TreeHouse was Winn-Dixie's private label supplier from 2012 to 2016. (DSUMF ¶¶ 19, 24.) "That this kind of contract was 'a common and generally accepted practice' supports the

conclusion that these kinds of private label deals were not exclusive as a matter of law." (Op. 73 (quoting *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 79 (3d Cir. 2010)).)

Therefore, Keurig's motion is GRANTED as to the Retail Agreements but DENIED as to the Roaster Agreements, Supplier Agreements, and Distribution Agreements.[6]

**E. *Tying Claims***

My ruling in the Opinion that the moving plaintiffs' tying claims survived summary judgment applies equally to the claims of Winn-Dixie and BJ's. As I noted in the Opinion, a jury could credit the argument that the alleged tying "agreements were the only viable options for distributors and redistributors seeking to reach end consumers." (Op. 66.) Much like the assertion that the exclusive dealing claims brought by BJ's ipso facto cannot succeed because BJ's contract itself was not exclusive, this argument misses the mark. Winn Dixie and BJ's correctly point out in their opposition that "like other plaintiffs they assert tying in the 'away from home' segment of the market involving KAD and KARD agreements with an effect on market wide prices." (Opp'n 20.)

As I have previously ruled, the relevant inquiry is not whether the brewer and the single-serve portion package can be sold "separately," but rather whether "it was economically viable for the single-serve brewer and K-cups to be sold separately, thus circumventing the exclusivity clause undisputedly present in the KAD and KARD agreements." (Op. 67; *see also Nobel Sci. Indus., Inc. v. Beckman Instruments, Inc.*, 670 F. Supp. 1313, 1324 (D. Md. 1986) ("There need

[6] In this section of their memorandum, Keurig argues that claims predicated on acquisitions and mergers are not cognizable as part of the course of conduct alleged in this action, (*see* Mem. 19), and Winn-Dixie and BJ's do not respond to this argument in their opposition, (*but see* Opp'n *generally*). An argument is "waived or abandoned if a party fails to make it." *Vasquez v. New York City Dep't of Educ.*, No. 11-CV-3674, 2015 WL 3619432, at *14 (S.D.N.Y. June 10, 2015) (collecting cases), *aff'd*, 667 F. App'x 326 (2d Cir. 2016)). In any event, I see no reason to deviate from my previous ruling that Keurig is entitled to summary judgment on claims predicated on the acquisitions and mergers from the 2009 to 2010 time frame. (*See* Op. § IV.D.6.)

not be an explicit condition that the buyer of the tying product buy the tied product. 'Separate availability will not preclude antitrust liability where defendant has established its pricing policy in such a way that the only viable economic option is to purchase the tying and tied products in a single package.'"), *aff'd*, 831 F.2d 537 (4th Cir. 1987) (citing *Ways and Means, Inc. v. IVAC Corp.*, 506 F. Supp. 697, 701 (N.D.Cal.1979), *aff'd*, 638 F.2d 143 (9th Cir.1981), *cert. denied*, 454 U.S. 895 (1981)).

Because Winn-Dixie and BJ's adduce enough competent evidence to raise a genuine dispute of material fact concerning whether it was economically viable for distributors to get to market outside of the Keurig system and the exclusive contracts that it entailed, Keurig's motion for summary judgment on the tying claims of Winn-Dixie and BJ's is DENIED.

### F. *Sham Litigation Claims*

Keurig is also entitled to summary judgment on Winn-Dixie and BJ's sham litigation claims. As I explained in the Opinion, "Plaintiffs put forward no evidence, after years of discovery, that these lawsuits were brought for frivolous or anticompetitive reasons." (Op. 94.) Such evidence would be a necessary prerequisite to maintaining such claims over a motion for summary judgment, due to the high bar that sham litigation claims must clear in order to be cognizable under binding caselaw. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (plaintiff must show that litigation is "an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." (internal citation omitted)). The "sham exception should be construed narrowly so as to avoid intrusion upon, or a chilling of, one's right to petition under the First Amendment," and "[t]he burden of proving the exception rests with the party attempting to invoke it." *In re*

*Elysium Health-Chromadex Litig.*, 354 F. Supp. 3d 330, 336 (S.D.N.Y. 2019), *as amended* (Feb. 7, 2019).

Regardless of the impact of the litigation on the Winn-Dixie private label launch, the suits in question survived motions to dismiss and, in part, summary judgment motions. *See supra* § I. This alone suggests that the suits were not "objectively baseless." *See Krasnyi Oktyabr, Inc. v. Trilini Imports*, 578 F. Supp. 2d 455, 475 (E.D.N.Y.2008) (litigation was not objectively baseless, "although plaintiff's suit . . . prove[d] unsuccessful, [in part because] plaintiff's claims had enough merit to survive defendants' motion to dismiss"). Furthermore, sanctions were not issued by either court against Keurig and there is no indication in the evidentiary record in this case that Keurig intended to use the suits for anticompetitive reasons, to harm Winn-Dixie, BJ's, or any other competitor in the market, as opposed to bringing a legitimate action for patent infringement, even if it may not have ultimately succeeded.

Therefore, Keurig's motion for summary judgment on the "sham litigation" claims is GRANTED.

### G. *False Advertising Claims*

Winn-Dixie and BJ's antitrust allegations premised on Keurig's advertising are not legally viable and cannot survive summary judgment. "Antitrust claims premised on false or misleading advertising are rare and infrequently succeed." (Op. 87 (citing *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Lab'ys, Div. of/and Am. Home Prods. Corp.*, 850 F.2d 904, 916 (2d Cir. 1988) ("Because the likelihood of a significant impact upon the opportunities of rivals is so small in most observed instances—and because the prevalence of arguably improper utterance is so great—the courts would be wise to regard misrepresentations as presumptively de minimis for § 2 purposes.").) It is only when, through cumulative proof of six factors, Plaintiffs rebut the

presumption that speech and advertising is de minimis, that such assertions can survive a motion for summary judgment. *See Ayerst*, 850 F. 2d at 916 (de minimis presumption can only be overcome "by cumulative proof that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals."). Winn-Dixie and BJ's fail to meet their burden here.

To the contrary, it is clear that the statements made by Keurig regarding its products and compatibility with unlicensed packs were readily capable of being neutralized by Winn-Dixie and BJ's, who are sophisticated actors capable of testing single-serve coffee packets for themselves and determining the quality of various products. (PCSUMF ¶¶ 78–81; *see also* Doc. 2494-6; Doc 2494-10; Doc. 2494-32; Doc. 2494-34; Doc. 2494-2; Doc. 2494-6; Doc. 2494-12; Doc. 2494-13; Doc. 2494-33; Doc. 2494-47.) In cases such as these, where Plaintiffs "cannot demonstrate that specific consumers relied on the statements in question or considered them in making purchasing decisions that would impact competitive conditions in the market," (*see* Op. 89), summary judgment is appropriate, *see In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. and Antitrust Litig.*, 507 F. Supp. 3d 1289, 1361 (D. Kan. 2020) (granting summary judgment to defendant when plaintiff had "teams of sales representatives," who "engaged in various marketing efforts," to neutralize alleged misrepresentations).

Keurig's motion is GRANTED as to the antitrust claims predicated on false or misleading advertisements.

### H. *State Law Claims*

Keurig also argues that BJ's Massachusetts Consumer Protection claim and Winn-Dixie's Florida unjust enrichment claims fail because they "are derivative of their antitrust claims."

(Mem. 22.) In response, BJ's argues that "the Massachusetts law . . . is broader and encompasses unfair and deceptive trade practices and conduct in the form of incipient violations or conduct that violates the spirit of the Sherman Act within the meaning of Section 5 of the FTC Act." (Opp'n 22.) Furthermore, BJ's argues that "[i]t is hard to imagine conduct more unfair or deceptive than Keurig's design and false representations about its 2.0 Brewer." (*Id.*)

In order to make out a Chapter 93 claim under the Massachusetts Consumer Protection Act, a plaintiff must make a showing that "the defendant's actions fell within at least the penumbra of some common-law, statutory, or other established concept of unfairness, or were immoral, unethical, oppressive or unscrupulous." *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1484 (1st Cir. 1996). Where a plaintiff "has not made any unique arguments related to its [Chapter 93] claim," their claims rise and fall with their Sherman Act claims. *RSA Media, Inc. v. AK Media Grp., Inc.*, 260 F.3d 10, 16 (1st Cir. 2001). BJ's allegations here represent such coextensive claims. BJ's cites no caselaw suggesting that introduction of a new product without accompanying coercion and removal of the old product from the market is actionable under the Massachusetts Consumer Protection Act, *but see supra* § IV.C, that non-exclusive Retail Agreements are nonetheless cognizable under the Massachusetts Consumer Protection Act, *but see supra* § IV.D., that litigation that is not objectively baseless may still serve as the predicate for a Chapter 93 claim, *see supra* § IV.F, or that the *de minimis* presumption against advertising as an exclusionary act does not apply under the Massachusetts Consumer Protection Act, *but see supra* § IV.G.

Therefore, BJ's Massachusetts Consumer Protection Act claims may only proceed based on actionable conduct such as the Distribution Agreements, the Supplier Agreements, and the Roaster Agreements. As Plaintiffs have "fail[ed] to allege a plausible antitrust" claim based on

the Retail Agreements, sham litigation, false advertising, and the introduction of the 2.0 Brewer, *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 183 (D. Mass. 2013), the Massachusetts Consumer Protection Act claims may not proceed to the extent they are based on this conduct, *see Suzuki of W. Mass, Inc. v. Outdoor Sports Expo, Inc.*, 126 F. Supp. 2d 40, 50 (D. Mass. 2001) (dismissing Chapter 93 claims when no "unique arguments" were made related to these allegations and analogous federal and state antitrust claims were dismissed); *Egan v. Athol Memorial Hosp.*, 971 F. Supp. 37, 47 (D. Mass. 1997) (similar).

Likewise, Keurig may well be correct that Winn-Dixie's Florida unjust enrichment claims are "a rehash of its antitrust claim," (*see* Mem. 22–23), but because I have determined that Winn-Dixie's antitrust claims may proceed, in part, based on some of the conduct alleged, the same principle applies to its unjust enrichment claims, *see In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 928 (E.D. Pa. 2012) (permitting Florida unjust enrichment claims coextensive with antitrust claims to go forward).

Keurig's motion is DENIED as to the state law claims.

### I. *Purchases from Starbucks and Smucker*

Finally, Keurig argues in its initial brief that it is entitled to summary judgment based on any purchases of portion packs from Starbucks and Smucker as any such purchases "are indirect and not recoverable." (Mem. 23 (citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977).) In response, Winn-Dixie argues that it is a direct purchaser and not an indirect purchaser because there was "no middleman – no intervening purchaser," (Opp'n 23), and that "Starbucks and Smucker were co-conspirators in Keurig's anticompetitive conduct, including its exclusive agreements as exclusive dealing in violation of Section 1," (Opp'n 24).

"*Illinois Brick* allocate[s] to the first non-conspirator in the distribution chain the right to collect 100% of the damages." *Paper Sys. Inc. v. Nippon Paper Indus. Co., Ltd.*, 281 F.3d 629, 631–32 (7th Cir. 2002) (Easterbrook, J.); *see also Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 482 (S.D.N.Y. 2012) ("[W]here intermediate purchasers in the chain of distribution . . . are alleged to be participants in the conspiracy, the first purchasers who are not part of the conspiracy 'are entitled to collect damages from both the manufacturers and their intermediaries if conspiracy and overcharges can be established.'" (quoting *Paper Sys. Inc.*, 281 F.3d at 632)). In the Opinion, I concluded that Plaintiffs had put forward sufficient evidence to create a jury question concerning whether Keurig and the roasters, including Starbucks and Smucker, were part of a vertical group boycott under Section 1 of the Sherman Act. (Op. 58 ("Plaintiffs have done enough to raise at least a cognizable, genuine, dispute of material fact concerning whether Keurig's Roster Agreements were anticompetitive as a matter of law and whether they restricted the entry of additional competitors after the expiration of Keurig's short-filter patent.").)

Although the Fourth and Ninth Circuits, despite also recognizing the "co-conspirator exception," have limited its application to price-fixing conspiracies, *In re ATM Fee Antitrust Litig.,* 686 F.3d 741, 750 (9th Cir. 2012); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 n. 24 (4th Cir. 2002), the Seventh Circuit has imposed no such limitation, *see Paper Sys*, 81 F.3d at 631–32. The Second Circuit has not ruled on this issue. I agree with the Seventh Circuit that permitting suit by the first direct purchaser outside of the conspiracy is the best interpretation of the *Illinois Brick* rule. *See Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 840 (7th Cir. 2020) ("The relevant inquiry in determining the applicability of *Illinois Brick* focuses on the relationship between the seller and the purchaser, not the difficulty of assessing

the overcharge."); *see also Apple Inc. v. Pepper*, 587 U.S. 273, 279–81 (2019) ("Our decision in *Illinois Brick* established a bright-line rule that authorizes suits . . . [against] antitrust violators from whom [plaintiffs] purchased a good or service.")

The Court in *Illinois Brick* barred indirect purchasers from recovering treble damages through antitrust litigation because of "[t]he risk of duplicative recoveries," that "would create a serious risk of multiple liability for defendants," from both direct purchasers and indirect purchasers. 431 U.S. at 730. "*Illinois Brick* provides that, where antitrust violator (A) has sold to direct purchaser (B) who then sold to another customer (C), B may sue A for the violation, but C may not." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 731 (2d Cir. 2023) (Leval, J., concurring). In other words, "the purpose of *Illinois Brick* was *not* to prevent the only non-conspirators in a multi-level distribution chain . . . from bringing a private antitrust suit." *Laumann*, 907 F. Supp. 2d at 482.

Keurig cannot defend by arguing merely that "Starbucks and Smucker had exclusive deals with Keurig" and that they were not a part of an antitrust conspiracy—the plaintiffs in this multidistrict litigation assert that the Roaster Agreements are both anticompetitive exclusionary acts actionable as exclusive dealing but also as part of an antitrust conspiracy under Section 1, and I found that these claims were actionable and survived summary judgment in the Opinion. (*See* Op. § IV.C.1.) The relevant inquiry is whether Winn-Dixie "dealt directly with the conspiracy and [was] thus entitled to the full amount of its overcharge." *Marion*, 952 F.3d at 839 (reversing a district court that refused to apply the "co-conspirator exception" in a case that did not involve vertical price fixing). "A contrary rule that looked behind the conspiracy to the role each member played would render upstream antitrust violators effectively immune from suit through the simple expedient of conspiring with a middleman or distributor to pass on the

inflated prices. Other circuits to consider the issue have come to the same conclusion." *Id.* (collecting cases).

In contrast, *Simon v. KeySpan Corporation* entailed a suit by a consumer of electricity against "KeySpan Corporation" a producer of electricity in New York, even though he purchased his electricity "from Con Ed between 2006 and 2009," and "Con Ed in turn purchased electricity . . . through the previously described New York City auction process," from the defendants in that case. 694 F.3d 196, 201 (2d Cir. 2012). This resulted in a paradigmatic application of the *Illinois Brick* rule because Con Ed acted as a middleman between the antitrust defendant and the plaintiff. *Id.* at 204 (Simon's suit "implicate[d] *Illinois Brick*'s concerns about duplicative recovery and apportionment.") There was no conspiracy or collusion between Con Ed and Key Span as is alleged in this case. Therefore, I find that the Second Circuit's ruling in *Simon* is no obstacle to concluding that Winn-Dixie may recover on purchases from Starbucks and Smucker.

Keurig's motion to preclude damages based on purchases from Starbucks and Smucker is DENIED. These claims may proceed to trial.

### J. *Motion to Strike Cross-References*

Finally, Keurig moves to strike the cross-references in Winn-Dixie and BJ's opposition brief, claiming that they "should not be considered" because they are an improper "end run" around the 25-page limit set for opposition briefs. (Reply 10.) Winn-Dixie and BJ's respond in their sur-reply that "[s]uch cross-referencing and even incorporation is common and recognized as helpful in multi-district litigation proceedings where there are parallel and overlapping arguments and evidence." (Sur-Reply 2.) Winn-Dixie and BJ's are correct. In contrast to *In re AXA Equitable Life Ins. Co. COI Litig.*, cited by Keurig, where the defendant attempted a blatant end run around page limits by "purport[ing] to incorporate by reference two pages of a brief that

it filed in an earlier stage of litigation," 595 F. Supp. 3d 196, 229 n.26 (S.D.N.Y. 2022), *on reconsideration in part*, No. 16-CV-740, 2022 WL 3018104 (S.D.N.Y. July 29, 2022), here Winn-Dixie and BJ's avoid spilling ink by incorporating arguments made by their co-plaintiffs. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 89 n.7 (2d Cir. 2018) (explaining that when "the district court . . . [i]s faced with an extraordinary case-management challenge" in a wide-ranging multidistrict litigation, a "requirement of joint briefing" may pose "unusual difficulties . . . beyond the usual constraints of page limitations."). Therefore, I find that incorporation by reference of the Cross-Motions was an entirely appropriate and expedient way to brief these issues.

Defendant's motion to strike the cross-references to the briefing from the Cross-Motions is DENIED.

## V. **Conclusion**

Accordingly, Keurig's motion for summary judgment is GRANTED as to all claims based on the introduction of the 2.0 Brewer, all claims based on the Retail Agreements, the Sham Litigation claims, and the False Advertising claims. Keurig's motion for summary judgment is DENIED as to all other claims. Keurig's motion to strike Winn-Dixie and BJ's cross-references is also DENIED.

Due to potential references to sealed filings and information, this Opinion & Order is being issued temporarily under seal. By November 16, 2026, the parties are directed to submit any proposed redactions to this Opinion & Order.

SO ORDERED.

Dated: October 16, 2026
New York, New York

Vernon S. Broderick
United States District Judge